**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**Applicable to the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia** |

*This document relates to:*     Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*
04 CV 01922 (RCC)

**AMENDED RICO STATEMENT APPLICABLE**
**TO THE SUPREME COUNCIL OF ISLAMIC AFFAIRS**
**FOR THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this Amended RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

This filing is a supplemental pleading in accordance with 03 MDL 1570, CMO-2, Para. 14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time, and is not to be construed as revoked, in whole or in part, as a result of any subsequent amendment of the complaint.

1.   The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2.   The names of the defendants, to whom this RICO statement pertains is the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia ("Supreme Council"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

3.   Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.*

- 1 -

(SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v. the Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including without limitation Paragraph 17 hereof.

5.

    a.  <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15; NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15; NY Penal § 150.15 |

- 2 -

| | |
|---|---|
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. § 1344 |
| Relating to Unlawful Procurement of Citizenship or Naturalization Papers | 18 U.S.C. § 1425 |
| Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers | 18 U.S.C. § 1426 |
| Relating to the Sale of Naturalization or Citizenship Papers | 18 U.S.C. § 1427 |
| Obstruction of Justice | 18 U.S.C. § 1503 |
| Obstruction of a Criminal Investigation | 18 U.S.C. § 1510 |
| Obstruction of State or Local Law Enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| Fraud or Misuse of Visa Permits or Other Documents | 18 U.S.C. § 1546 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |

- 3 -

| | |
|---|---|
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) |
| | 18 U.S.C. § 2339A; |
| | 18 U.S.C. § 2339B; |
| | 18 U.S.C. § 2339C |

b. <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| <u>DATES</u> | <u>PARTICIPANTS</u> | <u>FACTS</u> |
|---|---|---|
| mid-1990s to 9/11/2001 | The Kingdom of Saudi Arabia (the "Kingdom") and/or its Agencies, including the Directorate of Intelligence, the General Staff, Intelligence Section (G-2), the Ministry of State for Internal Affairs, the Ministry of Interior, the Saudi Committee for Support of the Intifada, ***<u>the Supreme Council of Islamic Affairs ("Supreme Council")</u>***, the Council of Ministers, and the Special Committee of the Council of Ministers (collectively known as "Agencies"), and/or its Agents, including but not limited to certain charities such as Muslim World League, the Internal Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi Joint Relief Committee, the Benevolence Foundation, and certain individuals | Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents, including so-called charities funded and controlled by the Kingdom (collectively referred to as "KSA"), conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. KSA, specifically referring to the Supreme Council, conspired to |

- 4 -

| | | |
|---|---|---|
| | including but not limited to Prince Abdullah Al Faisal bin Abdulaziz Al Saud, Prince Bandar bin Sultan bin Abdulaziz Al Saud, Prince Naif bin Abdulaziz Al Saud, Prince Salman bin Abdul Aziz Al Saud, Prince Sultan bin Abdulaziz Al Saud, Prince Turki Al Faisal Al Saud, and certain commercial entities including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom of Saudi Arabia (these charities, individuals, commercial entities and other actors are collectively referred to as "Agents"). | conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Throughout this period, KSA, specifically referring to the Supreme Council, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, undertook actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents.<br><br>KSA, specifically referring to the |

- 5 -

| | | |
|---|---|---|
| | | Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council,  undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by KSA, specifically referring to the Supreme Council. |
| Mid-1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise.<br><br>KSA, specifically referring to the Supreme Council, conducted or |

- 6 -

| | | |
|---|---|---|
| | | participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990's to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with the Enterprise.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the |

- 7 -

| | | |
|---|---|---|
| | | operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the |

- 8 -

| | | |
|---|---|---|
| | | Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 371, the Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to |

- 9 -

| | | |
|---|---|---|
| | | and did defraud the United States Government of taxes legally due.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agencies, specifically referring to the Special Committee, and/or Agents, conspired to and did file false or materially false tax returns.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the |

- 10 -

| | | |
|---|---|---|
| | | operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws.<br><br>KSA, specifically referring to the Supreme Council, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. KSA, specifically referring to the Supreme Council, conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>KSA, specifically referring to the Supreme Council, agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

- 11 -

c.   Not applicable.

d.   No.

e.   No.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  The Kingdom, through its Agencies, specifically referring to the Supreme Council, and Agents consistently, evenly, constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically including the Kingdom , directly and through its Agencies, specifically referring to the Supreme Council, and Agents, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.

a.   The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the

Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents, and illegal activity to generate material support to continue its terrorist operations.

c. No.

d. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are associated with the alleged enterprise.

e. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are members of the Enterprise, and are separate and distinct from the Enterprise.

f. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but were a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents fund that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated

- 14 -

by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Not applicable.

12. Not applicable to this defendant.

13.

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents are associated with the Enterprise.

    b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint and any additional Complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents, of both those goals and the uses to which the Funds were put.

- 15 -

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. The Kingdom, directly and through its Agencies, specifically referring to the Supreme Council, and Agents also, with

- 16 -

knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and/or intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| | |
|---|---|
| **Count One** | Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 |
| **Count Two** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Three** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Ten** | Anti-Terrorism Act, 18 U.S.C. § 2331, |

| | |
|---|---|
| | 2333, *et. seq.* |
| **Count Eleven** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Thirteen** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| | |
|---|---|
| **Count Four** | Wrongful Death |
| **Count Five** | Survival |
| **Count Six** | Negligent and Intentional Infliction or Emotional Distress |
| **Count Seven** | Conspiracy |
| **Count Eight** | Aiding and Abetting |
| **Count Nine** | Negligence |
| **Count Twelve** | Punitive Damages |

20.  Not applicable

Date: July 29, 2005

> LAW OFFICES OF JERRY S. GOLDMAN
> & ASSOCIATES, P.C.
>
> BY:_____
> GINA M. MAC NEILL, ESQUIRE
> (GM 0581)
>
> BY: _____
> JERRY S. GOLDMAN,  ESQUIRE
> (JG 8445)
>
> Attorneys for the Plaintiffs
> 111 Broadway, 13th Floor
> New York, N.Y. 10006
> 212.242.2232

- 18 -

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia ("Supreme Council") | In 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission.  As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd") set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups.    The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.<br><br>The 9/11 Commission report states that:<br><br>"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities. Charitable giving, or *zakat*, is one of the five pillars of Islam.  It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures.    Funding charitable works is an integral function of the governments in the Islamic world.  *It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax*. Closely tied to zakat is the dedication of | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

- 19 -

| | | |
|---|---|---|
| | the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."<br><br>Addionally, the 9/11 Commission report states that the "Saudi domestic charities (ex. Muslim World League) are regulated by the Ministry of Labor and Social Welfare, while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs." (comment in parenthesis added).<br><br>The Supreme Council thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>The growth and development of al Qaida was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia, specifically the Supreme Council, and members of its royal family.<br><br>The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's, specifically the Supreme Council participation.<br><br>Kingdom of Saudi Arabia, specifically the Supreme Council, controlled elements of al Qaida's financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom, specifically the Supreme Council. | |
| The Kingdom of Saudi Arabia | The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

- 20 -

justice, criminal investigations, and local law enforcement efforts with respect to the activities of the Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent.

In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government.  This Special Committee of the Council of Ministers is funded entirely from Saudi government funds.  The Special Committee decides which "charities" to fund and provides grants to selected entities.

Additionally, in 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission.  As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd")  set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups.   The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.

The 9/11 Commission report states that:

"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities. Charitable giving, or *zakat*, is one of the five pillars of Islam.  It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures.   Funding charitable works is an integral function of the governments in the Islamic world.  ***It is so ingrained in Islamic culture that in Saudi***

- 21 -

*Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax.* Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Addionally, the 9/11 Commission report states that the "Saudi domestic charities (ex. Muslim World League) are regulated by the Ministry of Labor and Social Welfare, while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs." (comment in parenthesis added).

The Saudi Arabian government thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

According to intelligence experts and officials of the United States Government, Saudi Arabia has channeled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. These funds are directed to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through various Saudi-based "charities" which, as described above, are under the Saudi Arabian government's effective control. Such charities include, but are not limited to, the Muslim World League, al-Haramain Islamic Foundation, International Islamic Relief Organization (IIRO), Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation, Rabita Trust, SAAR Foundation, Safa Trust, International Institute for Islamic Thought (niT), Sanabel Al Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim

Youth (WAMY).

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, *I work for the Government of Saudi Arabia*. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means ***we are controlled in all our activities and plans by the Government of Saudi Arabia***. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . *The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia*. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, stating as follows:

> "It would be incorrect to view these charities as purely non-governmental organizations . . . . [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi Cabinet Member, chairs the

Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable contributions from the Saudi Royal Family that have been detailed in Saudi periodicals.

In a separate report, U.S. intelligence reports revealed that Saudi officials began supporting Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden in 1996.

According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy, "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader."

In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd. Among the items found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo. Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities"

were funneling contribution to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations. Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties would materially benefit from those contributions, and use the funds received from those "charities" to finance terrorist attacks against the United States, its nationals and allies.

Despite its express awareness, for several years prior to September 11, 2001 that Saudi "charities" were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi failed to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them from continuing to finance terrorism, in violation of its obligations under United Nations Security Council Resolutions 49/60, 1269, 133, and 1363. In this regard, an Independent Task Force sponsored by the Council on Foreign Relations to investigate the sources of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders funding concluded as follows:

> "[I]t is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaida; and for years, Saudi officials have turned a blind eye to this problem."

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al

- 25 -

Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated terrorist organizations, persons, organizations, commercial entities, and other parties would materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate the "charities" which were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and otherwise prevent those "charities" from continuing to finance terrorism.

Defendant Saudi Arabia has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, but not limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity Committee, the Islamic Society, and Egyptian Islamic Jihad. By virtue of its affiliation with other foreign terrorist organizations sponsored by Saudi Arabia, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would materially benefit from its sponsorship of other foreign terrorist organizations, and that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden. The support provided by Saudi Arabia to Osama bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

The growth and development of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia and members of its royal family.

The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's participation.

Kingdom of Saudi Arabia controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.

All activities of members of the royal family were done on behalf of or at the behest of the Kingdom.

The Kingdom,                     The Kingdom's Agent NCB has been implicated in

| | | |
|---|---|---|
| through its Agent National Commercial Bank ("NCB") | many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' preferred banks for many years, maintaining accounts for many of the charity defendants that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.   NCB knowingly facilitates  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' fundraising by advertising the existence and numerical designations of the accounts it maintains for  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' cooperating charities throughout the Muslim world, so that  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders supporters can deposit funds directly into those accounts for the benefit of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through the International Islamic Relief Organization, and also transferred significant funding to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

- 28 -

| | | |
|---|---|---|
| | Jihad Against Jews and Crusaders through Blessed Relief Foundation accounts it maintained. | |
| The Kingdom, through its Agent the Saudi American Bank | The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in the Sudan during the years that the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport.<br><br>Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated Foreign Terrorist Organizations. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

- 29 -

| | | |
|---|---|---|
| | Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | |
| The Kingdom, through its Agent the Muslim World League (the "MWL") | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust.<br><br>The MWL has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated FTOs. The MWL has provided substantial material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | International Foundation.<br><br>The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:<br><br>"Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."<br><br>The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government. | |
| The Kingdom, through its Agent International Islamic Relief Organization (the "IIRO") | The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure, and the IIRO has long operated as a fully integrated component of  Radical Muslim terrorism, and/or the | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | |
| The Kingdom, through its Agent the Rabita Trust | The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, | BIF is an agency, instrumentality and organ of the | |

| | | |
|---|---|---|
| through its Agent the Benevolence International Foundation (the "BIF") | Kingdom of Saudi Arabia. The Kingdom controls and directs BIF operations, appoints and terminates BIF personnel, provides BIF with virtually all of its funding, determines how funds will be distributed throughout the World, and otherwise stringently controls BIF's operations. In many countries, BIF conducts operations from the local Saudi Embassy, under the supervision of the embassy's Islamic Affairs Division.

BIF is an apparent charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League, and has frequently shared common officers and directors with that organization.

BIF has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. On November 19,2002, BIF was designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and/or affiliated foreign terrorist organizations, associations, organizations or persons.

Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.   On January 6, 2003, federal prosecutors filed a proffer in the criminal prosecution of Enaam Arnaout which details at length the pervasive involvement, and material support of BIF, and of its executives and employees, in sponsoring  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations.  This support included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters, and sponsoring  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders camps throughout the World.

  BIF played a pivotal role in  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' efforts to establish operations in Bosnia.  BIF provided food, clothing, money and communications' equipment to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders affiliated fighters.  BIF also facilitated the movement of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters into the region by falsely representing to authorities that those terrorists would be working as BIF relief workers.  In March 2002, Basonian police raided BIF's Sarajevo offices and recovered extensive documentation relating to the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations, including contributions of various individuals and charities to the terrorist organizations development and expansion.

  BIF also played an equally important role in the

<table>
<tr><td></td><td>infrastructure supporting the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in Chechnya.  BIF provided material support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters supporting Chechnya mujihadeen by supplying military informs, financing, and anti-mine boots.<br><br>BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities.<br><br>BIF used the U.S. financial system, mainly through BIF's US operation, extensively to launder money for  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source.</td><td></td></tr>
<tr><td>The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY")</td><td>WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders's financial and logistical infrastructure, and provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad</td><td>18 U.S.C. §§ 1962 (b), 1962(c), 1962(d)</td></tr>
</table>

- 35 -

| | | |
|---|---|---|
| | Against Jews and Crusaders leadership in Afghanistan and operational cells throughout the world.<br><br>The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a General Assembly and President who is appointed by the Saudi government. | |
| The Kingdom, through its Agent, the Saudi Red Crescent (the "SRC") | The SRC has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.<br><br>Prior to its dissolution, Al Haramain was one of the | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | principle Islamic non-governmental organizations that provided support for the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its website, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | |
| The Kingdom, through its Agent Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince Abdullah") | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror. Further, Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities in Europe, served for many years as Prince Abdullah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership. Thus, through his official and personal acts, Prince Abdullah has provided critical | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that this support would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") | In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, thereby providing critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Naif bin Abdulaziz Al Saud ("Prince Naif") | In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders members and loyalists. Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' presence and operations in | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

- 38 -

| | | |
|---|---|---|
| | Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure. Remarkably, Prince Naif publicly denied Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' responsibility for the Attack. Further, Prince Naif has also made large personal contributions to Saudi-based charities for the purpose supporting terrorism, with the knowledge and intent the contributions he made would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, has donated substantial funds to several other charities that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | Against Jews and Crusaders' global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, Through its Agent Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan) | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, which Saudi-based charities were providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Rather than intervening to stem the flow of money and support from the charities to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations Prince Sultan knew and intended that the contributions he made to these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, but has nonetheless provided | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.<br><br>Prince Sultan further made substantial contributions to certain charities which sponsored or supported Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, without limitation, IIRO, Al Haramain, Muslim World League and WAMY.<br><br>Prince Sultan directly aided and abetted and materially sponsored Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Islamic terrorism, through these contributions and supervised the charities, or, in the alternative, was grossly negligent in supervising the charities, knowing they would be used to sponsor terrorism.<br><br>Prince Sultan has been Minister of Defense and Aviation, Chairman of the Supreme Council of Islamic Affairs, Second Deputy Prime Minister of the Council of Ministers, and, on information and belief, is the Third highest ranking member of the Saudi Government, and a brother of the King. | |
| The Kingdom, through its Agent Prince Turki Al Faisal Al Saud ("Prince Turki") | During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki knew and intended that the support provided to the Taliban by | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

- 41 -

the Kingdom of Saudi Arabia under his direction would materially benefit  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, and coordinated the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by several wealthy members of Saudi society, knowing that all such contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

Prince Turki was aware of the terrorist threat originating from Osama Bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Prince Turki met several times with Osama Bin Laden and or Osama Bin Laden's representatives on behalf of the Saudi Government and offered not to extradite him and otherwise provide him and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders with support, in exchange for protection.

Prince Turki facilitated money transfers from wealthy Saudi's to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the

- 42 -

| | | |
|---|---|---|
| | Taliban.<br><br> Prince Turki made contributions to charities he knew were sponsors or affiliated with   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached Amended RICO statement Applicable to the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia was served on all parties by way of electronic filing in the Southern District of New York on July 29, 2005

Dated: July 29, 2005

BY:_____
       GINA M. MAC NEILL, ESQUIRE