## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**Applicable to Sulaiman Abdul**<br>**Aziz Al Rajhi** |

*This document relates to:*     Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
                                 04 CV 01923 (RCC)

## AMENDED RICO STATEMENT
## <u>APPLICABLE TO SULAIMAN ABDUL AZIZ AL RAJHI</u>

Based on information currently available, plaintiffs submit this Amended RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendants Sulaiman Abdul Aziz Al Rajhi.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

This filing is a supplemental pleading in accordance with 03 MDL 1570 CMO-2, Para. 14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time, and is not to be construed as revoked, in whole or in part, as a result of any subsequent amendment of the complaint.

1. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2. The names of the defendant, to whom this RICO statement pertains is Sulaiman Abdul Aziz Al Rajhi ("Sulaiman"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

3. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may

be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4. The name of each victim is indicated on the attached hereto as Exhibit "B."  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including without limitation Paragraph 17 hereof.

5.

    a.  <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY  Penal § 105.15; <br> NY  Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY  Penal § 105.15; <br> NY  Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |

| | |
|---|---|
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) <br><br> 18 U.S.C. § 2339A <br><br> 18 U.S.C. § 2339B <br><br> 18 U.S.C. § 2339C |

     b. <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | Sulaiman | Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of |

3

| | | the Enterprise itself. |
|---|---|---|
| | | Throughout this period, Sulaiman conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | Sulaiman | Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. |
| | | Sulaiman undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Sulaiman. |

4

| Mid-1990s to 9/11/2001 | Sulaiman | Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

Sulaiman agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

    c.  Not applicable.

    d.  No.

    e.  No.

    f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders,.

    g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Sulaiman, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim

Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.

    a.   The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a

particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sulaiman fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Sulaiman, and illegal activity to generate material support to continue its terrorist operations.

c. No.

d. Sulaiman is associated with the alleged enterprise.

e. Sulaiman is a member of the Enterprise, and is separate and distinct from the Enterprise.

f. Sulaiman intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Sulaiman is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sulaiman funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sulaiman, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within in and the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Not applicable.

12. Not applicable to this defendant.

13.

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

8

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Sulaiman, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Sulaiman, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Sulaiman, of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Sulaiman. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Sulaiman. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sulaiman. Sulaiman, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate

9

acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Sulaiman also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| | |
|---|---|
| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Two** | Alien Tort Claims Act 28 U.S.C. §1350 |

10

| Count Nine | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
|---|---|
| Count Ten | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| Count Twelve | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| Count Three | Wrongful Death |
|---|---|
| Count Four | Survival |
| Count Five | Negligent and Intentional Infliction or Emotional Distress |
| Count Six | Conspiracy |
| Count Seven | Aiding and Abetting |
| Count Eight | Negligence |
| Count Eleven | Punitive Damages |

20.  Not applicable

Date: July 29, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____

GINA M. MAC NEILL, ESQUIRE
(GM 0581)

BY: _____

JERRY S. GOLDMAN, ESQUIRE
(JG 8445)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

11

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sulaiman Al Rajhi | Sulaiman Al Rajhi has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>"Sulaiman is a wealthy Saudi figure and reputed financier of terrorism" according to the testimony of Dr. Michael Waller, Annenberg Professor of International Communications, at the United States Senate Committee on the Judiciary, <u>Terrorist Recruitment and Infiltration in the United States: Prisons and Military as an Operational Base</u>, *October 14, 2003*.  Sulaiman Al Rajhi is also the head of one of Saudi Arabia's wealthiest families, the Al Rajhi family, which, based upon information and belief, is the primary financier of the SAAR Foundation, an organization that provided funding to the Enterprise.<br><br>**<u>Connection to Al Rajhi Bank:</u>**<br><br>Sulaiman is the chairman of the Board of Directors and the Managing Director of Al Rajhi Banking and Investment Corporation ("Al Rajhi"). Sulaiman is also the largest shareholder of Al Rajhi.  Al Rajhi has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>Al Rajhi is the primary and/or preferred bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

Foundation, the Muslim World League, and the International Islamic Relief Organization.

Al Rajhi Bank has served as one of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders preferred and/or primary banks for many years. Al Rajhi is the primary bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation ("Al- Haramain"), the Muslim World League ("MWL"), the World Association of Muslim Youth ("WAMY"), the Benevolent International Foundation ("BIF"), and the International Islamic Relief Organization ("IIRO").

In cooperation with these charitable organizations, Al Rajhi Bank advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for there charitable organizations, thereby providing a mechanism, Al Rajhi facilitated Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, fundraising events.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for Al Haramain and the IIRO, have been used to transfer funds to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaida's, and/or Radical Muslim Terrorism's, and/or the International Islamic Front for the Jihad Against Jews and Crusaders', charity fronts, via *zakat* and *haram* contributions, including MWL, WAMY, IIRO Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi Bank has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or the

13

International Islamic Front for the Jihad Against Jews and Crusaders, and that the funds it contributed directly to the charities were being funneled to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Nevertheless, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Al Rajhi Bank thereby has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Rajhi Bank's participation in al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' jihadist campaign.

Sulaiman al Rajhi conducted or participated in, directly or indirectly, the affairs of Al Rajhi through a pattern of racketeering activity by, inter alia authorizing, ratifying, supervising, controlling, overseeing and/or directing Al Rajhi in its knowing and intentional provision of financial services to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and in servicing al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders bank accounts, and other accounts used to fund and support al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to National Commercial Bank:**

Sulaiman Al Rajhi managed the National Commercial Bank (NCB) budget for the Saudi Joint Relief Committee.

NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization.

Moreover, NCB has served as one of al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, infrastructure, including the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), the Benevolence International Foundation ("BIF"), Blessed Relief (Muwafaq) Foundation and al Haramain, among others.

Under the supervision of Sulaiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.

NCB knowingly facilitates al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, fundraising by advertising the existence and numerical designations of the accounts it maintains for al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, cooperating charities throughout the Muslim world, so that the supporters can deposit funds directly into those accounts for the benefit of al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, and their cells

throughout the world.

During the 1990s, NCB channeled in excess of $74 million to al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through the IIRO, and also transferred significant funding to al Qaida, and/ or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through Blessed Relief.

**Connection to International Islamic Relief Organization ("IIRO"):**

Sulaiman Al Rajhi also serves on the board of directors of the IIRO, a purported "charitable" organization which has long acted as fully integrated components of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorists.

**Connection to SAAR:**

Sulaiman Al Rajhi established the SAAR Foundation and Network ("SAAR"). SAAR was named after Sulaiman Abdul Aziz Al Rajhi. The Al Rajhi family has been the foundation's biggest donor, and Sulaiman Al Rajhi is the head of the family.

SAAR was formed in the 1970's by a group of Muslim scholars and scientists from the Middle East and Asia. SAAR incorporated in 555 Grove Street, Herndon Virginia as a 501(c)(3) non-profit organization on July 29, 1983. It was dissolved as of December 28, 2000.

SAAR was a long-time financial supporter of terrorism. According to the Virginia Secretary of

16

State Corporate Records, there are more than one hundred affiliated organizations registered or doing business at just one address in Herndon, Virginia – 555 Grove Street. Most of these organizations do not maintain a physical presence there, or anywhere. The SAAR network is a sophisticated arrangement of front groups for fundamentalist Islamic terrorist organizations. The SAAR network includes but is not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc. Sterling Charitable Gift Fund, Sterling Management Group, Inc. and York Foundation. Many of the directors/managers of one organization, company or charity also serve as directors/managers for may other organizations, companies, or charities within the network. For example, at the Herndon address, Abdullah Omar al-Obaid was an officer of two of the SAAR network entities – Muslim World League and Sana-Bell Al-Kheer, which received rent from the Muslim World League and the International Islamic Relief Organization.

In March 2002, SAAR was raided under a search warrant, for the Grove Street in Herndon, Virginia location, by the U.S. Treasury Department's Operation Greenquest looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as ... al Qaeda as well as individual terrorists . . . (including) Osama bin Laden." It was said by authorities that the probe of Herndon groups is the largest federal investigation of terrorism financing in the world. An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon has sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to …provide material support to foreign terrorist organizations."

The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of terror. This

17

network has been used to funnel money, billions of dollars, to al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism. Additionally, the SAAR network provided logistical assistance to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through this web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

**Connection to Al Taqwa Bank and Youssef M. Nada:**

Sulaiman Al Rajhi was employed by Youssef M. Nada, the founder of Al Taqwa Bank.   On November 1, 2001, Al Taqwa Bank, by President Bush's executive Order, was denoted as a Specially Designated Global Terrorist Entity.  Its assets were frozen by the US Department of Treasury.

**Connection to al-Watania Poultry, Mar-Jac Investments, Inc. and Piedmont Poultry:**

Sulaiman Al Rajhi owns Saudi Arabia's largest poultry farm, al-Watania.  Mar-Jac Investments, Inc., Piedmont Poultry, al-Watania is controlled by the Safa Group, a known entity within the SAAR network.  These three companies have a significant business presence in the United States. SAAR, (as described above) had an indirect financial interest in Safa Trust.

Safa Trust is considered to be SAAR's successor.

**Connection with Golden Chain:**

 Sulaiman  Al Rajhi is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and

18

Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror officials of the US government concluded that the document id "a list of people referred to within al Qaida" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. Filed Jan. 6, 2003). The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designation him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee.

 As the foregoing demonstrates, Sulaiman Al Rajhi thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Sulaiman Al Rajhi's participation in al Qaida's jihadist campaign.

19

| Khalid Al Rajhi | Khalid Al Rajhi is the son of Sulaiman Al Rajhi. He is the General Manager of al-Watania Poultry in Saudi Arabia. He oversees the operation of the company's subsidiaries in other parts of the world. Al-Watania is controlled by Safa, an entity in SAAR and is now considered to be SAAR's successor. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
|---|---|---|
| | Khalid Al Rajhi conducted or participated in, directly or indirectly, the affairs of Al Rajhi and al-Watania through a pattern of racketeering activity by, inter alia authorizing, ratifying, supervising, controlling, overseeing and/or directing al-Watania in its knowing and intentional provision of financial services to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and in servicing al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders bank accounts, and other accounts used to fund and support al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | |
| | Khalid Sulaiman has provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached RICO statement Applicable to Sulaiman Al Rajhi was served on all counsel of record by way of electronic filing in the Southern District of New York on July 29, 2005.

Dated: July 29, 2005

BY:_____
GINA M. MAC NEILL, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Sulaiman Abdul Aziz Al Rajhi - Amended RICO statement - v1.doc