**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**Applicable to Muslim World**<br>**League, as that term is defined**<br>**herein** |

*This document relates to:*      Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

**AMENDED RICO STATEMENT APPLICABLE TO**
**MUSLIM WORLD LEAGUE, AS THAT TERM IS DEFINES HEREIN**

Based on information currently available, plaintiffs submit this Amended RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendant Muslim World League, including:

a. Muslim World League (Buenos Aires, Argentina)

b. Muslim World League (Preston, Australia)

c. Muslim World League (Vienna, Austria)

d. Muslim World League (Dhaka, Bangladesh)

e. Muslim World League (Bujumbura, Burundi)

f. Muslim World League (Etobicoke, Canada)

g. Muslim World League (Moroni, Comores)

h. Muslim World League (Brazzaville, Congo)

i. Muslim World League (Kobenhaven, Denmark)

j. Muslim World League (Mantes la Joile, France)

k. Muslim World League (Libreville, Gabon)

l. Muslim World League (Jakarta, Indonesia)

m. Muslim World League (Rome, Italy)

n. Muslim World League (Amman, Jordan)

o. Muslim World League (Nairobi, Kenya)

p. Muslim World League (Kuala Lumpur, Malaysia)

q. Muslim World League (Nouakchott, Mauritania)

r. Muslim World League (Mauritius, Mauritius)

s. Muslim World League (Maputo, Mozambique)

t. Muslim World League (Wuse Abuja, Nigeria)

u. Muslim World League (Islamabad, Pakistan)

v. Muslim World League (Makati City, Philippines)

w. Muslim World League (Male, Republic of Maldives)

x. Muslim World League (Moscow, Russia)

y. Muslim World League (Makkah, Saudi Arabia)

z. Muslim World League (Dakar, Senegal)

aa. Muslim World League (Djibouti, Somalia)

bb. Muslim World League (Gauteng, South Africa)

cc. Muslim World League (Khartoum, Sudan)

dd. Muslim World League (Dar Es Salaam, Tanzania)

ee. Muslim World League (Bangkok, Thailand)

ff. Muslim World League (Lome, Togo)

gg. Muslim World League (Port of Spain, Trinidad)

hh. Muslim World League (London, U.K.)

ii. Muslim World League (Kampala, Uganda)

jj. Muslim World League (New York, U.S.A.)

kk. Muslim World League (Falls Church, U.S.A.)

These defendants are hereinafter collectively referred to as Muslim World League ("MWL").  Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

This filing is a supplemental pleading in accordance with 03 MDL 1570 CMO-2, Para. 14, and the Individual Rules of Judge Casey.  It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time, and is not to be construed as revoked, in whole or in part, as a result of any subsequent amendment of the complaint.

1. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2. The names of the defendant, to whom this RICO statement pertains is Muslim World League ("MWL").  The alleged misconduct and basis for liability is set forth in Exhibit "A."

3. Not applicable.  All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others.  Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4. The name of each victim is indicated on the attached hereto as Exhibit "B."  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals

3

identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including without limitation Paragraph 17 hereof.

5.

    a.   List of predicate acts and specific statutes violated:

| | |
|---|---|
| Conspiracy to commit murder | NY  Penal § 105.15;<br>NY  Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY  Penal § 105.15;<br>NY  Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |

4

| | |
|---|---|
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br><br>18 U.S.C. § 2339A<br><br>18 U.S.C. § 2339B<br><br>18 U.S.C. § 2339C |

  b.  <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | MWL | MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br> Throughout this period, MWL conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy |

5

| | | |
|---|---|---|
| | | culminated in the Attack. |
| Late 1990s to 9/11/2001 | MWL | MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>MWL undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by MWL. |
| Mid-1990s to 9/11/2001 | MWL | MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of |

6

|  |  | the Enterprise itself.<br><br>MWL agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| --- | --- | --- |

    c. Not applicable.

    d. No.

    e. No.

    f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders,.

    g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including MWL, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.

    a. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."   Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.   In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.   The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:   (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.   Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. MWL fit neatly into this framework by raising funds for and providing funding to an otherwise

8

providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including MWL, and illegal activity to generate material support to continue its terrorist operations.

    c.  No.

    d.  MWL is associated with the alleged enterprise.

    e.  MWL is a member of the Enterprise, and is separate and distinct from the Enterprise.

    f.  MWL intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by MWL is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by MWL funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by MWL, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities

9

conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere.    Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Not applicable.

12. Not applicable to this defendant.

13.

   a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b.   The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including MWL, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including MWL, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of MWL, of both those goals and the uses to which the Funds were put.

10

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like MWL. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including MWL. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by MWL. MWL, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. MWL conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. MWL conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. MWL also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the

Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| | |
|---|---|
| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Two** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Nine** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*. |
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| Count Three | Wrongful Death |
|---|---|
| Count Four | Survival |
| Count Five | Negligent and Intentional Infliction or Emotional Distress |
| Count Six | Conspiracy |
| Count Seven | Aiding and Abetting |
| Count Eight | Negligence |
| Count Eleven | Punitive Damages |

20.  Not applicable

Date: July 29, 2005

> LAW OFFICES OF JERRY S. GOLDMAN
> & ASSOCIATES, P.C.
>
> BY:_____
>    GINA M. MAC NEILL, ESQUIRE
>    (GM 0581)
>
> BY: _____
>    JERRY S. GOLDMAN, ESQUIRE
>    (JG 8445)
>
>    Attorneys for the Plaintiffs
>    111 Broadway, 13th Floor
>    New York, N.Y. 10006
>    212.242.2232

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Muslim World League - Amended RICO Statement - v1.doc

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| MWL | MWL has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>MWL was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." The MWL is the parent organization of the al Qaida charity International Islamic Relief Organization ("IIRO") and uses the IIRO as an operational arm to perform many of its charitable activities.[1]<br><br>The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities commonly referred to as bodies or members of the League, including IIRO, the World Assembly of Muslim Youth ("WAMY"), Benevolence International Foundation ("BIF") and Rabita Trust.[2] The MWL has long operated as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

---

[1] Given the control this defendant, MWL, had over IIRO, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement Applicable to the International Islamic Relief Organization, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

[2] Given the control this defendant, MWL, had over Rabita Trust, Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill et al. v. AL Baraka, et al.*, 04-CV-1923 (RCC).

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Muslim World League - Amended RICO Statement - v1.doc

Jihad Against Jews and Crusaders.

MWL is an organization funded, supported, financed and controlled by Saudi Arabia. According to the testimony of Arafat al-Asahi, a MWL representative and head of IIRO's Canada branch IIRO and MWL were intimately connected to and funded by Saudi Arabia:

> Q:  During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government had any concern whatsoever with respect to your office?

> A:  Let me tell you one thing.  The Muslim World League, which it the mother of IIRO, is a fully government funded organization.  In other words, I work for the Government of Saudi Arabia.   I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia…

> Q: …When you say you work for the Government of Saudi Arabia, are you also paid by that government?

> A:  I am paid by my organization which is funded by the government.  Let me tell you one little thing.  Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project.

MWL has two offices in the United States.  One is in Herndon, Virginia – an office which many other alleged charities shared the same address. The other is in New York City.  The Herndon

15

office was the target of federal raids in early March, 2002. The president of MWL was Abdulaziz Al Al-Sheikh, the Grand Mufti of the Kingdom of Saudi Arabia. The officers for the Virginia office were Abdullah Bin Saleh al Obaid, as president; Hassan A.A. Bahafzallah, as vice president; and Yaqub M. Mirza, as secretary/treasurer.

Abdullah Bin Salej al Obaid, president of the MWL in the US, runs one of the Al Rajhi family's largest corporations, al-Watania Poultry. The Al Rajhi family is the primary funder of the entire SAAR Foundation network, a network of charities alleged to assist the funding and support of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Obaid also served as secretary general of the Rabita Trust, an alleged charity which had its assets frozen as a Specially Designated Global Terrorist Entity.

Yaqub Mirza, the secretary and treasurer of the MWL in the United States the financial mastermind of the SAAR Network. Yaqub Mirza's house was raided in March, 2002 by federal authorities for his alleged connections to al Qaida and September 11, 2001.

WML also is tied to Abdullah Omar Naseef of Saudi Arabia. Naseef is associated with the SAAR Foundation and Al Rajhi, a banking institution which assisted the funding and support of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Naseef served as secretary-general of the MWL during the time he created Rabita Trust and has attempted to spread MWL offices around the world. Part of his global efforts are found in his involvement in the SAAR Network charity. Naseef is an officer at the Makkah al-Mukarramah, Inc., at the same Herndon, Va. address as the SAAR network, Muslim World League, IIRO, al-Wantania Poultry, and numerous other known organizations which supported the Enterprise.

16

MWL has numerous connections with al-Qaida operatives.  Osama Bin Laden's brother-in-law, Mohammed Jamal Khalifa, opened a Muslim World League office in Pakistan for the use of the al-Qaida founders.

Wa'el Jalaidan, identified by the U.S. Treasury Department as "one of the founders of al-Qaida," headed the MWL in Peshawar, Pakistan and served as secretary general of the Rabita Trust. Jalaidan spread Muslim World League offices around the world.  These offices served in the early days of al-Qaida to attract and train warriors for the war in Afghanistan.

Wadih el-Hage, convicted for his role in the 1998 U.S. embassy bombings in Africa, stated at his trial that he worked at the Muslim World League in Peshawar, Pakistan in the 1980s.  It was while working at MWL that el-Hage met Abdullah Azzam, the mentor of Osama Bin Laden and co-founder of al-Qaida.

In January, 2004, the Senate Finance Committee asked the Internal Revenue Service ("IRS") for its records on more than twenty-five (25) Muslim charities and organizations as part of an investigation into possible links between nongovernmental organizations and terrorist financing networks.  Including in this list of charities was MWL and IIRO.

 As the foregoing demonstrates, MWL thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.   The September 11th Attack was a direct, intended and foreseeable product of MWL's participation in the jihadist campaign of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached RICO statement Applicable to Muslim World League was served on all counsel of record by way of electronic filing in the Southern District of New York on July 29, 2005.

Dated: July 29, 2005

BY:_____
        GINA M. MAC NEILL, ESQUIRE

18