**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to SAUDI BIN LADEN GROUP, ABDULLAH BIN LADEN, BAKR BIN LADEN, TAREK BIN LADEN, OMAR BIN LADEN AND THE MOHAMMED BIN LADEN ORGANIZATION** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                      03 CV 06978 (RCC)

**RICO STATEMENT APPLICABLE TO SAUDI BIN LADEN GROUP,**
**ABDULLAH BIN LADEN, BAKR BIN LADEN, TAREK BIN LADEN,**
**OMAR BIN LADEN AND THE MOHAMMED BIN LADEN ORGANIZATION**

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.      The names of the defendants to whom this RICO statement pertains are Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore

reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.    The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.    (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s | Saudi Bin Laden Group, | Participants conspired to support terrorism |

| to 9/11/2001 | Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization | and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
|---|---|---|
| early 1990s to 9/11/2001 | Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization | Participants undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it  knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization | Participants agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c)  not applicable

(d)  No.

(e)  No.

(f)  The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g)  The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.      (a)  The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon

which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization fit neatly into this framework by raising and providing funds for, and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization are associated with the Enterprise.

(e) Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization  are members of the Enterprise, and are separate and distinct from the Enterprise.

(f) Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.    The pattern of racketeering activity conducted by Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.      The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.     The Enterprise, and the racketeering activities conducted by Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.     Not applicable.

12.     Not applicable.

13.     The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14.     The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

        The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

        The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of

recruits and trainees, which pool would not have been available to it without the assistance provided by Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Saudi Bin Laden Group, Abdullah bin Laden, Bakr bin Laden, Tarek bin Laden, Omar bin Laden and the Mohammed Bin Laden Organization also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.    As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.    Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.    Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.    pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.    Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Saudi Binladin Group ("SBG") | SBG played an integral role in developing al Qaida.   Bakr Bin Laden is its current Chairman, and Tarek bin Laden and Omar bin Laden are on its board of directors.<br><br>During the war against the Soviet occupation of Afghanistan, SBG materially assisted Osama bin Laden in his efforts to provide material support to the mujihadeen fighters.<br><br>After the Soviet Union withdrew from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for SBG. While working for SBG, bin Laden began establishing the infrastructure for his al Qaida network.<br><br>In 1989, Hassan al Turabi, the ideological and political leader of the National Islamic Front in Sudan, invited Osama bin Laden to move the nascent al Qaida organization to Sudan. Turabi, whose NIF party had recently seized power in a coup, was at the time seeking to establish a radical Islamic state in Sudan.  Not long after Turabi extended the invitation, the Saudi regime moved to expel Osama bin bin Laden from the Kingdom due to his radical Islamic activities – a sanction that was widely reported and undeniably known to bin Laden's immediate family members.   Lacking any other safehaven for his terrorist empire, bin Laden accepted the invitation, and transplanted al Qaida to Sudan in 1991.  When Osama bin Laden moved the al Qaida infrastructure to the Sudan in 1991, he continued to maintain a close relationship with SBG and the members of his family who controlled the conglomerate. | 1962(a)<br>1962(c)<br>1962(d) |

Osama bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan. During the five years that al Qaida resided in Sudan, the organization maintained a symbiotic relationship with the NIF. In exchange for the NIF's complete protection and sponsorship of the organization, bin Laden invested funds in the country, performed infrastructure improvements, and provided al Qaida fighters for the NIF's ongoing conflict with Christians in southern Sudan.

The protection, support and safehaven provided by the NIF allowed al Qaida to grow from a small organization with less than 20 dedicated members to a global terrorist empire. In addition, while in Sudan, al Qaida established several businesses in partnership with the NIF, to fund al Qaida's campaign to attack America. Absent the support and safehaven provided by the NIF during this time, al Qaida would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

The benefits al Qaida derived from its relationship with the NIF were made possible, in large part, by the support and resources provided to Osama bin Laden by SBG during this period. Among other activities, SBG actively participated in several of the infrastructure projects which provided the foundation for al Qaida's relationship with the NIF.

For example, through two of its subsidiaries, SBG directly participated in construction projects involving the Tahaddi road and the Port of Sudan airport, two of the most significant infrastructure projects Osama bin Laden performed on behalf of his patrons in the NIF. In addition, SBG provided substantial support to Osama Bin Laden,

including financial assistance and engineering support for other Sudanese construction projects undertaken by bin Laden in conjunction with al Qaida's symbiotic relationship with the NIF. This assistance enabled Osama Bin Laden to offer safe haven and employment to al Qaida members. Through its participation in the projects undertaken by Osama bin Laden in Sudan and support of the businesses Osama bin Laden established in that country, SBG knowingly provided material support and resources to al Qaida

SBG maintained a close relationship with Osama Bin Laden even after the bin Laden family purportedly disowned him. Osama bin Laden is still listed on SBG corporate records. SBG subsidiary Al Hijra was headed by Muslim activists who were directly involved with al Qaida, and Al Hijra worked with Sudanese military officials to transport and supply provisions to terrorists training in Osama Bin Laden's terror training camps.

At all times material, SBG was expressly aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan. Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized. In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan. News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of *mujihadeen* were traveling to Sudan to receive terrorist training. As SBG was controlled throughout this period by Osama bin Laden's immediate family members, his activities within Sudan were undeniably well known to SBG.

In addition to its role in assisting Osama bin Laden perform construction projects for the NIF in Sudan, SBG provided cover for Mohammed Jamal Khalifa, a senior al Qaida operative and official of the International

Islamic Relief Organization ("IIRO"), a "charity" fronting for al Qaida. The Mohammed Bin Laden Organization, a subsidiary of SBG, sponsored Khalifa's visa application to the United States.

SBG has significant involvement in America. Until recently, SBG maintained an office in Rockville, MD. In addition, SBG had a $2 million investment in the Carlyle Fund, a US based entity. SBG had other US based investments and banking arrangements with such US firms as General Electric, Fremont Group, Microsoft, Boeing and Citibank. SBG has a significant, possibly controlling interest in Global Diamond Resources, Inc, a Nevada based firm. In 1993 and again in 1994, SBG contributed one million dollars to an endowment establishing the Harvard Law School's Islamic Legal Studies Program. The proceeds from that endowment continue to fund the program to this day. From at least the mid 1990s, SBG has retained Hullin & Metz, a New York based public relations firm. A check of public property records showed numerous properties in the United States are owned by members of the Bin Laden family. The Middle East Policy Council ("MEPC") Board of Directors includes Dr. Fuad A. Rihani, who is also the Director of Research and Development for SBG and based in Hickory, NC. The SBG has maintained an office in Rockville, MD.

According to the SBG's website, the products of its manufacturing companies are exported to eighteen countries, including the United States. SBG is a member of the U.S.-Saudi Arabian Business Council ("USSABC"), an organization that maintains an office in Washington, D.C. In June 1999, the USSABC, along With the Saudi American Bank, organized a Saudi-American companies' conference in Washington, D.C. Dr. Fuad Rihani attended on behalf of SBG.

The Mohammed Bin Laden Organization is a

| | | |
|---|---|---|
| | wholly owned subsidiary of SBG. See below. The Mohammed Bin Laden Organization provided technical assistance on the Tahhadi road construction in the Sudan. SBG publicly confirmed this collaboration.<br><br>In sum, SBG, directly and through its subsidiaries, is a co-conspirator in the al Qaida Movement which intentionally, willfully and knowingly financed, supported and worked with Bin Laden and al Qaida, thereby enabling al Qaida to attack the U.S. and its citizens. | |
| Bakr bin Laden | In addition to his responsibility in directing SBG's assistance to the Enterprise, Bakr bin Laden is a significant donor to organizations with known ties to the Enterprise in his personal capacity. At a July 1992 annual fundraiser for Sanabel Al-Kheer and IIRO, which raised more than SR19 million in one day, Abdul Mohsen Al-Kayal, chairman of the higher court in Jeddah, told the audience that "donating for a worthy cause is a kind of jihad and Muslims should generously help the Bosnian Muslims." The largest single donors reportedly included Bakr bin Laden<br><br>**Golden Chain:** Bakr bin Laden is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government | 1962(a)<br>1962(c)<br>1962(d) |

| | | |
|---|---|---|
| | concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).<br><br>The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm | |
| Abdullah bin Laden and Omar bin Laden | Abdullah, nephew of Osama, was the president of WAMY (World Assembly of Muslin Youth) in the United States. His brother, Omar, whom he lived with, was also significantly involved in WAMY. Both men fled the United States immediately after 9/11 as part of the mass airlift of family members to Saudi Arabia. Omar is a member of the board of both SBG and the Mohammed Bin Laden Organization, and has been integrally involved in their decision making.<br><br>WAMY has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.<br><br>Along with Al Haramain Islamic Foundation, Benevolence International Foundation, the International Islamic Relief Organization, the Rabita Trust, and the Muslim World League, WAMY is one of the principal players in the charity-based funding and sponsorship of al | 1962(a)<br>1962(c)<br>1962(d) |

Qaida.

WAMY operates under the aegis of the Muslim World League, and Saudi Joint Relief Committee (SJRC), along with a number of other Islamic charities. WAMY further sponsored al Qaida through its participation in MWL and SJRC activities.

WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.

Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Kashmiri terrorists.

According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Kashmiri terrorist groups associated with al Qaida.

WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world. When he was arrested in 1992, Ahmed Ajaj, who was subsequently convicted for his role in the 1993 World Trade Center bombing, had in his possession an al Qaida Manual entitled "*Military Lessons In The Jihad Against The Tyrants*" which detailed how to establish and maintain clandestine operational cells. The manual was distributed to Ajaj by WAMY. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

In 1992, Abdullah bin Laden, Osama bin Laden's nephew, established a WAMY office within the United States, in Falls Church, Virginia.

At least through 1998, Abdullah bin Laden

| | | |
|---|---|---|
| | served as the president of WAMY's U.S. operations. WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. WAMY's U.S. operations were raided by federal authorities in conjunction with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.<br><br>WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a purported civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development. On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to Executive Order 13224.<br><br>WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan. Other members of the ICC included the IIRO, Saudi Red Crescent and Qatar Charitable Society. Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujihadeen elements which joined Osama bin Laden's al Qaida. | |
| Tarek (Tariq) bin Laden | Tarek bin Laden is a member of the board of both SBG and the Mohammed Bin Laden Organization, and has been integrally involved in their decision making.<br><br>He has also served as the IIRO general supervisor. IIRO was involved in the plots to assassinate President Clinton and Pope John | 1962(a)<br>1962(c)<br>1962(d) |

| | | |
|---|---|---|
| | Paul II, the plot to blow up twelve U.S. airliners simultaneously (which ultimately formed the blueprint for the September 11, 2001 attacks), and the 1998 embassy bombings in Kenya and Tanzania. IIRO was headquartered in Sudan near Bin Laden's personal office.<br><br>During his time as supervisor, IIRO was rapidly becoming al Qaida's foremost charity, used as a means to transfer funds and personnel. According to an Arabic publication, Tarek bin Laden had a prominent role in 1990 at the IIRO: "Tarek bin Laden has been a member of the IIRO in MWL for ten years. He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world." | |
| Mohammed Bin Laden Organization | The Mohammed Bin Laden Organization is a wholly-owned subsidiary of SBG. Bakr, Tarek and Omar Bin Laden are all members of its board.<br><br>The Mohammed Bin Laden Organization provided technical assistance directly to Osama bin Laden relative to the Tahhadi road construction in the Sudan. The Saudi Bin Laden Group publicly confirmed this collaboration.<br><br>The Mohammed Bin Laden Organization sponsored Mohammed Jamal Khalifa's visa application to the United States. Khalifa is a key figure in the al Qaida network and has been implicated in many of its terrorist plots, including bombings in Jordan, its plot to destroy multiple airplanes simultaneously over the Pacific Ocean, a papicide plot and its successful 1993 bombing of the World Trade Center. | 1962(a)<br>1962(c)<br>1962(d) |

PHILA1\2326012\1 117430.000