## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) ECF Case<br><br>**AMENDED RICO STATEMENT Applicable to Council on American-Islamic Relations (CAIR) and CAIR - Canada** |

*This document relates to:*   Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
04 CV 01923 (RCC)

## AMENDED RICO STATEMENT
## APPLICABLE TO COUNCIL ON AMERICAN-ISLAMIC
## RELATIONS (CAIR) AND CAIR-CANADA

Based on information currently available, plaintiffs submit this Amended RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules, for defendant Council for American-Islamic Affairs (CAIR) and CAIR-Canada (collectively referred to as "CAIR").

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

This filing is a supplemental pleading in accordance with 03 MDL 1570, CMO-2, Para. 14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time, and is not to be construed as revoked, in whole or in part, as a result of any subsequent amendment of the complaint.

1. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is CAIR. The alleged misconduct and basis for liability is set forth in Exhibit "A."

3. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and

other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

4.   The name of each victim is indicated on the attached hereto as Exhibit "B."  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including without limitation Paragraph 17 hereof.

5.

a.   List of predicate acts and specific statutes violated:

| Conspiracy to commit murder | NY  Penal § 105.15; NY  Penal § 125.25 (xi) |
|---|---|
| Conspiracy to commit arson | NY  Penal § 105.15; NY  Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |

2

| | |
|---|---|
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) <br><br> 18 U.S.C. § 2339A <br><br> 18 U.S.C. § 2339B <br><br> 18 U.S.C. § 2339C |

b.  Dates of, the participants in, and a description of the facts surrounding the predicate acts:

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | CAIR | CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or |

3

| | | |
|---|---|---|
| | | management of the operation of the Enterprise itself.<br><br>Throughout this period, CAIR conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Late 1990s to 9/11/2001 | CAIR | CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>CAIR undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by CAIR. |
| | | |

| Mid-1990s to 9/11/2001 | CAIR | CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>CAIR agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

    c.  Not applicable.

    d.  No.

    e.  No.

    f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders,.

    g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including CAIR, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.

    a.   The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

        *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida

6

and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. CAIR fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including CAIR, and illegal activity to generate material support to continue its terrorist operations.

    c.  No.

    d.  CAIR is associated with the alleged enterprise.

    e.  CAIR is a member of the Enterprise, and is separate and distinct from the Enterprise.

    f.  CAIR intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by CAIR is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by CAIR funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination,

and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by CAIR, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Not applicable.

12. Not applicable to this defendant.

13.

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

14. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including CAIR, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also

8

relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including CAIR, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of CAIR, of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like CAIR. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including CAIR. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by CAIR. CAIR, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. CAIR also, with knowledge and intent, agreed to and did aid and abet all of the above illegal

9

activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

16. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.

| Count One | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| Count Two | Alien Tort Claims Act 28 U.S.C. §1350 |
| Count Nine | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*. |
| Count Ten | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |

| Count Twelve | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |
|---|---|

19.

| Count Three | Wrongful Death |
|---|---|
| Count Four | Survival |
| Count Five | Negligent and Intentional Infliction or Emotional Distress |
| Count Six | Conspiracy |
| Count Seven | Aiding and Abetting |
| Count Eight | Negligence |
| Count Eleven | Punitive Damages |

20.  Not applicable

Date: August 15, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE
(GM 0581)

BY: _____
JERRY S. GOLDMAN, ESQUIRE
(JG 8445)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

11

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| CAIR | CAIR has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>CAIR is a non-governmental organization whose mission statement is to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims and build coalitions that promote justice and understanding.<br><br>However, the true purpose for CAIR is to legitimize the activities of Islamic militants and to neutralize opposition to Islamic extremism. They serve as perception management in support of Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Their purpose is to create propaganda, misinformation, misdirection, marginalize opposition, silence critics and deceive governments. In February 2000, expert Sheihk Professor Abdul Hadi Palazzi, addressing the International Conference on Countering Suicide Terrorism sponsored by the Institute for Counter-terrorism of the Interdisciplinary Center in Herzlyia, Israel: | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

The Council for American–Islamic Relations is a Muslim Brotherhood front organization. It works in the United States as a lobby against radio, television and print media journalists who dare to produce anything about Islam that is at variance with their fundamental agenda. CAIR opposes diversity in Islam: They are aggressive and closed-minded. Notwithstanding CAIR's evident connection to Hamas, they are regarded by the US. Administration as legitimate representatives of the Muslim American community."

CAIR has links to both Hamas and the Muslim Brotherhood.[1] Terrorism expert, Steve Emerson has stated before Congress that CAIR is a front for Hamas. CAIR was founded in 1994 as an offshoot of the Islamic Association for Palestine ("IAP"). It was founded by two former leaders of the IAP, Hamas supporters, Omar Ihmad and Nihad Amad. Additionally, a founding director of CAIR is Rafeeq Jabur, the president of IAP. IAP is a front for the Palestinian terrorist organization, Hamas. In 2002, Judge Gladys Kessler declared, "[t]here is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP") has acted in support of the HAMAS." Holy Land Foundation for Relief & Development v. Ashcroft, 219 F.Supp.2d 57, 70 (D.C. Dist. 2002). Also, founder Omar Ihmad was previously a key leader of the Palestinian Muslim Brotherhood.

CAIR was founded by donations from the Holy Land Foundation ("HLF"), which is a Specially Designated Global Terrorist Organization, World Assembly of Muslim Youth ("WAMY"),[2] and International Islamic Relief Organization ("IIRO").[3]

CAIR is funded by terrorists. The International Institute of Islamic Thought, an organization linked to the Muslim Brotherhood, donated money in 2003, according to its tax filings.

Additionally, the Saudi-based Islamic Development Bank ("IDB") gave CAIR $250,000 in August 1999. The IDB also manages funds for the Al-Quds which finance suicide bombings against Israeli civilians by providing funds to the families of Palestinian "martyrs."

CAIR has proven links to Islamic Terrorists.

**Ghassin Elashi**

Elashi was the founder of CAIR's Texas chapter. He was convicted in July 2004 of shipping computers to Libya and Syria, two designated state sponsors of terrorism. In April 2005, he was also convicted of *knowingly* doing business with Mousa Abu Marzook, a senior Hamas leader and Specially Designated Terrorist. On July 27, 2004, he was indicted for providing material support to Hamas, engaging in prohibited financial transactions with a Specially Designated Global Terrorist, money laundering, conspiracy and filing false tax returns.[4]

**Randall (Ismail) Royer**

In 1997, Royer began working as CAIR's "Communications Specialist" and continues to work there through October 2001. He also served as "Civil Rights Coordinator." He was indicted on charges of conspiring to help Al Qaida and the Taliban to battle American troops in Afghanistan. On January 16, 2004, he plead guilty to lesser offenses and was convicted of weapons and explosives charges in connection to a terrorist related offense.[5]

**Bassam Khafasi**

As late as November 1, 2002, Khafagi served as CAIR's Director of Community Relations. In January 2003, he was arrested and indicted in January 2003 on bank fraud charges.[6] In September 2003, Kahfagi pleaded guilty to visa fraud and bank fraud,[7] for passing bad checks for substantial amounts in early 2001, and he was

14

deported.[8]

Khafagi also served as founding member and President of the Islamic Assembly of North America ("IANA"). IANA is under investigation un the U.S. for money laundering and recruiting terrorists over the Internet.[9] The FBI raided their offices in February 2003.

**Rabih Hadid**

Haddad served as a CAIR fundraiser. Haddad was co-founder of the Global Relief Foundation ("GRF"). GRF was designated by the US Treasury Department for financing the Al Qaida and other terrorist organizations and its assets were frozen by the US Government on December 14, 2001.[10]

On this same date, Haddad was taken into custody based upon terrorism related charges.

According to the Treasury Department, Haddad was a member of Makhtab Al-Khidamat, the precursor to Al Qaida.[11]

In July 2003, Haddad was deported to Lebanon.[12]

**Mohammad Nimer**

Nimer was the director of CAIR's Research Center. He also served as a member of the Board of Directors of the United Association for Studies and Research ("UASR"). The UASR is the strategic arm of Hamas in the United States.

**Imam Siraji Wahaj**

Wahaji is a member of CAIR's Board of Advisors. Named in 1995 by U.S. Attorney Mary Jo White as a possible unindicted co-conspirator in the World Trade Center bombing case. He serves as the spiritual leader of the al-Taqwa Mosque in Brooklyn, and provided a forum for Sheik Omar Abdel Rahman, who was convicted as the master-mind of the conspiracy.

He is also the Vice President of the Islamic Society of North America, a group which embraces the elements of the Muslim Brotherhood.

**Holy Land Foundation and Global Relief Foundation**

Both HLF and GRF were listed on the US Treasury Specially Designated Global Terrorist list and their assets were frozen.

Prior to this designation, CAIR actually solicited money for these organizations. Immediately after the attacks on September 11, 2001, on the home page of the CAIR website, it featured a section telling readers "what you can do for the victims of the WTC and Pentagon attacks." CAIR advised: "Donate through Global Relief Foundation" and "Donate through the Holy Land Foundation," providing the links to the groups' websites.

Additionally, in December 2001, the FBI raided several offices of the HLF, under the order of the President of the United States, as suspects of the main North American fundraiser for Palestinian Islamic terrorist organization Hamas. CAIR issued a public statement, along with the Islamic Association for Palestine ("IAP") and the Muslim Student Association ("MSA"), denouncing the President's order and insisting that these actions were taken without any evidence.

**CAIR has consistently opposed the US Government action against individuals suspected of involvement in terrorism:**

**Sami Al-Arian**

CAIR vehemently defended the alleged Plaestinian Islamic Jihad mastermind Sami Al-Arian and alleged that his arrest was based on "political considerations." On February 20, 2003,

16

a South Florida professor Sami al-Arian was indicted for allegedly serving as North American leader of Palestinian Islamic Jihad ("PIJ"),[13] a government-designated terrorist organization that was labeled by Attorney General Joh Ashcroft as "one of the most violent organizations in the world," and which is allegedly responsible for the deaths of two Americans and over 100 Israelis.

Despite Al-Arian's documented history of extremism, CAIR officials have consistently defended him since his arrest.

**Fawaz Damra**

Damra was convicted for concealing his involvement in groups that advocated "violent terrorist attacks against Jews and others" on his citizenship application.

CAIR-Ohio's Executive Director defended Damra as a "great interfaith leader." CAIR Spokesman Ibrahim Hooper stated, "we're concerned that all of his due process is maintained and evidence be free of religious or ethnic stereotyping… We're always concerned when prominent leaders of the American Islamic community are charged, or detained, or harassed."

**Musa Abu Marzook**

On August 7, 1995, the Deputy US Attorney for the SDNY requested the arrest and extradition to Israel of IAP founder Marzook (who was formerly the chief and is currently deputy chief of the Hamas Political Bureau.) Marzook was arrested at Kennedy airport.

CAIR came out in support of Marzook by stating, "[t]he arrest, detention and extradition is politically motivated…[and] this campaign has been orchestrated to serve as a wedge between America and Islamic countries."[14]

In June 1996, CAIR signed an open letter to then

Secretary of State Warren Christopher that railed against "the injustice that has prevailed against Dr. Marzook" and alleged that "our judicial system has been kidnapped by Israeli interests." The letter additionally stated, "Dr. Abu Marzook is a political leader; no more, no less than any other political leader in the world.[15]   CAIR also labeled Marzook's incarceration a hate crime in a 1996 report.[16]

**Jamil Al-Amim**

CAIR responded to the arrest and conviction of Jamil Al-Amim by praising him, by raising funds for him and then denying his guilt after his conviction for the murder of an Atlanta policeman.

**Imam Wagdy Ghoneim**

Ghoneim is a radical Egyptian cleric who has been videotaped calling for suicide bombings at radical Islamic conferences.  He has been denied entrance to Canada after immigration officials determined he was a member of Hamas and the Muslim Brotherhood.[17]

In May 1998, he led an audience in a song with lyrics, "No to the Jews, descendants of the apes," at the CAIR co-sponsored rally at Brooklyn college.

After Ghoneim was arrested, CAIR's Southern California Executive Director Hussam Ayloush defended him: "[t]he whole Muslim community today is under a microscope of scrutiny. Committing a mistake that would invite a slap on the wrist for anyone else could lead to prison or deportation fro a Muslim."[18]

**Sheik Yusuf Al Qaradawi**

Qaradawi is a leader of the Muslim Brotherhood, who has issued fatwas calling for attacks on American forces and killing Jews and mandating Jihad.   In 2000, Qaradawi was banned from

18

visiting the United States.  However, CAIR has repeatedly championed Qaradawi, for example, CAIR's legal director Arsalan Iftikhar said: "if you look at Sheikh Yusuf Al-Qaradawi, the --- one of the most famous Muslim scholars in Cairo, Egypt, he has said unequivocally that people who commit suicide bombings and --- and acts of terror are completely outside the bounds of Islam."[19]

However, the following are fatwas and pronouncements of Qaradawi:

- Only July 13, 2004, on his weekly program on the Arab satellite channel Al-Jazeera Qaradawi accused "the Jews" of permitting the spilling o f Arab blood and of being oppressors, and he concluded by stating, "There is no dialogue between us except by the sword and the rifle…"[20]
- In August, 2004, Qaradawi signed a statement calling for the support of the terrorist "resistance" in Iraq to the American and Coalition forces.[21]
- In March 2002, Qaradawi issued a fatwa on the "liberation" of "Muslim lands" from "disbelievers."[22]

As the foregoing demonstrates, CAIR thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.    The September 11th Attack was a direct, intended and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International

19

| | Islamic Front for the Jihad Against Jews and Crusaders. | |
|---|---|---|

20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached RICO statement Applicable to CAIR was served on all counsel of record by way of electronic filing in the Southern District of New York on August 15, 2005.

Dated: August 15, 2005

BY:_____
          GINA M. MAC NEILL, ESQUIRE

---

[1] These groups are both co-defendants in the above-referenced action.
[2] Specific misconduct regarding WAMY, a co-defendant herein, is provided via Amended RICO Statement Applicable to WAMY.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its Amended RICO statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), filed on July 28, 2005.
[3] Specific misconduct regarding IIRO, a co-defendant herein, is provided via Amended RICO Statement Applicable to IIRO.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its RICO statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) , filed on July 29, 2005.
[4] U.S. v. Holy Land Foundation, (N.D. Texas), indictment filed July 27, 2004.
[5] "Two Defendants in Virginia Jihad Case Plead Guilty to Weapons Charges, Will Cooperate with Ongoing Investigations,"  U.S. Department of Justice News Release, January 16, 2004.
[6] U.S. v. Khafagi, Case No. 03-CR-80087 (E.D. Mich.), indictment filed February 13, 2003.
[7] "Ex-Head of Islamic Charity Pleads Guilty," Associated Press, September 10, 2003.
[8] "Former Head of Islamic Charity Sentenced in Fraud Case," Associated Press, November 13, 2003.
[9] "Saudi National Charged with Conspiracy to Provide Material Support to Hamas and Other Violent

X:\Clients\ONeill v. Saudi arabia\RICO Statements\CAIR RICO statement - v1.doc

Jihadists," U.S. Department of Justice News Release, March 4, 2004.

[10] OFAC Designations of BIF and GRF, December 14, 2001.

[11] "Treasury Department Facts Sheet on the Global Relief Foundation."

[12] Sarah Freemean, "Haddad Deported, Family Remains in the U.S." Associated Press, July 16, 2003.

[13] U.S. v. Al-Arian, (M.D. Fl. 03-CR-77), indictment filed February 20, 2003.

[14] Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[15] Open letter of Mr. Christopher Warren, Secretary of State, Signed by CAIR, Reprinted in Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[16] The Price of Ignorance, American Muslim Research Center, 1996 and Laurie Goodstein, "Harassment of Muslims," The Washington Post, April 20, 1996.

[17] Ellen Van Wageningen, "Egyptian Religious Leader Denied Canadian VISA," The Ottawa Citizen January 10, 1999.

[18] Ben Fox, "Arrest of Orange County Mosque Leader a 'Mistake,' Supporters Say," Associated Press, November 9, 2004.

[19] July 26, 2005 interview of CAIR's legal director Arsalan Iftikhar on MSNBC.

[20] MEMRI Special Dispatch Series No. 753, Sheikh Yousef Al-Qaradhawi: 'There is No Dialogue between Us and the Jews Except by the Sword and the Rifle,' July 27, 2004.

[21] ABC News Online, "Senior Muslim Figures Back Iraqi Insurgents," August 23, 2004.

[22] IslamOnline, Fatwa mandating Jihad against Christians, Jews and pagans to "liberate Muslim lands from the grips of disbelievers," March 20, 2002.