**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to YESLAM BIN LADEN** |

*This document relates to:*    *Federal Insurance Co. v. al Qaida*
                               03 CV 06978 (RCC)


### RICO STATEMENT APPLICABLE TO YESLAM BIN LADEN

      Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Yeslam bin Laden.

      Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2. The names of the defendant to whom this RICO statement pertains are Yeslam bin Laden. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.    (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

(c)

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Yeslam bin Laden | Yeslam bin Laden conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s | Yeslam bin Laden | Yeslam bin Laden undertook the above- |

| | | |
|---|---|---|
| to 9/11/2001 | | named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support he supplied. |
| early 1990s to 9/11/2001 | Yeslam bin Laden | Yeslam bin Laden agreed to form and associate hismelf with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(d) not applicable

(e) No.

(f) No.

(g) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(h) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western

3

        influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Yeslam bin Laden fit neatly into this framework by raising funds for, providing funding and money laundering services to, and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

        (c) No.

        (d) Yeslam bin Laden is associated with the Enterprise.

        (e) Yeslam bin Laden is a member of the Enterprise, and are separate and distinct from the Enterprise.

        (f) Yeslam bin Laden intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Yeslam bin Laden is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Yeslam bin Laden furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Yeslam bin Laden, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Yeslam bin Laden, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

    The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Yeslam bin Laden.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Yeslam bin Laden.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Yeslam bin Laden.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Yeslam bin Laden also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

5

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.  pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.  Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Yeslam bin Laden | Yeslam bin Laden is an international business man and a member of the board of directors of the Saudi Binladin Group and the Mohammed bin Laden Organization. Yeslam bin Laden provided material support to his brother, Osama bin Laden and the al Qaida international terrorist network. In addition to his support of the Enterprise through the work he directed at SBG and the Mohammed bin Laden Organization, his material support includes, but is not limited to, the acts of material support specified herein.<br><br>Along with numerous other global entities, Yeslam bin Laden founded Cygnet S.A., later renamed Saudi Investment Company ("SICO"), in May 1980 in Geneva, Switzerland. SICO serves as the international investment arm of the Saudi Binladin Group ("SBG"), the bin Laden family business based in Jeddah, Saudi Arabia. SICO's Curacao branch, established in 1984, manages SBG's partnership with the American Daniels Realty Corporation, part of the Fluor Corporation conglomerate based in Aliso Viejo, California, United States of America. With the help of SBG, Fluor Corporation became one of the major recipients of reconstruction contracts in Kuwait.<br><br>In 2000 and 2001, Yeslam bin Laden made donations to the Muslim World League Cultural Center in Geneva, which aided, abetted, and materially supported Defendant Hani Ramadan. SICO received $10 million from SBG in management funds during the | 1962(c)<br>1962(d) |

|  | 1990's.<br><br>In addition to receiving funds from SBG, Yeslam's key positions within the Saudi Binladin Group include:<br><br>• Former Chief Financial Officer of the bin Laden Organization in Saudi Arabia (a subsidiary of SBG involved in Sudan)<br>• Board Member of the Mohammed bin Laden Organization, a wholly-owned subsidiary of SBG.<br><br>The address of the Saudi Binladin Group (P.O. Box 958, Jeddah, Saudi Arabia) appears on an account (account # CO-565167) opened by Omar bin Laden and Haydar bin Laden at UBS Bank in Geneva, Switzerland on August 17, 1990 for their brother, Osama bin Laden. The authorized persons on the account were Yeslam bin Laden and Osama bin Laden, who was only authorized to use the account with the co-signature of Yeslam. The named economic beneficiary of the account was Osama bin Laden. On August 20, 1990, $450,000 was transferred into the account; on October 25, 1991, $482,000 was transferred to Defendant Saudi American Bank in Jeddah in favour of Haydar bin Laden. The account was closed on October 9, 1997. This joint account was among fifty-four others created to shelter the assets and financial activities of the bin Laden family.<br><br>In a United States Department of Justice investigation, it was discovered that Osama bin Laden had received funds from two accounts at Deutsche Bank in Geneva, Switzerland, in the names of Cambridge Engineering and the Saudi Binladin Group. An amount totalling nearly $300 million was transferred through these accounts; Yeslam bin Laden was the account manager for both. Cambridge Engineering Systems Ltd. was registered under the names Yahia bin Laden, Shafiq bin Laden, and Akber Moawalla. Moawalla, a former treasurer and Chief Financial Officer of SBG, |  |

| | is managing Falcon Ltd., a financial holding of the bin Laden family registered in the Cayman Islands and owned by Fawzia bin Laden, Ibrahim bin Laden, Khalil bin Laden, and Yeslam bin Laden. | |
| --- | --- | --- |
| | Tracfin, a financial intelligence service that reports to the French customs service, has investigated Yeslam bin Laden on suspicion of money laundering based on "suspicious operations reports" filed by a number of banks concerning operations by Yeslam bin Laden in the United Kingdom, France, and the British Virgin Islands. | |
| | French authorities have recently expanded this investigation to also include terrorist financing. Yeslam bin Laden was questioned in 2004 by French Judge Renaud Van Ruymbeke regarding the testament of Mohammed bin Laden, father of Yeslam and Osama, which details the bin Laden family fortune and the origin of the funding for al Qaida. During the questioning, Yeslam bin Laden stated that in 1968 and 1969, all male heirs of Mohammed bin Laden, including Osama, received nearly $500,000 each. They also received an annuity every year thereafter of $300,000, equivalent to their share of the dividends of the family business, SBG. Yeslam bin Laden estimated that the total amount received by each heir of Mohammed bin Laden between 1974 and 1994 would range from $12 - $15 million. | |
| | These inheritances provided a substantial base of funding for Osama bin Laden and his al Qaida organization. Al Qaida and other terrorist groups, in partnership with wealthy individuals, banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world. These practices have allowed unscrupulous front groups, organizations, institutions, and/or charities to fund violent, extremist Islamic groups, including Al Qaida. Al Qaida and its mentors, sponsors, and facilitators are | |

responsible for the horrific acts of terror on September 11, 2001.

In addition to the actual monetary donations by Yeslam bin Laden to corrupt charities, his use of his banking and financial institutions also provided a broad range of facilities, material support, and banking services to his brother Osama bin Laden. These activities include assistance in the actual distribution of funds, the maintenance of bank accounts for various charities and individuals associated with the al Qaida, accounts specifically set up for the collection of donations; use of joint accounts; and the facilitation of wire transfers to and from various al Qaida related entities.

Al Qaida, and other international terrorist organizations, raise money from a variety of sources and move money in a variety of manners. Once the system is in place to raise the money, a set of mechanisms is necessary to move the money:

> "The first, and most simple, is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, Al Qaida has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy." "*Terrorist Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations*" ("*Terrorist Financing Report*"), pg. 14, Maurice R. Greenberg, Chair, 2002.

Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from donations made by and/or passed

through Islamic banks or charities, and they rely on individuals including but not limited to Yeslam bin Laden, to facilitate the illicit transfer of funds.

Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate to his terrorist organization. In December 1998, during an interview with ABC News, Osama bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al- Munawwarah), where the followers of Islam embraced the Prophet of God."

On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including Al Qaida, as international terrorists. Osama bin Laden, his sponsors and followers, were known to openly promoting hatred and violence against innocents long before this time. On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other support to support terrorism. The list of these "specially designated global terrorists" or terrorist organizations ("SDGT") included Osama bin Laden and al Qaida. Osama bin Laden and his al Qaida organization were sponsored by a network of banks, charities and individuals, including Yeslam bin Laden.

Yeslam bin Laden provided material support to Osama bin Laden while he was in Sudan during the early 1990s. Yeslam provided funding and financial support for Osama bin Laden's international terrorist operations, infrastructure, and organizations in the Sudan.

In early 2001, Yeslam bin Laden paid for certain individuals to take flight training lessons at Huffman Aviation in Venice,

| | |
|---|---|
| | Florida, United States of America. Mohammed Atta and Marwan Al Shehhi attended this same flight training school prior to hijacking Flights 11 and 175, respectively, and crashing them into the World Trade Center on September 11, 2001. Yeslam bin Laden financed trips to the United States and flight lessons over the course of the year in 2001. |
| | Similarly, Yeslam bin Laden also paid for certain individuals to take flight training lessons at a flight school in Tucson, Arizona, United States of America. |
| | Yeslam bin Laden knew or had to know that Al Qaida was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. Yeslam bin Laden also knew or had to know that Al Qaida was and is the recipient of millions of dollars from corrupt charities, including Muslim World League. As such, Yeslam bin Laden aided, abetted, acted in concert with and/or materially supported al Qaida terrorists and international terrorist activities. Yeslam bin Laden knew or had to know that he was providing material support to international terrorism and terrorist activities |
| | Yeslam bin Laden had significant contacts with and presence in the United States. From 1983 to 1998, he was the owner of a single family residence situated on 2.09 acres at 634 Stone Canyon Road, Los Angeles, California. According to the assessor's report, the "owner occupied [the] location." On December 2, 1998, "Yeslam M. Binladin" transferred ownership of this property (valued at $2,865,429) through a grant deed to Ibrahim Binladin, as detailed in the state of California's deed transfer records in document 000002354383. The name "Yeslam M Binladin" is also listed at the following addresses on the corresponding dates: |
| | 125 South Oakhurst Drive<br>Apt. 101 |

|  | Beverly Hills, CA 90212<br>01/01/1998<br><br>11728 Folkstone Lane<br>Los Angeles, CA 90077<br>11/01/1999<br><br>Since September 11, 2001, Yeslam bin Laden has been interviewed by Western media outlets. On July 9, 2004, Yeslam bin Laden appeared on Dateline NBC to answer questions about his life since September 11$_{th}$. On November 8, 2004, Time Magazine published an interview with Yeslam bin Laden as reported from a correspondent in Paris, France. |  |
|---|---|---|