**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738 (RCC)
*Cantor Fitzgerald & Co. et al. v. Akida Bank Private Limited*, 04-CV-7065 (RCC)
*Continental Cas. Co. v. Al Qaeda*, 04-CV-5970 (RCC)
*Euro Brokers Inc. v. Al Baraka Inv. & Dev. Corp.*, 04-CV-7279 (RCC)
*Federal Ins. v. Al Qaida*, 03-CV-6978 (RCC)
*New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)
*Estate of O'Neill v. Al Baraka Investment and Development Corp.*, 04-CV-1923 (RCC)
*World Trade Ctr. Props. L.L.C. v. Al Baraka Inv. & Dev. Corp.*, 04-CV-7280 (RCC)


**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION TO DISMISS OF KHALID BIN MAHFOUZ**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PLAINTIFFS STATE CLAIMS AGAINST KHALID BIN MAHFOUZ
UPON WHICH RELIEF CAN BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  A.  Applicable Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  B.  Plaintiffs State A Claim Against KBM Under The Anti-Terrorism Act . . . . . . . 11

  C.  Plaintiffs State Claims Against KBM Under The Alien Tort Claims Act
And Under Customary International Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

  D.  Plaintiffs State Common Law Claims Against KBM . . . . . . . . . . . . . . . . . . . . 16

  E.  Plaintiffs State RICO Claims Against KBM . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.  THIS UNITED STATES COURT HAS PERSONAL JURISDICTION OVER
KHALID BIN MAHFOUZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  A.  Applicable Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  B.  This Court Has Personal Jurisdiction Over KBM Who Knowingly &
Intentionally Provided Financial Support To Al Qaeda To Attack America . . . . 21

  C.  This Court Has Personal Jurisdiction Over KBM Who Knew & Intended
That The Acts Of His Al Qaeda Co-Conspirators Would Impact America . . . . . 23

  D.  Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery . . . . . . . . . 24

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

*Page*

## CASES

*Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899
(S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Baisch v. Gallina*, 346 F.3d 366 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Baker v. Socialist People's Libyan Arab Jamahiriya*,
Civ. Action. No. 03-749, *slip op.* (D.D.C. June 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . 22

*Barrueto v. Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002) . . . . . . . . . . . . . . . . . . . . . . 16

*Boim v. Quranic Lit. Institute*, 291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . 1, 11, 12

*Burnett v. Al Baraka Investment & Development Corp.*,
274 F. Supp.2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Conley v. Gibson*, 355 U.S. 31 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361
(2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Desiderio v. National Association of Sec. Dealers, Inc.*,
191 F.3d 198 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Diaz v. Gates*, 2005 U.S. App. LEXIS 17228 (9th Cir., Aug. 16, 2005) . . . . . . . . . . . . . 20

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
774 F. Supp. 802, 813 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp.2d 158
(S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*First Capital Asset Management v. Satinwood, Inc.*,
385 F.3d 159 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Friedman v. Hartmann*, 1994 WL 376058 (S.D.N.Y. July 5, 1994) . . . . . . . . . . . . . . . . 19

*Geisler v. Petrocelli*, 616 F.2d 636 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp.2d 765 (S.D.N.Y. 2005) . . . . . . . . 8, 11, 12, 13, 14, 15, 16, 17, 21, 22, 23, 25

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . . . . 24

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049
(2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jifrey v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kamen v. America Telegraph & Telegraph Co.*, 791 F.2d 1006
(2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899
(2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mwani v. Bin Laden*, 2005 WL 1844423 (D.C. Cir. Aug. 5, 2005) . . . . . . . . . . . . . . . . . 22

*PDK Laboratories v. Friedlander*, 103 F.3d 1105
(2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People's Mojahedin Org. of Iran v. U.S. Dept. Of State*,
182 F.3d 17 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . 10, 11

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Presbyterian Church of Sudan v. Talisman Energy Inc.*,
244 F. Supp.2d 289 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp.2d 54 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rasul v. Bush*, 124 S. Ct. 2686 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Salinas v. United States*, 522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sosa v. Alvarez-Machain*, 124 S. Ct. 2379 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*United States v. Coonan*, 938 F.2d 1553 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Turkette*, 452 U.S. 576 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Warren v. District of* Columbia, 353 F.3d 36 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . 11

*Woodford  v. Community Action Agency*, 239 F.3d 517
(2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*World Wide Volkswagen Corp.*, 444 U.S. 286 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wynder v. McMahon*, 360 F.3d 73 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL STATUTES

Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . 13, 14, 15, 16

Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq* . . . . . . . . . . . . . . . . . . 1, 11, 12, 13

Racketeer Influenced & Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1962 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note . . . . . . . . . . . . . . . . . 17

## FEDERAL RULES

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 12(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

## LEGISLATIVE HISTORY

S. Rep. 102-342 at 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INTERNATIONAL LAW

United Nations Security Council Resolution 1373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United Nations Security Council Resolution 54-109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## MISCELLANEOUS

9/11 Commission Final Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

5 Charles Alan Wright & Arthur R. Miller,
FEDERAL PRACTICE AND PROCEDURE § 1218, at 276 (3d ed. 2004) . . . . . . . . . . . . . . . 11

MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Periodic Report on the National Emergency With Respect To Persons Who Commit,
Threaten to Commit, or Support Terrorism (President George W. Bush)(Apr. 9, 2002)
p. at 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Remarks by Vice President Richard Cheney to the Heritage Foundation, October 10,
2003. Http://www.heritage.org/Research/MiddleEast/DickCheneySpeech.cfm. . . . . . . . 1

U.S. Government Evidentiary Proffer Supporting Admissibility Of Co-Conspirator
Statements in *United States v. Enaam Arnaout*, No. CR-892 (N.D. Ill. Jan. 6, 2003) . . . 7

## I.    INTRODUCTION

Khalid Bin Mahfouz ("KBM") is subject to civil liability in this United States Court for

knowingly providing financial support to al Qaeda for a decade leading up to the September 11

attacks. *Boim v. Quranic Lit. Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002)("The only way to imperil

the flow of money and discourage the financing of terrorist acts is to impose liability on those

who knowingly and intentionally supply the funds to the persons who commit the violent acts.").

The United States Congress expressed its clear intent that by imposing "liability at any point

along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for

terror attacks on America.  S. Rep. 102-342 at 22 (Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*).

Likewise, the United Nations Security Council declared in Resolution 1373 that  "all

States shall . . . shall prevent and suppress the financing of terrorist acts."  And the United States

Executive Branch backs Resolution 1373:

> The international community has recognized the need to take action against terrorism . . .
> in the United Nations Security Council [R]esolutions 1368 of Sept. 12, 2001, 1373 of
> Sept. 28, 2001, and 1390 of Jan. 16, 2002.  These resolutions, taken together, obligate
> U.N. Member states . . . to take necessary steps to prevent the financing of terrorism. . . .

President George W. Bush, Periodic Report on the National Emergency With Respect To Persons
Who Commit, Threaten to Commit, or Support Terrorism (Apr. 9, 2002) at ¶7.

As put by Vice President Richard B. Cheney:  "Any person . . . that supports, protects or

harbors terrorists is complicit in the murder of the innocent and will have to be held to account."[1]

It is time to hold KBM to account.[2]

---

[1] Http://www.heritage.org/Research/MiddleEast/DickCheneySpeech.cfm.

[2] *Accord*, United Nations Resolution 54-109:  International Convention for the Suppression of the Financing
of Terrorism (Dec. 9, 1999)(all States shall "prevent and counteract . . . the financing of terrorists and terrorist
organizations, whether such financing is direct or indirect through organizations which also have claimed to have
charitable, social or cultural goals. . . .").

1

Specifically, plaintiffs[3] allege that through 1999 KBM channeled $3 million to al Qaeda

front Muwaffaq Foundation and $74 million to al Qaeda front IIRO.[4]  Plaintiffs allege that KBM

channeled that $77 million to these al Qaeda fronts through the National Commercial Bank

("NCB"), which KBM directed and controlled from 1986 to 1999 as its President, CEO, and

majority shareholder owning more than 50% of NCB's capital.[5]

Plaintiffs allege that NCB – controlled, owned and directed by KBM himself – was al

Qaeda's "financial arm, operating as a financial conduit for Osama Bin Laden's operations."[6]

Plaintiffs allege, based on October 2001 Congressional testimony of a former CIA counter-

terrorism expert, that the financial support KBM channeled through NCB enabled:

> Al Qaeda [to] fund its worldwide network of cells and affiliated groups. . . .  There is
> little doubt that a financial conduit to Bin Laden was handled through the National

---

[3] KBM moves to dismiss the claims of plaintiffs in *Ashton* (02-6977), *Burnett* (N.Y.)(03-5738), *Cantor Fitzgerald* (04-7065), *Continental Casualty* (04-5970), *Euro Brokers* (04-7279), *Federal Ins.* (03-6978), *New York Marine* (04-6105), *O'Neill* (04-1923) and *World Trade Center Properties* (04-7280) (collectively, "Plaintiffs"). Plaintiffs hereby file this consolidated Opposition Brief to KBM's motion to dismiss.

Plaintiffs note that KBM's motion purports to relate to *Burnett* (D.C.)(03-9849), rather than to *Burnett* (N.Y.)(03-5738), but assume that the use of the wrong case number is error.  KBM's motion cannot apply to 03-9849, the *Burnett* case filed in D.C. and transferred to this Court by the MDL panel, because KBM's motion to dismiss the *Burnett* (D.C.) Complaint has already been fully briefed.

[4]*Ashton* 4AC ¶¶ 461, 569, 571, 573 ("4AC" = Fourth Amended Complaint); *WTC* ¶¶ 233, 667, 231; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶ 2; *Cantor Fitzgerald* 1AC ¶ 96; *O'Neill* 2AC ¶¶ 34-35; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶¶ 352, 367.

[5]*Ashton* 4AC ¶¶ 461, 563, 564; *WTC* ¶¶ 225, 775; *WTC* RICO Statement Exhibit A; *Euro Brokers* ¶81; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶ 2; *Cantor Fitzgerald* 1AC ¶ 96; *New York Marine* RICO Statement ¶ 2; *O'Neill* 2AC ¶ 34; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶¶ 352, 361, 367-69.

[6] *Ashton* 4AC ¶564; *WTC* ¶ 226; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 7-8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *O'Neill* Amended RICO Statement Question 2 Exhibit "A"; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 362.

Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel."[7]

Plaintiffs further allege that "Khalid Bin Salim Bin Mahfouz [KBM] was dismissed from the NCB in 1999 soon after the release of the [NCB] bank's audit report and placed under house arrest."[8] That "NCB audit report reflects a $3 million transfer to Muwaffaq."[9] KBM's arrest, directly after that $3 million transfer revealed by the 1999 NCB audit, supports the inference that KBM was arrested because he knowingly and intentionally gave financial support to Muwaffaq.

Plaintiffs further allege that "Muwaffaq [is] an al Qaeda front[10] that transfers millions of dollars from wealthy Saudi businessmen to bin Laden."[11] Plaintiffs further allege that "Muwaffaq-Blessed Relief was endowed by Defendant KBM."[12] The *specific facts* that $3 million was channeled through NCB – which KBM controlled, owned and directed himself – to Muwaffaq – which KBM endowed himself – support the inference that this $3 million transfer

---

[7]*Ashton* 4AC ¶564; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *accord*, *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 7-8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 362.

[8]*Ashton* 4AC ¶571; *WTC* ¶ 233; *WTC* RICO Statement Exhibit A; *Euro Brokers* ¶81; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 7-8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *New York Marine* RICO Statement ¶ 2; *O'Neill* 2AC ¶ 126; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 369.

[9]*Ashton* 4AC ¶571; *WTC* ¶ 233; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 369.

[10] The U.S. Department of Treasury has confirmed that Muwaffaq is an al Qaeda front. *See* First Affidavit of John Fawcett at ¶¶ 3-4, attached as Ex. 1.

[11] *Ashton* 4AC ¶¶458; 461; *WTC* ¶ 665; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 352.

[12]*Ashton* 4AC ¶460; *WTC* ¶ 666; *O'Neill* 2AC ¶¶ 35, 126; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 351.

was knowingly and intentionally made by KBM to al Qaeda front Muwaffaq.[13]

Plaintiffs further allege that the $3 million KBM-to-Muwaffaq transfer, revealed by the 1999 NCB audit,[14] occurred after Osama Bin Laden in 1995 specifically identified Muwaffaq (a/k/a Blessed Relief) as a source of funding *within* Osama's "support network."[15] Osama Bin Laden's "support network" *is* al Qaeda, and thus Osama Bin Laden told the world in 1995 that *Muwaffaq is al Qaeda.* Hence, when KBM channeled $3 million to Muwaffaq in 1998, KBM directly and knowingly provided $3 million to al Qaeda itself.

Plaintiffs further allege that the $3 million KBM-to-Muwaffaq transfer, revealed in the 1999 NCB audit,[16] occurred after Osama Bin Laden issued his 1996 *fatwah* declaring *jihad* on Americans.[17] Hence, the $3 million KBM-to-Muwaffaq transfer occurred after KBM knew that al Qaeda was waging war on America.

Likewise, plaintiffs allege that the $74 million KBM-to-IIRO transfer, revealed in the

---

[13] Moreover, according to Yassin al Kadi, a Muwaffaq trustee and supervisor from 1991 through 2001, KBM himself appointed Muwaffaq's directors and dictated Muwaffaq's strategy. *See* First Affidavit of John Fawcett at ¶ 5, attached as Ex. 1. Plaintiffs reserve the right to move for leave to re-plead these and similar allegations showing that KBM oversaw, directed and controlled Muwaffaq throughout the 1990s.

[14] *Ashton* 4AC ¶571; *WTC* ¶ 233; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 369.

[15] *Ashton* 4AC ¶462 ("In a 1995 interview, Osama Bin Laden identified Blessed Relief's place in his support network. . . ."); *WTC* ¶ 668; *Continental Casualty* 1AC ¶ 353.

[16] *Ashton* 4AC ¶571; *WTC* ¶ 233; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *O'Neill* 2AC ¶¶ 35, 126; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 369.

[17] *Ashton* 4AC ¶115; *see also, Ashton* 4AC ¶120 (bin Laden declaring: "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it. . . ."); *WTC* ¶¶ 972, 1025; *Euro Brokers* ¶22; *Cantor Fitzgerald* RICO Statement ¶ 6; *Cantor Fitzgerald* 1AC ¶¶ 33-42; *Continental Casualty* 1AC ¶ 120.

1999 NCB audit,[18] occurred after KBM knew that al Qaeda declared war on America in 1996.[19]

And lest there be any doubt that the $74 million KBM-to-IIRO transfer directly supported terror attacks on America, plaintiffs allege that IIRO knowingly and intentionally provided al Qaeda and the Taliban $60 million to fund terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America.[20] Plaintiffs further allege that IIRO bankrolled al Qaeda attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.[21] Plaintiffs further allege that less than thirty percent (30%) of IIRO funds go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaeda.[22] Based on these pleaded facts, plaintiffs are entitled to the inference that a substantial portion of the $74 million KBM-to-IIRO transfer was used in al Qaeda attacks on America.

And based on the above pleaded facts, plaintiffs further allege that when KBM provided $77 million "through NCB facilities to . . . IIRO and Muwaffaq," KBM "knew or should have

---

[18] *Ashton* 4AC ¶¶569-571; *WTC* ¶ 231; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *O'Neill* 2AC ¶ 35, *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A.

[19] *Ashton* 4AC ¶115; *WTC* ¶¶ 972, 1025; *Cantor Fitzgerald* RICO Statement ¶¶ 6, 10; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *Continental Casualty* 1AC ¶ 367.

[20] *Ashton* 4AC  ¶¶ 229, 322, 556; *WTC* ¶¶ 371, 383, 388; *WTC* RICO Statement Exhibit 14; *Euro Brokers* ¶43; *Euro Brokers* RICO Statement Exhibit 14; *Federal Ins.* RICO Statement Exhibit A.

[21]*Ashton* 4AC ¶¶ 310, 315, 318, 322, 574; *WTC* ¶¶ 371, 379, 936; *Euro Brokers* ¶¶ 23, 44; *Cantor Fitzgerald* 1AC ¶¶ 35-42; *Continental Casualty* 1AC ¶¶ 441, 448.

[22]  *Ashton* 4AC ¶¶ 310, 316; *WTC* ¶ 377; *Continental Casualty* 1AC ¶ 446.

known that [he was] materially sponsoring, aiding, abetting al Qaeda, Osama Bin Laden, and international terrorism."[23]

To be sure, KBM now insists that the above pleaded facts – the $74 million KBM-to-IIRO transfer, *and* the $3 million KBM-to-Muwaffaq transfer, *and* that KBM himself endowed the Muwaffaq al Qaeda front, *and* that KBM himself controlled, owned and directed NCB to channel that $77 million to al Qaeda fronts, *and* that the $77 million transfer was made after al Qaeda declared war on America in 1996 – are mere coincidences that do not support the allegation that KBM knowingly transferred funds to al Qaeda.

To accept KBM's "mere coincidence" defense is to abandon logic. For the above pleaded facts give rise to an inference that through 1999 KBM knowingly and intentionally channeled $77 million through NCB to fund al Qaeda's "worldwide network of cells and affiliated groups,"[24] Moreover, KBM's use of NCB as a financial conduit to al Qaeda in the late 1990s was not the first time that KBM exploited his position of control, ownership and direction of a major banking institution to channel funds to Islamist terrorists. Plaintiffs allege that KBM as a major shareholder and active director of BCCI supported international Islamist terrorism by channeling funds through BCCI to terror cells in London and around the world between 1986 and 1990.[25] BCCI under KBM's control, ownership and direction:

_____

[23]*Ashton* 4AC ¶¶570-571; *WTC* ¶¶ 231-232; *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 6, 8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *O'Neill* 2AC ¶¶ 22-24, 35, 126; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Continental Casualty* 1AC ¶ 368.

[24]*Ashton* 4AC ¶564; *WTC* ¶ 226; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 6, 8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *O'Neill* 2AC ¶¶ 22-24, 35, 126; *O'Neill* Amended RICO Statement Question 2 Exhibit A; *Federal Ins.* RICO Statement Exhibit A.

[25] *Ashton* 4AC ¶¶ 564, 567, 568; *WTC* ¶¶ 228-230; *WTC* RICO Statement Exhibit A; *Euro Brokers* RICO Statement Exhibit A; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 365.

was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.[26]

As predictably as the sun rises, KBM argues that it is mere coincidence that BCCI under KBM's control, ownership and direction channeled funds to Islamist terror cells worldwide from 1986 to 1990, just as it is (yet another) mere coincidence that NCB under KBM's control, ownership and direction channeled $3 million to al Qaeda front Muwaffaq through 1999, just as it is (yet another) mere coincidence that KBM endowed that al Qaeda front Muwaffaq,[27] just as it is (yet another) mere coincidence that NCB under KBM's control, ownership and direction channeled $74 million to al Qaeda front IIRO through 1999, just as it is (yet another) mere coincidence that his name "Bin Mahfouz" appears on the Golden Chain list of al Qaeda sponsors.[28]

---

[26]*Ashton* 4AC ¶¶ 567, 568 (quoting 1992 U.S. Senate Investigative Report); *WTC* ¶ 230; *Federal Ins.* RICO Statement Exhibit A; *Continental Casualty* 1AC ¶ 366.

[27] Just as it is (yet another) mere coincidence that KBM appointed as trustee & director of Muwaffaq from 1991 through 2001 his friend and associate Yassin al Qadi, who just happens to be a Specially Designated Global Terrorist of the United States. *See* First Affidavit of John Fawcett at ¶ 5, attached as Ex. 1.

[28] The Golden Chain document seized in an al Qaeda file in Bosnia lists "Bin Mahfouz." Upon good-faith information and belief, the "Bin Mahfouz" identified is Khalid Bin Mahfouz. *See* First Affidavit of John Fawcett at ¶ 6, attached as Ex. 1. Based on analysis of all the documents within that al Qaeda file, and other intelligence gathered during the war on terror, U.S. government officials conclude that the Golden Chain is a "list of the people referred to within *al Qaeda*" as wealthy donors thereto. *See* Govt.'s Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States v. Enaam Arnaout*, No. 02 CR-892 (N.D. Ill. Jan. 6, 2003).

Moreover, the *9/11 Commission* embraced this interpretation of the Golden Chain in its Final Report: "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other non governmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents

Plaintiffs submit that KBM's "mere coincidence" defense is specious, and that KBM is as "innocent" of knowingly financing al Qaeda as Captain Renault in *Casablanca* was "*shocked, shocked* to find that gambling is going on in here.*"

But even if a jury might ultimately credit KBM's "coincidence" argument, the facts alleged and described above plainly state claims on which relief can be granted. Regardless of any other inferences that KBM might wish to ascribe to them, the facts alleged give rise to inference that KBM knowingly and intentionally provided financial support to al Qaeda for a decade leading up to the September 11 attacks. Moreover, as this Court has already recognized: "In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005). Hence, KBM's motion to dismiss should be denied, and plaintiffs should be permitted to prove their case against KBM at trial by jury.

## II.   PLAINTIFFS STATE CLAIMS AGAINST KHALID BIN MAHFOUZ UPON WHICH RELIEF CAN BE GRANTED.

### A.   Applicable Legal Standard

KBM moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S.

---

roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'" *9/11 Commission Final Report*, July 2004, p. 55. And the *9/11 Commission* went further and said that the Golden Chain was functioning until at least the late 1990s. In a section outlining Bin Laden's activities *after* leaving Sudan for Afghanistan, the 9/11 Commission wrote: "Bin Ladin *eventually* enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain." *9/11 Commission Final Report*, July 2004, p. 66.

31, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002)(*per curiam*).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether plaintiffs ultimately could prevail, the Court must "accept all of Plaintiffs' factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the Plaintiffs." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999).  Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has instructed that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001).

A Rule 12(b)(6) motion is analyzed in the context of the liberal pleading requirements of Fed.R.Civ. P. 8(a)(2). *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).  Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quoting *Conley*, 355 U.S. at 47); *Wynder*, 360 F.3d at 77.  Further, in the absence of averments of fraud or mistake, which must be pleaded with particularity pursuant to Fed.R.Civ.P. 9(b), a federal court is prohibited from imposing more demanding requirements than those prescribed under Rule 8(a).  *Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

Two recent Second Circuit cases affirm these principles.  In *Phelps,* the plaintiff alleged that the employees of the prison where he was incarcerated had violated his Eight and Fourteenth Amendment rights by inflicting cruel and unusual punishment.  *Phelps*, 308 F.3d at 182.

9

Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the defendants had placed him on was inadequate and would cause him pain and suffering. *Id.* The District Court dismissed that complaint, finding that it failed to state a claim, in part because the plaintiff had not sufficiently alleged that defendants acted with *scienter*. The District Court found plaintiff's allegations of *scienter* conclusory, and held that plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge. *Id.* at 184. The Second Circuit reversed, holding that a District Court "may not go beyond FRCP 8(a) to require the plaintiff to supplement his pleadings with additional facts that support his allegations of knowledge either directly or by inference." *Id.* at 186-87. The Second Circuit explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement Phelps's basic allegations with additional facts to support them by inference, for it does not appear from the face of the complaint beyond doubt that Phelps "can prove no set of facts in support of his claim which would entitle him to relief."

*Id.* at 187 (*quoting Conley*, 355 U.S. at 45-46). Moreover, the Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations. *Phelps*, 308 F.3d at 187. Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point, courts must take care lest judicial haste [in dismissing a complaint] in the long run makes waste. Untimely dismissal may prove wasteful of the court's limited resources rather than expeditious, for it often leads to a shuttling of the lawsuit between the district and appellate courts.

*Id.* at 185 (internal citations omitted).

Likewise, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit vacated a Rule 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. In *Pelman*, the District Court had dismissed because, it ruled, plaintiffs had failed to

10

"draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id.* at 511. The Second Circuit rejected that approach, and held that the information the District Court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512. Quoting the U.S. Supreme Court's unanimous decision in *Swierkiewicz*, the Second Circuit instructed:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Id.* (citing *Swierkiewicz*, 534 U.S. at 512-13).[29]

### B. Plaintiffs State A Claim Against KBM Under The Anti-Terrorism Act.

Under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, KBM is liable if he provided material support to al Qaeda with knowledge of its terrorist agenda to attack America. *See Boim*, 291 F.3d at 1014-1016.[30]

---

[29] The D.C. Circuit recently addressed similar issues post-*Swierkiewicz* in reversing the dismissal of a complaint in which the plaintiff did not plead "facts" establishing knowledge. *Warren v. District of* Columbia, 353 F.3d 36 (D.C. Cir. 2004). Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." *Id.* at 39 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure§ 1218, at 276 (3d ed 2004)("[I]t must be remembered that the federal rules require a short and plain statement of a claim for relief that provides fair notice to the opposing party; it does not make any difference whether the pleader accomplishes this by stating 'conclusions,' 'ultimate facts,' or 'evidence.'")

[30] *Boim* explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A ["material support or resources" means "currency"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333:

> If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333 . . . . The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability

Like *Boim*, this Court has already recognized that under the ATA, "material support includes money [and] financial services[.]" *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d at 825. As demonstrated above, plaintiffs have alleged that KBM knowingly and intentionally provided money and financial services to al Qaeda by channeling $77 million to al Qaeda fronts Muwaffaq and IIRO for a decade leading up to the September 11 attacks.

Moreover, the ATA entails conspiracy and aiding and abetting liability. As put by *Boim*:

> [I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence. . . . [A]iding and abetting liability is both appropriate and called for by the language, structure and legislative history of [ATA] section 2333.

*Boim*, 291 F.3d at 1021. Because the pleaded facts discussed above show that KBM deliberately provided substantial financial assistance to al Qaeda, with knowledge that al Qaeda was waging war on America, KBM is subject to aiding and abetting liability under the ATA.

And Plaintiffs properly allege that KBM's knowing provision of financial support and assistance to al Qaeda was a proximate cause of the September 11 attacks. For this Court has already resolved that "[i]n light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826.[31]

---

under section 2333 by proving that [defendants] provided material support to terrorist organizations. *Boim*, 291 F.3d at 1015-16.

[31]*Accord, Burnett* 1AC ("The financial resources and support network [provided by] Defendants – charities, banks, fronts organizations and financiers – are what allowed the attacks of September 11, 2001 to occur. Terrorists like Osama bin Laden and his al Qaeda network . . . cannot plan, train and act on a massive scale without significant financial power, coordination and backing."); *see also, Ashton* 4AC ¶ 610; *Burnett* 3AC Introduction; *WTC* Introduction; *Euro Brokers* ¶5; *Cantor Fitzgerald* RICO Statement ¶¶ 6-8; *Cantor Fitzgerald* 1AC ¶¶ 33-42; *O'Neill*

Contrary to KBM's insistence that proximate cause is not well pleaded unless plaintiffs allege with specificity that KBM "participated in the September 11 attacks," KBM Brief at 15, this Court has already resolved that "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829.

Moreover, this Court has already determined that proximate cause may be supported by plaintiffs' allegations that KBM aided and abetted or conspired with the al Qaeda terror network for a decade leading up to the September 11 attacks: "[A]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826.

Accordingly, under the standards set by this Court, plaintiffs have properly alleged proximate cause. The September 11 attacks were a natural and probable consequence of KBM's financial support of the al Qaeda terror network – of his actions *in concert* with al Qaeda – for a decade leading up to those attacks. Hence, plaintiffs' ATA claim against KBM is well pleaded.

### C.    Plaintiffs State Claims Against KBM Under The Alien Tort Claims Act And Under Customary International Law.

KBM insists that the alien-plaintiffs' claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350, should be dismissed "because the ATCA does not create secondary liability among private actors." KBM Brief at 24. KBM thereby disregards this Court's ruling that "the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs

---

2AC ¶¶ 22-24, 156-163; *O'Neill* Amended RICO Statement Question 2 Exhibit A.

here." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826 (citing

*Presbyterian Church of Sudan v. Talisman Energy Inc.,* 244 F. Supp. 2d 289, 311 (S.D.N.Y.

2003)("ATCA suits [may] proceed based on theories of conspiracy and aiding and abetting")).

In spite of this Court's clear ruling that "courts, including the Second Circuit, have almost

unanimously permitted [ATCA] actions premised on a theory of aiding and abetting," *id.* at 826,

(*quoting Presbyterian* at 311) KBM sallies forth with the following bizarre distinction: whereas

he could be subject to ATCA liability if he aided and abetted a "state actor" to hijack an aircraft,

KBM insists that he cannot be subject to ATCA liability if he aided and abetted only a "private

actor" like Mohammed Atta to hijack an aircraft and fly it into the World Trade Center. He says:

> All of the ATCA cases cited by Plaintiffs and this Court that apply a theory of secondary
> liability involved a private actor's joint action with a state actor, not another private actor,
> to commit a violation of international law. . . . This Court should decline Plaintiffs'
> invitation to extend the doctrine of secondary ATCA liability to cases where one private
> actor allegedly supported another private actor.

KBM Brief in *Burnett* (D.C.)(03-9849) at 36-37 (incorporated by reference at KBM Brief at 24).

To accept that proffered "distinction" hinging on the status of the primary tortfeasor is to

embrace the absurd. The crime of aircraft hijacking is carried out by individuals, not states. And

individuals, lacking the resources of a state, are likely to require the assistance of others to carry

out an aircraft hijacking. There is no basis in law, logic, or policy to allow those who aid and

abet individuals to hijack aircrafts to escape liability, while imposing liability on those who aid

and abet individuals to commit other crimes. But if KBM's proffered "distinction" were

accepted, then aiding and abetting liability would never be imposed for aircraft hijacking.

Moreover, this Court has already resolved that "aircraft hijacking is generally recognized

as a violation of international law" actionable under the ATCA. *In re Terrorist Attacks on*

14

*September 11, 2001*, 349 F. Supp. 2d at 826.  Hence, because plaintiffs allege that KBM aided

and abetted al Qaeda to launch the September 11 attacks using hijacked aircraft, the alien-

plaintiffs may assert tort claims under the ATCA against KBM.[32]

Trying to escape concerted-action liability under the ATCA, KBM insists that plaintiffs

"fail[ed] to adequately allege conspiracy or aiding and abetting." KBM Brief at 24.

KBM is wrong.

Plaintiffs make a *prima facie* aiding-and-abetting claim by alleging:  (i) KBM knowingly

and substantially assisted al Qaeda to attack America by channeling $77 million to al Qaeda

fronts for a decade leading up to the September 11 attacks, (ii) KBM knew that al Qaeda declared

war on America, and (iii) al Qaeda carried out the September 11 attacks causing the deaths of

plaintiffs' decedents.[33]  And plaintiffs make a *prima facie* conspiracy claim by alleging:  (i)

KBM's financing of al Qaeda supports an inference that KBM and al Qaeda made an agreement[34]

to injure America through terror attacks, (ii) for a decade leading up to the September 11 attacks,

KBM participated in that agreement by knowingly channeling $77 million to al Qaeda fronts, (iii)

---

[32]KBM fails to recognize that the Supreme Court recently held that the ATCA creates a cause of action "based on the present-day law of nations" to the extent that such claim rests "on a norm of international character accepted by the civilized world . . . ." *Sosa v. Alvarez-Machain*, 124 S.Ct. 2379, 2761-62 (2004).  The status of the primary tortfeasor, as a state actor or individual, did *not* enter into the Supreme Court's analysis in *Sosa*.

[33] To state a *prima facie* case of aiding and abetting, plaintiffs need only present allegations that show: (i) the party whom defendant aids must perform a wrongful act that causes an injury; (ii) the defendant must be generally aware of wrongful nature of the primary actor's course of conduct; and (iii) the defendant must knowingly and substantially assist the principal violation.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983).

[34] In *Burnett I*, Judge Robertson found that "plaintiffs' allegations about Al-Haramain's financing of al Qaeda support an inference that there was an *agreement* concerning the commission of terrorist acts." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003)(upholding conspiracy claims).  Here, plaintiffs' allegations about KBM's financial support of al Qaeda imply agreement between KBM and al Qaeda to injure America.  *See Diduck v. Kaszycki*, 774 F.Supp. 802, 813 (S.D.N.Y. 1991)(to establish civil conspiracy, "[p]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement.  A court may *infer* agreement.").

15

the September 11 attacks carried out by al Qaeda were acts done in furtherance of that

agreement, and (iv) the September 11 attacks caused injury to plaintiffs' decedents.[35] Hence,

concerted-action liability against KBM is well pleaded and plaintiffs' ATCA claims stand.

Likewise, KBM's motion to dismiss the *Cantor Fitzgerald* and *WTC Properties*

international law claims[36] must fail. KBM's conduct, whereby he directly and in concert with

others provided financial support to al Qaeda to launch the September 11 attacks through aircraft

hijacking – a well-recognized violation of international law – exposes KBM to aiding and

abetting liability in United States Courts.[37] We respectfully refer the Court to plaintiffs' prior

briefings in support of their international law claims.[38]

### D.    Plaintiffs State Common Law Claims Against KBM.

KBM moves to dismiss plaintiffs' common law claims – including claims for wrongful

death, survival, assault and battery, intentional infliction of emotional distress, and property

---

[35]*Ashton* 4AC ¶¶ 458, 460, 461, 569, 571, 573; *WTC* ¶¶ 233, 665-667, 231; *WTC* RICO Statement Exhibit A; *Euro Brokers* ¶81; *Euro Brokers* RICO Statement Exhibit A; *Cantor Fitzgerald* RICO Statement ¶¶ 2, 5, 7-8; *Cantor Fitzgerald* 1AC ¶¶ 93-97; *O'Neill* 2AC ¶¶ 22-25, 156-163, 176-180; *O'Neill* Amended RICO Statement Question 2 Exhibit A;  To state a *prima facie case* of conspiracy, plaintiffs need only present allegations entailing the primary tort and the following four elements: (i) corrupt agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance thereof, and (iv) the resulting damage. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

[36] *Cantor Fitzgerald* 1AC ¶¶ 226-236 (Counts 9 & 11); *WTC Props.* Complaint ¶¶ 1174-1179 (Count 9). (alleging that all defendants are jointly and severally liable for plaintiffs' damages under international law).

[37] *See, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996)(affirming district court's jury instruction allowing foreign leader to be held liable upon finding that he "directed, ordered, conspired with, or aided the military in torture, summary execution, and 'disappearance'"); *Presbyterian Church*, 244 F. Supp.2d at 321 (collecting cases) ("U.S. courts have consistently permitted ATCA suits to proceed based on theories of conspiracy and aiding and abetting."); *Barrueto v. Larios*, 205 F. Supp. 2d 1325, 1331-32 (S.D. Fla. 2002) (holding ATCA liability can be based on allegations that defendants conspired or aided and abetted violations of the law of nations);

[38] *See Cantor Fitzgerald and Port Authority* Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); *Cantor Fitzgerald and Port Authority* Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

destruction – because, he insists, plaintiffs have not well pleaded causation, conspiracy, and aiding and abetting. But that is simply a repetition of his arguments with respect to plaintiffs' claims under the ATA and ATCA, and should be rejected for the reasons set forth above.

KBM also argues that the "*Ashton and Burnett-NY* Plaintiffs' intentional tort claims . . . fail for failure to allege (1) direct involvement in 9/11 attacks; (2) 'extreme and outrageous conduct' on the part of Mr. Bin Mahfouz himself; and (3) conduct by Mr. Bin Mahfouz directed the plaintiffs themselves." KBM Brief at 24. KBM thus ignores this Court's ruling that if "the *Ashton* and *Burnett* Plaintiffs' allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11 terrorists, they will have also stated a claim for intentional infliction of emotion distress [and] they will have also stated claims for wrongful death and survival." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829-830. As demonstrated above, plaintiffs allege that KBM supported, aided and abetted, and conspired with the September 11 terrorists by channeling $77 million to al Qaeda for a decade leading up to the September 11 attacks. Hence, plaintiffs' common law claims are well pleaded.[39]

KBM also suggests that claims for contribution and indemnity by plaintiff *Port Authority of New York and New Jersey* ("Port Authority") should be dismissed on the grounds that Port

---

[39]Plaintiffs recognize that this Court dismissed plaintiffs' negligence and negligent infliction of emotion distress claims upon finding defendants owned no duty to plaintiffs. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 831. Plaintiffs respectfully disagree and refer the Court to their prior briefing on this issue. Also, plaintiffs recognize that the Court held that the *Federal Ins.* Plaintiffs claims for assault, battery and intentional infliction of emotion distress are time-barred. *Id.* at 829. Since that ruling, the *Federal Insurance* Plaintiffs have clarified that they are pursuing common law assault and battery claims under both state common law and federal common law. Plaintiffs refer the Court to that briefing, which demonstrates that the federal common law claims are governed by a four-year statute of limitations, and hence are not time-barred.

Plaintiffs also note that they do not currently intend to pursue their claim under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note, against KBM. Plaintiffs reserve the right to re-plead this claim against KBM should additional information become available in discovery demonstrating that he acted "under actual or apparent authority or color of law, of any foreign nation" in connection with his support of al Qaeda.

Authority has not yet been forced to pay judgment.  KBM is wrong again.  The Port Authority's legal and factual arguments in support of its contribution and indemnity claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein.[40]

### E.    Plaintiffs State RICO Claims Against KBM.

Plaintiffs' complaints and RICO statements assert RICO claims against KBM pursuant to 18 U.S.C. §§ 1962(a), (c) and (d).

Plaintiffs allege that al Qaeda is an enterprise – an association in fact of terrorists and an ongoing terrorist organization with a definitive structure – whose purpose is to perpetrate acts of terrorism.  Plaintiffs thereby well plead that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan,* 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO statements allege that KBM engaged in conduct in furtherance of the al Qaeda enterprise, which is actionable under Section 1962(a):

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in . . . the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.  18 U.S.C. §1962(a).

Plaintiffs allege that KBM, through his positions in both NCB and Muwaffaq, solicited funds from donors throughout the world under the guise of "charity," and devoted the funds collected under that false pretense to al Qaeda.[41]  Thus, plaintiffs' complaints and RICO

---

[40] *See Cantor Fitzgerald and Port Authority* Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); *Cantor Fitzgerald and Port Authority* Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

[41] *See, e.g., Federal Ins.* RICO Statement Exhibit A.

18

Statements plainly allege that KBM derived income through a pattern of racketeering activity, including acts of mail and wire fraud, and invested that income in the al Qaeda enterprise.[42] Given that the Supreme Court has explicitly recognized that al Qaeda's terror operations, including the September 11th attacks, directly affect interstate commerce, plaintiffs have stated RICO claims under 1962(a). *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004)(finding that the September 11th attacks "severely damaged the U.S. economy").

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by KBM in the al Qaeda enterprise to sustain claims under both Sections 1962(c) and (d). Although a plaintiff asserting a civil claim under Section 1962(c) must prove that the defendant had "some part" in the "operation or management" of the enterprise, *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003), the Second Circuit instructs that the "'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004). Moreover, as a general rule, it may not be "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 WL 376058 at *2 (S.D.N.Y. July 15, 1994).

With respect to conspiracy under Section 1962(d), all that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating

---

[42]*See, e.g., Federal Ins.* RICO Statement Exhibit A.

the criminal endeavor." *Baisch v. Gallina,* 346 F.3d 366, 376-77 (2d Cir. 2003)(*quoting Salinas*

*v. United States*, 522 U.S. 52, 65 (1997)). Thus, "[a]lthough parties who do not control the

organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be

liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

As demonstrated above, the plaintiffs have alleged that KBM for a decade leading up to

the September 11 attacks channeled funds to multiple al Qaeda fronts to finance al Qaeda

operations worldwide. Accordingly, it may be inferred that KBM played a direct and active role

in the management and operation of al Qaeda's financing scheme, and that KBM was a central

figure in the enterprise in the years leading up to the attack. Hence, plaintiffs' Section 1962(c)

and Section 1962(d) RICO claims are well pleaded.[43]

## III.   THIS UNITED STATES COURT HAS PERSONAL JURISDICTION OVER KHALID BIN MAHFOUZ.

KBM also moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), insisting that he lacks

"any contacts" with the United States. KBM Brief at 9.

That is false.

---

[43] KBM at fn. 68 argues that the *O'Neill* Plaintiffs lack standing to bring RICO claims because there was no damage to business or property. As set forth in the *O'Neill Plaintiffs' Memorandum Of Law In Opposition To Al Haramain* (03 MDL 1570 (RCC), April 8, 2005, Docket Entry No. 810), Second Circuit precedent does not support KBM's position. To the contrary, RICO's legislative history and U.S. Supreme Court RICO caselaw establish that there *is* RICO standing where plaintiffs suffer pecuniary injuries deriving from personal injury or death. *Id.* at pp. 9-14. Indeed, on August 16, 2005, the Ninth Circuit *en banc* adopted plaintiffs' position, holding that pecuniary damages incidental to personal injury provided a basis for RICO standing. *Diaz v. Gates*, 2005 U.S. App. LEXIS 17228 at * 3-16 (9th Cir., Aug. 16, 2005). The *O'Neill* Plaintiffs allege such injury. *O'Neill* 2AC, ¶¶ 146(a), 176, 179; *O'Neill* Amended RICO Statement ¶¶ 4, 15-7.

Secondly, KBM at fn. 68 argues that the *O'Neill* Plaintiffs invoke 18 U.S.C. § 1962(**b**), and that they failed to sufficiently plead same. Nonsense. Paragraph 12 of the *O'Neill* Amended RICO Statement says that Section 1962(**b**) was "[n]ot applicable to this defendant." However, the *O'Neill* Plaintiffs RICO Statement does make and well plead claims under 1962(**c**) & 1962(**d**) against KBM. *O'Neill* Amended RICO Statement ¶¶ 1, 13, 14.

When KBM knowingly provided financial support to al Qaeda waging war on America, and when KBM participated in a conspiracy that culminated in the September 11 attacks, he not only made "minimum contacts" with America, but he engaged in conduct that he knew would have devastating impact on America. Hence, KBM "should [have] reasonably anticipate[d] being haled into court there." *World Wide Volkswagen Corp.*, 444 U.S. 286, 297 (1980).

### A.     Applicable Legal Standard

To defeat a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction made before discovery, plaintiffs "need only made a *prima facie* showing by [their] pleadings and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997). And the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).

### B.     This Court Has Personal Jurisdiction Over KBM Who Knowingly & Intentionally Provided Financial Support To Al Qaeda To Attack America.

In its jurisdictional analysis of "whether the defendant has minimum contacts with the United States as a whole" in this ATA case, this Court already resolved that "Plaintiffs may rely on their 'purposefully directed' theory to establish these minimum contacts." *In re Terrorist Attacks on September 11*, 349 F. Supp.2d at 806, 809.[44]

---

[44] *Accord, Burnett,* 274 F. Supp. 2d at 95-96 (personal jurisdiction proper in ATA case where defendants have minimum contacts with U.S. as a whole); *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp.2d 54, 59-60 (D.D.C. 2003)(upholding personal jurisdiction over individual Libyan defendants in their personal capacities who "should have anticipated the possibility of being haled into court in the United States" for conspiring to bomb a French plane flying from Congo to Paris "at the risk of killing Americans").

This "purposefully-directed" theory of personal jurisdiction in the terror-litigation context was recently confirmed by the D.C. Circuit in *Mwani v. Bin Laden*, 2005 WL 1844423 (D.C. Cir. Aug. 5, 2005), which arose from al Qaeda's 1998 bombing attack on the U.S. Embassy in Kenya. The district court had dismissed claims against Osama Bin Laden and al Qaeda for lack of personal jurisdiction, finding that plaintiffs did not "establish sufficient contacts between the defendants and the [U.S.] forum to permit the exercise of personal jurisdiction. . . ." *Id.* at * 2. The D.C. Circuit reversed, holding that Osama Bin Laden and al Qaeda were subject to jurisdiction in a United States Court because defendants had:

> engaged in unabashedly malignant actions directed at and felt in this forum. . . . The defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorists activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court.

*Id.* * 8-9 (internal cites omitted).[45]

Predictably, KBM tries to escape being subject to jurisdiction based on his purposefully-directed conduct at the United States by saying that "plaintiffs allege no facts from which to infer that Mr. Bin Mahfouz purposefully directed any conduct at the United States." KBM Brief at 10.

Plaintiffs' complaints and RICO Statements show that KBM is wrong again.

---

[45]Other courts have taken an even more expansive view of the jurisdiction of the federal courts and have held that non-resident aliens who lack contact with the United States have no Due Process rights that would interfere with the court's assertion of personal jurisdiction over them. In *Baker v. Socialist People's Libyan Arab Jamahiriya*, Civ. Action. No. 03-749, *slip op.* (D.D.C. June 30, 2005), the court held that it had personal jurisdiction over non-resident alien individual defendants alleged to be responsible for the hijacking of EgyptAir Flight 648. The court rejected defendants' arguments that they lacked sufficient contacts with the United States to satisfy the requirements of due process, holding that the due process protections of the Fifth Amendment were unavailable to them. The *Baker* court based its holding on long-established precedents in the United States Supreme Court and the D.C. Circuit that "non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *Baker, slip op.* at 10, *quoting Jifrey v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *see also People's Mojahedin Org. of Iran v. U.S. Dept. Of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("aliens receive constitutional protections only when they have come within the territory of the United States and developed substantial connections with this country"); *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (same).

As described above, plaintiffs allege facts from which it can be inferred that KBM knowingly channeled millions of dollars to al Qaeda at war with America. Those allegations include the facts that through 1999 KBM channeled $3 million to al Qaeda front Muwaffaq, which Osama Bin Laden himself in 1995 had publically identified as part of his "support network" and which KBM himself had endowed. Those allegations further include the facts that through 1999 KBM channeled $74 million to al Qaeda front IIRO that financed multiple attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks. Because these pleaded facts give rise to the inference that KBM purposefully provided financial support for al Qaeda attacks targeting the United States, KBM ought to be held to account in this United States Court.

### C.    This Court Has Personal Jurisdiction Over KBM Who Knew & Intended That The Acts Of His Al Qaeda Co-Conspirators Would Impact America.

This Court has already resolved that it may exercise personal jurisdiction over foreign defendants pursuant to a conspiracy theory. *In re Terrorist Attacks on September 11*, 349 F. Supp.2d at 805 ("acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy theory may subject the out-of-state defendant to jurisdiction").

Imputing the forum acts of their co-conspirators to foreign defendants "supplies the necessary minimum contacts [under] *International Shoe*" to satisfy due process when asserting personal jurisdiction over these foreign defendants. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980); *Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17

23

(S.D.N.Y. 1997)(same).  Because when foreign defendants enter into a conspiracy knowing that acts of their co-conspirators would impact the forum, such foreign defendants should "reasonably anticipate being haled into court there."  *Dixon* at 352; *Andre Emmerich* at * 17.

Predictably, KBM insists that plaintiffs do not "make a prima facie case of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendants' co-conspirator committed a tort in New York."  KBM Br. at 10-11.

KBM is wrong again.

As shown above, plaintiffs' complaints and RICO Statements make a *prima facie* case of conspiracy between KBM and al Qaeda to injure America:  (i) KBM's financing of al Qaeda supports an inference that KBM and al Qaeda agreed to injure America through terror attacks; (ii) KBM participated in that agreement by knowingly channeling $77 million to al Qaeda fronts for a decade leading up to the September 11 attacks; (iii) the September 11 attacks carried out by al Qaeda were acts done in furtherance of that agreement; and (iv) the September 11 attacks killed plaintiffs' decedents.  Hence, by imputing the September 11 forum acts of his al Qaeda co-conspirators to KBM, this Court may assert personal jurisdiction over KBM.

### D.    Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery.

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also*, MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ("Generally, the District Court should allow discovery if the jurisdictional claim has a reasonable basis and it appears that pertinent facts may be uncovered.").  Indeed, this Court has already recognized that "if a plaintiff has identified a genuine issue of jurisdictional fact, jurisdictional discovery is appropriate even in

the absence of a prima facie showing as to the existence of jurisdiction." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 812 (internal cites omitted).

Especially where, as here, jurisdictional facts lie within the peculiar knowledge and grasp of defendant KBM contesting jurisdiction, it would be unfair to deny plaintiffs the chance to start jurisdictional discovery. *Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986).

Here, jurisdictional discovery is warranted to resolve the range of KBM's substantial and continuous contacts with the United States, including that:

- From the mid 1970s until 2004, KBM owned two apartments in New York, New York. *See* Second Affidavit of John Fawcett at ¶ 3, attached as Ex. 2;

- From 1988 through 1999, KBM owned a large estate in Houston, Texas. *See id.* at ¶ 4;

- From the 1970s through the present, KBM invested in companies registered and doing business in the United States, including WorldSpace (Washington D.C./Maryland), Pathfinder (Texas), Sedco Services (Delaware/Connecticut), The Euram Group (Delaware/New York), and KBM Investments (Texas/New York). *See id.* at ¶ 5;

- From the 1970s through the 1990s, KBM has invested throughout the United States in major banking institutions, with the intent to gain controlling interests therein, including in Main Bank of Houston, First American Bank, the Bank of Credit and Commerce International ("BCCI"), and M-Corp. *See id.* at ¶ 6;

- In 1992, the Board of Governors of the U.S. Federal Reserve System brought a civil action against KBM for his involvement with BCCI, whereupon the presiding United States District Judge froze the United States-based assets of KBM. *See id.* at ¶ 7;

- In 1992, KBM was indicted by a Grand Jury in New York for the crime of "Scheme to Defraud in the First Degree," and a warrant was issued for his arrest. KBM paid $225 million in fines to the U.S. Government to settle and resolve that matter. *See id.* at ¶ 8.

Hence, jurisdictional discovery should be ordered to resolve these jurisdictional facts.

## IV.   CONCLUSION

For the above reasons, KBM's motion to dismiss should be denied with prejudice.

Dated: August 24, 2005
New York, New York

Respectfully submitted,


_/s/_____
James P. Kreindler, Esq. (JK7084)
Justin T. Green, Esq. (JG0318)
Andrew J. Maloney III, Esq. (AM8684)
Vincent Ian Parrett, Esq. (VP5092)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone (212) 687-8181


_/s/_____
Ronald L. Motley, Esq. (RM2730)
Jodi Westbrook Flowers, Esq.
Michael Elsner, Esq. (ME8337)
Justin B. Kaplan, Esq.
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Phone (843) 216-9000


_/s/_____
Paul J. Hanly, Jr., Esq. (PH5486)
Jayne Conroy, Esq. (JC8611)
Andrea Bierstein, Esq. (AB4618)
Hanly Conroy Bierstein & Sheridan LLP
112 Madison Avenue, 7th floor
New York, New York 10016
Phone (212) 784-6400

/s/ _____
Elliott R. Feldman, Esq. (admitted *pro hac vice*)
Sean P. Carter, Esq. (admitted *pro hac vice*)
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone (215) 665-2000


/s/ _____
Jerry S. Goldman, Esq. (JG8445)
Law Offices of Jerry S. Goldman
& Associates, P.C.
The Trinity Building
111 Broadway, 13th Floor
New York, New York 10060
Phone (212) 242-2232


/s/ _____
Kenneth L. Adams, Esq. (admitted *pro hac vice*)
Richard W. Fields, Esq. (admitted *pro hac vice*)
Christopher T. Leonardo, Esq. (CL3043)
Stacey Saiontz, Esq. (SS1705)
Dickstein Shapiro Morin & Oshinsky
1177 Avenue of the Americas
New York, N.Y. 10036-2714
Phone: (212) 835-1400


/s/ _____
Robert M. Kaplan, Esq. (RK1428)
Ferber Frost Chan & Essner, LLP
530 Fifth Avenue
New York, New York 10036
Phone: (212) 944-2200

27