**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738 (RCC)
*Cantor Fitzgerald v. Akida Bank Private Limited*, 04-CV-7065 (RCC)
*Continental Cas. Co. v. Al Qaeda*, 04-CV-5970 (RCC)
*Euro Brokers Inc. v. Al Baraka Inv. & Dev. Corp.*, 04-CV-7279 (RCC)
*Federal Ins. v. Al Qaida*, 03-CV-6978 (RCC)
*New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)
*Estate of O'Neill v. Al Baraka Investment and Development Corp.*, 04-CV-1923 (RCC)
*World Trade Ctr. Props. L.L.C. v. Al Baraka Inv. & Dev. Corp.*, 04-CV-7280 (RCC)

**SECOND AFFIDAVIT OF JOHN FAWCETT IN SUPPORT OF**
**PLAINTIFFS' OPPOSITION TO**
**KHALID BIN MAHFOUZ'S  MOTION TO DISMISS**

STATE OF NEW YORK      )
          ) ss.:
COUNTY OF NEW YORK   )

JOHN FAWCETT, being duly sworn, deposes and says:

1.  For over two years, I have been working under contract for Kreindler & Kreindler LLP as an investigator in the case of *Kathleen Ashton v. al Qaeda Islamic Army et al.*

2.  As part of my duties, I have been asked to research Khalid Bin Mahfouz and his contacts with the United States.

3.  According to documents obtained from the New York City Department of Finance, Office of the City Register, Khalid Bin Mahfouz owned two apartments at 645 5th Avenue.  The first, apartment #29A, was purchased on May 21, 1975  and sold in May 2004. The second,

apartment #31A, was purchased on May 21, 1975 and sold in August 2004.  See Attached
Document #1, New York City Property Records.

4.      According to the Washington Post in 1981, Khalid Bin Mahfouz owned a
mansion in the River Oaks section of Houston, Texas.   Harris County, Texas property records
list 3800 Willowick Rd, Houston as being owned by Pathfinder Investments from 1988-1999.
Willowick Rd is in River Oaks.  Pathfinder Investments is a real estate firm affiliated with
Khalid Bin Mahfouz.  See Document #2, Willowick Rd documents.

5.      Khalid Bin Mahfouz owned, invested or was affiliated with the following
entities.  Pathfinder Investment was founded in Curacao and operated in Texas.  Sedco Services
was founded in Delaware and operates from Connecticut.  The Euram Group, Ltd was founded in
Delaware and operated from New York City.  KBM Investments was founded in Curacao and
operated from Texas and New York.  Worldspace, a company in which Khalid Bin Mahfouz
invested over $1 billion, operates from Washington DC and Maryland. See Document #3, KBM
corporate documents.

6.      From 1977 to 1980, Khalid Bin Mahfouz held a 50% interest in Main Bank of
Houston.  Via mergers this became a 5% holding in M-Corp. According to the Middle East
Economic Survey, in 1986 he bought 20% of the First American Bank, a bank secretly controlled
by BCCI.  He owned 30% of BCCI and expressed the intention to gain 100% ownership.  The
National Commercial Bank, in which he held a controlling interest, operated a branch in New
York City until 1992 according to the Middle East Economic Survey.  A subsidiary, SNCB
Securities, Inc. was operating in the United States until at least 2001.  See Document #4, KBM
US banking interests.

7.     A Civil Suit 92:cv 5096 was filed in Southern District of New York against Khalid

Bin Mahfouz by the Board of Governors of the US Federal Reserve System.  The presiding judge

froze the US-based assets of Khalid Bin Mahfouz with a temporary restraining order. See

Document #5, Fed Reserve v Bin Mahfouz.

8.     Khalid Bin Mahfouz was indicted by a grand jury in the County of New York in

1992.  A warrant was issued for his arrest.  Khalid Bin Mahfouz paid $225 million in restitution

and fines in order to settle the matter. See Document #6, Indictment and Settlement.

Dated: New York, New York
       August 22, 2005

Respectfully submitted,

John Fawcett

Sworn to before me this
22nd day of August, 2005

Notary Public

LESLIE WASSERBAUER
NOTARY PUBLIC, State of New York
No. 30-4860403
Qualified in Nassau County
Commission Expires June 9, ____

3

# Document #1

New York City Property Records

REEL 367 PAGE 235

NOTICE: The powers granted by this document are broad and sweeping. They are defined in New York General Obligations Law, Article 5, Title 15, sections 5-1502A through 5-1503, which expressly permits the use of any other or different form of power of attorney desired by the parties concerned.

KNOW ALL MEN BY THESE PRESENTS, which are intended to constitute a GENERAL POWER OF ATTORNEY pursuant to Article 5, Title 15 of the New York General Obligations Law:

That I, SHEIK KHALID BIN MAHFOUZ, residing at Jeddah, Saudi Arabia, do hereby appoint JEFFRY N. GRABEL and/or CARROLL J. CAVANAGH, both c/o Sullivan & Cromwell, 250 Park Avenue, New York, New York, my attorney-in-fact TO ACT

First: in my name, place and stead in any way which I myself could do, if I were personally present, with respect to the following matters as each of them is defined in Title 15 of Article 5 of the New York General Obligations Law to the extent that I am permitted by law to act through an agent:

All real estate transactions including, but not limited to, all acts and matters relating in any way whatsoever to my acquisition of certain units designated as Units No. 29A and 31A in the Declaration for Olympic Tower Condominium, as such Declaration may be amended, filed in the office of the Register of the City of New York, County of New York, State of New York, together with a .521441O% undivided interest in the Common Elements appurtenant thereto (the "Units"), in accordance with certain purchase agreements dated May 21, 1975 and May 21, 1975, respectively, between Olympic Tower Associates and Sheik Khalid Bin Mahfouz, including, without limitation, the payment of all fees, costs and taxes and the execution and delivery of all documents, receipts, agreements, mortgage instruments, bonds, notes, waivers and powers of attorney as either of my attorneys-in-fact shall deem, in his sole and absolute discretion, necessary or proper to effectuate my acquisition of the Units and my securing mortgage loans from Olympic Tower Associates in connection therewith.

Second: with full and unqualified authority to delegate any or all of the foregoing powers to any person or persons whom either of my attorneys-in-fact shall select.

Third: To induce any third party to act hereunder, I hereby agree that any third party receiving a duly executed copy, photocopy or facsimile of this instrument may act hereunder, and that revocation or termination hereof by operation of law or otherwise shall be ineffective as to such third

-1-

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2004051901808001002EA958

## RECORDING AND ENDORSEMENT COVER PAGE          PAGE 1 OF 6

| | | |
|---|---|---|
| **Document ID: 2004051901808001** | Document Date: 12-07-2003 | Preparation Date: 06-16-2004 |

Document Type: POWER OF ATTORNEY
Document Page Count: 4

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| COMMONWEALTH/LAWYERS  TITLE | WOHABE  LAW OFFICES |
| 655 THIRD AVENUE | 375 PARK AVENUE |
| NEW YORK, NY  10017 | NEW YORK, NY  10152 |
| 212-949-0100 | ATTN: OMAR WOHABE |
| NY040267M | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1287 | 1057  Entire Lot | 29A | 645 5 AVENUE |

**Property Type:**  SINGLE RESIDENTIAL  CONDO UNIT

### CROSS REFERENCE DATA

CRFN_____  *or*  Document ID_____  *or* _____ Year _____ Reel ____ Page _____  *or* File Number _____

### PARTIES

| **PARTY ONE:** | **PARTY TWO:** |
|---|---|
| SHEIKH KHALID BIN MAHFOUZ | LAWRENCE G. SMITH |
| P. O. BOX 52558 | 320 CENTRAL PARK WEST, APT. 12A |
| JEDDAH 21573 | NEW YORK, NY  10025 |
| SAUDI ARABIA | |
| x  Additional Parties Listed on Continuation Page | |

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 57.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee:  $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed          08-19-2004 18:17
City Register File No.(CRFN):

2004000518038

*Rochelle Patrice*

*City Register Official Signature*



**2004083100434002002E401D**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 5 |
|---|---|---|
| **Document ID: 2004083100434002** | Document Date: 08-25-2004 | Preparation Date: 09-10-2004 |

Document Type: DEED
Document Page Count: 4

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| LEX TERRAE, LTD | GOLDBERG, WEPRIN, & USTIN, ESQ. |
| 331 MADISON AVENUE | 1501 BROADWAY 22ND FLOOR |
| 9TH FL | ATTN: DAVID GALANTER, ESQ. |
| NEW YORK, NY 10017 | NEW YORK, NY 10036 |
| 212-599-1300 | M234319/KR |
| AS AGENTS FOR OLD REPUBLIC | |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1287 | 1073 | Entire Lot | 31A | 645 5 AVENUE |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year ____ Reel ___ Page ____ *or* File Number _____

### PARTIES

| **GRANTOR/SELLER:** | **GRANTEE/BUYER:** |
|---|---|
| SHEIK KHALID SALIM BIN MAHFOUZ | CHARLES YASSKY |
| C/O WOHABE LAW OFFICES, 375 PARK AVENUE | 424 MADISON AVENUE |
| ATTN:OMAR WOHABE, ESQ. | NEW YORK, NY 10021 |
| NEW YORK, NY 10152 | |

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 57.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 75.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $7,300.00 + $18,250.00 = $ | 25,550.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | |
| MTA: | $ | 0.00 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 0.00 | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**

Recorded/Filed          09-21-2004 16:14
City Register File No.(CRFN):

**2004000591366**

NYC HPD Affidavit in Lieu of Registration Statement

*Rochelle Patricia*

*City Register Official Signature*

NYCProperty | Statements List | Select a B-B-L | NYC.GOV Home | DEP Home | DOF Home | NYCProperty Home

*The Official New York City Web Site*

# FINAL ASSESSMENT ROLL 2003-2004 | City of New York

**Taxable Status Date: January 5, 2003**

View 2004 TENTATIVE ASSESSMENT ROLL
View 2004 FINAL ASSESSMENT ROLL
View 2005 TENTATIVE ASSESSMENT ROLL
View 2005 FINAL ASSESSMENT ROLL
View May 25, 2005 - Market Value History

EXPLANATION OF ASSESSMENT ROLL

## Parcel Information

◀◀ **Previous BBL**          **Next BBL** ▶▶

**Owner Name:**

SHEIK MAHFOUZ

**Property Address and Zip Code:**

645 5 AVENUE 10022

**Real Estate Billing Name and Address:**

PATHFINDER INVESTMENT NV

C/O SEDCO SERVICES INC

300 FIRST STAMFORD PL ST

STAMFORD CT 06902

**Borough:**        MANHATTAN

**Block:**          1287

**Lot:**            1057

**Tax Class:**      2

**Building Class:** R4 Codes

## Land Information

| Lot Size | Irregular | Corner |
|---|---|---|
| 201.00FT X 193.00FT | | |

## Building Information

| Number of Buildings | Building Size | Extension | Stories |
|---|---|---|---|
| 1 | 0.00FT X 0.00FT | | 21 |

## Assessment Information

| Description | Land | Total |
|---|---|---|
| ESTIMATED MARKET VALUE | | 483,096 |
| ACTUAL AV | 70,374 | 217,393 |
| ACTUAL EX AV | 0 | 0 |
| TRANS AV | 65,976 | 199,347 |
| TRANS EX AV | 0 | 0 |

## Taxable/Billable Assessed Value

| | Assessed Value |
|---|---|
| SUBJECT TO ADJUSTMENTS, YOUR 2003/04 TAXES WILL BE BASED ON | 199,347 |

# Document #2

Willowick Rd Documents

17 of 23 DOCUMENTS

Copyright 1981 The Washington Post
The Washington Post

April 19, 1981, Sunday, Final Edition

**SECTION:** Outlook; C1

**LENGTH:** 2588 words

**HEADLINE:** The Saudi Connection: The Next Best Thing to Mecca Is Houston;
Houston as the Mecca for the Saudis

**BYLINE:** By Dan Balz; Dan Balz is The Washington Post's Texas bureau chief.

**DATELINE:** HOUSTON

**BODY:**

Mohamed R. Miri puffs slowly on his pipe as he looks out of his eighth-floor office at the transformation of Houston's mushrooming west side.  Construction cranes dot the skyline, new glass towers line the nearby freeway, traffic clogs the roads night and day and the Galleria complex of shops, stores and hotels absorbs new wealth like an enormous sponge of consumption.

"I am amazed at how business is booming here," Miri says admiringly.  "It reminds me of Jeddah."

He means Jeddah, Saudi Arabia, and it is no wonder that Miri, who heads the Saudi consulate in Houston, feels at home here.  The interconnections of oil and politics have brought city and country together in a bond that is unique in America.  What New York has long been to Israel and Jews, Houston has become to the Saudis.

"Money talks in this town, and it doesn't have any color," said one international banker.  "This is the mecca of capitalism."

For nearly 40 years, Texans have been doing business in the Middle East.  Today 75 Houston-based companies have operations in Saudi Arabia, and 25 or 30 Saudi companies do business here, most of them buying drill bits and valves and pipe and lubricant and everything else that this huge oil industry bazaar has to offer.

"The affinity is purely commercial," said a Houston-based banker.  "It's tools, equipment and servicing.  It's gone on ever since Aramco [the Arabian American Oil Co.], and Houston has always been the center."

"A cultural bond between Texans and Saudis, born of economic necessity, has developed over the years.  As the joke here goes, Texas and Saudi Arabia share one thing in common: Both would like better relations with the U.S. government.

Saudi Arabia has replaced Japan as Houston's No.  1 trading partner, with approximately $2 billion in goods (much of it imported crude oil) flowing back and forth through the Port of Houston.

Contracts for services add considerably to that figure.  Brown & Root Inc., the huge Houston engineering firm, has nearly completed an oil pipeline across Saudi Arabia.  M.W. Kellogg and Bechtel, two other large construction firms with offices here, have considerable business in Saudi Arabia, and the Saudis are involved in joint ventures with many other Houston-based energy companies.

Architectural design and engineering firms like 3D/International and the CRS Group have earned as much as 25 percent of their revenues in recent years building hotels, airports, universities and shopping centers in Saudi Arabia.

In 1974, Aramco Services Co., the purchasing subsidiary of Aramco, was established in Houston, bringing not only Saudi money but, over time, thousands of Saudis to town.

Four years ago, the Saudi Education Mission, which processes all Saudi students studying in this country, moved here from New York.  Shortly after that came the Saudi consulate.  A Saudi publishing company has located here, and firms specializing in advertising and translation services for American and Saudi companies doing business with one

another have established operations nearby.

Representatives of the state-owned petroleum and minerals company, Petromin, and its subsidiaries maintain offices here, while many other Saudi companies have purchasing or operational offices in Houston.

The Saudis here have clustered around the Galleria in the glass and metal towers that form Houston's second skyline. On Fridays many of them gather at the Education Mission for prayer services, and every day, like other Houstonians, they fight the traffic.

It is perhaps the only thing they do not like about living here. They even rave about the city's hot, muggy climate, although there is one man who likes to go to Seattle to see the rain.

What started as an oil connection has now branched out into everything, from buying real estate to airplanes to, yes, even rugs.

The Texas Medical Center is a major attraction, drawing hundreds of Saudis each year, some for major operations, others to use it as a kind of neighborhood clinic. They fly in on their own planes, stay in their own condos or homes and turn themselves over to internationally famous doctors like Michael DeBakey and Denton Cooley.

Saudi visitors mostly stay at the Warwick Hotel, whose European air and tight-lipped staff provide them the service and privacy they demand. They shop at the Galleria, the gaudy American interpretation of the *souks* back home. And at night, when they play, it is always at a club called elan.

The regulars always arrive late, after midnight, often after 1 a.m. They come in a group of about 20, always together, always in a caravan of expensive cars. They sit in what is called the library, a loft-like space of sofas, soft chairs and bookshelves, from which they look down on the small dance floor and the rectangular bar that is the center of a nightly mating dance. The visiting businessmen come for the evening, sometimes alone, often with American female companions.

They mostly drink Cokes, spend freely but not lavishly, and are never impolite. The waitresses at elan like the Saudis, and one man, before leaving the country, gave one of the waitresses a small going-away present. It was a gold necklace.

Resist stereotypes, said the young woman of Lebanese descent who deals in real estate and knows the Saudis. "Everybody's looking for sensationalism, but it's basically a myth. They're very low-key, very low-profile, very behind-the-scenes."

That is the message all over Houston. The Saudis here are not flashy, not the princely playboys of London. They are businessmen from the eastern province who got rich in the oil business, made their connections through Aramco and see Houston as an extension of home. They may go to Colorado to ski and Las Vegas to gamble, but in Houston they are all business.

"Houston is not a fun town," said one banker. "People come here to work, or maybe relax, but not to play."

The cultural bond between Saudi Arabia and Houston has less to do with the natural attraction of rich Arab sheiks to free-spending Texas oilmen than with conservative values, the traditions of home and family and a society that is male-dominated.

Jack Rains is a full-faced man who is said to typify the new Houston. Born in rural Shelby County, educated at Texas A&M, he is a lawyer and president of 3D/International, the architecture and design firm with close ties to the Saudis. In the late 1960s and early '70s, he spent months roaming through Saudi Arabia knocking on doors, trying to interest the Saudis in his company's services.

Eventually it paid off in fat contracts, and today Rains sits in a modernistic office on the 21st floor of a slick gray tower, his furniture maroon in the tradition of his alma mater, his suit dark and conservative, and his accent the twang of deep East Texas. He complains about the stereo-typing of Saudis and Texans and tells what he sees as the real reasons Saudis feel comfortable doing business in Houston.

"Our revolution and sense of place are stil alive in Texas," he says. "So many of us came off the land, go back to it, are drawn to it. The Saudis' love of the land is not alien to me.

"Second, so much of life in Saudi Arabia is governed by religion, which permeates their society. I'm very comfortable with a lot of their rules. They're the ones I grew up with in a small Texas town with fundamentalist values. It's not alien or foreign to me.

"The last thing is, your word is your bond. So much is based on personal relationships. Just like in Texas."

And the business is man to man. When Rains travels to Saudi Arabia with his wife, she is whisked away by the women there and the couple rarely see one another until evening. In Houston, his wife gathers up the Saudi women for a

shopping trip while the men conduct their business.  The sex roles are well established in both cultures.

In Houston, Rains and his wife prefer to entertain Saudi visitors in their home -- as they are entertained when they travel to the Middle East -- rather than go out to restaurants.  The tradition of hospitality is shared by both cultures, and is one of the things the Saudis say they like best about living in Houston.

"I feel at home here," says Mohammed Miri.  "The people are conservative and hospitable.  They have cowboys; we like horses.  They have ranches and farms; we have the same.  We share so many things in common."

But it is politics as much as culture that makes Houston so agreeable to the Saudis.  "the political link to Israel is much less strong here than in the North, the West or the South," said one banker with ties to the Middle East and Europe.

Saudis are welcomed openly by Houstonians, who are not only interested in learning more about the country but also say they appreciate what the Saudis have done for the United States.  "They are sympathetic to our policies here," says Miri, the Saudi vice counsul.

But it is a sympathy based on what Miri calls a "materialistic interest" in Saudi Arabia that could evaporate with the last drop of oil.  Miri understands this and it troubles him.  "They understand us only from their own view," he says. "They should support us because our cause is just."

Miri spends part of his time trying to educate Americans about the conflict in the Middle East.  "I feel it is our duty as Arabs to reach the masses," he says.  "What ended the Vietnam War was the masses."

And he says he believes he has made progress.  He describes an American birthday party he attended in Houston. "The family told me, 'Thank God we have Saudi Arabia as a friend.'"

He lives in a $3.5 million stone mansion in River Oaks, Houston's most exclusive neighborhood.  An imposing iron fence protects him from outsiders and shelters the sea of pink azealas that covers part of his front yard.  Next to the house, a beefy guard sits ready to intercept anyone who passes through the electric gate.  Tour buses roll by and the drivers often ask who lives there.  The guards are under orders not to tell.

The owner's name is Khaled Bin Mahfouz.  He owns Main Bank in Houston, small potatoes as Houston banks go, but nonetheless a bank.  It is said that he and his family are on the prowl for more business in Houston, and when a visitor asks for an appointment, the word from inside, relayed through a bodyguard and the guard, is that Bin Mahfouz is in the middle of business and will make contact later.  The call never comes.

Many of the neighbors have never seen him and know him only as "the Saudi." From their swimming pools, they watch his helicopter fly over the neighborhood.  "Does he really fly it downtown to work and back?" one of his men is asked.  The man does not respond directly.  "He has helicopters, he has planes," the man says.  "He has everything."

"The first thing you have to know," said the banker, "is that Arab money doesn't even come close to European money here, not even close.  The European money dwarfs the Arab money.  Don't think that Arab money is important here.  That's a fallacious argument.  And I'm well placed to say that."

Khaled Bin Mahfouz, with his extravagant life style and secretive ways, perpetuates the myth of the Arab sheik buying up America, but in the Saudis' favorite city, where the local government welcomes all money, their impact beyond the oil business is minimal.

Bin Mahfouz is the exception here, along with the few other Saudis whose business dealings have given them notoriety.  Ghaith Pharaon is perhaps the foremost in this group.  It was Pharaon who with John B. Connally's help, first bought into Main Bank in Houston, who also bought a company in Dallas, who helped out Bert Lance by purchasing a controlling interest in the National Bank of Georgia.  Other Saudi businessmen whose names are even remotely known to Americans can be counted on one hand.

That is the paradox of the Saudis in Houston: that they have brought so little money back into the area to stay.

Stories of Saudis moving around town looking for action abound.  A few weeks ago, a Saudi businessman walked into the office of a young businessman with crude oil to peddle.  He needed a buyer -- no middleman, please, he said: He wanted no artificial price increases or profits.

Saudi government officials come to town looking for deals on the side; conflicts of interest are less observed there than here.  Young Saudis are looking for American companies to buy, with the goal of establishing assembly plants in their own country.  One group of five or six investors, including serveral princes, has hired a man to look for companies in the area.  One man in Houston makes a living selling airplanes to the Saudis.  Another specializes in shipping goods back to Saudi Arabia for various clients.

But the effect of all this may be less than meets the eye, and the long-term impact of the Saudis in Houston is difficult to measure.  Much of their activity is with a single purpose: to help build Saudi Arabia.  Once that monumental

job is completed, the commercial links between Houston and the Saudis could begin to decline.

There are no big Saudi-owned office buildings.  It was Germans who bought the Pennzoil building, not Saudis.  Canadians are developing a huge chunk of real estate on the eastern edge of downtown, not Saudis.  Saudis are not buying many of the condos for sale at the Warwick Towers, nextdoor to their favorite hotel; other foreign investors are.

The Saudis are not naturally suited to Houston's go-go business environment.  They move slowly, look principally for stability in their investments and don't like to pour huge amounts of money into anything.

"The Saudi objective is to put $5 million or $10 million into a single investment or building," said Michael Casper of Texas Commerce Bank.  "They are naturally conservative."

The Saudis are called good businessmen and endless negotiators who nonetheless don't always know the value of a dollar.  "They can be freewheeling in what they spend, but miserly in negotiating over an eighth of a point on a loan," said one banker.

And they demand strict secrecy on the part of the Americans with whom they are dealing.  Some American businessmen say they are not allowed to talk about costs or details of projects with the Saudis.  The Saudis, they say, are sensitive about being portrayed as people who can afford gold faucets for their bathroom sinks.

Jamil Ismail came to Houston last May, his first visit to America.  Before coming, he spent hours with American friends back home, going over maps of the city, learning the names of major streets and buildings.  He felt at home when he arrived, and though his wife, who does not drive, is sometimes lonely here, he is happy they came.  He has been to Disney World in Florida and plans to go again before leaving the United States.

His Saudi friends now want to know everything he can tell them about Houston.  "They ask a lot about the cost of Living," he says in the office he shares with the construction firm of Brown & Root.

What does he tell them?  "If you compare it with Egypt or some countries in Europe, it's high," he says.  "Rent is very high.  Food is too.  Clothing is not bad; it varies."

"And of course," say Jamil Ismail, the American representative of Petromin, Saudi Arabia's state-owned petroleum and minerals company, without a trace of irony in his voice, "the price of gasoline is very high also."


**GRAPHIC:** Picture 1, Saudi Vice Consul Mohamed Miri: "We have so many things in common."; Picture 2, Houston businessman Jack Rains: "I'm very comfortable with a lot of their rules." Photos by F. Carter Smith for The Washington Post

# Ownership History for
# 0601620920004

| Owner and Mailing Address | Effective Date |
|---|---|
| *FERTITTA TILMAN J & PAIGE*<br>*3800 WILLOWICK RD*<br>*HOUSTON TX    77019-1118* | *11/17/1999* |
| *PATHFINDER INVESTMENTS*<br>*TEXAS COMMERCE BANK TR*<br>*PO BOX 27701-460*<br>*HOUSTON TX    77227-7701* | *1/2/1988* |

[end of record]

**Home**   **Services**   **Links**   **Contact Us**





**Registry**

**Business Guide**

**Curaçao Info**

**Publications**

**FAQ**



# Curaçao Commercial Register

## Excerpt from the Commercial Register

**Registration number: 16301 (0)**
**Date: May 28, 2003  Time: 2:10:01 PM**

In the Commercial Register of the Curaçao Chamber of Commerce & Industry is registered with number 16301 the company with trade name Pathfinder Investments N.V.

| | |
|---|---|
| Trade name | Pathfinder Investments N.V. |
| Legal form | Limited Liability Company |
| Official company name | Pathfinder Investments N.V. |
| Statutory seat | Curaçao |
| Date of incorporation | October 6, 1978 |
| Date last amendment | March 1, 1979 |
| Date established | October 6, 1978 |
| Authorized capital | U.S.A. Dollar 30,000.00 |
| Issued capital | U.S.A. Dollar 6,000.00 |
| Paid up capital | U.S.A. Dollar 6,000.00 |
| Fiscal year | The fiscal year is equal to the calendar year |
| Business address | De Ruyterkade 62 |
| | Curaçao |
| | Netherlands Antilles |
| Correspondence address | same as above |
| Object categories of the business | Investment Company (8135) |

---

**Official(s)**

**1**

| | |
|---|---|
| Function | Statutory director |
| Title description | Managing Director |
| Name | Netherlands Antilles Corporation Company N.V. |
| Address | A.M. Chumaceiro Boulevard 11 |
| | Curaçao |
| | Netherlands Antilles |
| Registration number official | 2072 |

**2**

| | |
|---|---|
| Function | Statutory director |
| Title description | Managing Director |
| Name | Adnan Soufi |

**Address**                          **P.O. Box 5486**
                                     **21422 Jeddah**
                                     **Saudi Arabia**
**Date of birth**                    **September 23, 1953**
**Place of birth**                   **Jeddah**
**Country of birth**                 **Saudi Arabia**
**Nationality**                      **Saudi Arabian**
**3**
**Function**                         **Statutory director**
**Title description**                **Managing Director**
**Name**                             **Camille A. Chebeir**
**Address**                          **155 Monterey Avenue,**
                                     **Pelham, New York, N.Y. 10803**
                                     **United States of America**
**Date of birth**                    **November 19, 1938**
**Country of birth**                 **Lebanon**
**Nationality**                      **Libanese**

**Source: Registry-information Internet. This document is not an excerpt in accordance with article 19 paragraph 1 of the Commercial Register Decree (O.G. 1946 no. 41)**

# Document #3

KBM Corporate Documents

U U U I 5 2 0 2 9 4 9

FILED
In the Office of the
Secretary of State of Texas

## APPLICATION FOR CERTIFICATE OF AUTHORITY

FEB 2 8 1985

Clerk B
Corporations Section

Pursuant to the provisions of Article 8.05 of the Texas Business Corporation Act, the undersigned corporation hereby applies for a Certificate of Authority to transact business in Texas:

1.  The name of the corporation is _____

_____KBM INVESTMENTS, N. V._____ .

2.  If the name of the corporation does not contain the word "corporation," "company," incorporation," or "limited" (or an abbreviation thereof), then the name of the corporation with the word or abbreviation which it elects to add thereto for use in Texas is:   (If the corporate name is not available in Texas, then set forth the name under the corporation will qualify and transact business in Texas)

KBM INVESTMENTS CORP.
_____ .

3.  It is incorporated under the laws of NETHERLANDS ANTILLES .

4.  The date of its incorporation is ___AUGUST 22, 1977___ and the period of duration is __PERPETUAL____. (State "Perpetual" or term of years).

5.  The address of its principal office in the state or country under the laws of which it is incorporated is

___DE RUYTERKADE 62, CURACAO,_____

___NETHERLANDS ANTILLES_____

6.  The address of its proposed registered office in Texas is (a P. O. Box is not sufficient) ___SUITE 1835___

_FIVE POST OAK PARK,_, HOUSTON, TEXAS  77027___
and the name of its proposed registered agent in Texas at such   FEB 2 0 1985
address is ___CAROL A. LAMBERT_____

_____

_____

7.  The purpose or purposes of the corporation which it proposed to pursue in the transaction of business in Texas are:
TO BUY AND SELL REAL ESTATE

8.  It is authorized to pursue such purpose or purposes in the state or country under the laws of which it is incorporated.

9.  The names and respective addresses of its directors are:

| NAME | ADDRESS |
|---|---|
| M. FAZL AMEER | 7 OLD PARK LANE |
|  | LONDON, W1Y 3LJ, ENGLAND |
| HARRY A. COCKRELL | 7 OLD PARK LANE |
|  | LONDON, W1Y 3LJ, ENGLAND |

10.  The names and respective addresses of its officers are:

| NAME | ADDRESS (city & state) | OFFICE |
|---|---|---|
| CAROL A. LAMBERT | SUITE 1835, FIVE POST OAK PARK HOUSTON, TEXAS  77027 | ASSISTANT TREASURER |
| CHARLES S. OGLETHORPE | 7 OLD PARK LANE LONDON, W1Y 3LJ, ENGLAND | TREASURER |

0 0 0 1 5 2 0 2 9 5 0

11. The aggregate number of shares which it has authority to issue, itemized by classes, par value of shares, shares without par value, and series, if any, within a class, is:

| NUMBER OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR STATEMENT THAT SHARES ARE WITH- OUT PAR VALUE |
|---|---|---|---|
| 30 | ORDINARY | FIRST | $1,000 |
| | | | |

12. The aggregate number of its issued shares, itemized by classes, par value of shares, shares without par value, and series, if any, within a class, is:

| NUMBER OF SHARES | CLASS | SERIES | PAR VALUE PER SHARE OR STATEMENT THAT SHARES ARE WITH- OUT PAR VALUE |
|---|---|---|---|
| 6 | ORDINARY | FIRST | $1,000 |
| | | | |

13. The amount of its stated capital is $30,000 .(See Texas Business Corporation Act, Article 1.02A(11) for definition of stated capital).

14. Consideration of the value of at least One Thousand Dollars ($1,000.00) has been paid for the issuance of its shares.

15. The application is accompanied by a certificate issued by the Secretary of State or other authorized officer of the jurisdiction of incorporation evidencing the corporate existence.

KBM INVESTMENTS, IN'V .

By _____

Its ~~President~~
MANAGING DIRECTOR, M. FAZL AMEER

and _Carol A. Lambert_

Its ~~Secretary~~
ASSISTANT TREASURER, CAROL A. LAMBERT

STATE OF _Texas_ )
                                      )
COUNTY OF _Harris_ )

Before me, a notary public, on this day personally appeared _M. Fazl Ameer + Carol A. Lambert_, known to me to be the persons whose names is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein are true and correct.

Given under my hand and seal of office this _31st_ day of _January_ , A.D., _1995_ .

(Notarial Seal)

_Susan Haggard_
(Printed or stamped name)
~~Notary Public, State of~~ _____
My Commission expires:

_____, 19__

SUSAN HAGGARD
Notary Public State of Texas
My Commission Expires April 6, 1986
Bonded by Lovell Agency, Lawyers Surety Corp.

0 0 0 1 5 2 0 2 9 5 1

# ANTI-TRUST AFFIDAVIT

STATE OF ..... TEXAS ................................

COUNTY OF ...... HARRIS ................................

Before me, the undersigned authority, on this day personally appeared ................................

...... M. FAZL AMEER ................................ who being by me duly sworn, deposes and says:

That the ................. KBM INVESTMENTS, N. V. ................................ is not a trust or organization in restraint of trade, in violation of the laws of Texas; that it has not, within twelve months next preceding the date of this affidavit, entered into any combination, contract, obligation or agreement to create nor which may tend to create or to carry out any restriction in trade or commerce or aids to commerce, nor to fix, maintain, increase or reduce the price of any merchandise, produce or commodity, or any article of commerce; nor to prevent or lessen competition in the manufacture, making, transportation, sale or purchase of any merchandise, produce or commodity, or any article of commerce, or in the preparation thereof for market; nor to fix or maintain any standard or figure whereby the price of same is or has been in any manner affected, controlled or established. That it has not, during said time, entered into, executed or carried out any contract, obligation or agreement with any person, corporation or association of persons not to sell or dispose of any commodity or articles of commerce below a common standard or figure, or to keep the price thereof at a fixed or graded figures, or to preclude a fair and unrestricted competition in the sale of any commodity or articles of commerce, or to regulate, fix or limit the output thereof, or to abstain from engaging in or continuing business or from the purchase or sale of any commodity or article of commerce partially or entirely within the State of Texas or any portion thereof.

Affiant further says that the above named corporation has not within twelve months next preceding the date of this affidavit, either directly or through the instrumentality of trustees or otherwise, acquired the shares or certificates of stocks or bonds, franchises or other rights or the physical properties or any part thereof of any other corporation or corporations for the purpose of preventing or lessening or which tends to affect or lessen competition. That it has not within said time entered into any agreements or understanding to refuse to buy from or sell to any other person, corporation, firm or association of persons any commodities or articles of commerce, nor entered into any agreement to boycott or threaten to refuse to buy from or sell to any person, firm or corporation or association of persons for the buying from or selling to any other person, firm, corporation or association of persons.

Affiant further says that no officer of the above named corporation has, within his knowledge, during the said twelve months, made on behalf of it or for its benefits, any such contract or agreement as is specified in this affidavit.

M. FAZL AMEER, MANAGING DIRECTOR

Sworn to and subscribed before me, this the 31st . day of ... January ... A. D., 19 85 .

Susan Haggard

(SEAL)

Notary Public in and for    SUSAN HAGGARD
Notary Public State of Texas
My Commission Expires April 6, 1986
Bonded by Lovett Agency, Lawyers Surety Corp.

NOTE—The above affidavit must be subscribed and sworn to by the president or vice-president or secretary or treasurer or two of the directors of the corporation applying for permit.

Case 1:03-md-01570-GBD-SN   Document 1149   Filed 08/24/05   Page 21 of 56



0 0 0 1 5 2 0 2 9 5 2

The Undersigned:

GERARD CHRISTOFFEL ANTONIUS SMEETS, a civil-law notary, residing in Curacao, Netherlands Antilles;

herewith certifies:

that the limited liability company: **K.B.M. INVESTMENTS N.V.**, established in Curacao, has been legally incorporated by deed, executed before a substitute of the undersigned, on August 22, 1977, on a draft of which deed the declaration of no-objection, referred to in Article 38 of the Commercial Code of the Netherlands Antilles, was issued by the Minister of Justice of the Netherlands Antilles on August 17, 1977, under number 8999/ JAZ;

that the articles of incorporation have been amended by deed of November 8, 1979, executed before the undersigned, on a draft of which deed the declaration of no-objection, referred to in Article 97 of the Commercial Code of the Netherlands Antilles, was issued by the Minister of Justice of the Netherlands Antilles on November 7, 1979, under number 5747/N.V.;

that the registered office of the company is: De Ruyterkade 62, Curacao, Netherlands Antilles;

that the limited liability company: **K.B.M. INVESTMENTS N.V.** is legally existing in good standing under the laws of the Netherlands Antilles.

IN WITNESS WHEREOF, I have set my hand hereunto, after having affixed my official seal of office.

Curacao, February 5, 1985.





## business inquiry

**BUSINESS DETAILS:**

| Business Name: | Business ID: | Business Address: |
|---|---|---|
| SEDCO SERVICES, INC. | 0673976 | 300 FIRST STAMFORD PL. SUITE 440 STAMFORD, CT 06902 |

| Mailing Address: | Citizenship/State Inc: | Last Report Year: |
|---|---|---|
| 300 FIRST STAMFORD PL. SUITE 440 STAMFORD, CT 06902 | Foreign/DE | 2004 |

| Business Type: | Business Status: | Date Inc./Register: |
|---|---|---|
| Stock | Active | Feb 16, 2001 |

| Name in State of INC: | | Commence Business Date: |
|---|---|---|
| SEDCO SERVICES, INC. | | Jan 01, 1999 |

**PRINCIPALS:**

| Name/Title: | Business Address: | Residence Address: |
|---|---|---|
| CAMILLE A. CHEBEIR PRESIDENT | 300 FIST STAMFORD PL. SUITE 440 STAMFORD, CT 06902 | 155 MONTEREY AVE. PELHAM, NY 10803 |
| RAMZI A. BISHUTI VICE PRESIDENT | 300 FIST STAMFORD PL. SUITE 440 STAMFORD, CT 06902 | 44 SEPTEMBER PL. FAIRFIELD, CT 06430 |
| CAMILLE A. CHEBEIR DIRECTOR | 300 FIST STAMFORD PL. SUITE 440 STAMFORD, CT 06902 | 155 MONTEREY AVE. PELHAM, NY 10803 |

**BUSINESS SUMMARY:**

| Agent Name: | Agent Business Address: | Agent Residence Address: |
|---|---|---|
| C T CORPORATION SYSTEM | ONE COMMERCIAL PLAZA HARTFORD, CT 06103 | NONE |

» **View Name History**    » **View Filing History**    » **View Shares**

---

**MAIN MENU**

» INQUIRIES
- BUSINESS
- UCC
- HELP

» ON-LINE FILINGS
- BUSINESS FILING
- HELP

» PREPAID CUSTOMER
- LOGIN
- HELP

» VIEW REPORTS
- UCC REPORTS

» HOME

State of Delaware | The Official Website for the First State   Seasonal Image of Delaware

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware:

Citizen Services | Business Services | Visitor Info.

## Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location
**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions

General Information Name Search

\* Required Field

\* Enter Entity Name:

This field is not case sensitive.

| FILE NUMBER | ENTITY NAME |
|-------------|-------------|
| 2947522 | SEDCO SERVICES, INC. |

site map   |   about this site   |   contact us   |   translate   |   delaware.gov

It's Good Being First | Delaware The First State

It's Good Being

# NYS Department of State

## Division of Corporations

## Entity Information

---

**Selected Entity Name:** EURAM GROUP LIMITED

### Selected Entity Status Information

**Current Entity Name:** EURAM GROUP LIMITED
**Initial DOS Filing Date:** JUNE 11, 1993
**County:** NEW YORK
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** INACTIVE

### Selected Entity Address Information

**DOS Process** (Address to which DOS will mail process if accepted on behalf of the entity)

EURAM GROUP LIMITED
33 EAST 67TH ST.
NEW YORK, NEW YORK, 10021

**Chairman or Chief Executive Officer**

CAMILLE A CHEBEIR
33 EAST 67TH ST
NEW YORK, NEW YORK, 10021

**Principal Executive Office**

CAMILLE A CHEBEIR
33 EAST 67TH ST
NEW YORK, NEW YORK, 10021

**Registered Agent**

NONE

**NOTE:** New York State does not issue organizational identification numbers.

Search Results   New Search

[Division of Corporations, State Records and UCC Home Page](#)   [NYS Department of State Home Page](#)

  

EDGARPlus(R) FORM-TYPE: PROSP FILING-DATE: August 5, 2005

1 of 15 DOCUMENTS

Copyright 2005 Disclosure Incorporated
EDGARPlus(R)

COMPANY: WORLDSPACE INC
TICKER: WRSP
EXCHANGE: NMS

FORM-TYPE: PROSP

DOCUMENT-DATE: August 5, 2005
FILING-DATE: August 5, 2005

Full text   Company info   Contents   Other   Return

* * * * * * * * * * * * * * **TEXT OF FILING** * * * * * * * * * * * * * * * * *

Table of Contents

Filed Pursuant to Rule 424(b)(1)
Registration File No. 333-124044

PROSPECTUS

11,868,400 Shares

Class A Common Stock

This is the initial public offering of 11,868,400 shares of our Class A Common Stock. No public market currently exists for our common stock. We are offering 11,500,000 shares of the Class A Common Stock and a selling stockholder is offering 368,400 shares of our Class A Common Stock offered by this prospectus. We will not receive any of the proceeds from the sale of our Class A Common Stock by the selling stockholder.

Our Class A Common Stock has been approved for quotation on the NASDAQ National Market under the trading symbol "WRSP."

Investing in our Class A Common Stock involves a high degree of risk. Before buying any shares, you should carefully read the discussion of material risks of investing in our common stock under " Risk factors" beginning on page 11 of this prospectus.

EDGARPlus(R) FORM-TYPE: PROSP FILING-DATE: August 5, 2005

Inc., a Maryland corporation (WorldSpace Maryland), which was the holding company for the WorldSpace group. Immediately thereafter, for purposes of reincorporating WorldSpace Maryland in Delaware, WorldSpace Maryland was merged into a newly-formed Delaware company, also named WorldSpace, Inc. (WorldSpace or the Company).

As discussed in more detail below, immediately following these mergers, (i) all of WorldSpace's predecessor companies' outstanding long-term debt obligations were converted, in the case of certain of such obligations, into shares of Class B Common Stock and, in the case of other of such debt obligations, into a contingent royalty obligation based on the Company's annual EBITDA, if any, for each year through December 31, 2015 and (ii) WorldSpace issued $155 million of senior convertible notes (Convertible Notes) to a group of private investors (New Investors). As a result of these transactions, our only long-term debt is the Convertible Notes. The background to the conversion of such debt obligations and the issuance of the Convertible Notes is described in more detail below.

STONEHOUSE OBLIGATIONS

During the mid-1990s, two Saudi Arabian citizens, Mr. Mohammed H. Al Amoudi and Mr. Khalid Bin Mahfouz (through companies controlled by them and through Credit Suisse as a fiduciary), provided a majority of the capital necessary to develop the WorldSpace system and commence commercial operations. In total, they provided approximately $1.1 billion in cash to the WorldSpace group.

In 1999, Mr. Al Amoudi transferred all of his interests, direct or indirect, in any of the WorldSpace companies to the Bin Mahfouz family. Pursuant to certain rescission transaction agreements dated as of April 21, 2000 (Rescission Transaction Agreements), all of the direct and indirect Bin Mahfouz family debt and equity interests in the WorldSpace group were consolidated into a single debt obligation owed by the WorldSpace group to Stonehouse Capital Limited (Stonehouse), a Cayman Islands company wholly owned by two sons of Mr. Bin Mahfouz.

On December 30, 2004, a Loan Restructuring Agreement (Loan Restructuring Agreement) and a Royalty Agreement (Royalty Agreement), each dated September 30, 2003 and amended through December 30, 2004, superseded the Rescission Transaction Agreements. Pursuant to the Restructuring Agreement and the Royalty Agreement, the debt owed by the WorldSpace companies to Stonehouse, upon the effective date of such agreements, was cancelled and replaced by an obligation to make certain annual royalty payments to Stonehouse. Under the terms of the Royalty Agreement, WorldSpace is required to pay to Stonehouse 10% of the earnings before interest, taxes, depreciation and amortization (EBITDA), if any, of WorldSpace and its consolidated subsidiaries for each year from January 2005 through December 31, 2015. The principal condition to the effectiveness of the Loan Restructuring Agreement and the Royalty Agreement was the receipt by the Company of at least $50 million in funding from outside investors. Simultaneously with the issuance by the Company, on December 30, 2004, of the Convertible Notes to the New Investors, Stonehouse and WorldSpace agreed that all conditions to the effectiveness of the Loan Restructuring Agreement and the Royalty Agreement had been satisfied, and the Loan Restructuring Agreement and Royalty Agreement became effective.

# Document #4

KBM U.S. Banking Interests

VOL. XXXVI
NO. 46
16-AUGUST-1993

**Financial and Banking News**

**REGIONAL BANKING**

**Sheikh Khalid bin Mahfouz Issues Account Of Dealings With BCCI and FAB**

Publicists for Sheikh Khalid bin Mahfouz, the former deputy general manager of Jeddah-based National Commercial Bank (NCB), have circulated an account of his involvement with BCCI and First American Bankshares (FAB) which rejects charges laid against him last year by the US Federal Reserve Bank and the Manhattan District Attorney (DA). The shaikh has been accused of misrepresenting his investments in the two banks and so helping to perpetuate the fraudulent activities of BCCI and its affiliates. *The Investment Odyssey of Sheikh Khalid bin Mahfouz*, at 14 pages, is the most comprehensive account of Mr. Mahfouz's involvement in BCCI which has been made publicly available, but it offers few new insights into the affair and still leaves many questions unanswered. (For previous statements from Sheikh Khalid's representatives see *MEES*, 24 February 1992 and 2 March 1992.)

The key passages in the *Odyssey* are reprinted below. The following points are worth highlighting:

- The Odyssey says that the proposal that Mr. Mahfouz take a stake in BCCI came from Mahfouz himself and not from BCCI's founder Mr. Aga Hasan Abedi, who was shocked when he first heard the idea. If true, this would refute the allegation that Mr. Abedi approached Mr. Mahfouz as part of his attempts to shore up the bank's balance sheet which was riddled with false deposits and bad loans.

- The Odyssey says that the idea that Mr. Mahfouz might like to take a share in FAB came from Mr. Abedi. Furthermore, the negotiations over the stake were conducted by Mr. Abedi, who told Mr. Mahfouz that BCCI and FAB had many of the same stockholders.

It is surprising that Mr. Mahfouz did not feel the need to clarify the exact relationship between BCCI and FAB. The fact that the two institutions had some common shareholders was known in the Middle East banking community as was the fact that BCCI had been refused a banking license in the US a few years earlier. There would appear to have been a prima facie need to check that FAB was not a BCCI front, as the

Federal Reserve now alleges it to have been. Whether failure to do so amounted to criminality, rather than simple credulity, will be a matter for the courts to decide.

- The timing of the share purchases in BCCI and FAB and of the subsequent disposals are well known, but the Odyssey is vague on whether Mr. Mahfouz's brothers, Sheikh Muhammad and Sheikh 'Abd al-Ilah were involved in paying for the shares or in receiving money arising from their sale. For example, the purchase in July 1986 of $300mn of BCCI capital notes is said to be "for NCB's account", as opposed to the purchase of 12 million BCCI shares, which the Odyssey specifically says was made by Mr. Mahfouz. Similarly, there are references to an initial lot of 4mn BCCI shares purchased by "the Mahfouz's". Whether this is just sloppy editing by Mr. Mahfouz's publicists or whether the phraseology reflects changing ownership of the shares may never be known. It is tangential to the criminal cases being brought against Mr. Mahfouz, although the truth would offer an insight into the way NCB was run at that time.

It is generally believed that the BCCI and FAB investments were managed solely by Mr. Khalid bin Mahfouz and that the two brothers had nothing to do with them. Whether Khalid used NCB money (which is also, to some extent, his brothers' money, since they are co-shareholders in the bank) is not known. However, it seems that some of the BCCI shares were beneficially owned by the brothers and not just Khalid alone.

- The Odyssey shows one of the ways in which BCCI was able to represent that the Mahfouz investment had not been sold even though it had been. (If the Mahfouz disposal had been known at the time when it happened questions would have been asked about the bank earlier and its fraudulent activities curtailed sooner. If Mr. Mahfouz colluded in concealing his disposal, he could therefore be guilty of perpetuating the bank's fraudulent activities.)

Five Bermuda holding companies held the Mahfouz shares in BCCI, the shares in Credit and Commercial American Holdings (CCAH - FAB's holding company) and $330mn in BCCI convertible capital notes. As part of the disinvestment process, the CCAH shares were transferred to another company, Burford, beneficially owned by the Mahfouz family. The capital notes were transferred to NCB. This left the five Bermuda companies with a sole asset - 3,979,345 BCCI shares. The five companies were then sold, with their sole asset, to a major BCCI shareholder, International Credit and Investments Company (Overseas - ICIC).

In Spring 1989 Swaleh Naqvi, BCCI's chief executive officer, gave an interview to the London-based *Arab Banker* magazine. He was asked about the Mahfouz family stake and, in a rare "on the record" comment on the bank's shareholder structure, he said that

the family's 20% stake was through their five Bermuda investment companies "which continue to be the shareholders". It was true that the companies still owned the shares, but Mr. Naqvi was implying that the companies were still owned by the Mahfouzes, which was not then the case. Such dissimulation was only possible because the assets of the five companies, other than the BCCI shares, had been hived off elsewhere, allowing BCCI to repurchase the shares by buying the companies rather than just the shares themselves.

The image of Mr. Mahfouz which emerges from the Odyssey is of someone who, for all his banking experience, was rather uninquisitive. To be fair, this fits with the portrait of him painted by many who are familiar with NCB. They describe him as a trader by nature rather than a banker and say his knowledge of international banking issues was limited. It is quite possible, such people say, that Mr. Mahfouz would have no knowledge of BCCI's failed attempt to win a US banking license, nor did he have a battery of advisors who would have told him so. Haroon Kahlon, his aide, conducted most of the business after the initial decisions had been taken. Mr. Mahfouz's management style at NCB reflected a trader's outlook on banking. After his departure last year, many of the bank's control structures have been tightened up, the bank has stopped taking huge treasury positions, particularly in the bullion markets, and a top-flight international banker, Michael Callen, has been appointed to plan and implement new strategies. The change has been greeted with relief by NCB's correspondent banks.

The Odyssey is particularly critical of the role of the Abu Dhabi government which it accuses of withholding BCCI documents and keeping key witnesses under house arrest. It points out that Abu Dhabi has an agreement with BCCI's liquidators, Touche Ross, to share equally any recoveries from the bank. Abu Dhabi therefore has an interest in supporting the liquidator's civil suits against Mr. Mahfouz and NCB, which claim billions of dollars in damages.

The Odyssey quotes a deposition from Mr. Brian Smouha, of Touche Ross, in which he said, "I have seen...a warehouse which is probably sixty yards long with boxes covering most of the floor. One-third of those boxes have been moved into a partitioned area where they are available for us to go and inspect them...Because of the volume of documents there is one category where there are documents which are not sorted or indexed in any way...There are others in a category which Abu Dhabi authorities have described [mainly through their attorneys] as maybe incriminating for themselves, `prejudicial' I believe is the word they used. They have not used the word `incriminating' but the word prejudicial."

**Extracts From *The Investment Odyssey of Sheikh Khalid bin Mahfouz***

The BCCI Investment "In the fall of 1985, at a luncheon with BCCI founder Aga Hasan Abedi at BCCI's 100 Leadenhall Street headquarters in London, Sheikh Khalid casually raised his interest in BCCI, then a fast growing Middle-East based bank with an already global reach - just the sort of bank the sheikh had been looking for. "Would you be interested to sell?" he asked Abedi. "The guy was shocked actually I may say and said `I am not a shareholder, but let me see and check,' "the sheikh told the Federal Reserve attorneys who came to London to interview him in May, 1992.

The sheikh's blunt query only seemed to be spontaneous. As it happened, Sheikh Khalid since the late 1970s had been searching for acquisition to expand internationally - "to have an arm outside the Kingdom of Saudi Arabia," as the sheikh put in his talks with the Fed attorneys. During the booming late 1970s and early 1980s in Saudi Arabia, oil prices were high and predicted to go higher and a new government growth plan had made Saudi businessmen optimistic. The sheikh responded by examining a wide range of international banking acquisitions "from Grindlay's in London here to American Express in the United States to Texas Commerce in Houston," Sheikh Khalid told the Fed lawyers.

Within days of the luncheon, BCCI's top London official and Abedi's principal aide, Swaleh Naqvi, phoned the Sheikh's aid, Haroon Kahlon, to ask "Was Khalid serious?" about acquiring a BCCI stake. And when Kahlon conveyed the question to Sheikh Khalid, he "said `Why not?" meaning `why not' in a sense of let's take a look and see what happens," Kahlon told Federal Reserve attorneys in New York early in 1992.

Consistent with his long-term strategy, Sheikh Khalid repeatedly stressed his goal of acquiring 100% of BCCI at the ensuing series of informal meetings with Abedi that stretched into early 1986.

**Abedi's Alternative Proposal**

Abedi "said `Fine, maybe most of the investors would like to sell, but my advice to you is not to do it now,' "Sheikh Khalid recalled in May 1992. "`Buy a big chunk,' "the sheikh remembered Abedi telling him. "`And, second of all, if you like what you have seen, we could talk about your increasing your shareholding.'" Abedi had a three year period in mind, during which Sheikh Khalid could get his own personal perspective on BCCI from within.

At that point, presuming the sheikh liked what he saw, he could move to expand the investment. Mr. Kahlon, representing the sheikh, discussed whether if, on the other hand, Sheikh Khalid didn't like what he saw, the sheikh could then dispose of the BCCI shares without loss, an arrangement referred to in capital markets as a "put" option. Abedi

readily agreed.

This legal structure, documented with the assistance of Sheikh Khalid's US counsel Akin, Gump, Strauss, Hauer & Feld, eliminated a stumbling block to Sheikh Khalid's prompt investment. That stumbling block was the time needed for "due diligence" work, where the sheikh's accountants and investment bankers would pore over BCCIs books and examine its assets to verify their value. With an organization as complex and far-flung as BCCI, proper due diligence could take many months.

Sheikh Khalid saw the BCCI investment as both a diversification of risk and a significant strategic marketing opportunity. And for Abedi, Sheikh Khalid's investment was, after all, a rich plum. It not only would strengthen BCCI's capital base, but would enhance the Pakistani-led bank's status in the Middle East. Abedi may even have hoped that it might lead to BCCI's gaining favored access to the fabled Saudi Arabian international market, where NCB is the largest player.

Sheikh Khalid and Abedi eventually agreed that the "big chunk" of BCCI which Abedi had recommended should be 30%. Sheikh Khalid reasoned that it ought to be a commanding interest given his long-term plan to acquire the entire equity of the bank, and he believed that the Abu Dhabi royal family already held a stake of about that size.

By the end of March, 1986, Abedi and the sheikh were fairly sure they had a deal and so instructed their top aides, Messrs. Naqvi and Kahlon, to work out the final terms, including the exact price, size and structure of the investment.

The arrangements they eventually completed involved:

a) Sheikh Khalid's purchase, during the Spring and Summer, of a total of 12mn BCCI shares, acquired in a series of three transactions for $40 a share, or about $480mn, and representing approximately 20% of BCCI's equity.

b) The purchase in July, for NCB's account, of $300mn of BCCI capital notes which were convertible into a further 10% interest. (Later $30mn of additional such notes were purchased pursuant to a BCCI rights offering).

## The Investment in First American

Early in 1986, shortly after their informal talks began, Abedi asked whether Sheikh Khalid might be interested in an equity position in First American Bank, the Washington D.C. bank whose chairman was former US Secretary of Defense Clark Clifford and whose

president was Robert Altman. If so, Abedi said, some existing shareholders of First American's holding company, Netherlands Antilles-based Credit and Commerce American Holdings (CCAH), might be willing to sell their shares to the sheikh.

Now the international banking presence Khalid long had sought could include even a major presence in the United States. And First American had a rare additional advantage - it was grandfathered under the law preventing banks from multi-state operations. Indeed, at the time it was the only multi-state bank holding company east of the Mississippi River and could freely expand in the District of Columbia and the four states in which First American already operated, including such favorable banking markets as Virginia and New York.

BCCI was a natural intermediary to help Sheikh Khalid acquire a First American stake, Abedi assured him, because the two institutions shared many of the same stockholders.

Agreement between Abedi and Sheikh Khalid on the basic terms of the First American investment was the easy part. It seemed to Sheikh Khalid that an initial 30% stake in CCAH - the same size position he was to take in BCCI - was appropriate. Agreed. On price, Abedi (on behalf of the selling CCAH shareholders, he said) proposed a price equal to 3.0 times First American's book value (per CCAH share). The sheikh countered at 2.5 times book value. The two sides split the difference, agreeing on 2.75 times book value. That was $6,094 for each of the CCAH shares to be purchased. Finally, for the same reasons as with the BCCI investment - the impracticality of timely due diligence work - the sheikh would get the same three-year "put," or guarantee that he could sell the shares without a loss."

## The Procurement Deed

"In June, 1986, before Akin Gump [Sheikh Khalid's lawyers] completed work on the Procurement Deed, Abedi began pressing the sheikh to put up $270mn of his intended investment by the June 30 closing date that was targeted for the investment and which also was the close of an interim financial period at BCCI. However, Sheikh Khalid refused to commit so large a sum before Akin Gump completed the Procurement Deed. Abedi countered by proposing a compromise approach. BCCI would lend Sheikh Khalid the $270mn, with the loan to be secured by shares the sheikh was to acquire. Then, if for some reason the work toward the definitive Procurement Deed aborted, BCCI could simply call the loan and seize the shares, effectively canceling the investment. About the time he signed the $270mn BCCI loan agreement, the sheikh also put $270mn of his won money into an account at BCCI London - to demonstrate "good faith," he later said, and good faith only, since the deposit was not pledged to support the loan.

Pursuant to the terms of the Procurement Deed, Sheikh Khalid thus bought stock representing about two-thirds of the 30% equity he sought in BCCI - about 12mn BCCI shares. He assured access to the remaining 10% interest through a $300mn issue of five-year BCCI convertible capital notes - notes convertible into enough shares to equal a 10% equity interest. Until or unless the notes were converted (or redeemed at maturity: July, 1991), they would pay interest at a floating rate 1/2 percentage point above the London Interbank Overnight Rate (LIBOR).

The notes were attractive for two reasons: First, they were debt obligations, meaning that these claims against BCCI's assets as a lender would be superior under the law to those of the common stockholders . Furthermore, the $300mn of notes were direct obligations of BCCI Holdings, the issuer of the stock.

## The Loans to CCAH Shareholders

Abedi had assembled willing sellers of 30% of CCAH's shares. However, the sheikh and his US attorneys, Akin Gump, understood that, under federal law, in order to acquire ownership of more than a 9.9% equity interest in an American bank, he might have to give notice to, or obtain approvals from regulators, including the Federal Reserve. This was not Sheikh Khalid's first investment in an American bank. In the 1970s, the sheikh had acquired a 25% stake in Main Bank of Houston and eventually expanded that stake to 100% with the approval of regulators. And the sheikh's later sale of Main Bank to M-Corp of Dallas netted him shares equal to a 5% interest in that big Texas bank.

So it was clear to Sheikh Khalid and his attorneys from the outset that his eventual target of a 30% holding in CCAH could be reached only in stages, and only if he received prior regulatory approval - a realistic expectation given his earlier investments in US banks. Accordingly, in July, Sheikh Khalid bought 22,152 shares of CCAH stock (representing 9.9% of the outstanding shares) for $135mn.

Later that summer Abedi representing the additional holders of CCAH, asked whether NCB might make loans to them secured by pledges of their shares. Sheikh Khalid agreed to the loans, seeing this as an opportunity to earn a market return. And in September, NCB disbursed loans - to Mashriq Holdings, S.A., and Faisal Saud Al Fulaij, a Kuwaiti businessman - totaling $256.7mn.

Meanwhile, the sheikh asked Akin Gump to confirm that the proposed pledges would comply with US laws. So Akin Gump lawyers in London sought the advice of one of the firm's US banking law experts on the legality of the contemplated security arrangement.

He advised that "there will be no violations of US banking regulations" and Akin Gump completed documentation of the loans and pledges in 1987. The security on the two loans amounted to 42,123 CCAH shares (an 18.8% interest in CCAH), including 21,660 of Mashriq's remaining CCAH shares and 21,660 shares owned by Mr. Fulaij."

## Unwinding the BCCI Investments - Abedi Illness Slows Process

"The unwinding of the bin Mahfouz investment in BCCI, now grown to 14,519,650 shares thanks to an April 1987 stock dividend, finally began in 1988. In a series of transactions, International Credit & Investments Company (Overseas) Ltd. (ICIC), a major BCCI shareholder (which prosecutors now allege was part of the BCCI Group), acted as agent for an undisclosed third party buyer or buyers.

In March, 1988, ICIC purchased 2,753,815 BCCI shares for $113mn. In May, ICIC acquired a further 3,786,490 BCCI shares for $144.5mn. Then, September 7, ICIC bought back the initial lot of 4,000,000 shares it had sold to the bin Mahfouz's two years before - for the same $160mn the bin Mahfouz's had paid for it.

This left 3,979,345 more BCCI shares - distributed among the assets of the five bin Mahfouz Bermuda holding companies - to complete the unwinding. ICIC did not propose to purchase these remaining shares outright and it was still well ahead of the deadline under which the sheikh could have compelled their purchase under terms of the buyback agreement.

The CCAH shares, also among the five Bermuda companies' assets, were transferred into a single new Bermuda company formed by the sheikh - Burford Investments Ltd. And the $330mn of BCCI convertible notes also in the Bermuda companies were transferred to NCB, for whom they had been beneficially held all along. ICIC then bought the shares of the five earlier Bermuda holding companies - whose assets now consisted only of the nearly 4mn BCCI shares - for $137mn (the value of the BCCI shares). Sheikh Khalid, eager to complete the divestiture, even lent an ICIC unit, Fulda Investments, $115mn of the $137mn price. (This loan was subsequently repaid on schedule.)

## Unwinding the CCAH Investments

Sheikh Khalid's top priority was to heal the family rift by shedding the BCCI holding. He was willing to defer, initially, the sale of the CCAH stock investment - where the buyback agreement was secured by a BCCI standby letter of credit.

However, once the BCCI unwinding was concluded in September, 1988, the parties

focused on the sale of that 9.9% CCAH interest, now held in Burford Investments - as well as the collection of NCB's $256mn of loans that were secured by another nearly 20% of the CCAH shares.

Still, it would be almost two years - until September, 1990 - before the matter was finally closed. The sale of the CCAH shares held in Burford took place in two installments - roughly $146mn, equal to the purchase price of the shares in October 1989, and the final payment in June, 1990 - $44.9mn in interest on the CCAH loans. The repayment to NCB by Mashriq and Fulaij of their loans in September, 1990, concluded all the related transactions."

VOL. XXXV
NO. 41
13-JULY-1992

**Financial and Banking News**

**Regional Banking**

**US Comptroller of Currency Closes NCB's New York Branch**

The US Comptroller of Currency has closed down the New York branch of Saudi Arabia's National Commercial Bank (NCB), following the indictment of its former chief operating officer, Mr. Khalid bin Mahfouz, by the New York district attorney and the issuance of a civil suit by the Federal Reserve Bank. The Comptroller's office said that it was concerned by the allegations in the Federal Reserve's suit, which names NCB in many places. It said that these concerns were heightened by a lack of current financial data from the bank. NCB has not published audited accounts for 1990 or 1991, and its accounts in the previous three years were qualified. However, it is believed that NCB was providing management accounts to the Bank of England and the Federal Reserve, as well as to the Saudi central bank, the Saudi Arabian Monetary Agency (SAMA).

The Federal Reserve is alleging that NCB assisted Mr. Mahfouz in an illegal acquisition of shares in Credit and Commerce American Holdings (CCAH). No charges have been laid against NCB. On 8 July the Federal Reserve fined Mr. Mahfouz $170mn for allegedly helping BCCI to conceal its true financial condition. Mr. Mahfouz's assets in the US were also frozen. Mr. Mahfouz was indicted on 1 July by the New York district attorney and charged with concealing his disinvestment from BCCI and CCAH and with concealing financial support allegedly extended by NCB to BCCI.

The Federal Reserve's civil suit, which is separate from the indictment brought by the New York district attorney, alleges that Mr. Mahfouz had NCB pay $134.9mn for a 9.9% stake in CCAH in July 1986. Mr. Mahfouz does not dispute the fact that he owned 9.9% of CCAH. The suit further alleges that Mr. Mahfouz had the bank pay $256.6mn for an additional 18.8% of the company in 1986. The $256.6mn was falsely entered in NCB's books as a loan, the suit alleges. Such an entry would have concealed the true ownership of those shares. The essence of the charges against Mr. Mahfouz is that he gave support to a fraudulent bank, so assisting it to continue its fraudulent activities. The Federal Reserve seems to believe that NCB was a party to these acts. Mr. Mahfouz resigned from NCB on 7 July.

*MEES*, understands that SAMA tried to persuade the Federal Reserve to delay the closure order against NCB and that it is annoyed at the way the closure has been handled. NCB had started winding down its New York branch before the closure order was issued. Both NCB and Mr. Mahfouz vigorously deny the charges being made against them.

# Document #5

Fed Reserve v Bin Mahfouz

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,                :

                                       :   ORDER TO SHOW CAUSE AND
                     Plaintiff,            TEMPORARY RESTRAINING
                                       :   ORDER
          v.
                                       :   92 Civ.
KHALID BIN MAHFOUZ,
                                       :
                     Defendant.
                                       :

- - - - - - - - - - - - - - - - - - - x

          Upon the motion of the Board of Governors of the

Federal Reserve System, the Complaint, the declaration of Thomas

C. Baxter, Jr., and the exhibits attached thereto, and the

accompanying Memorandum of Law, it is hereby

          ORDERED that defendant Khalid Bin Mahfouz shall appear

before the Honorable _____, United States

District Judge for the Southern District of New York, in Room

_____, United States Courthouse, Foley Square, New York,

New York, on _____, 1992, at _____ o'clock in

the _____ noon, or as soon thereafter as counsel may be heard,

to show cause why an order should not be entered, pursuant to 12

U.S.C. § 1818(i)(4), 28 U.S.C. § 3001 et seq., and the equitable

powers of this Court, for a preliminary injunction to:

          (a) Enjoin Khalid Bin Mahfouz from withdrawing,

transferring, removing, dissipating, or disposing of funds,

assets or other property which he either owns or controls, said

funds, assets or other property being within the jurisdiction of

the United States.  Such property includes, but is not limited

to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof.

(b) Enjoin (1) any employee or agent of Khalid Bin Mahfouz or of any corporation or business entity owned or controlled by Khalid Bin Mahfouz, or (2) any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property owned, either directly or indirectly, by Khalid Bin Mahfouz, and from transferring, removing, or disposing of any funds, assets or other property in a way which would benefit Khalid Bin Mahfouz, provided that these individuals or entities receive actual notice of this order. Such funds, assets, or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof.

(c) Prevent any of the funds, assets or other property within the jurisdiction of the United States (1) in the possession of Khalid Bin Mahfouz, (2) in the possession of any employee or agent of Khalid Bin Mahfouz or of any corporation or

2

business entity owned or controlled by Khalid Bin Mahfouz, or (3)
in the possession of any individual or entity acting for or in
concert with Khalid Bin Mahfouz, his employees or agents, or any
corporation or business entity owned or controlled by him, from
being withdrawn, transferred, removed, disposed of, or
dissipated, by any individual or entity with actual  notice of
this order.  Such funds, assets or property include, but are not
limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership
interest in MCorp, and (b) ownership interest in Apartment 31A in
the Olympic Towers, 641 Fifth Avenue, New York, New York (Block
No. 1287, Lot No. 1073), and any proceeds deriving from the sale
or transfer thereof.

(d)  Appoint a receiver of all the property owned
or controlled, directly or indirectly, by Khalid Bin Mahfouz and
direct the receiver to take immediate possession of said property
and to hold and manage it until further order of the Court; and
it is further

ORDERED that, pending further order of this Court,
Khalid Bin Mahfouz shall be and is hereby prohibited from
withdrawing, transferring, removing, dissipating, or disposing of
funds, assets or other property which he either owns or controls,
said funds, assets or other property being within the
jurisdiction of the United States.  Such property includes, but
is not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock
ownership interest in MCorp, and (b) ownership interest in
Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York,

3

New York (Block No. 1287, Lot No. 1073), and any proceeds

deriving from the sale or transfer thereof; and it is further

ORDERED that, pending further order of this Court, (a)

any employee or agent of Khalid Bin Mahfouz or of any corporation

or business entity owned or controlled by Khalid Bin Mahfouz, or

(b) any individual or entity acting for or in concert with Khalid

Bin Mahfouz, his employees or agents, or any corporation or

business entity owned or controlled by him, shall be and hereby

are prohibited from withdrawing, transferring, removing,

dissipating, or disposing of any funds, assets or other property

owned, either directly or indirectly, by Khalid Bin Mahfouz, and

from transferring, removing, or disposing of any funds, assets or

other property in a way which would benefit Khalid Bin Mahfouz,

provided that these individuals or entities receive actual notice

of this order.  Such funds, assets, or property include, but are

not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock

ownership interest in MCorp, and (b) ownership interest in

Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York,

New York (Block No. 1287, Lot No. 1073), and any proceeds

deriving from the sale or transfer thereof; and it is further

ORDERED that, pending further order of this Court,

any of the funds, assets or other property within the

jurisdiction of the United States (a) in the possession of Khalid

Bin Mahfouz, (b) in the possession of any employee or agent of

Khalid Bin Mahfouz or of any corporation or business entity owned

or controlled by Khalid Bin Mahfouz, or (c) in the possession of

4

any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, shall be and hereby are prohibited from being withdrawn, transferred, removed, disposed of, or dissipated, by any individual or entity with actual notice of this order.  Such funds, assets, or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof; and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), service of the Complaint, the Memorandum of Law, the declaration of Thomas C. Baxter, Jr., and this Order may be effected by service upon Michael A. Cooper, Esq., Sullivan & Cromwell, 125 Broad Street, New York, New York  10004, counsel for Khalid Bin Mahfouz, and by service upon Khalid Bin Mahfouz at his last known United States residence, Apt 31A, Olympic Towers, 641 Fifth Avenue, New York, New York, or, alternatively, pursuant to Federal Rule of Civil Procedure 4(i)(1)(E), by overnight mail to Jeddah, Saudi Arabia, in the event that plaintiff learns of defendant's exact whereabouts in Jeddah, Saudi Arabia; and it is further

any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, shall be and hereby are prohibited from being withdrawn, transferred, removed, disposed of, or dissipated, by any individual or entity with actual notice of this order.  Such funds, assets, or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof; and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), service of the Complaint, the Memorandum of Law, the declaration of Thomas C. Baxter, Jr., and this Order may be effected by service upon Michael A. Cooper, Esq., Sullivan & Cromwell, 125 Broad Street, New York, New York  10004, counsel for Khalid Bin Mahfouz, and by service upon Khalid Bin Mahfouz at his last known New York residence, Apt 31A, Olympic Towers, 641 Fifth Avenue, New York, New York; and it is further

ORDERED that service of this Order shall be made on or before _____, 1992, at _____ o'clock in the _____ noon.

Dated:  New York, New York
        July ____, 1992

_____
UNITED STATES DISTRICT JUDGE

5

# Document #6

Indictment and Settlement

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

THE PEOPLE OF THE STATE OF NEW YORK          :

                                         :

           - against -                   :          INDICTMENT

                                         :

KHALID BIN MAHFOUZ AND HAROON KAHLON

                                         :

           Defendants.                   :

                                         :

- - - - - - - - - - - - - - - - - - - x

     THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuse the defendants KHALID BIN MAHFOUZ and HAROON KAHLON of the crime of SCHEME TO DEFRAUD IN THE FIRST DEGREE, in violation of Penal Law Section 190.65(1)(b), committed as follows:

     The defendants, in the County of New York and elsewhere, acting together with Agha Hasan Abedi, Swaleh Naqvi and others, during the period January 1, 1985 to July 5, 1991, with intent to defraud more than one person and to obtain property from more than one person by false and fraudulent pretenses, representations and promises, engaged in a scheme constituting a systematic ongoing course of conduct and so obtained property with a value in excess of one thousand dollars from one and more such persons.

During the period of the scheme, Khalid Bin Mahfouz, hereinafter referred to as "Mahfouz" was a principal managerial official in The National Commercial Bank, hereinafter "NCB", a bank organized under the laws of Saudi Arabia in which Mahfouz's family had a controlling interest.  NCB conducted business in facilities located in several countries, including a facility in the County of New York.

During the period of the scheme, the BCCI Holdings (Luxembourg) SA, Bank of Credit and Commerce International SA and Bank of Credit and Commerce International (Overseas) Limited and other related financial entities, hereinafter referred to as the "BCC Group," was a banking group which conducted business in facilities located in several countries, including a facility in the County of New York.  The operations of the BCC Group were controlled by Agha Hasan Abedi and Swaleh Naqvi.

During the period of the conspiracy, International Credit and Investment Company Holdings, International Credit and Investment Company (Overseas) Limited, and other related financial entities, hereinafter referred to as the "ICIC Group," were used by Abedi and Naqvi to facilitate the operations of the BCC Group and for other purposes.

During the period of the scheme Credit and Commerce American Holding N.V., hereinafter "CCAH", was a bank holding

2

company which owned a bank doing business in the County of New York. During the period of the scheme, the BCC Group had a substantial financial interest in CCAH.

During the period of the scheme, Haroon Kahlon acted as the principal agent of Mahfouz in connection with an investment, described below, made by Mahfouz in the BCC Group and CCAH and in connection with certain transactions conducted between the BCC Group and NCB.

During the above-described period, the defendants engaged in a scheme with Abedi, Naqvi and others to defraud bank regulators and directors, auditors, depositors and customers of the BCC Group by, among other things, misrepresenting and concealing the true financial condition and ownership of the BCC Group. The defendants participated in this scheme by misrepresenting and fraudulently concealing material facts and circumstances related to the investment, described below, made by Mahfouz in the BCC Group and CCAH and by misrepresenting and fraudulently concealing material facts and circumstances related to certain transactions between NCB and the BCC Group.

Beginning on or about May 1986, at a time when the BCC Group, due to recent losses, was in need of additional capital to sustain and expand its operations, Mahfouz invested more than $450 million in shares and more than $300 million in capital

notes of the BCC Group; the investment in BCC Group shares was subject to a "put" option, guaranteed by entities in the ICIC Group, under which Mahfouz could sell the shares, at an increased price, after 3 years.   In a related investment, Mahfouz purchased more than $140 million in shares of CCAH, beginning in about September 1986; the CCAH investment was also subject to a put option, which was guaranteed by a letter of credit issued by the BCC Group.   As a consequence of his investment, Mahfouz became a principal shareholder and a director in the BCC Group, serving in the latter capacity from July 1986 to July 1989.

As a part of the scheme to defraud, the defendants and their co-schemers misrepresented Mahfouz's commitment to and financial interest in the BCC Group by concealing the fact that during the period March to September 1988, Mahfouz sold his BCC Group shares.   Knowing full well that the shares had been sold during this period, the defendants and their co-schemers nonetheless maintained the false appearance that Mahfouz continued to be a substantial shareholder in the BCC Group until on or about April 1990.   This they did by, among other things, causing Mahfouz to remain as a director of the BCC Group while intentionally refraining from disclosing, even to other BCC Group directors, that Mahfouz was no longer a shareholder; creating the fraudulent and misleading appearance that the put option guaranteed by the ICIC Group had been cancelled without

revealing Mahfouz had in fact sold his shares in accordance with the terms of the option; and by making false representations to auditors of the BCC Group and to bank regulators that Mahfouz continued to be a substantial shareholder, committed to the BCC Group, during the period after the sale until on or about April 1990.

Mahfouz was paid more than $550 million for the sale of his BCC Group shares in 1988. Later, in October 1989 and June 1990, Mahfouz was paid more than $190 million for the sale of his CCAH shares, more than $2 million of which was paid to Haroon Kahlon. A substantial portion of these payments, amounting to more than $300 million, came from the BCC Group's own cash resources. As a further part of the scheme, the defendants and their co-schemers fraudulently concealed the BCC Group's role in financing the above-described purchase of BCC Group and CCAH shares from Mahfouz by, among other things, misrepresenting to directors of the BCC Group the nature and purpose of the underlying transactions, recording more than $300 million in bogus loans on the books of the BCC Group, including bogus loans of more than $140 million to Mahfouz himself, and causing those bogus loans to be falsely confirmed to the BCC Group's auditors as genuine loans receivable.

As a further part of the scheme, the defendants and their co-schemers fraudulently misrepresented the BCC Group's

5

assets being held in NCB and concealed the true exposure of the BCC Group to certain of its clients during a five-year period beginning in 1985.  This they did by causing NCB to make loans to clients of the BCC Group, causing more than $200 million in BCC Group funds to be placed with NCB as collateral for these loans, and falsely concealing the nature of these security arrangements from directors and auditors of the BCC Group and others.  As part of the scheme, the BCC Group's auditors were supplied with false and misleading confirmations concerning BCC Group's placements in NCB which failed to disclose that these placements were being held as collateral for loans.  In 1990, after Mahfouz had received the final payment for the sale of the BCC Group and CCAH shares, the defendants caused these so-called "back-to-back" arrangements between NCB and the BCC Group to be cancelled.

By these and other fraudulent means the defendants and their co-schemers obtained more than $300 million from depositors and other customers of the BCC Group in New York County and elsehwere.

ROBERT M. MORGENTHAU
District Attorney

SENT BY:D. A. N. Y. —APPEALS BUR.  : 7-14-92 :11:07AM :          2123359288→          212 385 6252:# 4



# DISTRICT ATTORNEY
### OF THE
## COUNTY OF NEW YORK
ONE HOGAN PLACE
NEW YORK, N.Y. 10013
(212) 335-9000

**ROBERT M. MORGENTHAU**
District Attorney

<u>BY FAX</u>

July 14, 1992

Michael A. Cooper, Esq.
Sullivan & Cromwell
125 Broad Street
New York, New York 10004

Re: <u>People v. Khalid Bin Mahfouz</u>
Ind. No. 6138/92

Dear Mr. Cooper,

This will serve to confirm our telephone conversation on Friday, July 10, 1992, concerning the status of your client in the above-referenced indictment.

As I informed you, a warrant for the arrest of Sheikh Mahfouz was issued immediately after his indictment by the New York County Grand Jury. That warrant is at present active; this Office has taken no steps to stay its execution. As a consequence, Sheikh Mahfouz' appearance is required in New York County Supreme Court so that he may be arraigned on the charges outstanding against him. Until he surrenders and is arraigned, he is a fugitive.

The assertion by your colleague, Mr. Richard Carlton, that Khalid Bin Mahfouz is not a fugitive, made before Judge Kimba Wood in federal District Court on Friday July 10, 1992, was in error. Mr. Carlton made this assertion during oral argument on a motion brought on behalf of Mahfouz for discovery in connection with a hearing on a preliminary injunction sought by the Board of Governors of the Federal Reserve Board. The Board charged Mahfouz with violations of the federal banking laws which are similar, in part, to the charges underlying the New York County Indictment, and assessed significant penalties against him. On July 8, 1992, Judge Wood issued an order temporarily restraining Sheikh Mahfouz from transferring his assets out of the United States to insure that these penalties would be satisfied. She also set a hearing on whether a preliminary injunction should issue to that effect. The issue of whether Sheikh Khalid is a fugitive was raised at the July 10 proceeding by representatives of the Federal Reserve Board, who maintained that Sheikh Mahfouz was disentitled to seek discovery in the federal court because he is a fugitive on the instant state charges.



RECYCLED PAPER

During his oral argument, Mr. Carlton wrongly asserted that Sheikh Mahfouz should not be regarded as a fugitive in light of an agreement made between Assistant District Attorney James Kindler and defense counsel at a meeting on June 30, 1992.  At that meeting, Mr. Kindler informed you and co-counsel Stanley Arkin that Khalid Bin Mahfouz had been indicted.   Both you and Mr. Arkin requested to make a presentation to this Office on behalf of Sheikh Mahfouz, and Mr. Kindler agreed to hear such a presentation. Mr. Arkin requested assurance that Sheikh Mahfouz would not be arrested on the present indictment if he travelled outside Saudia Arabia before that presentation was made.  Mr. Kindler agreed not to take any action on the arrest warrant pending such a presentation without prior notice to counsel.   This agreement was confirmed by Mr. Kindler in a letter to counsel dated July 2, 1992, in which Mr. Kindler urged that the proposed presentation occur during the week of July 20.

As Mr. Kindler explained at oral argument and as I hope I made clear during out telephone conversation, this agreement does not alter Mahfouz' status as a fugitive. The arrest warrant is active, and he is obliged to surrender for arraignment. Mr. Kindler did not agree not to make any efforts to arrest Mahfouz; instead, he pledged only that he would not do so before the presentation without giving his attorneys prior notice.

Furthermore, this Office cannot permit you to misrepresent and exploit this limited courtesy extended to your client at your request to defeat the disentitlement argument being advanced by the Federal Reserve Board in federal court.  You assured me in our telephone conversation that you understood this, and that you would not argue that Sheikh Mahfouz is not a fugitive on the basis of the agreement with Mr. Kindler. As I hope I made clear then, should this argument be advanced on behalf of Sheikh Mahfouz in the proceedings initiated by the Federal Reserve Board, this Office will consider that you have received the promised prior notice and proceed to arrest your client as soon as possible.

If there is any confusion on any aspect of our discussions, please let me know.

Sincerely,

Nikki Kowalski
Assistant District Attorney

60 of 62 DOCUMENTS

Copyright 1993 The Washington Post
The Washington Post


December 24, 1993, Friday, Final Edition

**SECTION:** FINANCIAL; PAGE D10

**LENGTH:** 276 words

**HEADLINE:** Saudi to Pay $ 225 Million in BCCI Settlement

**SERIES:** Occasional

**BYLINE:** David S. Hilzenrath, Washington Post Staff Writer

**BODY:**

Saudi banker Khalid bin Mahfouz, who had been charged with attempting to defraud customers of the now-defunct Bank of Credit and Commerce International (BCCI), has agreed to pay $ 225 million in a settlement with federal and New York authorities, his representatives said yesterday.

Under the settlement, the Manhattan District Attorney's office and the Board of Governors of the Federal Reserve system have agreed to drop all charges against Mahfouz, who has maintained his innocence, spokesmen for Mahfouz said.

"I have accepted these agreements, and their monetary costs, as a business decision and for peace of mind," Mahfouz said in a prepared statement.

New York District Attorney Robert M. Morgenthau and a Federal Reserve spokesman declined to comment on the matter yesterday.

Haroon Kahlon, a former executive of Mahfouz's bank, and Eastbrook Inc., an investment company Mahfouz controlled, each pleaded guilty yesterday to a New York misdemeanor charge of failing to register with the state as a broker in connection with the sale of shares of BCCI's parent company. In connection with the Mahfouz settlement, Kahlon was discharged without fine or incarceration, and a fraud charge against him was dropped, his lawyer said.

Mahfouz, 45, was chief operating officer of his family-controlled National Commercial Bank of Saudi Arabia. In the 1980s, he and the bank invested about $ 800 million in BCCI and he was on its board of directors, said his spokesman, Tim Metz.  The 1992 New York indictment accused him of abetting a conspiracy by top BCCI officers to conceal the bank's true ownership and financial condition from regulators.

**LOAD-DATE:** December 24, 1993