UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to ABDUL AZIZ AL IBRAHIM** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                     03 CV 06978 (RCC)

<u>**RICO STATEMENT APPLICABLE TO**</u>
<u>**ABDUL AZIZ AL IBRAHIM**</u>

   Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Abdul Aziz al Ibrahim.

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is Abdul Aziz al Ibrahim. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; |

|  | NY CLS Penal § 125.25(xi) |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Abdul Aziz al Ibrahim | Abdul Aziz al Ibrahim conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Abdul Aziz al Ibrahim | Abdul Aziz al Ibrahim undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support he supplied. |

2

| early 1990s to 9/11/2001 | Abdul Aziz al Ibrahim | Abdul Aziz al Ibrahim agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Abdul Aziz al Ibrahim fit

>  neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.
>
>  (c) No.
>
>  (d) Abdul Aziz al Ibrahim is associated with the Enterprise.
>
>  (e) Abdul Aziz al Ibrahim is a member of the Enterprise, and are separate and distinct from the Enterprise.
>
>  (f) Abdul Aziz al Ibrahim intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Abdul Aziz al Ibrahim is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Abdul Aziz al Ibrahim furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Abdul Aziz al Ibrahim, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Abdul Aziz al Ibrahim, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

      The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

      The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Abdul Aziz al Ibrahim. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Abdul Aziz al Ibrahim. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Abdul Aziz al Ibrahim. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Abdul Aziz al Ibrahim also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |

5

| | |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.    Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Abdul Aziz al Ibrahim | Abdul Aziz al Ibrahim is the brother-in-law of King Fahd of Saudi Arabia. (His sister, Jawhara, is the second wife of King Fahd.) With another brother, Walid, along with Defendant Saleh Abdullah Kamel, Abdul Aziz al Ibrahim created in 1991 the leading Arab television satellite service, Middle East Broadcasting Corp, which purchased the press agency United Press International in 1992. In 1990, he created the Ibrahim bin Abdul Aziz al Ibrahim Foundation which purports to support humanitarian assistance. Through his direction and control, he entrusted the organization with the responsibility of realizing his objective of using it as a covert vehicle for supporting the al Qaida movement and other terrorists. The organization is present in Kenya, Bosnia, Chechnya, South America and South Asia. The organization's branch in Nairobi in Kenya was associated with Osama bin Laden's network in the FBI's investigation into the attacks against the American embassies on August 7, 1998. In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including Defendant Al-Haramain Foundation, Help African People, the Islamic Relief Organization, the Ibrahim bin Abdul Aziz al Ibrahim Foundation, and Mercy Relief International. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief | 1962(a), 1962(c), 1962(d) |

agencies.

The decision was announced by the Kenyan government's NGO coordinator who declared:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five non-governmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Ibrahim bin Abdul Aziz al Ibrahim Foundation did not seek an appeal.

In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Ibrahim bin Abdul Aziz al Ibrahim Foundation as one of those which provided help to Osama bin Laden: "The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have

huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects."

Other reports suggest that Ibrahim bin Abdul Aziz al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Ibrahim bin Abdul Aziz al Ibrahim Foundation, World Youth Islamic Assembly and Islamic Rescue Organization - had taken part in setting up these bases.

In an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz al Ibrahim, which emphasized (quote): "Armed struggle in the name of Allah, for his word to be above all else…Sacrifice your life in witness of Allah's religion."

According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

That seminar event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in

9

1995 a Joint Committee for Islamic Action and Studies with representatives from Defendants Muslim World League, Islamic International Relief Organization, World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

Abdul Aziz al Ibrahim has extensive ties to the United States.

In 1989, Abdul Aziz al Ibrahim acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to al Ibrahim at the end of 1989 by BCCI. Al Ibrahim was one of BCCI's leading loan beneficiaries.

In the mid 1980s, while living in Hollywood, California, Abdul Aziz al Ibrahim engaged in a romantic pursuit of actress/model Brooke Shields, setting up a movie production company (Mystery Man Productions) to invest over $22 million (including BCCI loan proceeds) in the production of a starring film vehicle for her, *Brenda Starr*. The production was so flawed that while filmed in 1986, the movie would not be released in the United States until 1992.

Apart from being a lead investor in Marina del Rey, Abdul Aziz al Ibrahim real estate assets have included Ritz-Carlton hotels in New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. (Ritz-Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA company owned by Abdul Aziz al Ibrahim.)

The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc,

|  | MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey. Al Anwa holding is Al Anwa for Contracting Establishment (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by Abdul Aziz al Ibrahim. Al Anwa for Contracting is shareholder, along with Defendant Dallah al Baraka (Chaired by Defendant Saleh Abdullah Kamel), of the National Environmental Preservation Co Ltd in Jubail, Saudi Arabia.<br><br>According to court papers filed in 1995, as reported by the *Washington Post*, Abdul Aziz al Ibrahim has won large sums of money gambling in the United States for which he did not wish to pay the Internal Revenue Service. In order to silence a former employee regarding these and other allegations, Abdul Aziz al Ibrahim hired the law firm of Sidley & Austin and filed suit in Washington, D.C. to seek injunctive relief.  The suit was dismissed. |  |