| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK<br><br>In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to Abdul Aziz Bin Ibrahim Al Ibrahim** |
|---|---|

*This document relates to :*   New York Marine and General Insurance Company v. Al Qaida, et al.
04 CV 6105 (RCC)

## RICO STATEMENT APPLICABLE TO
## ABDUL AZIZ BIN IBRAHIM AL IBRAHIM

Based on information currently available, plaintiff New York Marine and General Insurance Company, submits this RICO Statement with respect to its claims against defendant Abdul Aziz Bin Ibrahim Al Ibrahim ("Ibrahim").  Given the complicated nature of the wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiff, absent discovery.  Plaintiff therefore reserves the right to amend this RICO Statement as information is learned and verified through discovery and otherwise.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and (d).

2. This RICO Statement pertains to defendant Ibrahim.  Ibrahim conducted or participated, directly or indirectly, in the affairs of the RICO enterprise of defendant Al Qaida through a pattern of racketeering activity that, among other things, has facilitated, materially supported and substantially assisted Al Qaida's purposes. Specifically, Ibrahim established the Abdul Aziz Bin Ibrahim Foundation (the "Ibrahim Foundation").  Ibrahim's misconduct includes providing material support to Al Qaida, knowingly and intentionally employing Al Qaida members, laundering money for Al Qaida, raising and distributing financial assistance to Al Qaida (often under false pretenses), providing Al Qaida with safe houses and false documentation, and/or facilitating money transfers and weapons and military equipment purchases for Al Qaida through the Ibrahim Foundation.  Ibrahim knowingly and intentionally collected, diverted and transferred funds to Al Qaida and otherwise lent material support to Al Qaida through the Ibrahim Foundation.  Additionally, Ibrahim knowingly and intentionally provided repeated material support and substantial assistance to Al Qaida through the Ibrahim Foundation through the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings in violation of numerous federal statutes.

Specifically, in 1990, Ibrahim created the Ibrahim Foundation, which purports to

support humanitarian assistance in the Middle East, South America and South Asia. An FBI investigation into the attacks on the United States Embassy in Kenya on August 7, 1998 concluded that the Ibrahim Foundation's branch in Nairobi, Kenya was associated with the Al Qaida enterprise.

In September 1998, the Kenyan government cancelled the registration of five Islamic relief agencies for allegedly supporting terrorism. Among these five agencies was the Ibrahim Foundation. The authorities claimed that materials for the bomb used in the United States Embassy bombing in Kenya were smuggled in as relief aid with the help of the Ibrahim Foundation. After several of the organizations appealed the decision to cancel their registration, Kenya's High Court blocked the deregistration of these Islamic relief agencies. Only the Ibrahim Foundation did not seek an appeal.

Other reports suggest that Ibrahim and the Ibrahim Foundation were funding the Islamic Movement of Uzbekistan, an affiliate of Al Qaida, whose leaders met Osama bin Laden in 1999 in Afghanistan. Reports stated that the Islamic Movement of Uzbekistan received approximately $270,000 from the Ibrahim Foundation.

Ibrahim also has extensive ties to the United States. His real estate assets in the United States have included Ritz-Carlton hotels in New York, Washington and Houston, and a hotel and office complex near O'Hare International Airport in Chicago. Ritz-Carlton decided in 1997 to remove its name from the facilities owned by Ibrahim after they became controlled by Al Anwa USA, a company owned by Ibrahim.

Ibrahim's knowing and intentional conduct through the Ibrahim Foundation enabled Al Qaida to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attacks that injured plaintiff. The basis of Ibrahim's liability is 18 U.S.C. § 1962(c) and (d).

3.     All known wrongdoers are named as defendants in this action. Plaintiff will file separate RICO Statements with respect to the misconduct of these defendants. However, given the complicated nature of the conspiracy and other wrongdoing that led to the September 11th attacks, much information is unavailable to plaintiff, and the identities of additional wrongdoers may be revealed through discovery. Plaintiff therefore reserves the right to amend this RICO Statement as information is learned through discovery and otherwise.

4.     The alleged victim is the plaintiff, New York Marine and General Insurance Company. Plaintiff was injured as a result of insurance payments it made for claims filed by its insureds, airline companies which owned and operated the commercial airliners which were hijacked and used as weapons in the September 11th attacks, to recover for the damage they suffered in connection with the September 11th attacks.

5.     (a)     List Of Predicate Acts And Specific Statutes Violated

| Providing material support of terrorism | 18 U.S.C. §2332b(g)(5)(B)<br>18 U.S.C. §2339A |
|---|---|

|  | 18 U.S.C. §2339B |
|---|---|
|  | 18 U.S.C. §2339C |
| Money Laundering | 18 U.S.C. §1957 |
| Mail Fraud | 18 U.S.C. §1341 |
| Wire Fraud | 18 U.S.C. §1343 |

    (b)    Dates Of, The Participants In, And A Description Of The Facts Surrounding The Predicate Acts

    The Ibrahim Foundation is a Saudi based charity with branches throughout the world. Defendant Ibrahim established the Ibrahim Foundation in 1990. The Ibrahim Foundation holds itself out at as a charity with humanitarian goals, and has raised, solicited and distributed funds under the pretense that the funds would be used for legal and humanitarian purposes. Nevertheless, through the Ibrahim Foundation, Ibrahim has knowingly and intentionally lent material support to the Al Qaida Enterprise through, *inter alia,* the use of interstate and international faxes, telephones, wire transfers and transmission, and mailings.

    Ibrahim, through the Ibrahim Foundation, conducted or participated, directly or indirectly, in the affairs of the Al Qaida RICO enterprise through a pattern of racketeering activity that, among other things, has facilitated, materially supported and substantially assisted Al Qaida's purposes. Ibrahim's misconduct includes materially supporting Al Qaida (i.e., providing "access to bank accounts" and serving as "cover" to Al Qaida members who were able to travel undetected "under the guise of working for" these humanitarian organizations), knowingly and intentionally employing Al Qaida operatives, laundering money for Al Qaida, raising and distributing financial assistance to Al Qaida (often under false pretense), providing Al Qaida with safe houses and false documentation, and/or facilitating weapons and military equipment purchases and transfers for Al Qaida.

    Additionally, Ibrahim, through the Ibrahim Foundation, knowingly and intentionally collected, diverted and transferred *Zakat* funds to Al Qaida and otherwise lent material support to Al Qaida. The Ibrahim Foundation knowingly and intentionally lent material support to Al Qaida through, *inter alia,* the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings. Ibrahim's knowing and intentional conduct enabled Al Qaida to plan, orchestrate and carry out violent anti-American, antidemocratic activity, including the September 11th attacks that injured plaintiffs.

    (c)    Plaintiff's RICO claims are based in part on the predicate offenses of wire fraud and mail fraud. Up to the time of the September 11th attacks, Ibrahim utilized interstate and international faxes, telephones, wire transfers and transmissions, and the United States and international mails to facilitate, provide financial and material support and provide substantial assistance to Al Qaida. The financial support provided to Al Qaida by Ibrahim and the Ibrahim Foundation assisted the business and financial transactions in which Al Qaida engaged to further its operations and purposes. Al Qaida relied upon Ibrahim, among others in a global network of banks, financial institutions and charities, to generate material support to continue its terrorist operations. The creation and maintenance of a financial network is essential to Al Qaida.

Further, given the complicated nature of Ibrahim's and others' wrongdoing that led to the events of September 11, 2001, additional information relating to the circumstances constituting Ibrahim's wire and mail fraud activities likely will be revealed through discovery. Plaintiff therefore reserves the right to amend this RICO Statement as information is learned through discovery and otherwise.

(d) No.

(e) No.

(f) The predicate acts conducted by Ibrahim form a pattern of racketeering in that they are repeated and continuous, and include funneling money to Osama bin Laden and Al Qaida. Ibrahim consistently, evenly and constantly, laundered money, provided material support for terrorism, committed wire fraud and mail fraud and engaged in monetary transactions improperly derived from unlawful activity.

(g) The predicate acts relate to each other as a part of a common plan because each act of money laundering, wire and mail fraud and providing material support of terrorism allowed Ibrahim, through the Ibrahim Foundation, to provide financial and other assistance to Al Qaida, which assistance culminated in the September 11 attacks.

6. (a) The enterprise is comprised of defendant Al Qaida, defendant Osama bin Laden, and other unknown members (the "Al Qaida Enterprise").

(b) The Al Qaida Enterprise was formed in or about 1988 by Osama bin Laden with the help of other Muslim *mujahideen* who traveled to Afghanistan in the 1980s to wage jihad against Soviet occupation forces. Al Qaida financed and directed the activities of Islamic militants worldwide. Osama bin Laden heads Al Qaida. Underneath Osama bin Laden is Ayman al-Zawahiri, an Egyptian national.

Al Qaida's stated purpose is the overthrow of secular non-Muslim governments through violent, terrorist means in favor of radical Islamic theocracies governed by Islamic law. As a matter of organizational doctrine, Al Qaida views western-style democratic societies and their institutions, particularly the United States, as enemies of Islam. As stated in Osama bin Laden's 1998 *fatwah,* Al Qaida's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." For years, Al Qaida and its members (both individuals and affiliated terrorist organizations operating under the Al Qaida organizational umbrella) repeatedly acted upon this shared anti-American, anti-democratic purpose, the September 11th attacks being the most dramatic in a series of terrorist operations against American interests.

Al Qaida is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. Its internal organizational structure allows it to build relationships with other terrorist organizations while maintaining and promoting its own goals and terrorist operations around the world. Al Qaida is run by a council that "discusse[s] and approve[s] major undertakings, including terrorist operations." It also uses a treasurer and operation and planning chiefs to design and plan terrorist attacks. Al Qaida operations are conducted around the world through the efforts of individual

4

members and affiliated groups. Al Qaida members swear an oath of loyalty to Al Qaida's aims and mission. These members carry out the terrorist directive received from their superiors.

Al Qaida is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia,* the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings.

At the time of the September 11th attacks, Al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. Al Qaida relies upon a global network of banks, financial institutions and charities, including the United States Branch of the Ibrahim Foundation, founded by Ibrahim, and illegal activity (including narcotics trafficking) to generate material support to continue its terrorist operations.

   (c)    Ibrahim does not appear to be an employee, officer or director of the Al Qaida Enterprise.

   (d)    Ibrahim associated himself with the Al Qaida Enterprise.

   (e)    Ibrahim is a person who is separate and distinct from the Al Qaida Enterprise, but Ibrahim associated himself with the Al Qaida Enterprise.

   (f)    Not applicable.

7. As stated, Al Qaida is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. Ibrahim holds himself out as the director of a legitimate charity with legitimate goals. The pattern of racketeering activity conducted by Ibrahim and the Ibrahim Foundation is separate from the existence of Al Qaida, but was a necessary component of the September 11th attacks.

8. Al Qaida conducts terrorism around the world. Ibrahim conducted the racketeering activity through his charity operations, by raising, soliciting and distributing funds under the pretense that the funds would be used for legal and humanitarian purposes. The racketeering activity conducted by Ibrahim and the Ibrahim Foundation substantially assists and materially supports Al Qaida' terrorist activity. The usual and daily activities of Al Qaida include planning and executing acts of terrorism against the United States and its citizens, all of which are funded and/or materially supported by the racketeering activities described herein.

9. Al Qaida benefits by having the funds available to commit its terrorism goals as described above in 6(b).

10.     Al Qaida's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." The Enterprise's activities in support of terrorism affect interstate commerce as illustrated by the September 11th attacks, which damaged the United States economy when four commercial airlines were hijacked and crashed into the World Trade Center, a vital center of interstate and foreign commerce.

11.     Not applicable.

12.     Not applicable.

13.     (a)     Defendants Osama bin Laden and Ibrahim, among others whose identities are unknown are employed or associated with Al Qaida.

        (b)     The same entity is not both the liable "person" and the "enterprise" under § 1962(c).  Al Qaida is the RICO enterprise.  Ibrahim is a separate person within the meaning of RICO.

14.     At the center of the alleged conspiracy is Al Qaida's plan to orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attacks that injured plaintiff.  The Al Qaida Enterprise established itself in Afghanistan in 1996 after being turned out of the Sudan.  The Al Qaida Enterprise relies on well-placed financial facilitators, including the Ibrahim Foundation, and laundered funds from Islamic so-called charities and corporations.  The financial facilitators also raised money from donors.  They also relied heavily on certain individuals at mosques who were willing to divert *Zakat* funds.  Al Qaida also collected money from employees of corrupt charities.

        The funds raised were used for such purposes as operation of terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but others were trained in terrorist tactics.  Recruits in these training camps were encouraged to think creatively about ways to commit mass murder.

        These camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who helped recruits get in and out of Afghanistan.  It is in these training camps that the nineteen hijackers were selected to carry out the September 11th attacks.  None of this would have been possible without the funds supplied by participants and conspirators like the Ibrahim Foundation.  Indeed, the Al Qaida Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Ibrahim Foundation.  In order to identify nineteen individuals to carry out the September 11th attacks, Al Qaida needed to select from a large pool of recruits and trainees, which would not have been possible without the assistance provided by the Ibrahim Foundation.  The Ibrahim Foundation also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.     The injuries suffered by the Plaintiff resulting from the September 11th attacks include damage to the physical property and property interests of their insureds,

resulting in the payment of insurance proceeds for said damage.

16.    Ibrahim's uninterrupted financial and material support of terrorism, mail fraud, wire fraud, money laundering, and substantial assistance, as described herein and in plaintiff's First Amended Complaint, enabled the Al Qaida Enterprise to plan, orchestrate, and carry out the September 11th attacks that injured the plaintiff. Therefore, the conduct of Ibrahim proximately resulted in the September 11th attacks. The plaintiff suffered injury by reason of the above conduct of Ibrahim.

17.    Ibrahim is jointly and severally liable for all damages sustained by each plaintiff in an amount in excess of $2,863,347.98 in damages for plaintiff's injuries.

18.    Federal Causes of Action

| Count Three | Civil RICO, 18 U.S.C. §1962 |
|---|---|
| Count Five | 18 U.S.C. §2333 |

19.    Pendant State Claims

| Count One | Trespass |
|---|---|
| Count Two | Conspiracy |
| Count Four | Aiding and Abetting |
| Count Six | Negligence |
| Count Seven | Punitive Damages |

20.    None at this time. If any additional information is learned through discovery, it shall be provided.

Dated: August 26, 2005

                                Respectfully submitted,

                                _/s/_____
                                Frank J. Rubino, Esq. (FR-6202 )
                                BROWN GAVALAS & FROMM LLP
                                Attorneys for Plaintiff
                                NEW YORK MARINE AND GENERAL
                                INSURANCE COMPANY
                                355 Lexington Avenue
                                New York, New York 10017
                                (212) 983-8500

**CERTIFICATE OF SERVICE**

      I hereby certify that, pursuant to this Court's Case Management Order No. 2, on August 26, 2005, I caused a true and correct copy of the foregoing RICO STATEMENT APPLICABLE TO ABDUL AZIZ BIN IBRAHIM AL IBRAHIM to be served on all counsel electronically by the Court's Electronic Case Filing (ECF) system.

Dated: August 26, 2005                      /s/_____
                                                    Frank J. Rubino, Jr. (FR-6202)