
| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK | 03 MDL 1570 (RCC) ECF Case |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | **RICO STATEMENT** **Applicable to Saudi Dallah Al Baraka Group LLC** |

*This document relates to :*   New York Marine and General Insurance Company v. Al Qaida, a/k/a Al Qaeda et al.
04 CV 6105 (RCC)

## RICO STATEMENT APPLICABLE TO
## SAUDI DALLAH AL BARAKA GROUP LLC

Based on information currently available, plaintiff New York Marine and General Insurance Company submits this RICO Statement with respect to its claims against defendant Saudi Dallah Al Baraka Group LLC ("SDAB").  Given the complicated nature of the wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiff, absent discovery.  Plaintiff therefore reserves the right to amend this RICO Statement as information is learned and verified through discovery and otherwise.

1.     The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and/or (d).

2.     This RICO Statement pertains to defendant SDAB.  SDAB conducted or participated, directly or indirectly, in the affairs of the RICO enterprise, defendant Al Qaida a/k/a Al Qaeda ("Al Qaida"), through a pattern of racketeering activity that, among other things, has facilitated, materially supported and substantially assisted Al Qaida's purposes through SDAB's financial and banking operations.  SDAB's misconduct includes laundering money for Al Qaida, knowingly and intentionally providing financial services to Al Qaida (including maintaining and servicing Al Qaida bank accounts and accounts used to fund and support Al Qaida), and/or facilitating money transfers and weapons and military equipment purchases for Al Qaida.  SDAB knowingly facilitated Al Qaida's fundraising efforts by advertising the existence and numerical designations of the accounts it maintained for Al Qaida's cooperating charities throughout the Muslim world.  SDAB has channeled millions of dollars to Al Qaida through its banking and financial operations, and knowingly and intentionally provided repeated material support and substantial assistance to Al Qaida through the use of interstate and international faxes, telephones, wire transfers and transmissions, and mailings in violation of numerous federal statutes.

Specifically, SDAB is a diversified conglomerate based in Jeddah, Saudi Arabia. The group includes twenty-three banks, most of which are located in the Arab and

Islamic countries, as well as several investment and financial companies. The company was established in 1969 by defendant Sheikh Saleh Abdullah Kamel.

SDAB is at the center of a complex banking system through which Saudi Arabia channeled financial support for the spread of radical Islam practiced by Al Qaida. Upon information and belief, SDAB, through its subsidiaries, directly financed some of the September 11th hijackers.

As the Wall Street Journal reported, "U.S. intelligence and counterterrorism officials say they have information linking the [Saudi Arabian] Dallah al Baraka Group to transactions by al Qaeda and other extremist groups. One U.S. official said al Qaeda is suspected of using the banking services of one of the group's biggest subsidiaries, the Jidda-based Al Baraka Bank, which has offices across the Middle East and Asia. Officials wouldn't give specific information about what transactions caught their interest. But Dallah's chairman, Saleh Abdullah Kamel ("Kamel"), is a longtime investor in a Sudanese bank used during the 1990s by al Qaeda." (Wall Street Journal, November 2, 2001)

Headed by defendant Kamel, Al Baraka Bank is a wholly-owned subsidiary of SDAB. Al Baraka Bank has for many years knowingly maintained accounts for many of the so-called charities that operate within al Qaida's infrastructure. Al Baraka Bank advertises the existence and numerical designations of the accounts that it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts.

Al Baraka Bank had knowledge that the accounts it maintained were used to fund terrorism and al Qaida. However, despite this knowledge, Al Baraka Bank continued to maintain the accounts and thereby knowingly provided financial services and other forms of material support to al Qaida. Throughout this mechanism, SDAB has facilitated al Qaida's fundraising efforts. The accounts maintained by SDAB on behalf of the so-called charities have been used to transfer funds to al Qaida cells throughout the world. Despite its knowledge that the accounts it maintained were being used to fund terrorist activities, SDAB has continued to maintain those accounts, and has knowingly provided financial services and other forms of material support to al Qaida.

Along with Kamel, SDAB is also a shareholder in Tadamon Islamic Bank, which has long provided financial services and other forms of material support to al Qaida. SDAB is also an investor in Al Shamal Bank, whose other investors include Osama bin Laden, Omar Abdullah Kamel, al Faisal Islamic Bank and the Sudanese Government.

In addition, Kamel is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigations and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents

2

chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the United States Government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement. See, Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D.Ill. filed January 6, 2003).

The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used the list as a basis for designating Adel Batterjee as a terrorist sponsor under Executive Order 13224. See, December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

Al Qaida established its own financial institutions in under-regulated jurisdictions and fostered relationships with banks like Al Baraka and individuals and entities operating within the Islamic banking system like SDAB that shared al Qaida's perverse world view and were willing collaborators in al Qaida's global *jihad*. As a result, al Qaida was able to gain access to the international banking system and conceal the illicit nature of the transactions that it conducted through that system.

Absent the material support and sponsorship provided by banks and individuals within the Islamic banking system like SDAB, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level.

SDAB's knowing and intentional conduct enabled Al Qaida to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attacks that injured plaintiff. Based on the foregoing, the basis of SDAB's liability is 18 U.S.C. § 1962(c) and (d).

3. All known wrongdoers are named as defendants in this action. Plaintiff separately will file RICO Statements with respect to the misconduct of these defendants. Given the complicated nature of the wrongdoing that led to the September 11th attacks, however, much information is unavailable to plaintiff, and the identities of other wrongdoers may be revealed through discovery. Plaintiff therefore reserves the right to amend this RICO Statement as information is learned through discovery and otherwise.

4. The alleged victim is the plaintiff, New York Marine and General Insurance Company. Plaintiff was injured as a result of insurance payments it made for claims filed by its insureds, airline companies which owned and operated the commercial airliners which were hijacked and used as weapons in the September 11th attacks.

5. (a) <u>List of Predicate Acts and Specific Statutes Violated</u>

| Providing material support | 18 U.S.C. §2332b(g)(5)(B) |

3

| | |
|---|---|
| of terrorism | 18 U.S.C. §2339A<br>18 U.S.C. §2339B<br>18 U.S.C. §2339C |
| Money laundering | 18 U.S.C. §1957 |
| Mail Fraud | 18 U.S.C. §1341 |
| Wire Fraud | 18 U.S.C. §1343 |

(b) Dates Of, The Participants In, And A Description Of The Facts Surrounding The Predicate Acts

From the mid-1990's through September 11, 2001, SDAB facilitated, materially supported and substantially assisted Al Qaeda's purposes through the financial and banking operations, as described above. SDAB laundered money for Al Qaeda; knowingly and intentionally provided financial services to Al Qaeda members, including maintaining and servicing Al Qaeda bank accounts and accounts used to fund and support Al Qaeda; and facilitated weapons and military equipment purchases and money transfers by and for Al Qaeda. In providing the described financial and material support and substantial assistance to Al Qaeda, SDAB utilized interstate and international faxes, telephones, wire transfers and transmissions, and the United States and international mails.

(c) Plaintiff's RICO claims are based in part on the predicate offenses of wire fraud and mail fraud. Up to the time of the September 11th attacks, SDAB utilized interstate and international faxes, telephones, wire transfers and transmissions, and the United States and international mails to facilitate, provide financial and material support and provide substantial assistance to Al Qaeda. The financial and banking support and assistance provided to Al Qaeda by SDAB assisted the business and financial transactions in which Al Qaeda engaged to further its operations and purposes. Al Qaeda relied upon SDAB, among others in a global network of banks and financial institutions, to generate material support to continue its terrorist operations.

The creation and maintenance of a financial network is essential to Al Qaeda. SDAB used its banking and financial operations to assist Al Qaeda to cloak its financial network in legitimacy.

Further, given the complicated nature of SDAB's and others wrongdoing that led to the September 11 attacks, additional information relating to the circumstances constituting SDAB's wire and mail fraud activities likely will be revealed through discovery. Plaintiff therefore reserves the right to amend this RICO Statement as information is learned through discovery and otherwise.

(d) No.

(e) No.

(f) The predicate acts conducted by SDAB form a pattern of racketeering in that they are repeated and continuous, including funneling millions of dollars to Osama

4

bin Laden and Al Qaeda in the mid to late-1990s. From the mid-1990's through September 11, 2001, SDAB consistently, evenly and constantly laundered money, provided material support for terrorism, committed wire fraud and mail fraud and engaged in monetary transactions improperly derived from unlawful activity.

      (g)    The predicate acts relate to each other as a part of a common plan because each act of money laundering, wire and mail fraud and providing material support of terrorism allowed SDAB to provide financial and other assistance to Al Qaeda, which assistance culminated in the September 11 attacks.

6.    (a)    The Enterprise is comprised of defendant Al Qaeda, defendant Osama bin Laden, defendant Ayman al-Zawahiri, and other unknown members (the "Al Qaida Enterprise").

      (b)    The Al Qaida Enterprise was formed in or about 1988 by Osama bin Laden with the help of other Muslim *mujahideen* who traveled to Afghanistan in the 1980s to wage jihad against Soviet occupation forces. Al Qaeda financed and directed the activities of Islamic militants worldwide. Osama bin Laden heads Al Qaeda. Underneath Osama bin Laden is Ayman al-Zawahiri, an Egyptian national.

      Al Qaeda's stated purpose is to overthrow secular non-muslim governments through violent, terrorist means in favor of radical Islamic theocracies governed by Islamic law. As a matter of organizational doctrine, Al Qaeda views western-style democratic societies and their institutions, particularly the United States, as enemies of Islam. As stated in Osama bin Laden's 1998 *fatwah,* Al Qaeda's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." For years, Al Qaeda and its members (both individuals and affiliated terrorist organizations operating under the Al Qaeda organizational umbrella) repeatedly acted upon this shared anti-American, anti-democratic purpose, the September 11th attacks being the most dramatic in a series of terrorist operations against American interests.

      Al Qaeda is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. Its internal organizational structure allows it to build relationships with other terrorist organizations while maintaining and promoting its own goals and terrorist operations around the world. Al Qaeda is run by a council that "discuss[es] and approve[s] major undertakings, including terrorist operations." It also uses a treasurer and operation and planning chiefs to design and plan terrorist attacks. Al Qaeda operations are conducted around the world through the efforts of individual members and affiliated groups. Al Qaeda members swear an oath of loyalty to Al Qaeda's aims and mission. These members carry out the terrorist directive received from their superiors.

      Al Qaeda is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia,* the use of interstate and international faxes, telephones, wire transfers and transmissions,

and mailings.

At the time of the September 11th attacks, Al Qaeda's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. Al Qaeda relies upon a global network of banks and financial institutions, including SDAB, and illegal activity (including narcotics trafficking) to generate material support to continue its terrorist operations.

(c) SDAB does not appear to be an employee, officer or director of the Al Qaida Enterprise.

(d) SDAB associated itself with the Al Qaida Enterprise.

(e) SDAB is a entity that is separate and distinct from the Al Qaida Enterprise, but SDAB associated itself with the Al Qaida Enterprise.

(f) Not applicable.

7. As stated, Al Qaeda is highly organized and exhibits a definitive structure, separate and apart from its terrorist operations. SDAB holds itself out as a legitimate banking and financial institution. It continues to operate as a banking and financial institution through its various subsidiaries and affiliated entities located around the world. The pattern of racketeering activity conducted by SDAB is separate from the existence of Al Qaeda, but was a necessary component of the September 11th attacks.

8. Al Qaeda conducts terrorism around the world. SDAB conducted the racketeering activity through its banking and financial operations, including provision of financial services to Al Qaeda members, maintenance and service of Al Qaeda bank accounts and accounts used to fund and support Al Qaeda, and facilitation of weapons and military equipment purchases and money transfers by and for Al Qaeda. The racketeering activity conducted by SDAB substantially assists and materially supports Al Qaeda' terrorist activity. The usual and daily activities of Al Qaeda include planning and executing acts of terrorism against the United States and its citizens, all of which are funded and/or materially supported by the racketeering activities described herein.

9. Al Qaeda benefits by having the funds available to commit its terrorism goals as described above in 6(b).

10. Al Qaeda's commonly held purpose is to "kill the Americans and their allies-civilians and military" and to "plunder their money wherever and whenever they find it." The Al Qaida Enterprise's activities in support of terrorism affect interstate commerce as illustrated by the September 11th attacks, which damaged the United States economy when four commercial airlines were hijacked and crashed into the World Trade Center, a vital center of interstate and foreign commerce.

11. Not applicable.

12. Not applicable.

13. (a) Defendants Osama bin Laden and Reston, among others whose identities are unknown are employed or associated with Al Qaida.

(b) The same entity is not both the liable "person" and the "enterprise" under § 1962(c). Al Qaida is the RICO enterprise. SDAB is a separate person within the meaning of RICO.

14. At the center of the alleged conspiracy is Al Qaida's plan to orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attacks that injured plaintiff. The Al Qaida Enterprise established itself in Afghanistan in 1996 after being turned out of the Sudan. The Al Qaida Enterprise relies on well-placed financial facilitators, including SDAB, and laundered funds from Islamic so-called charities and corporations.

The funds raised were used for such purposes as operation of terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but others were trained in terrorist tactics. Recruits in these training camps were encouraged to think creatively about ways to commit mass murder.

These camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who helped recruits get in and out of Afghanistan. It is in these training camps that the nineteen hijackers were selected to carry out the September 11th attacks. None of this would have been possible without the funds supplied by participants and conspirators like SDAB. Indeed, the Al Qaida Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including SDAB. In order to identify nineteen individuals to carry out the September 11th attacks, Al Qaida needed to select from a large pool of recruits and trainees, which would not have been possible without the assistance provided by SDAB. SDAB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries suffered by the plaintiff resulting from the September 11th attacks include damage to the physical property and property interests of their insureds, resulting in the payment of insurance proceeds for said damage.

16. SDAB's uninterrupted financial and material support of terrorism, mail fraud, wire fraud, money laundering, and substantial assistance, as described herein and in plaintiff's First Amended Complaint, enabled the Al Qaida Enterprise to plan, orchestrate, and carry out the September 11th attacks that injured the plaintiff. Therefore, the conduct of SDAB proximately resulted in the September 11th attacks. The plaintiff suffered injury by reason of the above conduct of SDAB.

17. SDAB is jointly and severally liable for all damages sustained by each plaintiff in an amount in excess of $2,863,347.98.

18. <u>Federal Causes of Action</u>

| Count III | 18 U.S.C. §1962 |
|---|---|
| Count V | 18 U.S.C. §2333 |

19. <u>Pendant State Claims</u>

| Count I | Trespass |
|---|---|
| Count II | Conspiracy |
| Count IV | Aiding and Abetting |
| Count VI | Negligence |
| Count VII | Punitive Damages |

20.   None at this time.  If any additional information is learned through discovery, it shall be provided.

Dated:  September 9, 2005

                                        Respectfully submitted,

                                        ___s/_____
                                        Frank J. Rubino, Esq. (FR-6202)
                                        BROWN GAVALAS & FROMM LLP
                                        Attorneys for Plaintiff
                                        NEW YORK MARINE AND GENERAL
                                        INSURANCE COMPANY
                                        355 Lexington Avenue
                                        New York, New York 10017
                                        (212) 983-8500

**CERTIFICATE OF SERVICE**

      I hereby certify that, pursuant to this Court's Case Management Order No. 2, on September 9, 2005, I caused a true and correct copy of the foregoing RICO STATEMENT APPLICABLE TO SAUDI DALLAH AL BARAKA GROUP LLC to be served on all counsel electronically by the Court's Electronic Case Filing (ECF) system.

Dated: September 9, 2005            /s/_____
                                            Frank J. Rubino, Jr. (FR-6202)