# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                                       )

In Re TERRORIST ATTACKS on         )      03 MDL 1570 (RCC)
SEPTEMBER 11, 2001               )      ECF Case
                                         )
_____)

This document relates to:

    *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC)

    *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-CV-1076 (RCC)

# O'NEILL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MARTIN WACHTER, ERWIN WACHTER, SERCOR TREUHAND ANSALT AND ASAT TRUST REG.'S  MOTION TO DISMISS

## LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, P.C.

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

*Attorneys for the Plaintiffs*

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Gina M. MacNeill, Esquire (GM 0581)
Frederick J. Salek, Esquire (FJS 8565)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.   SERVICE OF PROCESS WAS SUFFICIENT AS PROVIDED FOR UNDER THE
FEDERAL RULES OF CIVIL PROCEDURE RULE 4(F)(2)(C)(II)........................................... 3

   A.   Service is Valid Because Service Pursuant to the Federal Rules of Civil Procedure Rule
   4(f)(2)(C)(ii) was not *Prohibited* by Liechtenstein Law. ............................................................ 4

   B.   If the Court Finds That the Plaintiffs' Service Is Insufficient, Permission By the Court to
   Remedy the Defects in Service is Appropriate. ...................................................................... 10

II.   THERE IS PROPER *IN PERSONAM* JURISDICTION OVER THE DEFENDANTS. ..... 13

   A.   General. ................................................................................................................................. 13

   B.   The Defendants Have Been Sued Under Federal Statutes Permitting Nationwide Service
   of Process and Providing a Basis for Federal Jurisdiction, As Aell as The New York Long-
   Arm Statute. ............................................................................................................................... 14

   C.   Tthe Plaintiffs Adequately Allege Conspiracy as a Basis for Jurisdiction. ...................... 18

      1.   The O'Neill Pleadings Adequately Demonstrate the Conspiracy and the
      Defendants' Role Thereby Supporting Jurisdiction.......................................................... 22

   D.   The United States Due Process Protections to Not Apply to These Foreign Defendants. 24

CONCLUSION.................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................ 26

APPENDIX I ....................................................................................................................... 27

EXHIBIT I .......................................................................................................................... 39

# TABLE OF AUTHORITIES

***Cases***

*730 Bienville Ptnrs., Inc. v. Assurance Co. of Am.*, 2002 U.S. Dist. LEXIS 18780 (D. La. 2002)............ 10

*A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998) ....... 27

*A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir. 1993) ..................................................... 13, 14

*Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network*, No. CIV. A. 99-4653, 2001 WL 41143 (E.D.Pa. Jan. 18, 2001)............................................................................................................... 27

*Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001) ...................................... 27

*Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215 (S.D.N.Y. 1992)............................................ 20

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431 (S.D.N.Y. 2000)............................ 20

*Andre Emmerich Gallery v. Segre*, 96 Civ. 889 (CSH), 1997 U.S. Dist. LEXIS 16899 (S.D.N.Y Oct. 29, 1997)............................................................................................................................................ 23

*Baker v. Great Socialist People's Libyan Arab Jamahiriya*, CV 03-749 (D.D.C. June 30, 2005)............ 25

*Banco Latino S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273 (S.D. Fla. 1999)......................................... 9

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431 (S.D.N.Y. 2000)............................ 20

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) .............................................................................. 18, 19

*Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F. Supp.2d 86 (D. D.C. 2003) .............................................. 15

*Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1225 (5th Cir. 1994) .................................. 16

*Calder v. Jones*, 465 U.S. 783 (1984) ........................................................................................... 19, 20

*Carnigal v. Kartria Shipping, Ltd.*, 2000 WL 1036224 (E.D. La. July 25, 2000) ........................................ 9

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ................. 20, 21, 23

*Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574 (E.D.N.Y. 1998) ....................................... 20, 21

*Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122 (D.D.C. 1984) ..................................................... 16

*Conley v. Gibson*, 355 U.S. 41 (1957) .......................................................................................................... 21

*Curtis v Beatrice Foods Co.*, 481 F Supp 1275 (S.D.N.Y. 1980), *aff'd. without op.*, 633 F2d 203 (2d Cir. 1980)................................................................................................................................................. 5

*Dee-K Enterprises, Inc. v. Heveavil SDN. BHD.*, 174 F.R.D. 376 (E.D. Va. 1997)............................ 5, 6, 9

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001) .................................................................... 27

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) .................................. 13, 14

*Dixon v. Mack*, 507 F.Supp 345 (S.D.N.Y. 1980) ...................................................................... 23

*Echevarria v. Dep't of Correctional Services*, 48 F. Supp. 2d 388 (S.D.N.Y. 1999). ............................. 12

*Emery v. Wood Indus.*, 98-480-M, 2001 DNH 155, 2001 U.S. Dist. LEXIS 12914 (D.N.H. 2001) ........ 6, 9

*Estate of Unger v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001) ............................................... 15, 16

*Flock v. Scripto-Tokai Corp.*, H-00-3794, 2001 U.S. Dist. LEXIS 23881  (S.D. Tex. 2001) ................... 11

*Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d Cir. 1981)........................................................ 20

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................................. 19

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997).................................... 3

*In re Southold Dev. Corp.*, 148 B.R. 726 (E.D. N.Y. 1992) ........................................................ 11

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................... 22

*International Shoe Co. v.  Washington*, 326 U.S. 310 (1945)........................................................ 15, 19, 24

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, (2d Cir. 1993) ........................................ 15, 16, 17

*Jefry v.  FAA*, 370 F.3d 1174 (D.C. Cir. 2004) ........................................................................ 25

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .......................................................................... 25

*Kashi v. Gratos*, 790 F.2d 1050 (1986)................................................................................... 21

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993)....... 21

*Lehigh Valley Industries, Inc. v. Lehigh Colonia  Corp*, 527 F.2d 87 (2d Cir. 1975) ................................ 20

*Lucas v. Natoli*, 936 F.2d 432 (9th Cir. 1991) ........................................................................ 11

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) ................................................ 10

*Mariash v. Morrill*, 496 F.2d 1138 (2d Cir. 1974)..................................................................... 15

*Matesic v. Curtiss-Wright Corp.,* 128 F.R.D. 30 (W.D.N.Y. 1989) ............................................. 11

*McGann v. New York,* 77 F.3d 672 (2d Cir. 1996) ................................................................. 11

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992) ............................................................ 27

*Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999) ........ 27

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,* 84 F.3d 560 (2d Cir. 1996).......................... 13

*Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737 (2d Cir. 1985) ........................................................ 11

*Moses v.Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ........................................................ 27

*Mwami v. Osama Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ........................................................ 15, 23

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) ........................................................ 15

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ........................................................ 21

*People's Mojahedin Org. of Iran v. Dept. of State*, 182 F.3d 17 (D.C. Cir. 2003) ........................................................ 25

*People's Mojahedin Org. of Iran v. Dept. of State*, 327 F.3d 1238 (D.C. Cir. 1999) ........................................................ 25

*Power Integrations, Inc. v. System General Corporation*, C 04-02581 (JSW), 2004 U.S. Dist. LEXIS 25414 (N.D. Ca. 2004) ........................................................ 5, 6

*Prewitt Enters. v. O.P.E.C.*, 224 F.R.D. 497 (D. Ala. 2002) ........................................................ 9

*Proctor & Gamble Cellulose Co. v. Viskoza-Loznica*, 33 F.Supp. 2d 622 (W.D. Tenn. 1998) ........................................................ 7

*Republic of Panama*, 119 F.3d 935 (11th Cir. 1997) ........................................................ 15

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F.Supp. 2d 423 (D. Del. 1999) ........................................................ 6, 7, 9

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ........................................................ 12

*Riverdale Mills Corp. v. U.S. Department of Transportation*, 225 F.R.D. 393 (D. Mass. 2005) ........................................................ 12

*Ryan v. Brunswick Corp.*,   02-CV-0133E (F), 2002 U.S. Dist. LEXIS 13837 (W.D.N.Y. 2002) ........................................................ 12

*S.E.C. v. Vision Communications, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996) ........................................................ 15

*Santos v. State Farm  Fire & Cas. Co.*, 902 F.2d 1092, 1095 (2d Cir. 1990) ........................................................ 13

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) ........................................................ 16

*Self International (HK) Ltd. v. La Salle National Bank, Chicago*, 01 CV 4291 (RCC), 2002 U.S. Dist. LEXIS 5631 (S.D.N.Y. 2002) ........................................................ 13, 14

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ........................................................ 19

*Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95 (E.D.N.Y. 2000) ........................................................ 21

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984) ........................................................ 20

*Smith et al., v. The Islamic Emirate of Afghanistan*, No. 01-CV-10132, 2001 WL 1658211 (S.D.N.Y. Dec. 26, 2001 ........................................................ 12

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ........................................................ 21

*U.S. Fire Ins. Co. v. Jesco Construction Corp.*, 03 Civ. 2906 (SAS), 2003 U.S. Dist. LEXIS 12459 (S.D.N.Y. 2003).................................................................................................................11

*Umbenhauer v. Woog*, 969 F.2d 25 (3d Cir. 1992)...............................................................7, 11

*United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S. Ct. 1011 (1992) ................................9

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).........................................................25

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ........................................13, 14

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.286 (1980) ............................................23

*Yamataya v. Fisher*, 189 U.S. 86 (1903) ..................................................................................25

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)................................................................................25

*Zola v. Gordon,* 685 F. Supp. 354 (S.D.N.Y. 1988) .................................................................11

## Statutes

18 U.S.C. § 1956(a)(1)..............................................................................................................17

18 U.S.C. § 1956(a)(3) .........................................................................................................16, 17

18 U.S.C. § 1961 ......................................................................................................................17

18 U.S.C. § 1965(b) ...........................................................................................................15, 16

18 U.S.C. § 2334(a) ............................................................................................................14, 16

18 U.S.C. § 2339A ....................................................................................................................17

18 U.S.C. § 2339B ....................................................................................................................17

18 U.S.C. § 2339C ....................................................................................................................17

N.Y. C.P.L.R. § 302(a) .......................................................................................................18, 20, 21

## Other Authorities

*American Heritage Dictionary,* http://education.yahoo.com/reference/dictionary (viewed 9/9/05) .........10

*Ballentine's Law Dictionary* (Lexis Law Publishing, 1969) ........................................................9

Buhler, *Transnational Service of Process and Discovery in Federal Court Proceedings: An Overview,* 27 Mar. Law. 1  (2002)...................................................................................................11

*Merriam-Webster Online Dictionary*, http://www.m-w.com (viewed 9/9/05) ...........................10

*MSN Encarta Dictionary*, http://encarta.msn.com/dictionary (viewed 9/9/05) ........................................... 10

*Oxford English Dictionary*, Second Edition (1989) ................................................................................. 9

## Rules

*Advisory Committee Notes of 1963 to Rule 4(i)* ...................................................................................... 6

*Advisory Committee Notes of 1993 Amendments to Rule 4(f)* .................................................................. 6

Fed. R. Civ. Proc. Rule 4 ......................................................................................................................... 3

Fed. R. Civ. Proc. Rule 4(f) .................................................................................................................. 4, 5

Fed. R. Civ. Proc. Rule 4(f)(2)(A) ................................................................................................... *passim*

Fed. R. Civ. Proc. Rule 4(f)(2)(B) ............................................................................................... 6, 8, 12

Fed. R. Civ. Proc. Rule 4(f)(2)(C)(ii) .............................................................................................. *passim*

Fed. R. Civ. Proc. Rule 4(f)(3) ........................................................................................................ *passim*

Fed. R. Civ. Proc. Rule 4(h) .................................................................................................................... 4

Fed. R. Civ. Proc. Rule 4(k)(1)(D) ........................................................................................................ 15

Fed. R. Civ. Proc. Rule 4(m) ................................................................................................................. 11

Fed. R. Civ. Proc. Rule 8(a) ............................................................................................................. 21, 24

Fed. R. Civ. Proc. Rule 8(f) ................................................................................................................... 21

Fed. R. Civ. Proc. Rule 12(b)(4) ........................................................................................................... 13

Fed. R. Civ. Proc. Rule 12(b)(5) ............................................................................................................. 3

Fed. R. Civ. Proc. Rule 44.1 ................................................................................................................... 5

## Treatises

16-108 *Moore's Federal Practice- Civil* Sec 108.42[3][b][i] ................................................................ 20

H. Batliner, *Litigation and Arbitration in Liechtenstein*, 26-7 (Staempfli Publishers Ltd., Berne 2004) 6, 7, 8

*Moore's Federal Practice, Civil*,  Sec. 452 ........................................................................................... 11

## INTRODUCTION

Defendants Martin Wachter, Erwin Wachter, Sercor Treuhand Ansalt and Asat Trust Reg. (collectively referred to as "Wachter Defendents" or "Defendants") filed their Motion to Dismiss two of the cases which are part of *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (RCC):  *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp*., et al., 04-CV- 1923 (RCC) ("*Al Baraka*") and *Estate of John P. O'Neill, Sr. et al. v. The Republic of Iraq, et al*., 04- CV- 1076 (RCC) ("*Iraq*") (collectively the "O'Neill cases" or "Plaintiffs").[1] Defendants' Motion to Dismiss raises two arguments and defenses - that service was improper; and that even if service were proper, personal jurisdiction is lacking.

The Wachter Defendants cannot escape their liability for the horrendous events of September 11, 2001, by way of either of these efforts.  Service upon the Defendants, via Federal Rules of Civil Procedure Rule 4(f)(2)(C)(ii), was sufficient, and personal jurisdiction has been established, as this Memorandum of Law and the record manifestly demonstrates.

## FACTS

The Wachter Defendants are alleged to have participated in a world-wide conspiracy which, culminated, for purposes of this case, in the attacks of September 11, 2001, causing massive death and destruction in New York, Pennsylvania, and the Washington, D.C. area. To seek monetary compensation for the wrongs committed by the conspirators, in the form of actual and punitive damages, the O'Neill Plaintiffs have brought this action in a United States Court.

---

[1] The named Plaintiffs consist of the Estate of the Decedent, together with certain named heirs at law, and a proposed class consisting of others similarly situated, in *Al Baraka*.  Al Baraka SAC ¶¶ 16, 18, 19, 20, 21.   Class certification has not yet been sought.

The decedent, John P. O'Neill, Sr., was murdered on September 11, 2001 as a result of the activities committed by the Defendants named herein, and in the other companion case of *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et  al*., 04-CV-1922 (RCC), as alleged in the Complaint(s) and the companion RICO Statement(s).  In addition to the named Plaintiffs, the Al Baraka SAC describes a proposed class.  SAC ¶¶14, 15 and 127.  *Iraq* is not framed as a class action.

The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the Wachter Defendants and others, who have conspired for many years to attack the United States, to destroy American property, and murder innocent United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. (Iraq TAC ¶ 63).

In essence, as described at length in the O'Neill pleadings, and discussed in part, below,[2] the Wachter Defendants conspired with Osama Bin Laden ("Bin Laden"), Al Qaida, foreign states, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Iraq TAC ¶¶ 38, 41; Al Baraka SAC ¶¶ 22, 23, 25.

Defendants' concert of action and conspiracy to support and promote Bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Iraq TAC ¶ 252. As a result, Plaintiffs have suffered damages as set forth in the Pleadings. Iraq TAC ¶ 253.

The injuries to business or property suffered by the O'Neill Plaintiffs, resulting from the September 11th attack, include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the

---

[2] Attached hereto and incorporated herein as Appendix I is a table summarizing the factual allegations contained in the pleadings relevant to the Wachter Defendants for purposes of the jurisdictional issues discussed in Point II of this Memorandum.

leading symbol of the United States leader in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiffs' jobs, businesses, and livelihoods. RICO ¶¶ 15, 16

## ARGUMENT

## I.   SERVICE OF PROCESS WAS SUFFICIENT AS PROVIDED FOR UNDER THE FEDERAL RULES OF CIVIL PROCEDURE RULE 4(f)(2)(C)(ii).

Notwithstanding their actual receipt of the summons and complaints in the instant matters, the Defendants are seeking to dismiss the actions based upon a purported insufficiency of service of process asserting that such means of service was not proper of the national laws of the Principality of Liechtenstein.  Fed.R.Civ. Proc. Rules 4, 12(b)(5). Wachter Memorandum of Law in Support of Motion to Dismiss ("Wachter Mem.") p. 2-4.

The Plaintiffs respectfully submit that they have met their burden of setting forth a prima facie case of sufficiency of process and sufficiency of service of process (collectively referred to as "sufficiency of service") as to the Wachter Defendants, by serving them with copies of the summons and complaints, dispatched by the Clerk of the United States District Court for the Southern District of New York, via international registered mail, return receipt request, to Liechtenstein, pursuant to the Federal Rules of Civil Procedure Rule 4(f)(2(C)(ii).  *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 658 (S.D.N.Y. 1997).[3]

Plaintiffs served the Defendants pursuant to the Fed. R. Civ. Proc. 4(f)(2)(C)(ii), by directing the Clerk of the Southern District of New York to dispatch copies of the Summons and Complaints, for the above-referenced cases, via international registered mail, return receipt requested.  The Clerk, in fact, dispatched these packages.  *See* MacNeill Affidavit, Exhibit I.

---

[3]  Additionally, the Defendant Asat Trust Reg. was served by publication, and has not challenged same.  As such, in any event, Asat Trust Reg. was properly served, independent of any potential error by way of the Fed. R. Civ. Proc. 4(f)(2)(C)(ii) service.

The adequacy of service of process for entities and individuals located outside of the United States is governed by the Federal Rules of Civil Procedure Rules 4(h) and 4(f).  Rule 4(h) states that service may be effectuated "in any manner prescribed for individuals by subdivision (f) except personal delivery…"  Under Rule 4(f), service upon an "individual not within any judicial district of the United States" may be effected in a number of alternative means.[4]

As Liechtenstein has not entered into a treaty or agreement regarding service, such as the Hague Convention, service under Rule 4(f)(2)(A) was not possible.  Accordingly, Plaintiffs adequately served the Defendants pursuant to the FRCP 4(f)(2)(C)(ii), through the Clerk.

## A.  SERVICE IS VALID BECAUSE SERVICE PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE RULE 4(f)(2)(C)(ii) WAS NOT *PROHIBITED* BY LIECHTENSTEIN LAW.

The Defendants assert that Plaintiffs' service is not valid because Liechtenstein law "prohibits service of process in foreign actions by any means without the mutual legal assistance of the Liechtenstein courts," relying upon the Declaration of one Guntram Wolf ("Wolf") which

---

[4]The alternative means set forth in Rule 4(f) are as follows:

 (1) by any internationally agreed means reasonably calculated to give notice, such  as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents; or

(2) if there is no internationally agreed means of service or the applicable international agreement allows other means of service, provided that service is reasonably calculated to give notice:

A.  in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or

B.  as directed y the foreign authority in response to a letter rogatory or letter of request; or

C.  unless <u>prohibited</u> by the law of the foreign country, by

(i) delivery to the individual personally of a copy of the summons and complaint; or

(ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served; or

(3) by any other means not prohibited by international agreement as may be directed by the court.

(emphasis added).

was submitted by the Schreiber and Zindel defendants.  In neither the Wolf Declaration[5] nor the
Liechtenstein code does it state that service, in the manner prescribed by the Rule 4(f)(2)(C)(ii) is
<u>prohibited</u> under Liechtenstein law; rather, they merely indicate that it may not be a <u>prescribed</u>
manner of service as provided for in Rule 4(f)(2)(A).

     The Defendants' argument rests upon the notion that service of process in Liechtenstein
can only be validly effectuated by the court.  However, service pursuant to Rule 4(f)(2)(C)(ii)
does not seek service which is per se valid under a foreign law, as required under Rule 4(f)(2)(A)
but instead seeks service which is not <u>prohibited</u> by  a country's laws.

     "An interpretation of subsection 4(f)(2)(C) properly begins with the Rule's language,
specifically the pivotal term 'prohibit…'  Thus the plain language of (f)(2)(C)(ii) permits service
via any form of return receipt mail that is not 'forbidden by authority or command.'  A form of
service is not 'forbidden by authority' merely because it is not a form explicitly "prescribed" by
the laws of a foreign country."  *Dee-K Enterprises, Inc. v. Heveavil SDN. BHD.*, 174 F.R.D. 376,
380 (E.D. Va. 1997).  Accordingly, (f)(2)(C)(ii) allows for service in a manner that, is not
expressly prescribed by the laws of a foreign country, so long as it is not expressly prohibited by
those laws.  *Power Integrations, Inc. v. System General Corporation*, C 04-02581 (JSW), 2004
U.S. Dist. LEXIS 25414, *7 (N.D. Ca. 2004).

     This conclusion is supported by the other provisions in subsection (f).  For example:

> "subsection (f)(2)(A) allows service to be effected in the manner
> prescribed by the law of the foreign country.  If subsection (f)(2)(A)
> cannot be satisfied, then a plaintiff may effect service under subsections

---

[5] Nowhere in the Wolf declaration is there any substantiation of his proficiency in the English language, or as to the accuracy of the portions of the statutes purportedly translated from German to English which have an alleged particular impact in the case at bar.  As the purported English language excerpts of the foreign statute are devoid of any indicia or certification as to the skills or proficiency of the 'translator,' this Court is free to reject same.  *Curtis v Beatrice Foods Co*., 481 F Supp 1275 (S.D.NY 1980), *aff'd. without op.*, 633 F2d 203 (2d Cir. 1980).  *See*, Fed. R. Civ. Proc. 44.1. The original German text of the statute, either in part, or as a whole, has not been provided by the challenging party.

(f)(2)(B) or (f)(2)(C).  Thus, if subsection (f)(2)(C) is inapplicable where a form of return receipt mail is not prescribed by the law of a foreign country, then a plaintiff's failure to satisfy (f)(2)(A) would preclude the availability of subsection (f)(2)(C) thereby making the latter subsection useless.   In order to give subsection (f)(2)(C) operative effect, the subsection should be interpreted to permit service of process by the alternative forms of service that, while not specifically prescribed by the laws of a foreign country, are also not prohibited by such laws."

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F.Supp. 2d 423, 430 (D. Del. 1999). *Dee-K Enterprises,* 174 F.R.D. at 380 *See, Power Integrations*, 2004 U.S. LEXIS at *7 , ; *Emery v. Wood Indus.*, 98-480-M, 2001 DNH 155, 2001 U.S. Dist. LEXIS 12914 (D.N.H. 2001) (burden on movant to show that such service was prohibited).

Rather than unequivocally stating that service by mail is was <u>prohibited</u>, as it can not given the actual existence of judicial service by mail as a part of local practice, coupled with service by counsel, upon consent, H. Batliner, *Litigation and Arbitration in Liechtenstein*, 26-7 (Staempfli Publishers Ltd., Berne 2004), Wolf declares that, "[u]nder Liechtenstein law, in order for the O'Neill Plaintiffs to make <u>proper</u> <u>service</u> on these four Defendants, Plaintiffs were required to obtain letters rogatory and the Defendants should have been served through that procedure."  (Wolf ¶12) [emphasis added].  Wolf states that "because no other procedure is set forth in the Liechtenstein codes, the letters rogatory procedure is the only method available."[6] (Wolf ¶ 13).  Mr. Wolf states that, "these provisions of the Liechtenstein Code of Civil Procedure <u>do not permit</u> judicial documents to be served in Liechtenstein by the mail by an American court or by a court officer, such as the Clerk of the Court."

---

[6] The Wolf declaration, while acknowledging the *potential* for the use of letters rogatory sets forth that local process will not be issued in Liechtenstein in all instances where such a request is made.  Taking the Defendants' analysis to its logical conclusion, what they appear to be saying is that they can not be served pursuant to 4(f)(2)(c)(ii), and may not necessarily be able to be served pursuant to 4(f)(2)(B) or even, perhaps, 4(f)(3), leaving them free to avoid the consequences of their actions.  The drafters of the Rules of Civil Procedure certainly would not have envisioned that as a result. *See, e.g., Advisory Committee Notes of 1963 to Rule 4(i)* (the predecessor to 4(f))("permitting service by certain types of mail, affords a manner of service that is inexpensive and expeditious, and requires a minimum of activity within the foreign country"); *Advisory Committee Notes of 1993 Amendments to Rule 4(f)*.

- 6-

That is, Wolf opines as to how such service may be conducted, under local law, but not as to what is prohibited. There is a clear distinction between what is *not permitted*, and what is *prohibited,* both as a matter of language and to effectuate the legislative purpose.

Plaintiffs respectfully suggest that the overwhelming majority of the cases relied upon by the Defendants, are, in fact, supportive of the O'Neill contention, as they all rely upon means of service that were explicitly 'forbidden' or 'prohibited.' *See, e.g.*, *Proctor & Gamble Cellulose Co. v. Viskoza-Loznica*, 33 F.Supp. 2d 622, 665 (W.D. Tenn. 1998) (service of process did not satisfy the requirements of Rule 4(f)(2)(C)(ii) when applicable law was <u>prohibitive</u> of such method of service"); *Umbenhauer v. Woog*, 969 F.2d 25, 33 (3d Cir. 1992) (noting that Rule 4(f)(2)(C)(ii) "would preclude a district court clerk from serving process by signed receipt mail on a defendant in a country whose laws <u>forbid</u> that method of service"); *Resource Ventures, Inc.*, 42 F.Supp.2d  at 430 (subsection 4(f)(2)(c)(ii) limits the forms of service to those that <u>do</u> <u>not</u> <u>violate</u> the law of the country where service is attempted).   Therefore service that may not be proper under the foreign law,[7] and thus may not qualify under 4(f)(2)(A), it is not <u>precluded</u>, under 4(f)(2)(C)(ii) and is sufficient.

Wolf specifically refers to purported English language versions of Sections 27 to 29 of the Liechtenstein Code of Jurisdiction in his declaration. These sections of the Liechtenstein Code do not state that international service is *required* to be completed in this manner.  Rather,

---

[7]  Had the O'Neill Plaintiffs attempted to serve in conformity with local law pursuant to 4(f)(2)(A), as opposed to 4(f)(2)(C)(ii), we would have had to comply with the process described in Wolf's Declaration, that is, "[i]n general, service of judicial documents in Liechtenstein must be made ex officio, that is, by <u>mail</u> or by a court officer."  (¶8) [Emphasis added].  Mr. Wolf does not provide any other cited reference, description, or the actual language of the code relating to the requirements of ex officio service, to support his position.  In fact, "notices from the court to parties are usually sent by registered mail." H. Batliner, *Litigation and Arbitration in Liechtenstein*, 26-7.  Under Liechtenstein law, service by a court by registered mail is a permissible means of effectuating service.  Given the fact that local law utilizes mail for service, it is illogical that process sent by a United States Court would be <u>prohibited.</u>

Nothing in the Federal Rules require an attempt to serve by way of 4(f)(2)(A) prior to using 4(f)(2)(C)(ii).

they provide a manner in which the Liechtenstein Courts *may* provide legal assistance to foreign courts.  Nowhere does it state that a foreign court is *required* to seek the assistance of the Liechtenstein courts.  Nor does it state that service dispatched by a clerk in the United States via registered mail, return receipt, pursuant to the FRCP 4(f)(2)(C)(ii), violates Liechtenstein law or is in any way prohibited.

The sole case cited in support of the Defendants' position, *Jung v. Neschis*, 2003 U.S. Dist. LEXIS 5569 (S.D.N.Y. 2003), Plaintiffs contend, was erroneously decided.

First, the Liechtenstein Code of Judicial Procedure §§27-29, relied upon by the District Court and discussed in the Wolf Declaration, does not state that service of foreign judicial documents *must* be effectuated by these means.  These sections of the Code merely set forth how the courts of Liechtenstein can (not <u>must</u>) assist a foreign court.  Therefore, the Court's finding that Liechtenstein *required* service pursuant to "mutual legal assistance" was in error.

Second, the *Jung* opinion denied the argument that service by registered mail is proper under Liechtenstein procedural statutes when effected ex officio, i.e. by the Clerk of the Court, as discussed in footnote 6, supra.  Neither in *Jung*, nor in the case at hand, was support stated for this naked assertion of Mr. Wolf.  *See*, Batliner, *Litigation and Arbitration in Liechtenstein* at 26-7 (courts ordinarily serve process, although briefs can be exchanged by counsel upon consent).

Third, the *Jung* Court failed to consider Congress' explicit choice of language in differentiating the terms <u>prohibit</u> (4(f)(2)(C)(ii)) from <u>permit</u> (4(f)(2)(A)).  The District Court never made a finding that service pursuant to Fed. R. Civ. Proc. 4(f)(2)(C)(ii) is <u>prohibited</u> by the Courts or the law of Liechtenstein.

The O'Neill Plaintiffs respectfully suggest that, at best, Wolf describes the methodology of service under 4(f)(2)(A) ("manner prescribed by the law of the foreign country") or 4(f)(2)(B)

- 8-

("as directed by the foreign authority in response to a letter rogatory"), but fail to address the alternative of 4(f)(2)(C)(iii) ("unless prohibited by the law of the foreign country, by…any form of mail requiring a signed receipt…dispatched by the clerk of the court…"), let alone the potential for 4(f)(3) ("by other means not prohibited by international agreement as may be directed by the court").

Plaintiffs submit that the "prohibited by" clause of Rule 4(f)(2)(C)(ii) refers only to means of service expressly forbidden by the law of the foreign national.  *See Dee-K Enterprises, Inc.* 174 F.R.D. at 379-380; *Emery*, 2001 U.S. Dist. LEXIS 12914; *Carnigal v. Kartria Shipping, Ltd.*, 2000 WL 1036224, at *2 (E.D. La. July 25, 2000); *Banco Latino S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273, 1277 (S.D. Fla. 1999); *Resource Ventures, Inc.*, 42 F. Supp.2d 423.

Otherwise, subsection (f)(2)(C)(ii) would not have any operative effect, and be merely superfluous to subsection (f)(2)(A), which allows service in a foreign country in any matter "prescribed" by the law of that country.  *Prewitt Enters. v. O.P.E.C.*, 224 F.R.D. 497, 502 (N.D. Ala. 2002).; *Dee-K Enterprises, Inc.* 174 F.R.D. at 379-380.  *See also United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S. Ct. 1011, 1015 (1992) ( "[A] statute must, if possible, be construed in such fashion that every word has some operative effect.")

Furthermore, an interpretation of subsection 4(f)(2)(C)(ii) must examine the pivotal term "prohibit." Webster's defines the verb "prohibit" as "to forbid by authority or command: enjoin; interdict." *Dee-K Enterprises, Inc.* at 379-380, *citing*, *Webster's Third Inter. Dictionary*, at 1813 (1993); *Ballentine's Law Dictionary* (Lexis Law Publishing, 1969) (to forbid, to prevent ); *Oxford English Dictionary*, Second Edition (1989) (to forbid (an action or thing); to prevent, preclude, hinder, or debar (an action or thing) by physical means;  by or as by a command or statute; to interdict; to forbid, stop, or prevent); *Merriam-Webster Online Dictionary*,

http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=prohibit (viewed 9/9/05)(viewed 9/9/05)(viewed 9/9/05) (to forbid by authority; to prevent from doing something); *MSN Encarta Dictionary*, http://encarta.msn.com/dictionary (viewed 9/9/05) (forbid; prevent); *American Heritage Dictionary,*  http://education.yahoo.com/reference/dictionary/entry/prohibit(viewed 9/9/05)  (viewed 9/9/05) (same).  *C.f.*, *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 469 (1988) (Brennan, dissent) (although the dictionary is "hardly the final word on the meaning of constitutional language, it is noteworthy that Webster's" includes, as one of the definitions of "prohibit," "to prevent from doing something."  Webster's Ninth New Collegiate Dictionary 940 (1983)); *730 Bienville Ptnrs., Inc. v. Assurance Co. of Am.*, 2002 U.S. Dist. LEXIS 18780 (D. La. 2002).

The Rules are designed to provide for flexibility in service, particularly in the international arena where countries may refuse to enter into an international agreement relative to the service of process.  Where, it can not be demonstrated that the procedure utilized was forbidden under the laws of the foreign state, where the defendant received actual notice of the proceedings and timely filed a motion to dismiss, where the Plaintiff have acted in good faith, the relief requested should be denied.

### B.  IF THE COURT FINDS THAT THE PLAINTIFFS' SERVICE IS INSUFFICIENT, PERMISSION BY THE COURT TO REMEDY THE DEFECTS IN SERVICE IS APPROPRIATE.

In the event that this Court deems that service was incorrectly made, the Plaintiffs request that this Court reject the relief sought by the Defendants, a dismissal; rather, it should quash the service and grant leave to leave to serve, *non pro tunc,* pursuant to Fed. R. Civ. Proc. Rule 4(f)(3), or, alternatively, grant leave to re-serve as certain of the statutes of limitations may have run .

Upon determining that process has not been properly served on a defendant, a district court possess' discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply quash service of process.  However, dismissal of a complaint is inappropriate when there exists a reasonable prospect that service may yet be obtained. In such instances, the district court should, at most, quash service, leaving the Plaintiff free to effect proper service. *Umbenhauer*, 969 F.2d at 30.  *See also, Montalbano v. Easco Hand Tools, Inc.,* 766 F.2d 737, 740 (2d Cir. 1985) (the courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant; service will ordinarily be quashed and the action preserved where there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly); *Matesic v. Curtiss-Wright Corp.,* 128 F.R.D. 30, 32 (W.D.N.Y. 1989); *McGann v. New York,* 77 F.3d 672, 674 n.2 (2d Cir. 1996); *Zola v. Gordon,* 685 F. Supp. 354, 377 (S.D.N.Y. 1988); *U.S. Fire Ins. Co. v. Jesco Construction Corp*., 03 Civ. 2906 (SAS), 2003 U.S. Dist. LEXIS 12459, *10 (S.D.N.Y. 2003); *Flock v. Scripto-Tokai Corp*., H-00-3794, 2001 U.S. Dist. LEXIS 23881, *17 (S.D. Tex. 2001).[8, 9]

---

[8] The one hundred and twenty (120) day rule of Fed.R.Civ.Proc. 4(m) by its very terms does not apply to service in foreign jurisdictions ("This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1)").  *Lucas v. Natoli*, 936 F.2d 432, 432-433 (9th Cir. 1991), *cert. denied,* 502 U.S. 1073 (1992); *Flock v. Scripto-Tokai Corp*., H-00-3794, 2001 U.S. Dist. LEXIS 23881 *15-7 (S.D. Tex. 2001) (time can be extended even when good cause is not shown); *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 805 F. Supp. 3, 4-5 (E.D. N.Y. 1992); *In re Southold Dev. Corp*., 148 B.R. 726, 728-730 (E.D. N.Y. 1992); *See generally, Moore's Federal Practice, Civil,*  Sec. 452; Buhler, *Transnational Service of Process and Discovery in Federal Court Proceedings: An Overview*, 27 Mar. Law. 1, 25-26 (2002).

It is undisputed that in the cases at bar, the Defendant made good faith attempts at service, with the instant service having been attempted well under 120 days after the Defendants were named in the *Al Baraka* case, and in both instances within the time frame as set forth in the Scheduling Order of the Court, as amended.  See the Declaration of Gina M. MacNeill, Esquire, Exhibit I.

This Court recognized the need for flexibility in service in Paragraph 11 of CMO 2, wherein it provided that "…provided that the plaintiffs show good cause for the failure to serve, the Court may extend the time for service for an appropriate period."

As noted in notes 9 and 11, below, this Court has the authority, to authorize the instant service *non pro tunc* under 4(f)(3).

[9] The Plaintiffs would seek leave to serve by certified mail (or 'overnight' mail such as FedEx or DHL), receipt requested, by the Clerk pursuant to 4(f)(3), as described in Footnote 11, or such alternative means as to this Court

To the extent that this Court determines that a showing of cause is required to extend the time to serve, Plaintiffs suggest that such showing can be made.  Generally, courts consider whether the delay resulted from inadvertence or whether a reasonable effort to effect service has occurred, and whether the defendant has been prejudiced in determining good cause.  *Echevarria v. Dep't of Correctional Services*, 48 F. Supp. 2d 388, 392 (S.D.N.Y. 1999).  The Plaintiffs herein attempted, in good faith, service pursuant to the Rules, as outlined in the MacNeill declaration.  The Defendants have shown, and can not show any sort of prejudice, given the status of the other defendants in the instant cases and the related cases in the subject multi-district litigation.  Even if good cause has not been shown the time period for service should be extended as the Defendants indisputably received actual notice of the lawsuit,  they will not suffer prejudice, and the Plaintiffs would be severely prejudiced if theircomplaint were dismissed.  *In re Sheehan*, 253 F.3d 507, 512 (9th Cir. 2001);  *Riverdale Mills Corp. v. U.S. Department of Transportation*, 225 F.R.D. 393, 395 (D. Mass. 2005).

For these reasons, the Plaintiffs respectfully request that in the instance that the Court finds service to be insufficient, the Court merely quash service but preserve the action against these Defendants as there is a reasonable prospect that the Plaintiffs can serve the Defendants. [10,11]

---

seem just and proper, if *non pro tunc*, approval is denied.  Conceivably, Plaintiff could seek letters rogatory pursuant to 4(f)(2)(B), and upon the denial of such action by the local authorities, come back for service pursuant to 4(f)(3).  We suggest that neither is required, for the reasons set forth herein.  *See also Smith et al., v. The Islamic Emirate of Afghanistan*, No. 01-CV-10132, 2001 WL 1658211, at *2 (S.D.N.Y. Dec. 26, 2001) (Fed. R. Civ. P. 4(f)(3) was "adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries[.]")   Such service via certified mail, would be proper, even if in contravention of  the law of the recipient state.  *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002); *Ryan v. Brunswick Corp.*,  02-CV-0133E (F), 2002 U.S. Dist. LEXIS 13857, *6-7 (W.D.N.Y. 2002)

[10] To the extent that due process considerations are even applicable (see Point II-D, below). *See S.E.C. v. Tome*, 833 F.2d 1086, 1092 (2nd Cir. 1987) ("To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend." *citing Wuchter v. Pizzutti*, 276 U.S. 13, 24 (1928)).

## II.  **THERE IS PROPER *IN PERSONAM* JURISDICTION OVER THE DEFENDANTS.**

### A.  GENERAL.

Defendants have moved to dismiss the case, pursuant to the Federal Rules of Civil Procedure Rule 12(b)(4) based upon a purported lack of personal jurisdiction over them.  They are seeking to challenge this court's assertion of long-arm jurisdiction over non-United States citizens, based upon statutory law and constitutional principles of due process.  *Santos v. State Farm  Fire & Cas. Co.,* 902 F.2d 1092, 1095 (2d Cir. 1990).

They are wrong.

The burden is on the plaintiff of establishing that the court has jurisdiction over the defendant.  *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001); *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Self International (HK) Ltd. v. La Salle National Bank, Chicago,* 01 CV 4291 (RCC), 2002 U.S. Dist. LEXIS 5631, at *4 (S.D.N.Y. 2002).  The plaintiff may meet this burden by way of pleadings and affidavits. *Whitaker,* 261 F.3d at 208 (2d Cir. 2001) (affidavits); *Distefano*, 286 F.3d at 84 (2d Cir. 2001) (pleadings and affidavits).

To survive a motion to dismiss, plaintiff is only "required to make only a prima facie showing that [defendant] is amenable to personal jurisdiction in New York."  *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993); *Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566-7 (2d Cir. 1996); *Whitaker,* 261 F.3d at 208 (2d Cir. 2001).  All allegations are construed in the light most favorable to the plaintiff and all doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving

---

[11] In *Export-Import Bank v. Asia Pulp*, 03 Civ. 8554, 2005 U.S. Dist. LEXIS 8902 (S.D.N.Y. May 11, 2005) , Magistrate Francis, upon finding that service via DHL was improper under Rule 4(f)(2)(C)(ii), held that alternatively, upon request of the Plaintiff, determined that the service was proper, *non pro tunc,*  under Rule 4(f)(3). Plaintiffs herein request such relief, or in the alternative, leave to reserve, as referenced in notes 8 and 9, above.

.

party.  *A.I. Trade Finance, Inc.*,  989 F.2d at 79-80; *Distefano*, 286 F.3d at 84 (2d Cir. 2001); *Self International (HK) Ltd.*, 2002 U.S. Dist. LEXIS 5631 at *4 ("Where the court relies on pleadings and affidavits, rather than conducing an evidentiary hearing, the plaintiff need only make a prima facie showing that the exercise of jurisdiction is proper.  Moreover, the pleadings and affidavits are construed in the light most favorable to the plaintiff and all doubts are resolved in the plaintiff's favor.")

Personal jurisdiction in a diversity cases, or in federal question cases where the statute, unlike the case at bar, does not provide for national service of process, is governed by the law of the forum state, in this case, New York.  *A.I. Trade Finance, Inc.*, 989 F.2d 76(2d Cir. 1993); *Whitaker,* 261 F.3d at 208 (2d Cir. 2001); *Distefano*, 286 F.3d 81 at 84; *Self International (HK) Ltd.*, 2002 U.S. Dist. LEXIS 5631 at *5.  If jurisdiction is found to be appropriate under the laws of the forum state, the court must then determine, if applicable, if the requisites of due process are satisfied.  *Whitaker,* 261 F.3d at 208 (2d Cir. 2001); *Self International (HK) Ltd.* 2002 U.S. Dist. LEXIS 5631 at *5.

Plaintiffs contend that service was proper under the various applicable federal statutes permitting nationwide service of process as well as under the New York long-arm statute. Plaintiffs further contend that while due process standards were complied with, as the Wachter Defendants claim to have absolutely no United States contacts, due process considerations do not even come into play.

### B.  THE DEFENDANTS HAVE BEEN SUED UNDER FEDERAL STATUTES PERMITTING NATIONWIDE SERVICE OF PROCESS AND PROVIDING A BASIS FOR FEDERAL JURISDICTION, AS WELL AS THE NEW YORK LONG-ARM STATUTE.

As an initial matter, the Plaintiffs have brought federal statutory claims that permit nationwide service of process. ATA, 18 U.S.C. § 2334(a) ("Process in such a civil action may be

served in any district where the defendant resides, is found, or has an agent."); RICO 18 U.S.C. §

1965(b) ("process . . . may be served in any judicial district of the United States by the marshal

thereof"). Indeed, the D.C. Court has already recognized that nationwide service of process is an

appropriate tool in this case. In denying defendant Khudeira's motion to dismiss *Burnett v. Al*

*Baraka* (*Burnett I*), the court held that "a plaintiff may utilize a statutes nationwide service of

process to establish personal jurisdiction, however, if the plaintiff asserts merely a colorable

claim under the statute." *Burnett v. Al Baraka Inv. & Dev. Corp.*,, 274 F. Supp.2d 86, 97-98 (D.

D.C. 2003), *citing Republic of Panama*, 119 F.3d 935, 941-42 (11th Cir. 1997); *IUE AFL-CIO*

*Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993), *cert. denied*, 513 U.S. 822 (1994).

The United States Court of Appeals for the District of Columbia, recently highlighted, in

another terrorism case, the extensive reach of this doctrine. *Mwani v. Osama Bin Laden*, 417

F.3d 1 (D.C. Cir. 2005).

Accordingly, the Court need not refer to the forum state's long-arm statute in determining

whether the first prong of *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) is

satisfied, if it applies at all. *See Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104

(1987); *See also,* Fed. R. Civ. P. 4(k)(1)(D) (service of summons may establish personal

jurisdiction when "authorized by a statute of the United States"); *S.E.C. v. Vision*

*Communications, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996); *Mariash v. Morrill*, 496 F.2d 1138 (2d

Cir. 1974); *Estate of Unger v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001); *Mwami,* 417

F.3d 1.

It is beyond question that if Plaintiffs do properly state a claim against the Wachter

Defendants under ATA or RICO,[12] then this Court may properly assert personal jurisdiction over

the Wachter Defendants to adjudicate the ATA and RICO Claims, as well as all of the other

---

[12] The Defendants herein did not challenge the sufficiency of the pleadings in their motion.

claims asserted in the complaints.  The ATA provides that claims may be brought in "any district where any plaintiff resides" and that process "may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a).  RICO similarly provides that "process . . . may be served in any judicial district of the United States . . ." 18 USC §1965(b).  Because both statutes provide for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1225, 1258 (5th Cir. 1994) (citations omitted); *see also SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Unger,* 153 F.Supp2d at 88; *Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 125 (D.D.C. 1984).  Moreover, if the court has personal jurisdiction over the Wachter Defendants with respect to Plaintiffs' ATA or RICO claims, then it may also assert pendent personal jurisdiction over the remaining claims that derive from the same events.  *Herrmann* 9 F.3d at 1056-57.

Because the Plaintiffs' RICO claims, and other allegations, against the Defendants herein arise from their money laundering activities[13] on behalf of al Qaida in furtherance of al Qaida's conspiracy to attack America, this Court necessarily possesses personal jurisdiction over the

---

[13] Pursuant to 18 U.S.C. § 1956(a)(3), a financial institution engages in money laundering if it conducts or attempts to conduct a financial transaction involving property used to conduct or facilitate specified unlawful activity, with the intent:

    (A) to promote the carrying on of specified unlawful activity;

    (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

    (C) to avoid a transaction reporting requirement under State or Federal law.

Under subsection (b)(2) of that same statute:

    the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and –

    (C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

Defendants.  Defendants knowingly facilitated financial transactions on behalf of Osama bin Ladin and others in order to further al Qaida's terrorist activities.  Importantly, 18 U.S.C. § 1961 defines "specified unlawful activity" to include conduct in violation of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material support or resources to terrorists. Thus, the Wachter Defendants have engaged in acts of money laundering within the meaning of 18 U.S.C. § 1956(a)(3).[14] *See generally*, Appendix I, infra.

As various co-conspirators maintained correspondent bank accounts with United States Banks, the money laundering activities underlying the Plaintiffs' RICO claims confer personal jurisdiction over Defendants in this case.

Even if Plaintiffs do not state a claim under the ATA or RICO, that statutes nonetheless provide a basis for the assertion of jurisdiction over the Wachter Defendants, so long as Plaintiffs' claims under either the ATA or RICO are at least colorable. As the Second Circuit explained in *Herrmann*:

> Dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not involved a federal controversy.

9 F.3d  at 1055.

---

[14] 18 U.S.C. § 1956(a)(1) further provides that a financial institution is guilty of money laundering in the event that it conducts or attempts to conduct such a financial transaction, knowing that the property involved in that financial transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity. As alleged in the pleadings, al Qaida has, from its inception, depended on the diversion of contributions to ostensible charities to support its global operations. The funds obtained through this process necessarily represent the proceeds of unlawful activity, in that many well meaning contributors are defrauded in the process. Given the relationship between the Defendants, various other co-conspirators and al Qaida during al Qaida's formative years, the Defendants were aware that the funds deposited in the al Qaida accounts it maintained were generated through illegal means, and were being channeled to support al Qaida's terrorist ambitions. As such, Defendants are guilty of money laundering under § 1956(a)(1) as well. The violations of that subsection also give rise to personal jurisdiction over the Wachter Defendants under § 1956(b)(2).

Here, regardless of whether the Court finds that Plaintiffs have stated a claim under the ATA or RICO, Plaintiffs' claims against the Wachter Defendants under those statutes are not "so insubstantial, implausible, foreclosed by prior decisions. . .  or otherwise completely devoid of merit" so as to preclude the exercise of jurisdiction.

Finally, there is jurisdiction under the New York long-arm statute.  N.Y. C.P.L.R. § 302(a)(2) and 302(a)(3). [15,16]

## C.  THE PLAINTIFFS ADEQUATELY ALLEGE CONSPIRACY AS A BASIS FOR JURISDICTION.

Moreover, personal jurisdiction over the Defendants is appropriate because the Wachter Defendants purposefully directed its activities towards the United States through its active, knowing assistance to al Qaida.[17]  In *Burger King v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court held that the requirements of due process were satisfied  "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472.  Physical

---

[15] CPLR Section 302(a) provides, in pertinent part, that there is personal jurisdiction over non-domiciliaries, "who in person or through an agent:

    (1)   transacts any business within the state or contracts anywhere to supply goods or services in the state; or

    (2)   commits a tortuous act within the state, except as to a cause of action for defamation of character arising from the act; or

    (3)   commits a tortuous act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

       i    regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods  used or consumed or services rendered, in the state, or

       ii    expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or *international* commerce; or

       iii   owns, uses or possesses any real property situated within the state.

[16]At this point in the litigation, the parties have extensively briefed the applicability of the New York long arm statute. Rather than burdening the Court with a restatement of those same arguments herein, Plaintiffs incorporate by reference the discussion of the applicability of the New York long arm statute set forth in the various previously filed co-plaintiffs' memoranda of law, such as the *Federal* Plaintiffs' Opposition to the Motion to Dismiss of National Commercial Bank at pp. 10-11.

[17] As indicated in Point II- D, below, the Plaintiffs do not believe that this Court need even reach this due process argument.

presence is not a requirement.  *Id*. at 475.  In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if none of the defendant's conduct took place in the forum.  *Calder v. Jones*, 465 U.S. 783, 789 (1984).

The Supreme Court, in *International Shoe*, 326 U.S. at 316 (1945), established a two-part test for jurisdiction – minimum contacts and fundamental fairness.  That is, if the defendant is not present in the territory of the forum, he has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice."  326 U.S. at 316.  It depends on the 'quality and nature' of the defendant's forum related activities.  326 U.S. at 317.

In *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), the Supreme Court ruled that minimum contacts can not exist unless "there be some act by which the defendant *purposely avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  357 U.S. at 253; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  *A. I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 82 (2d Cir. 1993).  It is a question of foreseeability- did the defendant have reason to foresee being 'haled' before the forum court. *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977).

In *Burger King*, the Supreme Court ruled that specific jurisdiction requires a showing by the plaintiff that (i) the non resident defendant had  purposefully established significant (i.e., not 'random, fortuitous or attenuated') contact with the forum state; and (ii) the plaintiff's cause of action arises out of or is related to the defendant's forum  state contacts.  471 U.S. at 472, 486.

"Purposefully directed" includes situations where the nonresident defendant's act is geographically intentionally directed at the plaintiff in the forum state.  *See*, 16-108 *Moore's*

*Federal Practice- Civil* Sec 108.42[3][b][i].  Thus, causing an effect in the forum state

constitutes purposeful availment.  *See, e.g., Calder v. Jones*, 465 U.S. 783, 790 (1984) (writing

and publishing article about California resident knowing that it would be distributed in

California, made them subject to California jurisdiction).

   In certain situations, a defendant may be considered to have established contacts through

the acts of a third party, such as the actions by a co-conspirator.[18]  By joining a conspiracy,

knowing that acts in furtherance of the conspiracy have taken place or will take place in the

forum state, the defendant purposefully avails himself of the privileges of the forum state and

should reasonably expect to be haled into court there.  *See, e.g., Cleft of the Rock Foundation v.*

*Wilson*, 992 F. Supp. 574, 581-2 (E.D.N.Y. 1998); *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782

F. Supp. 215, 220-222 & n.6 (S.D.N.Y. 1992) (plaintiff must "(1) make a prima facie factual

showing of a conspiracy, (2) allege specific facts warranting the *inference* that the defendant was

a member; and (3) show that defendant's co-conspirator committed a tortuous act pursuant to the

conspiracy in this jurisdiction" *citing Chrysler Capital Corp. v. Century Power Corp.*, 778 F.

Supp. 1260 (S.D.N.Y. 1991); *Singer v. Bell*, 585 F. Supp. 300, 302-3 (S.D.N.Y. 1984) (same);[19,]

[20]  *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 446 (S.D.N.Y. 2000)

(the third element is changed to "demonstrate the commission of an overt act in New York

during, and pursuant to, the conspiracy.")  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial*

*Corp*, 527 F.2d 87, 93 (2d Cir. 1975).  Merely asserting of the existence conspiracy, unlike in the

---

[18] For purposes of the New York long arm statute, C.P.L.R. 302(a), a co-conspirator may be an agent.  *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122-3 (2d Cir. 1981); *Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 581 (E.D.N.Y. 1998); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 445 (S.D.N.Y. 2000).

[19] Jurisdictional discovery should be had if this court determines that the record is presently inadequate.  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial  Corp*, 527 F.2d 87, 93 (2d Cir. 1975).  If this court so determines, such relief is specifically sought.

[20] The district court notes that a conspiracy can rarely be proved by direct evidence and usually is established by circumstantial evidence and the totality of conduct of the parties and the reasonable inferences which can be drawn therefrom; mere speculation and conjecture are not enough. *Singer*, 585 F. Supp. at 303-4.

pleadings in the case a bar, may not be sufficient to establish jurisdiction for purposes of CPLR 302(a)(2).  *Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998) (plaintiff "must demonstrate (i) a prima  facie factual showing of a conspiracy to commit a tort in New York; and (ii) allege specific facts warranting the *inference* that the defendant was a member of the conspiracy").[21]

To make a prima facie showing of conspiracy, the Plaintiff must allege the primary tort and the following four elements:

> (i)     a corrupt agreement between two or more parties;
>
> (ii)    an overt act in furtherance of the agreement;
>
> (iii)   the parties intentional participation in the furtherance of the plan or purpose; and,
>
> (iv)    the resulting damage or injury.

*Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998), *citing Kashi v. Gratos,* 790 F.2d 1050, 1055 (1986).

The prima facie showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt at in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital*, 778 F. Supp. at 1267.  This Court has further held that: "[t]o warrant the inference that a

---

[21] It should be noted that these cases pre-date the Supreme Court's re-emphasis of the Fed. R. Civ. Proc. 8(a) concept of 'notice pleading' in *see generally Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993); *Pelman v. McDonald's Corp*., 396 F.3d 508, 511-12 (2d Cir. 2005) (need only meet the bare-bones notice-pleading requirements of Rule 8(a)).  Fed. R. Civ. Proc. 8(f) requires that federal district courts construe all pleadings to do "substantial justice." Therefore, pleadings should not be dismissed for technical defects. The pleading should be construed as a whole, to determine whether adequate notice of the claim or defense is presented  Fed. R. Civ. Proc. 8 (f); *Conley v. Gibson*, 355 U.S. 41, 48 (1957) (complaint construed to do substantial justice).

defendant was a member of the conspiracy, plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005) (citations omitted).

### 1.   The O'Neill Pleadings Adequately Demonstrate the Conspiracy and the Defendants' Role Thereby Supporting Jurisdiction.

The Wachter Defendants are subject to jurisdiction here because, as alleged in the pleadings, they conspired with al Qaida to attack the United States.  The Plaintiffs have satisfied these elements here.  Fairly read, the pleadings, as outlined in Appendix I, allege that the Wachter Defendants, personally and through the entity defendants, knowingly provided funds to al Qaida and/or otherwise assisted in their financial activities in furtherance of the conspiracy. Moreover, al Qaida's ambition to attack the United States, and New York in particular, was well known for many years prior to the September 11th Attacks, as evidenced by the 1993 bomb attack on the World Trade Center and the foiled plot to simultaneously attack the George Washington Bridge and Holland Tunnel.  Thus, the potential effects in New York of contributing to al Qaida were undeniably foreseeable to that terrorist organization's sponsors and supporters, including the Wachter Defendants.  Further, the Plaintiff have specifically alleged that "the September 11th Attack was a direct, intended and foreseeable product" of the material support provided by the Wachter Defendants and al Qaida's other sponsors and facilitators. Indeed, given that al Qaida had repeatedly declared that its primary objective was to conduct terrorist attacks against the United States, it is self evident that the entities and people who chose to knowingly sponsor al Qaida did so in order to assist that terrorist organization in mounting successful

attacks, and that the individuals chosen to carry out such attacks, and that the individuals chosen to carry out such attacks act "for the benefit" and "on behalf" of all of the organization's members and sponsors.  When read in a light most favorable to the Plaintiffs, the allegations of the pleadings give rise to a reasonable inference that the Wachter Defendants were members of al Qaida's conspiracy to attack America. As a result, the actions of the Defendants co-conspirators, including the September 11th Hijackers themselves, are imputable to the Wachter Defendants for jurisdictional purposes and serve to establish minimum contact with New York sufficient to satisfy Due Process.  *See*, *Mwami v. Osama Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005).[22]

For example, as demonstrated at length in Appendix I, it is alleged that the Wachter Defendants were members of the conspiracy (Iraq TAC 38, 41, 250; Al Baraka SAC 22, 25), that they were engaged in money laundering activities on behalf of the conspiracy, including, without limitation, on behalf of Al Qaida, sovereign defendants, and other co-conspirators, including Al Taqwa (Iraq TAC 3, 38, 41, 49, 48, 50, Al Baraka SAC 25) and that the hijackings causing the death and destruction on September 11 were the culmination of a conspiracy among the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks.  Iraq TAC 63, 252-3; Al

---

[22] By imputing forum acts of their co-conspirators to non-resident defendants, this court has repeatedly found that non-resident defendants have minimum contacts wit the forum to satisfy Due Process. *Dixon v. Mack*, 507 F.Supp 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is on the acts, of course, complained of in the suit, supplies the necessary minimum contacts . . ."); *Andre Emmerich Gallery v. Segre*, 96 Civ. 889 (CSH), 1997 U.S. Dist. LEXIS 16899 (S.D.N.Y Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contact satisfying Due Process).  The conspiracy jurisdiction cases from this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being held into court there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. LEXIS at *18 (both citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)); *Chrysler Capital Corp.*, 778 F.Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process. In that Defendant was not a "non-resident" until recently, these cases are instructive, but not necessary for a finding of jurisdiction.

Baraka 25.  The attacks of September 11, 2001 were not isolated incidents, but rather the coordinated effort of a terrorist organization, after years of planning, and utilizing an extensive network of support and aid, by various individuals, including the Defendants herein. Al Baraka. 2.  The Defendants, who conspired with each other, knew or should have known that their actions in furtherance of a conspiracy to commit international terrorist acts against the United States and its nationals, including the events of September 11, would result in the murder of innocent persons. Al Baraka SAC. 151, 152.

Details as to the scope of the conspiracy are set forth at various locations in the pleadings. Attached hereto and incorporated herein as Appendix I, is a detailed summary of the various allegations expressly set forth in the pleadings, setting forth the conspiracy and the relationship of the Defendants to such conspiracy.  Such specific allegations, to the extent that they are even required under Rule 8(a) notice pleading standards, coupled with reasonable inferences, clearly support a finding of *in personam* jurisdiction for the Wachter Defendants.

### D.  THE UNITED STATES DUE PROCESS PROTECTIONS TO NOT APPLY TO THESE FOREIGN DEFENDANTS.

The Defendants further challenge the assertion of an American court over them on the ground that they lack the 'minimum contacts' and other requirements of the due process clause as set forth in *International Shoe* and its progeny.  In support of such position, they have submitted lengthy affidavits detailing their purported lack of ties with the United States.  Their position, in brief, is that they have absolutely no direct contacts with the United States nor any presence in the United States.

Their due process challenge, however, must fail, as it is premised upon a flawed assumption - that is, that they are subject to the due process protections of the Fifth Amendment. To the contrary, non-resident aliens who do not have sufficient contacts with the United States

are not entitled to Fifth Amendment protections.  *Jefry v.  FAA,* 370 F.3d 1174, 1182-3 (D.C. Cir. 2004), *citing, United States v. Verdugo-Urquidez,* 494 U.S. 259, 271 (1990), *Johnson v. Eisentrager,* 339 U.S. 763, 771 (1950), *Yamataya v. Fisher,* 189 U.S. 86, 101 (1903), *Yick Wo v. Hopkins,* 118 U.S. 356 (1886); *People's Mojahedin Org. of Iran v. Dept. of State,* 327 F.3d 1238 (D.C. Cir. 1999); *People's Mojahedin Org. of Iran v. Dept. of State,* 182 F.3d 17 (D.C. Cir. 2003).   In *Baker v. Great Socialist  People's Libyan Arab Jamahiriya,* CV 03-749, p.10 (D.D.C. June 30, 2005) (Kessler, J), involving another terrorist attack, in this case a hijacking of an airplane in Greece, the District Court in the District of Columbia, following this analysis, denied a motion to dismiss filed by Libyan nationals who, identical to the situation in the case at bar, denied having any presence in the United States.

## CONCLUSION

For the reasons set forth herein, and as addressed at argument, which is requested, the Defendants' Motion should be denied.

Alternatively, with regard to the issue of service, Plaintiffs should be granted leave to reserve the summons and complaint.

Dated:  September 14, 2005

Respectfully submitted

LAW OFFICES OF JERRY S. GOLDMAN &
    ASSOCIATES, P.C.

By: _/s/_____
    JERRY S. GOLDMAN, ESQ. (JG8445)
    FREDERICK J. SALEK, ESQ. (FS8565)
    GINA M. MAC NEILL, ESQ. (GM0581)

*Attorneys for the Plaintiffs,*
*Estate of John P. O'Neill, et al.,*

    111 Broadway, 13TH Floor
    New York, N.Y. 10006
    212.242.2232

- 25-

## **CERTIFICATE OF SERVICE**

I, GINA M. MAC NEILL, ESQUIRE, do hereby certify that I served the within

Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss, on this

date, on all of the parties in the case via filing with the Court's electronic case filing (ECF)

system.

Dated: September 14, 2005

/s/_____
GINA M. MACNEILL, ESQUIRE

# APPENDIX I

## Summary of O'Neill Pleadings[23] References to the Conspiracy and the Wachter Defendants For Purposes of Jurisdiction

The Conspiracy For Purposes of Jurisdiction[24]

1.  On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. RICO Statement (Attacks). RICO Statement, *passim.*

2.  The attacks of September 11, 2001, were not isolated incidents, but rather a coordinated effort by the al Qaeda terrorist organization, planned for years by an extensive network of Islamic militants with the support, aid and assistance of banks, governments, and individuals. Al Baraka SAC ¶2.

3.  The hijackings referenced above were the culmination of a conspiracy among the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Iraq TAC ¶213.

4.  The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Iraq TAC ¶249.

5.  The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror. Iraq TAC ¶250.

6.  The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United

---

[23] The pleadings, pursuant to CMO No. 2, Para. 14, consist of the TAC in Iraq (hereinafter cited as IRAQ TAC ¶), the SAC in Al Baraka (hereinafter cited as Al Baraka SAC ¶), and the RICO Statement filed, pursuant to Stipulation, as to the Wachter Defendants on behalf of both the Iraq and the Al Baraka cases, Docket 961, and as amended, Docket 1105 (hereinafter cited as RICO ¶). See also, Amended RICO Statement, p 1, third introductory paragraph ("This filing is a supplemental pleading in accordance with 03 MDL 1570, CMO-2, Para. 14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time…"). *McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) (noting district court dismissed complaint after considering both complaint and RICO case statement); *Moses v.Martin*, 360 F. Supp. 2d 533, 539, n. 22 (S.D.N.Y. 2004) ("My individual rules require a party alleging a RICO violation to submit a RICO Statement, which is considered part of the complaint); *Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999); *A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998); *Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network*, No. CIV. A. 99-4653, 2001 WL 41143, at *3 n.1 (E.D.Pa. Jan. 18, 2001) ("The RICO case statement is a pleading that may be considered part of the operative complaint for purposes of a motion to dismiss.").

The parties entered into a scheduling stipulation. MDL Docket # 829.

[24] There are references in various points of the complaints (e.g., by the substantive causes of actions) to incorporating various paragraphs in the pleadings without setting them forth at length. See, e.g., Iraq TAC ¶248; Al Baraka SAC ¶156

States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Iraq TAC ¶251.

7.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Iraq TAC ¶252.

8.     As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein. Iraq TAC ¶253.

9.     As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaeda, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  Al Baraka SAC ¶157.

10.    As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. Al Baraka SAC ¶158.

11.    The Defendants' conspiracy resulted in the September 11th terrorist attacks that killed the Decedents. Al Baraka SAC ¶159.

12.    The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, As set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Al Baraka SAC ¶160.

13.    As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding  Al Baraka SAC ¶ 161, which were incorporated by reference. Al Baraka SAC ¶161.

14.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka SAC ¶168.

15.     By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Al Baraka SAC ¶169.

16.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Al Baraka SAC ¶177; see Iraq TAC ¶266 (alleging violations of 18 USC 1962 (b), (c) and/or (d).

17.    The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate

result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. SAC ¶ ¶178-180; see Iraq TAC ¶ ¶267-8, 269-72.

18.    The Defendants performed acts directly or participated in activities and conspired to participate. Iraq TAC ¶267.

19.    The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Al Baraka SAC ¶162.

20.    The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Iraq TAC ¶ 249.

21.    Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Iraq TAC ¶ 251.

22.    The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Al Baraka SAC ¶163.

23.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Al Baraka SAC ¶ 51.

24.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Al Baraka SAC ¶ 152

The Relationship Between the Wachter Defendants and the Conspiracy

25.    Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt,  along with others, are natural persons, organizations, and/or banks, and charities located all over the world who conspired with Osama Bin Laden, Al Qaeda, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Iraq TAC ¶¶ 38, 41, 250; Al Baraka SAC ¶ ¶ 22 (without Iraq and Taliban),, 25.

26.    These Defendants, and others located all over the world, conspired with Osama bin Laden, al Qaeda, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaeda front

organizations and actively support its terrorist activities and goals. Some of those organizations are purely a sham front for al Qaeda. Al Baraka SAC ¶ 25

27.     Defendants (including Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt) are natural persons(or the personal representatives of their estates), organizations, banks, and charities located all over the world who conspired with Osama Bin Laden, Al Qaeda, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as Al Qaeda front organizations and actively support its terrorist activities. Some of those organizations are purely a sham front for Al Qaeda. Iraq TAC ¶ 38.

28.     Defendants (including Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt) are natural persons(or the personal representatives of their estates), subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency or other agents or instrumentalities of Iraq and/or are natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees of Iran and/or its Intelligence Agency or other agents or instrumentalities of Iran and/or are natural persons (or the personal representatives of their estates), organizations, banks, and charities located all over the world, who participated in the acts and conspiracy described below, in their individual capacities and while acting in the course and scope of their employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as front organizations for Hezbollah and Al Qaeda and actively support its terrorist activities. Some of those organizations are purely a sham front for Hezbollah and Al Qaeda. Iraq TAC ¶ 41.

29.     Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as Al Qaeda front organizations and actively support its terrorist activities. Some of those organizations are purely sham fronts for Al Qaeda. Iraq TAC ¶¶ 38, 42; Al Baraka SAC ¶¶ 25, 26, 77.

30.     The defendant charities (as named in the complaints) were used as terrorist fronts to mask money transfers and provide cover for terrorist operatives and operations. Al Baraka SAC ¶ 24.

31.     Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt were members of the conspiracy. Al Baraka SAC ¶ 22.

32.      Defendants Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Albert Friedrich Armand Huber, a/k/a Ahmed Huber  a/k/a Albert Huber a/k/a Armand Albert Friedric  a/k/a Armand Huber a/k/a/ Ahmad Huber-el Biali, Ali Ghaleb Himmat, al Taqwa bank a/k/a Bank Al Taqwa, a/k/a Bank al Taqwa Limited a/k/a Bank of Taqwa Limited, al Taqwa Trade, Property and Industry, Ltd. a/k/a al Taqwa Trade, Property and Industry Company Limited, a/k/a al Taqwa Trade, Property and Industry Establishment a/k/a Himmat Establishment a/k/a Hochburg a/k/a Waldenburg a/k/a Al Taqwa Trade, Property and Industry Limited, Akida Bank Private Limited, Akida Investment Co. Ltd, NADA Management Organization, S.A.,

Youssef M. Nada a/k/a Yousseff Mustafa Nada a/k/a Youssef Nada, Youssef M. Nada & CO. Gesekkscgaft, M.B.H., Nada International Anstalt, Youssef M. Nada & Co., Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., BARZAN E-TIKRITI a/k/a/ Barzan Ibrahim Hasan a/k/a Barzan Ibrahim Hasan al-Tikriti, METALOR a/k/a La Groupe Metalor a/k/a La Groue Metalor Technologies a/k/a Metalor Group a/k/a Metalor Technologies SA, Babca Dek Gottardo a/k/a Banca Del'Gottardo,  Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group, International Holding Limited, Nasreddin International Group Limited Holding,  Ahmad I. Nasreddin a/k/a  Hadj Ahmed Nasreddin a/k/a Ahmed Idriss Nasreddin *AND* Nasreddin Group International Limited Holdings a/k/a Nasreddin International Group Holdings Limited *a/k/a* Nasreddin International Group Ltd., Asat Trust Reg., have aided, abetted, and materially sponsored and al Qaeda and international terrorism.  Al Baraka SAC ¶76.

33.     Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd. and Defendant Asat Trust Reg.  Iraq TAC ¶ 43.

34.     Defendant Asat Trust Reg. of Vaduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001.  Defendant Yousef M. Nada founded and operated Asat Trust Reg.  Defendants Martin Wachter and Erwin Wachter of the Defendant firm Sercor Treuhand Anstalt based in Liechtenstein, represented Asat Trust Reg.  Iraq TAC ¶ 49.

35.     Upon information and belief, Defendants Martin Wachter and Erwin Wachter engaged in money laundering on behalf of Al Taqwa and Al Qaeda.  Their assets have not been frozen by the United States after the events of September 11, 2001.  Iraq TAC ¶ 50.

36.     Defendant Asat Trust Reg. of Vaduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001.  Defendant Yousef M. Nada founded and operated Asat Trust Reg.  Iraq TAC ¶ 55.

37.     Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd. and The Asat Trust. Iraq TAC ¶ 43; Al Baraka SAC ¶ 78.

38.     Upon information and belief, the Al Taqwa Defendants have financed and laundered money for Arab and Islamic political and militant groups including the Algerian Armed Islamic Group (GIA) and the Egyptian Gala'a al-Islamiya, Islamic terrorist groups with links to Bin Laden and his Al Qaeda organization.  Additionally, international investigations

indicate that Al-Taqwa facilitated the movement of Bin Laden's money around the world in the late 1990's, a task made easier because its complex structure was designed to prevent scrutiny of its operations. Iraq TAC ¶ 44; Al Baraka SAC ¶ 79.

39.    The Al Taqwa Defendants were founded by Defendant Yousef M. Nada, and its other principals are Defendants Ali G. Himmat, Ahmed Huber and Mohamed Mansour. Defendants Huber and Mansour are senior members of the Muslim Brotherhood. Iraq TAC ¶ 45; Al Baraka SAC ¶80.

40.    Defendant Al Taqwa Bank is part of Defendant Al Taqwa Trade, Property and Industry Company which is located in Vaduz, Liechtenstein. This entity is also known as Himmat Establishment, run by a partner of Nada who, like Nada, is a member of the Egyptian Islamic Brotherhood. Although Egyptian-born, Mr. Nada is a naturalized citizen of Italy. Mr. Nada also is a member of Jamaa al-Islamiya, which is directly allied to Al Qaeda through Dr. Ayman al Zawahiri, second in command to Osama Bin Laden. Iraq TAC ¶ 46; Al Baraka SAC ¶ 81.

41.    Shortly after dual U.S. Embassy bombings in Kenya and Tanzania by Al Qaeda in 1998, U.S. intelligence agencies tracked telephone contact between Al Taqwa, members of Bin Laden's inner circle, and Albert "Ahmed" Huber, a convert to Islam in the 1960's who has publicly expressed support for Al Qaeda. Huber has acknowledged that Ahmad I. Nasreddin, a/k/a Hadj Ahmed Nasreddin, a/k/a Ahmed Idriss Nasreddin, is, in fact, an Al Taqwa founding member and bank shareholder who was very active in financing and operating the Islamic Cultural Institute of Milan, which follows the violent teachings of convicted terrorist Omar Abdul Rahman. The Institute was frequently visited by known Al Qaeda terrorists. Upon information and belief, the Institute is known in Western intelligence communities as one of the main Al Qaeda stations in Europe and was used to move weapons, men, and money around the world. Iraq TAC ¶ 47; Al Baraka SAC ¶ 82.

42.    After September 11, 2001, Al Taqwa changed its name to the Nada Management Organization SA in an attempt to avoid scrutiny. Al Taqwa and the Nada group, as well as their four principals – Nada, Himmat, Huber, and Mansour, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of Al Qaeda. Iraq TAC ¶ 47; Al Baraka SAC ¶ 83.

43.    A direct link between Iran and the joint activities of Hezbollah and Al Qaeda is the Al-Taqwa bank of Switzerland and Liechtenstein. The link primarily is through Ahmad Huber-El Biali (aka Ahmed Huber). Huber is a principal shareholder of Al-Taqwa bank which was sanctioned by the U.S. government for helping to finance Al Qaeda. Since 1983, Huber has repeatedly visited Iran. In 1988, Huber first met Youssef Nada in Iran. Nada, an Egyptian belongs to the Muslim Brotherhood. Like Nada, Huber embraced the Muslim Brotherhood. At a conference in Iran in 1988, Nada asked Huber to participate in the founding of al-Taqwa.Al-Taqwa bank has been been a funding source for activities involving Hamas, which has received direct funding from Iran. Hamas, an outgrowth of Palestinian Muslim Brotherhood founder Abdullah Azzam, is closely associated with Hezbollah. Azzam, along with Osama bin Laden, were cofounders of the Maktab al-Khidamir (MAK), a precursor to Al Qaeda. Iran is known to have appointed Hezbollah's terrorist chief, Imad Mughniyeh as coordinator of Iran's activities with the Hamas and the Palestinian Islamic Jihad in Lebanon. Al Baraka SAC ¶ 84.

44.     Defendant Asat Trust Reg. of Vaduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001. Defendant Yousef M. Nada founded and operated Asat Trust Reg. (Al Baraka SAC ¶ 85).

45.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg., Sercor Treuhand Anstalt,, and others, who have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. Iraq TAC ¶ 63.

46.     By virtue of the predicate acts described in this Complaint, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, Osama bin Laden and Al Qaeda, along with other non-sovereign Defendants herein, transferred, received, and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(b), (c) and/or (d). Iraq TAC ¶ 266.

47.     The Defendants named in the Complaint herein conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Such Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Iraq TAC ¶ 267.

48.     The Enterprise was formed and funded for the purpose of extortion: to force the United States, Israel, and other Western nations, and their citizens, to discontinue support of certain governments in the Middle East and otherwise to disengage from the Middle East. The extortion was carried out under the threat and practice of the predicate acts of murder, kidnapping, piracy, bombing, and other crimes directed at the citizens, business, and economic infrastructure of the target countries. Over time, these threats have escalated into threats and accompanying efforts to inflict the maximum possible damage through each such predicate act. Iraq TAC ¶ 268.

49.     Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt among others caused the extrajudicial killing of John Patrick O'Neill, Sr. Iraq TAC ¶ 275.

50.     From the mid-1990's to September 11, 2001, Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the

- 33-

conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  RICO ¶ 5(b).

51.     From the mid-1990's to September 11, 2001, Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.  RICO ¶ 5(b).

52.     From the late 1990's to September 11, 2001, Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt. RICO ¶ 5(b).

53.     From the mid-1990's to September 11, 2001, Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. RICO ¶ 5(b).

54.     Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack. RICO ¶ 6(b).

55.     The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.  RICO ¶ 5(g).

56.     The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions. RICO ¶6(b).

57.     On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between

$300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt, and illegal activity to generate material support to continue its terrorist operations. RICO ¶6(b).

58.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt  funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein. RICO ¶ 8.

59.    The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg. who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg., were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg., of both those goals and the uses to which the Funds were put.  RICO ¶ 14.

60.    The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses. RICO ¶ 14.

61.    The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder. RICO ¶14.

62.    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat

Trust Reg..  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg..  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt.  Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg., with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt and Asat Trust Reg. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations. RICO ¶ 14.

63.    Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt have long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. RICO Question 2, Exhibit A.

64.    Erwin Wachter is the head of Asat Trust, a co-defendant in the above-referenced cases. Additionally, available information reveals a pattern of activity over a period of many years of the Wachters, including both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust.  He is also an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases.  As owner and head of Asat Trust and Secor Treuhand Anstalt, Erwin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Erwin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Erwin Wachter continued to permit, make available, assist, and maintain those accounts. Erwin Wachter RICO, Question 2, Exhibit A.

65.    Martin Wachter is the director of Asat Trust, a co-defendant in the above-referenced cases.  Additionally, available information reveals a pattern of activity over a period of many

years of the Wachters, both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust. Martin Wachter is an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases. As a director and owner of Asat Trust and Secor Treuhand Anstalt, Martin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Martin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Martin Wachter continued to permit, make available, assist, and maintain those accounts. Martin Wachter RICO, Question 2, Exhibit A.

66.     Asat Trust was designated by the United States and the United Nations as a terrorist-related entity. The Office of Foreign Assets Control, of the United States Treasury, froze their assets due to their links to Al Taqwa, their individual activities to support terrorism and their financial support of the Al Qaida. Asat Trust has been involved with the Al Taqwa network during the last thirty (30) years, registering changes in company names, personnel and financial structure, along with many other duties. Al Tawqa is a co-defendant in the above-referenced cases. In fact, many of the transactions of Al Taqwa and the Himmat Establishment were undertaken in care of Asat Trade Regulation. Al Taqwa has also been designated as a terrorist-related entity and has been linked to significant support of the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Asat Trust is owned by Youssef M. Nada, a co-defendant in the above-referenced cases. Youssef M. Nada has been designated as a person who supports terrorism by the Department of the Treasury, Office of Foreign Assets Control. He was sanctioned as a sponsor of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Ahmed Idris Nasreddin, Albert Friedrich Armand Huber, and Ali Ghaleb Himmat have been linked to Asat Trust. Asat Trust RICO, Question 2, Exhibit A.

67.     Available information demonstrates that there has been activities between the Wachters and Al Taqwa Bank, a co-defendant in the above-referenced cases who has been significantly linked to activities and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order #13224. Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas. There is also information which links the Wachters to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Nasreddin, and Albert Friedrich Armand Huber, co-defendants in the above-referenced cases which have been linked to funding and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Based upon information and belief, the Wachters were involved in laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa. RICO Question 2, Exhibit A.

68.     As the foregoing demonstrates, Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt thereby knowingly have, for a period of many years, provided

critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Martin Wachter's, Erwin Wachter's, Asat Trust Reg.'s and Sercor Treuhand Anstalt's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. RICO Question 2, Exhibit A.

69.     The actions of Defendants, acting in concert to carry out their unlawful objectives, were malicious and willful, wanton and reckless in their disregard of the life of John Patrick O'Neill, Sr. and the other victims of the September 11 terrorist attacks.  Defendants intended to carry out actions that would end the lives of persons at the World Trade Center, including the life of John Patrick O'Neill, Sr.  Iraq TAC ¶ 274.

70.     Defendants Martin Wachter, Erwin Wachter, Asat Trust Reg. and Sercor Treuhand Anstalt, along with others, caused the extrajudicial killing of John Patrick O'Neill, Sr. Iraq TAC ¶ 275.

Consequences of the Conspiracy

71.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Iraq TAC ¶ 252.

72.     As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein. Iraq TAC ¶ 253.

73.     These Defendants, located all over the world, conspired with Osama bin Laden, al Qaeda, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaeda front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a sham front for al Qaeda. Al Baraka SAC ¶25.

74.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Al Baraka SAC¶151.

75.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Al Baraka SAC ¶152.

***

## EXHIBIT I

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

_____
                                                    )        03 MDL 1570 (RCC)
In Re TERRORIST ATTACKS on                          )        ECF Case
SEPTEMBER 11, 2001                                  )        **DECLARATION**
                                                    )        **OF GINA MACNEILL**

_____)


This document relates to:

   *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC)

   *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-CV-1076 (RCC)


       Gina M. Mac Neill, Esquire, an attorney at law duly admitted to practice before the

Courts of the Commonwealth of Pennsylvania and the State of New Jersey, as well as the United

States District Courts for the Southern and Eastern Districts of New York, the District of New

Jersey, and the Eastern District of Pennsylvania, declares the following to be true and correct

under the penalty of perjury:

1.  I am an associate with the Law Offices of Jerry S. Goldman & Associates, P.C., counsel of

record for the Plaintiffs herein.

2.  We submitted to the clerk of the United States District Court of the Southern District of New

York service packages for Asat Trust, Erwin Wachter, Martin Wachter, and Sercor Treuhand in

the *Estate of John P. O'Neill, Sr. et al., v. Republic of Iraq, et al.*,04 CV 1076 (RCC) ("*Iraq*") on

February 11, 2005 for service pursuant to Fed. R. Civ. Proc. 4(f)(2)(C)(ii) and in the *Estate of*

*John P. O'Neil,l Sr. et al., v. Al Baraka Invest., et al.,* 04 CV 1923 (RCC) ("*Al Baraka*") on

February 11, 2005 for service pursuant to Fed. R. Civ. Proc. 4(f)(2)(C)(ii).

3.   The Clerk properly mailed such packages pursuant to Fed. R. Civ. Proc. 4(f)(2)(C)(ii) as set forth in docket items 713, 754, 755, copies of which are annexed hereto as Exhibits B-1 through B-3.

4.   As to the *Iraq* Complaint, according to the docket, attached hereto and incorporated herein as Exhibits -4  through B-8, inclusive, the packages were received as follows:

| | | |
|---|---|---|
| Exhibit B-4: | Asat Trust | Received on 3/14/2005 - RB 632 969 764 |
| Exhibit B-5: | Erwin Wachter | Received on 3/14/05 - RB 632 969 720 |
| Exhibit B-6: | | Received on 3/14/05 - RB 632 969 733 |
| Exhibit B-7: | Martin Wachter | Received on 3/14/2005 - RB 632 969 778 |
| Exhibit B-8: | Sercor Treuhand | Received on 3/14/2005 - RB 632 969 693 |

5.   As to the *Al Baraka* Complaint, according to the docket, attached hereto and incorporated herein as Exhibits B-9  through B-13, inclusive, the packages were received as follows:

| | | |
|---|---|---|
| Exhibit B-9: | Asat Trust Reg. | Received on 3/14/2005 - RB 632 969 821 |
| Exhibit B-10: | Erwin Wachter | Received on 3/14/2005 - RB 632 969 781 |
| Exhibit B-11: | | Received on 3/14/2005 - RB 632 969 870 |
| Exhibit B-12: | Martin Wachter | Received on 3/14/2005 - RB 632 969 849 |
| Exhibit B-13: | Sercor Truehand | Received on 3/14/2005 - RB 632 969 866 |

Dated: September 14, 2005

_/s/_____
GINA M. MAC NEILL, ESQUIRE