# Exhibit 1 (Part 4 of 14)

## Attachment A (Part 3 of 6) to

## Affidavit of David K. Draper

# Attachment A
## (Part 3 of 6)

**Part 2 of Exhibit 5**

### F.   Shift from "LBI" to "BIF"

In the early 1990s, LBI's founder Adel Batterjee expressed his desire to see LBI expand and increase its international appeal, including its appeal to organizations such as the United Nations. Accordingly, in 1992, he incorporated BIF in the U.S., specifically, in Illinois. Ex. 107. Batterjee hoped that the organization would have more universal appeal if its name did not include a reference to Islam, unlike LBI. Shortly before BIF's incorporation, all new offices of the organization opened in countries other than Pakistan and Saudi Arabia used BIF's name and a nearly identical logo. However, BIF and LBI remained one organization, under Batterjee's control, and their assets were interchangeable.

On March 15, 1993, according to BIF minutes, BIF's Board of Directors consisting of Batterjee and two others from Saudi Arabia was replaced by defendant Arnaout, Zakaria Khudeira, and Jamal Nyrbe. Ex. 108. Defendant Arnaout, whose position at the time was coordinator of BIF-USA, was selected to run BIF "since everyone knew, worked with, and trusted Mr. Arnaout." *Id.* As the minutes reveal, BIF had not accomplished much in the U.S. before this. *Id.* at 1-2. Despite this change, however, Batterjee maintained an important role in BIF. *See* Ex. 109 (fax to Batterjee from "Inam Mahmoud" apologizing for the delay in sending Batterjee the 1995 budget because the Sarajevo and Zenica offices were late).

As executive director, defendant Arnaout played a very active role in BIF's operations, requiring employees of BIF in the U.S. to provide a log outlining the work they performed each day and requiring overseas offices to prepare and submit to him weekly and monthly reports. Because these reports were required to keep defendant Arnaout informed of BIF's activities, they are all in furtherance of the conspiracy.

Early on, Mohamed Loay Bayazid, also known as "Abu Rida," took a leadership role at BIF. Minutes of a BIF meeting on September 15, 1994, state: "Mr. Loay Baizid, president BIF presided the meeting which was started at 9:00 a.m. and lasted until 10:30 a.m. The following people were present: 1- Enaam Arnaout, Executive Director[.]" Ex. 110 .  An unsigned

"Memorandum of Action" for BIF's Board of Directors in 1994 states that "Mr. Loay Baizid is hereby elected to fill the vacancy created by the resignation of Mr. Jamal Nyrabeh." Ex. 111. A check register possessed by defendant Arnaout shows a payment of $4742.00 to Bayazid. Ex. 112.

### G.    BIF's Hidden Mission

The Indictment explains that from its inception, BIF, while purporting publicly to be a charitable organization involved only in humanitarian projects such as supporting orphans and assisting refugees, spent a significant amount of money in support of groups engaged in violence and concealed that fact from the public.

BIF purported to the public that it was engaged in only humanitarian relief work.    Ex. 113 at 6 (BIF's Financial Statement claiming that it "was organized exclusively for charitable religious, educational and scientific purposes, including to establish, promote, contribute and carry out relief and charitable activities, projects, organizations, institutions and funds.    The Foundation provides its benefits and services to needy and poor people irrespective of color, race and gender."); Ex. 107 (BIF's Illinois Articles of Incorporation listing its objectives as humanitarian); Ex. 114 (Illinois Charitable Organization Registration Statement listing BIF's work as purely humanitarian); Ex. 115 (BIF's website on October 31, 2001, listing BIF's work as purely humanitarian and stating that it "has not closed projects in any country it has been active in"). On February 29, 2000, the "About Us" page of BIF's website stated:

> BIF is a humanitarian organization dedicated to helping those afflicted by wars. BIF first provides short-term relief such as emergency food distribution, and then moves on to long term projects providing education and self-sufficiency to the children, widowed, refugees, injured and staff of vital governmental institutions.

Ex. 116; *see also* Ex. 117 (flyer advertising a 2001 auction fundraiser for 2001 claiming BIF was established in 1992 and stating: "Benevolence International Foundation is a humanitarian organization dedicated to helping those afflicted by wars and natural disasters. BIF first provides short-term relief such as emergency food distribution, and then moves on to long term projects

45

providing education and self-sufficiency to children, widows, refugees, and the injured").

It should be noted that BIF was tightly controlled by defendant Arnaout and that persons affiliated with defendant Arnaout – including donors – were given varying accounts of BIF's purposes. Arms length donors – particularly corporate donors and those monitoring the website, particularly in English – were led to believe that BIF was involved in purely relief work: they were certainly not informed of any support of violence, *jihad* or military activity. Others – including board members and officers – had discussions of how much to reveal publicly about BIF's nebulous agenda to propagate Islam. Still others – including those who read the official website of the Chechen *mujahideen* or watched a fundraising video produced under the name LBI or who attended certain mosque fundraisers – provided support to BIF on the clear understanding that the support was going to fighters.

A BIF report recovered from its Illinois office regarding its activities in Sudan explained BIF's history in remarkably blunt terms:

From its first day, the BIF aimed to support Jihad and Mujahideen, by
* Assisting in military and logistical support.
* Assisting in providing medical care for the Mujahideen in the field.
* Assisting in providing training, running camps, providing shelter, and in what accompanies these services, such as providing education, Da'awah,[22] and looking after the families of Mujahideen and taking care of the orphans.
* Providing moral and political support for the Mujahideen.

Ex. 118 at 2. The report continues:

This aim of supporting Jihad, may be connected to the establishment of the BIF in the land of Hijaz, and the desire of a wide ranging section of the committed people to support Jihad. Therefore, we find that the Foundation received a generous support that had a deep effect (by the Will of Allah) in the shaping of events in Afghanistan.

---

[22]     Da'awah, sometimes spelled "Dawah" or "dawah", translates to "the call" in English and refers to the propagation of Islam. BIF Board Member Suleman Ahmer explained dawah as follows: "As contrast to relief, Islam looks at Dawah as a tool for an end, which is the establishment of Islam and making it supreme in the world." Ex. 119 at 40.

*Id.*

The report adds: "It is vital for our new vision and approach that the general aim be changed from merely supporting Jihad and Mujahideen to spreading Islamic Da'wah. . . . This aim (the above), must be a hidden aim." *Id.* at 6 (emphasis and parentheses in original).

This report confirms that BIF was established in Saudi Arabia, often referred to as the "Land of Hijaz." Moreover, the "events in Afghanistan" discussed in the report refer to the conflict between Afghanistan and the Soviet Union in the late 1980s and early 1990s. As this report demonstrates, BIF had a fundamental mission which it did not share with the general public, including many of its donors, namely, supporting *jihad* and *mujahideen* as well as spreading Islamic dawah.

On October 15, 1997, BIF Board Member and Operations Manager Suleman Ahmer wrote to defendant Arnaout:

> By the grace of Allah we had the final meeting in our office about the mission statement. I realized how important it was to have the other people in the office join in (Zakaria was also there.) First I am of the opinion that this statement should be only for the board and officers of BIF so that we can think clearly without having to worry about what the other people would think of it.
>
> The other thing I realized that in reality we, especially I was, not clear about what BIF is all about. I had an idea but by having to write it down, I have been forced to think clearly about it.
>
> <center>* * * * *</center>
>
> In the absence of a clearly written mission statement, a lot of our plans have been directionless, coming due to the needs and circumstances around us. The Azerbaijan wells are one such example.
>
> For example in the discussions we realized that we have never worked in the countries which are affected by natural disasters and looking at what we are doing now we may never work in this area. But somehow in so many of our publications we have that BIF works in areas affected by wars and natural disasters. I wonder where it came from and so on.
>
> <center>* * * * *</center>
>
> I have written the above to emphasize the point that the time to finalize the mission statement has come and inshallah I look forward to having it finalized in our next meeting.

<center>47</center>

With its finalization we shall have a constitution for BIF with which we can measure our work and constantly check our direction. Also with which we can decide which country to work in and which to not; and with which we can have a clear understanding of why we are working in some areas and why not in others.

Ex. 120 at 1-2.

A month later, in November 1997, defendant Arnaout and others in the U.S. decided to document formally BIF's private and public missions, as revealed in minutes of a board meeting involving defendant Arnaout and Suleman Ahmer:

12.1 It was decided that there would be two documents for the mission statement: one, an internal document for the board members and the key employees and a summarized one as a general statement for the public. It was decided that Suleman would present a draft for both.

12.2 It was decided that all the new and old projects should be judged according to this mission statement and that all actions taken with in the Foundation must be in line with this statement.

Ex. 121 at 2. On May 28, 1998, Ahmer wrote to another BIF Board Member Jamal Nyrbe (sometimes spelled "Nyrabeah"):

[W]e have a mission statement now and the purpose of having a written document stating our direction is to avoid exactly what we would like to do now: going off in different directions. Kosovo does not fit into our field of work and this is clear from the beginning. As we have decided we are not a relief organization rather a dawah organization for countries where the islamic (sic) identity of the Muslims is at risk. And when we would be making this dawah, we would also take care of some of the needs of the people.

Ex. 122. A few days later, Ahmer provided Nyrbe with a letter attaching BIF's private and public mission statements:

Mission Statement "A"

With the pleasure of Allah as the sole motivation and within the guidelines set by the Shariah, the mission of Benevolence International Foundation is to make Islam supreme on this Earth.

Ex. 123 at 1-2. A computer at BIF's Illinois office also contained an electronic document stating

48

BIF's true mission, titled "Mission Statement (INTERNAL USE ONLY)" and stating "[T]he mission of Benevolence International Foundation is to make Islam supreme on this Earth." Ex. 124 (emphasis in original); *see also* Ex. 125 ("[T]he mission of Benevolence International Foundation is to establish Islam on this Earth.")

> However, BIF's public mission statement differed:
> "Mission Statement"
>
> BIF will strive to empower Muslims whose Islamic identity is collectively threatened by wars or other causes . . . and would address the humanitarian needs of such Muslims if any.

Ex. 123 at 3; *see also* Ex. 126 at 2 (memorandum on October 18, 1998, from Ahmer stating that BIF's website had to be changed to include its new "final" public mission statement: "BIF will strive to empower Muslims in its area of operation to lead Islamically principled lives both individually and collectively and to alleviate their sufferings to the best of its capacity.")

In July 1998, defendant Arnaout met with others on BIF's board, including Nyrbe, and again discussed BIF's non-public mission:

> 12.0   The mission statement was finalized and it is attached.
>
> > 12.1   It was furthermore decided that all of the work of the Foundation would be decided according to the mission statement.
> >
> > 12.2   The CEO will be responsible for making a study of all projects in light of the mission statement and submit a report on the projects' compliance with the mission statement. By April 1st, 1999 all the projects must be altered to conform to the mission of BIF and the ones that can't be changed would be shut down.
>
> 13.0   Br. Enaam will submit a proposal about the orphan sponsorship in the countries in which BIF doesn't have an office. The proposal will demonstrate as to how these sponsorship programs are in line with the Vision and Mission of BIF.
>
> 14.0   To sometime have a pure relief project without Dawah if it can be proven that it is necessary for the successful operation of other Dawah projects.

Ex. 127 at 3.

Ahmer prepared "A General Fundraising Proposal" for defendant Arnaout dated June 17, 1999, reiterating that BIF was not primarily a relief organization: "[A]s decided in our new mission, we have effectively moved away from pure relief work and the money which is available for just crisis is no longer that readily available for us." Ex. 128 at 2.

BIF made efforts to distance itself – on paper – from the internal mission shortly after Ahmer's "A General Fundraising Proposal." Minutes of a BIF Board Meeting dated June 22, 1999 state: "The mission statement was discussed in details and it was decided to keep the mission with the understanding of the board, that BIF is, a relief organization. The board did not agree with the present understanding of Mr. Ahmer." Ex. 129. The minutes add: "The board accepted the resignation of Mr. Ahmer from the board." *Id.* Ahmer later informed defendant Arnaout that the minutes had been "edited for our legal books." Ex. 130 at 1.

Minutes from a meeting attended by Ahmer, Nyrbe and defendant Arnaout two days later state:

It was decided that;

1.    Suleman will take another look at the letter that has to be sent to the people to whom he explained this mission . . . .

2.    I [Ahmer] will try to make sure that this letter can't be used against BIF . . . .

4.    For the officers in BIF who know this mission, I will let them read the letter for the people who know our mission and let them come back to me with questions. . . .

Ex. 131.

As those minutes indicate, defendant Arnaout was apparently concerned that Ahmer told untrustworthy people about BIF's non-public mission. Ahmer explained to defendant Arnaout in an undated e-mail:

Like I told you before, I have not made any public announcement of the mission rather was talking about it privately to people. I consider the communities in which these people reside as the communities which in general are introduced to this mission as most of these people are very influential in their respective communities.

Ex. 132. However, a memorandum from Ahmer to defendant Arnaout on August 11, 1999 (after

50

Ahmer was going to resign) reveals that BIF and defendant Arnaout had not eliminated or

modified its non-public mission. Ex. 133. In that memorandum, Ahmer wrote:

> [W]hen brother Jamal [Nyrbe] was here I discussed with him a matter regarding the
> public and private mission of BIF.
>
> * * * * *
>
> [A] Muslim in his community receives the one you have made for the public which says
> that the mission is to make lives of people more comfortable, any sensible person can
> easily see that these two statements are not a difference of understanding rather they are
> two completely opposite statements.
>
> * * * * *
>
> If you go back to last year, when we talked about having two statements there were
> actually the same statements just the wording for the public was to be a little light and not
> so upfront and assertive. But in this case, the one you claim to have it for the board and
> the one for the public is completely different.

*Id.* at 1-2.

> Nevertheless, on approximately October 15, 1999, Ahmer wrote a letter stating:
>
> I am writing to all such individuals -- a select group -- who I had discussed with and
> explained the mission of BIF in finer details and believe that they had understood me
> clearly.
>
> * * * * *
>
> Based on this realization, the board has decided to maintain the prior position and entity
> of BIF, which is that BIF is primarily a relief organization and would get involved with
> Dawah work when it deems it proper as opposed to the mission that I had shared with you
> which is that BIF would essentially be a Dawah organization doing relief as an obligation
> when needed.

Ex. 134 (emphasis in original).

Despite Ahmer's resignation, BIF's non-public mission remained the same. An employee

of BIF who knew BIF's true mission recorded months later on January 28, 2000 in a notebook

recovered from BIF's Illinois office: "Mission Statement (2) 1. Hardcore make Islam Supreme on

Earth". Ex. 135 (parentheses in original). In another note recovered from BIF's Illinois office a

BIF employee wrote: "That is our mission -- Lying to the people." Ex. 136 (emphasis in

original). These sentiments were echoed in another handwritten note at BIF: "unwritten law no

matter how poor/sick – first priority is for mujahideen". Ex. 137 at 9.

Moreover, defendant Arnaout reiterated Ahmer's "A General Fundraising Proposal" of June 17, 1999 with his own "A General Fundraising Proposal" in January or June (the month is partially illegible) 2000. Ex. 138. In that memorandum, like Ahmer, defendant Arnaout stated:

> The big problem is our move away from Relief. As decided last year in our new mission, we have effectively moved away from pure relief work, and the money which is available for just crises was no longer that readily available. (The Kosovo issue was the best example).

*Id.* at 2.

Also in 2000, BIF employees noted that with respect to presentations to the public:

> **Sister Dina** made the same point as Br. Mohammed as well as suggesting Br. Khalil to stick to the official explanation of who BIF is, as stated by published materials and our mission statement. We are a non-profit, non-political humanitarian relief agency. . . . We are not a dawah organization or affiliated to any Islamic organizations. We happen to be Muslim and the countries we work in, happen to be Muslim. But we are not a 'religious non-profit' like Habitat for Humanity which is a 'Christian based' operation.
> * * * * *
> Sister also noted the importance of taking precautionary measures to protect BIF. **Br. Muzaffar** brought up the point that it has to be made clear to people that our role in the UMMAH is a relief organization and no Dawah based and the differences between them.

Ex. 139 (emphasis in original).

As the statements above establish, much thought went into BIF's effort to portray its mission falsely to the public.

### H.   BIF's Efforts in Sudan

As stated above, BIF maintained in its Illinois office a Sudan file containing a BIF report that explained that from its first day BIF aimed to support *jihad* and *mujahideen*, by assisting in military and logistical support, and providing medical care for *mujahideen* and caring for families of *mujahideen*. The report states:

> By the grace of Allah, the services of the BIF in the Sudan started in May 1991, after the agreement of *the base* in Sudan with the Sudanese Government. The BIF was able in a short span of time to occupy a distinguished place among the organizations which work in the relief and service work in the country, and the tawfiq is from Allah (SWT).

Ex. 118 at 7 (emphasis added). The report does not explain who "the base" is that reached an agreement with the Sudanese government in May 1991. However, at that time, as discussed above, Usama bin Laden and *al Qaeda* relocated from Afghanistan to Sudan, where they operated in partnership with elements of the Sudanese government, specifically the Sudanese intelligence service and the ruling National Islamic Front. Literally translated from Arabic to English, "*al Qaeda*" means "the base."

In a bulletin on BIF letterhead titled "Eight Years of Benevolent Work," defendant Arnaout stated:

> BIF is currently active in Bosnia-Herzegovina, Chechnya, Croatia, Azerbaijan, Afghanistan, Bangladesh, Pakistan, the Sudan, Tajikistan and Yemen. . . . BIF is funded solely from the donations of concerned Muslims.
> * * * * *

### SUDAN PROJECTS

> For the past five years, BIF has provided millions of dollars in aid to Sudan, especially for the people of the war-torn south. BIF has assisted in resettling thousands of refugees and has provided food, medicine, clothes and shelter.

Ex. 140.

Although undated, the bulletin likely was written in 1995. It celebrates "eight years" of BIF's work, and as discussed above, on some materials BIF claims to have begun its work in 1987 (while on other items it claims to have established in 1992).

BIF also included the mailing address and telephone number of its Sudan office on various versions of its letterhead, including the letterhead of BIF's Canada office. Ex. 141. Moreover, BIF noted in solicitations (in addition to the "Eight Years of Benevolent Work" bulletin) that it worked in Sudan. Ex. 142. A 1999 "Agenda for Enaam" listing defendant Arnaout's responsibilities included "Approve the budget for all BIF" and "Coordination with BIF Sudan." Ex. 143 at 1 and 7.

In a detailed report on its Sudan office, which describes BIF "first, before the establishment of the Sudan Office, and second after the establishment of the Office," BIF

explained that "from its first day," its goal was to support *jihad* and *mujahideen* by assisting with military and logistical support, providing medical care in the field, providing training and running camps, providing dawah, looking after the families including children of *mujahideen*, and providing moral and political support for *mujahideen*. Ex. 118 at 1.

After noting BIF's historical success in supporting *jihad* and *mujahideen*, as well as some of BIF's weaknesses, the report continues:

> The Foundation came to the Sudan without any preparation. In came carrying its general objectives and it was consequently under influence by the new political and security circumstances immediately after the resurrecting of the Sunnah of Jihad in the Sudan. **It formed a close union with the popular defense force on many fronts:**
> * Meeting over the strategic and detailed objectives.
> * Meeting over the management and financial aspects.
> * Meeting over the programs and work accomplishment aspects:
>   * The training camps experience.
>   * The "Ribat Al-khail" Project.
>   * The "Mugheeraati Subhan" Operation.
>   * The information and media planning.
>   * The medical teams accompanying the military operations.
>   * The Muglad Hospital.
>   * The Kadugly Hospital.
>   * The Naw Hospital.
>   * The armored battalion of "Waleed".
>
> In addition to all the above, the work domain and the selection of workers was under direct influence of the military think-tank. The general plan was from the beginning tied to the notion of operating along the confrontation lines and according to three stages. This was to be followed by a gradual advance towards the south. Upon consecutive victory achievements after "Saif El-'Ubur", **an urgent need appeared for:**
>
> * Maintaining a direct presence in the security hot spots.
> * Maintaining a humanitarian presence by an international organization which found itself in the midst of a complicated political struggle in the south.
>
> It was therefore essential to take all the measures and precautions in dealing with military events as dictated by the first point above, as well as on the non-military side as required by the second need.

*Id.* at 2-3 (emphasis in original). The Arabic name for the "popular defense force" in Sudan

54

referred to in the BIF report is *Difaar al Shabi*.

The report explains that BIF eventually "separat[ed]" from the "popular defense," although it maintained "close contacts" with it. *Id.* at 3. Because of their separation from the popular defense

and "the economic and political effects of the Gulf War," BIF's officials were "led to think in two directions": 1) "investment"; and 2) "looking for support in other international horizons, while associating ourselves with, and taking along, the humanitarian elements and the programs of various organizations." *Id.* at 3. The report then explains that BIF became unfocused and disorganized, lacking "the strategic planning and the high quality programming." *Id.* at 4-5. Next, the report addressed BIF's projects in the Sudan, noting that there were significant unanswered questions about the objectives and details of the projects. *Id.* at 5-6.

The report then discusses BIF's plans for the future:
We are on the verge of a new era in which the BIF looms up on a hostile world. A world which is eager to unleash its onslaught on us, and on our objectives. The BIF has become a big responsibility on our shoulders in front of Allah (S.W.T.) and then in front of the group of founders of this organization, who trusted us after we pledged our good promises to them, and after they saw from us what make them delighted. The big challenge now is, however, that the general aims and objectives be clearly specified in a manner that is comprehensible by all, a manner that unifies our steps and progress so as to make our move, a one strong-man move.

**First:** It is vital for our new mission and approach that the general aim be changed from merely Supporting Jihad and Mujahideen to spreading Islamic Da'wah. We no longer need to argue about the details of the rites that we are going to support and traditions (of the Prophet *salla Allahu aliehi wa sallam*) that we are going to resurrect!!

**Second:** This aim (the above) must be a hidden aim, that we ought to replace by aims that are inclined toward resurrecting the good human values, and guarding human rights, woman rights and children rights.

*Id.* at 6 (emphasis in original).

BIF's Sudan file also contains a quarterly report for its Sudan office for May 31, 1995 to

August 17, 1995 documenting humanitarian work (Ex. 144), an "Operational Plan & Budget Balance" for 1995-1996 (Ex. 145), and a series of handwritten reports about BIF's activities in Sudan (Exs. 146, 147, 148, and 149).

In the report on its Juba, Sudan office, BIF notes among its "programs achieved" "supporting the Mujahideen with food and medicine in their departure centers to operations areas." Ex. 146 at 1. Among the "projects achieved" by BIF in Damazin, Sudan, Muhammad Almahdi Abdelbaqui, the "Director of Damazin Mission," states: "Financial and material donations were given to the Mujahideen in the areas of Al-Mazan and Al-Boutej." Ex. 147 at 2. He also notes BIF's substantial *dawah* work. *Id.* at 2-3.

In notes on BIF's Kadugli, Sudan office, BIF describes a visit by Ambassador Melissa (spelled "Milicia" in the report) Wells, a special envoy from the U.S. under President Clinton who worked in Sudan as part of international efforts to bring peace to the country. Ex. 148 and 149. BIF recorded that on June 15, 1994, Ambassador Wells met with the director of BIF's Kadugli office, Ma'moun Muhammad Al-Hasan Bilou who provided her "information about the goals and activities of BIF in Kadugli province." Ex. 148 at 1. Director Bilou told Ambassador Wells

> that BIF is a international organization working in the humanitarian fields and provide (sic) free basic services like health care, education, agriculture, mother and child care, and helping the poor families regardless of color or gender. He added that BIF works in coordination with all international organizations in Kadugli like UNICEF, WHO and Red Crescent.

*Id.*; *see also* Ex. 149 at 1 ("Mr. Bilou: BIF is an international organization accredited by the United Nations and is recognized worldwide. Its humanitarian work includes providing health care, schooling, and relief to refugees, deportees, and children regardless of their religion, race, or color."). After this description, the report notes: "Ms. Milicia Wells praised BIF and its efforts to provide humanitarian relief." Ex. 148 at 1. The report then describes visits by a Dutch Aid delegation, a group from UNICEF, and a group from the American Muslim Friendship

organization. *Id.* at 1-2. It does not indicate that BIF informed Ambassador Wells or the organizations in the least bit about its support of *mujahideen* efforts or of *al Qaeda.*

A handwritten BIF "news report" describes Ambassador Wells's visit and includes questions she asked along with Director Bilou's answers. Ex. 149. It notes that in response to Ambassador Wells's question "from where BIF gets the financial support," Director Bilou stated:

> BIF has fundraising offices in the U.S., Canada ((Ottawa)), Qatar ((Doha)), Saudi Arabia ((Jeddah))and other Arab countries. through their offices, BIF collects funds from donors and sends them to Sudan to be spend (sic) on the needy, orphans, the poor, and the deportees.

*Id.* at 1-2. Director Bilou also said that BIF works in "Sudan, Somalia, Bosnia, Afghanistan, Burma, Bangladesh and Pakistan." *Id.* at 2. According to Director Bilou, BIF's "work in Sudan is located in Kadugli, Damazeen, Al Mujallad, and Juba." *Id.*

It should also be noted that when the *al Qaeda* leadership returned to Afghanistan from the Sudan in the summer of 1996, BIF in Pakistan promptly became aware of the return of the "Arab leadership." See Ex. 150 (July 24, 1996, letter to Enaam Arnaout); Ex. 151 (August 23, 1996 "Message from Usama Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula.").

## I. BIF's Efforts in Bosnia-Herzegovina

Much of BIF's efforts were focused on Bosnia-Herzegovina. Indeed, defendant Arnaout had a family and residence in the capital, Sarajevo, and BIF had offices in Sarajevo and Zenica. It also at one time had an office in neighboring Croatia.

A BIF folder recovered from the trash outside BIF's Illinois offices in December 2001 contained the following handwritten notations (translated from Arabic):

> Donate generously to Benevolence International Foundation because it is:
>
> * * * * *
>
> It has field offices in the following:
> Europe – Zagreb (Croatia): for relief operations and support of jihad in Bosnia-Herzegovina
> Asia - Peshawar (Pakistan) - to support Afghan jihad, participate in huge effort of rebuilding, and helping war casualties
>
> * * * * *
>
> America - Chicago - to raise donations and benevolence endowment and deepen volunteer sense among the Muslims and their brothers in disaster areas
>
> * * * * *
>
> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands
>
> * * * * *
>
> Steeds of war projects
> Hospitals, saving the mujahideen wounded (health care programs), eight
>
> * * * * *
>
> Training heralds and repelling Christianization activity.

Ex. 152. "Steeds of war projects" appears to refer to a verse in the Koran which reads: "Against them make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies[.]"[23]

After the formation of BIF, in 1993 or later, a videotape was produced soliciting funds for *mujahideen* in Bosnia. The videotape states at the outset that "the copying and distribution rights of this product are exclusive to *Lajnatt Al-Birr Al-Islamiah*" and that it cannot be reproduced

23 The Holy Koran, Surah 8, Verses 60-61.

without permission, and that unauthorized reproduction is unlawful. Ex. 153 (transcript of videotape, translated from Arabic). Throughout the video, the logo of LBI, which is nearly identical to BIF's, appears in the corner of the screen, after erupting from Saudi Arabia, depicted on a graphic of Earth. The beginning of the video claims to depict the "first actual recording of the battles which are being fought by the Muslims and the Serbs on the land of Bosnia and Herzegovina, and the facts surrounding the martyrdom of a number of Arab *mujahideen*." *Id.* at 1. Near the end of the video, LBI's logo erupts from a graphic depicting Saudi Arabia on a globe and a voice announces: "*Lajnatt Al-Birr Al-Islamiah* is your trusted hand for the support of the *mujahideen* and the immigrants of the Muslims." *Id.* at 12. After that, a montage is displayed showing among other things a building used by LBI in Saudi Arabia and video of relief work in or near Afghanistan. The tape concludes with graphics displaying various accounts and corresponding numbers, including a general charity account and an account for orphans. A voiceover states near the end: "*Lajnatt Al-Birr Al-Islamiah* – trust and honesty."

Most of the video depicts combat footage and scenes of destruction within Bosnia, clearly designed to appeal to donors who wished to financially support the *mujahideen* fighting in Bosnia. The video also contains a long interview with a Saudi Arabian soldier who describes combat involving *mujahideen*, including the deaths of Abu Zubair al Madani and Abu Abbas al Madani. Also included is footage eulogizing Abu Zubair al Madani and Abu Abbas al Madani, including their burials and shots of their families. Both of these individuals were well-known members of *al Qaeda*.

The entire videotape furthers the conspiracy because it was designed to raise funds for *jihad*. Although it uses LBI's name (charged as part of the BIF Enterprise), it was produced after BIF was formed (based in part on the approximate date of Abu Zubair al Madani's death). Moreover, LBI did not operate in Bosnia, but BIF did. Both organizations were founded by Adel Batterjee, and their assets were interchangeable.

BIF also maintained in Illinois a receipt from the "Black Swans" commando brigade in

Bosnia showing that it received from BIF 300 blankets and 200 pairs of boots on July 21, 1994, which also expressed hope that their collaboration will continue. Ex. 154 (letter typed in Arabic). The receipt is signed by Brigadier Hase Tiric.[24] *Id.*

BIF also had in its Illinois office a receipt from the army in Bosnia dated June 3, 1994, issued to BIF for the donation between 1992 and 1994 of 2000 uniforms, 2000 pairs of shoes, 2500 square meters of plastic or nylon, and ten mass communication stations. Ex. 156. The letter thanked BIF "on their noted assistance and collaboration with this military unit" and hoping that "this mutual collaboration will continue." *Id.*

On December 31, 1994, the Bosnian army requested that BIF provide it with an ambulance. Ex. 157; *see also* Ex. 158 (letter from army commander requesting an ambulance from BIF). Shortly thereafter, a unit commander in the Bosnian army thanked BIF for providing it an ambulance, delivered on January 25, 1995. Ex. 159.

In February 1995, BIF established a sewing center in Tejsan, Bosnia-Herzegovina expressly "for the wives and daughters of Bosnian ["Muslim" is crossed out] soldiers who have died fighting in Bosnia." Ex. 160. BIF noted that "the center takes in 70-75 sisters every 3 months." *Id.*

On August 10, 1995, defendant Arnaout wrote a letter thanking donors for contributing over $250,000 for assistance in two towns in Bosnia. Ex. 161. Defendant Arnaout wrote that BIF is assisting Bosnian refugees "with a view of preserving the precious resources of the Bosnian government as much as possible." *Id.*

In a separate solicitation for funds, titled "We need your help for the people of Srebrinica

---

[24]    The Black Swans are discussed in the article at Ex. 155 (Chuck Sudetic, "Bosnia's Elite Force: Fed, Fit, Muslim,"*The New York Times*, June 16, 1995). The article cites Brigadier Tiric, who explained that the Black Swans spend around $700,000 per month in cash on weapons, equipment and supplies. *Id.* The article states: "He said that some of the funds come through the army's general command but that most come from 'private sources.'" *Id.*

now!", BIF declared: "Once again in front of the whole civilized world the Muslim town of Srebenica has been allowed to fall." Ex. 162. The letter states: "The Serbs have specifically done this to divert the attention of the Bosnian army which is on the offensive is trying to break the deadly siege of Sarajevo. The offensive must continue!" *Id.* (emphasis in original). The letter then asks for donations in an effort to buy tents for refugees, stating: "This will relieve the burden from the government." *Id.*

As the notes on the folder above indicate, however, BIF's military support in Bosnia during the war was not limited to merely freeing up Bosnian resources to spend on military activity. In a memorandum to defendant Arnaout on November 17, 1995 (three months after the letter from defendant Arnaout discussed above), BIF employee "H. Ghawji" described the delivery of 200 tents from BIF to the Bosnian government in October 1995. Ex. 163 at 1. Ghawji described his meeting with government officials and summarized the government's needs, including a request for humanitarian assistance in establishing factories to generate income for the wounded and families of soldiers killed in the war (referred to as "shahids"). *Id.* at 1-2. Ghawji then wrote:

> Now let us go to the army needs: The fifth corpus in the Bihac area need the following: Tents, sleeping bags, other equipment for outdoor activities, kitchen sets for camping, medicines as antibiotics, bandages, Military shoes, field cars, and foods.

Ghawji's letter discusses future plans in Bosnia, including possibly hiring an individual from Sudan named Naser. *Id.* at 2-4.

At the same time, defendant Arnaout was also keeping well informed of the happenings in the neighboring Zagreb office. *See* Ex. 163a (letter from Arnaout dated October 31, 1995, telling BIF employees how to handle the Croatian authorities and advising that the Interior Ministry will ask questions about a visitor to Zagreb and to advise that it is a "friend to friend" visit; June 17, 1995, letter to Arnaout advising of an inquiry by the "Black Swan" (incorrectly translated as "black tie") group and a request for ambulances for "units" in Tshin and Tsljnish; a

July 2, 1995, letter from Arnaout that a man named "Hamad" with no beard and mustache will be coming to Zagreb and is to be taken to "brother Haitham" as soon as possible; and a July 3, 1995, letter from a BIF employee in Zagreb indicating that the brother Hamad had arrived and was going to Bosnia the next day; a letter to Arnaout marked "urgent," indicating that the "Institute" should not be contacted as "circumstances are not convenient these days"; an October 8, 1996 letter advising of time and manner of contact to the "Institute"; and a letter in the Illinois files which discusses how to fill out the shipping forms so as not to encounter a problem with Croatian authorities).

On April 30, 1998, the Ljiljan Commerce Group, a Bosnian corporation directed solely by defendant Arnaout (Ex. 164) and part of the BIF Enterprise, wrote to the Bosnian Consulate in Turkey requesting a visa for the entry of Abu Hajer (Mamdouh Salim) into Bosnia, purportedly for a business meeting. Ex. 164. On May 5, 1998, Abu Hajer — who was present for the founding of *al Qaeda*, served on its *shurah* (consultation) council, issued *fatwahs* authorizing violence against America and authorized efforts to obtain uranium for nuclear weapons for *al Qaeda* and had described Bosnia as the base for *al Qaeda* operations in Europe — completed a visa application, listing his occupation as "Businessman." Ex. 165. That same day, a letter on Ljiljan Commerce Group letterhead was sent to the Metalurg Hotel over defendant Arnaout's signature requesting an apartment for "one of the directors of the organization BIF in Bosnia [.]" Ex. 166.

A receipt from the Metalurg Hotel shows that Salim stayed there from May 7 to May 10, 1998. Ex. 167. The receipt also shows that the Ljiljan Commerce Group paid his bill. *Id.*

In October 1998, BIF's employees in Bosnia responded to questions from BIF about various aspects of BIF's work in Bosnia. In an electronic mail on October 26, 1998, in response to the question "What do you think is the best thing that BIF has done in Bosnia?," the employee responded: "Military training of soldiers during the war[.]" Ex. 168 at 1.

In Bosnia, BIF established an Orphan Sponsorship Program. BIF explained the program

to potential donors as follows:

> BIF has sponsored thousands of orphans in its eight years of operation and continues to do so in countries as varied as Afghanistan, Bosnia and Sudan
>
> * * * * *
>
> * *Raising the morale of the soldiers:* The reassurance that his child will be taken care of adequately in the case of his death inspires confidence and raises the morale of a soldier. A study that B.I.F. conducted shows that in all areas where an effective orphan sponsorship program has been instituted the morale of the soldiers improves.
>
> * *Freeing up resources for defense:* Caring for orphans requires a sizable investment in financial and human resources, especially close to an area of active conflict. By setting up and administering a successful program, we free up the resources of the Bosnian government to use them for an important task: to ensure that children are not made orphans in the first place (i.e. defense). It must be kept in mind that the war in Bosnia has dramatically escalated and the Muslims have to make the most of all the resources they have.
>
> We hope you can understand by now that your sponsorship means much more than supporting a needy child whose parent(s) have been cruelly snatched away from them. It also represents an opportunity to influence the overall situation on the ground with a statement to the men at the front, *'Don't worry, we'll stand by your dear young ones if something were to happen to you!'*

Ex. 169 at 1-2 (emphasis in original). BIF used reports mirroring this one for more than one year and for sponsorship programs in areas in addition to Bosnia.

On April 10, 1999, Suleman Ahmer completed his "Vision 2013 Proposal" for BIF's Board of Directors. Ex. 119. The report, a blueprint for the "creation of an Islamically empowered generation which understands that the Muslims of Bosnia have to stand-up on their own feet and fare for themselves" concludes that: "The critical mass will come from the 400 orphans that we sponsor and their brothers and sisters. In general we are looking at a pool of around 1000 children to start with." *Id.* at 6. Ahmer suggested that the "recruitment of the children would start from September 1 and the training of the children would start from November 15, 1999." *Id.* at 20.

On April 21, 2001, defendant Arnaout purported to introduce himself to the organization "Bosnia Ideal Future" in a letter from BIF-Sarajevo stating that BIF was going to give its projects

to Bosnia Ideal Future.  Ex. 170.  On May 1, 2001, defendant Arnaout (as a representative of BIF-USA) and Munib Zaharigac (as a representative of "Bosnian Ideal Future", or *Bosanska Idealna Futura*), executed an agreement which stated that BIF-USA would fund Bosnia Ideal Future's projects, and that Bosnia Ideal Future has to submit budgets for projects in advance.  Ex. 171.  The "new" Bosnian organization used BIF's Sarajevo and Zenica offices as well as its logo (and of course its initials "BIF").  Ex. 172.

On November 9 or 10, 2001, Munib Zaharigac, the director of the Sarajevo office, e-mailed defendant Arnaout about a problem with their books.  Ex. 173.  Zaharigac explained that about six months earlier, BIF helped a wounded soldier from Sarajevo reconstruct a flat after he and his family were evicted from their home.  *Id.*  Zaharigac explains that an accountant explained to him and "Alen" (the director of BIF's office in Zenica, Bosnia-Herzegovina) the laws applying to residential humanitarian organizations.  *Id.*  Zaharigac explained:

> As I had informed you before we couldn't present buying flats as our outcome.  Also many other bills we could hardly account as our outcome.  Alen suggested making new distributing list of orphans and present it as our outcome.  But, if it's able, the easiest solution, I mentioned it before, is that we take the needy amount from your BIF Central Bank account  and distribute it for OSP for two months in order to be equal our income and outcome.

*Id.*

In his initial response, defendant Arnaout wrote only: "I did not understand what do you mean in this email??????"  *Id.*  In response, Zaharigac wrote: "It is impossible that you didn't understand anything in this e-mail even my English is bad (sorry for that)."  *Id.*  Zaharigac added that he supposes that defendant Arnaout is angry with him for his poor job performance.  *Id.*

Zaharigac sent a separate response to defendant Arnaout on November 15, 2001, explaining that countries are looking into who is financing terrorism and some humanitarian organizations finance terrorism.  Ex. 174.  Zaharigac then wrote: "Now I'm going to inform you about the most important thing about my last letter you didn't understand.  We have a big

64

difference between our bank account income and outcome." *Id.* He then explained that about half of BIF's expenditures are not on the books, adding: "We can expect their visit and we should be ready for that, because we spent all this money here but must have the papers of that. Please let me know what you think." *Id.*

On November 16, 2001, defendant Arnaout forwarded Zaharigac's e-mail to Alen Cosic and stated that it appears that Zaharigac is confused about the accounting. *Id.* Defendant Arnaout explained that the way Zaharigac is approaching the problem does not seem correct. Defendant Arnaout instructed Cosic: "Please remind him about our last deal and the things we should follow in our last meeting[.] No phone calls or emails about this subject any more please." *Id.* Defendant Arnaout concluded by asking Cosic to explain Zaharigac's e-mail. *Id.*

In response, Cosic reiterated that there is a "gap" in BIF's official accounting. *Id.* He wrote that one solution is to send money from BIF in the U.S. to an account in Bosnia that is not BIF's regular account – "that way, official accounting would not have any incomes from abroad and for the next 3-4 months we would 'spend the gap.'" *Id.* Cosic adds that this solution is not a good one because the amount of money is so high that it would be noticed. *Id.* Cosic then explains that he does not want to give all the accounting information to the accountant, and concludes by stating that Zaharigac's problems stem from his limited understanding of English. *Id.* Defendant Arnaout replies by stating that he thinks there is a misunderstanding with Zaharigac, and he will be in Bosnia the following week. *Id.*

On January 15, 2002, Batterjee e-mailed defendant Arnaout to tell Arnaout that he got the update from Dr. Hisham (defendant Arnaout's brother, through whom Arnaout communicated to Batterjee, as discussed below). Ex. 175. Batterjee e-mailed defendant moments later and encouraged him to come to Saudi Arabia for Hajj. Ex. 176. A few days later, defendant Arnaout and Batterjee spoke by telephone and Batterjee requested that Arnaout relocate with his family to Saudi Arabia. Ex. 177.

On February 12, 2002, defendant Arnaout spoke via telephone with his brother Hisham

overseas. Defendant Arnaout was obviously well aware of BIF's history in Bosnia. *See* Ex. 178. Defendant Arnaout told Hisham that "they" took the former director of BIF's Bosnian office "in a special plane" "[t]o Cuba." *Id.* Defendant Arnaout added: "[J]ust tell him [referring to "Abu Sulafa," or Adel Batterjee] ninety-three, ninety-four, and Abu Sulafa will know what you are talking about."[25] *Id.* He elaborated: "Yeah, ninety-three, the director of those days. It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how. . . . Yes, in ninety-two and ninety-three, the work there was Abu Sulafa's. . . . And the work was the type of two-edged razor. So the owner of the job, the director who was on the job there, whom I was responsible for, is now with them. . . . So I mean, after him, after him, after him, after him, after him, after him as long as it takes[.]" *Id.* at 16.

### J.     **BIF's Efforts in Chechnya**

#### 1.     **Background**

Beginning in or before 1995, BIF worked in Chechnya, an area within Russia that has been consumed by violence between Russian forces and Chechen separatists. As discussed below, BIF's efforts in Chechnya centered on supporting the *mujahideen* fighting against Russia. BIF Board Member Suleman Ahmer described Chechnya in a memorandum titled "The embattled innocence: Chechnya." Ex. 180. The report chronicled Ahmer's trip to Chechnya as "part of the effort by a local humanitarian organization, BIF, in taking relief to the region." *Id.* In the report, Ahmer referred to Chechnya as "[o]ne of the last great forts of Islam in the Caucasus." *Id.*

In describing the conflict, Ahmer explained that "the strategy of the Russians is to seek a comprehensive defeat of the Dudayev's forces." *Id.* Ahmer added:

The most ironical yet moving instance for me was to find together the Chechens who

---

[25]     Defendant Arnaout had previously informed Batterjee that he had been searched at the airport. Ex. 179.

fought with the Mujahideen against the Russians in Afghanistan and the Chechens who fought the Mujahideen as Russian soldiers. It brought tears of happiness to my eyes when I shared some time with all of them eating together and talking about Islam. Such are the moments which expose the true strength and greatness of Islam and fill our broken hearts with pride and joy. Sultan, a former Russian soldier, who spent a year in Faizabad (Afghanistan) fighting the Mujahideen said that he had returned to wage a Jihad against the Russians with a hope that Allah would forgive the time that he had spent in Afghanistan.

It is difficult to ignore the deep reverence to Islam, the pride and fearlessness that permeates in the whole society. "War is a frequent visitor to our land." remarked a young Chechen, "It doesn't annoy us any more. We have fought Ghazwas [()Chechen term for war) for centuries."

*Id.*

In January 2001, BIF published on www.benevolence.org the "History BIF in Chechnya." Ex. 181. After stating that Chechen Muslims declared independence from Russia in December 1994, BIF states:

BIF took an immediate interest in helping the Muslims, and became established in the Vendeno district in March of 1995 through our contact, Shiekh (sic) Fathi.

BIF first project in Chechnya was the distribution of protective shoes to the population. During the war, the Russians were using small camouflage mines called Frog mines. They dropped these mines from the air on roads that refugees used to flee the fighting. The mines created a small enough explosion to blow off a person's foot. BIF distributed $100,000 worth of protective shoes that would lessen the destructive force and the pain from stepping on the mine, and allow doctors to save the foot rather [than] amputating. Also, BIF immediately transferred medical supplies and equipment from our office in Pakistan to help the Chechens.

In late 1995, we opened an office in Baku, Azerbaijan for the two-fold purpose of helping the Muslims in Azerbaijan who were coming out of a bloody six year conflict with Armenia and to have a staging point to send money and supplies into Chechnya.

* * * * * *

In the end of 1996, after the Russians had withdrawn from Chechnya, BIF was able to establish a physical office in Chechnya, in a suburb of Grozny called Tashkala. Two native Chechens were hired to run the office and the programs in Chechnya.

*Id.* BIF omitted the facts that the "$100,000 worth of protective shoes" it purchased were expressly for the *mujahideen*, along with camouflage uniforms, medical equipment and money,

as discussed below.

On October 18, 1999, defendant Arnaout recounted the history of Chechnya to a BIF fundraiser, Uwaymir Anjum, describing  Sheikh Fathi Mohamed (BIF's initial contact in Chechnya), among others.  Around the time defendant Arnaout shared this history, Anjum was actively raising funds for BIF for use in Chechnya.  *See* Ex. 182 (December 7, 1999 fundraising letter).  Anjum memorialized defendant Arnaout's statements in a document titled "Daghestan and Chechnya: A Brief Recap of the Islamic Movement".  Ex. 183 and 184 (electronic version and hard copy version).  At the outset of his notes, Anjum wrote:

> Enaam Arnaout, the CEO of the Benevolence International Foundation, a US-based humanitarian relief organization operating in the Caucus, Central Asia and Balkans, has made six trips to Daghestan/Chechnya area and has collected invaluable information on the history and details of the Islamic movement.  Most of this information is collected through personal contacts and log (sic) term relationship (sic) with many key people in the movement.[26]

*Id.* at 1.

> With respect to Sheikh Fathi, Anjum recorded:
> One greatly significant figure in the Islamic movement in Chechnya is *Sheikh Fathi* (a BIF friend who died recently while Enaam was there). . . .  He is one of the most significant figures in the Islamic movement in Chechnya.  By profession, he was an electronic engineer and helped the Afghan Jihad through his skills in electronics.  He stayed in Afghanistan from 1982 to 1992 and then moved to Chechnya.  Coming from Ikhwan-salafi background, he had a broad-based knowledge of Islamic movements.

*Id.* (emphasis in original).  According to defendant Arnaout, as recorded by Anjum:
> Sh. Fathi was initially with Ikhwan ["Brotherhood"] then he broke off to make his own group since he thought that Ikhwan were too narrow in their approach and more broad and daring  approaches have to be adopted.  Fathi started receiving Mujahideen, especially Arabs, from other Muslim countries.

---

[26]     This example reinforces that defendant Arnaout was part of a longstanding agreement to provide support to *mujahideen* that simply expanded geographically over time but involved the same core set of participants and core goals.

68

*Id.* Defendant Arnaout continued:

> At the time of his death, Sh. Fathi was busy in another great task: organizing and structuring his Islamic group.  He died before completing the task of structuring his movement completely.

> One of Sh. Fathi's legacies, probably the leader of the group after him, is *Arabi*, a Chechen student of Sheikh Fathi.  He commands of a group of about 600 mujahideen situated in the capital to keep a watch on the president to ensure that the president does not blatantly violate Islamic principles.

*Id.*

In addition to Sheikh Fathi, defendant Arnaout described the following individuals:
*Zdhokar Dudayev*, a central figure in the Chechen jihad, was a nationalist initially who became Islamist in 1992 and fought till he died in 1995.  He was an army commander.

In the opening years of the 1990s, the Islamic movement found itself strongest Tajikistan and then in Daghestan.  Tajikistan, being poverty-stricken and away from the Russian center, was able to keep remnants of its Islamic identity.  Daghistanis had a similar advantage: many of them lived in the center of the Islamic world, Hijaz for a long time, preserving, however, their culture and language.
* * * * *
*Saif-ul-Islam*, the BIF officer in Chechnya, is an Egyptian lawyer who is very knowledgeable.  He also came there through Sh. Fathi.
* * * * *
*Shamil Basayev* was another army commander who became surrounded by Sufis. . . .
However, lately he was trained and Islamically educated by Khattab the leader of Arab Mujahideen.
* * * * *
*Khattab* is a Saudi mujahed who went to Afghanistan when he was 17, fought there till he moved to Tajikistan and later to Chechnya.  He saved Chechnya from Russian onslaught during the last war by his great courage and is greatly respected by the Chechens.  When the Russians had entered Chechnya and almost took over, he went at their back and attacked after carefully choosing the assault time and place such that the Russians were finally defeated.

*Id.* at 1-2.

The reference to Saif ul Islam is particularly significant as he was a top military leader in

*al Qaeda*.  Indeed, in 1997, Saif ul Islam was in telephonic contact from Baku, Azerbaijan, with

the *al Qaeda* cell in Nairobi, Kenya, headed by Wadih el Hage who was relaying messages between Saif ul Islam on the one hand and Muhammed Atef (then military commander of *al Qaeda*) and Bin Laden in Afghanistan on the other. Ex. 185.

On March 14, 2000, after he left BIF, Uwaymir Anjum wrote to a BIF employee involved in the Orphan Sponsorship Program:

> As for Chechnya, it is almost certain that most of the orphans we are taking money for will not be found after war, and I still feel guilty for not disagreeing more strongly with the decision of continuing receiving the money. The money of the orphans is a great responsibility upon bif and we should do our best to either return the money or find the orphans.

Ex: 186.

## 2.   X-Ray Machine and Anti-Mine Boots for Chechen *Mujahideen*

In the summer of 1995, defendant Arnaout, and others working with the BIF Enterprise, purchased and delivered a mobile x-ray machine and accessories expressly for use by the *mujahideen* fighting in Chechnya, along with $3200.   The delivery of the machine was documented in a detailed report by a BIF employee Syed Sarfaraz (or "Sarfarz") which recounts and his journey and also demonstrates BIF's continuing ties to *Hezb e Islami*. Ex. 187. Moreover, as the report reveals, Essa Abzoutov (or Abzoutove), a contact of the Chechen *mujahideen* in Baku, Azerbaijan, asked Sarfaraz on this visit about BIF procuring anti-mine boots for the *mujahideen*:

> The above visit was made by the undersigned on behalf of Benevolence International Foundation and at the request of Mr. Suleman Ahmer, Operations Manager, B.I.F. North America/Pakistan.
>
> <div align="center">* * * * *</div>
>
> Having failed on the first two attempts to send the X-Ray unit with other passengers bound for Baku (last minute refusal on the first occasion,; cancellation of permission by Custom Authorities second time) no viable alternative was left except that I should carry

---

[27]   One of these failed delivery efforts involved Asad Ullah, who, as discussed later in Sarfarz's report, delivered $3200 to Essa Abzoutov, the person who ultimately received the

the unit.[27]

\* \* \* \* \*

The Unit (a photocopy attached) is made in Shanghai, China.  With a brand name of Mednif, Model F-30III-2, this mobile unit has a net weight of 95 Kg.[28]

\* \* \* \* \*

Finally, got the unit through by assuring the authorities that it was meant for refugee camps of Azerbaijan."

\* \* \* \* \*

Contacted Mr. Gul Mohammad, B.I.F.'s Baku contact who is also a senior representative of Hisb-e-Islami of Afghanistan in Azerbaijan.

\* \* \* \* \*

Mr. Gul Mohammad (G.M.) picked me up at mid-day and made arrangements for my stay at his town office-cum-residence.  Attempts were made by us to locate Mr. Essa Abzoutove, contact man of Chechen Logistics Cell in Baku. . . .  Spent time reviewing status with G.M. and Dr. Atif Aminee, another senior member/office bearer of Hizb-e-Islami Group in Baku.

\* \* \* \* \*

Accompanied G.M. . . . to the office of Mr. Khasan G. Khazutev, Vice Prime Minister of the Cabinet of Ministers of the Chechen Republic (See copy of his calling card, attached).[29]  G.M. Explained to him the purpose of my visit and B.I.F.'s desire to provide financial and material support to the Chechen cause.  Mr. Khazutev welcomed B.I.F.'s humanitarian help and assured to become an effective conduit to pass on the proposed aid, cash or kind, most expeditiously to the Mujahideen.  After being convinced of our bonafides, he showed us two letters issued by the office of President Dzokhar Dudayev . . . which contained the names of the Chechen based in Baku and other cities of Azerbaijan who were designated to receive the donations in cash or kind.  These letters were signed by President Dudayev himself . . . .  G.M. appreciated our being taken into confidence but discreetly asked for a photocopy of the letters for B.I.F.'s purposes.  Mr. Khazuyev, as expected, said it could be considered later.

\* \* \* \* \*

---

x-ray machine.  In a May 19, 1995, memorandum from Ahmer to "Brother Essa," Ahmer stated: "the X-Ray machine is arriving on Sunday (21-May-1995).  The name of the brother who is bringing the machine is Asad Ullah Khan."  Ex. 188.  That same day, BIF employee Muzaffar Khan prepared a memorandum to "Sister Umme Mohammad" stating that Asad Ullah Khan is traveling on Pakistan International Airlines ("PIA") on May 21, 1995 with an x-ray machine, asking her to convey that to Abzoutov and to have Abzoutov call Gul Mohammad.  Ex. 189.

[28]        A photocopy of the front page of a brochure or instruction manual was recovered at BIF's Illinois office.  Ex. 190.

[29]        Khasan G. Khazutev's business card was recovered from BIF's Illinois office.  See Ex. 194.

G.M. came to meet me along with Essa and his fellow Mujahid Buda? Essa was visibly moved by B.I.F.'s help by sending the much needed X-Ray machine. Following some discussions, Essa took the unit and gave a proper receipt for it. He indicated that as soon as a viable route/transport is arranged, the unit would be taken to a field hospital in Southern Chechnya. He also acknowledged the receipt of amount given by G.M. ($3225/- sent through Mr. Asad Ullah and the amount paid to him earlier on by G.M.)[30] G.M. said he would Fax to Suleman Ahmer the receipt of these amounts. The receipt of the unit is also enclosed.

* * * * *

Essa also showed interest in anti-mine steel-sole boots for Chechen fighters. He also added that he could arrange funds to purchase these from USA or other sources at a reasonable price.

* * * * *

It appears that Suleman Ahmer is making some inquiries about the manufacture/supply of such boots.

* * * * *

Visited the main office of Hizb-e-Islami with G.M. and Dr. Atif and I was introduced to Mr. Abdur Rehman, General Manager . . . . These two oversee administrative functions whereas G.M. and Dr. Atif are responsible for external affairs and for coordination with Government Agencies /foreign functionaries etc. Hisb's official lauded B.I.F.'s efforts to help the Chechen's cause and indicated their cooperation in facilitating such efforts in Baku.

* * * * *

Met couple of Hisb's Mujahideen. Exchanged views on latest situation; role of B.I.F. in distress areas like Bosnia, Sudan and now Chechnya etc.

* * * * *

Met G.M., Dr. Atif and visiting official from Hisb's Peshawar. . . . G.M. briefed him on B.I.F.'s contribution, financial and material, to the Chechen Mujahideen and a desire for continuing support on humanitarian grounds.

* * * * *

Met, at G.M.'s house, five veteran Afghan Mujahideen who participated in Nagorno Karabakh conflict against the Armenians. G.M. apprised them of B.I.F.'s humanitarian efforts in Chechnya.

---

[30]     The $3200 sent to Abzoutov was discussed in a May 14, 1995 facsimile from Ahmer to Fathi Mohammed (also refereed to as Sheikh Fathi, discussed *infra*.) via "Brother Essa," stating: "I hope you have received all the money from Gul Mohammad" and "I am also sending an X-ray machine for the Vidino Hospital." Ex. 191. That note followed a May 2, 1995 handwritten note from Ahmer to defendant Arnaout requesting that defendant Arnaout transfer money to a man in Peshawar, Pakistan and say it is for Gul Mohammed in Baku, Azerbaijan. Ex. 192.

* * * * *

G.M. therefore concluded that any aid from us in cash or kind should better be routed through Essa or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the ongoing Jehad.

* * * * *

Accompanied Hamine Aminee to meet a recuperating Afghan mujahid. He was injured last year in the Nagorno Karabakh conflict with the Armenians. Until recently all of his compensation from the Azerbaijan government has been exhausted. . . . I would recommend some help on continuing basis from B.I.F. to him.

*Id.* In listing the accomplishments of this trip, Sarafraz wrote:

Various meetings with senior members of the Baku based Hisb-e-Islami Group of Afghanistan and receiving their personal attention, at respective levels, to meet our visit objectives. . . . A close rapport with Hisb's senior officials which would facilitate our future efforts in the area, . . . . As a sequel to Suleman Ahmer's last Baku-Chechnya visit (April 20-May 10), the Chechens/Hisb-e-Islami are reassured of the seriousness of B.I.F. to help Chechens following our financial and material (X-Ray unit) assistance. . . . [W]inning a good-will for B.I.F. and enhancing its visibility as an International Organization engaged in alleviating the human sufferings in selective flash points involving oppressed and helpless Muslim civilians, refugees and freedom fighters.

*Id.*

A handwritten telephone list recovered from BIF's Illinois office lists numbers for *Hezb e Islami* personnel in Baku, Azerbaijan and "Essa Abzoutov, Chechen Contact in Baku." Ex. 193.

As Sarfaraz noted in his report, Essa Abzoutov provided a signed receipt for the delivery of the x-ray machine and money. Ex. 194. The receipt states that the Mednif x-ray machine Sarfaraz described was "[r]eceived with thanks from Benevolence International Foundation, P.O. Box, 548, Worth, Illinois, USA, 60482". *Id.* The receipt makes clear: "As arranged this unit will be transported to Chechnya for the use of Chechen Mujahideen." *Id.* The receipt is signed by Abzoutov, Sarfaraz, and Gul Mohammed who Sarfaraz explained worked for both BIF and *Hezb*

---

[31]     In late 2000 and early 2001, BIF spent over $75,000 for the purchase of chemical handwarmers and toewarmers (small disposable packets which when shaken heat up for a period of hours and can be inserted in gloves or boots, commonly used for skiing, hunting and fishing in

*e Islami* in Baku, Azerbaijan.[31] *Id.*

Materials going to Chechnya often passed through Azerbaijan, much like materials going to Afghanistan during its conflict with the Soviet Union often passed through Pakistan.[32] In fact, a BIF memorandum shows that BIF established an office in Azerbaijan to facilitate its efforts in Chechnya:

> [T]his office will serve as a conduit of relief supplies to Chechnya. Our study has proved that the best way to get relief supplies into Chechnya is through Azerbaijan.
>
> \* \* \* \* \*
>
> BIF will be transporting relief supplies to Chechnya in the first phase. These will include shoes, canned food, sleeping bags, medicine and medical equipment. To this date a mobile x-ray unit was bought and transported to Azerbaijan with Mr. Sarfarz for onward transportation to Southern Chechnya.

Ex. 196.

Within weeks of the delivery of the x-ray machine (or perhaps prior to the delivery), defendant Arnaout inquired about the anti-mine boots Abzoutov requested. A facsimile on July 5, 1995, from the Al-Aman Trading Company ("Al-Aman") to "Mr. Azeem/Sarfaraz" containing a note written to defendant Arnaout and a sketch of a boot states:

> Honorable Brother Abu Mahmoud . . . . I have just received the offer, and according to your request, shoes having these specifications are not readily available and they must be made. The least quantity is 20-foot shipping container. The container holds 2900 shoes (pairs) . . . . The cost, receivable to Dubai, with insurance is 31 Dollars.

Ex. 197. Defendant Arnaout later shared Al-Aman's telephone and facsimile numbers with an individual in the course of discussions of opening a BIF office in Thailand. Ex. 198.

Two days after the Al-Aman facsimile to defendant Arnaout, Syed Sarfaraz sent a

---

cold weather). In a letter to the distributor, BIF requested that the warmers be shipped to Essa Abzoutov at an address in Turkey. Ex. 195 at 2. After problems arose in Turkey with the delivery, BIF changed the name of the recipient and the delivery was completed.

[32] And the continuing agreement is made clear by the fact that defendant Arnaout and LBI worked with *Hezb e Islami* in Afghanistan and that Arnaout and BIF worked with *Hezb e Islami* in Afghanistan and then Arnaout and BIF with *Hezb e Islami* again in Chechnya.

facsimile to Suleman Ahmer containing the same boot sketch and advising Ahmer that Al-Aman quoted $31 per pair. Ex. 199. Sarfaraz added: "The only alternative now is to go for the Pak boots which will be fully financed by the time tested Brother."

Approximately one month later, on August 8, 1995, BIF employee Muzaffar Khan wrote a memorandum about the boots to Jehanzeb Sikandar (sometimes spelled "Sikander"), a trusted BIF officer in its Baku, Azerbaijan office (discussed further below), informing him that defendant Arnaout ordered the boots and seeking advice on the best way to get the boots into Azerbaijan:

> Enaam called me and said that we are going to ship about 2900 pairs of shoes for Chechnya in next 15-20 days. The shipment will arrive in Baku, Azerbaijan. We are declaring the shipment as a business shipment.
> * * * * *
> What is the Custom's process for the business shipments? Or is it a good idea to ship the goods in some other name? He suggested that you should consult the Chechen representative in Baku for the best means available to ship the shoes safely and without any problems.
>
> But be careful in discussing the matter with anybody. As you are well aware of the importance of the matter.
>
> The shipment will come through Iran (Abadan) into Baku.

Ex. 200.

A month later, on September 6, 1995, defendant Arnaout met with Sarfaraz in Pakistan to discuss the anti-mine boots, as Sarfaraz chronicled in a report a day after the meeting:

> This refers to an introductory meeting with br. Inam, Director, BIF and myself on Sep. 6, 1995 at Hotel Sheraton, Karachi.
> * * * * *
> Discussed latest situation regarding donations for the import of the anti-mine boots for the Chechen Mujahideen. I will try to set up an appointment with Mr. Naveed Anwer, a donor who has committed US $30,000/= for this noble cause. I strongly feel that br. Inam should meet with him (Suleman also recommended earlier).

Ex. 201 (handwritten version). The report also explains that defendant Arnaout and Sarfaraz discussed BIF's merger with a group known as Nasr Trust. *Id.* Sarfaraz sent this report to

defendant Arnaout and apologized because it had not yet been typed: "I could not even get my memorandum of meeting with you typed. I should have given it to you on the day you were leaving. Anyway I am enclosing it now and cannot wait for a day or two to get it typed." *Id.* Eventually, Sarafraz sent a typed report. Ex. 202.

Around this same time in September 1995, Sikandar informed defendant Arnaout by fax that Gul Mohammed wanted defendant Arnaout to know that Hekmatyar is in Peshawar for three days and defendant Arnaout can meet with him. Ex. 203.

BIF purchased the 2900 pairs of anti-mine boots in October 1995. In a letter to "Br. Ahmed, Al-Aman Trading Company" from BIF employee Muzaffar Khan on Oct. 10, 1995 regarding "Money transfer and original documents," Khan stated to Al-Aman: "You should have received the wire by now, Insha' Allah.[33] Please send us all the original documents to our office in Chicago as per your conversation with Enaam Arnaout." Ex. 204. BIF maintained at its Illinois office a facsimile copy of a Citibank transfer receipt for $100,000 from BIF to Al-Aman on Oct. 11, 1995. Ex. 205.

> BIF received an invoice from Al-Aman on October 31, 1995, stating:
> HUNTING BOOTS PACKED IN 20 PRSX145-CARTON BOX ... SIZE: NO.9 1160 PRS; NO. 10 1160 PRS; NO. 11 580 PRS ... MADE IN KOREA ... Total US DOLLAR EIGHTY NINE THOUSAND NINE HUNDRED ONLY. 89,900.00

Ex. 206 at 4. BIF also received a bill of lading from Iranland Services Shipping Agency, Tehran, Iran, dated November 1, 1995, and the shipment was insured by another company. Ex. 207. The bill of lading is for a shipment of "145 CTNS OF HUNTING BOOTS" from Dubai, United Arab Emirates ("U.A.E.") to Bandar Abbas, Iran, stating "TRANSIT VIA IRAN T BAKU". *Id.* Notably, BIF's name does not appear on the bill of lading.

The absence of BIF's name on the bill of lading was discussed five days later in a

---

[33]     *"Insha' Allah"* or *inshallah* means "God willing."

memorandum from defendant Arnaout to Sikandar, BIF's representative in Baku:

> The shoe shipment has left from port Bandar Abbas for Baku on 11/5/95.  The bill of
> ladings and the related invoices have been sent to you from Dubai.  The DHL airway bill
> number is 3035075956, you should contact the local DHL office to get the paper work.
> The important thing is that the shipment is not in BIF's name for some reasons. . . .  We
> are transferring another $20,000.00 to you today.

Ex. 208.  Sikandar repeated these concerns to defendant Arnaout in an e-mail to on May 25,
1996:

> It's possible to meet Dr. Abdallah in Moscow, but it's not good to meet him there,
> otherwise (the others) will know his direction (the Brothers who will meet him are known
> by their face that they are from inside)[34] . . . To transfer money here will put us under the
> questions, how and where spend it like the shoes.

Ex. 209.

Also in November 1995, BIF was raising money from donors for these shoes.  Ahmer
himself was giving speeches in various areas in the United States about the war in Chechnya and
soliciting donations "for the Chechen cause."  *See* Ex. 210 (noting that Ahmer's speech on the
war in Chechnya "will conclude with a fundraiser for the Chechen cause"); *see also* Ex. 211
("Example of Speech on Chechnya": "We are raising funds for the shoes only, and so focus your
attention on this project" and noting that the "shoes" cost "$32 each").

On July 17, 1996, approximately eight months after the shipment of the 2900 pairs of
anti-mine boots, Muzaffar Khan received an e-mail from an employee in BIF's Zenica,
Bosnia-Herzegovina office stating: "Also he [Gul Mohammad] received request from Sheik in
Chechnya asking for another 2500 shoes.  Please consult it with Suleyman and let me know
about it."  Ex. 212.  Less than a month later, the "Congress of Chechen International

---

[34]      During the conflict between Afghanistan and the Soviet Union, individuals in
Pakistan and elsewhere commonly referred to Afghanistan as the "inside."  Likewise, during the
conflict between Chechnya and Russia, individuals in Azerbaijan and elsewhere referred to
Chechnya as the "inside."

Organizations" in Washington D.C. sent a letter to BIF's Board of Directors stating: "[T]he (2500) pairs of shoes that were sent to Chechnya have been very helpful.  Shaikh Fathi talked to me about three weeks ago and asked if you could send another (5000) pairs because they are badly needed especially for the coming winter."  Ex. 213.

BIF made efforts to finance the purchase an additional 6000 pairs of boots following this request, seeking donations from the public and indicating that these boots and the ones previously shipped were for civilian use.  In a letter titled "Project: Reinforced Winter Shoes for Chechnya", BIF discussed the dangers of "frog mines" dropped by the Russians in Chechnya and explained:

> [A]nd the civilians attempt to flee, they fall victim to these mines.
> * * * * *
> Last year BIF, distributed 2,900 pairs to the localities where the mines are reported to be scattered.  These winter shoes provide a degree of protection as they have reinforced soles.
> * * * * *
> Recently BIF has received another request for these shoes for this upcoming winter.  BIF has decided to go ahead with this project.
> * * * * *
> The cost of the shoes is $29.50 per pair.  Including the shipment, the cost per pair is $32.00 per pair.  The minimum quantity that has to be ordered from the company is 30[illeg.].  That brings the total cost plus shipping into Chechnya to be;
> Total cost of the project: 3,000 X 32.00 = $96,000
> * * * * *
> BIF will be receiving a sample of the shoe from South Korea in the first week of September.

Ex. 214.  In a follow-up letter titled "Project update: Reinforced Winter Shoes for Chechnya" on September 8, 1996, BIF stated:

> Salient Features – No. pairs needed: 6,000; Cost per pair: $32.00; Total cost: $192,000; Funds raised: $106,149; Funds remaining: $85,851
> * * * * *
> In the end of July BIF received another request for these shoes for this upcoming winter.  A minimum of 5,000 pairs were requested.  BIF has decided to go ahead with this project.
> * * * * *
> Fundraising was started in early August and the target was set for 3000 pairs by the 10th of September. . . .  It was decided to monitor the response and in the case of a favorable response BIF will go ahead with 6,000 pairs and the project will be done in two batches. . . .  The net cost for the whole project is $192,000.
> * * * * *

All donations to B[illeg.] tax exempt.  Please make the check out to BIF and mail it to BIF, P.O. Box 548, Worth, IL [illeg.] and indicate in the memo "Winter Shoes for Chechnya."

\* \* \* \* \*

Remember, currently the shoes that were shipped last year are being used and positively affecting thousands of people (2,900 at least).  Please join hands with us to continue the much needed assistance being provided to our brothers and sisters in Chechnya.

Ex. 215.

In a related flyer, BIF stated:

URGENT!  REINFORCED  WINTER  SHOES  URGENTLY  NEEDED  FOR CHECHNYA

\* \* \* \* \*

Unfortunately, the mines don't discriminate between innocent women, children, and the army and continue to be a menace even after the war is over!

Ex. 216.  Another BIF flyer asked: "The Chechens have given 150,000 Lives for Islam . . . How much will you give?"  Ex. 217 (ellipsis in original).

In response to BIF's solicitations, donors sent money for the "shoes" without knowing that they were only for fighters.  For example, on September 9, 1996, an Iowa donor sent $500 "for the 'reinforced shoes' drive for Chechnya."  Exs. 218 (letter, receipt, check and postmarked envelope) and 219 (receipt); *see also* Ex. 220 (letter to same Iowa donor from BIF regarding orphan sponsorship in Feb. 1996).

A BIF form letter from defendant Arnaout ensured donors that the "reinforced shoes" were for civilian use:

Assalamualaikum dear brother «NAME»: Thank you for your generous donation toward the purchase of reinforced winter shoes for Chechnya. May Allah reward you in the fullest.

Last year BIF shipped over two thousand pairs to the region.  The shoes were found useful and BIF is doing the same project again this year on the request of the people of Chechnya.

Insha'Allah, these shoes with a reinforced sole, will go a long way towards minimizing the damage that land mines are causing to the civilian population in Chechnya.

Ex. 221 (emphasis in original).

Indeed, at this same time, Ahmer continued his fundraising speeches for Chechnya. Ex. 222 (flyer advertising a November 1996 Speech by Ahmer titled "The struggle for the freedom of the Chechens!"). In a later speech delivered to a group in Urbana-Champaign, Illinois, Ahmer solicited donations which he said would be used for anti-mine boots for Chechen freedom fighters. Ahmer explained at the presentation that BIF provides items to fighters that could be viewed as relief items in order to avoid scrutiny by Customs officials. He cited an x-ray machine and ambulance as items purchased for the Chechen freedom fighters.[35]

BIF's records indicate that it did not deliver the anti-mine boots "for the upcoming winter" as requested. Instead, in late 1996 or early 1997, BIF apparently shifted its efforts from anti-mine boots to non-reinforced footwear for soldiers in Chechnya, as well as uniforms for the soldiers. BIF's January 1, 1997 "Strategic Plan for Chechnya - Proposal of Projects" stated: "In addition, further request came in for the winter boots. However, it was necessary that the quality of the shoes be investigated and improved upon for the next shipment." Ex. 223. The report continued: "Regarding the shoes, it was found out that the land mines were no longer a threat, hence the metal shoes do not need to be included. This will result in lower cost, and hence a larger amount of shoes to be bought." *Id.* In listing proposed future projects, the report includes:

> More shoes. The quantity requested is 10,000. Due to the changing cost of shoes, we can buy upto (sic) 8,000 pairs with the money already raised, therefore needing funds for additional 2,000 pairs. In addition, same number of uniforms and shirts were requested. These can be purchases in Korea because [rest of report not recovered].

*Id.*

Between April 17 and 25, 1997, BIF paid Al Aman an additional $200,000, as Al Aman

---

[35]     In Afghanistan, fighters were transported to camps by ambulances on occasion.

noted in a receipt faxed to defendant Arnaout. Ex. 224.

### 3.   Camouflage Uniforms for Chechen *Mujahideen*

Following the request for 10,000 "uniforms and shirts" described in the January 1, 1997 "Strategic Plan for Chechnya," defendant Arnaout made efforts to provide camouflage uniforms to the Chechen *mujahideen*. Defendant Arnaout visited Chechnya in 1997, as described in a report by Suleman Ahmer. In that report, Ahmer explained:

> The factory will produce uniform for the army and needs supply of cloth. Initial requirement is for 14,000 meters of quality grade camouflage cloth. . . . A tentative business plan has been made between this factory and Lilian a business concern of BIF in Bosnia[36] . . . . Military Shoes for Chechnya. There is a need of high grade shoes for the region. Market research has shown that shoes with the required specifications can be bought for around $35.00 a pair including transportation from South Korea.

Ex. 225.

Sometime prior to August 10, 1997, defendant Arnaout gave Ahmer a sample uniform. On August 10, Ahmer wrote to defendant Arnaout (sent via Muzaffar Khan):

> I have spent almost two days along with brother Naveed Anwar[37] researching about the uniform and we have talked to some factories here who produce these for export to europe (sic) etc. Here are the results:
>
> The uniform which you have given to me are of a very good quality and they take more than just cloth. The cloth is available in Pakistan but the uniform need a lot of accessories. If we want good quality stuff to be manufactured then we shall have to send all the accessories with them to the destination. For example the buttons are special quality reinforced type and have to be ordered from Honk (sic) Kong. Similarly the Zippers are also special strong ones etc. Similarly the thread that should be used is also special and is stronger than the normal thread. Here is a list of other items that have to be included:
>
> Camouflage fabric, Lining fabric ( Different quality), Front metallic zipper, Collar Zipper, Horn Buttons, vel-crow, snap buttons, Draw strings, Nylon tape, Knitted nylon jersey for

---

[36]    This is a reference to Ljiljan Commerce Group, the entity which sponsored the visit of Abu Hajer (Salim) to Bosnia discussed above.

[37]    This is the individual who committed $30,000 for anti-mine boots for Chechnya.

the head cover, Twill tape, and buckle at waist band.

All of the above would be available from different suppliers and should be purchased by experts so that the quality is assured. Usually a garment trader would do it with a 20 to 25 % mark up as I have found out here. Which means that the trader would get you all the stuff and would guarantee the quality and deliver it to you.

So if you would like a quotation please keep all of the above in mind.

You had said that we would need around 14,000 meters and we have calculated that would produce around 300 dozen uniforms depending upon the sizes.

We calculated roughly and it would take Naveed Anwar's factory US $18.83 to produce one set in Pakistan and we calculated this so that you can get an idea. The material alone would be around US $16.00.

I have talked to Naveed Anwar and he said that he can get his factory to purchase the material at 10% mark up and the rest would be considered as donation. ( Remember the industry average of a mark up is 20 to 25 % )

when you take a quotation from others make sure that you get all the specifications of all the material so that we can correctly compare.

If we have to do this project we should make sure that we make the best quality uniforms. And inshallah in the future we can hope that the garment factory can get more orders.

To prepare a quotation is a very time consuming process and I do not want Naveed Anwar to go ahead and do all that work if we are not very serious.

Ex. 226 at 1-2.

One month later, Ahmer explained to defendant Arnaout his frustration on certain projects and noted that they cannot expect information to be hidden from donors:

One thing I want to stress at this time is the update on the shoes project. . . . It happened in Pakistan that brother Naveed Anwar (One of our major donor) introduced me to some people and told them that we have sent two shipments to Chechnya. I was embarrassed as this was not true[.]

* * * * *

In the US we can not expect information to be kept hidden. . . . (Already we are having a problem with some brothers in Massachusetts who are saying that we are giving false information in our newsletters – They picked up the point that in our financial report how come we have only $15,000 per year in salaries when we have more than three

82

employees.

* * * * *

What about the 1000 shoes that we had decided to send?  What is the decision about the uniforms?

Ex. 227.

Seventeen days later, on September 27, 1997, Ahmer wrote to defendant Arnaout:
May Allah reward you for taking care of the Chechnya dress.  The reason I would like to have the samples is that we have 7 or 8 people who have either donated directly or raised around $80,000 for the shoes.  If I can have say two samples of just the jacket, pants and the shoe, I can meet with them privately and try to raise the same amount of money again. . . .  For example, the brother in Orlando had given 10,000 cash for the shoes (You know who) and he had done that privately.  I would like to visit him again privately, show the samples and raise funds for the other projects.  Similarly the brother in Massachusetts who had given $25,000.00 should be visited.

* * * * *

Also send me the price details of the dress so that I can tell Brother Naveed Anwar that we would not be getting the dress in Pakistan.  I do not want him to feel that we just neglected his offer of help.  Also I would like to, may be, ask him to pay some amount too.

Ex. 228.

A memorandum discussing a shipment to Chechnya demonstrates that BIF intended to keep details about the uniforms from its donors: "According to the request of the locals we found that they need uniforms (in the newsletter we would say only pants and shirts) thermal underwears and jackets with the shoes." Ex. 229 (parentheses in original).  The memorandum lists the "contents of the shipment" to Chechnya as shoes, "top quality" thermal underwear, belts, woolen socks, material for 3000 pants, shirts and jackets including "the cloth, the lining, the zippers, buttons etc." costing a total of $100,553.  The memorandum adds: "Guess what: the dress and the jackets will be stitched in the factory.  This will save money and provide the

---

[38]     In a written "History of BIF in Chechnya," which omits all of BIF's support of the *mujahideen*, BIF explains: "In July of 1997, BIF opened a sewing factory in Shelkovskaya, 40 km northeast of Grozny.  This factory was opened for two reasons.  First, it provided career

income to the Chechens."[38]   *Id.*   The memorandum also discusses the difficulty in getting medicine out of Russia, explaining that if they cannot get the medicine out "we may think about disposing it properly and using the revenue in Chechnya (Again this is not for the newsletter)" *Id.* (parentheses in original).   A copy of this memorandum, recovered in electronic format from BIF in Illinois, adds: "We have struck a relationship between a Chechen company called Al Badr (Of course set up by the brothers affiliated with Sheikh Fathi).   This company has received 48 [sewing] machines as a donation." Ex. 230.

### 4.   WWW.QOQAZ.COM

In its Illinois office, BIF had a copy of "A Call to All Muslims" from "The Commanders of the Mujahideen in Chechnya," dated February 22, 2000. Ex. 231.  On the bottom of BIF's copy is written "WWW.QoQaz.Com," apparently the source of the document.  *Id.*  In discussing the fighting in Chechnya, the *mujahideen* commanders ask: "And today thousands of your fellow Muslims are being killed, yet where is your support for us?"  *Id.*

BIF also had and "Update on Chechnya Fighting" which "was compiled from the web site www.qoqaz.com."  Ex. 232.  This document describes Russian aggression against Chechens and disputes reports about Russia providing humanitarian assistance in Chechnya.  *Id.*

In early 2000, www.qoqaz.net, also dedicated to the cause of Chechen *mujahideen*, identified the leaders of the military fight in Chechnya as including Ibn al Khattab (discussed above as the leader to whom *al Qaeda* was sending support in Chechnya) and included pictures of *mujahideen* training as well as killed *mujahideen*.  Ex. 233.  The website sought doctors to travel to Chechnya to make contact with Ibn al Khattab and provide medical services at the front.  *Id.*  The same website urged those wishing to go Chechnya to fight to get training in Afghanistan,

---

experience and income to women in the area, and the Islamic style of clothing that was made in the factory was distributed in some of the more hard hit areas of the country."

adding:

> Anyone interested in going to fight (if they are trained) or in going to train should contact members of their own communities and countries who are known to have been for Jihad. You will know these people and they will know you. In these cases, you should only speak in confidence to those whom you trust, rather than speaking to everyone.
> \* \* \* \* \*
> To see what the Mujahideen in Chechnya need at present, read the answers below.

*Id.*

The website urged doctors and medical supplies to "make their way to Chechnya through the aid organizations and join the fighting units of Ibn al Khattab." *Id.*  The website also condemned America for its alleged secret financial support for the Russians fighting in Chechnya and elsewhere on the site indicated that "on the other hand, as for those fighting the Muslims and those who support this fight with money, words or actions, the Muslims consider them all as enemies and in the same group." *Id.*  The website also indicated that the news reports on its site were received from correspondents traveling with the fighting units of Ibn al Khattab and that the reports were checked by "Field Commander Khattab" before being posted on the site. *Id.*   The website also indicated that large news organizations desiring to interview Khattab (or a Chechen military leader with whom he worked) could e-mail questions to the site "and we can try without promising to have those questions answered by them." *Id.*

On February 22, 2000, the website posted donations links on the website for two charities, one of which was BIF. *Id.*  Records obtained from Citibank reveal that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen wire transfers from its checking account, number 980110435, in the amount of $685,560, to the bank accounts of the "Georgian Relief Association MADLEE" ("MADLEE") in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Latvia.  MADLEE's director is Marat Avlarigov, whose brother, Chamsoudin Avlarigov, is affiliated with the Chechen *mujahideen.*

### K.   BIF's Efforts in Azerbaijan

85

As stated above, in 1995, BIF opened an office in Baku, Azerbaijan (Ex. 234) to assist Muslims in Azerbaijan and to have a staging point to send money and supplies into Chechnya.

In August 1995, Sikandar completed his detailed "Strategic Plan for BIF in Azerbaijan." Ex. 235. At the outset, Sikandar provided historical and geographical information on Azerbaijan. *Id.* at 2-8. Sikandar then describes BIF's plans in Azerbaijan, stating: "Since it is a non-war zone our projects should have longterm (sic) strategic outlook for the region; keeping well in mind our organizations (sic) motivations, objectives and organizational mechanics." *Id.* at 9. Sikandar made clear his understanding that BIF's motivations and objectives in Azerbaijan involve BIF's private mission of dawah rather than its public mission of providing humanitarian aid where needed:[39]

> Although in short term Azerbaijan is in need of emergency food aid however, it is not advised for BIF to enter this sector. There are already anumber (sic) of organizations are concentrting (sic) in this area. For BIf (sic) this is also inappropriate because of differing objectives in the region. We want to establlish (sic) an institutional presence of Islam in the region and this area does not provide us the best of opportunities.

*Id.* Instead of providing needed food aid, Sikandar recommended that BIF get involved in health care in Azerbaijan "[t]o help the Azerbaijan war injured population and to estabilsh (sic) a base for BIF activities in the region." Sikandar continued:

> Summary:
>
> The conflict with Armenia has had and continues to have a heavy toll on the people and government of the Azerbaijan Republic. The wars (sic) military aspect is very much at the fore front of government's agenda. Any kind of help that would help the Azerbaijan government with its defence preparations is very much wellcome (sic). There is a lack of established surgery centre and those that are donot (sic) have supplies or equipment.

*Id.* In listing the assistance BIF can provide in education, Sikandar wrote: "This region for sure

---

[39]     As will be clear at trial, defendant Arnaout was frugal at times with the amount of information he shared with other employees, particularly in writing.

has all the potential of once again becoming the cradle of Islamic learning and Jihad." *Id.*

### L.      BIF's Efforts in Tajikistan

In the early or mid-1990s, BIF began working in Republic of Tajikistan, a small, predominantly Muslim country situated on Afghanistan's northern border,

In an "Update: The Tajik Refugees in Afghanistan," BIF summarized the plight of Tajikistan refugees, its humanitarian work with these refugees, and stating it was "[s]etting up plans for establishing clinics in the fronts to support the Mujahideen directly in Tajikistan." Ex. 236.

In 1998, BIF opened an office in Tajikistan, and defendant Arnaout set up its "administrative structure." Ex. 237 at 23. A letter on February 20, 1998 containing instructions to the individual who was opening the office listed as a goal: "Assisting the injured soldiers. . . . Please set up a system in which these soldiers can get the money that has been promised to them every month." Ex. 238.

In Suleman Ahmer's October 1998 "Tajikistan Report," he writes: "There is no way we can make dawah openly with planning and strategy as we had initially thought. . . . So our course now is only to do relief work in Tajikistan and have patience." Ex. 237 at 22. In "The New Tajik Initiative," Ahmer explained:

> The war and the sufferings are fresh in people's minds. We have thousands of orphans who would take up the struggle and the cause. . . . In a few years these children of war would have grown old and it would be very difficult to influence them. If the war doesn't break out again, the wounds of the surrounding society would heal soon. In conclusion, now is the time to work, to move, to act: not next week, not tomorrow and not even today. Now!

*Id.* at 53.

BIF had an "Orphan Rehab Project" in Tajikistan, which Ahmer described as "building the homes of the orphans we sponsor." *Id.* at 45. Despite his description, not all funds in this program went to orphans' homes. Some of it went to BIF employees, as Ahmer explained: "There are two officers whose houses are destroyed; one is Daulat Beg and one is Mustufa (sic).

87

The budget for both of their homes in (sic) included in the projects Orphan rehabilitation project." *Id.* at 17. At the time, Beg was married with three children, while Mustafa is married with one child. *Id.* at 16-17.

Ahmer noted in his Tajikistan Report that BIF donors had been (or would be) informed that 10% of the money they contributed to BIF's orphan sponsorship program would be used for administrative expenses, with the remainder going to the orphans. *Id.* at 89. An electronic mail on January 3, 1999 from Ahmer to defendant Arnaout, preserved in hard copy form at BIF's Illinois offices, reveals that far less than 90% of contributions for orphans actually went to orphans, unbeknownst to donors. Ex. 239 at 4. In response to a suggestion from defendant Arnaout that they "recede" the percentage for new donors and that new donors be informed by letter that "most of [the donation] went to the child in cash and some of its was spent on the orphans program" (apparently meaning administrative expenses), Ahmer wrote:

> We have discussed this many times before and inshallah let me discuss this again. I know we have not delivered the whole amount to the orphans and this is the big mistake we have made. If you notice in the letter we are not saying that the whole amount was delivered but we are saying that the whole amount is reserved for the child. The reasons we can't tell them that we took some amount from the orphan's money are as follows:

> First, how can we tell them that we took money from the amount when for the last four years when people were asking and calling we were telling them that all of the money is for the child. This is what we told thousands of Muslims in our presentations (this is what I told the brothers last night). This is what was sent written in letters. So now if we make the mistake of writing this they will ask as to how come we were saying something and doing something else. This is the whole reason that I will be working on correcting and finding out how much money is due to the orphans and delivering it. Like I told you in my meeting with you before, the taking of the money of the orphans without the permission of the sponsors is a big haram [meaning forbidden] and we need to correct this now. Whether we took $100,000 or $1.00 and I don't agree (absolutely not) with what Brother Adil taught you (may Allah forgive him). So we should write that we have reserved this amount for the children which is true as we shall now deliver the remaining money to them inshallah. You have written above that we should write that most of the money was delivered to the child which is incorrect. For some of the orphans who were sponsored in Tajikistan we were collecting $25 and giving only $6.00 to the children. (This was going on in Kunduz) so now 6 out of 25 is not the most by any account. To say that for all the children the most of the money from the sponsor was given is false.

*Id.* at 5.  Despite Ahmer claiming that he wanted to correct the shortage of payments to orphans,

BIF's records indicate that BIF did not send another wire transfer to Tajikistan for ten months.

### M.    BIF's Matching Gift Program

As explained in the Indictment, BIF had a "matching gift program" with which it encouraged donors to solicit their employers to match individual donations. The matching gift program is explained in BIF's "Double the Donation" memorandum. Ex. 240. In explaining how the program works, the memorandum states: "In actual fact BIF has long received direct employee donations as well as matching gifts from many firms including Microsoft, UBS, and Compaq in Houston, TX." *Id.*

BIF also prepared for its employees a memorandum titled "Precautions Facing the Matching Gifts Program." Ex. 241. The memorandum notes: "The company may ask for certain information from B.I.F. Usually, the 501c (tax exempt) letter that is in the folder. ***Please make sure to read the application carefully and give them, only what they ask for." *Id.* (emphasis in original). The memorandum further instructs: "CONFIDENTIALITY IS KEY TO THIS PROGRAM. Answer questions in a general way, but be careful not to give away specifics. ie: the procedures we follow to get back with donors and the companies." *Id.* (emphasis in original). Given the massive fraud BIF was perpetrating upon unknowing donors, it was essential to the success of the scheme that BIF employees be evasive in dealing with inquisitive corporate donors.

### N.    Fundraising by Yusuf Ansari Wells

BIF records reveal that its fundraiser Yusuf Ansari Wells openly solicited donations to support *jihad* efforts from various donors. A January 3, 2000 letter to Wells accompanying a money order thanks him for a particular presentation and indicates that the donation is for "our brother fighting for the sake of Allah" and stating "may Allah continue to help the mujahideen." Ex. 242.    A report Wells provided to another BIF employee on May 8, 2001 described an April fundraising trip Wells made to Eastern states on BIF's behalf. Ex. 243. Wells's entry for April 9, 2001, discusses a lecture he gave and describes as the main point of his lecture: "That the Taliban are not the bad guys that everybody says they are. And that they have done much good

90

for the establishment of order in the country." *Id.* at 3. The entry for April 15, 2001 discusses Wells's participation in paintball "training" with an elite group and Wells's lecture afterward: "I also stressed the idea of being balanced. That we should not just be jihadis and perfect our fighting skills, but we should also work to perfect our character and strengthen our knowledge of Islam. I also said that Muslims are not just book reading cowards either, and that they should be commended for forming such a group." *Id.* at 4-5.

O.     **Defendant Arnaout's False Declarations and Continuing Fraud**

On December 14, 2001, the Federal Bureau of Investigation searched BIF's Illinois office (recovering most of the documents cited above) and the Department of the Treasury blocked BIF's domestic bank accounts pending its investigation of BIF.

Following the search and blocking action, BIF, under defendant Arnaout's control, filed in this District a lawsuit against various government officials. The case was assigned to Judge James H. Alesia.

On March 26, 2002, BIF filed a Motion for Preliminary Injunction seeking the immediate return or its blocked funds and other relief so that it could immediately continue its operation. In support of its Motion for Preliminary Injunction, defendant Arnaout submitted to the court a declaration he executed on March 22, 2002 under penalty of perjury falsely stating:

> BIF is required to maintain the donations of *zakat* in a non-interest bearing account and to use those funds only to assist the poor and needy. BIF abides strictly by those requirements.
>
> * * * * *
>
> <u>BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature.</u> BIF abhors terrorism and all forms of violence against human beings.
>
> * * * * *
>
> I have no idea or understanding as to why the government has taken these actions against BIF.

Ex. 244. (emphasis added). On April 2, 2002, defendant Arnaout submitted a "corrected declaration" executed under penalty of perjury on April 1, 2002 containing these same false

statements in an effort to get immediate access to BIF's funds.

In addition, in or around late 2001 and early 2002, while BIF, under defendant Arnaout's control, continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, defendant Arnaout individually and through an attorney falsely informed the *Chicago Tribune* newspaper that defendant Arnaout did not know Usama Bin Laden personally, that defendant Arnaout never fought against the Soviet Union, that defendant Arnaout was never at the *al Masada* camp and that he could not have been there because he was working in a restaurant in the Persian Gulf area during the relevant time frame. *Id.*

On February 23, 2002, defendant Arnaout spoke by telephone with Basil Refai. Ex. 245. Refai authored a book, published by LBI under LBI's name in furtherance of LBI's mission, recounting experiences of *mujahideen* in Afghanistan, including Bin Laden, defendant Arnaout and others. Defendant Arnaout coached Refai on the telephone, falsely telling Refai that defendant Arnaout is not the Abu Mahmoud al Suri discussed in the book. *Id.* at 8-10. Defendant Arnaout also told Refai that he explained to a *Chicago Tribune* reporter that he is not the person she thinks he is, and he never knew Bin Laden. *Id.* at 11-12.

### P.    Defendant Arnaout's Message to Batterjee

In the February 12, 2002, telephone conversation between defendant Arnaout and his brother Hisham overseas, discussed above, defendant Arnaout asks Hisham to pass certain messages to Batterjee. Ex. 178. Defendant Arnaout told Hisham about the scrutiny BIF was receiving from authorities, adding "all their problem with us, the last three or four weeks, is if there is a relation between us and Saudi Arabia or not." *Id.* at 9. In referring to "Abu Sulafa," a name used by Adel Batterjee, defendant Arnaout remarked: "[H]e loves goodwill, so he does not want to boycott the offices . . . . he is sending them wire transfers. So, if, if I receive I wire transfer from him, to any office of the offices, my home is destroyed." *Id.* at 10.

Hisham responded: "Yes, meaning, should I tell him not to send a thing." Defendant

Arnaout continued: "Tell him, oh brother, now they want, now scrutinizing on what is our relation to Saudi Arabia. . . . Without, without telling him to send, or not to send. Tell him they are scrutinizing the foundation, whether it has a Saudi connection or not. . . . They [the directors of BIF's offices] do not want to deal with him. Even the offices abroad do not want to deal with him. . . . So I want you to talk to Abu Sulafa, tell him 'Enaam is telling you, that oh beloved brother, the scrutiny now is on a Saudi connection.'. . . I mean, wire transfers the foreign branch offices, because the foreign offices are being watched, like we are being watched here." *Id.* at 10-12.

After explaining to Hisham that the government views BIF like a "mafia," "[s]aying we are covers, we are a cover and there are people behind us," defendant Arnaout tells Hisham that he wants Hisham to tell Batterjee three things: "first information, tell him about the connection subject, the second information about the subject, thinking there is a mafia behind it, and the, the third matter, that, they took the, our director from ninety-three and ninety-four from Bosnia." *Id.* at 15.

### Q.   Defendant Arnaout's Coaching of BIF's Sarajevo Director

On March 21, 2002, following the search of BIF's Bosnian offices, defendant Arnaout spoke to Munib Zaharigac, the director of BIF's Sarajevo office. Ex. 246. Zaharigac informed defendant Arnaout that "they" came to his house and those of some of his relatives and "took all the things." *Id.* at 2. Zaharigac also informed defendant Arnaout that he was in jail, explaining: "[T]hey took things . . . I had documents from, from, intelligence, where I worked before, and I had various documents, from the, from the, from the, what is it called, from the job." *Id.* at 3. Defendant Arnaout asked if the documents had a connection to BIF, and Zaharigac responded that there were "possibly a few things, but they want to connect them, maybe." *Id.*

Defendant Arnaout instructs Zaharigac: "[T]ell your family, your father, your brothers . . . the story, tell them in details, so that the operation will not be like such and be clear with them, we have nothing hidden. I am in America, tell the people that I am in America, we have

93

nothing hidden." *Id.* After learning that Zahiragic was inside a police station, defendant Arnaout coached him: "I just sent a, a, a message to Alen, advised him . . . that each, each one of you . . . gives information about himself, not to give information about the others. . . . Meaning we now, I don't know a thing about you, I know you, that you are a good, excellent man working with us. I don't know your life . . . and your wife, your children, your citizenship. . . . Meaning each one gives information about, about himself, about his person. . . . About the others, what do you know about me, you don't know a thing about me, what do you know about me?" *Id.* at 3-6.

Zaharigac then explained that he had been asked already about defendant Arnaout and he said where he met Arnaout. *Id.* at 6. Defendant Arnaout then said: "Meaning, we know each other for the last few years, you, we have a relationship, business relationship for one and a half years, we work together. . . . Meaning we shouldn't be, I mean, I don't know what they are digging for and I, we have to be patient . . . . [W]e never work anything secret, we never do, we never steal money, we never did do anything the problem, we are clear hundred percent." *Id.* Zaharigac then explains that "one problem" is the documents found in his house. *Id.* at 7.

### R.   Defendant Arnaout's Instructions to BIF Officer to Flee

On April 15, 2002, Solange Waithe, the director of BIF's Canada Office (the "Benevolence International Fund"), called defendant Arnaout and told him that "Haroon," the director of BIF's Pakistan office, wanted to speak to defendant Arnaout because "he's worried." Ex. 247 at 1. Defendant Arnaout resists, but Waithe ultimately convinces him to speak to Haroon.[30] *Id.* at 1-3.

Haroon called defendant Arnaout shortly thereafter. *Id.* at 4. Haroon explained that

---

[30]     Haroon informed Waithe that he did not think that the visit from Pakistani Intelligence was that serious of an issue (a 2 or 3 on a scale of 1 to 10, with 10 being the most serious), although many of his friends told him that he should not go home. Ex. 248 at 17-21. Waithe told Haroon that in discussing this with defendant Arnaout, Haroon should keep in mind that Arnaout's phone is monitored. *Id.* at 19-20.

someone from the "Special Branch" was asking about him. *Id.* at 5. Defendant Arnaout then instructed Haroon to take BIF's money, including the "orphan money," and go alone to Kabul, Afghanistan immediately. *Id.* at 3-4. Arnaout explained that they will check on Haroon by calling Haroon's brother every two or three weeks. *Id.* at 4. He also told Haroon to take all of BIF's records with him. *Id.* at 5. Defendant Arnaout then warned that Haroon could be traced through e-mail, telephones and banks. *Id.* at 6. Defendant Arnaout advised: "I prefer that you travel to the inside and to put everything in boxes, and to let your brother, or your two or three brothers, every one or two days, one of them would travel with a box[.]"   *Id.*

## III.   CONCLUSION

This proffer of evidence, much of which the government expects to introduce in its case-in-chief with other evidence, demonstrates that beginning in or around 1987, in Pakistan, defendant Arnaout and others conspired to support the efforts of persons engaged in violence through the BIF Enterprise, including LBI and BIF, as described in the Indictment.  In 1992, members of the conspiracy chose to incorporate and headquarter the enterprise in the U.S. in order to best use the cover of relief work – and the credibility of an American based charity – to assist fighters in various areas of the world, and they concealed from donors and various governments and, ultimately, a federal court that it was materially assisting those fighters.  The government respectfully submits that the evidence recited above establishes by a preponderance of the evidence that (1) a conspiracy existed; (2) defendant Arnaout and the declarants discussed above were members of such conspiracy; and (3) the statements were made during the course of and in furtherance of such conspiracy.

WHEREFORE, the government respectfully moves this Court for a ruling that these statements, along with the documents recovered from BIF and sources related to BIF attached hereto, are admissible against defendant Arnaout.

Respectfully submitted,


PATRICK J. FITZGERALD
United States Attorney

DEBORAH L. STEINER
JOHN C. KOCORAS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

### CERTIFICATE OF SERVICE

The undersigned attorney, John C. Kocoras, certifies that he is employed in the

Office of the United States Attorney for the Northern District of Illinois; that on the 6th day of January 2003, he served a copy of the foregoing GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS with attachments via messenger to:

> Mr. Joseph Duffy, Esq.
> Stetler & Duffy Ltd.
> 140 South Dearborn Street
> Suite 400
> Chicago, Illinois 60603

> _____
> JOHN C. KOCORAS
> Assistant U.S. Attorney