# Exhibit 1 (Part 9 of 14)

## Attachment D (Part 1 of 3) to

## Affidavit of David K. Draper

# Attachment D
## (Part 1 of 3)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001     MDL No. 1570

-------------------------------------------------------x

Thomas Burnett, Sr., *et al.*

03 CV 9849 (RCC)

Plaintiffs

- against -

Al Baraka Investment & Development Corp., *et al.*

Defendants.

-------------------------------------------------------x

## AFFIDAVIT OF JEAN-CHARLES BRISARD

Jean-Charles Brisard declares under penalty of perjury:

1. I am a consultant offering expertise and analysis to various governmental and non-governmental clients on issues relating to Al-Qaeda and International Terrorism. I am a doctor in International law and former assistant to the French antiterrorist chief prosecutor. I started studying the Al Qaeda financial network for the French intelligence community in 1997. In the past, I have testified as an expert witness on terrorism and the history of Al Qaeda. I also testified before the United States Congress on this issue. I submit this affidavit to provide the Court with an explanation of the documents seized in Bosnia including the "Golden Chain".

2. During the course of my studies concerning Al Qaeda, my team and I have had the opportunity to review the testimony, witness statements and documents seized by Bosnian authorities relating to the foundation and development of Al Qaeda. A

critical member of the Al Qaeda network was Jamal Ahmed Al Fadl.  Al Fadl trained at various terrorist training camps operated by Osama bin Laden on the Afghanistan and Pakistan border including:  Khalid bin al-Walid, Jihad Wal, Al-Farooq, and Abu Bark al-Siddiz.  In these camps, Ad Fadl studied C4 and TNT explosives and urban warfare.

3.      Jamal Ahmed Mohamed Al-Fadl was one of the first to swear allegiance to Usama Bin Laden when Al Qaeda was formed in Afghanistan in 1988.  Osama bin Laden selected Al-Fadl to move with him to Sudan in 1991.  In Sudan, Al Fadl was given a budget of Two-Hundred Fifty Thousand U.S. Dollars ($250,000.00) to rent and purchase properties for the Al Qaeda Shura council.  Jamal Al Fadl also managed the finances for several front companies formed by Usama Bin Laden in Sudan.  While in Sudan, Jamal Al Fadl provided extensive financial services for Usama Bin Laden and high ranking members of Al Qaeda.

4.  Acting on behalf of Usama Bin Laden was a Saudi-based charity called Lajnat Al-Birr Al-Islamiyya (a.k.a. Lajnat al-Birr al-Dawaliyya, Benevolence International Foundation).  From the beginning, Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the foreign mujahideen in Afghanistan.  An internal BIF document confirms that "its purpose 'from the first day' was to provide support to *jihad* and *mujahideen* and which indicated that BIF moved to the Sudan because of its relationship with 'the base,' the English translation for *Al Qaeda*."[1]

---

[1] "Government's Bill of Particulars."  United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. February 3, 2003, pp. 2-3. Attached hereto as Exhibit 2.

5. One of the documents seized in the Bosnian office of BIF is a handwritten memo on BIF letterhead stationery providing a detailed expense report for months in 1990. Among the transactions described are wage payments made for the months April to June, 1990; 70,000 paid to the Yemeni camp by Adel Batterjee; a 100,000 payment to "the Jihad Department;" and 500 paid to "Usama's ...(illegible). account."[2] This payment was made by BIF to Osama Bin Laden's Jihad Department two years after the formation of Al-Qaeda and after the withdrawal of the Soviets from Afghanistan.

6. In approximately 1993, in conversations with former senior Al-Qaeda lieutenant Jamal Al-Fadl, Usama Bin Laden identified three Muslim charities as the primary sources of Al-Qaeda financial and fundraising activity, including BIF. "In or about 1993, Bin Laden advised *Al Qaeda* member Jamal Ahmed Al Fadl that *Al Qaeda* was using several charities to fund its operations oversees, specifically naming *al Birr*, which translates in English to 'Benevolence.'"[3] Like the other charities Bin Laden named, BIF served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaeda personnel worldwide, and helping "to move funds to areas where al Qaeda was carrying out operations."[4]

---

[2] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Exhibit 98*. (Parenthesis indicates a translator's notation). **Attached hereto as Exhibit 3.**
[3] "Government's Response to Defendant's Position Paper as to Sentencing Factors." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. June 12, 2003, p.31. **Attached hereto as Exhibit 4.**
[4] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. Pages 28-29. **Attached hereto as Exhibit 5.**

7. During interviews with federal prosecutors and FBI agents, Jamal al-Fadl detailed meetings held in the early 1990's with high-ranking Al-Qaeda officials in the Balkans. During those meetings, the group discussed Usama Bin Laden's decision to use Bosnia as "a base for operations... against al Qaeda's true enemy, the United States."[5]

8. Al Qaeda members in Bosnia recruited a former Bosnian intelligence officer Munib Zahiragic. Zahiragic was placed in charge of a cache of extremely sensitive internal Al-Qaeda historical documents that were deemed too important to accidentally fall into enemy hands in the tumultuous Sudan or Afghanistan. The documents, some stored on CD-ROM and computer hard drives, revealed the detailed early history of Al-Qaeda in Afghanistan through the eyes of Usama Bin Laden and his henchmen.

3. In 1996, Jamal al-Fadl turned himself in to the U.S. government and volunteered to be an inside informant. Al-Fadl testified for the U.S. Justice Department against Usama Bin Laden in the Southern District of New York. Al-Fadl testified about the financing for Al Qaeda's attack against the United States Embassies in Africa in 1998 and identified several banks that the operatives used to finance their activities. Al Fadl testified about Bin Laden's companies: Ladin International Company; Taba Investments; Qudurat Transportation; and Themar al Mubaraka. He also provided details on the holding company of Bin Laden in Sudan, Wadi al Aqiq. Al Fadl provided the first insight on the role of Sudanese banks, including Bank Al-Shamal, Tadamon Islamic Bank, Faisal Islamic Bank Sudan, and Bank of Almusia or Farmers Bank, in support to the Al Qaeda organization through bank accounts, cash deliveries and loans to the group and its various fronts.

4. In March of 2002, Bosnian security forces raided BIF's offices in Sarajevo in March 2002 and detained its manager, Munib Zahiragic. Zahiragic turned over nearly 100 top-secret documents about suspected fundamentalist terrorists operating in Bosnia,

---

[5] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Page 24-25*. Attached hereto as Exhibit 5.

including transcripts of communications between BIF management and senior commanders of Al-Qaeda based in Afghanistan.[6] This cache of documents describing the formation of Al-Qaeda are discussed in the complaint filed by <u>Burnett</u> plaintiffs at paragraph 219.

5. This cache of documents describes and historically annotates the formation and the development of Al-Qaeda. The documents do not purport to describe the war in Afghanistan. For this reason the earliest documents within the collection are dated 1987. The bulk of the documents, however, are dated after the formation of Al-Qaeda in 1988.

6. In the same cache of documents among the materials which describe the historical formation of Al Qaeda is a document which has been described by Jamal Ahmed Al Fadl as the "Golden Chain". According to briefs filed by the U.S. Attorney's Office in Chicago:

> "BIF had in its Sarajevo office a computer file labeled 'Tareekh Osama,' or 'Osama's History.' The file contains scanned images of documents which chronicles Usama Bin Laden's activities in Afghanistan which led to the formation of al Qaeda and even includes later reports of the danger Bin Laden poses to the U.S. BIF possessed in the file a handwritten draft list of the people referred to within al Qaeda as the 'Golden Chain,' wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: 'And spend for God's cause.' The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. 'Usama' appears after seven of the listings, including the listing 'Bin Laden Brothers.' 'Baterji', LBI's and BIF's founder, appears after six of the listings. Only three other persons are listed in the parentheses."[7]

7. Jamal Al Fadl was prepared to provide testimony in the case of <u>United States of America v. Enaam M. Arnaout</u>, United States District Court, Northern District of

---

[6] Whitmore, Brian. "Bosnian Charities Tied to Terror." <u>The Boston Globe.</u> July 2, 2002. Page 1.
[7] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." <u>United States of America v. Enaam M. Arnaout.</u> United States District Court Northern District of Illinois, Eastern Division. Case #: 02CR 892. January 31, 2003. *Pages 33-34.* Attached hereto as Exhibit 5.

Illinois, Eastern Division, Case #: 02CR 892, concerning the "Golden Chain" -- Exhibit 5 of the Government's Proffer. In fact the Government stated that they were prepared to call Al Fadl at sentencing if necessary.[8] Al Fadl said that the list "appeared to be members of a group referred to as the 'Golden Chain'". Al Fadl stated that the individuals mentioned in the list "provided Bin Laden and Al Qaeda with money on a regular basis," further stating that Bin Laden indicated he "would never fight or attempt to change governments of any Gulf States because members of the Golden Chain reside in those states." Moreover, he specifically states that Youseff Jameel donated funds to Al Qaeda and a satellite phone. Al Fadl's potential testimony indicates that the Golden Chain list is a list of donors to Al Qaeda and not a list of individuals who provided financial support to Osama Bin Laden during the first Afghan war.

8. According to the final report of the bi-partisan Congressional 9/11 Commission released in July 2004:

> "Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'"[9]

---

[8] "Government's Response to Defendant's Position Paper as to Sentencing Factors." United States of America v. Enaam M. Arnaout United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. June 12, 2003, fn 13, p.31. **Attached hereto as Exhibit 4.**

[9] The 9/11 Commission Final Report. *Page 55.*

6

Al Fadl's statements concerning the contributions of the members on the Golden Chain extend into the early to mid 1990s long after the conclusion of the war in Afghanistan and the formation of Al Qaeda.

I am a lawyer licensed in France.  I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2004.

Jean Charles Brisard

Exhibit 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA      )
                             )
v.                           )     No. 02 CR 892
                             )     Hon. Suzanne B. Conlon
ENAAM M. ARNAOUT             )

## BILL OF PARTICULARS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits the following Bill of Particulars addressing the provision of material support by defendant and his co-conspirators to individuals associated with *al Qaeda*.

**I.     Material Support related to *al Qaeda***

The government will prove at trial that  material support was provided to *al Qaeda* by defendant and his co-conspirators during the time frame charged in the Indictment in the following ways:

(i) the defendant worked with the BIF Enterprise (hereafter "BIF") in the Sudan to provide financial support to training camps and fighters for the Popular Defense Force ("PDF") militia who were working under the direction of *al Qaeda*;

(ii) the defendant worked with BIF in Bosnia to provide financial assistance to fighters in Bosnia aligned with *al Qaeda*;

(iii) the defendant worked with BIF to provide the cover of legitimate employment for members of the *al Qaeda* network: naming Mohamed Bayazid President of BIF for at least some part of the fall of 1994; describing Mamdouh Salim as a director of BIF and paying for his lodging in May 1998; and employing Saif ul Islam as the BIF officer in Chechnya in approximately 1998 and

171

1999; and

(iv) the defendant concealed the relationship between BIF and *al Qaeda*.[1]

## II.   Proof of The Above Particulars

The proof the government will elicit to establish the above particulars includes both general proof of the conspiratorial agreement charged and proof of particular instances when *al Qaeda* was provided material support or when the use of such resources was concealed.

### General Agreement Between BIF and *al Qaeda*

As to the general agreement, the government will offer the testimony of Jamal Ahmed al Fadl, an *al Qaeda* member, that Usama Bin Laden specifically advised him in late 1993 or early 1994 that *al Qaeda* was using BIF (referred to as "*al Birr*", the Arabic word for "Benevolence") to move funds to areas where *al Qaeda* was carrying out operations. Al Fadl will also testify that on another occasion the then chief financial officer of *al Qaeda* advised him that an employee of BIF had been detained in Saudi Arabia in 1993, apparently because a link had been found between BIF and Usama Bin Laden but the problem had been handled.[2] (The reports concerning al Fadl's statements to agents investigating this case are appended as Exhibit A. The voluminous other reports and his prior testimony have also been provided to the defense.)

The general proof of BIF's assistance also includes an internal BIF document that its purpose "from the first day" was to provide support to *jihad* and *mujahideen* and which indicated that BIF

---

[1]      Concealment itself is an act in violation of the material support statute. Title 18, United States Code, Section 2339A.

[2]      On another occasion in 1995, Bin Laden complained that a different charity had been used to fund an operation unrelated to BIF but Bin Laden was concerned that this might end his ability to use charities for funding. Al Fadl specifically recalled Bin Laden mentioning BIF ("*Birr*") as one of the charities that *al Qaeda* was then using during this 1995 conversation.

.2

moved to the Sudan because of its relationship with "the base," the English translation for *al Qaeda*.

In short, the general nature of the conspiratorial agreement by which BIF was supporting *al Qaeda* is demonstrated by the statements by both Usama Bin Laden and *al Qaeda's* former chief financial officer as well as statements contained in BIF's internal documents.

The more specific proof focuses in particular on defendant's involvement in, and concealment of, BIF efforts principally in the Sudan and Bosnia, as demonstrated primarily by BIF internal documents and the testimony of al Fadl.

**Material Support to *al Qaeda* Efforts in the Sudan**

BIF's own documents reflect that one of the reasons BIF was in the Sudan was to work with *al Qaeda*. During the search of BIF's offices here in Illinois, a file marked "Sudan" was recovered. Inside was information about the BIF offices in Sudan. *See* Sudan File, attached in separate, under seal appendix, as Exhibit B. In the Appendices, BIF had a document which stated,

> From its first day, the BIF aimed to support Jihad and Mujahideen, by
> • Assisting in military and logistical support.
> • Assisting in providing medical care for the Mujahideen in the field.
>
> *   *   *   *   *
>
> By the grace of Allah, the services of the BIF in the Sudan started in May 1991, after the agreement of *the base* in Sudan with the Sudanese Government.

*Id.* (emphasis added). These documents reflect not only that BIF and the defendant were involved in support of the *mujahideen* in the region, but that BIF was aligned with "the base," the English translation for *al Qaeda*, after an agreement between *al Qaeda* and the Sudanese government.

Al Fadl will describe that agreement: an accord between the National Islamic Front ("NIF")(the party with *de facto* control over the Sudan) and *al Qaeda* by which *al Qaeda* would

3

provide, among other things, training and support to the Popular Defense Force ("PDF")[3] in guerilla warfare and other tactics for use in the war against the people of Southern Sudan. Al Fadl will testify that after a meeting attended by Bin Laden and many others (including Bayazid), it was agreed that a camp for training the PDF would be opened by *al Qaeda*.[4]

Al Fadl will identify a photograph recovered from BIF's Illinois office of that camp in the Sudan. *See* Photograph, attached in separate, under seal appendix, as Exhibit B. That photograph shows a sign in the background of the camp bearing the logo of BIF stating it was "feeding a *Mujahid* with the *Mujahideen*." Among others, Saif ul Islam (an Egyptian who was a member of *al Qaeda's* military committee and later a BIF officer) trained others at that camp to train the PDF, according to al Fadl. Al Fadl will testify that BIF located its office in Khartoum near the office of the PDF and persons managing the PDF frequently visited BIF. The foregoing corroborates Bin Laden's statement that BIF was being used to support *al Qaeda* in countries where it had operations.[5]

**Material Support to *al Qaeda* Efforts in Bosnia**

Proof of the support the BIF enterprise provided to *al Qaeda* in Bosnia is demonstrated by a combination of the "Bosnian video" and the testimony of al Fadl.

---

[3]   The PDF was referred to in Arabic as the *Difaar al Shabi*.

[4]   The meeting was also attended by an influential member of the NIF named Dr. Abdel Salaam Saad Suliman who exerted considerable inference in the NIF and over the Sudanese intelligence service and PDF. Al Fadl will identify a photograph of defendant meeting with Dr. Abdel Salaam Saad Suliman in Khartoum, Sudan, in Suliman's office, which al Fadl recognizes from the furniture. *See* Photograph, attached in separate, under seal appendix, as Exhibit C. Al Fadl will further testify that he recognizes from the same series of photographs: a photograph of Bayazid (Abu Rida) and a photograph of the defendant next to Bayazid (Abu Rida). *See* Photographs, attached in separate, under seal appendix, as Exhibit D.

[5]   In return for the assistance provided to the PDF, al Fadhl explains, the Sudanese intelligence service facilitated the free movement of *al Qaeda* members and weapons in the Sudan.

As described elsewhere, the government will be offering in evidence a videotape obtained in Illinois bearing the *Lajnatt Al-Birr Al-Islamiah* ("LBI") name and logo, depicting combat footage in Bosnia-Herzegovina, eulogizing two *al Qaeda* members killed in combat, showing scenes of relief work in Afghanistan, and soliciting donations to *mujahideen*. *See* Transcript of Video, attached in separate, under seal appendix, as Exhibit F.

Al Fadl will testify that while working for *al Qaeda* in the Sudan (and being supervised by Bayazid) he was dispatched to Zagreb, Croatia, by Usama Bin Laden and Salim, among others, for the purpose of assessing the situation in Bosnia and, in particular, assessing what businesses *al Qaeda* could purchase to support its operations and what banking services could be used by *al Qaeda*. In connection with that trip, Salim advised al Fadl that Bosnia was to be a base for *al Qaeda* operations in Europe.

Al Fadl attended meetings in Zagreb, Croatia, involving several relief agencies, including the BIF office. Al Fadl will testify that he recalls meeting with *al Qaeda* member Abdel Rahman al Dosari in the office of *"al Birr"* (BIF) in Zagreb and that the defendant, among others, was present. Al Fadl was told by Abdel Rahman al Dosari (a military expert) that weapons were purchased in Germany for the fighters in Bosnia. Abdel Rahman al Dosari also advised that the Islamic scholars needed to issue a ruling (*fatwah*) that would allow *al Qaeda* members to shave their beards and wear Western clothing as necessary to blend in while in Bosnia and Croatia.

Abdel Rahman al Dosari worked with Abu Zubair al Madani, another *al Qaeda* member who appeared on the Bosnian video (bearing the LBI logo), training fighters in Bosnia.[6]  At its essence,

---

[6]    Al Fadl identifies one of the individuals eulogized in the Bosnian War Video as Abu Zubair al Madani, a well-known member of *al Qaeda* and cousin of Bin Laden.

then, the Bosnian video is a memorial to an *al Qaeda* member and a solicitation for the continued support of the mujahideen that *al Qaeda* was supporting in its effort to establish a European base for *al Qaeda*.

### Bayazid's Position with BIF in Fall 1994

As of the fall of 1994, Loay Bayazid officiated over at least one BIF meeting as the President of BIF in Illinois, working with defendant Arnaout and receiving a check in the amount of over $4000.[7] *See* BIF documents, attached in separate, under seal appendix, as group Exhibit H.[8] Al Fadl will testify that Bayazid (Abu Rida) was a key member of the *al Qaeda* network and particularly involved in efforts to obtain weapons for the PDF in the Sudan.[9]

### Travel of Mamdouh Mahmud Salim, a.k.a. Abu Hajer

In May 1998, Salim traveled to Bosnia using a document bearing defendant Arnaout's signature indicating that Salim was a director of BIF. Specifically, on April 30, 1998, the Ljiljan Commerce Group, a Bosnian corporation directed solely by defendant Arnaout and part of the BIF

---

[7]     While the defense has contended elsewhere that a sealed exhibit indicates that "Bayazid affirmed that he had never been president of BIF-USA," that is not correct. The relevant document states that "Arnaout invited him to help run the organization. Rida traveled to Chicago to work with the foundation but subsequently realized that Arnaout was only using him and was ... continuing to manage the organization from behind the scenes. Rida departed Chicago but had already obtained a driver's license ..." Bayazid does not deny that he ever worked for BIF or had been president – he only indicated that his service to BIF was brief.  *See* Reports of Interviews, attached in separate, under seal appendix, as Exhibit G.

[8]     The material support statute prohibits the provision of "currency," as well as "lodging" "facilities" "false documentation or identification" and "transportation." 18 U.S.C. 2339A.

[9]     Al Fadl can testify that Bayazid (as well as Salim and Saif ul Islam) were ranking members of the *al Qaeda* network, with or without specifying the particular transactions he was aware of (or participated in) which demonstrated their trust. That conduct is discussed in other filings and not repeated herein.

Enterprise, wrote to the Bosnian Consulate in Turkey requesting a visa for the entry of Abu Hajer (Mamdouh Salim) into Bosnia, purportedly for a business meeting. *See* Documents supporting Salim trip, attached in separate, under seal appendix, as group Exhibit I. On May 5, 1998, Abu Hajer completed a visa application, listing his occupation as "Businessman." That same day, a letter on Ljiljan Commerce Group letterhead was sent to the Metalurg Hotel over defendant Arnaout's signature requesting an apartment for "one of the directors of the organization BIF in Bosnia [.]" A receipt from the Metalurg Hotel shows that Salim stayed there from May 7 to May 10, 1998. The receipt also shows that the Ljiljan Commerce Group paid his bill.[10]

Documents and al Fadl will establish that Salim was a key member of the *al Qaeda* network. The minutes of the founding of *al Qaeda*, found in the possession of the defendant (and annexed as Exhibit J)[11], reflect that Salim was present for the founding. The minutes explain that the meeting was held over three days, and it names the persons on the Advisory Council, beginning with "Sheikh Usama" and including "Abu Hajer" (Mamdouh Salim). Moreover, al Fadl will testify that Salim was a member of *al Qaeda*'s *shura* (consultation) council and *fatwah* committee and was responsible, among other things, for obtaining communication equipment for *al Qaeda*. Moreover, he will testify that in connection with his 1992 trip, Salim advised al Fadl that *al Qaeda*'s goal was to make Bosnia a base for European operations.

---

[10]     Whether Salim was actually a director of BIF is irrelevant to the support that the defendant provided him in 1998. Salim, needed to travel safely through Bosnia – the place he described as *al Qaeda*'s base in Europe. In order to facilitate Salim's travel, defendant Arnaout represented that Salim was a director of BIF and BIF paid the expenses of Salim.

[11]     We have endeavored to annex a set of the most relevant documents showing Arnaout's knowledge of *al Qaeda* and the key members of its network. *See* Letters and Memorandum, attached in separate, under seal appendix, as Group Exhibit K.

**Employment of Saif ul Islam**

BIF's internal documents establish that defendant reported that Saif ul Islam, an Egyptian, served as the BIF officer in Grozny, Chechnya.   Prior to October 1999, defendant Arnaout toured Chechnya and Dagestan and reported back to a BIF fundraiser as to the role that Saif ul Islam and others played in Chechnya.  In particular, on October 18, 1999, defendant Arnaout recounted the history of Chechnya to a BIF fundraiser, Uwaymir Anjum.  Anjum memorialized defendant Arnaout's statements in a document titled "Daghestan and Chechnya: A Brief Recap of the Islamic Movement."  *See* Report, attached in separate, under seal appendix, as Exhibit L.  At the outset of his notes, Anjum (on behalf of defendant Arnaout) wrote:

> Enaam Arnaout, the CEO of the Benevolence International Foundation, a US-based humanitarian relief organization operating in the Caucus, Central Asia and Balkans, has made six trips to Daghestan/Chechnya area and has collected invaluable information on the history and details of the Islamic movement.  Most of this information is collected through personal contacts and log (sic) term relationship (sic) with many key people in the movement.

>           *       *       *       *       *

> *Saif-ul-Islam*, the BIF officer in Chechnya, is an Egyptian lawyer who is very knowledgeable. He also came there through Sh. Fathi.

*Id.* at 1.

Al Fadl  will describe Saif ul Islam as an Egyptian university graduate who became an *al Qaeda* member and a top military instructor as well as a member of *al Qaeda*'s military committee who was involved in military matters in Afghanistan, the Sudan (training at the camp whose picture was recovered from the Illinois office of BIF), and elsewhere.  It is a reasonable inference that defendant, who worked with Bin Laden, possessed an archive of historical *al Qaeda* records, and maintained contact with Salim and Bayazid, knew Saif ul Islam's important role in *al Qaeda*.

8

Concealment

In addition to the above specific instances of material support to *al Qaeda*, the government will also show generally that BIF concealed its true purpose and activities, most clearly in the two sworn filings submitted by defendant Arnaout denying any links to groups engaged in violence. *See* Declaration, attached in separate, under seal appendix, as Exhibit M.  While this proof will be offered generally as concealment, it serves to conceal the assistance provided to *al Qaeda* discussed above and thus constitutes conduct in violation of the material support statute.

WHEREFORE, the government respectfully submits this Bill of Particulars.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

DEBORAH L. STEINER
JOHN C. KOCORAS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

9

## CERTIFICATE OF SERVICE

The undersigned attorney, Deborah L. Steiner, certifies that she is employed in the Office of

the United States Attorney for the Northern District of Illinois; that on the 3rd day of February 2003,

she served a copy of the foregoing BILL OF PARTICULARS via messenger to:

> Mr. Joseph Duffy, Esq.
> Stetler & Duffy Ltd.
> 140 South Dearborn Street
> Suite 400
> Chicago, Illinois 60603

DEBORAH L. STEINER
Assistant U.S. Attorney

Exhibit 3

Musanadat Aljehad LBI 58
In the name of God, the most compassionate, the most merciful
Islamic Benevolence Committee                     Internal Memo
In---Date---No.---Subject---To---Division---From---Division---

| | |
|---|---|
| I received in person at the time brother<br>Abul Bara'a traveled | 10,000 |
| I received from Sajjad, owner of Abul Bara'a<br>house for the price of two (UI-PH) | 21,000 |
| I received from Abul Ridha-a debt he took<br>from Abul Bara'a | 27,000 |
| I received from Asif-a debt he took from<br>Abul Bara'a | 4,000 |
| I received from brother Abul Bara'a at the<br>time of his trip for tickets (balance<br>of 39,000) | 6,600 |

68,600

| | |
|---|---|
| I received from Asif-balance of ticket price<br>for Dr. Mustapha's ticket | 1,400 |

70,000

Expenditures:

| | | |
|---|---|---|
| On the House of Friday, the Friday/balancing account | | 17,979 |
| Al-Fitr alms | | 1,000 |
| Sacrifice during EID vigil, 30 Ramadhan<br>by Abdul Malik     #1 | (1) | 1,500 |
| With Reedy Gul and Shair in moving the House/ | | 1,000 |
| On Abul Ridha given by Abdul Sabir/ will be<br>paid by Abu hajir<br>(The whole item above is crossed throughout.<br>Nos.in ()indicate (3) sacrifices.Trans. Note.) | | 3,000 |
| I paid to Mohammed Al-faith on April 30, 1990<br>A loan from brother Abul Bara'a (UI-PH) | | 38,000 |
| Sacrifice for a martyr in Sada on 4th. Shawal (month<br>following Ramadhan) by Abdul Ghaffar #2 | (2) | 950 |
| Sacrifice at the camp by me          #3 | (3) | 1,400 |
| Feast thrown by Haji Gul Afreedi-house owner | | 2,000 |
| He withdrew from me in person on April 30 | | 5,000 |

                                   (is crossed out)---------63,829
                                   (" " " " " ")--------- 45,850
1171 (this # is circled) 58,754 (this # " " ")---------68,829
-500                 20,754 (" " " " " ")
  671 will be expenses for Shair and Reedy Gul
Six hundred seventy one

Copy to:

BOS000394



BOS000395

Musanadat Aljehad LBI 59
In the name of God, the most compassionate and the most merciful

In:--------- Date:----------No.----------------Subject---------
To:--------- Division------------From----------Division--------

Islamic Benevolence Committee               Internal Memo

I have received 50,000 from brother Abu Al-Bara'a in two
installments (24,000/26,000) at the beginning of founding the
House of Friday, the Friday.

Expenditures:

| | |
|---|---|
| Spent on Friday, the Friday old expenses from the old house that was taken by Abu Firas | 4,204 |
| Shaikh Adil took from me at the airport | 500 |
| Three-month wages beginning April 1, 1990 | 24,000 |
| Wages for Shair for the month of April | 1,500 |
| Expenses of Shair for the month of April | 500 |
| Expenses of Shair for the month of April | 100 |
| New National air conditioner for guest room | 14,800 |
| Small washing machine | 1,150 |
| Kitchen utensils | 18,500 |
| Expenses of Shair for the month of May | 525 |

" " " " " " " " " " " " " " " " "     " " "
                    600
" " " " " " " " " " " " " " " " " "                    100

| | |
|---|---|
| Wages for Shair for the month of May | 1,500 |
| (Scribbles UI)" " " " " " " | (Scribbles UI) |
| Paid Shair in person around June 6, 1990 | 500 |

                                          ‾‾‾‾‾‾‾
                                          68,479
A number that is crossed out----------------------- 67,979

Copy to:

BOS000396



اللجنة الإسلامية

| إلى : | الرقم : | في : |
|---|---|---|
| قسم : | | رقم : |
| من : | | الموضوع : |
| قسم : | | |

الخبر : ٥ر... تبلغت من مركز أبو الندى في دفعتين ........ رؤوس بداية تأسيس بيت لجنة الحج .

البيانات :

| ٤ر٠٤ | في قيمة الحجة الدينية شديدة مع البيت القديم الذي ونجده أبو الندى |
| ٠.. | وجد ها في طلع عمل م المشاف |
| ٤ر.. | دفعت أجرة الورشة أ ... شهر وذلك سبه .... |
| ١٥.. | ما بش شهر بيع ... شهر |
| ٥.. | نصف " " " |
| ١.. | " " " " |
| ٢٨.. | ملكين جديد م ناس ... لشركة العنيف |
| ١١٥. | عـــــا لحت صريرة |
| ١٨٥.. | عدة مواعين |
| ٥ر٥ | معدن شهر ١٥ شهر |
| ٦.. | معدن شهر ١٠ شهر |
| ١.. | معدن شهر ١٥ شهر |
| ١٥.. | عشر شهر مراد |
| ...... | ............................ |
| ٥.. | بيك في ١ – ٦ / ٩٩ |

٢٦٤٩

صورة إلى :

BOS000397

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: **Musadat Aljehad LBI/36/Musanadat Aljehad LBI 60**)*

In the name of God, the most Compassionate, the most Merciful

Islamic Al-Birr Committee
(The World Assembly of Muslim Youth)

Internal Memo

| On:      Corresponding with: | To: |
|---|---|
| Number: | Section: |
| Subject: | From: |
|  | Section: |

Text: 100,000 a payment from Abu Al-Baraa to the Jihad Department:

Expenses:

| | |
|---|---|
| 70,000 | Seventy Thousand for Abu Asim the Yemenis' Camp with coordination with Sheikh Adel |
| 5000 | Jlebeeb purchasing tents with the knowledge of Abu Al-Baraa |
| 4000 | For Abu Wael, "      "      "      "      "      "      "      " |
| 3400 | Truck rental and it's expenses to Cooz *(or, Coz, phonetic)* for the blankets      "      "      " *(with the knowledge of Abu AL-Baraa)* |
| 1500 | Sheer's salary month 3 |
| 3200 | Abdel Saboor Wounded and transportation |
| 2700 | Expenses in Abdel Ghafar's possession in two payments 1500 1200 |
| 2100 | Abdel Ghafar's salary in addition to three other days for month 3 |
| 650 | The cost of transporting the blankets to the warehouse |
| 500 | Miram Kul (on Usama's *(illegible)* account) *(crossed out)* |
| 3421 | Expenses of the Al-Khiyam *(the tents)* trip |

BOS000398

2724    Martyr's funeral from our project in Abdel Saboor's
        possession 6 Shawwal *(10th month in the Islamic
        calendar)*

-99195
Copy to: *(number is illegible, crossed-out)*

BOS000399



لجنة البر الإسلامية

مذكرة داخلية

| | | | |
|---|---|---|---|
| ل : | المؤرخ : | إلى : | |
| رقم : | | قسم : | |
| الموضوع : | | من : | |
| | | قسم : | |

في : ١٠٠٠ ... ميزانية موازنة اللواء لإدارة الجهاد :

المصروفات :

٧,١٠٠ ...
٥ ...
٤ ...
٢٤ ...
١٥ ...
٢٥ ...
٤٧ ...
٤١ ...
٦٥ ...
٢٤٤١
٤٧٤٤

٩٩ ١٩٠

صورة إلى :

BOS000400

Exhibit 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
v.  )   No. 02 CR 892
)
ENAAM M. ARNAOUT )   Hon. Suzanne B. Conlon

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits the following Response to

Defendant Enaam M. Arnaout's Position Paper as to Sentencing Factors ("Pos. Paper").

### I.    DEFENDANT'S OBJECTIONS TO THE LOSS CALCULATIONS

Defendant objects to the U.S. Probation Office's Presentence Report's ("PSR's") estimate

of the loss amount under U.S. Sentencing Guideline ("U.S.S.G.) § 2B1.1 of $438,238.  Pos. Paper

at 1-2.

The parties agree with the PSR that the fraud guideline, U.S.S.G. § 2B1.1, applies to the

offense of conviction.  Under § 2B1.1, the base offense level is 6, and that level is increased by the

amount of "loss." The amount of "loss" may be a reasonable estimate where an exact amount cannot

be determined and may be based on a number of factors, including "the scope and duration of the

offense." U.S.S.G. § 2B1.1 Note 2(C).

### A.    Estimating Loss

To determine an appropriate "loss" amount, the government added the known costs of goods

that defendant's charity, Benevolence International Foundation, Inc. ("BIF"), supplied to fighters,

and the estimated value of goods that BIF supplied to fighters when the actual cost was unknown.

194

The government included in its estimate only those items which the government could prove with supporting documents that BIF provided or attempted to provide to fighters. As outlined below, this method of determining loss yields an amount in excess of $400,000 but less than $1,000,000, resulting in a 14-level increase to defendant's total offense level under § 2B1.1(b)(1).

Notably, this method of determining loss provides a conservative estimate for purposes of calculating defendant's Guidelines range. While the government believes that this estimate should be used for sentencing purposes, a number of other factors arguably call for an even higher loss amount, including the fact that the vast majority of donors to BIF would likely not have donated had BIF not received tax-exempt status from the IRS or otherwise been truthful to the public about its expenditures. Moreover, a conservative estimate of the federal taxes BIF would have been obligated to pay had it not deceived the IRS and obtained tax-exempt status, but received the same amount of donations as reported to the IRS in 1994 to 2001, is $543,354. *See* Ex. 1 (table setting forth applicable tax rates and chart summarizing BIF's tax obligations prepared by IRS Auditor Shari Schindler, CPA).[1]   Finally, it is likely that not all of BIF's support to violent groups was memorialized in documents recovered by the government. In fact, the amounts listed here do not include any expenditures in Sudan, even though BIF documents demonstrate that BIF financially supported violent groups there.[2]

---

[1]      For ease of reference, the exhibits cited in this filing have been bound separately.

[2]      Defendant claims that *his* BIF never spent money in Sudan, and that his solicitations to the public about BIF's work in Sudan were an effort to "'puff' its accomplishments by taking credit for the activities of a separate organization." Pos. Paper at 6. The government has no estimate of the amount of donations BIF received for Sudan relief as a result of its purportedly fraudulent "puffing."

**B.**   **Undisputed Amounts**

Defendant admits to misappropriating **$196,653** of donors' funds to purchase the following items: boots for Chechen fighters ($89,900); uniforms for Chechen fighters ($66,053); boots for the Bosnian commando group "Black Swans" ($6200); an ambulance for the Bosnian army ($7500); blankets for the "Black Swans" ($300); and tents for Bosnian soldiers ($24,000). As defendant is aware, the government possesses documentary proof on each of these items. The documents are not attached because the amounts are undisputed, and the government will have them available at the sentencing hearing.

**C.**   **Disputed Amounts**

The items in dispute, along with the evidentiary support for including these items, are discussed below.

    1.   **Support Provided to Chechen Fighters**

A)   **$34,500** for shoes for Chechen fighters. While defendant acknowledges that the cost of uniforms ($66,053) for the same individuals should be included in the loss amount, he inexplicably ignores the cost of the shoes that accompanied those uniforms ($34,400). *See* Ex. 2 (stating that the contents of the shipment were 1500 pairs of shoes costing $34,500; and $66,053 worth of 1500 pairs of thermal underwear, 1500 belts, 1500 pairs of socks, material for 3000 pants and shirts and 1500 jackets, along with lining, zippers and buttons).

B)   **$6775** for a mobile x-ray machine and **$3225** cash for fighters in Chechnya.[3] BIF gave the x-ray machine and cash to Essa Abzoutov for use by fighters in Chechnya. *See* Ex. 3 at 3.

---

[3]   The government's previously estimated the cost of the x-ray machine to be $8000, but it has reduced that amount in response to the suggestion that the $3225 cash delivered to fighters was the difference between the cost of the x-ray machine and $10,000 allocated for that purchase.

Defendant contends now that this x-ray machine and cash were not for fighters and/or did not involve BIF funds. Pos. Paper at 5. This argument is contradicted by a detailed report recovered from BIF in Illinois which states:

> The above visit was made by the undersigned on behalf of Benevolence International Foundation and at the request of Mr. Suleman Ahmer, Operations Manager, B.I.F. North America/Pakistan.
>
> * * * * *
>
> Attempts were made by us to locate Mr. Essa Abzoutove, contact man of Chechen Logistics Cell in Baku.
>
> * * * * *
>
> Accompanied G.M. . . . to the office of Mr. Khasan G. Khazutev, Vice Prime Minister of the Cabinet of Ministers of the Chechen Republic (See copy of his calling card, attached). G.M. Explained to him the purpose of my visit and B.I.F.'s desire to provide financial and material support to the Chechen cause. *Mr. Khazutev welcomed B.I.F.'s humanitarian help and assured to become an effective conduit to pass on the proposed aid, cash or kind, most expeditiously to the Mujahideen.* After being convinced of our bonafides, he showed us two letters issued by the office of President Dzokhar Dudayev . . . which contained the names of the Chechen based in Baku and other cities of Azerbaijan who were designated to receive the donations in cash or kind. These letters were signed by President Dudayev himself . . . . G.M. appreciated our being taken into confidence but discreetly asked for a photocopy of the letters for B.I.F.'s purposes. Mr. Khazuyev, as expected, said it could be considered later.
>
> * * * * *
>
> G.M. came to meet me along with Essa and his fellow Mujahid Buda? [question mark in original] Essa was visibly moved by B.I.F.'s help by sending the much needed X-Ray machine. . . . He also acknowledged the receipt of amount given by G.M. ($3225/- sent through Mr. Asad Ullah and the amount paid to him earlier on by G.M.)
>
> * * * * *
>
> *Essa also showed interest in anti-mine steel-sole boots for Chechen fighters. . . .* It appears that Suleman Ahmer is making some inquiries about the manufacture/supply of such boots.[4]
>
> * * * * *
>
> Met couple of Hisb's Mujahideen. Exchanged views on latest situation; role of B.I.F. in distress areas like Bosnia, Sudan and now Chechnya etc.
>
> * * * * *
>
> G.M. therefore concluded that *any aid from us in cash or kind should better be routed through Essa or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the ongoing Jehad.*

---

[4]     Defendant admits that BIF later purchased 2900 pairs of these boots and delivered them to Chechen rebels.

4

Because § 3A1.4 places defendant in Criminal History Category VI, his Guidelines range is life; however, his sentence cannot exceed 240 months imprisonment because of the maximum in the statute of conviction. If the Court does not apply § 3A1.4, defendant is in Criminal History Category I, with a total offense level of 36, for a Guidelines range of 188-235 months imprisonment. As set forth in the government's Alternative Motion for Upward Departure, if the Court does not apply § 3A1.4, an upward departure resulting in a sentence of 240 months would be appropriate.

## VIII.   DEFENDANT'S RELATIONSHIP WITH *AL QAEDA*

As set forth below, for nearly a decade, defendant worked with various members or associates of *al Qaeda* and provided them logistical and other assistance while they were engaged in violence. These facts paint an accurate picture of defendant's conduct – his knowing dealings with persons engaged in violence – that contradicts his self-portrait as a "goodwill ambassador." Second, they demonstrate that defendant's racketeering conduct "involved and intended to promote" a federal crime of terrorism, including efforts to assist Sheik Fathi's fighters with anti-mine boots and to provide uniforms to Chechen fighters. Third, they place in context the statements defendant swore to in his two affidavits, discussed above, which are plainly false. Finally, they make plain that defendant's unlawful conduct is far different than that in a typical fraud case. Defendant's conduct allowed violent persons (both inside and outside of the *al Qaeda* network) to flow to areas of conflict and survive there under the cover of an American charity.

### A.   Background

As defendant now acknowledges, defendant became well-acquainted with Usama Bin Laden and *al Qaeda* in the 1980s, having spent significant time in bin Laden's *al Masada* camp in Afghanistan and then living in Bin Laden's house. In 1997, defendant arranged to preserve in

electronic form historical documents concerning Usama Bin Laden and *al Qaeda* as well as other persons and groups. These items, which have been discussed in detail in the government's *Santiago Proffer* and other filings, include the August 1988 minutes of the founding of *al Qaeda* and handwritten notes taken by defendant himself in October 1988 of a *shura* ("consultation") council meeting at Bin laden's house involving Bin Laden and others that occurred two months after *al Qaeda* had been formed. Ex. 24.

In or about 1993, Bin Laden advised *al Qaeda* member Jamal Ahmed al Fadl that *al Qaeda* was using several charities to fund its operations overseas, specifically naming *al Birr*, which. translates in English to "Benevolence."[13]   Al Fadl understood from conversations with Bin Laden and others in *al Qaeda* that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for *al Qaeda* operations. The charities also provided assistance for *mujahideen* who traveled.

**B.    *al Qaeda* and BIF in Bosnia**

According to al Fadl, in Fall 1992, *al Qaeda* dispatched al Fadl from Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by *al Qaeda*. Al Fadl traveled to Zagreb where he met with defendant and *al Qaeda* members Abdel Rahman al Dosari a/k/a "Hown" (a mortar expert and leader of the *al Qaeda* fighters in Bosnia) and Abu Zubair al Madani. Hown told al Fadl that *al Qaeda* was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses. He also said that "*al Birr*" was providing money for weapons for *al Qaeda*. Hown explained that *al Qaeda*'s goal in Bosnia was to establish a base for operations in Europe against *al*

---

[13]      The government is prepared to call al Fadl at sentencing if necessary.

31

*Qaeda*'s true enemy, the United States.[14]

As discussed below, al Fadl's account is corroborated by items seized from BIF and admissions by defendant. Moreover, it further demonstrates the inaccuracy of defendant's statement that BIF's support was "not provided to irregular *mujahideen* units but to legitimate Bosnian and Chechen armies." Pos. Paper at 26.

Defendant admits that in his first trip to Bosnia in 1992, he traveled with a group to an area known as Tesanj, or Tishin. The group included a fighter later eulogized in a video soliciting funds for *mujahideen* in Bosnia and distributed under the logo of BIF's predecessor organization, *Lajnatt al Birr al Dawalia* ("LBI"). Over one thousand copies of this tape were sent to the United States from Saudi Arabia in late 1992, and the tape was played at a convention in Detroit, Michigan. BIF distributed all of the tapes, including one later found in a Chicago area mosque. After arriving with this fighter in Tesanj, defendant met with "Hown" and others, and he observed that those gathered were armed and ready to fight.

Defendant also admitted what the government learned from other sources: that BIF offices and facilities were used to transport dozens of fighters into Bosnia from Croatia. The fighters were met at the airport by BIF employees, taken to a BIF guesthouse and then transported into Bosnia in BIF vehicles by BIF employees and on to Tesanj, where they were delivered to a BIF schoolhouse. The fighters transported included a number of participants in the "Battle of Tishin" in December 1992, which is described on an authoritative website of the *mujahideen*. See Ex. 25. In fact, by his own account, defendant arrived at the schoolhouse within a day of the Battle of Tishin, seeing some

---

[14]     Al Fadl understood that Bin Laden had concerns about whether the *jihad* in Bosnia was a "true" *jihad* that Muslim fighters could win, but *al Qaeda* had an interest in participating in the conflict and to have fighters gain training and experience.

of the BIF sponsored fighters seriously wounded, only some of whom survived.  None of these fighters were part of the Bosnian army at the time.

The fighters who were transported into Bosnia by BIF included *al Qaeda* member Abu Zubair al Madani, described above.  Defendant arranged the his transportation along with five others to Bosnia at the specific request of Adel Battergy.  Abu Zubair al Madani was killed in Bosnia in the Fall 1992 and was eulogized on the LBI fundraising video.  Ex. 26 (transcript of video).

Other fighters sponsored by BIF included Khalid Harbi and Abu Assim al Makkee.  Harbi, also known as Sheik Abu Sulaiman al Makki, led of the group of *mujahideen* that BIF transported into Bosnia.  He was injured and partially paralyzed in the Battle of Tishin and transported out of Bosnia by Defendant and BIF.[15]  Abu Asim al Makkee, who was also wounded in the Battle of Tishin, was later imprisoned in Saudi Arabia and then released.  He has been named by the State Department as a Specially Designated Global Terrorist.

Defendant also admitted to information previously received by the government: that he dispatched a BIF employee in the latter part of 1992 to travel to Afghanistan to bring to Bosnia trainers from the "Sada" camp in Afghanistan.[16]  These trainers, nine in all, included al Hajj

---

[15]     Khaled Harbi a/k/a "Abu Suleiman al Makki" appeared on a videotape of a meeting with Usama Bin Laden and *al Qaeda* military commander Muhamed Atef after the September 11 attacks.  On the video Bin Laden describes the planning of the attacks and how they occurred.  An individual on the videotape who appears unable to stand is referred to as "Suleiman," and initial reports identified the person as Suleiman al Ghamdi.  Saudi officials and Islamic figures later identified the person alternately as "Suleiman al Makkee" and "Khalid Harbi" – the same person. *See, e.g.,* Ex. 27.  While this videotape does not implicate defendant in any way in the September 11 plots, it does reinforce that the fighters he provided support to were the "irregular *mujahideen*" he denies assisting.

[16]     The Sada camp was described in 1988 in the founding minutes of *al Qaeda* as an open camp for which the best "brothers" would be selected to join *al Qaeda*.

Boudella, who was primarily in charge of the school in Tesanj. Al Hajj Boudella is the BIF director whom defendant believed was taken to Guantanamo Bay, Cuba, as he attempted to inform Batterjee in the conversation recounted above. Al Hajj Boudella is seen in photographs seized from BIF in a military headquarters building in Bosnia where he trained Bosnian fighters. *See* Ex. ___ .

This group of trainers from the Sada camp also included two *mujahideen* who were later killed in the Battle of Tishin. One was Abu Abdallah al Falastini, later described on a *mujahideen* website as follows: "A 25 year-old experienced military trainer of the *mujahideen* both in Afghanistan and Bosnia. Many *mujahideen* received military training through his hands." Ex. 25. In fact, contrary to defendant's assertions in his position paper that BIF was not involved in military training, photographs recovered in Bosnia show a building bearing an insignia of a Bosnian military unit *and* a logo similar to BIF's. This is consistent with a response in an internal BIF questionnaire in 1998, asking, "What do you think is the best thing that BIF has done in Bosnia?," with an employee's response, "Military training of soldiers during the war[.]" Ex. 26 at 1, item 8. Defendant and BIF also arranged for false documentation for a BIF employee who posed as journalist to travel on a United Nations flight into Bosnia in late 1993 for the purpose of transporting a sum of German currency to another organization.

In 1998, defendant facilitated the travel of influential *al Qaeda* figure Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," in Bosnia. Defendant knew that Salim was close to Usama Bin Laden in Afghanistan. Numerous documents in defendant's *al Qaeda* archive discussed Salim, including notes of a meeting of a *shura* council in October 1998 at Bin Laden's house, about which defendant took handwritten notes. Defendant by his own admission later heard that Salim was the director of several Bin Laden businesses in the Sudan, and defendant saw Salim in Turkey in 1997. Defendant

34

claims that Salim told him that he separated from Bin Laden when Bin Laden returned to Afghanistan from Sudan (which would be Summer 1996) and disagreed with Bin Laden's relationship with the Taliban, but Salim continued to admire and respect Bin Laden. Salim told defendant that he was reluctant to return to Saudi Arabia because of his prior relationship with Bin Laden (who had by this time boasted of responsibility for involvement in attacks on American forces in Yemen in December 1992 and in Somalia in 1993 and declared war on American military personnel and civilians).

At defendant's suggestion, which he acknowledges, Salim traveled to Bosnia in May 1998 and stayed at the Metalurg Hotel. Defendant assigned a BIF employee as Salim's driver and translator and introduced Salim to BIF employees. BIF provided Salim a letter bearing defendant's signature stamp falsely describing Salim as a director of BIF in order to facilitate his travel. Ex. 30. In 2000, Croatian police asked a BIF employee whether the employee knew a visitor named Mamdouh Salim from the Sudan. Defendant, who was present for the inquiry, told Munib Zaharigac (then a Bosnian intelligence officer) not to tell the Bosnian authorities about Salim, who defendant knew had been brought to the U.S. to face criminal charges.

### C.    *al Qaeda* and BIF in Sudan

Defendant struggles mightily to distance himself from any link to the BIF office in the Sudan, with good reason – documents recovered in the BIF's Illinois office explicitly prove that BIF in Sudan directly supported *al Qaeda*. One such report explains:

From its first day, the BIF aimed to support Jihad and Mujahideen, by

- Assisting in military and logistical support.
- Assisting in providing medical care for the Mujahideen in the field.
- Assisting in providing training, running camps, providing shelter, and in what

35

> accompanies these services, such as providing education, Da'awah, and looking after
> the families of Mujahideen and taking care of the orphans.
> • Providing moral and political support for the Mujahideen.
> \* \* \* \* \*
> By the grace of Allah, the services of the BIF in the Sudan started in May 1991, after the
> agreement of *the base* in Sudan with the Sudanese Government. The BIF was able in a short
> span of time to occupy a distinguished place among the organizations which work in the
> relief and service work in the country[.]

Ex. 31. While the report does not further identify "the base" that reached an agreement with the

Sudanese government in May 1991, literally translated from English to Arabic, "the base" is "*al*

*Qaeda*."

As al Fadl can testify, Bin Laden and *al Qaeda* in fact relocated from Afghanistan to Sudan

at that time, where they operated in partnership with elements of the Sudanese government. In 1993

and 1994, al Fadl worked as an *al Qaeda* member in the Sudan under the supervision of Loay

Bayazid and Mamdouh Salim, both of whom are discussed below. Al Fadl identified a photograph

recovered in the BIF Illinois office as a training camp in Sudan sponsored by *al Qaeda* (Ex. 32), at

which Saif ul Islam (also discussed further below) served as trainer.

Documents recovered from BIF refute defendant's current claims that there is no relationship

between the BIF in Sudan and what he calls "BIF-USA." While defendant clearly did not control

BIF's Sudan office – unlike BIF's Illinois, Bosnia and Chechnya offices – he certainly coordinated

efforts with BIF's Sudan office. For example, "BIF-USA's" letterhead previously listed BIF's Sudan

address along with BIF's Illinois address. *See* Ex. 33 (fundraising letter signed by defendant as

"Executive Director" of BIF). And as defendant acknowledges, "BIF-USA" printed in its

newsletters and in solicitations to donors updates about its purportedly charitable projects in Sudan –

claiming to have sent "millions of dollars in aid to Sudan" (Ex. 34 at 2) – although he now claims

36

that was "puffing" apparently designed to mislead donors.   Elsewhere, a report from a BIF representative reflect that the representative talked to *Hezb e Islami* officials in Azerbaijan about the "role of BIF in distress areas like Bosnia, Sudan and now Chechnya[.]" Ex. 3 at 3.

BIF's Illinois files included partial budgets for the BIF's Sudan offices, a 1995 quarterly report for the Sudan office documenting humanitarian work (Ex. 35) and an "Operational Plan & Budget Balance" for Sudan for 1995-1996. BIF also had organizational charts for BIF in Sudan, photographs which were apparently taken by defendant in Sudan in 1994. *Id.* Separately, a 1999 "Agenda for Enaam" tasks defendant to "Approve the budget for all BIF" and with "Coordination with BIF Sudan." Ex. 36.

Those in Sudan thought their work was related to defendant's work, as shown in notes found at BIF in Illinois describing a visit to BIF in Sudan by Ambassador Melissa Wells, a presidential envoy from the U.S. who worked in Sudan as part of international peace efforts. Exs. 37 and 38. BIF recorded that on June 15, 1994, Ambassador Wells met with the director of BIF's office in Kadugli, Sudan. BIF reports that in response to Ambassador Wells's question "from where BIF gets the financial support," BIF's Kadugli director stated: "BIF has fundraising offices in the U.S., Canada ((Ottawa)), Qatar ((Doha)), Saudi Arabia ((Jeddah))and other Arab countries. Through their offices, BIF collects funds from donors and sends them to Sudan to be spend (sic) on the needy, orphans, the poor, and the deportees." Ex. 37 at 1-2. The Director also said that BIF works in "Sudan, Somalia, Bosnia, Afghanistan, Burma, Bangladesh and Pakistan." *Id.* at 2.

Regardless, defendant admits meeting with representatives of BIF's Sudan office and Battergy in Saudi Arabia in 1993. Defendant learned at that meeting that two other BIF employees from Sudan had been detained by Saudi authorities shortly after their arrival. Remarkably, it appears

37

that their detention was reported to Usama Bin Laden. Al Fadl independently knew that around 1993, a BIF employee in Sudan traveled to Saudi Arabia to meet with Batterjee but was detained and questioned by Saudi authorities. After he was released, the BIF employee returned to Sudan where he met with Usama Bin Laden, who questioned him about what had happened. Madani al Tayyib, then *al Qaeda*'s chief financial officer, told al Fadl that the Saudi authorities must have questioned the employee because they had found documents linking "*al Birr*" to Bin Laden. Tayyib later indicated that the problem had been fixed, although BIF's operations in Saudi Arabia were apparently curtailed at that time.

In early 1994, defendant met with Mohamed Bayazid in Sudan. Contrary to the assertions in defendant's filing, the evidence is clear that defendant was well aware of Bayazid's close ties to Usama Bin Laden and *al Qaeda*. Indeed, much of the historical *al Qaeda* archive seized from the BIF offices, which defendant arranged to have electronically scanned, were materials defendant took from the homes of Bin Laden and Bayazid, including notes handwritten by defendant of a meeting attended by Bayazid and Bin Laden. Ex. 24. Indeed, defendant now believes that Bin Laden obtained the idea to start *al Qaeda* from Bayazid, and defendant understood that Bayazid had traveled to Sudan around 1989 as Bin Laden's first ambassador to Sudan. Defendant claims that he first formed the impression during his 1994 Sudan trip that Bayazid had separated from Bin Laden.

When defendant visited BIF personnel in Sudan, he learned quickly that the BIF office was very tight with the National Islamic Front ("NIF") and that some of the BIF employees were NIF members. Defendant contacted Bayazid, who then visited defendant at a BIF guesthouse. Photographs show defendant and BIF personnel with Bayazid. Exs. 39 and 40. Bayazid later

38

traveled at BIF expense to BIF in Illinois, and September 1994 minutes of a BIF meeting in Illinois recorded Bayazid as "President" of the meeting. Ex. 41.

### D.    *al Qaeda* **and BIF in Chechnya**

BIF's activities in Chechnya began after a meeting between a BIF representative and Sheikh Fathi, discussed above. Sheikh Fathi followed that meeting with a letter to Adel Battery and defendant. Ex. 42. Later, defendant personally met with Sheik Fathi in Chechnya on two occasions. Defendant recounted the information he gathered in these meetings and others to a BIF fundraiser on October 18, 1999. Ex. 14. The fundraiser noted:

> Enaam Arnaout, the CEO of the Benevolence International Foundation . . . has made six trips to Daghestan/Chechnya area and has collected invaluable information on the history and details of the Islamic movement. *Most of this information is collected through personal contacts and log (sic) term relationship (sic) with many key people in the movement* [emphasis added]. . . . One greatly significant figure in the Islamic movement in Chechnya is *Sheikh Fathi* (a BIF friend who died recently while Enaam was there). . . . He is one of the most significant figures in the Islamic movement in Chechnya. By profession, he was an electronic engineer and had helped the Afghan Jihad through his skills in electronics. He stayed in Afghanistan from 1982 to 1992 and then moved to Chechnya. Coming from Ikhwan-salafi background, he had a broad-based knowledge of Islamic movements.

*Id.* (emphasis added). As quoted elsewhere, defendant explained that Sheik Fathi started a group that began receiving *mujahideen* from other countries, and he died before "structuring his movement completely." *Id.*

Defendant continued:

> One of Sh. Fathi's legacies, probably the leader of the group after him, is *Arabi*, a Chechen student of Sheikh Fathi. He commands of a group of about 600 mujahideen situated in the capital to keep a watch on the president to ensure that the president does not blatantly violate Islamic principles.

Defendant also described certain individuals as follows::

> *Saif-ul-Islam*, the BIF officer in Chechnya, is an Egyptian lawyer who is very

39

knowledgeable. He also came there through Sh. Fathi.

＊ ＊ ＊ ＊ ＊

***Shamil Basayev*** was another officer in Russian (sic).[17] As a defender of Chechnya, he became surrounded by Sufis. He is criticized by some and has shown signs of corruption in the past. However, lately he was trained and Islamically educated by Khattab the leader of Arab Mujahideen.

＊ ＊ ＊ ＊ ＊

***Khattab*** is a Saudi mujahed who went to Afghanistan before the age of 20, fought there till he moved to Tajikistan and later to Chechnya. His group of mujahideen saved Chechnya from Russian onslaught during the last war with great courage and is greatly respected by the Chechens.

*Id.* at 1-2.

Contrary to defendant's claim that the "Chechen separatist movement was widely supported internationally as it attempted to establish self-governance and independence from Russia," both sides in the Chechen conflict have been criticized by Amnesty International for "serious abuses of human rights and breaches of international humanitarian law." *See* Amnesty International report, attached as Ex. 43 . "Arabi," whose full name is Arabi Barayev, was publicly named by the Chechen Deputy Prime Minister as being responsible for the beheading deaths of four British telecommunications workers in Chechnya in December 1998. Ex. 44. Shamil Basayev took over 1000 people hostage after capturing a hospital in Chechnya in June 1995, the same time BIF was arranging the purchase and delivery of boots to Chechen fighters.[18] In the subsequent fighting, 100 hostages were killed. *see* Amnesty International Press Release on July 17, 1995, at 2, attached as

---

[17]     To be clear, "officer" does not refer to BIF officer.

[18]     After delivery of the boots, in January 1996, an urgent request for binoculars, night vision goggles and other items – written partly in Urdu as a sort of code – for an apparent fighting unit in Chechnya was transmitted to Baku, Azerbaijan for defendant from the "*aks janub*" contact (meaning the contact from the North, an apparent reference to a contact in Chechnya). Ex. 45. According to the testimony of defense witness Muzaffar Khan, Khan gave defendant this document after Khan received it. Ex. 46. Defendant claims that he cannot recall seeing the document.

Ex. 47 ("[Basayev] stated that he was acting without the knowledge or consent of the President . . . . Basayev was also quoted as saying that he and his men would fight to the death, and shoot the hostages if necessary, to achieve their demands that Russian forces declare a ceasefire and disengage from the Chechen Republic").   Khattab, or Ibn al Khattab, who was aligned with bin Laden, led groups of fighters in incursions into Daghestan from Chechnya in September 1999.  In 1995, *al Qaeda*'s chief financial officer asked *al Qaeda* member al Fadl to travel to Chechnya to join with *al Qaeda* in the fighting.  Al Fadl – whose trip was later cancelled for personal reasons – was told that he would be joining up with Khattab, who had fought alongside Bin Laden in Afghanistan.

In 1998, Saif ul Islam, an *al Qaeda* military commander, served as the BIF officer in Grozny, Chechnya.  Saif ul Islam was identified as an *al Qaeda* member by two different witnesses (both *al Qaeda* members) at a federal trial in the Southern District of New York: al Fadl and L'Houssaine Kherchtou.  Al Fadl described Saif ul Islam as a member of al Qaeda's military committee , and he saw Saif ul Islam with explosives in the Sudan.  Ex. 48.[19]  Al Fadl has elsewhere described Saif ul Islam as an important *al Qaeda* figure who participated in training persons in Somalia in the early 1990's for an eventual attack on the American forces there and later underwent explosives training in Lebanon by Hezballah after *al Qaeda* forged a relationship with Iranian intelligence.  L'Houssaine Kherchtou also identified Saif ul Islam as a member of al Qaeda's military committee.  Ex. 49.

The foregoing information is corroborated by the recovery in August 1997 of the photograph of Saif ul Islam from an *al Qaeda* location in Nairobi, Kenya.[20]  Ex. 50.  Similarly, a wiretap on a

---

[19]      A transcript of al Fadl's trial testimony was recovered on a computer at BIF's office in Illinois in December 2001.

[20]      The location was the home of Wadih el Hage, who was convicted of conspiracy to
(continued...)

41

telephone associated with that location captured conversations between *al Qaeda* operatives and Saif ul Islam in April 1997 during which messages were passed between Saif ul Islam and *al Qaeda's* then military commander Muhammed Atef and during which Saif ul Islam explained his difficulty in maintaining contact with the leadership in Afghanistan. Ex. 51.

Remarkably, even defendant admits in part that he knew of Saif ul Islam's relationship with *al Qaeda* when he hired him for BIF's office in Chechnya, though one would never know it from his court filings. Defendant admits being told by Saif ul Islam that Saif ul Islam had been a member of the Egyptian Islamic Group (which has been officially designated a terrorist organization by the United States) and had gone to Afghanistan. Saif ul Islam told defendant that he had then joined *al Qaeda*. Saif ul Islam claimed he had spent time in the Sudan, had then been to "Africa" where he starved for days (an apparent reference to his involvement in Somalia) and that he had then gone to Chechnya where he became involved in fighting in 1995. Despite his knowledge that Saif ul Islam had been involved with *al Qaeda*, defendant employed him in 1998 – after al Qaeda's declaration of war against American civilians was public – and never advised anyone in BIF (much less donors or any government) of the fact that the lead officer of the charity in Chechnya was at least an important "former" *al Qaeda* member.

Later, in about September 1999, defendant met again with Saif ul Islam and noticed weapons (including a Kalashnikov) behind the door. Defendant claims he was told by Saif ul Islam that Saif ul Islam had just crossed the border into Daghestan with a group seeking to support the forces of Shamil Basayev and Ibn al Khattab as the latter two had made an incursion into Dagestan shortly

---

[20](...continued)
kill United States nationals in 2001. The relevant photographs were recovered from his Nairobi home which was often used by Harun al Fadhl, an indicted fugitive in the 1998 embassy bombings.

before. (In fact, it was reported in the open press that in August 1999 Basayev led fighters in to Dagestan and taken over two villages.)

## IX.   CONCLUSION

For the reasons set forth above, the government respectfully requests that defendant's sentence include a term of imprisonment of 240 months.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

JOHN C. KOCORAS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-7602

43