# Exhibit 1 (Part 14 of 14)

## Attachments S-U to
## Affidavit of David K. Draper

# Attachment S

# THE 9/11 COMMISSION REPORT

# THE 9/11 COMMISSION REPORT

Final Report of the
National Commission on Terrorist
Attacks Upon the United States

OFFICIAL GOVERNMENT EDITION

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC 20402-0001

ISBN 0-16-072304-3

Finally, Bin Ladin had another advantage: a substantial, worldwide organization. By the time he issued his February 1998 declaration of war, Bin Ladin had nurtured that organization for nearly ten years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

## 2.3 THE RISE OF BIN LADIN AND AL QAEDA (1988–1992)

A decade of conflict in Afghanistan, from 1979 to 1989, gave Islamist extremists a rallying point and training field. A Communist government in Afghanistan gained power in 1978 but was unable to establish enduring control. At the end of 1979, the Soviet government sent in military units to ensure that the country would remain securely under Moscow's influence. The response was an Afghan national resistance movement that defeated Soviet forces.[19]

Young Muslims from around the world flocked to Afghanistan to join as volunteers in what was seen as a "holy war"—*jihad*—against an invader. The largest numbers came from the Middle East. Some were Saudis, and among them was Usama Bin Ladin.

Twenty-three when he arrived in Afghanistan in 1980, Bin Ladin was the seventeenth of 57 children of a Saudi construction magnate. Six feet five and thin, Bin Ladin appeared to be ungainly but was in fact quite athletic, skilled as a horseman, runner, climber, and soccer player. He had attended Abdul Aziz University in Saudi Arabia. By some accounts, he had been interested there in religious studies, inspired by tape recordings of fiery sermons by Abdullah Azzam, a Palestinian and a disciple of Qutb. Bin Ladin was conspicuous among the volunteers not because he showed evidence of religious learning but because he had access to some of his family's huge fortune. Though he took part in at least one actual battle, he became known chiefly as a person who generously helped fund the anti-Soviet jihad.[20]

Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors."[21]

Mosques, schools, and boardinghouses served as recruiting stations in many parts of the world, including the United States. Some were set up by Islamic extremists or their financial backers. Bin Ladin had an important part in this

e 1:03-md-01570-GBD-SN   Document 1244-15   Filed 09/16/05   Page 7 o

There is also evidence that around this time Bin Ladin sent out a number of feelers to the Iraqi regime, offering some cooperation. None are reported to have received a significant response. According to one report, Saddam Hussein's efforts at this time to rebuild relations with the Saudis and other Middle Eastern regimes led him to stay clear of Bin Ladin.[74]

In mid-1998, the situation reversed; it was Iraq that reportedly took the initiative. In March 1998, after Bin Ladin's public fatwa against the United States, two al Qaeda members reportedly went to Iraq to meet with Iraqi intelligence. In July, an Iraqi delegation traveled to Afghanistan to meet first with the Taliban and then with Bin Ladin. Sources reported that one, or perhaps both, of these meetings was apparently arranged through Bin Ladin's Egyptian deputy, Zawahiri, who had ties of his own to the Iraqis. In 1998, Iraq was under intensifying U.S. pressure, which culminated in a series of large air attacks in December.[75]

Similar meetings between Iraqi officials and Bin Ladin or his aides may have occurred in 1999 during a period of some reported strains with the Taliban. According to the reporting, Iraqi officials offered Bin Ladin a safe haven in Iraq. Bin Ladin declined, apparently judging that his circumstances in Afghanistan remained more favorable than the Iraqi alternative. The reports describe friendly contacts and indicate some common themes in both sides' hatred of the United States. But to date we have seen no evidence that these or the earlier contacts ever developed into a collaborative operational relationship. Nor have we seen evidence indicating that Iraq cooperated with al Qaeda in developing or carrying out any attacks against the United States.[76]

Bin Ladin eventually enjoyed a strong financial position in Afghanistan, thanks to Saudi and other financiers associated with the Golden Chain. Through his relationship with Mullah Omar—and the monetary and other benefits that it brought the Taliban—Bin Ladin was able to circumvent restrictions; Mullah Omar would stand by him even when other Taliban leaders raised objections. Bin Ladin appeared to have in Afghanistan a freedom of movement that he had lacked in Sudan. Al Qaeda members could travel freely within the country, enter and exit it without visas or any immigration procedures, purchase and import vehicles and weapons, and enjoy the use of official Afghan Ministry of Defense license plates. Al Qaeda also used the Afghan state-owned Ariana Airlines to courier money into the country.[77]

The Taliban seemed to open the doors to all who wanted to come to Afghanistan to train in the camps. The alliance with the Taliban provided al Qaeda a sanctuary in which to train and indoctrinate fighters and terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes. While Bin Ladin maintained his own al Qaeda guesthouses and camps for vetting and training recruits, he also provided support to and bene-

Case 1:03-md-01570-GBD-SN   Document 1244-15   Filed 09/16/05   Page 8 of

AL QAEDA AIMS AT THE AMERICAN HOMELAND        169

as did basic communications and the movement of money. Where electronic communications were regarded as insecure, al Qaeda relied even more heavily on couriers.

KSM and Abu Zubaydah each played key roles in facilitating travel for al Qaeda operatives. In addition, al Qaeda had an office of passports and host country issues under its security committee. The office was located at the Kandahar airport and was managed by Atef. The committee altered papers, including passports, visas, and identification cards.[106]

Moreover, certain al Qaeda members were charged with organizing passport collection schemes to keep the pipeline of fraudulent documents flowing. To this end, al Qaeda required jihadists to turn in their passports before going to the front lines in Afghanistan. If they were killed, their passports were recycled for use.[107] The operational mission training course taught operatives how to forge documents. Certain passport alteration methods, which included substituting photos and erasing and adding travel cachets, were also taught. Manuals demonstrating the technique for "cleaning" visas were reportedly circulated among operatives. Mohamed Atta and Zakariya Essabar were reported to have been trained in passport alteration.[108]

The purpose of all this training was twofold: to develop an institutional capacity for document forgery and to enable operatives to make necessary adjustments in the field. It was well-known, for example, that if a Saudi traveled to Afghanistan via Pakistan, then on his return to Saudi Arabia his passport, bearing a Pakistani stamp, would be confiscated. So operatives either erased the Pakistani visas from their passports or traveled through Iran, which did not stamp visas directly into passports.[109]

## 5.4 A MONEY TRAIL?

Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. KSM provided his operatives with nearly all the money they needed to travel to the United States, train, and live. The plotters' tradecraft was not especially sophisticated, but it was good enough. They moved, stored, and spent their money in ordinary ways, easily defeating the detection mechanisms in place at the time.[110] The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11.

### General Financing
As we explained in chapter 2, Bin Ladin did not fund al Qaeda through a personal fortune and a network of businesses in Sudan. Instead, al Qaeda relied primarily on a fund-raising network developed over time. The CIA

now estimates that it cost al Qaeda about $30 million per year to sustain its activities before 9/11 and that this money was raised almost entirely through donations.[111]

For many years, the United States thought Bin Ladin financed al Qaeda's expenses through a vast personal inheritance. Bin Ladin purportedly inherited approximately $300 million when his father died, and was rumored to have had access to these funds to wage jihad while in Sudan and Afghanistan and to secure his leadership position in al Qaeda. In early 2000, the U.S. government discovered a different reality: roughly from 1970 through 1994, Bin Ladin received about $1 million per year—a significant sum, to be sure, but not a $300 million fortune that could be used to fund jihad.[112] Then, as part of a Saudi government crackdown early in the 1990s, the Bin Ladin family was forced to find a buyer for Usama's share of the family company in 1994. The Saudi government subsequently froze the proceeds of the sale. This action had the effect of divesting Bin Ladin of what otherwise might indeed have been a large fortune.[113]

Nor were Bin Ladin's assets in Sudan a source of money for al Qaeda. When Bin Ladin lived in Sudan from 1991 to 1996, he owned a number of businesses and other assets. These could not have provided significant income, as most were small or not economically viable. When Bin Ladin left in 1996, it appears that the Sudanese government expropriated all his assets: he left Sudan with practically nothing. When Bin Ladin arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fund-raising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan war in the 1980s.[114]

Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.[115] Some individual donors surely knew, and others did not, the ultimate destination of their dona= tions. Al Qaeda and its friends took advantage of Islam's strong calls for char= itable giving, *zakat*. These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause.[116]

Al Qaeda also collected money from employees of corrupt charities.[117] It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities—particularly those with lax external oversight and ineffective inter= nal controls, such as the Saudi-based al Haramain Islamic Foundation.[118] Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda.[119]

In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank

accounts.[120] Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of work= ing for a humanitarian organization.

It does not appear that any government other than the Taliban financially supported al Qaeda before 9/11, although some governments may have con= tained al Qaeda sympathizers who turned a blind eye to al Qaeda's fund-raising activities.[121] Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi govern= ment as an institution or senior Saudi officials individually funded the organ= ization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)[122]

Still, al Qaeda found fertile fund-raising ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight.[123] Al Qaeda also sought money from wealthy donors in other Gulf states.

Al Qaeda frequently moved the money it raised by *hawala*, an informal and ancient trust-based system for transferring funds.[124] In some ways, al Qaeda had no choice after its move to Afghanistan in 1996: first, the banking system there was antiquated and undependable; and second, formal banking was risky due to the scrutiny that al Qaeda received after the August 1998 East Africa embassy bombings, including UN resolutions against it and the Taliban.[125] Bin Ladin relied on the established hawala networks operating in Pakistan, in Dubai, and throughout the Middle East to transfer funds efficiently. Hawaladars associated with al Qaeda may have used banks to move and store money, as did various al Qaeda fund-raisers and operatives outside of Afghanistan, but there is little evidence that Bin Ladin or core al Qaeda members used banks while in Afghanistan.[126]

Before 9/11, al Qaeda spent funds as quickly as it received them. Actual ter= rorist operations represented a relatively small part of al Qaeda's estimated $30 million annual operating budget. Al Qaeda funded salaries for jihadists, train= ing camps, airfields, vehicles, arms, and the development of training manuals. Bin Ladin provided approximately $10–$20 million per year to the Taliban in return for safe haven. Bin Ladin also may have used money to create alliances with other terrorist organizations, although it is unlikely that al Qaeda was funding an overall jihad program. Rather, Bin Ladin selectively provided start-up funds to new groups or money for specific terrorist operations.[127]

Al Qaeda has been alleged to have used a variety of illegitimate means, par= ticularly drug trafficking and conflict diamonds, to finance itself. While the drug trade was a source of income for the Taliban, it did not serve the same purpose for al Qaeda, and there is no reliable evidence that Bin Ladin was involved in or made his money through drug trafficking.[128] Similarly, we have seen no per= suasive evidence that al Qaeda funded itself by trading in African conflict dia= monds.[129] There also have been claims that al Qaeda financed itself through

# Attachment T

# National Commission on Terrorist Attacks Upon the United States

## Monograph on Terrorist Financing



## Staff Report to the Commission

John Roth
Douglas Greenburg
Serena Wille

$20,000), and potential maritime operations against oil tankers in the Strait of Hormuz (approximately $130,000). The actual operations themselves were relatively cheap, although these figures do not include such "overhead" as training at camps, evaluation of trainees, and recruitment. Although the cyclical nature of fund-raising may have created periodic cash shortfalls, we are not aware of any evidence indicating that terrorist acts were interrupted as a result.

## Money for the Taliban

Once Bin Ladin revitalized his fund-raising after moving to Afghanistan, he provided funds to the Taliban in return for safe haven. Al Qaeda probably paid between $10 to 20 million per year to the Taliban. As time passed, it appeared that the Taliban relied on al Qaeda for an ever-greater share of their needs, such as arms, goods, and vehicles, and even social projects. In return, the Taliban resisted international pressure to expel Bin Ladin or turn him over to a third country.

## Money to other terrorist groups

Before 9/11 Bin Ladin appears to have used money to create alliances with other Islamic terrorist organizations. Al Qaeda's cash contributions helped establish connections with these groups and encouraged them to share members, contacts, and facilities. It appears that al Qaeda was not funding an overall jihad program but was selectively providing start-up funds to new groups or money for specific operations. Generally, however, al Qaeda was more likely to provide logistical support and cover and to assist with terrorist operations than to provide money.

## Since 9/11

Al Qaeda's expenditures have decreased significantly since the 9/11 attacks and the defeat of the Taliban, although it is impossible to determine to what extent. Al Qaeda has become decentralized and it is unlikely that the Finance Committee still exists. Sa'id continues to operate, but given the difficulties of communication, it is doubtful that he exerts much control. The direction and financing of operations are now based more on personal relationships with operatives than on a management structure.

Al Qaeda no longer pays money to the Taliban (for safe haven or otherwise) and no longer operates extensive training camps in Afghanistan or elsewhere. It still provides operatives and their families with modest support. Al Qaeda occasionally provides funds to other terrorist organizations, especially those in Southeast Asia. Intelligence analysts estimate that al Qaeda's operating budget may be only a few million dollars per year, although such estimates are only tentative.

# Attachment U

JS-2164: U.S. Treasury Designates Two Individuals with <BR>Ties to al...R>Former BIF Leader and al-Qaida Associate <BR>Named Under E.O. 13224

Case 1:03-md-01570-GBD-SN   Document 1244-15   Filed 09/16/05   Page 15 of 19



PRESS ROOM

## FROM THE OFFICE OF PUBLIC AFFAIRS

December 21, 2004
JS-2164

### U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL
### Former BIF Leader and al-Qaida Associate Named Under E.O. 13224

The U.S Department of the Treasury today announced the designation of Adel Abdul Jalil Batterjee and Saad Rashed Mohammad al-Faqih for providing financial and material support to al Qaida and Usama bin Laden (UBL).

The U.S. is submitting both names to the United Nations 1267 Committee, which will consider adding them to the consolidated list of terrorists tied to al Qaida, UBL and the Taliban.  Batterjee and al-Faqih are not linked to each other.

Today's action was taken pursuant to Executive Order 13224.  The United States has now designated 396 individuals and entities as terrorists, their financiers or facilitators since September 2001.  In addition, the global community has frozen over $144 million in terrorist-related assets.

Adel Abdul Jalil Batterjee served as the Executive Director and a member of the Board of Directors of Benevolence International Foundation (BIF), which was designated as a Specially Designated Global Terrorist (SDGT) by the Treasury in November 2002 for its support to al Qaida and UBL.

"Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida.  A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator," said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan.  LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.  LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al

JS-2164: U.S. Treasury Designates Two Individuals with <BR>Ties to al...R>Former BIF Leader and al-Qaida Associate <BR>Named Under E.O. 13224

Case 1:03-md-01570-GBD-SN   Document 1244-15   Filed 09/16/05   Page 16 of 19

Qaida. LBI later joined al Qaida upon the dissolution of MK.

In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments. BIF and LBI remained one organization with interchangeable assets under Batterjee's control.

In 1993, Batterjee incorporated BIF in the United States, where it also provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya. At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida.

According to information available to the U.S. Government, it was around that time that a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee. Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL. Once released, he returned to the Sudan where he met with UBL and informed him of his detainment. As a result, BIF operations were curtailed for a period of time.

Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head. Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps. While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

Batterjee remained active in BIF despite having officially resigned as Director. Evidence shows that Arnaout made an effort to conceal Batterjee's continued involvement in BIF. In 2002, when Arnaout learned that U.S. authorities were scrutinizing BIF's activities, he warned Batterjee through an intermediary against transferring funds to any BIF offices.

Evidence of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices. These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization. Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."

This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor. "Usama" appears after seven of the listings and "Baterji" appears after an additional six listings.

Also uncovered from the Bosnian raid were photographs of Arnaout with UBL and an administrative diagram of UBL's close associates, along with cover names and assignments within al Qaida of mujahideen trained in Afghanistan.

JS-2164: U.S. Treasury Designates Two Individuals with <BR>Ties to al...R>Former BIF Leader and al-Qaida Associate <BR>Named Under E.O. 13224

Case 1:03-md-01570-GBD-SN   Document 1244-15   Filed 09/16/05   Page 17 of 19

In October 2002, Arnaout was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities. Batterjee was named as an un-indicted co-conspirator in the indictment. On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for diverting BIF funds to pay for supplies to armed jihadists in Bosnia and Chechnya.

**Identifying Information**
**ADEL ABDUL JALIL BATTERJEE**
**AKAs:**       Adel Abdul Jalil Batarjee
`Adil Al-Battarjee
Adel Batterjee
`Adil `Abd al Jalil Batarji

**DOB:**         July 1, 1946
**POB:**         Jeddah, Saudi Arabia
**Nationality:**  Saudi Arabian
**Address:**      2 Helmi Kutbi Street, Jeddah, Saudi Arabia

Saad Rashed Mohammad al-Faqih has maintained associations with the al Qaida network since the mid-1990s, including an individual associated with the 1998 East Africa embassy bombings.

Al-Faqih has had contact with both UBL and Khaled al Fawwaz, who acted as UBL's de facto representative in the U.K. According to information available to the U.S. Government, al-Faqih and al Fawwaz shared an office in the late 1990s, and al-Faqih worked with and provided assistance to al Fawwaz, who served as the intermediary between UBL and al-Faqih.

Following the 1998 East African embassy bombings, al Fawwaz was arrested in the United Kingdom under an extradition request from the United States. At the U.S. trial of the East African embassy bombers, prosecutors provided evidence that al-Faqih paid for a satellite phone that al Fawwaz passed on to UBL, who allegedly used it to help carry out the attacks.

According to information available to the U.S. Government, al-Faqih was also associated with al Qaida member and fugitive Abu Musab al-Suri, a.k.a. Mustafa Nasar

Al-Faqih is head of the non-governmental organization Movement for Islamic Reform in Arabia (MIRA). Extremists utilize a website controlled by al-Faqih and MIRA to post al Qaida-related statements and images. While MIRA has issued disclaimers warning users to not attribute postings on MIRA message boards to al Qaida, information available to the U.S. and UK Governments shows that the messages are intended to provide  ideological and financial support to al-Qaida affiliated networks and potential recruits. AQ-affiliated author, Lewis Attiyatullah, whose statements have been published on MIRA's website, has been directly

associated with Al-Faqih for several years.

**Identifier Information**
**SAAD RASHED MOHAMMAD AL-FAQIH**
AKAs: Sa'd AL-FAQIH
Sa'ad AL-FAQIH
Saad ALFAGIH
Sa'd AL-FAQI
Saad AL FAQIH
Saad AL-FAGIH
Saad AL-FAKIH
Abu Uthman

**DOB**:   February 1, 1957
**POB**:   Zubair, Iraq
**Nationality:**   Saudi Arabian
**Address:**   London, UK

Batterjee and al-Faqih were designated today pursuant to Executive Order 13224 chiefly pursuant to paragraphs (d)(i) and (d)(ii) based on a determination that they assist in, sponsor or provide financial, material, or technological support for, or financial or other services to or in support of, or are otherwise associated with, persons listed as subject to E.O. 13224.  The individuals also meet the standard for inclusion in the UN 1267 Sanctions Committee's consolidated list because of the support provided to UBL, al Qaida or the Taliban.

Inclusion on the 1267 Committee's list triggers international obligations on all member countries, requiring them to freeze the assets and prevent the travel of listed individuals and to block the sale of arms and military equipment.  Publicly identifying these supporters of terrorism is a critical part of the international campaign to counter terrorism. Additionally, other organizations and individuals are put on notice that they are prohibited from doing business with them.

Blocking actions are critical to combating the financing of terrorism.  When an action is put into place, any assets existing in the formal financial system at the time of the order are to be frozen.  Blocking actions serve additional functions as well, acting as a deterrent for non-designated parties who might otherwise be willing to finance terrorist activity; exposing terrorist financing "money trails" that may generate leads to previously unknown terrorist cells and financiers, disrupting terrorist financing networks by encouraging designated terrorist supporters to disassociate themselves from terrorist activity and renounce their affiliation with terrorist groups; terminating terrorist cash flows by shutting down the pipelines used to move terrorist-related assets; forcing terrorists to use alternative, more costly and higher-risk means of financing their activities; and engendering international cooperation and compliance with obligations under UN Security Council Resolutions.

