# Exhibit 7

Copyright 1988 Guardian Newspapers Limited
The Guardian (London)

July 18, 1988

LENGTH: 2910 words

HEADLINE: Kidnap punches hole in law: Thatcher to be last line of appeal in parents' tussle over girl

BYLINE: By SARAH BOSELEY

BODY:
A Saudi Arabian businessman who spent six years and millions of pounds successfully persuading the English courts he had no intention of kidnapping his daughter by his English ex-wife, finally snatched her two weeks after her ninth birthday. Under Islamic law in Saudi Arabia he has absolute right to her custody.

The case raises worrying questions about the ability of the courts in this country to defend children of mixed marriages. Even though the child, Sara, had every protection the British law could offer, her mother, Mrs Carole Bailey, believes that the only hope for her return is through the personal intervention of Mrs Thatcher or the Foreign Secretary, Sir Geoffrey Howe - who is her MP - with King Fahd of Saudi Arabia.

**The father, Yousef Jameel, aged 43, an international businessman, described by the Foreign Office in Jeddah as an Anglophile, and a man to whom money is almost meaningless, had threatened to kidnap Sara shortly after her birth. She was made a ward of court and to gain access, Mr Jameel put up a Pounds 1 million bond which would be forfeit if he abducted the child.**

But all the legal fences failed in the face of a meticulously planned and successful campaign by Mr Jameel to get the court restrictions on him lifted. He wanted to remove Sara from her mother, who was bringing her up as an English girl, and give her the Islamic upbringing that Muslims believe their children must have to ensure their own salvation.

**To this end, he even set up for her an Arabic/English school, at a cost of Pounds 4 million, to get around the decision of the court's educational psychologist that Sara should stay at her English private school and take Arabic lessons once a week.**

When Sara herself rebelled against the school Jameel took her away last October to Saudi Arabia on one of the access visits the court had finally granted - and kept her there.

Carole Chapman, at the time the separated wife of a policeman, was 32 when she met Jameel in Jeddah where she had gone to live with her parents in 1976. Her father was working for a construction company, and Carole got a secretarial job with the Jameel Organisation, the multinational family firm of which Yousef was president and his father was the head.

The family, said to be one of the wealthiest in Saudi Arabia, made its money through the Toyota franchise in Saudi, together with oil, shipping and real estate interests.

They began to live together in 1977, and Carole travelled with Jameel on business around the world. She discovered she was pregnant and after her divorce from Michael Chapman, and Jameel's divorce from his Saudi wife, they went through an Islamic marriage ceremony in London.

**Even at that time, Carole said, she had doubts about Jameel, who was a womaniser, sometimes drank heavily and could be violent. She did not want to live the normal life of a Saudi wife or bring up her child as a Muslim. When Sara was born in Ocrober 1978, she registered her as Sara Chapman.**

At the home in Caterham where Sara's bedroom is kept ready for her return, she said: 'I explained to the courts later that it was for her protection, so he could not give her Saudi identity.'

Jameel persuaded her to go through a register office ceremony in March 1979, but because he was not a British citizen, still could not re-register Sara as his child against Carole's wishes. He bought Carole a house in Esher, Surrey, and another in Hyde Park Street, London, which was sold in 1982 for Pounds 310,000. Jameel was giving Carole Pounds 60,000 a year to keep herself, her daughter from the first marriage, Debbie, and Sara, but Carole was not prepared to put up with his loose living.

**While she was pregnant, she said, he frequented brothels in Cairo, where he was educated, and she remembers an occasion in Annabel's in London when he turned up with a prostitute, on each arm. Trying to convince the courts that she was justified in her fear that Jameel would kidnap Sara, she swore affidavits to his 'frequent irrational and irresponsible behaviour.'**

**She said: 'When he was violent to me he would punch me with his fists. Sometimes he would continue to hit and punch and kick me for several minutes causing me to be badly bruised. While we lived together he was drunk almost every evening. He often drank between a half bottle and a full bottle of whisky.'**

**Once while drunk in Jeddah he fired a loaded revolver at her, but missed, she said. On another occasion after drinking in Jeddah he played Russian**

**roulette with another revolver, which turned out not to work.**

**The final straw for Carole was in December, 1979, after she had challenged him at dinner in a London hotel over a woman he appeared to know. When they got home, she said: 'He came towards me with a leather belt and hit me with it violently many times about the head and on my face and back. I fell to the floor. While I was on the floor he kicked me in my back and in my kidneys. I was screaming. Debbie woke up and saw me crying and covered with bruises. I spent the next three days in bed. I was very sore and stiff and bruised. I had diffculty walking.'**

**From January, 1982, the kidnap threats began. Carole said: 'There was a torrent of phone calls. He said, 'I'm going to hurt everyone close to you. I have the money and the power to crush you to little pieces'. He said everyone who came to the house was being recorded on tape and told me the telephone was bugged. He said he had bought the flat next door to have me watched.'**

Carole left the phone off the hook and had another ex-directory line installed. Within two days, Jameel had the number and was phoning her on it. Years later, and even after the kidnap, surveillance on Carole and her then boyfriend began again. The anxiety it caused him is thought to have caused him to crash his car one night - an accident he survived but with very serious injuries.

Jameel consistently vowed during the break-up of the marriage that he would take Sara away from her mother. He said Carole was selfish because she had two children and he had none. He offered to buy the little girl from her for Pounds 1 million.

On Mothers' Day in March 1982 he tied to woo Carole back with Pounds 10,000 of jewellery but when she refused a reconciliation over dinner at Annabel's, he became violent again and hit her several times. He followed her into the ladies toilet and threw champagne over her. Carole filed for divorce.

That month, Jameel began to try to persuade the court to allow him weekend and holiday access to Sara, by then a ward of court, away from Carole's home. His base was at that time the two penthouse flats, in a complex called Buckingham Palace he owned in Avenue St Michel overlooking the harbour in Monte Carlo, but he was buying a flat in Eaton Square, and meanwhile stayed at the Dorchester or with his brother in Chelsea.

**He stated in his affidavit of March 12, 1982: 'I accept that .. Sara should make her home with her mother in England.'**

**He suggested that Sara should go for a fortnight in the summer and at Christmas to his family's house, Stonecourt in Staplefield, Sussex, 'a lovely**

country house with 22 acres of land, a swimming pool, horses, a donkey and a special part set aside for the children including a nursery and kitchen.'

 Because of their Islamic marriage, he said that Carole had become a Muslim, and added: 'I hope she will accept that she even agreed that Sara should be brought up as a Muslim.

 It may be that she will deny this and if the court feels that it would not be in the child's best interests to be brought up as a Muslim then I am prepared to accept the court's ruling on the matter.' He would, however, like her to learn Arabic, so that she could appreciate her Arab heritage later in life.

 Turning to Carole's kidnap fears, he said: 'I think that I can understand that fear because I think it would be understandable in any mother in her position.

 'It is true that I am wealthy. It is true that I could snatch the child. It is also true that it was a possibility that I had to consider. But I would like to stress the fact that my firm decision was not to do it and that remains my decision and my principle reason is that I do not believe that it would be in Sara's interest, apart from the fact that it would be very cruel to the plaintiff (Carole).

 'Nothing could have been simpler, for example, when the child was on my yacht in the Mediterranean last August, than to have rung up my crew who are loyal to me and told them to set sail straight away for the North African coast. But I did not do that; I did not want to do it and I am concerned to try to reassure the plaintiff on the matter.'

 In each of the many succeeding affidavits he swore, he returned to this theme - that he had no intention of kidnapping Sara. He was backed up by his family. His father, Sheikh Abdul Latif Hosein Jameel, said on oath: 'I would like to assure the court and also Carole that I personally and indeed my whole family would be completely against keeping her in Saudi Arabia. Sara needs both her mother's family and her father's family and we all believe that to exclude Sara from her mother would not be fair to her and would be doing her an injustice.' His younger brother, Mohammad, said in November, 1984 that a kidnap would bring shame on the family and impede their worldwide business.

In January 1983, Jameel married an English model of 24 called Linda Richards, by whom he now has three daughters, Linda, too, swore in June, 1983 that the kidnap fears were groundless.

She said: 'I would be most distressed at the idea of Yousef doing such a thing and he knows it.' It would be 'unthinkable to me that we could never go back to England to see my mother and family.'

Following the affidavit, the court ordered Jameel to lodge a Pounds 1 million bankers' performance bond with solicitors. It was intended to be a disincentive to kidnapping Sara and to provide a fighting fund for Carole if the worst happened. He was given one week's staying access at Stonecourt at Christmas and two weeks in the summer, but Debbie, five years older than Sara but close to her half-sister, and the nanny were to go too and Carole had the right to visit daily.

Six months later, Jameel asked for longer access, Carole's visits to cease and release from the bond. He was about to marry Linda and they would be making their home at Stonecourt. He began to put on pressure to have Sara re-registered as Jameel - something Carole resisted to the end, to prevent him applying for Saudi nationality for the child.

In March 1983, having married Linda, who was expecting a baby, he began his most persuasive argument: 'Once I have been given the sort of access arrangements that any father might normally expect without the presence of a third party or a Pounds 1 million bond and once all proves to be well, the plaintiff may be more likely to see how ungrounded her fears are.'

Four months later, Jameel told the court he and Linda had decided that they must make their home in Monaco, where the centre of their business was. It would still be possible for him to arrange a week in the English countryside at access periods, but he said: 'I would hope that the court would be equally happy about her coming over to Monaco for access periods'.

He told the court that he had just bought a villa in two acres of gardens outside Monte Carolo, where he intended to build a swimming pool and where Sara would have her own permanent bedroom. 'The summer holidays we will probably spend, as usual, on my yacht, which is moored at Monte Carlo.'

He said he was planning to start an Arab school in the south of Rance, with the implication that it would be suitable for Sara, who would need to spend time in an Arab environment to assimilate the language and culture if she were to be able to mingle with the rest of his family in Saudi Arabia.

As for the Pounds 1 million bond, he said he considered it 'negative and sterile.' Its continuation would 'denote a lack of confidence in me which I do not think I have merited.' He argued that re-registraton of Sara as Jameel 'would make no difference whatsoever to my ability to kidnap her.'

The court agreed that Sara should go to Monaco, which has a reciprocal agreement with Britain over child custody. Although it recognised Carole's 'grave anxiety', it ordered that she must re-register Sara as Jameel instead of Chapman, but it continued the bond. Jameel's wife, Linda, was put on an

undertaking to use her best endeavours to make Jameel return Sara, should he kidnap her - an undertaking which still applies. A year later, in June 1984, Jameel brought all his persuasive powers to bear on the court. He said: 'I want to take her to Saudi Arabia where my family come from so that she can get to know and understand our heritage and I would respectfully say that it would be surprising if, as her father, I wanted anything less.' His home was on a date farm in Riyadh, he said, where at Christmas and Easter 'the climate is delightful'.

He quoted expert witnesses who said Sara must experience the culture to know it properly. He was hoping matters were 'more relaxed' with Carole since he had taken Sara to Monaco and brought her back.

Carole, who by then had remarried herself, to solicitor Jeffrey Bailey - a marriage which has since broken up - could only repeat her fears.

'My worry is that Yousef is trying to lull me, the court and everyone else concerned into believing that he would never kidnap Sara,' she said in affidavit. Under pressure to agree to visits to Saudi Arabia she suggested Sara might benefit more when she was nine, and added that at that age it would be harder to keep her there against her will.

**Jameel replied by saying, 'I do not intend to keep Sara in Saudi Arabia and the suggestion of some sort of imprisonment against her will is as horrific to me as I am sure it must be to Sara's mother.'**

Once again, the court backed Jameel. Sara was to go to Saudi Arabia for Christmas, 1985 and Easter, 1986 and her father was allowed to apply for a full Saudi Arabian passport for her.

**After the first visit, which Jameel described to the courts as 'a great success,' he declared he was once more based in England, and began asking for weekend access as well as the holidays.**

**The court agreed to release Jameel from his Pounds 1 million bond when it expired in September 1986.**

Education then became the big issue. Jameel wanted Sara at an Arabic school. The court appointed an educational psychologist to look at the various possibilities. The psychologist decided she ought to stay where she was unless a better option presented itself.

Suddenly it did. Jameel bought a country manor in Long Ditton, Surrey, and turned it into a school at a cost of Pounds 4 million. He brought in a highly respected headmaster who had been about to retire and filled Victoria College, named after his own school in Cairo, with children of his Arab friends. The school was an hour's car journey from Carole. He and Linda offered to have to

Sara stay with them during the week at their Mayfair home, but Carole refused.

Carole's lawyer, Diana Parker of Withers Crossman Block, felt she had no option but to allow Sara to go. 'The court had got tired of hearing of these kidnap worries. I sensed that the court had begun to think Carole was the problem. The man had spent Pounds 4 million on a school. Was Carole really saying he was going to kidnap his child?' Besides, Ms Parker believed Jameel was preparing to go back to the court, to ask for custody of Sara. It has since become clear that was indeed his intention.

Sara went to the school, but hated it. On the timetable were 11 periods of Arabic and two of Islamic education every week.

Carole said: 'In Islamic education the teacher told her to stand up and asked her her father's name and what religion she was. She said Christian. It caused chaos. He brought her up to the front of the class and tried to make her pray. She got very upset.' Carole brought in the Official Solicitor and it was accepted that Sara should not take an active part in Islam but watch and listen.

Sara went to Jameel that first half term. On October 23, they flew to Saudi Arabia. On October 31, 1987, the day she was due home, Carole got a phone call saying Sara would not be returning. The nightmare had finally come true, and Carole collapsed. She said: 'When Sara didn't come back that Saturday I just went to pieces. I was hysterical and stopped eating. My father, who lives with us, had a heart attack and Debbie suffered terribly.' **Ms Parker sought orders freezing all Jameel's assets in Britian, but it turned out that he had transferred everything in his name to the company. He is now liable to arrest for contempt of court if he returns to this country. He is now known to have left Saudi Arabia since, but he once admitted to the court that he possesses other passports in different identities in case of a revolution at home.**

Carole places her hope in a personal approach to King Fahd by the Prime Minister or Sir Geoffrey Howe. She said: 'Here is a man who has invoked the English jurisdiction time and time again and now is thwarting it. We feel sure King Fahd will not tolerate such behaviour in one of his subjects.'

Tomorrow: Watched by teams of private detectives.

Copyright 1988 Guardian Newspapers Limited
The Guardian (London)

July 19, 1988

LENGTH: 445 words

HEADLINE: Howe may seek Saudi king's help over kidnap

BYLINE: By SARAH BOSELEY

BODY:

The Foreign Secretary, Sir Geoffrey Howe, will consider a personal approach to King Fahd of Saudi Arabia for the return of a nine-year-old girl, who was abducted from the custody of her English mother.

Following the story in the Guardian of the abduction of Sara Jameel, who was a ward of coutr, by her Saudi Arabian millionaire father, a spokesman for the Foreign Office said that although the British Government could not make any official representations to the Saudi Arabian government, Sir Geoffrey would consider any other route suggested by the mother, Mrs Carole Bailey.

The Conservative MP, Sir George Young, who with the Labour MP, Ms Claire Short, last month launched a charter to help mothers regain their abducted children, said last night that he would urge Sir Geoffrey, who is Mrs Bailey's constituency MP, to act.

Ms Short blamed the British judiciary for failing to protect the child. 'It is basically negligence on the part of the courts,' she said. 'The courts made a very severe error.'

Ms Jenny Kuper, a solicitor at the Children's Legal Centre, said: 'Obviously the wardship jurisdiction failed totally to protect this particular child.'

She said there was a strong argument for the courts refusing to allow a parent to take a child during access periods to a country which does not accept the judgement of the British courts.

Mrs Bailey and her lawyers are convinced that personal intervention by sir Geoffrey with King Fahd is the only chance for Sara's return. Mrs Bailey's solicitor, Ms Diana Parker, said: 'I'm sure the king will not tolerate one of his subjects playing with the English jurisdiction.'

**She pointed out that Mr Yousef Jameel, the father, and members of his family had sworn on affidavit that he would not kidnap Sara and that Mr Jameel had often said he was happy to abide by decisions of the court.**

A Foreign Office spokesman last night said: 'Anything that Mrs Bailey and her advisers feel that we might usefully do - of course we will listen to it. But everything has to be qualified by the inevitability that our room for action is constrained.'

One of the proposals in sir George Young and claire Short's charter to protect abducted children was that a mediator should be appointed between the parent in this country and the authorities and parent abroad.

The Law Commission is working on a paper on reform of wardship, which is regarded as an unsatisfactory instrument in many ways.

Ms Kuper suggested that some reform, to prohibit a ward's removal to such a country, could be incorporated in the paper and draft bill which may come before the next session of Parliament.

LOAD-DATE: June 13, 2000