**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Thomas Burnett, Sr., et al. v. Al Baraka Invest. & Develop. Corp., et al.*, No. 03-CV-5738
*Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-CV-6978
*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.* No. 02-CV-6977
*Continental Casualty Co. et al, v. Al Qaeda, et al.*, No. 04-CV-5970
*New York Marine & General Insurance Co. v. Al Qaida, et al.*, No. 04-CV-6105
*Euro Brokers Inc., et al., v. Al Baraka, et al.*, No. 04-CV-7279
*WTC Properties LLC, et al. v. Al Baraka, et al.*, No. 04-CV-7280
*Tremsky v. Bin Laden, et al.,* No. 02-CV-7300

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE CONSOLIDATED MOTION TO DISMISS OF THE SAUDI RED CRESCENT SOCIETY AND DR. ABDUL RAHMAN AL SWAILEM

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

I.      FACTUAL BACKGROUND ....................................................................................1

II.     APPLICABLE LAW .............................................................................................6

   A.   The Burden of Proof in a Jurisdictional Challenge is on the Party Claiming Immunity .....6

   B.   Plaintiffs' *Prima Facie* Showing of Personal Jurisdiction May be
        Established Solely by Legally Sufficient Allegations of Jurisdiction ...............................7

   C.   A Rule 12(B)(6) Motion Merely Tests the Legal Feasibility of the Complaint .................7

III.    ARGUMENT ........................................................................................................8

   A.   Plaintiffs' Claims Fall Squarely Within the Tortious Act Exception .................................8

   B.   Plaintiffs' Allegations are Sufficient to Sustain Causation Under the FSIA ......................9

   C.   The Defendants are Subject to the Personal Jurisdiction of this Court..............................14

        1.  The FSIA Provides a Statutory Basis for Personal Jurisdiction ..............................14

        2.  Personal Jurisdiction Exists Under New York's Long-Arm Statute ........................15

        3.  The Exercise of Jurisdiction Comports With Due Process .....................................15

   D.   The Defendants' Motion to Dismiss for Failure to State a Claim Should be Denied........18

        1.  The Complaints Adequately Allege ATA and Common Law Claims ....................20

        2.  Plaintiffs' Assault, Battery, and Intentional Infliction of
            Emotional Distress Claims Are Not Barred by the Statute of Limitations ...............21

        3.  Plaintiffs' Civil RICO Claims Are Cognizable ........................................................22

        4.  Plaintiffs' Negligence and Negligent Infliction of Emotional Distress Claims Are
            Viable Against These Defendants............................................................................24

        5.  Plaintiffs' Conspiracy and Punitive Damages Claims Should Not Be Dismissed ....25

IV.     CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baisch v. Gallina,*
  346 F.3d 366 (2d Cir. 2003)....................................................................................23

*Ball v. Metallurgie Hoboken Overpelt, S.A.,*
  902 F.2d 194 (2d Cir 1990)......................................................................................7

*Boim v. Quranic Literacy Institute,*
  291 F.3d 1000 (7th Cir. 2002) ............................................................................9, 13

*Bryks v. Canadian Broadcasting Corp.,*
  906 F. Supp. 204 (S.D. N.Y. 1995)..........................................................................17

*Burger King v. Rudzewicz,*
  471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)...........................................16

*Burnett v. Al Baraka Invest. & Development Corp.,*
  274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................................9

*Calder v. Jones,*
  465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984)...........................................16

*Cargill Int. S.A. v. M/T Pavel DyBenko,*
  991 F.2d 1012 (2d Cir. 1993)....................................................................................6

*Chuidian v. Philippine National Bank,*
  912 F.2d 1095 (9th Cir. 1990) .................................................................................17

*Commercial Cleaning Services, LLC v. Colins Service Systems, Inc.,*
  231 F.3d 374 (2d Cir. 2001).....................................................................................22

*Conley v. Gibson,*
  355 U.S. 41 (1957)..............................................................................................7, 10

*Daliberti v. Iraq,*
  97 F. Supp. 2d 38 (D. D.C. 2000) ............................................................................16

*Davis v. Barrett Day Securities, Inc.,*
  1995 U.S. Dist. LEXIS 15434 (M.D.N.C. 1995)........................................................17

*DiStefano v. Carozzi North America, Inc.,*
  286 F.3d 81 (2d Cir. 2001).......................................................................................7

*Dubai Islamic Bank v. Citibank, N.A.*,
    256 F. Supp. 2d 158 (S.D. N.Y. 2003)........................................................................23

*Filus v. Lot Polish Airlines*,
    907 F.2d 1328 (2d Cir. 1990)........................................................................................6

*First Capital Asset Management v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)........................................................................................23

*First City, Texas-Houston, N.A. v. Rafidian Bank*,
    150 F.3d 172 (2d Cir. 1998)..........................................................................................6

*Friedman v. Hartmann*,
    1994 U.S. Dist. LEXIS 9727 (S.D.N.Y. July 15, 1994) ..............................................23

*Geisler v. Petrocelli*,
    616 F.2d 636 (2d Cir. 1980)..........................................................................................7

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................8, 13, 14

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*,
    2004 U.S. Dist. LEXIS 3892 (S.D. N.Y. Mar. 12, 2004) ............................................21

*Jacobs v. Verlag*,
    160 F. Supp. 2d 722 (S.D. N.Y. 2001)........................................................................18

*Johnson v. Nyack Hospital*,
    86 F.3d 8 (2d Cir. 1996)..............................................................................................21

*Jones v. R.R. Donnelly & Sons Co.*,
    541 U.S. 369 (2004)....................................................................................................21

*Leatherman v. Tarrant County*,
    507 U.S. 163 (1993)....................................................................................................10

*Linde, et al v. Arab Bank, PLC*,
    2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005)............................11, 12

*In re Magnetic Audiotape Antitrust Litigation*,
    334 F.3d 204 (2d Cir. 2003)....................................................................................7, 17

*Morin v. Trupin*,
    832 F. Supp. 93 (S.D. N.Y. 1993)..............................................................................24

*Mwani v. Bin Laden,*
   417 F.3d 1 (D.C. Cir. 2005) ...................................................................16

*Pelman v. McDonald's,*
   396 F.3d 508 (2d Cir. 2005)........................................................... 11, 20

*Phelps v. Kapnolas,*
   308 F.3d 180 (2d Cir. 2002)......................................................7, 8, 10, 12

*Pugh v. Socialist People's Libyan Arab Jamahiriya,*
   290 F. Supp. 2d 54 (D. D.C. 2003) .......................................................16

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
   995 F. Supp. 325 (E.D. N.Y. 1998) ......................................................16

*Reiss v. Societe Centrale DuGroupe Des Assurances Nationales,*
   235 F.3d 738 (2d Cir. 2000).................................................................7

*Robinson v. Malaysia,*
   269 F.3d 133 (2d Cir. 2001)..........................................................6, 12

*Saudi Arabia v. Nelson,*
   507 U.S. 349, 123 L. Ed. 2d 47 (1993) .............................................6, 12

*Swierkiewicz v. Sorema,*
   534 U.S. 506 (2002)......................................................................6, 10

*In re Terrorist Attacks on September 11, 2001,*
   349 F. Supp. 2d 765 (S.D. N.Y. 2005)...................................8, 9, 15, 17, 20

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,*
   751 F.2d 117 (2d Cir. 1984)..............................................................18

*Wagh v. Metris Direct, Inc.,*
   348 F.3d 1102 (9th Cir. 2003) ..........................................................22

*Warren v. District of Columbia,*
   353 F.3d 36 (D.C. Cir. 2004) .......................................................11, 12

*Wynder v. McMahon,*
   360 F.3d 73 (2d Cir. 2004).............................................................7, 8

*Yeadon v. New York Transit Authority,*
   719 F. Supp. 204 (S.D. N.Y. 1989)......................................................21

## DOCKETED CASES

*Continental Casualty Co. et al, v. Al Qaeda, et al.*,
        No. 04-CV-5970 ...................................................................................................1

*Euro Brokers Inc., et al., v. Al Baraka, et al.*,
        No. 04-CV-7279 ...................................................................................................1

*Federal Insurance Co., et al. v. Al Qaida, et al.*,
        No. 03-CV-6978 ...................................................................................................1

*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.*,
        No. 02-CV-6977 ...................................................................................................1

*New York Marine & General Insurance Co. v. Al Qaida, et al.*,
        No. 04-CV-6105 ...................................................................................................1

*Thomas Burnett, Sr., et al. v. Al Baraka Invest. & Develop. Corp., et al.*,
        No. 03-CV-5738 ...................................................................................................1

*Tremsky v. Bin Laden, et al.*,
        No. 02-CV-7300 ...................................................................................................1

*WTC Properties LLC, et al. v. Al Baraka, et al.*,
        No. 04-CV-7280 ...................................................................................................1

## FEDERAL STATUTES

28 U.S.C. § 1330(b) ........................................................................................................15

28 U.S.C. § 1605(a)(5)......................................................................................................8

28 U.S.C. § 1605(a)(7)......................................................................................................14

137 Cong. Rec. 54511 04 (April 16, 1991) ....................................................................21

Fed. R. Civ. P. 4(k)(1)(D) ................................................................................................15

Fed. R. Civ. P. 8................................................................................................................6

Fed. R. Civ. P. 8(a) ..........................................................................................................10

Fed. R. Civ. P. 9(b) ..........................................................................................................10

## TREATIES AND RESOLUTIONS

G.A. Res. 51-210, U.N. GAOR, 51st Sess. (1996) ........................................................................24

*International Convention for the Suppression of the Financing of Terrorism,*
G.A. Res. 54-109, U.N. GAOR, 54th Sess. (1999). ....................................................................24

## OTHER MATERIALS

Final Report of the National Commission on Terrorist
Attacks Upon the United States ........................................................................................................1

James Rupert, *Dreams of Martyrdom Draw Islamic Arabs to Join Afghan Rebels,*
Washington Post Foreign Service, July 21, 1986 ...........................................................................1

*Swift Night Report Concerning Terrorist Activities of Sheikh Usam
Ben Muhammad Ben Avad Ben Laden,* United States Department
of Defense, October 1998 ................................................................................................................2

*Second Report of the U.N. Monitoring Group on Al Qaida*, December 2003 ................................2

Government's Evidentiary Proffer Supporting the Admissibility of
Co-Conspirator Statements, United States v. Enaam Arnaout, 02-CR-892 (N.D. IL.) ..................2

Nick Wood, *US Fears Terrorist Attack in Kosovo*, , BBC News, April 3, 2000 ...........................3

*Pakistan:  Two Sudanese Held in Egyptian Embassy Blast Case,*
The News, February 1, 1996............................................................................................................3

Ed Blanche, *Ayman Al-Zawahiri:  Attention Turns to the Other Prime Suspect,* Jane's
Intelligence Review, October 23, 2001.............................................................................................4

*Who Is Ayman al Zawahiri,* MSNBC.Com, March 25, 2004 ........................................................4

*Bin Laden Underling Raised Money in U.S.,* NewsMax.com Wires, October 12, 2001 ................4

Government Seeks Deportation of NGO's Arab Workers,
Rawalpindi Jang, October 3, 2001...................................................................................................4

*ONASA carries biographies of six Algerians handed over to US officials,*
ONASA, January 18, 2002 ...............................................................................................................4

I.      **FACTUAL BACKGROUND**

Plaintiffs in the above referenced actions (Plaintiffs) have named the Saudi Red Crescent Society (SRC) and Dr. Abdul Rahman Al Swailem (Al Swailem) as defendants, based on their longstanding sponsorship and support of al Qaida's global jihad.[1]

The SRC's close ties to al Qaida's leadership date to the 1980s, when Osama bin Laden was deeply involved in financing and supporting the *mujihadeen* in Afghanistan.  During that conflict, bin Laden and other future al Qaida leaders established a complex network of front "charities" and "relief organizations" to support to the *mujihadeen* forces:

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization…Donations flowed through charities or other non-governmental organizations (NGOs).

Final Report of the National Commission on Terrorist Attacks Upon the United States (9/11 Report) at p. 55.

By all accounts, the SRC played a prominent role within that network.  Indeed, in 1986, Dr. Abu Hazifa, a Director of the SRC, openly acknowledged the organization's direct ties to the *mujihadeen*, and that many of those fighters in fact worked for the SRC.  James Rupert, *Dreams of Martyrdom Draw Islamic Arabs to Join Afghan Rebels,* Washington Post Foreign Service, July 21, 1986, attached to the Affirmation of  Sean P. Carter (Carter Aff.) as Exhibit 1.

When the Soviets withdrew from Afghanistan in 1988, bin Laden concluded that the organization created to wage the *jihad* in Afghanistan should not be dissolved, but instead

---

[1] The SRC is a defendant in all of these cases.  Al Swailem is a defendant only in the *Federal*, *NY Marine* and *Tremsky* cases.  To the extent this brief refers to allegations and claims against al Swailem, such references apply only to three actions in which he is a defendant.  The allegations against the SRC and al Swailem are set forth in the most recent Complaints in each case; the *Federal* Plaintiffs' RICO Statement Applicable to the Saudi Red Crescent and Al Swailem; and the More Definite Statement Relating to the Saudi Red Crescent Society filed commonly by the *Burnett*, *EuroBrokers* and *World Trade Center Properties'* Plaintiffs (*Burnett* More Definite Statement).  For purposes of this Opposition, Plaintiffs adopt the allegations from one another's pleadings, and request leave to amend their Complaints to include any omitted allegation the Court deems material in deciding this Motion.

transformed into a multi-national Islamic army.  9/11 Report at p. 56.  The transformed

organization, to be known as al Qaida, would wage war with America through terrorist activities,

and engage in armed combat in regional conflicts throughout the world in the hopes of rallying

Muslim communities to join its campaign to establish a Pan-Islamic Caliphate.  *Swift Night*

*Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,*

United States Department of Defense, October 1998, Carter Aff. Exh. 2.

      Bin Laden relied heavily on the network of charities established to support the Afghan

*jihad*, including the SRC, in building this global terrorist network:

> From its inception, Al-Qaida has relied heavily on charities and
> donations from its sympathizers to finance its activities…The roots
> of these charity networks stem from the anti-Soviet Jihad in
> Afghanistan during the late 1980s.

*Second Report of the U.N. Monitoring Group on Al Qaida,* December 2003, pp. 13-14, Carter

Aff. Exh. 3.

      The SRC's support for bin Laden's terrorist organization was orchestrated largely by

Wa'el Julaidan, a Specially Designated Global Terrorist.  In the 1980's, Julaidan headed the

SRC's office in Peshawar, Pakistan, the coordinating point for supporting the *mujihadeen*.

Historical documents regarding al Qaida's formation, uncovered in a raid of Benevolence

International's office in Bosnia, confirm that Julaidan remained dedicated to bin Laden's vision

after the Afghan conflict, and continued to funnel support to bin Laden through the charity

organizations he headed.  For example, one internal al Qaida document states that the SRC could

no longer be relied on to function as an "umbrella" for al Qaida members, because Julaidan was

being recalled to Saudi Arabia.  See Government's Evidentiary Proffer Supporting the

Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, 02-CR-892 (N.D.

IL.) Carter Aff., Ex. 4, at p. 31.  The import of this statement is clear – under Julaidan's direction

the SRC was serving as a front for al Qaida.  Authorities also discovered a message on the

letterhead of the SRC bureau in Peshawar requesting that 'weapons' be inventoried.  That letter contains a note from bin Laden to Julaidan, the SRC's then director, stating "we have an extreme need for weapons." Id. at p. 38.

Years later, Julaidan facilitated the SRC's sponsorship of al Qaida activities in Kosovo and Chechnya.  In 1999, Saudi Arabia formed the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) to coordinate the relief efforts of the SRC and other Saudi charities in Kosovo and Chechnya.  The Kingdom designated the SRC to exclusively serve as the operational arm for SJRC-coordinated relief efforts.  Although bin Laden had publicly confirmed that Julaidan was one of al Qaida's founding members in a 1999 interview, the SJRC and SRC appointed Julaidan Director of SJRC and SRC operations in Pristina.  In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC officials Adel Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.  Nick Wood, *US Fears Terrorist Attack in Kosovo*, BBC News, April 3, 2000, Carter Aff. Exh. 5, at p.2.  Separate incidents revealed that members of the SRC staff working under the supervision of the SJRC actively participated in the development and planning of terrorist attacks against American interests.  Id. at p.1.

Employees of the SRC were similarly implicated in the 1996 al Qaida bombing attack on the Egyptian Embassy in Islamabad.  Following that attack, investigators arrested Muhammed Ali Sayed and Bashir Barbar Qadim, two Sudanese employees of the SRC.  The investigation which led to the arrests revealed evidence that Sayed had indirectly funded the attack by channeling SRC funds to Egyptian al Jihad, the terrorist organization run by Ayman al Zawahiri which formally merged with al Qaida several years before the September 11th Attack.  Egyptian authorities alleged that Zawahiri personally masterminded the Embassy attack.  See *Pakistan: Two Sudanese Held in Egyptian Embassy Blast Case,* The News, February 1, 1996, Carter Aff.

Exh. 6; Ed Blanche, *Ayman Al-Zawahiri: Attention Turns to the Other Prime Suspect,* Jane's Intelligence Review*,* October 23, 2001, Carter Aff., Exh. 7.

Zawahiri's relationship with the SRC was established long before the attack on the Egyptian Embassy.  Zawahiri, who is universally regarded to be bin Laden's top lieutenant, joined the SRC in 1985.  By that time, he was already a prominent figure within the Muslim Brotherhood, and had been jailed by the Egyptian government.  *Who Is Ayman al Zawahiri,* MSNBC.Com, March 25, 2004, Carter Aff. Exh. 8.  Zawahiri continued to serve as an SRC official until at least 1995, when he made a fundraising trip to the United States.  According to members of the terrorist cell who arranged the trip, the funds raised by Zawahiri were channeled to al Qaida's sister organization, the Egyptian Islamic Jihad.[2]  *Bin Laden Underling Raised Money in U.S.,* NewsMax.com Wires, October 12, 2001, Carter Aff. Exh. 9.

The SRC continued to serve as a front for al Qaida through the date of the September 11th Attack.  In fact, just weeks after the September 11th Attack, the Pakistani government deported employees of the SRC, based on evidence that they were involved in al Qaida related terrorist activities.  *Government Seeks Deportation of NGO's Arab Workers,* Rawalpindi Jang, October 3, 2001, Carter Aff. Exh. 10.  In 2002, NATO and Bosnian authorities arrested six Algerian al Qaida members who were plotting attacks on the U.S. and British embassies in Sarajevo.  Two of those men were employees of the SRC.  *ONASA carries biographies of six Algerians handed over to US officials*, ONASA, January 18, 2002, Carter Aff. Exh.  11.

Stated simply, the SRC has extensively and knowingly supported al Qaida, assisting it in raising money, concealing documents, giving shelter to operatives, and maintaining and

---

[2] The defendants attempt to discount this fact by arguing that Zawahiri traveled under an alias during that trip. However, as Zawahiri was a well-known Islamic extremist and al Qaida member at that time, his decision to travel under an alias is hardly surprising.  In any event, Zawahiri's use of an alias does not change the simple fact that he conducted fundraising trips as an official of the SRC in 1995, when al Qaida was already a firmly established global terrorist organization.  To the extent the defendants intend to suggest that Zawahiri was not acting as an employee of the SRC during this trip, they merely raise a fact issue which must be resolved after discovery

transporting weapons.  In other words, the SRC's role in al Qaida's global *jihad* is identical to the role it played in supporting the *mujihadeen* in Afghanistan.

The claims against al Swailem arise from his participation in the SRC's sponsorship of al Qaida.  Al Swailem was appointed to head the SRC in 1998, and held that position until 2005. As head of the SRC, al Swailem used his authority to foster the organization's continued role in al Qaida's global *jihad*.  For example, as head of the SRC, al Swailem was responsible for the decision to appoint Julaidan as a Director of the SJRC, thus placing a prominent and known al Qaida figure in a position of authority within his charity.

The SRC and al Swailem were well aware of the SRC's pervasive sponsorship of al Qaida during the relevant period.  To begin with, it was well known that the SRC formed close ties with the al Qaida leadership during the conflict with the Soviet Union in Afghanistan, and that the fighters and charities who participated in that conflict formed the foundation of the al Qaida terrorist organization.  In addition, media reports prior to September 11, 2001 directly implicated the SRC in terrorist activities.  The SRC leadership undoubtedly knew of those reports.  Indeed, in many instances, high level officials of the SRC participated directly in that misconduct, a fact which in and of itself confirms the SRC's knowledge.  Moreover, given the close ties between the SRC and the Kingdom, it is also reasonable to infer that the SRC's leaders received warnings regarding their organization's illegal activities through official governmental channels.[3]

---

[3] The Saudi government received such warnings from the United States, France, Russia, Pakistan, Egypt, India, the United Nations and other sources, as detailed in Exhibit A to the Federal Plaintiffs' RICO Statement Applicable to World Assembly of Muslim Youth, incorporated herein by reference.  As the SRC's involvement in terrorist activities was well known to intelligence officials since the early 1990's, it is reasonable to infer that it was identified specifically during many of those discussions.  On this point, Plaintiffs respectfully refer the Court to the documents submitted as Exhibits to the June 1, 2005 Affirmation of Sean P. Carter Transmitting Supplemental Evidence in Opposition to All Motions to Dismiss Under the Foreign Sovereign Immunities Act, which are hereby adopted as part of this Opposition and incorporated herein by reference.

## II.    APPLICABLE LAW

### A.    The Burden of Proof in a Jurisdictional Challenge is on the Party Claiming Immunity

Consistent with Fed. R. Civ. P. 8, a plaintiff in an FSIA case need only provide the defendant with a "short and plain statement of the claims showing that the plaintiff is entitled to relief" sufficient to "give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  In responding to the Complaint, a defendant seeking FSIA immunity must present a *prima facie* case that it is a foreign sovereign, entitled to the protections of the FSIA.  Cargill Int. S.A. v. M/T Pavel DyBenko, 991 F.2d 1012, 1016 (2d Cir. 1993).  In the event that the defendant makes such a showing, the burden of production shifts to the plaintiff to come forward with allegations **or** evidence which, if proven, would bring the plaintiff's claims within one of the exceptions to immunity set forth in the FSIA.  Robinson v. Malaysia, 269 F.3d 133, 141-43 (2d Cir. 2001).

In deciding a motion to dismiss based on the FSIA prior to discovery, the court must accept as true the factual allegations and any evidence proffered by the plaintiff in support of jurisdiction.  Saudi Arabia v. Nelson, 507 U.S. 349, 351, 123 L.Ed.2d 47 (1993).  To the extent the defendant challenges the accuracy of those factual allegations, and the court determines that the resolution of any fact in dispute is necessary to determine the availability of jurisdiction under the FSIA, the plaintiff must be afforded an opportunity to complete discovery relative to that disputed factual contention.  First City, Texas-Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 177 (2d Cir. 1998); Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990).  Upon completion of discovery, the Court should normally "afford the parties the opportunity to present

evidentiary material at a hearing on the question of FSIA jurisdiction."[4]   Reiss v. Societe

Centrale DuGroupe Des Assurances Nationales, 235 F.3d 738, 748 (2d Cir. 2000).

>   **B.      Plaintiffs' *Prima Facie* Showing of Personal Jurisdiction May be Established
>            Solely by Legally Sufficient Allegations of Jurisdiction**

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the

motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.

At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by

allegations." Ball v. Metallurgie Hoboken Overpelt, S.A., 902 F.2d 194, 197 (2d Cir 1990).

Thus, in order to defeat a motion challenging jurisdiction under Rule 12(b)(2), a plaintiff need

only present allegations that connect the defendant with the applicable forum, here, the United

States.  In deciding such a motion, the plaintiff's jurisdictional averments must be taken as true.

Id.; In re Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 206 (2d Cir. 2003).

Moreover, the court must construe the pleadings in a light most favorable to plaintiff, resolving

all doubts in his favor.  DiStefano v. Carozzi North America, Inc., 286 F.3d 81 (2d Cir. 2001).

>   **C.      A Rule 12(B)(6) Motion Merely Tests the Legal Feasibility of the Complaint**

A motion to dismiss under Rule 12(b)(6) must be denied unless "it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8

(2d Cir. 2004); Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam).  The court's

role is "not to assay the weight of the evidence which might be offered in support" of the

Complaint, but "merely to assess the legal feasibility" of the Complaint.  Geisler v. Petrocelli,

616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether Plaintiffs ultimately could prevail, the

---

[4] Plaintiffs request the opportunity to conduct discovery as to any disputed fact the Court deems material to the
FSIA jurisdictional analysis, and to present evidence at a hearing on the question of FSIA jurisdiction.

court must accept as true the allegations of the pleadings and draw all reasonable inferences in Plaintiffs' favor.  <u>Wynder</u>, 360 F.3d at 78; <u>Phelps</u>, 308 F.3d at 184.

## III.    ARGUMENT

### A.    Plaintiffs' Claims Fall Squarely Within the Tortious Act Exception[5]

For purposes of the sovereign immunity analysis, Plaintiffs concede that the SRC and Al Swailem qualify as agencies, instrumentalities or organs of the Kingdom within the meaning of the FSIA.  However, because Plaintiffs' claims fall within the tortuous act exception set forth in 28 U.S.C. § 1605(a)(5), the limited protections of the FSIA do not serve to immunize those defendants from the subject matter jurisdiction of this Court.

As this Court has recognized already, the test used to determine whether a defendant's conduct falls within the tortious act exception of the FSIA in the Second Circuit is "whether the defendant's alleged acts were tortious under the laws of New York, and if so, whether the defendant's acts were discretionary."  <u>In re Terrorist Attacks on September 11, 2001</u>, 349 F. Supp. 2d 765, 794 (S.D. N.Y. 2005).  Further, New York law has long recognized tort claims based in conspiracy and aiding and abetting theories.  <u>Id.</u> at 797.[6]  Thus, where a plaintiff's complaint adequately alleges that a defendant aided and abetted or conspired in a tort which causes injury in New York, and the underlying misconduct does not involve the exercise of a valid discretionary governmental function,[7] the court possesses subject matter jurisdiction over the claim under the tortious act exception to the FSIA.  <u>Robinson</u>, 269 F.3d at 142.

---

[5] The Federal Plaintiffs allege that certain of the support the defendants provided to al Qaida constitutes money laundering, actionable under the FSIA's commercial activity exception.   As the Court has already decided this issue as a matter of law, the Federal Plaintiffs incorporate by reference the relevant discussion presented in their Opposition to the SJRC's Motion to Dismiss, in lieu of restating it herein.

[6] In so holding, the Court implicitly found that victims of terrorist acts may sustain tort claims against foreign sovereigns who sponsored the responsible terrorist organization, directly or indirectly, pursuant to the standards announced in <u>Halberstam v. Welch</u>, 705 F.2d 472 (D.C. Cir. 1983)  or <u>Boim v. Quranic Literacy Institute</u>, 291 F.3d 1000, 1023 (7th Cir. 2002) ("<u>Boim II</u>").  <u>See</u>  <u>In re Terrorist Attacks</u>, 349 F. Supp. 2d at 800.

[7] These defendants do not argue that their sponsorship of al Qaida involved the exercise of a discretionary governmental function, so the analysis of jurisdiction under the tortious act exception merely requires the Court to determine whether plaintiffs have alleged that the defendants committed a tort under the liberal pleading requirements of Rule 8(a)(2).

The Complaints seek to impose liability on the SRC and al Swailem for personal injuries, wrongful deaths and property damage resulting from the September 11th Attack, based on their knowing participation in al Qaida's conspiracy to attack America, and material aiding and abetting of bin Laden's terror network. The Complaints further allege that the September 11th Attack was a direct, intended and foreseeable product of the conspiracy in which the defendants knowingly participated. Thus, Plaintiffs' claims fall squarely within the tortious act exception under the standards enunciated above.

**B.    Plaintiffs' Allegations are Sufficient to Sustain Causation Under the FSIA**

In an effort to avoid application of the tortious act exception, the SRC and Al Swailem argue only that Plaintiffs fail to adequately allege causation under the FSIA. In making this argument, these defendants do not dispute this Court's earlier holdings that jurisdictional causation under the FSIA is satisfied by pleading "proximate causation," In re Terrorist Attacks, 349 F. Supp. 2d at 797 n. 26 (S.D. N.Y. 2005), and that "[a]ny terrorist attack, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda…" Id. at 797 (quoting Burnett v. Al Baraka Invest. & Dev. Corp., 274 F. Supp. 2d 86, 105 (D.D.C. 2003) ("Burnett I")). Rather, the defendants' causation argument is predicated entirely on their contention that Plaintiffs are required to, but do not, allege "facts showing that the Saudi Red Crescent and Dr. Al Swailem … knowingly supported terrorists." Motion to Dismiss at p. 11.

As will be demonstrated below, the defendants' causation argument is predicated entirely on a fundamentally flawed principle – the belief that Plaintiffs' claims are subject to a heightened pleading standard under which Plaintiffs are required to present detailed factual allegations regarding a defendant's state of mind.

The Federal Rules of Civil Procedure establish an extremely permissive "notice pleading" standard. Fed. R. Civ. P. 8(a); Swierkiewicz, 534 U.S. at 512-13. Under Rule 8(a)(2), a complaint only need include "a short and plain statement of the claim showing that the pleader is entitled to relief" sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. at 512 (quoting Conley, 355 U.S. at 47). In the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). See, e.g., Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993). In keeping with this concept, "malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

In its decisions in the post Swierkewicz era, the Second Circuit has consistently and uniformly applied these clear standards and held that a plaintiff is not required to plead particularized facts regarding a defendant's state of mind. For example, in Phelps, the Second Circuit reversed a district court ruling which had dismissed a complaint for failure to plead specific facts in support of allegations of the defendant's knowledge, holding instead that such a heightened pleading standard was "unwarranted" under Fed. R. Civ. P. 8(a). Phelps, 308 F.3d at 186. "A plaintiff's allegation of knowledge is itself a particularized factual allegation, which he will have the opportunity to demonstrate at the appropriate time 'in the usual ways'." Id. at 187 n. 6 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)). As the Phelps Court further instructed: "However unlikely it may appear to a court from a plaintiff's complaint that he will ultimately be able to prove an alleged fact such as mental state, the court may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." Phelps, at 186-87; see also

10

Pelman v. McDonald's, 396 F.3d 508 (2d Cir. 2005) (rejecting district court's efforts to impose heightened pleading standard for causation element of plaintiff's claim).

In Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge. "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." Id. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

More recently, in Linde, et al v. Arab Bank, PLC, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005), the United States District Court for the Eastern District of New York rejected the defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here. In Linde, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations. Id. at *11-23. Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent." Id. at *42. The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules:

> To the extent the defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard. It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

Id.  The Linde court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, defendant attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  Id. at *50.

Consistent with the Federal Rules of Civil Procedure and holdings of the Phelps, Warren and Linde courts, Plaintiffs have met their pleading burden relative to the scienter element of their conspiracy and aiding and abetting claims, and therefore adequately alleged the defendants' involvement in the tort giving rise to their injuries.  Through their Complaints and the additional evidence submitted in support of this Opposition, Plaintiffs plainly allege that the SRC and Dr. Al Swailem knew that they were involved in the sponsorship of al Qaida.  See Burnett More Definite Statement at ¶ 2; see also Federal First Amended Complaint ¶¶ 192-202 (alleging that the SRC has long acted as a fully integrated component of al Qaida's financial and logistical support network, and that the September 11th Attack was an intended and foreseeable product of the SRC's participation in al Qaida's global jihad).  At this early stage of the litigation, Plaintiffs' consistent averments that the defendants acted "knowingly" are sufficient.  That these defendants seek dismissal under the FSIA does not alter this analysis.  Once again, Plaintiffs' allegations of knowledge and intent constitute "particularized factual allegations,"  Phelps, 308 F.3d at 187, which must be accepted as true in deciding the defendants' FSIA motion.  Nelson, 507 U.S. at 351; see also Robinson, 269 F.3d at 141-43 (holding that plaintiffs may meet burden of production in response to FSIA motion to dismiss solely through allegations).   Thus, the sole argument these defendants raise in opposition to the tortious act exception is devoid of merit.

Even assuming Plaintiffs' claims were subject to a heightened pleading standard requiring them to present particularized descriptions of their proofs at this stage of the litigation,

dismissal would be improper, as the pleadings do in fact articulate details of each element of the conspiracy and aiding and abetting claims, including the defendants' knowledge.   Under Halberstam, a plaintiff must plead the following elements to sustain a claim for civil conspiracy: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the overall scheme.  Halberstam, 705 F.2d at 477.  The Halberstam court described the elements of aiding and abetting as: "(1) the party whom the defendant aids must perform a wrongful act that causes injury; (2) the defendant must be generally aware of his role as part of an overall illegal and tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist in the principal violation."  Id.  Under Boim II, a defendant may be held liable where that defendant: (1) knows that a party to whom he is providing support or assistance is engaged in illegal activities; (2) desires to help those activities succeed; and (3) engages in some act of helping the illegal activities.  Boim II, 291 F.3d at 1023.[8]

The specific allegations of the Complaints, as supplemented by the additional evidence submitted in support of this Opposition, satisfy the standards of both Halberstam and Boim II, even under the erroneous pleading standard advocated by the defendants.  Among other things, the Plaintiffs allege that the SRC contributed **direct** financial and logistical support to al Qaida; provided passports to al Qaida operatives; has "employed" high level al Qaida operatives, including Ayman al Zawahiri and Wa'el Julaidan; and that SRC employees have directly participated in al Qaida attacks.  Given the fact that al Qaida members were personally involved in directing the SRC's activities and sponsorship of al Qaida, and participated in al Qaida

---

[8] While Boim II involved claims under the Antiterrorism Act (ATA), it is properly read as setting forth the standards for establishing liability over sponsors of terrorism under common law concerted action theories.  Indeed, in enacting the ATA, Congress sought to extend liability over terrorist sponsors to the furthest reaches of the common law.  Boim II, 291 F.3d at 1011.

attacks, it is clear that there existed an agreement between the SRC and al Qaida to conspire with one another in furtherance of al Qaida's perverse agenda, and that the SRC and al Swailem were aware of the SRC's involvement in that conspiracy for many years prior to September 11, 2001. Furthermore, al Qaida was a well known terrorist organization at the time the SRC supported the organization, which had publicly and repeatedly targeted the United States.  In short, the pleadings allege that the defendants were directly and intimately involved in advancing the agenda of a known terrorist organization that had publicly declared its intention to conduct terrorist attacks against the United States.  These allegations clearly satisfy both <u>Halberstam</u> and <u>Boim II</u>.  Moreover, to the extent the Court finds the allegations against the SRC or Al Swailem in any way deficient, the appropriate remedy is to require plaintiffs to file more definite statements, and not to dismiss the action.  <u>Pelman</u>, 396 F.3d at 512 n. 5. [9]

**C.   The Defendants are Subject to the Personal Jurisdiction of this Court**

The SRC and Al Swailem contest this Court's authority to exercise personal jurisdiction over them on two grounds.  First, they argue that the requirements of New York's Long-Arm Statute are not satisfied, and that this Court consequently lacks a valid statutory basis to exercise personal jurisdiction.  Second, they assert that the exercise of jurisdiction over them would not comport with the due process requirements of the Constitution.  Both of these arguments are meritless.

**1.   The FSIA Provides a Statutory Basis for Personal Jurisdiction**

Because the SRC and Dr. Al Swailem claim status as "agencies and instrumentalities" of Saudi Arabia for purposes of this action, this Court need not even consider the arguments they advance regarding the applicability of New York's Long-Arm Statute.  Under the FSIA, personal

---

[9] Plaintiffs do not seek to invoke the exception to immunity set forth in 28 U.S.C. 1605(a)(7) as to these defendants, and therefore do not respond to their arguments relating to that exception herein.  However, to the extent these defendants intended to argue that 1605(a)(7) is the exclusive exception available for the claims asserted in these consolidated proceedings, this Court already has held otherwise.  <u>In re Terrorist Attacks</u>, 349 F. Supp. 2d at 796.

jurisdiction is satisfied so long as the court possesses subject matter jurisdiction and the

defendant has been served validly.  See 28 U.S.C. § 1330(b).  As the SRC and Dr. Al Swailem

do not contest the validity of service upon them, the FSIA provides a valid statutory basis for

personal jurisdiction over those defendants.

2.       Personal Jurisdiction Exists Under New York's Long-Arm Statute

In addition to being irrelevant given the personal jurisdiction provisions of the FSIA, the

defendants' arguments regarding the applicability of New York's Long-Arm Statute are simply

wrong.  As this Court has previously recognized, "acts committed by a co-conspirator of an out-

of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction

under C.P.L.R. 302(a)(2)."  In Re Terrorists Attacks, 349 F. Supp. 2d at 805 (quoting, Chrysler

Capitol Corporation v. Sentry Power Corp., 778 F. Supp. 1260, 1266, S.D. N.Y. 1991).

For the reasons set forth above, Plaintiffs have adequately alleged that the SRC and Dr.

Al Swailem were active and knowing participants in al Qaida's conspiracy to attack America.

Without question, those who knowingly contribute to a terrorist organization do so in order to

see the organization successfully carry out terrorist attacks.  Indeed, in recognition of that fact,

the United States Government has declared that those who support terrorists are as culpable as

those who carry out the attacks.  Thus, the operatives who carried out the September 11th Attack

necessarily were acting for the benefit of al Qaida's material sponsors and supporters, and the

New York Long-Arm Statute consequently provides a statutory basis for exercising personal

jurisdiction over al Qaida's co-conspirators, including the SRC and Dr. Al Swailem.[10]

3.       The Exercise of Jurisdiction Comports With Due Process

The defendants' assertion that the exercise of personal jurisdiction over them would

violate due process is equally unconvincing.  The Supreme Court has consistently held that the

---

[10] Plaintiffs have asserted claims against these defendants under the ATA and Civil RICO, both of which include
nationwide service of process provisions.  As such, the exercise of personal jurisdiction also is authorized under Fed.
R. Civ. P. (4)(k)(1)(D), provided that the exercise of jurisdiction comports with due process.

due process clauses of the Fifth and Fourteenth Amendments permit personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  Calder v. Jones, 465 U.S. 783, 788, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984).  Under these standards, due process considerations are satisfied so long as the defendant has "fair warning" that he may be haled into court in the forum to respond for his actions.  Burger King v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).  In an action involving harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence."  Calder, 465 U.S. at 788.  Consistent with this principle, the courts have found that due process is not violated by the exercise of jurisdiction over those who deliberately target our citizens.  Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F.Supp.2d 54 (D. D.C. 2003); Daliberti v. Iraq, 97 F. Supp. 2d 38, 54 (D. D.C. 2000); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D. N.Y. 1998); Mwani v. Bin Laden, 417 F.3d 1, 28 (D.C. Cir. 2005) (finding that al Qaida and its co-conspirators have "engaged in unabashedly malignant actions directed at and felt in" the United States). [11]

a)   The Defendants Directed Their Conduct at the United States

In the present case, Plaintiffs have satisfied their burden to make a *prima facie* showing of personal jurisdiction over the SRC and Al Swailem, pursuant to the applicable standards set forth above.  As described above, Plaintiffs have alleged that the defendants directly channeled financial and logistical support to al Qaida, and that the SRC, under al Swailem's stewardship, has "employed" senior al Qaida operatives.  These facts plainly establish that the SRC and al Swailem have, for a period of many years, directly supported al Qaida.

---

[11] Although the Second Circuit has held that foreign states are entitled to the protections of the due process clause, the Supreme Court has not yet addressed the issue.  Plaintiffs recognize that this Court is bound by Second Circuit precedent, but reserve their right to argue, on any potential appeal, that the defendants are not entitled to due process protections in the event that they are deemed agencies of Saudi Arabia.

In knowingly sponsoring and directly participating in al Qaida's campaign to attack America, the defendants necessarily directed their conduct at the United States, as it has been publicly known, since at least the mid-1990's, that al Qaida was engaged in a global campaign of terror directed against the United States.  In re Terrorists Attacks, 349 F. Supp. 2d at 813.  Thus, the exercise of jurisdiction over the defendants for claims arising from their sponsorship of al Qaida complies with due process.[12]

        b)      The Defendants Have Extensive Contacts With the United States

Moreover, the defendants have extensive contacts with the United States, sufficient to sustain a *prima facie* case of personal jurisdiction under general jurisdiction standards.

In arguing that he is entitled to the protections of the FSIA in this litigation, Al Swailem is representing to this Court that he is an official of the Kingdom, and that the claims against him arise from actions undertaken by him in his official capacity.  Under such circumstances, a suit against a foreign official is viewed to be the "practical equivalent" of a suit against the sovereign itself.  Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1099-1103 (9th Cir. 1990); Bryks v. Canadian Broadcasting Corp., 906 F. Supp. 204, 210 (S.D. N.Y. 1995).  Thus, the relevant contacts for jurisdiction purposes are those of the Kingdom of Saudi Arabia as a whole, and not simply those of Al Swailem as an individual.  As it is beyond dispute that the Kingdom maintains pervasive and ongoing contacts with the United States,[13] the exercise of jurisdiction over al Swailem as an official of the Kingdom comports with due process.

In addition, given the character of the SRC's relationship with Saudi Arabia, the U.S. contacts of the Kingdom also are attributable to the SRC for jurisdictional purposes.  Under Second Circuit law, the contacts of a department or agency within the jurisdiction are attributable

---

[12] Plaintiffs' allegations of conspiracy are, in and of themselves, sufficient to satisfy due process at this stage of the litigation.  In Re Magnetic Audiotape Antitrust Litig., 334 F.3d at 208; see also Davis v. Barrett Day Securities, Inc., 1995 U.S. Dist. LEXIS 15434, *11-12 (M.D.N.C. 1995).

[13] Notably, the Kingdom has not contested personal jurisdiction in these proceedings.

to its parent and vice versa.  See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,
751 F.2d 117, 120-22 (2d Cir. 1984).  Factors to be considered in determining whether
attribution for jurisdictional purposes is appropriate include whether the subsidiary functions as a
"mere department" of the parent; whether it is financially dependent upon the parent; and the
extent to which the parent entity interferes in personnel decisions and otherwise demonstrates a
failure to obey corporate formalities and extent of control.  See Volkswagenwerkt, 751 F.2d at
120-22; Jacobs v. Verlag, 160 F. Supp. 2d. 722, 734 (S.D.N.Y. 2001).

In the present case, the Kingdom's contacts with the United States are attributable to the
SRC under the foregoing standards.  In its own Motion to Dismiss, the SRC acknowledges that it
was created by the Saudi government, relies extensively on the Kingdom for its funding, and is
actively supervised by the Kingdom.  Motion to Dismiss at p. 2.  In addition, the management of
the SRC includes numerous high-ranking officials of the Kingdom.  Given the Kingdom's
extensive control over the SRC, the Kingdom's contacts with the United States are attributable to
the SRC for purposes of determining jurisdiction.  As the Kingdom has pervasive and continuing
contacts with the U.S., the exercise of jurisdiction over the SRC comports with due process.[14]

Plaintiffs have also alleged that the SRC has extensive contacts with the United States,
independent of the Kingdom's contacts.  Those U.S. contacts include extensive fundraising
efforts, such as Ayman al Zawahiri's 1995 fundraising trip in the United States on behalf of the
SRC.  Plaintiffs are entitled to conduct discovery into these contacts, for purposes of establishing
jurisdiction.

**D.     The Defendants' Motion to Dismiss for Failure to State a Claim Should be
Denied**

The SRC and Al Swailem also move pursuant to Rule 12(b)(6), for dismissal of
Plaintiffs' individual causes of action for failure to state a claim upon which relief can be

---

[14] At a minimum, Plaintiffs are entitled to discovery regarding the Kingdom's control over the SRC.

granted.  At the outset, the defendants argue that all of Plaintiffs' statutory and common law

claims should be dismissed because, in their view, Plaintiffs "have not pled sufficient facts

showing that the Saudi Red Crescent's and Dr. Al Swailem's acts proximately caused plaintiffs'

injuries."  Motion to Dismiss at p. 17.  In addition to this general argument, the defendants raise

individual challenges under Rule 12(b)(6) to several of the causes of action.  While cast as

separate theories of dismissal, most of these "particularized" 12(b)(6) arguments merely restate

the defendants' general argument regarding the sufficiency of Plaintiffs' pleadings.  For the

reasons set forth below, none of the arguments advanced by the SRC or Dr. Al Swailem under

Rule 12(b)(6) have merit.

The defendants' general challenge to causation under Rule 12(b)(6) is identical to the

causation argument they advance under the FSIA, and plagued by the same fundamental

misunderstanding of the applicable pleading requirements.  In their motion, the defendants argue

Plaintiffs have failed to adequately support their allegations of proximate causation under

concerted action theories, on the ground that Plaintiffs have failed to plead sufficient facts to

demonstrate that those defendants acted knowingly in supporting al Qaida.  However, for the

reasons detailed in Section III B above, Plaintiffs' express allegations that the SRC and Al

Swailem acted knowingly and intentionally constitute particularized factual allegations, which

must be accepted as true at this stage of the proceedings.  Those factual allegations regarding the

defendants' knowledge and intent are sufficient to meet Plaintiffs' burden to plead the scienter

element of their concerted action theories under the liberal notice pleading requirements of the

Federal Rules of Civil Procedure.  Consequently, the defendants' causation argument, which

rests entirely upon the theory that Plaintiffs have not adequately alleged the defendants'
knowledge or intent, must be rejected.[15]

    1.    The Complaints Adequately Allege ATA and Common Law Claims

The "separate" arguments the SRC and Dr. Swailem advance in favor of dismissal of
Plaintiffs' statutory claim under the ATA, and common law wrongful death, survival, intentional
infliction of emotional distress and trespass claims, are in fact mere recitations of their 12(b)(6)
causation argument.  In particular, the defendants assert that Plaintiffs' ATA claims should be
dismissed because Plaintiffs have failed to "show knowledge of and an intent" to further al
Qaida's criminal endeavors.  Motion to Dismiss at p. 19.  Similarly, the defendants urge this
Court to dismiss Plaintiffs' common law tort claims for wrongful death and survival on the
ground that Plaintiffs' have not "pled any facts to support an allegation that these two
defendants" knowingly supported al Qaida.  Motion to Dismiss at p. 19-20.  As to Plaintiffs'
intentional infliction of emotional distress claims, the defendants ask this Court to find that
Plaintiffs have failed to plead "sufficient facts" relating to the defendants' intent.  Motion to
Dismiss at p. 20.  The defendants' Motion to Dismiss Plaintiffs' property damage and trespass
claims is predicated on the same theory, and the baseless contention that the conspiracy alleged
in the Complaints is "vague."  Motion to Dismiss at p. 21.

This Court already has ruled that Plaintiffs state valid ATA and common law claims
against defendants in this litigation by adequately alleging that those defendants aided and
abetted, or conspired with, al Qaida.  In re Terrorist Attacks, 349 F. Supp. 2d at 829-30.  For the
reasons set forth above, Plaintiffs have met that burden with respect to the SRC and Dr. Al

---

[15] For the reasons set forth in Section III B, Plaintiffs submit that they have adequately pled all causes of action,
even under the improper pleading standard the defendants' advocate.  Moreover, to the extent there exists any
deficiency in Plaintiffs' pleadings, the proper course is to require Plaintiffs to file a More Definite Statement.
Pelman, 396 F.3d at 512, n. 5.

Swailem.  Accordingly, the defendants' motion to dismiss Plaintiffs' ATA and common law claims for alleged pleading deficiencies should be denied.

>　2.　Plaintiffs' Assault, Battery, and Intentional Infliction of Emotional Distress Claims Are Not Barred by the Statute of Limitations

Contrary to the defendants' assertion, the *Federal* and *Burnett II* Plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not demonstrably time-barred.  At this stage of these proceedings, the substantive law governing most of the claims remains to be determined.  As such, it would be manifestly premature to dismiss Plaintiffs' assault, battery and intentional infliction of emotional distress claims, under the mere assumption that the law of New York law applies.  See 42 Pa.C.S. § 5524 (2005) (establishing two year limitation period for assault, battery and intentional tort claims under Pennsylvania law); Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369 (2004) (holding that federal common law claims arising under Act of Congress after 1990 are governed by a four year limitations period).[16]

Moreover, all of Plaintiffs' claims arise from the defendants' participation in the conspiracy to conduct terrorist attacks against the United States, a conspiracy designed to hide the identity of the participants from disclosure to the outside world.  As a result, the statute of limitations was tolled until Plaintiffs reasonably should have become aware of the defendants' involvement within the conspiracy, itself a question of fact to be determined through discovery. Yeadon v. New York Transit Authority, 719 F. Supp. 204, 209 (S.D. N.Y. 1989); In re Issuer Plaintiff Initial Public Offering Antitrust Litigation, 2004 U.S. Dist. Lexis 3892 at *17-18 (S.D. N.Y. Mar. 12, 2004).  Given the clandestine nature of the conspiracy in which SRC participated, equitable principles require that the statute of limitations be tolled.  See Johnson v. Nyack Hospital, 86 F.3d 8, 12 (2d Cir. 1996).

---

[16] The ATA imports "the remedies of American tort law," 137 Cong. Rec. 54511 04 (April 16, 1991), thus giving rise to federal common law assault, battery and intentional infliction of emotional distress claims thereunder.  On this point, Plaintiffs refer the Court to the discussion included in their Consolidated Opposition to the Motion to Dismiss of Perouz Sedaghaty at pp. 16-17, incorporated herein by reference.

3.      Plaintiffs' Civil RICO Claims Are Cognizable[17]

As a preliminary matter, the SRC and Al Swailem argue that Plaintiffs in all cases other than *Federal* are barred from pursuing RICO claims, because they have not filed RICO Statements applicable to the SRC and Al Swailem.  However, the Second Circuit has explicitly held that the District Court may not dismiss the RICO claims of a plaintiff on substantive grounds, based on that plaintiff's failure to file a RICO statement which requires information beyond the pleading requirements of the Federal Rules of Civil Procedure.  See Commercial Cleaning Services, LLC v. Colins Service Systems, Inc., 231 F.3d 374, 385-87 (2d Cir. 2001); see also, Wagh v. Metris Direct, Inc., 348 F.3rd 1102, 1107-1109 (9th Cir. 2003).

To the extent the defendants are advocating that the Plaintiffs' RICO claims be dismissed as a sanction for failing to comply with this Court's individual practices, their argument lacks both factual and legal merit.  To begin with, this complex litigation is being managed under a comprehensive Case Management Order, dated June 15, 2004 (CMO 2).  CMO 2 contains a specific provision governing "RICO Statements" in these proceedings, which preempts any relevant individual practice rules governing a typical case.  At the request of the defendants, the Court has held that only the *Federal* Plaintiffs are permitted to file RICO Statements pursuant to CMO 2.   Thus, in refraining from filing RICO Statements applicable to these defendants, Plaintiffs simply complied with this Court's Orders and practices, and there exists no violation to complain of.  Even assuming that this Court's individual practices regarding RICO Statements were applicable here, dismissal with prejudice may be imposed as a sanction only in cases of willfulness, bad faith, or serious fault.  Commercial Cleaning Services, 231 F.3d at 386.  To the extent there has been any violation of this Court's practices here, such violation is at most the

---

[17] The *Burnett II* and *Tremsky* Plaintiffs do not  intend to pursue RICO claims at this time, and therefore do not address the defendants' standing argument herein.

result of a reasonable misinterpretation of CMO 2.   Therefore, dismissal of Plaintiffs' RICO claims would be fundamentally improper.

The defendants also seek to dismiss the civil RICO claims of all Plaintiffs on the grounds that "active management or operation" of the Enterprise has not been alleged, nor were the defendants alleged to be "central figures" in the al Qaida Movement.   These assertions misstate the law.

The defendants are correct that a plaintiff asserting a civil claim under 1962(c) must allege that the defendant participated in the operation or management of the enterprise.  Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D. N.Y. 2003).  However, such "discretionary authority" generally has been described as "a relatively low hurdle for plaintiffs to clear" in the Second Circuit.  See First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise."  Friedman v. Hartmann, 1994 U.S. Dist. LEXIS 9727, at *4 (S.D.N.Y. July 15, 1994).  Through discovery, this allegation will be further substantiated.

"[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003).  All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  Id. at 376-77 (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)). "Although parties who do not control the organization cannot be liable under § 1962(c), they

may still conspire to do so and therefore be liable under § 1962(d)."  <u>Morin v. Trupin</u>, 832 F. Supp. 93, 100 (S.D. N.Y. 1993).

The plaintiffs have satisfied the pleading standards applicable to their 1962(c) and 1962(d) claims, as set forth above.  Plaintiffs allege that the SRC has played an integral role in supporting al Qaida since that organization's inception.  Under al Swailem's direction, the SRC's support has included financial and logistical services, orchestrated by founding al Qaida members who held senior positions in the SRC.  *Federal* RICO at Exh. A.  These allegations satisfy the pleading requirements for Plaintiffs' RICO claims at this stage of the proceedings.[18]

   4.   Plaintiffs' Negligence and Negligent Infliction of Emotional Distress
        Claims Are Viable Against These Defendants

The United Nations has adopted numerous Resolutions addressing the duties and obligations of the international community with regard to the problem of terrorism financing.  In 1996, the U.N. General Assembly adopted Resolution 51-210, which expressly calls upon all states "to take steps to prevent and counter-act…the financing of terrorists and terrorist organizations, ***whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals***…."  G.A. Res. 51-210, U.N. GAOR, 51st Sess. (1996) (emphasis supplied).  The *International Convention for the Suppression of the Financing of Terrorism,* adopted as Resolution 54-109, contains the same language.  G.A. Res. 54-109, U.N. GAOR, 54th Sess. (1999).

As agencies of the Kingdom, the SRC and Dr. al Swailem are charged with responsibility to act in accordance with the duties and obligations imposed upon states by international law, including those embodied in the Resolutions of the United Nations, of which the Kingdom is a member.  The plain language of Resolutions 51-210 and 54-109 required the SRC, and Dr. al

---

[18] Plaintiffs allege that the defendants solicited funds under the guise of "charity," and diverted the funds collected under that false pretense to al Qaida.  Thus, Plaintiffs adequately allege that the defendants derived income through a pattern of racketeering activity, and invested that income in the Enterprise.  As the activities of the Enterprise clearly affect interstate commerce, these allegations give rise to claims under 1962(a).

Swailem as the head of the SRC, to take reasonable and appropriate measures to ensure that the SRC was not used as a vehicle for financing terrorists.  Without question, the duties announced in those Resolutions were adopted to protect innocent parties, including the September 11th victims, from violence at the hand of terrorists.  Thus, it is clear that these defendants owed a duty of care to Plaintiffs, giving rise to cognizable claims under negligence theories.

     5.     **Plaintiffs' Conspiracy and Punitive Damages Claims Should Not be Dismissed**

At this stage of these proceedings, the substantive law governing each of Plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss the conspiracy and punitive damages causes of action at this time.  Moreover, Plaintiffs clearly are entitled to recover punitive damages in the event that they prevail on the theories advanced.  Accordingly, dismissal of the conspiracy and punitive damages counts would be inappropriate.

## IV.    CONCLUSION

For the foregoing reasons, this Court should deny the consolidated Motion to Dismiss of the SRC and Dr. al Swailem in its entirety.

Respectfully submitted,

|  |  |
|---|---|
| Dated: September 20, 2005 | COZEN O'CONNOR<br><br>BY: _____/S/_____<br>    Stephen A. Cozen, Esquire<br>    Elliott R. Feldman, Esquire<br>    Sean P. Carter, Esquire<br>    1900 Market Street<br>    Philadelphia, PA 19103<br>    Tele: (215) 665-2000<br><br>    Attorneys for *Federal Insurance* Plaintiffs |

| | |
|---|---|
| | Ronald L. Motley, Esq. (RM-2730)<br>Jodi Westbrook Flowers, Esq.<br>Donald A. Migliori, Esq.<br>Michael Elsner, Esq. (ME-8337)<br>MOTLEY RICE LLC<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mount Pleasant, South Carolina 29465<br>Telephone: (843) 216-9000 |
| | Paul J. Hanly, Jr., Esq. (PH-5486)<br>Jayne Conroy, Esq. (JC-8611)<br>Andrea Bierstein, Esq. (AB-4618)<br>HANLY CONROY BIERSTEIN &<br>   SHERIDAN, LLP<br>415 Madison Avenue<br>New York, NY 100 17-1111<br>Telephone: (212) 401-7600<br><br>Attorneys for *Burnett*, *EuroBrokers* and<br>*WTC Properties* Plaintiffs |
| | James P. Kreindler, Esq. (JK7084)<br>Justin T. Green, Esq. (JG0318)<br>Andrew J. Maloney III, Esq. (AM8684)<br>Vincent Ian Parrett, Esq. (VP5092)<br>KREINDLER & KREINDLER LLP<br>100 Park Avenue<br>New York, NY  10017-5590<br>(212) 687-8181<br><br>*Attorneys for Ashton Plaintiffs* |
| | Robert M. Kaplan (RK1428)<br>FERBER FROST CHAN & ESSNER, LLP<br>530 Fifth Avenue, 23rd Floor<br>New York, New York 10036-5101<br>(212) 944-2200<br><br>Attorneys for *Continental* Plaintiffs |

|  | David H. Fromm, Esq. (DH-9334)<br>Frank J. Rubino, Jr., Esq. (FR-6202)<br>BROWN GAVALAS & FROMM LLP<br>355 Lexington Avenue<br>New York, New York 10017<br>(212) 983-8500<br><br>Attorneys for Plaintiff *New York Marine And General Insurance Company* |
|---|---|