# APPENDIX I

## Summary of Pleadings References

## Shahir Abdulraouf Batterjee

**The Conspiracy**[1]

1. On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the Al Qaeda network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. III. 3, 66; N.Y. Marine 45, Al Baraka SAC ¶ 23, Tremsky 120, WTC 365.

2. The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett, 649, 650, 654, Continental Casualty 26,

3. The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror. Continental Casualty 26, 603, Federal Insurance III. 4, 83, 601

4. Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance III. 5.

5. The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page 217; Continental Casualty 605, 613, 617; Federal Insurance 603, 626,629, 633, 643; NY Marine 60, 64, 67, 71, 80; O'Neill Al Baraka SAC ¶ 144.

6. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, 649; Continental Casualty 605, 613, 617; Federal

---

[1] There are references in various points of the complaints (e.g., by the substantive causes of actions) to incorporating various paragraphs in the pleadings without setting them forth at length. See, e.g., O'Neill Al Baraka SAC (O'Neill)¶156

Insurance 603, 626,629, 633, 643; NY Marine 60, 64, 67, 71, 80; O'Neill Al Baraka SAC ¶ 144.

7. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett, 662; Federal Insurance 603, 629, Al Baraka SAC ¶ ¶178-180.

8. As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaeda, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties. Al Baraka SAC ¶157.

9. As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. Al Baraka SAC ¶158.

10. The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies. Federal Insurance 625, Al Baraka SAC ¶160.

11. As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka SAC ¶ 161, which were incorporated by reference. Al Baraka SAC ¶161.

12. The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka SAC ¶168.

13. By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance 642, Al Baraka SAC ¶169.

14. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud. Federal Insurance 628, Al Baraka SAC ¶177.

15. The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett 662, Al Baraka SAC ¶ ¶178-180.

16. The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance 601, Al Baraka SAC ¶162.

17. Through the material support and resources provided to al Qaida, the co-defendants aided and abetted al Qaida in its campaign to commit acts of international terrorism against the United States, its nationals, and allies. Federal Insurance 632.

18. The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance 600, 633 Al Baraka SAC ¶163.

19. All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett 674, Continental Casualty 604, Federal Insurance 602, 615, Al Baraka SAC ¶ 51.

20. The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett 673, Federal Insurance 642, Al Baraka SAC ¶152, 169.

**The Relationship between Shahir Abdulraouf Batterjee and the Conspiracy**

21. Defendants Saleh Abdullah Kamel, Abdul-Matin Tatari, Mazin M.H. Bahareth, **Shahir Abdulraouf Batterjee,** Hassan Bahfzallah a/k/a Hassan A.A. Hahfzallah, Mohammed Majed Said a/k/a Mohammed Mljed Said, Hamed al- Barakati, Yassin Abdullah al Qadi a/k/a Yassin Al-Qadi a/k/a Yassin al Kadi a/k/a Yasin al-Qadi, Youssef M. Nada a/k/a YoussefNada a/k/a Youssef Mustafa Nada, Khalid bin Mahfouz a/k/a Khaded Bin Mahfous a/k/a Khalid bin Mahfouz, Sulaiman Abdul Aziz al-Rajhi a/k/a Suleiman Abdel Aziz Al Rajhi a/k/a Sulaiman Abdel Aziz Al Rajhi, Mohammed al Faisal al Saud and Enaam Mahmoud Arnaout a/k/a Abdel Samil a/k/a Abu Mahmoud a/k/a Amu Mahmoud Al Suri a/k/a Abu Mahmoud Al Hamawi, and others are all businessmen, bankers, financiers, organizations, and operatives who have conspired with Osama bin Laden and al Qaeda to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks or otherwise assisted them in their terrorist activities.  Al Baraka SAC ¶ 23.

22. Defendants, Princess Haifa Al-Faisal; … Shahir Abdulraoof Batterjee; …; and Sadam Hussein, have aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons.  Federal Insurance 66; NY Marine 45.

23. Defendant Shahir Batterjee was one of the founders of Benevolence International Foundation, based in Palos Hills, Illinois, and its branch office in Plantation, Florida. Bierstein Aff. Exhibits 1, 2 and 3.

**Benevolence International Foundation Inc.**

24. The Benevolence International Foundation (a/k/a Al Bir al DaWalia) (or "BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992. One of the directors listed on the incorporation documents is Defendant Adel Abdul Jalil Batterjee (a/k/a Adil Abdul Galil Batargy) (or "Baterjee"). BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingushetia. Burnett 180, Continental Casualty 381, Tremsky 101, WTC 317.

25. The organization is also known as "al Bir al Dawalia," which translated from Arabic means "Benevolence International." It was originally founded in the 1980's by a wealthy Saudi Arabian national named Adel Abdul Jalil Batterjee, who was an associate of Osama bin Laden. Defendant Adel Abdul Jalil Batterjee later transferred control of the organization to the current Chief Executive Officer Enaam M. Arnaout (or "Arnaout"). Defendant Enaam Arnaout has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds to sponsor al Qaeda. Burnett 181, Continental Casualty 382, WTC 318.

26. Adel Abdul Jalil Batterjee is a wealthy Saudi Arabian businessman. He has investments across a number of different industries including commercial, property, medical, industrial, and contracting. This business is done primarily through the family's business, the Batterjee Group, but also through other investments and businesses. Recent attempts to locate Batterjee in Saudi Arabia have failed and it is currently believed that he may be in the Sudan. Burnett 182, Continental Casualty 383, WTC 319.

27. Batterjee originally met Arnaout in 1987 when Arnaout was teenager studying Islam in Pakistan. Batterjee appointed Arnaout as the head of the Bosnian branch in the early 1990s. According to Benevolence International Foundation's 1992 articles of incorporation, Adel Batterjee is one of the three founders of BIF in the United States. In 1993, the Saudi Government closed Batterjee's charity al-Birr at the same time it was closing other organizations for ties to terrorism. Following this closing, Batterjee moved the BIF headquarters to Chicago, Illinois and brought Arnaout in from Bosnia to run the organization. Batterjee officially transferred control of the organization to Enaam Arnaout on September 15, 1997, when Arnaout assumed the Executive Director position. Burnett 183, Continental Casualty 384, WTC 320.

28. Adel Batterjee's name does not readily appear in any Benevolence International Foundation corporate records after 1994, yet he continued funding the foundation. On February 12, 2002, the United States Government recorded a telephone conversation that the now jailed CEO of BIF, Enaam Arnaout, had with his brother Hisham in Saudi Arabia. During this conversation, Arnaout discusses "Abu Sulafa" with his brother. The United States government has identified the name "Abu Sulafa" as an alias for Adel Batterjee. Using Batterjee's alias, Arnaout states the Batterjee has been sending money to Benevolence International Foundation's branches:

> EA:   And the man [Abu Sulafa], may God reward him with goodwill, he loves goodwill, so he does not want to boycott the offices, (UI) the offices, he is sending them wire transfers.  So, if, if I receive a wire transfer from him, to any office of the offices, my home is destroyed.
>
> H:   Yes, meaning, should I tell him not to send a thing.
> EA:   Tell him, oh brother, now, they want, now scrutinizing on what is our relation to Saudi Arabia. …
> EA:   So I want you to talk to Abu Sulafa, tell him "Enaam is telling you, that oh beloved brothers, the scrutiny now is on a Saudi connection."
>
> (EA:   Enaam Arnaout, H = Hisham, Arnaout's brother)
> Burnett 184, Continental Casualty 385, WTC 321.

29.     One Justice Department al Qaeda expert suggested that this telephone conversation may further elucidate Batterjee's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month.  Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation. Burnett 185, Continental Casualty 386, WTC 322.

30.     Evidence introduced in the criminal trial of United States v. Usama Bin Laden, et al., Case Number S98 Cr. 1023, United States District Court, Southern District of New York, and gathered in the related investigation, demonstrated that al Qaeda sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses.  In addition, al Qaeda terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously.  They are also taught to avoid putting matters in writing.  Al Qaeda members have held positions with BIF and this charity is one of the organizations utilized by al Qaeda. Burnett 186, Continental Casualty 387, WTC 323.

31.     Once money was withdrawn from the bank accounts of relief organizations, its use by al Qaeda can be virtually untraceable.  According to an affidavit of Special Agent Robert Walker of the FBI, an al Qaeda witness explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor.  According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were provided to al Qaeda for whatever use al Qaeda deemed necessary.  This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence.  Al Qaeda operatives and supporters have also smuggled money into the United States. Burnett 187, Continental Casualty 388, WTC 324.

32.     On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country.  The

documents recovered included documents establishing direct communication between Enaam Arnaout and Osama bin Laden and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents. Burnett 188, Continental Casualty 389, WTC 325.

33. On December 16, 1994, Defendant Mohamad Jamal Khalifa, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Mohamad Jamal Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation (or "BIC") and the International Islamic Relief Organization (or "IIRO"). At the time of his travel, Mohamad Jamal Khalifa had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with Mohamad Jamal Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Mohamad Jamal Khalifa was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Mohamad Jamal Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money. Burnett 189, Continental Casualty 390, WTC 326.

34. Mohamad Jamal Khalifa, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa. Burnett 190, Continental Casualty 391, WTC 327.

35. Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560. Burnett 191, Continental Casualty 392, WTC 328.

36. A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements: "Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands - Steeds of war projects." Burnett 192, Continental Casualty 393, WTC 329.

37. The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ." Burnett 193, Continental Casualty 394, WTC 328.

38. On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country. Burnett 194, Continental Casualty 395, WTC 329.

39. BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity. Burnett 195, Continental Casualty 396, WTC 330.

40. Enaam Arnaout has a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents. BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda have had contacts with Benevolence International Foundation offices and personnel. Burnett 196, Continental Casualty 397, WTC 331.

41. Benevolence International Foundation has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. Benevolence International Foundation made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support. Burnett 197, Continental Casualty 398, WTC 332.

42. On December 14, 2001, searches were conducted of the offices of Benevolence International Foundation in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, Enaam M. Arnaout, removing materials from each place. According to a government witness, Enaam M. Arnaout was planning in March 2002, to leave for Jeddah, Saudi Arabia. Burnett 198, Continental Casualty 399, WTC 333.

43. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking Benevolence International Foundation's assets and records, pending further investigation into BIF's ties to terrorists. Enaam M. Arnaout, Chairman of Benevolence International Foundation, has a relationship with Osama bin Laden and key associates dating back more than a decade. The Benevolence International Foundation is used by al Qaeda for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaeda have contacts with the Benevolence International Foundation and its office personnel; and, Benevolence International Foundation has had direct dealings with al Qaeda operatives, providing them with military and financial support. Defendant Arnaout has been criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of al Qaeda. Burnett 199, Continental Casualty 400, WTC 334.

44. In the latter part of the 1980's, an al Qaeda organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States. The organization was operated principally by Sheik Abdullah Azzam and Osama Bin Laden for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan. Burnett 200, Continental Casualty 401, WTC 335.

45. In the mid to late 1980s, Defendant Enaam Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden. Burnett 201, Continental Casualty 402, WTC 336.

46. Within that same time frame, Defendant Arnaout served as director of communications in

the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden. Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others. Burnett 202, Continental Casualty 403, WTC 337.

47. Defendant Arnaout and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas. Burnett 203, Continental Casualty 404, WTC 338.

48. Defendant BIF and Arnaout and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates. Burnett 204, Continental Casualty 405, WTC 339.

49. Defendant Arnaout and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, material facts about Defendant Arnaout's relationship with organizations engaging in violence, including al Qaeda and Osama Bin Laden. Burnett 205, Continental Casualty 406, WTC 340.

50. Defendant BIF and Arnaout and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities. Defendant BIF and Arnaout and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities. Burnett 206, Continental Casualty 407, WTC 341.

51. Defendant BIF and Arnaout and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A. Burnett 207, Continental Casualty 408, WTC 342.

52. Defendant BIF and Arnaout and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations. Burnett 208, Continental Casualty 409, WTC 343.

53. BIF and Arnaout engaged in a conspiracy, the method and means of the conspiracy

included the following, among other illegal activities. Burnett 209, Continental Casualty 410, WTC 344.

54.     In or about 1992, Defendant Arnaout assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami. Burnett 210, Continental Casualty 411, WTC 345.

55.     Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including al Qaeda members and soliciting donations to support international terrorism. Burnett 211, Continental Casualty 412, WTC 346.

56.     On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan. Burnett 212, Continental Casualty 413, WTC 347.

57.     In or about November 1995, Defendant Arnaout and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen.  Defendant Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians. Burnett 213, Continental Casualty 414, WTC 348.

58.     In or about May 1998, BIF and Arnaout facilitated the travel of an influential founding member of the al Qaeda network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF. Burnett 214, Continental Casualty 415, WTC 349.

59.     In the latter part of the 1990's, with Defendant Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaeda's majlis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF. Burnett 215, Continental Casualty 416, WTC 350.

60.     Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas. Burnett 216, Continental Casualty 417, WTC 351.

61.     In or about October 2001, Defendant Arnaout relayed to the BIF founder Adel Batterjee in Saudi Arabia via telephone Arnaout's concern that Arnaout was under scrutiny of the United States government and in particular the fact that Defendant Arnaout had been searched at the airport upon his return to the United States. Burnett 217, Continental Casualty 418, WTC 352.

62.     In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant Arnaout spoke via telephone to Adel Batterjee in Saudi Arabia, and Batterjee requested Defendant Arnaout to relocate with his family to Saudi Arabia. Burnett 218, Continental Casualty 419, WTC 353.

63.     Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaeda, including:

i. a chart of an organization involved in military activity headed by Osama Bin Laden;

ii. notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

iii. notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

iv. iv. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v. v. a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

vi. various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii. various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii. various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix. a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons; and

x. In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant Arnaout falsely and publicly stated that he did not know Osama Bin Laden personally, that Defendant Arnaout never fought against the Soviet Union, that Defendant Arnaout was never at the al Masada camp.

Burnett 219, Continental Casualty 420, WTC 354.

64. On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature.  BIF abhors terrorism and all forms of violence against human beings." Burnett 220, Continental Casualty 421, WTC 355.

65. On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail. Burnett 221, Continental Casualty 422, WTC 356.

66. Enaam M. Arnaout conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including al Qaeda, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism in violation of Title 18, United States Code, Sections 2339A and 2 and other criminal statutes. Burnett 222, Continental Casualty 423, WTC 357.

67. Defendant Arnaout and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities. Burnett 223, Continental Casualty 424, WTC 358.

68. Enaam M. Arnaout conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds of a specified unlawful activity, namely mail fraud in violation of Title 18, United States Code, Section 1341, with the intent to promote the carrying on of the mail fraud and wire fraud;  in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2. Burnett 224, Continental Casualty 425, WTC 359.

69. Enaam M. Arnaout for the purpose of executing a scheme to defraud knowingly caused an envelope containing a donation check in the amount of $1,620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465. Burnett 225, Continental Casualty 426, WTC 360.

70. Enaam M. Arnaout for the purpose of executing a scheme to defraud, knowingly caused an envelope, containing a donation check in the amount of $1,000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to: Benevolence International Foundation, 9838 S. Roberts Rd. #1W, Palos Hills, IL 60465. Burnett 226, Continental Casualty 427, WTC 361.

71. Enaam M. Arnaout for the purpose of executing the scheme to defraud, knowingly

caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey; in violation of Title 18, United States Code, Sections 1343 and 2. Burnett 227, Continental Casualty 428, WTC 362.

72. Co-conspirators, aiders and abettors of the Benevolence International Foundation (a/k/a al-Birr al-Dawalia), include Defendants: Benevolence International Foundation – U.S.A. (Main Office), Benevolence International Foundation – U.S.A. (East Coast Office), Benevolence International Foundation – Canada, Syed Suleman Ahmer, Enaam Mahmoud Arnaout (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Adel Baterjee, Zahir H. Kazmi, Muzaffar Khan, Soliman J. Khudeira, and Jamal Nyrabeh, all located, doing business or registered to do business in the United States. Burnett 228, Continental Casualty 429, Tremsky 120, WTC 365.

73. Defendant Benevolence International Foundation ("BIF"), was originally founded in the 1980's by a wealthy Saudi Arabian, Adel Abdul Jalil Batterjee, an associate of Osama bin Laden. It is headquartered in Palos Hills, Illinois, and has offices in numerous Asian countries. It purports to be an international charity, but is actually an al Qaeda affiliate engaged in support of terrorist activities. O'Neill Al Baraka 118.

74. One of BIF's directors is Defendant Adel Abdul Jalil Batterjee; Defendant Enaam Arnaout, a known associate of Osama bin Laden's, has also been affiliated with BIF. O'Neill Al Baraka 119.

75. Defendant BIF is tightly connected with Defendant WAMY, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaeda network. O'Neill Al Baraka 120.

76. Defendant BIF has been deeply involved in financing, supporting, and facilitating al Qaeda terror operations through provision of money, equipment, and information, and by concealing and fabricating information and evidence concerning same. O'Neill Al Baraka 121.

77. Defendant BIF's involvement in support and financing for al Qaeda terrorist operations is disguised as charitable activities. O'Neill Al Baraka 122.

78. BIF has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated FTOs. Federal Insurance 87.

79. On January 6, 2003, federal prosecutors filed a Santiago proffer in the criminal prosecution of Enaam Arnaout referenced above. The evidentiary proffer, which is incorporated herein by reference, details at length the pervasive involvement of BIF, and of its executives and employees, in sponsoring al Qaida's global operations, describing the provision of material support and sponsorship to al Qaida as BIF's "core mission." Federal Insurance 88.

80. As set forth in greater detail in the Santiago proffer, BIF materially supported al Qaida and al Qaida affiliated militants in Afghanistan, Sudan, Bosnia-Herzegovina, Chechnya and other areas. For a period of more than 15 years, BIF representatives used the cover of

their employment with BIF to shield their direct involvement in providing material support to Osama bin Laden, al Qaida, Gulbuddin Hekmatyar and Hezb e Islami. The support provided by BIF included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to al Qaida fighters, and sponsoring al Qaida camps throughout the World. Federal Insurance 89.

81. BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor al Qaida's activities. Federal Insurance 90.

82. In 1990, while Enaam Arnaout was ostensibly working for BIF, he participated with other al Qaida members in the purchase of weapons for al Qaida, including AK assault rifles and mortar rounds. These weapons were ultimately delivered to al Qaida camps within Afghanistan, under Enaam Arnaout's supervision. . Federal Insurance 92.

83. In 1991, Osama bin Laden decided to relocate al Qaida's leadership structure and principal training camps to the Sudan, under the protection of the ruling National Islamic Front regime. Al Qaida remained in Sudan for a period of five (5) years, during which it worked closely with the National Islamic Front, the Sudanese Intelligence Service, and the Popular Defense Force. . Federal Insurance 93.

84. When the al Qaida leadership structure relocated to Sudan in 1991, BIF immediately opened an office in the Sudan, to support al Qaida in its new location. BIF's sponsorship of al Qaida in the Sudan mirrored how it had worked with al Qaida in Afghanistan prior to 1991. . Federal Insurance 94.

85. In 1992 the al Qaida leadership, including Osama bin Laden, made a strategic decision to become deeply involved in the ongoing ethnic conflict in the Balkan region, in order to establish relationships and a base of operations to support future al Qaida attacks in Europe. Towards that objective, al Qaida sent its mujihadeen fighters to Bosnia, to train and fight alongside members of the Bosnian Muslim Army. . Federal Insurance 95.

86. From the outset, BIF played a pivotal role in al Qaida's efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to al Qaida affiliated fighters in Bosnia. BIF facilitated the movement of hundreds of al Qaida mujihadeen fighters into the region, by falsely representing to authorities that those terrorists would be working as BIF relief workers. . Federal Insurance 96.

87. Within the Muslim world, BIF made little effort to conceal its support for al Qaida's operations in Bosnia. In its Arabic language fundraising appeals, BIF advertised itself as a "trustworthy hand for the support of [both] the Mujahideen and refugees" in Bosnia. Similarly, documents recovered during a federal raid of BIF's Illinois office in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations in support of Jihad in Bosnia/Herzegovina…contribute with your Mujahideen brothers to repel the Crusader/Zionist attack on Muslim lands." . Federal Insurance 97.

88. The federal raid of BIF's Illinois office uncovered the following additional documents confirming the scope and extent of BIF's sponsorship of al Qaida's efforts in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade

for 300 blankets and 200 pairs of boots obtained from BIF; a receipt from the BiH Army dated June 3, 1994, for 2000 uniforms, 2000 pairs of shoes, and 10 "mass communication stations" donated by BIF to "this military unit;" a request dated December 31, 1994, from the Bosnian military for a combat ambulance, later delivered as promised in January 1995; and, a memorandum to BIF director Enaam Arnaout, dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army. Federal Insurance 98.

89. In March 2002, Bosnian police raided BIF's Sarajevo offices. During the raid, investigators recovered extensive documentation relating to al Qaida's operations from BIF's computer system, including internal al Qaida documents detailing the contributions of various individuals and purported charities to the terrorist organization's development and expansion. As is discussed in greater detail in the U.S. government's Santiago proffer in the Arnaout prosecution, the computer system housed a file labeled "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. BIF also maintained scanned documents in a voluminous "Tareekh al Musadat" file, detailing the history of al Qaida's Al Masada training camp, as well as an "Al Jabal" file containing daily reports of activities at the Al Jabal camp, operated by the al Qaida affiliated Hizb e Islami. Federal Insurance 99.

90. The documents contained within the aforementioned files confirm the long term and global participation of BIF, MWL, Rabita Trust, and other purported charities in al Qaida's support infrastructure. Federal Insurance 100.

91. Within the Tareekh Osama file, investigators also uncovered a document called the "Golden Chain." According to officials of the U.S. government, this document is "a list of people referred to within al Qaida" as wealthy donors to the al Qaida movement. Among the individuals identified in the Golden Chain as al Qaida's principal sponsors are defendants Suleiman al-Rashid, Abdulkader al Bakri a/k/a Abdel Qader Bakri, Bakr Bin Laden, Youseff Jameel, Ibrahim Muhammad Afandi, Saleh Abdullah Kamel, Suleiman Abdulaziz al Rajhi, Mohammad bin Abdullah al-Jomaih, Abulrahman Hassan Sharbalty, Ahmed Mohamed Naghi, Khalid Bin Mahfouz Adel Faqih a.k.a Abdel Qader Faqeeh, Salahuddin Abduljawad a/k/a Salah al-Din Abdel Jawad, Ahmad Turki Yamani a/k/a Ahmed Zaki Yamani, Abdul Hadi Taher, Ahmad al Harbi Mohammed al-Issai, Hamad al Hussaini, Mohamed Omar and al Kuwait. Federal Insurance 101.

92. In conjunction with the March raid of BIF's regional headquarters in Sarajevo, Bosnian police detained its manager, Munib Zahiragic, a former intelligence officer affiliated with the Bosnian Foreign Ministry. Zahiragic turned over secret documents regarding al Qaida activities in Bosnia, including transcripts of communications between BIF management and senior commanders of al Qaida based in Afghanistan. The Bosnian officials also discovered firearms, ski masks, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Osama bin Laden during the raid. Federal Insurance 102.

93. BIF played an equally important role in the infrastructure supporting al Qaida's activities in Chechnya. Recognizing that the best way to transfer supplies into Chechnya was through Azerbaijan, BIF established a branch office in Baku, Azerbaijan to serve as a conduit for military supplies to al Qaida militants in Chechnya. Al Qaida lieutenant Saif ul Islam al Masri (a/k/a Abu Islam al Masri) served as BIF's charge d'affaires in the

Chechen capital of Grazni, at the end of the supply chain. Saif ul Islam was a member of al Qaida's military committee and had graduated from an expert training course in explosives conducted by the Iranian backed Hezbollah terrorist group in Southern Lebanon. Saif also trained Somali Muslim militiamen to shoot down U.S. helicopters during the United Nations' humanitarian mission in the Horn of Africa in the early 1990s. His passport photograph was recovered during a search in 1997 of Kenyan residents suspected of belonging to a local al Qaida cell. During this time period, Saif was in direct contact via telephone from Baku with the Kenyan terrorist cell led by Wadih el Hage, who was responsible for relaying messages between Saif ul Islam in the Caucuses and the military committee of al Qaida in Afghanistan, which included Muhammed Atef and Osama bin Laden. Federal Insurance 103.

94. Within Chechnya, BIF provided material support to al Qaida fighters supporting the Chechen mujihadeen in the form of anti-mine boots, an x-ray machine, military uniforms and cash, in direct contravention of governing United Nations resolutions. Federal Insurance 104.

95. Within the United States, BIF's operations within the United States were headquartered in Illinois and run by senior al Qaida lieutenants Enaam Arnaout and Mohammed Laoy Bayazid, both founding members of the al Qaida movement. In the New York area, BIF was represented by Saffet Abid Catovich, a prominent leader of radical islamic elements in Bosnia-Herzegovina. Federal Insurance 105.

96. BIF engaged in extensive efforts to cover the nature of its operations within the United States from the public, going so far as to draft separate mission statements for internal and external purposes. While the external drafts portray BIF as a pure relief agency, the internal documents make clear that BIF's primary mission was the support of jihad and al Qaida mujihadeen. Federal Insurance 106.

97. Enaam Arnaout spoke with Munib Zahiragic while he was in the custody of Bosnian officials. During the conversation, Zahiragic advised Arnaout that the Bosnian officials had recovered various documents relating to al Qaida activities in Bosnia. Upon learning of the nature of the materials recovered in the raid, Arnaout ordered Zahiragic to conceal from authorities the involvement of other BIF representatives in the sponsorship of al Qaida activities, including Arnaout's own involvement. Federal Insurance 107.

98. BIF's U.S. arm used the U.S. financial system extensively to launder money for al Qaida and support its terrorist operations throughout the world. Between June 2000 and September 2001, members of the al Qaida movement transferred in excess of $1,000,000 via wire from an account at Union Bank at Switzerland to BIF's checking account in the United States. Those funds were co-mingled in BIF's checking account with donations the BIF Enterprise received from other sources and dispersed in large part to BIF offices overseas. Federal Insurance 108.

99. BIF substantially understated the amount of funds it received from the Swiss bank account it its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source. Federal Insurance 109.

100. Between January 4, 2000 and April 11, 2000, BIF sent 19 wire transfers from its checking account with Citibank to the bank accounts of Jordan Relief Association,

Case 1:03-md-01570-GBD-SN   Document 1249-2   Filed 09/20/05   Page 16 of 20

    MADLEE in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Lavia, to support al Qaida mujihadeen fighters in Chechnya. Federal Insurance 110.

101.    As the forgoing demonstrates, BIF has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad. Federal Insurance 111.

102.    The September 11th Attack was a direct, intended and foreseeable product of BIF's participation in al Qaida's jihadist campaign. Federal Insurance 111.

### Triple-B Trading Gmbh of Rethwisch

103.    Defendant Triple-B Trading Gmbh of Rethwisch, Germany ("Triple-B"), is owned by Defendant Abdul-Matin Tatari, who also owns the Hamburg, Germany, firm Tatex Trading Gmbh, together with other major shareholders Defendants Mazin M.H. Bahareth and **Shahir Abdulraoof Batterjee**, and Hassan Bahtzallah. All of these wealthy Saudis are linked to Defendant Enaam Mahmoud Arnaout. Al Baraka SAC ¶ 68.

104.    Defendant Arnaout, the current Chief Executive Officer of Defendant Benevolence International Foundation ("BIF"), was criminally indicted for his role in sponsoring al Qaeda through diversion of charitable funds. Al Baraka SAC ¶ 69.

105.    Defendant BIF and Defendant Arnaout facilitated the travel of an influential founding member of the al Qaeda network, Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF in or about May 1998. Salim, arrested in Munich, Germany in February 1999, was associated with Mamoun Darkanzanli, a former employee of Defendant Tatex Trading GmbH. Darkanzanli has appeared in a video with several September 11th hijackers made at the wedding of accused September 11th co-conspirator Said Bahaji, a former friend and fellow student of Mohammed Hady Tatari. Al Baraka SAC ¶ 70.

106.    Defendant Triple-B has hired a number of persons associated with the September 11th hijackers. Hijacker Mohammed Atta was employed by Defendant Tatari for a period of time. Defendant Tatari is a member of the Syrian Brotherhood. Al Baraka SAC ¶ 71.

107.    Defendant Triple-B and its principal shareholders and associates have materially supported, aided, abetted, and financed al Qaeda. Al Baraka SAC ¶ 72.

108.    Defendant Tatex Trading and its principal shareholders and associates have materially supported, aided, abetted, and financed al Qaeda. Al Baraka SAC ¶ 75.

109.    The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the Defendant Shahir Abdulraouf Batterjee and others who have conspired for many years to attack the United States and murder United States' citizens. Defendant supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. Burnett 228, Continental Casualty 429, Federal Ins. 66; N.Y. Marine 45, O'Neill Al Baraka SAC ¶ 23, Tremsky 120, WTC 365.

- 16-

**Certain Additional Allegations Material to the RICO Counts in the Complaints.**

110. At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce. That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty 609.

111. At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c). This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty 610.

112. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud. Federal Insurance 628, Al Baraka SAC ¶177.

113. The acts of racketeering activity consisted of:

(a) acts that involve murder and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

(b) acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents) and are within the scope of 18 U.S.C. § 1961(1)(B);

(c) acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

(d) acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

(e) acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

(f) acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

(g) acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B)

Continental Casualty 611.

114. Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies. Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612.

115. As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty 613.

116. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance 629.

117. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *See e.g.,* Erwin Wachter RICO Statement filed by the O'Neill Plaintiffs, Item 6.

## **Consequences of the Conspiracy**

118. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty 605, 613, 617; Federal Insurance 603, 626,629, 633, 643; NY Marine 60, 64, 67, 71, 80; O'Neill Al Baraka SAC ¶ 144.

119. These Defendants, located all over the world, conspired with Osama bin Laden, al Qaeda, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin

Laden and al Qaeda in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaeda front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a sham front for al Qaeda. Federal Insurance 628, O'Neill Al Baraka SAC ¶25.

120. All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries. Federal Insurance 615, O'Neill Al Baraka SAC¶151.

121. The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent. O'Neill Al Baraka SAC ¶152.

122. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance 629.

123. The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. *See e.g.,* O'Neill Erwin Wachter RICO Statement ¶¶ 15, 16.

124. As a result of the September 11th Attack, certain of plaintiffs' insureds' employees were killed, as set forth in the Exhibits attached hereto. 606. As a result of the intentional, willful and malicious killing of plaintiffs' insureds' employees, the family members of plaintiffs' insureds' decedent employees have suffered severe and permanent injuries, damages and losses, including, but not limited to, the following:

      a)    Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

      b)    Non-economic damages, including but not limited to the loss of consortium, solatium, society, companionship, care, comfort, love, mental anguish, bereavement and grief.

Federal Insurance 605.

***

X:\Clients\ONeill v. Saudi arabia\Motions\Motions to Dismiss\S  Batterjee\Facts More-FINAL.doc