**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03 MDL 1570 (RCC)
ECF Case

**Opinion and Order**

-------------------------------------------------------------------------------X

*This document relates to*:    Ashton v. al Qaeda Islamic Army      02 Civ. 6977
    Federal Insurance v. al Qaida      03 Civ. 6978
    Burnett v. Al Baraka Inv. & Dev. Corp.      03 Civ. 9849

**Richard Conway Casey, United States District Judge:**

The Court presumes familiarity with the factual background giving rise to this multi-district litigation. See In re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("Terrorist Attacks I"). Generally, Plaintiffs are representatives, survivors, and insurance carriers of the victims of the attacks of September 11, 2001, who allege, pursuant to various theories of liability including the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 et seq.; the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note; theories of aiding and abetting, civil conspiracy, intentional infliction of emotional distress, negligence, survival, wrongful death, trespass, and assault and battery, that Defendants are responsible for those attacks as terrorists, state sponsors of terror, or material sponsors of terror. In Terrorist Attacks I, the Court resolved several motions to dismiss the complaints by various Defendants. Additional motions remain pending before the Court.

Saudi High Commission ("SHC"), HRH Prince Salman bin Abdulaziz Al-Saud ("Prince Salman"), and HRH Prince Naif bin Abdulaziz Al-Saud ("Prince Naif") move to dismiss the complaints for lack of subject matter jurisdiction pursuant to the FSIA, lack of personal jurisdiction, and failure to state a claim for relief. Immediately prior to the Court's scheduled oral argument on these motions, the Federal Plaintiffs moved to supplement the record against Prince Salman and Prince Naif.

Defendants Rabita Trust, Wa'el Jalaidan, and International Islamic Relief Organization ("IIRO") move to dismiss the complaints for lack of personal jurisdiction and failure to state a claim.

Other Defendants move to dismiss the complaints for failure to state a claim. Tarik Hamdi and Abdulrahman Alamoudi move to dismiss the Burnett and Federal complaints. Success Foundation moves to dismiss the Burnett complaint. The Burnett Plaintiffs denominate certain Defendants as the "SAAR Network entities." The SAAR Network entities, which include

African Muslim Agency, Grove Corporate, Heritage Education Trust, International Institute of Islamic Thought ("IIIT"), Mar-Jac Investments, Mar-Jac Poultry, Reston Investments, Safa Trust, and York Foundation, move to dismiss the Burnett complaint. IIIT also moves to dismiss the Ashton complaint. In addition to its motion to dismiss Burnett, Mar-Jac Poultry moves to dismiss the Ashton and Federal complaints. The Federal Plaintiffs label certain individuals "SAAR Network executives." These Defendants, including Taha Al-Awani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza, Iqbal Unus, and Jamal Barzinji, move to dismiss the Federal complaint.

Finally, Defendant National Commercial Bank ("NCB") moves for reconsideration of this Court's denial without prejudice of its motions to dismiss the Ashton and Burnett complaints. The Court resolves all the aforementioned motions in this opinion.

## I. Subject Matter Jurisdiction Under the FSIA

Pursuant to the FSIA, a foreign state and its instrumentalities are presumed immune from this Court's jurisdiction unless one of the statute's exceptions applies. Robinson v. Gov't of Malaysia, 269 F.3d 133, 138 (2d Cir. 2001). "In contrast to a Rule 12(b)(6) motion to dismiss for failure to state a claim, in a challenge to FSIA subject matter jurisdiction, the defendant must present a 'prima facie case that it is a foreign sovereign.'" Virtual Countries v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (quoting Cargill Int'l S.A. v. M/V Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993)). "Then, the plaintiff 'has the burden of going forward with evidence showing that, under the exceptions to the FSIA, immunity should not be granted.'" Virtual Countries, 300 F.3d at 241 (quoting Cargill, 991 F.2d at 1016); see also Terrorist Attacks I, 349 F. Supp. 2d at 792-797 (explaining that the possibly relevant exceptions to immunity in this litigation include the commercial activities, torts, and state sponsor of terrorism exceptions). Determining whether this burden is met involves a 'review [of] the allegations in the complaint, the undisputed facts, if any, placed before [the court] by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – [resolution of] disputed issues of fact.'" Virtual Countries, 300 F.3d at 241 (quoting Robinson, 269 F.3d at 141). Throughout the inquiry, Defendants retain the burden of persuasion, which they must meet by a preponderance of the evidence. Virtual Countries, 300 F.3d at 241; see also Robinson, 269 F.3d at 141 n.8.

### A. Allegations Against Defendants Asserting Foreign Sovereign Immunity
### 1. Saudi High Commission[1]

In 1993, then-King Fahad bin Abdulaziz Al-Saud, the President of the Council of Ministers of Saudi Arabia, decreed the formation of SHC, also known as the Saudi High Relief Commission, by High Order 17419. (Ashton Compl. ¶ 446; Burnett Compl. ¶ 392; Federal

---

[1] SHC moves to dismiss the Ashton, Burnett, Federal, Barrera, and Salvo complaints. The Court consolidated Barrera v. al Qaeda Islamic Army, 03 Civ. 7038, with Ashton on December 6, 2004. Similarly, at Plaintiffs' request, the Court consolidated Salvo v. al Qaeda Islamic Army, 03 Civ. 5071, with Burnett on August 16, 2005.

Compl. ¶ 180; see also SHC Mem. in Sup. Mot. to Dismiss at 3.)  The same High Order named Defendant Prince Salman the President of SHC.  (Ashton Compl. ¶ 446; Burnett Compl. ¶ 392; SHC Mem. in Sup. Mot. to Dismiss at 3.)

SHC allegedly has contributed $600 million to aid "Bosnian Muslims impoverished by the country's recent civil war."  (Ashton Compl. ¶ 446; Burnett Compl. ¶ 392.)  Plaintiffs claim, however, that SHC does not provide support to the needy but actually diverts funds for terrorist activities.  (Ashton Compl. ¶ 454; Burnett Compl. ¶ 404.)  In support, Plaintiffs allege that Prince Salman received a letter in September 2000 from a Bosnian association claiming SHC did not provide charitable assistance, and that none of the money collected after the fall of Srebrenica in July 1995 actually reached the Srebrenican people.  (Ashton Compl. ¶¶ 454-55; Burnett Compl. ¶¶ 404-05; Federal Compl. ¶¶ 185, 457.)  Plaintiffs claim SHC's financial records fail to account for $41 million.  (Ashton Compl. ¶ 456; Burnett Compl. ¶ 407; Federal Compl. ¶ 460.)  SHC allegedly made donations to charity Defendant Taibah and the bin Laden Establishment.  (Ashton Compl. ¶¶ 376, 462 (relying on 1995 bin Laden interview); Burnett Compl. ¶ 298.)  Plaintiffs also claim that SHC is responsible for "importing the extreme form of Saudi Islam, Wahhabism" to Bosnia.  (Ashton Compl. ¶ 447; Burnett Compl. ¶393.)

The Federal Plaintiffs allege that al Qaeda fighters began entering Bosnia-Herzegovina in 1992 disguised as SHC relief workers.  (Federal Compl. ¶ 183.)  On October 21, 2001, a group of Algerians who were supposedly part of the al Qaeda network were arrested in Bosnia Herzegovina on charges of terrorism directed at the United States embassy.  (Ashton Compl. ¶¶ 448-49; Burnett Compl. ¶¶ 394-95.)  One of the arrested, Sabir Lamar, apparently worked for SHC as an Arabic language teacher.  (Ashton Compl. ¶ 450; Burnett Compl. ¶ 396.)  Also in October 2001, Plaintiffs claim that United States forces raided the Sarajevo branch of SHC and "found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the U.S.S. Cole."  (Ashton Compl. ¶ 451; Burnett Compl. ¶ 397; Federal Compl. ¶¶ 186, 458.)  The U.S. forces also apparently found files on pesticides and crop dusters, the locations of Washington government buildings, fake State Department badges, and cash.  (Ashton Compl. ¶¶ 451, 453; Burnett Compl. ¶¶ 397, 399; Federal Compl. ¶¶ 186, 459.)  After the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance analyzed the seized documents and stated that some did "not belong in the scope of work of a humanitarian organization."  (Federal Compl. ¶¶ 187, 459; see also Ashton Compl. ¶ 452; Burnett Compl. ¶ 398.)  The Federal Plaintiffs claim that the SHC "has long acted as a fully integrated component of al Qaida's logistical and financial support infrastructure . . .[and that the attacks of September 11 were] a direct, intended and foreseeable product of [its] participation in al Qaida's jihadist campaign." (Federal Compl. ¶¶ 182, 189.)

**2. Prince Salman**[2]

Prince Salman is a member of the Kingdom of Saudi Arabia's Council of Ministers, the

---

[2] Prince Salman moves to dismiss the Ashton, Burnett, and Federal compaints.

governor of the province of Riyadh, and the President of Defendant SHC.  (Prince Salman Mem. in Sup. Mot. to Dismiss at 2.)  Plaintiffs allege that Prince Salman provided material support to Osama bin Laden and al Qaeda.  (Ashton Compl. ¶ 255; Burnett Compl. ¶ 403; Federal Compl. ¶¶ 455, 463; see also Federal RICO Statement Applicable to Saudi Princes at Ex. A.)  The Federal Plaintiffs claim Prince Salman "fully intended [SHC] would serve as a vehicle for funding and supporting Islamic militants in Bosnia, including elements of the al Qaida movement."  (Federal Compl. ¶ 456.)  "Prince Salman knowingly failed to take appropriate actions regarding the management and use of funds of the SHC in Bosnia."  (Ashton Compl. ¶ 457; Burnett Compl. ¶ 406.)  On December 30, 2000, the Embassy of the State of Palestine in Riyadh sent Prince Salman a letter expressing Yasser Arafat's concern regarding the funding of radical organizations in Palestine.  (Ashton Compl. ¶ 291; Burnett Compl. ¶ 402.)  Further, Plaintiffs claim Prince Salman "has a history of funding Islamic extremism," because he was named the Chairman of the General Donation Committee for Afghanistan in 1980, which gave $39 million to aid the Afghan mujahideen.  (Ashton Compl. ¶ 289; Burnett Compl. ¶ 400.)

In 1994, Prince Salman allegedly stated that he had personally raised more than six million Saudi Riyals for Defendant IIRO and Sanabel al-Kheer.  (Federal Compl. ¶ 462.)  And in 1998, he allegedly donated one million Saudi Riyals during a fundraising drive by IIRO and Sanabel al-Kheer.  (Federal Compl. ¶ 461.)  In 1999, Prince Salman donated $400,000 during a fundraising event organized by charity Defendants IIRO, World Assembly of Muslim Youth ("WAMY"), and Al-Haramain Foundation for the benefit of Bosnia Herzegovina and Chechnya.  (Ashton Compl. ¶ 290; Burnett Compl. ¶ 401; Federal Compl. ¶ 461.)  Finally, Plaintiffs claim that members of the Saudi royal family have assets and do business in the United States.  (Ashton Compl. ¶ 296.)

### 3. Prince Naif[3]

Prince Naif has been the Minister of Interior of the Kingdom of Saudi Arabia since 1975.  (Ashton Compl. ¶ 286; Federal Compl. ¶ 433; Prince Naif Mem. in Supp. Mot. to Dismiss at 1, 5.)  According to Plaintiffs, the Minister of Interior "controls the activities of Islamic Charities and is empowered to verify their legality and conduct."  (Ashton Compl. ¶ 286; Burnett Compl. ¶ 382; see also Federal Compl. ¶ 435 (alleging that as Minister of Interior Prince Naif is "responsible for the oversight of charities based within Saudi Arabia, including the operations of the Saudi Joint Relief Committee [("SJRC")], Muslim World League [("MWL")], IIRO, Saudi Red Crescent, WAMY, and al Haramain Foundation").)  He is also a member of the Council of Ministers and serves on the Supreme Council for Islamic Affairs.  (Plaintiff's Mem. in Opp'n to Prince Naif's Mot. at 2-3, 5.)

Plaintiffs claim that "Prince Naif has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and Al Qaeda."  (Ashton Compl. ¶¶ 288, 255; Burnett Compl. ¶¶ 342, 381; Federal Compl. ¶ 434; see also Federal RICO Statement Applicable to Saudi Princes at Ex. A.)  They claim that along with other Saudi princes, Prince Naif made

---

[3] Prince Naif moves to dismiss the Ashton, Burnett, and Federal complaints.

"monetary payoffs to Osama bin Laden's al Qaeda." (Ashton Compl. ¶ 288; Burnett Compl. ¶ 381.) "In 1996, according to various intelligence sources, a group of Saudi princes . . . met in Paris and agreed to continue contributing, sponsoring, aiding and abetting Osama bin Laden's terrorist network." (Burnett Compl. ¶ 347.) Plaintiffs claim that Prince Naif and the Saudi government received warnings from the United States and France that charitable donations to Islamic charities were being used to fund terrorism. (See Plaintiffs' Mem. in Opp'n to Naif's Mot. to Dismiss at 5.) Prince Naif was present for one such meeting in 1994 with French Interior Minister Charles Pasqua. (Id.) The Federal Plaintiffs allege that Prince Naif has used his position as the Minister of Interior to "protect al Qaida's support infrastructure." (Federal Compl. ¶ 438.)

The Federal complaint further alleges that "[b]etween 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with SJRC bureaus. Throughout this time, [SJRC] was under the supervision and control of . . . Prince Naif." (Federal Compl. ¶¶ 126, 436.) "Prince Naif also heads the Saudi Committee for Relief to Afghans, . . .[i]n this position, Prince Naif has channeled substantial financial and logistical support to sustain al Qaida's presence and operations in Afghanistan." (Id. ¶ 437.) Plaintiffs allege that Prince Naif is the "Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds, [which] knowingly transferred large sums of money to the families of Hamas terrorists who had executed murderous attacks against Israelis." (Ashton Compl. ¶ 287; Burnett Compl. ¶ 379; Federal Compl. ¶ 439; see also Burnett Compl. ¶ 380 (citing letter written on behalf of Yasser Arafat and claiming this committee funds radical groups).) As a result, Plaintiffs assert that "Prince Naif . . . supports suicide martyrs." (Ashton Compl. ¶ 287; Burnett Compl. ¶ 379.) The Federal Plaintiffs also allege that in 2003, U.S. Senator Charles Schumer asked that Prince Naif be replaced as Interior Minister because of his "well-documented history of supporting terrorist financing and ignoring the evidence when it comes to investigating terrorist attacks on Americans." (Federal Compl. ¶ 441.) Finally, the Federal Plaintiffs claim Prince Naif made significant personal contributions to Saudi-based charities that were sponsors of al Qaida's operations, including IIRO, MWL, WAMY, BIF, SHC, SJRC, and al Haramain. (Federal Compl. ¶¶ 442-43.)

The Federal Plaintiffs seek leave to supplement the record against Prince Salman and Prince Naif with an article that appeared in Rus al Yusef, an Egyptian publication, in August 1998. The unidentified author writes that Islamic aid organizations located in Afghanistan, Bosnia, Somalia, and Tajikistan provided funds and cover to terrorists. (See Federal Mot. to Supplement Record on Prince Naif and Prince Salman, Ex. 2, at 2.) Donors to these unidentified organizations "probably ha[d] no idea where their charity money ha[d] gone." (Id.) Prince Naif reportedly responded that "if charity money is going to illegitimate targets, it must stop immediately." (Id.) From this submission, the Plaintiffs argue that the Princes knew their charitable donations were going to terrorists.

The submission is problematic for a variety of reasons and will not be accepted. First, Plaintiffs do not provide an explanation as why they were only able to obtain and translate the article on the eve of oral argument – well after the motions were fully submitted. Second, the

article and its translation have not been authenticated.  More pointedly, however, it simply does not say that the Princes were put on notice regarding specific charities and that they continued to contribute to those charities with the intent that their donations would assist al Qaeda.  The Federal Plaintiffs' motion to supplement the record against Prince Salman and Prince Naif is denied.

### B. Defendants' Status as Foreign States for FSIA Purposes

The FSIA provides the following definition of "foreign state":

(a) A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity –

    (1) which is a separate legal person, corporate or otherwise, and

    (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

    (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

28 U.S.C. § 1603.  Further, "immunity under the FSIA extends also to agents of a foreign state acting in their official capacities [because] [i]t is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly."  Bryks v. Canadian Broad. Corp., 906 F. Supp. 204, 210 (S.D.N.Y. 1995) (internal quotations omitted); see also Terrorist Attacks I, 349 F. Supp. 2d at 788-89 (finding Princes Sultan and Turki were foreign states for FSIA purposes to the extent Plaintiffs alleged liability for actions taken in their official capacities).

### 1. SHC

SHC contends that it is an organ, agency, or instrumentality of the Kingdom of Saudi Arabia and acts on behalf of the Kingdom to fund a range of humanitarian relief efforts to Bosnia, Egypt, and Somalia.  (See generally Al-Roshood Decl., at Huffman Decl. Ex. A.)  In support of its position as a foreign state, SHC submits the affidavits of Dr. Al-Nafissa, a Saudi Arabian lawyer and a Minister of State on the Council of Ministers in the Kingdom of Saudi Arabia, and Mr. Al-Roshood, who has been the Director of the Executive Office of SHC since its inception.  The Court notes it is "required to give 'great weight' to any extrinsic submissions made by the foreign defendants regarding the scope of their official responsibilities."  Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001).

King Faud authorized Dr. Al-Nafissa to make his declaration concerning SHC.  (Al-Nafissa Decl. ¶ 2, at Huffman Decl. Ex. C.)  Dr. Al-Nafissa attests that SHC is "an arm of the Saudi Arabian government [and that its actions] are in keeping with the foreign and domestic governmental policies of the Kingdom of Saudi Arabia."  (Id. ¶ 3.)  SHC was formed by Decision of the President of the Council of Ministers in 1993.  (Al-Roshood Decl. ¶ 6.)  In the same Decision, the Council of Ministers appointed Prince Salman as President of SHC.  (Id. ¶ 7.)  As President of SHC, Prince Salman is the head of SHC's Executive Committee and Supreme Commission, members of which Prince Salman appoints.  (Id.)  SHC is staffed by civil servant

employees of the Kingdom of Saudi Arabia. (<u>Id.</u> ¶ 10.)

Dr. Al-Nafissa states that private charities in the Kingdom of Saudi Arabia receive governmental approval through Royal Order, are run by boards, and disburse funds in accordance with their charters. (Al-Nafissa Decl. ¶ 5.) In contrast, governmental commissions, such as SHC, are chaired by a governmental official, like Prince Salman, and conduct their affairs in accordance with the Kingdom's policy objectives. (<u>Id.</u> ¶ 5.) According to Dr. Al-Nafissa, "[d]ecisions regarding causes to support and recipients for Saudi High Commission funds are within the discretion of the Executive Committee, the Supreme Commission, and Prince Salman." (<u>Id.</u> ¶ 8.) The Kingdom of Saudi Arabia is SHC's largest source of funding, having provided approximately 30% of the funds used and distributed by SHC. (Al-Roshood Decl. ¶ 24.) The remainder of SHC funds are collected through fundraisers "in accordance with the directives of . . . King Fahd." (<u>Id.</u> ¶ 5.) SHC can be sued for its administrative acts in the Board of Grievances. (Al-Nafissa Decl. ¶ 8.)

In their complaint, the <u>Federal</u> Plaintiffs alleged that SHC is "an agency, instrumentality and organ of the Kingdom of Saudi Arabia." (<u>Federal</u> Compl. ¶ 181.) They now back away from that allegation and join other Plaintiffs in disputing SHC's status. Plaintiffs submit that SHC has repeatedly and systematically described itself as a non-governmental organization in representations to the Bosnian government. (<u>See</u> Plaintiffs' Mem. in Opp'n to SHC Mot. to Dismiss at 10.) Thus, even if SHC is considered a foreign state, Plaintiffs assert it has implicitly waived its immunity through those representations. <u>See</u> 28 U.S.C. § 1605(a)(1) (FSIA waiver provision). Plaintiffs also argue that it is disingenuous for SHC to simultaneously maintain that it is an organ of the Kingdom and that this Court lacks personal jurisdiction over it when the Kingdom itself did not dispute the personal jurisdiction issue.

In response to Plaintiffs' arguments that it described itself as a non-governmental organization to Bosnian authorities, SHC submits the declaration of Hadsimuratovic Hajrudin, a Bosnian lawyer who serves as a legal advisor to SHC. (<u>See generally</u> Hajrudin Decl. at SHC Reply Ex. A.) Mr. Hajrudin states that SHC characterized itself as non-governmental in accordance with Article 22 of the Law on Humanitarian Activities and Humanitarian Organizations of the Federation of Bosnia and Herzegovina because SHC is "not considered part of the government of Bosnia-Herzegovina." (<u>Id.</u> ¶ 4.) Mr. Hajrudin attests that the head of SHC's European Office received diplomatic status in Bosnia-Herzegovina in 1996 because SHC is an organization of the Saudi government. (<u>Id.</u> ¶ 6.) He also states that the Kingdom of Saudi Arabia is represented by SHC when it makes donations to Bosnia-Herzegovina. (<u>Id.</u>)

There is no dispute that SHC is a separate legal person from the Kingdom and not a citizen of the United States or any third country. <u>See</u> 28 U.S.C. § 1603. Accordingly, the only dispute regarding SHC's status is whether it is an organ of the Kingdom. In <u>Filler v. Hanvit Bank</u>, 378 F.3d 213 (2d Cir. 2004), the Second Circuit considered various factors to determine whether an entity could be considered an organ of a foreign sovereign. <u>Id.</u> at 217. The factors include:

(1) whether the foreign state created the entity for a national purpose; (2) whether the

foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

Id. at 217 (citations omitted).

SHC offers undisputed evidence that it was created by the Kingdom's Council of Ministers to "centralize all charitable giving from the Kingdom to Bosnia-Herzegovina [and that it was] vested with the sole authority to collect and distribute charitable funds in Bosnia." (Al-Roshood Decl. ¶¶ 5-6; Hajrudin Decl. ¶ 6 & Ex. D (noting the Kingdom of Saudi Arabia provides humanitarian relief to Bosnia through SHC).) The Council of Ministers appointed Prince Salman to supervise SHC. (Al Roshood Decl. ¶¶ 7-9.) The salaries of SHC employees are paid by either the Kingdom of Saudi Arabia or out of the SHC budget. (Id. ¶ 10.) Like other Saudi Arabian government agencies, SHC can be sued in the administrative court of the Kingdom. (Al-Nafissa Decl. ¶ 8.)

The Court finds that SHC has made a prima facie showing that it is a foreign sovereign. See Cargill, 991 F.2d at 1016 (requiring defendant to make prima facie case of sovereignty). Because SHC was formed by order of the Kingdom's governing body, it provides the Kingdom's aid to Bosnia, it is governed by a Saudi official and its employees are civil servants, it is an organ of the Kingdom of Saudi Arabia. See Filler, 378 F.3d at 217. Further, the Court finds SHC has not waived its sovereign immunity. The representations to the contrary on which Plaintiffs rely were made before this lawsuit was contemplated and cannot be read as a waiver of immunity from this court's jurisdiction. The Second Circuit has made clear that the waiver of FSIA immunity must be explicit. See Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003) (requiring wavier that unambiguously waives claims of immunity from legal proceedings in this country). Finally, Plaintiffs have not identified a factual dispute that would require jurisdictional discovery. See Filetech S.A. v. France Telecom S.A., 304 F.3d 180, 183 (2d Cir. 2002) (finding no abuse of discretion where district court resolved jurisdictional issue without holding evidentiary hearing because factual disputes were "readily ascertainable" from the record). Accordingly, Plaintiffs must demonstrate that an exception under the FSIA applies to their claims against SHC. See Virtual Countries, 300 F.3d at 241.

### 2. Prince Salman and Prince Naif

Aside from allegations regarding personal contributions to charities that were fronts for terrorists, the Plaintiffs' claims against Prince Salman and Prince Naif concern their official functions. The allegations against Prince Salman, for example, center on his role as President of SHC, (see, e.g., Ashton Compl. ¶ 457; Burnett Compl. ¶ 406; Federal Compl. ¶ 456) or as Governor of Riyadh, (see Ashton Compl. ¶ 291; Burnett Compl. ¶ 402). Similarly, the allegations against Prince Naif center on his role as Minister of Interior of the Kingdom. (See Ashton Compl. ¶ 286; Burnett Compl. ¶ 382; Federal Compl. ¶ 435.) To the extent the allegations concern actions undertaken in their government positions, the Court finds that Prince Salman and Prince Naif are foreign states for FSIA purposes. See Leutwyler, 184 F. Supp. 2d at 286-87 (recognizing that "individuals employed by a foreign state's agencies or instrumentalities

are deemed 'foreign states' when they are sued for actions undertaken within the scope of their official capacities"). Thus, Plaintiffs must also show that an FSIA exception applies to Princes Salman and Naif. Virtual Countries, 300 F.3d at 241.

### C. Application of FSIA Torts Exception

Plaintiffs claim any immunity enjoyed by SHC, Prince Salman, and Prince Naif is overcome by the FSIA's torts exception. The Federal Plaintiffs also argue that the commercial activities exception should lift the sovereigns' immunity. For the reasons explained in its previous opinion, the Court concludes that the torts exception is the only exception relevant to the allegations contained in the Ashton, Burnett, and Federal complaints against SHC, Prince Salman, and Prince Naif. See Terrorist Attacks I, 349 F. Supp. 2d at 793-94 (explaining that the Federal Plaintiffs' reliance on the commercial activities exception is inappropriate because the alleged acts by Defendants were not the type of actions "by which a private party engages in trade and traffic or commerce," and explaining the state sponsor of terrorism exception applies only to designated state sponsors of terror, of which the Kingdom of Saudi Arabia is not).

The torts exception lifts immunity for "personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or any official . . . of that foreign state while acting in the scope of his office." 28 U.S.C. § 1605(a)(5). For jurisdiction to be proper under the torts exception, Plaintiffs will have to show, first, that the Defendants' tortious acts caused Plaintiffs' injuries. Robinson v. Gov't of Malaysia, 269 F.3d 133, 142 (2d Cir. 2001) ("If those activities could not render the Malaysian government liable for a tort under New York law, then it remained immune under § 1605(a)(5)."). Second, Plaintiffs must show that Defendants' actions were not discretionary, i.e., not grounded in the social, economic, or political policies of the Kingdom of Saudi Arabia. Terrorist Attacks I, 349 F. Supp. 2d at 794-97; see also 28 U.S.C. § 1605(a)(5)(A) (providing that the torts exception is not applicable to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused"). "Under the FSIA's 'discretionary function' exception, 'acts which are performed at the planning level of government, as opposed to those at the operational level, are protected by the immunity.'" Marchisella v. Gov't of Japan, No. 02 Civ. 10023 (DC), 2004 WL 307248, at *2 (S.D.N.Y. Feb. 17, 2004) (quoting Napolitano v. Tishman Constr. Corp., No. 96 Civ. 4402 (SJ), 1998 WL 102789, at *4 (E.D.N.Y. Feb. 26, 1998)).

Here, since SHC, Prince Salman, and Prince Naif are not alleged to have been the actual perpetrators of the attacks, Plaintiffs rely on theories of conspiracy and aiding and abetting.
> Conspiracy and aiding and abetting are varieties of concerted-action liability: conspiracy requires an agreement to commit a tortious act . . . , aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer . . . . In order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct.

Pittman v. Grayson, 149 F.3d 111, 122-23 (2d Cir. 1998). Accordingly, to survive these Rule 12(b)(1) motions to dismiss, Plaintiffs must plead facts from which it reasonably can be inferred that the Defendants knew or should have known that their tortious actions were supporting

terrorists or terrorist fronts.  Terrorist Attacks I, 349 F. Supp. 2d at 800-01; see also Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1023 (7th Cir. 2002) ("Boim II") (explaining elements of concerted-action civil liability under ATA); Virtual Countries, 300 F.3d at 241 ("Determining whether [Plaintiffs have demonstrated that one of the FSIA's exceptions applies] involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of fact.") (internal quotations omitted).

### 1. SHC

Even if Plaintiffs alleged that SHC was tortiously liable for the attacks of September 11, such allegations could not overcome the discretionary function exception.  SHC offers undisputed evidence that all decisions regarding the distribution of humanitarian relief funds were within the sole discretion of its Chairman Prince Salman and the advisors he selected.  (See Al-Nafissa Decl. ¶ 8.)  Further, SHC was guided by the Kingdom's policies regarding Bosnia-Herzegovina in making its funding determinations.  (Id. ¶ 3.)  Accordingly, SHC's alleged misuse of funds and/or inadequate record-keeping – even if it resulted in the funds going to terrorists – was the result of a discretionary function and cannot be the basis for overcoming SHC's immunity.  See U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984) (explaining FTCA discretionary function exception is designed to "prevent judicial 'second-guessing' of . . . decisions grounded in social, economic, and political policy through the medium of an action in tort"); Marchisella, 2004 WL 307248, at *2 (explaining the FSIA's discretionary function exception replicates that found in the FTCA and that courts rely on the FTCA for guidance in interpreting the scope of the FSIA's exception); Kline v. Kaneko, 685 F. Supp. 386, 392 (S.D.N.Y. 1988) (explaining sovereign's decisions regarding formation and enforcement of national policies are discretionary functions); 28 U.S.C. § 1605(a)(5)(A) (stating torts exception is not applicable to claims based discretionary actions, even when that discretion is abused).  Accordingly, the Court finds SHC is immune from suit in this litigation.  Its motions to dismiss the Ashton, Burnett, and Federal complaints for lack subject matter jurisdiction are granted.

### 2. Prince Salman and Prince Naif

Similarly, even if Plaintiffs adequately plead a tort against Prince Salman and Prince Naif, the discretionary function exception prevents this Court from exercising jurisdiction over them in their official capacities.  Plaintiffs take issue with Prince Salman's management of SHC and its funding decisions.  Prince Salman's direction of SHC, however, is discretionary.  He was appointed President of SHC by King Fahd to carry out the Kingdom's policy toward the refugees of the Bosnian war.  (Al-Roshood Decl. ¶ 6; Al-Nafissa Decl. ¶ 5.)  Plaintiffs claim that as Chairman of the General Donation Committee for Afghanistan he assisted the Afghanistan mujahideen in the 1980s.  To the extent Prince Salman held this position as a member of the Saudi government, this was also a policy decision made at the operational level of government.  Plaintiffs claim Yasser Arafat complained to Prince Salman as Governor of Riyadh regarding Saudi funding of extremists in Palestine.  Plaintiffs do not allege, however, what relation that complaint has to the al Qaeda terrorists or this litigation.  They argue that Prince Salman, who did not attend the meeting with the former French Minister of Interior, should have known from

Saudi officials who did meet with him that unnamed terrorists were receiving funding from largely unidentified Saudi charities.[4] See Terrorist Attacks I, 349 F. Supp. 2d at 799. The Saudi attendees' decisions concerning with whom the French Minister's warnings should be shared and what the Saudi response would be, are surely grounded in social, economic, and political policy, and are, therefore, not actionable under the FSIA. Varig Airlines, 467 U.S. at 814.

Similarly, the claims against Prince Naif stem from his discretionary functions. The Plaintiffs complain that Prince Naif, as Minister of Interior, ignored warnings in 1994 from French Interior Minister Charles Pasqua that Islamic charities were being used to fund terrorism. Additionally, Plaintiffs contend that he did not adequately supervise certain Saudi charities whose diverted funds allegedly landed in the coffers of al Qaeda and Hamas.

Prince Naif's role on the Council of Ministers and as Minister of Interior makes it "nearly self-evident" that his official acts are "squarely covered by the 'discretionary function' language of [the FSIA]." Burnett II, 292 F. Supp. 2d at 20. As the Minister of Interior, Prince Naif oversees matters relating to Saudi public security, civil defense, fire service, police, passports, special security, and investigative forces. The Council of Ministers, of which he is a member, oversees the implementation of internal, external, financial, economic, educational, defense policies, and general affairs of state for the Kingdom. Prince Naif's official responsibilities included managing Saudi relations with Osama bin Laden, see Prince Naif Mem. in Supp. Mot. to Dismiss at 2 (stating Prince Naif urged the Kingdom to strip bin Laden of his Saudi citizenship in 1994), and thus became a target of al Qaeda himself (see, e.g., Bierstein Aff. in Opp'n to Prince Sultan's Mot. to Dismiss (fatwa issued by Osama bin Laden expressing extreme bitterness toward Saudi Royal family).) Therefore, Prince Naif's administration of his responsibilities was "clearly . . . grounded in social, economic, and political policy." Burnett II, 292 F. Supp. 2d at 21 (citing Varig Airlines, 467 U.S. at 814)).

This Court lacks subject matter jurisdiction over Prince Salman and Prince Naif for their official acts. The FSIA does not immunize an official for his private tortious acts, however. See 28 U.S.C. § 1605(a)(5) (explaining torts exception is relevant to official's official acts); Leutwyler, 184 F. Supp. 2d at 286-87 (explaining officials are "deemed foreign states when they are sued for actions undertaken within the scope of their official capacities"). Accordingly, the Court will consider the appropriateness of exercising personal jurisdiction over Prince Salman and Prince Naif for their alleged personal acts below.

## II. Personal Jurisdiction

To survive the motions to dismiss under Federal Rule of Civil Procedure 12(b)(2), Plaintiffs must make a prima facie showing that personal jurisdiction exists over each moving Defendant. PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997). The Court reviews the complaints and affidavits in a light most favorable to Plaintiffs, id., but it does not

---

[4] The French Interior Minister named one charity, the World Islamic League, during his meeting. Plaintiffs claim this is another name for the Muslim World League.

accept conclusory allegations or draw "argumentative inferences." <u>Mende v. Milestone Tech., Inc.</u>, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citing <u>Robinson v. Overseas Military Sales Corp.</u>, 21 F.3d 502, 507 (2d Cir. 1994)).

Plaintiffs offer two bases for personal jurisdiction. First, New York's long-arm statute, which the Court looks to in federal question cases in which no federal statute provides for national service of process or when the Court is sitting in diversity. <u>PDK Labs</u>, 103 F.3d at 1108; <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, 305 F.3d 120, 124 (2d Cir. 2002). New York's long-arm statute, C.P.L.R. 302(a)(2), provides for personal jurisdiction over a person who, personally or through an agent, "commits a tortious act within the state." Because a co-conspirator can be considered an agent, <u>see</u> <u>Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991), Plaintiffs argue that Defendants are subject to personal jurisdiction here based on the acts of their co-conspirators, the al Qaeda terrorists.

As this Court has previously explained, to establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy and allege facts warranting an inference that the defendant was a member of the conspiracy. <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 805. "To plead a valid cause of action for conspiracy . . . a plaintiff must allege the primary tort and four elements: '(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'" <u>Chrysler Capital Corp.</u>, 778 F. Supp. at 1267 (quoting <u>Kashi v. Gratsos</u>, 790 F.2d 1050, 1055 (2d Cir. 1986)). Further, "[t]o warrant the inference that a defendant was a member of the conspiracy, Plaintiffs must show that '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' of or 'at the request of or on behalf of' the out-of-state defendant." <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 805 (quoting <u>Chrysler Capital Corp.</u>, 778 F. Supp. at 1268-69). The Court must resolve the question of whether a conspiracy exists "based upon an independent examination of the factual allegations while mindful of its duty to draw all factual inferences in plaintiffs' favor." <u>Daventree v. Republic of Azerbaijan</u>, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004).

The alternative basis for personal jurisdiction offered by Plaintiffs is found in Federal Rule of Civil Procedure 4(k). Rule 4(k)(1) provides that service of process establishes personal jurisdiction when service is authorized by a federal statute. Here, the ATA provides for personal jurisdiction through its nationwide service of process provision. <u>See</u> 18 U.S.C. § 2334(a); Fed. R. Civ. P. 4(k)(1)(D). In situations in which Defendants were not served in the United States pursuant to the ATA, Rule 4(k)(2) acts as a personal jurisdiction gap-filler "in the enforcement of federal law." Fed. R. Civ. P. 4(k)(2) advisory committee's note. For the Court to exercise personal jurisdiction pursuant to Rule 4(k)(2), "there must be a federal claim, personal jurisdiction must not exist over the defendant in New York or any other state, and the defendant must have sufficient minimum contacts with the United States as a whole such that the exercise of jurisdiction does not violate Fifth Amendment due process." <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 807 (citing <u>United States v. Int'l Bhd. of Teamsters</u>, 945 F. Supp. 609, 617 (S.D.N.Y.

1996)).

Under either basis offered by Plaintiffs, the exercise of personal jurisdiction must comport with due process requirements – there must be minimum contacts and the exercise of jurisdiction must be reasonable. Metro. Life Ins. Co v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996); see also Terrorist Attacks I, 349 F. Supp. 2d at 810-11 (reviewing due process requirements); Ungar v. Palestinian Auth., 153 F. Supp. 2d 76, 87 (D.R.I. 2001) (requiring minimum contacts with the United States for personal jurisdiction under ATA). If personal jurisdiction is based on New York's long-arm statute, the Fourteenth Amendment's due process standards apply. If jurisdiction is based on Rule 4(k), the Fifth Amendment applies. The analysis is essentially the same. "The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only contacts with the forum state may be considered." Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998).

Plaintiffs claim that Rule 4(k)'s minimum contacts requirement is satisfied because the Defendants have purposefully directed their activities at the United States. See Terrorist Attacks I, 349 F. Supp.2d at 807 (reviewing the purposefully directed activities theory). This Court has held that to succeed on this theory, "Plaintiffs must make a prima facie showing of each Defendant's personal or direct participation in the conduct giving rise to Plaintiffs' injuries." Id. at 809.[5] The Court does not require direct participation in the attacks themselves, but at least participation in al Qaeda's terrorist agenda.

In analyzing a defendant's minimum contacts, courts distinguish between specific and general jurisdiction. "Specific jurisdiction exists when the forum exercises jurisdiction over the defendant in a suit arising out of the defendant's contacts with that forum." Terrorist Attacks I, 349 F. Supp. 2d at 811 (citing Metro. Life Ins. 84 F.3d at 567-68). General jurisdiction is based on a defendant's general business contacts with the forum. Because the defendant's contacts are

_____

[5] Plaintiffs bring the Court's attention to Mwani v. Bin Laden, 471 F.3d 1 (D.C. Cir. 2005), in which the D.C. Circuit found that Osama bin Laden and al Qaeda were subject to personal jurisdiction under Rule 4(k)(2) because they had "engaged in unabashedly malignant actions directed at and felt in this forum." Id. at 13 (citing, among other examples, bin Laden's and al Qaeda's orchestration of the Nairobi embassy bombing and the 1993 World Trade Center bombing, their plot to bomb various landmarks in New York City, their fatwas against Americans, the criminal indictment against them arising from the Nairobi attack, and the conclusions of the 9/11 Commission). As a result, their "decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court." Id. at 14. In light of the level of bin Laden's and al Qaeda's unquestionably direct involvement in the Nairobi attack, Mwani supports this Court's conclusion that a defendant's actions must be personal or direct so that the defendant has fair warning that his activities could subject him to personal jurisdiction in the United States. Id.

not related to the suit, a considerably higher level of contacts is generally required and the plaintiff must demonstrate the defendant's continuous and systematic general business contacts with the forum.  Metro. Life. Ins., 84 F.3d at 568; see also Helicopteros v. Nationales de Columbia, S.A., 466 U.S. 408, 414-16 (1984).

In most instances, Plaintiffs do not specify which basis for personal jurisdiction applies to each Defendant, or whether the Defendant was served in the United States pursuant to the ATA's nationwide service of process provision.  Accordingly, in analyzing Defendants' motions, the Court considers as a threshold matter whether Plaintiffs have made a prima facie showing of the Defendant's minimum contacts with the United States as a whole.

**A. Prince Salman and Prince Naif**

Plaintiffs seek to hold Prince Salman responsible for the attacks of September 11, theorizing that Prince Salman purposefully directed his activities at the United States by contributing to and raising funds for IIRO, Sanabel-al Kheer, WAMY, and Al-Haramain.  As for other contacts with the United States, Prince Salman owns stock in two United States corporations based in Texas, and, during a trip to the United States in 1989, he met with President George H.W. Bush and the governor of Maryland.  (Plaintiffs' Opp'n to Prince Salman Mot. to Dismiss at 21-22; see generally Parrett Aff.)  Additionally, Plaintiffs claim that Prince Salman's son attended school in California, had a residence in the United States, owned a corporation that breeds race horses in the United States, and is involved, through his estate, in a New Jersey lawsuit with a former employee.  Id.  They seek jurisdictional discovery to determine if Prince Salman has other contacts here.

Plaintiffs do not allege that Prince Naif has any general contacts with the United States.  Rather, they claim that he purposefully directed his activities toward the United States by making personal contributions to several Saudi-based charities.  (Federal Compl. ¶¶ 442-43.)

Plaintiffs must make a prima facie showing that Prince Salman and Prince Naif have minimum contacts with the United States.  The minimum contacts requirement is satisfied "if the defendant has 'purposefully directed' his activities at the residents of the forum."  Burger King v. Rudzewicz, 471 U.S. 462, 474 (1985).  Foreseeability is not enough, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum."  Id.  Donating money to established humanitarian organizations that may or may not have been diverting funds to support al Qaeda cannot be considered primary participation in intentional wrongdoing expressly aimed at the United States.  Terrorist Attacks I, 349 F. Supp. 2d at 809 (citing In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003)).

As to Prince Salman's various limited contacts with the United States, they do not support general jurisdiction over him.  The 1989 visit to the White House and Maryland is too far removed in time from the 2001 attacks.  See, e.g., Metro. Life Ins. Co., 84 F.3d at 569 (explaining that a defendant's "continuous and systematic" contacts with a forum must be examined over a period of time and finding a six-year period reasonable).  Prince Salman's deceased son's contacts with the United States are irrelevant to this Court's analysis.  Keeton v.

Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 ("Each defendant's contacts with the forum State must be assessed individually.").  Prince Salman's ownership of shares in Texas corporations, on its own, cannot be considered sufficiently systematic and continuous to establish general jurisdiction.  Helicopteros, 466 U.S. at 414-16 (finding CEO's travel to forum for contract negotiations, employees' travel to forum for training, receipt of funds drawn on forum bank accounts, and purchase from forum companies were not contacts sufficiently systematic and continuous to establish general jurisdiction).  Plaintiffs have not presented a genuine issue of jurisdictional fact such that discovery is necessary.  Daventree, 349 F. Supp.2d at 761.  Plaintiffs have not satisfied the constitutional requirement of showing that the Princes have minimum contacts with the United States.  Accordingly, Prince Salman's and Prince Naif's motions to dismiss the Ashton, Burnett, and Federal complaints for lack of personal jurisdiction are granted.

###### **B. Rabita Trust**[6]

Plaintiffs allege that Rabita Trust is

a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis from Bangladesh.  Founded in 1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, [Defendant MWL].  Rabita Trust received the majority of its funding from the MWL and the Saudis, and [has] been involved with terrorism.

(Ashton Compl. ¶ 521; Burnett Compl. ¶ 268.)  The charity initially received funding from its founders to help relocate 250,000 displaced refugees.  (Ashton Compl. ¶ 522; Burnett Compl. ¶ 269.)  Plaintiffs assert that Rabita Trust has actually relocated only a few hundred refugees.  (Ashton Compl. ¶ 522; Burnett Compl. ¶ 269.)

On October 12, 2001, the United States Treasury Department designated Rabita Trust a Specially Designated Global Terrorist Entity and froze its assets.[7]  (Ashton Compl. ¶ 312, 527; Burnett Compl. ¶ 236; Federal Compl. ¶¶ 117, 214.)  Rabita Trust is allegedly related to various

---

[6] Rabita Trust moves to dismiss the Ashton, Burnett, and Federal complaints.

[7] Certain Defendants have been designated Specially Designated Global Terrorists ("SDGTs") pursuant to Executive Order 13224.  In response to the attacks of September 11, President Bush issued Executive Order 13224 on September 23, 2001, pursuant to the authorities of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., the National Emergencies Act, 50 U.S.C. § 1601 et seq., United Nations Participation Act of 1945, as amended, 22 U.S.C. 287(c), and 3 U.S.C. § 301.  The Secretaries of State and Treasury, in consultation with each other and the Attorney General, may designate individuals or entities if they determine the individual or entity has committed or poses the risk of committing acts of terrorism, or are owned or controlled by terrorists, or assist in or sponsor terrorism.  As a result, the property and interests of the SDGT that come within the possession or control of U.S. persons are blocked.  The process is intended to deter contributions to designated persons and entities and heighten public awareness regarding links to terrorism.  See Executive Order 13224 Fact Sheet available at http://www.state.gov/s/ct/rls/fs/2002/16181.htm.

other charity Defendants and al Qaeda.  For instance, as a subsidiary of MWL, it is a "sibling organization of the IIRO."  (Ashton Compl. ¶ 525; Burnett Compl. ¶ 272; Federal Compl. ¶ 113.)  Through MWL and its own officers, Rabita Trust is also related to the SAAR Network.  (Ashton Compl. ¶¶ 338, 526-28; Burnett Compl. ¶¶ 273-75; Federal Compl. ¶ 213.)   Plaintiffs claim that "Rabita Trust is an al Qaeda front" and that its General Director, Wa'el Julaidan, is a known al Qaeda member.  (Ashton Compl. ¶ 523; Burnett Compl. ¶ 270; Federal Compl. ¶¶ 100, 121, 210.)  In a list of orders obtained in a raid of BIF's Sarajevo's offices, investigators allegedly recovered a document from Osama bin Laden regarding the management of Islamic charities in which he urged the creation of a committee to receive and distribute donations to al Qaeda and suggests Rabita Trust's participation.  (Federal Compl. ¶¶ 195, 211.)

Rabita Trust claims that it does not have an office in the United States and that the complaints are devoid of any allegations that it directed money to terrorists.  It admits that it has been designated a terrorist, but claims it does not have the same connections to the United States, bin Laden, and al Qaeda that Defendants Benevolence International Foundation ("BIF") and Adel A.J.Batterjee had.  See Terrorist Attacks I, 349 F. Supp. 2d at 823-25 (finding Court had personal jurisdiction over Mr. Batterjee based on his designation as a global terrorist, his role with BIF, another designated terrorist, his leadership of BIF's United States operations, and his relationship with Osama bin Laden).  It also argues that the document that Plaintiffs attribute to Osama bin Laden is similar to the Golden Chain, in that it lacks foundation and authentification.  See Terrorist Attacks I., 349 F. Supp. 2d at 817 ("The 'Golden Chain' is a group of documents that was discovered by Bosnian authorities searching the offices of charity Defendant BIF in March 2002.  Plaintiffs claim the "Golden Chain" contains a list of early direct donors to al Qaeda.")

In assessing whether Rabita Trust has purposefully directed its activities at the United States under Rule 4(k), the Court is mindful of the executive branch's designation of it as a SDGT.  While the designation is not dispositive on its own, it does warrant some deference.  In the realm of foreign affairs, the executive branch has access to "confidential sources of information [and] agents in the form of diplomatic, consular and other officials."  United States v. Curtiss-Wright Corp., 299 U.S. 304, 320 (1936).  Entities are designated under Executive Order 13224 if the executive branch determines they are involved in terrorist activities.  See Executive Order 13224 Fact Sheet.  Courts enjoy great discretion in deciding whether to order jurisdictional discovery before resolving motions to dismiss for lack of personal jurisdiction.  See, e.g., APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003).  This Court finds that such discovery would be helpful in assessing whether any of Rabita Trust's activities were directed at the United States.  Accordingly, Rabita Trust's motions to dismiss the Ashton, Burnett, and Federal complaints are denied without prejudice.

## C. Wa'el Jalaidan[8]

The United States Department of Treasury has designated Defendant Jalaidan a terrorist,[9] frozen his assets, and named him "one of the founders of al Qaeda." (<u>Ashton</u> Compl. ¶ 304; <u>Burnett</u> Compl. ¶ 255; <u>Federal</u> Compl. ¶¶ 117, 91.)  The Treasury Department "characterized [him] as having 'directed organizations that have provided financial and logistical support to al-Qa-ida, [he] is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan.'" (<u>Ashton</u> Compl. ¶¶ 304, 312, 523-24; <u>Burnett</u> Compl. ¶¶ 236, 255, 271; <u>Federal</u> Compl. ¶ 117; <u>see also</u> <u>Federal</u> Compl. ¶ 196 (claiming documents found in the Bosnian raid of BIF offices contained a note from Osama bin Laden to Jalaidan regarding al Qaeda's need for weapons).)  Further, Osama bin Laden and his lieutenant, Abu Zubaydah, allegedly "have acknowledged Wa'el Julaidan as a known associate of their operations.  Julaidan has been the head of various non-government organizations providing financial and logistical support to the al-Qa'ida network."  (<u>Ashton</u> Compl. ¶¶ 304, 312, 341, 484; <u>Burnett</u> Compl. ¶ 236, 255.)

Jalaidan was in charge of the MWL in Peshawar, Pakistan and served as the General Director of Rabita Trust.  (<u>Ashton</u> Compl. ¶ 304; <u>Burnett</u> Compl. ¶ 236, 255.)  He "operated MWL offices that served in the early days of al Qaeda to attract and train holy warriors from around the world for the war in Afghanistan" and has "repeatedly aided and abetted terrorists." (<u>Ashton</u> Compl. ¶¶ 304, 312; <u>Burnett</u> Compl. ¶ 255.)  Jalaidan is also allegedly connected to Defendant SJRC.  (<u>Ashton</u> Compl. ¶ 484; <u>Federal</u> Compl. ¶ 125.)

Defendant Jalaidan argues that the allegations against him are simply allegations of guilt by association, and do not include any specificity regarding dates to put his actions in context. He urges the Court to not rely on his designation as a terrorist by the Treasury Department because he did not have an opportunity to rebut it.

Plaintiffs do not claim to have served Mr. Jalaidan in the United States under the ATA's nationwide service provision.  Accordingly, Rule 4(k)(2) may provide a basis for personal jurisdiction. There are several federal claims at issue in this litigation and Plaintiffs have not made a prima facie showing that Mr. Jalaidan is subject to personal jurisdiction in New York or any other state.  The Court turns to Mr. Jalaidan's contacts with the United States. In addition to being designated as a global terrorist by the Department of Treasury, Mr. Jalaidan is alleged to be a founder and the logistical chief of al Qaeda, and affiliated with several other charities that are allegedly in al Qaeda's fundraising network.  In light of al Qaeda's public declarations of war against the United States, someone who is alleged to be a founder, an admitted associate, and a provider of financial and logistical support to al Qaeda, has purposefully directed his activities at

---

[8] Wa'el Jalaidan moves to dismiss the <u>Ashton</u>, <u>Burnett</u>, and <u>Federal</u> complaints.

[9] At oral argument Plaintiffs alleged and Defendant heard for the first time, that Saudi Arabia and the United Nations have also designated him a terrorist.

the United States such that the exercise of personal jurisdiction over him is reasonable.[10]  See Mwani v. Bin Laden, 471 F.3d at 14.

### D. IIRO[11]

Plaintiffs claim that IIRO has "materially supported terror around the globe, including Osama bin Laden and al Qaeda."  (Ashton Compl. ¶ 310; Burnett Compl. ¶¶ 234, 239; Federal Compl. ¶ 133.)  In the early 1990s, IIRO "was rapidly becoming al Qaeda's foremost charity used as a means to transfer funds, personnel, and other means of material support."  (Burnett Compl. ¶ 326; Federal Compl. ¶ 142.)  Plaintiffs claim IIRO remains "firmly entrenched with Osama bin Laden's al Qaeda organization" because of its support of an al Qaeda guest house in Egypt, its office's close proximity to Osama bin Laden's personal office in Sudan, and its relationship with bin Laden's brother-in-law Defendant Mohammed Jamal Khalifa.  (Ashton Compl. ¶¶ 310, 315, 317; Burnett Compl. ¶¶ 234, 239, 241.)

Mohammed Jamal Khalifa headed IIRO's Philippines office, which served as a center of terrorist financing and training.  (Ashton Compl. ¶ 310; Burnett Compl. ¶ 234; Federal Compl. ¶¶ 135-36.)  Khalifa collected and laundered money for al Qaeda through IIRO's Phillipines office.  (Ashton Compl. ¶ 316; Burnett Compl. ¶ 240.)  Through Khalifa, IIRO was allegedly involved with bombings in Jordan in 1993 and 1994, the 1993 attack on the World Trade Center, plots to assassinate former President Bill Clinton and the late Pope John Paul II and to simultaneously blow up twelve American airliners, and the 1998 Embassy bombings in Africa.  (Ashton Compl. ¶¶ 310, 318, 510-12; Burnett Compl. ¶¶ 189, 234, 239 240, 242; Federal Compl. ¶¶ 136, 137, 139.)

Plaintiffs claim IIRO supported al Qaeda terrorists in other ways as well.  One of the September 11 hijackers claimed to be working for IIRO's Fazeh Ahed.  (Ashton Compl. ¶ 322; Burnett Compl. ¶ 246.)  IIRO allegedly funded the Taliban regime with $60,000,000.  (Ashton Compl. ¶ 322; Burnett Compl. ¶ 246.)  Pakistan deported 89 aid workers from the IIRO on the grounds that they were supporting al Qaeda.  (Ashton Compl. ¶ 322; Burnett Compl. ¶ 246; Federal Compl. ¶ 144.)  Plaintiffs claim IIRO funded al Qaeda training camps in Afghanistan.  (Ashton Compl. ¶ 556; Federal Compl. ¶ 134 (basing allegations on declassified 1996 CIA report alleging IIRO funded six al Qaeda training camps, including those from which it planned, approved, and coordinated the September 11 attacks and where hijackers received training and indoctrination).)  IIRO funded Egyptian al-Jihad, a branch of al Qaeda.  (Burnett Compl. ¶ 243.)  IIRO conducted a joint fundraising event with al-Haramain and WAMY in Riyadh, Saudi Arabia in December 1999.  (Burnett Compl. ¶ 156.)

---

[10] In reaching this conclusion, the Court did not consider the supplemental material that the Burnett and Federal Plaintiffs submitted in opposition to Mr. Jalaidan's motions to dismiss.  (See Letter from Sean P. Carter to Court of June 23, 2005; Letter from Jodi Westbrook Flowers to Court of June 24, 2005.)

[11] IIRO moves to dismiss the Ashton, Burnett, and Federal complaints.

Defendant MWL is the parent organization of IIRO and uses it as an "operational arm to perform many of its charitable activities."  (<u>Ashton</u> Compl. ¶ 298; <u>Federal</u> Compl. ¶¶ 130-31.)  Plaintiffs claim IIRO also works with numerous other charities allegedly affiliated with al Qaeda, including SJRC, BIF, Global Relief Foundation, Taibah International, Islamic African Relief Agency, and WAMY.  (<u>Ashton</u> Compl. ¶ 320; <u>Burnett</u> Compl. ¶¶ 172, 244; <u>Federal</u> Compl. ¶ 147.)  The FBI raided IIRO's offices in Virginia after September 11, 2001.  (<u>Ashton</u> Compl. ¶ 322; <u>Burnett</u> Compl. ¶ 246.)

Plaintiffs allege that IIRO operates under the name International Relief Organization ("IRO") in the United States in Falls Church, Virginia, and that the IIRO and IRO transfer money to each other and have the same president.  (<u>Ashton</u> Compl. ¶¶ 311, 320; <u>Burnett</u> Compl. ¶¶ 172, 235, 237; <u>Federal</u> Compl. ¶ 146 (U.S. branch established in 1991); <u>see also</u> Parrett Aff. Ex. 1 (attaching IRO's 1991 certificate of incorporation in Virginia); <u>id.</u> Ex. 2 (attaching IRO's 1993 certificate for doing business in Virginia under assumed name of International Islamic Relief Organization (IIRO)).)  IIRO claims IRO was finally dissolved as a corporate entity in December 2002.  (Saleh bin Abdallah Alsaikhan Decl. ¶ 10.)

The parties agree that this Court's exercise of personal jurisdiction over IIRO depends on its contacts with the United States as a whole under Rule 4(k)(1).  The Court looks, therefore, at IIRO's contacts with the United States.  It appears that IIRO was operating in the United States until December 2002.  It is alleged to have supported an al Qaeda guest house.  Through its relationship with Mohammed Jamal Khalifa, it has allegedly been involved in several al Qaeda attacks and plots for other attacks.  It has allegedly funded the Taliban and al Qaeda training camps in Afghanistan.  The Court finds that Plaintiffs have made a prima facie case that IIRO has purposefully directed its activities at the United States, thus satisfying the constitutional minimum contacts requirement.  IIRO's motions to dismiss the <u>Ashton</u>, <u>Burnett</u>, and <u>Federal</u> complaints are denied.

## III. Failure to State a Claim

In these Rule 12(b)(6) motions to dismiss for failure to state a claim, the Court accepts as true the facts alleged in the complaints and draws all reasonable inferences in favor of Plaintiffs. <u>Harris v. City of New York</u>, 186 F.3d 243, 247 (2d Cir. 1999).  The complaints should be dismissed only if it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claims that would entitle them to relief.  <u>Id.</u>; <u>see also</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.").

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."   "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."  <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506, 512 (2002) (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168-69 (1993)).  Plaintiffs must still give

Defendants fair and adequate notice of their claims and the grounds on which they rest. See Simmons v. Abruzzo, 49 F. 3d 83 , 86 (2d Cir. 1995). "[W]hile Swierkiewicz made clear that pleading a McDonnell Douglas prima facie case was not necessary to survive a motion to dismiss, it did not even remotely suggest that a pleading could survive dismissal when it contained only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based." Jackson v. BellSouth Telecomms., 372 F.2d 1250, 1270-71 (4th Cir. 2004).

The Court limits its review to the facts stated in the complaints, documents attached to the complaints as exhibits, and documents incorporated by reference in the complaints. Dangler v. N.Y.C. Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir. 1999). For purposes of the RICO claims, the Court also reviews the RICO statements.

Plaintiffs claim that Defendants in these lawsuits are liable for the attacks of September 11, in most instances, as co-conspirators, aiders, or abettors with al Qaeda. The Court has held that Defendants may be responsible for the September 11 attacks if they knowingly and intentionally provided material support to al Qaeda. See Terrorist Attacks I, 349 F. Supp. 2d at 826. The complaints' various theories of recovery merit a brief review here. See id. at 825-31.

The ATA provides a civil remedy for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or estate, survivors, or heirs." 18 U.S.C. § 2333(a). An act of international terrorism includes the provision of material support to terrorists, which is also a criminal act under the ATA. Boim II, 291 F.3d at 1015. The ATA's criminal provisions define "material support or resources" as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. § 2339A(b); see also Boim II, 291 F.3d at 1015 (finding conduct that violates § 2339A would be sufficient to meet the definition of "international terrorism" in § 2333). This Court adopts the Seventh Circuit's requirement that Plaintiffs plead that Defendants knew of al Qaeda's illegal activities, "that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities." Id. at 1023-24 (finding allegation that defendants are "'front' organizations with ostensibly legitimate purposes which are actually engaged in fund-raising and money laundering in support of terrorist activities" and that those defendants "supplied money to Hamas to fund terrorist operations" were sufficient to survive 12(b)(6) motion).

The ATCA provides a basis for relief when an alien sues for a tort committed in violation of the law of nations. 28 U.S.C. § 1350; Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995). Aircraft hijacking is considered a violation of international law, Kadic, 70 F.3d at 240, and the ATCA includes "actions premised on a theory of aiding and abetting and conspiracy." Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 311 (S.D.N.Y. 2003). The ATCA, therefore, may provide a basis of recovery for those Plaintiffs who are aliens.

The Federal Plaintiffs include violations of civil RICO in their complaint. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962 (c). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Id. § 1962(d). Section 1964 provides for a private right of action to enforce the statute. Id. § 1964. Plaintiffs must plead an injury resulting from conduct of an enterprise through a pattern of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 491 (1985).

In Reves v. Ernst & Young, 507 U.S. 170 (1993), the Supreme Court found that liability under § 1962(c) requires that a defendant be a participant "in the operation or management of the enterprise itself." Id. at 185. The Court stated:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

Id. at 179. Therefore "to state a claim for liability under § 1962(c), Plaintiffs must allege that the [Defendants] participated 'in the operation or management of the enterprise itself,' which requires that these Defendants must have had some part in directing the enterprise's affairs." Redtail Leasing, Inc. v. Bellezza, No. 95 Civ. 5191 (JFK), 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997).

The TVPA provides a cause of action against individuals who under actual or apparent authority of any foreign nation subject an individual to torture or extrajudicial killing. 28 U.S.C. § 1350 note; Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004). The TVPA claims against Rabita Trust, IIRO, Success Foundation, and the SAAR Network entities are dismissed because these Defendants are not individuals. Arndt, 342 F. Supp. 2d at 141. The TVPA claims against Tarik Hamdi, Abdulrahman Alamoudi, Wa'el Jalaidan, and the SAAR Network executives are dismissed because there is no allegation that these Defendants were acting under color of state law. In re: South African Apartheid Litigation, 346 F. Supp. 2d 538, 548 (S.D.N.Y. 2004) (finding no TVPA claim where complaint did not include allegation of individual acting under color of state law or with significant state aid)

Under New York law, Plaintiffs who are personal representatives who sufficiently allege that Defendants caused the death of their represented decedent will have also stated a claim for wrongful death and survival. N.Y. Est. Powers & Trusts Law §§ 5-4.1 (providing claim for wrongful death) and 11-3.2(b) (providing claim for survival).

Plaintiffs bring various torts claims against these Defendants. As the Court explained in

Terrorist Attacks I, the Federal Plaintiffs' claims of assault, battery, and intentional infliction of emotional distress are time-barred, and therefore dismissed against Rabita Trust, Wa'el Jalaidan, IIRO, Tarik Hamdi, Abdulrahman Alamoudi, Mar-Jac Poultry, and the SAAR Network executives. Terrorist Attacks I, 349 F. Supp. 2d at 829; N.Y. C.P.L.R. 215(3). To the extent the Ashton and Burnett Plaintiffs plead that Defendants are liable for the September 11 attacks as co-conspirators or aiders or abettors of al Qaeda, they will have pled a claim for relief for intentional infliction of emotional distress, which requires extreme and outrageous conduct, intent to cause severe emotional distress, a causal connection between the conduct and the injury, and severe emotional distress. See Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). The Federal Plaintiffs' trespass claims require "the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1361 (2d Cir. 1989). Provided the Federal Plaintiffs plead that Defendants here acted in concert with the September 11 hijackers, they will have stated a claim for relief for trespass. Finally, the negligence claims against the Defendants are dismissed because the complaints do not allege or identify a duty owed to Plaintiffs by these Defendants. Terrorist Attacks I, 349 F. Supp. 2d at 830-31.

To summarize, the TVPA and negligence claims against all of the Defendants moving for dismissal under Rule 12(b)(6) here are dismissed. The Federal claims of assault and battery and intentional infliction of emotional distress are also dismissed. The Court reviews the complaints to determine if they state a claim for relief under the ATA and RICO. If Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival, the Federal Plaintiffs will have stated a claim for trespass, and the Ashton and Burnett Plaintiffs will have stated claims for intentional infliction of emotional distress. Plaintiffs who are aliens will have also stated a claim for relief under the ATCA.

### A. Tarik Hamdi[12]

The Burnett and Federal Plaintiffs allege that after 1996, when Osama bin Laden declared war on Americans, Tarik Hamdi allegedly arranged for the delivery of a battery for a satellite phone used by Osama bin Laden. (Burnett Compl. ¶¶ 245, 581 (citing arguments of then-AUSA Kenneth Karas); Federal RICO Statement Ex. A.) Osama bin Laden allegedly used that phone and battery pack to coordinate and order the African embassy bombings. (Federal RICO Statement Ex. A.)

Plaintiffs also allege that Hamdi is affiliated with various al Qaeda operatives. For instance, he has connections with the Committee for the Defense of Legitimate Rights ("CDLR") and the Advice and Reformation Committee ("ARC"), two dissident Saudi groups with ties to Osama bin Laden. (Burnett Compl. ¶¶ 561-62.) A radical Arabic publication allegedly provided a phone number registered in Hamdi's name when it advertised the contact information of CDLR's U.S. branch. (Burnett Compl. ¶ 580.) CDLR published bin Laden's October 12, 1996 fatwa on the Muslim Students Association listserve, the "MSA News." (Burnett Compl. ¶ 584.)

---

[12] Tarik Hamdi moves to dismiss the Burnett and Federal complaints.

Plaintiffs claim that ARC allegedly serves as al Qaeda's front in the United Kingdom and facilitates communication to and from Osama bin Laden. (Burnett Compl. ¶¶ 562, 564, 575, 577, 584-85.) Hamdi is also alleged to have connections to Khalid al-Fawwaz, one of the masterminds of the embassy bombings. (Burnett Compl. ¶ 582.) Finally, Plaintiffs claim Hamdi is a co-conspirator with the SAAR Network. He worked at IIIT in Herndon, Virginia, "the central address surrounding the SAAR Foundation raids, evidence and investigation." (Burnett Compl. ¶¶ 267, 583; Federal Compl. ¶146, 224.)

Hamdi asserts that he is a journalist. He argues that ABC requested that he arrange the interview with Osama bin Laden and that he did not purchase the phone or battery pack. He claims he has not had any ties to CDLR since 1995. He admits that he worked at IIIT as an editor. These factual disputes cannot be resolved on a 12(b)(6) motion.

The Federal Plaintiffs have not alleged that Mr. Hamdi participated in the operation or management of any enterprise. The RICO claims against Mr. Hamdi must be dismissed. See Redtail Leasing, Inc. v. Bellezza, 1997 WL 603496 at *5. Plaintiffs allege that Mr. Hamdi knew about bin Laden's terrorist activities at the time he procured a phone for him because the first fatwas had already been issued. They allege he provided material support to bin Laden in the form of a satellite phone battery. The ATA includes communications equipment in its definition of material support. See 18 U.S.C. § 2339A(b). "[E]ven small donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability in section 2333." Boim II, 291 F.3d at 1015. These allegations are sufficient to notify Mr. Hamdi of the claims against him. Tarik Hamdi's motions to dismiss the Burnett and Federal complaints are denied.

## B. Abdulrahman Alamoudi[13]

Defendant Abdulrahman Alamoudi has connections with several organizations that the Burnett and Federal Plaintiffs claim support terrorism. He is Vice President of Taibah International Aid Association's U.S. branch. (Federal Compl. ¶ 245.) Plaintiffs claim Taibah was implicated in the 1998 embassy bombings. (Federal Compl. ¶¶ 66, 239, 244.) Additionally, Taibah allegedly works closely with designated-terrorist Global Relief Fund and SHC and has diverted funds to al Qaeda and its affiliates in Bosnia. (Federal Compl. ¶¶ 241, 243.) Through Taibah, Alamoudi is also connected with several SAAR Network entities, including American Muslim Council, American Muslim Foundation, Hajj Foundation, Happy Hearts Trust, IIRO, and Success Foundation. (Federal Compl. ¶¶ 245, 490; Burnett Compl. ¶¶ 237, 248.) He allegedly used his SAAR connections to funnel money to al Qaeda through various fronts. (Federal Compl. ¶ 247.)

Plaintiffs allege that Alamoudi has openly stated his support for Hamas and Hezbollah, both designated terrorist organizations that cooperate with al Qaeda. (Federal Compl. ¶¶ 50, 53 Burnett Compl. ¶ 237.)

---

[13] Abdulrahman Alamoudi moves to dismiss the Burnett and Federal complaints.

In August 2003, Alamoudi was detained at Heathrow Airport on his way to Syria. Customs officers seized approximately $340,000 in sequentially numbered bills, two U.S. passports, and one Yemeni passport. (Federal Compl. ¶ 246.) Alamoudi was arrested by U.S. officials at Washington Dulles Airport on September 28, 2003. (Federal Compl. ¶ 247.) He subsequently pleaded guilty to unlicensed travel to and commerce with Libya, false statements on his naturalization application, and tax offenses involving Libyan financial transactions. (Federal Mem. in Opp'n at 6.) He is currently serving a twenty-three year sentence. (Id.)

The Burnett complaint does not allege any act taken by Mr. Alamoudi that could be considered the provision of material support for al Qaeda. The Federal complaint is sustained inasmuch as it claims that Mr. Alamoudi funneled money to al Qaeda through the charities with which he was involved. (Federal Compl. ¶¶ 241, 243.) See 18 U.S.C. § 2339(A) (including "currency or other financial securities [and] financial services" in definition of material support). This claim puts Mr. Alamoudi on notice that he is alleged to have provided financial material support to al Qaeda. Because the Federal complaint does not allege that Mr. Alamoudi had any role in directing an enterprise, however, the RICO claims against Mr. Alamoudi are dismissed. In sum, Mr. Alamoudi's motion to dismiss the Burnett complaint is granted; his motion to dismiss the Federal complaint is denied.

### C. Success Foundation[14]

The Burnett Plaintiffs claim that Success Foundation is a sister company to Defendant IIRO and that it "sends money back and forth with the IIRO and IRO" and other sponsors of terror. (Burnett Compl. ¶ 235.) If given the opportunity to replead its allegations against Success, the Plaintiffs would allege that, in 1998, Success Foundation entered into a contract to act as an agent for Defendant Taibah, which has since been designated a global terrorist.

The complaint does not allege that Success Foundation knew the money it was transferring between IIRO and IRO would somehow assist al Qaeda, nor does it allege facts showing that Success Foundation knew the other unnamed organizations to which it transferred money were in the business of supporting terrorism. See Boim II, 291 F.3d at 1012 ("To hold the defendants liable for donating money without knowledge of the donee's intended criminal use of the funds would impose strict liability. Nothing in the language of the statute or its structure or history supports that formulation."). The Burnett complaint is against Success Foundation is dismissed without prejudice.

### D. Wa'el Jalaidan

For the reasons the Court found that it has personal jurisdiction over Mr. Jalaidan, the Court finds the Plaintiffs have stated a claim for relief against him. Plaintiffs have alleged facts, that if true, would be sufficient to prove that he knowingly provided material support to al Qaeda in the form of financial and logistical support. See 18 U.S.C. § 2339(A) (including "currency or other financial securities, financial services, . . . weapons, [and] personnel" in definition of

---

[14] Success Foundation moves to dismiss the Burnett complaint.

material support).  The <u>Federal</u> complaint does not allege that Jalaidan directed an enterprise and the RICO claim is dismissed.  Wa'el Jalaidan's motions to dismiss the <u>Ashton</u>, <u>Burnett</u>, and <u>Federal</u> complaints are denied

### E. IIRO

Similarly, for the reasons the Court found that Plaintiffs made a prima facie demonstration that IIRO has purposefully directed its activities at the United States, the Court finds they have stated a claim under the ATA in that IIRO has allegedly funded al Qaeda training camps in Afghanistan, supported al Qaeda guest houses, and been involved in other terrorist attacks and plots. <u>See</u> 18 U.S.C. § 2339(A) (including "currency or other financial securities, financial services, . . . weapons, [and] personnel" in definition of material support).  IIRO's motions to dismiss the <u>Ashton</u>, <u>Burnett</u>, and <u>Federal</u> complaints are denied.

### F. Rabita Trust

Rabita Trust moves to dismiss the complaints against it for failure to state a claim.  These motions are denied without prejudice until this Court determines whether it has personal jurisdiction over Rabita Trust.

### G. SAAR Network Defendants[15]
### 1. Entities

The <u>Burnett</u> and <u>Ashton</u> complaints' allegations against the SAAR Network entities are substantially similar to one another.[16]  Paragraph 267 of the <u>Burnett</u> complaint and paragraph 339 of the <u>Ashton</u> complaint both state:

> Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR Network include Defendants . . . African Muslim Agency, . . . Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mar-Jac Poultry, Inc., . . . Reston Investments, Inc., . . . Safa Trust, . . . and York Foundation, all located doing business or registered to do business in the United States.

In support of their claims against these Defendants, Plaintiffs rely primarily on their allegations against the "SAAR Foundation and network."  (<u>See</u> <u>Burnett</u> Compl. ¶¶ 261-67; <u>Ashton</u> Compl. ¶¶ 333-39.)  The SAAR Foundation, allegedly a financial sponsor of terror, was formed in the 1970s by a group of Muslim scholars and scientists.  (<u>Burnett</u> Compl. ¶ 261; <u>Ashton</u> Compl. ¶ 333.)  It was incorporated in Virginia in 1983 and dissolved in December 2000.

_____

[15] Certain of these Defendants object to the label "SAAR Network Defendants," arguing there is no such entity and that, even if there were, Plaintiffs cannot agree as to which Defendants are included in the network.  The Court refers to these Defendants under this label solely because Plaintiffs have so-identified these Defendants in their complaints.

[16] African Muslim Agency, Grove Corporate, Heritage Education Trust, IIIT, Mar-Jac Investments, Mar-Jac Poultry, Reston Investments, Safa Trust, and York Foundation move to dismiss the <u>Burnett</u> complaint.  IIIT and Mar-Jac Poultry also move to dismiss the <u>Ashton</u> complaint.  Mar-Jac Poultry moves to dismiss the <u>Federal</u> complaint as well.

(<u>Burnett</u> Compl. ¶ 261; <u>Ashton</u> Compl. ¶ 333.)  Its largest donor is the al Rajhi family of Saudi Arabia.  (<u>Burnett</u> Compl. ¶ 261; <u>Ashton</u> Compl. ¶ 333.)

The complaints claim that over one hundred "affiliated organizations" are registered or are doing business at one of the SAAR Foundation's addresses in Herndon, Virginia, but many "do not maintain a physical presence at that address, or elsewhere."  (<u>Burnett</u> Compl. ¶ 262; <u>Ashton</u> Compl. ¶ 334.)  The complaints further allege that many of the "SAAR Network" organizations' offices in Herndon were raided in March 2002 as part of Operation Greenquest to investigate "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including) Osama bin Laden."  (<u>Burnett</u> Compl. ¶ 263; <u>Ashton</u> Compl. ¶ 335.)  As noted above, Plaintiffs claim that the entity Defendants are among numerous co-conspirators, material sponsors, and/or aiders and abettors of the SAAR Network.  (<u>Burnett</u> Compl. ¶ 267; <u>Ashton</u> Compl. ¶ 339.)  The Plaintiffs also refer the Court to their allegations regarding charity sponsors of terror.  (<u>See, e.g.</u>, <u>Burnett</u> Compl. ¶¶ 150-53 (alleging, for example, that charity Defendants "are used as terrorist fronts, to mask money transfers and provide cover for terrorist operatives").)  Additionally, the <u>Ashton</u> complaint claims that IIIT received its "operating expenses" from SAAR and "in turn financed two Florida charitable organizations accused of being cells for Islamic Jihad in Florida."  (<u>Id.</u> ¶ 579.)

Unlike the SAAR Network entities whose motions to dismiss the <u>Federal</u> complaint the Court considered in its previous opinion and order, <u>see</u> <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 822-23, these Defendants do not dispute that this Court has personal jurisdiction over them.  Although each of these moving Defendants filed a separate motion to dismiss, their arguments in favor of dismissal are similar.[17]  They argue that, even "assum[ing] that plaintiffs have stated a claim against the 'SAAR Network,'" (<u>see, e.g.</u>, African Muslim Agency's Mem. in Supp. Mot. to Dismiss at 3, n.1) the complaints must be dismissed because they contain only conclusory allegations that they are "co-conspirator[s], material sponsor[s], and/or aider[s] and abettor[s] of the SAAR Network."  (<u>Burnett</u> Compl. ¶ 267; <u>Ashton</u> Compl. ¶ 339.)  Further, they argue that the complaints must be dismissed because they do not allege that they donated any money improperly, or with the knowledge that it would be given to Osama bin Laden, al Qaeda, or to any other charity allegedly funneling money to terrorists.

Plaintiffs offer the legal conclusion that the SAAR Network entities conspired with the SAAR Network.  These Defendants, however, have no notice of the factual grounds on which Plaintiffs' claims of conspiracy are based.  <u>See</u> <u>Jackson</u>, 372 F.3d at 1271 (explaining <u>Swierkiewicz</u> does not permit bare conclusory allegations without notice of the factual grounds on which they purport to be based); <u>see also</u> Bodner v. Banque Paribas, 114 F. Supp. 2d 117, 125 (E.D.N.Y. 2000) (noting the Second Circuit "has dismissed complaints which plead conspiracy

---

[17] The <u>Burnett</u> Plaintiffs filed one opposition brief in response to all of the SAAR Network entities' motions, except Mar-Jac Poultry.  The <u>Ashton</u> Plaintiffs filed a single opposition brief in response to IIIT's and Mar-Jac Poultry's motions to dismiss.  The <u>Burnett</u> and <u>Federal</u> Plaintiffs filed separate briefs opposing Mar-Jac Poultry's motions to dismiss.

in vague or conclusory terms and which do not allege specific instances of misconduct in furtherance of the conspiracy"); Ying Jing Gan v. City of New York, 996 F.2d 522, 534 (2d Cir. 1993) (explaining that on a Rule 12(b)(6) motion, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness") (internal quotations omitted)). The Burnett complaint against African Muslim Agency, Grove Corporate, Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Mar-Jac Poultry, Reston Investments, Safa Trust, and York Foundation is therefore dismissed without prejudice. For the same reasons, the Ashton complaint against Mar-Jac Poultry is dismissed without prejudice.

The Ashton complaint alleges one action by IIIT in support of its claims – that it allegedly financed two charitable organizations in Florida accused of being Islamic Jihad cells. The complaint does not allege that IIIT knew these charities were Islamic Jihad cells or whether and how these cells participated in or contributed to al Qaeda's agenda of terror. See Boim II, 291 F.3d at 1011-12 (making donations to an alleged terrorist group, without "knowledge of and intent to further payee's violent criminal acts," cannot sustain cause of action). Accordingly, the Ashton complaint against IIIT is dismissed without prejudice.

In support of the claim that Mar-Jac Poultry is a material sponsor of terrorism, Plaintiffs allege two acts: first, that it donated money to African Muslim Agency, which the Plaintiffs claim was later "laundered," and second, that it donated money to unnamed SAAR Network entities, which was later forwarded to al Qaeda. (See Federal RICO Statement Applicable to SAAR Network Entities at 5(f) and Ex. A.) The RICO claim against Mar-Jac Poultry is dismissed because it is not alleged that Mar-Jac had any role in directing an enterprise, see Redtail Leasing, Inc., 1997 WL 603496, at *5. The Federal complaint does not provide Mar-Jac Poultry with notice as to how it could be liable for the terrorist attacks. See Boim II, 291 F.3d at 1012 ("To hold the defendants liable for donating money without knowledge of the donee's intended criminal use of the funds would impose strict liability. Nothing in the language of the statute or its structure or history supports that formulation."). Mar-Jac's motion to dismiss the Federal complaint is therefore granted.

## 2. Executives

Taha Al-Awani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza, and Iqbal Unus are SAAR Network executives who are mentioned once in the Federal complaint in a long list of Defendants who allegedly "have aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons, as described herein." (Federal Compl. ¶ 66.) The complaint does not include any other allegations against these Defendants.

The Federal complaint alleges that Jamal Barzinji, another SAAR Network executive who moves to dismiss the complaint, is a Saudi national who, "through his various for-profit enterprises and involvement with charities and individuals operating within al Qaida's infrastructure, has long provided material support and resources to al Qaida." (Federal Compl. ¶¶ 490-91.) Barzinji has served as a board member of, or been associated with, several SAAR

Network entities, including IIIT, WAMY, Safa Trust, Mar-Jac Poultry, and SAAR Foundation. Id. ¶ 490 (claiming that while he was the President of Safa Trust, he "held authority over eighteen bank accounts"). He is a business associate of the designated terrorist Yousef Nada. (Id.) According to unnamed federal authorities, Barzinji "committed and conspired to: transit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosive, fire, kidnapping or extortion . . .; provide material support or resources to foreign terrorist organizations . . .; and provide material support or conceal or disguise the source of ownership of material support intended for use in preparation for or in carrying out a terrorist act." (Id.)

The RICO statement provides additional associations between each of these SAAR Network executives and the SAAR Network. (See Federal RICO Statement Applicable to the SAAR Network Executives at Ex. A (alleging in their roles as executives of SAAR Network entities, each of these Defendants committed multiple acts of conspiracy to commit multiple crimes).) Specifically, Taha Al-Alwani was President of IIIT and an officer of Heritage Education Trust; Muhammad Ashraf was an officer and/or director of Sterling Investment Group, Sterling Charitable Gift Fund, and York Foundation; M. Omar Ashraf was an officer and/or director of Grove Corporate Plaza, Mar-Jac Investments, and Sterling Charitable Gift Fund; Yaqub Mirza served as an officer and/or director of African Muslim Agency, Mar-Jac Investments, Mar-Jac Poultry, Reston Investments, SAAR Foundation, Safa Trust, where he was the principal signatory on Safa Group checks, and York International; Iqbal Yunus was a director of Child Development Foundation, a SAAR Network entity, and was associated with Sterling Charitable Gift Fund, and Sterling Management Group; finally, Jamal Barzinji was president of Safa Trust and a director of Mar-Jac Poultry, Reston Investments, IIIT, and Safa Trust. (Id. at 5(f) and Ex. A.)

The complaint does not state a claim for relief against Taha Al-Awani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza, or Iqbal Unus on a civil RICO theory or under the ATA. Reading the complaint as a whole and considering the overlap of executives among the SAAR Network entities, the complaint does not adequately provide these Defendants with notice as to how they provided material support to al Qaeda terrorists. See Boim II, 291 F.3d at 1023 (explaining a claim under the ATA must include allegation that defendant knew about terrorists' illegal activities, defendant wanted to help those activities succeed, and defendant engaged in an act of helping). The Federal complaint against Taha Al-Awani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza, and Iqbal Unus is dismissed without prejudice.

Jamal Barzinji controlled several bank accounts. (Federal Compl. ¶ 490.) He has allegedly transmitted money internationally for terrorist purposes. (Id.) He allegedly made these transfers to support al Qaeda. (Id. at ¶¶ 490-91.) The Federal Plaintiffs do not allege that Mr. Barzinji participated in the operation or management of their claimed RICO enterprise, and the RICO claim against him is dismissed. Reves, 507 U.S. at 179. But Mr. Barzinji does have sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda. See 18 U.S.C. § 2339(A) (including provision of

"currency or other financial securities [and] financial services" in definition of material support)
Accordingly, his motion to dismiss the Federal complaint is denied.

## IV. NCB's Motion for Reconsideration

In deciding NCB's motions to dismiss the Ashton and Burnett complaints, the Court ruled that NCB's status as a foreign sovereign for purposes of immunity under the FSIA was unclear. It also questioned whether it had personal jurisdiction over NCB. The Court ordered limited jurisdictional discovery on both issues. Terrorist Attacks I, 349 F. Supp. 2d at 792, 820. In light of the possible lack of subject matter and personal jurisdiction, the Court refrained from deciding NCB's motion to dismiss for failure to state a claim. NCB moves for reconsideration of those decisions.

### A. Standard

A motion for reconsideration is appropriate where a court overlooks "controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 392 (S.D.N.Y. 2000); see also Shrader v. CSX Transp. Inc., 70 F.3d 255, 257 (2d Cir. 1995) ("The standard for granting a motion [for reconsideration] is strict, and . . . will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked . . . ."). A motion for reconsideration may also be granted to "correct a clear error or prevent manifest injustice." Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir. 1983).

### B. The Court Will Consider NCB's Personal Jurisdiction Defense First

NCB offers two bases for reconsideration. First, NCB argues that even if the Court becomes assured of its subject matter and personal jurisdiction over NCB, Plaintiffs' claims are doomed because the Court dismissed similar claims against Al Rajhi Bank, Saudi American Bank, and Arab Bank. NCB contends that Center for Reproductive Law & Policy v. Bush, 304 F.3d 183, 194-95 (2d Cir. 2002), supports its theory that the Court does not need to establish jurisdiction over NCB because the Court's dismissal of other Saudi banks "foreordains" NCB's dismissal on 12(b)(6) grounds. Alternatively, NCB urges the Court to limit this litigation's intrusion on Saudi Arabia and postpone resolution of its FSIA immunity defense until after the personal jurisdiction question is resolved.

The Ashton and Burnett Plaintiffs argue that the Court should not consider NCB's reliance on Bush because it was not raised in NCB's original motion to dismiss. Moreover, they are adamant that jurisdictional questions must be resolved first. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal citation and quotations omitted). And in Plaintiffs' view, the subject matter jurisdiction question must be resolved before the Court addresses personal jurisdiction. See Reiss v. Societe Centrale du Groupe des Assurances Nationales, 235 F.3d 738, 746 (2d Cir. 2000) ("The initial question to be answered in this case is

not whether there is personal jurisdiction within the meaning of the New York [C.P.L.R.] but whether there is subject matter jurisdiction within the meaning of the [FSIA].").  Plaintiffs submit that it would be inefficient to separate the personal jurisdiction discovery from the FSIA discovery since the two inquiries are related.  Finally, Plaintiffs argue that the Court's rulings on the other Saudi banks' Rule 12(b)(6) motions cannot apply to NCB because the allegations against the various banks are not identical.

In <u>Bush</u>, following the Supreme Court's instructions in <u>Steel Co.</u>, the district court dismissed the case for lack of subject matter jurisdiction after finding plaintiffs lacked standing to sue.  On appeal, the Second Circuit found the case "exceptional," because twelve years earlier it had "entertained and rejected, on the merits, the same constitutional challenge to the provision at issue."  <u>Bush</u>, 304 F.3d at 186; <u>see also</u> <u>Planned Parenthood Fed. of Am. v. Agency of Int'l Devl.</u>, 915 F.2d 59 (2d Cir. 1990) (rejecting same constitutional challenge to same governmental provision).  It explained two exceptions to the general rule that courts "ordinarily . . . are not to assume the existence of jurisdiction in favor of reaching an 'easier' merits issue."  <u>Bush</u>, 304 F.3d at 193 (quoting <u>Fidelity Partners, Inc. v. First Trust, Co. of N.Y.</u>, 142 F.3d 560, 565 (2d Cir. 1998)).

The only exception relevant here is "in those 'particular circumstances' where the outcome on the merits has been 'foreordained' by another case such that the 'jurisdictional question could have no effect on the outcome,' provided the court 'does not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed.'"  <u>Bush</u>, 304 F.3d at 194 (quoting <u>Steel Co.</u>, 523 U.S. at 98).  The exception stems from <u>Secretary of Navy v. Avrech</u>, 418 U.S. 676 (1974), in which the Supreme Court dismissed a constitutional challenge to a governmental provision on the merits before reaching the jurisdiction question because the Court had earlier rejected a similar constitutional challenge to the same provision in <u>Parker v. Levy</u>, 417 U.S. 733 (1974).  <u>See Bush</u>, 304 F.3d at 194 (describing <u>Avrech</u> and <u>Parker</u>).  Accordingly, in <u>Bush</u>, the Second Circuit skipped the initial –and "novel"– standing question because that analysis would have been rendered "advisory" by "a controlling decision of this Court [that] has already entertained and rejected the same constitutional challenge to the same [governmental] provision."  <u>Id.</u> at 195 (limiting holding to constitutional challenges to governmental provisions).

NCB's reliance on <u>Bush</u> cannot prevail here.  The exception relied on in <u>Bush</u> is limited to constitutional challenges to governmental provisions.  <u>Bush</u>, 304 F.3d at 195; <u>see also</u> <u>Steel Co.</u>, 523 U.S. at 99.  Here, the merits of NCB's liability for the attacks of September 11 do not present a constitutional challenge to a governmental provision such that skipping the jurisdiction question would be appropriate.

In its alternative argument for reconsideration, NCB requests that the Court postpone resolution of the subject matter jurisdiction question posed by the FSIA until NCB's personal jurisdiction defense is resolved.  NCB argues that such a course would lead to its quicker dismissal from the litigation and would limit the intrusion into Saudi affairs since personal

jurisdiction discovery would involve only NCB's contacts with the United States and not Saudi Arabia's relationship to NCB.

The Supreme Court and Second Circuit agree that there are certain circumstances in which it is appropriate to give priority to the personal jurisdiction inquiry. See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 578, 588 (1999) (holding "there is no unyielding jurisdictional hierarchy . . . [and] there are circumstances in which a district court appropriately accords priority to a personal jurisdiction inquiry" and finding no abuse of discretion where a court resolves a straightforward personal jurisdiction question before a novel subject matter jurisdiction question); Cantor Fitzgerald v. Peaslee, 88 F.3d 152, 155 (2d Cir. 1996) (upholding district court's decision to dismiss for lack of personal jurisdiction before considering whether it had subject matter jurisdiction and finding "[o]n some occasions . . . considerations of judicial economy and restraint may persuade the court to avoid a difficult question of subject-matter jurisdiction when the case may be disposed of on a simpler ground"). Further, deference to foreign sovereigns under the FSIA "need not imply priority of immunity determination. . . . If one (or more) of the other jurisdictional defenses hold out the promise of being cheaply decisive, and the defendant wants it decided first, it may well be best to grapple with it (or them) first." In re Minister Papandreou, 139 F.3d 247, 254 (D.C. Cir. 1998).

Here, the Court finds that the personal jurisdiction issue raised by NCB is "straightforward" when compared to the more "difficult" subject matter jurisdiction question posed by NCB's status within the Kingdom of Saudi Arabia. See Ruhrgas, 526 U.S. at 588; see also Terrorist Attacks I, 349 F. Supp.2d at 789-792 (analyzing NCB's status as a foreign sovereign). Additionally, NCB acknowledges that personal jurisdiction discovery will only involve it, its relationship to the Kingdom of Saudi Arabia is sufficiently remote that an inquiry into NCB's contacts with the United States will not intrude on the inner workings of the Kingdom's government. Finally, discovery regarding NCB's FSIA defense would necessarily subject the Kingdom to discovery, which the Court is hesitant to do unnecessarily. See First City, Texas-Houson, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998); see also Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992) (recommending that "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination").

For all the foregoing reasons, the Court reconsiders its order regarding simultaneous subject matter and personal jurisdiction discovery. See Shrader, 70 F.3d at 257 ("[I]n light of [defendant's] introduction of additional relevant case law . . . we cannot say that reconsider[ation is] an abuse of discretion."). Further inquiry into NCB's status as a foreign sovereign is postponed until the parties have completed their personal jurisdiction discovery and this Court has determined whether it has personal jurisdiction over NCB. See Ruhrgas, 526 U.S. at 588; In re Arbitration Between Monegasque De Reasurrances S.A.M., 311 F.3d 488, 498 (2d Cir. 2002) (noting "dismissal for want of personal jurisdiction is independent of the merits and does not require subject-matter jurisdiction") (quoting In re Minister Papandreou, 139 F.3d at 255-56).

## V. Conclusion

For the reasons explained above, SHC's motion to dismiss the Ashton, Burnett, and Federal complaints for lack of subject matter jurisdiction is granted. Prince Salman's motion to dismiss the Ashton, Burnett, and Federal complaints for lack of subject matter and personal jurisdiction is granted. Prince Naif's motion to dismiss the Ashton, Burnett, and Federal complaints for lack of subject matter and personal jurisdiction is granted. Rabita Trust's motions to dismiss the Ashton, Burnett, and Federal complaints are denied without prejudice. Wa'el Jalaidan's motions to dismiss the Ashton, Burnett, and Federal complaints are denied, but the RICO, TVPA, negligence, and Federal intentional tort claims against him are dismissed. IIRO's motions to dismiss the Ashton, Burnett, and Federal complaints are denied, but the RICO, TVPA, negligence, and Federal intentional tort claims against it are dismissed. Tarik Hamdi's motions to dismiss the Burnett and Federal complaints are denied, but the RICO, TVPA, negligence, and Federal intentional tort claims against him are dismissed. Abdulrahman Alamoudi's motion to dismiss the Burnett complaint is granted; his motion to dismiss the Federal complaint is denied, but the RICO, TVPA, intentional tort, and negligence claims are dismissed. Success Foundation's motion to dismiss the Burnett complaint is granted. The motions by African Muslim Agency, Grove Corporate, Heritage Education Trust, IIIT, Mar-Jac Investments, Reston Investments, Safa Trust, and York Foundation to dismiss the Burnett complaint are granted. IIIT's motion to dismiss the Ashton complaint is granted. Mar-Jac Poultry's motions to dismiss the Burnett, Ashton, and Federal complaints are granted. The motions to dismiss the Federal complaint by Taha Al-Awani, Muhammad Ashraf, M. Omar Ashraf, M. Yaqub Mirza, and Iqbal Unus are granted. Jamal Barzinji's motion to dismiss the Federal complaint is denied, but the RICO, TVPA, intentional tort, and negligence claims against him are dismissed. National Commercial Bank's motion to reconsider the Court's January 18 opinion and order is granted to the extent that it requests the Court to consider its personal jurisdiction defense before resolving the FSIA issue.

So ordered.

Richard Conway Casey, U.S.D.J.

Dated:
September 21, 2005
New York, New York