# EXHIBIT 3A

S/2003/1070

up the keys to their new vehicles, the armed men severely beat them and set three of their vehicles on fire.

Persons killed: none

### 5 August 2003, Maiwand District, Kandahar Province, Afghanistan

Five policemen were injured when their checkpoint in Maiwand District was attacked by fighters equipped with rocket-propelled grenades, heavy machine guns and grenades.

Persons killed: none

### 6 August 2003, Kandahar Province, Afghanistan

Four government soldiers were injured in an attack on a government post 70 km from Kandahar.

Persons killed: none

### 7 August 2003, Deshu District, Helmand Province, Afghanistan

Six Afghan soldiers and an Afghan driver for an American aid organization, Mercy Corps, who were conducting an agricultural survey in the region, were killed when about 40 suspected Taliban fighters drove up to the government offices in four vehicles and opened fire.

Persons killed: 7

### 7 August 2003, Spin Buldak, Kandahar Province, Afghanistan

Five Afghan government soldiers were killed and three were wounded when a rocket attacked their vehicles in the Mal Pul area.

Persons killed: 5

### 7 August 2003, Chahar Bolak District, Balkh Province, Afghanistan

A vehicle belonging to HALO Trust, the mine-clearance agency, was hit by a rocket in a village in the Chahar Bolak District of northern Balkh Province. The rocket, which hit the undercarriage of the vehicle, broke in half and did not explode.

Persons killed: none

### 8 August 2003, Asadabad, Konar Province, Afghanistan

Insurgents fired two rockets at a coalition base in Asadabad. There were no immediate reports of casualties or damage.

Persons killed: none

### 8 August 2003, Baghdad

A truck bomb killed 19 persons and wounded more than 50 at the Jordanian Embassy, as Iraqis waited near the entrance to apply for visas. According to reports, about 1,000 pounds of commercial-grade explosives were used in the attack. While the blast caused the collapse of the outer walls of the compound, there was no

significant damage to the embassy itself. The embassy had received a threat two days previously in the form of a letter tossed out of a passing car close to the embassy's entrance. The bombing came shortly after Jordan granted asylum to Saddam Hussein's daughters Raghd and Rana and their children.

Persons killed: 19

### 13 August 2003, Khowst Province, Afghanistan

Thirteen Taliban and Al-Qaida fighters and two Afghan border policemen were killed in an attack by insurgents on a base used by a border battalion in the Shinkai area. The insurgents, who used heavy guns, recoilless rifles, mortars and rocket-propelled grenades, conducted the attack in three phases. It is not known how many guerrillas participated in the attack but, according to Major Ghafar of the border police, the attack was led by Jalaluddin Haqqani, a top military commander and a former minister in the Taliban regime. Afghan border police seized a cache of Kalashnikov assault rifles, a telephone, radios and ammunition.

Persons killed: 15

### 13 August 2003, Lashkar Gah, Helmand Province, Afghanistan

A powerful explosion that ripped through a Toyota minibus in Nadh Ali District, around 15 km west of Lashkar Gah, killed 17 people, half of them children. The blast was caused by explosives inside the bus. No one claimed responsibility, and no arrests were made.

Persons killed: 17

### 13 August 2003, Kabul

Two students at Kabul Medical Institute were killed and one was injured when a bomb they were building exploded in a house belonging to one of the students. Police seized two old Volkswagen cars from the house in order to investigate whether the vehicles were to be used in car bomb attacks.

Persons killed: 2

### 13 August 2003, Andar District, Ghazni Province, Afghanistan

Two members of the Afghan Red Crescent Society were killed and three were injured when suspected guerrillas loyal to the former Taliban regime and the renegade Islamic warlord Gulbuddin Hekmatyar on motorcycles ambushed their convoy near the capital.

Persons killed: 2

### 14 August 2003, Khowst, Afghanistan

Three rockets landed on a suburb of the eastern town of Khowst. In addition, unidentified residential property was damaged when a bomb exploded in the area. No casualties were reported.

Persons killed: none

S/2003/1070

### 16 August 2003, Zormat, Paktia Province, Afghanistan

One 107-mm rocket landed in the vicinity of the coalition firebase at Zormat in Paktia Province. No casualties were reported.

Persons killed: none

### 16 and 17 August 2003, Mazar-e Sharif, Afghanistan

Two gunmen on motorcycles opened fire on a vehicle belonging to Save the Children, wounding both of the people in it before they were able to escape. The attack, which occurred in the Char Bolak area where a rocket was fired at a vehicle of a British-based demining agency, is being blamed on members of the resurgent Taliban movement.

Persons killed: none

### 17 August 2003, Tarway, Paktika Province, Afghanistan

An estimated 200 suspected members of the former Taliban regime attacked a police compound. After setting it ablaze, the attackers took four police officers hostage before fleeing across to Pakistan.

Persons killed: none

### 18 August 2003, Lowgar Province, Afghanistan

Ten policemen, including a provincial police chief, Abdul Khaliq, were killed by a rocket attack in an ambush on their convoy. The Taliban are being blamed for the attack.

Persons killed: 10

### 18 August 2003, Barikot, Konar Province, Afghanistan

An improvised bomb exploded near a patrolling coalition convoy in the border town of Barikot. According to reports, the bomb damaged a vehicle but did not cause any casualties.

Persons killed: none

### 19 August 2003, Baghdad

A truck bomb killed at least 22 persons and injured at least 100 at the United Nations headquarters in Baghdad. The bomb, consisting of 1,500-pound mix of aerial bombs and other munitions, was on the back of a Soviet-built Kamaz military flatbed truck. According to some reports, the main explosive used was C-4, also used in attacks on the U.S.S. *Cole*. Three groups, the Armed Vanguards of a Second Muhammad Army, Muhammad's Army and the Abu Hafs al-Masri Brigades, all claimed responsibility for the attack.

Persons killed: 22

S/2003/1070

**19 August 2003, Asadabad, Konar Province, Afghanistan**

Three rockets were fired at a coalition firebase at Asadabad. There were no reported casualties.

Persons killed: none

**19 August 2003, Salar, Vardak Province, Afghanistan**

Twenty-two Afghan nationals working for the locally run Mine Detection Centre were slightly injured after being beaten by armed men who ransacked their office.

Persons killed: none

**20 August 2003, Sadiqabad town, Konar Province, Afghanistan**

Two Afghans armed with Kalashnikovs shot Gul, a former Taliban military commander, in the north-eastern province of Konar. The attackers fled immediately. A local administration official, Mawaz Khan Afridi, explained that they have arrested five people to put pressure on the Afghan elders to hand over the two attackers.

Persons killed: 1

**20 August 2003, Orgun, Paktika Province, Afghanistan**

A United States special operations soldier died from his injuries during operations in the vicinity of Orgun in Paktika Province. Another United States soldier was injured by a bomb while on patrol in the same area. It is not clear whether the two incidents are linked.

Persons killed: 1

**22 August 2003, Oruzgan Province, Afghanistan**

Two Afghan soldiers and four Taliban fighters were killed in a clash in the central province of Oruzgan. Afghan soldiers captured nine Taliban and recovered important documents, assault rifles, shoulder-held rocket launchers and ammunition. The rest of the Taliban escaped to the south-east.

Persons killed: 6

**22 August 2003, Dai Chupan District, Zabol Province, Afghanistan**

Suspected Taliban fighters ambushed a truck full of Afghan government soldiers in the Dai Chupan District of Zabol. According to the provincial Governor Hafizullah Khan, five government soldiers and four Taliban were killed in a gun battle, while two Taliban were taken into custody. Contrary to the account of the Afghan Government, Mohammed Hanif, a Taliban spokesman, claimed that 12 Afghan soldiers were killed. He also indicated that the Taliban were able to seize 17 automatic rifles from a truck before leaving the scene.

Persons killed: at least 9

S/2003/1070

### 29 August 2003, Najaf, Iraq

A car bomb killed at least 91 people at a holy shrine in Najaf. Approximately 1,000 pounds of Soviet-era explosives were used in the bombing.

Persons killed: at least 91

### 1 September 2003, Zabol Province, Afghanistan

Four policemen died when their checkpoint, set up to guard reconstruction work on the Kabul-Kandahar highway performed by the Louis Berger Group Inc. (United States), came under fire at around 1 a.m.

Persons killed: 4

### 1 September 2003, Zabol Province, Afghanistan

Indian contractors working for the Louis Berger Group Inc. came under fire in a guesthouse where they were staying.

Persons killed: 3 dead or 3 injured (reports vary)

### 2 September 2003, Muhammad Agha District, Lowgar Province, Afghanistan

Moghul Khil school, built by villagers and teachers with the help of a Danish charity, in the Muhammad Agha District of Lowgar Province (40 miles south of Kabul) was set on fire. Leaflets stating that girls should not be allowed in the classroom were scattered around. Although no one was arrested, Afghan officials suspect the resurgent Taliban. According to reports, two other schools were set on fire last month in the same area.

### 2 September 2003, Baghdad

A car bomb killed one person at Iraqi police headquarters in Baghdad; 150 pounds of explosives were used in the attack.

Persons killed: 1

### 6 September 2003, Shahwali, Kandahar Province, Afghanistan

Five Afghan soldiers were killed and five injured when suspected Taliban ambushed their convoy in Kighai Gorge (Shahwali Kot District), about 15 miles north of Kandahar. According to Haji Granai, a military commander, 13 men with Taliban connections were being questioned.

Persons killed: 5

### 6 September 2003, Gardiz, Afghanistan

Three rockets landed near a United States-led coalition base near the town of Gardiz in Paktia Province. There were no reported casualties.

Persons killed: none

### 7 September 2003, Kandahar Province, Afghanistan

Four Afghan villagers were killed and one wounded when suspected Taliban ambushed their truck on a road between Spin Buldak and Shorawak.

Persons killed: 4

### 8 September 2003, Moqur District, Ghazni Province, Afghanistan

Four Afghan aid workers employed by the Danish Committee for Aid to Afghanistan Refugees were killed when their agency's car was ambushed.

Persons killed: 4

### 9 September 2003, Arbil, Iraq

A suicide bomber killed three persons at a United States intelligence base in Arbil. According to reports, 1,500 pounds of TNT were used.

Persons killed: 3

### 11 and 12 September 2003, Kabul Province, Afghanistan

Five rockets were fired at coalition targets in and around Kabul. First, three rockets were fired on the night of 11 September, one of them slamming into a shipping container in the main peacekeepers' compound in the east of the city. One Canadian civilian worker was injured by shrapnel from a small-calibre rocket. The second attack occurred about one km from a Canadian base in western Kabul, while the third was near the airport often used by the peacekeepers. The same airport was fired upon again on 12 September. Lastly, a 122-mm rocket was launched into the north of the city but did not explode.

Persons killed: none

### 13 September 2003, Jani Khel, Paktika Province, Afghanistan

More than 15 heavily armed attackers riding motorcycles raided a compound housing a police station and district offices. While police tried to counter the attack, they had to withdraw after running out of ammunition. The attack was being blamed on Taliban insurgents, their Al-Qaida allies and militiamen loyal to the renegade warlord Gulbuddin Hekmatyar.

Persons killed: none

### 13 and 14 September 2003, Shkin, Paktika Province, Afghanistan

Troops belonging to the United States Tenth Mountain Division came under small-arms fire, light machine gun fire and mortar during a patrol near their base in Shkin, in Paktika Province on the Pakistan border. No United States casualties were reported. The anti-coalition forces retreated towards the Pakistani border after the incident.

Persons killed: none

### 15 September 2003, Magas, Ingushetia, Russian Federation

At least three people died and 17 were injured when a truck loaded with explosives detonated near the building used as a headquarters of the Russian security service in

S/2003/1070

Ingushetia. It is not clear whether the truck was parked near the building or was driven to it by a suicide bomber. More than 100 people were working in the building at the time of the explosion. The explosion shattered glass, damaged cars and left a 3-m-wide crater near the building, which was completed in July 2003.

Persons killed: 3

### 16 September 2003, Moqur District, Ghazni Province, Afghanistan

A United States military convoy was bombed on the same road where four Afghan aid workers were attacked the previous week. The explosive device detonated about 10 m from the lead vehicle. There were no reported casualties or damage.

Persons killed: none

### 17 September 2003, Barikot, Konar Province, Afghanistan

Ten militants armed with AK-47 assault rifles and rocket-propelled grenades attacked United States-led coalition forces near a firebase in Barikot. The coalition forces called in air support and returned fire when the attackers fired at their guard post. There were no reported casualties.

Persons killed: none

### 19 September 2003, Bagram Air Base, Kabul Province, Afghanistan

A blast in a house near the entrance of the United States military Bagram Air Base north of Kabul killed three Afghan nationals and left 15 others trapped inside. The house stored ammunition.

Persons killed: 3

### 19 September 2003, Ghazni, Afghanistan

Four rockets were fired at a roadwork site along the Kabul-Kandahar highway near the town of Ghazni which houses workers and equipment of the private Turkish firm, Mensel JV. There were no reported casualties.

Persons killed: none

### 19 September 2003, Sangisar, Kandahar Province, Afghanistan

Sardar Mohammad, an Afghan police commander, was killed and two of his bodyguards were injured in a drive-by shooting. No one was arrested, but police are searching for the attackers.

Persons killed: 1

### 22 September 2003, Baghdad

A suicide bomber driving a grey 1995 Opel and wearing an explosive belt killed a 23-year old Iraqi policeman and injured at least 19 others, including United Nations workers. According to reports, the bomber was trying to get near a parking lot situated approximately 200 yards from the Canal Hotel, which housed the United Nations offices, when he was stopped by an Iraqi policeman.

Persons killed: 1

S/2003/1070

**24 September 2003, Shkin, Paktika Province, Afghanistan**

Suspected Taliban fighters fired eight rockets at a United States military base at Shkin. No casualties were reported.

Persons killed: none

**24 September 2003, Konar Province, Afghanistan**

Suspected Taliban fighters fired two rockets at a United States military base in north-eastern Konar. No casualties were reported.

Persons killed: none

**24 September 2003, Helmand Province, Afghanistan**

An aid worker belonging to an Afghan non-governmental organization, the Voluntary Association for the Rehabilitation of Afghanistan, was killed and a driver injured when suspected armed Taliban men attacked their vehicle.

Persons killed: 1

**27 September 2003, Shkin, Paktika Province, Afghanistan**

Unidentified individuals fired six rockets at the Shkin base, prompting coalition troops to respond with artillery fire. The attack did not cause any coalition casualties or damage.

Persons killed: none

**28 September 2003, Shkin, Paktika Province, Afghanistan**

Unidentified individuals fired two rockets at the Shkin coalition base. No coalition casualties or damage were reported.

Persons killed: none

**29 September 2003, Shkin, Paktika Province, Afghanistan**

A United States soldier was killed and two were wounded in a battle that left two suspected Taliban militants dead. The United States soldiers were involved in a combat manoeuvre against anti-coalition forces who were using small-arms fire.

Persons killed: 1

**1 October 2003, Dara-e-noor Nish, Kandahar Province, Afghanistan**

Ten government soldiers and two children were killed when up to 16 Taliban fighters attacked a pickup truck transporting government soldiers in the Nish area, about 45 miles north of Kandahar. One of the fighters was killed and another one wounded when the government soldiers returned fire. According to reports, one wounded Taliban fighter was captured in the area that night.

Persons killed: 1

**2 October 2003, Orgun, Paktika Province, Afghanistan**

Two people were beheaded when two fuel trucks supplying the United States-led coalition forces were ambushed by suspected Taliban insurgents. The remaining four individuals were kidnapped.

Persons killed: 2

**2 October 2003, Orgun, Paktika Province, Afghanistan**

Two Canadian peacekeepers were killed and three injured as a result of a landmine blast in Kabul.

Persons killed: 3

**9 October 2003, Baghdad**

A suicide bomber targeted a police station in Al-Sadr City, in the Shiite neighbourhood of Baghdad. Nine people were killed, including three policemen, five civilians and the suicide bomber, and 38 people were wounded.

Persons killed: 9

**10 October 2003, Kandahar, Afghanistan**

Forty Taliban and Hezb-e Islami prisoners, including Abdul Hadi, the brother of the former Taliban Defence Minister, Maulvi Obaidullah, escaped from a central jail overnight on Friday. According to reports, the escapees crawled through a tunnel, which had taken about a month to dig. The officials, who suspect that there might be a connection between the release of the former Taliban Foreign Minister, Mullah Wakil Ahmed Muttawakil, and the prison escape, said that they found a truck full of soil at the opening of the tunnel in a field nearby.

**11 October 2003, Kabul**

An American soldier was injured and an insurgent captured in a firefight that took place near a training centre for the Afghan army in the north-eastern part of Kabul. According to a statement from Bagram Air Base, three insurgents attacked United States troops who were observing a training exercise. One of the attackers was captured, after the three ran into a nearby building. The report did not state the status of the other two attackers.

Persons killed: none

**12 October 2003, Arghandab District, Zabol Province, Afghanistan**

Eight Afghani policemen were killed and two were wounded in an attack on a district office shortly before 2 a.m. on 12 October. Up to 100 Taliban guerrillas involved in the attack also burned down the district office and destroyed four vehicles.

Persons killed: 2

**12 October 2003, Baghdad**

A suicide attacker driving a white Toyota Corolla ran a security checkpoint and blew himself up in the parking lot of the Baghdad Hotel about 100 m from the

S/2003/1070

hotel's entrance, after he refused to stop to provide identification papers. Police officers shot at him to prevent him from reaching the hotel. Seven people were killed and 11 wounded, including a United States soldier, in the explosion that destroyed a car and a cement protective barrier and left a 2-ft-deep crater behind. Al-Qaida, declaring this operation No. 9, openly claimed responsibility for the attack.

Persons killed: 7

### 14 October 2003, Zabol Province, Afghanistan

Two Americans working on a road construction project were ambushed by suspected Taliban gunmen while travelling on a road to Ghazni Province. No injuries were reported.

Persons killed: none

### 14 October 2003, Baghdad

A suicide bomber blew himself up near the Turkish Embassy. The bomber was killed and six people were wounded as a result of the attack.

Persons killed: 1

### 17 October 2003, Farah Province, Afghanistan

According to State-run Kabul Television, seven people were killed and two were wounded when a group of armed men dressed in military uniforms ambushed their car on the main road between Kandahar and Herat, near Bakwa.

Persons killed: 7

### 17 October 2003, Paktia Province, Afghanistan

A group of 50 Taliban fighters briefly seized part of a road linking Khowst and Gardiz in Paktia Province. According to reports, they set up a picket, searched vehicles and punished drivers without beards in addition to confiscating and destroying music found in the vehicles.

Persons killed: none

### 17 October 2003, Konar Province, Afghanistan

Four people travelling from Pashat village to Asadabad were killed and five wounded when a bomb blew up their pickup truck. The truck's driver, his brother, the brother's son, and the daughter of another brother were among those killed.

Persons killed: 4

### 17 October 2003, Helmand Province, Afghanistan

A pickup truck carrying Afghan military intelligence agents hit a landmine south of Lashkar Gah. Two Afghan military intelligence officials were killed and three were injured as a result of the incident.

Persons killed: 2

S/2003/1070

### 26 October 2003, Paktia Province, Afghanistan

Two classrooms were destroyed by a blast at a Durnami school in Mando Zayi, about 18 km west of Khowst. Additional explosives were found during the search of the building. No injuries were reported.

Persons killed: none

### 25 and 26 October 2003, Paktika Province, Afghanistan

Two contract workers working for the CIA were killed in a gunfight by armour piercing rounds. Ten insurgents also died in the fighting.

Persons killed: 2

### 26 October 2003, Baghdad

Twenty-nine Katyusha missiles were remotely fired at Al-Rasheed Hotel, which houses the majority of the senior coalition staff, killing a United States soldier. Seventeen others were wounded. The missile-launching bay used in the attack was hidden behind a car carrying a portable generator; it contained 40 missiles but only 29 were fired. The missile-launching bay was placed in a zoo less than 100 m away from the hotel in a park called Al-Zaouraa. It has been noted that four rocket-propelled grenades were also used in the attack. It is believed that the attack had been planned for two months.

Persons killed: 1

### 27 October 2003, Baghdad

The headquarters building of the International Committee of the Red Cross in the neighbourhood of Karada was attacked by a bomb in a car which was disguised to look like a Red Cross or Red Crescent ambulance. The suicide bomber blew up the car at about 20 m from the building's entrance, as the guard prevented him from entering it. The explosion created a hole 20 m deep and close to 4 m across, and destroyed the front façade of the building. Twelve persons were killed and at least 22 were wounded as a result of the blast.

Persons killed: 12

### 27 October 2003, Baghdad

A suicide bomber, who pulled up his car to the least protected part of the compound, attacked Al-Shaab police station in northern Baghdad. While the 4-wheel drive vehicle was nearing the police station, and before it exploded, the police started shooting at it. Seven people were wounded.

Persons killed: none

### 27 October 2003, Baghdad

A suicide bomb exploded in north-eastern Baghdad close to a police station. Eight people were killed and many were wounded.

Persons killed: 8

S/2003/1070

**27 October 2003, Baghdad**

A suicide attacker dressed in police uniform driving a police car exploded the car in the courtyard of the Al-Baya'a police station in the southern district of Al-Doura. It has been reported that at least four people could have been killed as a result of the attack.

Persons killed: 0-4

**27 October 2003, Baghdad**

A suicide bomb exploded in Al-Khadra Street, close to a police station. An unknown number of people were killed and wounded.

**30 October 2003, Shah Joy District, Zabol Province, Afghanistan**

Suspected Taliban members kidnapped a Turkish engineer working on the reconstruction of the Kabul-Kandahar highway, Hassan Onal, and his Afghan driver on the highway linking the two cities. The driver was later released and sent to Ghazni Province with a letter demanding the release of six unidentified Taliban fighters.

**30 October 2003, Deh Rawood District, Oruzgan Province, Afghanistan**

A United States soldier died as a result of injuries received in a clash with 10 to 15 suspected Taliban fighters about 35 miles west of the Deh Rawood District.

Persons killed: 1

**30 October 2003, Zabol Province, Afghanistan**

Four government officials, including the brother of a district commissioner, were kidnapped and taken to mountains nearby. It is believed that the initial target was Mullah Mohammad Zafar, commissioner of the Khak Afghan District in southern Afghanistan.

Persons kidnapped: 4

S/2003/1070

## Appendix II

### Individuals, publicly identified, allegedly linked with Al-Qaida and the Taliban

| Number | Name |
|---|---|
| 1. | Abdeladim Akoudad |
| 2. | Abdul Azi Haji Thiming |
| 3. | Abu Bakr |
| 4. | Abu Saleh |
| 5. | Adil Charkaoui |
| 6. | Adnan alias Hasanat |
| 7. | Ahmad Sajuli bin Abdul Rahman |
| 8. | Ahmed Koshagi Kelani |
| 9. | Arifin Ali |
| 10. | Bambang Tetuko |
| 11. | Bandar ibn Abdul Rahman al-Ghamdi |
| 12. | Bilal Khazal |
| 13. | Esam Mohammed Khidr Ali |
| 14. | Gungun Rusman Gunawan |
| 15. | Hamid Razak/Hamid Razzaq |
| 16. | Hasam Alhusein |
| 17. | Ibrahim Obaidallah Al-Harbi |
| 18. | Iksan Miarso bin Warno Wibatso |
| 19. | Mahmood Afif Abdeljalil |
| 20. | Maisuri Haji Abdullah |
| 21. | Mayahi Haji Doloh |
| 22. | Moammar Kawama alias Ibn al-Shahid |
| 23. | Mohamed el Osmani |
| 24. | Mohamed Javed |
| 25. | Muchtar Daeng Lau |
| 26. | Muhaimin Yahya alias Siat |
| 27. | Muhammad Jalaludin Mading |
| 28. | Mullah Sharafuddin |
| 29. | Noor Islam |
| 30. | Osama Kasir |
| 31. | Payo Khan |
| 32. | Qalam |
| 33. | Sadik Merizak |
| 34. | Saifuddin |
| 35. | Samarn Wakaji |
| 36. | Sanae Al-Ghariss |
| 37. | Sulaiiman Dimansalang |
| 38. | Sumsul Bahri aka Farhan |
| 39. | Taufik Rifqi/Taufek Refke |
| 40. | Tayseer Alouni |
| 41. | Waemahadi Wae-dao |
| 42. | Wahid Koshagi Kelani |
| 43. | Willie Virgile Brigitte |
| 44. | Yaser Al-Sabeh |
| 45. | Zari Gul |

S/2003/1070

## Appendix III

### Assets frozen as reported by Member States

| Country | Number of assets frozen | Amount frozen | Amount in United States dollars[a] |
|---|---|---|---|
| Austria | 1 | $4 000.00 | 4 000.00 |
| Bahrain | not specified | not specified | - |
| Belgium | not specified | €4 568.1 | 5 316.35 |
| Canada | 17 | $340 000.00 | 340 000.00 |
| France | 3 | €30 198.22 | 35 144.70 |
| Germany | 10 | €4 935.75 | 5 744.23 |
| Italy | 64 | €435 000.00 | 506 253.00 |
| Japan | 351 | not specified | - |
| Liechtenstein | 2 | SwF 182 000.00 | 136 616.00 |
| Morocco | not specified | not specified | - |
| Netherlands | 1 | €2 763.21 | 3 215.82 |
| Norway | 1 | $1 000.00 | 1 000.00 |
| Pakistan | 22 | $10 655 680.40 | 10 655 680.40 |
| Portugal | 3 | €323.12 | 376.05 |
| Saudi Arabia | 41 | $5 679 400.00 | 5 679 400.00 |
| Spain | 8 | Ptas 29 593.00 | 207.00 |
| Sweden | not specified | SKr 1 200 000.00 | 153 986.00 |
| Switzerland | 82 | SwF 34 000 000.00 | 25 521 693.00 |
| Tunisia | 3 | not specified | - |
| Turkey | 1 | 2 000 000.00 | 2 000 000.00 |
| United Kingdom | - | £334 428.14 | 566 789.00 |
| United States of America | - | $29 900 000.00 | 29 900 000.00 |
| Yemen | 1 | YRls 5 900.00 | 35.74 |
| **Total amount frozen** | | | **75 003 068.79** |

[a] The total figure quoted is approximate. It is based on the rates of exchange applicable on 1 November 2003.

S/2003/1070

## Appendix IV

### Nada and Nasreddin networks



S/2003/1070

## Appendix V

### Member States that have not submitted a 90-day report pursuant to Security Council resolution 1455 (2003)

| Number | Country | Region | Subregion |
|---|---|---|---|
| 1. | Afghanistan[a] | Asia | South-Central Asia |
| 2. | Albania[a] | Europe | Southern Europe |
| 3. | Andorra | Europe | Southern Europe |
| 4. | Antigua and Barbuda | Latin America | Caribbean/Latin America |
| 5. | Armenia | Asia | Western Asia |
| 6. | Azerbaijan | Asia | Western Asia |
| 7. | Bangladesh[a] | Asia | South-Central Asia |
| 8. | Barbados | Latin America | Caribbean/Latin America |
| 9. | Belize | Latin America | Central America |
| 10. | Benin | Africa | Western Africa |
| 11. | Bhutan | Asia | South-Central Asia |
| 12. | Bolivia | Latin America | South America |
| 13. | Bosnia and Herzegovina[a] | Europe | Southern Europe |
| 14. | Botswana | Africa | Southern Africa |
| 15. | Brunei Darussalam[a] | Asia | South-eastern Asia |
| 16. | Burkina Faso | Africa | Western Africa |
| 17. | Burundi | Africa | Eastern Africa |
| 18. | Cambodia[a] | Asia | South-eastern Asia |
| 19. | Cameroon | Africa | Middle Africa |
| 20. | Cape Verde | Africa | Western Africa |
| 21. | Central African Republic | Africa | Middle Africa |
| 22. | Chad[a] | Africa | Middle Africa |
| 23. | Comoros[a] | Africa | Eastern Africa |
| 24. | Congo | Africa | Middle Africa |
| 25. | Costa Rica | Latin America | Central America |
| 26. | Côte d'Ivoire | Africa | Western Africa |
| 27. | Cyprus | Asia | Western Asia |
| 28. | Democratic People's Republic of Korea | Asia | Eastern Asia |
| 29. | Democratic Republic of the Congo | Africa | Middle Africa |
| 30. | Djibouti[a] | Africa | Eastern Africa |
| 31. | Dominica | Latin America | Caribbean/Latin America |
| 32. | Dominican Republic | Latin America | Caribbean/Latin America |
| 33. | Egypt[a] | Africa | Northern Africa |
| 34. | El Salvador | Latin America | Central America |
| 35. | Equatorial Guinea | Africa | Middle Africa |
| 36. | Eritrea | Africa | Eastern Africa |
| 37. | Estonia | Europe | Northern Europe |
| 38. | Ethiopia | Africa | Eastern Africa |
| 39. | Fiji | Oceania | Oceania/Melanesia |
| 40. | Gabon | Africa | Middle Africa |
| 41. | Gambia | Africa | Western Africa |

S/2003/1070

| Number | Country | Region | Subregion |
|--------|---------|--------|-----------|
| 42. | Georgia[a] | Asia | Western Asia |
| 43. | Ghana | Africa | Western Africa |
| 44. | Grenada | Latin America | Caribbean/Latin America |
| 45. | Guinea-Bissau | Africa | Western Africa |
| 46. | Guyana | Latin America | South America |
| 47. | Haiti | Latin America | Caribbean/Latin America |
| 48. | Honduras | Latin America | Central America |
| 49. | Indonesia[a] | Asia | South-eastern Asia |
| 50. | Iraq | Asia | Western Asia |
| 51. | Ireland | Europe | Northern Europe |
| 52. | Jamaica | Latin America | Caribbean/Latin America |
| 53. | Kenya[a] | Africa | Eastern Africa |
| 54. | Kiribati | Oceania | Oceania/Micronesia |
| 55. | Kyrgyzstan[a] | Asia | South-Central Asia |
| 56. | Latvia | Europe | Northern Europe |
| 57. | Liberia | Africa | Western Africa |
| 58. | Libyan Arab Jamahiriya[a] | Africa | Northern Africa |
| 59. | Lithuania | Europe | Northern Europe |
| 60. | Luxembourg | Europe | Western Europe |
| 61. | Madagascar | Africa | Eastern Africa |
| 62. | Malawi | Africa | Eastern Africa |
| 63. | Maldives[a] | Asia | South-Central Asia |
| 64. | Mali[a] | Africa | Western Africa |
| 65. | Malta[a] | Europe | Southern Europe |
| 66. | Marshall Islands | Oceania | Oceania/Micronesia |
| 67. | Mauritania[a] | Africa | Western Africa |
| 68. | Micronesia | Oceania | Oceania/Micronesia |
| 69. | Mongolia | Asia | Eastern Asia |
| 70. | Mozambique | Africa | Eastern Africa |
| 71. | Myanmar | Asia | South-eastern Asia |
| 72. | Namibia | Africa | Southern Africa |
| 73. | Nauru | Oceania | Oceania/Micronesia |
| 74. | Nepal | Asia | South-Central Asia |
| 75. | Nicaragua | Latin America | Central America |
| 76. | Niger[a] | Africa | Western Africa |
| 77. | Nigeria[a] | Africa | Western Africa |
| 78. | Oman | Asia | Western Asia |
| 79. | Palau | Oceania | Oceania/Micronesia |
| 80. | Panama | Latin America | Central America |
| 81. | Papua New Guinea | Oceania | Oceania/Melanesia |
| 82. | Rwanda | Africa | Eastern Africa |
| 83. | Saint Kitts and Nevis | Latin America | Caribbean/Latin America |
| 84. | Santa Lucia | Latin America | Caribbean/Latin America |
| 85. | Saint Vincent and the Grenadines | Latin America | Caribbean/Latin America |
| 86. | Samoa | Oceania | Oceania/Polynesia |
| 87. | San Marino | Europe | Southern Europe |
| 88. | Sao Tome and Principe | Africa | Middle Africa |

S/2003/1070

| Number | Country | Region | Subregion |
|--------|---------|--------|-----------|
| 89. | Senegal | Africa | Western Africa |
| 90. | Seychelles | Africa | Eastern Africa |
| 91. | Sierra Leone | Africa | Western Africa |
| 92. | Solomon Islands | Oceania | Oceania/Melanesia |
| 93. | Somalia[a] | Africa | Eastern Africa |
| 94. | Sri Lanka | Asia | South-Central Asia |
| 95. | Sudan[a] | Africa | Northern Africa |
| 96. | Suriname | Latin America | South America |
| 97. | Swaziland | Africa | Southern Africa |
| 98. | Timor-Leste | Asia | South-eastern Asia |
| 99. | Togo | Africa | Western Africa |
| 100. | Trinidad and Tobago | Latin America | Caribbean/Latin America |
| 101. | Tuvalu | Oceania | Oceania/Polynesia |
| 102. | Uganda | Africa | Eastern Africa |
| 103. | United Republic of Tanzania[a] | Africa | Eastern Africa |
| 104. | Uruguay | Latin America | South America |
| 105. | Uzbekistan[a] | Asia | South-Central Asia |
| 106. | Vanuatu | Oceania | Oceania/Melanesia |
| 107. | Zambia | Africa | Eastern Africa |
| 108. | Zimbabwe | Africa | Eastern Africa |

[a] See paragraph 159 of the report.

## Appendix VI
### Analysis of reports submitted by Member States

## Contents

| | Page |
|---|---|
| Introduction | 62 |
| General observations | 63 |
| Threat assessment by States | 64 |
| The fear of stigma | 65 |
| Engaging in dialogue | 65 |
| The list: only as strong as its weakest link | 66 |
| Technical hindrances | 66 |
| Other hindrances | 67 |
| Towards a more credible list | 69 |
| Financial and economic asset freeze | 69 |
| Domestic legislation | 69 |
| Operational implementation | 71 |
| Freezing and unfreezing of assets | 72 |
| Informal remittance systems | 73 |
| Charities and non-profit organizations | 73 |
| Precious commodities | 74 |
| Conclusions and outlook on the asset freeze | 74 |
| Travel ban | 75 |
| Effectiveness of the travel ban | 75 |
| Conclusions and outlook on the travel ban | 76 |
| Arms embargo | 76 |
| Scope of the arms embargo: weapons of mass destruction and export controls | 77 |
| Enforcing the arms embargo | 78 |
| Arms-brokering systems: a measure for the future | 79 |
| Role of international conventions | 80 |
| Conclusions and outlook on the arms embargo | 81 |
| Future reporting requirements | 82 |

S/2003/1070

## Introduction

1.    In paragraph 6 of resolution 1455 (2003) the Security Council called upon all States to submit an updated report on all steps taken to implement the measures referred to in paragraph 1 of the resolution and all related investigations and enforcement actions, including a comprehensive summary of frozen assets of listed individuals and entities.

2.    The Security Council furthermore invited States to inform the Committee of the adoption of legislative enactments or administrative acts to enforce and strengthen the measures imposed against their nationals and other individuals or entities operating in their territory to prevent and punish violations of the sanctions regime against Al-Qaida and the Taliban.

3.    To assist States with the submission of their reports, the Committee issued a document entitled "Guidance for reports required of all States pursuant to paragraphs 6 and 12 of resolution 1455 (2003)" containing 26 questions, grouped as follows: Introduction, Consolidated list, Financial and economic asset freeze, Travel ban, Arms embargo, and Assistance and conclusion.

4.    As at 30 October 2003 a total of 83 reports had been submitted and reviewed. The methodology applied in the in-depth analysis of the reports had two levels, one measuring the scope of reporting and the other the degree of implementation of the sanctions against Al-Qaida and the Taliban. The analysis was based on the information as presented by States in their reports. Other reports such as those submitted pursuant to paragraph 6 of Security Council resolution 1390 (2002) and those submitted to the Counter-Terrorism Committee were also taken into account whenever required to gain a deeper understanding of the degree of implementation.

5.    The statistics relating to submitted reports are as follows:

   • 83 States submitted a report under resolution 1455 (2003)

   • 86 States submitted a report under resolution 1390 (2002)

   • 66 States submitted a report under both resolutions

   • 88 States have not submitted a report under either resolution

   • 20 States submitted a report only under resolution 1390 (2002)

   • 17 States submitted a report only under resolution 1455 (2003)

It must be stressed that 108 States did not submit a report under resolution 1455 (2003). As reflected in figure I, this corresponds to 57 per cent of all States. This analysis therefore does not project a picture of the total possible implementation.



**Figure I**

**Distribution of reporting and non-reporting States**

Reporting States
43%

Non-reporting States
57%

S/2003/1070

6.    Figures II and III illustrate the assessment of two aspects of the reports: the scope of reporting (extensiveness of information provided) and the scope of implementation of the measures. The four-point scale applied ranged from incomplete to complete. With regard to the reporting aspect, "complete reporting" entailed having provided all the information requested, whereas "incomplete reporting" applied to reports not covering the requested elements. As illustrated in figure II, the vast majority of reports had addressed most of the issues requested, thus providing either complete or extensive reporting.



**Figure II**
**Scope of reporting on measures taken by States**

Incomplete reporting 15%
Partial reporting 15%
Complete reporting 39%
Extensive reporting 31%

☐ Complete reporting
■ Extensive reporting
☐ Partial reporting
☐ Incomplete reporting

7.    Concerning the assessment of the degree of implementation of the sanctions measures, it should be noted that the assessment took into account only the information provided by States in their reports. Thus "complete implementation" would entail that a report had provided information indicating that all three sanctions measures had been fully implemented. As illustrated in figure III, none of the reports submitted indicated the complete implementation of every aspect of the measures. However, almost half of reporting States provided information that indicated extensive implementation of the sanctions regime.



**Figure III**
**Scope of implementation of measures as reported by States**

Incomplete implementation 21%
Partial implementation 32%
Extensive implementation 47%

☐ Extensive implementation
■ Partial implementation
☐ Incomplete implementation

**General observations**

8.    The majority of States followed the guidance in preparing their reports under resolution 1455 (2003). The depth of description and detail varied greatly and in general reports prepared according to the guidance tended to be more comprehensive and provided more substantive and comparable information than

S/2003/1070

reports submitted under resolution 1390 (2002). However, a number of replies submitted either did not address the issues in detail or were repetitive. This resulted in gaps and overlaps, thus limiting the possibility of assessing the implementation.

9.    Most of the States reported that they had encountered problems because of insufficient information on names of individuals and entities on the consolidated list. A number of ways to address some of the shortcomings were suggested.

10.    The sections of the reports that addressed the implementation of the financial and economic asset freeze tended to provide more information than the sections dealing with the travel ban and the arms embargo. Also noticeable was the fact that most of the legislation recently adopted or amended dealt specifically with financing of terrorist activities and money-laundering laws.

11.    The data provided by States concerning the travel ban highlighted the shortcomings of the list and the limitations States experienced in implementing this measure.

12.    The information provided concerning the arms embargo covered primarily conventional arms, thus indicating that the measures in place are not sufficient to control dual-use technology and other sensitive material that may be used for the development of weapons of mass destruction. In addition, the scant regulation on arms brokering proved to be an area where there is ample room for improvement.

13.    Some States expressed the need for technical assistance in implementing the sanctions measures against Al-Qaida and the Taliban and in a number of cases the specific areas where assistance was needed were highlighted.

## Threat assessment by States

14.    The introductory question of the guidance provided an open invitation to States to describe activities of Osama Bin Laden, Al-Qaida, the Taliban and their associates, and the threat they posed to their countries and the region, as well as likely trends, thus providing a unique opportunity to evaluate how those groups are perceived. In spite of this, the great majority of States chose a cautious approach, providing only brief responses with few details.

15.    A majority of reporting States responded to the question concerning the assessment of the Al-Qaida threat, but the replies varied greatly in level of detail. Almost half of the reporting States asserted that within their territory no activities of the designated individuals or entities had been detected. Moreover, most of the responses did not provide an assessment of the threat Al-Qaida posed to the country or the region, or of likely trends. The low number of responses fully acknowledging the domestic threat was in many cases coupled with a greater preparedness to point to an unspecified global threat that had to be addressed internationally. Many States reiterated their full and continued commitment to collaborating with the international community in combating Al-Qaida and the Taliban.

16.    A number of States indicated the expectation that the threat to their country was likely to increase in the future. The reasons provided varied from probable links of collaboration between Al-Qaida and other factions to the risk of their territory being used as a potential transit route for illegal trafficking as it relates to the financing of terrorism, and the degree of their involvement in counter-terrorism

S/2003/1070

efforts. Meanwhile, a number of States did not see a threat to their country, but foresaw possible attacks on foreign interests within their territory.

17. Furthermore, a few States stressed the importance of also addressing the underlying causes, such as poverty and global development gaps, in the overall approach in the fight against terrorism.

18. It should be noticed that some States tended to apply an all-inclusive definition of Al-Qaida, reporting on extremist and/or criminal groups within their territory, without providing detailed information on any association to Al-Qaida. This all-encompassing definition of Al-Qaida is significant as it may prove to have an impact on the ability of States to fully implement the sanctions regime.

### The fear of stigma

19. In his briefing to the Security Council on 29 July 2003 the Chairman of the Committee stated that recognition of the possible presence of Al-Qaida or those associated with the network within their territory appears to be a stigma to some States. By and large this was corroborated by the responses, which indicated a fear of stigmatization in acknowledging the threat that Al-Qaida may pose. One of the clearest indicators of this trend was the fact that almost a fifth of reporting States did not comment on or dismissed the threat, although in some of those countries there had been Al-Qaida-related activities, including dismantling of cells and uncovering of financial operations, as reflected in other parts of the reports.

20. The fear of stigmatization was particularly apparent in the reports of some countries bordering Afghanistan. These either did not address the issue directly or asserted the non-existence of Al-Qaida and the Taliban within their territories. Nevertheless, other parts of the reports, especially in the cases of the Islamic Republic of Iran, Pakistan and Tajikistan, gave evidence of ongoing activities aimed at preventing and combating Al-Qaida and the Taliban, such as enhancement of border controls, ongoing investigations concerning alleged Al-Qaida operatives and arrests of suspected individuals.

21. Taking into account the relevance of the region that Afghanistan and its neighbours constitute and the evidence of recent attacks and detentions linked to Al-Qaida and the Taliban, the vague recognition of the potential threat is worrisome. In spite of all measures taken to combat Al-Qaida, the Taliban and their associates in those countries it is unlikely that the threat they pose to the area is, as reported, close to non-existent. These examples confirm the fear of stigmatization, which, in the light of the considerable international focus on combating Al-Qaida, may lead some States to place greater emphasis on demonstrating effectiveness, or even downplaying their vulnerability, than addressing the complex matter through collective dialogue.

### Engaging in dialogue

22. Some reporting States showed a greater readiness to engage in a dialogue to address the threat posed by Al-Qaida and the Taliban by providing detailed assessments and descriptions of incidents of Al-Qaida activities, detentions and investigations.

23. For instance, France reported on several operations having shown that "terrorist networks, both active and logistical, are still present in French territory". Those operations involved dismantling the support structure of operatives with ties to Al-Qaida and arrests of several individuals.

S/2003/1070

24.   In its report, Italy recognized the presence of radical groups linked to Al-Qaida inside its territory and provided an extensive description of various intelligence operations aimed at dismantling cells primarily engaged in providing logistical support such as procurement of counterfeit or false documents and the recruitment of volunteers for training camps.

25.   Another example was provided by the Philippines, which recognized the activities of Osama bin Laden, who has "apparently established numerous organizations, corporation and charitable institutions, some of which are under the control of his brother-in-law Mohammed Jamal Khalifa". Those entities are "… being utilized as conduits of funds for local extremists and their terrorist-related activities".

26.   A number of Central and South American States highlighted the vulnerability of certain areas and the risk of future Al-Qaida operations. For instance, both Argentina and Paraguay referred to the "triborder area", which was deemed vulnerable to financing of terrorism through profits from illegal trafficking. Colombia pointed to the possibility of a future link between the Revolutionary Armed Forces of Colombia (FARC) and Al-Qaida, owing to the mutual benefit in arms trading and financing of activities through drug trafficking. Guatemala deemed parts of its territory vulnerable to being used as a transit route for trafficking in drugs, arms or explosives or as basis for money-laundering. Some of these States stressed the need for assistance in dealing with some of the issues of concern.

27.   In describing the internal presence of Al-Qaida some States distinguished between the core "Al-Qaida organization/network/structure" and the peripheral "sympathizers/messengers/associates of Al-Qaida" mainly involved in financing, logistics and other supporting activities. The tendency, as in the cases of Canada, Colombia, the Netherlands and Spain, was to exclude the former possibility while acknowledging the latter option of a less structured presence of Al-Qaida "affiliates".

## The list: only as strong as its weakest link

28.   The list provides the foundation for the effective implementation of Security Council resolution 1455 (2003). It is one of the essential tools the international community has in the fight against Al-Qaida, the Taliban and their associates. Indeed, the value added to the implementation of the travel ban, asset freeze and arms embargo by an operational, user-friendly list is immeasurable.

29.   The various technical and political impediments highlighted in the reports received from States as well as the suggestions outlined below, some of which were provided by reporting States, will demonstrate that countries possessing enough political will can indeed contribute to strengthening this invaluable tool. It is therefore imperative that States and the Committee continuously strengthen the list in order to give the resolution a greater impact in this international challenge. As long as there are names on the list with insufficient identifiers and as long as the list is not fully implemented by all States, this foundation is in practical terms only "as strong as its weakest link".

### Technical hindrances

30.   A significant number of reporting States indicated that they had encountered or continued to experience problems with the names of individuals and entities on the

list. The predominant shortcoming of the list continues to be insufficient identifiers, which actually deters States from posting listed individuals on their watch lists. In some cases, this has resulted in making the processing of travellers cumbersome, in several errors by border control authorities and as in undermining the effectiveness of freezing funds by financial institutions. It should be noted that not a single State reported on using the list while implementing the arms embargo or on experiencing any technical difficulties in this regard.

31. Indeed, States of various regions pointed out that, owing to incomplete information on designated individuals or entities, it is impossible to effectively search for or monitor their activities. The following sampling from the reports illustrates this obstacle in the actual implementation of the travel ban and freezing of assets. Liechtenstein reported that, when freezing assets, it is often not able to freeze the accounts of a given individual without having a date of birth. It further reported that some of the aliases listed give rise to confusion. Pakistan reported that in some cases detailed particulars are not given in the list, which leads to problems in identifying individuals. Portugal declared that lack of identifying data created problems: "In one case one name on the list corresponded to around 50 identical names in the database of a banking institution." Serbia and Montenegro stated, "The Security Agency lacks precise data for identifying individuals. In this regard a physical description is deemed helpful." South Africa noted that the difficulty with incomplete data hinders the positive identification of individuals.

32. Other States informed the Committee that transliteration from Arabic to English was proving to be an additional obstacle. For example, Turkey observed that the listing of all designated individuals and entities is difficult when there are different spellings of the same name. Another facet of the spelling impediment is exemplified by the listing of an entity with reported activities in Lebanon. The group is officially designated with the spelling Asbat al-Ansar. The first word could be spelled with an initial U or E depending on the transliteration. Indeed, there are quite a few variations, but listing or incorporating an individual or entity's name into a State's watch list using spelling variations may result in a lack of detection while authorities are searching the list electronically or manually in their efforts to enforce the sanctions measures. To overcome these technical impediments, several States suggested that the list be provided in Arabic. This would enable States that use the Arabic alphabet to easily incorporate the data and to effectively search and monitor listed individuals and entities.

33. Finally, several States reported that designated individuals on the list could not be placed on their national lists unless there was an international arrest warrant or a judicial charge against them.

### Other hindrances

34. The reports indicated that various obstacles may be discouraging States from submitting new names and additional identifiers to the Committee. Excluding the confidentiality of ongoing investigations, only 22 of 83 reporting States had identified designated individuals and entities or their associates within their territories. Even fewer reported having designated individuals and entities or potential designees as nationals of their countries. Of those that did report either identifying listed individuals and entities within their territories, or carrying out surveillance activities, arrests and sentencing of Al-Qaida members or their

associates, only a few indicated their intention to submit new names and additional identifiers to the Committee. Indeed, most States did not mention submitting names even though they had detected the presence of Al-Qaida in their territory. For instance, there are currently more than 20 designated individuals who are reportedly nationals or residents of Tunisia and yet its report did not fully address this matter.

35.  This obvious gap between the actual activities of States in combating Al-Qaida, the Taliban and their associates and what is reported of States' activities to the Committee has a contrary effect to that intended by the resolution, in that it reduces the list's effectiveness and will render it insignificant unless States proactively seek to update and report on their actions in their fight against Al-Qaida and its associates to the Committee. Logically, this should commence with the exchange of information between States and the submission of sufficient information on the names of individuals and entities that are known to them. As mentioned earlier, only a limited number of States reported that they had submitted names or were planning to submit names to the Committee.

36.  Indeed, it seems pertinent to refer to paragraph 4 of Security Council resolution 1455 (2003), in which the Council:

"... stresses to all Member States the importance of submitting to the Committee the names and identifying information, to the extent possible, of and about members of the Al-Qaida organization and the Taliban and other individuals, groups, undertakings and entities associated with them so that the Committee can consider adding new names and details to its list, unless to do so would compromise investigations or enforcement actions".

Almost a third of reporting States offered some relevant information on ongoing investigations and enforcement actions. Several of them did not invoke the clause of confidentiality on ongoing investigations. They also did not provide additional information and updates on specific enforcement actions, particularly States bordering or neighbouring Afghanistan, such as the Islamic Republic of Iran, Pakistan, Saudi Arabia, Tajikistan, Turkmenistan and Uzbekistan. The provision of critical data on ongoing investigations and enforcement would assist in bridging the gap between the actual activities being undertaken by States and their current reporting on those activities to the Committee.

37.  In paragraph 7 of resolution 1455 (2003) the Security Council called upon all States, relevant United Nations bodies, and, as appropriate, other organizations and interested parties to cooperate fully with the Committee, including supplying such information as might be sought by the Committee pursuant to all pertinent resolutions and by providing all relevant information, to the extent possible, to facilitate proper identification of all listed individuals and entities.

38.  In order for the Committee to proactively assist and monitor the implementation of the measures, States must intensify their collaboration with the Committee and be more forthcoming with critical information. Again, it is necessary to point out that the identification and inclusion of key players, be they individuals or entities, is highly warranted for the effective implementation of the resolution.

39.  The majority of reporting States informed the Committee that listed individuals and entities had neither brought any lawsuits nor engaged in any legal proceedings against their authorities because of inclusion in the list. Only five States reported having lawsuits filed. These challenged the listing of individuals and

entities and requested either their delisting or the unfreezing of their assets. Switzerland reported that several individuals requested the removal of their names from the list and initiated the delisting procedure according to the Committee's guidelines. Sweden was the only Member State that reported the actual delisting of two individuals.

**Towards a more credible list**

40.   In reviewing the list, it is apparent from the findings set out above that there are names that do not have enough identifiers. This warrants some action on the part of States and the Committee. Names without sufficient identifiers are problematic. Listing a name used commonly without distinct details of an individual is ineffectual. The Committee should therefore consider and decide upon the procedures that could be adopted to resolve this matter. The Committee could also consider setting a time frame for States to submit additional information. If the information is not provided within the allotted time, the Committee may wish to discuss possible follow-up action.

41.   When listing individuals, a State submits to the Committee the names of individuals and entities with varying degrees of verifying information. This process could be further clarified and made more transparent by introducing the requirement to include minimum verification criteria as well as minimum identifying data. This could be achieved by having the submitting Member State engage in bilateral or multilateral discussions with the State or States (as in the delisting process) where the individual is a national or resident or where the entity or its management is legally based or is operating. Moreover, the Committee should amend its guidelines to outline specific minimum criteria for listing individuals and entities. It would also be useful if a standardized format for submission of names and details were adopted.

42.   The Committee initiated a dialogue with States during 2002 by sending letters requesting updates and additional information on listed individuals and only a few States responded and provided the much-needed additional information. Certainly, the Committee recently updated the Taliban section of the list when the Government of Afghanistan, in conjunction with the Monitoring Group and the Secretariat, collaborated to effect those changes. This positive action highlights the urgency of stepping up the exchange of information as well as cooperation and collaboration between States and the Committee. Much more remains to be done in this regard.

43.   The Committee, for its part, may wish to consider amending the criteria currently in use to further facilitate the use of the list. This should in practice provide the Committee with ample room to manoeuvre in amending and updating the list. To date, there still remain on the list names with insufficient identifiers as well as names of individuals who are reportedly dead.

## Financial and economic asset freeze

**Domestic legislation**

44.   States were asked to provide information regarding their domestic legislation to implement the asset freeze as required by resolutions 1390 (2002) and 1455 (2003).

45.   The vast majority of reporting States indicated that they had specific legal instruments to implement the freezing of assets linked to Al-Qaida or Taliban

financial networks as required by the resolutions aforementioned. Four States did not address the matter. They were Angola, the former Yugoslav Republic of Macedonia, Saudi Arabia and Ukraine.

46. Other States reported that they did not have specific legislation, but were able to invoke, *ex lege*, other legislative enactments to freeze assets, such as anti-money-laundering laws and anti-terrorism acts. In other instances they can call upon the self-executing application of the Charter of the United Nations to fulfil the obligations under Security Council resolutions concerning the freezing of assets. For instance, Australia reported that it "has implemented the obligations to freeze the assets of listed individuals and entities through the Charter of the United Nations .... From the moment an individual or entity is listed by the Committee, an obligation to freeze the assets of that individual or entity under Australian law is automatically activated".

47. Several States that lack specific legislation reported not having legal provision to criminalize the financing of terrorist acts. Colombia noted that financing of terrorist activities is currently not a criminal offence, but a proposal has been submitted for consideration to the competent authorities to remedy this. It also noted that if needed the authorities can apply other legislation in place to criminalize the financing of terrorism.

48. Other States indicated that they were in the process of identifying areas where assistance would enable them to fully implement the financial freeze as stipulated in the sanctions against Al-Qaida and the Taliban. For instance, Guinea requested assistance in elaborating specific legislation to freeze assets linked to terrorism.

49. The reports indicated mainly two procedures on which the freezing of assets were based, one administrative, the other judicial. The administrative process neither requires the prior notification nor the approval of the judicial authorities. Administrative orders to freeze assets can therefore be carried out expeditiously.

50. Other States indicated that their legislation required a judicial order to freeze the assets of designated individuals and entities. The requirement for a judicial order is in most cases observed in those States whose legal systems are based on the provisions of civil law. Some States such as Chile and Spain reported that their authorities were considering the adoption of new measures to expedite the process of freezing assets belonging to designated individuals and entities.

51. In some cases both procedures are applied, freezing assets through an administrative order while awaiting, within a fixed period of time, a judicial ratification to confirm the freezing order. The judicial authorities can either endorse or invalidate the decision taken by the administrative authorities. These procedures were reported to be in place in countries such as Cuba, the Philippines, Qatar and Switzerland.

52. Moreover, a number of States reported that they had ratified or were about to ratify the International Convention for the Suppression of the Financing of Terrorism (1999). The ratification of the Convention paves the way for introducing new legislation and/or amending existing legislation. There is a clear link between States having ratified the Convention and the existence in those States of proper legal instruments to implement the assets freeze.

53. The provisions of the Convention can be integrated within national legislation at two levels: either adjusting, prior to the ratification, the existing national legislation on fighting the financing of terrorism to the criteria set by the

Convention, or, after the deposit of the instrument of ratification, since the Convention is directly applicable as a national law, setting up the required legal instruments to ensure that its provisions are put into force. To date, of the 83 reporting States, 41 have ratified the Convention.

54. Regarding the impediments to implementing the asset freeze, the Philippines reported that the impediments previously derived from the Philippine Bank Secrecy Law have been addressed by amendments to the law to enhance the power of the anti-money-laundering authorities.

**Operational implementation**

55. Most States provided information on the structure in place within their Governments to identify and investigate financial networks related to Osama bin Laden, Al-Qaida or the Taliban. The information submitted varied greatly. The majority of reporting States indicated the existence of some operational measures that addressed the issue but did not provide detailed information on how they function or how the measures were coordinated. The lack of information made it somewhat difficult to reach a concrete conclusion on the structures in place.

56. Certain States did not report on their national structures or mechanisms to identify and investigate designated individuals and entities even though they indicated having legislation in place to freeze assets. This was the case for States such as Austria, Bahrain, Hungary, Israel, Slovenia, the Syrian Arab Republic and Tajikistan.

57. For the most part the review of the reports indicated that States had taken practical steps to adopt policies to facilitate and strengthen the exchange of information with the authorities of other States. Few indicated that they had designated one agency or department to lead bilateral and multilateral efforts and actions required to locate and freeze assets. In some cases the reports made reference to the Forty Recommendations of the Financial Action Task Force (FATF) on anti-money-laundering measures and the Eight Special Recommendations on Terrorist Financing, to the Basel Core Principles for Effective Banking Supervision and the recommendations of the Egmont Group. Germany reported enacting into law the FATF Eight Special Recommendations on Terrorist Financing.

58. Regarding the practical steps that banks and other financial institutions are required to take to locate funds linked to Al-Qaida and/or its associates, a majority of States reported having the necessary procedures in place. Generally, there are two types of authority to which financial institutions have to report: ad hoc or administrative authorities and judicial authorities.

59. For instance, suspicious transactions reports are generally sent to the Central Bank or designated committees overseeing the freezing of assets. In other cases, suspicious transactions reports are sent to national ministries, including the Ministry of Finance, the Interior and Foreign Affairs. Generally, States have established a ceiling beyond which financial operations must be reported to the designated authorities. The amount is usually $10,000.

60. As a general trend, little information was provided on the "due diligence" policy that financial institutions may apply in dealing with their customers. More detailed descriptions were presented regarding the "know your customer" criteria, which are applied by the financial institutions of the majority of reporting States.

61. Moreover, some reporting States neither answered in a detailed way nor reported on the steps that banks and financial institutions have to take or the procedural instruments in place to investigate and identify assets of Al-Qaida and its associates.

**Freezing and unfreezing of assets**

62. As reported, 26 States have frozen approximately $75 million. The amount of assets frozen was given in the national currencies of the States. To facilitate the evaluation the reported amounts were converted into United States dollars. Fifteen States reported freezing approximately $27 million under resolution 1390 (2002). The entities and individuals whose assets have been frozen are either listed on the United Nations list or included in other lists. However, while a significant number of individuals have been added to the list in the past year, the amount of frozen funds has not increased in tandem with expectations. It should be noted that the amounts reflect only the activities in the formal banking system.

63. According to the information submitted, reporting States can be grouped as follows:

(a)   States that reported having frozen assets and provided comprehensive information regarding the amount, the type of assets and the name of the asset holder. For instance, Italy, Pakistan and Spain provided the names of the banks, the number of accounts and the names of the account holders. However, in the case of Spain some bank accounts seemed to have been inactive and had no funds.

(b)   States that reported having frozen assets but did not provide detailed information regarding the amounts frozen, the type and the holder of the assets. This was the case of Austria, Belgium, Canada, France, Germany, Japan, Liechtenstein, the Netherlands, Norway, Portugal, Saudi Arabia, Sweden, Switzerland, Tunisia, Turkey, the United Kingdom, the United States and Yemen.

(c)   States that reported having frozen assets without providing any additional information. This was the case in the reports of Bahrain, Morocco and the Philippines.

(d)   States that reported not having found any assets.

(e)   States, such as Bosnia and Herzegovina and Qatar, that have not submitted a report to the Committee but provided information on assets frozen to the Counter-Terrorism Committee, as well as States that in their report to the Committee did not clearly indicate whether they had frozen assets but had done so in their submission to the Counter-Terrorism Committee.

(f)   States that did not provide detailed information, making it unclear whether they had or had not identified funds.

64. Several countries reported that they are aware of the presence of Al-Qaida members or associates in their territory, either as part of operating or sleeping cells or as an active recruiting force. According to the information provided in their reports, it was not clear, however, whether their authorities had found assets belonging to the individuals involved in those acts and/or had frozen them accordingly. This was the case for Algeria, Australia, the Islamic Republic of Iran, Israel, Jordan, Lebanon, the Philippines, the Russian Federation and Singapore.

65. Under the provisions of resolutions 1390 (2002) and 1455 (2003), States are required to freeze "funds and other financial assets or economic resources" belonging to Al-Qaida members and associates. Only two reporting States, Italy and Pakistan, have frozen assets other than bank accounts.

66. For the majority of States, it is unclear whether the freezing of assets limited to bank accounts is due to the non-existence of such assets or other factors.

67. In the submitted information, the United States of America indicated that it had released $2.2 million for basic living expenses and reasonable fees of persons whose assets had been frozen pursuant to Executive Order 13224. Switzerland reported that it had released funds on several occasions prior to the entry into force of the procedure established by resolution 1452 (2002). A request for the release of funds has been transmitted by Switzerland to the Committee in accordance with the procedures set forth in that resolution. Japan, the Netherlands, the United Kingdom and the United States reported that funds had been released after the adoption of resolution 1388 (2002) and the Committee's decisions of 11 and 24 January 2002.

#### Informal remittance systems

68. Notwithstanding some relevant exceptions, the great majority of States either did not provide detailed information or any information on the regulations and restrictions applicable to alternate and informal remittance systems.

69. States that had submitted substantive information in this regard can be grouped as follows:

(a) States where informal remittance systems are illegal, prohibited or unauthorized such as France, India, the Islamic Republic of Iran, Malaysia, Portugal, Spain and Venezuela.

(b) States where such systems are subject to restrictions and where individuals and entities that provide this service render themselves liable to prosecution. This category includes Germany, the Republic of Korea, Singapore and the Netherlands.

(c) States that reported having some restrictions or regulations on informal remittance systems, such as the obligation to report to the competent authorities or obtain from the Central Bank prior authorization to operate. This category includes Paraguay, Qatar and the Syrian Arab Republic.

(d) States that reported on existing legislation to regulate and control informal remittance systems, such as Canada, Sweden, the United Kingdom and the United States.

(e) States that reported not having legal provisions to regulate informal remittance systems, such as Belarus, Bulgaria, Guatemala, Iceland, the Lao People's Democratic Republic, Lesotho and the Russian Federation. It is to be pointed out that some of these States, including the Philippines and Viet Nam, are in the process of enacting legislation to address the issue.

#### Charities and non-profit organizations

70. The vast majority of States provided no detailed information concerning their national legislations to regulate charities and non-profit organizations engaged in the collection and disbursement of funds for social or charitable purposes. Where

information was provided it covered mainly two areas: requirements for tax exemption and controls over fund-raising and collection of monies.

71. Regarding tax exemption, in a number of cases non-profit associations are controlled only if they request exemption from corporate income tax. In other instances tax-exempt organizations must declare the amount of grants made, but are not required to list recipients.

72. Concerning the controls that national authorities have over fund-raising and collection of monies by charities and other non-profit organizations, several States reported that their authorities are entrusted with oversight. In some cases, there are private sector self-regulating mechanisms. Others indicated that annual reviews of charities' accounts are conducted by approved auditors whenever the annual receipt or expenditure exceeds a certain amount of money. In addition, a few States reported applying a mixed control system, involving both public and private sector oversight.

**Precious commodities**

73. Few reporting States touched upon the issue of national restrictions or regulations in place to control the commerce and movement of precious commodities such as gold, diamonds and other precious commodities as requested by the guidance. There are general and specific types of restriction to regulate precious commodities:

(a) The most common instrument for regulating precious commodities is an obligation, set upon dealers, to register with the relevant authorities to obtain an authorization to trade and engage in operations involving such goods;

(b) Regarding diamonds the general framework referred to is the Kimberly Process, which regulates international and national control;

(c) Regarding gold, in many cases, the regulations in place deal with the amount of gold allowed to be taken in and out of the national territories by dealers, buyers and intermediaries.

**Conclusions and outlook on the asset freeze**

74. A major conclusion that can be drawn from the information provided is that States have in general taken positive steps towards implementing the freeze on assets. Indeed, many Governments have exhibited their readiness to curb the financing of Al-Qaida activities. There are those that have yet to show the same preparedness, however. It is pertinent to note that an international effort is required to combat this threat.

75. Even though the reporting on the financial measures is extensive, it is far from being comprehensive. There are two points of concern that should be addressed. The majority of States provided vague information on the mechanisms and the structures in place to identify and investigate individuals and entities, often overlapping data on this matter with information on the steps financial institutions and banks are required to take to locate suspicious funds. This could be addressed by formulating more targeted questions eliciting more accurate replies.

76. Only two countries have frozen assets other than bank accounts. This could be addressed by requesting that States take a more proactive approach in locating assets other than bank accounts. In cases where the impediments for doing so refer to the

S/2003/1070

lack of a legal framework, States should be encouraged and assisted in setting up the necessary legal provisions. In this regard the promotion of greater collaboration within the realm of international financial regulatory institutions, such as FATF and the Egmont Group, would be valuable.

## Travel ban

77.   The effectiveness of the travel ban on Al-Qaida, the Taliban or their associates cannot be accurately gauged from the information provided in the reports. The majority of reporting States indicated that they had applied legal and/or administrative measures for implementing the travel ban against Al-Qaida, the Taliban and their associates. A significant number of States also noted that they had included the names of the designated individuals in their national watch lists. However, approximately a third of States have yet to incorporate the whole list or parts of it into their national watch lists. Again, the main reason cited for not listing some designated individuals was the absence of sufficient identifiers.

78.   Of the reporting States, the tendency towards incomplete incorporation of all designated individuals can be observed primarily through the analysis of reports from Schengen area countries. To date, those States have reported incorporating only listed individuals with enough or minimum identifiers to technically fit into the Schengen Information System. Some Schengen States reported that other designated individuals were added to their own national stop lists. One can thus conclude that there are names outstanding; that is, some designated individuals cannot be found on any of the Schengen States' lists. Lebanon, New Zealand, Romania, Singapore and the United States of America among others also reported that they had not incorporated in their national stop lists designated individuals about whom there was insufficient data.

79.   As pointed out earlier, the more identifying information and names submitted to the Committee by States, the higher the odds that these will be incorporated into their national lists. This then would lead to more viable screening procedures for suspicious individuals at the border entry and exit points. Without those, the current incomplete information on listed individuals will continue to hamper the actual identification process of individuals at border points.

### Effectiveness of the travel ban

80.   The minimal activity indicated by States in implementing the travel ban brings into question the efficacy of the measure in its current state. No State reported stopping any of the listed individuals at any of their border points or in transit through their territory. Only three countries, Belarus, Pakistan and the Philippines, reported barring individuals from entering their territory. It is unclear, however, whether those individuals are to be found on the list, as no further information was provided. The Netherlands reported barring an unlisted individual who heads a listed entity from entering their territory.

81.   Several States indicated that they had established new visa requirements and adopting stricter criteria to enforce the travel ban after 11 September 2001. Countries bordering Afghanistan mentioned implementing new visa regulations. The Islamic Republic of Iran, for instance, reported having decided to restore a visa requirement to better control entry into its territory and to prevent illegal transit.

Tajikistan reported strengthening measures to monitor the issuance of passage documents and to prevent falsification. However, visa-issuing authorities in all of the reporting States had not identified any visa applicant whose name appears on the list.

82. Furthermore, only half of the States reported that they both regularly transmitted the updated list to their border control authorities and had the capability to perform an electronic search. Little information was provided on the process of disseminating the list to the competent bodies and relevant agencies, including travel agencies, airline carriers and maritime authorities. Here it is worthwhile to note that several States requested financial and technical assistance in order to upgrade their border control facilities and enhance their capabilities. For instance, Croatia identified the need for border control equipment such as optical passport readers, devices for the detection of counterfeit passports, detectors of explosives and video surveillance. Paraguay noted that it would like to enhance its electronic capabilities in order to transmit relevant data throughout its territory.

**Conclusions and outlook on the travel ban**

83. The full implementation of the travel ban is intrinsically dependent on the quality and credibility of the list. It also requires that States strengthen their capabilities to enforce the travel ban by adopting stringent measures to control their borders, such as training their officials and upgrading their information technology capabilities.

84. Improving the list and increasing the technical capacity of States are thus two ways that may lead to more effective implementation of the travel ban. The former would resolve what many States reported, namely, not listing individuals with insufficient identifiers at their border entry and exit points. The latter would address the lack of capacity of some States in monitoring their borders.

85. It may also be useful to consider overhauling the travel ban to address some of the difficulties encountered by States while actually implementing the measure. Several of those difficulties, as mentioned in the Stockholm Process on the Implementation of Targeted Sanctions,[a] are the lack of clear procedures and legal requirements for States which find targeted actors attempting to enter their territories or present in their territories; the difficulty in clearly identifying individuals subject to travel bans owing to their legitimate holding of multiple nationalities or multiple passports; and the failure in the electronic dissemination of travel ban lists to all relevant States or officials within States because of the limitations of State capacity.

86. States should also consider taking the necessary measures to inform the designated individuals linked to them by virtue of nationality or residence that they have been placed on the list and are banned from travelling. This may help to provide a domestic basis for holding individuals who violate the travel ban accountable for their actions. Furthermore, States should report to the Committee on the status of those individuals.

## Arms embargo

87. The arms embargo is the least transparent of the measures in the sanctions regime against Al-Qaida, the Taliban and their associates and appears to be the

---

[a] Peter Wallensteen and others, eds., *Making Targeted Sanctions Effective: Guidelines for the Implementation of UN Policy Options* (Uppsala University, 2003).

S/2003/1070

hardest to implement. The possession, manufacturing and sale of arms are generally seen as matters of national security. The lack of substantive information in States' reports rendered it difficult to assess the effectiveness of this crucial measure.

88. The global dispersion of Al-Qaida network has changed the scope of the arms embargo to the extent where it falls short and needs to be strengthened to prevent Al-Qaida, the Taliban and their associates from acquiring arms.

89. Notably, in their responses covering the implementation of the arms embargo none of the States provided information on how the list is used by their competent authorities.

### Scope of the arms embargo: weapons of mass destruction and export controls

90. The arms embargo against Al-Qaida and the Taliban is aimed at "arms and related materiel of all types, including weapons and ammunition, military vehicles and equipment, paramilitary equipment, and spare parts, for the aforementioned, and technical advice, assistance, or training related to military activities" (resolution 1390 (2002), para. 2 (c)).

91. The majority of responses from States covered mainly controls on conventional arms. A number of States addressed the issue of weapons of mass destruction, but expressed different interpretations of the required controls. Some referred to national safeguards on nuclear material and facilities while others simply stated that weapons of mass destruction were not produced within their territory. The responses did not fully acknowledge the relevance of control over dual-use products, which, although manufactured primarily for civilian use, might be used for military purposes, including the development of weapons of mass destruction. In addition, several States failed to cover measures to prevent the acquisition of conventional arms and weapons of mass destruction by Al-Qaida and its associates.

92. The replies from States indicated that export controls on material related to weapons of mass destruction are unevenly implemented on a global level. This was observed primarily in reports from States that are not parties to the multilateral export control regimes. The current non-proliferation regimes are the Australia Group (non-proliferation of chemical and biological weapons); the Missile Technology Control Regime (non-proliferation of unmanned delivery systems for weapons of mass destruction); the Nuclear Suppliers Group (non-proliferation of nuclear weapons); and the Wassenaar Arrangement (non-proliferation of conventional weapons and dual-use goods).

93. Approximately a third of reporting States provided information on export control measures concerning sensitive technology and dual-use items. Most of those States referred to their obligations under the existing export control regimes mentioned above and provided detailed information on the measures taken, such as the implementation of established guidelines for evaluating applications for export licences, requirements for end-user certificates, information-sharing, and revisions of lists of controlled goods and material.

94. The diverse spectrum of replies concerning export controls does not allow for generalizations. A few examples may serve to illustrate the workings of current control measures:

• Examples of the effectiveness of enforcement initiatives included descriptions of foiled attempts to smuggle weapons, ammunition and explosives, and the

denial of applications to export sensitive goods. Spain reported that it had refused a number of export licences for chemicals and equipment for fear of the intention to develop chemical and biological weapons. Another 35 application denials were based on fear of instability in the intended destination.

- Some States addressed measures to control the movement of goods by referring to their efforts to implement the Container Security Initiative.

- Others provided information on the use of post-shipment verification and physical inspection of exports in recipient destinations as an additional control measure supplementing end-user certificates. States that do not implement post-delivery verification regimes pointed to the risk of diversion of goods to banned individuals.

- A number of States indicated that they had benefited from expanding the collaboration among customs and intelligence officers in their respective regions.

- Some States, such as Argentina, Japan, the Republic of Korea and Sweden, referred to the implementation of a "catch-all clause". This additional mechanism would ensure that even goods not listed as products under export control would be "caught" and prevented from being exported in cases involving suspicious end-users and fear of diversion for the development of weapons of mass destruction.

- A few States described attempts at fine-tuning export controls by engaging the private sector in sharing the responsibility for preventing sensitive goods from being diverted.

95. All in all, the descriptions provided by members of the export control regimes indicated the awareness-raising and regulating effect of multilateral collaboration. Considering the fact that illicit brokers often seek to take advantage of loopholes in countries with less stringent controls, or of the differing interpretations of the scope of controls among countries, there are legitimate reasons for raising the awareness of the relevance of such controls and harmonizing controls internationally so as to establish a common standard.

### Enforcing the arms embargo

96. The information submitted by States highlighted three different aspects of the enforcement of the arms embargo, namely, the legal measures to criminalize breaches of the arms embargo; various safeguards to prevent nationally produced weapons and ammunition from being diverted; and formulation of a normative framework to guide decisions regarding arms transfers.

97. Approximately two thirds of reporting States indicated that they had general legislation in place to criminalize violations of the embargo. For the most part reference was made to existing legislative provisions criminalizing violations of United Nations embargoes. A few States indicated that penal provisions directed at particular individuals were deemed problematic from a constitutional point of view. In many cases the legislation referred to predated 11 September 2001.

98. A significant proportion of States either failed to address the issue of criminalization of embargo violations or provided vague responses, rendering it impossible to assess whether measures were actually in place. A few States

indicated that they had no legislation in this regard, though some of them reported that new laws were being considered.

99. A couple of reports illustrated that the existence of a legislative framework and measures to criminalize violations of the arms embargo did not necessarily preclude occurrences of illicit arms trading. In the final instance, laws are only as effective as their implementation and enforcement. Regrettably, only very few countries submitted details of the results of enforcement actions or examples of how the arms embargo was being implemented in practical terms.

100. Apart from the sensitivity of the issue, part of the explanation for this absence of practical detail may be found in the changed scope of the measures required to implement the arms embargo against Al-Qaida and the Taliban: the challenge is no longer to prevent the acquisition of arms by certain individuals and groups within a confined territory but to prevent the flow of arms to non-State actors and their associates dispersed all over the globe.

101. Concerning the safeguards to prevent weapons and ammunition produced nationally from being diverted, a significant number of States deemed the question irrelevant, as they do not produce weapons or ammunition. Some arms-producing States provided examples of safeguard mechanisms, including physical protection of arms stockpiles, licensing procedures combined with end-user certificates, and post-shipment checks of exports. As an additional measure against forged documents, some States introduced procedures for preventing the falsification of end-user certificates through verification of the authorization of the signatories.

102. Finally, States in their reports drew a telling picture of the lack of a common international framework to guide decision-making regarding arms transfers. A couple of States indicated that they had established normative criteria for granting licences to export arms. One of the few examples of multilateral collaboration aimed at establishing a normative standard, referred to by Chile, was the International Code of Conduct on Arms Transfers, which asks Governments to uphold internationally recognized standards of democracy, human rights and peaceful international relations.

103. Another example of multilateral collaboration is the European Union Code of Conduct for Arms Exports, to which several European Union Member States made reference. The European Union Code of Conduct stipulates that exports of arms should not be allowed if there is a clear risk that the arms may be used for aggression against another country, internal repression or violations of human rights in the recipient country, or if there is a risk of prolonging or aggravating armed conflicts. Other criteria relate to the arms purchasing country, including its attitude towards terrorism and its commitment to non-proliferation, United Nations embargoes and other international agreements. Although neither of these codes of conduct address the crucial role of arms brokering, or is legally binding, they function as a normative framework for more concrete measures to regulate arms transfers.

### Arms-brokering systems: a measure for the future

104. States were requested to describe how their arms-brokering system, if any, could prevent Osama bin Laden, Al-Qaida, the Taliban and others from obtaining items under the arms embargo. Owing in part to the broad formulation of the question, and possibly also to the lack of a unified international approach in this

area, the replies differed significantly in level of detail and bore witness to the lack of uniform regulation on arms brokering.

105. The replies from the vast majority of reporting States reflected inconsistent interpretations of what constitutes the minimum requirements of an arms-brokering system:

- Most replies referred to a licensing mechanism requiring arms exporters to apply for an authorization to transfer arms. Little information was provided in general on the criteria for granting such a licence, however.

- Only very few reports included information on the existence of a national registry of authorized brokers. Some States reported that they held registers concerning arms possession within the country, but did not address the question of arms sales and transfers across borders.

- Notably, no States addressed the issue of how to control national brokers operating outside their territory. The lack of extraterritorial jurisdiction is known to be a loophole that illicit brokers take advantage of in circumventing international arms embargoes. Few countries have made attempts to close this gap, and in some instances the extraterritorial jurisdiction is limited to cases of breaches of the United Nations embargoes.

106. The lack of international regulation of brokering activities practically allows brokers to facilitate arms transfers to war zones or suspicious groups or individuals without violating any laws. This is further confirmed by open sources, which in some cases are able to identify those brokers operating at large.

107. The general absence of international regulation of arms brokering cannot be justified by a lack of adequate tools. As demonstrated in the reports, a set of tools already exists. This has been reaffirmed by the Programme of Action to Prevent, Combat and Eradicate the Illicit Trade in Small Arms and Light Weapons in All its Aspects and by the recommendations of the Stockholm Process on the Implementation of Targeted Sanctions on how to improve arms embargoes. What is missing is that States apply those instruments, showing a unified political will to regulate arms brokering.

### Role of international conventions

108. States have confirmed in their reports the importance of international conventions related to the arms embargo. Several referred to the ratification of some of those conventions:

Convention on the Physical Protection of Nuclear Material

Treaty on the Non-Proliferation of Nuclear Weapons

Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction

Convention on the Prohibition of the Development, Production and Stockpiling of Bacteriological (Biological) and Toxin Weapons and on Their Destruction

Convention on the Marking of Plastic Explosives for the Purpose of Detection

International Convention for the Suppression of Terrorist Bombings.

S/2003/1070

109. International conventions provide a vital framework for capacity-building and implementation of legal measures at the national and international levels. A number of these conventions are still to be ratified by a number of States. As recently pointed out by the Secretary-General, 37 States have not signed the Chemical Weapons Convention. The International Convention for the Suppression of Terrorist Bombings is still to be adopted by a large number of States, some of which have been the victims of major incidents of terrorist bombings.

110. So far no international convention or other legally binding instrument has been concluded aimed at regulating brokering activities. Arms brokering has however been included in the recently introduced Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, supplementing the United Nations Convention against Transnational Organized Crime. While the Protocol represents a step towards a more unified approach to arms brokering, it is still limited to encouraging States and putting forward proposals on what an arms-brokering system could include.

**Conclusions and outlook on the arms embargo**

111. Descriptions by States of the measures taken to prevent Al-Qaida, the Taliban and their associates from acquiring arms are more telling for the information they do not provide than the information they do provide. The lack of transparency, information-sharing and a common international approach regarding the arms embargo is confirmed by the absence of substantive information in the reports of States. This, however, sheds light on the areas where improvements to the arms embargo are highly warranted.

**Targeting and specification of focus**

112. In the light of recent developments, the arms embargo falls short as a measure to prevent the acquisition of arms and ammunition by Al-Qaida, the Taliban and their associates. The problem is twofold and requires the redefinition of the scope of the embargo at two levels.

113. First, the analysis of the reports revealed an inconsistency with regard to the interpretation of the scope of the arms embargo. Addressing this shortcoming would require a more specific and targeted formulation of the arms embargo to meet the new reality of terrorist warfare of Al-Qaida and the Taliban, including explicit mention of goods and material related to weapons of mass destruction.

114. Second, the fact that Al-Qaida and the Taliban now operate on a global scale, rather than within a confined territory, creates challenges of a magnitude that the arms embargo does not adequately meet. The only way to avoid the diversion of weapons and dangerous material to Al-Qaida is through dedicated collaboration at the regional and international levels. Therefore, the arms embargo cannot stand alone as an obligation upon each State, but has to be coupled to enhanced international collaboration. A multitude of relevant tools to this end have already been defined in the aforementioned Programme of Action. Moreover, joined efforts in the regulation of arms brokering would significantly strengthen the effectiveness of the arms embargo.

**Promotion of an international arms-brokering system**

115. States in their reports have clearly documented the lack of arms-brokering systems in spite of the availability of various tools.

116. The findings set out above, and reports of other expert panels and the Stockholm Process on the Implementation of Targeted Sanctions, point to the relevance of considering the international implementation of an effective arms-brokering system as an integral part of the arms embargo. This should entail the establishment of national registries of authorized brokers in all States and the introduction of licensing requirements for arms brokers. In addition, the existing legislative loopholes should be closed by introducing extraterritorial jurisdiction, where this is still not the case, to regulate national brokers wherever they are located.

117. An additional measure to strengthen the regulation of arms brokering would be to establish a register ("black list") of individuals and entities engaged in illegal arms-related activities and ensure that those convicted cannot operate. This could be facilitated through enhanced collaboration and exchange of information among States and international agencies dealing with arms.

**Enhancement and expansion of export controls**

118. Some reports bore witness to the benefit of information-sharing, development of best practices, and policy regulation within export control regimes. On the other hand, the reports indicated the disadvantages of limited membership, which precludes some States from obtaining relevant information, sharing knowledge and contributing to maintaining a common standard on export controls. Regional as well as global initiatives to enhance dialogue among States, relevant sanctions committees dealing with arms embargoes, and international export control regimes could facilitate the development of best practice guidelines on export controls.

**Global implementation of relevant international conventions**

119. The ratification and implementation by all States of the requirements of international conventions related to arms is crucial. Two of them should be highlighted, as their ratification and implementation would significantly reduce the availability and use of explosives by Al-Qaida, the Taliban and their associates, namely, the Convention on the Marking of Plastic Explosives for the Purpose of Detection and the International Convention for the Suppression of Terrorist Bombings.

## Future reporting requirements

120. The guidance prepared by the Committee assisted States in providing full and accurate information on the steps taken to implement the sanctions regime against Al-Qaida and the Taliban.

121. In general, reports prepared according to the guidance provided more substantive and comparable information than reports submitted under resolution 1390 (2002).

122. In describing the measures taken to implement the sanctions against Al-Qaida, the Taliban and their associates, States tended to report on legislation rather than practical steps taken. Furthermore, replies were in some instances repetitive. This resulted in gaps and overlaps, thus limiting the possibility of fully assessing the implementation of the measures. Moreover, a number of replies submitted either did not fully address or omitted the specific issue.

123. Even though the guidance contributed to more accurate reporting and greatly facilitated the analysis of reports, the formulation of questions targeting practical

implementation would have resulted in even more accurate and full reporting. In this regard the Committee may wish to consider refining the guidance.

124. Universal reporting requirements following the adoption of new Security Council resolutions imposing sanctions are necessary. However, in situations where the sanctions imposed remain in place for a long period of time, as in the case of the sanctions regime against Al-Qaida and the Taliban, universal reporting requirements alone may not be as effective. It was evident from the analysis of the reports that not all questions were relevant to all States. In such situations a more targeted approach to reporting may prove to be more fruitful.

125. As a result, the Committee may wish to consider adding more specific reporting requirements to the existing universal ones. Moreover, in order to address the gaps observed in reporting, the Committee may consider making it mandatory upon States to report.