# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | No. 02 CR 892 |
| | ) | |
| ENAAM M. ARNAOUT | ) | Hon. Suzanne B. Conlon |

JAN  6 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

JAN  7 2003

## GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING
## THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this proffer, pursuant to Federal

Rule of Evidence 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the

government's evidence supporting the admission of coconspirators' statements at trial.

78

## TABLE OF CONTENTS

I.      GOVERNING LAW ...................................................... 5

        A.      General Principles ........................................... 5

        B.      The "In Furtherance" Requirement ................................... 10

                1.      Statements Made to Execute the Conspiracy ...................... 10

                2.      Statements Regarding the Conspiracy's Activities ................. 11

                3.      Statements to Recruit Conspirators ........................... 12

                4.      Statements Regarding the Activities of Other Conspirators
                        Designed to Inform or Reassure the Listener ...................... 12

                5.      Statements About the Progress and Accomplishments of the Conspiracy 13

                6.      Statements to Conceal the Criminal Objectives of the Conspiracy ..... 13

        C.      Admission of Statements Without Regard to the Coconspirator Rule ........ 14

        D.      The Absence of Confrontation Clause Issues with Coconspirator Statements .. 14

II.     EVIDENCE OF THE CONSPIRACY, ITS PARTICIPANTS, AND STATEMENTS IN
        FURTHERANCE OF THE CONSPIRACY ................................... 15

        A.      Overview of Conspiracy ........................................... 15

                1.      Defendant Arnaout, LBI and *Mekhtab al Khidemat* ................ 17

                2.      Defendant Arnaout and *al Qaeda* in Afghanistan .................. 20

                3.      Defendant Arnaout, *al Qaeda*, the Sudan and BIF ................. 21

                4.      Defendant Arnaout and BIF in Illinois ........................... 22

                5.      *Al Qaeda*, BIF and Bosnia-Herzegovina .......................... 23

                6.      BIF, Batterjee and Bin Laden ................................... 24

                7.      BIF, *al Qaeda* and Chechnya .................................. 25

B.     Beginning of the Rule 801(d)(2)(E) Conspiracy ......................... 26

C.     *Lajnatt Al-Birr Al-Islamiah* ........................................ 27

D.     BIF's Archive .................................................... 28

       1.     "Tareekh Osama" File ...................................... 28

       2.     "Tareekh Al Musadat" File ................................. 37

       3.     "Al Jabal" File ........................................... 39

       4.     Miscellaneous Files ....................................... 43

E.     Defendant Arnaout's Videos With Hekmatyar .......................... 46

F.     Shift from "LBI" to "BIF" ......................................... 47

G.     BIF's Hidden Mission ............................................. 48

H.     BIF's Efforts in Sudan ............................................ 56

I.     BIF's Efforts in Bosnia-Herzegovina .................................. 62

J.     BIF's Efforts in Chechnya ......................................... 71

       1.     Background ............................................... 71

       2.     X-Ray Machine and Anti-Mine Boots for Chechen *Mujahideen* ...... 75

       3.     Camouflage Uniforms for Chechen *Mujahideen* .................... 86

       4.     WWW.QOQAZ.COM ...................................... 89

K.     BIF's Efforts in Azerbaijan ........................................ 91

L.     BIF's Efforts in Tajikistan ......................................... 92

M.     BIF's Matching Gift Program ....................................... 95

N.     Fundraising by Yusuf Ansari Wells ................................... 95

O.     Defendant Arnaout's False Declarations and Continuing Fraud ............. 96

P.    Defendant Arnaout's Message to Batterjee ............................. 98

Q.    Defendant Arnaout's Coaching of BIF's Sarajevo Director ................ 99

R.    Defendant Arnaout's Instructions to BIF Officer to Flee ................. 100

III.    CONCLUSION ...................................................... 101

## I. GOVERNING LAW

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Below are summaries of the case law interpreting this rule, the background of the charged conspiracy, the evidence of the conspiracy and its participants, and the evidence showing that the proffered coconspirator statements were made during and in furtherance of the conspiracy.

### A. General Principles

The admission of a coconspirator statement against a defendant is proper where the government establishes, by a preponderance of evidence, that: (1) a conspiracy existed; (2) the defendant and the person making the cited statement were members of that particular conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gajo*, 290 F.3d 922, 928 (7th Cir. 2002); *United States v. Centracchio*, 265 F.3d 518, 530 (7th Cir. 2001); *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130-31.

The Seventh Circuit has "identified several options available to the district court to determine the admissibility of *Santiago* evidence: (1) make a preliminary determination based on the government's proffer of evidence, (2) rule on each statement as elicited at trial based on the evidence presented at that point, (3) conditionally admit the evidence without a proffer subject to eventual supporting evidence to be presented sometime at trial (risking, of course, a possible mistrial), or (4) hold a 'full-blown' pre-trial hearing to consider all the evidence and make a decision." *United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001). However, the court "often discouraged the fourth

5

alternative, a full-blown pre-trial hearing, as inefficient and potentially duplicative." *Id.* (citing *United States v. McClellan*, 165 F.3d 535, 554 (7th Cir.1999)). In this circuit, the preferred way for the government to make its preliminary "coconspirator-statement" factual showings is by the filing of a pretrial written proffer of the government's evidence.[1] *See United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992); *United States v. Hooks*, 848 F.2d 785, 794-95 (7th Cir. 1988).

In determining whether a coconspirator statement is admissible pursuant to Rule 801(d)(2)(E), the court may examine the coconspirator statement itself to decide whether a conspiracy existed and whether the defendant participated in it. "Bootstrapping" in this fashion is expressly permitted – the statement of a coconspirator may be the predicate for its own admissibility. *Bourjaily*, 107 S.Ct. at 2781-82; *Godinez*, 110 F.3d at 454-55; *see also United States v. Zambrana*, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (discussing how overall context of coconspirator statements is what makes the statements very reliable as evidence of a defendant's role in a conspiracy). The evidence used in showing a conspiracy and a given defendant's participation in that conspiracy may be either direct or circumstantial. *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983).

Case law makes clear that a "conspiracy" under Rule 801(d)(2)(E) includes any joint venture, including lawful ones. *See United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989) ("[W]e initially note that Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and that a charge of criminal conspiracy is not required to invoke the evidentiary rule"); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1984) ("Conspiracy as an evidentiary rule differs from conspiracy

---

[1]     This Court has substantial discretion in the manner in which it decides to evaluate the admissibility of coconspirator statements. Although the pre-trial proffer is the customary procedure, the Court may admit coconspirator statements subject to the government's eventual proof at trial by preponderance of the evidence of the elements required under Fed. R. Evid. 801(d)(2)(E). *See United States v. Doerr*, 886 F.2d 944, 967 (7th Cir. 1989).

as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . . The government did not have to prove by a preponderance of the evidence all the elements of the criminal conspiracy before Coe's statement could be admitted against Korenak and Joseph. The proposition that the government did have to establish by a preponderance of independent evidence was that Coe, Korenak and Joseph were engaged in a joint venture – that there was 'a combination between them[.]'") (quoting *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917)) (internal citations omitted); *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir. 1988), *overruled on other grounds, United States v. George*, 960 F.2d 97, 99 (9th Cir. 1992) ("[T]he district court correctly determined that Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated."). Indeed, the "conspiracy" for purposes of Rule 801(d)(2)(E) can be any joint venture and need not be one charged in an indictment – in fact, the rule can be invoked in civil cases. *Coe*, 718 F.2d at 835-36.

Importantly, the coconspirator need not be specifically identified in order for his or her statement to be admitted as a coconspirator's statement. In *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000), a prosecution of leaders of the Gangster Disciples ("GDs") street gang, the Seventh Circuit upheld the admission of a document identifying high-ranking GDs as a coconspirator's statement, even though the author was unknown. The court explained:

> The details contained in "The List" were such that it could only have been written by a member of the GDs or by someone sufficiently involved with the business to be intimately familiar with it – in other words, by a co-conspirator. The defendants are wrong to suggest that it is necessary to know the precise identity of a coconspirator before statements can be admitted under Rule 801(d)(2)(E).

7

*Id.* Likewise, in *United States v. De Guidino*, 722 F.2d 1351, 1356 (7th Cir. 1984), cited in *Smith*,

the court upheld the admission of a similar, anonymously-authored document:

> The contents of the pollo lists also establish the lists as co-conspirator statements admissible under rule 801(d)(2)(E) of the Federal Rules of Evidence. This rule provides that a statement is not hearsay (and thus is admissible) if it is a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. In the present case, the contents of the lists clearly show that their author was familiar with the workings of the conspiracy. The fact that the lists contain dates and records of payment is evidence that they were written during the course of the conspiracy. The names, dollar figures, and telephone numbers are evidence that the lists were utilized to maintain information necessary to continue the smuggling activities of the conspiracy. Since this evidence was not countered by any evidence that the lists were made at any time other than during the conspiracy or that the lists were not made to further the conspiracy, we hold that the lists were admissible as co-conspirators' statements.

*See also United States v. Postal*, 589 F.2d 862, 886 n. 41 (5th Cir. 1979) (admitting a document

under Rule 801(d)(2)(E) and stating "Although it is not clear who authored the logbook . . . we think

it inescapable that one of the crew of La Rosa did so.").

Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A),

without reference to the coconspirator statement rule. *See United States v. Shoffner*, 826 F.2d 619,

626-27 & n.10 (7th Cir. 1987). Of course, a defendant's own admissions are obviously and

powerfully relevant to establish the factual predicates for the admission of coconspirator statements

against him. *See United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987); *United States v.*

*Alexander*, 741 F.2d 962, 966 (7th Cir. 1984), *overruled on other grounds, United States v.*

*Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985).

Where Rule 801(d)(2)(E) is implicated, it is clear that once a conspiracy is established, "only

slight evidence is required to link a defendant to it." *Shoffner*, 826 F.2d at 617 (quoting and citing

prior authorities). It is also clear that "statements made during the course of and in furtherance of

8

a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern." *Potts*, 840 F.2d at 372 (citing cases). "Conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." *Shoffner*, 826 F.2d at 628 (citations omitted).

Further, certain principles of general conspiracy law are relevant to Rule 801(d)(2)(E) inquiries that are made as to the existence of a conspiracy and a defendant's membership in it. For instance, a defendant joins a conspiracy if he i) agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others, and ii) knowingly acts in furtherance of that object; it is immaterial whether the defendant knows, has met with, or has agreed with every coconspirator. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985). Similarly, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may be found guilty even if he joined or terminated his relationship with core conspirators at different times. *United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985). Even after a conspirator has concluded his active participation in the activities of the conspiracy, the statements of coconspirators will be admitted against him, unless he affirmatively establishes that he has withdrawn from the scheme. *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

In addition, coconspirators' statements generally may be relayed to the jury in their entirety to place the coconspirators' statements in context and make them intelligible for the jury. *United*

*States v. Zizzo*, 120 F.3d 1338, 1348 (7th Cir. 1997); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

### B.   The "In Furtherance" Requirement

To establish that a statement was made "in furtherance" of the conspiracy, the government need only show "some reasonable basis" upon which to conclude that the statement furthered the conspiracy. *United States v. Zizzo*, 120 F.3d 1338, 1352 (7th Cir. 1997); *United States v. Stephens*, 46 F.3d 587, 597 (7th Cir. 1995); *Shoffner*, 826 F.2d at 628. Furthermore, the government has a "relatively low burden of proof on this issue." *Shoffner*, 826 F.2d at 628 (collecting cases). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception. *United States v. Singleton*, 125 F.3d 1097, 1107 (7th Cir. 1997); *United States v. Powers*, 75 F.3d 335, 340 (7th Cir. 1996); *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995). Thus, updates on a conspiracy's progress, *Potts*, 840 F.2d at 371, and conversations concerning planning or review of coconspirators' exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985), are statements "in furtherance."

As discussed below, the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement.

### 1.   Statements Made to Execute the Conspiracy

Statements made by conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). Such statements "intended to promote the

conspiratorial objectives" are readily admitted pursuant to Rule 801(D)(2)(E). *See, e.g., United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994). Statements which prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991). *See also United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

## 2.   Statements Regarding the Conspiracy's Activities

Similarly, statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992). Likewise, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy *Gajo*, 290 F.3d at 929; *Godinez*, 110 F.3d at 454; *United States v. Herrero*, 893 F.2d 1512, 1527-28 (7th Cir. 1990); *Garlington*, 879 F.2d at 283-84; *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988). Statements to assure that a coconspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986).

11

### 3. Statements to Recruit Conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. *Godinez*, 110 F.3d at 454; *Shoffner*, 826 F.2d at 628. Indeed, "[c]onversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." *United States v. Dorn*, 561 F.2d 1252, 1256-57 (7th Cir. 1977).

### 4. Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy, such as couriers, contribute to the conspiracy. *Van Daal Wyk*, 840 F.2d at 498-99. The Seventh Circuit has also found that "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson*, 53 F.3d at 845; *United States v. Curtis*, 37 F.3d 301, 307 (7th Cir. 1994).

As the Seventh Circuit held in *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990):

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname . . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. *See id.*; *Van Daal Wyk*, 840 F.2d at 499 ("statements were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

12

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A coconspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. *Garlington*, 879 F.2d at 284 (upholding admission of coconspirator's statement to defendant in a murder conspiracy "We're going to take care of him" reasoning that the statement encouraged the defendant to perform his task in the conspiracy).

### 5. Statements About the Progress and Accomplishments of the Conspiracy

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371, *Molt*, 772 F.2d at 368-69. Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

### 6. Statements to Conceal the Criminal Objectives of the Conspiracy

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where ongoing concealment is one of its purposes. *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *Xheka*, 704 F.2d at 985-86. "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499.

13

**C.** **Admission of Statements Without Regard to the Coconspirator Rule**

As discussed above, statements that a defendant personally makes are admissible against him as admissions of a party-opponent pursuant to Rule 801(d)(2)(A) without reference to the coconspirator statement rule. *See Shoffner*, 826 F.2d at 626-27 & n.10. Statements that a conspirator does not make personally, but which he impliedly or expressly authorizes an agent to make in the context of an existing agency relationship are admissible pursuant to Rule 801(d)(2)(D). *United States v. Feldman*, 825 F.2d 124, 128 (7th Cir. 1987); *see also United States v. Gibson*, 690 F.2d 697, 701 (9th Cir. 1982).

**D.** **The Absence of Confrontation Clause Issues with Coconspirator Statements**

No separate Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements which are offered for their truth against the defendant. This is because the requirements for admission under Rule 801(d)(2)(E) are identical to "the requirements of the Confrontation Clause." *Bourjaily*, 483 U.S. at 182. Thus, there are no "constitutional problems" once Rule 801(d)(2)(E)'s requirements have been met. *Id.*; *United States v. Ceballos*, 302 F.3d 679, 689, n.2 (7th Cir. 2002) (stating that the Confrontation Clause of the Sixth Amendment does not apply to statements admitted under Rule 801(d)(2)(E)) ; *United States v. Singleton*, 125 F.3d at 1107-08; *see also Idaho v. Wright*, 497 U.S. 805, 814 (1990) (Confrontation Clause is not violated where hearsay statement falls within a firmly rooted hearsay exception). As a result, in considering the admissibility of proffered coconspirator statements, the trial court does not consider whether or not the coconspirator-declarant is "unavailable" or whether there is independent evidence to establish the "reliability" of the proffered statements. *Inadi*, 475 U.S. at 400; *Bourjaily*, 483 U.S. at 183-84.

14

## II. EVIDENCE OF THE CONSPIRACY, ITS PARTICIPANTS, AND STATEMENTS IN FURTHERANCE OF THE CONSPIRACY

Set forth below is the government's proffer demonstrating that the conspiracy described below existed at least as early as 1987 in Afghanistan and grew over the years to include individuals working in many additional countries.

The first section below provides an overview of the conspiracy, including overviews of defendant Arnaout's collaboration with *al Qaeda, Hezb e Islami* and other violent groups in various countries. The conversations recounted in those overviews and subsequent sections are merely summaries of oral statements in furtherance of the conspiracy. The documents summarized in the first section are discussed in more detail in the ensuing sections (where they are cited by their exhibit number in the appendix) which explain the evolution of BIF and the expansion of defendant Arnaout's support to violent organizations in various locations, along with the efforts defendant Arnaout employed to raise money fraudulently and to conceal facts from donors and the public.

### A. Overview of Conspiracy

Outlined in detail in this proffer is a fifteen-year, international conspiracy to use ostensibly charitable organizations to support violence overseas on behalf of purportedly Islamic causes. As the evidence set forth below and in the appendix demonstrates, defendant Arnaout played an integral role in the conspiracy. As summarized in those sections, in the latter part of the 1980s, defendant Arnaout actively assisted *mujahideen* while working for a Saudi relief organization, *Lajnatt Al-Birr Al-Islamiah* ("LBI"), and other organizations within Afghanistan and Pakistan, along with Usama Bin Laden and others who ultimately established *al Qaeda* (literally translated as "the base"). Defendant Arnaout continued his work with those individuals and affiliated groups after *al Qaeda*

15

formed and even after LBI evolved into Benevolence International Foundation, Inc. ("BIF") and incorporated in the U.S.[2] The assistance provided was neither incidental nor sporadic but a core mission of defendant Arnaout and those organizations.

Indeed, the evidence shows that defendant Arnaout's participation in the material support of violent *jihad* remained consistent in methods over the years and merely changed to expand the number of armed belligerents he and the BIF Enterprise (described in the Indictment) supported: first fighters in Afghanistan, then fighters in the Sudan, then Bosnia-Herzegovina (or "Bosnia") and then Chechnya, among others. The people and organizations he collaborated with over time – including, but not limited to, BIF (and LBI), its founder Adel Batterjee, Usama Bin Laden and his *al Qaeda* network, and Gulbuddin Hekmatyar and the *Hezb e Islami* ("Islamic Party") group – changed little over time, and indeed the plans made in Afghanistan and Pakistan in the late 1980s discussed below were made precisely for the purpose of establishing support for *jihad* in places outside of Afghanistan. Moreover, the trust and methods of operation that defendant Arnaout and the BIF

---

[2]     Documents containing quoted and paraphrased statements in this proffer have been filed in a four-volume appendix to this proffer. With the exception of a newspaper article on the "Black Swans" commando group, the government incorporates the appendix in its entirety herein and asserts that the complete documents are statements in furtherance of a conspiracy under Rule 801(d)(2)(E). Indeed, the government has endeavored to be inclusive in this proffer and the appendix in order to advise the Court and counsel of the theory of admissibility and to comply with the Court's direction in its decision denying a bill of particulars. Nevertheless, considering the length of this conspiracy and its international scope, it is impossible to include in this proffer every statement made in furtherance of the conspiracy that the government may seek to introduce at trial, particularly considering that the government does not know what defense or defenses defendant Arnaout might raise. Moreover, despite its length, this proffer does not include all of the evidence the government will seek to introduce at trial; rather, it includes a good faith outline of the statements the government anticipates it may seek to have admitted at trial as coconspirators' statements, along with additional evidence to place those statements into context. This proffer does not even attempt to summarize all statements made by defendant Arnaout to others which will be offered in evidence without resort to the co-conspirator exception to the hearsay rule.

16

Enterprise forged in Afghanistan with the *mujahideen* cemented the working relationships with various *mujahideen* as the work of the BIF Enterprise expanded to encompass the Sudan, Bosnia-Herzegovina ("Bosnia"), Chechnya and elsewhere, and continued at least until the day of defendant Arnaout's arrest. The agreement clearly violated American law in 1992 when the BIF Enterprise most explicitly decided to take action within the United States, by incorporating here. Importantly, however, the conspiratorial agreement had been formed and acted upon several years earlier, as BIF acknowledged in documents discussed below. In that context, actions taken in Afghanistan, the Sudan, Bosnia and Chechnya should not be viewed as disparate conduct but should instead be viewed as the conduct of an evolving enterprise in which defendant Arnaout played a leadership role.[3]

### 1.    Defendant Arnaout, LBI and *Mekhtab al Khidemat*

Beginning in approximately 1987, defendant Arnaout used the cover of work with BIF's predecessor charity entity, *Lajnatt Al-Birr Al-Islamiah* (the "Islamic Benevolence Committee"), to provide material support to *mujahideen* in Afghanistan associated with, among others, Usama Bin Laden and the *al Qaeda* organization as well as Gulbuddin Hekmatyar and the *Hezb e Islami* organization. Defendant Arnaout provided support in a variety of ways, including purchasing large quantities of weapons, operating radio communications at a *mujahideen* camp and delivering a variety of supplies to the *mujahideen* ranging from food and blankets to weapons, during the time he purported to be a relief worker.

---

[3]    Thus, although the Indictment charges that the unlawful conspiracy began in 1992, when BIF first incorporated in the United States, the agreement or joint venture for purposes of Rule 801(d)(2)(E) began in 1987. *See Kelley*, 864 F.2d at 573; *Coe*, 718 F.2d at 835 and the discussion above.

17

By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ("MK") (the "Office of Services") to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI, the BIF forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani")[4] of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name *"Hay'at al-Igatha al-Islamiya al-'Alamiyaa"*), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ("MWL").[5] In many respects, Wael Julaidan was a leading supporter of the *jihad* through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for "Jihad Support," even dating to the time prior to the forming of *al Qaeda*. MK also published *"al Jihad"* magazine which was a tool to recruit *mujahideen* to fight in Afghanistan. Bin Laden, a *mujahideen* leader, received financial support from a group of wealthy

---

[4]      In this proffer and at trial there will be numerous references to "Abu" names that warrant a brief explanation. "Abu" in Arabic means "father of." Thus the name "Abu Hassan" means "father of Hassan." In much of the Middle East, a man who has a son will be referred to as "Abu (son's name)" as a sign of respect. However, this practice was adopted in Afghanistan by the *mujahideen* as a device to make it more difficult for hostile intelligence services to track the *mujahideen*. Thus, the use of real names was generally avoided. Many of the "Abu" names included an additional reference to the country (or city) from which the person hailed. Thus, "Abu Hassan al Madani" is an indication that the person hailed from Medina in Saudi Arabia. Defendant Enaam Arnaout was known as "Abu Mahmoud al Suri" and "Abu Mahmoud al Hamawi" because he hailed from the town of Hama in Syria.

[5]      Defendant Arnaout himself worked with the Muslim World League prior to working for LBI.

donors from the Gulf area known as the "Golden Chain," linked to Adel Batterjee, the Saudi founder of both LBI and BIF. Other military leaders in Pakistan in the late 1980's included Gulbuddin Hekmatyar, a highly-educated member of a Pashtun tribe. *Hezb e Islami* (the "Islamic party") was one of the *mujahideen* groups fighting against the Russians and for a time was headed by Yunis Khalis. Hekmatyar served under Yunis Khalis and then later headed *Hezb e Islami*. Hekmatyar was aligned with Usama Bin Laden in Afghanistan after *al Qaeda* was formed in 1988, and indeed many of *al Qaeda*'s camps were located in territory controlled by Hekmatyar. As discussed below, *Hezb e Islami* later became involved in activities in Baku, Azerbaijan, in support of the Chechen *mujahideen* in or about 1995, and *Hezb e Islami* was then similarly aligned with *al Qaeda* in Chechnya.

Bin Laden and Azzam went their separate ways in approximately 1988 because Bin Laden wanted to conduct *jihad* outside of Afghanistan and Azzam was not prepared to do so. After the split, Bin Laden remained aligned with Hekmatyar who held views similar to Bin Laden, while Azzam continued with MK until he was killed in 1989. Hekmatyar provided Bin Laden with training camps in geographic areas that Hekmatyar controlled.

During this time frame, defendant Arnaout administered military camps and purchased supplies for the camps, including food and a variety of weapons. Defendant Arnaout worked directly with Usama Bin Laden,[6] Wael Julaidan, Abu Rida al Suri (Mohamed Loay Bayazid), Abu Hajer al Iraqi (Mamdouh Salim), Hekmatyar and other *mujahideen* military leaders during this time. As

---

[6]     Defendant Arnaout was very close to Abu Qutaiba al Suri, a Syrian who was extremely close to Bin Laden and served as his bodyguard. Defendant Arnaout often drove Bin Laden or otherwise accompanied him in Afghanistan.

discussed below, BIF documents later purport that both Abu Rida and Abu Hajer – who both became key figures in the *al Qaeda* network – served as officials of BIF.

During the time while defendant Arnaout was providing this military logistical support, he was ostensibly working for LBI or at times MWL. At LBI, Arnaout's work was segregated from that of the other LBI workers who reported their budgets and activities through a chain of command (which reported in part to the United Nations) while defendant Arnaout worked in areas controlled by Bin Laden's and Hekmatyar's forces and reported outside the other chain of command and instead directly to Batterjee.

### 2. Defendant Arnaout and *al Qaeda* in Afghanistan

As remarkable materials archived by BIF prove, Bin Laden formed *al Qaeda* in 1988 with others, including Salim (Abu Hajer) and Bayazid (Abu Rida). *Al Qaeda* maintained personnel files and members pledged a *bayat* (oath of allegiance) and signed a contract.[7] Defendant Arnaout himself is not known to have made *bayat*, though evidence demonstrates he was very important to the *al Qaeda* network.

For example, in or about 1990, at the direction of *al Qaeda*'s military commanders (Abu Hafs and Abu Ubaidah), defendant Arnaout participated with *al Qaeda* member Yaseen al Iraqi in the purchase of weapons for *al Qaeda* from a Pashtun tribesman named Hajji Ayoub, which weapons included AK47 assault rifles and mortar rounds. Several ten-ton trucks containing these weapons were delivered to *al Qaeda* camps, including the *Jihad Wal* and *Jawr* camps in Afghanistan after

---

[7]     Members did not always know who else signed a contract or swore a *bayat*. Moreover, many key members of the *al Qaeda* network, including Abu Hajer, may not have become formal members of the group by making *bayat* even though they played a controlling role in the work of *al Qaeda*.

being stored in other locations, including a facility controlled by Hekmatyar. This again occurred while defendant Arnaout was ostensibly working for LBI.

### 3.   Defendant Arnaout, *al Qaeda*, the Sudan and BIF

Some time after the Soviets withdrew from Afghanistan in 1989, Bin Laden decided to relocate *al Qaeda* to the Sudan, and Abu Hajer laid the groundwork with the Sudanese regime. Abu Hajer – who held very high stature as an *al Qaeda* religious scholar – and Bin Laden persuaded the *al Qaeda* membership in Afghanistan to relocate to the Sudan in 1991. Once in the Sudan, *al Qaeda* worked closely with the National Islamic Front ("NIF") (in effect the ruling party in the Sudan), as well as the Sudanese intelligence service and the *Difaar al Shabi* (meaning the "Popular Defense" and referring to the Sudanese militia known as the Popular Defense Force, hereafter "PDF"). *Al Qaeda* agreed to train the PDF in guerilla warfare tactics for the "civil" war in Southern Sudan against Christians and animists.[8] In addition, *al Qaeda*, working principally through Abu Rida and Abu Hajer, obtained weapons for the PDF and the Sudanese with *al Qaeda* funds – in one instance, obtaining thousands of Kalashnikov weapons for use by the PDF. Abu Hajer also advised an *al Qaeda* member then in the Sudan that *al Qaeda* was seeking to develop chemical weapons in an area near Khartoum.[9] In part, the weapons were to be used by the PDF in the civil war. Abu Rida and Abu Hajer later also sought in 1993 or 1994 to obtain uranium for *al Qaeda* to attempt to build a nuclear weapon.

---

[8]   Prior to 1991, a *jihad* had been declared against John Garang and others (primarily Christians and animists) in the South Sudan in what Sudan termed a civil war. Statements were later issued by a *Hezb e Islami* official (Yunis Khalis) and another *mujahideen* leader from Afghanistan (Haqqani) supporting that *jihad*.

[9]   The effort was a joint effort involving Sudanese officials and an Iranian affiliated organization, with some support from Iraq.

In return, the Sudanese intelligence service facilitated the free movement of *al Qaeda* members and weapons in the Sudan. *Al Qaeda* conducted military training (including explosives training) in the Sudan and was given certain camps by the NIF. During this time period beginning after the move to the Sudan in 1991, Bin Laden (working with Salim) issued *fatwahs*[10] indicating that the United States was the "head of the snake" and the enemy and should be attacked in Somalia and elsewhere.

In or about 1991, at the time when the leadership of the *al Qaeda* organization relocated to the Sudan, the LBI/BIF organization (each referred to in Arabic as "al Birr," or "Benevolence") followed suit and opened its first office in the Sudan specifically to support *al Qaeda* and the *mujahideen* in the Sudan, particularly the PDF, as discussed in further detail below. BIF's collaboration with *al Qaeda* in the Sudan mirrored how LBI had worked in Afghanistan. BIF located its office in Khartoum near the office of the PDF and persons managing the PDF frequently visited BIF, which provided all manner of logistical support to the PDF. BIF then continued to function in the Sudan to support *al Qaeda* and *mujahideen* efforts as detailed below.

### 4. Defendant Arnaout and BIF in Illinois

In 1992, BIF incorporated in Illinois, with Adel Batterjee and two others in Saudi Arabia serving as directors. Defendant Arnaout was named a board member and executive director. At least as of fall 1994, Bayazid – the man known as Abu Rida, who was present for the founding of *al Qaeda*, who participated in obtaining various weapons (including weapons for *al Qaeda* and the PDF in the Sudan) and communications equipment and also sought to develop chemical weapons

---

[10]    A *fatwah* is in essence an Islamic legal ruling. Islamic law ("*sharia*") gives guidance as to what is "*halal*" (proper) and "*haram*"(forbidden). When there is a question as to whether Islamic law permits or forbids certain activity, an Islamic scholar is approached for *fatwah*.

and obtain uranium for a nuclear weapon for *al Qaeda* – became the President of BIF in Illinois, working with defendant Arnaout.[11]

### 5.    *Al Qaeda*, BIF and Bosnia-Herzegovina

In the period of the fall of 1992, *al Qaeda* dispatched a representative then based in the Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by *al Qaeda*. The *al Qaeda* member traveled to Zagreb, Croatia, where he met with various people, including defendant Arnaout, as well as two *al Qaeda* members, Abdel Rahman al Dosari a.k.a. "Hown" (an expert in mortars) and Abu Zubair al Madani (a cousin of Bin Laden).[12] Abdel Rahman al Dosari advised that *al Qaeda* was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support *al Qaeda* economically. He further advised that BIF (referred to as "*al Birr*") was providing money for weapons for *al Qaeda* and that they had in fact obtained weapons from Cologne, Germany, for Bosnia with the assistance of BIF and Abu Rida.[13] Abdel Rahman al Dosari also stated that *al Qaeda*'s goal in Bosnia was to establish a base for operations in Europe against *al Qaeda*'s true enemy, the United States.

---

[11]    Indeed, when stopped by law enforcement officials in December 1994 in California, Bayazid possessed an Illinois driver's license with BIF's business address (except for the suite number) listed as his address. He was in the company of Bin Laden's brother and brother-in-law.

[12]    Later, the *al Qaeda* member Abu Zubair al Madani was killed in battle in Bosnia and was featured prominently in a fundraising video produced under the logo of LBI.

[13]    To be clear, BIF was not the only organization providing weapons to the *mujahideen*. On that same trip, the *al Qaeda* member had meetings with the Third World Relief Agency ("TWRA"), headed by Fatih Abu Hassanein, an influential member of the Sudanese NIF.

23

Also in about 1993, a BIF employee in the Sudan traveled to Saudi Arabia to meet with Adel Batterjee but was detained and questioned by Saudi authorities. After he was released, the BIF employee returned to the Sudan where he met with Usama Bin Laden who questioned him about what had happened. Madani al Tayyib, then *al Qaeda*'s chief financial officer, reported to another *al Qaeda* member that the Saudi authorities must have questioned the employee because they had found documents linking "*al Birr*" to Bin Laden. Tayyib later indicated that the problem had been fixed, although BIF's operations in Saudi Arabia were apparently curtailed at that time.

### 7.    BIF, *al Qaeda* and Chechnya

In 1995, Madani al Tayyib (then in the Sudan serving as *al Qaeda*'s chief financial officer) asked an *al Qaeda* member to travel to Chechnya through Baku, Azerbaijan, to join with *al Qaeda* in the fighting in Chechnya. The *al Qaeda* member -- whose trip was later cancelled for personal reasons -- was told that he would be joining up with Ibn al Khattab, a *mujahideen* leader who had worked in Afghanistan with Bin Laden. At about this time, the website of the Chechen *mujahideen* indicated that Ibn al Khattab led the Arab contingent of fighters in Chechnya. BIF (and the Global Relief Foundation) had been identified on the Internet website as conduits for financial support to those fighters.

Meanwhile, BIF opened an office in Chechnya mirroring *al Qaeda*'s expansion into this area. BIF worked closely with Sheik Fathi, an influential *mujahideen* supporter from Afghanistan who was of Jordanian/Chechen extraction. During this time, BIF provided material support to the Chechen *mujahideen* in the form of anti-mine boots, while raising money on the false pretense that the funds were for winter shoes for civilians. BIF also provided an X-ray machine, cash, anti-mine boots and military uniforms to the Chechen *mujahideen*.

25

Indeed in 1998, *al Qaeda* military commander Saif ul Islam served as the BIF officer in Grozny, Chechnya.  Saif ul Islam (also known as "Abu Islam" and "Abu Islam al Masry") is an Egyptian lawyer who became an *al Qaeda* member and a top military instructor as well as a member of *al Qaeda*'s military committee who was very active in violent activity.[15]  Meanwhile, the BIF office in neighboring Baku, Azerbaijan, was staffed by Gul Mohamed, the *Hezb e Islami* representative in Baku.

During the period prior to October 1999, defendant Arnaout toured Chechnya and Dagestan and reported back to a BIF fundraiser as to the role that Ibn al Khattab, Sheik Fathi, Saif ul Islam (whom he described as "knowledgeable") and others played in Chechnya.

## B.   Beginning of the Rule 801(d)(2)(E) Conspiracy

In effect, LBI and BIF were closely intertwined. The conspirators were less concerned about the formality of the corporate structure and more concerned with creating an image of BIF as international and less associated with Islam to increase its donor base and appeal to other international organizations.

Indeed, so intertwined were LBI and BIF that BIF often claimed to have been established in 1987 despite not being incorporated until 1992. An internal list of questions and answers prepared by an employee of BIF in Illinois for BIF workers states:

**Started?**
* 12 years ago.  Have been in Chicago since May 1993.
* Dec. 1992 had Florida address.

**Established?**

---

[15]   Saif ul Islam participated in training persons in Somalia in the early 1990's for an eventual attack on the American forces there and later underwent explosives training in Lebanon by Hezballah after Abu Hajer helped forge a relationship between *al Qaeda* and Iranian intelligence. Saif ul Islam's passport photograph was recovered in a 1997 search of the Kenyan cell of *al Qaeda*.