# EXHIBIT 4C

G.M. appreciated our being taken into confidence but discreetly asked for a photocopy of the letters for B.I.F.'s purposes. Mr. Khazuyev, as expected, said it could be considered later.

\* \* \* \* \*

G.M. came to meet me along with Essa and his fellow Mujahid Buda? Essa was visibly moved by B.I.F.'s help by sending the much needed X-Ray machine. Following some discussions, Essa took the unit and gave a proper receipt for it. He indicated that as soon as a viable route/transport is arranged, the unit would be taken to a field hospital in Southern Chechnya. He also acknowledged the receipt of amount given by G.M. ($3225/- sent through Mr. Asad Ullah and the amount paid to him earlier on by G.M.)[30] G.M. said he would Fax to Suleman Ahmer the receipt of these amounts. The receipt of the unit is also enclosed.

\* \* \* \* \*

Essa also showed interest in anti-mine steel-sole boots for Chechen fighters. He also added that he could arrange funds to purchase these from USA or other sources at a reasonable price.

\* \* \* \* \*

It appears that Suleman Ahmer is making some inquiries about the manufacture/supply of such boots.

\* \* \* \* \*

Visited the main office of Hizb-e-Islami with G.M. and Dr. Atif and I was introduced to Mr. Abdur Rehman, General Manager . . . . These two oversee administrative functions whereas G.M. and Dr. Atif are responsible for *external affairs* and for coordination with Government Agencies /foreign functionaries etc. Hisb's official lauded B.I.F.'s efforts to help the Chechen's cause and indicated their cooperation in facilitating such efforts in Baku.

\* \* \* \* \*

Met couple of Hisb's Mujahideen. Exchanged views on latest situation; role of B.I.F. in distress areas like Bosnia, Sudan and now Chechnya etc.

\* \* \* \* \*

Met G.M., Dr. Atif and visiting official from Hisb's Peshawar. . . . G.M. briefed him on B.I.F.'s contribution, financial and material, to the Chechen Mujahideen and a desire for continuing support on humanitarian grounds.

\* \* \* \* \*

Met, at G.M.'s house, five veteran Afghan Mujahideen who participated in Nagorno Karabakh conflict against the Armenians. G.M. apprised them of B.I.F.'s humanitarian efforts in Chechnya.

\* \* \* \* \*

---

[30]      The $3200 sent to Abzoutov was discussed in a May 14, 1995 facsimile from Ahmer to Fathi Mohammed (also refereed to as Sheikh Fathi, discussed *infra*.) via "Brother Essa," stating: "I hope you have received all the money from Gul Mohammad" and "I am also sending an X-ray machine for the Vidino Hospital." Ex. 191. That note followed a May 2, 1995 handwritten note from Ahmer to defendant Arnaout requesting that defendant Arnaout transfer money to a man in Peshawar, Pakistan and say it is for Gul Mohammed in Baku, Azerbaijan. Ex. 192.

G.M. therefore concluded that any aid from us in cash or kind should better be routed through Essa or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the ongoing Jehad.

\* \* \* \* \*

Accompanied Hamine Aminee to meet a recuperating Afghan mujahid. He was injured last year in the Nagorno Karabakh conflict with the Armenians. Until recently all of his compensation from the Azerbaijan government has been exhausted. . . . I would recommend some help on continuing basis from B.I.F. to him.

*Id.* In listing the accomplishments of this trip, Sarafraz wrote:

Various meetings with senior members of the Baku based Hisb-e-Islami Group of Afghanistan and receiving their personal attention, at respective levels, to meet our visit objectives. . . . A close rapport with Hisb's senior officials which would facilitate our future efforts in the area. . . . . As a sequel to Suleman Ahmer's last Baku-Chechnya visit (April 20-May 10), the Chechens/Hisb-e-Islami are reassured of the seriousness of B.I.F. to help Chechens following our financial and material (X-Ray unit) assistance. . . . [W]inning a good-will for B.I.F. and enhancing its visibility as an International Organization engaged in alleviating the human sufferings in selective flash points involving oppressed and helpless Muslim civilians, refugees and freedom fighters.

*Id.*

A handwritten telephone list recovered from BIF's Illinois office lists numbers for *Hezb e Islami* personnel in Baku, Azerbaijan and "Essa Abzoutov, Chechen Contact in Baku." Ex. 193.

As Sarfaraz noted in his report, Essa Abzoutov provided a signed receipt for the delivery of the x-ray machine and money. Ex. 194. The receipt states that the Mednif x-ray machine Sarfaraz described was "[r]eceived with thanks from Benevolence International Foundation, P.O. Box, 548, Worth, Illinois, USA, 60482". *Id.* The receipt makes clear: "As arranged this unit will be transported to Chechnya for the use of Chechen Mujahideen." *Id.* The receipt is signed by Abzoutov, Sarfaraz, and Gul Mohammed who Sarfaraz explained worked for both BIF and *Hezb e Islami* in Baku, Azerbaijan.[31] *Id.*

---

[31]    In late 2000 and early 2001, BIF spent over $75,000 for the purchase of chemical

(continued...)

78

Materials going to Chechnya often passed through Azerbaijan, much like materials going to

Afghanistan during its conflict with the Soviet Union often passed through Pakistan.[32] In fact, a BIF

memorandum shows that BIF established an office in Azerbaijan to facilitate its efforts in Chechnya:

> [T]his office will serve as a conduit of relief supplies to Chechnya. Our study has proved
> that the best way to get relief supplies into Chechnya is through Azerbaijan.
> * * * * *
> BIF will be transporting relief supplies to Chechnya in the first phase. These will include
> shoes, canned food, sleeping bags, medicine and medical equipment. To this date a mobile
> x-ray unit was bought and transported to Azerbaijan with Mr. Sarfarz for onward
> transportation to Southern Chechnya.

Ex. 196.

Within weeks of the delivery of the x-ray machine (or perhaps prior to the delivery),

defendant Arnaout inquired about the anti-mine boots Abzoutov requested. A facsimile on July 5,

1995, from the Al-Aman Trading Company ("Al-Aman) to "Mr. Azeem/Sarfaraz" containing a note

written to defendant Arnaout and a sketch of a boot states:

> Honorable Brother Abu Mahmoud . . . . I have just received the offer, and according to your
> request, shoes having these specifications are not readily available and they must be made.
> The least quantity is 20-foot shipping container. The container holds 2900 shoes
> (pairs) . . . . The cost, receivable to Dubai, with insurance is 31 Dollars.

Ex. 197. Defendant Arnaout later shared Al-Aman's telephone and facsimile numbers with an

individual in the course of discussions of opening a BIF office in Thailand. Ex. 198.

---

[31](...continued)
handwarmers and toewarmers (small disposable packets which when shaken heat up for a period of
hours and can be inserted in gloves or boots, commonly used for skiing, hunting and fishing in cold
weather). In a letter to the distributor, BIF requested that the warmers be shipped to Essa Abzoutov
at an address in Turkey. Ex. 195 at 2. After problems arose in Turkey with the delivery, BIF
changed the name of the recipient and the delivery was completed.

[32]      And the continuing agreement is made clear by the fact that defendant Arnaout and
LBI worked with *Hezb e Islami* in Afghanistan and that Arnaout and BIF worked with *Hezb e Islami*
in Afghanistan and then Arnaout and BIF with *Hezb e Islami* again in Chechnya.

Two days after the Al-Aman facsimile to defendant Arnaout, Syed Sarfaraz sent a facsimile to Suleman Ahmer containing the same boot sketch and advising Ahmer that Al-Aman quoted $31 per pair. Ex. 199. Sarfaraz added: "The only alternative now is to go for the Pak boots which will be fully financed by the time tested Brother."

Approximately one month later, on August 8, 1995, BIF employee Muzaffar Khan wrote a memorandum about the boots to Jehanzeb Sikandar (sometimes spelled "Sikander"), a trusted BIF officer in its Baku, Azerbaijan office (discussed further below), informing him that defendant Arnaout ordered the boots and seeking advice on the best way to get the boots into Azerbaijan:

> Enaam called me and said that we are going to ship about 2900 pairs of shoes for Chechnya in next 15-20 days. The shipment will arrive in Baku, Azerbaijan. We are declaring the shipment as a business shipment.
>
> * * * * *
>
> What is the Custom's process for the business shipments? Or is it a good idea to ship the goods in some other name? He suggested that you should consult the Chechen representative in Baku for the best means available to ship the shoes safely and without any problems.
>
> But be careful in discussing the matter with anybody. As you are well aware of the importance of the matter.
>
> The shipment will come through Iran (Abadan) into Baku.

Ex. 200.

A month later, on September 6, 1995, defendant Arnaout met with Sarfaraz in Pakistan to discuss the anti-mine boots, as Sarfaraz chronicled in a report a day after the meeting:

> This refers to an introductory meeting with br. Inam, Director, BIF and myself on Sep. 6, 1995 at Hotel Sheraton, Karachi.
>
> * * * * *
>
> Discussed latest situation regarding donations for the import of the anti-mine boots for the Chechen Mujahideen. I will try to set up an appointment with Mr. Naveed Anwer, a donor who has committed US $30,000/= for this noble cause. I strongly feel that br. Inam should meet with him (Suleman also recommended earlier).

Ex. 201 (handwritten version). The report also explains that defendant Arnaout and Sarfaraz discussed BIF's merger with a group known as Nasr Trust. *Id.* Sarfaraz sent this report to defendant Arnaout and apologized because it had not yet been typed: "I could not even get my memorandum of meeting with you typed. I should have given it to you on the day you were leaving. Anyway I am enclosing it now and cannot wait for a day or two to get it typed." *Id.* Eventually, Sarafraz sent a typed report. Ex. 202.

Around this same time in September 1995, Sikandar informed defendant Arnaout by fax that Gul Mohammed wanted defendant Arnaout to know that Hekmatyar is in Peshawar for three days and defendant Arnaout can meet with him. Ex. 203.

BIF purchased the 2900 pairs of anti-mine boots in October 1995. In a letter to "Br. Ahmed, Al-Aman Trading Company" from BIF employee Muzaffar Khan on Oct. 10, 1995 regarding "Money transfer and original documents," Khan stated to Al-Aman: "You should have received the wire by now, Insha' Allah.[33] Please send us all the original documents to our office in Chicago as per your conversation with Enaam Arnaout." Ex. 204. BIF maintained at its Illinois office a facsimile copy of a Citibank transfer receipt for $100,000 from BIF to Al-Aman on Oct. 11, 1995. Ex. 205.

BIF received an invoice from Al-Aman on October 31, 1995, stating:

> HUNTING BOOTS PACKED IN 20 PRS X 145-CARTON BOX . . . SIZE: NO. 9 1160 PRS; NO. 10 1160 PRS; NO. 11 580 PRS . . . MADE IN KOREA . . . Total US DOLLAR EIGHTY NINE THOUSAND NINE HUNDRED ONLY. 89,900.00

Ex. 206 at 4. BIF also received a bill of lading from Iranland Services Shipping Agency, Tehran, Iran, dated November 1, 1995, and the shipment was insured by another company. Ex. 207. The

---

[33]     *"Insha' Allah"* or *inshallah* means "God willing."

bill of lading is for a shipment of "145 CTNS OF HUNTING BOOTS" from Dubai, United Arab Emirates ("U.A.E.") to Bandar Abbas, Iran, stating "TRANSIT VIA IRAN T BAKU". *Id.* Notably, BIF's name does not appear on the bill of lading.

The absence of BIF's name on the bill of lading was discussed five days later in a memorandum from defendant Arnaout to Sikandar, BIF's representative in Baku:

> The shoe shipment has left from port Bandar Abbas for Baku on 11/5/95. The bill of ladings and the related invoices have been sent to you from Dubai. The DHL airway bill number is 3035075956, you should contact the local DHL office to get the paper work. The important thing is that the shipment is not in BIF's name for some reasons. . . . We are transferring another $20,000.00 to you today.

Ex. 208. Sikandar repeated these concerns to defendant Arnaout in an e-mail to on May 25, 1996:

> It's possible to meet Dr. Abdallah in Moscow, but it's not good to meet him there, otherwise (the others) will know his direction (the Brothers who will meet him are known by their face that they are from inside)[34] . . . To transfer money here will put us under the questions, how and where spend it like the shoes.

Ex. 209.

Also in November 1995, BIF was raising money from donors for these shoes. Ahmer himself was giving speeches in various areas in the United States about the war in Chechnya and soliciting donations "for the Chechen cause." *See* Ex. 210 (noting that Ahmer's speech on the war in Chechnya "will conclude with a fundraiser for the Chechen cause"); *see also* Ex. 211 ("Example of Speech on Chechnya": "We are raising funds for the shoes only, and so focus your attention on this project" and noting that the "shoes" cost "$32 each").

---

[34]    During the conflict between Afghanistan and the Soviet Union, individuals in Pakistan and elsewhere commonly referred to Afghanistan as the "inside." Likewise, during the conflict between Chechnya and Russia, individuals in Azerbaijan and elsewhere referred to Chechnya as the "inside."

On July 17, 1996, approximately eight months after the shipment of the 2900 pairs of anti-mine boots, Muzaffar Khan received an e-mail from an employee in BIF's Zenica, Bosnia-Herzegovina office stating: "Also he [Gul Mohammad] received request from Sheik in Chechnya asking for another 2500 shoes. Please consult it with Suleyman and let me know about it." Ex. 212. Less than a month later, the "Congress of Chechen International Organizations" in Washington D.C. sent a letter to BIF's Board of Directors stating: "[T]he (2500) pairs of shoes that were sent to Chechnya have been very helpful. Shaikh Fathi talked to me about three weeks ago and asked if you could send another (5000) pairs because they are badly needed especially for the coming winter." Ex. 213.

BIF made efforts to finance the purchase an additional 6000 pairs of boots following this request, seeking donations from the public and indicating that these boots and the ones previously shipped were for civilian use. In a letter titled "Project: Reinforced Winter Shoes for Chechnya", BIF discussed the dangers of "frog mines" dropped by the Russians in Chechnya and explained:

> [A]nd the civilians attempt to flee, they fall victim to these mines.
> * * * * *
> Last year BIF, distributed 2,900 pairs to the localities where the mines are reported to be scattered. These winter shoes provide a degree of protection as they have reinforced soles.
> * * * * *
> Recently BIF has received another request for these shoes for this upcoming winter. BIF has decided to go ahead with this project.
> * * * * *
> The cost of the shoes is $29.50 per pair. Including the shipment, the cost per pair is $32.00 per pair. The minimum quantity that has to be ordered from the company is 30[illeg.]. That brings the total cost plus shipping into Chechnya to be;
> Total cost of the project: 3,000 X 32.00 = $96,000
> * * * * *
> BIF will be receiving a sample of the shoe from South Korea in the first week of September.

Ex. 214. In a follow-up letter titled "Project update: Reinforced Winter Shoes for Chechnya" on

September 8, 1996, BIF stated:

> Salient Features – No. pairs needed: 6,000; Cost per pair: $32.00; Total cost: $192,000;
> Funds raised: $106,149; Funds remaining: $85,851
> * * * * *
> In the end of July BIF received another request for these shoes for this upcoming winter. A
> minimum of 5,000 pairs were requested. BIF has decided to go ahead with this project.
> * * * * *
> Fundraising was started in early August and the target was set for 3000 pairs by the 10th of
> September. . . . It was decided to monitor the response and in the case of a favorable
> response BIF will go ahead with 6,000 pairs and the project will be done in two
> batches. . . . The net cost for the whole project is $192,000.
> * * * * *
> All donations to B[illeg.] tax exempt. Please make the check out to BIF and mail it to BIF,
> P.O. Box 548, Worth, IL [illeg.] and indicate in the memo "Winter Shoes for Chechnya."
> * * * * *
> Remember, currently the shoes that were shipped last year are being used and positively
> affecting thousands of people (2,900 at least). Please join hands with us to continue the
> much needed assistance being provided to our brothers and sisters in Chechnya.

Ex. 215.

> In a related flyer, BIF stated:

> URGENT! REINFORCED WINTER SHOES URGENTLY NEEDED FOR CHECHNYA
> * * * * *
> Unfortunately, the mines don't discriminate between innocent women, children, and the army
> and continue to be a menace even after the war is over!

Ex. 216. Another BIF flyer asked: "The Chechens have given 150,000 Lives for Islam . . . How

much will you give?" Ex. 217 (ellipsis in original).

In response to BIF's solicitations, donors sent money for the "shoes" without knowing that

they were only for fighters. For example, on September 9, 1996, an Iowa donor sent $500 "for the

'reinforced shoes' drive for Chechnya." Exs. 218 (letter, receipt, check and postmarked envelope)

and 219 (receipt); *see also* Ex. 220 (letter to same Iowa donor from BIF regarding orphan sponsorship in Feb. 1996).

A BIF form letter from defendant Arnaout ensured donors that the "reinforced shoes" were for civilian use:

> Assalamualaikum dear brother «NAME»: Thank you for your generous donation toward the purchase of reinforced winter shoes for Chechnya. May Allah reward you in the fullest.
>
> Last year BIF shipped over two thousand pairs to the region. The shoes were found useful and BIF is doing the same project again this year on the request of the people of Chechnya.
>
> Insha'Allah, these shoes with a reinforced sole, will go a long way towards minimizing the damage that land mines are causing to the civilian population in Chechnya.

Ex. 221 (emphasis in original).

Indeed, at this same time, Ahmer continued his fundraising speeches for Chechnya. Ex. 222 (flyer advertising a November 1996 Speech by Ahmer titled "The struggle for the freedom of the Chechens!"). In a later speech delivered to a group in Urbana-Champaign, Illinois, Ahmer solicited donations which he said would be used for anti-mine boots for Chechen freedom fighters. Ahmer explained at the presentation that BIF provides items to fighters that could be viewed as relief items in order to avoid scrutiny by Customs officials. He cited an x-ray machine and ambulance as items purchased for the Chechen freedom fighters.[35]

BIF's records indicate that it did not deliver the anti-mine boots "for the upcoming winter" as requested. Instead, in late 1996 or early 1997, BIF apparently shifted its efforts from anti-mine boots to non-reinforced footwear for soldiers in Chechnya, as well as uniforms for the soldiers. BIF's January 1, 1997 "Strategic Plan for Chechnya - Proposal of Projects" stated: "In addition,

---

[35]   In Afghanistan, fighters were transported to camps by ambulances on occasion.

further request came in for the winter boots. However, it was necessary that the quality of the shoes

be investigated and improved upon for the next shipment." Ex. 223. The report continued:

"Regarding the shoes, it was found out that the land mines were no longer a threat, hence the metal

shoes do not need to be included. This will result in lower cost, and hence a larger amount of shoes

to be bought." *Id.* In listing proposed future projects, the report includes:

> More shoes. The quantity requested is 10,000. Due to the changing cost of shoes, we can
> buy upto (sic) 8,000 pairs with the money already raised, therefore needing funds for
> additional 2,000 pairs. In addition, same number of uniforms and shirts were requested.
> These can be purchases in Korea because [rest of report not recovered].

*Id.*

Between April 17 and 25, 1997, BIF paid Al Aman an additional $200,000, as Al Aman

noted in a receipt faxed to defendant Arnaout. Ex. 224.

### 3.   Camouflage Uniforms for Chechen *Mujahideen*

Following the request for 10,000 "uniforms and shirts" described in the January 1, 1997

"Strategic Plan for Chechnya," defendant Arnaout made efforts to provide camouflage uniforms to

the Chechen *mujahideen*. Defendant Arnaout visited Chechnya in 1997, as described in a report by

Suleman Ahmer. In that report, Ahmer explained:

> The factory will produce uniform for the army and needs supply of cloth. Initial requirement
> is for 14,000 meters of quality grade camouflage cloth. . . . A tentative business plan has
> been made between this factory and Lilian a business concern of BIF in
> Bosnia[36] . . . . Military Shoes for Chechnya. There is a need of high grade shoes for the
> region. Market research has shown that shoes with the required specifications can be bought
> for around $35.00 a pair including transportation from South Korea.

Ex. 225.

---

[36]    This is a reference to Ljiljan Commerce Group, the entity which sponsored the visit
of Abu Hajer (Salim) to Bosnia discussed above.

Sometime prior to August 10, 1997, defendant Arnaout gave Ahmer a sample uniform. On

August 10, Ahmer wrote to defendant Arnaout (sent via Muzaffar Khan):

> I have spent almost two days along with brother Naveed Anwar[37] researching about the uniform and we have talked to some factories here who produce these for export to europe (sic) etc. Here are the results:
>
> The uniform which you have given to me are of a very good quality and they take more than just cloth. The cloth is available in Pakistan but the uniform need a lot of accessories. If we want good quality stuff to be manufactured then we shall have to send all the accessories with them to the destination. For example the buttons are special quality reinforced type and have to be ordered from Honk (sic) Kong. Similarly the Zippers are also special strong ones etc. Similarly the thread that should be used is also special and is stronger than the normal thread. Here is a list of other items that have to be included:
>
> Camouflage fabric, Lining fabric ( Different quality), Front metallic zipper, Collar Zipper, Horn Buttons, vel-crow, snap buttons, Draw strings, Nylon tape, Knitted nylon jersey for the head cover, Twill tape, and buckle at waist band.
>
> All of the above would be available from different suppliers and should be purchased by experts so that the quality is assured. Usually a garment trader would do it with a 20 to 25 % mark up as I have found out here. Which means that the trader would get you all the stuff and would guarantee the quality and deliver it to you.
>
> So if you would like a quotation please keep all of the above in mind.
>
> You had said that we would need around 14,000 meters and we have calculated that would produce around 300 dozen uniforms depending upon the sizes.
>
> We calculated roughly and it would take Naveed Anwar's factory US $18.83 to produce one set in Pakistan and we calculated this so that you can get an idea. The material alone would be around US $16.00.
>
> I have talked to Naveed Anwar and he said that he can get his factory to purchase the material at 10% mark up and the rest would be considered as donation. ( Remember the industry average of a mark up is 20 to 25 % )
>
> when you take a quotation from others make sure that you get all the specifications of all the material so that we can correctly compare.

---

[37]    This is the individual who committed $30,000 for anti-mine boots for Chechnya.

87

> If we have to do this project we should make sure that we make the best quality uniforms. And inshallah in the future we can hope that the garment factory can get more orders.
>
> To prepare a quotation is a very time consuming process and I do not want Naveed Anwar to go ahead and do all that work if we are not very serious.

Ex. 226 at 1-2.

One month later, Ahmer explained to defendant Arnaout his frustration on certain projects

and noted that they cannot expect information to be hidden from donors:

> One thing I want to stress at this time is the update on the shoes project. . . . It happened in Pakistan that brother Naveed Anwar (One of our major donor) introduced me to some people and told them that we have sent two shipments to Chechnya. I was embarrassed as this was not true[.]
> * * * * *
> In the US we can not expect information to be kept hidden. . . . (Already we are having a problem with some brothers in Massachusetts who are saying that we are giving false information in our newsletters – They picked up the point that in our financial report how come we have only $15,000 per year in salaries when we have more than three employees.
> * * * * *
> What about the 1000 shoes that we had decided to send? What is the decision about the uniforms?

Ex. 227.

Seventeen days later, on September 27, 1997, Ahmer wrote to defendant Arnaout:

> May Allah reward you for taking care of the Chechnya dress. The reason I would like to have the samples is that we have 7 or 8 people who have either donated directly or raised around $80,000 for the shoes. If I can have say two samples of just the jacket, pants and the shoe, I can meet with them privately and try to raise the same amount of money again. . . . For example, the brother in Orlando had given 10,000 cash for the shoes (You know who) and he had done that privately. I would like to visit him again privately, show the samples and raise funds for the other projects. Similarly the brother in Massachusetts who had given $25,000.00 should be visited.
> * * * * *
> Also send me the price details of the dress so that I can tell Brother Naveed Anwar that we would not be getting the dress in Pakistan. I do not want him to feel that we just neglected his offer of help. Also I would like to, may be, ask him to pay some amount too.

Ex. 228.

A memorandum discussing a shipment to Chechnya demonstrates that BIF intended to keep details about the uniforms from its donors: "According to the request of the locals we found that they need uniforms (in the newsletter we would say only pants and shirts) thermal underwears and jackets with the shoes." Ex. 229 (parentheses in original). The memorandum lists the "contents of the shipment" to Chechnya as shoes, "top quality" thermal underwear, belts, woolen socks, material for 3000 pants, shirts and jackets including "the cloth, the lining, the zippers, buttons etc." costing a total of $100,553. The memorandum adds: "Guess what: the dress and the jackets will be stitched in the factory. This will save money and provide the income to the Chechens."[38] *Id.* The memorandum also discusses the difficulty in getting medicine out of Russia, explaining that if they cannot get the medicine out "we may think about disposing it properly and using the revenue in Chechnya (Again this is not for the newsletter)" *Id.* (parentheses in original). A copy of this memorandum, recovered in electronic format from BIF in Illinois, adds: "We have struck a relationship between a Chechen company called Al Badr (Of course set up by the brothers affiliated with Sheikh Fathi). This company has received 48 [sewing] machines as a donation." Ex. 230.

### 4.   WWW.QOQAZ.COM

In its Illinois office, BIF had a copy of "A Call to All Muslims" from "The Commanders of the Mujahideen in Chechnya," dated February 22, 2000. Ex. 231. On the bottom of BIF's copy is written "WWW.QoQaz.Com," apparently the source of the document. *Id.* In discussing the fighting

---

[38]   In a written "History of BIF in Chechnya," which omits all of BIF's support of the *mujahideen,* BIF explains: "In July of 1997, BIF opened a sewing factory in Shelkovskaya, 40 km northeast of Grozny. This factory was opened for two reasons. First, it provided career experience and income to women in the area, and the Islamic style of clothing that was made in the factory was distributed in some of the more hard hit areas of the country."

in Chechnya, the *mujahideen* commanders ask: "And today thousands of your fellow Muslims are being killed, yet where is your support for us?" *Id.*

BIF also had and "Update on Chechnya Fighting" which "was compiled from the web site www.qoqaz.com." Ex. 232. This document describes Russian aggression against Chechens and disputes reports about Russia providing humanitarian assistance in Chechnya. *Id.*

In early 2000, www.qoqaz.net, also dedicated to the cause of Chechen *mujahideen*, identified the leaders of the military fight in Chechnya as including Ibn al Khattab (discussed above as the leader to whom *al Qaeda* was sending support in Chechnya) and included pictures of *mujahideen* training as well as killed *mujahideen*. Ex. 233. The website sought doctors to travel to Chechnya to make contact with Ibn al Khattab and provide medical services at the front. *Id.* The same website urged those wishing to go Chechnya to fight to get training in Afghanistan, adding:

> Anyone interested in going to fight (if they are trained) or in going to train should contact members of their own communities and countries who are known to have been for Jihad. You will know these people and they will know you. In these cases, you should only speak in confidence to those whom you trust, rather than speaking to everyone.
> * * * * *
> To see what the Mujahideen in Chechnya need at present, read the answers below.

*Id.*

The website urged doctors and medical supplies to "make their way to Chechnya through the aid organizations and join the fighting units of Ibn al Khattab." *Id.* The website also condemned America for its alleged secret financial support for the Russians fighting in Chechnya and elsewhere on the site indicated that "on the other hand, as for those fighting the Muslims and those who support this fight with money, words or actions, the Muslims consider them all as enemies and in the same group." *Id.* The website also indicated that the news reports on its site were received from

correspondents traveling with the fighting units of Ibn al Khattab and that the reports were checked by "Field Commander Khattab" before being posted on the site. *Id.* The website also indicated that large news organizations desiring to interview Khattab (or a Chechen military leader with whom he worked) could e-mail questions to the site "and we can try without promising to have those questions answered by them." *Id.*

On February 22, 2000, the website posted donations links on the website for two charities, one of which was BIF. *Id.* Records obtained from Citibank reveal that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen wire transfers from its checking account, number 980110435, in the amount of $685,560, to the bank accounts of the "Georgian Relief Association MADLEE" ("MADLEE") in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Latvia. MADLEE's director is Marat Avlarigov, whose brother, Chamsoudin Avlarigov, is affiliated with the Chechen *mujahideen*.

## K.    BIF's Efforts in Azerbaijan

As stated above, in 1995, BIF opened an office in Baku, Azerbaijan (Ex. 234) to assist Muslims in Azerbaijan and to have a staging point to send money and supplies into Chechnya.

In August 1995, Sikandar completed his detailed "Strategic Plan for BIF in Azerbaijan." Ex. 235. At the outset, Sikandar provided historical and geographical information on Azerbaijan. *Id.* at 2-8. Sikandar then describes BIF's plans in Azerbaijan, stating: "Since it is a non-war zone our projects should have longerterm (sic) strategic outlook for the region; keeping well in mind our organizations (sic) motivations, objectives and organizational mechanics." *Id.* at 9. Sikandar made

clear his understanding that BIF's motivations and objectives in Azerbaijan involve BIF's private

mission of dawah rather than its public mission of providing humanitarian aid where needed:[39]

> Although in short term Azerbaijan is in need of emergency food aid however, it is not
> advised for BIF to enter this sector. There are already a number (sic) of organizations are
> concentrting (sic) in this area. For BIf (sic) this is also inappropriate because of differing
> objectives in the region. We want to establlish (sic) an institutional presence of Islam in the
> region and this area does not provide us the best of opportunities.

*Id.* Instead of providing needed food aid, Sikandar recommended that BIF get involved in health

care in Azerbaijan "[t]o help the Azerbaijan war injured population and to estabilsh (sic) a base for

BIF activities in the region." Sikandar continued:

> Summary:
>     The conflict with Armenia has had and continues to have a heavy toll on the people
> and government of the Azerbaijan Republic. The wars (sic) military aspect is very much at
> the fore front of government's agenda. Any kind of help that would help the Azerbaijan
> government with its defence preparations is very much wellcome (sic). There is a lack of
> established surgery centre and those that are donot (sic) have supplies or equipment.

*Id.* In listing the assistance BIF can provide in education, Sikandar wrote: "This region for sure has

all the potential of once again becoming the cradle of Islamic learning and Jihad." *Id.*

### L.   BIF's Efforts in Tajikistan

In the early or mid-1990s, BIF began working in Republic of Tajikistan, a small,

predominantly Muslim country situated on Afghanistan's northern border,

In an "Update: The Tajik Refugees in Afghanistan," BIF summarized the plight of Tajikistan

refugees, its humanitarian work with these refugees, and stating it was "[s]etting up plans for

establishing clinics in the fronts to support the Mujahideen directly in Tajikistan." Ex. 236.

---

[39]    As will be clear at trial, defendant Arnaout was frugal at times with the amount of
information he shared with other employees, particularly in writing.

In 1998, BIF opened an office in Tajikistan, and defendant Arnaout set up its "administrative structure." Ex. 237 at 23. A letter on February 20, 1998 containing instructions to the individual who was opening the office listed as a goal: "Assisting the injured soldiers. . . . Please set up a system in which these soldiers can get the money that has been promised to them every month." Ex. 238.

In Suleman Ahmer's October 1998 "Tajikistan Report," he writes: "There is no way we can make dawah openly with planning and strategy as we had initially thought. . . . So our course now is only to do relief work in Tajikistan and have patience." Ex. 237 at 22. In "The New Tajik Initiative," Ahmer explained:

> The war and the sufferings are fresh in people's minds. We have thousands of orphans who would take up the struggle and the cause. . . . In a few years these children of war would have grown old and it would be very difficult to influence them. If the war doesn't break out again, the wounds of the surrounding society would heal soon. In conclusion, now is the time to work, to move, to act: not next week, not tomorrow and not even today. Now!

*Id.* at 53.

BIF had an "Orphan Rehab Project" in Tajikistan, which Ahmer described as "building the homes of the orphans we sponsor." *Id.* at 45. Despite his description, not all funds in this program went to orphans' homes. Some of it went to BIF employees, as Ahmer explained: "There are two officers whose houses are destroyed; one is Daulat Beg and one is Mustufa (sic). The budget for both of their homes in (sic) included in the projects Orphan rehabilitation project." *Id.* at 17. At the time, Beg was married with three children, while Mustafa is married with one child. *Id.* at 16-17.

Ahmer noted in his Tajikistan Report that BIF donors had been (or would be) informed that 10% of the money they contributed to BIF's orphan sponsorship program would be used for administrative expenses, with the remainder going to the orphans. *Id.* at 89. An electronic mail on

January 3, 1999 from Ahmer to defendant Arnaout, preserved in hard copy form at BIF's Illinois

offices, reveals that far less than 90% of contributions for orphans actually went to orphans,

unbeknownst to donors. Ex. 239 at 4. In response to a suggestion from defendant Arnaout that they

"recede" the percentage for new donors and that new donors be informed by letter that "most of [the

donation] went to the child in cash and some of its was spent on the orphans program" (apparently

meaning administrative expenses), Ahmer wrote:

> We have discussed this many times before and inshallah let me discuss this again. I know
> we have not delivered the whole amount to the orphans and this is the big mistake we have
> made. If you notice in the letter we are not saying that the whole amount was delivered but
> we are saying that the whole amount is reserved for the child. The reasons we can't tell them
> that we took some amount from the orphan's money are as follows:
>
> First, how can we tell them that we took money from the amount when for the last four years
> when people were asking and calling we were telling them that all of the money is for the
> child. This is what we told thousands of Muslims in our presentations (this is what I told the
> brothers last night). This is what was sent written in letters. So now if we make the mistake
> of writing this they will ask as to how come we were saying something and doing something
> else. This is the whole reason that I will be working on correcting and finding out how much
> money is due to the orphans and delivering it. Like I told you in my meeting with you
> before, the taking of the money of the orphans without the permission of the sponsors is a
> big haram [meaning forbidden] and we need to correct this now. Whether we took $100,000
> or $1.00 and I don't agree (absolutely not) with what Brother Adil taught you (may Allah
> forgive him). So we should write that we have reserved this amount for the children which
> is true as we shall now deliver the remaining money to them inshallah. You have written
> above that we should write that most of the money was delivered to the child which is
> incorrect. For some of the orphans who were sponsored in Tajikistan we were collecting $25
> and giving only $6.00 to the children. (This was going on in Kunduz) so now 6 out of 25 is
> not the most by any account. To say that for all the children the most of the money from the
> sponsor was given is false.

*Id.* at 5. Despite Ahmer claiming that he wanted to correct the shortage of payments to orphans,

BIF's records indicate that BIF did not send another wire transfer to Tajikistan for ten months.

## M.   BIF's Matching Gift Program

As explained in the Indictment, BIF had a "matching gift program" with which it encouraged donors to solicit their employers to match individual donations. The matching gift program is explained in BIF's "Double the Donation" memorandum. Ex. 240. In explaining how the program works, the memorandum states: "In actual fact BIF has long received direct employee donations as well as matching gifts from many firms including Microsoft, UBS, and Compaq in Houston, TX." *Id.*

BIF also prepared for its employees a memorandum titled "Precautions Facing the Matching Gifts Program." Ex. 241. The memorandum notes: "The company may ask for certain information from B.I.F. Usually, the 501c (tax exempt) letter that is in the folder. ***Please make sure to read the application carefully and give them, only what they ask for." *Id.* (emphasis in original). The memorandum further instructs: "CONFIDENTIALITY IS KEY TO THIS PROGRAM. Answer questions in a general way, but be careful not to give away specifics. ie: the procedures we follow to get back with donors and the companies." *Id.* (emphasis in original). Given the massive fraud BIF was perpetrating upon unknowing donors, it was essential to the success of the scheme that BIF employees be evasive in dealing with inquisitive corporate donors.

## N.   Fundraising by Yusuf Ansari Wells

BIF records reveal that its fundraiser Yusuf Ansari Wells openly solicited donations to support *jihad* efforts from various donors. A January 3, 2000 letter to Wells accompanying a money order thanks him for a particular presentation and indicates that the donation is for "our brother fighting for the sake of Allah" and stating "may Allah continue to help the mujahideen." Ex. 242.

A report Wells provided to another BIF employee on May 8, 2001 described an April

fundraising trip Wells made to Eastern states on BIF's behalf. Ex. 243. Wells's entry for April 9, 2001, discusses a lecture he gave and describes as the main point of his lecture: "That the Taliban are not the bad guys that everybody says they are. And that they have done much good for the establishment of order in the country." *Id.* at 3. The entry for April 15, 2001 discusses Wells's participation in paintball "training" with an elite group and Wells's lecture afterward: "I also stressed the idea of being balanced. That we should not just be jihadis and perfect our fighting skills, but we should also work to perfect our character and strengthen our knowledge of Islam. I also said that Muslims are not just book reading cowards either, and that they should be commended for forming such a group." *Id.* at 4-5.

### O. Defendant Arnaout's False Declarations and Continuing Fraud

On December 14, 2001, the Federal Bureau of Investigation searched BIF's Illinois office (recovering most of the documents cited above) and the Department of the Treasury blocked BIF's domestic bank accounts pending its investigation of BIF.

Following the search and blocking action, BIF, under defendant Arnaout's control, filed in this District a lawsuit against various government officials. The case was assigned to Judge James H. Alesia.

On March 26, 2002, BIF filed a Motion for Preliminary Injunction seeking the immediate return or its blocked funds and other relief so that it could immediately continue its operation. In support of its Motion for Preliminary Injunction, defendant Arnaout submitted to the court a declaration he executed on March 22, 2002 under penalty of perjury falsely stating:

> BIF is required to maintain the donations of *zakat* in a non-interest bearing account and to use those funds only to assist the poor and needy. BIF abides strictly by those requirements.
> \* \* \* \* \*

> BIF has never provided aid or support to people or organizations known to be engaged in
> violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and
> all forms of violence against human beings.
>
> * * * * *
>
> I have no idea or understanding as to why the government has taken these actions against
> BIF.

Ex. 244. (emphasis added). On April 2, 2002, defendant Arnaout submitted a "corrected declaration" executed under penalty of perjury on April 1, 2002 containing these same false statements in an effort to get immediate access to BIF's funds.

In addition, in or around late 2001 and early 2002, while BIF, under defendant Arnaout's control, continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, defendant Arnaout individually and through an attorney falsely informed the *Chicago Tribune* newspaper that defendant Arnaout did not know Usama Bin Laden personally, that defendant Arnaout never fought against the Soviet Union, that defendant Arnaout was never at the *al Masada* camp and that he could not have been there because he was working in a restaurant in the Persian Gulf area during the relevant time frame. *Id.*

On February 23, 2002, defendant Arnaout spoke by telephone with Basil Refai. Ex. 245. Refai authored a book, published by LBI under LBI's name in furtherance of LBI's mission, recounting experiences of *mujahideen* in Afghanistan, including Bin Laden, defendant Arnaout and others. Defendant Arnaout coached Refai on the telephone, falsely telling Refai that defendant Arnaout is not the Abu Mahmoud al Suri discussed in the book. *Id.* at 8-10. Defendant Arnaout also told Refai that he explained to a *Chicago Tribune* reporter that he is not the person she thinks he is, and he never knew Bin Laden. *Id.* at 11-12.

**P.  Defendant Arnaout's Message to Batterjee**

In the February 12, 2002, telephone conversation between defendant Arnaout and his brother Hisham overseas, discussed above, defendant Arnaout asks Hisham to pass certain messages to Batterjee. Ex. 178. Defendant Arnaout told Hisham about the scrutiny BIF was receiving from authorities, adding "all their problem with us, the last three or four weeks, is if there is a relation between us and Saudi Arabia or not." *Id.* at 9. In referring to "Abu Sulafa," a name used by Adel Batterjee, defendant Arnaout remarked: "[H]e loves goodwill, so he does not want to boycott the offices . . . . he is sending them wire transfers. So, if, if I receive I wire transfer from him, to any office of the offices, my home is destroyed." *Id.* at 10.

Hisham responded: "Yes, meaning, should I tell him not to send a thing." Defendant Arnaout continued: "Tell him, oh brother, now they want, now scrutinizing on what is our relation to Saudi Arabia. . . . Without, without telling him to send, or not to send. Tell him they are scrutinizing the foundation, whether it has a Saudi connection or not. . . . They [the directors of BIF's offices] do not want to deal with him. Even the offices abroad do not want to deal with him. . . . So I want you to talk to Abu Sulafa, tell him 'Enaam is telling you, that oh beloved brother, the scrutiny now is on a Saudi connection.'. . . I mean, wire transfers the foreign branch offices, because the foreign offices are being watched, like we are being watched here." *Id.* at 10-12.

After explaining to Hisham that the government views BIF like a "mafia," "[s]aying we are covers, we are a cover and there are people behind us," defendant Arnaout tells Hisham that he wants Hisham to tell Batterjee three things: "first information, tell him about the connection subject, the second information about the subject, thinking there is a mafia behind it, and the, the third matter, that, they took the, our director from *ninety-three* and ninety-four from Bosnia." *Id.* at 15.

**Q.    Defendant Arnaout's Coaching of BIF's Sarajevo Director**

On March 21, 2002, following the search of BIF's Bosnian offices, defendant Arnaout spoke to Munib Zaharigac, the director of BIF's Sarajevo office. Ex. 246. Zaharigac informed defendant Arnaout that "they" came to his house and those of some of his relatives and "took all the things." *Id.* at 2. Zaharigac also informed defendant Arnaout that he was in jail, explaining: "[T]hey took things . . . I had documents from, from, intelligence, where I worked before, and I had various documents, from the, from the, from the, what is it called, from the job." *Id.* at 3. Defendant Arnaout asked if the documents had a connection to BIF, and Zaharigac responded that there were "possibly a few things, but they want to connect them, maybe." *Id.*

Defendant Arnaout instructs Zaharigac: "[T]ell your family, your father, your brothers . . . the story, tell them in details, so that the operation will not be like such and be clear with them, we have nothing hidden. I am in America, tell the people that I am in America, we have nothing hidden." *Id.* After learning that Zahiragic was inside a police station, defendant Arnaout coached him: "I just sent a, a, a message to Alen, advised him . . . that each, each one of you . . . gives information about himself, not to give information about the others. . . . Meaning we now, I don't know a thing about you, I know you, that you are a good, excellent man working with us. I don't know your life . . . and your wife, your children, your citizenship. . . . Meaning each one gives information about, about himself, about his person. . . . About the others, what do you know about me, you don't know a thing about me, what do you know about me?" *Id.* at 3-6.

Zaharigac then explained that he had been asked already about defendant Arnaout and he said where he met Arnaout. *Id.* at 6. Defendant Arnaout then said: "Meaning, we know each other for the last few years, you, we have a relationship, business relationship for one and a half years, we

99

work together. . . . Meaning we shouldn't be, I mean, I don't know what they are digging for and I, we have to be patient . . . . [W]e never work anything secret, we never do, we never steal money, we never did do anything the problem, we are clear hundred percent." *Id.* Zaharigac then explains that "one problem" is the documents found in his house. *Id.* at 7.

### R.   Defendant Arnaout's Instructions to BIF Officer to Flee

On April 15, 2002, Solange Waithe, the director of BIF's Canada Office (the "Benevolence International Fund"), called defendant Arnaout and told him that "Haroon," the director of BIF's Pakistan office, wanted to speak to defendant Arnaout because "he's worried." Ex. 247 at 1. Defendant Arnaout resists, but Waithe ultimately convinces him to speak to Haroon.[30] *Id.* at 1-3.

Haroon called defendant Arnaout shortly thereafter. *Id.* at 4. Haroon explained that someone from the "Special Branch" was asking about him. *Id.* at 5. Defendant Arnaout then instructed Haroon to take BIF's money, including the "orphan money," and go alone to Kabul, Afghanistan immediately. *Id.* at 3-4. Arnaout explained that they will check on Haroon by calling Haroon's brother every two or three weeks. *Id.* at 4. He also told Haroon to take all of BIF's records with him. *Id.* at 5. Defendant Arnaout then warned that Haroon could be traced through e-mail, telephones and banks. *Id.* at 6. Defendant Arnaout advised: "I prefer that you travel to the inside and to put everything in boxes, and to let your brother, or your two or three brothers, every one or two days, one of them would travel with a box[.]" *Id.*

---

[30]     Haroon informed Waithe that he did not think that the visit from Pakistani Intelligence was that serious of an issue (a 2 or 3 on a scale of 1 to 10, with 10 being the most serious), although many of his friends told him that he should not go home. Ex. 248 at 17-21. Waithe told Haroon that in discussing this with defendant Arnaout, Haroon should keep in mind that Arnaout's phone is monitored. *Id.* at 19-20.

## III.    CONCLUSION

This proffer of evidence, much of which the government expects to introduce in its case-in-chief with other evidence, demonstrates that beginning in or around 1987, in Pakistan, defendant Arnaout and others conspired to support the efforts of persons engaged in violence through the BIF Enterprise, including LBI and BIF, as described in the Indictment. In 1992, members of the conspiracy chose to incorporate and headquarter the enterprise in the U.S. in order to best use the cover of relief work – and the credibility of an American based charity – to assist fighters in various areas of the world, and they concealed from donors and various governments and, ultimately, a federal court that it was materially assisting those fighters. The government respectfully submits that the evidence recited above establishes by a preponderance of the evidence that (1) a conspiracy existed; (2) defendant Arnaout and the declarants discussed above were members of such conspiracy; and (3) the statements were made during the course of and in furtherance of such conspiracy.

WHEREFORE, the government respectfully moves this Court for a ruling that these statements, along with the documents recovered from BIF and sources related to BIF attached hereto, are admissible against defendant Arnaout.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

DEBORAH L. STEINER
JOHN C. KOCORAS
Assistant United States Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

101

## CERTIFICATE OF SERVICE

The undersigned attorney, John C. Kocoras, certifies that he is employed in the Office of the

United States Attorney for the Northern District of Illinois; that on the 6th day of January 2003, he

served a copy of the foregoing GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE

ADMISSIBILITY OF COCONSPIRATOR STATEMENTS with attachments via messenger to:

> Mr. Joseph Duffy, Esq.
> Stetler & Duffy Ltd.
> 140 South Dearborn Street
> Suite 400
> Chicago, Illinois 60603

JOHN C. KOCORAS
Assistant U.S. Attorney