# EXHIBIT 40

𝕱ederal 𝕮ourt of 𝕮anada
𝕿rial 𝕯ivision



𝕾ection de première instance de
la 𝕮our fédérale du 𝕮anada

Deputy Administrator
Sous-administrateur

P
R
O
D
U
I
T

Date: 19991102

Docket: DES-6-99

FILED
1999 -11- 0 2

Designated Proceedings
Procédures Désignées

**BETWEEN:**

## THE MINISTER OF CITIZENSHIP AND IMMIGRATION

Applicant

- and -

## MAHMOUD JABALLAH

Respondent

## REASONS FOR ORDER

### CULLEN, J.:

[1]     To summarize legislation is in all likelihood unnecessary in that the sections clearly spell out the process, but, so there can be no doubt, I have decided once again as I have done in other hearings, to quote directly from the *Immigration Act*, as this is the basis for the two Ministers' decision giving them the authority to issue a certificate under section 40.(1).

**40. (1) Security Certificate** - Where, after considering a report made under subsection 39(9) by the Review Committee of the person appointed under subsection 39.1(1), the Governor in Council is satisfied that the person with respect to whom the report was made is a person described in paragraph 19(1)(c.2), subparagraph 19(1)(d)(ii), paragraph 19(1)(e)(f)(g)(k) or (l) or 27(1)(a.1), subparagraph 27(1)(a.3)(ii) or paragraph 27(1)(g) or (h), the Governor in Council may direct the Minister to issue a certificate to that effect.

**(2) Effect of Certificate** - A certificate issued under subsection (1) is, in any prosecution or other proceeding under or arising out of this Act, conclusive proof of the matters stated therein without proof of the signature or official character of the person appearing to have signed the certificate unless called into question by the Minister.

**40.1 (1) Certificate** - Notwithstanding anything in this Act, where the Minister and the Solicitor General of Canada are of the opinion, based on security or criminal intelligence reports received and considered by them, that a person, other than a Canadian citizen or permanent resident, is a person described in subparagraph 19(1)(c.1)(ii), paragraph 19(1)(c.2) (d),(e),(f),(g), (j), (k) or (l) or subparagraph 19(2)(a.1)(ii), they may sign and file a certificate to that effect with an immigration officer, a senior immigration officer or an adjudicator.

**(2) Delay of Inquiry** - Where a certificate is signed and filed in accordance with subsection (1),

(a) an inquiry under this Act concerning the person in respect of whom the certificate is filed shall not be commenced, or if commenced shall be adjourned, until the determination referred to in paragraph 4(d) has been made; and

(b) a senior immigration officer or an adjudicator shall, notwithstanding section 23 or 103 but subject to subsection (7.1), detain or make an order to detain the person named in the certificate until the making of the determination.

**(3) Reference to Federal Court** - Where a certificate referred to in subsection (1) is filed in accordance with that subsection, the Minister shall

(a) forthwith cause a copy of the certificate to be referred to the Federal Court for a determination should be quashed; and

**40.1 (1) Attestation de sécurité** - - S'il est d'avis, après étude du rapport fait en vertu du paragraphe 39(9) par le comité de surveillance ou la personne nommée au titre du paragraphe 39.1(1), que l'intéressé appartient à l'une des catégories visées à l'alinéa 19(1)c.2), au sous-alinéa 19(1)(d)(ii), aux alinéas 19(1)e), f), g), k) ou l) ou 27(1)a.1), au sous-alinéa 27(1)a.3)(ii) ou aux alinéas 27(1)g) ou h), le gouverneur en conseil peut ordonner au ministre de délivrer une attestation à cet effet.

**(2) Preuve** - - Dans toute poursuite ou procédure relative à l'application de la présente loi, l'attestation délivrée en vertu du paragraphe (1) établit de façon concluante les faits qui y sont mentionnés, seul le ministre ayant le pouvoir de contester l'authenticité de la signature et la qualité officielle du signataire.

**40.1(1) Attestation** - -Par dérogation aux autres dispositions de la présente loi, le ministre et le solliciteur général du Canada peuvent, s'ils sont d'avis, à la lumière de renseignements secrets en matière de sécurité ou de criminalité dont ils ont eu connaissance, qu'une personne qui n'est ni citoyen canadien ni résident permanent appartiendrait à l'une des catégories visées au sous-alinéa 19(1)c.1)(ii), aux alinéas 19(1)c.2), d), e), f), g), j), k) ou l) ou au sous-alinéa 19(2)a.1)(ii), signer et remettre une attestation à cet effet à un agent d'immigration, un agent principal ou un arbitre.

**(2) Suspension de l'enquête** - En cas de remise de l'attestation visée au paragraphe (1):

a) l'enquête prévue par ailleurs aux termes de la présente loi sur l'intéressé ne peut être ouverte tant que la décision visée à l'alinéa (4)d) n'a pas été rendue;

b) l'agent principal ou l'arbitre doit, par dérogation aux articles 23 ou 103 mais sous réserve du paragraphe (7.1), retenir l'intéressé ou prendre une mesure à cet effet contre lui en attendant la décision.

**(3) Renvoi à la Cour fédérale** - En cas de remise de l'attestation prévue au paragraphe (1), le ministre est tenu:

a) d'une part, d'en transmettre sans délai un double à la Cour fédérale pour qu'il soit décidé si l'attestation doit être annulée;

(b) within three days after the certificate has been filed, cause a notice to be sent to the person named in the certificate informing the person that a certificate under this section has been filed and that following a reference to the Federal Court a deportation order may be made against the person.

(4) **Judicial Consideration of Certificate** - Where a certificate is referred to the Federal Court pursuant to subsection (3), the Chief Justice of that Court or a judge of that Court designated by the Chief Justice for the purposes of this section shall

(a) examine within seven days, *in camera*, the security or criminal intelligence reports considered by the Minister and the Solicitor General and hear any other evidence or information that may be presented by or on behalf of those Ministers and may, on the request of the Minister or the Solicitor General, hear all or part of such evidence or information in the absence of the person named in the certificate and any counsel representing the person where, in the opinion of the Chief Justice of the designated judge , as the case may be, the evidence or information should not be disclosed on the grounds that the disclosure would be injurious to national security or to the safety of persons;

(b) provide the person named in the certificate with a statement summarizing such information available to the Chief Justice or the designated judge, as the case may be, as will enable the person to be reasonably informed of the circumstances giving rise to the issue of the certificate, having regard to whether, in the opinion of the Chief Justice or the designated judge, as the case may be, the information should not be disclosed on the grounds that the disclosure would be injurious to national security or to the safety of persons;

(c) provide the person named in the certificate with a reasonable opportunity to be heard;

(d) determine whether the certificate filed by the Minister and the Solicitor General is reasonable on the basis of the evidence and information available to the Chief Justice or the designated judge, as the case may be, and, if found not to be reasonable, quash the certificate; and

(e) notify the Minister, the Solicitor General and the person named in the certificate of the determination made pursuant to paragraph (d).

**5. Evidence** - For the purpose of subsection (4), the Chief Justice or the designated judge may, subject to subsection (5.1), receive, accept and base the determination referred to in paragraph (4)(d) on such

b) d'autre part, dans les trois jours suivant la remise, d'envoyer un avis à l'intéressé l'informant de la remise et du fait que, à la suite du renvoi à la Cour fédérale, il pourrait faire l'objet d'une mesure d'expulsion.

(4) **Examen judiciaire** - Lorsque la Cour fédérale est saisie de l'attestation, le juge en chef de celle-ci ou le juge de celle-ci qu'il délégué pour l'application du présent article:

a) examine dans les sept jours, à huis clos, les renseignements secrets en matière de sécurité ou de criminalité dont le ministre et le solliciteur général ont eu connaissance et recueille les autres éléments de preuve ou d'information présentés par ces derniers ou en leur nom; il peut en outre, à la demande du ministre ou du solliciteur général, recueillir tout ou partie de ces éléments en l'absence de l'intéressé et du conseiller le représentant, lorsque, à son avis, leur communication porterait atteinte à la sécurité nationale ou à celle de personnes;

b) fournit à l'intéressé un résumé des informations dont il dispose, à l'exception de celles dont la communication pourrait, à son avis, porter atteinte à la sécurité nationale ou à celle de personnes, afin de permettre à celui-ci d'être suffisamment informé des circonstances ayant donné lieu à l'attestation;

c) donne à l'intéressé la possibilité d'être entendu;

d) décide si l'attestation est raisonnable, compte tenu des éléments de preuve et d'information à sa disposition, et, dans le cas contraire, annule l'attestation;

e) avise le ministre, le solliciteur général et l'intéressé de la décision rendue aux termes de l'alinéa d).

**5. Preuve** - Pour l'application du paragraphe (4), le juge en chef ou son délégué peut, sous réserve du paragraphe (5.1), recevoir et admettre les éléments de preuve ou d'information qu'il juge utiles,

evidence or information as the Chief Justice or the designated judge sees fit, whether or not the evidence or information is or would be admissible in a court of law.

**(5.1) Information Obtained in Confidence from Foreign Governments** - For the purposes of subsection (4),

(a) the Minister or the Solicitor General of Canada may make an application, *in camera*, and in the absence of the person named in the certificate and any counsel representing the person, to the Chief Justice or the designated judge for the admission of information obtained in confidence from the government or an institution of a foreign state or from an international organization of states or an institution thereof:

(b) the Chief Justice or the designated judge shall, *in camera* and in the absence of the person named in the certificate and any counsel representing the person,
(i) examine that information, and
(ii) provide counsel representing the Minister or the Solicitor General of Canada with a reasonable opportunity to be heard as to whether the information is relevant but should not be disclosed to the person named in the Certificate on the grounds that the disclosure would be injurious to national security or to the safety of persons;

(c) that information shall be returned to counsel representing the Minister or the Solicitor General of Canada and shall not be considered by the Chief Justice or the designated judge in making the determination referred to in paragraph (4)(d), if
(i) the Chief Justice or the designated judge determines
(A) that the information is not relevant, or
(B) that the information is relevant and should be summarized in the statement to be provided pursuant to paragraph (4)(b) to the person named in the certificate or
(ii) the Minister or the Solicitor General of Canada withdraws the application; and

(d) if the Chief Justice or the designated judge determines that the information is relevant but should not be disclosed to the person named in the certificate on the grounds that the disclosure would be injurious to national security or to the safety of persons, the information shall not be summarized in the statement provided pursuant to paragraph (4)(d) to the person named in the certificate but may be considered by the Chief Justice or the designated judge in making the determination referred to in paragraph (4)(d).(6)

**(6) No Appeal** - A determination under paragraph (4)(d) is not subject to appeal or review by any court.

indépendamment de leur recevabilité devant les tribunaux, et peut se fonder sur ceux-ci pour se déterminer.

**(5.1) Renseignements secrets obtenus de gouvernements étrangers** - Pour l'application du paragraphe (4):

a) le ministre ou le solliciteur général du Canada peuvent présenter au juge en chef ou à son délégué, à huis clos et en l'absence de l'intéressé et du conseiller le représentant, une demande en vue de faire admettre en preuve des renseignements obtenus sous le sceau du secret auprès du gouvernement d'un état étranger, d'une organisation internationale mise sur pied par des états étrangers ou de l'un de leurs organismes;

b) le juge en chef ou son délégué, à huis clos et en l'absence de l'intéressé et du conseiller le représentant:

(i) étudie les renseignements,
(ii) accorde au représentant du ministre ou du solliciteur général la possibilité de lui présenter ses arguments sur la pertinence des renseignements et le fait qu'ils ne devraient pas être communiqués à l'intéressé parce que cette communication porterait atteinte à la sécurité nationale ou à celle de personnes;

c) ces renseignements doivent être remis au représentant du ministre ou du solliciteur général et ne peuvent servir de fondement à la décision visée à l'alinéa (4)d), si:

(i) soit le juge en chef ou son délégué détermine que les renseignements ne sont pas pertinents ou, s'ils le sont, devraient faire partie du résumé mentionné à l'alinéa (4)b),

(ii) soit le ministre ou le solliciteur général retire sa demande;

d) si le juge en chef ou son délégué décide qu'ils sont pertinents mais que cette communication porterait atteinte à la sécurité nationale ou à celle de personnes, les renseignements ne font pas partie du résumé mais peuvent servir de fondement à la décision visée à l'alinéa (4)d).

**(6) Aucun appel-** - La décision visée à l'alinéa (4)d) ne peut être portée en appel ni être revue par aucun tribunal.

[2]    It was probably unnecessary for counsel for the applicant to stress the fact that as

designated judge I have an obligation to consider all the evidence - namely that heard in

open court, *in camera* and *in camera ex parte*.


## WHAT IS BEING SOUGHT


[3]    At. p. 1415 of the transcript, Vol. 14, the applicant seeks to establish:

> whether it was reasonable for the Ministers, in light of the circumstances of this
> case, to issue a security certificate identifying the respondent as a member of the
> inadmissible class of persons 1) described in s. 19(1)(f)(ii) of the Act as a person
> who there are reasonable grounds to believe has engaged in terrorism, or 2) whether
> the respondent falls within s. 19(1)(f)(iii)(B) of the Act as a person who there are
> reasonable grounds to believe is or was a member of an organization that there are
> reasonable grounds to believe is or was engaged in terrorism.

> In this case the certificate is issued on the basis of a Security Intelligence Report
> which alleges that Mr. Jaballah is inadmissible to Canada because he falls within
> the categories of persons described in subparagraphs (19(1)(e)(ii), 19(1)(e)(iv)(B)
> and 19(1)(e)(iv)(C), 19(1)(f)(ii) and 19(1)(f)(iii)(B) of the Immigration Act.


For his part, the respondent, declares at p. 1540, Vol. 15 of the transcript:

> Any way you slice it, you have to determine whether or not the Certificate is
> reasonable, whether there are reasonable grounds to believe .... . That has to be on a
> cogency of evidence issued to support the Certificate as reasonable given the
> evidence presented in the summary to which my client responded in Court.


[4]    On April 6, 1999, in accordance with paragraph 40.1(4)(a) of the *Immigration Act*,

I reviewed the security intelligence report *in camera* and heard other evidence presented

on behalf of the Solicitor General and the Minister of Citizenship and Immigration in the absence of the respondent.

[5]    Under paragraphs 40.1(4)(b) and (c) of the Act, the respondent was provided with a summary of the information and I ordered that the respondent be given a reasonable opportunity to be heard on the determination of whether the certificate filed by the Solicitor General and the Minister of Citizenship and Immigration was reasonable on the basis of the evidence and information available.

**INTRODUCTION**

[6]    Very early in these proceedings (June 8/99) I suggested to counsel for the respondent that he explain to his client the role of the designated judge. At page 9, Vol. 2, of the transcript I stated:

> Mr. Rodrigues, I want to check whether you have explained to the witness the role that I am playing here. In other words, he is not on trial before me. I have to determine whether the people who signed the certificate had adequate or an appropriate amount of evidence to make that decision. If anybody is on trial, it is the people who signed the certificate.

[7]    Given the number of cases that have decided or touched on the role of the designated judge, it seems unlikely that the role could be misconstrued. Counsel for the applicant began his argument on this note and quoted several cases that leave no room for doubt on this subject. So there can be no doubt where I stand on this matter, I will

immodestly quote from my decision in the case of *Saygili v. Canada (Minister of Citizenship and Immigration)* (1997), 127 F.T.R. 112, at p.114:

> My task is not to substitute my decision for that of the two Ministers, but rather to decide whether the Certificate filed by the Ministers is reasonable on the basis of the evidence and information available to them, and to me.

And further, from my colleague, McGillis, J. in *Ahani v. Canada* (1995), 100 F.T.R. 261, at p.268:

> The proceedings under section 40.1 of the *Immigration Act* are directed solely and exclusively to determining the reasonableness of the ministerial certificate identifying the normal person as a member of certain inadmissible classes of persons.

This approach was supported by my colleague Denault, J., in *Farahi-Mahdavieh*, (1993), 63 F.T.R. 120 (T.D.)

## THE RESPONDENT

[8]     Our first witness, as might be expected, was the respondent whose presentation of his evidence was carefully lead by his counsel Mr. Roger Rodrigues. This was followed up with cross-examination by the counsel for the applicant Mr. Mathieson and the re-examination by another counsel for the respondent, Mr. Rocco Galati.

[9]     A rather comprehensive affidavit had been signed by the respondent, and it was used as a backdrop to the evidence of the respondent as well as the respondent's Motion Record. This witness was the subject of close attention in view of the fact that he had to

establish that his evidence and he were credible. The wife pretty well corroborated the respondent and needed less attention than that of the respondent.

[10]     The respondent is married and has six children. His wife's name is Hussnah Mohammed Al Sayyed El Mashtouli. One son is named Ahmed Jaballah and I mention this because he gave evidence to the hearing.

[11]     The respondent's evidence is that his name is Mahmoud Jaballah and he states he has never been known by any other name. He follows this up (transcript, Vol 2, p. 13) with:

> Q. Have you ever used any nicknames or any cultural nicknames or any other names at all?
>
> A. Abu Ahmed. Also he used in Canada the name of Mustafa. I used these two names because in our culture the father is called after his oldest son's name. My older son's name is Ahmed, so I was called Ahmed's father, Abu Ahmed. That is what it means.
>
> Q. What in particular does "Abu" mean?
>
> A. Father.
>
> Q. Are you the only person who follows this tradition of using the name "Abu" to mean the father of the eldest son?
>
> A. No, this is not unique to myself. This is a tradition in Egypt and a religion tradition. The father is called the father of the older son.

[12]     Later he told the Court he used the name Mustafa because he was afraid Egyptian

agents might be in Canada and until he felt at home he used the name Mustafa to strangers

when he was introduced.

[13]     The respondent has a Bachelor of Education in Biology.  He is a citizen of Egypt

and taught there.  He volunteered that he had taught in Pakistan when outside of Egypt.

He taught at the high school level.

[14]     At. p. 16, Vol. 2 of the transcript, the following exchange took place between

counsel and the respondent:

> Q.  Why did you stop teaching in July 1991?
>
> A.  Because I wanted to travel out of Egypt.  I left Egypt and I went to Saudi
> Arabia.
>
> Q.  You wanted to travel outside of Egypt?
>
> A.  Yes, I was planning on travelling outside of Egypt.
>
> Q.  Did you leave Egypt by choice?
>
> A.  I left Egypt because I was harassed and persecuted in Egypt.  I was under
> pressure in Egypt.
>
> Q.  Where did you go?
>
> A.  I went to Saudi Arabia on a pilgrimage visa.  I travelled on a pilgrimage visa to
> the holy places.  Because the pilgrimage to the holy places is for a limited time, I

> had to leave after the end of that specific period of the pilgrimage. I stayed in Saudi
> Arabia for three months and after that travelled from there to Pakistan. From
> Pakistan I travelled to Yemen.

It seems very clear from the evidence that the respondent had been detained although technically not arrested on seven or eight occasions and in the final analysis decided to file his own claim because of the fact that he hadn't been treated properly in a democratic country. The Egyptian officials were embarrassed by this and made all kinds of promises if he would withdraw it, but he just didn't trust or believe them. We also heard from the respondent and his wife that they were both tortured while detained and, in point of fact, this caused the wife to suffer a miscarriage. This part of his testimony rings true and it does seem obvious that he was endeavouring to get out of Egypt.

[15]    However, it does seem from the evidence and was corroborated by his wife that he made at least three attempts to get out of the country and each time when he received a visa he was refused at the airport but when the restrictions were eased somewhat for the religious meeting in Saudi Arabia, he was able to get through the lines and then board a ship and get to Saudi Arabia. Through all of his evidence it rings pretty clear that he never had any intention of returning to Egypt once he was able to get out and yes, he abandoned his law suit.

[16]    As I have indicated above, when the restrictions were eased a bit, the respondent still had some concern because, first of all, he had to clear it with the captain of the ship

taking them to Saudi Arabia and told a few lies about that situation. But I think, in the circumstances, anyone would have been tempted to mislead the captain so that he could get to Saudi Arabia and not be returned to Egypt.

[17]   Incidentally, the visa was a temporary one and required returning to Egypt after a particular period of time. He then tells us, rather than be caught up in being forced out of the country, because it had been requested by Egypt of Saudi Arabia, or at least there was a strong feeling on his part that he would be moved out of Saudi Arabia once the visa had expired, he made plans to move once again.

[18]   From Saudi Arabia his evidence is that he made his way to Pakistan because of the fear he had already expressed in his evidence. He recognized that he would have to be looking for work if he was to sustain himself and his family. He indicates that someone at a mosque put him in touch with an organization next to the mosque calling itself the Islamic Assistance Organization of the Saudi Arabian Government which he described as an organization formed to help people in the countries outside Saudi Arabia in dire need through economic or natural catastrophe: "they are looking after orphans and teaching orphans". Subsequently he was asked the question if this organization was associated with the International Islamic Relief Organization and he confirmed that it was.

[19]     With a few problems outlined for us by the interpreter they had one more stab at

getting it correct and this time referred to it as "Islamic Relief Organization of the Saudi

Arabian Government". I don't think there is anything to be commented on here; there was

just an honest mistake in translation and the translator herself indicated that this was in

fact the case.

[20]     The respondent's position is that he was in need of assistance which he understood

would be provided by this particular organization. The information the respondent had

was to the effect that this organization was involved in teaching which was of interest to

him because if he were going to work it would have to be as a teacher. According to the

respondent the organization was a multi-discipline type operation and in addition to the

interest in providing teaching they also looked after orphans, and that this was an

organization looking after all people, not only outside Saudi Arabia but in Bangladesh or

any other place in the world. The respondent also made the point that he never heard

about the organization when he was in Egypt and he indicated that he approached this

organization on August 1, 1991. The respondent states at p. 21, Vol. 2:

> Q. Could you tell us what happened when you approached the organization in
> Mecca?
>
> A. I contacted the organization. I gave them some of my certificates, my graduation
> diplomas, and I told them, "If you have any teaching branches in any country, I am
> willing to work there". They gave me some time, almost one month, and they told
> me, "We have a branch in Pakistan that teaches orphans." They teach academic and
> religious subjects. Within the academic subjects there was a biology course. They
> interviewed me to find out my qualifications. Some high professional professors
> looked at my qualifications and experience documents in teaching. Accordingly,
> after this interview, I was successful, and they nominated me to go to Pakistan.

I travelled to Pakistan in the tenth month, in October 1991

.Later the respondent confirmed that he was hired and that he received a salary and that the money was coming from the organization, although the organization received 70 percent of its budget from the government of Saudi Arabia.

[21]    The respondent considered himself in the country legally and he had used his name Mahmoud Jaballah.

[22]    The respondent tells us that what was uppermost in his mind is the fact that the government gave him a visa to work in Saudi Arabia but when the visa expired he had to go back to Egypt. He recognized that the Saudi Arabian government would recognize their responsibility to return him. We heard the following exchange between the respondent and his counsel (p. 23, Vol. 2):

> Q. You indicated earlier that the International Islamic Relief Organization assists various needy people. What motivated you to want to work with this organization?
>
> A. I wanted to work teaching in the teaching profession anyway, and because the International Relief Organization was an organization that they would pay my salary and I would be helpful in teaching orphans.
>
> Q. Did you teach orphans while you were in Pakistan?
>
> A. Yes. All the time that I taught in Pakistan I was teaching orphans.

[23]    The respondent's evidence offers up a forceful denial of knowing about or having

any association with Ossama Bin Laden.  Jaballah indicated that he had worked at the

International Islamic Relief (IIRO) as a teacher while in Pakistan.


[24]    The footnote no. 7 at p. 60 of the respondent's Motion Record  was read to the

respondent:

> According to JABALLAH's statement to CIC, he worked as a teacher at the
> International Islamic Relief Organization (IIRO).  Reference B4 p.3.  This
> organization is suspected to be linked to Ossama Bin Laden and involved in
> fraudulent activities

After reading the footnote counsel asked the following questions (p.24, Vol. 2 of the

transcript):

> Q. Mr. Jaballah, when you approached the Relief Organization in Saudi Arabia,
> did you know that it was linked to Ossama Bin Laden?
>
>
> A. No.
>
>
> Q. While working as a teacher in Pakistan with this organization, did you ever
> come to know that this organization had links to Ossama?
>
>
> A. No.
>
>
> Q. While working as a teacher with the International Islamic Relief Organization,
> did you ever see or speak to Ossama Bid Laden?
>
>
> A. No.
>
>
> Q. Did you ever hear the name being mentioned during the course of the years you
> were there?

Page: 15

A. No.

Q. When you initially approached the International Islamic Relief Organization in Saudi Arabia, had you ever heard the name Ossama Bin Laden before?

A. No.

Q. When in fact, did you first hear the name Ossama Bin Laden?

A. The first time I heard the name of Ossama Bin Laden was when the embassies in Tanzania and Kenya were blown up.

Q. In what context? How did you come across the name?

A. Because the whole world was accusing Ossama Bin Laden that he was the one behind blowing the embassies. I heard and read about the name in the newspapers.

Q. Was that the first time you came across the name?

A. Yes.

If the respondent is deemed to be credible the answers to these questions are a strong denial of his having any knowledge about Ossama Bin Laden. I am of course required to examine the evidence presented in open court and that produced at the *in camera* session.

[25]    The respondent indicated that he never had any suspicions or any knowledge during the years that he was with the organization that they were engaged in any fraudulent activities. He indicates that the organization has a chapter in Canada too and its Director is Doctor Arafat El-Asahi. He makes the point, through questioning from counsel, that:

Page: 16

Q. To your knowledge, is the chapter operating legally in Canada?

A. Yes, they are legal.

[26]     The respondent makes another strong statement, admittedly under examination-in-

chief (p. 27, line 13, Vol. 2 of transcript):

> Q. If we can assume for a moment that, in fact, Bin Laden is a terrorist and he has
> links to the International Islamic Relief Organization, if this was in fact the case and
> you were aware of it, would you have joined the organization when you did in
> 1991?

> A. Of course not.

> Q. Why not?

> A. If this gentleman was belonging or affiliated with this organization and if it is
> proved that this gentleman was a terrorist and he was violent, of course these kinds
> of activities are not legal activities, because he kills innocent people, of course I
> would not participate in such activities.

Once again we have a hypothetical question to which the respondent gives a fairly forceful

response.

[27]     The respondent indicated that he had worked in a Saudi School and that it was

affiliated with the Saudi embassy in Pakistan. "I was getting paid by the Embassy" and he

was paid because he taught biology from about 1993 to 1994, approximately nine months.

[28]     The respondent also makes the point that he was paid by the Saudi Arabian

government in Pakistan and used his name Mahmoud Jaballah.  While he was in Pakistan

his wife was with him and she was working as a teacher of the Arabic language. At that time his four children were with him, one of whom was born there.

## NEWSPAPER ARTICLES

[29]    Counsel for the respondent indicated that, among the materials before the Court, were some newspaper articles and other media reports which indicate that the International Islamic Relief Organization is suspected of having links with an individual by the name of Dr. Ayman Al-Zawaheri who was said to be one of the leaders of an organization known as the Al Jihad. The respondent indicated that he had joined the IIRO in 1991 and at that time he had never heard that this individual, Al-Zawaheri, had links to the organization. He further indicated that during the time that he was in Pakistan he never heard about this individual or his name being mentioned. When asked again, "have you ever heard the name Ayman Al-Zawaheri", he answered: "I heard the name after the events in Tanzania. Also, in 1981, his name was mentioned in one of the newspapers that he was arrested. That's it."

[30]    After some toeing-and-froing about a page of the Personal Information Form (PIF), the document was shown to the respondent and he confirmed that at p. 11 of the form there is a signature under claimant declaration and that it was his. It was also pointed out that there was an interpreter's declaration also dated July 11, 1996 and it appears to be

signed by an individual by the name of Ali Hussein.  Counsel indicated that later on when

he refers to him by name, that is what he would be referring to.

[31]    At p. 35 of the transcript, Vol. 2, there is again a series of questions and answers:

> Q. So as early as two months after your arrival in Canada you were telling the
> Canadian authorities that you worked for the International Islamic Relief
> organization in Pakistan.
>
> A. Yes.
>
> Q. At any time during the course of your stay here in Canada, did you ever attempt
> to hide this fact from the Canadian authorities?
>
> A. No. When I arrived, from the first day at the airport I gave them all my
> documents, my diplomas related to my work and the Relief Organization.
>
> Q. Are you referring now to your day of arriving in Canada?
>
> A. Yes.
>
> Q. The same day?
>
> A. Yes, the same day, and they still have the originals.
>
> Q. On that day, the same day that you arrived in Canada, did you tell the Canadian
> authorities that you had worked as a teacher for the organization in Pakistan?
>
> A. Yes.
>
> Q. In your mind, when you arrived in Canada, did you have any reason to believe
> that you should hide this fact from the Canadian authorities?

A. Of course not.

Q. Did you ever consider hiding this fact from the Canadian authorities before arriving in Canada?

A. I gave this information voluntarily.

## LEAVING PAKISTAN FOR THE FIRST TIME

[32]   Continuing from the transcript, p. 36, Vol. 2, line 11:

Q. When did you leave Pakistan for the first time?

A. August 1994.

Q. Why did you leave Pakistan at this time?

A. During 1994 the Egyptian government asked from the Pakistan authorities all the Egyptians who are living in Pakistan, not only Egypt but many other countries around the world started asking the throwing out or trying to put out all the Arabs living in Pakistan.

Q. Who was asking?  Which government was asking?

A. Any countries were asking to expel the Arabs from Pakistan.  It wasn't only those countries; even the Pakistani government wanted to expel Arabs from Pakistan.

Q. Was Egypt making this request as well of the Pakistani government?

A. Yes.  The Pakistani government was forced to arrest some people, and they arrested four people and they handed them to the Egyptian government.

Page: 20

Q. What did you fear at this time?

A. The Pakistani government was looking for Arabs and, if they arrested them - - if they came to my house and they arrested me, immediately they would have handed me to the Egyptian government like they did with the others.

Q. When you realized this, what did you decide to do?

A. I thought to leave Pakistan with a false passport and I travelled from there to Yemen.

Q. With a false passport, did you say?

A. Yes.

Q. From what country?

A. Iraq.

Q. You went to what country?

A. Yemen.

Q. How long did you remain in Yemen?

A. One year; I stayed one year.

Q. From what month to what month?

A. From August 1994 to August 1995.

Q. Why did you choose to go to Yemen?

A. Because the Iraqi passport was the only passport available to me. I was able to travel from Pakistan to Yemen without a visa. Accordingly, I travelled to Yemen.

Q. What did you do during that one-year period from August 1994 to August 1995?

A. I tried to work in the teaching profession. For my bad luck, the application acceptance period was over because the school year starts in the ninth month, in September. Whoever wants to work has to make application three months prior. I arrived only one month before the school year, so I had to wait until next year.

Q. Did you re-apply?

A. I made application to private schools. I wasn't very successful. That's it.

Q. So you never ended up working while you were in Yemen?

A. No, I did not.

Q. How did you support yourself during this time?

A. I was working in Pakistan for three years. I saved some money from my work there. At that time I left my wife in Pakistan and she was still working in Pakistan.

Q. When you arrived in Canada, did you advise Canadian authorities that you had been in Yemen for a period of one year?

A. Yes, I did.

Q. Did you divulge this information on the same date that you arrived, along with the other information?

A. Yes, the same day.

[33]     The respondent was asked at p. 40, Vol. 2 of the transcript:

Q.  While you were in Yemen from August 1994 to August 1995, was your wife working in Pakistan during this time.

A.  Yes.

Q.  Was she earning enough money to support the four children?

A.  Yes.

Q.  Could you tell us again why you decided to leave Pakistan?

A.  During 1995 the President of Yemen travelled to Egypt.  During the discussion with Hosni Mubarak they signed a security treaty.  After Ali Saleh returned, some internal security forces started arresting some Egyptians.  Because I was there with a false passport - - any Arab knows the Egyptian accent, the language.  I was afraid that if I was arrested and if I told them I am Iraqi, they won't believe me because my accent was different and it would be very easy for them to know me and arrest me.

So I started thinking of moving from there and travelling from there to another country.

Q.  Where did you end up going to?

A.  I went to Azerbaijan.

Q.  Why did you choose to go to Azerbaijan?

A.  When I was in Yemen, I got acquainted with a Yemeni person.  He was studying in Azerbaijan.  His name is Aiman.

. . .

Q. So you met an individual in Yemen named Aiman?

A. He was studying in the university in Azerbaijan. He was explaining to me the situation over there, and he told me, "There are some charitable institutions over there and there are some schools where they teach orphans, and it will be easy for you to find a job over there".

That is why I thought to go to Azerbaijan. The other reason is because it was very easy to get an Azerbaijani visa.

Q. When you travelled to Azerbaijan from Yemen, what passport did you use?

A. The same Iraqi passport that I used.

Q. How long did you remain in Azerbaijan?

A. Six months.

Q. From when to when?

A. I stayed from September 1995 to March 1996. I went to Pakistan afterward.

. . .

Q. It is 1995, September 1995 and the second one is 1996. So the year is 1995 to 1996.

Q. Could you give us a brief indication of the efforts you made to find work in Azerbaijan.

A. I went to some institutions to teach. I found out there was no opportunity to work or find a job.

Q. You mean there were no positions?

A. They didn't have positions available for me.

Q. When you arrived in Canada, did you advise the Canadian authorities that you had spent some time in Azerbaijan?

A. Yes.

Q. When did you first tell the Canadian authorities that you had spent some time in Azerbaijan?

A. In the airport.

Q. Upon your arrival?

A. Yes.

Q. My understanding is - - and I am looking again at your Personal Information Form, at page 30 of the Respondent's Motion Record, my lord.

You indicate that you travelled to Canada using a false Saudi Arabian passport. Is that correct?

A. Yes.

Q. Do you know where that passport ended up? Where is it?

A. In the Immigration.

Q. Did you attempt at any time to destroy that passport before your arrival in Canada?

Page: 25

A. No, I gave it to them voluntarily.

Q. Were there stamps on that passport indicating that you had been in Yemen and Azerbaijan?

A. There was a stamp showing that I was in Azerbaijan.

Q. Was there a stamp showing that you were in Yemen?

A. No.

Q. So the Canadian authorities would not have known from that false Saudi Arabian passport that you had been in Yemen?

A. The Canadian government knew about my being in Yemen from my discussion, from my talk, when I talked with them.

Q. Had you not told the Canadian authorities that you were in Yemen, would they have been able to gather that information from any other source?

A. No, they would not know.

Prior to proceeding with the CISIS interviews and in the course of tying up a few loose ends we had this exchange when counsel for the respondent was continuing with the examination-in-chief (p.119, line 22, Vol. 3 of the transcript):

Q. Mr. Jaballah, I believe that your testimony yesterday was that you were arrested and detained in Egypt seven times.

A. Yes.

Q. And that was, according to my notes, from 1981 to 1991, during that 10-year period.

A. Yes.

Q. My reading of the documents which were provided to us by CSIS is that Al Jihad has been around Egypt since approximately 1981. If you don't know, you don't have to agree.

A. I don't know.

Q. Do you have any idea why, during that 10-year period you were released seven times by the Egyptian authorities, given that they were accusing you of being a member of Al Jihad; yet, they released you over and over and over again?

A. This is the kind of policy that is being followed by the Egyptian authorities. In the case of a person who has been arrested once, in our popular terminology we say that he has been blacklisted.[emphasis added]. Should there by any more trouble, if they don't have the real culprits for this action or for this disturbance, they would immediately start arresting everyone who was arrested before. Anyone who looks like an observing Muslim, whether he is wearing a beard or his wife wears the Islamic hijab, would be tortured. Then following the torture and the investigation, if it was found out that one of those arrested was in fact taking part in that action or that event, when he would be put to trial. If still they have no evidence against him, even through he was tortured and investigated, he would be released.

Q. During the seven periods of time that you spent in detention, were you ever shown any proof by the Egyptian authorities that you were in fact involved in Al Jihad activities?

A. Nothing was proved. There was no evidence.

[34]     The respondent indicated that in the seven times he had been arrested the Egyptian authorities had never in fact on their own initiated a trial with him. However, the respondent indicated that on one occasion that they did send him to trial which was based on finger prints and that he was actually charged with certain accusations, he had his lawyer defend him and prove that all this was false. This was easy to establish because on

the occasion of the alleged wrongdoing the respondent was in jail on that date and hardly
in a position to do anything to anybody.

[35]   When asked by his counsel if he had ever heard of an organization by the name of
Islamic Brotherhood, he answered, yes and added the comment: "Islamic Brotherhood is a
well known organization and it is always in the papers". He went on to deny that he was
ever a member of the Islamic Brotherhood or that he had ever knowingly associated with
or communicated with someone who is a member of the Islamic Brotherhood. Later Mr.
Jaballah was shown an article from the El Aram newspaper dated September 1, 1987
indicated that five terrorists constitute the military wing responsible for carrying out
political assassinations. The respondent indicated that he was picked up on this occasion
because his name appeared in the article. The fact of the matter is, as he explained it, is
that the people who picked him up were dead wrong because the assassination had taken
place when he was in jail, as I referred to earlier. When asked what had become of the
article, the respondent indicated that he had turned it over to the Board determining his
application for refugee status. He had done that voluntarily.

**THE THREE INTERVIEWS**

[36]   There is no disputing the fact that the respondent, after he arrived in Canada, was
interviewed on three occasions by CSIS. On March 5, 1998; on August 21, 1998; and on

September 26, 1998. Each interview took place at his home. First names only were used here in the interest of protecting the interviewing CSIS officers. The first one, conducted by "Michel", lasted about two and a half to three hours and took place in the evening some time beginning around 7:00 p.m. or 8:00 p.m. The second interview took place at 10:00 p.m., lasted approximately three hours to 2:00 a.m. and was conducted by "David". The third interview was again conducted by David sometime between 7:00 and 10:00 in the evening. There is legitimate confusion about the actual times but I have indicated above they were akin to those particular times and for that particular duration.

[37]     The respondent emphasized that his English was not very good and an interpreter was provided for the first two meetings but not for the third meeting. In part of his evidence the respondent made the point that he was not reluctant to speak with the CISIS officers but rather says at p. 135, Vol. 3, line 7 of the transcript:

> A. I wasn't reluctant at all.

> Q. So any references that may be contained in there to your being uneasy or reluctant are not accurate?

> A. I was afraid. I was also feeling a bit uneasy. I had been subjected to all kinds of bad treatment in Egypt and, when I came here to Canada, I was looking for a kind of life where all these things are things of the past. When I was in fact subjected to almost the same kind of treatment, this was the real reason of fear. I was feeling unsettled.

> I was feeling uneasy because these interviews always took place during the night, and my apartment has only two bedrooms, although I have six children. There wasn't really a place where we can sit and talk comfortable.

> During the interview when we stayed up until two o'clock after midnight, I
> explained to him that the children were not able to go to sleep because we were
> sitting in one of the rooms where the children were supposed to sleep. He seemed
> not to care about all these details and he would go on talking. These two things
> happened.
>
> Q. I don't think I asked you this earlier. During this third interview that you just
> spoke of, was an interpreter present all?
>
> A. Yes, there was no interpreter.
>
> Q. Did you ask the CSIS officer why there was no interpreter present?
>
> A. I asked. I said, "Where is the interpreter?" When he was at the door, I asked for
> the interpreter. He said, "There is no need for that. I just need you on a very small
> matter." I said, "But maybe I can't understand you."

[38]   There is some dispute about the son Ahmed and whether or not he was forbidden
to be part of the interviews. The respondent makes the point that they ordered him out or
would not let him come in whereas the officers indicated the kinds of questions they were
going to ask and allegations they were going to make might not be suitable for a boy of his
age.

[39]   When the respondent, somewhat grudgingly, invited them in he states that they led
him to believe that they didn't need any document from the Court to enter his home and to
question him. In the final analysis the respondent states: "I have no idea what the law is so
I invited him in. I said, 'you are welcome. I have nothing to be afraid of and I'm not
threatened by anything. I am not hiding anything that might be dangerous so I would not
feel uncomfortable talking about it.' "

[40]    In a kind of summation counsel for the respondent asked (p.138, Vol.3 of

transcript):

> Q.  At any time did you refuse to provide CSIS with an interview?
>
> A.  Every time I would express my objection, and I would say that I won't have the
> time and I don't feel right about this.  His presence was making me concerned and
> worried.

And then:

> Q.  So in the end you ended up having all the interviews, consenting to all
> interviews.

[41]    During the time of these interviews the respondent had a lawyer and he was never

told at any one of the three interviews that he could contact his lawyer and seek his advice.

The officers did not provide a warning but did indicate that the respondent shouldn't talk

about this case to anybody.

[42]    There was a considerable amount of evidence on the subject of these three

interviews and I do not intend to go into them line by line or paragraph by paragraph.  By-

and-large it is fair to say that the respondent denied knowledge or acquaintance with a

whole series of names and/or organizations put to him by the CISIS officers.

[43]    In one situation he was asked about the name Hassan Farhat and the summary done

by the CISIS officers says that the respondent had heard of Mr. Farhat and then went on to

explain the connection at p. 142, line 15, Vol. 3 of the transcript:

A. Yes. The officer mentioned several names, including Mr. Farhat, and I recognized this name.

Q. How did you recognize the name, Hassan Farhat ?

A. I mentioned this yesterday in court. When I came to Canada, I was staying in a shelter on Queen Street. For my prayers I would go to the nearest mosque, and the mosque is the Madina Mosque. I was looking for assistance from anyone because my English was very poor. I was looking for someone who would help me to find a place to live in and to accompany me for some of the required processes. I talked to the people there, including this Hassan Farhat, and that was the beginning of my acquaintance with this gentleman. He helped me to find housing accommodation. That's all.

Q. Prior to coming to Canada, had you had any knowledge of Mr. Farhat?

A. No.

Q. Since those initial dealings with Mr. Farhat through the mosque, have you maintained a relationship with him? Do you still have dealings with Mr. Farhat today?

A. Very casual, like "How are you? How are you doing?" I keep very casual relationships with this person.

## SUMMARY OF THE INTERVIEWS

[44]   Very few suggestions put to the respondent received a yes answer when it came to identifying people or places. Where he indicated that he knew the person we would hear a thorough response of the sort which appears in the transcript at pp. 147-150, Vol. 3:

Q. Do you recall being interviewed during the first interview about an individual by the name of Mustafa Kreir?

A. Yes.

Q. At that time, what did you know about Mustafa Kreir?

A. When he asked me about Mustafa Kreir, in fact, I didn't know anyone by that name. He asked me about this person during the first interview, and he seemed very interested. The second time he was even more adamant in asking about this person. In the third interview, he persisted in asking about this person. Every time I would ask him, "Give me some kind of description."

At the third interview, I said, "Every time you are asking about this person, so if you have any photo for this person, maybe you would show it to me." He in fact did show me a photograph, and I said, "Yes, I know this person, but his name is not Mustafa Kreir. His name is Abdul Salam.

Q. When you acknowledged recognizing the picture, what happened after that?

A. He asked me, "Did you in fact know this person?" I told him that I had a friend whose name is Ali Hussein; he used to help me with the translation since I arrived here in Canada. The person who introduced me to this Ali Hussein. Hassan Farhat introduced me to Ali Hussein because Ali Hussein speaks English fluently and he has been here in Canada for 12 years.

At one time I was going to my lawyer, so I went to Ali in order to take him with me to the lawyer because he was my interpreter. There was a person there; his name is Abdul Salam, and that was the person and I met him there.

When Ali used to come and visit me, if Abdul Salam happened to be visiting Ali, he would bring Ali with him to my house.

Q. Did you indicate all of this to the CSIS officer?

A. Yes.

Q. Was he satisfied with your answer?

A. He was silent at the end.

[45]   During the course of the hearing and because it was slow-going with all of the interpretations having to be made, I had the opportunity to listen very carefully to the answers given to questions posed, whether they were by counsel for the respondent or counsel for the applicant. As I have indicated earlier, I do not think it is necessary to parrot out all of the questions and answers that occurred here. However, I have tried to pick out some salient ones to indicate a mood or a sense of credibility because, in the final analysis, my determination is to be very much a question of the credibility of the various witnesses and the weight to be given to their evidence, culminating in my decision.

**RESIDENCE IN CANADA**

[46]   The respondent touched base with many people in Canada, some for a brief moment of time and others were dealt with on a very intensive manner. My impressions of these contacts flow from the evidence and a re-reading of the transcripts as they became available. I think it is fair comment that his new friends were not suspicious and we know that others befriended him in several ways.

[47]   Certainly his family were very supportive and the eldest of the children was "afraid" because he apparently overheard a threat to his father to the effect that if he did not come forward with the information he would be jailed. The son Ahmed wanted to be present during the interviews because his father did not speak very good English but he

was either discouraged or forbidden - and that depends on the person conveying the message.  Certainly, at his mother's direction, he was the one who put the recording machine near the room to gather at least some wisps of conversation from that meeting. The tape, incidentally, was not something upon which to rest one's case and despite valiant efforts by the court reporter we learned very little from this tape.

### WITNESSES

[48]   The son, named Ahmed Jaballah

The wife, named Husnah Mohammad El-Sayyed El-Mashtouli

Mr. Hisham Bakir

Dr. Aly Hindy

Mr. Arafat El-Ashi

Steve Rosenbaum

### Ahmed Jaballah (the son)

[49]   The respondent's son is 13 years old.  He knows that men had come to his home on three occasions and indicated that two people came for the first two meetings and one person came on the third meeting.  It is Ahmed who said that he was barred from the room.

[50]   In answer to a direct question he confirmed that, other than his family, no one stayed overnight at their home.  He also indicated in his evidence that the CSIS officer who came the second time wasn't the "same guy" who came the first time.  Ahmed consistently maintained that: "my father asked the CSIS officer if he had any proof of where he came from or who he was related to, which office he is from or what kind of place he works.  He said, 'I don't have to show you.  I can go to any people any time and ask them questions at any time' "(he, being the CSIS officer).  He also made the point that his father responded to that by letting them come into the house.

[51]   On the second occasion Ahmed indicates that the CSIS officer said the same thing as the earlier one had said at the first interview, namely, no children.  "So I moved to the other room and sometimes I was standing with my mother in the hallway."  The son also confirmed that the tape presented to the Court, "was the tape that I recorded when the second interview was underway".

[52]   With respect to the interpreter, the son indicated that he was sleeping and he said he saw him sleep and he was snoring and he could even hear him from the other room.  I am not attaching too much weight to this sentiment because of the evidence that the interpreter gave with respect to having a sore back and not being able to get to sleep, or snore for that matter.

[53]    The son corroborated what his father said throughout these hearings that he didn't

know very much English and Ahmed said, "I know more English than my father".

However, he did indicate that his father was using a computerized dictionary in an

endeavour to improve his English.

[54]    We learned also, again from Ahmed, that the officer left about 1:30 a.m. or 2:00

a.m. and Ahmed went into the room for about five minutes before the CSIS officer left.

He was asked by counsel for the respondent (p.562, Vol. 7 of the transcript):

> Q.  So you were in the room for five minutes before he left?
>
> A.  Yes.
>
> Q.  Do you remember what was being said during those five minutes between your
> father and the officer?
>
> A.  He was talking about taking my father to jail.
>
> Q.  He was talking about taking your father to jail?
>
> A.  Yes.  He said, "You have three days to call us and give us some information.  If
> you don't call us - - you have three days and somebody will come to your house and
> take you to jail."
>
> Q.  "Someone will come to your house and take you to jail?
>
> A.  Yes.  Then at that time I started crying?
>
> Q.  Who?

A. Me. I started crying.

Q. Why?

A. I didn't want my father to go to jail.

[55]   Ahmed indicated to the counsel for the respondent (line 12, p. 568, Vol. 7 of the

transcript:

Q. One of the first questions I asked you was whether or not you were the son of Mahmoud Jaballah.

A. Yes.

Q. And you said "yes.". I refer to your father as Mahmoud Jaballah.

A. Yes.

Q. Have you ever heard your father being referred to by any other name? Does anybody call him by any other name?

A. Abu Ahmed.

Q. Abu Ahmed?

A. Yes

Q. Why?

A. Because in Egypt or in our religion they call the father by his oldest son's name.

Q. What does "Abu" mean?

A. "Abu" is the father of.

Q. Of Ahmed?

A. Yes.

Q. You have heard your father being called this?

A. Yes.

Q. By whom?

A. By some people in the mosque that he knows.

Q. Have you ever used the term "Abu" yourself in referring to someone?

A. Yes, Abu by his oldest son's name.

Q. So you use this yourself?

A. Yes.

Q. I want to give you an Arabic term. I am going to say it in Arabic, and I want you to tell me if you have ever heard this name?

A. Okay.

Q. El Walid. Have you ever heard these two words?

A. Yes.

Q. What does it mean?

A. My father calls my mother's father El Walid.

Q. Have you ever heard anybody else besides your father use this term?

A. Yes, other people use it.

Q. Other people use it too?

A. Yes.

Q. If I wanted to use it, who would I use it for?

A. Your wife's father. That's it.

[56]    On another subject Ahmed was asked if he knew a fellow by the name of Hisham and he responded, "yes and as a matter of fact he was the one brought the kids to court and does other favours, for example, picking up food. He is my father's friend." Ahmed also indicated that he knew another of his father's friends at the mosque and that was on the occasion when they were talking about the possible sale of the father's van. There was some confusion in the evidence but in the final analysis it ends up that Ahmed had met Mr. Saleh when Ahmed was with his father who was not in jail at that time.


**Husnah Mohammad El-Sayyed El-Mashtouli (the wife)**