# EXHIBIT 40B

headquarters in Saudi Arabia and has over 30 offices all over the world. He was questioned at p. 855 Vol. 20 of the transcript:

> Q. That is the Muslim World League?
>
> A. Which is the mother organization of what is called IIRO, the Relief branch of the Muslim World League.
>
> Q. Is IIRO also known as the International Islamic Relief Organization?
>
> A. Yes, it is.

[109] It was agreed that it would be referred to as the IIRO. On p. 857, Vol. 10:

> Q. In your professional capacity, do you do any work with the IRRO?
>
> A. Yes. I am Director of this office in Canada.
>
> Q. Where is the office located?
>
> A. It is in Etobicoke here.
>
> Q. Is that the only IIRO office in Canada?
>
> A. Yes.
>
> Q. How long has that office been operating?
>
> A. For the last eight years or so.
>
> Q. During those eight years, have you been associated with the IIRO in Canada? Have you been here throughout those eight years?

A. I am in charge of this - - actually, it is not a very active office in Canada. It is only representing some activities among the Muslim communities in Canada.

Q. Have you been with that office for the past eight years?

A. All the time, yes.

Q. During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?

A. Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.

Q. I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A. I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?

Q. Yes.

A. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.

Q. For those of us who are not as familiar as you are with the Muslim World League, could you tell us a bit about the work of that organization internationally?

A. The Muslim World League was established in 1963 as an organization trying to help Muslims who live as minorities. Where ever Muslims exist as minorities, this organization tries to help them in one way or another - - in education, in social needs, in every aspect of their lives. Whatever it can give to them, it doesn't hesitate to do that.

Q. Is there any connection between that organization and the United Nations?

A. Absolutely. We have an observer status with the United Nations - - not only the United Nations, but a number of prominent international organizations. One of them is called the Arab League. The Arab League is a league of all Arab States. Also we have a status with the OIC, the Organization of Islamic Countries, which represents 55 countries who are all Muslim. We have this status with all of them.

Q. Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?

A. Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.

Q. When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?

A. What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

[110] From this juncture on counsel for the respondent indicated that he would be referring strictly to the IIRO. We now go to p. 862, Vol. 10 of the transcript:

Q. During the eight years that you have been with IIRO/World Muslim League here in Canada, have you ever received any indication from the Canadian authorities that they are concerned in any way about your office?

A. Yes.

Q. When was that?

A. Some agents from CSIS called me, and they came and visited me.

> Q. Do you recall who it was?
>
> A. The same person representing CSIS. Everybody knows this. He came to my office and he asked me about us, what we are, what our activities here and elsewhere in the world are. When he knew, as I told you, about ourselves, he was satisfied and he said to me, "If you need any help, here is my card. Call me." Then he called again maybe one year later.
>
> Q. When did he call you the first time?
>
> A. About three years ago. The second time he called asking the question, which was very strange to me, "Do you receive any threats from anybody?" I said, "Yes, it so happens that I had two letters threatening us." "Can I come and see them?" He came. He said, "Are these threats from Muslim terrorists?" I said, "No. <u>Why should Muslims threaten us when we are here to help them?</u>" [emphasis added]

[111]   Dr. El-Asahi took considerable pride, and well he should, when he said at p. 864, Vol. 10::

> We publish booklets actually to educate Muslims and Canadians non-Muslims about what we stand for, what Islam stands for. One our books fell into the hands of the Minister of Defence at the time, David Collonnette (sic). He is still the Honourable Collonnette (sic). He is a minister until now, but of course he has a different portfolio. He read one of our books called 'The Holy Koran's Message to Jews and Christians'. The Holy Koran is our holy book, like the Holy Bible. It is a message not only to Muslims; it is a message to the universe, to everybody, including the members of the other two divine religions. The book was quotations from the Koran addressed to the followers of Judaism and Christianity. He [the Minister] read the book and he expressed his happiness about it, ... and he said, "Other people, when they write about religion, concentrate on differences and, thus, they divide people. In this book by this author there is a concentration on commonalities." He was happy with the book because it concentrates on what joins us together.

[112]   During Dr. El-Ashi's examination-in-chief, we come yet again across the name Ossama Bin Laden. At p. 867, Vol. 10:

> A. Everybody knows who Ossama Bin Laden is. He was with the Afghan guerillas from the beginning of their uprising against the Soviet Union. The United States used to help the Afghans during that period, before the nineties. He was on the popular level getting help from the people of Saudi Arabia and sending them - -

from what I read in the papers - - sending them to those guerillas. Then afterward, after the Soviet Union left, he continued to do the same thing.

To me, as a representative of the Muslim World League and IIRO, I feel that he has exceeded his limits, to make attacks or to say, "I want to make an international war against everybody." That is not Islam; this is against Islam.

Q. So what we have been reading in the newspapers as to what Ossama Bin Laden is supporting, you don't support?

A. Absolutely not, and I categorically say that there are no relationships between Ossama Bin Laden - - how can there be a relationship when Ossama Bin Laden himself lost his Saudi citizenship? He is no more a Saudi citizen, and the Government of Saudi Arabia, I am stating, is our government. We work for it. Whatever the government does and its attitude toward Ossama Bin Laden and other people, that is our attitude, too.

Q. So when CSIS says that Ossama Bin Laden is connected to your organization's offices in Pakistan, what do you say to CSIS?

A. I am afraid this is inaccurate. This is absolutely not correct.

Q. My recollection of CSIS' position is that, in addition to that, the IIRO offices in Pakistan are involved in fraudulent activities.

A. Again, this is an offence to the IIRO. It is absolutely unfounded.

. . .

Q. I would like you to tell me, Dr. El-Asahi, if you know Mahmoud Jaballah.

A. I heard the name. He called me on the phone and he said he worked for our office in Pakistan. He was a Principal. He sent me a letter, and his wife also called me. I never met any of them, and I saw the letter. The letter has been issued by the Director of our office in Pakistan. They know the person, so it is a genuine letter, that he was the Principal of the school operated and started by the IIRO for orphans in Pakistan. He was there. Because the letter is in Arabic and it is from Pakistan, he wanted me to confirm this information. I wrote a letter to that effect, to whom it

may concern, that indeed, based on this letter, this man worked for this organization during a certain period.

Q. When Mr. Jaballah approached you with that letter, do you recall if that was the name he introduced himself as, Mahmoud Jaballah?

A. Of course, Mahmoud Jaballah. I have a copy of the letter.

Q. Would you check the name on that letter, please.

A. His name is Mahmoud El-Sayy Jaballah.

Q. Is that the Arabic letter?

A. English. That is my letter, and the Arabic is here. It is the same, Mahmoud El Sayy Jaballah.

Q. That letter came to you from Mr. Jaballah?

A. Yes.

Q. And that is the letter that was issued by the organization in Pakistan?

A. The one in Arabic is written by my organization, the office in Pakistan. If you need a copy of it.

Q. Perhaps you could take us through it again. You received the letter from your branch in Pakistan?

A. No. I received the letter on behalf of Mr. Jaballah here, that he had a letter that proves that he worked as a Principal of one of our organizations in Pakistan during a certain period, and the organization says that he was of excellent character and good behaviour. This is text of the letter. I am paraphrasing it for you. So we issued this letter, to whom it may concern.

> Q. In English?
>
> A. In English. We say: "This is to certify that the IIRO is an Islamic international organization that has branches in various countries, one of which is in Pakistan, where Mr. Mahmoud used to work."
>
> ...
>
> Q. Do you recall, Dr. El-Asahi, when you were initially approached by Mr. Jaballah?
>
> A. It has a date. It was January 6, 1999. That is the date of my letter, January 1999.

[113] In cross-examination Dr. El-Asahi confirms (at p. 875, Vol. 10) that he is an employee of the Muslim World League. At p. 877, Vol. 10, the following questions and answers were given:

> Q. Do I understand correctly from the questions that you responded to from Mr. Rodrigues that the IIRO is really only active in those places where there is need for relief?
>
> A. Yes.
>
> Q. In other words, in Canada, in terms of your dual role with your dual office here, you would be doing more activity in relationship to the Muslim World League than you would with regard to the IIRO?
>
> A. Exactly, although we do have certain activities from the IIRO required to be done in Canada. For instance, in the month of fasting we have some money coming from there to spend to make parties for those who fast. The poor people here in a number of mosques would get together and eat as guests of the IIRO.
>
> Q. When they break their fast?

A. Exactly. This is an example. There are other things.

Q. You said "money from there".

A. From Saudi Arabia.

Q. You also indicated in response to a question from Mr. Rodrigues that you would not know what was going on with the Muslim World League/IIRO office in Washington, D.C. in terms of the Americans possibly investigating them because that is an affair for their office.

A. That is true.

Q. At the same time you indicated in a response to a question from Mr. Rodrigues that you are not aware of what the IIRO office in Pakistan would do in recruiting people to teach there because that is an affair that is intrinsic to that office.

A. Ask me about what I do here and my relationship with the headquarters in Jeddah.

Q. Having said that, you are not really able to tell this Court what goes on at the IIRO office in Pakistan beyond which somebody in Pakistan is prepared to say, are you?

A. I can tell because I know about the general policy and the rules and objectives of the organization which nobody is allowed to go beyond. Everybody has to abide by the rules and the principles of the organization. In that way I can tell.

Q. You have already told us that, in your view, what Ossame Bin Laden has done is beyond the principles of Islam and is contrary to the principles of Islam

A. In his threat to declare war against civilians and to demolish and bomb targets everywhere in the world just because they are American or European, this is not Islamic at all.

Q. Given that you don't know precisely what goes on in the office in Pakistan - - and I recognize that your view is that Ossama Bin Laden is beyond the principles of

>Islam - - would it be possible that there might be individuals operating within the office in Pakistan who admire what Ossama Bin Laden has done?
>
>A. No. The answer is "no" because the office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.
>
>If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within - - there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.
>
>Q. How can you say that, Dr. El-Asahi, when you don't know exactly what it is that might be going on inside the Pakistan office? Is it not possible that somebody could keep his opinions to himself about Ossama Bin Laden, but work quietly on his behalf without letting his superiors or the officials in Jeddah know what he is doing?
>
>A. Does anybody know what goes on in my mind and your mind? We are not accountable for what goes into our minds; we are accountable for our actions. Whether he keeps this or that is not a concern of anybody as long as he or she abides by the principles of the organization or the government.
>
>Q. Are you saying that it is possible that somebody could act or attempt to act in secret but, so long as he keeps to the official policy line of the organization and the home organization doesn't know what he is doing in secret, he might continue along at variance to official policy?
>
>A. I am not saying that; you are saying that. I am saying that I don't know what happens in secret with anybody; nobody knows. This is what I am saying.

[114]  In re-examination counsel for the respondent, at p.883 asked:

>Q. In your opinion, Doctor, would the Saudi government fund any organization that is involved, perceived, or stated to be involved in terrorism?
>
>A. This exactly as you would say: Would the U.S. government fund any organization that is involved in terrorism? The same answer.

Q. What is that answer?

A. The answer is: Impossible. How can they?

**Mr. Steve Rosenbaum**

[115] Mr. Galati called the next witness, Mr. Steve Rosenbaum. Mr. Rosenbaum is a barrister and solicitor and a member of the Bar of Ontario since 1984. He represented Mr. Jaballah, his wife and children during the course of the refugee claim and hearing. At p. 890, Vol. 10 Mr. Galati asked:

> Q. During your representation of Mr. Jaballah, his wife and children, did anyone from CSIS ever call you to tell you that they were interviewing your client during the same time period and during the course of their claim?
>
> A. No.
>
> Q. Did the Minister's representative, the Refugee Claims officer or any of the interpreters during the sittings of the refugee claim ever indicate to you or tell you that CSIS was investigating my client, Mr. Jaballah?
>
> A. Never.

[116] Then in a question at p. 892:

> Q. Is it normal practice, both in your own experience and in dealing with other practitioners in your area, that refugee lawyers will encourage and request their clients to collect documentation or documentary evidence to support their refugee claim?
>
> A. That is correct.
>
> Q. I don't know whether you recall, but is it likely that you did so with Mr. Jaballah and his family?

A. Yes, I do recall that.

Q. Did you.

A. Yes.

Q. Do you know a Mr. Ali Hussein?

A. Yes, I do.

Q. Who is he?

A. He was the interpreter who assisted us during our preparatory meetings for the refugee hearing, together with Mr. Jaballah.

Q. Was he someone Mr. Jaballah brought to your office or was he a regular interpreter of yours that you had used?

A. He was a person that Mr. Jaballah brought to my office.

## CONCLUSIONS AND REASONS FOR ORDER

[117] Both counsel emphasized the fact this case would turn on the credibility of the parties and the witnesses and I agree.

[118] There is also one major feature of applications brought pursuant to paragraph 40.1(4)(a) of the *Immigration Act* and that is the direction from Parliament which I think bears repeating here.

| | |
|---|---|
| (4) Judicial Consideration of Certificate - Where a certificate is referred to the Federal Court pursuant to subsection (3), the Chief Justice of that Court or a judge of that Court designated by the Chief Justice for the purposes of this section shall<br>(a) examine within seven days, *in camera*, the security or criminal intelligence reports considered by the Minister and the Solicitor General and hear any other evidence or information that may be presented by or on behalf of those Ministers and may, on the request of the Minister or the Solicitor General, hear all or part of such evidence or information in the absence of the person named in the certificate and any counsel representing the person where, in the opinion of the Chief Justice of the designated judge, as the case may be, the evidence or information should not be disclosed on the grounds that the disclosure would be injurious to national security or to the safety of persons; | (4) Examen judiciaire - Lorsque la Cour fédérale est saisie de l'attestation, le juge en chef de celle-ci ou le juge de celle-ci qu'il délègue pour l'application du présent article:<br><br>a) examine dans les sept jours, à huis clos, les renseignements secrets en matière de sécurité ou de criminalité dont le ministre et le solliciteur général ont eu connaissance et recueille les autres éléments de preuve ou d'information présentés par ces derniers ou en leur nom; il peut en outre, à la demande du ministre ou du solliciteur général, recueillir tout ou partie de ces éléments en l'absence de l'intéressé et du conseiller la représentant, lorsque, à son avis, leur communication porterait atteinte à la sécurité nationale ou à celle de personnes. |

[119] It's not surprising that counsel have attacked this particular admonition to judges but the authority is now clearly spelled out and we have proceeded with it since at least 1994 and probably earlier.

[120] When counsel are representing a client under these terms and conditions I can appreciate that it is extremely difficult but it is a difficulty that Parliament feels should be overcome given its responsibility for protecting Canadians and other residents of Canada.

[121] This case lends itself to being divided into three points of time, namely: A. the time in Egypt; B. the time between arrival in Saudi Arabia and departure for Canada; and C. the time in Canada.

### A. Time in Egypt

[122] Both the respondent and his wife gave a very careful, albeit chilling, commentary and evidence of the time they spent in Egypt and why they wanted to leave. Of all of their evidence this was certainly the most credible and really unchallenged. I accepted that they were persecuted; I accept that they were imprisoned and that no charges were brought against them; and I accept the fact that the respondent instituted an action against the government which, as I have indicated earlier, he abandoned when he left for Saudi Arabia. Nor did I find any real fault with the fact he had to tell a few lies in order to convince the captain of the ship they were sailing on that everything was in order when he knew it was not in order. I don't think that exchange really impinged upon his credibility and I suspect that anyone of us caught in that situation would be tempted to tell a few lies if it meant becoming clear of something they feared for good reason. In any event that was the way I saw it, save and except for the evidence presented to me at the *in camera* meeting and of course I cannot comment on that.

### B. Time spent after left Egypt until arrival in Canada

[123]  Again, the respondent brought to our attention that the pilgrimage to the holy place was for a limited time and he had to leave at the end of that specific period of the pilgrimage. He was able to stay in Saudi Arabia for a limited period of time and after that he was forced to travel to Pakistan and later Yemen. His wife was not with him in Yemen but apparently working in Pakistan during this time. He then tells us, in answer to questions from his counsel, about his going to Yemen and Azerbaijan and that the Canadian authorities would know that he had gone to Azerbaijan because it was shown on the passport. He adds that there was no stamp in his passport showing Yemen and the only way the Canadian authorities would get that information would be if he told them, as he indicated he did.

[124]  On the other side of the coin is the fact that he spent a year in Yemen and we heard very few if any details other than the fact of why he went there and that he was unsuccessful in getting a job and that he sustained himself by using money that he had earned in Pakistan and his wife was able to look after her financial requirements because she had also been working and in fact was still working and had saved some money. By and large, there wasn't too much to criticize about the evidence here but this is an area where he had gone to seek protection and yet seemed to move around quite easily in what was for him a danger zone, if Egypt was apparently demanding that Egyptians be returned to Egypt.

Page: 94

[125]   Here again the *in camera* evidence tells a different story and I can't of course comment on that information.

## C. Time in Canada

[126]   I don't need to belabour this again other than to say that I was impressed by the number and the calibre of people who came forward on his behalf and on behalf of his wife and children. I have already highlighted some of the actions that were taken by people who wanted to do nothing more than help.

[127]   I was particularly impressed by Dr. Ali Hindy because he had taken on the responsibility of checking Mr. Jaballah out after being told by CSIS that he might be a problem. He said at the end of his study: "I didn't notice anything wrong". He also brought home to the Court that he had no concerns about Mr. Jaballah, no concerns at all from the community or from himself or from the people who help him at the centre. This was pretty strong backing coming from a person in the community who has obligations of his own to see to the members of his mosque and an indication that people were coming from various centres just to be at the mosque because of the way it was run. The wrapping-up information about Dr. Hindy's relationship with the respondent came when counsel said: "You hold a significant, and I think everyone would agree, a respected professional position and are also a person of respect in your community. Why have you taken so much time to be present here at these proceedings?" and Dr. Hindy replied:

"Because we care about Mr. Jaballah. We know he is innocent and this could happen to anybody in our community."

[128]   I don't wish to reiterate what I have already said in these Reasons but I thought it important to include strong attitudes of people who have known the respondent over a comparatively short time and would have a natural propensity, I believe, and a correct one, to support their compatriots in the community.

[129]   The respondent had been given work by a friend with the initials TJ and it amounted to menial labour from time to time when a job vacancy occurred. The respondent befriended TJ and agreed to drive him to the airport with all of his luggage and his family. TJ's evidence was to the effect that neither his car nor the car of his brother was large enough for the amount of luggage they were taking and that is why they seized upon this offer from the respondent.

[130]   Of interest here was that the luggage was not taken into the airport but simply unloaded at the sidewalk and TJ would have to move it the rest of the way. At this point I think it should also be pointed out that the respondent was known to TJ as Mustafa Jaballah.

[131] When TJ and his family arrived in Egypt they apparently were treated shamefully by the Egyptian authorities and I think it is pretty clear from the evidence that they were not interested in TJ but they were interested in Jaballah. The problems faced by TJ were unlike anything he had ever had happen to him before and he had made several trips to Egypt but this was the first time that he was manhandled in this particular way. He was asked a series of questions and shown pictures in which he was asked to identify the people in them.

[132] I believe that once the officials realized, or more importantly, once TJ realized that the man he knew was called Mahmoud Jaballah, he conceded that he knew him but that he didn't know him by that particular name.

[133] Once it had been settled in the minds of the Egyptian authorities they then began their questioning about contacts TJ had had with Jaballah. I believe they kept him for something like ten hours the first time at the airport and for a shorter time on the second occasion when the photographs was finally identified.

[134] This incident points out that Jaballah would have some reason to be concerned if he returned to Egypt, or so the evidence seems to say to me because the clear-cut evidence is that TJ suffered at the hands of the officials because they thought he was a good friend of, or working with, or on behalf of Jaballah.

[135] Jaballah's evidence has been that if he returned to Egypt voluntarily or if he was forced back there was clearly interest in him. His friend, TJ, made the point that he had been questioned in a very deliberate fashion and for a long period of time about the whereabouts of the respondent. And so, as the respondent indicates, they were out to get him back; certainly on this particular issue he is on pretty solid ground on that part of his testimony.

[136] If nothing else this incident squares with Jaballah using the name Mustafa with people he did not trust or did not know and he had reason to be apprehensive about meeting new people in Canada. There is also an indication here that the Egyptian authorities were well informed because they had taken a photo of Jaballah and TJ outside the airport and then showed it to TJ during the second meeting with officials.

[137] I cite this instance because it goes a long way to establishing the credibility of the respondent.

## DECISION

[138] I am satisfied, based upon the evidence presented to me *in camera* and in open court, that the certificate filed by the Minister and the Solicitor General is not reasonable and the certificate is quashed.

Ottawa, Ontario
November 2, 1999

_____B. Cullen_____
J.F.C.C.