# EXHIBIT 44

# AL-QAEDA AND THE GLOBAL REACH OF TERRORISM

---

## HEARING

BEFORE THE

## COMMITTEE ON INTERNATIONAL RELATIONS HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

---

OCTOBER 3, 2001

---

**Serial No. 107–50**

---

Printed for the use of the Committee on International Relations

Available via the World Wide Web: http://www.house.gov/international_relations

U.S. GOVERNMENT PRINTING OFFICE

75-562PDF WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250 Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON INTERNATIONAL RELATIONS

HENRY J. HYDE, Illinois, *Chairman*

BENJAMIN A. GILMAN, New York
JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
CHRISTOPHER H. SMITH, New Jersey
DAN BURTON, Indiana
ELTON GALLEGLY, California
ILEANA ROS-LEHTINEN, Florida
CASS BALLENGER, North Carolina
DANA ROHRABACHER, California
EDWARD R. ROYCE, California
PETER T. KING, New York
STEVE CHABOT, Ohio
AMO HOUGHTON, New York
JOHN M. McHUGH, New York
RICHARD BURR, North Carolina
JOHN COOKSEY, Louisiana
THOMAS G. TANCREDO, Colorado
RON PAUL, Texas
NICK SMITH, Michigan
JOSEPH R. PITTS, Pennsylvania
DARRELL E. ISSA, California
ERIC CANTOR, Virginia
JEFF FLAKE, Arizona
BRIAN D. KERNS, Indiana
JO ANN DAVIS, Virginia

TOM LANTOS, California
HOWARD L. BERMAN, California
GARY L. ACKERMAN, New York
ENI F.H. FALEOMAVAEGA, American Samoa
DONALD M. PAYNE, New Jersey
ROBERT MENENDEZ, New Jersey
SHERROD BROWN, Ohio
CYNTHIA A. McKINNEY, Georgia
EARL F. HILLIARD, Alabama
BRAD SHERMAN, California
ROBERT WEXLER, Florida
JIM DAVIS, Florida
ELIOT L. ENGEL, New York
WILLIAM D. DELAHUNT, Massachusetts
GREGORY W. MEEKS, New York
BARBARA LEE, California
JOSEPH CROWLEY, New York
JOSEPH M. HOEFFEL, Pennsylvania
EARL BLUMENAUER, Oregon
SHELLEY BERKLEY, Nevada
GRACE NAPOLITANO, California
ADAM B. SCHIFF, California
DIANE E. WATSON, California

THOMAS E. MOONEY, SR., *Staff Director/General Counsel*
ROBERT R. KING, *Democratic Staff Director*
JOHN MACKEY, *Investigative Counsel*
LIBERTY DUNN, *Staff Associate*

# CONTENTS

Page

## WITNESSES

Vincent Cannistraro, Former Chief of Counterterrorism Operations, Central Intelligence Agency ..... 16
Charles Santos, Former Special Assistant to The Undersecretary for Political Military Affairs, United Nations ..... 20
Oliver "Buck" Revell, Former Associate Director in Charge of Investigative and Counter-Intelligence Operations, Federal Bureau of Investigation ..... 25

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

The Honorable Henry J. Hyde, a Representative in Congress from the State of Illinois, and Chairman, Committee on International Relations: Prepared statement ..... 3
The Honorable Tom Lantos, a Representative in Congress from the State of California: Material submitted for the record ..... 6
The Honorable Diane E. Watson, a Representative in Congress from the State of California: Prepared statement ..... 13
Vincent Cannistraro: Prepared statement ..... 18
Charles Santos: Prepared statement ..... 23
Oliver "Buck" Revell: Prepared statement ..... 27
The Honorable Gregory W. Meeks, a Representative in Congress from the State of New York: Prepared statement ..... 56
The Honorable Robert Menendez, a Representative in Congress from the State of New Jersey: Prepared statement ..... 66

## APPENDIX

The Honorable Edward R. Royce, a Representative in Congress from the State of California: Prepared statement ..... 69
The Honorable Joseph R. Pitts, a Representative in Congress from the State of Pennsylvania: Prepared statement ..... 69
The Honorable Darrell E. Issa, a Representative in Congress from the State of California: Prepared statement ..... 70

# AL-QAEDA AND THE GLOBAL REACH OF TERRORISM

---

**WEDNESDAY, OCTOBER 3, 2001**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON INTERNATIONAL RELATIONS,
*Washington, DC.*

The Committee met, pursuant to call, at 10:15 a.m. In Room 2172, Rayburn House Office Building, Hon. Henry J. Hyde (Chairman of the Committee) presiding.

Chairman HYDE. The Committee will come to order.

With the September 11 attacks on the United States, the once-distant prospect of terrorism has become an inescapable reality for all Americans. The impact of this assault is greater than the tally of physical destruction, greater even than the tragic loss of life. The images forced into our lives are permanent ones. The realization that human beings are capable of performing such deeds forces us to accept that evil still exists among us, especially in our modern era when many had hoped it might be abolished altogether.

We understand that the challenge before us is a deeply entrenched one, that we face more than a simple emergency. Many have said that we are at the beginning of a new era, one in which our daily lives and routines will be altered significantly.

But what does this mean? Are we now to live in permanent fear in our own country and adopt a defensive crouch as part of our national character? Do we remake our country and communities into fortresses? Must we sacrifice our entire foreign policy agenda in order to address this suddenly urgent problem?

Clearly, such responses are unacceptable to a free people. Even more, they are unnecessary. Without doubt, we are faced with a malevolent and implacable enemy, but we should not let its sudden emergence or its embrace of horror distort our deliberations. We must remember that we have overcome far more powerful enemies in the past, from Nazi Germany and Imperial Japan to the Soviet Union. Thus, it seems to me this latest challenge is well within our capacity to overcome, but only if we are fully committed to the struggle that lies ahead.

As President Bush has correctly stated, terrorism is not a problem that will be solved easily or quickly. We cannot eliminate this threat overnight because it didn't arise overnight. It has taken root in many places, growing steadily as our attention was focused elsewhere, drawing strength from a bottomless reservoir of hatred. Given the nature of the threat, we should not expect quick victories or even a final victory. I have no doubt we will eliminate Osama

bin Laden and the al-Qaeda network, but we should not make the mistake of believing that our battle will then be won.

Let us begin by accepting there is no single enemy to be defeated, no one network to be eliminated. Al-Qaeda is but our most prominent opponent, but its outlook is shared by many others who are equally committed to our destruction. If we believe that our safety can be secured by destroying any one organization or any single person, we will only ensure that we will remain unsafe and unprepared once again. For we know now that we have permanent, mortal enemies who will seize upon our vulnerabilities to bloody us, to murder our citizens, to commit horror for the purpose of forcing horror upon us.

There can be no dispute that we were unprepared for the assault upon us. In retrospect, the warning signs may seem obvious, but there is no person or organization we can saddle with the blame. We as a Nation did not heed them.

We are now moving to correct our failings and to prepare ourselves for the task ahead. Our hopes and prayers are with our men and women in uniform on whose strength and dedication to duty the safety of our country rests, but we cannot place this burden entirely on their shoulders. If we are to be successful, our enemy must be engaged in many areas far from any battlefield, and our efforts must draw upon the energies and resources of the entire country. Our strategy, plans, and actions must be comprehensive, deliberate and formulated for the long-term. We must be prepared not only to protect ourselves from new assaults, not only to intercept and frustrate them, but to eliminate new threats at their source. This must be a permanent campaign, similar to the ancient one humanity has waged against disease and its never-ending assault upon our defenses.

The optimism that is so integral a part the American outlook often leads some to assume an image of the world that is at odds with reality, one that is peaceful and welcoming without effort. I hope that illusion is now gone. In its place should be a new recognition that peace and security exists for us only because we have created them. We have wrested them from an often hostile world, and they will continue only so long as we are prepared to defend them. The world will be safe for us only if we are prepared to make it safe.

America has always triumphed over her enemies, and I have no doubt we will do so again. But to do so, we must cast aside any illusions of an easy victory. We must take up our responsibilities and commit ourselves to fully and completely prosecuting the conflict ahead.

We did not seek this conflict, and we cannot run from it. We have no choice but to take it up and to prevail. We have more at stake than even our own safety and that of our children and grandchildren. For this is a battle for our future and the future of our country.

I would now like to recognize Mr. Lantos for an opening statement. Because of time constraints, I would ask that other Members place their opening statements in the record, except Mr. Gilman who has a statement and anybody who else has a statement.

[The prepared statement of Mr. Hyde follows:]

PREPARED STATEMENT OF THE HONORABLE HENRY J. HYDE, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS, AND CHAIRMAN, COMMITTEE ON INTERNATIONAL RELATIONS

With the September 11 attacks on the United States, the once-distant prospect of terrorism has become an inescapable reality for all Americans. The impact of this assault is greater than the tally of physical destruction, greater even than the tragic loss of life. The images forced into our lives are permanent ones. The realization that human beings are capable of performing such deeds forces us to accept that evil still exists among us, especially in our modern era when many had hoped it might be abolished altogether.

We understand that the challenge before us is a deeply entrenched one, that we face more than a simple emergency. Many have said that we are at the beginning of a new era, one in which our daily lives and routines may be altered significantly.

But what does this mean? Are we now to live in permanent fear in our own country and adopt a defensive crouch as part of our national character? Do we remake our country and our communities into fortresses? Must we sacrifice our entire foreign policy agenda in order to address this suddenly urgent problem?

Clearly, such responses are unacceptable to a free people. Even more, they are unnecessary. Without doubt, we are faced with a malevolent and implacable enemy, but we should not let its sudden emergence or its embrace of horror distort our deliberations. We must remember that we have overcome far more powerful enemies in the past, from Nazi Germany and Imperial Japan to the Soviet Union. Thus, it seems to me that this latest challenge is well within our capacity to overcome, but only if we are fully committed to the struggle that lies before us.

As President Bush has correctly stated, terrorism is not a problem that will be solved easily or quickly. We cannot eliminate this threat overnight because it did not arise overnight. It has taken root in many places, growing steadily as our attention was focused elsewhere, drawing strength from a bottomless reservoir of hatred. Given the nature of the threat, we should not expect quick victories or even a final victory. I have no doubt that we will eliminate Osama bin Laden and the al-Qaeda network, but we should not make the mistake of believing that our battle would then be won.

Let us begin by accepting that there is no single enemy to be defeated, no one network to be eliminated. Al-Qaeda is but our most prominent opponent, but its outlook is shared by many others who are equally committed to our destruction. If we believe that our safety can be secured by destroying any one organization or any single person, we will only ensure that we will remain unsafe and unprepared once again. For we now know that we have permanent, mortal enemies who will seize upon our vulnerabilities to bloody us, to murder our citizens, to commit horror for the purpose of forcing horror upon us.

There can be no dispute that we were unprepared for the assault upon us. In retrospect, the warning signs may seem obvious, but there is no person or organization we can saddle with the blame. We as a nation did not heed them.

We are now moving to correct our failings and to prepare ourselves for the task ahead. Our hopes and prayers are with our men and women in uniform on whose strength and dedication to duty the safety of our country rests, but we cannot place this burden entirely on their shoulders. If we are to be successful, our enemy must be engaged in many areas far from any battlefield, and our efforts must draw upon the energies and resources of our entire country. Our strategy, plans, and actions must be comprehensive, deliberate, and formulated for the long-term. We must be prepared not only to protect ourselves from new assaults, not only to intercept and frustrate them, but to eliminate new threats at their source. This must be a permanent campaign, similar to the ancient one humanity has waged against disease and its neverending assault on our defenses.

The optimism that is so integral a part of the American outlook often leads some to assume an image of the world that is at odds with reality, one that is peaceful and welcoming without effort. I hope that illusion is now gone. In its place should be a new recognition that peace and security exist for us only because we have created them. We have wrested them from an often hostile world, and they will continue only so long as we are prepared to defend them. The world will be safe for us only if we are prepared to make it safe.

America has always triumphed over her enemies. I have no doubt that we will do so again. But to do so, we must cast aside any illusions of an easy victory, we must take up our responsibilities, and commit ourselves to fully and completely prosecuting the conflict ahead.

We did not seek this conflict, and we cannot run from it. We have no choice but to take it up and to prevail. We have more at stake than even our own safety and

that of our children and grandchildren. For this is a battle for our future and for the future of our country.

I would now like to recognize Mr. Lantos for an opening statement. [Because of time constraints, I would ask that other members place their opening statements in the record]. And then we will turn to our witnesses and what I expect will be their very enlightening testimony.

Ms. MCKINNEY. I have a statement, Mr. Chairman.

Chairman HYDE. Of course. We will hear all statements.

Mr. LANTOS. Thank you, Mr. Chairman.

Let me first identify myself with your excellent opening statement. In the last 3 weeks, bipartisanship has permeated this city. Let the record show that on the House International Relations Committee bipartisanship was the order of the day since the very first day of this congressional session, and it will continue to be.

Mr. Chairman, I want to thank you for holding this hearing. Winning the war on terrorism requires that we in Congress devote our full and undivided attention to this daunting endeavor. To this end, I believe that our Committee must play a key role and I urge you to follow this hearing up with a series of others devoted to this topic.

Mr. Chairman, the war on terrorism will be nasty, brutish and anything but short. It has already involved some 6,000 American casualties, and it will involve many more. It attacks our strength, our intelligence, our patience and our commitment. But, in the end, I have no doubt that the American people are prepared to bear the costs of this campaign; and I am supremely confident that the United States, joined by our true friends, will prevail.

I declare, Mr. Chairman, that we must wage the war against terrorism in a sequential fashion. First, we must find and destroy the terrorists that perpetrated September 11; and, in this regard, I urge the Administration not only to target Osama bin Laden and his al-Qaeda organization but the Taliban as well. The Taliban has chosen to be on the side of the terrorists, and they have chosen to share their fate.

At the same time, Mr. Chairman, we must recognize that defeating all terrorist organizations of global reach is an indispensable component of the struggle. As the President said in his address to our joint session 2 weeks ago, and I quote,

> "Our war on terror begins with al-Qaeda, but it does not end there. It will not end until every terrorist group of global reach has been found, stopped and defeated."

In this connection, Mr. Chairman, I would like to place in the record from *The Washington Post* this morning an excellent article by Jim Hoagland on terrorism. This article, among others, points out the risk of building what appear like coalitions.

Let me quote:

> "The first risk of building a broad strategic coalition is that the construction becomes an end in itself, that photos of parades of foreign ministers shaking hands and expressing sympathy get defined as success and overtake effective action as the ultimate goal."

He goes on to say that,

> "American policy will now drift into incoherence if it continues to aim at assembling the broadest possible coalition and co-operating seriously with regimes that are broken beyond repair. With us or against us, the American President warned the world 2 weeks ago. Others will believe those words only if Mr. Bush shows he meant them."

In this connection, Mr. Chairman, I would like to place in the record a letter to Secretary Powell by our former Speaker Newt Gingrich.

Newt Gingrich calls on Mr. Powell and the President to include both Hamas and Hezbollah in the list of international terrorist organizations, since, I quote, "both groups publicly embrace and exalt suicide bombers who kill innocent civilians and are symbols of terrorist violence."

Now a great deal has been made of the fact that during the Second World War we made common cause with Stalin against Hitler. We did that, Mr. Chairman, but not as long as Stalin was in co-operation with Hitler. And I think it is extremely important that organizations which have engaged in terrorist activities must cease and desist all of these activities before they can be considered as part of an effort to engage in this global struggle.

The Congress and the American people are prepared to trust the President with extraordinary powers during these extraordinary times. I urge the Administration to remain true to the principles it has set forth in the President's address to our joint session and not falter in this fight. We cannot compromise our principles. We cannot pretend that we do not see terrorist organizations for what they are. We must not sweep the ugly truth under the rug. There are no good terrorists and bad terrorists. There are terrorist organizations and in a sequential fashion they must and will all be defeated.

Thank you, Mr. Chairman.

Chairman HYDE. Mr. Gilman.

Mr. GILMAN. Thank you, Mr. Chairman. And I want to thank the Chairman for conducting this hearing in a timely manner and for your very erudite statement at the opening of the hearing.

The panel that has been assembled here cannot be more distinguished and more——

Chairman HYDE. Excuse me, Mr. Gilman.

Without objection, the article by Mr. Hoagland and the letter referred to by Mr. Lantos will be made a part of the record.

Mr. LANTOS. Thank you.

[The information referred to follows:]

6

Copyright 2001 The Washington Post
The Washington Post

October 03, 2001, Wednesday, Final Edition

SECTION: EDITORIAL; Pg. A31

LENGTH: 785 words

HEADLINE: An Ally's Terrorism

BYLINE: Jim Hoagland

BODY:

Improvised in the horror and shock of the Sept. 11 terror attacks on America, the Bush administration's initial diplomatic strategy bought valuable time and space for the more serious and sustained response to come. So let us praise that strategy and prepare to bury it as soon as its limited utility is exhausted.

Napoleon warned that nothing lasts as long as the temporary. The first risk of building a broad strategic coalition is that the construction becomes an end in itself -- that photos of parades of foreign ministers shaking hands and expressing sympathy get defined as success and overtake effective action as the ultimate goal. That is a temptation President Bush and Secretary of State Colin Powell should resist without great trouble. Less obvious but equally dangerous are the future risks involved in reaching out too broadly now -- the long-term peril of recruiting and rewarding nations that do not share U.S. values and interests. Some countries sign up primarily to stall and limit U.S. action, not to facilitate it.

There's the rub of the coalition Bush and Powell have assembled in all necessary haste. They have recruited to fight terrorism regimes that practice or tolerate terrorism as a matter of policy. The inclusion of such states at the center of the coalition undermines the sweeping and noble war aims enunciated by Bush, who has promised not to divide terrorists into bad and good camps.

The difficulties of keeping that promise -- and the huge stakes this still-developing

campaign has for South Asia -- were blasted home Monday by a car bomb and guerrilla assault that wrecked the state assembly in Srinagar in Indian-administered Kashmir. At least 38 persons were killed in a gruesome attack on a building that, for Kashmir inhabitants, matches the Pentagon and the World Trade Center in symbolic value.

You would think the radical Islamic guerrillas who claimed responsibility for Monday's attack -- the Pakistani-based Jaish-e-Muhammed group -- might deserve to be at least called terrorists. India implored the United States to put the group on its terrorist list for earlier outrages. But Washington declined out of fear that such action would undermine the regime of Gen. Pervez Musharraf and complicate U.S. diplomatic goals.

This is diplomacy without vision and without the roots needed for a long, difficult struggle against terrorism. It is delusional to think that the United States can reform the Musharraf regime or elements in the Taliban regime in neighboring Afghanistan into responsible partners to fight terrorism.

This is the lure of the quick fix. Previous administrations pursued it in building up Saddam Hussein to protect the Arab world against Iran, in counting on the Iraqi army to take care of Saddam in the wake of the Gulf War, in betting that Mikhail Gorbachev's reform communism could keep the Soviet Union together and in dozens of other instances of short-termism.

Washington knows full well that Pakistan actively supports Jaish-e-Muhammed and other guerrilla organizations that see terror as the only effective tool they have against India. Members of these groups freely tell Western journalists that they have trained in camps in Afghanistan run by Pakistani intelligence services and then been deployed into Kashmir. These terrorists are creatures of Musharraf and the Taliban and soulmates of Osama bin Laden.

Theoretically it should be possible to set them against each other. But Musharraf sees the Taliban's opponents in the Northern Alliance as agents of India working for his mortal foes. Survival for him means seeming to go along with U.S. goals while making sure they do not actually get carried out. As a bonus, stroking Musharraf so openly makes the stronger relationship Washington should be creating with India more difficult.

American cooperation with Stalin in World War II is frequently cited as an example of the necessity of dealing with the devil in times of crisis. But the United States did not make the Soviet Union a strategic ally while Stalin was still cooperating with Hitler. There has yet to be a serious tangible act by Pakistan to break its alliance with terror and earn the kind of trust the administration has ostensibly extended.

Short-term goals of initial positioning, both military and political, have largely been met. American policy will now drift into incoherence if it continues to aim at assembling the broadest possible coalition and cooperating seriously with regimes that are broken beyond repair.

8

Mr. GILMAN. This panel that we have assembled cannot be more distinguished and more expert in their appropriate areas. Of course, there is no way to turn the clock back at this time. We can rebuild buildings, but the nearly 6,000 who lost their lives in the September 11 attacks cannot be brought back to life. Their families cannot be put back together. In my congressional district, I have 98 families who have lost close members of their family, creating a devastating impact upon them.

The September 11 barbaric attacks demonstrate clearly that terrorism is not just a part of modern life. It is just not a cost of doing business for the world's only remaining superpower. It cannot be just factored into our foreign policy as just another problem. Terrorism is indeed a threat to our Nation's security and to the security of nations throughout the world.

September 11 and other attacks similar to it affect our way of life, our economy, our perceptions of safety, our collective national psyche and our whole national fabric. Certainly we should have been able to have seen this attack coming. With all the resources that our Government has, looking at Osama bin Laden and his terrorist network, especially since the August, 1998, bombings of our two embassies in Africa, the former bombing in the World Trade Center, it is almost beyond belief how this plot could have been missed.

Clearly, some in the Government believe that bin Laden was in a box, unable to communicate with his followers in over 60 countries. Those assertions were sadly mistaken, and on September 11 that was demonstrated. At some point, we will need to consider why anyone in our Government ever believed those assertions.

Of course, we cannot turn the clock back, but we can ourselves work to make certain that nothing of this nature ever happens again. I welcome the comments of our witnesses of what can and should be done to this threat. It is hoped that at this hearing they can bring some clarity to what should be the objectives of our U.S. response to the September 11 attacks.

I ask our panelists to consider some of the following questions:

Should our objective be narrow, to decapitate the bin Laden network leadership network in Afghanistan, while avoiding being punitive toward the Afghan people? Or should the objective be broader, to take down the Taliban regime itself as a signal to other state sponsors that they will lose their regimes if they harbor such groups as bin Laden's? And would that signal be appropriately understood or is the Taliban regime so weak that the lesson will not be absorbed by other regimes such as Iran?

Is one name contingent on the other? Can we get bin Laden and his top lieutenants without first changing the regime in Afghanistan? Alternatively, is there some combination of U.S. military or covert action that might compel the Taliban to hand over bin Laden?

Perhaps an even broader question is whether the dismantling of bin Laden's top echelons will result in the kind of response we are seeking. Does the answer not lie in better law enforcement cooperation among the 60 or so countries where these networks operate? Will going to the source in Afghanistan eliminate the threat for the network? And then what other states are harboring al-Qaeda?

Let me also say something about rewarding terror. Especially where democratic governments and our friends are under pressure, we cannot take any actions or begin to contemplate any actions which would give the impression of rewarding terror or encouraging others to reward terror. If someone must make peace with the terrorists, if they can trust the change in someone else's heart, that must be for them to decide, not for us.

So let me be explicit.

Chairman HYDE. The gentleman's time has expired.

Mr. GILMAN. I am about to close. With your indulgence, Mr. Chairman, just 30 seconds.

As to Mr. Arafat, who used violence against innocents, terror to advance his political goals, only the Government of Israel, which is politically responsible in a democratic way to the potential victims of terror, can decide if he is worthy of trust.

Accordingly, we face a set of difficult issues as we try to determine how to respond to the September 11 disasters, and we look forward to the assessments by our witnesses.

Thank you, Mr. Chairman.

Chairman HYDE. Mr. Ackerman?

Mr. ACKERMAN. Mr. Chairman, I will pass, unless provoked.

Chairman HYDE. Please don't provoke Mr. Ackerman.

Mr. Royce?

Mr. ROYCE. I will pass.

Chairman HYDE. God love you, Mr. Royce.

Ms. McKinney from Georgia.

Ms. MCKINNEY. Thank you, Mr. Chairman. I would ask if I could have Mr. Ackerman's and Mr. Royce's time.

Mr. ROYCE. Reclaiming my time, Mr. Chairman. I am afraid I have been provoked.

Chairman HYDE. The gentlelady is recognized for 5 minutes.

Ms. MCKINNEY. Thank you, Mr. Chairman.

I would like to congratulate you for having this important hearing on the global reach of terrorism.

I also would like to take this opportunity to make a recommendation that we have another hearing on a topic that I feel is vitally important. That is the issue of domestic terrorism. Domestic terrorism is probably a more widespread worldwide phenomenon than international terrorism. But because international terrorism has had a direct impact on U.S. interests, it is the primary focus of intelligence and defense agencies.

As we all learned to our horror on September 11th, no nation is immune from the manifestations of hatred and rage that comes from other parts of the world. But what about the terror that originates from sources that are purely domestic in nature? In the last decade or so, we have seen a rise in anti-U.S. Government sentiments, anti-Government from the standpoint of militia groups, the Aryan Nation, white supremists, skinheads, the KKK. In the Oklahoma City bombing in which 169 died, the two who were responsible for the crime, Timothy McVeigh and Terry Nichols, were both affiliated with right-wing militia movements.

In 1996, a pipe bomb exploded at Centennial Olympic Park in Atlanta, Georgia, killing two people and injuring more than 100 others. The FBI said that the pipe bomb looked homemade, with nails

and screws attached. They suspected domestic terrorists. Even after a $500,000 reward was offered, there still has been no breakthrough in the Atlanta Olympic bombing case.

Violent protests in the form of arson, fire bombing and vandalism against abortion clinics started in the early 1970s in the United States. Recent cases involving the assassination and attempted murder of abortion providers in both the U.S. and Canada have shown that perpetrators may be sheltered by a network of sympathizers.

What about the victimization of gays and lesbians based upon their sexual orientation, which includes harassment, vandalism, robbery, assault, rape and even murder? Shouldn't this be considered terrorism as well?

Well, according to Title 22 of the U.S. Code, it is considered terrorism. That statute contains the following definitions: The term terrorism means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents usually intended to influence an audience. The term terrorist group means any group practicing or that has significant subgroups that practice international terrorism.

The U.S. Government has employed this definition since 1983. COINTELPRO was the FBI's secret program and arguably would fall under Article 22 of this definition of terrorism.

The FBI and other Federal agencies set out to eliminate political opposition inside the United States. When traditional modes of repression, exposure, blatant harassment and prosecution for political crimes failed to counter the growing insurgency and even helped to fuel it, the Bureau of Investigation took the law into its own hands and secretly used fraud and force to sabotage constitutionally protected political activity.

It is our patriotic duty to continue to examine our own history and search for improvements in our policies even in this difficult time. We will win the battle against terrorism all the more quickly for doing so and establish development of justice with a global reach.

I have offered a bill to allow victims of the September 11 attacks to seek compensation through U.S. courts from whatever nations may have sponsored these attacks. Victims and their families already have the right to seek restitution from nations on the State Department's countries of concern list, namely Cuba, Iraq, Iran, Syria, North Korea, Libya and Sudan. However, if a terrorist activity is sponsored by a state that is not on this list, as appears to be the case with regard to September 11, the victims have no opportunity to seek compensation through U.S. courts. H.R. 2947 would correct that by permitting U.S. citizens to seek justice from any country that propagates or sponsors terrorist activity.

We cannot selectively use the term terrorism nor can we or should we protect nations that harm or support terrorism. Tragically, experience has shown us that American citizens are in great danger in many parts of the world. The current list of seven nations as state sponsors of terrorism is proving inadequate and needs to be expanded to include the right for U.S. citizens to seek redress against any and all nations that harm them.

Chairman HYDE. The gentlelady's time has expired.

Ms. MCKINNEY. Thank you, Mr. Chairman.

We need to study terrorism and understand it and eliminate it from the face of the earth.

Chairman HYDE. The gentleman from New Jersey, Mr. Smith.

Mr. SMITH OF NEW JERSEY. I, too, will put my statement in the record [no statement submitted for the record]; and I hope other Members—there are at least an hour's worth of opening statements still remaining. We have three very distinguished witnesses that I am looking forward to hearing from, and I would hope that other Members would take your admonition in the beginning and put their statements into the record.

Chairman HYDE. The Chair thanks Mr. Smith.

Mr. Sherman of California.

Mr. SHERMAN. Thank you, Mr. Chairman. I will be brief.

There are 6 billion people on this planet and a few will want to kill Americans because, as the *National Review* states, we are resented for our power, envied for our wealth and hated for our liberty. Since we cannot control all 6 billion people, we must instead focus on a foreign policy that puts the responsibility on the roughly 200 governments on this planet that we can hold responsible.

Homeland security is important. But just as no hockey goalie can stop every shot, if we had a perfect homeland security system but we still allowed terrorist groups to organize these attacks, some of those attacks would be successful. It is also not enough to go after just the terrorist groups, because new terrorist groups can spring up.

As I mentioned, there are 6 billion people on the planet and a tiny percentage hate us. Therefore, we must go after the Taliban not only because of justice—they have been coconspirators in the death of 7,000 Americans—but also to set example for other regimes.

Finally, Mr. Chairman, we cannot and dare not change our foreign policy, because to placate Mr. bin Laden and his gang is impossible. They want nothing less than to turn the entire world into a giant Afghanistan. To placate them is dishonorable. Because when Pearl Harbor was attacked, we sought not peace but victory. And, in this case, we have faced three times as many American casualties.

But finally, Mr. Chairman, if we change our policy in this instance, we simply whet the appetite of those who want to change the policies of the world's only superpower toward Kosovo or Sri Lanka, Taiwan or Sumatra. The list goes on and on. If it ever becomes known that by killing Americans one can change the policy of the world's only superpower, then this is just the beginning.

I look forward to this Committee working toward an effective way of setting an example with the Taliban regime. Thank you.

Chairman HYDE. Ms. Ros-Lehtinen of Florida.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Chairman.

It has been repeatedly said that the United States lost our innocence on Tuesday, September 11. The sense of security and stability that stemmed from being the Cold War victor and global superpower was destroyed in less than an hour—the span of time between the attack on the first tower of the World Trade Center and that on the second tower and then later the Pentagon.

In this brief moment in history, the United States and the American people realize that anything and everything is possible. We now fully understand that terrorists have no boundaries and no sense of remorse. Terrorists place no value on human life. As the September 11 attacks taught us, no country or no target is immune from this cancer.

To terrorists, any means is justifiable. Suddenly, the warnings and analysis by experts on the potential use of chemical and biological weapons and potential for nuclear terrorism were no longer viewed as abstract arguments or action film plots. Suddenly, nuclear-related terrorism became a vivid and very real threat.

The Subcommittee which I chair will be holding a hearing at 1 o'clock today in this same room on nuclear terrorism and on the International Atomic Energy Agency. We will work to ensure that the physical protection of nuclear materials and countering the illicit trafficking in these radioactive elements is underscored.

Secretary of Energy Spencer Abraham said we know that our security and that of nations around the world largely depends upon what this agency does to prevent the proliferation and misuse of nuclear materials. We cannot assume that tomorrow's terrorists' acts will mirror those we have just experienced, and that is why the work of the International Atomic Energy Agency is so pivotal.

How real or imminent is the threat of nuclear-related terrorism? We will be discussing these topics today, and I hope that some of the audience will be with us later on today at 1 o'clock.

I thank the Chair.

Chairman HYDE. I thank the gentlelady.

Mr. Jim Davis of Florida.

Mr. DAVIS. I pass.

Chairman HYDE. Thank you, Mr. Davis.

Mr. Schiff of California.

Mr. SCHIFF. Mr. Chairman, in the interest of getting to our witnesses, I will pass as well.

Chairman HYDE. Thank you, Mr. Schiff.

Mr. Meeks of New York. Not here.

Mr. Berman of California.

Mr. BERMAN. Pass.

Chairman HYDE. Ms. Watson.

Ms. WATSON. Mr. Chairman, I would like to submit my statement for the record. I pass.

Chairman HYDE. The Chair thanks you. Without objection, it shall be received.

[The prepared statement of Ms. Watson follows:]

PREPARED STATEMENT OF THE HONORABLE DIANE E. WATSON, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA

Mr. Chairman, I want to thank you and the Ranking Minority Member, Mr. Lantos, for holding this important and timely hearing. The events of September 11 have forever demonstrated that our homeland is not invulnerable to attack from the outside. More direct attacks on American citizens on American soil are, sadly, likely in the future. We now must prepare ourselves to deal with this reality.

In the face of this new threat, our nation does not have a comprehensive, integrated plan and government structures in place to respond effectively to homeland terrorist attacks. The President has recommended the creation of a cabinet level Office of Homeland Security. The effectiveness of this new office will be predicated on the power and authority that the Congress and President vest in it. Perhaps most

critical to the success or failure of a comprehensive homeland security policy is our willingness to engage in an honest reexamination of the role and effectiveness of our government structures and military doctrine in the post Cold War world.

It is therefore my hope that this hearing, besides providing us with important information on Al Qaeda and international terrorism, will commence the public dialog on how our nation can best begin to reallocate its resources to meet the new challenges.

Chairman HYDE. Mr. Tancredo is not here.

Mr. Kerns is not here.

Mr. Burton of Indiana.

Mr. BURTON. Mr. Burton passes, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Burton.

Mr. Nick Smith of Michigan.

Mr. SMITH OF MICHIGAN. Mr. Chairman, just very briefly. I and 10 other Members of a congressional delegation just returned from a trip to Moscow, Russia and to Turkey and Rome, to meet with the former King Shah.

One issue that concerns me is that one of the chief sources of terrorism is the radical religious schools in Pakistan and in Afghanistan that often take on orphans and young boys to indoctrinate and, if you will, brainwash over several years. So I hope we can get the comments from the witnesses today on that issue.

Certainly, the CIA and other intelligence agencies seem to have adopted an excessively defensive attitude toward terrorist activity, and I hope we learn today what is being done to improve our operations and focus more on disrupting terrorist activities in addition to simply attempting to defend our country.

I hope that you will relate to where we go from here on the Church Commission and the CIA's evident decision not to get information from those individuals that have or might conduct human rights.

Thank you, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Smith.

The gentleman from Indiana, Mr. Kerns.

Mr. KERNS. Thank you, Mr. Chairman; and thank you for calling this important hearing. I am looking forward to hearing from our panelists and the important information.

Also, I would like to say I was one of those travelling to Turkey, Italy and to Russia recently. We learned very valuable information, meeting with the King of Afghanistan and the leaders of the United Front and actually going over a map of some of the things where the United States can be helpful.

I am also happy to report we are not in this fight against terrorism alone, and we also recognize it is going to take our friends and help from many.

But, with that, Mr. Chairman, I look forward to hearing from our witnesses; and thank you again for calling this hearing.

Chairman HYDE. Thank the gentleman.

Mr. Cooksey, you have been passed over. Do you want an opening statement?

Mr. COOKSEY. No, Mr. Chairman.

Chairman HYDE. Mr. Rohrabacher.

Mr. ROHRABACHER. Thank you, Mr. Chairman. I will try to be brief.

America has witnessed a ruthless slaughter of our fellow citizens, and we need—and I say we—we in Congress and this Committee—need to hold those who are responsible for this slaughter accountable. And of course bin Laden is responsible. Of course, the Taliban have their fingerprints all over this crime. But we also need to make sure that we hold accountable those people in our State Department and our intelligence agencies who did not do their job in providing policies and providing information that were necessary for the protection of our citizens.

We cannot just sit back and blame the terrorists for being terrorists but not hold accountable those people in our Government who were incompetent in fulfilling their responsibilities. They, too, must share the burden of blame for this horrible atrocity that has been committed against honest American citizens who were just going about their lives.

Now I understand that some of the people, who I believe had advocated incompetent policies over these last 5 years in relationship to the Taliban, are suggesting that we have a policy that in some way might leave the Taliban in power. Well, I would hope that our President has more common sense than this. Because some of these very same folks were the ones who suggested to his father that we keep Saddam Hussein alive and that he would crumble on his own after we left that last conflict in Iraq so many years ago. Well, of course, we know what their advice is worth when it came to Saddam Hussein. If we leave the Taliban in power now, it will be a horrible signal to any government around this world that may or may not choose to give aid or to harbor terrorists in the future.

This is a very serious issue. The Taliban must go. Bin Laden must die. We are saying this not because we seek revenge but because we want to deter people in the future, terrorists and governments, from doing things that will result in the slaughter of innocent people, especially Americans.

So today I am looking forward to hearing the testimony. I know two of the witnesses very well. Vince and I worked in the White House together when he was deeply involved in the Afghan issue—and Vince, I remember going to your office on many occasions talking about this. And Mr. Santos and I have worked in recent years very often.

I want to thank you for holding this hearing. We do have some very expert witnesses today. But let us not heed the advice of people who in some way have to bear some responsibility, whose incompetence caused this slaughter in the first place, who are suggesting now that we hold back and that we in some way don't finish this job in the first stage. The first stage of fighting terrorism, if we are going to have the rest of the stage successful, is bin Laden dead and the Taliban out.

Chairman HYDE. Mr. Delahunt.

Mr. DELAHUNT. Mr. Chairman, I would like to yield some of my 5 minutes to one of the witnesses. I don't know if that is appropriate.

Chairman HYDE. It certainly is. We thank the gentleman.

That will conclude the statements, and I appreciate the cooperation of the Committee. I would like to welcome our panel of distinguished witnesses.

Mr. Vincent Cannistraro is a former Chief of Operations and Analysis at the CIA's Counterterrorism Center from October 1988 to November 1990. Prior to this, he worked at the Department of Defense where he was Special Assistant for Intelligence in the Office of the Secretary of Defense; and from November 1984 to January 1987, he was Director of Intelligence Programs at the National Security Council under President Reagan. Mr. Cannistraro is also a consultant on intelligence and international security affairs for ABC World News with Peter Jennings.

Charles Santos was a special assistant to Diego Cordovez, United Nations Under Secretary General for Special Political Military Affairs in the late 1980s, who negotiated the Soviet withdrawal from Afghanistan. He was responsible for Afghan internal political issues dealing with the different Afghan factions, and in the mid-1990s he helped to establish the United Nations Special Mission to Afghanistan and was its first Political Advisor and Deputy to its head. He is currently a partner at SBS Associates, LLC, an energy consulting and marketing firm in New York.

Mr. Oliver Revell is the Founder and President of Revell Group International, a global business and security consulting firm based in Dallas County, Texas. On November 16, 1964, Mr. Revell was appointed a Special Agent of the FBI. In January 1975, he was promoted to Assistant Special Agent in Charge of the Chicago Division and later served as Acting Special Agent in Charge. In June 1980, he was promoted to Assistant Director and placed in charge of the Criminal Investigative Division, making him responsible for the criminal investigative and counter-terrorism programs and operations of the FBI. He served as the Director's deputy in charge of the FBI's Criminal Investigative, Counter-Terrorism and Counter-Intelligence programs. He has been interviewed or served as a commentator on numerous national television and commentary programs.

We are very honored to have you three appear before the Committee today. If we could request gently a 5-minute summary of your statement, we promise to insert your statement in full in the record, and that will leave time for some questions.

So we will begin with you, Mr. Cannistraro.

**STATEMENT OF VINCENT CANNISTRARO, FORMER CHIEF OF COUNTERTERRORISM OPERATIONS, CENTRAL INTELLIGENCE AGENCY**

Mr. CANNISTRARO. Thank you, Mr. Chairman.

It is very difficult for Americans to understand the nature of extremist organizations with the religious orientation such as al-Qaeda, but we have to understand and comprehend it if we are to confront the threat itself.

Religious fundamentalists are domestic as well as international. An analogy might be Christian Identity, a white supremist group that has carried out killings and assassinations in the United States. Unless we know what drives these religious extremists, who are willing to kill themselves in the performance of their violent acts, we will see other days like September 11, perhaps with even greater casualties.

It is worth studying the evolution of the al-Qaeda group. Bin Laden, who opposes the American influence in the Middle East, was outraged by the Persian Gulf War which saw American and other western troops stationed in Saudi Arabia, his home country. He considers that country, ruled by the al-Sau'd family, as the guardian of the Islamic holy places. King Abd'al aziz al-Sau'd, who founded the kingdom, had the support of the Wahabis, a fundamentalist Islamic sect that prevails in Saudi Arabia itself. The monarchy drives its authority from the Wahabis. In return, the monarchy guarantees the sanctity of the holy places.

In bin Laden's view, the Saudi monarchy betrayed that sacred pact by allowing Christian and Jewish soldiers to be stationed on the soil of this country during the Gulf War. Bin Laden opposed the monarchy in 1991 and was expelled from the country by Saudi intelligence. He then moved to the Sudan where he began organized training camps for Islamic activists from almost every major Islamic country.

The mission was to train these fighters and to send them back to their native lands to fight and promote insurgency against the secular Arab regimes and replace them with religious governments based on Sharia, Islamic law. The targets were countries such as Egypt and Algeria and Muslim dominated provinces such as Chechnya and Dagestan in Russia, and in Bosnia and Kosovo. Even movements in Libya against Khadafi were promoted by Islamic activists trained in bin Laden's camps in the Sudan.

We have to understand what bin Laden is trying to do. He believes in the restoration of an Ottoman Empire, but this time based opon Islam. An "Islamic Caliphate" to be re-established under the leadership of the Taliban leader Mullah Omar. Osama sees the United States and its world influence as the principal obstacle to achieving his vision.

In 1996, he moved lock, stock and barrel to Afghanistan after pressure by the Governments of Saudi Arabia, the United States and Egypt. He aligned himself with the Taliban, a group of religious students who were trained in Pakistani schools. They were then sent back into Afghanistan by the Pakistani government's military intelligence service, Interservices Directorate (ISI), in order to promote ethnic Pashtun control over Afghanistan, which had been suffering tribal conflict among various groups, particularly Tajik and Uzbek.

The Pashtuns—we say Pathuns in common American usage—designates about a dozen separate tribes on both sides of the Afghan-Pakistani border. The Taliban, as we know, is almost medieval in its concept of governance. Rulers from the Taliban have mismanaged the country and promoted starvation and human rights abuses against their own population. Pakistan has allowed bin Laden really to exist in Afghanistan by contributing to the defense of some of his training camps, which are used as schools to train Kashmiri terrorists who then go back into Kashmir and fight that war there.

They don't have clean hands here. The Northern Alliance, of course, which had up until a few weeks ago 7 percent of the territory, is dominated by ethnic Tajik and Uzbek, which the Pakistanis, of course, opposed. About 3 weeks ago, the leader of the

Northern Alliance, Ahmad Shah Massud, was assassinated by bin Laden's operatives. He did it for Mullah Omar.

The bonds between Mullah Omar and Osama bin Laden are bonds of blood. Bin Laden has offered "bayat," an Arabic word meaning an offering of submission to his will and his leadership. Bin Laden recently declared Taliban-ruled Afghanistan as the "new Mecca" and Mullah Omar as the new caliph. Bin Laden's fighters are intertwined with the Taliban, and any effort to remove bin Laden from Afghanistan by necessity means the removal of Mullah Omar in the inner core of the Taliban leadership.

What is al-Qaeda? Al-Qaeda means the "base," or the "foundation." Bin Laden doesn't talk about all of his networks around the world as al-Qaeda. He uses that to refer to his inner circle.

Mr. Chairman, I see I have gone over my 5 minutes, so I will sum up very quickly.

For the past 4 years, bin Laden has fought, with the Taliban military, against the Northern Alliance. He lost his own son in fighting against the Northern Alliance. So it is clear that, without the Taliban, bin Laden could not exist. Removing him means removing the Taliban.

I will conclude here, Mr. Chairman, because I will go on for a couple of hours if you let me.

Chairman HYDE. Well, perhaps during the questioning these other points will come out.

[The prepared statement of Mr. Cannistraro follows:]

PREPARED STATEMENT OF VINCENT CANNISTRARO, FORMER CHIEF OF COUNTERTERRORISM OPERATIONS, CENTRAL INTELLIGENCE AGENCY

I am pleased to appear before this committee to provide my views on al-Qaeda, its structure and its objectives. It is important to note that Americans have a difficult time in understanding extremist organizations with a religious orientation like al-Qaeda. It is essential that the agencies of our government involved in law enforcement and intelligence become intimately familiar with the culture of religious zealots whether of foreign or domestic origin. We must understand the nature of the threat before we can successfully confront it. In America, we also have fundamentalists such as Christian Identity, and other religious extremists who kill or maim in the name of God. Comprehending the danger and the mind-set of these groups is a first step to deterring the violence executed by the Osama Bin Laden's of the world. Unless we know what drives these religious extremists, who are willing to kill themselves in the performance of their violent acts, we will see days like September 11, 2001, repeated, perhaps with even greater casualties.

It is worth studying the evolution of the al-Qaeda group. Bin Laden, who opposes the American influence in the Middle East, was outraged by the 1990 Persian Gulf War which saw American and other western troops stationed in Saudi Arabia. Bin Laden considers the country, ruled by the Al-Sau'd family, as the guardian of the Islamic holy places. King Abd'al aziz al-Sau'd, who founded the monarchy, had the support of the Wahabis, the fundamentalist Islamic sect. The al-Sau'd monarchy derives its authority from the Wahabis, who allied with Abd'al aziz, in creating modern Saudi Arabia. In return, the monarchy serves to guarantee the sanctity of Mecca and Medina, the site and magnetic pole for pilgrimages by the world's Muslims. In Bin Laden's view, the Saudi monarchy betrayed that sacred pact by allowing Christian and Jewish soldiers to be stationed on the soil of this Islamic country which had been entrusted with a special protectorate mission for the holy places. Bin Laden's opposition to the monarch resulted in his expulsion from the Kingdom. Shortly after, Bin Laden used his personal fortune and continuing contributions from wealthy Islamic businessmen in Saudi and the Gulf to organize training camps in the Sudan for Islamic activists from every major Islamic country. These contributions, plus revenues from Islamic Charity fronts, such as the International Islamic Relief Organization, headed by Bin Laden's brother-in-law, as well as numerous other charitable fronts, continue to fuel his group today

The international cadres that comprise many of the networks associated with al-Qaeda, were trained by so-called "Arab-Afghans" with fighting experience from the Soviet-Afghan war, although many of these "mujahedin" did not reach Afghanistan until after the Soviet withdrawal in 1989. The main mission for Bin Laden was to disperse trained fighters to their native lands to fight against the secular Arab regimes and replace them with religious governments based on the Sharia-Islamic rather than civil law. The targets were secular Muslim countries such as Egypt and Algeria, and Muslim dominated provinces such as Chechnya and Dagestan in Russia and in Bosnia and Kosovo. Anti-government movements were also promoted in Libya and Tunisia as well. Indeed, Bin Laden's vision is to re-establish the "Islamic Caliphate" across every Muslim country, a religious restoration of the old Ottoman Empire, this time under the leadership of the Taliban leader, Mullah Omar. Usama sees the United States and its world influence as the principal obstacle to achieving his vision.

Bin Laden relocated his operations to Afghanistan following pressure on the Sudan exerted by Saudi Arabia and the U.S. The Taliban, a group of religious students from Pakistani schools, were successful in establishing control over Afghanistan with the active military support of Pakistan's military intelligence service, the Inter Services Directorate (ISI). Pakistan's concern was to promote ethnic Pashtun control over the country, which was being run by Afghans hostile to Pashtun rule and Pakistani influence. The Pashtuns, or Pathans in common western usage, designates several dozen separate tribes on both sides of the Afghan/Pakistani border. The Taliban, lacking a secular education, is almost medieval in its concept of governance. The Taliban rulers have mismanaged the country, but have been amenable to Pakistani political influence although not totally subservient to it. Pakistan has also used its position and support to the Taliban to establish within Afghanistan a series of training camps for Kashmiri terrorists. ISI personnel are present, in mufti, to conduct the training. This arrangement allowed Pakistan "plausible denial" that it is promoting insurgency in Kashmir. Pakistan also provisioned the Taliban with weapons to fight the "Northern Alliance" which contests Taliban control over the country and had until recently about 7% of Afghan territory, mostly north of Kabul and in the Panshir. The Northern Alliance, while including some Pashtuns, has been commanded by Ahmad Shah Massud, an ethnic Tajik. About three weeks ago, Massud was assassinated by suicide bombers identified as part of Bin Laden's group.

The bonds between Mullah Omar, and Usama Bin Laden, are bonds of blood and Bin Laden has offered "bayat" to Mullah Omar, an offering of submission to his will and his leadership. Bin Laden recently declared Taliban-ruled Afghanistan as the "new Mecca" and Mullah Omar as the new caliph. It is therefore all but impossible for Mullah Omar to turn over Bin Laden to the U.S. for prosecution as the U.S. has demanded. The Taliban and Bin Laden's estimated 4,000 to 5,000 fighters are intertwined with the Taliban military and Mullah Omar considers Bin Laden as his right hand.

What is Al-Qaeda? The Arabic word means the "Base," or "foundation." Bin Laden does not refer to his international network as al-Qaeda. This word refers to his companion in arms at his headquarters in Southern Afghanistan. In his camps perhaps 10,000 Bangladeshi, Pakistani, Tunisian, Moroccan, Algerian, Egyptian and ethnic Chechens, Dagestanis, Kosovars and dozens of other nationalities have been trained. Some of them are provided specialized intelligence training, some schooled in the arts of making improvised explosive devices, and others given instruction in the production and use of chemical weapons. Those not chosen for specialized tasks are given combat training and either sent back to their native countries to foment insurgency against their secular regimes or enlisted in his combat brigade that fights alongside the Taliban against the Northern opposition. For the past four years, Bin Laden's men have fought with the Taliban against Massud, and have suffered the losses of at least seven hundred to a thousand men in the fighting, including one of Bin Laden's own sons about seven months ago.

It is important to distinguish between the so-called "loose networks" of affiliated groups, and the tightly controlled inner circle of al-Qaeda that conceives and implements their strategic operations. The bombing of the USS Cole, for example, was a tightly controlled al-Qaeda operation that had some local support, drawn from the Islamic Army of Aden, a radical Islamic group in the Yemen set up by Bin Laden's brother-in-law and funded by Usama. The operation was apparently directed by Muhammad Atef, an Egyptian who serves as Bin Laden's Chief of Operations. It was Atef's daughter who married one of Bin Laden's sons last May, a marriage that also symbolized the merger of the Egyptian Islamic Jihad into al-Qaeda, and a new name for the inner circle: "Jidad al-Qaeda."

The Ahmad Ressam case, was an example of the use of affiliated groups by al-Qaeda to promote violence against America. This was the "millennium" plot frustrated when Ressam panicked at the Canadian/US border while transporting materials for five bombs. Ressam, a member of an Algerian terrorist faction funded and supported by Bin Laden, was trained at an al-Qaeda camp in Afghanistan and given $12,000 seed money. He was told to raise the rest of the monies needed through criminal activity in Canada, organize his cell, and choose targets in America to destroy. Ressam planned to plant bombs at Los Angeles International Airport, to kill as many people as possible. At the same time, a more centrally controlled and sensitive al-Qaeda operation was being implemented in the port of Aden, against the USS Sullivans, the sister ship of the Cole. The explosives laden boat sank in the harbor while being piloted by the two would-be suicide bombers. They swam back to shore, and went to ground, certain that their abortive operation would be discovered. It was not. About 8 months later, the same operation, using more sophisticated and lighter explosives, was carried out against the Cole. The devastating results are well known.

How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways. For example, orders may be given to liquidate a stock portfolio in New York, and have those funds deposited in a Gulf, African or Hong Kong bank controlled by a Bin Laden associate. Other channels exist for the flow of monies to Bin Laden, through financial entities in the UAE and Qatar. Cash, carried to intermediaries, is also a source of funding. There are some female members of Bin Laden's own family who have been sending cash from Saudi Arabia to his "front" accounts in the Gulf.

I will stop my remarks here, and I am prepared to address any questions you may have.

Chairman HYDE. Mr. Santos.

**STATEMENT OF CHARLES SANTOS, FORMER SPECIAL ASSISTANT TO THE UNDERSECRETARY FOR POLITICAL MILITARY AFFAIRS, UNITED NATIONS**

Mr. SANTOS. Thank you, Mr. Chairman.

The Taliban leadership has refused to turn over bin Laden, citing their obligation, supposedly under tribal norms, to provide hospitality. Make no mistake, their relationship has nothing to do with hospitality. Mullah Omar and his Taliban provide sanctuary to bin Laden because he has helped the Taliban as much or even more than they have helped him. Both are part of the same extremist reality: dogmatically committed to a wider, Islamic struggle to expel western and secular influences which they view as corrupt, replacing it with their vision of a purified Islamic control over the Muslim world. In this sense, they are not so much looking to the past but using it to create a future—one particularly intolerant, narrow-minded and alarming. They are also both united in a willingness to pursue these ends by all means necessary.

Early on, Mullah Omar publicly demonstrated his closeness to bin Laden. One significant occasion occurred in March 1997 during the Eid prayers after the Haj, when Omar pulled bin Laden from a large crowd in Kandahar, announcing in front of them that bin Laden was a friend, a brother and a great holy warrior. The two then led prayers for the tens of thousands gathered in an open field.

For Omar, the Saudi exile was a powerful symbol of Islamic struggle and defiance, built on their common triumph over Soviet occupation. Mullah Omar's rise to power came as the Taliban successfully identified themselves not in fractious political terms but in extremist, ethnic and religious terms. Their vision fused ethnic Pashtun hegemony with Sunni fundamentalism. The Taliban were able to promote themselves as Afghanistan's true rulers among the Pashtuns with an historic and divine mandate. They effectively consolidated power by masking their political intentions and minimizing talk of power or their political ambitions.

Bin Laden and his extremist links thus not only provided political legitimacy to his Taliban allies, but also important resources in a contest that was otherwise waged with meager means. These resources were not simply monetary. Communications, training, technical expertise and crucial recruits were also provided in those campaigns reaching beyond the traditional Pashtun lands now into areas dominated by the other Afghan ethnic minorities. This is a crucial point—the extremist international networks fed an ethnic war machine to further their own purposes.

As the Taliban consolidated their control with these resources, their movement began to expunge the more traditionalist elements, leaving Mullah Omar and his more radical allies in the Taliban unchallenged. At the same time, links to extremist Sunni fundamentalists in Pakistan and the Gulf deepened and expanded, which in turn provided yet more recruits and resources. International Islamicists, including crucial Pakistani support, in turn came to champion the Taliban as the true representative of a pure Islamic State built upon Islam's victory over the Communist infidels. The Taliban thus have become an integral and important part of Sunni fundamentalist mythology and its international networks, connecting them well beyond Afghanistan to Islamicists all over the world. Afghanistan became not only a place where extremists from around the world could meet safely, share ideas, develop strategies, and receive training—a physical base of terror—it also became a symbol to extremists of the possibilities of their mission.

Throughout, the Taliban have continued to receive support from the Government of Pakistan, whose policies have led to a growing wave of extremism as well. It is important to note that the growing Islamic extremism in Pakistani society is not only the result of corruption, growing poverty, disconnected elite and a government policy that has actively encouraged Islamicist ideology as a means of holding together a diverse society. That policy is now out of control, producing a stronger, more virulent anti-western view and a much less reliable Pakistan.

Pakistani support of the Taliban also allowed them to strengthen their control and expand their influence into the Pashtun areas of Afghanistan. It enabled Pakistan to relocate its training camps for Kashmiri separatists to Afghanistan. Those camps benefitted from the extremist networks in Afghanistan and provided Pakistan with plausible deniability. Moreover, Pakistani extremist groups have functioned as umbrella organizations for other international terror groups that sought shelter in Afghanistan.

We should be clear: The Taliban see the West through their ethno-nationalist and fundamentalist eyes as being both corrupt

and potentially hostile to their campaign to impose their extremist vision, precisely as bin Laden and his ideological allies see America as an obstacle to a "pure" Islamic region, untainted by westernization. Bin Laden is neither a guest nor a foreigner in Afghanistan. He is one of them ideologically, politically, and pragmatically.

Nonetheless, bin Laden's alliance with the Taliban has significant vulnerabilities. He has taken sides in a civil war which is ethnic much more than it is religious. The Taliban are Pashtuns, a group that represents less than 40 percent of Afghanistan's population. They are still the largest minority in a country of minorities—including the Shi'a Hazara, Uzbeks, Turkmens and Tajiks, to name the largest of the nine or so ethnic groups that live within the borders of Afghanistan.

The ugly truth is that the Pakistani supported Taliban-Bin Laden extremist alliance is built on religious, cultural and ethnic domination in Afghanistan. Bin Laden and his extremist network are vulnerable in the same way that the Taliban are vulnerable—their brutal actions have completely antagonized those that live in the North and Central parts of the country, and beyond as well.

There are capable leaders currently on the ground in Afghanistan such as General Rashid Dostum, an ethnic Uzbek leader with significant forces in northern Afghanistan; Karim Khalili, leader of the Hazara of Central Afghanistan; Ismael Khan, an ethnic Tajik leader and a former governor of western Afghanistan; Commander Fahim, the man who replaced Massud, an ethnic Tajik leading forces in Panshir and in northeast Afghanistan. All are fighting to protect their people and rid their areas of Taliban and extremist supporters.

In the end, Osama bin Laden must depend on the Taliban's ability to maintain dominance over the other ethnic communities in Afghanistan. If Pashtun chauvinism buckles, bin Laden and his extremist networks and, most importantly, the symbol of a true and pure Islamic state that serves as an ideological as well as a physical base for extremism and terror, will collapse.

To ensure that Afghanistan will no longer be a base of terror requires not only eliminating the Taliban, but crucially eliminating the idea of ethnic dominance and religious extremism in that country. This can only happen if a system of government emerges that is democratic and provides protection and rights to all the country's ethnic communities, allowing the links of goodwill to be rebuilt among the various people.

I believe that the alliance between the north and the former King can assist in this regard, but we should make no mistake: This will not come from any one individual. It will require a change in thinking of many Pashtuns and a decentralized political system of government—a federal system or confederation—that accurately reflects the political aspirations of the diverse communities of Afghanistan.

To summarize, there are five important points to keep in mind. The extremism of the Taliban and bin Laden may be religious, but in Afghanistan it is built on ethnic domination. Break the ethnic domination and you break the Taliban, bin Laden and his extremists. Give full support to all the elements in the Northern Alliance in their struggle. Focus political efforts mainly on building a new

political structure, not short-term power-sharing agreements. This was the failure of the U.N. in the past. The new political structure must be decentralized and modeled on a federal or confederated system.

Thank you, Mr. Chairman.

Chairman HYDE. Thank you, Mr. Santos.

[The prepared statement of Mr. Santos follows:]

PREPARED STATEMENT OF CHARLES SANTOS, FORMER SPECIAL ASSISTANT TO THE UNDERSECRETARY FOR POLITICAL MILITARY AFFAIRS, UNITED NATIONS

The Taliban leadership has refused to turn over Bin Ladin, citing their obligations, supposedly under tribal norms, to provide hospitality. But their relationship has nothing to do with hospitality. Mullah Omar and his Taliban provide sanctuary to Bin Ladin because he has helped the Taliban as much—or even more—than they have helped him. Both are part of the same *extremist* reality: dogmatically committed to a wider, Islamic struggle to expel western and secular influences which they view as corrupt, replacing it with their vision of purified Islamic control over the Muslim world. In this sense they are not so much looking to the past but using it to create a future—one particularly intolerant, narrow-minded and alarming. They are also both united by a willingness to pursue these ends by all means necessary.

This was not always the case. When I was the Political Advisor to the United Nations Special Mission to Afghanistan, I was the first member of the Mission to meet the Taliban Council in January 1995, two months after they emerged in Kandahar. The Taliban, as a new movement, was weak and thus inclined to allow certain less extremist, elements within its ruling Council. At that time, Bin Ladin was nowhere to be found in Taliban areas. Instead he had established a base in Eastern Afghanistan not far from Jalalabad. He started living there more permanently in the summer of 1995 under the protection of Islamicist Jihadi commanders who were opposing the Taliban.

During this period, Bin Ladin's low profile and relatively constrained situation were due to civil strife, particularly in Kabul. However, when the Taliban took control of Jalalabad and Kabul in September 1996, instead of expelling Bin Ladin, a logical conclusion given his relationship with their enemies, he was immediately moved south to Kandahar for his safety.

Bin Ladin, his family and some followers lived in Kandahar for several months in a building across from the Taliban foreign ministry offices. He clearly was given the full support and protection of the Taliban, and traveled freely around the city in an easily recognized caravan of approximately eight Toyota Hiluxes and Landcruisers. My residence was located near a complex of houses in central Kandahar, which, he was building for himself. In fact, he next moved to Kandahar Airport where he lived for more than a year. He gave the newly constructed complex in Kandahar to Mullah Omar and his Taliban leadership.

Mullah Omar publicly demonstrated his closeness to Bin Ladin on several occasions. One important occasion occurred in March 1997 during the Eid prayers after the Haj, when Omar pulled Bin Ladin from the large crowd, announcing in front of them that Bin Ladin was a friend, a brother and great holy warrior. The two then led the prayers for the tens of thousands gathered in an open field.

Why did he show such support for Bin Ladin? For Omar, the Saudi exile is first and foremost a powerful symbol of Islamic struggle and defiance, built on their common triumph over Soviet occupation. As the various mujahideen political parties were contesting Kabul, the Taliban rose to power by successfully identifying themselves not in fractious political terms, but in extremist national and religious terms. Their vision fused ethnic Pashtun hegemony with Sunni fundamentalism. The Taliban were able to promote themselves as Afghanistan's true rulers among the Pashtuns with an historic and divine mandate. They effectively consolidated power by masking their political intentions and minimizing talk of power of their political ambitions.

Bin Ladin and extremist links thus not only provided political legitimacy to his Taliban allies, but also important resources in a contest which was otherwise waged with meager means. These resources were not simply monetary: communications, training, technical expertise and crucial recruits were also provided in those campaigns reaching beyond the traditional Pashtun lands, now into areas dominated by the other Afghan ethnic minorities—*This is a crucial point, the extremist international networks fed an ethnic war machine to further their own purposes.*

As the Taliban consolidated their control with these resources, their movement began to expunge the more traditionalist elements, leaving Mullah Omar and his more radical allies in the Taliban unchallenged. At the same time, links to extremist Sunni fundamentalists in Pakistan and the Gulf deepened and expanded, which in turn provided yet more recruits and resources. International Islamicists, including crucial Pakistani support, in turn came to champion the Taliban as the true representative of a pure Islamic State built upon Islam's victory over the Communist infidels. The Taliban thus have become an integral and important part of Sunni fundamentalist mythology and its international networks, connecting them well beyond Afghanistan to Islamicists in Pakistan, the Gulf, Kashmir, Chechnya and Central Asia. Afghanistan became not only a place where extremists from around the world could meet safely, share ideas, develop strategies, and receive training—a physical base of terror—it also became a symbol to extremists of the possibilities of their mission.

Throughout, the Taliban have continued to receive support from the Government of Pakistan, whose policies have led to a growing wave of "extremism" within Pakistan as well. What was Pakistan's interest in Taliban domination of its neighbor? Often it is mentioned that Pakistan sought strategic depth as a counterweight to India as well as reconnecting Pakistan to transit routes and energy resources in Central Asia. I believe that these are valid reasons but not sufficient in explaining Pakistan's actions, which have isolated the country significantly. Most important is the growing Islamic extremism in Pakistan society, resulting from a combination of corruption, growing poverty, a disconnected elite and a government which has actively encouraged Islamicists as a means of holding together a diverse society. That policy is now out of control, producing a stronger more virulent anti-western view and a much less reliable Pakistan.

Pakistani support of the Taliban also allowed them to strengthen their control and expand their influence into the Pashtun areas of Afghanistan, which presented a historic reversal in their favor. It enabled Pakistan to relocate its training camps for Kashmiri separatists to Afghanistan, benefiting from extremist networks in Afghanistan and providing Pakistan with plausible deniability. Pakistani extremist groups have functioned as umbrella organizations for other international terror groups that sought shelter in Afghanistan.

We should be clear: The Taliban see the West through their ethno-nationalist and fundamentalist eyes as being both corrupt and potentially hostile to their campaign to impose their extremist vision, precisely as Bin Ladin and his ideological allies see America as an obstacle to a "pure" Islamic region, untainted by westernization. Bin Ladin is neither a guest nor a foreigner in Afghanistan: he is one of them, ideologically, politically, and pragmatically.

The Taliban war machine has also benefited significantly from the trade in opium, levying a thirty percent tax and providing security for the illicit shipments.

Nonetheless, Bin Ladin's alliance with the Taliban has significant vulnerabilities: he has taken sides in a civil war in Afghanistan which is ethnic more than it is religious. The Taliban are for all intents and purposes Pashtun, a group that represents less than 40 percent of Afghanistan's population. They are still the largest minority in a country of minorities—including the Shi'a Hazara, Uzbeks, Turkmens and Tajiks, to name the largest of the nine or so ethnic groups that live within the borders of Afghanistan.

The ugly truth is that the Pakistani supported Taliban-Bin Ladin extremist alliance is built on religious, cultural and ethnic domination in Afghanistan. Bin Ladin and his extremist network are vulnerable in the same way the Taliban are vulnerable—their brutal actions have completely antagonized those that live in the North and Central part of the country, and beyond as well.

There are capable leaders currently on the ground such as General Rashid Dostum, an ethnic Uzbek leader with significant forces in Northern Afghanistan; Karim Khalili, leader of the Hazara of Central Afghanitsan; Ismael Khan, an ethnic Tajik leader and former Governor of Western Afghanistan; and Commander Fahim, an ethnic Tajik, leading forces in the Panshir Valley and Northeast Afghanistan. All are fighting to protect their people and rid their areas of the Taliban and their extremist supporters.

In the end, Osama Bin Ladin must depend on the Taliban's ability to maintain dominance over the other ethnic communities of Afghanistan. If Pashtun chauvinism however buckles, Bin Ladin and his extremist network, and most importantly, the symbol of a true and pure Islamic State that serves as an ideological as well as physical base for extremism and terror, will collapse.

To ensure that Afghanistan will no longer be a base of terror requires not only eliminating the Taliban, but crucially eliminating the idea of ethnic dominance and religious extremism. This can only happen if a system of government emerges that

is democratic and provides protection and rights to all the country's ethnic communities, allowing the links of goodwill to be rebuilt among the various peoples. I believe the Alliance between the North and the former king can assist in this regard, but we should make no mistake: this will not come from any one individual. It will require a change in the thinking of many Pashtuns and a decentralized political system of government—a federal system or confederation—that accurately reflects the political aspirations of the diverse communities of Afghanistan.

Chairman HYDE. Mr. Revell.

**STATEMENT OF OLIVER "BUCK" REVELL, FORMER ASSOCIATE DIRECTOR IN CHARGE OF INVESTIGATIVE AND COUNTER-INTELLIGENCE OPERATIONS, FEDERAL BUREAU OF INVESTIGATION**

Mr. REVELL. I thank you and the Members of the Committee for holding these hearings. It is an extremely important responsibility that you bear; and I know that you and your colleagues want to provide the very best support that you can to our President and those in our Government, including the military, intelligence, diplomatic and law enforcement agencies that must face this challenge. I will try and provide you with my honest and forthright assessment and opinions based on some 40 years now that I have been involved in this arena.

The terrible events of September 11 shall ever remain in our collective memories. I, like so many Americans, lost friends in those attacks. I wish I could tell you that they could not have been anticipated and that we are unlikely to face such devastation again. I cannot. It is very clear that we have been the targets of a sustained campaign of terrorism since at least 1979. The fall of the Shah of Iran and the establishment of a fundamentalist Islamic state in Iran under the Ayatollah Khomeini and the invasion of Afghanistan by the Soviet Union, both in 1979, were the direct predicates in my mind to the tragedy that we suffered on September 11.

In Iran, the Islamic extremists found that they could take and hold Americans hostage without serious repercussions. Out of that experience, the Iranian-backed Hezbollah in Lebanon and Syria bombed our embassies in Beirut twice, Kuwait once, as well as killing over 200 Marines in a suicide bomb attack. The Hezbollah took Americans hostage and highjacked our airliners and yet we seemed impotent to respond.

Before we even knew of Osama bin Laden, Imad Mugniyah of the Hezbollah was the leading terrorist against America. He was directly responsible for the attacks against our personnel and facilities in Lebanon, and yet he and his organization have never been punished for their crimes against our Nation. This example was not lost on the founders of al-Qaeda, primarily members of the Afghan mujahidin from Arab countries. Osama bin Laden and his associates experienced firsthand that guerilla warfare and terrorist tactics could defeat a superpower. He learned from Mugniyah that America was not likely to fight back.

Since the attack on Americans Special Forces on a humanitarian mission in Somalia in 1992, bin Laden and his associates have carried out a steady and increasingly deadly campaign against America and Americans. The following are publicly known events that have occurred in his campaign beginning with Somalia in 1992; the first World Trade Center bombing in 1993; the planned attacks

against the Lincoln-Holland Tunnels and George Washington Bridge and other sites in New York in July 1993 that was thwarted; the planned assassination of Pope John Paul in the Philippines, including the Americans and his entourage; the planned assassination of President Clinton in the Philippines; the planned bombing of 11 to 13 American jumbo jets over the Pacific in January 1995; the car bombing of the U.S. military mission in Riyadh, Saudi Arabia, in 1995; truck bombing of the U.S. housing area Khobar Towers in Dhahran, Saudi Arabia, 1996; the truck bombing of the U.S. Embassy in Kenya in 1998; and the simultaneous bombing of the U.S. Embassy in Tanzania; the plot to bomb the Los Angeles International Airport, Y2K, coming out of Canada and another apparent attempt coming out of eastern Canada in the New England area; the plot to attack a U.S. Naval ship in Yemen in January of 2000; the actual suicide boat attack on the USS Cole in Yemen in October of 2000.

If that is not a campaign, I have never seen or heard of one. It has been consistent and has been increasingly violent.

By September 11, we should have known that we were the principal targets of a terrorist campaign unlike any that we had ever faced, and yet we totally failed to recognize the impending disaster that stalked our Nation. Some of us in the counterterrorist business have tried to warn over the years that we were in danger and the danger was increasing, but we generally have been thought to be alarmists. For the purpose of lessons learned, I am going to cite just briefly some remarks I made at a conference on terrorism sponsored by the U.S. Justice Department in 1999.

I pointed out that the rather abrupt end to the Cold War had been expected to bring about a substantial improvement in international cooperation and a concordant change in the manner in which governments dealt with transnational issues such as terrorism and organized crime. However, the expected improvements in overall safety and security of U.S. citizens and interests have not materialized except at the strategic level.

I went on to point out that terrorism remains a constant and viable threat to American interests on a global basis, even though the sources of the threat may be evolving into heretofore unknown and/or undetected elements and organizations.

The threat is changing and increasing due to the following factors:

The philosophy, motivation, objectives and modus operandi of terrorist groups, both domestic and international, has changed.

The new terrorist groups are not concerned with and in many instances are trying to inflict mass casualties. I have to admit, Mr. Chairman, I never thought it would be 7,000 simultaneously.

Terrorist groups now have ready access to massive data bases concerning the entire United States infrastructure, including key personnel, facilities and networks, including, of course, our air transportation network.

Aided by state sponsors or international organized crime groups, terrorists can now obtain weapons of mass destruction.

The Internet now allows even small or regional terrorist groups to have a worldwide C3I—Command, Control, Communication and Intelligence—system and propaganda dissemination capabilities.

Domestic anti-government reactionary extremists have proliferated and now pose a significant threat to the Federal Government and law enforcement at all levels.

Militia organizations have targeted the Federal Government for hostile actions and could target any element of our society that is deemed to be their adversary, and Islamic extremism has spread to the point where it now has a global infrastructure, including a substantial network in the United States.

I will cut my statement off there, but I will simply state that, in addition to the terrorist organizations—and certainly the al-Qaeda is a network that has many terrorist associations—we also have seen indications of significant drug trafficking and organized crime involvement with terrorist organizations; and, in fact, there have been some substantial reports that a great deal of the money and proceeds for al-Qaeda has come from heroin trafficking from Afghanistan and their support of other types of criminal activities, including supporting their operatives by various fraudulent schemes both in Europe and in the United States.

Mr. Chairman, we have to take these very serious events, this tragedy that faced us on September 11, we have to learn the lessons because we will again be attacked and they will change their tactics next time, so we can't just prepare for the last event.

Thank you.

[The prepared statement of Mr. Revell follows:]

PREPARED STATEMENT OF OLIVER "BUCK" REVELL, FORMER ASSOCIATE DIRECTOR IN CHARGE OF INVESTIGATIVE AND COUNTER-INTELLIGENCE OPERATIONS, FEDERAL BUREAU OF INVESTIGATION

Chairman Hyde, I thank you and members of your Committee for the opportunity to testify during these hearings. Yours is an extremely important responsibility and I know that you and your colleagues want to provide the very best support that you can to our President and those in our Government, military, intelligence, diplomatic and law enforcement that must face this challenge. I will try and provide you with my honest and forthright assessment and opinions based upon the forty years that I have now been involved in this arena.

The terrible events of September 11, 2001 shall ever remain in our collective memories. I like so many other Americans lost friends in the attacks. I wish that I could tell you that the attacks could not have been anticipated and that we are unlikely to face such devastation again. I cannot. For it is very clear that we have been the targets of a sustained campaign of terrorism since 1979. The fall of the Shah of Iran and the establishment of a fundamentalist Islamic State in Iran under the Ayatollah Khomeini, and the invasion of Afghanistan by the Soviet Union in 1979 were the predicates of the tragedy that we suffered on September 11th. In Iran the Islamic extremists found that they could take and hold Americans hostage without serious repercussions. Out of that experience the Iranian back Hezbollah bombed our Embassies in Beirut twice and Kuwait once, as well as killing over two hundred Marines in a suicide truck bombing. The Hezbollah took American's hostage and hijacked our airliners and yet we seemed impotent to respond. Before we even knew of Osama bin Laden, Imad Mugniyah of the Hezbollah was the leading terrorist against America. He was directly responsible for the attacks against our personnel and facilities in Lebanon and yet he and his organization have never been punished for their crimes against our nation.

This example was not lost on the founders of al Qaida, primarily members of the Afghan mujahidin from Arab countries. Osama bin Laden and his associates' experienced first hand that guerilla warfare and terrorist tactics could defeat a "Super Power". He learned from Mugniyah that America was not likely to fight back.

Since the attack on the American Special Forces on a humanitarian mission in Somalia in 1992 bin Laden and his associates have carried out a steady and increasingly deadly campaign against America and Americans. The following are but the publicly known events:

1. Somalia 1992

2. World Trade Center, New York, 1993
3. Planned attacks against multiple targets in New York in July 1993
4. Planned assassination of Pope John Paul in the Philippines 1994 (Americans were in the Pope's entourage)
5. Planned assassination of President Clinton in the Philippines 1995
6. Planned bombings of 11–13 American Airliners over Pacific Ocean 1995
7. Car bombing of U.S. military mission in Riyadh, Saudi Arabia 1995
8. Truck bombing of U.S. Air Force housing area Khubar Towers, Dhahran, Saudi Arabia 1996
9. Truck Bombing U.S. Embassy, Kenya 1998
10. Truck Bombing U.S. Embassy, Tanzania 1998
11. Plot to bomb Los Angeles International Airport, Y2K, New Year 2000
12. Plot to bomb East Coast target, Y2K, New Year, 2000
13. Plot to attack U.S. Naval Ship in Yemen, January 2000
14. Suicide boat attack on USS Cole, Yemen October 2000

By September 11th we certainly should have known that we were the principal targets of a terrorist campaign unlike any we had ever faced. And yet we totally failed to recognize the impending disaster that stalked our nation. Some of us in the Counter-terrorist business tried to warn of the danger, but we were generally thought of as alarmists. For the purpose of lessons learned I am citing the concerns I, among others, expressed about our lack of preparedness for the struggle we now face as a war.

In a speech to a conference held by the National Institute of Justice in May of 1999 on "Terrorism & Technology: Threat and Challenge in the 21st Century" I pointed out my concerns for our lack of readiness to deal with the growing threat of terrorism. Some of these remarks are set forth below.

"The rather abrupt end to the Cold War was expected to bring about a substantial improvement in international cooperation, and a concordant change in the manner in which governments dealt with transnational issues such as terrorism and organized crime. However, the expected improvements in overall safety and security of U.S. citizens and interests have not materialized except at the strategic level.

Terrorism remains a constant and viable threat to American interests on a global basis even though the sources of the threat may be evolving into heretofore unknown or undetected elements/organizations.

The threat is changing and increasing due to the following factors:

1.) The philosophy, motivation, objectives and modus operandi of terrorists groups both domestic and international has changed.

2.) The new terrorist groups are not concerned with and in many instances are trying to inflict mass causalities.

3.) Terrorist groups now have ready access to massive databases concerning the entire United States infrastructure including key personnel, facilities, and networks.

4.) Aided by state sponsors or international organized crime groups, terrorist can obtain weapons of mass destruction.

5.) The Internet now allows even small or regional terrorist groups to have a worldwide C3I (Command, Control, Communication and Intelligence) system, and propaganda dissemination capability.

6.) Domestic anti-government reactionary extremists have proliferated, and now pose a significant threat to the Federal Government and to law enforcement at all levels. Militia organizations have targeted the Federal Government for hostile actions, and could target any element of our society that is deemed to be their adversary.

7.) Islamic extremism has spread to the point where it now has a global infrastructure, including a substantial network in the United States.

Terrorism has been a tough political, analytical and operational target for years. Nonetheless, twenty years ago, analysts could agree on several "tenets of terrorism." First, terrorists were viewed as falling into one of three categories: those that were politically motivated, and used violence as a means to achieve legitimacy, such as the IRA or PLO, or; those that used violence as a means of uprising, or finally; those that were state-sponsored whose violence was manipulated by foreign powers to achieve political leverage. Second, terrorists were generally thought to calculate

thresholds of pain and tolerance, so that their cause was not irrevocably compromised by their actions.

While U.S. officials worried about terrorists "graduating" to the use of weapons of mass destruction, especially nuclear, we believed that most terrorist groups thought mass casualties were counterproductive. This was because mass casualties seemed to de-legitimize the terrorists' cause, would certainly generate strong governmental responses, and erode terrorist group cohesion. In essence, we thought a certain logic and morality line existed beyond which terrorist dared not go.

The different types of terrorist groups had a wide range of motives. The extreme left's motivation for violence has been significantly diminished by the disenchantment with communism on a global scale. These groups find that their message is out-of-fashion, and they can no longer mobilize the public to their causes. This loss of motivation is a major reason for the recent downward trend in international terrorist incidents, as documented in the State Department's report, "Patterns in Global Terrorism." The threat level of all leftist groups globally, once rated high, is now considered moderate. Of the twenty-two known groups, three have denounced violence altogether. Indeed, high collateral casualties are inconsistent with the fundamental message of leftist terrorists who profess their goal to be the betterment of the masses.

State-sponsored terror has seen a notable decline in the last several years for three primary reasons. First, the Middle East peace process has given previously violent groups and states a motive to refrain from terrorism in order to gain leverage and bargaining power at the table. Second, post Cold-War geopolitical realities have brought about many new agreements and growing cooperation among nations in countering terrorism. One of the largest sponsors of terrorism in the past—the former communist East European countries—are now aggressively supporting counter-terrorism initiatives.

However, several state sponsors remain who continue to fund, motivate, support, and train terrorists. Iran is by far the most active of these state sponsors, with the greatest long-term commitment and worldwide reach. Iraq remains of concern, but has a more limited transnational capability. However, attacks within Iraq's own backyard, such as the attempted assassination of former President George Bush in 1993 during his Kuwaiti trip, and the assassinations of dissidents in Jordan, are more likely to threaten the peace and stability of the region. Syria is a more pragmatic sponsor, by providing supplies in transit, but has refrained more recently from terrorism in order to enhance its negotiating position in the peace talks. Its loss of USSR patronage has meant a decline in financial and logistical support, but it nevertheless allows some rejectionists to maintain headquarters in Syria. Hezbollah still receives supplies through the Damascus airport and operates openly in parts of Syria and Syrian controlled territory. The newest sponsor on the list is Sudan, which was added in 1993 because of its provision of safe haven and training for a variety of terrorist groups. Sudan has hosted Osama Bin Laden's facilities. Libya, a notorious state sponsor, has also refrained lately from terrorism in order to obtain some sanctions relief. It continues, however, to target dissidents, fund extremist Palestinians, and provide safe haven for Abu Nidal, all while attempting to avoid accountability for the PanAm 103 bombing. The recent surrender of the PanAm 103 suspects came only after crippling sanctions by the United Nations. For state-sponsored terrorism, the value of deterrence retains credibility, and America should not relinquish this capability.

Radical Islamic groups are now the most active in terms of the rate of incidents. Many of these groups are considered separatists, and desire a seat at the recognition and negotiation table. Others, considered extreme Islamic zealots, operate as loosely affiliated groups, as in the World Trade Center and East African bombings. For these groups deterrence has less effect. And in fact many have stated that they wanted to maximize casualties to punish the United States, which they have demonized as the Great Satan.

Ethnic separatist terrorism, as old as mankind, can be temporarily sidetracked by a few contemporary geopolitical developments, but generally, it is impervious to such developments because its root-cause is invariable long-lived. Most of these groups seek world recognition and endorsement; to date, they have not resorted to the use of weapons of mass destruction.

The "New" Terrorist, the argument has been made that while traditional terrorism—in terms of motivations—is still a large segment of the terrorist population, there is a new breed of terrorist for which the old paradigms either do not apply at all or have limited application. These groups—cults, religious extremists, anarchists, or serial killers—must be regarded as serious threats, and perhaps the most serious of the terrorist groups operating today. These "new" terrorists are driven by a different set of motivations: they seek an immediate reward for their act, and

their motivations and objectives may range from rage, revenge, hatred, mass murder, extortion, or embarrassment, or any combination of these. They may desire mass casualties, or at least not care about how many people are killed in their attacks. As such, they do not make traditional calculations of thresholds of pain or tolerance within a society. These groups tend to be loosely affiliated both internationally and domestically, and may have no ties at all to state sponsorship. They change affiliations and identities as needed, and are extremely difficult to detect. Where traditional groups want publicity to further their cause, many "new" terrorists do not desire attribution; this is particularly true of the religious extremists, God knows, and will reward. Religious extremism is growing in numbers, and is not limited to the Islamic faith. While the "new" terrorist may have a variety of motivations, some single issue groups, such as, extremists in the animal rights, environmental, and anti-abortion movements, may also pose a significant threat, and can not be overlooked. Additionally, the new millennium is an important apocalyptic milestone for many religious or extremist cults. Many terrorist groups, both traditional and "new," have privatized their practices through a few standard business techniques (fund-raising, use of technology, etc.)

Also new today is the proliferation of knowledge and technology among many criminal, terrorist, and narcotics groups. Many of these groups are building skills in state-of-the-art communications, and weaponry. They are achieving new global links and support from one another in cooperative ways. While inflicting mass casualties have never been prohibitive, the barriers to their use seem to be falling.

Twenty years ago, intelligence specialists viewed proliferation of Weapons of Mass Destruction primarily through the lens of nation states seeking the ultimate weapon. Chemical and biological weaponry was only a minuscule afterthought of the whole nuclear problem.

One of the outcomes of the globalization of economies and technologies, the phenomenon that President Bush termed the "New World Order" is the relatively new linking and intermingling of disparate crime and narcotics organizations with terrorists. Analysts have been dismayed to find that even the most notorious crime groups with global reach, such as the Italian Mafia, the Russian Mafias, the Nigerian criminal enterprises, the Chinese triads, the Colombian and Mexican cartels, and the Japanese Yakuza, are developing new working relationships. They are developing cooperative arrangements, and networking with one another and with insurgent and terrorist organizations to take advantage of one another's strengths and to make inroads into previously denied regions.

This has allowed terrorists a new means to raise money as well as provide them with a marketplace to purchase sophisticated weaponry and other high tech equipment. This cooperation, for example, has long been seen among Colombian drug lords and Italian crime groups in exploiting the West European drug market, but now is seen in New York City and in Eastern Europe with drug and financial crime networks linking Russian and Italian groups.

As organized crime groups become increasingly international in the scope of their activities, they are also less constrained by national boundaries. The new lowering of political and economic barriers allows them to establish new operational bases in commercial and banking centers around the globe. The willingness and capability of these groups to move into new areas and cooperate with local groups is unprecedented, magnifying the threats to stability and even governability.

All of these transnational groups are becoming more professional criminals, both in their business and financial practices and in the application of technology. Many of them use state-of-the-art communications security that is better than some nation's security forces can crack.

*The Challenge of Cyber-terrorism:*

While a number of excellent studies—both classified and unclassified—have been produced on the information warfare threat, popular journalism has also produced a great deal of hyperbole on this subject. That the National Information Infrastructure is vulnerable to an Information Warfare attack is unarguable. A recent National Intelligence Estimate verified this threat. The challenge comes in providing context and a proper appreciation of the nature of the vulnerabilities and the extent of the threat.

Traditionally, the information warfare threat has been associated with the telecommunications infrastructure and the ability to communicate. This remains a primary area of concern. But the government is also growing more and more dependent upon the commercial power, transportation, energy, and finance communities, and these communities are also vulnerable to attack. All of these major national infrastructures share a common dependency on computer driven management and control systems. With the passage of time, technical and economic imperatives have

driven these infrastructures to more and more dependence on networked computer driven systems. Indeed, the complexity of the software involved in the "system-of-systems" that drive some of the major infrastructures is a significant concern.

By virtue of this increasing dependence on networked computer driven systems, all of these infrastructures possess some degree of vulnerability to infowar attack. The question is how vulnerable?

Some of the critical infrastructures (e.g., the Public Switched Telephone Network—PSTN) have been the subject of hacker attacks for years. A number of the major companies operating networks that comprise the PSTN have very robust programs to defeat toll fraud and ensure network continuity. Others have placed less emphasis on this problem and, while a structure exists to facilitate cooperation among the various companies, the level and quality of the cooperation is mixed. The continued globalization of the economy, information, and technology will provide significant new opportunities for those seeking to terrorize or intimidate. This is because the interdependencies created by such networking provide a broader base for greater destruction, especially in the areas of infowar. Concurrently, these very trends may also provide new and better means of tracking, capturing, preventing or deterring these same criminal elements. However, our own growing dependency on computer-driven systems in government, within industry, and throughout the Nation's infrastructures of oil and gas, finance, communications, power, and transportation undoubtedly increases our vulnerability. The President's Commission on Infrastructure Protection has vigorously studied the vulnerabilities of our infrastructure, however it remains to be seen if our society can effectively organize itself to protect these key assets of our nation. (The denial of service attacks launched against several major Internet sites in February of 2000 graphically demonstrates this growing threat to our National security and well being ).

Whatever tools terrorists select, the fact of increasing cooperation between crime, narcotics and terrorist groups will provide terrorists with new, more creative ways to raise money and a marketplace to shop for weaponry and high tech equipment.

Weapons of mass destruction are not the only highly destructive tools that terrorists may use. As the government becomes more and more dependent upon commercial-off-the-shelf information technologies, products, and networks, it will become more vulnerable to the infowar threat. This vulnerability will not be limited to potential IW attack on the operation of support infrastructures, but also will include potential "time bomb" attack via pre-programmed imbedded software in operating systems, much, of which software is written abroad.

In addition to foreign nations placing more emphasis on developing infowar capabilities, there is growing evidence that drug cartels and other transnational groups—to include some terrorist groups—have recognized the potential for infowar and are developing capabilities. In fact, some groups, like the FARC, ELN, Provisional IRA, and the Sendero Luminoso, already target information infrastructures today for the purposes of collecting intelligence, targeting data, and monitoring of law enforcement and other government activities. In time, with the increasing availability of infowar attack information on the Internet and in other public media, transnational groups will establish some modicum of capability in this arena.

It is the American character to believe we can solve all problems with our ingenuity and hard work. But even if the United States intelligence and law enforcement communities were given the means to correct these gaps, there still would remain a significant portion of terrorist planning, preparation, operations and attacks that will be unpredictable. Just as better defenses have turned some terrorists away from harder targets, the amorphous nature of the "new" terrorism, combined with the uncertainty inherent in predictive analysis of chaotic behaviors, means that some events will remain unforeseen.

We as a nation may not be able to prevent all acts of terrorism given the nature of our democratic society. However, the new vehemence of terrorist groups and their access to both high technology and weapons of mass destruction make it imperative that we do our utmost to prevent terrorist acts and prepare for the dire consequences if we fail."

Not long after I retired from Federal service I was asked to participate in a conference on Terrorism, hosted by the Ethics and Public Policy Center in Washington. On October 11, 1996 I made a presentation to the conference entitled, "Counter-terrorism and Democratic Values: An American Practitioners Experience" This presentation outlined some of the many difficulties that we have in balancing our need for security and our desire to maintain our Constitutional protections. I have edited the remarks for brevity but believe that what I said has relevance to our current situation.

"In 1980, I became an Assistant Director of the Federal Bureau of Investigation and was placed in charge of the Criminal Investigative Division of the FBI, which

had responsibility for all criminal investigative programs, including Terrorism. At that time, the U.S. was suffering approximately 100–120 terrorist incidents per year. People think the World Trade Center and Oklahoma City, were the first acts of terrorism in the U.S., however, we have a very short collective memory. During this period when we were still attempting to deal with violence associated with Black power, the uproar in the civil rights movement, the anti-war movement, and so forth. We still had a very active level of terrorism by many groups in the U.S. There were a number of Puerto Rican organizations that were carrying out the most acts of terrorism. We also had the remnants of the Weather Underground that was still very active in committing acts of terrorism, including murder, assassination and bombings. We had groups that were committing terrorist acts right here in Washington—placing a bomb in the Capitol building and at the Naval base in the Potomac Basin. We had groups that were targeting the infrastructure of the U.S., carrying out bombings against power stations and communication centers. And we also had groups that were aiming at the military structure, recruit centers, depots, and so forth in the United States. In the FBI we were trying to cope with the aftermath of one of the frequent purges that goes on in our Government.

There had been no consensus in our Nation in the 60s and 70s on how to deal with major national issues, particularly the Vietnam War and anti-war movement, and to some degree the more radical elements of the civil rights movement, and therefore the Executive branch of our Government had taken certain actions, and those actions had not been by consensus. They had been essentially Presidential decisions. Some of these governmental actions included tactics that today would be considered illegal—at the time were not illegal, but were very unwise. The FBI and military intelligence as well as the CIA, engaged in activities, which sought to determine who was behind certain movements, causes and groups that carried out violent acts. Improper activities by these agencies included wiretaps and surreptitious entries into locations seeking intelligence. In most of the world today, including Britain, France, and Germany, these types of activities are still authorized by executive order of their government. In the U.S. they are not. In my view they should not be. But at the time they were.

In the mid-70s, our Nation had gone through Watergate and the turmoil that brought to our political system, and coming out of the Watergate milieu was a series of Congressional hearings called the Church and Pike Committee hearings. In these hearings the intelligence components of the U.S. Government were highly criticized for their activities during this period of time. Particularly, their spying upon elements in our society that were considered radical, but not necessarily a threat to our existence as a Nation. Of course, they never became that. So, there was no consensus in our body-politic as to the degree and extent to which the domestic law enforcement and intelligence services could and should be utilized to determine the root causes, the structure organization, membership and participants in groups, that in fact, descended into the use of systemic violence.

The Church and Pike hearings resulted in a great deal of criticism, it was primarily directed at the CIA, but the FBI got its share, including for a very misconstrued and ill-considered program called COINTELPRO. COINTELPRO was the adoption of counterintelligence methods used against a foreign power for use against domestic groups. In COINTELPRO the FBI used extralegal tactics to determine who was behind certain movements and what they were involved in and so forth. As a result, the Bureau was quite traumatized and not certain of its proper role and the legal use of executive authority in the pursuit of terrorism, although it was not even called that at the time. Terrorism was still considered a domestic security issue. Terrorism was not *en vogue* as a description for a program that the government would use, today "terrorism" or "anti-terrorism."

In the late 1970s, the FBI practically shut down its entire domestic security operation. It was dealing with specific criminal acts after the fact and had virtually no collection, analysis, or utilization of intelligence prior to the commission of any sort of violent action by a politically motivated organization. In 1980, the level of these incidents had climbed to the point where we simply believed that we had to become pro-active again, but to do so very carefully and under a set of guidelines which we had participated in designing called the Attorney General Guidelines. These guidelines were intended not only to tell us the limitations of our authority, but also to sanction those actions that we did take, and to make sure that people understood that this was a legitimate exercise of the legal authority of the President, the Attorney General, and those charged with carrying out their responsibilities. So under the Attorney General Guidelines, we began to build a more pro-active program during the early 80s. In 1982, I recommended and Director Bill Webster, who had been appointed Director of FBI in 1978, agreed to designate Terrorism as a national pri-

ority of the FBI, thereby joining counterintelligence, organized crime and white-collar crime as the principal national priorities of the FBI.

In 1982, we incurred 51 terrorist incidents, 7 people being killed and 26 being injured. There were still a number of very active groups. From 1982 until 1988, we were able to reduce terrorism in the U.S. down to the point where we were incurring only 5 to 10 incidents a year, and only three or four groups were actually still functioning. We had been able, through the use of the law, through the use of prosecution, through the use of the legal procedures, to preempt and neutralize organizations both domestic and foreign that were operating and committing acts of terrorism in the U.S.

In the late 1970s and early 1980s, in addition to domestic groups operating in the United States, we had groups that had their cause, and their base overseas. We had Sikh terrorism, Armenian terrorism, Croatian terrorism; we had terrorism from virtually every continent, but with some of their violent acts being perpetrated in the U.S. There were groups carrying out attacks against the Soviet Union, Turkey, and India, all functioning and operating in the U.S. It was a precursor to what we have today.

But because of the renewed vigor of the Counter-Terrorism program and the emphasis we had given it, we were able to prevent 56 terrorist incidents that if they had occurred, would have resulted in massive loss of life in the U.S., including assassination of foreign leaders while they visited the U.S.

Other incidents similar to PanAm 103 were prevented because of our ability to collect and utilize information under the Attorney General Guidelines.

Of course, this was also the time President Reagan's policy in Central America had become very controversial. We had another situation develop that again set back the development of a totally effective counter-terrorism program. That was a case or series of cases called CISPES—the Committee in Solidarity with the People of El Salvador was the organization. In 1982 or 1983, intelligence had been received from the CIA that this entity in the U.S. was actually a front organization for the terrorist apparatus in El Salvador and was largely funded by Cuba and the Sandinista regime in Nicaragua. The FBI developed an informant who was Salvadoran and there was a substantial amount of information coming in that indicated that CISPES was formed to support of the revolutionary element in El Salvador, which directly supported the terrorist organizations in El Salvador, particularly the "Farabundo Marti National Liberation Front" (FMLN). Information was also received that indicated CISPES was using the U.S. for fundraising, arming and even recruiting people to go to El Salvador—all in violation of U.S. law, and was otherwise engaged in activities that were illegal in the U.S. An investigation began within the Terrorism Section, utilizing FBI field offices in several locations—Dallas, New Orleans, and so forth. This case was one of several hundred pending cases in the Terrorism Section at the time. It never reached the level of the Assistant Director in charge of Criminal Investigations, which I was when the case began, or later the Executive Assistant Director for Investigations, which I was at the time that the difficulties developed. The reason it didn't is because no extraordinary investigative techniques were used—there were no wiretaps, there were no undercover operations, the information was gathered from attending public meetings, from physical surveillance, from the use of informants, all of which were authorized under the Attorney General Guidelines. But, because of the heightened political dichotomy and the disagreement between the President and the Congress, we had a Democratic Congress and a Republican President (this became a focal point for a clash of philosophies, and particularly strategies in dealing with Central America), it became very much a *cause celebe.*

While not denying that there had been mistakes made in the investigation and some violations of our own regulations, the charges against the FBI were that: 1) it was involved in a political investigation; 2) that it was using illegal tactics; and 3) it was violating the Constitutional rights of those involved in this movement. In fact the investigations by the FBI, by the Justice Department, and by the Senate Intelligence Committee, found that none of those allegations were true. There was no political involvement whatsoever on the part of the Reagan Administration—they were not even cognizant that we were involved in this investigation when it was opened. The investigation had been reviewed by the Justice Department's Office of Intelligence Policy and Oversight early on and had been sanctioned as a legitimate investigation. There had been no violation of anyone's Constitutional rights. No one had been prohibited from attending meetings, from speaking their piece or from carrying out their activities, from engaging in all of the protected activities. No one had been impeded, obstructed, or in any way intimidated into not engaging in those activities. Nor had any FBI agent committed any violation of law other than the case

agent who was involved in a financial fraud in dealing with informant payments. But that had nothing to do with the members of the CISPES organization.

Then *The New York Times* and *The Washington Post* said, "The FBI admits that it was engaged in illegal actives as they did during COINTELPRO," which was nonsense. I testified before the Senate Intelligence Committee although I had not been personally involved in the CISPES investigation; it had never risen to my level for approval. But in looking at case, I felt there was substantial justification for at least part of the investigation and I was extremely worried that we would suffer again what we had gone through in the late 70s and early 80s. In that the Senate inquiry would jeopardize careers of people who were honestly trying to do their very best to prevent acts of terrorism in the U.S., and who had no ulterior motive except to defend their Country. Unfortunately, that's exactly what happened. In 1988 again we almost went down to ground zero in carrying out our counter-terrorism responsibilities. And that's what led us, in my view, to what happened at the 1993 World Trade Center bombing. Before the World Trade Center, there was an assassination in New York of an individual who was known to most of you, Rabbi Meir Kahane. Rabbi Kahane was himself an extremist. He created an organization—the Jew Defense League (JDL)—, which also engaged in acts of terrorism in the U.S. He engendered a group in Israel that ultimately, I think, committed acts of terrorism, or at least facilitated acts of terrorism, including by an American Jewish doctor who had moved to Israel—Dr. Goldstein. And some of his more active followers fled from the U.S. while under investigation for assassinating a Palestinian-American in Los Angeles and were essentially given sanctuary in Israel—which was one of the difficulties that we had at the time. The New York City Police Department carried out the investigation of the assassination of Meir Kahane with the FBI looking over their shoulder to see if there was anything of interest for the Bureau. I was in charge of Bureau operations at the time and I never received any information that the assassin of Meir Kahane was connected with any sort of organization that might have a terrorist agenda.

As it turns out later, as we see after the World Trade Center, there was substantial information available that if it had been properly translated, processed, authenticated and analyzed, would have led to a direct association between the assassin of Meir Kahane and the group that conspired and eventually did bomb the World Trade Center, and was conspiring to carry out a number of other heinous acts of terrorism. A proper analysis of the Kahane assassination was not conducted. By-and-large the reason it didn't get done was because of the political climate and the fact that FBI agents were loathe to undertake anything that had any appearance of being involved in the political process. That includes religious activity, free speech, etc., that are obviously protected under our Constitution. It had become very difficult to assess how to deal with those issues.

When I left Washington in May 1991, we were feeling pretty good. The Cold War had ended, we believed our side had won, Communism in the U.S. and the affiliated organizations were largely defunct. Communism as a global movement was essentially discredited. Terrorism was held in check in the U.S. and was descending on an international scale, at least the international acts of terrorism, although terrorism still was very evident in certain countries—Algeria, Israel, India, Northern Ireland, etc. But as far as the U.S., we were becoming less and less a victim. We had defeated Saddam Hussein in an unprecedented alliance and in doing so had countered his threat of global terrorism without any serious losses.

All in all we had done a good job in dealing with the threat of terrorism in spite of a lot problems along the way. Of course, the Iran-Contra controversy arose and there were new allegations that we had again been manipulated and used by the Reagan Administration, which were also untrue. But it took a while to sort this out. However by 1991, I felt very good about leaving Washington, finishing my career in Texas and moving on into another life after government.

Then in 1993 the World Trade Center bombing occurred. Although I was in Texas at the time, we started seeing a nexus between certain people in Texas, particularly in the Dallas/Richardson area, and those directly involved in the World Trade Center. This heightened my interest as to what was really involved. Was this the act of a very small group that was independent and now defunct because of the investigation? Or did it really indicate a much larger and perhaps more global conspiracy?

Unfortunately, perhaps the most informative trial, or series of trials, in the history of the United States, as it relates to the issue of international terrorism, was overshadowed. During the entire course of the New York trials for the WTC bombing, some of the most important testimony, some of the most important revelations about an international movement, which had targeted the U.S. for vicious acts of terrorism on a global basis, was almost totally ignored. The Terrorism trial of the

Century was totally overshadowed by a tragic soap opera (The O.J. Simpson trial) from Los Angles. It would have been very instructive to academia, to the media, to our Congress, to have paid attention to what was going on in that trial. The trial revealed a global conspiracy not necessarily of a huge magnitude, but with a very sophisticated capability. One of the individuals who escaped the initial arrests, Ramzi Yousef, went on to plan a whole series of additional acts of terrorism, including the simultaneous bombings of between 11 and 13 U.S. airliners flying from Asia to the U.S., which was planned to occur in January 1995. They had already developed the technology, they had tested it, it had in fact worked—it killed a Japanese citizen aboard a Philippine airliner, they had tested it in a theater, it had worked, they had developed the techniques to put explosive devices on board aircraft, and were fully engaged in the plot to carry out these simultaneous bombings of the U.S. air fleet.

Growing out of the investigation into the World Trade Center, the Bureau through the Joint Terrorism Task Force detected a continuing conspiracy, that had not even slowed down because of the arrests, to carry out bombings on July 4, 1993, of the Lincoln and Holland tunnels, the George Washington bridge, the UN building, and the Federal building housing the FBI. This group also planned a number of political assassinations, including the president of Egypt and a senator from New York. If they had been successful these attacks would have cost several thousand lives. The conspirators were already present in the U.S. and were actively utilizing the protections of our Constitution to aid and facilitate their ability to operate and conspire to carry out these terrorist acts. We also saw certain potentially connected activities overseas, the bombing of the Israeli embassy in Buenos Aires, followed up by a terrible bombing of the Jewish Community Center in Buenos Aires, an attempted bombing in Bangkok, and a bombing in London, by an organization that was functioning and operating that neither the U.S. government nor Allied governments had come to grips with as of yet.

We started to get a handle on this group. The investigations were and are being conducted under the Foreign Counterintelligence Guidelines, which gives somewhat more latitude than the domestic guidelines do, and through the help of some people like Yigal Carmon and Steve Emerson, the Bureau started to understand and appreciate that it was dealing with a much wider conspiracy than just those involved in the World Trade Center bombing.

However, the bombing of the Federal Building in Oklahoma City on April 19, 1995, again demonstrated that our government was not properly prepared to address the specter of domestic Terrorism. The FBI was ill prepared to deal with this phenomenon because it was not investigating the growth of the anti-government militias and similar organizations at the time. Oklahoma City occurred on Wednesday. On Sunday morning I was asked to appear on Face the Nation, immediately prior to my appearance was Leon Panetta, the President's Chief of Staff. Mr. Panetta comes on and says, "Not to worry. The FBI knows all about these organizations and it has things in hand." I'm the next person and my comment is, "It isn't so". "The FBI does not have it in hand, the FBI has not been investigating these organizations, the FBI is not even aware of the totality of the militia movement." In fact, if it hadn't been for the Anti-Defamation League and the Southern Poverty Law Center, I don't think many people in the U.S., including the FBI, would have known much about the militia movement at all. The reason is because under the Attorney General Guidelines as interpreted at the time—and still—the FBI did not believe nor did the Justice Department believe that the FBI had the authority to collect information on groups that openly espouse the use of force and violence unless and until there is a criminal predicate. In other words, that there has been an action taken that would be an indication of a criminal offense in progress, or had that already occurred. The espousal of violence, the collections of arms, as long as the arms were not illegal, and organizing to commit violence, these things would not necessarily have predicated an investigation, and in fact with the militias they had not. We were faced with a situation in that not only did we have evidence of a growing militant, extremist element from overseas based on a misinterpretation of Islam, but we also had within our own country a growing network of groups and individuals who misperceived the entire rationale for our Constitutional form of government and blamed the government for all of the ills that they and our society were subject to. So, we had these twin concerns, one totally domestic, one primarily international, both coming to bear upon the safety and the security of the people of the United States.

No government can totally protect all the people, all the locations, all of the activities in their nation, no matter how high the level of security at any given time, if a person or group is prepared to carry out a terrorist act no matter the risks involved and whatever the consequences might be. In the United States today, we're