# EXHIBIT 47

S. Hrg. 108–245

# TERRORISM FINANCING: ORIGINATION, ORGANIZATION, AND PREVENTION

# HEARING

BEFORE THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

JULY 31, 2003

Printed for the use of the Committee on Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE

89–039 PDF                        WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON GOVERNMENTAL AFFAIRS

SUSAN M. COLLINS, Maine, *Chairman*

| | |
|---|---|
| TED STEVENS, Alaska | JOSEPH I. LIEBERMAN, Connecticut |
| GEORGE V. VOINOVICH, Ohio | CARL LEVIN, Michigan |
| NORM COLEMAN, Minnesota | DANIEL K. AKAKA, Hawaii |
| ARLEN SPECTER, Pennsylvania | RICHARD J. DURBIN, Illinois |
| ROBERT F. BENNETT, Utah | THOMAS R. CARPER, Delaware |
| PETER G. FITZGERALD, Illinois | MARK DAYTON, Minnesota |
| JOHN E. SUNUNU, New Hampshire | FRANK LAUTENBERG, New Jersey |
| RICHARD C. SHELBY, Alabama | MARK PRYOR, Arkansas |

MICHAEL D. BOPP, *Staff Director and Counsel*
DAVID A. KASS, *Chief Investigative Counsel*
MARK R. HEILBRUN, *General Counsel and National
Security Advisor to Senator Arlen Specter*
JOYCE A. RECHTSCHAFFEN, *Minority Staff Director and Counsel*
DAVID BARTON, *Minority Professional Staff Member*
AMY B. NEWHOUSE, *Chief Clerk*

# C O N T E N T S

———

|  |  | Page |
|---|---|---|
| Opening statements: |  |  |
| Senator Collins | ........................................................... | 1 |
| Senator Specter | ........................................................... | 3 |
| Senator Akaka | ........................................................... | 13 |
| Senator Lautenberg | ........................................................... | 16 |
| Senator Coleman | ........................................................... | 17 |
| Senator Levin | ........................................................... | 18 |
| Senator Pryor | ........................................................... | 22 |
| Senator Carper | ........................................................... | 24 |

## WITNESSES

### THURSDAY, JULY 31, 2003

| | | |
|---|---|---|
| John S. Pistole, Acting Assistant Director for Counterterrorism, Federal Bureau of Investigation | ................... | 4 |
| R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury | ................... | 7 |
| Dore Gold, Former Israeli Ambassador to the United Nations, and President, Jerusalem Center for Public Affairs | ................... | 25 |
| Jonathan M. Winer, Alston and Bird | ................................. | 28 |
| Steven Emerson, Executive Director, The Investigative Project | ................... | 31 |

### ALPHABETICAL LIST OF WITNESSES

| | | |
|---|---|---|
| Emerson, Steven: | | |
| Testimony | ........................................................... | 31 |
| Prepared statement | ........................................................... | 131 |
| Gold, Dore: | | |
| Testimony | ........................................................... | 25 |
| Prepared statement with attachments | ........................................ | 77 |
| Newcomb, R. Richard: | | |
| Testimony | ........................................................... | 7 |
| Prepared statement with attachments | ........................................ | 54 |
| Pistole, John S.: | | |
| Testimony | ........................................................... | 4 |
| Prepared statement | ........................................................... | 45 |
| Winer, Jonathan M.: | | |
| Testimony | ........................................................... | 28 |
| Prepared statement | ........................................................... | 110 |

### APPENDIX

| | | |
|---|---|---|
| Council on American-Islamic Relations (CAIR), Nihad Awad, Executive Director, prepared statement with an attachment | ................... | 176 |
| Questions and Responses for the Record from: | | |
| Mr. Pistole | ........................................................... | 180 |
| Mr. Newcomb | ........................................................... | 185 |
| Mr. Gold | ........................................................... | 190 |
| Mr. Winer | ........................................................... | 192 |
| Mr. Emerson | ........................................................... | 194 |

# TERRORISM FINANCING: ORIGINATION, ORGANIZATION, AND PREVENTION

### THURSDAY, JULY 31, 2003

U.S. SENATE,
COMMITTEE ON GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:16 a.m., in room SD–342, Dirksen Senate Office Building, Hon. Susan M. Collins, Chairman of the Committee, presiding.

Present: Senators Collins, Coleman, Specter, Levin, Akaka, Carper, Lautenberg, and Pryor.

### OPENING STATEMENT OF CHAIRMAN COLLINS

Chairman COLLINS. The Committee will come to order.

Today, the Committee on Governmental Affairs is holding a hearing on the financing of terrorism. Terrorism costs money. From funds needed to buy explosives and airline tickets, to living expenses, to payoffs to the families of suicide bombers, terrorists must have constant and untraceable sources of money. Stopping the flow of these funds is a formidable task. Osama bin Laden is an experienced financier who once reportedly boasted that he and other al-Qaeda leaders know the cracks in the Western financial system like the lines on their own hands.

Immediately after the September 11 attacks, the President took strong action to close the gaps in our financial system by issuing Executive Order 13224 to block terrorist funds. Nevertheless, serious questions persist about whether we are doing enough. There are even more serious questions about whether some of our allies are doing enough.

Last year, the Council on Foreign Relations issued a report contending that U.S. efforts to curtail terrorism financing are impeded, "not only by a lack of institutional capacity abroad but by a lack of political will among American allies."

The report concludes that our government appears to have responded to this lack of will with a policy decision not to use the full power of our influence and legal authority to compel greater cooperation.

A key nation in the fight against terrorist financing is Saudi Arabia. It appears that from the joint inquiry by the House and Senate Intelligence Committees, which examined the kingdom's role in terrorist financing, that it is difficult to tell for sure exactly what the extent of the Saudi involvement is because almost an entire chapter regarding foreign support for the September 11 hijackers is classified. Even the parts that were published, however, raise seri-

2

ous concerns about Saudi Arabia's role in the September 11 attacks.

For example, the unclassified portion of the joint inquiry report describes the activities of Omar al-Bayoumi, a man who apparently provided extensive assistance to two of the September 11 hijackers. According to the report, a source told the FBI that he thought al-Bayoumi must have been a foreign intelligence officer for Saudi Arabia or another power. The report also finds that al-Bayoumi had access to "seemingly unlimited funding from Saudi Arabia." Al-Bayoumi is now reported to be living in Saudi Arabia.

Last month, the General Counsel of the Treasury Department testified before the Terrorism Subcommittee of the Judiciary Committee that in many cases Saudi Arabia is the "epicenter" of terrorist financing. The Council on Foreign Relations report found that for years individuals and charities based in Saudi Arabia have been the most important source of funds for al-Qaeda and that for years Saudi officials have turned a blind eye to this problem.

As our witnesses Ambassador Dore Gold and Steven Emerson will describe in some detail, there is evidence that enormous sums of money flow from Saudi individuals and charitable organizations to al-Qaeda, to Hamas, and other terrorist organizations. The key question now is whether the Saudi Government is doing enough to stop the flow of this money, and if not, what actions the U.S. Government should take to prompt the Saudis to take more effective action. The Saudi Government recently announced some changes in its banking system and charity laws, but it is not clear that these changes go far enough or will be truly effective.

We are fortunate to have with us today key counterterrorism officials from the FBI and the Department of Treasury. They will describe the administration's actions against terrorism financing, and they will help us better understand the level of cooperation our country is receiving from the Saudi and other governments. We also have three experts to discuss their views regarding the fight against terrorist financing generally and Saudi Arabia's role specifically.

As the discussion of the joint inquiry report has made clear, there are still many questions about Saudi Arabia's role, even if that role is inadvertent, in the September 11 attacks and about the extent of the Saudi Government's cooperation in the fight against terrorism. I hope today's hearing will help us get answers to some of these questions and will highlight areas in which our government needs to refocus its efforts in order to stop the flow of funds to terrorists.

I am very pleased today to pass the gavel to Senator Specter, who spearheaded this investigation and is one of the Senate's leaders in the war against terrorism. He has served as the Chairman of the Senate Intelligence Committee. He chaired a hearing about this very subject last November in the Judiciary Committee, and he has continued to investigate this matter as a Member not only of this Committee but the Judiciary Committee as well.

This hearing today is particularly timely given the release last week of the joint inquiry report on the September 11 attacks. I applaud Senator Specter for his leadership in this area, and I am pleased to join him in working on an issue and a challenge to our

3

country that has profound impact on the safety of our Nation and all law-abiding nations.

Senator Specter.

## OPENING STATEMENT OF SENATOR SPECTER

Senator SPECTER [presiding.] Thank you very much, Madam Chairman, Senator Collins. At the outset I compliment you on the outstanding job you are doing in chairing this very important Committee, a brief meteoric career so far in the U.S. Senate, and I thank you for your leadership on this important subject and for cooperating in this investigation and in this hearing and for handing me this mighty gavel. I appreciate it very much.

The issue of the financing of terrorists is one of enormous importance, and the Saudi role is especially important in the wake of the very extensive report published on September 11 with 26 missing pages identified as being Saudi involvement. There has been a decision by the Executive Branch not to release those pages, and I believe that puts a greater responsibility on Congress in oversight on hearings just like this.

The question of Saudi cooperation with the United States has been on my agenda for the better part of the last decade. When I chaired the Senate Intelligence Committee in the 104th Congress, I went to Khobar Towers, investigated the matter, and talked to the Crown Prince as part of a U.S. effort to get cooperation from the Saudis. And while they profess to be very cooperative, the fact was that they were very uncooperative. There had been a car bombing in Riyadh in 1995 where Americans were killed. Federal officials were not permitted to talk to the suspects. They were beheaded by the Saudi Government so that we never did find out what they had to say. And then on June 25, 1996, Khobar Towers was blown up, 19 airmen killed, 400 airmen wounded, and the issue has never yet been fully resolved.

A criminal indictment was returned naming Iran as a co-conspirator, and questions linger to this day as to whether some of those who were involved in Khobar Towers might have been involved in September 11. And our hearing today is going to probe this issue further to see if we can shed some light as to what the Saudi involvement is.

The business of the financing of terrorism has broader scope, which we have investigated on the Judiciary Committee, last year a hearing on the financing of Hizbollah. They go into a small town in North Carolina and reap millions of dollars on cigarette smuggling, which goes to show you the scope of the tentacles. Hamas is raising money in the United States, and we are pursuing an investigation to identify those who contribute to Hamas with a thought to hold them liable as accessories before the fact to murder.

When you contribute to a known terrorist organization and that terrorist organization then murders American citizens, those people who contribute knowingly could be indicted and prosecuted for being accessories before the fact to murder. And Saudi Arabia contributes reportedly about $4 billion a year to so-called charities which have dual purposes. And we really need to pull back the covers on this item, and this is a real challenge for the U.S. Government, and congressional oversight is a very important part.

4

We have some expert witnesses today from the Federal Bureau of Investigation and from the Treasury Department who will detail efforts to identify Saudi contributions, and we have experts who have been in government, former Ambassador to the UN, Dore Gold, and others on a second panel.

We are going to establish the time of 5 minutes for opening statements. Everything prepared in writing will be, as usual, made a part of the record, but that will leave us the maximum time for questions and answers.

Our first witness is John Pistole, Deputy Executive Assistant Director for Counterterrorism of the Federal Bureau of Investigation. Welcome, Mr. Pistole, and the floor is yours.

## TESTIMONY OF JOHN S. PISTOLE,[1] ACTING ASSISTANT DIRECTOR FOR COUNTERTERRORISM, FEDERAL BUREAU OF INVESTIGATION

Mr. PISTOLE. Thank you, Senator Specter and Madam Chairman Collins. Thank you for the opportunity to be here today, and I will just take a couple of minutes, if I may, to make two points and then, as you mentioned, Senator Specter, to allow maximum time for questions.

The first point is the FBI's focus on terrorism financing and the radically changed organization that the FBI is today compared to prior to September 11, where today we have as our overriding emphasis the prevention of terrorist activity in the United States or against U.S. interests overseas. A key component of that is the identification of individuals involved in the financing of potential terrorist activity and trying to identify the full scope of the enterprise, the individuals associated with this group that is raising money that may be going to terrorist financing. And we see that as one of the key means of being able to disrupt and dismantle terrorist cells that may be operating here in the United States or overseas that may be targeting U.S. interests.

The second point that I would like to make is talking about the unprecedented cooperation that we have had with not only our law enforcement and intelligence community partners here in the United States since September 11 but also with foreign partners in both the law enforcement and intelligence communities in addressing terrorism matters overall. Terrorism financing remains one of those challenging issues that certain countries such as Saudi Arabia we believe can do more in, and we will address that shortly.

In terms of the FBI's response to September 11, I think the Committee is quite aware of the FBI's response in creating the Terrorist Financing Operations Section, or TFOS for short, which originally looked at the 19 hijackers and detailed every financial transaction that they conducted, overseas money coming in to them or while they were here in the United States. TFOS has evolved from that time into the central entity responsible for coordinating all terrorist financing investigations for the FBI and then working in concert with, again, our domestic law enforcement and intelligence community partners. And with me today is Dennis Lormel, the chief of the Terrorist Financing Operations Section, who has

---

[1] The prepared statement of Mr. Pistole appears in the Appendix on page 45.

been almost singularly responsible to develop and implement the TFOS strategy.

What TFOS has been doing is trying to follow the money, to identify those individuals who may be involved in terrorist financing and then to trace that money with law enforcement and intelligence aspects to ascertain where that money is going. And one of the key aspects of what the FBI is doing post-September 11 is addressing every terrorist investigation as an intelligence-driven investigation as opposed to strictly a law enforcement investigation.

The key here is to use all the tools available to us, whether it is the FISA court and the intercepts we are able to obtain through the FISA court, national security letters, any of the other tools available to us as a member of the intelligence community, and then to focus that investigation on the intelligence aspect, coupled with the law enforcement sanctions and tools that we have if we need to bring charges against individuals to take them off the street if they pose a threat or to elicit their cooperation.

Given that background and that new paradigm that the FBI has employed since September 11, TFOS has followed the terrorist trail in a number of situations, and rather than go into the detail that is enumerated in my statement, I will just touch briefly on a couple of the successes in general terms.

One of the key areas has been our outreach with and cooperation from the private sector. In that area, for example, we have developed the ability to conduct real-time monitoring of specifically identified financial activity, which has been invaluable not only to investigations here in the United States but to some of our foreign partners who have relied on that information, tracking money going from the U.S. overseas that may be used in terrorist activity and vice versa.

In support of a specific high-profile joint terrorist investigation on financing, a number of countries and agencies, such as United Kingdom, Switzerland, Canada, and Europol, have detailed their investigators to TFOS on a temporary-duty basis. We have engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, which has led to joint investigative efforts around the world, including identifying and exploiting the financing of several overseas al-Qaeda cells, including those in Indonesia, Malaysia, Singapore, Spain, and Italy.

There are a number of other relationships that have been established with central banks of foreign countries that have also enabled us to track terrorist funding in a way that we simply did not do prior to September 11.

The other aspect that is critical here is the information sharing where our greatest successes have come in the interagency forum, where we are part of the National Security Council's Policy Coordinating Committee on terrorist financing, which was created in March 2002. The information sharing we have found has simply been critical to any success we have had, and especially our relationship with the Central Intelligence Agency in some sensitive ongoing matters has allowed us to develop an expertise that simply the U.S. Government did not have prior to September 11.

Senator Specter, you mentioned the case in Charlotte, North Carolina, as one example. There are numbers of other examples

6

which, again, I won't go into at this time. They are in my statement.

The other point that I want to touch on is the cooperation of the foreign governments, and specifically Saudi Arabia. As we all know, late on the evening of May 12 of this year, three large bombs were detonated in Western housing complexes of Riyadh, Saudi Arabia. The next day, I was on a flight to Riyadh to lead an assessment team of the FBI, working with the CIA, to assess what the Saudi Government, specifically the Mabahith, the Saudi counterpart of the FBI, would allow us to do in terms of bringing a team of investigators and experts in to go through the crime scenes, to talk to witnesses, and to assess who may be responsible for those acts.

As a result of the discussions, the Saudis allowed us to bring 75 FBI employees and an undisclosed number of agency people in to not only go through the crime scene, comb through it with shovels and screens, but also to analyze DNA from some of the human remains that were there, to do forensic tests on any and all evidence. They also gave us access to Saudi citizens who were witnesses to those three heinous acts.

To summarize, what they did after May 12, which I believe was a defining moment for the Saudis because al-Qaeda attacked Saudi interests in their homeland, what they allowed us to do was unprecedented. You mentioned the Khobar Towers and the OPM–SANG bombing prior to that where, frankly, we were frustrated beyond any recognition to accomplish what we were hoping to do, as you are well aware, Senator Specter.

What I would say is that post-May 12, the Saudis have had a wake-up call, and we have had unprecedented cooperation with them in virtually every area. To that end, the one key area and the focus of today's hearing is on terrorist financing. The Saudis last year made a number of representations and enacted a number of laws designed to identify and dismantle terrorist financing that may be emanating from Saudi. From our position, the jury is still out on the effectiveness of what they have done. We simply have not seen the results of those initiatives from a terrorism financing perspective. Since May 12, they have arrested hundreds of people, either detained or killed in an attempt to apprehend——

Senator SPECTER. Where do you say the jury is out? On what issue?

Mr. PISTOLE. On the terrorism financing issue as far as the effectiveness of the Saudi initiatives to stem the tide of financing through NGOs or charitable organizations.

Senator SPECTER. When the question and answer period comes, we are going to ask you when you think the jury will be in on that.

Mr. PISTOLE. OK.

Senator SPECTER. We would like to know. Could you sum up at this point?

Mr. PISTOLE. Yes. I would be glad to, Senator.

As a follow-up to a number of ongoing measures, there is a National Security Council team that is leaving Sunday to go to Riyadh, which I am participating in with State Department and Treasury Department senior officials, who are meeting with senior

7

Saudi officials to address a number of the issues that may arise in this hearing today.

That would conclude my opening statement.

Senator SPECTER. OK. Thank you very much, Mr. Pistole.

Our next witness is Rick Newcomb, who is the Treasury Office of Foreign Assets Control Director. Thank you for joining us, and we look forward to your testimony.

### TESTIMONY OF R. RICHARD NEWCOMB,[1] DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF THE TREASURY

Mr. NEWCOMB. Thank you, Senator Specter, Madam Chairman, Members of the Committee. I am pleased to have the opportunity to testify this morning about our efforts to combat terrorist support networks that threaten U.S. citizens and property worldwide.

The threat of terrorist support networks and financing is real. It has been our mission to help identify and disrupt these networks. There is much we know about how radical Islamic terrorist networks are established and still thrive. Wealthy individuals and influential individuals and families based in the Middle East have provided seed money and support to build a transnational support infrastructure that terrorists have used for their purposes. This network, fueled by deep-pocket donors and often controlled by terrorist organizations, their supporters, and those willing to look the other way, includes or implicates banks, businesses, NGOs, charities, social service organizations, schools, mosques, madrassas, and affiliated terrorist training camps and safe houses throughout the world.

The terrorist networks are well entrenched, self-sustaining, though vulnerable to the United States, allied, and international efforts applying all tools at our disposal. Today, I will explain our efforts being implemented in coordination with other Federal agencies, including the Departments of Defense, State, Justice, Homeland Security, the FBI, the intelligence community, and other agencies to choke off the key nodes in the transnational terrorist support infrastructure.

The primary mission of the Office of Foreign Assets Control of the Treasury Department is to administer and enforce economic sanctions against targeted foreign countries and foreign groups and individuals, such as terrorists, terrorist organizations, and narcotics traffickers, which pose a threat to the national security, foreign policy, or economy of the United States. We act under the general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and block or freeze assets subject to U.S. jurisdiction. The origin of our involvement in the fight against terrorism stems from the initial conception of terrorism as being solely state-sponsored. Our mandate in the realm of terrorism was to compile available evidence establishing that certain foreign entities or individuals that were owned or controlled by, or acting for or on behalf of, a foreign government subject to an economic sanctions program. Such entities and individuals be-

---

[1] The prepared statement of Mr. Newcomb with attachments appears in the Appendix on page 54.

8

came known as SDNs and are subject to the same sanctions as the foreign government to which they are related.

The President harnessed these powers and authorities in launching the economic war against terrorism in response to the terrorist attack of September 11 and pursuant to the powers available to the President under the International Emergency Economic Powers Act. President Bush issued Executive Order 13224, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," declaring that acts of grave terrorism and threats of terrorism committed by foreign terrorists pose an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. This order prohibits U.S. persons from transacting or dealing with individuals or entities owned or controlled, acting for or on behalf of, assisting or supporting, or otherwise associated with persons listed in the Executive Order and those designated under the Executive Order as specially designated global terrorists.

After the September 11 attacks, President Bush rallied the international community to unite in the economic war on terrorism. The U.S. Government has worked with the United Nations to pass resolutions that parallel U.S. authorities to designate entities supporting al-Qaeda. The international community, including our allies in the Persian Gulf, joined us and have committed to fully cooperating on all fronts against al-Qaeda and its supporters. On a regular basis, for example, the United States works cooperatively with Saudi authorities on issues relating to the war on terrorism. In some areas, cooperation is routine and systematic. In others, especially those touching aspects of terrorist financing and infrastructure, which touches all aspects of government, coordination is more complex.

We have acted with Saudi Arabia and other allies in targeting al-Qaeda and other terrorist infrastructure. These actions have included a number of multilateral efforts that many times resulted in notifying and listing at the United Nations under United Nations Security Council Resolutions 1267 and 1455.

Some of the terrorist supporters we targeted include financial networks, including the al-Barakaat network, a Somalia-based hawala operator that was active worldwide. And the Muslim Brotherhood-backed Nasreddin financial services network. Other efforts have targeted charitable fronts based in the United States, including the Benevolence International Foundation, Global Relief Foundation, and the Holy Land Foundation, and foreign-based charitable fronts including branch offices of the Revival of Islamic Heritage Society and the Afghan Support Committee. We also acted with our allies against major al-Qaeda-affiliated organizations such as Jemaa Islamiyah.

In the coming months, we are seeking to significantly expand these efforts and impact the implementation of the President's authorities under the Executive Order by adopting a more systematic approach to evaluating the activities of major terrorist organizations in various regions. This approach will focus on identifying key nodes that sustain the abilities of terrorist organizations to remain operational despite successful actions by the United States and its

9

allies to capture and arrest terrorists, cell members, leaders, and operational planners.

In furtherance of this end, we have initiated a collaborative effort with the Department of Defense and other agencies to develop information and strategies against terrorist financing and infrastructure. Last fall, we began a pilot project with the U.S. Pacific Command and other DOD elements that identified terrorist support networks in Southeast Asia and selected key nodes or priority targets in these networks. The project focused special attention on al-Qaeda network affiliates in PACOM's AOR, including Jemaa Islamiyah, which subsequently carried out the Bali bombings, and the Abu Sayaff Group and others. This approach identified the key leaders, fundraisers, businessmen, recruiters, companies, charities, mosques, and schools that were part of its support network. Thus far, we have imposed sanctions against two of these key nodes and are coordinating actions against several others.

This process is the model that we are seeking to continue and expand in the collaborative efforts with DOD agencies and the combatant commands. We are working with USEUCOM headquarters. Meetings in the near future are planned to lay the groundwork for a continuing joint project. We also plan to begin projects with the Central Command Southern Command shortly thereafter. Working with these commands and other agencies provides us and DOD partners with, in effect, a force multiplier that brings together a variety of counterterrorism tools and resources to enhance opportunities for future efforts.

Taking a regional approach, following the various command's areas of responsibility, this effort will seek to identify and isolate the key nodes of the transnational terrorist support infrastructure in the respective AORs. This approach seeks to provide the opportunity to cripple an entire organization at one time through our implementation of the President's authority in coordination with possible actions in other departments and agencies and in cooperation with our allies at the UN.

We have already taken steps to implement this approach in some regions. For example, we are working with other DOD agencies, including the Office of Naval Intelligence, to fully identify the terrorism support infrastructure in the Horn of Africa. In this region, shipping and related drug-smuggling activities appear to be strengthening the terrorist networks in this area. Working with ONI provides us the opportunity to work with analysts who have unique experience in other areas less accessible to us.

I have today a few graphical representations of the key nodes approach that could be applicable to a terrorist support network in any region. It is related in Appendix 2 of my written testimony. Charts 1 and 2 are examples of the various steps of the funding process. Donors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist

10

groups or members of the extremist group with responsibility for liaising with charitable organizations.

Chart 2 is a theoretical model of how the key nodes of the terrorist support structure can be more systematically identified in their respective levels of participation in the funding network.

Chart 3 is a model of a terrorist support network with the key nodes highlighted that we believe economic sanctions could effectively impact. These include financial, leadership, and influence nodes, which are color-coded in red, blue, and green. Influence nodes can include individuals and institutions that provide spiritual or other guidance or serve as recruitment centers.

Chart 4 shows theoretically how designation and——

Senator SPECTER. Before you leave Chart 3, what does Chart 3 show?

Mr. NEWCOMB. Chart 3 shows in green the financial targets, in red the leadership targets, in purple the influence targets. And by using an effects-based targeting approach, we are able on an interagency basis to identify who the key leaders of these various participating entities are so that when taking them out, we can result in Chart 4, which shows theoretically how designation will isolate the key nodes of Chart 3 and sever the critical ties within the overall network and thereby disrupt its overall functioning. By removing these key nodes of the support structure, the leadership, the influence, the financial, the terrorist group is unable to mobilize people and resources in support of terrorists, thus rendering it ineffective.

The funds necessary for a terrorist organization to carry——

Senator SPECTER. Mr. Newcomb, you are double time now plus. Would you sum up? And we will go to Q and A.

Mr. NEWCOMB. I have perhaps another minute.

Senator SPECTER. OK.

Mr. NEWCOMB. The funds necessary for a terrorist organization to carry out an attack often are minimal, but the support infrastructure critical for indoctrination, recruitment, training, logistical support, the dissemination of propaganda, and other material requires substantial funding. The President's power under Executive Order 13224, as well as other legislation, provide the United States with authorities that are critical to attacking this threat posed by these terrorist organizations. Our effectiveness in implementing these authorities requires strong coordination with other U.S. departments and agencies and support from U.S. allies under United Nations Security Council Resolutions 1267 and 1455.

Terrorist organizations including al-Qaeda, the Egyptian Islamic Jihad, Jemaa Islamiyah, Al-Ittihad Al-Islamiyya, Hamas, Hizbollah, and others rely on their infrastructure for support and to shield their activities from scrutiny. The secretive nature of their activities and their frequent reliance on charitable, humanitarian, educational, and religious cover are vulnerabilities we can exploit by making designations under the Executive Order. Decisive action against high-impact targets deters others, forcing key nodes of financial support to choose between public exposure of support for terrorist activities or tarnishing their reputation, to the detriment of their business and commercial interest.

Thank you, Senator.

11

Senator SPECTER. We will now proceed with questioning, 5-minute rounds, and the Chairman has deferred to me for the first round.

Mr. Newcomb, in interviews by staff preparatory to your coming here, you advised that a good many of your recommendations for sanctions were rejected. Would you amplify what has happened on that?

Mr. NEWCOMB. Yes, Senator. In identifying key nodes, our responsibility is to identify how these terrorist organizations fit their activities together.

Senator SPECTER. Well, after you have identified them and made the recommendation—I only have 5 minutes. I want to focus very sharply on the rejections on the recommendations which involve Saudi sources. Precisely what has happened on that?

Mr. NEWCOMB. Well, the designation, as we indicated in our discussions, is not the only possible action. There is also law enforcement, intelligence, diplomatic, and military——

Senator SPECTER. Well, let's focus on economic sanctions, which is my question, before we go into other possible actions. I want to know about the recommendations on economic sanctions as to Saudis which have been turned down.

Mr. NEWCOMB. Senator Specter, we have made numerous recommendations, including relating to Saudi Arabia and other terrorist support organizations and groups. This goes through a Policy Coordinating, PCC process, where all the equities of the government come to the table, including——

Senator SPECTER. Well, my question focuses on recommendations which you have made for sanctions as to Saudi organizations which have been rejected.

Mr. NEWCOMB. Well, first let me say it is not—it is the policy not to comment on internal policy deliberations within the government. I can tell you these issues have been discussed with all the key players at the table, and when there is another possible action that can be taken, we have achieved our goal by teeing issues up.

Senator SPECTER. I am not asking about internal deliberations. I am asking you—and let me be specific with some organizations which have been discussed with you by staff prior to your coming here.

Were there recommendations as to the National Commercial Bank of Saudi Arabia for economic sanctions which were rejected?

Mr. NEWCOMB. No, Senator Specter, there was not.

Senator SPECTER. Were there recommendations for sanctions against the World Assembly of Muslim Youth?

Mr. NEWCOMB. There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

Senator SPECTER. Well, what conclusions did you come to on the World Assembly of Muslim Youth?

Mr. NEWCOMB. That along with the whole variety of charitable organizations operating head offices in Saudi are organizations that we are looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities. Rising to the level of a recommendation is a complicated policy——

12

Senator SPECTER. Well, I am not concerned about several hundred others. I would like to know, what about the World Assembly of Muslim Youth? Were they funding terrorist organizations, subject to economic sanctions, without any action being taken?

Mr. NEWCOMB. I can not conclude that in this hearing today. It is an organization that we——

Senator SPECTER. You can or you can not conclude——

Mr. NEWCOMB. Cannot.

Senator SPECTER. At this hearing today?

Mr. NEWCOMB. Well, we did not conclude that in our deliberations, so I can not say that was a recommendation of our office.

Senator SPECTER. How about the International Islamic Relief Organization? Were there recommendations for sanctions there which were rejected by higher officials in the Treasury Department?

Mr. NEWCOMB. This is an issue that we looked at, and, again, your question relates to policy deliberations within the administration which I can not comment on. I can tell you we did look at that organization.

Senator SPECTER. I am not interested in your policy deliberations. What I am interested in is your conclusions. Were there economic sanctions taken against the International Islamic Relief Organization?

Mr. NEWCOMB. To date, there have not been as of this date.

Senator SPECTER. Do you think there should be?

Mr. NEWCOMB. It is something that we would look at very carefully along with the others participating in the policy process.

Senator SPECTER. Well, when you look at it very carefully, how long have you been looking at it up until now?

Mr. NEWCOMB. Certainly since immediately in the aftermath of September 11.

Senator SPECTER. Well, that is almost 2 years. How long will it take you to come to a conclusion?

Mr. NEWCOMB. We can recommend and we can designate, but there is a policy process which takes into account all the variety of——

Senator SPECTER. I have got 16 seconds left. Have you recommended as to any of the organizations I have mentioned to you some tough economic sanctions which were turned down by higher officials, implicitly because they were Saudi organizations?

Mr. NEWCOMB. I can not say it is because they were Saudi organizations.

Senator SPECTER. Well, could you say whether they were turned down?

Mr. NEWCOMB. I can say that there have been some charities and other organizations that we have considered, we have had at the table, and that have been deferred for other actions which I would deem as appropriate.

Senator SPECTER. Well, my red light went on in the middle of your last answer, but I will be back.

Mr. NEWCOMB. OK.

Senator SPECTER. Senator Akaka.

13

## OPENING STATEMENT OF SENATOR AKAKA

Senator AKAKA. Thank you very much, Mr. Chairman, for holding this hearing on terrorism financing.

I agree with my colleagues Senator Shelby and Senator Graham, who say that we need to make public much of the information from a congressional report on intelligence and the activities surrounding the terrorist attacks of September 11, 2001. There needs to be a full and open debate on these issues. And this is an effort partly today at this hearing.

I am also concerned about terrorism in Africa, and I think that we should put an end to the illicit trade in so-called blood diamond funds, which funds activities of Liberian President Charles Taylor, and also supports conflicts in Angola and the Congo.

I am equally concerned about terrorism in Asia. We must stop the activities of terrorists in Bali and the laundered money there that financed the bombing in Bali. These confront us as we look into Saudi Arabia and our tracking and coordinating intelligence with them and the lack of some of this information from them.

What we are learning is that there is a lesson that we cannot afford to ignore, and this Committee is certainly moving out on this.

Mr. Pistole, the House-Senate September 11 Commission report states that intelligence resources to fight terrorism are stretched thin. Do you believe that the FBI has adequate resources, people, and funding for training in place to combat terrorism?

Mr. PISTOLE. Senator, you have identified some critical issues for the FBI in terms of ensuring adequate training. To answer your question, I believe we have sufficient personnel, nearly 29,000 employees right now, over 11,000 of whom are special agents, to address the counterterrorism issue facing the United States domestically. But it is through the enhancement or augmentation through the Joint Terrorism Task Forces where we have over 2,000 FBI and other agency, law enforcement, and intelligence community personnel dedicated to 84 JTTFs around the country that we're able to leverage our limited resources in an effective means of being the arms and the operational node of the U.S. Government in fighting terrorism in the United States

Senator AKAKA. Mr. Pistole and Mr. Newcomb, we know there are frustrations, as you mentioned, Mr. Pistole, about what we are doing about tracking and coordination. My question to each of you is: What more needs to be done to improve tracking and coordination of terrorist funding intelligence?

Mr. PISTOLE. I think one of the keys is to achieve the cooperation of foreign governments such as Saudi Arabia where the assessment is much of the funding stems from, and as I mentioned earlier, I am leaving Sunday to go to Jiddah. I hope to achieve some success in that arena with my colleagues from Treasury and from State and from the National Security Council.

There are a number of issues on the table that will be discussed, and I would be willing to give the Committee a follow-up briefing after that trip, if they so desired.

Senator AKAKA. Mr. Newcomb.

Mr. NEWCOMB. Thank you, Senator. I share my colleague's point of view that we need to continue doing the work that we are doing,

14

working within the administration and other government agencies but also with foreign counterparts, to have a unified front utilizing authorities under the United Nations to take joint action, coordinating fully with local law enforcement authorities, but continuing our current efforts.

Senator AKAKA. My time is up, Mr. Newcomb, but I noted that your written statement discusses a terrorist supporter identification program that has been developed with the Pacific Command. Given that Hawaii is the gateway to and from the Pacific, this is of interest, of course, to me, and I certainly want to hear more about that.

My time is up, but I wish to learn more about that project.

Mr. NEWCOMB. Fine, Senator. I would be happy——

Senator SPECTER. Thank you, Senator Akaka. Chairman Collins.

Chairman COLLINS. Thank you very much, Senator Specter.

Mr. Newcomb, I want to make sure that the Committee understands how you compile the list of suspected terrorist financers. First of all, it is my understanding that the Office of Foreign Assets Control has the power to recommend that individuals and entities that are involved in financing acts of terrorism can be placed on a government list, and the listing of that individual or entity is critical to depriving them of the ability to provide funds for terrorists. Is that accurate?

Mr. NEWCOMB. That is accurate. I would also point out and add that we also are the implementing and enforcement agency as well. So it is those two nodes, a recommending function and an implementation function.

Chairman COLLINS. And after your office recommends an entity for listing, that recommendation is then reviewed by an Interagency Policy Coordinating Committee that you referred to in your discussions with Senator Specter. Is that correct?

Mr. NEWCOMB. That is correct, Madam Chair.

Chairman COLLINS. Have you ever recommended that an entity be listed and had that recommendation rejected by this Interagency Policy Committee?

Mr. NEWCOMB. We have made numerous recommendations on a variety of different targets, as is our responsibility. And it goes to the Policy Coordinating Council which has a multitude of different points of view—State Department, the Justice Department, the FBI, the CIA, and others. So long as there is a responsible action to be taken, designation per se is not the only possible tool within the President's ambit of foreign policy——

Chairman COLLINS. And I understand that, that there may be other ways to approach the problem. But I assume that when you recommend the listing of an entity, that is based on an investigation that you have conducted and that there is a sound factual record for the listing of the entity, that is why you brought that recommendation forward. Is that correct?

Mr. NEWCOMB. That is correct. When we have a target we wish to designate, we develop evidence so that, should a designation happen, we are able to sustain a challenge to that in Federal court. So we do develop evidentiary packages as the basis for recommendations.

15

Chairman COLLINS. And it is correct—and I understand there may be other action taken, but it is correct that your recommendations are sometimes turned down by this interagency committee, correct?

Mr. NEWCOMB. The issue I think we are having somewhat of a debate about is the characterization of "turned down." Turned down——

Chairman COLLINS. For listing on the terrorist financers list.

Mr. NEWCOMB. Oftentimes they are not adopted for purposes of listing at this time.

Chairman COLLINS. That is the same as being turned down, not adopted, not—entities that you recommend be listed are not always listed as a result of the committee, the interagency committee, not accepting your recommendation that they be listed. Is that correct?

Mr. NEWCOMB. That is correct, but I have to add the caveat that because there are other agencies—for example, the FBI may say we have law enforcement equities in that particular target at this time. If you move forward now, you will disrupt those equities. That is, in my opinion, and in the opinion of the PCC, a very responsible way to proceed. Let us not interfere with your case. We will stand down until an appropriate time. And there have been examples when that objection has been removed.

Chairman COLLINS. What percentage of your recommendations to list Saudi entities or individuals have been rejected?

Mr. NEWCOMB. Madam Chairman, I don't have the answer to that information. You sent that to——

Chairman COLLINS. We have asked for that, as you know.

Mr. NEWCOMB. You have asked for it, and we will get it to you for the record.

Chairman COLLINS. Would you say that more than 50 percent of the recommendations that you have made to list Saudi entities or individuals have not been accepted by the committee?

Mr. NEWCOMB. I am going to have to get that information for you for the record. I don't have it at this time.

Chairman COLLINS. In conversations with staff, you were asked whether it might be as high as 95 percent. Do you recall telling the staff that you did not believe it was quite that high?

Mr. NEWCOMB. Yes, I certainly did say it wasn't that high. I don't have the exact figure. Let me also explain to you, there are a range of specific areas where we have been looking where there are considerable other equities at stake. I think the point that has to be made is that there are a whole range of targets that we are prepared to move forward on, can move forward on, have developed evidentiary packages on, and other equities come into play that are responsible equities.

I don't know if the number in every one of these categories is that high, but we do a thorough examination of potential targeting.

Chairman COLLINS. One final question on this area, since my time has expired. On this interagency committee, as you point out, there are representatives from various departments and agencies like the FBI, departments like the State Department and Justice. Which agency is responsible for most of the rejections of your recommendations to list Saudi entities and individuals?

16

Mr. NEWCOMB. I would say it is a combination of deferring action based on recommendations from the State Department, the FBI, the Justice Department, and the intelligence community based on a variety of equities that they have involved—diplomatic, law enforcement, intelligence, and others.

Chairman COLLINS. So no one agency or department on the committee is responsible for rejecting your recommendations more than any other agency or department?

Mr. NEWCOMB. I think in all conversations relating to foreign policy and foreign relations, we look very strongly to the State Department, and the State Department is always a very active player in these. So they do have a view, as well as the other agencies. But I think it is a combination of all of those.

Chairman COLLINS. Thank you.

Senator SPECTER. Thank you very much, Senator Collins. Senator Lautenberg.

## OPENING STATEMENT OF SENATOR LAUTENBERG

Senator LAUTENBERG. Thank you, Mr. Chairman.

There are things that concern me—and I want to examine the specifics. Unfortunately, we are pushed for time, and I look at the clock and realize that you have another panel, Madam Chairman, and we have to get on with it. But I do want to say I have an active interest in the relationship with Saudi Arabia. In 1991, immediately after the first Gulf War, I went to Saudi Arabia, and I was outraged at diplomats, Senators, and Congressmen with an Israeli stamp on their passports were prohibited entry. And I got the Saudis to change that in a hurry, and it is no longer a restriction, that is, for officials of the U.S. Government. But I think if you are an ordinary citizen of this great country, you are prohibited entry if you have had an Israeli stamp in your passport.

It is outrageous. When they dial 911, we answered the phone immediately, sent over 500,000 people to the area to try and provide a rescue operation and the resuscitation effort, because that is what I specifically want to call it. All was lost there, Kuwait, Saudi Arabia, and then the ingratitude of the Government of Saudi Arabia not to present a witness here, not to present someone to offer testimony. Very frankly, it is compounded even to a more aggravating degree when the President has refused to permit the full record established in the 900-page report to be out there when the Saudis themselves say they would like to clear the record. Or are we looking at a sleight of hand, forgive the suspicion, that a routine was set up that said, well, OK, we in the Saudi Government will say make it public, and, Mr. President, we would thank someone in the administration if they would simply say that it is being withheld for methods, etc. It is pitiful.

I am using this time knowledgeably, Mr. Chairman, and I would like to ask Mr. Pistole for a short view on the Saudi Government's willingness to cooperate in investigations subsequent to terrorist attacks on the embassies in Africa and the USS Cole?

Mr. PISTOLE. Subsequent to those two incidents, Senator, as I think you are aware, there was very limited cooperation from the Saudi Government. As I mentioned in my opening statement, I believe May 12 was the defining moment for the Saudis in that the

17

fact that they were attacked, that Saudi citizens were killed in the attacks, and that al-Qaeda seemed to be thumbing their noses at the royal family to say we will conduct attacks in the homeland here and you can not stop us. The cooperation since May 12 on the Riyadh bombings, as I mentioned, has been unprecedented in all areas but for the financing issue, which is still ongoing, and there are a number of issues on the table for that.

Senator LAUTENBERG. So there is still a reluctance to open up the relationship and to say, "America, you are without a doubt our best and most needed friend." I find that more than just a curious response to this kind of symbiotic relationship that we have had for a long time.

I yield back the time here.

Senator SPECTER. Thank you very much, Senator Lautenberg. Senator Coleman.

### OPENING STATEMENT OF SENATOR COLEMAN

Senator COLEMAN. Thank you, Mr. Chairman.

Following up on the questions from my distinguished colleague from New Jersey on the level of cooperation, first let me backtrack a little bit. I believe in the written testimony of Mr. Winer, one of the subsequent panelists, he noted that, "Saudi Arabia has been the most significant source of terrorist funds for al-Qaeda."

Mr. Pistole, would you agree or disagree with that assertion?

Mr. PISTOLE. I would at this point say the FBI does not have enough intelligence or law enforcement information to agree or disagree with that. There is obviously a tremendous amount of money that has flown through NGOs and charitable organizations. As Mr. Newcomb mentioned, the question is how much of that has gone specifically for terrorist activity. And in limited situations, we can document that, and I can tell you affirmatively, yes, that this money has gone for this act. But to trace it from the government to a particular terrorist, I can not sit here and tell you that has been done.

Senator COLEMAN. Mr. Newcomb, could you respond to that?

Mr. NEWCOMB. I agree with my colleague from the Bureau. We are aware of large amounts of money going to charitable organizations. They are dual purpose in the fact that some of the otherwise legitimate activities are subverted. The extent to which that takes place is not completely clear, but I would characterize it as considerable.

Senator COLEMAN. Mr. Pistole, on the issue of financing, you indicated at least in the willingness to cooperate there has been substantial improvements in some areas but still work to be done on the financing side. Can you identify two or three things that need to be done that aren't being done today?

Mr. PISTOLE. Yes, Senator, several areas. One is the Saudi Government payment of defense counsel, for example, here in the United States of Saudi citizens who have been charged with crimes. That is an issue that we have raised with the Saudi Government and pursuing next week in follow-up meetings. To us, that is tantamount to buying off a witness, if you will, and so that gives us concern if the government is supplying money for defense counsel.

18

Other areas that we are addressing is the specific funding through whether it is NGOs or charitable organization, that they know or should know is going to specific terrorist organizations or individuals associated with terrorism.

Senator COLEMAN. Again, short questioning periods. I am going to switch gears for a second, and I apologize I wasn't here for your oral testimony, but I read your written testimony. You give a very spirited defense of the PATRIOT Act, which has certainly been the source of a lot of discussion.

Can you help me connect the dots? Is there something in the PATRIOT Act that you didn't have before that specifically allows you to break an organization that was doing something it shouldn't be doing?

Mr. PISTOLE. Absolutely, Senator. The most compelling part of the PATRIOT Act has been the elimination of what we refer to as "the wall" between law enforcement and intelligence collection activities. For example, if Mr. Newcomb was an FBI agent sitting in New York working a criminal investigation on Osama bin Laden, and I was an intelligence agent, because of prohibitions under "the wall," we would not be allowed to share that information. With the passage of the PATRIOT Act, we are now able to share that information and "connect the dots." That is the most compelling part of the PATRIOT Act.

Senator COLEMAN. Does that break in the wall also go down to the level of local sheriffs, local law enforcement? And let me explain why I ask. There has been concern raised about crop dusters and the ability to spread, for instance, something like anthrax. And I know the FBI often has been notified about that, but I wonder if our local sheriffs—they know where the grass fields are. They know where the crop dusters are.

Mr. PISTOLE. Absolutely, and this week, in fact, with tomorrow's deadline, our Joint Terrorism Task Forces are going back and recontacting all those individuals we contacted after September 11 to see if there has been any suspicious activity.

To answer specifically your question about sharing with local and State law enforcement agencies, that is done primarily through the Joint Terrorism Task Forces, and obviously it is a matter of, if there is classified information, whether they have the appropriate clearances. We still pass the information of the threat related but just may not identify the source or method of acquiring that information, for example, overseas.

Senator COLEMAN. Thank you. Thank you, Mr. Chairman.

Senator SPECTER. Thank you, Senator Coleman. Senator Levin.

## OPENING STATEMENT OF SENATOR LEVIN

Senator LEVIN. Thank you, Mr. Chairman. Just very briefly a few comments, and then my questions.

Saudi behavior towards terrorism, particularly towards terrorism aimed at the United States, has been very lax and very disturbing for many years. The reference has already been made to the attack on Khobar Towers in Saudi Arabia in 1996 where we lost 19 American servicemen, after which the FBI complained that Saudi officials failed to cooperate with the United States probe and denied requests to question key Saudi officials.

19

During the 1990's, the Saudi Government became one of the few governments in the world that supported the Taliban, despite the Taliban's link to terrorists.

At the same time the Saudi Government was taking steps to strengthen its relations with the United States, it is said, it was funding extreme Muslim clerics in educational schools, the madrassas, that routinely called for attacks on the United States and hatred of all things American. And those madrassas in Pakistan, funded mainly by Saudi money, have provided recruits for the Taliban.

Anti-American statements became standard fare in Saudi-supported newspapers and publications. In 2001, after the September 11 attack killed 3,000 people in the United States, we found out that 15 of the 19 hijackers were Saudi nationals.

The recently released report by the joint inquiry on the September 11 attack states in the unclassified section that a Saudi citizen employed by the Saudi Civil Aviation Agency paid many of the expenses of two of the hijackers and "had access to seemingly unlimited funding from Saudi Arabia."

Until recently, Saudi Government officials and prominent Saudi citizens routinely contributed huge sums to Muslim charities which supported terrorism, including support for families of terrorists. The United States finally shut down several of those charities which were operating in the United States.

The question that the President asked not too long ago—"Are you with us or against us in the war on terrorism?"—in the case of the Saudis has got to be answered, "Yes." Both. The rhetoric is that they are with us, but the actions too often have been that, in fact, they have been against us. And, of course, there is now a new issue with U.S.-Saudi relations, and that is that 28-page piece of the September 11 joint inquiry report which has been redacted, blanked out. These deletions have been described by the former chairman of the Intelligence Committee, Senator Shelby, as being related to embarrassing information and not to information which should be properly classified. And it seems to me that there just has to be declassification of all or almost all of that material if we are going to make public what is in there which is so critically important.

[The prepared opening statement of Senator Levin follows:]

PREPARED OPENING STATEMENT OF SENATOR LEVIN

Terrorists need money to carry out acts of terrorism. They need money for explosives, for communications, for travel, and for all the other details involved in carrying out plans for mass murder and mayhem. Global terrorist organizations need global financing. They need to be able to transfer funds across international lines, move money quickly, and minimize inquiries into their finances, their activities, and their supporters.

Since the 9-11 attack, stopping terrorist financing has become a U.S. priority. This Committee has contributed in a significant way to that priority through a 3-year anti-money laundering investigation conducted by our Permanent Subcommittee on Investigations. This investigation, which produced extensive hearings and reports, not only documented little known methods for transferring illegal funds into the United States, but also provided important recommendations for strengthening U.S. laws to detect, prevent, and halt terrorist financing. These recommendations were included in S. 1371, a bipartisan bill I introduced in early 2001; they were picked up by the Senate Banking Committee which improved and expanded

20

them; and they were then included in Title III of the USA Patriot Act, which was enacted into law in October 2001, six weeks after the 9-11 attack.

The new anti-money laundering provisions in Title III of the Patriot Act boosted U.S. efforts to stop terrorist financing. For example, Title III tightened the rules for money transfers by completely barring foreign shell banks from opening U.S. financial accounts, making it harder for offshore banks to arrange transfers of money into the United States, and requiring U.S. banks and securities firms to exercise more care before opening accounts for foreign persons and financial institutions. Title III also targeted informal money transfer systems, called "hawalas," which are often used in the Middle East to transfer funds outside normal banking channels without paperwork or regulatory oversight. The new law essentially requires these operations to register with the U.S. Government or risk shutdown and criminal prosecution.

Title III also made it easier to prosecute money laundering offenses involving foreign offenders by making it easier to freeze and seize foreign funds, obtain information from foreign jurisdictions, and prosecute foreign individuals and companies. The new law also required more U.S. financial institutions to establish ant-money laundering programs, verify customer information, and report suspicious financial transactions. Title III also modernized U.S. anti-terrorism criminal statutes by making it a crime to bring into the United States or take out of the United States large amounts of cash without disclosing the action and, if asked, providing an explanation for the funds, and by making it clear that anti-money laundering prohibitions apply to funds obtained legally if intended for use in planning, committing or concealing a terrorist act. The new law has enabled U.S. prosecutors to apply anti-terrorism prohibitions to funds legally collected by a charity if that charity intends to use the funds to support terrorism.

The U.S. Government has started to make good use of these new anti-money laundering provisions to intensify the fight against terrorist financing, but it would be incorrect to say that the United States has yet won this fight. We will hear testimony today about the difficulties of shutting down terrorist financing when some foreign governments are reluctant to take the necessary steps and may even, directly or indirectly, support persons or entities facilitating the movement of terrorist funds.

The example the Committee has chosen to highlight today is Saudi Arabia. For years, there has been disturbing Saudi behavior regarding terrorism. In 1996, for example, after bombs killed 19 U.S. servicemen at Khobar Towers in Saudi Arabia, the FBI complained that Saudi officials failed to cooperate with the U.S. probe and denied requests to question key Saudi suspects. Also during the 1990's, the Saudi government became one of the few governments in the world to support the Taliban in Afghanistan, despite its links to terrorists. The Saudi government also funded some extreme Muslim clerics and schools known as madrassas that routinely called for attacks on the United States and hatred of all things American. Madrassas in Pakistan, funded mainly by Saudi money, provided recruits for the Taliban.

Anti-American statements became standard fare in some Saudi-supported newspapers and publications. In 2001, after the 9-11 attack killed more than 3,000 people in the United States, it was determined that 15 of the 19 hijackers were Saudi nationals. The recently released report by the Joint Inquiry into the 9-11 attack states in an unclassified section that a Saudi citizen employed by the Saudi civil aviation agency paid many of the expenses of two of the hijackers, and "had access to seemingly unlimited funding from Saudi Arabia."

Saudi government officials and prominent Saudi citizens have routinely contributed millions of dollars to Muslim charities which support terrorism, including supporting families of terrorists killed in bombings or other terrorist attacks. The United States finally shut down several such charities that were operating in the United States. The United States also decided earlier this year to vacate its military posts in Saudi Arabia at least in part due to discontent within the country at having a U.S. presence and continuing attacks on the United States by some Saudi clerics and in some Saudi publications.

There are some recent actions taken by the Saudi government to stop terrorism. Saudi officials have openly identified their country as a strong U.S. ally and a foe of anti-American terrorism. In May of this year, after terrorist suicide bombings in Saudi Arabia killed 35 people, the Saudi government began a series of raids to arrest terrorists within its borders. One such raid in July reportedly resulted in the arrest of 16 persons linked to al Quaeda and the dismantling of a weapons arsenal with 20 tons of bomb-making chemicals, detonators, rocket-propelled grenades, and rifles. Saudi officials also allegedly used information uncovered in this raid to halt several terrorist plots. We will also hear testimony today that the Saudi government

21

has taken steps to strengthen cooperation in terrorist financing cases and other anti-terrorism efforts.

Today, there is a new irritant in U.S.-Saudi relations. It arises from the 28-page gap and other blanked out information in the 9-11 Joint Inquiry report. These deletions have been described as based less on protecting U.S. national security than on protecting Saudi Arabia from embarrassment. The former head of the Senate Intelligence Committee, Senator Richard Shelby, recently said, for example, that he had closely reviewed the deleted information and "90 to 95 percent" involved simply "embarrassing" information that should be declassified and disclosed. Recently, the Saudi government itself called for declassifying the information. Disclosure is the right course to set the record straight.

The evidence of the past few years indicates that Saudi Arabia has a mixed record when it comes to stopping terrorism aimed at the United States. Some of the madrassas and some of the government-controlled press continue to teach hatred of Americans and the United States. Some Saudi nationals, including Osama bin Laden, have led terrorist organizations focused on U.S. destruction. Some Saudi-supported charities collect money that supports anti-U.S. terrorism. Some Saudi-supported clerics continue to praise suicide bombings that kill Americans.

The overly simplistic question of President Bush—"Are you with us or against us in the war on terrorism?"—is seemingly answered "yes" in the case of Saudi Arabia. The disturbing question remains: Is Saudi Arabia, in too many cases, failing to take the actions needed to cut off terrorist funding and failing to encourage tolerance and moderation rather than the hatred and extremism that breeds new terrorists.

Senator LEVIN. My question of you, Mr. Newcomb, is the following: You have indicated that the recommendations that your Department has made relative to listing of entities that have contributed or have links to terrorist organizations in a number of cases were not accepted. And you have declined to identify the organizations, those charities and other entities that you recommended. On what basis do you decline to share with us those recommendations? Are you asserting Executive privilege here this morning?

Mr. NEWCOMB. No, Senator, I am not.

Senator LEVIN. Then what is the basis for your refusal to share with this Committee the names of those entities that you have recommended?

Mr. NEWCOMB. Let me be real clear about what it is we have done. We have looked at evidence or information we believe was credible, and we have surfaced the target to a Policy Coordinating Committee chaired by the Treasury Department to determine what action is appropriate, whether it be designation, law enforcement, intelligence, or diplomatic. A number of agencies have come forward in a variety of different contexts and recommended that action be deferred.

As to the specific names, it is matters that are sensitive because of law enforcement or other equities that are at stake. If you wish to have a briefing in a classified session, that would be more appropriate. But today, in a public hearing, it is not appropriate to mention actions that we may be taking to subvert the element of surprise or to in any way interfere with ongoing diplomatic, law enforcement, or other actions.

Senator LEVIN. Is that information classified?

Mr. NEWCOMB. Oftentimes——

Senator LEVIN. No, not oftentimes. Specifically, are the names of the entities that you have recommended for listing classified?

Mr. NEWCOMB. The evidentiary packages we prepare in most instances are.

22

Senator LEVIN. Now let me ask my question again. My time is up? I will still ask it one more time, if I may, Mr. Chairman. I know the Chairman tried very hard and others have tried very hard to get this information, so let me try again.

Are the names of those entities classified? The names classified that you have recommended for listing. It is a yes or no question.

Mr. NEWCOMB. The names themselves are not classified.

Senator LEVIN. Then I think you ought to present them to us today.

Mr. NEWCOMB. I don't have them with me, Senator.

Senator LEVIN. I think you ought to present them to the Committee within the next 24 hours if they are not classified, unless you are asserting Executive privilege that the President only can assert.

Thank you.

Senator SPECTER. Thank you, Senator Levin. When I passed you the note that the time was up, I was enjoying your questioning, not so much the answers but the questioning. But we have got a lot of Senators here and another panel.

Senator LEVIN. I appreciate that.

Senator SPECTER. Thank you. Senator Pryor.

**OPENING STATEMENT OF SENATOR PRYOR**

Senator PRYOR. Thank you, Mr. Chairman.

I have a question first for Mr. Pistole, and that is, have you found Saudi Arabia in general to be cooperative with your agency?

Mr. PISTOLE. There is a clear delineation between prior to May 12 and the bombings in Riyadh and after May 12. Prior to May 12, there was a lot of frustration. Several Senators have mentioned Khobar Towers, tremendous frustration with that. Since the May 12 bombings where Saudi citizens were killed, and U.S. citizens were killed, there has been, as I described it, unprecedented cooperation.

Senator PRYOR. When you say unprecedented, do you feel like it is totally transparent cooperation, or do you feel like they are still holding some things back?

Mr. PISTOLE. Oh, clearly, I believe they are holding some things back, just as I think we would in any investigation if we have the Mabahith come here to conduct an investigation because Saudi citizens were killed. We would not share everything with them because of national security concerns. So I don't for a minute doubt that they are withholding some information, what they perceive as in their national security interest. But the level of cooperation that we have had is such that, for example, having direct access to interview Saudi citizens who were eyewitnesses, direct access to the evidence, to bring back to the FBI laboratory if we so desired to do any type of analysis we wanted, that is what I describe as unprecedented.

Senator PRYOR. Mr. Newcomb, I would ask you the same question, and that is, the level of cooperation from Saudi Arabia to your agency.

Mr. NEWCOMB. Yes, we have achieved a number of successes. One was the joint designation of two branches of the Al-Haramain charitable organization in Bosnia and Somalia, as well as an indi-

23

vidual that was affiliated with one of the charities, Mr. Julaidan. At meetings that we participated bilaterally with the Saudis, they announced to us and then subsequently announced in a press release the creation of a ministry specifically for the oversight of charities. In discussions we had with the Jeddah Chamber of Commerce, they implemented a code of conduct relating to standards for charitable giving. And we have had dialogues with a variety of deep-pocket Saudi individuals going through the responsibilities that we believed they were presented in the sanctions initiative and the United Nations resolutions.

We have had meetings in Saudi and here, people soliciting us and us soliciting them. So those are things I would point to of things we have been able to do together, Senator.

Senator PRYOR. Thank you. I would also join with Senator Levin, Mr. Newcomb, that if the names are not classified, I think you should provide those to the Committee, hopefully within the next 24 hours.

The last thing I wanted to ask—this is a general question probably for both of you, and that is, as I understand Saudi Arabia, there are a lot of internal pressures relating to terrorist activity, and perhaps the government does not either have the will or in the final analysis maybe the total control over some terrorist activities that may be going on within its borders. And as I understand it, the royal family there has been subject to acts of terrorism and near acts of terrorism on a number of occasions.

Has that changed since—you were talking about May 11? I have forgotten the date.

Mr. PISTOLE. May 12.

Senator PRYOR. Has that changed since May 12?

Mr. PISTOLE. I believe so because I think that the royal family in particular sees themselves as being vulnerable to al-Qaeda efforts in the kingdom and that no longer is this simply an entity that is focusing on Western interests but has now turned on the kingdom and the royal family that represents the kingdom. So, yes, I think they see themselves in a struggle for survival at this point.

Senator PRYOR. Mr. Newcomb, do you have any comments on that?

Mr. NEWCOMB. I don't. I have not had discussions since that date so I could base any summary or conclusions, so I cannot add to that.

Senator PRYOR. Thank you. That is all, Senator Specter. Thank you.

Senator SPECTER. Thank you very much, Senator Pryor.

Mr. Pistole and Mr. Newcomb, there are obviously many more questions to be asked, but we have another panel. What we would request that you do is stay in the hearing room because something may arise in the course of the testimony from the next panel which would lead us to want to ask you some follow-up questions, if that should arise.

We will now turn to Dore Gold, former Israeli Ambassador——

Senator CARPER. Mr. Chairman, could I ask one quick question of these panelists before they leave?

Senator SPECTER. One quick question?

Senator CARPER. Yes.

24

Senator SPECTER. With an answer?

Senator CARPER. Hopefully.

Senator SPECTER. OK.

Mr. Pistole, we have had a late arrival here. Senator Carper has arrived and has one quick question.

### OPENING STATEMENT OF SENATOR CARPER

Senator CARPER. Gentlemen, and Mr. Chairman, thank you for your consideration.

Gentlemen, the report issued last year on terrorist financing by the independent task force sponsored by the Council on Foreign Relations States, "It is true that Saudi Arabia has taken two or three important steps to improve its capability to cooperate on these matters with the United States, for which it should be commended. A hundred more steps, and Saudi Arabia may be where it needs to be."

That is the quote, and that sounds like Saudi Arabia is about 1 percent of the way where it needs to be. Is that a fair characterization?

Mr. NEWCOMB. Senator, I would respond by saying at least from where we sit, Saudi has taken some important first steps, steps I have mentioned in answer to Senator Pryor's questions. I think then the question becomes follow-up, how are they implementing, what are the oversight of charities that this new ministry is doing, what future joint designations are we going to make, and how are they going to be implementing the regulation of charities and other such activities. So I think it is an ongoing process and one that we need to continue.

Senator SPECTER. Senator Carper, you have a second quick question?

Senator CARPER. Thank you, Mr. Chairman.

In terms of getting the other 99 percent of the way, what do we need to be doing at our end, the legislative end, to encourage that along?

Mr. NEWCOMB. I think we need to be doing more of what we are doing, what we are doing except more of it, and I think we need to continue dialogues where we are able to focus on the issues that are relevant to the relationship.

Senator CARPER. Mr. Pistole, do you want to add any comments on this?

Mr. PISTOLE. My only insight on that, Senator, is that it is such a broad issue for the U.S. Government as a whole with so many equities represented that, from an FBI perspective, we are having some significant successes that we are trying to build upon and that anything that we would do would need to be done in concert with the National Security Council, with all the other equities represented. So we are building on the successes. We are trying to get into things that we have never been allowed to before, and we have had some incremental successes.

Senator CARPER. All right. Thanks very much.

Senator SPECTER. Thank you very much, Senator Carper.

We will now proceed to the second panel. The first witness is former Ambassador Dore Gold, Israeli Ambassador to the United Nations, a recognized expert on Middle Eastern strategic affairs,

25

author of "Hatred's Kingdom: How Saudi Arabia Supports the New Global Terrorism." Ambassador Gold, we are very tight on time, and we will set the clock at 5 minutes, and we look forward to your testimony.

### TESTIMONY OF DORE GOLD,[1] FORMER ISRAELI AMBASSADOR TO THE UNITED NATIONS, AND PRESIDENT, JERUSALEM CENTER FOR PUBLIC AFFAIRS

Mr. GOLD. Thank you very much, Madam Chairman and Senator Specter and the Senators who are Members of this Committee, for inviting me to this panel. I should start by saying my testimony here, I am speaking on my own behalf. I don't represent the Government of Israel or any other institution. I think, however, that there are three dimensions of what Israel has experienced over the last number of years that will be of interest to the Committee and to the American people at large because of the concern about Saudi Arabia's role in support, both ideological and financial, of the new terrorism that we are facing.

I believe some of the lessons and some of the experiences that we are having have direct connections and implications for the issues that are of concern to you.

Let me begin with a little bit about how we have gotten into this subject, and I am going to basically restrict my presentation to just a number of issues that are in a PowerPoint presentation. You have my written testimony, if you want to go into further detail on historical elements as well.

If today, for example, a young Palestinian wishes to see what are the ideological sources on what basis he should commit a suicide bombing attack against Israelis, and he goes to the website of the Hamas organization, what you will find here—and you see it here on the PowerPoint. This is directly from a Hamas website. Of, let's say, the number of clerics that are mentioned here who justify suicide attacks, the use of suicide bombing, and the fact that the person is regarded as a martyr in Islam, the largest national grouping of clerics that support these positions are Saudis.

This immediately opened up the question of the Saudi relationship to the wave of suicide bombing that Israel is facing. But the problem of ideological support that we are seeing for these kinds of suicide attacks is not just confined to the area of Israel.

If we go on to the next presentation, right after the September 11 attack a book was published on a Saudi website which was rather alarming since it basically—it is called "The Foundations of the Legality of the Destruction That Befell America." This basically justifies the attacks on the United States.

Now, when you find a book like this on a Saudi website—and what was interesting, of course, is one of the men who is one of the authors of this book is mentioned on the Hamas website—you have to ask: Are we dealing with a Saudi extremist, someone who is on the periphery of society, somebody who is maybe the equivalent of a Timothy McVeigh in the Saudi system?

Well, we did biographical research on these individuals, particularly the two that wrote the introduction to the book. One of them

---

[1] The prepared statement of Mr. Gold with attachments appears in the Appendix on page 77.

26

is Sheikh al-Shuaibi, who recently died last year, in 2002, and he, of course, is one of the ideological sources on the Hamas site as well. He happens to be an individual who grew up in the Saudi system, who studied under the Grand Mufti of Saudi Arabia when King Faisal was in power. His students look like a "Who's Who" of Saudi Arabia, including the former Minister of Islamic Affairs of Saudi Arabia and the current Grand Mufti. And, therefore, when someone like this puts his name on a book justifying the attacks on September 11 and we find that that individual has a leading role in the education of elements of the Saudi establishment, that is a source of very serious concern about what is going on in Saudi Arabia in terms of religious support for the new wave of attacks that we are facing.

It also has a relationship to the financial side as well, because if leading clerics are taking position of this radical nature, what does that suggest to members of society who are thinking about what to do about charitable contributions, and even if an organization is considered tainted because of terrorist connections? Therefore, looking into the ideological support structure of the new terrorism becomes very important.

Just to give you a sense of where things can possibly lead, once you can justify attacks on the United States of September 11, it doesn't become surprising that we have now a new fatwa that was released in May 2003 which justifies the use of weapons of mass destruction against the United States, including the killing of 10 million Americans or other infidels.

Now, the author of this particular fatwa—his name is Nasser al-Fahad—happens to have been imprisoned by Saudi Arabia recently, which is a positive development because I know many of the Senators are following the post-May 12 developments. But, nonetheless, that these ideas are out there, that these ideas influence young people, are of tremendous concern. And, of course, we have also seen in the past in the 1990's where extremist clerics were put in prison by Saudi Arabia were subsequently let out. So this is an issue that you should be looking at.

Let me move now into the issue of the terrorist financing with direct implications for your Committee and for your concerns. This may be difficult for you to read, but this particular element of the powerpoint presentation outlines the three largest Saudi charities that have been suspected of being involved in terrorist financing: IIRO, WAMY—that is the World Assembly of Muslim Youth—and al-Haramain. I think the important element in this particular slide that you should pay attention to is many times you hear in a lot of these hearings Saudi NGOs, non-governmental organizations. And you would think from that, therefore, that the government responsibility in Riyadh is somewhat minimal when you see connections between Saudi charities and particular terrorist organizations.

But someone doing the most minimal declassified work possible, going to the websites of each of these organizations, in Arabic, you would find—when you try to see who is at the head of these organizations, what you will find is that these are not NGOs. These are GOs. These are government organizations, and let me be very specific.

27

When you look to see who is the head of the IIRO, which is a branch or a subset of the Muslim World League, you find that the chairman of the Constituent Council of the World Muslim League, the Muslim World League, is no less than the Grand Mufti of Saudi Arabia, who is, by the way, a member of the Saudi cabinet. If you look both at WAMY and al-Haramain—I understand you should have before you also these papers so that you can see them more clearly—you will see that at the head of both WAMY and al-Haramain, the chairman of these organizations, the chairman of the WAMY Secretariat and the chairman of the al-Haramain Administrative Council, is the Minister of Islamic Affairs of Saudi Arabia, who is also a Saudi cabinet member. So that the ultimate corporate responsibility in each of these organizations is in the hands of a member of the Saudi Government.

Now, in following how these organizations have been active, probably one of the earliest sources of evidence of some problem in the way that these organizations function comes from documents that were found in Bosnia in the late 1980's. One of these documents is on the stationery of the International Islamic Relief Organization, and it summarizes a meeting between bin Laden representatives and the Secretary General of the Muslim World League. This document is, of course, not an Israeli document. It wasn't found by Israeli sources, but it is certainly well known among those who are following this issue in the intelligence community.

But I think what directly relates to Israel is the following document. In Operation Defensive Shield in the West Bank, when Israel went into Palestinian headquarters, a number of Saudi documents were found, not just Palestinian documents, on the pattern of terrorist funding. This document is on stationery of the International Islamic Relief Organization, and it summarizes the disbursement of $280,000 to 14 Hamas front organizations. So here we have IIRO——

Senator SPECTER. Do you have a date on that document?

Mr. GOLD. I can get the date for you, but this document was undated. We can probably approximate it in the year 2000.

Now, what is very important, I think, for your study of this situation of Saudi financing of terrorism is to look at the statements that Saudi officials are making about issues which we can document. For example, Adel Jubeir, who frequently appears on American television—he is the foreign policy adviser of Crown Prince Abdullah—stated on August 16, 2002, on "Crossfire," "We do not allow funding to go from Saudi Arabia to Hamas." And he has made repeated references of this sort. On the other side, in the Foreign Ministry of Saudi Arabia, the Foreign Minister, Prince Saud al-Faisal told Arab News, an English newspaper of Saudi Arabia, the following on June 23, 2003. He was asked if the kingdom had ever financed Islamic movements in Palestine, meaning Hamas and Islamic Jihad, whether directly or indirectly. And Prince Saud said that since the establishment of the Palestine Liberation Organization as the sole legitimate representative of the Palestinian people, the Saudi Kingdom has been sending the remittances through the PLO. So, again, we have another firm denial of any Saudi Arabian support for Hamas.

Senator SPECTER. Ambassador Gold, you are now double time, so could you sum up?

Mr. GOLD. Yes. I will wrap up with one more document.

One of the strongest sources of evidence showing Saudi Arabian support for Hamas, a recognized international terrorist organization, is actually a letter written by Mahmud Abbas, also known as Abu Mazen, the Prime Minister of the Palestinian Authority today. This letter was written in December 2000. It was a fax that was sent to Prince Salman, governor of Riyadh and a full brother of King Fahd. In this letter, Abu Mazen specifically requests that the Saudis stop funding al-Jamiya al-Islamiya, which is a Hamas front in the Gaza Strip.

I would just end by showing you the kind of activities that this organization does, because many people say, oh, well, they are involved in civilian activity. This is a graduation of 1,650 kindergarten students in the Gaza Strip in 2001 in which the children are in uniforms. They are re-enacting terrorist attacks. For example, here is a young girl re-enacting the lynching of Israeli soldiers. Many of them are also wearing suicide belts as well. So this is the kind of education which Saudi Arabia has been funding and the kind of education which Abu Mazen has sought that the Saudis stop.

One last element, because terrorist financing is—and this will be my final slide. This is a check, a corporate check from the Chase Manhattan Bank in New York. The corporate check belongs to Al-Rajhi Banking and Investment Company, which has long been suspected of being a conduit for terrorist financing by many authorities. In this case, we actually found a check from 1999 showing how an American account could be used for funding Hamas. The organization the check is written to is Lajna Sakat Tulkarm, which means the Tulkarm Charity Board, which is an unquestionable Hamas front.

I will stop here, and we can go into further elements of my presentation.

Senator SPECTER. Thank you, Ambassador Gold.

The Committee had invited Adel al-Jubeir, foreign policy spokesman for the Kingdom of Saudi Arabia, to appear and he declined. I want that to be known publicly.

Our next witness is Jonathan Winer, formerly Deputy Assistant Secretary of State for International Law Enforcement, and now an attorney with the firm of Alston and Bird. Thank you very much for joining us, Mr. Winer, and we look forward to your testimony.

### TESTIMONY OF JONATHAN M. WINER,[1] ALSTON AND BIRD

Mr. WINER. Thank you, Mr. Chairman. Before the team goes off to Saudi Arabia to try and work these issues out, it may be useful to recollect what has happened in past missions.

Back in 1998, 5 years ago, right after the bombs went off in Dar es Salaam and Nairobi, the Executive Branch convened an interagency meeting on the International Emergency Economic Powers Act to determine whether there should be designations in connection with those bombings in relationship to terrorist finance. We

---

[1] The prepared statement of Mr. Winer appears in the Appendix on page 110.

29

tried to assess as a government then what the basis was for al-Qaeda to carry out its activities around the world, and we had two false conclusions we were basing our assessment on at the time. The first is it doesn't take a lot of money to be a terrorist, and the second is bin Laden is wealthy and doesn't need money from anybody else. It was an incomplete theory of the case, an inadequate theory of the case, and ultimately a wrong theory of the case.

The actual case was it cost a lot of money to create al-Qaeda. It was a constant fundraising operation. And it took us some months until late 1998 to figure that out. We now had a theory. The question was what to do about it.

What we sought to do then was to map the network with fragmented information, identify the key nodes, and then try to disrupt those nodes. We also had as a government the enormous power of the International Emergency Economic Powers Act to freeze assets of foreign entities—banks, businesses, charities, whatever. And we recognized that this important power was not recognized or understood by many countries, including countries where we saw terrorist finance to be a problem.

We came to the conclusion that we should do an International Emergency Economic Powers Act designation against the Taliban as one way of taking action against al-Qaeda, as a means of putting pressure not only on the Taliban but their supporters, as well as other governments in the region. We wanted to increase the leverage that we had.

We had had sporadic contacts at that point with embassies in the region, including with the Saudis. These were not particularly focused, and they weren't particularly high level. We recognized in late 1998, early 1999 as a government that the only way you can really deal with the Saudi Government is from the top down. There were communications between the Vice President's office and Crown Prince Abdullah which took place in which the United States said we want to send a team over that is very high level to discuss something that is very important in connection with our embassies having been attacked.

In May or June 1999, these meetings took place in Saudi Arabia. They were interagency meetings, very similar to the interagency meetings that are about to take place once again in Saudi Arabia that have been discussed earlier today in these hearings.

We had said we didn't want one-on-one's, this agency meeting with that agency on either side, because when you have one-on-one's agency after agency, you can get the runaround: We would love to help you, but you have to go talk to someone else. We wanted a unified, integrated approach government to government. That is my understanding of what took place. I was not directly part of that mission. I received reports when it came back.

The delegation talked about IEEPA to the Saudi Government. They talked about how the use of IEEPA could hurt U.S.-Saudi financial and economic relationships and even result in substantial freezes of Saudi funds and freezes of funds of high-level individuals in Saudi Arabia with international prominence. These meetings took place 4 years ago, prior to the September 11 attacks.

We advised them that we would be shutting down Ariana Airlines, the Taliban's airline, and that any airports that continued to

permit Ariana flights to take place, they could potentially get shut down. At that point, the Moscow airport and the Saudi airport were two of the airports that Ariana was using, given cover in part by the Russians. The Saudi ability—Ariana Airlines' ability to use Saudi Arabia was stopped at that time, and that provided the first use of IEEPA in that area relevant to the terrorist area.

We hoped that this would start a new relationship on the subject of terrorist finance. I left the government in late 1999. I was told that there was a second meeting in early 2000. Another U.S. inter-agency delegation went to Saudi Arabia. The readout that I hear on an unclassified basis very generally is that there was only marginal benefit from the second meeting, that the desert sands of Saudi Arabia had ground down this initiative like so many before it. Again, 3½ to 4 years ago, prior to September 11.

One problem we ran into was that the Saudis had very little centralized integration and their government agencies didn't talk to one another, didn't trust one another, didn't work together, didn't communicate with one another. And that had an impact on the political will of the Saudi Government.

Now, I was asked also to talk briefly about the designation process. I participated in IEEPA designation processes on various issues when I was in the Clinton Administration, and I can tell you that, yes, sometimes it was the State Department who said no, we don't want to get our foreign partners upset—not my part of the State Department but other parts of the State Department. And, of course, geographics trump functionals most of the time at the State Department. State relationships are more important. Sometimes it was the FBI. Quite often it was the FBI because they didn't want to have criminal cases interfered with. Sometimes it was the Justice Department backing up the FBI.

In my experience, it was never the CIA or the intelligence agency. It may have happened in other cases, but not in any case that I participated in. And very rarely—rarely—it was the White House or the Treasury, but very rarely. Usually State or FBI in my experience.

Now, did we shoot down designations that Treasury had the ability to put together and, in fact, recommended? We absolutely did. It did not happen to be in the terrorist area during my time. It was in other areas. But it certainly happened, in which foreign policy or other considerations trumped decisions or recommendations made by OFAC. I can say that as a general matter.

A couple of final points before I run out of time. It has been my experience that collective leadership is not usually a mechanism to forceful action. In the Clinton Administration, through much of the time a fellow named Dick Clark pushed counterterrorism in a central way, including terrorist finance. I am sure there is someone doing this in the administration today. I just don't happen to know who it is. I am concerned that there isn't somebody in the White House with that job. I think there should be.

Finally, with regard to the Saudis and this latest mission, coming 4 years after the first mission on exactly this topic, denial is not just a river in Egypt, and those who forget the past are condemned to repeat it.

Thank you, Mr. Chairman.

Senator SPECTER. Thank you very much, Mr. Winer.

Our next witness is Steve Emerson, an expert on terrorism and terrorist financing, the author of "American Jihad: The Terrorists Living Among Us." Mr. Emerson is currently NBC's terrorism analyst and a special investigative correspondent for CNN.

Thank you for joining us, Mr. Emerson, and we look forward to your testimony.

## TESTIMONY OF STEVEN EMERSON,[1] EXECUTIVE DIRECTOR, THE INVESTIGATIVE PROJECT

Mr. EMERSON. Let me clarify that I was formerly a correspondent for CNN. Thank you to the Committee for holding this hearing this morning. I think that shining a light on the whole issue of the very intricate web of connections between the Saudi Government and the funding of terrorism is absolutely pivotal to preventing another September 11.

Just recently, in the last month, Adel al-Jubeir, foreign affairs adviser to the Crown Prince Abdullah, denied that Saudi Arabia was funding terrorism, and when asked about whether Saudi charities had complied with the new regulations, he said he hoped so. He also stated, "If the UN is headquartered in New York, is America responsible for everything the UN does?"

Now, I think it is very important to bear out in the very beginning here that the analogy that Mr. Jubeir has referred to is not correct. The fact of the matter is that major Saudi NGOs, non-governmental organizations, as they have been designated legally, either in Saudi Arabia or in conjunction with the United Nations, have been tied for years directly and indirectly to the support for al-Qaeda, Hamas, Islamic Jihad, and other terrorist groups. Often, it must be stated, the connections are not neatly compartmentalized, largely because of the very complex ways in which terrorist funding has been laundered to terrorist groups. Still at other times, the evidence shows that NGOs carry out activities that are "totally legitimate and legal." Indeed, it is the very external legitimacy of these groups that provides the perfect cover to siphon off, divert, or launder financial support or to provide cover for terrorist cells. There is also a problem sometimes in determining whether an affiliate group makes the entire organization corrupt or whether, in fact, there is just one bad rogue chapter in that organization.

Let me just briefly go over some of these things that I have presented in the written testimony to give an indication of why the problem is not just limited to either select chapters and why it is connected to the Saudi regime itself.

For example, we have collected several textbooks used and distributed in the United States, distributed by the Saudi Embassy in Washington, D.C. They have the full imprimatur of the Kingdom of Saudi Arabia on the textbooks. In the testimony, I refer to the curricular used in grades 4 through 11, but let me just cite a quote from the 7th grade class Book 5. The book says, "'What is learned from the Hadith?' and teaches, 'The curse of Allah be upon the Jews and the Christians.'" Grades 8 through 11 continue to emphasize the notion and piousness of the jihad, and in grade 11 it warns

---

[1] The prepared statement of Mr. Emerson appears in the Appendix on page 131.

against taking the Jews and Christians as friends or protectors of Muslims.

I think this, unfortunately, helps develop a whole generational mind-set that leads to terrorism, noting that terrorism is really the culmination of indoctrination and recruitment. Much of that indoctrination is entirely legal, with terrorism being the violent, illegal expression ultimately and representing the culmination of the indoctrination and recruitment.

The Muslim World League, as has been referred to previously, is a group that was established in 1962 by the Saudi Arabian regime. It has continued to fund major Islamic movements around the world, often defending itself by claiming it is only involved in promoting education or repelling hatred against Islam.

However, it is absolutely clear that U.S. investigators, law enforcement for the FBI and intelligence investigators at the CIA, have collected abundant material showing MWL connections to al-Qaeda and to Hamas during the past 20 years—15 years in Hamas, to be specific, and in the case of al-Qaeda going back to the late 1980's. Similarly, other groups in Saudi Arabia, NGOs such as the International Islamic Relief Organization, established in 1978 as an arm of the MWL. Let me just briefly point out that in 1994, Muhammad Jamal Khalifa, Osama bin Laden's 37-year-old brother-in-law, was arrested in California coming from the Philippines. In his possession were documents connecting Islamic terrorist manuals to the International Islamic Relief Organization, the group that he had headed in the Philippines. In addition, the Canadian Government has stated in testimony in Canadian courts in the last 2 years that the IIRO secretly funded terrorism.

I think it is also important to note that Fayez Ahmed Alshehri, one of the September 11 airline hijackers, told his father before he set out for the hijacking conspiracy that he was going to work for the IIRO.

There is another group that is also involved and controlled by the Saudi Government and also has been cited in terms of its ties to Bosnian terrorists and to al-Jemaa Islamiyah. This group is al-Haramain.

Last, I would like to point out that the group called WAMY, the World Assembly of Muslim Youth, is an organization that, even though Saudi officials claim have no official connection, is largely funded by Saudi officials and by senior Saudi philanthropists. This organization has been tied to the 1993 World Trade Center bombing and has been repeatedly tied to al-Qaeda in numerous activities around the world. Most of that material I submit for the record in the testimony.

Thank you very much.

Senator SPECTER. Thank you, Mr. Emerson.

I had asked FBI Official Pistole to stay, and I have one question for you at this point as a follow-up to Mr. Winer. Is Mr. Pistole present?

Mr. LORMEL. I am Dennis Lormel, sir. Mr. Pistole had to go back to the office. I stayed behind. I am chief of the Terrorist Financing Operations Section.

Senator SPECTER. Well, when we ask witnesses to come, we request that they stay for the full hearing because in the course of

the hearing other issues arise where we would like to have them here.

Mr. LORMEL. Sir, that is why I stayed. If I could answer the question, I would be happy to.

Senator SPECTER. Well, when the Committee asked Mr. Pistole to stay, he ought to stay. In his absence, I will ask you the question.

It has been reported that the FBI will not pursue a criminal investigation where probable cause exists for the investigation if there is an objection from the State Department. Is there any validity to that report?

Mr. LORMEL. No, sir, I don't believe so. Maybe if you could explain a little more, I could better understand the context.

Senator SPECTER. Well, the report is that where there is probable cause to pursue an investigation under the criminal laws of the United States, the State Department can interpose an objection and prevent that investigation from going forward. And that is a very relevant point of inquiry at this particular hearing. It is a point that I have inquired about before.

Would you do two things? Would you identify yourself for the record? Do that now.

Mr. LORMEL. Dennis Lormel, and I am the chief of the Terrorist Financing Operations Section in the Counterterrorism Division of the FBI.

Senator SPECTER. OK. And would you relay that question to higher authorities in the Federal Bureau of Investigation and respond to this Committee?

Mr. LORMEL. Yes, sir, I will.

Senator SPECTER. Thank you.

Mr. LORMEL. And to my knowledge, I am not aware of any such cases. I can specifically speak to terrorist financing, and in our investigations there has been no such interaction with the State Department requesting that we stand down on criminal cases.

Senator SPECTER. Well, take the question up with higher authorities in the FBI, and while you are doing that, tell them that when the Committee asks a witness to appear, we like to have them here for the entire hearing, like the Senators are here for the entire hearing.

Mr. LORMEL. Yes, Senator.

Senator SPECTER. Mr. Winer, you very delicately stated that the State Department doesn't want to get our foreign partners upset. That is a magnificent understatement. Have you ever heard of a report that the FBI would not pursue an investigation, a criminal investigation, where probable cause existed if the State Department raised an objection at the highest levels?

Mr. WINER. I have not heard such reports, sir. In the time that I was at the State Department as the senior person for international law enforcement, I was aware of no such request from the State Department to the Bureau. Certainly I made none or would have encouraged or permitted the making of none.

However—and it is an important caveat—when requests of that nature are made, they are not written down and they are not done within the system, and they are done at a high level. I don't mean this specific request because I don't know of such a request. But

34

if a foreign government wished to be protected from a particular action by the U.S. Government and a Secretary of State so chose to do it, they do have the capacity and, in my experience, take advantage of that capacity to go around the system on any number of highly sensitive matters to arrange to have things done.

I think it is very undesirable because I believe every decision made should be on the record. I believe it is critical for the integrity of the system not to have decisions taken off the record. But it did take place during my time in government, not in connection with the FBI, not in connection with a criminal justice matter.

Senator SPECTER. Well, what was it in connection with and what was it?

Mr. WINER. Inquiries that other people were making other than the FBI. Matters were essentially calmed, quieted, stopped as a result of very high-level interventions, but not criminal justice pertaining to terrorism, not law enforcement per se. Regulatory.

Senator SPECTER. Can you be a little more specific in 12 seconds?

Mr. WINER. I can not, not because I am trying to protect any information from the Committee but because while I recollect it happening more than once, the exact circumstances are not at my fingertips, unfortunately. The memory of it is absolutely precise, but the substance, unfortunately, is not, sir.

I will say last, if I may, that in the regulatory review process, the fact that there is no process for integrating the equities into a solution is a huge problem when it comes to IEEPA. And, generally speaking, the way in which the Bureau deals with the State Department is that simply the Bureau does its thing, the State Department does its thing, and never the twain shall meet. So the problem is, when you get into everyone asserting their equities within the interagency process for an IEEPA designation, if one component objects, often that terminates, shuts down the whole thing, and that is not a good outcome.

Thank you, sir.

Senator SPECTER. Well, there is considerable concern by many in the Congress about Saudi Arabia being shielded for foreign policy reasons.

Mr. WINER. I have that concern, sir.

Senator SPECTER. That has been broadly expressed here today and in virtually every quarter. And one of the inquiries which has to be pursued is to what extent that is done and what are the policy ramifications, and it may be appropriate on public policy lines. But when you have a criminal investigation, an investigation into the U.S. Criminal Code, and there is probable cause to proceed, and it does not proceed because of foreign policy considerations, that is a matter which should attract the attention of the Congress at the highest levels. And that is an issue which is being pursued. It is not an easy issue to get answered.

Chairman Collins.

Chairman COLLINS. Thank you very much, Senator Specter. Ambassador Gold, your exhibits are extremely persuasive and convincing in casting much doubt on the repeated claims by the Saudi Government that it is not funneling money to terrorist groups such as Hamas. Our previous FBI witness believes that

35

there has finally been a sea change in the commitment of the Saudis since the bombing in May in Riyadh.

I want to ask you two questions. First, what is your general assessment of the commitment by the Saudis in the wake of the May bombing? Do you believe there really is an attitude change and a commitment now? And, second, have you seen any evidence that the May 12 bombings have caused the Saudis to cut back on their financial and other support for Hamas?

Mr. GOLD. Let me answer your question, Madam Chairman. I think one has to draw a fundamental distinction between what is going on domestically in Saudi Arabia and what might be going on globally. Certainly that is the evidence that I have at this point.

I think it is clear, anybody just perusing newspapers since May 12, that Saudi Arabia is taking a large number of counterterrorist actions at home in terms of unveiling different units of al-Qaeda or—and, by the way, in geographically different parts of the kingdom—or trying to find weapons caches. That seems to be what is going on there. Counterterrorism activity at home seems to be considerable in comparison to what existed before.

However, I can report to you with, let's say, full authority and perhaps even encapsulating the national intelligence assessment of Israel that at present, as we speak, approximately 50 to 70 percent of the Hamas budget comes from Saudi Arabia. And I would say that portion, the Saudi portion of Hamas funding, is growing rather than declining.

Now, that is all I can say about the particular case of Saudi Arabia and Hamas. I think it would be interesting to compare what is going on globally in the Philippines, in Russia, in East Africa, and with respect to al-Qaeda as well outside of Saudi Arabia to see whether their action is only aimed at protecting themselves domestically, but it is basically the same old business overseas.

Chairman COLLINS. Thank you.

Mr. Emerson, you raised a very good point in your statement that it is not only a matter of Saudi support, financial support for terrorist organizations but, rather, the curriculum, the schools, what Saudi children and Saudi-supported schools elsewhere are teaching young people and whether or not they are instilling a hatred of Christians and Jews. And to me that is equally disturbing because it helps raise a whole new generation of people who are going to be susceptible to terrorists, to involvement with terrorist groups.

Have you seen any change in Saudi schools since the events of September 11 or more recently since the bombing in Riyadh?

Mr. EMERSON. Since September 11, I can tell you Saudi officials have declared that they have reined in some of the clergy and they fired or, "re-educated more than a thousand clerics."

On the other hand, the fact of the matter is if one looks at the FBIS reports, the Foreign Broadcast Information Service reports, plus the Saudi media and Saudi television, which is openly available on satellite television, one can see routine demagoguery leveled against the United States, against Christians and Jews routinely. Saudi websites features are the demonization of Jews and Christians as well as moderate Muslims. And I think you should be aware of something else, very disturbing. This incitement is not

36

necessarily illegal. It is considered free speech, and particularly in the United States. The problem is: How does one combat incitement within the context of an open society?

It is my feeling that incitement needs to have the sunshine to expose the whole virus of extremism, and those groups, entities, individuals that are propagating the incitement need to be delegitimized, or invited to the United States, or embraced. And I think that goes to the heart of getting Saudi Arabia to understand and recognize that it must rein in the extremists that in turn breed the terrorists that carried out September 11.

Chairman COLLINS. Thank you. May I do just one quick question for Mr. Winer?

Senator SPECTER. Absolutely.

Chairman COLLINS. Thank you.

Mr. Winer, you have experience in a previous administration, and I am trying to better understand why the U.S. Government has not been tougher with the Saudis. Do you believe that one factor, aside, perhaps, from our bases or oil, but I have heard that the U.S. Government has been hesitant to go after some suspected financers of terrorist groups because they are prominent Saudi business people. Do you think that is accurate?

Mr. WINER. Yes.

Chairman COLLINS. Could you expand further on why you think the Federal Government under both the previous administration and perhaps this administration as well has been somewhat reluctant to fully confront the Saudi Government in the wake of all of this compelling evidence?

Mr. WINER. I think a number of the factors are institutional and bureaucratic before you get to the additional factors pertaining to Saudi Arabia itself.

First, institutionally and bureaucratically, the only businessmen really that the U.S. Government went after prior to September 11 were Colombian businessmen who were also major cocaine traffickers. Prior to that, we used the International Emergency Economic Powers Act against countries or against military leaders, that kind of thing. These were businessmen. We were able to go after them because we found a computer in Colombia from the Cali cartel that listed all the businesses owned by these people who we had chapter and verse as drug traffickers. Easy case to make. Justice led making that case. Treasury, Mr. Newcomb strongly supported doing that because he felt all the facts were there, and it wasn't going to put IEEPA powers at risk, because what the U.S. Government is worried about, if we reach too far and somebody who is well funded goes after us and says you don't have the authority to do that, you don't have the public evidence to do that, we might lose some of that power. So there is an institutional concern. Don't overreach and then lose some of the power you have. Those are institutional and bureaucratic but very important constraints.

In the area of Saudi businessmen, you have got the problem of the fragmentary nature of the information, the fact that money is fungible, and just because a businessman funded a huge charity and that charity engaged in terrorist logistical support and recruitment in the Philippines and in the Middle East and in Chechnya

37

and Bosnia and wherever, while also doing lots of wonderful other things, how do you know that that businessman when he gave that money intended the bad things as well as the good things? A difficult case to make.

So prior to September 11, you are having tremendous tensions over what is the right thing to do in light of those institutional issues, legal issues, practical issues, even before you get to the sensitivity of the Saudi relationship itself. The facts about terrorist finance, while voluminous, are also often rather murky and difficult to fully decipher. Our intelligence was poorly arrayed prior to September 11 to gather all the information we needed. The interagency process didn't work as well as it should have, although Dick Clark tried valiantly to put it together and did, I think, a remarkable job. We didn't have as many facts as we should have. But we went to the Saudis as a government, shared with them what we had, asked them for more information, warned them of what might take place, and ultimately nothing happened. I think those are all facts that are undisputable. The why's and the wherefore's and the what should's are really up to you all to determine next.

Thank you very much, Madam Chairman.

Chairman COLLINS. Thank you, Senator Specter.

Senator SPECTER. Thank you, Chairman Collins. Senator Pryor.

Senator PRYOR. Thank you.

Mr. Winer, if you can educate this Committee just very briefly, as I understand Saudi Arabia—tell me if this is true or not. But as I understand Saudi Arabia, the economic power and the political power really are merged into one in the sense of there are families and it is pretty much one and the same.

Mr. WINER. I know of no facts to dispute that assessment. I think that is right.

Senator PRYOR. OK. So sometimes when we talk about individuals doing something versus the government doing something, a lot of times it is a matter of an individual maybe in their personal capacity versus in some other official capacity, right? It is all a hodgepodge. It is all mixed up. Is that fair to say?

Mr. WINER. Yes, sir.

Senator PRYOR. One thing that we are sensitive to obviously here in this country is al-Qaeda as a terrorist organization. I know that Ambassador Gold has mentioned a few times, Hamas. In this country, we are not quite as tuned into that. But, Ambassador Gold, what other terrorist organizations in your personal view have ties to Saudi Arabia besides al-Qaeda and Hamas?

Mr. GOLD. Well, many of these organizations are part of all the same network. In fact, al-Qaeda should probably be seen as a consortium of terrorist organizations where they use the assets, sometimes manpower assets, sometimes financial, conduit assets, sometimes expertise in explosives, and share them around the world. Some of those assets are in the Philippines. Some of those assets are in Indonesia. Some of those assets are in Chechnya and Dagestan in Russia. Some of those assets are in Egypt. And Hamas, by the way, is part of that network to a large extent.

I think you can find the fingers of Saudi financial involvement through these charities with most of the countries that I mentioned.