# EXHIBIT 47A

38

Let me just add one other point to my presentation at this time. Many times you are going to see Saudi denials, very firm denials, that they have cleaned up their act, that these charitable contacts around the world no longer are with suspected groups. For example, there was a press release put out on October 18, 2002, by the Saudi Embassy in Washington, and in it the Saudis asserted that, since September 11, all charitable groups have been audited to ensure that there are no links to suspected groups.

Now, I don't know what a suspected group is and they don't clarify it, but you would think that a suspected group would be groups that are on the State Department list of terrorist organizations. Well, the very same month that in Washington the Saudis were putting this out as a press release to the Washington Press Corps, you had another little event going on in Riyadh, Saudi Arabia. You had a WAMY conference. And that photograph of Khaled Mashal, one of the highest leaders in the Hamas organization, was taken by Reuters at a WAMY conference in October 2002, the very same month. So, in Washington, they are saying that they are cutting off their contacts, the contacts of the charities, with suspected groups, yet in Riyadh you have the Saudis inviting one of the leaders of Hamas to a WAMY conference in Saudi Arabia.

By the way, the Hamas actually prepared a record of Khaled Mashal's meetings in Riyadh, and it was found by Israeli forces the following month in the Gaza Strip. And according to that record, Khaled Mashal was not just a peripheral guest of a peripheral organization, WAMY. He actually had a for-eyes meeting with Crown Prince Abdullah, who actually chaired that WAMY conference.

Senator PRYOR. Mr. Winer, if I may ask you, with the increased financial security on terrorist organizations around the world, do you see some new tactics out there that they are trying to do to get around some of our efforts? And what are those tactics, and what do we need to be looking for?

Mr. WINER. Yes, sir. One quick observation. I am not aware of any individual or entity that has been arrested for terrorist finance in Saudi Arabia to date. If there have been any such arrests, none of them have been publicly announced.

As to new techniques, gold markets and precious metals generally, commodities, diamonds, as Senator Akaka raised before, remain essentially unregulated globally. Regulation of charities globally still is extremely poor, and charities remain a tremendous opportunity well outside Saudi Arabia for moving terrorist funds.

The underground alternative remittance systems are still, by and large, extremely poorly regulated. In every country, we are beginning a crackdown. Here we have required them to register in theory. I am not sure whether that is as effective as it should be. Certainly registration of hawalas in the Middle East remains relatively minimalist in practice, and those networks are very substantial. Money continues to move back and forth in terms of currency from Yemen to Saudi Arabia and into and out of UAE. So our ability to track all of that, particularly in connection with remittances, some of which involve legitimate remittances and some of which don't, is poor. And the religious schools around the world generally have no oversight in terms of movements of money.

39

In the United States, if you go to the IRS filings for religious groups, mosques, synagogues, or churches—it doesn't matter what religion—all you have to do is say, "I am a mosque," "I am a church." That is all you have to report to the IRS. There is no further detail in the public filings beyond that. That is in the United States, which is presumably one of the better regulated countries. So I think that is still a potentially significant problem.

That said, formal financial institutions cannot risk being associated with terrorist finance. If the U.S. Government were to go after any major financial institution anywhere in the world with a terrorist finance designation, it would create such a chilling impact that one would imagine further due diligence, regulatory efforts be put into place by financial institutions all over the world to ensure that didn't happen to them and to protect shareholder interests and equities.

Thank you.

Senator PRYOR. Thank you for that answer, and I want to thank the panel for being here.

Senator SPECTER. Thank you, Senator Pryor.

The Committee intends to pursue the question as to whether economic sanctions are being imposed, and there are very substantial indicators that they are not. When Saudi Arabia is involved, we are soft on economic sanctions. But there is a broader picture which is emerging, and that is the potential for criminal sanctions.

We have held in the Judiciary Committee hearings several years ago on the focus on U.S. citizens being murdered in Israel by terrorist organizations. And we are pursuing the question of bringing those terrorists to the United States for trial.

In 1986, we passed the Terrorist Prosecution Act, which gives extraterritorial jurisdiction to the United States to bring terrorists into our courts and to impose the death penalty. And there are two cases which we are currently focusing on with Israeli Attorney General Rubenstein and U.S. Attorney General John Ashcroft. One involves an individual who is in the United States where requests have been made to get witnesses to testify about his conduct involved in terrorism and murder of American citizens, and that evidence has to be provided by Israel. And contacts have been made at the very highest level with the Israeli Government, and some assurances have been received that there will be cooperation.

There is another individual who confessed on television, with no question about the voluntariness of the confession. And the issue is getting that individual extradited to the United States, which is complicated because, as is well known, Israel does not have the death penalty. But there are exceptions under Israeli law where national security is involved. And when we go through the very impressive chart, Ambassador Gold, that you put up about Saudi national charities and the financing of international terrorism, and they are not non-governmental organization, they are governmental organizations, those individuals who finance Hamas are potentially liable for prosecution in the United States criminal courts because Hamas takes credit for the killings. The murders at Hebrew University were American. U.S. citizens were murdered.

So this is a matter that we need to pursue further on the hard evidentiary line. But I think that economic sanctions are fine. I

would like to see them imposed, but there is a lot more that can be done.

Let me yield at this point to Senator Collins, and I will come back to questioning.

Chairman COLLINS. I just want to thank you, Senator, for spearheading this investigation. It is important, and the evidence we have heard in the statements this morning from the experts are compelling in painting a picture of the Saudi Government's many links to these charitable organizations and those organizations linked to terrorist groups. So I applaud your initiating this investigation, and I look forward to continuing to work with you.

Senator SPECTER. Well, thank you. Thank you, Senator Collins. Senator Pryor, do you have any further questions?

Senator PRYOR. No.

Senator SPECTER. Then let me proceed just a bit further.

Ambassador Gold, you have testified about the document which was signed by the current Palestinian Prime Minister requesting that Saudi official stop financing Hamas. Would you go through that again and elaborate on precisely what it says?

Mr. GOLD. Well, we actually have an English translation.

Senator SPECTER. That is from Abu Mazen?

Mr. GOLD. Abu Mazen, yes. Also known as Mahmud Abbas.

Senator SPECTER. Who is the Palestinian Prime Minister.

Mr. GOLD. He is the Palestinian Prime Minister, and he wrote in his own handwriting a fax that was sent to Prince Salman, the governor of Riyadh and full brother of King Fahd, probably the fourth most powerful man in Saudi Arabia. And I can just read this paragraph to you that I have on the screen, which is an exact translation of the relevant material.

Senator SPECTER. Please do.

Mr. GOLD. "I hereby wish to inform you that he"—meaning Yasser Arafat—"has spoken with me on the telephone and asked me to transmit to you his request that you mediate and interfere and express his view concerning the ongoing situation in our homeland. The Saudi committee responsible for transferring the donations to beneficiaries has been sending large amounts to radical committees and associations, among which the Islamic Society"—that is a translation of al-Jamiya al-Islamiyah—"which belongs to Hamas, the al-Islah Association"—an association known to be a Hamas institution in Gaza—"and to the brethren who engage in jihad in all regions. This fact badly influences the internal situation. It also results in strengthening these brethren and has, therefore, a negative impact on all sides. Moreover, the Committee does not send any money or assistance to members of Fatah."

So this is, again, written not by an Israeli but by perhaps the No. 2 man in the Palestinian Authority today——

Senator SPECTER. Perhaps the No. 1 man.

Mr. GOLD. Well, a lot of people are hoping to make him the No. 1, Prime Minister Mahmud Abbas. It is in his own handwriting, and it was written in December 2002.

Senator SPECTER. I will come to you in a minute, Mr. Winer.

And it is directed to whom, again?

41

Mr. GOLD. Prince Salman is the governor of Riyadh, and it is directed to him. He is a full Sudairi brother of King Fahd, and I would say about the fourth most powerful man in Saudi Arabia.

Senator SPECTER. Do you have a judgment as to why the letter was written to him?

Mr. GOLD. Well, apparently they had sent messages to others as well, such as Prince Naif. But Salman has always been a kind of critical figure in many of the charitable enterprises, and perhaps that was why he was chosen.

Senator SPECTER. And when the last line says that no contributions were given to Fatah, what do you make of that?

Mr. GOLD. Well, I think here there is a desire, clearly, to make sure that all resources coming from Saudi Arabia go through the Fatah organization, which is the largest national component inside the Palestinian Authority. They want the money in their hands and not going to Hamas.

I think the importance of this document is that it clearly indicates that Saudi Arabia was funding Hamas in the year 2000, and we would say, as I said earlier, that funding is continuing to this day, in fact, becoming more significant as we speak.

Senator SPECTER. Mr. Winer, you had your hand up indicating a wish to say something?

Mr. WINER. It relates to this topic. Last year, FBIS reported that President Musharraf in Pakistan sent a similar communication to senior Saudi officials asking the Saudi Government to stop funding or Saudi Arabia to stop funding radical militants in madrassas in Pakistan who were creating problems of Islamic militancy within Pakistan for President Musharraf.

Senator SPECTER. What do you think we ought to do about that, Mr. Winer? You are a former State Department official.

Mr. WINER. I think that the Congress and the White House still speak with the bully pulpit, that they are communicating, as you are doing today, is important. Beyond that, I think sanctions have to be taken against particular entities, when we have sufficient evidence to determine that an entity, regardless of who——

Senator SPECTER. How about sanctions against the Saudi Arabian Government?

Mr. WINER. I think the first thing to do is sanctions against economic entities that are substantial where we have definitive information that those entities have been used to fund terrorism. That is what our law permits. That is what we have warned Saudi Arabia, among others, we could do. To the extent that we have the ability to do that and the evidentiary packages are sufficient, I think we should do it. That is my opinion.

Senator SPECTER. Ambassador Gold, to what extent, as you produce documents and show charts, is there an evidentiary chain which would go to these officials of the Saudi Government who are chairmen of these organizations, IIRO, WAMY, al-Haramain, to show the connection between those individuals and their direction of funds through these specific organizations to Hamas, which then results in the murders of U.S. citizens?

Mr. GOLD. I cannot supply the evidence to show that the heads, the chairmen of these organizations know where every dollar is going in these particular allocations to Hamas. But, again, the ma-

42

terial showing that the organizations are allocating to Hamas is clear-cut.

I would say there is one other aspect here, I think, that should be taken into account. I cannot speak about how the U.S. Government should respond. I am an Israeli citizen. But we are now——

Senator SPECTER. We are going to reserve those questions for State Department officials. We are not going to ask an Israeli former Ambassador to tell us what to do.

Mr. GOLD. But I will comment on one aspect affecting policy today because the United States is now leading the way to implement what is called the road map, a performance-based road map to a permanent two-state solution. And in phase one of the road map—this is from the Department of State website—you can see that Arab States are expected to cut off public and private funding and all other forms of support for groups supporting and engaging in violence and terror. Therefore, I would say the crown jewels of U.S. Middle East policy, that is, the road map, specifically refers to cases like Saudi Arabia. In short, Saudi Arabia ought to go under the road map.

I would also add that at the Sharm El-Sheikh Summit on June 3, 2003, President Bush made a declaration in which he said he had the assurances of all those present that there would be no more terrorist funding, and here is the actual phrase that he used at the summit: "The leaders here today have declared their firm rejection of terror regardless of its justifications. They have also committed to practical actions to use all means to cut off assistance, including arms and financing, to any terror group."

So what you have is clear-cut U.S. policy to make sure that Saudi Arabia doesn't continue funding Hamas. I would say from the testimony you have heard today, the same networks that are working with Hamas are also working with al-Qaeda. If you make sure that the funding to Hamas stops, you will also, to a large extent, improve the national security of the United States by cutting off the funding routes to al-Qaeda as well.

Senator SPECTER. Ambassador Gold, when you say you can not say that these officials in these organizations, these governmental officials knew where every dollar went, I can understand that. But if they know that there are some dollars going to Hamas and they know Hamas is engaged in terrorism, and that terrorism results in murders of U.S. citizens, that is—you don't have to find where every dollar goes. You just have to be able to prove that they know that some dollars are going to terrorists.

Mr. GOLD. I would suggest they have a kind of corporate responsibility standing at the head, at the apex of these organizations to know about it.

Senator SPECTER. You can not establish criminal liability as the head of a corporation. You have got to prove that they knew what was going on, knowledge, participation, and acquiescence.

Mr. GOLD. The documents that I can supply can show the organizations' links to Hamas. I can also show you how the organization is structured. But you would have to go probably to U.S. agencies to find out whether any other information is available linking these individuals to Hamas funding.

Senator SPECTER. And when you have the connection to al-Qaeda, it is a much broader criminal responsibility. There you have the murders of 3,000 American citizens.

Mr. GOLD. That is absolutely true. But, again, I will only make statements here about things that I can document. What I have stated in this Committee hearing I can document.

Senator SPECTER. Well, the statement by the President that you have got on the board is about as good as you can get for him to extract those promises from the leaders of Saudi Arabia and other countries. And now the issue is pursuit to see to it that they live up to what they have said.

One other subject before adjourning. Mr. Emerson, your comment, I think, about the 7th graders who were having hate materials in their educational portfolios, that has been a problem ongoing for quite a long time. We have seen in the Palestinian Authority materials in grade schools, and part of the funding of the Palestinian Authority after Oslo, before we stopped the funding, was conditioned on changing, taking those materials out of the textbooks.

You have had considerable experience in this field. What recommendations would you have as to how to deal with the problem of this hate literature going to the next generation?

Mr. EMERSON. I think it is probably the most frustrating problem to deal with insofar as asking Saudi Arabia to stop the incitement within its own borders is basically asking it to essentially renounce its own Wahhabist ideology. There is a fundamental contradiction here.

On the other hand, as a result of the Riyadh attacks, I think more members of the family realize that the tiger is now coming to bite it and it cannot afford to keep paying off cooptation money overseas or even trying to essentially incite its citizens against Christians or Jews or Israelis or Americans in an effort to dissuade them from being frustrated with the regime itself.

But there is a fundamental contradiction here. My belief is that Saudi Arabia, as you have noted here, should be subject to the sanctions that were empowered by the PATRIOT Act because of the fact that foreign national central monetary institutions are allowed to be subject to sanctions if their funding mechanisms do not stop or are aware of terrorist financing. And I think the body of evidence of terrorist ties going back for the last 15 years on WAMY, IIRO, al-Haramain, and several other Saudi, "NGOs are so demonstrably present that it would be reckless disregard for anyone to say that they were unaware of those ties, let alone not taking responsibility."

At this point, I can tell you based on the information we have collected that there are direct ties between Saudi Government officials, the members of the family—not all, but some—and all of those NGOs in terms of the financial support and the largesse they receive.

One other point I would just like to add, because you have been very good in terms of pressing the government to make sure that it does not succumb to any political pressure. I can tell you based on discussions that I have had with law enforcement officials and prosecutors that while no one has said to me that they received a

44

red light from the State Department, they have repeatedly expressed their frustration at the resistance within the government decisionmaking process to fully give them the green light to go after and conduct criminal investigations against Saudi entities and individuals. Part of the frustration is because Saudi Arabia has provided diplomatic immunity or actually pulled back some of the key witnesses, material witnesses that were being held here or subject to investigation and not made them available to the U.S. Government.

In other cases, it is the fear of antagonizing the Saudi regime that has basically put a red light to some of the key law enforcement prosecutions that are being considered at this point as we speak.

Senator SPECTER. Well, first you say there is no red light, and then you say there is not a green light. And we are not looking for amber in between. And then you just concluded by saying that there was a red light on criminal investigations. Could you amplify that a bit?

Mr. EMERSON. The red light insofar as a document that says we will not support a criminal investigation because of fear of engendering antagonism of the Saudi regime, I know of no such document that would ever be produced.

Senator SPECTER. Well, you wouldn't necessarily expect to have a document under seal, notarized. You might have a conversation. Who would want to put that in writing? Some congressional committee might get a hold of it.

Mr. EMERSON. Right, but you might not even have the conversation. It might just die, on the wane. In other words, it might not be acted upon.

Senator SPECTER. Well, there would be a reason for why it wasn't acted upon.

Mr. EMERSON. Well, there would be some type of bureaucratic reasons. Look, I can tell you documents we received under FOIA going back to 1996, 1997, and 1998, show that certain radical Islamic charities were being categorized as terrorist conduits back in those years—and yet they weren't frozen or had any sanctions against them until 2001. So something intervened to stop that designation and stop the asset forfeiture.

Now, I can not tell you what stopped it because I haven't received the documents—and I deal only with empirical evidence. But I know something stopped it, and I can only imagine that it was diplomatic pressure.

Senator SPECTER. Well, those are subjects we are going to pursue. One final comment. When you talk about Saudi textbooks responding to Wahhabi philosophy, there is a limit to how far you can go, even under those circumstances, as far as inciting murder. That crosses international lines, and it is an international crime. And we have got to look at the toughest lines, economic sanctions, criminal sanctions, whatever it takes.

Well, thank you very much, gentlemen. I think this has been informative, and stay tuned.

[Whereupon, at 12:41 p.m., the Committee was adjourned.]

# A P P E N D I X

Senate Committee on Governmental Affairs
John S. Pistole
Deputy Assistant Director
Counterterrorism Division
Federal Bureau of Investigation

July 31, 2003

"Terrorism Financing: Origination, Organization, and Prevention"

Good morning Madam Chair Collins, Senator Lieberman, and other distinguished members of the committee. It is an honor to testify before this committee regarding the FBI's efforts in identifying, tracking and dismantling the financial structure supporting terrorist groups.

Prior to the events of September 11, 2001 (9/11), the FBI had no mechanism to provide a comprehensive, centralized, focused and pro-active approach to terrorist financial matters. While the FBI examined financial records at the time of previous terrorist attacks, as part of the investigation into each of the attacks, the events of 9/11 identified a critical need for a more comprehensive, centralized approach to financial matters. The Terrorist Financing Operations Section (TFOS) of the FBI's Counterterrorism Division was formed, after 9/11, in response to this critical need. The mission of the TFOS has since evolved into a broader strategy to identify, investigate, prosecute, disrupt and dismantle incrementally, all terrorist related financial and fund-raising activities.

Identifying, tracking and dismantling the financial structure supporting terrorist groups is critical to successfully dismantling the organizations and preventing future terrorist attacks. As is the case in most investigations, locating and "following the money" plays a critical role in identifying those involved in the criminal activity, establishing links among them, and developing evidence of their involvement in the activity.

Terrorists, their networks and support structures, require funding in some form to exist and operate. Whether the funding and financial support is minimal or substantial, it usually leaves a financial trail that can be traced, tracked, and exploited for pro-active and reactive purposes. Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified, represents only a small portion of the mission; the key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts.

In forming the TFOS, the FBI built upon its traditional expertise in conducting complex criminal financial investigations and long established relationships with the financial services

1

(45)

46

communities in the United States and abroad. Integrating these skills and resources with the Counterterrorism Division, allows the FBI to bring its full assets to bear in the financial war on terrorism.

The TFOS is both an operational and coordinating entity with pro-active and reactive responsibilities. As a coordinating entity, the TFOS is responsible for ensuring that a unified approach is pursued in investigating terrorist financing networks. The TFOS achieves this directive by: 1) coordinating the financial aspects of FBI Field Office and Legat terrorism investigations; 2) establishing overall initiatives, policy and guidance on terrorist financing matters; 3) participating in the National Security Council's Policy Coordinating Committee (PCC) on Terrorist Financing; 4) coordinating national liaison with the financial services sector; 5) cooperating in and coordinating criminal terrorist financing investigations with the Department of Justice; and 5) providing support and training to Field Offices to include the designated Terrorism Financing Coordinator (TFC).

It is critical that the financial aspects of terrorism investigations be adequately addressed and that a concerted, coordinated effort is made to investigate terrorist finance issues by experienced financial investigators. Rarely will a terrorist financing investigation be confined to the territory of one field office, rather they normally span not only multiple field office jurisdictions, but the globe; i.e., these types of investigations will frequently be linked to investigations and/or issues in other jurisdictions and other countries. It is imperative that these investigative efforts be effectively coordinated, placed into perspective with other counterterrorism efforts, prioritized in accordance with national and global strategies, and addressed in concert rather than in a disjointed, inefficient manner. Prior to the establishment of the TFOS, there did not exist within the FBI a mechanism to ensure appropriate focus on terrorist finance issues and provide the necessary expertise and overall coordination to comprehensively address these matters.

So how far have we come in the war on terrorist financing since 9/11? There currently exists a much better understanding of terrorist financing methods. More sophisticated and effective processes and mechanisms to address and target terrorist financing continue to develop and evolve. Pro-active approaches are increasingly being utilized. The awareness around the world on the part of law enforcement, government agencies, regulators and policy makers, and the private sector of terrorist financing methods, suspicious financial activity and vulnerabilities is much higher since 9/11. International cooperation has reached unparalleled levels. Outreach with, and cooperation from, the private sector has been outstanding and continues to develop, particularly the level of two-way interaction between law enforcement and the private sector. The ability to access and obtain this type of information immediately has significantly enhanced the FBI's ability to identify, investigate, and resolve immediate threat situations involving potential terrorist activity. For example, the ability to conduct real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations. Another example of not only more pro-active measures but also of increased cooperation and coordination with the international community.

2

47

Extensive training and support of international investigations by TFOS has led to Agent visits/exchanges and training programs involving a variety of countries from Europe, Southeast Asia, the Middle East, South America, etc. In support of specific high profile joint terrorist financial investigative matters, a number of countries and agencies, including the United Kingdom, Switzerland, Canada and Europol, have detailed investigators to TFOS on a TDY basis. TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas al-Qa'ida cells, including those located in Indonesia, Malaysia, Singapore, Spain, and Italy. Furthermore, with the assistance of relationships established with the central banks of several strategic countries, successful disruptions of al-Qa'ida financing have been accomplished in counties such as the UAE, Pakistan, Afghanistan, and Indonesia.

TFOS has developed a specific terrorist financing/money laundering crimes curriculum for international training which includes topics such as: acquiring and handling evidence in document intensive financial investigations, major case management techniques, forensic examination tools, and methods of terrorist financing. At the request of the US Department of State, TFOS has led an interagency team to provide this curriculum to a number of countries (and is scheduled to provide to approximately 38 countries) identified as needing law enforcement training on conducting terrorist financing investigations.

TFOS has cultivated and maintains a contact database of private industry and government sources/persons who can provide financial data, including real-time monitoring of financial transactions. Many of these contacts can be reached or accessed on 24 hour/7 days a week emergency allowing TFOS to respond rapidly to critical incidents.

Through these contacts the TFOS has access to data and information from a variety of entities including: Banking, Credit/Debit Card Sector, Money Services Businesses, Securities/Brokerages Sector, Insurance, Travel, Internet Service Providers, Telecommunications Industry, Law Enforcement, State/Federal Regulatory Agencies, Public and Open Source Data Providers, the Intelligence Community, and International Law Enforcement and Intelligence Contacts. The timeliness and accessibility of the data is contingent on a variety of factors including whether the acquisition of the information requires legal process, the search capabilities of the data provider, and the size and depth of the data request. The ability to access and obtain this type of information in a time sensitive and urgent manner has significantly enhanced the FBI's ability to identify, investigate and resolve immediate threat situations involving potential terrorist activity. For example, the ability to conduct real-time monitoring of specifically identified financial activity has been invaluable to not only investigations ongoing in the US, but to foreign law enforcement and intelligence agencies in related investigations.

Being able to identify and track financial transactions and links after a terrorist act has occurred or terrorist activity has been identified represents only a small portion of the mission; the key lies in exploiting financial information in efforts to identify previously unknown terrorist cells, recognize potential terrorist activity/planning, and predict and prevent potential terrorist acts. Prior

3

48

to 9/11, there was not enough emphasis placed on addressing the mechanisms and systems associated with terrorist financing and disrupting them before they could be utilized to further terrorist activities. Since September 11, TFOS, together with the Counter-Terrorism Section (CTS), Criminal Division of the Department of Justice (DOJ), have begun a number of pro-active link analysis initiatives to identify potential terrorists and terrorist related financing activities.

The overriding goal of these projects is to pro-actively identify potential terrorists and terrorist related individuals/entities, mechanisms or schemes through the digital exploitation of data. To accomplish this, TFOS seeks to 1) identify potential electronic data sources within domestic and foreign government and private industry providers; 2) create pathways and protocols to acquire and analyze the data; and 3) provide both reactive and proactive operational, predictive and educational support to investigators and prosecutors.

Information sharing is critical to all of our efforts. The intelligence community, including the FBI, produces and obtains tremendous amounts of classified intelligence information. While much of the information can be of significant value in terrorist finance investigations, the value will not be realized nor maximized absent the ability to filter the information, analyze it, and disseminate it in an appropriate manner to those who can make the best use of the information. Toward this end, the TFOS participates in joint endeavors involving the CIA, FBI, Treasury Department, Department of Justice, and the Department of Homeland Security involving potential terrorist related financial transactions, in addition to other joint participation between TFOS and the intelligence agencies. TFOS has personnel detailed to the CIA/CTC/FINO and personnel from there work directly with TFOS on financial intelligence matters.

The National Security Council formalized the Policy Coordinating Committee (PCC) on Terrorist Financing at the end of 2001. Treasury chairs the PCC and representatives from the Central Intelligence Agency, the Department of Defense, the Department of Justice, the Federal Bureau of Investigation, the Department of Homeland Security, the National Security Council and the State Department attend meetings.

The PCC generally meets at least once a month to coordinate the United States government's campaign against terrorist financing. The meeting generally focuses on ensuring that all relevant components of the federal government are acting in a coordinated and effective manner to combat terrorist financing.

### Terrorist Financing Successes

In addition, the FBI, working in coordination with other entities of the US government, has participated in the following successes:

•   An FBI Joint Terrorism Task Force in Charlotte used racketeering statutes to obtain convictions which disrupted and dismantled a Hizballah procurement and fund-raising cell. Twenty-six individuals were arrested for crimes including immigration fraud, visa fraud,

4

49

cigarette smuggling, interstate transportation of stolen property, fraud, bank fraud, bribery, money laundering, racketeering, and providing material support to a terrorist organization.

• The FBI coordinated with the Office of Foreign Asset Control (OFAC) to justify the blocking of Holy Land Foundation for Relief and Development (HLF) assets and the closing of its US offices, shutting down HAMAS' largest fund-raising entity in the US. The HLF had been linked to the funding of HAMAS terrorist activities, and in 2000, HLF raised $13 million.

• Offices of the Benevolence International Foundation (BIF), a US based charity, were shut down and its assets and records blocked following an OFAC and FBI investigation which determined that the charity was being used to funnel money to Al Qa'ida. In February 2003, Enaam Arnaout, the head of BIF, pled guilty to racketeering conspiracy, admitting he fraudulently obtained charitable donations in order to provide financial assistance to persons engaged in violent activities overseas.

• As a result of information developed by the FBI, a foreign security service, in conjunction with US Intelligence Community agencies, apprehended one of the most significant money launderers associated with Usama Bin Laden, for funneling $67 million through international accounts to al-Qa'ida and the Taliban.

• A criminal case against Sami Al Arian, the alleged US leader of the Palestinian Islamic Jihad (PIJ), and the World Islamic Studies Enterprise has forced the closure of several front companies suspected of funneling money to support PIJ operations against Israel. In August 2002, the investigation led to the deportation of Mazen Al-Najjar, the brother-in-law of Sami Al Arian and a known PIJ member. In February, following a 50-count indictment for RICO and Material Support of terrorism violations, the FBI arrested Al-Arian and three other U.S.-based members of the Palestinian Islamic Jihad, including Sameeh Hammoudeh, Hatim Naji Fariz, and Ghassan Ballout. The FBI also executed seven search warrants associated with this action.

• TFOS has provided operational support to FBI Field Divisions across the United States to enhance the intelligence/criminal investigations of individuals and groups, associated with or providing material support to, terrorist organizations and activities. This assistance is provided in the form of conducting intelligence/criminal financial investigations, financial analytical support, major case management, financial link analysis, and the deployment of teams of experts to develop investigative plans to analyze large volumes of documents and data. TFOS has provided this operational support in the Al Qa'ida sleeper cell cases in Buffalo and Portland, as well as in the Richard Reid, John Walker Lindh, Jose Padilla, Al Haramain, PIJ, and Mohamed Almoayad cases, among many others. This type of operational support has also been provided to Divisions investigating NGOs, such as the Holy Land Foundation for Relief and Development, Benevolence International Foundation and the Global Relief Foundation.

5

50

- TFOS has engaged in extensive coordination with authorities of numerous foreign governments in terrorist financing matters, leading to joint investigative efforts throughout the world. These joint investigations have successfully targeted the financing of several overseas Al Qa'ida cells, including those located in Indonesia, Malaysia, Singapore, Spain, and Italy. Furthermore, with the assistance of relationships established with the central banks of several strategic countries, successful disruptions of Al Qa'ida financing have been accomplished in counties such as the UAE, Pakistan, Afghanistan, and Indonesia.

- The FBI conducted a detailed financial investigation/analysis of the 19 hijackers and their support network, following the September 11th attacks. This investigation initially identified the Al Qa'ida funding sources of the 19 hijackers in the UAE and Germany. The financial investigation also provided the first links between Ramzi Binalshibh and the 9/11 operation. A continuing investigation, in coordination with the PENTTBOMB Team, has traced the origin of the funding of 9/11 back to financial accounts in Pakistan, where high-ranking and well-known Al Qa'ida operatives played a major role in moving the money forward, eventually into the hands of the hijackers located in the U.S. As part of the 9/11 financial investigation, thousands of individuals and organizations were investigated in the U.S. and abroad to determine whether they played any part in supporting the hijackers or the operation. Although the vast majority of these individuals and organizations were cleared, this process of elimination resulted in numerous other quality terrorism investigations being initiated, as well as criminal charges against hundreds of individuals for fraud and other criminal activity.

- At the request of a foreign liaison service, TFOS traced financial transactions in a near real-time manner which led to the location of a terrorist cell and prevention of a terrorist act.

- Since 9/11, the United States has frozen $36.3 million in terrorist assets while other countries have frozen an estimated $97 million, for a total of over $133 million.

- U.S. authorities issued blocking orders on the assets of 281 terrorists, terrorist organizations, and terrorist supporters, effectively denying them access to the U.S. financial system.

- Federal law enforcement officials have arrested over 61 individuals, indicted 43 and convicted 12 in connection with terrorist financing investigations.

- U.S. Government agencies, to include the FBI's TFOS, deployed trainers and advisers on missions to countries around the world to assist with the drafting of legislation to combat terrorist financing, strengthen bank supervision in identifying suspicious transactions, and address other financial crimes and corruption.

- Since 9/11, over 120 countries have introduced new terrorist-related legislation and approximately 80 countries established Financial Investigation Units.

**Saudi Arabia and the War on Terrorism**

6

51

Following the 9/11 attacks, it became apparent that the role of Non-Governmental Organizations (NGOs) and charitable organizations, as a source of funding for terrorist groups, needed closer scrutiny. This included the role of Saudi Arabia and its citizens in the support of terrorism, both directly and indirectly, through the financial support of these charitable organizations.

The Kingdom of Saudi Arabia has taken proactive measures to deter global terrorism. In 1995, the bombing of Khobar Towers occurred in Saudi Arabia. In 1996, the Kingdom established a joint Counter-Terrorism Committee with the United States to share information on al-Qa'ida. In the wake of September 11, Saudi Arabia has increased its counterterrorism efforts with the following initiatives:

- Saudi Arabia has put new laws and regulations in place for all charitable groups, ensuring that they are audited to prevent the flow of funds to entities other than charity.

- Saudi Arabia has further strengthened its laws and regulations regarding money laundering. These efforts include new rules concerning the verification of customers' identities as well as restrictions on non-residents' ability to open accounts in the country.

- Saudi Arabia and the United States maintain a Counter-Terrorism Committee comprised of intelligence and law enforcement personnel who meet regularly to share information and resources and develop action plans to root out terrorist networks.

- In March 2002, Saudi Arabia and the US jointly blocked the accounts of Bosnia and Somalia branches of Al-Haramain Islamic Foundation, and in the summer of 2002, jointly froze the assets of the Rabita Trust, and those of its director Wa'el Hamza Julaidan, an associate of Bin Laden who provided financial and logistical support to al-Qa'ida.

- Saudi Arabia has contributed to the break up of a number of al-Qa'ida cells, the arrests of key al-Qa'ida leaders and capture of al-Qa'ida members in Saudi Arabia.

Since the May 12, 2003 bombings of the three western compounds in Riyadh, Saudi Arabia, cooperation with the Kingdom of Saudi Arabia has improved. The FBI sent an investigative team to the Kingdom and worked with the law enforcement and intelligence services to conduct the appropriate post incident investigation and evidence collection. Cooperation with the Saudi Arabian government continues on this and other terrorism investigations.

**The USA PATRIOT Act and Other Legislation**

Our efforts to combat terrorism have been greatly aided by the provisions of the PATRIOT Act. The success in preventing another catastrophic attack on the U.S. homeland would have been much more difficult, if not impossible, without the Act. It has already proved extraordinarily beneficial in the war on terrorism, and our opportunities to use it will only

increase. Most importantly, the PATRIOT Act has produced greater collection and sharing of information within the law enforcement and intelligence communities.

Title III of the Act, also known as the International Money Laundering Anti-Terrorist Financing Act of 2001, has armed us with a number of new weapons in our efforts to identify and track the financial structure supporting terrorist groups. Past terrorist financing methods have included the use of informal systems for transferring value in a manner that is difficult to detect and trace. The effectiveness of such methods should be significantly eroded by the Act, which establishes stricter rules for correspondent bank accounts, requires securities brokers and dealers to file Suspicious Activity Reports or SARS, and certain money services to register with FinCEN and file SARS for a wider range of financial transactions.

There are other provisions of the Act that have considerably aided our efforts to address the terrorist threat including: strengthening the existing ban on providing material support to terrorists and terrorist organizations; the authority to seize terrorist assets; and the power to seize money subject to forfeiture in a foreign bank account by authorizing the seizure of a foreign bank's funds held in a U.S. correspondent account.

It is important for the Committee and the American people to know that the FBI is using the PATRIOT Act authorities in a responsible manner. We are making every effort to effectively balance our obligation to protect Americans from terrorism, with our obligation to protect their civil liberties.

### Executive Branch Organizational Changes

Organizational changes that have taken place within the Executive Branch with respect to the investigation of terrorism financing include the execution of a Memorandum of Agreement (MOA) between the Department of Justice (DOJ) and the Department of Homeland Security (DHS) concerning terrorist financing investigations. The MOA addresses the importance of waging a seamless, coordinated campaign against terrorist sources of financing. It was signed by Attorney General Ashcroft and Homeland Security Secretary Ridge on May 13, 2003. Prior to this agreement, both the DOJ and DHS had separate terrorist financing task forces. Under DOJ, the FBI had the TFOS, which was discussed earlier. The DHS had the Bureau of Immigration and Customs (ICE) led Operation Green Quest (OGQ).

Pursuant to the MOA, OGQ ceased to exist as a program name as of June 30, 2003. Accordingly, the FBI was designated to lead terrorist financing investigations and operations. It was agreed that DHS would focus its activities on protecting the integrity of U.S. financial infrastructures. To that extent, the DHS implemented the ICE led Operation Cornerstone. Operation Cornerstone will identify vulnerabilities in financial systems through which criminals launder their illicit proceeds, bring the criminals to justice and work to eliminate the vulnerabilities.

53

The majority of the former OGQ case inventory was criminal cases, with no nexus to terrorism. These cases were converted from OGQ to Operation Cornerstone. Those cases that had a nexus to terrorism that were investigated by the former OGQ are currently being assessed for transition to the appropriate FBI Joint Terrorism Task Force (JTTF). Ongoing and future Operation Cornerstone investigations that develop links to terrorism will be referred to the FBI through the TFOS. The ICE and TFOS are coordinating investigative initiatives that will enable the ICE to identify financial systemic vulnerabilities and which will enable the TFOS to identify ties to terrorism and terrorist financing. In addition, there is a liaison from ICE assigned to TFOS, and investigators from ICE will be represented on the JTTFs.

Terrorism represents a global problem. The solution is grounded in what would have been considered prior to 9/11, unprecedented international cooperation and coordination. The threat it poses must always be considered imminent. In addition to considerable financial investigative expertise, addressing terrorism and the finances that support and propagate it requires the ability to both implement proactive and preventive approaches to disrupt and dismantle as well as the ability to conduct highly reactive immediate response financial investigations to address potential imminent threats. As stated herein and in conjunction with more and more of the international community and other aspects of the US Government, the FBI has made considerable progress toward achieving and implementing these abilities.

Again, I offer my gratitude and appreciation to you, Madam Chair Collins, Senator Specter, and the Governmental Affairs Committee, for dedicating your time and effort to this issue and I would be happy to respond to any questions.

9

54

STATEMENT OF R. RICHARD NEWCOMB, DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL
U.S. DEPARTMENT OF THE TREASURY
BEFORE THE
COMMITTEE ON GOVERNMENTAL AFFAIRS
UNITED STATES SENATE
HEARINGS ON TERRORISM FINANCING: ORIGINATION, ORGANIZATION
AND PREVENTION
JULY 31, 2003

Madam Chairman, members of the Committee, thank you for the
opportunity to testify on OFAC's efforts to combat
terrorist support networks that threaten United States
citizens and property worldwide. It's a pleasure to be
here. Please allow me to begin with a brief general
overview of the problem, as I see it.

### Foundations of Terrorist Financing and Support

The threat of terrorist support networks and financing is
real, and it has been our mission to help identify and
disrupt those networks. The vast majority of the world's
Muslims are peaceful, though a committed, vocal, and well-
organized minority is competing to mobilize a new
generation in the tools and trade of Jihad.

There is much we know about how such radical Islamic
terrorist networks were established and still thrive.
Wealthy and influential individuals and families based in
the Middle East have provided seed money and support to
build a transnational support infrastructure that
terrorists have used for their purposes. This network,
fueled by deep-pocket donors and often controlled by
terrorist organizations, their supporters or those willing
to look the other way, includes or implicates banks,
businesses, NGOs, charities, social services organizations,
schools, mosques, madrassas, and affiliated terrorist
training camps and safe houses throughout the world.

The terrorist networks are well-entrenched and self-
sustaining, though vulnerable to U.S., allied and
international efforts applying all tools at our disposal.
Looking forward, please allow me to explain how we have
come to this view and present the strategy, being
implemented in coordination with other Federal agencies

1

Case 1:03-md-01570-GBD-SN   Document 1260-16   Filed 09/23/05   Page 19 of 41

including the Departments of Defense, State, Justice, Homeland Security, the FBI, the intelligence community and other agencies, to choke off the key nodes in the transnational terrorist support infrastructure.

**OFAC Mission and Experience on Counterterrorism**

The primary mission of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury is to administer and enforce economic sanctions against targeted foreign countries and foreign groups and individuals, such as terrorists and terrorist organizations and narcotic traffickers, which pose a threat to the national security, foreign policy or economy of the U.S. OFAC acts under general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and freeze (or "block") assets subject to U.S. jurisdiction. Economic sanctions are intended to deprive the target of the use of its assets and deny the target access to the U.S. financial system and the benefits of trade, transactions and services involving U.S. markets, businesses and individuals. These same authorities have also been used to protect assets within the U.S. jurisdiction of countries subject to foreign occupation and to further important U.S. nonproliferation goals.

OFAC currently administers and enforces 26 economic sanctions programs pursuant to Presidential and Congressional mandates. Active enforcement of these programs is a crucial element in preserving and advancing the foreign policy and national security objectives that underlie these initiatives that are usually taken in conjunction with diplomatic, law enforcement and occasionally military action. In 1977, the Congress passed the International Emergency Economic Powers Act ("IEEPA"), which serves as the primary statutory authority for a Presidential declaration of a national emergency in peacetime for the purpose of imposing economic sanctions.

Many "country-based" sanctions programs are part of the U.S. government's response over time to the threat to U.S. national security and foreign policy posed by international terrorism. The Secretary of State has designated seven countries – Cuba, North Korea, Iran, Libya, Iraq, Sudan and Syria – as supporting international terrorism. Most of these countries are subject to comprehensive economic sanctions, including: Cuba (1963); Iran (1979 and again in

2

56

1987); Libya (1986); and Sudan (1997).  Comprehensive
sanctions against Iraq, originally imposed in 1990, were
recently lifted although the national emergency remains in
place.  Comprehensive sanctions against North Korea,
originally imposed in 1950, were lifted in 2000, except
with respect to North Korean imports and "Weapons of Mass
Destruction" blockings.  Syria is not subject to
comprehensive sanctions; however, certain financial
transactions involving all terrorism list countries
including Syria are regulated.

The origins of OFAC's involvement in the fight against
terrorism stem from the initial conception of terrorism as
being solely state-sponsored. OFAC's mandate in the realm
of terrorism was to compile available evidence establishing
that certain foreign entities or individuals were owned or
controlled by, or acting for on behalf of, a foreign
government subject to an economic sanctions program.  Such
entities and individuals become "specially designated
nationals," ("SDNs") and are subject to the same sanctions
as the foreign government to which they are related.

**Authorities to Target Non State Organizations, Individuals
and Entities**

In January 1995, the President used the IEEPA authorities
to deal with the threat to U.S. foreign policy and national
security posed by terrorists who threaten to disrupt the
Middle East Peace Process.  This marked the beginning of
the use of IEEPA sanctions authorities to target
terrorists, terrorist groups and their sources of
fundraising.  This action, implemented through Executive
Order 12947, opened the door to new programs and expanded
the use of economic sanctions as a tool of U.S. foreign
policy to target groups and individuals, as well as foreign
governments.  During the late 1990s, IEEPA authorities were
used to issue additional Executive orders imposing
sanctions on Al-Qaeda, and Usama bin Ladin.  These E.O.s
also provide authority to designate and sanction entities
or individuals that are owned or controlled by, act for or
on behalf of, or that provide material or financial support
to Al-Qaeda or Usama bin Ladin.

Following this model, in October 1995, during a speech at a
UN 50th anniversary celebration, the President announced the
concept of adapting E.O. 12947 to target significant
foreign narcotics traffickers centered in Colombia, i.e.,

3

57

the Colombian drug trafficking cartels. That IEEPA program, under E.O. 12978, began with the President identifying four Cali Cartel drug kingpins, and has expanded into a key tool in the fight against the Colombian cartels. As of today, 14 Colombian drug kingpins, 340 entities, and 470 other individuals associated with the Cali, North Valle, and North Coast cartels' and their business empires have been designated as Specially Designated Narcotics Traffickers ("SDNTs") under E.O. 12978.

Building on the successes of the Colombian cartels Program under E.O. 12978, in December 1999, Congress enacted the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), originally introduced by Senators Coverdell and Feinstein, modeled on IEEPA and OFAC's SDNT program. It provides a statutory framework for the President to impose sanctions against foreign drug kingpins and their organizations on a worldwide scale. Like the terrorism program under E.O. 12947 and the SDNT program under E.O. 12978, the Kingpin Act is directed against the individual or entity and their support infrastructure, not against the countries in which they are imbedded. Since the first list of kingpins was issued under that authority, 38 foreign drug kingpins (these are in addition to the 14 Colombian drug kingpins designated under E.O. 12978), 11 derivative companies, and 15 derivative individuals have been designated.

The Congress, in 1996, passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"). AEDPA makes it a criminal offense to: (1) engage in a financial transaction with the government of a country designated as supporting international terrorism; or (2) provide material support or resources to a designated Foreign Terrorist Organization (FTO).

Currently, 36 FTOs are subject to OFAC-administered sanctions. These FTOs have been designated by the Secretary of State in consultation with the Secretary of the Treasury and the Attorney General. Under the AEDPA and OFAC's implementing regulations, U.S. financial institutions must maintain control over all funds in which an FTO has an interest and report those actions to OFAC. OFAC is the coordination point with State and Justice on FTO designations and also has responsibility for coordinating with the financial community, the FBI, State,

4

58

and other Federal agencies in implementing the prohibitions of the AEDPA.

### Authorities in Response to September 11th

The President harnessed these economic powers and authorities in launching the war against terrorism.  In response to the terrorist attacks of September 11, and pursuant to the powers available to the President under IEEPA, President Bush issued Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism" declaring that the acts of grave terrorism and the threats of terrorism committed by foreign terrorists posed an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. E.O. 13224, as amended, authorizes the Secretary of the Treasury, in consultation with the Department of State, Department of Justice and the Department of Homeland Security, to implement the President's authority to systemically and strategically attack terrorists, terrorist organizations and terrorist support networks.

This order prohibits U.S. persons from transacting or dealing with individuals and entities owned or controlled by, acting for or on behalf of, assisting or supporting, or otherwise associated with, persons listed in the Executive Order. Those designated and listed under the Executive Order are known as "Specially Designated Global Terrorists", or SDGTs. Violations of the E.O. with respect to SDGTs are subject to civil penalties; and if the violation is willful, persons may be criminally charged. The Executive Order also blocks "all property and interests in property of [designated persons] that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons[.]"[11]

The PATRIOT Act, passed in October 2001, amends IEEPA to provide critical means and authority to OFAC to counter terrorist financing. The Act has enhanced OFAC's ability to implement sanctions and to coordinate with other agencies by clarifying OFAC's authorities to block assets of suspect entities prior to a formal designation in "aid of an investigation."  This critical authority helps prevent the flight of assets and prevents the target from engaging in potential damaging behavior or transactions.

5

59

Prior to the passage of the PATRIOT Act, OFAC was wary of
relying on classified information under IEEPA programs,
because, unlike the Antiterrorism and Effective Death
Penalty Act of 1996, IEEPA did not contain a provision
explicitly authorizing submission of classified information
to a court, in camera and ex parte, upon a legal challenge
to a designation.  The new PATRTIOT Act authority has
greatly enhanced our ability to make and defend
designations by making it absolutely clear that OFAC may
use classified information in making designations without
turning the material over to an entity or individual that
challenges its designation.

**Rolling FTO's into SDGT's Makes War on Terrorist
Infrastructure Global**

On November 2, 2001, the U.S. took a significant step in
the War on Terrorism when the Secretary of State, in
consultation with the Secretary of the Treasury and the
Attorney General, utilized the new authorities in E.O.
13224 to designate 22 Foreign Terrorist Organizations
(FTOs) as Specially Designated Global Terrorists (SDGTs).
This action expanded the War on Terrorism beyond Al-Qaeda
and the Taliban and associated individuals and entities to
include Hamas, Hizballah, the FARC, the Real IRA and
others. As then recognized by the State Department, this
action created a truly global war on terrorism and
terrorist financing and demonstrated our commitment to
continue and expand our efforts against all terrorist
groups posing a threat to the United States, our citizens,
our interests, and our allies. Currently, there are 36 FTOs
which are also designated as SDGTs.

To date, the U.S. has designated 281 individuals and
entities as SDGTs pursuant to E.O. 13224. 202 of these
entities are associated with either Al-Qaeda or the Taliban
which provides the basis to notify these names to the UN
for listing pursuant to United Nations Security Resolutions
(UNSCRs) 1267, 1333, 1373, 1390 and 1455. The United States
has worked diligently with the UN Security Council to adopt
international resolutions reflecting the goals of our
domestic executive orders and providing the mechanisms for
UN member states to freeze terrorist-related assets.

6

60

### Using Designation Authorities in Cooperation with International Partners

The emerging international threat of Al Qaeda in the 1990s necessitated OFAC's participation in the U.S. government's focus on developing information and strategies against terrorist financing and infrastructures. In that context, it was clear that the cooperation of foreign governments, including Saudi Arabia, Kuwait and the UAE, would be critical in impeding the flow of funds to terrorists.

Having developed an understanding of how terrorist support networks operate, we began direct engagements with allies. For example, in June 1999, an OFAC delegation met with Finance Ministry, Intelligence and Law enforcement officials in Saudi Arabia, Kuwait and the UAE. The purpose of the trip was to find answers to certain questions we were unable to resolve to our satisfaction and to put officials on notice that cooperation on these issues was critical. We were clear that U.S. interest in these issues would continue.

In these meetings and others held subsequently in the region, we shared information and asked questions. Through the discussions, we identified areas where we could work together. These areas included strengthening the weak regulatory authorities over financial institutions and discussing the possibility for creating new oversight for charities. These proposals were met with assurances of cooperation, but we understood that getting assistance on these issues would be a serious challenge because it represented a change in policies and structures within governments and societies.

Importantly, in efforts to crack down on support for terrorists and terrorist fundraising, we have always made clear the intent of the U.S. government to deal with these issues cooperatively. A key element of our strategy and engagement was to take open, decisive action with host governments against several high impact targets. The designation and blocking of assets of high-profile supporters of terrorist groups could deter others, forcing key nodes of financial support to choose between public exposure of their support for terrorist activity or their good reputation. We believed this approach could also be effective against banks, business, NGOs and other institutions.

7

61

We traveled to Saudi Arabia again in January 2000. The purpose was again to communicate that the U.S. wanted to work with Saudi officials jointly in efforts to crack down on support for terrorists and terrorist fundraising. At the time however, we did not have many of the tools necessary to sufficiently back up threats with action; especially, in cases where the target was assessed as intransigent. This is the strategy that has been in place since September 11th as one of the means of deterring and disrupting terrorist financing. The tools Congress and the President have given us since September 11th have enhanced our ability to deliver this message and carry out this strategy.

**Post 9-11 Efforts**

After the 9-11 attacks, President Bush rallied the international community to unite in the war on terrorism. The international community, including our allies in the Persian Gulf, joined us and have committed to fully cooperating on all fronts against Al-Qaeda and its supporters. On a regular basis, for example, the United States works cooperatively with Saudi authorities on issues relating to the war on terrorism. In some areas, cooperation is routine and systematic; in other areas, especially those touching on aspects of terrorist financing and infrastructure, which touches on all aspects of government, coordination is more complex.

Following up on our previous trips and other U.S. efforts, OFAC visited Saudi Arabia and several other states in the region in December 2001 and January 2002. In Saudi Arabia, we met with an inter-agency delegation to discuss terrorist financing and to explore areas of mutual concern. Specifically, we discussed some possible joint U.S.-Saudi public actions to deny individuals and entities we suspected were supporting terrorism access to international financial markets and to prevent U.S. and Saudi citizens from having dealings with them. We also discussed Saudi efforts to strengthen regulatory oversight of charities and other charitable fundraisers, and steps taken by the Saudi Arabian Monetary Authority (SAMA) to tighten-up banking controls and improve compliance efforts.

In addition, we held meetings with a small group of private Saudi citizens and leaders of the Jeddah Chamber of

8

62

Commerce (JCCI). The purpose was to explore the charitable giving practices amongst its membership and encourage actions that would ensure that charitable funds are not ultimately channeled to terrorist activity. Later in January 2002, the JCCI announced that a task force would be set up to develop a comprehensive financial and administrative system for the nation's charities.

On March 11, 2002, Treasury Secretary O'Neill and Saudi authorities announced the joint designation of the Somalia and Bosnia-Herzegovina offices of the Al Haramain Foundation, a Saudi-based NGO with offices throughout the world. In addition to on-going law enforcement and intelligence cooperation, this effort marked an expansion of U.S.-Saudi cooperative efforts to act against the terrorist support networks. Based on evidence that these two branch offices were providing support to Al-Qaeda, these entities were forwarded to the UN Sanctions Committee for inclusion under the UNSCR 1333/1390 list.

In May 2002, an OFAC delegation returned to Saudi Arabia to continue the on-going dialogue on issues related to terrorist finance and infrastructure. During this trip, we were informed that the Saudi Government planned to significantly enhance its oversight of charitable organizations to prevent their exploitation by supporters of terrorism. Several months later, on September 6, 2002, the United States acted again with Saudi Arabia and jointly referred to the UN Sanctions Committee Wa'el Hamza Julaidan, an Al-Qaeda co-founder who was a leader of several terrorist-affiliated NGOs.

In October 2002, Saudi authorities announced that a full review was conducted of its charitable organizations and issued new guidelines, including one which mandates reporting to the Saudi Foreign Ministry of all charitable activities outside of Saudi Arabia. Shortly thereafter, on December 3, 2002, Saudi authorities publicly announced the establishment of a High Commission for oversight of all charities. Saudi authorities also reported that a process was being developed to establish operational procedures to track all donations to and from charities.

In addition to these actions, SAMA enhanced its scrutiny of the financial system. As part of this effort, in February 2003, SAMA reported that it had launched a program to train judges and investigators on legal aspects of terrorist

9

63

financing and money laundering, international requirements for financial secrecy, and methods followed by criminals to exchange information.

**Effect of May 12, 2003 Riyadh Attacks**

On May 12, 2003, homicide bombers affiliated with Al-Qaeda struck three residential compounds in Riyadh, Saudi Arabia, killing thirty-four including nine Americans. Saudi authorities responded with new resolve in fighting the war on terrorism and carried out a number of actions to capture, kill or arrest suspected terrorists operating in Saudi Arabia.

Marking a recognition of the seriousness of the challenges on terrorist finance and infrastructure issues, Saudi authorities announced that charitable organizations would no longer be authorized to provide funds outside of Saudi Arabia other than through highly-controlled and government supervised channels. Additionally, Saudi authorities announced that Al Haramain was closing operations in as many as ten countries outside Saudi Arabia. The U.S. continues to monitor the status of these announced efforts and to express our critical interest in cooperating to maximize possibilities for effectiveness.

In June 2003, Saudi authorities announced that SAMA distributed a circular to all banks and financial institutions in Saudi Arabia requiring the full and immediate implementation of nine new policies and procedures applicable to charitable and welfare institutions. The new rules include requirements that all accounts of a single organization be consolidated into one account, that depositors provide banks with sufficiently verifiable identification, and that cash withdrawals be strictly prohibited.

To implement these new rules, SAMA reported that it intends to verify compliance through on-site inspections by SAMA officials, receipt of regular compliance reports, and certification by external auditors. The new rules take into account the Saudi Banking Control Law, SAMA's regulations, the Financial Action Task Force (FATF) 40 Recommendations, the FATF 8 Special Recommendations on Terrorist Financing, and applicable UN Security Council resolutions.

10

64

The United States supports all efforts reported by Saudi
authorities to improve efforts to prevent the flow of
charitable funds to terrorist activity.  Joint efforts,
including the designation of senior Al-Qaeda leadership
based in Saudi Arabia like Wael Hamza Julaidan, demonstrate
the willingness of Saudi authorities to cooperate on high
impact financing and infrastructure targets.  These actions
by Saudi authorities present the U.S. with opportunities to
cooperate in improving, verifying, and evaluating progress.
We must continue to engage Saudi authorities in areas where
we believe improvements can be made, and continue to
demonstrate that we are steadfast in our determination to
eliminate the threat posed by the terrorist networks.

As efforts to improve oversight of charities continue, we
believe we should seek to cooperate closely in three key
areas:  (1)-programmatic; (2) personnel; and (3) financial.
Specifically, it is critical that we continue to follow up
with Saudi authorities to measure whether 1) the true goals
and objectives of charities are what they purport to be; 2)
whether leadership and staff are appropriately vetted and
not committed to any dual-purposes; and 3) whether the
means that are used to raise and move funds are
transparent.

Additionally, we must continue our dialogue with wealthy
individuals, families and merchants to ensure that they are
taking all necessary precautions to prevent charitable
donations from supporting terrorist activity.  In instances
where we have strong reason to believe that some elements
are not doing enough, we must pursue more stringent
measures, which we believe, may force others to become more
vigilant in ensuring that funds are not provided for
terrorist activity.  Looking forward, Saudi Arabia and
other important partners continue to indicate their
willingness to cooperate in joint efforts, and we remain
committed to ensuring that maximum efforts are made to
achieve tangible results.

**Multilateral Actions Against Al-Qaeda and other Terrorist
Infrastructure**

Reflecting the broad range of mechanisms by which terrorist
groups, particularly Al-Qaeda, receive financial and other
material support, OFAC has effectively implemented the
President's designation authority against a variety of
targets.  These range from using targeted economic

11

65

sanctions to disrupt the terrorist financing operations of
an international "hawala" network as well as a more
traditional banking network, to disrupting the activities
of several key NGOs in supplying financing and other
services to Al-Qaeda.  Information available to the US
Government indicates that these actions have disrupted Al-
Qaeda's support network and OFAC continues its efforts to
plan, prepare and implement actions, which will impact on
the ability of terrorists and their networks to provide
material, financial and logistical support for future
terrorist strikes.  For examples of some of these actions,
please see Appendix 1.

Due to the transnational nature of the terrorist
infrastructure, support and cooperation with our allies is
a critical part of making U.S. designation actions
successful.  By developing and establishing authorities and
procedures for entities associated with Al-Qaeda and the
Taliban to be submitted to the UN, we have begun to
institutionalize on a global scale the importance of
sanctions as a critical tool against the terrorist support
networks.  We continue to work with our allies in making
designations against Al-Qaeda's infrastructure that may be
notified to the UN.

**Towards a Strategic Effort and "Key Nodes" Approach**

Over the next six to twelve months, OFAC is seeking to
significantly expand its efforts and the impact of the
implementation of the President's authorities under E.O.
13224 by adopting a more systematic approach to evaluating
the activities of major terrorist organizations in various
regions.  This approach will focus on identifying "key
nodes" that sustain the abilities of terrorist
organizations to remain operational, despite successful
actions by the U.S. and its allies to capture, kill and
arrest terrorist cell members, leaders and operational
planners.

In furtherance of this end, OFAC initiated a collaborative
effort with the Department of Defense to develop
information and strategies against terrorist financing and
infrastructure. Before OFAC's secure facility was
operational, DOD agencies to include the Office of Naval
Intelligence (ONI), in addition to the Financial Crimes
Enforcement Network (FINCEN), generously provided space and
support to OFAC personnel that was critical to OFAC efforts

66

immediately following the 9-11'attacks.  Since this time,
OFAC staff have continued liaison relationships with
several DOD agencies and combatant commands. As a result of
this effort, OFAC has gained wider access to information
and expertise critical in carrying out the President's
authorities under EO 13224.

Specifically, in October 2002, OFAC began a joint project
with the U.S. Pacific Command (USPACOM) and other DOD
elements that identified terrorist support networks in
Southeast Asia and selected key nodes, or priority targets,
in these networks.  The project's geographic scope included
four countries — Indonesia, the Philippines, Malaysia and
Singapore — and eight terrorist or Islamic extremist
groups.  The project focused special attention on Jemaa
Islamiyah (JI), the Abu Sayyaf Group (ASG), and the Moro
Islamic Liberation Front (MILF), because of their relative
importance in the region and threat to U.S. interests.

For JI, which subsequently carried out the Bali bombings
and has strong ties to Al-Qaeda, the project identified the
key leaders, fundraisers, businessmen, recruiters,
companies, charities, mosques, and schools that were part
of its support network.  Thus far, we have imposed
sanctions against two of these key nodes, and are
coordinating action against several others.

This process is the model that OFAC is seeking to continue
and expand in collaborative efforts with DOD agencies
including ONI and the combatant commands. Next week, I will
be visiting USEUCOM headquarters and meeting with the Chief
of Staff, to lay the groundwork to continue a joint project
including USEUCOM and OFAC Officers.  We also hope to begin
projects with the Central (USCENTCOM) and Southern
(USSOUTHCOM) Commands shortly thereafter.  Working with DOD
Commands and other DOD agencies provides OFAC and its DOD
partners a force multiplier that brings together a variety
of counterterrorism tools and resources to enhance
opportunities for future efforts.

Taking a regional approach along with the various command's
areas of responsibility, the effort will seek to identify
and isolate key nodes in the transnational terrorist
support infrastructure in the respective areas of
responsibility.  This approach seeks to provide the
opportunity to cripple an entire organization at one time
through OFAC's implementation of the President's authority

13

67

in coordination with possible actions of other U.S.
departments and agencies and in cooperation with our
allies.

We have already taken steps to implement this approach in
some regions. OFAC analysts are currently working with DOD
agencies, including analysts from the Office of Naval
Intelligence (ONI), to fully identify the terrorism support
infrastructure in the Horn of Africa. In this region,
shipping and related drug smuggling activities appear to be
strengthening the terrorist networks in this area. Working
with ONI provides OFAC the opportunity to work with
analysts with unique expertise in areas otherwise less
accessible to OFAC.

In the Southern Command area of responsibility, Narco-
Terrorists in Colombia are one of the major targets.  On
October 31, 2001, three Colombian guerrilla-terrorist
organizations that had previously been determined to be
Foreign Terrorist Organizations - the FARC (Revolutionary
Armed Forces of Colombia), the AUC (United Self-Defense
Forces of Colombia) and the ELN (National Liberation Army)
- were added to the list of global terrorists under E.O.
13224. On June 1 of this year, President Bush named two of
those organizations - the FARC and the AUC - as foreign
drug kingpins under authority of the Foreign Narcotics
Kingpin Designation Act, thus, effectively recognizing them
as narco-terrorists.

Although the structure, goals, and international ties of
these groups are significantly different from those of the
Islamic extremist terrorist organizations linked to Al-
Qaeda and Hamas, these Colombian narco-terrorist
organizations are still dependent upon cash or other media
of exchange, such as drugs-for-guns, to sustain their
guerrilla and paramilitary forces.  Thus, although their
key nodes may be more difficult to isolate in a meaningful
sense for the effective application of OFAC's economic
sanctions, they are not immune.  We expect that some
aspects of these organizations and their support structures
will be found to be susceptible to OFAC actions.

For a description of the graphical representations of a key
nodes approach that could be applicable to a terrorist
support network in any region, please see Appendix 2.

14

68

## Summary

The funds necessary for a terrorist organization to carry
out an attack often are minimal, but the support
infrastructure critical for indoctrination, recruitment,
training, logistical support, the dissemination of
propaganda and other material support requires substantial
funding. The President's powers under IEEPA, E.O. 13224, as
well as other legislation provide the United States with
authorities that are critical to attacking the unusual and
extraordinary threats posed by the transnational terrorist
support networks.  OFAC's effectiveness in implementing
these authorities requires strong coordination with other
U.S. departments and agencies and support from U.S. allies.

Terrorist organizations including Al-Qaeda, Egyptian
Islamic Jihad, Jemaa Islamiyah, Al-Ittihad Al-Islamiyya,
Hamas, Hizballah and others rely on their infrastructure
for support and to shield their activities from scrutiny.
The secretive nature of their activities and their frequent
reliance on charitable, humanitarian, educational and
religious cover are vulnerabilities OFAC can exploit by
making designations under E.O. 13224.  Decisive action
against high impact targets deters others, forcing key
nodes of financial support to choose between public
exposure of support for terrorist activity or tarnishing
their reputation, to the detriment of their business and
commercial interests.

Looking forward, OFAC seeks to continue coordinating with
other U.S. agencies as efforts are expanded to impede the
activities of terrorist organizations.  By duplicating the
approach to Southeast Asia in coordination with USPACOM,
we plan to identify and isolate key nodes in the
transnational terrorist support infrastructure through a
regional approach reflecting the areas of responsibility of
the military commands.  This approach seeks to enhance the
coordination of OFAC's actions with those of other U.S.
departments and agencies and in cooperation with allies.

15

69

## Appendix 1

**Al-Barakaat network:** Shortly after September 11, 2001, OFAC identified the Al-Barakaat Network as a major financial operation that was providing material, financial, and logistical support to Usama Bin Laden, Al-Qaeda, and other terrorist groups. The work done by OFAC led to President Bush's November 7, 2001 announcement of the freezing of assets of the Al-Barakaat Network. In the announcement, the President was joined by the Secretary of the Treasury, the Secretary of State and the Attorney General. As a result of that action, Barakaat's cash flow--nearly $1.4 billion in less than two years--was severely disrupted. Al Ittihaad Al Islamiya--the Somali militia closely tied to Al Qaeda and a major beneficiary of the funds moving through Barakaat—also suffered a crippling loss of income.

**Nada-Nasreddin network:** OFAC worked closely with its partners in the Caribbean and Europe for nearly a year to unearth the Muslim Brotherhood backed network of financial houses and investment firms used by the European and Caribbean-based Al-Qaeda supporters, Yousef Nada and Ahmed Idris Nasreddin. These companies were then publicly designated by the U.S. and notified and listed at the UN in November 2001 and August 2002, significantly disrupting their activities. Cooperative efforts made by international partners including Italy, Switzerland, Luxembourg, and the Bahamas were critical in making this action successful.

**Benevolence International Foundation (BIF) and Global Relief Foundation (GRF) Blocking in aid of Investigation:** On December 14, 2001, the U.S. Treasury Department blocked in aid of investigation both BIF and GRF in Chicago, Illinois. OFAC, in coordination with the FBI in Chicago, blocked the business records and bank accounts of BIF and GRF, pending further investigation by OFAC. GRF filed for injunctive relief in U.S. District Court on January 28, 2002. BIF filed its complaint in U.S. District Court on January 30, 2002. On October 17, 2002, OFAC designated GRF pursuant to E.O. 13224 and on November 18, 2002, designated BIF. The district court rejected GRF's motion for a preliminary injunction on June 11, 2002. This decision was affirmed by the Seventh Circuit on December 31, 2002. On February 25, BIF's civil suit against the US Government was voluntarily dismissed with prejudice and without costs. On July 3, 2003, GRF filed a petition for writ of

1

70

*certiorari* with the Supreme Court. Both BIF and GRF were notified and listed at the UN.

**Designation of Holy Land Foundation (HLF), Beit al-Mal, and al-Aqsa Islamic Bank:** On December 4, 2001, the U.S. Treasury Department designated Holyland Foundation ("HLF"), Beit al-Mal Holdings, and al-Aqsa Islamic Bank pursuant to E.O.s 13224 and 12947. HLF was also added to the EU's list of terrorists in June 2002. On March 8, 2002, HLF filed its complaint in U.S. District Court. On May 31, 2002, OFAC redesignated HLF. On August 8, 2002, the district court denied HLF's motion for a preliminary injunction on all counts and granted summary judgment to the government as to most of HLF's claims, including its due process, First Amendment, and Religious Freedom Restoration Act claims. On June 20, 2003, the D.C. Circuit upheld the district court's ruling in full. On February 6, 2002, OFAC received a petition from Beit al-Mal for removal from the SDGT list. On June 7, 2002, al-Aqsa submitted a petition to OFAC for removal from the SDGT list. Both cases are under review.

**Kuwaiti Charities:** On January 9, 2002, Treasury designated the Pakistani and Afghan branches of the Revival of Islamic Heritage Society (RIHS) and the Afghan Support Committee (ASC) as entities supporting the Al-Qaeda network. The RIHS is a Kuwaiti-based charity with offices in Pakistan, Afghanistan and throughout the world. The Peshawar, Pakistan office defrauded donors to fund terrorists, including inflating the number of orphans it was ostensibly supporting with the names of fictitious or dead children in order to obtain additional funds from the RIHS Kuwait headquarters. The additional money was then diverted to Al-Qaeda terrorists. ASC located in Jalalabad, Afghanistan, solicited donations from local charities in Arab countries by falsely asserting that the funds collected were destined for orphans and widows. In reality, the financial chief of the ASC served as the head of organized fundraising for Usama Bin Laden and turned over the funds collected by the ASC to Al-Qaeda operatives. These entities were notified and listed at the UN.

**G7 Joint Designation:** On April 19, 2002, the United States, along with the other G7 members, jointly designated nine individuals and one organization. Most of these groups were European-based Al-Qaeda organizers and financiers of

2

71

terrorism.  Because of their Al-Qaeda links, all ten of these names were notified and listed at the UN.

**U.S.-Central Asia Joint Designation:** On September 6, 2002, the United States, Afghanistan, Kyrgyzstan, and China jointly notified and listed at the UN the Eastern Turkistan Islamic Movement, an Al-Qaeda-linked organization active in parts of South and Central Asia.

**Jemaa Islamiyya:** On October 23, 2002, the United States designated the Southeast Asia-based terrorist group, Jemaa Islamiyya, the perpetrator of the deadly attacks on a nightclub in Bali on October 12th.  In the subsequent request of the United Nations to also designate this group for its ties to the Al-Qaeda organization, the U.S. joined Australia, Indonesia, Singapore, and 46 other countries, including all the members of ASEAN and the EU, in notifying and listing Jemaa Islamiyya's at the UN.  This represents the most widespread show of support to initiate a designation at the UN to date.

**Three Chechen Groups:** On February 28, 2003, the United States designated three Chechnya-based terrorists groups responsible for the Moscow theater siege.  In the subsequent request to the UN for notification and listing these groups based on their ties to the Al-Qaeda organization, the U.S. was joined by UN Security Council members France, Russia, China, the UK, Spain, and Germany.

**Cooperation with European Union Member States:** On February 26, 2002 and May 3, 2002, the United States joined the Spanish Government and designated more than 20 ETA related operatives. These names were not notified to the UN. On August 8, 2002 joined the Italian Government in designating several Al-Qaeda related individuals which were notified to and listed at the UN. In addition, on June 6, 2003, the U.S. joined Italy and Germany in designating 17 Al-Qaeda individuals which were notified to the UN.

3

72

### Appendix 2

**Anatomy and Disruption of Terrorism Support Networks**

The attached four charts lay out OFAC's theory regarding
how we currently employ and could expand the use of
sanctions authority to disrupt the financial and support
networks of several prominent terrorist groups.

**Charts 1 and 2** are examples of the various steps of the
funding process. Donors provide money to a variety of
intermediaries often acting on behalf of charitable
organizations to collect funds. The charitable
organizations, in turn, use the funds both for legitimate
humanitarian efforts, but also either wittingly or
unwittingly allow some funds to be siphoned off by
facilitators who serve as the conduit to the extremist
groups. Facilitators frequently are employees of the
charitable organization with close ties to the extremist
group or members of the extremist group with responsibility
for liaising with charitable organizations.

**Chart 3** is a model of a terrorist support network with the
key nodes highlighted that we believe economic sanctions
could effectively impact. These include financial,
leadership, and influence nodes. Influence nodes can
include individuals and institutions that provide spiritual
or other guidance, or serve as recruitment centers.

**Chart 4** shows theoretically how designation and isolation
of the key nodes identified in Chart 3 will sever critical
ties within the overall network and thereby disrupt its
overall functioning.

73



Model of the Origin and Flow of Funds to Extremist Groups

74



CHART #2

MODEL OF THE ORIGIN AND FLOW OF FUNDS TO EXTREMIST GROUPS

Page 1

75



76



MODEL TERRORIST NETWORK WITH NODES REMOVED

CHART #4

Page 1

77

### SAUDI SUPPORT FOR INTERNATIONAL TERRORISM:
### BACKGROUND AND CURRENT DEVELOPMENTS

**Testimony by Dr. Dore Gold, President of the Jerusalem Center for Public Affairs
and former Israeli Ambassador to the United Nations**

**U.S. Senate Committee on Governmental Affairs, Thursday, July 31, 2003**

Nearly two years ago on September 11, 2001, most well-informed observers about the Middle East were shocked to hear that 15 out of the 19 hijackers who carried out the attacks on the World Trade Center and the Pentagon were Saudi citizens. It was equally surprising that the mastermind of the worst terrorist attack on the United States in its history, Osama bin Laden, was born and raised in Saudi Arabia. This curiosity and wonder about the Saudi role in the attack came up once more with the release of the September 11 report by the U.S. Congress and its disclosure of "incontrovertible evidence" linking Saudis to the financing of al-Qaeda operatives in the United States.

For decades, terrorism had been associated with states like Libya, Syria, or Iran. Saudi Arabia had been a pro-Western force during the Cold War and had hosted large coalition armies during the 1991 Gulf War. Saudi Arabia had not been colonized during its history, like other Middle Eastern states that had endured a legacy of European imperialism. This background only sharpened the questions of many after the attacks: What was the precise source of the hatred that drove these men to take their own lives in an act of mass murder?

In a series of articles appearing in the Egyptian weekly, *Ruz al-Yousef* (the *Newsweek* of Egypt), this past May, Wael al-Abrashi, the magazine's deputy editor, attempted to grapple with this issue. He drew a direct link between the rise of much of contemporary terrorism with Saudi Arabia's main Islamic creed, Wahhabism, and with the financial involvement of Saudi Arabia's large charitable organizations:

> "Wahhabism leads, as we have seen, to the birth of extremist, closed, and fanatical streams, that accuse others of heresy, abolish them, and destroy them. The extremist