# EXHIBIT 48A

36

words, those individuals say in Iraq per se that need help, that need support and that we encourage, are allowing the provision of goods in kind, tractors and the like, and not cash. So the government has interposed themselves. They have their hands on the choke point. The good Saudi people that want to contribute for a good cause have a way to do that.

Mr. PITTS. Have they cooperated with U.S. intelligence or U.S. personnel on the Khobar Towers bombing, the Air Force billeting facility that was struck in June 1996? Is their investigative arm willing to share evidence with U.S. counterparts?

Ambassador BLACK. If I can turn that over to my FBI colleague? I am not so sure on that.

Mr. HARRINGTON. Again, in an open hearing, this is somewhat difficult, but certainly we waited over 4 years for direct access to individuals we believe that were involved in Khobar Towers. Certainly the environment is completely different from that time compared to today. I think there is still room for us to have further discussions on that, but they are more actively involved in trying to provide that assistance. We are building relationships now one on one between investigators at both the working level, mid level and, as I stated earlier, the executive levels. We are making progress.

Mr. PITTS. Thank you, Madam Chair. My time is up.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Pitts.

Congressman Crowley was sweet enough to let us skip his turn so that Congresswoman Berkley can ask her question and get back to her other hearing and then we will hear from Congressman Crowley.

Shelley?

Ms. BERKLEY. Thank you very much, Madam Chairman.

Thank you all for being here, I appreciate the information, but with all due respect, I am not overly impressed with our Saudi partners.

The Saudis have been exporting terrorists and funding terrorism throughout the world for the last 20 years under the mistaken belief that they would not be the victims of their own creation and now that they are the victims all of a sudden they have become our partners against terrorism. I think it is too little too late and while you have spoken of some improvements, the reality is you are touching the tip of the iceberg and we do not have a clue what the Saudis are doing or what the Saudi royal family is funding. But there is certainly enough evidence to believe that they continue, if not at the same pace, to fund al-Qaeda, to fund Hamas, and other terrorist organizations throughout the world.

There are a number of questions that I have, but I have to get back to the other hearing, but what I would like to do is leave a list and have you answer in writing.

One issue that I would like to bring up is the Saudi support for the Qassam rockets. There have been reports that Saudi Arabia may be playing a role in Hamas' development of the Qassam rockets. Apparently, Hamas operative Osama Karika was recently caught en route from Gaza to Saudi Arabia carrying documents detailing the Qassam rocket program.

Karika told Israeli interrogators that he had received financial backing for the Hamas rocket program in Saudi Arabia and was returning to brief people on progress and secure more funding.

Can you confirm this cooperation?

Mr. Ambassador?

Ambassador BLACK. Yes, Ma'am. Thank you very much for that. We certainly look forward to your questions and we will try and answer them.

It sounds like it is in the preserve of intelligence. I cannot rule out something like this could be possible certainly without the support of the Saudi government. It would need to be checked out and looked into and we would need to have the intelligence and security people look at it. I do not know what the state of play on that is.

There are people moving around the Middle East with money involved in nefarious activities, it is a fact of life, it has been going on for a long time. It is our mission to identify them and stop them.

Ms. BERKLEY. And funded by the Saudi government?

Ambassador BLACK. Ma'am, we have been told at a very senior levels and we do everything to confirm this that there is no official Saudi government support for Hamas.

Ms. BERKLEY. What is the definition of official?

Ambassador BLACK. Well, a government entity would be like the U.S. Government vis-a-vis perhaps—it is a bad analogy, but yourself. You acting in your private capacity would be seen as different than being a representative of the government. As we understand now, representatives of the government would be in contrast to private individuals.

Ms. BERKLEY. Do you consider members of the Saudi royal family members of the government or private individuals? And if you have a prince writing a million dollar check to Hamas so that they can develop these rockets, are they doing it as citizens of Saudi Arabia or as members of the Saudi royal family?

Ambassador BLACK. I do not mean to be cute, but there are a lot of princes of various levels. Some of them are unemployed and sort have no jobs and live off of wealth. One's affiliation to the royal family does not make them a part of the government. It is possible that a junior prince or someone well removed from the government could be involved with something like this, but it would be speculation.

Ms. BERKLEY. How we do we rein that in?

Ambassador BLACK. The problem is we have to identify these people.

Ms. BERKLEY. And who does that?

Ambassador BLACK. Well, we do that through, one, cooperation with the Saudi government; two, by security and intelligence activities outside the Kingdom and those people would look at the problem from both ends.

Ms. BERKLEY. I would submit to you if we are relying on the Saudi government to turn over information about their Saudi princes, no matter how low ranking they are, we are going to be waiting an awfully long time.

I am going to prepare a list of questions, if you do not mind answering them, and I thank you very much for your courtesy.

38

I have to say and I know this is not the subject of this hearing, but when I go on a Saudi Web site, when they are encouraging tourists to come to Saudi Arabia and I hear you speak of them glowingly and say that they are really cooperating and they are good friends and allies, when they list people that need not apply for visas and they talk about Jews, I am Jewish, does that mean that I could not get a visa to go to Saudi Arabia? And what type of friendly country is that that we would wish to be associated or allied with?

Ambassador BLACK. Yes, Ma'am. I certainly agree with you. I am speaking from a standpoint of counterterrorism, as a partner with the government of Saudi Arabia in the field of counterterrorism, and I would submit that that is reprehensible. Our government is against it. We work with them to change it, yet in this process you have to work with what you have and we are attempting to save lives in the process.

Ms. BERKLEY. I would submit to you that there are hundreds of dead Israelis that have been omitted from this process that we are working on with the Saudis and if this nation wants to get serious about terrorists and terrorism and eradicating the threat world-wide, the first country we ought to look to are the Saudis and stop pretending that they are allies and friends of ours. They are not.

Ms. ROS-LEHTINEN. Thank you, Congressman Berkley.

Congressman Crowley?

Mr. CROWLEY. Thank you, Madam Chair. Thank you for holding this hearing today.

I just want to make an observation. I do not want to get too far afield from the subject matter at hand and I was not in the room when the statement was made pertaining to Mr. Clarke, but I feel that more needs to be said about the statement alleging the actions by Mr. Clarke while in the White House.

It appears as though to me that character assassination has trickled up to the legislative branch and is not solely owned by the White House at this time. In other words, if you do not like what the person is saying, attack at every opportunity that makes itself available, even if the opportunity comes at a Subcommittee hearing that was conceived, I understand, months in advance and before we knew that Mr. Clarke would be releasing his book this week.

I do not know if there is anyone here from the White House, but I am sure if they are here they must have been cringing when that question was being asked. That is just an observation I would make. I do not think the White House would actually ask Mr. Chabot or any other Member of this Committee to ask such a question before such an impressive panel when we are dealing with the issue of international terrorism and the sponsorship thereof and what role the Saudi government is playing in that.

Having said that, Ambassador Black, I just want to come back to your statement. The line where it says: "We have such a like-minded ally in the Kingdom of Saudi Arabia," I understand that you are probably making reference to a like mindedness in terms of fighting the war against terrorism. That is correct, am I not?

Ambassador BLACK. Yes, sir. I apologize if that is not clear. I do counterterrorism, perhaps I overly focus on that and I would say, sir, just having worked on this for years, there has been a signifi-

39

cant change and they very much see this issue, gratefully and thankfully, very much the way we do, that we have to identify these people and we have to have them arrested or detained or otherwise taken care of so they do not hurt innocent men, women and children.

Mr. CROWLEY. See, I agree with you, I think they probably do get it now that they have had the same acts committed against their government, their own people in essence, but I think it is interesting that like mindedness, in my opinion, ought to extend beyond the war of international terrorism.

When you look within the country itself and way in which it treats half of its own population, I think one could describe that as state sponsored terrorism within its own borders, the way in which it treats women, not being given the right to vote, not being able to drive, not being able to leave the building without a man with that person, the religious police that are on the streets that beat people for wearing inappropriate clothing, etc.

A country that has that set of standards, that set of rules within its own borders and then somehow is going to be working with us to undo international terrorism or go after international terrorism and at the same time with the other hand not necessarily with the government but members of the government who are then funnelling money to madrassas all around the world, including countries like Pakistan, Indonesia, to Bangladesh, for instance, and certainly even here to the United States, it is just an interesting—and I do not mean to come on you, Ambassador, too much, but it is an interesting choice of language to use within your statement and I just want to make a point of that.

What are we doing in terms of bringing the pressure to bear upon the Saudis? And if you have already answered this, I apologize. If you have, I will make reference to your notes, but one of the U.S. counterterrorism policies is to isolate and to apply pressure on states that sponsor terrorism to force them to change their behavior.

I, for one, would agree and want to be associated with Ms. Berkley in terms of her observation of Saudi Arabia. Whether it is Saudi Arabia or other countries, but specifically, Saudi Arabia, what is the United States doing to force them to change their behavior or their past behavior?

Ambassador BLACK. I certainly agree with you. Their behavior in the past left considerable room for improvement.

Beginning in my experience in this job, beginning in January of last year, diplomatically, the United States Government began working very closely with the leadership of Saudi Arabia. Our desires were made very clear. There was responsiveness on their part. It was adopted and operationalized among the key individuals and their legal and security establishments. We have seen measurable evidence of this cooperation in terms of terrorists killed, joint entities established.

I certainly agree with the Congresswoman just speaking from a standpoint of counterterrorism. Young police officers in Saudi Arabia are locking and loading and having shootouts in the Kingdom and people are dying.

40

A large number of al-Qaeda terrorists have been killed or detained. They have lost a lot of their young men in these struggles. This is counterterrorism. This is what happens in this kind of war.

Mr. CROWLEY. And some would argue that they are actually responsible for the terrorism that was created in their own country by the policies they put forward.

Ambassador BLACK. Well, I am not going to——

Mr. CROWLEY. I know you are not. I understand that.

Ambassador BLACK. Again, I guess the key point I am saying is it is very difficult for me to speak to the sort of history of the relationship. I would say to you I have been a counterterrorism practitioner; before, it was not as good as it is now and before it was not very good at all, but I think we have really made significant progress because of the reality of the threat. They are working with us closely.

In fact, the last time I was in the Kingdom, sometimes I look at the evidence of this cooperation and I think how long ago would it have been where one would think something like this was possible. There are full-page advertisements in the newspapers with pictures of al-Qaeda terrorists asking the population if you know anything about these people turn them in and they are doing it. So you have that going.

They are engaging terrorists, they are working closely with us. So we are not all the way there yet, there are other aspects of their society absolutely that we would encourage them to think about changing, but in counterterrorism alone, that is all I can speak to, I think we are making some real progress there.

Mr. CROWLEY. Thank you, Ambassador.

Mr. SMITH. The reports that Saudi Arabia is funding the PLO and Hamas, is accurate? Is it still happening?

Ambassador BLACK. In part. The Palestinian Authority receives sort of a bimonthly stipend from the government of Saudi Arabia for support costs and infrastructure support and administration. As I commented earlier, sir, the government of Saudi Arabia claims, and we have no evidence to contradict them, that the government is not providing support to Hamas.

Mr. SMITH. And the World Muslim Fund?

Mr. ZARATE. Congressman, you may be referring to the Muslim World League or the World Assembly of Muslim Youth. These are two of the multi-lateral organizations we were referring to earlier that are charities that operate, certainly, within Saudi Arabia and around the world. That is something that we are addressing directly with the Saudis, trying to both ferret out those operatives that are using those organizations worldwide to continue to funnel money to al-Qaeda and like-minded groups, but as well looking for opportunities to change the regulatory oversight of those organizations within Saudi Arabia.

Mr. SMITH. So do I understand your testimony, and I apologize for coming in late, we have several Committees, as you know, that you are optimistic, positive about the increase in cooperation over the last couple of years and you are optimistic about the continuing cooperation in the Saudis' help to fight terrorism?

Ambassador BLACK. I would say that I have been increasingly optimistic in the last year and a half. It has matured greatly. Our

cooperation now is productive in terms of measurable achievements, number of terrorists arrested, detained, the work we are doing in IDing and cutting financial links to terrorism. So I think the recent past is very good and I am here to tell you that we have a reason to be optimistic because of the results achieved and this has been directly related to the leadership shown by senior officials in the Kingdom in making a fundamental and strategic choice to cooperate with us and to allow us to work with them on some aspects of counterterrorism inside the Kingdom of Saudi Arabia.

Mr. SMITH. And help me understand the effort of sanctions on individual firms or individual Saudis.

Mr. ZARATE. Congressman, what we have done with the Saudis, as Ambassador Black mentioned earlier, is to identify 10 entities to the United Nations for the application of sanctions by the international community. Those sanctions include asset freezes that require the international community to not only freeze the assets that may exist for those entities, which in this case involve Saudi-based charities and branches around the world as well as a Saudi citizen, but as well commits the international community to a travel ban as well as other measures.

Mr. SMITH. Gentleman, on behalf of the Chairman and the Ranking Member, thank you all very much. We will ask the second panel——

Are there any other short statements that you would like to put on the record?

Ambassador BLACK. No, sir. Thank you. It was an honor to be here.

Mr. SMITH. Gentlemen, Thank you very much.

Mr. ZARATE. Thank you, Congressman.

Mr. SMITH. The second panel, as I understand it, has been introduced, Mr. Robert Baer, the former CIA Middle East intelligence officer, and Mr. Steven Simon, the senior analyst with RAND Corporation.

Gentlemen, again, thank you very much. Your total testimony will be made part of the Committee's record. We would ask you to come close to the 5 minutes, starting with you, Mr. Simon.

### STATEMENT OF STEVEN SIMON, SENIOR ANALYST, RAND CORPORATION

Mr. SIMON. Thank you, Mr. Chairman, and Members of the Committee.

Fundraising is a key issue. Groups who commit terrorist acts need cash to do that. Having said that, these groups are, to a degree, self-sufficient. They are self-sufficient in part as a matter of necessity, both in terms of the uncertainty of supply of cash from elsewhere and, in the interests of operational security, they are to some extent self-sufficient for doctrinal reasons.

The lure of Muslim warfare justifies or calls for the taking of booty, fay or hanima are the words, and terrorist groups are doctrinally motivated to secure funds on their own by stealing from the societies in which they live. Of course, we know that terrorist groups do this with alacrity, especially on the Islamist side. Credit card fraud and so on are important ways of gaining funds.

42

The other thing to bear in mind is that without a big infrastructure as al-Qaeda required before September 11th and its expulsion from Afghanistan, they have a lesser need for funds, although a surge capability for fund raising is a useful thing to have for establishing new networks, consolidating networks, and setting into motion high impact or large scale operations.

A third thing to bear in mind is that the very metastasis of this group, the way it has spread and dispersed and become in effect a global jihad. This means that funds are being raised in many different locations and there is very good scholarly work going on concerning fund raising that has been dispersed well beyond what was called earlier the epicenter of Saudi Arabia and Southeast Asia is a particularly important area for this kind of activity. The tri-border area in Latin America is as well.

This is not to say that tracking funds is unimportant. It is important not only for the purposes of interdicting the funds that are in motion or stanching the flow at the base in order to starve operators, it is important, too, for the purposes of locating operators themselves. This is a very useful string for intelligence agencies on the right side of the fence to pull on.

It is also true that the emergence or maybe a better way to put it is the unavoidable recognition at this point by the Saudi leadership that there is an intifada going on in their own country against them has moved them to acknowledge the urgency of long-standing United States demands that they get a grip on the significant flow of funds from the Kingdom to a variety of charitable and missionary organizations that have been linked to terrorist acts.

We have talked in this chamber in the past few minutes about Hamas. We know that money is going to Hamas in significant sums from Saudi Arabia, at least viewed against the scale of Hamas requirements, maybe 12 to 14 million a year, and we know this because the Palestinian Authority is very upset about it and they talk to us about it. They are contesting political control of a future Palestinian state with Hamas and Saudi support of their competitor is not a very good thing from their perspective and probably not a good thing from ours either.

A number of initiatives were discussed earlier in this presentation. They are very impressive. The FATF review process, the joint task force, the Saudi Arabian Monetary Agency's regulatory process for monitoring money laundering and terrorist financing, the establishment of a financial intelligence unit, the Saudi Royal Commission on Charities and so forth, all of these are very impressive. Thus far, their appears at least to the outside scholar very little follow-through.

The very ambiguity with which the representatives of the Administration expressed in discussing the degree of follow-through, the confusion that one could see in this testimony, is just evidence that the situation remains in flux, so you have a regulatory framework being established, but it is very difficult actually to launch as a practical matter.

But I am not going to focus on these things for the simple reason that I am not involved in the implementation. What I would like to do is just take 2 or 3 minutes to underline the huge difficulty

43

that the Saudis are going to have in implementing these arrangements and explaining why it will be so difficult for them to do so.

In the first instance, most Saudis, I think, believe that the Muslim world is under lethal attack by a vigorous, robust and maybe an all powerful enemy. Under such circumstances, it is the personal obligation of every able bodied Muslim to come to the defense of the Muslim community, of his fellow Muslims.

Now, of course, as a practical matter, most people cannot do this. You have a family, you have a business, you live in a particular country, unless you are young and relatively unencumbered, you cannot run off to Chechnya or to Palestine or to Kashmir or to any number of other places where Muslims are perceived to be under attack and join the war. So you do the next best thing, you write a check or you give cash.

And this impulse within Saudi society is deeply seated. It is hard wired, if you will. It is a passionate need. Public opinion survey data that has been collected within the Kingdom tends to confirm this fact. The bin Laden worldview, if I can put it that way, is widely shared. And when important Muslim leaders like Sheikh Amed Yasin in Gaza or the former Chechan leader Yadarbaev are assassinated, the long arm, the tentacles of a hostile power are seen as operating within the Muslim world in a pernicious way and this tends to reinforce the perception of beleaguerment, of being besieged.

It is also true, unfortunately, that polling data within the Kingdom shows that bin Laden himself remains a revered figure by many people, perhaps most people, in that country, so support for a jihad against the enemies of Islam that bin Laden embodies is a very important element of societal values.

Now, when you have a situation like this, you can build a dam in the form of interlocking regulatory and law enforcement structures, but tributaries will develop around that dam, flows of money that this dam will not stop.

Now, this is not to say that one should not build the dam. The dam must be built and the Saudis must have their feet held to the fire and so forth. It is absolutely essential.

My point, rather, is that the money will leak out anyway and probably in significant numbers.

Now, let me just conclude by saying that the Saudi leadership is engaged now in a very delicate process of transition. It is extremely fraught, the outcome at this point is unknowable. In the course of this transition, they have to negotiate two long-standing contracts, one with society and one with a clerical establishment whose approval is indispensable to the legitimacy of the Saudi rulers themselves.

The bargaining process in this renegotiation is a very delicate one and there will be horse trading, especially with the clerical establishment. Things will have to be offered up by the Saudi leadership in return for concessions it expects to get from a clerical establishment on whom it relies for its legitimacy.

Thus, you will see continuing, just as an example, you will see continuing oppression of women in Saudi Arabia because that is something that at this point in time the Kingdom will have to surrender to the clerics in return for other forms of support.

44

Reform in the education system is perhaps another example in which concessions will have to be made. The education system emphasizes a curriculum known to specialists as tawhid. It is very xenophobic, it is very hostile toward the Shiites as well as Jews and Christians, and it does not exactly favor an open view of the world, yet that element of the curriculum may have to remain as a concession by the Kingdom to the clerics.

Many of these tradeoffs, it seems to me, will have to be made in the process of winning both clerical and societal support for the kinds of changes we are looking for in broad Saudi support for jihad.

The clerical leadership, which embodies, as we know by now, a Wahhabi doctrine, believes that it is incumbent upon the ruler, upon the political ruler, if you will, to wage jihad where it is necessary on behalf of the Muslim community and there is no question in the minds of many that such a jihad is necessary.

Any walking back from that obligation or, even worse, any impediment that the political leadership may put in the way of the exercise of that obligation will be strongly resisted by the clerical leadership. So this combination of a strong, broad societal commitment to jihad as well as the commitment of a clerical establishment whose support is crucial to the regime are going to be very powerful structural impediments to the kinds of reforms we would like to see in Saudi Arabia.

And, again, to conclude, this is not to say that we should not press for such reforms, we absolutely must. It is essential, but we should not expect miracles.

Thank you.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Simon.

Before I recognize Mr. Baer, I would like to point out that in the audience we have our esteemed colleague, the former Chair of the International Relations Committee, Mr. Ben Gilman of New York.

Ben, it is always a delight to see you and I congratulate for the wonderful work you are doing on United States interests in the United Nations. We thank you for all of your efforts.

Mr. Baer, if you could just bear with us for 1 minute, there was a question that had arisen regarding Mr. Chabot's line of questioning and I think a lot was read into the way he phrased the question and I would like to recognize him now so he could cite the source upon which his question related to Mr. Clarke was based.

Mr. CHABOT. Thank you, Madam Chair, and I will be relatively brief here.

I had asked a question, I wish Mr. Berman was here right now, but I had asked a question early on, and I will quote what I said:

"There was a recent report that in the days immediately following 9/11 that former White House Counterterrorism Director Richard Clarke authorized that nearly 140 Saudis be allowed to be flown out of the United States, out of fear of retribution."

So that is what I said.

Ms. ROS-LEHTINEN. So you were referring to an article?

Mr. CHABOT. Yes.

Ms. ROS-LEHTINEN. You did not say——

45

Mr. CHABOT. I said there was a report.

Ms. ROS-LEHTINEN [continuing]. That you had knowledge of it, but you had a report of an article.

I had asked Mr. Chabot to share with us the source of that questioning.

Mr. CHABOT. Well, there was indeed a report and I would ask unanimous consent——

Ms. ROS-LEHTINEN. Without objection.

Mr. CHABOT [continuing]. That the *International Herald Tribune* dated September 4, 2003 be included in the record.

If I could just read two paragraphs here:

"Top White House officials personally approved the evacuation of dozens of influential special agents, including relatives of Osama bin Laden, from the United States in the days after the September 11, 2001 attacks when most flights were still grounded, according to a former White House advisor. Richard Clarke, who ran the White House crisis team after the attacks but has since left the Bush Administration, said he agreed to the extraordinary plan because the Federal Bureau of Investigation assured him that the departing Saudis were not linked to terrorism. The White House feared that the Saudis could face retribution for the hijackings, Clarke said."

And the article goes on.

There is also a second article in *National Review* which goes into even more detail along the same lines. There is also a reference to a *Vanity Fair Magazine* article again along those same lines. So I would ask that these articles be included in the record.

Ms. ROS-LEHTINEN. Thank you. Without objection.

[The information referred to follows:]

WHITE HOUSE AGREED TO WHISK SAUDIS AWAY AFTER 9/11

Eric Lichtblau, *NYT*
Thursday, September 4, 2003

SENATOR CRITICIZES AIRLIFT

WASHINGTON—Top White House officials personally approved the evacuation of dozens of influential Saudis, including relatives of Osama bin Laden, from the United States in the days after the Sept. 11, 2001, attacks when most flights were still grounded, according to a former White House adviser.

Richard Clarke, who ran the White House crisis team after the attacks but has since left the Bush administration, said he agreed to the extraordinary plan because the Federal Bureau of Investigation assured him that the departing Saudis were not linked to terrorism. The White House feared that the Saudis could face "retribution" for the hijackings, Clarke said.

The fact that relatives of bin Laden and other Saudis had been rushed out of the country became public soon after the Sept. 11 attacks. But questions have lingered about the circumstances of their departure, and Clarke's statements provided the first acknowledgment that the White House had any direct involvement in the plan and that senior administration officials had personally signed off on it.

Clarke made his remarks in an article in Vanity Fair magazine published Thursday, and amplified them Wednesday in an interview and congressional testimony. The White House had no comment on his statements.

The disclosure came just weeks after the classified portion of a congressional report on the Sept. 11 attacks suggested that Saudi Arabia had financial links to the hijackers. Clarke's comments are likely to fuel accusations that the United States has gone soft on the Saudis because of diplomatic concerns.

46

Senator Charles Schumer, a New York Democrat, seized on Clarke's comments to call on the White House to conduct an investigation into the hasty departures of about 140 Saudis in the days after the attacks.

Schumer said in an interview that he suspected some of the Saudis who were allowed to leave, particularly two relatives of bin Laden who he said had links to terrorist groups themselves, could have shed light on the events of Sept. 11.

"This is just another example of our country coddling the Saudis," Schumer said. "It's almost as if we didn't want to find out what links existed."

While FBI officials would not discuss details of the case, they said that in the days immediately after the Sept. 11 attacks bureau agents interviewed the adult relatives of bin Laden, members of a rich Saudi family, before the White House cleared them to leave. Bin Laden is said to be estranged from his family.

"We did everything that needed to be done," said John Iannarelli, a bureau spokesman. "There's nothing to indicate that any of these people had any information that could have assisted us, and no one was accorded any additional courtesies that wouldn't have been accorded anyone else."

But Vanity Fair quotes Dale Watson, the former head of counterterrorism at the FBI, as saying that the departing Saudis "were not subject to serious interviews or interrogations." Watson could not be reached for comment.

The article depicts an elaborate but hurried evacuation, with private planes picking up Saudis from 10 U.S. cities. Some aviation and bureau officials said they had been upset by the operation because the government had not yet lifted flight restrictions for the general public, but said they had not had the power to stop it, the article says.

Clarke, who left the White House in February, said in an interview that he was driven by concern for the safety of the Saudis after the hijackings. "We were concerned, just as the Saudis were concerned, that the Saudis and other Middle Easterners would be targeted for retribution," he said. He called the current criticism of the evacuation "a tempest in a teapot," adding that he had told the bureau to hold anyone it had suspicions about, and that the FBI had said it had not held anyone.

Schumer said in a letter to the White House Wednesday that the Saudis appeared to have had "a free pass" despite possible knowledge about the attacks.

"I find it hard to believe that two days after 9/11, the FBI would even know what questions to ask and who to ask it of," Schumer said in an interview. The New York Times

---

THE GREAT ESCAPE: HOW DID ASSORTED BIN LADENS GET OUT OF AMERICA AFTER SEPTEMBER 11?

*National Review*, Sept 29, 2003
by Byron York

Last year, on the first anniversary of September 11, there were serious, unanswered questions about the Bush administration's decision to allow members of the bin Laden family living in the United States to leave the country in the days after the terrorist attacks. Now, on the second anniversary of September 11, there are still serious, unanswered questions. But ever so slowly, new information is emerging.

The basic story has been known for quite a while. Not long after the attacks, the Saudi government, saying it feared retribution against Saudi citizens, worked with the bin Laden family to gather up more than 100 family members and other prominent Saudis for a flight to Jeddah. A chartered jet made pickups in Los Angeles, Orlando, and Washington, D.C., before making a final stop at Boston's Logan Airport, from which it departed for Saudi Arabia.

But the Saudis required permission to leave the country, and it has never been clear who in the U.S. government gave it to them. In interviews with National Review last year (see "The Great Escape," Sept. 30, 2002), a State Department source said Foggy Bottom "played no role" in the matter; an FBI spokesman said the Bureau did not have the authority to make that decision; and the White House declined to answer questions.

Recently, however, Richard Clarke, the former head of anti-terrorism at the National Security Council, gave some answers while testifying before the Senate Judiciary Committee's subcommittee on terrorism. "I do recall that the State Department coming to us that week [after September 11]," Clarke testified,

saying that the Saudi Embassy felt that in the wake of the terrorist attacks, Arabs in this country, particularly Saudis, might be victims of retribution attacks, and they wanted therefore to take some Saudi students and the Saudi citizens back

47

to their kingdom for safety, and could they be given permission to fly, even though we had grounded all flights. Now, what I recall is that I asked for flight manifests of everyone on board and all of those names need to be directly and individually vetted by the FBI before they were allowed to leave the country. And I also wanted the FBI to sign off even on the concept of Saudis being allowed to leave the country. And as I recall, all of that was done. It is true that members of the bin Laden family were among those who left. We knew that at the time. I can't say much more in open session, but it was a conscious decision with complete review at the highest levels of the State Department and the FBI and the White House.

What Clarke could not testify to was the thoroughness with which the FBI questioned the departing Saudis. Last year, National Review reported that the FBI conducted brief, day-of-departure interviews with the Saudis—in the words of an FBI spokesman, "at the airport, as they were about to leave." Experts interviewed by National Review called the FBI's actions "highly unusual" given the fact that those departing were actually members of Osama bin Laden's family. "They [the FBI] could not have done a thorough and complete interview," said John L. Martin, the former head of internal security at the Justice Department.

At the Judiciary subcommittee hearing, New York Democratic senator Charles Schumer asked Clarke how closely the Saudis were questioned. "Sir, all I can tell you is that I asked the FBI to do that," Clarke replied. "I asked the director and the assistant director of the FBI to do that. They told me they did it." End of story.

Clarke's statement—and Schumer's questions—came as a result of an article in Vanity Fair that questioned some aspects of the Saudi exodus. Author Craig Unger reported that the Saudis made an additional pickup flight, on an eight-passenger Learjet that flew from Tampa to Lexington, Ky., on the afternoon of September 13, 2001. That flight, Unger said, occurred at a time when the Federal Aviation Administration had banned all private flights (commercial planes had just resumed flying). "Three private planes violated the ban that day, and in each case a pair of jet fighters quickly forced the aircraft down," writes Unger. Yet the Saudi flight, he says, was allowed to travel undisturbed.

Vanity Fair suggests that that was the result of some sort of intervention by the Bush White House. But administration sources tell National Review they have looked into the matter and found no record of such a flight receiving any special permission to fly. The sources also say that charter aviation was allowed to resume on the morning of September 13, several hours before the Tampa-to-Lexington flight is said to have departed, which would mean that the plane, which Vanity Fair says was chartered, did not need any clearance to fly. Overall, it appears that all flights—the ones gathering up Saudis domestically and the one from Boston to Jedda—took place after the government allowed aviation to resume.

Yet the big question—Who decided to allow the bin Ladens to leave the country and why?—remains.

Vanity Fair quotes Nail al-Jubeir, the Saudi director of information, as saying that the Saudi flights were approved "at the highest level of the U.S. government"—just as Clarke said. So far, however, those highest levels are saying very little. The FBI's account remains the same—"We didn't clear them to leave the country, we don't have that power," a spokesman tells National Review . As for the State Department, Secretary Colin Powell, when asked about the subject on Meet the Press , said, "I don't know the details of what happened, but my understanding is that there was no sneaking out of the country; that the flights were well known, and it was coordinated within the government." For its part, the White House remains silent.

All of which has led to growing curiosity. "I think people need to know the facts," says Arizona Republican senator Jon Kyl, who chaired the Judiciary subcommittee hearing the day Richard Clarke testified. "It's a perfectly legitimate subject. Clarke very candidly testified that he had run it past the State Department."

The official silence has also led observers to wonder whether there is some information about the bin Laden flights in the 28 blacked-out pages of the House and Senate intelligence committees' September 11 report. Those pages are apparently devoted to Saudi involvement in the terrorist attacks, but it seems they do not cover the Saudi departures. Sen. Kyl has read the material, and while he will not say what is in it—not even whether it discusses the Saudis—he says he is "unaware of any information in the intelligence reports that I have read that specifically goes into that."

Finally, the administration's silence on the Saudi question is having one more effect: It is allowing some Democrats to turn the issue into a political football.

The day after he questioned Clarke, Sen. Schumer participated in a news conference with the Senate Democratic leadership. "On September 12th and 13th [2001], hundreds of Saudis were able to take flights home back to Saudi Arabia

48

when no one else could fly," Schumer said. "I couldn't fly. Senator Boxer couldn't fly. Senator Durbin couldn't fly. But relatives of the royal family, including two members of the bin Laden family, were allowed to get on airplanes and go back to Saudi Arabia."

According to all available evidence, that is simply not true. Perhaps Schumer was unaware of the facts; at the hearing the day before, he confessed that he had not even read the Vanity Fair article, relying instead on a summary the magazine had released. In any event, he leveled an incendiary charge based on faulty premises.

Schumer has also written a letter to the president calling for an investigation of the Saudi flights. "For whatever reason, it appears as if these particular Saudis were given a free pass by the U.S. government despite their potential knowledge about 9–11," Schumer wrote. "Allowing approximately 140 Saudi citizens with potential links to the 9–11 attacks to leave the United States without FBI interrogation in the days after September 11th is clearly a glaring investigative failure."

Now, it's possible that other Democrats will pick up the story as well. Presidential candidates Howard Dean and Richard Gephardt have both been highly critical of the administration's dealings with the Saudis, and asking why George W. Bush let the family of the mastermind of September 11 leave the country shortly after the terrorist attacks might work very well in a campaign speech. In the end, then Bush White House might end up paying a political price for its refusal to answer a few simple questions.

COPYRIGHT 2003 National Review, Inc.
COPYRIGHT 2003 Gale Group

---

PRESS RELEASE FROM VANITY FAIR

FORMER COUNTERTERRORISM CZAR TELLS VANITY FAIR HOW BIN LADENS AND OTHER SAUDIS WERE CLEARED TO FLY OUT OF U.S. AFTER SEPTEMBER 11; GOVERNMENT OFFICIALS DENY FLIGHTS EVER TOOK PLACE

NEW YORK, N.Y.—Former White House counterterrorism czar Richard Clarke tells Vanity Fair that the Bush administration decided to allow a group of Saudis to fly out of the U.S. just after September 11—at a time when access to U.S. airspace was still restricted and required special government approval. According to other sources, at least four flights with about 140 Saudis, including roughly two dozen members of the bin Laden family, flew to Saudi Arabia that week—without even being interviewed or interrogated by the F.B.I.

Officially, the White House has declined to comment. But a source inside the White House says that the administration is confident that no secret flights took place and that there is no evidence to suggest that the White House ever authorized such flights. An F.A.A. spokesman, Chris White, told the Tampa Tribune that a flight on September 13 did not even take place. "It's not in our logs. It didn't occur." In addition, the F.B.I. denies that it played any role in the repatriation.

But Vanity Fair writer Craig Unger interviewed Dan Grossi, a private eye and former Tampa Police Department officer who received a call two days after 9/11 asking him to escort Saudi students on a flight from Tampa to Lexington, Kentucky, even though private planes were still grounded nationwide. "I was told it would take White House approval," Grossi tells Unger. But when the plane's pilot showed up, they took off.

At the time, Richard Clarke chaired an ongoing crisis group in the 18-by-18-foot Situation Room in the West Wing of the White House. Vice President Dick Cheney and National-Security Adviser Condoleezza Rice were hunkered down managing the crisis, and Colin Powell, C.I.A. director George Tenet, and Defense Secretary Donald Rumsfeld came and went. "Somebody brought to us for approval the decision to let an airplane filled with Saudis, including members of the bin Laden family, leave the country," Clarke tells Unger. "My role was to say that it can't happen until the F.B.I. approves it. And so the F.B.I. was asked—we had a live connection to the F.B.I.—and we asked the F.B.I. to make sure that they were satisfied that everybody getting on that plane was someone . . . O.K. to leave. And they came back and said yes, it was fine with them. So we said, 'Fine, let it happen. . . . I asked them if they had any objection to the entire event—to Saudis leaving the country at a time when aircraft were banned from flying."

Clarke, who headed the Counterterrorism Security Group of the National Security Council, now runs a consulting firm in Virginia and does not recall who initiated the request for approval. He says it was probably either the F.B.I. or the State Department, both of which have denied playing any such role.

49

"It did not come out of this place," says a State Department source. "The likes of Prince Bandar does not need the State Department to get this done."

"I can say unequivocally that the F.B.I. had no role in facilitating these flights one way or another," Special Agent John Iannarelli, the F.B.I.'s spokesman on counterterrorism activities, tells Unger.

However, Saudi Arabia's director of information, Nail al-Jubeir, said that the flights had been requested by the Saudis and were authorized "at the highest level of the U.S. government."

After the September 11 attacks, Prince Bandar bin Sultan, the Saudi ambassador to the United States, was in Washington orchestrating the exodus of about 140 Saudis scattered throughout the country who were members of, or close to, the House of Saud, which rules Saudi Arabia, and the bin Laden family. By coincidence, even before the attacks, Bandar had been scheduled to meet President Bush in the White House on September 13, 2001, to discuss the Middle East peace process. The meeting took place as planned. Nail al-Jubeir tells Unger that he does not know if Bandar and the president discussed getting the bin Ladens and other Saudis back to Saudi Arabia.

Some Saudis tried to get their planes to leave before the F.B.I. had even identified who was on them, Unger reports. "I recall getting into a big flap with Bandar's office about whether they would leave without us knowing who was on the plane," an F.B.I. agent says. "Bandar wanted the plane to take off, and we were stressing that the plane was not leaving until we knew exactly who was on it." Dale Watson, the F.B.I.'s former head of counterterrorism, tells Unger that while the Saudis were identified, "they were not subject to serious interviews or interrogations." The bureau has declined to release the Saudis' identities.

The wealthy bin Laden family long ago broke with their terrorist brother, Osama, but Unger reports that some members of the family have had links to militant Islam. Abdullah and Omar bin Laden had been under F.B.I. investigation for their involvement with the American branch of the World Assembly of Muslim Youth (WAMY), which has published writings by one of Osama bin Laden's principal intellectual influences. According to documents obtained by the Public Education Center in Washington, the file on Abdullah and Omar was reopened on September 19, 2001, while the Saudi repatriation was under way. A security official who served under George W. Bush tells Unger, "WAMY was involved in terrorist-support activity. There's no doubt about it."

The Saudis' planes took off from or landed in Los Angeles, Washington, D.C., Houston, Cleveland, Orlando, Tampa, Lexington, Kentucky—and Newark and Boston, both of which had been points of origin for the September 11 attacks. "We were in the midst of the worst terrorist act in history," Tom Kinton, director of aviation at Boston's Logan airport, tells Unger, "and here we were seeing an evacuation of the bin Ladens! . . . I wanted to go to the highest authorities in Washington. This was a call for them. But this was not just some mystery flight dropping into Logan. It had been to three major airports already, and we were the last stop. It was known. The federal authorities knew what it was doing. And we were told to let it come."

"I asked [the F.B.I.] to make sure that no one inappropriate was leaving," Clarke tells Unger. Clarke assumed the F.B.I. had vetted the bin Ladens prior to September 11. "I have no idea if they did a good job. I'm not in any position to second-guess the F.B.I."

Prince Bandar has had a 20-year friendship with former president George H. W. Bush. Unger questions whether the long-standing Bush-Saudi relationship could have influenced the administration. The latest in a line of business links between the Bush family and the Saudis involves the Carlyle Group, a private-equity firm for which George H. W. Bush is a senior advisor and former secretary of state James Baker III is a senior counselor. The Carlyle Group has received $80 million in Saudi investment, Unger reports, including $2 million from the bin Ladens which was returned to them after September 11. In 1995, Abdulrahman and Sultan bin Mahfouz invested "in the neighborhood of $30 million" in the Carlyle Group, according to family attorney Cherif Sedky. Abdulrahman bin Mafouz was a director of the Muwafaq Foundation, which has been designated by the U.S. Treasury Department as "an al-Qaeda front." (Carlyle categorically denies that the bin Mahfouzes are now or have ever been investors.)

Clarke believes the decision to let the Saudis go was made because "there's a realization that we have to work with the government we've got in Saudi Arabia. The alternatives could be far worse. The most likely replacement to the House of Saud is likely to be more hostile—in fact, extremely hostile—to the U.S."

The October issue of Vanity Fair hits newsstands in New York on September 3 and nationally on September 9.

Ms. ROS-LEHTINEN. And, once again, as Mr. Chabot has pointed out, he is not saying that he has any knowledge himself of this, but just was pointing out that there were some reports. We know that Mr. Clarke has denied that and said that he had not approved the request but that other agencies had.

Mr. CHABOT. Thank you, Madam Chair.

Ms. ROS-LEHTINEN. We thank you so much, Mr. Chabot, for sharing that with us.

Mr. CHABOT. Thank you.

Ms. ROS-LEHTINEN. Mr. Baer?

### STATEMENT OF ROBERT BAER, FORMER CIA MIDDLE EAST INTELLIGENCE OFFICER

Mr. BAER. Madam Chair and this honorable Committee, thank you very much for having me.

I would like to start with the comments of my co-panelist, Mr. Simon, with which I fully agree. We have to keep in mind that many people in Saudi Arabia and the rest of the Middle East consider that they are at war with us, and yet try to remain our allies in a very difficult time.

Many of these societies have medieval banking systems, private banks and accounting procedures which do not match our standards and they in fact have ways to get around funding terrorism, funding jihad, supporting Hamas, supporting the Islamic jihad, and supporting Hezbollah in Lebanon.

What I would like to do is get down to the specifics right away to let you know what I am talking about. I was just out in Dubai where I talked with police officials and they say, yes, we understand, we understand that you have a problem with the charities and that money is getting into bin Laden's movement and to other movements, but the problem is that we very much have a cash economy in Dubai.

They told me every day there is somebody flying out of Dubai, 20, 30 people, with $250,000 apiece. They are going to Pakistan, some are going to Afghanistan, they do not know where the money is going, they are not prepared to clamp down on this transfer of cash right now. It would destroy their economy. They are not even sure they could do it if they wanted to.

More than that, you have to take a look at other banking systems around the Middle East. One is Lebanon. It has traditionally been a major center in the Middle East, and as of today you can still open a passbook account in Lebanon and put as much money as you want in this account. All it consists of is a piece of paper signed by the bank manager, it is typed out. I have seen examples where the full name is not used, so you can use a partial name, you can put several million dollars in it.

There is also in Europe a problem with banking as well which we cannot address in spite of our best efforts from Treasury and that is nominee accounts. In many places in Europe, you can open an account, a lawyer opens the account and gives management of the money to another individual, so theoretically Osama bin Laden could open a bank account in Monte Carlo, put it in the name of a lawyer who is at least not publicly associated with him, and draw

51

money off that account, he could even use credit cards, and his
name would never appear on that bank account.

This is something that we need to consider as a tributary to this
dam that we have put up and it is quite effective and it is quite
effective in Saudi Arabia, but more than that, we have in the Mid-
dle East, I think we need to look at this, a process of—let us say
they are going through a crisis. Some people call it disintegration.
There is a lot of loose money that is not controlled.

One case I ran into this fall was Al-Madina Bank. I was able to
talk to the manager of the bank. The bank president was in jail,
his brother was in jail. His brother is one of the chief advisors to
King Fahd. They gave me accounts adding up to $2.8 billion of
money that was transferred from Saudi Arabia to the UBS Bank
in Switzerland to the bank in Lebanon. Subsequently, this money
has disappeared and the way it disappeared was that someone
transferred it around the world to numerous nominee accounts and
then destroyed the hard drives for the Swift accounts.

So if we are talking about stemming 200 or 300 million dollars
going to bin Laden through the charities and through private do-
nors, what can we do about something like this where you have se-
rious management of accounts in the Middle East?

Another thing we have to consider, we seem to step around this
question, is that the 9/11 attacks were largely funded through cash.
As I understand, people came from Saudi Arabia, deposited the
money in a bank in Dubai and it was transferred to the United
States.

We still until today do not know who that money belonged to.
Two of the people that transferred the money are under arrest.
Was it their money? Was it somebody else's? There are numerous
front companies in Germany that supported the Hamburg cell and
a lot of that money came from Saudi Arabia. We still do not have
arrests on that, we still do not have disclosure where that money
came from.

Finally, what I would like to point out is that there were 15
Saudis on those airplanes and, as a former case officer with the
Central Intelligence Agency, they were recruited by somebody and
we know it was not bin Laden.

I would like to know who in Saudi Arabia recruited those people
and if they are in jail, that is fine; if they are not, why not? We
are not getting any disclosure on Saudi Arabia. We are being as-
sured that they are cooperating with terrorism and that they are
scared and, yes, they are indeed scared. And, no, the Saudi govern-
ment did not sponsor 9/11, but it is still very much an opaque coun-
try and there are still a lot of answers we need to get.

Thank you very much, Madam Chair.

Ms. ROS-LEHTINEN. Well put. Thank you so much, Mr. Baer.

I would like to recognize Mr. Royce to start our line of ques-
tioning.

Mr. ROYCE. I thank the gentlelady. I have a couple of questions,
but I wanted to start with Mr. Baer.

Just recently, one of our colleagues made some observations
about Afghanistan and Pakistan after he returned. He said that
they are shifting in al-Qaeda from traditional charity-based financ-

ing over to financing through heroin trade, basically narco-terrorism.

Now, even if that is true, you still have these other networks of terrorist that are using charity, I just wanted your view on that question.

I chair the Africa Subcommittee and whenever I travel on the continent, I hear from local leaders about what is happening in their sufi communities in North Africa, West Africa, East Africa, with the radical new Wahhabi madrassas.

As one local governor said to me in Nigeria,

"My old mosque is across from a new mosque which is 10 times the size with 100 times the budget and only one condition came with it and that was a Gulf State mullah who preaches a very different education than the one I got in the old madrassa. The students I see them wearing Osama bin Laden T-shirts and they are teaching jihad."

He says,

"They are teaching nothing but hate for the west."

It is being funded by Gulf States, how do we cut off those funds? Some observations from you on how we could do that.

Mr. BAER. Well, for a start, on narco-terrorism, I think it is an extremely important point. I was assigned to Lebanon in the 1980s and we noticed that the Islamic jihad in Lebanon that were hijacking airplanes, TWA, blowing up our Embassy, blowing up the Marines, were using the heroin trade and the hashish trade to raise money and, not only that, they were using the financing mechanisms of narcotics and I think we are seeing that in Afghanistan again.

Those channels of raising money are extremely efficient. They are well tried, they are hard to close down, as DEA found out. Today in Washington—I can deposit money in Dubai, hundreds of thousands of dollars, and collect in Washington through facilities. There is no reason why these people cannot.

Keep in mind that I did work for the CIA, I was a case officer, and we spent our lives hiding money so we could pay agents. It is efficient, it is hard to close down, and we were up against some of the best, the KGB.

Mr. ROYCE. But let me ask you this question. The example you just gave us was 2.8 billion transferred out of Saudi Arabia, ends up in Lebanon. Funds of that magnitude—clearly, if we could figure out a way to get cooperation—in your book, you said the Saudi government seemed to be adopting the same see no evil, the same blinders that we had adopted with respect to this.

What if we were to really focus on a high level position in the United States Government that was solely devoted to going after money laundering after getting support in Europe and especially in the Middle East for a new regimen of banking laws which would allow us greater transparency?

Do you think things like this 2.8 billion, which really is a frightening number when you think about what that could finance, that we could go after and crack some of that if we had that type of concerted effort?

53

Mr. BAER. Oh, absolutely. We have to start in some of these banking centers. It is not just Lebanon, Liechtenstein has become a major conduit of illegal funds, money laundering. We have to go to Lebanon and ask what happened to this $2.8 billion.

I have provided the transfers to this Committee, which you can find to look at this. This is public information now. I would like to know where that money went.

Mr. ROYCE. And your request to us on the Committee is to follow up and get an answer to some of these questions that you are asking in your testimony and I think without objection, if I could ask, Madam Chair——

Ms. ROS-LEHTINEN. Of course.

Mr. ROYCE [continuing]. If we could do that and get back to you on that question.

Also, in your book, *See No Evil*, there is one particular paragraph that really stood out for me and I just want to go through this. You say,

"Whether it was Osama bin Laden, Yassir Arafat, Iranian terrorism, Saddam Hussein, or any of the other evils that so threaten the world, the Clinton Administration seemed determined to sweep them all under the carpet. Ronald Reagan and George Bush before Clinton were not much better. The mantra at 1600 Pennsylvania Avenue seemed to be get through the term, keep the bad news from the newspapers, dump the nay sayers, gather money for the next election, gobs and gobs of it, and let some other Administration down the line deal with it all. Worst of all, my CIA had decided to go along for the ride. Now that such horrendous neglect has come home to roost in such misery provoking ways, I take no pleasure whatsoever in having been right."

There is a lot of finger pointing going on these days, it is an election year. We have the 9/11 commission working as we speak, but I am going to ask, and I understand that you are out of government, has this situation improved?

Mr. BAER. The situation has definitely improved. We are aware today, as we were not before 9/11, that we are the target of war. You can call it Suni fundamentalism, militant Islam, anything you want. These people believe they are at war with us. They want us out of the Middle East, they want to destroy Israel.

The problem is what do we do because we ignored this in the 1980s and the 1990s. And, by the way, I will point the finger at myself, too. My last job was group chief for Central Asia and we had no systematic program to go after bin Laden and I take responsibility there. I did not realize that bin Laden was a threat.

This is completely bipartisan. I do not think that today we as Americans really understand the transition the Middle East is going through and the fact that it is going to come home to roost again. We have a hard time penetrating these groups because they are believers. I mean, after all, if you are going to have suicide bombers, what is the CIA, DIA or the FBI going to offer them? A trip to Disneyland? You cannot get inside these groups. They do not want money, they are indoctrinated to martyrdom and it is something completely alien to us.

Case 1:03-md-01570-GBD-SN   Document 1260-21   Filed 09/23/05   Page 20 of 37

54

Our attitude is fine, you know, go buy some MIG jets and start a war, do anything but do not kill civilians. We just cannot compare our cultures. We have a long way to go.

The CIA has got to change its recruiting. We are going to need a lot of foreigners, we are going to need a lot of people that believe there is a moderate way in Islam. We are going to need Muslim agents that are going to need to penetrate this. This is all going to be a long war, as Ambassador Black said.

And starting with the banking and the charities is a good start, but that is just the tip of the iceberg.

Mr. ROYCE. Mr. Baer, I just want to conclude by thanking you for speaking out and getting on the record things that we need to know and I would like to follow up later with you. Thank you.

Mr. BAER. Thank you, Congressman.

Mr. ROYCE. Thank you, Madam Chair.

Ms. ROS-LEHTINEN. Thank you very much, Mr. Royce.

Mr. Ackerman?

Mr. ACKERMAN. Thank you, Madam Chair. I would like to get a few things on the record myself.

I find the statements that Mr. Chabot has popped in and out making to be very troubling, that somebody on the Committee would continue the harangue of joining with a political campaign and using the forum of this Committee to constantly try to discredit a former member of the Administration much in the news today and, by inference and innuendo, accuse him of various things.

It is indeed a sad moment for this Subcommittee, but if this Subcommittee is going to be used as a platform to discredit one political party or another, I find that both sad, it may improve the attendance here at our sessions, but it certainly demeans the process considerably.

To expand on the selective record that Mr. Chabot tried to establish, he put certain things by unanimous consent in the record. Mr. Berman asked several questions of the first panel that was before us at that time and Ambassador Black said that the State Department had no knowledge of Mr. Clarke's activity vis-a-vis putting the Saudis on the plane after September 11th and cited an article in *Vanity Fair* and placed an article in the record from the *Herald Tribune*.

Mr. Clarke said that he signed off on the plan. He did not say that this was his plan. In fact, he said it was higher ups in the White House.

Now, I do not think that the Vice President and the President of the United States can have it both ways, first to say that this guy was out of the loop, not in a real decision making position after appointment him the terrorism czar for the United States, and then claim, well, he was out of the loop, just ignore him because that is not an important position, someone who served four Administrations in a non-partisan fashion.

But indeed in his testimony before the Senate Judiciary Committee, Mr. Clarke said, and I would ask unanimous consent to put his remarks in the record——

Ms. ROS-LEHTINEN. Without objection.

Mr. ACKERMAN [continuing]. From that session.

55

Thank you, Madam Chair.

He said that he could not cite the specifics at the open hearing, but assured the Senate Judiciary Committee that the decision to send those Saudis out of the country on the plane was sent down to him by the highest levels in the State Department, the FBI and the White House and that what he did was what any prudent person in that position would do, he asked for the names of the people that were being put on the plane and to have them vetted, which he believed the FBI did in a cursory fashion.

That is the record as we know it, but to try to use this Committee to further a campaign to shaft this guy, to discredit him and his credibility, is something that is beneath the dignity of this Committee, Madam Chair, and the way that you have always respectfully handled the Committee.

Ms. ROS-LEHTINEN. If the gentleman would yield?

Mr. ACKERMAN. I would be delighted to yield to the Chair.

Ms. ROS-LEHTINEN. I think that if we would read back Mr. Chabot's words, I do not think that there would be any insinuation that he was saying anything disparaging of the character. This was literally what he said, there was a recent report, which is true, it is right here. That does not mean the report is true, but listen to what it said, and he read it just like that. There was a recent report in the days immediately following 9/11 that former White House——

So he did not say that he was an evil man, he did not say that he is personally responsible, and he alluded to the article, as you had pointed out, in *Vanity Fair* and I will read just this quote, and this is Mr. Clarke's quote, I am not saying he did not use any characterization of it:

"My role was to say that it can't happen until the FBI approves it and so the FBI was asked, we had a live connection to the FBI, we asked the FBI to make sure that they were satisfied that everybody getting on that plane was someone okay to leave. And they came back and said yes, it was fine with them, so we said fine, let it happen."

Mr. ACKERMAN. Right. So Mr. Clarke did everything——

Ms. ROS-LEHTINEN. So if you read back Mr. Chabot's words, I do not think he was doing any character assassination or anything of that type. He wanted to ask the witnesses what they knew of that and I think that is something that this Subcommittee is directly asking about, Saudi involvement in this problem.

Mr. ACKERMAN. I happen to be very fond of Mr. Chabot. I do not agree with a lot of things he says and he certainly says then in a rather laid back kind of way, but I know that he has said a lot of things that he deeply regrets. The fact that he said it in a kind and offering way, brought it up here at this hearing at a time that was intended, I believe, to just lay it out in a matter of a perfunctory way until Mr. Berman called him on it, to try to be discrediting of somebody's reputation, which is very much a part of a campaign on the national level right now.

The Vice President was very soft spoken, too, when he tried to roast the guy on national T.V. and said, well, you know, we do not even know who this guy is, he is only our national terrorism czar,

56

he is not in the loop, but he did not say it with all the undertones that I am saying it with, but that is how the American people read it.

Despite the fact that Mr. Chabot's tone might be a lot warmer than mine at the moment, still there is no doubt in the minds of anybody who was listening carefully to what he said and, more importantly, what he was doing, that this was intended to be damage control for the Administration and roughing up Mr. Clarke a bit further in yet another forum and you can turn any dial and you will see the spinmeisters doing this all over the lot. And that is what I am sad about, that it would be done here, but if he chooses to do that in even the kind and gentlemanly way that he does it, he should expect that this side will be ready for the fight.

Ms. Ros-Lehtinen. Thank you. And just to either continue or end this, I think that if we would read back without any tone what Mr. Chabot's actual words were, it was asking a legitimate question of the State Department, FBI, Department of Treasury officials who might have also had a hand in allowing these flights to take off and there were those press reports and I literally read what Mr. Chabot said and we could read back his comments after that and I do not think that there was any character classification, positive/negative, it was neutral: What about these reports, are they true?

Mr. Ackerman. Did he ask that of anybody? Or did he just lay that out there?

Ms. Ros-Lehtinen. He asked——

Mr. Ackerman. It was Mr. Berman that asked the question.

Ms. Ros-Lehtinen. He said what kind of investigation was each of these Saudis put through by the FBI, he wanted a list of the folks who were allowed to travel and the folks indicated that they had no knowledge of it. I think in the 9/11 investigation, the State Department——

Mr. Ackerman. The State Department guy did not know anything, the FBI did not know anything, and yet this guy is running the country, Mr. Baker, he is deciding to send 140 Saudis out on a special flight when all the airports are closed and no flight could get in and out and you and I were taking the railroad to get to Washington because we could not get airborne, but this guy was running the country and the air control system and everything, despite the fact that the Vice President said he is out of the loop.

It is just a matter of his putting it out there, Madam Chair, that was offensive.

Ms. Ros-Lehtinen. I know, but I think it was a legitimate question.

Mr. Ackerman. He did not say it in an offending way, but, you know——

Ms. Ros-Lehtinen. When the reports were cited, his name was linked and I think it was a legitimate question on Mr. Chabot's part.

Mr. Ackerman. I am sure it was and I am legitimately trying to de-link it.

Ms. Ros-Lehtinen. Okay. Good deal.

Mr. Royce. Madam Chair? Excuse me.

Ms. Ros-Lehtinen. Thank you.

Mr. Royce?

Mr. ROYCE. If I could, there was another question I wanted to ask, if I could.

Ms. ROS-LEHTINEN. Yes, please go ahead.

Mr. ROYCE. It had to do with a question of a special envoy for money laundering, actually setting up a position in our government of having a special envoy who would be held responsible. I think there is a lot of responsibility to go around on all of these questions.

The question now is how do you give somebody the power and the authority and a high enough position in an administration that they can actually go after the money laundering and stay on it day in, day out. Get answers and be at the table with the international institutions. For example, when the World Bank meets they can exert their influence from the top and say if the United States is going to go along with these international institutions, we are going to have reforms that allow for more transparency, specifically so that we can look at the laundering of money that ends up financing terror.

I would like to ask the two witnesses if they think that if we could push for such an agenda, such an elevation of responsibility and authority into a special envoy that would be given that authority and power, whether that comes out of Treasury or however, what they feel.

Would that make a discernable difference or not?

Ms. ROS-LEHTINEN. And dovetailing, if I could, Mr. Royce, on your question, the role of banks in Europe also. How would you see this envoy if he would have some sort of capability in overseeing or looking at some of the transfer of funds, that we have had reports of banks in Europe, the Middle East perhaps, having a role in transferring the funds for these groups and expanding on that if you could tell us the role of private fiduciaries in Switzerland and Lebanon that we have heard may have had a role in these transfer of funds.

Mr. BAER. If I could answer first, I think it is a brilliant idea, Congressman. First of all, this government has an enormous amount of resources to trace money: The Central Intelligence Agency, the State Department, the IRS, but more than that the National Security Agency, which has a responsibility for following this, has an incredible database that if a czar for money laundering overlooked this—and also getting to the point where you are looking at really what the Department of Justice is doing in a country like Switzerland and, as far as I can tell, the Swiss are more concerned about keeping American money out because of all the pressure we put on them than they are of keeping Arab money out. It is the way it works, I think the Swiss are being very vindictive about it.

And also you have the question of the fiduciary accounts. All you do is you find a nominee, trusted, you can either carry cash to him or you can make a transfer and the money essentially disappears in another man's name.

You have to regulate these fiduciary accounts. They are all over Europe. Some countries are better than others. I think the Swiss

are the worst. These people are untouchable. France, they watch it very closely and they put pressure on the nominee.

We have to get some sort of unity in Europe, as well as the prime banking centers in the Middle East and East Asia, you have the same problems.

What I have found is that the people who deal in money are very clever and they are very concerned about keeping their money away from the tax authorities and everybody else and they seem to be just a step ahead of us and a more concerted effort to go after these people and throw some of our best bankers at it under a czar, I think it would be very effective. It would also be very effective in finding where you have strange transfers of money which would give leads to the FBI and the CIA to follow people, in particular in this country, ATM transfers and things like that.

Thank you.

Ms. ROS-LEHTINEN. Thank you so much, Mr. Royce.

And thank you, Mr. Ackerman.

Thank you to this excellent panel of witnesses for your testimony today and for all the audience members as well who participated.

This Subcommittee is now adjourned.

[The Subcommittee was adjourned at 4:02 p.m.]

# APPENDIX

MATERIAL SUBMITTED FOR THE HEARING RECORD

60

RESPONSES FROM THE HONORABLE J. COFER BLACK, COORDINATOR, OFFICE OF THE COORDINATOR FOR COUNTERTERRORISM, U.S. DEPARTMENT OF STATE TO QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE ILEANA ROS-LEHTINEN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA, AND CHAIRWOMAN, SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA

### Questions for the Record Submitted to
### Ambassador J. Cofer Black by
### Representative Ros-Lehtinen (#1)
### House International Relations Committee,
### Subcommittee on the Middle East and Central Asia
### March 24, 2004

#### Question:

"How would the National Saudi Society for Relief and Charitable Works Abroad that the Saudis announced they were forming, work with the Saudi Ministry of Finance to monitor and oversee Zakat funds? Have Saudi decrees controlling and providing instructions for the auditing and collecting of Zakat been altered, or have new decrees been issued, as part of the efforts that the Saudis are undertaking to increase 'accountability?'"

#### Answer:

The National Saudi Society for Relief and Charitable Works Abroad

is an entirely new entity, as its creation was only announced on February 21st

of this year. We are currently engaged with the Saudi government in

discussions over the form and function of this new entity.

Regarding instructions for the auditing and collection of Zakat, the

decrees put in place last year – i.e., the banning of cash contributions,

limiting charitable institutions to a single bank account, etc. – are still in

place. We anticipate that the Saudi government will institute additional

oversight measures with the stand-up of its new charities oversight entity.

61

**Questions for the Record Submitted to
Ambassador J. Cofer Black by
Representative Ros-Lehtinen (#2)
House International Relations Committee,
Subcommittee on the Middle East and Central Asia
March 24, 2004**

### Question:

"I mentioned in my statement that I am concerned that there might be certain "red lines" that the Saudis have been unable to cross when it comes to reforms in the Kingdom. In your discussions with Saudi authorities, have you encountered such problems?"

### Answer:

Our engagement with the Saudis is a work in progress, and while we have had solid cooperation and success to date, there is much more that needs to be done. We continue to press forward with our views on issues of concern in the Kingdom, including in areas which are politically sensitive. The Saudis have implemented reforms to date (e.g., new charity regulations, zakat collection boxes) which would have seemed unlikely in the past. We will continue to press forward on sensitive issues, building on the cooperation we have received to date in our successful bilateral engagement on counterterrorism issues.

62

**Questions for the Record Submitted to
Ambassador J. Cofer Black by
Representative Ros-Lehtinen (#3)
House International Relations Committee,
Subcommittee on the Middle East and Central Asia
March 24, 2004**

**Question:**

"We have heard reports for some time about the Saudis, among others, who
have crossed the border with Iraq to join the "fight" against U.S. troops in
Iraq. We also understand that these forces are receiving funding from within
Saudi Arabia, particularly in the Fallujah area. What is the Saudi
government doing to stop this infiltration from Saudi Arabia? What are we
doing to curb Saudi funding and proseletyzing in Iraq?"

**Answer:**

We are concerned about the presence of "foreign fighters" in Iraq, and

efforts to tighten border controls have been a high priority in discussions of

U.S. officials with all of Iraq's neighbors. The Saudis have been responsive

to our concerns, and have increased security measures on their side of the

border to interdict flows of goods and personnel which might support

insurgent and terrorist activities in Iraq. The Saudis maintain regular

contacts with U.S. forces patrolling on the Iraq side of the border to

coordinate activities, and they regularly share information with us as part of

this cooperation.

63

We are also engaged with the Saudi government to identify, in Iraq and elsewhere, instances where Saudi-supported mosques and religious schools overseas are being used to preach or teach hatred, or serve as terrorist recruitment centers by extremist elements.  The Saudis have implemented several initiatives in this regard in the Kingdom, and we are working to ensure that similar procedures are taken by Saudi-supported activities in other countries.

64

**Questions for the Record Submitted to**
**Ambassador J. Cofer Black by**
**Representative Ros-Lehtinen (#4)**
**House International Relations Committee,**
**Subcommittee on the Middle East and Central Asia**
**March 24, 2004**

### Question:

"What is the Administration doing to encourage our friends in Europe to join with us in freezing assets of a variety of terrorist groups, including Hizballah?"

### Answer:

We regularly raise our concerns about the terrorist activities of

Hizballah and other terrorist groups in our diplomatic contacts with our

European partners. This includes information exchanges on these groups, as

well as the activities of State Sponsors of Terrorism Iran and Syria in

supporting terror, particularly the Palestinian rejectionist groups. These

efforts have yielded some successes, such as the EU designation of HAMAS

in 2003, but we continue to press for asset-freezing actions against charities

with links to this terrorist organization and against the group's leaders, of

the type carried out by the United Kingdom in March against five senior

members of HAMAS.

65

We will continue to make our case to the Europeans to take action collectively and individually to freeze the assets of those supporting terrorist groups that pose a threat to our mutual interests.

66

**Questions for the Record Submitted to**
**Ambassador J. Cofer Black by**
**Representative Ackerman (#1)**
**House International Relations Committee,**
**Subcommittee on the Middle East and Central Asia**
**March 24, 2004**

**Question:**

"Are there HAMAS representatives that travel to Saudi Arabia to raise
money? And also what about affiliates of al-Qaida? Do they come to Saudi
Arabia to raise money?" What have the Saudi authorities done, if anything,
to stop this kind of activity?"

**Answer:**

We are concerned about the activities of fundraisers from numerous

terrorist groups in the Arabian Gulf region.


There is no official HAMAS or al-Qaida presence in the Kingdom of

Saudi Arabia. The Saudi Government has also stated repeatedly that it does

not provide any financial assistance to HAMAS. That said, there is clear

evidence that private funds for terrorist groups, including HAMAS and al-

Qaida affiliates, are raised in the Kingdom. We have clearly expressed this

concern to the Saudi government, as we have to other governments in the

region and also in Europe, where HAMAS in particular derives a great deal

of its financing.

67

The Saudis have put in place some of the most restrictive controls against anti-money laundering and terrorist financing in the region, and we are engaged with them on a number of initiatives to curb the flow of funds from the Kingdom to terrorists. This includes the identification of organizations and individuals believed to be providing assistance to terrorist groups. The Saudis have cooperated with our efforts in the past (e.g., joint designation of Wa'il Hamza Julaidan and branches of the al-Haramain Foundation), and we expect this process to continue.

———

68

QUESTIONS SUBMITTED FOR THE RECORD BY THE HONORABLE ILEANA ROS-LEHTINEN,
A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA, AND CHAIRWOMAN,
SUBCOMMITTEE ON THE MIDDLE EAST AND CENTRAL ASIA, TO JUAN C. ZARATE,
DEPUTY ASSISTANT SECRETARY, EXECUTIVE OFFICE FOR TERRORIST FINANCING &
FINANCIAL CRIMES, U.S. DEPARTMENT OF THE TREASURY

[NOTE: At the time of the printing of this hearing, Mr. Zarate's responses to these
questions had not been received by the Committee on International Relations.]

*Question 1:*

Are the majority of payments from Saudi Arabia to Al-Qaeda and other terrorist
groups made through conventional banking methods such as wire transfers, or are
you noticing a shift to gold transfers or other in forms of assets such as diamonds
and of course drugs?

*Question 2:*

With this new U.S.-Saudi terrorism financing task force, what are the operational
rules regarding the sharing of intelligence information? Do we grant full and unfet-
tered access? Do Saudi officials see all the information we possess on the various
targets of our investigations?

*Question 3:*

Regarding other details of the agreement for this task force, can you explain

- the precautions to prevent Saudis learning how to evade our methods
- the security level
- who will have access to information and what types of information will they
  see
- what are the terms of U.S. access and freedom to operate in Saudi Arabia
- is this an open-ended operation or will it be time-limited

*Question 4:*

Are numbered or secret accounts as well as correspondent accounts part of Saudi
bank reforms that would tighten "know your customer rules?"

*Question 5:*

Are U.S. banks being unwittingly used to transfer funds between Saudi donors
and Al-Qaeda, through corporate, private, or other types of accounts?

*Question 6:*

Al-Haramain of Oregon, whose assets were recently blocked by Treasury pending
an OFAC determination, was described by the Treasury as a "branch" of Al-
Haramain in Saudi Arabia. What made it a "branch"? Who were the Oregon organi-
zation's directors and officers at the time of its closure by the USG? Who appointed
them? When? How much control was exerted by Saudi authorities throughout the
time of the group's operations? Had any orders been given to transfer its assets else-
where? How much? By whom? To what end?

*Question 7:*

There had been earlier reports that the Saudi government had ordered all of Al-
Haramain's foreign branches closed. Did such an order go out from the Saudis? And
when? To whom was it directed? Was it carried out and to what effect? What hap-
pened to the assets of the foreign branches?

PREPARED STATEMENT OF THE HONORABLE NICK SMITH, A REPRESENTATIVE IN
CONGRESS FROM THE STATE OF MICHIGAN

I want to thank Chairwoman Ros-Lehtinen for holding this hearing today on
Saudi terrorist financing.

Since September 11th, we have heard much about the significance of Saudi Ara-
bia in Middle Eastern and Islamic terrorism. Osama bin Laden and 15 of the 19
September 11th terrorists were Saudis. More fundamentally, Saudi Arabia has been
an important part of the infrastructure of terror. Many Saudi charities have been
linked to terrorist organizations. People with Saudi diplomatic credentials have been
linked to terrorist organizations, even near us in Washington. And the Kingdom
itself has funded religious institutions throughout Central Asia, the Middle East,
and Europe that have formed a core of the recruiting network that turns young
Muslims into terrorists.

Saudi Arabia has, in some ways, recognized its own culpability in terrorism. The Kingdom has cooperated significantly with the United States, our allies, and the United Nations in reforming some of its financing system. New regulations make it significantly harder for funds from Saudi Arabia to find their way into terrorist coffers without the knowledge of the government. For example, charities must now be registered with the government, and they cannot wire money out of the Kingdom. This has restricted the flow of terrorist funds to some extent.

Saudi Arabia has responded as it has, in part, because its own interests are very much at stake. The attacks last year in Riyadh and the subsequent discoveries about the depth of support for al-Qaeda in Saudi society have shocked the royal family into taking genuine steps. No leader in the Middle East missed the lesson of Sadat that terrorists undermine the state itself. Osama bin Laden has explicitly targeted the government of Saudi Arabia and its royal family as al-Qaeda's primary target. In a number of less-publicized attacks, al-Qaeda has targeted the Saudi oil infrastructure, the financial life-blood of the monarchy.

However, it appears that the Saudi government's response to al-Qaeda is somewhat of a special case. There is clear evidence that Saudi Arabia funds the PLO, and there is suggestive evidence that it funds Hamas. The Saudi government also has not been as helpful as they could be in addressing al-Haramayn and the World Muslim Fund. There is clearly work to be done more broadly in fighting terrorism.

It is important to continue to work with Saudi Arabia and others to expose and destroy terrorist financial networks. We must also recognize that the terrorists are changing how they get and use money in response to our actions, and we must update our techniques to address these new methods. We have found al-Qaeda sleeper cells in Europe that fund themselves through legitimate businesses such as car dealerships. This committee has already spoken about the link between narcotics and terrorism. Kidnapping and extortion have been a significant source of funds for Abu Sayyaf in the Philippines.

Shutting down terrorists financial networks is an important step, but it is not enough. We must work with the Saudis, the Pakistanis, and others to shut down logistical and information networks. Terrorist organizations are evolving from top-down structures where commands flow down to much more diffuse bottom-up structures where recruiting, financing, and operational planning is all being done at the cell level. Our pressure in the financial realm may have accelerated this process because it is harder to track. We must focus on the implications of this shift if we are to continue to be effective in our fight against terror.

Again, I would like to thank the Chairwoman for holding this hearing today. Saudi Arabia has served a dangerous role in the international terrorist infrastructure. We should applaud them for the progress that they have made, but we should also make sure that they realize that there is more progress to be made. Finally, we should also be aware of how the terrorist threat is evolving.

---

TESTIMONY FROM THE HEARING BEFORE THE SUBCOMMITTEE ON TERRORISM, TECHNOLOGY AND HOMELAND SECURITY OF THE COMMITTEE ON THE JUDICIARY, UNITED STATES SENATE, SEPTEMBER 3, 2003

Senator SCHUMER. No, but it is an issue you and I have been working on. Senator Kyl has been very, very out front in chairing hearings on Wahabi-ism and what it means and how we have ignored it. We hope to have more hearings on this issue. We even wrote an op ed together, which I heard while we were away got published in the Washington Post.

There is a report out today about an article that is going to—or is, I think, being made public today or tomorrow in Vanity Fair, which has done pretty serious journalism, where you are quoted, Mr. Clarke, and I just wanted to talk a little bit about it.

The basic thrust of the article is that right after 9/11, when no one was allowed to fly, some special planes were able to spirit Saudis out of the country; that it had top clearance, that some of the members on that plane were members of the bin Laden family.

Now, let me posit that much of the bin Laden family is not allied with the terrorist bin Laden and, in fact, are part of the Saudi rulers or, you know, upper class, ruling class, whatever you want to call it. But two, at least, of those bin Ladens had been under some suspicion for other kinds of terrorist activities or supporting terrorism in the past.

This reporter seemed to do a pretty good job. He interviewed some private investigators who received a call 2 days after 9/11 asking them to escort Saudi students on a flight from Tampa to Lexington, Kentucky. He interviewed some airport offi-

cials who knew that the planes had gotten top, top, top clearance when no one else could fly, and a bunch of other people.

Can you tell us what you know about this? You are quoted in the article, and again I think you are doing a service because one of the things the Chairman and I have felt is that we haven't gone deeply enough and looked into enough the relationship between some in the Saudi leadership and terrorism.

Mr. CLARKE. Senator, as I recall the event—as you know, I was the national crisis coordinator on 9/11 and 9/12, making a lot of decisions, or implementing a lot of decisions. I do recall the State Department coming to us that week, and I don't remember what day, and saying that the Saudi embassy felt that, in the wake of the terrorism attacks, Arabs in this country, particularly Saudis, might be victims of retribution attacks. And they wanted, therefore, to take some Saudi students and other Saudi citizens back to the Kingdom for safety, and could they be given permission to fly even though we had grounded all flights?

What I recall is that I asked for flight manifests of everyone on board, and all of those names to be directly and individually vetted by the FBI before they were allowed to leave the country. I also wanted the FBI to sign off even on the concept of Saudis being allowed to leave the country. As I recall, all of that was done. It is true that members of the bin Laden family were among those who left. We knew that at the time.

I can't say much more in open session, but it was a conscious decision with complete review at the highest levels of the State Department and the FBI and the White House.

Senator SCHUMER. Now, in this article—and I don't want to tear into the Chairman's time here—he has a source, so who knows? But he says that the State Department did not—"It did not come out of this place," says a State Department source. "The likes of Prince Bandar do not need the State Department to get this done." Then he quotes Special Agent John Ianorelli, of the FBI, saying "I can say unequivocally that the FBI had no role in facilitating these flights one way or the other."

Let me ask you, I guess, two questions. Are you confident, given your vast knowledge, that every person who was on—how many flights were there? The article is unclear.

Mr. CLARKE. I believe there was one.

Senator SCHUMER. Just one that stopped in all these places, because he names four or five cities. "The Saudi planes"—he says plural; he uses "planes"—"took off or landed in Los Angeles, Washington, Houston, Cleveland, Orlando, Tampa, Lexington, Kentucky, and Newark and Boston."

How thoroughly were these people on this plane or these planes vetted?

Mr. CLARKE. Senator, all I can tell you is that I asked the FBI to do that. I asked the director and the assistant director to do that. They told me they did it. I think the key thing here is that no one on those aircraft manifests has ever been subsequently wanted by the FBI for an interrogation.

So the notion which this author perhaps is trying to paint that people who were involved in 9/11 or in planning terrorism somehow were allowed to escape, I think, is wrong. No one on those flight manifests has ever been designated by the FBI as having been involved in 9/11.

Senator SCHUMER. But let me ask you this question. This is just a summary, so I haven't read the article. It is what Vanity Fair puts out. My impression, or at least my assumption of why this was important was not necessarily that those connected with terrorism might have escaped, although who knows—but your word means a whole lot to me; I have such huge respect for you, and we knew each other even back in the Clinton days when we were talking about some of these issues—but rather that many of them might have been able to shed some light, particularly in the time thereafter, about what happened, what went on, et cetera.

Do you know if we have made any efforts to question any of these people subsequent to their being in Saudi Arabia, given something you have acknowledged and we have all acknowledged, the lack of complete Saudi cooperation when we wished to question some people there? Have we tried, have we been successful? Do you have any knowledge of that?

Mr. CLARKE. I do not know the answer to that, Senator. I would be guessing and I would rather not do that. But I would stress that, despite what the article may say, this decision was reviewed by the State Department and was reviewed by the FBI and signed off on by the FBI. All of the names on all of the flight manifests were checked before anyone was allowed to leave the country. And my specific question to the FBI was, if there is anybody you want to hold, hold them.

Senator SCHUMER. And was anyone—sorry. I wouldn't mind if you have your question and I could just continue for 4 or 5 minutes myself.

71

Chairman KYL. Yes. Here is what I would like to do and see if it is okay with you, Senator Schumer. Obviously, we are deviating in this line of questioning from what the hearing was all about.

Senator SCHUMER. It just was so officious.

Chairman KYL. I understand, and I am fascinated by the pursuit of the issue as well, but Mr. Clarke wasn't advised beforehand that we were going to get into this.

Senator SCHUMER. Right.

Chairman KYL. Here is what I would like to suggest. Since I have to get down to the White House and my car is leaving in just a second, I would like to just make a concluding comment and, with your permission, bring the hearing to a close, with the understanding that we will continue to converse with Mr. Clarke and, as events call for it—we are going to have a hearing a week from today, September 10, that is going to get back to the question of Saudi involvement and other related issues.

Senator SCHUMER. That is just fine with me.

Chairman KYL. We have plenty of time to pursue this, but I think, under the circumstances, if it is all right with you, that is the way I would like to deal with it.

Senator SCHUMER. Well, I read this 2 hours ago.

Chairman KYL. I have got it here and I think it is worth pursuing, but let's give Mr. Clarke a little more time just to——

Senator SCHUMER. Would you be available tomorrow or the next day to talk about this?

Mr. CLARKE. Yes.

○