**Plaintiffs' More Definite Statement as to Defendants Al-Barakaat, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Co., Al-Barakat Global Telecommunications, Al-Barakat Group of Companies Somalia Limited, Al-Barakat International, Al-Barakat Investments, <u>Barakat Wire Transfer Company</u>**

1. Plaintiffs hereby incorporate all allegations and counts contained in the Third Amended Complaint in *Burnett, et al. v. Al Baraka Investment and Development Corp., et al.*, 03 MD 1570 (RCC), 03 CV 5738 & 03 CV 9849; *World Trade Center Properties LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, 03 MD 1570 (RCC); 04 CV 7280 (RCC); and *Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, 03 MD 1570 (RCC); 04 CV 7279 (RCC), including all of the allegations and claims contained therein.

*The Companies Comprising the Barakat Network Have Been Named Specially Designated Global Terrorists*

2. On November 7, 2001, the United States Government named as Specially Designated Global Terrorists (SDGT) and froze the assets of Al-Barakaat, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Co., Al-Barakat Global Telecommunications, Al-Barakat Group of Companies Somalia Limited, Al-Barakat International, Al-Barakat Investments, and Barakat Wire Transfer Company (the "Barakaat Network") on the grounds that the owner of the Barakaat Network was directing some of the profits of the business to al Qaeda.

3. On September 21, 2005 the Court of First Instance of the European Communities issued its first judgment in the case of *Ahmed Ali Yusuf and Al Barakaat International Foundation and Yassin Abdullah Kadi v Council of the European Union and Commission of the European Communities*, Case No. T-306/01, upholding the

Council of the European Union's right to impose economic and financial sanctions such as the freezing of funds on Al Barakaat, in connection with the fight against international terrorism.

4. President Bush called the Barakaat Network companies fronts for funding global terrorism, asserting that evidence shows a portion of the money being sent to impoverished families in Africa was being skimmed off the top by al Qaeda.

5. In 2004, United Arab Emirates authorities confiscated $3 million in terror-related funds and froze 14 accounts of companies and individuals named on lists by the United Nations and the United States. UAE Central Bank governor Sultan bin Nasser al-Suweidi said among the frozen accounts was Al-Barakaat Group.

6. Juan C. Zarate, Deputy Assistant Secretary for the Executive Office for Terrorist Financing and Financial Crimes, gave a testimony on March 4, 2004 before the Senate Caucus on International Narcotics Control in which he said the UAE and Somalia-based Al-Barakaat network was once used to funnel potentially millions of dollars annually to al Qaeda and its affiliates. He added that important financial networks - such as those of Al-Barakaat - have been identified and shut down.

***The Barakaat Network Uses Its United States-Based Companies to Funnel Money to al Qaeda***

7. On November 7, 2001, when the Department of Treasury's Office of Foreign Assets Control (OFAC) froze the assets of the Barakaat Network and its agents across the United States, among the assets frozen by OFAC was Chevy Chase Bank Account 1154301173 in the name of Abdirahman Sheikh-Ali Isse. Between 1997 and November 7, 2001, Isse operated a money transmitting service, first from his residence at 4949 Manitoba Drive in Alexandria, Virginia, and later from the premises of an Al-

Barakat money transmitting exchange, doing business as Rage Associates at 4810 Beauregard Street in Alexandria, Virginia.

8. During the period of 1997 to November 7, 2001, Isse collected millions of dollars in cash from individuals wishing to transmit money to Somalia, Ethiopia, Kenya, and the Sudan. Isse did not ask his customers about the source of the cash they gave to him to remit through the Barakaat Network or the uses for which the money was being remitted. Isse then deposited the monies in multiple accounts of multiple branches of various banks in Northern Virginia, including First Union Bank, Bank of America, and Chevy Chase Bank, before wire transferring those monies to the Barakaat Network in the UAE for further transfer to Somalia, Ethiopia, Kenya, and Sudan, all without obtaining a money-transmittal license as required by Virginia and federal law. Isse generally charged customers a 4% fee for any wire transfer, retained 1% for himself, and remitted the remaining 3% to the Barakaat Network in the UAE; however, a higher fee was sometimes charged to reflect individual circumstances. During the course of this conspiracy, various individuals, including one Abdillah Abdi, would make currency deposits at various banks under Isse's direction. Other customers, with general authorization to do so from Isse, made currency deposits directly into bank accounts controlled by Isse. In the course of making these deposits, Isse and Abdi intentionally caused these various banks to fail to file Currency Transaction Reports (CTRs) required by law by "structuring" these deposits in amounts of less than $10,000 for each transaction. Isse and Abdi made currency deposits in this manner for the purpose of evading the reporting requirements of section 5313(a) of Title 31, United States Code, in violation of Title 31, United States Code, Sections 5322 and 5324. Isse and Abdi made

multiple deposits into different branches of different banks on any given day to avoid the filing of CTRs. Among the accounts into which Isse and Abdi made many structured deposits included Account 4121681346 in the name of Abdirahman S. Isse d/b/a Rage Associates, Inc., located at Bank of America; and Account 1154301173 in the name of Abdirahman S. Isse d/b/a Rage Associates, Inc., located at Chevy Chase Bank.  During the course of this conspiracy, Isse and Abdillah Abdi structured total currency deposits in the amount of approximately $4,244,499.00.  At all times during the conspiracy, Isse and Abdi knowingly deposited only amounts less than $10,000 for the purpose of causing the various banks to fail to file the appropriate reports.

9. On November 7, 2001, law enforcement agents executed search warrants upon the offices of various agents of the Barakaat Network across the United States, including Isse's business at 4949 Manitoba Drive in Alexandria, Virginia.  Moreover, law enforcement agents seized the contents of Bank of America Account 4121681346 in the name of Isse, doing business as Rage Associates, Inc.  During the execution of the search warrant at 4949 Manitoba Drive, law enforcement agents found on the premises of Rage Associates $29,422 in cash.  Most of that cash had been available for deposit by Isse on November 6, 2001, but Isse declined to deposit that cash because he did not want to trigger the filing of a report by the bank.

10. For the tax years 1999 and 2000, Isse filed individual income tax returns in which he under-reported, on Schedule C, the net profits he derived from his money transmitting business. In particular, for 1999, Isse only claimed commission income he earned for the months October, November, and December, even though he earned taxable commission income for the entire year.

11. On November 7, 2001, law enforcement agents also raided the Barakat Wire Transfer Company located at 4419 S. Brandon Street in Seattle, Washington based on evidence that the wire transfer service was funneling money to the al Qaeda network.

*Information Regarding the Barakaat Network from 9/11 Commission Report*

12. In the late 1990s, the intelligence community also began to draw links between AIAI (Al-Itihaad Al-Islamiya), al- Barakaat (particularly its founder, Ahmed Nur Ali Jumale) and Usama Bin Ladin.

13. The reporting centered on a few key facts. First, it alleged that Usama Bin Ladin not only assisted Jumale in establishing al-Barakaat in about 1992 but was in fact a silent partner, and that Jumale managed Bin Ladin's finances as well. This was consistent with other information that indicated a prior relationship between Jumale and Bin Ladin.

14. Second, the first FBI investigation on AIAI and al-Barakaat was started in San Diego in October 1996, on an individual investigated as a result of his connection with HAMAS. The reporting indicated that al-Barakaat was associated with AIAI, in that al-Barakaat managed the finances of AIAI, and AIAI used al-Barakaat to send money to operatives.

15. Variations of that reporting stated that the head of al-Barakaat, Jumale, was part of the AIAI leadership, or that Usama Bin Ladin used al-Barakaat to fund AIAI.

16. Third, there were allegations that al-Barakaat actually assisted in procuring weapons for AIAI or sold weapons to AIAI. There were specific reports, for example, of al-Barakaat's supplying Somalia's Sharia court with 175 "technicals" and 33 machine guns between January and mid-July 2000, and AIAI with 780 machine guns, which it had procured from sources in China and Chechnya.

17. Other reporting indicated that al-Barakaat was founded by members of the Muslim Brotherhood in order to facilitate the transfer of money to terrorist organizations, including Hamas and AIAI.

18. Lastly, there was fairly detailed information from a U.S. embassy in Africa in July 1999. Two sources known to the embassy claimed that Usama Bin Ladin was a silent partner and frequent customer of al-Barakaat. One of the sources further related that Bin Ladin gave Jumale $1 million of venture capital to start al-Barakaat, and that terrorist funds were intermingled with the funds sent by NGOs. A third source told the embassy that al- Barakaat did not practice any kind of due diligence in making financial transactions.

19. Both sources claimed that al-Barakaat security forces supported Usama Bin Ladin by providing protection for Bin Ladin operatives when they visited Mogadishu. The embassy cautioned that the allegations could not be confirmed and noted the risk that the sources may simply be spreading negative information about their rivals

20. The intelligence community developed information that Usama Bin Ladin had contributed money to al-Barakaat to start operations, that it was closely associated with or controlled by the terrorist group Al-Itihaad Al-Islamiya (AIAI), and that some of al-Barakaat's proceeds went to fund AIAI, which in turn gave a portion to Usama Bin Ladin.