# EXHIBIT 1

**Plaintiffs' More Definite Statement as to
<u>Defendant Yassin Al-Qadi</u>**

1. Plaintiffs hereby incorporate all allegations and counts contained in the Third Amended Complaint in <u>Burnett, et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC), 03 CV 5738 & 03 CV 9849; <u>World Trade Center Properties LLC, et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC); 04 CV 7280 (RCC); and <u>Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC); 04 CV 7279 (RCC), including all of the allegations and claims contained therein.

2. Yassin Al-Qadi is one of Saudi Arabia's most prominent businessmen. He is involved in a multitude of global business investments in a variety fields—including real estate, financial services, trading, manufacturing, healthcare, animation productions and the services sector.

3. On October 12, 2001 according to Executive Order 13224, President George W. Bush designated Yassin Al-Qadi as a terrorist entity for financially supporting al-Qaeda. Al-Qadi's assets were frozen in the United States, Europe, Albania and Turkey.

4. Al-Qadi has spent his entire career intentionally surrounding himself with individuals who either participate in or financially support Islamic terrorism. He is firmly embedded in the Islamic terrorist financing community through his business investments as well as his professional and personal relationships. Indeed, Al-Qadi openly admits that he knows Osama Bin Laden and has met with him on several occasions. According to a 2004 report by the Office of Foreign Assets Control (OFAC) a letter found in 2002 that was addressed to Osama bin Laden referenced Al-Qadi's managing money for Bin Laden in Sudan. The letter also referred to Al-Qadi as one of Bin Laden's former managers.

5. On September 21, 2005, The European Union and Commission of the European Communities refused to hear Yassin Al-Qadi's appeal against the freezing of his assets; holding that the European Community is obligated to adhere to the U.N. Security Council—which is outside EU jurisdiction and which supersedes the right of an individual (Al-Qadi) to have his case heard tried before the courts.

6. Although the Court's decision initially appears to be based on the issue of jurisdiction, the EU justifies its ruling as an international security measure—"The applicants' interest in having a court hear their case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council."

7. This decision is an implicit acknowledgement of Al Qadi's guilt.

8. Al-Qadi has knowingly provided material assistance to Islamic terrorist groups such as al-Qaeda, Hamas and terrorist outfits in Bosnia- Herzegovina and Albania through his involvement with the charities and corporations detailed below.

**Maram and Al Iman**

9. Bank records show that between January 1998 and August 1998 Al-Qadi transferred $1.25 million dollars to Maram, a Turkish travel and trading firm that has significant ties to al-Qaeda.

10. Maram was founded in December of 1996 as an Istanbul travel agency by Mamduh Salim—a former al-Qaeda financial officer who is now serving time in a U.S. prison for his involvement in the bombing the U.S. Embassies in Kenya and Tanzania in August 1998..

11. In 1997, all of Salim's shares in Maram were transferred to Wael Jalaidan, a longtime friend of Al-Qadi, and his partner Mohamed Bayazid.

12. Al-Qadi claims that his donation to Maram was used solely to aid in the construction of Al Iman, a religious school in Yemen. Bank records confirm that Al-Qadi's claim is true but this in and of itself does not exonerate Al-Qadi, as Al Iman has extensive ties to Islamic militancy. Al Iman was founded by Sheikh Abdul Mejid Al Zindani. Zindani fought alongside Bin Laden in Afghanistan, leads the Yemen chapter of the Muslim Brotherhood and has been designated by the U.S. as an active supporter of terrorism. According the U.S. Treasury Department, all Al Iman students are "suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries." John Walker Lindh, the American Taliban, is a former student of Al Iman.

**Wael Jalaidan**

13. Al-Qadi's close friend, Wael Jalaidan, is an associate of Osama bin Laden and a high ranking member of IIRO and the Muslim World League (MWL), both of which are front organizations for al-Qaeda. On September 6, 2002, the U.S. government designated Jalaidan as a supporter of international terrorism and his assets were frozen. The U.S. Treasury Department asserts that Jalaidan is—"one of the founders of al-Qaeda."

14. Wael Jalaidan publicly embraced the notion of jihad in forums for militant Islamic thinking. Wael Jalaidan's photograph appears in the pages of *Al-Jihad Magazine*, a publication edited by Azzam, in a section discussing the reconstruction of Afghanistan. *Al-Jihad* was a publication of Mekhtab al Khidemat, a pre-Al-Qaeda group formed by Osama Bin Laden and Abdullah Azzam to support jihadi fighters in Afghanistan.

15. Additionally, Bin Laden himself acknowledged his close ties to Jalaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qaeda co-founder

Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wael Jalaidan."

16. According to U.S. officials, Jalaidan's role in al-Qaeda is best described as a logistics chief, charged with the responsibility of moving people, ammunition and supplies from one place to another. Edward Turzanski, a national security analyst and political scientist at LaSalle University, states that capturing Jalaidan would be—"like getting a hold of Al Capone's bookkeeper…He knows where all the accounts are, he knows where he spends his money, he knows who gets it."

17. Jalaidan served as the head of the Islamic Center of Tucson (ICT), Arizona in 1983 while he was a graduate student at the School of Agriculture. Jalaidan withdrew from the University of Arizona on March 20, 1985 and soon surfaced in Peshawar, Pakistan. Authorities claim that it was during his time in Peshawar that Jalaidan became involved with the individuals that would eventual evolve into al-Qaeda, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

18. Wael Jalaidan headed the MWL in Peshawar and also served as the Secretary-General of the Rabita Trust, an operating division of MWL . The Rabita Trust had its assets frozen after it was labeled a Specially Designated Global Terrorist Entity by President Bush on October 12, 2001.

19. U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah.  Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Usama bin Laden and former Al-Qaeda military chief Mohammed Atef (a.k.a. Abu Hafs Al-Masri).

20. Jalaidan also has extensive links to terrorist activity in Bosnia Herzogovina. A BBC report in April 2000 cited a confidential memo sent to UN police forces in Kosovo titled "Secret: US office only-Release to UNMIK." The document named MWL representative Wa'el Jalaidan as an associate of Osama bin Laden and stated that Jalaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

21. Seik Ajadi, former director of the Saudi humanitarian organization Muwafaq's offices in Croatia and Bosnia Herzogovina, who also has been -- since October of last year -- on the list of those suspected of supporting terrorism, first registered Euroinvest--a construction, trade, import, and export company--as an individually owned company, and then as a corporation under the ownership of Sefik Ajadi and Yasin Kadi.   In October 1997, Jalaidan also became of a co-owner of this company with 10 percent of its capital.  Local sources claim that Jalaidan was authorized to withdraw money from the account of the Al Haramain humanitarian organization and that he was the supervisor of Saudi

humanitarian aid in Bosnia Herzogovina. Therefore, it is very likely that most of the money Al Haramain invested into Euroinvest ended up in the hands of Islamic terrorists in Bosnia Herzogovina.

22. Jalaidan also has ties to the Benevolence International Foundation (BIF), which was classified as a Specially Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002.

23. Al-Qadi has had a close relationship with Jalaidan since the early 1980's and has not only employed Jalaidan but he has also provided him with personal and professional financial assistance. Despite the above information regarding Jalaidan, Al-Qadi still maintains that Jalaidan has not been in contact with Bin Laden since 1994.

24. Al-Qadi's main Albanian firm was Karavan Construction and Development. In 1996, Al-Qadi promoted Karavan's Egyptian engineer, Amr Abd' al-Wahab Selem al-Zaini to be the director of Karavan and Al-Qadi's financial representative in Albania. Al-Qadi had al-Zaini provide unlimited support to Jalaidan during his visit to Albania for the Laprake hospital construction project in the late 1990's.

25. In another instance, Karavan provided aid to the Saudi NGO Saudi Joint Relief Committee (SJRC) for Kosovo. SJRC's Chief at the time was Jalaidan. Jalaidan was provided an office in the Karavan corporate building.

26. Al-Qadi and Jalaidan were "involved in a small-scale travel company named Abrar of Saudi Arabia. The focus of this business was to provide services to Muslim pilgrims especially during the pilgrimage season (Hajj) and throughout the year, for minor pilgrimages."

27. Al-Qadi gave shares of a business he owned, KA Stan, to Jalaidan as a "reward for the assistance he provide to [Al-Qadi's] charitable activities in Bosnia."

28. By his account, Al-Qadi helped fund housing units for the Al Eman University in Sanaa, Yemen, transferring $1.25 million between February 24, 1998, and August 3, 1998. He accomplished this transfer by sending money from the account of his company Karavan Development Group directly to Jalaidan.

29. Al-Qadi claims that Jalaidan was entrusted with the implementation of "the University Housing Project" and executed the Project through Jalaidan's company, Maram. Maram was responsible for executing a contract with another company, Vefa, which constructed the housing.

30. Moreover, the founder of Al Eman University, Sheikh Abdel Majid Zindani, was labeled as a SDGT by President Bush on February 24, 2004.

5

**Mohamed Bayazid**

31. Jalaidan's partner in Maram, Mohamed Bayazid, is also a member of al-Qaeda. The Justice Department believes that Bayazid is one of al-Qaeda's top leaders. In the East Africa bombing trial, a former member of al-Qaeda recalled how he once went with Bayazid and Mamdouh Mahmud Salim (who was convicted in the East Africa bombing trial) to receive a cylinder of purported uranium.

32. Bayazid has publicly issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

33. On September 9, 2001, Bayazid carried out a plan (along with Bin Laden, other al Qaeda members, and other members of the Taliban) to assassinate Ahmed Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years.  Al Qaeda terrorists posed as television journalists seeking an interview with Masood.  The video camera was armed with explosives and when detonated at the purported interview, killed Ahmed Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

**Qadi International**

34. Al-Qadi owns a company named Al-Qadi International that has provided material assistance to Hamas.

35. According the affidavit of Immigration and Customs Enforcement Special Agent David Kane, the Vice President of Qadi International is Dr. Tareq Al-Swaiden. Al-Swaiden is a Kuwaiti businessman and lecturer who has several times publicly encouraged jihad against the U.S. and Israel and praised Palestinian suicide bombers.

36. Al-Qadi was mentioned in a civil asset forfeiture proceeding in Chicago in 1998 as a result of a donation he made to an Islamic organization that was funding Hamas.  In 1991, Qadi International donated $820,000 dollars to the Quranic Literacy Institute (QLI). The FBI claims that the Chairman of QLI, Ahmed Zaki, is a conduit for terror money.

37. QLI used the money to purchase several acres in Woodridge, a small town southwest of Chicago. In 1994 QLI sold the institute for more than the price of the initial purchase but never repaid Al-Qadi the $820,000 dollars. In 1998 QLI's assets were frozen by the government on the grounds that it was using the income generated by the Woodridge investment to finance a member of Hamas.

38. The Hamas operative in question is Mohammad Salah, an employee of QLI. According to an affidavit by FBI Agent Robert Wright, Salah received almost all of the $110,000 that the Woodridge property generated. Salah was arrested in 1993 and charged with

being a member and financer of Hamas. Salah pled guilty in an Israeli court in 1995 and was sentenced to seven years in prison.

39. In addition to the $820,000 donation to QLI, Al-Qadi also used Qadi International to transfer money directly to Mohammed Salah. Bank records show that Al-Qadi sent $27,000 directly to Salah in March 1992. Qadi International also executed transfers of $107,000 and $60,000 to bank account number 8060700 of First National Bank of Chicago, which was held by Salah.

40. During the time period that Al-Qadi was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for Hamas. In August and September of 1992, Salah flew to the Middle East on a sixteen day trip to Israel and the Occupied Territories. During this trip, Salah funneled approximately $100,000 in funds to Hamas leader Mousa Abu Marzook. According to Salah, these funds were intended for and used for to purchase weapons to carry out specified terrorist actions against Israel.

41. FBI Agent Robert Wright was ordered to discontinue his investigation into QLI, Salah and Al-Qadi. Wright has since written a book that discusses the relationship between al-Qadi, QLI, Salah and Hamas; however, he is under orders from the U.S. government to remain silent and is prevented from distributing or discussing his manuscript.

42. Despite Al-Qadi's knowledge of Saleh's involvement with Hamas and the ultimate forfeiture case brought by the United States against QLI and Salah, Al-Qadi never attempted to reclaim the $820,000 provided to QLI for the land deal. Nor did he stop further payments to QLI. Indeed, he states that "following Mohammed Salah's arrest I had agreed to with Dr. Zaki to provide additional support directly to QLI." Al-Qadi further admits that "at the express request of Dr. Zaki, I transferred between 1991 and 1997, sums totaling $210,000 to Dr. Zaki for charitable purposes of QLI and for his own personal account." Al-Qadi's involvement with QLI continued through at least 2002.

**BMI**

43. In the 1980's Soliman Biheiri established BMI Investments Services, Inc., which was the holding company for three occupational companies all located at the same address: BMI Real Estate Development, BMI Leasing and BMI Trade and Investment. Biheiri's intention was to use BMI Real Estate Development to "purchase residential lots, construct houses on those lots, and sell the newly constructed houses."

44. Until 1996, Al-Qadi was an investor in an Islamic Bank named Arabic Beit ul Mal (BMI) which shared offices with Al-Qadi's Qadi International in Secaucus, N.J. BMI's other investors included a Syrian Hamas leader named Mousa Abu Marzouk and Tarek Swaiden, an alleged member of the Muslim Brotherhood.

45. BMI also has ties to the Bin Laden family. Defendant Abdullah Bin Laden invested a total of $500,000 with BMI Real Estate Development Limited Partnership and BMI

Construction Fund Limited Partnership. Abdullah Bin Laden was also the incorporator and head of the United States branch of the Defendant World Assembly of Muslim Youth (WAMY) in northern Virginia. WAMY has extensive ties to Islamic terrorism and openly recruits and indoctrinates Muslim youth. According to the article "The Roots of Terror" dated December 5, 2002 and published on National Review online (www.nationalreviewonline.com), the WAMY book entitled *Islamic View* states:

> "*Teach our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah.*"

46. BMI has ties to Islamic terrorism not only through its personal but also through its financial relations with the northern Virginia charity named International Relief Organization (IRO), the U.S. arm of the known al-Qaeda financer International Islamic Relief Organization (IIRO).

47. The IIRO/IRO has extensive ties to Islamic terrorism. According to a CIA report that was released in the summer of 2003, IIRO/IRO has connections to Hamas, Algerian radicals and the Egyptian precursor to al-Qaeda—Al Gamaat Al-Islamiya. The report states that the IIRO/IRO is connected to Osama bin Laden and convicted terrorist Ramzi Yousef through its ties to the Muslim World League. Finally, the reports documents that the IIRO/IRO—"helps fund six militant training camps in Afghanistan."

48. On January 7, 1999, a Bangladeshi national by the name of Sayed Abu Nasir was arrested in India with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S. Plot in India is Foiled in the January 21, 1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO/IRO in Asia.

49. According to Richard Chesnoff's story, "It's More Than Just Who Plants the Explosives," in the July 31, 1996 edition of the New York Daily News, western intelligence sources traced IIRO money transfers to bank accounts in London and Amman, Jordan, at which point the funds were transferred to Hamas in Gaza and the West Bank. In a Declaration of Support for Pre-Trial Detention in the case of *United States of America v. Soliman S. Biheiri*, Senior Special Agent of the Bureau of Immigration and Customs Enforcement David Kane testified that he had evidence confirming that IIRO/IRO had transferred money to Hamas through the Holy Land Foundation for Relief and Development.

50. According to the testimony of an IIRO/IRO official in federal court in Greenbelt, MD, IIRO/IRO received an infusion of $10 million from Saudi businessmen in the spring of 1992. Additionally, FBI court filings show that the charity received $400,000 from the Saudi Embassy in Washington.

8

51. In the summer of 1985, Soliman Biheiri first met Sulaiman Al-Ali, the eventual executive officer of IIRO/IRO's U.S. branch. Sulaiman Al-Ali was very familiar to Biheiri because he had given lectures in Muslim conventions and conferences in the United States. They developed both a personal and business relationship. Al-Ali frequently acted as a consultant to BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia. During this time, Biheiri paid "tens of thousands" of dollars to Al-Ali for "assistance he gave me on occasions, introducing BMI Finance and Investment Group to important institutions, important personalities. And when that resulting in any business for BMI Finance and Investment Group, we have paid him a fee. You can call it a commission or a fee, but that is how it is."

52. At the beginning of 1989, during a visit to the U.S., Al-Ali told Biheiri of his plans to move permanently to the United States and establish IRO, a non-profit organization, which would be headquartered in Virginia. He further told him that he was also involved in forming a D.C. nonprofit corporation to be named **"The Sana-Bell, Inc." which "would act as a funding source for IRO."** According to Dr. Al-Ali, he was or would be a founding member of the Board of Directors of Sana-Bell, Inc.

53. In the summer of 1991, Sulaiman Al-Ali moved to the U.S. and established IRO. He told Soliman Biheiri that he, through Sana-Bell, was in the midst of receiving a $10,000,000 donation from an entity named the International Islamic Relief Organization (IIRO) located in Jeddah, Saudi Arabia. According to Al-Ali, he was to invest that money, through Sana-Bell, and then use the return of the income generated from these investments to cover the costs of IRO's operations.

54. As of February 2000, Sana-Bell, Inc. had made a total of four investments. Significantly, there was never a meeting of either Sana-Bell's Investment Committee or the Board of Trustees to discuss or formally approve any of these investments. The four were as follows:

    - Property at 360 S. Washington St. in Falls Church, Virginia where Al-Ali established IRO's office. For a number of years, Sulaiman Al-Ali and IRO managed the office building on the property at 360 S. Washington St. Al-Ali signed leases on behalf of Sana-Bell, Inc. and collected the rent. IRO and Al-Ali occupied the third floor of the building for only "nominal rent," resulting in Sana-Bell's inability to cover the building's carrying costs from the building's rental income. The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sana-Bell paid cash for the building and, therefore, had no mortgage expenses associated with the building. Its only carrying costs were real estate taxes, utilities, and maintenance. The decision to charge IRO only a nominal rent, insufficient to permit Sana-Bell to cover its costs through the building's rental income, was never the subject of a Trustee meeting, an Investment Committee meeting.

    - Residential real estate building lots in Prince Georges County, Maryland for which BMI Real Estate and Development, Inc. (BMI REDI) acted as a

9

      general agent and a general contractor of houses.  In mid-1993, Sana-Bell purchased 15 developed residential building lots in Prince Georges County, Maryland.  At Al-Ali's suggestion, Sana-Bell entered into a management agreement with BMI REDI to build, market, and sell those houses for Sana-Bell's account.  Al-Ali was Sana-Bell's only point of contact with BMI with respect to all matters relating to Sana-Bell's role in the project.

- 200 limited partnership units, valued at $1 million, in BMI Leasing Limited Partnership (BMI Leasing).

- 20 limited partnership units, valued at $1.1 million, in BMI Construction Fund Limited Partnership (BMI Construction).

55. All of BMI's dealings with respect to Sana-Bell were through Sulaiman Al-Ali at the IRO office at 360 S. Washington St.  At Al-Ali's direction, all the tax matters were sent to Yaqub Mirza at his office at 555 Grove St. in Herndon, Virginia.  Al-Ali located, negotiated, and decided what investments Sana-Bell would make "because the benefit of those investments were designed to go to IRO, and not to [Sana-Bell].  The building purchase was designed to benefit IRO, not Sana-Bell, D.C.  [Sana-Bell] operated as a mere conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia."

56. In 1992, IIRO/IRO invested $2 million in BMI through Sana Bell, Inc. By a subscription agreement executed on December 1, 1992, The Sana-Bell, Inc. purchased 20 units of limited partnership interests in BMI Construction Fund Limited Partnership of New Jersey (valued at $1.1 million). The declared purpose of the formation of the limited partnership with BMI Construction Fund was "acquiring and developing land and constructing dwellings for sale to the public at a profit."

57. By another subscription agreement executed by The Sana-Bell, Inc. on December 12, 1992, The Sana-Bell, Inc. purchased 200 units of limited partnership interests in BMI Leasing Limited Partnership, a New Jersey limited partnership.  The declared purpose for the formation of the limited partnership with BMI Leasing was "purchasing and leasing capital equipment, instruments, machinery, vehicles, computers, office systems and related software to the public at a profit."

58. The $2 million from Sana Bell soon disappeared from BMI's books. A month after the al-Qaeda embassy bombing in North Africa in August of 1998, Sana Bell filed suit against BMI in a federal court in Maryland. Sana Bell claimed that it had uncovered several accounting irregularities in BMI's financial records—including the disappearance of the $2 million. More specifically, Sana Bell alleged that BMI illegally disbursed Sana Bell's investment in BMI at the direction of IIRO/IRO officer Suliman Al Ali. Since Sana Bell was an operating subsidiary of IIRO/IRO, the plaintiff and the defendant in the case were essentially part of the same corporate entity. Sana Bell obtained a judgment of $2.3 million in the lawsuit but it never collected on its judgment.  Federal investigators believe that IIRO/IRO's law suit was intended to create an explanation for the disappearance of the funds and conceal any financial ties between BMI and Islamic extremists.

59. Although the final destination of the $2 million is not clear, authorities believe that the end result of the transaction was Biheiri and Al-Ali liquidating and splitting the $2.1 million cash investment by Sana-Bell, Inc. at an indeterminate time between 1996 and 1998 and never giving any form of compensation to Sana-Bell. Biheiri never attempted to contact anyone else affiliated with Sana-Bell to authorize or verify the changes authorized by Sulaiman Al-Ali.

60. According to FBI agent Robert Wright, a former BMI accountant contacted the FBI in 1999 and expressed concerns that his employer transferred money overseas to finance the "embassy bombings in Africa." Moreover, the 1996 IRS 990 form for IRO revealed that it donated $153, 768 to Mercy International, Canada. It came to light during the prosecution of the al-Qaeda operatives involved in the embassy bombings that Mercy International's Nairobi branch provided assistance in the attack.

61. Additionally, a German intelligence report states that Mercy International is a front for the Muslim Brotherhood. Omar Al-Qadi, a member of Yassin Al-Qadi's family, is the director of Mercy International's U.S. branch.

62. IIRO/IRO, along with a dozen other northern Virginian Islamic charities, was raided by federal agents in March of 2002. The investigation into IIRO/IRO and, subsequently BMI, is still pending.

**Abrar Group International**

63. Al-Qadi is Vice Chairman of Abrar Group International. Abrar is headquartered in Stamford, Connecticut, has a strong presence in Malaysia and deals mainly in the financial service sector. The Abrar Group has been implicated in providing material assistance to Hamas through its financial dealings with IIRO/IRO and the Chicago, Illinois based Global Chemicals Inc.

64. According to FBI agent Valerie Donahue's 1997 affidavit, Abrar and IIRO/IRO jointly invested $2 million in Global Chemical Corp., which allegedly produced household and pool cleaning supplies. Abrar invested $250,000 by itself and $345,000 on behalf of one of its top clients. IIRO/IRO fronted the remaining amount of money, as two of its top officials owned 20% of Global Chemicals.

65. The president of Global Chemicals was Mohammed Mabrook, a Libyan immigrant who had worked for a pro-Palestinian group headed by Marzouk—the Syrian Hamas leader who invested in BMI with Al-Qadi. Although Global Chemicals had a warehouse full of toxic chemicals, it did not have any customers. In 1997 the FBI asked Dennis J. Reutter, a government employed chemical weapons expert, to investigate the chemical purchases of Global Chemicals. Reutter issued a report stating that the company's purchases—"do not appear to be consistent with R&D for formulation of commercial cleaning products or for quality control of commercial cleaning products…the purchases appear to be more consistent with support" of a laboratory performing biochemistry or "organic synthesis."

11

> Organic synthesis is a term used to describe the process for manufacturing some explosives.

66. Although U.S. law enforcement officials did not find any direct evidence of bomb making materials at Global Chemicals facilities, in January of 1997 the Chicago fire department confiscated the company's chemicals and Marbrook left the U.S. for Saudi Arabia. At roughly the same time, Abrar vacated its Connecticut office. In response to pressure from the U.S., Saudi Arabia returned Marbrook to the U.S. in June of 1999. Many FBI officials believed that he had ties to Hamas; however, he was ultimately convicted on fraud charges for taking money from IIRO/IRO under false pretenses. In August 2001 he was sentenced to 51 months in jail. The U.S. government is still trying to determine the final destination of the money that Abrar and IIRO/IRO invested in Global Chemicals.

**Muwafaq Ltd**

67. Muwafaq Ltd is an Islamic charity that transferred millions of dollars from wealthy Saudi businessmen to al-Qaeda. Muwafaq Ltd. was founded in 1991 as a private company in the Isle of Man but its primary headquarters was located in Jeddah, Saudi Arabia. In 1992, the charity registered as a trust in the Isle of Jersey, a Great Britain tax haven. The corporation was endowed by Khalid bin Mahfouz, a known al-Qaeda financer. Muwafaq quickly started relief work in Bosnia, Somalia, Sudan, Pakistan, Ethiopia, Albania and Afghanistan and opened branches in Germany and Austria; however, the charity also functioned as a financing tool for al-Qaeda as well as the general Islamic fundamentalist movement.

68. Al-Qadi was the director and one of four shareholders for Muwafaq. In cooperation with Talal M.M. Bradkook and Dr. Mohaman Ali Elgari, Al-Qadi incorporated Muwafaq in Delaware in 1992 and operated the charity until 1997. During that time Al-Qadi spent roughly 15-20 million dollars of his own money on the day to day operations of Muwafaq.

69. Al-Qadi states that he selected the managers responsible for the various countries, and that he then delegated his authority to the various country managers, who in turn took day-to-day responsibility for running Muwafaq. Al-Qadi took an active role in the activities of each regional branch of the Muwafaq foundation and admits that he would visit each project country three to four times a year.

70. Al-Qadi states that there was little auditing performed by the foundation and that in several of the countries that Muwafaq had a presence, there "are no meaningful financial records available." Even in countries where there was a requirement that audits be filed, e.g. Pakistan, Al-Qadi can not confirm that the results of the audits were filed as required.

71. Muwafaq's ties to Islamic terrorism, specifically Osama bin Laden and al-Qaeda, are widespread and pervasive.

72. Al-Qadi hired Chafiq Ayadi, an SDGT since October 12, 2001, to head Muwafaq's European operation upon the recommendation of Jalaidan in late 1992. According to a 2004 report from the Office of Foreign Assets Control (OFAC), the U.S. government has information that demonstrates this hiring occurred shortly after Ayadi's expulsion from Tunisia for belonging to an Islamic extremist group.

73. During the mid-1990's, Ayadi also headed the Muwafaq branch in Bosnia.

74. Ayadi was employed as director in charge of Muwafaq's European activities from 1992 to 1995 or 1996, and during that time Al-Qadi transferred substantial sums to Ayadi's personal account. Al-Qadi states that these transfers were for the sole purpose of the charitable objectives of the Muwafaq.

75. At the time of his appointment by Al-Qadi to be Muwafaq's European director, evidence indicates that Ayadi was operating under agreements to help Osama bin Laden. According to information available to the U.S. Government, Ayadi was one of the principal leaders of the Tunisian Islamic Gront, the military wing of the extremist Al-Nadha movement. Ayadi reportedly went to Afghanistan in the early 1990's to receive paramilitary training, and went to Sudan along with suspected Tunisian terrorist Muhammad Harrath and Abdallah Jajji in order to meet with Osama bin Laden. Later, according to information available to the U.S. Government, they met bin Laden a second time, in the presence of Hassan Turabi, where they secured Bin Laden's agreement for Bin Laden collaborators in Bosnia to receive Tunisian Al-Nadha mujaheddin from Italy.

76. A considerable number of foreign and U.S. intelligence reports list Muwafaq as a primary source of funding for Islamic terrorist groups in several theatres of the globe.

77. A U.S. intelligence report states Muwafaq has ties to the extremist group al Gama'at Al Islamiyya and that it funds Egyptian terrorists in Bosnia. Similarly, an internal memorandum by Spanish External Intelligence also found that Muwafaq maintained contacts with the Egyptian Gamaa Islamiya.

78. According to information available to the U.S. Government, in 1995, the then-leader of Al- Gamaa Islamiya, Talad Fuad Kassem, said that Muwafaq had provided logistical support and financial support for a mujahadin battalion in Bosnia.

79. Russia has also documented Muwafaq's terrorist activities. In a classified document that was released in 2003, the Counter-Terrorism Center for the Commonwealth and the Independent States, a unit of the Russian Ministry of Defense, states that—"the Muwafaq Foundation was set up to give assistance to the families of Islamic terrorists….The headquarters are located in Jeddah, KSA."

80. A European intelligence source found that Khamir Amer Ballayth, an associate of Osama bin Laden, transferred between $200,000 to $250,000 to the Muwafaq foundation through the account of the Bin Jaad establishment at the Faysal Bank in Peshawar.

81. According to a foreign intelligence document, the Muwafaq foundation provided capital Osama bin Laden's personally owned Animal Resources Bank of Sudan.

82. Together Al-Qadi and Khalid bin Mahfouz formed two offshoot subsidiaries, the National Management Consultancy Center (NMCC) and the National Commercial Bank (NCB), to help conceal Muwafaq's financial ties to Osama bin Laden and al-Qaeda.

83. In similar fashion to Muwafaq, NMCC was registered in Isle of Man but managed from Jeddah, Saudi Arabia. Al-Qadi delegated managerial power over NMCC to Sharia scholar Mohammed Ali Al Gari and appointed himself as co-executive director and primary share holder. Additionally, Al Gari was also appointed NCB Sharia Board Advisor—giving him authority over the use and attribution of the Zakat (money to be given to charity) funds. Ali Gari was also a member of Muwafaq Foundation Council. Essentially, Al-Qadi and his associates were able to maintain control over NCB and NMCC and use them to consolidate and transfer money to Muwafaq and other charities that served as front organizations for al-Qaeda.

84. For instance, an audit of NCB revealed that over a ten year period the bank's Zakat Committee gave $74 million dollars to the International Islamic Relief Organization, which at the time was operated by Osama bin Laden's brother in law and documented as a primary source of funding for Osama bin Laden. During a Congressional Hearing in October of 2001, former CIA Chief of Counter-terrorism Vincent Cannistraro stated that NCB operated as a "financial conduit" for Osama bin Laden and helped him fund training camps in Sudan.

85. Similarly, another audit of the National Commercial Bank of Saudi Arabia revealed that $3 million was pulled from the accounts of several wealthy Saudi businessmen and placed in Muwafaq's account for Osama bin Laden.

86. Many of Muwafaq's employees are either members of or associated with Islamic terrorist groups. For instance, a European intelligence source found that al-Qaeda operative Mahmond Mehdi was once a member of Muwafaq, as was an Afghan fighter and suspected Hamas member named Husam Tayeh. The same source alleged that Muwafaq opened a branch in Manila in 1994 in cooperation with Muhammad Jamal Khalifa, who is involved in the Abu Sayyaf Group and the Moro Islamic Liberation Front. Additionally, Jamal Khalifa is Osama Bin Laden's brother in law.

87. Along the same lines, in 1995 Muwafaq's Islamabad office in Pakistan was raided by the police and its local director, Amir Mehdi, arrested due to suspicions of connections with Ramzi Yousef, the man behind the bombing of the WTC in 1993. Although the director was released three months later and no charges were brought against the charity, its operations in Pakistan were terminated.

88. Upon his arrest, Mehdi was informed that telephone numbers, including a telephone number installed at his residence, had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.

89. In 1993, Abdel Latif Saleh became partner of Yassin Al Qadi in Loks-Holl company, Medicare Sh.P.K and Karavan company. In 1994, he founded the Albanian branch of the Muwafaq Foundation. According to a Turkish intelligence report, Saleh was previously a member of the International Islamic Relief Organization—a know al-Qaeda front organization. In the 1998 "Returnees from Albania" Egyptian military trials, many of the Albanian extremists who testified identified Abdul Latif Saleh as a primary supporter of the extremist movement in Albania. In 1999, in cooperation with the U.S. government, he was arrested and deported by Albanian officials based on suspicion of his involvement with the Egyptian Islamic Jihad and al-Qaeda.

90. According to information available to the U.S. Government, Saleh founded and organized the Albanian Islamic Jihad (AIJ). As early as 1999, Al-Qadi was known to be an active supporter of, and fund raiser for, the AIJ. Muwafaq operated an Islamic school in Kukes until 1997, and several of the most radical students from the school were selected for membership in AIJ.

91. OFAC found numerous documents and correspondence between Al-Qadi and Saleh. Saleh was named as an official signatory for Karavan bank accounts. Saleh was the general manager of all Al-Qadi businesses in Albania. Saleh was the only person who had authorization to withdraw money directly from Al-Qadi's bank account and transfer the funds whenever the situation required it.

92. Large wire transfers were seen through these documents coming into and out of Al-Qadi's personal accounts in Albania. As well, large cash withdrawals were paid to Saleh.

93. Similarly, the April/May 1998 edition of Defense and Foreign Affairs' Strategy Policy states that Muwafaq is mainly used to—"recruit and train Albanian Mujahedin."

94. Muwafaq employees also have ties to terrorist activity in Sarajevo, Bosnia-Herzegovina. Karim Merjri is listed at the Head Officer of Muwafaq's division in Kosevsko, Sarajevo. The Bosnian Financial Police have tied Mejri to al-Haramian Al-Aqsa, another Arab foundation that has financial ties to Islamic terrorism.

95. Moreover, foreign Muslim volunteers en route to Bosnia to join the resistance often stayed at Muwafaq safe houses in Croatia. Croatian authorities conducted several raids on these houses and seized illegal arms.

96. According to information available to the U.S. Government, Muwafaq transferred $500,000 to terrorist organizations in the Balkens.

97. According to information available to the U.S. Government, Al-Qadi continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996. The primary recipients of Al-Qadi's support in the Balkans were Defendant Al-Haramain, the Revival of Islamic Heritage Society, Al-waqf al-Islamiya and Defendant the World Association of Islamic Youth. The Revival of

      Islamic Heritage Society's Pakistan and Afghanistan offices were designated as SDGT's on January 9, 2002. The Bosnia-Herzegovina branch of the Al-Haramain Foundation was designated as an SDGT on March 11, 2002.

98. In 2001, according to information available to the U.S. Government, Al-Qadi acknowledged that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkens.

99. Finally, a German intelligence report states that Al-Qadi uses the following companies to transfer money on behalf of the Muwafaq Brigade militia in Bosnia and Kosovo: Abrar International of Kula Lumpur, Malaysia, BMI of Istanbul, Turkey, Loxall of Tirana, Albania, and Medicare of Tirana, Albania.

100. According to a press report, Al-Qadi asserted at the time of his designation as a global terrorist that Muwafaq had terminated operations in 1996 or 1997. However, according to one of Al-Qadi's submission, as of late 2002, Muwafaq continued to be registered in Holland and Belgium.

**Vakufska Banka D.D. and Depozitna Banka D.D**

101. Vakufska Banka and Depozitna Banka have supported, facilitated and participated in terrorism financing on the territory of Bosnia Herzegovina. Moreover, the banks have provided financial support to several organizations acting as fronts for al-Qaeda, including Muwafaq, Al Haramian Islamic Foundation and the Saudi High Commission for Releif in Bosnia Herzegovina.

102. Al-Qadi has played a central role in the ownership and management of Vakufska and Depozitna. Depozitna was based in Sarajevo and owned by Al-Qadi, Chafiq Ayadi and Mahmal Investment Company—an Isle of Man based corporation that is currently under Bosnian investigation by the Financial Police and Federal Banking Agency. While he was a co-owner of the bank, Chafiq Ayadi used the bank to transfer $2.5 million to the account of the Muwafaq Foundation. Ayadi sold his shares of the bank to Al-Qadi in September of 2000.

103. In August 2002 Vakufska merged with Depozitna Banka, as the Banking Agency had rescinded Depozitna's banking permit on March 30, 2001. At the time, Vakufska was already partially owned by both Al-Qadi and Mahmal Investment Company, the same two groups that owned Vakufska.

104. Aside from Al-Qadi and Mahmal, several of Vakufska's past shareholders have financial ties to Islamic terrorist organizations. For instance, El Tarik Oil D.O.O., an oil company based in Sarajevo, was a shareholder with 8% bank capital in 2000. A Bosnian Financial Police report from 2002 documents that El Tarik regularly provides financial assistance to the Saudi High Commission and al Haramian al Aqsa foundation in Sarajevo, both of whom consistently offer logistical support to al-Qaeda.

105. The involvement of Al-Qadi in both Depozitna Banka and Vakufska Banka with the financial backing of Mahmal Investment Co. Limited has provided a financial arm to Islamic charities and terrorist organizations operating in Bosnia Herzegovina. A 2002 Bosnian Intelligence report describes Vakufska Banka as a financial base for al Haramian Islamic Foundation and, subsequently, al-Qaeda:

> *"The al Haramian Islamic Foundation spent around 13 KM ($7, 647,000) between its foundation in 1997 and the end of last year (2000). Financial transactions were through accounts at the Depozitna Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering."*

106. The Bosnian intelligence report then establishes the link between al Haramian Islamic Foundation and Osama bin Laden:

> *"Al Haramain…has acted as a channel for financing the activities of terrorist organizations…According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamija, while members of Bin Laden's El Itihad al Islamija terrorist groups were employed at the Somalia offices, which also financed their operations."*

107. The Bosnian Financial Police have documented that Vakufska Banka is involved in terrorist financing through financial transactions between the Saudi High Commission for Relief and a company named Engra. From 1998 to 2000, Engra conducted financial transactions of behalf of an organization linked to Osama bin Laden through the following bank accounts: account number 1604205500000502 at the Vakufska Banka in Sarajevo, Zenica Branch and account number 1602000000869046, which was opened at the Depozitna Banka.

108. According to information available to the U.S. Government, planning sessions for an attack against a U.S. facility in Saudi Arabia during the mid 1990's may have taken place at Depozitna Bank.

109. Chafiq Ayadi held Al-Qadi's shares in Depozitna Bank as the nominee for Al-Qadi from 1996 to 1998, and had a position with the bank until the end of 1998.

**Ptech**

110. In 1998 Yassin Al-Qadi invested 14 million in Ptech, a privately owned Massachusetts based technology company. By 2001, Al-Qadi was one of the company's top investors and managers.

111. Ptech was re-incorporated in Delaware in 2001 and is used primarily to develop enterprise blueprints at the highest level of US government and corporate infrastructure. These blueprints hold every important functional, operational, and technical detail of the

17

enterprise. A secondary use of this powerful tool is to build other smart tools in a short period of time. Ptech's clients in 2001 included the Department of Justice, the Department of Energy, Customs, Air Force, the White House, the FAA, IBM, Sysco, Aetna, and Motorola.

112. Along with Al-Qadi, Ptech has several other disconcerting ties to Islamic terrorism. Defendant Yaqub Mirza is on Ptech's Board of Directors. Mirza shares links with several individuals and groups under investigation for terrorist funding or activity.

113. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. The SAAR Foundation is the organizational epicenter of a network of terrorist financing charities that were raided by the FBI in March of 2002. Mirza is the director of Sterling Advisory, a SAAR organization which controlled Ptech Fund LLC.

114. Mirza is listed as the President and CEO of Mar Jac Investments, Inc. Mar Jac Poultry, a Georgia based operating division of Mar Jac Investments is under investigation by U.S. authorities for its role in terrorist financing.

115. In August of 2000, Mirza registered the defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Islamic terrorists. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to the 1998 Embassy bombings.

116. Lastly, Mirza is involved with the Wahabbi Lobby, an influential Saudi based organization that promotes Islamic extremism through the World Association of Muslim Youth.

117. Soliman Biheiri is also a founding member of Ptech. Biheiri ran BMI Real Estate Development, a Virginia based group that is affiliated with the IIRO and suspected of financing the 1998 Embassy bombings.

118. Two of Ptech's employees, Suheil Laher and Muhamed Mubayyid, are affiliated with Care International, an organization that is co-located in Boston and Sudan and is under investigation due to its financial ties to bin Laden. Both of the two above mentioned employees subscribe to al-Qaeda's radical interpretation of Islam. Indeed, a Muslim Cleric at Harvard University described Laher as "over the top" with regards to his religious beliefs.

119. Husssein Ibrahim, a co-founder and chief scientist at Ptech is also an officer of the above mentioned BMI Real Estate.

120. Ptech's Middle Eastern branch, Horizons, is also neck deep in the Islamic fundamentalist movement, as there client list includes the Saudi bin Laden Company and the Afghan based BTC Bin Laden Telecom.

121. In December of 2002 the FBI raided Ptech and the investigation is still pending.

**Additional Business Assets and ties to Islamic Terrorism**

122. Al-Qadi is an executive with a Saudi company, MM Badkook, that supplied 15,000 meals a day to Kuwaiti and U.S. troops during the Gulf war. Talal Badkook , the company's founder, is also a member of the Al-Mustaqbal group along with Saleh Mohammed bin Laden, son of Mohammed bin Laden, and Abdullah Saleh Kamel, son of Saleh Kamel who is the chairman of the Dallah al-Baraka.

123. Al-Qadi is Vice President of Jamjoon, a Saudi Arabian company that has investments in a number of different industries. The company's owner, Shaykh Ahmad Salah Jamjoom, is related to the deputy chairman of Faysal Islamic Bank—Ahmed Shah Jamjoom.

124. Al-Qadi is the Director of Global Diamond Resources (GDR), a Nevada based company that manages three mines in South Africa. More specifically, Al-Qadi sits on GDR's board as a representative of New Diamond Holdings—a firm which has a controlling interest in GDR. Initially, Al-Qadi invested initially invested $3 million into GDR but as of October 2001 his investment had diminished to roughly $750,000.

125. GDR has strong ties with the Islamic fundamentalist movement. Several representatives of the bid Laden family invested heavily in GDR and serve on the board of directors with Al-Qadi. Al-Qadi was introduced and recommended to GDR through an executive of the Saudi bin Laden Group.

126. Al-Qadi serves on the Board of Directors of Shifa International Hospitals in Pakistan along with M. Saleem Khanani. Saleem Khanani is on the Board of Directors with Barakat Corporation and Barakat International in Florida. Although they were not targeted, these two businesses are part of the Barakaat Hawala Network that had its assets frozen on November 7th for funneling money to al-Qaeda.

127. Investors in the Al-Qadi investment Alintid Holding Company included major al-Haramain contributors, and a major contributor to al-Waqf and al-Haramain NGO's, according to information available to the U.S. Government. Albanian law enforcement officials seized Alintid documents during an October 2001 raid of the Tirana, Albania headquarters of al-Waqf al-Islami—an NGO that has personal linked to terrorist and extremist groups.

128. Yassin Al-Qadi knew or had to know that he was providing financial assistance to al-Qaeda, Hamas and other independent terrorist outfits. This financial assistance was proximate cause of the September 11, 2001 attacks and the damages suffered by the Plaintiffs.