# EXHIBIT 1

**Plaintiffs' More Definite Statement as to Defendant**
**Benevolence International Foundation**

1.      Plaintiffs hereby incorporate all allegations and counts contained in the Third Amended Complaint in <u>Burnett, et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC), 03 CV 5738 & 03 CV 9849; <u>World Trade Center Properties LLC, et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC); 04 CV 7280 (RCC); and <u>Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.</u>, 03 MD 1570 (RCC); 04 CV 7279 (RCC), including all of the allegations and claims contained therein.

*History, Organizational Structure and Purpose of Benevolence International Foundation*

2.      In or around 1987, co-Defendant and Specially Designated Global Terrorist ("SDGT") Adel Abdul Jalil Batterjee founded 'Lajnat al-Birr al-Islamiya' ("LBI") in Saudi Arabia and Peshawar, Pakistan.  According to the Government's indictment in <u>USA v. Enaam M. Arnaout</u>, 02 CR 892, "One of the purposes of LBI was to raise funds in Saudi Arabia to provide support to the mujahideen then fighting in Afghanistan."   "Al Birr" and "Lajnatt Al-Birr Al-Islamiah (LBI)" are referenced in <u>USA v Enaam Arnaout</u> as being synonymous with Benevolence International Foundation.

3.      In or about the early 1990s, the Kingdom of Saudi Arabia shut down Al-Birr for ties to terrorist financing.   Around this same time, LBI was renamed Benevolence International Foundation (herein "BIF"), referred to in Arabic as "Al Birr al Dawalia" and incorporated in the United States.  According to the U.S. Treasury Department, LBI "began operating under the name Benevolence International Foundation in an effort to widen its appeal to the general public and increase its credibility with other governments.  BIF and LBI remained one organization with interchangeable assets under Batterjee's control."

4.      Between January 1999 and March 2000, BIF's website listed its year of establishment as 1987.  Sometime after March 2000, BIF changed this date to 1992.  BIF likely made this change in order to create a false impression that the two organizations (LBI and BIF) were different and to further disassociate the organization from any previous ties to terrorist funds.

5.      At Batterjee's request, co-Defendant Enaam Arnaout moved to the United States in 1993 to run BIF's Chicago office.  Prior to arriving in Illinois, Arnaout oversaw BIF's operations in Bosnia.  Arnaout assumed the position of Executive Director on September 15, 1997, and amended BIF's articles of incorporation in July 1998 to reflect a shift in the organization's headquarters from Saudi Arabia to Illinois.

6.      On December 14, 2001, FBI agents raided BIF's offices in Chicago and Newark and froze the organization's assets on suspicion that the charity secretly funded al-Qaeda.  The U.S Treasury Department declared BIF a financier of terrorism under Executive Order 13224 on November 19, 2002.

7.      BIF has or had offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Sudan, Bangledesh, Turkey, Dagestan, Georgia, China, Ingueshetia, England, Netherlands and Switzerland.  BIF operates as Benevolence International Fund in Canada and as Bosanska Idealna Futura in Bosnia.

*Jurisdiction*

8.      BIF is a not-for-profit organization incorporated in the State of Illinois on or around March 30, 1992.  Adel Batterjee is listed as a Director in BIF's initial filings with the Internal Revenue Service ("IRS").  Shortly after its incorporation, BIF moved to its current place of business in Palos Hills, Illinois.  BIF is a charitable organization accorded section 501(c)(3)

tax-exempt status by the IRS.

9.      Benevolence International Foundation lists its address as 9838 S. Roberts Road, 1-W, Palos Hills, Illinois, 60465.

10.     BIF also maintained a satellite office in New Jersey at 20-24 Branford Place, Suite #705, Newark, NJ 07102.

11.     From 1992 to 1993, BIF operated an office in Florida at 150 South University Drive, Plantation, Florida, 33324.  Papers filed with the Florida Department of State in 1993 list Adel Batterjee as an Officer/Director with the Florida branch.

*On Benevolence International Foundation*

12.     BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund international terrorist operations.  Various persons involved in terrorist activities, including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda, have had contacts with Benevolence International Foundation offices and personnel and also served on its staff.

13.     According to the U.S. Treasury Department, Osama bin Laden confirmed to a colleague that BIF "was one of the non-governmental organizations providing funds to al-Qaeda."

14.     The 9/11 Commission's Final Report describes how Bin Laden used BIF, as well as other charities and non-profit organizations, as fronts to finance Al Qaeda:

> Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad

both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)

15.     As part of the Government's Proffer in <u>U.S. v. Enaam Arnaout</u>, a former al Qaeda financier and expert government witness explained how Bin Laden diverted funds under the guise of legitimate charitable activity.  The witness "understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations.  The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy."[4]

16.     In or about 1991, at the time when leadership of the al Qaeda organization relocated to Sudan, BIF's predecessor LBI followed suit and opened its first office in the Sudan specifically to support al Qaeda and the mujahideen there.  BIF's collaboration with al Qaeda in Sudan mirrored LBI's operations in Afghanistan.

17.     In the fall of 1992, al Qaeda dispatched a representative then based in Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by al Qaeda.  Upon arrival in Zagreb, the al Qaeda member met with various people, including Arnaout, as well as two al Qaeda members, Abdel Rahman al Dosari a/k/a "Hown" (an expert in mortars) and Abu Zubair al Madani (a cousin of Bin Laden). Abdel Rahman al Dosari advised that al Qaeda was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support al Qaeda economically.  He further advised that BIF (referred to as "al Birr") was providing money for weapons for al Qaeda and that they had in fact obtained weapons from Cologne, Germany,

for Bosnia with the assistance of BIF and Abu Rida.  Abdel Rahman al Dosari also stated that al

Qaeda's goal in Bosnia was to establish a base for operations in Europe against al Qaeda's true

enemy, the United States.

18.     BIF aided several military organizations in Bosnia including the Black Swans, an

irregular military unit of Bosnian Muslims.

19.     On or about June 10, 1995, BIF caused the delivery of an X-ray machine to a

representative of the Chechen mujahideen in Baku, Azerbaijan.  In or about November 1995,

Arnaout and other members of BIF caused the shipment of anti-mine boots to Baku, Azerbaijan,

ultimately destined for the Chechen mujahideen.  Defendant Arnaout and BIF members solicited

donations from the public to purchase additional anti-mine boots for the mujahideen, falsely

claiming that the project was for the benefit of civilians.

20.     BIF established training camps in Tesanj, Zeljezno Polje and Bistricak (Zenica).

Many of the instructors came from Algeria and Albania.  Enaam Arnaout sponsored these

instructors through donations provided by the Muslim Brotherhood.   These individuals gained

entry to Bosnia by claiming they were business partners of Arnaout.  Arnaout also provided

funding for several veteran Afghani and Pakistani mujahideen fighters to travel to Bosnia and

train recruits there.

21.     Beginning at a time unknown through in or about March 2002, Defendant

Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in

Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning

Osama Bin Laden and al Qaeda, including:

    i.      a chart of an organization involved in military activity headed by Osama Bin
    Laden;

    ii.     notes summarizing several meetings during which al Qaeda was formed in
    Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri

and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

iii.   notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

iv.   personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v.   a list of wealthy sponsors from Saudi Arabia including references to Osama Bin Laden and Adel Batterjee;

vi.   various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii.   various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii.   various newspaper articles including a 1988 article with a photograph depicting Osama Bin Laden, Defendant Arnaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix.   a handwritten organizational chart placing Defendant Arnaout at the top of a jihad organization involved with weapons.

22.   Evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, in April 1999 included a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon.   Sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted.  BIF has never indicated an interest in dealing with the issue of small pox in any country.

23.   According to the Government's Proffer, BIF sponsored a number of terrorist training camps in Afghanistan, among them Al Masadah, Jawr (aka Jawara) and the Jihad Wal. Mustafa Ahmed Al-Hawsawi, a source of several money transfers to the 9/11 hijackers while in the United States, attended Jihad Wal in 2000 and 2001.

24.     The March 2002 search of BIF's Bosnian affiliate produced three rifles, a number of military manuals on various themes, explosives, a forged passport, and confidential documents related to Islamic terrorism.  Officials also discovered evidence that BIF executives had access to significant amounts of cash which they dispensed without regard to accounting procedures.

25.     BIF openly advertised itself in its Arabic-language fundraising appeals as a "trustworthy hand for the support of [both] the mujahideen and refugees" in Bosnia.   Similarly, documents taken from BIF's U.S.-based offices in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations and support of jihad in Bosnia-Herzegovina... Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands."   Another handwritten note found in Illinois by investigators revealed BIF's supreme "unwritten law":  "no matter how poor/sick - first priority is for mujahideen.

26.     On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the U.S. Treasury Department, BIF and Defendant Arnaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature.  BIF abhors terrorism and all forms of violence against human beings."

27.     On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

28.     Internal records recovered in raids of BIF's Chicago office show that some charity officials became wary of the amount of money channeled to actual causes.  One top official, Suleman Ahmer, feared that the organization was misleading donors.  In a 1999 e-mail message to Arnaout, Ahmer complained that the group misrepresented the percentage of donations sent to orphans.   Arnaout received another e-mail message in November 2001 informing him that administrators could not reconcile over half of the charity's expenditures in Bosnia.

29.     While the charity publicly cast itself as a relief organization, internal documents reveal discrepancies between the organization's stated purpose and actual mission. One BIF memo states:

> From its first day, the BIF aimed to support Jihad and Mujahideen by:
>
> Assisting in military and logistical support.
>
> Assisting in providing medical care for the Mujahideen in the field.
>
> Assisting in providing training, running camps, providing shelter, and in what accompanies these services, such as providing education, Da'awah, and looking after the families of Mujahideen and taking care of the orphans.
>
> Providing moral and political support for the Mujahideen.
>
> The aim of supporting Jihad, may be connected to the establishment of the BIF in the land of Hijaz, and the desire of a wide ranging section of the commited people to support Jihad.

*Al Qaeda Members and Other Individuals with Ties to BIF*

30.     The affidavit filed by FBI Special Agent Robert Walker in USA v. Benevolence International Foundation, 02 CR 0414, directly quotes a government witness as stating that "several Al Qaeda members held positions in BIF and that this organization is one of the organizations utilized by al Qaeda."

31.     In the latter part of the 1990s, with Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaeda's majlis al shura (consultation council), as

well as a top military expert and instructor, served as a BIF officer in Chechnya.

32.     A founding member of al Qaeda and close associate of Bin Laden, Mamdouh Mahmud Salim, arrived in Bosnia in 1998 under BIF's auspices.  Arnaout sponsored Salim's visa, reserved his apartment and designated him as one of the organization's directors. According to the Batterjee-commissioned biography of Bin Laden, *The Arab Volunteers in Afghanistan*, Arnaout states that Salim first introduced him to al-Masada, Bin Laden's camp in Afghanistan.

33.     Mohamed Loay Bayazid a/k/a Abu Rida, an al Qaeda founder implicated in U.S. v. Bin Laden, S(10) 98 Cr. 1023, for purchasing military and communications equipment for Bin Laden, assumed the title of president of BIF's American operations in 1994.  Bayazid's driver's license application, dated September 12, 1994, lists his address as BIF's Illinois office.   As a confidant of Bin Laden, Bayazid sought to obtain nuclear and chemical weapons for al Qaeda.

34.     Arnaout also found employment for Muwafak Hamami, a Syrian imprisoned for membership in the Muslim Brotherhood.  Hamimi worked for six months at BIF's office in Zenica during 1995-96.

35.     Hassan Faraj, a former BIF employee who worked for Arnaout in the early 1990s in Zagreb, Croatia, was arrested in Brooklyn, New York, in June 2004 on charges of falsely obtaining American citizenship.  As a BIF employee, Faraj regularly transported mujahideen fighters across the border to Bosnia for training in BIF-sponsored camps.  Faraj also trained in these camps.

*Adel Abdul Jalil Batterjee, Founder of Benevolence International Foundation*

36.     The U.S. Treasury Department designated Batterjee as an SDGT on December 21, 2004.  In addition to founding BIF, Batterjee served as former Chairman of co-Defendant World

Assembly of Muslim Youth ("WAMY").

37.      After Saudi government scrutiny of his organization, Batterjee resigned as Director of BIF in 1993.  Enaam Arnaout assumed Batterjee's position within BIF.  Despite his resignation, Batterjee continued to materially support BIF.  Batterjee registered the Internet domain BIFINT.ORG on September 20, 1999, and is listed as the administrative and billing contact for the website.    According to BIF's IRS filings, Batterjee also gave a $48,484 contribution to the organization.

38.      Batterjee commissioned a biography of Osama bin Laden, *The Arab Volunteers in Afghanistan*, in 1991.  Nine years later, Batterjee responded to an e-mail request for "your book on Afghan jihad" by sending a copy of Bin Laden's biography to an undercover terrorism expert.  The 9/11 Commission's Final Report notes that Batterjee, under the pseudonym Basil Mohammad, wrote the book in question published jointly by BIF and WAMY in 1991.

39.      Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida.  A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator."

40.      As part of its Proffer in USA v. Enaam Arnaout, the Government describes documents discovered during a raid of BIF's Bosnian headquarters:

> BIF had in its Sarajevo office a computer file labeled "Tareekh Osama," or "Osama's History."  The file contains scanned images of documents which chronicle Usama Bin Laden's activities in Afghanistan which led to the formation of al Qaeda and even includes later reports of the danger Bin Laden poses to the US.  BIF possessed in the file

a handwritten draft list of the people referred to within al Qaeda as the "Golden Chain," wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: "And spend for God's cause." The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." "Baterji", LBI's and BIF's founder, appears after six of the listings.

41.     Another exhibit in the Government's Proffer consists of a letter addressed to Batterjee seeking ammunition and a car for *Hezb e Islami*, a radical Islamic group.

42.     In a telephone conversation recorded by the Government on February 12, 2002, Defendant Enaam Arnaout asks to have messages sent to Batterjee, *a/k/a* Abu Sulafa, stating, "[Batterjee] does not want to cut off the offices, so he contacted the offices, in order to send them the transfers (*money transfers*) . . . ." Arnaout continues with describing the criminal scrutiny BIF is under with respect to its relationship to Saudi Arabia, and urges the messenger to tell Batterjee to be careful about wire transfers.

43.     One Justice Department official suggested that this telephone conversation may further elucidate Batterjee's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

44.     In a book published in 2002, Batterjee writes that the West is morally corrupt and that its war on terrorism is just an excuse to stop Muslims from spreading Islam. Batterjee states that Muslims have tried to peacefully expand Islam throughout the world, but those attempts have always met armed opposition. More and more clashes with the West are inevitable, with Batterjee predicting that they will culminate in a final military encounter. "Does any doubt remain that the great confrontation…is certainly coming?"

*Enaam Arnaout, Executive Director of BIF*

45.     Enaam Arnaout had a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by witnesses and seized documents.

46.     In the latter part of the 1980s, an al Qaeda organization known as "Mekhtab al Khidemat" (the "Services Office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States.   The organization was operated principally by Sheik Abdullah Azzam and Osama Bin Laden for purposes of providing of logistical support to the mujahideen (fighters) in Afghanistan.

47.     In the mid to late 1980s, co-Defendant Arnaout, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri,"  "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for Mekhtab al Khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

48.     Within that same time frame, Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden. Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

49.     A witness in <u>USA v. BIF</u> advised being familiar with Arnaout and his activities in Pakistan in the late 1980s.  On one occasion in 1989, Arnaout picked up one of Osama bin Laden's wives at an Islamabad airport and took her to his residence.  A week later, Bin Laden and his bodyguards arrived during the night at Arnaout's house to pick up the woman.  The witness explained that Arnaout must have been a close associate of Bin Laden or he would not have been trusted with the care of bin Laden's wife.

50.     Photographs recovered from the March 2002 raids on BIF branches in Bosnia

depict Arnaout with Bin Laden and Arnaout shown with a rifle, a portable rocket launcher and an anti-aircraft gun.

51.     One handwritten letter from Bin Laden recovered during the same raid authorizes Arnaout to sign on Bin Laden's behalf.

52.     According to a book dictated by Osama Bin Laden, *Massadat Ul-Ansar*, Arnaout was one of eleven founders of the first Jaji Camp and later founded Mekhtab al Khidemat and subsequently Al-Qaida in Afghanistan.

53.     Adel Batterjee met Enaam Arnaout during the latter's studies in Pakistan in 1987. After working for LBI in Afghanistan, Batterjee appointed Arnaout as head of BIF's Bosnian branch in the early 1990s.

54.     In or about 1991, defendant Arnaout, while employed by LBI, worked with others, including members of al Qaeda, to purchase rockets and assorted rifles in large quantities and distribute them to various mujahideen camps, including camps operated by al Qaeda.

55.     In or about 1992, Defendant Arnaout assisted in delivering, assembling and operating a satellite telephone purchased by co-Defendant Yousef Jameel for use in Afghanistan by co-Defendant and SDGT Gulbuddin Hekmatyar and the radical organization Hezb e Islami.

56.     Croatia suspected BIF of involvement in illegal arms activities in the early 1990s. Croatian authorities arrested Arnaout sometime in or around 1993.  Arnaout apparently escaped from Croatian jail and, upon his return to the United States, wrote United States Senator Carol Moseley Braun seeking intervention regarding "our unfortunate problem with Croatian authorities."

57.     In February 2002, Arnaout worriedly contacted his brother "Dr. Hisham" to discuss how "they" had taken the former director of BIF's office in Bosnia "in a special plane...

[t]o Cuba." Arnaout, convinced of his own inevitable fate, explained to Hisham how he would attempt to shoulder the blame and exonerate BIF's Saudi founders. He somberly reflected, "It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how."   According to a government witness, Enaam M. Arnaout planned to flee the United States in March 2002 for Jeddah, Saudi Arabia, at the urging of Adel Batterjee.

58.     On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding investors by diverting funds to pay for supplies to jihadists in Bosnia and Chechnya.

59.     On August 18, 2003, Enaam Arnaout was sentenced to 11 years and four months in federal prison and ordered to pay $315,624 in restitution.   Arnaout admitted that "I'm here because I lied, I deceived people, I was involved with people I shouldn't have been involved with. I supported fighters when I told people I didn't."

*Al-Shamal Islamic Bank, in which BIF and Batterjee are major shareholders*

60.     Adel Abdul Jalil Batterjee is a major shareholder and Chairman of Al Shamal Islamic Bank.  Al Shamal knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and facilitating weapons and military equipment purchases for al Qaeda.

61.     Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hussan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises.   Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and Al Qaeda.  Bin Laden even provided the institution with USD $50 million in capital.  According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al

Shamal Islamic Bank in Khartoum.  Bin Laden invested $50 million in the bank."

62.     According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

63.     Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank.  Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
> $1,200 a month.
> For how long did you work for him [Osama bin Laden]?
> Almost two years.
> What Banks did he keep his money at?
> Bank Al Shamar.

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.

64.     Al-Fadl also described acting as courier for a cash payment from Al Qaeda to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership.  When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> 1 Q. Who gave you the money?
> 2 A. Abu Fadhl, he bring it from Shamal Bank and he bring it to
> 3 me.
> 4 Q. Abu Fadhl brought it from the Shamal Bank?
> 5 A. Yes.
> 6 Q. Is that a bank in the Sudan?
> 7 A. Yes.

65.     In the same trial, another former al Qaeda operative stated that Al Qaeda used Al

Shamal for operational purposes.  The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden.  Upon presenting Bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route.  The witness took the check to Al Shamal and cashed it.

66.     The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank.  Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd.  According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.   This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

67.     Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities.

68.     According to reports from a leading intelligence publication, Bin Laden remained a shareholder in Al Shamal as late as 2000.   A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

69.     Co-Defendant Yasin Al-Qadi wired more than $22 million from Swiss Bank accounts to Al Qaeda operatives and entities between 1990 and 2003.  Al-Qadi transferred nearly

half of these funds through Al-Shamal Bank.