**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to DR. ABDULLAH BIN SALEH**<br>**AL-OBAID** |

*This document relates to:*            *Federal Insurance Co. v. al Qaida*
                                       03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO DR. ABDULLAH BIN SALEH AL-OBAID

      Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Dr. Abdullah bin Saleh Al-Obaid.

      Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.      The name of the defendant to whom this RICO statement pertains is Dr. Al-Obaid. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.      (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; |

|  | NY CLS Penal § 125.25(xi) |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Dr. Abdullah bin Saleh Al-Obaid | Dr. Al-Obaid conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Dr. Abdullah bin Saleh Al-Obaid | Dr. Al-Obaid undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |
| early 1990s | Dr. Abdullah bin Saleh Al- | Dr. Al-Obaid agreed to form and associate |

| to 9/11/2001 | Obaid | | himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.    (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Dr. Al-Obaid fit neatly into this framework by raising and providing funds for and otherwise providing material

support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) Dr. Al-Obaid is associated with the Enterprise.

(e) Dr. Al-Obaid is a member of the Enterprise, and are separate and distinct from the Enterprise.

(f) Dr. Al-Obaid intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.    The pattern of racketeering activity conducted by Dr. Al-Obaid is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Dr. Al-Obaid furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.    The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.   The Enterprise, and the racketeering activities conducted by Dr. Al-Obaid, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.   Not applicable.

12.   Not applicable.

13.   The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14.   The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Dr. Al-Obaid, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the zakat, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Dr. Al-Obaid. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Dr. Al-Obaid. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Dr. Al-Obaid. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Dr. Al-Obaid also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |

| III | Survival |
|-----|----------|
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.    Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Dr. Abdullah bin Saleh Al-Obaid | Dr. Al-Obaid is the President of the U.S. branch of the Muslim World League ("MWL").  He also served as President of two Virginia corporations, Sana-Bell, Inc.  and Sanabel Al Kheer, Inc.   Both entities are part of the "SAAR network" (a group of charities so named because of funding provided by Sulaiman Abdul Aziz al Rajhi, and both are alleged to have engaged in fund-raising and money-laundering for al Qaida and bin Ladin. At the same time, he is also employed as the Deputy General Manager of Al Watania Poultry, a substantial Saudi company owned by the al Rajhi family, from 1994 to the present.<br><br>In addition to his positions in the business world, Al-Obaid has held high leadership roles in numerous charities that operated as conduits for al Qaida financing, including the Muslim World League ("MWL"), Rabita Trust ("Rabita"), International Islamic Relief Organization ("IIRO"), Sanabell, Inc., and Sanabel al-Khair. Dr. Al-Obaid was Secretary-General of MWL and now heads MWL's U.S. branch. He was vice-chairman of the Board of Trustees of Rabita and president of Sanabell, Inc. and Sanabel al-Khair.<br><br>Each of these organizations has ties and has provided assistance to al Qaida. Although one might (conceivably) be associated with one such charity-front without taking an active role in diverting funds to al Qaida, Dr. Al-Obaid's positions with at least five such organizations cannot be a coincidence. The only plausible inference is that Dr. Al-Obaid himself was instrumental in funneling funds from the | 1962(a), 1962(c), 1962(d) |

various organizations with which he was affiliated to Osama bin Laden and al Qaida to support their *jihad* against the United States.

The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation, and the Rabita Trust.

The MWL has long operated as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. As described in testimony before the House Committee on Financial Services Subcommittee on Oversight and Investigations in March 2003, "As part of [its] mission over the past two decades, MWL has. . . secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaida and Usama Bin Laden." *See* Matthew Epstein with Evan F. Kohlmann, "Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities," March 11, 2003, at 2, annexed as Exhibit 3 to the Andrea Bierstein Al-Turki Affirmation and submitted in support of the *Burnett* Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss of Defendant Abdullah Bin Abdul Mohsen Al-Turki (June 30, 2004) ("*Burnett* Plaintiffs' Opposition").

According to Epstein and Kohlmann, MWL is one of "three organizations [that] served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel

documents to Al-Qaida personnel worldwide," and helping "to move funds to areas where Al-Qaida was carrying out operations." *Id.* at 1. Further details of MWL's role in financing bin Laden are al Qaida are provided in the Epstein and Kohlmann report.

Rabita, which is an arm of MWL, is in reality an Al Qaida front. Its Secretary General, Wael Julaidan, is known to be an al Qaida member and has repeatedly aided and abetted terrorists. The U.S. Treasury Department has described Julaidan as "the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network." In October, 2001, Rabita was designated by President Bush as a "Specially Designated Global Terrorist Entity" ("SDGTE") and its assets were frozen by the Treasury Department.

Sanabell, Inc. and Sanabel al-Khair, both part of the "SAAR network" (a group of charities so named because of funding provided by Sulaiman Abdul Aziz al-Rajhi), played a substantial role in raising funds for MWL and for the International Islamic Relief Organization ("IIRO"), and then diverting those funds to terrorist causes.

In July 1998, Dr. Al-Obaid wrote to MWL secretary and treasurer Yaqub Mirza and noted that part of the proceeds from Sanabell's investments were used to establish Sana-Bell, Inc. in the United States. On the Muslim World League's websites, a list of international branches of the Muslim World League include the same New York and Virginia addresses given for the IIRO, on whose executive committee al-Obaid simultaneously served.

IIRO was associated with other alleged terrorist-financing charities. On October 26, 1996, senior representatives of Benevolence International Foundation, Global Relief Foundation, Holy Land Foundation, International Relief Association, Islamic African Relief Agency, Mercy International – USA, and IIRO met to study the idea of

establishing a council for American Muslim Charities. The first four of these charities are on the U.S. Government's SDGT list and have had their assets frozen.

Dr. Al-Obaid cannot credibly contend that he was unaware that the charities he supported and directed were pervasively involved in the sponsorship of Islamic extremists, including al Qaida. In this regard, it is important to note that the involvement of the Saudi charities was well documented during the years that Dr. Al-Obaid exercised authority over those organizations.

Indeed, MWL and its constituent charities, including IIRO, WAMY and al Haramain, were repeatedly implicated in terrorist and extremist activities between 1990 and September 11, 2001.

Given his supervisory authority over those charities, Dr. Al-Obaid most certainly knew of these reports. In fact, in a 1997 interview published in the MWL's own newspaper, Dr. Al-Obaid himself acknowledged that charges of terrorism sponsorship had been leveled against the Saudi charities, including the MWL, and that those charges were accurate.

> "Answering a question on the reports regarding the League's funds being funneled to extremist groups, Dr. al Obeid said, 'this is a closed chapter…It has already been proven that there were people who exploited this situation and misused some funds."

> See Exhibit 4 to the June 1, 2005 Affirmation of Sean Carter Transmitting Supplemental Evidence in Opposition to all Motions to Dismiss Under the FSIA.

Moreover, as a government official with direct responsibility for the operations of the charities, it is reasonable to assume that Saudi government officials would have conveyed to Dr. Al-Obaid the multiple warnings they

| | | |
|---|---|---|
| | received regarding the criminal conduct of the Saudi charities. The Saudi government received such warnings from the United States, France, Russia, Pakistan, Egypt, India, the United Nations and other sources, as detailed in Exhibit A to the Federal Plaintiffs' RICO Statement Applicable to World Assembly of Muslim Youth, incorporated herein by reference.<br><br>Nonetheless, Dr. Al-Obaid continued to use his authority to generously fund and support those organizations. In doing so, Dr. Al-Obaid knowingly provided material support and resources to al Qaida.  Absent the material support and sponsorship provided by Dr. Al-Obaid to the Enterprise, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. | |