UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to THE MUSHAYT FOR TRADING ESTABLISHMENT** |

*This document relates to:*   *Federal Insurance Co. v. al Qaida*
                              03 CV 06978 (RCC)

**RICO STATEMENT APPLICABLE TO
THE MUSHAYT FOR TRADING ESTABLISHMENT**

      Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Mushayt for Trading Establishment.

      Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.     The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.     The name of the defendant to whom this RICO statement pertains is the Mushayt for Trading Establishment. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.     Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.     The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.     (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | The Mushayt for Trading Establishment | The Mushayt for Trading Establishment conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | The Mushayt for Trading Establishment | The Mushayt for Trading Establishment undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support |

| | | each supplied. |
|---|---|---|
| early 1990s to 9/11/2001 | The Mushayt for Trading Establishment | The Mushayt for Trading Establishment agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

  (c) not applicable

  (d) No.

  (e) No.

  (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

  (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.   (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

  (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating

3

functions and providing material support to operations. The Mushayt for Trading Establishment fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) The Mushayt for Trading Establishment is associated with the Enterprise.

(e) The Mushayt for Trading Establishment is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f) The Mushayt for Trading Establishment intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by the Mushayt for Trading Establishment is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Mushayt for Trading Establishment furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by The Mushayt for Trading Establishment, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including the Mushayt for Trading Establishment, to raise, manage and distribute money

4

and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like the Mushayt for Trading Establishment. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Mushayt for Trading Establishment. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Mushayt for Trading Establishment. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. The Mushayt for Trading Establishment also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |

|   |   |
|---|---|
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

|   |   |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Mushayt for Trading Establishment | The Mushayt for Trading Establishment ("MFT"), chaired by Mohamed Ali Mushayt and founded by Muhammed Galeb Kalaje Zouaydi called which was used to transfer funds for al Qaida operations in Europe. | 1962(a), 1962(c), 1962(d) |
| | Zouaydi funneled money from MFT through Spanish corporations to the al Qaida network in Europe, including donations to Abdul Fattah Zammar and Mamoun Darkazanli (both of whom are awaiting trial in Germany on charges of providing financial and logistical support to the organization of the September 11, 2001 attacks) who maintained the bank accounts of hijacker Mohamed Atta, and other members of the Hamburg al Qaida cell. | |
| | Zouaydi was among several members of al Qaida who were arrested in Spain in April 2002; he is considered a senior financier of al Qaida in Europe. | |
| | Mushayt for Trading Establishment ("MFT") in Jeddah, Saudi Arabia, sheltered and materially and economically supported Nabil Nanakli Kosaibati Nabil, who was convicted for terrorist activities in Yemen. Zouaydi sent $227,000 dollars to Nabil Sayadi, a radical Muslim extremist in charge of the Fondation Secours Mondial and Defendant Global Relief Foundation in Belgium, through Mushayt for Trading Establishment. | |
| | From 1996 to 2001, the al Qaida network in Europe received at least $1 million dollars from MFT "donations" and false contracts that were used to cover up Zouaydi's and Mushayt's sponsorship of al Qaida. Mushayt assisted Zouaydi in financing al Qaida cells in | |

Europe, including the Hamburg Cell, of which the September 11 hijackers were members.

MFT was one of several companies used as umbrella organizations to facilitate al Qaida operations in Europe through false contracts signed by a Saudi company controlled by Zouaydi, who created several corresponding companies in Spain with several al-Qaida militants.

To date, the Saudi company, Mushayt for Trading Establishment, is still in activity and managed by several members of the Muslim Brotherhood. MFT and other members of the economic network maintained regular incomes for the cells in Europe or in the Middle East (Germany, Italy, Yemen, Syria, and Saudi Arabia). In addition these firms employed Ex-Fighters of Islam in Chechnya or Bosnia and radical Muslims.

MFT and other members of the network also maintained close relations with Al-Qaida members and leaders in Europe, including hijacker Mohammed Atta, Said Bahaji and Ramzi Binalshibh, all related to Osama Bin Laden.

Money was funneled to the Hamburg cell through the Saudi Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar who provided the cell of hijackers with financial and logistical support. The network of companies also facilitated in 1997 the preliminary filming of the World Trade Center that was delivered to a bin Laden courier in Europe.

Ghasoub Al Abrash Ghalyoun (aka Abu Musab), a Spanish cell member and business partner of Muhammad Zouaydi traveled to the United States in August 1997 to film future targets of Al-Qaida, including the World Trade Center.

In addition, Mushayt for Trading Establishment in Jeddah sheltered and supported economically other international Muslim radicals, including Nabil Nanakli

|  | Kosaibati Nabil, right-hand man of the al-Qaida Spanish cell leader, convicted for terrorist activities in Yemen on behalf of Saudi intelligence services. |  |
|---|---|---|
|  | As with Muhammad Zouaydi and most of the al-Qaida Spanish members, Kosaibati is a Spanish national of Syrian origin. He acknowledged during his trial in 1997 that he was recruited and trained to use arms and explosives by the Saudi intelligence. During his trial confession he said that the Saudi intelligence "sent him to Yemen in 1996 as an active Saudi intelligence agent". |  |
|  | He also acknowledged he received $150,000 from the Saudi intelligence to kill the Yemeni Foreign minister. Documents also revealed that Kosaibati received $14,000 from Muhammad Zouaydi in 1996 and 1997 while living in Sanaa, Yemen on a monthly basis at the request of a lieutenant of Usama bin Laden. |  |
|  | In providing this financial assistance to al Qaida, MFT purposefully directed its conduct at the United States because, as demonstrated throughout this litigation, the evidence shows that throughout the 1990's al Qaida's target was the United States. Moreover, Osama bin Laden announced this, repeatedly and publicly, so that groups like MFT which provided material support in that period plainly knew that they were targeting the United States when they assisted al Qaida with its terrorist agenda. |  |
|  | Absent the material support and sponsorship provided by the Mushayt for Trading Establishment, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |