UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to ADNAN BASHA** |

*This document relates to:*     *Federal Insurance Co. v. al Qaida*
                                03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO ADNAN BASHA

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Adnan Basha.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains are Adnan Basha. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| | |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Adnan Basha | Adnan Basha conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Adnan Basha | Adnan Basha undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |
| early 1990s to 9/11/2001 | Adnan Basha | Adnan Basha agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, |

2

|  |  | multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|--|--|--|

      (c) not applicable

      (d) No.

      (e) No.

      (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

      (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.    (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

      (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Adnan Basha fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

3

(c) No.

(d) Adnan Basha is associated with the Enterprise.

(e) Adnan Basha is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f) Adnan Basha intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Adnan Basha is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Adnan Basha furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Adnan Basha, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Adnan Basha, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious

4

indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Adnan Basha.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Adnan Basha.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Adnan Basha.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Adnan Basha also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent |

5

|  | Infliction of Emotional Distress |
|---|---|
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Adnan Basha | As Secretary-General of the International Islamic Relief Organization (IIRO), defendant Adnan Basha provided financial support to al Qaida. Secretary-General Basha himself knew and intended that IIRO provide al Qaida $60,000,000 to fund al Qaida terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained. | 1962(a), 1962(c), 1962(d) |
| | Those al Qaida training camps funded by Secretary-General Basha's IIRO fueled radical extremist ideology, fostered inner resolve among recruits, and taught skills to launch suicide attacks to kill United States civilians, as on September 11. | |
| | Secretary-General Basha's IIRO is an al Qaida "charity" front that knowingly and intentionally provided al Qaida funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks. | |
| | Less than thirty percent (30%) of the funds distributed by Secretary-General Basha's IIRO go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaida. Not only did IIRO finance al Qaida, but Secretary-General Basha's IIRO also actively recruited and provided new personnel for al Qaida to carry out terrorist attacks against the United States, and IIRO bankrolled sanctuaries | |

|  | for al Qaida operatives around the world. Indeed, one of the September 11 hijackers declared that he worked for Fazeh Ahed of IIRO |  |
|--|--|--|
|  | Secretary-General Basha's IIRO in Southeast Asia became a center of al Qaida financing activity – collecting, laundering, and providing funds for al Qaida operations against the United States, including al Qaida's 1993 World Trade Center bombing and the 1995 plot to blow up twelve American airlines. After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government de-registered Secretary-General Basha's IIRO in Kenya. |  |
|  | After the September 11 attacks, Pakistan deported scores of IIRO workers who were "aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaida." These official Government actions confirm the open and notorious fact reported by the Arab publication *Rose Al-Yusuf* that "IIRO is firmly entrenched with Osama Bin Laden's al Qaida organization." |  |
|  | In the United States, Secretary-General Basha's IIRO financed al Qaida terrorist attacks against America from IIRO's office in Virginia before, on, and after September 11, 2001. IIRO calls its Virginia office International Relief Organization ("IRO"). IRO and IIRO are the *same* entity. IIRO's Virginia office sends money back and forth between the Virginia Office and IIRO in Saudi Arabia. IIRO's Virginia office also sends money to related terrorist organizations targeting the United States. After the September 11 attacks financed by Secretary-General Basha's IIRO and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of al Qaida. |  |
|  | IIRO works with numerous other al Qaida affiliated charities. The U.S.-based Success Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz, an al Qaida financier. Success Foundation sends money back and forth from the United States to IIRO; |  |

|  | the Success Foundation also sends money to terrorist organizations targeting the United States. |  |
|---|---|---|
|  | Secretary-General Basha's IIRO also provides financial support to the Saudi Joint Relief Committee, an al Qaida charity in Bosnia and elsewhere. |  |
|  | IIRO, through Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaida charity front. And IIRO provides funding for other al Qaida fronts posing as "humanitarian organizations" that have materially sponsored, aided and abetted and conspired with al Qaida to attack America, including: Global Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth. |  |
|  | Absent the material support and sponsorship provided by Adnan Basha, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |