UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to SHEIKH SALEH AL-HUSSAYEN** |

*This document relates to:*　　　　　　　　*Federal Insurance Co. v. al Qaida*
　　　　　　　　　　　　　　　　　　　　03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO SHEIKH SALEH AL-HUSSAYEN

　　Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Sheikh Saleh Al-Hussayen.

　　Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.　　The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.　　The name of the defendant to whom this RICO statement pertains is Sheikh Al-Hussayen. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.　　Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.　　The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.　　(a)　<u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| | |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Sheikh Saleh Al-Hussayen | Sheikh Al-Hussayen conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Sheikh Saleh Al-Hussayen | Sheikh Al-Hussayen undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |
| early 1990s | Sheikh Saleh Al-Hussayen | Sheikh Al-Hussayen agreed to form and associate himself with the Enterprise and |

| to 9/11/2001 | | agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Sheikh Al-Hussayen fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c) No.

    (d) Sheikh Al-Hussayen is associated with the Enterprise.

    (e) Sheikh Al-Hussayen is a member of the Enterprise, and are separate and distinct from the Enterprise.

    (f) Sheikh Al-Hussayen intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Sheikh Al-Hussayen is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sheikh Al-Hussayen furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sheikh Al-Hussayen, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Sheikh Al-Hussayen, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist

training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Sheikh Al-Hussayen. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Sheikh Al-Hussayen. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sheikh Al-Hussayen. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Sheikh Al-Hussayen also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |

5

| | | |
|---|---|---|
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sheikh Saleh Al-Hussayen | Sheikh Al-Hussayen has maintained a long career as a government official for the Kingdom of Saudi Arabia, holding positions with the Ministry of Finance and National Economy (1961-1971), the Council of Prime Ministers (1971-1974), and other appointed positions with government sponsored organizations (1974-2002). In March 2002, six months after the September 11th attack, King Fahd bin Abdulaziz al Saud appointed Sheikh Al-Hussayen as the General President of the Committee of the Two Holy Mosques. Despite this seemingly reputable career with the Saudi government, Sheikh Al-Hussayen's actions have been anything but admirable.<br><br>Sheikh Al-Hussayen provided material support to Osama Bin Laden and al Qaida, knowing that al Qaida's terrorist agenda was to attack the United States and its interests abroad.<br><br>For instance, Sheikh Al-Hussayen has actively supported co-defendant Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan. IANA was incorporated in Colorado in 1993 and has since used a number of media outlets to spread its intolerant, often violent, Wahhabist message including a number of websites, a 1-800 fatwa resource line, a radio station, and a quarterly magazine. IANA solicits donations widely throughout the United States and abroad and has come under a great deal of scrutiny and investigation for its clear advocacy of militant Islamic jihad and its funneling of money to al Qaida and affiliated organizations. Mohammed al-Ahmari, IANA President and Chairman, said in an interview | 1962(a), 1962(c), 1962(d) |

to the *New York Times* in 2001 that half of IANA's money comes from the Saudi government and other half primarily from Saudi donors.

In September 1998, Sheikh Al-Hussayen transmitted two checks totaling $100,000.00 to his nephew, co-defendant Sami al-Hussayen. These checks were subsequently forwarded to the IANA. Sami al-Hussayen was employed by the IANA to create and maintain websites and other internet media which were intended to recruit personnel and raise funds for violent jihad. From March 1995 until February 2002, IANA received $3,000,000.00 in financial support from Sami al-Hussayen resources. He was indicted by the U.S. Government on January 9, 2004 for providing material support and resources to terrorists.

In addition, Sheikh Al-Hussayen has traveled to the United States on trips sponsored by the IANA. He traveled to the United States on an IANA fundraising mission to the United States in the weeks leading up to the September 11, 2001 attack. In August 2001, he arrived in New York City and was given a tour of the city, including the vicinity of the World Trade Center Towers. He then traveled to Chicago, Detroit and Canada, meeting with IANA officials and with officials from other charities.

Saudi embassy officials have declared that they consider IANA a radical organization affiliated with the Muslim Brotherhood. *See* Susan Schmidt, "Spreading Saudi Fundamentalism in U.S.," *The Washington Post*, p. A1, October 2, 2003.

Even more disturbing is the connection between Sheikh Al-Hussayen and several of the September 11th hijackers. On September 6, 2001, Sheikh Al-Hussayen arrived in Herndon, VA. Then, just days before the September 11th attack, Sheikh Al-Hussayen switched from his original hotel to the Marriott Residence Inn in Herndon, just a few miles away. The Marriott Residence Inn in Herndon is the same hotel where at least three of the American Airlines

| | | |
|---|---|---|
| | Flight 77 hijackers stayed before September 11, 2001.<br><br>The following morning these men hijacked Flight 77 and crashed the airliner into the Pentagon.<br><br>Following the attacks, the FBI attempted to interview Sheikh Al-Hussayen in his hotel room. According to the FBI, the interview came to an abrupt end when he feigned a seizure, prompting the agents to take him to a hospital where the attending physicians "found nothing wrong with him." The FBI was successful in interviewing Sheikh Al-Hussayen's wife and the couple left the country shortly thereafter.<br><br>Sheikh Al-Hussayen also spent five years as a member of the Sharia Board at Al Rajhi Banking & Investment Company. Al Rajhi has long provided financial services and other forms of material support to terrorist organizations and has served as one of al Qaida's preferred banks for many years, maintaining accounts for many of the Saudi charitable organizations that operate within al Qaida's infrastructure, including but not limited to, the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, Benevolent International Foundation, and Al Haramain Islamic Foundation.<br><br>Absent the material support and sponsorship provided by Sheikh Al-Hussayen to the Enterprise, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. | |