UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to DR. ABDULLAH BIN**<br>**ABDUL MOHSEN AL-TURKI** |

*This document relates to:*  *Federal Insurance Co. v. al Qaida*
                             03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO
## DR. ABDULLAH BIN ABDUL MOHSEN AL-TURKI

   Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Dr. Abdullah Bin Abdul Mohsen Al-Turki.

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is Dr. Abdullah Bin Abdul Mohsen Al-Turki. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Dr. Abdullah Bin Abdul Mohsen Al-Turki | Dr. Al-Turki conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Dr. Abdullah Bin Abdul Mohsen Al-Turki | Dr. Al-Turki undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |

| early 1990s to 9/11/2001 | Dr. Abdullah Bin Abdul Mohsen Al-Turki | Dr. Al-Turki agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

    (c) not applicable

    (d) No.

    (e) No.

    (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

    (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.     (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Dr. Al-Turki fit neatly into

        this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

   (c) No.

   (d) Dr. Al-Turki is associated with the Enterprise.

   (e) Dr. Al-Turki is a member of the Enterprise, and are separate and distinct from the Enterprise.

   (f) Dr. Al-Turki intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Dr. Al-Turki is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Dr. Al-Turki furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Dr. Al-Turki, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Dr. Al-Turki, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

      The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

      The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Dr. Al-Turki. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Dr. Al-Turki. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Dr. Al-Turki. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Dr. Al-Turki also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |

5

| | |
|---|---|
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20. Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Dr. Abdullah Bin Abdul Mohsen Al-Turki | Dr. Al-Turki, a close advisor to the late King Fahd bin Abdulaziz al Saud and former rector of the University of Riyadh in Saudi Arabia (1975-1993), has held several prominent positions within the Saudi government.<br><br>In 1992, Dr. Al-Turki was appointed to be a member of the Council of Ulema (Senior Council of Scholars). In 1993, Dr. Al-Turki was appointed by King Fahd as Minister of Islamic Affairs. In that role, al-Turki held primary authority for setting policies for the Saudi based charities, and directing and supervising their activities and operations<br><br>The charities under al-Turki's authority in this position included the International Islamic Relief Organization, al Haramain Foundation, Muslim World League, World Assembly of Muslim Youth and Rabita Trust. Thus, the claims against al-Turki must be viewed in light of the allegations against these organizations.<br><br>In 1995, King Fahd appointed him to the Saudi Council of Ministers, the highest decision-making body of the Saudi government. Despite this seemingly reputable career with the Saudi government, Dr. Al-Turki's actions have been anything but admirable. Dr. Al-Turki provided material support to Osama Bin Laden and al Qaida, knowing that al Qaida's terrorist agenda was to attack the United States and its interests abroad.<br><br>Dr. Al-Turki was appointed as Secretary General of the Muslim World League ("MWL") in 2000. The MWL is among the | 1962(a), 1962(c), 1962(d) |

world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation, and the Rabita Trust.

The MWL has long operated as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations. As described in testimony before the House Committee on Financial Services Subcommittee on Oversight and Investigations in March, 2003: "As part of [its] mission over the past two decades, MWL has . . . secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaida and Usama Bin Laden." *See* Matthew Epstein with Evan F. Kohlmann, "Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities," March 11, 2003, at 2, annexed as Exhibit 3 to the Andrea Bierstein Al-Turki Affirmation and submitted in support of the *Burnett* Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss of Defendant Abdullah Bin Abdul Mohsen Al-Turki (June 30, 2004) ("*Burnett* Plaintiffs' Opposition").

According to Epstein and Kohlmann, MWL is one of "three organizations [that] served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al- Qaida personnel worldwide, and helping to move funds to areas where Al-Qaeda was carrying out operations." Id. at 1. Further details of MWL's role in financing bin

Laden and al Qaida are provided in Plaintiffs' respective Complaints and pleadings, and the Epstein and Kohlmann report.

As Minister of Islamic Affairs, Member of the Council of Ministers and Head of the MWL, Dr. al-Turki knowingly used his authority to assist the Saudi charities in sponsoring Islamic extremists, including al Qaida. In this regard, it is important to note that the involvement of the Saudi charities was well documented during the years that al-Turki exercised authority over those organizations. Indeed, MWL and its constituent charities, including IIRO, WAMY and al Haramain, were repeatedly implicated in terrorist and extremist activities between 1990 and September 11, 2001. Given his supervisory authority over those charities, al-Turki most certainly knew of these reports. In fact, in a 1997 interview published in the MWL's own newspaper, then MWL Secretary General Abdullah al-Obeid acknowledged that charges of terrorism sponsorship had been leveled against the Saudi charities, including the MWL, and that those charges were accurate.

> "Answering a question on the reports regarding the League's funds being funneled to extremist groups, Dr. al Obeid said, 'this is a closed chapter…It has already been proven that there were people who exploited this situation and misused some funds."
>
> See Exhibit 4 to the June 1, 2005 Affirmation of Sean Carter Transmitting Supplemental Evidence in Opposition to all Motions to Dismiss Under the FSIA.

Moreover, as a government official with direct responsibility for the operations of the charities, it is reasonable to assume that Saudi government officials would have conveyed to al-Turki the multiple warnings they received regarding the criminal conduct of the Saudi charities. The Saudi government received such

| | warnings from the United States, France, Russia, Pakistan, Egypt, India, the United Nations and other sources, as detailed in Exhibit A to the *Federal* Plaintiffs' RICO Statement Applicable to World Assembly of Muslim Youth, incorporated herein by reference. (On this point, Plaintiffs respectfully refer the Court to the documents submitted as Exhibits to the June 1, 2005 Affirmation of Sean P. Carter Transmitting Supplemental Evidence in Opposition to All Motions to Dismiss Under the Foreign Sovereign Immunities Act, which are hereby adopted as part of this Opposition and incorporated herein by reference.) | |
|---|---|---|
| | Nonetheless, al-Turki continued to use his authority to generously fund and support those organizations. | |
| | Equally disturbing is the connection between Dr. Al-Turki and a senior al Qaida financier, Muhammed Galeb Kalaje Zouaydi. Zouaydi, who was arrested by Spanish authorities on April 23, 2002 and is a brother-in-law of Osama bin Laden. A top financier for al Qaida, he also served as one of the original terrorists who fought with bin Laden and the other original founders of al Qaida. Zouaydi used various Spanish businesses to launder money from Saudi Arabia through Spain to al Qaida cells in Germany, including the Hamburg Cell that carried out the September 11th attacks. It appears that the business transactions between Al-Turki and Zouaydi were part of this money laundering scheme. | |
| | Despite his denials, Dr. Al-Turki indeed had a business relationship with Zouaydi. For instance, on October 10, 1999, Dr. Al-Turki and Zouaydi agreed to participate as business partners in a construction project in Madrid, Spain. A contract was written by Zouaydi's company in Spain stating that both parties would finance 50% of the project and that the income would be split 70/30 between Dr. Al-Turki and Zouaydi. | |
| | Furthermore, a letter dated October 21, 1999, | |

|  | from Francisco G. Prol, apparently representing Zouaydi, details the state of the negotiations between Dr. Al-Turki and Zouaydi for Dr. Al-Turki's purchase of shares in Proyectos y Promociones ("Promociones") and participation in certain real estate transactions. (Promociones was purported to be a construction company, but in fact, engaged in no actual construction. Instead, the dummy corporation provided financing for al Qaida cells in Europe.) The details contained in the letter suggest that it was part of ongoing negotiations. Moreover, Plaintiffs also have obtained a copy of check from Promociones dated September 15, 1999 for $191,000,000 Spanish pesetas. The check is made out to "D. Abdula Abdul Muhsen Al Turky" as beneficiary from Banco Sabadel in Madrid and appears to have been signed by Zouaydi and Bassam Dalati Satut on behalf of Promociones. Dr. Al-Turki denies having received this check, but the numbers stamped along the bottom edge suggest that the check was in fact cashed. |  |
|---|---|---|
|  | Further evidence supports an on-going business relationship between Dr. Al-Turki and Zouaydi. On October 15, 1999, Zouaydi sent a fax to Dr. Al-Turki requesting that he send the money through Al Rajhi Bank (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to Dr. Al-Turki by a law firm in Madrid, Prol & Asociados, referencing a telephone conversation with Waleed Al Husseini, Dr. Al-Turki's representative, regarding a project of Dr. Al-Turki to buy 100% of Zouaydi's Spanish company. |  |
|  | Absent the material support and sponsorship provided by Dr. Al-Turki to the Enterprise, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |