UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT<br>applicable to SHAHIR BATTERJEE** |

*This document relates to:*            *Federal Insurance Co. v. al Qaida*
                                        03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO SHAHIR BATTERJEE

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Shahir Batterjee.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is Shahir Batterjee. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

    | | |
    |---|---|
    | conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
|---|---|
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Shahir Batterjee | Shahir Batterjee conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Shahir Batterjee | Shahir Batterjee undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |
| early 1990s to 9/11/2001 | Shahir Batterjee | Shahir Batterjee agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, |

|  |  | multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

    (c) not applicable

    (d) No.

    (e) No.

    (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

    (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.     (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

    (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Shahir Batterjee fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

3

    (c) No.

    (d) Shahir Batterjee is associated with the Enterprise.

    (e) Shahir Batterjee is a member of the Enterprise, and are separate and distinct from the Enterprise.

    (f) Shahir Batterjee intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Shahir Batterjee is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Shahir Batterjee furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Shahir Batterjee, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Shahir Batterjee, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist

training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Shahir Batterjee. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Shahir Batterjee. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Shahir Batterjee. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Shahir Batterjee also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| **I** | Trespass |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |

| | | |
|---|---|---|
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Shahir Batterjee | Shahir Batterjee is the scion of a wealthy Saudi family who was an officer and director of Benevolence when it established its Palos Hills office nearly a decade ago. According to the Illinois secretary of state, Shahir and Adel Batterjee and Mazen Bahareth were listed as the foundation's incorporators and directors. Shahir Batterjee is also listed as an owner of Triple-B Trading GmbH, a self-described import-export concern that does no apparent business | 1962(a), 1962(c), 1962(d) |
| | Corporate records show that the Batterjee family's holdings in the Middle East and Europe are vast and highly diversified, reporting annual sales well into the hundreds of millions of dollars from real estate, computers, supermarkets, hospitals, health-care products, pharmaceuticals, medical equipment, hotels and even an ice cream factory. By contrast, the family's German outpost, Triple-B Trading, consists of one employee (Abdul Matin Tatari) and about $25,000 in capital, according to records on file in the neighboring state of Schleswig-Holstein, where Triple-B was incorporated in 1995 as an exporter of food, clothing and industrial equipment. | |
| | Reached by telephone in Saudi Arabia, Shahir Batterjee refused to discuss the activities or purpose of Triple-B Trading. "I don't answer questions on the phone," he said repeatedly before hanging up. | |
| | Abdul Matin Tatari is a 60 year old Syrian-born German citizen who is the owner and principal investor in Tatex Trading GmbH and | |

Tatari Design—German textile firms with sales of several million dollars per year. Triple-B Trading GmbH is headquartered in the same town as Tatex and Abdul Matin Tatari's place of residence.

The other two owners are Mazin Mohammad Bahareth, listed as BIF's treasurer and a top executive of the Bahareth Organization, a Saudi construction conglomerate; and Hassan Bahfzallah, who oversaw BIF's Saudi Arabia operations in the early 1990s and is listed as an official in three northern Virginia charities that were raided in March 2002 by federal agents probing alleged ties to Al Qaida.

Abdul Matin Tatari is listed as Triple-B's managing director. He moved to Germany from Syria in 1962.

Abdul Matin Tatari told the *Chicago Tribune* in November 2002 that he has known Shahir Batterjee for 15 to 16 years. Tatari said he met Shahir through Shahir's father, Abdulraouf Ibrahim Batterjee, who heads a large Saudi company that imports medical equipment, and his uncle, Mohammed Ibrahim Batterjee, whose enterprises include Jeddah's Jumbo Ice Cream Factory. He has known both elder Batterjees since 1983.

Tatari acknowledged numerous business transactions between Tatex and the Batterjee family, including the sale to Mohammed Ibrahim Batterjee of a summer home near Rethwisch and 17 trucks to be used as "ice cream cars." Shahir Batterjee visits Tatari 3 three or four times a year on buying trips for German textiles that are exported to Saudi Arabia and used to make women's underwear for sale in the family's garment shops. Tatari also told the *Tribune* that he buys textiles through Tatex and then sells them to Batterjee for a 10 percent commission, instead of using the Triple-B partnership for mutual purchase/sale transactions.

German intelligence officials told the *Chicago Tribune* in November 2002 that the Syrian

government has identified Tatari as a member of the Muslim Brotherhood. On Tuesday September 10, 2002, German authorities seized documents and financial information from Tatari's two homes and three company warehouses. German intelligence officials had been investigating Tatari, his wife, and two sons since July 2002 on suspicion that the family is using its companies as a front to launder money for terrorist organizations and smuggle Islamic militants into Western Europe. Investigators are also examining 111 commercial visa requests filed by Tatex from 2000-2002 for "prospective buyers." Investigators suspect some of the applicants were actually al Qaida operatives or other militants from Syria, Egypt and Jordan. The Tatari family was briefly detained in September 2002 and are currently living freely in Germany while the government continues its investigation of Tatex and affiliated companies.

Tatari's son, Mohammed Hadi Tatari has admitted personally knowing several members of the Hamburg cell including Mounir el Motassadeq, Mohammed Atta, and Mohammed Haydar Zammar, the man who investigators believe recruited Atta, Al-Shehhi, Jarrah and others from Hamburg to visit training camps in Afghanistan in November 1999. In fact, Hadi acknowledged knowing Zammar since meeting him in 1971 at the age of 11. The senior Tatari told the *Chicago Tribune* that his son stood as a witness at Motassadeq's wedding and the pair traveled to Denmark in March 2000 for an undisclosed purpose, at a time when hijacking plans were being made in Hamburg. Hadi Tatatri has told authorities that he knew the cell members but had no prior knowledge of their plans or activities.

According to German authorities, several members of the Hamburg cell worked at Tatex GmbH during the 1990s. These individuals include: Mohammed Atta, Zammar (three different stints), and Mamoun Darkanzali, who

|  | worked at Tatex briefly around 13 years ago. |  |
|--|--|--|
|  | A search of internal German documents revealed that Hadi Tatari was a signatory on an application to establish a Muslim prayer room for the 'Islam AG' Muslim student group at the Technical University Hamburg of which several members were also active in the Hamburg cell. Related materials seized from el Motassadeq's apartment include a printed piece of paper with contact information for Tatex Trading, a personal pocket calendar with the phone numbers of Mohammed Hadi Tatri (Abdul's son) and Abdul's wife, Karen Tatari. It was discovered that el Motassadeq called the Tatari's home phone line (#04822-6821) in October 2000. Also, the documents show that M.H. Zammar called Tatex Trading GmbH on October 7, 2001 at 1:18pm. |  |
|  | Shahir Batterjee is listed as Vice President on BIF's 1993 Form 990. As explained at length in several of the Complaints, BIF has acted as one of the charities fronting for al Qaida, and in fact the United States has designated BIF as a supporter of international terrorism. |  |
|  | Among other things, on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking BIF's assets and records, pending further investigation into BIF's ties to terrorists. Batterjee had knowledge of these activities. Enaam M. Arnaout ("Arnaout"), Chairman of BIF, has a relationship with Osama bin Laden and key associates dating back more than a decade. With Batterjee's knowledge and under his control, the BIF was used by al Qaida for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaida have contacts with the BIF and its office personnel; and, BIF had direct dealings with al Qaida operatives, providing them with military and financial support |  |
|  | BIF's Chairman, Defendant Arnaout, was criminally indicted for his role in the September 11, 2001 attacks due to his |  |

|  | sponsorship of al Qaida. It is alleged that Arnaout was photographed with Osama Bin Ladin and that he was authorized to sign on behalf of Bin Ladin. Arnaout was Executive Director of BIF while Defendant Batterjee was still a Director and Vice President of BIF. Absent the material support and sponsorship provided by Shahir Batterjee, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |
|---|---|---|