UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to SHEIKH SAFER AL-HAWALI AND SHEIKH SALMAN AL-OADAH** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                      03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO
## SHEIKH SAFER AL-HAWALI AND SHEIKH SALMAN AL-OADAH

Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendants Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendants to whom this RICO statement pertains are Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) <br> 18 U.S.C. § 2339A <br> 18 U.S.C. § 2339B <br> 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah undertook the above-named actions as part of a conspiracy to commit murder and arson, in that each knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the |

2

|  |  | resources and support each supplied. |
|---|---|---|
| early 1990s to 9/11/2001 | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah agreed to form and associate themselves with the Enterprise and each agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees

>   were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah fit neatly into this framework by raising and providing awareness and funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.
>
>   (c) No.
>
>   (d) Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah are associated with the Enterprise.
>
>   (e) Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah are members of the Enterprise, and are separate and distinct from the Enterprise.
>
>   (f) Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The patterns of racketeering activity conducted by Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah are separate from the existence of the al Qaida movement, but were necessary components to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activities conducted by Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah further and facilitate that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its

inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| **VI** | Torture Victim Protection Act, |

|          |                                          |
|----------|------------------------------------------|
|          | 28 U.S.C. § 1350                         |
| **VIII** | RICO, <br> 18 U.S.C. § 1962(c), 1962(d)  |
| **X**    | Anti-Terrorism Act, <br> 18 U.S.C. § 2333 |

19. pendent state claims:

|          |                                                              |
|----------|--------------------------------------------------------------|
| **I**    | Trespass                                                     |
| **II**   | Wrongful Death                                               |
| **III**  | Survival                                                     |
| **IV**   | Assault & Battery                                            |
| **V**    | Intentional and Negligent Infliction of Emotional Distress   |
| **VII**  | Conspiracy                                                   |
| **IX**   | Aiding and Abetting                                          |
| **XI**   | Negligence                                                   |
| **XII**  | Punitive Damages                                             |

20. Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah | Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah was part of a complex system through which al Qaida's sponsors, including charities, businesses and individual businessmen, channeled support to that terrorist organization.<br><br>Al-Hawali and al-Oadah are two of Saudi Arabia's most radical Sheikhs. For more than a decade leading up to September 11, 2001, al-Hawali and al-Oadah have publicly supported Osama bin Laden and Al Qaida's objective of the destruction of the United States. They were mentors and spiritual advisors to Osama bin Laden and Al Qaida.<br><br>A former Al Qaida member turned key government witness, Jamal Ahmed Al-Fadl, testified that bin Laden was in direct contact with the two men:<br><br>    Q. Wasn't Mr. Bin Laden in contact with religious scholars in Saudi Arabia?<br><br>    A. Yes, he got two scholars.<br><br>    Q. Didn't he talk about the scholars who were imprisoned in Saudi Arabia?<br><br>    A. Yes, Salman al Auda and Safar al Hawali.<br><br>In 1993, the two Sheikhs were banned from speaking in public as part of the Saudi Arabian government's crack-down on Islamic extremists. The following year, in 1994, they were imprisoned despite much protest from their followers. They spent five years in jail until their release in 1999 due to pressure from | 1962(a), 1962(c), 1962(d) |

radical groups. During their imprisonment, al Qaida and its affiliate groups vigorously defended their spiritual leaders Al-Hawali and Al-Oadah. After al Qaida terrorist attacks, including the 1995 bombing of the U.S. National Guard Khobar Towers and the 1998 U.S. Embassy bombings, bin Laden himself and other Al Qaida members would repeatedly call for the release of their spiritual leaders Al-Hawali and Al-Oadah as a condition precedent for their ceasing terrorist activity.

In fact, in his 1996 Fatwa entitled Declaration of War against the Americans Occupying the Land of the Two Holy Places," bin Laden specifically called for the release of Al-Hawali and Al-Oadah from prison:

> "By orders from the USA they also arrested a large number of scholars, Da'ees and young people - in the land of the two Holy Places- among them the prominent Sheikh Salman Al-Oud'a and Sheikh Safar Al-Hawali and their brothers; (We bemoan this and can only say: "No power and power acquiring except through Allah")...The imprisoned Sheikh Safar Al- Hawali, may Allah hasten his release..."

In addition, Al-Hawali and Al-Oadah were directly connected to the 9/11 hijackers through Mohammed Atta and members of his Hamburg cell including Mounir Motassedeq who has already been convicted in Germany as an accessory to over 3,000 counts of murder for his involvement in the September 11, 2001 attacks. Motassedeq had the numbers of both Al-Oadah and Al-Hawali in his phonebook, indicating that Motassadeq was in contact with them in the time leading up to the September 11, 2001 attacks.

As far back as 1990, Al-Hawali made known his vision for Osama bin Laden's war against the United States and the West:

> We have asked the help of our real

| | |
|---|---|
| | enemies in defending us. The point is that we need an internal change. The first war should be against the infidels inside and then we will be strong enough to face our external enemy. Brothers, you have a duty to perform. The war will be long. The confrontation is coming. |
| | In an open letter to President Bush on October 19, 2001, Al-Hawali wrote: "In the midst of this continuous confusion and frustration, the events of the 11th of September occurred. I will not conceal from you that a tremendous wave of joy…was felt by the Muslim in the street." |
| | Al-Hawali, one of the most radical dissident clerics in Saudi Arabia, is repeatedly cited as a key inspiration by Osama Bin Laden himself. He is personally listed on the incorporation documents for Mercy International Relief Agency-Dublin, a charitable-front group that is suspected of providing funds for Al Qaida terrorist operations. Mercy's head office in Dublin, Ireland has been linked in published reports to Zacarias Moussaoui and other conspirators in the September 11 suicide hijackings. |
| | In a televised interview, Al- Hawali referred to America as a "tyrannous and evil nation that Allah is manipulating, unbeknownst to it, until it reaches the end to which it is sentenced." |
| | In addition, plaintiffs have alleged that Safar al-Hawali was one of the original incorporators of the Mercy International Relief Agency (MIRA) in Dublin. MIRA, working as a front for al Qaida, was deeply involved in the planning and funding of the 1998 U.S. Embassy bombings in Kenya and Tanzania. |
| | Al-Oadah has repeatedly and openly advocated suicide bombings and the destruction of the West. *See WTC* ¶ 515. According to FBI Special Agent Michael Gneckow, defendant Sami Omar Al-Hussayen helped Al-Oadah and Al-Hawali set up websites which could be used to spew their vitriolic hate for America "to the |

|  | widest audience possible." |  |
|---|---|---|
|  | Defendant IANA published statements by three radical sheikhs including Al-Oadah on numerous occasions including May 15, 2001, which the FBI noted "extolled the virtue of and advocated suicide operations and martyrdom as necessary and permitted aspects of world jihad". Al-Oadah wrote: |  |
|  | The second part of the rule is that the Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on. This is not possible except by involving the human element in the operation. In this new era, this can be accomplished with the modern means of bombing or bringing down an airplane on an important location that will cause the enemy great losses. |  |
|  | During the search of a former Al Qaida safe house in Afghanistan after September 11, 2001, tapes of Al-Oadah preaching for jihad were found. As Agent Gneckow testified: |  |
|  | Q. And the tapes dealt with what, generally speaking? |  |
|  | A. They were generally motivational speeches, talking about Jihad, talking about -- basically motivational sort of speeches. Lectures. |  |
|  | Absent the material support and sponsorship provided by Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |