**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.:
SEPTEMBER 11, 2001                             03 MDL 1570 (RCC)


-------------------------------------------------------x

This document relates to:
    *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development*
        *Corp. et al., Civil Action No.: 04-CV- 1923  (RCC)*

**PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS**
**AS TO DEFENDANT DAR AL MAAL AL ISLAMI A/K/A DAR-AL-MALL AL**
**ISLAMI A/K/A DAR AL-MAAL AL-ISLAMI (DMI) REFERRING TO AND**
**INCLUDING DAR AL MAAL ADMINISTRATIVE SERVICES, SA A/K/A DMI**
**ADMINISTRATIVE SERVICES SA AND  DAR AL MAAL AL ISLAMI TRUST**

Counsel for the above captioned Plaintiffs hereby provide a more definite

statement/additional allegations ("More Definite Statement") as to the above referenced

Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the

Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management

No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004,

paragraph 13.

Dated:  September 30, 2005
                              Respectfully submitted,


                              _____
                              Jerry S. Goldman, Esq. (JG-8445)
                              Frederick J. Salek, Esq. (FS-8565)
                              Gina M. MacNeill, Esq. (GM-0581)
                              LAW OFFICES OF JERRY S. GOLDMAN
                                 & ASSOCIATES, P.C.
                              111 Broadway, 13th Floor
                              New York, N.Y. 10006
                              212.242.2232

                              *Attorneys for the Plaintiffs*

# EXHIBIT 1

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT DAR AL MAAL AL ISLAMI A/K/A DAR-AL-MALL AL ISLAMI A/K/A DAR AL-MAAL AL-ISLAMI (DMI) REFERRING TO AND INCLUDING DAR AL MAAL ADMINISTRATIVE SERVICES, SA A/K/A DMI ADMINISTRATIVE SERVICES SA AND DAR AL MAAL AL ISLAMI TRUST

1. The name of the defendant to whom this Statement pertains is Dar Al Maal Al Islami a/k/a Dar-Al-Maal Al Islami a/k/a Dar Al-Maal Al-Islami (DMI) referring to and including Dar al Maal Administrative Services, SA a/k/a DMI Administrative Services SA ("DMI SA") and Dar Al Maal Al Islami Trust ("DMI Trust") (herein after collectively known as "DMI"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

b. In the Mid 1990's to September 11, 2002, DMI conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* , affairs and participated in the operation or management of the operation of the Enterprise itself.  DMI  conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, DMI conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

   c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

   d.   The predicate act is not based upon a criminal conviction.

   e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

   f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

   g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including DMI , to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

   a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et. al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et. al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

   b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of

which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.     Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. DMI fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including DMI, and illegal activity to generate material support to continue its terrorist operations.

c.   DMI was not an employee, officer or director of the Enterprise, based upon present information available.  DMI is associated with the alleged Enterprise.  DMI is a member of the Enterprise, and is separate and distinct from the Enterprise.  DMI intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\DMI- More Definite Statement - AL BAraka_b.doc

7. The pattern of racketeering activity conducted by DMI is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by DMI funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by DMI , relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. DMI acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including DMI, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including DMI, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of DMI, of both those goals and the uses to which the Funds were put.

    b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like DMI. Indeed, the Enterprise would not have been

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\DMI- More Definite Statement - AL BAraka_b.doc

successful without enthusiastic participation of all of the conspirators, including DMI. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by DMI. DMI, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. DMI conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. DMI conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. DMI also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are

in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against DMI are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. DMI has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. DMI conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  DMI conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended. [1]

21. Dar Al Maal Al Islami Trust ("DMI Trust") and DMI Administrative Services, S.A. ("DMI S.A.") are part of a network of related and intertwined financial institutions, collectively known as Dar Al Maal Al Islami ("DMI"), also known as the "House of Islamic Money" – created on July 29, 1981 and headquartered at avenue Louis-Casai 84, in Cointrin, Geneva, Switzerland.

**Organizational Structure and Purpose of Dar Al  Maal Al Islami, DMI Administrative Services S.A. and Daar Al-Maal Al-Islami Trust**

22. DMI is the predecessor-in-interest to DMI Trust and DMI S.A. DMI S.A. is located in Geneva, Switzerland. The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions."[2] These continents include North America, Europe, Africa and Asia.  DMI S.A. provides assistance to the

---

[1] Plaintiffs further incorporate herein More Definite Statements filed in connection with the O'Neill cases as to any defendant referenced in the following paragraphs.

[2] Annual Report DMI Trust 2002, p. 3.

Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology."[3]   Therefore, DMI Trust and DMI S.A. directly participate in the oversight and management of DMI Trust's subsidiary and associate entities. DMI Trust owns 100% of DMI S.A. DMI S.A. is both a wholly owned subsidiary and an agent of DMI Trust. DMI S.A. and DMI Trust are referred to collectively herein as "DMI." The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money").

23. DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank, as described herein. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

24. DMI Trust is an Islamic Financial Institution founded in 1981.[4] "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."[5] Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. Asset management, however, is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board. The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."[6] DMI S.A. is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust. DMI S.A. acts as one of DMI Trust's operational arms.

25. Since its establishment, DMI has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modern era. DMI was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."[7] DMI is one important element

---

[3] Id.

[4] Annual Report DMI Trust 1994, p. 2.

[5] Id.

[6] Id.

[7] Dr. Ali Hassan Abdel Kader, member of the Sharia Control Authority of DMI, "Report on the Islamic Economy and Contemporary Transactions," published by DMI, (1981). Preface

Page 11

of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."[8] "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim. The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."[9]

26. Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen. As Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

27. In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to financial jihad: "May Allah bless your Jihad and all your efforts.  May He aid you and affirm your faith."[9]

28. Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

## DMI Liability

29. DMI has, over a period of many years, directly and through its subsidiaries and affiliates, knowingly provided material support and resources to al Qaeda and/or affiliated individuals and entities. DMI's misconduct includes laundering money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. In addition, DMI's *Zakat* accounts have been used to support al Qaeda. In addition, DMI companies have facilitated financial transactions for, and advertised, maintained and serviced accounts on behalf of, several of al Qaeda's known charity fronts, including al Haramain Islamic Foundation, International Islamic Relief Organization and the Muslim World League. Both the United States and the Kingdom of Saudi Arabia have

---

authored by Dr. Ibrahim Moustapha Kamel, Executive Vice President to the President of the Administrative Council of DMI.

[8] Id.

[9] Id.

designated as al Qaeda terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for the financial, material and logistical support they provided to al Qaeda. DMI S.A. has handled the accounts of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaeda goals.

30. DMI Trust is a major shareholder in Al Shamal Bank, which Osama Bin Laden helped to establish in 1991 by providing capital of $50 million. Additionally, Faisal Islamic Bank (Sudan), another major shareholder of Al Shamal Bank is a subsidiary of defendant Islamic Investment Company of the Gulf (Bahrain) EC, which is in turn a wholly-owned subsidiary of DMI Trust. Moreover, another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan). Al Shamal Bank regularly provided financial and account services to al Qaeda operatives – six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

31. Islamic Investment Company of the gulf is based in Bahrain. It recently merged with Faisal Islamic Bank, and the new entity is called Al-Shamil Islamic Bank. Al-Shamil Islamic Bank is a subsidiary of DMI Trust. One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

32. DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

33. DMI is a primary vehicle for Saudi financing of the international Islamic fundamentalist movement. For example, Faisal Islamic Bank was implicated during the 2001 U.S. trial on the 1998 embassy bombings in Africa as holding bank accounts for al Qaeda operatives.

34. Functioning on an Islamic method, DMI adheres to the Zakat system. After the transaction is made, the funds earmarked as Zakat disappear and are off the books. Later, under no financial regulation, the money may be used to fund radical Islamic groups. Islamic banking institutions operate by participating in investments, sharing profits on projects, and earning fees for services performed.

35. Al Qaeda raises money from a variety of individuals, charities and businesses, including banks and financial institutions. Once raised, finances are transferred through banks and financial institutions, through individual accounts and accounts maintained by charities and other businesses. Money is also transferred through alternative remittance systems such as hawala, travelers' checks and directly by transporting and delivering cash. The simplest, safest and most efficient

mechanism to transfer money, however, "is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy."

36. Al Qaeda has infiltrated and abused the Islamic financial system, a typically legitimate form of investment and finance that abides by Sharia, or Islamic law, which prohibits the earning or payment of interest. "Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations. Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement. Moreover, al Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system."

37. A number of businesses and financial institutions which provide material support to al Qaeda do so through a complex web of inter-related corporations, charities, and financial service companies. These entities purposefully create subsidiaries with inter-locking directors and business ventures, in part, to conceal the distribution of funds for terrorist purposes. Such institutions maintain several associations, joint ventures and subsidiary banks which are used to finance and facilitate Osama bin Laden and the al Qaeda network.

38. The United Nations Security Council has created a committee to actively address the issue of the use of shell companies and offshore trusts as shields to obscure the identities of those groups or persons active in the financing of terrorism. In a December 2003 report, the Council declared that "such arrangements serve to mask potential terrorist-financing activities, and make it difficult to locate and deal with terrorist-related financial assets...." The Group of Eight (G8) Counter-Terrorism Action Group has "concluded that shell companies, offshore trusts and other beneficial ownership arrangements have allowed [businesses and individuals] to circumvent the full application of the measures set out in the [UN Security Council's anti-terrorism] resolutions."

39. Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world by perverting and taking advantage of every Muslim's religious duty - - payment of Zakat.

40. One of the so-called "five pillars" of Islam is Zakat, or almsgiving. The Quran requires every Muslim, both as individuals and corporations, to give Zakat for

specific charitable purposes as identified in the Quran. The standard rate for Zakat is 2.5% of current assets and other items of income.

41. Each year, every able Muslim citizen and company is obligated to donate 2.5% of his or its assets, in money or kind, to the poor and indigent as specified in the Quran. This legal and religious duty is generally satisfied by yearly donations to charities. Many of these charities have financed and continue to finance international terrorism under the cover of supporting Islamic schools, mosques, or orphanages.

42. It is estimated that hundreds of Saudi-based charitable organizations distribute as much as four billion U.S. dollars ($4,000,000,000.00) each year. Zakat funds are often provided in cash to prominent, trusted community leaders, or to institutions such as banks, which then commingle and disperse donated monies to persons or charities that they deem worthy. These practices have allowed unscrupulous front groups or charities to fund violent, extremist Islamic groups, including al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror which occurred on September 11, 2001.

43. Islamic businesses and financial organizations are major donors to Islamic charities as a result both of their own corporate Zakat obligations as well as their guidance and involvement in the distribution of the Zakat payments of their individual investors. Most Islamic financial institutions maintain a Zakat Department. This department selects the recipients for the business' own Zakat donations and is charged with ensuring that the Zakat is in fact distributed to worthy and appropriate recipients so that the donation satisfies the business' religious obligation as set forth in the Quran and under Sharia law. As a result, Islamic religious charities have tremendous influence and power in the Middle East and throughout the world.

44. Islamic financial institutions, through their Zakat Departments, also typically provide services to individual investors to assist them in selecting recipients for their Zakat funds and also to facilitate the actual donations. Investors make use of these services and do so in reliance on the financial institution to ensure that the donation is made to worthy recipients so that the donation complies with Sharia law and satisfies the investor's Zakat obligation. DMI engages in the Zakat services described above.

45. Islamic financial institutions that adhere to Sharia principles must also calculate the percentage of unlawful or unacceptable income that is collected but is considered unacceptable according to Sharia principles. This income is referred to as "Haraam," or forbidden. Examples of Haraam income include, among other things, any interest that is earned as a result of an account holder's credit balance and any income derived by a corporation from impure activities such as gambling or the sale of liquor. The donation of Haraam income that must be given away cannot count as a virtuous or charitable act. As such, it cannot fulfill a Muslim's

Zakat obligation. Donations of Haraam income, then, are made in addition to the donations made to satisfy the Zakat requirement.

46. In addition to the actual monetary donations to charities, Islamic businesses like DMI also provide a broad range of facilities, material support, and services to charities and individuals and in some cases directly to al Qaeda through their various subsidiaries and investments. These activities include assistance in the actual distribution of both individual and corporate Haraam and Zakat obligations.

47. As partners, the financial institution and its associates, conspirators or agents have a close and collaborative relationship that requires that the bank be aware of the project or business involved in the transactions, the source of its funding, and its goals, successes and failures. In other words, the Islamic financial institution's relationship to its investment "customer" is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.

48. Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from both Zakat and Haraam donations made by and/or passed through Islamic businesses on behalf of themselves and/or their investors, and they rely on financial institutions, including DMI and its subsidiaries, to facilitate the illicit transfer of funds.

49. Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate through the Zakat system to his terrorist organization. In December 1998, during an interview with ABC News, Osama bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God."

50. On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including al Qaeda, as international terrorist entities. Osama bin Laden and his sponsors and followers were known to openly promote hatred and violence against innocents long before this time.  On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other assistance in support of terrorism. The list of these "Specially Designated Global Terrorists" or terrorist organizations ("SDGT") included Osama bin Laden and al Qaeda.

51. In full recognition of Islamic principles, Osama bin Laden and his al Qaeda organization, in partnership with several Saudi and Gulf Islamic banks, founded banking institutes in the Republic of Sudan that provided funding and support for international terrorist operations and organizations and Osama Bin Laden.

52. DMI has also entered into business partnerships with prominent al Qaeda supporters, such as the National Islamic Front, the fundamentalist regime which has ruled Sudan since 1989 and provided safe haven to Osama bin Laden and al Qaeda from 1991 through 1996.

53. Through these actions, DMI has knowingly conspired to support al Qaeda's global jihad, and aided and abetted that terrorist organization.

54. DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

**DMI Trust Supervising Board  Member Hassan Abdallah Al Turabi**

55. Consistent with this founding principle of invoking and organizing a financial jihad, DMI Trust appointed a supervising board of directors who embrace an ideology of violence. Hassan Abdallah Al Turabi served as one of the initial Supervising Board members of DMI Trust. Hassan Abdallah Al Turabi was the Secretary General of the Muslim Brotherhood in the Sudan in the early 1960's, and in 1986 he founded the National Islamic Front in the Sudan. Al Turabi promotes violent jihad as a means to achieve an Islamic state. In 1989, Al Turabi seized power in Sudan by coup and an Islamic state was created. Al Turabi encouraged radical Islamic terrorist groups such as al Qaeda to immigrate to Sudan.

56. In 1991, Osama bin Laden moved to the Sudan where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the al Qaeda network with military and logistical support through the government of Sudan.

57. In 1991 the U.S. State Department reported that:

> Terrorist and militant Muslim groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations.... The National Islamic Front, under the leadership of Hassan Al Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

58. Turabi also provided these groups with business and investment opportunities and in some cases political positions within the Sudanese government. Even before

Page 17

arriving in the Sudan, bin Laden began to invest in the region. He quickly developed a number of joint ventures with prominent National Islamic Front leaders such as Al Turabi. The United States State Department created a fact sheet on Osama Bin Laden which described his activities as follows:

59. Bin Laden relocated to Sudan in 1991, where he was welcomed by National Islamic Front leader Hassan Al Turabi.... He embarked on several business ventures in Sudan in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf.

60. One of these business ventures was the creation of an Islamic bank in the Sudan called Al Shamal Islamic Bank.  "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank." DMI conducted its financial support of jihad by also investing in the Al Shamal bank through the Faisal Islamic Bank of Sudan and the Tadamon Islamic Bank.

61. In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces; and providing for martyrs' families.

62. The ISSF jihad fund's largest public or private contributors were Prince Mohammed Al Faisal Al Saud's Faisal Islamic Bank, which gave 7 million Sudanese Pounds, along with Faisal Islamic Bank subsidiaries Shamal Islamic Bank, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

63. In June of 1991, during the period in which Osama bin Laden was transferring his center of operations to the Sudan, there were 26 Faisal Islamic Bank branches, 13 Tadamon Islamic Bank branches, and two Al Shamal Islamic Bank branches operating in the Sudan.

64. Another personal friend of Hassan Al Turabi is Sheik Omar Abdel Rahman (a/k/a the "Blind Sheik"), who was convicted for the 1993 bombing of the World Trade Center. The Blind Sheik provided religious inspiration to Hassan Al Turabi and Osama bin Laden, issuing a notorious fatwa permitting Afghan-Arab mujahideen

to assassinate Muslims who violated the Sharia and authorizing the killing of President Sadat of Egypt and tourists in Muslim lands. The Blind Sheik was also given refuge in Sudan by Hassan Al Turabi.

65. The government of Sudan and the Blind Sheik assisted Osama bin Laden and his al Qaeda network in the 1993 bombing of the World Trade Center. Sudan sent two intelligence agents to New York who posed as officials of the Sudan UN Mission to the United States. These agents attempted to assist the bombing co-conspirators to leave the country after the attack. One of the agents, Siddiq Ali, served as a bodyguard for Turabi when he visited the United States. Ali was arrested for attempting to blow up New York City landmarks, along with the Blind Sheik and five other Sudanese recruits and members of bin Laden's al Qaeda network.

66. On November 3, 1997, President Bill Clinton imposed a trade embargo against Sudan and a total asset freeze against the Government of Sudan. This was done after learning that the Government of Sudan's policies and actions such as support for international terrorism, efforts to destabilize neighboring governments, and the prevalence of human rights violations constituted an unusual and extraordinary threat to national security and foreign policy of the USA.

67. Turabi endorsed DMI's mission of worldwide jihad through his activities in the Sudan. In 1991, Turabi organized the Popular Arab and Islamic Congress (*Al-Mutamar al-Arabi al'Shabi al-Islami*, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines.  Among their leaders was Co-Defendant Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

68. Khalifa provided material support to Ramzi Youssef, convicted of the World Trade Center bombing in 1993, who was preparing to assassinate Pope John Paul II during a trip to the Philippines in 1995. Youssef was also planning Bojinka -- a plot to simultaneously explode twelve US flagship airplanes over the Pacific Ocean.

69. "There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

70. Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the

PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic.

71. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without *jihad* … the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

72. In October 1994 Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States—the 'Great Satan.'"

73. Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

74. In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught....To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

75. In selecting Turabi, DMI Trust chose as one of its Supervising Board members an Islamic scholar who provided refuge, business opportunities, ideological support and logistical support to Osama bin Laden and the al Qaeda network. Turabi promoted and encouraged international Islamic movements to engage in jihad – the principle espoused by the DMI Trust. Founding DMI board members and spiritual advisors Hassan Al Turabi and Youssef al-Karadawi belong to the Muslim Brotherhood. Considered to be the first Islamic fundamentalist jihadi organization, the Muslim Brotherhood was the model for numerous militant groups, including al Qaeda. The Brotherhood's homepage states the group's basic credo:

> Allah is our objective.
> The messenger is our leader.
> Quran is our law.
> Jihad is our way.
> Dying in the way of Allah is our highest
> hope.

76. During the first meeting of the PAIC, Al-Turabi led the attendees with chants "Down with the USA." In October 1994, Hassan al-Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. At the conference

Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the "Great Satan." Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques" which calls for jihad against Americans.

### Faisal Islamic Bank of the Sudan

77. An associated company of the DMI Trust is the Faisal Islamic Bank of the Sudan.[10] The Faisal Islamic Bank of the Sudan has served on the Board of Supervisors of the DMI Trust.[11] Statements by officials of DMI Trust confirm DMI's direct involvement in Faisal Islamic Bank's operations. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."[12]

78. Prince Mohammed founded Faisal Islamic Bank of Sudan in 1977 in partnership with the National Islamic Front (NIF), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989. Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of the Faisal Islamic Bank. In addition, the NIF has granted Faisal Islamic Bank privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization. Moreover, the bank has supplied loans to the NIF and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the NIF to operate, at least as late as 1992, from the penthouse of the bank's headquarters.[13] Through this association, "Turabi's party became the best financed in the Sudan."[14]

79. Al Qaeda has materially benefited from the business relationship among DMI, Faisal Islamic Bank and the NIF. In 1989, Hassan al Turabi, the ideological and political leader of the NIF, invited Osama bin Laden to move the entire al Qaeda

---

[10] Annual Report DMI Trust 1996, p. 28.

[11] Annual Report DMI Trust 1989, p. 5.

[12] Id.

[13] Judith Miller, "The Islamic Wave," the New York Times Magazine, p.22 (May 31, 1992); *See also,* Jonathan Randal, "Sudan Party Puts New Face on Fundamentalism," Washington Post, A30, Col. 4. (April 7, 1988).

[14] Id.

organization to Sudan. Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991. Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan. During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF, and enjoyed the NIF's complete protection. The protection, support and safe haven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire. In addition, while in Sudan, al Qaeda established several businesses in partnership with the NIF, to fund al Qaeda's campaign to attack America.

80. Absent the support and safe haven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

81. The benefits al Qaeda derived from its relationship with the NIF were made possible, at least in part, by the partnership between the NIF and Faisal Islamic Bank, which partnership helped the NIF retain power in Sudan during the relevant time period. As a corollary, it is reasonable to infer that DMI and Faisal Islamic Bank hoped to reap financial benefit from the NIF's relationships with bin Laden. As Islamic banking institutions, DMI and Faisal Islamic Bank are forbidden to charge interest. Instead, the banks enter into partnerships with their depositors and borrowers, and share in the financial success of those partnerships. As Prince Mohammad al Faisal al Saud has explained: "We make money when our borrowers make money. If they don't we don't collect anything." By virtue of this system, DMI and Faisal Islamic Bank were partners with the NIF in the NIF's endeavors, including those involving Osama bin Laden.

82. Given Faisal Islamic Bank's close relationship with the NIF, and the NIF's direct role in managing the bank's operations, DMI and Faisal Islamic Bank were necessarily aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan. Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized. In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan. News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of *mujihadeen* were traveling to Sudan to receive terrorist training. By virtue of these reports, and their close relationship with the NIF, DMI and Faisal Islamic Bank necessarily were aware of al Qaeda's relationship with the NIF during this time.

83. Al Qaeda was so confident in the absolute protection of the NIF that it openly maintained accounts at Faisal Islaimc Bank. Former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum had held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

Q. Where were the accounts [of al Qaeda] held? In what

countries?

A. (…) we got account in Bank Faisl Islami [Faisal Islamic

Bank].

Q. Is that also in Khartoum?

A. Yes.[15]

## Connections To The Al Shamal Islamic Bank of Sudan

84. The Faisal Islamic Bank of the Sudan was a founding member of the Al Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.[16] The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development. Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, Al Baraka for Investment and Development, and Sheik Saleh Abdullah Kamel.

85. The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank which was a founding shareholder of the Al Shamal Islamic Bank. The Tadamon Islamic Bank was formed in the Sudan on November 28, 1981.

86. A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps.... Jihad has now become an obligation that comes before any other duty."[17]

87. DMI Trust is a major investor in Al Shamal Bank. Another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan).

88. The Al Shamal Islamic Bank was capitalized by Osama bin Laden in the amount of fifty million U.S. dollars ($50,000,000.00). "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal."[18] Osama bin Laden continued to use this bank to finance his terrorist training activities in Sudan and to support his world wide terrorist network. In addition, Al Shamal Bank regularly provided financial and

---

[15]  Testimony of Jamal Ahmed Al-Fadl, *United States v. Osama bin Laden*, *et al.*  (S.D.N.Y. February 6, 2001).

[16]  Statement by Al Shamal Islamic Bank (October 1, 2001).

[17]  "Sudanese students enroll for controversial military service," AP News (June 6, 1998); AP News (August 4, 1998).

[18]  Congressional Research Service, "Terrorism: Near Eastern Groups and State Sponsors," p. 16 (February 13, 2002).

account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts.  Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

89. Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank.[19] Osama bin Laden also financed the al Qaeda network in part through the Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
>
> $1,200 a month.
>
> For how long did you work for him [Osama bin Laden]?
>
> Almost two years.
>
> What Banks did he keep his money at?
>
> Bank Al Shamar.[20]
>
> [In responding "Bank Al Shamar," Al-Fadl    as referring to Al Shamal Islamic Bank.]

90. Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaeda representative in Jordan.[21] In the same trial, another former al Qaeda operative stated that the Al Shamal Islamic Bank was used for operational purposes. The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) *via* the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden.[22]

91. The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank. The accounts were opened on March 30, 1992 for the company Al-Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a

---

[19] Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 6, 2001).

[20] Id.

[21] Id.

[22] Testimony of Essam Al Riddi, U.S.A. v. Osama bin Laden (February 14, 2001).

company registered in Saudi Arabia.[23]  This company, according to the U.S. State Department, was founded by prominent National Islamic Front members and exercises a monopoly over major agricultural exports from the Sudan.[24]

92. Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that Al Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.[25]

93. The Chairman of the Al Shamal Islamic Bank was Adel Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaeda network. In 1993, the government of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaeda. Adel Batterjee is a United States specially designated global terrorist.

**Tadamon Islamic Bank**

94. The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank, which was a founding shareholder of the Al Shamal Islamic Bank. Jamal Al-Fadl testified in the criminal trial concerning the 1998 Embassy bombings that the Tadamon Islamic Bank was used by members of al Qaeda to fund the terrorist attacks and to generally support the network.[26]

**Faisal Islamic Bank of Egypt**

95. Designated terrorist and Co-Defendant Youssef Nada[27] co-founded Faisal Islamic Bank of Egypt with former DMI Trust chairman Prince Mohammed Al Faisal Al Saud. Youssef Nada is the director of Al Taqwa Bank (a Specially Designated Global Terrorist entity) and a member of the Egyptian Muslim Brotherhood and Gama'a al-Islamiya, which is directly allied with al Qaeda through Dr. Ayman al Zawahiri. In 1970 Nada moved to Saudi Arabia and established contact with

---

[23] Statement of Mohamed S. Mohammed, Al Shamal Islamic Bank (September 2001).

[24] U.S. State Department Fact Sheet on Osama bin Laden (August 14, 1996).

[25] Statement of Senator Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (September 26, 2001).

[26] Testimony of Jamal Ahmed Al-Fadl, U.S.A. v. Osama bin Laden (February 20, 2001).

[27] The United States Department of the Treasury designated Youssef Nada as a Global Terrorist on November 6, 2001 for his role in funding al Qaeda *via* his Al Taqwa bank. (*Source: OFAC bulletin, November 7, 2001.*)

members of the Saudi Royal family, and in 1977 he and Mohammed Al Faisal Al Saud established the Faisal Islamic Bank in Egypt.[28]

96. Faisal Islamic Bank of Egypt was heavily involved in the Bank of Credit and Commerce International (BCCI) banking fraud scandal of the 1970s and 1980s. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA)[29] rapidly spread to become a vast fraudulent empire. BCCI head Khalid bin Mahfouz was indicted in the United States on July 1, 1992 on criminal fraud charges and ultimately paid two hundred twenty-five million U.S. dollars ($225,000,000.00) in a settlement with U.S. prosecutors.  The 1992 Senate Investigative Report on BCCI detailed the bank's role in supporting terrorism via massive diversions of laundered money.[30] Faisal Islamic Bank of Egypt moved approximately five hundred fifteen million five hundred thousand U.S. dollars ($515,500,000.00) of its deposits into overseas BCCI accounts.[31] A "major creditor of BCCI,"[32] Faisal Islamic Bank of Egypt was the main source of unrecorded deposits used by BCCI to conceal losses.

97. DMI Trust board members continue to participate in the regulation of Faisal Islamic Bank of Egypt. Through the conduct described above, DMI has knowingly and intentionally conspired to channel material support to al Qaeda, and aided and abetted al Qaeda in its ongoing campaign to attack America.

### Faisal Finance S.A. (Switzerland)

98. One of DMI's Trust subsidiary institutions is Geneva- based Faisal Finance S.A. DMI Trust and its subsidiary Shamil Bank own the majority of Faisal Finance S.A. capital. Yassin al-Qadi, who has been indicated as a top financial sponsor of HAMAS, was designated on October 12, 2001 as a terrorist by the United States government under the criteria established in Executive Order 13224 for his financial support of al Qaeda. Yassin al-Qadi heads the Muwafaq Foundation. An SDGT entity, Muwafaq was created by Qadi and Khalid bin Mahfouz as an al Qaeda front company, and has been used to transfer millions of dollars to bin Laden. In 1995, bin Laden himself described Muwafaq as a central element to his financial network.

---

[28] Paul W. Rasche, "The Politics of Three - Pakistan, Saudi Arabia, Israel," *Studien von Zeitfragen* 35, Jahrgang InternetAusgabe 2001, p. 6 (December, 2001). Also published under the name F. William Engdahl.

[29] John Aloysius Farrell, "With Probes, Making His Mark," the Boston Globe (June 20, 2003)

[30] Senate Foreign Relations Committee Investigative Report on the BCCI Affair (December, 1992).

[31] William E. Schmidt, "Egypt Takes Control of BCCI Affiliate," Wall Street Journal.

[32] http://www.icclaw.com/1500/formex/pps/ukp51973.htm.

**Islamic Principles and *Zakat***

99. DMI and its affiliated and subsidiary companies have also channeled support to al Qaeda through the distribution of *Zakat* and *haraam* funds. DMI and its affiliates operate under Islamic principles of finance, paying no interest on investments, and performing financial transactions inline with *Sharia* (Islamic law).

100.      To ensure that the investments and activities of DMI and its subsidiaries and affiliates comply with *Sharia* principles, DMI, like virtually every Islamic bank, maintains a Religious Board to oversee operations and ensure compliance with Islamic law.

101.      One important recommendation from the Religious Board is the amount of Zakat which should be distributed and the manner in which those funds should be disbursed. Each year the Religious Board has advised that over two million two hundred thousand U.S. dollars ($2,200,000.00) should be designated from the DMI for Zakat appropriation.  Subsumed within this amount is also the Zakat distributed on behalf of DMI's equity participants.

102.      The Religious Board plays a crucial role in determining the amount, manner and purposes for which *Zakat* is distributed.  *Zakat*, or almsgiving, is one of the five pillars of Islam. The Quran requires every Muslim, both as individuals and corporations, to give *Zakat* for specific charitable purposes as identified in the Quran.

103.      One previous member of the Religious Board of DMI Trust was Youssef al-Karadawi. Karadawi is the spiritual leader of the Muslim Brotherhood who promotes the DMI philosophy of jihad. On May 12, 2001, Karadawi stated that:

104.      The suicide mission is the loftiest form of jihad. We are talking about a heroic act of sacrifice and sanctification. The person who redeems his soul for Allah, sacrifices himself as a sacrifice for his religion and people, and fights the enemies of Allah, with new weapons that fate awarded to the downtrodden, in order to fight with these means against the tyranny of the arrogant.

105.      Youssef al-Karadawi was also a shareholder of Bank Al Taqwa in the Bahamas, which has been identified by the United States government as a financial supporter of al Qaeda. At the time of the Bank's designation President George Bush declared that:

106.      Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world. Al Taqwa raises funds for Al Qaeda.

107.      Karadawi has been barred from entering the US since November 1999 for his alleged support of terrorism and affiliations with al-Qaeda associates. He

teaches at Qatar University in Doha, and serves as Chairman of Qatar Bank's Sharia board.

108.    In another interview in Palestine Times, Karadawi stated:

The foreign military presence in the Arab world is in fact a new imperialist invasion.

The Islamic resistance in Lebanon and Palestine represents the glorious face of the Muslim Umma and serves as an example to that effect. As for the martyrs, I have issued a religious edict blessing the martyrdom operations in which a given Muslim fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy.

These heroes are carrying out the duty of Jihad on behalf of the entire Umma. Jihad and Resistance is our fate and destiny; it is a duty upon us.

109.    Karadawi has also endorsed the killing of American military personnel stationed in the Middle East. In an al-Quds Press Agency interview Karadawi stated: "Those killed fighting the American forces are martyrs given their good intentions since they consider these invading troops an enemy within their territories but without their will."

110.    Fatwas issued by Youssef al-Karadawi have long  appeared on numerous Islamic websites with broad readerships.  One such site is www.islam-online.net. Though based in Qatar, the site considers itself to be "global" and "multilingual," with content appearing in both Arabic and English and boasting a "global presentation" to reach out to "all people, Muslim and non-Muslim, without regard to geographic boundaries, religion, language, background, culture or gender." Karadawi heads up the Sharia advisory created by the website's owners to ensure the site's content remains in accordance with Islamic standards.

111.    On this webpage, Karadawi has referred to "the marvelous fighting carried out by our brothers in Chechnya" as "one of the best kinds of Jihad in the Cause of Allah:"

There is a scholarly consensus (Ijma`) that whoever fights in defense of his religion, land and household, and is killed in that fighting, is considered a Martyr (Shahid). ...we are sure that Allah the Almighty will help [the Chechen fighters] put their enemy to rout, grant them victory and help them gain supremacy in their lands. ...The recent days augurs (sic) victory for Chechnya, and the Promise of Allah will for sure come true soon.

112.     Other fatwas authored by Karadawi urging jihad can be seen on www.islam-online.net. In one, he encourages Muslims to wage jihad on all non-Muslims, declaring:

> Disbelievers are all alike. Capitalists, Communists, Westerners, Easterners, People of the Book [Christians and Jews] and pagans are by no means different from one other. They should all be fiercely fought if they attempt to occupy any part of the Muslim land.

113.     Waging war on the unbelievers, Karadawi states in his fatwas, is an ideology that must be embraced by all  Muslims, and must be supported by their financial means.  "Declaring Jihad to save our land is an Islamic obligation," he states; it is "incumbent on all Muslims to take part in Jihad." Karadawi endorses the use of the Zakat payments to support jihad efforts:

> If war is waged anywhere to achieve [the liberation of Muslims from] the tyranny of disbelievers, it is undoubtedly a case of Jihad for the sake of Allah. It thus needs to be financed from the money of Zakah....

114.     Prince Mohammed Al Faisal Al Saud, former Chairman of DMI Trust and Faisal Islamic Bank of Sudan, stated: "We make money when our borrowers make money. If they don't we don't collect anything." He said there was well over twelve billion U.S. dollars ($12,000,000,000.00) kept in cash in Saudi hands "because these religious people do not believe that they should put them in banks that collect or give interest." He said he hoped his Islamic banks would attract these funds, and said that over the brief period they had been in business—one year—they were already doing so.

115.     Prince Mohammed Al Faisal and DMI Trust sought the investment and distribution business of the Saudi religious elite that collect millions of dollars for the purpose of promoting Islam and funding religious works. These religious leaders also promote the same jihadist ideals as espoused by DMI. DMI supports radical and violent jihad by facilitating the transfer of funds from the religious Saudi elite to jihad groups, including al Qaeda.

116.     One cause that DMI S.A. has supported is the Islamic Center of Geneva. Established in Geneva in 1961 by the son-in-law of Hassan al-Banna, founder of the Egyptian Muslim Brotherhood and of co-defendant Muslim World League, the Islamic Center has received financial support from DMI S.A. The Center has also received financial support from Bank Al Taqwa, designated a terrorist entity by the United States government. Al Taqwa is headed by Specially Designated Global Terrorists Youssef Nada and Ahmed Idris Nasreddin. Youssef Al-Karadawi, a former member of the Religious Board of DMI Trust, also was a shareholder of Bank Al-Taqwa. On January 4, 2002, the Deputy General Counsel

of the United States Department of the Treasury wrote to prosecutors in Switzerland stating that:

> [b]ased on information available to the United States Government, we have a reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist-related organizations....Bank Al Taqwa was founded in the Bahamas and is a close affiliate of Al Taqwa Management Organization....The Malta and Lugano, Switzerland branch offices of Al Taqwa Management Organization receive money that 'pours in' from Kuwait and the United Arab Emirates for Osama bin Ladin....As of late September 2001, bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada and Ali bin Mussalim. Nada has a controlling interest in, and is chairman of, Bank Al Taqwa, and Mussalim is involved in Bank Al Taqwa operations. Since the 1980s, following the pullout of the Soviet army from Afghanistan, Mussalim, assisted by Nada, has been providing indirect investment services for Al Qaida, investing funds for bin Laden, and making cash deliveries on request to the Al Qaida organization.

117.    The Islamic Center of Geneva provided a support network for al Qaeda's terrorist activities. In 1991, the son of the Islamic Center's founder organized a conference at which Ayman al-Zawahiri and the "Blind Sheik" Omar Abdel Rahman, indicted for his role in the 1993 World Trade Center bombing, were present. As further evidence of the Islamic Center of Geneva's association with al Qaeda, Islamic convert Albert Huber (a board member at Youssef Nada's company) acknowledged that he used his connections to the Center to meet with members of Osama bin Laden's al Qaeda network in Lebanon.

118.    DMI Trust satisfies its Zakat obligations by directly funding the al Qaeda network and by financially supporting charities and other groups which it knows support al Qaeda. DMI Administrative Services has directly funded an al Qaeda operative whom the United States Treasury has specially designated as a Global Terrorist. In addition, Islamic financial institutions identify and calculate Haraam income for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute Haraam income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with Sharia law. As a result of those obligations and services, Islamic financial institutions were and are directly involved in the selection of beneficiaries and the donation of billions of their own and their depositors' dollars to charities that sponsor terrorism.

119.    In addition, Islamic financial institutions like the DMI companies identify and calculate *Haraam* income - income that is collected but is considered unacceptable according to *Sharia* principles – for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute *Haraam* income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with *Sharia* law. In addition, DMI Trust and its affiliates and subsidiaries have their own *Haraam* obligation that must be calculated and subsequently donated to charity.

120.    Rather than provide charity directly to the needy, DMI and its affiliates disburse *Zakat* and *Haraam* funds under their control to charities of their own choosing. The charities, in theory, are to disburse the money to the needy. As a result, Islamic financial institutions like DMI are directly involved in the selection of charities to receive donations of their own and their depositors' dollars.

121.    The charities selected by DMI Trust or its agents materially supported, aided and abetted al Qaeda, international terrorists and their activities. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

122.    For a period of many years, DMI and its affiliated and subsidiary companies have known that many of the ostensible charities to which they channeled *Zakat* and *Haraam* funds were, in fact, fronts for al Qaeda. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

123.    In addition, DMI Trust's subsidiary Faisal Islamic Bank and the Islamic Investment Company of the Gulf actively participated in the collection of funds for certain of al Qaeda's "charitable" front organizations. For example, co-defendant IIRO solicited donations through full-page advertisements run in leading Islamic journals.  These advertisements, which called for *Zakat* donations to assist the needy in Chechnya, Bosnia, and other such areas, often provided account numbers to facilitate the contribution of funds. In many of these advertisements, which ran throughout the 1990s to the present in such publications as the English-language Muslim World League Journal (an Islamic periodical distributed widely throughout the United States), account numbers appeared for Faisal Islamic Bank and the Islamic Investment Company of the Gulf.

124.    During the time period that Faisal Islamic Bank provided the foregoing support and services to MWL and IIRO, the involvement of those ostensible charities in the sponsorship of al Qaeda was well known in the Arab and Muslim communities. Indeed, between 1992 and 2001, numerous media reports and statements by government officials implicated the MWL and IIRO in al Qaeda

activities, plots and attacks in Pakistan, Afghanistan, Egypt, India, Kenya, Tanzania, the Philippines and elsewhere.

125.    DMI and its affiliated and subsidiary companies were necessarily aware of the reports and investigations implicating prominent Islamic charities, including IIRO and MWL, in the sponsorship of al Qaeda. In fact, in order to comply with its obligations under *Sharia*, DMI's Religious Board was required to carefully investigate and screen the "charities" selected to receive *Zakat* and *Haraam* contributions from the DMI companies, to ensure that those "charities" were using donated funds for purposes authorized by the Quran. As a result, DMI Trust knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

126.    Despite the actual knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of *Zakat* and *Haraam* contributions on their own behalf and on behalf of their investors, depositors and account holders.  Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

127.    For instance, as early as 1992, DMI, its affiliates, agents or predecessors in interest knew or had to know that Osama Bin Laden and al Qaeda were directly collaborating with the International Islamic Relief Organization as part of the Bin Laden Organization's recruitment and training efforts which were crucial to the expansion of al Qaeda. In late 1992, a major Egyptian daily, *Rose Al Yusuf*, reported that the IIRO and Bin Laden Organization in Egypt recruited and sponsored more than 700 Arab operatives to travel to Afghanistan to train as jihadist terrorists. It was also widely reported in the international media that the Cairo office of the IIRO was managed by the Bin Laden family and Mohamad Showki Al Istanbul, who was sentenced to death in Egypt for his Islamic extremist activities. The IIRO was shut down by Egyptian authorities later in 1993 or early 1994 as a result of the charity's links to Osama Bin Laden.

128.    With operations in Egypt, DMI knew or had to know that the Muslim World League office in Cairo was also managed by Osama Bin Laden. Along with the IIRO Cairo offices, the MWL served as a direct recruitment and transit facility for jihadists on their way to Afghanistan. As a May 1993 *Rose Al Yusuf* article describes:

> Working with Palestinian Islamist Shaykh Abdallah Azzam, Bin-Ladin set up the 'Jihad and Relief" guesthouse in Peshawar to receive volunteers who would arrive after a short stop in the al-Ansar guesthouse in Jeddah. The route of this process passed through the unlicensed Cairo office

of the Islamic World League [MWL], directed by Dr. Abdallah Umar Nasif.

129.    DMI knew or had to know that the Muslim World League was directly funding and materially supporting al Qaeda.   Plaintiffs' Third Amended Complaint describes the pre-September 11th testimony of a high level al Qaeda operative, Mohammed Bayazid, who described how Osama Bin Laden's brother-in-law, convicted terrorist and IIRO employee, Jamal Khalifa, opened a Muslim World League office in Pakistan for the use of the founders of al Qaeda to recruit, train and equip al Qaeda terrorists.

130.    DMI knew or had to know that al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. DMI also knew or had to know that al Qaeda was and is the manager and recipient of millions of dollars from charities which DMI supported financially.  As such, DMI aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists and international terrorist activities.

131.    Despite the actual and/or implied knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of Zakat and Haraam contributions on their own behalf and on behalf of their investors, depositors and account holders. Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

132.    As a result of its obligation to inquire and its access to information about its investors and depositors, DMI knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and account holders, to certain charities, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

**United States Contacts and Jurisdiction**

133.    DMI sought and seeks depositors from the general public throughout the world. It also sought and seeks capital from its shareholders. DMI makes its money from investing its depositors' money and from investing its own and others' capital. DMI, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

134.    In its quest to seek world wide participation, DMI advertises in the United States. A full page advertisement was published in the Wall Street Journal in 1981 announcing the "Foundation of Dar Al Maal Al Islami With a Capital of 1000 Million Dollars." In its 'Covenant and Call to Ummat Al Islam,' DMI executed a declaration that included the following statement:

> The Founders observe with dismay the pernicious temptation Afforded to Muslims by the all pervasive influence of the Riba-dominated financial structure established in Ummat Al-Islam in imitation of institutions alien to it, and the Founders will join in a Holy Struggle for the sake of Allah, exalted be his Name, to eliminate Riba from Ummat Al-Islam since Riba as defined by the Glorious *Sharia* is banned by Allah.[33]

135.     By advertising in a major United States publication with nationwide circulation and soliciting business from American consumers in support of a "holy struggle" in the slightly veiled language of jihad, DMI illustrates that it has purposefully directed its material support for Islamic extremist activities at the United States for more than two decades.

136.     On November 27, 1984, Faisal Islamic Bank (Egypt), Faisal Islamic Bank (Sudan) and Dar Al-Maal Al Islami (DMI) ran an ad in the *New York Times* stating that they would be unable to attend a Conference on Islamic Banking and Finance at the Westbury Hotel, New York on December 12, 1984 "due to conflict with DMI's Annual General Meeting in Istanbul. It is therefore evident that the Conference will not have the necessary expertise to represent practices in Islamic Banking."[34]

137.     When DMI was established in mid-1981, bank officials told the *Wall Street Journal* that it would be active in:

> Islamic investment, Islamic solidarity, and Islamic banking activities…" in Moslem nations and *in the U.S.* and Europe. It added that "Islamic banks capitalized by an organization of the standing of DMI will have a greater capacity to attract deposits from the public and governments." DMI said it is fixing its capitalization at $1 billion because it "will compete with well established and well-capitalized" Western financial institutions."[35] (emphasis added).

138.     In addition, DMI has published various advertisements in U.S. magazines and journals distributed by various Saudi-based charities. In one such advertisement in the Journal of the Muslim World League, there is a picture of the DMI building in Switzerland with a notation which reads "the group benefits from an extensive network with a strong foothold with the major international Islamic centers. Its subsidiaries -- banks, insurance and investment companies -- are

---

[33] Dar Al-Maal Al-Islami, Advertisement, *Wall Street Journal*, June 12, 1981, p. 28.

[34] Dar Al-Maal Al-Islami and Faisal Bank Advertisement, New York Times, November 27, 1984, p. D21.

[35]  "Islamic-Style Bank and Investment Group Is Formed with Capital Set at $1 Billion," *Wall Street Journal*, June 11, 1981, p. 31.

rooted regionally to respond more rapidly and effectively to client needs. The synergetic relationship between the subsidiaries gives DMI the leading edge."

139.     DMI also has significant business operations in the United States. DMI's wholly-owned subsidiary, Crescent International Ltd., is a Bermuda registered company owned by Greenlight SA of Switzerland. Both entities are DMI Trust subsidiaries. A 2003 SEC 'Registration Statement' for shareholders of Acclaim Entertainment Inc., states:

> Mel Craw, Manager of DMI Trust, has voting and dispositive control over securities held by Crescent International, Ltd.[36]

140.     DMI Trust's 2001 Annual Report states that Greenlight (Switzerland) S.A. and Crescent International Ltd are 100 percent DMI Trust-owned "principal subsidiaries."[37]

141.     DMI, Crescent International, Ltd., and Greenlight SA have overlapping business managers and addresses. In Crescent International Ltd.'s SEC filings, Crescent International, Greenlight (Switzerland) SA, and DMI SA Services use the same business address in Geneva Switzerland:

> *Crescent International Ltd. January 2, 1999 SEC Filing*
> Melvyn Craw
> Crescent International Limited
> c/o Greenlight (Switzerland) SA
> 84, Av Louis-Casai, P.O. Box 42
> 1216 Geneva, Cointrin, Switzerland[38]
>
> *Crescent International Ltd. February 10, 2004 SEC Filing*
>
> c/o Greenlight (Switzerland) SA
> 84 AVE LOUIS CASAI, 1216
> COINTRIN/GENEVA Switzerland[39]

142.     DMI Trust uses the same business address as DMI Administrative Services S.A., Greenlight (Switzerland) SA, and Crescent International, Ltd.:

---

[36] Securities and Exchange Commission, Amendment No. 1 to Form S-3 Registration Statement Under the Securities Act of 1933, Acclaim Entertainment, Inc. August 22, 2003, p. 21.

[37] Dar Al-Maal Al-Islami Trust, Annual Report 2001, p. 35.

[38] Crescent International Ltd SEC Filing, Acquisition of Infocure Corp. Stock, Schedule 13D, Amdt. No.1, January 2, 1999.

[39] Crescent International Ltd SEC Filing, Acquisition of Franklin Wireless Corp. Stock, February 10, 2004.

*www.dmitrust.com has the following under contact information:*
Daar Al-Maal Al-Islami Trust
Contact:
c/o DMI Administrative Services S.A.
84, Avenue Louis-Casai, P.O. Box 161
1216 Cointrin-Geneva Switzerland

143.     The 1999 SEC report lists a U.S. contact for Crescent International/DMI as:

COPY TO:
Sara P. Hanks, Esq.
Rogers & Wells
200 Park Avenue
New York, NY 10166
Tel: 212-878-8000

144.     In June 2003, Crescent International Ltd. owned 1.2%, or 1.4 million shares of Acclaim Entertainment Inc. prior to Acclaim's stock offering.[40] An April 1, 2004 stock sale Prospectus for Sun Healthcare Group, Inc., lists Crescent International Ltd. as owner of 35,000 shares of Sun Healthcare Group being offered for sale on the NASDAQ exchange. The report states:

Mel Craw and Maxi Brezzi, in their capacity as managers of Green Light (Switzerland) SA, the investment adviser to Crescent International Ltd., have voting control and investment discretion over the shares owned by Crescent International Ltd. Messrs. Craw and Brezzi disclaim beneficial ownership of such shares.[41]

145.     Since 2000, International FiberCom, Inc., (IFC) a Phoenix-based telecommunications service provider has borrowed at least $14 million from Crescent International. Crescent owns more than 2 million FiberCore shares. On June 22, 2001, IFC announced:

The completion of the private placement of $10 million in Series D Convertible Preferred Stock to Crescent International Ltd., an investment company managed by GreenLight (Switzerland) SA, and warrants exercisable to purchase 509, 554 shares of common

---

[40] Dar Al-Maal Al-Islami Trust, Annual Report 2001.

[41] Sun Healthcare Group, Inc., Form 424B3, Prospectus, File No. 333-113710, Securities and Exchange

Commission, April 1, 2004.

stock at a price of $5.89 for a five year term…Crescent also agreed to purchase up to $10 million of common stock of the company in increments of between $200,000 and $2.5 million at the discretion of the company during the 18-month commitment period.[42]

146.     In June 2002, Dauphin Technology announced that 6.6 million shares of common stock: "may be acquired by Crescent International Ltd." In September 2001, Dauphin entered into a $10 million securities purchase agreement that "allows Dauphin to sell Crescent Crescent up to $7.5 mission in stock until September 27, 2003."[43]

147.     As of October 2001, DMI Trust had invested at least $200 million in the International Development Bank Infrastructure Fund L.P.[44]   DMI committed "$100 million for equity and an additional $100 million for complementary finance facility purposes."[45] The fund "seeks to work with governments, international project sponsors and local companies in investing in infrastructure projects in Islamic Development Bank member countries."[46]

148.     The fund was launched and is "managed" by Washington, DC based Emerging Markets Partnership (EMP). The private equity firm expects to raise $1 billion for the initiative. It is believed to be the first private investment vehicle for private-sector infrastructure projects in the Islamic world. EMP set up offices for the fund in Bahrain to "handle fund-raising efforts." [47]

149.     In addition, DMI became a 35% partner in Boston Capital, a Massachusetts based real estate financing firm with "holdings in 48 states and the U.S. Virgin Islands."[48]

150.     The CEO of DMI stated in an interview with the Gulf Daily news that the DMI group has "substantially increased" its investments in the United States after September 11, 2001.[49]

---

[42] "International FiberCom Amends Credit Facility," *The Phoenix Business Journal,* June 22, 2001.

[43] "Dauphin Technology Registers Stock," Tampa Bay Business Journal, June 26, 2002.

[44] Otis Bilodeau, "Private Equity True Believers," *The Daily Deal*, October 23, 2001.

[45] Asia Private Equity Review, August 1, 2003.

[46] Emerging Market Partnership Web site: http://www.empwdc.com/EMPIDBFund.htm.

[47] *Daily Deal*, October 23, 2001; "Jeddah-Based IDB Launches a Fund," *Wall Street Journal Europe*, October 8, 1998.

[48] Boston Capital Web site: https://www.bostoncapital.com/aboutIndex.html.

[49] Islamic Banks Victimized by Western Media," Gulf Daily News, (November 12, 2001).

151.     DMI has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts.  Moreover, DMI has purposefully availed itself of the jurisdiction of the United States because it has directed its activities at the United States. DMI has financially and materially supported al Qaeda, Wael Jelaidan, Yassin Al Kadi and other al Qaeda members that call for holy war or jihad against the United States. Moreover, DMI's supervising board members and religious board members have publicly called for jihad against the United States.

152.     As the foregoing demonstrates, DMI thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of DMI 's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

153.     Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.


Date:  September 30, 2005



LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.



BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## **CERTIFICATION OF SERVICE**

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2 has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: September 30, 2005

_____
GINA M. MACNEILL, ESQ.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\DMI- More Definite Statement - AL BAraka_b.doc