**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                       Civil Action No.:
SEPTEMBER 11, 2001                                    03 MDL 1570 (RCC)


--------------------------------------------------------x

This document relates to:
   *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development*
      *Corp. et al., Civil Action No.: 04-CV- 1923 (RCC)*


### PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT SAUDI AMERICAN BANK

Counsel for the above captioned Plaintiffs hereby provide a more definite

statement/additional allegations ("More Definite Statement") as to the above referenced

Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the

Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management

No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004,

paragraph 13.


Dated:  September 30, 2005

                          Respectfully submitted,


                          _____
                          Jerry S. Goldman, Esq. (JG-8445)
                          Frederick J. Salek, Esq. (FS-8565)
                          Gina M. MacNeill, Esq. (GM-0581)
                          LAW OFFICES OF JERRY S. GOLDMAN
                             & ASSOCIATES, P.C.
                          111 Broadway, 13th Floor
                          New York, N.Y. 10006
                          212.242.2232


                          *Attorneys for the Plaintiffs*

# EXHIBIT 1

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT SAUDI AMERICAN BANK

1. The name of the defendant to whom this Statement pertains is Saudi American Bank ("SAB"). The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Saudi American Bank - More Definite Statement - AL BAraka.doc

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, SAB conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

Page 4

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including SAB, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

Page 5

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. SAB fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.   The Enterprise relies upon a global network of banks and financial institutions, including SAB, and illegal activity to generate material support to continue its terrorist operations.

c.  SAB was not an employee, officer or director of the Enterprise, based upon present information available.  SAB is associated with the alleged Enterprise.   SAB is a member of the Enterprise, and is separate and distinct from the Enterprise.   SAB intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by SAB is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by SAB funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by SAB, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. SAB acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

Page 7

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including SAB, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including SAB, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of SAB, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like SAB.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including SAB.  In order to identify nineteen individuals willing, able and

Page 8

competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by SAB. SAB, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. SAB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against SAB are as follows: Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows: Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. SAB has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. SAB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. SAB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. SAB is a financial institution headquartered in Riyadh, Saudi Arabia, with offices in New York. The Saudi American Bank was established by royal decree on February 12, 1980, to assume the banking functions of Citibank's branches in the Kingdom of Saudi Arabia.

22. In the new formation 44.5% of the equity was sold for cash to 60 founders, including the original Saudi members of the Board of Directors. The remaining 40% of the equity was acquired by Citibank in exchange for their assets in the Kingdom.

23. Simultaneously Citibank entered into Technical Management Agreement (TMA) under which it agreed to manage the new bank for 8 years. This agreement provided that Citibank would second staff to the new bank and would provide technical support to the new bank. The TMA was renewed and it finally expired on Oct. 31, 2003.

24. In July 1999 SAMBA merged with United Saudi Bank (the "USB") to create one of the largest and the most profitable banks in the Middle East. USB itself was the product of a merger in 1997 between United Saudi Commercial Bank (USCB) and Saudi Cairo Bank (SCB). The USCB was founded in 1982 after a merge of 3

branches of foreign banks (United Bank of Pakistan, Bank Melli Iran and Banque du Liban d'Outre Mer).

25. According to the SAB Annual Report 2003, on Oct. 31, 2003, when the TMA expired, SAB moved to full local management, culminating a transition plan previously agreed with Citibank. From the following day Citibank ceased to be involved in the management of SAB. The report describes that "the most critical transition issue was retaining the selected Citibank seconded staff... that we successfully achieved ..."

26. Prior to the expiration of the TMA, Citibank's stake in SAB was gradually reduced. Once in late 1991 they sold a 10% stake to two Saudi national agencies for social welfare and then sold additional shares in 1999 following the merger with Saudi United Bank. In 1999 Citibank holdings in the merged SAB remained 22.83%.

27. According to a Reuter's newswire, in October 2002 Citibank sold 2.83% of SAB to a Saudi Pension Fund for US$230 million.

28. Citigroup announced (May 27, 2004) that it planned to sell its remaining 20% stake in SAB Financial Group, ending its presence in the country after nearly 50 years. Citigroup said it was selling the stake to a Saudi state entity, the Public Investment Fund, and would record an aftertax gain of $760 million when it released second quarter earnings.

29. In addition to operating under the guidance of a corporation based in the United States, SAB had a U.S. office in 1996:

> Saudi American Bank
> 666 Fifth Avenue, 7th Floor
> New York, NY 10103 (212) 307-8274
> (212) 307-8310 [fax]

30. SAB has been a member of the U.S. – Saudi Arabian Business Council, a coalition of corporations developed to promote business relations between the two countries, since 1997. The headquarters of this group is located in Washington, D.C.

31. SAB is the main banker of the Arab Cement Company which is owned by the Al Rajhi Group and the Saudi Bin Ladin Group, two groups which have had ties to supporting Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Arab Cement Company

is managed by such Saudis as Khalid bin Salim Bin Mahfouz[1] and Mohammed Bin Laden.

32. Additionally, Khalid bin Salim bin Mahfouz maintained a bank account at SAB. This fact was realized when the United States Treasury Department sent a team of investigators to Saudi Arabia to track down prominent individuals allegedly associated with terrorist funding.   Around September, 2003, SAB closed the account and returned his money.

33. It has been widely reported that Khalid bin Salim bin Mahfouz, a co-defendant herein, provided material support to Osama bin Laden and Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by providing millions of dollars to them.

34. Specifically, Khalid bin Salim bin Mahfouz, as the Chief Operating Officer of the Bank of Credit and Commerce International (BCCI), was implicated in supporting terrorism and fraud.  Also, in Spain, he provided money through his bank.  The National Commercial Bank ("NCB")[2] to Al Qaida operators.  He is also the brother-in-law of Osama Bin Laden.   He has been known to set up various charities organizations around the world since 1991, which have been linked to the Al Qaida and involved in the financing of Osama Bin Laden.

35. The 1992 US Senate Report on the BCCI Affair linked the bank to financial funding of the Afghan war.

> "(…) BCCI may have been moving money through the National Bank of Oman tofund the war in Afghanistan. The bank's role began to surface in the mid-1980's (…).This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%."

---

[1] Specific misconduct regarding Khalid Bin Mahfouz. ("Mahfouz"), a co-defendant herein, will be provided via More Definite Statement Applicable to Mahfouz.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Mahfouz, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

[2] Specific misconduct regarding National Commercial Bank. ("NCB"), a co-defendant herein, will be provided via More Definite Statement Applicable to NCB.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to NCB, relating to *Estate of John P. O'Neill,  et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Saudi American Bank - More Definite Statement - AL BAraka.doc

36. Under Khalid Bin Mahfouz, the BCCI was also implicated in supporting terrorism, as reported by the US Senate.

> *"In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization."*

37. The Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

> *"BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.*

38. In 1986, KBM became President and CEO of Defendant National Commercial Bank (NCB) and its principal shareholder with control over more than 50% of the bank's capital.

39. According to several testimonies, the NCB was operating during those years as a "financial conduit" for Osama Bin Laden operations as recalled by former CIA Chief of Counter-terrorism Vincent Cannistraro during a Congress Hearing in October 2001.

> *"How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism."*

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Saudi American Bank - More Definite Statement - AL BAraka.doc

40. A bank audit conducted in 1998 revealed that over a 10 year period $74 million was funneled by NCB's Zakat Committee to the International Islamic Relief Organization (IIRO),[3] headed by Osama Bin Laden's brother-in-law. The charity happened to be a major contributor to Osama Bin Laden's operations:

> *"Bin Laden used his personal fortune and continuing contributions from wealthy Islamic businessmen in Saudi and the Gulf to organize training camps in the Sudan for Islamic activists from every major Islamic country. These contributions, plus revenues from Islamic Charity fronts, such as the International Islamic Relief Organization, headed by Bin Laden's brother-in-law, as well as numerous other charitable fronts, continue to fuel his group today."*

41. The NCB audit report also stated that direct donations were "received through those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief Organization and Muwafaq Foundation".

42. In or about 1998, the NCB opened two "shared accounts" with Al-Rajhi Banking & Investment Corp[4] (Special Joint account #22 and #33) for IIRO as a member of the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), which was founded in 1998 by the Kingdom of Saudi Arabia to funnel donations to Islamic fighters in Kosovo and Chechnya.

43. The bank's audit report shows that:

> *NCB established special relations with the SJRC and maintained two shared accounts with Al-Rajhi Banking & Investment Corp for IIRO and SJRC donations in Kosovo and Chechnya. These special accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998.*

44. In June 1991 the Bin Mahfouz family founded Muwafaq Ltd in the Isle of Man, a tax haven. Its backers were named as a group of Saudi investors from Jeddah. The

---

[3] Specific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, will be provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

[4] Specific misconduct regarding Al Rajhi Bank, a co-defendant herein, will be provided via More Definite Statement Applicable to Sulaiman Abdul Aziz Al Rajhi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to AL Rajhi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC)

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Saudi American Bank - More Definite Statement - AL BAraka.doc

same year, Muwafak Foundation (Blessed Relief) was established in Sudan with Yasin Al-Qadi acting as chairperson.

45. Abdulrahman Bin Khalid Bin Mahfouz, son of KBM, became trustee of the Muwafaq Foundation (Blessed Relief) while serving as member of the board and Vice Chairman of the Executive Management Committee of NCB.

46. Abdulrahman Bin Khalid Bin Mahfouz acknowledged in a recent interview with Forbes Magazine that Muwafaq Foundation was the "brainchild" of his father, "who funded it with as much as $30 million."

47. The assets of Muwaffaq Foundation and those of its Chairman, Yasin Al-Qadi,[5] were frozen on October 12, 2001 by the US Treasury Department pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism. The governments of the United Kingdom, Turkey, Kazakhstan, Albania, Slovenia and Switzerland have also followed suit.

48. The US authorities described Yasin Al-Qadi as a "terrorist" and Muwaffaq Foundation as an organization that "financially supports terrorism" and "funnels money to the al Qaeda terrorist network". A Treasury Department statement added that:

> *Muwafaq is an Al-Qaida front that receives funding from wealthy Saudi businessmen" (…) "Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief.*

49. In an interview with the magazine *al-Watan al-Arabi* in 1996, Osama bin Laden stated that Muwaffaq in Zagreb is one of the humanitarian organizations that he is actively supporting.

50. SAB's Islamic Banking unit was created at the end of 1996. Regarding the body's activities, the SAMBA Web site states:

> *Every product introduced by SAMBA's Islamic Banking Group is carefully evaluated and monitored by our Shariah Supervisory Board. Products originated outside of SAMBA by other institutions undergo the same rigorous evaluation for compliance either by an appropriate Shariah authority or by SAMBA's own Shariah Board.*

---

[5] Specific misconduct regarding Yassin Al Qadi ("Al Qadi"), a co-defendant herein, will be provided via More Definite Statement Applicable to Al Qadi. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

> *SAMBA's Shariah Supervisory Board issues fatwas for each financing and investment product that belongs to the Islamic Banking Group. Fatwas establish guidelines that must be followed to ensure compliance with Shariah principles. Semi-annual reviews are made to confirm that guidelines are being implemented.*

51. The SAMBA Shariah Board is chaired by Justice Mohammed Taqi Usmani, a prominent Pakistani Islamic scholar and Mufti with powerful positions on Shariah Boards and Accounting Standard bodies across the Arab world.

52. Justice Usmani has been a member of the Supreme Court of Pakistan since 1982. Presently, he is Chairman, Shariah Board, Citi Islamic Investment Bank, Bahrain; Chairman, Shariah Board, Amana Investments Ltd, Sri Lanka; Vice-Chairman, Shariah Board, Abu Dhabi Islamic Bank, Abu Dhabi; Member, Shariah Board, Dow Jones Islamic Market Index; Chairman, Shariah Board, Al-Meezan Commercial Bank Ltd; Vice President, Darul-Uloom Karachi; Deputy Chairman/ Permanent Member of Islamic Fiqh Academy, Jeddah; Chairman, Centre for Islamic Economics, Pakistan, since 1991; Chairman, Shariah Council AAOIFI; Chairman, Shariah Board, IslamiQ.com; Chairman, Shariah Board, Saudi American Bank, Jeddah; Chairman, Shariah Board, HSBC, Global Islamic Finance, London; Chairman, Shariah Board, Robert Fleming Oasis Fund, Luxembourg. He was also a member of Shariah Board, Faisal Bank, till recently.

53. Usmani made pro-Taliban mujahideen statements to a gathering of worshippers in Pakistan, we believe in late 2001 or early 2002. English language excerpts and a reporter's description of the speech, from the Pakistani magazine, *Jang*, follows:

> *Mufti Taqi Usmani Sahi urged the Muslim Ummah to help and assist their Afghan Muslim brethren instead of performing Umrah, because the Afghan Mujahideen are defending the existence and identity of the entire Muslim Ummah at large, hence assisting them is an Islamic obligation. Addressing a gathering on Friday, he said that Muslims should daily perform two rakaats Salaatul Haajah and make duaa for the victory of the Talibaan.*
>
> *Justice Mufti Taqi Uthmani has said that at this point in time, helping our Afghan brothers is the most excellent meritorious deed, citing the noble Hadith narrated by Hazrat Abu Hurairah (radiallahu anhu) who reports "When famine and drought becomes widespread amongst Muslims and they are suffering, then assisting them is the most virtuous good deed." Our Afghan brethren are facing a catastrophe. Despite the bombardment and severe winter, they are facing the enemy with great courage. Under the present circumstances, if we cannot participate in the battlefield and fight shoulder to shoulder with the Mujahideen then surely we could*

*assist them financially and also participate in this Jihaad.
Therefore, this year, over and above routine donations, we should
assist our Afghan brethren with the monies normally spent on
Umrah trips and other such noble acts. We hope this way that their
good deeds will be accepted.*

*The Imaams should recite Qunoote Naazilah and pray especially
for the success of the Afghan Mujaahideen after every Salaah.
According to the fataawa of the Ulama, the Jihaad of the Taliban
is a true Jihad and it is the duty of every Muslim to participate in it
according to one's means and capacity.*

*Muslims are urged to fulfill this obligation.*

54. Saudi American was one the two banks used by the Spanish al Qaeda cell to
finance its own operations. Mohammed Galeb Zouaydi, an al Qaeda member
prosecuted in Spain for terrorist ties, owned numerous accounts at SAMBA that
showed various suspicious cash deposits.

55. On a letter seized Zouaydi's office in Spain, he described his personal bank status
in Jeddah while he was financing the September 11 attacks from his various
companies. On this document, Zouaydi noted that he had a personal bank account
on the Saudi American Bank, "Jeddah Al Medina Road Branch" with the account
number # 1014452201, to finance his activities in Europe. According to the
Spanish Court, Zouaydi used this account to materially support the terrorism.

56. The Saudi American Bank is the official correspondent of the Al Baraka Bank[6] of
Lebanon, which is based in Beirut and chaired by Saleh Abdullah Kamel.[7] Saleh
Abdullah Kamel was one of the three founding members of Al Shamal Islamic
Bank.  The Saudi American Bank has maintained a partnership with the Al
Baraka financial system since its inception.

57. The Saudi American Bank serves as the bank for the Dallah al Baraka Group,
LLC ("Dallah Al Baraka") which is chaired by Saleh Abdullah Kamel.  Dallah Al

---

[6] Specific misconduct regarding Al Baraka Investment & Development Corp. ("Al Baraka"), a
co-defendant herein, will be provided via More Definite Statement Applicable to Al Baraka.
Plaintiffs herein incorporate by reference throughout this document the factual averments and
arguments which are contained within its More Definite Statement Applicable to Al Baraka,
relating to *Estate of John P. O'Neill, Sr.  et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Specific misconduct regarding Saleh Abdullah Kamel, a co-defendant herein, will be provided
via More Definite Statement Applicable to Saleh Abdullah Kamel.  Plaintiffs herein incorporate
by reference throughout this document the factual averments and arguments which are contained
within its More Definite Statement Applicable to Saleh Abdullah Kamel, relating to *Estate of
John P. O'Neill, Sr. et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Baraka is a diversified conglomerate based in Jeddah, Saudi Arabia.  It is involved in various industries, services and financial activities.  The group includes twenty-three (23) banks located mostly in Arab and Islamic countries, in addition to several investment and financial companies.  Dallah Al Baraka's financial arm if Al Baraka, as a wholly owned subsidiary.  Saudi American Bank undertook financial transactions through the United States sanctioned Al Taqwa Bank.

58. SAB is the Riyadh correspondent to Faisal Islaimic Bank.[8]  Faisal Islamic Bank is managed by Mohammed Al Faisal Al Saud.  Faisal Islamic Bank, along with Mohamed Al Faisal Al Saud, has facilitated Al Qaida terrorist operations.

59. SAB is also the main correspondent in Riyadh for a branch of Al Shamal Bank, a branch of Dar al Mal al Islamic Trust[9] is Nassau, which have been involved in the financing and support of the Al Qaida.

60. In 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia to collect donations to the "heroes of the Al Quds Uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including defendants World Assembly of Muslim Youth ("WAMY"), International Islamic Relief Organization ("IIRO") and Al Haramain Foundation.[10]

61. The effort was managed by the Saudi Committee for the Support of the Intifada Al Quds, says a U.S. government official. The committee is run by Prince Naif Bin Abdul Aziz, the interior minister, an official in the Israel Defense Forces says.

---

[8] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Faisal Islamic Bank,  a co-defendant herein,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[9] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to Dar al Maal Al Islami Trust, , a co-defendant herein,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[10] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its More Definite Statement Applicable to World Association of Muslim Youth (WAMY), a co-defendant herein,  within its More Definite Statement applicable to International Islamic Relief Organization (IIRO), a co-defendant herein,  and within its More Definite Statement applicable to Al Haramain, a co-defendant herein,  relating to *Estate of John P. O'Neill, et al. v. Al  Baraka, et al.*, 04-CV-1923 (RCC), filed previously at the United States District Court of the Southern District of the United States, as part of the instant multi-district litigation.

In October 2000 another royal, Prince Salman Bin Abdul Aziz, governor of Riyadh, encouraged citizens to deposit money in Account 98.

62. By participating in this effort, SAMBA directly and materially supported Hamas, Palestinian Islamic Jihad, and other terrorist groups in that region.

63. For over twenty (20) years, Citigroup has had a 20 percent stake in SAB. It has run the operation under a management contract since 1980. "Forbes" reports the United States bank used SAB to nurture its ties with the Saudi elite and that the relationship runs deep and sometimes loose. Prince Alwaleed bin Alsud, a Saudi prince, is purportedly the fourth-richest man in the world and he owns approximately $9.4 billion in Citigroup stock and a 7% interest in SAB. There are other Saudi royal family members who have significant holdings in both banks.

64. As has been recently reported, much money which was received by Arab Bank was transferred through SAB.

65. In 2000, the Saudi government issued an edict requiring all banks operating in the Kingdom to have charitable accounts to handle donations to the "martyrs" in the Palestinian uprising. Money from the funds, known as Account 98, was paid to the beneficiaries of suicide bombers and to the Hamas to help with the recruitment. SAB was a major conduit for this money. The Saudis refused to cooperate when Citigroup expressed concerns about the cash going to terrorist groups.

66. Some of the Saudi checks to the terrorists were routed through Saudi American Bank.

67. SAB financed many of the projects undertaken by Osama Bin Laden and the Al Qaida in Sudan during the years that the Al Qaida leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport. SAB was the main banker of the Saudi Bin Laden Group and the Mohamed Bin Laden Organization which provided technical assistance on these projects.

68. As the foregoing demonstrates, SAB thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of SAB's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

69. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
     GINA M. MAC NEILL, ESQUIRE (GM 0581)
     JERRY S. GOLDMAN, ESQUIRE (JG 8445)
     FREDERICK J. SALEK, ESQUIRE (FS 8565)
     Attorneys for the Plaintiffs
     111 Broadway, 13th Floor
     New York, N.Y. 10006
     212.242.2232

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2 has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: September 30, 2005

_____
GINA M. MACNEILL, ESQ.