UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.:
SEPTEMBER 11, 2001                            03 MDL 1570 (RCC)

--------------------------------------------------------x

This document relates to:
> *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development*
> *Corp. et al., Civil Action No.:  04-CV- 1923 (RCC)*


**PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS
AS TO DEFENDANT SALEH ABDULLAH KAMEL**

Counsel for the above captioned Plaintiffs hereby provide a more definite statement/additional allegations ("More Definite Statement") as to the above referenced Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004, paragraph 13.

Dated:  September 30, 2005

Respectfully submitted,

_____
Jerry S. Goldman, Esq. (JG-8445)
Frederick J. Salek, Esq. (FS-8565)
Gina M. MacNeill, Esq. (GM-0581)
LAW OFFICES OF JERRY S. GOLDMAN
    & ASSOCIATES, P.C.
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

*Attorneys for the Plaintiffs*

# EXHIBIT 1

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Kamel, Saleh - FINAL!!! More Definite Statement.doc

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT **SALEH ABDULLAH KAMEL**

1. The name of the defendant to whom this Statement pertains is Saleh Abdullah Kamel ("Kamel").  The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Kamel, Saleh - FINAL!!! More Definite Statement.doc

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY  Penal § 105.15; NY  Penal § 125.25 (xi)

- Conspiracy to commit arson - NY  Penal § 105.15; NY  Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Saleh Abdullah Kamel conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Saleh Abdullah Kamel, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Saleh Abdullah Kamel fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Saleh Abdullah Kamel, and illegal activity to generate material support to continue its terrorist operations.

c. Saleh Abdullah Kamel was not an employee, officer or director of the Enterprise, based upon present information available. Saleh Abdullah Kamel is associated with the alleged Enterprise. Saleh Abdullah Kamel is a member of the Enterprise, and is separate and distinct from the Enterprise. Saleh Abdullah Kamel intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Saleh Abdullah Kamel is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida,

and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Saleh Abdullah Kamel funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Saleh Abdullah Kamel, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.  Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Saleh Abdullah Kamel acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Saleh Abdullah Kamel, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Saleh Abdullah Kamel, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Saleh Abdullah Kamel, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and

conspirators like Saleh Abdullah Kamel. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Saleh Abdullah Kamel. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Saleh Abdullah Kamel. Saleh Abdullah Kamel, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Saleh Abdullah Kamel also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency,

loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Saleh Abdullah Kamel are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaints, as amended.

20. Saleh Abdullah Kamel has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Saleh Abdullah Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Saleh Abdullah Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Kamel has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Kamel conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Kamel conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Saleh Abdulah Kamel is one of the wealthiest businessmen in Saudi Arabia.

23. In 1969, Kamel founded Dallah Al Baraka Goup.  He is the majority owner, the CEO and the chairman of Dallah al Baraka Group.[1]  The Dallah al Baraka Group provides banking, investment, insurance and lending services to businesses located throughout the Muslim world.  It is the third largest Saudi company.

24. Kamel is Chairman of al Baraka Financial Institution, which is deeply involved in providing financial services and other forms of material support to Al Qaida.

25. Kamel was one of Al Shamal Bank's three founding members.  The other two founding members were Al Shamal for Investment and Development (a Sudanese company) and the Government of the Northern State.  Kamel is also a large shareholder of Al Shamal Bank.

26. Kamel also co-founded the U.S. branch of Sana-Bell, Inc., and enterprise established to provide revenues to sustain the US operations of the International Islamic Relief Organization ("IIRO")).[2]  In founding Sana-Bell, Inc., Kamel knew and intended that it would be used as a vehicle for funding terrorist organizations, including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, through the IIRO and the SAAR network.

27. Kamel has been identified as a principal financier of the Al Qaida and has made substantial contributions to many of the alleged charities operating within Al Qaida's infrastructure, with full knowledge that those funds would be used to support the operations of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. For example, Kamel is listed on the "Golden Chain" as a donor.  The "Golden Chain" is a list of the top wealthy financial supporters of the Al Qaida.  This document was seized by the Bosnian police during searches in the offices of the Benevolence International Foundation in Sarajevo in March 2002.  This document was presented by the United States Government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Co-

---

[1] Specific misconduct regarding Dallah Al Baraka Group, a co-defendant herein, is provided via More Definite Statement Applicable to Al Baraka Investment and Development Corp. a/k/a Al Baraka Bank a/k/a Dallah Al Baraka Group, LLC.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Baraka Investment and Development Corp. a/k/a Al Baraka Bank a/k/a Dallah Al Baraka Group, LLC, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC).

[2] Specific misconduct regarding IIRO, a co-defendant herein, is provided via the More Definite Statement Applicable to International Islamic Relief Organization.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to International Islamic Relief Organization, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

conspirators Statements" in the case of United States v. Arnaout filed on January 29, 2003. Additionally, this list was mentioned in the indictment of Enaam Arnaout (02 CR 892), a co-defendant. According to the United States government, this document is a "list of people referred to within Al Qaida as the "Golden Chain", wealthy donors to mujahadeen efforts."

28. Saleh Abdullah Kamel, son of Abdullah Kamel and Fatma NagroAbdullah Kamel, son of Abdullah Kamel and Fatma Nagro, was born in Makkah, Saudi Arabia, in 1941. After serving as an adviser to the Saudi Minister of Finance, he founded Dallah Al Baraka Group, LLC in 1969, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

29. Beginning in the late 1970s, Saleh Kamel financed and developed Dallah Al Baraka and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

30. In 1982, Saleh Kamel and Dallah Al Baraka began directing tens of millions of dollars in funds to at least 20 non-governmental organizations – including Osama Bin Laden's Mekhtab al Khidmat—the predecessor to al Qaida‑ which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

31. Dallah Al Baraka, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. Dallah Al Baraka posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third in Saudi company in sales.

32. The Dallah Al Baraka financial arm is Al Baraka Investment & Development (ABID)[3], a wholly owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al Barakaat Bank".

33. These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank, Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American, Yemen Islamic Bank for Finance & Investment.

34. ABID assets, including funds under management, are valued at $4.4 billion. US assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

---

[3] Specific misconduct regarding Al Baraka Investment and Development ("Al Baraka"), a co-defendant herein, is provided via the More Definite Statement Applicable to Al Baraka. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Baraka, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

35. Dallah Al Baraka's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah. Dallah Al Baraka has also facilitated Jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

36. ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, a co-defendant in this action, Faisal Islamic Bank,[4] Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

37. Saleh Kamel and Al Baraka materially supported Osama Bin Laden and his al Qaida network of front companies, farms, and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

38. Saleh Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaida first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal*, the official International Islamic Relief Organization publication, illustrates how Saleh Kamel has carried out his ongoing jihad. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of … Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

39. The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir … Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

40. Saleh Kamel and ABID are also major shareholders of the Arab Albanian Bank and Faisal Islamic Bank-Egypt. Kamel's conglomerate Dallah al Baraka has large investments in Islamic banks, including al Tawqa bank, a co-defendant in this action, based in the Bahamas, among other financial institutions. Kamel is chairman of the Bahrain-based General Council of Islamic Banks and Financial Institutions (IBFI).

41. Saleh Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaida. In fact, the United States Government has been investigating Saleh Abdullah Kamel for his material support of Al Qaida along with numerous other *Burnett* defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaida, and the assets of other material sponsors have already been frozen by the Department of Treasury.

---

[4] Specific misconduct regarding Faisal Islamic Bank ("FIB"), a co-defendant herein, is provided via the More Definite Statement Applicable to FIB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to FIB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

42. In March 2002, the Bosnian police found several documents and items regarding the history of Al-Qaida during searches in the offices of Benevolence International Foundation (BIF) in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that according to the US government is "a list of people referred to within Al Qaida as the "Golden Chain" or wealthy donors to mujahideen efforts". Among them was Saleh Abdullah Kamel.

43. The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the Indictment of Enaam Arnaout, a co-defendant in this action, on October 9, 2002 (02 CR 892).

44. The "Golden Chain" list was introduced and relied on in *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL255226, at *1-2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaida sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists (SDGT), a decision not lightly taken by the executive branch of the government.

45. A former member of al Qaida, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified Saleh Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaida. Al Fadl is a former al Qaida leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaida terrorist trials.

46. In 1992, Saleh Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Saleh Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

47. As part of his ongoing material support for Al Qaida and other Islamic militants groups in the Balkans, Saleh Kamel visited Bulgaria "prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles."

48. In 1998, Saleh Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain[5] account at Al Baraka account in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from Al Haramain accounts.

49. The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

50. Both brothers have, at various times, served on the Shariah Compliance Board of Saleh Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

51. The Darul Ulum Madrassa "backs jehadi organizations and both the Usmani brothers have provided practical help in setting jehadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa."

52. Darul Ulum provides support to Al Qaida affiliates and SDGT entities Harkatul Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen. Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and Al Qaida in their war against the United States.

53. Saleh Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in Houston, Texas. As early as 1984, Saleh Kamel held "sizeable investments in the United States…" via his financial interests in the Dallah Al Baraka Group.

54. In 1996, Dallah Al Baraka owned more than $230 million in assets in the United States and Europe. Saleh Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

55. In 2004, as chairman of the General Council of Islamic Banks, Saleh Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

56. In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials. Saleh Kamel is part owner of London-based Middle East Broadcasting Centre (MEBC). In 1992, Saleh Kamel purchased the U.S. media company, United Press International (UPI), for $3.9 million through his company MEBC. Saleh Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended

---

[5] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via the More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

to invest more than $10 million between 1993-1995 to revive the struggling media company. Saleh Kamel owned UPI until 2002 when it was sold to the Unification Church.

57. In 1999, it was announced that Saleh Kamel and Dallah Al Baraka were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

58. Saleh Kamel and Al Baraka sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

59. Al Baraka's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

60. In July 2003, Saleh Kamel and Dallah Al Baraka announced that it would sue four unnamed Western banks as third party defendants if Kamel and Al Baraka were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, "…the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

61. Saleh Kamel and Dallah Al Baraka are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.*, (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

62. Sanabel al Khair, the North American financial arm of IIRO, was established to receive, invest, and generate funds for the operations of International Relief Organization (IRO)—the 'United States arm' of IIRO.  Beginning in about 1991, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali.

63. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain Al Qaida fundraiser.  Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas providedaccount numbers to facilitate the contribution of funds.  These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of Dallah al Baraka, owned and controlled by Saleh Kamel.

64. A December 1993 advertisement from the official publication of the International Islamic Relief Organization, *Al Igatha Journal*, which was distributed across the United States, illustrates how Saleh Kamel carried out his jihad by establishing Al

Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaida first started carrying out attacks against the United States. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of … Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir … Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

65. Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Saleh Kamel contributed at least $100,000 to the organization through his Dallah al Baraka Group branch in the U.S. in 1992.

66. Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993. Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

67. In 1992, regarding Saleh Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

68. A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier*, describes the likely economic collaboration of Saleh Kamel and Al Baraka with Bin Laden:

> "Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

69. In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Saleh Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden.

70. Saleh Kamel and Al Baraka were provided with numerous public notices regarding the Sudanese government's support and harboring of international terrorists.

71. When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

> Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed

terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

72. Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaida network with military and logistical support through the government of Sudan.

73. During 1991, Saleh Kamel, Yassin Al Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

74. Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

75. "There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

76. Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad … the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

77. In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, Al Qaida's second in command, was in attendance. At the conference Turabi accused the West of

trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States—the 'Great Satan.'"

78. Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

79. In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught...To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

80. The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Saleh Kamel and Al Baraka:

> In 1992 and 1993 Mohamed Atef [AlQaida's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

> In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaida, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

> On October 3 and 4, 1993 operatives of Al Qaida participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

> From 1993 members of Al Qaida began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaida, including Atef and Abu Ubaidah al Banshiri.

> Beginning in the latter part of 1993, members of Al Qaida in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, A US citizen and admitted member of Al Qaida, surveyed the US Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

81. An Al Baraka annual report from the period describes how Saleh Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads …." During this time, Osama Bin Laden was

overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country.

82. In January 1992, U.S. diplomats warned the government of Sudan to stop harboring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice.  They [terrorists] can come and go as they please. They operate here with impunity."

83. The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

84. In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

85. In August 1993, it was widely reported in the English, Arabic, and Sudanese press that the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic fundamentalist terrorist entities.

86. A portion of Saleh Kamel's investment revenues in Sudan were annually required to be committed to zakat – the Islamic almsgiving. However, in Sudan, Saleh Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

87. In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defense forces; and providing for martyrs' families."

88. The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Saleh Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

89. Osama bin Laden warned the West, in the 1999 August edition of *Sudanow* two months before Al Qaida coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops.  The attack was carried out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

90. Osama Bin Laden was using diverted zakat funds, provided by Saleh Kamel and other major investors in the Sudanese economy, to recruit and train Al Qaida recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

91. In November 1993, the Arab Albanian Islamic Bank (AAIB) was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), Saudi Dallah Al Baraka Group (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

92. The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, "…a secrecy that cannot be maintained in an institution that pretends to be serious".  The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

93. On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi[6] in the Arab Albanian Islamic Bank.  The Arab-Albanian Bank was subsequently renamed United Albanian Bank.  It is believed that Saleh Kamel and Al Baraka remain shareholders in the successor entity of the Arab-Albanian Bank.

94. Saleh Abdullah Kamel's Who's Who biography states that he has been a "founding member of Faisal Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Saleh Kamel in *The Saudi Gazette* on January 7, 2003.

95. According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions on its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

96. The Muslim World League[7] Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan".

---

[6] Specific misconduct regarding Yassin Al Qadi ("al Qadi"), a co-defendant herein, is provided via the More Definite Statement Applicable to al Qadi.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Qadi, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via the More Definite Statement Applicable to MWL.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

97. Faisal Islamic Bank of the Sudan is an associated company of the DMI Trust.[8] The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

98. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, a co-defendant in this action, stated:

> "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

99. The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

100. Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, Al Qaida, and other extremist groups.

101. Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

102. Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic State. Together they encouraged Osama bin Laden to travel to Sudan and to develop his Al Qaida terrorist network to train soldiers for jihad.

---

[8] Specific misconduct regarding DMI Trust, a co-defendant herein, is provided via the More Definite Statement Applicable to DMI Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to DMI Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

103. In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

104. The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Saleh Abdullah Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

105. The Saudi American Bank serves as the bank for the Dallah al Baraka Group. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

106. Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaida terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaida's and Osama bin Laden's tenure there.

107. Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaida terrorist operations as detailed herein. The Saudi American Bank[9] is also the main correspondent in Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaida.

108. In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of

---

[9] Specific misconduct regarding Saudi American Bank ("SAB"), a co-defendant herein, is provided via the More Definite Statement Applicable to SAB. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to SAB, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Muslim Youth,[10] International Islamic Relief Organization and al Haramain Foundation.

109. Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co., Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

110. Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale, is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there.

111. Saleh Abdullah Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

112. In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and Al Baraka Investment and Development. According to newly obtained information on al Shamal Islamic Bank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

113. Osama Bin Laden was close to the new regime of Hassan Al-Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

114. One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department:

> "Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

115. The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

116. Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Saleh Abdullah Kamel and ABID. Saleh Abdullah Kamel holds 15% of the bank shares.

---

[10] Specific misconduct regarding World Assembly of Muslim Youth ("WAMY"), a co-defendant herein, is provided via the More Definite Statement Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

117. Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

118. A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaida operatives held bank accounts in al Shamal Islamic Bank under their real names:

> Q: While you were in the Sudan, did you handle money for Osama Bin Laden?
> A: Could you repeat the question.
> Q: Did you work on the finances for al Qaida while you were in the Sudan?
> A: Yes.
> Q: Did you know where the bank accounts of Osama Bin Laden and al Qaida were?
> A: Yes.
> Q: Do you know whose names they were in?
> A: The bank account under Usama Bin Laden in Bank Shaml [Al Shamal Islamic Bank], Khartoum.
> Q: That was under Osama Bin Laden's true name?
> A: Yes.
> Q: Were there accounts in other names?
> A: Yes. Afad Makkee got account also.
> Q: Afad Makkee, the account that he had under his name, do you know what name that is?
> A: I remember Madani Sidi al Tayyib.
> Q: Do you know of any other persons who had al Qaida money in their accounts?
> A: Abu Rida al Suri.
> Q: Do you know his true name?
> A: Nidal.
> Q: Anyone else that you knew had al Qaida money in bank accounts in their name?
>  A: Abu Hajer al Iraqi.
> Q: Do you know his true name?
> A: Mamdouh Salim.
> Q: Did you have any accounts in your name?
> A: Shared with Abu Fadhl.

> Q: So you had accounts in your name that
> were shared with Abu Fadhl?
> A: Yes.
> Q: Do you recall anyone else that had bank
> accounts in their name for al Qaida?
> A: Abdouh al Mukhlafi.

119. Jamal Ahmed Al-Fadl also testified that Al-Qaida operatives received monthly
   checks of several hundred dollars from al Shamal Islamic Bank accounts:

> Q: When you worked for Osama Bin Laden,
> in the Sudan, how much were you paid?
> A: $1,200 (…) per month.
> Q: For how long did you work for him?
> A: Almost two years.
> Q: What banks did he keep his money at?
> A: Bank el Shamar [Al Shamal Islamic
> Bank].
> Q: Any other banks?
> A: I think he had accounts in different banks,
> but I only recall Bank Shamar [Al Shamal
> Islamic Bank].

120. Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al
   Shamal Islamic Bank to an Al-Qaida representative in Jordan:

> Q: How did you carry the $100,000?
> A: In my bag with my clothes.
> Q: Do you recall what kind of bills the
> $100,000 was in?
> A: I remember they all hundred bill.
> Q: Sorry?
> A: They all hundred bill.
> Q: They were all hundred dollar bills?
> A: Yes.
> Q: Who gave you the money?
> A: Abu Fadhl, he bring it from Shamal Bank
> [Al Shamal Islamic Bank] and he bring it to
> me.
> Q: Abu Fadhl brought it from the Shamal
> Bank [Al Shamal Islamic Bank]?
> A: Yes.

121. During the course of the same trial, another associate of Bin Laden, Essam Al
   Ridi, testified that the bank was used for operational purposes in stating that
   "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a

Page 26

Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

122. Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation (BIF), was subject to a complaint from the FBI on April 29, 2002. The assets of the Benevolence International Foundation have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding Al Qaida.

123. Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

124. Saleh Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely known that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

125. Osama Bin Laden was allowed to maintain accounts as an investor in al Shamal Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y Februrary 1994 bin Laden had already been stripped of his Saudi nationality and was a well known supporter of Islamic terrorist causes."

126. When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Saleh Kamel's Al Baraka Bank. This fact indicates that Saleh Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaida by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

127. Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency (TWRA), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

128. TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

129.  During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaida network and operating terrorist training camps for al Qaida and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

130.  In a 1994 interview with the Islamist magazine *Gazi Husrev Beg*, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

131.  In 1977, Saleh Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the *Financial Strategy of the Muslim Brothers*, illustrates that Saleh Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

132.  The document describes how Saleh Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

> No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

133.  The document states the Saleh Kamel and Al Baraka is the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

134.  With the investment support of Saleh Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank …"

135.  Swiss authorities have seized a copy of the *Financial Strategy of the Muslim Brotherhood* containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada.  The same document mentions Saleh Abdullah Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

136.  The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

137.  By becoming majority owners in the International Islamic Bank in Luxemburg, Saleh Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Kamel, Saleh - FINAL!!! More Definite Statement.doc

the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics … is a good instrument to implement many projects which are necessary for the Gamaat and its members … [and] it is a good instrument to train higher level economic, financial and technical staff, within the framework of the Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

138.  Saleh Abdullah Kamel and Al Baraka Bank, appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

139.  On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaida by President George W. Bush. In announcing the designation of Al-Taqwa as a global terrorist entity, President Bush stated:

> "Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaida shift money around the world. Al Taqwa raises money for Al Qaida. They manage, invest, and distribute those funds…They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

140.  In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

> "As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada [director of the bank]."

141.  The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaida, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

142.  Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q: A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that…?
>
> A: Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

143. Saleh Abdullah Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's, a co-defendant in this action, house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

144. In 1995, it was reported that Saleh Kamel and Al Baraka Bank had "major investments" in Bank Al-Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

145. In 1997, while Saleh Kamel maintained investments at Bank Al-Taqwa, Agence France Presse and the U.S. Department of Treasury reported that terrorist fundraisers were annually transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts. Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

146. Thus, as early as 1995, Saleh Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

147. As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its "own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

148. Bank Al Taqwa diverted funds from investors' accounts to terrorist entities– but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

149. Thus, Saleh Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

150. Along with SDGT Yassin Al Qadi, Saleh Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. (ALINTID) which was established during the early 1990s. The financial institution was reportedly designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

151. Multiple private and government sources have confirmed that Saleh Kamel and Yassin Al Qadi turned over the ownership and financial assets of the bank to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

152. A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

> "Through one of its branch offices, the Al-Haramain transferred large amounts of money to the local Wahhabi center in Dagestan,

known as the Islamic center "Kavkaz," in the capital of the republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-Barakaat Bank."

153. A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists,* states the following regarding the international financial structures, involved in funding of Chechen rebels:

In Saudi Arabia – (…) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al- Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

154. The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman, Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in Saudi Arabia.

155. The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

156. A memo from the FSB details the bank's role in funding Al Haramain:

"Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

157. FSB had intercepted from Saudi- based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

"The load is ready for sending – grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles.  One thousand rounds

of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet- proof) vests have been bought."

158. Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview:

> "The Saudi Arabian Al-Haramain (…) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

159. The US State Department reported the connections between Al-Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

> "The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries.  According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (…).One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden.  In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

160. The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets have been blocked pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

161. Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

162. In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

163. Saleh Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Saleh Kamel and Al

Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

164. Saleh Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaida was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets – including Americans.

165. The involvement of Saleh Abdullah Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

166. According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, *US v. Soliman Biheiri*, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

167. In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank. The investigation report of his interview with agent David Kane states the following:

> "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 … Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

168. In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were Dallah Al Baraka and the Jordan Islamic Bank.

169. Jordan Islamic Bank, a Dallah Al-Baraka subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a statement, Saleh Abdullah Kamel acknowledged that Dallah Al-Baraka owns another 12 percent.

170. Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

171. According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the US government in December 2001.

172. Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

173.  According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

174.  Assets of Beit El-Mal, a 20% shareholder, were frozen.  The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas.  Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

175.  Saudi national Omar Al Bayoumi, who lived in the United States from the late 1990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of Dallah al Baraka.

176.  Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

177.  Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan,

a subsidiary company of Dallah Avco Aviation, a Saudi government contractor owned by Saleh Kamel.

178.  During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"---made it clear that the government wanted al-Bayoumi's contract renewed "as quickly as possible."

179.  The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaida.

180.  Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaida sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

181.  In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

182.  The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

183.  Al Baraka Bank provided material support to the Spanish Al-Qaida cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

184.  Saleh Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaida cell which directly funded and helped coordinate the September 11th hijacker cell.  Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi.

185. Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaida network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turk Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

186. Saleh Kamel provided material support to the Hamburg Al Qaida cell which planned, organized, and carried out the September 11th attacks.

187. Saleh Abdullah Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public relations & Marketing.

188. The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

189. Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

190. According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

191. Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable organization founded in 1983 by Saleh Abdullah Kamel and managed by Mohammed Abed al-Yamani.

192. Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

193. Iqra International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

194. Iqraa International has a branch in the US registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa international announced, in 2002, annual sales in an amount of $1,200,000.

195. IRS form 990 of the US branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

196. Iqraa International is currently under investigation by Russian Federal Security Services (FSB) for terrorism financing and logistic support.

197. The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

198. Servakh Abid Saad, Director of the Russian office of Iqraa international charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

199. Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Saleh Kamel partners. He began his career as manager of the board of Dallah Al Baraka.

200. Mohammed Abed al-Yamani became executive board member of Dallah Al Baraka. Mohammed Abed al-Yamani is currently deputy President of Dallah Al Baraka.

201. Mohamed Abed al-Yamani, as director of Iqra International, and Saleh Abdullah Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

202. Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

203. In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina, received $4,266,723 from Bakr Bin Laden and Saleh Abdullah Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

204. Muhammad Abed Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

205. Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

206. Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by the Saudi-based Dallah Al Baraka and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with Dallah Al Baraka. Iqraa also maintains operations through a local branch of the organization

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Kamel, Saleh - FINAL!!! More Definite Statement.doc

based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-400016.

207.  Saleh Kamel is the owner of the Iqraa satellite television network. According to Iqraa TV's director, Abdul-Qader Tash, the channel is the "brain child" of Saleh Kamel.

208.  Saleh Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by Al Qaida and other transnational terror groups worldwide via the powerful medium of television programming.  A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

> The issue is not one person, two, 10 or 100 going out with their guns to support their brothers. Defeating the infidels requires a much greater effort. It requires the mobilization of the nation. How can the nation be mobilized? I believe that the stupid acts of these Jews and Crusaders mobilize the nation. The big explosion will come!

209.  Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Saleh Kamel's ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

210.  Another Kamel-sponsored program on Iqraa TV, *Muslim Woman Magazine*, explicitly extols the virtues of child violence and hatred against Jews and Christians:

> "Anchor Doaa Amer: Our report today will be a little different because our guest is a girl, a Muslim girl, but a true Muslim.  Allah willing, may our God give us the strength to educate our children the same way, so that the next generation will turn out to be true Muslims who understand that they are Muslims and know who their enemies are. This girl will introduce herself immediately. She is the daughter of my sister in faith and of the artist Wagdi al-Arabia. Her name is Basmallah.

> 3 ½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

> 'Amer: Basmallah, how old are you?'

> Child: Three-and-a-half.

> 'Amer: Are you a Muslim?

> Child: Yes.

> 'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because ...

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child: In the Koran.

Amer: Right, he said that about them in the Koran.. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. ...May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate them now while they are still children so that they will be true Muslims.

211. Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

"Only our culture understands sacrifice, loyalty and honour. No one in the [western] world sacrifices his life for his homeland. If his homeland is drowning he is the first to jump ship. But in our culture it is different because when a martyr dies, he reaches the height of bliss. When the martyr explodes, he knows that he is not dead. He is simply in transition to another, more beautiful world, because he knows very well that within seconds he will see the light of the Creator."

212. Saleh Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

213. In January 2003, Saleh Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S.-based public relations firm … designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam."

214. In October 2001, Saleh Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were

"seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

215.  As the foregoing demonstrates, Saleh Abdullah Kamel  thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Saleh Abdullah Kamel's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

216. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## CERTIFICATION OF SERVICE

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2 has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: September 30, 2005

_____
GINA M. MACNEILL, ESQ.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Kamel, Saleh - FINAL!!! More Definite Statement.doc