**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.:
SEPTEMBER 11, 2001                            03 MDL 1570 (RCC)

--------------------------------------------------------x

This document relates to:

> *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development*
> *Corp. et al., Civil Action No.: 04-CV- 1923 (RCC)*

## PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT SULAIMAN ABDUL AZIZ AL RAJHI

Counsel for the above captioned Plaintiffs hereby provide a more definite statement/additional allegations ("More Definite Statement") as to the above referenced Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004, paragraph 13.

Dated:  September 30, 2005

                              Respectfully submitted,

                              _____
                              Jerry S. Goldman, Esq. (JG-8445)
                              Frederick J. Salek, Esq. (FS-8565)
                              Gina M. MacNeill, Esq. (GM-0581)
                              LAW OFFICES OF JERRY S. GOLDMAN
                                 & ASSOCIATES, P.C.
                              111 Broadway, 13th Floor
                              New York, N.Y. 10006
                              212.242.2232

                              *Attorneys for the Plaintiffs*

# EXHIBIT 1

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT SULAIMAN ABDUL AZIZ AL RAJHI

1. The name of the defendant to whom this Statement pertains is Sulaiman Abdul Aziz Al Rajhi ("Sulaiman").  The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY  Penal § 105.15; NY  Penal § 125.25 (xi)

- Conspiracy to commit arson - NY  Penal § 105.15; NY  Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Sulaiman conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al

Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.  The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Sulaiman, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sulaiman fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Sulaiman, and illegal activity to generate material support to continue its terrorist operations.

c.   Sulaiman was not an employee, officer or director of the Enterprise, based upon present information available. Sulaiman is associated with the alleged Enterprise. Sulaiman is a member of the Enterprise, and is separate and distinct from the Enterprise. Sulaiman intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

7.  The pattern of racketeering activity conducted by Sulaiman is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sulaiman funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sulaiman, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Sulaiman acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons,

organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Sulaiman, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Sulaiman, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Sulaiman, of both those goals and the uses to which the Funds were put.

    b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc

recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Sulaiman. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Sulaiman. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sulaiman. Sulaiman, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Sulaiman also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss

of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Sulaiman are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (04-CV-1923 (RCC)), including all of the allegations and claims contained therein.

20. Sulaiman has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Sulaiman conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Sulaiman conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. "Sulaiman is a wealthy Saudi figure and reputed financier of terrorism" according to the testimony of Dr. Michael Waller, Annenberg Professor of International Communications, at the United States Senate Committee on the Judiciary, Terrorist Recruitment and Infiltration in the United States: Prisons and Military as an Operational Base, *October 14, 2003*.  Sulaiman Al Rajhi is also the head of one of Saudi Arabia's wealthiest families, the Al Rajhi family, which, based upon information and belief, is the primary financier of the SAAR Foundation, an organization that provided funding to the Enterprise.

## Connection to Al Rajhi Bank

22. Sulaiman is the chairman of the Board of Directors and the Managing Director of Al Rajhi Banking and Investment Corporation ("Al Rajhi"). Sulaiman is also the largest shareholder of Al Rajhi.  Al Rajhi, a co-defendant in this action, has long

provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

23. Al Rajhi is the primary and/or preferred bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation,[1] the Muslim World League,[2] and the International Islamic Relief Organization.[3]

24. Al Rajhi Bank has served as one of Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders preferred and/or primary banks for many years.  Al Rajhi is the primary bank for a number of charities that serve as al Qaida fronts, including Al-Haramain Islamic Foundation ("Al-Haramain"), the Muslim World League ("MWL"), the World Association of Muslim Youth ("WAMY"),[4] the Benevolence International Foundation ("BIF"), and the International Islamic Relief Organization ("IIRO").

25. In cooperation with these charitable organizations, Al Rajhi Bank advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for there charitable organizations, thereby providing a mechanism, Al Rajhi facilitated Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, fundraising events.

26. The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for Al Haramain and the

---

[1] Specific misconduct regarding Al Haramain, a co-defendant herein, is provided via More Definite Statement Applicable to Al Haramain.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Al Haramain,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] Specific misconduct regarding Muslim World League ("MWL"), a co-defendant herein, is provided via More Definite Statement Applicable to MWL.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[3] Specific misconduct regarding International Islamic Relief Organization ("IIRO"), a co-defendant herein, is provided via More Definite Statement Applicable to IIRO.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[4] Specific misconduct regarding World Assembly of Muslim Youth ("WAMY"), a co-defendant herein, is provided via More Definite Statement Applicable to WAMY.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

IIRO, have been used to transfer funds to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cells throughout the world.  In addition, Al Rajhi has directly funded several of al Qaida's, and/or Radical Muslim Terrorism's, and/or the International Islamic Front for the Jihad Against Jews and Crusaders', charity fronts, via *zakat* and *haram*  contributions, including MWL, WAMY, IIRO Al Haramain and the Saudi Joint Relief Committee.

27. Al Rajhi Bank has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and that the funds it contributed directly to the charities were being funneled to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

28. Nevertheless, Al Rajhi Bank has continued to maintain those accounts and to directly fund the charities.  In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders

29. The IIRO has accounts in Al Rajhi Bank, where donors deposit their donations. One of the IIRO Bank Account Numbers at Al Rahji Bank is 77700. The IIRO places advertisements for donations in their own publications, and Al Rajhi Bank collects and deposits these charitable donations into joint accounts according to the account numbers.

30. The IIRO is one of the chief Saudi charities definitively linked to financing a variety of international terrorist groups.

31. Al Rajhi Bank assisted the terrorist group al Qaeda knowing that the assistance would lead to wrongful and harmful acts. Specifically, Al-Rajhi Bank collected so-called "charitable" donations on behalf of Sanabil Al Kheer (Translation: "Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabil's Al Rajhi Bank account no. 77707. Sanabel Al-Kheer, which the IIRO "owns or controls," was established as a separate branch of the IIRO in 1987 to make investments designed to support the IIRO's charitable operations. Al Rajhi Bank collects Sanabel's donations, while organizations like Sanabel/IIRO and the Jeddah Al-Birr Society ensure their donors a reward of religious fulfillment.

32. Under the guise of IIRO funds labeled and designated for purposes such as "war and disaster" (Account number for Immigrants, Refugees, and Victims of Disasters: 77702) or "sponsor a child" (IIRO Account Number of Deprived

Children: 77704) charitable organizations such as the IIRO use banks like Al Rajhi Bank to gather donations that fund terrorism and terrorist activities.

33. Al Rajhi Bank also handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha Journal advertisements toward humanitarian needs in Somalia, Sri Lanka, India, and the Philippines under IIRO Account number 77709 for "the action most loved by Allah."

34. Al Rajhi Bank aided and abetted al Qaeda as the handler of donations for the donee, the IIRO, because Al Rajhi Bank knew about their terrorist organization's illegal operations and provided aid to al Qaeda with the intent to facilitate those their illegal activities.  While serving as the collector of donations for these "charitable" organizations, professing "sublime noble values and deep-rooted traditions," Al Rajhi Bank's pattern is also to make direct donations to terrorist organizations.

35. This financial support managed by Al Rajhi Bank, although intended to aid an organization's peaceful activities, is a de facto mechanism for freeing up resources that can be used for terrorist acts.

36. Al Rajhi Bank knowingly and intentionally supplied the funds to the persons who committed the violent terrorist acts. Money was funneled to the Hamburg, Germany al Qaida cell through the Saudi Al Rajhi Bank to businessmen Mahmoud Darkazanli Abdul Fattah Zammar who provided the al Qaida cell of September 11 hijackers with financial and logistical support.

37. Through Al Rajhi Bank, September 11 hijacker Abdulaziz Al Omari received funds into his Al Rajhi Bank Account Number: 162608010366080, 39800061, and Visa Debit Card No. 4909-8016-2002-5747. Al-Omari frequently utilized a credit card drawn on a Saudi Arabian Bank [al-Rajhi bank] in the planning of the attacks.

38. On September 7, 2001, four days before the 9/11 attacks, Al-Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia on SunTrust bank account 265D-NY-280350.

39. On February 17, 1994, Al Rajhi Banking and Investment Company did a $533,333 donation for the Saudi High Commission in charge of collecting donations for Bosnia and Somalia.

40. On August 1995, Al Rajhi Banking and Investment Company contributed for $400,000 to the Saudi High Commission in charge of collecting donations for Bosnia during a 12 hour telethon. The donation has been released by Arabic newspaper Asharq Al-Awsat.

41. Transfers to the Al-Rajhi Bank account of Wa'el Hamza Julaidan (account #314608010016294, Haye Al-Salamah, Jeddah, Saudi Arabia) on December 5, 2000. Wa'el Hamza Julaidan has been publicly described in 1999 as "the logistics chief of Bin Ladin's organization who has fought on Bin Ladin's side in Afghanistan". Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV.

42. Al Rajhi Banking & Investment materially supported terrorism of the type that implies the element of knowing or intentional support. The liability that arises out of [this kind of] Al Rajhi Bank's knowing and intentional support extends to all points along the causal chain of terrorism. Al Rajhi Bank therefore aided and abetted acts of international terrorism, namely (including but not limited to) the September 11, 2001 attacks on the United States.

43. Al Rajhi Bank provided material support or resources and aided and abetted al Qaida terrorists, and they did so knowingly and intentionally resulting in a [the] causal chain of violence.

44. Al Rajhi Bank has aided in the commission of the modern day equivalent of piracy, and Al Rajhi has violated present day international law.

45. Al Rajhi Bank has participated in the operation or management of [the] an "Enterprise" – alternatively defined as al Qaida, the al Qaida Movement or Radical Muslim Terrorism.

46. Al Rajhi Bank conspired with al Qaeda to attack the United States. As a conspirator, Al Rajhi Bank not only adopted the goal of furthering or facilitating the criminal endeavor, but intended to engage in conduct in furtherance of the enterprise. This endeavor, when [if] completed, would satisfy all the elements of the substantive criminal offense.

47. Abdullah al Rajhi, the head of Al Rajhi Bank, established a network of ostensible charities, known as the Sulaiman Abdul Aziz al-Rajhi ("SAAR") network, to serve as a complex fundraising and money laundering mechanism for al Qaeda. Abdullah al Rajhi used his authority as head of Al Rajhi Bank and as a Director of IIRO and MWL to facilitate the sponsorship of al Qaeda's operations throughout the world.

48. On January 1996, Sulaiman Al-Rajhi donated personally $80,000 for the Saudi High Commission in charge of collecting donations for Bosnia.

49. Al Rajhi Bank played a direct and active role in the management and operation of al Qaida's financial network, and Al Rajhi Bank knowingly conspired to further the objectives of the al Qaida movement during the years leading up to the September 11th attacks.

**U.S. Contacts of Al Rajhi Bank**

50. Al Rajhi Bank has adequate contacts with United States. Al Rajhi Bank purposely directed their actions at residents of the United States when Al Rajhi Bank financed al Qaida, whose stated purpose was targeting Americans.

51. September 11 hijacker Abdulaziz Al Omari financial transfers with Al Rajhi Bank (supra) [support the FBI's assertion that] demonstrates that al-Omari used his Al Rajhi credit card while in the U.S. In one financial transfer from the account of two of the other hijackers, Marwan al-Shehhi and Mohamed Atta, $200.00 was transferred into al-Omari's Al Rajhi Bank account via the Chase Manhattan Bank in New York, NY, to aid al-Omari's efforts in their planning of the attacks.

52. Al Rajhi Bank has many business interests which include extensive dealings with American corporations, or corporations which do extensive business in the United States.

53. The following organizations are Al Rajhi's U.S. investments: Aradi, Inc., and the Sulaiman Abdul Aziz al-Rajhi ("SAAR") Foundation. Sulaiman is also the Chairman and Managing Director of Al Rajhi Bank. Abdullah Sulaiman Al Rajhi, the General Manager of Al Rajhi Bank, is the President of Aradi Inc. Both of these U.S. Investments are located at 555 Grove Street, Herndon, Virginia, United States.

54. Al Rajhi Bank also has a direct involvement – through a position on the board of directors – in the following organizations:

> Piedmont Poultry Processing, Inc.,
> Address 1: 555 Grove Street
> Herndon, Virginia, United States 20170
>
> Address 2: Post Office Box 129 Lumber
> Bridge, North Carolina United States 28357
>
> Techno-Chemicals International, Inc.
> 1635 North Ironwood
> South Bend, Indiana, United States 46635
> Incorporated by Khaled Abdullah al-Rajhi InfoCom Corporation
> 630 International Parkway Post Office Box 850415
> Richardson, Texas, United States 75081

55. Many of the Al Rajhi businesses used InfoCom to host their websites. InfoCom, incorporated on March 16, 1992 and based in Richardson, Texas, hosts five hundred websites for Muslim organizations, many of which have ties to terrorism. Two of those organizations are Benevolence International Foundation (BIF) and Global Relief Foundation (GRF), both of whom were declared Specially

Designated Global Terrorists (SDGT) by the United States Treasury Department for their financial support to al Qaida. These two charities laundered money and defrauded investors in order to fund bin Laden and al Qaida. WAMY, under US investigation for its ties to al Qaida, also has its website registered care of InfoCom.

56. SDGT Holy Land Foundation for Relief and Development (HLF) shares employees with and has offices right across the street from InfoCom. The FBI had InfoCom's assets frozen by the Treasury Department six days before the World Trade Center and Pentagon attacks and the plane crash in Pennsylvania. Like the HLF, InfoCom received much of its early money from Mousa Abu Marzook, a top Hamas official who, the U.S. courts have determined, was directly involved in terrorism.

57. InfoCom began hosting the website for Al Rajhi Banking and Investment Corporation in 1997. InfoCom also used Al Rajhi Banking and Investment to receive money from their numerous Saudi investors. InfoCom received considerable money from an Al Rajhi Bank located in Saudi Arabia, and it was reasonable to assume that the money was used in furtherance of InfoCom's trade activity. SDGT Mousa Abu Marzook and one of his agents made 11 wire transfers totaling $2,003,659.00 into an unknown Al Rajhi Bank account from January 1989 through September 1992. InfoCom [and ICC, InfoCom's precursor] bank records show 48 wire transfers, totaling $1,542,804.00, from an unknown Al Rajhi Bank account between January 31, 1991 and July 2, 1997.

58. The Al Rajhi family is the SAAR Foundation's biggest donor. The SAAR Foundation is the hub of an enormous U.S. business enterprise. The Foundation dissolved in December 2000, but the hundreds of organizations that it created continue on as its legacy.

59. The Al Rajhi funded SAAR Foundation spawned a complex network of organizations that share officers, addresses, and funding. As of 2003, the Virginia Secretary of State Corporate Records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses at the 555 Grove Street location. Through this business enterprise, the Al Rajhi family maintains a strong presence with hundreds of U.S. businesses.

60. In addition to collecting donations on behalf of so-called "charities," Al Rajhi Bank has made numerous donations directly to charities headquartered or with offices in the United States. Al Rajhi Bank also conducts business in the United States through several corporate holdings.

61. Al Rajhi Bank and others, "purposefully directed" activities at the United States by funding those whose "activities" included killing innocent people for no reason other than that they were Americans.

62. Sulaiman Al Rajhi conducted or participated in, directly or indirectly, the affairs of Al Rajhi through a pattern of racketeering activity by, inter alia authorizing, ratifying, supervising, controlling, overseeing and/or directing Al Rajhi in its knowing and intentional provision of financial services to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and in servicing al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders bank accounts, and other accounts used to fund and support al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

**Connection to National Commercial Bank**

63. Sulaiman Al Rajhi managed the National Commercial Bank (NCB)[5] budget for the Saudi Joint Relief Committee.

64. NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization.

65. Moreover, NCB has served as one of al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, preferred banks for many years, maintaining accounts for many of the charity defendants that operate within al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, infrastructure, including the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), the Benevolence International Foundation ("BIF"), Blessed Relief (Muwafaq) Foundation and al Haramain, among others.

66. Under the supervision of Sulaiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.

67. NCB knowingly facilitates al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, fundraising by advertising the existence and numerical designations of the accounts it maintains for al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism, cooperating charities

---

[5] Specific misconduct regarding National Commercial Bank ("NCB"), a co-defendant herein, is provided via More Definite Statement Applicable to NCB.   Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to NCB,  relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 17

throughout the Muslim world, so that the supporters can deposit funds directly into those accounts for the benefit of al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, and their cells throughout the world.

68. During the 1990s, NCB channeled in excess of $74 million to al Qaida, and/or or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through the IIRO, and also transferred significant funding to al Qaida, and/ or International Islamic Front for the Jihad Against Jews and Crusaders and/or Radical Muslim Terrorism, through Blessed Relief.

## Connection to International Islamic Relief Organization ("IIRO")

69. Sulaiman Al Rajhi also serves on the board of directors of the IIRO, a purported "charitable" organization which has long acted as fully integrated components of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorists.

## Connection to SAAR

70. Sulaiman Al Rajhi established the SAAR Foundation and Network ("SAAR"). SAAR was named after Sulaiman Abdul Aziz Al Rajhi.  The Al Rajhi family has been the foundation's biggest donor, and Sulaiman Al Rajhi is the head of the family.

71. SAAR was formed in the 1970's by a group of Muslim scholars and scientists from the Middle East and Asia.  SAAR incorporated in 555 Grove Street, Herndon Virginia as a 501(c)(3) non-profit organization on July 29, 1983.  It was dissolved as of December 28, 2000.

72. SAAR was a long-time financial supporter of terrorism. According to the Virginia Secretary of State Corporate Records, there are more than one hundred affiliated organizations registered or doing business at just one address in Herndon, Virginia – 555 Grove Street. Most of these organizations do not maintain a physical presence there, or anywhere. The SAAR network is a sophisticated arrangement of front groups for fundamentalist Islamic terrorist organizations.  The SAAR network includes but is not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc. Sterling Charitable Gift Fund, Sterling Management Group, Inc. and York Foundation.  Many of the directors/managers of one organization, company or charity also serve as directors/managers for may other organizations, companies, or charities within the network.  For example, at the Herndon address, Abdullah

Omar al-Obaid was an officer of two of the SAAR network entities – Muslim World League and Sana-Bell Al-Kheer, which received rent from the Muslim World League and the International Islamic Relief Organization.

73. In March 2002, SAAR was raided under a search warrant, for the Grove Street in Herndon, Virginia location, by the U.S. Treasury Department's Operation Greenquest looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as ... al Qaeda as well as individual terrorists . . . (including) Osama bin Laden."  It was said by authorities that the probe of Herndon groups is the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon has sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to …provide material support to foreign terrorist organizations."

74. The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of terror.  This network has been used to funnel money, billions of dollars, to al Qaida's, and/or International Islamic Front for the Jihad Against Jews and Crusaders' and/or Radical Muslim Terrorism.  Additionally, the SAAR network provided logistical assistance to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through this web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

## Connection to Al Taqwa Bank and Youssef M. Nada

75. Sulaiman Al Rajhi was employed by Youssef M. Nada, the founder of Al Taqwa Bank.  On November 1, 2001, Al Taqwa Bank, by President Bush's executive Order, was denoted as a Specially Designated Global Terrorist Entity.  Its assets were frozen by the US Department of Treasury.

## Connection to al-Watania Poultry, Mar-Jac Investments, Inc. and Piedmont Poultry

76. Sulaiman Al Rajhi owns Saudi Arabia's largest poultry farm, al-Watania.  Mar-Jac Investments, Inc., Piedmont Poultry, al-Watania is controlled by the Safa Group, a known entity within the SAAR network.  These three companies have a significant business presence in the United States.  SAAR, (as described above) had an indirect financial interest in Safa Trust.

77. Safa Trust is considered to be SAAR's successor.

## Connection with Golden Chain

78. Sulaiman Al Rajhi is identified on the Golden Chain as one of al Qaida's principal financiers.  The "Golden Chain" document was discovered during a raid of the

Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror officials of the US government concluded that the document id "a list of people referred to within al Qaida" as wealthy donors to the movement.   See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. Filed Jan. 6, 2003).  The National Commission on Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.   See Final Report of the 9/11 Commission, Note 21 to Chapter 2.   The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designation him as a terrorist sponsor under Executive Order 13224.   See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee.

79. As the foregoing demonstrates, Sulaiman thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Sulaiman's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

80. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

{BALANCE OF PAGE INTENTIONALLY LEFT BLANK}

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## **CERTIFICATION OF SERVICE**

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2 has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: September 30, 2005

_____
GINA M. MACNEILL, ESQ.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Al Rajhi, Sulaiman - More Definite Statement - AL BAraka.doc