**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON          Civil Action No.:
SEPTEMBER 11, 2001             03 MDL 1570 (RCC)

--------------------------------------------------------x

This document relates to:
> *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development*
> *Corp. et al., Civil Action No.: 04-CV- 1923  (RCC)*


### PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT FAISAL ISLAMIC BANK

Counsel for the above captioned Plaintiffs hereby provide a more definite statement/additional allegations ("More Definite Statement") as to the above referenced Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004, paragraph 13.


Dated:  September 30, 2005

                    Respectfully submitted,


                    _____
                    Jerry S. Goldman, Esq. (JG-8445)
                    Frederick J. Salek, Esq. (FS-8565)
                    Gina M. MacNeill, Esq. (GM-0581)
                    LAW OFFICES OF JERRY S. GOLDMAN
                      & ASSOCIATES, P.C.
                    111 Broadway, 13th Floor
                    New York, N.Y. 10006
                    212.242.2232


                    *Attorneys for the Plaintiffs*

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

# EXHIBIT 1

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO DEFENDANT  FAISAL ISLAMIC BANK

1. The name of the defendant to whom this Statement pertains is Faisal Islamic Bank ("FIB").  The alleged misconduct and basis for liability is set forth below as well as elsewhere in the Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.  The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, FIB conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e. Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f. The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including FIB, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the Enterprise is as follows:

a. The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals

that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.     Thus,  although  al  Qaida,  for  example,  had  its  own membership roster and a structure of "committees" to guide and oversee such  functions  as  training  terrorists,  proposing  targets,  financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and  providing  material  support  to  operations.  FIB  fit  neatly  into  this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These  transactions  include  but  are  not  limited  to  transferring  funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).   These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.   The Enterprise relies upon a global network of banks and financial institutions, including FIB, and illegal activity to generate material support to continue its terrorist operations.

c.   FIB was not an employee, officer or director of the Enterprise, based upon present  information  available.    FIB  is  associated  with  the  alleged Enterprise.  FIB is a member of the Enterprise, and is separate and distinct from the Enterprise.  FIB intended to further the Attack and adopted the goal  of  furthering  and/or  facilitating  that  criminal  endeavor,  which criminal activity culminated in the Attack.

7.  The  pattern  of  racketeering  activity  conducted  by  FIB  is  separate  from  the existence  of  Radical  Muslim  Terrorism,  and/or  the  Al  Qaida,  and/or  the

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by FIB funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by FIB, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. FIB acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.    The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including FIB, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including FIB, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of FIB, of both those goals and the uses to which the Funds were put.

    b.    The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

    c.    The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

    d.    The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and

conspirators like FIB.   Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including FIB.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by FIB.  FIB, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. FIB also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against FIB are as follows:  Count One, Torture Victim Protection Act, 28 U.S.C. § 1350; Count Two, Alien Tort Claims Act 28 U.S.C. §1350; Count Nine, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Ten, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d); Count Twelve, Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606.

18. The state causes of action are as follows:  Count Three, Wrongful Death; Count Four, Survival; Count Five, Negligent and Intentional Infliction or Emotional Distress; Count Six, Conspiracy; Count Seven, Aiding and Abetting; Count Eight, Negligence; Count Eleven, Punitive Damages.

19. FIB has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. FIB conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  FIB conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. FIB is a subsidiary of Islamic Investment Company of the Gulf (Bahrain) EC, whose holding company is Defendant Dar-al-Maal al Islami (DMI),[1] based in Switzerland.  All three entities are chaired by Defendant Mohammed al Faisal al Saud.[2]

---

[1]Specific misconduct regarding DMI, a co-defendant herein, is provided via More Definite Statement Applicable to DMI.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to DMI, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[2] [2]Specific misconduct regarding Mohammed al Faisal al Saud ("Prince Mohammed"), a co-defendant herein, is provided via More Definite Statement, previously filed, Applicable to Prince Mohammed.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its RICO Statement, previously filed, Applicable to Prince Mohammed, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC). Such allegations shall only apply to defendants who are not presently dismissed in this action, without further leave of the Court.

22. FIB was founded in 1970 by Yousef M. Nada ("Nada"), a co-defendant in this action. Nada is a member of the Egyptian Muslim Brotherhood and the Jamaa al-Islamiya, which is directly allied with al Qaida. When he came to Saudi Arabia, he became friendly with the Royal Family, though his membership in the Muslim Brotherhood, a co-defendant in this action, opened a construction company, and thereafter, founded the FIB. Nada has been implicated as a supporter of the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, and has been connected to the Al Taqwa Bank, as their president, in supporting Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

23. Fib enjoyed privileges denied other commercial banks (full tax pensions), as well as guarantees against confiscation or nationalization. Moreover, these privileges came under official government protection from 1983 onward as the ruling regime became committed to all aspects of Sudanese life.

24. FIB is a subsidiary of Islamic Investment Company of the Gulf.

25. There are a number of FIB's across the Islamic world from Egypt to Pakistan to the Emirates and Malaysia. The head of the FIB is Prince Mohammed Al Faisal Al Saud ("Prince Mohammed").

26. During Prince Mohammed's tenure, FIB was involved with running accounts for bin Laden and his associates.

27. FIB was one of the main founders of the al Shamal Islamic Bank, the bank which Osama Bin Laden helped to establish in 1991 by providing capital in the amount of $50 million.

28. At this time, it is believed that FIB remains a major shareholder of al Shamal Bank.

29. At the time Faisal Islamic Bank provided financial services to Osama bin Laden, it was well known in the Muslim World that he was building a terrorist organization to wage jihad against the United States and the perceived enemies of Islam.

30. Indeed, at the conclusion of the Afghan was against the Soviets in 1989, Osama bin Laden had returned to Saudi Arabia as a "hero" of the *jihad* against the Soviets.

31. When the United States intervened against Iraq on behalf of Kuwait in 1990, bin Laden rallied radical Islamic elements to reject any U.S. support or intervention in the region. As a result of his efforts to incite radical Islamic elements, bin Laden

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc

was publicly expelled from Saudi Arabia and moved immediately to the Sudan, where a radical Islamic group, openly welcomed him and his top lieutenants.

32. Once situated in Sudan, bin Laden began bringing veterans of the Afghan jihad to the country, where they received terrorist training and became the first members of what is known today as al Qaida.

33. These early al Qaida members fought alongside NIF troops in the ongoing conflict against Christians in the South, in return for which al Qaida received land for training camps, weapons and other forms of support from the Sudanese government. Bin Laden also established numerous front companies to support the new organization in Sudan. All of these activities were well publicized at the time and, as a result, bin Laden's terrorist intentions were well known to people and organizations within the Sudan, including FIB.

34. Al Shamal Bank regularly provided financial and account services to al Qaida operatives – six of whom held bank accounts at Al Shamal.

35. Osama Bin Laden paid al Qaida members from Al Shamal accounts. Moreover, money from these Al Shamal accounts was deposited, housed and transferred to other al Qaida members to buy military equipment, including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

36. FIB was also implicated during the 2001 United States trial relating to the 1998 embassy bombings in Africa. A former finance manager for al Qaida in Khartoum, Jamal al-Fadl, testified that FIB held bank accounts for al Qaida operatives by stating:

> Q: "Where were the accounts [of the al Qaida] held? In what countries?
>
> A: …we got account in Bank Faisal Islami.
>
> Q: Is that also in Khartoum?
>
> A: Yes."

37. The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by FIB. The events of 9/11 were a direct and intended and foreseeable result of FIB's participation.

38. FIB continued to maintain accounts for these entities long after al Qaida's murderous intent was made clear though the terrorist activities in the complaint, as amended. In doing so, FIB knowingly provided financial services and other forms

of material support to al Qaida, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the Enterprise through anti-terrorist and money laundering safeguards.

39. FIB misconduct includes laundering money for Al Qaida (including maintaining and servicing AL Qaida bank accounts and accounts used to fund and support Al Qaida), and/or facilitating money transfers and weapons and military equipment purchases for Al Qaida.

40. FIB knowingly facilitated Al Qaida's fundraising efforts by advertising the existence and numerical designations of the accounts it maintained for Al Qaida's cooperating charities throughout the Muslim world.

41. FIB has channeled millions of dollars to al Qaida through its baking and financial operations, and knowingly and intentionally provided repeated material support and substantial assistance to al Qaida through the use of interstate and international faxes, telephones, wire transfers and transmissions and mailing in violation of numerous federal statutes.

42.  FIB controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States, and did nothing to stop them.

43. As the foregoing demonstrates, FIB thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of FIB's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

44. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005


LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2 has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: September 30, 2005

_____
GINA M. MACNEILL, ESQ.

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Al Baraka\Faisal Islamic Bank - More Definite Statement - AL BAraka_b.doc