UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x
                                      **:**
In re TERRORIST ATTACKS ON       **:**    03 MDL 1570 (RCC)
SEPTEMBER 11, 2001           **:**    ECF Case
                                        **:**
-------------------------------------------------- x

This document relates to:

Estate of John P. O'Neill, Sr., on behalf John P. O'Neill, Sr.,
deceased, and on behalf of decedent's heirs-at-law, et al. v.
Al Baraka Investment and Development Corp., et al., Case
No. 04-CV-1923

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT ON BEHALF OF DEFENDANT BANCA DEL GOTTARDO

**SONNENSCHEIN NATH & ROSENTHAL LLP**
Martin R. Gold (MG 6528)
Martin Schwartz (MS 4227)
Monica Pa (MP 3307)
1221 Avenue of the Americas
New York, New York  10020
Tel.:  (212) 768-6700

*Attorneys for Defendant Banca del Gottardo*

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................................... ii

Preliminary Statement ........................................................................................................ 1

Procedural History ............................................................................................................. 2

The SAC's Allegations Against BDG ............................................................................... 3

The Case Statement............................................................................................................ 4

ARGUMENT ...................................................................................................................... 7

      General Standards ....................................................................................................... 8

      Conspiracy and Aiding and Abetting ......................................................................... 9

**POINT I -** THE FEDERAL LAW CLAIMS MUST BE DISMISSED...................................... 12

      A.   Anti-Terrorism Act ....................................................................................... 12

      B.   Torture Victim Protection Act ...................................................................... 14

      C.   Alien Tort Claims Act................................................................................... 14

      D.   RICO ............................................................................................................ 15

**POINT II -** THE STATE LAW CLAIMS MUST BE DISMISSED.......................................... 19

      A.   Negligence ................................................................................................... 19

      B.   Negligent and/or Intentional Infliction of Emotional Distress .................... 20

      C.   Wrongful Death ............................................................................................ 21

      D.   Conspiracy and Aiding and Abetting........................................................... 21

      E.   Survival........................................................................................................ 22

      F.   Punitive Damages ......................................................................................... 23

CONCLUSION................................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Page**

### **CASES**

*AB v. Rhinebeck Central School Dist.*, 361 F. Supp. 2d 312 (S.D.N.Y. 2005) ............................20

*Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 510 N.Y.S.2d 546 (1986) ....................................................................................................................................21

*Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610, 2001 WL 293683 (S.D.N.Y. March 27, 2001)................................................................................................................................18

*Anisfeld v. Cantor Fitzgerald & Co.*, 631 F. Supp. 1461 (S.D.N.Y. 1986)..................................19

*Arndt v. UBS AG*, 342 F. Supp. 2d 132 (E.D.N.Y. 2004)............................................................14

*Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir. 1984), *vacated on other grounds*, 473 U.S. 922 (1985) ..............................................................................................................16

*Barrow v. Wethersfield Police Dep't*, 66 F.3d 466 (2d Cir. 1995) ...............................................20

*Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492 (4th Cir. 1995) .............................................16

*Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362 (E.D. La. 1997), *aff'd*, 197 F.3d 161 (5th Cir. 1999) ...............................................................................................................14

*Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565 (S.D.N.Y. 1999)...............21, 22

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000 (7th Cir. 2002) .....................................................................................................................13

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ..........................................................................................8, 10, 12, 16, 19

*Casio Computer Co., Ltd. v. Sayo*, No. 98 Civ. 3772, 1999 U.S. Dist. LEXIS 14675 (S.D.N.Y. Sept. 20, 1999), *confirmed*, 2000 U.S. Dist. LEXIS 15411 (S.D.N.Y. Oct. 13, 2000).................................................................................................................18, 19

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) .............15

*Ciambriello v. County of Nassau*, 292 F.3d 307 (2d Cir. 2002)....................................................8

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001)................................23

*Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105 (D.D.C. 2003) ..............................23

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .........................................................................18

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996) .....................................................8

*Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449 (S.D.N.Y. 1996) .........18

*Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992) .....................................................................................16

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) .....................................................................23

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ..............8, 17, 18, 23

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)....................................9

*Friedman v. Bayer Corp.*, No. 99-C 1999 WL 33457825 (E.D.N.Y. Dec. 15,  1999).................14

*Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994)...........................................................5

*Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764 (S.D.N.Y. June 29, 2001)...........................................................................................................................................15

*Grogan v. Platt*, 835 F.2d 844 (11th Cir. 1988) ..........................................................................16

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .........................................8

*Heffernan v. HSBC Bank USA*, No. 1:99CV07981, 2001 WL 803719 (E.D.N.Y. March 29, 2001)....................................................................................................................................18

*Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289 (2001) ..........................................13

*Industrial Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032, 1994 WL 286162 (S.D.N.Y. June 27, 1994) ........................................................................................................18

*Jenkins v. Virgin Atlantic  Airways, Ltd.*, 46 F. Supp. 2d 271 (S.D.N.Y. 1999) ..........................19

*Jones v. Petty Ray Geophysical Geosource, Inc.*, 722 F. Supp. 343 (S.D. Tex. 1989) ................14

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).........................................................................................................17

*Khan v. State Bank of India*, No. 01 Civ. 1305, 2001 WL 1463783 (S.D.N.Y. Nov. 15, 2001)........................................................................................................................................19

*McDonald v. McDonald*, 193 A.D.2d 590, 597 N.Y.S.2d 159 (2d Dep't 1993) .........................22

*Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291 (2d Cir. 2000) ..........................................15

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351
(S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d
Cir. 2005)..................................................................................................................8

*Morin v. Trupin*, 747 F. Supp. 1051 (S.D.N.Y. 1990)....................................................17

*Mortise v. United States*, 102 F.3d 693 (2d Cir. 1996).................................................20

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514 (S.D.N.Y.
2001).......................................................................................................................18

*Pereira v. Binet*, 153 B.R. 617 (Bankr. E.D.N.Y. 1993) .................................................9

*In re Pfohl Bros. Landfill Litig.*, 68 F. Supp. 2d 236 (W.D.N.Y. 1999), *vacated and
remanded on other grounds sub nom. Freier v. Westinghouse Elec. Corp.,*, 303 F.3d
176 (2d Cir. 2002) ................................................................................................22

*Pittman v. Grayson*, 149 F.3d 111 (2d Cir. 1998) .......................................................22

*Pollack v. Nash*, 58 F. Supp. 2d 294 (S.D.N.Y. 1999) ..............................................8, 9

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926, 1999 WL 47239 (S.D.N.Y. Feb. 3,
1999)........................................................................................................................19

*Salinas v. United States*, , 522 U.S. 52 (1997)............................................................18

*Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340 (S.D.N.Y. 1998) ...............................17, 18

*Shams v. Fisher*, 107 F. Supp. 2d 266 (S.D.N.Y. 2000)..............................................17

*Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 698 N.Y.S.2d 615 (1999) ...................21

*Smith v. County of Erie*, 295 A.D.2d 1010, 743 N.Y.S.2d 649 (4th Dep't 2002) .........23

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 125 S. Ct. 2739 (2004)................................15

*In re South African Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) ..........14, 15, 17

*Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.*, 923 F. Supp. 38 (S.D.N.Y. 1996).................18

*Synor v. Padavano*, 15 A.D.3d 1010, 788 N.Y.S.2d 916 (4th Dep't 2005)..................20

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765
(S.D.N.Y. 2005) ..........................................................7, 9, 10, 11, 12, 13, 14,
16, 17, 18, 19, 20, 21, 22

*United States v. Hickey*, 16 F. Supp. 2d 223 (E.D.N.Y. 1998) ........................................................17

*United States v. Perscio*, 832 F.2d 705 (2d Cir. 1987) ...................................................17

*Ward v. City of New York*, 15 A.D.3d 392, 789 N.Y.S.2d 539 (2d Dep't 2005).............................21

## STATUTES & REGULATIONS

18 U.S.C.A. § 1961(1) (West 2000) ..........................................................17

18 U.S.C.A. § 1961(5) (West 2000) ..........................................................17

18 U.S.C.A. § 1962 (West 2000)...............................................................16, 17, 18

18 U.S.C.A. § 1964(c) (West 2000)..........................................................16

18 U.S.C.A. § 2333(a) (West 2000)..........................................................12

18 U.S.C.A. § 2339A (West 2000 & Supp. 2005) ....................................13

18 U.S.C.A. § 2339B (West 2000 & Supp. 2005) ....................................13

28 U.S.C.A. § 1350 (West 1993) ..............................................................14

28 U.S.C.A. § 1350 note (West 1993) .......................................................14

28 U.S.C.A. § 1367(c)(3) (West 1993) ......................................................19

28 U.S.C.A. § 1603(b) (West 1994) ..........................................................23

28 U.S.C.A. § 1605(a)(7) (West Supp. 2005) ............................................23

28 U.S.C.A. § 1606 (West Supp. 2005)......................................................23

N.Y.C.P.L.R. 214(4) (McKinney 2003) .....................................................20

N.Y.C.P.L.R. 215(3) (McKinney 2003) .....................................................20

N.Y.E.P.T.L. § 5-4.1 (McKinney Supp. 2005)............................................21

N.Y.E.P.T.L. § 11-3.2(b) (McKinney 2001) ...............................................22

Pub. L. 108-458, Title VI, § 6603(c) (Dec. 17, 2004) .................................13

Pub. L. 107-56, Title VIII, § 805(a)(1) (Oct. 26, 2001)..............................13

67 Fed. Reg. 12644 (March 19, 2002) ........................................................7

68 Fed. Reg. 7836 (Feb. 18, 2003) ...............................................................................7

### OTHER AUTHORITIES

Richard A. Clarke, *Against All Enemies: Inside America's War on Terror* (Free Press 2004)..........................................................................................................................6

Kenneth M. Pollock, *The Persian Puzzle: The Conflict Between Iran and America* (Random House Trade Paperback Ed. 2005) ..........................................................6

*The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks Upon the United States* (Authorized Ed., W.W. Norton & Co. 2004) ........................6

## Preliminary Statement

Defendant Banca del Gottardo ("BDG") submits this memorandum in support of its motion to dismiss the Second Amended Class Action Complaint ("SAC") for failure to state a claim, and as to the claim brought under the Alien Tort Claims Act, lack of subject matter jurisdiction.  The plaintiffs are the estate and survivors of John P. O'Neill, Sr., who was killed in al Qaeda's attack on the World Trade Center on September 11, 2001 (SAC ¶¶ 5-10, 16-21). They bring this case as a purported class action on behalf of the estates and survivors of all individuals who died as a result of the several terrorist attacks on September 11, 2001 (SAC ¶ 14).  The heinousness of the infamous events of 9/11, and the right of its victims to seek redress from its perpetrators is not in issue.   Upon the facts alleged in the SAC, even as recently supplemented by plaintiff's RICO Statement, however, plaintiffs simply have not stated any basis on which to hold BDG in any way liable for these horrific events.  Indeed, plaintiffs' allegations against BDG are so conclusory and insubstantial that the inclusion of BDG as a defendant is grossly irresponsible -- which may explain why among the many individuals and corporate entities that have brought actions arising out of the September 11 attacks, no other plaintiff or law firm has seen fit to name BDG as a defendant.

## Banca del Gottardo

The SAC provides information about the religious or political affiliations, ownership, management, goals and/or purposes of most of the named defendants, virtually all of whom are alleged to be individuals, or organizations controlled by persons, who are Islamic fundamentalists or militants who, by virtue of their presumed belief systems (if nothing else), are supposed to be in sympathy with the anti-Western jihadist goals of Osama bin Laden and al Qaeda.  Notably as to BDG, however, the SAC is conspicuously silent, even though the facts about BDG's business, ownership and management (including its directors and principal

executive officers) are a matter of public record readily available to anyone with access to a computer.  *See* www.swisslife.com and www.gottardo.com.

Founded in 1957, BDG is a public limited company created pursuant to articles 620 *et seq.* of the Swiss Code of Obligations and which is subject to the Swiss Federal Law governing Banks and Savings Institutions and the regulatory authority of the Swiss Federal Banking Commission.  Headquartered in Lugano, with branches throughout Switzerland, and branches or representative offices in several European countries, Nassau and Hong Kong, BDG is a leading Swiss bank, serving private, corporate, commercial and institutional clients who are resident or operate primarily in Switzerland and other Western European countries.

BDG is a wholly-owned subsidiary of Swiss Life Holding, a publicly-owned Swiss corporation headquartered in Zurich, whose shares are traded on the Swiss Exchange, and which has over 200,000 shareholders.  Swiss Life is Switzerland's largest life insurance company. Prior to being acquired by Swiss Life in 1999, BDG was a subsidiary of Sumitomo Bank Ltd., Japan's No. 2 bank, which acquired control from the liquidators of a subsidiary of Banco Ambrosiano in 1984.

As is apparent from the SAC and plaintiffs' RICO Statement, BDG has not been charged or accused by any regulatory, executive or prosecutorial authority of any country of violating any penal law, statute or regulation pertaining in any way to transfers of funds in connection with al Qaeda or any other terrorist organization.

**<u>Procedural History</u>**

This action was commenced on March 10, 2004, and a first amended complaint was filed on October 15, 2004.  Plaintiffs did not name BDG as a defendant in either of them.  BDG was named as a defendant in this action for the first time on December 30, 2004, when plaintiffs filed

the SAC.  On June 28, 2005, service was effected on BDG at its offices in Lugano, Switzerland

pursuant to the Hague Convention.

The parties entered into a stipulation, so ordered by the Court on July 26, 2005, providing

for plaintiffs to file their RICO Statement, as required by Judge Casey's rules, on September 1,

2005, and BDG to move or answer by October 3, 2005.  On September 1, 2005, plaintiffs filed a

document entitled "More Definite Statement Pursuant to the Fed. R. Civ. Pro. Rule 12(e), Judge

Casey's CMO-2, Paragraph 13, and/or RICO Statement Applicable to Banca del Gottardo a/k/a

Banca del Gottardo" (hereinafter, the "Case Statement").[1]

### The SAC's Allegations Against BDG

The 60-page SAC mentions BDG (excluding the caption) twice:  SAC ¶¶ 22, 76.  In

paragraph 22, BDG is lumped in with dozens of other defendants, generally described as "banks,

financial organizations, and companies," who, it is conclusorily alleged, "conspired with Osama

bin Laden and al Qaeda to raise, launder, transfer, distribute, and hide funds . . . to support and

finance their terrorist activities including, but not limited to, the September 11th attacks."[2]

---

[1]     We note that Case Management Order #2 ("CMO-2") ¶ 13 does not appear to contemplate amendments or more definite statements to serve as amendments after July 31, 2005 without approval of the Court pursuant to Rule 15(a), and that the parties' so-ordered stipulation authorized only the filing of a RICO Statement by plaintiffs on September 1, 2005.  On September 30, 2005 -- one business day before BDG's motion to dismiss was due -- plaintiffs inexplicably filed yet another document titled: "Plaintiffs' More Definite Statement/Additional Allegations" as to BDG.  This document, albeit formatted differently than the Case Statement, is substantively identical to it and contains no new factual allegations as to BDG.  Because we completed our Memorandum of Law before receiving this redundant document, our citations herein are to the Case Statement.

[2]     Paragraph 23 lumps together numerous "businessmen, bankers, financiers, organizations, and operatives" -- none of whom includes any officer, director, employee, shareholder or agent of BDG -- alleged to have done the same.  Paragraph 24 lumps together dozens of organizations which are alleged to be "charities and charitable foundations which are used as terrorist fronts to mask money transfers and provide cover for terrorist operatives and operations" -- none of which is alleged to have had a relationship with BDG or to have been known to BDG as a terrorist front.

Under a heading titled "Common Factual Allegations," covering SAC ¶¶ 28-126, plaintiffs, under various subheadings, make additional allegations describing the background, nature and alleged role of most of the named defendants -- except that there is no such set of allegations with respect to BDG. Rather, the only other mention of BDG occurs in paragraph 76, where BDG is again lumped in with dozens of defendants conclusorily alleged to have "aided, abetted, and materially sponsored and [sic] al Qaeda and international terrorism."

### The Case Statement

Plaintiffs' effort to salvage their claims through their recently filed Case Statement is in vain, since it is largely a rehash of the SAC's recitations pertaining to al Qaeda's jihad and acts of terrorism, with conclusory assertions from time to time referring to "participants and conspirators like Banca del Gottardo" (*e.g.*, Case Statement ¶ 14, at p. 10), or to "financial facilitators, including Banca del Gottardo" having laundered funds "from Islamic so-called charities and corporations . . . ." (Case Statement ¶ 14, at p. 9). Substantively, these allegations are no more factual than the conclusory allegations in the SAC, the only difference being that, since the Case Statement is supposed to relate to BDG, BDG's name is mentioned more frequently and is not surrounded by the names of the dozens of other named defendants.

In response to item 2 of Judge Casey's RICO Statement Instructions, requiring plaintiffs to "state the alleged misconduct and basis for liability of each defendant," plaintiffs have attached a 2-page chart labeled "Exhibit A" to their Case Statement, which contains additional allegations about BDG, all of which are either completely irrelevant to the terrorist attacks by al Qaeda or are hopelessly vague, insubstantial and insufficient. Moreover, plaintiffs have ignored Judge Casey's admonition in his Instructions that plaintiffs set forth "the facts the party is relying upon . . . *as a result of the 'reasonable inquiry' required by Rule 11, Fed. R. Civ. P.*" Plaintiffs obviously made no reasonable inquiry or investigation but have merely quoted directly from an

article published by the *Washington Times* on June 2, 2004, with respect to plaintiffs' principal allegation against BDG, and lifted other portions of that article (sometimes verbatim) -- omitting quotation marks or direct citation to the article -- for most of their remaining irrelevant allegations against BDG.[3]  A copy of the June 2, 2004 article relied on by plaintiffs, "Saddam's Secret Money-Laundering Trail," by Lucy Komisar (apparently a freelance writer) is attached hereto as Appendix A (with references to BDG or pertaining to the Case Statement allegations marked in the margin, for ease of comparison to plaintiffs' Case Statement).   While the allegations about BDG made or adopted by plaintiffs are materially untrue and misleading, solely for purposes of this motion pursuant to Rule 12(b)(6), such allegations must be assumed to be true.  As such, they do not state a claim.

At the outset, it may be readily appreciated that plaintiffs' (Ms. Komisar's) allegations about BDG's alleged movement of "bribe and kickback money paid . . . to former Russian President Boris Yeltsin and his cronies" by a "Swiss construction company," and BDG's status, in the 1970s, as a subsidiary of Banco Ambrosiano, "the Vatican Bank," (Case Statement, Exhibit A), do not constitute predicate crimes under RICO, or a violation of any other U.S. law, and have nothing whatsoever to do with the events of September 11 or al Qaeda.

Plaintiffs also allege that "Banca del Gottardo . . . handled payments for the Saddam money network" and that "[t]here have been links to support Saddam's funding of the al Qaida." (Case Statement, Exhibit A).  Plaintiffs, however, have disingenuously omitted the fact that the Komisar article, their evident source, refers to BDG and the so-called "Satan account" only in connection with transfers, allegedly occurring in *1981, 1982, and 1983*, which she alleges or implies represented bribes and kickbacks to Saddam or his family members from Dassault

---

[3]     *See Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279-81 (3d Cir. 1994) (attorneys who asserted securities fraud claims based only on review of a *Wall Street Journal* article and complaints filed by other plaintiffs did not make "reasonable inquiry" as required by Rule 11).

International, a leading French weapons manufacturer, and transfers to other banks where accounts were held by Saddam relatives or other unidentified individuals.  These transfers are alleged to have occurred long before -- according to plaintiffs' own Case Statement -- al Qaeda was even organized, and long before BDG is alleged by plaintiffs to have joined the alleged conspiracy (the mid or late 1990s).[4]

Not only have plaintiffs alleged no facts about BDG in relation to Iraq that could have any conceivable temporal nexus to al Qaeda or the events of 9/11, but the 9/11 Commission, after an exhaustive investigation, declared that it had seen "no evidence" that any contacts between Bin Laden or his aides "ever developed into a collaborative operational relationship" or "indicating that Iraq cooperated with al Qaeda in developing or carrying out any attacks against the United States."  *The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks Upon the United States* 66, 228-29 (Authorized Ed., W.W. Norton & Co. 2004).

Finally, *quoting directly from and with direct attribution to the Komisar article*, Exhibit A to the Case Statement includes the following:  "Banca del Gottardo in Lugano, Switzerland, moved al-Qaida money via the Al Taqwa bank, a shell that operated through correspondent

---

[4]    Plaintiffs disregard the historic fact that this was the period of the Iran-Iraq War, in which the United States was supporting Saddam.  In February 1982, the Reagan Administration removed Iraq from the list of nations that sponsored terrorism, allowing Iraq to apply for U.S. government-backed export promotion loans; in 1983, Donald Rumsfeld went to Baghdad as a presidential envoy, which trip was followed by the provision of U.S. satellite intelligence to Iraq about Iranian deployments; U.S. arms sold to Saudi Arabia and Egypt as part of overstocking were re-sold to Iraq without any effort by the United States to stop it; and in 1984, the United States resumed full diplomatic relations with Iraq.  *See* Richard A. Clarke, *Against All Enemies: Inside America's War on Terror* 41-42 (Free Press 2004); Kenneth M. Pollock, *The Persian Puzzle:  The Conflict Between Iran and America* 206-08 (Random House Trade Paperback Ed. 2005).

accounts at the Gottardo branch in Nassau."[5]  Absent from plaintiffs' Case Statement, as well as from the Komisar article, are any facts permitting the inference that BDG had knowledge that any money transferred was "al Qaeda money," *i.e.*, had its source in al Qaeda, or was being transferred to, or at the direction of, al Qaeda.  Nor is there any allegation as to when such "al Qaeda money" was allegedly transferred, *i.e.*, how many years before the events of 9/11.  Nor is there any factual allegation that BDG had knowledge that Al Taqwa Bank had al Qaeda accounts, performed services for, or gave support to al Qaeda, or that Al Taqwa was itself a terrorist organization.  The Court may take judicial notice of the fact that the United States did not list Al Taqwa as a terrorist organization and freeze (or request other countries to freeze) Al Taqwa accounts until *after* the events of 9/11.[6]

## ARGUMENT

The SAC asserts four federal claims, under the Torture Victim Protection Act, the Alien Tort Claims Act, the Anti-Terrorism Act, and RICO, as well as several common law claims.  On January 18, 2005, this Court dismissed the same claims brought by different plaintiffs in this MDL proceeding against similarly situated defendants.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*In re Terrorist Attacks*").  Based upon the holdings

---

[5]     The malign ambiguity of this inflammatory sentence, which is not accompanied by any corroborating facts or details, no doubt accounts for plaintiffs' calculated decision to include the statement in their Case Statement surrounded by quotation marks and with direct attribution to the article.  It is apparent from the article as a whole that the author's purpose -- through the force of cumulative innuendo dating back to the 1970s -- was to carry out an attack on BDG's character.

[6]     *See* 67 Fed. Reg. 12644, 12645 (March 19, 2002) (listing November 7, 2001 designations -- which include Bank Al Taqwa and other Al Taqwa entities -- under Executive Order 13224 imposing economic sanctions (blocking of assets) on persons determined to be owned, controlled or acting on behalf of persons who commit or threaten acts of terrorism); 68 Fed. Reg. 7836 (Feb. 18, 2003) (Nov. 6, 2002 order placing Al Taqwa Bank and other Al Taqwa entities on Terrorist Exclusion List (TEL)).

and reasoning expressed in this Court's January 18 decision, the claims brought by these plaintiffs against BDG must likewise be dismissed.

## General Standards

In adjudicating this motion, the Court is required to accept as true only "well-pleaded" allegations of fact. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 355 n.2 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) "[C]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Id.* at 355 n.5 (citation omitted). "The Court is not required to accept 'conclusions of law or unwarranted deductions of fact' as true." *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003). *See also Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 103 (D.D.C. 2003) ("a court may accept neither inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations") (internal quotation marks and citations omitted); *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996) ("a complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)") (citations omitted).

In order to avoid dismissal, the complaint must "specify in detail the factual basis," including "time and place" of the conspiratorial acts, for a claim based on conspiracy. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n.4 (2d Cir. 1990) (under Rule 8(a), the complaint "must allege some factual basis for a finding of a conscious agreement among the defendants").

Further, the adequacy of conspiracy allegations must be analyzed separately with respect to each defendant charged. *See, e.g., Pollack v. Nash*, 58 F. Supp.2d 294, 299-305 (S.D.N.Y. 1999). The "complaint must contain *more than naked, improbable, unsubstantiated assertions*

- 8 -

without any specifics." *Id.* at 299 (emphasis supplied; internal quotations and citations omitted). Thus, the "lumping together" of defendants in broad allegations of conspiracy to commit criminal or tortious activity is not sufficient, particularly as to a defendant who appears to be an "outsider" -- which, in the context of this case, aptly defines BDG. *See Pereira v. Binet*, 153 B.R. 617, 628 (Bankr. E.D.N.Y. 1993) ("Incantations that Schlesinger 'masterminded' a conspiracy, without more, are insufficient to overcome dismissal of the conspiracy charges").

**Conspiracy and Aiding and Abetting**

Plaintiffs do not claim that BDG itself committed the September 11th attacks. Instead, in order to assert their various claims against BDG, plaintiffs must rely on theories of conspiracy and aiding and abetting. As stated by this Court, these theories are

> based on the principle that all those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer are equally liable with him. To be liable under either conspiracy or aiding and abetting . . . the defendant must know the wrongful nature of the primary actor's conduct and the conduct must be tied to a substantive cause of action.

*In re Terrorist Attacks*, 349 F. Supp. 2d at 826 (internal quotation marks, alterations and citations omitted).

Plaintiffs must also allege that any material support given by a particular defendant proximately caused the injuries suffered by plaintiffs. *In re Terrorist Attacks*, 349 F. Supp. 2d at 825-26. Temporally remote conduct does not generally lend itself to a finding of proximate cause. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) ("When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim").

As noted by the court in *Burnett*, prior to its transfer to this Court:

> [I]t is difficult to imagine uglier or more serious charges than those the plaintiffs have leveled at these defendants. The use of the privileged medium of a lawsuit to publicly label someone an accomplice of terrorists can cause incalculable reputational damage. . . . [G]iven the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of plaintiffs' allegations as to any particular defendant, to ensure that he - or it - does indeed have fair notice of what the plaintiffs' claim is and the grounds upon which it rests, and that no inferences are accepted that are unsupported by the facts set out in the [complaint].

*Burnett,* 274 F. Supp. 2d at 103-04.

In *In re Terrorist Attacks,* this Court found that the claims against various banking defendants, charges that were set forth in more factual detail than those asserted against BDG, were insufficient to state claims against those defendants because there were no sufficient factual allegations that defendants knowingly participated in a conspiracy or knowingly rendered material aid to the perpetrators of the September 11th attacks. 349 F. Supp. 2d at 831-35. For example, this Court dismissed the claims against Al Rajhi Bank, notwithstanding the fact that the Bank was charged with the following: (1) the bank held the accounts for numerous charities, specifically identified in the complaint, that served as al Qaeda fronts; (2) some of these charities had been designated by the U.S. and Saudi Arabian authorities as terrorist organizations; (3) one of the September 11th hijackers had an account at the Al Rajhi Bank and another hijacker made a transfer to an account at this bank; (4) an al Qaeda financier asked a Saudi government official to send money through the Al Rajhi Bank; (5) a company which was owned and operated by a Hamas leader and designated terrorist was the host of the Al Rajhi Bank website, and money was transferred to this terrorist company through the Al Rajhi Bank; (6) Al Rajhi Bank directly funded a charity named the Tulkarm Charity Committee and the SAAR Network, among others, that were known fronts for Hamas; and (7) members of the Al Rajhi family, who own and

- 10 -

control the defendant bank, were alleged to have ties to Osama bin Laden's personal secretary and were closely associated with wealthy donors of bin Laden. *Id.* at 831-32.

Notwithstanding these allegations, this Court found that the allegations against Al Rajhi Bank were not sufficient to allege that this defendant bank was a member of the alleged conspiracy or aided and abetted the commission of the September 11th attacks. Although the Al Rajhi Bank provided financial service for numerous terrorist organizations, the Court reasoned that plaintiffs failed to allege that the Bank knew that its clients were engaged in international terrorist activities. *Id.* at 832-33. The Court disregarded the plaintiffs' plainly conclusory allegation "that Al Rajhi Bank *had to know* that Defendant charities . . . were supporting terrorism[,]" finding that conclusory allegations of knowledge were not sufficient for pleading purposes. *Id.* at 833 (emphasis added).

Similarly, this Court dismissed the claims against the Arab Bank notwithstanding allegations that this bank directly supported al Qaeda terrorist cells. *Id.* at 834-35. The allegations against Arab Bank were that: (1) it had "long provided financial services and . . . material support to terrorist organizations;" (2) it had "long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations," including "for al Qaeda money transfers throughout the world;" (3) that Israeli officials had seized funds associated with several Arab Bank accounts maintained on behalf of known fronts for Hamas; and (4) that "members of the Spanish al Qaeda cell used Arab Bank to make wire transfers," for example, a "$6400 wire transfer through Arab Bank from member of Spanish al Qaeda cell to an extremist associated with [a terrorist organization] in Spain." *Id.* Notwithstanding these and other allegations, this Court held that "the complaints do not include any facts to support the inference that Arab Bank knew or had to know that it was providing material support to terrorists by

providing financial services to the charity Defendants or by processing wire transfers in Spain." *Id.* at 835.

The claims against Saudi American Bank -- similar to the instant claim against BDG -- were based largely on allegations that it had served as a correspondent bank for other banks alleged to have been involved in financing al Qaeda.  This Court dismissed the actions because the relevant complaints lacked factual allegations showing that Saudi American had  knowledge "that anything relating to terrorism was occurring through the services it provided."  *Id.* at 834.

Underlying the Court's disposition of the charges against these and other banking defendants is the principle that banks do not become liable for injuries caused by money passing through them on routine banking business.  *Id.* at 833; *Burnett*, 274 F. Supp. 2d at 109. Inasmuch as the allegations against BDG are even more conclusory and devoid of relevance, and lacking in any facts indicative of a purpose, motive or intent by BDG to help al Qaeda launch a terrorist attack upon the people of the United States, this salutary principle requires dismissal of the claims against BDG.

### POINT I

### <u>THE FEDERAL LAW CLAIMS MUST BE DISMISSED</u>

**A.    <u>Anti-Terrorism Act</u>**

Plaintiffs assert a claim under the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* ("ATA") (SAC, Count Nine, ¶¶ 171-75).  The ATA, which is a penal statute, provides a civil remedy for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . . ."  18 U.S.C.A. § 2333(a) (West 2000).  As this Court has held, "To adequately plead the provision of material support under this section, a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the

defendant engaged in some act of helping those activities." *In re Terrorist Attacks*, 349 F. Supp.

2d at 828.  *See also Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291

F.3d 1000, 1011-12 (7th Cir. 2002) (to set forth claim for ATA, plaintiff must plead that

defendants "knowingly and intentionally" participated in terrorist activities; ". . . funding

*simpliciter* of a terrorist organization is insufficient because it sets too vague a standard, and

because it does not require a showing of proximate cause").

    As discussed above, plaintiffs' allegation that BDG at some unspecified time transferred

"al Qaeda money" via a correspondent account held by another bank cannot alone, or together

with the other allegations, create the inference that BDG knew that it was transferring "al Qaeda

money," or that BDG desired to help make al Qaeda terrorist attacks against the United States

succeed, or that BDG knowingly conspired with or aided and abetted the perpetrators of such

terrorist attacks.  Accordingly, this claim must be dismissed.[7]

---

[7]    Furthermore, the only "material support" as to BDG attempted to be alleged by plaintiffs is the alleged transfer of "al Qaeda money," *i.e.*, "currency" or "financial services" within the meaning of the relevant section of the ATA, 18 U.S.C.A. § 2339A(b) (West 2000 & Supp. 2005).  During the relevant period, such "material support or resources" had to be provided "within the United States" to be illegal or actionable under the statute.  18 U.S.C.A. § 2339A(a) (West 2000).  The words "within the United States" were deleted by Pub. L. 107-56, Title VIII, § 805(a)(1), on October 26, 2001.  *See* 18 U.S.C.A. § 2339A, Historical and Statutory Notes (West Supp. 2005).  *See also* 18 U.S.C.A. § 2339B (West 2000 & Supp. 2005) (defendant's conduct must be "within the United States or subject to the jurisdiction of the United States"), amended on December 17, 2004 by Pub. L. 108-458, Title VI, § 6603(c), deleting words "within the United States or subject to the jurisdiction of the United States").  There is no allegation that BDG made any transfer of al Qaeda money within or to the United States or subject to the jurisdiction of the United States.  There is no allegation -- nor could there be -- that BDG had a branch or office in the United States.  "[C]ongressional enactments … will not be construed to have retroactive effect unless their language requires this result. . . .  Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . ."  *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 315-16 (2001) (internal quotations and citations omitted).

### B.   Torture Victim Protection Act

Plaintiffs' claim under the Torture Victim Protection Act ("TVPA"), 28 U.S.C.A. § 1350 note (West 1993), (SAC, Count One, ¶¶ 134-37) must be dismissed.  This Court has held:  "The TVPA establishes a cause of action in federal court against an individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture or extrajudicial killing.  *Only individuals* may be sued under the TVPA."  *In re Terrorist Attacks*, 349 F. Supp. 2d at 828 (citing *Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004)). *See Friedman v. Bayer Corp.*, No. 99-CV-3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec. 15, 1999); *Beanal v. Freeport-McMoRan, Inc.,* 969 F. Supp. 362, 382 (E.D. La. 1997), *aff'd*, 197 F.3d 161 (5th Cir. 1999).  BDG, a public limited company under Swiss law, is not an individual subject to liability under the TVPA.  Nor are there any factual allegations showing that BDG acted under color of law.  *In re Terrorist Attacks*, 349 F. Supp. 2d at 828; *In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 555 (S.D.N.Y. 2004) (no aider and abettor liability under TVPA for private actors not acting under color of law).  Accordingly, for these reasons, as well as the failure to allege any knowing participation by BDG in a scheme to accomplish torture or extra-judicial killings, this claim must be dismissed.

### C.   Alien Tort Claims Act

Plaintiffs' claim under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA") (SAC, Count Two, ¶¶ 138-41), must be dismissed because all of the named plaintiffs in this action are U.S. citizens (*see* SAC ¶¶ 16-21).  As this Court has recognized, the ATCA requires that the plaintiff be an alien.  *See In re Terrorist Attacks*, 349 F. Supp. 2d at 826 (noting that "[c]ertain Plaintiffs in these actions are aliens").  Here, no aliens are among the plaintiffs, so the claim must be dismissed.  *See Jones v. Petty Ray Geophysical Geosource, Inc.*, 722 F. Supp. 343, 348-49 (S.D. Tex. 1989) (dismissing ATCA claim where "complaint does not allege that the plaintiff is

an alien"). Plaintiffs cannot avoid dismissal based on the contention that non-joined members of the putative class may have standing to assert a claim under ATCA. *See, e.g., Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) (since the only named plaintiff lacks standing to assert a claim against defendant in putative class action, the claim must be dismissed).[8] In any case, plaintiffs have failed to adequately allege any factual basis to hold BDG liable for conspiring to hijack airplanes or knowingly aiding and abetting airplane hijackers, or any other violations of the law of nations or treaties that might arguably be the proper subject of a claim under ATCA.[9]

### D.   RICO

Plaintiffs' claim under RICO, 18 U.S.C. § 1961 *et seq.*, was brought only under Section 1962(a) (*see* SAC, Count Ten, ¶¶ 176-80), but in their Case Statement, plaintiffs expressly

---

[8]      Moreover, ATCA is "jurisdictional in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 125 S. Ct. 2739, 2755 (2004). The absence of an alien plaintiff necessarily deprives the court of subject matter jurisdiction of the claim. *See, e.g., Jones, supra*. The citizenship of putative class members who are not named plaintiffs must be disregarded for purposes of subject matter jurisdiction. *See Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000) (citizenship of unnamed plaintiffs not considered in determining whether diversity jurisdiction exists). The Supreme Court has stated that while the ATCA "was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations . . . we know of no reason to think that federal-question jurisdiction was extended subject to any comparable congressional assumption." *Sosa*, 124 S. Ct. at 2765 n.19.

[9]      While we recognize that this Court has found that aircraft hijacking is a generally recognized violation of international law which may support a claim under the ATCA, 349 F. Supp. 2d at 826, in *Sosa*, the Supreme Court last year placed strict limits on the ability of federal courts to imply new causes of action under the ATCA based on the law of nations not recognized at the time the statute was first enacted in 1789. *See Sosa*, 124 S. Ct. at 2761-63, 2765-66. Assuming *arguendo* that aircraft hijacking is a violation of international law that would meet the standards recently established by the Supreme Court, secondary liability on an aiding and abetting theory -- for the reasons stated by Judge Sprizzo, relying on *Sosa* and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) -- is not. *See In re South African Apartheid Litig.*, 346 F. Supp. 2d at 549, 550-54 (nothing cited by plaintiffs "that would lead this Court to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation").

abandon their § 1962(a) claim, presumably in light of the Court's holding that such a claim is not

actionable.  *In re Terrorist Attacks*, 349 F. Supp. 2d at 827.  In their Case Statement, plaintiffs

instead assert that they seek recovery under Sections 1962(b), (c), and (d).

None of these claims is cognizable against BDG.  Unlike the insurance companies whose

RICO claims this Court considered in its January 18 decision, the O'Neill plaintiffs have not

sufficiently alleged injury to their "business or property by reason of a violation of section

1962."  18 U.S.C.A. § 1964(c) (West 2000).  In *Burnett*, Judge Robertson, held that individual

plaintiffs alleging injuries the same as those alleged by the O'Neills lacked standing to assert a

civil RICO claim, because they "alleged personal injuries, and economic losses derived

therefrom, but not any specific injuries to business or property that are separate from their

personal injuries."  *Burnett*, 274 F. Supp. 2d at 100.  We refer the Court to the numerous cases

cited by Judge Robertson in support of his holding.  *Id.* at 101-02.[10]

Second, assuming *arguendo* that plaintiffs have sufficiently alleged an "enterprise" under

RICO,[11] plaintiffs have failed to allege facts showing that BDG acquired or maintained an

---

[10]     *See, e.g., Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984) ("[A] person physically injured in a fire whose origin was arson is not given a right to recover for his personal injuries; damage to his business or his building is the type of injury for which § 1964(c) permits suit"), *vacated on other grounds*, 473 U.S. 922 (1985); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995) ("An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'") (citation omitted); *Doe v. Roe*, 958 F.2d 763, 767, 770 (7th Cir. 1992) (loss of earnings derivative of personal injury not compensable under RICO); *Grogan v. Platt*, 835 F.2d 844, 846, 848 (11th Cir. 1988) (the court's task is "not to decide whether the economic aspects of damages resulting directly from personal injuries could, as a theoretical matter, be considered injury to 'business or property,' but rather to determine whether Congress intended the damages that plaintiffs seek in this case to be recoverable under civil RICO").

[11]     Plaintiffs' Case Statement (Item 6) variously identifies the enterprise as "al Qaida," "International Islamic Front for the Jihad Against Jews and Crusaders," and "Radical Muslim Terrorism," but each of these is defined *identically*.  To the extent plaintiffs seek to broaden the "enterprise" beyond al Qaeda to encompass every group or individual anywhere in the world who has carried out or supported acts of insurgency or terrorism in furtherance of the goals of diverse Muslim groups or polities, it is too amorphous and unstructured an aggregation to qualify

interest in al Qaeda (or any other alleged enterprise) through a pattern of racketeering activity, as required by § 1962(b).  Nor have plaintiffs alleged, as required, that they were injured as a result of BDG's acquisition or maintenance of an enterprise as distinct from the alleged predicate acts themselves.  *See, e.g.*, *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 657 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997).

Third, plaintiffs have not stated a claim against BDG under § 1962(c) because they have failed to adequately plead at least two (or, indeed, any) predicate acts of "racketeering activity" as defined in 18 U.S.C.A. § 1961(1) (West 2000), constituting a "pattern of racketeering activity," 18 U.S.C.A. § 1961(5) (West 2000), that were committed by BDG.  *See United States v. Perscio*, 832 F.2d 705, 714 (2d Cir. 1987) ("focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise . . ."); *United States v. Hickey*, 16 F. Supp. 2d 223, 228-29 (E.D.N.Y. 1998); *Morin v. Trupin*, 747 F. Supp. 1051, 1064-65 (S.D.N.Y. 1990).  Moreover, for the reasons stated and the authorities cited by this Court in *In re Terrorist Attacks*, 349 F. Supp. 2d at 827-28, plaintiffs have failed to allege facts permitting the inference that BDG, which is alleged to have performed routine banking services, "had 'some part in directing' the 'operation or management' of the enterprise."  *Id.* at 827 (citation omitted).  There is a "substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because the 'test is not involvement but control.'"  *Shams v. Fisher*, 107 F. Supp. 2d 266, 274-75 (S.D.N.Y. 2000) (citation omitted).  Provision of "goods or services that ultimately benefit the enterprise" is not enough.  *Schmidt*, 16 F. Supp. 2d at 346 (dismissing RICO claims against banks); *Dubai Islamic Bank v. Citibank,*

---

as a RICO enterprise.  *See In re South African Apartheid Litig.*, 346 F. Supp. 2d at 556-57; *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 349-51 (S.D.N.Y. 1998) (discussing "enterprise" requirement).

*N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) (same); *Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.*, 923 F. Supp. 38, 41 (S.D.N.Y. 1996) (same); *Industrial Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032, 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994) (same).[12]

Finally, for reasons stated by the Court in *In re Terrorist Attacks*, 349 F. Supp. 2d at 828, no RICO conspiracy claim under § 1962(d) is adequately alleged against BDG. To establish a violation of § 1962(d) a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense . . . ." *Salinas v. United States*, 522 U.S. 52, 65 (1997). "An individual may be liable only if he knew of the conspiracy's goals and agreed to facilitate them." *Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610, 2001 WL 293683, at *9 (S.D.N.Y. March 27, 2001). A defendant is entitled to dismissal where the pleadings "fail to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy." *Id.* *See Schmidt*, 16 F. Supp. 2d at 354; *Heffernan v. HSBC Bank USA*, No. 1:99CV07981, 2001 WL 803719, at *8 (E.D.N.Y. March 29, 2001) ("conclusory allegations of participation in a conspiracy" insufficient; complaint "must plead specifically that each defendant knowingly agreed to further the purpose of the enterprise through the commission of particular crimes"); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001) (§ 1962(d) claim dismissed because plaintiffs' "pleadings fail to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy"); *Casio Computer Co., Ltd. v. Sayo*, No. 98 Civ. 3772, 1999 U.S. Dist. LEXIS 14675, at *71-74 (S.D.N.Y. Sept. 20, 1999) (§ 1962(d) claim dismissed became complaint "sets forth conclusory allegations of conspiracy . . . without pleading facts sufficient to support such allegations"; no allegations that "defendants committed

---

[12]     There is, moreover, no aiding and abetting liability under civil RICO. *See DeFalco v. Bernas*, 244 F.3d 286, 330 (2d Cir. 2001); *Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 475-77 (S.D.N.Y. 1996).

the predicate acts with the requisite knowledge of the purpose of the enterprise and with the intent to further its alleged goals"), *confirmed*, 2000 U.S. Dist. LEXIS 15411 (S.D.N.Y. Oct. 13, 2000).

## POINT II

### THE STATE LAW CLAIMS MUST BE DISMISSED

While plaintiffs invoke diversity jurisdiction, particularly 28 U.S.C. § 1322(a)(2), as an alternative basis for subject matter jurisdiction (SAC ¶ 12), the SAC fails to allege, as it must, the citizenship of *each* of the defendants and plaintiffs.  *See, e.g., Khan v. State Bank of India*, No. 01 Civ. 1305, 2001 WL 1463783, at *2 (S.D.N.Y. Nov. 15, 2001); *Jenkins v. Virgin Atlantic Airways, Ltd.*, 46 F. Supp. 2d 271, 273-74 (S.D.N.Y. 1999); *Anisfeld v. Cantor Fitzgerald & Co.*, 631 F. Supp. 1461, 1468 (S.D.N.Y. 1986).  It therefore cannot be determined whether there are one or more defendants who are deemed to be citizens of New Jersey or Maryland, where the plaintiffs are alleged to reside.  Since no federal law claim is stated against BDG, the Court should decline to exercise supplemental jurisdiction over the state law claims and dismiss the entire action as against BDG.  *See* 28 U.S.C.A. § 1367(c)(3) (West 1993).

As shown below, the state law claims are not actionable against BDG in any event.

### A.   Negligence

Plaintiffs' claim for negligence (SAC, Count Eight, ¶¶ 166-70) must be dismissed because BDG owed no duty of care to these plaintiffs, who do not allege that they had a relationship with BDG of any kind.  "Banks do not owe non-customers a duty to protect them from the intentional torts of their customers."  *In re Terrorist Attacks*, 349 F. Supp. 2d at 830-31; *Renner v. Chase Manhattan Bank,* No. 98 Civ. 926, 1999 WL 47239, at *13 (S.D.N.Y. Feb. 3, 1999); *Burnett,* 274 F. Supp. 2d at 109.

- 19 -

Furthermore, a negligence claim is governed by a three-year statute of limitations. N.Y.C.P.L.R. 214(4) (McKinney 2003); *Synor v. Padavano,* 15 A.D.3d 1010, 788 N.Y.S.2d 916 (4th Dep't 2005) (dismissing negligence claim as barred by three year statute of limitations period). This action was not filed against BDG until December 30, 2004, more than three years after the 9/11 attacks, and is therefore time-barred.[13]

### B.   Negligent and/or Intentional Infliction of Emotional Distress

These claims, combined in Count Five of the SAC (¶¶ 151-55), must be dismissed. Any claim for negligent infliction must fail for the same reason plaintiffs' negligence claim fails, the absence of any duty owed to plaintiffs by BDG. *See In re Terrorist Attacks*, 349 F. Supp. 2d at 830-31 (dismissing negligent infliction of emotional distress claim against banks). The claim also fails because plaintiffs have not pled facts supporting such a claim on a "bystander" theory, i.e., that any of the O'Neill family members suing here was herself "threatened with physical harm as a result of defendant's negligence . . . ." *See Mortise v. United States,* 102 F.3d 693, 696 (2d Cir. 1996). The claim is also barred by the statute of limitations. *See AB v. Rhinebeck Central School Dist.,* 361 F. Supp. 2d 312, 317 (S.D.N.Y. 2005) (dismissing negligent infliction claim not brought within three-year limitations period).

As held by this Court, a claim for intentional infliction of mental distress must be brought within one year (N.Y.C.P.L.R. 215(3) (McKinney 2003)). *In re Terrorist Attacks*, 349 F. Supp. 2d at 829. This claim is therefore also time-barred. In any event, plaintiffs have not sufficiently alleged that BDG intentionally and knowingly conspired with or aided and abetted the September 11 terrorists. Therefore, no claim for intentional infliction of emotional distress is stated. *Id.* at 830.

---

[13]   The claims against BDG do not relate back to the filing in March 2004 of the original complaint, which did not name BDG as a defendant or allege any wrongdoing by it. *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469-70 (2d Cir. 1995).

### C.   Wrongful Death

Plaintiffs' wrongful death claim (SAC, Count Three, ¶¶ 142-47) must be dismissed because the SAC, even as supplemented by the Case Statement, does not sufficiently "allege that [BDG] supported, aided and abetted, or conspired with the September 11 terrorists".   *In re Terrorist Attacks*, 349 F. Supp. 2d at 829.   Moreover, the statute of limitations for a wrongful death suit is generally two years, though with respect to decedents killed in the attacks of September 11, it has been extended to two years and six months.   N.Y.E.P.T.L. § 5-4.1 (McKinney Supp. 2005).   The claim against BDG, even with this extension, is time-barred.

### D.   Conspiracy and Aiding and Abetting

Count Six (SAC ¶¶ 156-61) asserts a common-law claim for conspiracy, and Count Seven (SAC ¶¶ 162-65) asserts a claim for aiding and abetting.   These claims must be dismissed because neither of them is an independent tort.   "New York does not recognize civil conspiracy to commit a tort as an independent cause of action."   *Ward v. City of New York,* 15 A.D.3d 392, 393, 789 N.Y.S.2d 539, 541 (2d Dep't 2005); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 583 (S.D.N.Y. 1999).   Civil conspiracy is essentially a joinder device.   *See Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547 (1986) ("[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort"); *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 621 (1999) ("there is no independent tort to provide a basis for liability under their concert of action, conspiracy, and aiding and abetting theories.   These causes of action must fail as well.").

Plaintiffs have not stated a cognizable state (or federal) law claim against BDG in the SAC, and indeed, all of their state law claims are time-barred.   Moreover, under New York law, as under federal, "[c]onclusory allegations of a conspiracy are not sufficient; rather, a plaintiff

must allege facts from which a trier of fact can infer such an agreement." *Black Radio Network*, 44 F. Supp. 2d at 583 (must allege "intentional participation in efforts" to "accomplish an unlawful purpose" and "damage stemming" therefrom).   Nor have plaintiffs alleged facts showing that BDG (1) had knowledge of a primary tortfeasor's wrongful conduct and (2) took intentional steps to substantially assist its commission. *See Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998).   As this Court has stated, there is "no basis for a bank's liability for injuries funded by money passing through it on routine banking business." *In re Terrorist Attacks*, 349 F. Supp. 2d at 833.

### E.   Survival

Plaintiffs' survival claim (SAC, Count Four, ¶¶ 148-50) is likewise not an independent cause of action; instead, it is a procedural device by which an individual's estate may pursue the decedent's cause of action that accrued prior to his or her death.   *See* N.Y.E.P.T.L. § 11-3.2(b) (McKinney 2001).   In order to prevail, the estate must establish all the elements of the underlying tort, and all defenses, such as statute of limitations, remain applicable. *See, e.g. In re Pfohl Bros. Landfill Litig.*, 68 F. Supp. 2d 236, 250 (W.D.N.Y. 1999) ("An essential element of both survival and wrongful death claims is that the decedent have died with a viable cause of action against the infliction of the injury which caused the death"), *vacated and remanded on other grounds sub nom. Freier v. Westinghouse Elec. Corp.*,, 303 F.3d 176 (2d Cir. 2002); *McDonald v. McDonald*, 193 A.D.2d 590, 591, 597 N.Y.S.2d 159, 161 (2d Dep't 1993) (dismissing survival claim because one-year statute of limitations, applicable to underlying tortious conduct of assault and killing, barred the claim).   Since plaintiffs fail to allege a single viable claim, there are no claims that "survive."

### F.    <u>Punitive Damages</u>

Count Eleven (SAC ¶¶ 181-83) asserts a claim for punitive damages and Count Twelve (SAC ¶¶ 184-87) asserts a claim captioned "Punitive Damages: Foreign State Agencies and Instrumentalities," brought under 28 U.S.C. § 1606.  Both claims should be dismissed because, as a matter of settled law, punitive damages are "but an incident of ordinary damages" and not an independent cause of action.  *See Smith v. County of Erie*, 295 A.D.2d 1010, 1011, 743 N.Y.S.2d 649, 651 (4th Dep't 2002) (internal quotation marks and citation omitted); *cf. Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001) (defining purpose of punitive damages generally).  Because plaintiffs have failed to adequately allege a single cause of action against BDG, there is no basis to seek punitive damages.  Further, punitive damages are only available to punish gross misbehavior by the defendant.  *See Dubai Islamic Bank,* 256 F. Supp. 2d at 168 (dismissing claim for punitive damages against defendant Citibank because the plaintiff "relie[d] only on conclusory and still unsupported, sweeping allegations of Citibank's alleged misconduct to state its demand for punitive damages").

Moreover, the federal punitive damage claim, predicated on 28 U.S.C. § 1606 (the Foreign Sovereign Immunity Act) fails as a matter of law because this statute applies only to an agency or instrumentality of a foreign state, which BDG, a privately owned and operated Swiss bank, is not.  *See* 28 U.S.C.A. § 1603(b) (West 1994) (defining "agency or instrumentality of a foreign state"); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) (foreign state must itself own a majority of shares of a corporation for the corporation to be deemed an "instrumentality" under the FSIA); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 202 (D.D.C. 2003) ("Congress has specifically limited the availability of punitive damages in a § 1605(a)(7) case to an 'agency or instrumentality' of a foreign state").

## CONCLUSION

For the reasons stated above, the SAC should be dismissed in its entirety against BDG.

Dated: October 3, 2005
       New York, New York

SONNENSCHEIN NATH & ROSENTHAL LLP

By:    /s/_____
       Martin R. Gold (MG 6528)
       Martin Schwartz (MS 4227)
       Monica Pa (MP 3307)
1221 Avenue of the Americas
New York, New York  10020
Tel.:  (212) 768-6700

*Attorneys for Defendant Banca del Gottardo*