UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACK
ON SEPTEMBER 11, 2001          CIVIL ACTION NO.:  03 MD 1570

--------------------------------------------------------------------------------X

CONTINENTAL CASUALTY COMPANY,
TRANSCONTINENTAL INSURANCE COMPANY,
TRANSPORTATION INSURANCE COMPANY, VALLEY
FORGE INSURANCE COMPANY, NATIONAL FIRE
INSURANCE COMPANY OF HARTFORD and
AMERICAN CASUALTY COMPANY OF
READING, PENNSYLVANIA.

|  |  |
|---|---|
| | 04 Civ. 5970 |
| Plaintiffs, | |
| | SECOND AMENDED |
| | COMPLAINT |
| - against - | |
| | JURY TRIAL |
| | DEMANDED |

AL QAEDA                           ECF CASE
ABD AI-HADI AL-IRAQI
ABD AL SAMAD AL-TA'ISH
ABD AL-MUSHIN AL-LIBI
ABDEL BARRY
ABDEL HUSSEIN
ABDELGHANI MZOUDI
ABDELKADIR MAHMOUD ES SAYED
ABDUL AL-MOSLAH
ABDUL AZIZ AL IBRAHIM
ABDUL FATTAH ZAMMAR
ABDUL RAHMAN KHALID BIN MAHFOUZ
ABDUL RAHMAN YASIN
ABDUL RAJEM MOHAMMED HUSSEIN, Interior Minister
ABDULA BIN LADEN
ABDULAZIS BIN ABDUL RAHMAN AL SAUD
ABDULAZIZ BIN HAMAD
ABDULLA AL OBALID
ABDULLAH AHMED ABDULLAH
ABDULLAH M. AL-MAHDI
ABDULLAH QASSIM
ABDULLAH SALAIMAN AL-RAJHI
ABDULLA BIN ABDUL MUHSEN AL TURKI (AL TURKI)
ABDUL-RAHIM MOHAMMED HUSSEIN
ABDULRAHMAN AL-AMOUDI

60573

ABU ABDUL RAHMAN
ABU AL-MAID
ABU HAJER AL IRAQI
ABU HAMZA AL MASRI
ABU HAFS THE MAURITANIAN
ABU MUSAB ZARQAWI
ABU SAYEF GROUP (ASG)
ABU SULAYMAN
ABU WA'EL a/k/a Sadoun Abdul Latif
ABU ZUBAYDAH
ADEL MUHAMMAD SADIQ BIN KAZEM
ADNAN BASHA
ADVICE AND REFORMATION COMMITTEE
AFGHAN SUPPORT COMMITTEE
AFRICAN MUSLIM AGENCY
AHMAD AL-SHINNI
AHMAD AL HARBI AHMAD IBRAHIM AL-MUGHASSIL
AHMAD SA'ID AL KADR
AHMAD SALAH
AHMED IBRAHIM AL NAJJAR
AHMED KHALFAN GHAILANI
AHMED KHALIL IBRAHIM SAMIR AL-AM
AHMED MOHAMED HAMED ALI
AHMED NUR ALI Jim'ale
AHMED RESSAM
AHMED TOTONJI
AKIDA BANK PRIVATE LIMITED
AKIDA INVESTMENT COMPANY LIMITED
AKIDA MANAGEMENT AND TRUST
AL BARAKA EXCHANGE LLC
AL BARAKAAT BANK
AL BARAKA
AL BARAKA BANCORP, INC.
AL BARAKA BANK
AL FAROOG MOSQUE
AL AQSA ISLAMIC BANK
AL BARAKA INVESTMENT AND DEVELOPMENT
AL GAMA'A AL-ISLAMIYYA
AL ITIHAAD AL ISLAMIYA
AL KHALEEJIA FOR EXPERT PROMOTION AND MARKETING COMPANY
AL RASHID TRUST
AL SHAMAL FOR INVESTMENT AND DEVELOPMENT
AL SHAMAL ISLAMIC BANK
AL SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE
AL TAQWA TRADE PROPERTY AND INDUSTRY COMPANY LIMITED
AL TAQWA NADA GROUP
AL TAWHID
AL-BARAKAAT
AL-BARAKAT BANK OF SOMALIA (BSS)
AL-BARAKAT FINANCE GROUP
AL-BARAKAT FINANCIAL HOLDING CO.

60573

AL-BARAKAT GLOBAL TELECOMMUNICATIONS
AL-BARAKAT GROUP OF COMPANIES SOMALIA LIMITED
AL-BARAKAT INTERNATIONAL A/K/A BARACO CO
AL-BARAKAT INVESTMENTS
AL-BIR SAUDI ORGANIZATION
ALFAISALIAH GROUP
ALGERIAN ARMED ISLAMIC GROUP (GLA)
AL-HAMATI SWEETS BAKERIES
AL-HARAMAIN ISLAMIC FOUNDATION
AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD.
AL-HUR HONEY PRESS SHOPS a/k/a AL-NUR HONEY CENTER
ALI FALAHYAN
ALI GHALEB HIMMAT
AL-MUSTAQBAL GROUP
AL-RAJHI BANKING & INVESTMENT CORPORATION
AL-SHAYKH AL-IRAQI
AMERICAN MUSLIM FOUNDATION (AMF)
DR-AMIN AL HAQ
ANAS AL LIBY
ANSAR AL ISLAM
AQEEL AL-AQEEL
ARAB CEMENT COMPANY
ARADI, INC.
ARAFAT EL-ASAHI
ARMAND ALBERT FRIEDRICH HUBER a/k/a AHMED HUBER
ASAT TRUST REGISTERED
AYATOLLAH ALl KHAMENEI, Spiritual Leader of Iran
AYMAN AL ZAWAHIRI

BA TAQWA FOR COMMERCE AND REAL ESTATE COMPANY LIMITED
BAKR M. BIN LADEN
BANK AL TAQWA LIMITED
BARAKA TRADING COMPANY
BARAKAAT BOSTON
BARAKAAT CONSTRUCTION COMPANY
BARAKAAT ENTERPRISE
BARAKAAT GROUP OF COMPANIES
BARAKAAT NORTH AMERICA, INC.
BARAKAAT RED SEA TELECOMMUNICATIONS
BARAKAAT TELECOMMUNICATIONS CO. SOMALIA
BARAKAT BANK AND REMITTANCES
BARAKAT COMPUTER CONSULTING (BCC)
BARAKAT CONSULTING GROUP (BCG)
BARAKAT GLOBAL TELEPHONE COMPANY
BARAKAT INTERNATIONAL COMPANIES (BICO)
BARAKAT POST EXPRESS (BPE)
BARAKAT REFRESHMENT COMPANY
BARAKAT TELECOMMUNICATIONS COMPANY LIMITED (BTELCO)
BARAKAT WIRE TRANSFER COMPANY
BARAKO TRADING COMPANY, LLC
BASHSH HOSPITAL

BENEVOLENCE INTERNATIONAL FOUNDATION - CANADA
BENEVOLENCE INTERNATIONAL FOUNDATION - U.S.A.
BENEVOLENCE INTERNATIONAL FUND
BENSAYAH BELKACEM
BILAL BIN MARWAN
BLESSED RELIEF FOUNDATION

CEMSTEEL IMPEX ESTABLISHMENT

DAAR AL MAAL AL ISLAMI TRUST
DALLAH AL BARAKA GROUP LLC
DALLAH AVCO TRANS ARABIA CO. LD.
DUBAI ISLAMIC BANK

EGYPTIAN GAMA'A AL-ISLAMIYA
EGYPTIAN ISLAMIC JIHAD
ENAAM M. ARNAOUT

FAHID MOHAMMED ALLY MSALAM
FAISAL GROUP HOLDING CO.
FAISAL ISLAMIC BANK
FARUQ AL-HIJAZI
FATHA ADBUL RAHMAN
FAZEN AHED
FAZUL ABDULLAH MOHAMMED

GENERAL ALI BLOKIAN
GENERAL MOHSEN REZA'I
GENERAL YAHYA RAHIM SAFAVI
GHASOUB AL ABRASH GHALYOUN
GLOBAL DIAMOND RESOURCE
GLOBAL RELIEF FOUNDATION, INC. a/k/a Foundation Secours Mondial
GROVE CORPORATE, INC.
GULBUDDIN HEKMATYAR
GULF CENTER S.R.L.
GUM ARABIC CO. LTD.

HABIB FARIS ABDULLAH AL-MAMOURI
HAJI MOHAMAD AKRAM
HAMAS
HAMDI SADIQ AL-AHDAL a/k/a ABU ASIM AL-MAKKI
HASSAN A.A. BAHFZALLAH
HASSAN AL TURABI
HAYDAR MOHAMED BIN LADEN
HAZEM RAGAB
HELP AFRICAN PEOPLE
HERITAGE EDUCATION TRUST
HISHAM ARNAOUT
HISHAM AL-TALIB
HOSEYN SHAYKH OL—ESLAM
HUMAN CONCERN INTERNATIONAL SOCIETY

60573                                    4

IBN AL-SHAYKH AL-LIBI
IBN SHEIK AL-LIBI
IBRAHIM BIN ABDUL AZIZ
IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION
IBRAHIM HASSABELLA
IDRIS NASREDDIN EC
IHAB ALI
IKSIR LIMITED HOLDING
IMAD MUGHNIYEH
INFOCUS TECH OF MALAYSIA
INTERNATIONAL ANSTALT
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION
IQBAL YUNUS
IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY ("MOIS")
ISLAMIC AFRICAN RELIEF AGENCY
ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES
ISLAMIC ARMY OF ADEN
ISLAMIC CULTURAL CENTER OF GENEVA
ISLAMIC CULTURAL INSTITUTE OF MILAN
ISLAMIC MOVEMENT OF UZBEKISTAN
ISLAMIC REPUBLIC OF IRAN
ISLAMIC RESCUE ORGANIZATION
ISLAMIC REVOLUTIONARY GUARD
ISS EL-DIN EL SAYED

JAMAL BARZINJI
JAMAL NYRABEH
JAMIL QASIM SAEED
JEMAAH ISLAMIYA

KHAL1D AL FAWAZ
KHALED BIN SALIM BIN MAHFOUZ
KHALED NOURI
KHALID SHAIKH MOHAMMED

LASED BEN HENI
LASHKAR REDAYAN-E-ISLAMI
LASHKAR I JANGHVI
LASHKAR-E TAYYIBA
LEBANESE HEZBOLLAH

M. OMAR A. SHRAF
M. YAQUB MIRZA
M.M. BADKOOK CO. FOR CATERING & TRADING
MAHDI CHAMRAIN SAVEHI
MAHMOUD JABALLAH
MAMDOUH MAHAMUD SALIM
MAMOUN DARKAZANLI
MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY

MANSOUR AL-KADI
MAR-JAC INVESTMENTS, INC.
MAR-JAC POULTRY
MAZIN M.H. BAHARETH
MENA CORPORATION
MERCY INTERNATIONAL RELIEF AGENCY
MIDDLE EAST AND TURKEY INVESTMENT HOLDING LIMITED
MINISTRY OF DEFENSE OF THE REPUBLIC OF SUDAN
MINISTRY OF INTERIOR OF THE REPUBLIC OF SUDAN
MOHAMAN ALI ELGARI
MOHAMED BAYAZID
MOHAMED BEN BELGACEM AOUADI
MOHAMED MANSOUR
MOHAMED MANSOUR, a/k/a MOHAMED AL-MANSOUR
MOHAMED SADEEK ODEH
MOHAMED SULEIMAN AL NALFI
MOHAMMAD S. MOHAMMAD
MOHAMMED ALCHURBAJI
MOHAMMED ALI HASSAN AL-MOOYAD
MOHAMMED BAHARETH
MOHAMMED BIN ABDUL RAHMAN AL ARIEFY
MOHAMMED CHEHADE
MOHAMMED IQBAL ABDURRAHMAN a/k/a ABNU JIBRIL
MOHAMMED JAGHLIT
MOHAMMED JAMAL KHALIFA
MOHAMMED KHATIB
MOHAMMED MOHAMMADI RAYSHAHRI
MOHAMMED NUR RAHIMI
MOHAMMED OMAR AL-HARAZI
MOHAMMED OMEISH
MOHAMMED SALIM BIN MAHFOUZ
MOHAMMED SARKAWI
MOKHTAR BOUCHOUCHA
MOMMAMED MOHAMMADI RAYSHAHRI
MORO ISLAMIC LIBERATION FRONT (MILF)
MOUNIR EL-MOTASSADEQ
MUFTI MOHAMMED RASHID
MUHAMMAD ABU-ISLAM
MUHAMMAD AL-HAMATI
MUHAMMAD ASHRAF
MUHAMMAD OMAR
MUHAMMAD SALAJI
MUHAMMED MAHDI SALAH
MUHSIN MUSA MATWALLI ATWAH
MULLAH KAKSHAR
MUSHAYT FOR TRADING ESTABLISHMENT
MUSLIM BROTHERHOOD
MUSLIM WORLD LEAGUE
MUSTAFA AL-KADIR
MUSTAFA MOHAMED FADHIL
MUSTASIM ABDEL-RAHIM

60573

MUWAFFAQ FOUNDATION a/k/a BLESSED RELIEF FOUNDATION
MUZAFFAR KHAN

NADA INTERNATIONAL ANSTALT
NADA MANAGEMENT ORGANIZATION SA
NASCOSERVICE S.R.L.
NASCO NASREDDIN HOLDING A.S.
NASCOTEX S.A.
NASREDDIN COMPANY NASCO SAS DI AHMED IDRIS NASSNEDDIN EC
NASREDDIN FOUNDATION
NASREDDIN GROUP INTERNATIONAL HOLDING LTD.
NASREDDIN INTERNATIONAL GROUP LIMITED HOLDING
NATIONAL COMMERCE BANK
NATIONAL DEVELOPMENT BANK
NATIONAL FUND FOR SOCIAL INSURANCE
NATIONAL ISLAMIC FRONT
NATIONAL MANAGEMENT CONSULTANCY CENTER
NATIONAL MANAGEMENT CONSULTANCY CENTER
NEW DIAMOND HOLDINGS
NURJAMAN RIDUAN ISMUDDIN a/k/a HAMBALI

OMAR ABDULLAH KAMEL
OMAR AL BAYOUMI
OMAR HASSAN AHMAD AL-BASHIR
OMAR M. BIN LADEN
OSAMA BIN LADEN

PALESTINE ISLAMIC JIHAD
PEROUZ SEDA GHATY
PIEDMONT POULTRY
PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD (PRINCE ABDULLAH)
PRINCE MOHAMMED AL FAISAL AL SAUD
PRINCE NAYEF BIN ABDULAZIZ AL SAUD
PRINCE SALMAN IBN ABDUL AZIZ (PRINCE SALMAN)
PRINCE SULTAN BIN ABDULAZJZ AL SAUD
PRINCE TURKI AL FAISAL AL SAUD

QORBAN 'ALl NAJAF 'ABADI
QUEEN CITY CIGARETTES AND CANDY

RABIH HADDAH
RABITA TRUST
RAED HIJAZI
RAHMAN ABDUL SIRAL-KHATIM, Minister of Defense
RAMZI MOHAMMED ADBULLAH BINALSHIBH
RANMAN ABDUL SIRAL-KHATIM
RAW MAT SERVICE AND MANAGEMENT SA
RED SEA BARAKAT COMPANY LIMITED
RESTON INVESTMENTS, INC.

SAAR FOUNDATION

60573

7

SABIR LAMAR
SADDAM HUSSEIN
SAFA TRUST
SAFIQ AYADI
SAID PAHAJI
SAIF AL ADEL a/k/a SAYF AL ADL
SAIF AL ISLAM EL MASRY
SALAFIST GROUP FOR CALL AND COMBAT
SALAH BADAHDH
SALAH SULEIMAN
SALEH ABDULAZIZ AL-RAJHI
SALEH ABDULLAH KAMEL
SALEH MOHAMED BIN LADEN
SAMI BEN KHEMAIS ESSID
SAMIR SALAB
SANABEL AL-KHEER, INC.
SANA-BELL, INC.
SANABIL AL-KHAIR
SAQAR AL JADAWI
SAUDI AMERICAN BANK
SAUDI BIN LADEN GROUP
SAUDI BIN LADEN INTERNATIONAL COMPANY
SAUDI DALLAH AL BARAKA GROUP LLC
SAUDI HIGH COMMISSION
SAUDI JOINT RELIEF COMMITTEE
SAUDI RED CRESCENT COMMITTEE
SAUDI SUDANESE BANK
SHAHIR ABDULRAOOF BATTERJEE
SHEIK ADEL GALIL BATTERJEE
SHEIKH ABU ABDUL AZIZ NAGI
SHEIKH AHMED SALIM SWEDAN
SHEIKH OMAR BAKRI MUHAMMAD
SHERIF SEDKY
SNCB CORPORATE FINANCE LTD.
SNCB SECURITIES LTD. IN LONDON
SNCB SECURITIES LTD. IN NEW YORK
SOLIMAN H.S. AL-BUTHE
SOLIMAN J. KHUDEIRA
STATI ARABI DEL GOLFO E LA SVIZZERA
STERLING CHARITABLE GIFT FUND
STERLING MANAGEMENT GROUP, INC.
SUCCESS FOUNDATION
SUDANESE GOVERNMENT OF NORTHERN STATE
SUDANESE INTELLIGENCE SERVICE
SULAIMAN AL-ALI
SULEIMAN ABDEL AZIZ AL RAJHI
SYED SULEMAN AHMER

TABA INVESTMENTS
TADAMON ISLAMIC BANK
TAHA YASSIN RAMADAN

TAIBAH INTERNATIONAL AID ASSOCIATION
TALAL MOHAMMED BADKOOK
TANZANITE KING
TAREK CHARAABI
TAREK M. BIN LADEN
TAREQ M. AL-SWAIDAN
TARIK HAMDI
THE COMMITTEE FOR THE DEFENSE OF LEGITIMATE RIGHTS
THE ESTATE OF ABDULAZIZ AL OMARI
THE ESTATE OF AHMED AL GHAMDI
THE ESTATE OF AHMED AL NAMI
THE ESTATE OF AHMED IBRAHIM A. AL HAZNAWI
THE ESTATE OF FAYEZ AHMED
THE ESTATE OF HANI HANJOUR
THE ESTATE OF KHALID AL MIDHAR
THE ESTATE OF MARWAN AL- SHEHHI
THE ESTATE OF NAWAF AL HAZMI
THE ESTATE OF SAEED AL GHAMDI
THE ESTATE OF SALEM AL HAZMI
THE ESTATE OF SATAM M. A. AL SUQAMI
THE ESTATE OF WAIL AL SHEHRI
THE ESTATE OF WALEED M. AL SHEHRI
THE ESTATE OF ZIAD SAMIR JARRAH
THE ESTATE OF ABU JAFFER AL-JAZIRI a/k/a OMAR CHEBBANI
THE ESTATE OF ABU SALAH AL-YEMENI
THE ESTATE OF MUHAMMAD ATEF
THE ESTATE OF QUSAY HUSSEIN
THE ESTATE OF UDAY HUSSEIN
THE REPUBLIC OF SUDAN
THE TALIBAN
THIRWAT SALAH SHIHATA
THE ESTATE OF HAMZA AL GHAMDI
THE ESTATE OF MAJED MOQED
THE ESTATE OF MOHALD AL SHEHRI
THE ESTATE OF MOHAMMED ATTA

ULEMA UNION OF AFGHANISTAN
UMAR FARUQ

WADI AL AQIQ
WADIH EL-HAGE
WA'EL HAMZA JULAIDAN a/k/a AL HASAN AL MADANI
WAFA HUMANITARIAN ORGANIZATION
WALI KHAN AMIN SHAH
WALID AL-SOUROURI
WORLD ASSEMBLY OF MUSLIM YOUTH

YASSER AL-AZZANI
YASSIN AL-QADI a/k/a YASSIN AL-KADI
YAZID SUFAAT OF KUALA LUMPUR MALAYSIA
YESLAM M. BIN LADEN

YORK FOUNDATION
YOUSAF AHMED ALI
YOUSSEF M. NADA & CO. GESELLSCHAFT MBH
YOUSSEF M. NADA ESTABLISHMENT
YOUSSEF MUSTAFA NADA

ZACARIAS MOUSSAOUI
ZAHIR H. KAZMI
ZAKARIYA ESSABAR
ZAKAT COMMITTEE

                              Defendants.
---------------------------------------------------------------------------X

Plaintiffs, by their attorneys, Ferber Frost Chan & Essner, LLP, allege as follows:

1.      Plaintiffs bring this action to recover the damages they suffered as the result of the terrorist attacks on the World Trade Center Towers and the Pentagon perpetrated by some of the defendants with the support and assistance of the other defendants on September 11, 2001 (the "September 11, 2001 Attacks").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1330(a) (actions against foreign states), 1605(a)(2), 1605(a)(5), 1605(a)(7) (the Foreign Sovereign Immunities Act), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et seq.

3.      Venue is proper in this district pursuant to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101, Title IV, § 408(b)(3), designating the Southern District of New York as the exclusive venue for all civil litigation arising out of, or related to the September 11, 2001 Attacks, and 28 U.S.C. §§1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences and injuries occurred in the Southern District of New York.

4.      The claims against the foreign states of the SUDAN and IRAN through their instrumentalities and their official and unofficial employees, agents and servants alleged herein,

60573                                    10

fall within the exceptions to immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7) (the

Foreign Sovereign Immunities Act).

## THE PARTIES

5.      Plaintiff Continental Casualty Company is a corporation

organized and existing under the laws of the State of Illinois with its principal place of business

located at Chicago, Illinois.

6.      Plaintiff Transcontinental Insurance Company is a corporation organized and

existing under the laws of the State of New York with its principal place of business located at

Chicago, Illinois.

7.      Plaintiff Transportation Insurance Company is a corporation organized and

existing under the laws of the State of Illinois with its principal place of business located at

Chicago, Illinois.

8.      Plaintiff Valley Forge Insurance Company is a corporation organized and existing

under the laws of the State of Pennsylvania with its principal place of business located at

Chicago, Illinois.

9.      Plaintiff National Fire Insurance Company of Hartford is a corporation organized

and existing under the laws of the State of Conneticut with its principal place of business located

at Chicago, Illinois.

10.     Plaintiff American Casualty Company of Reading, Pennsylvania is a corporation

organized and existing under the laws of the State of Pennsyvlania with its principal place of

business located at Chicago, Illinois.

11.     Defendants are co-conspirators who intentionally, willfully and knowingly aided

and abetted, conspired with, and provided material support and resources to, defendant AL

QAEDA and/or affiliated FTOs, associations, organizations or persons, as described herein and

intentionally, willfully and knowingly conspired, planned, financed, supported, executed and

carried out a plan to murder, maim and injure United States' citizens, residents and others and to

destroy and injure their property on September 11, 2001; and all participated directly or

indirectly in the September 11, 2001 terrorist attacks on the United States of America.

Defendants fall into three primary categories, (1) AL QAEDA and its members and associates,

(2) the SUDAN and IRAN, State Sponsors of AL QAEDA's terrorist activities, and (3) entities or

individuals who provided logistical, material, financial or other support to AL QAEDA and its

errorist activities.

12.     Defendant AL QAEDA, a/k/a Islamic Army, is an unincorporated association

organized to perpetrate acts of international terrorism, including murder, mayhem, bombings and

hijackings against the United States, its citizens and its allies. AL QAEDA has also encouraged,

financed and supported other terrorist groups who targeted U.S. citizens. AL QAEDA, as of

September 11, 2001, was headquartered in Afghanistan, but has a network of terrorist "cells" and

affiliated groups throughout the world.

13.     Defendant OSAMA BIN LADEN a/k/a Osama Bin Laden, Abu Abdullah,

Mujabid Shaykh Hajjs and Abdul Hay ("BIN LADEN") was formerly a national of Saudi Arabia

with Yemen as his ancestral home, but who is now an alien of unknown nationality. He is last

known to have been living in Afghanistan. At all relevant times, BIN LADEN has headed and

directed the terrorist activities of AL QAEDA.

14.     Defendants OSAMA BIN LADEN, MUHAMMAD ATEF, AYMAN AL

ZAWAHIRI, ABU ZUBAYDH, SAIF AL ADEL, KHALID SHEIKH MOHAMMED,

ABDULLAH AHMED ABDULLAH, ABU AL JAFAR AL-JAZIRI, ABU HAFS a/k/a the

Mauritanian, ABU JAFFER AL-JAZIRI, ABU SALAH AL-YEMENI, MUHSIN MUSA

MATWALLI AHAH, ANAS AL LIBY, FAZUL ABDULLAH MOHAMMEM, AHMED

MOHAMED HAMED ALI, MOHAMED SULEIMAN AL NALFI, MUSTAFA MOHAMED

FADHIL, AHMED KHALFAN GHAILANI, FAHID MOHAMMED ALLY MSALAM,

SHEIKH AHMED SALIM SWEDAN, MUHAMMAD ABU-ISLAM, ABDULLAH QASSIM,

RAMZI BIN AL-SHIBB, HASHIM ABDULRAHMAN, MUSTAFA MUHAMMED AHMAD, JAMAL AL-BADAWI, MOHAMMED OMAR AL-HARAZI, WALID AL-SOUROURI, FATHA ADBUL RAHMAN, YASSER AL-AZZANI, JAMAL BAKHORSH, AHMAD AL-SHINNI, RAED HIJAZI, JAMIL QASIM SAEED, ABU ABDUL RAHMAN, MOHAMED BAYAZID and AL-SHAYKH AL-IRAQI and others named herein are or were natural persons who, on or before September 11, 2001, were leaders or members of AL QAEDA who conspired, acted in concert with, aided and abetted, sponsored and assisted directly and indirectly, in the September 11th terrorist attacks against the United States of America.

15.     MOHAMMED ATTA, MARWAN AL-SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, MOHALD AL SHEHRI, SATAM M. A. AL SUQAMI, ABDULAZIZ AL OMARI, WALEED M. AL SHEHRI, WAIL AL SHEHRI, KHALID AL MIDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked three commercial aircrafts on September 11, 2001 and committed mass murder by deliberately flying the aircraft into the World Trade Center and the Pentagon. ZIAD SAMIR JARRAH, AHMED IBRAHIM A. AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 and attempted to deliberately fly the aircraft into the White House or another prominent Washington D.C. landmark but were thwarted by the efforts of heroic passengers, resulting in the aircraft crashing to the ground in Shanksville, Pennsylvania. The "twentieth hijacker," ZACARIAS MOUSSAOUI, was in custody on September 11, 2001, and thus unable to participate in the attacks perpetrated that fatal day. Plaintiffs have named as defendants, the estates of various AL QAEDA members who were killed on September 11, 2001 or in armed conflict with allied forces since September 11, 2001.

16.     Defendant TALIBAN, as of September 11, 2001, was an unincorporated association that served as the de facto government of Afghanistan from approximately 1996 until shortly after September 11, 2001. THE TALIBAN, as of September 11, 2001, was headquartered in Kandahar, Afghanistan and had declared itself to constitute the government of Afghanistan.

17.     Defendant MUHAMMAD OMAR ("OMAR") founded the TALIBAN and since 1996 Omar was the leader of the TALIBAN's six member ruling council and was responsible for the TALIBAN' s financial activities. OMAR, individually and through the TALIBAN organization that he controlled, supplied material and logistical support to AL QAEDA and BIN LADEN in furtherance of their terrorist plans to attack the United States of America and murder U.S. citizens.

18.     AL QAEDA and the TALIBAN were closely linked. OMAR and the TALIBAN afforded BIN LADEN special status in Afghanistan; and BIN LADEN was the de facto head of TALIBAN intelligence and security. BIN LADEN acted on OMAR's behalf, by providing soldiers to crush opposition to the TALIBAN's ruthless rule inside Afghanistan. OMAR enabled BIN LADEN to export terrorism to the United States and elsewhere by allowing him to construct and maintain camps in Afghanistan and train AL QAEDA members and other terrorists from around the world in the deadly and depraved methods of committing acts of violence, murder, destruction and mayhem. OMAR refused to turn BIN LADEN over to the United States after the September 11th attacks and instead continued to offer sanctuary to BIN LADEN and AL QAEDA members.

19.     Defendants SADDAM HUSSEIN, QUSAY HUSSEIN, UDAY HUSSEIN, TAHA YASSIN RAMADAN, MUHAMMED MAHDI SALAH, FARUQ AL-HIJAZI, SALAH SULEIMAN, AHMED KHALIL IBRAHIM SAMIR AL-ANI, HABIB FARIS ABDULLAH AL-MAMOURI, ABDEL HUSSEIN, a/k/a "The Ghost," HAQI ISMAIL, TAHA AL ALWANI, ABU AGAB, and ABU WA'EL all of whom are or were natural persons, subjects and citizens of IRAQ and leaders, agents/or employees of IRAQ and/or its INTELLIGENCE AGENCY, participated in the acts and conspiracy described below while acting in the course and scope of their employment.  Prior to 2003, IRAQ had, for many years and at all relevant times, been designated by the United States Department of State as a foreign state that sponsors terrorism

within the meaning of the Export Administration Act of 1979, 50 U.S.C. §2405 (j), the Foreign

Assistance Act of 1961, 22 U.S.C. § 2371(b) and 18 U.S.C. § 2333.

20.     The defendant REPUBLIC OF SUDAN ("SUDAN") is a foreign sovereign state

within the meaning of 28 U.S.C. § 1391(f) and 1603(a) and is located on the continent of Africa

and borders the Red Sea west of Saudi Arabia and south of Egypt. The United States does not

have formal diplomatic relations with the current government of the defendant SUDAN, which

maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W.,

Washington, D.C. 20008-2831.

21.     The defendant SUDAN has, for many years and at all relevant times, been

designated by the United States Department of State as a foreign state that sponsors terrorism

within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. §2405(j); the

Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 18 U.S.C. § 2333. The defendant

SUDAN, by and through its agents and instrumentalities including, but not limited to,

SUDANESE INTELLIGENCE and Ministries of Interior and Foreign Affairs has supported,

encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror

to pursue their goals. The defendant SUDAN has provided financing, training, safe-haven, and

weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN, through its

officials, officers, employees and agents, including but not limited to MINISTRY OF

DEFENSE, MINISTRY OF INTERIOR, NATIONAL ISLAMIC FRONT, HASSAN TURABI,

Islamic leader, OMAR HASSAN AHMAD AL-BASHIR, President of Sudan, ABDUL RAHIM

MOHAMMED HUSSEIN, Interior Minister, ABDEL WAHAB OSMAN, former Sudanese

Minister of Industry, and ISS EL-DIN EL SAYED, Minister of Finance and National Economy.

22.     Defendant, the ISLAMIC REPUBLIC OF IRAN ("IRAN"), is a foreign state

within the meaning of 28 U.S.C. §1391(f) and 1603(a) and borders Afghanistan to its east and

IRAQ to its west. IRAN maintains an Interest Section within the United States at 2209

Wisconsin Avenue, N.W., Washington, D.C. 20007.

23.     Defendant IRAN has for many years, and at all relevant times, been designated as

a foreign state that sponsors terrorism within the meaning of the Export Administration Act of

1979, 50 U.S.C.App.§ 2405(i), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b) and

18 U.S.C. § 2333.

24.     Defendant IRAN has been found to be liable as a state sponsor of international

terrorism under 28 U.S.C. § 1605(a) (7), especially in connection with acts perpetrated by its

state sponsored paramilitary terrorist organization known as "Hezbollah," in various cases,

including Anderson v. The Islamic Republic of Iran, 90 F. Supp.2d 107 (D.D.C. 2000), and

Cicippio v. The Islamic Republic of Iran, 18 F.Supp. 2d 62 (D.D.C.1998).

25.     Defendant IRAN through its officials, officers, agents and employees, including

but not limited to, its Ministry of Intelligence and Security ("MOIS"), ISLAMIC

REVOLUTIONARY GUARD ("IRGC"), AYATOLLAH ALI KHAMENEI, Spiritual Leader of

Iran, MOMAMMED MOHAMMADI RAYSHAHRI, special advisor to Spiritual Leader,

QORBAN ALI NAJAF-ABADI, Minister of Intelligence, ALI FALAHYAN, Director of Public

Intelligence, GENERAL ALI BLOKIAN, former advisor to HEZBOLLAH, AHMAD SALAH

(SALIM), member of committee of three of Int'l Hezbollah, MAHDI CHAMRAIN SAVEHI,

director of International HEZBOLLAH and Iranian External Intelligence chief, Iranian security

director HOSEYN SHAYKH OL-ESLAM, former Assistant Foreign Minister, General Mohsen

Reza'I, former commander of the Islamic Revolutionary Guard Corps (IRGC) who is now in

charge of the reorganization of Iran's security apparatus, GENERAL YAHYA RAHIM SAFAVI,

head of the IRGC, Information MINISTER QORBAN 'ALI NAJAF 'ABADI, Former minister

'AL FALAHYAN, MOHAMMED MOHAMMADI RAYSHAHRI, special adviser to Iran's

supreme leader Ali Khamene'i, HOSEYN SHAYKH OL-ESLAM, former assistant foreign

minister provided material support and resources to defendants AL QAEDA and BIN LADEN

both directly and through its surrogate, HEZBOLLAH. The support provided by IRAN to BIN

LADEN and AL QAEDA assisted in or contributed to the preparation and execution of the plans

that culminated in the September 11 Attacks.

26.     The remaining defendants are individuals, organizations, banks and charities

located in Saudi Arabia and other parts of the world, many of whom have been designated as

supporters and associates of terrorists by the United States government pursuant to Executive

Order 13224, have conspired with, have aided and abetted and have provided material support

and resources to BIN LADEN, AL QAEDA, and/or affiliated foreign terrorist organizations,

associations and persons, including raising, laundering, transfering, distributing and hiding funds

for BIN LADEN and AL QAEDA in order to support and finance their terrorist activities,

including, but not limited to, the September 11th attacks. Some of the individuals, businesses,

banks and charities operate legitimate businesses but also maintain a dual role as an AL QAEDA

co-conspirator and have actively supported its terrorist activities; while others, including some of

the individuals, are a sham front for AL QAEDA or are full fledged members of AL QAEDA.

Absent the material support and resources provided by the co-defendants, both directly and

indirectly, al Qaida would not have possessed the financial resources, physical assets,

membership base, technological knowledge, communication skills, and global reach required to

conceive, plan and execute the September 11th Attack.


## SUMMARY OF ALLEGATIONS

27.     The horrific events of September 11th were the result of a world-wide terror

conspiracy against the United States involving defendants who have conspired for many years to

attack the United States, murder United States' citizens, destroy and damage the property of

United States citizens and disrupt the United States' economy and who ultimately conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more and destroyed, or damaged, numerous properties and businesses.

28.     For many years AL QAEDA wanted to drive the United States from the Arabian peninsula, topple Middle East governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran. Over the years, AL QAEDA has grown as it absorbed or allied with other like-minded Islamic terrorist groups, including the EGYPTIAN ISLAMIC JIHAD.

29.     AL QAEDA carried out the September 11th terror attacks with the financial and logistical support of numerous individuals and organizations. These individuals and organizations provided AL QAEDA with the means to recruit, train, and employ thousands of terrorists, including the twenty assigned the ghastly mission to murder United States citizens and destroy U.S. landmarks on September 11, 2001.

30.     The SUDAN and IRAN have repeatedly sponsored violent terrorist attacks on U.S. and Israeli targets in the Middle East and have supported AL QAEDA financially, materially and logistically for over a decade and support its goals.

31.     This lawsuit seeks to strip the assets of AL QAEDA, BIN LADEN, SUDAN, IRAN and those individuals, entities and organizations who participated in or supported the September 11th terror attacks and to compensate plaintiffs for the damages they suffered as the result of these attacks.

60573

32.     Starting in 1989, an international terrorist group emerged dedicated to opposing non-Islamic governments with brutal force and terrifying violence. This organization grew out of the "mekhtab al khidemat" (the "AZZAM SERVICE CENTER") organization which maintained offices in Peshawar, Pakistan and received funds from Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises, among others, during the Soviet-Afghan war.

33.     Under the leadership of BIN LADEN, MUHAMMAD ATEF, a/k/a "Abu Hafs al Masry," Sheikh Taysir Abdullah, Abu Fatima, Abu Khadija, together with "Abu Ubaidah al Banshiri" (deceased in 1996), AYMAN AL ZAWAHIRI and others, the AZZAM SERVICE CENTER expanded, creating terrorist cells in various parts of the world, including Afghanistan, Pakistan and the United States, and financing and supporting other terrorist groups dedicated to committing acts of violence, murder, destruction and mayhem. From approximately 1989 until the present, this terrorist group called itself "AL QAEDA" ("the Base").

34.     At all relevant times, AL QAEDA was led by BIN LADEN. Members of AL QAEDA pledged an oath of allegiance (called a "bayat") to BIN LADEN and AL QAEDA, committing themselves to become martyrs in their depraved cause.

35.     AL QAEDA actively and vehemently opposed the United States for several reasons. First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believed the United States was providing essential support for other "infidel" nations and organizations, particularly the governments of Egypt, Israel and the United Nations, which AL QAEDA regarded as enemies. Third, AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in the Middle East afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993. AL QAEDA viewed these as pretextual preparations for an

60573

American occupation of Islamic countries. In particular, AL QAEDA opposed the continued presence of American military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War. Fourth, AL QAEDA opposed the United States Government because of the arrest, conviction and imprisonment of AL QAEDA members or other terrorists with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman who was convicted of planning to bomb bridges and tunnels in New York City. Fifth, AL QAEDA believed United Nation sanctions against IRAQ were orchestrated by the United States out of "eagerness to destroy IRAQ".

36.     One of the AL QAEDA's principal goals was to use violence to drive the United States armed forces out of Saudi Arabia and Somalia. Members of AL QAEDA issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

37.     At least as early as 1991, BIN LADEN and AL QAEDA began working closely with AYMAN AL ZAWAHIRI, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/Ida "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," whose EGYPTIAN ISLAMIC JIHAD terrorist group shared BIN LADEN's and AL QAEDA's goals. BIN LADEN had met ZAWAHIRI in Peshawar, Pakistan in 1987 during the Afghan-Soviet War.

38.     From in or about 1987, until in or about December 1997, AYMAN AL ZAWAI-TIRI, led the EGYPTIAN ISLAMIC JIHAD, a group dedicated to the forceful overthrow of the Egyptian Government and committing violence against the United States, in part, for what ZAWAHIRI believed to be United States support of the Egyptian Government. Members of EGYPTIAN ISLAMIC JIHAD pledged allegiance to AL ZAWAHIRI.  Many of the leading members of the EGYPTIAN ISLAMIC JIHAD ultimately became influential members of AL QAEDA, including AYMAN AL ZAWAHIRI and MUHAMMAD ATEF. By February 1998, the EGYPTIAN ISLAMIC JIHAD led by AL ZAWAHIRI and MUHAMMAD ATEF, and

including THIRWAT SALAH SHIHATA, TARIQ ANWAR AL SAYYID AHMAD a/k/a

FATHI a/k/a AMRAL FATIH and MUHAMMAD SALAH a/k/a NASR FAHMI NASR

HASANAYN had effectively merged with AL QAEDA and had joined with AL QAEDA in

targeting United States' citizens.

39.     AL QAEDA had a command and control structure which included a majalis al

shura (or consultation council) that discussed and approved major undertakings, including

terrorist operations. BIN LADEN, MUHAMMAD ATEF, a/k/a "Abu Hafs," AYMAN AL

ZAWAHIRI, SAIF AL ADEL, MAMDOUH MAHMUD SALIM, a/k/a "Abu Hajer," and

ABDULLAH AHMED ABDULLAH, a/k/a "Abu Mohamed el Masry," a/k/a "Saleh" among

others, sat on the majalis al shura (or consultation council) of AL QAEDA. Its affiliate, the

EGYPTIAN ISLAMIC JIHAD had a Founding Council, on which Ibrahim Eidarous sat.

40.     AL QAEDA also maintained a "military committee" which considered and

approved "military" matters. MUHAMMAD ATEF sat on the military committee and was one of

BIN LADEN's two principal military commanders together with "Abu Ubaidab al Benshiri,"

(until his death in May 1996). MUHAMMAD ATEF had the principal responsibility for

supervising the training of AL QAEDA members. SAIF AL ADEL also served on the military

committee reporting to MUHAMMAD ATEF. AMIN AL HAQ was an Afghan national who

served as security coordinator to BIN LADEN.  SAQARZ AL-JADAWI was a senior lieutenant

to BIN LADEN.

41.     AL QAEDA functioned both on its own and as a conduit for other terrorist

organizations in other parts of the world that shared its ideology, such as the EGYPTIAN

ISLAMIC JIHAD as described above, and the SALAFIST GROUP FOR CALL AND

COMBAT. Salafist Group members including MOHAMED BEN BELGACEM AOUADI who

provided false identity documents for AL QAEDA members and LASED BEN HENI, TAREK

CHARAABI, MOKHTAR BOUCHOUCHA and SAMI BEN KHEMAIS ESSID, trafficked in

arms and explosives for AL QAEDA.  Ahmed Refai Taha, a/k/a "Abu Yasser al Masri," and a

number of jihad terrorist groups in other countries, including the SUDAN, Egypt, Saudi Arabia,

Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria,

Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the

Chechnyan region of Russia. AL QAEDA camps were used to train terrorists to fight in Islamic

causes, such as supporting Pakistan in its dispute with India over the province of Kashmir. AL

QAEDA maintained terrorist cells and personnel in a number of countries to facilitate its

activities, including Italy, where defendant ABDELKADIR MAHMOUD EL SAYED has been

indicted for conspiring to traffic in arms, explosives, chemical weapons, and identity papers from

his position as organizer of AL QAEDA's Milan, Italy, cell. EL SAYED is a fugitive under a

death sentence, having been convicted of involvement in a 1997 terrorist attack in Luxor, Egypt,

carried out by GAMA'AT AL ISLAMIYYA. Defendant MAHMUD ABU AL-FATUH

MUHAMMAD was a member of the ISLAMIC JIHAD and participated in the ISLAMIC

CULTURAL CENTER OF MILAN. He is the owner of AL SHIFA' HONEY PRESS FOR

INDUSTRY AND COMMERCE, which has branches in Peshawar. AL SHIFA' HONEY PRESS

FOR INDUSTRY AND COMMERCE was named a sponsor of terror by the United States and

the United Nations. AL QAEDA also maintained terrorist cells in Kenya, Germany, Tanzania,

the United Kingdom, Canada and the United States.

     42.     The ISLAMIC ARMY OF ADEN is a Yemeni group which supports BIN

LADEN.  Its members consist largely of veterans of the Afghanistan war against the Soviet

Union who fought with bin Laden. The leader of the ISLAMIC ARMY OF ADEN, Abu al

Hassan, had contact with AL QAEDA through his relationship with AYMAN AL ZAWAHIRI

and the EGYPTIAN ISLAMIC JIHAD. Defendant ABUHAMZA AL MASRI was in contact

with bin Laden lieutenant defendant ABU ZUBADYA.  AL MASRI recruited people for Bin

Laden terror training camps and AL QAEDA sponsored acts of terror including (1) ZACARIAS MOUSSAOUI, suspected of helping to plan the September 11, 2001 Attacks, and (2) Richard Reid the shoe bomber arrested in December 2001. Both would-be terrorists were worshipers at the British mosque where AL MASRI is a cleric.

43.    The conflict between IRAN and the TALIBAN did not, however, prevent Iranian assistance to BIN LADEN's AL QAEDA, directly and through HEKMATYAR. This assistance is ongoing. Following the September 11 attacks, BIN LADEN, HEKMATYAR and Iranian officials along with some Taliban members, formed a new alliance called LASHKAR FEDAYAN-E-ISLAMI (ISLAMIC MARTYRS BRIGADE) based in Northeastern Afghanistan with the goal of launching suicide attacks against American troops.

44.    BIN LADEN and AL QAEDA also forged alliances with the National Islamic Front in the SUDAN and with representatives of the government of IRAN, and its associated terrorist group HEZBOLLAH, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

45.     At various times from as early as 1989, BIN LADEN, and others known and unknown, ran terrorist training "camps and guesthouses" in various areas, including Afghanistan, IRAQ , IRAN, Pakistan, the SUDAN, Somalia, Kenya, Malaysia, Philippines and Germany for the use of AL QAEDA and its affiliated groups.  MAMDOUH MAHMUD SALIM, ABU HAJER AL IRAQI, an IRAQI, and ABD AL HADI AL IRAQI, one of the top 25 AL QAEDA military advisors, managed some of these training camps and guesthouses in Afghanistan and Pakistan.

46.    Since 1991, BIN LADEN, AL QAEDA and many of their co-defendants unlawfully, willfully and knowingly combined, conspired, confederated and agreed to murder and injure United States citizens throughout the world, including in the United States, and to

conceal their activities and methods by, among other things, establishing front companies, providing false identity and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries and seeking to detect and kill informants.

THE SUDAN

47.     In 1991, BIN LADEN left Saudi Arabia and relocated in the SUDAN. He centered his AL QAEDA operations there for the next four years while maintaining offices and orchestrating terrorist recruitment, training and launching attacks in various parts of the world. Defendant, MUSHIN MUSA MATWALL ATWAH, an Egyptian known as "Abdel Rahman" provided military and intelligence training for AL QAEDA members as early as 1990 in Afghanistan and Pakistan, and then in the Sudan. BIN LADEN recruited new members in the SUDAN, such as MOHAMED SULEIMAN AL NALFI and at least 200 Afghan Arabs, Saudis, Yemenis and Egyptians who had fought against the Soviets in Afghanistan and who became part of AL QAEDA's cell in the SUDAN. MAMDOUH MAHMUID SALIM a/k/a ABU HAJER AL-IRAQI, an IRAQI served as BIN LADEN's top lieutenant in the SUDAN shortly after BIN LADEN's arrival there.

48.     In 1989, Defendant HASSAN AL TURABI installed a radical extremist Islamic government in SUDAN through a coup. Beginning in 1991, he and the Sudanese government provided refuge to BIN LADEN. A 1996 State Department fact sheet on BIN LADEN described his operations in the country beginning in 1991:

> Bin Laden relocated to SUDAN in 1991, where he was welcomed by National Islamic Front (NIT) leader Hasan al-Turabi. ... [bin Laden] embarked on several business ventures in SUDAN in 1990, which began to thrive following his move to Khartoum. Bin Laden also formed symbiotic business relationships with wealthy NIP members by undertaking civil infrastructure development projects on the regime's behalf.

49.     BIN LADEN's close relationship with the new extremist Sudanese regime became symbiotic and he conducted several business projects with or on behalf of the NIF. One of these investments was the Defendant AL SHAMAL ISLAMIC BANK, as reported by the State Department, Bin Laden and wealthy NIF members capitalized al-Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank.

50.     BIN LADEN's involvement in business transactions in the SUDAN including the AL SHAMAL ISLAMIC BANK, was confirmed by a 2002 Congressional Research Service Report:

> In 1991, Bin Laden relocated to SUDAN with the approval of SUDAN National Islamic Front (NIP) leader Hasan al-Turabi. There, in concert with NIP leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help SUDAN build roads and airport facilities. The business in SUDAN . . . enabled him to offer safe haven and employment in SUDAN to AL QAEDA members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-U.S. terrorism.

51.     Defendant AL SHAMAL ISLAMIC BANK in the SUDAN has been tied not only to BIN LADEN and TURABI, but also to shareholder Defendant FAISAL ISLAMIC BANK which is chaired by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD and other Saudi investors. AL SHAMAL ISLAMIC BANK was chaired by Defendant ADEL ABDUL JALIL BATTERJEE who was responsible for funding AL QAEDA through BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") and WORLD ASSEMBLY OF MUSLIM YOUTH ('WAMY").  BIN LADEN maintained accounts at AL SHAMAL in his own name and for his Sudanese businesses defendants AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD., WADI AL AQIQ (an import export company); TABA INVESTMENT CO. LTD. (an agricultural exporter); GUM ARABIC CO. LTD. (co-owned by BIN LADEN and Sudanese

Government); ALTHEWAR (an agricultural company); BLESSED FRUITS CO.; and IKHLAS (a honey exporter).

52.    Defendant AL SHAMAL ISLAMIC BANK was founded in 1983 by three individuals or entities: (1) AL SHAMAL FOR INVESTMENT AND DEVELOPMENT, a Sudanese company; (2) Defendant SALEH ABDULLAH KAMEL, Chairman of the SAUDI DALLAH AL BARAKA GROUP LLC; and (3) the Sudanese Government of Northern State, then controlled by Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, and representative of extremist HASSAN AL-TURABI.

53.    In April 1984, the AL SHAMAL ISLAMIC BANK issued shares to its main founders. They included the Government of Northern State of Sudan, the Defendant FAISAL ISLAMIC BANK - SUDAN, Defendant SALEH ABDULLAH KAMEL, his brother OMAR ABDULLAH KAMEL, and Defendant AL BARAKA INVESTMENT AND DEVELOPMENT (ABID), a wholly owned subsidiary of DALLAH AL BARAKA GROUP LLC and Defendant SALEH ABDULLAH KAMEL.

54.    Among the shareholders of the AL SHAMAL ISLAMIC BANK was Defendant FAISAL ISLAMIC BANK - SUDAN, a subsidiary of ISLAMIC INVESTMENT COMPANY OF THE GULF (Babrain) EC, whose parent company is Defendant DAR-AL-MAAL AL ISLAMI (DMI), based in Switzerland. The three entities are chaired by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD, and controlled by Saudi investors.

55.    AL SHAMAL ISLAMIC BANK Chairman and shareholder, Defendant ADEL ABDUL JALIL BATTERJEE, is the Chairman of al-Bir Saudi Organization, whose United States branch, BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF"), is also a front for AL QAEDA sponsorship.

60573

56.     Defendant ADEL ABDUL JAIL BATTERJEE is both Chairman of the AL SHAMAL ISLAMIC BANK and was also Chairman of the WORLD ASSEMBLY OF MUSLIM YOUTH. BATTERJEE is the subject of an FBI investigation into terrorist activities and has been implicated in the criminal indictment of ENAAM MAHMOUD ARNANOUT of BIF (discussed below).

57.     AL SHAMAL ISLAMIC BANK General Manager, MOHAMMAD S. MOHAMMAD, acknowledged in a September 2001 press release that BIN LADEN had two accounts in the bank, opened on March 30, 1992 in the name of AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD. This company, according to the United States Department of State, worked directly with Sudanese military officials to transport and provide provisions to terrorists training in BIN LADEN's terrorist training camps in northern SUDAN.

58.     A third AL SHAMAL ISLAMIC BANK account was opened in 1993 in the name of BIN LADEN's company, WADI AL AQIQ, a company registered in Saudi Arabia. The import-export firm, in conjunction with BIN LADEN' s TABA INVESTMENT COMPANY LTD., secured a near monopoly over SUDAN's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent Sudanese NIF members.

59.     Jamal Ahmed Al-Fadl (or "AL-FADL"), was the first person called in the trial of four men charged with participating in a terrorism conspiracy led by BIN LADEN, the 1998 bombings of the American Embassies in Kenya and Tanzania. In February of 2001, AL-FADL's testimony described BIN LADEN's global banking network, naming institutions in SUDAN, Malaysia, The United Kingdom, Hong Kong and Dubai where OSAMA BIN LADEN and his international terrorist organization kept money. He also gave a detailed account of OSAMA BIN LADEN's agricultural, construction, transportation and investment companies in SUDAN, which are fronts for terrorist activities. OSAMA BIN LADEN, his co-conspirators, aiders and abettors,

and material sponsors have engaged in a global conspiracy aimed at the United States and other Western targets. AL QAEDA has also acted as a kind of umbrella organization providing support for other terrorist groups and also cooperating with other terrorist organizations like the Iranian-backed HEZBOLLAH.

60.     AL-FADL testified that he helped OSAMA BIN LADEN pay the employees of his companies and AL QAEDA, whose members received monthly checks of several hundred dollars, and that he was sent out to buy five farms in SUDAN for the group to use as training camps. AL-FADL testified one farm cost $250,000 and another $180,000.

61.     After OSAMA BIN LADEN moved his group to SUDAN in 1991, AL- FADL testified, its activities were greatly aided by SUDANESE INTELLIGENCE and by other government officials. AL-FADL described several arms shipments, including AL QAEDA's smuggling of Kalishnikov rifles into Egypt from SUDAN on two separate occasions that involved about 50 camels each. AL-FADL also recalled a midnight shipment of four large crates of weapons and explosives to an Islamic group in Yemen, carried on a boat owned by AL QAEDA and accomplished with the help of a SUDANESE INTELLIGENCE officer.

62.     AL-FADL testified OSAMA BIN LADEN was surrounded by a group of AL QAEDA associates who participated on a ruling council and ran various committees on military, business and religious matters.

63.     Al SHAMAL ISLAMIC BANK has repeatedly been used to fund criminal and terrorist activities. Al-FADL further testified, that OSAMA BIN LADEN and at least six AL QAEDA operatives held bank accounts in AL SHAMAL ISLAMIC BANK under their real names.

64.     Jamal Ahmed Al-Fadl also testified that Al QAEDA operatives received monthly checks of several hundred dollars from AL SHAMAL ISLAMIC BANK accounts and that he transferred $100,000.00 from AL SHAMAL ISLAMIC BANK to an AL QAEDA representative in Jordan.

65.     Defendant FAISAL ISLAMIC BANK – SUDAN, a subsidiary of ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC and DMI, was one of the five main founders of AL SHAMAL ISLAMIC BANK in April 1984 and became a member of the board in July 1988. PRINCE MOHAMMED AL FAISAL AL SAUD is heavily involved in the sponsorship of terror through FAISAL ISLAMIC BANK – SUDAN.

66.     Defendant FAISAL ISLAMIC BANK – SUDAN was also implicated as an AL QAEDA sponsor during the 2001 United States trial on the 1998 embassy bombings in Africa as managing bank accounts for AL QAEDA operatives. AL-FADL testified:

Q.      Where were the accounts [of AL QAEDA] held? In what countries?
A.      …we got account in Bank Faisal Islami [Faisal Islamic Bank].
Q.      Is that also in Khartoum?
A.      Yea,"

67.     Defendant FAISAL ISLAMIC BANK's subsidiary in Turkey is currently under investigation by the Istanbul Prosecutor's Office on charges of tax irregularities concerning seven executives. Prosecutors are demanding three years imprisonment for the executives including Defendant PRINCE MOHAMMED AL-FAISAL AL-SAUD.

68.     Defendant TADAMON ISLAMIC BANK was formed in Khartoum, SUDAN on November 28, 1981 and started operations on March 24, 1983, less than one month before AL SHAMAL ISLAMIC BANK obtained banking authorization for its own activities. The TADAMON ISLAMIC BANK is active across the Sudanese territory through twenty-one different establishments and has several subsidiaries there.

69.     Shareholders of the TADAMON ISLAMIC BANK include AL BARAKA

INVESTMENT AND DEVELOPMENT CORPORATION (and/or subsidiaries of the SAUDI

DALLAH AL BARAKA GROUP) SALEH ABDULLAH KAMEL, NATIONAL COMPANY

FOR DEVELOPMENT AND TRADE, and DUBAI ISLAMIC BANK. Defendant FAISAI

ISLAMIC BANK SUDAN, a subsidiary of the ISLAMIC INVESTMENT COMPANY OF THE

GULF (Babrain) EC, whose parent is DAR AL MAL AL ISLAMI, was the main shareholder of

TADAMON ISLAMIC BANK as of 1995.

70.     TADAMON ISLAMIC BANK facilitated, materially sponsored, aided and

abetted, and/or conspired with AL QAEDA and its international terrorists and financial

operations. According to testimony of AL-FADL, during the 2001 trial regarding the 1998

Embassy bombings in Africa, TADAMON ISLAMIC BANK managed accounts of AL QAEDA

operatives:

Q       "Do you recall anyone else that had bank accounts in their name for AL QAEDA?
A.      Abdouh al Mukhlafi.
Q.      Who was this person named Abdouh al Mukhlafi?
A.      He is from Yemen.
Q.      What role did he play for Bin Laden?
A.      He goes with Bin Laden when Bin Laden travel outside or inside SUDAN.
Q.      What role did he play for Bin Laden when Bin Laden traveled?
A.      He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use
        account for that.
Q.      Did he handle money during the travel?
A.      Yes.
Q.      Where were the accounts held? In what countries?
A.      In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."

71.     TADAMON ISLAMIC BANK is also a shareholder of Defendant AL  SHAMAL

ISLAMIC BANK, a bank formed in SUDAN and extensively used for AL QAEDA operations.

TADAMON ISLAMIC BANK joined the provisional Board of Directors of AL SHAMAL

ISLAMIC BANK on July 1988 and has been a major shareholder of AL SHAMAL ISLAMIC

BANK since March 26, 1986.

72.     During the 1991-1996 time period, SUDAN abandoned visa requirements for Arabs and actively encouraged Islamic militants to live within its borders. By the end of 1991, there were between 1,000 and 2,000 members of AL QAEDA in the SUDAN. OSAMA BIN LADEN established a headquarters in the Riyadh section of Khartoum, SUDAN, an area heavily populated by Saudis.

73.     OSAMA BIN LADEN was able to establish a powerful military and political presence in the SUDAN in the early 1990s, using a variety of business ventures to finance his activities, aided and abetted and materially sponsored by Defendants and co-conspirators named herein.

74.     In SUDAN, between the years 1990 and 1993, members of AL QAEDA undertook the task of writing the Encyclopedia of the Afghan Jihad. AL QAEDA wrote another terrorist work entitled Military Studies in the Jihad against the Tyrants. It was during this period that OSAMA BIN LADEN and AL QAEDA became fully operational, expanding their terrorist network.

75.     OSAMA BIN LADEN organized AL QAEDA into camps dedicated to exportation of terrorism throughout SUDAN (and eventually the world); the main Sudanese training site being a 20-acre site near Soba, 10 kilometers south of Khartoum. OSAMA BIN LADEN and AL QAEDA were sponsored, encouraged and allowed to operate freely in SUDAN. AL QAEDA purchased communications equipment, radios, and rifles for the Sudanese NIF, while the Sudanese government in exchange provided 200 passports to AL QAEDA so that those terrorists could travel internationally with new identities.

76.     In or about the early 1990s, Jamal Al-Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of AL QAEDA and the Sudanese army to discuss the joint manufacture of chemical weapons. AL QAEDA and the Sudanese army cooperated in

efforts to mount chemical agents on artillery shells. AL QAEDA at this time also began to experiment with biological warfare — injecting or gassing dogs with cyanide.

77.     During the early 1990s, while OSAMA BIN LADEN was being harbored in SUDAN, AL QAEDA grew into a sophisticated international terrorist organization. Several key figures in the organization portrayed AL QAEDA at the time as a multinational corporation complete with a finance committee, investments and well-organized, concealed accounts and operations worldwide.

78.     At various times between in or about 1992 and 1996, OSAMA BIN LADEN and MAMDOUH MAHAMUD SALIM worked together with a ranking official in the NIF to obtain communications equipment on behalf of the Sudanese INTELLIGENCE SERVICE.

79.     On at least two occasions in the period from in or about 1992 until 1995, members of AL QAEDA transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to the Saudi Arabian peninsula, using vehicles owned by or used in OSAMA BIN LADEN's businesses.

80.     In 1993, AL QAEDA paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, SUDAN. This plane was intended to transport American stinger anti-aircraft missiles from Pakistan to SUDAN, although that missile transport did not take place as the plane was damaged before the operation could take place.

81.     Because of SUDAN's active and material support of BIN LADEN and AL QAEDA, the United States Department of State first put SUDAN on the list of State sponsors of terrorism in 1993, largely because of BIN LADEN's residency and activities and the Sudanese connection to a terrorist plot to blow up bridges and tunnels in New York City.

82.     In 1995, Defendant HASSAN AL-TURABI organized militant groups from IRAQ, IRAN, Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and Hamas, as well as AL QAEDA and hosted meetings. During the time that AL QAEDA was based in SUDAN, it also forged alliances with EGYPTIAN ISLAMIC JIHAD and other Global Jihad groups in becoming an international sponsor of terrorism.

83.     HASSAN AL-TURABI, under pressure from the United States and others, finally expelled BIN LADEN from SUDAN in 1996, but allowed him to relocate and regroup in Afghanistan. According to a 1998 FBI warrant, even after BIN LADEN left SUDAN, BIN LADEN maintained his businesses there.

84.     The SUDAN continues to be one of the governments that the United States has designated as a State sponsor of international terrorism. SUDAN serves as a safe-haven for members of AL QAEDA, the Lebanese-Iranian HEZBOLLAH, AL-GAMA'A AL-ISLAMIYYA, EGYPTIAN ISLAMIC JIHAD, the Palestine Islamic Jihad, and Hamas and continued to provide financial support to AL QAEDA through September 11, 2001. SUDAN still has not complied fully with United Nations Security Council Resolutions 1044, 1054, and 1070, passed in 1996, which require that SUDAN end all material support to terrorists. SUDAN has assets frozen by the United States government.

85.     The Sudanese government and Sudanese officials close to BIN LADEN co-founded the AL SHAMAL ISLAMIC BANK and were associated with its operations until at least October, 2001. Among the three founders of the AL SHAMAL ISLAMIC BANK was the Northern State Government of SUDAN, ruled at that time by Mutasim Abdel-Rahim, the personal representative of HASSAN AL-TURABI, leader and principal BIN LADEN supporter in the country.

86.     Under Sudanese banking regulations, AL SHAMAL ISLAMIC BANK is considered as a joint ownership commercial bank, and therefore subject to the Central Bank of SUDAN's review, supervision and control, according to the provisions of the Banks' Practice Act of 1991.

87.     AL QAEDA operative AL-FADL testified that his terrorist activities were greatly aided by Sudanese intelligence and by other Sudanese officials. AL-FADL said that he helped BIN LADEN pay the employees of his companies and AL QAEDA, whose members received monthly checks of several hundred dollars from AL SHAMAL ISLAMIC BANK accounts. He also testified that AL QAEDA members were granted Sudanese passports and diplomatic privileges by the government. Such material support constitutes the sponsoring of international terrorism.

88.     These facts fall under the scope of the 1999 International Convention for the Suppression of the Financing of Terrorism, signed by SUDAN on February 29, 2000, and entered in force on April 10, 2002. THE REPUBLIC OF SUDAN's course of conduct contradicts the General Assembly Resolution 51/210 of December 17, 1996 calling upon the States to "prevent and counteract….the financing of terrorists and terrorist organizations, whether such financing is direct or indirect," the United Nations Security Council Resolution 1373 of September 28, 2001 and the United Nations Security Council Resolution 1269 of October 19, 1999, calling upon all States to "prevent and suppress in their territories through all lawful means the preparation and financing of any acts of terrorism." These resolutions were adopted under Chapter VII of the United Nations Charter, and are therefore binding on all United Nations member States, including SUDAN.

89.     As described above, SUDAN acted through its officials, officers, agents, employees and instrumentalities in aiding, abetting, and providing material support and resources

to BIN LADEN, AL QAEDA and international terrorism. The support provided by the

REPUBLIC OF SUDAN to BIN LADEN and AL QAEDA assisted in, or contributed to, the

preparation and execution of plans that culminated in the attacks on September 11, 2001 and to

the damages to the plaintiffs herein.

90.     Lieutenant General OMAR HASSAN AHIMAD AL-BASHIR is the President of

SUDAN, and is an instrumentality of SUDAN for the purposes of liability and damages under

the Foreign Sovereign Immunities Act. As head of SUDAN, Lieutenant General OMAR

HASSAN AHMAD AL-BASHIR is responsible for formulating and executing SUDAN's policy

of supporting terrorism and BIN LADEN and AL QAEDA.

91.     The SUDAN Ministry of Defense, headed by General RAHMAN ABDUL

SIRAL-KHATIM, is an agency of the REPUBLIC OF SUDAN. The Ministry of Defense, as a

government agency, aided and abetted BIN LADEN and AL QAEDA as outlined above.

92.     The SUDAN Ministry of the Interior, headed by Major General ABDUL-RAHIM

MOHAMMED HUSSEIN, is an agency of SUDAN. The Ministry of the Interior, as a

government agency, aided and abetted BIN LADEN and AL QAEDA by providing instructors to

the training camps run by BIN LADEN and AL QAEDA. He was assisted by ABDEL WAHAB

OSMAN, the Minister of Industry and ISS EL-DIN EL SAYE, the Minister of Finance. In early

1994, BIN LADEN was responsible for at least three major terrorist training camps in Northern

SUDAN and the Sudanese INTELLIGENCE SERVICES, AL AMN AL-DAKHILI and AL

AMN AL-KHARIJI, provided the training. These services are answerable in part to the Ministry

of the Interior.

IRAQI TERRORISM

93.     Since the early 1990s, IRAQ and IRAQI INTELLIGENCE have used both IRAQI agents and independent "contractors" to commit terrorist acts against the United States in revenge for IRAQ 's Gulf War defeat.

94.     While AL QAEDA's presence was growing in the SUDAN in 1992, the Government of IRAQ also had close ties with the Sudanese GOVERNMENT. SUDAN supported IRAQ during the Gulf War and allowed IRAQ to establish a major IRAQI INTELLIGENCE center in the SUDAN through IRAQ's ambassador to Khartoum, and AL SAMAD AL-TA'ISH.  AL TA'ISH was a highly placed IRAQI INTELLIGENCE agent, who brought 35 other intelligence officers with him to the SUDAN to establish a base for IRAQI operations. AL TA'ISH remained in the SUDAN through the summer of 1998. IRAQ arranged to smuggle scud missiles, chemical weapons and uranium into the SUDAN using Sudanese diplomatic mail privileges and other means. SUDAN agreed to store this material for IRAQ for safekeeping after the Gulf War to help circumvent U.N. weapons inspections.

95.     During the early 1990s, SUDAN's Sheikh HASSAN AL-TURABI of the NATIONAL ISLAMIC FRONT arranged meetings between BIN LADEN and IRAQI INTELLIGENCE officials. BIN LADEN met with FARUQ AL-HIJAZI, an IRAQI INTELLIGENCE agent in the SUDAN who would later head IRAQI INTELLIGENCE for SADDAM HUSSEIN. BIN LADEN again met with IRAQI INTELLIGENCE officers in 1994 and 1995 in the SUDAN.

96.     During his time in SUDAN, BIN LADEN became interested in using IRAQI chemical and biological weapons and explored plans to use crop dusting aircraft to disperse toxins as the IRAQI INTELLIGENCE and military had done earlier in Kurdistan.

97.     Upon information and belief, there have been numerous meetings between IRAQI INTELLIGENCE agents and high-ranking AL QAEDA terrorists to plan terror attacks. One such

meeting occurred in 1992, when ZAWAHIRI (EGYPTIAN ISLAMIC JIHAD leader and AL QAEDA officer) met with IRAQI INTELLIGENCE agents in Baghdad, IRAQ over several days. An IRAQI serving with the TALIBAN who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that IRAQI contacts with AL QAEDA began in 1992.

THE 1993 WTC BOMBING

98.     On February 26, 1993 a bomb was detonated in the World Trade Center underground parking lot, killing six U.S. citizens.  Upon information and belief, IRAQI sponsored terrorists planned, financed, executed and carried out that World Trade Center bombing.

99.     The 1993 WTC bombing, took place on the Friday before the two year anniversary of IRAQ's defeat in Kuwait, which was February 28, 1991. The anniversary in 1993 was a Sunday and few people would have been working at the World Trade Center that day, and IRAQ and the terrorists wanted to maximize the number of American casualties.

100.     During the initial planning of the WTC bombing, Mohammed Salameh (who was later convicted for his role in the bombing) was in regular and frequent contact with his uncle KADRI ABU BAKR, who lived in IRAQ and had been a member of a PLO faction allied with SADDAM HUSSEIN. Shortly after these calls, the mastermind of the bombing, RAMZI AHMED YOUSEF a/k/a Abdul Basit, an IRAQI INTELLIGENCE agent, traveled to the United States using identification documents obtained in Kuwait during the IRAQI occupation of that country in 1991.

101.     Ramzi Yousef arrived in New York on September 1, 1992 using an IRAQI passport and requesting asylum. On December 31, 1992, he presented photocopies of passports for Abdul Basit at the Pakistani consulate in New York claiming to be Basit and requesting

replacement of his "lost" passport. Basit was a Pakistani citizen who had moved to Kuwait and

disappeared during the Iraqi occupation in August 1990. IRAQI INTELLIGENCE had access to

the Kuwaiti Interior Ministry files and upon information and belief, inserted Yousef's

fingerprints into the file and provided him with photocopies of two older passports from Basit's

file. The Pakistani Consulate, accordingly, provided Yousef a temporary passport, based on the

false documents. This provided Yousef with a means to escape the U.S. two days after the World

Trade Center bombing. In fleeing the United States after the bombing, Yousef first traveled

through Baluchistan, an uncontrolled region of IRAN straddling the border of IRAN and

Pakistan with strong ties to IRAQ.  By the following year, 1994, Yousef was living in the

Philippines. He left the Philippines however, after authorities discovered a plan he was working

on to bomb United States' airliners. Yousef fled to Pakistan and was eventually sheltered at an

AL QAEDA guesthouse. He was arrested in February 1995 in Pakistan and extradited to the U.S.

for prosecution and was eventually convicted in the 1993 World Trade Center bombing

conspiracy.

102.    ABDUL RAHMAN YASIN, who was born in the United States to IRAQI parents

but had been raised in IRAQ, within days of the 1993 bombing was questioned in New York and

New Jersey in connection with the World Trade Center bombing, but was released after

appearing to cooperate with U.S. officials. He fled the country the next day and traveled to

Baghdad, IRAQ. U.S. prosecutors later learned that he,  along with others, had prior training in

bomb making, and had mixed the chemicals and constructed the bomb that was used in the

World Trade Center. IRAQI INTELLIGENCE knew of YASIN's presence in IRAQ and

provided him refuge. On August 4, 1993 YASIN was indicted in absentia for the World Trade

Center bombing.

103.    In June 1994 YASIN was seen in Baghdad by an ABC news correspondent who

was told that YASIN worked for IRAQI government. U.S. law enforcement officials confirmed

60573

that fugitive YASIN has been sheltered in IRAQ, a continuing violation of United Nations Security Council Resolution 687 which makes it unlawful to harbor a suspected terrorist. In June 2002, YASIN was interviewed in Baghdad by Leslie Stahl from CBS. YASIN remains in IRAQ.

104.    RAMZI AHMED YOUSEF, Mohammed Salameh, Nidal Ayyad, Mahmud Abu Halima and Abmad Mohammed Ajaj were all eventually convicted in the Southern District of New York for the 1993 conspiracy to bomb the World Trade Center.

105.    Following his arrest in 1995, YOUSEF told U.S. investigators that his intent was to create an explosion that would cause one of the World Trade Center Towers to fall over onto the other, destroying both and causing massive American casualties.

106.    During the worldwide hunt for fugitive YOUSEF, he was living in the Philippines with KHALID SHEIKH MOHAMMED.  KHALID SHEIKH MOHAMMED's involvement in terror activities became known when law enforcement authorities interrupted a plot to blow up a dozen U.S. commercial airliners flying to the United States from Asian cities. MOHAMMED's participation in the planning of these acts of terror was uncovered by authorities after he and YOUSEF accidentally started a fire in their apartment in Manila while mixing bomb chemicals. Filipino authorities were suspicious when they saw chemicals, bomb making instructions and timing devices in the apartment and they seized those items along with a computer containing the details of the airliner bombing plans.  MOHAMMED and YOUSEF fled the country before they could be arrested.

107.    MOHAMMED eventually found sanctuary in Doha, Qatar. In early 1996, MOHAMMED was visited in Qatar by BIN LADEN. Around the same time, FBI director Louis Freeh, wrote to the Qatari government requesting that it surrender MOHAMMED to U.S. authorities. Not long after the FBI request, with the assistance of Qatari officials, MOHAMMED fled to Prague, Czech Republic, foiling U.S. attempts to arrest him.

60573

108.    Documents and AL QAEDA members captured in Afghanistan identified MOHAMMED as a leader in the AL QAEDA terror network and actively involved in the planning, logistics and financing of the September 11th Attacks.  His participation in the planned hijacking of U.S. commercial airliners was not new for him. MOHAMMED is a close associate of ABU ZUBAYDAH, a top BIN LADEN associate who was fully aware of the targets of the September 11th hijackers. ZUBAYDAH is in the custody of United States authorities and is providing some corroborating information about AL QAEDA operations.

SOMALIA

109.    In 1992 and 1993, AL QAEDA trained terrorists in Somalia and from nearby SUDAN attempted to incite an Islamic jihad there against U.S. military forces stationed in Mogadishu, Somalia by working with Somali warlord, General Farah Adid. BIN LADEN issued a fatwa urging Muslims to attack the U.S. and U.N. military forces stationed there during Operation Restore Hope. BIN LADEN, MAMDOUH MAHMUD SALIM, MUHAMMAD ATEF, SAIF AL ADEL, ABDULLAH AHMED ABDULLAH, MUHSIN MUSA MATWALLI ATWAH, a/ka "Abdel Rabman," FAZUL ABDULLAH MOHAMMED, a/k/a "Harun," AHMED MOHAMED HAMED ALI and MOHAMED SADEEK ODEB, along with Abu Ubaidah Al Banshiri, provided weapons, military training and assistance to the Somali tribes working for Adid who were opposed to the U.N. intervention in Somalia and urged them to attack U.S. military personnel. On October 3 and 4, 1993, these forces did attack U.S. military personnel in Mogadishu and killed 18 U.S. servicemen.

1994-1996

110.    In 1994, AL QAEDA member MOHAMED SADEEK ODEH and others established a cell in Nairobi and Mombassa, Kenya and followed BIN LADEN's SUDAN model by setting up seemingly legitimate businesses and aid organizations to facilitate their terrorist missions. The businesses employed AL QAEDA terrorists and the proceeds from those

businesses provided money to their terrorist cause. These businesses and aid organizations included, but were not limited to, the Asthma, Ltd., TANZANITE KING and the Help African People organization. ATEF, KHALID AL FAWAZ, a/k/a "Khaled Abdul Rabman Hamad al FAWAZ," a/k/a "Abu Omar," a/k/a "Hamad," Odeh, WADIH EL HAGE, Fahid Mohammed Ally Msalam, Anas Al Liby and Ali Mohamed spent considerable time in Kenya from 1993 through August 1998 solidifying this AL QAEDA cell.

111.   In or about 1994, BIN LADEN, working together with KHALID AL FAWAZ, set up a media information office in London, England (the "London office"), which was designed both to publicize BIN LADEN's statements and to provide a cover for activity in support of AL QAEDA's "military" activities, including the recruitment of trainees, the disbursement of funds and the procurement of equipment and services. In addition, the London office served as a communication center for  reports on military, security and other matters from various AL QAEDA cells to AL QAEDA's headquarters.

112.   In November 1995, upon information and belief AL QAEDA terrorists conspired with IRANIAN INTELLIGENCE and with the HEZBOLLAH to bomb the Khobar Towers in Saudi Arabia, killing five U.S. servicemen. Fearing further attacks by BIN LADEN and AL QAEDA, some Saudi government officials and businessmen agreed to provide financial support to AL QAEDA and began funneling millions of dollars to charities that would then forward the money to AL QAEDA. Some of these charities were madrassas (schools) that provided new recruits for terrorism by preaching a form of Islam that is intolerant of non-Muslims.

RETURN TO AFGHANISTAN

113.   In 1996, BIN LADEN was asked to leave the SUDAN by Sudanese officials pressured by the United States to crack down on terrorism. BIN LADEN returned to Afghanistan as the TALIBAN had seized control of most of that country. The number of AL QAEDA

members and terrorist training camps in Afghanistan grew rapidly following BIN LADEN's return. AL QAEDA actively supported the TALIBAN and assisted them in violently suppressing all opposition. BIN LADEN and Defendant MULLAH OMAR developed a very close relationship.

114.    From 1996 until 2001, BIN LADEN with the financial and logistical support of OMAR and others in the TALIBAN and IRAQ and IRAQI INTELLIGENCE, created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking enemies throughout the world. These camps trained men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives. Classes were also given in "how to kill a policeman" and "traps, murder and terrorist moves."

115.    On August 23, 1996, a strengthened BIN LADEN issued a fatwa declaring a jihad against Americans present in Muslim lands. The message was disseminated throughout all AL QAEDA cells and associated terrorist groups, such as the EGYPTIAN ISLAMIC JIHAD. The London AL QAEDA cell run by KHALID AL FAWAZ under the name Advice and Reformation Committee, and the Egyptian cell, run by AL ZAWAHIRI and ABDEL BARRY, were used to send the fatwa to Muslims living in the Western World. WADIH EL HAGE was also used by BIN LADEN to deliver messages, money and terrorist material to AL QAEDA operatives in the U.S. and U.K. AHMAD SA'ID AL-KADR an Egyptian-born aide to BIN LADEN was an associate of defendant AYMAN ZAWAHIRI when he was charged with the 1995 bombing of the Egyptian embassy in Islamabad, Pakistan in which 16 people were killed. AL KADR was running the Afghanistan operations of the Canadian charity, Human Concern International Society, and sending money to support AL QAEDA.

60573                                              42

116.    In February 1997, BIN LADEN publicly expressed his support for IRAQ in its conflict with the United States stating: "The hearts of the Muslims are filled with hatred towards the United States of America and the American president for American conduct towards IRAQ."

117.    Having decided to carry out acts of terrorism, SADDAM HUSSEIN, with the advice and prompting of his son and IRAQI INTELLIGENCE chief, QUSAY HUSSEIN and his other son UDAY HUSSEIN, head of an IRAQI INTELLIGENCE subdivision known as the "Fedayeen" and "Al-Qare," concluded that a campaign of terrorist attacks against the United States, under the banner of BIN LADEN and AL QAEDA, was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining IRAQI revenge.

118.    IRAQ upon information and belief, agreed to supply arms to AL QAEDA and provide AL QAEDA with access to and training in the use of chemical and biological weapons and agreed to instruct AL QAEDA terror trainers at its Salman Pak camp in Baghdad that contained a Boeing 707 used to practice hijacking. IRAQ also agreed to supply AL QAEDA terrorists with new identities and passports from Yemen and the United Arab Emirates.

119.    AL QAEDA agreed to provide protection from political opponents to IRAQ and SADDAM HUSSEIN, and to commit assassinations and other acts of violence to create instability in regions of IRAQ, particularly Kurdistan, to assist the regime of SADDAM HUSSEIN. Defendant ABU WA'EL, an agent of the IRAQ regime, and the Islamic group he directed defendant ANSAR AL ISLAM, used explosives provided by IRAQ to make bombs. To further SADDAM HUSSEIN'S desire to keep Kurdistan  off-balance, ANSAR AL ISLAM attempted three assassinations, killing Kurdish political leader Franso Hariri in February 2001, and Kurdish political party founder Shawkat Haji Mushir in February 2003. The attempt on the life of PUK Prime Minister Barham Salih during a visit with U.S. officials in April 2002 was unsuccessful.

120.    On February 22, 1998, BIN LADEN, Khalid Al FAWWAZ and AYMAN AL ZAWAHIRI of the EGYPTIAN ISLAMIC JIHAD issued a fatwa published in the Arabic newspaper Al-Quds stating:

> The ruling to kill the Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it....

121.    In their February 22, 1998 fatwa, BIN LADEN and AL QAEDA expressly referenced the United States' "continuing aggression" towards IRAQ as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" they are found:

> The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless.  The BIN LADEN and AL QAEDA fatwa also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States "alleged eagerness to destroy Iraq."

122.    Additional fatwas of a similar nature were issued in May 1998 and published in Al-Quds, the Arabic language newspaper, under the banner of the ULEMA UNION OF AFGHANISTAN. A May 29, 1998 fatwa issued by BIN LADEN called for the use of a nuclear bomb to "terrorize the Jews and Crusaders who were enemies of God." At the time BIN LADEN was seeking to obtain nuclear material from IRAQ and others who possessed nuclear material in order to create nuclear weapons.

123.    Between April 25 and May 1, 1998, two of BIN LADEN's senior military commanders, MUHAMMAD ABU-ISLAM and ABDULLAH QASSIM, visited Baghdad for discussions with SADDAM HUSSEIN's son -- QUSAY HUSSEIN -- the "czar" of IRAQI INTELLIGENCE.

124.    QUSAY HUSSEIN's participation in those meetings highlights the importance of the talks in both symbolic and practical terms. Upon information and belief, as a direct result of

60573                                            44

these meetings, IRAQ again made commitments to provide training, intelligence, clandestine Saudi border crossings, financial support and weapons and explosives to AL QAEDA.

125.    IRAQI INTELLIGENCE officials met with BIN LADEN in Afghanistan several more times. A second group of BIN LADEN and AL QAEDA operatives from Saudi Arabia were then trained by IRAQI  INTELLIGENCE in IRAQ to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence. A third group of BIN LADEN and AL QAEDA operatives received a month of sophisticated guerrilla operations training from IRAQI INTELLIGENCE officials later in the Summer of 1998.

126.    Despite philosophical and religious differences with SADDAM HUSSEIN, BIN LADEN continually sought to strengthen and reinforce the support he and AL QAEDA received from IRAQ. In mid-July 1998, BIN LADEN sent Dr. AYMAN AL-ZAWAHIRI, the Egyptian co-founder of AL QAEDA, to IRAQ to meet with senior Iraqi officials, including Iraqi vice president TAHA YASSIN RAMADAN.

127.    Upon information and belief, IRAQI INTELLIGENCE officials pledged IRAQ's full support and cooperation on the condition that BIN LADEN and AL QAEDA promised not to incite those groups inside IRAQ opposed to the regime of Iraqi dictator SADDAM HUSSEIN.

128.    During the July 1998 visit, ZAWAHIRI toured an IRAQI military base and nuclear and chemical weapons facility near al-Fallujah in IRAQ and upon information and belief, observed training by IRAQI INTELLIGENCE officials of AL QAEDA operatives at the al-Nasiriyah military and chemical weapons facility in IRAQ.

U.S. EMBASSY BOMBINGS

129.    To demonstrate its commitment to IRAQ and its anti-U.S. policies, in the Spring of 1998, AL QAEDA planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania. FAZUL ABDULLAH MOHAMED, KHALFAN KHAMIS MOHAMED, MUSTAFA MOHAMED FADHIL, MOHAMED RASHED DAOUD AL-'OWALI, SHEIKH AHMED SALIM SWEDAN, FAHID MOHAMED ALLY MSALAM and an individual known as Abdullah Azzam were chosen as some of the AL QAEDA terrorists who would conduct the coordinated attacks in Nairobi and Dar Es Salsam.

130.    In July and early August 1998, AL QAEDA terrorists MUSTAFA MOHAMED FADHIL, Khalfan Khamis Mohamed, AHMED KHALFAN GRAILANI, FAHID MOHAMMED ALLY MSALAM, AHMED the German, SHEIKH AHMED SALIM SWEDAN, Mohamed Sadeek Odeh and FAZUL OBDULLAH MOHAMMED were stationed in Dar es Salaam where they purchased a 1987 Nissan Atlas truck and outfitted it with oxygen, acetylene tanks, TNT, batteries, detonators, fertilizer and sand bags, creating a massive bomb to be driven into the U.S. Embassy. Odeh, FAZUL OBDULLAH MOHAMMED and others who participated in the bombings had been with BIN LADEN since the early l990s and BIN LADEN's days in the SUDAN.

131.    On July 30, 1998, IRAQ warned it would take action unless the United Nations embargo was lifted. IRAQ blamed the United States for the United Nations embargo. On August 4, 1998, IRAQ refused to cooperate with the United Nations weapons inspectors in IRAQ and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

132.    Three days later, on August 7, 1998, at approximately 10:30 a.m., FAZUL, Al-'Owhali and AZZAM drove a Toyota Dyna truck (outfitted similarly to a Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4,500

people. Defendant MUSHIN MUSA MATWALL ATWAH a/k/a "Abdel Rahman" a long time AL QAEDA lieutenant, wired the detonator and explosives in both trucks that exploded at the embassies.

133.     On August 7, 1998 at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and AHMED the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania severely damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

134.     On August 7, 1998 shortly before the bombing, Eidarous, an AL QAEDA member in London, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, UAE claiming responsibility for the Embassy bombings under the fictitious name Islamic Army for the Liberation of Holy Places.

135.     At the trial in New York of some of the AL QAEDA U.S. Embassy bombers, some defendants elicited testimony in their defense that cited the poor living conditions in IRAQ. They blamed those conditions on the U.S.- U.N. sanctions, and used it as motivation and explanation for the AL QAEDA attacks on the Embassies.

THE 1998 U.S. AIR STRIKES ON AL QAEDA

136.     On August 20, 1998, the United States initiated a pre-emptive and retaliatory air strike with cruise missiles on AL QAEDA training camps in Khost, Afghanistan and a factory in Khartoum, SUDAN, believed at the time to be a chemical weapons plant used by the Sudanese and IRAQI governments to manufacture weapons for their use and that of AL QAEDA terrorists.

137.     On August 20, 1998 President Clinton issued a statement on the air strike.

> Our target was terror... our mission was clear to strike at the
> network of radical groups affiliated with and funded by
> BIN LADEN, perhaps the preeminent organizer and
> financier of international terrorism in the world today.

138.    In December 1998, after a stand off between the U.N. and IRAQ and a discovery of weapons violations in IRAQ, the U.S. led U.N. allies in a four-day air strike on IRAQ. IRAQI Trade Minister MUHAMMAD MAHDI SALAH then stated that he expected terrorist activities against the United States to increase as a result of the bombing of IRAQ. The Arabic language daily newspaper Al-Quds Al-Araby cited the cooperation between IRAQ, BIN LADEN and AL QAEDA in a late December 1998 editorial, which predicted that "President SADDAM HUSSEIN, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama Bin-Laden, whom the United States considers to be the most wanted person in the world."    The editorial noted that this type of cooperation was already taking place, considering that "Bin-Laden was planning on moving to IRAQ before the recent strike."

139.    Following the December 1998 air strikes on IRAQ, SADDAM HUSSEIN dispatched FARUQ AL-HIJAZI to Kandahar, Afghanistan in order to meet with BIN LADEN and plot their revenge.

140.    QUSAY HUSSEIN also dispatched representatives to follow-up with BIN LADEN and obtain his firm commitment to exact revenge against the United States for the December 1998 bombing campaign. IRAQ offered BIN LADEN and AL QAEDA an open-ended commitment to joint operations against the United States and its "moderate" Arab allies in exchange for an absolute guarantee that BIN LADEN, AL QAEDA and their allies would not attempt to overthrow SADDAM HUSSEIN's regime in IRAQ.

141.    To demonstrate IRAQ's commitment to BIN LADEN and AL QAEDA, HIJAZI presented BIN LADEN with a pack of blank, official Yemeni passports, supplied to IRAQI INTELLIGENCE from their Yemeni contacts.  HIJAZI's visit to Kandahar was followed by a contingent of IRAQI INTELLIGENCE officials who provided additional training and instruction

to BIN LADEN and AL QAEDA operatives in Afghanistan. These Iraqi officials included members of "Unit 999," a group of elite IRAQI INTELLIGENCE officials who provided advanced sabotage and infiltration training and instruction to AL QAEDA operatives.

143.    Upon information and belief, at this meeting, IRAQ  agreed to provide BIN LADEN and AL QAEDA with the assistance of an expert in chemical weapons and BIN LADEN agreed to hunt down Iraqi opposition leaders who cooperated with the United States against HUSSEINand  to have a group of AL QAEDA 's "Afghan" Arabs enter IRAQ to fight Kurdish dissidents.

145.    In addition to the al-Nasiriyah and Salman Pak training camps, by January 1999, BIN LADEN and AL QAEDA operatives were being trained by IRAQI INTELLIGENCE and military officers at other training camps on the outskirts of Baghdad.

146.    In January 1999,  HAQI ISMAIL, believed to be a member of the IRAQ'S MUKHABARAT Secret Service, left IRAQ to train in an Afghanistan AL QAEDA camp. ISMAIL was believed to be a liaison between IRAQ, the TALIBAN and AL QAEDA and was rewarded with a position in the TALIBAN Foreign Ministry.

147.    On or about June 1999, during an interview with an Arabic-language television station, BIN LADEN issued a further threat indicating that all American males should be killed.

MILLIENIUM PLOT

148.    On December 14, 1999, Ahmed Ressam, an AL QAEDA operative, was arrested while driving a truck from Canada into the United States at Port Angeles, Washington. The truck was loaded with bomb making materials and detonators. Ressam later confessed to, and was convicted of conducting an AL QAEDA plan to detonate a large bomb at Los Angeles

International Airport on New Year's Day 2000. AL QAEDA terrorists ABU JAFFER AL-

JAZIRI, BIN LADEN's longtime IRAQI assistant, and MAHFUZ OUL AL-WALID, a/k/a

Khaled AI-Shanguiti, a/k/a Abu Hafs, a/k/a "the Mauritanian," were both identified as

orchestrating the so-called "Millennium Plot. "

149.    In April 2000, UDAY HUSSEIN, as a birthday gift to his father, SADDAM

HUSSEIN, assembled a squad of 1,200 trained men called AL QARE. Thirty of them were

dispatched with UAE passports' to points around the world to standby for orders to commit acts

of sabotage, urban warfare and hijacking.

ATTACK ON U.S.S. COLE

151.    On October 12, 2000,  members of AL QAEDA including BIN LADEN, JAMAL

AL-BADAWI, KHALID AL-MIDHAR, MOHAMMED OMAR AL-HARAZI, WALID AL-

SOUROURI, FATHA ADBUL RAHMAN, YASSER AL-AZZANI, JAMAL BA KHORSH,

AHMAD AL-SHINNI, RAED HIJAZI, JAMIL QASIM SAEED MOHAMMED,

MOHAMMAD AL HAMATI a/k/a MOHAMMAD HAMDI SADIQ AL AHDAL, a/k/a ABU

ASIM AL MAKKI, NURJAMAN RIDUAN ISMUDDIN a/k/a HAMBALI, and MOHAMMED

IQBAL ABDURRAHMAN as well as the two suicide boat bombers Abd Al-Mushin Al-Taifi

(deceased) (and a suspect in the August 1998 Embassy bombings) and Hassan Said Awadh

Khemeri (deceased), and upon informnation and belief, members of Iraqi intelligence carried out

their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side

of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17

American sailors and injuring an additional 39.

152.    The Yemeni government investigation reported that the terrorists behind the

attack were Islamic extremists who fought the Soviets in the Afghan War and who were tied to

the EGYPTIAN ISLAMIC JIHAD and AL QAEDA and who were trained in Afghanistan. Four were arrested in Yemen. Jamil Qaseri Saeed Mohammed was arrested a year later in Pakistan. After his arrest, AL-BADAWI admitted that he  received his instructions to bomb the U.S.S. Cole from AL QAEDA member AL-HARAZI who he had met during the war in Afghanistan.

153.    MOHAMMAD AL HAATI owner of the defendant companies in Yemen, AL HAMATI SWEETS BAKERIES and AL NUR HONEY PRESS SHOPS a/k/a AL NUR HONEY CENTER was one of those Yemenis who served with the Afghan mujahideen. Kuwaiti Intelligence charges that AL HAMATI is a member of AL QAEDA who also helped to plan the bombing of the USS Cole. AL HAMATI was held for participation in terrorist activities in Saudi Arabia but released in 1999. Upon information and belief AL HAMATI allowed AL HAMATI SWEETS BAKERIES and AL NUR HONEY PRESS SHOPS to be used as fronts to facilitate the movement of goods and money for AL QAEDA.

154.    On June 20, 2001, in a videotape released to the press, BIN LADEN appears to boast that his followers bombed the U.S.S. Cole. The 100-minute tape depicts BIN LADEN, wearing a Yemeni dagger on his belt and reciting a poem to show that he and AL QAEDA were not afraid of attacking the United States military: And in Aden, they charged and destroyed a destroyer that fearsome people fear, one that evokes horror when it docks and when it sails. Video of the damaged destroyer was superimposed with the words in Arabic, "the destruction of the American Destroyer Cole."

AL QAEDA-SAUDI HIJACKING

155.    On October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 from Saudi Arabia and had it flown to Baghdad, IRAQ. The hijackers were given "asylum" in IRAQ. They were extensively interviewed in the Iraqi press and criticized the Saudi government.

156.    Upon information and belief, this hijacking was a message between BIN LADEN and IRAQ intended to demonstrate that AL QAEDA terrorists could seize control of large commercial aircraft that could be used as a weapon in the hands of suicide terrorists, foreshadowing a well coordinated attack in the planning stages at the time and less than a year away from execution.

IRAQI THREATS

157.    On January 22, 2001, the Arab language newspaper Al Watan Al Arabi, reported that SADDAM HUSSEN and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies." The newspaper characterized HUSSEIN's statement as calling for an uncompromising campaign and "scorched earth policy."

158.    In May 2001, AL QAEDA operatives in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with SADDAM HUSSEIN. The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan. This benefited the HUSSEIN regime in IRAQ.

159.    In May 2001, Iraqi physician and kidney specialist Dr. Mohammed Khayal was dispatched from Baghdad to Afghanistan for three days to treat BIN LADEN's kidney problem, further demonstrating the important relationship between IRAQ and BIN LADEN less than four months before the single largest terrorist attack in history.

160.    On May 29, 2001, Wadih El-Hage, a U.S. citizen believed to be BIN LADEN's personal secretary, was convicted in the Southern District of New York, along with Mohamed Sadeek Odeh, Mohammed Rashed Daoud Al-'Owali and Khalfan Khamis Mohamed, for participating in the conspiracy to bomb the United States Embassies in Nairobi and Dar es Salasm in August of 1998. BIN LADEN and other AL QAEDA members were indicted but remain at large.

IRAQI FORE-KNOWLEDGE OF THE SEPTEMBER 11TH ATTACKS

161.     There is evidence that the Iraqi government had foreknowledge that AL QAEDA was planning to attack U.S. landmarks and civilians in September 2001 in Washington and New York and supported the planned attacks.

162.     Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with IRAQI INTELLIGENCE since the early 1980s. He comments on matters of IRAQI political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah. On September 1, 2001 he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by SADDAM HUSSEIN. In addition, Al Nasiriyah also contains a military base that is believed to contain a chemical weapons storage facility. IRAQ had previously denied access to this base to UN weapons inspectors. It was visited by ZAWAHIRI as early as 1998 and AL QAEDA terrorists trained there for several years.

163.     On July 21, approximately six weeks before the September 11th attacks, IRAQI columnist Mulhalhal reported that BIN LADEN was making plans to "demolish the Pentagon after he destroys the White House".

164.     Mulhalhal's July 21 article further informed that BIN LADEN would strike America "on the arm that is already hurting." Upon information and belief, this references a second attack on the World Trade Center. This interpretation is further bolstered by another reference to New York as "[BIN LADEN] will curse the memory of Frank Sinatra every time he hears his songs," (e.g., "New York, New York") identifying New York, New York as a target.

165.     Mulhalhal further indicated, "The wings of a dove and the bullet are all but one and the same in the heart of a believer."  This appears to be a reference to the use of commercial aircraft as a weapon. The information was reported in an IRAQI newspaper whose editor-in-chief serves as secretary to UDAY HUSSEIN'S Iraqi Syndicate of Journalists. The article

expressed IRAQI admiration and support for BIN LADEN's plans and its appearance in the newspaper would clearly have to be endorsed by SADDAM HUSSEIN himself.

166.    All IRAQI news media was strictly controlled and censored by the government of SADDAM HUSSEIN and was under the direct oversight of UDAY HUSSEIN. Various members of IRAQI INTELLIGENCE work at and control the content of each and every newspaper published inside IRAQ.

167.    The information contained in Mulhalhal's published statements were known prior to the events of September 11th, and because Mulhalhal has ties to IRAQI intelligence, it demonstrates foreknowledge of the planned attacks by BIN LADEN and indicates support by IRAQI co-conspirators.

168.    IRAQ's July 21, 2001 public statements also exemplify the BIN LADEN pattern of publicly threatening violent strikes against the United States prior to and after committing them. For example, weeks before the August 1998 AL QAEDA attacks on the U.S. embassies in Africa, BIN LADEN threatened U.S. civilians and shortly thereafter, bombed the embassies in Kenya and Tanzania within minutes of each other, killing 223 civilians.

169.    Additionally, after the suicide boat bombing of the U.S.S. Cole in Yemen in October 2000, BIN LADEN publicly threatened violence against America while wearing traditional Yemeni clothing including a Yemeni war dagger. BIN LADEN sought media attention to taunt the United States and recruit additional Muslim supporters.

PREPARATION FOR SEPTEMBER 11TH ATTACKS

170.    According to U.S. and foreign intelligence officials, in the spring of 2000 IRAQI INTELLIGENCE agents met with September 11th pilot hijackers ZAID SAMIR JARRAH and MARWAN AL-SHEHHI in Dubai, UAE in order to advance the hijacking of U.S. aircraft to

60573

commit terrorist acts. Not long after the meeting, AL-SHEHHI entered the United States on May 29 and JARRAH entered on June 27 to begin preparations for attacks.

171.     According to Czech intelligence sources, on June 2, 2000, MOHAMMAD ATTA, a pilot in training and the operational leader of the September 11, 2001 terrorist attacks, traveled to Prague to meet other co-conspirators. The following day, ATTA arrived at Newark International Airport in the United States.

172.     According to the FBI, from July 2000 through March 2001, ATTA, SHEHHI, HANJOUR, JARRAH and HAMZI traveled to the U.S. where they resided and took pilot courses to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the AL QAEDA IRAQI conspiracy to hijack U.S. aircraft to commit terrorist acts.

173.     Upon information and belief, sometime between April 8-11, 2001, ATTA left Florida where he was a flight student, to again meet in Prague with IRAQI INTELLIGENCE agent AL-ANI. ATTA returned to Florida and within two weeks opened a Sun County Bank account with $100,000 sent through a money changer in the UAE. Later in 2001, AL-ANI was expelled from the Czech Republic for espionage activities. Other intelligence reports indicate that AL-ANI met with another September 11th hijacker, KHALID AL MIDHAR as well.

174.     Italian security sources reported that IRAQ made use of its embassy in Rome to foster and cultivate IRAQ's partnership with BIN LADEN and AL QAEDA. HABIB FARIS ABDULLAH AL-MAMOURI, a general in the IRAQI SECRET SERVICE, and a member of IRAQ's M-8 Special Operations branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats. AL-MAMOURI met with September 11th pilot hijacker MOHAMMED ATTA in Rome, Hamburg and Prague. AL-MAMOURI has not been seen in Rome since July 2001, shortly after he last met with ATIA.

175.    Sometime between April 23, 2001, and on or about June 29, 2001, SATAM AL SUQAMI (Flt. 11), WALEED AL SHEHRI (Flt. II), AHMED AL GHAMDI (Flt.175), MAJED MOQED (Flt. 77), AHMED AL NAMI (Flt. 93), HAMZA AL GHAMDI (Flt. 175), MOHALD AL SHEHRI (Flt. 175), WAIL AL SHEHRI (Flt. 11), AHMED AL HAZNAWI (Flt. 93), and FAYEZ AHMED (Flt. 175), traveled from various points in the world to the United States.

176.    The FBI has reported that ATTA visited commercial crop dusting aircraft facilities in Florida in March and August of 2001. In the wake of the September 11th attacks, authorities concluded that ATTA was investigating the possibility of spraying chemical or biological weapons on U.S. civilians. In July and August 2001, on several occasions several other Middle Eastern men also visited the same crop dusting facility.

177.    On July 7, 2001 two members of the IRAQ MUKHABARAT, ABU AGAB and ABU WA'EL traveled together from Germany to Afghanistan and eventually to Kurdistan. ABU WA'EL trained at AL QAEDA terror camps and became the authority for fundamentalist groups operating in Kurdistan, intent on crushing opposition to SADDAM HUSSEIN.

178.    The FBI reported that in furtherance of his participation in the hijacking conspiracy, ZACARIAS MOUSSAOUI purchased flight deck videos for the Boeing 747 on June 20, 2001 and took a three day Boeing 747 simulator course in Minneapolis, Minnesota on August 13-15, 2001. He also purchased two knives in Oklahoma City, Oklahoma on August 3, 2001. MOUSSAOUI received approximately $14,000 from RAMZI BIN AL-SHIBH on August 1-3, 2001.

179.    U.S. government officials reported that in the summer of 2001, FAYEZ  AHMED (Flt. 175), SAEED ALGHAMDI (Flt. 93), HAMZA AL GHAMDI (Flt. 175), WALEED AL SHEHRI (Flt. 11), ZIAD JARRAH (Flt. 93), SATAM AL SUQAMI (Flt. 11), MOHALD SHEHRI (Flt. 175), AHMED AL GHAMDI (Flt. 93), and AHMED AL HAZNAWI (Flt. 93)

each opened a Florida Sun Trust Bank account with a cash deposit. These and other bank accounts were used by the 9/11 hijackers for living expenses, travel, pilot training, weapons and other incidentals and served as places where AL QAEDA operatives could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

180.    On September 9, 2001, BIN LADEN and other AL QAEDA members, OMAR and other members of the TALIBAN, carried out their plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the TALIBAN for many years. AL QAEDA terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

181.    This assassination solidified BIN LADEN's asylum and protection in TALIBAN controlled Afghanistan and cleared the way for AL QAEDA's unprecedented attack on the United States two days later. The TALIBAN would continue to refuse to surrender BIN LADEN or AL QAEDA members to the United States after the September 11th attacks.

SEPTEMBER 11TH ATTACKS

182.    On September 11, 2001, defendants MOHAMMED ATTA, ABDIJL ALZIZ AL OMARI , WAIL AL-SHEHRI, WALEED AL-SHEHRI, and SATAM AL SUQAMI hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the North Tower of the World Trade Center in New York.

183.    On September 11, 2001, defendants MARWAN AL-SHEHHI, FAYEZ AHMED, AHMED AL-GHAMDI, HAMZA AL-GHAMDI, AND MOHAUD AL-SHEHRI hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at

approximately 9:02 a.m., crashed it into the South Tower of the World Trade Center in New York.

184.    On September 11, 2001, defendants KHALID AL-MIHDHAR, NAWAF AL-HAZMI, HAM HANJOUR, SALEM AL-HAZML, and MAJED MOQED hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 a.m., crashed it into the Pentagon.

185.    On September 11, 2001, defendants ZIAD JARRAHI, AHMED AL-HAZNAWI, SAEED AL-GHAMDI, and AHMED AL-NAMI hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., probably the White House. At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

186.    At approximately 9:50 a.m., the South Tower of the World Trade Center collapsed; at approximately 10:29 a.m., the North Tower of the World Trade Center collapsed. Defendants intentionally caused the deaths of and injuries to thousands of innocent persons.

187.    The hijackings referenced above were the culmination of a conspiracy among defendants to attack the United States and murder United States citizens, destroy United States' properties and businesses and disrupt the United States economy.

POST SEPTEMBER 11TH

188.    On two videotapes made by AL QAEDA in September and October 2001, BIN LADEN took credit for the September 11th attacks and stated that the attacks went better than expected.

190.    Upon information and belief, several hundred AL QAEDA members., including ABU ABDUL RAHMAN fled Afghanistan for Kurdistan in IRAQ to try to take control of towns not under the control of SADDAM HUSSEIN and IRAQ, including Halabja, Tawela and Biyarah. These areas were under the control of defendant ANSAR AL ISLAM and its leader Iraqi Mukhabarat officer and defendant ABU WA'EL a/k/a Sadoun Abdul Latif. Upon information and belief, ANSAR AL ISLAM was acting on behalf of IRAQ and SADDAM HUSSE1N to destabilize the Kurdish region. On September 23, 2001, Kurdish forces ousted ANSAR AL ISLAM from Halabja, but the Islamic fundamentalist group remained in control of Tawela and Biyarah.

194.    ABU ZUBAYDH was arrested in April 2002 in Pakistan near the border of Afghanistan, along with other AL QAEDA members. Documents and other evidence were found at the scene of the arrest that demonstrate AL QAEDA plans for past and future terrorist activities. ZUBAYDH has made self-incriminating statements about his high level role in AL QAEDA and his close connection to BIN LADEN. He has further identified several high level AL QAEDA officers, including, but not limited to, KHALID SHEIKH MOHAMMED.

195.    On April 22, 2002 during a court appearance in the Eastern District of Virginia, ZACARIAS MOUSSAOUI stated that his Court appointed lawyers had "no understanding of terrorism, Muslims, Mujahideen," that he wanted to "fight against the evil force of the [U.S.] federal government" and called for the destruction of the United States and Israel.

RAN

196.    Powerful government officials in IRAN provided long-term assistance to BIN LADEN and his army of allied Islamists.  Iran's support enabled BIN LADEN to maintain a steady course of violent activities against America and American interests culminating on September 11, 2001.

197.    In 1996 when BIN LADEN left the SUDAN and enjoyed sanctuary in largely Taliban-controlled Afghanistan, he notably maintained a relationship with the Iranian-supported Taliban opposition leader, defendant GULBUDDIN HEKMATYAR who was residing in Tehran. BIN LADEN and HEKMATYAR met in the 1980s while the Afghani HEKMATYAR was leading Hezb-e-Islami, a Pakistan-based group fighting the Soviet occupation of Afghanistan. Their cooperative relationship lasted over a decade.

198.    In the mid nineties this cooperation consisted of jointly supported military training camps and drug smuggling operations in Afghanistan that provided funding for both Hezb-e-Islami and AL QAEDA. HEKMATYAR was welcomed in IRAN because he shared IRAN's opposition to the Taliban government. The religious leaders in IRAN opposed the TALIBAN for two reasons: religious and economic.

199.    In the mid nineties, IRAN as a Shiia Muslim nation was actively competing with Wahabi Muslim-Saudi Arabia for influence in the fledgling Islamic nation of Afghanistan. At the same time IRAN was competing with Afghanistan to be the site of a planned gas pipeline from Central Asia to the Caspian Sea.

200.    The conflict between IRAN and the TALIBAN did not, however, prevent Iranian assistance to BIN LADEN's AL QAEDA, directly and through HEKMATYAR. This assistance is ongoing. Following the September 11 attacks, BIN LADEN, HEKMATYAR and Iranian officials formed a new alliance called LASHKAR FEDAYAN-E-ISLAMI (ISLAMIC MARTYRS BRIGADE) based in Northeastern Afghanistan with the goal of launching suicide attacks against American troops.

201.    According to a September 26, 2002 interview with Salauddin Safi, a military commander under HEKMATYAR living in Pakistan, IRAN "is helping with money and weapons," for suicide attacks on Americans in Afghanistan. Safi explained the relationship

between IRAN and HEKMATYAR saying, "IRAN needs HEKMATYAR because IRAN is an enemy of the United States and HEKMATYAR is too," despite the fact that the United States removed the TALIBAN from Afghanistan. IRAN continues to seek influence and control in Afghanistan and to reject the American presence there and in other parts of the Middle East.

202.    In addition to HEKMATYAR, BIN LADEN maintained associations with other Iranian sponsored terrorists. The International Policy Institute for Counter Terrorism reports that in 1995 and 1996, BIN LADEN approached IRAN'S MINISTRY OF INTELLIGENCE AND SECURITY (MOIS) and offered to join forces against America. This was followed by a number of meetings between BIN LADEN, Iranian operatives and leaders of the Iranian government's proxy army, HEZBOLLAH. BIN LADEN met with IMAD MUGHNIYEH, HEZBOLLAH's director of operations at a meeting sponsored by the Iranian MOIS in IRAN in 1996, but it was not the first or only meeting between those two terrorists.

203.    A witness at the United States Federal court trial in New York against some of the United States Embassy terrorist bombers reported that contacts between BIN LADEN and MUGHNIYEH began before BIN LADEN even left the SUDAN in 1996.  The former AL QAEDA member, ALI MOHAMMED testified,

> I arranged security for a meeting in the SUDAN between Mughniyah, Hezbollah 's chief and Bin Laden…Hezbollah provided explosives training for al-Qaeda and al-Jihad…Iran also used Hezbollah to supply explosives that were disguised to look like rocks."

204.    Yossef Bodansky, Director of the House of Representatives Task Force on terrorism and unconventional warfare, reported that right after a speech on June 7, 1996 in which Iranian Spiritual Leader AYATOLLAH ALI KHAMENEI declared that HEZBOLLAH must reach "all continents and countries", the IRANIAN government hosted a meeting of international terrorists. At this meeting, a committee called the "Committee Of Three" was created to preside

60573                                                    61

over an International HEZBOLLAH. Leading the committee were IMAD MUGHNIYAH, BIN LADEN and AHMAD SALAH (Salim), of the Egyptian Islamic Jihad. An Iranian leader, MAHDI CHAMIRAN SAVEHI (whose official title with the government is Director of the Foundation for Preservation of the Values of the Sacred Defense), would direct the committee's work in sponsoring terrorist attacks against the United States and others.

205.   At an October 1997 meeting between terrorist organizations and high level Iranian officials, including GENERAL MOHSEN REZA'I, former commander of the ISLAMIC REVOLUNTIONARY GUARD CORPS (IRGC) who is now in charge of the reorganization of IRAN's security apparatus; GENERAL YAHYA RAHLM SAFAVI, head of the IRGC; QORBAN 'ALI NAJAF'ABADI, Information Minister; former minister 'ALI FALAHYAN; MOHAMMED MOHAMMADI RAYSHAHRI, special adviser to Iran's supreme leader ALI KHAMENE'I; and HOSEYN SHAYKH OL-ESLMAN, former assistant foreign minister, plans were made to increase support of anti-U.S. terrorism. The report stated "Reza'i informed the participants that IRAN would double the amount of material and logistical support for those organizations engaged in defending the revolution." "Defending the revolution" is a rallying cry for acts of violence against the West.

206.   On September 14, 1998, the U.S. requested Germany extradite AL QAEDA Member MAMDOH MAHMUD SALIM, and stated that during the period 1992-1996, while BIN LADEN lived in SUDAN, AL QAEDA and the SUDANESE GOVERNMENT worked closely together on training and arming terrorists. According to the FBI, AL QAEDA "agreed to put aside its differences with Shi'a Muslim terrorist organizations, including the Government of IRAN and its affiliated terrorist group HEZBOLLAH, to cooperate against the perceived common enemy, the United States and its allies. "

207.    In 1998, prior to the bombings of the U.S. embassies in East Africa, a representative of BIN LADEN reportedly met again with an official of the Iranian government in order to establish an "anti-U.S. alliance." By this time, communication between BIN LADEN and Iranians was regular and frequent. Investigators reported that 10% of the calls made from BIN LADEN's satellite phone were to IRAN.

208.    Running parallel to their interest in anti-American activities, BIN LADEN and IRAN were active in promoting an Islamic government in Albania and Kosovo. According to the Times of London March 22, 1998, on February 16, 1998, BIN LADEN and the Iranian Revolutionary Guards signed a pact consolidating their operations in Albania and Kosovo. They created financial support networks by setting up banks and humanitarian organizations. Small factories and businesses were encouraged with loans and this helped create jobs and bolster neighborhood economies.

209.    Muslim proselytizing organizations like AL-HARAMAIN and AL MUWAFAQ attracted young Albanians who were then recruited for training as holy warriors at training camps that were being established in remote areas of the country.

210.    This work did not distract the clerics of IRAN from continuing to support other AL QAEDA missions.  German authorities debriefed terrorists in custody and learned that an important and virulent AL QAEDA combat commander MOHAMMED SARKAWI lived and worked in Tebran in the months before September 11, 2001.  Around the time of the September 11 attacks SARKAWI traveled to Afghanistan but returned to IRAN before the American bombing campaign began in the fall of 2001.

211.    SARKAWI's movements were tracked by monitoring his satellite phone, according to German information. Germany's interest in SARKAWI is based on its belief that he is involved in a terrorist group called AL TAWHID and that he assisted a hundred or more AL

QAEDA fighters who were fleeing Afghanistan by arranging for funds, passports, escape routes (sometimes through IRAN) and sanctuary. Defense Secretary Donald Rumsfeld confirmed the flight of AL QAEDA members to or through Iran.

212.    After the September 11 attacks, IRAN provided an escape route for two Egyptian AL QAEDA members on the FBI's most wanted list, SAIF AL-ADEL and MAUFOUZ OULD AL-WALID. Additionally, American intelligence reports that Al- ADEL and top AL QAEDA leader ABU HAFS, "the Mauritanian", were in Eastern Iran where, the Washington Post reported, they might be planning further AL QAEDA operations.

213.    HAJI MOHAMAD AKRAM, a captured BIN LADEN aide told an interviewer from the Christian Science Monitor that BIN LADEN fled Afghanistan to IRAN in November 2001. AKRAM said that at the time, BIN LADEN had offers of sanctuary from IRAQ and from IRAN. AKRAM claimed that IRAN distributed money to AL QAEDA for distribution to terrorist soldiers and that he himself had received the equivalent of $1400.

214.    Other AL QAEDA terrorists have been located in a dozen camps around Tehan that serve as underground railroads for terrorists and their families en route through IRAN for Beirut and Syria as well as a route for the smuggling of AL QAEDA and HEZBOLLAH assets, gold and diamonds from Pakistan to SUDAN.

215.    SARKAWI is considered a major player in the Iranian AL QAEDA activities. He is also suspected of assisting in the murder of American diplomat Laurence Foley on October 28, 2002 in Amman, Jordan. Jordan's Foreign Minister, Marwan Muashe, reports that two men who admitted to the killing implicated SARKAWI, claiming he provided them with machine guns, grenades and money to attack embassies and foreign diplomats in Jordan.

216.    At the time of the September 11 attacks, Iranian military officers including GENERAL ALI BLOKIAN, formerly an advisor to HEZBOLLAH in Lebanon, were assisting Afghanis on the ground near the Iranian border region. The bodies of three Iranian Revolutionary Guards were found in the west Afghanistan province of Herat after the U.S. air strikes against the TALIBAN. Ismail Khan, an Iranian ally, ruled this district. Because he is working to challenge Kabul's rule, the IRANIAN REVOLUTIONARY GUARD is providing advice and assistance to Khan and others. Afghan defense officials claim that elite forces from the IRANIAN REVOLUTIONARY GUARD are providing arms and ammunition to Iranian-friendly commanders.

217.    A U.S. government report in 2000, Patterns of Global Terrorism, alleged that "IRAN remained the most active state sponsor of terrorism."

> "Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals."

218.    The Iranian pattern of terrorism support has been ongoing for many years. Indeed, by providing training, facilities, planning, logistics, escape routes and most importantly leadership, IRAN enabled BIN LADEN's army to carry out acts of terrorism it otherwise would be incapable of accomplishing. Likewise, without terrorists like BIN LADEN and HEZBOLLAH, IRAN would lose a most effective weapon against the United States and the West.

HAMBURG AL-QAEDA CELL

219.    On August 28, 2002, German prosecutors brought charges against MOUNIR EL-MOTASSADEQ (or "el-Motassadeq"), a Moroccan man who supported members of the Hamburg AL QAEDA terrorist cell and helped to plan and carry out the September 11, 2001 terrorist attacks.

60573

220.     MOUNIR EL-MOTASSADEQ is an AL QAEDA co-conspirator. His indictment was the first formal criminal charge brought by German authorities in connection with the September 11, 2001 attacks. EL-MOTASSADEQ was arrested in November of 2001 on evidence that he had access to the bank account of one of the suicide hijackers and arranged wire transfers to hijackers while they were learning to fly in the United States.

221.     When arrested in 2001, prosecutors said EL-MOTASSADEQ was a close associate of MOHAMED ATTA, a suspected ringleader of the plot.  In 1996, EL-MOTASSADEQ was one of the witnesses who signed ATTA's will. EL-MOTASSADEQ managed the finances of another hijacker, MARWAN AL-SHEHHI, and that money was used to help AL-SHEHHI pay for his flight lessons in the United States and cover living expenses here. According to the criminal indictment, these funds were used to support members of the terrorist group AL QAEDA.

222.     EL-MOTASSADEQ admitted that he knew the September 11, 2001 hijackers, but he provided conflicting versions of the nature and intensity of those contacts. At times EL-MOTASSADEQ said he knew them only through the Al Quds mosque, which was attended by ATTA and other hijackers. On other occasions, he said he had visited the apartment on Marienstrasse where ATTA lived. EL-MOTASSADEQ and ATTA were both students at TUHH University in Hamburg.

223.     In July 2000, EL-MOTASSADEQ traveled to Karachi, Pakistan for a "vacation." The Pakistanis later confirmed that he had been in the country at this time and that there were indications that he had visited an AL QAEDA camp in Afghanistan. In May 2001, EL-MOTASSADEQ visited the State nuclear plant near Hamburg, Germany.

224.    The German investigation revealed that in summer of 1999 or earlier, a group of Muslim students in Hamburg joined forces with the express goal of carrying out, in countries of Western culture, especially in the United States, the "Holy War" ("Jihad") by means of international terror. The group's members included MOHAMMED ATTA, MARWAN YOUSEF MOHAMED RASHED AL-SHEHHI (or "al-Shehhi"), and ZIAD SAMIR JARRAH (or "JARRAH") (hijackers, all of whom died in the course of the attacks), co-conspirators and Defendants RAMZI MOHAMMED ABDULLAH BIN AL SHIBH (a/k/a Ramzi Mohamed Abdallah Omar), ZAKARIYA ESSABAR, SAID BAHAJI, as well as MOUNIR EL-MOTASSADEQ.

225.    Initially, the principal meeting point of the Hamburg cell was the apartment rented by ATTA, BAHAJI and BIN AL SHIBH in Hamburg-Marburg, which temporarily served as AL-SHEHHI's residence, too. EL-MOTASSADEQ, ESSABAR and JARRAH convened for meetings of the group at this location. In September 1999, the apartment AL-SHEHHI rented nearby served as an alternative base of operations. In October of 1999, after AL-SHEHHI and ATTA moved into the second apartment, it also became the primary address of EL-MOTASSADEQ.

226.    In October of 1999 or earlier, the group's members finalized their terrorist scheme, which called for the use of airplanes in "jihad" to kill as many "infidels" in the United States as possible. In order to coordinate details and logistical support with the responsible representatives of the international terrorism network, they resolved to travel to Afghanistan in two groups.

227.    In late November of 1999, the three hijackers (ATTA, AL-SHEHHI and JARRAH) and BIN AL SHIBH traveled on almost identical dates to an AL QAEDA training camp. Aside from providing training in military operations, the camps served to fuel radical extremist ideology and foster an inner resolve among recruits to sacrifice their own lives fighting

the "godless enemies." AL-SHEHHI went back to Hamburg in early January 2000 (through late March 2000). JARRAH did not return to Hamburg until late January. ATTA stayed in Afghanistan until late February and BIN AL SHIBH re-entered Germany in March 2000.

228.    In the spring of 2000, a second group traveled to Afghanistan. EL-MOTASSADEQ flew from Hamburg to Karachi on May 22, 2000, and returned on August 1, 2000. In the meantime, he underwent military training in a camp near Kandahar, Afghanistan.

229.    In accordance with the plans for the attacks discussed in Afghanistan, the three terrorists began making arrangements for pilot training in the United States upon their return. Accordingly, in March 2000, Atta contacted 31 flight schools in the United States via email from Hamburg, inquiring about the possibilities and conditions of flight training for two or three men from different Arab countries. On March 26, 2000, JARRAH signed an agreement to receive pilot training at the Florida Flight Training Center in Venice, Florida, and on March 30, 2000, transferred the amount of 349 German Marks to the account of the flight school's Munich representative.

230.    On May 25, 2000, JARRAH applied for a United States entry visa, which he received without difficulty, as ATTA had before him, on May 18, 2000. AL-SHEHHI had received his United States entry visa from the United States consulate in Dubai, United Arab Emirates (UAE), on January 10, 2000. All three terrorists had previously obtained new passports.

231.    Following their entry into the United States (AL-SHEHHI arrived on May 29, 2000, ATTA on June 3, 2000), AL-SHEHHI and ATTA opened a joint bank account on July 18, 2000 with Sun Trust Bank in Venice, Florida, through which they obtained financing and material support for their stay in the United States from backers within the international terrorist network. On July 7, 2000, they started taking flight lessons together at the flight school Hoffman

Aviation in Venice, Florida. By December 21, 2000, they had successfully completed their training, receiving professional pilot licenses from the Federal Aviation Administration.

232.   ATTA and AL-SHEHHI then put their acquired skills to the test on a Boeing 727 flight simulator at the Simulations Center in Opa-Locka, Florida, in December 2000, and by taking several exercise flights at the Advanced Aviation Flight Training School in Lawrenceville, Georgia, and at the flight school in Decatur, Georgia, in January and February 2001, respectively.

233.   JARRAH entered the United States on June 26, 2000, and, until January 13, 2001, underwent pilot training at the Florida Flight Training Center in Venice, Florida, where he obtained a private pilot license. Between December 15, 2000, and January 5, 2001, he took flight lessons at the Aero service Aviation Center in Virginia Gardens, Florida.

234.   BIN AL SHIBH's applications for a non-immigrant visa for the United States were denied and he was unable to train in Florida with JARRAH.

235.   To take BIN AL SHIBH's place, ESSABAR was to be sent to the United States to undergo pilot training. Like ATTA, AL-SHEHHI and JARRAH before him, ESSABAR attempted to obscure his visit to Pakistan from U.S. authorities by obtaining a new passport from the Moroccan embassy in Berlin on October 24, 2000. United States authorities however, denied ESSABAR's visa applications. His plan to become a suicide hijacker could not be realized. Instead, ZACARIAS MOUSSAOUI (currently detained and indicted in the United States for his involvement in the preparations for the attacks of September 11, 2001), traveled to the United States following an eight-week visit to Pakistan, and enrolled in flight school. However, due to MOUSSAOUI's arrest on August 17, 2001, he never completed his training.

236.     EL-MOTASSADEQ and the other AL QAEDA co-conspirators who remained in Hamburg remained involved in the preparing for the attacks. In particular, they were responsible for ensuring that the terrorists and ZACARIAS MOUSSAOUI had sufficient funds for their stay and training in the United States.

237.     Several meetings were held for group members in Germany and Spain for the purpose of coordinating those who remained in Hamburg and those who had traveled to the United States. Accordingly, BIN AL SHIBH and JARRAH met on January 4, 2001, in Bochum or Dusseldorf. Later, BIN AL SHIBH traveled to Berlin to meet ATTA who had arrived there no later than January 6, 2001, after spending time in Spain. ATTA returned to the United States on January 10, 2001. Another meeting between ATTA and BIN AL SHIBH on July 17 or July 18, 2001, in Tarragona, Spain, served the purpose of coordinating the exact times of the attacks.

238.     EL-MOTASSADEQ, together with Bahaji, acted as the resident administrator of the terror organization in Hamburg. EL-MOTASSADEQ's chief responsibility consisted of securing funding for the group's terrorist activities. He made use of AL-SHEHHI's account for financing.  EL-MOTASSADEQ made sure that the account received sizeable support payments from sources in the United Arabian Emirates and elsewhere.  By transferring tuition money to maintain the status of AL-SHEHHI as a student, he allowed AL-SHEHHI to remain in Germany. Shortly before AL-SHEHHI left for Afghanistan, in late November 1999, EL-MOTASSADEQ also gained control over the AL-SHEHHI's bank account and bank card which he used to transact financial and other personal business on behalf of AL-SHEHHI and cover up the latter's absence.  The account and card were also used to distribute funds. EL-MOTASSADEQ transferred funds from AL-SHEHHI's to BIN AL SHIBH's account which the latter passed on to AL-SHEHHI in the United States; this money was used to finance AL-SHEHHI's flight training. After AL-SHEHHI left Germany, several cash withdrawals were made to provide funding for the

intended flight training of BIN AL SHIBH and ESSABAR and to benefit other cell members and promote acts of international terrorism.

## STATEMENTS OF CAPTURED AL QAEDA MEMBERS

239.    UMAR FARUQ, an admitted terrorist co-conspirator and a member of the AL QAEDA terrorist organization, was arrested in or about May 2002. According to the confession of ABU ZUBAYDAH, a top AL QAEDA leader detained by the United States authorities, UMAR FARUQ was a senior AL QAEDA representative in Southern Asia. An interrogation of UMAR FARUQ was conducted by United States authorities at the United States Air Force Base in Baghram, Afghanistan, on May 23, 2002.

240.    During a custodial interview on September 9, 2002, UMAR FARUQ confirmed that he was AL QAEDA's senior representative to Southeast Asia and was initially sent to the region by ABU ZUBAYDAH and IBN SHEIK AL-LIBI to plan large-scale attacks against United States interests in Indonesia, Malaysia, Philippines, Singapore, Thailand, Taiwan, Vietnam and Cambodia. In particular, FARUQ prepared a plan to conduct simultaneous car/truck bomb attacks against United States embassies in the region to take place on or about September 11, 2002.

241.    ABDELGHANI MZOUDI had close and frequent contact with members of the AL QAEDA Hamburg cell who supervised and directed the September 11 attacks. He provided logistical support to defendant ATTA, ESSABAR and other suicide hijackers by making money available to them to finance flight training in the United States.  MZOUDI arranged for living accommodations in a student residence in Germany for defendant AL SHEHHI his final weeks before leaving Germany for the United States. MZOUDI attended terrorist training camps in Afghanistan in the summer of 2000 with ESSABAR and defendant MOTASSADEQ. MZOUDI provided material and logistical support to defendant RAMZIBINALSHIBB and AL QAEDA.

242.     HAJI JAMSHED is an AL QAEDA co-conspirator and a principal financier in the creation and management of AL QAEDA training camps.

243.     AL QAEDA leader ABD AL-RAHIM AL-NASHIRI, the network's operations chief in the Persian Gulf, was recently captured by United States officials. AL-NASHIRI is a known high level AL QAEDA operative who carried out spectacular acts of international terrorism including the attack on the USS Cole in October 2000 and the near simultaneous bombing of the U.S. embassies in Kenya and Tanzania. AL-NASHIRI was involved in the planning of other attacks for AL QAEDA some of which were foiled.

SAUDI ARABIAN DEFENDANTS

244.     Upon information and belief, there were and are, a large number of Saudi citizens and members of The Saudi Royal Family who support BIN LADEN. High ranking officials in the Saudi government and Saudi businessmen have provided money to support BIN LADEN and AL QAEDA. Money to support BIN LADEN and AL QAEDA was transferred using charitable institutions, businesses and banks. In many cases, these entities shared management and or offices, creating an interlocking financing structure that obscures the movement, source and ultimate destination of money.

245.     BIN LADEN was born in Saudi Arabia to a wealthy Saudi family which operated a large multi-national construction company. He and many other Saudis reacted to the Soviet invasion of Afghanistan by taking up arms in the name of Islam. Throughout the 1980's and 1990's and continuing today, many Saudis support and attend the religious schools that preach hatred toward the West. Indeed, 15 of the 19 September 11th hijackers were from Saudi Arabia.

246.     The close relationship between BIN LADEN and certain of the highest members of the Saudi Royal Family stretches back for a long period of time and continues to this day.

247.    BIN LADEN met with Defendant PRINCE SULTAN BIN ABDULAZIZ AL SAUD (or "PRINCE SULTAN") after IRAQ invaded Kuwait in August 1990. PRINCE SULTAN is the Second Deputy Prime Minister, Minister of Defense and Aviation, Inspector General, and Chairman of the Board of Saudi Arabian Airlines, which does business in the United States and internationally. In the meeting, BIN LADEN offered the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi militants who BIN LADEN was willing to recruit.

248.    This offer was also made to Defendant PRINCE TURKI AL FAISAL AL SAUD (or "PRINCE TURKI"), the then Chief of Saudi Intelligence, or Istakhbarat. PRINCE TURKI had an ongoing relationship with BIN LADEN from the time that they first met in Islamabad, Pakistan at the Saudi embassy, during the Soviet Union's occupation of Afghanistan.

249.    Defendant PRINCE MOHAMMED AL FAISAL AL SAUD (or "PRINCE MOHAMMED" or "PRINCE MOHAMMED AL FAISAL") is involved in the financing, aiding and abetting and material support of BIN LADEN, AL QAEDA, and international terrorism in part through FAISAL ISLAMIC BANK and AL SHAMAL ISLAMIC BANK in the Sudan. PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD (or "PRINCE ABDULLAH" or "PRINCE ABDULLAH AL FAISAL") and PRINCE NAYEF BIN ABDULAZIZ AL SAUL (or "PRINCE NAYEF") are also engaged in the aiding and abetting or material sponsorship of OSAMA BIN LADEN, AL QAEDA, and international terrorism as described herein. PRINCE SALMAN IBN ABDUL AZIZ (or "PRINCE SALMAN") has also provided material support to BIN LADEN, and AL QAEDA.

250.    PRINCE TURKI was head of Saudi Arabia's Department of General Intelligence (Istakhbarat) from 1977 until 2001. As such, he was in a position to know the threat posed by BIN LADEN, AL QAEDA, the TALIBAN, and the extremist and violent perversion of jihad and

hatred that the Saudi religious schools were encouraging in young students. PRINCE TURKI abruptly left his position in or around August 30, 2001, when he was dismissed as chief of Saudi Intelligence just prior to the September 11, 2001 attacks.

251.    PRINCE TURKI met personally with BIN LADEN at least five times while in Pakistan and Afghanistan during the mid-eighties to mid-nineties. PRINCE TURKI also had meetings with the TALIBAN in 1998 and 1999. In 1995, while the Saudi Istakhbarat was headed by PRINCE TURKI, he decided to give massive financial and material support to the TALIBAN.

252.    Defendants PRINCE TURKI AL FAISAL AL SAUD and PRINCE MOHAMMED had close financial ties with AL QAEDA financier MUHAMMED GALEB KALAJE ZOUAYDI.

253.    MULLAH KAKSHAR is a senior TALIBAN official who defected and provided a sworn statement regarding the transfer of funds from wealthy Saudis directly to AL QAEDA and BIN LADEN in Afghanistan. MULLAH KAKSHAR's sworn statement implicates PRINCE TURKI as the facilitator of these money transfers in support of the TALIBAN, AL QAEDA, and international terrorism.

254.    In 1996, according to various intelligence sources, a group of Saudi princes and prominent Saudi business leaders met in Paris and agreed to continue contributing, sponsoring, aiding and abetting BIN LADEN's terrorist network.

255.    In July of 1998, a meeting occurred in Kandahar, Afghanistan that led to an agreement between certain Saudis and the TALIBAN. The participants were PRINCE TURKI, the TALIBAN leaders, as well as senior Pakistani intelligence officers of the ISI and representatives of BIN LADEN. The agreement reached stipulated that BIN LADEN and his followers would not use the infrastructure in Afghanistan to subvert the royal families' control of Saudi government and in return, the Saudis would make sure that no demands would be acceded to for the extradition of terrorist individuals, such as BIN LADEN, nor permit the closure of

terrorist facilities and camps. PRINCE TURKI also promised to provide oil and generous

financial assistance to both the TALIBAN in Afghanistan and to Pakistan. After the meeting, 400

new pick-up trucks arrived in Kandahar for the TALIBAN, still bearing Dubai license plates.


256.    PRINCE TURKI was instrumental in arranging a meeting in Kandahar between

Iraqi senior intelligence operative, the Ambassador to Turkey FARUQ AL- HIJAZI and BIN

LADEN, in December of 1998.


257.    Istakhbarat served as a facilitator of BIN LADEN's network of charities,

foundations, and other funding sources. PRINCE TURKI has recently been named as an

ambassador from Saudi Arabia to the United Kingdom.


258.    Born in Riyadh, Saudi Arabia in 1924, PRINCE SULTAN is the son of Abdulaziz

Bin Abdul Rahman Al Saud, founder of the modern Kingdom of Saudi Arabia and Hussa Bin

Ahmad Sudairi. He is one of the six full brothers of King Fahd Bin Abdulaziz Al Saud. These

seven brothers are referred to as the Sudairi seven. PRINCE SULTAN was appointed Governor

of Riyadh in 1947.


259.    PRINCE SULTAN has been the Second Deputy Prime Minister, Minister of

Defense and Aviation since 1962 and Inspector-General of the Kingdom of Saudi Arabia. In

addition, PRINCE SULTAN is Chairman of the Supreme Council for Islamic Affairs which has

oversight and control over charities in Saudi Arabia.


260.    Beginning with the Gulf War, PRINCE SULTAN took radical stands against

western countries and publicly supported and funded several Islamic charities that were

sponsoring BIN LADEN and AL QAEDA operations, including the Defendants

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION ("IIRO"). MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH and AL-HARAMAIN. He was appointed head of the Supreme Council of Islamic Affairs which was responsible for charitable financing.

261.    PRINCE SULTAN has been involved in the sponsorship of international terrorism through the IIRO and other Saudi-funded charities. Defendant IIRO is a direct arm of the Saudi Royal family, according to Arafat El-Asahi, the Director of the Canadian branch of the IIRO. The United States Department of State has also identified IIRO as an organization which sponsors terrorism. Dr. ADNAN AL BASHA, the Secretary General of the IIRO publicly thanked PRINCE SULTAN on December 22, 2000, for his support and aid.

262.    A Saudi embassy press release announced in April 2001 that "PRINCE SULTAN affirms [the] Kingdom's Support" for the Palestinian Intifada, with the generous amount of $40 million already disbursed to "the families of those martyred" and other "worthies."

263.    PRINCE SULTAN personally funded several Islamic charities over the years that sponsor, aid, abet or materially support BIN LADEN and AL QAEDA: the IIRO (and its financial fund SANABEL EL-KHAIR), AL-HARAMAIN, MUSLIM WORLD LEAGUE, and the WORLD ASSEMBLY OF MUSLIM YOUTH. All of these charities are and/or were involved in the financing of international terrorism. The total of PRINCE SULTAN's personal donations to these entities since 1994 amounts to at least $6,000,000, according to official and public reports.

264.    PRINCE SULTAN's role in the IIRO's financing is of significance. Since the IIRO's creation in 1978, PRINCE SULTAN donated various gifts to the charity. In 1994 alone,

he donated $266,652 to the IIRO. Since 1994, the amount funneled by PRINCE SULTAN into IIRO alone is reported to be $2,399,868.  PRINCE SULTAN's role in directly contributing to and in the oversight of IIRO evidences his material sponsorship, aiding and abetting of international terrorism. PRINCE SULTAN maintains close relations with the IIRO organization headquarters and knew or should have known these assets were being diverted to AL QAEDA.

265.    PRINCE SULTAN is also a large financial contributor of the MUSLIM WORLD LEAGUE.  PRINCE SULTAN donated during a television fundraising campaign for MWL.  The total collection made as a result of the television campaign was SR 45,000,000, with the Emir of Riyadh, PRINCE SULTAN, donating a million Saudi Royals ($533,304).

266.    PRINCE SULTAN is also a regular donator to the WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY"). WAMY was founded in 1972 in a Saudi effort to prevent the "corrupting" ideas of the western world influencing young Muslims. With official backing it grew to embrace 450 youth and student organizations with 34 offices worldwide. WAMY has been officially identified as a "suspected terrorist organization" by the FBI since 1996 and has been the subject of numerous governmental investigations for terrorist activities.

267.    Shortly after the September 11, 2001 attacks, PRINCE SULTAN publicly accused the "Zionist and Jewish lobby" of orchestrating a "media blitz" against the Saudi Kingdom. PRINCE SULTAN argued against the United States use of Saudi bases to stage military strikes on Afghanistan after the September 11, 2001 attacks, stating that his government "will not accept in [Saudi Arabia] even a single soldier who will attack Muslims or Arabs."  Saudi Minister of Defense PRINCE SULTAN also stated in 2002 that his country would not permit allied aircraft to launch preventive or major retaliatory strikes against IRAQ from bases in Saudi Arabia.

PRINCE SULTAN expressed the hope that the Arab Nationals who have fought alongside the TALIBAN and AL QAEDA will be allowed to return safely to their respective countries.

268.    PRINCE MOHAMMED is engaged in the sponsorship of international terrorism through DAR AL MAAL AL ISLAMI, THE FAISAL ISLAMIC BANK and AL SHAMAL ISLAMIC BANK in the Sudan. As detailed supra, until 1983, DMI was under M. Ibrahim Kamel's chairmanship. On October 17, 1983, PRINCE MOHAMMED became CEO of DMI. Under PRINCE MOHAMMED's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices across the world. DMI was founded in 1981 to foster the spread of Islamic banking across the Muslim world and its Board of Directors included Haydar Mohamed bin Laden, a half-brother of OSAMA BIN LADEN.  FAISAL ISLAMIC BANK SUDAN was one of the five main founders of AL SHAMAL ISLAMIC BANK.

269.    Prominent Saudi businessman and terrorism financier ADEL ABDUL JALIL BATTERJEE is the Chairman and one of the largest shareholders of AL SHAMAL ISLAMIC BANK in Khartoum, SUDAN.  AL SHAMAL ISLAMIC BANK is an instrumental bank in BIN LADEN's financial support network. BIN LADEN used AL SHAMAL BANK for the funding of his AL QAEDA network leading up to the 1998 United States Embassy bombings in Africa. Defendant FAISAL ISLAMIC BANK was implicated during Al-Fadl's May 2001 United States trial testimony regarding the bombings as holding and managing bank accounts for AL QAEDA operatives (supra).

270.    As the head of DMI, PRINCE MOHAMMED knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of AL QAEDA, BIN LADEN, and international terrorism.

271.     PRINCE ABDULLAH was born in 1923 and is the son of former King Faisal. His brothers include Defendant PRINCE TURKI and Defendant PRINCE MOHAMMED.

272.     PRINCE ABDULLAH AL FAISAL, a former official of the Saudi Ministry of Interior, was Minister of Health between 1949 and 1950. He is Chairman of the Arabian Establishment for Trade and Shipping Ltd, Qassim Cement Company and owner of ALFAISALIAH GROUP. He is also Chairman of the board of trustees of the King Faisal Foundation.

273.     ALFAISALIAH GROUP (a/k/a Al Faisal Group Holding Co.) (or "AFG") is based in Riyadh, Saudi Arabia. Its main shareholder is PRINCE ABDULLAH. Its Chairman is MOHAMMED ABDULLAH AL FAISAL, PRINCE ABDULLAH AL FAISAL's son.

274.     ALFAISALIAH GROUP was reorganized in 2001 with PRINCE ABDULLAH holding 97.5% of the shares, and businessman MOHAMMED BIN ABDULRAHMAN AL ARIEFY, President, owning 2.5 percent of the shares. The company at that time changed its name to AL FAISAL GROUP HOLDING CO., a successor in interest to ALFAISALIAH GROUP.

275.     Founded in 1970, the ALFAISALIAH GROUP is a large commercial conglomerate with 3,000 employees and thirteen subsidiaries involved in five business sectors (Food & Beverages, Petrochemicals & Plastics, Entertainment & Multimedia, Consumer Electronics, and High Tech & Information Technology). ALFAISALIAH GROUP is the representative agent in Saudi Arabia of several international companies, including Sony, Hewlett Packard, MegaStar, Columbia Tri-Star, 20th Century Fox, Motorola, Toshiba and Danone. Its main subsidiaries include Modern Electronic Establishment, Modern Petrochemicals

Establishment, Al Safi Diary Establishment, Al Faisalia Agricultural Establishment, Al Faisalia Real Estate Establishment and Al Faisalia Computer & Communication Services Establishment. ALFAISALIAH GROUP maintains branches in Jeddah, Al Khobar, Khamis Mushait, Medinah, Qassim, Arar and Tabuk.

276.    According to FBI records, September 11, 2001, hijacker HANI SALEH H. HANJOUR (a/k/a Hani Saleh Hanjour, Hani Saleh, Hani Hanjour) is a Saudi national from the city of Taif, Saudi Arabia.  Hanour was one of the hijackers on American Airlines Flight 77 that crashed into the Pentagon on September 11, 2001. His brother Abdulrahman Saleh Hanjour harbored him in Tucson, Arizona, in the months preceding the September 11, 2001 attacks.

277.    The two Hanjour brothers and another AL QAEDA suspect in the attacks, Abdal Monem Zelitny, had a registered address in Taif, Saudi Arabia, under the name of Alfaisaliah, P.O. Box 1717, Taif, Saudi Arabia. The name and address are the branch office of Alfaisaliah Group in Taif, a subsidiary of the Riyadh based holding company. As detailed above, Alfaisaliah is owned and controlled by PRINCE ABDULLAH AL FAISAL, son of King Faisal, and for whom terrorist financier ZOUAYDI has worked as an accountant in Jeddah, Saudi Arabia.

278.    One of PRINCE ABDULLAH'S accountants in Jeddah, Saudi Arabia was Defendant MUHAMMED GALEB KALAJE ZOUAYDI (a/k/a Abu Talha) (or "ZOUAYDI") convicted in Spain for financing AL QAEDA operations in Europe. ZOUAYDI set up Spanish companies established during the time he was staying in Saudi Arabia and working for PRINCE ABDULLAH, between 1996 and 2000.  ZOUAYDI laundered Saudi money through Spain to an AL QAEDA cell in Germany.

279.     Evidence from eye witnesses indicates that ZOUAYDI was present in offices of PRINCE ABDULLAH in Jeddah. ZOUAYDI was also recognized in the offices of Dr. Bakhsh with Abdul Rahman Taha Bakhsh, brother of businessman ABDULLAH TAHA BAKHSH, former director of Zakat and Income Tax at the Saudi Ministry of Finance. Both brothers are members of the board of Trading Engineering & Contracting Corp. (Traco), based in Jeddah, Saudi Arabia.

280.     Evidence recovered by the Spanish authorities shows that MUHAMMED GALEB KALAJE ZOUAYDI, a Syrian born businessman, along with several associates in Spain and Europe, funneled money from the Saudi-based company, Mushayt for Trading Establishment (or "Mushayt"), through Spanish corporations to entities and individuals known to be associated with the AL QAEDA terrorist organization in Europe. PRINCE ABDULLAH is implicated in these financial transactions of material support to AL QAEDA, as is PRINCE TURKI.

281.     According to Spanish authorities, Mushayt received funds and donations from other companies and individuals in Saudi Arabia that were funneled to AL QAEDA through Spain. This fraudulent scheme provided material, financial support to the GLOBAL RELIEF FOUNDATION in Spain, to ABDUL FATTAH ZAMMAR and MAMOUN DARKAZANLI in Germany, who maintained the bank accounts of hijacker MOHAMED ATTA and other members of the Hamburg AL QAEDA cell. These co-conspirators (ZAMMAR and DARKAZANLI) are awaiting trial in Germany on charges of providing financial and logistical support to the organization of the September 11, 2001 attacks.

282.     GHASOUB AL ABRASH GHALYOUN (a/k/a Abu Musab), an associate of ZOUAYDI's in Spain, was observed filming future targets of AL QAEDA in the United States.

In his videotapes, Spanish authorities found pictures of the World Trade Center taken on August 9, 1997.

283.    PRINCE NAYEF is Saudi Minister of Interior and heads the Saudi Committee for relief to Afghans, which supervises the activities of Defendant AL-HARAMAIN FOUNDATION whose sponsorship of terrorism is detailed infra. The Minister of Interior, by function, controls the activities of Islamic Charities and is empowered to verify their legality and conduct.

284.    PRINCE NAYEF is the Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds. According to documents captured by the Government of Israel in the Palestinian territories during operation Defensive Shield, this committee knowingly transferred large sums of money to the families of Hamas terrorists who had executed murderous attacks against Israelis. PRINCE NAYEF, along with others in Saudi Arabia, supports suicide martyrs.

285.    PRINCE NAYEF has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and AL QAEDA. As with PRINCE SULTAN and PRINCE TURKI, PRINCE NAYEF has engaged in material support, including but not limited to monetary payoffs, to BIN LADEN's AL QAEDA.

286.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI (or "al Turki") is a Saudi and the former rector of the University of Riyadh (1994), former minister of Waqf and Islamic Affairs until 2000, and advisor to KING FAUD. AL TURKI is also Secretary General of the MUSLIM WORLD LEAGUE.

287.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI is a counselor to the government of Saudi Arabia and was in contact with AL QAEDA financier ZOUAYDI.  AL TURKI acted as Saudi Minister of Islamic Affairs for many years and was in a position where he knew or should have known about the reach of international terrorism and AL QAEDA.  AL TURKI later became a shareholder in the front organization known as Promociones which bought real estate but did no actual construction work, although listing itself as a construction company.  Instead, that company made direct payments to AL QAEDA cells.

288.    On October 10, 1999, AL TURKI and ZOUAYDI, a senior AL QAEDA financier for Europe, agreed to participate as business partners in a construction project in Madrid, Spain. A contract was written by ZOUAYDI'S Company in Spain stating that both parties will finance 50% of the project. The income would be split 70/30 between AL TURKI and ZOUAYDI.

289.    ZOUAYDI was part of an international terrorist movement for global jihad which encompassed the AL QAEDA network. This network channeled money directly to the perpetrators of September 11, 2001.

290.    Several faxes in support of this enterprise, scheme and conspiracy were sent by ZOUAYDI to AL TURKI.  As a guaranty for the Spanish company, ZOUAYDI sent a check of 191 million Pesetas on September 15, 1999 to AL TURKI as beneficiary from Banco Sabadell in Madrid. In one fax sent on October 15, 1999, ZOUAYDI asked AL TURKI to send the money through AL RAJHI BANK (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to AL TURKI by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of AL TURKI, named Waleed O Houssainy, about a project of AL TURKI to buy 100% of ZOUAYDI's Spanish company.

291.    On February 4, 2000, ZOUAYDI sent a fax to AL TURKI, referring to him as "advisor to KING FAHD."  In his declarations to the Spanish judge on April 26, 2002, ZOUAYDI referred to AL TURKI as "advisor to KING FAHID." AL TURKI's representative, Waleed Al Husseini, is the manager of a major Saudi company owned by the prominent shareholders.

292.    THE SAUDI HIGH COMMISSION, (a/k/a the Saudi High Relief Commission) (or "SHC") was founded in 1993 by PRINCE SALMAN IBN ABDUL AZIZ (or "PRINCE SALMAN"), the Mayor of Riyadh and a son of King Fahd, and a prime supporter of the charity. Hailed as the largest fundraising effort in the Arab and Muslim world, the SAUDI HIGH COMMISSION claims to have spent more than $600 million in aid to Bosnian Muslims impoverished by the country's recent civil war.

293.    Despite the Saudi commission's generous efforts in Bosnia, it has been widely criticized by aid agencies and Bosnian intellectuals for importing the extreme form of Saudi Islam, Wahhabism, which is alien to the more moderate, secular form of Islam found in Bosnia. Bosnian officials claim that the Wahhabis' intolerant and anti-Western form of Islam contradicts and offends Bosnian tradition and undermines the country's rich and diverse religious heritage.

294.    On October 21, 2001, five Algerians were arrested in Bosnia Herzegovina on criminal charges of international terrorism following a threat to the United States embassy. The incident resulted in the five day closure of the United States and British embassies for what both embassies called "a credible security threat." The plot was discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission.  During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours."

60573                                    84

295.     This group of Algerians is suspected to be a part of the AL QAEDA network. The NATO Secretary-General, George Robertson, stated that at least one of the five had "direct links with AL QAEDA and BIN LADEN." The leader of the group, BENSAYAH BELKACEM, has been identified as a top AL QAEDA lieutenant.  In October, 2001, BELKACEM was arrested at his apartment in Zenica, Bosnia, where authorities found phony passports and a mobile telephone listing for ABU ZUBADAH, AL QAEDA's third-in-command.  According to phone transcripts, BELKACEM was also in phone contact with an AL QAEDA military commander ABU AL-MAID.

296.     One of the six Algerian terror suspects, Sabir Lamar, worked for the SAUDI HIGH COMMISSION as an Arabic language teacher.  Sabir Lamar fought in Afghanistan with the Mujahideen. He is married to the daughter of a former local employee at the United States embassy in Sarajevo and is believed to have had keys to the building, in which photographs and other information were available.

297.     In October, 2001, United States forces raided the Sarajevo branch of the SAUDI HIGH COMMISSION of Bosnia and Herzegovina and found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the USS Cole. Additionally, United States forces discovered files on pesticides and crop dusters, information about how to make fake State Department badges as well as photographs and maps of Washington, with government buildings marked. About $100,000 worth of local currency was found in a safe, as well as anti-Semitic and anti-United States computer material geared toward children.

298.     The Financial Police of the Federation of Bosnia Herzegovina Ministry of

Finance analyzed the documents seized from the offices of the SAUDI HIGH COMMISSION

and described the organization as a front for radical and terrorism-related activities:

> Members of the SFOR have on premises of the SAUDI HIGH
> COMMISSION Relief for Bosnia and Herzegovina confiscated
> some documentation for which it can be claimed with certainty that
> it does not belong in the scope of work of a humanitarian
> organization (various photographs of the World Trade Center,
> sketches of military bases, certain photographs of military ships,
> civil airplanes, certain specially protected facilities, and other).

299.     In October 2001, a Bosnian spokesman announced that between 100,000 DM and

200,000 DM in cash were also seized in the offices of the Saudi High Commission. The SAUDI

HIGH COMMISSION used 24 vehicles with diplomatic plates to transport members and

material inside Bosnia Herzegovina.

300.     PRINCE SALMAN was named Chairman of the General Donation Committee for

Afghanistan (a/k/a Afghan Jihad Support Committee) in 1980 and has a history of funding

Islamic extremism. In 1981, the General Donation Committee for Afghanistan gave $39 million

dollars to aid the Afghan Mujabideen. PRINCE SALMAN stated the donation was made to "our

Afghan brothers."

301.     In 1999, PRINCE SALMAN made a donation of $400,000 during a fund-raising

event organized for Bosnia Herzegovina and Chechnya by Defendants INTERNATIONAL

ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTH, and AL-

HARAMAIN FOUNDATION.

302.     A letter seized by the Israeli Defense Forces during Operation Defensive Shield,

further evidenced the involvement of PRINCE SALMAN in financing terrorist organizations.

The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to PRINCE SALMAN IBN ABDIJL AZIZ, Chairman of the Popular Committees for Support of the Palestinian Fighters. The Palestinian ambassador expresses the concern of Yasser Arafat regarding funding of radical organizations.

> I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.

303.     Given its level of financing, the SAUDI HIGH COMMISSION does not provide adequate financial aid to the needy. The SAUDI HIGH COMMISSION was functioning at least until February 2001, when the announcement was made that the organization provided in a nine-year period a total of $560,900,000 in donations. Since at least year 2000, funds sent to help Bosnia Herzegovina were diverted for terrorist activities and not charity. For instance, in September 2000, PRINCE SALMAN was alerted by a letter from the Bosnian association "Mothers of Srebrenica and Podrinje" in which it was clearly claimed that the SAUDI HIGH COMMISSION in Bosnia Herzegovina did not provide charitable assistance.

304.     This Bosnian association stated that while PRINCE SALMAN announced that 200 million DM were collected in only one day after Srebrenica's fall in July 1995, none of Saudi assistance reached the Srebrenica people.

305.     PRINCE SALMAN knowingly failed to take appropriate actions regarding the management and use of funds of the SAUDI HIGH COMMISSION in Bosnia Herzegovina, as

proven by the evidence of non-charitable work discovered in the raids conducted in the Sarajevo office of the organization less than one year later.

306.    United States investigative forces are currently reviewing suspicious financial records of the SAUDI HIGH COMMISSION.  SAUDI HIGH COMMISSION financial records fail to account for $41 million dollars.

307.    ABDUL AZIZ AL IBRAHIM (or "AL IBRAHIM") is a Saudi citizen and the brother-in-law of KING FAHD of Saudi Arabia. His sister, Jawhara, is the second wife of KING FAHD.

308.    In 1989 ABDUL AZIZ AL IBRAHIM acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to AL IBRAHIM at the end of 1989 by BCCI. AL IBRAHIM was one of BCCI's leading loan beneficiaries.

309.    Apart from being a lead investor in Marina del Rey, AL IBRAHIM's real estate assets have included Ritz-Carlton hotels in New York, Washington, Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz-Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by ABDUL AZIZ AL IBRAHIM.

60573

310.    The registered President of Al Anwa USA is TAREK AYOUBI, who also

manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel and NY

Overnight Inc., all based at the same address in Marina Del Rey.

311.    Al Anwa holding is AL ANWA FOR CONTRACTING ESTABLISHMENT

(a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a

construction company owned by ABDUL AZIZ AL IBRAHIM.  It is a shareholder, along with

Defendant DALLAH AL BARAKA (Chaired by Defendant SALEH ABDULLAH KAMEL), of

the National Environmental Preservation Co Ltd in Jubail, Saudi Arabia.

312.    In 1991 with another brother, Walid, Defendant SALEH ABDULLAH KAMEL

and ABDUL AZIZ AL IBRAHIM created the leading Arab television satellite service, Middle

East Broadcasting Corp (or "MBC"), which purchased the press agency United Press

International (or "UPI") in 1992.

313.    In 1990, AZIZ AL IBRAHIM created the IBRAHIM BIN ABDUL AZIZ AL

IBRAHIM FOUNDATION whose official stated aim is humanitarian assistance. The

organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia. The

Foundation has built mosques in Dusseldorf, Gibraltar, Milan and Moscow.

314.    The organization's branch in Nairobi in Kenya was associated with BIN LADEN's

network according to the FBI's investigation into the attacks against the American embassies on

August 7, 1998.

315.    In September 1998, the Kenyan government canceled the registration of five

Islamic relief agencies for allegedly supporting terrorism including Defendant AL-HARAMAIN

FOUNDATION, HELP AFRICAN PEOPLE, THE ISLAMIC RELIEF ORGANIZATION, THE

IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, and MERCY RELIEF

INTERNATIONAL. The authorities claimed that materials for the bomb were smuggled in as

relief aid with the help of Islamic relief agencies.

316.    The decision was announced by the Kenyan government's NGO coordinator who

declared that:

> Our investigations reveal that the operations of these organizations
> are inconsistent with the reasons for which they were registered...
> These organizations are supposed to work for the welfare of
> Kenyans, but are instead endangering Kenyans' lives... They had
> been found to be working against the interests of Kenyans in terms
> of security.

317.    After several organizations appealed this decision, Kenya's High Court

blocked the de-registration of four of the five non-governmental organizations.  THE

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, MUSLIM WORLD

LEAGUE, AL-HARAMAIN FOUNDATION, and MERCY INTERNATIONAL RELIEF

AGENCY can however still operate pending an appeal. Only the IBRAHIM BIN ABDUL AZJZ

AL IBRAHIM FOUNDATION did not ask the court for an appeal.

318.    In a study paper dated October 1999, called "The New Azerbaijan Hub: How

Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky,

Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the IBRAHIM BIN

ABDUL AZIZ AL IBRAHIM FOUNDATION as one of those which provided help to BIN

LADEN.

> The key Islamist facilities are concealed as charity and educational
> organizations affiliated with the web used by bin Laden's
> networks. Moreover, the headquarters of these organizations are
> staffed with Arab "teachers" and "managers" from the ranks of
> such organizations as the International Muslim Brotherhood, the
> Islamic Salvation Front, several branches of Islamic Jihad, and the
> National Islamic Front of SUDAN. The key organizations are... Al

Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

319.    Upon information and belief, IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION was funding the ISLAMIC MOVEMENT OF UZBEKISTAN (or "IMU"), an affiliate of AL QAEDA , whose leaders met BIN LADEN in 1999 in Kandahar, Afghanistan. The IMU received $270,000 dollars from the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

320.    In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, WORLD YOUTH ISLAMIC ASSEMBLY and ISLAMIC RESCUE ORGANIZATION - had taken part in setting up these bases.

321.    During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by IBRAHIM BIN ABDUL AZIZ AL IBRAHIM, which emphasized:

> Armed struggle in the name of Allah, for his word to be above all else.. . . Sacrifice your life in witness of Allah's religion.

322.    According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of

Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

323.     The seminar took place in the Middle Urals Kaziat Muslim community, where in 1995 Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI created a Joint Committee for Islamic Action and Studies with representatives from Defendants MUSLIM WORLD LEAGUE, IIRO, WAMY, along with the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

324.     The role of certain Saudis in the sponsorship of AL QAEDA is evidenced in the AL QAEDA organization's own words. Confiscated AL QAEDA documents state that among all the Muslim governments in the world, the government of Saudia Arabia is the only representative model Islamic government, the greatest center of Islam as AL QAEDA moves to expel the Jews and Christians from Arab lands through mass murder.

325.     BIN LADEN is referred to in AL QAEDA documents as the billionaire merchant prince and the beloved member of Saudi Arabia's billionaire family who has been supported by the bin Laden family to aim the Kalishnikov at super power America.

326.     Information found in the possession of AL QAEDA terrorists indicates that financial support of international terrorism by wealthy Saudis is designed to undermine moderate Arab regimes and movements while providing support for Saudi legitimacy as the strict guardians of Mecca and Medina.

327.     These acts described herein constitute a pattern of conduct in sponsoring and promoting radicals and international terrorism generally, as well as AL QAEDA and BIN

LADEN, specifically. The participation of certain Saudi nationals in the sponsoring and promotion of terrorism is widely known.  As USA Today reported back in 1999:

>More than a year after the U.S. Embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to bank accounts linked to indicted terrorist OSAMA BIN LADEN, senior U.S. intelligence officials told USA Today.
>
>The money transfers, which began more than five years ago, have been used to finance several terrorist acts by bin Laden, including the attempted assassination in 1995 of Egyptian President Hosni Mubarak in Ethiopia, the officials said.
>
>Secretary of State Madeleine Albright is expected to raise the issue with PRINCE SULTAN, the Saudi defense minister, during his visit to Washington next week. Saudi Arabia, the main U.S. ally in the Persian Gulf, has pledged to fight terrorism.
>
>According to a Saudi government audit acquired by U.S. intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the kingdom's largest, to transfer personal funds, along with $3 million diverted from a Saudi pension fund, to New York and London banks.
>
>The money was deposited into the accounts of Islamic charities that serve as fronts for bin Laden. The businessmen are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia.

328.    Certain members of the Saudi Royal family and related persons overtly and covertly aid, abet, and materially support the IIRO and other charities, despite their roles in terrorist financing. Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support AL QAEDA without suffering from the social (and legal) ramifications that such contributions bring. The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia. The Saudi Royal family members own substantial assets in the United States of America, and do substantial business in the United

States of America, the profits of which in part, are used to fund international terrorist acts,

including those which led to the murderous attacks of September 11, 2001.

329.     As the 2002 Report on terrorist financing by the independent task force of the

Council on Foreign Relations pointed out: "it is worth stating unambiguously what official U.S.

government spokespersons have not: [F]or years, individuals and charities based in Saudi Arabia

have been the most important source of funds for AL QAEDA; and for years, Saudi officials

have turned a blind eye to this problem."  The report goes onto note that this is hardly surprising

given that the Saudis possess the greatest concentration of wealth in the area.

SAUDI BIN LADEN GROUP

330.     THE SAUDI BIN LADEN GROUP (or "SBG"), also known as the BIN LADEN

CORPORATION, is an expansive global conglomerate.

331.     THE SAUDI BIN LADEN GROUP's website details its history in the following

manner:

> The history of bin Laden began in 1931 when Mohammed bin
> Laden founded the company. From its humble beginnings as a
> general contractor, the company has grown and prospered in
> parallel with the growth and prosperity of the Kingdom of Saudi
> Arabia. Over the years the company has been entrusted with
> many major construction projects, projects that helped the
> Kingdom to develop its resources and expand its infrastructure.

332.     THE SAUDI BIN LADEN GROUP is based in Jeddah, Saudi Arabia. The group

founded in 1931, is a privately held company wholly owned by the descendants of Mohammed

Awad Bin Laden, father of OSAMA BIN LADEN.  The international conglomerate is active in

the areas of construction, engineering, real estate, distribution, telecommunications and publishing. Construction accounts for more than half of SBG's gross revenue.

333.    SBG or its predecessor in interest, was the first private contractor in Saudi Arabia. SBG's status as an organization makes it exempt from publishing its financial records.  For several years, it was the official and exclusive contractor of the holy sites of Mecca and Medina.

334.    SAUDI BIN LADEN GROUP is run by BAKR M BIN LADEN, son of Mohammed Bin Laden. Family member Salem Bin Laden ran the group until his accidental death in 1998. SBG's board of directors include SALEHI GAZAZ, MOHAMMED BAHARETH, ABDULLAH BIN SAID, MOHAMMED NUR RAHIMI, TAREK M. BIN LADEN, and BIN LADEN.  Until recently, the SAUDI BIN LADEN GROUP had an address in Rockville, Maryland.

335.    OSAMA BIN LADEN used SBG support and assistance to build necessary infrastructure in Afghanistan as he did in SUDAN.  In the introduction of his Declaration of War against the Americans in 1996, OSAMA BIN LADEN admitted this family support:

> Then in 1979, just after he graduated from King Abdul Aziz University in Afghanistan, and the Mujahideen put out an international plea for help, Osama bin Laden responded by packing himself and several of his family's bulldozers off to Afghanistan.

336.    The SAUDI BIN LADEN GROUP provided material support and financing to OSAMA BIN LADEN in Afghanistan, as reported by the United States State Department:

> Under Al-Qaeda auspices, Bin Laden imported bulldozers and other heavy equipment to cut roads, tunnels, hospitals, and storage depots

Afghanistan's mountainous terrain to move and shelter fighters and supplies.

His [OSAMA BIN LADEN's] father backed the Afghan struggle and helped fund it, so when Bin Laden decided to join up, his family responded enthusiastically.

337. After the Soviets withdrew from Afghanistan in 1989, OSAMA BIN LADEN returned to work in the SAUDI BIN LADEN GROUP's Jeddah-based construction business. He continued to support militant Islamic Groups until his departure to SUDAN in 1991. After his relocation to SUDAN, OSAMA BIN LADEN maintained close relationships with the SAUDI BIN LADEN GROUP and they remained his sponsor.

The relationships between OSAMA BIN LADEN and his family continued, despite claims to the contrary. Dr. Sand Al Fagih, Saudi dissident living in London, and former Afghan combatant, who kept close relationship with OSAMA BIN LADEN for many years, stated in 1994: There's a very interesting thing in Islamic structure of the family: you are obliged to support your family members. Even if they are distant members.  If it's a cousin or a niece or a nephew, especially a brother, you have to support them if you are a capable person. And the people feel sinful if they don't let this money go to its real owner, in this case, OSAMA BIN LADEN.

338. The notion that OSAMA BIN LADEN had been somehow "disowned" by the BIN LADEN family is not supported by the facts or by the realities of Islamic culture. In a 1997 interview, OSAMA BIN LADEN revealed that on nine different occasions, his mother, uncle and brothers had visited him in Khartoum in Sudan even though he had been exiled.  The SAUDI BIN LADEN GROUP provided OSAMA BIN LADEN financial assistance and engineering support in Sudanese construction projects. Various sources confirmed that the Sudanese construction company set up by OSAMA BIN LADEN, AL-HIJRA FOR CONSTRUCTION AND DEVELOPMENT, was a subsidiary of the SAUDI BIN LADEN GROUP. This information is confirmed by an Intelligence Newsletter:

> These are Wadi al Aqiq, an agricultural company with an
> investment arm; Al Timar Al Mubarikab, a sugar concern; Al Hijra
> a building and public works company... an affiliate of the powerful
> Saudi group headed by Bin Laden's father.

339.    In SUDAN, OSAMA BIN LADEN participated in the construction of the Tahaddi road and the Port Sudan Airport. The SAUDI BIN LADEN GROUP provided support and contributions to these public works through two subsidiaries. The Public Buildings and Airports Division of the SAUDI BIN LADEN GROUP participated in the construction of the Port Sudan Airport, and the MOHAMMED BIN LADEN ORGANIZATION (of SBG) provided technical assistance on the road construction in the Sudan with OSAMA BIN LADEN. The SAUDI BIN LADEN GROUP confirmed publicly these two collaborations:

> Over the years the Division has undertaken various challenging
> projects, large and medium scale, including complete airports and
> roads. . . The projects executed include... Port SUDAN Airport.
> SBG's skills... has been recognized and utilized in the United Arab
> Emirates, Jordan, Yemen and SUDAN.

340.    The agreement for the construction of an airport in Port Sudan was between the Sudanese Government and the SAUDI BIN LADEN INTERNATIONAL COMPANY.  In 1993, OSAMA BIN LADEN stated that he was involved in the construction of the road linking Khartoum to Port Sudan with some of former Afghan fighters who became part of AL QAEDA.

341.    Relationships between the three entities, OSAMA BIN LADEN, the Republic of SUDAN, and the SAUDI BIN LADEN GROUP were stressed during the inauguration ceremony of the Port Sudan airport:

> Meanwhile, OSAMA BIN LADEN, was the first guest invited to
> attend the inauguration of the new Port SUDAN Airport. He sat in the
> front row and was the guest of honor in this ceremony. It was a group
> of Bin Laden's companies that carried out the project of the new and
> modern airport that cost huge amounts of money.

342.    Moreover, while OSAMA BIN LADEN was constructing the Tahaddi Road with SAUDI BIN LADEN GROUP's technical assistance, his own company, AL-HIJRA, was headed by Muslim activists. The testimony of Al-Fadl during the 2001 trial of the 1998 African Embassy Bombings further revealed the nature of AL-HIJRA executives in SUDAN:

> Q.     Do you know who ran the Al-Hijra Company while it was in the Sudan?
>
> A.     At the time, few people. The first one Dr. Sharif al Din Ali-Mukhtar,
>
> Q.     Who else?
>
> A.     Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu Rida Suri and Abu Hajer.

343.    Other AL-HIJRA agents, officers, or executives were directly involved in AL QAEDA and terrorist operations. MAMDOUH MAHMUD SALIM, an AL QAEDA co-conspirator, was on the AL-HIJIRA board of directors and is a founding member of AL QAEDA.

344.    The SAUDI BIN LADEN GROUP sheltered and directly supported operatives of the AL QAEDA terrorist organization. Mohammad Jamal Khalifa is a key figure in the network of OSAMA BIN LADEN and has been implicated as a central AL QAEDA figure in several international terrorist plots.  Yet KHALIFA was taken in by a branch of SAUDI BIN LADEN GROUP, the MOHAMMED BIN LADEN ORGANIZATION, headed by OSAMA BIN LADEN's brothers. The address listed on KHALIFA's visa application was the Mohammed Bin Laden Organization in Jeddah, Saudi Arabia.

345.    The MOHAMMED BIN LADEN ORGANIZATION is a wholly-owned subsidiary of the SAUDI BIN LADEN GROUP. The board members include SALEH GAZAZ,

MOHAMED BAHARETH, ABDULLAH BIN SAID, MOHAMED NUR RAHIMI, BAKR M.

BIN LADEN, TAREK M. BIN LADEN, OMAR M. BIN LADEN, and YESLAM M. BIN

LADEN.

346.     In the early 1990s, TAREK BIN LADEN served as the general supervisor of the

IIRO, a charity that has aided and abetted and materially supported AL QAEDA and

international terrorism (*supra*). During this time, IIRO was rapidly becoming AL QAEDA' s

foremost charity used as a means to transfer funds, personnel, and other means of material

support.

347.     According to an Arabic publication, TAREK BIN LADEN had a prominent role

in 1990 at the IIRO:

> Tarek bin Laden has been a member of the IIRO in MWL for ten
> years. He has been working quietly for the orphans and the
> immigrants in the Islamic world. In the past two years the operation
> of IIRO has grown thanks to the support of the Saudi Royal family.
> Tarek says that the IIRO relies on donations of the Saudi people and
> some donations from the Islamic world.

348.     OSAMA BIN LADEN's name is still listed in the SAUDI BIN LADEN GROUP's

corporate records.

MUWAFFAQ-BLESSED RELIEF; AL-QADI AND BIN MAHFOUZ

349.     One month after the September 11, 2001 attacks, on October 12, 2001,with

Executive Order 13224, President George W. Bush designated Saudi businessman YASSIN AL-

QADI as a terrorist entity and sponsor for financially supporting AL QAEDA. As stated in a

United States Department of Treasury Press Release on October 12, 2001:

Yassin al-Qadi (heads) the Saudi-based Muwafaq (or "Blessed Relief") Foundation, an AL QAEDA front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden.

350.     YASSIN AL-QADI is a United States designated terrorist and Director of GLOBAL DIAMOND RESOURCES, based in Nevada. Along with YASSIN AL-QADI, serving on the board of directors are representatives of the BIN LADEN family who invested in GLOBAL DIAMOND RESOURCES.  YASSIN AL-QADI was introduced to GLOBAL DIAMOND RESOURCE's Chairman by an executive at the SAUDI BIN LADEN GROUP. In regards to the company's decision to let AL-QADI join as an investor, the Chairman said, "I relied on the representations of the BIN LADEN family. They vouched for him."

351.     Defendant MUWAFFAQ (or "BLESSED RELIEF") was registered in the Channel Islands in 1992 but run from Jeddah, Saudi Arabia. The BLESSED RELIEF charity had an international presence with offices in Europe, Ethiopia, Pakistan, SUDAN, Somalia and a post office box in the United States. BLESSED RELIEF purported to conduct traditional relief work such as the distribution of food, clothing and medical equipment to victims of war or famine. MIJWAFFAQ-BLESSED RELIEF was endowed by Defendant KHALID BIN SALIM BIN MAHFOUZ, the AL QAEDA financier, and run by YASSIN AL-QADI.  KHALID BIN SALIM BIN MAHFOUZ's son, ABDUL RAHMAN KHALID BIN SALIM BIN MAHFOUZ, is also a director of the BLESSED RELIEF charity.

352.     YASSIN AL-QADI ran BLESSED RELIEF from 1992 until approximately 1997 with $15 to $20 million of his own money, along with contributions from other wealthy associates and according to a June 1998 U.S. Justice Department report, sent $820,000 to buy weapons for HAMAS. Millions of dollars have been transferred to OSAMA BIN LADEN and AL QAEDA through BLESSED RELIEF. During the 1990s an audit of the Defendant

NATIONAL COMMERCIAL BANK OF SAUDI ARABIA, which was then run by KHALID BIN SALIM BIN MAHFOUZ, revealed the transfer of $3 million for BIN LADEN that was moved from the accounts of wealthy Saudi businessmen to BLESSED RELIEF.

353.    In a 1995 interview, BIN LADEN identified BLESSED RELIEF's place in his support network, "The bin-Laden Establishment's aid covers 13 countries…this aid comes in particular from the SAUDI HIGH COMMISSION ." BIN LADEN went on to list a number of the Human Concern International Society's branches, including the BLESSED RELIEF SOCIETY.

354.    YASSIN AL-QADI incorporated the United States branch of BLESSED RELIEF in Delaware in 1992, along with Talal M. M. Badkook and Dr. Mohaman Ali Elgari. BLESSED RELIEF in the United States was also used as an AL QAEDA front used by wealthy Saudis and others to funnel money to BIN LADEN's terrorist network.

355.    YASSIN ABDULLAH AL-QADI is the Vice President of the Saudi Arabian company M.M. Badkook Co. for Catering & Trading, owned by his partner in BLESSED RELIEF, and Talal Mohammed Badkook. Talal Badkook is also a member of the Al-Mustaqbal group along with SALEH MOHAMED BIN LADEN, son of Mohammed Bin Laden, and ABDULLAN SALEH KAMEL, son of SALEH KAMEL and the Chairman of the Dallah al-Baraka.

356.    YASSIN AL-QADI is the Chairman of the National Management Consultancy Center (or "NMCC") in Jeddah, Saudi Arabia. The NMCC lists an address in Jeddah, Saudi Arabia, which is the same address listed on BLESSED RELIEF's Delaware corporate records.

AI-RAJHI BANK

357.     Officially founded in 1987, Defendant AL-RAJHI BANKING & INVESTMENT CORPORATION, (or "AL-RAJHI BANK") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries across the world. Defendant SULAIMAN ABDULAZIZ AL-RAJHI is the Managing Director of AL-RAJHI BANKING & INVESTMENT CORPORATION and Defendant SALEH ABDULAZIZ AL-RAJHI is the Chairman.

358.     The AL-RAJHI BANKING & INVESTMENT CORPORATION is the primary bank for a number of charities that serve as AL QAEDA front groups. AL-HARAMAIN ISLAMIC FOUNDATION, THE MUSLIM WORLD LEAGUE ("MWL"), and the IRO all funnel terrorism financing and support through the AL-RAJHI BANKING & INVESTMENT CORPORATION financial system. One of the American Airlines Flight 11 hijackers, ABDULAZIZ AL-OMAIRI, held an account with AL-RAJHI BANKING & INVESTMENT CORPORATION.

359.     Defendant SULAIMAN ABDUL AZIZ AL-RAJHI has a history of financially supporting AL QAEDA terrorists. SULAIMAN ABDUL AZIZ AL-RAJHI managed the defendant NATIONAL COMMERCIAL BANK (infra) budget of the SAUDI JOINT RELIEF COMMITTEE. The AL-RAJHI family is also the primary financier of the SAAR FOUNDATION NETWORK (infra) and, as such, is implicated by the SAAR Network's sponsorship of terrorism and BIN LADEN. SALEH ABDULAZIZ AL-RAJHI has been closely linked to BIN LADEN's personal secretary and convicted terrorist, WADIH EL-HAGE. When the Kenyan house of BIN LADEN's personal secretary, WADIH EL-HAGE, was raided in 1997, information regarding SALEH ABDULAZIZ AL-RAJHI was discovered. WADIH EL-HAGE is an AL QAEDA member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

360.    Co-conspirators, agents, aiders and abettors of the AL-RAJHI banking scheme to fund or otherwise materially support terrorism include: SULAIMAN ABDUL AZIZ AL-RAJHI, SALEH AL-RAJHI, ABDULLAH SULAIMAN AL-RAJHI, and KHALID SULAIMAN AL-RAJHI. All of these Defendants do business in and have a significant business presence in the United States, including but not limited to, through AL-WATANI POULTRY, one of the World's largest poultry businesses, and through Defendants MAR-JAC POULTRY, INC., MAR-JAC INVESTMENTS, INC. and PIEDMONT POULTRY. They are also material sponsors of international terrorism.

## NATIONAL COMMERCIAL BANK AND BIN MAHFOUZ

361.    The defendant NATIONAL COMMERCIAL BANK (or "NCB") was founded in 1950 by SALIM BIN MAHFOUZ. Defendant KHALID BIN SALIM BIN MAHFOUZ was born in Hadramaut, Yemen, on September 12, 1928. KHALID BIN SALIM BIN MAHFOUZ is the son of SALIM BIN MAHFOUZ, who emigrated to Saudi Arabia in or about 1930. The NCB was the first commercial bank of Saudi Arabia, based in Jeddah.  After SALIM BIN MAHFOUZ's death in 1986, his son KHALID BIN MAHFOUZ became President and CEO of the NCB and remained in that position until 1999, becoming its principal shareholder with control over more than 50% of the bank's capital. The NCB has several wholly-owned subsidiaries, including SNCB Corporate Finance Ltd. in London, SNCB Securities Ltd. in London, and SNCB Securities Ltd. in New York City through which it operates an international banking enterprise.

362.    The NATIONAL COMMERCIAL BANK was implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce International (or "BCCI").  NCB Chairman KHHALID BIN SALIM BIN MAHFOUZ became Chief Operating Officer and major shareholder of BCCI. A 1992 United States Senate Report on the BCCI scheme detailed the role of NCB in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism. The NCB was used

by OSAMA BIN LADEN and AL QAEDA as a financial arm, operating as a financial conduit for OSAMA BIN LADEN's operations. As a former CIA counter-terrorism expert explained in October 2001:

> How does the AL QAEDA organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the NATIONAL COMMERCIAL BANK, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.

363.    The BIN MAHFOUZ family businesses are organized through a series of "holding" companies, including a conglomerate, Saudi Economic and Development Company LLC (Sedco), founded in 1976 and based in Jeddah, and the petroleum company which is chaired by KHALID BIN MAHFOUZ's son.

364.    Between 1986 and 1990, KHALID BIN SALIM BIN MAHFOUZ was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI). After several fraudulent practices were discovered, KHALID BIN SALIM BIN MAHFOUZ was indicted on July 1, 1992, on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleged a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of his interest in BCCI.

365.    Under KHALID BIN SALIM BIN MAHFOUZ, BCCI was also implicated in supporting international terrorism, as reported by the United States Senate:

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri al-Bannah or Abu Nidal, and his terrorist organization.

366.    The 1992 Senate investigative Report detailed the initial involvement of BCCI in financially supporting terrorism:

> BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

367.    A bank audit of the defendant NCB conducted in 1998 revealed that over a 10 year period $74 million dollars was funneled by its Zakat Committee to the IIRO, headed by OSAMA BIN LADEN's brother-in-law.

368.    The defendant NCB audit report also stressed various irregularities due to "unreported expenses and loans" It states that "without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with banking facilities that were not reviewed by the Committee." Direct donations were received through NCB facilities to the Red Crescent Saudi Committee, IIRO and the MUWAFFAQ Foundation.  NCB, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting AL QAEDA, OSAMA BIN LADEN, and international terrorism.

369.    The NCB audit report reflects a $3 million dollar transfer to MUWAFFAQ-BLESSED RELIEF FOUNDATION. KHALID BIN SALIM BIN MAHFOUZ was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under arrest. Former CIA Director James Woolsey testified before the Senate Judiciary Committee that, along with the financial ties to and support of OSAMA BIN LADEN, KHALID BIN SALIM BIN MAHFOUZ was OSAMA BIN LADEN's brother-in-law by virtue of BIN LADEN's marriage to BIN MAHFOUZ's sister Kaleda Khalid bin Mahfouz and set up various charity organizations around the world since 1991. Every one of these foundations was linked to AL QAEDA and involved in the financing and material sponsorship of OSAMA BIN LADEN's international terrorist operations.

370.    KHALED BIN MAHFOUZ is linked to BIN LADEN through several financial and charitable organizations, including, INTERNATIONAL DEVELOPMENT FOUNDATION, SAUDI SUDANESE BANK and AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY and NATIONAL COMMERCIAL BANK.

371.    The BIN MAHFOUZ family controlled the NCB in Saudi Arabia, until 1999 when the Saudi Government bought the majority of its ownership. Upon information and belief that bank has financed the operations of BIN LADEN and reports from NCB show that in 1998 MUWAFFAQ provided BIN LADEN with $3 million.

372.    MOHAMMED SALIM BIN MAHFOUZ (Khaled's brother) is the founder of SAUDI SUDANESE BANK in Khartoum, Sudan, which in the early 1990s, shared an address in the SUDAN with the IIRO, which upon information and belief was a recruiting facility for AL QAEDA. The London IIRO branch shares an address with the INTERNATIONAL DEVELOPMENT FOUNDATION, an organization also believed to be designed to support activities of BIN LADEN and also established by MOHAMMED SALIM BIN MAHFOUZ.

373.     ABDULRAHMAN KHALED BIN MAHFOUZ (brother to Khaled) served on the board of directors of MUWAFFAQ FOUNDATION.

374.     SALEH SALIM BIN MAHFOUZ managed the AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY, upon information and belief, a company directly linked to BIN LADEN.

375.     Upon information and belief, KHALID BIN MAHFOUZ, is also linked to the SAAR FOUNDATION and its related charities. Offices of the SAAR FOUNDATION, a Saudi financed entity in Herndon, Virginia were searched by Treasury Department investigators in March 2002. SAAR shares a mailing addresses with many Islamic organizations with overlapping offices, donors, directors and significantly, overlapping goals.  Many of the organizations whose offices were searched along with SAAR have been listed by the U.S. Treasury Department as having links to BIN LADEN or sponsoring terrorism.

376.     JAMAL BARZINII, of WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY") with an office in Herudon, Virginia was also a target of the Treasury Department raids. The president of WAMY is ABDULA BIN LADEN, younger brother of OSAMA BIN LADEN. The U.S. Government has frozen the assets of WAMY and BARZINJI because of their role in funneling money to AL QAEDA.

377.     SAAR provided the bulk of the operating expenses of the INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ("IIIT") which in turn financed to two Florida charitable organizations accused of being cells for Islamic Jihad in Florida.  IIIT is directed by Taha Al Alwani, an Iraqi who also founded the MUSLIM WORLD LEAGUE, another group whose assets were also frozen by the U.S. Government because of its links to terror. The MUSLIM WORLD LEAGUE is funded in part, by Saudi government officials.

60573                                        107

DAR AL MAAL AL ISLAMI

378.    DAR AL MAAL AL ISLAMI (or "House of Islamic Money" or "DMI") is the

registered name for DMI Administrative Services SA. The company is headquartered in

Cointrin, Switzerland. DMI Administrative Services SA replaced DAR AL MAAL AL ISLAMI

on February 5, 2002, and is its successor in interest. DMI activities started July 29, 1981. Until

1983, DMI was operated under M. IBRAHIM KAMEL's chairmanship. On October 17, 1983,

PRINCE MOHAMMED AL FAISAL AL SAUD became CEO.  Under PRINCE MOHAMMED

AL FAISAL AL SAUD's chairmanship, DMI developed banking, investment and insurance

activities in approximately twenty offices around the world.  DMI operates broadly in Islamic

countries, and investments are conducted strictly under Islamic rules. DMI's actions and breach

of duty have aided, abetted and provided material sponsorship of the spread of international

terrorism and AL QAEDA:

> The $3.5 billion DMI Trust, whose slogan is "Allah is the purveyor
> of success" was founded 20 years ago to foster the spread of Islamic
> banking across the Muslim world. Its 12-member board of directors
> includes Haydar Mohamed bin Laden, a half-brother of OSAMA
> BIN LADEN.

379.    DMI is currently chaired by ABDULKARIM KHALED UUSUF

ABDULLA who replaced PRINCE MOHAMED AL-FAISAL AL-SAUD in early 2002. DMI

has involved itself in AL QAEDA financing through several of its subsidiaries,

including but not limited to, Islamic Investment Bank of the Gulf, FAISAL ISLAMIC

BANK, TADAMON ISLAMIC BANK, and AL SHAMAL ISLAMIC BANK in the Sudan.

380.    DMI owns 100% of ISLAMIC INVESTMENT COMPANY OF THE GULF.

PRINCE MOHAMED chairs ISLAMIC INVESTMENT COMPANY OF THE GULF. OSAMA

BIN LADEN's brother, HAYDAR MOHAMED BIN LADEN, was a director of the company.

ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC is the main shareholder of

FAISAL ISLAMIC BANK OF SUDAN, chaired by PRINCE MOHAMED.  BENEVOLENCE

INTERNATIONAL FOUNDATION. INC. AND BATTERJEE.

381.    BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") was a Saudi

based charity set up by BATTERJEE, chairman of the AL SHAMAL ISLAMIC BANK. Upon

information and belief, BATTERJEE befriended BIN LADEN during the Afghan-Soviet War.

382.    The U.S. State Department reported that BIN LADEN capitalized the AL

SHAMAL ISLAMIC BANK with a $50 million investment. BIN LADEN and companies he set

up in the early 1990's, maintain accounts at the AL SHAMAL ISLAMIC BANK. According to

U.S. officials, the bank has been used as a conduit for funds to AL QAEDA terrorists along with

the charity BATTERJEE created, BENEVOLENCE INTERNATIONAL FOUNDATION.

383.    BIF has a branch in Illinois that purports to provide assistance to Muslim

orphanages and hospitals in the United States and abroad, particularly in Bosnia. The current

chief executive of BIF is ENAAM M. ARNANOUT.  BATTERJEE remains a director of BIF

according to documents filed with the Illinois Secretary of State. ARNANOUT was arrested in

May, 2002 on charges he perjured himself by denying links with BIN LADEN and AL QAEDA.

384.    The organization is also known as "al Bir al Dawalia," which translated from

Arabic means "Benevolence International." It was originally founded in the 1980's by

BATTERJEE , who was an associate of OSAMA BIN LADEN. Defendant ADEL ABDUL

JALIL BATTERJEE later transferred control of the organization to the current Chief Executive

Officer ENAAM M. ARNANOUT (or "ARNANOUT").  ARNANOUT has been affiliated with

BIF since at least 1992, and was criminally indicted for his role in sponsoring AL QAEDA

through diversion of charitable funds to sponsor AL QAEDA.

385.    BATTERJEE has investments across a number of different industries including

commercial, property, medical, industrial, and contracting. This business is done primarily

through the family's business, the BATTERJEE Group, but also through other investments and businesses. Recent attempts to locate BATTERJEE in Saudi Arabia. have failed and it is currently believed that he may be in the SUDAN.

386.    BATTERJEE originally met ARNANOUT in 1987 when ARNANOUT was a teenager studying Islam in Pakistan. BATTERJEE appointed ARNANOUT as the head of the Bosnian branch in the early 1990s. According to BENEVOLENCE INTERNATIONAL FOUNDATION's 1992 articles of incorporation, ADEL BATTERJEE is one of the three founders of BIF in the United States. In 1993, the Saudi Government closed BATTERJEE 's charity al-Bir at the same time it was closing other organizations for ties to terrorism. Following this closing, BATTERJEE moved the BIF headquarters to Chicago, Illinois and brought ARNANOUT in from Bosnia to run the organization.  BATTERJEE officially transferred control of the organization to ARNANOUT on September 15, 1997, and ARNANOUT assumed the Executive Director position.

387.    ADEL BATTERJEE's name does not readily appear in any BENEVOLENCE INTERNATIONAL FOUNDATION corporate records after 1994, yet he continued funding the foundation. On February 12, 2002, the United States Government recorded a telephone conversation with the then jailed CEO of BIF, ARNANOUT, with his brother Hisham in Saudi Arabia. During this conversation, ARNANOUT discusses "Abu Sulafa" with his brother.  The United States government has identified the name "Abu Sulafa" as an alias for ADEL BATTERJEE. Using BATTERJEE's alias, ARNANOUT stated that BATTERJEE has been sending money to BENEVOLENCE INTERNATIONAL FOUNDATION's branches.

388.    One Justice Department AL QAEDA expert suggested that this telephone conversation may further elucidate BATTERJEE's role as the source of the "mysterious set of

60573                                      110

wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

389.    Evidence introduced in the criminal trial of the Embassy bombers (known as United States v. Osama Bin Laden, et al., Case Number S98 Cr. 1023, United States District Court, Southern District of New York), and gathered in the related investigation, demonstrated that AL QAEDA sought and received a substantial amount of financial support from  numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses. In addition, AL QAEDA terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously. They were also taught to avoid putting matters in writing.  AL QAEDA members have held positions with BIF and this charity is one of the organizations utilized by AL QAEDA.

390.    Once money was withdrawn from the bank accounts of relief organizations, its use by AL QAEDA can be virtually untraceable. According to an affidavit of Special Agent Robert Walker of the FBI, an AL QAEDA witness explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor. According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining finds were provided to AL QAEDA for whatever use AL QAEDA deemed necessary. This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence. AL QAEDA operatives and supporters have also smuggled money into the United States.

391.    On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered included documents establishing direct communication between ARNAOUT and BIN LADEN and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these documents.

392.    On December 16,1994, Defendant MOHAMAD JAMAL KHALIFA, while traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, KHALIFA had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as BENEVOLENCE INTERNATIONAL CORPORATION (or "BIC") and the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO"). At the time of his travel, KHALIFA bad been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan. Two of the principal participants in the bombing were Jordanians who had spent time with KIIALIFA in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. KHALIFA was then retried - and acquitted - after his extradition from San Francisco to Jordan following the December 1994 stop. At his Jordanian trial, KHALIFA admitted to the Jordanian authorities that he had known the bombers and had sent them money.

393.    KHALIFA, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002. On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephone contact with a telephone number in Saudi Arabia used by KHALIFA.

394.    Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560.

395.    A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements:

> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands. Steeds of war projects.

396.    The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies....

397.    On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning smallpox as a biological terrorism weapon. The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of smallpox in any country.

398.    BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

399.    ARNANOUT has a relationship with OSAMA BIN LADEN and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents. BIF is an organization that AL QAEDA has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons

on behalf of AL QAEDA have had contacts with BENEVOLENCE INTERNATIONAL

FOUNDATION offices and personnel.

400.    BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings

with representatives of the Chechen insurgents as well as Hezb e Islami, a military group

operating at various times in Afghanistan and Azerbaijan. BENEVOLENCE INTERNATIONAL

FOUNDATION made efforts to provide the Chechen mujahideen with money, an X-ray

machine, and anti-mine boots, among other material support.

401.    On December 14, 2001, searches were conducted of the offices of

BENEVOLENCE INTERNATIONAL FOUNDATION in Palos Hills, Illinois, and in Newark,

New Jersey, along with the home of its chief executive officer, ARNANOUT, removing

materials from each place. According to a government witness, ARNANOUT was planning in

March 2002, to leave for Jeddah, Saudi Arabia.

402.    Also on December 14, 2001, the Treasury Department's Office of Foreign Asset

Control (or "OFAC") issued an order blocking BENEVOLENCE INTERNATIONAL

FOUNDATION's assets and records, pending further investigation into BIF's ties to terrorists.

ARNANOUT, Chairman of BENEVOLENCE INTERNATIONAL FOUNDATION, has a

relationship with OSAMA BIN LADEN and key associates dating back more than a decade. The

BENEVOLENCE INTERNATIONAL FOUNDATION is used by AL QAEDA for logistical

support: terrorists attempting to obtain chemical and nuclear weapons on behalf of AL QAEDA

have contacts with the BENEVOLENCE INTERNATIONAL FOUNDATION and its office

personnel; and BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings

with AL QAEDA operatives, providing them with military and financial support.  Defendant

ARNANOUT has been criminally indicted for his role in the September 11, 2001 attacks due to

his sponsorship of AL QAEDA.

403.     In the latter part of the 1980's, an AL QAEDA organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States. The organization was operated principally by Sheik Abdullah Azzam and OSAMA BIN LADEN for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan.

404.     In the mid to late 1980s, Defendant ARNANOUT, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Sri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for mekhtab al khidemat and AIF to provide assistance to various mujahideen including those under the command of OSAMA BIN LADEN.

405.     Within that same time frame, Defendant ARNANOUT served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of OSAMA BIN LADEN. Defendant ARNANOUT distributed resources, including weapons, at the direction of OSAMA BIN LADEN and others.

406.     Defendant ARNANOUT and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

407.     Defendant BIF and ARNANOUT and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

408.    Defendant ARNANOUT and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, facts about Defendant ARNANOUT's relationship with organizations engaging in violence, including AL QAEDA and OSAMA BIN LADEN.

409.    Defendant BIF and ARNANOUT and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities. Defendant BIF and ARNANOUT and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

410.    Defendant BIF and ARNANOUT and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism in violation of Title 18, United States Code, Section 2339A.

411.     Defendant BIF and ARNANOUT and co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

412.     BIF and ARNANOUT engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

413.     In or about 1992, Defendant ARNANOUT assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by GULBUDDIIN HEKMATYAR and HEZB-E-ISLAMI.

414.     Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including AL QAEDA members and soliciting donations to support international terrorism.

415.     On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujabideen in Baku, Azerbaijan.

416.     In or about November 1995, Defendant ARNANOUT and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen. Defendant ARNANOUT and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

60573

417.     In or about May 1998, BIF and ARNANOUT facilitated the travel of an influential founding member of the AL QAEDA network, MAMDOUH MAHMUD SALIM (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

418.     In the latter part of the 1990's, with Defendant ARNANOUT's knowledge, SAIF AL ISLAM EL MASRY (a/k/a Abu Islam el Masry), a member of AL QAEDA's majalis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

419.     Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States. Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

420.     In or about October 2001, Defendant ARNANOUT relayed to the BIF founder ADEL BATTERJEE in Saudi Arabia via telephone ARNANOUT's concern that ARNANOUT was under scrutiny of the United States government and in particular the fact that Defendant ARNANOUT had been searched at the airport upon his return to the United States.

421.     In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant ARNANOUT spoke via telephone to ADEL BATTERJEE in Saudi Arabia, and BATTERJEE requested Defendant ARNANOUT to relocate with his family to Saudi Arabia.

422.     Beginning at a time unknown through in or about March 2002, Defendant ARNANOUT, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in

Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning

OSAMA BIN LADEN and AL QAEDA, including:

      i.     a chart of an organization involved in military activity headed by OSAMA BIN LADEN;

      ii.     notes summarizing several meetings during which AL QAEDA was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective AL QAEDA members to AL QAEDA;

      iii.     notes reflecting the commencement of AL QAEDA 's "work" on or about September 10, 1988;

      iv.     personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

      v.     a list of wealthy sponsors from Saudi Arabia including references to OSAMA BIN LADEN and ADEL BATTERJEE, the founder of the BIF Enterprise;

      vi.     various documents reflecting Defendant ARNANOUT's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

      vii.     various documents in a separate folder reflecting Defendant ARNANOUT's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

      viii.     various newspaper articles including a 1988 article with a photograph depicting OSAMA BIN LADEN, Defendant ARNANOUT, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning OSAMA BIN LADEN's threats against the United States and the State Department's 1997 list of designated terrorist organizations; and

      ix.     a handwritten organizational chart placing Defendant ARNANOUT at the top of a jihad organization involved with weapons.

      423.     In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit

and receive donations from the public while fraudulently holding itself out as a humanitarian

organization that had never supported or financed violence, Defendant ARNAINOUT falsely and

publicly stated that he did not know OSAMA BIN LADEN personally, that Defendant

ARNANOUT never fought against the Soviet Union, that Defendant ARNANOUT was never at the al Masada camp.

424.    On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant ARNANOUT submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

425.    On or about April 15, 2002, ARNANOUT spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

426.    ARNANOUT conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism.

427.    Defendant ARNANOUT and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

428.     ARNANOUT transferred by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds were to be used by terrorists.

429.     Co-conspirators, aiders and abettors of the BENEVOLENCE INTERNATIONAL FOUNDATION (a/k/a al-Birr al-Dawalia), include Defendants: BENEVOLENCE INTERNATIONAL FOUNDATION - U.S.A. (Main Office), BENEVOLENCE INTERNATIONAL FOUNDATION - U.S.A. (East Coast Office), BENEVOLENCE INTERNATIONAL FOUNDATION - Canada, Syed Suleman Ahmer, ENAAM MAHMOUD ARNANOUT (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), MAZIN M.H. BAHARETH, SHAHIR ABDULRAOOF BATTERJEE, ADEL BATTERJEE, ZAHIR H. KAZMI, MUZAFFAR KHAN, SOLIMAN J. KHUDEIRA, and JAMAL NYRABEH, all located, doing business or registered to do business in the United States.

430.     ARNANOUT initially denied knowing BIN LADEN, but a March 19, 2002, police raid at Bosnian offices and homes related to BIF, uncovered photographs of ARNANOUT with a rifle in his hands and BIN LADEN at his side at what appeared to be an AL QAEDA training facility. Documents found in the raid detail a relationship between ARNANOUT and BIN LADEN going back 15 years. Both BIF and ARNANOUT have had their assets frozen and are believed, by the United States Department of Justice, to be AL QAEDA co-conspirators.

431.     A former AL QAEDA member informed the FBI that BIF is used by AL QAEDA for logistical support. Additionally terrorists attempting to obtain chemical and nuclear weapons on behalf of AL QAEDA had direct contacts with BIF and BIF employees and listed the Illinois BIF offices as their residence.

432.    Terrorists who had direct contact with BIF include: MAMDOUH MAHMUD SALIM, an IRAQI who established links between AL QAEDA and groups in IRAQ, SUDAN and Lebanon. He was a key BIN LADEN aide who tried to obtain nuclear and chemical weapons for AL QAEDA. He was arrested in the 1998 AL QAEDA Embassy bombings and was at one time listed as a BIF director. Other terrorists linked to BIF include: MOHAMED BAYAZID, who also assisted AL QAEDA attempts to acquire nuclear material; MOHAMAD JAMAL KHALIFA, BIN LADEN's brother-in-law who has been linked to the 1993 World Trade Center bombing and the disrupted plot to bomb 12 American airliners in 1995; and WALI KHAN AMIN SHAH who was convicted for his participation in the plot to bomb American airliners.

433.    Upon information and belief, BIF assisted these and other AL QAEDA terrorists with housing, travel documents and/or funding in the United States and abroad. AL QAEDA members were given jobs with the Foundation and used the charity to transfer money to AL QAEDA members.

434.    Using unidentified witnesses who are former AL QAEDA members or terrorists currently in U.S. custody, and documents seized in the raids on the group's offices in Chicago and Bosnia, the U.S. Justice Department has detailed links between BENEVOLENCE INTERNATIONAL and AL QAEDA.

435.    Federal agents stated that BIN LADEN and AL QAEDA members withdrew funds to support terrorist activities from bank accounts held by the charity and that BIF accounts in offices around the world provided a cover for the movement of terror funds.

436.    The WORLD ASSEMBLY OF MUSLIM YOUTH (or 'TWAMY") and BIF are tightly connected organizations that share the same leadership and work together on a number of joint projects. ADEL ABDUL JALIL BATTERJEE was the Secretary General of WAMY at the

time he founded the AL QAEDA front organization BIF in the United States. Outside of BATTERJEE's role, the two organizations WAMY and BIF have also cooperated in joint-publishing of literature and film that bears both of their logos.

437.    BATTERJEE commissioned the writing of a biography specifically about OSAMA BIN LADEN and the origins of the AL QAEDA network in Arabic. This biography, The Arab Volunteers in Afghanistan, was jointly published in 1991 by the BENEVOLENCE INTERNATIONAL FOUNDATION and the WORLD ASSEMBLY OF MUSLIM YOUTH. The book details OSAMA BIN LADEN's life, including the creation of BIN LADEN's terrorist network, AL QAEDA. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river."

438.    The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught.  Ahmad Ajaj had in his possession an AL QAEDA manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert. It was found in an envelope that had both the WAMY and Lajnat al-Birr logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.

439.    KHALID AL-FAWAZ, a senior AL QAEDA leader currently imprisoned in The United Kingdom, had the same manual as Ajaj except for updates that included more recent AL QAEDA knowledge. AL-FAWAZ ran OSAMA BIN LADEN's public relations organization the Advice and Reformation Committee in London and masterminded the 1998 United States Embassy bombings, for which he was indicted by the United States government. That someone of AL-FAWAZ stature in AL QAEDA possessed manuals that were distributed by WAMY is indicative of the shared ideology and cooperation between WAMY and AL QAEDA.

440.    Another manual found in Abmed Ajaj 's possession was hate literature against Americans, Christians, and Jews. This encyclopedia, which glorified the hijacking of buses and the killing of innocent civilians in Israel, was published by WAMY.

INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

441.    The INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "JIRO") has materially supported terror around the globe, including OSAMA BIN LADEN and AL QAEDA. IIRO's office in the Philippines is headed by OSAMA BIN LADEN's brother-in-law, Defendant MOHAMMED JAMAL KHALIFA and has acted as a center of terrorist financing and training activity — across the globe. IIRO then evolved into a vast independent terrorist machine - finding, recruiting and aiding and abetting AL QAEDA members around the globe. TIRO was involved with the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

442.    The IIRO sister organization, INTERNATIONAL RELIEF ORGANIZATION (or "IRO"), sends money back and forth with IIRO.  IIRO sends money to other organizations that sponsor terror. Another IIRO sister company, the SUCCESS FOUNDATION, sends money back and forth with the IIRO and IRO. The SUCCESS FOUNDATION also sends money to other organizations who sponsor terror.

443.    Several employees of the MUSLIM WORLD LEAGUE (TMWL"), IIRO's parent organization, have explicitly worked with AL QAEDA. OSAMA BIN LADEN's associates from Afghanistan infiltrated and propagated MWL offices around the world. The Rabita Trust, another branch of the MWL, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. WA'EL JULAIDAN, as Secretary General of the Rabita

Trust and MWL office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. Julaidan has been branded a SDGT by the United States Treasury Department and his assets have been frozen. The Treasury Department described Julaidan as follows at his designation as a terrorist entity:

> Osama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaydah, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.

444.    ABDURAIHMAN ALAMOUDI, the Secretary of the SUCCESS FOUNDATION, has openly stated his support for HAMAS and HEZBOLLAH, both designated terrorist organizations. ALAMOUDI is the President of the AMERICAN MUSLIM FOUNDATION (or "AMF"), which receives thousands of dollars from the SUCCESS FOUNDATION, as stated on the income tax Form 990s for the SUCCESS FOUNDATION. MOHAMMED OMEISH, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based SUCCESS FOUNDATION, is also Vice-President of the AMERICAN MUSLIM FOUNDATION. ADNAN BASHA, IIRO's Secretary-General, wrote "The major finance is coming from the generous people of Saudi Arabia, KING FAHD, and the royal family." ARAFAT EL-ASHI, head of IIRO's Canadian branch, testified in the trial of MAHMOUD JABALLAH that IIRO and MWL were intimately connected to and funded by certain Saudi Arabian interests. ARAFAT-ASHI stated in his testimony in the JABALLAH trial that as a IIRO and MWL employee, he considered himself an employee of the Saudi government.

445.    According to the account of MOHAMMED BAYAZID, AL QAEDA member and associate of OSAMA BIN LADEN, the MWL opened an office in Pakistan for the use of the founders of AL QAEDA. The MWL initially was funded by OSAMA BIN LADEN, then the government of Saudi Arabia took over the funding. According to the Arabic periodical

125

publication Rose Al-Yusuf, the IIRO is firmly entrenched with OSAMA BIN LADEN's AL QAEDA organization. As one example, the IIRO supported an AL QAEDA guest house in Egypt.

446.    MOHAMAD KHALIFA, as the head of IIRO, used the organization to collect and launder money for AL QAEDA operations. IIRO funded the terrorist AL QAEDA groups Moro Islamic Liberation Front (or "MILF") and the KHALID BIN MAHFOUZ (or "ASG"). A former Abu Sayyaf member stated: "Less than 30% of the IIRO funds went to legitimate public works, the rest going toward the purchase of weapons." MOHAMAD KHALIFA's branch of the IIRO served as a base to plan and finance AL QAEDA and international terrorism.

447.    IIRO built its office in Khartoum, SUDAN in the same residential neighborhood as OSAMA BIN LADEN's personal office, according to the testimony of a former AL QAEDA member, Jamal Ahmed Mohammed Al-Fadl.  IIRO also built its Khartoum office near the office of BENEVOLENCE INTERNATIONAL FOUNDATION, another AL QAEDA front.

448.    The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998. Kenya deregistered the IIRO after the bombing.  IIRO Tanzania was reportedly working with AL QAEDA immediately before the United States Embassy bombing. IIRO went on to plot to destroy United States Consulates in India in 1999.

449.    According to Canadian intelligence documents, IIRO funded al-Jihad. MAHMOUD JABALLAH, an Islamic al-Jihad member tried in Canada, was an IIRO employee. Egyptian al-Jihad, led by AL QAEDA's second-in-command, Ayman al-Zawahiri, is a branch of AL QAEDA. As an employee of IIRO Canada, MOHAMMED KHATIB founded the Canadian branch of Benevolence International Foundation.

450.     IIRO works with numerous other AL QAEDA affiliated charities. IIRO shares the same address in THE UNITED KINGDOM AS THE INTERNATIONAL DEVELOPMENT FOUNDATION (or "IDF"), a charity affiliated with Defendant KHALID BIN MAFOUZ, a senior AL QAEDA financier (supra).  The SUCCESS FOUNDATION, IIRO's namesake, is also funded by KHALID BIN MAFOUZ. IIRO aids and abets the SAUDI JOINT RELIEF COMMITTEE, an AL QAEDA charity in Bosnia and elsewhere.  IIRO, through KHALIFA, sponsors, aids and abets BENEVOLENCE INTERNATIONAL FOUNDATION, the AL QAEDA charity front.  IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with AL QAEDA: GLOBAL RELIEF FOUNDATION (or "GRF"), TAIBAH INTERNATIONAL, ISLAMIC AFRICAN RELIEF AGENCY, WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY").

451.     MOHAMMED OMEISH is Vice President of AMERICAN MUSLIM FOUNDATION which according to its tax form 990, filed in 1999, gave money to TARIK HAMDI. HAMDI helped OSAMA BIN LADEN get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.

452.     After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of AL QAEDA sponsorship. One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed. IIRO also extensively funded the TALIBAN regime. As stated by Dr. ADAN BASHA, Secretary-General of IIRO, the IIRO donated more than Sixty Million ($60,000,000) dollars to the TALIBAN Regime. The TALIBAN Regime was a known material sponsor, aider and abettor of AL QAEDA terrorists. After September 11, 2001, Pakistan deported 89 Arab aid workers from the IIRO and other organizations because they were aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting AL QAEDA.

453.     SANABIL AL-KHAIR was created to manage the IIRO's financial assets. IIRO's website states, "It [IIRO] has established an endowment fund (Sanabil Al-Khair) which will be used to generate a stable income to finance its various activities." The SANABIL AL-KHAIR was incorporated in the United States under two different names: The SANA-BELL, INC. and SANABEL AL-KHEER, INC. Their corporate records indicate the same address as IIRO in Herndon, Virginia.

454.     Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION include Defendants: SUCCESS FOUNDATION, INC., MOHAMED S. OMEISH, ABDURAHMAN AL-AMOUDI, KHALED NOURI, SULAIMAN AL-ALI, ABDULLAH M. AL-MAHDI, TAREQ M. AL-SWAIDAN, ABDUL AL-MOSLAH, SALAH BADAHDH, ABDULLAH BIN SALEH AL OBAID, HASSAN A.A. BAHFZALLAH, and M. YAQUB MIRZA, all located, doing business or registered to do business in the United States.

THE MUSLIM WORLD LEAGUE

455.     The MUSLIM WORLD LEAGUE ("MWL") was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam."  The MWL is the parent organization of the charity IIRO. MWL uses the IIRO as an operational arm to perform many of its charitable activities.

456.     The MWL is an organization funded, supported, and financed by persons or entities of Saudi Arabia. According to the testimony of Arafat al-Asahi, a MWL representative in Canada:

> Q.     During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government

has any concern whatsoever with respect to your office?

A.     Let me tell you one thing. The Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is the relief branch of that organization which means that we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please.

Q.     I will. Thank you. When you say you work for the Government of Saudi Arabia, are you also paid by that government?

A.     I am paid by my organization which is funded by the government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Do you get this point?

Q.     Yes.

A.     Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia.

Q.     Is the Muslim World League the type or organization that would actually have physical offices in countries throughout the world?

A.     Of course. I said in the beginning that we have over 30 offices all over the world? One is here; one is in Washington, D.C. They are spread all over, in Europe, in Asia.

Q.     When you speak of an office that is an IIRO office, that counts as a Muslim World League office as well?

A.     What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League.

457.    The MWL has at least two offices in the United States. The New York City office is currently active, while its main office in Hemdon, Virginia, was the target of federal raids in early March 2002. Its officers at the Virginia office are President Abdullah bin SALEH AL-OBAID, Vice President Hassan A. A. Bahafzallah, and Secretary/Treasurer YAQUB M. MIRZA.

458.    ABDULLAH AL-OBAID, President of the United States branch of MWL, and former Secretary-General of the organization, also runs one of the AL-RAJHI family's largest corporations, AL-WATANIA. ADULLAH AL-OBAID also served as Secretary-General of the RABITA TRUST.

459.    YAQUB MIRZA, the secretary and treasurer of the MWL in the United States, is the financial mastermind of the SAAR Network (founded by the Al-Rajhi family). YAQUB MIRZA'S house was raided in March, 2002 by federal authorities investigating his alleged connections to AL QAEDA and September 11, 2001.

460.    The MWL has numerous connections with AL QAEDA operatives. MOHAMMED BAYAZID, an AL QAEDA operative who fought alongside OSAMA BIN LADEN and the other Mujahideen in Afghanistan (and has been implicated in a plot to get nuclear materials for AL QAEDA), described how Defendant MOHAMMED JAMAL KHALIFA, OSAMA BIN LADEN's brother-in-law, opened a MWL office in Pakistan for the use of the founders of AL QAEDA:

> Brother Jamal KHALIFA (Abu-l-Bara) was the one who started the educational project, both in the interior of Afghanistan and abroad. Thanks to Dr. Abdullab Azzam's efforts he succeeded in getting the approval of the Muslim World League to open an office for the League in Peshawar as an umbrella under which the brothers could work and move in Pakistan freely.

461.    WAEL JULAJIDAN, whom the United States Treasury Department named as "one of the founders of AL QAEDA," headed the MWL in Peshawar, Pakistan and also served as the Director General of the defendant RABITA TRUST. JULAIDAN has had his assets frozen by the United States Treasury Department which characterized JULAIDAN as having "directed organizations that have provided financial and logistical support to al-Qa'ida". WA'EL JULAIDAN operated MWL offices that served in the early days of AL QAEDA to attract and train holy warriors from around the world for the war in Afghanistan. He had contact with bin Laden lieutenants, defendants AYMAN AL ZAWAHIRI and ABU ZUBAYDA.

462.    WADIH EL-HAGE, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the MWL in Peshawar, Pakistan in the 1980s. It was while working at the MWL that EL-HAGE met Abdullah Azzam, the mentor of OSAMA BIN LADEN, and a co-founder of AL QAEDA.

463.    Ihab Ali, another AL QAEDA operative in prison in the United States on perjury charges, also went to work for the MWL in 1987. Ihab Ali played a large role in the embassy bombings, facilitating communication between OSAMA BIN LADEN and other AL QAEDA members and also piloting OSAMA BIN LADEN's personal jet. In 1993, Ihab Ali took flight lessons at the Altman Flight School in Norman, Oklahoma—the same school ZACARIAS MOUSSAOUI attended and which MOHAMMED ATTA scouted as a possibility for his flight training.

464.    According to the grand jury, Ihab Ali did not disclose the extent to which his pilot training and international travels concerned efforts to assist in AL QAEDA 's terrorist activities.

465.    In conjunction with the attempted assassination of Egyptian President Hosni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought

our travel tickets and gave us spending money before we arrived at the [OSAMA BIN LADEN's] farm in Suba region in southern SUDAN."

466.     Co-conspirators, aiders and abettors of the MWL include Defendants: Rabita Al-alam Al-islami, a/k/a Islamic World League, ABDULLAH BIN SALEH AL-OBAID, HASSAN

> A.A. BAIHAFZALLAH, AND YAQUB M. MIRZA, all
> located, doing business or registered to do business in the
> United States.

THE SAAR FOUNDATION

467.     The SAAR Foundation was named after SULAIMAN ABDUL AZIZ AL-RAJHIT, head of the Saudi Arabian AL-RAJHI family, and was formed in the 1970s by a group of Muslim scholars and scientists from the Middle East and Asia. SAAR was incorporated in Herndon, Virginia as a 501e(3) non-profit organization on July 29, 1983, and dissolved as of December 28, 2000. The Saudi Arabian AL-RAJHI family is the foundation's biggest donor. The SAAR Network financially supports terrorism and its main contributors, the AL-RAJHI Family, has a long history of supporting terrorism.

468.     Virginia Secretary of State corporate records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses in Herndon, Virginia. Most of these organizations do not maintain a physical presence at that address, or elsewhere. The SAAR Foundation and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for extremist Islamic terrorist organizations.

469.     On March 20-21, 2002, the offices of many SAAR Network organizations, along with the residences of their top executives, were raided by the joint terrorism task-force, Operation Greenquest. Operation Greenquest was created after September 11, 2001, by the

United States Treasury Department as a new multi-agency financial enforcement initiative bringing the full scope of the U.S. Government's financial expertise to bear against sources of terrorist funding. According to the search warrants issued at nearly twenty locations, the SAAR Network was raided for "potential money laundering and tax evasion activities and their ties to terrorist groups such as... AL QAEDA as well as individual terrorists.. . (including) OSAMA BIN LADEN."

470.    The SAAR Foundation reported revenues of over $1.7 billion for the year 1998, which represents more than any other United States charity has ever generated. The SAAR Foundation and its affiliated charities keep a low profile in that they do not conduct fundraising events or publicly reach out to potential donors like most charities.

471.    On November 7, 2001, Bank al-Taqwa (infra) was first designated by President George W. Bush's Executive Order as a Specially Designated Global Terrorist Entity and the United States Department of Treasury and its assets were frozen. Two SAAR network executives, Samir Salah and Ibrahim Hassabella, were both former executives at Bank al-Taqwa. Two other executives in the SAAR Network, Jamal Barzinji and Hisham al-Talib, worked for Youssef M. Nada (infra), the head of Bank al-Taqwa who also had his assets frozen. The SAAR network links with Youssef Nada include that SULAIMAN AL-RAJHI was on the Board of Directors at YOUSSEF NADA's AKIDA BANK in the Bahamas. People associated with the SAAR Foundation and its network were also implicated in the United States Embassy terrorist bombings in Kenya and Tanzania.

472.    The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of AL QAEDA and international terror. These organizations are closely inter-twined with Defendants IIRO, MWL and their related "charities." The connections between the AI-RAJHI family, the SAAR network, and the terrorist front-

groups extends past the financial network to a repetitious pattern of overlapping officers. The United States branches of the MWL and its subsidiaries are a part of the SAAR Network. The MWL and SAAR share officers and addresses. Both play an intermediary role between wealthy Saudi financiers and terrorist groups.

473.     Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR network include Defendants ABU SULAYMAN, AHMED TOTONJI, HISHAM AL- TALIB, IQBAL YUNUS, JAMAL BARZINJI, M. OMAR ASHRAF, MOHAMMED JAGHLIT, MUHAMMAD ASHRAF, TAHA JABER AL-ALWANI, TARIK HAMDI, YAQUB M1RZA, SHERIF SEDKY, AFRIiCAN MUSLIM AGENCY, ARADI, INC., GROVE CORPORATE, INC., HERITAGE EDUCATION TRUST, INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT, MAR-JAC INVESTMENTS, INC., MAR-JAC POULTRY, INC., MENA CORPORATION, RESTON INVESTMENTS, INC., SAAR INTERNATIONAL, SAFA TRUST, STERLING CHARITABLE GIFT FUND, STERLING MANAGEMENT GROUP, INC., and YORK FOUNDATION, all located, doing business or registered to do business in the United States.

AL BARAKA INVESTMENT AND DEVELOPMENT CORP.

474.     AL BARAKA INVESTMENT & DEVELOPMENT CORPORATION (or "AL BARAKA"), a wholly owned subsidiary of DALLAH ALBARAKA GROUP LLC (or "DALLAH ALBARAKA"), is based in Jeddah, Saudi Arabia. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "al Baraka Bank." United States assets include AL BARAKA Bancorp Inc. in Chicago, Illinois, and AL BARAKA Bancorp Inc. in Houston, Texas.

475.     A memo from the Russia Federation's Security Service details the AL BARAKA Bank's role in funding Defendant AL-HARAMAIN:

> On existing knowledge, part of the obtained financing comes
> from the charitable collections (Zakat) and goes to the personal
> foreign accounts of field commanders, including Khattab and
> Basayef.

476.    AL BARAKA provided OSAMA BIN LADEN with financial infrastructures in

SUDAN beginning in 1983. For example, the use of AL BARAKA Bank by AL-HARAMAIN

was confirmed by a statement from AL-HARAMAIN chairman, AQUEEL AL-AQUEEL, who

declared that the charity maintained accounts at AL BARAIKA Bank in Saudi Arabia.

477.    AL BARAKA INVESTMENT & DEVELOPMENT is mostly present in the

Sudanese banking sector, through assets held in Algharb Islamic Bank, AL SHAMAL ISLAMIC

BANK, FAISAL ISLAMIC BANK, SUDANESE ISLAMIC BANK and TADAMON ISLAMIC

BANK. AL BARAKA is also affiliated with the National Development Bank in SUDAN.

478.    Defendant SALEH ABDULLAH KAMEL was born in Makkah, Saudi Arabia, in

1941. After being the adviser to the Saudi Minister of Finance, in 1969 he founded Dallah

Albaraka Group LLC, quickly establishing himself as one of the leading promoters of an Islamic

financial and banking system capable of rivaling large Western institutions.

479.    Dallah Albaraka Group LLC, a diversified conglomerate based in Jeddah, Saudi

Arabia, is involved in various industries, services and financial activities. The group includes

twenty-three banks in Arab and Islamic countries, in addition to several investment and financial

companies.

480.    Dallah Albaraka Group LLC's portfolio includes a wholly owned subsidiary

specializing in aviation-services, Dallali Avco Trans-Arabia Co Ltd. The company was formed

in 1975 and is based in Jeddah, Saudi Arabia.

481.     OMAR AL BAYOUMI, a Saudi national, was Assistant to the Director of Finance for an AL BARAKA company, Dallah Avco, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998.

482.     On May 5, 1998, OMAR AL BAYOUMI registered a fictitious company name called Masjed al Madinah al Munawarah (a/k/a Masjid al Madinab al Munawarah) based in San Diego, California. In March 25, 1999 a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawarah, Inc.

483.     Two of the hijackers on September 11, 2001, of American Airlines Flight 77, NAWAF AL HAZMI and KHALID AL MIHDHAR, received funding from OMAR AL BAYOUMI who paid their house rent in San Diego. OMAR AL BAYOUMI is listed as a suspect wanted by the FBI in connection with the September 11, 2001 attacks.

484.     Dallah Albaraka Group LLC's financial arm is AL BARAKA Investment & Development (or "ABID"), a wholly owned subsidiary based in Jeddah, Saudi Arabia.

485.     SALEH ABDULLAR KAMEL, Chairman of Dallah AL BARAKA and AL BARAKA Bank, was one of the three founding members of AL SHAMAL ISLAMIC BANK. SALEH ABDULLAH KAMEL founded the bank in 1983, along with a Sudanese company, AL SHAMAL INVESTMENT AND DEVELOPMENT, and the Government of Northern State, then controlled by Governor Mutasin m Abdel-Rabim, representative of HASSAN AL-TURABI.

486.     The practice and policy of Dallah Albaraka Group LLC and AL BARAKA Bank is to provide financial support and material assistance to international terrorist organizations including AL QAEDA.

487.     In 1998, AL AQSA ISLAMIC BANK was established with $20 million in capital. The main shareholders were Dallah AL BARAKA Group LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a Dallah al-Baraka LLC subsidiary, owns 14 percent of AL-AQSA

60573

ISLAMIC BANK. SALEH ABDULLAH KAMEL acknowledged that Dallah AL-BARAKA Group LLC owns another twelve percent directly.

488.    Since 1998, Israel has refused to approve the bank, citing its obvious ties with known terrorists. At the beginning of 2001, several antiterrorist authorities from Israel visited Citibank's headquarters in New York to warn its directors of the nature of the bank's activities with respect to international terrorism.

489.    AL BARAKA provided support to the "charity" AL-HARAMAIN operations and helped transfer funds for OSAMA BIN LADEN operations, as reported by the Bosnian Intelligence Agency (Agency for Investigation and Documentation — AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FBH)":

> Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million].

490.    Al Baraka Turkish Finance House, an AL BARAKA branch in Turkey, is a subsidiary of Dallah AL BARAKA Group LLC.

491.    A Bosnian Intelligence memo regarding the activities of AL-HARAMAIN states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover...

492.    The report establishes AL-HARAMAIN's role in financing and assisting OSAMA BIN LADEN's operations.

> [t]he Saudi HO [Humanitarian Organization] al-Haramain, ... has
> acted as a channel for financing the activities of terrorist
> organizations. . . . According to available intelligence, the
> Sarajevo office assisted the terrorist organization Gama al
> Islamija, while members of bin Laden's el Itihad al Islamiija
> (AIAI) terrorist groups were employed at the Somalia offices,
> which also financed their operations.

AL-HARAMAIN

493.    The Saudi Arabian-based AL-HARAMAIN ISLAMIC FOUNDATION INC. (or

"AL-HARAMAIN") is a private charitable organization that is supposed to provide a variety of

humanitarian services for Muslims worldwide. Established in Riyadh in 1992, AL-HARAMAIN

quickly developed a vast network of offices and representatives that now spans over fifty

countries, including the United States. AL-HARAMAIN raises most of its funds from Saudi

Arabia where it oversees the distribution of its resources across the world.

494.    Although AL-HARAMAIN operates these branches in many countries but are

still controlled primarily from AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The

President and Vice-President of the United States branch, AQEEL AL-AQEEL and MANSOUR

AL-KADI, both reside in Riyadh, Saudi Arabia where they run all of AL-HARAMAIN

worldwide. Defendant AL-HARAMAIN ISLAMIC FOUNDATION, INC., is a Saudi charity

front that has exploited its non-profit status for the benefit of OSAMA BIN LADEN and his

terrorist network AL QAEDA, in the furtherance of international terrorism. In doing so, AL-

HARAMAIN has developed an extensive worldwide network. Many of AL-HARAMAIN's

foreign branches have been exposed for providing direct and material support to AL QAEDA.

The United States State Department has designated two of AL-HARAMAIN's branches located

in Bosnia and Somalia as terrorist entities and frozen the assets of both. The leaders of AL-

HARAMAIN have direct links to AL QAEDA.

495.    In December of 1999, AL-HARAMAIN conducted a joint fundraising event with

a known AL QAEDA front, the Defendant INTERNATIONAL ISLAMIC RELIEF

ORGANIZATION (IIRO) and the WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) in Riyadh, Saudi Arabia. AL-HARAMAIN and its co-conspirators also solicit and operate widely in the United States.

496.    Co-conspirators, aiders and abettors of the AL-HARAMAIN ISLAMIC FOUNDATION doing business or registered to do business in the United States include Defendants:

> AL HARAMAIN FOUNDATION; AL HARAMAIN ISLAMIC FOUNDATION, INC.; AQEEL ABDUL-AZEEL AL-AQEEL; MANSOUR AL-KADI, SOLIMAN H.S. AL-BUTHE; and PEROUZ SEDA GHATY.

497.    AL-HARAMAIN's self-titled "Most Important Aims" include relief work in areas of the world where Muslims are deprived. An unwritten, though no less important, aim of AL-HARAMAIN is providing assistance to OSAMA BIN LADEN's AL QAEDA.

498.    Intelligence officials throughout the world have acknowledged that AL-HARAMAIN exploited its non-profit status by providing secret aid to terrorist groups. In referring to AL-HARAAIN in a speech given on March 11, 2002, United States Treasury Secretary Paul O'Neill, stated:

> Few deceits are more reprehensible than the act of collecting charity from well-intentioned donors, and then diverting those funds to support hatred and cruelty. As I said during my visit to the Gulf, misusing charity funds to support terrorism harms the people who gave the donation, harms the people who should have received it and is dangerous to us all. Organizations that pervert the name of charity are an affront to us all, and we will find them, expose them, and shut them down.

499.    After the June 2, 2002, raids of AL-HARAMAIN offices in Bosnia, the Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> We detected a pattern here… for terrorist cells and those who aid and harbor them to operate behind the shield of legitimate humanitarian. . . organizations.... They were preaching good, and sometimes doing good, while plotting evil.

500.    On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the AL-HARAMAIN Islamic Foundation. These branches of AL-HARAMAIN were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated: The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing.

501.    Although AL-HARAMAIN in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the AL-HARAMAIN headquarters in Riyadh, Saudi Arabia.

502.    AI-HARAMAIN's Bosnia and Somalian offices and the rest of AL- HARAMAIN are closely intertwined. AL-HARAMAIN's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches. The headquarters also maintains one website that covers AL-HARAMAIN worldwide and, on occasion, devotes certain pages of its web site to certain individual branches.

503.    A United States Treasury Department Press Release stated that AL-HARAMAIN worked with the AL QAEDA-linked Somali-based terrorist group AL ITIHAD AL ISLAMIYA. This like-minded Islamic fundamentalist group operated in the AL QAEDA orbit as it sought to establish an Islamic state in Somalia and moved into a terrorist force in the mid 1990s. AIAI's involvement in September 11 includes sharing of training and personnel with AL QAEDA using money provided by the Saudis through defendant AL HARAMAIN's offices in Bosnia and Somalia. Defendant the AL BARAKA AT BANK was a financial vehicle for AL QAEDA.  The press release states:

60573                                        140

The Somalia office of AL-HARAMAIN is linked to OSAMA BIN LADEN's AL QAEDA network and al-Itihad al-Islamiya (AIM), a Somali terrorist group. AL-HARAMAIN Somalia employed AIAI members and provided them with salaries through al-Barakaat Bank, which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for OSAMA BIN LADEN.

504.     The cooperation between AL QAEDA and AL-ITIHAD AL-ISLAMIYA has not ceased. The 2002 United States Department of State's Patterns on Global Terrorism report states that AL-ITIHAD AL-ISLAMIYA is a terrorist group that maintains ties to AL QAEDA. The Treasury Department Press Release about the designation also states that AL-HARAMAIN' s support of AL-ITIHAD AL-ISLAMIYA has been concealed under its humanitarian cover:

> Over the past few years AL-HARAMAIN Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also employed AIAI members and provided them with salaries through Barakaat Banks and Remittances, a subsidiary of al-Barakaat Bank.

505.     This concert of action, aiding and abetting of terror and material sponsorship of international terrorism is precisely the hallmark of the offensive upon the United States that culminated on September 11, 2001.

506.     The AL-HARAMAIN Islamic Foundation was banned from Kenya for national security concerns following the 1998 embassy bombings. OSAMA BIN LADEN and AL QAEDA were convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi, Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and injured more than 4,000. These indictments and convictions demonstrate the United States government's belief that both OSAMA BIN LADEN and AL QAEDA have committed acts within and outside the United States which trigger the United States District Courts' jurisdiction over such entities.

507.     The United States Treasury Department Press Release following the March 11, 2002, designation of AL-HARAMAIN's Bosnian and Somalian offices, stated the following about its connection to the terrorist group AL-GAMA'A AL-ISLAMIYYA:

> The Bosnia office of AL-HARAMAIN is linked to al-Gama'a al-Islamiyya, an Egyptian terrorist group. Al-Gama'a al-Islamiyya was designated on November 2, 2001 and it is a signatory to OSAMA BIN LADEN's Fatwa dated February 23, 1998, targeting Americans and their allies.

508.     In March 2002, Bosnian officials raided AL-HARAMAIN' s Sarajevo office and discovered more proof of AL-HARAMAIN using its humanitarian image as a cover for terrorism. A Bosnian intelligence report explains how investigators discovered that AL-HARAMAIN's financial records from 1994 through 1998 had been destroyed and that $1.59 million dollars had been inexplicably withdrawn from the charity between 1999 and 2001.  The Bosnian intelligence report about the March 2002 raids also stated: "We believe that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism."  In 2001, the Saudi-based AL-HARAMAIN aided AL QAEDA terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

509.     AL-HARAMAIN's website used to have a direct link to the AL QAEDA site about the Chechan operations (qoqaz.com). The website was one of several AL QAEDA websites, including qoqaz.com, qoqaz.net, and azzam.com (among others) that are part of the AL QAEDA propaganda effort of Azzam Publications. The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut down the sites for their role as an AL QAEDA sponsor, promoter and mouthpiece. FBI Special Agent Robert Walker described qoqaz.net, the English language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of' Complaint Against BENEVOLENCE INTERNATIONAL

FOUNDATION, Inc. and ENAAM M. ARNANOUT. In his Affidavit, Walker stated that

qoqaz.net leverages its relationship with charities:

> In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen. CW-1 has identified Ibn al Khattab as a well-known mujahideen leader with links to OSAMA BIN LADEN. . . The website condemned America...

510.    Shortly after the merger of EGYPTIAN ISLAMIC JIHAD with OSAMA BIN

LADEN's AL QAEDA (see SUDAN allegations, infra), AHMED IBRAHIM AL-NAJJAR,

initially a member of the Egyptian Islamic Jihad, was sent on a new mission to Albania to work

for AL-HARAMAIN. After al-Najjar was deported from Albania to Egypt in 1999, he was

sentenced to death for acts of terrorism. In his testimony, AL-NAJJAR admitted to being a full-

fledged AL QAEDA member who entered Albania with a false passport and who, like many

other AL QAEDA operatives, was engaged in purported humanitarian activities while waiting

for orders to participate in terror activities.  The case of AL-NAJJAR is but one example of a

senior AL QAEDA operative who not only found refuge from authorities with AL-

HARAMAIN, but a platform from which to wage war and promote the use of terror.

511.    AL-HARAMAIN took part in a committee of charitable organizations that formed

the SAUDI JOINT RELIEF COMMITI'EE (or "SJRC"). Along with AL-HARAMAIN, the

SJRC is comprised of the IIRO, WAMY, the SAUDI RED CRESCENT, and the MUSLIM

WORLD LEAGUE, among others. The SJRC has been connected to OSAMA BIN LADEN and

two of his top operatives, WA'EL HAMZA JULAIDAN and Adel Muhammad Sadiq bin Kazem.

The United States Treasury Department has branded JULAIDAN a Specially Designated Global

Terrorist Entity [SDGT], stating that JULAIDAN. is "an associate of Osama bin Laden and a

support of al-Qa'ida terror." AL-HARAMAIN has been able to continue its cooperation with AL

QAEDA for years in large part due to its ostensible appearance as a humanitarian organization.

512.    In the United States, AL-HARAMAIN has three business entities in Ashland,

Oregon: AL-HARAMAIN FOUNDATION, and AL-HARAMAIN Islamic Foundations. All

three of these separately filed businesses are at the same address and under the same

management. These three businesses are one and the same as AL-HARAMAIN' s headquarters

in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL

AL-AQEEL and MANSOUR AL-KADI, are the Secretary General and Deputy General,

respectively, of the Riyadh office. The AL-HARAMAIN branch in Ashland, Oregon, is

specifically linked to AL QAEDA operations.

513.    AL-HARAMAIN Ashland states in its year 2000 Form 990 that it operates an

Islamic center in Springfield, Missouri. Corporate records reveal that AL-H.ARAMAIN owns

property in Springfield, Missouri.

514.    AL-HARAMAIN has been implicated as providing funds for the bombing of a

night club in Bali in 2002. AL-HARAMAIN continues in its illicit pattern of conduct in

sponsoring acts of international terrorism.

515.    During an interrogation conducted by United States authorities at the United

States Air Force base in Baghram, Afghanistan, on May 23, 2002, Umar Faruq, senior AL

QAEDA representative in Southern Asia, confessed that AL-HARAMAIN was the main

financial mechanism for funding terrorists operations in the region, through its Indonesian office

director in Jakarta, Ahmed al-Moudi. The AL-HARAMAIN organization is said to have planned

terrorist attacks in Indonesia.

Al Haramayn was the funding mechanism of all operations in Indonesia. Money was laundered through the foundation by donors from the Middle East. Money was given to [him] to al Haramayn's branch in Jakarta, which he said is connected to Kompak [Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakvah Islamiyah organization, Islamic Propagation Council in Indonesia]. The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [Director of Kompak]. Faruq was given orders by Rasbid [al-Qaida senior officer] to get money transferred to the foundation's office in Jakarta through Ahmed al-Moudi [head of al Haramayn 's office in Jakarta].

516.    UMAR FARUQ further stated that AL-HARAMAIN received money from a Saudi Sheikh (Sheikh Bandar), who heads the AL-HARAMAIN ISLAMIC FOUNDATION in Saudi Arabia according to Faruq.  Sheikh Bandar gave $99,000 to Faruq to give to Al Moudi. Faruq said SHEIKH BANDAR was the head of AL HARAMAIN in Saudi Arabia.

517.    Furthermore, during a custodial interview on September 9, 2002, UMAR FARUQ stated that terrorist operations of JEMAAH ISLAMIYA, founded by Abu Bakar Bashir and directed by his top commander defendant NURJAMAN RIDUAN ISMUDDIN AKA HAMBALI, an defendant MOHAMMED IQBAL ABDURRAHMAN a/k/a Abu Jibril, were funded by donations channeled through AL HARAMAIN ISLAMIC FOUNDATION. JEMAAH ISLAMIYA is an Islamic extremist group closely associated with AL QAEDA. Its terror activities with AL QAEDA included planning the Bojinka attack, a foiled attempt to bomb 12 American airliners traveling over the Pacific, and cooperation in the bombing of the USS Cole in 2000. HAMBALl is also believed to have arranged a meeting of September 11 hijackers with other AL QAEDA members in Malaysia in 2000:

AL QAEDA encourages Basyir's [Abu Bakar Bashir] goal to spark a religious civil war in Indonesia in order to achieve his vision of a pure Islamic state under Islamic law. Basyir's plan of training jihadists and massing weapons and ammunition has been coordinated with Rashid, a senior lieutenant of Osama bin Ladin.

> Rashid also acts as a representative of a committee of Gulf-state
> sheiks who are Al Qa'ida financiers and who have committed ample
> funds, weapons, ammunition and computers to support this war.
> Funds are channeled through the Al-Haramain NGO.

518.    AI-HARAMAIN is engaged in unlawful aiding, abetting, conspiring with and

offering material support to AL QAEDA which constitutes an unlawful pattern of conduct, illicit

scheme and enterprise.


AL-BARAKAAT AND JUMALE

519.    The AL-BARAKAAT GROUP OF COMPANIES SOMALIA LIMITED and

BARAKAAT GROUP OF COMPANIES (BARAKAAT) encompass a money transfer network

with operations in 40 countries. These companies were founded in 1989 by SHEIKH AHMED

NUR ALI JUMALE, who controls the activities of the BARAKAAT.  Defendant BIN LADEN,

a friend of JUMALE's from the Afghanistan-Soviet war made a significant investment in

BARAKAAT. United States Under Secretary for International Affairs John B. Taylor has

described BARAKAAT as a premier financial transfer system for AL QAEDA:


> The founder of the organization, Sheikh Abmed Nur Ali Jumale has
> close links with Osama bin Laden and has used al Barakaat to
> facilitate the financing and operations of Al Qaida and other
> terrorist organizations.

Treasury Secretary O'Neill corroborated BARAKAAT funding of AL QAEDA:

> The al Barakaat companies are the money movers, the
> quartermasters of terror. At core, it is a hawala conglomerate
> operating in 40 countries around the world with business ventures in
> telecommunications, construction, and currency exchange. They are
> a principal source of funding, intelligence and money transfers for
> bin Laden.

520.    Defendant JUMALE was able to penetrate the United States banking system

using his BARAKAAT companies. Upon information and belief, during the 1990s and in 2000

and 2001, the BARAKAAT financial network moved over $300-$400 million per year in its worldwide network, an estimated $15 to $20 million is believed to have gone to AL QAEDA. BARAKAAT also donated a portion of its commissions to AL QAEDA. From 1979 to 1986, JUMALE worked in Jeddah, Saudi Arabia as a senior employee of the SAUDI AMERICAN BANK. The bank was founded by Citibank, which owned 40% of it at the time he worked there. The United States government designated BARAKAAT and its branches as terrorist entities on November 7, 2001, and froze the organization's assets. Two of the United States branches - in Boston, MA, and Alexandria, VA - were accused of racketeering and conspiracy respectively to avoid reporting financial transactions. The members of the Alexandria branch have pled guilty. All of the BARAKAAT group of companies are co-conspirators, aiders and abettors, material sponsors of AL QAEDA, BIN LADEN and international terrorism.

SAUDI AMERICAN BANK

521.   SAUDI AMERICAN BANK is based in Riyadh, Saudi Arabia, and was formed in 1980 pursuant to a royal decree to take over the then existing branches of Citibank in Riyadh and Jeddah, Saudi Arabia. Citibank opened its Jeddah branch in 1955 and its Riyadh branch in 1966. SAUDI AMERICAN BANK was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970's under which all foreign banks were required to sell majority equity interests to Saudi nationals.

522.   SAUDI AMERICAN BANK started operations on July 12, 1980, based in Riyadh. The SAUDI AMERICAN BANK is chaired by Abdulaziz Bin Hamad Al Gosaibi. Khalil A. Kordi and Rashid M. Al. Romaizan are among the directors of the bank. The SAUDI AMERICAN BANK is the second largest bank in Saudi Arabia.

523.   The SAUDI AMERICAN BANK has offices in the United States based in New York. The Chairman of the bank is ABDULAZIZ BIN HAMAD AL GOSAIBI who was born in 1923 and is also Chairman of the Saudi Cement Company in Damman, Saudi Arabia. The Saudi

Cement Company shareholders include Defendant OMAR SULAIMAN AL-RAJHI. The

SAUDI AMERICAN BANK is also the main banker of Arab Cement Company. The company is

owned by AL RAJHI Group and SAUDI BIN LADEN GROUP. Arab Cement Company is

managed by several other Defendants including KHALID BIN SALIM BIN MAHFOUZ and

Mohammed Bin Laden.


524.    The SAUDI AMERICAN BANK is the official correspondent of the al Baraka

Bank Lebanon, based in Beinit and chaired by Defendant SALEH ABDULLAH KAMEL. The

SAUDI AMERICAN BANK has maintained a partnership with al Baraka financial system since

its beginning.


525.    The SAUDI AMERICAN BANK serves as the bank for the Dallah AL BARAKA

Group, named as Defendant herein and chaired by DEFENDANT SALEH ABDULLAH

KAMEL. The SAUDI AMERICAN BANK is close to the Saudi Bin Laden family, and appears

on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the

Bin Laden family including BAKR BIN LADEN and Mohammed Bin Laden.

526.    SAUDI AMERICAN BANK financed these Sudanese projects, described above,

by directly providing material support and assistance to OSAMA BIN LADEN. Indeed, SAUDI

AMERICAN BANK was the main banker of the Saudi Bin Laden Group and Bin Laden

Organization with respect to Sudanese operations. SAUDI AMERICAN BANK is also the

Riyadh correspondent of AL FAISAL ISLAMIC BANK, which is managed by Defendant

PRINCE MOHAMMED AL FAISAL AL SAUD. AL FAISAL ISLAMIC BANK has facilitated

AL QAEDA terrorist operations as detailed above. The SAUDI AMERICAN BANK is also the

main correspondent in Riyadh for a branch of AL SHAMAL BANK, a branch of DMI Trust

based in Nassau, involved in the financing of AL QAEDA.

527.     In year 2000, the SAUDI AMERICAN BANK participated in the fund raising

campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising"

(Intifada) by providing a bank account and facilities to receive donations for a committee of

charity organizations including Defendants WAMY, IIRO and AL HARAMAIN

FOUNDATION.


MERCY INTERNATIONAL RELIEF AGENCY

528.     The Saudi-backed Mercy International Relief Agency (a/k/a MERCY

INTERNATIONAL, a/k/a MERCY) (or "MIRA") was incorporated in Dublin, Ireland in 1992

with the ostensible purpose of embarking on Muslim charitable activities around the world. All

the shareholders of the charity are all of Saudi nationality and listed their address at Makkah,

Saudi Arabia. MIRA also has branches in Somalia and Kenya. Its Dublin branch dissolved on

January 16, 1998.

529.     During the trial and conviction of OSAMA BIN LADEN's personal secretary

WADIH EL-HAGE, for his role in the 1998 United States Embassy bombings in East Africa,

WADIH EL-HAGE's testimony before a grand jury established that MIRA was funded by "Saudi

merchants":

> "Q.     The grand jury had a couple of quick questions one of
> which is who funds the Mercy International relief agent in Kenya?
> "A.     Some Saudi merchants in Saudi Arabia.
> "Q.     Merchants in Saudi Arabia?
> "A.      Yes

530.     An AL QAEDA member further maintained that MIRA was also an AL QAEDA

sponsor. L'Houssaine Kherchtou, a 36-year old Moroccan, joined AL QAEDA in 1991. He

affirmed this in his testimony as a government witness in the United States Embassy bombings

trial. He worked for AL QAEDA in Kenya, and noted specifically that MIRA served and

sponsored AL QAEDA's activities. In his testimony, Kherchtou asserted that several AL

QAEDA members were workers at MIRA, received identity cards from MIRA, and that the

organization was dealing directly with OSAMA BIN LADEN himself:

> Q.      And during the time that you were in Nairobi were you familiar with a charity or relief organization known as Mercy International Relief Organization?
> A.      Yes.
> Q.      And were there any AL QAEDA people affiliated with the Mercy International Relief Organization?
> A.      Let me just.
> (Witness consults with interpreter)
> A.      Yes, the people of AL QAEDA they were dealing with the Mercy International.
> Q.      Who were those people? Which AL QAEDA people were dealing with Mercy International?
> A.      Bin Laden, Mohammad Masry.
> Q.      Are you talking about the military commander?
> A.      Yes.
> Q.      Abu Mohamimad, are you talking about Saleh lay again?
> A.      Yes.
> Q.      Were there any people inside Mercy International who were part of AL QAEDA in the past or the present?
> A.      Well, in the past Abu Jamal he was the manager of that relief agency but he was in the past of AL QAEDA.
> Q.      You said Abu Jamal?
> A.      Yes.
> Q.      Anyone else in Mercy International who was a member of AL QAEDA in the past or while in Kenya?
> A.      The accountant of Mercy International, too, he was of AL QAEDA but in the past his name Abu al Kheryemeni.
> Q.      Did you ever see any AL QAEDA members in Kenya who had identification cards in the Mercy International Relief agency?
> A.      No.
> Q.      Did you ever hear whether or not AL QAEDA members in Nairobi obtained identification cards from Mercy International Relief agency?
> A.      Yes.
> Q.      Who did you hear obtained those cards?
> A.      I heard that Abu Mohammed Amriki and Bin Laden they had identity card.

531.    MIRA's Kenya Office served as a front for AL QAEDA. Like many OSAMA

BIN LADEN fronts, MIRA was an operating charity. The organization may have embarked upon

actual charitable work, but only as a cover for their insidious goals. Following the Embassy

bombings, federal authorities raided the offices of MIRA in Kenya on August 21, 1998, after

finding MIRA documents in Wadih el-Hage's residence. At MIRA's office, agents discovered

documentary evidence linking it to OSAMA BIN LADEN.

532.    Some of the documents seized belonged to WADIH EL-HAGE and concerned

Abu Ubaidah, a top AL QAEDA leader who died in 1996. At the Embassy bombing trial in New

York Assistant U.S. Attorney ("AUSA") Patrick Fitzgerald stated:

> When they searched Mercy International, they found a number of
> documents, included among which Wadih El Hage's files and files
> concerning Abu Ubaidah.

533.    Documents found on site indicated that MIRA was smuggling weapons into

Kenya from Somalia. AUSA Fitzgerald noted that authorities found a receipt dated July 24,

1998, on the back of which stated it was related to getting weapons from Somalia.

534.    FBI Special Agent John Michael Anticev interviewed Mohammed Odeh, who

was convicted for his role in the 1998 Embassy bombings. Mr. Anticev testified that Mohammed

Odeh explained to him that MIRA was working for AL QAEDA.

> Q.      Did Odeh talk to you at all about an entity known as the
> Mercy International Relief Agency?
> A.      Yes.
> Q.      What did he tell you about the Mercy International Relief
> Agency?
> A.      That was also -- it was run by a guy in Nairobi named
> Tawhili, and that organization had ties to AL QAEDA, and Harun
> and Abu Ubaidah al Banshiri were close to that organization.

535.    The individual referred to above as Tawhili is also known as Sheikh Ahmad alem

Suweidan, one of the FBI's most wanted terrorists. Therefore, a fugitive AL QAEDA member

ran MIRA at all relevant points up to the Embassy bombings. Special Agent Anticev further

testified that Harun, WADIH EL-HAGE's former roommate who also worked for AL QAEDA,

frequented MIRA, typing information for top AL QAEDA leadership:

> Q.      Did Odeh describe to you any particular tasks that Harun
> performed for AL QAEDA?
> A.      Yes. Harun, he said that Harun was a good typist, and, you
> know, he spent a lot of time at MIRA, the organization we just
> talked about, and he would type reports for the hierarchy in AL
> QAEDA.
> Q.      And when you said MIRA, MIRA, are you referring to the
> Mercy International Relief?
> A.      Yes, Mercy International Relief.
> Q.      Did Odeb indicate to you what was contained in those
> reports that he typed for the hierarchy?
> A.      In those reports they were using certain code words to
> conceal what their true intentions were.

536.    An AL QAEDA fugitive was deeply involved in MIRA's branch in Dublin.

Hamid Aich (or "Aich"), an Algerian who lived in Ireland and volunteered at the MIRA branch

in Dublin, was heavily involved in the 2000 bomb plot to destroy Los Angeles International

Airport (LAX). Shortly before moving to Ireland, Aich was a roommate of Ahmed Ressam, the

man currently in jail for his role in the LAX bomb plot. On December 21, 1999, Aich was

arrested by Irish authorities, seizing several personal papers and computer documents, though he

was released shortly afterwards, while FBI agents were traveling to interrogate him. Aich fled

and went into hiding, and his current whereabouts are unknown.

537.    Documents found in MIRA's branch in Dublin link the charity to ZACARIAS

MOUSSAOUI. Travel documents found in a raid at a flat which served as one of MIRA's offices

in Dublin are linked to forged documents used by alleged 20th hijacker, ZACARIAS

MOUSSAOUI, who has been criminally charged in the September 11, 2001 attacks. The

documents relate to air travel financed by MUSTAFA MUHAMMED AHMAD a/k/a Shaykh

Sai'id a/k/a Mustafa Ahmed AI-Hasawi an alleged paymaster of September 11th. The documents

show that MOUSSAOUI's travel was financed by MUSTAFA MUHAMMED AHMAD. FBI

agents maintain that the evidence found at MIRA's office "proves 'without a shadow of a doubt' that Moussaoui is linked to Osama bin Laden."

538.    Dr. Safar Alhawali, Dr. Soliman Alsaloomi, Dr. Mohamed Said Alghtani (a/k/a Alghatani, AI-Qohtany), Dr. Abdallah Aldomaiji (a/k/a Aldonaji), Abdalaziz Farsi, Faisal Alahmadi, and Waheed Almasry were co-conspirators, aiders and abettors, agents of MIRA and material sponsors of international terrorism.

AL WAFA


539.    The AL WAFA ORGANIZATION a/k/a Wafa Humanitarian Organization; a/k/a Wafa Al-Igatha Al Islamic charity was headed by Saudi citizen SHEIKH ABO ABDUL AZIZ NAGI, a high ranking AL QAEDA official who was captured in Afghanistan in December 2001. Upon information and belief, while part of the organization provided money for humanitarian projects, much of the money was diverted to AL QAEDA. AL WAFA was also instrumental in providing AL QAEDA with arms, supplies and logistical support in Afghanistan before and after September 11, 2001. AL WAFA and AZIZ NAGI have been designated as terrorist co-conspirators and have had their assets frozen.

MISCELLANEOUS INTERNATIONAL SPONSORS

AL TAQWA AND NADA MANAGEMENT ORGANIZATION

540.    In the late 1980s, the leaders of the Muslim Brotherhood formed financial management firms and banks called AL TAQWA ("Fear of God"), dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government. Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the AHMED IDRIS NASREDDIN, a/k/a NASREDDIN AHMED IDRIS, AKIDA BANK PRIVATE LIMITED a/Ida AKIDA ISLAMIC BANK, INTERNATIONAL LIMITED a/k/a IKSIR INTERNATIONAL BANK LIMITED, AKIDA COMMODITY LIMITED, AKIDA INVESTMENT COMPANY LIMITED, AKIDA MANAGEMENT AND

TRUST a/k/a AKIDA ISLAMIC BANKERS' TRUSTEE AND MANAGEMENT, ALI

GHALEB HIMMAT, AL TAQWA TRADE PROPERTY AND INDUSTRY COMPANY

LIMITED, a/k/a AL TAQWA TRADE PROPERTY AND INDUSTRY ESTABLISHMENTS

a/k/a HIMMAT ESTABLISHMENT, AL TAQWA ZAKA ESTABLISHMENT, ARMAND

ALBERT FRIEDRICH HUBER a/k/a AHMED HUBER, ASAT TRUST REGISTERED,

BANK TAQWA FOR COMMERCE AND REAL ESTATE COMPANY LIMITED, a/k/a

BANK TAQWA FOR COMMERCE AND REAL ESTATE ESTABLISHMENT, a/k/a BEN M.

NADA ESTABLISHMENT, a/k/a YOUSSEF M. NADA ESTABLISHMENT, BANK AL

TAQWA LIMITED, a/k/a AL TAQWA BANK, CEMSTEEL IMPEX ESTABLISHMENT,

GULF CENTER S.R.L, IKSIR LIMITED HOLDING, MIGA-MALAYSIAN SWISS, GULF

AND AFRICAN CHAMBER, a/k/a CAMERA DI COMMERCIO, INDUSTRIA E TURISMO

PER GLISTATI ARABI DEL GOLFO E LA SVIZZERA, MOHAMED MANSOUR, a/k/a

MOHAMED AL-MANSOUR, NADA INTERNATIONAL ANSTALT, a/k/a NADA GROUP

INTERNATIONAL ANSTALT, NADA MANAGEMENT ORGANIZATION SA, a/k/a AL

TAQWA MANAGEMENT ORGANIZATION, NASCO BUSINESS RESIDENCE CENTER

SAS DI NASREDDIN AHMED IDRIS ED, NASCO NASREDDIN HOLDING SA,

NASCOSERVICE S.R.L, NASCOTEX S .A., a/k/a INDUSTRIE GENERALE DE FILATURE

ET TISSAGE, a/k/a INDUSTRIE GENERALE DE TEXTILE, NASREDDEN CHARITABLE

FOUNDATION, NASREDDI'N COMPANY NASCO SAS DI ARMED IDRIS NASSREDDIN

EC, NASREDDIN FOUNDATION, a/k/a NASREDDIN STIFTUNG, NASREDDIN GROUP

INTERNATIONAL HOLDING LIMITED, NASREDDIN INTERNATIONAL GROUP,

LIMITED HOLDING a/k/a MIDDLE EAST AND TURKEY INVESTMENT HOLDING

LIMITED, RAW MAT SERVICE AND MANAGEMENT SA, YOUSSEF MUSTAFA NADA,

YOUSSEF M. NADA ESTABLISHMENT, a/k/a YOUSSEF M. NADA ANSTALT, YOUSSEF

M. NADA & CO. GESELLSCHAFT MBH, ZEINAB MANSOUR a/k/a ZEINAB MANSOUR

FATTOUH.

60573

541.     Upon information and belief, the AL TAQWA GROUP has financed and

laundered money for Arab and Islamic political and militant groups including Algerian Armed

Islamic Group (GIA) and the Egyptian Gama'a al-Islamiya, Islamist terrorist groups with links to

BIN LADEN and his AL QAEDA organization. Additionally, international investigations

indicate that AL-TAQWA was facilitating the movement of BIN LADEN's money around the

world in the late 1990s, a task made easier because its complex structure is designed to prevent

scrutiny of its operations.


542.     AL-TAQWA was founded by YOUSSEF M. NADA and AHMAD I.

NASREDDIN, a/k/a Hadj Ahmed Nasreddin, AHMED IDRISS NASREDDIN, and its other

principals are: ALI G. HIMMAT, AHMED HUBER and MOHAMED MANSOUR. HUBER

and MANSOUR are senior members of the Muslim Brotherhood. Shortly after the 1998 AL

QAEDA embassy bombings, U.S. intelligence agencies tracked telephone contact between AL-

TAQWA and members of BIN LADEN's inner circle along with ALBERT "AHMED" HUBER,

a convert to Islam in the 1960s who has publicly expressed support for AL QAEDA. HUBER

has acknowledged the very active funneling of money from oil wealthy Saudi families to the AL

TAQWA BANKS. NASREDDIN is also a AL-TAQWA founding member and bank shareholder

who helped finance the creation of the ISLAMIC CULTURAL INSTITUTE OF MILAN, which

follows the violent teachings of convicted terrorist OMAR ABDEL RAHMAN. The Institute

was frequently visited by known AL QAEDA terrorists. Upon information and belief, the

Institute is known in Western intelligence communities as one of the main AL QAEDA stations

in Europe and was used to move weapons, men and money around the world.


543.     ALI GHALEB HIMMAT, AHMED HUBER, MOHAMED MANSOUR,

ZEINAB MANSOUR-FATTOUH, AHMED ALI JUMALE, AHMAD I. NASREDDIN AND

YOUSSEF M. NADA (a/k/a Youssef Mustafa Nada) are aiders, abettors, material sponsors and/or co-conspirators of international terrorism.

544.    After September 11, 2001 AL TAQWA changed his name to the NADA MANAGEMENT ORGANIZATION, SA in an attempt to avoid scrutiny. AL TAQWA and the NADA group, as well as their four principals - NADA, HIMMAT, HUBER and MANSOUR, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of AL QAEDA.

RABITA TRUST

545.    RABITA TRUST is a charitable organization which was created to organize the repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in 1988, the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the MUSLIM WORLD LEAGUE. RABITA TRUST received the majority of its funding from the MWL and the Saudis, and has been involved with terrorism.

546.    RABITA TRUST was initially granted 250 million Royals from the Pakistani government as well as 50 million Royals from the MWL to help relocate some 250,000 displaced Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed to relocate a few hundred Biharis.

547.    RABITA TRUST is an AL QAEDA front, and the Head of RABITA TRUST is a known AL QAEDA member. A Treasury Department press release issued when RABITA TRUST 's assets were frozen indicated that:

> Rabita Trust is headed by Wa'el Hamza Julaidan, one of the founders of al-Qaida with bin Laden. He is the logistics chief of bin Laden's organization and fought on bin Laden's side in Afghanistan.

548.    According to a biography of Bin Laden and the original members of AL QAEDA noted for its accuracy and clarity, the head of RABITA TRUST, WA'EL JULAIDAN, fought alongside OSAMA BIN LADEN and championed his cause. The biography, written by a fellow compatriot of bin Laden, noted how AL QAEDA' s key founders fought against the Soviets in Afghanistan during the Soviet-Afghan war of the 1980s.

> One of the men who led the Arab Afghan Jihad forces came from one of the wealthiest Saudi families; he was influenced by the Afghan struggle, who would live together with them and sacrifice everything for the Afghani jihad. This man was Osama Bin Laden, a young, tall man who followed Dr. Abdullah Azzam to fight in Afghanistan. Another Saudi joined together with them; his name was Wa'el Julaidan, a US student who was studying agriculture and left to fight jihad in Afghanistan. These three: Osama Bin Laden (a.k.a. 'Abu Abdallah'), Dr. Abdullah Azzam (a.k.a.. Abu Muhammed), and Wa'el Julaidan (a.k.a. Abu Al-Hassen al-Madani), gathered together in December 1979 to create the new Islamic revolution in Afghanistan. Accordingly, Julaidan was branded a Specially Designated Global Terrorist Entity by the United States Treasury Department and his assets have been frozen.

549.    RABITA TRUST is the sibling organization of the IIRO as they are both subsidiaries of the MWL.

550.    RABITA TRUST is connected to the SAAR network (see above), through two officers, Dr. Abdullah Omar Naseef and Abdullah al-Obaid.

551.    On October 12, 2001, President George W. Bush's Executive Order designated Defendant RABITA TRUST as a Specially Designated Global Terrorist Entity and the Treasury Department froze its assets. Its chairman is Defendant ABDULLAH OMAR NASEEF who founded the Defendant RABITA TRUST in July 1988.

552.    Abdullah Omar Naseef ( or "Naseef") also served as Secretary-General of the MWL during the time he created RABITA TRUST and has attempted to spread MWL offices around the world. Part of his global efforts are found in his involvement in a SAAR network charity. Naseef is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization. A second shared executive is the Vice-Chairman of the Board of Trustees of RABITA TRUST, ABDULLAH AL-OBAID, who is also an officer at two of the SAAR network businesses that were raided, the MWL and Sanabel al-Kheer. Defendant ABDULLAH OMAR AL-OBAID is unique in that not only is he an officer at the MWL and the SAAR Network, but he is also the Deputy General Manager at one of the al-Rajhi's largest businesses, AL-WATANIA POULTRY in Saudi Arabia. AL-WATANTA POULTRY has branches worldwide and in the United States.

THE GLOBAL RELIEF FOUNDATION

553.    The GLOBAL RELIEF FOUNDATION (or "GRF") was incorporated in January 1992 in Illinois. According to its website, GRF "is a non-profit humanitarian organization working to provide care, support and relief to people in need throughout the world."

554.    GRF is active all over the world, providing relief for several countries, including the United States, Afghanistan, Kosova, Lebanon, Bosnia, Kashmir, Turkey, and Chechnya, among others. GRF has branches of its organization, aside from Bridgeview, Illinois, located in Belgium, Yugoslavia, and Serbia.

555.    In 2000, GRF's name appeared on a list being circulated by the government of charities allegedly funding terrorism. On December 14, 2001, federal authorities raided the offices of the Global Relief Foundation as well as the residences of several of its directors. Simultaneously, the United States Treasury froze GRF's assets. A spokesman for the Treasury Department noted that GRF is aiding terrorism:

> There was coordinated action to block the assets, because this
> group is suspected of funding terrorist activities.

556.    The Treasury spokesman added that the public's safety was at risk if GRF were

allowed to continue to operate:

> This extraordinary action was taken because it's relevant to the
> health and safety of the American public.

557.    On the same day as the raids in the United States, the NATO-led task force named

the Kosova Force (KFOR) stormed two GRF offices in Yugoslavia and Serbia. A statement from

KFOR explaining the raids detailed why:

> This afternoon KFOR soldiers, working in close cooperation with
> UNMIK-Police, carried out a coordinated search operation on the
> offices of the Global Relief Foundation in Pristine/Pristina and
> Dakovice/Dakovica, after receiving credible intelligence
> information that individuals working for this organization may have
> been directly involved in supporting worldwide international
> terrorist activities.

558.    This action was an orchestrated element of a worldwide operation coordinated

with governments and law enforcement agencies against the offices of the Global Relief

Foundation and other organizations suspected of supporting international terrorists.

559.    GRF by and through its agents has engaged in the planning of attacks against the

United States:

> The Global Relief Foundation is a worldwide, US based Non-
> Governmental Organization (NGO), which has headquarters in
> Chicago, Illinois, USA and a European Headquarters in Brussels,
> Belgium. It is suspected of supporting worldwide terrorist activities
> and is allegedly involved in planning attacks against targets in the
> USA and Europe.

560.     The head of the GLOBAL RELIEF FOUNDATION branch in Belgium received over $200,000 from MUHAMMED GALEB KALAJE ZOUAYDI (a/k/a Abu Talha) (or "ZOUAYDI"), a high level AL QAEDA financier. ZOUAYDI, who was arrested by Spanish authorities on April 23, 2002, is a brother-in-law of OSAMA BIN LADEN. A top financier for AL QAEDA, he also served as one of the original terrorists who fought with OSAMA BIN LADEN and the other original founders of AL QAEDA.

561.     On October 12, 2001, the United States Treasury froze the assets of Jam'yah Ta'awun Al-Islamia (Society of Islamic Cooperation) and branded it a Specially Designated Terrorist Entity. According to the Treasury, the Society of Islamic Cooperation is headed by ZOUYADI, who is also an explosives expert. Based in Kandahar City, United States Treasury department officials allege that the organization was founded by OSAMA BIN LADEN in early 2001.

562.     ZOUYADI was closely connected to the AL QAEDA cell in Germany that participated in the September 11, 2001 attacks. ZOUYADI also sent money to MAMOUN DARKAZANLI, who had his assets frozen as well as the assets of a company he controlled MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY and both were designated a terrorist entity by the United States government shortly after September 11, 2001. DARKAZANLI is suspected of being a key AL QAEDA point man in Europe, as is described in more detail infra.

563.     GRF's offices have also been raided in Yugoslavia and Serbia as part of international investigations into GRF's support of terrorism. On at least one occasion, ZOUAYDI transferred 231,664 euros to the head of GRF's Belgium arm, Nabil Sayadi, who is also linked to OSAMA BIN LADEN.

564.     Documents provided by the United States government in defense of its freezing of GRF's assets indicate that known AL QAEDA terrorist WADIH EL-HAGE was in direct contact with GRF officials while he was planning international terrorism attacks. Specifically, the government noted in its supporting documents that the FBI reported that evidence introduced at EL-HAGE's trial demonstrated that, in the late 1990s. GRF maintained communications with WADIH EL-HAGE.

565.     Furthermore, the government indicated:

> At the time, el Hage was in contact with GRF, he resided in Kenya, and played an "active role" in an AL QAEDA terrorist cell operating there....

566.     During this same period, 1996 and 1997, EL-HAGE was also in contact with GRF offices in Belgium and Bridgeview, Illinois. In particular, documents recovered in a search in Kenya showed that EL-HAGE was in contact with GRF in Bridgeview, Illinois after returning from a visit with AL QAEDA leadership in Afghanistan in February 1997.

567.     Evidence provided by the government in freezing GRF's assets corroborates GRF's promotion of martyrdom to kill the "enemies of Islam." The government assessed:

> Newsletters distributed by GRF and published in 1995 by the Central Information News Agency Network (CINAN), which, like GRF, is operated via a Bridgeview post office box, encourage "martyrdom through JIHAD." The newsletters, written in Arabic and translated by the FBI, include an article soliciting funds for the Bosnian relief effort to assist those suffering from the prolonged agony due to atrocities imposed by the "enemies of Islam." The article refers to the Jihad (struggle) that should be carried out by Muslims and states: "It seems that the Prophet (Mohammad) had linked religion with JIHAD. So when do we awake? When can we take revenge for God and his religion? When can we rise to defend our rights and self respect?" The article continued, "God had equated martyrdom though JIHAD with supplying funds for the

JIHAD effort," and concluded, "All contributions should be mailed to: GRF."

568.    GRF newsletters implored individuals to donate money to their organization for the purposes of buying weapons. The government explained:

> Other GRF newsletters and publications encourage readers to give their Zakat, or charitable tithe, to GRF to assist in the purchase of, inter alia, weaponry. "[F]or God's cause (the Jihad, they [the Zakat Funds] are disbursed for equipping the readers for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word and protect the gaps...." The article concluded by exhorting Muslims "to make the Global Relief Foundation your messenger of goodness, and we will, God willing, disburse it as specified in Bosnia, Kashmir, Afghanistan, Tajikistan, and Lebanon."

569.    Since GRF's assets were blocked, information gathered about GRF, according to the government, has only reaffirmed that GRF works closely with and in support of terrorist organizations:

> In addition to this unclassified evidence, the classified material gathered since the date of the blocking has greatly amplified OFAC' s [Office of Foreign Asset Control] belief that GRF may have acted in concert with, and in support of, terrorists and terrorist entities.

570.    Several photographs obtained at GRF's offices in Chicago indicate that GRF used its humanitarian cover as means to send expensive communications equipment abroad. The government described what exactly was found during the raids on GRF's offices:

> A set of photographs and negatives discovered at GRF's Chicago offices indicate types of "humanitarian" supplies that GRE has sent abroad. The photographs display large shipping boxes arrayed under a GRF banner. Other photographs reveal that the boxes contain sophisticated communications equipment: approximately 200 handheld radio transceivers, long range radio antennas, and portable power packs, with an estimated total value of $120,000. Arrayed near the communications equipment are a tool kit, a box of Bushnell binoculars, saddles, and ropes.

571.    Other photographs found in the raids indicate that GRF had an specific interest in munitions:

> Other photographs in this same set depict fighters armed with automatic rifles, a sand-bagged bunker with a radio mounted outside, and mutilated corpses with the name "KPJ" (Kashmiri Press International) printed alongside. Finally, one photograph displays two dead men with the caption "HIZBUL MUJAHIDEEN," a known terrorist organization operating in the Kashmir region between India and Pakistan. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government."

572.    Mohammed Chehade, Rabih Haddad, Hazem Ragab, and Mohammed Alchurbaji are aiders, abettors, agents, sponsors and/or co-conspirators of the GLOBAL RELIEF FOUNDATION.

TAIBAH INTERNATIONAL AID ASSOCIATION

573.    TAIBAH INTERNATIONAL AID ASSOCIATION (or "Taibah") is a charitable organization headquartered in Falls Church, Virginia. Established in 1991, Taibah's IRS Form 1023, which serves as an application to the United States Government for tax exempt status, lists ABDULLAH A. BIN LADEN, OSAMA BIN LADEN's half- brother, as a founding officer. The same form also lists TAIBAH's stated goals as a humanitarian organization.

574.    From its headquarters in the United States, TAIBAIR has a presence around the world through offices, mosques, and educational centers in the following countries: Albania, Bosnia-Herzegovina, Bulgaria, Gargizia, Kazakhistan, Kosova, Ozpakistan. Russia, Shofishia, Tajikistan and Tataristan, among others.

575.    Despite a well developed website, TAIBAH does not solicit funding through this channel. According to its IRS Form 1023, TAIBAN relies on fundraising trips to the Middle East and mailings sent to Muslims in the United States for its revenue. As a result, roughly half of the United States arm of TAIBAH INTERNATIONAL's revenue comes from Saudi Arabia. On its

year 2000 IRS Form 990, TAIBAH lists a four year aggregate contribution of nearly $150,000

dollars in fund raising from Saudi Arabia. Also, TAIBAH's Bosnian branch relies on Saudi

Arabia for funding. The Saudi Arabian SAUDI HIGH COMMISSION has been identified by

Bosnian intelligence as a source of TAIBAH's funds.

576.     Although it purports to be a humanitarian organization, the TAIBAH

INTERNATIONAL AID ASSOCIATION furthers the aims and materially supports OSAMA

BIN LADEN and AL QAEDA. Through the actions of its agents, officers and employees,

TAIBAH has provided financial and material support to AL QAEDA. The strong affiliation that

TAIBAH maintains with many other AL QAEDA front-groups demonstrates its place as a highly

connected component of OSAMA BIN LADEN's financial and logistical support network.

577.     TIABAH's support of international terrorism and AL QAEDA is ongoing. One of

the individuals involved in the October 2001 threat to the American and British Embassies in

Bosnia was Mustafa al-Kadir, who was granted Bosnian citizenship based on his employment

with Taibah INTERNATIONAL. Al-Kadir was still working with Taibah at the time of this

foiled terrorist attack and ensuing arrests.

578.     The NATO Secretary-General, George Robertson, stated that at least one of the

five arrested Algerians (in Bosnia in October 2001) had direct links with AL QAEDA and

OSAMA BIN LADEN. The leader of the group, BENSAYAH BELKACEM, has been identified

as a top AL QAEDA lieutenant. In October 2001, BELKACEM was arrested at his apartment in

Zenica, Bosnia where authorities found phony passports and a mobile telephone listing for ABU

ZUBAYDAH, AL QAEDA's third-in-command. According to phone transcripts, BELKACEM

was also in phone contact with AL QAEDA military commander Abu al-Maid.

579.     On December 13, 2001, Bosnian police searched the offices of TAIBAH INTERNATIONAL. Following the raid, an audit and investigation of TAIBAH's financial records was conducted on January 25, 2002. This audit reveals that TAIBAH's financial records were managed in a way that obscured its true financial status. The financial records contained flagrant abuses in TAIBAN's allocation of donations and in the manner its expense accounts were maintained. A March, 2002, Bosnian Intelligence Memo from the Agency for Investigation & Documentation (AID) that summarizes the audit described the illegal management of TAIBAH's funds by its executives:

> It is also noteworthy that large cash sums were withdrawn by management individuals at the organization which were never accounted for by any record of expenditure, and which indicates a wide scope for possible illegal spending of money. It is clear that each of these items is for more than 10 thousand marks.

580.     Other discrepancies noted in the audit were the misuse of automobiles, supplying of fictitious declarations of affiliation and employment, as well as suspicious requests for visas.

581.     Funding for the Bosnian office of TAIBAH originates from bank accounts: at the AL-RAJHI ISLAMIC BANK. The flow of money begins with the AL-RAJHI ISLAMIC BANK in Saudi Arabia, then to TAIBAH via wire transfers through Hypobank in Germany and Commerce Bank in Bosnia. The AL-RAJHI ISLAMIC BANK, its agents, officers, directors, and so-called charities, members of the AL-RAJHI family are significant financial supporters of terrorism as is discussed supra.

582.     In Bosnia, TAIBAH INTERNATIONAL works closely with another AL QAEDA front-group, the charitable organization and Defendant GLOBAL RELIEF FOUNDATION (or GRF). According to the 2002 Bosnian Intelligence Memo, when GRF was initially registered, it operated in Bosnia under the auspices of TAIBAH INTERNATIONAL. TAIBAH's close

working relationship with GRF is in accord with both charities' role as AL QAEDA sponsors and front groups.

583.    The 2002 Bosnian Intelligence Report on non-profit organizations affirms that TAIBAH's Bosnian office received its revenues from another Saudi Arabian charity, the SAUDI RELIEF COMMISSION (a/k/a Saudi High Relief Commission) (or "SRC"). TAIBAH has been implicated in the 1998 United States embassy bombings along with the SRC.

584.    Two officers from TAIBAH INTERNATIONAL's United States branch, SAMIIR SALAH and ABDULRAHMAN AL-AMOUDI (or "al-Amoudi"), play a large role with United States organizations that have come under scrutiny for their ties to AL QAEDA. Both of them are officers of a number of organizations in the SAAR network. ABDULRAHMAN AL-AMOUDI, TAIBAH' s Vice-President, is a past employee of the SAAR Foundation, the hub of the SAAR Network, and currently heads a few SAAR Network charities. AL-AMOUDI also runs the United States operations of the Saudi based IIRO. SAMIR SALAH, TAIBAH's Secretary, serves as a director at many SAAR Network organizations, including CFO at PIEDMONT POULTRY. SAMIR SALAH also managed the Caribbean branch of the BANK AL-TAQWA.

AL RASHID TRUST

585.    The AL RASHID TRUST was established in Pakistan in 1996 at the time the TALIBAN took control in Afghanistan. The trust was established by MUFTI MOHAMMED RASHID (a/k/a Rashid) to carry out welfare projects from fundraising in the Pakistani Muslim Community. The AL RASHID TRUST changed its name to THE AID ORGANIZATION OF THE ULEMA (AOU) following September 11, 2001. This organization remains active and headquartered in Pakistan where it operates offices. Upon information and belief, the Trust provides financial aid to jailed Muslim terrorists around the world and is closely aligned to the TALIBAN and BIN LADEN. THE AL RASHID TRUST has been raising funds for the TALIBAN since 1999. The Trust helped fund radio, newsprint and madrassas (schools) that

teach a view of Islam that is anti-western and endorses violence and martyrdom in the name of Allah. The Trust provided money and logistical support to the TALIBAN and AL QAEDA and has had its assets frozen. Upon information and belief, the group conspired with AL QAEDA and Pakistani terrorists to kidnap, torture and murder Wall Street Journal reporter Daniel Pearl, holding him hostage in a two room hut in the AL RASHID compound.

LAUNDERING OF AL QAEDA FUNDS
THROUGH DIAMOND BUSINESSES

586.    Three of the AL QAEDA members on the FBI's most wanted terrorist list have been discovered to have dealings in the diamond field. Following September 11, 2001, and the increased difficulty AL QAEDA is facing moving its money through its traditional financial channels, AL QAEDA has been converting more of its assets into diamonds. As one European investigator put it:

> I now believe that to cut off AL QAEDA funds and laundering activities you have to cut off the diamond pipeline. We are talking about millions and maybe tens of millions of dollars in profits and laundering.

587.    Yassmine Diamonds in Vereffening BVBA is a diamond company registered in Antwerp, Belgium. Ossailly's relatives are members of the board: Mike Ossailly, or Najla Ossailly, but the company is managed by Samih Ossailly.

588.    Aziz Nassour and Samih Ossailly are both involved in diamonds business in Sierra Leone and Congo on behalf of AL QAEDA leaders in order to continue its terrorists operations despite the international agreements to freeze bank accounts linked to AL QAEDA. According to various investigations conducted on this issue, Samih Ossaily set up a safe house in Monrovia to funnel money from the diamonds fields to international terrorists throughout the world, including AL QAEDA.

587.    Echogem NV, was used as a courier to exchange $300,000 for diamonds every week between December 2000 and September 2001.

60573

589.     Since 1998, Ibrahim Bah, through several Lebanese businessmen based in Belgium, has expanded his operations. Official sources identified the key brokers working with Bah as Aziz Nassour and Samih Ossaily.

590.     A large part of these financial operations on behalf of AL QAEDA were operated by Aziz Nassour through two companies in Belgium: African International Contact Office BVBA based in Brussels, and Echogem NV based in Antwerp.

591.     Echogem is based in Antwerp, Belgium. Until recently, the company was headed by Aziz Nassour as Managing director and Francis Gerres as CEO.

592.     African International Contact Office BVBA is based in Brussels, Belgium. The company is chaired by Aziz Nassour as CEO and Ngalula Tseuhi is Managing Director of the company. Aziz Nassour ran his diamond trading activities with his cousin, Samih Ossaily, CEO of a company based in Brussels called Yassmine Diamonds in Vereffening BVBA. Ossaily is currently detained in Belgium, pending trial.

AFGHAN SUPPORT COMMITTEE (ASC)

593.     The AFGHAN SUPPORT COMMITTEE ("ASC") a/k/a Ahya Ul Turas; Janiat Ayat-Ur-Rhas Al Islamia; Janiat Ihga Ul Torath Al Islamia; Lajnat Ul Masa Eidatul Afghania was established by BIN LADEN in the 1990s in a small town outside Peshawar, Pakistan with offices in Jalalabad, Afghanistan purporting to raise money for charitable works in Afghanistan and Pakistan. Upon information and belief, ABU BAKR AL-JAZIRI and ABD AL-MUSHIN AL-LIBI are the officers of ASC who raise money and distribute it to AL QAEDA terrorists. ASC provided travel and other logistical support to AL QAEDA. The U.S. Treasury has frozen the assets of ASC, AL-LIBI and AL-JAZIR, as they are believed to be AL QAEDA co-conspirators.

SHAYKH SAI'ID

594.    SHAYKII SAI'ID a/k/a MUSTAFA MUHAMMED AHMAD a/k/a MUSTAFA

AHMED AL-HAWSAWI was one of the paymasters for the September 11th hijackers.

Documents show that SAI'ID sent $100,000 from Pakistan to ATTA in the United States. On the

morning of September 11, 2001 in United Arab Emirates SAI'ID receives wire transfers of

$15,000 from three of the 9/11 hijackers, money that they had not been spent prior to their

suicide hijackings. SAI'ID immediately flew from the UAE to Pakistan. SAI'ID's involvement

with BIN LADEN dates back to BIN LADEN'S days operating out of Khartoum, SUDAN.

SAI'ID, a London educated economist controlled BIN LADEN's many Sudanese businesses,

including a financial network called TABA INVESTMENTS that was created with a $50 million

dollar contribution from BIN LADEN. SAI'ID was jailed in 1994 for Islamic based terror

operations in Kashmir but freed in 1999 in exchange for a release of hostages on an Indian

Airlines flight. The aircraft was commandeered in a manner similar to the way the four

September 11th aircraft were hijacked in the United States. A passenger was stabbed and

hijackers seized control of Flight 814 diverting the aircraft to Kandahar, Afghanistan. Though

Afghanistan's TALIBAN government was in control of the area, authorities did not interfere with

the hijackers' actions in Kandahar or make efforts to apprehend them later. The passengers were

held captive for eight days while the release from an Indian prison of SAI'ID and two other

Islamic militants was arranged. Upon his release, SAI'ID and the others fled to Pakistan, SAI'ID

has also been convicted of the kidnapping and murder of Wall Street Journal reporter Daniel

Pearl.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

595.    Plaintiffs Continental Casualty Company, Transcontinental Insurance Company,

Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance

Company of Hartford and American Casualty Company of Reading, Pennsylvania provided

insurance coverage to numerous insureds whose property was damaged or destroyed in the

September 11th attacks.

596.     In accordance with the terms of the applicable policies of insurance, plaintiffs Continental Casualty Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford and American Casualty Company of Reading, Pennsylvania have made payments to their insureds in an amount in excess of $212,500,000, and may make additional payments in the future, in compensation for the damages resulting from the September 11th Attacks.  By virtue of these payments, plaintiffs Continental Casualty Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford and American Casualty Company of Reading, Pennsylvania are subrogated to their insureds' rights of recovery against any responsible third parties.

597.     The actions of the foreign state defendants -- the Republic of Sudan and the Islamic Republic of Iran (collectively, the "Foreign State Defendants") --  and the actions of their agencies and instrumentalities as described herein forfeited their right to claim immunity under the Foreign Sovereign Immunities Act ("FSIA"),  28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and 1605(a)(7).  In addition, pursuant to 28 U.S.C. § 1605(a)(5), all defendants who are or were officials, employees or agents of the Foreign State Defendants and who are or were officials, employees or agents of the Republic of Iraq are individually liable to plaintiffs for the damages to plaintiffs' insureds which were caused by their acts.

598.     The actions of the Foreign State Defendants and their agencies and instrumentalities as described herein constituted commercial activity that had a direct effect on the United States and is not subject to immunity under the FSIA, 28 U.S.C. § 1605(a)(2).

599.     The actions of the Foreign State Defendants, their agencies, instrumentalities, officials, employees or agents and the actions of the defendants who were officials, employees or agents of the Republic of Iraq, as described herein, constituted tortious acts and omissions, while acting within the scope of their office and employment, which caused property damage in the United States and thus are not subject to immunity pursuant to 28 U.S.C. § 1605(a)(5).

## FIRST CLAIM FOR RELIEF

600.    Plaintiffs repeat the allegations of paragraphs 1 through 599, as well as the factual

allegations set forth in the accompanying addendum and the factual allegations against

defendants which are set forth in the pleadings in the other actions consolidated under 03 MDL

1570.

601.    The September 11th Attacks constituted an intentional and unlawful trespass upon

the real and personal property of plaintiffs' insureds, to which plaintiffs' insureds did not

consent.

602.    As set forth above, the September 11th Attacks were a direct, intended and

foreseeable product of a larger conspiracy among the defendants to commit acts of international

terrorism against the United States, its nationals and allies.

603.    The conspiracy among the defendants to commit acts of international terrorism

against the United States, its nationals and allies, included the provision of material support and

resources to defendant AL QAEDA and affiliated foreign states, FTOs, persons, organizations,

commercial entities and other parties.

604.    The co-defendants knew, or should have known, that their provision of material

support and resources to AL QAEDA and affiliated foreign states, FTOs, persons, organizations,

commercial entities and other parties would result in an unlawful trespass upon the real and

personal property of plaintiffs' insureds.

605.    The damages suffered by plaintiffs were the direct and proximate result of the

aforesaid trespass upon the real and personal property of plaintiffs' insureds.

606.    By reason of the foregoing, plaintiff is entitled to damages against defendants,

jointly and severally, in an amount to be determined at trial but believed to be in excess of

60573

$212,500,000.

## SECOND CLAIM FOR RELIEF

607.    Plaintiffs repeat the allegations of paragraphs 1 through 606.

608.    This claim for relief arises under RICO.

609.    At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged.

610.    At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity.

611.    The acts of racketeering activity consisted of:

(a) acts that involve murder and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

(b) acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents) and are within the scope of 18 U.S.C. § 1961(1)(B);

(c) acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

(d) acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

(e) acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

60573                                                172

(f) acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

(g) acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B).

612.   Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies.  Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results.

613.   As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964.

## THIRD CLAIM FOR RELIEF

614.   Plaintiffs repeat the allegations of paragraphs 1 through 613.

615.   Defendants unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c), i.e., to conduct and participate, directly and indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. § 1962(d).

616.   Pursuant to this conspiracy, each defendant either committed, or agreed to commit, at least two act of racketeering activity and conducted and agreed to conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), as described above.

617.   As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964.

WHEREFORE, plaintiffs demand judgment as follows:

60573

1.  On the first claim for relief, against defendants, jointly and severally, damages in an amount to be determined at trial but believed to be in excess of $212,500,000;

2.  On the second claim for relief, against defendants, jointly and severally, damages in an amount to be determined at trial but believed to be in excess of $212,500,000, trebled, together with reasonable attorneys' fees;

3.  On the third claim for relief, against defendants, jointly and severally, damages in an amount to be determined at trial but believed to be in excess of $212,500,000, trebled, together with reasonable attorneys' fees; and

4.  Such other and further relief as to this Court appears just and proper, together with pre and post judgment interest and the costs and disbursements of this proceeding.


Dated:  New York, New York
        September 30, 2005


                                  FERBER FROST CHAN & ESSNER, LLP


                                  By: /s/Robert M. Kaplan (RK1428)
                                  Attorneys for Plaintiffs
                                  530 Fifth Avenue, 23rd Floor
                                  New York, New York 10036-5101
                                  (212) 944-2200

60573

# ADDENDUM TO SECOND AMENDED COMPLAINT

### A.       Al Rajhi Banking & Investment Corporation

Al Rajhi has long provided financial services and other forms of material support to terrorist organizations, including al Qaeda.

Al Rajhi has served as one of al Qaeda's preferred banks for many years, maintaining accounts for many of the charitable organization defendants that operate within al Qaida's infrastructure, including but not limited to the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

In cooperation with these charitable organizations, Al Rajhi advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for these charitable organizations, thereby providing a mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi facilitated al Qaeda's fundraising efforts.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for al Haramain and the IIRO, have been used to transfer funds to al Qaeda cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaeda's charity fronts, via *zakat* and *haran'*, contributions, including MWL, WAMY, IIRO, Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaeda, and that the funds it contributed directly to the charities were being funneled to al Qaeda. In fact, individual defendant Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of these charitable organizations, including the MWL and the IIRO. Through his involvement in the affairs of these charitable organizations, Suleiman Abdul Aziz Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaeda's operations, and consequently that the accounts maintained by Al Rajhi on behalf of those charitable organizations were being used to channel funds to al Qaeda.

Nevertheless, Al Rajhi has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaeda.

Al Rajhi thereby has, for a period of many years, provided critical financial and logistical support to al Qaeda to support that terrorist organization's global jihad. The

60573                                      175

# ADDENDUM TO SECOND AMENDED COMPLAINT

**A.      Al Rajhi Banking & Investment Corporation**

Al Rajhi has long provided financial services and other forms of material support to terrorist organizations, including al Qaeda.

Al Rajhi has served as one of al Qaeda's preferred banks for many years, maintaining accounts for many of the charitable organization defendants that operate within al Qaida's infrastructure, including but not limited to the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

In cooperation with these charitable organizations, Al Rajhi advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for these charitable organizations, thereby providing a mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi facilitated al Qaeda's fundraising efforts.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for al Haramain and the IIRO, have been used to transfer funds to al Qaeda cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaeda's charity fronts, via *zakat* and *haran',* contributions, including MWL, WAMY, IIRO, Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaeda, and that the funds it contributed directly to the charities were being funneled to al Qaeda. In fact, individual defendant Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of these charitable organizations, including the MWL and the IIRO. Through his involvement in the affairs of these charitable organizations, Suleiman Abdul Aziz Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaeda's operations, and consequently that the accounts maintained by Al Rajhi on behalf of those charitable organizations were being used to channel funds to al Qaeda.

Nevertheless, Al Rajhi has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaeda.

Al Rajhi thereby has, for a period of many years, provided critical financial and logistical support to al Qaeda to support that terrorist organization's global jihad. The Attack was a direct, intended and foreseeable product of Al Rajhi's participation in al Qaeda's jihadist campaign.

**B.      Sulaiman Abdel Aziz al Rajhi**

Sulaiman Abdel Aziz al Rajhi is a Saudi national who has long provided material support and resources to al Qaida.  Al Rajhi is Chairman, Managing Director, and the largest shareholder of al Rajhi Banking and Investment Corporation, and the primary financier of the SAAR Foundation and many of the organizations which operated within the SAAR Network of charities

and businesses, including but not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation.  These charities, largely based in Herndon, Virginia, have been used to funnel moneys direct to al Qaeda and the Enterprise. Specifically, the SAAR Network entities funneled billions of dollars of financial sponsorship as well as logistical assistance to al Qaeda through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

In addition, Sulaiman al Rajhi funneled money through Youssef Nada, a noted terrorist financier, through the banks he controlled in the Bahamas and for which al Rajhi had worked under Nada, as well as Bank al-Taqwa.

Persons associated with the SAAR Foundation and its network are also implicated in the United States Embassy bombings in Kenya and Tanzania.

Sulaiman Al Rajhi also serves on the board of directions of the International Islamic Relief Organization (the "IIRO"), a purported "charitable" organization which has long acted as a fully integrated component of al Qaeda's logistical and financial support infrastructure, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations.

Through his control of al Rajhi Bank, Sulaiman Abdel Aziz al Rajhi actively participated in that financial institution's support and sponsorship of al Qaeda.  For example, with Sulaiman Abdel Aziz al Rajhi's support and authorization, al Rajhi Bank maintained accounts for many of al Qaeda's charity fronts, including the IIRO, the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, and provided mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts.  At all times material hereto, Sulaiman Abdel Aziz al Rajhi was expressly aware  that many of the charities for which al Rajhi Bank provided financial services were conduits for financing al Qaeda, and that the Bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that terrorist organization.

Indeed, as mentioned previously, Sulaiman Abdel Aziz al Rajhi has served as an officer of the IIRO.  Significantly, numerous branches of the IIRO were publicly implicated in al Qaeda plots throughout the 1990s, during the time that Sulaiman Abdel Aziz al Rajhi was serving as an officer of the IIRO, and at which time al Rajhi Bank maintained accounts for that ostensible charity.  Branch offices of Al Haramain were similarly implicated in al  Qaeda plots throughout the 1990s.

Sulaiman Al Rajhi is identified on the "Golden Chain" as one of al Qaeda's principal financiers.  The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaeda.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the

document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. Filed Jan. 6, 2003). The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaeda's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm.

Through his business enterprises and involvement in charities operating within al Qaeda's infrastructure, Sulaiman Abdel Aziz al Rajhi has long provided material support and resources to al Qaeda. Al Rajhi has close ties to the Saudi Royal Family. Several members of the Saudi Royal Family are employed by or serve as officers of businesses owned or controlled by al Rajhi. For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange. Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company. Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company. Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.

Sulaiman al Rajhi also managed the National Commercial Bank budget of defendant Saudi Joint Relief Committe. In addition, for decades, al Rajhi has been involved with the Muslim Brotherhood, a 74-year-old group which is under investigation by European and Middle Eastern governments for its alleged support of radical Islamic and terrorist groups. For decades the Brotherhood has been a wellspring of radical Islamic activity; Hamas, the militant Palestinian group, is an offshoot of it. It is also tied to leading neo-Nazism, including the Swiss Holocaust denier Ahmed Huber.

In all these capacities, including his capacity as an officer and/or director of many of the SAAR Network Entities, Sulaiman al Rajhi has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attach on America.

## C.     Saleh Abdulaziz Al Rajhi

Saleh Abdulaziz al Rajhi, eldest brother of Sulaiman, has been Chairman of Al Rajhi Banking and Investment Corporation, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

Furthermore, Saleh Abdulaziz al Rajhi is personally linked to Wadi el-Hage, Osama bin Laden's personal secretary (Saleh's phone number was found in Wadi's phone book upon his arrest.). Wadi el-Hage was convicted for his role in the 1998 Embassy bombings in Kenya and Tanzania.

## D.     Abdullah Sulaiman Al Rajhi

Abdullah Sulaiman Al Rajhi is General Manager of the Al-Rajhi Banking & Investment Corp., and member of its executive committee, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

In addition, he was President of Aradi, Inc., located at the same address as SAAR, 555 Grove Street in Herndon, Virginia. Through Abdullah Sulaiman Al Rajhi, the Safa Group had access to a bank and banking officials for purposes of producing checks purportedly paid for SAAR's charitable purposes but which actually went towards the benefit of the Enterprise.

**E.     Sheikh Abdul Aziz Al Ibrahim**

Sheikh Abdul Aziz Al Ibrahim is the brother-in-law of the late King Fahd of Saudi Arabia. (His sister, Jawhara, was the second wife of King Fahd.)

With another brother, Walid, along with Defendant Saleh Abdullah Kamel, Sheikh Abdul Aziz Al Ibrahim created in 1991 the leading Arab television satellite service, Middle East Broadcasting Corp, which purchased the press agency United Press International in 1992.

In 1990, he create            In 1990, he created the Ibrahim bin Abdul Aziz al Ibrahim Foundation which purports to support humanitarian assistance. Through his direction and control, he entrusted the organization with the responsibility of realizing his objective of using it as a covert vehicle for supporting the al Qaeda movement and other terrorists. The organization is present in Kenya, Bosnia, Chechnya, South America and South Asia.
In 1990, he create
The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network in the FBI's investigation into the attacks against the American embassies on August 7, 1998.

In September 199            In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including defendants Al-Haramain Foundation, Help African People, the International Islamic Relief Organization, the Ibrahim bin Abdul Aziz al Ibrahim Foundation, and Mercy International Relief Agency. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

> The decision was announced by the Kenyan government's NGO coordinator who declared: Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyans' lives . . . They had been found to be working against the interests of Kenyans in terms of security.

> After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five nongovernmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Ibrahim bin Abdul Aziz al Ibrahim Foundation did not seek an appeal.

> In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky,

Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Ibrahim bin Abdul Aziz al Ibrahim Foundation as one of those which provided help to Osama bin Laden: "The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are ... Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects."

Other reports suggest that Ibrahim bin Abdul Aziz al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Ibrahim bin Abdul Aziz al Ibrahim Foundation, World Youth Islamic Assembly and Islamic Rescue Organization - had taken part in setting up these bases.

In an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was instruction in religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz al Ibrahim, which emphasized (quote): "Armed struggle in the name of Allah, for his word to be above all else…Sacrifice your life in witness of Allah's religion."

According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

That seminar event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint Committee for Islamic Action and Studies with representatives from Defendants Muslim World League, Islamic International Relief Organization, World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

Sheikh Abdul Aziz Al Ibrahim has extensive ties to the United States.

In 1989, Sheikh Abdul Aziz Al Ibrahim acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to Sheikh Abdul Aziz Al Ibrahim at the end of 1989 by BCCI. Sheikh Abdul Aziz Al Ibrahim was one of BCCI's leading loan beneficiaries.

In the mid 1980s, while living in Hollywood, California, Sheikh Abdul Aziz Al Ibrahim engaged in a romantic pursuit of actress/model Brooke Shields, setting up a movie production company (Mystery Man Productions) to invest over $22 million (including BCCI loan proceeds) in the production of a film vehicle for her, *Brenda Starr.* The production was so flawed that while filmed in 1986, the movie would not be released in the United States until 1992.

Apart from being a lead investor in Marina del Rey, Sheikh Abdul Aziz Al Ibrahim's real estate assets have included Ritz-Carlton hotels in New York, Washington, Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills above Bel-Air and largely vacant land near Disney World in

60573

Florida. (Ritz-Carlton hotels decided in 1997 to pull back their name from those facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Sheikh Abdul Aziz Al Ibrahim.)

The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

According to court papers filed in 1995, as reported by the *Washington Post,* Sheikh Abdul Aziz Al Ibrahim has won large sums of money gambling in the United States on which he did not wish to pay taxes to the Internal Revenue Service. In order to silence a former employee regarding these and other allegations, Sheikh Abdul Aziz Al Ibrahim hired the law firm of Sidley & Austin and filed suit in Washington, D.C. to seek injunctive relief. The suit was dismissed.

### F.    World Assembly of Muslim Youth

### I.    INTRODUCTION

World Assembly of Muslim Youth ("WAMY") is a multi-national organization which has been at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (7) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

### II.    WAMY'S ORGANIZATIONAL STRUCTURE

Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League ("MWL"). Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization ("IIRO"), and Rabita Trust. Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia. WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.

The Kingdom extensively supervises and controls WAMY's activities. On the macro level, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.

Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within -- there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

The operations of WAMY's branch offices are closely supervised and directed by WAMY's

central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanismsto rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters. which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

### III.   THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

Osama bin Laden's al Qaeda organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaeda's terrorist activities gamer the most attention, terrorist attacks represent but one of many vehicles through which al Qaeda seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaeda views the confrontation with the West to have two distinct, but equally important fronts: (1)   cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad - The Various Threats From Radical Islam to the Democratic Legal Order,* General Intelligence and Security Service of the Netherlands, December 2004.

As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaeda engages in militant and violent operations throughout the World. Al Qaeda's military activities are by no means limited to terrorist attacks. In fact, in establishing al Qaeda, Osama bin Laden sought to create a multi-national Islamic army

to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaeda's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaeda has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaeda's participation in these regional conflicts takes many forms. Al Qaeda provides funding and logistical assistance to local extremist organizations in support of their military and terrorist activities. In addition, al Qaeda deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.

Through its military activities in these "regional" conflicts, al Qaeda aims to establish and support radical Islamic regimes, a critical component of al Qaeda's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaeda's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:

> [al Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.

> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad *Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report").

> Al Qaeda also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the organization's image among local Muslim communities, and represent an integral component of al Qaeda's ongoing recruiting and fundraising efforts. Al Qaeda's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West.  In fact, several of the September 11th hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaeda's growth and development cannot be overstated. Perhaps more than any other factor, al Qaeda's participation in these "regional" conflicts has enabled al Qaeda to extend its sphere of influence throughout the globe.

### IV.    WAMY'S ROLE IN ADVANCING THE AL QAEDA MOVEMENT

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad. . . Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad" and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book I*slamic Camps: Objectives, Program Outlines and Preparatory Steps,* prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

Hail! Hail! O Sacrificing Soldiers! To Us! To Us!

So we may defend the flag on this Day of Jihad, are you miserly with your blood?!

And has life become dearer to you? And staying behind sweeter?

Is staying in this world of torment more pleasing to us?

You are amongst those called upon by Destiny.

Come! So we may revive the times of our predecessors!

Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaeda movement, and actively advocated

young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaeda's cultural assault on the United States and democratic institutions throughout the world.

Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, Southeast Asia, the United States and elsewhere. WAMY's support for al Qaeda's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaeda training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaeda and associated groups; and operated as a recruiting vehicle for al Qaeda and associated groups. Through these criminal activities, WAMY has further helped al Qaeda to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina... has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces....

> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered.... Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times,* December 5, 1992.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him...." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS:*

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC).
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops….
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab...
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerrillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS,* May 19, 2000.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to Chechnya by Osama bin Laden to organize al Qaeda's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists.... He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

1998 Defense Department Report

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan. . ." *U.S. Links bin Laden to Chechnya, MSNBC.com,* August 15, 1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab 's control. *Id.*

Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published

in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. ... It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1. The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2. ***The need money to buy arms and ammunition. (emphasis supplied)***
>
> The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.
>
> Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

*The Chechen Tragedy — The Reality and the Required Role,* Dr. Maneh al Jahari, *al Jazeera,* January *15,* 2000.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19, 1999 article in the *Australian General News,* the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF"), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News,* January 15, 1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism - 1999,* United States Department of State, April 2000.

Statements by government officials and press reports

in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips,* a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips,* December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella. *See SIMI:  Nursery of Hate, India Today,* April 2, 2001; *ISI Twin Plan — Attack Christians, Defame Hindu Outfits, The Economic Times of India,* July *15,* 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring,* August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India),* July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

Q: In your conferences, you have openly eulogized Osama bin Laden.

A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

SIMI:  *Nursery of Hate, India Today,* April 2, 2001.

In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lashkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigation of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online,* December 9, 2002.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled *"Military Lessons In The Jihad Against The Tyrants,"* was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational cells. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda.  WAMY's U.S. offices were established in Falls Church, Virginia in 1992

by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar,* June 11, 2002.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire,* September 5, 2003.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda... Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe. *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence. U.S. Department of the Treasury,* Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005.

## V.    WAMY'S KNOWLEDGE

For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11, 2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaeda and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

Given the close ties between WAMY's senior leadership and high level officials of the Kingdom, it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from 1997 forward.

The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well.

A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, ***whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals....***" (emphasis supplied). The ***International Convention*** *for the* ***Suppression of the Financing of Terrorism,*** adopted by the General Assembly as Resolution 54-109 on December 9, 1999, contains the same language.

The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack.

In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and ideological support to al Qaeda and affiliated groups, for a period of many years leading up to the September 11th Attack.

## G.    The Abdul Aziz al Ibrahim Foundation

The Abdul Aziz al Ibrahim Foundation has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, or the al Qaeda, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Abdul Aziz al Ibrahim Foundation conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Abdul Aziz al Ibrahim Foundation conspired to conduct and/or participate in the operation or management of the enterprise itself.

HRH Prince Abdul Aziz al Ibrahim (or "Ibrahim Abdul Aziz Al Ibrahim") is a Saudi citizen and the brother-in-law of King Fahd of Saudi Arabia.

In 1990, he created the Abdul Aziz Al Ibrahim Foundation (a.k.a. Ibrahim Abdul Aziz al Ibrahim Foundation) whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia.

The Abdul Aziz Al Ibrahim Foundation has built, among others, mosques in Düsseldorf, Gibraltar, Milan and Moscow. The Sheik Ibrahim Mosque in Caracas, the continent's second largest mosque, was built with funding from the Ibrahim bin Abdul Aziz Al Ibrahim Foundation, according to Iman Omar Kaddoura. The Saudi royal family established the foundation to help the spread of Islam.

The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network, as uncovered by the FBI's investigation into the attacks against the American embassies on August 7, 1998, as was revealed in the confidential publication, *French Africa Online.*

In August 1998, Kenya became the focal point of the international news following the bombing of the U.S. embassies there and in neighboring Tanzania. The attack on the embassy resulted in the death of some 400 Kenyans, as well as twelve embassy staff members; thousands of Kenyans were wounded, many grievously. In addition to the human suffering caused by the bombing itself, the incident had further repercussions for the human rights situation.

Fazul Abdullah Mohammed, an al Qaeda operative implicated in the 1998 US Embassy bombings, was arrested and searched by Kenyan authorities. One of the items seized with him was a notebook containing the business card of al Ibrahim Foundation's director, Abdul Kader M. Izzi. He was also carrying a business card of Mohamed Munir Chaudhri, the lawyer used by Wadi al Hage and al Qaeda operative, Khalid al Fawwaz.

In September 1998, the Kenyan government cancelled the registration of five Islamic

relief agencies for allegedly supporting terrorism including Al-Haramain Foundation, Help African People, the Islamic Relief Organization, the Abdul Aziz Al Ibrahim Foundation, and Mercy Relief International. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

The decision was announced by the Kenyan government's NGO coordinator who declared that:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered. . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five non-governmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Abdul Aziz Al Ibrahim Foundation remained blocked.

First, the event drew international attention from the domestic human rights problems in Kenya. Second, the government's response to the bombing was to crack down indiscriminately against foreigners and Muslim-run nongovernmental organizations (NGOs). Refugees, without distinction, were told to report to the immigration authorities and informed that documents issued by the U.N. High Commissioner for Refugees to them were no longer valid. When accredited refugees, with UNHCR letters, presented themselves at immigration, these letters were taken away and they were given papers that deemed them illegal immigrants.

> In a study paper dated October 1999, called *The New Azerbai Jan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh,* Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Abdul Aziz Al Ibrahim Foundation as one of those which provided help to Osama bin Laden:

The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

> Other reports suggest that Ibrahim bin Abdul Aziz Al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Abdul Aziz Al Ibrahim Foundation.

> In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Abdul Aziz Al Ibrahim Foundation, World Youth Islamic Assembly, and Islamic Rescue Organization - had taken part in setting up these bases.

The foreign Islamic aid, which has been granted under the banner of da'awa ("summon to Islam"), has been targeted at Russia's Muslim population in the Volga-Urals, the North Caucasus, and Central Russia. Its major official benefactor has been King Fahd of Saudi Arabia, who has regularly subsidized an annual hajj (pilgrimage) to Mecca and Medina for hundreds of Russia's Muslims. He has also sponsored dozens of scholarships to those who wanted to study at Islamic universities and colleges in Saudi Arabia, Turkey, Jordan, Syria, Libya, Kuwait, the United Arab Emirates and Malaysia, and subsidized the free distribution of Korans and other Islamic literature in various Islamic communities of Russia. Among other providers of official Islamic assistance are the University of Imam Muhammad bin Saud, the Islamic Development Bank, the Organization of Islamic Conference, the World Islamic League, the World Association of Islamic Youth and the World Center of Islamic Sciences of Iran.

Unofficial Islamic assistance has been even more impressive. It has been conducted by Kuwait's Committee of Muslims of Asia, the Iranian World Organization Madaris, Saudi Arabia's Islamic Charities of Taiba and al-Ibrahim Foundation, the International Islamic Charities of Ibrahim Hayri, Igatha, Zamzam and the United Arab Emirates' Islamic Charity Organization A1-Khairya. Along with building and staffing mosques, madrassas, Islamic universities and other Islam-related institutions, these funds have heavily invested in the proselytizing conducted by Islamic missionaries and the organizing of various Islamic training camps and courses.

Some Islamic organizations in a few countries also acted as outside players financing the IMU's activities and operations. Pakistani Jamaat-e-Islami, the Qatar Charity Society, the Saudi Islamic Salvation Foundation, the Ikhwan Al Muslimun, and the World Assembly of Muslim Youth (WAMY) were such supporters.

In the spring of 1999, an IMU delegation visited Saudi Arabia and received $270,000 dollars from the Abdul Aziz Ibrahim Foundation, a relief organization of the Saudi royal family. A few months later the Taliban allocated $50,000 dollars to support the families of the IMU members based in Afghanistan. In early August of the same year, Bin Laden's five personal envoys visited the village of Hoit in Tajikistan and delivered $130,000 dollars to Namangani. At that time, IMU fighters were carrying out incursions into Uzbekistan via southern Kyrgyzstan.

Shortly thereafter, a meeting took place in Karachi between the members of Islamic organizations from Pakistan, Kuwait, Jordan, Egypt, Palestine, Kashmir, Uzbekistan, and Chechnya. They agreed to raise two million dollars to support the Holy Jihad against Karimov's regime.

In June of 2000, IMU's press-secretary Zubair ibnAbdurahman confirmed the receipt of a few thousand dollars from Bin Laden intended to stir up 'the holy war against Karimov 's pro-Zionist government'. According to the Ferghana Province Directorate of National Security, Juma Namangani annually received around three million dollars from Osama bin Laden.

During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz Al Ibrahim, which emphasized:

Armed struggle in the name of Allah, for his word to be above all else. . . Sacrifice your life in witness of Allah's religion.

According to a document summarizing the seminar, "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

The event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint committee for Islamic Action and

Studies with representatives from the Muslim World League, Islamic International Relief Organization, and World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz Al Ibrahim Foundation. Saudi-funded textbooks and other publications reveal the presence of institutionalized hate speech. These products are distributed by Saudi officials including senior diplomats at the Saudi Embassy — as well as by Saudi-funded organizations, such as the Abdul Aziz al Ibrahim Foundation, the World Assembly of Muslim Youth (WAMY), and the Institute for Islamic and Arabic Studies in America (IIASA), groups that take full advantage of America's First Amendment freedoms.

The book, *Deen al-Haqq* (The True Religion), authored in Arabic by Abdul-Rahman Bin Hamad Al-Omer, printed by the Ministry of Islamic Affairs and Endowments, paid for by the foundation of Abdul-Aziz Al Ibrahim, and distributed by IIASA and WAMY in the U.S. contains the following:

"Judaism and Christianity are deviant religions" (page 25)

"The Saved Sect — Muslims are many in number but few in reality, and the groups that claim to be Muslim are many, approaching 73 sects and numbering more than 1 billion." (An assertion that only Wahhabis are Muslims and all other true Muslims are unbelievers.— page 47)

"(Negations of One's Islam) [Negation 8] -Befriending the unbelievers, through loving and cooperating with them while knowing that they are unbelievers, makes those who are their friends the same as them." (page 99)

"We say to every Christian and every Jew and all those outside Islam, 'your children are born into Islam, but you and their mother take them away from Islam with your corrupt rearing.". (page 119)

"There are groups in the Muslim world that claim to be Islamic but they are outside Islam. They claim Islam while in reality they are not Muslims because their beliefs are the beliefs of unbelievers." (page 123)

Abdul Aziz al Ibrahim, founder of the Abdul Aziz al Ibrahim Foundation, also had many other U.S. contacts.  In 1989, he acquired a portion of the Marina Del Rey real estate venture in Los Angeles through various offshore companies. Al Ibrahim did this to mask the company's connection to the Saudi royal family. A bank account was opened in Luxemburg as a shelter from public disclosure of the company's financial identity and activity. Al Ibrahim set up 10 companies in California as shell corporations to be the named owners of the real estate holdings of the company. However, he used his company in the Cayman Islands, Marina Enterprises, to control 100% shareholder interest for each of the 10 California shell corporations. On paper, these shell companies were to be managed by Newfield Enterprises, a front company set up by al Ibrahim for real estate purposes. Al Ibrahim also formed North American Real Estate Holding and named it 100% controlling shareholder of the Cayman Island company, Marina Enterprises.

American authorities discovered a loan of $132 million that was granted to al Ibrahim at the end of 1989 by Bank of Credit and Commerce (BCCI). Al Ibrahim was one of BCCI's leading loan beneficiaries. Between 1986 and 1990, BCCI was involved in the fraudulent schemes and practices of the NCB Chairman Khalid Bin Salim Bin Mahfouz, who was also the Chief Operating Officer of BCCI and major shareholder.

The 1992 US Senate report on the BCCI affair detailed the role played by the NCB in hiding BCCI assets in a development in the "cover-up and obstruction of investigation".

In September of 1990, Price Waterhouse learned that BCCI had concealed further lending of over $500 million to its major customs by "parking" that lending with a Middle Eastern bank, namely, the National Commercial Bank of Saudi Arabia controlled by Khalid bin Mahfouz, the most powerful banker in the Middle East, who was later indicted in the United States in connection with his activities pertaining to BCCI and First American.

> Khalid Bin Mahfouz was indicted on July 1, 1992 on charges of participation in a Scheme to Defraud in the First Degree in violation of N.Y. Penal Law § 190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of defendant's interest in BCCI. Pursuant to the indictment, an arrest warrant was issued. A settlement with US authorities resulted in approximately $190 million paid to the Court Appointed Fiduciaries with an additional $10 million paid to a plaintiff The settlement agreement regarding the plea and cooperation with the District Attorney of New York and the Department of Justice concerned Khalid Bin Mahfouz and the National Commercial Bank.

> The 1992 US Senate Report on the BCCI Affair has linked the bank to financial funding of the Afghan war.

(...) BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

> The BCCI was also implicated in supporting terrorism, as reported by the US Senate.

In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

> The Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

> The Report gives details regarding the facilities provided by the bank to known terrorist Abu Nidal and other terrorists.

In the United Kingdom, a key window on BCCI's support of terrorism was an informant named Ghassan Qassem, the former manager of the Sloan Street branch of BCCI in London. Qassem had been given the accounts of Palestinian terrorist

60573

196

Abu Nidal at BCCI, and then proceeded, while at BCCI, to provide detailed information on the accounts to British and American intelligence, apparently as a paid informant, according to press accounts based on interviews with Qassem. As of 1986, the information obtained about Abu Nidal's use of BCCI was sufficiently detailed as to justify dissemination within the U.S. intelligence community. In July, 1987, as a result of the information provided by Qassem, a State Department report concerning Abu Nidal and Qassem, declassified in 1991 at the request of the subcommittee, describes Abu Nidal's .use of BCCI. (...) Other terrorist groups continued to make use of BCCI, including one "state sponsor of terrorism," and the Qassar brothers, Manzur and Ghassan, who have been associated with terrorism, arms trafficking, and narcotics trafficking in connection with the Government of Syria(...).

  Apart from being a lead investor in Marina Del Rey, Al <u>Ibrahim</u> <u>real</u> <u>estate</u> <u>assets</u> <u>have</u> <u>included</u> <u>Ritz-Carlton</u> <u>hotels</u> <u>in</u> New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Abdul Aziz Al Ibrahim.

> The al Ibrahim partnership that holds Marina Del Rey's biggest real estate portfolio, MGC Commercial, filed Chapter 11 bankruptcy protection in June of *1995*. The action was filed in the US Bankruptcy Court for the Central District of California.

> MGC Commercial's filing came just as lenders, owed about *$50* million in defaulted mortgages, were about to take possession of a half-dozen multi-family and commercial/retail properties. It also came barely two years after confirmation of a previous Chapter 11 reorganization plan - the plan through which Sheik Abdul Aziz al Ibrahim took full control of the big marina portfolio from former partner Abraham M. Lurie.

> The *L.A. Business Journal* reported the al Ibrahim-controlled partnership that holds the 369-unit Doubletree Marina Beach hotel has also defaulted on a mortgage - and is under a court-appointed receiver's supervision. The sheik also controls a partnership that holds two other Marina hotels.

> The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel, and NY Overnight Inc., all based at the same address in Marina Del Rey.

> Al Anwa Holding is Al Anwa for Contracting Establishment (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by Abdul Aziz Al Ibrahim. Al Anwa for Contracting is shareholder, along with Dallah al Baraka (Chaired by Saleh Abdullah Kamel), of the National Environmental Preservation Co. Ltd. in Jubail, Saudi Arabia.

  In 1991, Abdul Aziz Al Ibrahim, his brother, Walid, and Saleh Abdullah Kamel, created the leading Arab television satellite service, Middle East Broadcasting Corp (or "MBC"), <u>which</u> <u>purchased the press agency United Press International</u> (or "UPI") in 1992.

> Since 1993, funds and companies having the purpose of expanding their ideas of religious extremism ("Al-Igasa", "CAAP", Worldwide Assembly of Islamic Youth**,** "Al Ibrahim") legally operated in the territory of Tatarstan, a member of the Russian Federation in the Ural Mountains. Practically all religious schools and a number of large educational institutions are opened or are secretly financed by wahhabist international organizations ("Taiiba", Committee of Moslems of Asia, Islamic Heritage Revival Society), and the libraries are completed with the literature of wahhabist nature.

In March 2002, searches by Bosnian authorities of BIF's offices in Sarajevo, Bosnia-Herzegovina (operating under the name *Bosanska Idealna Futura)* yielded a substantial amount of evidence shedding light on the network al Qaeda established, including links to al Ibrahim. Shortly thereafter, the offices of al Haramain were raided in Bosnia, as well.  In that raid they came across documents containing the home and office phone numbers of al Ibrahim and the al Ibrahim Foundation.

The raids produced several documents offered into evidence in Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements, *United States v. Enaam M Aranout,* No. 02 CR 892 (N.D. Ill, filed January 6, 2003).

The Abdul Aziz al Ibrahim Foundation has thereby knowingly, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of the aforementioned Abdul Aziz al Ibrahim Foundation's participation in the jihad campaign for a! Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad Against Jews and Crusaders.

## H.    Saleh Abdullah Kamel, Dallah Al Baraka Group and Al Baraka Investment And Development

Saleh Abdullah Kamel ("Kamel") has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, al Qaeda and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Kamel conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Kamel conspired to conduct and/or participate in the operation or management of the enterprise itself.

After serving as an adviser to the Saudi Minister of Finance, Kamel founded Dallah Al Baraka Group, LLC ("DABG") in 1969, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

Beginning in the late 1970s, Kamel financed and developed DABG and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

In 1982, Kamel and DABG began directing tens of millions of dollars in funds to at least 20 non-governmental organizations, including Osama Bin Laden's Mekhtab al Khidmat, the predecessor to al Qaeda, which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

DABG, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. DABG posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third among Saudi companies in sales.

The DABG financial arm is Al Baraka Investment & Development ("ABID"), a wholly

owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al Barakaat Bank".

These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank and Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, including Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American and Yemen Islamic Bank for Finance & Investment.

ABID assets, including funds under management, are valued at $4.4 billion. U.S. assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

DABG's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah.

DABG has also facilitated jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

Kamel and DABG materially supported Osama Bin Laden and his al Qaeda network of front companies, farms and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaeda first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal,* the official International Islamic Relief Organization ("IIRO") publication, illustrates how Kamel has carried out his ongoing jihad. The advertisement states:

"All donations are deposited into the organization's joint accounts in all the branches of... Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaeda. In fact, the United States Government has been investigating Kamel for his material support of Al Qaeda along with numerous other defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaeda, and the assets of other material sponsors have already been frozen by the Department of Treasury.

In March 2002, the Bosnian police found several documents and items regarding the history of Al Qaeda during searches in the offices of Benevolence International Foundation ("BIF") in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that

according to the U.S. government is "a list of people referred to within Al Qaeda as the "Golden Chain" or wealthy donors to mujahideen efforts". Among them was Kamel.

The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the indictment of Enaam Arnaout on October 9, 2002 (02 CR 892).

The "Golden Chain" list was introduced and relied on in *United States v. Arnaout,* No. 02 Cr. 892, 2003 WL255226, at *l.2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists ("SDGT"), a decision not lightly taken by the executive branch of the government.

A former member of al Qaeda, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified  Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaeda. Al Fadl is a former al Qaeda leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaeda terrorist trials.

In 1992, Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

As part of his ongoing material support for al Qaeda and other Islamic militant groups in the Balkans, Kamel visited Bulgaria prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles.

In 1998, Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain account at Al Baraka Bank in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from the Al Haramain accounts.

The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

Both brothers have, at various times, served on the Shariah Compliance Board of Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

The Darul Ulum Madrassa backs jihadi organizations and both the Usmani brothers have provided practical help in setting up jihadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa.

Darul Ulum provides support to al Qaeda affiliates and SDGT entities Harkatul

Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen.

Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and al Qaeda in their war against the United States.

Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in Houston, Texas. As early as 1984, Kamel held sizeable investments in the United States via his financial interests in DABG.

In 1996, DABG owned more than $230 million in assets in the United States and Europe. Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

In 2004, as chairman of the General Council of Islamic Banks, Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials.

Kamel is part owner of London-based Middle East Broadcasting Centre ("MEBC"). In 1992, Kamel purchased the U.S. media company United Press International ("UPI") for $3.9 million through his company MEBC. Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended to invest more than $10 million between 1993-1995 to revive the struggling media company. Kamel owned UPI until 2002 when it was sold to the Unification Church.

In 1999, it was announced that Kamel and DABG were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

Kamel and DABG sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

DABG's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

In July 2003, Kamel and DABG announced that they would sue four unnamed Western banks as third party defendants if Kamel and DABG were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, ". . .the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

Kamel and DABG are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.,* (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

Sanabel al Khair, the North American financial arm of IIRO, was established to receive,

60573

201

invest, and generate funds for the operations of International Relief Organization ("IRO"), the "United States arm" of IIRO. Beginning in about 1991, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain al Qaeda fundraiser.

Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas provided account numbers to facilitate the contribution of funds. These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of DABG.

A December 1993 advertisement from the official publication of the IIRO, *Al Igatha Journal,* which was distributed across the United States, illustrates how Kamel carried out his jihad by establishing Al Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaeda first started carrying out attacks against the United States. The advertisement states:

"All donations are deposited into the organization's joint accounts in all the branches of Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Kamel contributed at least $100,000 to the organization through his DABG branch in the U.S. in 1992.

Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993, Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

In 1992, regarding Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier,* describes the likely economic collaboration of Kamel and Al Baraka with Bin Laden:

"Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden,

Kamel and Al Baraka were provided with numerous public notices regarding the Sudanese government's support and harboring of international terrorists.

When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaeda network with military and logistical support through the government of Sudan.

During 1991, Kamel, Yassin Al Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

"There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad ... the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim

independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the 'Great Satan.'"

Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught... To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Kamel and Al Baraka:

In 1992 and 1993 Mohamed Atef [al Qaeda's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaeda, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

On October 3 and 4, 1993 operatives of Al Qaeda participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

From 1993 members of Al Qaeda began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaeda, including Atef and Abu Ubaidah al Banshiri.

Beginning in the latter part of 1993, members of al Qaeda in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, a U.S. citizen and admitted member of al Qaeda, surveyed the U.S. Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

An Al Baraka annual report from the period describes how Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads....During this time, Osama Bin Laden was overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country.

In January 1992, U.S. diplomats warned the government of Sudan to stop harbouring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice. They [terrorists] can come and go as they please. They operate here with impunity."

The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

60573

204

In August 1993, it was widely reported in the English, Arabic, and Sudanese press that the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic fundamentalist terrorist entities.

A portion of Kamel's investment revenues in Sudan were annually required to be committed to zakat — the Islamic almsgiving. However, in Sudan, Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). . .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.. .mobilization and training of the popular defense forces; and providing for martyrs' families."

The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

Osama bin Laden warned the West, in the 1993 August edition of *Sudanow* two months before Al Qaeda coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops. The attack was carried out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

Osama Bin Laden was using diverted zakat funds, provided by Kamel and other major investors in the Sudanese economy, to recruit and train al Qaeda recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

In November 1993, the Arab Albanian Islamic Bank ("AAIB") was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), DABG (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, ". . . a secrecy that cannot be maintained in an institution that pretends to be serious".

The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

 On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi in the Arab Albanian Islamic Bank.

The Arab Albanian Islamic Bank was subsequently renamed United Albanian Bank. It is believed that Kamel and Al Baraka remain shareholders in the successor entity of AAIB.

Kamel's Who's Who biography states that he has been a "founding member of Faisal Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Kamel in *The Saudi Gazette* on January 7, 2003.

According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions in its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

The Muslim World League Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan".

Faisal Islamic Bank of the Sudan is an associated company of the DMI Trust. The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated:

> "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and

Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic state. Together they encouraged Osama bin Laden to travel to Sudan and to develop his al Qaeda terrorist network to train soldiers for jihad.

In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

The Saudi American Bank serves as the bank for DABG. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaeda terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaeda's and Osama bin Laden's tenure there.

Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaeda terrorist operations as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaeda.

In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of Muslim Youth, IIRO and al Haramain Foundation.

Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co. and Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale is a Somali

financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there,

Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and ABID. According to newly obtained information on al Shamal Islamic Dank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

Osama Bin Laden was close to the new regime of Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department:

"Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Kamel and ABID. Kamel holds 15% of the bank shares.

Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaeda operatives held bank accounts in al Shamal Islamic Bank under their real names:

Q:     While you were in the Sudan, did you handle
        money for Osama Bin Laden?

A:                          Could you repeat the question.

Q:                          Did you work on the finances for al
Qaeda while

                            you were in the Sudan?

A:                          Yes.

Q:                         Did you know where the bank accounts of Osama
                    Bin Laden and al Qaeda were?

A:                         Yes.

Q:                         Do you know whose names they were in?

A:                         The bank account under Usama Bin Laden in Bank
                    Shaml [Al Shamal Islamic Bank], Khartoum.

Q:                         That was under Osama Bin Laden's true name?

A:                         Yes.

Q:       Were there accounts in other names?

A:       Yes. Afad Makkee got account also.

Q:       Afad Makkee, the account that he had under his
         name, do you know what name that is?

A:       I remember Madani Sidi al Tayyib.

Q:       Do you know of any other persons who had al Qaeda
money in their accounts?

A:       Abu Rida al Sun.

Q:       Do you know his true name?

A:       Nidal.

Q:       Anyone else that you knew had al Qaeda money in
         bank accounts in their name?

A:       Abu Hajer al Iraqi.

Q:       Do you know his true name?

A:       Mamdouh Salim.

Q:       Did you have any accounts in your name?

A:       Shared with Abu Fadhl.

Q:       So you had accounts in your name that were shared
         with Abu Fadhl?

A:      Yes.

Q:      Do you recall anyone else that had bank accounts in
        their name for al Qaeda?

A:      Abdouh al Mukhlafi.

Jamal Ahmed Al-Fadl also testified that al Qaeda operatives received monthly
checks of several hundred dollars from al Shamal Islamic Bank accounts:

Q:      When you worked for Osama Bin Laden,
        in the Sudan, how much were you paid?

A:      $1,200 (...) per month.

Q:      For how long did you work for him?

A:      Almost two years.

Q:      What banks did he keep his money at?

A:      Bank el Shamar [Al Shamal Islamic Bank].

Q:      Any other banks?

A:      I think he had accounts in different banks,
        but I only recall Bank Shamar [Al Shamal Islamic Bank].

Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al Shamal Islamic
Bank to an al Qaeda representative in Jordan:

Q:                          How did you carry the $100,000?

A:                          In my bag with my clothes.

Q:      Do you recall what kind of bills the $100,000 was in?

A:      I remember they all hundred bill.

Q:      Sorry?

A:      They all hundred bill.

Q:                          They were all hundred dollar bills?

A:                          Yes.

Q:                          Who gave you the money?

A:                          Abu Fadhl, he bring it from Shamal

Bank [Al
   Shamal Islamic Bank] and he bring it to me.

Q:      Abu Fadhl brought it from the Shamal
Bank [Al
   Shamal Islamic Bank]?

A:      Yes.

During the course of the same trial, another associate of Bin Laden, Essam Al Ridi, testified that the bank was used for operational purposes in stating that "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation ("BIF"), was subject to a complaint from the FBI on April 29, 2002. The assets of BIF have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaeda.

Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely know that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

Osama Bin Laden was allowed to maintain accounts as an investor in al Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y Februrary 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes."

When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Kamel's Al Baraka Bank. This fact indicates that Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaeda by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency ("TWRA"), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaeda network and operating terrorist training camps for al Qaeda and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

In a 1994 interview with the Islamist magazine Gazi Husrev Beg, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

In 1977, Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the Financial Strategy of the Muslim Brothers, illustrates that Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

The document describes how Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

The document states that Kamel and Al Baraka are the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

With the investment support of Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank…"

Swiss authorities have seized a copy of the Financial Strategy of the Muslim Brotherhood containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada. The same document mentions Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

By becoming majority owners in the International Islamic Bank in Luxemburg, Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics … is a good instrument to implement many projects

which are necessary for the Gamaat and its members ... [and] it is a good instrument to train higher level economic, financial and technical staff, within the framework of the Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

Kamel and Al Baraka Bank appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaeda by President George W. Bush. In announcing the designation of AlTaqwa as a global terrorist entity, President Bush stated:

"Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaeda shift money around the world. Al Taqwa raises money for Al Qaeda. They manage, invest, and distribute those funds. . . They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

"As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaeda organization received financial assistance from Youssef M. Nada [director of the bank]."

The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaeda, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q:    A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that...?

> A:    Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

In 1995, it was reported that Kamel and Al Baraka Bank had "major investments" in Bank Al Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

In 1997, while Kamel maintained investments at Bank Al-Taqwa, Agence France Presse

and the U.S. Department of Treasury reported that terrorist fundraisers were annually transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts. Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

Thus, as early as 1995, Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

Bank Al Taqwa diverted funds from investors' accounts to terrorist entities— but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

Thus, Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

Along with SDGT Yassin Al Qadi, Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. ("ALINTID") which was established during the early 1990s. The financial institution was reportedly designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

Multiple private and government sources have confirmed that Kamel and Yassin Al Qadi turned over the ownership and financial assets of ALINTID to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

"Through one of its branch offices, the AlHaramain transferred large amounts of money to the local Wahhabi center in Dagestan, known as the Islamic center "Kavkaz," in the capital of the republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-B arakaat Bank."

A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists*, states the following regarding the international financial structures, involved in funding of Chechen rebels:

In Saudi Arabia — (...) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al-Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman,

Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in Saudi Arabia.

The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

A memo from the FSB details the bank's role in funding Al Haramain:

> "Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

FSB had intercepted messages from Saudi-based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

> "The load is ready for sending -- grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles. One thousand rounds of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet-proof) vests have been bought."

Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview:

> "The Saudi Arabian Al-Haramain (...) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

The U.S. State Department reported the connections between al Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

> "The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries. According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (...). One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden. In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets

have been blocked pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian          Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Kamel and Al Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaeda was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets — including Americans.

The involvement of Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, U.S. v. Soliman Biheiri, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank.

The investigation report of his interview with agent David Kane states the following:

> "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 … Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were DABG and the Jordan Islamic Bank.

Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a statement, Kamel acknowledged that DABG owns another 12 percent.

Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the U.S. government in December 2001.

Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

Assets of Beit El-Mal, a 20% shareholder, were frozen. The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

Saudi national Omar Al Bayoumi, who lived in the United States from the late 1 990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of DAGB.

Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their

60573                                    217

house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, a subsidiary company of Dallah Avco Aviation.

During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"--made it clear that the government wanted alBayoumi's contract renewed "as quickly as possible."

The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaeda.

Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

Al Baraka Bank provided material support to the Spanish al Qaeda cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaeda cell which directly funded and helped coordinate the September 11th hijacker cell. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe,

and brother-in-law of Zouaydi.

Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaeda network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turkish Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

Kamel provided material support to the Hamburg al Qaeda cell which planned, organized, and carried out the September 11th attacks.

Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing.

The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable organization founded in 1983 by Kamel and managed by Mohammed Abed al-Yamani.

Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

Iqraa International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

Iqraa International has a branch in the U.S. registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa int,ernational announced, in 2002. annual sales in an amount of $1,200,000.

IRS form 990 of the U.S. branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

Iqraa International is currently under investigation by Russian Federal Security Services

(FSB) for terrorism financing and logistic support.

The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

Servakh Abid Saad, Director of the Russian office of Iqraa International charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Kamel partners. He began his career as manager of the board of DABG.  Mohammed Abed al-Yamani became executive board member of DABG and is currently deputy President of DABG.

Mohamed Abed al-Yamani, as director of Iqraa International, and Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina, received $4,266,723 from Bakr Bin Laden and Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

Muhammad Abed al-Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by DABG and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with DABG. Iqraa also maintains operations through a local branch of the organization based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-4000l6.

Kamel is the owner of the Iqraa satellite television network. According to Iqraa TV's director, Abdul-Qader Tash, the channel is the "brain child" of Kamel.

Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by al Qaeda and other transnational terror groups worldwide via the powerful medium of television programming.

A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

The issue is not one person, two, 10 or 100 going out with their guns to support their brothers. Defeating the infidels requires a much greater effort. It requires the mobilization of the nation. How can the nation be mobilized? I believe that the stupid acts of these Jews and Crusaders mobilize the nation. The big explosion will come!

Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Kamel's ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

Another Kamel-sponsored program on Iqraa TV, Muslim Woman Magazine, explicitly extols the virtues of child violence and hatred against Jews and Christians:

"Anchor Doaa Amer: Our report today will be a little different because our guest is a girl, a Muslim girl, but a true Muslim. Allah willing, may our God give us the strength to educate our children the same way, so that the next generation will turn out to be true Muslims who understand that they are Muslims and know who their enemies are. This girl will introduce herself immediately. She is the daughter of my sister in faith and of the artist Wagdi alArabia. Her name is Basmallah.

3½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

'Amer: Basmallah, how old are you?'

Child:  Three-and-a-half.

'Amer: Are you a Muslim?

Child: Yes.

'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because…

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child: In the Koran.

Amer: Right, he said that about them in the Koran.. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate them now while they are still children so that they will be true Muslims.

Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

> "Only our culture understands sacrifice, loyalty and honour. No one in the
> [western] world sacrifices his life for his homeland. If his homeland is
> drowning he is the first to jump ship. But in our culture it is different
> because when a martyr dies, he reaches the height of bliss. When the
> martyr explodes, he knows that he is not dead. He is simply in transition to
> another, more beautiful world, because he knows very well that within
> seconds he will see the light of the Creator."

Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

In January 2003, Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S. based public relations firm … designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam."

In October 2001, Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were "seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

As the foregoing demonstrates, Kamel thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Kamel's participation in the jihad campaign for al Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad against Jews and Crusaders.

## ADDENDUM TO SECOND AMENDED COMPLAINT

60573

## A.      Al Rajhi Banking & Investment Corporation

Al Rajhi has long provided financial services and other forms of material support to terrorist organizations, including al Qaeda.

Al Rajhi has served as one of al Qaeda's preferred banks for many years, maintaining accounts for many of the charitable organization defendants that operate within al Qaida's infrastructure, including but not limited to the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

In cooperation with these charitable organizations, Al Rajhi advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for these charitable organizations, thereby providing a mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi facilitated al Qaeda's fundraising efforts.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for al Haramain and the IIRO, have been used to transfer funds to al Qaeda cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaeda's charity fronts, via *zakat* and *haran',* contributions, including MWL, WAMY, IIRO, Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaeda, and that the funds it contributed directly to the charities were being funneled to al Qaeda. In fact, individual defendant Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of these charitable organizations, including the MWL and the IIRO. Through his involvement in the affairs of these charitable organizations, Suleiman Abdul Aziz Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaeda's operations, and consequently that the accounts maintained by Al Rajhi on behalf of those charitable organizations were being used to channel funds to al Qaeda.

Nevertheless, Al Rajhi has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaeda.

Al Rajhi thereby has, for a period of many years, provided critical financial and logistical support to al Qaeda to support that terrorist organization's global jihad. The Attack was a direct, intended and foreseeable product of Al Rajhi's participation in al Qaeda's jihadist campaign.

## B.      Sulaiman Abdel Aziz al Rajhi

Sulaiman Abdel Aziz al Rajhi is a Saudi national who has long provided material support and resources to al Qaida.  Al Rajhi is Chairman, Managing Director, and the largest shareholder of al Rajhi Banking and Investment Corporation, and the primary financier of the SAAR Foundation and many of the organizations which operated within the SAAR Network of charities and businesses, including but not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc.,

Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation. These charities, largely based in Herndon, Virginia, have been used to funnel moneys direct to al Qaeda and the Enterprise. Specifically, the SAAR Network entities funneled billions of dollars of financial sponsorship as well as logistical assistance to al Qaeda through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

In addition, Sulaiman al Rajhi funneled money through Youssef Nada, a noted terrorist financier, through the banks he controlled in the Bahamas and for which al Rajhi had worked under Nada, as well as Bank al-Taqwa.

Persons associated with the SAAR Foundation and its network are also implicated in the United States Embassy bombings in Kenya and Tanzania.

Sulaiman Al Rajhi also serves on the board of directions of the International Islamic Relief Organization (the "IIRO"), a purported "charitable" organization which has long acted as a fully integrated component of al Qaeda's logistical and financial support infrastructure, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations.

Through his control of al Rajhi Bank, Sulaiman Abdel Aziz al Rajhi actively participated in that financial institution's support and sponsorship of al Qaeda. For example, with Sulaiman Abdel Aziz al Rajhi's support and authorization, al Rajhi Bank maintained accounts for many of al Qaeda's charity fronts, including the IIRO, the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, and provided mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts. At all times material hereto, Sulaiman Abdel Aziz al Rajhi was expressly aware that many of the charities for which al Rajhi Bank provided financial services were conduits for financing al Qaeda, and that the Bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that terrorist organization.

Indeed, as mentioned previously, Sulaiman Abdel Aziz al Rajhi has served as an officer of the IIRO. Significantly, numerous branches of the IIRO were publicly implicated in al Qaeda plots throughout the 1990s, during the time that Sulaiman Abdel Aziz al Rajhi was serving as an officer of the IIRO, and at which time al Rajhi Bank maintained accounts for that ostensible charity. Branch offices of Al Haramain were similarly implicated in al Qaeda plots throughout the 1990s.

Sulaiman Al Rajhi is identified on the "Golden Chain" as one of al Qaeda's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaeda. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator

Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. Filed Jan. 6, 2003). The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaeda's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm.

Through his business enterprises and involvement in charities operating within al Qaeda's infrastructure, Sulaiman Abdel Aziz al Rajhi has long provided material support and resources to al Qaeda. Al Rajhi has close ties to the Saudi Royal Family. Several members of the Saudi Royal Family are employed by or serve as officers of businesses owned or controlled by al Rajhi. For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange. Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company. Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company. Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.

Sulaiman al Rajhi also managed the National Commercial Bank budget of defendant Saudi Joint Relief Committe. In addition, for decades, al Rajhi has been involved with the Muslim Brotherhood, a 74-year-old group which is under investigation by European and Middle Eastern governments for its alleged support of radical Islamic and terrorist groups. For decades the Brotherhood has been a wellspring of radical Islamic activity; Hamas, the militant Palestinian group, is an offshoot of it. It is also tied to leading neo-Nazism, including the Swiss Holocaust denier Ahmed Huber.

In all these capacities, including his capacity as an officer and/or director of many of the SAAR Network Entities, Sulaiman al Rajhi has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attach on America.

## C.    Saleh Abdulaziz Al Rajhi

Saleh Abdulaziz al Rajhi, eldest brother of Sulaiman, has been Chairman of Al Rajhi Banking and Investment Corporation, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

Furthermore, Saleh Abdulaziz al Rajhi is personally linked to Wadi el-Hage, Osama bin Laden's personal secretary (Saleh's phone number was found in Wadi's phone book upon his arrest.). Wadi el-Hage was convicted for his role in the 1998 Embassy bombings in Kenya and Tanzania.

## D.    Abdullah Sulaiman Al Rajhi

Abdullah Sulaiman Al Rajhi is General Manager of the Al-Rajhi Banking & Investment Corp., and member of its executive committee, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

In addition, he was President of Aradi, Inc., located at the same address as SAAR, 555 Grove Street in Herndon, Virginia.  Through Abdullah Sulaiman Al Rajhi, the Safa Group had access to a bank and banking officials for purposes of producing checks purportedly paid for SAAR's charitable purposes but which actually went towards the benefit of the Enterprise.

## E.      Sheikh Abdul Aziz Al Ibrahim

Sheikh Abdul Aziz Al Ibrahim is the brother-in-law of the late King Fahd of Saudi Arabia. (His sister, Jawhara, was the second wife of King Fahd.)

With another brother, Walid, along with Defendant Saleh Abdullah Kamel, Sheikh Abdul Aziz Al Ibrahim created in 1991 the leading Arab television satellite service, Middle East Broadcasting Corp, which purchased the press agency United Press International in 1992.

In 1990, he created the Ibrahim bin Abdul Aziz al Ibrahim Foundation which purports to support humanitarian assistance. Through his direction and control, he entrusted the organization with the responsibility of realizing his objective of using it as a covert vehicle for supporting the al Qaeda movement and other terrorists. The organization is present in Kenya, Bosnia, Chechnya, South America and South Asia.

The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network in the FBI's investigation into the attacks against the American embassies on August 7, 1998.

In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including defendants Al-Haramain Foundation, Help African People, the International Islamic Relief Organization, the Ibrahim bin Abdul Aziz al Ibrahim Foundation, and Mercy International Relief Agency. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

The decision was announced by the Kenyan government's NGO coordinator who declared: Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyans' lives . . . They had been found to be working against the interests of Kenyans in terms of security.

After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five nongovernmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Ibrahim bin Abdul Aziz al Ibrahim Foundation did not seek an appeal.

In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Ibrahim bin Abdul Aziz al Ibrahim Foundation as one of those which provided help to Osama bin Laden: "The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with

Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are ... Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects."

Other reports suggest that Ibrahim bin Abdul Aziz al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Ibrahim bin Abdul Aziz al Ibrahim Foundation, World Youth Islamic Assembly and Islamic Rescue Organization - had taken part in setting up these bases.

In an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was instruction in religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz al Ibrahim, which emphasized (quote): "Armed struggle in the name of Allah, for his word to be above all else…Sacrifice your life in witness of Allah's religion."

According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

That seminar event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint Committee for Islamic Action and Studies with representatives from Defendants Muslim World League, Islamic International Relief Organization, World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

Sheikh Abdul Aziz Al Ibrahim has extensive ties to the United States.

In 1989, Sheikh Abdul Aziz Al Ibrahim acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to Sheikh Abdul Aziz Al Ibrahim at the end of 1989 by BCCI. Sheikh Abdul Aziz Al Ibrahim was one of BCCI's leading loan beneficiaries.

In the mid 1980s, while living in Hollywood, California, Sheikh Abdul Aziz Al Ibrahim engaged in a romantic pursuit of actress/model Brooke Shields, setting up a movie production company (Mystery Man Productions) to invest over $22 million (including BCCI loan proceeds) in the production of a film vehicle for her, *Brenda Starr*. The production was so flawed that while filmed in 1986, the movie would not be released in the United States until 1992.

Apart from being a lead investor in Marina del Rey, Sheikh Abdul Aziz Al Ibrahim's real estate assets have included Ritz-Carlton hotels in New York, Washington, Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills above Bel-Air and largely vacant land near Disney World in Florida. (Ritz-Carlton hotels decided in 1997 to pull back their name from those facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Sheikh Abdul Aziz Al Ibrahim.)

The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

According to court papers filed in 1995, as reported by the *Washington Post,* Sheikh Abdul Aziz Al Ibrahim has won large sums of money gambling in the United States on which he did not wish to pay taxes to the Internal Revenue Service. In order to silence a former employee regarding these and other allegations, Sheikh Abdul Aziz Al Ibrahim hired the law firm of Sidley & Austin and filed suit in Washington, D.C. to seek injunctive relief. The suit was dismissed.

## F.    World Assembly of Muslim Youth

### I.    INTRODUCTION

World Assembly of Muslim Youth ("WAMY") is a multi-national organization which has been at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (7) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

### II.    WAMY'S ORGANIZATIONAL STRUCTURE

Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League ("MWL"). Other organizations operating under the auspices of the MWL include the

International Islamic Relief Organization ("IIRO"), and Rabita Trust. Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia. WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.

The Kingdom extensively supervises and controls WAMY's activities. On the macro level, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.

Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

> If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within -- there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia

set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters. which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

### III.    THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

Osama bin Laden's al Qaeda organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaeda's terrorist activities gamer the most attention, terrorist attacks represent but one of many vehicles through which al Qaeda seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaeda views the confrontation with the West to have two distinct, but equally important fronts: (1)   cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad - The Various Threats From Radical Islam to the Democratic Legal Order,* General Intelligence and Security Service of the Netherlands, December 2004.

As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaeda engages in militant and violent operations throughout the World. Al Qaeda's military activities are by no means limited to terrorist attacks. In fact, in establishing al Qaeda, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaeda's military efforts have

focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaeda has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaeda's participation in these regional conflicts takes many forms. Al Qaeda provides funding and logistical assistance to local extremist organizations in support of their military and terrorist activities. In addition, al Qaeda deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.

Through its military activities in these "regional" conflicts, al Qaeda aims to establish and support radical Islamic regimes, a critical component of al Qaeda's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaeda's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:

> [al Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.

> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad *Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report").

> Al Qaeda also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the organization's image among local Muslim communities, and represent an integral component of al Qaeda's ongoing recruiting and fundraising efforts. Al Qaeda's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West.  In fact, several of the September 11th hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaeda's growth and development cannot be overstated. Perhaps more than any other factor, al Qaeda's participation in these "regional" conflicts has enabled al Qaeda to extend its sphere of influence throughout the globe.

## IV.     WAMY'S ROLE IN ADVANCING THE AL QAEDA MOVEMENT

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad. . . Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad" and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book I*slamic Camps: Objectives, Program Outlines and Preparatory Steps,* prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us!
>
> So we may defend the flag on this Day of Jihad, are you miserly with your blood?!
>
> And has life become dearer to you? And staying behind sweeter?
>
> Is staying in this world of torment more pleasing to us?
>
> You are amongst those called upon by Destiny.
>
> Come! So we may revive the times of our predecessors!

Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaeda movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role

in al Qaeda's cultural assault on the United States and democratic institutions throughout the world.

Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, Southeast Asia, the United States and elsewhere. WAMY's support for al Qaeda's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaeda training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaeda and associated groups; and operated as a recruiting vehicle for al Qaeda and associated groups. Through these criminal activities, WAMY has further helped al Qaeda to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina... has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces....

> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered.... Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times,* December 5, 1992.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him...." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing

and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS:*

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC).
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops….
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab...
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerrillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS,* May 19, 2000.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to Chechnya by Osama bin Laden to organize al Qaeda's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists.... He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

1998 Defense Department Report

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan. . ." *U.S. Links bin Laden to Chechnya, MSNBC.com,* August 15, 1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab 's control. *Id.*

Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

[I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. ... It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1. The question that must be asked is: What do the Chechen Muslims need from us today?

2. **The need money to buy arms and ammunition. (emphasis supplied)**

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

*The Chechen Tragedy — The Reality and the Required Role,* Dr. Maneh al Jahari, *al Jazeera,* January *15,* 2000.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19, 1999 article in the *Australian General News,* the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF"), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News,* January 15, 1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism - 1999,* United States Department of State, April 2000.

Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir. According to a December 8, 1995 article in the

periodical *Money Clips,* a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips,* December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella. *See*
*SIMI:  Nursery of Hate, India Today,* April 2, 2001; *ISI Twin Plan — Attack Christians, Defame Hindu Outfits, The Economic Times of India,* July *15,* 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring,* August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India),* July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

Q: In your conferences, you have openly eulogized Osama bin Laden.

A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

*SIMI:  Nursery of Hate, India Today,* April 2, 2001.

In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lashkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigation of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online,* December 9, 2002.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled *"Military Lessons In The Jihad Against The Tyrants,"* was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational cells. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda.  WAMY's U.S. offices were established in Falls Church, Virginia in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in

the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar,* June 11, 2002.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire,* September 5, 2003.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda... Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe. *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence. U.S. Department of the Treasury,* Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005.

## V.    WAMY'S KNOWLEDGE

For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11, 2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly

orchestrated and participated in the support provided to al Qaeda and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

Given the close ties between WAMY's senior leadership and high level officials of the Kingdom, it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from 1997 forward.

The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well.

A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, *whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals...."* (emphasis supplied). The *International Convention for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution 54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic

charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack.

In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and ideological support to al Qaeda and affiliated groups, for a period of many years leading up to the September 11th Attack.

## G.    The Abdul Aziz al Ibrahim Foundation

The Abdul Aziz al Ibrahim Foundation has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, or the al Qaeda, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Abdul Aziz al Ibrahim Foundation conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Abdul Aziz al Ibrahim Foundation conspired to conduct and/or participate in the operation or management of the enterprise itself.

HRH Prince Abdul Aziz al Ibrahim (or "Ibrahim Abdul Aziz Al Ibrahim") is a Saudi citizen and the brother-in-law of King Fahd of Saudi Arabia.

In 1990, he created the Abdul Aziz Al Ibrahim Foundation (a.k.a. Ibrahim Abdul Aziz al Ibrahim Foundation) whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia.

The Abdul Aziz Al Ibrahim Foundation has built, among others, mosques in Düsseldorf, Gibraltar, Milan and Moscow. The Sheik Ibrahim Mosque in Caracas, the continent's second largest mosque, was built with funding from the Ibrahim bin Abdul Aziz Al Ibrahim Foundation, according to Iman Omar Kaddoura. The Saudi royal family established the foundation to help the spread of Islam.

The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network, as uncovered by the FBI's investigation into the attacks against the American embassies on August 7, 1998, as was revealed in the confidential publication, *French Africa Online*.

In August 1998, Kenya became the focal point of the international news following the bombing of the U.S. embassies there and in neighboring Tanzania. The attack on the embassy resulted in the death of some 400 Kenyans, as well as twelve embassy staff members; thousands of Kenyans were wounded, many grievously. In addition to the human suffering caused by the bombing itself, the incident had further repercussions for the human rights situation.

Fazul Abdullah Mohammed, an al Qaeda operative implicated in the 1998 US Embassy bombings, was arrested and searched by Kenyan authorities. One of the items seized with him was a notebook containing the business card of al Ibrahim Foundation's director, Abdul Kader M. Izzi. He was also carrying a business card of Mohamed Munir Chaudhri, the lawyer used by Wadi al Hage and al Qaeda operative, Khalid al Fawwaz.

In September 1998, the Kenyan government cancelled the registration of five Islamic relief agencies for allegedly supporting terrorism including Al-Haramain Foundation, Help African People, the Islamic Relief Organization, the Abdul Aziz Al Ibrahim Foundation, and

Mercy Relief International. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

The decision was announced by the Kenyan government's NGO coordinator who declared that:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered. . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five non-governmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Abdul Aziz Al Ibrahim Foundation remained blocked.

First, the event drew international attention from the domestic human rights problems in Kenya. Second, the government's response to the bombing was to crack down indiscriminately against foreigners and Muslim-run nongovernmental organizations (NGOs). Refugees, without distinction, were told to report to the immigration authorities and informed that documents issued by the U.N. High Commissioner for Refugees to them were no longer valid. When accredited refugees, with UNHCR letters, presented themselves at immigration, these letters were taken away and they were given papers that deemed them illegal immigrants.

> In a study paper dated October 1999, called *The New Azerbai Jan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh,* Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Abdul Aziz Al Ibrahim Foundation as one of those which provided help to Osama bin Laden:

The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

> Other reports suggest that Ibrahim bin Abdul Aziz Al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Abdul Aziz Al Ibrahim Foundation.

> In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Abdul Aziz Al Ibrahim Foundation, World Youth Islamic Assembly, and Islamic Rescue Organization - had taken part in setting up these bases.

> The foreign Islamic aid, which has been granted under the banner of da'awa ("summon to Islam"), has been targeted at Russia's Muslim population in the Volga-Urals, the

North Caucasus, and Central Russia. Its major official benefactor has been King Fahd of Saudi Arabia, who has regularly subsidized an annual hajj (pilgrimage) to Mecca and Medina for hundreds of Russia's Muslims. He has also sponsored dozens of scholarships to those who wanted to study at Islamic universities and colleges in Saudi Arabia, Turkey, Jordan, Syria, Libya, Kuwait, the United Arab Emirates and Malaysia, and subsidized the free distribution of Korans and other Islamic literature in various Islamic communities of Russia. Among other providers of official Islamic assistance are the University of Imam Muhammad bin Saud, the Islamic Development Bank, the Organization of Islamic Conference, the World Islamic League, the World Association of Islamic Youth and the World Center of Islamic Sciences of Iran.

Unofficial Islamic assistance has been even more impressive. It has been conducted by Kuwait's Committee of Muslims of Asia, the Iranian World Organization Madaris, Saudi Arabia's Islamic Charities of Taiba and al-Ibrahim Foundation, the International Islamic Charities of Ibrahim Hayri, Igatha, Zamzam and the United Arab Emirates' Islamic Charity Organization A1-Khairya. Along with building and staffing mosques, madrassas, Islamic universities and other Islam-related institutions, these funds have heavily invested in the proselytizing conducted by Islamic missionaries and the organizing of various Islamic training camps and courses.

Some Islamic organizations in a few countries also acted as outside players financing the IMU's activities and operations. Pakistani Jamaat-e-Islami, the Qatar Charity Society, the Saudi Islamic Salvation Foundation, the Ikhwan Al Muslimun, and the World Assembly of Muslim Youth (WAMY) were such supporters.

In the spring of 1999, an IMU delegation visited Saudi Arabia and received $270,000 dollars from the Abdul Aziz Ibrahim Foundation, a relief organization of the Saudi royal family. A few months later the Taliban allocated $50,000 dollars to support the families of the IMU members based in Afghanistan. In early August of the same year, Bin Laden's five personal envoys visited the village of Hoit in Tajikistan and delivered $130,000 dollars to Namangani. At that time, IMU fighters were carrying out incursions into Uzbekistan via southern Kyrgyzstan.

Shortly thereafter, a meeting took place in Karachi between the members of Islamic organizations from Pakistan, Kuwait, Jordan, Egypt, Palestine, Kashmir, Uzbekistan, and Chechnya. They agreed to raise two million dollars to support the Holy Jihad against Karimov's regime.

In June of 2000, IMU's press-secretary Zubair ibnAbdurahman confirmed the receipt of a few thousand dollars from Bin Laden intended to stir up 'the holy war against Karimov 's pro-Zionist government'. According to the Ferghana Province Directorate of National Security, Juma Namangani annually received around three million dollars from Osama bin Laden.

During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz Al Ibrahim, which emphasized:

Armed struggle in the name of Allah, for his word to be above all else. . . Sacrifice your life in witness of Allah's religion.

According to a document summarizing the seminar, "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

The event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint committee for Islamic Action and Studies with representatives from the Muslim World League, Islamic International Relief Organization, and World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz Al

Ibrahim Foundation. Saudi-funded textbooks and other publications reveal the presence of institutionalized hate speech. These products are distributed by Saudi officials including senior diplomats at the Saudi Embassy — as well as by Saudi-funded organizations, such as the Abdul Aziz al Ibrahim Foundation, the World Assembly of Muslim Youth (WAMY), and the Institute for Islamic and Arabic Studies in America (IIASA), groups that take full advantage of America's First Amendment freedoms.

The book, *Deen al-Haqq* (The True Religion), authored in Arabic by Abdul-Rahman Bin Hamad Al-Omer, printed by the Ministry of Islamic Affairs and Endowments, paid for by the foundation of Abdul-Aziz Al Ibrahim, and distributed by IIASA and WAMY in the U.S. contains the following:

"Judaism and Christianity are deviant religions" (page 25)

"The Saved Sect ⸺ Muslims are many in number but few in reality, and the groups that claim to be Muslim are many, approaching 73 sects and numbering more than 1 billion." (An assertion that only Wahhabis are Muslims and all other true Muslims are unbelievers.⸺ page 47)

"(Negations of One's Islam) [Negation 8] -Befriending the unbelievers, through loving and cooperating with them while knowing that they are unbelievers, makes those who are their friends the same as them." (page 99)

"We say to every Christian and every Jew and all those outside Islam, 'your children are born into Islam, but you and their mother take them away from Islam with your corrupt rearing.". (page 119)

"There are groups in the Muslim world that claim to be Islamic but they are outside Islam. They claim Islam while in reality they are not Muslims because their beliefs are the beliefs of unbelievers." (page 123)

Abdul Aziz al Ibrahim, founder of the Abdul Aziz al Ibrahim Foundation, also had many other U.S. contacts.  In 1989, he acquired a portion of the Marina Del Rey real estate venture in Los Angeles through various offshore companies. Al Ibrahim did this to mask the company's connection to the Saudi royal family. A bank account was opened in Luxemburg as a shelter from public disclosure of the company's financial identity and activity. Al Ibrahim set up 10 companies in California as shell corporations to be the named owners of the real estate holdings of the company. However, he used his company in the Cayman Islands, Marina Enterprises, to control 100% shareholder interest for each of the 10 California shell corporations. On paper, these shell companies were to be managed by Newfield Enterprises, a front company set up by al Ibrahim for real estate purposes. Al Ibrahim also formed North American Real Estate Holding and named it 100% controlling shareholder of the Cayman Island company, Marina Enterprises.

American authorities discovered a loan of $132 million that was granted to al Ibrahim at the end of 1989 by Bank of Credit and Commerce (BCCI). Al Ibrahim was one of BCCI's leading loan beneficiaries. Between 1986 and 1990, BCCI was involved in the fraudulent schemes and practices of the NCB Chairman Khalid Bin Salim Bin Mahfouz, who was also the Chief Operating Officer of BCCI and major shareholder.

The 1992 US Senate report on the BCCI affair detailed the role played by the NCB in hiding BCCI assets in a development in the "cover-up and obstruction of investigation".

In September of 1990, Price Waterhouse learned that BCCI had concealed further lending of over $500 million to its major customs by "parking" that lending with a

Middle Eastern bank, namely, the National Commercial Bank of Saudi Arabia controlled by Khalid bin Mahfouz, the most powerful banker in the Middle East, who was later indicted in the United States in connection with his activities pertaining to BCCI and First American.

> Khalid Bin Mahfouz was indicted on July 1, 1992 on charges of participation in a Scheme to Defraud in the First Degree in violation of N.Y. Penal Law § 190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of defendant's interest in BCCI. Pursuant to the indictment, an arrest warrant was issued. A settlement with US authorities resulted in approximately $190 million paid to the Court Appointed Fiduciaries with an additional $10 million paid to a plaintiff The settlement agreement regarding the plea and cooperation with the District Attorney of New York and the Department of Justice concerned Khalid Bin Mahfouz and the National Commercial Bank.

> The 1992 US Senate Report on the BCCI Affair has linked the bank to financial funding of the Afghan war.

(...) BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

> The BCCI was also implicated in supporting terrorism, as reported by the US Senate.

In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

> The Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

> The Report gives details regarding the facilities provided by the bank to known terrorist Abu Nidal and other terrorists.

> In the United Kingdom, a key window on BCCI's support of terrorism was an informant named Ghassan Qassem, the former manager of the Sloan Street branch of BCCI in London. Qassem had been given the accounts of Palestinian terrorist Abu Nidal at BCCI, and then proceeded, while at BCCI, to provide detailed information on the accounts to British and American intelligence, apparently as a paid informant,

60573

according to press accounts based on interviews with Qassem. As of 1986, the information obtained about Abu Nidal's use of BCCI was sufficiently detailed as to justify dissemination within the U.S. intelligence community. In July, 1987, as a result of the information provided by Qassem, a State Department report concerning Abu Nidal and Qassem, declassified in 1991 at the request of the subcommittee, describes Abu Nidal's .use of BCCI. (...) Other terrorist groups continued to make use of BCCI, including one "state sponsor of terrorism," and the Qassar brothers, Manzur and Ghassan, who have been associated with terrorism, arms trafficking, and narcotics trafficking in connection with the Government of Syria(...).

Apart from being a lead investor in Marina Del Rey, Al Ibrahim real estate assets have included Ritz-Carlton hotels in New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Abdul Aziz Al Ibrahim.

> The al Ibrahim partnership that holds Marina Del Rey's biggest real estate portfolio, MGC Commercial, filed Chapter 11 bankruptcy protection in June of *1995*. The action was filed in the US Bankruptcy Court for the Central District of California.
>
> MGC Commercial's filing came just as lenders, owed about *$50* million in defaulted mortgages, were about to take possession of a half-dozen multi-family and commercial/retail properties. It also came barely two years after confirmation of a previous Chapter 11 reorganization plan - the plan through which Sheik Abdul Aziz al Ibrahim took full control of the big marina portfolio from former partner Abraham M. Lurie.
>
> The *L.A. Business Journal* reported the al Ibrahim-controlled partnership that holds the 369-unit Doubletree Marina Beach hotel has also defaulted on a mortgage - and is under a court-appointed receiver's supervision. The sheik also controls a partnership that holds two other Marina hotels.
>
> The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel, and NY Overnight Inc., all based at the same address in Marina Del Rey.
>
> Al Anwa Holding is Al Anwa for Contracting Establishment (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by Abdul Aziz Al Ibrahim. Al Anwa for Contracting is shareholder, along with Dallah al Baraka (Chaired by Saleh Abdullah Kamel), of the National Environmental Preservation Co. Ltd. in Jubail, Saudi Arabia.

In 1991, Abdul Aziz Al Ibrahim, his brother, Walid, and Saleh Abdullah Kamel, created the leading Arab television satellite service, Middle East Broadcasting Corp (or "MBC"), which purchased the press agency United Press International (or "UPI") in 1992.

> Since 1993, funds and companies having the purpose of expanding their ideas of religious extremism ("Al-Igasa", "CAAP", Worldwide Assembly of Islamic Youth**,** "Al Ibrahim") legally operated in the territory of Tatarstan, a member of the Russian Federation in the Ural Mountains. Practically all religious schools and a number of large educational institutions are opened or are secretly financed by wahhabist international organizations ("Taiiba", Committee of Moslems of Asia, Islamic Heritage Revival Society), and the libraries are completed with the literature of wahhabist nature.
>
> In March 2002, searches by Bosnian authorities of BIF's offices in Sarajevo,

Bosnia-Herzegovina (operating under the name *Bosanska Idealna Futura)* yielded a substantial amount of evidence shedding light on the network al Qaeda established, including links to al Ibrahim. Shortly thereafter, the offices of al Haramain were raided in Bosnia, as well.  In that raid they came across documents containing the home and office phone numbers of al Ibrahim and the al Ibrahim Foundation.

The raids produced several documents offered into evidence in Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements, *United States v. Enaam M Aranout,* No. 02 CR 892 (N.D. Ill, filed January 6, 2003).

The Abdul Aziz al Ibrahim Foundation has thereby knowingly, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of the aforementioned Abdul Aziz al Ibrahim Foundation's participation in the jihad campaign for a! Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad Against Jews and Crusaders.


## H.     Saleh Abdullah Kamel, Dallah Al Baraka Group and Al Baraka Investment And Development

Saleh Abdullah Kamel ("Kamel") has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, al Qaeda and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Kamel conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Kamel conspired to conduct and/or participate in the operation or management of the enterprise itself.

After serving as an adviser to the Saudi Minister of Finance, Kamel founded Dallah Al Baraka Group, LLC ("DABG") in 1969, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

Beginning in the late 1970s, Kamel financed and developed DABG and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

In 1982, Kamel and DABG began directing tens of millions of dollars in funds to at least 20 non-governmental organizations, including Osama Bin Laden's Mekhtab al Khidmat, the predecessor to al Qaeda, which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

DABG, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. DABG posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third among Saudi companies in sales.

The DABG financial arm is Al Baraka Investment & Development ("ABID"), a wholly owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab

and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al Barakaat Bank".

These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank and Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, including Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American and Yemen Islamic Bank for Finance & Investment.

ABID assets, including funds under management, are valued at $4.4 billion. U.S. assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

DABG's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah.

DABG has also facilitated jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

Kamel and DABG materially supported Osama Bin Laden and his al Qaeda network of front companies, farms and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaeda first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal,* the official International Islamic Relief Organization ("IIRO") publication, illustrates how Kamel has carried out his ongoing jihad. The advertisement states:

> "All donations are deposited into the organization's joint accounts in all the branches of... Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaeda. In fact, the United States Government has been investigating Kamel for his material support of Al Qaeda along with numerous other defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaeda, and the assets of other material sponsors have already been frozen by the Department of Treasury.

In March 2002, the Bosnian police found several documents and items regarding the history of Al Qaeda during searches in the offices of Benevolence International Foundation ("BIF") in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that according to the U.S. government is "a list of people referred to within Al Qaeda as the "Golden

Chain" or wealthy donors to mujahideen efforts". Among them was Kamel.

The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the indictment of Enaam Arnaout on October 9, 2002 (02 CR 892).

The "Golden Chain" list was introduced and relied on in *United States v. Arnaout,* No. 02 Cr. 892, 2003 WL255226, at *l.2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists ("SDGT"), a decision not lightly taken by the executive branch of the government.

A former member of al Qaeda, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaeda. Al Fadl is a former al Qaeda leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaeda terrorist trials.

In 1992, Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

As part of his ongoing material support for al Qaeda and other Islamic militant groups in the Balkans, Kamel visited Bulgaria prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles.

In 1998, Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain account at Al Baraka Bank in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from the Al Haramain accounts.

The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

Both brothers have, at various times, served on the Shariah Compliance Board of Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

The Darul Ulum Madrassa backs jihadi organizations and both the Usmani brothers have provided practical help in setting up jihadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa.

Darul Ulum provides support to al Qaeda affiliates and SDGT entities Harkatul Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen.

Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and al Qaeda in their war against the United States.

Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in Houston, Texas. As early as 1984, Kamel held sizeable investments in the United States via his financial interests in DABG.

In 1996, DABG owned more than $230 million in assets in the United States and Europe. Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

In 2004, as chairman of the General Council of Islamic Banks, Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials.

Kamel is part owner of London-based Middle East Broadcasting Centre ("MEBC"). In 1992, Kamel purchased the U.S. media company United Press International ("UPI") for $3.9 million through his company MEBC. Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended to invest more than $10 million between 1993-1995 to revive the struggling media company. Kamel owned UPI until 2002 when it was sold to the Unification Church.

In 1999, it was announced that Kamel and DABG were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

Kamel and DABG sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

DABG's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

In July 2003, Kamel and DABG announced that they would sue four unnamed Western banks as third party defendants if Kamel and DABG were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, ". . .the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

Kamel and DABG are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.,* (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

Sanabel al Khair, the North American financial arm of IIRO, was established to receive, invest, and generate funds for the operations of International Relief Organization ("IRO"),

the "United States arm" of IIRO. Beginning in about 1991, IRO was operated out of an office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain al Qaeda fundraiser.

Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas provided account numbers to facilitate the contribution of funds. These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of DABG.

A December 1993 advertisement from the official publication of the IIRO, *Al Igatha Journal,* which was distributed across the United States, illustrates how Kamel carried out his jihad by establishing Al Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaeda first started carrying out attacks against the United States. The advertisement states:

"All donations are deposited into the organization's joint accounts in all the branches of Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Kamel contributed at least $100,000 to the organization through his DABG branch in the U.S. in 1992.

Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993, Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

In 1992, regarding Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier,* describes the likely economic collaboration of Kamel and Al Baraka with Bin Laden:

"Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden,

Kamel and Al Baraka were provided with numerous public notices regarding the Sudanese government's support and harboring of international terrorists.

When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaeda network with military and logistical support through the government of Sudan.

During 1991, Kamel, Yassin Al Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

"There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad ... the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the

60573

United States--the 'Great Satan.'"

Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught... To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Kamel and Al Baraka:

In 1992 and 1993 Mohamed Atef [al Qaeda's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaeda, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

On October 3 and 4, 1993 operatives of Al Qaeda participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

From 1993 members of Al Qaeda began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaeda, including Atef and Abu Ubaidah al Banshiri.

Beginning in the latter part of 1993, members of al Qaeda in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, a U.S. citizen and admitted member of al Qaeda, surveyed the U.S. Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

An Al Baraka annual report from the period describes how Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads....During this time, Osama Bin Laden was overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country.

In January 1992, U.S. diplomats warned the government of Sudan to stop harbouring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice. They [terrorists] can come and go as they please. They operate here with impunity."

The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

In August 1993, it was widely reported in the English, Arabic, and Sudanese press that

60573

the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic fundamentalist terrorist entities.

A portion of Kamel's investment revenues in Sudan were annually required to be committed to zakat — the Islamic almsgiving. However, in Sudan, Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). . .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.. .mobilization and training of the popular defense forces; and providing for martyrs' families."

The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing *5* million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

Osama bin Laden warned the West, in the 1993 August edition of *Sudanow* two months before Al Qaeda coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops. The attack was carried out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

Osama Bin Laden was using diverted zakat funds, provided by Kamel and other major investors in the Sudanese economy, to recruit and train al Qaeda recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

In November 1993, the Arab Albanian Islamic Bank ("AAIB") was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), DABG (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, ". . . a secrecy that cannot be maintained in an institution that pretends to be serious".

The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi in the Arab Albanian Islamic Bank.

The Arab Albanian Islamic Bank was subsequently renamed United Albanian Bank. It is believed that Kamel and Al Baraka remain shareholders in the successor entity of AAIB.

60573

Kamel's Who's Who biography states that he has been a "founding member of Faisal Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Kamel in *The Saudi Gazette* on January 7, 2003.

According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions in its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

The Muslim World League Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan".

Faisal Islamic Bank of the Sudan is an associated company of the DMI Trust. The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated:

> "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to

establish an Islamic state. Together they encouraged Osama bin Laden to travel to Sudan and to develop his al Qaeda terrorist network to train soldiers for jihad.

In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

The Saudi American Bank serves as the bank for DABG. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaeda terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaeda's and Osama bin Laden's tenure there.

Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaeda terrorist operations as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaeda.

In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of Muslim Youth, IIRO and al Haramain Foundation.

Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co. and Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to

1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank. The bank was founded by Citibank, which owned 40% of it at the time he worked there,

Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and ABID. According to newly obtained information on al Shamal Islamic Dank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

Osama Bin Laden was close to the new regime of Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department:

"Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Kamel and ABID. Kamel holds 15% of the bank shares.

Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaeda operatives held bank accounts in al Shamal Islamic Bank under their real names:

> Q:      While you were in the Sudan, did you handle
>           money for Osama Bin Laden?
>
> A:                          Could you repeat the question.
>
> Q:                          Did you work on the finances for al
> Qaeda while
>
>                             you were in the Sudan?
>
> A:                          Yes.
>
> Q:                          Did you know where the bank

accounts of Osama
Bin Laden and al Qaeda were?

A:                              Yes.

Q:                              Do you know whose names they were in?

A:                              The bank account under Usama Bin Laden in Bank
Shaml [Al Shamal Islamic Bank], Khartoum.

Q:                              That was under Osama Bin Laden's true name?

A:                              Yes.

Q:      Were there accounts in other names?

A:      Yes. Afad Makkee got account also.

Q:      Afad Makkee, the account that he had under his name, do you know what name that is?

A:      I remember Madani Sidi al Tayyib.

Q:      Do you know of any other persons who had al Qaeda money in their accounts?

A:      Abu Rida al Sun.

Q:      Do you know his true name?

A:      Nidal.

Q:      Anyone else that you knew had al Qaeda money in bank accounts in their name?

A:      Abu Hajer al Iraqi.

Q:      Do you know his true name?

A:      Mamdouh Salim.

Q:      Did you have any accounts in your name?

A:      Shared with Abu Fadhl.

Q:      So you had accounts in your name that were shared with Abu Fadhl?

A:    Yes.

Q:    Do you recall anyone else that had bank accounts in
      their name for al Qaeda?

A:    Abdouh al Mukhlafi.

Jamal Ahmed Al-Fadl also testified that al Qaeda operatives received monthly
checks of several hundred dollars from al Shamal Islamic Bank accounts:

Q:    When you worked for Osama Bin Laden,
      in the Sudan, how much were you paid?

A:    $1,200 (...) per month.

Q:    For how long did you work for him?

A:    Almost two years.

Q:    What banks did he keep his money at?

A:    Bank el Shamar [Al Shamal Islamic Bank].

Q:    Any other banks?

A:    I think he had accounts in different banks,
      but I only recall Bank Shamar [Al Shamal Islamic Bank].

Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al Shamal Islamic
Bank to an al Qaeda representative in Jordan:

Q:                        How did you carry the $100,000?

A:                        In my bag with my clothes.

Q:    Do you recall what kind of bills the $100,000 was in?

A:    I remember they all hundred bill.

Q:    Sorry?

A:    They all hundred bill.

Q:                        They were all hundred dollar bills?

A:                        Yes.

Q:                        Who gave you the money?

A:                        Abu Fadhl, he bring it from Shamal
Bank [Al

Shamal Islamic Bank] and he bring it to me.

Q:                                    Abu Fadhl brought it from the Shamal
Bank [Al
        Shamal Islamic Bank]?

A:                          Yes.

During the course of the same trial, another associate of Bin Laden, Essam Al Ridi, testified that the bank was used for operational purposes in stating that "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation ("BIF"), was subject to a complaint from the FBI on April 29, 2002. The assets of BIF have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaeda.

Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely know that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

Osama Bin Laden was allowed to maintain accounts as an investor in al Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y February 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes."

When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Kamel's Al Baraka Bank. This fact indicates that Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaeda by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency ("TWRA"), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaeda network and operating terrorist training camps for al Qaeda and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

In a 1994 interview with the Islamist magazine Gazi Husrev Beg, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

In 1977, Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the Financial Strategy of the Muslim Brothers, illustrates that Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

The document describes how Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

The document states that Kamel and Al Baraka are the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

With the investment support of Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank…"

Swiss authorities have seized a copy of the Financial Strategy of the Muslim Brotherhood containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada. The same document mentions Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

By becoming majority owners in the International Islamic Bank in Luxemburg, Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics ... is a good instrument to implement many projects which are necessary for the Gamaat and its members ... [and] it is a good instrument to

train higher level economic, financial and technical staff, within the framework of the Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

Kamel and Al Baraka Bank appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaeda by President George W. Bush. In announcing the designation of AlTaqwa as a global terrorist entity, President Bush stated:

"Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaeda shift money around the world. Al Taqwa raises money for Al Qaeda. They manage, invest, and distribute those funds. . . They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

"As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaeda organization received financial assistance from Youssef M. Nada [director of the bank]."

The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaeda, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q:     A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that...?

> A:     Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

In 1995, it was reported that Kamel and Al Baraka Bank had "major investments" in Bank Al Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

In 1997, while Kamel maintained investments at Bank Al-Taqwa, Agence France Presse and the U.S. Department of Treasury reported that terrorist fundraisers were annually

transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts. Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

Thus, as early as 1995, Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

Bank Al Taqwa diverted funds from investors' accounts to terrorist entities— but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

Thus, Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

Along with SDGT Yassin Al Qadi, Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. ("ALINTID") which was established during the early 1990s. The financial institution was reportedly designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

Multiple private and government sources have confirmed that Kamel and Yassin Al Qadi turned over the ownership and financial assets of ALINTID to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

"Through one of its branch offices, the AlHaramain transferred large amounts of money to the local Wahhabi center in Dagestan, known as the Islamic center "Kavkaz," in the capital of the republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-B arakaat Bank."

A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists*, states the following regarding the international financial structures, involved in funding of Chechen rebels:

In Saudi Arabia — (...) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al-Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman, Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in

Saudi Arabia.

The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

A memo from the FSB details the bank's role in funding Al Haramain:

> "Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

FSB had intercepted messages from Saudi-based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

> "The load is ready for sending -- grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles. One thousand rounds of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet-proof) vests have been bought."

Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview:

> "The Saudi Arabian Al-Haramain (...) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

The U.S. State Department reported the connections between al Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

> "The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries. According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (...). One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden. In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets have been blocked pursuant to Executive Order 13224 blocking property and prohibiting

60573

transactions with persons who commit, threaten to commit or support terrorism.

Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian        Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Kamel and Al Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaeda was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets — including Americans.

The involvement of Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, U.S. v. Soliman Biheiri, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank.

The investigation report of his interview with agent David Kane states the following:

> "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 ... Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were DABG and the Jordan Islamic Bank.

Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al-Aqsa, according to Al-

Aqsa's acting general manager, Mohammed Sarsour. In a statement, Kamel acknowledged that DABG owns another 12 percent.

Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the U.S. government in December 2001.

Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

Assets of Beit El-Mal, a 20% shareholder, were frozen. The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

Saudi national Omar Al Bayoumi, who lived in the United States from the late 1 990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of DAGB.

Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving

from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, a subsidiary company of Dallah Avco Aviation.

During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"-- made it clear that the government wanted alBayoumi's contract renewed "as quickly as possible."

The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaeda.

Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

Al Baraka Bank provided material support to the Spanish al Qaeda cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaeda cell which directly funded and helped coordinate the September 11th hijacker cell. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi.

Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaeda network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turkish Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

Kamel provided material support to the Hamburg al Qaeda cell which planned, organized, and carried out the September 11th attacks.

Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing.

The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable organization founded in 1983 by Kamel and managed by Mohammed Abed al-Yamani.

Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

Iqraa International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

Iqraa International has a branch in the U.S. registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa int,ernational announced, in 2002. annual sales in an amount of $1,200,000.

IRS form 990 of the U.S. branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

Iqraa International is currently under investigation by Russian Federal Security Services (FSB) for terrorism financing and logistic support.

The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

Servakh Abid Saad, Director of the Russian office of Iqraa International charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Kamel partners. He began his career as manager of the board of DABG.  Mohammed Abed al-Yamani became executive board member of DABG and is currently deputy President of DABG.

Mohamed Abed al-Yamani, as director of Iqraa International, and Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina, received $4,266,723 from Bakr Bin Laden and Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

Muhammad Abed al-Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by DABG and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with DABG. Iqraa also maintains operations through a local branch of the organization based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-4000l6.

Kamel is the owner of the Iqraa satellite television network. According to Iqraa TV's director, Abdul-Qader Tash, the channel is the "brain child" of Kamel.

Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by al Qaeda and other transnational terror groups worldwide via the powerful medium of television programming.

A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

The issue is not one person, two, 10 or 100 going out with their

267

guns to support their brothers. Defeating the infidels requires a
much greater effort. It requires the
mobilization of the nation. How can the nation be mobilized? I
believe that the stupid acts of these Jews and Crusaders mobilize
the nation. The big explosion will come!

Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Kamel's
ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in
Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an
enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

Another Kamel-sponsored program on Iqraa TV, Muslim Woman Magazine, explicitly
extols the virtues of child violence and hatred against Jews and Christians:

"Anchor Doaa Amer: Our report today will be a little different because our guest is a girl,
a Muslim girl, but a true Muslim. Allah willing, may our God give us the strength to
educate our children the same way, so that the next generation will turn out to be true
Muslims who understand that they are Muslims and know who their enemies are. This
girl will introduce herself immediately. She is the daughter of my sister in faith and of the
artist Wagdi alArabia. Her name is Basmallah.

3½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

'Amer: Basmallah, how old are you?'

Child:  Three-and-a-half.

'Amer: Are you a Muslim?

Child: Yes.

'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because…

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child: In the Koran.

Amer: Right, he said that about them in the Koran.. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate them now while they are still children so that they will be true Muslims.

Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

> "Only our culture understands sacrifice, loyalty and honour. No one in the
> [western] world sacrifices his life for his homeland. If his homeland is
> drowning he is the first to jump ship. But in our culture it is different
> because when a martyr dies, he reaches the height of bliss. When the
> martyr explodes, he knows that he is not dead. He is simply in transition to
> another, more beautiful world, because he knows very well that within
> seconds he will see the light of the Creator."

Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

In January 2003, Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S. based public relations firm ... designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam.

In October 2001, Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were "seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

As the foregoing demonstrates, Kamel thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Kamel's participation in the jihad campaign for al Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad against Jews and Crusaders.

## ADDENDUM TO SECOND AMENDED COMPLAINT

60573

## A.      Al Rajhi Banking & Investment Corporation

Al Rajhi has long provided financial services and other forms of material support to terrorist organizations, including al Qaeda.

Al Rajhi has served as one of al Qaeda's preferred banks for many years, maintaining accounts for many of the charitable organization defendants that operate within al Qaida's infrastructure, including but not limited to the International Islamic Relief Organization (the "IIRO"), the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

In cooperation with these charitable organizations, Al Rajhi advertises throughout the Muslim world the existence and numerical designations of the accounts it maintains for these charitable organizations, thereby providing a mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts. Through this mechanism, Al Rajhi facilitated al Qaeda's fundraising efforts.

The accounts maintained by Al Rajhi Bank on behalf of the charitable organizations, and in particular accounts it maintained for al Haramain and the IIRO, have been used to transfer funds to al Qaeda cells throughout the world. In addition, Al Rajhi has directly funded several of al Qaeda's charity fronts, via *zakat* and *haran',* contributions, including MWL, WAMY, IIRO, Al Haramain and the Saudi Joint Relief Committee.

Al Rajhi has long known that the accounts it maintained for these charitable organizations were being used to solicit and transfer funds to terrorist organizations, including al Qaeda, and that the funds it contributed directly to the charities were being funneled to al Qaeda. In fact, individual defendant Suleiman Abdul Aziz Al Rajhi directly participates in the management, funding and operation of several of these charitable organizations, including the MWL and the IIRO. Through his involvement in the affairs of these charitable organizations, Suleiman Abdul Aziz Al Rajhi has known, for a period of many years, of their extensive sponsorship of al Qaeda's operations, and consequently that the accounts maintained by Al Rajhi on behalf of those charitable organizations were being used to channel funds to al Qaeda.

Nevertheless, Al Rajhi has continued to maintain those accounts and to directly fund the charities. In doing so, Al Rajhi Bank knowingly provided financial services and other forms of material support to al Qaeda.

Al Rajhi thereby has, for a period of many years, provided critical financial and logistical support to al Qaeda to support that terrorist organization's global jihad. The Attack was a direct, intended and foreseeable product of Al Rajhi's participation in al Qaeda's jihadist campaign.

## B.      Sulaiman Abdel Aziz al Rajhi

Sulaiman Abdel Aziz al Rajhi is a Saudi national who has long provided material support and resources to al Qaida.  Al Rajhi is Chairman, Managing Director, and the largest shareholder of al Rajhi Banking and Investment Corporation, and the primary financier of the SAAR Foundation and many of the organizations which operated within the SAAR Network of charities and businesses, including but not limited to African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift

60573

Fund, Sterling Management Group, Inc., and York Foundation.  These charities, largely based in Herndon, Virginia, have been used to funnel moneys direct to al Qaeda and the Enterprise. Specifically, the SAAR Network entities funneled billions of dollars of financial sponsorship as well as logistical assistance to al Qaeda through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

In addition, Sulaiman al Rajhi funneled money through Youssef Nada, a noted terrorist financier, through the banks he controlled in the Bahamas and for which al Rajhi had worked under Nada, as well as Bank al-Taqwa.

Persons associated with the SAAR Foundation and its network are also implicated in the United States Embassy bombings in Kenya and Tanzania.

Sulaiman Al Rajhi also serves on the board of directions of the International Islamic Relief Organization (the "IIRO"), a purported "charitable" organization which has long acted as a fully integrated component of al Qaeda's logistical and financial support infrastructure, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations.

Through his control of al Rajhi Bank, Sulaiman Abdel Aziz al Rajhi actively participated in that financial institution's support and sponsorship of al Qaeda.  For example, with Sulaiman Abdel Aziz al Rajhi's support and authorization, al Rajhi Bank maintained accounts for many of al Qaeda's charity fronts, including the IIRO, the Muslim World League (the "MWL"), the World Association of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF") and Al Haramain Islamic Foundation ("Al Haramain").

Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, and provided mechanism to allow al Qaeda's supporters to deposit funds directly into those accounts.  At all times material hereto, Sulaiman Abdel Aziz al Rajhi was expressly aware  that many of the charities for which al Rajhi Bank provided financial services were conduits for financing al Qaeda, and that the Bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that terrorist organization.

Indeed, as mentioned previously, Sulaiman Abdel Aziz al Rajhi has served as an officer of the IIRO.  Significantly, numerous branches of the IIRO were publicly implicated in al Qaeda plots throughout the 1990s, during the time that Sulaiman Abdel Aziz al Rajhi was serving as an officer of the IIRO, and at which time al Rajhi Bank maintained accounts for that ostensible charity.  Branch offices of Al Haramain were similarly implicated in al  Qaeda plots throughout the 1990s.

Sulaiman Al Rajhi is identified on the "Golden Chain" as one of al Qaeda's principal financiers.  The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaeda.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, <u>United States of America v. Enaam Arnaout</u>, No. 02-CR-892 (N.D. Ill. Filed Jan. 6,

2003).  The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See Final Report of the 9/11 Commission, Note 21 to Chapter 2.  The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaeda's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsor under Executive Order 13224.  See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm.

Through his business enterprises and involvement in charities operating within al Qaeda's infrastructure, Sulaiman Abdel Aziz al Rajhi has long provided material support and resources to al Qaeda.  Al Rajhi has close ties to the Saudi Royal Family.  Several members of the Saudi Royal Family are employed by or serve as officers of businesses owned or controlled by al Rajhi.  For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange.  Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company.  Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company.  Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.

Sulaiman al Rajhi also managed the National Commercial Bank budget of defendant Saudi Joint Relief Committe.  In addition, for decades, al Rajhi has been involved with the Muslim Brotherhood, a 74-year-old group which is under investigation by European and Middle Eastern governments for its alleged support of radical Islamic and terrorist groups.  For decades the Brotherhood has been a wellspring of radical Islamic activity; Hamas, the militant Palestinian group, is an offshoot of it.  It is also tied to leading neo-Nazism, including the Swiss Holocaust denier Ahmed Huber.

In all these capacities, including his capacity as an officer and/or director of many of the SAAR Network Entities, Sulaiman al Rajhi has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attach on America.

## C.      Saleh Abdulaziz Al Rajhi

Saleh Abdulaziz al Rajhi, eldest brother of Sulaiman, has been Chairman of Al Rajhi Banking and Investment Corporation, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

Furthermore, Saleh Abdulaziz al Rajhi is personally linked to Wadi el-Hage, Osama bin Laden's personal secretary (Saleh's phone number was found in Wadi's phone book upon his arrest.).  Wadi el-Hage was convicted for his role in the 1998 Embassy bombings in Kenya and Tanzania.

## D.      Abdullah Sulaiman Al Rajhi

Abdullah Sulaiman Al Rajhi is General Manager of the Al-Rajhi Banking & Investment Corp., and member of its executive committee, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation as alleged above and in previous court filings.

60573

In addition, he was President of Aradi, Inc., located at the same address as SAAR, 555 Grove Street in Herndon, Virginia.  Through Abdullah Sulaiman Al Rajhi, the Safa Group had access to a bank and banking officials for purposes of producing checks purportedly paid for SAAR's charitable purposes but which actually went towards the benefit of the Enterprise.

## E.      Sheikh Abdul Aziz Al Ibrahim

Sheikh Abdul Aziz Al Ibrahim is the brother-in-law of the late King Fahd of Saudi Arabia. (His sister, Jawhara, was the second wife of King Fahd.)

With another brother, Walid, along with Defendant Saleh Abdullah Kamel, Sheikh Abdul Aziz Al Ibrahim created in 1991 the leading Arab television satellite service, Middle East Broadcasting Corp, which purchased the press agency United Press International in 1992.

In 1990, he create           In 1990, he created the Ibrahim bin Abdul Aziz al Ibrahim Foundation which purports to support humanitarian assistance. Through his direction and control, he entrusted the organization with the responsibility of realizing his objective of using it as a covert vehicle for supporting the al Qaeda movement and other terrorists. The organization is present in Kenya, Bosnia, Chechnya, South America and South Asia.

In 1990, he create

The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network in the FBI's investigation into the attacks against the American embassies on August 7, 1998.

In September 199           In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including defendants Al-Haramain Foundation, Help African People, the International Islamic Relief Organization, the Ibrahim bin Abdul Aziz al Ibrahim Foundation, and Mercy International Relief Agency. The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

> The decision was announced by the Kenyan government's NGO coordinator who declared: Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyans' lives . . . They had been found to be working against the interests of Kenyans in terms of security.

> After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five nongovernmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Ibrahim bin Abdul Aziz al Ibrahim Foundation did not seek an appeal.

> In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Ibrahim bin Abdul Aziz al Ibrahim Foundation as one of those which provided help to Osama bin Laden: "The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim

Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are ... Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects."

Other reports suggest that Ibrahim bin Abdul Aziz al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Ibrahim bin Abdul Aziz al Ibrahim Foundation, World Youth Islamic Assembly and Islamic Rescue Organization - had taken part in setting up these bases.

In an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was instruction in religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz al Ibrahim, which emphasized (quote): "Armed struggle in the name of Allah, for his word to be above all else…Sacrifice your life in witness of Allah's religion."

According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

That seminar event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint Committee for Islamic Action and Studies with representatives from Defendants Muslim World League, Islamic International Relief Organization, World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz al Ibrahim Foundation.

Sheikh Abdul Aziz Al Ibrahim has extensive ties to the United States.

In 1989, Sheikh Abdul Aziz Al Ibrahim acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies. American authorities discovered a loan of $132 million that was granted to Sheikh Abdul Aziz Al Ibrahim at the end of 1989 by BCCI. Sheikh Abdul Aziz Al Ibrahim was one of BCCI's leading loan beneficiaries.

In the mid 1980s, while living in Hollywood, California, Sheikh Abdul Aziz Al Ibrahim engaged in a romantic pursuit of actress/model Brooke Shields, setting up a movie production company (Mystery Man Productions) to invest over $22 million (including BCCI loan proceeds) in the production of a film vehicle for her, *Brenda Starr.* The production was so flawed that while filmed in 1986, the movie would not be released in the United States until 1992.

Apart from being a lead investor in Marina del Rey, Sheikh Abdul Aziz Al Ibrahim's real estate assets have included Ritz-Carlton hotels in New York, Washington, Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills above Bel-Air and largely vacant land near Disney World in Florida. (Ritz-Carlton hotels decided in 1997 to pull back their name from those facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Sheikh Abdul Aziz Al Ibrahim.)

The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

According to court papers filed in 1995, as reported by the *Washington Post,* Sheikh Abdul Aziz Al Ibrahim has won large sums of money gambling in the United States on which he did not wish to pay taxes to the Internal Revenue Service. In order to silence a former employee regarding these and other allegations, Sheikh Abdul Aziz Al Ibrahim hired the law firm of Sidley & Austin and filed suit in Washington, D.C. to seek injunctive relief. The suit was dismissed.

## F.  World Assembly of Muslim Youth

### I.  INTRODUCTION

World Assembly of Muslim Youth ("WAMY") is a multi-national organization which has been at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (7) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

### II.  WAMY'S ORGANIZATIONAL STRUCTURE

Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League ("MWL"). Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization ("IIRO"), and Rabita

Trust. Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia. WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.

The Kingdom extensively supervises and controls WAMY's activities. On the macro level, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world.

Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within -- there is also an embassy in every country. In Pakistan there is a Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run

276

those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters. which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

### III.    THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

Osama bin Laden's al Qaeda organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaeda's terrorist activities gamer the most attention, terrorist attacks represent but one of many vehicles through which al Qaeda seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaeda views the confrontation with the West to have two distinct, but equally important fronts: (1)   cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad - The Various Threats From Radical Islam to the Democratic Legal Order,* General Intelligence and Security Service of the Netherlands, December 2004.

As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaeda engages in militant and violent operations throughout the World. Al Qaeda's military activities are by no means limited to terrorist attacks. In fact, in establishing al Qaeda, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaeda's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist

60573

movements throughout the World. In this context, al Qaeda has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaeda's participation in these regional conflicts takes many forms. Al Qaeda provides funding and logistical assistance to local extremist organizations in support of their military and terrorist activities. In addition, al Qaeda deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.

Through its military activities in these "regional" conflicts, al Qaeda aims to establish and support radical Islamic regimes, a critical component of al Qaeda's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaeda's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:

> [al Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination.

> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad *Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report").

> Al Qaeda also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the organization's image among local Muslim communities, and represent an integral component of al Qaeda's ongoing recruiting and fundraising efforts. Al Qaeda's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West.  In fact, several of the September 11th hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaeda's growth and development cannot be overstated. Perhaps more than any other factor, al Qaeda's participation in these "regional" conflicts has enabled al Qaeda to extend its sphere of influence throughout the globe.

### IV.     WAMY'S ROLE IN ADVANCING THE AL QAEDA MOVEMENT

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad. . . Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad" and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book Is*lamic Camps: Objectives, Program Outlines and Preparatory Steps,* prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us!

> So we may defend the flag on this Day of Jihad, are you miserly
> with your blood?!

> And has life become dearer to you? And staying behind sweeter?

> Is staying in this world of torment more pleasing to us?

> You are amongst those called upon by Destiny.

> Come! So we may revive the times of our predecessors!

> > Through these and other WAMY publications, as well as the
> > madrassas, camps, Islamic Centers, mosques, conferences and
> > other events it sponsors, WAMY has provided the ideological
> > foundation for the al Qaeda movement, and actively advocated
> > young Muslims to take up arms and engage in violent jihad against
> > the United States. In this regard, WAMY has played a critical role
> > in al Qaeda's cultural assault on the United States and democratic

60573

279

institutions throughout the world.

Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, Southeast Asia, the United States and elsewhere. WAMY's support for al Qaeda's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaeda training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaeda and associated groups; and operated as a recruiting vehicle for al Qaeda and associated groups. Through these criminal activities, WAMY has further helped al Qaeda to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina... has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces....

> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered.... Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times,* December 5, 1992.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him...." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19,

2000 article in the Russian newspaper *ITAR-TASS:*

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC).
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops….
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab...
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerrillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS,* May 19, 2000.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to Chechnya by Osama bin Laden to organize al Qaeda's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists.... He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

1998 Defense Department Report

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan. . ." *U.S. Links bin Laden to Chechnya, MSNBC.com,* August 15, 1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab 's control. *Id.*

Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

[I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. ... It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1. The question that must be asked is: What do the Chechen Muslims need from us today?

2. *The need money to buy arms and ammunition. (emphasis supplied)*

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

*The Chechen Tragedy — The Reality and the Required Role,* Dr. Maneh al Jahari, *al Jazeera,* January *15,* 2000.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19, 1999 article in the *Australian General News,* the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF"), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News,* January 15, 1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism - 1999,* United States Department of State, April 2000.

Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips,* a Kashmiri leader publicly thanked WAMY during a press conference

for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips,* December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella. *See SIMI: Nursery of Hate, India Today,* April 2, 2001; *ISI Twin Plan — Attack Christians, Defame Hindu Outfits, The Economic Times of India,* July *15,* 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring,* August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India),* July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

> Q: In your conferences, you have openly eulogized Osama bin Laden.

> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

*SIMI: Nursery of Hate, India Today,* April 2, 2001.

In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lashkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigation of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online,* December 9, 2002.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled *"Military Lessons In The Jihad Against The Tyrants,"* was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational cells. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda. WAMY's U.S. offices were established in Falls Church, Virginia in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities

raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar,* June 11, 2002.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire,* September 5, 2003.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda... Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe. *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence. U.S. Department of the Treasury,* Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005.

## V.   WAMY'S KNOWLEDGE

For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11, 2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaeda and affiliated militants through

the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

Given the close ties between WAMY's senior leadership and high level officials of the Kingdom, it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from 1997 forward.

The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well.

A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, *whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals....*" (emphasis supplied). The *International Convention for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution 54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and

discourse within the international community in the years prior to the September 11th Attack.

In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and ideological support to al Qaeda and affiliated groups, for a period of many years leading up to the September 11th Attack.

## G.    The Abdul Aziz al Ibrahim Foundation

The Abdul Aziz al Ibrahim Foundation has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, or the al Qaeda, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Abdul Aziz al Ibrahim Foundation conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Abdul Aziz al Ibrahim Foundation conspired to conduct and/or participate in the operation or management of the enterprise itself.

HRH Prince Abdul Aziz al Ibrahim (or "Ibrahim Abdul Aziz Al Ibrahim") is a Saudi citizen and the brother-in-law of King Fahd of Saudi Arabia.

In 1990, he created the Abdul Aziz Al Ibrahim Foundation (a.k.a. Ibrahim Abdul Aziz al Ibrahim Foundation) whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia.

The Abdul Aziz Al Ibrahim Foundation has built, among others, mosques in Düsseldorf, Gibraltar, Milan and Moscow. The Sheik Ibrahim Mosque in Caracas, the continent's second largest mosque, was built with funding from the Ibrahim bin Abdul Aziz Al Ibrahim Foundation, according to Iman Omar Kaddoura. The Saudi royal family established the foundation to help the spread of Islam.

The organization's branch in Nairobi, Kenya was associated with Osama bin Laden's network, as uncovered by the FBI's investigation into the attacks against the American embassies on August 7, 1998, as was revealed in the confidential publication, *French Africa Online*.

In August 1998, Kenya became the focal point of the international news following the bombing of the U.S. embassies there and in neighboring Tanzania. The attack on the embassy resulted in the death of some 400 Kenyans, as well as twelve embassy staff members; thousands of Kenyans were wounded, many grievously. In addition to the human suffering caused by the bombing itself, the incident had further repercussions for the human rights situation.

Fazul Abdullah Mohammed, an al Qaeda operative implicated in the 1998 US Embassy bombings, was arrested and searched by Kenyan authorities. One of the items seized with him was a notebook containing the business card of al Ibrahim Foundation's director, Abdul Kader M. Izzi. He was also carrying a business card of Mohamed Munir Chaudhri, the lawyer used by Wadi al Hage and al Qaeda operative, Khalid al Fawwaz.

In September 1998, the Kenyan government cancelled the registration of five Islamic relief agencies for allegedly supporting terrorism including Al-Haramain Foundation, Help African People, the Islamic Relief Organization, the Abdul Aziz Al Ibrahim Foundation, and Mercy Relief International. The authorities claimed that materials for the bomb were smuggled

in as relief aid with the help of Islamic relief agencies.

The decision was announced by the Kenyan government's NGO coordinator who declared that:

> Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered. . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.

After several organizations appealed this decision, Kenya's High Court has blocked the deregistration of four of the five non-governmental organizations. The International Islamic Relief Organization, Moslem World League, Al-Haramain Foundation, and Mercy International Relief Agency can still operate pending an appeal. Only the Abdul Aziz Al Ibrahim Foundation remained blocked.

First, the event drew international attention from the domestic human rights problems in Kenya. Second, the government's response to the bombing was to crack down indiscriminately against foreigners and Muslim-run nongovernmental organizations (NGOs). Refugees, without distinction, were told to report to the immigration authorities and informed that documents issued by the U.N. High Commissioner for Refugees to them were no longer valid. When accredited refugees, with UNHCR letters, presented themselves at immigration, these letters were taken away and they were given papers that deemed them illegal immigrants.

> In a study paper dated October 1999, called *The New Azerbai Jan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh*, Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the Abdul Aziz Al Ibrahim Foundation as one of those which provided help to Osama bin Laden:

The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.

> Other reports suggest that Ibrahim bin Abdul Aziz Al Ibrahim Foundation was funding the Islamic Movement of Uzbekistan (or "IMU"), an affiliate of al Qaeda, whose leaders met Osama bin Laden in 1999 in Kandahar, Afghanistan. Reports stated that the IMU received $270,000 dollars from the Abdul Aziz Al Ibrahim Foundation.

> In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the Abdul Aziz Al Ibrahim Foundation, World Youth Islamic Assembly, and Islamic Rescue Organization - had taken part in setting up these bases.

> The foreign Islamic aid, which has been granted under the banner of da'awa ("summon to Islam"), has been targeted at Russia's Muslim population in the Volga-Urals, the North Caucasus, and Central Russia. Its major official benefactor has been King Fahd of Saudi

Arabia, who has regularly subsidized an annual hajj (pilgrimage) to Mecca and Medina for hundreds of Russia's Muslims. He has also sponsored dozens of scholarships to those who wanted to study at Islamic universities and colleges in Saudi Arabia, Turkey, Jordan, Syria, Libya, Kuwait, the United Arab Emirates and Malaysia, and subsidized the free distribution of Korans and other Islamic literature in various Islamic communities of Russia. Among other providers of official Islamic assistance are the University of Imam Muhammad bin Saud, the Islamic Development Bank, the Organization of Islamic Conference, the World Islamic League, the World Association of Islamic Youth and the World Center of Islamic Sciences of Iran.

Unofficial Islamic assistance has been even more impressive. It has been conducted by Kuwait's Committee of Muslims of Asia, the Iranian World Organization Madaris, Saudi Arabia's Islamic Charities of Taiba and al-Ibrahim Foundation, the International Islamic Charities of Ibrahim Hayri, Igatha, Zamzam and the United Arab Emirates' Islamic Charity Organization A1-Khairya. Along with building and staffing mosques, madrassas, Islamic universities and other Islam-related institutions, these funds have heavily invested in the proselytizing conducted by Islamic missionaries and the organizing of various Islamic training camps and courses.

Some Islamic organizations in a few countries also acted as outside players financing the IMU's activities and operations. Pakistani Jamaat-e-Islami, the Qatar Charity Society, the Saudi Islamic Salvation Foundation, the Ikhwan Al Muslimun, and the World Assembly of Muslim Youth (WAMY) were such supporters.

In the spring of 1999, an IMU delegation visited Saudi Arabia and received $270,000 dollars from the Abdul Aziz Ibrahim Foundation, a relief organization of the Saudi royal family. A few months later the Taliban allocated $50,000 dollars to support the families of the IMU members based in Afghanistan. In early August of the same year, Bin Laden's five personal envoys visited the village of Hoit in Tajikistan and delivered $130,000 dollars to Namangani. At that time, IMU fighters were carrying out incursions into Uzbekistan via southern Kyrgyzstan.

Shortly thereafter, a meeting took place in Karachi between the members of Islamic organizations from Pakistan, Kuwait, Jordan, Egypt, Palestine, Kashmir, Uzbekistan, and Chechnya. They agreed to raise two million dollars to support the Holy Jihad against Karimov's regime.

In June of 2000, IMU's press-secretary Zubair ibnAbdurahman confirmed the receipt of a few thousand dollars from Bin Laden intended to stir up 'the holy war against Karimov 's pro-Zionist government'. According to the Ferghana Province Directorate of National Security, Juma Namangani annually received around three million dollars from Osama bin Laden.

During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk. The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by Ibrahim bin Abdul Aziz Al Ibrahim, which emphasized:

Armed struggle in the name of Allah, for his word to be above all else. . . Sacrifice your life in witness of Allah's religion.

According to a document summarizing the seminar, "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

The event took place at the Middle Urals Kaziat Muslim community, where Abdullah bin Abdul Muhsen al Turki settled in 1995 a Joint committee for Islamic Action and Studies with representatives from the Muslim World League, Islamic International Relief Organization, and World Assembly for Islamic Youth, along with the Ibrahim bin Abdul Aziz Al Ibrahim Foundation. Saudi-funded textbooks and other publications reveal the presence of

institutionalized hate speech. These products are distributed by Saudi officials including senior diplomats at the Saudi Embassy — as well as by Saudi-funded organizations, such as the Abdul Aziz al Ibrahim Foundation, the World Assembly of Muslim Youth (WAMY), and the Institute for Islamic and Arabic Studies in America (IIASA), groups that take full advantage of America's First Amendment freedoms.

The book, *Deen al-Haqq* (The True Religion), authored in Arabic by Abdul-Rahman Bin Hamad Al-Omer, printed by the Ministry of Islamic Affairs and Endowments, paid for by the foundation of Abdul-Aziz Al Ibrahim, and distributed by IIASA and WAMY in the U.S. contains the following:

"Judaism and Christianity are deviant religions" (page 25)

"The Saved Sect — Muslims are many in number but few in reality, and the groups that claim to be Muslim are many, approaching 73 sects and numbering more than 1 billion." (An assertion that only Wahhabis are Muslims and all other true Muslims are unbelievers.— page 47)

"(Negations of One's Islam) [Negation 8] -Befriending the unbelievers, through loving and cooperating with them while knowing that they are unbelievers, makes those who are their friends the same as them." (page 99)

"We say to every Christian and every Jew and all those outside Islam, 'your children are born into Islam, but you and their mother take them away from Islam with your corrupt rearing.". (page 119)

"There are groups in the Muslim world that claim to be Islamic but they are outside Islam. They claim Islam while in reality they are not Muslims because their beliefs are the beliefs of unbelievers." (page 123)

Abdul Aziz al Ibrahim, founder of the Abdul Aziz al Ibrahim <u>Foundation, also had many other U.S. contacts</u>.  In 1989, he acquired a portion of the Marina Del Rey real estate venture in Los Angeles through various offshore companies. Al Ibrahim did this to mask the company's connection to the Saudi royal family. A bank account was opened in Luxemburg as a shelter from public disclosure of the company's financial identity and activity. Al Ibrahim set up 10 companies in California as shell corporations to be the named owners of the real estate holdings of the company. However, he used his company in the Cayman Islands, Marina Enterprises, to control 100% shareholder interest for each of the 10 California shell corporations. On paper, these shell companies were to be managed by Newfield Enterprises, a front company set up by al Ibrahim for real estate purposes. Al Ibrahim also formed North American Real Estate Holding and named it 100% controlling shareholder of the Cayman Island company, Marina Enterprises.

American authorities discovered a loan of $132 million that was granted to al Ibrahim at the end of 1989 by Bank of Credit and Commerce (BCCI). Al Ibrahim was one of BCCI's leading loan beneficiaries. Between 1986 and 1990, BCCI was involved in the fraudulent schemes and practices of the NCB Chairman Khalid Bin Salim Bin Mahfouz, who was also the Chief Operating Officer of BCCI and major shareholder.

The 1992 US Senate report on the BCCI affair detailed the role played by the NCB in hiding BCCI assets in a development in the "cover-up and obstruction of investigation".

In September of 1990, Price Waterhouse learned that BCCI had concealed further lending of over $500 million to its major customs by "parking" that lending with a Middle Eastern bank, namely, the National Commercial Bank of Saudi Arabia controlled

by Khalid bin Mahfouz, the most powerful banker in the Middle East, who was later indicted in the United States in connection with his activities pertaining to BCCI and First American.

> Khalid Bin Mahfouz was indicted on July 1, 1992 on charges of participation in a Scheme to Defraud in the First Degree in violation of N.Y. Penal Law § 190.65, in connection with certain acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of defendant's interest in BCCI. Pursuant to the indictment, an arrest warrant was issued. A settlement with US authorities resulted in approximately $190 million paid to the Court Appointed Fiduciaries with an additional $10 million paid to a plaintiff The settlement agreement regarding the plea and cooperation with the District Attorney of New York and the Department of Justice concerned Khalid Bin Mahfouz and the National Commercial Bank.

> The 1992 US Senate Report on the BCCI Affair has linked the bank to financial funding of the Afghan war.

(...) BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (...). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

> The BCCI was also implicated in supporting terrorism, as reported by the US Senate.

In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

> The Senate investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

> The Report gives details regarding the facilities provided by the bank to known terrorist Abu Nidal and other terrorists.

> In the United Kingdom, a key window on BCCI's support of terrorism was an informant named Ghassan Qassem, the former manager of the Sloan Street branch of BCCI in London. Qassem had been given the accounts of Palestinian terrorist Abu Nidal at BCCI, and then proceeded, while at BCCI, to provide detailed information on the accounts to British and American intelligence, apparently as a paid informant, according to press accounts based on interviews with Qassem. As of 1986, the

60573

information obtained about Abu Nidal's use of BCCI was sufficiently detailed as to justify dissemination within the U.S. intelligence community. In July, 1987, as a result of the information provided by Qassem, a State Department report concerning Abu Nidal and Qassem, declassified in 1991 at the request of the subcommittee, describes Abu Nidal's .use of BCCI. (...) Other terrorist groups continued to make use of BCCI, including one "state sponsor of terrorism," and the Qassar brothers, Manzur and Ghassan, who have been associated with terrorism, arms trafficking, and narcotics trafficking in connection with the Government of Syria(...).

Apart from being a lead investor in Marina Del Rey, Al Ibrahim real estate assets have included Ritz-Carlton hotels in New York, Washington and Houston and Aspen, a hotel and office complex near Chicago's O'Hare International Airport, undeveloped property in the hills high above Bel-Air and largely vacant land near Disney World in Florida. Ritz Carlton hotels decided in 1997 to pull back their name from the facilities by terminating management agreements after they became controlled by Al Anwa USA, a company owned by Abdul Aziz Al Ibrahim.

The al Ibrahim partnership that holds Marina Del Rey's biggest real estate portfolio, MGC Commercial, filed Chapter 11 bankruptcy protection in June of *1995*. The action was filed in the US Bankruptcy Court for the Central District of California.

MGC Commercial's filing came just as lenders, owed about *$50* million in defaulted mortgages, were about to take possession of a half-dozen multi-family and commercial/retail properties. It also came barely two years after confirmation of a previous Chapter 11 reorganization plan - the plan through which Sheik Abdul Aziz al Ibrahim took full control of the big marina portfolio from former partner Abraham M. Lurie.

The *L.A. Business Journal* reported the al Ibrahim-controlled partnership that holds the 369-unit Doubletree Marina Beach hotel has also defaulted on a mortgage - and is under a court-appointed receiver's supervision. The sheik also controls a partnership that holds two other Marina hotels.

The registered President of Al Anwa USA is Tarek Ayoubi, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc., MDR Hotel, and NY Overnight Inc., all based at the same address in Marina Del Rey.

Al Anwa Holding is Al Anwa for Contracting Establishment (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by Abdul Aziz Al Ibrahim. Al Anwa for Contracting is shareholder, along with Dallah al Baraka (Chaired by Saleh Abdullah Kamel), of the National Environmental Preservation Co. Ltd. in Jubail, Saudi Arabia.

In 1991, Abdul Aziz Al Ibrahim, his brother, Walid, and Saleh Abdullah Kamel, created the leading Arab television satellite service, Middle East Broadcasting Corp (or "MBC"), which purchased the press agency United Press International (or "UPI") in 1992.

Since 1993, funds and companies having the purpose of expanding their ideas of religious extremism ("Al-Igasa", "CAAP", Worldwide Assembly of Islamic Youth**,** "Al Ibrahim") legally operated in the territory of Tatarstan, a member of the Russian Federation in the Ural Mountains. Practically all religious schools and a number of large educational institutions are opened or are secretly financed by wahhabist international organizations ("Taiiba", Committee of Moslems of Asia, Islamic Heritage Revival Society), and the libraries are completed with the literature of wahhabist nature.

In March 2002, searches by Bosnian authorities of BIF's offices in Sarajevo, Bosnia-Herzegovina (operating under the name *Bosanska Idealna Futura)* yielded a substantial

amount of evidence shedding light on the network al Qaeda established, including links to al Ibrahim. Shortly thereafter, the offices of al Haramain were raided in Bosnia, as well.  In that raid they came across documents containing the home and office phone numbers of al Ibrahim and the al Ibrahim Foundation.

The raids produced several documents offered into evidence in Government's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements, *United States v. Enaam M Aranout,* No. 02 CR 892 (N.D. Ill, filed January 6, 2003).

The Abdul Aziz al Ibrahim Foundation has thereby knowingly, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of the aforementioned Abdul Aziz al Ibrahim Foundation's participation in the jihad campaign for a! Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad Against Jews and Crusaders.

## H.    Saleh Abdullah Kamel, Dallah Al Baraka Group and Al Baraka Investment And Development

Saleh Abdullah Kamel ("Kamel") has long provided financial support and other forms of material support to terrorist organizations including but not limited to Radical Muslim Terrorism, al Qaeda and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Kamel conducted or participated directly and/or indirectly in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Kamel conspired to conduct and/or participate in the operation or management of the enterprise itself.

After serving as an adviser to the Saudi Minister of Finance, Kamel founded Dallah Al Baraka Group, LLC ("DABG") in 1969, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

Beginning in the late 1970s, Kamel financed and developed DABG and its subsidiaries to operate as profitable banking and investment institutions and to serve as financial vehicles for transferring millions of dollars to Islamic militants around the world.

In 1982, Kamel and DABG began directing tens of millions of dollars in funds to at least 20 non-governmental organizations, including Osama Bin Laden's Mekhtab al Khidmat, the predecessor to al Qaeda, which operated as a financing front for the Afghan mujahideen in their battle against the Soviets.

DABG, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services, and financial activities. The group includes 23 banks located mostly in the Arab and Islamic countries, in addition to several investment and financial companies. DABG posted sales of $4.50 billion and assets of $12.42 billion for 2001. The group is third among Saudi companies in sales.

The DABG financial arm is Al Baraka Investment & Development ("ABID"), a wholly owned subsidiary based in Jeddah. Its investments include 43 subsidiaries, mainly banks in Arab and Islamic countries. Most of them are known as or registered as "Al Baraka Bank" or "Al

Barakaat Bank".

These assets include, but are not limited to, Al Tawfeek Co. for Investment Funds Ltd. (Cayman Islands), Egyptian-Saudi Finance Bank, Jordan Islamic Bank and Al Baraka Bank Sudan. ABID is also a shareholder of several other banks, including Arab Albanian Bank, Islamic Bank Bangladesh Ltd., Faisal Islamic Bank-Egypt, Lariba Bank Kazakh/American and Yemen Islamic Bank for Finance & Investment.

ABID assets, including funds under management, are valued at $4.4 billion. U.S. assets include Al Baraka Bancorp Inc. in Chicago, Illinois and Al Baraka Bancorp Inc. in Houston, Texas.

DABG's portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co. Ltd. The company was formed in 1975 and is based in Jeddah.

DABG has also facilitated jihad operations in the world and providing Osama Bin Laden with financial infrastructures in Sudan since 1983.

ABID is indeed mostly present in the Sudanese banking sector through assets held in Algharb Islamic Bank, Al Shamal Islamic Bank, Faisal Islamic Bank, Sudanese Islamic Bank, and Tadamon Islamic Bank. ABID is also affiliated to National Development Bank in Sudan.

Kamel and DABG materially supported Osama Bin Laden and his al Qaeda network of front companies, farms and factories in Sudan by entering into joint "symbiotic business" investments with Bin Laden entities.

Kamel established ABID as a central financial clearing house for Islamic terrorism when al Qaeda first started carrying out attacks against the United States. An advertisement in the December 1993 issue of the *Al-Igatha Journal,* the official International Islamic Relief Organization ("IIRO") publication, illustrates how Kamel has carried out his ongoing jihad. The advertisement states:

"All donations are deposited into the organization's joint accounts in all the branches of... Al Baraka General Fund (G, K) and all the branches of Al Baraka Bank Group around the world."

The advertisement also states that with the financial assistance of ABID, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Kamel has long been suspected by the United States of materially supporting transnational terrorist groups, such as the Muslim Brotherhood and Al Qaeda. In fact, the United States Government has been investigating Kamel for his material support of Al Qaeda along with numerous other defendants since September 11, 2001. Sealed indictments have been issued against several of these major material supporters of al Qaeda, and the assets of other material sponsors have already been frozen by the Department of Treasury.

In March 2002, the Bosnian police found several documents and items regarding the history of Al Qaeda during searches in the offices of Benevolence International Foundation ("BIF") in Sarajevo. A computer file labeled "Tareekh Osama", or "Osama History", contained scanned images of several documents, including a list known as the "Golden Chain", that according to the U.S. government is "a list of people referred to within Al Qaeda as the "Golden Chain" or wealthy donors to mujahideen efforts". Among them was Kamel.

The Golden Chain list (or list of wealthy Saudi sponsors) was presented by the US government as Exhibit 5 in the Department of Justice "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements" in the case of *USA v. Arnaout* (USDC, Northern District of Illinois, Eastern Division) filed on January 29, 2003. The list was also mentioned in the indictment of Enaam Arnaout on October 9, 2002 (02 CR 892).

The "Golden Chain" list was introduced and relied on in *United States v. Arnaout,* No. 02 Cr. 892, 2003 WL255226, at *1.2 (N.D. Ill. Feb. 4, 2003). It has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the *9/11 Commission's Final Report* in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists ("SDGT"), a decision not lightly taken by the executive branch of the government.

A former member of al Qaeda, Jamal al Fadl has reviewed and confirmed that the names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified  Kamel, Yousef Jameel, Wael Jelaidan and Adel Batterjee (and others) as direct financiers and facilitators of al Qaeda. Al Fadl is a former al Qaeda leader who repudiated Osama bin Laden in the 1990's and has appeared as a principal government witness in numerous al Qaeda terrorist trials.

In 1992, Kamel contributed substantial funds and 10 ambulances to the Saudi Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina. At the fundraising event, Kamel was put on notice regarding the true purpose of the contributions. The Chairman of the Higher Committee, Abdul Mohsen Al-Kayal told the audience that making contributions to the committee was a "kind of jihad and Muslims should generously help the Bosnian Muslims."

As part of his ongoing material support for al Qaeda and other Islamic militant groups in the Balkans, Kamel visited Bulgaria prior to 1999 and met with members of various Islamic foundations financed by fundamentalist circles.

In 1998, Kamel's Al Baraka Bank in Turkey transferred 1,059,687 Deutsche Marks (DEM) from an Al Haramain account at Al Baraka Bank in Turkey to the Deposit Bank (Depozitnaya Banka) in Sarajevo, Bosnia-Herzegovina where Al Haramain also maintained an account. Of this amount, 300,000 DEM disappeared from the Al Haramain accounts.

The brothers Maulana Mohammed Rafi Usmani and Maulana Justice Mohammed Taqi Usmani are well-known Islamic clerics in Pakistan who direct the Jami Darul Ulum Madrassa in Karachi, Pakistan.

Both brothers have, at various times, served on the Shariah Compliance Board of Kamel's Al Baraka Bank. Darul Ulum has certified Al Baraka Bank as a "true Islamic bank."

The Darul Ulum Madrassa backs jihadi organizations and both the Usmani brothers have provided practical help in setting up jihadi organizations and delegates of these organizations have permission to preach and collect donations from mosques and branches of the madrassa.

Darul Ulum provides support to al Qaeda affiliates and SDGT entities Harkatul Mujahideen, Jaish-e-Mohammed and Jamiatul Mujahideen.

Both Rafi and Taqi Usmani were signatories to a fatwa in late 2001 supporting the Taliban and al Qaeda in their war against the United States.

Kamel's personally held assets include Al Baraka Bancorp, Inc. in Chicago, Illinois; Al Baraka Bancorp, Inc. in California and Al Baraka Bancorp, Inc. in Houston, Texas. As early as 1984, Kamel held sizeable investments in the United States via his financial interests in DABG.

In 1996, DABG owned more than $230 million in assets in the United States and Europe. Kamel's Al Baraka Bancorp, Chicago held $44 million in assets.

In 2004, as chairman of the General Council of Islamic Banks, Kamel hosted other Islamic financial institutions and John Snow, U.S. Treasury Secretary, at a Washington Islamic Banks conference. The event was designed to "present the true picture of the activities of Islamic banks."

In June 2004, representatives of Al Baraka Bank visited Washington and New York to discuss development of the Iraqi financial sector with U.S. government officials.

Kamel is part owner of London-based Middle East Broadcasting Centre ("MEBC"). In 1992, Kamel purchased the U.S. media company United Press International ("UPI") for $3.9 million through his company MEBC. Kamel indicated that he and his partner, Sheik Walid bin Ibrahim, intended to invest more than $10 million between 1993-1995 to revive the struggling media company. Kamel owned UPI until 2002 when it was sold to the Unification Church.

In 1999, it was announced that Kamel and DABG were 25 percent minority shareholders in FLAG Telecom, which was licensed to build a "dual transoceanic cable system" between New York City and a number of European capitals. The project was scheduled to be completed in the "second half of 2000."

Kamel and DABG sponsored the Third Harvard University Forum on Islamic Finance at Cambridge, Massachusetts in October 1999.

DABG's wholly-owned sporting goods subsidiary, Eurovictory Sports, USA, imports footwear from Europe into the United States.

In July 2003, Kamel and DABG announced that they would sue four unnamed Western banks as third party defendants if Kamel and DABG were not dismissed from the *Burnett v. Al Baraka* lawsuit. Kamel stated, ". . .the banks had provided services to the alleged terrorists or their assistants," making them liable under the aggressive legal strategy of the *Burnett* lawyers.

Kamel and DABG are defendants in the civil suit, *Skidmore Energy, Inc. v. KPMG, et al.,* (United States District Court for the Northern District of Texas), for their alleged involvement in a conspiracy scheme to defraud a Texas oil company from investment funds and exploration rights in a Moroccan oil field.

Sanabel al Khair, the North American financial arm of IIRO, was established to receive, invest, and generate funds for the operations of International Relief Organization ("IRO"), the "United States arm" of IIRO. Beginning in about 1991, IRO was operated out of an

office at 360 S. Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali. Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. He is also listed as an incorporating board member alongside Ibrahim Mohammed Afandi, a fellow Golden Chain al Qaeda fundraiser.

Sanabel al Khair/IIRO has long diverted legitimate funds to support terrorism, soliciting donations through full-page advertisements run in leading Islamic journals. These advertisements calling for zakat contributions to assist the needy in Chechnya, Bosnia, and other such areas provided account numbers to facilitate the contribution of funds. These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers appear for Al Baraka Bank, a subsidiary of DABG.

A December 1993 advertisement from the official publication of the IIRO, *Al Igatha Journal,* which was distributed across the United States, illustrates how Kamel carried out his jihad by establishing Al Baraka as a central financial clearing house for Islamic terrorism during the period when Al Qaeda first started carrying out attacks against the United States. The advertisement states:

"All donations are deposited into the organization's joint accounts in all the branches of Al Baraka General Fund (G,K) and all the branches of Al Baraka Bank Group around the world." The advertisement states that with the financial assistance of Al Baraka, the IIRO will distribute funds to "Somalia, Afghanistan, Kashmir ... Palestine, Lebanon, the Philippines, Albania, and the former Yugoslavia."

Mohammed Jamal Khalifa was the director of the IIRO in the Philippines when Kamel contributed at least $100,000 to the organization through his DABG branch in the U.S. in 1992.

Khalifa provided material support to Ramzi Youssef, who convicted of the World Trade Center bombing in 1993, Youssef planned to assassinate Pope John Paul II during a trip to the Philippines in 1995; the Pope was never injured. Youssef was also devising, among other things, "Plan Bojinka," a plot to simultaneously explode twelve U.S. flagship airliners over the Pacific Ocean.

In 1992, regarding Kamel's and Al Baraka's investments in Sudan, Rashid Oomer, managing director of Al Baraka Finance stated, "[c]urrently, 60 percent of the Saudi imports of these seeds are sourced by us from Sudan."

A 1996 United States State Department report entitled, *Osama Bin Laden: Islamic Extremist Financier,* describes the likely economic collaboration of Kamel and Al Baraka with Bin Laden:

"Bin Laden's import-export firm Wadi al-Aqiq Company, Ltd., in conjunction with his Taha Investment Company, Ltd., secured a near monopoly over Sudan's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent NIF members."

In order to purchase and export substantial amounts of sesame products to the Kingdom of Saudi Arabia, Kamel and Al Baraka knew or should have known that they were, in all likelihood, dealing with businesses owned and operated by Osama Bin Laden,

Kamel and Al Baraka were provided with numerous public notices regarding the

Sudanese government's support and harboring of international terrorists.

When Hassan Al Turabi took power in 1989, Sudan became an operational base for international Islamic terrorism groups, as reported by the State Department annual "Patterns of Global Terrorism" for 1991:

> Terrorist and militant Moslem groups have increased their presence in Sudan. The government reportedly has allowed terrorist groups to train on its territory and has offered Sudan as a sanctuary to terrorist organizations. The National Islamic Front (NIF), under the leadership of Hassan al-Turabi, has intensified its domination of the government of Sudanese President General Bashir and has been the main advocate of closer relations with radical groups and their sponsors.

Osama bin Laden moved to the Sudan in 1991, where he was welcomed by Al Turabi and the National Islamic Front. In fact, Hassan Al Turabi held a lavish reception in bin Laden's honor upon his arrival. Al Turabi permitted and endorsed the creation of training camps by Osama bin Laden and other radical Islamic terrorist groups to promote jihad or holy war. Turabi provided these camps and the Al Qaeda network with military and logistical support through the government of Sudan.

During 1991, Kamel, Yassin Al Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine foreign investment opportunities in Sudan. The event was hosted by the Sudanese government.

Also in 1991, Turabi organized the Popular Arab and Islamic Congress (Al-Mutamar al-Arabi al'Shabi al-Islami, PAIC). The PAIC, or General Assembly as it was called by its delegates, held its first meeting in Khartoum for three days from April 25 to 28, 1991. "Islamists from the Middle East were, of course, well represented, but there were exotic members such as the Abu Sayyaf movement from the Philippines. Among their leaders was Muhammad Jamal Khalifa, brother-in-law of Osama bin Laden."

"There were [also] numerous individual patrons of the conference, like-minded Saudis including Osama bin Laden who had recently begun to invest in the Sudan. During the deliberations of the conference Turabi presented a foreign policy initiative to the Sudan government based on an Islamist model of his own creation. He argued that Khartoum should serve as an outpost, a meeting place, and a training camp for Afghan-Arabs. Using the Sudan as a safe-haven they could spread the Islamist message to Afghanistan, Pakistan, Kashmir, and the former Soviet republics of Central Asia."

Turabi used the PAIC to bring together Islamic radicals from around the world who were actively participating in Islamic jihad. During this first meeting of the PAIC, Al Turabi led the attendees with chants of "Down with the USA" in English and "Death to the Jews" in Arabic. Turabi also preached DMI's message of jihad to various student groups. At the sixth Student Union Conference at the University of Khartoum, Turabi urged Muslim youths throughout the world "to take up the challenge of uniting the Islamic countries [that] could never be achieved without jihad ... the Islamic era will prevail, where truth defeats falsehood and all Moslems live in a united Islamic Nation."

In October 1994, Hassan Al Turabi opened and chaired the second Conference on Inter-Religious Dialogue in Khartoum. Dr. Ayman al-Zawahiri, al Qaeda's second in command, was in attendance. At the conference Turabi accused the West of trying to wipe out Muslim independence. Attendees lashed out in "diatribes against tyranny, imperialism, the West and the United States--the 'Great Satan.'"

Turabi also praised the fatwa issued by Osama bin Laden from Afghanistan on August 23, 1996 entitled "Declaration of Jihad against Americans occupying the land of the Two Holy Mosques," which calls for jihad against Americans.

In 1998, Turabi sent a delegation to Saddam Hussein in Iraq to coordinate attacks on Americans. "Since America is an open society governed by weak liberals, he argued, it would be helpless against a sustained terrorist onslaught... To do this, he envisioned a terrorist attack like none before, striking at the very heart of the United States."

The United Kingdom has publicly reported at length the activities of Osama Bin Laden in Sudan, Somalia, and Kenya during 1992 and 1993 being materially supported by Kamel and Al Baraka:

In 1992 and 1993 Mohamed Atef [al Qaeda's military chief] traveled to Somalia on several occasions for the purpose of organizing violence against United States and United Nations troops then stationed in Somalia. On each occasion, he reported back to Osama Bin Laden, at his base in the Riyadh district of Khartoum.

In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaeda, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

On October 3 and 4, 1993 operatives of Al Qaeda participated in the attack on US military personnel serving in Somalia as part of Operation 'Restore Hope.' Eighteen US military personnel were killed in the attack.

From 1993 members of Al Qaeda began to live in Nairobi and set up businesses there. They were regularly visited there by senior members of Al Qaeda, including Atef and Abu Ubaidah al Banshiri.

Beginning in the latter part of 1993, members of al Qaeda in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia. Ali Mohamed, a U.S. citizen and admitted member of al Qaeda, surveyed the U.S. Embassy as a possible target for a terrorist attack. He took photographs and made sketches, which he presented to Osama Bin Laden while Bin Laden was in Sudan.

An Al Baraka annual report from the period describes how Kamel and Al Baraka have "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads....During this time, Osama Bin Laden was overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country."

In January 1992, U.S. diplomats warned the government of Sudan to stop harbouring terrorists from the "radical Palestinian organization of Abu Nidal, the Iranian-backed Hizbollah Group, and allowing operatives to use the country as a "safe haven." An American official stated in the article: "[t]his is a [terrorist] safe haven of choice. They [terrorists] can come and go as they please. They operate here with impunity."

The official also stated that "if Sudan was a facilitator of these terrorist groups, then the actions of the terrorist groups would be a responsibility of Sudan." In late 1992, "Islamic extremists who perpetrated the December 1992 attempted bombings against some 100 U.S. servicemen in Aden" told U.S. authorities that Bin Laden financed their group.

In May 1993, a joint Egyptian-Saudi investigation disclosed that Bin Laden business interests helped funnel money to Egyptian extremists, who used the cash to buy unspecified equipment, printing presses, and weapons.

In August 1993, it was widely reported in the English, Arabic, and Sudanese press that the United States placed Sudan on its list of state sponsors of terrorism for its support of Islamic

fundamentalist terrorist entities.

A portion of Kamel's investment revenues in Sudan were annually required to be committed to zakat — the Islamic almsgiving. However, in Sudan, Kamel was on notice that his personal and corporate contributions to the state zakat fund were being used to finance Islamic fundamentalist militant activities.

In March 1991, Hassan Turabi's National Islamic Front ruling government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). . .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.. .mobilization and training of the popular defense forces; and providing for martyrs' families."

The ISSF jihad fund's largest public or private contributors were al Shamal Islamic Bank, contributing 7 million Sudanese Pounds, and Tadamon Islamic Bank, contributing 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Kamel is a founding shareholder and principal investor in the al Shamal Islamic Bank.

Osama bin Laden warned the West, in the 1993 August edition of *Sudanow* two months before Al Qaeda coordinated attack on American soldiers in Mogadishu, Somalia in October 1993 which killed 19 American troops. The attack was carried out by Arab veterans of the Afghanistan war, who were trained for the plot in Osama Bin Laden's terrorist training camps in Sudan.

Osama Bin Laden was using diverted zakat funds, provided by Kamel and other major investors in the Sudanese economy, to recruit and train al Qaeda recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets.

In November 1993, the Arab Albanian Islamic Bank ("AAIB") was formally established in Tirana, Albania. AAIB was formed with the following partners: Arab Islamic Bank (20%), Islamic Development Bank (15%), National Commercial Bank of Albania (40%), DABG (10%), and individuals from Saudi Arabia (15%). Al Baraka Bank had an indirect control of AAIB through its own stake in the bank and through its own shareholding interest in the Islamic Development Bank.

The Arab Albanian Islamic Bank was used by Osama Bin Laden operations. The first allegations of terrorism funding appeared in 1998 with the release of a letter signed by several employees stating, ". . . a secrecy that cannot be maintained in an institution that pretends to be serious".

The letter says the bank has 13 Arab shareholders, including Osama Bin Laden himself.

On February 2002, Albanian authorities froze assets of several Arab companies and accounts of Yassin Al Qadi in the Arab Albanian Islamic Bank.

The Arab Albanian Islamic Bank was subsequently renamed United Albanian Bank. It is believed that Kamel and Al Baraka remain shareholders in the successor entity of AAIB.

Kamel's Who's Who biography states that he has been a "founding member of Faisal

Islamic Bank (Egypt) and Faisal Islamic Bank (Sudan)". This is also confirmed by Kamel in *The Saudi Gazette* on January 7, 2003.

According to ABID, ABID is a shareholder of Faisal Islamic Bank Sudan. Al Baraka Bank Sudan also mentions in its presentation an investment in Faisal Islamic Bank Sudan. The list also includes al Shamal Islamic Bank and Tadamon Islamic Bank. Faisal Islamic Bank Sudan was also a founding member of al Shamal Islamic Bank during the same period.

The Muslim World League Journal also stated in its January 2003 issue that "Saleh Kamel is the founder of Faisal Islamic Bank in Sudan".

Faisal Islamic Bank of the Sudan is an associated company of the DMI Trust. The Faisal Islamic Bank of the Sudan has also served on the Board of Supervisors of the DMI Trust. DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed Al Faisal Al Saud, stated:

> "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

The Faisal Islamic Bank of Sudan was chartered in Khartoum in 1983. Its first director was Abd al-Rahim Hamdi, a member of the Muslim Brotherhood and friend of Hassan Al Turabi. In 1983, Turabi and the leadership of the National Islamic Front began to convert the banks in Sudan to an Islamic banking system.

Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking. The DMI Trust was founded by Mohammed Al Faisal Al Saud in 1981. Prince Mohammed Al Faisal also served as the chairman of the Faisal Islamic Bank of the Sudan. Mohammad Al Faisal Al Saud founded Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

Hassan Al Turabi was a friend of Prince Mohammed Al Faisal, and he used that friendship to allow the Muslim Brotherhood to obtain Saudi funding in the Sudan. The Faisal Islamic Bank of the Sudan quickly became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, "Turabi's party became the best financed in the Sudan."

Turabi and Mohammed Al Faisal, through the Faisal Islamic Bank of Sudan, staged the coup in Sudan which brought Turabi to power. Together Mohammed Al Faisal and Turabi, through the Faisal Islamic Bank of Sudan and the DMI Trust, attempted to establish an Islamic state. Together they encouraged Osama bin Laden to travel to Sudan

and to develop his al Qaeda terrorist network to train soldiers for jihad.

In order to ensure that its zakat and haraam contributions and those of its investors will, in fact, satisfy their religious obligations under Islam, DMI is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat. As a result, DMI knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

The Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Kamel. The Saudi American Bank has maintained a partnership with al Baraka financial system since its beginning.

The Saudi American Bank serves as the bank for DABG. The Saudi American Bank is close to the Saudi Bin Laden family, and appears on its financial transactions. Bin Laden for Contracting and Trading is owned by members of the Bin Laden family, including Bakr Bin Laden and Mohammed Bin Laden.

Regarding the construction of infrastructure in Sudan while Osama bin Laden was training and developing al Qaeda terrorists, the Saudi Bin Laden Group offered material support. The Public Buildings and Airports Division of Saudi Bin Laden Group participated in the construction of the Port Sudan Airport, and Mohamed Binyamin Organization (or "Bin Laden Organization") provided a technical assistance to major road construction. The Saudi Bin Laden Group confirmed publicly these two collaborations with Sudan during al Qaeda's and Osama bin Laden's tenure there.

Saudi American Bank financed these Sudanese works, directly providing material support and assistance to Osama bin Laden. Indeed, Saudi American Bank was the main banker of the Saudi Bin Laden Group and Bin Laden Organization with respect to Sudanese operations. Saudi American Bank is also the Riyadh correspondent of al Faisal Islamic Bank managed by Mohamed al Faisal al Saud. Al Faisal Islamic Bank has facilitated al Qaeda terrorist operations as detailed herein. The Saudi American Bank is also the main correspondent in Riyadh for a branch of al Shamal Bank, a branch of DMI Trust based in Nassau, involved in the financing of al Qaeda.

In year 2000, the Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including World Assembly of Muslim Youth, IIRO and al Haramain Foundation.

Kamel visited Sudan in March 2003. The junket was led by Prince Amin Muhammad al-Faisal al-Saud, chairman of Faisal Islamic Bank, and included Omar Bin Laden head of Bin Laden International Overseas Co. and Shaykh Gamil Khogair. Al-Faisal adressed a Symposium of Arab and Foreign Investments.

Al Barakaat was able to penetrate the United States banking system with the help of Ahmed Ali Jumale (or "Jumale"). Employed by Barakaat Boston, Ahmed Ali Jumale is a Somali financier who founded Barakaat and was a close associate of Osama bin Laden. From 1979 to 1986, Jumale worked in Jeddah, Saudi Arabia as a senior employee of the Saudi American Bank.

The bank was founded by Citibank, which owned 40% of it at the time he worked there,

Kamel was one of the three founding members of al Shamal Islamic Bank in 1983, along with a Sudanese company, al Shamal for Investment and Development and the Government of Northern State, then controlled by Governor Mutasin Abdel-Rahim, representative of Hassan Al-Turabi.

In April 1984, the bank issued shares for subscription of main founders. They included the Government of Northern State, Faisal Islamic Bank Sudan and three individuals and entities representing Saleh Abdullah Kamel, including himself, his brother Omar Abdullah Kamel and ABID. According to newly obtained information on al Shamal Islamic Dank, they owned in total 20% of the shares of Al Shamal Islamic Bank when first shares were issued in 1985.

Osama Bin Laden was close to the new regime of Turabi, leader of the National Islamic Front (NIF) and conducted several business projects with or on behalf of the NIF.

One of these projects concerned Al Shamal Islamic Bank, as reported by the State Department:

"Bin Laden and wealthy NIF members capitalized al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

The provisional Board of Directors, approved in July 1988, included ABID and the National Development Bank, an affiliate of ABID.

Main shareholders of the al Shamal Bank as of October 1st, 2001, as reported by the bank itself, include Kamel and ABID. Kamel holds 15% of the bank shares.

Al Shamal Islamic Bank General Manager Mohammad S. Mohammad acknowledged, in a September 2001 press release, that Osama bin Laden had two accounts in the bank, opened on March 30, 1992 for Al-Hijrah for Construction and Development Ltd, a company the State Department says "works directly with Sudanese military officials to transport and provision terrorists training in [terrorist training camps in northern Sudan]".

A former Bin Laden associate, Jamal Ahmed Al-Fadl, testified during the U.S. trial on the 1998 African embassy bombings that Osama Bin Laden and at least 6 Al-Qaeda operatives held bank accounts in al Shamal Islamic Bank under their real names:

Q:      While you were in the Sudan, did you handle
         money for Osama Bin Laden?

A:                          Could you repeat the question.

Q:                          Did you work on the finances for al
Qaeda while

                            you were in the Sudan?

A:                          Yes.

Q:                          Did you know where the bank
accounts of Osama

Bin Laden and al Qaeda were?

A:                              Yes.

Q:                              Do you know whose names they were in?

A:                              The bank account under Usama Bin Laden in Bank
        Shaml [Al Shamal Islamic Bank], Khartoum.

Q:                              That was under Osama Bin Laden's true name?

A:                              Yes.

Q:      Were there accounts in other names?

A:      Yes. Afad Makkee got account also.

Q:      Afad Makkee, the account that he had under his
        name, do you know what name that is?

A:      I remember Madani Sidi al Tayyib.

Q:      Do you know of any other persons who had al Qaeda
money in their accounts?

A:      Abu Rida al Sun.

Q:      Do you know his true name?

A:      Nidal.

Q:      Anyone else that you knew had al Qaeda money in
        bank accounts in their name?

A:      Abu Hajer al Iraqi.

Q:      Do you know his true name?

A:      Mamdouh Salim.

Q:      Did you have any accounts in your name?

A:      Shared with Abu Fadhl.

Q:      So you had accounts in your name that were shared
        with Abu Fadhl?

A:      Yes.

60573

> Q:    Do you recall anyone else that had bank accounts in
>        their name for al Qaeda?
>
> A:    Abdouh al Mukhlafi.

Jamal Ahmed Al-Fadl also testified that al Qaeda operatives received monthly checks of several hundred dollars from al Shamal Islamic Bank accounts:

> Q:    When you worked for Osama Bin Laden,
>        in the Sudan, how much were you paid?
>
> A:    $1,200 (...) per month.
>
> Q:    For how long did you work for him?
>
> A:    Almost two years.
>
> Q:    What banks did he keep his money at?
>
> A:    Bank el Shamar [Al Shamal Islamic Bank].
>
> Q:    Any other banks?
>
> A:    I think he had accounts in different banks,
>        but I only recall Bank Shamar [Al Shamal Islamic Bank].

Jamal Ahmed Al-Fadl also testified that he transferred $100,000 from Al Shamal Islamic Bank to an al Qaeda representative in Jordan:

> Q:                          How did you carry the $100,000?
>
> A:                          In my bag with my clothes.
>
> Q:    Do you recall what kind of bills the $100,000 was in?
>
> A:    I remember they all hundred bill.
>
> Q:    Sorry?
>
> A:    They all hundred bill.
>
> Q:                          They were all hundred dollar bills?
>
> A:                          Yes.
>
> Q:                          Who gave you the money?
>
> A:                          Abu Fadhl, he bring it from Shamal
> Bank [Al
>        Shamal Islamic Bank] and he bring it to me.

> Q:                         Abu Fadhl brought it from the Shamal
> Bank [Al
>          Shamal Islamic Bank]?
>
> A:                         Yes.

During the course of the same trial, another associate of Bin Laden, Essam Al Ridi, testified that the bank was used for operational purposes in stating that "$250,000 was wired from al Shamal Islamic Bank" via Bank of New York to a Bank of America account held in Dallas, Texas -- where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993.

Furthermore, al Shamal Islamic Bank Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999 and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization. Al Bir's US branch, Benevolence International Foundation ("BIF"), was subject to a complaint from the FBI on April 29, 2002. The assets of BIF have been frozen by the United States Department of Treasury on suspicion that the charity was secretly funding al Qaeda.

Senator Carl Levin, Chairman of the Senate Armed Services Committee and Chairman of the Permanent Subcommittee on Investigation of the Governmental Affairs Committee recently stated that al Shamal Islamic Bank operations continue and that there are indications that Osama Bin Laden is still shareholder of the bank through trustees and may still use the bank facilities.

Kamel and Al Baraka continued to maintain joint investments, shares, finances, and correspondent bank accounts with al Shamal even after it was widely know that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.

Osama Bin Laden was allowed to maintain accounts as an investor in al Bank even though, as al Shamal shareholder and Saleh Kamel's "social friend" Yassin Al Qadi stated: "[b]y Februrary 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes."

When SDGT Yassin Al Qadi invested in the al Shamal Bank, he was instructed by the bank's managers to transfer funds to the bank via al Shamal's correspondent account at Kamel's Al Baraka Bank. This fact indicates that Kamel was using Al Baraka as a vehicle for covertly directing funds to Al Qaeda by having major terrorist financiers, such as Yassin Al Qadi, funnel money through Al Baraka to end-point financial institutions, such as Al Shamal, which would then distribute funds to the Bin Laden network. Yassin al Qadi was also an investor in Saleh Kamel's subsidiary company, Al-Tawfeek Company until 1997.

Additionally, recently disclosed financial documents obtained from the offices of the Third World Relief Agency ("TWRA"), an Islamic charity responsible for the funding of militant Islamic activities in Bosnia, show that Elfatih Ali Hassanein, the Director of the Third World Relief Agency in Vienna, Austria, made a sizable financial transfer (No. 769) to Al Barak Tuek, Buyukdere Caddesi 78, 80290 Mecidiyekoy. This address corresponds to the offices of Al Baraka Turkish Finance House, a subsidiary of Kamel's ABID.

TWRA Director Elfatih Hassanein was expelled from Austria in 1994 due to his support

for Islamic extremist activities. During Hassanein's time in Vienna when he served as the director of TWRA, the Sudanese national also held the position of cultural attaché at the Sudanese Embassy.

During this period, Sudan was harboring and supporting Osama bin Laden and his al Qaeda network and operating terrorist training camps for al Qaeda and other transnational terrorist groups. As an important leader in the Sudanese National Islamic Front government, Hassanein served as a significant financial link between the Sudanese regime, Osama bin Laden and the Muslim jihad taking place in the Balkans.

In a 1994 interview with the Islamist magazine Gazi Husrev Beg, Hassanein called for the creation of an Islamic state in Bosnia. "Bosnia, at the end, must be Muslim Bosnia, otherwise everything has lost its sense and this was for nothing."

In 1977, Kamel helped found and was an initial personal investor and director in the Islamic Bank of Luxembourg. A historical document of the Muslim Brotherhood, the Financial Strategy of the Muslim Brothers, illustrates that Kamel was involved early on in using financial institutions as a cover to secretly finance and facilitate the recruitment and training of Islamic militants.

The document describes how Kamel and Al Baraka used the Islamic Bank of Luxembourg to establish a financial base for the Islamic militant movement:

No doubt the economic side is important for any Dawa, since it has to own the economic foundation which makes available the financial resources which protects it from upheavals on the political front and in a way that makes it less dependent on individual charity payments. Also, this base offers a field for training human resources for the Gamaat [Muslim Brotherhood], in different economic and technical fields. On top of this, it will be easy to use the economic base as an umbrella which can not be easily penetrated through political activities.

The document states that Kamel and Al Baraka are the largest shareholder in the bank among the Muslim Brotherhood with 25,000 shares.

With the investment support of Kamel and Al Baraka, the Muslim Brotherhood was able to become the majority investor in the Islamic Bank of Luxembourg in order to "be in a position to manipulate and manage it as a Gamaat [Muslim Brothers] Bank…"

Swiss authorities have seized a copy of the Financial Strategy of the Muslim Brotherhood containing details regarding Al Taqwa founders and shareholders during searches of Al Taqwa offices in Switzerland. The same document was found in a house owned by Youssef Nada. The same document mentions Kamel as being member of the board of directors of the Islamic Bank of Luxemburg.

The Muslim Brotherhood, initially helped established the International Islamic Bank in Luxemburg with a capital of $100 million.

By becoming majority owners in the International Islamic Bank in Luxemburg, Kamel and the Muslim Brotherhood were able to keep secret money transactions, since it is regarded as safe from security watch domains. It broadens the field of Islamic alternatives, in a practical framework for Islamic principles and the ideas of the Gamaat in the field of finance and economics … is a good instrument to implement many projects which are necessary for the Gamaat and its members … [and] it is a good instrument to train higher level economic, financial and technical staff, within the framework of the

Gamaat plan. Moreover, expansion in the Bank's activities, shall lead to absorption of a great many specialized members of the Gamaat in its different departments.

Kamel and Al Baraka Bank appear as initial shareholders of the International Islamic Bank, predecessor of Al Taqwa Bank, affiliated to the Muslim Brotherhood.

On November 7, 2001, Bank Al-Taqwa, its affiliated business and key executives were designated as financial supporters of Osama bin Laden and al Qaeda by President George W. Bush. In announcing the designation of AlTaqwa as a global terrorist entity, President Bush stated:

"Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaeda shift money around the world. Al Taqwa raises money for Al Qaeda. They manage, invest, and distribute those funds. . . They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations."

In 2002, US Treasury Secretary Paul O'Neill stated the following regarding Al Taqwa:

"As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his Al Qaeda organization received financial assistance from Youssef M. Nada [director of the bank]."

The co-director of Bank Al Taqwa, SDGT Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaeda, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself."

Youssef Nada acknowledges that Bank Al Taqwa was publicly under investigation for financing terrorism as early as 1995.

> Q:     A report of the United States Treasury Department, published in 1999, mentioned that fund transfer companies compose a sanctuary for terrorist and criminal bodies, those companies have been used to support terrorism. Do you think that...?

> A:     Well, I cannot exclude that because we started facing the problems publicly from 1995; they were escalated in 1997 and reached the peak in this final situation in 2000-2001.

Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's house in December 1999. His name is followed by a phone number in Cannes, France as "Kamel Saleh Sheikh, Cannes, 0033936/19607".

In 1995, it was reported that Kamel and Al Baraka Bank had "major investments" in Bank Al Taqwa, the Bahamas-based Specially Designated Global Terrorist entity.

In 1997, while Kamel maintained investments at Bank Al-Taqwa, Agence France Presse and the U.S. Department of Treasury reported that terrorist fundraisers were annually transferring $60 million for the Hamas terrorist group through Bank al Taqwa accounts.

Furthermore, the Treasury Department report mentioned that Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.

Thus, as early as 1995, Kamel knew or should have known that Bank Al Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities.

As an Islamic banking institution, Bank Al Taqwa required its investors to comply with its own obligations of zakat. The bank managers and directors would then "give [these] funds to fundamentalist groups."

Bank Al Taqwa diverted funds from investors' accounts to terrorist entities— but only after the investor authorized the zakat funds to be withdrawn from the investment accounts in compliance with shariah.

Thus, Kamel would have been required to authorize the zakat withdrawal from his mudarabah investment account with the knowledge that these funds could have been used for the material support of terrorism.

Along with SDGT Yassin Al Qadi, Kamel is a founder, financier and shareholder of Albanian International Development, Ltd. ("ALINTID") which was established during the early 1990s. The financial institution was reportedly designed to finance construction projects in south-eastern Europe. However, "none of the construction projects were ever built and the money disappeared."

Multiple private and government sources have confirmed that Kamel and Yassin Al Qadi turned over the ownership and financial assets of ALINTID to Osama Bin Laden in support of his international terrorist network when he visited Albania in 1995. OFAC has described Albania as the Ground Zero for terrorist financing. This story has been confirmed by OFAC, a witness by the name of Adnon, and anonymous witness in the U.K.

A Russian intelligence memo on Al-Haramain, compiled by the Counter-Terrorism Center illustrates the extent of the financial backing provided by the Al Baraka Bank network:

"Through one of its branch offices, the AlHaramain transferred large amounts of money to the local Wahhabi center in Dagestan, known as the Islamic center "Kavkaz," in the capital of the republic, Makhachkala, and in the village of Karamakhi in Buinaksk in the Republic of Dagestan. The Al-Haramain set up a new fund in support of Chechnya, known as the Foundation Regarding Chechnya, which used the services of the Al-B arakaat Bank."

A Russian intelligence memo, *Reference Information on funding of Abroad-Stationed Chechen Separatists*, states the following regarding the international financial structures, involved in funding of Chechen rebels:

In Saudi Arabia — (...) From Saudi Arabia, moneys are remitted to Chechen separatists through the Lebanese banks of "Al Baraka Bank Lebanon" and "Al-Takwa", which, through their respective affiliations, remitted the total of 10 million US Dollars to Europe. In Great Britain - the "Al-Baraka" bank diverts money through the institution, which is incorporated in Dalian [Dallah] Al Baraka group, controlled by the industrial corporation of Saleh Al Kamel.

The use of Al Baraka Bank was confirmed by a statement from Al-Haramain chairman, Aqueell Al Aqueell, who declared that the charity maintained accounts at Al Baraka bank in Saudi Arabia.

60573

The Russian security service (FSB) has publicly alleged that al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

A memo from the FSB details the bank's role in funding Al Haramain:

> "Al Haramein [Haramain] created a foundation in support to Chechen, whose branch at the end of 1999 was opened in Azerbaijan and it uses the services Al Baraka Bank. Funds were directed into the near-boundary with the Chechen republic region of the operators, which is occupied by the rebel forces. Despite the fact that the official financing is dedicated to religious use for conducting of Moslem holidays, actually they are consumed on the needs of Chechen NVF. On existing knowledge, part of the obtained financing comes from the charitable collections (Zakat) and goes to the personal foreign accounts of field commanders, including Khattab and Basayef. The families of those have settled in the United Arab Emirates and other neighboring countries in the Middle East".

FSB had intercepted messages from Saudi-based Islamic organization Al-Haramain to its envoys in Chechnya, the source said. One of the latest intercepted messages said:

> "The load is ready for sending -- grenade launchers with ammunition, bullets for various systems, machine-guns, Kalashnikov submachine-guns, sniper rifles. One thousand rounds of ammunition, automatic grenade launchers, a Fagot antitank missile and 500 (bullet-proof) vests have been bought."

Oleg Syromolotov, Deputy Director of counterintelligence, Russian FSB stated during an interview:

> "The Saudi Arabian Al-Haramain (...) was funding gunmen and organizing arms supplies to and the recruitment of foreign mercenaries to fight in Chechnya on the pretext of giving charitable aid."

The U.S. State Department reported the connections between al Qaida terrorist organization and Chechen rebel leader Al-Khattab in its annual report on Human Rights Practices for 2001:

> "The international terrorist leader Usama Bin Laden reportedly sent funds, personnel, and material to elements in the rebel camp. A number of the rebels are not ethnic Chechens and are from foreign countries. According to press reports, as many as 400 of Bin Laden's followers may have joined the rebels from his base in Afghanistan (...). One rebel field commander, Ibn-ul-Khattab, is Saudi-born and reportedly was trained in Afghanistan by Osama Bin Laden. In October presidential spokesman Sergey Yastrzhembskiy claimed that there were approximately 200 non-Chechen fighters in Chechnya".

The Saudi Al Haramain Islamic Foundation's offices of Bosnia Herzegovina and Somalia have been added on March 12, 2002 on the list of Special Designated Terrorist (SDN) by the Office of Foreign Assets Control (OFAC) of the Department of the Treasury and their assets have been blocked pursuant to Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit or support terrorism.

60573

Russian law enforcement agencies have added Servakh Abid Saad to their Wanted List and the head of the public relations centre of the Dagestan branch of the Russian FSB security service, Murad Khadzhimuradov, told Tass, on April 2, 2001, that a criminal case was opened against Servakh Abid Saad under Article 208 of the Russian          Criminal Code on "organisation and participation in illegal armed detachments" adding that he was in possession of documents proving that Chechen extremists, including Khattab, Basayev, and Barayev, have had financial and material assistance from some prominent political and financial leaders in Saudi Arabia through Iqraa International.

In late 2000, the Egyptian national left Russia (he was charged in absentia and put on the list of wanted persons) and reappeared in Egypt recently. According to the Federal Security Service, Egyptian secret services have been contacted and negotiations over Servakh's extradition are underway.

Kamel and Al Baraka also consulted the autonomous Chechen government on establishing a shariah compliant economy. Kamel and Al Baraka sponsored Chechen specialists to go to the United States to study shariah compliant Islamic finance.

Kamel and Al Baraka were expanding their global jihadist banking network by setting up operations in a locality where al Qaeda was known to operate and where Kamel and Al Baraka were directing millions of dollar in illicit funding from the Middle East for the purposes of carrying out an Islamic jihad against Russian and foreign civilian targets ― including Americans.

The involvement of Kamel in providing financial support and assistance to terrorist organizations is also revealed in the context of the Palestinian uprising and the financing of the Hamas terrorist group.

According to the declaration by FBI agent David Kane in support of pre-trial detention of Soliman S. Biheiri filed on August 14, 2003 in case 03-365-A, U.S. v. Soliman Biheiri, (US District Court, Eastern District of Virginia), Bait-Ul-Mal Inc (BMI Inc), an Islamic investment firm, "transferred funds to or for terrorists". The affidavit also includes business relationship with Yassin Al Qadi.

In an interview of Soliman Biheiri by agent David Kane on June 15, 2003, Soliman Biheiri claims that BMI attracted investments from major banks, including Al Baraka Bank.

The investigation report of his interview with agent David Kane states the following:

> "Al Barakat [Al Baraka] Group invested $500,000 into BMI in late 1992 or early 1993 ... Al Barakat [Al Baraka] subsequently began to invest $2 to $3 million a month with BMI".

In 1998, a new bank was founded in Al-Beireh, West Bank, Palestine, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were DABG and the Jordan Islamic Bank.

Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a statement,

Kamel acknowledged that DABG owns another 12 percent.

Since 1998, Israel had refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York—Al Asqa's correspondent in the United States—to warn its directors of the nature of the bank's activities.

According to the Israelis, financial support for the Hamas originated from the U.S. based Muslim charity Holy Land Foundation for Relief and Development, whose assets were frozen by the U.S. government in December 2001.

Finally, the assets of Al Aqsa Islamic Bank and of two shareholders were frozen in December 2001 by the United States pursuant to Executive Order 13224. The bank is described as the "financial branch of Hamas".

According to the Department of the Treasury statement:

> "Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

Assets of Beit El-Mal, a 20% shareholder, were frozen. The White House fact sheet stated that:

> "Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

Saudi national Omar Al Bayoumi, who lived in the United States from the late 1 990s until 2001, was Assistant to the Director of Finance for Dallah Avco, a subsidiary of DAGB.

Nawaf al Hazmi and Khalid al Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people. Al Hazmi and Al Mihdhar received funding from Omar Al Bayoumi, (a.k.a. Abu Imard) a Saudi national who shared his home with them and paid their house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in

connection with the September 11 attacks.

Al Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States. The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia." In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, a subsidiary company of Dallah Avco Aviation.

During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that leading his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't keep al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"-- made it clear that the government wanted alBayoumi's contract renewed "as quickly as possible."

The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaeda.

Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

In April 1998, Bassnan solicited the Saudi Embassy for help on his wife's behalf for thyroid surgery. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for the medical treatment. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of $2,000 to $3,000 to his wife's bank account. The later payments came from Princess Haifa, in the form of cashier's checks, also from Riggs Bank, continuing until the summer of 2002 and totaled approximately $130,000.

The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi.

Al Baraka Bank provided material support to the Spanish al Qaeda cell uncovered by the investigation and prosecution of Judge Baltasar Garzon since 2002.

Kamel and Al Baraka Bank also provided material support to the Spanish Al Qaeda cell which directly funded and helped coordinate the September 11th hijacker cell. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi.

Spanish authorities seized documentation regarding bank transfers between Muhammed Zouaydi and Fawaz Zakri, another alleged member of al-Qaeda network in Istanbul for an amount of $3,000 US. The bank transfer was handled through Al Baraka Turkish Finance House. This money transfer had the final destination "Imad", Imad Eddin Barakat Yarkas, according to Spanish officials. Imad Eddin Barakat Yarkas was the head of the Spanish cell.

Kamel provided material support to the Hamburg al Qaeda cell which planned, organized, and carried out the September 11th attacks.

Kamel is a principal shareholder and former Chairman of the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing.

The mastermind behind the September 11th attacks, Ramzi Binalshibh, owned a joint bank account with the Saudi Arabia-based Tihama Group for Advertising, Public Relations & Marketing while he was living in Hamburg, Germany and planning the September 11th attacks.

Shortly after September 11th, German authorities discovered a bank statement (Account No. 0002-125356-002) in Ramzi Binalshibh's name registered to Binalshibh's last known address in Hamburg, Bunawiete 2, 21073 Hamburg, Germany. The account number and registration data matched an account owned by the Tihama Group.

According to German prosecutorial documents, there is evidence that Ramzi Binalshibh utilized funds from this account during his planning and coordination of the September 11th attacks.

Iqraa International (a.k.a. Iqraa Charitable Society, a.k.a. Ikraa International, a.k.a Ikraa Society, a.k.a. Iqra Association) is a Saudi-based charitable organization founded in 1983 by Kamel and managed by Mohammed Abed al-Yamani.

Iqraa International headquarters are located in Dallah Tower, Palestine Road, Jeddah, Saudi Arabia. Iqraa International's purpose is to provide educational help for Muslims in the world.

Iqraa International is involved in several countries, such as India, Bosnia, and Chechnya. Its financial activities are managed by the Iqraa Trust based at 24 Culross Street, in London, UK. The trust was founded in 1988 for the purpose of providing services and resources to Muslim prisoners. In 2001, it reported an income of £660,000.

Iqraa International has a branch in the U.S. registered as Iqraa International Educational Foundation Inc. in the State of Illinois. Since November 22, 1983, the branch has been located at 7450 Skokie Blvd, Skokie, IL, 60077-3374, United States. The US Isqraa branch is currently headed by Mohamed Fakhri. The US branch of Iqraa int,ernational announced, in 2002. annual sales in an amount of $1,200,000.

IRS form 990 of the U.S. branch for 1997 shows that Iqraa International Educational Foundation was granted a loan by the SAAR Foundation for an amount of $10,000.

Iqraa International is currently under investigation by Russian Federal Security Services (FSB) for terrorism financing and logistic support.

The activities of Iqraa International in Russia were coordinated by Servakh Abid Saad, an Egyptian national who acted on behalf of Saudi Intelligence according to a recent official study and Russian officials.

Servakh Abid Saad, Director of the Russian office of Iqraa International charity organization was involved in data gathering activities, reporting to Iqraa headquarters in Jeddah and to the Embassy of Saudi Arabia in Moscow.

Mohammed Abed al-Yamani, chairman of Iqraa International, is one the oldest Kamel partners. He began his career as manager of the board of DABG.  Mohammed Abed al-Yamani became executive board member of DABG and is currently deputy President of DABG.

Mohamed Abed al-Yamani, as director of Iqraa International, and Kamel, as founder of the same NGO, are registered together in the board of directors of Cominco N.V. The company declared $11,000,000 of authorized capital in 2002.

Mohammed Abed al-Yamani also has financial interests with the bin Mahfouz family, including Walid Mohammed Bin Salem Bin Mahfouz, brother of Khalid Bin Salem Bin Mahfouz, in the Fitaihi Complex in Jeddah.

In 1992, Mohammad Abed al-Yamani, in his capacity of Vice-Chairman of the Higher Committee for Collecting Donations for Muslims of Bosnia-Herzegovina, received $4,266,723 from Bakr Bin Laden and Kamel. The Muslim World League and its main branch, the IIRO, were participating in this collection.

Muhammad Abed al-Yamani is also chairman of the IIRO investment committee and participated in financing the fundamentalist "Islamic alliance of Afghanistan" and the wider structure of the Afghani opposition, the "Islamic alliance of the families" since 1983.

Dr. Abdullah Omar Nassief is member of the board of Iqraa International Educational Foundation. He is also former Secretary General of Muslim World League and member of the Shura Council of the Kingdom of Saudi Arabia.

Iqraa also developed its activities in India through the Iqraa International Hospital and Research Centre (IIHRC), jointly financed at a cost of $5 million by DABG and Iqraa International. Most of the time, the Iqraa Charitable Society financial operations are operated jointly with DABG. Iqraa also maintains operations through a local branch of the organization based at A-2, Firdaus Apt., 24, Veer Saverkar Marg (Cadel Road), Mahim, Mumbai-4000l6.

Kamel is the owner of the Iqraa satellite television network. According to Iqraa TV's director, Abdul-Qader Tash, the channel is the "brain child" of Kamel.

Kamel has exploited his satellite TV channel to propagate his violent jihad against the west and rally financial support for terrorist activities carried out by al Qaeda and other transnational terror groups worldwide via the powerful medium of television programming.

A sampling of regular programming on the channel illustrates this point. Saudi Arabian Sheikh Muhammad Al-Munajid stated on Iqraa TV:

> The issue is not one person, two, 10 or 100 going out with their guns to support their brothers. Defeating the infidels requires a

much greater effort. It requires the
mobilization of the nation. How can the nation be mobilized? I
believe that the stupid acts of these Jews and Crusaders mobilize
the nation. The big explosion will come!

Shortly before the above program aired on Iqraa, Prince al-Waleed bin Talal, Kamel's ownership partner in Iqraa TV, contributed $27 million to a government organized telethon in Saudi Arabia that raised $109 million for the families of Palestinian suicide bombers as an enticement to murder Israelis by providing a guaranteed income to the families of the murderers.

Another Kamel-sponsored program on Iqraa TV, Muslim Woman Magazine, explicitly extols the virtues of child violence and hatred against Jews and Christians:

"Anchor Doaa Amer: Our report today will be a little different because our guest is a girl, a Muslim girl, but a true Muslim. Allah willing, may our God give us the strength to educate our children the same way, so that the next generation will turn out to be true Muslims who understand that they are Muslims and know who their enemies are. This girl will introduce herself immediately. She is the daughter of my sister in faith and of the artist Wagdi alArabia. Her name is Basmallah.

3½ Year Old Guest Basmallah: Allah's mercy and blessing upon you.

'Amer: Basmallah, how old are you?'

Child:  Three-and-a-half.

'Amer: Are you a Muslim?

Child: Yes.

'Amer: Basmallah, are you familiar with the Jews?

Child: Yes.

'Amer: Do you like them?

Child: No.

'Amer: Why don't you like them?

Child: Because…

'Amer (prompting): Because they are what?

Child: They're apes and pigs.

'Amer: Because they're apes and pigs? Who said they are so?

Child: Our God.

Amer: Where did he say this?

Child:In the Koran.

Amer: Right, he said that about them in the Koran.. Basmallah, Allah be praised! Basmallah, Allah be praised! May our God bless her. No one could wish Allah could give him a more believing girl than she. May Allah bless her and her father and mother. The next generation of children must be true Muslims. We must educate them now while they are still children so that they will be true Muslims.

Another Iqraa TV program attempts to justify suicide bombings against Israeli civilian targets. Adel Sadeq, the chair of the Arab Psychiatrists Association, glorified suicide bombing and the taking of Israeli lives:

"Only our culture understands sacrifice, loyalty and honour. No one in the [western] world sacrifices his life for his homeland. If his homeland is drowning he is the first to jump ship. But in our culture it is different because when a martyr dies, he reaches the height of bliss. When the martyr explodes, he knows that he is not dead. He is simply in transition to another, more beautiful world, because he knows very well that within seconds he will see the light of the Creator."

Kamel has made clear that he wishes to target this same type of militant and hate-filled ideological programming to U.S. audiences.

In January 2003, Kamel announced that he planned to invest $100 million in an "English-language radio station, a multi-language television channel and a U.S. based public relations firm ... designed to present an alternative picture of the Muslim world to that broadcast by the mainstream international media," and, "explain real Islam.

In October 2001, Kamel stated that he was negotiating with U.S.-based EchoStar satellite TV service distribution company and that the parties were "seriously thinking of producing an English-language channel aimed at opening West's eyes to Arab culture."

As the foregoing demonstrates, Kamel thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaeda, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Kamel's participation in the jihad campaign for al Qaeda, and/or Radical Muslim Terrorism, and/or the International Front for the Jihad against Jews and Crusaders.

I.      **Yeslam Bin Laden**

1.      This Court has personal jurisdiction of Yeslam Bin Laden. Before September 2001, Yeslam Bin Laden had significant contacts with and presence in the United States. From 1983 to 1998, he was the owner of a single family residence situated on 2.09 acres at 634 Stone

Canyon Road, Los Angeles, California, United States of America (Bel Air lot 168). According to the assessor's report, the "owner occupied [the] location." On December 2, 1998, "Yeslam M. Binladin" transferred ownership of this property (valued at $2,865,429) through a grant deed to Ibrahim Binladin, as detailed in the state of California's deed transfer records in document 000002354383. The name "Yeslam M Binladin" is also listed at the following addresses on the corresponding dates:

|  |  |
|---|---|
| 125 South Oakhurst Drive | |
| Apt. 101 | 01/01/1998 |
| Beverly Hills, CA 90212 | |
| 11728 Folkstone Lane | 11/01/1999 |
| Los Angeles, CA 90077 | |

2.      Since September 11, 2001, Yeslam Bin Laden has been interviewed by Western media outlets. On July 9, 2004, Yeslam Bin Laden appeared on Dateline NBC to answer questions about his life since September 11th. On November 8, 2004, Time Magazine published an interview with Yeslam Bin Laden as reported from a correspondent in Paris, France.

3.      Yeslam Bin Laden is an international businessman. Along with numerous other global entities, Yeslam Bin Laden founded Cygnet S.A., later renamed Saudi Investment Company ("SICO"), in May 1980 in Geneva, Switzerland. SICO serves as the international investment arm of the Saudi Binladin Group ("SBG"), the Bin Laden family business based in Jeddah, Saudi Arabia. SICO's Curacao branch, established in 1984, manages SBG's partnership with the American Daniels Realty Corporation, part of the Fluor Corporation conglomerate based in Aliso Viejo, California, United States of America. With the help of SBG, Fluor Corporation became one the major recipients of reconstruction contracts in Kuwait.

4.      Yeslam Bin Laden provided material support to his brother, Osama Bin Laden and the al Qaeda international terrorist network. This material support includes, but is not limited to, the acts of material support specified herein. The material support provided to Osama Bin Laden by his brother Yeslam Bin Laden was a proximate cause of the attacks of September 11, 2001 on the United States and the Plaintiffs herein.

5.      In 2000 and 2001, Yeslam Bin Laden made donations to the Muslim World League Cultural Center in Geneva, which aided, abetted, and materially supported Defendant Hani Ramadan.

6.      SICO received $10 million from SBG in management funds during the 1990's. In addition to receiving funds from SBG, Yeslam's key positions within the Saudi Binladin Group include:

•      Former Chief Financial Officer of the Bin Laden Organization in Saudi Arabia (a subsidiary of SBG involved in Sudan)

•      Board Member of the Mohammed Binladin Organization, a wholly-owned subsidiary of SBG, along with Saleh Gazaz, Mohamed Bahareth, Abdullah Bin Said, Moharned Nur Rahimi, Bakr M. Bin Laden, Tarek M. Bin Laden, and Omar M. Bin Laden.

7.      The address of the Saudi Binladin Group (P.O. Box 958, Jeddah, Saudi Arabia) appears on an account (account # CO-565 167) opened by Omar M. Bin Laden and Haider M. Bin Laden at UBS Bank in Geneva, Switzerland on August 17, 1990 for their brother, Osama Bin Laden. The authorized persons on the account were Yeslam M. Bin Laden and Osama Bin Laden, who was only authorized to use the account with the co-signature of Yeslam. The named economic beneficiary of the account was Osama Bin Laden. On August 20, 1990, $450,000 was transferred into the account; on October 25, 1991, $482,000 was transferred to Defendant Saudi American Bank in Jeddah in favour of Haider M. Bin Laden. The account was closed on October 9, 1997. This joint account was among fifty-four others created to shelter the assets and financial activities of the Bin Laden family.

8.      In a United States Department of Justice investigation, it was discovered that Osama Bin Laden had received funds from two accounts at Deutsche Bank in Geneva, Switzerland, in the names of Cambridge Engineering and the Saudi Binladin Group. An amount totaling nearly $300 million was transferred through these accounts; Yeslam Bin Laden was the account manager for both. Cambridge Engineering Systems Ltd. was registered under the names Yahia Bin Laden, Shafiq Bin Laden, and Akber Moawalla. Moawalla, a former treasurer

and Chief Financial Officer of SBG, is managing Falcon Ltd., a financial holding of the Bin Laden family registered in the Cayman Islands and owned by Fawzia Bin Laden, Ibrahim Bin Laden, Khalil Bin Laden, and Yeslam Bin Laden.

9.      Tracfin, a financial intelligence service that reports to the French customs service, has investigated Yeslam Bin Laden on suspicion of money laundering based on "suspicious operations reports" filed by a number of banks concerning operations by Yeslam Bin Laden in the United Kingdom, France, and the British Virgin Islands. French authorities have recently expanded this investigation to also include terrorist financing.

10.      Yeslam Bin Laden was questioned in 2004 by French Judge Renaud Van Ruymbeke regarding the testament of Mohammed Bin Laden, father of Yeslam and Osama, which details the Bin Laden family fortune and the origin of the funding for al Qaeda. During the questioning, Yeslam Bin Laden stated that in 1968 and 1969, all male heirs of Mohammed Bin Laden, including Osama, received nearly $500,000 each. They also received an annuity every year thereafter of $300,000, equivalent to their share of the dividends of the family business, SBG. Yeslam Bin Laden estimated that the total amount received by each heir of Mohammed Bin Laden between 1974 and 1994 would range from $12 - $15 million. These inheritances provided a substantial base of funding for Osama Bin Laden and his al Qaeda organization.

11.      Al Qaeda and other terrorist groups, in partnership with wealthy individuals, banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world. These practices have allowed unscrupulous front groups, organizations, institutions, and/or charities to fund violent, extremist Islamic groups, including Al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror on September 11, 2001. In addition to the actual monetary donations by Yeslam Bin Laden to corrupt charities, his use of his banking and financial institutions also provided a broad range of facilities, material support, and banking services to his brother Osama Bin Laden. These activities include assistance in the actual distribution of funds, the maintenance of bank accounts for various charities and individuals associated with the al Qaeda, accounts specifically set up for the collection of donations; use of joint accounts; and the facilitation of wire transfers to and from various al Qaeda related entities.

12.      Al Qaeda, and other international terrorist organizations, raise money from a variety of sources and move money in a variety of manners. Once the system is in place to raise the money, a set of mechanisms is necessary to move the money. "The first, and most simple, is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy. For years, Al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy." *"Terrorist Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations" ("Terrorist Financing Report"),* pg. 14, Maurice R. Greenberg, Chair, 2002.

13.      Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from donations made by and/or passed through Islamic banks or charities, and they rely on individuals including but not limited to Yeslam Bin Laden, to facilitate the illicit transfer of funds.

14.      Since at least 1998, Osama Bin Laden made open and public calls for Muslims to donate to his terrorist organization. In December 1998, during an interview with ABC News, Osama Bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God."

15.      On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama Bin Laden and his terrorist cells, including Al Qaeda, as international terrorists. Osama Bin Laden, his sponsors and followers, were known to openly promoting hatred and violence against innocents long before this time. On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other support to support terrorism. The list of these "specially designated global terrorists" or terrorist organizations ("SDGT") included Osama Bin Laden and al Qaeda.

16.      Osama Bin Laden and his al Qaeda organization were sponsored by a network of

banks, charities and individuals, including Yeslam Bin Laden. Yeslam Bin Laden provided material support to Osama Bin Laden while he was in The Republic of Sudan during the early 1990's. Yeslam Bin Laden provided funding and financial support for Osama Bin Laden's international terrorist operations, infrastructure, and organizations in the Sudan.

17.     In early 2001, Yeslam Bin Laden paid for certain individuals to take flight training lessons at Huffman Aviation in Venice, Florida, United States of America. Mohammed Atta and Marwan Al Shehhi attended this flight training school prior to hijacking Flights 11 and 175, respectively, and crashing them into the World Trade Center on September 11, 2001. Yeslam Bin Laden financed trips to the United States and flight lessons over the course of the year in 2001. Similarly, Yeslam Bin Laden also paid for certain individuals to take flight training lessons at a flight school in Tucson, Arizona, United States of America.

18.     Yeslam Bin Laden knew or had to know that Al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States. Yeslam Bin Laden also knew or had to know that Al Qaeda was and is the recipient of millions of dollars from corrupt charities, including Muslim World League. As such, Yeslam Bin Laden aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists and international terrorist activities.

19.     Yeslam Bin Laden knew or had to know that he was providing material support to international terrorism and terrorist activities through his financial dealings with his brother Osama Bin Laden. Despite knowledge of Osama Bin Laden's intentions and goals, Yeslam Bin Laden continued his financial partnership and collaboration with Osama Bin Laden and as a result, Yeslam Bin Laden himself aided, abetted, conspired with and/or materially supported international terrorism and terrorist activities. This material support was a proximate cause of the September 11, 2001 attacks and the damages suffered by Plaintiffs.

**J.      Al-Barakaat, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Co., Al Barakat Global Telecommunications, Al-Barakat Group of Companies SomaliaLimited, Al-Barakat International, Al-Barakat Investments,Barakat Wire Transfer Company**

*The Companies Comprising the Barakat Network Have Been Named Specifically Designated Global Terrorists*

1.          On November 7, 2001, the United States Government named as Specially Designated Global Terrorists (SDGT) and froze the assets of Al-Barakaat, Al-Barakat Bank of Somalia, Al-Barakat Finance Group, Al-Barakat Financial Holding Co., Al Barakat Global Telecommunications, Al-Barakat Group of Companies Somalia Limited, Al-B arakat International, Al-Barakat Investments, and Barakat Wire Transfer Company (the "Barakaat Network") on the grounds that the owner of the Barakaat Network was directing some of the profits of the business to al Qaeda.

2.          On September 21, 2005 the Court of First Instance of the European Communities issued its first judgment in the case of Ahmed Au Yusuf and Al Barakaat International Foundation and Yassin Abdullah Kadi v Council of the European Union and Commission of the European Communities, Case No. T-306/0 1, upholding the Council of the European Union's right to impose economic and financial sanctions such as the freezing of funds on Al Barakaat, in connection with the fight against international terrorism.

3.          President Bush called the Barakaat Network companies fronts for funding global terrorism, asserting that evidence shows a portion of the money being sent to impoverished families in Africa was being skimmed off the top by al Qaeda.

4.          In 2004, United Arab Emirates authorities confiscated $3 million in terror-related funds and froze 14 accounts of companies and individuals named on lists by the United Nations and the United States. UAE Central Bank governor Sultan bin Nasser alSuweidi said among the frozen accounts was Al-Barakaat Group.

5.          Juan C. Zarate, Deputy Assistant Secretary for the Executive Office for Terrorist Financing and Financial Crimes, gave a testimony on March 4, 2004 before the Senate Caucus on International Narcotics Control in which he said the UAE and Somaliabased Al-Barakaat network was once used to funnel potentially millions of dollars annually to al Qaeda and its affiliates. He added that important financial network - such as those of Al-Barakaat - have been identified and shut down.

*The Barakaat Network Uses Its United States-Based Companies to Funnel Money to al Qaeda*

6.          On November 7, 2001, when the Department of Treasury's Office of Foreign Assets Control (OFAC) froze the assets of the Barakaat Network and its agents across the United States, among the assets frozen by OFAC was Chevy Chase Bank Account 1154301173 in the name of Abdirahman Sheikh-Ali Isse. Between 1997 and November 7, 2001, Isse operated a money transmitting service, first from his residence at 4949 Manitoba Drive in Alexandria, Virginia, and later from the premises of an Al-Barakat money transmitting exchange, doing business as Rage Associates at 4810 Beauregard Street in Alexandria, Virginia.

7.          During the period of 1997 to November 7, 2001, Isse collected millions of dollars in cash from individuals wishing to transmit money to Somalia, Ethiopia, Kenya, and the Sudan. Isse did not ask his customers about the source of the cash they gave to him to remit through the Barakaat Network or the uses for which the money was being remitted. Isse then deposited the monies in multiple accounts of multiple branches of various banks in Northern Virginia, including First Union Bank, Bank of America, and Chevy Chase Bank, before wire transferring those monies to the Barakaat Network in the UAE for further transfer to Somalia, Ethiopia, Kenya, and Sudan, all without obtaining a money-transmittal license as required by

Virginia and federal law. Isse generally charged customers a 4% fee for any wire transfer, retained 1% for himself, and remitted the remaining 3% to the Barakaat Network in the UAE; however, a higher fee was sometimes charged to reflect individual circumstances. During the course of this conspiracy, various individuals, including one Abdillah Abdi, would make currency deposits at various banks under Isse's direction. Other customers, with general authorization to do so from Isse, made currency deposits directly into bank accounts controlled by Isse. In the course of making these deposits, Isse and Abdi intentionally caused these various banks to fail to file Currency Transaction Reports (CTRs) required by law by "structuring" these deposits in amounts of less than $10,000 for each transaction. Isse and Abdi made currency deposits in this manner for the purpose of evading the reporting requirements of section 5313(a) of Title 31, United States Code, in violation of Title 31, United States Code, Sections 5322 and 5324. Isse and Abdi made multiple deposits into different branches of different banks on any given day to avoid the filing of CTRs. Among the accounts into which Isse and Abdi made many structured deposits included Account 4121681346 in the name of Abdirahman S. Isse d/b/a Rage Associates, Inc., located at Bank of America; and Account 1154301173 in the name of Abdirahman S. Isse d/b/a Rage Associates, Inc., located at Chevy Chase Bank. During the course of this conspiracy, Isse and Abdillah Abdi structured total currency deposits in the amount of approximately $4,244,499.00. At all times during the conspiracy, Isse and Abdi knowingly deposited only amounts less than $10,000 for the purpose of causing the various banks to fail to file the appropriate reports.

8.          On November 7, 2001, law enforcement agents executed search warrants upon the offices of various agents of the Barakaat Network across the United States, including Isse's business at 4949 Manitoba Drive in Alexandria, Virginia. Moreover, law enforcement agents seized the contents of Bank of America Account 4121681346 in the name of Isse, doing business as Rage Associates, Inc. During the execution of the search warrant at 4949 Manitoba Drive, law enforcement agents found on the premises of Rage Associates $29,422 in cash. Most of that cash had been available for deposit by Isse on November 6, 2001, but Isse declined to deposit that cash because he did not want to trigger the filing of a report by the bank.

9.          For the tax years 1999 and 2000, Isse filed individual income tax returns in which he under-reported, on Schedule C, the net profits he derived from his money transmitting business. In particular, for 1999, Isse only claimed commission income he earned for the months October, November, and December, even though he earned taxable commission income for the entire year.

10.          On November 7, 2001, law enforcement agents also raided the Barakat Wire Transfer Company located at 4419 S. Brandon Street in Seattle, Washington based on evidence that the wire transfer service was funneling money to the al Qaeda network.

***Information Regarding the Barakaat Network from 9/11 Commission Report***

11.          In the late 1990s, the intelligence community also began to draw links between AIAI (Al-Itihaad Al-Islamiya), al-Barakaat (particularly its founder, Ahmed Nur Ali Jumale) and Usama Bin Ladin.

12.          The reporting centered on a few key facts. First, it alleged that Usama Bin Ladin not only assisted Jumale in establishing al-Barakaat in about 1992 but was in fact a silent partner, and that Jumale managed Bin Ladin's finances as well. This was consistent with other information that indicated a prior relationship between Jumale and Bin Ladin.

13.          Second, the first FBI investigation on AIAI and al-Barakaat was started in San Diego in October 1996, on an individual investigated as a result of his connection with HAMAS. The reporting indicated that al-Barakaat was associated with AIAI, in that al-Barakaat managed the finances of AIAI, and AIAI used al-Barakaat to send money to operatives.

14.          Variations of that reporting stated that the head of al-Barakaat, Jumale, was part of the AIAI leadership, or that Usama Bin Ladin used al-Barakaat to fund AIAI.

15.          Third, there were allegations that al-Barakaat actually assisted in procuring weapons for AIAI or sold weapons to AIAI. There were specific reports, for example, of al-

Barakaat's supplying Somalia's Sharia court with 175 "technicals" and 33 machine guns between January and mid-July 2000, and AIAI with 780 machine guns, which it had procured from sources in China and Chechnya.

16.         Other reporting indicated that al-Barakaat was founded by members of the Muslim Brotherhood in order to facilitate the transfer of money to terrorist organizations, including Hamas and AIAI.

17.         Lastly, there was fairly detailed information from a U.S. embassy in Africa in July 1999. Two sources known to the embassy claimed that Usama Bin Uadin was a silent partner and frequent customer of al-Barakaat. One of the sources further related that Bin Ladin gave Jumale $1 million of venture capital to start al-Barakaat, and that terrorist funds were intermingled with the funds sent by NGOs. A third source told the embassy that al- Barakaat did not practice any kind of due diligence in making financial transactions.

18.         Both sources claimed that al-Barakaat security forces supported Usama Bin Ladin by providing protection for Bin Ladin operatives when they visited Mogadishu. The embassy cautioned that the allegations could not be confirmed and noted the risk that the sources may simply be spreading negative information about their rivals

19.         The intelligence community developed information that Usama Bin Ladin had contributed money to al-Barakaat to start operations, that it was closely associated with or controlled by the terrorist group A1-Itihaad Al-Islamiya (AIAI), and that some of al-Barakaat's proceeds went to fund AIAI, which in turn gave a portion to Usama Bin Uadin.

     **K.**         **Al Shamal Islamic Bank a/k/a Shamel Bank a/k/a Bank El Shamar**

*History and Organizational Structure of Al Shamal Islamic Bank*

1.         The government of Sudan granted approval to Al Shamal Islamic Bank (herein "Al Shamal") in April 1983 in response to a request from the Northern State Government, Al Shamal Investment and Development Company and Saleh Abdullah Kamel. The bank received an initial capitalization of USD $20 million.

2.         Al Shamal issued subscription shares in April 1984. The Northern State Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and co-Defendant Faisal Islamic Bank (Sudan) purchased shares in this initial offering.

3.         The government granted final approval to Al Shamal in July 1988. Chaired by Dr. Wahab Osman Sheikh Mosa, Al Shamal's provisional board included Al Baraka Investment and Development Corporation as well as co-Defendants Faisal Islamic Bank (Sudan) and Tadamon Islamic Bank. The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (USD $3.9 million).

4.         As of late 2001, co-Defendants Al-Bir International Organization (Benevolence International Foundation), Faisal Islamic Bank (Sudan), Tadamon Islamic Bank and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal.

5.     Al Shamal is heavily invested in the Sudanese import/export sector and posted revenues of $6.2 million and total assets of $63.1 million in 2000.

*US Contacts and Jurisdiction*

6.      Al Shamal has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts. Moreover, Al Shamal has purposefully availed itself of the jurisdiction of the United States by directing its activities at the United States. Al Shamal has financially supported Osama Bin Laden and the al Qaeda organization in its call for holy war or jihad against the United States.

7.      Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America. In the United States, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and CitiBank in New York.

8.      Al Shamal shareholders also maintain significant U.S. operations. Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States. In addition, Al Shamal Chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially Designated Global Terrorist entity, in the United States in 1992.

*Al Shamal Islamic Bank*

9.      Al Shamal knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and facilitating weapons and military equipment purchases for al Qaeda.

10.     Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hassan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaeda. Bin Laden even provided the institution with USD $50 million in capital. According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

11.     According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

12.     Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
> $1,200 a month.
> For how long did you work for him [Osama bin Laden]?
> Almost two years.
> What Banks did he keep his money at?
> Bank Al Shamar.

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.

13.     Al-Fadl also described acting as courier for a cash payment from al Qaeda to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Q. Who gave you the money?
> A. Abu Fadhl, he bring it from Shamal Bank and he bring it to me.

Q. Abu Fadhl brought it from the Shamal Bank?
A. Yes.

Q. Is that a bank in the Sudan?
A. Yes.

14.     In the same trial, another former al Qaeda operative stated that Al Qaeda used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting Bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route. The witness took the check to Al Shamal and cashed it.

15.     The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

16.     Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities.

17.     According to reports from a leading intelligence publication, Bin Laden remained a shareholder in Al Shamal as late as 2000. A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

18.     The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist ("SDGT") Adel Abdul Jalil Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaeda network. In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaeda.

19.     Co-Defendant Yasin Al-Qadi wired more than $22 million from Swiss Bank accounts to al Qaeda operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al-Shamal Bank.

20.     In March 1991, Hassan Al Turabi's  government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.  mobilization and training of the popular defence forces; and providing for martyrs' families.

21.     The ISSF jihad fund's largest public and private contributors were Prince Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

*Adel Abdul Jalil Batterjee, Chairman of Al Shamal Islamic Bank*

22.     Co-Defendant, SDGT and Al Shamal Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999, and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization, whose American branch, Benevolence International Foundation (BIF), was subject to a criminal complaint in U.S. District Court on April 29, 2002.

23.     Co-Defendant Enaam M. Arnaout, Chairman of Batterjee's BIF, had a relationship with Osama Bin Laden and key associates dating back more than a decade. The foundation is used by al Qaeda for logistical support. Terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaeda have contacts with the foundation and its office personnel. On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding BIF donors by diverting funds to pay for supplies to jihadists active in Bosnia and Chechnya.

24.     Documents recovered from March 2002 raids of BIF's offices in Bosnia illustrate Batterjee's instrumental role in the founding of al Qaeda. The Government's Evidentiary Proffer in *United States v. Enaam Arnaout* describes a document called the "Golden Chain":

> BIF possessed in the file a handwritten draft list of the people referred to within al Qaeda as the "Golden Chain," wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: "And spend for God's cause." The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." "Baterji", UBI's and BIF's founder, appears after six of the listings.

25.     Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the West's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator."

26.     In a book published in 2002, Batterjee writes that the West is morally corrupt and that its war on terrorism is just an excuse to try to stop Muslims from spreading Islam. According to Batterjee, Muslims have tried to peacefully expand Islam throughout the world, but those attempts have always met armed opposition. So Muslims have a right to fight back. More and more clashes with the West are inevitable, he writes, predicating that they will culminate in a final military encounter. "Does any doubt remain that the great confrontation.. is certainly coming?"

*Faisal Islamic Bank (Sudan), founding shareholder of Al Shamal Islamic Bank*

27.     The Faisal Islamic Bank (Sudan) (herein "FIBS") was chartered in Khartoum in 1983. Its first director, Abdal-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of co-Defendant Hassan Al Turabi. In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system.

28.     FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

29.     FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of co-Defendant DM1 Trust. The Islamic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed Al Faisal Al Saud, as is DM1 Trust and the Faisal Islamic Bank (Sudan).

30.     Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking, founding Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

31.     Hassan Al Turabi's friendship with Prince Mohammed Al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan. FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that FIIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, Turabi's party became the best financed in the Sudan.

32.     Former al Qaeda financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaeda operatives during bin Laden's time in Sudan:

Q.     Where were the accounts [of al Qaeda] held? In what countries?
A.     (...) we got account in Bank Faisl Islami [Faisal Islamic Bank].
Q.     Is that also in Khartoum?
A.     Yes.

*Taclamon Islamic Bank, major shareholder of Al Shamal Islamic Bank*

33.         Founded on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank") became a major shareholder of Al Shamal on March 26, 1986. Tadamon Islamic Bank continued to hold a significant stake in Al Shamal through September 11, 2001.

34.         According to testimony from former al Qaeda financier Jamal Ahrned Mohamed al-Fadl, Tadamon Islamic Bank held accounts for al Qaeda operatives. During the 1998 embassy bombings trial, al-Fadl testified on February 20, 2001, that Osama Bin Laden's assistant, Abdouh al Mukhlafi, used the bank at Bin Laden's behest:

 *-Do you recall anyone else that had bank accounts in their name for al Qaeda?*
 *Abdouh al Mukhlafi.*
 *Who was this person namedAbdouh alMukhlafi?*
 *He is from Yemen.*
 *What role did he play for Bin Laden?*
 *He goes with Bin Laden when Bin Laden travel outside or inside Sudan.*
 *What role did he play for Bin Laden when Bin Laden traveled?*
 *He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.*
 *Did he handle money during the travel?*
 *Yes.*
 *Where were the accounts held? In what countries?*
 *In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."*

*Islamic Investment Company of the Gulf (Bahrain)*

35.         Islamic Investment Company of the Gulf, the parent of Al Shama] shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan), is based in Bahrain. The bank recently merged with Faisal Islamic Bank group, creating a new entity called Al-Shamil Islamic Bank. Al-Shamil Islamic Bank is a direct subsidiary of DM1 Trust. One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

*Dar Al Maal Al Islami Trust*

36.     Dar Al Maal Al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981. "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.

37.     Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).

38.     DMI Trust laundered money for al Qaeda, knowingly and intentionally providing financial

services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. Also, DMI Trust's *Zakat* accounts have been used to support al Qaeda. In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization. Both the United States and the Kingdom of Saudi Arabia have designated as al Qaeda terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaeda. DMI Administrative Services S.A. handled accounts of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaeda goals.

## L.  Omar al-Bayoumi

1.  Omar al-Bayoumi is also known as Abu Imard. He was born in 1959 in Riyadh, Saudi Arabia.

*Income*

2. In August of 1994, al-Bayoumi moved to the United States and settled in San Diego, California, where he became involved in the local Muslim community and worshipped at the Islamic Center of San Diego. He lived with his wife and four children. He was very inquisitive, and was known to always carry around a video camera. Al-Bayoumi was strongly suspected by many residents of being a Saudi government spy. The man the FBI considered their "best source" in San Diego said that al-Bayoumi "must be an intelligence officer for Saudi Arabia or another foreign power."

3. Al-Bayoumi was employed in the finance department of a Saudi Civil Aviation Presidency project called Air Navigation Systems Support for seven years. He then was paid about $3,000 per month by Dallah Avco, a Saudi company closely tied to the Saudi Ministry of Defense and Aviation and a unit of Dallah Al-Baraka business group. The salary was officially for a project in Saudi Arabia, but he was living in the United States at the time and apparently did not work for them. For five of the seven years with the company, the Saudi ministry reimbursed Dallah Avco for al-Bayoumi's salary. He was considered a civil servant, When the company tried to fire al-Bayoumi in 1999, a Saudi government official replied with a letter marked "extremely urgent" that the government wanted al-Bayoumi's contract renewed "as quickly as possible." Al-Bayoumi was quickly rehired. While working for the Saudi Aviation Authority, his salary was approved by the father of an al-Qaeda figure and top official of the Saudi Civil Aviation authority, Hamid al-Rashid. Dallah Avco is currently being investigated by the FBI for ties to al-Qaeda.

4. Al-Bayoumi had been receiving a salary from the Saudi civil authority of about
   $500 a month in the spring of 2000. However, shortly after hijackers Nawaf Alhazrni and Khalid Almihdhar moved to San Diego, al-Bayoumi's salary increased to about $3,000 to $3,500 a month. It is not clear whether this pay spike is from his Dallah Avco job, or an additional payment by the Saudi government, but the pay spike appears to be a separate stream of money, because another report indicates his Dallah Avco job started with $3,000 a month payments and remained consistent.

5. In June of 1998, an anonymous Saudi philanthropist thought to be Saad AlHabeeb, aka "Mohamed Barak," donated $500,000 to have a Kurdish mosque built in San Diego, on the condition that al-Bayoumi was hired as the maintenance manager with a private office. The donation was accepted, but because al-Bayoumi rarely showed up for work, the mosque's leadership became unhappy with him. Eventually, they fired him. Al-Bayoumi came to San Diego from Saudi Arabia to set everything up financially, set up the San Diego cell, and set up the mosque. Anyone handling business for a mosque or a church could set it up as a tax-exempt charitable organization. They have a veil of legitimacy, which can easily be used for money laundering.

6. Some time in late 1999 or early 2000, Omar al-Bayoumi began receiving another monthly payment. This payment was from Princess Haifa bin Faisal, the wife of Bandar bin Sultan, the Saudi ambassador to the US who is a prominent Washington figure, and the daughter of the late Saudi King Faisal. He received checks between $2,000 and $3,000 that were sent monthly from the princess. The payments continued for several years, totaling between $50,000 and $75,000. The payments went from the princess' account at Washington Riggs Bank to the family of Omar al-Bayoumi. After Bayoumi left the country in mid-2001, payments began flowing to Osama Basnan, another friend of both al-Bayoumi and the future hijackers, Nawaf alHazmi and Khalid al-Mihdhar. Osama Basnan is believed to have funneled monthly donations to hijackers via his wife's bank account. He was arrested for visa fraud in August 2001 and was deported to Saudi Arabia in November 2002. After the 9/11 terrorist attacks, Basnan, who was known as a vocal al-Qaeda sympathizer, "celebrated the heroes of September 11" arid talked about "what a wonderful, glorious day it had been."

7. Slightly more than half of that money had been forwarded unbeknownst to the princess to either Osama Basnan or Manal al-Bayoumi (Ahmed Bagader), Omar al-Bayoumi's wife. The checks that the princess wrote were also going to Majida Ibrahim Ahmad. (Dweikat), wife of Osama Basnan, who is a close confidant of al-Bayoumi. The checks included monthly payments of $2,000 between November 1999 and May 2002 and at least one check for $15,000 in April 1998. The cash was to help defray the cost of treatment for a thyroid condition for Osama Basnan, but several of the checks were endorsed to al-Bayoumi's wife, Manal, and later diverted to an account maintained by al-Bayoumi.

8. The links between Princess Haifa's powerful Saudi family and financing of terrorism are even more extensive, however. The trails of both Omar al-Bayoumi and that of the financial network of Princess Haifa's family each lead to Osama bin Laden:

> Al-Shamal Islamic Bank in Khartoum, Sudan, was capitalized by bin Laden and wealthy members of Sudan's National Islamic Front. Bin Laden invested fifty million dollars in the bank. Mohammed al-Faisal, Princess Haifa's brother, is an investor and board member at al-Shamal.

> Al-Shamal appears to have been a bin Laden bank of choice. Al-Qaeda members had accounts in al-Shamal, according to testimony during U.S. trials surrounding the 1998 attacks on American embassies in Kenya and Tanzania. One al-Qaeda collaborator, Essam al-Ridi, recounted how bin Laden transferred $230,000 from al-Shamal to a bank in Arizona to buy a plane to fly Stinger missiles from Pakistan to Sudan. Al-Ridi, a flight instructor, was a veteran of the Afghanistan conflict where he first met bin Laden in 1983. During the 1980s, Al-Ridi shipped night vision goggles and rifles to the mujahadeen. In 1993, Al-Ridi purchased a used jet for bin Laden.

> One of the bank's three founding members and major shareholders is Saleh Abdullah Kamel. A major financial and media power in the Arab world, he is in addition the chairman of the Dallah al-Baraka Group (DBG). Al-Bayoumi was an assistant to the Director of Finance for Dallah Avco, a DBG company that works with the Saudi aviation authority. The United States believes the Dallah al-Baraka Bank, another DBG company, was also used by al-Qaeda.

### Al-Hazmi and al-Midhar

9. In January of 2000, al-Bayoumi drove to Los Angeles, saying he was going "to pick up visitors." First, al-Bayoumi visited the Saudi consulate in Los Angeles and had a closed-door meeting with Fahad al Thumairy. After 9/11, al Thumairy, who was a Saudi diplomat, was barred entry into the U.S. due to his links to terrorism.

10.     On January 15, 2000, future 9/11 hijackers (Flight 77) Nawaf al-Hazmi and Khalid al-Mihdhar flew to Los Angeles, California from Bangkok, Thailand, just after attending the 2000 Al-Qaeda Summit in Kuala Lumpur, Malaysia. The final 9/11 Commission Report noted:

> *Hazmi and Mihdhar were ill-prepared for a mission in the United States   Neither had spent any substantial time in the West, and neither spoke much, any, English. It would therefore be plausible that they or [Khalid Sheikh Mohammed] would have tried to identify, in advance, a friendly contact for them in the United States... We believe it unlikely that Hazmi and Mihdhar... would have come to the United States without arranging to receive assistance from one or more individuals informed in advance of their arrival.*

> Al-Bayoumi met the hijackers at a restaurant after their landing. He invited the two hijackers to move to San Diego with him. Al-Bayoumi found them an apartment in the same building as him (Parkwood Apartment complex), co-signed for the lease, and gave them $1500 to help pay for their first two months rent. Al-Bayoumi also hosted a welcoming party for them, set them up with a translator, helped the two obtain driver's licenses and Social Security cards, and helped them research information on flight schools.

11.     Al-Hazmi and al-Mihdar's neighbors later reported that the two struck them as quite odd. They had no furniture, they constantly played flight simulator games, and limousines picked them up for short rides in the middle of the night. During this time, al-Bayoumi lived across the street from them. Throughout this period, the payments from Dallah Avco, his titular employer, greatly increased. Al-Hazmi and al-Mihdar later moved into the house of Abdussattar Shaikh, a friend of al-Bayoumi's, who was secretly working as an FBI informant at the time.

12.     In August 1994, al-Bayoumi showed up in California and began taking English classes at San Diego University's College of Extended Studies, in its American Language Institute. He was said to have studied in the United States on Saudi government scholarship from 1994 to 2000. Over the next several years, al-Bayoumi told numerous people that he was a student at San Diego State, even though he never attended a college-credit class there.

13.     In July of 2001, Omar al-Bayoumi moved to England to pursue a PhD at Aston University. He moved to Birmingham, lived in student housing for six months while he attended
    graduate school and then rented a home when his family joined him. Ten days after the September 11 attacks, he was arrested by British authorities working with the FBI. He was held on an immigration charge

while the FBI and Scotland Yard investigate him He was released, and went back to studying at Aston and later moved to Saudi Arabia.

## M.     Mamoun Darkazanli

### Background Information on Darkazanli and the Darkazanli Import-Export Company

1. Mamoun Darkazanli, aka Abu Ilias, aka Abu Al Loh, was born in Syria and resides in Hamburg, Germany. He was a naturalized German citizen who moved to Hamburg from Syria in 1982.

2. Mamoun Darkazanli and Darkazanli Import-Export Company are listed as specially designated global terrorists by the U.S. Treasury Department. With its designation on September 24, 2001, the Darkazanli Import-Export Company was the first private business to have its assets frozen by President Bush for financially supporting al-Qaeda.

3. A few weeks later, on October 12, 2001, Mamoun Darkazanli himself was designated as a financier of al-Qaeda. In a press release marking the designation, the Treasury Department described him as "a well connected bin Laden agent" and that "Darkazanli is wanted for his role in the US Embassy bombings in Africa."

4. The Treasury Department's assertion is explained by Darkazanli's financial relationship during the planning and execution of the 1998 Embassy Bombings with two of alQaeda's most prominent members, Wadih el-Hage and Mahmoud Salim. Unlike his two associates, Darkazanli was not arrested following the bombings and he continued to knowingly provide support to al-Qaeda by aiding the Hamburg cell for the September 11th attacks.

5. Mamoun Darkazanli, who was arrested in Hamburg in October of 2004 on charges that he "helped fund the al-Qaeda terrorist network for years and who is seen in a video at a mosque with some of the September 11 hijackers." According to the Hamburg authorities, "Darkazanli is alleged to have been involved in the purchase of a ship for bin Laden, handling administrative details, and paying bills. He also allegedly traveled to Kosovo in late 2000 on an al-Qaeda mission."

### Darkazanli and Money

6. German authorities analyzed the banking accounts of Mamoun Darkazanli and they found the following banking information:

> Account with Deutsche Bank of Hamburg, number 600-400721700 which was owned by Mamdoh Mahmoud Ahmed Salim aka Abu Hajar. He is the co-founder of AQ, Financial Chief. He was detained in Germany on September 16th 1996 and extradited to the United States where he was charged for conspiracy to murder American citizens, utilizing weapons of mass destruction and for having transported explosives, in connection with the attacks against the USA embassies in Kenya and Tanzania; and he is also accused of being a member of Al Qaeda. Darkazanli was an authorized user. On January 22, 1997, there were two payments for the amount of 5,955 German Mares which were sent from Caja Madrid accounts: number 17453000818548, in the name of Waheed Koshaji Kelani and one from the account 17453000870736, owned by Ahmad Koshagi Kelani.

> Syrian-born Ahmad Koshagi Kelani and his brother Waheed Koshaji Kelani, are accused of financing al Qaeda activities. They were arrested on December 18, 2003 in Madrid, Spain a day after Garzon issued a 700-page indictment against 35 other people, including al Qaeda leader Osama bin Laden. At least eight of the 35 have been linked to the September 11, 2001, attacks on New York and Washington.

7. During a 1993 business trip to Cyprus to purchase a ship for bin Laden, Wadih elHage asked that all related business documents be sent to his business address in Germany, which was Darkazanli's business address. When asked by German authorities about el-Hage, Darkazanli admitted to knowing that el-Hage visited Germany in the mid-90s with unmet aspirations of selling uncut diamonds to local diamond dealers. Therefore, al-Qaeda used Darkazanli both to facilitate and to legitimatize its terrorist activities by camouflaging its existence and business location behind an active "front" company.

8. German authorities also discovered that Darkazanli was an authorized user on the bank account number 4070207

60573

330

with the Deutsche Bank of Hamburg, owned by Abdulrahman Alfahad.

Alfahad had close links with the charities in Bosnia-Hercegovina and that he had used their money to set up the Rentakar Company which "used its cars to operate unnoticed in the Balkans, transporting terrorists, drugs and explosives." German intelligence agency BND had received reports that the Rentakar Company was linked to the Saudi intelligence agency and that "the Saudi High Commission is involved in helping terrorists."

Darkazanlj was an authorized user. German authorities have detected connections of this account with the brothers Waheed and Ahmed Koshagi Kelani, which are the following:

On January 29, 1996, there was a deposit of 2,698.69 German Mares, described as "helping family," the sender was Matilde Victoria Gonzalez, Ahmad Koshagi Kelani's wife, resident of 5 Nuestra Senora de Fatima Avenue, Madrid.

On December 12, 1996, there was a payment for the amount of 3,022 German Mares, described as "helping family," the beneficiary was Koshagi Victoria Sara.

On July 17, 1996, there was a deposit in the amount of 10,975 German Mares, described as "helping family," the sender was Matilde Victoria Gonzalez.

On December 27, 1996, there was a deposit of 5,775 German Mares, described as "helping family," the sender was the indicted Ahmad Kashogi Kelani.

On December 25, 1996, there was a deposit of 3,993 German Mares, described as "helping family," the sender was the indicted Ahmad Kashogi Kelani.

On December 2, 1997, there was a deposit of 3,993 German Mares, described as "helping family," the sender was the indicted Ahmad Kashogi Kelani.

9. In addition to the two previously mentioned people who are associated with Imad Eddin Barakat Yarkas constituting the Spanish al-Qaeda cell, Darkazanli also knew Mohamed Ghaled Kalaje Zouaydi and Mohamed Zaher Asade. The relationship between Zouaydi and Darkazanli was as follows:

On May 22, 1999, Darkazanli received $8,000 from the company "M/S Maher International" which is owned by Zouaydi. Possibly, the receipt is related to a financial transaction of Abdullah Zammer because in Zammar's account with Deutsche Bank, Number 4942058, it was registered a transfer on May 25, 1999 from Saudi Arabia for 15,000 German Mares. The sender was "M/S Maher International." This transfer was made through "Al Rahji Banking and Investment Corporation" in Riyadh, Saudi Arabia. On May 28, 1999, Zammar cashed 15,000 German Mares from his account and on July 21, 1999, he made a deposit for 15,000 German Mares in his account. On July 22, 1999, Zammar transferred his money to an account of the company "Proyectos Y Promociones Sabadell," in Madrid, which is Zouaydi's Real Estate/Construction Company.

Abdulfattah Zammar received the 15,000 German Mares on May 25, 1999 following Darkazanli's instructions to buy a car in Germany for Kalaje. Since Zammar did not find the correct car, Darkazanli told him to transfer the money to the company Proyectos Y Promociones Sabadell in Madrid. This company is Zouaydi's "Projects and Promotions" Real State/Construction company.

10.    In an interview with German police a few days after 9/11, detectives questioned Mohamed Haydar Zammar, a Syrian-born Hamburg resident. They asked whether he knew Darkazanli and he replied, "I know him we!!. He is a friend whom I have known for a long time." Police later learned that it was one of Zammar's brothers, Abdulfattah, who had driven Darkazanli to the Madrid meeting with Spanish al-Qaeda leader, Yarkas in January 2000. Darkazanli had met in Madrid with Imad Eddin Barakat Yarkas, the accused Al Qaeda leader in Spain, who is from Darkazanli's hometown of Aleppo, Syria. The meeting, monitored by Spanish police who were watching Yarkas, included some suspected Al Qaeda figures.

11.    During the searches carried out at the company Proyectos Y Promociones Iso, owned by Muhamed Galeb Kalaje Zouaydi and Bassam Dalati Satut, the police confiscated a business/Visa card on which the following was

printed:

> "Mushayt for Trading; The name Muhammed Galeb Kalaje, Marketing Manager"
> Also, the following telephone numbers and address:
> "Tel: 966-2-6443068. Fax: 966-2-643048 7. P0 Box 20729 Jeddah 21465. Al Cornish Comm. Center. 7th
>    Fl. Office No. 750. Hay Al Balad-Jeddah. Saudi Arabia."

> On the back of the card, the following annotation was handwritten with a ball point pen:

> "Call: Gasoub, Sahiji Tawileh, Abo Zainab, Abo Lias, Walid Zain, and Abo Fares."

> It is believed that "Abo Uias" is Mamoun Darkazanli.

12.     In 1996, Darkazanli met another member of the Spanish cell, Muhammed Galeb Kalaje Zouaydi, who is imprisoned in Spain for financially supporting al-Qaeda. A handwritten document confiscated in searched of Zouaydi's Spanish residence and business refers to "gifts" he made, while still in Saudi Arabia, to "brothers" in Germany. Another document refers to money kept in Germany by Abu Ilias, Darkazanli's alias. The total amount of money sent to Germany was $16,780, part of which went to Darkazanli.

13.     Darkazanli acted as a middleman channeling money between Zouaydi and the hijackers. Darkazanli was described by the Spanish judge Baltasar Garzon as "belonging to the most intimate circle of Mohammed Atta." Also, Darkazanli himself admitted helping Atta establish a bank account. Darkazanli also admits knowing two other pilots, Marwan al-Shehhi and Ziad Jarrah. These three hijackers, Atta, al-Shehhi, and Jarrah, were in the same group of friends as Darkazanli, with whom they attended the same Hamburh mosque, al-Quds.

14.     The Chicago Tribune reported that between 1995 and 1998, The Twaik Group deposited more than $250,000 in bank accounts controlled by Mamoun Darkazanli in the northern port city of Hamburg. The Twaik Group, along with Rawasin Media Productions, which is also linked to al Qaeda, has connections to the Saudi Arabian intelligence agency and Prince Turki bin Faisal.

15.     In 1997, the FBI led a raid on the residence of Osama bin Laden's personal secretary, Wadih el-Hage. In el-Hage's possession was a business card for "Anhar Trading Company," listing el-Hage as its director and giving two addresses for the company's location. The US address coincides with el-Hade's home address in Arlington, Texas; whereas, the address in Germany "Uhlenhorster Weg 34, 2000 Hamburg 76" matched exactly the location, phone and fax numbers for Mamoun Darkazanli and Darkazanli Import-Export Company.

16.     Darkazanli's financial relationship with an al-Qaeda operative was with Mamdouh Mahmud Salim, a resident of the United Arab Emirates. Imprisoned in the US, Salim once directed Wadi Aqiq, an umbrella company for bin Laden's financial empire. Salim was also engaged in al-Qaeda military training and, around 1993 or 1994, he tried to obtain uranium in an effort to create a nuclear bomb for al-Qaeda. Between 1995 and 1998, Salim made frequent trips to Germany. Washington officials suspect that, during those trips, Salim tried to procure enriched uranium for al-Qaeda.

17.     During these trips to Germany, Darkazanli and the Darkazanli Company provided cover, business collaboration and facilitated communication for Salim. For instance, in 1995, Darkazanli co-signed with Mamdouh Salim a joint Deutsche Bank business account, over which he had power of attorney. Darkazanli also acted as Salim's host, translator, and business partner in Germany. In addition, the Darkazanli Company's specialty in the import-export of electronic appliances was a suitable cover for procuring technical equipment for al-Qaeda. In an interview given to German authorities following the attacks of September 11, Darkazanli admits to working with Salim, but only on one deal sometime between 1993 and 1995.

18.     According to Darkazabli's lawyer, Andreas Beurskens:

> One is the disclosure that Darkazanli received at least $16,000 from Mohamed Kaleb Kalaje Zouaydi, a wealthy Spanish-Syrian arrest in Madrid and accused of funneling hundred of thousands of dollars to al-Qaeda and other radical organizations.

> Another is the discovery by German investigators that Darkazanli was previously employed by Abdul-Matin Tatari, an Aleppo-born textile exporter in Hamburg whose own links to the September 11 hijackers

were under investigation by German police.

Police sources say they have expanded the Darkazanli investigation to include his business transactions over the years.

### *Darkazanli's relationship with other al-Qaeda members in Hamburg*

19.     Darkazanli is connected with al-Qaeda logistics man, Said Bahaji. Darkazanli stated that he attended Bahaji's wedding. German investigators believe Bahaji played a key support role in the September 11 plot. A videotape made at the wedding, confiscated by police in a post-September 11 search of Bahaji's apartment, included a harangue by Binalshibh on the holy war against the "enemies."

20.     Darkazanli was employed by Abdul Matin Tatari, a Hamburg businessman with ties to al-Qaeda. Police were investigating whether Tatari helped extremists get into Germany by posing as buyers and getting immigration papers at one of his import-export companies. In another one of his companies, Triple-B Trading, Tatari is a business partner with three individuals who were directors of the al-Qaeda front Benevolence International Foundation, which was designated by the US as a terrorist entity. German prosecutors have also alleged that Tatari 's son attended the Islamic group at Hamburg Technical College along with the hijackers.

### *Darkazanli's Trips to Spain*

21.     Darkazanli was a regular contact of Imad Eddin Barakat Yarkas (his name was mentioned previously). Everytime Darkazanlj traveled to Spain, specifically to Madrid, he would stay in Yarkas's house located at 85 Pablo Neruda 4th.   In the searches carried out in Yarkas's, aka Abu Dahdah, house, they found a personal address book with numbers 491752459717 and 490402277536 beside the name "Mamun" and photographs corresponding to Darkazanli.

22.     The first trip of Darkazanli to Madrid happened in 1997. In May of 1998 he traveled to Madrid for a second time, when he interviewed with Yarkas and Kelani (both names mentioned previously). Darkazanli's third trip to Spain occurred on January 19-2 1, 2000, where he stayed at the home of Yarkas. The brother-in-law of the indicted Taysir Alouny Kate named Abdulfattah Zammar was also staying in the house. Taysir Alouny Kate was a journalist working for the Qatar-based Al-Jazeera television network. He was arrested in November 2004, charged with belonging to a terrorist organization, and is currently in prison in Spain.

23. During Darkazanli's stay in Madrid, investigators verified that he participated in the following meetings:

Yarkas was accompanied by Darkazanli and Zammar in a vehicle with license M4835-MP and drove to the Mosque known as M-30 in Madrid. In this place they contacted two people considered by the police as members of the Tunisian organization En Nahda.

Yarkas, Darkazanli, and Zammar also had meetings in the house of the indicted Waheed Koshaji Kelani, located at 4 Loyola Street in Madrid.

There were also meetings with Yarkas, Darkazanli, Zammar, Waheed, and his brother Ahmed Koshaji Kelani and Taysir Alouny Kate.

24.     The fourth trip of Darkazanli to Spain happened in July of 2001 and he again met with Yarkas. This time, Darkazanli was coming from Morocco where he had attended the celebration of the 2000 wedding of his friend Abdulfattah Zammar, who is married to the sister of Taysir Alouny Kate's wife.

## O.    Global Relief Foundation

*Global Relief Foundation is a Specially Designated Global Terrorist Organization*

1.           On December 14, 2001, the U.S. Treasury's Office of Foreign Asset Control (OFAC) froze Global Relief Foundation's (GRF) assets based on the determination that GRF has connections to, has provided support for, and has provided assistance to Osama bin Laden, the al Qaeda Network, and other known terrorist groups. GRF was named in an October 2002 U.S. Executive Order as a Specially Designated Global Terrorist (SDGT) for allegedly providing material support to al Qaeda, including "ammunition" for would-be "holy warriors."

2.           Since GRF's assets were blocked, the government has gathered classified information about GRF which has reaffirmed that the organization works closely with terrorist organizations:

In addition to this unclassified evidence, the classified material gathered since the date of the blocking has greatly amplified OFAC's [Office of Foreign Asset Control] belief that GRF may have acted in concert with, and in support of, terrorists and terrorist entities.

*Global Relief Foundation Has Connections with Taibah International*

3.           GRF operated in Bosnia-Herzegovina (BIH) under the aegis of Taibah International, a humanitarian organization which has provided financial and material support to al Qaeda.

4.           U.S. investigations in BIH and the U.S. show close relations between the now-prohibited organizations GRF and Taibah. Taibah employee Mohammed El-Nagmy concurrently served as GRF's representative. On February 21, 2002, the FBI interrogated Taibah employee Mustafa Ait-Idir who admitted Taibah was the organization representing GRF's interests in BIH after the BiH authorities had prohibited GRF's activities there. Mustafa Ait-Idir also said Taibah employee Mohammed Ibrahirn was GRF's assistant and directly responsible for GRF's concerns in the Sarajevo area.

5.           When Abdulrahman al-Amoudi, Taibah's Vice-President, was detained in London, his palm pilot contained the contact information for Mohamed Chehade, a former top GRF official in the U.S.

### Global Relief Foundation Has Received Monetary Transfers and Donations from People and Organizations Connected with al Qaeda and Other Terrorist Organizations

6.           In the year 2000 Khalil Zaidan's Portland-based company Rampart Technologies donated $8,500 to GRF. Zaidan has a history of involvement in fundamentalist terror activity. Phone records show his company has been called by the Al-Kifah Refugee Center, which until its closure in 1994, was the U.S. branch of Makhtab-e-Khademat (the "Mujahideen Services Office"), the direct predecessor of al Qaeda. Zaidan was subpoenaed to appear at al Qaeda terrorist Wadih el-Hage's embassy bombing trial after authorities found Zaidan's name in El-Hage's address book submitted as evidence in the trial. The address book contained names and addresses of El-Hage's international contacts, including many al Qaeda activists.

7.           The following transaction receipts for money sent to GRF CEO Nabil Sayadi were seized from a company owned by Muhammed Galeb Kalaje Zouaydi, a high-level al Qaeda financier and brother-in-law of Osama bin Laden:

A wire transfer receipt by Telex through National Commercial Bank in Saudi Arabia for the amount of $2000 sent from Muhammed Galeb Kalaje to Nabil Sayadi on June 2, 1996.

A wire transfer receipt by Telex through National Commercial Bank in Saudi Arabia for the amount of 128,860 riyals sent from Khaldon Katmawi to GRF's Belgium branch Foundation Secours Mondial on

October 3, 1997.

A wire transfer receipt by Telex through National Commercial Bank in
Saudi Arabia for the amount of $1,200 sent from Mazin Nahas to Nabil
Sayadi on April 19,1998.

A wire transfer receipt for a transaction through Al Rahji Banking &
Investment Corporation in Riyad for the amount of 498,344 riyals to Nabil
Sayadi.

The telephone number provided in the transactions is the same of Zouaydi's former
company Mushayt for Trading in Saudi Arabia.

8.         Imad Tarabishy, a Florida surgeon who is on both the board of trustees and
board of advisors of the North American Islamic Trust (NAIT) gave at least $796,600 between
1996 and 2000 to the Benevolence International Foundation (BIF) and the Global Relief
Foundation. NAIT had strong ties to the Quranic Literacy Institute (QLI). FBI Agent Robert
Wright, in a sworn affidavit, confirmed that QLI was used in the early 1990s by a group of Arab-
Americans as a corporate entity to launder funds for the Hamas terrorist organization.

9.         IANA transferred $21,519 to the Global Relief Foundation.

10.        Rabih Haddad, a co-founder of the GRF, was deported to Lebanon in July 2003
after being arrested and held by federal agents during a raid on GRF. Haddad was also a fundraiser
for the Ann Arbor CAIR (The Council on American-Islamic Relations, Inc.) chapter. Following
the September 11 attacks, CAIR had a link on its web site for persons to donate through the GRF.
After federal agents shut down GRF in December 2001, CAIR removed the link from its web site.

### GRF Disseminates al Qaeda Propaganda

11.        GRF extolled Osama bin Laden's mentor and founder of al Qaeda, Abdullah
Azzam. In a series of tapes and books offered for sale, GRF made available media about Azzam's
ideology—an ideology shared by Osama bin Laden. The government elucidated in filed court
documents:

GRF also offered for sale the "heritage of video tapes and books" of Sheikh Abdallah
Azzam. Azzam—Osama bin Laden's mentor—is regarded as the historical leader of
Hamas and the founder and leader of Makhtab al-Khidemat (MAK), both organizations
designated as terrorists under Executive Order 13224, Ex. C. Jane's Intelligence Review
reported that Azzam as bin Laden's superior in MAK (the precursor to Al Qaeda), shaped
bin Laden's worldview and worked together with bin Laden untill Azzam was
assassinated in September 1989. Despite Azzam's terrorist background, GRF has
enthusiastically promoted Azzam's materials to the public:

"His [Azzam's] theology is a sea, his words are jewels, and his thoughts are a light for
those who are holding the smoldering embers. He lived the Jihad experiences of the 20th
century in Afghanistan…and Palestine, and produced a new theory for saving the
[Islamic] Nation from disgrace, shame, weakness, and submission to others."

The titles GRF offered included, for example, "The International Conspiracy Against
Jihad," "A Series on the International Conspiracy," "In the Heat of Battle, the Editorials
of Sheikh Abdallah Azzam's Al-Jihad Magazine," and "The Jihad in its Present Stage."
GRF said it was "glad" to offer this "informational and propagational materials," and that
requests for such information should be sent to GRF.

*Global Relief Foundation Was Inspected by the BIH Financial Police and Failed to Comply with Financial and Accounting Requirements*

12.     On January 11, 2002, the Prime Minister of the Federation of BIH submitted an official document to the Federation Ministry of Finance requesting the Financial Police conduct an inspection of the operations of the humanitarian organizations listed in the request which included GRF. On March 7, 2002, an Information Report regarding the investigation of GRF was issued and revealed that GRF had violated the Federation of Bosnia and Herzegovina Accounting Code, Financial Code, and the Code of the Accounting Principles and Accounting Standards by failing to keep its master book, daily log, analytical records, cash book, other auxiliary books, annual or semi-annual accounting statements, and financial reports (Balance Sheets and Income Statements) for the period between 1997 and 2001. GRF also failed to record the balance of funds and obligations according to the source of funds with the actual balance, which is determined by inventory in violation of the Accounting Code, nor did it possess any documentation pertaining to the acquisition and allocation of funds as required by the Financial Code. On grounds of the above, a Conclusion number was issued on March 19, 2002, which required that GRF organize its books and draft accounting statements and financial reports for the aforementioned fiscal years. GRF failed to comply with the request by the deadline, and a Decision number was issued on April 3, 2002, which temporarily prevented the organization from managing the funds in the non-residential account 7160-164 held by the bank Commerc banka, d.d. Sarajevo located in Sarajevo, Dzidzikovac. The aforementioned Decision remains in effect.

*GRF Has Other Terrorist Connections*

13.     In early 2000, GRF appeared at an address in Sarajevo in a building used by the citizens association Al Furken. Al Furken is connected with suspicious activities and extremist behavior including involvement in financing the Active Islamic Youth, a sub-organization of the Saudi High Committee.

## P.     Bank Al Taqwa, Yousef Nada and Ahmed Nasreddin

1. On November 7, 2001, Al-Taqwa Bank, Yousef Nada, Nada Management Organization, Al-Taqwa Trade, Property and Industry Company Limited, Ba Taqwa for Commerce and Real Estate Company Limited and Youseff M. Nada & Co. Gesellschaft MBH were labeled as Specially Designated Global Terrorists (SDGT) by President Bush. Al-Taqwa and Nada's assets were frozen, al-Taqwa's headquarters, two of its satellite offices and a few of the executive's residences were raided as part of an international investigation into the bank's relationship with Osama bin Laden and al-Qaeda. Nada openly admits that he knew as early as 1995 that Al-Taqwa Bank may be financing the activities of terrorist outfits.

2. Yousef Nada is a long time member of both the Muslim Brotherhood and the Gama'a al-Islamiya. Nada is a prominent Egyptian businessman and his portfolio includes ownership and operational rights over following corporations and organizations:  Al Taqwa Bank, Akida Bank, Yousef Nada, Nada Management Organization, Al-Taqwa Trade, Property and Industry Company Limited, and Real Estate Company Limited and Youseff M. Nada & Co. Gesellschaft MBH. Nada and all of his assets and business holdings are under investigation for their ties Al-Qaeda and Osama Bin Laden.

3. On April 19, 2002, Ahmed Idris Nasreddin was labeled as a Specially Designated Global Terrorist by President Bush. On April 29, 2002, fourteen more companies affiliated with Al-Taqwa Bank, Yousef Nada and Ahmed Nasreddin had their assets frozen by President Bush as a result of their financial relations with al-Qaeda.

4. Ahmed Idris Nasreddin is an executive officer of Al-Taqwa and business partner of Nada. Nasreddin worked for the Bin Laden Group, was an honorary counsel of Kuwait in Milan, board member of the Islamic Center in Milan, which was Al-Qaeda's base of operations in Europe, and president of the Islamic Community of Ticino. Nasreddin's other business holdings

include: Akida Bank, Miga-Malaysian Swiss Gulf and African Chamber (Lugano), Gulf Centre S.R.L. (Milan, Italy), Nascoservice S.R.L. (Milan, Italy), NASCO Business Residence Centre SAS (Milan, Italy), Nasreddin Company Nasco SAS (Istanbul Turkey and Milan, Italy), Nasreddin Foundation (Lichtenstein), Nascotex (Tangiers, Morocco) and Nasreddin International Group Limited Holding (Nassau, Bahamas and Milan, Italy).

5. Al Taqwa Bank was founded by SDGT Yousef Nada in 1988 in Nassau, Bahamas. The Vice President of the bank is SDGT Ali Ghaled Himmatt, whose connections to Al-Qaeda include his documented presence at a conference of other Islamic fundamentalists near an Al-Qaeda training camp in Afghanistan in March of 1993. SDGT Defendant Ahmed Nasreddin Defendants Youseff Al-Qardawi, who has been barred from entering the U.S. because of his affiliations with Al-Qaeda, are also executive officers of Al-Taqwa Bank.

6. Al-Taqwa Bank also has offices in Lugano and Malta Switzerland and has a presence in over thirty countries.

7. Al-Taqwa Bank is closely tied to the Muslim Brotherhood. The Muslim Brotherhood is a highly secretive international fundamentalist group that was founded in Egypt in 1928 as a counterweight to corrupt and decadent royalist and colonial governments in the Islamic world. Although the organization does provide legitimate humanitarian aid it also possesses an underground militant wing that engages in acts of violence in an attempt to create a worldwide Islamic government. Many contemporary Islamic extremists and terrorist groups are splinter groups of the Muslim Brotherhood. Al-Taqwa Bank was heavily funded by the Brotherhood in its fledgling years and maintains bank accounts for many of the organizations members.

8. According to Italy's Division of General Intelligence and Special Operations, Al-Taqwa handled financing for a number of Arab and Islamic political and militant groups, including former Afghan mujahedin in Bin Laden's camps, the Palestine Liberation Organization, Hamas, the Algerian Armed Islamic Group and the Egyptian Gama'a al-Islamiya.

9. In March of 2001, the Bahamian government revoked Al Taqwa's banking license.

10. Testifying before Congress in February 2002, Juan Zarate of the Department of the Treasury told lawmakers that U.S. intelligence agencies had evidence that al-Qaeda operatives received financial assistance from Al-Taqwa's chairman as recently as late September 2001—after the 9/11 attacks.

11. George B. Wolfe, the Deputy General Counsel of the United States Department of Treasury, sent a letter to prosecutors in Switzerland that claimed the following:

*"we have reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist related organizations... The Malt and Lugano, Switzerland branch offices of Al Taqwa Management Organization receive money that 'pours in' from Kuwait and the United Arab Emirates for Usama bin Laden...As of late September 2001, bin Laden and his Al Qaida organization received financial assistance from Youssef M Nada. . . "As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit for a close associate of Usama Bin Laden. This bin Laden lieutenant had a line of credit with a Middle East financial institution that drew on an identical account number as Al Taqwa. Unlike other accounts—even accounts of private banking customers—this account was blocked by the computer system and special privileges were required to access it. No identifiable names were associated with the account. These*

*circumstances are highly unusual, and may have been done to conceal the association of the bin Laden organization with Bank Al Taqwa."*

12. Al-Taqwa Bank has an account for Mamdouh Mahmoud Salim, an al-Qaeda operative who is in U.S. custody for his role in the 1998 Embassy bombings. U.S. investigators believe that the account has been used to finance terrorist activity.

13. A report by the United Nations Security Council's Monitoring Group on Sanctions against al-Qaeda, the Taliban and their associates stated that Nada and Nasreddin—"Both, through their various commercial holding, operated extensive financial networks that provided support to al-Qaeda related activities."

14. According to an article in Newsweek, Al-Taqwa's Bahamian banking license allowed Al Taqwa officers to—"open commercial correspondent accounts with established European banks—paying the larger institutions fees to make cash transfers around the world for them, without calling attention to themselves." According to counterterrorism experts and government officials, such convoluted banking practices are a red flag for money laundering and terrorist financing.

15. The United Nations Security Council's Monitoring Group on Sanctions against al-Qaeda, the Taliban and their associates paints a similar picture of Al Taqwa, and Nada and Nasreddin's other business holdings, as a money laundering vehicle:

*"For a long time Nada and Nasredden resided and worked out of a small Italian enclave, Campione d 'Italia, neighboring Lugano (Switzerland)... Many of their businesses were registered as offshore companies through local trusts in Lichtenstein. These arrangements were usually made through the auspices of so-called "gate keepers, "in most cases one or two law firms in Lugano, specializing in establishing such offshore shell companies... There was no requirement to identify or profile the ownership.   or assets of the company being represented locally. No record was kept regarding activities or transactions on behalf of these companies."*

16. An Italian police report from April of 1996 concluded that the business activities of Nasreddin's import-export companies lacked commercial logic and asserted that it is—"legitimate to imagine the existence of a corporate network, located both in Italy and abroad, which operates for different purposes that could better be described.  .with access to bank movements."

17. The report based its conclusions on the "heterogeneity and untimely character of the transactions, as well as the absence of corporate logic." Similarly, the report notes that "the places of destination of the exports are significant, in countries which are surely at risk due to possible illegal activities, such as former Yugoslavia, Libya and Nigeria," all of which have been occupied by Al-Qaeda operatives at one time or another.

18. The Italian police report is consistent with the findings of the U.S. government, the U.N. and a multitude of independent investigators and journalists that have all reached a consensus on the questionable and illegitimate nature of the business practices of Nassreddin, Nada and Al Taqwa.

19.    The same U.N. Report that is mentioned in ¶13 also outlines the intricate relationship between the Nada and Nasredin networks:

"*Both Nada and Nasreddin served on the boards of each others' banks and companies, and in many cases shared the same locations and employees. Both were actively engaged in financial transactions, import-export businesses, and real estate ventures. Both had close relationships with the same investors in Saudi Arabia, UAE, Kuwait, Iraq, and other Middle East and North African Countries. Both were tied to several Islamic charities and business ventures, which had been linked to al-Qaida financing, including the Milan Islamic Centre, a major al-Qaeda recruiting centre.*"

20. Al-Taqwa Bank has a close relationship with another organization owned by Nada: Al-Taqwa Management Company (eventually renamed Nada Management Company). Al Taqwa Bank relied heavily on Al-Taqwa Management Organization to conduct audits and feasibility studies concerning the bank. As a result, Al Taqwa Bank often transferred large sums of money to Al Taqwa Management Organization. Furthermore, Al Taqwa Bank often transferred money throughout Nada and Nasreddin's many other corporations and investments as well as into various Islamic charities. According to U.S. authorities, the bank's convoluted structure—"made it easy to use as a money laundering mechanism."

21. According to a Swiss investigation, Nada and Himmatt both claimed that Al Taqwa lost roughly 75 million dollars through internal contracts between Al Taqwa Management and Al Taqwa Bank concerning investments in Southeast Asia. The federal judicial authorities in Switzerland were unable to confirm that Al Taqwa Management ever made any such investments on behalf of Al Taqwa Bank in Southeast Asia or conducted any of the feasibility studies required by the internal contracts. The true reason for the large financial losses is not known by the Attorney General and it is possible that contract was intended as an explanation for money that was funneled to Al-Qaeda.

22. On January 28, 2003, Nada traveled to Vaduz, Lichtenstein, in violation of his travel ban. While in Vaduz, he applied to the Company Registry Office to officially change the name of two of his companies that had been placed on the U.N.'s List of Specially Designated Global Terrorists—Al Taqwa Trade Property and Industry Company Limited and Ba Taqwa for Commerce and Real Estate Company Limited. The former became Waldenberg SA and the latter Hocberg SA; he also applied to put both companies in liquidation and appointed himself as the liquidator.

23. Since the late 1980's Al-Taqwa Bank has knowingly facilitated the activities of terrorist outfits such as Hamas and al-Qaeda. Along with Nada and Nasreddin, Al Taqwa is associated with several other members of a complex and far reaching network of Islamic fundamentalists that participate in, justify or enable acts of terrorism against innocent civilians.

24. Al-Taqwa's vice president, Ali Ghaled Himmat, was labeled as a SDGT by President Bush on November 7, 2001. Authorities in Switzerland have a video cassette showing Himmat in Afghanistan, in March of 1993, in close proximity to Al Qaida training camps and participating in the making of speeches calling for the use of violence against the United States. Himmat is a member of the Syrian chapter of the Muslim Brotherhood.

25. Defendant Youseff Al-Qardawi is also a shareholder of the Bank A1-Taqwa in the Bahamas and the spiritual leader of the Muslim Brotherhood; he has been barred from entering the United States since November of 1999 as a result of his support of terrorism. Qaradawi is also seen on the March 1993 video tape from Afghanistan that is mentioned earlier in reference to Himmat.

26. On May 12, 2001, Qardawi stated that:

*"The suicide mission is the loftiest form of jihad. We are talking about a heroic act of sacrifice and sanctification. The person who redeems his soul for Allah, Sacrifices himself as a sacrifice for religion and people, and fights the enemies of Allah, with new weapons that fate awarded to the downtrodden, in order to fight with these means against the tyranny of the arrogant."*

27. Additionally, in an interview in the *Palestine Times,* Qaradawi stated:

*"The foreign military presence in the Arab world is in fact a new imperialist invasion. The Islamic resistance in Lebanon and Palestine represents the glorious face of the Muslim Umma and serves as an example to that effect.   .I have issued a religious edict blessing the martyrdom operations in which a given Muslim fighter turns himseif or herself into a human bomb that casts terror into the hearts of the enemy."*

28. Qaradawi's public statements shed light on the radical character of the Al Taqwa Bank, as he is a member of the bank's religious board. Therefore, he is not only responsible for providing spiritual advice and guidance to the bank but he also makes decisions regarding the distribution of the bank's zakat (donations to charities). Given the extreme nature of Qaradawi's religious beliefs, his authority over Al-Taqwa donations, and Al Taqwa's financial ties to several terrorist front groups (see #37-41) it is very likely that Al-Taqwa was intentionally supporting Osama Bin Laden and Al-Qaeda.

29. Nada, Nasreddin and, subsequently, Al Taqwa Bank have explicit financial ties to several Islamic Centers that have served as operational headquarters for Al-Qaeda.

30. Nada and Nasreddin have used Al-Taqwa Bank in combination with their other business endeavors as well as their own personal wealth to finance the Islamic Cultural Institute of Milan (ICI). Authorities believe that the ICI is Al-Qaeda's central recruiting and coordinating center in Europe. The U.S. Treasury Department issued a press release claiming that the center is used to— facilitate the movement of weapons, men and money across the world." According to the U.S. investigation into the 1998 attacks on the American Embassies in Kenya and Tanzania, the Milan center was also a recruiting site for an al-Qaeda training camp in Afghanistan. The ICI is located in Italy, just across the border from Lugano, Switzerland at Viale Jenner n 50, 20159.

31. Ahmed Nasreddin played a central role in the ICI's founding in 1988 and has financially supported the center through charitable donations that were used for rent and utility expenses. He has also served as a board member for ICI. Nasreddin's lawyer, P.F. Barchi, has admitted that Nasreddin was warned by Egyptian Secret Service about potential terrorist "problems" with the center. According to Italian Prosecutor Stefano Dambruoso, Al Taqwa Bank was until recently paying $25,000 a year in rent of the Islamic Cultural Center in Milan.

32. In June of 1998, Italian intelligence investigated Islamic militants who had gone to Afghanistan and Pakistan to take training courses and were sent to fight "jihad" in Bosnia. The authorities learned that the leader of a Vienna, Austria mosque, Mahmoud Sami, sent a fax (NFI) to the ICI. From the fax, the Italian Police learned that the International Islamic Front and Osama Bin Laden's terrorist network had issued death sentences against American citizens. This communication illustrates the central role of the ICI in al-Qaeda's operational structure as well as the existing contacts between the ICI and other fundamentalist groups in Europe.

33. Relations between the ICI and Al-Taqwa Bank also include Sante Abdulawahab

Ciccarello, a board member that co-founded the branch of Al Taqwa Bank in the Bahamas.

34. Al-Taqwa Bank has also provided financial assistance to the Islamic Center of Geneva. Established by in 1961 by Said Ramadan, the founder of the co-defendant the Muslim World League, the Islamic Center provided a support network for Al Qaeda's terrorist activities. In 1991, the son of the Islamic Center's founder organized a conference at which Ayman al-Zawahiri and Omar Abdel Rahman, indicted for his role in the 1993 World Trade Center bombing, were present.

35. Moreover, Islamic convert and Nazi sympathizer Albert Huber a/k/a Ahmed Huber acknowledged that he used his connections to the Center to meet with members of Osama Bin Laden's al-Qaeda network in Lebanon. Huber also serves on the board of Al Taqwa and has described September 11th as— "counter terrorism against American-Israel terror."

36. Nada and Nasreddin jointly owned the Akida Bank in the Bahamas, wvhich has been designated for providing financial assistance to al-Qaeda. Additionally, one of the employees at Akida Bank was al-Qaeda financer and Defendant Sulaiman Abdul Aziz al-Rajhi. The Al-Rajhi family is a financial cornerstone for Osama Bin Laden's terrorist network. They have provided substantial aid to al-Qaeda through the Al-Rajhi Banking & Investment Corporation as well through the infamous SAAR Foundation—the organizational epicenter of a network of terrorist financing charities that were raided by the FBI in March of 2002.

37. Throughout the late 1990s, the SAAR Foundation completed many large multi-million dollar transfers to a number of Specially Designated Global Terrorist (SDGT) financing entities, including Akida Bank and Bank al-Taqwa.

38. In blatant disregard for U.S. anti-terrorism laws, the SAAR Defendants have admitted to providing Youssef Nada at least one financial loan in early 2001. As the *Washington Post* reports, "an individual connected to SAAR arranged for funds to be moved from a joint account of several SAAR executives to Nada as a loan."

39. Youssef Nada has admitted to receiving a $500,000 loan in February 2001 from Mena Estates, a SAAR network organization. Much of this money was transferred by Nada to Arthur Hanna, Bank al-Taqwa's financial manager in the Bahamas.

40. In the March 20, 2000 raid on the SAAR network offices, federal investigators discovered a letter written by Youssef Nada describing a $500,000 loan from Mena Estates, a SAAR network entity. In regard to the loan, Nada's letter states that the "eggs are in several baskets." Nada's letter went on to describe the investigation of Bank al-Taqwa and stated, "to avoid crimes, we have to perfect information (terrorism, money laundering)."

41. Furthermore, U.S. officials have stated that they believe the SAAR network entities have transferred a "total of about $20 million to offshore accounts, much of it through Bank al Taqwa and Akida Bank to Nada and Nasreddin firms."

42. A number of SAAR network officers have worked with and served as officers of terrorist financing "shell companies" controlled by Youssef Nada and Ahmed Nasreddin. These institutions include Bank al-Taqwa.

43. Hisham Al Talib serves as an officer of African Muslim Agency, Mar-Jac Poultry, Inc., Safa Trust, and Reston Investments and is a co-founder of the International Institute of

Islamic Thought—all of which are under investigation for financing Al Qaeda. He has also served as an officer of al-Taqwa Bank in the Bahamas and Nada International Anstalt, located in Riyadh, Saudi Arabia.

44. Jamal Barzinji, a prominent leader within the SAAR network and an officer of Mar-Jac Poultry, Inc., Mar-Jac Farms, Safa Trust, and Reston Investments Inc., have also worked with Youssef Nada and his conglomerate of companies.

45. As early as 1978, Jamal Barzinji, Abmed Totonji, and Hisham al-Talib served as officers on the Swiss corporate records of SDGT Nada International Anstalt, one of SDGT Youssef Nada's organizations based in Riyadh, Saudi Arabia.

46. Samir Salah formerly ran a branch of Al-Taqwa in the Caribbean. Throughout his career, Salah has consistently worked with individuals that have worked on behalf of Osama bin Laden and al-Qaeda. Sahah has also directed Dar al-Hijra, a mosque in Falls Church Va., notable for hardline Wahhabi preaching. Two of the Sept. 11 hijackers, Nawaf Alhazmi and Hani Hanjour, repeatedly attended Dar al Hijrah mosque in 2001 prior to commandeering United Flight 77 and crashing it into the Pentagon on September 11th 2001.

47. Salah is also deeply involved with Taibah International Aid Association, a Virginia charity whose office in Bosnia was raided in June of 2002 based on government suspicions of its ties to al-Qaeda. The Bosnian government reported finding evidence of "fictitious declarations of affiliation and employment" and of visas for entry into Bosnia for suspected militants. The government concluded that large sums of cash were withdrawn by management that were never accounted for, indicating "a wide scope for possible illegal spending."

48. Lastly, Salah serves on the board of Amana Mutual Funds Trust, a growth and income mutual fund headquartered near the Canadian border in Bellingham, Washington. Amana's board also includes Yaqub Mirza. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. In August of 2000, Mirza registered the Defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Al-Qaeda. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to Al-Qaeda in the 1998 Embassy bombings.

49. In 1977, Nada co-founded the Faisal Islamic Bank of Egypt with DMI chairman Prince Mohammed Al Faisal Al Saud. DMI is a defendant in this case and has laundered money for al Qaeda, knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitated weapons and military equipment purchases and money transfers for al Qaeda.

50. No one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Nada, Nasreddin and Al-Taqwa Bank have been providing support to Al-Qaeda. Rather, when considering the questionable and deceptive business practices, the lack of "commercial logic" in the activities of the Nasreddin network, the number of Al-Taqwa employees that have been red flagged as SDGT for their ties to Al-Qaeda, the continued support for radical Islamic centers in Milan and Geneva, the connections to the SAAR network, the totality of the evidence as a whole, this provides reason to believe that Nada, Nasreddin and Al-Qaeda Bank have intentionally and consistently funded Osama Bin Laden and the Al-Qaeda terrorist outfit.

60573

343

### Q.    Islamic African Relief Agency

1.   The Islamic African Relief Agency (a/k/a ISRA, IARA, YARA, African Islamic Relief Agency) was founded in 1981 in Khartoum, Sudan.

2.   The organization is represented in more than 30 countries worldwide, including the United States. The private relief agency is a Sudanese organization and most of its financing is supported by Saudi Arabia.

3.   The Islamic American Relief Agency ("IAMRA"), based in the US is a branch of the Islamic Relief Agency ("ISRA"), originally called the Islamic African Relief Agency ("IARA"). In the beginning, the Islamic African Relief Agency appeared as a branch of another Sudanese radical non-profit organization, called Da'wa Islamiya. ISRA split with the Da'wa Organization in the middle of the 1980's.

4.   The main office of IAMRA is located at 201 Cherry Street, Suite D (PU Box 7084), Columbia, MO 65205, United States (Telephone: 573-443-0166). The IAMRA is headed by Mubarak Ahmed as President. He formerly lived at the foundation address and currently lives at 4801 Samantha Court, Columbia, MO. IAMRA has other offices in the United States, including Missouri; Baltimore, Maryland; Norman, Oklahoma; and Orlando, Florida.

5.   In 1992, IARA received $10,000 from Defendant Sulaiman al-Ali, a member of the International Islamic Relief Organization, an organization under investigation by the United States government under suspicion of financial and material support of terrorism, specifically al-Qaeda.

6.   In the mid 1990s, the USAID entered into cooperative agreements with IARA. These contracts were terminated on December 16, 1999, after the US Department of State provided USAID with information suggesting these agreements were not in the national interests of the US:

> *"In December 1999, two federal grants totalling $4.2 million dollars from the U.S. Agency for International Development (USAID) to IARA were cut off when the U.S. State Department determined that they were not in America's 'national security interests'."*

7.   Ziyad Khaleel a/k/a Ziyad Sadaqa, a student located in Orlando, Florida, and a member of IARA, was detained by Jordanian authorities on December 29, 1999, and indicted under criminal charges of being a "procurement agent" for Usama Bin Laden. Khaleel was a fundraising director for the IARA Missouri branch (main branch) and the former IARA website administrator.

8.   The ISRA foundation was managed from Sudan until 1996 by Abdallah Suleyman Al-Awad. According to intelligence and academic sources, ISRA is an umbrella organization founded by the National Islamic Front in Sudan, which sheltered Osama Bin Laden and al-Qaeda operatives from 1991 to 1996. During the Sudanese civil war, ISRA was used by the regime to destabilize countries around Sudan. Thus, after investigations, Ethiopia closed the ISRA offices located on its territory. Uganda officials conducted similar investigations against ISRA in their country under the belief that the charity was conducting illegal Sudanese activities.

9.    According to a 1996 memo from the CIA studying radical Islamic charities support for terrorist operations, the Islamic Relief Agency is one the most active organizations in logistical and financial support for al Qaeda. According to this source, the ISRA office in Zagreb was controlled by officials of Sudan's ruling party, the National Islamic Front, which supported al-Qaeda members in Sudan from 1991 to 1996.

10.   Moreover, while Usama Bin Laden was operating in Sudan, constructing the Tahaddi Road with technical assistance by Defendant the Saudi Bin Laden Group, his own company, Al Hijra, was headed by Muslim activists, particularly from ISRA. This is revealed in the testimony of Jamal Ahmed Al-Fadl during the 2001 trial of the 1998 US Embassy bombings:

> *Q. Do you know who ran the Al Hijra Company while it was in the Sudan?*
> *A. At the time, few people. The first one Dr. Sharif al Din Ali Mukhtar.*
>
> *Q. Who else?*
> *A. Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu Rida Sun and Abu Hajer.*

11.   According to court testimony, Sharif al Din Ali Mukhtar was the head of Al Hijra for Construction and Development. At the same time, Sharif al Din Ali Mukhtar was head of Islamic Relief Agency in Jeddah.

12.   In March 1995, Pakistani police arrested six men, four of them foreigners, for alleged connections to a suspect in the 1993 World Trade Center bombing. The two Pakistanis were identified as Fazlullah Hamidi from the south-western province of Baluchistan and Dr Saleem Abdel Rahim, a Syrian-born director of ISRA in Peshawar.

13.   The Bosnian Anti-Terrorism Task Force Police Unit headed by Ivica Misic investigated the activities of the Islamic Relief Agency in Sarajevo and Tuzla. Among the five Islamic NGOs being investigated by the Bosnian Federal Financial Police, the Islamic Relief Agency is noted as a possible past or present conduit for terrorism financing.

14.   In addition, according to intelligence documents used in an international symposium on Money Laundering & Terrorism , the Third World Relief Agency ("TWRA"), a charity under investigation for terrorism support, had regular links with Islamic Relief Agency.

15.   In the case of TWRA, the foundation was managed by Sudanese diplomat Fatih el Hussanein. According to German Police and Judiciary Report dated 1998, TWRA was used to maintain contact with Usama Bin Laden and Omar Ahmad Ali Abdel Rahman, a co-conspirator in the 1993 World Trade Center bombing.

16.   Also according to this document, the Bosnian branch of the Islamic Relief Agency was also linked to the Maktab al-Khidamat organization operated personally by Usama Bin Laden.

17.   The Islamic Relief Agency office in Israel was also closed by the Israeli Government in 1996 for providing support to the families of Hamas activists involved in terrorists attacks on Israel. The Charity is still under police investigation after the head of the charity, Sheikh Raid Salah, tried to meet in Qatar with Defendant Yousef Qardawi, the spiritual leader of several Islamic terror organizations in Middle East.

18.   In addition, the Irish Security Section of the Gardai (Irish National police) raided the Dublin office of the Islamic Relief Agency in October 2001, under suspicion of terrorist financing. Irish Investigators seized documents, phone numbers and £10,000 in cash from the five houses and the office of the foundation.

19.   The Irish Anti-terrorism Unit also found explicit references to Defendant Mustafa Ahmed al-Hawsawi (aka "Mustafa Ahmed," aka "Hashem Abdollahi") in the offices of the Islamic Relief Agency in Dublin. Al-Hawsawi was arrested the March 4, 2003, along with Khalid Shaikh Mohammed and explicitly identified as the chief money handler for the Sept. 11, 2001 attacks.

20.   Finally, the Islamic African Relief Agency was listed as a Specially Designated Global Terrorist pursuant to Executive Order 13224 on October 13, 2004 under alleged direct financial support of terrorism, specifically to Usama Bin Laden. Information uncovered by United States government officials indicate that "hundreds of thousands of dollars [were sent] to UBL in 1999" through the offices of the IARA.

21.   Having its assets frozen by this U.S. Treasury action, the IARA appealed to the U.S. court system to unfreeze its assets. U.S. District Judge Reggie B. Walton ruled in favor of the Department of the Treasury on September 15, 2005, upholding the agency's decision to freeze the accounts connected to the IARA.

**R.**    **Benevolence International Foundation**

1.     In or around 1987, co-Defendant and Specially Designated Global Terrorist ("SDGT") Adel Abdul Jalil Batterjee founded 'Lajnat al-Bin al-Islamiya' ("LBI") in Saudi Arabia and Peshawar, Pakistan. According to the Government's indictment in <u>USA v. Enaam M. Amaout</u>, 02 CR 892, "One of the purposes of LBI was to raise funds in Saudi Arabia to provide support to the mujahideen then fighting in Afghanistan." "Al Birr" and "Lajnatt Al-Birr Al-Islamiah (LBI)" are referenced in <u>USA v Enaam Arnaout</u> as being synonymous with Benevolence International Foundation.

2.     In or about the early 1990s, the Kingdom of Saudi Arabia shut down Al-Birr for ties to terrorist financing. Around this same time, LBI was renamed Benevolence International Foundation (herein "BIF"), referred to in Arabic as "Al Birr al Dawalia" and incorporated in the United States. According to the U.S. Treasury Department, LBI "began operating under the name Benevolence International Foundation in an effort to widen its appeal to the general public and increase its credibility with other governments. BIF and LBI remained one organization with interchangeable assets under Batterjee's control."

3.     Between January 1999 and March 2000, BIF 's website listed its year of establishment as 1987. Sometime after March 2000, BIF changed this date to 1992. BIF likely made this change in order to create a false impression that the two organizations (LBI and BIF) were different and to further disassociate the organization from any previous ties to terrorist funds.

4.     At Batterjee's request, co-Defendant Enaam Arnaout moved to the United States in 1993 to run BIF's Chicago office. Prior to arriving in Illinois, Arnaout oversaw BIF's operations in Bosnia. Arnaout assumed the position of Executive Director on September 15, 1997, and amended BIF's articles of incorporation in July 1998 to reflect a shift in the organization's headquarters from Saudi Arabia to Illinois.

5.     On December 14, 2001, FBI agents raided BIF's offices in Chicago and Newark and froze the organization's assets on suspicion that the charity secretly funded al-Qaeda. The U.S Treasury Department declared BIF a financier of terrorism under Executive Order 13224 on November 19, 2002.

6.     BIF has or had offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Sudan, Bangledesh, Turkey, Dagestan, Georgia, China, Ingueshetia, England, Netherlands and Switzerland. BIF operates as Benevolence International Fund in Canada and as Bosanska Idealna Futura in Bosnia.

*Jurisdiction*

7.     BIF is a not-for-profit organization incorporated in the State of Illinois on or around March 30, 1992. Adel Batterjee is listed as a Director in BIF's initial filings with the Internal Revenue Service ("IRS"). Shortly after its incorporation, BIF moved to its current place of business in Palos Hills, Illinois. BIF is a charitable organization accorded section 501(c)(3) tax-exempt status by the IRS.

8.     Benevolence International Foundation lists its address as 9838 S. Roberts Road, 1-W, Palos Hills, Illinois, 60465.

9.     BIF also maintained a satellite office in New Jersey at 20-24 Branford Place, Suite #705, Newark, NJ 07102.

10.     From 1992 to 1993, BIF operated an office in Florida at 150 South University Drive, Plantation, Florida, 33324. Papers filed with the Florida Department of State in 1993 list Adel Batterjee as an Officer/Director with the Florida branch.

*On Benevolence International Foundation*

11.     BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda, have had contacts with Benevolence International Foundation offices and personnel and also served on its staff.

12.     According to the U.S. Treasury Department, Osama bin Laden confirmed to a colleague that BIF "was one of the non-governmental organizations providing funds to al-Qaeda."

13.     The 9/11 Commission's Final Report describes how Bin Laden used BIF, as well as other charities and non-profit organizations, as fronts to finance Al Qaeda:

> Bin Ladin's impressive array of offices covertly provided financial and other Support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and  Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)

14.     As part of the Government's Proffer in U.S. v. Enaam Arnaout, a former al Qaeda financier and expert government witness explained how Bin Laden diverted funds under the guise of legitimate charitable activity. The witness "understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy."[4]

15.     In or about 1991, at the time when leadership of the al Qaeda organization relocated to Sudan, BIF's predecessor LBI followed suit and opened its first office in the Sudan specifically to support al Qaeda and the mujahideen there. BIF's collaboration with al Qaeda in Sudan minored LBI's operations in Afghanistan.

16.     In the fall of 1992, al Qaeda dispatched a representative then based in Sudan to Zagreb, Croatia, to gather information for Bin Laden about Bosnia and the prospects of acquiring businesses in Croatia for use by al Qaeda. Upon arrival in Zagreb, the al Qaeda member met with various people, including Arnaout, as well as two al Qaeda members, Abdel Rahman al Dosari a/k/a "Hown" (an expert in mortars) and Abu Zubair al Madani (a cousin of Bin Laden). Abdel Rabman al Dosari advised that al Qaeda was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support al Qaeda economically. He further advised that BIF (referred to as "al Bin") was providing money for weapons for al Qaeda and that they had in fact obtained weapons from Cologne, Germany, for Bosnia with the assistance of BIF and Abu Rida. Abdel Rahman al Dosari also stated that al Qaeda's goal in Bosnia was to establish a base for operations in Europe against al Qaeda's true enemy, the United States.

17.     BIF aided several military organizations in Bosnia including the Black Swans, an irregular military unit of Bosnian Muslims.

18.     On or about June 10, 1995, BIF caused the delivery of an X-ray machine to a representative of the Chechen mujahideen in Baku, Azerbaijan. In or about November 1995, Arnaout and other members of BIF caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen. Defendant Arnaout and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

19.     BIF established training camps in Tesanj, Zeljezno Polje and Bistricak (Zenica). Many of the instructors came from Algeria and Albania. Enaam Arnaout sponsored these instructors through donations provided by the Muslim Brotherhood. These individuals gained entry to Bosnia by claiming they were business partners of Amaout. Arnaout also provided funding for several veteran Afghani and Pakistani mujahideen fighters to travel to Bosnia and train recruits there.

20.     Beginning at a time unknown through in or about March 2002, Defendant Arnaout, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Osama Bin Laden and al Qaeda, including:

i.      a chart of an organization involved in military activity headed by Osaina Bin Laden;

ii.     notes summarizing several meetings during which al Qaeda was formed in Afghanistan in August 1988 (indicating that Osama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective al Qaeda members to al Qaeda;

iii.    notes reflecting the commencement of al Qaeda's "work" on or about September 10, 1988;

iv.     personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v.      a list of wealthy sponsors from Saudi Arabia including references to Usaina Bin Laden and Adel Batterjee;

vi.     various documents reflecting Defendant Arnaout's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

vii.    various documents in a separate folder reflecting Defendant Arnaout's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

viii.   various newspaper articles including a 1988 article with a photograph depicting Usama Bin Laden, Defendant Amaout, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Osama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix.     a handwritten organizational chart placing Defendant Amaout at the top of a jihad organization involved with weapons.

21.     Evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, in April 1999 included a copy of a February 1999 article in the Seattle Times concerning small pox as a biological terrorism weapon. Sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. BIF has never indicated an interest in dealing with the issue of small pox in any country.

22.     According to the Government's Proffer, BIF sponsored a number of terrorist training camps in Afghanistan, among them Al Masadah, Jawr (aka Jawara) and the Jihad Wal. Mustafa Ahmed Al-Hawsawi, a source of several money transfers to the 9/11 hijackers while in the United States, attended Jihad Wal in 2000 and 2001.

23.     The March 2002 search of BIF's Bosnian affiliate produced three rifles, a number of military manuals on various themes, explosives, a forged passport, and confidential documents related to Islamic terrorism. Officials also discovered evidence that BIF executives had access to significant amounts of cash which they dispensed without regard to accounting procedures.

24.     BIF openly advertised itself in its Arabic-language fundraising appeals as a "trustworthy hand for the support of [both] the mujahideen and refugees" in Bosnia. Similarly, documents taken from BIF's U.S.-based offices in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations and

support of jihad in Bosnia-Herzegovina... Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands." Another handwritten note found in Illinois by investigators revealed BIF's supreme "unwritten law": "no matter how poor/sick - first priority is for mujahideen.

25.     On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the U.S. Treasury Department, BIF and Defendant Amaout submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

26.     On or about April 15, 2002, Arnaout spoke to the BIF director in Pakistan and advised him to avoid government scrutiny by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

27.     Internal records recovered in raids of BIF's Chicago office show that some charity officials became wary of the amount of money channeled to actual causes. One top official, Suleman Ahmer, feared that the organization was misleading donors. In a 1999 e-mail message to Arnaout, Ahmer complained that the group misrepresented the percentage of donations sent to orphans. Arnaout received another e-mail message in November 2001 informing him that administrators could not reconcile over half of the charity's expenditures in Bosnia.

28.     While the charity publicly cast itself as a relief organization, internal documents reveal discrepancies between the organization's stated purpose and actual mission. One BIF memo states:

> From its first day, the BIF aimed to support Jihad and Mujahideen by:
>
> Assisting in military and logistical support.
>
> Assisting in providing medical care for the Mujahideen in the field.
>
> Assisting in providing training, running camps, providing shelter, and in what accompanies these services, such as providing education, Da'awah, and looking after the families of Mujahideen and taking care of the orphans.
>
> Providing moral and political support for the Mujahideen.
>
> The aim of supporting Jihad, may be connected to the establishment of the BIF in the land of Hijaz, and the desire of a wide ranging section of the commited people to support Jihad.

*Al Qaeda Members and Other Individuals with Ties to BIF*

29.     The affidavit filed by FBI Special Agent Robert Walker in USA v. Benevolence International Foundation, 02 CR 0414, directly quotes a government witness as stating that "several Al Qaeda members held positions in BIF and that this organization is one of the organizations utilized by al Qaeda."

30.     In the latter part of the 1990s, with Arnaout's knowledge, Saif al Islam el Masry (a/k/a Abu Islam el Masry), a member of al Qaeda's majlis al shura (consultation council), as well as a top military expert and instructor, served as a BIF officer in Chechnya.

31.     A founding member of al Qaeda and close associate of Bin Laden, Mamdouh Mahmud Salim, arrived in Bosnia in 1998 under BIF's auspices. Arnaout sponsored Salim's visa, reserved his apartment and designated him as one of the organization's directors.

According to the Batterjee-commissioned biography of Bin Laden, *The Arab Volunteers in Afghanistan,* Arnaout states that Salim first introduced him to al-Masada, Bin Laden's camp in Afghanistan.

32.     Mohamed Loay Bayazid a/k/a Abu Rida, an al Qaeda founder implicated in U.S. v. Bin Laden, S(10) 98 Cr. 1023, for purchasing military and communications equipment for Bin Laden, assumed the title of president of BIF's American operations in 1994. Bayazid's driver's license application, dated September 12, 1994, lists his address as BIF's Illinois office. As a confidant of Bin Laden, Bayazid sought to obtain nuclear and chemical weapons for al Qaeda.

33.     Arnaout also found employment for Muwafak Hamami, a Syrian imprisoned for membership in the Muslim Brotherhood. Hamimi worked for six months at BIF's office in Zenica during 1995-96.

34.     Hassan Faraj, a former BIF employee who worked for Amaout in the early 1990s in Zagreb, Croatia, was arrested in Brooklyn, New York, in June 2004 on charges of falsely obtaining American citizenship. As a BIF employee, Faraj regularly transported mujahideen fighters across the border to Bosnia for training in BIF-sponsored camps. Faraj also trained in these camps.

*Adel Abdul Jalil Batterjee, Founder of Benevolence International Foundation*

35.     The U.S. Treasury Department designated Batterjee as an SDGT on December 21, 2004. In addition to founding BIF, Batterjee served as former Chairman of co-Defendant World Assembly of Muslim Youth ("WAMY").

36.     After Saudi government scrutiny of his organization, Batterjee resigned as Director of BIF in 1993. Enaam Arnaout assumed Batterjee's position within BIF. Despite his resignation, Batterjee continued to materially support BIF. Batterjee registered the Internet domain BIFINT.ORG on September 20, 1999, and is listed as the administrative and billing contact for the website. According to BIF's IRS filings, Batterjee also gave a $48,484 contribution to the organization.

37.     Batterjee commissioned a biography of Osama bin Laden, *The Arab Volunteers in Afghanistan,* in 1991. Nine years later, Batterjee responded to an e-mail request for "your book on Afghan jihad" by sending a copy of Bin Laden's biography to an undercover terrorism expert. The 9/11 Commission's Final Report notes that Batterjee, under the pseudonym Basil Mohammad, wrote the book in question published jointly by BIF and WAMY in 1991.

38.     Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator."

39.     As part of its Proffer in USA v. Enaam Arnaout, the Government describes documents discovered during a raid of BIF's Bosnian headquarters:

> BIF had in its Sarajevo office a computer file labeled "Tareekh Osama," or "Osama's History." The file contains scanned images of documents which chronicle Usarna Bin Laden's activities in Afghanistan which led to the formation of al Qaeda and even includes later reports of the danger Bin Laden poses to the US. BIF possessed in the file a handwritten draft list of the people referred to within al Qaeda as the "Golden Chain," wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: "And spend for God's cause." The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." "Baterji", LBI's and BIF's founder, appears after six of the listings.

40.     Another exhibit in the Government's Proffer consists of a letter addressed to Batterjee seeking ammunition and a car for *Hezb e Islami,* a radical Islamic group.

41.     In a telephone conversation recorded by the Government on February 12, 2002, Defendant Enaam Arnaout asks to have messages sent to Batterjee, *a/k/a* Abu Sulafa, stating, "[Batterjee] does not want to cut off the offices, so he contacted the offices, in order to send them the transfers *(money transfers)…"* Arnaout continues with describing the criminal scrutiny BIF is under with respect to its relationship to Saudi Arabia, and urges the messenger to tell Batterjee to be careful about wire transfers.

42.     One Justice Department official suggested that this telephone conversation may further elucidate Batterjee's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month. Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

43.     In a book published in 2002, Batterjee writes that the West is morally corrupt and that its war on terrorism is just an excuse to stop Muslims from spreading Islam. Batterjee states that Muslims have tried to peacefully expand Islam throughout the world, but those attempts have always met armed opposition. More and more clashes with the West are inevitable, with Batterjee predicting that they will culminate in a final military encounter. "Does any doubt remain that the great confrontation. .is certainly coming?"

*Enaam Arnaout, Executive Director of BIF*

44.     Enaam Arnaout had a relationship with Osama bin Laden and many of his key associates dating back more than a decade, as evidenced by witnesses and seized documents.

45.     In the latter part of the 1 980s, an al Qaeda organization known as "Mekhtab al Khidemat" (the "Services Office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States. The organization was operated principally by Sheik Abdullah Azzam and Osama Bin Laden for purposes of providing of logistical support to the mujahideen (fighters) in Afghanistan.

46.     In the mid to late 1980s, co-Defendant Arnaout, using various aliases including "Abu Mabmoud," "Abu Mahmoud al Sun," "Abu Mabmoud al Hamawi," and "Abdel Samia," worked with and for Mekhtab al Khidemat and LBI to provide assistance to various mujahideen including those under the command of Osama Bin Laden.

47.     Within that same time frame, Arnaout served as director of communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of Osama Bin Laden. Defendant Arnaout distributed resources, including weapons, at the direction of Osama Bin Laden and others.

48.     A witness in USA v. BIF advised being familiar with Arnaout and his activities in Pakistan in the late 1980s. On one occasion in 1989, Arnaout picked up one of Osama bin Laden's wives at an Islamabad airport and took her to his residence. A week later, Bin Laden and his bodyguards arrived during the night at Arnaout's house to pick up the woman. The witness explained that Arnaout must have been a close associate of Bin Laden or he would not have been trusted with the care of bin Laden's wife.

49.     Photographs recovered from the March 2002 raids on BIF branches in Bosnia depict Arnaout with Bin Laden and Arnaout shown with a rifle, a portable rocket launcher and an anti-aircraft gun.

50.     One handwritten letter from Bin Laden recovered during the same raid authorizes Arnaout to sign on Bin Laden's behalf.

51.     According to a book dictated by Osama Bin Laden, *Massadat Ul-Ansar,* Arnaout was one of eleven founders of the first Jaji Camp and later founded Mekhtab al Khidemat and subsequently Al-Qaida in Afghanistan.

52.     Adel Batterjee met Enaam Arnaout during the latter's studies in Pakistan in 1987. After working for LBI in Afghanistan, Batterjee appointed Arnaout as head of BIF's Bosnian branch in the early 1990s.

53.     In or about 1991, defendant Arnaout, while employed by LBI, worked with others, including members of al Qaeda, to purchase rockets and assorted rifles in large quantities

and distribute them to various mujahideen camps, including camps operated by a Qaeda.

54.        In or about 1992, Defendant Arnaout assisted in delivering, assembling and operating a satellite telephone purchased by co-Defendant Yousef Jameel for use in Afghanistan by co-Defendant and SDGT Gulbuddin Hekmatyar and the radical organization Hezb e Islami.

55.        Croatia suspected BIF of involvement in illegal arms activities in the early 1990s. Croatian authorities arrested Arnaout sometime in or around 1993. Arnaout apparently escaped from Croatian jail and, upon his return to the United States, wrote United States Senator Carol Moseley Braun seeking intervention regarding "our unfortunate problem with Croatian authorities."

56.        In February 2002, Arnaout worriedly contacted his brother "Dr., Risham" to discuss how "they" had taken the former director of BIF's office in Bosnia "in a special plane... [t]o Cuba." Arnaout, convinced of his own inevitable fate, explained to Hisham how he would attempt to shoulder the blame and exonerate BIF's Saudi founders. He somberly reflected, "It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how." According to a government witness, Enaam M. Arnaout planned to flee the United States in March 2002 for Jeddah, Saudi Arabia, at the urging of Adel Batterjee.

57.        On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding investors by diverting funds to pay for supplies to jihadists in Bosnia and Chechnya.

58.        Un August 18, 2003, Enaam Arnaout was sentenced to 11 years and four months in federal prison and ordered to pay $315,624 in restitution. Arnaout admitted that "I'm here because I lied, I deceived people, I was involved with people I shouldn't have been involved with. I supported fighters when I told people I didn't."

*Al-Shamal Islamic Bank, in which BIF and Batterjee are major shareholders*

59.        Adel Abdul Jalil Batterjee is a major shareholder and Chairman of Al Shamal Islamic Bank. Al Shamal knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and facilitating weapons and military equipment purchases for al Qaeda.

60.        Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hussan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and Al Qaeda. Bin Laden even provided the institution with USD $50 million in capital. According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

61.        According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

62.        Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at Al Shamal Bank:

When you worked for Osama bin Laden in the Sudan, how much were you paid?
$1,200 a month.
For how long did you work for him [Osama bin Laden]?
Almost two years.

What Banks did he keep his money at?
Bank Al Shamar.

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.

63.        Al-Fadl also described acting as courier for a cash payment from Al Qaeda to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

Q. Who gave you the money?
A. Abu Fadhl, he bring it from Shamal Bank and he bring it to me.
Q. Abu Fadhl brought it from the Shamal Bank?
A. Yes.
Q. Is that a bank in the Sudan?
A. Yes.

64.        In the same trial, another former al Qaeda operative stated that Al Qaeda used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting Bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route. The witness took the check to Al Shamal and cashed it.

65.        The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

66.        Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities.

67.        According to reports from a leading intelligence publication, Bin Laden remained a shareholder in Al Shamal as late as 2000. A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

68.        Co-Defendant Yasin Al-Qadi wired more than $22 million from Swiss Bank accounts to Al Qaeda operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al-Shamal Bank.

## S.    Yassin Abdullah Al-Qadi

1.    Yassin Al-Qadi is one of Saudi Arabia's most prominent businessmen. He is involved in a multitude of global business investments in a variety fields—including real estate, financial services, trading, manufacturing, healthcare, animation productions and the services sector.

2.    On October 12, 2001 according to Executive Order 13224, President George W. Bush designated Yassin Al-Qadi as a terrorist entity for financially supporting al-Qaeda. Al-

Qadi's assets were frozen in the United States, Europe, Albania and Turkey.

3.  Al-Qadi has spent his entire career intentionally surrounding himself with individuals who either participate in or financially support Islamic terrorism. He is firmly embedded in the Islamic terrorist financing community through his business investments as well as his professional and personal relationships. Indeed, Al-Qadi openly admits that he knows Osama Bin Laden and has met with him on several occasions. According to a 2004 report by the Office of Foreign Assets Control (OFAC) a letter found in 2002 that 'was addressed to Osama bin Laden referenced Al-Qadi's managing money for Bin Laden in Sudan. The letter also referred to Al-Qadi as one of Bin Laden's former managers.

4.  On September 21, 2005, The European Union and Commission of the European Communities refused to hear Yassin Al-Qadi's appeal against the freezing of his assets; holding that the European Community is obligated to adhere to the U.N. Security Council—which is outside EU jurisdiction and which supersedes the right of an individual (Al-Qadi) to have his case heard tried before the courts.

5.  Although the Court's decision initially appears to be based on the issue of jurisdiction, the EU justifies its ruling as an international security measure—"The applicants' interest in having a court hear their case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council."

6.  This decision is an implicit acknowledgement of Al Qadi's guilt.

7.  Al-Qadi has knowingly provided material assistance to Islamic terrorist groups such as al-Qaeda, Hamas and terrorist outfits in Bosnia- Herzegovina and Albania through his involvement with the charities and corporations detailed below.

8.  Bank records show that between January 1998 and August 1998 Al-Qadi transferred $1.25 million dollars to Maram, a Turkish travel and trading firm that has significant ties to al-Qaeda.

9.  Maram was founded in December of 1996 as an Istanbul travel agency by Mamduh Salim—a former al-Qaeda financial officer who is now serving time in a U.S. prison for his involvement in the bombing the U.S. Embassies in Kenya and Tanzania in August 1998.

10. In 1997, all of Salim's shares in Maram were transferred to Wael Jalaidan, a longtime friend of Al-Qadi, and his partner Mohamed Bayazid.

11. Al-Qadi claims that his donation to Maram was used solely to aid in the construction of Al Iman, a religious school in Yemen. Bank records confirm that Al-Qadi's claim is true but this in and of itself does not exonerate Al-Qadi, as Al Iman has extensive ties to Islamic militancy. Al Iman was founded by Sheikh Abdul Mejid Al Zindani, Zindani fought alongside Bin Laden in Afghanistan, leads the Yemen chapter of the Muslim Brotherhood and has been designated by the U.S. as an active supporter of terrorism. According the U.S. Treasury Department, all Al Iman students are "suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of

three American missionaries." JoIm Walker Lindh, the American Taliban, is a former student of Al Iman.

**Wael Jalaidan**

12. Al-Qadi's close friend, Wael Jalaidan, is an associate of Osama bin Laden and a high ranking member of IIRO and the Muslim World League (MWL), both of which are front organizations for al-Qaeda. On September 6, 2002, the U.S. government designated Jalaidan as a supporter of international terrorism and his assets were frozen. The U.S. Treasury Department asserts that Jalaidan is—"one of the founders of al-Qaeda."

13. Wael Jalaidan publicly embraced the notion of jihad in forums for militant Islamic thinking. Wael Jalaidan's photograph appears in the pages of *Al-Jihad Magazine,* a publication edited by Azzam, in a section discussing the reconstruction of Afghanistan. *Al-Jihad* was a publication of Mekhtab al Khidemat, a pre-Al-Qaeda group formed by Osama Bin Laden and Abdullah Azzam to support jihadi fighters in Afghanistan.

14. Additionally, Bin Laden himself acknowledged his close ties to Jalaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qaeda co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wael Jalaidan."

15. According to U.S. officials, Jalaidan's role in al-Qaeda is best described as a logistics chief, charged with the responsibility of moving people, ammunition and supplies from one place to another. Edward Turzanski, a national security analyst and political scientist at LaSalle University, states that capturing Jalaidan would be—"like getting a hold of Al Capone's bookkeeper. . .He knows where all the accounts are, he knows where he spends his money, he knows who gets it."

16. Jalaidan served as the head of the Islamic Center of Tucson (ICT), Arizona in 1983 while he was a graduate student at the School of Agriculture. Jalaidan withdrew from the University of Arizona on March 20, 1985 and soon surfaced in Peshawar, Pakistan. Authorities claim that it was during his time in Peshawar that Jalaidan became involved with the individuals that would eventual evolve into al-Qaeda, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

17. Wael Jalaidan headed the MWL in Peshawar and also served as the Secretary-General of the Rabita Trust, an operating division of MWL . The Rabita Trust had its assets frozen after it was labeled a Specially Designated Global Terrorist Entity by President Bush on October 12, 2001.

18. U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah. Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Usama bin Laden and former Al-Qaeda military chief Mohammed Atef (a.k.a. Abu Hafs Al-Masri).

19. Jalaidan also has extensive links to terrorist activity in Bosnia Herzogovina. A BBC report in April 2000 cited a confidential memo sent to UN police forces in Kosovo titled "Secret: US office only-Release to INMIK." The document named MWL representative Wa'el Jalaidan as an associate of Osama bin Laden and stated that Jalaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

20. Seik Ajadi, former director of the Saudi humanitarian organization Muwafaq's offices in Croatia and Bosnia Herzogovina, who also has been  since October of last year  on the list of those suspected of supporting terrorism, first registered Euroinvest--a construction, trade, import, and export company--as an individually owned company, and then as a corporation under the ownership of Sefik Ajadi and Yasin Kadi. In October 1997, Jalaidan also became of a co-owner of this company with 10 percent of its capital. Local sources claim that Jalaidan was authorized to withdraw money from the account of the Al Haramain humanitarian organization and that he was the supervisor of Saudi humanitarian aid in Bosnia Herzogovina. Therefore, it is very likely that most of the money Al Raramain invested into Euroinvest ended up in the hands of Islamic terrorists in Bosnia Herzogovina.

21. Jalaidan also has ties to the Benevolence International Foundation (BIF), which was classified as a Specially Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002.

22. Al-Qadi has had a close relationship with Jalaidan since the early 1980's and has not only employed Jalaidan but he has also provided him with personal and professional financial assistance. Despite the above information regarding Jalaidan, Al-Qadi still maintains that Jalaidan has not been in contact with Bin Laden since 1994.

23. Al-Qadi's main Albanian firm was Karavan Construction and Development. In 1996, Al-Qadi promoted Karavan's Egyptian engineer, Amr Abd' al-Wahab Selem al-Zaini to be the director of Karavan and Al-Qadi's financial representative in Albania. Al-Qadi had al-Zaini provide unlimited support to Jalaidan during his visit to Albania for the Laprake hospital construction project in the late 1990's.

24. In another instance, Karavan provided aid to the Saudi NGO Saudi Joint Relief Committee (SJRC) for Kosovo. SJIRC's Chief at the time was Jalaidan. Jalaidan was provided an office in the Karavan corporate building.

25. Al-Qadi and Jalaidan were "involved in a small-scale travel company named Abrar of Saudi Arabia. The focus of this business was to provide services to Muslim pilgrims especially during the pilgrimage season (Hajj) and throughout the year, for minor pilgrimages."

26. Al-Qadi gave shares of a business he owned, KA Stan, to Jalaidan as a "reward for the assistance he provide to [Al-Qadi's] charitable activities in Bosnia."

27.   By his account, Al-Qadi helped fund housing units for the Al Eman University in Sanaa, Yemen, transferring $1.25 million between February 24, 1998, and August 3, 1998. He accomplished this transfer by sending money from the account of his company Karavan Development Group directly to Jalaidan.

28. Al-Qadi claims that Jalaidan was entrusted with the implementation of "the University Housing Project" and executed the Project through Jalaidan's company, Maram. Maram

was responsible for executing a contract with another company, Vefa, which constructed the housing.

29. Moreover, the founder of Al Eman University, Sheikh Abdel Majid Zindani, was labeled as a SDGT by President Bush on February 24, 2004.

**Mohamed Bayazid**

30. Jalaidan's partner in Maram, Mohamed Bayazid, is also a member of al-Qaeda. The Justice Department believes that Bayazid is one of al-Qaeda's top leaders. In the East Africa bombing trial, a former member of al-Qaeda recalled how he once went with Bayazid and Mamdouh Mahmud Salim (who was convicted in the East Africa bombing trial) to receive a cylinder of purported uranium.

31. Bayazid has publicly issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

32. On September 9, 2001, Bayazid carried out a plan (along with Bin Laden, other al Qaeda members, and other members of the Taliban) to assassinate Ahmed Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years. Al Qaeda terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmed Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

**Qadi International**

33. Al-Qadi owns a company named Al-Qadi International that has provided material assistance to Hamas.

34. According the affidavit of Immigration and Customs Enforcement Special Agent David Kane, the Vice President of Qadi International is Dr. Tareq Al-Swaiden. Al-Swaiden is a Kuwaiti businessman and lecturer who has several times publicly encouraged jihad against the U.S. and Israel and praised Palestinian suicide bombers.

35. Al-Qadi was mentioned in a civil asset forfeiture proceeding in Chicago in 1998 as a result of a donation he made to an Islamic organization that was funding Harnas. In 1991, Qadi International donated $820,000 dollars to the Quranic Literacy Institute (QLI). The FBI claims that the Chairman of QLI, Ahmed Zaki, is a conduit for terror money.

36. QLI used the money to purchase several acres in Woodridge, a small town southwest of Chicago. In 1994 QLI sold the institute for more than the price of the initial purchase but never repaid Al-Qadi the $820,000 dollars. In 1998 QLI's assets were frozen by the government on the grounds that it was using the income generated by the Woodridge investment to finance a member of Hamas.

37. The Ramas operative in question is Mohammad Salah, an employee of QLI. According to an affidavit by FBI Agent Robert Wright, Salah received almost all of the $110,000 that the Woodridge property generated. Salah was arrested in 1993 and charged with being a member and financer of Hamas. Salah pled guilty in an Israeli court in 1995 and was

sentenced to seven years in prison.

38.  In addition to the $820,000 donation to QLI, Al-Qadi also used Qadi International to transfer money directly to Mohammed Salah. Bank records show that Al-Qadi sent $27,000 directly to Salah in March 1992. Qadi International also executed transfers of $107,000 and $60,000 to bank account number 8060700 of First National Bank of Chicago, which was held by Salah.

39.  During the time period that Al-Qadi was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for Hamas. In August and September of 1992, Salah flew to the Middle East on a sixteen day trip to Israel and the Occupied Territories. During this trip, Salah funneled approximately $100,000 in funds to Hamas leader Mousa Abu Marzook. According to Salah, these funds were intended for and used for to purchase weapons to carry out specified terrorist actions against Israel.

40.  FBI Agent Robert Wright was ordered to discontinue his investigation into QLI, Salah and Al-Qadi. Wright has since written a book that discusses the relationship between al-Qadi, QLI, Salah and Hamas; however, he is under orders from the U.S. government to remain silent and is prevented from distributing or discussing his manuscripipt.

41.  Despite Al-Qadi's knowledge of Saleh's involvement with Ramas and the ultimate forfeiture case brought by the United States against QLI and Salah, Al-Qadi never attempted to reclaim the $820,000 provided to QLI for the land deal. Nor did he stop further payments to QLI. Indeed, he states that "following Mohammed Salah's arrest I had agreed to with Dr. Zaki to provide additional support directly to QLI." Al-Qadi further admits that "at the express request of Dr. Zaki, I transferred between 1991 and 1997, sums totaling $210,000 to Dr. Zaki for charitable purposes of QLI and for his own personal account." Al-Qadi's involvement with QLI continued through at least 2002.

## BMI

42.  In the 1980's Soliman Biheiri established BMI Investments Services, Inc., which was the holding company for three occupational companies all located at the same address: BMI Real Estate Development, BMI Leasing and BMI Trade and Investment. Biheiri's intention was to use BMI Real Estate Development to "purchase residential lots, construct houses on those lots, and sell the newly constructed houses."

43.  Until 1996, Al-Qadi was an investor in an Islamic Bank named Arabic Beit ul Mal (BMI) which shared offices with Al-Qadi's Qadi International in Secaucus, N.J. BMI's other investors included a Syrian Hamas leader named Mousa Abu Marzouk and Tarek Swaiden, an alleged member of the Muslim Brotherhood.

44.  BMI also has ties to the Bin Laden family. Defendant Abdullah Bin Laden invested a total of $500,000 with BMI Real Estate Development Limited Partnership and BMI Construction Fund Limited Partnership. Abdullah Bin Laden was also the incorporator and head of the United States branch of the Defendant World Assembly of Muslim Youth (WAMY) in northern Virginia. WAMY has extensive ties to Islamic terrorism and openly recruits and indoctrinates Muslim youth. According to the article "The Roots of Terror" dated December 5, 2002 and published on National Review online (www.nationalreviewonline.com), the WAMY book entitled *Islamic View* states:

*"Teach our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."*

45. BMI has ties to Islamic terrorism not only through its personal but also through its financial relations with the northern Virginia charity named International Relief Organization (IRO), the U.S. arm of the known al-Qaeda financer International Islamic Relief Organization (IIRO).

46. The IIRO/IRO has extensive ties to Islamic terrorism. According to a CIA report that was released in the summer of 2003, IIRO/IRO has connections to Hamas, Algerian radicals and the Egyptian precursor to al-Qaeda—Al Gamaat Al-Islamiya. The report states that the IIRO/IRO is connected to Osama bin Laden and convicted terrorist Ramzi Yousef through its ties to the Muslim World League. Finally, the reports documents that the IIRO/IRO—"helps fund six militant training camps in Afghanistan."

47. On January 7, 1999, a Bangladeshi national by the name of Sayed Abu Nasi:r was arrested in India with detonators and more than four pounds of explosives. According to Cecilia Dugger's article "Anti-U.S. Plot in India is Foiled in the January 21, 1999 edition of The International Herald Tribune, Kamal Singh, the Deputy Commissioner of Police in India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by Sheikh Al-Gamdin, President of the IIRO/IRO in Asia.

48. According to Richard Chesnoffs story, "It's More Than Just Who Plants the Explosives," in the July 31, 1996 edition of the New York Daily News, western intelligence sources traced IIRO money transfers to bank accounts in London and Amman, Jordan, at which point the funds were transferred to Hamas in Gaza and the West Bank. In a Declaration of Support for Pre-Trial Detention in the case of *United States ofAmerica v. Soliman S. Biheiri,* Senior Special Agent of the Bureau of Immigration and Customs Enforcement David Kane testified that he had evidence confirming that IIRO/IRO had transferred money to Hamas through the Holy Land Foundation for Relief and Development.

49. According to the testimony of an IIRO/IRO official in federal court in Greenbelt, MD, IIRO/IRO received an infusion of $10 million from Saudi businessmen in the spring of 1992. Additionally, FBI court filings show that the charity received $400,000 from the Saudi Embassy in Washington.

50. In the summer of 1985, Soliman Biheiri first met Sulaiman Al-Ali, the eventual executive officer of IIRO/IRO's U.S. branch. Sulaiman Al-Ali was very familiar to Biheiri because he had given lectures in Muslim conventions and conferences in the United States. They developed both a personal and business relationship. Al-Ali frequently acted as a consultant to BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia. During this time, Biheiri paid "tens of thousands" of dollars to Al-Ali for "assistance he gave me on occasions, introducing BMI Finance and Investment Group to important institutions, important personalities. And when that resulting in any business for BMI Finance and Investment Group, we have paid him a fee. You can call it a commission or a fee, but that is how it is."

51. At the beginning of 1989, during a visit to the U.S., Al-Ali told Biheiri of his plans to move permanently to the United States and establish IRO, a non-profit organization, which

would be headquartered in Virginia. He further told him that he was also involved in forming a D.C. nonprofit corporation to be named "The Sana-Bell, Inc." which "would act as a funding source for IRO." According to Dr. Al-Ali, he was or would be a founding member of the Board of Directors of Sana-Bell, Inc.

52.   In the summer of 1991, Sulaiman Al-Ali moved to the U.S. and established IRO. He told Soliman Biheiri that he, through Sana-Bell, was in the midst of receiving a $10,000,000 donation from an entity named the International Islamic Relief Organization (IIRO) located in Jeddah, Saudi Arabia. According to Al-Ali, he was to invest that money, through Sana-Bell, and then use the return of the income generated from these investments to cover the costs of IRO's operations.

53.   As of February 2000, Sana-Bell, Inc. had made a total of four investments. Significantly, there was never a meeting of either Sana-Bell's Investment Committee or the Board of Trustees to discuss or formally approve any of these investments. The four were as follows:

> Property at 360 S. Washington St. in Falls Church, Virginia where Al-Ali established IRO's office. For a number of years, Sulaiman Al-Ali and IRO managed the office building on the property at 360 S. Washington St. Al-Ali signed leases on behalf of Sana-Bell, Inc. and collected the rent. IRO and Al-Ali occupied the third floor of the building for only "nominal rent," resulting in Sana-Bell's inability to cover the building's carrying costs from the building's rental income. The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sana-Bell paid cash for the building and, therefore, had no mortgage expenses associated with the building. Its only carrying costs were real estate taxes, utilities, and maintenance. The decision to charge IRO only a nominal rent, insufficient to permit SanaBell to cover its costs through the building's rental income, was never the subject of a Trustee meeting, an Investment Committee meeting.

> Residential real estate building lots in Prince Georges County, Maryland for which BMI Real Estate and Development, Inc. (BMI REDI) acted as a general agent and a general contractor of houses. In mid-1993, Sana-Bell purchased 15 developed residential building lots in Prince Georges County, Maryland. At Al-Ali's suggestion, Sana-Bell entered into a management agreement with BMI REDI to build, market, and sell those houses for Sana-Bell's account. Al-Ali was Sana-Bell's only point of contact with BMI with respect to all matters relating to Sana-Bell's role in the project.

> 200 limited partnership units, valued at $1 million, in BMI Leasing Limited Partnership (BMI Leasing).

> 20 limited partnership units, valued at $1.1 million, in BMI Construction Fund Limited Partnership (BMI Construction).

54.   All of BMI 's dealings with respect to Sana-Bell were through Sulaiman Al-Ali at the IRO office at 360 S. Washington St. At Al-Ali's direction, all the tax matters were sent to Yaqub Mirza at his office at 555 Grove St. in Herndon, Virginia. Al-Ali located, negotiated, and decided what investments Sana-Bell would make "because the benefit of those investments were designed to go to IRO, and not to [Sana-Bell]. The building purchase was designed to benefit IRO, not Sana-Bell, D.C. [Sana-Bell] operated as a mere

conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia."

55. In 1992, IIRO/IRO invested $2 million in BMI through Sana Bell, Inc. By a subscription agreement executed on December 1, 1992, The Sana-Bell, Inc. purchased 20 units of limited partnership interests in BMI Construction Fund Limited Partnership of New Jersey (valued at $1.1 million). The declared purpose of the formation of the limited partnership with BMI Construction Fund was "acquiring and developing land and constructing dwellings for sale to the public at a profit."

56. By another subscription agreement executed by The Sana-Bell, Inc. on December 12, 1992, The Sana-Bell, Inc. purchased 200 units of limited partnership interests in BMI Leasing Limited Partnership, a New Jersey limited partnership. The declared purpose for the formation of the limited partnership with BMI Leasing was "purchasing and leasing capital equipment, instruments, machinery, vehicles, computers, office systems and related software to the public at a profit."

57. The $2 million from Sana Bell soon disappeared from BMI's books. A month after the al-Qaeda embassy bombing in North Africa in August of 1998, Sana Bell filed suit against BMI in a federal court in Maryland. Sana Bell claimed that it had uncovered several accounting irregularities in BMI's financial records—including the disappearance of the $2 million. More specifically, Sana Bell alleged that BMI illegally disbursed Sana Bell's investment in BMI at the direction of IIRO/IRO officer Suliman Al Ali. Since Sana Bell was an operating subsidiary of IIRO/IRU, the plaintiff and the defendant in the case were essentially part of the same corporate entity. Sana Bell obtained a judgment of $2.3 million in the lawsuit but it never collected on its judgment. Federal investigators believe that IIRO/IRO's law suit was intended to create an explanation for the disappearance of the funds and conceal any financial ties between BMI and Islamic extremists.

58. Although the final destination of the $2 million is not clear, authorities believe that the end result of the transaction was Biheiri and Al-Ali liquidating and splitting the $2.1 million cash investment by Sana-Bell, Inc. at an indeterminate time between 1996 and 1998 and never giving any form of compensation to Sana-Bell. Biheiri never attempted to contact anyone else affiliated with Sana-Bell to authorize or verify the changes authorized by Sulaiman Al-Ali.

59. According to FBI agent Robert Wright, a former BMI accountant contacted the FBI in 1999 and expressed concerns that his employer transferred money overseas to finance the "embassy bombings in Africa." Moreover, the 1996 IRS 990 form for IRO revealed that it donated $153, 768 to Mercy International, Canada. It came to light during the prosecution of the al-Qaeda operatives involved in the embassy bombings that Mercy International's Nairobi branch provided assistance in the attack.

60. Additionally, a German intelligence report states that Mercy International is a front for the Muslim Brotherhood. Omar Al-Qadi, a member of Yassin Al-Qadi's family, is the director of Mercy International's U.S. branch.

61. IIRO/IRO, along with a dozen other northern Virginian Islamic charities, was raided by federal agents in March of 2002. The investigation into IIRO/IRO and, subsequently BMI, is still pending.

**Abrar Group International**

62. Al-Qadi is Vice Chairman of Abrar Group International. Abrar is headquartered in Stamford, Connecticut, has a strong presence in Malaysia and deals mainly i.n the financial service sector. The Abrar Group has been implicated in providing material assistance to Hamas through its financial dealings with IIRO/IRO and the Chicago, Illinois based Global Chemicals Inc.

63. According to FBI agent Valerie Donahue's 1997 affidavit, Abrar and IIRO/IRO jointly invested $2 million in Global Chemical Corp., which allegedly produced household and pool cleaning supplies. Abrar invested $250,000 by itself and $345,000 on behalf of one of its top clients. IIRO/IRO fronted the remaining amount of money, as two of its top officials owned 20% of Global Chemicals.

64. The president of Global Chemicals was Mohammed Mabrook, a Libyan immigrant who had worked for a pro-Palestinian group headed by Marzouk—the Syrian Harnas leader who invested in BMI with Al-Qadi. Although Global Chemicals had a warehouse full of toxic chemicals, it did not have any customers. In 1997 the FBI asked Denni.s J. Reutter, a government employed chemical weapons expert, to investigate the chemical purchases of Global Chemicals. Reutter issued a report stating that the company's purchases—"do not appear to be consistent with R&D for formulation of commercial cleaning products or for quality control of commercial cleaning products.. the purchases appear to be more consistent with support" of a laboratory performing biochemistry or "organic synthesis." Organic synthesis is a term used to describe the process for manufacturing some explosives.

65. Although U.S. law enforcement officials did not find any direct evidence of bomb making materials at Global Chemicals facilities, in January of 1997 the Chicago fire department confiscated the company's chemicals and Marbrook left the U.S. for Saudi Arabia. At roughly the same time, Abrar vacated its Connecticut office. In response to pressure from the U.S., Saudi Arabia returned Marbrook to the U.S. in June of 1999. Many FBI officials believed that he had ties to Hamas; however, he was ultimately convicted on fraud charges for taking money from IIRO/IRO under false pretenses. In August 2001 he was sentenced to 51 months in jail. The U.S. government is still trying to determine the final destination of the money that Abrar and IIRO/IRO invested in Global Chemicals.

**Muwafaq Ltd**

66. Muwafaq Ltd is an Islamic charity that transferred millions of dollars from wealthy Saudi businessmen to al-Qaeda. Muwafaq Ltd. was founded in 1991 as a private company in the Isleof Man but its primary headquarters was located in Jeddah, Saudi Arabia. In 1992, the charity registered as a trust in the Isle of Jersey, a Great Britain tax haven. The corporation was endowed by Khalid bin Mahfouz, a known al-Qaeda financer. Muwafaq quickly started relief work in Bosnia, Somalia, Sudan, Pakistan, Ethiopia, Albania and Afghanistan and opened branches in Germany and Austria; however, the charity also functioned as a financing tool for al-Qaeda as well as the general Islamic fundamentalist movement.

67. Al-Qadi was the director and one of four shareholders for Muwafaq. In cooperation with

Talal M.M. Bradkook and Dr. Mohaman Ali Elgari, Al-Qadi incorporated Muwafaq in Delaware in 1992 and operated the charity until 1997. During that time Al-Qadi spent roughly 15-20 million dollars of his own money on the day to day operation; of Muwafaq.

68. Al-Qadi states that he selected the managers responsible for the various countries, and that he then delegated his authority to the various country managers, who in turn took day-to-day responsibility for running Muwafaq. Al-Qadi took an active role in the activities of each regional branch of the Muwafaq foundation and admits that he would visit each project country three to four times a year.

69. Al-Qadi states that there was little auditing performed by the foundation and that in several of the countries that Muwafaq had a presence, there "are no meaningful financial records available." Even in countries where there was a requirement that audits be filed, e.g. Pakistan, Al-Qadi can not confirm that the results of the audits were filed as required.

70. Muwafaq's ties to Islamic terrorism, specifically Usama bin Laden and al-Qaeda, are widespread and pervasive.

71. Al-Qadi hired Chafiq Ayadi, an SDGT since October 12, 2001, to head Muwafaq's European operation upon the recommendation of Jalaidan in late 1992. According to a 2004 report from the Office of Foreign Assets Control (OFAC), the U.S. government has information that demonstrates this hiring occurred shortly after Ayadi's expulsion from Tunisia for belonging to an Islamic extremist group.

72. During the mid-1990's, Ayadi also headed the Muwafaq branch in Bosnia.

73. Ayadi was employed as director in charge of Muwafaq' s European activities from 1992 to 1995 or 1996, and during that time Al-Qadi transferred substantial sums to Ayadi's personal account. Al-Qadi states that these transfers were for the sole purpose of the charitable objectives of the Muwafaq.

74. At the time of his appointment by Al-Qadi to be Muwafaq's European director, evidence indicates that Ayadi was operating under agreements to help Osama bin Laden. According to information available to the U.S. Government, Ayadi was one of the principal leaders of the Tunisian Islamic Gront, the military wing of the extremist Al-Nadha movement. Ayadi reportedly went to Afghanistan in the early 1990's to receive paramilitary training, and went to Sudan along with suspected Tunisian terrorist Muhammad Harrath and Abdallah Jajji in order to meet with Osama bin Laden. Later, according to information available to the U.S. Government, they met bin Laden a second time, in the presence of Hassan Turabi, where they secured Bin Laden's agreement for Bin Laden collaborators in Bosnia to receive Tunisian Al-Nadha mujaheddin from Italy.

75. A considerable number of foreign and U.S. intelligence reports list Muwafaq as a primary source of funding for Islamic terrorist groups in several theatres of the globe.

76. A U.S. intelligence report states Muwafaq has ties to the extremist group al Gama'at Al Islamiyya and that it funds Egyptian terrorists in Bosnia. Similarly, an internal memorandum by Spanish External Intelligence also found that Muwafaq maintained contacts with the Egyptian Gamaa Islamiya.

77. According to information available to the U.S. Government, in 1995, the then-leader of Al-Gamaa Islamiya, Talad Fuad Kassem, said that Muwafaq had provided logistical support and financial support for a mujahadin battalion in Bosnia.

78. Russia has also documented Muwafaq's terrorist activities. In a classified document that was released in 2003, the Counter-Terrorism Center for the Commonwealth and the Independent States, a unit of the Russian Ministry of Defense, states that—"the Muwafaq Foundation was set up to give assistance to the families of Islamic terrorists... .The headquarters are located in Jeddah, KSA."

79. A European intelligence source found that Khamir Amer Ballayth, an associate of Osama bin Laden, transferred between $200,000 to $250,000 to the Muwafaq foundation through the account of the Bin Jaad establishment at the Faysal Bank in Peshawar.

80. According to a foreign intelligence document, the Muwafaq foundation provided capital Osama bin Laden's personally owned Animal Resources Bank of Sudan.

81. Together Al-Qadi and Khalid bin Mahfouz formed two offshoot subsidiaries, the National Management Consultancy Center NMCC) and the National Commercial Bank (NCB), to help conceal Muwafaq's financial ties to Osama bin Laden and al-Qaeda.

82. In similar fashion to Muwafaq, NIMCC was registered in Isle of Man but managed from Jeddah, Saudi Arabia. Al-Qadi delegated managerial power over NMCC to Sharia scholar Mohammed Ali Al Gari and appointed himself as co-executive director and primary share holder. Additionally, Al Gari was also appointed NCB Sharia Board Advisor—giving him authority over the use and attribution of the Zakat (money to be given to charity) funds. Ali Gari was also a member of Muwafaq Foundation Council. Essentially, Al-Qadi and his associates were able to maintain control over NCB and NMCC and use them to consolidate and transfer money to Muwafaq and other charities that served as front organizations for al-Qaeda.

83. For instance, an audit of NCB revealed that over a ten year period the bank's Zakat Committee gave $74 million dollars to the International Islamic Relief Organization, which at the time was operated by Usama bin Laden's brother in law and documented as a primary source of funding for Usama bin Laden. During a Congressional Hearing in October of 2001, former CIA Chief of Counter-terrorism Vincent Cannistraro stated that NCB operated as a "financial conduit" for Osama bin Laden and helped him fund training camps in Sudan.

84. Similarly, another audit of the National Commercial Bank of Saudi Arabia revealed that $3 million was pulled from the accounts of several wealthy Saudi businessmen and placed in Muwafaq's account for Osama bin Laden.

85. Many of Muwafaq's employees are either members of or associated with Islamic terrorist groups. For instance, a European intelligence source found that al-Qaeda operative Mahmond Mehdi was once a member of Muwafaq, as was an Afghan fighter and suspected Hamas member named Husam Tayeh. The same source alleged that Muwafaq opened a branch in Manila in 1994 in cooperation with Muhammad Jamal Khlalifa, who is involved in the Abu Sayyaf Group and the Moro Islamic Liberation Front. Additionally, Jamal Khalifa is Osama Bin Laden's brother in law.

86. Along the same lines, in 1995 Muwafaq's Islamabad office in Pakistan was raided by the police and its local director, Amir Mehdi, arrested due to suspicions of connections with Ramzi Yousef, the man behind the bombing of the WTC in 1993. Although the director was released three months later and no charges were brought against the charity, its operations in Pakistan were terminated.

87. Upon his arrest, Mehdi was informed that telephone numbers, including a telephone number installed at his residence, had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.

88. In 1993, Abdel Latif Saleh became partner of Yassin Al Qadi in Loks-Holl company, Medicare Sh.P.K and Karavan company. In 1994, he founded the Albanian branch of the Muwafaq Foundation. According to a Turkish intelligence report, Saleh was previously a member of the International Islamic Relief Organization—a know al-Qaeda front organization. In the 1998 "Returnees from Albania" Egyptian military trials, many of the Albanian extremists who testified identified Abdul Latif Saleh as a primary supporter of the extremist movement in Albania. In 1999, in cooperation with the U.S. government, he was arrested and deported by Albanian officials based on suspicion of his involvement with the Egyptian Islamic Jihad and al-Qaeda.

89. According to information available to the U.S. Government, Saleh founded and organized the Albanian Islamic Jihad (AIJ). As early as 1999, Al-Qadi was known to be an active supporter of, and fund raiser for, the AIJ. Muwafaq operated an Islamic school in Kukes until 1997, and several of the most radical students from the school were selected for membership in AIJ.

90. OFAC found numerous documents and correspondence between Al-Qadi and Saleh. Saleh was named as an official signatory for Karavan bank accounts. Saleh was the general manager of all Al-Qadi businesses in Albania. Saleh was the only person who had authorization to withdraw money directly from Al-Qadi's bank account and transfer the funds whenever the situation required it.

91. Large wire transfers were seen through these documents coming into and out of Al-Qadi's personal accounts in Albania. As well, large cash withdrawals were paid to Saleh.

92. Similarly, the April/May 1998 edition of Defense and Foreign Affairs' Strategy Policy states that Muwafaq is mainly used to—"recruit and train Albanian Mujahedin."

93. Muwafaq employees also have ties to terrorist activity in Sarajevo, Bosnia-Herzegovina. Karim Merjri is listed as the Head Officer of Muwafaq's division in Kosevsko, Sarajevo. The Bosnian Financial Police have tied Mejri to al-Haramian Al-Aqsa, another Arab foundation that has financial ties to Islamic terrorism.

94. Moreover, foreign Muslim volunteers en route to Bosnia to join the resistance often stayed at Muwafaq safe houses in Croatia. Croatian authorities conducted several raids on these houses and seized illegal arms.

95. According to information available to the U.S. Government, Muwafaq transferred $500,000 to terrorist organizations in the Balkens.

96. According to information available to the U.S. Government, Al-Qadi continued to finance

various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996. The primary recipients of Al-Qadi's support in the Balkans were Defendant Al-Haramain, the Revival of Islamic Heritage Society, Alwaqf al-Islamiya and Defendant the World Association of Islamic Youth. The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices were designated as SDGT's on January 9, 2002. The Bosnia-Herzegovina branch of the Al-Haramain Foundation was designated as an SDGT on March 11, 2002.

97. In 2001, according to information available to the U.S. Government, Al-Qadi acknowledged that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkens.

98. Finally, a German intelligence report states that Al-Qadi uses the following companies to transfer money on behalf of the Muwafaq Brigade militia in Bosnia and Kosovo: Abrar International of Kula Lumpur, Malaysia, BMI of Istanbul, Turkey, Loxall of Tirana, Albania, and Medicare of Tirana, Albania.

99. According to a press report, Al-Qadi asserted at the time of his designation as a global terrorist that Muwafaq had terminated operations in 1996 or 1997. However, according to one of Al-Qadi's submission, as of late 2002, Muwafaq continued to be registered in Holland and Belgium.


**Vakufska Banka D.D. and Depozitna Banka D.D**

100. Vakufska Banka and Depozitna Banka have supported, facilitated and participated in terrorism financing on the territory of Bosnia Herzegovina. Moreover, the banks have provided financial support to several organizations acting as fronts for al-Qaeda, including Muwafaq, Al Haramian Islamic Foundation and the Saudi High Commission for Releif in Bosnia Herzegovina.

101. Al-Qadi has played a central role in the ownership and management of Vakufska and Depozitna. Depozitna was based in Sarajevo and owned by Al-Qadi, Chafiq Ayadi and Mahmal Investment Company—an Isle of Man based corporation that is currently under Bosnian investigation by the Financial Police and Federal Banking Agency. While he was a co-owner of the bank, Chafiq Ayadi used the bank to transfer $2.5 million to the account of the Muwafaq Foundation. Ayadi sold his shares of the bank to Al.Qadi in September of 2000.

102. In August 2002 Vakufska merged with Depozitna Banka, as the Banking Agency had rescinded Depozitna's banking permit on March 30, 2001. At the time, Vakufska was already partially owned by both Al-Qadi and Mahmal Investment Company, the same two groups that owned Vakufska.

103. Aside from Al-Qadi and Mahmal, several of Vakufska's past shareholders have financial ties to Islamic terrorist organizations. For instance, El Tarik Oil D.O.O., an oil company based in Sarajevo, was a shareholder with 8% bank capital in 2000. A Bosnian Financial Police report from 2002 documents that El Tank regularly provides financial assistance to the Saudi High Commission and al Haramian al Aqsa foundation in Sarajevo, both of whom consistently offer logistical support to al-Qaeda.

104. The involvement of Al-Qadi in both Depozitna Banka and Vakufska Banka with the financial backing of Mahmal Investment Co. Limited has provided a financial arm to Islamic charities and terrorist organizations operating in Bosnia Herzegovina. A 2002 Bosnian Intelligence report describes Vakufska Banka as a financial base for al Haramian Islamic Foundation and, subsequently, al-Qaeda:

> *"The al Haramian Islamic Foundation spent around 13 KM ($7, 647,000) between its foundation in 1997 and the end of last year (2000). Financial transactions were through accounts at the Depozitna Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering."*

105. The Bosnian intelligence report then establishes the link between al Raramian Islamic Foundation and Osama bin Laden:

> *"Al Haramain. . . has acted as a channel for financing the activities of terrorist organizations. . .According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamja, while members of Bin Laden's El Itihad al Islamija terrorist groups were employed at the Somalia offices, which also financed their operations."*

106. The Bosnian Financial Police have documented that Vakufska Banka is involved in terrorist financing through financial transactions between the Saudi High Commission for Relief and a company named Engra. From 1998 to 2000, Engra conducted financial transactions of behalf of an organization linked to Osama bin Laden through the following bank accounts: account number 1604205500000502 at the Vakufska Banka in Sarajevo, Zenica Branch and account number 1602000000869046, which was opened at the Depozitna Banka.

107. According to information available to the U.S. Government, planning sessions for an attack against a U.S. facility in Saudi Arabia during the mid 1990's may have taken place at Depozitna Bank.

108. Chafiq Ayadi held Al-Qadi's shares in Depozitna Bank as the nominee for Al-Qadi from 1996 to 1998, and had a position with the bank until the end of 1998.

**Ptech**

109. In 1998 Yassin Al-Qadi invested 14 million in Ptech, a privately owned Massachusetts based technology company. By 2001, Al-Qadi was one of the company's top investors and managers.

110. Ptech was re-incorporated in Delaware in 2001 and is used primarily to develop enterprise blueprints at the highest level of US government and corporate infrastructure. These blueprints hold every important functional, operational, and technical detail of the enterprise. A secondary use of this powerful tool is to build other smart tools in a short period of time. Ptech's clients in 2001 included the Department of Justice, the Department of Energy, Customs, Air Force, the White House, the FAA, IBM, Sysco, Aetna, and Motorola.

111. Along with Al-Qadi, Ptech has several other disconcerting ties to Islamic terrorism. Defendant Yaqub Mirza is on Ptech's Board of Directors. Mirza shares links with several

individuals and groups under investigation for terrorist funding or activity.

112. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. The SAAR Foundation is the organizational epicenter of a network of terrorist financing charities that were raided by the FBI in March of 2002. Mirza is the director of Sterling Advisory, a SAAR organization which controlled Ptech Fund LLC,

113. Mirza is listed as the President and CEO of Mar Jac Investments, Inc. Mar Jac Poultry, a Georgia based operating division of Mar Jac Investments is under investigation by U.S. authorities for its role in terrorist financing.

114. In August of 2000, Mirza registered the defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Islamic terrorists. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to the 1998 Embassy bombings.

115. Lastly, Mirza is involved with the Wahabbi Lobby, an influential Saudi based organization that promotes Islamic extremism through the World Association of Muslim Youth.

116. Soliman Biheiri is also a founding member of Ptech. Biheiri ran BMI Real Estate Development, a Virginia based group that is affiliated with the IIRU and suspected of financing the 1998 Embassy bombings.

117. Two of Ptech's employees, Suheil Laher and Muhamed Mubayyid, are affiliated with Care International, an organization that is co-located in Boston and Sudan and is under investigation due to its financial ties to bin Laden. Both of the two above mentioned employees subscribe to al-Qaeda's radical interpretation of Islam. Indeed, a Muslim Cleric at Harvard University described Laher as "over the top" with regards to his religious beliefs.

118. Husssein Ibrahim, a co-founder and chief scientist at Ptech is also an officer of the above mentioned BMI Real Estate.

119. Ptech's Middle Eastern branch, Horizons, is also neck deep in the Islamic fundamentalist movement, as there client list includes the Saudi bin Laden Company and the Afghan based BTC Bin Laden Telecom.

120. In December of 2002 the FBI raided Ptech and the investigation is still pending.

**Additional Business Assets and ties to Islamic Terrorism**

121. Al-Qadi is an executive with a Saudi company, MM Badkook, that supplied 15,000 meals a day to Kuwaiti and U.S. troops during the Gulf war. Talal Badkook, the company's founder, is also a member of the Al-Mustaqbal group along with Saleh Mohammed bin Laden, son of Mohammed bin Laden, and Abdullah Saleh Kamel, son of Saleh Kamel who is the chairman of the Dallah al-B araka.

122. Al-Qadi is Vice President of Jamjoon, a Saudi Arabian company that has investments in a number of different industries. The company's owner, Shaykh Ahmad Salah Jamjoom, is related to the deputy chairman of Faysal Islamic Bank—Ahmed Shah Jamjcom.

123. Al-Qadi is the Director of Global Diamond Resources (GDR), a Nevada based company that manages three mines in South Africa. More specifically, Al-Qadi sits on GDR's board as a representative of New Diamond Holdings—a firm which has a controlling interest in GDR. Initially, Al-Qadi invested initially invested $3 million into GDR but as of October 2001 his investment had diminished to roughly $750,000.

124. GDR has strong ties with the Islamic fundamentalist movement. Several representatives of the bid Laden family invested heavily in GDR and serve on the board of directors with Al-Qadi. Al-Qadi was introduced and recommended to GDR through an executive of the Saudi bin Laden Group.

125. Al-Qadi serves on the Board of Directors of Shifa International Hospitals in Pakistan along with M. Saleem Khanani. Saleem Khanani is on the Board of Directors with Barakat Corporation and Barakat International in Florida. Although they were not targeted, these two businesses are part of the Barakaat Hawala Network that had its assets frozen on November 7th for funneling money to al-Qaeda.

126. Investors in the Al-Qadi investment Alintid Holding Company included major al Haramain contributors, and a major contributor to al-Waqf and al-Haramain NGO's, according to information available to the U.S. Government. Albanian law enforcement officials seized Alintid documents during an October 2001 raid of the Tirana, Albania headquarters of al-Waqf al-Islami—an NGO that has personal linked to terrorist and extremist groups.

127. Yassin Al-Qadi knew or had to know that he was providing financial assistance to al-Qaeda, Hamas and other independent terrorist outfits. This financial assistance was proximate cause of the September 11, 2001 attacks and the damages suffered by the Plaintiffs.

## T.   Wafa Humanitarian Organization

1. The Wafa Humanitarian Organization (a/k/a the Wafa Organization, a/k/a Wafa Allgatha Al Islamic charity) was headed by Saudi citizen Sheikh Abu Abdul Aziz Nagi ("Nagi"), a high ranking al Qaeda official who was captured in Afghanistan in December 2001.

2. Wafa is a key Saudi charity and Pakistan-based organization financing al Qaeda. Wafa was a militant supporter of the Taliban. Documents found in Wafa's offices in Afghanistan revealed that the charity was intimately involved in assassination plots against U.S. citizens as well as the distribution of "how to" manuals on chemical and biological warfare. Wafa was also instrumental in providing al Qaeda with arms, supplies and logistical support in Afghanistan before and after September 11, 2001. U.S. officials have described Wafa as a key component of Usama bin Laden's organization.

3.    Wafa was listed as a Specially Designated Global Terrorist by the United States on September 23, 2001 and had its assets frozen pursuant to Executive Order 13224.

4.    According to the The National Commission on Terrorist Attacks Upon the United States, Wafa was one of many charities where "al Qaeda operatives controlled the entire organization, including access to bank accounts." Wafa and other Islamic charities "were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."

5.    According to German intelligence sources, Wafa offices in Pakistan played an important role in facilitating the transfer of money from there to the German Al Tawhid al Qaeda cell. In Afghanistan, the offices of Wafa functioned as an al Qaeda subsidiary until bombed by United States war planes.

## Tadamon Islamic Bank

*History and Organizational Structure of Tadamon Islamic Bank*

1.    Founded in Sudan on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein "Tadamon Islamic Bank") lists its address as AlTadamon Tower, Al-Baladia Avenue, Khartoum. In 2000, Tadamon Islamic Bank operated through its head office in Khartoum and nineteen branches scattered throughoul: Sudan. The bank's corporate structure included four sub-branches and three subsidiary companies: Tadamon Islamic Co. for Trade and Investment, Ltd., Tadamon Islamic Company for Agricultural Development, Ltd., and El Tadamon Real Estate Company, Ltd. In addition, Tadamon Islamic Bank held material investments in fifteen entities engaged in service and industrial sectors in Sudan. The bank is listed on the Khartoum Stock Exchange as a public company.

2.    Tadamon Islamic Bank reported total assets of 83.5 billion Sudanese Dinars (US $326 million) in 1999. The bank's primary holdings were in import/export, [ndustrial and agricultural sectors.

3.    Tadamon Islamic Bank has become a magnet for Sudanese nationals with business in overseas markets. The bank receives daily transfers from Saudi Arabia, Oman, United Arab Emirates and Yemen and maintains correspondent relationships with banks in Asia, Europe and the Middle East.

4.    Since commencing operations on March 24, 1983, Tadamon Islamic Bank has adhered to a set of Islamic banking principles defined by Shari'a. Six Islamic banks opened in Sudan between 1978 and 1984, of which Tadamon Islamic Bank was the second. Only a month after the bank began operating, co-Defendant Al-Shamal Islamic Bank obtained banking authorization from the Sudanese government.

5.    Current and former shareholders of Tadamon Islamic Bank include Osama Bin Laden, Al-Baraka Investment and Development Company and co-Defendants Faisal Islamic Bank (Sudan), Dubai Islamic Bank, and Mohammed Hussein Al Amoudi.

6.    Along with co-Defendants Daar Al-Maal Al-Islami Trust and Faisal Islamic Bank (Sudan), Tadamon Islamic Bank is a major shareholder in co-Defendant Al-Shamal Islamic Bank. Tadamon Islamic Bank joined the provisional Board of Directors of Al-Shamal in July 1988 and has been a shareholder since March 26, 1986.

*US. Contacts and Jurisdiction*

7.    Tadamon Islamic Bank has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts. Moreover, Tadamon has purposefully availed itself of the jurisdiction of the United States by directing its activities at the United States. Tadamon has financially and materially supported Osama Bin Laden and the al Qaeda organization in its call for holy war or jihad against the United States.

8.     Tadamon is a major shareholder in Al Shamal Islamic Bank. Al Shamal maintains correspondent banking accounts in the United States with CitiBank, Arab American Bank and American Express Bank. In addition, Dar al Maal al Islami Trust, an indirect parent company of Tadamon, oversees significant holdings and maintains considerable business contacts with the United States.

*On Tadamon Islamic Bank*

9.     Tadamon Islamic Bank knowingly and intentionally provided material support in the form of financial services to Al Qaeda (including maintaining and servicing Al Qaeda bank accounts and accounts used to fund and support Al Qaeda).

10.     According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Tadamon Islamic Bank and co-Defendants Faisal Islamic Bank and Al Shamal Islamic Bank.

11.     Testimony from former al Qaeda financier and expert government witness Jamal Ahmed Mohamed al-Fadl confirms that Tadamon Islamic Bank knowingly maintained accounts for al Qaeda operatives. During the 1998 embassy bombings trial, al-Fadl testified on February 20, 2001, that Osama Bin Laden's assistant, Abdouh al Mukhlafi, used the bank at Bin Laden's behest:

> *"Do you recall anyone else that had bank accounts in their name for al Qaeda?*
> *Abdouh al Mukhlafi.*
> *Who was this person named Abdouh al Mukhlafi?*
> *He is from Yemen.*
> *What role did he play for Bin Laden?*
> *He goes with Bin Laden when Bin Laden travel outside or inside Sudan.*
> *What role did he play for Bin Laden when Bin Laden traveled?*
> *He is like bodyguard for him, and also of Bin Laden, he needs bank something, he use account for that.*
> *Did he handle money during the travel?*
> *Yes.*
> *Where were the accounts held? In what countries?*
> *In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."*

12.     In March 1991, co-Defendant Hassan Al Turabi's National Islamic Front ruling government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose:

> aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad).. .The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief.. . mobilization and training of the popular defence forces; and providing for martyrs' families.

13.     The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal Islamic Bank, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed *5* million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

*Al Shamal Islamic Bank, in which Tadamon Islamic Bank is a major shareholder*

14.     Al Shamal Islamic Bank (herein "Al Shamal") is an Islamic financial institution based in Khartoum, Sudan. The government of Sudan granted approval to Al Shamal in April 1983 in response to a request from the Northern State Government, Al Shamal Investment and Development Company and Saleh Abdullah Kamel. The bank received an initial capitalization of USD $20 million.

15.     Tadamon Islamic Bank became a major shareholder of Al Shamal on March 26, 1986, and continued to hold a significant stake in Al Shamal through September 11, 2001.

16.     Al Shamal knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and facilitating weapons and military equipment purchases for al Qaeda.

17.     Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hussan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, stablishing accounts at Al Shamal used by these front companies and Al Qaeda. Bin Laden even provided the institution with USD $50 million in capital. According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

18.          According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

19.          Jamal Abmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at Al Shamal Bank:

When you worked for Osama bin Laden in the Sudan, how much were you paid?
$1,200 a month.
For how long did you work for him [Osama bin Laden]?
Almost two years.
What Banks did he keep his money at?
Bank Al Shamar.

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.

20.          Al-Fadl also described acting as courier for a cash payment from Al Qaeda to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

Q. Who gave you the money?
 A. Abu Fadhl, he bring it from Shamal Bank and he bring it; to me.
Q. Abu Fadhl brought it from the Shamal Bank?
A. Yes.
Q. Is that a bank in the Sudan?
A. Yes.

21.     In the same trial, another former al Qaeda operative stated that Al Qaeda used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting Bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route. The witness took the check to Al Shamal and cashed it.

22.     The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

23.     Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities.

24.     According to reports from a leading intelligence publication, Bin Laden remained a shareholder in Al Shamal as late as 2000. A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

25.     The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist Adel Abdul Jalil Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaeda network. In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded a! Qaeda.

26.     Co-Defendant Yasin Al-Qadi wired more than $22 million from Swiss Bank accounts to al Qaeda operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al-Shamal Bank.

*Faisal Islamic Bank (Sudan), major shareholder of Tadamon Islamic Bank*

27.     The Faisal Islamic Bank (Sudan) (herein "FIBS") was chartered in Khartoum in 1983. Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of co-Defendant Hassan Al Turabi. In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system.

28.     FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

29.     FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of co-Defendant DMI Trust. The Islamlic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed Al Faisal Al Saud, as is DMI Trust and the Faisal Islamic Bank (Sudan).

30.     Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking, founding Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaeda, and other extremist groups.

31.     Hassan Al Turabi's friendship with Prince Mohammed Al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan. FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, Turabi's party became the best financed in the Sudan.

32.     Former al Qaeda financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaeda operatives during bin Laden's time in Sudan:

Q.      Where were the accounts [of al Qaeda] held? In what countries?

A.      (...) we got account in Bank Faisl Islami [Faisal Islamic Bank].

Q.      Is that also in Khartoum?

A.      Yes.

*Islamic Investment Company of the Gulf (Bahrain)*

33.        Islamic Investment Company of the Gulf, the parent of Al Shamal shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan), is based in Bahrain. The bank recently merged with Faisal Islamic Bank group, creating a new entity called Al-Shamil Islamic Bank. Al-Shamil Islamic Bank is a direct subsidiary of DMI Trust. One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

*Dar Al Maal Al Islami Trust*

34.        Dar Al Maal Al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981. "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takaful (insurance), Retakafol (reinsurance) and business companies. DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.

35.      Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).

36.      DMI Trust laundered money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. Also, DMI Trust's *Zakat* accounts have been used to support al Qaeda. In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization. Both the United States and the Kingdom of Saudi Arabia have designated as al Qaeda terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaeda. DMI Administrative Services S.A. handled accounts of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaeda goals.

## U.     Al Haramain Islamic Foundation ("AHIF")

AHIF has long provided financial services and other forms of material support to terrorist organizations, including al Qaida. Indeed, AHIF has long acted as a fully integrated component of al Qaida's worldwide logistical and financial support infrastructure, and provided material support and resources to al Qaida and affiliated foreign terrorist organizations.

AHIF has offices all over the world from which it coordinates its support for the Enterprise, Radical Muslim Terrorism, and an interlocking management by which it effectuates that support. For example, Aqeel Abdulaziz Al-Aqil, a Saudi, is Secretary General of the Saudi AHIF located in Riyadh and president of the Oregon AHIF.  Mansour Al-Kadi, a Saudi, is deputy director general of the Saudi AHIF, "head" of AHIF's Africa Committee, and vice president of the Oregon AHIF.

AHIF has advertised its connection to al Qaida. AHIF's website used to have a direct link to the al Qaida site about the Chechnyian operations (qoqaz.com). The website is part of the al Qaida

propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others)

Numerous branches of AHIF, including Afghanistan, Albania, Bangladesh, Bosnia, Ethiopia, Herzegovina, Indonesia, Kenya, the Netherlands, Tanzania and Pakistan, have been designated as sponsors and supporter of al Qaida and affiliated FTOs.

When viewed as a single entity, AHIF is one of the principal Islamic organizations providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under the leadership of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of AHIF and an al Qaida supporter, AHIF, numerous AHIF field offices and AHIF representatives operating throughout Africa, Asia, Europe and North America provided financial and material support to the al Qaida network.

Also under Aqeel Abdulaziz Al-Aqil's leadership, AHIF implemented its tasks through its offices and representatives, which span more than fifty countries around the world. AHIF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

In Southeast Asia, AHIF served as a primary source of al Qaida funding.

In Africa, AHIF was heavily involved in plotting terrorist attacks against Americans, including but not limited to the suicide bomber attacks against the U.S. Embassies in Nairobi and Dar es Salaam in which 224 people were killed.

AHIF's Pakistan office provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons to 10 al Qaida and al Qaida affiliated militants.

In Europe, AHIF sponsored al Qaida activity through the al Nur Mosque which served as a meeting place, recruitment center and base of operations for al Qaida within Germany. At the direction of the Kingdom of Saudi Arabia, AHIF contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

AHIF also sponsored al Qaida operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee (the "SJRC"). The SJRC offices in Pristine, Kosovo served as a cover for al Qaida operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaida members and loyalists affiliated with the SJRC bureaus.

In the United States, AHIF's Ashland, Oregon office committed violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act which funneling money to al Qaida.

In 2002, an intelligence report from the Bosnian Intelligence Services (AID- Agency for investigation and Documentation) revealed the active role of Vakufska Banka D.D. in terrorism funding. Indeed, AID described Vakufska Banka D.D. and the merged Depozitna Banka D.D., as a financial platform assisting al Haramain Islamic Foundation and al-Qaeda activities:

> "The HO (al Haramain) spent around 13 KM ($7,647,000) between its foundation in 1997 and the end of last year 2000. Financial transactions were through accounts at the Depozit[na] Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering".

The Bosnian Intelligence memo regarding the activities of Al Haramain states the following:

> "Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover (...)"

The report establishes Al Haramain role in financing and assisting Osama Bin Laden operations.

> "Saudi HO [Humanitarian Organization] Al Haramain, (...) has acted as a channel for financing the activities of terrorist organizations. (...) According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamija, while members of Bin Laden's El Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations."

The charity allegedly wired $1 million to Chechen rebels in 1999 and arranged to buy 500 heavy weapons for them from Taliban units. The Russian security service, FSB, has publicly alleged that Al Baraka Bank was used by the Saudi Al-Haramain Charitable Foundation to funnel money to Islamic resistance fighters in Chechnya.

In 2004, the United States Attorney's Office for the District of Oregon announced the execution of a federal search warrant against property purchased on behalf of the Al Haramain Islamic Foundation, Inc. in Ashland, Oregon. The accompanying affidavit by IRS Special Agent Colleen Anderson alleges Al Haramain and its officers attempted to conceal the transfer of $130,000 in American Express traveler's checks and a $21,000 cashier's check intended for aid to Muslims in Chechnya in mid-March of 2000. The affidavit also states that on several occasions from 1997 to 2001, Soliman H. Al-Buthe, co-founder of the U.S. branch of Al Haramain, brought significant sums of traveler's checks into the United States, according to declarations he made when entering the country. In 13 trips, he reported bringing in $777,845, of which $206,000 was used to buy the Ashland headquarters in 1997. But there is no explanation for the balance, Anderson wrote.

In early 2000, an Egyptian doctor wired a $150,000 donation from his London bank account to Al Haramain's Ashland bank, according to the affidavit. An e-mail from the doctor said the money was meant "to participate in your noble support to our Muslim brothers in Chechnya."

At the time, Russian forces were battling Chechen rebels for control of the region. The fight was considered a jihad, or holy war, by some Muslim factions.

The affidavit said that 11 days after the doctor's donation showed up in Oregon, Al Buthe traveled to Ashland from Saudi Arabia. He joined Perouz Sedaghaty ("Seda"), cofounder of the U.S. branch of Al Haramain, at an Ashland bank and the two took out $130,000 -- buying 130 traveler's checks in $1,000 denominations, the affidavit said. A bank clerk suggested it would be easier to issue a cashier's check, the affidavit said.

"Seda said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check," the affidavit said.

Seda took an additional $21,000 in a cashier's check, giving that to Al Buthe, the affidavit said. The check had the notation: "Donations for Chichania Refugees," the affidavit said.

The affidavit said Seda -- using the name Abu Yunus -signed an agreement with Al Buthe saying he was relinquishing the money for "brothers and sisters in Chechnya."

Within days, Al-Buthe returned to Saudi Arabia, failing to declare to Customs, as required, that he was taking the traveler's checks out of the United States, the affidavit said. Once back in Saudi Arabia, Al-Buthe cashed the traveler's checks and put the cashier's check into his personal account. It is unknown what happened to the money.

Al Haramain's 2000 tax return underreported income by $21,000, underreported grants by $150,000, and overstated the price of a second prayer house that Al Haramain bought in Missouri.

The tax return shows that "Seda, or one of his associates, improperly listed the $131,300 disbursement to Al-Buthe as funds used to purchase the Springfield prayer house.

AHIF thereby has, for a period of many years, provided critical financial and logistical support to al Qaida to support that terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of AHIF's participation in al Qaida's jihadist campaign.

## V.      SAAR Network Executives

Taha Jaber Al-Alwani

In his capacity as President of the International Institute of Islamic Thought and an officer of the Heritage Education Trust and Safa Trust, Al Alwani has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

Muhammad Ashrat

In his capacity as an officer and/or director of many of the SAAR Network Entities, including the Sterling Investment Group, the Sterling Charitable Gift Fund, and York Foundation, Ashraf has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

## M. Omar Ashraf

In his capacity as a director or officer several of the SAAR Network Entities, including Grove Corporate, Mar-Jac Investments, and Sterling Charitable Gift Fund, Ashraf has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

## Yaqub Mirza

In his capacity as an officer or director of numerous of the SAAR Network Entities, including Safa Trust, Inc., SAAR Foundation, Reston Investments, Inc., Mar-Jac Investments, Inc., Grove Corporate, York Foundation, and African Muslim Agency, Mirza is the principal signatory on Safa Group checks, and has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

Iqbal Yunus

In his capacity as director of the Child Development Foundation, a SAAR Network Entity, and through his association with the Sterling Charitable Gift Fund and Sterling Management Group, Yunus has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

Ahmed Totonji

In his capacity as Chief Financial Officer and a director of numerous of the SAAR Network Entities, including, SAAR Foundation, International Institute of Islamic Thought, and Safa Trust, Totonji has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

Mohammed Jaghlit

In his capacity as an officer or director of numerous the SAAR Network Entities, including, Heritage Education Trust and Safa Trust, Jaghlit has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

## W.    Asat Trust

Asat Trust has provided critical financial, logistical and technical support to al Qaida in relation to that terrorist organization's global jihad. Asat Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Asat Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

Asat Trust was designated by the United States and the United Nations as a terrorist-related entity. The Office of Foreign Assets Control, of the United States Treasury, froze their assets due to their links to Al Taqwa, their individual activities to support terrorism and their financial support of the Al Qaida. Asat Trust has been involved with the Al Taqwa network during the last thirty years, registering changes in company names, personnel and financial structure, along with many other duties.  Al Tawqa is a co-defendant in this case. In fact, many of the transactions of Al Taqwa and the Himmat Establishment were undertaken in care of Asat Trade Regulation.

Al Taqwa, too, has also been designated as a terrorist-related entity and has been linked to significant support of the al Qaida movement. At the time of the Bank's designation President George Bush declared, "Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world. Al Taqwa raises funds for Al Qaeda."

Asat Trust is owned by Youssef M. Nada, a co-defendant here. Youssef M. Nada has been designated as a person who supports terrorism by the Department of the Treasury, Office of Foreign Assets Control. He was sanctioned as a sponsor of the al Qaida movement.

Asat Trust, based in Liechtenstein, is headed and directed by Martin Wachter and Erwin Wachter (collectively referred to as the "Wachters"). Additionally, available information reveals a pattern of activity over a period of many years of the Wachters working at the same address registered to Asat Trust. Both Wachters also own Sercor Treuhand Anstalt. As owners and heads of Asat Trust and Secor Treuhand Anstalt, the Wachters oversaw the activities and had knowledge of the activities that supported al Qaida.. Both Wachters have long known that accounts, under their control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

Despite this knowledge, the Wachters continued to permit, make available, assist, and maintain those accounts. Available information demonstrates that there have been activities between the Wachters and Al Taqwa Bank, a co-defendant who has been significantly linked to activities and supporting al Qaida. Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order 13224. Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

There is additional information which links the Wachters and Asat Trust to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Ahmed Nasreddin, and Albert Friedrich Armand Huber, co-defendants here, who have been linked to funding al Qaida.

Via Galp International Trading Establishment, which Asat Trust also represented, the Wachters and Asat Trust have also been linked in news reports to laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa to the Enterprise.

As the foregoing demonstrates, Asat Trust thereby knowingly has, for a period of many years, provided critical financial and logistical support to the al Qaida movement, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Asat Trust's participation in the jihadist campaign for the al Qaida movement.

Through all this, Asat Trust knowingly and actively participated in continuous efforts to advance al Qaida's terrorist ambitions, and used his financial position as an effective mechanism for raising funds for, and providing other forms of material support to, al Qaida. By virtue of its active role in the Enterprise's wrongdoing, Asat Trust is personally responsible for the resulting harm.

## X.      Dar Al Maal Al Islami Trust

Dar Al Maal Al Islami Trust ("DMI Trust") and is the center of a network of related and intertwined financial institutions, collectively known as Dar Al Maal Al Islami, also known as the "House of Islamic Money", created on July 29, 1981 and headquartered at avenue Louis-Casai 84, in Cointrin, Geneva, Switzerland.

The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions." These continents include North America, Europe, Africa and Asia. DMI Trust directly participates in the oversight and management of its subsidiary and associate entities.

DMI Trust's main subsidiaries and affiliates are DMI Administrative Services, S.A. ("DMI S.A."), Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan,

Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank, as described herein. DMI Trust and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

DMI Trust is an Islamic Financial Institution founded in 1981.  "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."  Financial and business institutions established by DMI Trust include banking, investment, Takaful (insurance), Retakaful (reinsurance) and business companies. Asset management, however, is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board. The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."

Since its establishment, DMI Trust has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modem era. DMI Trust was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."  DMI Trust is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."  "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim. The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."

Significantly, the DMI Trust spokesman quoted above refers to his brothers in the banking industry as Mujahideen. As Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed A1 Faisal A1 Saud reaffirmed DMI Trust's commitment to financial jihad: "May Allah bless your Jihad and all your efforts. May He aid you and affirm your faith."

Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

DMI Trust has, over a period of many years, directly and through its subsidiaries and affiliates, knowingly provided material support and resources to al Qaeda and/or affiliated individuals and entities. DMI Trust's misconduct includes laundering money for al Qaeda, knowingly and intentionally providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. In addition, DMI Trust's
Zakat accounts have been used to support al Qaeda. In addition, DMI companies have facilitated financial transactions for, and advertised, maintained and serviced accounts on behalf of, several of al Qaeda's known charity fronts, including al Haramain Islamic Foundation, International

Islamic Relief Organization and the Muslim World League. DMI Trust has also entered into business
partnerships with prominent al Qaeda supporters, such as the National Islamic Front, the fundamentalist regime which has ruled Sudan since 1989 and provided safe haven to Osama bin Laden and al Qaeda from 1991 through 1996. Through these actions, DMI Trust has knowingly conspired to support al Qaeda's global jihad, and aided and abetted that terrorist organization.

DMI Trust's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs.

Faisal Islamic Bank of the Sudan -- An associated company of the DMI Trust is the Faisal Islamic Bank of the Sudan.  The Faisal Islamic Bank of the Sudan has served on the Board of Supervisors of the DMI Trust.  Statements by officials of DMI Trust confirm DMI's direct involvement in Faisal Islamic Bank's operations. In the Annual Report for the DMI Trust in 1989, the Chairman, Mohammed A1 Faisal A1 Saud, stated: "Relations with our affiliates, the Faisal Islamic Bank of Egypt and the Faisal Islamic Bank of Sudan have been further strengthened. DMI has actively participated in their investment operations and other activities. During the year, DMI Trust increased its capital participation in various subsidiaries and affiliates."

Prince Mohammed founded Faisal Islamic Bank of Sudan in 1977 in partnership with the National Islamic Front (NIF), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989. Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of the Faisal Islamic Bank. In addition, the NIF has granted Faisal Islamic Bank privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization. Moreover, the bank has supplied loans to the NIF and to its prominent members. In fact, the relationship remained so close that the Faisal Islamic Bank of the Sudan permitted the NIF to operate, at least as late as 1992, from the penthouse of the bank's headquarters.  Through this association, "Turabi's party became the best financed in the Sudan."

Al Qaeda has materially benefited from the business relationship among DMI, Faisal Islamic Bank and the NIF. In 1989, Hassan al Turabi, the ideological and political leader of the NIF, invited Osama bin Laden to move the entire al Qaeda organization to Sudan. Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991. Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan. During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF, and enjoyed the NIF's complete protection. The protection, support and safehaven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire. In addition, while in Sudan, al Qaeda established several businesses in partnership with the NIF,
to fund al Qaeda's campaign to attack America.

Absent the support and safe haven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

The benefits al Qaeda derived from its relationship with the NIF were made possible, at least in part, by the partnership between the NIF and Faisal Islamic Bank, which partnership helped the NIF retain power in Sudan during the relevant time period. As a corollary, it is reasonable to infer that DMI and Faisal Islamic Bank hoped to reap financial benefit from the NIF's relationships with

bin Laden. As Islamic banking institutions, DMI and Faisal Islamic Bank are forbidden to charge interest. Instead, the banks enter into partnerships with their depositors and borrowers, and share in the financial success of those partnerships. As Prince Mohammad al Faisal al Saud has explained: "We make money when our borrowers make money. If they don't we don't collect anything." By virtue of this system, DMI and Faisal Islamic Bank were partners with the NIF in the NIF's endeavors, including those involving Osama bin Laden.

Given Faisal Islamic Bank's close relationship with the NIF, and the NIF's direct role in managing the bank's operations, DMI and Faisal Islamic Bank were necessarily aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan. Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized. In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan. News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of mujihadeen were traveling to Sudan to receive terrorist training. By virtue of these reports, and their close relationship with the NIF, DMI and Faisal Islamic Bank necessarily were aware of al Qaeda's relationship with the NIF during this time.

Al Qaeda was so confident in the absolute protection of the NIF that it openly maintained accounts at Faisal Islaimc Bank. Former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum had held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

> Q. Where were the accounts [of al Qaeda] held?
> In what countries?
>
> A. (...) we got account in Bank Faisl Islami
> [Faisal Islamic Bank].
>
> Q. Is that also in Khartoum?
>
> A. Yes.

Connections To The Al Shamal Islamic Bank of Sudan -- The Faisal Islamic Bank of the Sudan was a founding member of the A1 Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.

The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development. Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, A1 Baraka for Investment and Development, and Sheik Saleh Abdullah Kamel.

The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank which was a founding shareholder of the Al Shamal Islamic Bank. The Tadamon Islamic Bank was formed in the Sudan on November 28, 1981.

A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps .... Jihad has now become an obligation that comes before any other duty."

DMI Trust is a major investor in Al Shamal Bank. Another major shareholder of Al Shamal Bank, Tadamon Bank, is an indirect subsidiary of DMI Trust through Faisal Islamic Bank (Sudan).

The Al Shamal Islamic Bank was capitalized by Osama bin Laden in the amount of fifty million U.S. dollars ($50,000,000.00). "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal."  Osama bin Laden continued to use this bank to finance his terrorist training activities in Sudan and to support his world wide terrorist network. In addition, Al Shamal Bank regularly provided financial and account services to al Qaeda operatives six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaeda operatives held accounts in their own names at the A1 Shamal Islamic Bank.  0sama bin Laden also financed the al Qaeda network in part through the Al Shamal Bank:

> When you worked for Osama bin Laden in the
> Sudan, how much were you paid?
>
> $1,200 a month.
>
> For how long did you work for him [Osama bin
> Laden]?
>
> Almost two years.
>
> What Banks did he keep his money at?
>
> Bank A1 Shamar. [In responding "Bank Al
> Shamar," Al-Fadl was referring to Al Shamal
> Islamic Bank.]

Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaeda representative in Jordan.  In the same trial, another former al Qaeda operative stated that the Al Shamal Islamic Bank was used for operational purposes. The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) via the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden.

The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank. The accounts were opened on March 30, 1992 for the company A1-Hijrah for Construction and Development Ltd. According to the

U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi A1 Aqiq, a company registered in Saudi Arabia.  This company, according to the U.S. State Department, was founded by prominent National Islamic Front members and exercises a monopoly over major agricultural exports from the
Sudan.

Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that A1 Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.

Tadamon Islamic Bank -- The Faisal Islamic Bank of Sudan is also a shareholder of the Tadamon Islamic Bank, which was a founding shareholder of the A1 Shamal Islamic Bank. Jamal A1Fadl testified in the criminal trial concerning the 1998 Embassy bombings that the Tadamon Islamic Bank was used by members of al Qaeda to fund the terrorist attacks and to generally support the network.

Faisal Islamic Bank of Egypt -- Designated terrorist and Co-Defendant Youssef Nada co-founded Faisal Islamic Bank of Egypt with former DMI Trust chairman Prince Mohammed Al Faisal Al Saud. Youssef Nada is the director of Al Taqwa Bank (a Specially Designated Global Terrorist entity) and a member of the Egyptian Muslim Brotherhood and Gama'a al-Islamiya, which is directly allied with al Qaeda through Dr. Ayman al-Zawahiri. In 1970 Nada moved to Saudi Arabia and established contact with members of the Saudi Royal family, and in 1977 he and Mohammed Al Faisal Al Saud established the Faisal Islamic Bank in Egypt.

Faisal Islamic Bank of Egypt was heavily involved in the Bank of Credit and Commerce International (BCCI) banking fraud scandal of the 1970s and 1980s. Established in the 1970s as a front to launder heroin money in Pakistan, the "Bank of Crooks and Criminals" (as referred to by the CIA) rapidly spread to become a vast fraudulent empire. BCCI head Khalid bin Mahfouz was indicted in the United States on July 1, 1992 on criminal fraud charges and ultimately paid two hundred twenty-five million U.S. dollars ($225,000,000.00) in a settlement with U.S. prosecutors. The 1992 Senate Investigative Report on BCCI detailed the bank's role in supporting terrorism via massive diversions of laundered money.° Faisal Islamic Bank of Egypt moved approximately five hundred fifteen million five hundred thousand U.S. dollars ($515,500,000.00) of its deposits into overseas BCCI accounts. A "major creditor of BCCI, " Faisal Islamic Bank of Egypt was the main source of unrecorded deposits used by BCCI to conceal losses.

DMI Trust board members continue to participate in the regulation of Faisal Islamic Bank of Egypt. Through the conduct described above, DMI has knowingly and intentionally conspired to channel material support to al Qaeda, and aided and abetted al Qaeda in its ongoing campaign to attack America.

Islamic Principles and *Zakat* -DMI and its affiliated and subsidiary companies have also channeled support to al Qaeda through the distribution of *Zakat* and *Haraam* funds. DMI and its affiliates operate under Islamic principles of finance, paying no interest on investments, and performing financial transactions in line with *Sharia* (Islamic law).

To ensure that the investments and activities of DMI and its subsidiaries and affiliates comply with *Sharia* principles, DMI, like virtually every Islamic bank, maintains a Religious Board to oversee operations and ensure compliance with Islamic law.

The Religious Board plays a crucial role in determining the amount, manner and purposes for which *Zakat* is distributed. *Zakat,* or almsgiving, is one of the five pillars of Islam. The Quran requires every Muslim, both as individuals and corporations, to give *Zakat* for specific charitable purposes as identified in the Quran.

In addition, Islamic financial institutions like the DMI companies identify and calculate *Haraam* income - income that is collected but is considered unacceptable according to *Sharia* principles - for their depositors or investors. Islamic financial institutions typically maintain a department to oversee and distribute *Haraam* income for themselves as well as for their individual investors to ensure that both the donation amount and its subsequent distribution comply with *Sharia* law. In addition, DMI Trust and its affiliates and subsidiaries have their own *Haraam* obligation that must be calculated and subsequently donated to charity.

Rather than provide charity directly to the needy, DMI and its affiliates disburse *Zakat* and *Haraam* funds under their control to charities of their own choosing. The charities, in theory, are to disburse the money to the needy. As a result, Islamic financial institutions like DMI are directly involved in the selection of charities to receive donations of their own and their depositors' dollars.

For a period of many years, DMI and its affiliated and subsidiary companies have known that many of the ostensible charities to which they channeled *Zakat* and *Haraam* funds were, in fact, fronts for al Qaeda. These al Qaeda front charities included Co-Defendants International Islamic Relief Organization, and the Muslim World League.

In addition, DMI Trust's subsidiary Faisal Islamic Bank and the Islamic Investment Company of the Gulf actively participated in the collection of funds for certain of al Qaeda's "charitable" front organizations. For example, co-defendant IIRO solicited donations through full-page advertisements run in leading Islamic journals. These advertisements, which called for Zakat donations to assist the needy in Chechnya, Bosnia, and other such areas, often provided account numbers to facilitate the contribution of funds. In many of these advertisements, which ran throughout the 1990s to the present in such publications as the English-language Muslim World League Journal (an Islamic periodical distributed widely throughout the United States), account numbers appeared for Faisal Islamic Bank and the Islamic Investment Company of the Gulf.

During the time period that Faisal Islamic Bank provided the foregoing support and services to MWL and IIRO, the involvement of those ostensible charities in the sponsorship of al Qaeda was well known in the Arab and Muslim communities. Indeed, between 1992 and 2001, numerous media reports and statements by government officials implicated the MWL and IIRO in al Qaeda activities, plots and attacks in Pakistan, Afghanistan, Egypt, India, Kenya, Tanzania, the Philippines and elsewhere.

DMI and its affiliated and subsidiary companies were necessarily aware of the reports and investigations implicating prominent Islamic charities, including IIRO and MWL, in the sponsorship of al Qaeda. In fact, in order to comply with its obligations under *Sharia*, DMI's Religious Board was required to carefully investigate and screen the "charities" selected to receive *Zakat* and *Haraam* contributions from the DMI companies, to ensure that those

"charities" were using donated funds for purposes authorized by the Quran. As a result, DMI Trust knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.

Despite the actual knowledge that money contributed to these charities was being used to support terrorist activities, DMI and its affiliates and subsidiaries continued to send funds to these charities in the form of *Zakat* and *Haraam* contributions on their own behalf and on behalf of their investors, depositors and account holders. Through these contributions, DMI aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

As a result of its obligation to inquire and its access to information about its investors and depositors, DMI knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and account holders, to certain charities, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

United States Contacts and Jurisdiction -- DMI sought and seeks depositors from the general public throughout the world. It also sought and seeks capital from its shareholders. DMI makes its money from investing its depositors' money and from investing its own and others' capital. DMI, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

In its quest to seek world wide participation, DMI advertises in the United States. A full page advertisement was published in the Wall Street Journal in 1981 announcing the "Foundation of Dar Al Maal Al Islami With a Capital of 1000 Million Dollars." In its 'Covenant and Call to Ummat Al Islam,' DMI executed a declaration that included the following statement:

> The Founders observe with dismay the pernicious temptation afforded to Muslims by the all pervasive influence of the Riba-dominated financial structure established in Ummat Al-Islam in imitation of institutions alien to it, and the Founders will join in a Holy Struggle for the sake of Allah, exalted be his Name, to eliminate Riba from Ummat Al-Islam since Riba as defined by the Glorious *Sharia* is banned by Allah.

By advertising in a major United States publication with nationwide circulation and soliciting business from American consumers in support of a "holy struggle" in the slightly veiled language of jihad, DMI illustrates that it has purposefully directed its material support for Islamic extremist activities at the United States for more than two decades.

On November 27, 1984, Faisal Islamic Bank (Egypt), Faisal Islamic Bank (Sudan) and Dar Al-Maal Al-Islami ran an ad in the New York Times stating that they would be unable to attend a Conference on Islamic Banking and Finance at the Westbury Hotel, New York on December 12, 1984 "due to conflict with DMI's Annual General Meeting in Istanbul. It is therefore evident that the Conference will not have the necessary expertise to represent practices in Islamic Banking.'' When DMI was established in mid-1981, bank officials told the Wall Street Journal that it would be active in:

60573                                            388

> Islamic investment, Islamic solidarity, and
> Islamic banking activities..." in Moslem nations
> and in the U.S. and Europe. It added that "Islamic
> banks capitalized by an organization of the
> standing of
> DMI will have a greater capacity to attract
> deposits from the public and governments." DMI
> said it is fixing its capitalization at $1 billion
> because it "will compete with well-established
> and well-capitalized" Western financial
> institutions.''

In addition, DMI has published various advertisements in U.S. magazines and journals
distributed by various Saudi-based charities. In one such advertisement in the Journal of the
Muslim World League, there is a picture of the DMI building in Switzerland with a notation
which reads "the group benefits from an extensive network with a strong foothold with the major
international Islamic centers. Its subsidiaries -- banks, insurance and investment companies -- are
rooted regionally to respond more rapidly and effectively to client needs. The synergetic
relationship between the subsidiaries gives DMI the leading edge."

DMI also has significant business operations in the United States. DMI's wholly-owned
subsidiary, Crescent International Ltd., is a Bermuda registered company owned by Greenlight
SA of Switzerland. Both entities are DMI Trust subsidiaries. A 2003 SEC 'Registration
Statement' for shareholders of Acclaim Entertainment Inc., states:

> Mel Craw, Manager of DMI Trust, has voting and
> dispositive control over securities held by Crescent
> International, Ltd.

DMI Trust's 2001 Annual Report states that Greenlight (Switzerland) S.A. and Crescent
International Ltd are 100 percent DMI Trust-owned "principal subsidiaries.''

DMI, Crescent International, Ltd., and Greenlight SA have overlapping business managers and
addresses. In Crescent International Ltd.'s SEC filings, Crescent International, Greenlight
(Switzerland) SA, and DMI SA Services use the same business address in Geneva Switzerland:

Crescent International Ltd. January 2, 1999 SEC Filing
Melvyn Craw
Crescent International Limited
c/o Greenlight (Switzerland) SA
84, Av Louis-Casai, P.O. Box 42
1216 Geneva, Cointrin, Switzerland

Crescent International Ltd. February 10, 2004 SEC Filing
c/o Greenlight (Switzerland) SA
84 AVE LOUIS CASAI, 1216
COINTRIN/GENEVA Switzerland39
DMI Trust uses the same business address as DMI Administrative Services S.A., Greenlight
(Switzerland) SA, and Crescent International, Ltd.:
www.dmitrust.com has the following under contact information:

Daar Al-Maal Al-Islami Trust
Contact:
c/o DMI Administrative Services S.A.
84, Avenue Louis-Casai, P.O. Box 161
1216 Cointrin-Geneva Switzerland

The 1999 SEC report lists a U.S. contact for Crescent International/DMI as:

COPY TO:
Sara P. Hanks, Esq.
Rogers & Wells
200 Park Avenue
New York, NY 10166 Tel: 212-878-8000

In June 2003, Crescent International Ltd. owned 1.2%, or 1.4 million shares of Acclaim Entertainment Inc. prior to Acclaim's stock offering. An April 1, 2004 stock sale Prospectus for Sun Healthcare Group, Inc., lists Crescent International Ltd. as owner of 35,000 shares of Sun Healthcare Group being offered for sale on the NASDAQ exchange. The report states:

> Mel Craw and Maxi Brezzi, in their capacity as managers of GreenLight (Switzerland) SA, the investment adviser to Crescent International Ltd., have voting control and investment discretion over the shares owned by Crescent International Ltd. Messrs. Craw and Brezzi disclaim beneficial ownership of such shares.

Since 2000, International FiberCom, Inc., (IFC) a Phoenix-based telecommunications service provider has borrowed at least $14 million from Crescent International. Crescent owns more than 2 million FiberCom shares. On June 22, 2001, IFC announced:

> The completion of the private placement of $10 million in Series D Convertible Preferred Stock to Crescent International Ltd., an investment company managed by GreenLight (Switzerland) SA, and warrants exercisable to purchase 509, 554 shares of common stock at a price of $5.89 for a five year term...Crescent also agreed to purchase up to $10 million of common stock of the company in increments of between $200,000 and $2.5 million at the discretion of the company during the 18-month commitment period.

In June 2002, Dauphin Technology announced that 6.6 million shares of common stock: "may be acquired by Crescent International Ltd." In September 2001, Dauphin entered into a $10 million securities purchase agreement that "allows Dauphin to sell Crescent Crescent up to $7.5 mission in stock until September 27, 2003.

As of October 2001, DMI Trust had invested at least $200 million in the International Development Bank Infrastructure Fund L.P. DMI committed "$100 million for equity and an

additional $100 million for complementary finance facility purposes.''45 The fund "seeks to work with governments, international project sponsors and local companies in investing in infrastructure projects in Islamic Development Bank member countries.''

The fund was launched and is "managed" by Washington, DC-based Emerging Markets Partnership (EMP). The private equity firm expects to raise $1 billion for the initiative. It is believed to be the first private investment vehicle for private-sector infrastructure projects in the Islamic world. EMP set up offices for the fund in Bahrain to "handle fund-raising efforts.''

In addition, DMI became a 35% parmer in Boston Capital, a Massachusetts based real estate financing firm with "holdings in 48 states and the U.S. Virgin Islands.''

The CEO of DMI stated in an interview with the Gulf Daily news that the DMI group has "substantially increased" its investments in the United States after September 11, 2001.

DMI has sufficient minimum contacts with the United States to subject them to the personal jurisdiction of United States courts. Moreover, DMI has purposefully availed itself of the jurisdiction of the United States because it has directed its activities at the United States. DMI has financially and materially supported al Qaeda, Wael Jelaidan, Yassin A1 Kadi and other al Qaeda members that call for holy war or jihad against the United States. Moreover, DMI's supervising board members and religious board members have publicly called for jihad against the United States.

## Y.    Saudi Bin Laden Group ("SBG")

SBG played an integral role in developing al Qaeda.  Bakr Bin Laden is its current Chairman, and Tarek bin Laden and Omar bin Laden are on its board of directors.

During the war against the Soviet occupation of Afghanistan, SBG materially assisted Osama bin Laden in his efforts to provide material support to the mujihadeen fighters.

After the Soviet Union withdrew from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for SBG.  While working for SBG, bin Laden began establishing the infrastructure for his al Qaeda network.

In 1989, Hassan al Turabi, the ideological and political leader of the National Islamic Front in Sudan, invited Osama bin Laden to move the nascent al Qaeda organization to Sudan.  Turabi, whose NIF party had recently seized power in a coup, was at the time seeking to establish a radical Islamic state in Sudan.  Not long after Turabi extended the invitation, the Saudi regime moved to expel Osama bin Laden from the Kingdom due to his radical Islamic activities – a sanction that was widely reported and undeniably known to bin Laden's immediate family members.  Lacking any other safehaven for his terrorist empire, bin Laden accepted the invitation, and transplanted al Qaeda to Sudan in 1991.  When Osama bin Laden moved the al Qaeda infrastructure to the Sudan in 1991, he continued to maintain a close relationship with SBG and the members of his family who controlled the conglomerate.  Osama bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan.  During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF.  In exchange for the NIF's complete protection and sponsorship of the organization, bin Laden invested funds in the

country, performed infrastructure improvements, and provided al Qaeda fighters for the NIF's ongoing conflict with Christians in southern Sudan.

The protection, support and safehaven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire.  In addition, while in Sudan, al Qaeda established several businesses in partnership with the NIF, to fund al Qaeda's campaign to attach America.  Absent the support and safehaven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

 The benefits al Qaeda derived from its relationship with the NIF were made possible, in large part, by the support and resources provided to Osama bin Laden by SBG during this period. Among other activities, SBG actively participated in several of the infrastructure projects which provided the foundation for al Qaeda's relationship with the NIF.

For example, through two of its subsidiaries, SBG directly participated in construction projects involving the Tahaddi road and the Port of Sudan airport, two of the most significant infrastructure projects Osama bin Laden performed on behalf of his patrons in the NIF.  In addition, SBG provided substantial support to Osama bin Laden, including financial assistance and engineering support for other Sudanese construction projects undertaken by bin Laden in conjunction with al Qaeda's symbiotic relationship with the NIF.  This assistance enabled Osama bin Laden to offer safe haven and employment to al Qaeda members.  Through its participation in the projects undertaken by Osama bin Laden in Sudan and support of the businesses Osama bin Laden established in that country, SBG knowingly provided material support and resources to al Qaeda.

SBG maintained a close relationship with Osama bin Laden even after the bin Laden family purportedly disowned him.  Osama bin Laden is still listed on SBG corporate records.  SBG subsidiary Al Hijra was headed by Muslim activists who were directly involved with al Qaeda, and Al Hijra worked with Sudanese military officials to transport and supply provisions to terrorists training in Osama bin Laden's terror training camps.

At all times material, SBG was expressly aware that Osama bin Laden was using the NIF's protection to build a global terrorist empire in Sudan.  Indeed, bin Laden's relationship with the NIF and Hassan al Turabi was widely publicized.  In fact, Turabi held an elaborate reception for bin Laden at the time of his arrival in Sudan.  News reports during this period confirmed bin Laden's ambition to conduct a global jihad and to attack America, and that thousands of *mujihadeen* were traveling to Sudan to receive terrorist training.  As SBG was controlled throughout this period by Osama bin Laden's immediate family members, his activities within Sudan were undeniably well known to SBG.

In addition to its role in assisting Osama bin Laden perform construction projects for the NIF in Sudan, SBG provided cover for Mohammed Jamal Khalifa, a senior al Qaeda operative and official of the International Islamic Relief Organization ("IIRO"), a "charity" fronting for al Qaeda.  The Mohammed Bin Laden Organization, a subsidiary of SBG, sponsored Khalifa's visa application to the United States.

SBG has significant involvement in America. Until recently, SBG maintained an office in Rockville, MD. In addition, SBG had a $2 million investment in the Carlyle Fund, a US based

entity. SBG had other US based investments and banking arrangements with such US firms as General Electric, Fremont Group, Microsoft, Boeing and Citibank. SBG has a significant, possibly controlling interest in Global Diamond Resources, Inc, a Nevada based firm. In 1993 and again in 1994, SBG contributed one million dollars to an endowment establishing the Harvard Law School's Islamic Legal Studies Program. The proceeds from that endowment continue to fund the program to this day. From at least the mid 1990s, SBG has retained Hullin & Metz, a New York based public relations firm. A check of public property records showed numerous properties in the United States are owned by members of the Bin Laden family. The Middle East Policy Council ("MEPC") Board of Directors includes Dr. Fuad A. Rihani, who is also the Director of Research and Development for SBG and based in Hickory, NC. The SBG has maintained an office in Rockville, MD.

According to the SBG's website, the products of its manufacturing companies are exported to eighteen countries, including the United States. SBG is a member of the U.S.-Saudi Arabian Business Council ("USSABC"), an organization that maintains an office in Washington, D.C. In June 1999, the USSABC, along With the Saudi American Bank, organized a Saudi-American companies' conference in Washington, D.C. Dr. Fuad Rihani attended on behalf of SBG.

The Mohammed bin Laden Organization is a wholly owned subsidiary of SBG. The Mohammed Bin Laden Organization provided technical assistance on the Tahhadi road construction in the Sudan. SBG publicly confirmed this collaboration.

In sum, SBG, directly and through its subsidiaries, is a co-conspirator in the al Qaida Movement which intentionally, willfully and knowingly financed, supported and worked with Bin Laden and al Qaida, thereby enabling al Qaida to attack the U.S. and its citizens.

## Z.     Bakr bin Laden

Bakr bin Laden in addition to his responsibility in directing SBG's assistance to the Enterprise, Bakr bin Laden is a significant donor to organizations with known ties to the Enterprise in his personal capacity. At a July 1992 annual fundraiser for Sanabel Al-Kheer and IIRO, which raised more than SR19 million in one day, Abdul Mohsen Al-Kayal, chairman of the higher court in Jeddah, told the audience that "donating for a worthy cause is a kind of jihad and Muslims should generously help the Bosnian Muslims." The largest single donors reportedly included Bakr bin Laden

Bakr bin Laden is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. I11. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report: See Final Report of the 9/11 Commission,

Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis to for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of' Adel Batterjee, available at http://www.treas.gov./press/releasos/j s2164.htm

## AA.    Abdullah bin Laden and Omar bin Laden

Abdullah, nephew of Osama, was the president bin Laden of WAMY (World Assembly of Muslin Youth) in the United States. His brother, Omar, whom he lived with, was also significantly involved in WAMY. Both men fled the United States immediately after 9/11 as part of the mass airlift of family members to Saudi Arabia. Omar is a member of the board of both SBG and the Mohammed Bin Laden Organization, and has been integrally involved in their decision making.

WAMY has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.

Along with Al Haramain Islamic Foundation, Benevolence International Foundation, the International Islamic Relief Organization, the Rabita Trust, and the Muslim World League, WAMY is one of the principal players in the charity-based funding and sponsorship of al Qaida.

WAMY operates under the aegis of the Muslim World League, and Saudi Joint Relief Committee (SJRC), along with a number of other Islamic charities. WAMY further sponsored al Qaida through its participation in MWL and SJRC activities.

[WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated FTOs.]

Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Kashmiri terrorists.

According to Indian officials, Nazir Qureshi, an Assistant Secretary General of WAMY, has supplied money and other assets to Kashmiri terrorist groups associated with al Qaida.

WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world. When he was arrested in 1992, Ahmed Ajaj, who was subsequently convicted for his role in the 1993 World Trade Center bombing, had in his possession an al Qaida Manual entitled "Military Lessons In The Jihad Against The Tyrants" which detailed how to establish and maintain clandestine operational cells. The manual was distributed to Ajaj by WAMY. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

In 1992, Abdullah bin Laden, Osama bin Laden's nephew, established a WAMY office within the United States, in Falls Church, Virginia.

At least through 1998, Abdullah bin Laden Tarek (Tariq) bin Laden served as the president of WAMY's U.S. operations. WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including alQaida. WAMY's U.S. operations were raided by federal

394

authorities in conjunction with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated FTOs.

WAMY also has provided financial support to the U.S. based Council on American Islamic Relations (CAIR), a purported civil rights organization which received its initial seed money from the Holy Land Foundation for Relief and Development. On December 4, 2001, the Treasury Department listed Holy Land Foundation for Relief and Development as a specially designed terrorist pursuant to Executive Order 13224.

WAMY has also supported al Qaida affiliated extremists through its participation in the Islamic Coordination Council, an umbrella organization established in Peshawar, Pakistan in 1985 to coordinate and maximize the funding of the mujihadeen in Afghanistan. Other members of the ICC included the IIRO, Saudi Red Crescent and Qatar Charitable Society. Following the withdrawal of Soviet forces from Afghanistan, the ICC continued to sponsor mujihadeen elements which joined Osama bin Laden's al Qaida.

## BB.    Tarek bin Laden

Tarek bin Laden is a member of the board of both SBG and the Mohammed Bin Laden Organization, and has been integrally involved in their decision making.

He has also served as the IIRO general supervisor. IIRO was involved in the plots to assassinate President Clinton and Pope John Paul II, the plot to blow up twelve U.S. airliners simultaneously (which ultimately formed the blueprint for the September 11, 2001 attacks), and the 1998 embassy bombings in Kenya and Tanzania. IIRO was headquartered in Sudan near Bin Laden's personal office.

During his time as supervisor, IIRO was rapidly becoming al Qaida's foremost charity, used as a means to transfer funds and personnel. According to an Arabic publication, Tarek bin Laden had a prominent role in 1990 at the IIRO: "Tarek bin Laden has been a member of the IRO in MWL for ten years. He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world."

## CC.    Mohammed Bin Laden Organization

The Mohammed Bin Laden Organization is a wholly-owned subsidiary of SBG. Bakr, Tarek and Omar Bin Laden are all members of its board.

The Mohammed Bin Laden Organization provided technical assistance directly to Osama bin Laden relative to the Tahhadi road construction in the Sudan. The Saudi Bin Laden Group publicly confirmed this collaboration.

The Mohammed Bin Laden Organization sponsored Mohammed Jamal Khalifa's visa application to the United States. Khalifa is a key figure in the al Qaida network and has been implicated in many of its terrorist plots, including bombings in Jordan, its plot to destroy multiple airplanes simultaneously over the Pacific Ocean, a papicide plot and its successful 1993 bombing of the World Trade Center.

## DD.    Prince Naif

60573

In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Nail's direction, one such charity, the Saudi Joint Relief Commission, diverted $74 million to al Qaida members and loyalists. Through yet another, the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain al Qaida's presence and operations in Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect al Qaida's support infrastructure. Remarkably, Prince Naifpublicly denied al Qaida's responsibility for the Attack. Further, Prince Nail has also made large personal contributions to Saudi-based charities for the purpose of supporting terrorism, with the knowledge and intent the contributions he made would be used to fund al Qaida's global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to al Qaida for a period of many years, knowing and intending that those contributions would be used to fund al Qaida's global operations and acts of terror, the foreseeable culmination of which was the Attack..

## EE.    Rabita Trust

Defendant Rabita Trust is a subsidiary body of the Muslim World League, with its headquarters in Lahore, Pakistan and offices throughout the world. It is an agency, instrumentality, and organ of the Kingdom of Saudi Arabia and the Kingdom controls and directs its operations, appoints and terminates its personnel, provides Rabita Trust with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust's operations. Defendant Rabita Trust has long acted as a fully integrated component of al Qaeda's logistical and financial support infrastructure, and provides material support and resources to al Qaeda and affiliated foreign terrorist organizations.

Rabita Trust's direct participation in al Qaeda's operations dates to the establishment of Osama bin Laden's terrorist movement, as confirmed by the internal al Qaeda document recovered from the computer files of the Benevolence International Foundation wherein Osama bin Laden suggests Defendant Rabita Trust's involvement in a committee to collect and distribute funds to al Qaeda. Rabita Trust's material sponsorship of al Qaeda has been facilitated by the direct participation of senior al Qaeda officials in the management and operation of Rabita Trust. A founding member of al Qaedu, Wael Hanza Julaidan, was the head of Rabita Trust for several years before September 11, 2001.

Defendant Rabita Trust also shared officers and directors with several other charities operating within al Qaeda's infrastructure, including the Muslim World League ("MWL") and the SAAR Network of charities and businesses. Abdullah Omar Naseef served as a chairman of Rabita Trust and as a Secretary General of the MWL. Naseef is also an officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR Network. The Vice Chairman of the Board of Trustees of Rabita Trust, Abdullah al-Obaid, also served as an officer of the MWL and an organization within the SAAR Network. al-Obaid also serves as a senior executive of al Watania Poultry in Saudia Arabia, one of the many businesses owned by Suleiman Abdel Aziz al-Rajhi, the founder of the SAAR Network, member of the board of directors of IIRO, CEO of al-Rajhi Banking and Investment, and a defendant herein.

Given the pervasive and ongoing involvement in al Qaeda's operations, and the direct participation of senior al Qaeda officials in its management, the United States Government designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant to an Executive Order 13224. As such, Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to al Qaeda in relation to that terrorist organization's global jihad. The September 11th Attack was a direct, intended, and foreseeable product of Rabita Trust's participation in al Qaeda's jihadist campaign.

## FF.    Prince Abdullah Al Faisal Bin Abdulaziz Al Saud, Mohammed Bin Abdulrahman Al Ariefy, and Alfaisaliah Group (a/k/a al Faisal Group Holding Co.)

**Prince Abdullah Al Faisal Bin Abdulaziz Al Saud**

For a period of many years, Prince Abdullah al Faisal Bin Abdulaziz Al Saud ("Prince Abdullah") has provided critical financial and logistical support to al Qaeda. Particularly, Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of al Qaeda's global operations, including International Islamic Relief Organization, Muslim World League, World Assembly of Muslim Youth, Benevolence International Foundation, the Saudi High Commission, the Saudi Joint Relief Committee, and at Haramain Islamic Foundation, among others. In doing so, Prince Abdullah knew and intended that contributions to these charities and to Sanabel al-Kheer would be used to fund al Qaeda's global operations and acts of international terrorism.

Prince Abdullah's significant business interests have also provided material and financial support to al Qaeda for some time. For example, Prince Abdullah maintains a controlling stake in al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group.  Investigations conducted by the Federal Bureau of Investigation have produced evidence that suggests a direct link between Prince Abdullah's business interests and the September 11th hijacker, Hani Saleh Hanjour. According to FBI records, Hanjour maintained a registered address in Taif, Saudi Arabia, under the name of al Faisaliah. This same address, the FBI contends, corresponds with the branch office of al Faisaliah Group in Taif.

Furthermore, there is substantial evidence that Prince Abdullah provided support to al Qaeda as a result of a close business partnership with Muhammed Galeb Klaje Zouaydi. Zouaydi, who served as Prince Abdullah's accountant for many years, founded a network of companies which served as a vehicle for economically supporting the al Qaeda Spanish cell and its activities in Europe. One of those companies included Mushayt for Trading Establishment, a Saudi-based company which Prince Abdullah entered into a number of transactions with during the time it was laundering money for the Spanish al Qaeda cell. Zouaydi was arrested and convicted in Spain for financing al Qaeda's operations in Europe.

**Mohammed Bin Abdulrahman Al Ariefy**

Mohammed Bin Abdulrahman Al Ariefy ("Al Ariefy") is a Saudi businessman with similar ties to al Qaeda. Al Ariefy is a minority owner, and president, of al Faisal Group Holding Co., and its predecessor-in-interest, al Faisaliah Group.  As stated above, investigations conducted by the FBI have produced evidence that suggests a direct link between Al Ariefy's business interests in al Faisaliah Group and the September 11th hijacker, Hani Saleh Hanjour.

**Alfaisaliah Group (a/k/a al Faisal Group Holding Co.)**

Al Faisal Group Holding Co., and its predecessor-in-interest, at Faisaliah Group, is a large Saudi commercial enterprise with more then 3,000 employees and headquartered in Riyadh, with branches throughout Saudi Arabia.  Al Faisal Group is owned by both Prince Abdullah and Al Ariefy and has been linked by the FBI to the September 11th hijacker Hani Saleh Hanjour, as discussed above.

## GG.   Abdulrahman Alamoudi

Abdulrahman Alamoudi ("Alamoudi") is the Vice President of Taibah International Aid Association's ("Taibah") U.S. branch. Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement, "Supplemental Declaration in Support of Detention," *United States v. A lamoudi* (E.D. Va.), at 13-14 (October 22, 2003) (hereinafter "Gentrup Supp."). Taibah has long acted as a fully integrated component of al Qaeda's financial and logistical infrastructure, and provided material support and resources to al Qaeda and affiliated FTOs.  Taibah has been directly implicated in the 1998 United States Embassy bombings in Kenya and Tanzania.  Moreover, Taibah has been particularly active in furthering al Qaeda's efforts to establish a base of operations in Bosnia. *see Progress Since 9/11: The Effectiveness of US. Anti-Terrorist Financing Efforts: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Financial Services,* at 13 (March 11, 2003) (prepared testimony of Matthew Epstein with Evan Kohlman, Senior Terrorism Analysts, The Investigative Project) (hereinafter "Epstein Test.").  Within Bosnia, Taibah worked closely with the Global Relief Foundation ("GRF") and the Saudi High Commission ("SHC"), from which it received a vast majority of its funding.

As an officer of Taibah, Alamoudi is intimately affiliated with several organizations within the SAAR network.  According to Alamoudi's resume, he served as Executive Assistant to the President of SAAR

Foundation between 1985 and 1990. Brett Gentrup, Special Agent, U.S. Immigration and Customs Enforcement, "Affidavit in Support of Criminal Complaint," *United States v. Alamoudi* (E.D. Va.), at 9 (September 30, 2003) (hereinafter "Gentrup Aff."). Alamoudi also served as President of the Hajj Foundation, and he is a director and Secretary of the Success Foundation ("Success"). Gentrup Aff. at 10; Gentrup Supp. at 4. Success is one of many organizations related to IIRO, which works through Success. Epstein Test. at 15. Indeed, there is a "closely shared" leadership between IIRO and Success and they "are in reality one and the same." Epstein Test. at 15 & 16. According to federal officials, Alamoudi used his control of Taibah, Success, and Happy Hearts Trust ("HHT") to funnel money to al Qaeda through various al Qaeda funds, including the designated terrorist organizations GRF and The Foundation for Human Rights and Humanitarian Relief, which supported al Qaeda operatives associated with the millennium bombing plot.

In 1990, Alamoudi founded the American Muslim Council ("AMC"). Gentrup Aff. at 9. Alamoudi has served as a member of the board of directors of AMC and as its Executive Director for the past several years. Gentrup Aff. at 9-10. Alamoudi is also President of the American Muslim Foundation ("AMF"). Gentrup Supp. at 4; Gentrup Aff. at 9.

Defendant Alamoudi has also openly supported terrorist organizations such as Hamas and Hezbollah, both of which cooperate with al Qaeda. On October 28, 2000, Defendant Alamoudi openly declared his support for those terrorist organizations at a rally in Washington, D.C.:

> I have been labeled by the media in New York to be a supporter of Hamas. Anybody support this Hamas here? Anybody's [sic] is a supporter of Hamas here? Anybody's [sic] is a supporter of Hamas here? Here that Bill Clinton, we are all supporters of Hamas! Allah akbar [God is greater]. I wish to add here I am also a supporter of Hezbollah! Anybody supports Hezbollah here? Anybody supports Hezbollah here?... I want to send a message. My Brothers, this is the message that we have to carry to everybody. It's an occupation, and Hamas is fighting to end an occupation. It's a legal fight. Allah akbar! Allah akbar!

Gentrup Aff. at 10. Alamoudi's involvement with and support of terrorist organizations is further shown by his participation in a Conference in Beirut in January 2001 alongside leaders of al Qaeda, Hamas, Hezbollah, and Islamic Jihad. Gentrup Aff. at 11 (referring to an article in *Jerusalem Post* dated June 22, 2001).

On August 16, 2003, officials of Britain's Metropolitan Police Service (New Scotland Yard), National Terrorist Financial Investigations Unit (Special Branch) detained Alamoudi at Heathrow Airport when he attempted to travel from London, England, to Damascus, Syria. Gentrup Aff. at 12. As a result of a search of Alamoudi's belongings, Customs officers discovered and seized approximately $340,000 in 34 bundles of sequentially numbered $100 bills, two U.S. passports and one Yemeni passport. Gentrup Aff. at 12 & 17. Alamoudi explained that he intended to eventually deposit the money in banks located in Saudi Arabia, from which he would then feed it back into accounts in the U.S. in smaller sums. Gentrup Aff. at 14. Alamoudi later explained to U.S. authorities how, from November 1995 to September 2003, he devised a scheme to obtain money from Libya and other sources overseas for transmission into the U.S. without attracting the attention of U.S. federal immigration, customs and law enforcement officials. Press Release, U.S. Department of Justice, *Abdurahman Alamoudi Sentenced to Jail in Terrorism Financing Case* (October 15, 2004) (hereinafter "DOJ Press Release"). He admitted to participating in a comprehensive scheme to conceal prohibited financial transactions related to Libya, his travel to Libya, and financial transactions designed to evade currency reporting requirements. DOJ Press Release. One government official has stated that "in addition to dealing with Libya, [Alamoudi] has a more direct connection with terrorist organizations designated by the United States government." *The Financing of Terror Organizations: Hearings Before the Senate Comm. on Banking, Housing, and Urban Affairs,* at 11 (October 22, 2003) (prepared testimony of Matthew A. Levitt, Senior Fellow, The Washington Institute for Near East Policy, "UNTANGLING THE TERROR WEB: The Need for a Strategic Understanding of the Crossover Between International Terrorist Groups to

398

Successfully Prosecute the War on Terror") (hereinafter "Levitt Test.").

Federal officials arrested Alamoudi shortly after he arrived at Washington Dulles International Airport on September 28, 2003. Gentrup Aff. at 24. On July 30, 2004, Alamoudi pleaded guilty to three federal offenses: (1) one count of violating the International Emergency Economic Powers Act (IEEPA), which imposes terrorism-related sanctions prohibiting unlicensed travel to and commerce with Libya; (2) one count of false statements made in his application for naturalization; and (3) tax offenses involving a long-term scheme to conceal from the IRS his financial transactions with Libya and his foreign bank accounts and to omit material from the tax returns filed by his charities. Alamoudi was sentenced to twenty-three (23) years in jail for these charges which were related to his activities in the U.S. and abroad with nations and organizations that have ties to terrorism. As part of his plea agreement, Alamoudi agreed that he should be sentenced under the terrorism provision of the federal sentencing guidelines, and he agreed to forfeit all proceeds from his illegal dealings with Libya, which total at least $910,000, including the $340,000 seized from him in the United Kingdom. According to Attorney General John Ashcroft, Alamoudi is "a terrorist facilitator. . . and we have reason to expect that through his cooperation, we will obtain intelligence that will assist us in our ongoing efforts to advance these critical investigations."

## HH.    Prince Mohamed Al-Faisal Al-Saud ("Prince Mohamed")

The financial entities over which Prince Mohamed executed ultimate control are Dar al Maal al Islami ("DMI"), Islamic Investment Co. of the Gulf-Bahrain BC ("IICG"), and the Faisal Islamic Bank-Sudan ("FIBS"). DMI, and hence Prince Mohamed, is the ultimate parent company of IICG, FIBS, and other institutions, all of which have ties to al Qaeda and the Attack. DMI was created in 1981, and has always operated under Islamic law which prohibits the earning or payment of interest and imposes an obligation to contribute and manage *Zakat*, funds intended to be used to promote Islam throughout the world. Consistent with this obligation, DMI sets aside a percentage of funds from each banking transaction with the institution as *zakat*. These *zakat* funds literally disappear from the bank's financial books. In the case of the financial institutions controlled by Prince Mohamed, they were used to fund radical, anti-American Islamic terrorist organizations.

DMI is at the center of a complex banking system through which, beginning in the early 1980s, the Kingdom of Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical sect of Islam which is the keystone of the al Qaeda ideology.  Prince Mohamed, under the cloak of DMI and its subsidiaries, knowingly provided material support and resources to al Qaeda with the direct intent to support al Qaeda in its campaign to attack America. Indeed, through the banks he ran, Prince Mohamed intentionally directed significant funds to al Qaeda after al Qaeda issued religious decrees, *or fatwas*, authorizing and encouraging attacks against the United States and its military, as well as civilian citizens.

## II.    African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, Inc., International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation (the "Saar Network Entities")

The SAAR Network Entities aided and abetted, conspired with, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations, associations, organizations or persons. The SAAR Network Entities funneled their financial and logistical sponsorship of al Qaeda through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network (the "SAAR Executive Defendants").

Beginning in the 1980s, several prominent and wealthy sponsors of at Qaeda's global jihad began establishing the SAAR Network within the United States. By September 11, 2001, no fewer than sixty-five

so-called charities and business enterprises functioned under the umbrella of the SAAR Network, including the SAAR Network Entities.  Most of the SAAR Network Entities are located at a single address in Herndon, Virginia, and have common officers, directors, and management.

On March 20 and 21, 2002, federal authorities raided the SAAR Network facilities (the "SAAR Raid"). The SAAR Raid, conducted pursuant to a federal search warrant, was part of an ongoing federal investigation into money laundering, tax evasion activities, and ties to terrorist individuals and organizations. The ongoing investigation of the SAAR Network Entities and the SAAR Executives, which prompted the SAAR Raid, has revealed that the SAAR Network Entities' funds had been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated "Global Terrorist Individuals" under Executive Order 13224 based on their material support and sponsorship of al-Qaeda The funds were transferred through Bank al-Taqwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin. Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense, but rather are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government. Both of those banks have been designated "Specially Designated Global Terrorist Entities" by the U.S. government pursuant to Executive Order 13224, based upon their involvement in financing radical groups throughout the world, including at Qaeda, both before and after the Attack. As of late September 2001, at Qaeda continued to receive financial assistance from Nada, through entities he controlled.

## JJ.    Mar-Jac Poultry, Inc.

Mar-Jac Poultry, Inc. ("Mar-Jac") aided and abetted, conspired with, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations ("FTOs"), associations, organizations or persons.  Mar-Jac funneled its financial and logistical sponsorship of al Qaeda through a complex network of interrelated entities, the hereinbefore described SAAR Network. Mar-Jac's activities can only be understood within the context of the terrorist mission of the SAAR Network and its individual leaders (the "SAAR Executive Defendants").'

Beginning in the 1980s, several prominent and wealthy sponsors of al Qaeda's global *jihad* began establishing within the United States the SAAR Network, a network of interrelated purported charities, think tanks and for-profit businesses used to generate and surreptitiously transfer funds to al Qaeda.  By September 11, 2001, no fewer than sixty-five so-called charities and business enterprises functioned under the umbrella of the SAAR Network, including Mar-Jac, as well as fellow SAAR Network Entity defendants African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment, Inc., Mena Corporation, Reston Investments, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., Success Foundation and the York Foundation.

Most of the SAAR Network Entities are located at a single address in Herndon, Virginia, and have common officers, directors, and management.  For example, SAAR Executive Defendant M. Yaqub Mirza is, or has been, an officer and/or director of twenty-nine SAAR Network Entities, including Mar-Jac, and maintains signatory authority over seventeen different bank accounts associated with fifteen different SAAR Network Entities. (Mirza is also the first organizer of the U.S offices of Muslim World League, notorious for its close association with and support of al Qaeda.  SAAR Executive Defendant Dr. Jamal Barzinji was an officer of Mar-Jac as well as of Safa Trust and SAAR Foundation, two other SAAR Network Entities. Dr. Barzinji long has provided material support and resources to al Qaeda.  In his capacity as President of Safa Trust, Dr. Barzinji held authority over eighteen bank accounts for SAAR Network entities. According to federal authorities, Dr. Barzinji "committed and conspired to: transmit money internationally for the purpose of promoting offenses against foreign nations involving murder or the destruction of property by means of explosive, fire, kidnapping or

extortion...; provide material support or resources to foreign terrorist organizations...; and provide material support or conceal or disguise the source of ownership of material support intended for use in preparation for or in carrying out a terrorist act." Further, Dr. Barzinji has made substantial contributions to many of the so-called charities operating within al Qaeda's infrastructure, with full knowledge that these funds would be used to support al Qaeda's operations and terrorist attacks.

On March 20 and 21, 2002, federal authorities raided the SAAR Network facilities (the "SAAR Raid"), including Mar-Jac's Gainesville, Georgia operations.  The SAAR Raid, conducted pursuant to a federal search warrant, was part of an ongoing federal investigation into money laundering, tax evasion activities, and ties to terrorist individuals and organizations. The ongoing investigation of the SAAR Network Entities and the SAAR Executives, which prompted the SAAR Raid, has revealed that SAAR Network Entities' funds had been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated "Global Terrorist Individuals" under Executive Order 13224 based on their material support and sponsorship of al-Qaeda.  The funds were transferred through Bank al Taqwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin.  Bank Al Taqwa and Akida Bank are not functional banking institutions in the conventional sense, but rather are shell companies lacking a physical presence and sharing the same address in the Bahamas where they were licensed. For this reason, the licenses of Bank Al Taqwa and Akida Bank have been revoked by the Bahamian government.  Both of those banks have been designated "Specially Designated Global Terrorist Entities" by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including al Qaeda, both before and after the Attack.

## KK.    Saudi Red Crescent Society (SRC) and Dr. Abdul Rahman Al Swailem (Al Swailem)

Defendants Saudi Red Crescent Society (SRC) and Dr. Abdul Rahman Al Swailem (Al Swailem) have engaged in longstanding sponsorship and support of al Qaeda's global jihad.

The SRC's close ties to al Qaeda's leadership date to the 1980s, when Osama bin Laden was deeply involved in financing and supporting the *mujihadeen* in Afghanistan. During that conflict, bin Laden and other future al Qaeda leaders established a complex network of front "charities" and "relief organizations" to support the *mujihadeen* forces:

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. . .Donations flowed through charities or other non-governmental organizations (NGOs).

Final Report of the National Commission on Terrorist Attacks Upon the United States (9/11 Report) at p. 55.

By all accounts, the SRC played a prominent role within that network. Indeed, in 1986, Dr. Abu Hazifa, a Director of the SRC, openly acknowledged the organization's direct ties to the *mujihadeen,* and that many of those fighters in fact worked for the SRC. James Rupert, *Dreams of Martyrdom Draw Islamic Arabs to Join Afghan Rebels,* Washington Post Foreign Service, July 21, 1986.

When the Soviets withdrew from Afghanistan in 1988, bin Laden concluded that the organization created to wage *the jihad* in Afghanistan should not be dissolved, but instead transformed into a multi-national Islamic army. 9/11 Report at p. 56. The transformed

organization, to be known as al Qaeda, would wage war with America through terrorist activities, and engage in armed combat in regional conflicts throughout the world in the hopes of rallying Muslim communities to join its campaign to establish a Pan-Islamic Caliphate. *Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,* United States Department of Defense, October 1998.

Bin Laden relied heavily on the network of charities established to support the Afghan *jihad,* including the SRC, in building this global terrorist network:

> From its inception, Al-Qaeda has relied heavily on charities and donations from its sympathizers to finance its activities. . .The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the late 1980s.

*Second Report of the UN. Monitoring Group on Al Qaeda,* December 2003, pp. 13-14.

The SRC's support for bin Laden's terrorist organization was orchestrated largely by Wa'el Julaidan, a Specially Designated Global Terrorist. In the 1980's, Julaidan headed the SRC's office in Peshawar, Pakistan, the coordinating point for supporting the *mujihadeen.* Historical documents regarding al Qaeda's formation, uncovered in a raid of Benevolence International's office in Bosnia, confirm that Julaidan remained dedicated to bin Laden's vision after the Afghan conflict, and continued to funnel support to bin Laden through the charity organizations he headed. For example, one internal al Qaeda document states that the SRC could no longer be relied on to function as an "umbrella" for al Qaeda members, because Julaidan was being recalled to Saudi Arabia. See Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, 02-CR-892 (N.D. Ill) at p. 31. The import of this statement is clear — under Julaidan's direction the SRC was serving as a front for al Qaeda. Authorities also discovered a message on the letterhead of the SRC bureau in Peshawar requesting that "weapons" be inventoried. That letter contains a note from bin Laden to Julaidan, the SRC's then director, stating "we have an extreme need for weapons." Id. at p. 38.

Years later, Julaidan facilitated the SRC's sponsorship of al Qaeda activities in Kosovo and Chechnya. In 1999, Saudi Arabia formed the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC) to coordinate the relief efforts of the SRC and other Saudi charities in Kosovo and Chechnya. The Kingdom designated the SRC to exclusively serve as the operational arm for SJRC-coordinated relief efforts. Although bin Laden had publicly confirmed that Jalaidan was one of al Qaeda's founding members in a 1999 interview, the SJRC and SRC appointed Julaidan Director of SJRC and SRC operations in Pristina. In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC officials Adel Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans. Nick Wood, *US Fears Terrorist Attack in Kosovo,* BBC News, April 3, 2000, at p.2. Separate incidents revealed that members of the SRC staff working under the supervision of the SJRC actively participated in the development and planning of terrorist attacks against American interests. Id. at p. 1.

Employees of the SRC were similarly implicated in the 1996 al Qaeda bomb attack on the Egyptian Embassy in Islamabad. Following that attack, investigators arrested Muhammed Ali Sayed and Bashir Barbar Qadim, two Sudanese employees of the SRC. The investigation which led to the arrests revealed evidence that Sayed had indirectly funded the attack by channeling SRC funds to Egyptian al Jihad, the terrorist organization run by Ayman al Zawahiri which formally merged with al Qaeda several years before the September 11th Attack. Egyptian authorities alleged that Zawahiri personally masterminded the Embassy attack. See *Pakistan:*

*Two Sudanese Held in Egyptian Embassy Blast Case,* The News, February 1, 1996;  Blanche, *Ayman Al-Zawahiri: Attention Turns to the Other Prime Suspect,* Jane's Intelligence Review, October 23, 2001.

Zawahiri's relationship with the SRC was established long before the attack on the Egyptian Embassy. Zawahiri, who is universally regarded to be bin Laden's top lieutenant, joined the SRC in 1985. By that time, he was already a prominent figure within the Muslim Brotherhood, and had been jailed by the Egyptian government. *Who Is Ayman al Zawahiri,* MSNBC.Com, March *25,* 2004.  Zawahiri continued to serve as an SRC official until at least 1995, when he made a fundraising trip to the United States. According to members of the terrorist cell who arranged the trip, the funds raised by Zawahiri were channeled to al Qaeda's sister organization, the Egyptian Islamic Jihad. *Bin Laden Underling Raised Money in US.,* NewsMax.com Wires, October 12, 2001.

The SRC continued to serve as a front for al Qaeda through the date of the September 11th Attack.  In fact, just weeks after the September 11th Attack, the Pakistani government deported employees of the SRC, based on evidence that they were involved in al Qaeda related terrorist activities.  In 2002, NATO and Bosnian authorities arrested six Algerian al Qaeda members who were plotting attacks on the U.S. and British embassies in Sarajevo. Two of those men were employees of the SRC.

Stated simply, the SRC has extensively and knowingly supported al Qaeda, assisting it in raising money, concealing documents, giving shelter to operatives, and maintaining and transporting weapons. In other words, the SRC's role in al Qaeda's global jihad is identical to the role it played in supporting the *mujihadeen* in Afghanistan.

The claims against al Swailem arise from his participation in the SRC's sponsorship of al Qaeda.  Al Swailem was appointed to head the SRC in 1998, and held that position until 2005. As head of the SRC, al Swailem used his authority to foster the organization's continued role in al Qaeda's global jihad, For example, as head of the SRC, al Swailem was responsible for the decision to appoint Julaidan as a Director of the SJRC, thus placing a prominent and known al Qaeda figure in a position of authority within his charity.

The SRC and al Swailem were well aware of the SRC's pervasive sponsorship of al Qaeda during the relevant period. To begin with, it was well known that the SRC formed close ties with the al Qaeda leadership during the conflict with the Soviet Union in Afghanistan, and that the fighters and charities who participated in that conflict formed the foundation of the al Qaeda terrorist organization. In addition, media reports prior to September 11, 2001 directly implicated the SRC in terrorist activities. The SRC leadership undoubtedly knew of those reports.  Indeed, in many instances, high level officials of the SRC participated directly in that misconduct, a fact which in and of itself confirms the SRC's knowledge. Moreover, given the close ties between the SRC and the Kingdom, it is also reasonable to infer that the SRC's leaders received warnings regarding their organization's illegal activities through official governmental channels.

## LL.   Adnan Basha

As Secretary-General of IIRO, defendant Adnan Basha ("Secretary General Basha") provided financial support to al Qaeda.  Secretary-General Basha himself knew and intended that

IIRO provide al Qaeda Sixty Million Dollars ($60,000,000) to fund al Qaeda terronst

training
camps in Afghanistan, where several of the September 11 hijackers were trained.  Those al
Qaeda training camps funded by Secretary-General Basha' s IIRO fueled radical extremist
ideology, fostered inner resolve among recruits, and taught skills to launch suicide attacks to kill
United States civilians, as on September 11.

Secretary-General Basha' s IIRO is an al Qaeda "charity" front that knowingly and
intentionally provided al Qaeda funds and recruits for terrorist attacks against America, including
the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes
simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S.
Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India,
and the September 11 attacks.

Less than thirty percent (30%) of the funds distributed by Secretary-General Basha's
IIRO go to legitimate public works, the rest going toward the purchase of weapons by
and for al Qaeda.  Not only did IIRO finance al Qaeda, but Secretary-General Basha's
IIRO also actively recruited and provided new personnel for al Qaeda to carry out
terrorist attacks against the United States, and IIRO bankrolled sanctuaries for al Qaeda
operatives around the world.   Indeed, one of the September 11 hijackers declared that he
worked for Fazeh Ahed of IIRO.

Throughout the 1990s, Secretary-General Basha's IIRO in Southeast Asia became a
center of al Qaeda financing activity - collecting, laundering, and providing funds for al
Qaeda operations against the United States, including al Qaeda's 1993 World Trade
Center bombing and the 1995 plot to blow up twelve American airlines.

After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government de-registered
Secretary-General Basha' s IIRO in Kenya.  After the September 11 attacks, Pakistan
deported scores of IIRO workers who were "aiding, abetting, funding, otherwise
conspiring with, sponsoring and/or supporting al Qaeda."  These official Government
actions confirm the open and notorious fact reported by the Arab publication *Rose Al-
Yusuf* that "IIRO is firmly entrenched with Osama Bin Laden's al Qaeda organization."

In the United States, Secretary-General Basha's IIRO financed al Qaeda
terrorist attacks against America from IIRO's office in Virginia before, on, and after
September 11, 2001.
IIRO's Virginia office sends money back and forth between the Virginia Office and IIRO in
Saudi Arabia. IIRO's Virginia office also sends money to related terrorist organizations targeting
the United States. After the September 11 attacks financed by Secretary-General Basha's IIRO
and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of al
Qaeda.

IIRO works with numerous other al Qaeda affiliated charities. The U.S.-based Success
Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz, an al Qaeda
financier. Success Foundation sends money back and forth from the United States to IIRO; the
Success Foundation also sends money to terrorist organizations targeting the United States.

Secretary-General Basha's IIRO also provides financial support to the Saudi Joint Relief
Committee, an al Qaeda charity in Bosnia and elsewhere. IIRO, through Osama's Bin
Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence
International Foundation, the al Qaeda charity front. And IIRO provides funding for

other al Qaeda fronts posing as "humanitarian organizations" that have materially sponsored, aided and abetted and conspired with al Qaeda to attack America, including: Global Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth.

Secretary-General Basha's provision of material support and assistance to Bin Laden and al Qaeda enabled the al Qaeda terror network to carry out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks.

**MM.  Shahir A. Batterjee**

Defendant Shahir Abdulraouf Batterjee was a founder or owner of two of the legal entities that played a distinct role in financing al Qaeda and the September 11th Attack, Benevolence International Foundation ("BIF") and Triple-B Trading Gmbh of Rethswich, Germany ("Triple-B"). He was a founding Director and Vice President of BIF and also served on the Board of the Florida branch of BIF.  Defendant Batterjee was an owner of Triple-B together with Abdul Matin Tatari, who also owns Tatex Trading Gmbh, of Hamburg. Germany ("Tatex").

BIF has acted as one of the charities fronting for al Qaeda, and in fact the United States has designated BIF as a supporter of international terrorism.

Among other things, on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking BIF's assets and records, pending further investigation into BIF's ties to terrorists. Enaam M. Arnaout ("Arnaout"), Chairman of BIF, has a relationship with Osama bin Laden and key associates dating back more than a decade. The BIF is used by al Qaeda for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaeda have contacts with the BIF and its office personnel; and, BIF had direct dealings with al Qaeda operatives, providing them with military and financial support.  Chairman, Defendant Arnaout, was criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of al Qaeda.  It is alleged that Arnaout was photographed with Osama Bin Laden and that he was authorized to sign on behalf of Bin Laden. Arnaout was Executive Director of BIF while Defendant Batterjee was still a Director and Vice President of BIF.

Batterjee's other company of interest, Triple-B, is located in Rethwisch, Germany, located between Berlin and Hamburg. Triple-B is owned by Defendant Tatari, who also owns Tatex in Hamburg, the location of the "Hamburg cell" that included several of the September 11 hijackers. It is alleged that Triple-B, Tatex and their principal shareholders and associates have materially supported, aided, abetted, and financed al Qaeda.  For example, it is alleged that Tatex employed Mamoun Darkanzanli, who appeared in a video in the company of several of the September 11th hijackers.  Furthermore, it is alleged that one of the owners of Triple-B, Defendant Abdul Matin Tatari, at one time employed the lead hijacker, Mohammed Atta.

Batterjee was one of the founders of one of the leading charities that fraudulently raised money in the United States for the support of al Qaeda, and at the same time an owner of a company located in Hamburg that supported members of the "Hamburg cell".

**NN.        Dr. Abdullah bin Abdul Mohsen Al-Turki**

Dr. Abdullah Bin Abdul Mohsen Al-Turki ("Dr. Al-Turki") a close advisor to the late King Fahd bin Abdulaziz Al Saud and former rector of the University of Riyadh in Saudi Arabia (197S-1993), has held several prominent positions within the Saudi government. In 1992, Dr. Al-Turki was appointed to be a member of the Council of Ulema (Senior Council of Scholars). In 1993, Dr. Al-Turki was appointed by King Fahd as Minister of Islamic Affairs. In that role, al-Turki held primary authority for setting policies for the Saudi based charities, and directing and supervising their activities and operations.  Final Report of the National Commission on Terrorist Attacks Upon the Untied States at p. 372. In 1996, King Fahd appointed him to the Saudi Council of Ministers, the highest

decision-making body of the Saudi government. Despite this seemingly reputable career with the Saudi government, Dr. Al-Turki's actions have been anything but admirable. Dr. Al-Turki provided material support to Osama Bin Laden and al Qaeda, knowing that al Qaeda's terrorist agenda was to attack the United States and its interests abroad.

Dr. Al-Turki was appointed as Secretary General of the Muslim World League ("MWL") in 2000. The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation, and the Rabita Trust. The MWL has long operated as a fully integrated component of al Qaeda's financial and logistical infrastructure, and provided material support and resources to al Qaeda and affiliated foreign terrorist organizations. As described in testimony before the House Committee on Financial Services Subcommittee on Oversight and Investigations in March, 2003: "As part of [its] mission over the past two decades, MWL has . . . secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaeda and Osama Bin Laden." *See* Matthew Epstein with Evan F. Kohlmann, "Arabian Gulf Financial Sponsorship of Al-Qaeda via U.S.-Based Banks, Corporations and Charities," March 11, 2003, at 2. According to Epstein and Kohlrnann, MWL is one of "three organizations [that] served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al Qaeda personnel worldwide, and helping to move funds to areas where Al-Qaeda was carrying out operations." Id. at 1. Further details of MWL's role in financing bin Laden and al Qaeda are provided in the Epstein and Kohlmann report.

As Minister of Islamic Affairs, Member of the Council of Ministers and Head of the MWL, al-Turki knowingly used his authority to assist the Saudi charities in sponsoring Islamic extremists, including al Qaeda. In this regard, it is important to note that the involvement of the Saudi charities was well documented during the years that al-Turki exercised authority over those organizations. Indeed, MWL and its constituent charities, including IIRO, WAMY and al Haramain, were repeatedly implicated in terrorist and extremist activities between 1990 and September 11, 2001. Given his supervisory authority over those charities, al-Turki most certainly knew of these reports. In fact, in a 1997 interview published in the MWL's own newspaper, then MWL Secretary General Abdullah al-Obeid acknowledged that charges of terrorism sponsorship had been leveled against the Saudi charities, including the MWL, and that those charges were accurate. "Answering a question on the reports regarding the League's funds being funneled to extremist groups, Dr. al Obeid said, 'this is a closed chapter.. . It has already been proven that there were people who exploited this situation and misused some funds." Moreover, as a government official with direct responsibility for the operations of the charities, it is reasonable to assume that Saudi government officials would have conveyed to al-Turki the multiple warnings they received regarding the criminal conduct of the Saudi charities. Nonetheless, al-Turki continued to use his authority to generously fund and support those organizations.

Equally disturbing is the connection between Dr. Al-Turki and a senior al Qaeda financier, Muhammed Galeb Kalaje Zouaydi. Zouaydi, who was arrested by Spanish authorities on April 23, 2002, is a brother-in-law of Osama bin Laden. A top financier for al Qaeda, he also served as one of the original terrorists who fought with bin Laden and the other original founders of al Qaeda. Zouaydi used various Spanish businesses to

launder money from Saudi Arabia through Spain to al Qaeda cells in Germany, including the Hamburg Cell that carried out the September 11th attacks. It appears that the business transactions between Al-Turki and Zouaydi were part of this money laundering scheme.

For instance, on October 10, 1999, Dr. Al-Turki and Zouaydi agreed to participate as business partners in a construction project in Madrid, Spain. A contract was written by Zouaydi's company in Spain stating that both parties would finance 50% of the project and that the income would be split 70/30 between Dr. Al-Turki and Zouaydi. Furthermore, a letter dated October 21, 1999, from Francisco G. Prol, apparently representing Zouaydi, details the state of the negotiations between Dr. Al-Turki and Zouaydi for Dr. Al-Turki's purchase of shares in Proyectos y Promociones ("Promociones") and participation in certain real estate transactions. Moreover, Plaintiffs also have obtained a copy of check from Promociones dated September 15, 1999 for $191,000,000 Spanish pesetas. The check is made out to "D. Abdula Abdul Muhsen Al Turki" as beneficiary from Baiico Sabadel in Madrid and appears to have been signed by Zouaydi and Bassam Dalati Satut on behalf of Promociones.

Further evidence supports an on-going business relationship between Dr. Al-Turki and Zouaydi. On October 15, 1999, Zouaydi sent a fax to Dr. Al-Turki requesting that he send the money through Al Rajhi Bank (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to Dr. Al-Turki by a law firm in Madrid, Prol & Asociados, referencing a telephone conversation with Waleed Al Husseini, Dr. Al-Turki' s representative, regarding a project of Dr. Al-Turki to buy 100% of Zouaydi's Spanish company.

### OO.    International Islamic Relief Organization ("IIRO")

IIRO is an al Qaeda "charity" front that knowingly and intentionally provided al Qaeda funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.

IIRO knowingly and intentionally provided al Qaeda Sixty Million Dollars ($60,000,000) to fund al Qaeda terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America.  These IIRO-financed camps fueled radical extremist ideology and fostered inner resolve among recruits to launch suicide attacks to kill United States civilians, as on September 11th.  Less than thirty percent (30%) of IIRO funds go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaeda.  Not only did IIRO finance al Qaeda, IIRO actively recruited and provided new personnel for al Qaeda to carry out terrorist attacks against the United States, and IIRO bankrolled sanctuaries for al Qaeda operatives around the world.  Indeed, one of the September 11 hijackers declared that he worked for IIRO's Fazeh Ahed.

Throughout the 1990s, IIRO in Southeast Asia, headed by Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, became a center of al Qaeda financing activity - collecting, laundering, and providing funds for al Qaeda operations against the United States, including al Qaeda's 1993 World Trade Center bombing and the 1995 plot to blow up twelve American airlines.

After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government registered IIRO in Kenya.  After the September 11 attacks, Pakistan deported scores of IIRO workers who were "aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaeda."  These official Government actions confirm the open and notorious fact reported by the Arab publication *Rose Al-Yusuf* that "IIRO is firmly entrenched with Osama Bin Laden's al Qaeda organization."

In the United States, IIRO financed al Qaeda terrorist attacks against America from IIRO's office in Virginia before, on, and after September 11, 2001.  IIRO calls its Virginia office International Relief Organization ("IRO").  IRO and IIRO are the *same* entity.  Defendant Mohammed Omeish is President of IIRO's Virginia office, which sends money back and forth between the Virginia Office and IIRO in Saudi Arabia.  IIRO's Virginia office also sends money to related terrorist organizations targeting the United States. After the September 11 attacks financed by IIRO and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of al Qaeda.

IIRO also established the endowment fund Sanabil al-Khair to provide stable financing for the activities of IIRO in both Saudi Arabia *and* in America. The corporate records of Sanabil al-Khair, which incorporated in the United States under two separate names, Sana-Bell, Inc. and Sanabel al-Kheer, Inc., reveal the same address as IIRO's office in Hernon, Virginia.

IIRO works with numerous other al Qaeda affiliated charities. IIRO shares the same address in the United Kingdom as International Development Foundation, a charity affiliated with defendant Khaled bin Mahfouz, a senior al Qaeda financier. The U.S.-based Success Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz. Success Foundation sends money back and forth from the United States to IIRO; the Success Foundation also sends money to terrorist organizations targeting the United States.

IIRO also provides financial support to the Saudi Joint Relief Committee, an al Qaeda charity in Bosnia and elsewhere.  IIRO, through Osama Bin Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaeda charity front.  IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with al Qaeda, including: Global Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth.

**PP.    Saudi Joint Relief Committee for Kosovo and Chechnya**

The Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), through its direct and extensive financial and logistical sponsorship of the al Qaeda terrorist organization, knowingly participated in that terrorist organization's well publicized conspiracy to conduct terrorist attacks against the United States, of which the September 11th Attack was a natural, intended and foreseeable product.

The Kingdom of Saudi Arabia established the SJRC in 1999, and endowed it with responsibility for coordinating and carrying out the operations of five constituent charities in Kosovo and Chechnya: al Haramain Islamic Foundation; the International Islamic Relief Organization (IIRO); World Assembly of Muslim Youth (WAMY); Muslim World League (MWL); and Saudi Red Crescent. Subsequent to the establishment of the SJRC, those constituent charities continued to solicit funds to support activities in Kosovo and Chechnya throughout the World, including from the United States. In addition, at least certain of the constituent charities

maintained an operational presence in the Balkans subsequent to the SJRC's establishment. However, the SJRC assumed principal responsibility for distributing funds and carrying out operations on behalf of the constituent charities.

The SJRC was primarily dedicated to exporting Wahhabism, a fundamentalist interpretation of Islam that has been repeatedly tied to terrorism. In fact, according to the SJRC's own records, nearly half of the organization's 1999 budget was spent to sponsor three hundred eighty-eight (388) religious "propagators," dedicated to converting Kosovars to Wahhabi fundamentalism. See Steven Schwartz, *Islamic Fundamentalism in theBalkans,* Partisan Review, at p. 2.  Counter terrorism experts and government officials have consistently identified Wahhabism as the source of al Qaeda's virulent philosophy.

Given the SJRC's role in propagating Wahhabi ideology, it is hardly surprising that the organization became a magnet for al Qaeda members and sympathizers in the Balkan region. After gaining entry into the region with the assistance of the SJRC and its constituent charities, these al Qaeda members and sympathizers channeled charitable contributions through the SJRC to the al Qaeda network, facilitated the transfer of physical assets to al Qaeda members fighting alongside local Muslim rebels, and actively recruited and trained new al Qaeda members from the local Muslim population. Between its formation in 1999 and 2001, the SJRC channeled more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

SJRC employees, including high ranking officers of the organization, were directly and intimately involved in al Qaeda's illicit activities. In fact, the SJRC offices in Pristina, Kosovo, served as cover for senior al Qaeda operatives Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.  In a 1999 interview with *al Jazeera* regarding the formative years of the al Qaeda organization, Osama bin Laden himself attested to Julaidan's important role in the organization, stating "[w]e were all in one boat, as is known to you, including our brother Wa'el Julaidan."  More than a year before the September 11th Attack, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the SJRC. In that document, the U.S. government asserted that SJRC officials Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.

On September 6, 2002, the United States government designated Wa'el Julaidan as a supporter of terrorism pursuant to Executive Order 13224.

In addition to the logistical and financial support of al Qaeda, members of the SJRC staff actively participated in the development and planning of terrorist attacks against American interests. In April of 2000, NATO forces raided SJRC offices in Kosovo, based on intelligence gathered by U.S. officials which indicated that employees of the ostensible charity were planning a terrorist attack on U.S. and NATO headquarters in Pristina.  In a separate incident, British soldiers blew up a suspect car belonging to an employee of the ostensible charity.  U.S. officials strenuously defended the actions, asserting that members of the SJRC were associated with Osama bin Laden and were involved in sponsoring al Qaeda in the region.

The SJRC's pattern of activity in Kosovo and Chechnya is typical of al Qaeda's charity fronts. As Treasury Department General Counsel David Aufhauser explained in a November 29, 2001 letter to Swiss officials:

> Working in troubled areas such as Bosnia, Somalia, Sudan and various refugee camps,

the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and training terrorist cells. Their provision of humanitarian aid and educational services is done in concert with the terrorists to win the hearts and minds of the local people to whatever causes the terrorists espouse.

The importance of the support provided by ostensible charities such as the SJRC to the success of the al Qaeda movement cannot be overstated. As the United Nations Security Council Committee Concerning al-Qaeda and the Taliban succinctly explained:

> From its inception, al-Qaeda has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaeda with the very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes. Al-Qaeda supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaeda.

*Second Report of the Monitoring Group on Al-Qaeda,* December 2, 2003, pp. 13-14.

The National Commission on Terrorist Attacks Upon the United States further found that there was a "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." 9/11 Commission Report, p. 171. The Commission's Staff expanded on that finding in a subsequent Monograph on al Qaeda's financing, explaining that "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and unwitting donors, primarily in the Gulf region." 9/11 Commission Staff Monograph on Terrorist Financing, p. 4. The Staff Monograph further states that "The intelligence community identified [Saudi Arabia] as the primary source of money for al Qaeda both before and after the September 11th attacks. Fund-raisers and facilitators throughout Saudi Arabia and the Gulf raised money for al Qaeda from witting and unwitting donors and diverted funds from Islamic charities and mosques." Id. at p. 8.

On June 2, 2004, Saudi Arabia announced that it intended to dissolve several of its international charities as a "counter-terrorism" measure. Notably, the SJRC is one of the charities the Kingdom intends to disband in connection with that counter-terrorism initiative.

## QQ.    Wael Julaiden

Wael Julaidan is a founding member of al Qaeda who has been designated as a Specially Designated Global Terrorist pursuant to Executive Order 13224. The Treasury Department statement supporting that designation states as follows:

> Wa' el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden. Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with several individuals and entities linked to al Qaeda, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Muhammad Atef; and the organizations: Makatab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya. These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations. Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al Qaeda's co-founder Abdallah Azzam, bin Laden stated that "we were all in one boat, as is known to you, including our

411

brother, Wa' el Juliadan." Juliadan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri. Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Muhammad Atef soon after arriving in Kandahar.

In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qaeda.

## BASIS FOR DESIGNATION

The United States has credible information that Wa' el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants. Julaidan has directed organizations that have provided financial and logistical support to al-Qaeda.

Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

Julaidan served as an official of the Benevolence International Foundation (BIF). FACIJ91. Defendant Julaidan replaced Abdullah Azzam, Osama bin Laden's spiritual mentor, and heading the MWL's Office in Peshawar, Pakistan and he also served as Director General and a member of the Board of Trustees of Rabita Trust, a financial arm of the MWL. Julaidan also served as a director of the Saudi Joint Relief Commission (SJRC). Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, directed more than $74,000,000 to al Qaeda members and loyalists affiliated with SJRC bureaus.

Defendant Julaidan also served as an officer of the Saudi Red Crescent for many years and continued to fill that role following the establishment of al Qaeda. Throughout the 1990s, the Saudi Red Crescent provided extensive financial and logistical support to the mujihadeen in Afghanistan. Following the withdraw of Soviet troops from Afghanistan, the Saudi Red Crescent re-directed its efforts toward the fulfillment of the objectives of the newly established al Qaeda movement. The Saudi Red Crescent's integral role in the growth and development of the nascent al Qaeda movement has been confirmed by documents seized in Bosnia and Herzegovina during searches of the BIF offices. During one of those searches, investigators recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At the bottom of the letter is a note from Osama bin Laden to Wael Julaidan stating that al Qaeda has an extreme need for weapons. The United Nations' mission in Kosovo has declared that the SJRC office in Pristina, Kosovo served as a cover for several al Qaeda operatives, including Julaidan. Rabita Trust, which Julaidan headed before September 11, 2001, provided material sponsorship to al Qaeda.

## RR.   Tarik Hamdi

In May 1998, well after Osama bin Laden had declared war against the United States, defendant Tarik Hamdi delivered a satellite telephone and battery pack to bin Laden in Afghanistan. That satellite phone was used to facillitate al Qaeda'a acts of terrorism against the United States and Hamdi knew and intended that it would be used in that manner.

Hamdi was employed by the International Institute of Islamic Thought, an entity which was and is part of the SAAR Network, whose entities have long acted as fully integrated components of al Qaeda's logistical and financial support infrastructure, and provided material support and resources to al Qaeda and affiliated FTOs.

In addition to aiding and abetting and conspiring with the SAAR Network entities, Hamdi associated himself with the Committee for the Defense of Legitimate Rights ("CDLR") and the Advice and Reformation Committee ("ARC").  In the Radical Arabic publication, *Al-Zaytuna,* an advertisement for CDLR listed in the contact information a telephone number that is registered in Hamdi's name.  In regard to ARC, Hamdi wrote a note to Khalid al-Fawwaz calling him "Brother Khalid," which indicates a more than professional relationship with one of ARC's key leaders. Khalid al-Fawwaz was head of bin Laden's ARC organization in London and one of the masterminds of the 1998 United States Embassy bombings, for which he was indicted by the United States government.

## SS.     Saudi High Commission for Relief to Bosnia and Herzegovina

The Saudi High Commission for Relief to Bosnia and Herzegovina (SHC) has participated in and aided and abetted a global conspiracy to strike the United States through terrorist attacks, of which the September 11th attack was a natural, intended and foreseeable product.

The SHC is ostensibly a charitable organization, headed by Defendant Prince Salman bin Abdulaziz al Saud. Since its formation in 1993, the SHC has served as a major conduit for funneling financial and logistical support to al Qaeda.  According to Bosnian officials, al Qaeda members began entering Bosnia and Herzegovina as relief workers for the SHC, almost immediately after the organization established operations in the country.

During the next ten years, the SHC channeled to al Qaeda literally millions of dollars that had been donated to the SHC. To this date, investigators have been unable to account for approximately $41,000,000 donated to the charity.

In October 2001, NATO peacekeeping forces raided the SHC's headquarters in Sarajevo, as part of an ongoing investigation into the organization's ties to terrorism. During the raid, investigators found computer hard drives of photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the USS Cole. Investigators also discovered files on pesticides and crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington, on which prominent government buildings had been specifically marked.

Following the raid, the Financial Police of the Federation of Bosnia-Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism related activities, stating:

> Members of the SFOR (stabilization forces) have on premises of the Saudi High Commission for relief to Boznia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization.

During the month of the raid, officials in Bosnia also arrested several members of the al Qaeda network, who were plotting an attack on the United States embassy in Sarajevo. At least two of those men, including the group's leader Bensayah Belkacem, were employees of the SHC. Belkacem has been identified as a top al Qaeda lieutenant. At the time of Belkacem's arrest, authorities discovered in his apartment fake passports and a mobile telephone listing for

Abu Zubeyda, al Qaeda's then third-in-command.

The SHC's funneling of financial and logistical resources to al Qaeda was well known to senior officials in the organization, including Prince Salman, for many years prior to the September 11th Attack. In fact, an association called the "Mothers of Srebrenica and Podrinje" sent a letter to Prince Salman in September of 2000, in his capacity as head of the SHC, complaining that the organization was not applying donated funds for humanitarian purposes.

The importance of Saudi "charities," such as the SHC, to al Qaeda's phenomenal growth from a small group of radicals to a sophisticated global terrorist organization, cannot be overstated.

## TT.   Prince Salman bin Abdul Aziz al-Saud (Prince Salman)

Prince Salman bin Abdul Aziz al-Saud (Prince Salman) has been sued based on his participation in, and aiding and abetting of, a global conspiracy to strike the United States through terrorist attacks, of which the September 11th attacks were the natural, intended and foreseeable products.  The claims against Prince Salman are based on the material support he provided, both personally and through his so-called charity, the Saudi High Committee for Assistance to Bosnia and Herzegovina ("the SHC"), to Osama Bin Laden and al Qaeda.

Prince Salman has provided material support to Bin Laden and al Qaeda, personally and through the SHC, in keeping with his long history of funding Islamic extremism. In 1999, Prince Salman personally donated $400,000 to an event sponsored by the International Islamic Relief Organization ("IIRO"), the World Assembly of Muslim Youth ("WAMY") and the Al-Haramain Islamic Foundation ("Al-Haramain"), each of which, at the time he made the donations, was a known and/or suspected terrorist front.

Prince Salman also used the SHC, an organization he founded in 1993, to support al Qaeda. The SHC has been criticized for supporting Islamic extremism, and in 2001 the Bosnian Financial Police raided the SHC's headquarters in Sarajevo. The raid uncovered SHC computer hard drives with photographs of the World Trade Center towers before and after the attacks of September 11, 2001, pictures of the U.S. embassies in Kenya and Tanzania and photos of the USS Cole. Also discovered were files on pesticides and crop duster aircraft, information on making false State Department badges and photographs and maps of Washington with several government buildings marked.  About 100,000 dollars of local currency was also found along with anti-Semitic and anti-U.S. material. *Id.* After analyzing the seized documents, the Bosnian Financial Police concluded that the SHC was a terrorist front.

By mid-1993, Prince Salman knew or should have known of the threat posed by Islamic charities and the extremist activities of charities which were not compliant with charitable or Islamic zakat. In May 1993, the al-Bin charity, known in English as Benevolence International Foundation (BIF), an Islamic organization which he co-founded in the 1980s, was ostensibly shut down and banned from operating in the Kingdom of Saudi Arabia because of its active support for Islamic extremist activities.

In July 1994, Salman ordered that ten major charities be "dissolved" and "ordered to stop their activities by a director order." The charities were closed down because of "intelligence reports that the trustees of the groups were Muslim activists."

But in remarkable disregard for international law and his own personal knowledge that

Islamic charities were being used to divert funds to terrorist groups including al Qaeda, Prince Salman continued to personally direct the al-Birr Charitable Society in the Kingdom of Saudi Arabia, despite ordering its closure in 1993 for supporting Islamic extremist activities.

> Indeed, Prince Salman is currently listed on numerous charitable web sites as the chairman of al-Birr.  Al-Birr (BIF) was designated by the Department of Treasury as a Specially Designated Global Terrorist on November 19, 2002.

The SHC has channeled large amounts of money away from its purported charitable purpose and toward the support of terrorism.  In September 2000, one year before the September 11, 2001 attacks, an organization called the Mothers of Srebrenica and Podrinji alerted Prince Salman that his organization was not pursuing its putative charitable purposes.  The organization noted, for example, that none of the 200 million local dollars raised in just one day in 1995 were ever made available to the people of Bosnia and Herzegovina. Additionally, U.S. investigators are currently investigating the SHC's finances and are focusing on $41 million for which the SHC cannot or will not account.

### UU.    National Commercial Bank

The National Commercial Bank ("NCB") knowingly and intentionally provided material support to al Qaeda. Throughout the 1990's, NCB was a private commercial bank, owned by defendant Khalid Bin Mahfouz ("KBM") and other members of the Mahfouz family. KBM used his control of NCB to intentionally transfer funds to organizations supporting terrorism, including a $3 million transfer to defendant MUWAFFAQ ("Blessed Relief") FOUNDATION, for the purpose of financing al Qaeda. A 1998 bank audit of NCB confirmed that $74 million dollars had been sent to defendant IIRO, an al Qaeda front "charity" connected to defendant Osama Bin Laden's brother-in-law.  As a result of the 1998 audit, KBM was dismissed from the bank and placed under house arrest.

During testimony before the House Committee on International Relations on October 3, 2001, Vincent Cannistraro, the former chief of counter-terrorism operations for the Central Intelligence Agency, asserted that NCB had knowingly provided financial services to al Qaeda. According to Cannistraro:

> There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi Government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism.

### VV.    Prince Sultan bin Abdul Aziz Al Saud

Since 1994, Prince Sultan bin Abdul Aziz Al Saud, Sultan has provided more than six million dollars in personal and Saudi government funds to charities that raised money for, and diverted funds, equipment and personnel to, Osama bin Laden and al Qaeda. While many of those who gave money to Islamic charities may have been ignorant of the ultimate destination of their donations, Sultan was not. Not only was he the man charged by the Saudi government with preventing charitable donations from going to terrorists, but beginning in the mid-1990s, he served on a joint intelligence committee with the United States whose purpose was to share information regarding terrorist financing activities. In addition, as early as 1994, he participated in meetings at which French and American officials explicitly warned him about the terrorist financing activities of the Islamic charities he personally supported throughout the 1990s.

Despite this knowledge, Sultan personally provided millions of dollars to these very organizations that he knew to be diverting funds to Al Qaeda. It is crucial to point out that Sultan continued to support these Islamic "charities" *after* he knew that these entities were supporting al Qaeda and *after* al Qaeda had unequivocally declared its intention to attack the United States and had carried out a series of attacks against the United States.

It has been publicly known since the mid-1990s, if not well before, that Osama bin Laden and his al Qaeda terrorist network had launched an international campaign of terror directed at the United States. In July 1996, bin Laden told the British newspaper, *The Independent,* that al Qaeda terrorists had "hit their main enemy, which is the Americans." That same summer, the Committee for the Defense of Legitimate Rights (CDLR), a Saudi Islamist dissident movement affiliated with bin Laden, released Osama bin Laden's "Declaration of War" on the internet. In the statement, bin Laden declared: "My Muslim Brothers of The World: Your brothers in Palestine and in the land of the two Holy Places are calling upon your help and asking you to take part in fighting against the enemy *-your enemy and their enemy- the Americans* and the Israelis." (Emphasis added.)

The following year, bin Laden told Peter Arnett, correspondent for CNN, "We declared *jihad against the US government . . . .*" Asked about whether American civilians also were targeted, bin Laden said: "As for what you asked regarding *the American people,* they *are not exonerated from responsibility,* because they chose this government and voted for it.

In 1998, bin Laden made even more explicit his declaration of war against the United States and all Americans, wherever they happen to be. He issued *a fatwa* in which he stated: "We -- with God's help -- call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to *kill the Americans* and plunder their money wherever and whenever they find it." Osama bin Laden and other Middle Eastern terrorist leaders in attendance at the meeting agreed that "the ruling to *kill the Americans* and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it." *Id.* That same year, the al Qaeda spiritual leader, Shaykh Omar Abdel Rahman, who led the 1993 World Trade Center bombing plot, issued his own *fatwa* which called on all Muslims to kill American infidels:

> Oh, Muslims everywhere! Cut the transportation of their countries, tear it
> apart, destroy their economy, burn their companies, eliminate their
> interests, sink their ships, shoot down their planes, kill them on the sea, air,
> or land. Kill them when you find them, take them and encircle them,
> paralyze their every post. Kill those infidels.

These fatwas proved to be more than just empty, albeit virulent, threats. Throughout the 1990's, Osama bin Laden and al Qaeda carried out a series of attacks on the United States that removed any doubt about the seriousness of their intentions or the identity of their target. These attacks included the 1993 World Trade Center bombing, the 1998 bombing of two U.S. embassies in East Africa, and the 2000 attack on the USS Cole. Other unsuccessful plots included the plan to blow up the Lincoln and Holland tunnels in New York City and "Plan Bojinka," a harrowing scheme developed in the Philippines to simultaneously blow up as many as a dozen American commercial air flights over the Pacific Ocean. The plan was foiled in 1995, but there was no doubt that the terrorist threat was real and that it was directed against America.

The source of the financing for Osama bin Laden's activities became clear almost as soon as the leader of al Qaeda began carrying out terrorist attacks against the United States in the

early 1990s. Saudi Arabia had financed Islamic resistance fighters in Afghanistan. With the fall of the Soviet Union, Saudi money previously sent by wealthy Saudi businessmen and members of the royal family to *mujahideen* in Afghanistan, was diverted to anti-American terrorist activities coordinated by bin Laden and other Islamic extremists.

The diversion of money from charities to terrorist groups was well known and publicized in the mid-1990's.  As early as 1991, King Fahd of Saudi Arabia urged wealthy Saudis to "be more careful in their charitable donations."

In 1993, in response to the first bombing of the World Trade Center, the Saudi government issued a ban on private charitable contributions sent overseas without the approval of the Saudi government.  In 1994, the Saudi Supreme Council of Islamic Affairs, with Sultan as its chair, was established to monitor and approve Islamic charitable giving within Saudi Arabia and abroad.  The purpose of this ban on donations abroad was to prevent Saudi charitable donations from being used to support terrorism.  Thus, Sultan was charged with the task of preventing the diversion of Saudi charitable donations to terrorists.

He was not left to figure out on his own how the money was being diverted. Between 1994 and September 11, 2001, Sultan and/or his government received at least three official warnings from the United States and France regarding the used of charitable donations to Islamic charities as conduits for supporting terrorism. In November, 1994, Charles Pasqua, then the French Interior Minister, made an official visit to Saudi Arabia where he met with Sultan and other officials of the Saudi government. As described by Mr. Pasqua:

> In the course of the meetings with my Saudi counterparts, I raised the question of financial aid furnished by Saudi charitable organizations enjoying state support, in particular the World Islamic League [Muslim World League], to Islamist movements or terrorist groups. I specifically warned my counterparts about this situation and officially requested that they put an end to it....

In June, 1999, the Saudi government received a similar visit from a U.S. delegation, sent specifically to warn the Saudis about the ways in which significant funds were being raised in their country to finance al Qaeda's terrorist attacks.  In October, 1999, Sultan visited the United States for follow-up discussions with senior American officials on defense and terrorist financing issues. Just days before Sultan visited the White House, *USA Today* reported that "[more than a year after the U.S. embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to banks accounts linked to indicted terrorist Osama bin Laden." The article explained that money was "deposited into the accounts of Islamic charities, including Islamic Relief and Blessed Relief, which serve as fronts for bin Laden." The article noted that "Secretary of State Madeleine Albright is expected to raise the issue with Prince Sultan during his visit to Washington next week."

Sultan also got information about terrorist financing directly from U.S. intelligence. Beginning in 1997, he participated in a joint initiative with the United States to share intelligence information on terrorist financing and al Qaeda.  Thus, in the mid-to-late 1990s, during the period when at Qaeda was planning major attacks against the United States, Sultan personally received U.S. intelligence information about Osama bin Laden's use of money from Islamic charities and front companies to finance his sprawling terrorist network.

Through his discussions and briefings with U.S. and other foreign government officials

during this period, Sultan knew or should have known that the Islamic charities to which he personally donated millions of dollars -- The Muslim World League, the International Islamic Relief Organization ("IIRO"), Al-Haramain International Islamic Foundation, the World Assembly of Muslim Youth ("WAMY"), and the Saudi Joint Relief Committee ("SJRC") -- all were major financial conduits for bin Laden and al Qaeda. The funding provided by these and other charities was critical to al Qaeda. The Independent Task Force Sponsored by the Council on Foreign Relations concluded in its 2002 Report on Terrorism Financing that "the most important source of al Qaeda's money is its continuing fundraising efforts." Moreover, the report found that individuals and charities in Saudi Arabia have been "the most important source of funds for al Qaeda."

MWL is a Saudi government-funded charity. The organization reportedly worked directly with bin Laden; its offices around the world served in the early days of al Qaeda to attract and train "holy warriors." The Rabita Trust, a Pakistan-based branch of MWL, has been designated by the U.S. Treasury Department as a "Specially Designated Global Terrorist Entity."

Al-Haramain has been designated as a terrorist entity by the United States Treasury Department. Al-Haramain played a major role in funding terrorism through its Bosnian office, which served as a crucial financial hub of Osama bin Laden's international financial and logistical support network. In addition to providing funding to al Qaeda, Al-Haramain employees helped coordinate the 1998 bombings of two U.S. embassies in Africa. More recently, Al-Haramain helped plan the 2002 bombing of a nightclub in Bali, Indonesia.

WAMY has been implicated as the distributor of terrorist training manuals, including those found in the possession of the 1993 World Trade Center bombing conspirators. WAMY was identified by the FBI as a "suspected terrorist organization" as early as 1996.

IIRO, a subsidiary of MWL, has been central to the financing of terrorist training activity around the globe for many years. Its office in the Philippines was headed by Osama bin Laden's brother-in-law, Mohammed Jamal Khalifa. IIRO was involved in financing the 1993 World Trade Center bombing and the 1998 African embassy bombings, as well as the unsuccessful plots to destroy the Lincoln Tunnel and the Brooklyn Bridge, to assassinate former President Bill Clinton and Pope John Paul II, and to blow up twelve American airplanes over the Pacific. In 1996, Western intelligence sources indicated that IIRO was a major clearinghouse for millions of dollars in Saudi financial aid to extremists.

As demonstrated above, the involvement of these particular charities in financing bin Laden and his terrorist agenda was hardly a secret. And yet, throughout the mid- and late 1990's, Sultan made repeated, substantial contributions to the very charities that had been identified as conduits for terrorist financing.

Sultan provided funding to IIRO, Al-Haramain, MWL, and WAMY. Public announcements concerning these donations, at least some of which were made personally, demonstrate the substantial size of the contributions that Sultan made to these organizations. Thus, in 1996, *The Muslim World,* an English-language weekly newspaper put out by MWL, reported that Sultan donated SRl ,000,000 to the IIRO in two installments. The paper reported that the contributions were part of Sultan's annual pledge of SR1,000,000 to the IIRO. IIRO secretary-general Fareed Qurashi thanked Sultan for his "continuous support to the organization." Sultan continued these sizable annual donations from at least 1997-1999. And in July 1999, Sultan donated SR5 million to the Saudi Joint Relief Committee of Kosovar Refugees.

## XX.    Soliman H.S. Al-Buthe

Soliman H.S. Al-Buthe, through his role at Al Haramain Islamic Foundation, Inc. ("AHIF"), provided material support to al Qaeda. AHIF, based in Oregon, was the U.S. branch of Al Haramain Islamic Foundation ("Al Haramain"), a global entity based in Saudi Arabia. The Riyadh office of Al Haramain was — until it was dissolved by the Saudi government amid suspicions that it was a terrorist front that had provided financing and other support to al Qaeda and Osama bin Laden — the headquarters of a vast network of offices and representatives around the world. (At least eleven of those branches, including AHIF, have been designated by the U.S. government as global sponsors of terrorism and, as noted above, the main office has been closed by the Saudi government).  Al-Buthe has also been designated a global sponsor of terrorism by the U.S. Government.

Al Haramain is a charity front that has exploited its nonprofit status for the benefit of Osama bin Laden and his terrorist network al Qaeda, in furtherance of international terrorism

It has long acted as a fully integrated component of al Qaeda's logistical and financial support infrastructure, and provided material support and resources to al Qaeda and affiliated Foreign Terrorist Organizations.

Moreover, AHIF is specifically linked to Al Qaeda operations and was one and the same as al-Haramain's headquarters in Riyadh, Saudi Arabia.

Al-Buthe was one of the founders of AHIF. He carried large sums in travelers' checks back and forth between AHIF' s headquarters in Ashland, Oregon, and Saudi Arabia.

## YY.    Faisal Islamic Bank-Sudan (FIBS)

FIBS was founded in 1977, with the support of the National Islamic Front (NIF), the radical Islamist party headed by Hassan al Turabi which has dominated Sudanese politics for several decades and controlled the government of Sudan since 1989.  Members of the Muslim Brotherhood and NIF occupy prominent positions on the Board of Directors of FIBS.  In addition, the NIF has granted FIBS privileges which were denied other banks, including full tax exemption on assets, profits, wages and pensions, as well as guarantees against confiscation or nationalization.  Moreover, the bank has supplied loans to the NIF and to its prominent members. Through this association, the NIF became the best financed political party in the Sudan.  Stated simply, FIBS is the financial and banking arm of the NIF.

In 1989, the NIF, under the leadership of al Turabi, invited Osama bin Laden to move the entire al Qaeda organization to Sudan.  Bin Laden accepted the invitation, and transplanted his nascent terrorist organization to Sudan in 1991.  Bin Laden and the organization remained in Sudan until 1996, when international pressure forced the NIF to request that bin Laden leave Sudan for Afghanistan.  During the five years that al Qaeda resided in Sudan, the organization maintained a symbiotic relationship with the NIF.  Under the arrangement, bin Laden invested heavily in the Sudan, performed infrastructure improvements for the NIF, and supplied al Qaeda fighters to assist the NIF in an ongoing conflict with Christians in southern Sudan.  In exchange, al Qaeda enjoyed the unqualified protection and support of the NIF regime.  The protection, support and safehaven provided by the NIF allowed al Qaeda to grow from a small organization with less than 20 dedicated members to a global terrorist empire.  In addition, while in Sudan, al

Qaeda established several businesses in partnership with the NIF, to fund al Qaeda's campaign to attack America.

Absent the support and safehaven provided by the NIF during this time, al Qaeda would not have possessed the resources and knowledge necessary to plan, coordinate and carry out the September 11th Attack.

Not surprisingly given the close ideological, business, political and personal relationships between the NIF and al Qaeda, FIBS has long been one of al Qaeda's preferred banks.  In fact, Al Qaeda was so confident in the absolute protection of the NIF that it openly maintained accounts at FIBS.  In this regard, former al Qaeda financial officer Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that FIBS in Khartoum held bank accounts for al Qaeda operatives during bin Laden's years of operation in Sudan:

Q.      Where were the accounts [of al Qaeda] held?  In what countries?

A.      (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].

Q.      Is that also in Khartoum?

A.      Yes.


Given FIBS's close relationship with the NIF, and the NIF's direct role in managing the bank's operations, FIBS was necessarily aware that al Qaeda was using the accounts at FIBS to build a global terrorist empire in Sudan, and to transfer funds to al Aida operatives throughout the World.  Indeed, the NIF invited bin Laden to Sudan precisely *because* bin Laden was a prominent Islamic extremist.  As the National Commission on Terrorist Attacks Upon the United States (the 9/11 Commission) explained in its final report:  "By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum."  During sworn testimony before the 9/11 Commission, Richard Clarke, the former White House counter-terrorism coordinator, elaborated on the relationship between the NIF and al Qaeda, emphasizing that: "Under Turabi, Sudan had become a safe haven for many terrorist groups, but bin Ladin had special status. He funded many development programs such as roads and dined often with Turabi and his family. Turabi and bin Ladin were ideological brethren."   By virtue of the relationship between the NIF and al Qaeda, and the NIF's direct role in the management and operation of FIBS, there can be no credible dispute that FIBS knew that the accounts it maintained for bin Laden and al Qaeda were being used to support al Qaeda's global jihad.

In addition to maintaining accounts for al Qaeda, FIBS partnered with al Qaeda in the establishment of the al Shamal Bank of the Sudan.  According to the U.S. government, Osama bin Laden personally contributed fifty million U.S. dollars ($50,000,000.00) to capitalize al Shamal.  "[Osama bin Laden] in concert with National Islamic Front leaders, built a network of businesses, including an Islamic Bank Al Shamal."  FIBS was a founding member of the Al Shamal Islamic Bank in Sudan and one of the bank's principal shareholders.   The other co-founders of the bank included the government of the Northern State of Sudan, which was under the control of the NIF and Hassan Al Turabi, and co-defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development.  Main shareholders included the following co-defendants: the predecessor of the Benevolence International Foundation, Al Baraka for Investment and Development, and Sheik Saleh Abdullah Kamel.

60573

Al Qaeda, the NIF and FIBS established al Shamal Bank to provide revenue to al Qaeda and the NIF, and to afford al Qaeda with convenient access to the global banking system. Indeed, Al Shamal Bank regularly provided financial and account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank.  Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts.  Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

In his testimony during the African Embassy bombings trial, Jamal al Fadl confirmed that bin Laden financed the al Qaeda network in part through the Al Shamal Bank:

Q.      When you worked for Osama bin Laden in the Sudan, how much were you paid?

A.      $1,200 a month.

Q.      For how long did you work for him [Osama bin Laden]?

A.      Almost two years.

Q.      What Banks did he keep his money at?

A.      Bank Al Shamar.

[In responding "Bank Al Shamar," Al-Fadl was referring to Al Shamal Islamic Bank.]

Jamal Al-Fadl also testified that he transferred one hundred thousand U.S. dollars ($100,000.00) on Osama bin Laden's behalf to an al Qaeda representative in Jordan.   In the same trial, another former al Qaeda operative stated that the Al Shamal Islamic Bank was used for operational purposes.  The witness was wired two hundred fifty thousand U.S. dollars ($250,000.00) via the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden.

The General Manager of Al Shamal Islamic Bank acknowledged in a September 2001 press release that Osama bin Laden had two accounts in the bank.  The accounts were opened on March 30, 1992 for the company Al-Hijrah for Construction and Development Ltd.  According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A third account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.   This company, according to the U.S. State Department, was founded by prominent NIF members and exercises a monopoly over major agricultural exports from the Sudan.

Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee stated that Al Shamal Islamic Bank operations continue and that there is evidence that Osama bin Laden "remains the leading shareholder of the bank" through trustees and may still use the bank's facilities.

## YY.   Khalid bin Mahfouz

Through 1999 Khalid bin Mahfouz ("KBM") channeled $3 million to al Qaeda

front Muwaffaq a/k/a Blessed Relief Foundation and $74 million to al Qaeda front IIRO.  KBM channeled that $77 million to al Qaeda fronts through the National Commercial Bank ("NCB"), which KBM directed and controlled from 1986 to 1999 as its President, CEO, and majority shareholder personally owning more than 50% of NCB's capital.  Plaintiffs allege that NCB – controlled, owned and directed by KBM himself – was al Qaeda's financial arm, operating as a financial conduit for Osama Bin Laden's operations.  Based upon the October 2001 Congressional testimony of a former CIA counter-terrorism expert, that the financial support KBM channeled through NCB enabled "al Qaeda [to] fund its worldwide network of cells and affiliated groups. . . .  There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel."

KBM was dismissed from the NCB in 1999 soon after the release of the NCB's audit report and placed under house arrest"  That NCB audit report reflects a $3 million transfer to Muwaffaq.  Plaintiffs respectfully submit that KBM's arrest, directly after that $3 million transfer revealed by the 1999 NCB audit, supports the inference that KBM was arrested because he knowingly and intentionally gave financial support to al Qaeda front Muwaffaq.

Plaintiffs further allege that Muwaffaq is an al Qaeda front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden.  Plaintiffs further allege that Muwaffaq-Blessed Relief was endowed by Defendant KBM.  Plaintiffs respectfully submit that the *specific facts* that $3 million was channeled through NCB – which KBM controlled, owned and directed himself – to Muwaffaq – which KBM endowed himself – support the inference that this $3 million transfer was knowingly and intentionally made by KBM to al Qaeda front Muwaffaq.

Plaintiffs further allege that the $3 million KBM-to-Muwaffaq transfer, revealed by the 1999 NCB audit, occurred after Osama Bin Laden in 1995 specifically identified Muwaffaq (a/k/a Blessed Relief) as a source of funding *within* Osama's "support network." ("In a 1995 interview, Osama Bin Laden identified Blessed Relief's place in his support network. . .").  This Court may take judicial notice that Osama Bin Laden's "support network" *is* al Qaeda, and thus that Osama Bin Laden told the world in 1995 that *Muwaffaq is al Qaeda.*  Hence, when KBM channeled $3 million to Muwaffaq in 1998, KBM directly and knowingly provided $3 million to al Qaeda itself.

Plaintiffs further allege that the $3 million KBM-to-Muwaffaq transfer, revealed in the 1999 NCB audit, occurred after Osama Bin Laden issued his 1996 *fatwah* declaring *jihad* on Americans, (bin Laden declaring:  "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it. . . .");  Hence, the $3 million KBM-to-Muwaffaq transfer occurred after KBM knew that al Qaeda was waging war on America.

Likewise, plaintiffs allege that the $74 million KBM-to-IIRO transfer, revealed in the 1999 NCB audit, occurred after KBM knew that al Qaeda declared war on America in 1996.

And lest there be any doubt that the $74 million KBM-to-IIRO transfer directly supported terror attacks on America, plaintiffs allege that IIRO knowingly and intentionally provided al Qaeda and the Taliban $60 million to fund terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America.  Plaintiffs further allege that IIRO bankrolled al Qaeda attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999

60573

plot to destroy U.S. Consulates in India, and the September 11 attacks. Plaintiffs further allege that less than thirty percent (30%) of IIRO funds go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaeda. Based on these pleaded facts, plaintiffs are entitled to the inference that a substantial portion of the $74 million KBM-to-IIRO transfer was used in al Qaeda attacks on America.

## ZZ.   Dubai Islamic Bank

Dubai Islamic Bank has long been associated with laundering al Qaeda money. DIB was founded in 1975, making it the longest-running bank operating under Shar'ia law.

DIB's involvement with terrorist financing began in the early 1990s, when it was a major shareholder in the Bank of Credit and Commerce International ("BCCI"), which was named in a 1992 U.S. Senate Report as a money laundering operation used to sponsor terrorism.

In 1999, officials from the State Department, Treasury Department and National Security Council visited Dubai to demand that the government take steps to end its lax supervision of DIB, which had allowed itself to be used by Osama bin Laden to launder money. According to a July 8, 1999 State Department press conference, the Bank's involvement with terrorist money laundering was the key concern. Specifically, the federal government possessed evidence demonstrating that Osama bin Ladin and al Qaeda were using the Dubai Islamic Bank to finance terrorist attacks against American interests. The same day as the State Department briefing, the *New York Times* reported that the Central Intelligence Agency had obtained evidence showing that bin Ladin had been allowed to funnel money through the Dubai Islamic Bank. According to the *Times*, "United States intelligence officials said they had evidence that Mr. bin Laden had a relationship with the bank, which they believed had been arranged with the approval of the officials who control the bank."

Beyond these reports of explicit approval of bin Laden's use of DIB for money laundering, which plaintiffs expect to further substantiate through the discovery process, a subsequent NATO Parliamentary Assembly analysis confirmed that al Qaeda had used Dubai Islamic Bank to fund the bombings of the American embassies in Tanzania and Kenya. In its November 5, 2004 final general report titled, "The economic consequences of September 11, 2001 and the economic dimension of anti-terrorism," the Assembly expanded upon its draft recommendations as referenced in the various complaints:

> It is now apparent that institutions located in the United Arab Emirates, the region's most developed and lightly regulated financial center, played a key role in moving resources to those who planned and carried out the September 11th attacks. There has subsequently been much discussion about a traditional trust based means of transferring value; the al Hawala transaction system, which allows clients to move funds internationally without leaving any traces of the operation. The Al Barakaat Hawala operating out of Somalia and the UAE apparently helped to move funds to the terrorists who carried out the New York and Washington attacks. Al Qaeda had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania.

Dubai Islamic Bank was directly involved in financing the September 11 attacks. Mustafa Ahmed al-Hisawi (Sheikh Saeed al Masri), bin Ladin's chief financial officer while in the Sudan, lived in the Emirates from June 2001 until September 11, 2001, when he fled for Karachi, Pakistan.  American authorities have identified at least $500,000 that flowed from his accounts to all nineteen hijackers, including hundreds of thousands of dollars in money transfers from Dubai Islamic Bank (and its affiliate and correspondent, Standard Chartered Bank) to two of the hijackers (Mohammed Atta and Marwan al-Shehhi) since at least June 2000, to pay for their flight training and expenses.

Finally, just two days before the September 11 attacks, hijackers Atta, al-Shehhi and Walid al-Sheri transferred back $15,000 in "surplus funds" back to al-Hisawi.  All these transactions were carried out in violation of international standards adopted to prevent money laundering, including the 40 Recommendations on Money Laundering adopted in 1990 by the international Financial Action Task Force, of which the UAE is a member.

The hijackers also employed Dubai Islamic Bank to donate to Muslim charities.  For example, an agreement for automatic withdrawal dated July 25, 1999, indicates that hijacker Marwan al Shehhi donated money to Darbar Charity.  The money was transferred from Hong Kong Shanghai Bank account no. 61052114001 into Dubai Islamic Bank account no. 1520449474101.

Shortly after the 9/11 Attack, the Central Bank of the UAE froze the accounts of various persons and organizations suspected of ties with the al Qaeda Movement, including Dubai Islamic Bank, mirroring the September 25, 2001 regulatory alert issued by Luxembourg authorities announcing the Bank's ties to Osama bin Ladin.

Dubai Islamic Bank has been a key shareholder in other banks well-known for their involvement in laundering money on behalf of the Enterprise, including the Bank of Credit and Commerce International (BCCI), Tadamon Islamic Bank and Baraka Islamic Bank, an affiliate of Al Baraka Bank.

Despite all these warnings, Dubai Islamic Bank continued to knowingly provided financial services and other forms of material support to al Qaeda, while disregarding warnings and refusing to adhere to even minimal banking industry standards designed to thwart the support of terrorist networks like the al Qaeda Movement through anti-terrorist and money laundering safeguards and "know your customer" regulations.