**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case Nos. 03-CV-5738 and 03-CV-9849 (S.D.N.Y.)

*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)

*Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)

*Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)

*New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)

*World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT**
**YESLAM BINLADIN'S**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINTS**</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT REGARDING SWISS LAW ....................................................1

INTRODUCTION ........................................................................................................................2

I.   THE OPERATIVE COMPLAINTS ARE DEVOID OF ANY SUBSTANTIVE
     ALLEGATIONS REGARDING YESLAM BINLADIN ......................................................3

     A.   BECAUSE PLAINTIFFS VIOLATED CASE MANAGEMENT ORDER #2 THE COURT
          SHOULD DISREGARD THEIR SEPTEMBER 30, 2005 FILINGS .............................................3

     B.   THE ORIGINAL AMENDED COMPLAINTS CONTAINED NO FACTUAL
          ALLEGATIONS AGAINST YESLAM BINLADIN ...................................................................6

II.  THE RICO STATEMENTS AND MORE DEFINITE STATEMENT IN BURNETT
     DO NOT CURE THE DEFICIENCIES IN PLAINTIFFS' ORIGINAL
     PLEADINGS ......................................................................................................................7

     A.   ALLEGATIONS REGARDING PAST OR CURRENT INVESTIGATIONS .................................8
     B.   ALLEGATIONS REGARDING BANK ACCOUNTS ...............................................................10
     C.   ALLEGED DONATIONS TO ISLAMIC ORGANIZATIONS .....................................................12
     D.   ALLEGED CORPORATE ROLES .......................................................................................12
     E.   OTHER CONCLUSORY "FACTUAL" ALLEGATIONS ..........................................................13

ARGUMENT ..............................................................................................................................14

I.   THIS COURT LACKS PERSONAL JURISDICTION OVER YESLAM
     BINLADIN .......................................................................................................................14

     A.   PLAINTIFFS HAVE FAILED TO ALLEGE MINIMUM CONTACTS WITH THE UNITED
          STATES .........................................................................................................................14

     B.   PLAINTIFFS CANNOT ESTABLISH PERSONAL JURISDICTION ON A CONSPIRACY
          THEORY ........................................................................................................................16

     C.   PLAINTIFFS FAIL TO ALLEGE THAT YESLAM BINLADIN "PURPOSEFULLY
          DIRECTED" HIS CONDUCT AT THE UNITED STATES .......................................................17

     D.   PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY ...............................22

II.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST YESLAM
     BINLADIN .......................................................................................................................23

     A.   PLAINTIFFS' ALLEGATIONS AGAINST YESLAM BINLADIN DO NOT STATE A
          CLAIM UNDER THE ANTI-TERRORISM ACT (ATA) .........................................................23

     B.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER RICO, THE ALIEN TORT
          CLAIMS ACT, THE TORTURE VICTIM PROTECTION ACT, OR ANY STATE LAW
          CAUSE OF ACTION .......................................................................................................24

CONCLUSION ...........................................................................................................................25

## TABLE OF AUTHORITIES

*Allojet PLC v. Vantage Associates*,
    No. 04 Civ. 05223, 2005 U.S. Dist. LEXIS 4006 (S.D.N.Y. Mar. 15, 2005) ..........................18

*Burnett v. Al Baraka Investment & Development Corp. (Burnett I)*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ..........................................................................................24

*First Capital Asset Management, Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002) ....................................................................................16

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................................................23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ...............................................................................................................14

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ...............................................................................................................23

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ...............................................................................................................22

*Lehigh Valley Indus. v. Birenbaum*,
    527 F.2d 87 (2d Cir. 1975) .....................................................................................................16

*Qadi v. Public Prosecutor's Dept. of the Swiss Confederation*,
    Case No. BK_B 094/04, Court of Appeal, Swiss Federal Court
    (Sept. 16, 2004)..........................................................................................................................9

*Reeves v. Ernst & Young*,
    507 U.S. 170 (1993) ...............................................................................................................25

*In re Terrorist Attacks on September 11, 2001*,
    349 F. Supp. 2d 765 (*"Terrorist Attacks I"*) ................................................................. *passim*

*In re Terrorist Attacks on September 11, 2001*,
    03 MDL No. 1570, slip op. (S.D.N.Y. Sept. 21, 2005)
    (*"Terrorist Attacks  II"*) ...................................................................................15, 21, 23, 24, 25

## STATUTES

18 U.S.C. §§ 1962(a), (c), (d) (2000)........................................................................................24

18 U.S.C. §2333 (2000) ............................................................................................................23

18 U.S.C.A. 2339A (West 2000 & Supp. 2005)........................................................................24

Pub. L. 107-56 § 805(a)(1) (Oct. 26, 2001) ..............................................................................24

Private International Law of Switzerland (PIL),
   Art. 1 § 1 ........................................................................................................................1
   Art. 1 § 2 ........................................................................................................................1
   Art. 129 § 1 ....................................................................................................................1

## **<u>FEDERAL RULES</u>**

Fed R. Civ. P. 10 ..................................................................................................................4

Fed R. Civ. P. 12(b)(2) .......................................................................................................14

Fed R. Civ. P. 12(b)(6) .......................................................................................................14

## PRELIMINARY STATEMENT REGARDING SWISS LAW

### *Pursuant To Swiss Law This Court Lacks Jurisdiction Over The Subject Matter Of This Case And The Person Of Yeslam Binladin*

Yeslam Binladin, a half-brother of Osama Bin Laden ("OBL"), is a citizen of Switzerland, where he has lived since approximately 1985.  Affidavit of Yeslam Binladin ¶ 4 ("Yeslam Binladin Aff.") (attached as Exhibit A).  As such, under Swiss law the only court with jurisdiction over a civil suit against him is the Tribunal of First Instance in Geneva, Switzerland.  Swiss law requires him to advance an objection to this Court's jurisdiction in order to preserve any defenses to potential enforcement.

The Private International Law of Switzerland ("PIL") governs the jurisdiction and rules of decision for Swiss judicial and administrative authorities in international matters.  Article 1 § 1 PIL.  While certain international treaties, such as the Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, take precedence over the PIL rules, Article 1 § 2 PIL, the United States is not a party to any such treaty.  The language of the PIL thus controls and dictates that "[l]awsuits based on unlawful acts are subject to the jurisdiction of the Swiss courts at the domicile of the defendant or, if he or she has none, at the place of his or her habitual residence or business establishment."  Article 129 § 1 PIL. Accordingly, Swiss law guarantees to Yeslam Binladin the right to have any civil claim against him brought in the court at his place of domicile, in this case the Tribunal of First Instance of Geneva, Switzerland, and to challenge and deny the jurisdiction of any United States court over him.  To preserve this right, Swiss authorities will refuse to recognize or enforce any decision or judgment that is rendered by any other court.

For this reason, Yeslam Binladin expressly challenges and denies the jurisdiction of the courts of the United States over his person.

## INTRODUCTION

Like several other Defendants this Court has already dismissed, *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 822 ("*Terrorist Attacks I*") (dismissing Bakr, Omar and Tariq Binladin from *Burnett* case), Yeslam Binladin is in this case by virtue of his last name, and nothing more.  Yeslam Binladin is one of the 54 children of Mohammad Awad Binladin, but he and his half-brother Osama have different mothers and grew up in different households.  Yeslam has only met Osama in person approximately a half-dozen times in his entire life and they have had no contact in more than 20 years.  *See* Yeslam Binladin Aff. ¶¶ 1, 3.  Yeslam Binladin has done nothing to support – and, in fact, he has repeatedly and publicly denounced – the al Qaeda terrorist organization and the tragic terrorist attacks of September 11, 2001.  Yeslam Binladin is being sued here only because he is a half-brother of Osama who, long after Yeslam's last contact with him, became a reviled terrorist.  That is not enough to avoid dismissal.

This Court does not have personal jurisdiction over Yeslam Binladin.  Yeslam Binladin has not been in the United States in almost 25 years, and he lacks the kind of contacts with the United States that would subject him to general jurisdiction.  The allegations against him, stripped of rhetoric and inflammatory adjectives, are also not sufficient to support specific jurisdiction.  Indeed, the Complaints are devoid of any specific factual allegations that Yeslam Binladin ever knowingly supported terrorist activities, directly or indirectly, let alone terrorist activities directed at the United States.  Plaintiffs rely on nothing more than his undeniable blood relationship to OBL and allegations that governmental authorities "investigated" Yeslam Binladin, as well as bank accounts and businesses with which he was allegedly affiliated.  Significantly, not one of those investigations has resulted in any accounts being frozen, any assets being seized, or any charges being brought against Yeslam Binladin.  There are thus simply no facts from which this Court could infer that Yeslam Binladin directed his conduct at

2

the United States or supported in any way the people behind the September 11 attacks.

Accordingly, Yeslam Binladin should be dismissed from this litigation.

## I.     THE OPERATIVE COMPLAINTS ARE DEVOID OF ANY SUBSTANTIVE ALLEGATIONS REGARDING YESLAM BINLADIN

### A.     Because Plaintiffs Violated Case Management Order #2 The Court Should Disregard Their September 30, 2005 Filings

As a preliminary matter, although paragraph 13 of Case Management Order #2 ("CMO #2") required each of the Plaintiffs to file an amended Complaint that included all previous amendments by July 31,[1] only the *Ashton* Plaintiffs did so (and Yeslam Binladin is not a Defendant in the *Ashton* action).  The other Plaintiffs groups either re-filed their previous Complaints purporting to attach and incorporate by reference scores of More Definite Statements ("MDSs") and purported RICO Statements, or filed purported "Notices of Consolidation of Pleadings" listing all previously filed documents that they now deem to be part of their Complaints.

These new "pleadings" are an end-run around both CMO #2 and the Court's prior order holding that RICO Statements, other than those filed in the *Federal Insurance* case, are not considered amendments to the Complaint.  *See* CMO #2 ¶ 14; Endorsed Letter, Aug. 22, 2005 (MDL 1570 Docket #1144).[2]  Contrary to the clear purposes envisioned by CMO #2, the new "pleadings" do not streamline the allegations or even organize them in any fashion that would assist Defendants (or this Court) in understanding or responding to the claims against them. Instead, they simply attach or list dozens of documents, most of which the Court has already

---

[1] The Court subsequently extended this deadline to September 30, 2005.  *See* Endorsed Letter, July 27, 2005 (MDL 1570 Docket #1073).

[2] Although ¶ 12 of CMO #2 provides that under certain circumstances a MDS will be deemed an amendment to the complaint, that provision does not qualify or limit Plaintiffs' obligation under ¶ 13 to include all such statements in a proper amended complaint on or before September 30, 2005.  Therefore, even if the *Burnett*

ruled are not to be considered amendments to the Complaint, and announce unilaterally that now they are.

Making matters worse, the purportedly incorporated RICO Statements do not, themselves, comply with the Court's standing order on RICO Statements.  They contain lengthy, boiler-plate language, with only the Defendants' names changed, laundry lists of alleged predicate acts, with no attempt to tie the statutory cites to any factual allegations,[3] and extensive narrative factual allegations, often running into dozens of pages, without so much as a paragraph number separating disparate factual allegations.[4]  Any pretense that such Statements are now part of the amended Complaints would be a clear violation of Rule 10 of the Federal Rules of Civil Procedure, which requires that "all averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances."  Fed. R. Civ. P. 10.

Moreover, some RICO Statements contain footnotes purporting to incorporate by reference Statements filed against other Defendants, but with no specification of how or why

_____

(continued…)

MDS relating to Yeslam Binladin fulfilled the requirements of ¶ 12, the *Burnett* Plaintiffs' failure to amend their complaint to reflect the allegations made in it render that Statement a nullity.

   [3] The Court's Instructions for Filing RICO Statements ("RICO Instructions") require, *inter alia*, that Plaintiffs "[p]rovide the dates of, the participants in, and a description of the facts surrounding the predicate acts." RICO Instructions ¶ 5(b).  Although as many as 20 predicate acts are listed in the various RICO Statements, Plaintiffs make no attempt to identify which facts in their narratives of alleged "misconduct" relate to which predicate acts, or to identify the dates or participants surrounding any particular predicate act.  Plaintiffs also fail to comply with the requirement in the RICO Instructions that, for claims predicated on wire or mail fraud, "the circumstances constituting fraud . . . shall be stated with particularity."  Although both mail and wire fraud are in the laundry list of predicate acts, Plaintiffs make no effort to "[i]dentify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made," as required by this Court.  *See* RICO Instructions, http://www.nysd.uscourts.gov/Individual_Practices/rico.pdf (last visited October 28, 2005)

   [4] *See, e.g.*, *Fed. Ins.* RICO Stmt. (Yeslam) Ex. A (containing seven pages of single-spaced, unnumbered narrative); *Euro Brokers* RICO Stmt. (Bakr, et al.) Ex. A (containing 24 pages of such narrative); *O'Neill* RICO Stmt. (DMI) Ex. A. (containing over 30 pages of such narrative).

such other Statements apply to the Defendant in question.[5]  In many cases, allegations do not appear in the RICO Statement directed to a particular Defendant, but are scattered throughout the RICO Statements filed against other unrelated Defendants without even so much as a cross-reference.[6]  Many RICO Statements rely extensively on what appear to be quotations from media articles, books and other documents, but generally without any identification of the source.[7] When the source can be identified, it often becomes clear that key contextual language has been omitted from the quotes, or words have been added, so as to change the meaning of the original source in ways that can only be characterized as intentionally misleading.

Plaintiffs knew exactly what the goals of CMO #2 were and what it required, but chose to ignore it.  Only three months ago, the *Federal Insurance* Plaintiffs, writing on behalf of all Plaintiffs, acknowledged that "[t]he clear objective of including the . . . deadline for filing amended complaints in CMO2 was to ensure that any and all additional allegations contained in More Definite Statements or other filings would be incorporated into a single pleading in each of the cases."  Letter from Sean P. Carter to The Honorable Richard C. Casey, July 15, 2005.  Yet only the *Ashton* Plaintiffs (who do not name Yeslam) fulfilled that objective and CMO #2's requirement.  Because the other Plaintiffs have intentionally flouted the obligations set forth in CMO #2, the Court should disregard the new "pleadings," as well as the allegations in RICO Statements and MDSs that, under CMO #2, have no continuing effect because they were not included in a single, consolidated amended Complaint that satisfies the basic rules of pleading set forth in the Federal Rules.[8]

---

[5] *See, e.g.*, *Euro* RICO Stmt. (Saleh Kamel) at 1 n.1.

[6] *See, e.g.*, *Euro* RICO Stmt. (WAMY) Ex. A. at 4-5, 11, 16-20, 20-24.

[7] *See, e.g.*, *WTC* RICO Stmt. (Saleh Kamel) Ex. A at 10-11, 15.

[8] Plaintiffs in the *Euro Brokers*, *Federal Insurance*, and *WTC* actions have filed RICO Statements, and the

**B.      The Original Amended Complaints Contained No Factual Allegations Against Yeslam Binladin**

Yeslam Binladin is named as a Defendant in the Complaints filed by Plaintiffs in *Burnett, Continental Casualty, Euro Brokers, Federal Insurance, New York Marine,* and *World Trade Center.*[9]   The *Euro Brokers* and *Federal Insurance* Complaints did not contain a single allegation relating to Yeslam Binladin.  The *New York Marine* Complaint contained the same conclusory boilerplate allegation that this Court has repeatedly found is not sufficient to state a claim, much less establish personal jurisdiction.[10]  The *Burnett* and *Continental Casualty* Complaints alleged that Yeslam was on the board of directors of the Mohammad Binladin Organization ("MBO"), but failed to identify any act he supposedly took in that capacity.[11]   The *World Trade Center* Complaint made the same allegation as to MBO and also alleged that Yeslam was the head of Saudi Investment Company ("SICO"), which it (inaccurately) characterized as "SBG's European investment arm," but it also alleged no conduct in that capacity.[12]  That Complaint also alleged (falsely) that Yeslam maintained a residence in Los Angeles, California until 2002; in fact, he has not been in the United States since 1981.[13]   None

---

(continued…)

*Burnett* Plaintiffs have filed a MDS, as to Yeslam Binladin.  Although Defendant Yeslam Binladin will address in Part II the allegations contained in these Statements and MDSs, he does not by so doing waive this challenge to the adequacy of Plaintiffs' new "pleadings" or to the continuing viability of RICO Statements and MDSs, all of which, save those in the *Federal Insurance* action, should be disregarded by this Court.

[9] Yeslam was also named as a Defendant in *Ashton* and *Salvo,* but both Complaints were voluntarily dismissed as to him on December 6, 2004.  *See* Order of Dismissal, December 6, 2004 (*Ashton* Docket #219).  The *Salvo* Complaint had never been served.

[10] The sum total of the allegations in the *New York Marine* First Amended Complaint ("*NY Marine* 1AC") is that Yeslam has "aided and abetted, conspired with, and provided material support and resources to, Defendant al Qaida and/or affiliated FTO's, associations, organizations or persons."  *NY Marine* 1AC ¶ 45.  *See also Terrorist Attacks I,* 349 F. Supp. 2d at 813-14.

[11]*Burnett* Third Amended Complaint ("*Burnett* 3AC") ¶ 325; *Contin. Cas.* ¶ 345.

[12] *WTC* ¶ 657.

[13] *WTC* ¶ 657.  As set forth in the Affidavit of Yeslam Binladin, he has not been to the United States since 1981, and he has never lived in or even seen this property.  *See* Yeslam Binladin Aff. ¶¶ 5, 6.  Although he initially

of these allegations are sufficient to state a claim against Yeslam, much less establish that he is subject to personal jurisdiction.  Thus, if the Court refuses to accept Plaintiffs' improper September 30, 2005 filings and accepts the original amended Complaints as the operative pleadings, there is no question that the action must be dismissed.

## II.   THE RICO STATEMENTS AND MORE DEFINITE STATEMENT IN *BURNETT* DO NOT CURE THE DEFICIENCIES IN PLAINTIFFS' ORIGINAL PLEADINGS

Plaintiffs' RICO Statements and MDSs are heavy on rhetoric and inflammatory adjectives, but woefully short on substance.  Plaintiffs describe innocuous business transactions but dress them up with references to "secret accounts," or "hiding assets," or "illicit transactions" without ever providing any facts that would support their characterizations.  Indeed, many of the allegations newly asserted against Yeslam do not even satisfy basic good faith pleading obligations, in that Plaintiffs know that either the facts alleged or the inferences they seek to have the Court draw are false.

Perhaps the most stark example is the allegation made by the Plaintiffs that Yeslam Binladin paid for flight training at Huffman Aviation in Florida for certain unidentified individuals.  *See Burnett* MDS (Yeslam) ¶ 17; *Fed. Ins.* RICO Stmt. (Yeslam) at 11-12; *Euro* RICO Stmt. (Yeslam) at 12-13; *WTC* RICO Stmt. (Yeslam) at 12-13.  In those same paragraphs, Plaintiffs claim that two of the September 11 hijackers used that same school for their flight training.  *Id.*  The inference Plaintiffs apparently seek to have the Court draw is that Yeslam might have paid for the hijackers' flight training.  But Plaintiffs know that is not true.  The *WTC* and *Euro* Plaintiffs, in RICO Statements inexplicably filed with respect to a different Defendant,

---

(continued…)

held record title to the property as agent for his brother, Ibrahim, record ownership was conveyed to his brother, the beneficial owner, in 1998.  *See id.* ¶ 6; *see also infra* at 15-16.

allege that the person for whom Yeslam financed flight lessons in Florida is the retired chief of the French customs service in Cannes – not anyone associated with the 9/11 terrorists.  *See WTC* RICO Stmt. (SBG) Ex. A at 31; *Euro* RICO Stmt. (SBG) Ex. A at 31.  There is no conceivable explanation for Plaintiffs' inclusion of allegations on flight training for a former French law enforcement official at a Florida flight school, other than an improper attempt to mislead the Court into believing Yeslam Binladin had some improper tie to the 9/11 terrorists.[14]

### A.    Allegations Regarding Past Or Current Investigations

Plaintiffs repeatedly claim that French officials have investigated Yeslam Binladin "on suspicion of money laundering" and at some point in time expanded that investigation to include unspecified "terrorist financing," and they also cite Swiss and U.S. Government investigations involving Yeslam Binladin.  *See WTC* RICO Stmt. (Yeslam) at 10; *Fed. Ins.* RICO Stmt. (Yeslam) at 9; *WTC* ¶ 658; *see also WTC* RICO Stmt. (Bakr et al.) Ex. A. at 18-19.  The inference Plaintiffs seek to draw – *i.e.*, that wrongdoing can be inferred from the mere fact of investigation – is not only logically implausible but it is contradicted by actual events:  If in fact any government had reached the conclusions Plaintiffs posit as official "beliefs," there would be some public evidence to be cited:  *e.g.*, an indictment, a criminal charge, the seizure of an account, or a designation under one of the statutes or executive orders relating to terrorism. Here, despite the passage of more than four years since the U.S. Department of Justice and Swiss

---

[14] Similarly, in RICO Statements that are not directed to Yeslam Binladin, Plaintiffs claim that Yeslam Binladin moved funds from the Saudi Investment Co. ("SICO") to a company named Moree Investments, and then onward to Saudi Marketing and Trading Company, which Plaintiffs allege was owned by the "*family* of Mohammed Al Attas," who is described as the second husband of OBL's mother.  *WTC* RICO Stmt. (SBG) Ex. A at 32-33; *Euro* RICO Stmt. (SBG) Ex. A at 32-33 (emphasis added).  Even apart from the fact that Plaintiffs' allegations are dead wrong – Saudi Marketing and Trading Company is owned by Yeslam Binladin and three of his full siblings, not by any person named Al Attas (Yeslam Binladin Aff. ¶ 18) – Plaintiffs do not identify who in the Al Attas "family" allegedly owned the company, or what the "family" relationship is between that person and Mohammad Al Attas. More importantly, Plaintiffs do not allege that such money was intended to or did in fact ever go to OBL.  Given the absence of any alleged connection to OBL, there is no explanation for the inclusion of such obviously irrelevant allegations in the pleadings other than, again, an intent to mislead the Court.

inquiries mentioned by Plaintiffs, there has not been a single such event:  No charges have been

filed, no accounts have been seized, and Yeslam Binladin has never been designated as having

any association with terrorist organizations by the United States government or anyone else.

*See, e.g.*, http://www.ustreas.gov/press/archive.html (last visited Oct. 28, 2005).  In fact, after

completing the investigations cited by Plaintiffs, Swiss authorities stated in writing that their

"detailed examination" of Yeslam Binladin's banking and business records "has not revealed the

existence of any criminal offence."  *See* Yeslam Binladin Aff. ¶ 15; *see also* Letter from Julie

Noto Lhermine, attached as Exhibit 6 to Yeslam Binladin Aff.; *and* Letter from Claude Nicati,

attached as Exhibit 7 to Yeslam Binladin Aff.

Plaintiffs' attempt to use the fact of these investigations without accounting for their

results is inexcusable in view of the fact that their "expert," Jean Charles Brisard, worked as an

advisor to the Swiss authorities until mid-2004 and he doubtless was aware that the Swiss

authorities had closed their investigation of Yeslam Binladin and had provided the exculpatory

letters to him.[15]  In fact, Brisard is driving the very investigations upon which Plaintiffs attempt

to rely.  According to media reports, shortly after losing his position with the Swiss authorities,

Brisard brought (already discredited) allegations to a French investigating magistrate and

convinced him to re-open his investigation.  *See Brother of Osama Bin Laden Subpoenaed by*

*French Judiciary*, Le Monde, September 28, 2004 (certified translation attached as Exhibit B).

Despite the passage of another year, that investigation, like those before it, has produced no

charges.

---

[15] Brisard lost his position as an advisor to the Swiss after complaints that he had wrongfully leaked
investigatory materials to MDL Plaintiffs' counsel, in violation of Swiss law, and that his role as a Plaintiffs'
"expert" created a conflict of interest.  *See Qadi v. Public Prosecutor's Dept. of the Swiss Confederation*, Case No.
BK_B 094/04, Court of Appeal, Swiss Federal Court (September 16, 2004).  Despite being required to return all
investigatory materials he obtained in his work with the Swiss prosecutor's office, Plaintiffs' RICO Statements are

## B.    Allegations Regarding Bank Accounts

Plaintiffs cite accounts at two European banks as supposedly tying Yeslam Binladin to OBL.  First, Plaintiffs reference an account in OBL's name at UBS in Geneva which, according to Plaintiffs, was the subject of an investigation by Swiss and U.S. authorities immediately after September 11, 2001.  That account, one of more than 50 sub-accounts set up by Omar and Haydar Binladin for the benefit of the heirs of their father, Mohammad Binladin, was, according to Plaintiffs' own allegations, opened in August 1990 – several years before OBL is alleged to have engaged in any terrorist activities aimed at the United States, and eight years before he was designated as a terrorist by the United States government.[16]  These accounts were opened for the benefit of all of the heirs only days after Saddam Hussein invaded Kuwait because the family sought to ensure access to assets during this period of instability in the Gulf region.  *See* Yeslam Binladin Aff. ¶ 12.  Yeslam agreed to be an additional signatory on most of the accounts because he was living in Geneva.  *Id.*

In October of 1991, after the Gulf War had ended, virtually all of the money in the OBL sub-account was transferred to an account in Saudi Arabia in the name of Haydar Binladin.  *See* Yeslam Binladin Aff. ¶ 13; *Fed. Ins.* RICO Stmt. (Yeslam) at 8; *Burnett* MDS (Yeslam) ¶ 7; *Euro* RICO Stmt. (Yeslam) at 9; *WTC* RICO Stmt. (Yeslam) at 9.   There is no allegation in any RICO Statement or MDS filed with respect to Yeslam Binladin that he was personally involved in the transfers into or out of the OBL sub-account at UBS, or that any of these funds in fact

---

(continued…)

peppered with purported quotes from documents that appear to have come from that office.  *See WTC* RICO Stmt. (SBG) Ex. A at 10-11.

[16] *Burnett* MDS (Yeslam) ¶ 7; *Fed. Ins.* RICO Stmt. (Yeslam) at 8; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9.  Each of the UBS sub-accounts was funded in August 1990 with a portion of the legal inheritance of each child of Mohammad Binladin.  *See* Yeslam Binladin Aff. ¶¶ 12-13.  Accordingly, $450,000 was deposited in OBL's sub-account at that time.  *See id.* ¶ 13.

went to OBL, or that Yeslam was aware of how the funds were ultimately used.  According to

UBS, there was no further activity in the account, and it was closed in 1997 because it had been

inactive for six years.  *See* Letter from UBS to Swiss Dept. of Justice, attached as Exhibit 5 to

Yeslam Binladin Aff.

Plaintiffs do not allege – nor could they under the circumstances – that these family

accounts were set up with the intent to provide support to OBL's terrorist activities, much less in

order to support an attack on the United States.  Nor do Plaintiffs allege any facts that suggest

that OBL was in fact involved in terrorist attacks on the United States or anywhere else at that

early date, much less that permit an inference that Yeslam – who had not had any contact with

him in almost ten years at that point – should have known in 1990-91 about OBL's future

terrorist activities.

Second, Plaintiffs reference two accounts at Deutsche Bank in Geneva supposedly in the

names of Cambridge Engineering and SBG, for both of which they allege that Yeslam Binladin

was the "account manager."[17]  As Yeslam Binladin affirms in his attached affidavit, he was not

an officer or director of either company, he had no involvement in any of the alleged accounts,

and he did not even know of the existence of either the bank accounts or of Cambridge

Engineering until authorities asked him about them after September 11, 2001.[18]  *See* Yeslam

Binladin Aff. ¶ 11.  In any event, Plaintiffs do not allege that Yeslam Binladin was personally

---

[17] *Burnett* MDS (Yeslam) ¶ 8; *Fed. Ins.* RICO Stmt. (Yeslam) at 8; *WTC* RICO Stmt. (Yeslam) at 10; *Euro* RICO Stmt. (Yeslam) at 10.

[18] Plaintiffs claim these accounts are the subject of an ongoing investigation by French authorities, but fail to mention that these too derive from Plaintiffs' "expert," Mr. Brisard.  *See Brother of Osama Bin Laden Subpoenaed by French Judiciary*, Le Monde, September 28, 2004 (certified translation attached as Ex. B); *French Magistrate Widens Bin Laden Finance Probe*, Reuters, Dec. 25, 2004, at 1.  The accounts in question are the same accounts that, according to Plaintiffs, had been investigated by the U.S. Department of Justice beginning in September 2001.  *See Fed. Ins.* RICO Stmt. (Yeslam) at 8; *Burnett* MDS (Yeslam) ¶ 8; *WTC* RICO Stmt. (Yeslam) at 10; *Euro* RICO Stmt. (Yeslam) at 10.  Despite the passage of more than four years since those investigations began, no charges have been brought, nor have any accounts been seized.

involved in any transfers of funds into or out of these accounts, much less that he made any such transfers with the knowledge and intent that they would support terrorism.

### C.      Alleged Donations To Islamic Organizations

Plaintiffs allege (again, falsely) that Yeslam Binladin made donations to the Muslim World League Cultural Center in Geneva.[19]   That organization in turn is alleged to have aided and abetted Defendant Hani Ramadan.[20]   Although Plaintiffs allege that Ramadan was an extremist Muslim speaker, they do not allege that he had any involvement in the 9/11 attacks. *See, e.g.*, *Burnett* 3AC ¶ 595.   Nor do they allege any facts suggesting that Yeslam Binladin knew of or had any intention of supporting Ramadan's activities, much less those of al Qaeda.

### D.      Alleged Corporate Roles

Several Plaintiffs have alleged that Yeslam Binladin is or was an officer or director of SBG,  but none of them allege any specific actions he took in that capacity.   The absence of any such allegation is not surprising because, in fact, Yeslam Binladin has never held any position as an officer or director of SBG.  *See* Yeslam Binladin Aff. ¶ 9*; see also* Declaration of Bakr M. Binladin, attached as Exhibit 3 to Yeslam Binladin Aff.   Plaintiffs should know that their allegation is false, as their own so-called expert, Mr. Brisard, removed that claim from his book, "Bin Laden, the Forbidden Truth," after being sued by Yeslam Binladin in Swiss court.  *See* Yeslam Binaldin Aff. ¶ 9.

Plaintiffs similarly allege that Yeslam Binladin was a director of MBO but, again, they fail to allege any conduct in that capacity.   This, too, is unsurprising, as Yeslam has never

---

[19] *Burnett* MDS (Yeslam) ¶ 5; *Fed. Ins.* RICO Stmt. (Yeslam) at 7; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9.  This allegation is false, as Yeslam has never donated money to the Muslim World League Cultural Center.  *See* Yeslam Binladin Aff. ¶ 16.

[20] *Burnett* MDS (Yeslam) ¶ 5; *Fed. Ins.* RICO Stmt. (Yeslam) at 7; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9.

attended a board meeting or had any role in the management of MBO's affairs.   *See* Yeslam

Binladin Aff. ¶ 10; Declaration of Hassan al Attas, attached as Exhibit 4 to Yeslam Binladin Aff.

### E.   Other Conclusory "Factual" Allegations

The rest of Plaintiffs' allegations against Yeslam Binladin consist principally of vague

and conclusory claims of wrongdoing.  Plaintiffs generally allege that Yeslam Binladin aided and

abetted and provided material support to OBL,[21] and that he knew or "had to know" that al

Qaeda was a terrorist organization at the time of such undated support.[22]  They do not, however,

support such claims with specific facts.

They also allege that Yeslam Binladin provided "funding and financial support" to OBL

when he was in Sudan,[23] but again provide absolutely no specific facts as to how or when he did

so, much less any facts that could permit an inference that the supposed "support" was given

with knowledge of or an intent to promote OBL's involvement in terrorist activities directed

against the United States.  In fact, although Plaintiffs provide no clarification in their pleadings,

it seems likely that their "Sudan" allegation is premised on nothing more than the allegation that

Yeslam was a signatory on the UBS account, and that funds were transferred out of that account

in October 1991, which was around the time that OBL is alleged to have moved to the Sudan.

But as explained elsewhere, Plaintiffs do not and cannot allege that family financial transactions

involving OBL in 1991, even if they are assumed to have occurred, were intended to, or in fact

---

[21] *Burnett* MDS (Yeslam) ¶ 4; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9; *Fed. Ins.* RICO Stmt. (Yeslam) at 7.  The *New York Marine First* Amended Complaint generally alleges that Yeslam Binladin and other Defendants "aided and abetted, conspired with, and provided material support and resources to al Qaida and/or affiliated terrorist organizations or persons."  *NY Marine* 1AC ¶45.  This broad, conclusory allegation is not supported by a single allegation of conduct by Yeslam, and should thus be disregarded.

[22] *Burnett* MDS (Yeslam) ¶¶ 18-19; *Fed. Ins.* RICO Stmt. (Yeslam) at 12; *WTC* RICO Stmt. (Yeslam) at 13; *Euro* RICO Stmt. (Yeslam) at 13.

[23] *Burnett* MDS (Yeslam) ¶16; *Fed. Ins.* RICO Stmt. 11; *WTC* RICO Stmt. (Yeslam) at 12; *Euro* RICO Stmt. (Yeslam) at 12.

did, support terrorist activities directed at the United States or any other country.

## ARGUMENT

Yeslam Binladin's motion to dismiss should be granted for two independent, but equally compelling reasons.  First, the motion should be granted pursuant to Federal Rule of Civil Procedure 12(b)(2) because Plaintiffs have failed to establish that this Court can properly exercise personal jurisdiction over this foreign Defendant.  Second, the motion should be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs have failed to state a claim against Yeslam Binladin.

## I.  THIS COURT LACKS PERSONAL JURISDICTION OVER YESLAM BINLADIN

To survive a motion to dismiss under Rule 12(b)(2), Plaintiffs must "make a *prima facie* showing that personal jurisdiction exists."  *Terrorist Attacks I,* 349 F. Supp. 2d at 804 (internal citation omitted).  Plaintiffs cannot do so here.  Yeslam Binladin has not been in the United States since 1981, and Plaintiffs have not and cannot allege contacts with New York or the United States as a whole that would be sufficient to support general jurisdiction.  Nor do Plaintiffs allege any specific facts to support any allegation that Yeslam Binladin participated in a conspiracy with OBL and al Qaeda.  And Plaintiffs allege no facts from which to infer that Yeslam Binladin purposefully directed any conduct at the United States.  Having failed to allege any relevant jurisdictional facts, Plaintiffs are not entitled to jurisdictional discovery.

### A.  Plaintiffs Have Failed To Allege Minimum Contacts With The United States

To support general jurisdiction, Plaintiffs must allege contacts with New York or the United States that are "'systematic and continuous.'"  *Terrorist Attacks I,* 349 F. Supp. 2d at 816 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).  General jurisdiction requires a "considerably higher level of contacts" than would specific jurisdiction.

*Id.* at 811; *In re Terrorist Attacks on September 11, 2001*, 03 MDL No. 1570, slip op. at 14

(S.D.N.Y. Sept. 21, 2005) ("*Terrorist Attacks II*").

Plaintiffs barely even try to allege facts that could be relevant to general jurisdiction.

Their meager allegations consist of claims that Yeslam Binladin owned real estate in the United

States and that, after September 11, 2001, he was interviewed by Western media outlets.[24]  Even

setting aside the fact that all of the interviews Plaintiffs cite were conducted in Europe, being

interviewed by Western media outlets has never been found sufficient to permit the exercise of

general jurisdiction.  Nor does the alleged real estate ownership come close to establishing

general jurisdiction, or even a disputed fact on which discovery would be appropriate.  Plaintiffs

allege that the name Yeslam Binladin was "listed" at two addresses in California in the late

1990s.[25]  As Yeslam Binladin's affidavit makes clear, he has never owned either of these

properties and he could not possibly have lived there in the 1990s, as he has not even been in the

United States for almost 25 years.   *See* Yeslam Binladin Aff. ¶ 7.

Plaintiffs also allege that Yeslam owned a residence in Los Angeles until 1998.[26]  That is

also false.  As explained in Yeslam's affidavit, his brother Ibrahim purchased the property on

Stone Canyon Road but initially placed record ownership in Yeslam's name as his agent.

Yeslam has never lived in that property or, in fact, ever even seen it.  *Id.* ¶ 6.  In 1998, record

ownership was transferred into Ibrahim's name.  *Id.*  The Los Angeles County Office of the

Assessor subsequently confirmed that the title transfer did not effect a change in ownership, as

---

[24] *See Burnett* MDS (Yeslam) ¶ 2; *Fed. Ins.* RICO Stmt. (Yeslam) at 12-13; *WTC* RICO Stmt. (Yeslam) at 8; *Euro* RICO Stmt. (Yeslam) at 8.

[25] *Burnett* MDS (Yeslam) ¶ 1; *WTC* RICO Stmt. (Yeslam) at 8; *Euro* RICO Stmt. (Yeslam) at 8; *Fed. Ins.* RICO Stmt. (Yeslam) at 12-13.

[26] *Burnett* MDS (Yeslam) ¶ 1; *WTC* RICO Stmt. (Yeslam) at 8; *Euro* RICO Stmt. (Yeslam) at 8; *Fed Ins.* RICO Stmt. at 12.  The *World Trade Center* Plaintiffs originally claimed this property was owned as recently as

Ibrahim had been the beneficial owner of the property all along.  *See id.*; *see also* Letter from Los Angeles County Assessor, attached as Exhibit 2 to Yeslam Binladin Aff.

These alleged contacts – none of which involve Yeslam Binladin's physical presence in the United States – fall well short of a "continuous and systematic" presence in the U.S.  *First Capital Asset Management, Inc. v. Brickellbush*, *Inc.*, 218 F. Supp. 2d 369, 393 (S.D.N.Y. 2002).  With nothing more, Plaintiffs can neither support jurisdiction on this basis nor claim entitlement to jurisdictional discovery.

### B.     Plaintiffs Cannot Establish Personal Jurisdiction On A Conspiracy Theory

The exercise of personal jurisdiction over Yeslam Binladin on a conspiracy theory would be equally inappropriate.  Although this Court has recognized the theory, it stressed that "'the bland assertion of conspiracy is insufficient to establish [personal] jurisdiction.'"  *Terrorist Attacks I,* 349 F. Supp. 2d at 805 (quoting *Lehigh Valley Indus. v. Birenbaum*, 527 F.2d 87, 93-4 (2d Cir. 1975)).  Rather, "[t]o establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy, *allege specific facts* warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York."  *Id.* (emphasis added).  Plaintiffs here have failed to do so.

Instead of alleging facts showing that Yeslam Binladin directed, controlled or requested al Qaeda to undertake terrorist activities, *see id.* at 806, Plaintiffs allege in various forms that *all* Defendants in these actions conspired with the al Qaeda terrorists to perpetrate the attacks of September 11.[27]  This Court has already recognized, however, that "[w]ithout supporting factual

---

(continued…)

January 2002, but dropped that claim from their RICO Statement against Yeslam Binladin.  *Compare WTC* ¶ 657 *with WTC* RICO Stmt. (Yeslam) at 8.

[27] *See Fed. Ins.* First Amended Complaint with Incorporated More Definite Statements ("*Fed. Ins.* 1AC") ¶¶ 66, 72-74; *Fed. Ins*. RICO Stmt. (Yeslam) ¶ 5(c) & at 14; *WTC* ¶¶ 1147-50; *WTC* RICO Stmt. (Yeslam) ¶ 5(b) & at 14; *Contin. Cas.* 2AC ¶¶ 615-16; *Euro Brokers* ¶¶ 175-77; *Euro Brokers* RICO Stmt. (Yeslam) ¶ 5(b) & at 14; *NY*

allegations, such a statement is insufficient to establish an agency relationship," and has dismissed numerous defendants against whom such allegations have been made. *Terrorist Attacks I*, 349 F. Supp. 2d at 805-06 (dismissing Princes Sultan and Turki); *see also id.* at 822 (dismissing on personal jurisdiction grounds because "[t]he [] complaint does not contain any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer . . . that they were members of a conspiracy"). Here again, absolutely no facts are alleged that would permit an inference that Yeslam intended to assist al Qaeda in carrying out its attacks against the United States, much less entered into any agreement to do so. Absent such specific factual allegations, the Court cannot find a basis for personal jurisdiction based on a conspiracy theory of jurisdiction and may properly dismiss without permitting jurisdictional discovery. *Id.* at 805.

### C. Plaintiffs Fail To Allege That Yeslam Binladin "Purposefully Directed" His Conduct At The United States

Much of Plaintiffs' jurisdictional argument to date has been directed at the claim that various Defendants have "purposefully directed" their conduct at the United States. As to Yeslam Binladin, such a claim must fail because Plaintiffs have not alleged "some *personal or direct involvement* by the Defendant[] in the conduct giving rise to their claims." *Terrorist Attacks I*, 349 F. Supp. 2d at 809 (emphasis added).

Indeed, Plaintiffs' Complaints are entirely devoid of any specific allegations of actual conduct by Yeslam Binladin that could give rise to liability. Plaintiffs instead attempt to weave together supposition and speculation in the hope that it will suffice to state a claim against "people whose names are Bin Laden." *See* October 12, 2004 Hearing Transcript at 44:16-21.

Plaintiffs allege absolutely no specific facts from which the Court could infer that Yeslam

---

(continued…)

*Marine* 1AC ¶¶ 45, 508; *NY Marine* RICO Stmt. (Yeslam) ¶ 5(c) & at 14; *Burnett* MDS (Yeslam) ¶ 11.

Binladin provided direct support to OBL's terrorist agenda or to al Qaeda.  Blanket assertions, such as Plaintiffs' conclusory claim that Yeslam Binladin "provided material support to Osama Bin Laden while he was in The Republic of Sudan during the early 1990s,"[28] do not fill the void. Plaintiffs allege no facts showing how, when or where Yeslam supposedly provided such support, nor do they allege any facts suggesting that Yeslam knew, or should have known, in the early 1990s that OBL might, at some future date, engage in a terrorist attack on the United States.  As this Court has held, "[l]egal conclusions done up as factual allegations are not facts and cannot substitute for facts."  *Terrorist Attacks I,* 349 F. Supp. 2d at 813 (internal quotation and citation omitted).

Likewise, Plaintiffs' allegations that Yeslam Binladin was involved with Swiss bank accounts that were allegedly tied to OBL fare no better in establishing that he purposefully directed his conduct at the United States.[29]  First, as explained above, Plaintiffs' allegation that Yeslam Binladin was the "account manager" for two accounts at Deutsche Bank in Geneva associated with SBG and a company called Cambridge Engineering is simply false.  *See* Yeslam Binladin Aff. ¶ 11.  Yeslam Binladin had no connection to those accounts and did not even know they existed until after September 11, 2001.  *See id.*  Absent some proof by Plaintiffs of this Brisard-generated speculation – and they will be able to produce none – the Court should not take the allegation as true.[30]   In any event, Plaintiffs fail to allege that Yeslam Binladin authorized or was otherwise involved with any alleged transfer of funds to OBL, let alone that he

---

[28] *Burnett* MDS (Yeslam) ¶ 16; *Fed. Ins.* RICO Stmt. (Yeslam) at 11; *WTC* RICO Stmt. (Yeslam) at 12; *Euro* RICO Stmt. (Yeslam) at 12.

[29] *Burnett* MDS (Yeslam) ¶¶ 7-8; *Fed. Ins.* RICO Stmt. (Yeslam) at 8; *WTC* RICO Stmt. (Yeslam) at 9-10; *Euro* RICO Stmt. (Yeslam) at 9-10.

[30] *Allojet PLC v. Vantage Assocs.*, No. 04 Civ. 05223, 2005 U.S. Dist. LEXIS 4006, at *11-12 (S.D.N.Y. Mar. 15, 2005) (noting that such unsupported jurisdictional allegations may be disregarded by the Court when rebutted by unopposed, specific factual testimony).

intended or knew that any hypothetical transfer would support terrorism.

Plaintiffs' allegation that Yeslam Binladin was an authorized person on an account at UBS Bank in Geneva in 1990-91 is equally insufficient to establish that he purposefully directed his conduct at the United States.[31]   The undisputed timing of the fund transfers alleged by Plaintiffs defeats any possible inference that the account was intended to be used to support OBL's terrorist attacks against the United States.  These family accounts were initially funded in August 1990, only days after Saddam Hussein's invasion of Kuwait, because of the growing political instability in the Middle East.  *See* Yeslam Binladin Aff. ¶ 12.  The account in OBL's name became dormant 14 months later when virtually the entire balance in the account was transferred to Haydar Binladin in Saudi Arabia in October 1991.[32]   Plaintiffs concede these facts.  These transactions thus occurred long before Plaintiffs allege that OBL was known to be targeting the United States[33] and some seven to eight years before OBL was designated an international terrorist in 1998 and had his assets frozen by the United States government.  Plaintiffs nowhere allege that Yeslam Binladin – or anyone else – actually knew in 1990 or 1991 that OBL was planning terrorist attacks on the United States, much less that he participated in setting up these accounts in order to materially support terrorist attacks on the United States.  One cannot establish jurisdiction merely by alleging that Yeslam Binladin had some unspecified role in assisting more than 50 family members in setting up Swiss accounts, funded with the

---

[31] *Burnett* MDS (Yeslam) ¶ 7; *Fed. Ins.* RICO Stmt. (Yeslam) at 8; *WTC* RICO Stmt. (Yeslam) at 9-10; *Euro* RICO Stmt. (Yeslam) at 9-10.

[32] *See Burnett* MDS (Yeslam) ¶ 7; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9; *Fed. Ins.* RICO Stmt. (Yeslam) at 8.  Plaintiffs do not allege that Yeslam personally played any role in the October 1991 transfer to Haydar.   Nor do they allege that the funds actually went to OBL.

[33] *See, e.g.*, *Fed. Ins.* 1AC ¶ 42 (alleging that al Qaeda issued a fatwa in February 1998 saying it was the duty of Muslims to kill United States citizens, including civilians); *Contin. Cas.* ¶ 120 (same); *WTC* ¶ 770 (alleging OBL announced his intention to target United States personnel in Saudi Arabia in August and November of 1996); *Burnett* 3AC ¶ 453 (same).

family inheritance, one of which allegedly benefited OBL years before he ever publicly advocated, much less conducted, terrorist acts aimed at the United States.

Plaintiffs cannot transform this wholly legitimate activity into something nefarious simply by adding inflammatory but baseless adjectives to their conclusory allegations. No amount of repetition can transform an account that was allegedly funded with $450,000 into a "shell account." Nor, as discussed above, can Plaintiffs supply the missing facts simply by alleging that these accounts have, at some point in time, been the subject of government inquiries. The mere fact of government investigations can never be sufficient to permit an inference of wrongdoing. Indeed, it would be shocking if the U.S. government, particularly in the immediate aftermath of the attacks of September 11, did not investigate any leads that might shed light on the source of OBL's wealth or current funding. But the only inference that can be drawn from the course of events, even as alleged by Plaintiffs, is that government authorities have concluded that it was not illegal for the Binladin family to allow OBL to continue to receive his inheritance in 1990-91 – and indeed, there was no legal or factual basis available in that time period that would have permitted them to do otherwise.[34] Thus, the mere fact that these accounts were at some point investigated by authorities cannot possibly permit an inference that Yeslam Binladin purposefully aimed his conduct at the United States.

Beyond these allegations, Plaintiffs' (false) claim that Yeslam made donations to the

---

[34] On July 22, 2003, after the Swiss authorities questioned Yeslam Binladin regarding the account at UBS Bank, the Public Prosecutor's Office of the Swiss Confederation confirmed in writing to Yeslam Binladin's Swiss counsel that "the detailed examination of Mr. Yeslam Binladin's activities has not revealed the existence of any criminal offence." *See* Yeslam Binladin Aff. ¶ 15; *see also* Letter from Julie Noto Lhermine, attached as Exhibit 6 to Yeslam Binladin Aff. Likewise, by letter dated April 2, 2004, the Acting Public Prosecutor confirmed yet again that its examination of banking and other documents had not led the Public Prosecutor's Office to institute criminal proceedings against Yeslam Binladin. *See* Yeslam Binladin Aff. ¶ 15; *see also* Letter from Claude Nicati, attached as Exhibit 7 to Yeslam Binladin Aff.

Muslim World League Cultural Center in Geneva[35] is inadequate for reasons this Court has already recognized.  Plaintiffs do not even allege that the Muslim World League Cultural Center provided material support to al Qaeda, much less allege facts demonstrating that Yeslam Binladin knew or had reason to know of such support.  This Court has repeatedly rejected Plaintiffs' reliance on the "purposefully directing" theory of personal jurisdiction where "Plaintiffs [failed to] offer any facts to lend support to their allegation that [a Defendant] purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism."  *Terrorist Attacks I*, 349 F. Supp. 2d at 813 (finding Plaintiffs' allegations, void of any facts, insufficient to find that Prince Sultan purposefully directed his conduct at the United States); *see also id.* at 813-14 ("Conclusory allegations that [Prince Turki] donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice.")  As this Court stated clearly just last month, "[d]onating money to established humanitarian organizations that may or may not have been diverting funds to support al Qaeda cannot be considered primary participation in intentional wrongdoing expressly aimed at the United States."  *Terrorist Attacks II*, slip op. at 14.  These allegations against Yeslam Binladin, even if assumed to be true, fail for the same reason.

Finally, Plaintiffs' reliance on allegations that Yeslam Binladin is or was an officer or director of SICO, SBG or MBO cannot support personal jurisdiction.[36]  Plaintiffs do not allege that Yeslam took any action in his purported capacity as an officer or director of any of those

---

[35] *Burnett* MDS (Yeslam) ¶ 5; *Fed. Ins.* RICO Stmt. (Yeslam) at 7; *WTC* RICO Stmt. (Yeslam) at 9; *Euro* RICO Stmt. (Yeslam) at 9.  Plaintiffs' only specific allegation against Muslim World League Cultural Center in Geneva is that it aided and abetted an individual named Hani Ramadan.  All Plaintiffs allege about Ramadan, however, is that he was an extremist Muslim speaker, not that he had any involvement in terrorism or the 9/11 attacks.  *See, e.g.*, *Burnett* 3AC ¶ 595.

[36] *Burnett* 3AC ¶ 325; *Burnett* MDS (Yeslam) ¶ 6; *Fed. Ins.* RICO Stmt. (Yeslam) at 7-8; *WTC* RICO Stmt. (Yeslam) at 8-9; *Euro* RICO Stmt. (Yeslam) at 8-9.

companies, much less explain how any such action could be construed as "purposeful direction" at the United States.  The mere allegation that an individual is an officer or director of a Saudi corporation with alleged ties to the United States[37] is not sufficient to establish personal jurisdiction over the individual.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 816 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (holding that a finding of jurisdiction over an entity does not support jurisdiction over an individual officer absent an independent showing as to that officer).  In any event, Plaintiffs' allegations with respect to SBG and MBO are simply false.  Yeslam has never been an officer or director of SBG, nor has he had any role in managing MBO.  *See* Yeslam Binladin Aff. ¶¶ 9-10.   Yeslam's alleged corporate roles cannot provide any basis for asserting jurisdiction over him.

###   D.     Plaintiffs Are Not Entitled To Jurisdictional Discovery

Having failed to allege any facts to support jurisdiction over Yeslam Binladin, Plaintiffs should not be permitted to conduct jurisdictional discovery in the hopes of finding some.  As this Court has already recognized, "'[c]ourts are not obligated to subject a foreign Defendant to discovery . . . where the allegations of jurisdictional facts, construed in Plaintiffs' favor, fail to state a basis for the exercise of jurisdiction or where discovery would not uncover sufficient facts to sustain jurisdiction.'"  *Terrorist Attacks I,* 349 F. Supp. 2d at 812 (citing cases).  That is precisely the case here.  Plaintiffs have not alleged a single relevant contact between Yeslam Binladin and the United States, let alone the substantial and continuous contacts required for general jurisdiction.  Nor have they alleged any specific conduct by Yeslam Binladin himself that could conceivably be construed as "purposeful direction" toward the United States.

Plaintiffs' resort to such irresponsible allegations as those involving "flight lessons" for

---

[37] SBG and MBO also deny that the allegations in the Complaint provide any basis for the exercise of jurisdiction over them in the United States.

retired customs officials and supposed ties to unidentified "family" of the second husband of the

mother of OBL should be viewed as a clear admission that they have nothing better to support

their claims.  No genuine issues of jurisdictional fact exist to justify discovery, s*ee Terrorist*

*Attacks II*, slip op. at 15, and Plaintiffs cannot avoid dismissal now by claiming otherwise.

## II.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST YESLAM BINLADIN

For largely the same reasons that they fail to support an inference that Yeslam Binladin

purposefully directed his conduct at the United States or entered into a conspiracy to do so,

Plaintiffs also fail to state a claim.

### A.     Plaintiffs' Allegations Against Yeslam Binladin Do Not State A Claim Under The Anti-Terrorism Act (ATA)

Plaintiffs' ATA claims fail for two primary reasons.  First, they fail to allege a direct

relationship between Yeslam Binladin's alleged conduct and the September 11 attacks, which is

required by the statute's "by reason of" requirement.  *See* 18 U.S.C. §2333 (2000).  That

language requires "some direct relation between the injury asserted and the injurious conduct

alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

Second, and more fundamentally, however, Plaintiffs fail to allege any specific facts that

could give rise to an inference that Yeslam Binladin knowingly and intentionally provided

material assistance to al Qaeda.  To do so, Plaintiffs must offer specific facts to support their

conclusions that Yeslam Binladin knew, *at the time of his alleged conduct*, that the bank

accounts or entities with which he was associated were being used to support al Qaeda.  *See*

*Terrorist Attacks I*, 349 F. Supp. 2d at 828, 831, 835-36.

Plaintiffs have alleged no facts to "support an inference that" Yeslam Binladin was

"sufficiently close to the terrorists' illegal activities to satisfy *Halberstam* or New York law."  *Id.*

at 800-01; *see also Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).   As demonstrated

above, Plaintiffs do not allege any facts from which the Court could possibly infer that when allegedly providing assistance to family members in setting up accounts at UBS in 1990-91, Yeslam Binladin – but virtually no one else in the world – knew about and intended to support some future plan by OBL to engage in violent attacks on the United States.[38]   Nor do Plaintiffs allege that Yeslam made contributions to the Muslim World League Cultural Center with knowledge and intent to support terrorist activities, or that he took any action in any corporate capacity that could in any way give rise to liability under the ATA.   As this Court has already held, allegations of the sort asserted here against Yeslam cannot survive a motion to dismiss.  *See Terrorist Attacks I*, 349 F. Supp. 2d. at 832-33.

### B.    Plaintiffs Have Failed To State A Claim Under RICO, The Alien Tort Claims Act, The Torture Victim Protection Act, Or Any State Law Cause Of Action

Plaintiffs' remaining causes of action fail to state a claim against Yeslam Binladin for reasons largely addressed in the Court's January 18 opinion and order.  First, Plaintiffs in five actions have brought civil RICO claims against Yeslam Binladin for violations of 18 U.S.C. §§ 1962(a), (c), and/or (d).[39]   Plaintiffs' RICO claims, however, must fail for the same reasons the Court has applied to claims against other Defendants: they do not – and cannot – allege that Yeslam Binladin was in any way involved in directing the alleged al Qaeda enterprise or that Plaintiffs' injuries resulted from his investment of racketeering income.  *See Terrorist Attacks* II,

---

[38] Apart from the fact that not even Plaintiffs allege that OBL was a known terrorist at that time – something that not even the United States government realized until years later – the prohibition on "material support" of terrorism, contained in § 2339A, did not come into existence until 1994.  Moreover, prior to 2001 that Section applied only to "whoever, *within the United States*, provides material support . . ."  18 U.S.C.A. 2339A (West 2000 & Supp. 2005) (emphasis added); Pub. L. 107-56 § 805(a)(1) (Oct. 26, 2001) (striking out ", within the United States,").

[39] Plaintiffs allege RICO violations in the *Continental Casualty*, *Euro Brokers*, *Federal Insurance*, *NY Marine* and *World Trade Center* actions.  The *Continental Casualty* and *NY Marine* Plaintiffs failed to file RICO Statements as required by standing order of this Court for any Plaintiff alleging violations of RICO in their Complaints.  Because the *Continental Casualty* and *NY Marine* Complaints contain none of the requisite elements of a RICO claim, and no RICO Statements were filed to provide the necessary elements, those claims must be dismissed.  The *Burnett* Plaintiffs also brought RICO claims, but those were dismissed as to all Defendants by Judge

slip op. at 21-22 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)); *Terrorist Attacks I*, 349 F. Supp. 2d at 826-28.

The *Burnett* ATCA claim also should be dismissed for failure adequately to allege conspiracy or aiding and abetting and because the ATCA does not create secondary liability among private actors.  With respect to Plaintiffs' Torture Victim Protection Act claims, the *Burnett* claim must be dismissed because it fails to allege that Yeslam Binladin acted under color of law.  *See Terrorist Attacks I,* 349 F. Supp. 2d at 828.  The *Federal Insurance* and *World Trade Center* Plaintiffs' common law intentional torts claims are time-barred for reasons this Court has already addressed.  *See Terrorist Attacks I,* 349 F. Supp. 2d at 829 (internal citation omitted).  The *Burnett* Plaintiffs' intentional tort claims, on the other hand, should be dismissed for failure to allege (1) direct involvement in the 9/11 attacks; (2) "extreme and outrageous conduct" on the part of Yeslam Binladin himself; and (3) conduct by Yeslam Binladin directed at the Plaintiffs themselves.  Finally, the *Federal Insurance* and *NY Marine* Plaintiffs' negligence claims should be dismissed for failing to "allege or identify a duty owed to Plaintiff" by Yeslam Binladin.  *Terrorist Attacks II*, slip op. at 22; *Terrorist Attacks I,* 349 F. Supp. 2d at 831.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' claims against Yeslam Binladin should be dismissed.

Dated:  October 28, 2005                                   Respectfully submitted,

/s/ Geoffrey S. Stewart
_____
Geoffrey S. Stewart (GS-5413)
JONES DAY
222 East 41st Street

_____
(continued…)
Robertson.  *See Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100-01 (D.D.C. 2003).

New York, New York  10017-6702
Tel:  (212) 326-3939
Fax:  (212) 755-7306

Stephen J. Brogan
Mary Ellen Powers
Timothy J. Finn
Jonathan C. Rose
James E. Gauch
Michael P. Gurdak
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700

Lawrence Schoenbach (S.D.N.Y #LS8497)
Law Offices of Lawrence H. Schoenbach
The Trinity Building
111 Broadway, 13th Floor
New York, New York  10006
Tel:  (212) 346-2400
Fax:  (212) 346-2400

*Attorneys for Defendant Yeslam Binladin*

# CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2005 caused an electronic copy of Defendant Yeslam Binladin's Motion to Dismiss Plaintiffs' Complaints and the accompanying Memorandum of Law In Support to be served by the Court's Electronic Case Filing System.

Date:   October 28, 2005

/s/ Stephen J. Brogan
Stephen J. Brogan