# EXHIBIT 3

**The New York Times**
nytimes.com

March 14, 2004

INTRUDERS IN THE HOUSE OF SAUD, PART II

# A Nation Unto Himself

**By JENNIFER SENIOR**

**Correction Appended**

If, in the future, the war on terrorism is fought in the orderly confines of the courtroom and not just in the caves of Tora Bora, then incriminating documents could become the equivalent of smart bombs. Ronald L. Motley, who has made a career of coaxing such documents from the shadows, made this clear in our very first phone conversation, during which he could barely contain his delight. "Have you heard of Mohammed Fakihi?" he demanded, in a drawl rich enough to fill a doughnut. "Investigated by the German police?"

Well, no --.

"That fella had a computer," he continued. "And do you know what I did with that computer?"

He allowed a capacious pause.

"I'll tell you what I did," he said. "I bought it."

As a trial lawyer, Motley thinks of terrorism not just as a form of war, but as a business -- a depraved, ruthlessly efficient business, whose financiers must be exposed and held accountable for their role in sowing harm. In the case of Sept. 11, Motley, like many in the American intelligence community, concluded that the 19 hijackers would never have been able to carry out their plans without generous Saudi assistance. Nineteen months ago, he filed a civil lawsuit in federal court in Washington charging that a wide variety of parties from the kingdom sponsored the attacks, either directly or indirectly, by making donations to institutions that they knew fostered terrorism. Among the case's 205 defendants are seven Saudi charities, including the largest in the Muslim world; three Saudi financial institutions, including one that is now state-run; dozens of prominent Saudi individuals; and perhaps most audaciously, several members of the royal family, for whom Motley has a rich assortment of epithets. Though Motley is not the only tort lawyer in the United States to have filed an international lawsuit in connection with Sept. 11, his case is by far the largest and most lavishly financed of its kind: he has already spent more than $12 million, most of it his own money or his firm's, investigating the case. The families of 1,667 people who died that day, as well as 1,197 men and women who sustained injuries, have signed on.

With all due respect, I asked Motley, how did he, rather than the F.B.I. or the C.I.A, gain custody of Fakihi's computer?

"Well, think about it this way," he said. "If you had information -- a computer hard drive, a Mullah

Omar document or whatever your currency might be -- would you necessarily want to give it to the F.B.I.? Why, you might wind up in Guantanamo Bay. Which is not a pleasant place to be, I understand."

Nor does it hurt, one imagines, that when it comes to procuring the hard drives of individuals with potentially valuable information, Motley is willing to pay a handsome fee. (Though in this case, the seller, who Motley said was on the lam, charged only $4,000, on the condition that Motley's people also take his car off his hands.)

Motley built a successful legal career by winning quixotic lawsuits -- first against asbestos companies, which made him an extravagantly wealthy man, and then as a central player in the huge, 46-state case against Big Tobacco, at a time when going after cigarette manufacturers was a demonstrable route to bankruptcy. But whatever risks he took in suing multibillion-dollar corporations pale in comparison to this terrorism case. In trying to use domestic courts to redress the problem of global terror, Motley is potentially subverting, or at least opening to redefinition, the very notion of diplomacy. He and his clients are effectively acting as their own nation. This is naturally worrisome to international-relations professionals, who wonder whether profit-seeking trial lawyers have the legitimacy, expertise or proper motivations to be making foreign policy. "That's why we have a government," said Sean D. Murphy, who served as a State Department lawyer from 1987 to 1998. "It's elected to make some of the hard calls about how to handle foreign countries."

That may be so. The problem, as Motley sees it, is that sometimes governments are not in the position to make those hard calls, whether it be for political or for commercial reasons. So instead, they make easy ones. They resort to gentle persuasion, and their pleas fall on deaf ears. "Since 1999," Motley said later, "officials at the highest levels of our government have tried repeatedly to warn the Saudis about terrorism funding. And what did they do? They ignored them."

He took another dramatic pause.

"Which is why our defendants," he concluded, "ought to be held accountable in an American court."

Unlike most of the litigation filed in the aftermath of Sept. 11, which involves a fairly traditional body of laws and assumes a predictable pattern (the victims' families suing the airlines suing the insurers), the sweeping antiterrorism case brought by Ron Motley relies on new and evolving legal terrain, and its key defendants live in a Muslim monarchy halfway around the world. The United States also happens to consider this monarchy an ally, no matter how imperfect it may be. While Motley is aiming at other foreign parties, too, and while he is not suing the kingdom of Saudi Arabia itself, he is making a rather provocative statement by going after the kingdom's prominent citizens, banks and even some of its leaders. The State Department, while not formally weighing in against the suit, is watching it warily: the last thing it desires is the transformation of the American legal system into a blunt instrument of foreign policy. Bankrupting terrorism is certainly a national priority, even an urgent one, but hardly the task the diplomatic corps wants to entrust to a man who once, during closing arguments, wore a toy stethoscope in court.

Motley insists, frequently and not always convincingly, that he doesn't mean to make a national nuisance of himself; he is simply trying to address a fundamental injustice. Why, in the context of terrorism, should the needs of the state be privileged above the rights of the victims? Or, put another way, why should the flesh-and-blood targets of terrorist attacks -- the deceased and the bereaved -- take a back seat to the less tangible target, the state?

"Going through the court system and trying to take their money is the only recourse I have," explained Deena Burnett, the first client to sign on to Motley's suit. Her husband, Thomas, was on United Airlines Flight 93, which crashed into the empty field in Shanksville, Pa. "I can't join the military. It would be impractical for me to go abroad. But if I can put a stranglehold on their finances," she said, "it assists our president in the war on terrorism."

Whether George W. Bush is grateful for her assistance is another matter. As Motley, a generous donor to the Democratic Party, is fond of pointing out, the president's ties to the Saudi kingdom are personal as well as political: his father, George H.W. Bush, was until recently a senior adviser to the Carlyle Group, an investment firm that counted bin Laden family members among its investors until October 2001. James Baker, whom Bush recently sent abroad seeking help to reduce Iraq's debt, is still a senior counselor for the Carlyle Group, and Baker's Houston-based law firm, Baker Botts, is representing the Saudi defense minister in Motley's case.

Yet however committed a Democrat Motley might be, Burnett v. Al Baraka Investment and Development Corporation, as the case is known, could hardly be described as a partisan crusade. Allan Gerson, a Washington lawyer and Motley's co-counsel, worked in the Reagan Justice Department. Private legal actions against terrorist financiers also have the support of a number of prominent Congressional Republicans, who have shown dwindling patience with the Bush administration's gingerly approach to Saudi diplomacy. Senator Arlen Specter, the Pennsylvania Republican, strongly supports Motley's investigation. Charles Grassley, an Iowa Republican and chairman of the Senate Finance Committee, was one of the original proponents of the legislation Motley is relying on for his case. In December, Grassley sent a sternly worded letter to the Treasury Department, demanding to know why the United States was slower than Europe to freeze certain Saudi assets. Last July, Richard Shelby, an Alabama Republican and former chairman of the Senate Intelligence Committee, publicly chastened the administration for classifying 28 pages reportedly about the Saudis from a Congressional report on Sept. 11.

Recently, I asked Shelby if he was nervous that Burnett might complicate life for the president. His answer was blunt. "If Ron Motley can help unravel the mystery of a lot of terrorist financing," he said, "I don't care who the president of the United States is. Or where the trail leads."

Assuming the answer is Saudi Arabia, what does that make Motley's case, exactly? A glorified, globalized tort suit? Or an example of a new wartime jurisprudence, one that fights terrorism with lawyers as well as guns and statesmen? The answer, in a sense, is both, and it could be the new way of the world. Those who take a dim view of Motley's work, dismissing it as nothing more than worldwide ambulance chasing, will be startled to learn that it is theoretically possible, in today's borderless society, to follow a screaming siren all the way to Riyadh. "Telling U.S. courts not to evaluate international tort claims is like King Canute telling the tide not to come in," said Harold Hongju Koh, the international law expert and next dean of Yale Law School. "I'm sorry, but the sun is coming up tomorrow, and it's called globalization."

Last fall Motley stood at a podium of a hotel conference room in suburban Virginia, addressing a large gathering of families of airline-disaster victims. "Let's pick on the Saudis for a moment," he said, grinning as the C-Span cameras rolled. He's regulation height, with a face that reddens easily and hair that's prone to feathering behind his ears. "I loooove," he continued, "to pick on the Saudis."

Motley, 59, is usually a dervish of energy and restless tics. His eyes dart and his fingernails tip-tap; in conversation he regularly interrupts himself. But not here. As soon as he stands before a crowd, armed

with a PowerPoint presentation and a linear legal argument, that energy field of mayhem disappears.

"I think," he said, "that we should be very angry with the Saudis."

In order to justify his latest legal undertaking, Motley must establish that the Arabian Peninsula is the fund-raising capital for merchants of terror. Though the allegation has always drawn adamant denials from the Saudis -- their Washington embassy refuses to comment on Motley's case -- it is not, from the intelligence-community point of view, a particularly controversial point. In the months after Sept. 11, Treasury and National Security officials appeared before Congress, declaring Saudi Arabia the epicenter of terrorism financing. (This, in fact, was the precise phrase used by David Aufhauser, a former general counsel to the Bush Treasury Department who was also chairman of the National Security Council's committee on terrorist financing.) Perhaps the most scathing declaration on the subject appeared in a report from the Council on Foreign Relations, issued 17 months ago: "It is worth stating clearly and unambiguously what official U.S. government spokespersons have not. For years, individuals and charities based in Saudi Arabia have been the most important source of funds for Al Qaeda, and for years the Saudi officials have turned a blind eye to this problem."

While Motley suggests that Saudi money occasionally takes a direct path into Al Qaeda's coffers -- generally via wealthy individual donors -- it more frequently takes a circuitous route, either through the clean-and-rinse cycle of quasi-legitimate businesses or, more commonly, through a highly complex web of Muslim charities, which receive a steady stream of alms from both individuals and Saudi banks. Some of the charities named in Motley's suit are already the subjects of federal criminal investigations. But others, like the Muslim World League, are highly esteemed in the Arab world.

"Here's how I would explain to a jury all this legal mumbo jumbo," Motley told the crowd in the hotel conference room. The graphic behind him changed to a cartoon of heaving smokestacks and tangled pipes. "This," he said, "is a terrorist factory. Let's call it Al Qaeda Inc. And those smokestacks are spewing out terror, hatred, jihad, suicide bombers. So who's liable if you've lost a loved one to Al Qaeda Inc.?" He looked around. "It's the bank that loaned the money. It's the architect who designed the factory, knowing it was going to be spewing out hatred. It's the suppliers who supplied the factory with ingredients to manufacture terrorist acts. They're all responsible, each and every one." He thumped the podium. "That's the law of the United States."

Congress has indeed passed several antiterrorism laws over the last dozen years. In 1992, it enacted a law that said terror victims could sue for civil damages; in 1994, it explicitly criminalized providing "material support" for terrorist activities, making sure the definition included not just money but also lodging, training, personnel, telecommunications equipment, false documents, safe houses, transportation -- as broad a range of terrorism services as the authors of the bill could identify. In 1996, Congress also made it possible to file civil suits against foreign governments identified by the State Department as sponsors of terrorism.

The problem with these statutes -- particularly those involving "material support" -- is that they are vague, largely untested and now being challenged partly on First Amendment grounds. For now, Motley is relying on just a handful of precedents to make his case, hoping they aren't overturned along the way. The most important emerged from the Seventh Circuit in the summer of 2002, when the appeals court refused to dismiss a case against several American-based institutions alleged to have contributed to the Palestinian militant group Hamas; the court declared that the institutions could, under certain circumstances, be held liable for the Hamas killing of an American student, David Boim, in the West Bank, even if the charities had nothing to do with the specific planning of the murder. "Civil liability for funding a foreign terrorist organization," the opinion stated, "does not offend the First

Amendment so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping." The case, commonly known as Boim, is now in federal court in Chicago.

Of course, with a case involving 205 defendants, many of them armed with the finest legal representation that money can buy, Motley can expect a world's worth of obstacles before Burnett ever gets that far. There will be motions to dismiss, extensions, delays -- all manner of procedural jujitsu that will probably keep the case going for years. Perhaps the biggest procedural obstacle of all is the question of jurisdiction: unlike Boim, Motley's case goes mainly after parties abroad. While collectively they have substantial American assets, it's unclear whether American courts will feel comfortable asserting jurisdiction over them. "The courts," Gerson said, "have to become involved in dealing with the reality of foreign affairs."

From behind the podium, Motley told the audience that he was about to run what he said was a surveillance video made in 1997 by the Madrid Qaeda cell. He warned it would be chilling. "When we intervened with the Spanish prosecution of this case," he explained, "the judge gave it to us."

For Motley, Burnett is a case not ultimately about foreign policy but about facts, which means that proving his defendants knowingly provided material support to terrorists is his other significant legal challenge. For the last two years, he has bankrolled a worldwide intelligence-gathering operation that makes the discovery process, ordinarily marked by subpoenas and dry depositions, read like a Tom Clancy novel. One process server he hired, he told me, disappeared in Saudi Arabia. Motley himself has received death threats, prompting him to hire a 350-pound former Army sergeant, the same bodyguard who accompanied him during the tobacco years.

Around the globe, Motley has hired 10 foreign "informants" -- including a former Taliban official -- whom he insists on referring to by code names (Arnold, the Albanian, the Muslim, Top Source). He has also hired Jean-Charles Brisard, a French intelligence expert, to persuade foreign governments to cooperate with his suit. Brisard is the author of the European best seller "Forbidden Truth," which posited that before Sept. 11 the Bush administration tried to coerce the Taliban into surrendering Osama bin Laden in exchange for a lucrative oil pipeline.

Motley asked his assistant to show the video. The footage at first looked like any tourist video -- a busy Manhattan streetscape, food vendors and people whizzing by, a seemingly reverential shot of the green sign that says Wall Street. Then the camera slowly panned up and down the length of the World Trade Center, while a voice spoke in Arabic. The subtitle translated: "I'll knock them all down."

From the very earliest days of his career, Motley showed the kind of passion, cocksureness and hallucinatory sense of possibility that have long made trial lawyers a metabolically distinctive species. He lived on credit cards, spent weeks on the road, drank hard in the evening and jogged long in the morning. He took on projects that seemed like surefire losers, sometimes to the utter disgust of his colleagues. To this day, said his partner, Joe Rice, "Ron just assumes there'll be money there to pay the bills."

Yet few who know Motley, including his adversaries, would dispute his talents as a lawyer. He thinks quickly, possesses a gift for making difficult concepts accessible and can quote, almost verbatim, documents and testimony he read months before. In the courtroom, he lurches between ruthlessness and shameless vaudeville but still manages to endear himself to juries, probably because his antics -- like bringing water guns to court -- provide relief from the undertaker-sonorousness of most defense

lawyers. Slowness he finds infuriating, especially these days, as he waits for documents from his more leisurely and bureaucracy-prone counterparts in Europe. ("They meet more often than the elders of the Church of the Nazarene," Motley complained. "And probably get less done.")

But underneath the comedy runs a hard streak of determination. "With Ron, there's this huge sense of wanting to beat the pants off Goliath," said Paul Hanly, a New York lawyer also working on the Burnett case, who in previous years opposed Motley as a defense attorney. "And then there's this whole populist thing -- that he's up against the Republican-funded, blue-chip, white-shoe Wall Street law firms who wouldn't have hired him as a paralegal when he graduated from law school."

Motley grew up in North Charleston, S.C. From the time he was tall enough to reach the nozzle, he pumped gas at his father's service station in a mostly black, working-class section of town. He attended the University of South Carolina, had a brief stint as a high-school history teacher, then returned to the university for law school. His ascent after graduation was swift. He had his own name on the law-firm door by 1975. He became the youngest president of the South Carolina Trial Lawyers Association in 1977. During the early 1980's, he formed an archipelago of agreements with law firms around the country, trying asbestos cases by the dozen. Then, in 1993, the Mississippi attorney general, Michael Moore, recruited Motley and a handful of other lawyers to lead an improbable assault against Big Tobacco on behalf of his state. The case ultimately swelled into a gargantuan project involving dozens of plaintiffs' lawyers representing 46 states and five United States territories. Motley's firm represented 25 government entities and, in a remarkable settlement in 1998, secured $246 billion for them over the course of 25 years.

Motley's firm reaped an estimated $2 billion in fees from the tobacco settlement, too, but the money seemed only to fuel an already festering tension between Motley and his partners. As he was gambling on Big Tobacco, they were toiling away on less risky, less glamorous cases, trying to keep the firm solvent. Then Motley started talking about 9/11 litigation, even though he'd never tried a single international case in his life. The partnership, Ness, Motley, Loadholt, Richardson & Poole, dissolved in 2002. Motley and Rice went on to form their own firm, based in Mount Pleasant, S.C.

Motley's fans concede that to know him is to appreciate his pandemonium, but he also has a quieter side. "He has this reputation for being a brash, successful plaintiffs' lawyer," said Marc Kasowitz, who faced Motley in the tobacco years as a lawyer for the Liggett Group. "But in person, he's very straightforward, actually, and sort of a sensitive guy." During the asbestos years, Rice recalled, Motley took breaks from his depositions of witnesses with lung disease to go outside and cry.

Opportunistic and compassionate, bombastic and fragile, undisciplined and focused -- it's a binary personality code that applies to a lot of successful people, and it applies rather vividly to Motley, who for all his bluster still stands with the sloped posture of someone who's both heartsick and disappointed in himself. He is three times divorced, admits he still drinks more than he should and now regrets, in ways he could hardly have imagined, that he saw too little of his two children as they were growing up. When Thomas Burnett's father phoned in the winter of 2001, inquiring about a potential Sept. 11 lawsuit, what drew Motley in were doubtless the same things that always did -- money, publicity, outrage, intellectual sport. But there was something else, too, and that was a terrible sense of identification: his own 28-year-old son, Mark, had died just 10 months before, following experimental surgery for epilepsy. When he met the Burnetts in person three months later, he told them so.

"Understand, it's not like I use it as a marketing tool," Motley told me. "But people who haven't been through it, they don't know what it's like to be in the fog of death." He was silent for a second. "Like I'm told I did my son's eulogy. I'm told I got up that morning, wrote it out and never read from a script. I'm

told that it was the most eloquent thing anybody's ever heard. And I don't remember a word I said."

Twitching his eyes and bouncing his knees, Motley sat in the pillowed corner of a common room at the Pentagon City Ritz-Carlton last October, drowning in his own adrenaline. He was preparing for a hearing in Washington the next day, during which a judge was to entertain motions to dismiss the two highest-profile defendants in his case: Prince Turki al-Faisal, the former head of Saudi intelligence, and Prince Sultan bin Abdel Aziz, the Saudi minister of defense.

"Say," he shouted to a colleague. "Have you gotten that memo on the Prince of Baloney yet?" Motley was referring to Prince Turki, whom he also once referred to on television as "Prince Cooked Goose." He turned and elaborated. "Turki gave a speech last night and labeled our charges baloney. So now we have a new name for him."

Gerson, rabbinical and elegant in a three-piece suit -- Motley was in sweats -- gently admonished him, suggesting that perhaps he ought not call the princes names.

As a trial lawyer, Motley is a generalist. Though clearly important to him, Burnett ultimately amounts to another chapter in a long and varied career. The same cannot be said of Gerson. Thoughtful, arrogant and tangibly intense, he has spent most of his adult life contemplating the relationship between individuals and nations -- first as chief counsel to the American delegation to the United Nations under Jeane Kirkpatrick, then as a lawyer in the Reagan Justice Department working on international affairs. When Gerson discusses Burnett, he talks in sweeping, conceptual terms, not tactical ones. His attitude toward the case borders on the messianic.

Like many specialists in international law, Gerson said he believes that domestic courts have a role to play in holding foreign parties accountable for their misdeeds. He came of age as a doctoral student at Yale under the tutelage of Myres McDougal, the eminence grise of international law, who preached that lawyers had a legitimate role in advancing political objectives. As soon as he entered the private sector, he began to put this philosophy into practice, becoming the first lawyer to file a civil suit against Libya for the bombing of Pan Am Flight 103 over Lockerbie, Scotland. Shortly after Sept. 11, he had an idea for a similar suit aimed at Saudis. A colleague introduced him to Motley in the spring of 2002, at the private-jet area of Dulles airport, where Motley had diverted his plane in order to meet him. Having already agreed to represent the Burnetts, Motley was digging a tunnel in the same direction. The two men -- a Democratic trial lawyer and a neoconservative Reaganite -- made a verbal agreement that afternoon.

What Gerson sees in Burnett is the perfect opportunity for the judiciary to play a critical role in the war on terror, punishing those enemies of the United States that the executive branch, hamstrung by diplomatic considerations, cannot. "If we left justice solely to the U.S. government, when it has so many commercial and other interests with countries like Saudi Arabia, what action would be taken?" he asked. "We've refused to join the international criminal court. And trying to accuse a foreign country of criminal activity gets us into a terrible diplomatic mess. So why shouldn't they be held responsible in our courts?"

To those accustomed to the genteel rites of diplomacy, the adversarial American court system may seem an unfortunate forum to engage questions of international wrongdoing. In an affidavit in the Burnett case, Charles Freeman, a former ambassador to Saudi Arabia, disparagingly referred to this solution as "the privatization of foreign policy." Gerson prefers to call it the privatization of justice. Absent the judiciary, he argues, victims of terror have no other means of redressing wrongs. "Freeman's

notion, which represents institutionalized State Department dogma, is like the old idea that the Post Office is only something that the U.S government can do -- it's so antiquated it's absurd," he said. "The idea is that the government is obligated only to itself and responsible to no one. Well, that idea has been eroding with the advent of contemporary human rights. This is the great human rights case. It's the right to be free from terrorism."

American civil courts are not unfamiliar with lawsuits involving international human rights. Since 1980, lawyers have made shrewd use of an obscure 1789 law called the Alien Tort Claims Act, originally intended to combat piracy, which gives American courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." As a result, American judges have heard from Guatemalan victims of torture, from Haitian dissidents and from survivors of the Bosnian genocide. In the last decade, the same law has also been used in an attempt to hold multinational corporations accountable for malfeasance -- like Unocal, for example, for its alleged use of forced labor to provide security for oil pipelines in Myanmar.

The difference between Alien Tort cases and Burnett, however, can be measured in light years. Alien Tort cases are generally brought by human rights lawyers, working for a pittance, hoping to turn a 215-year-old law into an instrument of justice for citizens around the globe. Burnett is being brought by a plaintiffs' lawyer, toiling for a cut of the proceeds, hoping to use laws recently enacted by a law-and-order Congress to punish those who have brought harm to Americans. One can see how tastelessly opportunistic it might seem from the point of view of the human rights community: plaintiffs' lawyers, swooping in, turning a handsome profit off history's ugliest moments. Yet some human rights experts see real value in Burnett. "It seems like a righteous case brought by an experienced lawyer," said Paul Hoffman, the human rights attorney involved in the Unocal suit. "And who else has the kind of resources for it? Who else has that kind of cash up front?"

Motley does, of course. Yet there aren't many precedents for spectacular payoffs in cases like this one. Almost none of the plaintiffs who have sued successfully using the Alien Tort Claims Act have been able to collect from the hostile foreign parties they've targeted; generally, they are awarded default judgments when the defense doesn't show up in court. And most of the successful cases using antiterrorism statutes have been directed at countries on the State Department list of terrorism sponsors, like Iran and Cuba, whose American assets, if there are any, are generally frozen. The victories in all these cases are mainly moral rather than financial. In going after wealthy Saudis and Saudi financial institutions with considerable assets in the United States, Motley is part of the first generation of lawyers trying these cases who might actually be able to collect.

Unless, that is, the Bush administration tries to block the suit. As a rule the administration favors a limited role for the judiciary in international cases. Later this month, it will argue before the Supreme Court against the use of the Alien Tort statute for human rights cases, absent a law from Congress explicitly allowing as much. Even with an imprimatur from Congress, the president clearly doesn't like Motley's use of the antiterrorism statutes; back in October 2002, news articles reported "administration officials" saying that the government was considering asking the courts to dismiss the suit. Victims' families reacted with the outrage you'd expect. The administration never intervened.

But should the administration consider Motley's suit a threat? David Aufhauser, the former general counsel to the Treasury Department, said he believes that private and government action against terrorism are not mutually exclusive pursuits. "If brought soberly and with substance, private actions can be of material assistance to the government," he said. "Because I can tell you: the bankers of terror are cowards. They have too much to lose by transparency. Name, reputation, affluence, freedom, status. They're the weak link in the chain of violence. They are not beyond deterrence."

Jean Charles-Brisard, Motley's chief European investigator, was a bit late to arrive at La Reserve Hotel in Geneva one afternoon last December, but it didn't seem to matter. The witness he was meeting, Carmen bin Laden, wasn't ready to speak with him anyway, because she was still talking to a pair of foreign journalists about "Inside the Opaque Kingdom," her chronicle of tribulations within the bin Laden family. When she finally finished, she walked over to Brisard, magisterially shook his hand and took a seat on a hard maroon couch. She was trim, plump-lipped, imposing and, in her own way, spectacular. Her face was stretched as taut as a volleyball net, and her coat collar was a vivid species of fur. She pulled out a cigarette.

Carmen bin Laden is Osama's Swiss-born sister-in-law. She is currently embroiled in a bitter divorce from his half-brother Yeslam, who is a defendant in Burnett. This makes her, like many of the witnesses in Motley's case, fairly rich in ulterior motives. Her discussion with Brisard did not last long. After just a few minutes, she received a phone call and abruptly left. Brisard turned to me and apologized for her "bizarre" behavior. "She's not a key witness," he said. "She's a contextual witness."

Over the course of their investigation, Motley's team has learned what the professional intelligence community has long known: the information trade often involves questionable types. Michael Elsner, an associate at Motley Rice who often accompanies Brisard on these trips, told me of once receiving a phone call from a Russian fellow named Igor who said just enough about Islamic banks and charities operating in Chechnya to earn himself an invitation to chat. The man who showed up was bald, rotund and almost permanently attached to a shining silver briefcase. "He was supposed to get us things," Elsner said. Yet he never returned. It's probably just as well. A background check revealed that Igor had a small problem with embezzling.

With his $12 million, Motley has begun an investigation that even most nation-states could not afford. But money alone is not enough to form an ersatz C.I.A. Motley sought out former intelligence agents, journalists and professors, all of whom spent their lives obsessing about Al Qaeda. Some turned out to be shady and unreliable. Yet Motley has had some success. Early on, one of his sources in Afghanistan learned of a Taliban fighter who was selling a computer file that he claimed had belonged to Muhammad Atef, military commander for Al Qaeda until he was killed in November 2001 in Afghanistan. The seller wanted $80,000. Motley wired it to Dubai. Motley's team also discovered a document supposedly signed by Mullah Omar containing a directive to turn over $2 million "in Saudi Arabia aids" to a terrorist in central Asia. That got attention in the press.

But Motley also concedes that his team had a hard time separating wheat from chaff when it began its investigation two years ago. Fakihi's computer, which Motley was so pleased to have obtained, for example, ended up adding little to the information he'd already collected. The car that came with it is still sitting somewhere in Europe.

Motley is now focusing on the documents culled by foreign governments, which have already been vetted and, presumably, authenticated. This is where Brisard comes in. Though his book was criticized in the United States, he is nevertheless considered an expert on Al Qaeda's financing stream, particularly its Saudi tributaries, and has written a well-respected report on the subject for the United Nations Security Council. So far Brisard has gotten his hands on two million pages of documents from 35 foreign governments, some of them quite tantalizing: Swiss bank records of Osama bin Laden; Albanian intelligence reports on bin Laden business dealings; information from 34 Bosnian hard drives from the offices of Al Haramain Charitable Foundation, which Brisard said he managed to get instead of the F.B.I. (Why? I asked. "Because the U.S. promised to give them the technology to recover the deleted files, but didn't," Brisard answered. "And we did.") Recently, added Motley, an Oregon federal

prosecutor investigating Al Haramain called him, wondering whether he could have a look at those files. Motley said he obliged.

One may wonder why these countries would bother cooperating with an American civil lawsuit. Motley has a characteristically blunt explanation. "Please -- these countries have their own parochial agendas," he said. "Radical Islamic fundamentalism is a huge problem in France. A huge problem in Spain. A terrible problem in Germany. And look at Chechnya! Why do you need to look any further at why Russia's gonna help us? Or look at Jordan. It's a secular kingdom! They're certainly not rah-rah-rah on the Wahhabi movement."

How this formidable pile of information will be interpreted by the courts -- if Motley's case ever gets that far -- remains to be seen. For the lay person, any foray into the intelligence world is surreal and initially intoxicating; who wouldn't respond to the formation minutes of Al Qaeda, which the team obtained from Bosnia? If genuine, this and many of Motley's documents are certainly of historical relevance, but whether they're of legal relevance, demonstrating that Motley's defendants knew they were providing material support to terrorists, is another question entirely.

"The claim against my client is that it gave money to charities and the money ended up in the hands of terrorists," said Christopher Curran, the lawyer for Al Rajhi Bank, one of the banks being sued by Motley. "But these were government-regulated and government-approved charities that held themselves out as bona fide charitable organizations. When we Americans donate our clothes to Goodwill or our funds to the United Way, do we really know where it's all going? Don't we also rely on government regulation and the representations of the charities themselves?"

Even if Motley compiles enough evidence to prove his defendants knowingly financed terrorism, it may not be enough: the judge must still agree that it is appropriate for an American court to assert jurisdiction over them. In the cases of the Saudi Princes Turki and Sultan, for example, the judge did not. In November the United States District Court in Washington ruled that the allegations against the princes, as Saudi officials, were not enough to surmount sovereign immunity, a powerful privilege that protects states and their officials not just from liability but also from lawsuits themselves.

The ruling didn't affect Motley's banking, charity and nonsovereign defendants, but his team was devastated when it heard the news. "The judge proceeded as if it were a time of peace," Gerson said, "and it's a time of war."

For Gerson and Motley, war means interpreting the antiterrorism statutes as aggressively as possible. But even people sympathetic with their efforts think there are limits. Like suing sovereigns. "Look," said Aufhauser, the former Bush administration official, "you have to be mindful that bringing them into an American court is an invitation for enormous mischief abroad, potentially against former and current U.S. officials . . . like me."

The United States more or less had to cope with this problem last year, when Iraqi families, using Belgium's "universal jurisdiction" law (now amended to give immunity to world leaders), tried to call Colin Powell, former President Bush and Dick Cheney into court for the bombing of a civilian shelter during the gulf war in 1991. Youssef M. Ibrahim, a former New York Times reporter who is now the managing director of Strategic Energy Investment Group, a consulting firm based in Dubai, told me that two lawyers in Saudi Arabia are flirting with the idea of recruiting Iraqi clients to sue Donald Rumsfeld for the use of depleted uranium munitions in Iraq. What if their targets don't stop with Rumsfeld? And what if they also sue Lockheed Martin and Northrop Grumman for making those arms? Or their

engineers for designing them?

For those who believe the executive branch should be wholly in charge of foreign policy, Burnett feels like a mockery of international relations, a flagrant end run around the institutions designed to engage the world community. "If people think we should be tougher on these countries, we have a democratic process to try to bring that about," said Murphy, the former State Department official. "They can vote, they can lobby, they can form networks and lobby even better. But it shouldn't be dictated by the initiatives of just a few victims."

Particularly, the argument goes, when Saudi Arabia has an incentive to finally address the problem of terrorist financing itself. In May and November 2003, terrorists blew up housing complexes in Riyadh, which reportedly spurred more on-the-ground intelligence cooperation between the United States and Saudi Arabia than ever before. The Treasury Department, charged with tracing terrorism dollars, noted in an announcement in January that it worked jointly with Saudi Arabia to close down four offices of the charity Al Haramain outside the kingdom. Would now be the time to humiliate Saudi Arabia with a lawsuit, just as our objectives are finally starting to align?

"Basically, this is U.S. diplomacy by contingency-fee lawyer," said Curran, the defense lawyer. "No one disputes that all of those responsible for 9/11 should be tracked down and held fully responsible. But in this case, allegations have been made indiscriminately against some of the most prominent and reputable Saudi organizations and citizens -- many of whom are Western-oriented and could play a major role in fostering constructive relations between our two countries. These lawsuits undermine that possibility."

Meanwhile, the American budget and trade deficits continue to grow. Is now the time to scare away the foreign investors who are pouring money into the American economy and buying Treasury bonds? Less than a year after Sept. 11, The Financial Times reported, Saudi investors had already withdrawn as much as $200 billion from the United States. "At the end of the day, I believe this president will prevent this lawsuit," Ibrahim said. "There's nothing more cowardly, as you know, than capital."

Some human rights lawyers, though reasonably convinced of the merits of Motley's case, also balk at the "material support" clauses it relies so heavily upon, believing they've been defined too broadly and could therefore unwittingly penalize those who give money to groups they consider politically legitimate. "When Nelson Mandela came to Yankee Stadium, should all the people who put $10 in the hat be treated as terrorists?" asked David Cole, a human rights lawyer who is leading an aggressive challenge to these statutes. Cole pointed out that not long before, the United States government had labeled the African National Congress a terrorist organization. "Are we going to go down the road of guilt by association in the name of fighting terrorism, just as we did in the name of fighting Communism?" Cole said. "That's my principal concern."

Motley would point out that he is not going after $10 donors in his lawsuit, but the gulf states may not view it that way. "I give to charity personally," said Khaled Al-Maeena, editor in chief of The Arab News, an English-language newspaper published in Jidda. "You can quote me on this. A lot of people supported the Afghan struggle against the Soviet Union. Some of that money may have been siphoned. But that does not mean we are responsible for Sept. 11. Who are these people who are accusing them? They are fat-cat lawyers -- fat-cat lawyers who want to make money."

Indeed, perhaps the most discomfiting aspect of the Burnett case is the message it sends abroad. The United States already has an international reputation for unquenchable litigiousness. And Motley, often prone to rhetorical excess -- like referring to Prince Turki as Prince Cooked Goose -- hardly seems like

the most sensitive champion of private action against foreign defendants. The average Saudi may read about Burnett and feel not deterred but further inflamed: the United States walked away from the Kyoto treaty; it attacked Iraq with only meager international support; it repeatedly flouted the desires of the United Nations. And now, the United States, whose citizens are among the richest and luckiest on Earth, has responded to its misfortune with a trillion-dollar lawsuit aimed at, of all things, some of the most prominent relief organizations in the Middle East.

"A judgment will cause great resentment on the part of the people here," Al-Maeena concluded, with a sigh so audible it temporarily muffled our connection across the globe. "And it will be fuel, I think, for our own extremists."

In mid-December, the Motley team got some disorienting though not entirely unexpected news. A panel of federal judges ordered the consolidation of all Sept. 11 cases involving foreign defendants into the Southern District of New York. It's for the pretrial phase only, in order to spare the defendants the hassle of showing up in multiple courts for multiple lawsuits, but it nevertheless has its consequences. Motley, who had been following his own rhythms, must now reach a power-sharing agreement with the lawyers representing a dozen or so other cases, and their styles, defendants and theories of liability are not necessarily the same. As it turns out, Motley's first attempt at court-driven diplomacy may not involve his defendants but his new colleagues. And lawyers, of course, get along only slightly better than warring nations. So far, no agreement has been reached.

Because Motley has served the most defendants and is representing the most wrongful death claims, he will doubtless have leverage in this deal. And some of the other lawyers now involved in this case could prove a real asset to Motley's team. Like James Kreindler, for example. Though Gerson was the first to sue Libya in the case of Pan Am 103, it was Kreindler, an airline litigation expert, who ultimately represented most of the families. His faint New York patois and familiarity with the folkways of the Southern District also can't hurt; he seems to have a genuine rapport with the new judge in this case, Richard C. Casey.

But Kreindler has spent only $2million so far on his suit. A good portion of it went toward examining Al Qaeda's ties with Iraq, which now appears to be moot -- even if he could provide proof, the Bush administration has declared Iraq's assets off-limits. Most important, though, Kreindler's approach to his lawsuit is very different from Motley's. "You have to handle this case in a delicate way," he said, "in a way that doesn't burn bridges with our government." He stressed that he's a Democrat. "But I believe in letting the government go first in their criminal prosecutions, and it takes years for the government to do its work. But when that's done, you have the weight of the government behind you when you make allegations."

This approach does not harmonize well with Motley's instincts. Patience is not his strong suit. "Jim is the Job of the trial bar for waiting so long on Pan Am 103," he said. "But my clients don't want to wait. They want the trial last week."

And yet they may have no choice. The court system, their chosen means of justice, is a fundamentally slow, lumbering thing, and with so many different lawyers and philosophies now thrown in the mix, it seems now to be even slower. Motley's clients, like Motley himself, may have to accept that legal solutions to misfortune, as gratifying and empowering as they seem, still don't give their victims full control.

Still, Motley is proceeding apace, serving defendants and collecting documents from around the globe.

And Bush has yet to interfere. Last year, at a Republican fund-raiser in Little Rock, Deena Burnett said she asked the president what he thought of the lawsuit she had initiated. The two were standing side by side, waiting to have their picture taken together. She said that Bush turned and looked at her, just before the flashbulb popped. "You just keep doing what you're doing," he said.

*Jennifer Senior is a contributing writer for the magazine. She last wrote about Gov. George E. Pataki.*

**Correction:** *March 14, 2004, Sunday*

*An article on Page 36 of The Times Magazine today about Ron Motley, an American lawyer filing a suit against prominent Saudis and Saudi organizations over supposed connections to the Sept. 11 terrorist attacks, misstates a phrase in some copies in a quotation from Richard Shelby, an Alabama senator who has criticized the Bush administration for classifying information that may be about the Saudis. He said: "If we can help unravel the mystery of a lot of terrorist financing, I don't care who the president of the United States is. Or where the trail leads." He did not say "If Ron Motley can help unravel. . . ."*

*In some copies the article also omits Mr. Motley's assertion about the administration's response to his investigation. He said it had refused to help him.*

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top