# EXHIBIT 4



# The King of Torts vs. al-Quaida Inc.

The inside story of how a group of Charleston-based lawyers is going after al-Qaida and its money
BY TONY BARTELME
Of The Post and Courier Staff

*After Flight 77 crashed through the Pentagon and into my space, I was immediately blown to the floor, and I knew I was on fire.*

*I kept praying, and I kept crawling, literally yelling at myself, 'Kevin, keep moving, keep your legs moving, keep moving,' almost like a drill sergeant yelling at a new recruit. I finally stood ... and across the carnage I could see, through the smoky haze, the light of day.*

*I was probably the very first casualty to arrive ... And I remember a nurse yelling to someone, I don't know who, "50 percent, 50/50 chance," and that made me very, very mad. The doctors and nurses were tugging at my hands and my fingers and causing me a great deal of discomfort, and then I realized what they were doing when one of the doctors yelled out for the ring cutters. I yelled out, "Stop!"*

*And about 20 people stopped in their tracks, and I'm told it was a sight to see, but I managed to focus all my will and strength at that time to pull off my wedding band and my class ring and hand them over. And that was the last memory I had on Sept. 11th, and for me the fight was just beginning.*

*- Kevin Shaeffer*

Last month, in the lobby of an old hotel in Europe, Mike Elsner waited anxiously for the Afghan, his witness.

*What's he going to be like?* he thought.

Elsner, a lawyer for Motley Rice in Mount Pleasant, was working on what had become a vast private investigation into al-Qaida and its benefactors. His mission: Meet the witness, who had been flown in from Afghanistan the night before, and take his statement. Do it all quickly, and make sure no one gets hurt.

*What will he say?*

The witness appeared, and Elsner shook his hand. The man wore Western clothes and seemed well-educated, mixing English phrases with Dari, the language of Afghanistan. Over tea and with the help of a translator, they talked about Elsner's case, a lawsuit on behalf of 3,965 people who were

injured or lost loved ones on Sept. 11, 2001. They talked about Afghanistan.

*This man understands loss.*

Much of his life had been framed by war, he told Elsner. The Soviets destroyed his country in the 1980s, leaving more than a million of his people dead. A new darkness shrouded the ruins with the rise of the Taliban and al-Qaida.

In his opinion, al-Qaida was another invasion force. Instead of Soviets, they were Saudis, Pakistanis, Yemenis. These people seemed brainwashed. They believed in an extreme form of Islam that called for a holy war against more moderate Muslims like himself.

He told Elsner that he had joined the Northern Alliance to fight the Taliban and was devastated when al-Qaida assassins killed the alliance's commander, Gen. Ahmed Shah Massoud, two days before Sept. 11.

During several points in their conversation, he looked around to make sure no one was listening. He said al-Qaida was well-organized and had lots of money. That's why he agreed to help the Sept. 11 victims. If someone shut down al-Qaida's financial pipeline, then the group's power and reach would fade. But he said his participation in the lawsuit could put him and his family in danger back in Afghanistan. He wanted assurances that his testimony would be put to good use.

Elsner replied that it was crucial to the case.

They met again the next morning in a hotel conference room. As a precaution, the exact time and location were kept secret until a few hours before. During the interview, no one was allowed to enter or leave the room.

The testimony took about an hour and a half. The Afghan looked into the camera lens and said he had seen Saudi Arabians give money to al-Qaida and the Taliban. He named names. He said one transaction in the late 1990s involved about 1 billion Saudi rials, roughly $266 million.

When the interview was over, the witness joked that Elsner should come to Afghanistan and be interrogated.

It had been a memorable morning. If true, the Afghan's testimony showed how al-Qaida's roots were firmly planted in Saudi Arabia, one of America's staunchest allies in the Middle East. Elsner couldn't wait to call Charleston and tell the boss.

## I. THE LAWSUIT

Several months before the Afghan's testimony, Ron Motley relaxed on the patio of his $6 million beach house on Kiawah Island, lost for a moment in the story of Kevin Shaeffer.

"He was just a hundred feet from the nose of the flight that hit the Pentagon and was burned over 50 percent of his body. There were 30 people in the office of the chief of naval operations that morning, and 29 were vaporized or killed. Kevin just happened to be in a space that didn't get blown apart. And those rings - his wedding ring and Naval Academy ring - they symbolized the most important parts of his life, and he pulled them off with a courage I couldn't imagine."

To Motley and the others on his team, the victims' stories were like phantoms -apparitions that kept them up at night, made them forgo other cases, pushed them to work harder than they had in years.

"This case is more invigorating and intellectually intense than anything I've ever worked on," said Motley, who has battled asbestos and tobacco companies over billions of dollars. "This is something in which I believe very deeply, if not devoutly."

As squadrons of pelicans glided over the dunes, Motley described the creation of what sounded like a private CIA. He said he had a team of more than 50 operatives on the ground on five continents. Some were drawn from American and European intelligence agencies.

Using satellite phones to keep in touch with Motley's headquarters in Mount Pleasant, they mingled with arms dealers, took sworn statements from witnesses, sought tips from well-connected journalists and chased leads in India, Sudan - even tiny Liechtenstein.

They pored over evidence discovered by police in Spain, Germany, Bosnia, Luxembourg and Italy. Working closely with U.S. and British intelligence agencies, they poked through the rubble of Kabul, looking for clues left behind by the Taliban. In less than nine months, his people had amassed more than 170,000 pages of documents from 21 countries in 12 languages.

Yes, he said, this investigation was expensive. "They're burning through about $400,000 a month, not including the lawyers' salaries." And he was footing most of the bills. He said he had pledged $10 million of his personal fortune toward the investigation.

It was dangerous work. Some operatives had risked their lives to meet witnesses. Motley and others on his team sometimes wondered whether they might eventually become targets. This wasn't paranoia. Earlier this year, a man hired to serve legal papers against defendants in Saudi Arabia and the United Arab Emirates disappeared. Motley's associates hired a private investigator to find out what happened and learned that the man might have been murdered on a highway to the United Arab Emirates. Legal documents reportedly were in the passenger seat of the man's car.

It's unclear whether he was killed because of his assignment or disappeared with Motley's money. Motley's people have yet to receive any definitive answers about the incident from Saudi authorities. What is clear is that this is

no ordinary lawsuit, and that the stakes are huge. "Someone once said that tobacco was the mother of all lawsuits," Motley said. "Tobacco was child's play compared to this."

* * *

Filed last August in federal court in Washington, D.C., the Sept. 11 lawsuit alleges that 213 entities financed or supported al-Qaida.

Among the defendants are Osama bin Laden and top al-Qaida lieutenants, three Saudi princes, the government of Sudan, some of the world's more prominent Islamic charities and an assortment of Middle Eastern banks and billionaires. The Sept. 11 victims are seeking $1 trillion in damages, a number that reflects the wealth of the lawsuit's targets and Motley's flair for drama.

In Washington, D.C., the lawsuit has been received with a mixture of support and anxiety. Motley's people have received private attaboys from some factions of the Bush administration, though, Motley added, "I haven't been to the Rose Garden yet."

Others, particularly in the State Department, worry about Motley's investigators tripping over government operatives or causing a diplomatic blowout with Saudi Arabia and other important U.S. allies in the Middle East.

In Saudi Arabia, the lawsuit prompted a bevy of princes and billionaires to hire their own legal gunslingers. Lawyers for the leader of a Muslim charity called the lawsuit a witch hunt, "only today instead of witches, lawyers hunt Muslims."

Last year, financial analysts cited the lawsuit in reports that Saudi investors had pulled between $100 billion and $200 billion out of the United States, causing a temporary dip in the dollar. Commentators in Saudi Arabia urged boycotts of American goods and said that the United States should be sued for killing American Indians and dropping atomic bombs on Japan.

Less than a year old, the lawsuit marks the intersection of two very different trends. One is the rise of al-Qaida, a well-funded international network of terrorists that operates like a corporate holding company, a group that Peter Bergen said in his book "Holy War Inc." represents the "privatization of terrorism."

The other trend is the emergence of a cabal of powerful American trial lawyers. Flush with cash from settlements and court victories in the 1980s and 1990s and masters of building networks of their own, they are attacking problems normally handled by governments. One of Motley's associates calls this trend the "privatization of justice."

With their private jets and mansions, Motley and his peers may be the world's most well-heeled detectives in the hunt for al-Qaida's patrons. But, in a

relatively short time, this mix of entrepreneurial drive, wealth and logistical know-how has opened an intriguing new window into al-Qaida and its similarly well-heeled friends.

## II. THE LAWYERS

On a recent Saturday morning, Motley's beach house had been converted into the lawsuit's war room. Papers and folders were scattered on kitchen counters. Boxes stuffed with documents were stacked on the dining room table and floor. An assistant typed away on a computer in a room off to the side. Other lawyers were expected in a few hours for a strategy session.

Outside, a chocolate lab puppy wandered by a pool. The pool blended into the dunes and a breathtaking view of the Atlantic.

Motley, 58, is not an easy man to peg. He has a thin frame, a ruddy face and a drawl that has been compared to warm bourbon. While relaxing on his patio in a faded blue Tommy Bahama sweatshirt and sunglasses, his leg bounced up and down like a sewing-machine needle. He is self-confident ("The one thing we have on our side is the shining truth!" he said.) and strangely fragile.

Family deaths clearly haunt him. He talks often about his son, Mark, who died three years ago after an operation in Florida. Mark was named after Motley's younger brother, who died when Motley was 13. Motley's mother, a heavy smoker, died of emphysema, and her death fueled his fight against Big Tobacco.

He said the Sept. 11 lawsuit has become his life. He's recently divorced. "My son was killed, my daughter is married and lives out of state, my father works at the office, so I try to work in as much family time as I can," he said. "But this case is all-consuming. I work all the time, seven days a week."

While he has a plaintive air about him, he also has a quick, folksy sense of humor, one that probably would have won him friends at the gas station his father owned in the 1950s in North Charleston. When he answers the phone, Motley tells the caller, "Yeah, I've been busier than a one-legged kickboxer."

Motley appreciates colorful language and can tell a good yarn. But this case is a storyteller's nightmare, with its profusion of Arabic names and Byzantine web of defendants. "Sometimes, the best I can do is call them Scumbag One and Scumbag Two," he said.

Still, at its core, the case is about a few simple questions:

Who committed the mass murder on Sept. 11, 2001?

Who helped the killers?

How can they be punished?

"First you have to prove the murder," he said.

That task would be relatively easy. After the attacks, a worldwide dragnet identified the hijackers, their connections to al-Qaida, and how they trained for years to turn commercial jets into suicide missiles. A more difficult challenge was to expose those who helped the hijackers, the accessories to the murder.

"Say a 15-year-old kid gets on a bus and blows it and himself up. Who's at fault? The 15-year-old, of course. But what about the person who strapped the bomb onto him? What about the people who paid for the bombs? That's what this case is about, the people who aid and abet terrorism."

The Sept. 11 families had a new legal weapon at their disposal: the Patriot Act of 2001, which Motley said gives victims stronger legal standing to sue terrorist financiers. "The law doesn't require you to prove that a person directly gave $10,000 to (Sept. 11 hijacker) Mohamed Atta," he said. "All you have to do is prove that the person gave the money to a charity knowing that they were funneling money in a general way to al-Qaida. If you helped build the structure of the group that planned and executed 9-11, then you are guilty."

In a larger sense, he said, the Patriot Act "says that this country is creating a civilian army to be combatants in the war on terrorism, and that's what this lawsuit is doing."

* * *

Few law firms were better prepared than Motley's to mobilize a civilian army of lawyers and investigators. Motley was an early pioneer in "mass torts," a legal strategy in which lawyers combine thousands of clients' cases into a single high-stakes lawsuit.

While battling the asbestos and tobacco industries, his firm developed a nationwide network of local attorneys. These lawyers did the field work, identifying clients and filing the appropriate claims and motions in their hometown courts. If a case came to trial - and the potential for huge verdicts often led to settlements out of court - Motley and his team parachuted in like a special forces unit.

It was in the courtroom where Motley earned his reputation as one of the nation's most effective litigators. Colleagues talk with awe about his ability to recall a detail from a seemingly inconsequential deposition and use it to shred a witness.

His plain-talking style charmed and entertained juries. To make a point, he once shot a squirt gun at a defense lawyer. Another time, he walked into a courtroom wearing medical scrubs. For luck, he occasionally wore a pair of ostrich-skin boots he bought after an early asbestos win. Armed with a library of incriminating documents, whistleblowers, expert witnesses and Motley's

courtroom charisma, his unit often walked away with multimillion-dollar verdicts.

Largely because of his firm's work, more than 30 asbestos companies declared bankruptcy. Using money made from asbestos lawsuits, his firm took on the tobacco companies, spending $30 million to represent states suing over the public health costs of smoking.

In 1998, the tobacco companies agreed to pay the states more than $246 billion over the next 25 years. In Motley's office, not far from the painting of his 120-foot yacht, are framed copies of tobacco industry bank deposit slips, one to Mississippi for $170 million and one to Texas for $15.3 billion.

It has been widely reported that his firm earned as much as $2 billion in fees from the tobacco settlement. Motley isn't sure exactly how much, and Joe Rice, the senior partner with the best grasp on the firm's finances, declined to discuss the matter.

Whatever the precise amount, these fees will be paid over the next two decades and are an annuity of sorts that helped Motley's firm take aim at other targets, including companies that once made lead paint, HMOs and, now, al-Qaida and its supporters.

Some say that trial lawyers - such as those depicted in John Grisham's bestselling novel "The King of Torts" - have become too wealthy and powerful, and that they're using the courts to address issues better left to elected officials. Mass tort lawyers are "implicitly offering a new kind of deal to those disappointed in the political process," one of the most vocal critics, Walter K. Olson, writes in his new book "The Rule of Lawyers." "Are you failing to get what you want at the ballot box? Hire a lawyer instead."

But Motley and his peers in the trial bar see themselves as counterweights to profit-hungry corporations and a government that often fails to address serious issues of public health and safety. When Time magazine asked Dickie Scruggs, another prominent tobacco lawyer, whether trial lawyers want to run the country, he replied: "Somebody's got to do it."

Because of its success against tobacco and asbestos companies, Motley's firm began getting calls after Sept. 11, 2001, from those who had been injured or lost family members. At first, Motley wasn't sure what he could do. "When it came to international law, I was a virgin."

In March 2002, he and another lawyer in his firm, Jodi Flowers, flew to San Francisco to meet the wife and parents of Tom Burnett, one of the passengers who rushed the hijackers on Flight 93 over the Pennsylvania countryside. Burnett's widow, Deena, had talked to friends and scoured the Internet for information about attorneys.

"In all the research, I heard that Ron Motley could get information that no one else could get," she said. "And that's what I was after: How and why

Sept. 11 happened and why my husband was dead." Motley and Flowers left the three-hour meeting touched by the Burnetts' heartache and impressed with their determination to get answers.

Even before meeting the Burnetts, Motley had decided to go after al-Qaida and its financiers. Before he made it official, though, he wanted to talk it over with the partners, especially Rice, who tended to be more conservative than Motley about the firm's long-term goals.

The case would be time-consuming, emotional and expensive, they all agreed. It also came at an awkward time. More than a dozen attorneys had left to form their own firm, and the split had degenerated into lawsuits over the use of the firm's $13.6 million jet, legal fees from past cases and other issues. As a result, the firm changed its name from Ness Motley to Motley Rice.

Aside from the firm's internal squabbles, Rice was anxious about suing a violent terrorist group and the sheer complexity of suing 200 defendants. But as he talked to the victims, his skepticism melted. "And when you have Ron Motley and Joe Rice thinking along similar lines," Flowers would say later, "you have a pretty good consensus."

* * *

In early 2002, while Motley was pondering his Sept. 11 litigation strategy, Allan Gerson, a lawyer in Washington, D.C., was shopping for a law firm.

Like Motley, Gerson had a storied legal career. He spearheaded the first lawsuit against Libya in the 1988 bombing of a Pan Am jet over Lockerbie, Scotland. Libya eventually offered $2.7 billion to settle the suit. He helped write a 1996 law that made it easier for people to sue governments that sponsor terrorists. With Newsweek senior editor Jerry Adler, he co-wrote a book, "The Price of Terror." Several Sept. 11 victims had read the book and asked for Gerson's help.

"I didn't quite know how to respond at the time," Gerson said. "I told them that I would canvas the intelligence community." One of his contacts was former CIA field officer Robert Baer, who served with the agency for 21 years, mainly in the Middle East. Baer told Gerson to focus on the Saudis.

Gerson said he "quickly realized that this would be a difficult investigation, an immense undertaking."

In his case against Libya, Gerson was able to use evidence obtained by American and British government prosecutors. Going after the Saudis, with whom the United States had strong economic and political ties, "was a different kettle of fish."

Gerson contacted law firms in Washington, D.C., and New York that had the experience and financial resources to do a complex international case. "The

problem I found was that they all had done work for Saudis, or had business relationships with them," he said.

Earlier, he had read "Civil Warriors," a book that detailed Motley's fight with the tobacco companies. Through another lawyer, Harry Huge, Gerson and Motley were introduced. It was a natural fit: Motley needed international law experts, while Gerson needed a firm with deep pockets and no ties to Saudi Arabia. "I found a soul mate," Gerson said.

The legal team began to take shape. Motley would be at the top of the food chain, making final decisions about strategy, organization and hires. Gerson would handle international law issues and work Washington's political levers. Rice would be in charge of settlement negotiations, and Flowers would be the key contact with clients. She also would coordinate the drafting of the lawsuit, which would be titled Burnett et al vs. Al Baraka Investment and Development Corp. et al and end up more than 400 pages long.

Motley also enlisted Huge, a well-connected lawyer from Washington who lived part time in Charleston and had a list of legal accomplishments as big as his mansion on East Battery. Among other things, he played a key role in the nationwide tobacco settlement and a case involving the World Bank, Argentina and France. Huge resigned from his firm in Washington to work on the case full time.

Don Migliori, a partner in the firm's Rhode Island office, was assigned to cultivate expert witnesses and whistleblowers. Motley hired Mike Elsner, a young lawyer from New York who was a few blocks away when the Twin Towers fell. Elsner and Huge would work with European prosecutors and the team's overseas investigators - "spy stuff," Elsner would say later.

Rounding out the team was Jack Cordray, a private attorney in Charleston who had worked with Motley on asbestos cases. Cordray's main assignment was to get evidence from overseas sources.

"One of the first things we had to do was get inside the minds of these murderers," Motley said. "Why would they hijack four airliners, slit the throats of the passengers and crew and crash them into buildings full of innocent people?"

## III. THE DETECTIVES

Motley and his colleagues took a crash course in al-Qaida, mining the Internet and court system for documents and government reports.

One rich seam was the trial of people charged in the 1993 bombing of the World Trade Center. Evidence in that case showed how al-Qaida planned to simultaneously blow up 12 airliners over the Pacific Ocean.

Another source of information was the trial of four men charged in the 1998 bombings of U.S. embassies in Kenya and Tanzania.

During trial, federal prosecutors revealed the discovery of an al-Qaida training manual. Among other things, it outlined al-Qaida's mission: "The overthrow of the godless regimes and their replacement with an Islamic regime." The manual also taught new al-Qaida recruits about torture and assassination. Lesson 16, "Assassinations Using Poisons and Cold Steel," was typical. Among other things, it explained how to poison someone by putting ricin on his prayer beads. "It will kill your victim slowly but relentlessly," the manual said.

The government's star witness in the embassy case was Jamal al-Fadl, who handled Osama bin Laden's finances in the Sudan in the early 1990s.

Al-Fadl testified that bin Laden kept money in banks in Sudan, Malaysia, Hong Kong and Dubai. He said Sudanese government officials hired bin Laden's companies to do construction work and helped al-Qaida ship arms into Egypt. He told the court that the group had tried to buy uranium for a bomb.

Testimony by al-Fadl was the foundation for the Sept. 11 lawsuit's claims against the government of Sudan and African and Sudanese banks.

But Motley knew he needed more than old trial testimony and government reports to build a case for a jury. To build a paper trail, he needed receipts, bills and other documents that jurors could hold in their hands. He needed witnesses to tell a jury who made the deals and how they were done.

Motley decided early on that the FBI and other U.S. agencies probably wouldn't reveal the results of their criminal investigations to a group of private lawyers. "So we decided to create our own investigatory team," he said.

That's when Motley was introduced to Jean-Charles Brisard, a consultant from France who had done work for the French equivalent of the CIA.

\* \* \*

Brisard had been on al-Qaida's scent for years, publishing a report in 1997 that was one of the first public accounts of al-Qaida's growing financial reach and its connections to charities and wealthy Saudis. He also wrote "Forbidden Truth," a best-selling book in Europe that said U.S. attempts to combat al-Qaida had been compromised by Washington's close ties to Saudi Arabia.

With his background in intelligence and advanced degrees in international law and finance, Brisard had excellent contacts and was comfortable in the courtroom. He also knew where to stand on busy streets to lessen the chances of getting hurt in a car bomb explosion.

With Brisard on board, Motley's team soon had a network of informants, accountants and intelligence consultants at its disposal.

"Their backgrounds come from the business and intelligence community," Brisard said in a recent phone call from Paris. "Many are accountants and have experience with banks and computers."

Some had served in U.S. and European intelligence services and had their own web of informants, investigators and government sources. "They're able to understand quickly what it's all about, and they have lots of sources," Brisard said. "Their job is to open doors when they can and break down doors when it's necessary."

## IV. THE DISCOVERIES

With Brisard at the helm, Motley's investigators quickly produced results.

In America, they worked with a counter-terrorism group that sifted through the trash of Islamic charities in Virginia and found links to a Saudi billionaire. Dressed in Arab garb, one of the group's investigators also visited American mosques and tape-recorded sermons from radical imams.

In Central Asia, Motley's team coordinated its movements with U.S. and British intelligence agencies and recovered rare photographs of al-Qaida fighters and what Motley described as "report cards" from graduates of al-Qaida training camps. They acquired computer hard drives that held sensitive information and hired computer experts to crack Arabic codes.

In Europe, they found witnesses to document a clandestine gathering in 1996 of Saudi government officials, arms dealers and members of al-Qaida. Meeting in a swank Paris hotel, the Saudis reportedly agreed to pay millions of dollars in protection money if the group didn't strike Saudi interests.

Given the resources of the lawsuit's targets and the U.S. government, Motley's people assumed that their communications were being monitored. They weren't concerned about U.S. officials listening in, said Cordray, who worked closely with Brisard's operatives. "In fact, we want them to know what we're doing."

But to protect itself against al-Qaida and its allies, Motley Rice hired international security consultants to beef up security of its phones and computers. Security experts routinely sweep the offices and Motley's house for electronic listening devices. "Sometimes," Flowers said, "it feels like we're living in a Tom Clancy novel."

On occasion, Motley's investigators found documents and witnesses where U.S. intelligence officers came up empty. Some informants "were afraid that if they talked to the U.S. government, they would be arrested and sent to Cuba," Motley said. "So we had an advantage there."

Motley's squad flew often to Washington, D.C., to discuss the findings with high-ranking officials in the U.S. government. One senior government official described Motley's work as "extremely valuable" in the war on terror.

Some evidence was so sensitive that any reference to it in the press could put Motley's operatives in harm's way, the official said.

Motley's people immediately turned over important findings to the U.S. District Court in Washington, D.C., where a judge placed the evidence under seal.

Motley said this system was necessary. If his team gave information directly to the Pentagon or other agencies, they could classify the materials. If that happened, it would be difficult to use them in the lawsuit.

"My clients are patriots above all else," Motley said. "They decided that even if it's a one-way street, we would give the government all our documentary evidence. But we didn't want the information to go down a black hole."

\* \* \*

As he predicted, his team has received little help from U.S. government prosecutors. "I told them to go (expletive) themselves," Motley said to Flowers one day in March after federal prosecutors in Chicago stiff-armed their investigators.

Their reception in Europe was better, and on a cool morning last October in Madrid, Motley's team got one of its biggest breaks.

Earlier in 2002, Spanish police had raided the homes of several al-Qaida suspects, carting off documents, videos and other items. Cordray flew to Madrid to meet with Spanish Judge Baltazar Garzon. The two hit it off, and the judge agreed to show the evidence to Motley's team.

It was a moment Cordray said he would never forget. Two clerks walked into a courtroom and dumped thick binders of documents on a long desk where a panel of judges normally sat. Cordray opened the cover of one binder and soon found himself staring at hotel and rental car bills for Mohamed Atta, ringleader of the Sept. 11 hijackers. The bills showed that Atta had been in Spain shortly before the attacks.

Other binders contained transcripts of wiretaps, faxes and other documents. They told the story of a mysterious Syrian businessman, Muhammed Galeb Kalaje Zouaydi, who had once been an accountant for Saudi Arabia's minister of health.

The documents showed that Zouaydi was a business partner of another former Saudi minister. They showed how money was funneled from wealthy Saudis through dummy corporations in Spain to members of the Hamburg, Germany, al-Qaida cell.

"Look at this," Cordray said over and over to his colleagues that day. The paper trail from Saudi Arabia to the hijackers was there in black and white.

Then there was the curious videotape found in the home of Ghasoub Ghalyoun, one of Zouaydi's business partners.

The tape contained extensive footage of the World Trade Center from different angles. At one point, Ghalyoun glanced down a canyon of buildings toward the World Trade Center, then turned to the camera and said in Arabic, "I will knock them all down." Zouaydi and Ghalyoun are now awaiting trial in Spain on terrorism charges.

Brisard said this was the kind of hard evidence his team needed to impress a jury. "For the first time since the beginning of the investigation, and apart from unverified intelligence pieces or public domain information, we had access to raw material, actual and factual evidence," he said.

To organize the Spanish materials and get them back to Charleston for analysis and translation, Cordray rented a high-speed digital scanner in Madrid. The machine was so large it didn't fit in the courthouse's narrow hallways and had to be taken apart and reassembled in one of the courtrooms. Over several weeks, all 40,000 documents were scanned onto compact discs. Cordray flew back to the United States with the 12 discs in his briefcase.

\* \* \*

The Spanish documents offered a glimpse into how al-Qaida used middlemen to turn "clean" Saudi money into "dirty" money for the hijackers. In Germany, Motley's team found a wide open window into the hijackers themselves.

This break happened last fall when Huge read an article about the upcoming trial of Mounir El Motassadeq, who had been arrested on terrorism charges. Among other things, Motassadeq had signed Atta's will and managed bank accounts of another hijacker, Marwan al-Shehhi,

Huge wrote a letter to German authorities asking for their help and eventually flew there to meet with Chief Federal Prosecutor Walter Hemberger.

They met in Hemberger's office, both men flanked by assistants and translators. On the wall were large charts linking banks and charities with members of al-Qaida. Huge also noticed pictures from a movie based on Hemberger's prosecution of the Bader-Meinhoff gang, a 1970s-era terrorist group.

After some formalities, Hemberger dropped a bombshell: In Germany, victims of a crime can see prosecutors' files.

"My first thought was, 'I don't believe this,'" Huge said. "My second thought was, 'We're going to do this as soon as possible.' "

German investigators had amassed another 50,000 pages of documents, including testimony from informants who told how they had traveled to

Afghanistan to train with al-Qaida and how they were taught to break attacks into stages to ensure an operation's survival if a cell member was arrested.

The files also had evidence and testimony that discussed how Atta and other hijackers set up bank accounts in Germany, the United States and United Arab Emirates to pay for flight training in the United States.

With the Spanish and German documents in hand, Motley's team began to see connections that prosecutors in other countries had missed. A business card belonging to a Saudi Arabian embassy official was found in Motassadeq's apartment. The cell phone number of a Hamburg al-Qaida member was programmed into phones belonging to al-Qaida operatives in Spain and Italy.

Foreign prosecutors hadn't seen the extent of the al-Qaida cells' interaction "because they didn't have the time to investigate, or thought the information was impossible to get, or didn't think it was important at the time," Brisard said. "But we were able to centralize this information and help them connect some dots."

"It's amazing," Motley added, "that a bunch of hillbillies from Charleston, South Carolina, have been facilitating the exchange of information between European prosecutors."

\* \* \*

A lawyer's biggest challenge, Motley said, is to take a complex body of evidence and turn it into a story that a jury of ordinary citizens can understand. Every story needs a beginning, and one of Motley's most recent overseas coups showed how al-Qaida was born.

Working with police in Bosnia, his team obtained materials from a raid on an Islamic charity in Sarajevo in early 2002. During the raid, Bosnian police and FBI agents recovered a computer. When they checked the hard drive, they discovered a file labeled Tareekh Osama, Arabic for "Osama's History."

The file was packed with digital images of documents describing the formation of al-Qaida. It was as if investigators stumbled on a museum exhibit about the world's most notorious terrorist group. The file contained handwritten notes from bin Laden, organizational charts, receipts for weapons and minutes of meetings describing the formation of al-Qaida.

"Work of al-Qaida commenced on 9/10/1988 with a group of 15 brothers," the minutes of one meeting said, describing how bin Laden and others worked from sunset until 2 a.m. onfinancial and administrative matters. "The mentioned al-Qaida is basically an organized Islamic faction; its goal will be to lift word of God, to make His religion victorious." Other documents showed how the group evolved into an international terror network, and that "Sheikh Osama" had America in his sights as early as 1991.

Perhaps the most surprising discovery, though, was a handwritten list in

Arabic of 20 Saudi Arabian donors known as the "Golden Chain." Included on the undated list were two former Saudi ministers, members of bin Laden's family and several other wealthy Saudis. Next to their names were people believed to have received the money. Bin Laden's name was next to seven donors. Motley's team did some calculations and estimated that the net worth of Golden Chain donors was about $86 billion.

While the roster probably was created in the late 1980s, several years before al-Qaida became an international menace, it showed who may have helped nurture the group in its formative years. "It demonstrates a pattern of conduct that will be highly significant," Motley said. "The problem is that Saudi Arabia made a pact with the devil."

## V. THE COUNTERATTACK

On May 17, suicide bombers believed to be part of al-Qaida set off bombs in Morocco, killing 41 people. A week before, in what appeared to be a challenge to Saudi Arabia's ruling family, attackers shot their way into three housing compounds in the Saudi capital, Riyadh, and set off a series of suicide car bombs, killing 34 people, including a man from Awendaw and seven other Americans. "The blood of Saudi citizens was mixed in this tragic event with American blood," the Saudi foreign minister, Prince Saud, told reporters. Al-Qaida was back in the news.

It may seem ironic that both al-Qaida and the victims of Sept. 11 would target the Saudi royal family. But this incongruence sheds light on the curious cultural currents that shaped al-Qaida and led to the attacks.

Awash in petrodollars, Saudi rulers oversee a country where many Muslim clerics preach an extreme form of Islam. To maintain their grip on power, some Saudi leaders have forked over money to these clerics and charities known to support radical causes. Some of these clerics and charities, however, have links to al-Qaida, which views the Saudi royal family as corrupt. In effect, the Saudi ruling family has been funding their enemies, said Robert Baer, the former CIA officer, in a recent article in Atlantic Monthly magazine. He called the country a "breathtakingly irrational state."

This strange political drama may play itself out most starkly in the claims against Saudi Prince Turki al-Faisal. Depending on whom you talk to, Prince Turki is one of Motley's biggest fish, or one of his biggest made-up fish stories.

Educated at a U.S. prep school and Georgetown University, Prince Turki was Saudi Arabia's director of intelligence from 1977 to 2001.

The Sept. 11 lawsuit alleges that Prince Turki met with the Taliban in 1998 and offered money and goods in exchange for a promise from al-Qaida not to attack Saudi interests. "After the meeting, 400 new pick-up trucks arrived in Kandahar for the Taliban, still bearing Dubai license plates," the lawsuit alleges.

Prince Turki's lawyers filed a blistering response in U.S. federal court in early May asking that claims against him be dismissed. "No defendant has been more unfairly tarred by this libel than Prince Turki," it said. Attached to the motion were statements by the prince, including a speech he made last year at Georgetown University. In the speech, he described his affection for America, his country's work with the CIA in arming the guerrillas in Afghanistan, and what he said was a personal attempt to stop bin Laden. Noting that his father, King Faisal, was killed in a terrorist attack in 1975, Prince Turki said he traveled to Afghanistan in 1998 to persuade the Taliban to hand over bin Laden for trial in Saudi Arabia. Instead, the Taliban's leader, Mullah Omar, hurled abuse at him.

He said he returned to his country with a recommendation that it suspend diplomatic relations with the Taliban. "I deny that I in any way encouraged, funded, or provided a form of material or other assistance, direct or indirect, to enable Osama bin Laden and his al-Qaida network of terrorists to perpetuate these attacks," he said.

Prince Turki's lawyers also noted in a legal brief that the prince's interaction with the Taliban and bin Laden was done while he was a government official. As such, they argue, he is immune to prosecution.

"This court should no sooner entertain such claims than a foreign tribunal should take up the question whether the head of the CIA is civilly liable under another sovereign's laws for carrying out U.S. government policies," the brief said. This was a not-so-subtle suggestion that if the Sept. 11 lawsuit is successful, it could set a precedent for future lawsuits against U.S. leaders over their foreign policy moves.

Without being specific, Motley said he has witnesses "who have the goods on Prince Turki," and that his involvement was as "thick as mama's homemade tomato soup." Revealing their identities could put the witnesses in danger, but the evidence eventually will be made public. He said he was looking forward to grilling the prince in a deposition.

"When I'm finished with Prince Turki," Motley said, "he'll have a new name: Prince Cooked Goose."

* * *

Other targets of the lawsuit are girding for battle. Six Saudi Islamic charities said they would contribute $1 million to fight the lawsuit. Attorneys for the Muslim World League, a major Islamic charity, said in a recent court brief that Motley's team is "not seeking to alleviate their (clients') grief and suffering."

A lawyer for another defendant described the lawsuit as a "witch hunt launched by tobacco lawyers trying to once again make their millions off the tragedy of others."

Motley's team has another potential antagonist: the U.S. government. Key members of the Bush Administration, including the president himself, have had close business and personal ties to members of the Saudi ruling family.

The government could seek an order from the courts to have defendants dismissed on national security grounds. Motley said the State Department floated that idea last fall but backed off after a blitz by the Sept. 11 families.

Members of the Motley team have told their clients that it may be years before the litigation comes to any kind of resolution, though the glacial speed of civil litigation could be a plus for Motley's side.

New discoveries and other legal maneuvers often generate headlines, and Motley's team already has distributed some of its evidence to CNN, The Wall Street Journal and other media organizations, which have then done high-profile stories.

Last April, Motley supplied the National Commission on Terrorist Attacks, the group looking into whether the government could have prevented Sept. 11, with an extensive report. Motley said he hopes eventually to create a library of al-Qaida-related evidence for journalists and scholars.

Like water against a rock, the constant drip of information over years can be an effective agent of change, what Motley's colleague Gerson called "the politics of shame."

As the world becomes more connected, it was perhaps inevitable that America's growing legal industry would seek new markets overseas. If the Sept. 11 lawsuit succeeds, Motley's team will get 22 percent of any settlement and 33 percent of any winnings at trial. But Motley, who has earned enough to live many lifetimes in comfort, said it's not about money. It's about loss and anger and injustice and trying to set things right. It's personal.

He mentions the death of his son, Mark. "While that was horrible," he said, "the mental torture these people have gone through has been incredible. Some families haven't even gotten any body parts back. They see the images of those planes crashing into the buildings all the time. Think of the horror of living with these reminders."

And if his team takes the case to trial and wins?

"One of my clients had a son who was a firefighter and was killed, and she said money is only a factor if she can take it away from them," he said. "She said any money she gets, she'll throw a party in the backyard and burn it."

* * *

*My husband was able to call me from the airplane four times that morning. The first call came at 6:27. I asked if he was OK, and he said, 'No I'm not.' He said 'I'm on an airplane that has been hijacked. It's United Flight 93."*

*At 9:54, Tom called me for the last time. He told me that he was waiting until they were over a rural area to storm the cockpit. I pleaded with him to be passive. He yelled into the phone, "No, Deena, No! If they are going to crash this plane, then we're going to do something."*

*Tom and I have three daughters - 6-year-old twins and a 4-year-old...*

*I hear them talk to their dad by whispering prayers to him in the middle of the night.*

*They stuff crayon drawings into helium-filled balloons and watch them float toward heaven with the childlike hope than an angel will carry them to Tom.*

*They bring home good report cards and with pride lift them as high as they can into the air and excitedly say, "Dad, see what I did."*

- Deena Burnett


Click here to return to story:
http://www.charleston.net/stories/062203/911_22alqstory.shtml