**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

_____
                                                      )
In Re TERRORIST ATTACKS on          )          03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                        )          ECF Case
                                                      )
_____)

This document relates to:

   *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC)

**O'NEILL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
BANCA DEL GOTTARDO'S MOTION TO DISMISS**

**LAW OFFICES OF JERRY S. GOLDMAN &
ASSOCIATES, P.C.**

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

*Attorneys for the Plaintiffs*

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Gina M. MacNeill, Esquire (GM 0581)
Frederick J. Salek, Esquire (FJS 8565)

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION.................................................................................................... 1

FACTS ..................................................................................................................... 2

ARGUMENT ........................................................................................................... 3

I.    THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ......................................... 3

A.    A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT. ....................................................................... 3

B.    THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR FEDERAL CAUSES OF ACTION.................................................................................................................... 6

    1.    THE PLAINTIFFS ADEQUATELY ALLEGE THE DEFENDANT'S ROLE AS A MEMBER OF THE CONSPIRACY. ........................................................................6

    2.    PLAINTIFFS ALLEGE A CAUSE OF ACTION UNDER THE ATA  (COUNT NINE).9

    3.    THE COMPLAINT STATES A CLAIM AGAINST BDG UNDER THE ATCA............15

    4.    PLAINTIFFS PROPERLY STATE RICO CLAIMS AGAINST BDG. ...............17

C.    PLAINTIFFS SUFFICIENTLY PLEAD THEIR COMMON LAW CLAIMS. .......... 21

    1.    PLAINTIFFS HAVE PROPERLY ALLEGED NEGLIGENCE IN COUNT 8. ................21

    2.    PLAINTIFFS' CLAIMS FOR WRONGFUL DEATH, SURVIVAL, PUNITIVE DAMAGES, AIDING AND ABETTING AND CONSPIRACY SHOULD NOT BE DISMISSED..................................................................................................................22

    3.    THE PLAINTIFFS' CLAIMS FOR NEGLIGENCE, WRONGFUL DEATH AND NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE NOT TIME BARRED.................................................................................................23

D.    IF ANY OF PLAINTIFFS' CLAIMS ARE FOUND TO BE INSUFFICIENT, PLAINTIFFS SHOULD BE GRANTED LEAVE TO RE-PLEAD. ...................................... 24

**CONCLUSION** ................................................................................................................ 25

**APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO** *BANCA DEL GOTTARDO* ....................................................................................................................... 1

**CERTIFICATE OF SERVICE** ................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) ..................................................... 17

*Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215 (S.D.N.Y. 1992) .................... 7

*Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) .................................................................................................... 20

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) .................................................................. 19

*Bao Ge v. Li Peng*, 201 F. Supp.2d 14 (D.D.C. 2000), *aff'd.*, 35 Fed. Appx. 1, U.S. App. LEXIS 7311 (D.C. Cir. 2002) (*per curiam*) ........................................................... 15, 16

*Barrueto v. Larios*, 205 F. Supp.2d 1325 (S.D. Fla. 2002) ............................................... 17

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ................................... 23

*Boim v. Quranic Literacy Institute and Holy Land Foundation For Relief and Development*, 291 F.3d 1000, 1009 (7th Cir. 2002) ............................................. 9, 10, 11

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998 ................................................................................................. 4

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ........ 7

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................. 3, 4, 5, 25

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) ................................................................ 18

*Doe v. Islamic Salvation Front (FIS)*, 993 F. Supp. 3 (D.D.C. 1998) *motion granted,* 2001 U.S. App. LEXIS 18387 (D.C. Cir. July 10, 2001) .................................................... 16

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp.2d 158 (S.D.N.Y. 2003) .................... 19

*F.D.I.C. v. McSweeney*, 976 F.2d 532 (9th Cir. 1992), *cert denied*, 508 U.S. 950 (1993) ........ 22

*Falco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .................................................................. 19

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ................................................. 15, 16

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ..................... 19

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) ............................. 13, 22

*Foman v. Davis*, 371 U.S. 178, 182 (1962) ...................................................................... 25

*Friedman v. Hartmann*, 91 Civ 1523 (PKL), 1994 U.S. Dist. LEXIS 9727, *4 (S.D.N.Y. July 15, 1994) 19

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ................................................................. 3

*Griffin v. Paine Webber, Inc.*, 99 Civ. 2292; 2001 WL 740764; 2001 U.S. Dist. LEXIS 8937 (S.D.N.Y. 2001).................................................................................................................................. 15

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)................................................................ 13

*Hilao v. Estate of Marcos*,103 F.3d 767 (9th Cir. 1996)............................................................ 17

*Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258 (1992) ................................................. 20

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000)......................................... 13

*Ideal Electronic Co. v. International Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997*), aff'd on appeal after remand*, 2003 F.3d 53 (D.C. Cir. 1999) ..................................................................... 24

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 00 Civ. 7804 (LMM), 2004 U.S. Dist. LEXIS 3892 (S.D.N.Y. Mar. 12, 2004)................................................................................ 24

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765 (S.D.N.Y. 2005) ................... 7, 10, 15

*Iwanowa v. Ford Motor Co.*, 67 F. Supp.2d 424, 445 (D.N.J. 1999) ........................................ 16

*Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir. 1996)................................................................. 24

*Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004) ......................................................... 24

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)......................................................................... 16

*Kilburn v. Socialist People's Libyan Arab Jamhiriya*, 376 F.3d1123 (D.C. Cir. 2004) ............. 14

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993)......... 4

*Lerner v. Fleet Bank, N.A*., 318 F.3d 113 (2d Cir. 2003).......................................................... 20

*Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005)................ 6

*Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306 (E.D. La. 1994) .......... 24

*Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529 (S.D.N.Y. 1985)................................................. 12

*Mehinovic v. Vuckovic*, 198 F. Supp.2d 1322, (N.D. Ga. 2002)................................................ 17

*Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y. 1993) .................................................................. 20

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 74 F. Supp.2d 221 (E.D.N.Y. 1999).... 20

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ....................................................... 5

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002)....................................................................... 3, 4, 5

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289 (S.D.N.Y.2003).......... 16, 17

*Resolution Trust Corp. v. Hess*, 820 F. Supp. 1359 (D. Utah 1993)............................................................22

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................19

*Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95 (E.D.N.Y. 2000)............................................................7

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984)............................................................7

*Sparrow v. United Airlines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000), *appeal dismissed after remand*, 2001 WL 936257 (D.C. Cir. July 12, 2001)............................................................4

*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)............................................................4, 5

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984)............................................................16

*Twombly v. Bell Atlantic Corp.*, __ F.3d ___, No. 03-9213, 2005 U.S. App. LEXIS 21390 (2d Cir. 2005)............................................................4, 5, 6, 25

*United States v. Allen*, 155 F.3d 35 (2d Cir. 1998)............................................................19

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)............................................................19

*United States v. Turkette*, 452 U.S. 576 (1981)............................................................18

*Von Bulow v. Von Bulow*, 634 F. Supp. 1284 (S.D.N.Y. 1986)............................................................20

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001)............................................................4

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004)............................................................3, 4

*Yeadon v. New York Transit Authority*, 719 F. Supp. 204 (S.D.N.Y. 1989)............................................................24

## STATUTES

18 U.S.C. § 1961 *et seq.*............................................................3, 17, 21

18 U.S.C. § 1962(b)............................................................18

18 U.S.C. § 1962(c)............................................................18, 19, 20

18 U.S.C. § 1962(d)............................................................18, 20

18 U.S.C. § 1964............................................................3

18 U.S.C. § 2331 *et seq.*............................................................passim

18 U.S.C. § 2333............................................................passim

18 U.S.C. § 2339A............................................................10, 11, 14

18 U.S.C. § 2339B, ......................................................................................... 10, 11, 14

28 U.S.C. § 1350 ............................................................................................... passim

28 U.S.C. § 1367 ..................................................................................................... 21

42 Pa.C.S. § 5524 ................................................................................................... 23

N.Y. Est. Powers & Trusts Law § 5-4.1 (2003) ..................................................... 24

## OTHER AUTHORITIES

137 Cong. Rec. S4511 04 (April 16, 1991) .............................................................. 23

*Foreign Relations Law of the United States* § 702 (1986) ...................................... 16

International Criminal Tribunal for Rwanda ("ICTR") Statute, art. 3 ....................... 16

International Criminal Tribunal for Yugoslavia (ICTY Statute), Art. 5, adopted by the U.N. Security
    Council in Resolution No. 955, U.N. Doc. S/INF/50 (1994) ................ 15

Restatement (Second) of Torts §  302 (1965) ......................................................... 21

Restatement (Third) of the Foreign Relations Law of the United States (1987) ........ 15

Rome Statute of the International Criminal Court (ICC Statute), art. 7, July 1998, UN Doc. A/CONF.
    183/9 ................................................................................................... 15, 16

S. Rep. No. 102-342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22 ............. 11, 12

*Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831 (1993) .................. 22

## RULES

Fed. R. Civ. Proc. Rule 12(b)(6) ..........................................................................passim

Fed. R. Civ. Proc. Rule 15(a) ................................................................................ 24

Fed. R. Civ. Proc. Rule 8(a) ............................................................................ 2, 4, 5

Fed. R. Civ. Proc. Rule 8(f) .................................................................................. 4, 5

Fed. R. Civ. Proc. Rule 9(b) .................................................................................. 4, 6

## INTRODUCTION

On September 11, 2001, thousands of innocent men, women, and children, in New York City, at the Pentagon, and aboard four airliners were horribly murdered – burned, suffocated, crushed, and otherwise - as a result of an invidious criminal conspiracy targeting American lives and property. They experienced extraordinary pain and suffering. They died. They lost the opportunity to see their children and their grandchildren. They were deprived of the chance to grow old with their spouses. They lost their property and their livelihoods. Thousands of others – their spouses, children, parents and other loved ones - had their lives irreparably shattered.

This lawsuit seeks to utilize the American system of justice to recompense them for this tragedy and to help prevent other families from suffering similar terrible losses.

This is what the O'Neill cases[1] are all about.

***

Defendant Banca del Gottardo[2] (collectively referred to as "BDG" or "Defendant") filed its Motion to Dismiss alleging that the causes of action were improperly pled.

The Defendant cannot escape its liability for the horrendous events of September 11, 2001, by way of this Motion. The causes of action in the complaint are adequately pled and

---

[1] The instant case, *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC) ("*Al Baraka*") one of the cases which are part of the instant multi-district litigation. The decedent, John P. O'Neill, Sr., was murdered on September 11, 2001 as a result of the activities committed by the Defendant named herein, and those named in the companion cases of *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et al.*, 04-CV-1922 (RCC), and the *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.,* 04-CV-1076 (RCC)*,* as well as the other cases part of the instant multi-district litigation, as alleged in the pleadings. See, e.g., FCC Exhibit 0, ¶ 2. The named Plaintiffs consist of the Estate of the Decedent, together with certain named heirs at law, and a proposed class consisting of others similarly situated. FCC ¶¶ 14, 16, 18, 19, 20, 21, 128. Class certification has not yet been sought.

[2] The instant case was commenced on March 10, 2004. The original complaint listed a number of "John Doe" defendants. FCC 27. It was amended on October 15, 2004 and then on December 31, 2004, at which point the instant Defendant was added to this particular suit. Following service, pursuant to a stipulation, approved by the Court on or about July 26, 2005, a RICO/More Definite was filed on September 1, 2005. Plaintiff incorporated such allegations into an amended More Definite Statement, filed on September 30, 2005, and then later that evening filed with the District Court the First Consolidated Complaint ("FCC"), where such amended More Definite Statement was physically attached as Exhibit O ("Exhibit O") and incorporated herein by way of paragraph 127 of the FCC, filed pursuant to CMO 2, ¶¶ 13, 14, and which was served email on that date.

presented in accordance with the requirements of Rule 8(a) and the applicable law.

## FACTS

It is alleged that the Defendant participated in a world-wide conspiracy which culminated, for purposes of this case, in the attacks of September 11, 2001, causing massive death and destruction in New York, Pennsylvania, and the Washington, D.C. area. To seek monetary compensation for the wrongs committed by the conspirators, in the form of actual and punitive damages, the O'Neill Plaintiffs have brought this action in a United States Court.

The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the Defendant and others, who have conspired for many years to attack the United States, to destroy American property,  and murder innocent United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. FCC ¶¶ 1, 2; See Appendix I, hereof Sec. 1-34. [3]

In essence, as described at length in the pleadings, and discussed in part, below, the Defendant conspired with Osama Bin Laden ("Bin Laden"), al Qaida, foreign states, and others to raise, launder, transfer, distribute, and hide funds for Bin Laden and the rest of the Enterprise in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. See, e.g., FCC ¶¶ 22, 23, 25, 44, 144.

Defendants' concert of action and conspiracy to support and promote Bin Laden and al Qaida were a proximate cause of the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs, and damaged and/or destroyed their property. FCC ¶¶140, 144, 170, 173. As a result, Plaintiffs have suffered damages as set forth in the pleadings. FCC ¶¶146, 179-80; Exhibit

---

[3] Attached hereto and incorporated herein as Appendix I is a table summarizing the factual allegations contained in the pleadings relevant to the Defendant and the issues raised herein.

0 Secs. 14-5.

## ARGUMENT

I.  **THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.[4]**

Plaintiffs have sufficiently alleged claims under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2331 *et seq.* (Count 9), Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (Count 10),[5] the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA") (Count 2), and the common law.[6] These claims should not be dismissed.[7]

### A. A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT.

BDG moves to dismiss the Complaints pursuant to Fed. R. Civ. Proc. 12(b)(6), for failure to state a claim upon which relief could be granted. Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). Plaintiffs are not required to prove their case at

---

[4] In addition to its legal arguments, the Defendant, in its Memorandum, makes unsworn, unpled and unsupported factual averments (See e.g., pp 1-2). The Defendant's attempt to introduce purported 'facts' as part of its motion are improper and should be stricken.
[5] 18 U.S.C. § 2333 provides for a private right of action under the ATA, while 18 U.S.C. § 1964 provides for a private right of action under RICO.
[6] The common law claims are wrongful death (Count 3), survival (Count 4), negligent and/or intentional infliction of emotional distress (Count 5), conspiracy (Count 6), aiding and abetting (Count 7), negligence (Count 8), and punitive damages (Count 11).
[7] Defendant has moved (see Mem. p. 14) to dismiss Plaintiffs' claim (Count 1), under the Torture Victim Protection Act ("TPVA"), 28 U.S.C. §1350 note. Plaintiffs do not currently intend to pursue this claim against this Defendant. Plaintiffs reserve the right, however, to re-plead this claim against Defendant should additional information become available in discovery demonstration that he acted "under actual or apparent authority, or color of law, of any foreign nation" in connection with its support of al Qaida.

the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001). The issue on Rule 12(b)(6) motion "is not whether a plaintiff is likely to likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

In determining whether Plaintiffs could ultimately prevail, the Court must accept as true the facts alleged in the pleadings and draw all reasonable inferences in Plaintiffs' favor. *Wynder*, 360 F.3d at 78; *Phelps*, 308 F.3d at 184.

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. Proc. 8(a), which are extremely permissive. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 513 (2002). Indeed, Rule 8(a)(2) provides that a complaint only need include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id*. at 512 (quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), *appeal dismissed after remand*, 2001 WL 936257 (D.C. Cir. July 12, 2001). Furthermore, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. Proc. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *Leatherman  v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168-9 (1993); *Twombly v. Bell Atlantic Corp*., No. 03-9213, 2005 U.S. App. LEXIS 21390, *20-25 (2d Cir. 2005).[8]

---

[8] Moreover, Fed. R. Civ. Proc. 8(f) requires that federal district courts construe all pleadings to do "substantial justice."  Therefore, pleadings should not be dismissed for technical defects. The pleading should be construed as a

Several recent Second Circuit cases underscore and re-affirm these cardinal principles. In *Phelps*, the Court of Appeals held that a district court "may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." *Id*. at 186-87. The Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations. *Phelps*, 308 F.3d at 187. Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point, courts must take care lest judicial haste in dismissing a complaint in the long run makes waste. Untimely dismissal may prove wasteful of the court's limited resources rather than expeditious, for it often leads to a shuttling of the lawsuit between the district and appellate courts. *Id*. at 185 (citations omitted).

In *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. Quoting the unanimous Supreme Court ruling in *Swierkiewiez*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13 ).

Again, last month, the Circuit reiterated that Rule 8(a) requires only (i) a short and plain statement of the grounds of the court's jurisdiction; (ii) a short and plain statement of the claim showing that the pleader is entitled to relief; and (iii) a demand for judgment for the relief which the pleader seeks. *Twombly v. Bell Atlantic Corp*., No. 03-9213, 2005 U.S. App. LEXIS 21390, *19 (2d Cir. 2005). All that is required is that the pleading provide a defendant with "fair notice"

---

whole, to determine whether adequate notice of the claim or defense is presented. Fed. R. Civ. Proc. 8 (f); *Conley v. Gibson*, 355 U.S. 41, 48 (1957) (complaint construed to do substantial justice).

of the claim and the grounds upon which it rests; it is not meant to impose a great burden upon the plaintiff, or require the pleading of facts except in exceptional circumstances. *Twombly*, 2005 U.S. App. LEXIS at *19-20.   Moreover, the requirement of a heightened pleading standard is narrowly circumscribed to averments of fraud and mistake only, *Twombly*, 2005 U.S. App. LEXIS at *20-5 (more specified pleadings are not required in anti-trust cases); Fed. R. Civ. Proc. 9(b). [9]

BDG does not, and can not, claim that it did not receive fair notice.  Because the pleadings provide fair notice, there is simply no basis for a dismissal at this time.

**B.  THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR FEDERAL CAUSES OF ACTION.**

1.  THE PLAINTIFFS ADEQUATELY ALLEGE THE DEFENDANT'S ROLE AS A MEMBER OF THE CONSPIRACY.

As set forth the pleadings, the events of 9/11, was the product of a world-wide conspiracy in which the Defendant is alleged to have participated.  E.g., FCC ¶¶ 1, 6-10, 22-5, 144.  By joining a conspiracy,[10] knowing that acts in furtherance of the conspiracy have taken place or will take place within the United States, the Defendant assumes liability, for both jurisdictional and substantive purposes.  *See, e.g., Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 581-2 (E.D.N.Y. 1998); *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215, 220-222 &

---

[9] Notably, in *Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005), the District Court rejected the defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here.  In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations.  2005 U.S. Dist. LEXIS 18864 at *11-23.  Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent."  2005 U.S. Dist. LEXIS 18864 at *42.  The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure. The *Linde* court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  *Id.* at *50.
[10] The Second Circuit has held that claims of conspiracy in an anti-trust prosecution need not be pled by way of evidentiary allegations. The complaint merely needs to avoid the extremes of 'bare bones' or 'implausibility.' *Twombly*, 2005 U.S. App. LEXIS at *27-34.

n.6 (S.D.N.Y. 1992); *Singer v. Bell*, 585 F. Supp. 300, 302-3 (S.D.N.Y. 1984); [11] *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp.2d 431, 446 (S.D.N.Y. 2000).  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial  Corp*, 527 F.2d 87, 93 (2d Cir. 1975).

The prima facie showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt at in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital*, 778 F. Supp. at 1267.  This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy, plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 805 (S.D.N.Y. 2005) (citations omitted).

> a)  The O'Neill Pleadings Adequately Demonstrate the Conspiracy and the Defendant's Role Therein.

The Defendant was a part of a conspiracy to attack the United States.  Fairly read, the pleadings allege that the Defendant knowingly assisted in the movement of funds to al Qaida and/or otherwise assisted in their financial activities in furtherance of the conspiracy.  Moreover, al Qaida's ambition to attack the United States, and New York in particular, was well known for many years prior to the September 11th Attacks.  Thus, the potential effects in the United States

---

[11] The district court notes that a conspiracy can rarely be proved by direct evidence and usually is established by circumstantial evidence and the totality of conduct of the parties and the reasonable inferences which can be drawn therefrom; mere speculation and conjecture are not enough. *Singer,* 585 F. Supp. at 303-4.

of assisting al Qaida were undeniably foreseeable to that terrorist organization's sponsors and

supporters, including the Defendant.  Further, the Plaintiffs have alleged that the September 11th

Attack was a direct, intended and foreseeable product of the material support provided by the

Defendant and al Qaida's other sponsors and facilitators. FCC ¶163.  Indeed, given that al Qaida

had repeatedly declared that its primary objective was to conduct terrorist attacks against the

United States, it is self evident that the entities and people who chose to knowingly assist, aid or

sponsor al Qaida did so in order to assist that terrorist organization in mounting successful

attacks, and that the individuals chosen to carry out such attacks, and that the individuals chosen

to carry out such attacks act "for the benefit" and "on behalf" of all of the organization's

members and sponsors.  When read in a light most favorable to the Plaintiffs, the allegations of

the pleadings give rise to a reasonable inference that the Defendant was a member of al Qaida's

conspiracy to attack America.

        For example, as demonstrated at length in Appendix I, it is alleged that the Defendant

was a member of the conspiracy, that it was engaged in money laundering activities on behalf of

the conspiracy, including, without limitation, on behalf of al Qaida, sovereign defendants, and

other co-conspirators, including Al Taqwa  and that the hijackings, causing the death and

destruction on September 11, were the culmination of a conspiracy among the Defendants to

attack the United States and murder United States citizens and to disrupt economic activities

within the United States and of the victims of the attacks.  FCC ¶¶2, 22, 25.  The attacks of

September 11, 2001 were not isolated incidents, but rather the coordinated effort of a terrorist

organization, after years of planning, and utilizing an extensive network of support and aid, by

various individuals, including the Defendants herein. FCC ¶2.  The Defendants, who conspired

with each other, knew or should have known that their actions in furtherance of a conspiracy to

commit international terrorist acts against the United States and its nationals, including the

events of September 11, would result in the murder of innocent persons. FCC ¶¶ 151, 152.

## 2. PLAINTIFFS ALLEGE A CAUSE OF ACTION UNDER THE ATA (COUNT NINE)

Defendant BDG argues that Plaintiffs failed to adequately allege that it knowingly

provided material support to terrorist activities, causation, or that it committed acts of

international terrorism sufficient to support a cause of action under the ATA  Their argument is

without merit.

An analysis must begin with the statutory framework that permits a private cause of

action in order to recover for injuries resulting from international terrorism. In this regard, §2333

provides, in pertinent part:

> Any national of the United States injured in his person, property, or business
> by reason of international terrorism, or his estate, survivors, heirs, may sue
> therefore in any appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the costs of the suit, including
> attorney's fees.

The ATA permits a private cause of action for inquiries resulting from international

terrorism. There can be no doubt that the acts of September 11 were acts of "international

terrorism" within the meaning of §2333 and BDG does not meaningfully contend otherwise.

The Seventh Circuit Court of Appeals recently interpreted these provisions.  *Boim v.*

*Quranic Literacy Institute and Holy Land Foundation For Relief and Development*, 291 F.3d

1000, 1009 (7th Cir. 2002), considered the case of the parents of a United States citizen who was

murdered in Israel by members of the Islamic revolutionary organization, Harakat Al-

Muqawama Al-Islamiyya ("HAMAS").  The parents brought an action under § 2333 against not

only individual defendants alleged to have aided, abetted and financed those individuals through

a series of complicated transactions. *Id*. at 1004. The organizational defendants moved to dismiss

the complaint for failure to state a claim upon which relief may be granted. *Id*. The district court denied the defendants' motion to dismiss, and the Seventh Circuit subsequently affirmed that judgment. *Id*. at 1001. In so doing, the Seventh Circuit concluded that funding, by itself, was insufficient to support liability. The court, nonetheless, recognized two theories of liabilities a under which the plaintiffs' complaint could be sustained under § 2333.

Under the ATA, a defendant is liable if it provided any material support to al Qaida with knowledge of its terrorist agenda or if it aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct. *See Boim*, 291 F.3d at 1021 ("[I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence.").[12]

Furthermore, this Court has already recognized that, under the ATA, "material support includes money [and] financial services . . . ." January 18 Order, 349 F. Supp.2d at 825.  As demonstrated above, Plaintiffs have alleged that BDG knowingly and intentionally provided money and financial services to Osama bin Laden and al Qaida.  Accordingly, under the standards set forth in this Court's January 18, 2005 Order, Plaintiffs have properly pled a claim under the ATA.

First, the court concluded, a plaintiff may recovered under § 2333 if he can prove that the defendants violated 18 U.S.C. §§ 2339B, 2339A, and 2339B, which criminalize the provision of "material support or resources" to terrorist and foreign terrorist organizations, respectively. *Boim*, 291 F.3d at 1012-13.  As used in §§2339A and 2339B, the term "material support or resources" means "currency or other financial securities, financial services, lodging, training,

---

[12]  Reviewing the legislative history, the Seventh Circuit concluded:  "All of this history indicates an intent by Congress to allow a plaintiff to recover from anyone along the causal chain of terrorism."  *Boim*, 291 F.3d at 1011.

safe houses, false documentation or identification, communications equipment, facilities,

weapons, lethal substances, explosives, personnel, transportation and other physical assets,

except medicine or religious materials."[13] 18 U.S.C. § 2339A(b).[14]

The second theory of liability endorsed by the Seventh Circuit permits recovery under §

2333 where the plaintiffs have proven that the defendants have aided and abetted an act of

international terrorism. *Boim*, 291 F.3d at 1021. The court reasoned that "although the words 'aid

and abet' do not appear in the statute, Congress purposely drafted the statute to extend liability to

all points along the causal chain of terrorism." *Id*. at 1019-20.  Specifically, Congress defined

"international terrorism" to include activities that "involve violent acts or acts dangerous to

human life that are a violation of the criminal laws of the United States or any State  . . .  " 18

U.S.C. § 2331(i) (emphasis added). The court concluded that such language "taken at face value

would certainly cover aiding and abetting violent acts." *Boim*, 291 F.3d at 1020. The court

further stated that the failure to impose aider and abettor liability on those who knowingly and

intentionally funded acts of terrorism would thwart "Congress' clearly expressed intent to cut off

the flow of money to terrorism at every point along the causal chain of violence." S. Rep. 102-

342, at 22. *Boim*, 291 F.3d at 1021. The Ninth Circuit held similarly in *Humanitarian Law*

*Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000), and flatly rejected the argument that specific

intent to aid an organization's illegal activities must be proven before liability would attach. *Id*.

---

[13] It should be noted that the term "material," as used within this statutory framework, "relates to the type of aid
provided rather than whether it is substantial or considerable." *Boim*, 291 F.3d at 1015.

[14] The Seventh Circuit reasoned that "[w]hen it passed section 2339A and 2339B, Congress undoubtedly intended
that the persons providing financial support to terrorists should also be held criminally liable for those violent acts . .
. [I]t would be counterintuitive to conclude that Congress imposed criminal liability in section 2339A and 2339B on
those who financed terrorism, but did not intend to impose civil liability on those same persons through section
2333," *Boim*, 291 F.3d at 1014. Accordingly, the court concluded that, if the *Boim* plaintiffs could prove that the
organizational defendants violated either § 2339A or 2339B by providing material support or resources to terrorist
activities, then that conduct was necessarily sufficient to support a finding of "international terrorism" under §§
2333 and 2331. *Boim*, 291 F.3d at 1015. In other words, those acts would give rise to civil liability under §2333 so
long as it was shown that such support was provided knowingly and intentionally. *Boim*, 291 F.3d at 1015.

at 1134.

In the instant case, the Plaintiffs have sufficiently alleged a cause of action 18 U.S.C. §
2333 against Defendant BDG. In this regard the FCC repeatedly  alleged, for example, in FCC ¶¶
22, 57-8, 59-60, 76, 78-9, 81-5, Exhibit 0 ¶¶ 19-21-7 that Defendant BDG was a co-conspirator
who aided and abetted al Qaida with al Taqwa, Nada and other defendants.

a)   The Plaintiffs Have Adequately Alleged the Necessary Causal Link.

Defendant claims that Plaintiffs have failed to plead a sufficient causal connection
between its actions and the September 11 terrorist attacks to sustain a claim under the ATA, or
any other cause of action. In making this argument, BDG completely ignores Congress' express
direction that the ATA is intended to "impose.. liability *at any point along the causal chain* of
terrorism." S. Rep. No. 102-342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22. (Emphasis
added.)  In making this argument, BDG fundamentally misapprehends the elements of plaintiffs'
conspiracy theory and ignored the allegations of the FCC.  Moreover, under New York law,
"those who aid or abet or conspire in tortuous conduct are jointly and severally liable with other
participants in the tortuous conduct, regardless of the degree of their participation pr culpability
in the overall scheme."  *Lumbard v. Maglia, Inc*., 621 F. Supp. 1529 (S.D.N.Y. 1985).

A causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's
injuries were caused by "an unlawful overt act performed by *one of the parties* to the
agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)(emphasis added).
Pursuant to this standard, BDG's participation in the conspiracy to commit terrorist attacks
against the United States, and aiding and abetting of that terrorist organization, ties it inextricably
to the Attack.  As Plaintiffs' injuries are indisputably the direct result of that Attack, Plaintiffs
have properly and adequately alleged causation. Accordingly, BDG's causation-based arguments

12

must be rejected.  It is sufficient that Plaintiffs plead, as they have, that this Defendant knowingly provided material support to al Qaida and/or aided and abetted al Qaida in its terrorist agenda. Moreover, the law is clear that the assistance provided by BDG need not have been used directly in the actual September 11 attacks. Under the ATA, defendant is liable if they provided any material support to al Qaida with knowledge of its terrorist agenda or if they aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

In keeping with the foregoing principles, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing financiers and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot.  As the United States District Court for the District of Columbia observed in *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998): "[a] Plaintiff need not establish that the material support and resources provided by a foreign state for a terrorist act contributed directly to the act from which his claim arises . . . [s]ponsorship of a terrorist group which causes the personal injury or death of a United States national alone is sufficient . . " *Id*. at 18. The Seventh Circuit adopted the same standard in *Boim v. Quranic Literact Inst.*, 291 F.3d 1000 (7th Cir. 2002), holding that plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof, *Id*. at 1023.

More recently, the D.C. Circuit explicitly held that application of the 'but for' standard of causation is manifestly improper in cases arising from the provision of material support to a

terrorist organization. *Kilburn v. Socialist People's Libyan Arab Jamhiriya*, 376 F.3d1123, 1130

(D.C. Cir. 2004).

      Here, the FCC alleges that Defendant provided "material support" to al Qaida in its

terrorist enterprise, as described above.  Under *Boim*, these allegations state claims against BDG

for violations of the Anti-Terrorism Act. [15,16,17]

      Pursuant to these standards, BDG's participation in al Qaida's conspiracy to commit

---

[15] That direct participation is not a requirement is further made clear in § 2339C, which makes it a crime knowingly to provide funds for terrorist acts and further provided that "[f]or an act to constitute an offense set forth in this subsection, it shall not be necessary that the funds were actually used to carry out a predicate act." 18 U.S.C. § 2339C(a)(3). Nor is it relevant that § 2339C was added after the events of September 11. In *Boim*, the court noted that much of the defendants' alleged conduct occurred prior to the passage of §§ 2339A and 2339B. The court rejected defendants' argument that these sections could not be used to set the standard of liability under § 2333. It held: "We are using sections 2339A and 2339B not as independent sources of liability under section 2333, but to amplify what Congress meant by 'international terrorism.'" 291 F.3d at 1016. In the same way, § 2339C amplifies Congress' purpose in enacting § 2333; use of the provision as a guide to interpreting § 2333; which was enacted in 1992, does not impose retroactive liability.

[16] While unnecessary to establish liability over BDG given the conspiracy theory alleged by Plaintiffs, it should be noted that the FCC does specifically allege that the Attack was only possible because of the financial and logistic support of numerous individuals and organizations. According to the FCC, these individuals and organizations provided AL QAIDA with the means to recruit, train and employ United States citizens and destroy U.S. Landmarks on September 11, 2001.  FCC ¶¶1, 22-3, 144, 157-9, 16, 163, 167. BDG conveniently ignores these and similar allegations of the FCC in its motion to dismiss.  For purposes of the present motion, however, the allegations of the FCC must be accepted as true.

It should be noted, that the Plaintiffs' theory is that the conspirators include all of the named individuals in the three O'Neill cases, those in the co-plaintiffs cases as part of this multi-district litigation, and others.  See, e.g., Exhibit 0,¶ 2.

The FCC also sufficiently alleges that the Attack was a foreseeable product of the conspiracy in which IICG knowingly participated, and of BDG's aiding and abetting of al Qaida. Indeed, the FCC unambiguously asserts that the Attack was a direct, intended and foreseeable product of that conspiracy (FCC ¶¶160, 163, 167). While at this stage it is not necessary for the plaintiffs to provide evidence of its allegations, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and kill its citizens. For example, in 1996 and 1998, al Qaida issued fatwas, or religious decrees, authorizing attacks against the United States and its citizens. In the 1998 fatwas. Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens, civilian or military, "in any country in which it is possible to do it . . . ".

During the years before the September 11 Attack, al Qaida followed though on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests, including: the first World Trade Center bombing in 1993; the simultaneous bombings of he U.S. Embassies in Kenya and Tanzania in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide attack on the USS Cole in October of 2000.

As the conduct of the terrorist acts against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is inconceivable to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as BDG is alleged to have done.

[17] Plaintiffs respectfully refer the Court to the more detailed discussions of the causation requirements of the ATA in the memoranda of law submitted by Co-Plaintiffs in opposition to dismiss filed by the Saudi Binladin Group, the Khalid bin Mafouz, and the National Commercial Bank, docket nos..

terrorist attacks against the United States ties it inextricably to the Attack. As Plaintiffs' injuries

are indisputably the direct result of that Attack, Plaintiffs have properly and adequately alleged

causation. Accordingly, BDG's causation-based arguments must be rejected.

> 3.   THE COMPLAINT STATES A CLAIM AGAINST BDG UNDER THE ATCA.

BDG offers several arguments in support of its contention that the Plaintiff fails to state a

claim under the ATCA.[18],[19] BDG also claims Plaintiffs fail to allege a violation of international

law. Additionally, BDG claims that the Complaint lacks sufficient details to state a claim under

the ATCA. None of the arguments prevail.[20, 21]

It has been recognized that "ATCA jurisdiction extends to private [non-state] parties for

egregious acts of misconduct," *Bao Ge v. Li Peng*, 201 F. Supp.2d 14, 22 n.5 (D.D.C. 2000),

*aff'd.*, 35 Fed. Appx. 1, U.S. App. LEXIS 7311 (D.C. Cir. 2002) (*per curiam*). *See also Foreign*

---

[18] The ATCA provides federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of a nations or a treaty of United States." 28 U.S.C. § 1350. The ATCA opens U.S. federal courts for adjudication of rights recognized by international law. See *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).

[19] Count Two, which alleges claims under the Alien Tort Claims Act, is brought on behalf of "plaintiffs who are estates, survivors, and heirs of non-United States citizens . . ." FCC at p. 5.

[20] Defendant also claims a lack of standing on the part of the named Plaintiffs under the ATCA. They are wrong. In his Jan 18 opinion, Judge Casey ruled that "aircraft hijacking is generally recognized as a violation of international law," for the reasons discussed above. Accordingly, the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here." 349 F.Supp. 2d at 826. Further, it is recognized by the parties and the Court that several members of the putative class are aliens. 349 F.Supp. 2d at 826. Defendants reliance on *Griffin v. Paine Webber, Inc.*, 99 Civ. 2292; 2001 WL 740764; 2001 U.S. Dist. LEXIS 8937 (S.D.N.Y. 2001), is misplaced. In *Griffin*, the District Court found that the single named plaintiff did not have any valid claims against one of the underwriter defendants (CIBC), because that plaintiff had not purchased the stock in question from that underwriter. The court ruled that the named plaintiff did not have a "case or controversy" with CIBC, and so dismissed the entire class action against CIBC (notably, the District Court gave the plaintiff 20 days to amend the complaint by adding a plaintiff who did buy from CIBC). *Griffin*, *7-8. In the instant matter, the named plaintiffs seek to represent the class, that includes a number of aliens, against this defendant in a number of claims. Therefore, there is a "case or controversy" between the named plaintiffs and the defendants in this matter. The rule in *Griffin* would apply to defendants' benefit only if all of the O'Neill claims are dismissed against this defendant.

[21] The Court's attention is directed to the numerous briefs of the co-plaintiffs as to the various theories as to how the 9/11 attacks violated customary law, which are incorporated herein, as if set forth in full. For further authority, *see*, e.g., *Islamic Salvation Front*, 993 F. Supp. at 7-8; Restatement (Third) of the Foreign Relations Law of the United States (1987) § 404 (1987); see *Karadzic*, 70 F.3d at 240; U.N. Security Council Resolution 1373 (September 28, 2001); the Statute of the International Criminal Tribunal for Yugoslavia (ICTY Statute), Art. 5, which was adopted by the U.N. Security Council in Resolution No. 955, U.N. Doc. S/INF/50 (1994); *Presbyterian Church of Sudan v. Talisman Energy*, 244 F. Supp.2d 289 (S.D.N.Y.2003); the Rome Statute of the International Criminal Court (ICC Statute), art. 7, July 1998, UN Doc. A/CONF. 183/9.

*Relations Law of the United States* § 702 (1986).  In *Doe v. Islamic Salvation Front (FIS)*, 993 F. Supp. 3 (D.D.C. 1998), *motion granted,* 2001 U.S. App. LEXIS 18387 (D.C. Cir. July 10, 2001), the court concluded that it had subject matter jurisdiction over Plaintiffs' ATCA claims, even though the defendant was not a state actor, because the violations of the law of nations alleged by the Plaintiffs included egregious acts, such as crimes against humanity, was crimes, aircraft hijacking, summary execution, and other violations of international law. *Id*. at 5 & 8.[22]

There can be little doubt that the attacks of September 11, 2001 do constitute both egregious misconduct and a violation of customary international law.[23,24,25]

Moreover, to sufficiently allege an ATCA cause of action against Defendant BDG, Plaintiffs need not allege, nor prove, that he was directly involved in the terrorist attacks themselves. Rather, it is sufficient for Plaintiffs to allege, as they have, that Defendant BDG conspired in or aided and abetted the violation of the law of nations alleged in the Complaint.

Indeed, many federal courts have recognized that the ATCA liability can be based on

---

[22] The Second Circuit likewise has concluded that Plaintiffs are not barred from bringing suit under the ATCA merely because the defendants are private parties. In *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), the court held that ATCA claims could proceed against the Bosnian Serb leader Radovan Karadzic for genocide and war crimes irrespective of whether or not he qualified as a state actor. *Id.* at 241-44. The court cited numerous examples of actions by private individual and entities that would violate international law, including privacy, slave trade, war crimes, and aircraft hijacking.  *Id.* at 239-40; *see also Presbyterian Church of the Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289, 309 (S.D.N.Y. 2003) ("no logical reason why corporations should not be held liable" under ATCA for violations of universally recognized norms of international law); *Iwanowa v. Ford Motor Co.*, 67 F. Supp.2d 424, 445 (D.N.J. 1999)(same). The D.C. Circuit's decision in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), is not to the contrary for reasons already briefed to the Court. See Docket #97.

[23] As numerous courts have noted, the "law of nations, currently known as international customary law, is formed by the 'general assent of civilized nations.'" *Islamic Salvation Front*, 993 F. Supp. at 7 (*citing Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir. 1980); *see also Li Peng*, 201 F. Supp.2d at 20. Moreover, "courts must interpret international law under the ATCA as 'it has evolved and exists among the nations of the world today.'" *Islamic Salvation Front*, 993 F. Supp at 8 (quoting *Karadzic*, 70 F.3d at 238); see also *Tel-Oren*, 726 F.2d at 777 ("[T]he 'law of the nations' is not stagnant and should be construed as it exists today among the nations of the world.') (Edwards, J., concurring)

[24] It is clear that the attacks of September 11th constitute crimes against humanity by those involved in the attacks, including the Defendant. First, individuals may be held individually responsible for the crimes.  Second, although international law might at one time have required that these crimes can take place in peacetime as well. *See* International Criminal Tribunal for Rwanda ("ICTR") Statute, art. 3, and ICC Statute, art. 7; Ratner & Abrams, at 57-58.  Moreover, in the *Tadic* case, the U.S. Government took the position in an amicus brief before the Tribunal prohibitions on crimes against humanity apply "even in times of peace."

[25] This was specifically pled in FCC ¶¶ 139, 152, 169, 172.

conspiratorial relationships or theories of aiding and abetting.[26]

Here, the Complaint alleges a violation of the law of nations, the terrorist attacks on September 11, 2001. Such conduct is actionable under the ATCA. The Complaint alleges that Defendant BDG facilitated, fostered, financed, or otherwise supported terrorists that committed terrorist attacks. The Complaint alleges those attacks could not have been carried out in the absence of financing and logistic support. The Complaint also alleges a relationship between Defendant BDG, al Taqwa, al Qaida and Osama Bin Laden. Unquestionably, such allegations satisfactorily allege that Defendant BDG conspired with others to facilitate the terrorist activities of al Qaida, aided and abetted those activities, resulting in the attacks of September 11th. Based on the foregoing, the Plaintiffs have sufficiently alleged an ATCA claim against Defendant BDG.

### 4.   PLAINTIFFS PROPERLY STATE RICO CLAIMS AGAINST BDG.

#### a)   Plaintiffs Have Standing To Assert RICO Claims.

BDG challenges the standing of the Plaintiffs to pursue RICO claims, contained within Count 10, arguing that these Plaintiffs lack standing as their injuries are personal injuries. BDG's argument is flawed.  The Plaintiffs, in the FCC, specifically alleged that the Defendants intended to cause damage to business and property, and did in fact intend to cause damage to business and property.  *See* FCC ¶¶ 176, 178-80.  The Plaintiffs further detailed certain elements of the damages: "including a. Economic damages, including but not limited to pecuniary losses,

---

[26] *See, e.g. Hilao v. Estate of Marcos*,103 F.3d 767, 776 (9th Cir. 1996)(affirming district court's jury instructions allowing foreign leader to be held liable upon finding that he "directed, ordered, conspired with, or aided the military in torture, summary execution, and 'disappearances'"): *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp.2d 289 (S.D.N.Y.2003) (collecting cases)("US courts have consistently permitted ATCA suits to proceed based on theories of conspiracy and aiding and abetting.") *Barrueto v. Larios*, 205 F. Supp.2d 1325, 1331-32 (S.D. Fla. 2002) (holding ATCA liability can be based on allegations that defendants conspired or aided and abetted violations of the law of nations); *Mehinovic v. Vuckovic*, 198 F. Supp.2d 1322, 1344-6 (N.D. Ga. Apr. 29, 2002)(holding defendant liable for aiding and abetting in acts that violate customary international law); *Abebe-Jira v. Negewo*, 72 F.3d 844, 845-48 (11th Cir. 1996) (affirming verdict for torture and cruel, inhuman or degrading treatment where defendant supervised or participated with others in "some of the acts of torture" against plaintiffs).

past and future wage losses, loss of support, loss of prospective inheritance …."  *See* FCC ¶ 146. Furthermore, in the More Definite Statement (Exhibit "O" incorporated pursuant to FCC ¶ 127) and RICO Statement filed in connection with the Defendant, the  Plaintiffs elaborated on the various factual elements of such damages, which we submit are not required for Rule 8(f) notice pleadings, to include direct pecuniary losses, past and future wage losses and profits, losses of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  *See, e.g.*, FCC ¶146, 178, Exhibit O ¶¶ 14-15.[27, 28]  Accordingly, such allegations have not only met, but exceeded the pleading threshold set in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (e.g., damages to tangible personal property), and the  Plaintiffs have established standing.

> b)  <u>The Plaintiffs Have Properly Stated RICO Claims</u>.

Defendant also contends that the Plaintiffs have failed to properly plead their RICO claims.  BDG is wrong.

Plaintiffs' complaint and RICO Statement assert RICO claims against BDG pursuant to 18 U.S.C. §§ 1962(b), (c) and (d).  The enterprise – alternatively, Radical Muslim Terrorism, al Qaida, and/or the International Islamic Front For the Jihad Against Jews and Crusaders (Exhibit O, ¶6)- - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure.  *See* Exhibit 0 ¶¶ 6, 7-10.   Its well documented purpose is to perpetrate acts of terrorism.  Thus, Plaintiffs have sufficiently pled that al Qaida is "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d

---

[27] For a more extensive discussion of this issue, *see*  Plaintiffs' Mem. of Law In Opp. to Al Haramain Islamic Foundation, Inc.'s Motion to Dismiss Pertaining to Certain RICO Issues Only," Docket No. 810, pp. 13-17.
[28] Alternatively, the  Plaintiffs seek leave to amend to specifically provide such factual detail as to such losses.

Cir. 1991).[29]

Plaintiffs' similarly allege sufficient involvement by BDG in the enterprise to sustain claims under both §§ 1962(c), as alleged in ¶12 of Exhibit 0, and 1962(d), as alleged in ¶ 13 of Exhibit 0. Although a plaintiff asserting a civil claim under § 1962(c) must allege that the defendant participated in the operation or management of the enterprise, *see Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp.2d 158, 164 (S.D.N.Y. 2003), such "discretionary authority" has been described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear." *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general rule, it may not be "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 91 Civ 1523 (PKL), 1994 U.S. Dist. LEXIS 9727, *4 (S.D.N.Y. July 15, 1994).

With respect to a RICO conspiracy under § 1962(d), the requirements "are less demanding." *Baisch*, 346 F.3d at 376. All that is required is that the conspirators "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id*. at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)). Thus, "[a]lthough parties who do not control the organization cannot be liable under § 1962(c) , they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F.

---

[29] Defendant further complains of a failure to plead a pattern of racketeering and related issues. Exhibit 0, ¶¶ 5(a, b, f, g)) and 27 address same.

Supp. 93, 100 (S.D.N.Y. 1993).

These allegations are more than enough to support a reasonable inference that, as alleged in the Complaints, Defendant BDG "supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks". *See generally*, Appendix I.

Plaintiffs have, accordingly, met their pleading burden in relation to their claims under §§ 1962(c) and 1962(d), particularly given the fact that Plaintiffs have not been afforded the opportunity to take discovery.

Plaintiffs also have adequately alleged proximate cause under RICO. This requirement is satisfied if plaintiffs allege that defendant's injurious conduct is both the factual and the proximate cause of the injury alleged. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003). Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is generally imprudent. *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 74 F. Supp.2d 221, 225 (E.D.N.Y. 1999). This Court's decision "should be guided by a flexible, case-by-case approach." *Id.* (citing *Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983), and *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)). Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static: as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures." *Id.* Further, failure to explain the alleged injury in detail is not fatal. *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D.N.Y. 1986). Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6). *Id.* The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts." *Id.* (citations omitted).

Here, Plaintiffs allege that they were directly injured by BDG's participation in al Qaida's campaign to attack the United States, and in particular, by his provision of "material support and resources to al Qaida."   Accordingly, Plaintiffs have sufficiently pled causation for purposes of their RICO claims.

### C.  PLAINTIFFS SUFFICIENTLY PLEAD THEIR COMMON LAW CLAIMS. [30]

1.  PLAINTIFFS HAVE PROPERLY ALLEGED NEGLIGENCE IN COUNT 8. [31]

Defendant BDG posits that he had no duty of care to Plaintiffs. However, this argument ignores the fact that Plaintiffs' Complaint alleges that Defendant BDG breached the duties encompassed in the norms of conduct found in international law. Defendant BDG further argues that he was not involved in international terrorism or mass murder, and as such, Plaintiffs have not sufficiently alleged a negligence claim. Defendant BDG is again mistaken. Plaintiffs pled that Defendant BDG was a conspirator in the provision of funding, money laundering, financial assistance and/or other logistical support to al Qaida and that such activities were a proximate cause of Plaintiffs' damages.   These allegations constitute adequate notice if a claim for negligence. The truth of these allegations must be determined at trial, not in the context of a motion to dismiss.

Plaintiffs have an additional basis for their negligence claims. The Complaint alleges that Defendant BDG violated the ATA, ATCA, and RICO. These statutes define the duty Defendant BDG owed to Plaintiffs. Negligence *per se* is a concept that developed at common law and found

---

[30] The Defendant also challenges, in passing at Mem. Footnote 8, diversity jurisdiction in this case, should the federal causes of action be dismissed.  The defendant is unequivocally, and by admission a foreign corporation; the residence of the Plaintiffs is clearly set forth in FCC ¶¶ 16-21.  Any argument pertaining to a lack of diversity is specious, at best.  Moreover, even if there were no diversity jurisdiction, in light of the ATA, ATCA, and RICO causes of action there is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

[31]   Plaintiffs recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs.  *See* January 18 Order, 349 F. Supp.2d at 830-31.  Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue.  *See* Restatement (Second) of Torts § 302 (1965) (stating that as a general principle of tort law, every individual has a duty to exercise reasonable care to avoid physical harm to others' person and property).

its way into jurisprudence of all of the states.  *Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831 (1993). Negligence *per se* establishes that statutes may be used to define the scope of duty owed by an actor to an individual who has been injured as a result of his conduct. *Id.*

Courts have held that negligence per se is a cognizable claim under federal common law, *See Resolution Trust Corp. v. Hess*, 820 F. Supp. 1359 (D. Utah 1993); *F.D.I.C. v. McSweeney*, 976 F.2d 532, 538 n. 7(9th Cir. 1992), *cert denied*, 508 U.S. 950 (1993) (the express saving language in § 1821 (k) preserving the FDIC's rights "under other applicable law" preserves its preexisting federal common law rights). As previously discussed, Plaintiffs sufficiently pled violations of standards of conduct as drawn from ATA, ATCA, RICO and international law to state a claim for negligence.

### 2.   PLAINTIFFS' CLAIMS FOR WRONGFUL DEATH, SURVIVAL, PUNITIVE DAMAGES, AIDING AND ABETTING AND CONSPIRACY SHOULD NOT BE DISMISSED.

Defendants correctly argue that no independent causes of action exist under New York law for conspiracy, wrongful death, survival, aiding and abetting or punitive damages; rather they are elements of a substantive claim or a remedy.  However, at this stage of these proceedings, the substantive law governing each of Plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss those causes of action at this time. Moreover, there can be little dispute that Plaintiffs' are entitled to recover punitive damages in the event that they prevail against this Defendant under the theories advanced.[32]  Under these circumstances, dismissal of the conspiracy, aiding and abetting and punitive damages counts

---

[32] Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998). If the Plaintiffs prove their allegations that BDG knowingly financed and provided material support to al Qaida giving its purpose to commit terrorist acts against innocent persons in the United States, BDG's conduct is sufficiently egregious and outrageous to warrant the imposition of punitive damages.

would be inappropriate. [33]

     3.   THE PLAINTIFFS' CLAIMS FOR NEGLIGENCE, WRONGFUL DEATH AND NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARE NOT TIME BARRED.

     Contrary to the Defendant's assertion, certain of the Plaintiffs' claims are not demonstrably time-barred.  At this stage of these proceedings, the substantive law governing most of the claims remains to be determined.  As such, it would be manifestly premature to dismiss Plaintiffs' assault, battery and intentional infliction of emotional distress claims, under the mere assumption that the law of New York law applies.  *See* 42 Pa.C.S. § 5524 (2005) (establishing two year limitation period for assault, battery and intentional tort claims under Pennsylvania law); *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004) (holding that federal common law claims arising under Act of Congress after 1990 are governed by a four year limitations period).[34]

     Moreover, these claims are subsumed within Plaintiffs' claims under the Anti-Terrorism Act, which imports into that federal cause of action "the remedies of American tort law."  See 137 Cong. Rec. S4511 04 (April 16, 1991); *see also Boim*, 291 F.3d at 1010  (language and history of ATA evidence [] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law").  To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law.  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal

---

[33] Plaintiff would, in the alternative, seek leave to incorporate or re-plead the allegations contained within the conspiracy, wrongful death, survival, punitive damages, aiding and abetting, and/or any other dismissed counts as part of the allegations applicable to the surviving causes of action.

[34] The ATA imports "the remedies of American tort law," 137 Cong. Rec.S4511 04 (April 16, 1991), thus giving rise to federal common law assault, battery and intentional infliction of emotional distress claims thereunder.  On this point, Plaintiffs refer the Court to the discussion included in the Consolidated Opposition to the Motion to Dismiss of Perouz Sedaghaty, docket no. at pp. 16-17, incorporated herein by reference.

statute).[35]  State statutes of limitation are inapplicable to federal common law claims.  *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004).  *See also Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306, 309 (E.D. La. 1994)  (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).

Furthermore, all of the Plaintiffs' claims arise from BDG's participation in the conspiracy to conduct terrorist attacks against the United States; a conspiracy designed to hide the identity of the participants from disclosure to the outside world.  As a result, the statute of limitations was tolled until the Plaintiffs reasonably should have become aware of BDG's involvement within the conspiracy, itself a question of fact to be determined through discovery.  *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 00 Civ. 7804 (LMM), 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D.N.Y. 2004). Given this fact, equitable principles require that the statute of limitations be tolled, *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996)(holding that "[e]quitable tolling allows courts to extent the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").[36]

### D.  IF ANY OF PLAINTIFFS' CLAIMS ARE FOUND TO BE INSUFFICIENT, PLAINTIFFS SHOULD BE GRANTED LEAVE TO RE-PLEAD.

If the Court finds Plaintiffs' pleading deficient in any way, Plaintiffs should be given leave to replead. Fed. R. Civ. Proc. 15(a) provides that "leave [to amend] shall be freely given when

---

[35] Should Plaintiffs' claims under the ATA fail for any reason, however, the common law claims also exist as separate claims arising under state law. In determining which states' law govern, this Court would apply the choice-of-law rules used by New York.  *See Ideal Electronic Co. v. International Fidelity Ins. Co.*, 129 F.3d 143 (D.C. Cir. 1997*), aff'd. on appeal after remand*, 2003 F.3d 53 (D.C. Cir. 1999)(federal court hearing state-law claims applies choice of law rules of the place in which it sits).

[36]  Furthermore, they are also extended by way of action of the New York Survival cause of action, which the New York legislature specifically extended from 2 years to 2.5 years for 9/11 cases.  *See* N.Y. Est. Powers & Trusts Law § 5-4.1 (2003).

justice so requires." In *Conley*, 355 U.S. at 48, the Supreme Court explained that, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." "Mere technicalities" should not prevent a case from being decided on the merits. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Monahan v. NYC Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000); *Twomby, 2005 US App. LEXIS at 28, n.4.* Here, no basis exists to deny leave to amend.

## **CONCLUSION**

For the reasons set forth herein, and as addressed at argument, which is requested, the Defendant's Motion should be denied, with prejudice. Alternatively, with regard to the issue of jurisdiction, under Rule 12(b)(2), Plaintiffs should be granted jurisdictional discovery. Alternatively, with regard to the 12(b)(6) claims, the Plaintiffs should be granted leave to re-plead.

Dated:  November 3, 2005

        Respectfully submitted

        LAW OFFICES OF JERRY S. GOLDMAN &
            ASSOCIATES, P.C.


        By: _____
           JERRY S. GOLDMAN, ESQ. (JG8445)
           FREDERICK J. SALEK, ESQ. (FS8565)
           GINA M. MAC NEILL, ESQ. (GM0581)

        *Attorneys for the Plaintiffs,*
        *Estate of John P. O'Neill, Sr. et al.*

           111 Broadway, 13TH Floor
           New York, N.Y. 10006
           212.242.2232

# APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO *BANCA DEL GOTTARDO*

**The Conspiracy**[37],[38],[39]

1.  On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualy 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC") ¶¶ 1, 6-10 22-5, Tremsky 120, WTC 365.

2.  The conspirators consist of the defendants named in the in the three O'Neill actions (O'Neill v. Al Baraka, et al, , 04 CV 1923 (RCC), O'Neill v. Kingdom of Saudi Arabia, 04 CV 1922 (RCC), O'Neill v. Iraq, 04- CV 1076) (with such complaints also including 'John Does', as well as the cases brought by the other plaintiffs in *In Re Terrorist Attaccks of September 11, 2001,* 03-MDL- 1570 (RCC) and others. Exhibit 0, ¶ 2.

3.  The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  FCC ¶27.

4.  On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. FCC 6-9.

5.  All 19 hijackers were members of the al Qaida network. ¶6-9.

6.  All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. FCC ¶10.

7.  The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett, 649, 650, 654, Continental Casualty 26, Federal Insurance FAC 622.

---

[37] There are references preceding the various substantive causes of actions incorporating the various paragraphs in the pleadings without setting them forth at length.  See, e.g., FCC ¶156.

[38] The pleadings consist of the First Consolidated Complaint, filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15..  Incorporated into the First Consolidated Complaint are the various other pleadings filed in the matter, such as the RICO Statements and the More Definite Statements.  These items, all separately docketed, were physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record. Paragraph 127 of the FCC lists these various Exhibits.  On or about September 30, 2005, most of the previously filed RICO Statements were incorporated into More Definite Statements.

[39] References herein to FCC or Al Baraka FCC are to the First Amended Complaint in *O'Neill v. Al Baraka, et al.*

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. Continental Casualty 26, 603, Federal Insurance FAC ,66, 632; NYMSAC 509

9.      Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC 74.

10.     The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page 217; Continental Casualty 605, 613, 617; Federal Insurance FAC 615, 616, 617, 619, 620; NYMSAC 509-511; O'Neill Al Baraka FCC ¶ 144.

11.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, 649; Continental Casualty 605, 613, 617; Federal Insurance FAC 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC 511, 515, 518, 531; O'Neill Al Baraka FCC ¶ 144.

12.     Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks. FCC ¶22

13.     Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives  who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities.  FCC ¶ 23.

14.     Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  FCC ¶ 24.

15.     The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks.

16.     The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  FCC ¶27.

17.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett, 662; Federal Insurance FAC 620,; O'Neill Al Baraka FCC ¶ ¶177-180.

18.     As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  Al Baraka FCC ¶157.

19.     As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. Al Baraka FCC ¶158.

20.     As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. FCC  ¶159.

21.     The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance 629, 631; O'Neill Al Baraka FCC ¶160, 163, 167.

22.     As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. Al Baraka FCC ¶161.

23.     Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. Al Baraka FCC  ¶ 162.

24.     OBL and the hijackers acted in concert with the other co-conspirators. Al Baraka FCC ¶165.

25.     The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka FCC ¶168.

26.      By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance 642, Al Baraka FCC ¶169.

27.     In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance 628, Al Baraka FCC ¶177.

28.     The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate

result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett 662, Al Baraka FCC ¶¶178-180.

29.     The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC 622, O'Neill Al Baraka FCC ¶162.

30.     The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC 623; O'Neill Al Baraka FCC ¶163.

31.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett 674, Continental Casualty 604, Federal Insurance FAC 606; O'Neill Al Baraka FCC ¶ 152.

32.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett 673, Federal Insurance FAC 633; O'Neill Al Baraka FCC ¶152, 169.

33.     The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill, Exhibit 0, ¶6a.

34.     The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331.  Al Baraka FCC ¶¶ 139, 172.

### The Relationship between *Banca del Gottardo* and the Conspiracy

35.     Defendants Al Baraka Investment & Development Corporation a/k/a Al Baraka Bank a/k/a Dallah Albaraka Group, LLC, National Commercial Bank … Banca del Gottardo … and Islamic Investment Company of the Gulf (Bahrain) EC, are banks, financial organizations, and companies located all over the world who have conspired with Osama bin Laden and al Qaida to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. O'Neill Al Baraka FCC ¶22.

36.     Defendant Youssef M. Nada & Co., a co-conspirator of Defendant Bank al-Taqwa Limited, has aided, abetted, and materially sponsored and al Qaida and international terrorism. Defendants … Banca Del Gottardo a/k/a Banca Del'Gottardo … have aided, abetted, and materially sponsored and al Qaida and international terrorism.  O'Neill Al Baraka FCC ¶76.

37.     Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities. Some of those organizations are purely a sham front for al Qaida.  O'Neill Al Baraka FCC ¶77.

38.     Banca Del Gottardo has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.   Banca Del Gottardo conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Banca Del Gottardo conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Exhibit 0 ¶19.

39.     Banca Del Gottardo in Lugano, Switzerland, on information and belief, moved al-Qaida money via the *Al Taqwa* bank, a shell that operated through correspondent accounts at the Gottardo branch in Nassau," as stated by the Washington Times stated on June 2, 2004. Exhibit 0 ¶21.

40.     Al Taqwa Bank, a co-defendant in this case, has been sanctioned by the United States and the United Nations for funding al-Qaida and other terrorist activities. Banca Del Gottardo also handled payments for the Saddam money network. Exhibit 0 ¶21.

41.     AL TAQWA ("Fear of God") was established in approximately 1988 in Nassau, Bahamas, and was founded by members of the Muslim Brotherhood. Al Baraka FCC ¶¶ 57-8.

42.     On November 7, 2001, al Taqwa and its affiliates were designated as financial supporters of al Qaida. Al Baraka FCC ¶¶ 59, 83.

43.     On August 29, 2002, other affiliates had their assets frozen. Al Baraka FCC ¶ 60.

44.     Al Taqwa and related Nada organizations which were dedicated to the overthrow of Western nations, and the creation of a world-wide Islamic government.  Al Baraka FCC ¶ 78.

45.     Al Taqwa is headquartered in Lugano Switzerland.  Al Baraka FCC ¶ 79.

46.     Al Taqwa, on information and belief,  moved bin Laden  and al Qaida money around the world. Al Baraka FCC ¶ 79.  See also, ¶¶ 81-3, 84-5.

47.     For over two decades, Saddam Hussein, a co-defendant in the O'Neill cases, and a former leader of Iraq and Radical Muslim Terrorism, caused money to be laundered to support Radical Muslim Terrorism. Sadam Husssein appointed his half-brother, Barzan e-Tikriti, a co-defendant in this case, to be his finance chief and control this laundering 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) operation. Barzan e-Tikriti made use of many Swiss Banks, such as the defendant Banca Del Gottardo, along with banks in Liechtenstein, Panama, and the Bahamas. Exhibit 0 ¶22.

48.     In fact, Iraqi networks financial activities were anchored in Lugano, Switzerland, on information and belief, at Banca Del Gottardo, in conjunction with one of its component firms, Mediterranean Enterprises Development Projects (MEDP) on information and belief, moved $5 billion annually. At Banca Del Gottardo, Saddam had an account in the name of "Satan account." Exhibit 0 ¶23.

49.     There have been links to support Saddam's funding of the Al Qaida. Exhibit 0  ¶24.

50.     Banca Del Gottardo has a colorful history: It is the bank that, on information and belief, moved the bribe and kickback money paid by a Swiss construction company to former

Russian President Boris Yeltsin and his cronies in exchange for contracts to refurbish Kremlin buildings. Exhibit 0 ¶25.

51.     In the late 1970s, Banca Del Gottardo was the Swiss subsidiary of Banco Ambrosiano, "the Vatican Bank," which collapsed in 1982 in a $1 billion fraud that involved money siphoned off to offshore shell companies and accounts. Ambrosiano had laundered drug and arms trafficking money for the Italian and American mafias. Exhibit 0  ¶26.

52.     As the foregoing demonstrates, Banca Del Gottardo thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Banca Del Gottardo's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Exhibit 0 ¶27.

## Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.

53.     At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty 609.

54.     At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty 610.

55.     In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation:  acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents;  the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance 619; O'Neill Al Baraka FCC ¶177.

56.     The acts of racketeering activity (predicate acts) include:

  a.  acts that involve murder and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

  b.  acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents) and are within the scope of 18 U.S.C. § 1961(1)(B);

6

c.  acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

d.  acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

e.  acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

f.  acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

g.  acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B)

Exhibit 0, ¶5(a); Continental Casualty 611.

57.     Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies.  Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612.  The pattern of racketeering is more fully set forth in Exhibit 0 5(b), (f), and (g)

58.     As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty 613.

59.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance 620.

60.     The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi*

*Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *See e.g.,* Exhibit 0, ¶ 6.

61.    The Enterprise is described, at length, in Exhibit 0, ¶¶ 6(b) and (c).

62.    The activities of the Enterprise relate to the commission of world-wide terrorism. The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack. The usual activities of the Enterprise includes recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of.  Exhibit 0, ¶¶ 7-10.

63.    Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in Paragraph 12 of Exhibit 0.

64.    The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in Paragraph 13 of Exhibit 0.

## Consequences of the Conspiracy

65.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty 605, 613, 617; FAC 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC 511, 515, 518, 531; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[40]

66.    These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance 80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶25.

67.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC 606; O'Neill Al Baraka FCC ¶ 152.

68.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Al Baraka FCC ¶153.

69.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶ 620.

---

[40] A list of the decedents is contained within Exhibit 0.

70.     The Defendants intended to cause damage to business and property.  Al Baraka FCC ¶ 178.

71.     Plaintiffs suffered damage to business and property as a result of the Defendants actions. Al Baraka FCC ¶¶ 179-180.

72.     The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Al Baraka FCC ¶ 146; Exhibit 0 ¶¶ 14-5.

*** 

X:\Clients\ONeill v. Saudi arabia\Motions\Motions to Dismiss\Banco Del Gottardo\BDG_Memo of LawFINAL.doc

## <u>CERTIFICATE OF SERVICE</u>

I, JERRY S. GOLDMAN, ESQUIRE, do hereby certify that I served the within

Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion to Dismiss, on this

date, on all of the parties in the case via filing with the Court's electronic case filing (ECF)

system.

Dated: November 3, 2005

_____
JERRY S. GOLDMAN, ESQUIRE