UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) <br><br> ECF Case |

This document relates to:   Estate of John P. O'Neill, Sr. v. Al Baraka Inv. &
                            Dev. Corp., et al. (04 CV 1923)

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT DMI ADMINISTRATIVE SERVICES S.A.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

30 Rockefeller Plaza, 24th Floor
New York, New York 10112
(212) 332-3800

*Attorneys for Defendant*
    *DMI Administrative Services S.A.*

W02-NY:1ESC1\120004844.2

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................................1

SUMMARY OF ALLEGATIONS AGAINST DMI S.A. ...................................................................1

ARGUMENT......................................................................................................................................4

I  AS MAINTAINED IN DMI S.A.'s INITIAL MEMORANDUM, THIS COURT LACKS PERSONAL JURISDICTION OVER DMI S.A. .............................................4

II  THE COMPLAINT FAILS TO STATE A CLAIM AGAINST DMI S.A.............................5

    A.  Plaintiffs Have Failed To Plead Facts Sufficient To Show That Any Actions By DMI S.A. Proximately Caused Plaintiffs' Injuries. ........................................8

    B.  Plaintiffs Have Failed To Plead Facts Sufficient To State Any Of Their Causes of Action Against DMI S.A. .....................................................................9

III  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE............................9

CONCLUSION.................................................................................................................................10

## INTRODUCTION

Pursuant to the Court's October 27, 2005 Order (Docket No. 1448), DMI Administrative Services S.A. ("DMI S.A.") is submitting this Supplemental Memorandum of Law in further support of its Motion to Dismiss and its initial Memorandum of Law in support thereof, filed on September 9, 2005 (Docket No. 1216) ("Initial Memorandum"), and in response to the *O'Neill* plaintiffs' 'First Consolidated Complaint' ("Complaint") and More Definite Statement as to DMI S.A. ("MDS") (Docket No. 1338) filed on September 30, 2005.

On September 30, 2005, the *O'Neill* plaintiffs filed the 'First Consolidated Complaint' and MDS, three weeks after DMI S.A. timely filed its Motion to Dismiss pursuant to a mutually-agreed stipulation.[1] However, the *O'Neill* plaintiffs' MDS contains no new allegations other than allegations parroted almost verbatim from the *Burnett* plaintiffs' More Definite Statement as to DMI S.A., filed on May 10, 2005 (Docket No. 896). The *O'Neill* plaintiffs' Complaint and MDS, like the *Burnett* pleadings from which they are largely copied, make no allegations that could establish the Court's jurisdiction over DMI S.A., and no allegations that even begin to state a claim against DMI S.A. See Memorandum of Law in support of DMI S.A.'s Motion to Dismiss the *Burnett* action ("*Burnett* Memorandum") (Docket No. 1240). Accordingly, for all the reasons stated herein and in DMI S.A.'s Initial Memorandum, the claims against DMI S.A. should be dismissed with prejudice.

## SUMMARY OF ALLEGATIONS AGAINST DMI S.A.

DMI S.A.'s Initial Memorandum addressed the allegations in the *O'Neill* plaintiffs' SAC and Second Amended RICO Statement. The *O'Neill* plaintiffs' skeletal, conclusory and contradictory allegations from their SAC have been copied verbatim into their newly titled 'First Consolidated Complaint.' The introductory allegations from plaintiffs' Second Amended RICO

---

[1] On the same day, September 30, 2005, counsel for the *O'Neill* plaintiffs' emailed certain defense counsel a document entitled 'First Consolidated Complaint', which is nearly identical to the *O'Neill* plaintiffs' Second Amended Complaint ("SAC") filed on or about December 30, 2004. However, neither the document entitled 'First Consolidated Complaint' nor the MDS complied with the Court's very clear and straightforward charge that "on July 31, 2005 [and later extended until September 30, 2005], the plaintiffs shall file an amended complaint that includes all amendments made prior to that date . . . ." CMO #2, ¶ 13. In light of the *O'Neill* plaintiffs' deliberate disregard for the Court's Orders, their September 30, 2005 pleadings should be stricken and, considering the waste of judicial resources and attorneys' fees and their continued assertion of allegations known to be without evidentiary support, DMI S.A. reserves the right to move for sanctions.

Statement ¶¶ 1-19 have been incorporated nearly verbatim into their MDS.  See MDS ¶¶ 1-18.  And, as demonstrated below, plaintiffs' 'additional' allegations in their MDS are simply copied from the *Burnett* plaintiffs' More Definite Statement as to DMI S.A.  Those allegations have already been shown to be without merit in the *Burnett* Memorandum.  For the Court's convenience, however, the *O'Neill* plaintiffs' 'new' allegations regarding DMI S.A. are restated and addressed below:

Jurisdictional Allegations:

Plaintiffs aver that "Defendant Dar al Maal al Islami (or . . . 'DMI') is the registered name for DMI Administrative Services S.A. and is headquartered in Cointrin, Switzerland." [2] Complaint ¶ 42.  Plaintiffs assert that DMI S.A., in the early 1980s, advertised three times in the *Wall Street Journal* or *New York Times* regarding the company's founding and its inability to attend a conference on Islamic Banking, and that DMI S.A.'s CEO reportedly said that related companies had "substantially increased" their investments in the United States since September 11, 2001.  See MDS ¶¶ 134-36, 150.  Additionally, plaintiffs aver that DMI S.A. held a 35% interest in Boston Capital, a Massachusetts-based real estate financing firm.  See id. ¶ 149.

Allegations Concerning Donations to Charities:

Plaintiffs allege that in the early 1990s DMI S.A. donated charitable *zakat* funds to branches of the International Islamic Relief Organization ("IIRO") and Muslim World League ("MWL"), which were subsequently designated as terrorist financiers.  See id. ¶¶ 121-22.  Plaintiffs conclude that, because it ostensibly made such donations, DMI S.A. "knew or had to know" that "al Qaeda [was] directly collaborating with the [IIRO]" and "that the [MWL] office in Cairo was … managed by Osama Bin Laden," see id. ¶¶ 121, 127-29 -- even though, according to plaintiffs' own allegations, those charities were then engaged not in supporting terrorism against the United States but in funding the Afghan *mujahideen*, and al Qaeda began to solicit *zakat* donations years later, in or

---

[2]  See Init. Mem. at 1 n.2.

about 1998.  See id. ¶¶ 49, 127-28.  Finally, plaintiffs allege that DMI S.A. also donated to the "Islamic Center of Geneva[, which] provided a support network for al Qaeda[]."  See id. ¶¶ 116-17.[3]

Allegations Concerning The Provision of Banking Services:

Plaintiffs themselves acknowledge that DMI S.A. is an administrative services provider, and not a bank.  See MDS ¶¶ 22-24.  Nevertheless, plaintiffs allege that DMI S.A., in support of al Qaeda, "launder[ed] money," "provid[ed] financial services," and "facilitat[ed] weapons and military equipment purchases and money transfers."  See id. ¶ 29.  DMI S.A., plaintiffs assert, "has involved itself in al Qaeda financing," by unspecified means, *via* its putative subsidiaries Faisal Islamic Bank (Sudan) ("FIBS"), Tadamon Islamic Bank ("TIB"), and al Shamal Islamic Bank ("al Shamal").  See Consol. Compl. ¶ 45; see also MDS ¶¶ 31, 60, 85, 87.  The only allegation of fact that plaintiffs offer in support of this proposition is that al Qaeda operatives "got account[s]" at FIBS, TIB, and al Shamal, in the Sudan in the mid-1990s, and that money from those accounts was transferred by the account holders to other al Qaeda members.  See MDS ¶¶ 30, 83, 88-91, 94; Consol. Compl. ¶¶ 37, 46-47, 52-53.  Plaintiffs further allege that, at an unspecified time and place and for unspecified purposes, affiliates of DMI S.A. have "facilitated financial transactions for, and advertised, maintained and serviced accounts on behalf of" several alleged charity 'fronts,' including the al Haramain Islamic Foundation ("al Haramain") the IIRO and the MWL; and that DMI S.A. "has handled the accounts of" Yassin Al Kadi and Wael Jelaidan, two individuals who were subsequently designated as terrorist sponsors by the United States.  See MDS ¶ 29.

In sum, plaintiffs allege that DMI S.A. made donations to two Islamic charities, that its purported affiliates maintained and serviced accounts for those charities, and that al Qaeda members opened and used accounts at other putative subsidiaries, in the Sudan in the mid-1990s.  In

---

[3] Plaintiffs offer no elaboration of the "support" that the Islamic Center of Geneva is supposed to have provided to al Qaeda's efforts to attack the United States; rather, plaintiffs allege that in 1991 the son of the founder of the Center organized a conference attended by future terrorists, and that "Islamic convert Albert Huber" contacted al Qaeda members in Lebanon through a "connection" at the Center, at an unspecified time and for unspecified purposes.  See MDS ¶¶ 116-17.

their most recent filings, as before, plaintiffs do not make any allegations of fact showing that DMI S.A. made donations to charities with any knowledge that such charities were al Qaeda 'fronts,' or provided anything other than routine banking services to anyone. See MDS ¶¶ 29, 121-22. Nor do plaintiffs allege *any facts* showing that DMI S.A. ever entered into any sort of agreement at all, let alone a conspiratorial agreement "intended to inflict catastrophic harm on the United States." See id. ¶ 13. Indeed, in their thrice-amended Complaint, their twice-amended 49-page RICO Statement, and now their 39-page More Definite Statement, plaintiffs fail to allege any communication between DMI S.A. and anyone associated with al Qaeda; any facts that could be read to imply DMI S.A.'s supposed intent to cause an attack on the United States; or any facts connecting DMI S.A. in any way with the events of September 11.

## ARGUMENT

### I
### AS MAINTAINED IN DMI S.A.'s INITIAL MEMORANDUM, THIS COURT LACKS PERSONAL JURISDICTION OVER DMI S.A.

Plaintiffs' meager jurisdictional allegations fail to allege any facts that could be read to show that DMI S.A. has had any systematic contacts with the United States or any role in the terrorist attacks of September 11. DMI S.A. has fully addressed these allegations in its Initial Memorandum, at 4-11, and its *Burnett* Memorandum, at 4-11. As set forth in detail in DMI S.A.'s Initial Memorandum and its *Burnett* Memorandum, neither the allegation that DMI S.A. held an ownership interest in a Boston firm, nor the allegation that defendants advertised in United States newspapers, states "continuous and systematic" contacts with New York or the United States. See Init. Mem., at 5-6, 8-9; *Burnett* Mem., at 5-6, 9; see also In re Terrorist Attacks on Sept. 11, 2001, --- F. Supp. 2d ----, 2005 WL 2296673, at *14 (S.D.N.Y. Sept., 21 2005) ("In re Sept. 11 Attacks II") (granting dismissal for lack of general jurisdiction even though defendant owned substantial shares in two Texas-based corporations). Moreover, the *O'Neill* plaintiffs, like the *Burnett* plaintiffs before them, have failed to allege facts that could give rise to personal jurisdiction on a theory of conspiracy or aiding and abetting. See In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 806

(S.D.N.Y. 2005) ("In re Sept. 11 Attacks I") ("personal jurisdiction cannot be based on a New York long-arm conspiracy theory" where plaintiffs "do not allege any specific facts from which the Court could infer that [defendant] directed, controlled, or requested al Qaeda to undertake its terrorist activities."); Init. Mem., at 6-7; Burnett Mem., at 6-8.  Accordingly, plaintiffs have not made a *prima facie* showing of either (i) personal jurisdiction under New York's long-arm statute or (ii) the minimum contacts necessary, for due process purposes, to invoke personal jurisdiction over DMI S.A.  Therefore, the claims against DMI S.A. should be dismissed in their entirety.

## II
## THE COMPLAINT FAILS TO STATE A CLAIM AGAINST DMI S.A.

Even with the benefit of the *Burnett* plaintiffs' additional allegations, as adopted wholesale by their September 30 filing, the *O'Neill* plaintiffs still have failed to allege facts sufficient to state *any* of the causes of action lodged against DMI S.A.  Plaintiffs' allegations concerning DMI S.A. in their September 30 Complaint are identical to the bare allegations asserted in their prior SAC. Compare Complaint ¶¶ 22, 42-45 with SAC ¶¶ 22, 42-45.  The 'new' allegations asserted in their MDS parrot those of the *Burnett* plaintiffs' More Definite Statement as to DMI S.A. (Docket No. 896).  DMI S.A.'s *Burnett* Memorandum, at 11-24, has already demonstrated that the *Burnett* allegations, now asserted by the *O'Neill* plaintiffs, allege no facts sufficient to state their claims.

The *O'Neill* plaintiffs, in their September 30 filings as well as those that preceded them, offer numerous conclusory allegations of the sort that the Court has already rejected.  Apart from such conclusory allegations, the *O'Neill* plaintiffs' 'new' allegations offer nothing that could be read to state their claims against DMI S.A.  Indeed, upon even cursory review, the *O'Neill* plaintiffs' allegations, like the *Burnett* allegations from which they have been copied, prove to be innocuous, and often self-contradictory.  For example, while plaintiffs conclusorily allege that DMI S.A. has "supported" the Islamic Center of Geneva ("ICG"), see MDS ¶¶ 116-17, and donated *zakat* funds to the IIRO and MWL in the early 1990s, see id. ¶¶ 121-22, plaintiffs do not allege what "support" DMI S.A. supposedly provided to the ICG; any facts showing that DMI S.A. provided support or donations to the ICG, IIRO or MWL with the knowledge that any charity was a terrorist 'front'; or any "facts to support an inference that [DMI S.A. was] sufficiently close to the terrorists' illegal

activities" to infer such knowledge.  See In re Sept. 11 Attacks I, 349 F. Supp. 2d at 800.  Moreover, plaintiffs' insinuation of wrongdoing is flatly contradicted by their own allegations.  Plaintiffs allege -- correctly -- that Muslims avoid making *zakat* contributions to charities that support prohibited activities such as the use of tobacco or alcohol, see MDS ¶¶ 45, 119, 122, 125-28, in an apparent attempt to imply that, because DMI S.A. donates to Islamic charities in order to ensure that *zakat* contributions do not support such activities, it must have known that the specific charities to whom it allegedly made contributions were terrorist 'fronts.'  This allegation regarding the duty of *zakat* cannot support such an implication, however.  First, although plaintiffs allege that DMI S.A. "knew or had to know" in the early 1990s that the IIRO and the MWL were 'fronts' for al Qaeda, see MDS ¶¶ 121-22, 127-29, plaintiffs themselves rightly allege that in the early 1990s, the IIRO and MWL were funding not al Qaeda but Afghan *mujahideen*, see id. ¶¶ 127-28, and that al Qaeda did not begin to solicit *zakat* donations until years later, in or about 1998, see id. ¶ 49.  More important, plaintiffs themselves acknowledge that Islamic charities' support for terrorism was conducted by "taking advantage of" *zakat* donors "under the cover of" legitimate charitable activities, see id. ¶¶ 39, 41, negating any inference that donors "had to know" that *zakat* funds were being diverted.  See In re Sept. 11 Attacks I, 349 F. Supp. 2d at 832-33 (dismissing claims against bank despite identical allegations regarding duty of *zakat*); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363 at 120-21 (3d ed. 2004) ("the district court will not accept as true pleading allegations that are contradicted by . . . other allegations").  Thus, "[p]laintiffs have not pleaded facts to suggest [that DMI S.A.] knew [it was] making contributions to terrorist fronts and provided substantial assistance or encouragement to the terrorists." In re Sept. 11 Attacks I, 349 F. Supp. 2d at 800.[4]

---

[4] Unlike Hamas in Boim, none of the organizations that DMI S.A. is alleged to have supported were designated a sponsor of terrorism at the time of the alleged contributions. See Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev., 291 F.3d 1000, 1002 (7th Cir. 2002) (noting Hamas was designated a terrorist organization by President Clinton in 1995 and by the Secretary of State in 1997). Moreover, unlike the conclusory and attenuated allegations made by plaintiffs here, the plaintiffs in Boim made specific factual allegations directly tying the defendants to Hamas, including allegations that "one defendant entity allegedly employed an individual designated as a terrorist affiliated with Hamas, another entity admitted providing funds to Hamas, two individual defendants had documented and admitted ties to

Similarly, as to provision of banking services, plaintiffs allege that al Qaeda members "got account" at the Sudanese banks FIBS, TIB and al Shamal, see MDS ¶¶ 83, 89, 94; Complaint ¶ 37; that DMI S.A. "handled the accounts of" subsequently-designated terrorists Yassin Al Kadi and Wael Jelaidan, see MDS ¶ 29; and that affiliates of DMI S.A. "facilitated financial transactions for . . . and serviced accounts on behalf of" al Haramain, IIRO and the MWL, see id. Plaintiffs, however, have pleaded no specific facts showing that DMI S.A. has ever engaged in any financial transactions of any sort, much less in any transactions having anything to do with terrorism; no facts showing when, how or why DMI S.A. allegedly maintained accounts of al Kadi or Jelaidan; and no facts to suggest that DMI S.A. knowingly provided banking services to anyone associated with al Qaeda. Absent any such allegations of fact, plaintiffs' assertions that DMI S.A. "handled the accounts of" persons later deemed suspect, or that its affiliates "facilitated financial transactions for" now-suspect charitites, allege nothing more than the provision of routine banking services. See In re Sept. 11 Attacks I, 349 F. Supp. 2d at 833 (dismissing claims against al Rajhi Bank), 835 (absent factual allegations supporting *scienter*, allegations that Arab Bank "provid[ed] financial services to the charity Defendants [and] process[ed] wire transfers" were innocuous and insufficient); In re Sept. 11 Attacks II, 2005 WL 2296673, at *23 (dismissing claims where plaintiff "does not allege that [defendant] knew the money it was transferring between IIRO and IRO would somehow assist al Qaeda, nor does it allege facts showing that [defendant] knew the other [] organizations to which it transferred money were in the business of supporting terrorism.").[5] And again, plaintiffs' insinuations of wrongdoing are contradicted by their own allegation that DMI S.A. is an

---

Hamas, and numerous links existed between the individual terrorist defendants and the entity defendants." In re Sept. 11 Attacks, 349 F. Supp. 2d at 800.  No such specific allegations are made here as to DMI S.A.

[5] Similarly, plaintiffs' conclusory and unsupported allegation that DMI S.A. "launder[ed] money" for al Qaeda, see MDS ¶ 29, does not substitute for allegations of facts sufficient to show that 1) DMI S.A. conducted a financial transaction in interstate commerce; 2) DMI S.A. knew that the property involved represented some form of specific unlawful conduct; 3) the transaction involved the proceeds of specific unlawful conduct; and 4) the transaction was conducted to conceal the nature of the illegally acquired proceeds. See Casio Computer Co. v. Sayo, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000) (holding conclusory allegations insufficient); Bernstein v. Misk, 948 F. Supp 228, 236 n.2 (E.D.N.Y. 1997) (same).

administrative services company, see MDS ¶¶ 22-24, which provides administrative services to related companies and provides no banking services to anyone at all.

In sum, the overwhelming majority of plaintiffs' allegations regarding DMI S.A. consist of conclusory, boilerplate allegations that categorically fail to state a claim. Those allegations that are not utterly conclusory are either thoroughly irrelevant,[6] or allege nothing more than routine banking services and innocuous charity donations that, according to plaintiffs' own allegations, neither provided support to al Qaeda nor could have been expected to do so. To state their inflammatory claims, plaintiffs are required to allege *some facts* "to support the allegation that [DMI S.A.] knew [a] receiving organization to be a solicitor, collector, supporter, front or launderer for [terrorists, or] to support an inference that the defendant knowingly provided assistance or encouragement to the wrongdoer." In re Sept. 11 Attacks I, 349 F. Supp. 2d at 801. "Here, there are no such factual bases presented, there are only conclusions." Id.

### A. Plaintiffs Have Failed To Plead Facts Sufficient To Show That Any Actions By DMI S.A. Proximately Caused Plaintiffs' Injuries.

Even with the additional allegations that they have copied from the *Burnett* plaintiffs' filings, the *O'Neill* plaintiffs still offer no allegation of fact showing that any action by DMI S.A. proximately caused their injuries. Nowhere do plaintiffs allege any facts indicating that the horrific events of September 11 were the direct and foreseeable result of any wrongful action by DMI S.A., and indeed plaintiffs have not alleged any particular wrongful action by DMI S.A. at all. Plaintiffs also have entirely failed to allege facts sufficient to make out an assertion that DMI S.A. caused their injuries by conspiracy or aiding-and-abetting. See Init. Mem. at 19-21. In sum, plaintiffs have failed to make any allegation against DMI S.A. that could support a finding of proximate cause as to any of the pending claims.

---

[6] For instance, plaintiffs' allegations regarding alleged former members of the Board of Directors or Religious Board of DMI S.A.'s ultimate parent, DMI Trust, are thoroughly irrelevant in the absence of any indication that such persons committed any wrong in the course of their employment. Compare MDS ¶¶ 52-83, 103-13 with, e.g., In re Sept. 11 Attacks I, 349 F. Supp. 2d at 833, 836 ("[A]n employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business."); Gmurzynska v. Hutton, 2003 WL 1193727, at *7-8 (S.D.N.Y. March 14, 2003) ("mere allegations that Defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in the Complaint, are insufficient, standing alone, to set forth a conspiracy claim").

### B.  Plaintiffs Have Failed To Plead Facts Sufficient To State Any Of Their Causes of Action Against DMI S.A.

DMI S.A. has previously addressed in detail each of plaintiffs' eleven causes of action. See Init. Mem. at 17-24.  The 'new' allegations borrowed from the *Burnett* plaintiffs include nothing that suffices to state any of the elements of any of plaintiffs' causes of action, other than injury.  See id.; see also *Burnett* Mem., at 17-18.  Consequently, plaintiffs "can prove no set of facts in support of their claims that would entitle them to relief."  In re Sept. 11 Attacks II, 2005 WL 2296673, at *18 (citations omitted).  The claims against DMI S.A. therefore must be dismissed.

### III
### PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE.

In its Initial Memorandum, DMI S.A. sought dismissal with prejudice on the ground that, even after three Complaints and three RICO Statements over the course of the last year and a half, plaintiffs had utterly failed to establish the Court's jurisdiction over DMI S.A. or to state any of their claims against DMI S.A.  Any further amendment of plaintiffs' claims, DMI S.A. argued, could be expected to be futile.  See Init. Mem. at 25.  Plaintiffs have now filed yet another Complaint, together with a More Definite Statement that adds to plaintiffs' quiver all of the allegations made by the *Burnett* plaintiffs; nevertheless, yet again, plaintiffs have thoroughly failed to allege facts sufficient to establish jurisdiction or to state their claims.  Thus, with these filings, plaintiffs have decisively confirmed that any further amendment of their allegations will be futile.  Dismissal of plaintiff's claims against DMI S.A., therefore, should ensue with prejudice.  See Electronic Commc'n Corp. v. Toshiba Am., 129 F.3d 240, 246 (2d Cir. 1997) (denying leave to amend because complaint failed to state claim and amendment would be futile); In re Sept. 11 Attacks I, 349 F. Supp. 2d at 832-33, 835 (dismissing Arab Bank with prejudice where plaintiffs "have not offered any facts to support an amendment"); Ford v. New Britain Trans. Co., 2004 WL 3078827, at *4 (D.Conn. Dec. 21, 2004) (dismissing with prejudice "because Plaintiff has now had three opportunities to file an amended complaint and has still been unable to state a viable claim").

## **CONCLUSION**

For the foregoing reasons, defendant DMI S.A. respectfully requests that this Court dismiss all claims against it with prejudice and award such further relief as deemed just and proper.

Dated: New York, New York
November 4, 2005

Respectfully submitted,
SHEPPARD MULLIN RICHTER & HAMPTON LLP

By:_____/x/_____
   James J. McGuire (JM-5390)

30 Rockefeller Plaza, 24th Floor
New York, New York 10112
(212) 332-3800

*Attorneys for Defendant*
   *DMI Administrative Services S.A.*

Timothy J. McCarthy
Eric S. O'Connor
Of Counsel