# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA          :
                                  :
                    Plaintiff,    :
                                  :
          -against-               :    S7R 98 Cr. 1023 (KTD)
                                  :    OPINION & ORDER
USAMA BIN LADEN, et al.,          :
                                  :
                    Defendants.   :
----------------------------------X

KEVIN THOMAS DUFFY, U.S.D.J.:

Through a mixture of inaction, incompetence and
stonewalling to cover up their mistakes, the United States
Marshals Service and the Department of Justice's Office of
Enforcement Operations have seriously jeopardized the
convictions of al Qaeda terrorist Wadih El-Hage.  On May 29,
2001, El-Hage (who at times has purportedly acted as Usama bin
Laden's personal secretary) was convicted of:  (1) conspiracy to
kill United States nationals; (2) conspiracy to commit murder;
(3) conspiracy to destroy buildings and property of the United
States; and (4) eighteen counts of perjury.  Because the
Marshals Service suppressed evidence during El-Hage's trial,
however, there are grave concerns that El-Hage must be retried.

El-Hage was tried jointly with three other al Qaeda
terrorists, each of whom were convicted for their roles in the
1998 synchronized bombings of two United States Embassies in
Africa.  Those attacks killed 224 people and wounded thousands.

El-Hage was convicted, not for hands-on participation in these bombings, but rather for participating in al Qaeda's broader conspiracy to kill Americans, and for lying to two grand juries regarding al Qaeda.  On October 18, 2001, El-Hage and his codefendants were each sentenced to life imprisonment.

On October 24, 2003, El-Hage filed a motion seeking various relief, including a new trial pursuant to Fed. R. Crim. P. 33. In an Opinion and Order dated February 7, 2005, United States v. Bin Laden, No. S7R 98 CR 1023 (KTD), 2005 WL 287404, (S.D.N.Y. Feb. 7, 2005), I denied all but one of El-Hage's requests.  That request seeks a new trial based on the Government's failure to make timely disclosure of the videotapes and transcripts of twenty-eight hours of interviews between prosecutors, FBI agents and government witness Jamal al-Fadl.

To determine whether the Government's failure to turn over the transcripts of these interviews until more than fifteen months after El-Hage's sentencing warrants a new trial, I held a series of hearings on February 17, April 26 and June 6-7, 2005. Based on the evidence adduced at those hearings, my review of the video-teleconference videotapes, the trial record and exhibits, the pre-trial discovery and "3500 material" originally produced, and the parties' submissions, I make the following findings.

I.   Creation and Disclosure of the Tapes

     A.   Jamal al-Fadl

     The Government's first witness at El-Hage's trial was Jamal
al-Fadl, a former al Qaeda member, who testified extensively
about the history, structure and operation of al Qaeda.  Al-Fadl
also testified about some of El-Hage's al Qaeda activities.  By
the time of his trial testimony, al-Fadl was a longtime
cooperator who had provided the Government with significant
inside information about al Qaeda and other Islamist terrorist
organizations.

     Al-Fadl's cooperation with the United States began in 1996
when he approached a United States Embassy and offered to
provide information about the terrorist groups and threats of
which he was knowledgeable.  During December 1996, al-Fadl was
brought to the United States in FBI custody and was assigned a
protective detail of FBI agents who guarded him around the
clock.[1]  From the time he approached the Embassy, and throughout
his FBI custody in the United States, FBI agents and Assistant
United States Attorneys investigating al Qaeda regularly
interviewed al-Fadl.

     On July 16, 1997, pursuant to a cooperation agreement, al-
Fadl pleaded guilty to charges of:  (1) conspiracy to injure and

---

[1] Although he was "in custody," al-Fadl was apparently not placed
in a jail, but rather was kept in an apartment or hotel under
the protection of FBI agents.

destroy national defense material, premises and facilities of the United States; and (2) conspiracy to carry an explosive during the commission of a felony.  Each charge involved al-Fadl's activities on behalf of al Qaeda.  Following his guilty plea, al-Fadl remained in the protective custody of the FBI, pursuant to a bail agreement, and continued cooperating with FBI agents and AUSAs through late 1998.

In late 1998, al-Fadl was accepted into the Witness Security Program administered by the United States Marshals Service ("WitSec") and his bail conditions were modified to allow WitSec to relocate al-Fadl (along with his family) to an undisclosed location.[2]  At the time of his relocation, the Marshals Service designated al-Fadl's case as "Secret" or "Top Secret" because of the national security implications of his information regarding terrorists.  In his relocation area, al-Fadl was assigned a WitSec Inspector, John Doe, who was responsible, inter alia, for day-to-day contact with al-Fadl.[3]  Following his relocation, and throughout 1999, al-Fadl continued to meet with FBI agents and prosecutors via telephone and in person via "neutral site" visits.

---

[2] To my knowledge al-Fadl has yet to be sentenced for his 1997 guilty plea and remains free on bail as a WitSec protectee.
[3] In deference to the security concerns of the WitSec program, I refer to al-Fadl's Inspector by the pseudonym, "John Doe."

B.  Recording of Video-Teleconferences

In late December 1999, the Southern District of New York Assistant United States Attorneys who had been interviewing al-Fadl since 1996 requested that WitSec install videoconferencing equipment in al-Fadl's relocation area to facilitate their contact with al-Fadl.  The request was motivated primarily by the AUSAs' desire to be able to contact al-Fadl quickly in the event that they needed to show him photographs of suspected terrorists.  WitSec complied with the request and, by the end of 1999, purchased and installed video conferencing equipment including: a camera, television, speakerphone, secure T1 line, and videocassette recorder in WitSec offices in al-Fadl's relocation area and New York.  This equipment allowed al-Fadl, accompanied by Inspector Doe, to travel to the WitSec office and engage in two-way video-teleconferences with the Southern District of New York prosecutors.

Around the time Marshals Service employees were installing the videoconference equipment, Inspector Doe spoke with one of his supervisors, Branch Chief Inspector George Walsh (who was stationed at USMS Headquarters in Washington, D.C.), regarding how he should prepare reports regarding the al-Fadl teleconferences.[4]  Doe was told that the Marshals Service

---

[4] At the time, George Walsh was a Chief Inspector in the WitSec program.  He has since been appointed to the office of United

computer system in the relocation area was unable to handle classified information and that he should therefore videotape the teleconferences rather than preparing detailed written reports.  Finding this order odd, Inspector Doe sought confirmation from his direct supervisor, Supervisory Inspector Mike.[5]  Supervisory Inspector Mike conferred with the Chief Inspector for the relocation area, William Wagner, who confirmed that USMS Headquarters had ordered the videotaping of the video-teleconferences.  Inspector Doe then requested, and received, approval from his supervisor to purchase videotapes on which he recorded the conferences.

Eighteen video-teleconferences were conducted between January 21, 2000 and January 14, 2002.  Thirteen of the conferences occurred before the conclusion of El-Hage's trial; twelve of these were videotaped.[6]  During the conferences, Inspector Doe would sit in the same room as al-Fadl, though Doe would generally be "off camera."  Inspector Doe recorded each session by placing a tape in the VCR (which was located in a cabinet directly underneath the television used for the

---

States Marshal for the District of Columbia.  In the body of
this Opinion and Order I refer to him by the position he held at
the time of the occurrences described.
[5] This too is a pseudonym used out of deference to the Marshals
Service's security concerns.
[6] The Government represents that the videotaping equipment
malfunctioned during the single pre-trial meeting that was not
recorded.

teleconference) and pressing "Record."  If the tape ran out during a session, Inspector Doe would eject it and replace it with a new one.  Inspector Doe did not announce these tape changes to the conference participants.  In all, Inspector Doe recorded approximately twenty-eight hours of video-teleconference on six videotapes.  The only person who explicitly indicates knowledge of the taping during the video-teleconferences is al-Fadl, who tells his wife (in Arabic) during one meeting that the session is being recorded.[7]

After each conference Inspector Doe prepared a USMS Field Report ("USM 210") with the date of the video-teleconference and the statement, "WC [al-Fadl] came to this office for interview on CCTV with AUSA, see tape #___," indicating the number of the videotape on which he had recorded the session.  After preparing the report and printing it, Inspector Doe deleted it from the computer system.  Inspector Doe then presented the printed report to Supervisory Inspector Mike who reviewed it, signed it and forwarded it to USMS headquarters in Washington.  At headquarters, the report was to be reviewed by the case manager on al-Fadl's case and placed in al-Fadl's file.  Throughout the period of the videotaping, al-Fadl's case manager changed frequently, with as many as five Inspectors filling the position

---

[7] El-Hage has also argued that a jocular comment by one of the FBI agents present in New York indicates that he was aware the sessions were being taped.  I cannot agree.

over the two-year period.  The case managers' supervisor,
however, did not change; Chief Inspector Walsh supervised all of
the case managers at USMS headquarters throughout substantially
all of the period when the videotaping occurred.

After creating the videotapes and reporting them to his
superiors, Inspector Doe secured the tapes in his office safe.
At no point prior to or during El-Hage's 2001 trial did
Inspector Doe, Supervisory Inspector Mike, Chief Inspector
Wagner, Chief Inspector Walsh, or any of the five case managers
from al-Fadl's case contact the United States Attorney's Office
to discuss turning over the tapes to the prosecutors for
possible disclosure to the defendants.

C.   Marshals Service and OEO Delays in Providing Tapes to
     Prosecutors

Prosecutors in the Southern District of New York first
learned of the tapes' existence in approximately January 2002.
In late 2001, George Dapra, the WitSec Inspector in the New York
area who had acted as the prosecutors' liaison with Inspector
Doe, was preparing to retire and called Inspector Doe to make
arrangements for the transition to a new Inspector in the New
York area.  During that call, Inspector Doe asked Inspector
Dapra what he should do with the videotapes of the al-Fadl
conferences.  Inspector Dapra responded that he had not known of
any tapes, and he subsequently called United States Attorney

8

Patrick Fitzgerald to inform him of the tapes' existence.[8]  Mr.

Fitzgerald was (to put it mildly) shocked and angered to learn

of the taping and called Assistant United States Attorney

Kenneth M. Karas who was equally surprised and upset to learn of

the recordings.[9]

Almost immediately after learning of the taping

(approximately January 18, 2002), U.S. Attorney Fitzgerald

contacted Laura Henry of the Department of Justice Office of

Enforcement Operations ("OEO"), with whom he had dealt

previously on some matters related to al-Fadl.[10]  U.S. Attorney

Fitzgerald informed Ms. Henry of the situation and explained the

importance of maintaining the tapes so that they could be

delivered to AUSA Karas.  By January 22, 2002, AUSA Karas had

also contacted OEO and explained that he needed the tapes as

_____

[8] Through August 2001, United States Attorney Patrick J.
Fitzgerald was one of the primary Assistant United States
Attorneys in this District responsible for al-Fadl and for the
prosecution of El-Hage and his codefendants.  On September 1,
2001, Mr. Fitzgerald began service as the United States Attorney
for the Northern District of Illinois.  In the body of this
Opinion and Order I refer to Mr. Fitzgerald by the office he
held at the time he was informed of the tapes' existence.
[9] At the time, Honorable Kenneth M. Karas, U.S.D.J., was one of
the primary AUSAs in this District responsible for al-Fadl and
for the prosecution of El-Hage.  On September 7, 2004, he was
appointed to the bench of this Court.  In the body of this
Opinion and Order I refer to Judge Karas by the office he held
at the time he was informed of the tapes' existence.
[10] OEO acts, in some regards, as a liaison between the various
United States Attorneys' Offices and WitSec.  To outsiders it
appears to be just another bureaucratic layer in the Department
of Justice.

soon as possible.  He did not, however, receive the tapes
forthwith, and never had possession of the original tapes or a
complete copy thereof.

Despite AUSA Karas's repeated requests (and later demands),
OEO and the Marshals Service failed to deliver the tapes
promptly.  Instead, the Marshals Service was conducting an
investigation of the taping, apparently under the leadership of
the Chief of Protective Operations, Frank Skroski.  Of course it
would have been possible (and preferable) to have a copy of the
tapes made and turned over immediately upon learning of their
existence.  This, however, did not happen.  Notably, the
"report" of the Skroski investigation, although prepared in
February and March 2002, was not turned over to the United
States Attorney's Office until February 14, 2005, mere days
before the initial hearing in this matter.  This withholding of
relevant information was part of the stonewalling faced by the
prosecutors in this matter.  The Marshals Service, however, was
not alone in the stonewalling.

At one point an OEO employee suggested that, if the
Marshals Service kept the tapes, the AUSAs might avoid any
disclosure obligation to the defense because the AUSAs would
have never "possessed" the relevant Jencks, Brady or Giglio
material.  This suggestion was, properly, rejected out of hand.
Stephen T'Kach, Director of OEO, suggested that the tapes might

constitute an illegal wiretap, and therefore posited that disclosing them to the prosecutors could run afoul of Title III.[11]

By February 21, 2002, almost a full month after his first request that the tapes be delivered as soon as possible, AUSA Karas was justifiably livid at the fact that he had received nothing.  In another call to OEO, he explained, with acute prescience, "it will look bad that the government has known about these tapes and hasn't done anything about it yet."  This admonition apparently did not prod OEO or the Marshals Service, and by February 25, nothing had changed.  AUSA Karas again called OEO, demanding that he receive the tapes by March 8, 2002.

---

[11] Considering that OEO handles all Title III surveillance applications for the Government, this suggestion was particularly ill conceived.  As one of Mr. T'Kach's subordinates at OEO noted in an e-mail, because the disclosure in this case was based on the prosecutors' constitutional duties under Brady and Giglio, "Title III restrictions and constraints on disclosure and use of illegal intercepts must yield to the constitutional requirements of due process."  Moreover, a rudimentary investigation would have indicated that al-Fadl was aware the video-teleconferences were being recorded.  Inspector Doe testified that he openly changed tapes during the conferences, apparently in full view of al-Fadl.  Indeed, in an Arabic comment captured on one of the tapes, al-Fadl told his wife that the conferences were being recorded.  Although it would have taken some effort on OEO's part to uncover this dispositive comment, a cursory questioning of Inspector Doe would have quickly shown that al-Fadl was likely aware of the taping and thus had implicitly consented.

By March 7, 2002 the Marshals Service and OEO had finally begun the process of providing copies of the tapes to AUSA Karas. The tapes were sent to the FBI Field Office in Washington, D.C. where they were duplicated, and portions of the tapes were edited out of the copies for security reasons.[12] AUSA Karas ultimately received these edited copies of the tapes approximately March 21, more than two months after U.S. Attorney Fitzgerald's initial call to OEO.[13]

Upon receiving the tapes, AUSA Karas and other Southern District AUSAs had them transcribed. They reviewed those transcriptions and redacted various portions to protect the identities of certain individuals and to protect operational information that they believed was not subject to discovery.

---

[12] The portions edited out consisted of: a handful of Inspector Doe's inadvertent appearances on camera and local television programs and commercials from al-Fadl's relocation area which appeared on portions of two of the videotapes where the videoconferences were apparently recorded over previous television recordings.

[13] A copy of this version of the tapes was entered into evidence at the hearing as Court's Ex. V2. With its Brief in Opposition to El-Hage's Motion, the Government initially provided me with a copy of the tapes subsequently entered into evidence as Court's Ex. V1. The V1 tapes were obviously incomplete in that they did not contain all of the conversations reflected in the transcripts also provided with the Brief. When I brought these omissions to the Government's attention, I was provided with what appear to be a copy of the tapes provided to AUSA Karas (Ex. V2). Additionally, the Government represented that the omissions in the V1 tapes were a result of a mistake in the copying of the tapes. Finally, I demanded the original tapes which, after some initial resistance from the Marshals Service, were produced and are now marked as Court's Ex. O.

The prosecutors then provided these redacted transcripts to counsel for El-Hage and his codefendants.  On October 24, 2003, El-Hage filed the instant motion seeking, <u>inter</u> <u>alia</u>, a new trial based on the government's failure to disclose the tapes earlier in accordance with <u>Brady</u>, <u>Giglio</u> and the Jencks Act.

> D.   <u>Marshals Service's Withholding of Information Regarding the Creation of the Tapes</u>

Briefing on El-Hage's Rule 33 Motion was complete by April 30, 2004.  As discussed in detail, <u>infra</u>, that Motion put at issue the Government's state of mind with respect to its failure to make timely disclosure of the videotapes.  Despite the importance of this issue, at no time, until February 2005, when I convened the first evidentiary hearing in this matter, did the Marshals Service disclose to the United States Attorney's Office the facts and circumstances regarding the tapes' creation. Indeed, until these hearings, the Marshals Service held an unyielding monopoly on the only information available regarding the critical issue of the Government's state of mind.

In his undated letter to AUSA Karas accompanying the transmission of the tapes, Witness Security Chief Frank Skroski made only the briefest mention of the circumstances surrounding the tapes' creation.[14]  Chief Skroski stated, "these tapes were

---

[14] The letter might be better described as "conspicuously undated."  Every other piece of Marshals Service correspondence presented as evidence in this matter is dated in accordance with

erroneously made as a result of mis-communication between members of my headquarters and field staff."  Despite having gathered statements from many of those involved in the taping in February and March 2002, the Marshals Service chose not to elaborate to prosecutors on this fragmentary explanation.

In the Government's initial Brief in Opposition to El-Hage's Rule 33 Motion, prosecutors aptly summarized the lack of information forthcoming from the Marshals Service, stating, "After repeated inquiries, the Marshals Service produced 28 hours of videotapes to [the U.S. Attorney's Office], without any explanation as to who had ordered the videotapes to be made and preserved, or why their existence had not been disclosed earlier."  Prosecutors in good faith also repeated the Marshals Service's representation "that the videotapes were made pursuant to an unauthorized, independent decision by one or two employees of the Marshals Service."[15]

On December 16, 2004, I held an initial conference in this matter to confirm which defendants sought to join in El-Hage's motion, and to inform the parties that I intended to conduct

---

customary business practice.  The fact that the cover letter accompanying the tapes, when they were finally disclosed (after months of the prosecutors' repeated demands), is undated is (to put it mildly) somewhat suspicious.

[15] In light of the testimony establishing that Inspector Doe, Supervisory Inspector Mike, Chief Inspector Wagner and Branch Chief Walsh were all involved to some degree in ordering the creation of the tapes, or confirming such orders, this representation by the Marshals Service is simply false.

hearings in the near future to resolve those issues requiring evidentiary presentations.  On February 7, 2005, I issued an Opinion and Order denying the majority of El-Hage's claims and reserving judgment on the claims related to the videotapes.  In that Opinion, I noted:

> The as-yet-unexplained circumstances surrounding the creation and discovery of the videotapes must be developed before resolving this motion.  Among other things, the legal standard governing whether to grant a new trial when the Government fails to produce Jencks Act material varies depending on the Government's state of mind.

Bin Laden, 2005 WL 287404, at *8.  I then identified five "keenly important" questions regarding the tapes:

> (1) who ordered the recording of the interviews; (2) who authorized payment and paid for the recordings; (3) who operated the recording equipment; (4) who had custody of the tapes after they were made; and (5) how were the tapes "discovered" after trial.

Id. at *9.  In that Opinion, I also set a scheduling conference for February 10, 2005 "to set a hearing on the issue of the al-Fadl videotapes and the question of whether the Marshals Service's conduct should be imputed to the prosecutors."  Id. at 14.

Prior to the February 10 conference, I asked the Government when it expected to have answers to the questions in my February 7 Opinion.  I was informed that prosecutors were unsure of when they would have answers, as they had been unable to learn from the Marshals Service the identity of all potentially relevant

witnesses.  At the February 10 scheduling conference, I again
asked the Government when I would have answers to the questions
I had posed.  I was again told that the United States Attorney's
Office had, as yet, been unable to identify even the "universe
of people who had knowledge of the recordings."

In light of the Government's submissions indicating that
prosecutors had been forced to make repeated requests to obtain
the videotapes themselves, it seemed unlikely that the Marshals
Service was going to promptly respond to the United States
Attorney's Office's requests for information.  Indeed, it
appeared the prosecutors were again encountering a stone wall,
like the one they initially ran up against when trying to get
the tapes.  Prodding the Marshals Service into action, I
scheduled a February 17 hearing, to be attended by the Director
and General Counsel of the Marshals Service.  At that hearing I
sought to inform the Director of the importance of the issues
outlined in my February 7 Opinion, and to enlist his assistance
in obtaining answers to the questions I had posed in that
Opinion.[16]

As is generally the case when the bureaucratic tree is
shaken from the top, the prod quickly proved effective.  In a
letter dated February 11, 2005, the United States Attorney's

---

[16] With the General Counsel I sought to explore the issues
related to United States v. Bufalino, 576 F.2d 446 (2d Cir.
1978), discussed at length, infra.

Office informed me that it had "identified individuals who [had]
the answers to [the] questions [posed in my February 7
Opinion]."  More importantly, on February 14, 2005, the Marshals
Service finally disclosed to prosecutors the statements prepared
by USMS personnel in 2002 regarding their involvement in the
videotaping.  Consequently, on February 14, prosecutors were
able, for the first time since El-Hage filed this Motion, to
give me the names of some individuals believed to have knowledge
relevant to the state-of-mind issue.[17]  On that date, the USMS
also provided prosecutors with other relevant documents,
including the invoices reflecting the Marshals Service's
purchase of the teleconferencing equipment.  Notably, however,
the Service did not produce all the relevant documents in its
possession.  Throughout the evidentiary hearings, important
documents continued to trickle in, including Inspector Doe's USM
210 reports reflecting the fact that he had informed numerous
other individuals within WitSec of the taping.

---

[17] Prosecutors named Inspector Doe, Inspector Dapra and Branch
Chief Walsh.  Although this list fell far short of including all
of the USMS personnel with relevant knowledge, it was a start,
and a significant improvement over the utter lack of information
that preceded it.

II.   Failure to Disclose

Having established the factual background surrounding the
tapes, I turn to the legal issues relevant to this Motion.[18]

A.   Government Disclosure Obligations

As every beginning student of criminal procedure learns,
the Constitution requires prosecutors to turn over to a
defendant any information in their possession that is both
favorable and material to his guilt or sentence.  See Brady, 373
U.S. at 87.  This obligation encompasses information useful
solely for impeaching the credibility of a government witness.
Giglio v. United States, 405 U.S. 150, 153-55 (1972).  After a
witness testifies, the government bears a separate obligation,
pursuant to the Jencks Act, 18 U.S.C. § 3500, to provide the
defendant with "any statement . . . of the witness in the
possession of the United States which relates to the subject
matter as to which the witness has testified."  18 U.S.C. §
3500(b).

In defining the scope of the Brady disclosure obligation,
the Supreme Court has held that "the individual prosecutor has a

_____

[18] In deciding this Motion and conducting the hearings described
herein, I have followed the procedure outlined by Judge Cote in
United States v. Ortega, first addressing the issue of the
Government's intent, then turning to the question of "whether a
new trial is warranted under the appropriate legal standard."
See United States v. Ortega, No. 00 CR 432(DLC), 2001 WL
1588930, at *8 (S.D.N.Y. Dec, 13, 2001), aff'd, 82 Fed.Appx.
7171 (summary order), vacated on other grounds, 125 S.Ct. 1031
(Mem.).

duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995).  In fleshing out the scope of the duty, this Circuit has made clear that a prosecutor's disclosure obligations are not based on a monolithic view of government where any information held by any government agency must be disclosed.  See United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).  Rather, a prosecutor is only obligated to disclose information of which he has either actual or constructive knowledge.  Id.  A prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him--those variously referred to as an "arm of the prosecutor" or part of the "prosecution team."  Id.; see, e.g., United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975); United States v. Gil, 297 F.3d 93, 106 (2d Cir. 2002).

B.  WitSec as Part of the Prosecution Team

The government implicitly argues that the decision to create the videotapes, and any blame for the subsequent failure to make timely disclosure, lies with the Marshals Service's WitSec division, an entity allegedly wholly independent of the prosecution team.  In essence, the Government claims that since the AUSAs involved turned over the transcripts of the tapes as promptly as possible after learning of their existence (given

19

the delays in receiving them from the Marshals Service), there
can be no Brady, Giglio or Jencks violation.  Although I have no
doubt that the blame for withholding the tapes lies squarely at
the feet of certain individuals in the Marshals Service, I
cannot agree that WitSec personnel responsible for al-Fadl were
not part of the prosecution team with respect to their
participation in the teleconferences.

"[T]he exact point at which government agents can fairly be
categorized as acting on behalf of the prosecution, thus
requiring the prosecutor to seek out any exculpatory or
impeachment evidence in their possession, is uncertain."
Chandras v. McGinnis, No. 01 Civ. 2519(LBS), 2002 WL 31946711,
at *7 (E.D.N.Y. Nov. 13, 2002); see also United States v.
Zagari, 111 F.3d 307, 320 n.13 (2d Cir. 1997) ("The extent to
which knowledge may be imputed from one federal investigative
agency to another for Brady purposes is as yet unclear.").  At
one end of the spectrum, it is clear that the investigating case
agents on a particular prosecution are part of the prosecution
team; their possession of producible material is imputed to the
prosecutor regardless of his actual knowledge.  See, e.g.,
Kyles, 514 U.S. at 438 (rejecting the argument that a state
prosecutor "should not be held accountable . . . for evidence
known only to police investigators and not to the prosecutor.");
Morell, 524 F.2d at 555 (holding government agent to be an arm

of the prosecutor where he:  (1) actively participated in the
investigation; (2) supervised a confidential informant; and
(3) sat throughout trial at counsel table with the prosecutors).
At the other end of the spectrum, government agents of a
separate sovereign who are wholly uninvolved in the
investigation being prosecuted are clearly not part of the
prosecution team.  See, e.g., Shakur v. United States, 32
F.Supp.2d 651, 665-66 (S.D.N.Y. 1999) ("whatever knowledge [the
undercover NYPD officer] and his superiors gained . . . during
[the officer's] undercover activities . . . may not be imputed
to the federal prosecution team").  The instant case lies in a
gray area between the two extremes that is largely unilluminated
by relevant precedent.

The parties' citations on this issue underscore the lack of
guiding authority.  The Government's cases principally involve
circumstances so different from the facts presented here that
they offer little assistance.[19]  El-Hage's citations are

---

[19] Illustrative of the Government's cases are:  United States v.
Merlino, 349 F.3d 144 (3d Cir. 2003) (no imputation of tape
recordings made by the Bureau of Prisons of immaterial phone
calls made by three cooperating witnesses over a two year
period); United States v. Locascio, 6 F.3d 924 (2d Cir. 1993)
(no imputation of information in reports made by FBI agents in
the course of investigations apparently unrelated to the
defendants' prosecutions); Pina v. Henderson, 752 F.2d 47 (2d
Cir. 1985) (no imputation of information in a parole officer's
possession where the parole officer played no role in
defendant's prosecution); United States v. Stofsky, 527 F.2d 237
(2d Cir. 1975) (no imputation of witness's tax information held

similarly wide of the mark, though two cases cited from other

circuits are analogous enough to this case to be of some

assistance.

Mastracchio v. Vose, 274 F.3d 590 (1st Cir. 2001), involved

a cooperating government witness who was purportedly serving his

sentence in "protective custody" during the time he testified at

Mastracchio's trial.  This so-called custody included numerous

exorbitant perquisites which, though known to the witness's

protection team, were unknown to the prosecutors and accordingly

not disclosed to Mastracchio's counsel for use in cross-

examination. 274 F.3d at 594-97.  These perquisites included,

by the IRS); United States v. Canniff, 521 F.2d 565 (2d Cir.
1975) (no imputation of information in witness's Pre-Sentence
Report); United States v. Quinn, 445 F.2d 940 (2d. Cir. 1971)
(no imputation to S.D.N.Y. prosecutor of information held by
Florida prosecutor in separate investigation); Chandras, 2002 WL
31946711 (applying deferential AEDPA standard of review and
holding state court's determination that prosecution team did
not have constructive knowledge of witness's information in
prison records was not an unreasonable application of federal
law); and Bell v. Poole, No. 00 CV 5214(ARR), 2003 WL 21244625
(E.D.N.Y. Apr. 10, 2003) (same).

     I also find unhelpful the Government's characterization of
this case as involving information held by the custodian of a
witness.  Here the undisclosed information was not held by some
prison guard or administrator employed by a state corrections
department.  Instead, the information was held by a law
enforcement officer of the United States Department of Justice.
That officer, as denoted by his job designation (GS-1811), was a
"Criminal Investigator."  This purportedly trained Criminal
Investigator sat through twenty-eight hours of meetings between
al-Fadl, prosecutors and case agents recording every word
spoken.  He never, however, made any attempt to turn the tapes
over to prosecutors.  In short, this case bears little in common
with the typical "custodian" case.

inter alia, large cash payments, state-subsidized sky-diving
lessons, access to illegal drugs, free passage through the
corridors of the police station where he was being held, out-of-
state trips to visit family and various unsupervised excursions.
Id.

Upon learning of these benefits after trial, Mastracchio
filed a habeas petition alleging a Brady violation.  In light of
the prosecutor's conceded ignorance of the unusual benefits
conferred on the witness, the First Circuit addressed the issue
of imputation.  Relying, inter alia, on Kyles, 514 U.S. at 437,
the court held that "Supreme Court precedents make manifest that
the knowledge of other members of the attorney general's
department and of the witness protection team must be imputed to
the prosecuting attorney."  Mastracchio, 274 F.3d at 600.  The
court reasoned that, by offering the witness's testimony, the
prosecutor had assumed a duty to learn of all "inducements and
rewards that the state had tendered" and that the prosecutor
was, therefore, chargeable with knowledge of the unorthodox
benefits conferred on the witness.  Id. at 600-01.

United States v. Wilson, 237 F.3d 827 (7th Cir. 2001),
likewise involved a prosecution witness under the Government's
protection.  237 F.3d at 831.  Like al-Fadl, the witness had, by
the time of trial, entered the USMS WitSec program.  Id.  At
trial, the witness testified that he had not failed any drug

tests while in the WitSec program.  Id.  In fact, the witness
had failed three such tests prior to his testimony, a fact known
to the Marshals Service but unknown to the prosecutors.  Id.
Approximately one month after the jury returned a guilty
verdict, the Marshals Service notified prosecutors that the
witness had been terminated from the WitSec program because of
his positive drug tests.  Id.  Defense counsel sought a new
trial based on the Government's failure to disclose the failed
tests before or during trial.  Id.  Without extended analysis,
the Seventh Circuit imputed the Marshals Service's knowledge to
the prosecutors, holding that, "imputation is proper in these
circumstances; it is impossible to say in good conscience that
the U.S. Marshal's [sic] Service was not 'part of the team' that
was participating in the prosecution even if the role of the
Marshal's [sic] Service was to keep the defendants in custody
rather than to go out on the streets and collect evidence."  Id.
at 832.

El-Hage argues that the language in Wilson is equally
applicable to this case and urges that the situation here is
"not any different" than Mastracchio, thus, imputation is
appropriate.  The Government counters that Wilson's cursory
handling of the imputation issue renders it of little value and
further argues that Mastracchio is distinguishable because, in
that case, prosecutors had a "reasonable expectation that

impeachment material exist[ed]" in the hands of the witness
protection team.  In the instant case, the Government contends,
prosecutors could not have reasonably foreseen that a WitSec
Inspector would record the al-Fadl teleconferences because such
action was not merely beyond the scope of his WitSec duties, but
adverse to the program's goal of protecting enrollees'
identities.

    While the Government's reasonable foreseeability argument
has some persuasive force, I do not believe that it is the
single dispositive factor regarding imputation.  Indeed, I
suspect the prosecutors in Mastracchio were equally incredulous
to learn that their witness had been supplied drugs, large sums
of cash and state-sponsored skydiving lessons during his
"incarceration" as were the prosecutors here to learn of the
videotaped teleconferences.  Moreover, I believe the
Government's "reasonable foreseeability" criterion, in
isolation, improperly narrows the scope of the Government's
disclosure obligations.  Focusing on this single factor
constrains the analysis to what a reasonable prosecutor should
have foreseen without regard to the obligations borne by the
other government agencies comprising the criminal justice
system.

    Although the Government's disclosure obligations are most
frequently discussed in terms of a prosecutor's duty, as the

Second Circuit has made clear in United States v. Bufalino, 576
F.2d 446 (2d Cir. 1978), other agencies involved in the criminal
justice system bear substantial responsibility for mandated
disclosures.  See 576 F.2d at 448-50 (criticizing FBI for
agent's destruction of backup tapes of conversation between
witness and defendant, pursuant to agent's understanding of
"standard Bureau policy," and holding that "[t]here simply is no
longer any excuse for official ignorance regarding the mandate
of the law" and that "[i]n educating personnel concerning their
responsibilities in this area [i.e., disclosure pursuant to the
Jencks act and Fed. R. Crim. P. 16], government agencies must
keep in mind the broad definition of discoverable 'statements'
incorporated in the governing texts.").  Thus, based in part on
Bufalino, I decline to apply reasonable foreseeability as the
single touchstone for imputation because it does not adequately
account for the obligations law enforcement agencies bear
regarding disclosures to defendants.  To hold otherwise would be
to shield from disclosure information held by those agencies, as
long as they managed to acquire that information in a way
prosecutors could not reasonably foresee.  I believe such a rule
is unjust.

    Having decided against assigning talismanic significance to
reasonable foreseeability, and lacking a clearly articulated
imputation test from the Court of Appeals, the test I discern

from the imputation cases cited is whether, under the totality of the circumstances, al-Fadl's WitSec team could be fairly described as part of the prosecution team.  Applying this standard, I find imputation appropriate.[20]

In assessing the totality of the circumstances, I first note that the Marshals Service spent approximately $78,000 of its own money to install video-teleconferencing equipment at the prosecutors' request.  The stated purpose for equipment's installation was to further the ongoing investigation of al Qaeda by allowing Southern District prosecutors and agents to contact al-Fadl quickly in the event they needed him to identify photographs of possible al Qaeda terrorists.

As the video-teleconferences progressed, though prosecutors sometimes sought permission for the meetings through an intermediary at OEO, meetings also appear to have been scheduled (apparently without OEO involvement) through direct discussions with WitSec Inspector Dapra in New York who then contacted

---

[20] In this regard I find it interesting that WitSec, at certain times, appears to represent itself as an integral part of the prosecution team.  On its web page, for example, WitSec boasts that, "Since the program's inception, it has obtained an overall conviction rate of 89 as a result of protected witnesses' testimonies."  http://www.usmarshalls.gov/witsec/index.html (emphasis added).  Crowing about conviction rates attained by the WitSec program seems to me inconsistent with a claim that the program is wholly independent of the prosecution team.

Inspector Doe to arrange logistics.[21]  Throughout the teleconferences, which focused largely on the Government's ongoing investigation of al Qaeda, Inspectors Dapra and Doe were continuously present at their respective ends of the connection, acting as necessary intermediaries for the communication.

Even without more, based on the fact that WitSec, in order to further the Government's investigation, installed and continuously operated the video-teleconference equipment at the prosecutors' request, I would find WitSec to be part of the prosecution team in this case (at least with respect to the Inspectors' participation in the video-teleconferences).[22]  There are, however, other facts that assure me imputation is proper. Though I find United States Attorney Fitzgerald's testimony entirely credible (including his testimony that he did not consider the WitSec Inspectors to be part of his investigative

---

[21] On the whole, I find the Government's argument that OEO somehow created an insulating intermediary between WitSec and the prosecution team unpersuasive.

[22] The Government relies heavily on the argument that, because the WitSec Inspectors purportedly had no investigative duties and no involvement in prosecutive decision-making, they could not have been part of the prosecution team.  I disagree.  I do not believe that either of these criteria establishes the sine qua non for membership on the prosecution team.  For example, I have no doubt that a paralegal, translator, or other non-lawyer assistant facilitating the prosecutors' work would be a member of the prosecution team, regardless of the fact that they were not investigating the case or making charging decisions.  On a related note, I am quite nonplussed by the argument that, had the WitSec Inspectors actually been "investigating," they would have reported their activities on Form USM 11 instead of USM 210.

team), my review of the videotapes indicates that Inspector Doe, at the time of the conferences, on occasion sought to aid the investigative effort by doing more than simply operating the teleconference equipment.

At one point during the conferences, Inspector Doe explains that he plans to bring al-Fadl to the WitSec office to allow al-Fadl to review a consensually recorded phone call he had made to another al Qaeda operative. After doing so, it appears that Inspector Doe contacted Inspector Dapra and asked him to inform the prosecutors of a substantive issue that had arisen during the review of the tape that al-Fadl believed he should discuss with them. This conduct, though clearly short of full-blown investigation, is nevertheless something more than merely protecting al-Fadl. Though this incident standing alone might be of little significance, considering it within the totality of the circumstances, I believe it entirely appropriate to consider the WitSec personnel as part of the prosecution team.

C. State of Mind

Having found that the Government's failure to disclose is attributable to the prosecution team, I turn to the question of the Government's state of mind. Where the Government fails to produce Jencks Act material, the standard for granting a new trial "depends upon whether the suppression was deliberate or inadvertent." United States v. Hilton, 521 F.2d 164, 166 (2d

Cir. 1975).  "[A] new trial is warranted if the evidence is

merely material or favorable to the defense" where the

government has either:  (1) "deliberately suppresse[d]

evidence"; or (2) "ignore[d] evidence of such high value that it

could not have escaped its attention."  Id.  On the other hand,

"if the government's failure to disclose is inadvertent, a new

trial is required only if there is a significant chance that

this added item, developed by skilled counsel, could have

induced a reasonable doubt in the minds of enough jurors to

avoid a conviction."  Id.[23]

I feel compelled to look closely at the question of intent

based in part on the initial response of OEO and the Marshals

Service to the prosecutors' requests for the tapes.  That

response (described supra), at first whiff, reeks of an attempt

to stonewall and cover up.[24]  I see no legitimate purpose for

---

[23] The standard for inadvertent Jencks violations closely tracks
the materiality standard applicable to alleged Brady or Giglio
violations.  United States v. Jackson, 345 F.3d 59, 77 (2d Cir.
2003).  Unlike the standard for Jencks violations, the
Brady/Giglio materiality standard does not vary based on the
Government's state of mind.  United States v. Agurs, 427 U.S.
97, 110 (1976) ("If the suppression of evidence results in
constitutional error, it is because of the character of the
evidence, not the character of the prosecutor.").
[24] Although significant time passed between the Marshals
Service's delivery of the tapes to the United States Attorney's
Office and the ultimate disclosure of the transcripts to defense
counsel, I see nothing similarly suspicious in this delay.  I
base this finding, in large measure, on the prosecutors'
unequivocal statement, upon learning of the tapes' existence,
that they would likely need to be produced to defendants.  The

delaying the production of the tapes to the U.S. Attorney's
Office by two months.  As AUSA Karas predicted, this delay looks
very bad indeed.  In particular, I find OEO Director Stephen
T'Kach's purported Title III concerns, in light of the possible
constitutional scope of the prosecutors' demands, at best
unfounded and at worst obstructionist.

By the time the prosecutors learned of the tapes and first
requested them, however, El-Hage's trial and sentencing were
completed.  Any Jencks Act damage had been done.  By that time,
no matter how willful or obstructionist the conduct of OEO and
the Marshals Service, it simply could not add to any damage
already suffered.  Accordingly, I believe the intent relevant to
this motion is the Government's intent at the time of El-Hage's
trial.

I find great difficulty in determining the Government's
intent at this time for one reason.  It is clear to me that
Inspector Doe then had, and likely still has, no idea that
videotapes like the ones he created are extremely likely to
contain material discoverable pursuant to <u>Brady</u>, <u>Giglio</u>, Jencks
or similar authority.

On the whole, the testimony I heard impressed upon me the
rampant ignorance about disclosure obligations within the

---

evidence presented does not give me the same confidence that OEO
and the Marshals Service approached the taping issue with a
similar intent to disclose.

Marshals Service.  The Government seeks refuge in this
ignorance, claiming it necessarily renders the failure to
produce inadvertent.  According to this argument, "The USMS
inspectors, who knew about the tapes, were unaware of the
prosecutors' Jencks Act obligations; and the prosecutors, who
understood their Jencks Act obligations, were unaware of the
tapes until after trial.  The failure to produce the statements
in the videotapes for trial was, therefore, inadvertent."
Although the Government's statement aptly describes some of the
relevant circumstances, I do not agree that inadvertence may be
so glibly decided.

In this regard, I remain mindful of the Court of Appeals'
admonition that "[t]here simply is no longer any excuse for
official ignorance regarding the mandate of the law" with
respect to the Government's disclosure obligations.  Bufalino,
576 F.2d at 449.  I am also guided by the court's direction to
government agencies that, "[i]n educating personnel concerning
their responsibilities in this area [i.e. disclosure pursuant to
the Jencks Act and Fed. R. Crim. P. 16], government agencies
must keep in mind the broad definition of discoverable
'statements' incorporated in the governing texts."  Id.[25]

---

[25] The Government urges that "[t]he effectiveness of USMS Jencks
Act training is not at issue here" and that "the [WitSec]
inspectors' awareness of disclosure obligations is irrelevant."
In light of the quoted language from Bufalino, I cannot agree.

Here, eight or nine United States Marshals Service Criminal Investigators were aware (or would have been aware if they were competently performing their jobs) of the videotapes and the fact that they contained debriefings of al-Fadl by prosecutors and agents.  Those Criminal Investigators included:  Inspector Doe, Supervisory Inspector Mike, Chief Inspector William Wagner, Chief Inspector George Walsh, and four to five Case Managers at USMS headquarters.  Additionally two USMS administrative personnel knew of the tapes.  Nevertheless, none of these Investigators (including those in senior positions) ever considered, much less acted upon, their obligation to turn the tapes over to prosecutors.  Chief Inspector Paonessa (one of the first, and only, USMS personnel to recognize the importance of the tapes and undertake action for their disclosure) summed up the situation succinctly.  He testified:  "It was shocking to me that a law enforcement officer would not realize" that the tapes might contain 3500 material.  I too would be shocked had I not come to learn of the utter dearth of guidance given to Marshals Service Investigators regarding the Government's disclosure obligations.

Inspector Doe and Supervisory Inspector Mike each testified that they did not recall receiving any training within the last nine to ten years regarding government disclosure obligations. Indeed, as the Government notes, "Supervisory Inspector Mike, a

USMS employee for nearly twenty-three years, did not recall ever receiving Jencks Act training, even when he received his initial law enforcement training upon entry into the USMS." This testimony, and that of other USMS personnel indicates that continuing legal training and updates for USMS personnel are, at best, sporadic and quixotic. Given this state of "continuing training," I do not believe Chief Inspector Wagner, Chief Inspector Walsh or the four to five Case Managers on al-Fadl's case were any better informed of their obligations. If they were, I find it incredible that none would have raised a question about turning the tapes over to prosecutors.

I have no doubt that responsibility for the Inspectors' ignorance of their legal duties lies squarely with those involved in setting Marshals Service policy, most notably the Office of General Counsel and General Counsel Gerald Auerbach. During the hearings on this matter, I sought testimony from Mr. Auerbach who has been ensconced in the Service's Office of General Counsel since 1974. I had hoped his testimony would illuminate the issue of whether the Marshals Service was "educating [its] personnel concerning their responsibilities in [the] area" of disclosure obligations as discussed in Bufalino, 576 F.2d 449. Although Mr. Auerbach's testimony was illuminating, the light shone on a pathetic sight.

Mr. Auerbach revealed that the Marshals Service relies upon a trickle-down system to inform Deputies, Inspectors and other USMS personnel of their legal obligations with respect to prisoners, witnesses and defendants. Constitutional and statutory duties are apparently not directly explained to USMS personnel. Rather, these legal duties are purportedly "described" in USMS policies that are "distributed" through posting on some sort of electronic database available only to Marshals Service personnel. Mr. Auerbach and the attorneys in his office typically do not draft these secondhand descriptions; instead, they merely give "advice" to Directors, United States Marshals and other non-lawyer managers who divine the relevant legal precepts and memorialize their understanding of those legal requirements as official Marshals Service policy. Once the policies are drafted, Mr. Auerbach and the lawyers he supervises are responsible for reviewing the policies for "legal sufficiency".[26] In addition to this review responsibility, Mr. Auerbach described his job, and that of his office, as little

---

[26] The testimony on this point was not entirely clear. In his February 17 appearance before me, Mr. Auerbach testified that his office reviews all policies before they are issued. During his subsequent April 26 appearance, he testified that his office generally only renders advice upon request, though he stated that Directors and Managers "routinely" seek such advice when implementing a "program" or "procedure." He further testified that the Service has a procedure whereby policies "issued formally by the Marshals Service" are reviewed by various offices within the Service, including the Office of General Counsel.

more than responding to requests from senior Marshals Service

Personnel.[27]

---

[27]Although the details of this system for obtaining legal advice
from the Office of General Counsel are somewhat unclear, it
seems to me that the system is a bureaucrat's dream.  The system
makes it almost impossible to pin down precisely who within the
Marshals Service is responsible for ensuring that Marshals
Service actions and policies meet all relevant legal
requirements.  The policy makers rely upon the Office of General
Counsel for legal advice, and if a policy is in some way
deficient, those policy makers may point their fingers at the
Office, claiming it failed to inform them adequately.  The
General Counsel's obligation to render advice, however, (at
least as Mr. Auerbach describes it) appears limited to
situations where the policy makers request that advice.  Thus,
the General Counsel's Office may disclaim responsibility for any
legal deficiencies in policy by claiming the policy makers never
asked for the requisite advice.  In the end, no one is
responsible.

     In discussing this, "advice upon request" regime, Mr.
Auerbach did not significantly elaborate on what, if any, types
of requests his office receives.  Notably, no one within the
Marshals Service ever sought counsel from Mr. Auerbach's office
regarding the videotaping at issue.  In fact, Mr. Auerbach
testified that he did not even learn of the taping until May
2004.  He further testified that his office received no requests
for any type of legal opinion regarding the taping and that the
office played no part in the purported "corrective action" taken
in connection with the taping.

     I do not know whether this failure to contact the Office of
General Counsel was a vote of no confidence in Mr. Auerbach, or
merely a reflection of the fact that no one within the Marshals
Service recognized the gravity of the situation.  It is,
however, clear that the Service has never appreciated the
seriousness of the situation.  The claimed "corrective action"
taken was apparently little more than a single conference call
where the WitSec Director told Inspectors not to videotape
witness interviews, an action hardly sufficient to address the
rampant ignorance of government disclosure obligations within
the Marshals Service.

     In fact, the Service's appreciation of the gravity of this
situation, and indeed, the hallmark of the Marshals Service's
training and leadership is found in the fact that information
about the potential scandal regarding the videotapes was not

The abject failure of this trickle-down system is painfully
evident from the current situation.  The fact that eight or nine
WitSec Inspectors could simultaneously overlook the possibility
that twenty-eight hours of videotaped interviews between a
witness and prosecutors might constitute discoverable materials
illustrates the utter irresponsibility of this system.  This
laissez-faire approach to "informing" USMS personnel of their
legal obligations left the Inspectors entirely ignorant of their
duties.

It is, nevertheless, difficult to say that the WitSec
Inspectors, who were never adequately informed of their duty to
disclose the tapes, intentionally violated that duty.  If the
hearings had shown that the Marshals Service made any reasonable
attempt to keep its personnel apprised of Government disclosure
obligations, one could argue that the WitSec Inspectors acted
intentionally in failing to turn the tapes over.  It simply
makes little sense, however, to ask whether the Inspectors tried

---

transmitted to USMS Director, Benigno Reyna, or Deputy Director,
Donald Gambatesta, until May 2004, seventeen months after the
struggle between the United States Attorney's Office and the
Marshals Service for production of the tapes began.  Of course
Deputy Director Gambatesta could not complain since he
apparently learned of the taping issue some days before Director
Reyna found out by reading the newspaper.
    Finally, the "investigation" by the Service into the
circumstances of the taping did little to illuminate what went
on.  On the whole, the hearings did not paint the Marshals
Service as an entity that understood its mistake, let alone an
organization working actively to prevent similar debacles in the
future.

to hide something they had no idea they were obliged to produce. To this extent I agree with the Government's argument quoted above. I decline, however, the Government's invitation to find the non-disclosure inadvertent simply because there has been no evidence of a conscious intent to deprive the defense of the tapes.

Failure to produce Jencks Act material is also deliberate under Hilton where the Government "ignores evidence of such high value that it could not have escaped its attention." 521 F.2d at 166. Neither party has cited, and I have not otherwise discovered, any cases applying this standard in a similar situation. Fortunately, it appears to be rare that government agents are (through the inexcusable nonfeasance of their superiors) wholly ignorant of their disclosure obligations.[28] Despite this lack of relevant authority, the proper rule to apply in this situation seems readily apparent to me.

If the tapes contain material of "such a high value that it could not have escaped [the prosecutors'] attention" had they been given timely access to the tapes, El-Hage is entitled to

---

[28] I am not confident that this apparent rarity paints an accurate picture of how diligently the Marshals Service, in particular, adheres to its disclosure obligations. For my part, I do not believe I have ever seen, during my thirty-three years on the bench, a USM Form 11 or Form 210 disclosed to defense counsel as potential 3500 material, regardless of the extent of the Marshals Service's involvement in a case. I know that during my time as an Assistant United States Attorney I never saw such a report.

the lower <u>Hilton</u> standard.  I am confident that this rule strikes the proper balance between:  (1) ensuring the Government does not reap an unjust benefit from the Marshals Service's inexcusable failure to train its Inspectors; and (2) ensuring that El-Hage's convictions are not overturned on a trivial Jencks Act "violation" that likely would have occurred even if the Inspectors had been trained by competent counsel.

A reasonably trained WitSec Inspector would have recognized, as the tapes were being made, that they very likely contained numerous producible Jencks Act statements.  If it were so recognized, the Inspector would have had a duty to provide the tapes to prosecutors in time for the prosecutors to make timely disclosure of any such statements.  Analyzing any Jencks statements in the tapes as if this duty had been fulfilled gives neither the Government nor El-Hage a windfall from the Marshals Service's failure.  Further, I believe this standard addresses the aims of <u>Hilton</u>'s prophylactic rule and comports with the relevant case law.  <u>See</u>, <u>e.g.</u>, <u>United States v. Paulino</u>, 299 F.Supp.2d 332, 344 (S.D.N.Y. 2004) ("Even if the suppressed statement of a Government witness is deemed Jencks Act material, that fact alone does not automatically give rise to a new

trial.").[29]  I turn, therefore, to an analysis of the alleged

Jencks Act statements contained in the videotapes.

   III.  Undisclosed Information

   As mentioned, supra, in deciding this Motion, I have

thoroughly reviewed and considered (in addition to the parties'

submissions and the relevant legal authority), the original

videotapes made by Inspector Doe and the redacted copies

provided to the prosecutors, along with the transcripts created

therefrom.  Additionally, I reviewed the record of El-Hage's

trial, focusing particular attention on al-Fadl's testimony and

a large number of the exhibits that were introduced.  Finally, I

have reviewed the pre-trial discovery and "3500 material" turned

over to the defense at trial.

   At the June 7, 2005 hearing in this matter, in an effort to

assess properly El-Hage's claims, I ordered counsel for El-Hage

to prepare and file (in addition to a post-hearing brief) a list

of the information contained in the videotapes to which they

believe they were denied timely access.  I also directed counsel

to identify which government disclosure obligation (e.g.,

---

[29] To the extent that the language El-Hage cites from United
States v. Morell, 524 F.2d 550, 554 (2d Cir. 1975), is relevant
to this part of his Motion, I likewise find this standard to be
fully congruent with it.  In light of United States v. Agurs,
427 U.S. 97 (1976), however, it appears that the cited language
is no longer good law.  See United States v. Provenzano, 615
F.2d 37, 46 n.19 (2d Cir. 1980); Bohanan v. United States, 821
F.Supp 902, 904-05 (S.D.N.Y. 1993) ("the Supreme Court abandoned
the Morell standard in United States v. Agurs").

Jencks, <u>Brady</u>, <u>Giglio</u>, Fed. R. Crim. P. 16, etc.) allegedly
entitled El-Hage to each piece of information.

In response, El-Hage's counsel identified numerous excerpts
of the videotape transcripts which are grouped into fourteen
subjects:  (1) the alleged "full scope" of al-Fadl's cooperation
agreement, (2) immigration and visa issues related to al-Fadl
and his family, (3) miscellaneous issues with respect to al-
Fadl's family members, (4) al-Fadl's participation on "the
government team" and a perceived need to win convictions,
(5) al-Fadl's reasons for cooperating with the Government,
(6) al-Fadl's alleged lack of insider knowledge of al Qaeda,
(7) al-Fadl's alleged lack of involvement in smuggling weapons
into Egypt, (8) the timing of al-Fadl's departure from al Qaeda,
(9) statements regarding Abu Hajer, (10) purported evidence of
"al-Fadl's willingness to mold testimony," (11) statements
allegedly suggesting the death of Abu Ubaidah was investigated
by someone from "the Tehrana group," (12) statements regarding
al Qaeda personnel who traveled to Somalia, (13) the alleged
relationship between Egyptian Islamic Jihad and al Qaeda, and
(14) the reaction within al Qaeda to the United States' arrest
of Omar Abdel Rahman.  With one exception, El-Hage claims he was
entitled to the cited information not only pursuant to the
Jencks Act, but also under <u>Brady</u> and <u>Giglio</u>, 405 U.S. at 153-

55.[30]  I first examine whether any of the cited excerpts
constitute Jencks Act material.

A.  Jencks Act

The Jencks Act, 18 U.S.C. § 3500, requires that, following
a government witness's direct testimony, the Government produce
to defendants "any statement . . . of the witness in the
possession of the United States which relates to the subject
matter as to which the witness has testified."  18 U.S.C. §
3500(b).  As used in the statute, the term "statement" means:

(1) a written statement made by said witness and
signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical or other
recording, or a transcription thereof, which is a
substantially verbatim recital of an oral statement
made by said witness and recorded contemporaneously
with the making of such oral statement; or

(3) a statement . . . by said witness to a grand jury.

18 U.S.C. § 3500(e).  Where the Government contends that
portions of an otherwise producible statement do not "relate to
the subject matter of the testimony of the witness," the
statement is to be delivered to the court for an in camera
inspection.  18 U.S.C. § 3500(c).  Material disclosed pursuant
to the statute is typically referred to as "3500 Material."[31]

_____

[30]El-Hage only claims a right to the information in Category 11
pursuant to Jencks and Brady.
[31] In practice both prosecutors and defense attorneys frequently
refer to any government disclosure as 3500 material, regardless
of the authority under which the disclosure is made.  In the

Notably, the Jencks Act does not impose a blanket requirement that the government disclose all available impeachment material in its possession.  Cf. United States v. Birnbaum, 337 F.2d 490, 498 (2d Cir. 1964) ("it is [] clear that not all statements that might in some way be helpful in impeaching the witness are producible.").[32]  Rather, the statute focuses on a narrow category of such material, prior statements made by the witness.  See United States v. Head, 586 F.2d 508, 512 (5th Cir. 1978) (describing a purpose of the Jencks Act as "assur[ing] that the witness had made no secret contrary statements in the past.").  The statute thus establishes three essential elements of 3500 Material:  (1) a statement by the witness, (2) in the possession of the United States, (3) that relates to the subject matter of the witness's testimony.  See 18 U.S.C. § 3500.  My conclusion that the WitSec Inspectors were part of the prosecution team resolves the second element with respect to whatever statements are contained in the tapes.  I

---

body of this Opinion, however, I use the term, "3500 Material," to refer only to disclosures pursuant to the Jencks Act.
[32] Of course the Government bears a constitutional duty to produce certain impeachment material.  See Giglio, 405 U.S. at 153-55.  Further, as discussed infra, the Second Circuit has held that the Jencks Act also requires the production of certain witness statements useful for impeachment.  See United States v. James, 609 F.2d 36, 48-49 (2d Cir. 1979) (noting that the Jencks Act may require production of a witness's statement  that relates "not only to the witness' factual narrative, but also to impeachment of his direct testimony by showing bias and interest.").

note, however, that a number of El-Hage's purported Jencks claims are, nevertheless, non-starters because they lack one of the other two essential elements.

### 1.  "Statement" by al-Fadl

El-Hage's Category (1) claim, that the tapes reveal the "full scope" of al-Fadl's cooperation agreement with the Government, fails because El-Hage has not identified any statement by al-Fadl in the tapes which might satisfy the first statutory requirement.[33]  Indeed, rather than relying upon a statement by al-Fadl, El-Hage points to a statement by one the FBI agents interviewing al-Fadl.  In that statement, the agent discusses the possibility of al-Fadl going to jail, and recounts a conversation the agent had with al-Fadl's wife on the subject.

This statement might well qualify as 3500 Material for the agent if the agent had testified about representations made to al-Fadl regarding the jail time al-Fadl faced.  El-Hage,

---

[33] El-Hage's brief suggests that the videotape transcripts reveal that al-Fadl "knew" he faced no genuine possibility of imprisonment because the tapes contain "not a single expression of concern that any of [al-Fadl's] plans will be interrupted by imprisonment."  The Jencks Act, however, as discussed supra, is not a general tool for discovery of impeachment material. Jencks applies only to prior statements by a witness.  Because El-Hage cites no specific statements by al-Fadl, his claim in this regard fails.  El-Hage's assertion that, "an objective observer of the negotiations between Mr. al Fadl and the government during the videoconferences could easily conclude that Mr. al Fadl was engaged in a 'continuous hustle' of the U.S. to wrangle financial and other benefits," likewise falls flat.

however, has not cited any such trial testimony by the agent. Thus, because the Jencks Act's disclosure obligation is witness-specific, the agent's statement simply is not part of al-Fadl's 3500 Material. See 18 U.S.C. § 3500; see also United States v. Lamma, 349 F.2d 338, 340 (2d Cir. 1965) (noting that, pursuant to the Jencks Act, "Congress intended to restrict defense access to statements of government witnesses, for purposes of impeachment, to those statements for which the witness and not the government agent is responsible").[34]

## 2. "Relating To" The Subject Matter of al-Fadl's Testimony

The fact that a government witness's prior statement is in the Government's possession does not, standing alone, make that statement 3500 Material. The statement must still "relate[] to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b) (emphasis added). Neither the Act, nor relevant case law, however, establishes a clear benchmark for determining which statements satisfy this requirement.

The core principles are clear, "[t]he statement must relate generally to the events and activities testified to." United States v. Cardillo, 316 F.2d 606, 615 (2d Cir. 1963). Further,

---

[34] The other statements by government agents, which El-Hage likewise claims constitute 3500 Material (e.g., alleged promises of immigration benefits to al-Fadl and his family), similarly fail to meet the threshold requirements of Jencks. I analyze, infra, the issue of whether the Government was obliged to disclose any of these statements (or any of the other statements and information cited by El-Hage) pursuant to Brady/Giglio.

statements that are merely "incidental or collateral" do not "relate." Birnbaum, 337 F.2d at 497. "Thus, if [a] statement deals only with the witness's general background and personal history and does not deal with the events and activities testified to on direct examination, it is not producible under the Act." Cardillo, 316 F.2d at 615. Courts applying these core principles, however, have come to widely divergent conclusions regarding what types of statements might be said to "relate to" a witness's direct testimony.

Some courts have held that only a witness's prior factual narrative may "relate to" the subject matter of the witness's direct testimony. See, e.g., United States v. Anderson, Nos. 03-3009-JWL, 98-20030-01-JWL, 2004 WL 624966, *5 (D.Kan. March 25, 2004) ("The type of 'statement' contemplated by the Jencks Act is a factual narrative."); Lovern v. United States, 689 F.Supp. 569, 586 (E.D.Va. 1988) ("The Court first concludes that the letters are not Jencks Act material. They are not narratives concerning past events"); see also United States v. Gambino, 835 F.Supp. 74, 92 (E.D.N.Y. 1993) ("The notes clearly do not reflect the kind of factual narrative contemplated by the Jencks Act"). Such courts have largely based this restrictive interpretation of "related to" on the concurrence of Justice Stevens in Goldberg v. United States, 425 U.S. 94, 114 (1976) (Stevens, J., concurring). See, e.g., Anderson, 2004 WL 624966,

at *5; <u>Lovern</u>, 689 F.Supp. at 586.  In that concurrence Justice
Stevens stated that, in order for a writing to qualify as a
producible Jencks Act statement, "more than relevance to the
testimony and approval by the witness is necessary." <u>Goldberg</u>,
425 U.S. at 114.  The purported statement "must first of all be
the kind of factual narrative by the witness that is usable for
impeachment." <u>Id.</u>

     The Second Circuit has rejected the argument that the term
"relate to" is "limited to factual narratives." <u>United States</u>
<u>v. Borelli</u>, 336 F.2d 376, 393 (2d Cir. 1964).  In so doing, the
Court relied upon <u>Rosenberg v. United States</u>, 360 U.S. 367, 370
(1959), where the Supreme Court held that "A statement by a
witness that she fears her memory as to the events at issue was
poor certainly 'relates to the subject matter as to which the
witness has testified.'" 360 U.S. at 370.  Applying <u>Rosenberg</u>,
the Second Circuit reasoned, "[w]e can see no reason why a
statement that would support impeachment for bias and interest
does not 'relate' to the witness' testimony as much as a
statement permitting impeachment for faulty memory." <u>Borelli</u>,
336 F.2d at 370.

     Thus, within this Circuit, "a statement may 'relate,'
within the meaning of [the Jencks Act], not only to the witness'
factual narrative, but also to impeachment of his direct
testimony by showing bias and interest." <u>United States v.</u>

James, 609 F.2d 36, 48-49 (2d Cir. 1979).  Though this
interpretation of "relate to" is broad, it is not without
limits.  Although some statements useful for impeachment "may
relate" to the witness's testimony, id. at 48, "it is [] clear
that not all statements that might in some way be helpful in
impeaching the witness are producible" and the "particular facts
[of the situation] must control."  Birnbaum, 337 F.2d at 498.

     With this authority in mind, I turn to the question of
which of al-Fadl's videotaped statements cited by El-Hage relate
to al-Fadl's direct examination.  This inquiry requires that I
compare each videotaped statement with any purportedly related
testimony from al-Fadl's direct examination.  Accordingly, my
June 7 Order required El-Hage's counsel to identify any portions
of al-Fadl's direct examination to which the videotaped
statements allegedly relate.

     a.  Categories (2), (4) and (5)

     For three of his categories of purported Jencks statements
El-Hage has not directed my attention toward any allegedly
factually-related direct testimony.  Instead he argues that the
videotaped statements would have impeached al-Fadl by showing
his bias or interest and "put[ting] the lie to the notion that
Mr. al Fadl's priority was to tell the truth, as opposed to
being part of the prosecution team and doing his part to secure
convictions."

i.  Category (2)

Within Category (2), El-Hage identifies statements by al-Fadl purportedly related to "INS and Visa Issues."[35]  In those statements al-Fadl expresses concern over his immigration status and tells agents and prosecutors, "I need you to give me now, for [sic] the citizenship."  He later states:

> what I understand from this [i.e., the cooperation agreement] is that the one-year visa is renewable subject to the testimony itself.  Or, maybe it's a tool the government might use to hold back from getting the visa as a renewal visa . . . . Something goes wrong, they would say, "Oh, we don't want to renew that visa."  But, if I had a . . . three- to five-year visa, it would be different, because I'll be more comfortable knowing that they cannot kick me out of the country within the three years after my testimony.

A strict reading of the Jencks Act's "relating to" requirement would not encompass these statements, as El-Hage has not identified any direct testimony by al-Fadl regarding immigration benefits inuring to him from his government cooperation.  Likewise, the restrictive "factual narrative" requirement imposed by some courts would hold these statements beyond the scope of Jencks.  Under Second Circuit precedent, however, these statements, which arguably reflect al-Fadl's bias or interest, may satisfy the Act's "relating to" requirement.

---

[35] El-Hage additionally identifies statements by government agents, however, as discussed supra, such statements are not 3500 Material for al-Fadl.

The cited statements suggest that al-Fadl perceived or feared a quid pro quo between his trial testimony and his immigration status.  Indeed, al-Fadl specifically refers to his impending trial testimony within the second statement, apparently voicing a concern that the government might not review his visa if the trial testimony "goes wrong."  Under the Second Circuit's test, I find this to be sufficient to render the statements related to al-Fadl's testimony.  See Borelli, 336 F.2d at 392-93 (rejecting argument that witness's "offer[] of his assistance to the Government 'providing we can come to some sort of an agreement' and that 'some thing can be done for me'" was not related to witness's testimony).  Accordingly, I find these two statements to be producible 3500 Material.

ii.  Category (4)

In Category (4), El-Hage identifies videotaped statements by al-Fadl allegedly indicating that al-Fadl believed he was part of the "prosecution team."  In these passages al-Fadl discusses his cooperation and states, "I don't want to prove myself, I prove already.  But now I feel like, I love to do this . . . I'm like addicted now."  Al-Fadl also tells agents and prosecutors, "we work three years.  You are my friends, be very honest with me" and "I love to help you, to help the case."  El-Hage also cites two similar statements where al-Fadl states, "I love my job.  I--I love what I do now.  It's--what I do now is

like my prayer," and "any time I ask about money, I feel bad
because when I work with you I feel I do this like trial.  I
feel like this is something great my life, something correct my
history."  Notably, the four latter statements are snippets of a
conversation between al-Fadl, prosecutors and agents regarding
medical expenses the Government provided for al-Fadl's father in
the Sudan.[36]  Indeed, these snippets do not reflect the focus of
the conversation and might best be characterized as passing
comments.

Plucked from their context and grouped together under the
heading, "Mr. al Fadl as part of [the] government team," these
statements appear to provide some ammunition for impeaching al-
Fadl as biased.  They fall short, however, of the implied quid
pro quo alluded to in al-Fadl's Category (2) statements.
Indeed, when read in context, the Category (4) statements have
little of the import El-Hage ascribes to them.  Nevertheless,
under the Second Circuit's standard, I find these statements to
be producible 3500 Material because they relate to al-Fadl's
direct testimony in that they might be used to impeach him for
bias.

---

[36] This payment was disclosed to El-Hage in materials provided at
trial.

### iii.  Category (5)

El-Hage cites a statement in Category (5) where al-Fadl discusses his "reasons for [his] cooperation" with the United States.  In that statement al-Fadl recounts:

> [I]t's simple.  Because I went to [REDACTED], I went to [REDACTED] and no one help me.  I quit the job with the --with the group.  And I went to five Muslim countries, and no one would help me.  And, I went to the American Embassy, and it's the first time, until now it's everything [sic] good.  Nobody hurt me, nobody treat me bad, nobody hurt my feelings, you know?

I see little impeachment value in this statement.  It does not suggest a quid pro quo like the Category (2) statements, and I do not read it as suggesting any improper motive for al-Fadl's testimony.

It is not clear to me precisely how El-Hage's counsel believes the statement might have been useful in cross-examination.  El-Hage's brief suggests that the statement would have "corroborated the defense claim that Mr. al Fadl was merely an opportunist who was looking for a refuge once he was exiled from Sudan (for stealing far more from Sudanese banks than he ever may have pilfered from Mr. bin Laden), and would sell his services to the highest bidder."  I do not believe the statement has such import.  Moreover, even if the statement might have some value as impeachment material, "not all statements that might in some way be helpful in impeaching the witness are

producible." <u>Birnbaum</u>, 337 F.2d at 498.  Any impeachment value
of this statement is simply too attenuated to render it "related
to" al-Fadl's testimony on direct examination.  Accordingly,
this statement is not producible 3500 Material.

    <u>b.</u>  <u>Categories (3), (6), (9), (10), (11) and (13)</u>

El-Hage has cited numerous videotaped statements by al-Fadl
in Categories (3), (6), (9), (10), (11) and (13).  Pursuant to
my June 7 Order, he has identified the portions of al-Fadl's
direct examination purportedly addressing subject matter to
which each of these statements relate.  After analyzing the
statements and the cited testimony, I find that El-Hage has
identified some 3500 Material.  Many of his claims, however,
miss the mark.

    <u>i.</u>  <u>Category (3)</u>

In Category (3), El-Hage cites a statement by al-Fadl,
purportedly showing "Issues as to [al-Fadl's] Family Members."
In that statement, a government agent asks al-Fadl whether a
certain member of his family "was ever involved in anything that
would have hurt the United States."[37]  Al-Fadl responds, "No. . .

---

[37] El-Hage also cites a three-page portion of the transcript
containing a discussion between al-Fadl and Government agents.
El-Hage claims that this excerpt "reveal[s] that at least a
brother of Mr. al-Fadl assisted Mr. bin Laden" and that "[a]
brother or brothers appear to be spending time with Mr. al Nalfi
and there are discussions of how to keep Mr. al Fadl's brothers
from being arrested by the government."  Examining this excerpt
I have not found the revelation to which El Hage refers.

. he--he--no, never.  But, he was in Afghanistan like other
people when, you know, just when -- Afghani people they make war
against Russia.  A lot of people, thousands of people go over
there."

El-Hage argues that this statement relates to al-Fadl's
trial testimony regarding arrangements made to bring his family
to the United States as part of his cooperation with the
government.  I cannot agree.  On direct Al-Fadl testified:

> Q.  After you pleaded guilty did the government do
> anything for your family, your immediate family in
> Sudan?
> A.  Yes.
> Q.  What did the government do?
> A.  Bring them to the United States.

T.Tr. 401.  He further testified:

> Q.  During the time that you have been living in the
> United States, first by yourself and then joined by
> your family, who was it that has paid your housing,
> living and medical expenses?
> A.  When I was in New York, it was the FBI.
> Q.  And after you left FBI custody, who paid for your
> expenses, housing, food, medical, etc.?
> A.  The Witness Protection.

T.Tr. 417.  Reading the videotaped statement side-by-side with
the purportedly related trial testimony, I can only conclude
that the statement is, at best, incidental and collateral to al-
Fadl's direct testimony.  I simply cannot find that two passing

---

Further, I cannot determine what, if any, statements by al-Fadl
allegedly constitute 3500 Material within these broad passages.
I decline the opportunity to guess which statements by al-Fadl
El-Hage intended to cite.

mentions of the fact that al-Fadl's immediate family was brought
to the United States at government expense opens the door to
statements regarding whether any member of al-Fadl's family was
in Afghanistan during the Afghanis' war with the Soviet Union.
I also reject El Hage's argument that this statement constitutes
Jencks material because it might be used to impeach al-Fadl for
bias.  I am dubious that this statement provides any impeachment
material; I am certain it provides none "relating to" al-Fadl's
direct testimony.  The Category (3) statement is not producible
3500 Material.

    ii.  <u>Category (6)</u>

    In Category (6) El-Hage cites statements by al-Fadl
purportedly providing "Impeachment of Mr. al Fadl's Claims That
He Was an Al Qaeda 'Insider' With Detailed and Intimate
Knowledge of Its Operations In the Sudan."  These statements
fall into three sub-categories:  (a) mentions of al-Fadl's work
history, (b) statements regarding al Qaeda's purchase of an
airplane, and (c) a statement regarding El-Hage's travel to
Cyprus.

    During one videoconference, al-Fadl laments to agents the
difficulty he is having as a WitSec protectee because his
situation practically dictates that he is either unemployed or
under-employed.  Al-Fadl complains that his business skills are
atrophying since entering the program, stating:

> all my experience about business, I am stupid, now.  I
> forget everything.  Because four years I didn't do
> anything like before.  Sometime I say I run the
> company . . . $6 million under myself, 80 cars.  More
> than 100 guys around me.

Al-Fadl also discusses his difficulty with his current job:

> GOVERNMENT:. . . I thought you had a job, or were
> working at a job.
> AL-FADL:  . . . I try, but it's hard, you know?
> GOVERNMENT:  Why is it hard?
> AL-FADL:  It's not too much money.  And also
> psychology, it's hurt my feeling, you know. . . .
> because I never work under someone.  You know, always
> I--I do my own business.  Or, if I work for Bin Laden,
> and my father, I run business.  A lot people under.
> And it's just, I don't know.

El-Hage contends that these statements relate to two pages
of al-Fadl's testimony where he briefly describes receiving a
salary from al Qaeda and later helping to distribute such
salaries to other members.[38]  I cannot agree.  At most these two
statements "deal[] only with [al-Fadl]'s general background and
personal history and do[] not deal with the events and
activities testified to on direct examination."  Cardillo, 316
F.2d at 615.  More likely, the statements are little more than
idle conversation revealing only al-Fadl's frustration with his
inability to keep a good job.  In either case, the statements
are unrelated to the subject matter of the cited testimony, are

---

[38] El-Hage also cites a portion of al-Fadl's cross examination as
allegedly related to the statements.  The appropriate inquiry,
however, is whether the statements relate to the subject matter
of al-Fadl's direct testimony.  See United States v. Mayersohn,
413 F.2d 641, 643 (2d Cir. 1969).

of no significant impeachment value, and are not producible under the Act.  See id. [39]

At trial the Government presented testimony from Essam al-Ridi, who described purchasing, and subsequently piloting, an airplane for al Qaeda.  Al-Ridi testified that El-Hage contacted him, at the behest of Usama bin Laden, to purchase an airplane capable of, inter alia, transporting Stinger missiles from Peshawar, Pakistan to Khartoum, Sudan.  Although al-Ridi purchased the requested plane, and piloted it on a handful of occasions (including transporting al Qaeda's military commander on one trip), he testified that he did not actually transport the Stinger missiles as discussed.  Importantly, al-Fadl offered no testimony on direct examination about al Qaeda's purchase of an airplane.

During the video-teleconferences, al-Fadl is asked by agents whether he ever heard about bin Laden's plans to purchase an airplane:

> GOVERNMENT:  Okay.  Quick question:  Did you ever hear about bin Laden trying to buy an airplane?
> AL-FADL:  Well, what I tell you before, some people they say he buy plane or he rent plane.
> ************************************
> GOVERNMENT:  Okay. Who was assigned to get the airplane?

---

[39] El-Hage has not cited any other excerpts from al-Fadl's testimony (which lasted four days and consumed 548 pages of transcript) to which the videotaped statements might relate.  My review of that testimony has likewise revealed no such related passages.

```
AL-FADL:  I don't know.
GOVERNMENT:  Who was supposed to get it for Bin Laden?
AL-FADL:  I really don't know.  I--I don't have too
much information about the plane.
```

Al-Fadl then recounted the little information he had; he was
shown a plane, which he described as "[l]ike the small plane,
Cessna plane," by a bin Laden employee who said, "This is our
plane."  Al-Fadl further recalled that someone named Jamil, an
executive with Toyota, was associated with the plane.

As noted supra, al-Fadl offered no testimony regarding the
al Qaeda airplane purchase.  Nevertheless, El-Hage claims these
statements relate to his direct testimony because al-Fadl
testified about a discussion he had with al Qaeda co-conspirator
Abu Fadhl al-Makkee.  I cannot agree.  Al-Fadl testified that
al-Makkee told him al Qaeda wanted to transport Stinger missiles
from Afghanistan or Pakistan to Sudan and planned to rent a
Sudan Airways cargo plane for this purpose.  I do not see how
the purported Jencks statements, reflecting that al-Fadl knew
little of any proposed airplane purchase, and that he was once
shown a small plane and told it belonged to bin Laden's people,
relate, even generally, to the specific plan recounted by al-
Makkee to rent a cargo plane for transporting weapons to the
Sudan.  Once again, I find that these statements, at most,
relate to incidental and collateral matters and accordingly are
not producible 3500 Material.  See Birnbaum, 337 F.2d at 497.

I am also not persuaded by El-Hage's argument that these statements are 3500 Material because of their alleged impeachment value.  El-Hage argues that "it is inconceivable that someone who claimed as close an involvement [with al Qaeda] as Mr. al Fadl did would have been so ignorant of the particulars of [the airplane's] purchase."  El-Hage has not cited, however, any authority establishing that the type of ill-defined impeachment value described here renders a statement "related to" a witness's testimony on direct examination. Indeed, the cases appear to be to the contrary.  See, e.g., Birnbaum, 337 F.2d at 498 ("it is [] clear that not all statements that might in some way be helpful in impeaching the witness are producible.")

While the Second Circuit has adopted a relatively broad interpretation of which statements may "relate" to a witness's direct testimony, I do not understand it to extend to the statements cited by El-Hage.  Although certain statements useful for impeaching a witness may, under Second Circuit authority, relate to the witness's testimony, such statements appear to be limited to those that might impeach a witness for bias, interest, faulty memory, or some similar reason.  See James, 609 F.2d at 48-49 ("a statement may 'relate,' within the meaning of [the Jencks Act], not only to the witness' factual narrative, but also to impeachment of his direct testimony by showing bias

59

and interest.") (emphasis added); see also Borelli, 336 F.2d at
370 ("[w]e can see no reason why a statement that would support
impeachment for bias and interest does not 'relate' to the
witness' testimony as much as a statement permitting impeachment
for faulty memory.").  Absent authority extending the Court of
Appeals' interpretation of "relate" to encompass the type of "if
you know so much, why didn't you know about X" impeachment
described by El-Hage, I cannot find al-Fadl's statements
regarding al Qaeda's airplane purchase to be 3500 Material.

In the final Category (6) statement cited by El-Hage, al-
Fadl responds to government questions regarding which al Qaeda
associates had traveled to Cyprus:

> GOVERNMENT:  Okay.  All right.  Going back to Cyprus.
> Um, do you know if Hajer was ever in Cyprus?
> AL-FADL:  Who?  Abu Hajer?
> GOVERNMENT:  Abu Hajer.
> AL-FADL:  No, I don't remember.
> GOVERNMENT:  How about Wadih el Hage?
> AL-FADL:  No.

During his direct examination, referring to El-Hage by one of
his aliases (Abu Abdallah Lubnani), al-Fadl testified to the
contrary:

> Q.  Do you know if anyone else besides Abu Isra al
> Iraqi ever traveled to Cyprus?
> A.  I remember Abu Rida al Suri and Abu Abdallah
> Lubnani.

T.Tr. 367-68.  The videotaped statement not only relates
generally to the subject matter of the cited testimony, it

clearly contradicts it.  This statement is producible 3500
Material and appears to be the type of "contrary statement[] in
the past" to which the Jencks Act is targeted.  See Head, 586
F.2d at 512 (describing a purpose of the Jencks Act as
"assur[ing] that the witness had made no secret contrary
statements in the past.").

    iii.  Category (9)

    In Category (9), El-Hage cites videotaped statements by al-
Fadl discussing Abu Hajer (also known as Salim), a religious
authority within al Qaeda who was partly responsible for
religious lectures and fatwahs within the organization.[40]  In the
first statement al-Fadl discusses certain lectures and fatwahs
by Abu Hajer:

> GOVERNMENT:  Did he [Abu Hajer] talk about America in
> his fatwah, the lecture about jihad?
> AL-FADL:  I don't remember now particular, but I--I
> remember Abu Hajer, he talk a lot about, yeah, about
> Westerner, about the United States, about, uh,
> something in English--now I don't know how to say it
> in English.  But we call it [Arabic word], mean like
> one day, Islamic and the Westerner, one day they going
> to go against each other.  And he say a lot of things
> now, it's--it's being start for that.

In the second statement al-Fadl discusses his wife's frustration
with being in the WitSec Program and recounts a prior experience
where he and his wife were "stuck in Pakistan":

--------

[40] A fatwah is a ruling on some issue of Islamic law.  The weight
accorded to various fatwahs (i.e., whether they must be obeyed,
or instead are simply meant to persuade) was argued at trial.

[W]e were stuck in Pakistan, I think for two months. They don't let her [al-Fadl's wife] go back to Sudan, because I have problem with Abu Hajer.

El-Hage argues that both of these statements relate to al-Fadl's direct testimony regarding various al Qaeda fatwahs, and specifically fatwahs and religious statements by Abu Hajer.  I agree that the first statement relates to the referenced testimony.  Indeed, I see no rational argument that al-Fadl's videotaped statement describing the content of some of Abu Hajer's lectures and fatwahs does not "relate generally" to his testimony on essentially the same subject.  See Cardillo, 316 F.2d at 615.  Accordingly, the first statement is producible 3500 Material.  It is, however, equally clear to me that the second statement is nothing more than "incidental or collateral" to the cited testimony.  Id. at 616.  It is, therefore, not producible.[41]

iv.  Category (10)

In Category (10) El-Hage cites several statements al-Fadl made in connection with two photographs shown to him by government agents.  According to El-Hage, these statements reflect "al-Fadl's willingness to mold [his] testimony."  As the agents show al-Fadl the first photograph, they ask if it depicts

---

[41] I also note that this statement is of only trifling impeachment value.

Abu Naem al Libi.[42]  Al-Fadl replies, "It similar, but no.  Not

him."  The agents then show al-Fadl a second photograph and he

states, "You know, the face--everything look right, but Abu

Naem, he don't lose hair."  The agents then ask al-Fadl how long

it has been since he has seen Abu Naem, to which al-Fadl

replies, "I think nine years, maybe, or eight years."  The

agents then ask whether the picture might be of Abu Naem if he

has begun to lose some of hair.  Al-Fadl responds, "It could be-

-because I do too."  After looking more closely at the

photograph, through a back-and-forth with agents, al-Fadl

states, "it's very similar like Abu Naem," "It just--it's just a

few years, you know since I see him.  But, I think it's Abu

Naem," and, finally, "I think it's Abu Naem."

     El-Hage claims that these statements relate to al-Fadl's

direct testimony regarding a shipment of weapons and explosives

from the Sudan in approximately 1993.  Al-Fadl testified that he

and several other al Qaeda associates transported four crates of

weapons, via a truck driven by Abu Naem, to a ship in the Port

of Sudan.  The mention of Abu Naem in the testimony is brief.

Al-Fadl did not identify Abu Naem while on the stand, and I do

not see that his videotaped statements about a photograph

looking similar to Abu Naem are anything more than tangentially

---

[42] Al-Fadl had previously described Abu Naem al Libi as an al
Qaeda associate in the Sudan.

related to the cited testimony.  Accordingly, they are not producible 3500 Material.  Nevertheless, the statement where al-Fadl indicates that it has been eight or nine years since he last saw Abu Naem (a statement made on approximately November 1, 2000) does, however, appear to be related generally to al-Fadl's testimony that, approximately seven years prior, he had been involved in a weapons shipment with Abu Naem; the statement is producible 3500 Material.

El-Hage cites a second videotaped statement by al-Fadl that he claims is likewise related to the weapons shipment testimony. In that statement, al-Fadl also discusses Abu Naem:

> GOVERNMENT:  Yeah, okay.  Did you remember anything
> else about Abu Naem?  Since you spoke to Mike, did you
> remember anything further?
> AL-FADL:  About what he did, or--?
> GOVERNMENT:  Yeah.  Besides what you told him already.
> AL-FADL:  I think it's just like what I tell him.  You
> know, it's just he's one of the al Qaeda group, and--
> GOVERNMENT:  Okay, that's fine.
> AL-FADL:  --and he's in Afghanistan, and Sudan and he
> move weapons.  And, uh, he move--most of the weapons
> go to Yemen from Sudan in '94, it's go through him.
> GOVERNMENT:  Okay.
> AL-FADL:  From other countries to Port Sudan in Sudan
> to Yemen, you know, go through his truck, or from
> Khartoum, because sometimes they bring the--the stuff
> through Hajara Construction. . . . [I]f they need to
> send Yemen, or other country something, it's go
> through his truck to go to Port Sudan, and to the boat
> or another boat.

I agree that this statement, which gives a general description of Abu Naem's involvement in weapons trafficking in Port Sudan generally relates to al-Fadl's direct testimony about the single

episode of such trafficking in which he and Abu Naem participated.  Accordingly, this statement is producible 3500 Material.

Finally, I reject El-Hage's argument that al-Fadl's initial statements about the photograph resembling Abu Naem, and his final statement, "I think it's Abu Naem," reflect "Mr. al Fadl's Willingness to Mold Testimony," rendering the statements useful for impeachment.  If al-Fadl had testified at trial in any way about identifying Abu Naem, his prior statements reflecting his uncertainty when viewing the photographs would have obvious impeachment value.  Absent such testimony, I do not find the statements to be of much use for impeachment.  Despite El-Hage's assertion that the statements reflect al-Fadl's susceptibility to coaching by the agents, I do not see that the statements carry such sinister import.  Because al-Fadl offered no testimony relating to an identification of Abu Naem, I am skeptical that the statements offer any genuine impeachment material.  Moreover, even assuming the statements might support some measure of impeachment, I do not find it sufficient to render them related to al-Fadl's direct testimony.  See Birnbaum, 337 F.2d at 498 ("it is [] clear that not all statements that might in some way be helpful in impeaching the witness are producible.").

v.  Category (11)

In Category (11), the "Tehrana group" statements, El-Hage
cites a number of statements by al-Fadl where he discusses with
agents a consensually recorded phone conversation he had with
Mohamed Suleiman al-Nalfi.[43]  The conversation with al-Nalfi
involved the death of Abu Ubaidah al-Banshiri, al Qaeda's
military commander.[44]  Al-Banshiri's death was relevant to El-
Hage's trial because, inter alia, the Government sought to prove
that El-Hage had gone to investigate al-Banshiri's death on al
Qaeda's behalf, and had lied to the grand jury regarding his
knowledge of al-Banshiri's death and his participation in al
Qaeda's investigation.  Indeed, El-Hage's participation in the
al Qaeda investigation of al-Banshiri's death was among the
overt acts for the charged conspiracies.

In the first videotaped statement El-Hage cites, al-Fadl
recounts that al-Nalfi told him that someone from al-Banshiri's
family and someone from al Qaeda went to the site of al-
Banshiri's death, "to be sure that he died.  And they were sure

---

[43] Al-Nalfi was an al Qaeda associate in the Sudan with whom al-
Fadl had continuing contact, via telephone, throughout his time
in protective custody.  The Government encouraged and
facilitated this contact, hoping al-Fadl could: (1) obtain
current information about al Qaeda; and (2) entice al-Nalfi to
visit a country where the Government could approach him and
either convince him to cooperate as an informant, or arrest him
for his terrorist activities.  The FBI, with al-Fadl's consent,
recorded the calls between al-Fadl and al-Nalfi.
[44] Al-Banshiri drowned when the ferry boat he was traveling on
capsized in May 1996 on Lake Victoria in Kenya.

that he died."  When asked by the Government whether al-Nalfi
said anything about the al Qaeda associate investigating the
death, al-Fadl replied, "I think he mentioned him, but I--
because the talk is fast, and the phone I think over there is
not good. . . . If I go through the--the tape".[45]

In the second videotaped statement El-Hage cites, al-Fadl
discusses his impressions after reviewing the audiotape of his
call with al-Nalfi.  In sum, al-Fadl states that the tape is of
very poor quality (worse than the call itself, where "the phone
. . . over there is not good"), but that he believes al-Nalfi
may have told him an al Qaeda person from "the Tehrana group"
went to investigate al-Banshiri's death.

Despite conceding that "Mr. al Fadl did not testify about
either of these conversations, or the ferry boat accident in
which Mr. al-Banshiri perished," El-Hage nevertheless contends
that the cited statements relate to al-Fadl's testimony and,
accordingly, are producible 3500 Material.  I cannot agree.
Although the statements relate to the subject matter at issue in
the case, as the Jencks Act itself makes clear, a statement's
mere relation to the subject matter at issue in a case does not
render it producible.  See United States v. Butenko, 384 F.2d

---

[45] Referring to the consensual audio recording of al-Fadl's call
with al-Nalfi, Inspector Doe then states, "That's what we'll
work on on Monday is--I'll bring it in, and he can go over the
tape."

554, 568 (3d Cir. 1967), vacated on other grounds, 394 U.S. 165
(1969) ("a defendant is not entitled to statements when they do
not relate to the subject matter as to which the witness has
testified on direct examination, even though they relate to the
subject matter of the indictment, information, or
investigation."). Rather, only a statement related to a
witness's testimony is producible. Id. El-Hage has cited no
testimony to which these statements even generally relate, and
his recitation that "Mr. al Fadl certainly did testify about Mr.
al Banshiri, about Mr. al Nalfi, and of course, about Mr. El
Hage, and their relationship with al Qaeda," is unavailing.

Al-Fadl's testimony regarding al-Banshiri consists only of
a general discussion of al-Banshiri's position within al Qaeda
and certain specific interactions involving al-Banshiri. Al-
Fadl never mentions al-Banshiri's death, or the ensuing al Qaeda
investigation thereof, and I do not understand his testimony to
have opened the door to prior statements about these subjects.
Although I construe broadly the principle that a statement need
only relate generally to the subject matter of a witness's
testimony in order to fall within the Jencks Act, that principle
does not stretch to the extent El-Hage suggests. Al-Fadl's
testimony regarding al Qaeda and El-Hage also involve no subject
matter to which the statements can reasonably be said to relate.
Indeed, if general testimony about an organization (like that

given by al-Fadl regarding al Qaeda) related to the type of
statements El-Hage cites, the Jencks Act would take on a breadth
at odds with its plain language.  In short, because the cited
statements do not relate to any of al-Fadl's testimony they are
not producible 3500 Material.[46]

   vi.  Category (13)

   In Category (13), under the heading, "Egyptian Jihad and al
Qaeda," El-Hage refers to two videotaped statements by al-Fadl,
alleging they relate to al-Fadl's testimony regarding the
loyalty oath, or bayat, taken by al Qaeda members.[47]  I cannot
agree.

   In the first statement, al-Fadl discusses al-Nalfi's
background with al Qaeda and Egyptian Islamic Jihad:

>    GOVERNMENT:  How does-how does he [al-Nalfi] get so
>    involved with Jihad, the Jihad group?
>    Al-FADL:  Well, I think Abu Ubaidah [al-Banshiri] and
>    Abu Hafs, they always try Sudanese people to help
>    Jihad Group.  Because other nationality, like Jordan,
>    Saudi, it's a little far from Egypt.  But, Sudan Port,
>    it's big port, and it's easier, you know, to--to do it
>    through Sudanese people.  And, I remember Abu Ubaidah,

---

[46] I address, infra, El-Hage's claim that the cited statements
are exculpatory because they allegedly establish that someone
from a "Tehrana group," and not El-Hage, went to investigate al-
Banshiri's death on al Qaeda's behalf.

[47] El-Hage also refers to a third utterance by al-Fadl where he
allegedly stated, "And my understanding, jihad group, they
control Bin laden al Qaeda group."  El-Hage, however has not
offered any citation indicating where, within the twenty-eight
hours of videoconferences, this statement was made.  Without
some such indication, from which I might determine the context
of the statement, I cannot find that it relates to any of al-
Fadl's direct testimony.

> he ask me one time about Abu (inaudible) al Sudani, if
> he would like to help Jihad group and al Qaeda group.
> And I ask Abu (inaudible) he say no.  So, it's just my
> analysis.  He try all the Sudanese people, and
> probably he ask Nalfi, and he accept that.

In the second statement cited by El-Hage, al-Fadl responds to a

question about two individuals Al-Fadl had identified from a

photograph during one of the videoconferences:

> GOVERNMENT:  . . . [D]o you know if any of those two
> guys were involved in any terrorist activities?  I
> don't--I don't mean, you know, Jihad against the
> Soviets.  I'm talking about anything else.
> AL-FADL:  [A]gainst--against the United States, I'm
> not sure.

According to El-Hage, these statements relate to al-Fadl's

direct testimony briefly describing his understanding of bayat,

the loyalty oath sworn by al-Fadl and other al Qaeda members.[48]

In that testimony, al-Fadl stated that he understood the oath to

mean that, "[i]f they [al Qaeda] ask me to go anywhere in the

world for a specific mission or target, I have to listen."

T.Tr. 199.  He further explained that an individual pledging

---

[48] El-Hage also cites an excerpt of testimony by L'Houssein
Kherchtou (another al Qaeda member) to which the statements
purportedly relate.  As discussed supra, however, any such
relation is immaterial in determining producibility pursuant to
the Jencks Act.  Further, I reject El-Hage's additional claim
that "These statements demonstrate that Mr. al Fadl was
completely incorrect in asserting in his testimony that al Qaeda
members were also pledged members of other organizations (i.e.,
Libyan, Algerian, Moroccan organizations that were also based in
Sudan)."  El-Hage has not offered a single citation to any such
testimony and I have not discovered any during my own review of
the transcript.  Moreover, any such contradiction would be of
minimal value to the defense.

bayat was expected to do whatever was asked of him:  "They say when you make bayat, and you agree about the al Qaeda and about the war, anything we can ask you--if you are a doctor, maybe we ask you to wash car or anything."  Id.

Reading the cited statements side-by-side with the allegedly related testimony, I do not see the relation El-Hage suggests.  Indeed, I do not find that the cited statements rise even to the level of incidental relation to the cited testimony. I am also unpersuaded by El-Hage's suggestion that the statements have significant impeachment value.  Accordingly, the Category (13) statements are not producible 3500 Material.  See Birnbaum, 337 F.2d at 498.

### c.  Categories (7), (8), (12) and (14)

As he did with the previous group of Categories, for each statement El-Hage cites in Categories (7), (8), (12) and (14), he identifies purportedly related portions of al-Fadl's direct testimony.  Unlike the previous group of Categories, however, the testimony citations for Categories (7), (8), (12) and (14) offer substantial support for the conclusion that the videotaped statements relate to al-Fadl's testimony and accordingly are producible 3500 Material.

### i.  Category (7)

In Category (7), El-Hage cites videotaped statements al-Fadl made regarding his own prior involvement with al-Nalfi in

71

smuggling weapons, via camels, from the Sudan into Egypt.  On
direct examination the Government elicited testimony from al-
Fadl regarding this smuggling.  See T.Tr. 320-21.  The
videotaped statements clearly relate to the actions and events
discussed in the testimony and, accordingly, are producible 3500
Material.

### ii.  Category (8)

In Category (8), El-Hage refers to three videotaped
statements by al-Fadl that El-Hage claims relate to the scope of
al-Fadl's involvement in al Qaeda's financial operations and the
timing of his departure from al Qaeda.  In the first statement,
al-Fadl responds to Government inquiries regarding the payment
of rewards to al Qaeda personnel who had gone to Somalia.  Al-
Fadl describes a conversation he had with another al Qaeda
associate regarding such rewards:

> AL-FADL:  From my understand, I know they give you
> reward.  And I asked him that, and he just laughed so
> much.
> GOVERNMENT:  Do you remember when this was, Jamal?
> AL-FADL:  Uh--for sure I remember that time I left the
> company.  I didn't work like financial like that
> stuff.  But, I--I just, I don't know, in particular,
> what--what--what year.
> GOVERNMENT:  You'd already left the company?
> AL-FADL:  I remember that time I already give Wadih
> El-Hage the--my place in Taba Investments and bin
> Laden companies.

In the second statement al-Fadl responds to a question about how
well al-Nalfi knew El-Hage.  Al-Fadl states, "He knew him very

well.  He know him from Afghanistan when Wadia [El-Hage]--I give

him my place in Taba Investment on McNimir Street, all the time

we see him in guest house.  He know him very well."[49]  Al-Fadl

also discusses al-Nalfi in the third statement El-Hage cites.

There al-Fadl discusses his hope that al-Nalfi will cooperate

with the United States when confronted by authorities.  Al-Fadl

states:

> I love if he came out and he work with you, because if
> he work with you, you going to get more information
> and maybe he going to recruit more people, or he going
> to tell you about something--fresh information,
> because I left the group like around end of '94.  But
> he still in Sudan, so that mean he could be--if he's

---

[49] Following the June 7 hearing in this matter, the Government,
at the urging of El-Hage's counsel, undertook to produce a
second, revised, transcript of the videoconferences.  The
purpose of this second transcript was to, inter alia:  correct
numerous misspellings in the original transcript, decipher words
and phrases that had been reflected as inaudible or
unintelligible in the first transcript, and to ascribe a speaker
to each statement (the first transcript generally did not
differentiate between government speakers).  Additionally, I
ordered the Government to provide El-Hage with translations of
portions of the videoconferences in Arabic, which had not been
translated in the original transcripts.  The Government provided
these revised transcripts and translations to El-Hage's counsel
and to me throughout the time both parties were preparing their
briefs on this matter.  I afforded El-Hage's counsel an
opportunity to file a supplementary brief regarding any material
contained in the revised transcript or translations that they
believed important.  No such supplemental brief was filed.
    I note this later transcript because El-Hage refers, in his
filing, to the version of al-Fadl's statement rendered in the
first transcript.  The first transcript reads, "He knew him very
well.  He know him from {Hoor-ahn-stan} when Wadia--I give him
my place in farm equipment in (inaudible) all the time we see
him in this house.  He know him very well."  I refer, however,
to the second transcription, which my review of the videotapes
indicates is a more accurate reflection of al-Fadl's statement.

not in group, at least he know all the people he work
before, so he know more information about what's going
on.

At trial, al-Fadl testified about his role in paying
salaries to al Qaeda members, and about training El-Hage to take
over that responsibility.  See T.Tr. 259.  He also testified
about leaving al Qaeda.  T.Tr. 391-92.  The videotaped
statements briefly discussing al-Fadl's lack of involvement in
the payment of rewards to al Qaeda members returning from
Somalia, and his mention of transferring his salary payment
responsibilities to El-Hage, relate generally to the subject
matter of the former testimony.  Al-Fadl's passing mention of
leaving "the group like around end of '94" relates generally to
the latter.  Accordingly, these Category (8) statements are
producible 3500 Material.

> iii.  Category (12)

In Category (12), El-Hage cites statements made by al-Fadl
during discussions about al Qaeda sending personnel to Somalia
to attack international relief operations involving members of
the United States military.  Those statements generally involve
information al-Fadl gathered from al-Nalfi and other al Qaeda
associates, and the conclusions al-Fadl drew from this
information.  Al-Fadl testified on direct examination about al
Qaeda sending personnel to Somalia to attack American troops.
See, e.g., T.Tr. 279-85.  The videotaped statements,

accordingly, relate to al-Fadl's testimony and are producible
3500 Material.

    iv.  <u>Category (14)</u>

    In Category (14), El-Hage cites a videotaped statement in
which al-Fadl describes sentiments voiced within al Qaeda around
the time the United States arrested Sheik Omar Abdel Rahman.  In
that statement Al-Fadl recounted, "[W]hen the people in the
United States arrest Omar [Abdel Rahman], some people they say,
'Why bin Laden's group they don't do something against the
United States.'"  On direct examination, al-Fadl gave
substantially identical testimony:

> Q.  What discussion was there within al Qaeda as to
> what to do in response to the arrest of Sheik Omar
> Abdel Rahman?
> A.  They talk about what we have to do against America
> because they arrest Sheik Omar Abdel Rahman.
> Q.  Did they end up doing, carrying anything out, as
> far as you know?
> A.  No.
> Q.  Did anyone express any dissatisfaction with the
> fact that nothing was done?
> A.  I remember some of the members in al Qaeda, they
> left the group, and they say no, we not going to stay
> in group because the group, they don't want to do
> anything to help Sheikh Omar Abdel Rahman.

T.Tr. 296.[50]  The videotaped statement not only relates to the
direct testimony, the testimony largely paraphrases the

---

[50] El-Hage cites a separate portion of al-Fadl's testimony to
which he argues the statement relates.  Having noted the
substantially identical testimony, however, I do not find it
necessary to decide whether the statement relates to this other
excerpt.

statement.  Accordingly, the cited statement is producible 3500
Material.

　　3.  Statements of High Value

　　As set forth in detail above, the videotapes and
transcripts of the teleconferences contain the following
producible 3500 Material:  the purported impeachment statements
(consisting of al-Fadl's statement that he needed citizenship
and his statement implying that he feared a quid pro quo existed
between his testimony and his immigration status; his statements
that he loved his cooperation work with the agents, considered
them to be his friends, felt like he was "addicted" to the work,
and felt that his cooperation redeemed his past bad deeds); al-
Fadl's statement that he did not know whether El-Hage went to
Cyprus; al-Fadl's statements describing his involvement in
weapons smuggling to Egypt via camel; al-Fadl's three brief
statements regarding his lack of involvement in paying rewards
to al Qaeda members returning from Somalia, transferring his
position at Taba Investments to El-Hage, and leaving "the group
like around end of '94"; al-Fadl's description of one of Abu
Hajer's lectures; al-Fadl's statement that the last time he saw
Abu Naem was eight or nine years ago; al-Fadl's statement that
certain al Qaeda members expressed their displeasure at the
group's failure to attack the United States in response to the
arrest of Sheik Omar Abdel Rahman; and al-Fadl's statements

about al Qaeda personnel going to Somalia.  I turn now to the question of whether any of these statements constitute material of "such a high value that it could not have escaped [the prosecutors'] attention" if the statements had been provided to them by a competently trained WitSec Inspector.  See Hilton, 521 F.2d at 166.

Although I know of no helpful authority elaborating on the phrase, "evidence of such high value that it could not have escaped [the Government's] attention," I find no great difficulty in determining whether al-Fadl's statements satisfy the standard.  Hilton's prophylactic rule is plainly targeted at preventing intentional suppression of evidence.  The language regarding "evidence of such high value that it could not have escaped [the Government's] attention," sets forth the circumstances where a presumption of intentional suppression is warranted.  Such a presumption is appropriate where:  (1) the statement obviously constitutes 3500 Material, and (2) is of significant value to the defendant's case.

a.  Purported Impeachment Material

I have no doubt that the most valuable 3500 Material contained in the videoconferences is al-Fadl's statement arguably suggesting that he fears a quid pro quo may exist between his testimony and his immigration status in the United States.  In my forty-seven years at the bar and on the bench, I

77

have seen few routes to impeachment that are more effective than words from a witness's own mouth suggesting that he understands he must shade his testimony in order to win the favor of one of the parties.  Where the witness seeks to curry favor with the Government, the impression made upon the jury is generally quite significant.  Nevertheless, I do not find that al-Fadl's statements in this regard were of such a high value that they would warrant drawing an inference of intentional suppression.

As discussed at length, supra, the answer to whether these statements satisfy the Jencks Act's "relat[ing] to" requirement is not immediately apparent.  Indeed, courts are divided on the issue of whether statements useful solely for impeaching a witness for bias or interest "relate to" the witness's testimony.  Language from Supreme Court cases is quoted by courts applying both the narrow, "factual narrative" test and those applying the broader "relation by impeachment for bias" test.  Further, even though this Circuit has adopted a permissive test in which statements useful for impeaching on the basis of bias or interest may relate to a witness's testimony, the contours of that test are ill-defined, and not all such statements "relate" within the meaning of the Act.

In short, it is conceivable to me that a well-intentioned prosecutor could overlook al-Fadl's statements regarding his immigration concerns without recognizing the statements as 3500

Material.  Likewise, and for the same reasons, a reasonable prosecutor might innocently overlook al-Fadl's statements arguably expressing his camaraderie with the government agents and expressing his "love" of cooperating with the Government. Further, these, "part of the team" statements are, as the Government notes in its brief, ambiguous.  While El-Hage reads the statements as betraying a sinister collusion between al-Fadl and the agents, the statements support, at least equally well, the inference that al-Fadl was "commit[ed] to fulfilling his obligations under his cooperation agreement, which, as was made clear in that document, was al Fadl's only opportunity to help himself potentially stay out of jail and safely in the United States."  This ambiguity too belies the statements being so important they could not have been accidentally overlooked.  See United States v. Rosner, 516 F.2d 269, 272 (2d Cir. 1975) (upholding district court's finding that ambiguous evidence's "dubious value could readily have escaped a prosecutor's attention").

Thus, although they constitute 3500 Material, none of the Category (2) or Category (4) statements cited by El-Hage warrants an inference of intentional suppression.  None of those statements are "of such high value that [they] could not have escaped [the Government's] attention."  Hilton, 521 F.2d at 166.

b.  Statements Regarding El-Hage's Travel to Cyprus

Although al-Fadl's videotaped statement that he did not know whether El-Hage went to Cyprus, and his contradictory direct testimony, would have provided defense counsel an opportunity to show a clear contradiction, that contradiction involves an utterly tangential matter.  The trial did not focus on any activity in Cyprus, and I reject El-Hage's argument that al-Fadl's inconsistent statement regarding whether El-Hage ever traveled there would have "cast[] further and grave doubt on Mr. al Fadl's testimony about his knowledge of Mr. El-Hage's affairs while in Sudan."  In short, this contradiction involves minutiae.

Further, as the Government notes in its brief, El-Hage's defense primarily consisted of trying to show that, though he associated with terrorists and al Qaeda members, he was ignorant of any conspiracy to attack Americans and did not conspire with them.  Rather, the argument goes, El-Hage was a legitimate businessman trying to make money for bin Laden's businesses. El-Hage, in fact, emphasized his travels in an effort to show he was engaged in business, not terrorism.  See T.Tr. 5636-39 (summation by El-Hage's counsel emphasizing El-Hage's purported business travel).

### c.   Statements Regarding Weapons Smuggling via Camel

As he did on direct examination, during the
videoconferences al-Fadl described his involvement with al-Nalfi
in smuggling weapons from Sudan into Egypt, via camel.  El-Hage
claims that "the videoconference transcripts present a
dramatically different account" than the trial testimony, and
accordingly would have been of great value to the defense.  I
cannot agree.  Reading all of al-Fadl's videotaped statements
together, in context, they are almost entirely consistent with
al-Fadl's direct testimony.  Any potential differences between
the two accounts are minimal, and appear to arise from
ambiguities in the statements, rather than actual
contradictions.  I am wholly unpersuaded by El-Hage's claim that
the videotaped statements somehow show that al-Fadl turned a
secondhand account of al-Nalfi's smuggling into a first-person
narrative of his own involvement during direct examination.  On
the whole, the impeachment value of these statements is
trifling.

### d.   Statements Regarding Leaving al Qaeda and Transferring Some Responsibilities to El-Hage

Al-Fadl's three brief statements describing his lack of
involvement in paying rewards to al Qaeda personnel returning
from Somalia, transferring his position at Taba Investments to
El-Hage, and leaving "the group like around end of '94," also

amount to little of value.  El-Hage argues that these statements
seriously undermine al-Fadl's testimony, proving that he left al
Qaeda years before he claimed, and further showing that he was
never involved in any financial aspects of bin Laden's exploits.
I cannot agree.  Read in context these statements provide, at
most, a minor discrepancy in al-Fadl's timeline, and an
admission that he was not involved in a particular al Qaeda
financial transaction.  The statements are, accordingly, of
almost no value.

     e.  Statement Regarding Abu Hajer's Lecture

Al-Fadl's statement describing the content of some of Abu
Hajer's lectures is, likewise, of little value and does not
warrant an inference of intentional suppression.  El-Hage argues
that the statement shows that while al Qaeda believed a conflict
with Westerners was brewing in the future, there existed no
current intention to attack the United States.  The statement,
however, is not of such broad import.  In fact, al-Fadl states
that Abu Hajer described the conflict not only as potentially
starting sometime in the future, but as currently beginning (Al-
Fadl describes Abu Hajer as saying, "one day, Islamic and the
Westerner, one day they going to go against each other.  And he
say a lot of things now, it's--it's being start for that.").
Moreover, given the other evidence indicating al Qaeda's intent
to attack and kill Americans (including bin Laden's 1996

"Declaration of Holy War Against the Americans Who are Occupying the Land of the Two Holy Places," explicitly calling for the killing of Americans), al-Fadl's brief statement about the content of Abu Hajer's lectures is of minimal value.

### f. Statements Regarding Abu Naem

Similarly, al-Fadl's statements about last seeing Abu Naem eight or nine years ago, and describing Abu Naem's role in weapons shipments are of minimal value. Al-Fadl's direct testimony involved Abu Naem only collaterally and was elicited by the Government primarily to impeach its own witness, al-Fadl, for his involvement in weapons shipments that al-Fadl believed might be used against Americans. The minor discrepancy in time, as to when al-Fadl last saw Abu Naem, would have had little effect on the testimony. Further, al-Fadl's statement describing Abu Naem's role in weapons shipments through Port Sudan only bolsters his testimony about the particular weapons shipment in which he participated with Abu Naem.

### g. Statement Regarding Omar Abdel Rahman's Arrest

Al-Fadl's statement describing displeasure within al Qaeda at its failure to attack the United States in retaliation for the arrest of Omar Abdel Rahman is notable because it is substantially identical to al-Fadl's direct testimony on the same subject. The prior videotaped statement, thus, would have given El-Hage no information that was not already available to

him in al-Fadl's testimony.  The statement was, accordingly, of no value.  Rosenberg, 360 U.S. at 371 ("Since the same information that would have been afforded had the [3500 Material] been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had the opportunity to inspect the [3500 Material].").

h.   Statements Regarding al Qaeda Personnel Traveling to Somalia

Al-Fadl described at some length, both during the videoconferences, and on direct examination, al Qaeda's actions relating to sending its personnel to Somalia to attack United Nations and United States troops there.[51]  El-Hage chiefly asserts that the videotaped statements reveal that, in his testimony, al-Fadl "personalized [] event[s] that happened to someone else, thereby making for more dramatic and effective testimony that was insulated from effective cross examination." I cannot agree.  Although al-Fadl's statements and testimony are not identical, this seems to be largely a product of ambiguities (rather than genuine inconsistencies) in both the testimony and

---

[51] El-Hage argues that "Mr. al Fadl's claim that al Qaeda sought to fight the U.S. in Somalia represented the only evidence of any violence al Qaeda contemplated against the U.S. prior to Mr. El-Hage's return to the United States in September 1997."  As discussed, infra, this argument is entirely without merit.

the recorded statements.  On the whole, I do not find that al-Fadl's statements about Somalia are of more than minimal value.

    i.  Value of 3500 Material

In sum, the most useful 3500 Material contained in the tapes is also the least obvious.  A well-intentioned prosecutor could, in good faith, simply overlook it.  Further, although the videotapes and transcripts contain a significant amount of obvious 3500 Material, those statements' value (individually, and as a group) is de minimis.  Accordingly, the Government's failure to make timely production of the 3500 Material in the videotapes and transcripts does not warrant a presumption of intentional suppression.  See Rosner, 516 F.2d at 272 (upholding district court's finding that information whose impeachment value was "de minimis" was not of "high value").

Neither individually, nor as a whole, do the Jencks Act statements rise to the level of "evidence of such high value that it could not have escaped [the prosecutors'] attention." Hilton, 521 F.2d at 166.  Accordingly, El-Hage is not entitled to Hilton's relaxed standard applicable to intentional suppression of 3500 Material, but rather, is entitled to a new trial only if "there is a significant chance that this [undisclosed 3500 Material], developed by skilled counsel, could

have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id.[52]

Because the overwhelming majority of the 3500 Material is of minimal value, it does not undermine confidence in the verdict and cannot satisfy this standard.  Further, the only 3500 Material of significant value, al-Fadl's suggestion of an immigration quid pro quo for his testimony (even when bolstered by his arguable expressions of camaraderie with the prosecution team) is also insufficient to require a new trial.  Since, however, the applicable standard under Hilton "closely tracks the materiality test applied under Brady and Giglio," I now turn to the question of whether El-Hage has identified any Brady or Giglio material in the video conferences, and whether any such material, considered in conjunction with the 3500 Material, is sufficient to "undermine confidence in the outcome" of El-Hage's

---

[52] I note that, although the value of the actual 3500 Material is quite minimal, even this minimal value would likely require a new trial if the Government's failure to produce the statements had been truly intentional, or under circumstances justifying a presumption of intentional suppression.  See Hilton, 521 F.2d at 166 (holding that "[a] new trial is warranted if the evidence is merely material or favorable to the defense" where the government has either:  (1) "deliberately suppresse[d] evidence"; or (2) "ignore[d] evidence of such high value that it could not have escaped its attention."); United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) ("Evidence is favorable to the accused if it either shows that the accused is not guilty or if it impeaches a government witness.").  Although none of the statements provide for significant impeachment of al-Fadl, the fact that they provide for any impeachment of him, appears sufficient to satisfy the "material or favorable" standard in Hilton.

trial.  <u>Jackson</u>, 345 F.3d at 77 (citations and quotations

omitted); <u>see also</u> <u>Kyles</u>, 514 U.S. at 436 (noting that

materiality of undisclosed evidence must be "considered

collectively, not item by item").

   B.  Brady/Giglio Material

   "Under <u>Brady v. Maryland</u> . . . the Government has a

constitutional duty to disclose favorable evidence to the

accused where such evidence is material either to guilt or to

punishment."  <u>Jackson</u>, 345 F.3d at 70 (internal citations and

quotation omitted).  "Favorable evidence includes not only

evidence that tends to exculpate the accused, but also evidence

that is useful to impeach the credibility of a government

witness."  <u>United States v. Coppa</u>, 267 F.3d 132, 139 (2d Cir.

2001).[53]

   With a single exception (the so-called "Tehrana Group"

information), El-Hage claims he was entitled to each piece of

information he identifies in the videoconferences pursuant to

Jencks, <u>Brady</u> and <u>Giglio</u>.  In analyzing whether any of the

information cited constitutes Jencks Act material, <u>supra</u>, I have

_____

[53] To support a <u>Brady</u>/<u>Giglio</u> claim, undisclosed information must
have been "suppressed" by the Government.  <u>Strickler v. Greene</u>,
527 U.S. 263, 281-82 (1999).  Information is suppressed, in this
context, where the Government fails to disclose it either
intentionally or inadvertently.  <u>Id.</u>  Here, because the
videotapes were in the possession of a member of the prosecution
team before, during, and after trial, any potential <u>Brady</u> or
<u>Giglio</u> information contained therein was "suppressed" under this
standard.

reached numerous conclusions regarding how useful the information might have been to El-Hage's defense.  Although I do not restate those conclusions here, they are equally relevant to the question of whether the cited material is "favorable" and "material" within the meaning of Brady.  Thus, those statements I have previously found to have little or no impeachment value, in the context of my Jencks Act analysis, likewise fall short of Brady's requirement that producible information be "favorable" and "material."  Accordingly, I do not revisit every statement and piece of information El-Hage cites.  Several items do, however, warrant particular attention.

### 1.  "Full Scope" of al-Fadl's Cooperation Agreement

El-Hage claims that the videoconferences reveal the previously undisclosed "full scope" of al-Fadl's cooperation agreement with the Government, thus constituting "quintessential" Brady material to which he was entitled.

### a.  Statement by FBI Agent

In support of this argument, El-Hage primarily points to an FBI agent's statement to al-Fadl in which the agent discusses the possibility of al-Fadl going to jail, and recounts a conversation the agent had with al-Fadl's wife.  The agent states:

> No one is going to jail.  I said -- what I told [your wife] was that you may go to jail, okay?  Because of, you know, because of what we do in court, and stuff

> like that.  Which we know is not going to happen.
> But, there's always that chance.  But it's not going
> to happen.

El-Hage argues that this statement is "a representation . . .

that Mr. al Fadl would not be sentenced to jail."  The

Government counters that the statement "was not a promise . . .

[but] was merely a prediction of what the agent believed might

happen."[54]  Neither of these descriptions, however, fully

captures the essence of the agent's words.

The agent's statement is doublespeak.  It is utterly self-

contradictory, vacillating between, "No one is going to jail"

and "you may go to jail," returning to, "which we know is not

going to happen," with the caveat, "but there's always that

chance," and finally concluding, "[b]ut it's not going to

happen."  Although the statement was made in the context of

reassuring al-Fadl that his wife would not be jailed if she left

the WitSec program, it is abundantly clear that the agent also

wanted to reassure al-Fadl about the potential prison time he

faced.  At the same time, the agent sought to leave himself an

"out"--enough ambiguity in his words so that they could not be

---

[54] To the extent the agent was making a prediction, to date it
has proved entirely accurate.  To my knowledge al-Fadl has yet
to be sentenced (and, consequently, to serve any jail time for
his crimes).  Al-Fadl's case, however, is not assigned to me;
thus, I am not privy to any details of his potential sentence.
I suppose that to gauge fully the accuracy of the agent's
prediction, I must wait to see what sentence is eventually
imposed, assuming a sentencing hearing is actually scheduled at
some future date.

interpreted as a promise to al-Fadl that he faced no jail time.
I have no doubt that the agent would have never made this
statement if he had known it was being recorded.

These reassurances to al-Fadl would have provided fertile
grounds for impeachment by defense counsel.  While not rising to
the level of an undisclosed promise of leniency present in
Giglio, the statement is clearly more than the agent's idle
musings or prediction of what might happen.  As I noted before,
in my years on the bench I have found that juries often have
strong reactions to witnesses who appear to be trying to curry
favor with the Government.  Even in light of the other
impeachment material disclosed to, and used by, defense counsel,
the agent's statement would have added significantly to the
picture of al-Fadl as such a witness.

Although I believe this statement would have been strong
impeachment evidence, I do not agree with El-Hage that the
Government's failure to disclose the statement, and allowing al-
Fadl to testify that no promises had been made to him regarding
what his sentence would be, amounted to the use of false
testimony.  On direct al-Fadl replied, "No" when asked, "Have
you been promised what your sentence will be."  This answer was
not false.  The agent's statement, convoluted as it is, cannot
fairly be construed as a promise.  Indeed, though El-Hage
implies that al-Fadl's testimony was false, even he does not

seriously argue that agent's statement is a "promise," generally referring to it instead as a "representation."[55]  Further, the agent's statement does not show al-Fadl's other testimony regarding his possible sentence (almost all of which is phrased in terms of al-Fadl's "understanding" of what sentence he faced) to have been false.

### b.   Failure to Discuss Impending Prison Sentence

El-Hage also argues that the videotapes constitute Brady material because, during the twenty-eight hours of conferences, "there is not a single expression of concern that any of [al-Fadl's] plans will be interrupted by imprisonment."  El-Hage, however, cites no authority extending the Government's Brady obligation to cover such a "failure to discuss," and I do not find it to so extend.

### c.   Alleged Additional Benefits and Requests for Additional Benefits

Finally, El-Hage claims that Brady and Giglio entitled him to portions of the tapes allegedly revealing that the Government agreed to provide previously undisclosed, and "unauthorized," immigration, (and other) benefits to al-Fadl and his family. Further, El-Hage argues he was entitled to portions of the tapes reflecting al-Fadl's numerous requests for additional benefits.

---

[55] Throughout his brief and accompanying chart El-Hage repeatedly refers to the agent's words as a, "representation."  In only a single instance, one of the entries of the accompanying chart, does he refer to the statement as a "promise."

El-Hage complains, "[w]hile al-Fadl's plea and cooperation agreement (and allocution), and the totality of money he received from the U.S. government, were provided as 3500 material, those sterile documents pale before the constant demands and requests Mr. al Fadl made of authorities as reflected in the transcripts."

Apart from the agent's doublespeak reassurances, addressed _supra_, I reject El-Hage's contention that the tapes somehow reveal that the government provided or promised benefits to al-Fadl that were previously undisclosed to the defense. Having thoroughly reviewed the original "3500 material," the videotapes and the transcripts, I find no such discrepancies and am unconvinced by the examples El-Hage cites. Although I agree that al-Fadl's frequent requests for additional benefits would have helped defense counsel to paint a somewhat more colorful picture of al-Fadl than that outlined by the cooperation agreement, I do not understand _Brady_ or _Giglio_ to have required the disclosure of those requests.

El-Hage has not cited any authority requiring the government to disclose every benefit requested by a witness (despite having already disclosed the actual benefits provided to that witness) and I decline to hold that _Brady_ so extends. As far as these additional requests are concerned, disclosure of the cooperation agreement, money expended on al-Fadl and his

family, and other information previously disclosed, provided

defense counsel with ample material to cross-examine al-Fadl.

In light of the significant benefits actually conferred,

disclosure of al-Fadl's additional requests would have only

slightly enhanced potential cross-examination on the subject.

Accordingly, failure to inform the defense of these requests was

not a Brady violation.  See United States v. Helmsley, 985 F.2d

1202, 1210 (2d Cir. 1993) (finding Brady claim to be "without

merit" where undisclosed information would have "no more than a

slightly enhanced basis for challenging [the witness's]

credibility" and "[a]mple materials concerning [the witness]

were turned over to . . . trial counsel").

   2.  "Tehrana Group" Statement

   El-Hage also claims that Brady required the Government to

disclose al-Fadl's videotaped statement that he thought al-Nalfi

told him (in a difficult to hear phone conversation) that

someone from "the Tehrana group" went to investigate the death

of al Qaeda's military commander, Abu Ubaidah al-Banshiri.[56]  He

argues that this statement is exculpatory because it allegedly

shows that "al Qaeda sent the 'Tirana group' (rather than Mr.

_____

[56] As discussed, supra, El-Hage's alleged travel to Lake Victoria
in order to investigate al-Banshiri's drowning was relevant to
the case as it provided one of the overt acts of the charged
conspiracies.  Further, in the perjury counts against El-Hage,
the Government alleged El-Hage lied to the Grand Jury about
conducting the investigation, and about knowing of al-Banshiri's
death.

El-Hage) to Lake Victoria to confirm Mr. Banshiri's drowning."
I cannot agree.

After reviewing the consensual recording made of his
telephone call with al-Nalfi, al-Fadl described what he thought
he had heard al-Nalfi say:

> So, but it still is not--is not very--because I
> confused when he talk meet with--he say Tehrana--I
> say, "Who's tehrana?"  He says, "Tehrana group."  One
> of Tehrana group, I think--is my understanding.  Like
> one of Tehrana group, he went with Ubaidah al Banshiri
> family to the, to the lake.  And, they make sure he's
> dead.

Nothing in this statement precludes the possibility that El-Hage
went to investigate al-Banshiri's death; it is not exculpatory
Brady material requiring a new trial.  Cf. United States v.
Middlemiss, 217 F.3d 112, 123 (2d Cir. 2000) (affirming denial
of a new trial motion based on new evidence where the new
evidence "did not preclude the possibility" that the defendant
committed the crime as charged).

Indeed, as the Government notes, El-Hage's defense to the
relevant charges "was not that [El-Hage] did not travel to Lake
Victoria to investigate the death of a passenger on a ferry."
In fact, in his Grand Jury testimony, El-Hage admitted going to
Lake Victoria to investigate the drowning death of a passenger
in the ferry accident that killed al-Banshiri.  El-Hage claimed,
however, that he was investigating the death of "Adel Habib" and
further claimed that he did not know that "Adel Habib" was also

known as Abu Ubaidah al-Banshiri.  Notably, at trial the
Government presented the eyewitness testimony of Ashif Juma, al-
Banshiri's brother-in-law, who recounted how he saw El-Hage at
Lake Victoria investigating al-Banshiri's death.  The Government
summarizes El-Hage's defense thusly:

> Essentially, el Hage contended that he just happened
> to have been at Lake Victoria investigating the death
> of somebody who just happened to be on the same ferry
> as the military commander of al Qaeda, and thus Ashif
> Juma . . . was lying when he testified that el Hage
> came to Lake Victoria to look for Abu Ubaidah.[57]

In light of El-Hage's Grand Jury testimony, and the defense
he offered, I find nothing favorable (much less material) to the
defense in al-Fadl's "Tehrana" statement.  See, e.g., Jackson,
345 F.3d at 70 (noting that Brady requires disclosure only of
information both favorable and material to the defense).  It is
not Brady material.[58]

### 3.  Al Qaeda Airplane Purchase

Finally, I return briefly to El-Hage's claim that al-Fadl's
videotaped statements regarding al Qaeda's purchase of an
airplane would somehow impeach al-Fadl's testimony.  As
discussed, supra, I do not find this statement to have any

---

[57] The Government has characterized this defense as, "ludicrous,"
a characterization I find difficult to dispute.

[58] Further, in its submissions, the Government has included
excerpts of the actual conversation between al-Fadl and al-Nalfi
that al-Fadl describes in the videotaped statement.  Those
excerpts clearly show that al-Fadl simply misheard al-Nalfi, who
never mentioned any "Tehrana group."

significant impeachment value.  Moreover, the original "3500
material" provided to defense counsel included an FBI "FD-302"
report of the videoconference at which al-Fadl discussed what
little knowledge he had of the airplane purchase.  That report
accurately reflects the substance of al-Fadl's statements
regarding being shown a small, Cessna-like plane.[59]  Thus, at
trial El-Hage already had at his disposal ample information to
"impeach" al-Fadl regarding his failure to know the specifics of
the jet al Qaeda purchased.  I do not see that Brady required
more.  See United States v. LeRoy, 687 F.2d 610, 618-19 (2d Cir.
1982) (rejecting Brady claim where the Government had given
Defendant notice of "the essential facts permitting him to take
advantage of any exculpatory evidence"); Helmsley, 985 F.2d at
1210 (rejecting Brady claim where "[a]mple materials concerning
[the witness] were turned over to . . . trial counsel").

    4.  Favorable Brady/Giglio Material

    In sum, although almost all of El-Hage's Brady and Giglio
claims are without merit, the agent's reassurances to al-Fadl
regarding the jail time he faced constitute favorable
information that would have been of significant value in cross-
examining al-Fadl.  Nevertheless, the suppression of even

---

[59] El-Hage argues that the transcripts reveal that this FD-302,
and other 302s prepared by the FBI and turned over to the
defense at trial, are "false and misleading."  Based on my
review of the relevant material, I find this contention entirely
without merit.

favorable information of significant value is insufficient,
standing alone, to establish a <u>Brady</u> violation.  "[S]trictly
speaking, there is never a real 'Brady violation' unless the
[Government's] nondisclosure was so serious that there is a
reasonable probability that the suppressed evidence would have
produced a different verdict." <u>Strickler v. Greene</u>, 527 U.S.
263, 281 (1999).  Accordingly I turn to the question of whether,
under the totality of the circumstances, these reassurances are
"material"--that is whether, considered together with the 3500
Material contained in the tapes, they are sufficient to
"undermine confidence in the outcome" of El-Hage's trial.
<u>Jackson</u>, 345 F.3d at 77 (internal citation and quotation
omitted); <u>see</u> <u>also</u> <u>Kyles</u>, 514 U.S. at 436.

 C. <u>Materiality</u>

 As discussed, <u>supra</u>, "[e]vidence is material only if there
is a reasonable probability that had the evidence been
disclosed, the result [of the proceeding] would have been
different." <u>United States v. Gonzales</u>, 110 F.3d 936, 943 (2d
Cir. 1997).  Notably, information that is useful only for
impeaching a government witness, rather than directly
contradicting the Government's case, only rarely meets this
standard.  <u>See</u> <u>United States v. Spencer</u>, 4 F.3d 115, 119 (2d
Cir. 1993).  Nevertheless, where "the Government's case
depend[s] almost entirely on [the impeachable witness's]

testimony," the Government's suppression of significant
impeachment material warrants a new trial.  Giglio, 405 U.S. at
154.  "Similarly, impeaching matter may be found material where
the witness supplied the only evidence of an essential element
of the offense."  Avellino, 136 F.3d at 256-57.  Finally,
impeachment matter is typically not material "when the testimony
of the [impeachable] witness is corroborated by other testimony,
or when the suppressed impeachment evidence merely furnishes an
additional basis on which to impeach a witness whose credibility
has already been shown to be questionable."  United States v.
Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal citation and
quotation omitted).

### 1.  Utility of Undisclosed Information

If the non-trivial 3500 Material and the only viable
potential Brady material contained in the tapes had been timely
disclosed to El-Hage, counsel could have mounted a significant
attack on al-Fadl's credibility that was unavailable without
that information.

Defense counsel could have shown that al-Fadl received
careful reassurances by the Government (reassurances that
intentionally, though rather unartfully, stopped just shy of
being promises) about not going to jail.  Those reassurances
were made by someone al-Fadl considered a friend.  They were
also made in the context of al-Fadl's feeling of camaraderie

with the government agents, and his love for working with them as part of his self-perceived redemption.

Further, counsel could have shown that al-Fadl perceived a potential quid pro quo between his immigration status in the United States and his testimony, and believed or feared his prospects for staying in the country depended on whether something might "go[] wrong" with his trial testimony.  It takes no great inferential leap to suggest a similar quid pro quo between al-Fadl's testimony and his potential prison sentence. Thus, the undisclosed material would have given defense counsel a significant opportunity that was previously unavailable to suggest that al-Fadl believed his hopes for avoiding prison, like his hopes for staying in this country, depended on his trial testimony not "go[ing] wrong."

In sum, however, although this material would have fueled a significant attack on al-Fadl's credibility, it would not have directly contradicted the government's case, and appears to fall within the general rule that undisclosed impeachment material generally does not warrant a new trial.  See Spencer, 4 F.3d at 119.  El-Hage contends, nevertheless, that the Government relied so heavily on al-Fadl's testimony that a successful attack on his credibility would have been "a strike at the heart of the government's case."

## 2.  Alleged Importance of al-Fadl

El-Hage was charged with conspiracies to:  (1) kill United States nationals; (2) commit murder; and (3) destroy buildings and property of the United States.[60]  Although El-Hage was tried jointly with those accused of bombing the United States Embassies in Kenya and Tanzania during 1998, the Government did not allege any hands-on participation by El-Hage in those specific terrorist plots.  Rather, the indictment alleged that El-Hage was part of al Qaeda's broader, overarching conspiracies to attack and kill Americans, and to destroy American property and facilities--conspiracies beginning as early as 1991.

El-Hage's association with bin Laden and other al Qaeda figures was largely undeniable (in large part because of El-Hage's Grand Jury testimony on which the perjury charges against him were based).  Thus, El-Hage focused his defense at trial on the issue of intent, as his post-hearing brief in support of this Motion explains:

> Mr. El-Hage never denied that he was employed by Mr.
> bin Laden's businesses in Sudan, and/or that he was
> associated with persons who were members of al Qaeda.
> Rather, what Mr. El-Hage denied . . . was that he
> possessed any intent, whether by conspiratorial
> agreement or affirmative act, to participate in any
> violent conduct directed against the United States.

On the issue of intent, El-Hage argues that al-Fadl was "the linchpin of the government's case."  He claims that, absent al-

---

[60] He was also charged with eighteen counts of perjury.

Fadl's testimony, "there was simply not any evidence that al
Qaeda targeted the U.S. privately before Mr. bin Laden's public
pronouncements in 1996," and further argues that, without al-
Fadl's testimony, "there would not have been any testimony
alleging Mr. El-Hage's knowledge--even by inference--of any
violent or illegal conduct (or intended conduct) by al Qaeda
against the U.S."  I cannot agree.

As an initial matter, this argument ignores the substantial
evidence establishing El-Hage's participation in the charged
conspiracies after bin Laden openly declared war on the United
States in 1996.  Moreover, al-Fadl's testimony regarding al
Qaeda's violent intentions toward the United States prior to
that declaration was significantly corroborated.  Indeed,
independent evidence and testimony corroborated al Fadl's
testimony on almost all significant subjects relating to El-
Hage.

### 3.  bin Laden's Declaration of Holy War on America

Evidence at trial established that, in August 1996, Usama
bin Laden openly declared "Holy War Against the Americans Who
are Occupying the Land of the Two Holy Places."  In a copy of
that Declaration, entered into evidence as GX 1600 A-T, bin
Laden referred to, "the occupying American enemy," and declared,
"all effort must be directed at this enemy, kill it, fight it,
destroy it, break it down, plot against it, ambush it, and God

the almighty willing, until it is gone."  Bin Laden further
described "a need for appropriate fighting tactics . . . . In
other words, [] launch[ing] guerilla attacks by the society's
sons and not the armed forces."

Substantial evidence at trial showed that, following this
public declaration, El-Hage remained involved in the bin Laden
organization, and indeed in the charged conspiracies.  Notably,
as discussed, <u>supra</u>, al-Fadl first approached the American
embassy in 1996 and was in the United States, in the FBI's
protective custody, by December 1996.  Consequently, al-Fadl
provided none of the evidence linking El-Hage to the
conspiracies after bin Laden's "Declaration of Holy War."

At trial, the Government introduced:  (1) transcripts of
numerous intercepted phone calls; (2) internal al Qaeda reports;
(3) numerous pieces of correspondence; and (4) stamps in El-
Hage's passport, all of which established that, in February and
August 1997, well after bin Laden's public declaration, El-Hage
traveled to Afghanistan to meet with the al Qaeda leadership.
One of those documents (introduced as GX 310-74 A-T), an al
Qaeda report found on El-Hage's computer and designated by its
author as "top secret," describes how El-Hage returned to Kenya
from his February visit with a "new policy pertaining to the
region" that bin Laden had issued.  The report describes the new
policy which, in essence, called for the militarization of the

al Qaeda cell in Nairobi, the cell later responsible for the
1998 embassy attacks.

A second al Qaeda report ("Security Report") recovered from
El-Hage's computer (introduced as GX 300 A-T), likewise
indicates El-Hage's continuing participation in the
conspiracies.  That report, apparently authored by one of El-
Hage's subordinates during El-Hage's August 1997 visit with bin
Laden, describes fears within the East African al Qaeda cell
that America has learned of bin Laden's and al Qaeda's
involvement in attacks on American forces in Somalia.  It
further describes fears that America is seeking to apprehend
those in Kenya who might have been involved, and fears that a
former al Qaeda member might have become an American informant.
The subordinate describes his response to these concerns, most
notably his efforts to conceal evidence of the cell's activities
by hiding all of El-Hage's incriminating files.  The subordinate
notes that he would have burned the files but, because they
belong to El-Hage, decided to await El-Hage's return from his
visit with bin Laden before taking such a drastic step.

Other evidence introduced (including passports and passport
photos of al Qaeda members found in El-Hage's files, visa stamps
found in El-Hage's files, and immigration stamps found in hidden
files on El-Hage's computer) established that El-Hage was
involved in providing false passports and other travel documents

to al Qaeda associates.   Intercepted telephone calls showed
that he continued providing such documents following bin Laden's
"Declaration of Holy War."   Further, the transcript of another
intercepted call reflected El-Hage providing bin Laden's
satellite telephone number to a co-conspirator in a coded
message in April 1997.   Indeed, telephone records introduced at
trial showed that, following bin Laden's "Declaration of Holy
War," there were frequent calls to El-Hage in Kenya from the
satellite phone used by the al Qaeda leadership.   Further, El-
Hage's address books (also in evidence) contained coded entries
for the telephone numbers of various al Qaeda members.

Finally, as the Government argues in its brief, El-Hage's
repeated perjury to the Grand Juries investigating al Qaeda,
including his testimony that he had not seen bin Laden since
1994, despite his two visits with him in 1997 (and the fact that
he returned from the first visit with bin Laden's new policy for
al Qaeda's East Africa cell), indicate El-Hage's consciousness
of guilt, and indeed offers significant evidence of his state of
mind with respect to the charged conspiracies.   In sum, there
was abundant evidence at trial establishing El-Hage's
participation in the bin Laden-led conspiracies against America
after bin Laden's 1996 public "Declaration of Holy War."

4.   al Qaeda's Violent Intentions Toward the United States

In addition to some descriptions of al Qaeda lectures or
fatwahs that he had heard, al-Fadl's testimony regarding al
Qaeda's violent intentions toward the United States, prior to
bin Laden's "Declaration of Holy War," largely consisted of
information about al Qaeda's dispatch of personnel to Somalia to
attack United States military forces there.  El-Hage ascribes
particular significance to this testimony, arguing that,
"Somalia was of critical importance in the case against Mr. El-
Hage, because Mr. al Fadl's claim that al Qaeda had sought to
fight the U.S. in Somalia represented the only evidence of any
violence al Qaeda contemplated against the U.S. prior to Mr. El-
Hage's return to the United States in September 1997."  In light
of bin Laden's open "Declaration of Holy War" in 1996, I find
this argument wholly untenable.  Moreover, al-Fadl's testimony
regarding al Qaeda's involvement in Somalia was amply
corroborated.

At trial the Government presented the testimony of
L'Houssaine Kherchtou, another former al Qaeda member and
government cooperator.  Kherchtou's testimony regarding al
Qaeda's involvement in Somalia corroborated al-Fadl's
description of al Qaeda's desire, and attempts, to attack
American forces in Somalia.  Specifically, Kherchtou testified
about another al Qaeda co-conspirator's description of the co-

conspirator's travel to Somalia (with another al Qaeda member) in an effort to aid the Somalis in attacking American personnel assisting the United Nations effort in that country.  Kherchtou specifically discussed the al Qaeda personnel helping the Somalis to build a car bomb, but noted that they were unsuccessful in attacking a United Nations compound with the bomb.  The Government also offered documentary evidence of al Qaeda's efforts in Somalia.  Notably, the Security Report recovered from El-Hage's computer discusses al Qaeda's responsibility for "[the] operations to hit the Americans in Somalia."

On the whole, El-Hage overstates the importance of Somalia in the Government's case against El-Hage.  Moreover, even if this subject were as important as El-Hage claims, al-Fadl did not provide the only testimony illustrating al Qaeda's attempts to attack Americans in Somalia.

### 5.  al-Fadl's Other Testimony

In addition to arguing that al-Fadl was the linchpin of the Government's case on the issue of intent, El-Hage also suggests that al-Fadl's testimony was critical in establishing the structure and history of al Qaeda, and in placing El-Hage within the organization.  I note, however, that as with al-Fadl's other testimony, his testimony on these subjects was significantly corroborated (and in many cases, surpassed) by other evidence.

L'Houssaine Kherchtou's description of the structure and hierarchy of al Qaeda largely paralleled al-Fadl's testimony, including his descriptions of al Qaeda's various governing committees.  Further, although al-Fadl's most damning testimony regarding El-Hage's ties to al Qaeda was his description of training El-Hage to take over his payroll responsibilities for the group, Kherchtou specifically testified that he believed El-Hage to be a member of al Qaeda, and described how El-Hage had taken over as Kherchtou's al Qaeda "boss" within the Nairobi cell when the cell's former leader left Kenya to establish an al Qaeda front organization in London.  Finally, as discussed, supra, Essam al-Ridi, testified about El-Hage seeking his assistance in purchasing a plane in approximately 1993, on bin Laden's behalf, capable of transporting Stinger missiles from Pakistan to Sudan.  Al-Fadl's testimony did not provide the only evidence establishing the al Qaeda hierarchy, nor the single stitch tying El-Hage to the al Qaeda conspiracies.

6.  Materiality of the Undisclosed Information

Evaluating the undisclosed 3500 Material and the potential Brady/Giglio material in light of all the evidence presented against El-Hage, there is no "reasonable probability that had the evidence been disclosed, the result [of the proceeding] would have been different."  Gonzales, 110 F.3d at 943.  The Government's case against El-Hage did not "depend[] almost

entirely on [al-Fadl's] testimony," Giglio, 405 U.S. at 154, and

al-Fadl did not provide "the only evidence of an essential

element" of the charges on which El-Hage was convicted.

Avellino, 136 F.3d at 256-57.  In sum, none of the undisclosed

information in the videotapes (considered individually or

collectively) satisfies the relevant materiality requirement.

    IV.  Conclusion

    The Government's failure to turn over the disclosable

material in the tapes deprived El-Hage of statements by al-Fadl

that he was clearly entitled to under the Jencks Act.  Many of

those statements were obvious 3500 Material, and others would

have significantly aided in cross-examining al-Fadl.  It so

happens, though, that none of the undisclosed material is

powerful enough to displace the Government's other evidence of

El-Hage's guilt.[61]  Thus, because none of the undisclosed

material in the video-teleconferences is sufficient to

"undermine confidence in the verdict," the motion for a new

trial is denied.  Jackson, 345 F.3d at 77 (internal citation and

_____

    [61] This fortuity cannot excuse the rampant ignorance within
the Marshals Service regarding the Government's disclosure
obligations.  Before El-Hage's trial, no one within the Marshals
Service could have known with certainty whether al-Fadl would
provide "the only evidence of an essential element of the
offense[s]" with which El-Hage was charged.  Avellino, 136 F.3d
at 256-57.  Likewise, the Service cannot assume that the next
WitSec witness who testifies will benefit from the same level of
corroboration supporting al-Fadl.

quotation omitted). El-Hage's related discovery requests and other remaining requests for relief are likewise denied.[62]

I finally note that resolving this Motion has required me to decide several issues in areas where the relevant legal boundaries are not well marked. Although I have done my best to determine the just contours of the law in these areas, and to resolve the related issues correctly, I am hopeful that the parties will expeditiously bring this matter to the attention of the Court of Appeals.

SO ORDERED.

DATED:   New York, NY
         November 2, 2005

KEVIN THOMAS DUFFY, U.S.D.J.

Copies Mailed to Counsel of Record   11/2/05

---

[62] Most notable among these related requests are El-Hage's requests for production of the consensual recordings of al-Fadl's calls with al-Nalfi, and any notes al-Fadl made of the calls. In light of my findings in this Opinion, and the fact that El-Hage has made no showing that the recordings or notes contain any information to which he is entitled under Section 3500 or Brady/Giglio, I do not order their production.