# EXHIBIT C

5b23parh.txt

1

```
 1    5B23PARH                    Hearing

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------x

 4    UNITED STATES OF AMERICA,

 5              v.                            03 CR 1197 (SHS)

 6    UZAIR PARACHA,

 7                   Defendant.

 8    ------------------------------x
                                             New York, N.Y.
 9                                           November 2, 2005
10                                           9:45 a.m.

11
      Before:
12
                         HON. SIDNEY H. STEIN,
13
                                             District Judge
14

15                         APPEARANCES

16    MICHAEL J. GARCIA
           United States Attorney for the
17         Southern District of New York
      ERIC B. BRUCE
18    KARL METZNER
           Assistant United States Attorneys
19
      ANTHONY L. RICCO
20    EDWARD D. WILFORD
           Attorneys for Defendant
21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

                              5b23parh.txt
 1              (In open court)
 2              THE COURT:  I thought the defendant was on his way so
 3    I came up.  Let's just wait until he arrives.
 4              MR. BRUCE:  Your Honor, while we're waiting, I wonder
 5    if I could make use of the time and ask a question we were
 6    curious about.
 7              THE COURT:  Let's put on the record that we have
 8    Mr. Bruce and Mr. Metzner here, Mr. Ricco and Mr. Wilford, and
 9    we are waiting for the arrival of the defendant.  Proceed.
10              MR. BRUCE:  It's just very procedural.  I don't think
11    the defense will have any objection to talking about it now.  I
12    wanted to ask about your Honor's jury selection method with
13    respect to strikes.
14              THE COURT:  All right.  Mr. Wilford can we proceed --
15              MR. WILFORD:  He's coming.
16              THE COURT:  The defendant's here.
17              MR. BRUCE:  Now if you want to wait until afterwards,
18    that's fine also.
19              THE COURT:  We'll do it as soon as he comes in.  As a
20    matter of law I could proceed without him because it's just a
21    legal issue as opposed to having anything to do with facts, but
22    since he's on the way up, I'd prefer.
23              (Defendant present)
24              THE COURT:  The defendant has arrived.  Let's talk for
25    a moment about the mechanics of jury selection.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                 3

 1              First of all, I met with the jury administrator and
 2    they can't accommodate a pool of 175 on Monday morning because
 3    they need to use their staff for the normal jury people.  But
                              Page 2

5b23parh.txt

4    they are able to accommodate us on Monday afternoon, so at

5    1 o'clock, they will call in a separate panel of 175.   They

6    will number and administer the questionnaires to that panel.

7    You've received the revised questionnaires sent out yesterday.

8            MR. WILFORD:   Yes, your Honor.

9            THE COURT:   I tried to accommodate all of the concerns

10   of both sides to the extent I thought appropriate.   The

11   administrator will then give the questionnaires to somebody to

12   copy.   I think that's the government; is that correct?

13           MR. METZNER:   Yes, your Honor.

14           THE COURT:   Okay.   The government will make copies.

15   The parties will then review those questionnaires to see those

16   questionnaires that they believe are agreed upon for cause

17   strikes.   I see no reason that I would disagree if you both

18   feel that they're for cause.   So we then will dismiss those

19   jurors who both the parties agree are for causes.   The jury

20   department can accommodate us starting Tuesday morning if you

21   want for that process.   That's a question of the attorneys

22   having to go over all of these things.   And if you can use our

23   jury deliberation room to meet, it's up to you.   I assume the

24   government has other facilities in the courthouse that you can

25   use.   But it seems to me that it is much more efficient if the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

1    attorneys are together rather than communicating by e-mail or

2    anything like that.

3            So you should get together, and decide on your agreed

4    upon for causes.   At that point, which again from my standpoint

5    can be Tuesday morning, unless you think you need more time for

Page 3

5b23parh.txt

6     that.  We'll bring up from the jury pool, however many we want,

7     in the first tranche to question.  Because it seems to me that

8     there will be a number of people who we have additional

9     questions for.

10          Presumably there will be a group of people, and it may

11    be significant number, that there's no need to ask additional

12    questions for.  That is, everyone sees that there is no for

13    causes, and those people will be in the alternate panel.  All

14    right.  I don't need to talk to those.  It's only those that

15    based on the questionnaires, the parties want further

16    questioning.

17          I guess there's another category, that is one party

18    thinks it's a for cause, and the other party doesn't.  Those

19    will, I assume, will need my attention first, because I may

20    believe on the questionnaire it's a for cause strike but I may

21    need additional questions.  So we'll call them up in groups,

22    offhand I would think we could bring up a group of 30 or

23    something along those lines.  It depends in part upon how many

24    people are left after the agreed upon for causes.  And although

25    I may be overly sanguine, I think we could get a jury picked by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

1     the end of Tuesday.

2          Now, your question was actually how I work on the

3     strikes.

4          MR. BRUCE:  Correct.

5          THE COURT:  After all the for causes are gone, the

6     jury will be sitting lowest number first, not only in this jury

7     box which I believe holds 18, but in the back.  Everyone will

8     see where the potential jurors are sitting.  You then exercise

Page 4

5b23parh.txt

9      your peremptory strikes according to the normal procedure.   And

10     at the end of that, it's the lowest number jurors who are

11     seated.   In other words, the lowest number 12, after all

12     peremptories are exercised, are the jurors.

13             We then go on to alternates.   And the same process.

14     In other words, you'll be focusing your peremptories on the

15     lower numbered of the remaining alternates because it will be

16     the lowest numbered people remaining after the jury is chosen

17     who will be the alternates.

18             Does that make sense?  Mr. Wilford, you've tried a

19     case in front of me so you know the procedure.

20             MR. WILFORD:  Or two.

21             THE COURT:   How many alternates do the parties think

22     appropriate?  I have a number but I want to hear from you.

23             MR. METZNER:   We think three alternates would probably

24     be a good number.

25             MR. WILFORD:   We concur.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

1              THE COURT:   All right.  I'll do three.  I was thinking

2      of four, but if you both want three that's it.  The number of

3      strikes are set forth in federal rules when you have more than

4      two.

5              We're not going to get five days.   My slight hesitancy

6      is we're not going to get five days a week out of the jury.

7      Because if we're talking two to three weeks in testimony, as we

8      choose a jury we have our jury empaneled by the end of Tuesday.

9      That just leaves Wednesday and Thursday for testimony because

10     Friday is a holiday.   Then on the following week, it may be

Page 5

5b23parh.txt

11   that we cannot sit on Tuesday, November 15.  I have to let you

12   know next week.  And during that week I'd like to be able to

13   sit on Friday, November 18, but that goes back to Mr. Wilford.

14   As I indicated, if you don't want to sit for religious reasons

15   then we're not going to sit on the 18th.  But if your letter to

16   me was based on the fact that you need a day away from the

17   trial per week to handle other things, then you'll probably get

18   that on November 15.  So you've got to let me know sometime

19   next week, sir.  All right, whether you wish to raise a

20   religious objection to sitting Friday, November 18.  Okay?  And

21   I repeat, if there is a religious objection, we will not sit.

22   The following week there are two legal holidays, the 24th and

23   25th.

24             MR. WILFORD:  Excuse me, your Honor.  On the 22nd of

25   November, both Mr. Ricco and I have a hearing that was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

1    scheduled a year ago in the Eastern District of Pennsylvania

2    regarding a death penalty trial we're commencing in January.

3    It involves six other lawyers in addition to ourselves.  That

4    was scheduled a year ago.  We did not anticipate -- we

5    anticipated starting this trial on October 31 and being

6    finished by that date.  We had that in mind when we selected

7    October 31.  It's a Tuesday.  It's unavoidable.  I wanted to

8    bring that to the Court's attention.

9             THE COURT:  November 22.

10            MR. WILFORD:  Yes.

11            THE COURT:  You have to be where?

12            MR. WILFORD:  In Philadelphia.  It's a full day

13   motion.  All the motions are going to be decided.  All three

Page 6

5b23parh.txt

14    defendants are authorized capital defendants.

15         THE COURT:  So we only have two days that week.  I

16    will see what I can do about making myself available on the

17    15th in light of that.  I didn't know that.  But it's going to

18    be very choppy, which I want to avoid.  What we're talking

19    about then is something like only eight trial days up to

20    November 28.  So the jury may think it's three weeks, we're

21    only getting eight trial days.

22         MR. RICCO:  Excuse me, Judge.

23         THE COURT:  I'm going to put in four alternates.

24         MR. RICCO:  Excuse me, Judge Stein.  Also with respect

25    to the Fridays, we're going to talk to Mr. Paracha about coming

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

1    in on Fridays.  We're going to try to work with that.

2         THE COURT:  There's only one Friday we're talking

3    about, November 18.  It may be also December 2nd.  Let's see.

4         MR. BRUCE:  Your Honor, could we go back to the

5    peremptories for one minute.  I assume you have six rounds

6    alternating with the peremptory strikes?

7         THE COURT:  No.  There's six rounds for the jury, not

8    for alternates.

9         MR. BRUCE:  Correct.  But --

10         THE COURT:  It's two, one, two, one, two, one, one,

11    one, one, one.

12         MR. BRUCE:  If a party doesn't use a challenge in that

13    round it's waived?

14         THE COURT:  Yes.  If both sides don't use a challenge,

15    then it's over.  In other words, both sides seriatim don't use

Page 7

5b23parh.txt

16    a challenge then the peremptories come to an end.

17         MR. BRUCE:   Okay.

18         THE COURT:   If one side waives, and other side

19    doesn't, we go forward.

20         MR. BRUCE:   Very good.   Thank you.

21         THE COURT:   You see, if both sides are waiving a

22    peremptory, it means everybody is satisfied with the numbers

23    they seat.

24         MR. BRUCE:   Understood.

25         THE COURT:   Now, when the government makes copies, I

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                 9

1     want a precise number of copies made.  I don't want extra

2     copies floating around.  I've told the jury commissioner to

3     make sure that he collects every numbered questionnaire that

4     goes out.  I'll want the original questionnaires.

5          All right.  We're here today for a Daubert hearing in

6     connection with my exercising my gatekeeping functions on the

7     proposed expert testimony of Evan Kohlmann.   The government has

8     proposed he be an expert.

9          I've previously ruled that I'm not going to permit

10    testimony in regard to the counter-interrogation techniques and

11    specifically that al Qaeda members are told to lie.   But

12    prospective testimony is in regard to al Qaeda's origins,

13    organization, and identification of members and leaders and

14    testimony regarding the rules to the extent they concern the

15    use of cells and the use of individuals to provide them with

16    logistical support.

17         It seems to me under Daubert what I have to look at is

18    what methodology, what his testimony is going to be, what

                              Page 8

5b23parh.txt

19    methodology he applied at arriving at that testimony.   And

20    whether it was applied in a reasonable, logical fashion.   I

21    think that's the analysis.

22              MR. BRUCE:   I agree.

23              THE COURT:   Why don't you put him on.

24              MR. BRUCE:   Government calls Evan Kohlmann.

25              THE COURT:   Then the defense can cross-examine and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

1     we'll have argument.

2               I take it you have nothing extra on Judge Lee's

3     determination.

4               MR. BRUCE:   I don't, your Honor, although I've been

5     trying as I indicated in my letter.

6               THE COURT:   I saw.   It takes you a while to get the

7     testimony is what that says.

8               MR. WILFORD:   On that issue we did confer with the

9     counsel in the matter and also with another counsel that

10    consulted with the trial counsel.   And they indicated that the

11    ruling was made based on the judge's review of the

12    qualifications of the expert and declined to accept the expert

13    at that time.

14              THE COURT:   We can have further discussion on that

15    after we're done.

16     EVAN KOHLMANN,

17         called as a witness by the Government,

18         having been duly sworn, testified as follows:

19    DIRECT EXAMINATION

20    BY MR. BRUCE:

Page 9

5b23parh.txt

21  Q.   Mr. Kohlmann, do you have a college degree?

22  A.   Yes, I do.

23  Q.   Where did you do your undergraduate studies?

24  A.   I went to undergraduate at the Edmund A. Walsh School of

25  Foreign Service at Georgetown University in Washington D.C.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

5B23PARH              Kohlmann - direct

1  Q.   Can you describe what the focus of the program is at the

2  School of Foreign Service in Georgetown?

3  A.   The Edmund A. Walsh School of Foreign Service was

4  established to help Americans learn about the world at large to

5  promote the study of international relations and foreign

6  policy.   Even for undergrads at a graduate level.   Particularly

7  areas of the world that have heretofore been ignored by other

8  academic institutions.

9  Q.   And what is your undergraduate degree in?

10  A.   I majored in international politics with a focus on

11  international securities studies.

12  Q.   Did you have a minor or the equivalent of a minor?

13  A.   Yeah.   The School of Foreign Service does not offer minor

14  programs per se.   However in its place they offer what are

15  known as certificate programs.   Specific programs which are

16  geared towards goals of the School of Foreign Service.

17       One of those certificate programs is known as a

18  certificate in Islam and Muslim Christian understanding that is

19  given by a center at the School of Foreign Service named the

20  Center for Muslim and Christian Understanding.   I did receive a

21  certificate in Islam and Christian understanding.

22  Q.   Can you briefly describe your activities within the Center

23  for Muslim Christian Understanding?

Page 10

5b23parh.txt

24    A.   Sure.   In addition to the course work that I was required
25    to take as part of my certificate program, I additionally had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

5B23PARH                    Kohlmann - direct

1    to complete a cap stone thesis that was subject to the approval
2    of one of the program's directors, in my case Dr. John Voll.
3    Q.   And what's the goal or the focus of the Center for Muslim
4    Christian Understanding?
5    A.   Well, the hope is to promote good relations between the
6    Muslim and Christian worlds, to help non-Muslims better
7    understand the Islam and Muslim world at large.
8    Q.   You indicated you did a thesis in connection with the
9    studies at the center?
10    A.   That's correct, yeah.   I wrote a cap stone thesis for
11    Dr. John Voll.
12            THE COURT:   What's a cap stone thesis?
13            THE WITNESS:   Sure.   As part of the certificate
14    program, students are required to write a final thesis at the
15    end on a subject of their own choosing, subject to the approval
16    of a faculty mentor, one of the directors of the program.
17            My thesis was on the subject of early 20th century
18    religious and political development in Afghanistan,
19    particularly the reign of King Amanullah Khan.
20    Q.   And after you wrote the -- the thesis was written as part
21    of your development of this minor program?
22    A.   In order to receive the certificate you must write the
23    thesis, yes.
24    Q.   You did receive the certificate?
25    A.   Yes, I did.

Page 11

5b23parh.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - direct

1   Q.   Okay.   In addition to the Center for Muslim Christian
2   Understanding, are you familiar with something at Georgetown
3   called the Center for Contemporary Arab Studies?
4   A.   Yeah.   As part of the School of Foreign Service mission,
5   particularly with regards to Middle East education, with
6   regards to Middle East, there is a second center at the School
7   of Foreign Service known as the Center for Contemporary Arab
8   Studies, in short CCAS.   The center was established to help
9   spread knowledge of the Arab world, the Arab language, Arab
10  culture.   And to provide students that would not ordinarily get
11  the opportunity to get that kind of exposure.   It's regarded
12  generally as one of the top institutions with regards to Middle
13  East study in the entire country.
14  Q.   Did you participate at all in the Center for Contemporary
15  Arab Studies?
16  A.   Yes, I did.
17  Q.   Can you explain how?
18  A.   Well, in addition to numerous courses that I took from
19  professors and at the center, I also served as an undergraduate
20  research assistant for Dr. Manoun Fandi, who is an Egyptian
21  political scientist who was formerly associated with the
22  center.
23  Q.   And did you take any course work with Dr. Fandi?
24  A.   Yes, I did.   I took numerous courses with him, in addition
25  again I served as his research assistant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5b23parh.txt
5B23PARH                      Kohlmann - direct

1    Q.   As his research assistant, what type of research did you do
2    for Dr. Fandi?
3    A.   Well, at the time I was working for Dr. Fandi, he was
4    completing his work on his book, Saudi Arabia Politics of
5    Dissent.  Primarily the work I was doing both in class and
6    separately for him revolved around Middle Eastern dissident
7    groups, particularly Saudi dissident groups, including figures
8    such as Osama bin Laden, Dr. Mohammed al Masri, and Dr. Saad al
9    Faqih.
10   Q.   Now, did that research also involve the group known as al
11   Qaeda?
12   A.   Yes, it did.  One of the chapters of Dr. Fandi's book is
13   specifically dealing with Osama bin Laden and his propaganda
14   and international political structure beyond the borders of
15   Saudi Arabia and Afghanistan.
16   Q.   Did you participate in that research regarding al Qaeda?
17   A.   Yes, I did.  I wrote several papers for him.  I helped
18   proofread parts of the book.  I read a -- I got a prerelease
19   copy of the book.  So that was the main focus of my work.  I
20   also did other work on Middle Eastern dissident groups with
21   him.
22   Q.   While you were at Georgetown, did you receive any awards?
23   A.   Yes.
24   Q.   What awards did you receive?
25   A.   I received magna cum laude in my studies.  In addition in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

5B23PARH                      Kohlmann - direct

1    my major I graduated with international politics honors.

Page 13

5b23parh.txt

2   Q.   In addition to those awards, were you nominated for any

3   other awards at Georgetown?

4   A.   Yes.   The administration of the School of Foreign Service

5   nominated me to be a Rhodes Scholar nominee.

6   Q.   You mentioned before in connection with the Center for

7   Christian Muslim Understanding the thesis you did in pursuit of

8   that program?

9   A.   That's correct.

10  Q.   In addition to the thesis, did you write any other thesis

11  papers during your undergraduate studies?

12  A.   Yes.

13  Q.   How many additional thesis papers did you write?

14  A.   Two.

15  Q.   Okay.   Can you tell us about the first of those two

16  additional thesis papers you wrote?

17  A.   While at Georgetown, I decided that I wanted to engage in a

18  more in depth academic study of Afghanistan and how the Taliban

19  and other mujahideen movements had resulted as a result of the

20  Afghan Soviet war.

21       I approached a professor, I volunteered -- excuse me.

22  I approached a professor at the School of Foreign Service, and

23  I asked him to be my mentor and he did volunteer.   So I ended

24  up writing a research seminar thesis on this topic, titled "A

25  Bitter Harvest, the Soviet Intervention in Afghanistan."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                    16
5B23PARH                  Kohlmann - direct

1   Q.   Just a thumbnail sketch, can you tell us what the thesis of

2   that paper was.

3   A.   Sure.   I was attempting to trace the modern political

4   development of Afghanistan and trace the origins of the modern

Page 14

5b23parh.txt

5    Taliban movement, how the Soviet Afghan war of the 1980s had

6    resulted in creation of, number one, Osama bin Laden and the

7    Arab Afghan movement; and number two, the Taliban movement in

8    Afghanistan.

9    Q.   You mention a term Arab Afghans.   Can you describe for us

10   what you mean by that term?

11   A.   Yeah.   The Arab Afghans is a term in the Western discourse

12   that's come to refer to foreign fighters who traveled to

13   Pakistan and Afghanistan during the 1980s and early 1990s

14   seeking combat training to fight both against Soviet forces in

15   Afghanistan, communist forces in Afghanistan, and potentially

16   other enemies of the Islamic empire.

17   Q.   When you did this research for the thesis paper you're

18   describing, entitled A Bitter Harvest, was that an existing

19   program at the School of Foreign Service?

20   A.   No.   I actually had to seek out professors to do this with.

21   There's obviously opportunities for independent study and this

22   area was one that was not very well covered by most academic

23   institutions, so I actually had to create my own area of focus.

24   Q.   In what way did that thesis paper, A Bitter Harvest, touch

25   on al Qaeda?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

5B23PARH                    Kohlmann - direct

1    A.   Specifically I was looking at the creation of how extremist

2    forms of religion and politics had entered into Afghanistan.

3    Not only did I trace the development of the Taliban, I also

4    traced the arrival of foreign fighters in Afghanistan, their

5    organization, their development, their goals, and how they had

6    interacted with local Afghan elements after the end of the

5b23parh.txt

7    Soviet Afghan jihad.

8    Q.   I want to turn to the third thesis project you worked on.

9    What was that entitled?

10   A.   The third thesis project that I worked on was my

11   international politics honors thesis at Georgetown.  It was

12   titled The Legacy of the Arab Afghans, A Case Study.

13   Q.   Can you just in a thumbnail sketch briefly give us a

14   description of that thesis paper.

15   A.   Sure.

16   Q.   Slowly.

17   A.   Georgetown University offers a small number of

18   opportunities each year, undergraduate students have an

19   opportunity to write a longer thesis, a year-length thesis.

20   Again, only a handful of students are approved for this.

21       I chose to write mine about the Arab Afghans.  The

22   idea behind this was initially to set out who are the Arab

23   Afghans, where did they come from, what is their organization,

24   who are their leaders.  Then subsequent to that taking four

25   countries where either Arab Afghans have come from or gone to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

5B23PARH                    Kohlmann - direct

1    in large numbers.  And comparing the activities in those

2    different countries, structure of local al Qaeda affiliates and

3    al Qaeda leaders, and trying to divine why in certain countries

4    al Qaeda and other affiliate groups have achieved relative

5    success, while in others they have achieved relative failure.

6    And try to figure out what are the reasons behind that.

7    Q.   Now, these three thesis papers that you have been

8    discussing, were they peer reviewed or reviewed by your

9    professors at all at Georgetown?

Page 16

5b23parh.txt

10    A.   Yes, they were.   All of them.

11    Q.   Can you briefly describe that process.

12    A.   Sure.   Again for starting off with the certificate program

13    at the Center for Muslim Christian Understanding, that is a

14    program, again not everyone is a allowed to participate in it.

15    You have to be specifically approved.   You have to write an

16    application to be approved into the program.

17          Then following that, when you do end up writing your

18    cap stone thesis paper, it has to be reviewed and approved by a

19    senior member of the faculty of the center.   So in my case it

20    was Dr. John Voll.

21          With regards to my second my research seminar thesis,

22    again in order to write that paper, I had to first of all get

23    approval of a faculty mentor who would agree to review the

24    paper and judge it based on its research and my conclusions.

25    And of course that was done.   And again, in order for that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

5B23PARH                    Kohlmann - direct

1     paper to be approved, it had to be read by I think at least two

2     professors.

3           With regard to my final thesis, my international

4     politics honors thesis, not only did I have to apply to have

5     that, to actually have the opportunity to write it, but in

6     addition, upon completion, it's actually reviewed by a series

7     of faculty members.   My faculty mentor and other senior faculty

8     members at the School of Foreign Service, to determine whether

9     or not it is a paper worthy of being titled a Georgetown

10    University honors thesis.

11    Q.   Was it approved in that manner?

Page 17

5b23parh.txt

12   A.   Yes, it was.

13   Q.   Do you have any graduate degrees, sir?

14   A.   Yes, I do.

15   Q.   What is your graduate degree in?

16   A.   I have a J.D. from the University of Pennsylvania Law

17   School.

18   Q.   Now, while you were in law school, did you take any classes

19   pertaining to issues of terrorism or national security?

20   A.   Yes, I did.

21   Q.   Can you describe those for us?

22   A.   Within the law school itself I took several courses dealing

23   with terrorism and modern international law.  In addition to

24   that, within the university itself, within the University of

25   Pennsylvania, care of Professor Brian Spooner, I also did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

5B23PARH                    Kohlmann - direct

1   course work on Afghanistan, graduate-level course work on

2   Afghanistan Afghan politics.  I ended up writing a longer paper

3   for Dr. Spooner comparing two Afghan mujahideen war lords.

4   Q.   When you say -- that's another term I want to define.  You

5   used the term mujahideen.  What does that term mean?

6   A.   Mujahideen is an Arabic word which means loosely holy

7   warriors or holy strugglers.  It comes from the root word

8   jihad.

9   Q.   When you use the term to describe a group of people, who

10   are those people?

11   A.   Generally when I speak about mujahideen I'm referring to

12   the Arab Afghans or linked affiliate groups.

13   Q.   A derivative of that word, mujahid; what does that term

14   mean?

Page 18

5b23parh.txt

15  A.  Mujahid is a singular for mujahideen.  It is a singular

16  holy warrior.

17  Q.  Sir, are you familiar with an organization known as the

18  Investigative Project?

19  A.  Yes, I am.

20  Q.  Can you tell us what the Investigative Project is?

21  A.  The Investigative Project is a counter-terrorism think tank

22  and research group that was established in 1995 by a former

23  journalist who had done a documentary about terrorism and who

24  sought to help sponsor further academic research on the subject

25  of terrorism.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

5B23PARH                    Kohlmann - direct

1   Q.  Just slow down for the court reporter a little bit.

2   A.  No problem.

3   Q.  When you use the term think tank, what does that mean?

4   A.  A think tank is a rough term to refer to a research

5   institution generally specializing in the kind of academic

6   research that's not profitable, but it's useful.  So for

7   nonprofit purposes, we research this, we go into extreme

8   detail, into esoteric detail that few are interested in, but we

9   believe is valuable for the purposes of history and for

10  education.

11  Q.  And once you research an issue at the Investigative

12  Project, what generally do you do with it; what types of things

13  come from that?

14  A.  Well, after conducting my research I would then collate all

15  of that into a final memorandum, a report, a testimony, and

16  then that document would be subsequently distributed to a wide

5b23parh.txt

17  audience.  Anything from policy makers in Washington D.C. to

18  other academics to law enforcement and government officials to

19  the public at large.  Anyone who will benefit from the study of

20  terrorism.

21  Q.  Now, did you work at the Investigative Project?

22  A.  Part-time, yes, I did.

23  Q.  From what year to what year did you work at the

24  Investigative Project?

25  A.  I began working in approximately 1998, in early 1998.

                                                      22
5B23PARH                   Kohlmann - direct

1   Again, I was full a full-time student at the time both in

2   Georgetown University and subsequently at the University of

3   Pennsylvania.  However, during that time I worked straight

4   through until about early 2004.

5   Q.  When you say you worked there part-time, give us your best

6   estimate of approximately how many hours per week you worked at

7   the Investigative Project?

8   A.  It would vary given what my exam schedule and whatnot.

9   Generally speaking between 20 and 25 hours per week.

10  Q.  What were the different titles or positions that you held

11  at the Investigative Project over that roughly six year time

12  frame?

13  A.  Well, over six years my titles changed.  The last title I

14  had when I left the Investigative Project was senior terrorism

15  consultant.

16  Q.  Did your work at the Investigative Project focus on any

17  particular terrorist organization?

18  A.  Yes, I did work on ancillary groups like Hamas and others,

19  but the main focus of my work over those years was on al Qaeda

5b23parh.txt

20      and its worldwide affiliates.

21      Q.   And who is the head of the Investigative Group?

22      A.   Former journalist by the name of Steve Emerson.

23      Q.   While you were working, I'm sorry, at the Investigative

24      Project, what type of things did you research?

25      A.   I researched a wide variety of elements relating to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

5B23PARH                    Kohlmann - direct

1       terrorism, primarily those of recruitment and financial

2       networks that al Qaeda had made use of.  Al Qaeda's leadership,

3       structure, their ideology, their history, going into the kind

4       of detail that very few academics had done before but to

5       analyze it at a minute level.

6       Q.   What types of sources did you use to do this research?

7       A.   Well, I deal primarily in open source information.

8       Q.   Can you define for us what you mean by open source

9       information.

10      A.   Open source information refers to non-classified documents.

11      It could be government documents in the form of trial

12      transcripts, FBI interviews and whatnot, but documents that are

13      generally considered in the public domain.  Those would also

14      include reports by other experts and other academics, original

15      material gathered directly from terrorist groups.  One of the

16      specialties that I work on is gathering video and audio and

17      communiques directly from terrorist groups.

18      Q.   Could you describe that process a little bit.  How do you

19      go about obtaining materials directly from terrorist groups?

20      A.   Sure.  Well, starting obviously as a focus of study the

21      recruitment and financial networks of terrorist groups, you

Page 21

5b23parh.txt

22     also come into their propaganda outlets.  Propaganda by these

23     groups are spread primarily through two means, either through

24     bookstores in Europe or in Pakistan, or secondly through the

25     Internet.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

5B23PARH                    Kohlmann - direct

1          I established relationships with several publications

2     outlets in the United Kingdom where I was able to obtain quite

3     a bit of al Qaeda or affiliated literature.  Additionally

4     through the Internet I've collected hundreds upon hundreds of

5     videos and audio recordings directly released by terrorist

6     groups.

7     Q.   Now, in addition to the open sources you've described so

8     far, do you use any computer databases to gather information?

9     A.   Yes, I do.

10    Q.   Can you describe those for us?

11         THE COURT:  When you indicate that you have hundreds

12    and hundreds of videos and audios, directly from terrorist

13    groups, I take it a certain number of those are from al Qaeda;

14    is that correct?

15         THE WITNESS:  Yes, your Honor.  Virtually all of them

16    are.

17         THE COURT:  Virtually all of them are?

18         THE WITNESS:  Well, there are groups that call

19    themselves al Qaeda's committee in the Arabian Peninsula or in

20    Mesopotamia.  These groups are considered to be al Qaeda

21    groups.  They swear allegiance to Osama bin Laden.  These are

22    the primary sources of these audio recordings.

23         THE COURT:  Thank you.

24         THE WITNESS:  Thank you, your Honor.

Page 22

5b23parh.txt

25    Q.   We were talking about the databases, computer databases you

25

5B23PARH                    Kohlmann - direct

1    use also.  Can you describe that a little bit.

2    A.   Sure.  To do open source research, obviously computer

3    databases are extremely useful.  One such database is Lexis

4    Nexis, which contains a wide variety of information relating to

5    a lot of subjects.  It's quite useful.

6            Second of all, the Foreign Broadcast Information

7    Service, which is an open source information arm of the Central

8    Intelligence Agency, publishes quite a bit of information

9    online and it is searchable through their index.

10           I also use my own index, since about 1998, I've been

11   collecting thousands upon thousands upon thousands of

12   documents.  I have a wide database that's searchable by key

13   words.  The database now contains I think over 20 million

14   documents.

15           THE COURT:  Is that available publicly or is that

16   proprietary?

17           THE WITNESS:  That's proprietary, your Honor.

18   Q.   How do you maintain that your own database of information?

19   A.   I actually, I maintain it myself by saving materials.  But

20   I have a very detailed organizational system.  Specifically so

21   I can maintain things like chains of custody in terms of when I

22   received original information.  I will also have original

23   documents that are in other languages translated into English

24   so they're then searchable, and I have software which is able

25   to instantly search through all of these documents looking for

5b23parh.txt
(212) 805-0300

5B23PARH                    Kohlmann - direct

1   key words, the same way you would use Lexis Nexis, only with my

2   own collection of internal documents related to terrorism.

3          THE COURT:  You said contains millions of documents?

4          THE WITNESS:  Yes, your Honor, yeah.

5          THE COURT:  Does that include both primary source

6   material and secondary source material?

7          THE WITNESS:  Yes, your Honor.  Everything is in its

8   original format so it's very clearly labeled what the source

9   is.  It makes it very easy because I tend to like to footnote

10  everything I do very meticulously.  This enables us to do

11  footnotes.  It is very easy to identify documents and where the

12  information comes from.

13  Q.  Once you've done your research on a particular project, you

14  indicated earlier a little bit how it's disseminated.  I want

15  to talk specifically about dissemination to government

16  agencies?

17  A.  Sure.

18  Q.  While you were at the Investigative Project, what

19  government agencies did you provide information to or work

20  with?

21         MR. WILFORD:  I'm sorry, your Honor.  Is Mr. Bruce

22  referring to his individual provision or the Investigative

23  Project provision?

24         MR. BRUCE:  I'll clarify.

25  Q.  You personally, sir, what government agencies did you work

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - direct

5b23parh.txt

1   with while you were employed at the Investigative Project?

2   A.   Well, obviously we worked informally, but we provided

3   informal assistance or I -- excuse me, I provided personally

4   informal assistance to the Department of Justice, the Federal

5   Bureau of Investigation, the National Security Council, U.S.

6   Treasury Department, the Department of Homeland Security.

7          THE COURT:   Just a moment.

8          THE WITNESS:   Sorry.

9   Q.   Let's go through them slowly for the judge.   The Department

10   of Justice?

11   A.   The FBI, the DOJ, the National Security Council, the

12   Department of Homeland Security, the U.S. Treasury Department,

13   the Bureau of Immigrations and Customs Enforcement, local law

14   enforcement, state law enforcement, and additionally the NCTC.

15   Q.   What is the NCTC?

16   A.   The NCTC is the research and analysis arm of the Central

17   Intelligence Agency.

18   Q.   When you were working with this variety of government

19   agencies, and you're presenting them with some of your research

20   and your work product, did you ever get feedback from them on

21   your analysis?

22   A.   Yes, I did.

23   Q.   Just generally describe that process; how would that work?

24   A.   Sure.   Whether I'm dealing with, you know, a government

25   agency or not, any potential recipient of a document of mine, I

                                                          28

5B23PARH                    Kohlmann - direct


1   frequently ask them for their opinion to see what they think of

2   the document.   Part of this is a learning process, it's

5b23parh.txt

3    educational.  So peer review is an integral part.  Obviously

4    some government agencies have access to information I don't, so

5    opinions of government policy makers or people that have an

6    inside view is extremely valuable in reaching my conclusions,

7    yes.

8    Q.  Since you've left the employ of the Investigative Project,

9    how have you been employed?

10   A.  I actually pretty much do the same thing that I did at the

11   Investigative Project, only now I work independently as a

12   consultant to private groups.  I also work as an on air analyst

13   for NBC News, MSNBC.

14   Q.  Let's go back for a minute to your work as consultant for

15   private groups.

16   A.  Sure.

17   Q.  What types of private groups do you do consulting for?

18   A.  I work as a researcher and investigator for the 9/11

19   Finding Answers Foundation and NEFA Foundation was set up as a

20   nonprofit group to help fund independent private

21   counter-terrorism research.  I also do work for government

22   agencies, I'll do work for foreign clients, anyone with an

23   interest in this.  But particularly I do work with prosecutors

24   and you know those involved in investigating these cases.

25   Q.  In law enforcement?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

5B23PARH                    Kohlmann - direct

1    A.  Yeah, law enforcement, sure.

2    Q.  Now --

3            THE COURT:  What entities have you been a consultant

4    for?

5            THE WITNESS:  Sure.  The NCTC, the Department of

Page 26

5b23parh.txt

6      Justice, the FBI, and outside of the United States, the Supreme

7      Court of Bosnia Herzegovina and the International Criminal

8      Tribunal for the former Yugoslavia at the Hague.

9                 THE COURT:  These are entities that have retained you?

10                THE WITNESS:  That's correct.

11                THE COURT:  As a consultant.

12                THE WITNESS:  That's correct.  And excuse me.

13     Additionally, the Metropolitan Police Antiterrorism Unit in

14     London.

15     Q.   Now, in connection with your current employment, do you

16     operate a Web site?

17     A.   Yes, I do.

18     Q.   What is the Web site?

19     A.   The Web site is globalterroralert.com.

20     Q.   And can you describe the Web site for us.

21     A.   Sure.  When I went independent I decided that I needed a

22     place on the Internet in order to disseminate information to

23     operate as an information clearing house on Internet terrorism.

24     I felt that despite the fact that terrorism was a major issue

25     in the news and for policy makers, there was a derth of

                          SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300

                                                                      30
       5B23PARH                    Kohlmann - direct

1      original information about terrorist groups.  Not just

2      analysis, but original audio recordings, video recordings,

3      communiques, the kind of material that are very important for

4      not just policy makers, but for the American public at large.

5                 I set the Web site up in order to help distribute that

6      kind of information.  Obviously edited it, to try to remove

7      some of the terrorist propaganda value out.  But nonetheless so

                                     Page 27

5b23parh.txt

8   people could learn more.   When I say people, I refer here to

9   government agencies, I refer to educators, I refer to the

10  public at large.

11  Q.   Now, when you say that your Web site focuses on original

12  materials, why do you consider that important?

13  A.   Well, because of the fact that original materials I think

14  tell us more about terrorist groups than virtually anything

15  else.   Hearing someone in their own words describe their

16  activities and their interests is much more compelling and I

17  think speaks much more to the goals and ideology of the

18  movement than reading intelligence reports or secondhand

19  information.   Very, very few researchers have been able to get

20  their hands on original materials relating to terrorist groups.

21  It's not that easy.   I have had the benefit in the sense that

22  many of the ways that terrorist groups had decided to

23  disseminate their material, have been means which I understand

24  well.   Such as the Internet.   It's given me something of a leg

25  up inspect that regard.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

5B23PARH                    Kohlmann - direct

1   Q.   In your current capacity as an independent consultant, has

2   your work focused on any particular terrorist organization?

3   A.   Yeah.   I mean, al Qaeda.   Al Qaeda is a wide organization

4   and encompass a lot of different affiliates, but al Qaeda and

5   other groups related to Afghan jihad of the 1980s.

6   Q.   The work you've done with the Web site, in your opinion, is

7   that peer reviewed in any way?

8   A.   Yes, it is.

9   Q.   How so?

10  A.   Well, everything that I put on there obviously is.   One of

Page 28

5b23parh.txt

11      the wonderful things about the Internet is it's subject to

12      review.  It can be edited.  When I put things out on the net

13      before they are put out generally, they are reviewed by other

14      colleagues of mine.  For after doing this for seven or eight

15      years, I've amassed a wide variety of colleagues around the

16      world, people like Dr. Rohan Gunaratna in Singapore, people

17      like John Charles Brisard in France.  There are people

18      virtually all the world that do the same thing.  If they come

19      up with something that either adds to my work or changes it or

20      in any way affects it, I'll often post an update where I'll say

21      for information purposes or for full disclosure, you should

22      also check out this and this by my colleagues here and here who

23      have also done work on this subject and this is what they have

24      found.  You know this is -- we generally work like academics.

25      We work like almost like university academics that peer review

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                            32
5B23PARH                    Kohlmann - direct

1       is very important.

2       Q.  When you say you post updates, you do that on your own Web

3       site?

4       A.  Yeah.  Or on the counter-terrorism blog which is another

5       Web site I am affiliated with.

6               THE COURT:  Let me try to understand the nature of the

7       peer review you're talking about.  When you say peer review, I

8       gather what you mean -- I don't want to put words in your

9       mouth, I think this is what you mean.  Tell me if it isn't.  Is

10      that by virtue of your findings going out of the Internet,

11      they're available for anyone who reads that posting to comment

12      on it.  Is that what you're talking about?

Page 29

5b23parh.txt
13          THE WITNESS:  Correct.

14          THE COURT:  It's not as if it's a formal jury peer

15  review of an article that I believe happens for the Journal of

16  the American Medical Association or something like that.

17          THE WITNESS:  Right, right.

18          THE COURT:  I assume that happened at Georgetown,

19  based on what you've said.

20          THE WITNESS:  Yes, your Honor.  It's more informal.

21  It's more like having a blackboard, an international blackboard

22  and having different academics writing things on the blackboard

23  and discussing different elements.  What they do, for instance,

24  the counter-terrorism blog which I am a part of, there are

25  often frequent discussions between different members of that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                        33
5B23PARH                    Kohlmann - direct

1   blog.   Sometimes agreeing sometimes --

2           THE COURT:  Blog?

3           THE WITNESS:  Blog.

4           THE COURT:  Go ahead.

5           THE WITNESS:  Sometimes disagreements, sometimes

6   agreements, but focusing on a particular area, an academic area

7   of counter-terrorism.  I think it's interesting, although it's

8   raw and although it is not refined the same way that a

9   university, such as my thesis was reviewed, it provides

10  interesting insight into what, you know, current research is

11  going on.  What different people are thinking about that

12  research.  It's kind of cutting edge.

13  Q.  Can you describe for us a little bit about how that process

14  works on the counter-terrorism blog?

15  A.  Sure.  I was chosen to be one of several contributing

5b23parh.txt

16    experts to contribute to this blog.  The blog is a variety of
17    different folks that have expertise in one area or another of
18    terrorism, terrorism financing, terrorism recruitment.  And the
19    idea is to contribute -- it's supposed to be -- it says this
20    flat out on the blog that the purpose is for policy makers, for
21    academics, it is supposed to be not headlines, it's supposed to
22    be more in-depth academic research on terrorism.
23    Q.  What's a blog?
24    A.  It's short for Web log.  It's a closed discussion forum on
25    the Internet where groups of individuals can disseminate

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            34
        5B23PARH                    Kohlmann - direct

1     material live to the world at large.
2     Q.  On the counter-terrorism blog that you've been discussing,
3     who are some of the other participants and their backgrounds on
4     that blog?
5     A.  Sure.  So other participants include Andy McCarthy who is a
6     former federal prosecutor here in New York who was the
7     prosecutor involved in 1959 New York jihad plots case; also
8     Matthew Leavitt is another individual on there who is a former
9     FBI analyst who now is an expert in Hamas and other Palestinian
10    groups; Zachary Abuza, probably the world's foremost expert on
11    al Qaeda and other militant Islamic groups in South East Asia.
12    He's a friend of mine, but also on the blog.
13           It is a wide variety of experts, with many former
14    government folks or former government officials.
15           THE COURT:  Could Mr. Bruce participate in the blog as
16    well?
17           THE WITNESS:  No.  It's closed.  It's limited to the

5b23parh.txt

18    participants involved.  However, as part of a service to

19    readers, the editor of the blog frequently posts questions or

20    will post issues that have come up or will post directly

21    e-mails to contributors and ask them to address specific issues

22    that have been raised by those who have visited the blog or

23    have commented.

24         THE COURT:  That is only in that context that

25    outsiders can participate; otherwise it's discussion among

                                                              35
5B23PARH                 Kohlmann - direct


1     those who are permitted to have access to this.

2          THE WITNESS:  Correct.  Correct.  You can always

3     e-mail the editor, and those comments are shared with all of

4     the contributors and they're discussed at great length.  But

5     it's closed to participants in the blog, yes.

6     Q.  If I was sitting home at my computer, although I couldn't

7     participate in the blog by posting something on that site,

8     could I read what others have posted?

9     A.  Yeah.  And in addition, the blog maintains a system which

10    allows to track where other people have posted their own

11    messages in regards to our postings.  If you have -- say if I

12    post something online, if I post the document online where it's

13    a report of some kind.  At the end of that if someone wants to

14    post something to attack it or to criticize it or whatnot, they

15    can actually leave what's called a track back.  Which is almost

16    like a note or a Post-it note saying if you want to see what my

17    opinion on this is, go here.  And that is something that's

18    built into the blog, so anyone can technically comment.

19    Comments are not posted directly on the blog.  But there are

20    links directly so people can go and see what other people are

5b23parh.txt

21      reading or saying about what's being written.

22      Q.   So in essence there's sort of a closed portion of the blog,

23      and then there's a more public portion that it's linked to?

24      A.   Right.  It's like saying this is what we say, and if you

25      want to see what other people are saying, this is where you can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

5B23PARH                    Kohlmann - direct

1       go to see that.  It's all automatic, it's not controlled.

2       Anyone can leave any kind of track back they want.  So if

3       someone wants to go on and, you know, and scream and yell at

4       us, they can do that, and there will be a listing, regardless

5       what it was they say, for us to go see what they are saying

6       about it.

7       Q.   In the closed portion only certain people have been

8       selected to participate?

9       A.   Yeah.  The idea is to foster serious discussion about

10      counter-terrorism.  There are a lot of people out there that

11      are would-be experts and we try to keep it to people that we

12      know, that there's been a group of people that have done this

13      for a long time.  We've all gotten to know each other.  It's

14      trying to keep it academic.

15      Q.   You mentioned that you also do work as a terrorism

16      consultant for NBC and MSNBC; is that right?

17      A.   That's correct, yes.

18      Q.   What are your duties in that regard?

19      A.   Well, in addition to providing on-air analysis for MSNBC

20      and NBC on issues of terrorism, I also provide them directly

21      with copies of breaking terrorist videos, audio recordings,

22      documents.  Particularly from Iraq, Afghanistan and Saudi

Page 33

5b23parh.txt

23     Arabia.

24     Q.   Do you ever appear on television with another colleague or

25     expert in the area of terrorism?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

5B23PARH                    Kohlmann - direct

1      A.   That's the preferred format is to have me on with another

2      expert, yeah.

3      Q.   How does that work generally?

4      A.   Generally speaking, we're both asked similar questions and

5      we are supposed to play off each other.   Either we're supposed

6      to agree or disagree with each other.   The questions are

7      somewhat general, sometimes specific.   But we are not given any

8      instruction or anything, so people can say whatever they want.

9      If someone disagrees with me, they can feel free to disagree

10     with me.

11     Q.   Now, I want to ask you about the 9/11 Commission.   Did you

12     participate in any way formally or informally in the 9/11

13     Commission and its subsequent report?

14     A.   Yes, informally.

15     Q.   Can you describe that.

16     A.   Sure.   While I was at the Investigative Project, I assisted

17     Congressional researchers and others who were engaged in

18     putting together the report.   I provided them original

19     information; I provided them with analysis.   I also engaged in

20     discussions with them about particular areas of study with

21     regards to both al Qaeda in general and the 9/11 plot in

22     specific.

23     Q.   Is your work cited at all in the final 9/11 Commission

24     report?

25     A.   Yes, it is.

Page 34

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38

5B23PARH                  Kohlmann - direct

1            MR. BRUCE:  If I may approach, your Honor.

2            THE COURT:  Yes.

3            MR. BRUCE:  I believe you have a copy of the exhibits,

4     your Honor.

5            THE COURT:  Yes.  Do you have an extra copy as well

6     for my clerk?  Okay.  Go ahead.

7            MR. BRUCE:  Your Honor, I've handed the witness

8     Government Exhibit 1 for purposes of this hearing.

9     Q.  Mr. Kohlmann, do you recognize that document?

10    A.  Yes, I do.

11    Q.  What is it?

12    A.  These are footnotes to the final version of the 9/11

13    Commission report.

14    Q.  This government exhibit is just a small excerpt of the

15    overall report?

16    A.  Yeah, it's page 467 and 470.

17    Q.  And is your work cited at all amongst these footnotes?

18    A.  Yes, I believe it is cited both on page 467 and 470.

19    Q.  Can you point out the footnotes for us and read the portion

20    where your work is cited?

21    A.  Sure.  Sure.  On footnote 37, the last line of footnote 37

22    for bin Laden's involvement in the Bosnian conflicts, see Evan

23    F. Kohlmann al Qaeda's Jihad in Europe, the Afghan-Bosnian

24    Network, Berg Publishers, 2004.

25    Q.  How about on page 470.  Which footnote are you cited in?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 35

5b23parh.txt

5B23PARH                    Kohlmann - direct

1    A.   On footnote 80, on Balkans --

2    Q.   The last sentence?

3    A.   Yeah, the last sentence.   Reference again to my book al

4    Qaeda's Jihad in Europe.

5    Q.   Could you read it us for us?

6    A.   Sure.   On Balkans, see government's evidentiary proffer

7    supporting the admissibility of coconspirator statements,

8    United States v. Arnaout, and Kohlmann al Qaeda's Jihad in

9    Europe.

10           MR. BRUCE:   Your Honor, I'd offer Government Exhibit

11   1.

12           MR. WILFORD:   May I have just a brief voir dire --

13   I'll save it for cross.

14           THE COURT:   I think it's probably more efficient if

15   you do it that way.   Right now I'll take it.

16           (Government's Exhibit 1 received in evidence)

17   Q.   The footnotes in Government Exhibit 1 in the 9/11

18   Commission report refer to your book?

19   A.   That's correct.

20   Q.   Okay.   And could you give us title of your book again?

21   A.   Sure.   It's al Qaeda's Jihad in Europe, the Afghan Bosnian

22   Network.

23           MR. BRUCE:   I am going to hand the witness with the

24   Court's permission Government Exhibit 2 and Government Exhibit

25   3 also.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - direct

1    Q.   Can you take a look at Government Exhibit 2, Mr. Kohlmann.

Page 36

5b23parh.txt

2      Is that your book?

3      A.   Yes, it is.

4           MR. BRUCE:   I'd offer Government Exhibit 2, your

5      Honor.

6           MR. WILFORD:   No objection.

7           THE COURT:   All right.   2 admitted.

8           (Government's Exhibit 2 received in evidence)

9      Q.   Can you just -- I realize it is a lengthy document.   Can

10     you briefly describe your book for us.

11     A.   Sure.   As a result of conducting research just prior to and

12     following 9/11 and as a result of the academic work I had done

13     as part of my honors thesis at Georgetown, I decide to take it

14     a step further and write a book specifically analyzing a

15     regional conflict zone where al Qaeda and the Arab Afghans had

16     gone to, and try to analyze both the hidden microhistory and

17     what the lessens were, the larger geopolitical lessons that

18     could be drawn.

19          So the book is both a very detailed analysis and

20     breakdown, a very detailed analysis and breakdown of the

21     foreign mujahideen, the foreign holy warriors in the Balkans.

22     Also an analysis of what the subsequent aftereffects of their

23     presence in Bosnia was.   And how that network in the Balkans

24     relates back to the central al Qaeda network in Afghanistan and

25     al Qaeda terrorist cells spread across Western Europe, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

5B23PARH              Kohlmann - direct

1      United States, and North America.

2           MR. BRUCE:   Just as a footnote, we didn't copy the

3      whole book for you, but it is available.   We do have the table

5b23parh.txt

 4   of contents there.

 5         THE COURT:  I see.

 6   Q.   Mr. Kohlmann, what type -- how would you characterize your

 7   book; what type of publication is it?

 8         MR. WILFORD:   Objection.

 9         THE COURT:   Sustained as to form.  Just be more

10   specific.

11   Q.   Certainly.  Who is the intended audience for your book?

12   A.   Well, it's Oxford University Press.  So it's a university

13   publisher, which means it is an academic book.  It is designed

14   primarily for use in classrooms, by academics, by other

15   experts.  It is not a general reading book.  It is pretty thick

16   and it is pretty detailed.  There's over 400 footnotes.

17         THE COURT:   Who is Berg Publishing?

18         THE WITNESS:   Berg is an imprint of Oxford University

19   Press.

20   Q.   Was your book, Government Exhibit 2, peer reviewed in any

21   way before it was published?

22   A.   Yes, it was.  My book was -- Berg, the imprint of Oxford,

23   is located in the United Kingdom which means the book is

24   subject to British liable law, which means in addition to the

25   lengthy peer review process that is normally afforded to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                42
     5B23PARH              Kohlmann - direct

 1   academic books and was afforded to this one, in which numerous

 2   experts around the world were given copies and asked to review

 3   it, including members of prestigious counter-terrorism programs

 4   in the United Kingdom, in addition --

 5   Q.   Let me just be clear.  That process did occur with respect

 6   to your book?

                            Page 38

5b23parh.txt

```
 7   A.  It's actually called peer review.  The academic publishers
 8   won't publish any book without having it thoroughly reviewed by
 9   other academics first.  Even in the United States --
10            THE COURT:  For what purpose?  For purposes of liable
11   or for another purpose?
12            THE WITNESS:  That was -- no, that was a secondary
13   issue.  The first issue was to make sure the book itself was
14   worthy of being an academic work, that the research was
15   accurate, that it was consonant with what others had found and
16   it reflected truth on the ground.  And numerous experts have
17   had a chance to review this based on content, and even those
18   who are Balkan experts, people that are specifically Balkans,
19   not necessarily terrorism, such as Marko Attila Hoare, have
20   given high praise to the book.
21            But separately, your Honor, there was also a secondary
22   process.  Because of the fact that the book is subject to
23   British liable law, that the book had to be carefully read by a
24   liable lawyer, by myself, and others to make sure that
25   everything was carefully footnoted and the evidence contained
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

5B23PARH                    Kohlmann - direct

```
 1   therein was correct.
 2   Q.  Now, during the course of your career, have you written any
 3   articles on terrorism issues and al Qaeda?
 4   A.  Yes, I have.
 5   Q.  Can you give us an estimate of approximately how many?
 6   A.  Sure.  I have written probably two dozen or so articles or
 7   various pieces on terrorism.  Sometimes they range from shorter
 8   pieces, such as what I did in the beginning back in 1999 in the
```

Page 39

5b23parh.txt
```
 9   Journal of Counter-Terrorism.  Most of what I write in the form

10   of terrorism pieces is longer journal articles, chapters for

11   books edited by other colleagues of mine, other folks involved

12   in studying terrorism.

13   Q.  I'd ask you to turn to Government Exhibit 3, Mr. Kohlmann.

14   Do you recognize that document?

15   A.  Yes, I do.  It's the Fall 2005 edition of the Journal of

16   International Security Affairs.

17   Q.  Okay.  Can you describe for us what the Journal of

18   International Security Affairs is.

19   A.  It's an academic journal for designed for individuals who

20   want to publish longer scholarly pieces specifically on

21   security affairs.  This issue is titled The War on Terror

22   Future Fronts.  So the idea is it is supposed to be kind of

23   like foreign policy.  It is sold in some newsstands.  It is the

24   kind of thing you would find in a university library or some

25   kind of academic institution.
```

44

5B23PARH                    Kohlmann - direct

```
 1   Q.  Now, obviously according to the front page you were

 2   recently published in this journal?

 3   A.  Yeah, I just contributed an article to the fall edition.

 4   Q.  Called the Balkan Breeding Ground?

 5   A.  That's correct.

 6   Q.  Can you briefly describe, again in a nutshell, that article

 7   for us.

 8   A.  Sure.  That article was meant to serve as somewhat of an

 9   update to my book.  It contained various references to new

10   developments with regards to al Qaeda and affiliate groups in

11   the Balkans, and was also a reflection of my experiences being
```

5b23parh.txt

12    in the Balkans earlier this year and doing direct field
13    research studying North African and Saudi militants in the
14    Balkans.
15                MR. BRUCE:   I offer Government Exhibit 3, your Honor.
16                MR. WILFORD:   No objection.
17                THE COURT:   Admitted without objection.
18                (Government's Exhibit 3 received in evidence)
19    Q.   Now, Mr. Kohlmann, was this particular article subject to
20    any type of peer review either before or after it was
21    published?
22    A.   Yeah.   The article was heavily reviewed by the editor of
23    the magazine.   It was sent back to me twice for different
24    revisions or with questions or with, you know, just requests
25    for me to flesh out details.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                                                  45
        5B23PARH                    Kohlmann - direct

1            The article was -- yeah, it was heavily reviewed
2     before being published
3     Q.   Once it's published, is it subject to any further review or
4     discussion?
5     A.   Sure.   I mean, the purpose of this is to generate academic
6     discussion.   The purpose of this is to get other people that
7     are engaged in detailed studies of the subject to talk about
8     what are the future -- the future training grounds.   This is
9     not meant to be a general reading piece.   Each of these
10    articles are 20 to 25 to 30 pages long.   They are really meant
11    to be for policy makers or others with a detailed knowledge of
12    this stuff.
13    Q.   Have you recently contributed to any other publications

5b23parh.txt

14    regarding terrorism issues that are due to be released any time

15    soon?

16    A.   Yes, I have.

17    Q.   Can you describe that for us?

18    A.   Sure.  I contributed a chapter to Dr. James Forest Making

19    of a Terrorist, which is a multivolume encyclopedia about to be

20    released next week by Dr. Forest, a West Point Academy

21    professor who deals with military strategy.  And who was

22    commissioned to write that multivolume encyclopedia about the

23    making of a terrorist.  One of the chapters I contributed.

24    Q.   What is the idea behind that publication, The Making of a

25    Terrorist?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46

5B23PARH                    Kohlmann - direct

1    A.   Again, it is multivolume encyclopedia.  It's not a general

2    reading book.  The idea is for those who are engaged in the

3    study of terrorism, of extremism, to get a comprehensive view

4    from A to Z literally of how terrorists are brought into

5    movements, how they're recruited, how they're financed, how

6    they're sent out, not just in one conflict zone, but multiple

7    conflict zones and multiple areas around the world with a

8    specific focus I believe on al Qaeda.

9    Q.   You contributed a chapter to that encyclopedia?

10    A.   That's correct.  Dr. Forest contacted me and requested I

11    contribute a chapter.

12    Q.   Can you briefly describe the chapter you contributed?

13    A.   Sure.  The chapter I contributed reflected on how the

14    Balkans had served as a breeding ground for extremism in Europe

15    and how terrorist cells in the 1990s have had direct links back

16    to the Bosnian war of the 1990s.

Page 42

5b23parh.txt

17  Q.  Can you tell us who the intended audience is for that

18  encyclopedia?

19  A.  It's academic audience.  I believe the primary folks that

20  are going to be purchasing it are going to be libraries,

21  university libraries.  It is being produced by a West Point

22  professor, so it is not general reading.

23  Q.  Was your work on that encyclopedia, The Making of a

24  Terrorist, peer reviewed or reviewed in any way?

25  A.  Yes, it was.  In addition to Dr. Forest obviously reading

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

5B23PARH                    Kohlmann - direct

1   it, offering his comments and whatnot, the university -- rather

2   the publisher itself also I believe distributed these documents

3   to other people and tried to gauge their reaction and what they

4   thought of the general tone.

5           THE COURT:  Who is the publisher?

6           THE WITNESS:  I actually believe it is Pregger Press,

7   but I am not sure off the top of my head, your Honor.

8   Q.  In addition to the encyclopedia you've been discussing,

9   have you recently contributed to any other projects or

10  publications?

11  A.  Yes.

12  Q.  What is that?

13  A.  Well, I'm actually contributing to several projects right

14  now.  I am actually engaged in revising a chapter for Dr. Rohan

15  Gutratna on cyberterrorism.  The chapter that I initially had

16  written for him for a new book he is editing on future fronts

17  again in the war on terrorism.

18          I'm also engaged right now in writing a report for as

Page 43

5b23parh.txt

19    part -- excuse me, as a chapter for a report for the government

20    of Denmark on the issue of terrorist financing and al Qaeda.

21    Q.   How did you become retained by the government of Denmark?

22    A.   It was actually through a colleague of mine, a university

23    professor in Copenhagen who was commissioned by the government

24    of Denmark to write a comprehensive report about the state of

25    al Qaeda, the state of other terrorist groups.  This colleague

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

5B23PARH                    Kohlmann - direct

1     of mine who I've known and I've worked with before and we've

2     had long discussions and debates about this stuff, he requested

3     that I write a chapter specifically about terrorism financing

4     with regards to al Qaeda, particularly focusing in on how the

5     latest earthquake in Pakistan may have affected that

6     phenomenon.

7     Q.   Approximately when were you retained by the government of

8     Denmark to assist --

9     A.   Indirectly.  I believe in August.

10    Q.   Okay.  Are you retained by the government or by your

11    colleague?

12    A.   My colleague.  Potentially there is an opportunity for me

13    to go to Denmark and present my findings before a government

14    body.

15    Q.   Is that work that you've done for this publication relating

16    to the government of Denmark or on behalf of the government of

17    Denmark reviewed or peer reviewed in any way?

18    A.   Yeah.  I mean the person who is editing it is a university

19    professor and the report is being produced for a government.

20    So everything is going to be extremely carefully reviewed by

21    other academics, by the editor.  I have no doubt that when -- I

Page 44

5b23parh.txt

22     haven't finished my final draft yet.  I have no doubt when my

23     final draft is done, I am going to have to make significant

24     revisions before final publication.  This is a regular, regular

25     process.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

5B23PARH                    Kohlmann - direct

1      Q.   Now, Mr. Kohlmann, have you spoken at any academic

2      conferences concerning issues relating to terrorism or al

3      Qaeda?

4      A.   Yes, I have.

5      Q.   Can you explain those in general.

6      A.   Sure.   Last spring, I spoke at a conference out in

7      California convened by several universities and government

8      agencies in northern California focusing in on future threats

9      from terrorist groups, potential areas that the Department of

10     Homeland Security was not covering in terms of weaknesses to

11     national infrastructure.   Particular threats from terrorist

12     groups that have gone overlooked.   A wide variety of different

13     experts were brought in to offer their expertise, and I was one

14     of them.

15     Q.   Have you spoken at any other academic conferences?

16     A.   Yeah.   I spoke twice this summer at academic conferences

17     organized in the Balkans, talking about the war in Iraq,

18     talking about the situation with regards to terrorist groups in

19     the Balkans.   Wide variety of subjects related to terrorism in

20     Europe.

21          I'm also scheduled to speak in the beginning of next

22     year in Edinburgh at the annual World Wide Web conference to

23     talk about international terrorism and the World Wide Web.

Page 45

                              5b23parh.txt
24   Q.   When you speak at these academic conference --
25              THE COURT:  Would you characterize the Edinburgh

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                          50
     5B23PARH              Kohlmann - direct

 1   conference as an academic conference?
 2              THE WITNESS:  It's being organized by a university.  I
 3   forget which university it is, but it's in Scotland.
 4   Q.   What's the nature of that conference in Scotland?
 5   A.   The nature -- it's really more of an Internet and World
 6   Wide Web conference than a terrorism conference, but as one of
 7   the elements they are dealing with, they were asking for an
 8   international authority to speak about terrorism on the
 9   Internet.  They contacted me and asked that I be their keynote
10   speaker for that part of the discussion.
11   Q.   When you speak at some of the academic conferences you've
12   mentioned, is there any debate or discussion among yourself and
13   the other participants?
14   A.   Frequently, yeah.
15   Q.   Can you describe that?
16   A.   Sure.  I don't agree with everything that every other
17   terrorism expert has ever said, and often times I will confront
18   them about that and I will debate about facts.  One of the
19   frequent debates is about the war in Iraq.  And I'm not
20   hesitant to debate with people about that.  Sometimes the
21   debates get heated, but it's interesting.  It's a good way of
22   sharing information and it's a good way of comparing and
23   contrasting ideas.
24   Q.   Have you ever provided testimony to the U.S. Congress?
25   A.   Yes, I have.

                                Page 46

5b23parh.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

5B23PARH                    Kohlmann - direct

1   Q.   Was that written or live testimony?

2   A.   It was written.  It was coauthored by myself and a

3   colleague.  My colleague delivered it, but it has both our

4   names on it.

5   Q.   Who was your colleague that delivered it?

6   A.   Matthew Epstein.

7   Q.   What was the nature of the testimony that you coauthored

8   with Mr. Epstein?

9   A.   It was supposed to be a comprehensive look at al Qaeda

10  terrorist financing.  The means, the mechanisms through which

11  al Qaeda finances itself.  And very specifically what are

12  those, not just, you know, not just what kinds of terrorist

13  financing there are.  What actual entities and individuals have

14  been responsible for raising money on behalf of al Qaeda.

15  Q.   And for what purpose were you and Mr. Epstein submitting

16  this testimony?

17  A.   For the purpose of educating policy makers.

18  Q.   Before it was submitted, was that written testimony that

19  you coauthored peer reviewed in any way?

20  A.   Yeah, it was written while we were at the Investigative

21  Project before any document would be submitted, Congressional

22  testimony.  It was reviewed by numerous people, both inside and

23  outside the Investigative Project.  Every footnote was

24  carefully analyzed two, three, four, times to make sure there

25  were no mistakes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

5B23PARH                    Kohlmann - direct
Page 47

5b23parh.txt

1          THE COURT:   What committee was it submitted to?
2          THE WITNESS:   I believe it was the subcommittee on
3    banking and finance, but I'm not sure, your Honor.
4          THE COURT:   Senate or House?
5          THE WITNESS:   Senate.
6    Q.   Now, other than what we've discussed so far, in the course
7    of your daily work, do you discuss your findings, your theories
8    and your conclusions with other people in your field?
9    A.   Yeah.   Because of the fact that I operate my own business,
10   I'm forced to go out frequently to my colleagues and talk about
11   this.   I've had discussions with people in government, outside
12   of government, academics, non-academics, anyone who is involved
13   in this in any way to see what's floating around out there, to
14   learn what people are thinking, to learn what ideas are being
15   expressed.   Frequently this involves debates.   Also because of
16   the fact that I am in the media, I frequently am involved in
17   debates, televised on air in the form -- on air in the form of
18   written reviews or written discussions on various magazines.   A
19   few months ago I participated in an online discussion on the
20   war on terrorism with several other contributors where we were
21   trading things back and forth, all written.   But yeah, very
22   frequently.   It is an integral part of this.
23   Q.   Have you ever personally interviewed a terrorist?
24   A.   Yes, I have.
25   Q.   For what purpose were you doing that?

53

5B23PARH                    Kohlmann - direct

1    A.   For multiple purposes.   I've interviewed alleged terrorists
2    for my own research purposes and I've also done so at the

5b23parh.txt

3      request of government agencies.

4      Q.   Can you give us an example of one of the people that you've

5      interviewed?

6      A.   Sure.  I've interviewed Abu Hamza al-Masri a/k/a Mustafa

7      Kamel in London.

8      Q.   Can you briefly describe for us who is Abu Hamza?

9      A.   He is a cleric originally from Egypt who during the 1980s

10     went to Afghanistan to seek combat against Soviet forces there.

11     Allegedly while playing with explosives, he blew off his hands

12     and became horribly disfigured.

13          He returned to the United Kingdom and became an

14     integral recruiter for al Qaeda and other extremist groups.  He

15     was the editor of the official magazine of the Algerian armed

16     Islamic group.  He also is widely known as a distributor of

17     proterrorist propaganda tapes and other materials from the

18     United Kingdom.

19     Q.   Is Abu Hamza al-Masri also known as Mustafa Kamel indicted

20     anywhere in the United States on terrorism charges?

21     A.   Yes, he was indicted here in the Southern District of New

22     York.

23     Q.   When did you interview him?

24     A.   I interviewed him in the summer of 2002.

25     Q.   Where is he now to your knowledge?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                      54
5B23PARH              Kohlmann - direct

1      A.   He's currently being held in custody in the United Kingdom

2      awaiting extradition to the United States to face charges.

3      Q.   Did any government agency ask you to interview Abu Hamza or

4      did you do that on your own?

Page 49

5b23parh.txt
```
 5   A.   No, it was my own research trip.  There were a number of
 6   individuals in that area I wanted to speak with.  I presumed
 7   they would be under greater and greater scrutiny by law
 8   enforcement.  It seemed to me that was as good a time as any to
 9   speak with them.
10   Q.   Where was Abu Hamza's main base of operations?
11   A.   In London.  It was the Finsbury Park Mosque in North
12   London.
13   Q.   Where did you interview him?
14   A.   I interviewed him in his office in the Finsbury Park
15   Mosque.
16   Q.   How did you set up that interview?
17   A.   I actually called him and I spoke with him on several
18   occasions.  I explained to him I was a graduate student, which
19   I was at the time, and I was interested in Islam and I had a
20   background in studying Islam and Muslim Christian relations,
21   and that I was writing a thesis on this subject, and I would
22   like to speak with him and interview him.  After several phone
23   calls and e-mails back and forth, he agreed for us to come,
24   myself and a colleague, to come there.  And we got a chance to
25   sit down and speak with him.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55

5B23PARH                    Kohlmann - direct

```
 1   Q.   And did you tape record this interview?
 2   A.   Yes, I did.
 3   Q.   Approximately how long was the interview?
 4   A.   Initially he told me the interview would only be able to
 5   last for about a half an hour, but our discussion got very
 6   intense and in depth.  It ended up lasting I think over two
 7   hours.
```

5b23parh.txt

8   Q.   When you were at the Finsbury Park Mosque in London, did

9   you speak to or interview anybody else at the mosque other than

10  Abu Hamza?

11  A.   Abu Hamza had kind of designated his person in the -- he

12  had assigned --

13  Q.   Why don't I ask the question again and let's take it more

14  slowly, Mr. Kohlmann.

15          While you were at the Finsbury Park Mosque, did you

16  interview anyone else other than Abu Hamza?

17  A.   Yes, I did.

18  Q.   Who was that?

19  A.   I also spoke with the custodian of the mosque, the person

20  that was in charge of the mosque behind Abu Hamza, who was an

21  individual who went by the name Attilla.

22  Q.   And for what purposes did you interview Attilla?

23  A.   Abu Hamza had more or less assigned Attilla to be our

24  guardian when we were at the mosque.  He led us throughout the

25  mosque, he showed us down into the library, and he helped us

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

5B23PARH              Kohlmann - direct

1   select various audio recordings and video recordings and books

2   that we thought would be useful.

3   Q.   This person Attilla showed you around?

4   A.   That's correct, yes.

5   Q.   Why were you interested in speaking with him?

6   A.   Well, he was the number two person in charge of Abu Hamza's

7   organization.  He was the person who was responsible for the

8   mosque.  And he obviously knew everything that was in the

9   library.  We were interested in purchasing materials at the

5b23parh.txt
```
10   library.  So he was, he was a good person to speak with.  He
11   knew the ins and outs of Abu Hamza's organization very well.
12   Q.   In addition to Abu Hamza and Attila, did you speak with
13   other people when you were at the Finsbury Park Mosque?
14   A.   Yeah, I did.
15   Q.   Can you generally describe who those people were?
16   A.   Sure.  I got in conversations with some of the other folks
17   that were there.  People that weren't affiliated necessarily
18   with the mosque, but worshippers or followers of Abu Hamza.  I
19   spoke with them in English and in French.
20   Q.   I want to change gears.  While you were on that same trip
21   to London in 2002, did you meet someone named Sheikh Omar Bakri
22   Mohammed?
23   A.   Yes, I did.
24   Q.   Can you briefly describe for us who Sheikh Omar Bakri
25   Mohammed is?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

57

5B23PARH                    Kohlmann - direct

```
1    A.   Sure.  Sheikh Omar Bakri Mohammed is a Muslim cleric
2    originally in Lebanon, who until recently was living in an
3    asylum in the United Kingdom.  He runs an organization known as
4    al Muhajiroun.
5    Q.   What does that word, al Muhajiroun, mean?
6    A.   It is an Arabic word meaning the immigrants.
7    Q.   What type of group is al Muhajiroun?
8    A.   The idea behind al Muhajiroun is to reestablish the rule
9    of a global Islamic empire, not just in the Middle East and in
10   Central Asia, but actually also in the United States and in
11   Great Britain.  And towards that purpose, they aim to recruit
12   people to form what they term to be a fifth column to upset
```
Page 52

5b23parh.txt

13    society and establish the rule of an Islamic calafate

14    worldwide.

15    Q.   When you say Islamic calafate, what do you mean?

16    A.   Calafate means the Islamic empire.  It's a reference to the

17    pre-1920s empire that was in control.

18    Q.   Does the group al Muhajiroun advocate violence?

19    A.   It advocates violence as the primary method to achieve that

20    goal.

21    Q.   How did it come to be that you interviewed Sheikh Mohammed?

22    A.   I called him and spoke with him.  Over e-mail I had asked

23    him -- I explained to him I was a graduate student and I would

24    like to speak with him, interview him on the subject of Islam

25    in the United Kingdom versus Islam in the United States.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

5B23PARH                    Kohlmann - direct

1     agreed.  I met him at his headquarters in Tottenham in North

2     London.  I proceeded to conduct an interview with him.

3     Q.   Was that interview recorded?

4     A.   Yes, it was.

5     Q.   In addition to Sheikh Omar Bakri, did you speak with anyone

6     else associated with al Muhajiroun?

7     A.   Sure.  While I was at the headquarters of al Muhajiroun

8     with my colleague, we also were able to speak with several of

9     Sheikh Omar Bakri's assistants.  Individuals that were his

10    followers that were helping set up stands or helping set up

11    things at the headquarters.  We met several others at other

12    events where Omar Bakri was speaking.

13    Q.   Okay.  I want to ask you about those other events.  What

14    types of other events did you go to that pertain to Sheikh Omar

Page 53

5b23parh.txt

15   Bakri or al Muhajiroun?

16   A.   After attending several events related to al Muhajiroun,

17   speeches being given by Omar Bakri, we asked if they would

18   allow us to go to more events, events that weren't being

19   advertised.   So we were invited to what I guess you would term

20   an underground al Muhajiroun event where followers of Omar

21   Bakri, individuals who had helped organize his other speeches,

22   were giving their own speech without the Sheikh.

23   Q.   What types of things were discussed at those meetings?

24   A.   The need to support Osama bin Laden, the need to support al

25   Qaeda, the issue of killing women and children in the sense

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

59

5B23PARH                    Kohlmann - direct

1    that it was a minor issue and it was more important to defeat

2    the enemy.

3    Q.   I want to ask you about an individual named Mohammed al

4    Massari.   While you were in London, did you get a chance to

5    interview that person?

6    A.   Yes, I did.

7    Q.   Who is he?

8    A.   He's a Saudi dissident who runs an organization that is

9    known as the Committee for the Defense of Legitimate Rights.

10   Dr. al Massari is also considered to be one of the world's

11   foremost spokesmen in the West for Osama bin Laden.   He has

12   been cited as an operational by al Qaeda terrorists who have

13   conducted bombings, including the 1995 bombing of a joint Saudi

14   U.S. national guard headquarters in Riyadh.   Massari has also

15   participated in the purchase of equipment destined for Osama

16   bin Laden, including a satellite telephone that was used in the

17   commission of the 1998 bombings of two U.S. embassies in East

Page 54

5b23parh.txt

18   Africa.

19   Q.   This group, the Committee for the Defense of Legitimate

20   Rights, can you describe that group?

21   A.   Sure.   It's a rather small group, mainly of militant Saudi

22   dissidents.   It began as a prodemocracy movement, but it was

23   hijacked by radical Islamists.   By the mid-1990s it became --

24               THE COURT:   You have to slow down.

25               THE WITNESS:   Excuse me, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

60

5B23PARH                  Kohlmann - direct

1               THE COURT:   Did you grow up in New York?

2               THE WITNESS:   Yes, I did, your Honor.

3               THE COURT:   All right.

4    A.   It was initially founded as a human rights organization.   A

5    means to promote human rights in Saudi Arabia.   However, after

6    the original founders were arrested, a group of radical

7    Islamists led by Dr. al Massari seized control of the

8    organization.   They began turning it towards their own methods

9    and their own means.   By 1996 CDLR communiques and reports were

10   openly offering support and enthusiasm for Osama bin Laden,

11   were discussing the need to overthrow the Saudi regime and to

12   strike directly at the United States.   As a result, CDLR

13   created a suborganization in approximately 1996 known as the

14   Global Jihad Fund.   Its express purpose was to, quote, provide

15   support to Osama bin Laden.

16   Q.   I want to ask you about another group call Hizbut Tahrir.

17   Are you familiar with that group?

18   A.   Hizbut Tahrir.   In English it means liberation party.

19   Q.   And did you speak with anyone associated with that group?

Page 55

5b23parh.txt

20    A.   Yes, I spoke with several of their leaders in the United

21    Kingdom.

22    Q.   Briefly, what does that group advocate; what is its goals?

23    A.   Hizbut Tahrir shares the same ideological roots as Sheikh

24    Bakri Mohammed.   The only difference is Hizbut Tahrir, while

25    emphasizing the need for an Islamic empire that would wipe away

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

61

5B23PARH                    Kohlmann - direct

1     the United States and United Kingdom and other Western regimes,

2     suggests this process can also be done non-violently.   However,

3     the organization has been tied to terrorist cells in Egypt and

4     in Central Asia.

5     Q.   I want to talk about for a moment work trips you've taken,

6     not necessarily to interview people but to see things.

7     A.   Sure.

8     Q.   Did you take a trip to San Diego?

9     A.   Yes, I did.

10    Q.   For what purpose was that?

11    A.   I wanted to get an idea for the 9/11 hijackers who had been

12    living in San Diego to check out where they were living, to

13    check out the mosque they had attended, to see where they were

14    gathering, to see the points which they had met other

15    conspirators in the plot, try to get a feel for how they all

16    worked together.   As a result I was able to take a tour and see

17    their houses and see the various points that they met at, and

18    it was helpful to gain an understanding what they were doing in

19    San Diego.

20    Q.   When did you take that trip?

21    A.   That was in 2003.

22    Q.   Did you also take a trip to Portland in connection with

Page 56

5b23parh.txt

23    your trip?

24    A.   Yes, I did.

25    Q.   For what purpose was that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

5B23PARH                    Kohlmann - direct

1     A.   Well, we were interested in quite a bit of activity in

2     Portland, Oregon, surrounding the --

3              MR. WILFORD:   I am going to object to the

4     characterization of "we."

5              THE COURT:   Sustained.

6              THE WITNESS:   Me.

7     A.   I was quite interested in developments in Portland, general

8     terrorism developments but specifically related to the Portland

9     7 jihad cell case.

10    Q.   Is that a case you've worked on?

11    A.   Yes.

12    Q.   What types things did you do when you were doing fieldwork

13    in Portland?

14    A.   I got a chance to go out, and much like what I did for the

15    9/11 hijackers, I got a chance to see where some of the

16    conspirators lived.   I saw the mosques they were attending,

17    some of the businesses owned by coconspirators.   The places of

18    employment of some of those involved in the plot.   Trying to

19    get a feel for what the daily life was of these folks, what was

20    their relationship with various religious institutions, private

21    institutions, etc.

22    Q.   You mentioned earlier in your testimony that you also took

23    a trip to Bosnia in connection with your work?

24    A.   That's correct, yeah.

Page 57

5b23parh.txt

25   Q.   When was that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    63
5B23PARH                    Kohlmann - direct

1    A.   I took a trip for several weeks back this spring.

2    Q.   And what types of things did you do in the field in Bosnia?

3    A.   Well, my primary purpose for being there was to do contract

4    work on behalf of the British office of the high representative

5    in Sarajevo.  I was there to provide expert analysis and

6    expertise on the issue of militant Middle Eastern groups,

7    Saudis, North Africans involved in the Balkans.  In addition to

8    that, in addition to testifying at the Bosnian Supreme Court,

9    while I was there I also went out in the fields to places like

10   Setna and around Sarajevo, checking out fundamental mosques,

11   purchasing videotapes, researching and going out and seeing and

12   videotaping different institutions that are currently be used

13   to support militancy, and also checking out where some of the

14   former mujahideen now live in central Bosnia.

15   Q.   You mentioned you actually did testify while you were in

16   Bosnia?

17   A.   Yes.  I testified on behalf of the international

18   prosecutors at the BIH which was operating under a three judge

19   panel under the jurisdiction of the International Criminal

20   Tribunal for the former Yugoslavia at the Hague.

21   Q.   Can you briefly describe the nature or the subject areas of

22   your expert testimony in that case?

23   A.   Sure.  First of all, I was to give a general background as

24   to the Arab Afghans, the Arab Afghan movement, Osama bin Laden.

25   I was to explain the relationship between the Arab Afghans

5b23parh.txt

5B23PARH                        Kohlmann - direct

1    foreign mujahideen in the Balkans.  I was to explain the

2    structure, leadership, structure, history and ideology of the

3    foreign mujahideen in the Balkans who had traveled there from

4    Afghanistan.  I was also meant to give a detailed analysis of

5    al Qaeda's view as to regards to Shiite Muslims.

6    Q.  In addition to in person interviews in connection with your

7    work, have you conducted any telephone interviews?

8    A.  I have.

9    Q.  Can you briefly describe for us who you've interviewed on

10   the telephone in the past year or so?

11   A.  Sure.  As part of a project that I started by myself which

12   is a project to track suicide bombers in Iraq, I've made

13   several telephone calls to families of suicide bombers in Saudi

14   Arabia and Kuwait who have joined al Qaeda in Iraq and have

15   blown themselves up in the last two years.  I've spoken with

16   their family to get an idea of what their background was, where

17   they were from, what religious institutions they might be

18   attending, who their colleagues were, why they had gone to

19   Iraq, how they had gone to Iraq --

20        THE COURT:  Do you speak Arabic, sir?

21        THE WITNESS:  I only speak a little bit.  Luckily I

22   have translators that do work with me.

23   Q.  In addition to these telephone interviews, have you

24   communicated by e-mail with anyone in connection with your

25   work?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                        Kohlmann - direct

5b23parh.txt

1  A.   Yeah.   I've communicated with several representatives of
2  terrorist groups.   And terrorists groups themselves over the
3  Internet such as the Islamic Great Eastern Radars Front, the
4  Algerian Salafist Group for Prayer and Combat.   GSPC.
5  Q.   Now, have you been retained by the government as an expert
6  witness prior to this case?
7  A.   Yes, I have.
8  Q.   Have you been retained as a consulting expert or a
9  testifying expert or both?
10 A.   Both.
11 Q.   I want to walk through some of those cases.   Are you
12 familiar with United States v. Jeffrey Leon Battle?
13 A.   Yes, I am.
14 Q.   Were you retained as an expert in that case?
15 A.   Yes, I was.
16 Q.   Can you briefly describe what the nature of the allegations
17 were in that case?
18 A.   This was the so-called Portland 7 jihad cell case.   The
19 allegations centered around a group of American Muslims who
20 were alleged to have travelled to China with the hopes of
21 entering Afghanistan or Pakistan and fighting against U.S.
22 forces alongside the Taliban.
23 Q.   What subject matters were you scheduled to testify as an
24 expert on?
25 A.   I was scheduled to testify about the history of al Qaeda,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

5B23PARH                Kohlmann - direct

1  the history of Arab Afghans, ideological underpinnings behind
2  al Qaeda such as Sheikh Abdullah Azzam.   I was also supposed to
3  testify about the geographic locations of the Taliban al Qaeda
Page 60

5b23parh.txt

4    training camps, etc.

5    Q.   Did you end up testifying in that case?

6    A.   No, I did not.

7    Q.   Why not?

8    A.   The defendants pled guilty.

9    Q.   Okay.   Although there was a guilty plea and you didn't

10   testify, did you do anything active in that case; did you play

11   any role?

12   A.   Yes, I did.

13   Q.   Can you describe that for us?

14   A.   I played several roles on behalf of the prosecution.

15   Number one, I provided a lengthy detailed expert witness report

16   where I went through the various exhibits that the prosecution

17   and bureau had collected in that case, and I provided a

18   detailed summary for each exhibit I thought was significant as

19   per its background, its significance, its relationship to the

20   case.

21        Secondly, I interviewed a cooperating defendant,

22   defendant who had pled guilty in that case, in order to help

23   the bureau and the Department of Justice get as much

24   information as possible out of this cooperating defendant.

25        Finally, I also was present during sentencing as an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

5B23PARH                 Kohlmann - direct

1    assistant to the prosecutors during that phase of the trial.

2    Q.   The next case I want to ask you about, United States v.

3    Randall Royer.  Are you familiar with that case?

4    A.   Yes, I am.

5    Q.   Were you retained as an expert by the government in that

5b23parh.txt

6    case?

7    A.   Yes.

8    Q.   Can you briefly describe the nature of the allegations in

9    that case?

10   A.   Sure.  The defendant in that case was accused of having

11   traveled to a foreign country, with the purpose of recruiting

12   others to participate in a war against another country, another

13   sovereign nation, and they had also participated in a

14   conspiracy to provide material support to a foreign terrorist

15   organization.

16            THE COURT:  What was that foreign terrorist

17   organization?

18            THE WITNESS:  It was a group known as Lashkar

19   E-Tayiba, and that means army of the pure, sometimes translated

20   as Army of Medina.

21            The idea behind this group is it's a group that was

22   founded during the Soviet Afghan jihad of the 1980s in order to

23   help encourage Pakistanis to participate in jihad.

24   Q.   Did you end up testifying in that case?

25   A.   No, I didn't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                            68

5B23PARH                    Kohlmann - direct

1    Q.   What district was that case in?

2    A.   The Eastern District of Virginia.

3    Q.   Why didn't you end up testifying in case?

4    A.   The defendant pled guilty.

5    Q.   Did you have any role in that case after the defendant pled

6    guilty?

7    A.   Yes, I did.

8    Q.   Can you explain that for us.

Page 62

5b23parh.txt

 9   A.   After the defendant pled guilty, prosecutors in the bureau

10   asked me to interview Randall Royer in an attempt to gain as

11   much information as possible, again because of the fact he was

12   cooperating from his experiences both in Bosnia Herzegovina and

13   also in Pakistan.

14   Q.   Next case, United States v. Masoud Khan.  Are you familiar

15   with that case?

16   A.   Yes, I am.

17   Q.   Were you retained by the government as an expert in that

18   case?

19   A.   Yes, I was.

20   Q.   Which district was that case in?

21   A.   Also the Eastern District of Virginia.

22   Q.   Can you again briefly describe the nature of the

23   allegations in that case?

24   A.   Sure.  Masoud Khan case was also linked to the Randall

25   Royer case.  This was also an instance of an American citizen

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              69
5B23PARH              Kohlmann - direct

 1   who was alleged to have traveled to a foreign country for

 2   purposes of providing material support, to seek military

 3   training, ultimately perhaps even to aid the Taliban in

 4   Afghanistan.

 5   Q.   Was the nature of your expert testimony, your proffered

 6   expert testimony in that case, the same as in the Randall Royer

 7   case?

 8   A.   Yeah.  The general subject was to be for me to talk about

 9   al Qaeda, the Taliban, the location of terrorist training

10   camps, the relationship between Lashkar E-Tayiba and al Qaeda,

5b23parh.txt

11    and the relationship between Lashkar and the Taliban.

12    Q.   Did you end up testifying in the Khan case?

13    A.   I did, but not as an expert.

14    Q.   Why didn't you testify as an expert in that case?

15    A.   Government didn't need me to testify as an expert.  They

16    needed me to testify as a fact witness.

17    Q.   You did testify as a fact witness?

18    A.   No.

19    Q.   You weren't precluded by the judge --

20             MR. WILFORD:  Objection.

21             THE COURT:  Sustained.

22    Q.   Were you precluded?

23             MR. WILFORD:  Objection.

24             MR. BRUCE:  I don't understand the basis.

25             THE COURT:  I take it it's a matter of public record.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

70

5B23PARH                    Kohlmann - direct

1     Go ahead.

2              THE WITNESS:  No, I was not precluded.  My expert

3     testimony simply wasn't needed.

4              THE COURT:  Did the judge make a ruling one way or

5     another?

6              THE WITNESS:  No, your Honor.

7              THE COURT:  It wasn't an issue?

8              THE WITNESS:  No, it wasn't an issue, your Honor.

9     Q.   Which judge was that?

10    A.   That was Judge Leonie Brinkema.

11    Q.   Next case, United States v. Sabri Benkhala.  Are you

12    familiar with that case?

13    A.   Yes, I am.

Page 64

5b23parh.txt

14    Q.   Were you retained by the government as an expert in that

15    case?

16    A.   Yes, I was.

17    Q.   What was the nature of the allegations in that case?

18    A.   The Sabri Benkhala case was again linked to the previous

19    two cases.  The allegations were that the defendant had engaged

20    in a conspiracy to assist others in traveling to terrorist

21    training camps and providing material support to a designated

22    foreign terrorist organization.

23    Q.   Did you testify as an expert witness in that case?

24    A.   Yes.

25    Q.   What areas of expertise did you testify?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71
5B23PARH                    Kohlmann - direct

1     A.   Much the same areas I was proffered for.  I talked about al

2     Qaeda training camps, I talked about the history and ideology

3     of the Taliban, I talked about the history ideology of Lashkar

4     E-Tayiba, I explained the relationship between Lashkar, the

5     Taliban, and al Qaeda, both religiously and politically.  I

6     also went through a brief history of al Qaeda itself.

7     Q.   Who was the judge in the Benkhala case?

8     A.   It was judge Leonie Brinkema.

9     Q.   Next case.  United States v. Ali al Timimi.  Were you

10    retained by the government as an expert witness in that case?

11    A.   Yes.

12    Q.   What were the nature of the allegations there?

13    A.   The nature of the allegations were that the defendant had

14    recruited a group of individuals to travel to a foreign country

15    and to wage war against the United States and its allies.

5b23parh.txt

16    Q.   And did you testify as an expert witness in that case?

17    A.   Yes, I did.

18    Q.   On what areas?

19    A.   Similar areas, again I testified about the history and

20    ideology of al Qaeda, the history and ideology of the Taliban,

21    the history and ideology of Lashkar E-Tayiba, the relationship

22    between those three groups, the location and names of al Qaeda

23    terrorist training camps, material related to those subjects.

24    Q.   Who was the judge in the al Timimi case?

25    A.   It was Judge Leonie Brinkema.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

72

5B23PARH                    Kohlmann - direct

1    Q.   Have you ever been precluded by a judge in testifying as an

2    expert witness?

3    A.   Yes.

4    Q.   When did that happen?

5    A.   Last Friday.

6    Q.   In which case?

7    A.   The case of United States v. Ahmed Omar Abuali.

8    Q.   Before you were precluded from testifying in that case, was

9    any Daubert hearing conducted in that case such as the one we

10    are having today?

11    A.   No.   I actually never entered the courtroom.   I never

12    presented any credentials to anyone.

13    Q.   You mentioned previously that you've been retained by the

14    British government as an expert as well?

15    A.   That's correct, yes.

16    Q.   Can you just real briefly describe that for us.

17    A.   Sure.   I've been asked by to be an expert witness in an

18    upcoming case by the metropolitan police antiterrorism branch

Page 66

5b23parh.txt

19    which is commonly known as Scotland Yard.  They've asked me to

20    provide expert testimony about the group Lashkar E-Tayiba, army

21    of the pure, and its relationship to the Taliban, al Qaeda, and

22    its recruitment efforts inside the United Kingdom.

23    Q.  In addition to the case you mentioned you testified in

24    Bosnia, are you scheduled to testify in any other cases, other

25    than the one you just mentioned on behalf of Scotland Yard,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73

5B23PARH                    Kohlmann - direct

1    outside the United States?

2    A.  Yes.  I've been requested by attorneys, prosecutors at the

3    International Criminal Tribunal for the former Yugoslavia to

4    the Hague to serve as an expert witness in an upcoming case

5    that will be carried out directly under their jurisdiction at

6    the Hague.

7    Q.  What's the nature of your expert testimony or your proposed

8    expert testimony in that case?

9    A.  My proposed expert testimony would cover the Arab Afghans,

10    the foreign mujahideen in Bosnia, the relationship between the

11    Arab Afghans, the foreign mujahideen in Bosnia, the history,

12    structure, leadership and ideology of the foreign fighters in

13    Bosnia.  The Arab Afghans, and finally their relationship,

14    their detailed relationship with the Bosnian government and

15    military.

16    Q.  Now --

17               THE COURT:  That does not involve al Qaeda; is that

18    correct?

19               THE WITNESS:  Actually, yes, your Honor, it does.  The

20    context, the subject of my material involves several

Page 67

5b23parh.txt

21   individuals who are known al Qaeda representatives who are

22   ideologues or clerics or operatives.

23   Q.   Mr. Kohlmann, when you're retained as an expert witness,

24   can you walk us through how you go about arriving at an expert

25   opinion, what methodology do you use?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

5B23PARH                    Kohlmann - direct

1    A.   Sure.  Well, I mean, typically what happens in a case such

2    as this is I'm provided with several exhibits, several

3    documents by who's ever retaining me.  On the basis of those

4    documents I'm asked to come up with a comprehensive report,

5    which not only includes material taken from those documents but

6    more importantly contains my analysis information that I have

7    gathered independently and puts all of that information into a

8    comprehensive narrative, into an understandable narrative with

9    an argument and with my, you know, my expert analysis involved.

10   Typically, it would involve hours, many hours of research,

11   cross checking through some of the digital databases we talked

12   to before, taking a look and seeing what other information that

13   I've gathered from other documents, other open source

14   documents, and like I said, ultimately producing a final

15   report.

16   Q.   How do you go about checking the information that's given

17   to you or that you obtain through open sources before you reach

18   your expert conclusion?

19   A.   Well, I cross check everything.

20   Q.   What does that mean?

21   A.   Well, one of the advantages to having everything digitized

22   is one can do searches through these documents for key words.

23   So if I am focusing on a particular individual, I can do a

Page 68

5b23parh.txt

24        search for that particular individual.  I can find all
25        documents that relate to that individual.  Thus I can compare a

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    75
        5B23PARH                    Kohlmann - direct

1         wide variety of sources, a wide variety of open sources that
2         discuss this individual.
3                 Again, those sources could be anything from court
4         transcripts, trial transcripts, exhibits submitted in trials,
5         open source intelligence documents, original materials from
6         terrorist groups, even if they are particularly knowledgeable,
7         perhaps even a newspaper article.
8                 THE COURT:  That requires this information to be on
9         your database, correct?
10                THE WITNESS:  Yeah.  But potentially I could also find
11        the information outside of my database through means such as
12        Lexis Nexis.
13                THE COURT:  In other words, can you do a word search
14        of the newspapers that are available on Lexis Nexis for
15        example?
16                THE WITNESS:  That would be one example, yeah, sure.
17        It's a little bit deeper than that though, because a lot of the
18        documents I would be doing searches for would not just be
19        newspapers, but they would be, particularly on Foreign
20        Broadcast Information Service, there would be translations of
21        actual terrorist documents, communiques and whatnot.
22                THE COURT:  Where are these available?
23                THE WITNESS:  They are available via closed databases
24        online.  Foreign Broadcast Information Service maintains a
25        service called World News Connection which allows you to log on
                              Page 69

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

76

5B23PARH                    Kohlmann - direct

1     and do a search through all their materials using key words.

2     Q.   When you say you cross check all these various materials,

3     what are you checking them for?

4     A.   I'm checking to see if there's anything varying, if any of

5     the facts seem to vary or whether they are consonant, whether

6     or not there is any background material, whether or not these

7     people are known by any particular aliases.  If I find

8     pseudonyms or aliases, I will check those aliases.  I am

9     looking for virtually anything I can find.  And then again try

10    to take that information together and produce a narrative of

11    what's agreed upon, what's known about the subject at hand.

12    Q.   Now, is your field of expertise a traditional scientific

13    field?

14    A.   I would consider it a modification of a traditional social

15    science field.  It's really a -- it is a microhistory.  I study

16    the microhistory of al Qaeda and its involvement in regional

17    conflicts.  So it's slightly different to a traditional social

18    science.  The methods of information gathering are slightly

19    different, but they do have some remarkable similarity, yes.

20    Q.   Now, how does the methodology that you've described that

21    you use compare to the methodology that other people use in

22    your field?

23    A.   I mean, it's strikingly similar.  I work again closely with

24    a group of colleagues who don't necessarily work for me, but we

25    work cooperatively, other academics around the world, we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

77

5B23PARH                    Kohlmann - direct

1    conduct research together.  Many times if I go on a research

2    trip, I'll go with another colleague.  We generally do about

3    the same thing.  It is the same general process for collecting

4    information on terrorism.  There aren't that many sources of

5    information, so you know, it's fairly easy to figure out what

6    the most valuable ones are.

7    Q.   Now, I want to ask you to focus on your proffered expert

8    opinion in this case that Ammar al-Baluchi was a al Qaeda

9    financier and contributor.  What types of materials did you

10   gather and look at to come to that conclusion?

11   A.   Well, I mean, first of all one document that was extremely

12   helpful was the 9/11 Commission final report.  9/11 Commission

13   final report goes into some detail about Ammar al-Baluchi and

14   his role in 9/11 and his role in other terrorist activities.

15   This document probably provides one of the best declassified

16   summaries of what Ammar al-Baluchi knows and has admitted to.

17          In addition there are a number of other publicly

18   available documents that have been issued by various government

19   agencies which contain either information or references to

20   Ammar al-Baluchi which are also instructive in the fact they

21   are consonant with the conclusions and material presented in

22   the 9/11 Commission report and they add further to what he was

23   doing after 9/11.

24   Q.   Although the 9/11 Commission report -- how would you

25   characterize that as what kind of source; primary, secondary?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

78

5B23PARH                    Kohlmann - direct

1    A.   I would consider it as a secondary source.  It's distilled

5b23parh.txt
2  information.  But it is based upon, especially this particular

3  point, is based upon interviews, direct interviews.  So, I

4  would consider it to be a secondary source of extreme value.

5  Q.  In this case, have you been permitted by the government to

6  view any of the hard data underlying any of the assertions in

7  the 9/11 report?

8  A.  Yes, I have.

9  Q.  Can you briefly describe those.

10  A.  Sure.  I was able to view the actual receipts from money

11  transfers sent by Ammar al-Baluchi to 9/11 hijackers, both in

12  the United Arab Emirates and also here in the United States.

13  Q.  In addition to the materials you've discussed so far, have

14  you relied on any statements reported to have been made by

15  coconspirators of Ammar al-Baluchi in reaching your conclusion?

16  A.  Yes, I was provided with summaries of declassified

17  statements made by conspirators in this case.  One of which is

18  a statement by Ammar al-Baluchi and one of which is a statement

19  by Majid Khan.

20  Q.  Before we get to those, have you been provided with any

21  other or have you obtained on your own any other statements by

22  Ammar al-Baluchi or any of his coconspirators?

23  A.  Yes.  I was, again, I was able to obtain documents

24  particularly relating to the case of Jose Padilla, which

25  discussed Omar al-Baluchi, his involvement with Khalid Sheikh

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79

5B23PARH                    Kohlmann - direct

1  Mohammed, and his attempts at carrying out a terrorist attack

2  in the United States post-9/11.

3  Q.  Can you describe what those statements by Jose Padilla

4  were.

Page 72

5b23parh.txt

5   A.   Sure.

6   Q.   How they were disseminated?

7   A.   Sure, sure.  They were disseminated in form of a memorandum

8   from I believe it was the Department of Justice on behalf of

9   the Pentagon.  They were statements apparently taken by

10   military interrogators and then used by the Department of

11   Justice to provide a summary of the case both for legal

12   purposes and I think also probably for public relations

13   purposes.

14   Q.   And did those statements reported to have been made by Jose

15   Padilla talk about Ammar al-Baluchi at all?

16   A.   Yes they did.

17   Q.   Can, you briefly describe that for us.

18   A.   Sure.  Jose Padilla discussed in those -- or Jose Padilla

19   is quoted as discussing in those documents how he was in

20   contact with Ammar al-Baluchi, and Ammar al-Baluchi served as

21   almost a lieutenant or fixer for Khalid Sheikh Mohammed in the

22   sense he would present ideas that Jose Padilla would have to

23   Khalid Sheikh Mohammed, he would help facilitate communication

24   between Jose Padilla and Khalid Sheikh Mohammed, and most

25   importantly, that he would, on behalf of Khalid Sheikh

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80

5B23PARH                    Kohlmann - direct

1   Mohammed, he would provide Jose Padilla with financial and

2   material means to carry out the plot.

3           MR. BRUCE:  I am going hand the witness what's been

4   marked as Government Exhibits 4 and 5.

5   Q.   I want to focus you first, Mr. Kohlmann, on Government

6   Exhibit 4.  Do you have that in front of you?

Page 73

5b23parh.txt

7    A.   Yes, I do.

8              THE COURT:   Mr. Bruce, the reporter understandably

9    would like a break.

10             MR. BRUCE:   Certainly.

11             THE COURT:   Is there a logical point?

12             MR. BRUCE:   Now is fine with me.

13             THE COURT:   All right.   Let's take 10 minutes.

14             (Recess taken)

15             (In open court)

16             THE COURT:   I have a slightly different issue it's

17   been pointed out to me.   The questionnaires that I sent to the

18   parties yesterday has blanks in it for the potential witnesses

19   who are going to be mentioned.   How do the parties want to

20   handle that?  Because obviously I'll need names for that.   We

21   could either have the government put it in or I can put it in,

22   makes no difference to me, but I'll need names if there are

23   going to be any names from the defense and the government

24   parties.

25             MR. WILFORD:   Your Honor, we had discussed that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

81

5B23PARH                 Kohlmann - direct

1    earlier.   Mr. Metzner had asked your clerk to e-mail the copy

2    of the questionnaire, we'll insert the necessary names and then

3    forward it back.

4              THE COURT:   That's all right with me.   In other words

5    both parties will insert the names.

6              MR. WILFORD:   Yes.

7              THE COURT:   That's fine.   You'll e-mail it back and

8    I'll present it to the jury clerk.

9              MR. WILFORD:   Yes.

Page 74

5b23parh.txt

10            THE COURT:  All right, fine.  Mr. Bruce, you may

11    proceed.

12            MR. METZNER:  On the very last point do you want to

13    then take the final to the jury clerk or would you like us to

14    make 175 blank copies?

15            THE COURT:  That's easier.  Let's get the mechanics

16    down.  We will e-mail it to you, because I just faxed it to

17    you.  We'll e-mail it to you so you have it in electronic form.

18    You'll put your names in, you'll get the names from

19    Mr. Wilford.  You will make 175 copies and give them to the

20    jury clerk.  But make the 175 copies, please either e-mail to

21    me back an e-mail, or fax it to me, because I want to look at

22    it before 175 copies are made.

23            MR. METZNER:  The understanding is the only thing we

24    intend to add and the change is the names that the jury might

25    be hearing during the trial.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              82
        5B23PARH                    Kohlmann - direct

1             THE COURT:  Yes.  The way I phrased it, that might be

2     witnesses at the trial.

3             MR. METZNER:  That's right.

4             THE COURT:  Proceed.

5             MR. BRUCE:  Thank you your Honor.

6     BY MR. BRUCE:

7     Q.  Mr. Kohlmann, before we broke, I had given you Government

8     Exhibit 4.  Do you have that in front of you?

9     A.  Yes, I do.

10    Q.  Can you tell us what Government Exhibit 4 is?

11    A.  I was given Government Exhibit 4 as the declassified

                              Page 75

5b23parh.txt

12   statements -- excuse me, declassified summaries of statements

13   of conspirators in this case.

14   Q.   Okay.   Just the piece of paper marked as 4, who are those

15   statements made by, reported to have been made by?

16   A.   The person known as Mustafa who I know to be Ammar

17   al-Baluchi.

18   Q.   Did you rely on that in reaching your expert opinion in

19   this case?

20   A.   Yes, I did.

21          MR. BRUCE:   Your Honor, I offer Government Exhibit 4.

22          MR. WILFORD:   No objection for purposes of the

23   hearing.

24          THE COURT:   Yes, admitted.

25          (Government's Exhibit 4 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83

5B23PARH                    Kohlmann - direct

1    Q.   Now, Mr. Kohlmann, can you sort of scan down the page and

2    tell us beginning with the first paragraph that's relevant, how

3    you relied upon this document in reaching your expert opinion

4    in this case?

5    A.   Well, this document contains a number of admissions, even

6    though there are a number of denials, there are also a number

7    of patent admissions in here.   Starting with the second

8    paragraph.

9    Q.   The second bullet point?

10   A.   Yes, excuse me.   Defendant was totally unwitting of

11   Mustafa's al Qaeda affiliation.   Or of Mustafa's intention to

12   use another individual for broader operational plan.   That

13   statement, number one, suggests that Mustafa has an affiliation

14   to al Qaeda, it's inherent in the statement; and second of all,

5b23parh.txt

15   that Mustafa has some sort of broader operational plan in

16   cooperation with al Qaeda.  That's -- I believe that's it for

17   bullet point two.

18   Q.  So you used that in reaching your conclusion that Ammar

19   al-Baluchi was in fact related to al Qaeda?

20   A.  It's inherit in the statement.

21          THE COURT:  What is your expert opinion in regard to

22   Ammar al-Baluchi?

23          THE WITNESS:  I believe Ammar al-Baluchi served as an

24   operational leader on behalf of al Qaeda as a fixer, as someone

25   between an operational commander like Khalid Sheikh Mohammed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

84

5B23PARH                    Kohlmann - direct

1    and those tasks to carry out a operation such as in this case

2    Majid Khan or others.

3           THE COURT:  Madam reporter, would you read that back

4    to me please.

5           (The record was read)

6           MR. WILFORD:  Excuse me, your Honor.  I have a little

7    different recollection in my notes.  He didn't say "leader"

8    specifically.  And he did say "Majid Khan and others."

9           THE COURT:  Well, we have what the testimony is.  Did

10   you say leader, sir?

11          THE WITNESS:  I believe so, yes, your Honor.

12          THE COURT:  All right.  Did you say Majid Khan and

13   others?

14          THE WITNESS:  Yes, I did.

15          THE COURT:  All right.

16   Q.  Mr. Kohlmann, scanning down from the point you just read to

Page 77

5b23parh.txt

17    us, can you tell us whether any other portions of this document

18    were helpful to you in reaching your expert conclusion in this

19    case?

20    A.   Yes.   Bullet point number three, individual was unwittingly

21    being used to assist in Mustafa a/k/a Ammar al-Baluchi's

22    broader plans with al Qaeda operative Majid Khan.

23           Inherent in this statement is Mustafa otherwise known

24    as Ammar al-Baluchi has broader plans with another al Qaeda

25    operative.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85
5B23PARH                    Kohlmann - direct

1           Next sentence:   Individual was someone Mustafa a/k/a

2     Ammar al-Baluchi used for information, but from whom he kept

3     his al Qaeda connections hidden.

4           Once again, inherent in this statement is the

5     admission by the conspirator that he has connections with al

6     Qaeda.

7     Q.   Moving down the rest of the page, is anything else on that

8     page that was of assistance to you in reaching your conclusion?

9     A.   Sure.   Bullet point number four or bullet point four,

10    starting with the second line:   Individual did not know it was

11    Uzair's true identity or other name for Uzair.   Mustafa, a/k/a

12    Ammar al-Baluchi, did not believe that another individual was

13    aware that he and Uzair were al Qaeda, suggesting that Mustafa

14    a/k/a Ammar al-Baluchi was indeed al Qaeda.   Continuing on

15    but --

16           MR. WILFORD:   Excuse me, your Honor.   Just for the

17    clarity of the record with respect to the reference to Uzair,

18    that reference is in quotations.   I think that is specifically

19    designed to differentiate that particular reference as Uzair

Page 78

5b23parh.txt

20    from Uzair Paracha.  It just won't be clear just from the

21    testimony being read the way it was.

22              THE COURT:  Yes.  Uzair is in quotes, that's correct.

23    Go ahead.

24              THE WITNESS:  Okay.

25              THE COURT:  No, I don't know if there's question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

86

5B23PARH                    Kohlmann - direct

1    Q.  Why don't I pose one.  Is there anything still in bullet

2    point number four that was of assistance to you in reaching

3    your expert conclusion in this case?

4    A.  Yeah, I mean continuing on with the rest of the sentence.

5    But Mustafa a/k/a Ammar al-Baluchi believed that individual

6    likely knew that Mustafa and Uzair were associated with

7    mujahideen and could be associated with the Taliban or al

8    Qaeda.

9              Again, inherent in this statement is the admission

10    that Mustafa a/k/a Ammar al-Baluchi is quote associated with

11    mujahideen and could be associated with the Taliban or al

12    Qaeda.

13    Q.  How about in the remainder of that paragraph, is there

14    anything else that was of assistance?

15    A.  Yeah.  The final line in that paragraph.  At the time of

16    Uzair's arrest, and Uzair in quotation marks, individual

17    probably knew of Mustafa's al Qaeda affiliation.  In other

18    words, the affiliation between al Qaeda and Ammar al-Baluchi.

19    Do you want me to keep going?

20    Q.  Yes, if anything else was of assistance to you, please

21    point it out.

Page 79

5b23parh.txt

22   A.   Here we go.   The next bullet point actually has, because

23   individual had never been properly vetted, he was never tasked

24   by al Qaeda i.e. Uzair in quotes or Mustafa a/k/a Ammar

25   al-Baluchi.   In this case Ammar al-Baluchi is synonymous with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87

5B23PARH                    Kohlmann - direct

1    al Qaeda.   Synonymous with those within al Qaeda who would be

2    responsible with others for tasking operations.

3    Q.   Anything further?

4    A.   Yes.   Actually no, I think that's it.

5          MR. WILFORD:   I'm sorry.   Just so the record is clear,

6    again in this particular document, it doesn't say

7    "individuals," it specifically references Saifullah Paracha.

8          THE COURT:   Proceed.

9    Q.   Now, Mr. Kohlmann, I want to turn now to your expert

10   opinion regarding Majid Khan in this case.   In one sentence,

11   would you sort of generally describe for us what your expert

12   opinion is regarding Majid Khan?

13   A.   Majid Khan worked initially as a foot soldier within al

14   Qaeda, but eventually became a lower level fixer, someone who

15   operated as an aid to a fixer, someone that would cooperate

16   with senior operational leaders of al Qaeda in terms of

17   organizing other lower level al Qaeda members into carrying out

18   a terrorist plot.

19   Q.   Okay.   What materials did you review and gather in order to

20   reach that expert conclusion regarding Majid Khan in specific?

21   A.   In order to reach that opinion, I used open source

22   documents and I also was provided with summaries of

23   declassified statements made by Majid Khan.

24   Q.   First, as to the open source materials, who is reported to

5b23parh.txt

25      have provided information that led to the reporting in those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

88

5B23PARH                    Kohlmann - direct

 1      open source materials?

 2      A.   I believe it's from the interrogation of Khalid Sheikh

 3      Mohammed.

 4      Q.   Who is Khalid Sheikh Mohammed?

 5      A.   Khalid Sheikh Mohammed is the former chief operational

 6      planner on behalf of al Qaeda's terrorist network.   He

 7      initially was trained at the al Sada military camp along the

 8      Afghanistan Pakistan border, grew closer and closer with bin

 9      Laden until 1996 when he swore a bayaat or oath of allegiance

10      to Osama bin Laden in Afghanistan.   Thereafter he assisted bin

11      Laden in conceiving and carrying out major international

12      terrorist plots directed against the United States and its

13      allies.

14      Q.   Is Khalid Sheikh Mohammed someone who would be in a

15      position to know whether someone like Majid Khan was an al

16      Qaeda operative or not?

17              MR. WILFORD:   Objection.

18              THE COURT:   I'll allow it.

19      A.   Majid Khan was for all intents and purposes --

20      Q.   You said Majid Khan.

21      A.   Excuse me, excuse me.   Khalid Sheikh Mohammed was for all

22      intents and purposes the head of al Qaeda aspirational wing,

23      thus it's fair to presume he would've had knowledge of most

24      major operations that the al Qaeda network was involved in,

25      particularly those operations in his area of jurisdiction, i.e.

SOUTHERN DISTRICT REPORTERS, P.C.
Page 81

5b23parh.txt
(212) 805-0300

1   Afghanistan and Pakistan.
2   Q.   You mentioned in addition to the open source materials you
3   also relied on unclassified summaries of statements made by
4   Majid Khan?
5   A.   That's correct, yes.
6   Q.   Can I refer you to Government Exhibit 5, sir.  What is that
7   document?
8   A.   This is again a summary of declassified statements
9   allegedly made by Majid Khan.
10   Q.   Did you rely on this document in reaching your expert
11   conclusion in this case?
12   A.   Yes, I did.
13         MR. BRUCE:   Your Honor, I offer it for purposes of
14   this hearing.
15         MR. WILFORD:   Just so it's clear, Exhibit 5 also
16   includes statements attributed to a person known as Uzair in
17   quotation marks as well.
18         THE COURT:   It's clear Uzair at various times is in
19   quotation marks, but there are also references to Uzair
20   Paracha.   When it's Uzair and it's in quotations, it appears to
21   be referring to somebody else.  Go ahead.
22         (Government's Exhibit 5 received in evidence)
23   Q.   Mr. Kohlmann, can you sort of follow the same procedure you
24   used with Government Exhibit 4 and scan down this page and tell
25   us what was of assistance to you in this document containing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5b23parh.txt

1    statements reported to have been made by Majid Khan?

2    A.   Sure.  I think the most relevant sections would probably

3    be, first of all, bullet points number four and five.

4    Q.   Let's start with number four.

5    A.   Sure.

6    Q.   How did that assist you in your expert --

7    A.   Bullet point number four.  He, i.e. Majid Khan, had no al

8    Qaeda contacts in the United States.  That sentence by its very

9    nature suggests that what Majid Khan is attempting to

10   communicate here is that he had al Qaeda contact elsewhere.

11   But not in the United States.  That conclusion is buttressed by

12   the next bullet point which is that none of his, i.e. Majid

13   Khan's, contacts were aware of his, i.e. Majid Khan's, gas

14   station attack plan or any other actions he might have taken on

15   behalf of al Qaeda.

16          Again, in this statement, Majid Khan is acknowledging

17   that he had a gas station attack plan, that he was undergoing

18   potentially other actions, that he was taking on behalf of al

19   Qaeda.

20   Q.   Is there anything further in the document above and beyond

21   bullet points four and five that assisted you in your expert

22   conclusion?

23   A.   Well, going forward with bullet point six, he, i.e. Majid

24   Khan, assessed Uzair Paracha -- I am going to move forward to

25   the second sentence -- he, i.e. Majid Khan, did not assess

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

91

5B23PARH                  Kohlmann - direct

1    Uzair Paracha as being suitable for any other assistance to al

2    Qaeda besides helping with Majid Khan's documents at the time.

Page 83

5b23parh.txt

3           This suggests that Majid Khan was searching for
4    individuals that could be useful or suitable for use in
5    assistance to al Qaeda.
6    Q.  Moving forward, were there any other points that were of
7    assistance to you?
8    A.  Yes.  The next bullet point, he, i.e. Majid Khan, would
9    only give Uzair Paracha a five to 10 percent suitability
10   assessment.  That suitability assessment refers to his
11   suitability as a terrorist operative on behalf of al Qaeda.
12   Inherent in that sentence is the suggestion that Majid Khan has
13   some control or some judgment over who is and who is not a
14   suitable candidate for al Qaeda.
15   Q.  Does that paragraph also refer to the word recruiting?
16   A.  Yeah, it does.  Majid Khan might have been interested in
17   recruiting Uzair Paracha.
18   Q.  What did you take from that?
19   A.  Well, taken along with the next sentence of that bullet
20   point, one could assume then that Majid Khan was interested in
21   potentially recruiting the defendant as an operative.
22   Q.  Is there anything else on Government Exhibit 5 that was of
23   assistance to you?
24   A.  I don't believe, no.
25   Q.  Okay.  In addition to the open source materials you

                                                        92
5B23PARH                 Kohlmann - direct

1    described regarding Majid Khan and Government Exhibit 5, is
2    there anything else you used in reaching your expert conclusion
3    regarding Majid Khan?
4    A.  Yes, I did.
5    Q.  What was that?
                          Page 84

5b23parh.txt

6    A.   I was provided with two summaries of interviews conducted

7    by the Federal Bureau of Investigation with two family members

8    of Majid Khan.

9    Q.   How did those in general assist you in your expert

10   conclusion in this case?

11   A.   Well, both relatives of Majid Khan had expressed that they

12   were not supporters of al Qaeda and not supporters of jihad,

13   but acknowledged that they had direct knowledge that their

14   relative Majid Khan had been recruited by individuals in

15   Pakistan for the purpose of providing support and aid to al

16   Qaeda and the Taliban.

17   Q.   Now, I want to talk about a more general topic,

18   Mr. Kohlmann.  In the various discussions and debates that

19   you've had that you've testified about today, have you ever in

20   those circles, in either government or academics, heard anyone

21   seriously argue that Osama bin Laden is not the head of al

22   Qaeda?

23            MR. WILFORD:   Objection.

24            MR. BRUCE:   Your Honor, I can address it if you like.

25            THE COURT:   Go ahead.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93

5B23PARH                    Kohlmann - direct

1            MR. BRUCE:   Address it?

2            THE COURT:   Yes.

3            MR. BRUCE:   Go ahead with the question?

4            THE COURT:   No, you can respond to the objection.

5            MR. BRUCE:   I'd like to.  One of the factors under

6    Daubert is essentially the old fry test which is whether the

7    expert's opinions are generally accepted in the community.  I

Page 85

5b23parh.txt

8   think it goes to that generally accepted in that field of

9   expertise.  If there's been debate --

10          THE COURT:  Mr. Wilford, what's your objection?

11          MR. WILFORD:  Your Honor, it's the form.

12          THE COURT:  Just "seriously," is that your objection,

13   the objection to the adverb "seriously"?

14          MR. WILFORD:  No.  The entire form of the question

15   presupposes what we have to establish here.  The question

16   revolves around whether or not there is any debate in the

17   community regarding -- in his particular community regarding

18   this particular topic.  And it presupposes we have a group of

19   experts, which this particular gentleman is including himself

20   in, who are then able to make a determination.  I think that's

21   putting it backwards.  We need to establish there is some

22   community of experts number one, number two, whether or not

23   there is, there is or is not some debate within that community

24   with respect to the question that was posed by the government.

25          THE COURT:  There's no jury here.  I will allow it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

5B23PARH                    Kohlmann - direct

1   Go ahead ask the question.

2   Q.  In the circle --

3          THE COURT:  Don't use the word "seriously."

4          MR. BRUCE:  Certainly.

5   Q.  In the academic and government circles where you've had

6   discussions that you've described previously, have you heard

7   anyone put forth the proposition or argue that Osama bin Laden

8   is not the head of al Qaeda?

9   A.  No.

10   Q.  In those same circles, have you ever heard someone put

Page 86

5b23parh.txt

11   forth the proposition that Khalid Sheikh Mohammed is not an

12   operational manager for al Qaeda?

13   A.   Never.

14   Q.   Those same circles, have you heard anyone put forth the

15   proposition or argue that Ammar al-Baluchi is not a financier

16   and facilitator on behalf of al Qaeda?

17   A.   No.

18   Q.   And same circles, have you heard anyone put forth the

19   proposition or argue that even after the September 11 attacks,

20   Ammar al-Baluchi continued to try to facilitate terrorist

21   attacks against the United States?

22            MR. WILFORD:   Objection.

23            THE COURT:   Again, I will allow it at this point.   Go

24   ahead.

25   A.   You're asking whether or not does anyone dispute that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              95
5B23PARH                    Kohlmann - direct

1   Q.   Correct.

2   A.   No.

3   Q.   That you've been exposed to?

4   A.   No.

5            MR. BRUCE:   I have no further questions, your Honor.

6            THE COURT:   All right.

7   CROSS-EXAMINATION

8   BY MR. WILFORD:

9   Q.   Good afternoon, Mr. Kohlmann.

10   A.   Good afternoon.

11   Q.   You graduated from Georgetown in 2001?

12   A.   That's correct.

5b23parh.txt

13    Q.    How old are you now, sir?

14    A.    I'm almost 27.

15    Q.    And you talked about theses that you worked on while you

16    were at Georgetown; is that correct?

17    A.    That's correct.

18    Q.    These were basically research papers that every

19    undergraduate has to do, right?

20    A.    No.

21    Q.    They weren't?

22    A.    No.

23    Q.    What were they?

24    A.    Two of them or actually all three of them were projects I

25    had independent taken upon myself.   Georgetown offers the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

5B23PARH                    Kohlmann - cross

1    opportunity for students who are interested, who really want to

2    get into the field, they offer opportunities at graduate level

3    research, but they're not required.   They're only if you take

4    them upon yourself.   I took those burdens upon myself because I

5    was very very interested in this particular area of study and

6    it happened that Georgetown University has a plethora of

7    professors who have various expertise on this issue.

8              But I mean, the honors thesis was entirely my own

9    option.   There were individuals who are part of that program

10   who never even completed their thesis.   So.

11   Q.   But my question was inartful.   The so-called thesis you did

12   it was simply a research paper, it wasn't a doctoral thesis?

13   A.   No, it was called a thesis.   The thesis I wrote for the

14   CMCU is known as a cap stone thesis.   It is actually, if you

15   read Georgetown University materials, they refer to it as a cap

Page 88

5b23parh.txt

16    stone thesis, that's why I called it that, and my international
17    politics honors thesis is actually on my transcript as an
18    international politics honors thesis.
19    Q.  It wasn't a doctoral thesis; is that correct?
20    A.  No.  Georgetown offers opportunity for undergrad students
21    that want to do graduate level research to conduct that
22    research.
23          THE COURT:  It did not lead to a PhD.
24          THE WITNESS:  No.
25    Q.  It did not lead to any degrees, master's or anything else,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

97

5B23PARH                Kohlmann - cross

1    right, no credit or anything else?
2    A.  That's not exactly true, because the work I did in law
3    school for my J.D. was directly related to work I had done in
4    undergrad and work I was doing on terrorism.
5    Q.  Sir, did you receive a degree from Georgetown University
6    based on your thesis, a master's or doctoral postgraduate
7    degree; yes or no?
8    A.  I was never given a PhD, no.
9    Q.  You didn't get a master's either, did you?
10    A.  No.
11    Q.  You went straight from Georgetown to law school?
12    A.  That's correct.
13    Q.  You mentioned you worked for the Investigative Project; is
14    that correct?
15    A.  That's correct.
16    Q.  And that was founded by somebody named Steve Emerson; is
17    that correct?

Page 89

5b23parh.txt

18    A.   That's correct.

19    Q.   And were you at the Investigative Project subsequent to the

20    Oklahoma City bombings; is that correct?

21    A.   Very subsequent, but yeah.

22    Q.   You are familiar with the fact that the Investigative

23    Project put out a report, or Steve Emerson put out a report

24    that the Oklahoma City bombings were the responsibility of

25    Islamic terrorists; is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98

5B23PARH                    Kohlmann - cross

1    A.   Actually no, he didn't.

2    Q.   He didn't?

3    A.   No, he didn't put out a report.  He went on TV and

4    suggested that the Oklahoma City bombing evinced

5    characteristics that were similar to Middle Eastern terrorist

6    bombings, but I wasn't working for him at the time so.

7    Q.   He went on TV the same way you do, right?

8         MR. BRUCE:  Objection, relevance.  If the witness

9    wasn't working with the Investigative Project at the time, I

10   don't think it's relevant.

11        MR. WILFORD:  Goes to his methodology.

12        THE COURT:  I'll allow this question.  Go ahead.

13   Q.   Steve Emerson went on TV the same way you do and made a

14   pronouncement that this bombing in Oklahoma City was based or

15   was in fact the work of Islamic terrorists; isn't that correct?

16   A.   You are characterizing what he said.  That's not exactly

17   what he said.  He said the attack evinced characteristics

18   similar to those bombings that had happened in the Middle East.

19   I don't believe he blamed it on anyone in particular.  Again, I

20   wasn't working for him at the time so I can't -- I started

Page 90

5b23parh.txt

21    working for him three years after that happened.

22    Q.   Well, did you see the program?

23    A.   No.

24    Q.   So you don't know what he said, right?

25    A.   I've seen the transcript of it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

99

5B23PARH                    Kohlmann - cross

1     Q.   When?

2     A.   I really -- I can't tell you.  I don't know.

3     Q.   Is it on your database with the other 20 million documents?

4     A.   Could be.  I don't know.

5     Q.   You have an index?

6     A.   If I was to do a search for it, I might be able to find it,

7     but I don't know if it's there.  It is not relevant to my work.

8     I don't know why it would be on there.

9     Q.   By the way, do you have an index with you of your database?

10    A.   The document's 20 million files.  The index file is

11    approximately two to three or four gigabytes in size.  If you

12    were to print out that index file, in the form of a -- it would

13    take up probably this room in terms of paper.

14    Q.   But you don't have it with you on a disk?

15    A.   It doesn't fit on a disk, it's --

16         THE COURT:   You don't have your index with you.

17         THE WITNESS:   No.  No, your Honor.

18         THE COURT:   That's it.

19         THE WITNESS:   Okay.

20         THE COURT:   Next question.

21    Q.   With respect to your thesis, your first thesis, your cap

22    stone thesis, at Georgetown, that was on early religious

Page 91

5b23parh.txt
23    development in the 20th Century in Afghanistan; is that
24    correct?
25    A.   Yes, that's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

100

5B23PARH                    Kohlmann - cross

1     Q.   Nothing at all to do the subject matter that you're
2     testifying as an expert today, right?
3     A.   Not that I am aware of, no.
4     Q.   And the second thesis that you did, you said you had a
5     professor who was your mentor; is that correct?
6     A.   That's correct.
7     Q.   Who was that professor?
8     A.   Professor Anthony Bennett.
9     Q.   Bennett?
10    A.   Bennett.
11    Q.   What department was he affiliated with?
12    A.   He is affiliated I believe with the Department of
13    Government and Political Science.
14    Q.   And did you discuss with Dr. Bennett the methodology that
15    you would use in gathering information that would support your
16    thesis?
17    A.   Yeah.
18    Q.   What discussions did you have with him?
19    A.   I had several meetings with him.  First, my first meeting
20    laid out the actual idea behind the paper, behind what I was
21    trying to research.  Throughout that process he would give me
22    sources that he thought were useful, for me to rely on in terms
23    of my research.  He would ask me what I had gotten, he would
24    ask me to compare and contrast what he had provided with what I
25    had obtained on my own.  And in the end my final product, my
Page 92

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

101

5B23PARH                    Kohlmann - cross

1   final paper was a basis on all those sources.
2   Q.   Those sources were primarily books that you read, magazine
3   articles?
4   A.   They were a wide variety of stuff.  It was everything from
5   actual videotapes of mujahideen leaders in Afghanistan to
6   academic pieces printed by such scholars as Barnett Rubin who
7   is a pretty well-known expert on Afghanistan, to first-hand
8   accounts to books to newspaper -- whatever would be useful.
9   But I mean, this was an academic paper and the sources were
10  somewhat controlled by my mentor, so there was a limit to what
11  I could and could not use.
12  Q.   When you were working on this thesis, I believe you said it
13  was reviewed by two professors?
14  A.   Which thesis?
15  Q.   I think the Bitter Harvest thesis?
16  A.   Yeah, it was reviewed by at least two or three different
17  people in the Government Department, yeah.
18  Q.   Who were they?
19  A.   Anthony Bennett and his colleagues, but I don't know
20  because he didn't share with me the people he shared them with.
21  Q.   You don't know who if anyone beside Anthony Bennett
22  reviewed your work?
23  A.   No, I know -- it was a thesis, I know he submitted that
24  paper to other people in the Government Department, but
25  typically with peer review, you're not told other than your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5b23parh.txt

5B23PARH                    Kohlmann - cross

1    main mentor, you are not told about the other professors who

2    are given the responsibility of reading it.  The point is to

3    keep alive the idea of academic anonymity, and people can say

4    whatever they feel like or can make whatever comments they feel

5    like without fear of retribution, aftereffects.

6    Q.   When you were research assistant for Dr. Fandi, you were

7    involved in studying Saudi dissident groups; is that correct?

8    A.   Well, it was Dr. Fandi covers virtually all Middle Eastern

9    dissident groups in North Africa and Arabian Gulf, but a large

10   focus of the work I did was in militant Saudi dissident groups,

11   Osama bin Laden, the Arab Afghans; yes.

12   Q.   What were you doing?

13   A.   I was conducting specific research as to their activities

14   in Europe and elsewhere, and I was conducting an analysis of

15   the evolution of ideology, showing how the group the Committee

16   for the Defense of Legitimate Rights, and which was founded by

17   Dr. Mohammed al Massari.  I was analyzing over time the

18   evolution in thought and ideology of this group.  I was

19   analyzing its structure within the United Kingdom, its primary

20   causes, which causes it was associating itself with, and it was

21   done primarily through an analysis of raw materials I had

22   gotten directly from the committee and outside research I had

23   done tracking CDLR operatives, both in the United Kingdom and

24   here in the United States.

25   Q.   So let's back up for a moment.  Your source material then

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - cross

1    for this particular work that you were doing with Dr. Fandi was

5b23parh.txt

2    videotapes or audio tapes from CDLR; is that correct?

3    A.   Written communiques, written reports, e-mails, books that

4    they've written that they've distributed, audio and video

5    recordings of Dr. Mohammed al Massari.   Audio and video

6    recordings of other folks associated with CDLR.   I collected a

7    lot of -- these folks went on Internet news group and they

8    published a lot of public notices about what they were doing,

9    including copies of that communique and everything else.   I was

10   able to get copies of all of this and integrate it.

11   Q.   Off the Internet?

12   A.   That was one of my sources, yeah.

13   Q.   You also said there are some other sources.   What other

14   sources?

15   A.   Other sources were things that I obtained from Dr. Fandi,

16   such as materials he had gathered when he went to Saudi Arabia

17   to interview the clerics that provide support to bin Laden and

18   provide support to Mohammed al Massari.   I also used materials

19   I had gathered during my work at the Investigative Project,

20   such as original copies of documents written and distributed by

21   CDLR and other groups.   I also used research that I had done at

22   the Investigative Project identifying an operative of CDLR in

23   this country and his involvement in the purchase of a satellite

24   telephone for the use of Osama bin Laden.

25   Q.   Would it be fair to say you basically used your own

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

104

5B23PARH                    Kohlmann - cross

1    research on CDLR to support your research for this particular

2    project you were doing with Dr. Fandi?

3    A.   It was from a wide variety of sources.   It was actually

5b23parh.txt
```
 4    interesting.  I was working at the Investigative Project at the
 5    time, so it was really a collective of the work I was doing,
 6    both in my spare time in the university and also separately at
 7    the Investigative Project, and then combined with the documents
 8    and other information that was given to me directly by
 9    Dr. Fandi.
10    Q.   But you just -- correct me if I'm wrong -- you just stated
11    the Investigative Project source that you used was your
12    research on CDLR?
13    A.   It was original documents that I had used in research on
14    CDLR -- it wasn't like I quoted a report that I had written.
15    What I did is I took an original document that the
16    Investigative Project had a copy of that nobody else did, and I
17    would take this document, explain what it was, explain the
18    context of it, and then explain its relevance to the paper.
19    But it was really only with original sources.  I won't quote --
20    for an academic paper I won't quote a report I did for a
21    private research group.
22    Q.   When you worked for the Investigative Project, you were
23    being paid, right?
24    A.   Yeah.
25    Q.   You said you were working 20, 25 hours?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

105

5B23PARH                    Kohlmann - cross

```
 1    A.   Depending, but yeah.
 2    Q.   What was the methodology that was used at the Investigative
 3    Project in terms of gathering research?
 4    A.   It's remarkably similar to what my methodology is now.
 5    It's a combination of multiple sources.  First of all,
 6    obviously primary research, going out in the field, going to
```
Page 96

5b23parh.txt

7    Islamic conferences, listening to speeches given by Islamic

8    clerics, going to bookstores, purchasing videos, audio tapes.

9    Going out, conducting interviews with people in the field.

10   Either extremists or those who have contact with them.

11   Collecting open source information, reports from other academic

12   institutions, original information from terrorist groups,

13   communiques, videos.  The Investigative Project has kept a

14   library of audio tapes and videotapes that go back to the late

15   1990s.  There was material there, original material which is

16   useful to be exploited in certain cases such as this.

17   Q.   And you testified on direct examination that you use

18   databases; is that correct?

19   A.   That's correct.

20   Q.   You use Lexis Nexis?

21   A.   Yes, sir.

22   Q.   And other databases that are located on the Internet; is

23   that correct?

24   A.   Yes, some.  Yeah, yeah.

25   Q.   You use the Foreign Broadcast International Service?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

106

5B23PARH                    Kohlmann - cross

1    A.   Foreign Broadcast Information Service, FBIS.

2    Q.   And you also testified that you provide informal

3    assistance, right; you testified that you provided informal

4    assistance to a wide variety of law enforcement entities.

5    A.   That's correct, yeah.

6    Q.   And by informal assistance, what exactly do you mean?

7    A.   I mean that if somebody comes to me from a law enforcement

8    agency and asks me for assistance on a particular case or a

5b23parh.txt

 9   particular matter, I will provide it to them.  As you know,

10   I'm -- I deal with the subject, that's part of my business.  I

11   don't volunteer information though.  I don't go out and

12   volunteer information.  The information I develop is almost

13   always at the specific request of a client.

14   Q.   So when say you provide informal information, is that an

15   occasion where you're not retained, that somebody just comes to

16   you and says, hey Evan, I need some information on this

17   particular topic, and you provide it on an informal basis; is

18   that what you are intimating?

19   A.   That happens, and occasionally I'm compensated.

20   Q.   When you are compensated, whom are you compensated by?

21   A.   By whatever agency is requesting the work I do.

22   Q.   Why do you call it informal assistance rather than a formal

23   actual retainer by that particular agency to provide them with

24   particular knowledge or expertise?

25   A.   Because very -- only in the cases when I'm testifying in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

107

5B23PARH                    Kohlmann - cross

 1   courts as an expert witness or I'm providing direct expertise

 2   in a case do I have a contract.  Informal assistance could also

 3   mean trading information to someone that needs it, right.  So I

 4   may get paid to provide certain pieces of information.  That

 5   pays me for my time to cover the costs of copying and providing

 6   the information, but typically, speaking most of the -- the

 7   support I provide, is I get compensation for my internal costs

 8   of copying and providing it.  I don't -- generally speaking

 9   it's informal, unless it's in a case.  If it's in a case such

10   as this, then I have a contract.

11   Q.   When you go through what you just stated, trading of

Page 98

5b23parh.txt

12     information, you give information and people give you

13     information, right?

14     A.   Sometimes.

15     Q.   You take that information that you're given and you use

16     that to base your opinion on at some point later on down the

17     road; is that correct?

18     A.   Typically I gather my own information.

19     Q.   I understand that.  But I'm asking you when you trade

20     information --

21     A.   No, it's not trading information.  It's I give information

22     to people and they pay me for it.

23     Q.   And no one gives you information in return?

24     A.   Generally speaking, no.  Occasionally I will get open

25     source information from other academics and I will get

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

108

5B23PARH                    Kohlmann - cross

1      information from outside sources.  But with the exception of

2      exhibits that are handed over to me directly during the context

3      of a case where I have a signed contract, it's a one-way flow

4      of information.  I am the open source, and I'm providing

5      information, open source information, to those that don't have

6      access to it.  But, like I said, other than the cases that I've

7      worked on specifically as an expert witness or a consultant in

8      an ongoing case, the information flow has been from me this

9      way.

10     Q.   And there's no occasion where any law enforcement personnel

11     have consulted with you and given you some information in

12     return for you giving them information?

13     A.   It doesn't work like that.

Page 99

5b23parh.txt

14  Q.  I didn't ask you that.  I asked you has it ever happened?
15  A.  No.  U.S. law enforcement, it doesn't work like that.  You
16  don't -- the information, number one is classified.  It would
17  never -- I don't have a security clearance, it would never be
18  traded with someone outside of the government without a
19  security clearance.  The only information I have access to is
20  from the government, that's given to me from the government
21  that's not publicly disseminated, is information that's given
22  to me in the context of an ongoing criminal case that I'm
23  either providing expert witness or consulting services in a
24  formal way.
25  Q.  What about foreign law enforcement; because you indicated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

109
5B23PARH                    Kohlmann - cross

1  you work in foreign law enforcement as well?
2  A.  It more or less works the same way.
3  Q.  When you say more or less?
4  A.  Again, I've never had a case where I've been provided
5  documents by a foreign law enforcement service without me
6  having a specific contract to work as an expert witness on a
7  case.
8  Q.  I'm not limiting it to documents, sir.  I'm not limiting it
9  to documents.  I'm talking about the exchange of information
10  that someone may give you verbally.  Doesn't have to be a
11  document.  If someone tells you something.
12  A.  There is an underlying issue here and that is that if I was
13  provided that kind of information, it would spoil my own
14  perspective, my own perspective is focused on open source
15  information.  If I took information from inside sources, right,
16  if I traded that classified information, that would in many

5b23parh.txt

17    ways pollute the way I do things.  If I'm retained on a

18    specific case as an expert and I have access to classified

19    documents or partially declassified document, that's different.

20    But generally speaking, in my dealings with foreign

21    governments, the information flow is unidirectional.  It is me

22    providing open source information about terrorism to them.  And

23    they -- they more or less, the only documents I receive from

24    them are exhibits in ongoing trials where they intend to use me

25    as a witness.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              110
         5B23PARH              Kohlmann - cross

1     Q.   With respect to globalterroralert.  That's your particular

2     Web site?

3     A.   That's correct.

4     Q.   And you said that I believe on direct examination you had

5     some peer review that was undergoing with respect to that?

6     A.   One of the nice things about the World Wide Web, you can

7     edit any time by publishing stuff on the Internet, particularly

8     on places like the counter-terrorism blog or on my Web site.

9     What it does is it offers colleagues of mine, those interested

10    in my work, an opportunity to view what I am working on, to

11    comment on it, to offer their feedback.

12            For instance, I'll give you an example.  A few weeks

13    ago I produced a chart of leadership network of Abu Zarqawi in

14    Iraq.  Before releasing this publicly on the Net, I sent copies

15    of this chart to a number of colleagues, people in the academic

16    or information world who follow this very closely.  And I asked

17    them take a look at this, see what you think, see what, you

18    know, what do you think of the work.  Am I missing someone

                            Page 101

5b23parh.txt
19    here, is there someone here you think I'm adding too much

20    importance to, give me feedback.

21          After taking that feedback in from a number of

22    different people who a chance to review the chart, I edited it

23    once more and I put it out there.

24          Now, that being said, this is already the second

25    version of this chart I've published.  I published one version

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

111
5B23PARH                    Kohlmann - cross

1    back in May.  This latest version already encompasses a number

2    of changes additions, subtractions that I've made after having

3    published this, after having the opportunity of others to view

4    it to offer their comments.  So, yeah.

5    Q.  Okay.  Who are the people specifically that you use as a

6    peer review?

7    A.  Almost virtually all of them are academics.  I have --

8    Q.  Who are they?

9    A.  Who are they.  Okay.  Sure.  First of all there's of course

10   Andy McCarthy who is --

11   Q.  He's a former prosecutor, right?

12   A.  That's right.

13   Q.  He is not an academic.  Go ahead.

14   A.  Actually, he writes academic pieces now about terrorism law

15   so I think that's a manner of semantics.

16   Q.  Andy McCarthy is a former prosecutor?

17   A.  Oh, yes.

18   Q.  In the United States Southern District, right?

19   A.  Yes.

20   Q.  Go ahead.  Who is the next person?

21   A.  Next person who be Dr. Rohan Gunaratna.
                    Page 102

5b23parh.txt

22   Q.   Who is that?

23   A.   Dr. Rohan Gunaratna is probably one of the world's foremost

24   experts on terrorism.   He wrote the book --

25   Q.   Excuse me.   Don't -- in this instance could you not tell me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

112

5B23PARH                    Kohlmann - cross

1    that he is a foremost expert, but describe what particular

2    academic affiliation he has, where he works; that sort of

3    thing?

4    A.   Of course.   He is the director of a university

5    counter-terrorism study center in Singapore.   I don't know the

6    exact name of it, but he's affiliated directly with I believe

7    the government there.   It's at a university.   He teaches a

8    program there.   He's actually invited me to come there and join

9    him at that program.

10          I deal with Dr. Manoun Fandi still, my old mentor from

11   Georgetown.   He was up until recently at the National Defense

12   University.

13   Q.   Where is he now?

14   A.   He is now at the Baker Institute down in Texas.   The James

15   Baker Institute.

16   Q.   That's James Baker who was a former secretary of state?

17   A.   I mean, that's who the center is named after I guess, yeah,

18   sure.

19   Q.   Is that the same person or is it somebody different?

20   A.   As far as I know, yeah.

21          I deal with also academics out in a center out in

22   California, in Northern California which deals specifically --

23   I can't, I'm sorry I can't remember the name of this particular

Page 103

5b23parh.txt

24      program, but it's in Monterey, California.  It's the nuclear

25      nonproliferation program.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    113
        5B23PARH                    Kohlmann - cross

 1      Q.  Who particularly do you deal with at that program for your

 2      peer review?

 3      A.  I deal with a number of individuals there.  It's --

 4      Q.  Names please.

 5      A.  I mean, I could give a list, but I can't name them all off

 6      the top of my head.

 7      Q.  Anybody that you can remember, name them please.

 8      A.  I can keep going.  There's Dr. Urs Gehriger.

 9      Q.  Let stop with this Northern California group and give me

10      the name of a person that you specifically are involved with

11      for peer review.

12      A.  I can provide you with the names, but honestly off the top

13      of my head, I deal with universities around the world.

14      Q.  I understand that, sir.  I am asking you right now you

15      don't know the name --

16      A.  Off the top of my head.  I didn't say that.

17      Q.  For that particular group, you don't know who the people

18      are right now, you cannot tell the Court who those people are;

19      is that correct?

20      A.  I can provide you their names if you like.  I can't off the

21      top of my head.

22      Q.  You can't do it right now?

23              THE COURT:  You've established that.  Move on.

24      Q.  Who is next?

25      A.  Dr. Urs Gehriger.

                            Page 104

5b23parh.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

114

5B23PARH                    Kohlmann - cross

1    Q.   Who is that?

2    A.   Dr. Urs Gehriger is a professor in Switzerland who studied

3    this, who recently returned from a trip in Jordan where he met

4    with supporters of Abu Zarqawi in Iraq, where he gathered

5    first-hand information of him, and afterwards him and I have

6    been working on project studying I guess the track of Abu

7    Zarqawi's al Qaeda movement in Iraq and its connections with

8    Europe.

9    Q.   Who else?

10   A.   Okay.  There's Dr. Michael Brown at Georgetown University.

11   He was my faculty mentor.

12   Q.   That's separate from Bennett, right?

13   A.   Yeah.  He was the one that helped with my final thesis, the

14   person in charge of grading my final thesis.  There's Dr. Brian

15   Spooner at the university of Pennsylvania who I had studied

16   Afghanistan with during graduate-level classes while he was at

17   the law school there.

18   Q.   I'm sorry.  When you say you studied on graduate-level

19   courses, are these classes that were taught at the law school?

20   A.   No.

21   Q.   So you took additional classes at the University of

22   Pennsylvania?

23   A.   Yeah.

24   Q.   In addition to your law school classes, you took graduate

25   classes?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

115

5B23PARH                    Kohlmann - cross
Page 105

5b23parh.txt

1    A.   What?

2    Q.   Graduate classes?

3    A.   Exactly.

4    Q.   You actually registered and took classes?

5    A.   Yeah.

6    Q.   You sat in on classes?

7    A.   No, they are on my transcript.

8    Q.   Okay.  So please continue with the people that you are

9    using in your peer review.

10   A.   I use John Charles Brisard who is a researcher who just

11   recently came out with a new book about Abu Zarqawi who is

12   affiliated with several research institutions in France.

13        There's a long list of names.  I can't recount

14   everyone off the top of my head.

15   Q.   All these people are people you submit your work to prior

16   to publishing; is that correct?

17   A.   I mean, not everyone every single time.  What I do is I

18   know a wide variety of people in this field.  What I'll do is

19   I'll take individual people who I think are particularly

20   knowledgeable about a given area.  If I'm writing about the

21   World Trade Center bombing here in New York or if I'm writing

22   about the 1996 New York City jihad plots case, I will go to

23   somebody like Andy McCarthy who has first-hand knowledge, who

24   has been writing quite a bit of academic material lately about

25   terrorism law here in the U.S, and he's probably a good

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

116

5B23PARH                    Kohlmann - cross

1    authority on that.  But if I was going to write a paper about

2    cyberterrorism for instance, I would go to the professors that

Page 106

5b23parh.txt

3    I took classes with at the University of Pennsylvania in cyber

4    crime.  Like Cheryl Krause for instance, Professor Cheryl

5    Krause.

6    Q.  Who also used to be an assistant United States attorney

7    here in this office?

8    A.  Cheryl Krause?

9    Q.  Yes?

10   A.  Not that I would know of.  Cheryl Krause was a professor at

11   the University of Pennsylvania and engaged in private practice

12   when I was taking classes with her.  But that would be another

13   person I would go to with academic papers to review them, sure.

14   But it depend, it really depends on the subject.  If I was

15   writing a paper about Bosnia, I would go to someone like Marko

16   Attilla Hoare, who is not an expert necessarily in terrorism,

17   but is an expert in the Balkans who knows quite a bit about

18   this and is someone who, I mean, is recognized, a recognized

19   expert on the subject.

20   Q.  Do you take -- when you say you would go to, is that a

21   review of your work or are you simply going to these people to

22   get information before you publish your work?

23   A.  No.  It's really more of a review thing.  Obviously when I

24   publish a book or if I publish a longer report, that sometimes

25   has its own separate review process.  For instance my book had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

117

5B23PARH            Kohlmann - cross

1    a specific peer review process engendered as part of it, one I

2    had no control over and one that was done very, very

3    specifically.

4         When it comes to other documents I do, it depends on

Page 107

5b23parh.txt

5   what I am working on.  If I am working on something official,

6   something that's a longer report, then it needs to be reviewed,

7   not for additional information, it needs to be reviewed to make

8   sure that everything I say is consonant with what my colleagues

9   also believe.  And if there is something they find that they

10  are not in agreement with, I encourage them to tell me about it

11  so I can bring it up, I can show them the source and we can

12  debate about whether or not which source is more reliable.

13  Q.   How many people you have on your list of people of peers

14  that review your materials are part of your private

15  counter-terrorism blog?

16  A.   How many of them?

17  Q.   Yes.

18  A.   Probably three or four.

19  Q.   Who are those?

20  A.   Zach Abuza, Matt Leavitt, Andy McCarthy and Lorenzo Vino.

21  Q.   Now, who selected the people that are involved in this

22  counter-terrorism blog?

23  A.   It was I believe the editor of the blog who is Andy

24  Cochran.

25  Q.   Andy Cochran?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

118

5B23PARH                    Kohlmann - cross

1   A.   Hmm-hmm.

2   Q.   And when you say on direct examination that you informally

3   assisted the Congressional committee researching or

4   Congressional aids researching the 9/11 Commission report, what

5   did you mean by that?

6   A.   Congressional 9/11 Commission aids would approach myself,

7   and at that point I was working at the Investigative Project,

5b23parh.txt

8      and would ask me to provide them with my break down of certain
9      particular areas that they were studying.
10              So for instance, if they were working on the Project
11     Bojinka, which was an attempted attack which was a plot in the
12     Philippines in 1995 to bring down commercial airliners
13     simultaneously, they would ask me what documents I had on this
14     subject, they would ask me what I knew about this subject, what
15     I knew about the particular players involved.  We would have a
16     discussion about the significance of the various players
17     involved.  But, in the end, they were very appreciative.  I
18     mean, they footnoted my book.
19     Q.  So, did you get -- when you talk about informal assistance,
20     were you compensated?
21     A.  No.
22     Q.  So it was different from informal assistance that you
23     testified about earlier?
24     A.  I mean actually, it's similar.  Most of the informal
25     assistance I give I am not compensated for.  Only very rarely

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                     119
       5B23PARH              Kohlmann - cross

1      am I compensated for it.  In particular instances where a
2      particular information is worth more than just, you know,
3      "thank you."
4      Q.  Now, you mentioned, and I think it's Exhibit 1 -- do you
5      still have that in front of you?
6      A.  Yes, I do.
7      Q.  You mentioned that you were cited in the 9/11 Commission
8      report; is that correct?
9      A.  That's correct.

5b23parh.txt

10   Q.   And what was chapter two about?

11   A.   You're asking me for the exact title?  I believe the

12   subject of chapter two was what happened with al Qaeda and

13   Osama bin Laden after the end of the Afghan war particularly.

14   I can tell what you my cite is to.  My cite --

15   Q.   I'm not asking what your cite is to.  I'm asking you, you

16   were cited in this report?

17   A.   Right.

18   Q.   What basis was the report citing you for?

19   A.   This section of chapter two dealt with regional conflicts

20   that al Qaeda had been involved with, conflicts such as Bosnia,

21   Kashmir, the Philippines.  Rather than go into lengthy detail

22   about al Qaeda's involvement in those particular areas, what

23   the 9/11 Commission staff did instead was to offer brief

24   summations of al Qaeda's involvement in those areas, and offer

25   footnotes for people that wanted to search for more

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

120

5B23PARH                    Kohlmann - cross

1   information.

2   Q.   And were these footnotes in some sort of order as to where

3   you can go for additional information?

4   A.   I don't understand your question.  Are they ranked?

5   Q.   Yeah, were they ranked?

6   A.   No.

7   Q.   They weren't ranked?  The fact that you were last in the

8   footnotes doesn't mean you are the least source; it just means

9   you are another source?

10   A.   The last part of that sentence had to do with Bosnia, so

11   that's I believe why the reference is last in the footnote.

12   But I don't have the 9/11 Commission report in front of me.  I

Page 110

5b23parh.txt

13    can't read it to you.  But I can tell that you the reason why

14    I'm cited last in there is because the part about Bosnia in

15    that sentence comes last.  It is just the way the sentence was

16    constructed.

17    Q.  It has to do with Bosnia, that was based your book that you

18    published?

19    A.  Yeah.  The sentence is referring to regional conflicts al

20    Qaeda has become involved with, and makes final reference to

21    Bosnia Herzegovina.

22    Q.  You said your book was pretty thick and not for public

23    consumption.  How many pages is that book?  You have it in

24    front of you?

25    A.  Yeah, I do.  It is 233 pages.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

121

5B23PARH                    Kohlmann - cross

1     Q.  With respect to your methodology that you utilized --

2     A.  Sure.

3     Q.  -- for your book.  What did you do?

4     A.  What did I do to research this?

5     Q.  Yeah.  What methodology did you use?

6     A.  This began as a project in approximately April of 2002.  It

7     lasted for over two years.  It involved me going out and doing

8     a tremendous amount of research.  The first thing I did

9     obviously was compile together as many open sources as I

10    already had access to.  Then I would go out and conduct

11    interviews.

12            THE COURT:  You speak quite quickly.

13            THE WITNESS:  I apologize.

14            THE COURT:  It's difficult for the reporter to get it

Page 111

5b23parh.txt

15    all down.

16              THE WITNESS:  Sure.

17              THE COURT:  Now each time I've asked you, what you

18    tend to do is what many people who talk quickly do, is in your

19    next answer you talk more quietly but just as fast.  Forget the

20    New York part, just breathe between each sentence.

21              THE WITNESS:  No problem, your Honor.  Sorry about

22    that.

23    A.  It began as a project in approximately April of 2002.  The

24    idea behind the project was to begin, first of all, compiling

25    all of the open sources that I had access to already.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                122
        5B23PARH                  Kohlmann - cross

1     Q.  Can I just stop you for one moment?

2     A.  Sure.

3     Q.  When you talk about these open sources, could you detail

4     what these sources are that you use for your book?

5     A.  Sure.  Definitely.  First of all, items such as transcripts

6     from the Osama bin Laden trials here in New York which provided

7     a great deal of information.

8     Q.  By that you are talking about the trial that occurred in

9     2000?

10    A.  United States v. Osama bin Laden.

11    Q.  Involving the embassy bombings?

12    A.  That's correct.

13    Q.  That trial testimony you used in formulating your work

14    about al Qaeda's jihad in Europe?

15    A.  Certainly I did.

16    Q.  That was one of your primary sources; is that correct?

17    A.  That was -- I don't know if -- it's only -- I only used it

                              Page 112

5b23parh.txt

18    for part of what I wrote.  I mean, the other sources -- I mean,

19    it's very hard to say what's primary.  I have over, I mean, I

20    have something like 400 footnotes in here, and none of them

21    is -- I mean, that transcript from the Osama bin Laden trial

22    are used, I don't know, maybe 10 or 15 times.  Is that a

23    principal source?

24    Q.  I don't know.

25    A.  I mean, it was very helpful.  Exhibits from the trial were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

123

5B23PARH                Kohlmann - cross

1    very helpful, but just --

2    Q.  Which exhibits are you referring to from that trial?

3    A.  Sure.  A number of exhibits were submitted during that

4    trial, as ancillary to the case, such as notebooks of Wadih

5    el-Hage, Osama bin Laden's personal secretary, manuals that

6    were seized from al Qaeda members both in the United Kingdom

7    and East Africa.  These were all very useful.

8            More useful than that, specifically on the subject of

9    my book were original documents I had obtained from an

10    organization in the United Kingdom known as Azzam Publications.

11    Q.  Can we go back for one moment.  You said there were manuals

12    or was there one manual?

13    A.  No, there were multiple manuals.

14    Q.  Which manuals are you referring to?

15    A.  There was one manual that was I believe seized off a

16    computer, Wadih el-Hage's computer.  There was a second manual

17    that was seized from a residence of an al Qaeda member in

18    England, in Manchester.

19    Q.  That's two.  You said there were several.

Page 113

5b23parh.txt

20   A.   Those are the only two I can recall off the top of my head.

21   Q.   When you were going through your methodology, you mentioned

22   a United Kingdom source, right; what was that?

23   A.   Oh, Azzam Publications.  It is an organization that was

24   founded in the United Kingdom by supporters of Osama bin Laden

25   in order to help disseminate information, original information

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

124

5B23PARH                    Kohlmann - cross

1   about the Arab Afghans, particularly their involvement in

2   conflicts principally in Bosnia Herzegovina, causes in

3   Chechnya.  This site offered biographies and communiques and

4   photos from foreign fighters who had been killed in Arab Afghan

5   conflict zones.  Such as the Caucasus, such as Bosnia

6   Herzegovina, such as Kashmir.

7   Q.   What process did you use to vet that material for its

8   reliability and accuracy?

9   A.   I had actually contacted a close personal friend of Osama

10   bin Laden in Saudi Arabia over e-mail.

11   Q.   Who is that?

12   A.   His name Adel Batterjee.  Adel Batterjee was one of the

13   original financiers who help provide support to Osama bin Laden

14   in 1991.  He wrote a book where he detailed the early founding

15   and history of al Qaeda.  I convinced Adel Batterjee to send me

16   a copy of that book.  That book provided a great deal of

17   corroboration to much of the material printed on Azzam

18   Publications.

19   Q.   I am talking about specifically you mentioned they had

20   photographs and biographies.  What did you do to corroborate

21   that information?

22   A.   I took the names, the photos, the biographies, and I

Page 114

5b23parh.txt

23    compared them with other stuff that I gotten from other

24    sources, such as the book I got from Adel Batterjee.  Some of

25    these biographies dated back to the 1980s to Afghanistan, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

125

5B23PARH                    Kohlmann - cross

1     sure enough, the same people that Azzam Publications was

2     listing their photos, their biographies, these people who had

3     been killed fighting in Afghanistan, their biographies, their

4     names, all their identifying information, also appeared quite

5     often in other sources, namely including information from Adel

6     Batterjee.

7     Q.   Adel Batterjee, what was the relationship -- did you

8     research the relationship between Adel Batterjee and Azzam

9     publications?

10    A.   As far as I know, there was no relationship.

11    Q.   What did you do to determine that?

12    A.   I attempted to figure out who Adel Batterjee was in contact

13    with, but Adel Batterjee as far as I know did not have contact

14    with Azzam Publications.

15    Q.   When you say as far as you know, what did you undertake to

16    determine the relationship?

17    A.   I've studied Azzam Publications since about 1996.  I have

18    saved copies of all their various Web sites.  I've ordered all

19    of their books and all of their materials.  I've engaged in

20    e-mail conversations with the people that were in charge of

21    Azzam Publications.  I --

22    Q.   Did you research their financial support?

23    A.   To the extent I could.  I don't have access to bank

24    records.

Page 115

5b23parh.txt
25   Q.   You really don't know whether or not there was a financial

126
5B23PARH                    Kohlmann - cross

1    relationship --
2    A.   I have no idea.
3              THE COURT:   Mr. Wilford, it's 15 after one.  I think
4    it's an appropriate time.  I don't want to interrupt you.
5              MR. WILFORD:   That's fine, Judge.
6              THE COURT:   Let's meet back at 2:20.
7              MR. WILFORD:   Thank you.
8              THE COURT:   Do you have an estimate, sir, as to how
9    long you will be?
10             MR. WILFORD:   We're moving kind of rapidly, Judge, so
11   I would say another half an hour or so.  Maybe a little longer.
12             THE COURT:   Fine.  Please be seated gentlemen.
13   Mr. Metzner, are there other areas that this witness is going
14   to testify about that is within my ruling?  I was permitting
15   him to testify on the use of cells and the use of individuals
16   to provide logistical support.  Was there going to be separate
17   testimony on that or you are not going to have him testify on
18   that?
19             MR. BRUCE:   No.
20             THE COURT:   I'm sorry.  Mr. Bruce.
21             MR. BRUCE:   We were going have him testify about that,
22   your Honor.  Definitely.  I think his qualifications and the
23   research he's done about the history of al Qaeda would go to
24   that.
25             THE COURT:   His expert opinions, am I correct, you

5b23parh.txt

5B23PARH                    Kohlmann - cross

1   just adduced an expert opinion in regard to Ammar al-Baluchi,

2   Majid Khan and Khalid Sheikh Mohammed as to their roles.

3           MR. BRUCE:  During this hearing.

4           THE COURT:  Yes.

5           MR. BRUCE:  Yes, I think your Honor asked first about

6   Ammar al-Baluchi as to what the witness's expert opinion was.

7   Since you seemed interested in that, I asked very briefly about

8   his opinion regarding Majid Khan and Khalid Sheikh Mohammed.

9           THE COURT:  What I am trying to find out is what his

10  expert opinions are going to be.  Then I can try to evaluate

11  whether or not he is an appropriate expert to render those

12  opinions.

13          MR. BRUCE:  Certainly.  I think he did give them.

14          THE COURT:  That's what I was asking.

15          MR. BRUCE:  Yes.

16          THE COURT:  Thank you.

17          (Luncheon recess taken)

18          (In open court)

19          THE COURT:  Everyone's present.  Proceed, Mr. Wilford.

20  BY MR. WILFORD:

21  Q.  Now, I believe we were talking about your methodology that

22  you used during the course of your book and also some of the

23  reports or informal exchanges that you've given to law

24  enforcement.

25          Now, in 20002, when you were discussing what you did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

128
5B23PARH                    Kohlmann - cross

Page 117

5b23parh.txt

1   in London, you actually interviewed people that you've

2   classified as terrorists; is that correct?

3   A.   I've interviewed people that have either -- either are I

4   believe fairly classified as militants, have either been

5   indicted as alleged terrorists, or in some cases are even

6   specially designated terrorists.

7   Q.   And when you were talking about the methodology that you

8   use, you say you used independent documents on direct

9   examination?

10  A.   You're going to have to refresh my memory.   Independent

11  documents with regards to what?

12  Q.   You were asked specifically by Mr. Bruce what methodology

13  that you used in respect to this case.   This particular case.

14  A.   Okay.

15  Q.   You indicated that you used independent documents.

16  A.   Oh, okay.   Yeah, yeah.

17  Q.   What independent documents did you use?

18  A.   I used the 9/11 Commission report; I used material that I

19  had obtained from Azzam Publications in London; I used

20  documents such as James Comey's summary of the Jose Padilla

21  case that was released through the DOJ Pentagon; I also relied

22  on other open source documents like I think I quoted a few or I

23  cited a few news report in there.

24  Q.   When you say you cross checked everything --

25  A.   Yeah.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

129

5B23PARH                    Kohlmann - cross

1   Q.   What did you use to cross check the information that was

2   contain in the report from James Comey -- or there was no

3   report actually, it was an affidavit.

Page 118

5b23parh.txt

4    A.   Yeah, excuse me, it was an affidavit.

5         You're asking what I did to confirm that?

6    Q.   Yes.   Cross check it.   You said you cross checked

7    everything.   What did you do to cross check the information in

8    that particular affidavit?

9    A.   Well, there's quite a bit of information out there about

10   Jose Padilla.   There's information referenced in the 9/11

11   Commission report.

12        Are you asking how I confirmed the information with

13   regards to Jose Padilla and Ammar al-Baluchi?

14   Q.   No, I'm asking you how you cross checked the information

15   contained in the James Comey report.

16   A.   I cross checked it with information that had been published

17   in the 9/11 Commission report, and I cross checked it with

18   information that had been published in open source documents I

19   believe.   I can't recall off the top of my head.   I'm sorry.

20   Q.   You don't know what open source document you used as part

21   of your methodology for cross checking?

22   A.   I have to go through all my notes.   I used the James Comey

23   document, and then I compared that with open source reporting

24   from the 9/11 Commission report and other documents.   I'd have

25   to take a look at my footnotes to take a look specifically.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

130

5B23PARH                    Kohlmann - cross

1    Q.   We're talking about the report that you prepared for this

2    case.

3    A.   That's correct, yeah.

4    Q.   Okay.   I want to come back to that in a moment.   I want to

5    take a look at Exhibit 3.

Page 119

5b23parh.txt

6    A.   Wait, let me check on that.  Yeah, I have it.

7    Q.   Have you Exhibit Number 3?  That's a Journal of

8    International Securities Affairs.  Who publishes that?

9    A.   It's published by the Jewish Institute for National

10   Security Affairs.  JINSA.

11   Q.   Who funds that organization?

12   A.   I believe it's a 501 (c)(3).  In fact I know it is.  It's a

13   tax except organization under Section 501 (c)(3), but I mean I

14   don't collect donations so I don't know.

15   Q.   Did you receive a fee for your report appearing in it?

16   A.   I think like $200.

17   Q.   You got a modest honorarium?

18   A.   Yeah.  It was more for the time I spent in editing and

19   whatnot.  It wasn't really profit.

20   Q.   You footnoted the materials that you relied upon; is that

21   correct?

22   A.   You mean in this?

23   Q.   Yeah.

24   A.   I believe so, but I can tell you for sure right now.

25        Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

131

5B23PARH                    Kohlmann - cross

1    Q.   And the materials that you used for footnote number three,

2    that was the bill of particulars from United States of America

3    v. Enaam M. Arnaout?

4    A.   Arnaout, yes.

5    Q.   That's a bill of particulars that was prepared by the

6    United States government; is that correct?

7    A.   That's correct.

8    Q.   And in footnote four, you use the government's evidentiary

5b23parh.txt

9    proffer supporting the admissibility of coconspirator

10   statements; is that correct?

11   A.   That's correct.

12   Q.   That was prepared by the United States attorney's office;

13   is that correct?

14   A.   That's correct.

15   Q.   And in footnote five, you use the government's response to

16   the defendant's position paper as to sentencing factors,

17   another document prepared by the government; is that correct?

18   A.   That's correct.

19   Q.   And in footnote 10, you use the affidavit of Special Agent

20   David Kane in United States of America v. Soliman S. Biheiri;

21   is that correct?

22   A.   That's correct.

23   Q.   That was a document prepared by an agent of the FBI?

24   A.   No.   Actually it was a document prepared by an agent of the

25   Bureau of Immigrations and Customs Enforcement, but it's a

132

5B23PARH                  Kohlmann - cross

1    public affidavit.

2    Q.   That's also a United States government employee?

3    A.   Yeah, yeah.

4    Q.   That's the basis of your research?

5    A.   Well --

6    Q.   One of the bases of your research?

7    A.   Those are I think three footnotes just quoted and there's

8    15 of them.

9    Q.   That's four.

10   A.   Okay, four.

5b23parh.txt

11   Q.   And footnote 15?

12   A.   Yeah.

13   Q.   You use an Internet site?

14   A.   Actually, no I use the report from NATO.  That's the

15   official NATO Web site.  I mean that's --

16   Q.   That's a Web site?

17   A.   Well, that's a press release put out by NATO.  I could get

18   a paper copy of it but I included the URL.

19   Q.   The Web site.  You went to a Web site to get the

20   information?

21   A.   I don't know where I got it, but you --

22   Q.   You don't know whether or not you used a paper document or

23   the Web site in the preparation of this article?

24   A.   Honestly, there is a Web site there where you can access

25   that document, but I can't tell you for sure whether I had the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              133
    5B23PARH                    Kohlmann - cross

1    paper or whether I accessed it through the Web site.

2    Q.   With respect to the bill of particulars that we discussed

3    earlier, did you in fact cross check information contained in

4    the bill of particulars?

5    A.   Yes, I did.

6    Q.   What did you use for your cross check?

7    A.   I used the cross check, the book provided to me by Adel

8    Batterjee from Saudi Arabia which was printed by an

9    organization that was run by the defendant in this case, Enaam

10   Arnaout.  I also used numerous other documents that had been

11   seized from Bosnia Herzegovina which are known as the Tareekh

12   al-Musadat or the Tareekh Osama file.  These documents provide

13   the initial background and filing with regards to the formation

                            Page 122

5b23parh.txt

14    and history of al Qaeda as established in the 1980s in

15    Afghanistan, and included the opening minutes of the al Qaeda

16    organization, including the context of discussion between

17    senior al Qaeda leaders.  They included actual commands issued

18    by Osama bin Laden and the head of al Qaeda's military wing to

19    other al Qaeda operatives.  They also included references, many

20    references to the defendant in that case, Enaam Arnaout.

21    Q.  Where is that information footnoted or referenced in your

22    material in this article?

23    A.  If I use something for general context, if I use something

24    to verify something else, I don't necessarily footnote it.  I

25    footnote the best available source that has the most

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                134
        5B23PARH                Kohlmann - cross

1     information.  These briefs I felt provided very good

2     background.  The briefs themselves are discussing pieces of

3     evidence or actually exhibits submitted in the case.

4     Q.  When you say briefs, what are you referring to?

5     A.  I'm referring to here the briefs you just brought up here,

6     the bill of particulars.

7     Q.  The bill of particulars?

8     A.  The government's evidentiary proffer and the government's

9     response.  They contain references to pieces of actual physical

10    evidence that were submitted in that trial.  Evidence that was

11    never contested by the defendant, as far as I know.  And those

12    pieces of evidence are directly relevant because they are bills

13    of sale, they are copies of communications, they also contained

14    bits of information that was taken from the headquarters of

15    Benevolence International Foundation in Illinois.  It was

                          Page 123

5b23parh.txt

16  seized out of their trash.  It is the kind of thing where it's

17  physical evidence.  I felt justified in making references to

18  it.

19  Q.  When you were just a moment ago saying as far as you know

20  they were never contested by the defendant, what's the basis of

21  that?

22  A.  The defendant pled guilty.

23  Q.  Okay.  Besides the fact that he pled guilty, do you know

24  whether or not he filed a motion, whether or not there was any

25  litigation about it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

135

5B23PARH                    Kohlmann - cross

1   A.  The defendant may have challenged the basis of which the

2   exhibits were seized, but I don't believe he ever challenged

3   the authenticity.  I didn't work as a consultant in the case,

4   but as far as I know he never challenged the authenticity of

5   those documents.

6   Q.  Did you compare the defendant's response to the

7   government's response in making your determination as to the

8   reliability of this --

9   A.  I compared all documents.  But from the most relevant

10  document I had, including the book that was provided to me by

11  Adel Batterjee in Saudi Arabia, that directly had references to

12  the defendant and had references which did not match what the

13  defendant was saying, and this document was an original

14  document taken directly from Saudi Arabia and printed in 1991,

15  I felt that the defendant was not necessarily evincing the

16  complete truth in balancing together the government's account

17  with other documents, such as the Adel Batterjee book, with the

18  defendant's response papers.  Plus with press releases put out

Page 124

5b23parh.txt

19      by defense counsel in that case and by the defendant Enaam

20      Arnaout.  In the end I came -- I reached certain conclusions.

21      Q.  I'm sorry.  Maybe I misspoke.  So you understand my

22      question, my question was not the conclusion you came to, but

23      in coming to your conclusion in your methodology that you

24      adopted, did you review the defense papers that relate to the

25      government papers that you have footnoted in this article?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

136

5B23PARH                    Kohlmann - cross

1       A.  I don't know if I reviewed every single one, but I did

2       review documents they submitted, including press releases they

3       submitted.

4       Q.  What documents that they filed in court related to these

5       issues in footnote three, four, and five did you review that

6       were filed by the defendant?

7       A.  I believe I reviewed the defendant's position paper as to

8       sentencing factors.

9       Q.  But not anything to do with the admissibility of

10      coconspirator statements or with the defendant's request for a

11      bill of particulars; is that correct?

12      A.  I honestly don't know.  I can't recall.  It's possible I

13      did.  I did work on this case now two years ago.  I can't tell

14      you every single document I relied on.

15      Q.  Let's move along.  I believe you testified that the FSBI --

16      is that it?

17      A.  FBIS, Foreign Broadcast Information Service.

18      Q.  That information is provided by the United States

19      government; is that correct?

20      A.  Well, it's translations, but the original information does

Page 125

5b23parh.txt

21    not come from the U.S. government, no.

22    Q.   Well, who hires the translators?

23    A.   Translator -- the translations are being done by U.S.

24    government agency.   They are being done by the U.S. government

25    translator.   The original material they are studying are not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137

5B23PARH                    Kohlmann - cross

1     U.S. government documents.

2     Q.   What agency supplies FBIS?

3     A.   The FBIS works as the open source arm of the Central

4     Intelligence Agency.

5     Q.   This is a Central Intelligence Agency site and the

6     information that's being provided by the Central Intelligence

7     Agency?

8     A.   No.   The information is being provided by different media

9     outlets worldwide.   It's translations.   All they are doing is

10    translating.   They don't add any analysis or -- they are just

11    taking original documents, translating them, and then making

12    them available in English.

13    Q.   Would you agree, Mr. Kohlmann, however, that the CIA

14    determines what information is going on that Web site and the

15    CIA alone makes that determination and no one else?

16    A.   I have to assume so.   It's part of the CIA.

17    Q.   They control what's on that Web site, right?

18    A.   I guess so.   I am not really in a position to know, though

19    I know what's on the Web site, I can't tell who makes the

20    decision about what goes on there.

21    Q.   When you were testifying, I believe that you attempted to

22    make a distinction on direct examination, you attempted to make

23    a distinction between your particular field and social science;

Page 126

5b23parh.txt

24    is that correct?

25    A.   I said it was a variation of a traditional social science,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

138

5B23PARH                    Kohlmann - cross

1     yeah.

2     Q.   So you called it something -- I believe microhistory?

3     A.   That's actually a term that a colleague of mine gave it.

4     It's studying microhistories, yeah.

5     Q.   Which colleague was that?

6     A.   Marko Attilla Hoare.

7     Q.   Even though you call it microhistory, the bottom line is,

8     it's still a social science; isn't that correct?

9     A.   Yeah, yeah, sure.

10    Q.   Now, as a social science, social scientists have for years

11    developed certain methodologies which have been accepted in

12    courts; isn't that correct?

13    A.   I guess so.  I don't really understand -- I don't really

14    have a basis to talk about what other people's methods are.  I

15    can speak to what my own methods are.

16    Q.   Have you ever heard of the qualitative approach?

17    A.   No.

18    Q.   Have you ever heard of ethnography?

19    A.   Yeah.

20    Q.   What's that?

21    A.   That's the study of ethnicities and how they influence

22    political and geographic development -- geopolitical

23    development, excuse me.

24    Q.   Doesn't that involve observations of the participants?

25    A.   Oh, yes.

Page 127

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

139

5B23PARH                    Kohlmann - cross

1   Q.   And when you were undertaking your course of study at
2   Georgetown University, did you undertake any study with respect
3   to methodology utilized by social scientists to make their
4   findings reliable?
5   A.   Yeah.   In order to write my undergraduate honors thesis, it
6   was actually a year-long course.   That's how it appeared on my
7   resume or my transcript.   The first half of the course, the
8   first semester, the entire purpose of the first semester was
9   for the five of us who were writing theses to get together with
10  a senior member of Georgetown University's political science
11  faculty and for him to go through with us research techniques,
12  writing techniques, how a thesis is laid out, what qualitative
13  research is.   But you know, it's -- it depends on the subject
14  matter you are doing what particular methods you use.   It
15  happens that the microhistories study, because it's modern
16  history, it uses similar techniques I guess to historians, but
17  there's twists on them.
18  Q.   You just -- correct me if I'm wrong.   I asked if you ever
19  heard of the qualitative approach, and you said no.   Now you
20  just said that you learned the qualitative research method as
21  part of your study for your thesis; is that correct?
22  A.   It was never introduced to me as the qualitative approach,
23  being labeled.   I was instructed how to conduct qualitative
24  research, how to conduct research that was based on authentic
25  and reliable sources, how to dismiss sources that were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

140

5b23parh.txt
5B23PARH                    Kohlmann - cross

1    non-authentic, non-reliable propaganda.
2    Q.   And you make the determination as to what's propaganda and
3    what's not, right?
4    A.   It's not just me.  I would say that my opinion is based
5    upon the thoughts my colleagues as well.  Everything -- again,
6    everything comes back to peer review.  I'll offer my own
7    concept, I'll discuss this with my colleagues, I'll see what
8    they think.  If everything matches up, if I seem like I'm right
9    on, then you know, then that's my opinion.  If I feel like
10   there's still room for doubt, or if there's, you know, there's
11   need for me to do further research, then I'll do further
12   research.  There are some things that are easier to come to a
13   consensus on than others.
14   Q.   Did you, with respect to your preparation of your expert
15   testimony report in this case, did you review the unclassified
16   statements of Saifullah Paracha?
17   A.   I reviewed -- no, I don't believe I did.
18   Q.   Did you, sir, in the preparation of your expert report in
19   this case, review Exhibit 4 and 5?
20   A.   Yes, I did.
21   Q.   What else did you review?
22   A.   In addition I reviewed a 302 interview and a summary of the
23   interview conducted by agents of the Federal Bureau of
24   Investigation, with two relatives of Majid Khan, one his
25   father, and I believe his name is Khan Shaukat Ali, and Majid

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

141
5B23PARH                    Kohlmann - cross

1    Khan's brother.

5b23parh.txt

2          MR. WILFORD:  May I have a moment, your Honor?

3          THE COURT:  Yes.

4          MR. WILFORD:  Your Honor, I have a request that the

5    government turn over to counsel the two documents that are

6    being referred to as a basis for our examination of his

7    methodology used in preparation of his expert report and his

8    ability to testify as an expert in this matter.

9          MR. BRUCE:  There's no basis under Rule 16 for that

10   kind of discovery, your Honor.  The underlying basis for an

11   expert's opinion are not provided for in discovery under Rule

12   16 or any of the Federal Rules of Evidence.

13         THE COURT:  I think that's right, Mr. Wilford.

14         MR. WILFORD:  Your Honor, I think it puts us in an

15   untenuous position in terms of establishing methodology.  The

16   witness is coming in and testifying he's developed an expert

17   report based upon certain information.

18         THE COURT:  This has to do, sir, this is one of the

19   things you used for as the basis for your opinion as to the

20   role of Majid Khan; is that correct?

21         THE WITNESS:  I used it to develop my opinion, but my

22   actual expert witness report was based primarily on the

23   summaries, the unclassified summaries.

24         THE COURT:  That's not what I am asking you.  The FBI

25   interviews with the Majid Khan family members, you used that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

142

5B23PARH                Kohlmann - cross

1    for purposes of developing your opinion as to the role that

2    Majid Khan played in al Qaeda, that is, that he was originally

3    a foot soldier and then a fixer; is that correct?

4          THE WITNESS:  Yes.

5b23parh.txt

5          THE COURT:  Go ahead, sir.  I think Mr. Bruce is

6     correct, that you're normally not entitled to discovery of the

7     sources of the basis of an expert's opinion, expert's opinion.

8          MR. WILFORD:  Your Honor, this is information that the

9     government has in their possession.  I understand we are not

10    normally entitled to it.  By the same token, he is making his

11    methodology a subject of this particular examination.

12         THE COURT:  I'm denying the request.  I understand.

13    You're totally free to inquire into the methodology and explain

14    that's part of the methodology.  You are not entitled to have

15    as discovery, unless I am mistaken -- you can submit anything

16    you'd like to me on that -- you are not entitled to have it as

17    discovery all of the bases for the expert's report.

18         MR. WILFORD:  Your Honor, just so we're clear on this

19    point, I am not looking for all the bases.

20         THE COURT:  You are asking for this basis.

21         MR. WILFORD:  Specifically why in relation to the

22    expert report he prepared in this case, which goes to

23    methodology he employed, we are talking about his expert

24    opinion that's been formulated on certain materials the

25    government --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

143

5B23PARH                    Kohlmann - cross

1          THE COURT:  Specifically the reference to Majid Khan's

2     role.

3          MR. WILFORD:  The government is giving us a portion of

4     those materials and not others.

5          MR. BRUCE:  But there's a reason why.  The

6     unclassified summaries were produced as Brady material.  As

Page 131

5b23parh.txt

7    we've discussed in great detail, they were not produced as part

8    of this exercise.

9         THE COURT:  Let's proceed.

10   BY MR. WILFORD:

11   Q.  In your expert report -- excuse me.

12         (Pause)

13   Q.  In your expert report when you concluded or arrived at your

14   opinion, you utilized those two documents from the FBI; is that

15   what you just mentioned related --

16   A.  Not my expert report.  I used them in forming my opinion.

17   In order to write my initial report, which is written before I

18   saw those documents, I used these documents.

19         MR. WILFORD:  So, he's referring to 4 and 5, your

20   Honor.

21         THE WITNESS:  That's correct.

22   Q.  When you then were shown these documents, that was after

23   your report was prepared?

24   A.  It was after the initial draft was prepared, yeah.

25   Q.  And when your report that you submitted to the government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

144

5B23PARH                    Kohlmann - cross

1    or was it a draft when you --

2    A.  It was -- I believe the report I submitted to the

3    government, I had to file the report several weeks ago, so this

4    I believe I got the other two documents after I was done with

5    the report.

6    Q.  So you were shown these FBI documents subsequent to the

7    preparation of your report?

8    A.  I believe so, yeah.

9    Q.  And your report encompassed your opinion; is that accurate?

Page 132

5b23parh.txt

10   A.   My analysis and opinion, yeah, sure.

11   Q.   And did you arrive at an opinion with respect to Majid

12   Khan's role in your report?

13   A.   Yes, I did.

14   Q.   That was prior to seeing these other two documents?

15   A.   Well, yeah.  I already had the unclassified summaries.  The

16   other documents merely buttressed what I had already derived

17   from this document.

18        That's -- excuse me, that's Exhibit 5, your Honor.

19   Q.   Let's talk about the unclassified documents for a moment.

20   Do you know the source of those documents?

21        THE COURT:  4 and 5.

22        MR. WILFORD:  Yes, 4 and 5.

23   A.   The U.S. government?

24   Q.   Do you know where they came from?

25   A.   Not any more specific than that, no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

145

5B23PARH                    Kohlmann - cross

1   Q.   Do you know the circumstances under which those purported

2   statements were taken?

3   A.   You're talking specifically with Exhibits 4 and 5 now.

4   Q.   4 and 5.

5   A.   No.

6   Q.   And you contrast that with the 302 and the other documents

7   that related to Majid Khan's family interviews; do you know how

8   those were taken?

9   A.   Yeah, sure.

10   Q.   And --

11   A.   Well, with one document, yes; the other document, there are

Page 133

5b23parh.txt

12   some details I don't know the full details.

13   Q.   Okay.   With respect to the document that you do know the

14   details, how was it derived?

15   A.   It was done through an interview with an FBI agent, of an

16   individual I believe in Maryland.

17   Q.   With respect to the document you said you are not sure

18   about?

19   A.   It was an interview, but I don't know where it was

20   conducted.   It was an FBI interview with an FBI translator, but

21   there was no location marked on the document.

22   Q.   When you prepared your report, your expert report for the

23   government, did you have any information as to where Ammar

24   al-Baluchi is at this point?

25   A.   Yeah.   I'm on the -- I mean, where geographically or in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

146

5B23PARH                    Kohlmann - cross

1   whose custody is he in?

2   Q.   In whose custody is he in.

3             MR. BRUCE:   Objection, your Honor.

4             THE COURT:   Just a moment.   Mr. Wilford, the

5   government's taking the position it can't confirm or deny.

6             MR. WILFORD:   That's the government's position.   But

7   their expert is not the government.

8             THE COURT:   All right.

9             MR. BRUCE:   In this context, your Honor, I'd rather

10   not have the government's expert try to opine on such a thing.

11   I mean, I don't see what relevance it has, and it's coming

12   dangerously close to getting --

13             THE COURT:   Yes, I think that's right.   What is the

14   relevance of that, sir?

Page 134

5b23parh.txt

15            MR. WILFORD:  The relevance, your Honor, goes to his

16   position.  He staked out a position with respect to his

17   expertise based on information contained in this documents that

18   he has.

19            THE COURT:  He said that this was given to him by the

20   government.

21            MR. WILFORD:  Right.  Part of his factoring in his

22   opinion would indeed be based upon where, his opinion as to

23   where or his knowledge as to where this particular individual

24   is at the time that these statements were made, Judge.

25            THE COURT:  I wouldn't frame it that way, no.  I

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                              147
     5B23PARH                    Kohlmann - cross

1    disagree that.

2            Go ahead.  Next question.

3    Q.   With respect to --

4            THE COURT:  There is no relevance to where he is.  Go

5    ahead.

6            MR. WILFORD:  He said he didn't know where they were,

7    but he did know whose custody they were in, and that's the

8    question I asked, Judge.

9            THE COURT:  I'll sustain the objection, given that

10   it's the government's expert.  But he would be testifying to

11   something that is not coming from the government, presumably,

12   and therefore it may look as if because he is the government

13   expert, the government's weight is behind his conclusion.  And

14   given the government position that they're not confirming or

15   denying where he is, I am going to sustain the objection.

16           Next question.

                              Page 135

5b23parh.txt

17          MR. WILFORD:  Your Honor, if I may with respect to

18   that issue.  Even though the government is not confirming or

19   denying, the basis upon which his ability to analyze that

20   statement goes to reliability of methodology that he used in

21   arriving at his expert opinion.  In order to question the

22   reliability, some of the factors -- at least one of the factors

23   that go into that is how and which manner -- the circumstances

24   under which this particular statement --

25          THE COURT:  Why don't you ask him whether he knows if

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

148

5B23PARH                    Kohlmann - cross

1    those were done on adversarial questioning or whether it was an

2    interview with a newsman.  I mean, that type of thing you can

3    ask.

4           MR. WILFORD:  Well, am I going to be allowed to ask

5    him was it a government entity that did this?  Because if he

6    says they are in custody, and that's his expert opinion, that's

7    not the government's confirming or denying.  That's what he's

8    basing his opinion on.

9           THE COURT:  Is the issue of custody something that the

10   government is not going to confirm or deny?  I thought the

11   issue was that the government can't confirm or deny where he

12   is.

13          MR. METZNER:  Both, your Honor.

14          THE COURT:  All right.  Proceed Mr. Wilford.  I'm

15   sustaining the objection.

16          MR. WILFORD:  Okay.

17   Q.  With respect to Khalid Sheikh Mohammed, same question.

18          MR. BRUCE:  Same objection.

19          THE COURT:  Same ruling.
                    Page 136

5b23parh.txt

20   Q.   And with respect to Majid Khan?

21             MR. BRUCE:   Same objection.

22             THE COURT:   Same ruling.

23             MR. WILFORD:   Thank you.

24   Q.   Now, with respect to your report, you indicated that Ammar

25   al-Baluchi was a financier; is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

149

5B23PARH                    Kohlmann - cross

1    A.   That was one of his missions, yes.

2    Q.   You indicated that Khalid Sheikh Mohammed was a major

3    player of operations; is that correct?

4    A.   He was a primary, if not the primary, operational planner

5    on behalf of al Qaeda.

6    Q.   With respect to Majid Khan, you indicated he was a fixer, a

7    foot soldier, and an operator; is that correct, an operative?

8    A.   Yeah.   He was someone who had started as a lower level guy

9    and he, because of the attrition following 9/11 in terms of the

10   senior leadership of al Qaeda, he was promoted to a more

11   important role than he otherwise might have gotten.

12   Q.   When you made this determination, you used methodology; is

13   that correct?

14   A.   Yeah, sure.

15   Q.   And I believe you testified that your methodology was open

16   source database information and declassified information; is

17   that correct?

18   A.   It's any open source information, anything that's not

19   classified that's in the open sphere, that's reliable.

20   Q.   In making your determination as to whether or not either of

21   these three individuals were in the custody of the United

Page 137

5b23parh.txt

22    States, you used this same informational sources to arrive at

23    that conclusion, whatever it may be?

24    A.  I mean, I can only hazard a guess as to whose custody

25    they're in.  I wasn't there when they were arrested.  I don't

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

150

5B23PARH                    Kohlmann - cross

1     know who's holding them.  I don't know who conducted

2     interrogations.  I don't know.  I mean, I wasn't there.

3     Q.  Now, you testified that you were proffered as an expert on

4     about six different occasions; is that correct?

5     A.  Roughly, yeah.

6     Q.  And in only one of those occasions did you testify?

7     A.  Actually, no.  In three of those occasions I testified.

8     Q.  Three occasions you testified?

9     A.  Yes.

10    Q.  At trial?

11    A.  Yes.

12    Q.  You were qualified as an expert and testified at trial?

13    A.  Yes.

14    Q.  Those three occasions were all before the same judge; isn't

15    that correct?

16    A.  No.

17    Q.  Which were they?

18    A.  Two were before Judge Leonie Brinkema, and the third was

19    before a three judge panel in the Supreme Court of Bosnia

20    Herzegovina.

21    Q.  I was trying to narrow it down to cases where you testified

22    in criminal proceedings in the United States.  That was two

23    times?

24    A.  I testified as an expert witness, yes.

Page 138

5b23parh.txt

25      Q.   You testified as a fact witness.  We are not talking about

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              151
        5B23PARH               Kohlmann - cross

1    that.  We are talking as an expert witness?

2    A.   That's correct.

3    Q.   Those two times were both in front of Judge Brinkema?

4    A.   Judge Leonie Brinkema, correct.

5                THE COURT:  Is that al Timimi and Behkhala?

6                THE WITNESS:  Yes, your Honor.

7    Q.   Isn't it a fact that both of those cases involved

8    situations where people were involved in the training camps and

9    visiting training camps and recruited people overseas?

10   A.   Yes, they were.

11   Q.   And they were actually training camps that were located

12   either in Pakistan or Afghanistan; isn't that correct?

13   A.   No.  There were also allegations that a number of the

14   individuals involved in the group had also conducted jihad

15   training or attempted jihad training here inside the United

16   States.

17   Q.   These training camps were materials or withdrawn.

18                You had information about these training camps, is

19   that correct, from your various Internet excursions?

20   A.   Are you talking about al Qaeda training camps in

21   Afghanistan?

22   Q.   I am talking about the training camps you testified to as

23   an expert.

24   A.   The ones I was talking about in that case.

25   Q.   Which case are you referring to?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 139

5b23parh.txt
(212) 805-0300

5B23PARH                    Kohlmann - cross

1    A.   You are talking about now in the Sabri Benkhala case and

2    the Ali al Timimi case.   The al Qaeda camps I discussed are the

3    ones that have been referenced in original materials taken from

4    al Qaeda.   Al Qaeda's opening minutes, Tareekh Osama file, the

5    early history, the book by Adel Batterjee which is again a 300

6    page ode to the beginning of al Qaeda, personal accounts by

7    Osama bin Laden, by others.

8    Q.   Keep going.

9    A.   I also used other documents in formulating my opinion,

10   including transcripts from the trial of Osama bin Laden et al

11   here in New York.   I also used documents seized elsewhere,

12   including groups like Lashkar E Tayiba, being the army of the

13   pure, which offered extensive information in its own

14   documentation, its own reporting about the various camps that

15   it uses, the kind of training that is conducted there.

16   Additionally, I have managed to purchase videotapes depicting

17   al Qaeda training camps, namely the al Farouq camp where a

18   number of the 9/11 hijackers were trained.

19   Q.   All of that information you just related to the Court deals

20   with training camps, right?

21   A.   Yeah.   I actually just missed one source.   I also relied on

22   the testimony of al Qaeda operatives who had gone to these

23   training camps and saw training there.   One of the more

24   important testimonies was that of Ahmed Ressam, an Algerian who

25   had allegedly attended Derunta and Kahlden camps.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - cross

5b23parh.txt

1    Q.   And this information also in both of those trials were

2    relating to same subject matter; is that correct?

3    A.   You mean the two --

4    Q.   The two --

5    A.   You're talking about the Timimi case and Sabri Benkhala

6    case now?

7    Q.   Yes.

8    A.   They were generally related to the same issue, but the

9    charges were different I believe.

10   Q.   It was Lashkar E Tayiba?

11   A.   No.   The issues in this case, that I was testifying as an

12   expert on anyway, were al Qaeda, the Taliban, Lashkar E Tayiba,

13   history, ideology, leadership, structure, and then

14   additionally, the link between those three organizations, and

15   training camps used by these three organizations in

16   Afghanistan.

17   Q.   And the relationship between those organizations and the

18   training camps in Afghanistan?

19   A.   That's correct, yes.

20   Q.   Now, in this case, there's nothing to do with training

21   camps; is that correct?

22   A.   Nothing to do with training camps --

23   Q.   You haven't been presented with any information --

24   A.   Actually, no.   In my expert witness report --

25   Q.   I am not asking you about your expert witness report.   I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

154

5B23PARH                    Kohlmann - cross

1    was asking you about whether or not you were presented with any

2    information related to training camps in this instance?

Page 141

5b23parh.txt

3    A.   Yes, I was.

4    Q.   What information was that?

5    A.   There were references in I believe both FBI summary

6    interviews of relatives in Majid Khan to seeking training, to

7    missions to seek training, and the people to go to -- to get to

8    training cramps.

9    Q.   Excuse me, Mr. Kohlmann.  Didn't you indicate that your

10   report was prepared prior to your receiving those documents?

11   A.   Yes, I'm sorry.  I wasn't certain you were referring to

12   only what was in my expert witness report.

13   Q.   Just so we're clear, the report you prepared, your expert

14   testimony report in this case, you were not presented with any

15   information about training camps in the preparation of that

16   report; isn't that correct?

17   A.   I don't -- I guess other than those documents, probably

18   not.

19   Q.   Well, when you say other than those documents, did you have

20   those documents when --

21   A.   No.  They were provided to me for purposes of my expert

22   opinion, but not the expert witness report.

23   Q.   They were provided to you later on?

24   A.   After I was finished with my expert witness report, yeah.

25   Q.   So they definitely had nothing to do with your report?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                            155
     5B23PARH              Kohlmann - cross

1              MR. BRUCE:  Objection to form.

2              THE COURT:  I'll allow it.

3    A.   I guess.

4    Q.   Now, when you --

5              MR. WILFORD:  I just need one moment, Judge.
                            Page 142

5b23parh.txt

```
 6              (Pause)
 7              MR. WILFORD:  Your Honor, may I approach the witness?
 8              THE COURT:  Yes.
 9    Q.  I'd like to have this exhibit shown to the witness as
10    3501-B.
11              Do you recognize that document, sir
12    A.  Yes, I do.
13    Q.  What do you recognize it as?
14    A.  This is a copy of my expert witness report in this case.
15    Q.  And you prepared that report?
16    A.  Yeah.
17    Q.  Personally?
18    A.  Yes, yes.
19              MR. WILFORD:  Do you have any objection to it for
20    purpose of the hearing?
21              MR. BRUCE:  No, your Honor.
22              MR. WILFORD:  I was moving it -- I was asking the
23    government if they had any objection for purpose of the
24    hearing.
25              THE COURT:  I'll take it for purposes of the hearing,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

156

5B23PARH                    Kohlmann - cross

```
 1    sure.  Certainly it's identical to what was attached to your
 2    letter of September 20.
 3              MR. BRUCE:  That's correct, your Honor.
 4              THE COURT:  Fine.
 5              (Defendant's Exhibit 3501-B received in evidence)
 6    Q.  On the third page if you could be so kind as to turn to
 7    that page.  This is a series of photographs on that page.
```

Page 143

5b23parh.txt

8    A.   Yes.   Yeah -- I'm -- I believe, yeah.

9    Q.   Okay.   You have several citations on that page related to

10   information concerning al-Baluchi; is that correct?

11   A.   Yes, I do.

12   Q.   All those citations are to the 9/11 report; is that

13   correct?

14   A.   That's correct.

15   Q.   There are no other sources whatsoever cited by you as a

16   basis for that information?

17   A.   The other -- that information was reported elsewhere, but

18   the most reliable source and I believe the original source for

19   the information was the 9/11 Commission report, and the

20   original sources that they based their report on.

21   Q.   Mr. Kohlmann?

22   A.   Yeah.

23   Q.   Could you just try to answer the question I asked you.

24   Okay.   The question was did you cite anything else besides the

25   9/11 Commission report as the basis for your opinion?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

157

5B23PARH                    Kohlmann - cross

1    A.   Like I said, there were other sources that had this

2    information, but I felt upon judging this, the 9/11 Commission

3    report was the most reliable and the most authentic document

4    reporting them.   That's why I cite them.

5         So yes, that's the only cite I have for this

6    particular paragraph or two paragraphs.

7    Q.   And by that, you mean to say that there are sources that

8    appear on your open source databases that are unreliable?

9    A.   No.   That -- I wouldn't put 100 percent stock in them.

10   There are things -- there are newspaper reports that come out

Page 144

5b23parh.txt

11    from, like Asharkelsa, which is a Middle Eastern journal in

12    London.   Some of the information is very vague because it

13    contains admissions from people that have no reason to make

14    those admissions, in which case you are quoting them.   But

15    there are other publications that make outlandish allegations

16    that simply cannot be proven by fact and are not reliable

17    enough to be considered to be evidence to be submitted in an

18    expert report.

19    Q.   On the next page, the source material that you cite for the

20    first four full paragraph, is all material prepared by the

21    Department of Justice; isn't that correct?

22    A.   Yeah, but I also had other legal briefs that were submitted

23    in that case.   I don't know the titles of the briefs off the

24    top of my head, but there were at least two other briefs

25    submitted in that case that offered additional information that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

158

5B23PARH                    Kohlmann - cross

1     buttressed the document by James Comey.

2     Q.   Were those briefs by the government or some government

3     entity?

4     A.   I can't recall off the top of my head.   I think one of them

5     may have been from the defense though.

6     Q.   Which one was that?

7     A.   I can't recall off the top of my head.   They are not cited

8     in here.   In the end I decided that the document that provided

9     the most reliable information, the most comprehensive, was the

10    document provided by James Comey.   I think it summarized other

11    documents well, other admissions well.   That's what I have

12    cited here.

Page 145

5b23parh.txt

13  Q.  When you say the document provided by James Comey, isn't it

14  a Department of Defense report that was prepared and given to

15  James Comey in his capacity as the number two man at the

16  Department of Justice?

17  A.  That's correct.

18  Q.  Those all relate to Jose Padilla?

19  A.  That's correct.

20  Q.  Now, turning to the next page, statement, I'm sorry,

21  footnotes 26 and 27.  Those both come from government-prepared

22  documents in cases that were pending in the Eastern District of

23  Virginia; isn't that correct?

24  A.  Actually, not pending at the time that these documents were

25  issued.  The case had already been settled.  This was the plea

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

159

5B23PARH                    Kohlmann - cross

1   agreement and the statement of facts.  This was at the very end

2   of the case after the defendant had already pled guilty.  But

3   yes, they did come from the government, yeah.  One of the

4   documents was the actual guilty plea agreement though from the

5   defendant.  So I mean, it's a government document but I believe

6   it's signed by the defendant.

7   Q.  Was it the plea or the plea agreement or plea minutes?

8   A.  Actually, if you look at footnote 26, you'll see I have

9   both here the statement of facts and the plea agreement.

10  Q.  The statement of facts were prepared by the government?

11  A.  Yes, that's correct.

12  Q.  The plea agreement was drafted by the government as far as

13  you know?

14  A.  I guess so.  I don't really have any personal knowledge for

15  knowing how it was drafted or who drafted it.

Page 146

5b23parh.txt

16   Q.   Now, in your social science methodology in preparation of

17   your expert report in this case, what is the margin for error?

18   A.   The margin for error?

19   Q.   Yeah.

20   A.   Pretty small.  Most of the people that were involved in

21   this case were already known to investigators.  They were known

22   to me.  I mean, I've been following Khalid Sheikh Mohammed and

23   his network since about 1999, and a lot of folks that have been

24   involved in here, there are multiple sources of information

25   about them.  There are some individuals that there are less,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                              160
      5B23PARH              Kohlmann - cross

1    but generally speaking everybody that comes out of the sources

2    that we have, is consonant.  I have not really found much to

3    question any of the material that I produced.

4    Q.   You didn't have any information with respect to Uzair

5    Paracha, did you?

6              MR. BRUCE:  Objection, your Honor.  He's not being

7    asked to offer an opinion on Uzair Paracha.  It has no

8    relevance.

9              THE COURT:  I'll allow that.

10   A.   I have no idea, other than the references that are in the

11   documents I provided, to what the defendant's role is.  That's

12   not what I was asked to do.

13   Q.   I didn't ask you with respect to -- you had no information

14   in your 20 million piece database related to Uzair Paracha,

15   zero; is that correct?

16   A.   Operatives that are low level enough very rarely come

17   across that kind of thing.

                              Page 147

5b23parh.txt

18            THE COURT:   The question is, if you know, is there any

19    reference to Uzair Paracha in your 20 million document

20    database?

21            THE WITNESS:   Yeah, probably in newspaper articles.

22            THE COURT:   Do you know if there is?

23            THE WITNESS:   I've never done a search, so, you know.

24    Q.   So you don't -- you don't know?

25    A.   Well, again, I save material almost every single day, and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              161
      5B23PARH              Kohlmann - cross

1     granted, I'm sure because of the fact that this case was

2     related to al Qaeda in the United States, there's got to be a

3     newspaper article or something saved somewhere.   But I mean, I

4     haven't utilized it in preparing this.   I didn't refer to it.

5     I wasn't asked to talk about Uzair Paracha so --

6     Q.   Let me understand this.   You are being called as an expert

7     and your methodology does not include you finding out

8     information about the person that you are going to testify

9     about?

10            MR. BRUCE:   Objection, your Honor.   It's not the

11    person he is going to testify about.

12            THE COURT:   Sustained.

13            MR. WILFORD:   Your Honor, if I may --

14            THE COURT:   He just testified that he was not asked to

15    render any opinion in regard to Uzair Paracha.

16            MR. WILFORD:   If I may, your Honor.   This individual

17    was asked to review Government Exhibits 4 and 5 which are

18    unclassified statements which refer to Uzair Paracha.   He is

19    asked to make some conclusions with respect to those documents.

20    He in fact testified on direct examination at this proceeding

5b23parh.txt

21    as to conclusions he reached based on those documents.

22         In order for him to have some knowledge about it, in

23    order to be able to distinguish between the two Uzairs that are

24    mentioned in the document, he had to have some ability to say

25    this Uzair Paracha is separate and distinct from a different

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

162

5B23PARH                    Kohlmann - cross

1    Uzair that's there.  It all goes to his methodology and his

2    ability to have reliability as an expert.

3         THE COURT:  I am not sure I followed that, sir.

4    What's your question of the witness?  Can he distinguish

5    between Uzair in quotes and Uzair Paracha?  That's not an

6    issue.

7         Why don't you ask a question.  Let me deal with it

8    that way.

9         MR. WILFORD:  I'm sorry to trouble the reporter.

10         (The record was read)

11         THE COURT:  I sustain the objection.

12         Did you include in what you did to prepare your expert

13    report any search or investigation into the activities of an

14    individual known as Uzair Paracha?

15         THE WITNESS:  No, your Honor, I didn't.

16         THE COURT:  All right.

17    Q.   Now, with respect to --

18         THE COURT:  Mr. Wilford, he just testified he did not

19    include investigation into the role of Uzair Paracha in what he

20    did.

21         Proceed.

22         MR. WILFORD:  Thank you, Judge.

Page 149

5b23parh.txt

23    Q.  With respect to Saifullah Paracha --

24    A.  I was also not requested to provide information or do a

25    search on him and I did not provide information nor do a search

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

163

5B23PARH                    Kohlmann - cross

1     on him.

2     Q.  With respect to materials you were provided, with -- you

3     did a search on Khalid Sheikh Mohammed?

4     A.  Yeah, but that wasn't necessarily because of materials I

5     was provided.  That was the expertise I was informed I would

6     need to give in this case.  That was the basis for the expert

7     testimony.  I was told that one of the subject was Khalid

8     Sheikh Mohammed.  That was why I did a search.  I was never

9     told I was needed to testify with regards to expert testimony

10    with regards to Saifullah Paracha or Uzair Paracha.

11    Q.  With respect to the information that you received, the two

12    documents in evidence --

13    A.  You are referring to 4 and 5?

14    Q.  4 and 5.  You relied upon the accuracy of those statements?

15    A.  I assumed that they were more or less accurate, yeah.

16    Q.  And you made that assumption based on your expertise in

17    this area; is that correct?

18    A.  Given the context of what's stated in here, given what's

19    being expressed in here, it seemed to me legitimate.  But I

20    only have these documents.  This is what I have to base on.

21    Q.  That's what I am asking you about, sir.  That's what it was

22    based on, right, those documents?

23    A.  Well, not -- my entire basis of my testimony or what I know

24    about the information presented in here?

25    Q.  Excuse me.  Excuse me.  Understand my question.  Let's be

Page 150

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

164

5B23PARH                    Kohlmann - cross

 1    clear about it, okay?

 2              With respect to Government Exhibit 4 and Government

 3    Exhibit 5, your basis of arriving at an opinion with respect to

 4    those document was based on your belief those documents were

 5    accurate?

 6    A.   Yeah, that's correct, yeah.

 7    Q.   Now --

 8    A.   But I should add though they are consonant.

 9    Q.   I am not asking you anything at this point, okay.

10              With respect to your opinion based upon your Internet

11    research, and the books you've read, is it your opinion that al

12    Qaeda is a fairly common term at this point?

13              MR. BRUCE:   Objection.

14              THE COURT:   Sustained, sustained.  I don't know what

15    that means.

16    Q.   Okay.  Is it your opinion that -- I'm sorry.

17              (Pause)

18    Q.   When you were -- when you are involved in your peer

19    discussions with your colleagues on the counter-terrorism blog,

20    and the people that you mention that you use for your peer

21    review, there's no dispute about the existence of al Qaeda, is

22    there?

23              MR. BRUCE:   Objection, your Honor.  This is argument.

24              THE COURT:   I'll allow it.

25    A.   I mean, there's -- I know that there is no dispute about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5b23parh.txt
5B23PARH                    Kohlmann - cross

1    the existence of al Qaeda from my personal conversations with
2    individuals that have been involved in al Qaeda.  That's, I
3    mean, there is no absolutely no doubt in anybody's mind, any of
4    the colleagues that I work with, that al Qaeda exists period.
5    Q.   And I believe you responded to the government, just want to
6    be clear about this, that Osama bin Laden was one of the
7    leaders and founders al Qaeda; is that correct?
8    A.   Yes.
9    Q.   There's no dispute about that, correct?
10   A.   There is absolutely no dispute that he was one of the
11   leaders and founders of al Qaeda, no.
12   Q.   Okay.
13   A.   I mean no serious dispute, anyway.  There is no legitimate
14   dispute.
15   Q.   With respect to your expert testimony report, when you were
16   discussing Ammar al-Baluchi, KSM and Majid Khan, did you
17   discuss other individuals in your report, in that report?
18   A.   Yes, I did.
19   Q.   You weren't asked to discuss those individuals, were you?
20   A.   No, I was.
21   Q.   You were asked to discuss Mahwan Shaheed?
22   A.   I was asked to discuss virtually everyone that's in this
23   report.
24   Q.   So the government specifically asked you about --
25   withdrawn.  To include in this report information related to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - cross

1    your expert opinion regarding Mohammed Atta?

5b23parh.txt

2  A.  No.  The government asked me to put together a report that

3  covered all connections between KSM and Ammar al-Baluchi,

4  excuse me, and other individuals who had committed or had

5  attempted to commit terrorist attacks against the United

6  States.  These are among them.

7  Q.  They didn't ask you to include anything about Saifullah

8  Paracha or Uzair Paracha?

9  A.  No.  But I wasn't -- yeah, I was not asked to produce

10  anything like that.

11            MR. WILFORD:  Thank you.

12            (Pause)

13            MR. WILFORD:  Your Honor, that will be all for the

14  defense at this point.

15            THE COURT:  Pardon me?

16            MR. WILFORD:  That will be all for defense at this

17  point.

18            THE COURT:  All right, thank you.

19            MR. BRUCE:  I'll be brief, your Honor.

20  REDIRECT EXAMINATION

21  BY MR. BRUCE:

22  Q.  Mr. Kohlmann, excuse me --

23            (Pause)

24            MR. RICCO:  I'm sorry, Judge.

25            THE COURT:  It's all right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

167

5B23PARH                    Kohlmann - redirect

1  Q.  Mr. Kohlmann, when you testified on cross-examination that

2  on occasion you informally provide information to government

3  agencies and do not get paid for it, why are you willing to do

5b23parh.txt

 4   that?

 5   A.   If I come across a piece of information that may have value

 6   that potentially could be a life or death scenario and could, I

 7   mean, could actually be useful and I'm asked to provide that

 8   information, rather than being subpoenaed for it which I

 9   probably would be anyway, I'm happy to turn that over.  If it's

10   any use in terms of justice.  It's to whoever would request it.

11   If a defense counsel came to me and had a specific request for

12   a document that would exonerate a client, I would provide that

13   too.

14   Q.   Now, on occasions where you indicated that you don't have a

15   formal contract with the government, but you do informally

16   provide some information on occasion, you were compensated for

17   it, correct?

18   A.   That's correct, yeah.

19   Q.   How is it determined how much you are paid on those

20   occasions?

21   A.   Well, in the case of me testifying in court or --

22   Q.   No.

23   A.   Separately?

24   Q.   When it's just informally exchanged.

25   A.   Usually just to cover whatever expenses I've incurred in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                          168

5B23PARH                    Kohlmann - redirect

 1   terms of obtaining that information.  There is no precise

 2   mathematical formula, but realistically it barely covers the

 3   costs involved.

 4   Q.   Now, I want to discuss al Qaeda's use of cells to perform

 5   terrorist operations.  Do you have an expert opinion on that

 6   subject, sir?

                          Page 154

5b23parh.txt

7    A.   Yes, I do.

8    Q.   And just in brief detail, without going into all of the

9    extended details of it, what is your expert opinion on that

10   subject?

11   A.   Well, my expert opinion is that al Qaeda as a network is a

12   relatively non-hierarchical amorphous network.  It's divided

13   into cells.

14   Q.   Slowly.

15   A.   Excuse me.  Groups of individuals who do not necessarily

16   have contact with each other, but often times only have contact

17   with one or two senior commanders.

18        The idea of a cell structure, where you have four or

19   five people involved in an individual unit, is that unit is a

20   single independent body, that it received orders from the

21   headquarters, it receives orders from the leaders of al Qaeda.

22   Yet the cell itself was responsible for carrying out many of

23   its most important tasks with al Qaeda assistance.

24        This means that the cell is less likely to be

25   infiltrated by law enforcement and intelligence.  It means cell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

169

5B23PARH                    Kohlmann - redirect

1    members can be adequately trained in security procedures in

2    case someone is arrested.  What's more is there is a limit to

3    the amount of information that they can potentially provide,

4    that a lower level operative can potentially provide as to who

5    his superiors are, where his orders are coming from.  That

6    information is generally only known by the commanders of the

7    cells.

8    Q.   Okay.  Now, are those things that you have outlined of

5b23parh.txt

9   benefit to al Qaeda?

10   A.   You mean the cell structure?

11   Q.   Yes.

12   A.   Yeah.  It is the reason why al Qaeda has continued to

13   proliferate as an organization, whereas other terrorist groups

14   have not.  It has effectively in many cases prevented

15   infiltration of terrorist networks.  It's prevented discovery

16   of a single cell from leading to the discovery of an entire

17   network.  So for instance, you know, if you capture one cell

18   that Khalid Sheikh Mohammed or another al Qaeda operative

19   commander is in charge, you don't necessarily find all the

20   other cells.  What's more, you don't necessarily immediately

21   know where the commander of these cells is located.

22   Q.   Now, for approximately how long during the course of your

23   career have you been studying the use of cells by terrorist

24   organizations?

25   A.   Since the start.  One of the first cells that I studied in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

170

5B23PARH                    Kohlmann - redirect

1   depth was the 1993 World Trade Center bombing plot and the 1995

2   New York jihad plots case.  I've reviewed video recording of

3   cell members, I reviewed testimony from cell members, I've

4   reviewed documents prepared for the cases in court.  I reviewed

5   transcripts of FBI wire taps involving members of that cell.

6   Discussions with regards to their security procedures, their

7   ideology, their tactics, their goals.

8          I've done much the same with a variety of other

9   terrorist cells, including the Orube gang in 1996 in France,

10   which was a cell of Algerian armed Islamic group militants who

11   were attempting to raise money to fund a jihad in France.

5b23parh.txt

12          The 1999 West Coast LAX plot involving Ahmed Ressam

13     and Mustafa Kamel, I traced that cell initially from

14     Afghanistan and the Balkans and then traced the path of the

15     cell members to from Europe to North America, organizing in

16     North America, then back to Afghanistan to seek training at al

17     Qaeda camps and ultimately their trajectories to attempted

18     terrorist targets here in the United States.

19          I've also studied countless other terrorist cells in

20     Balkans, in Kashmir, in Pakistan, in Afghanistan, in the United

21     Kingdom, in Denmark, in the United States, in Canada.

22     Virtually every country you can think of.

23     Q.   Now, once you've gathered all of this material about the

24     use of terrorist cells, how does your methodology in terms of

25     analyzing it and forming conclusions about the use of cells

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              171
       5B23PARH                 Kohlmann - redirect

1      compare to the methodology you've described already, regarding

2      the leaders and members of al Qaeda?

3      A.   It's virtually identical.  I tell you the first thing I do

4      is I go to original al Qaeda documents or al Qaeda documents

5      that have been seized and have been presented as exhibits in

6      court.  I take these manuals, then I compare them to the

7      testimony of former al Qaeda operatives who are either

8      testifying under oath on the stand or who I'm lucky enough to

9      have a personal interview with, which has happened on occasion.

10     Then I will take that information and then juxtapose it against

11     other original documents taken from terrorist groups.  Take

12     that and juxtapose it against analysis done by other experts

13     that deal with the idea of sleeper cell networks and terrorist

                           Page 157

5b23parh.txt

14    training camps.   Then ultimately I'll compare that to the world
15    at large.   See, you know, what other open source reporting is
16    there about this, does it match my research, does it say
17    anything I've missed here.   It's almost the exact same method.
18    It's really rigorous analysis.
19    Q.   Okay.   I want to also ask you about the subject matter of
20    al Qaeda's use of individuals to provide logistical support to
21    al Qaeda members or al Qaeda cells.   Do you have an expert
22    opinion on that subject?
23    A.   Yes, I do.
24    Q.   Can you again just in a nutshell without going into all the
25    details you would offer at trial, if permitted, explain your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

172

5B23PARH              Kohlmann - redirect

1    opinion on that subject.
2    A.   Sure.   Again, through the process of reviewing al Qaeda
3    training manuals, from the process of reviewing testimony by al
4    Qaeda operatives under oath in court, by interviews with them,
5    I've gained an understanding of how the system works and of how
6    these individuals act within the cells.
7    Q.   How do individuals at times provide logistical support to
8    al Qaeda members or al Qaeda cells?
9    A.   Support is usually provided in the form of either false
10   documentation, passports, that kind of thing, in the form of
11   technological instruments that could be used in the commission
12   of terrorist attack such as cellular phone, a GPS device, a
13   satellite phone, also money is an issue.   Terrorist cells
14   sometimes raise their own money, however, often times they need
15   to have someone either as part of the cell or as a contact to a
16   larger network who will bring in the financing, either through

5b23parh.txt

17    illegal means, through criminal means, or by receiving it from
18    a higher up within the terrorist organization.
19    Q.   Now, in reaching this opinion about logistical support,
20    have you relied on similar sources and methodology as for your
21    own expert opinions?
22    A.   Yeah.   This is all based upon the testimony of former al
23    Qaeda operatives, it is based on sworn testimony, it's based
24    upon authenticating al Qaeda training manuals.   There are
25    training manuals that lay out security procedures that al Qaeda

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

173

5B23PARH                    Kohlmann - redirect

1    uses in extreme detail.   Along with the kind of roles that are
2    assigned to different people within the cell and within the
3    network at large.
4    Q.   I want to shift gears now, sir, turn back to Government
5    Exhibits 4 and 5.   Now, do you give all of the information in
6    these statements, when you consider it, the same exact weight?
7
8              MR. WILFORD:   Objection.
9              THE COURT:   Rephrase it.   You mean does every
10   statement have the same weight as every other statement in
11   them?
12             MR. BRUCE:   Correct, your Honor.
13             THE WITNESS:   The answer is no.
14   Q.   Okay.   Can you explain why that is, in your opinion?
15   A.   Sure.   If someone makes an admission against interest, to
16   borrow a legal term, admitting something that is patently
17   against his interest to say, i.e. admitting he is an al Qaeda
18   member, boasting of a particular terrorist plot he is involved

Page 159

5b23parh.txt

19    in, that kind of thing, it is an admission against interest.

20    The person who is saying it has absolutely no reason to say it

21    unless it's the truth.  Whereas some statements in here are

22    denials, denials of particular elements of terrorist behavior

23    or terrorist activity.

24            That being said, you know, it's certainly possible

25    that this person is showing you denial.  However al Qaeda has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

174

5B23PARH                    Kohlmann - redirect


1     repeatedly emphasized to its operatives --

2             MR. WILFORD:  Objection --

3             THE COURT:  You can finish.

4             MR. WILFORD:  Your Honor, with respect, this is

5     information you indicated would not be permitted to be

6     testified to.

7             MR. BRUCE:  I am not offering it for that purpose,

8     your Honor.  Mr. Wilford on cross-examination talked about the

9     reliability of the information in these statements and I just

10    wanted the witness to be able to distinguish if he did so, what

11    weight he places on different statements.

12            THE COURT:  Let me hear the answer so far as it went.

13            (The record was read)

14            THE COURT:  That's all right.  What's coming up is not

15    going to be permitted at the trial.  For purposes of this

16    Daubert hearing just before me I'll take the answer, but it's

17    not permissible at trial.

18            MR. BRUCE:  I understand.

19            THE COURT:  Complete the sentence.

20            THE WITNESS:  Thank you, your Honor.

21            THE COURT:  Al Qaeda has repeatedly emphasized to its
                    Page 160

5b23parh.txt

22  operatives --
23  A.  In training manuals and in lessons that these operatives
24  have testified with in court that it is necessary to deceive
25  law enforcement --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

175

5B23PARH                      Kohlmann - redirect

1           THE COURT:  I understand.  Go ahead.
2   Q.  Now, Mr. Wilford on cross-examination asked you about
3   several FBI reports of interviews of family members that you
4   reviewed in connection with this case.  Do you remember that?
5   A.  Yeah, that's correct.
6   Q.  And you indicated that you reviewed those reports after you
7   had finalized your own expert report?
8   A.  Yes, I believe so, yeah.
9   Q.  And you indicated that those reports buttressed the opinion
10  you had already reached?
11  A.  Yeah.  Yeah.
12  Q.  I just wanted to ask you what you mean by that.  Explain
13  that.
14  A.  In other words they added additional detail, they fleshed
15  out a little bit more background about Majid Khan I was not
16  previously aware of.  However they underlined his role within
17  al Qaeda and they confirmed exactly that.  That Majid Khan had
18  been a lower level al Qaeda operative, someone that was drawn
19  in relatively recently, but because of family connections,
20  because of the shortage of trained al Qaeda operatives with
21  U.S. citizenship, that his importance to the organization was
22  more than it otherwise would have been, and in fact he was
23  operating as a terrorist -- a terror cell plot commander,

Page 161

5b23parh.txt

24   someone who was organized with fixing a particular terrorist

25   plot here in the United States.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

176

5B23PARH                    Kohlmann - redirect

1   Q.   Okay.  Now, Mr. Kohlmann, if permitted by the Court in this

2   case, do you intend to also offer an expert opinion on other

3   Taliban and al Qaeda members and associates and leaders?

4   A.   Yeah, sure.  Whatever is relevant to this case.

5   Q.   As outlined in your expert report and the slides you've

6   prepared?

7   A.   Yeah, I made a point to identify certain other important al

8   Qaeda leaders who may not be central to this case, but I feel

9   it's important to put all of this in perspective, so there's

10   not a loss of perspective.  You understand how this case fits

11   in with the larger global al Qaeda terrorist sleeper cell

12   network.

13   Q.   In reaching your conclusions about these other people who

14   haven't necessarily been mentioned by name today, what sources

15   and methodologies did you use in reaching those conclusions?

16        MR. WILFORD:  Objection.  Who are we talking about,

17   Judge?  This is in a vacuum, using methodology for these

18   people.

19        THE COURT:  All right.

20   Q.   Let me give you some examples with respect to Aafia

21   Siddiqui and Iyman Faris, did you use -- how does the

22   methodology you used with respect to the people you've already

23   talked about compare to those two individuals?

24   A.   It was almost identical.  In the case of Aafia Siddiqui I

25   was able to recover several electronic mail items that Aafia

Page 162

5b23parh.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - redirect

1    Siddiqui had sent out in the Internet back in the early 1990s
2    which indicated the source of activity she was involved in, who
3    she was fundraising for and what her personal political views
4    were.
5         In the case of Iyman Faris, again there were very
6    helpful government documents, his guilty plea and the statement
7    of facts issued after he pled guilty, which were openly
8    available and which laid out the facts of the case exactly as
9    Iyman Faris had pled guilty to.
10        MR. BRUCE:  Your Honor, if I could, I'd seek some
11   guidance from the Court at this time and see if defense counsel
12   has an objection.
13        I think between the expert report and the slides,
14   we've laid out the universe of people that, if allowed,
15   Mr. Kohlmann would testify about.  I'm prepared to go through
16   each name, for example, Abdullah Azzam, some of the people
17   we've seen in the slides if that's what the Court and defense
18   counsel want me to do.
19        MR. RICCO:  Your Honor, it seems to me if what
20   Mr. Bruce is saying if we have this information before us, if
21   it is going to establish the same methodology, we are just left
22   with 403 argument with respect to how much of this or what part
23   of this is admissible.  I don't disagree with what Mr. Bruce is
24   saying.
25        THE COURT:  I would like a summary of the slide show.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH                    Kohlmann - redirect
                            Page 163

5b23parh.txt

     1      All right.  Why don't you take him through what you have as the
     2      slide show.  I take it the slide show, the slides except for
     3      the last three, are you plan to use those during Mr. Kohlmann's
     4      testimony, correct?
     5              MR. BRUCE:  That's correct.
     6              THE COURT:  Why don't you have him lay out in brief
     7      what he would testify in regard to what's on your slide.
     8              MR. BRUCE:  If it makes it easier for you to follow,
     9      I'd like to state this slide show is a work in progress and we
    10      continue to tweak it based on your Honor's rulings.
    11              Why don't I hand up to you the latest version which is
    12      also in color.
    13              THE COURT:  This is later than October 24?
    14              MR. BRUCE:  Yes.
    15              THE COURT:  All right.
    16              MR. BRUCE:  I'm going to hand the witness one also.
    17      For purposes of the record, I am going to mark it Government
    18      Exhibit 6.  I guess I should offer it for purposes of the
    19      hearing.
    20              THE COURT:  Mr. Wilford, any objection?
    21              MR. WILFORD:  No, not for purpose of the hearing,
    22      Judge.
    23              THE COURT:  All right, admitted.  Mr. Wilford, you are
    24      going to have the defendant in civilian clothes, correct?
    25              MR. WILFORD:  Yes, your Honor.  I am going to submit

                                                                    179
5B23PARH                    Kohlmann - redirect

     1      an order to the court tomorrow to permit.
     2              THE COURT:  Fine.

5b23parh.txt

3          (Government's Exhibit 6 received in evidence)

4    Q.   Mr. Kohlmann, I just want to walk through this briefly.

5    First, I am using the first page, page one as the title page

6    United States v. Uzair Paracha, if you could flip to the second

7    page, entitled Osama bin Laden's influences and mentors.   Are

8    you with me there?

9    A.   Yes, yeah.

10   Q.   There is a name on that page at the top and a picture,

11   Sheikh Abdullah Azzam.

12          In your expert opinion, who is that, sir?

13   A.   Sheikh Abdullah Azzam was one the original founders of al

14   Qaeda.   He was a Palestinian cleric.   He had traveled to

15   Pakistan and Afghanistan during the 1980s to assist in the

16   creation of a mujahideen force, a Muslim force.

17          THE COURT:   I don't want to be perceived as being

18   facetious or anything.   I want to put in front of the witness a

19   sign that simply says slow down.   All right.   Again, I'm not

20   doing this to be cute.   I just think it may be helpful.

21          MR. WILFORD:   That's fine, Judge.

22          THE WITNESS:   I apologize, your Honor.

23          THE COURT:   I would not do that in front of a jury.   I

24   think it will help our record here.   Go ahead.

25   A.   Sheikh Abdullah Azzam, his goal was the formation of an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                         180
5B23PARH              Kohlmann - redirect

1    international mujahideen brigade to reestablish the rule of a

2    greater Islamic empire.   Abdullah Azzam was the one who came up

3    with the idea for al Qaeda.   He was assassinated in 1989.

4    Q.   Now, the bottom picture --

Page 165

5b23parh.txt

5       THE COURT:   Who is Sheikh Abdul Rasool Sayyaf?

6       THE WITNESS:   Your Honor, Sheikh Abdul Sayyaf is a

7   major Afghan mujahideen leader in the 1980s.   He was one of the

8   primary leaders of the Islamic unity of Afghan mujahideen,

9   which was the body tasked with fighting the Soviet Union in

10  Afghanistan on behalf of Islamic forces.   Abdul Rasool Sayyaf

11  was also a mentor to both Khalid Sheikh Mohammed, Sahed Sheikh

12  Mohammed, and Abed Sheikh Mohammed.   And in addition provided

13  the first training camp from which al Qaeda fighters were

14  educated.

15      THE COURT:   What's your testimony with regard to Osama

16  bin Laden?

17      THE WITNESS:   Sheikh Osama bin Laden is the official

18  leader of al Qaeda.   He has been since the assassination of

19  Sheikh Abdullah Azzam in 1989.   Osama bin Laden has engaged in

20  multiple attempts to strike at the United States and likewise

21  has declared his intention to kill Americans civilian and

22  military.

23  Q.   Now, page three of this slide in essence we've covered.

24  Regarding bin Laden.

25      If you could turn to page four which is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

181

5B23PARH                    Kohlmann - redirect

1   organizational chart.   Let's move downwards and from left to

2   right we've covered bin Laden.   On the left hand side of the

3   second tier of that chart, there's the name Abu Hafs al-Masri.

4   Who is that individual, sir?

5   A.   Abu Hafs al-Masri is otherwise known as Mohammed Atef.

6   Mohammed Atef is the former head of al Qaeda's military wing

7   who was killed in November 2001, during a U.S. air strike in

5b23parh.txt

8    Afghanistan.

9    Q.   Now, moving to the right on the page, there's the name

10   Ayman al-Zawahiri.  Who is that individual, sir?

11   A.   Dr. Ayman al-Zawahiri is considered to be the deputy

12   commander of al Qaeda.  He is the number two individual in

13   charge of the network.  He is deputy to Sheikh Osama bin Laden

14   and has been his deputy since approximately 1989.

15            MR. BRUCE:  Your Honor, unless you had questions about

16   the other three individuals, I think we've covered those

17   previously.  Unless you wanted to go back through them.

18            THE COURT:  No, it's all right.

19            MR. BRUCE:  Okay.

20            THE COURT:  When you were forming your opinion of

21   Khalid Sheikh Mohammed, sir, did you use the unclassified

22   summaries four and five that we've been talking about?

23            THE WITNESS:  No, I didn't.

24            THE COURT:  But you did in regard to Ammar al-Baluchi

25   and Majid Khan, correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        182
     5B23PARH              Kohlmann - redirect

1            THE WITNESS:  That's correct, yes, I did.

2            THE COURT:  All right.  Proceed.

3    Q.   Then I'd like to turn to the slide, Mr. Kohlmann, which I

4    think would have the next name we haven't previously discussed,

5    the title at the top is Ali Abdul Aziz Ali a/k/a Ammar

6    al-Baluchi.  At the bottom it has pictures of Jose Padilla and

7    Tawfiq Attash.  I think we've previously discussed Jose

8    Padilla.  So I'd like to turn your attention to Tawfiq Attash.

9    Can you tell us who Tawfiq Attash is, Mr. Kohlmann.

                        Page 167

5b23parh.txt

10    A.   Tawfiq bin Attash is otherwise known as Khallad.   He is an

11    individual who worked as an al Qaeda operational planner,

12    expected to be the central mastermind behind the 2000 bombing

13    of the USS Cole in the port of Aden in Yemen.

14    Q.   If you can turn to the next page to the slide entitled

15    Majid Khan.   Can you tell us briefly who Ayman Faris is.

16    A.   Sure.   Iyman Faris is an al Qaeda operative who admits to

17    being tasked with attempting to break down at least one bridge

18    connecting the Island of Manhattan to its suburbs using either

19    a tool, a torch tool, or else by attempting to crash ultralight

20    aircraft into those structures.

21    Q.   Has he been charged or pled guilty in federal court?

22    A.   He has pled guilty to those charges.

23    Q.   The next picture Aafia Siddiqui.   Can you just reiterate

24    for us who she is.

25    A.   Sure.   Aafia Siddiqui is a former resident of Boston who

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

183

5B23PARH                    Kohlmann - redirect

1    while she was here in the United States in the early 1990s was

2    raising money for organizations that included the Al-Kifah

3    Refugee Center, which was the U.S. branch of Makhtab-e-Khidmat.

4    That translates to office of -- excuse me, Makhtab

5    al-mujahideen, which translates to mujahideen services office.

6    Which was the direct precursor to al Qaeda.

7         Aafia Siddiqui also raised money in Pakistan for a

8    charity known as Mercy International.   Which at the time was

9    being run by Khalid Sheikh Mohammed's brother Zahed.

10    Q.   Although it's not on any of the slides, Mr. Kohlmann, can

11    you tell us who Mullah Mohammed Omar is?

12    A.   Mullah Mohammed Omar is the leader the Taliban movement in

5b23parh.txt

13   Afghanistan.  Taliban translates as students.  Mullah Mohammed

14   Omar is a former member of the Afghan mujahideen who fought

15   against Soviet forces in Afghanistan during the 1980s.  Later,

16   he was in exile in Pakistan and helped lead a group of Islamic

17   students, madrassas students, students of religious school, to

18   cross over the border in Afghanistan and seize control of

19   territory there that was then under the control of war lords.

20   Q.  Did he seize control of territories in Afghanistan?

21   A.  Within approximately two years of entering Afghan

22   territory, Mullah Mohammed Omar and the Taliban Army control

23   over 95 percent of Afghan territory.  Shortly thereafter,

24   Mullah Mohammed Omar set up an alliance with Osama bin Laden

25   and his advisors, which led to Mullah Mohammed Omar being

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

184

5B23PARH                Kohlmann - redirect

1   proclaimed as the Khalif by Osama bin Laden by Abu Hafs, al

2   Qaeda's number one military commander, and by Dr. al-Zawahiri.

3          MR. BRUCE:  May I have a moment, your Honor?

4          THE COURT:  Yes.

5          MR. BRUCE:  I have nothing further, your Honor.

6          MR. WILFORD:  Just one moment.

7          Your Honor, if I may just briefly on the slide

8   presentation?

9          THE COURT:  Go ahead.

10   RECROSS EXAMINATION

11   BY MR. WILFORD:

12   Q.  When you turn to the page that's the third or fourth page

13   in that has the organization and structure of al Qaeda?

14   A.  Yeah.

Page 169

5b23parh.txt

15   Q.   2001 to 2003.   First of all, you prepared these slides; is

16   that correct?

17   A.   That's correct, yes.

18   Q.   And again, your preparation of these slides, I notice that

19   you have solid lines linking bin Laden to the three individuals

20   underneath him?

21   A.   That's correct.

22   Q.   And then you have a broken line with respect to Ammar

23   al-Baluchi and Majid Khan?

24   A.   Yeah.

25   Q.   What's the symbolism for that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    185

5B23PARH                    Kohlmann - recross

1    A.   I was concerned by looking at the chart one might get the

2    impression that this is my view of the entire al Qaeda network

3    between 2001 and 2003.   The dotted lines are supposed to

4    signify there are other players involved in this level.   This

5    is not this person, this person, this person direct

6    relationships.   There are other people involved in this

7    relationship and it's more complex than simply straight lines.

8    Q.   There may be people involved in that time period who would

9    fill the positions that you have here for al-Baluchi and Khan?

10   A.   No.   What I meant to show here is that there's a chain, a

11   chain of individuals that are underneath Khalid Sheikh

12   Mohammed.   What I meant to show here is that Ammar al-Baluchi

13   and Majid Khan are A, not the only two people in that chain,

14   and that Majid Khan may have had contact with other KSM

15   associates indirectly.   You know, it's not a direct

16   relationship.   It's not -- it could be, but it doesn't have to

17   be.   I wanted to show there's room for other operatives within

Page 170

5b23parh.txt

18   that network.

19   Q.   So, to be accurate, the chart should have some other places

20   along the Khalid Sheikh Mohammed role also?

21   A.   I'm sorry, I didn't hear you.

22   Q.   There should be some other places along Khalid Sheikh

23   Mohammed to indicate there are other people on that level?

24   A.   You mean you're referring to the level of the chart where

25   it says --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

186

5B23PARH                    Kohlmann - recross

1            THE COURT:  I'm sorry.  As these things come up,

2    obviously, what I'd like from the parties, presumably the

3    government has list of these names that would be used to be

4    given to the court reporter and to me.

5            MR. BRUCE:  It's already been done with respect to the

6    court reporter.  She has it.

7            THE COURT:  Fine.  Okay.

8    A.   You're referring I believe to the level of the chart here

9    that's has the faces of Abu Hafs al-Masri, Ayman al-Zawahiri,

10   and Khalid Sheikh Mohammed.  As a matter of fact, on that

11   level, at the level of the senior operational planners of al

12   Qaeda, at least as far as before the death of Abu Hafs al-Masri

13   in November 2001, those are the three most important planners

14   on behalf of that network.  There's really -- these guys are

15   the three most important figures.  There are others that go

16   underneath them, but they are the primary players within al

17   Qaeda's network.

18   Q.   As far as you know?

19   A.   Yeah, okay, as far as I know.

Page 171

5b23parh.txt
20  Q.  Because you don't know everybody that's involved in al
21  Qaeda, right?
22  A.  I don't claim to, no.
23  Q.  With respect to the slide dealing with Majid Khan.  You
24  have the same solid line connection between these two
25  individuals and Majid Khan?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

187
5B23PARH                    Kohlmann - recross

1   A.  That's correct.
2   Q.  That's to symbolize what?
3   A.  To that's to symbolize a direct connection between these
4   two individuals, a direct connection between Majid Khan and
5   Faris and direct connection between Majid Khan and Aafia
6   Siddiqui.
7   Q.  There is no direct connection between Faris and Siddiqui?
8   A.  I wasn't asked to prepare that for the purposes of this
9   report.  I don't know that that's not the case.  I don't know
10  that that's the case.  I honestly -- I wasn't asked to prepare
11  the relationship between those two individuals, so they may
12  have had contact.
13  Q.  You don't know; you can't offer any opinion on that, right?
14  A.  I can't offer any opinion as to whether the two of them had
15  contact.  I don't have any personal knowledge of it, no.
16  Q.  If I could have a question with respect to the KSM page of
17  the slides.
18  A.  Are you referring to the actual KSM only slide, correct?
19  Yeah okay.
20  Q.  Are all four of these photographs purportedly of KSM?
21  A.  Yes, they are.
22  Q.  And they're taken at different times?
Page 172

5b23parh.txt

23    A.   Yes, they were.

24    Q.   Do you know when these photographs were taken?

25    A.   I know that the photograph at the top left, the top right

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

188

5B23PARH                    Kohlmann - recross

1     and the bottom left were all taken I believe prior to 1997

2     since they were used I believe in wanted posters for KSM before

3     then.   The photo at the bottom right I believe was taken in

4     2003.

5              MR. WILFORD:   I don't have anything else, Judge.

6              MR. BRUCE:   Nothing further from us, Judge.

7              THE COURT:   Mr. Kohlmann, if you would, sir, step out

8     and we have a room there on the left.   Ms. Blakely, is it open?

9     You just wait there.

10             THE WITNESS:   Thank you very much, your Honor.

11             THE COURT:   I didn't mean to badger you on the speed.

12    We get a much better record if the witness is speaking slowly.

13             THE WITNESS:   I apologize.   Next time I'll try to be a

14    little slower.   Thank you.

15             (Witness excused)

16             THE COURT:   Government, let me summarize what I think

17    you want his testimony to be.   He'll talk somewhat about the

18    origin of al Qaeda, because this expert by the way is much

19    broader than the testimony you are going to have.   You are now

20    proffering him for, as I understand --

21             MR. BRUCE:   Well, if I can address that, your Honor.

22    As I -- and this is part of the reason on redirect I added some

23    subject matter.   As I understood the purpose of today's

24    hearing, it was to go purely to his qualifications and his

Page 173

5b23parh.txt
25    methodology, and not to sort of vet his entire expert opinion.

189
5B23PARH

1    I really thought we were on a much more limited track.  I
2    understand to some extent you have to know what the opinion is
3    in order to test methodology.
4              THE COURT:  I think that's the issue.  I think my
5    image of it was -- I can understand how you don't want to give
6    a --
7              MR. BRUCE:  A deposition.
8              THE COURT:  You don't want to give a preview of his
9    testimony, but again experts are somewhat different and you do
10   have to, insofar as you have to give an expert report in
11   advance.  This expert report really covers the universe, so I
12   did want a better sense of what this man was going to testify
13   to.
14             MR. BRUCE:  Sure.  On the first point that you started
15   to raise, and then I will sit down and let you finish, I
16   would --
17             THE COURT:  We could switch.  You could tell me what
18   his testimony is going to be.
19             MR. BRUCE:  That's fine.
20             THE COURT:  On the first part.
21             MR. BRUCE:  That's fine also, your Honor.  In large
22   sense it will track the slides.  And --
23             THE COURT:  Right.  If it tracks the slides it's a
24   different kettle of expert than word for word the expert
25   report.

5b23parh.txt

5B23PARH

 1          MR. BRUCE:  Correct.  With some amplifications, in

 2     other words, on the origin and history of al Qaeda, I'd like

 3     him to be able to discuss because I think it's important for

 4     the jury to understand how al Qaeda came to be.  To understand

 5     that you need to give some background.  And I'm going to try to

 6     have him do it in a real limited fashion about the Soviet

 7     invasion of Afghanistan, the formation of mujahideen fighters

 8     who battled against the Soviets, who defeated the Soviets.  The

 9     Soviets withdrew from Afghanistan.  After that Soviet invasion

10     sort of coalesced into what would eventually become al Qaeda.

11     And that's how these people sort of came together.  That's

12     somewhat depicted in the photographs on the first slide,

13     regarding Sheikh Azzam, and Sheikh Sayyaf.

14          If we had gone into all detail, he would explain that

15     those were famous mujahideen fighters who fought against the

16     Soviets in Afghanistan.  And then as bin Laden sort of came to

17     power, influenced them and then bin Laden sort of took the lead

18     of this organization which became known as al Qaeda.  That's by

19     way of background.

20          THE COURT:  While you're doing that with him, that's

21     slide one.

22          MR. BRUCE:  Correct.  Exactly.

23          THE COURT:  Then I take it you'll start with his

24     qualifications.

25          MR. BRUCE:  Sure.  I'm skipping that part in essence.

5B23PARH

5b23parh.txt
1    The qualifications -- I would not get into this until I
2    proffered him as an expert to the Court.  Then I would start
3    with basically the basic question, what is al Qaeda, what's the
4    history of it, and go through the slides.
5              Then I'd like to focus on bin Laden with the next
6    slide and explain who bin Laden is, and you have the bullet
7    points in front of you which would sort of outline what his
8    testimony would be about bin Laden.
9              As we covered this last Friday, as I understood there
10   was no objection from the defense as to this slide.
11             Give the jury a sense of how al Qaeda has gotten into
12   conflict with the United States, what the conflict is, and that
13   bin Laden of course is the head of al Qaeda.
14             MR. RICCO:  Judge, there is an objection to slide
15   number two.
16             THE COURT:  Well, my recollection is you had an
17   objection to one part of it; is that correct?
18             MR. RICCO:  That's what I am talking about, Judge.
19             THE COURT:  The last bullet point.
20             MR. RICCO:  Correct.
21             THE COURT:  That was my recollection.
22             MR. BRUCE:  Okay.
23             MR. RICCO:  That's the objection.
24             MR. BRUCE:  That may be --
25             THE COURT:  That was the discussion I used the term of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

192

5B23PARH

1    whether to what extent we're going to talk about specifics or
2    whether we were going to be generic.
3              MR. BRUCE:  Correct.
                    Page 176

5b23parh.txt

4          THE COURT:  In non-9/11 and 1993 attacks.  And you

5    dealt with 9/11 and 1993 by excluding them from specific

6    references.

7          MR. BRUCE:  Correct.

8          THE COURT:  Go ahead.

9          MR. BRUCE:  After we describe bin Laden and his role

10   in al Qaeda, I would turn to the organizational chart which is

11   the next slide.  And have him briefly describe what I'll just

12   refer to as the second tier of al Qaeda leaders.  And I won't

13   mention the names so we don't have to spell them again, but we

14   can all see them on the second tier, and he's proffered his

15   opinion as to who those people are.

16         THE COURT:  You're talking about that organization and

17   structure of al Qaeda 2001-2003, the middle level there, right?

18         MR. BRUCE:  Correct.

19         THE COURT:  Okay.  Go ahead.

20         MR. BRUCE:  Then as he indicated --

21         THE COURT:  Who they are.

22         MR. BRUCE:  Who they are.  Exactly.  And with respect

23   to Khalid Sheikh Mohammed, because he's much more central and

24   pertinent to this case, there's a separate slide which you saw

25   detailing his role.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                          193

5B23PARH


1          THE COURT:  That's the next slide.

2          MR. BRUCE:  Correct.

3          THE COURT:  All right.  Was there an objection to that

4    slide?

5          MR. WILFORD:  Yes.

5b23parh.txt

6              THE COURT:  Is there an objection to the prior slide,

7    that is with three levels?

8              MR. WILFORD:  No, your Honor.

9              MR. BRUCE:  Then --

10             THE COURT:  Just a moment.

11             MR. BRUCE:  I'm sorry.

12             THE COURT:  I take there's no objection to the first

13   slide; is that right, UBL's influences and mentors.

14             MR. WILFORD:  No, your Honor.

15             THE COURT:  All right.

16             MR. WILFORD:  All of this is excepting --

17             THE COURT:  The methodology.  Yes, I understand.  The

18   objection on the next page is to the fourth bullet point in

19   regard to the embassy bombing.

20             MR. WILFORD:  That's correct.

21             THE COURT:  And there's no objection in regard to the

22   organization and structure of AQ 2001 to 2003.

23             MR. WILFORD:  No, your Honor.

24             THE COURT:  What's the objection on the KSM slide?

25             MR. WILFORD:  Bullet points three and four.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                            194
5B23PARH

1              THE COURT:  Why three?

2              MR. WILFORD:  Because, your Honor, what does that have

3    to do with this particular case?  It's a relevancy.  What's the

4    fact that he is the mastermind of terrorist plots against the

5    United States have to do with the charges in this case?

6              MR. BRUCE:  Your Honor, it previously said mastermind

7    of the 9/11 terrorist attacks against the U.S.  And you ruled

8    on Friday that it should be made generic.  That's exactly what

Page 178

5b23parh.txt

9      I did.

10          MR. RICCO:  Judge, how's this for generic:  Mastermind

11     of terrorist attacks throughout the world.

12          THE COURT:  That helps the government actually.  Well,

13     don't let me tell you it helps you.

14          MR. WILFORD:  That would cover three and four I think,

15     Judge.

16          MR. BRUCE:  What if it said mastermind of terrorist

17     attacks against the United States and United States interests

18     around the world.

19          MR. RICCO:  It is the U.S.  The country is at war.

20          THE COURT:  I understand.

21          MR. BRUCE:  It somewhat goes, your Honor, to the

22     ruling I think that you tentatively made but did hold in

23     abeyance about the other plots --

24          THE COURT:  Well, I must say I'm very troubled by the

25     other plots.  Because they're not involved here and I am

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

195

5B23PARH

1      concerned about the spillover by the jury, any potential

2      spillover despite the instructions.

3          MR. BRUCE:  I don't know if you want me to address

4      that point now.

5          THE COURT:  Go ahead.

6          MR. BRUCE:  I mean, our main point is going to be al

7      Qaeda and its members are defined by their attacks against the

8      United States.  I mean, and that's how we're going to prove who

9      these people are.  So, to sanitize it even further, I

10     understand you did a rule 403 balancing on 9/11 and the '92

Page 179

5b23parh.txt

11    World Trade Center bombing, but to continue to sanitize it even

12    further, it's going to lose all meaning.

13          Let me put it this way also.  It is not going to be --

14    I know your Honor hasn't seen all the proof in this case.  But

15    I think this evidence from the expert is going to in some ways

16    be much less important in the jury's final consideration when

17    they hear that the defendant has admitted to helping an al

18    Qaeda operative come into the country, knowing he was going to

19    perform a terrorist attack on the United States.

20          THE COURT:  I'm not quite sure why the government

21    seems to be relying so heavily on this expert when you have so

22    many admissions from the defendant that presumably will come in

23    as admissions when you put the law enforcement people who took

24    the admissions on the stand.  And you seem to be compromising

25    the case by relying on this -- well, Mr. Wilford would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196

5B23PARH

1     characterize him his own way, but you're at least maybe

2     weakening the issue.

3           Go ahead.

4           MR. BRUCE:  Well, I respectfully disagree, your Honor.

5     The problem is we've all gotten focused on the expert because

6     we are in this Daubert hearing now.  In the scheme of this

7     case, the expert is going to be on -- I expect he'll be our

8     first witness, we'll get him qualified if your Honor permits

9     him to testify, and to go through these slides.  It will take

10    maybe an hour.  In the scheme of it --

11          THE COURT:  You're talking about --

12          MR. BRUCE:  Direct.

13          THE COURT:  An hour.

5b23parh.txt

14          MR. BRUCE:  In the scheme of a two-week case, I don't

15    think it's going to be the focal point it is now.  Once, as

16    your Honor indicates, the jury starts hearing from agents who

17    took the confession from Mr. Paracha, from the materials that

18    were found in his suitcase, which have --

19          THE COURT:  It seems to me that's the heart.  I am not

20    going to tell you how to try your case.  That should be the

21    heart of your case.

22          MR. BRUCE:  Absolutely, and it will be.  But we want

23    to give it some context.  Like I said, I think an hour of

24    direct examination from this expert about these events is going

25    to set the stage, put it in context, and then we move on to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

197

5B23PARH

1    confession, the materials from the search.  That's the other

2    nine and a half trial days in this case.  Assuming it's 10

3    trial days.  Whatever it comes out to be.

4          I just don't think it's going to have the focus that

5    it has right now in this context.

6          MR. RICCO:  Judge.

7          THE COURT:  That suggests to me that -- go ahead.

8          MR. RICCO:  Judge, I don't believe by keeping this

9    reference out, bullet point three, that you're further watering

10    down.  This is the same concept, this is attacks testimony from

11    an expert about attacks against United States citizens.  That's

12    what we objected to.  That's why we're objecting to this.

13    There's going to be plenty of testimony in this case for the

14    jury to make that determination from the facts of this case

15    from something other than expert or opinion testimony.

Page 181

5b23parh.txt

16          Because of that, we're asking that this be presented

17   in a way so that the jury can focus on those issues that they

18   can resolve without expert testimony.   And that testimony

19   comes from the statements of the defendant himself and the law

20   enforcement experts.

21          MR. BRUCE:   Your Honor, the problem is unless

22   Mr. Ricco and Mr. Wilford are going to say they're not going to

23   attack the credibility of the agents who are going to testify

24   about the confession and the statement made by Mr. Paracha,

25   they're subject to attack as to their credibility.   Did --

5B23PARH

1           THE COURT:   Yes, but that has nothing to do with

2    whether or not al Qaeda has led attacks on the United States,

3    does it?   He could talk to them about, I don't know what he is

4    going to talk to them about, are they sure if they heard what

5    they heard.   Whatever he is going to say.   What does that have

6    to do with whether or not al Qaeda has launched attacks in the

7    United States?

8           MR. BRUCE:   Because the agents will testify that it

9    was that Uzair Paracha said yes, I knew Majid Khan and

10   al-Baluchi were al Qaeda, okay.   As I said before, people are

11   defined as being al Qaeda or not al Qaeda, not by carrying a

12   membership card or some registry list, but by the attacks they

13   committed on the United States.

14          So if they intend to attack the agents' credibility as

15   to what Uzair Paracha said and what he knew, it goes to show

16   that -- or we should be permitted to prove that in fact Ammar

17   al-Baluchi and Majid Khan did participate in attacks against

18   the United States.   In other words, Uzair Paracha was right.

5b23parh.txt

19    The agents aren't making it up, number one, so it goes to their
20    credibility to some extent.
21        And it goes to the defendant's knowledge that, yes
22    indeed, he said Ammar al-Baluchi and Majid Khan were al Qaeda.
23    And he was right.  He wasn't fantasizing, he wasn't throwing
24    names out there, and the agents aren't lying about those
25    statements.  In fact those statements are true.   And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

199

5B23PARH

1    Mr. Kohlmann's testimony goes to that point.
2        MR. RICCO:   Judge, members of al Qaeda --
3        THE COURT:   Just a moment.
4        MR. RICCO:   Members of al Qaeda are not defined by
5    whether or not they will commit attacks against the United
6    States.   Members of al Qaeda are defined by their allegiance to
7    join a war of terrorism throughout the world, which has
8    included Americans wherever they're found throughout the world.
9    I came up with this alternative solution because I think the
10   alternative solution more accurately defines what al Qaeda does
11   throughout the world, and at the same time doesn't prejudice
12   Mr. Paracha from the kind of testimony that an expert would
13   give.
14       THE COURT:   We need to give the reporter a break.
15   Let's take 10 minutes.
16       (Recess taken)
17       (In open court)
18       THE COURT:   Let's continue.   On the KSM slide and the
19   defense has indicated an objection to the use of the phrase
20   United States as well as the bullet point number four.   The

Page 183

5b23parh.txt
21    specifics, and I think the parties have said everything they
22    have to say.  I need to make a 403 ruling on whether we should
23    say the United States and have the specific terrorist plots.
24          I have to say that my inclination is to permit the
25    reference to the United States.  Indeed, saying around the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

200

5B23PARH

1    world includes the United States.  But if the government seeks
2    to have the United States in, that seems appropriate.
3          I do think, at least preliminarily, again I want to
4    think about what I've heard today, the specific references to
5    the destroying 12 airliners and the terrorist plot in East Asia
6    will be out.  So the fourth bullet point will be out.  If you
7    want to say Masterminded terrorist attacks including funding
8    against the United States, if that's the case, in other words
9    combine three and four.  That's my ruling at this point.
10          You can use the United States, cut out the reference
11    to the 12 airliner incident.
12          All right.  Next.  That's Ammar al-Baluchi.  Defense,
13    any objection?
14          MR. RICCO:  Yes, Judge.
15          THE COURT:  What.
16          MR. RICCO:  We object to bullet point two, bullet
17    point three.
18          THE COURT:  When you say two, which do you mean?
19          MR. RICCO:  Facilitate and finance of terrorist
20    attacks against the United States.  We object to that.  We
21    believe that compromise to protect the defendant from prejudice
22    and from improper expert testimony should be facilitate and
23    finance of the terrorist attacks period.  We object to bullet
Page 184

5b23parh.txt

24      point three.  Same objection.

25              THE COURT:  I don't understand what three is.  That's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

201

5B23PARH

1       all I'm asking.

2               MR. RICCO:  Three is wired money to individuals

3       plotting terrorist attacks against the United States.

4               THE COURT:  Yes.

5               MR. RICCO:  We believe that sentence should end with

6       the word attacks.  Bullet point four is facilitated the travel

7       of individuals plotting terrorist attacks against the United

8       States and taught them about life in the West.  We believe that

9       should be facilitated the travel of individual plotting

10      terrorist attacks and taught them about life in the West.

11              Bullet point five says relaying messages KSM --

12              THE COURT:  Is your objection on everything

13      referencing the United States?

14              MR. RICCO:  Yes, Judge.

15              THE COURT:  All right, I understand.  That's it.  Go

16      ahead.

17              MR. RICCO:  Judge, I wanted to make a point with this.

18      And it's not, Judge, that the United States --

19              THE COURT:  I got the point, if it's just that you

20      want the United States out.  So if there's something more, tell

21      me.

22              MR. RICCO:  I'm trying to do that right now.  It's

23      not, Judge, that the United States is a part of the world so it

24      doesn't matter.  Our country is at war.  So we have the issue

25      of prejudice on one hand.  We also have the issue of what is

Page 185

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

202

5B23PARH

1    proper expert testimony.  And if the Court is allowing expert

2    testimony on this subject, then what the government needs,

3    without prejudicing the defendant, is that this man al-Baluchi

4    was involved in terrorist attacks and then they prove up

5    factually through a fact witness, that is Uzair Paracha's

6    statements as it connects to al Qaeda.  As opposed to making

7    that connection, that is having testimony in this case about

8    attacks against the United States, coming from an expert

9    witness opinion testimony.

10            THE COURT:  Now I understand that point.  Okay.

11            MR. BRUCE:  Your Honor, with respect to the phrase

12   against the United States, I think effectively you just ruled

13   on that with respect to the KSM slide.

14            THE COURT:  Mr. Ricco has now put a different slant on

15   it.  Yes, I did in the context of KSM, but what he's saying now

16   is he doesn't think it's appropriate expert testimony.

17            MR. BRUCE:  And I don't understand why.  I mean, those

18   are the facts.  I mean we know 9/11 happened, we know the '93

19   World Trade Center bombing happened.  We know all the other

20   plots that are laid out in here happened.

21            You know, I don't know if he is taking issue with the

22   reality of whether it happened or what it is.  The touchstone

23   of the Daubert case is supposed to be is it reliable.  In this

24   case it's not only reliable, it's, you know, totally proven.

25   We know it happened.  It happened, you know, not far from here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

203

5b23parh.txt

5B23PARH

1    So why can't it come in through an expert?  It's not like he's
2    fantasizing about this or, you know, it's something crazy he's
3    come up with.
4           If he wanted to call one of the victims from 9/11,
5    that's a fact witness.  But obviously we are not doing it that
6    way.  We're doing it in a much more truncated way.  As I said,
7    I expect it will be an hour on direct to get through these
8    slides.  I don't think it's something that's so out in left
9    field it couldn't come through an expert.
10          MR. RICCO:   Judge, reliability is only one part of the
11   Court's gatekeeping function.  I know this Court is aware of
12   that.  Judge, this case does not involve an attack against the
13   United States, so therefore this Court should be extra
14   circumspect with respect to any testimony about that subject
15   matter because of the sensitivity of it.
16          On the one hand the government says everybody knows
17   about these attacks so what's the problem.  The problem, Judge,
18   is that expert testimony should be testimony that assists the
19   jury in determining the facts or drawing inferences from the
20   facts they hear in the case.
21          What the jury will hear is testimony that al-Baluchi
22   is involved in terrorism.  They will hear factual testimony
23   from Uzair Paracha and other witnesses about what he did to
24   further that cause.  It should be done in a nonprejudicial way.
25   In the context of this case, what's charged in this case, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH

1    testimony with respect to attacks against the United States,

5b23parh.txt
2   United States citizens, is not appropriate expert testimony.

3          THE COURT:  All right.  I understand the point.  I

4   need to think about that.  Let's go on to the next line.

5          MR. BRUCE:  Could I just add one thing, your Honor,

6   because I think it's important and it keeps coming up as a

7   refrain from the defense.

8          This case is about providing material -- a conspiracy

9   to provide material support to al Qaeda, which could have

10  indeed resulted in an attack against the United States.

11         MR. WILFORD:  Could have.

12         MR. BRUCE:  It is perfectly relevant.  As I indicated,

13  statements from the defendant were that he knew Majid Khan was

14  al Qaeda and that he believed he was coming to the United

15  States to do a terrorist attack.  So it's not like you can

16  totally divorce it and say al Qaeda is this amorphous thing

17  that has no relationship to the United States.  I wanted to add

18  this.

19         THE COURT:  Next three slides, defense.

20         MR. RICCO:  Judge, we object to the next slide in its

21  entirety on the grounds we said before and also on relevancy

22  grounds with respect to the specific bullet points dealing with

23  the attack on the Cole, the Jose Padilla dirty bombs, and cell

24  phones.  We would object to that entire slide.

25         THE COURT:  On relevance grounds.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                205
        5B23PARH

1          MR. RICCO:  Yes, sir, and prejudice and 403.

2          THE COURT:  I understand.

3          MR. RICCO:  The next slide, Judge, with Majid Khan,

4   it's the same objection.  And what we would have is -- what we
                            Page 188

5b23parh.txt

 5   would hope is the Court would do is to allow the first bullet

 6   point up to targets, and the rest of this slide's bullet points

 7   should be not permitted, and of course those relating to

 8   storage tanks against America, gas stations, links to tear down

 9   bridges in the Metropolitan area, like the bridge we can see

10   here from the courtroom, and fundraising by a woman named

11   Siddiqui, that has absolutely no relevance to this case

12   whatsoever.  From a factual standpoint, I don't know of any

13   fact as to how this woman's fundraising is relevant in this

14   case in any way.

15             THE COURT:  Is that true of Faris as well?

16             MR. RICCO:  Yes, sir.

17             MR. BRUCE:  Let me take --

18             MR. RICCO:  And you have the prejudice with respect to

19   Faris.  I'm sorry.

20             THE COURT:  Prejudice with respect to -- Faris?

21             MR. RICCO:  Yes, Judge, because you kept out the other

22   information about the -- about New York, the World Trade

23   Center, and Faris is the bridge right here, Judge.

24             MR. BRUCE:  What the defense is now asking you to

25   rule, your Honor, is to go back to where we were on Friday when

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    206
5B23PARH

 1   they offered to stipulate that Majid Khan was al Qaeda.  And we

 2   talked about why that wouldn't be sufficient.  Now they want

 3   your ruling to be basically just a stipulation.  They want to

 4   just say Majid Khan was an al Qaeda operative working with KSM

 5   to collect intelligence on potential terrorist targets period.

 6   That's what they offered on Friday and we sort of got past

                              Page 189

5b23parh.txt

7    that.

8           In terms of, you know, there was reasons why people

9    needed to know about the roles of particular people, there

10   needed to be some meat on the bones, we kept using that phrase.

11   So Evan Kohlmann's credibility would be understood by the jury

12   and they would have an understanding as to why he is saying

13   things.  He is saying about who these people are.

14           THE COURT:  What's the relevance of Faris and Siddiqui

15   to this case?

16           MR. BRUCE:  Siddiqui is extremely relevant in the

17   defendant's statements.  His confession, your Honor, he talked

18   about Aafia Siddiqui, so the jury needs to know who she is.  No

19   question about it.  She is all over the defendant's statements.

20           THE COURT:  What does he say in the statements?

21           MR. BRUCE:  In essence, your Honor, he says that Majid

22   Khan, when the defendant and Majid Khan were in Pakistan

23   together, asked him to monitor a PO box in Maryland.  The PO

24   box in Maryland was important, and you are going to hear a lot

25   about it during the course of the case, because the travel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

207

5B23PARH

1    document which Majid Khan sought from the INS was to be

2    returned to that PO box.  Majid Khan's in Pakistan, he can't

3    get it obviously.

4           And the whole genesis -- the whole sort of crux of

5    this case is that Majid Khan asked him to get the travel

6    document and that's part of the conspiracy to get Majid Khan

7    into the United States.  He told him that Aafia Siddiqui had

8    opened the PO box for him.

9           Indeed, you'll see the evidence during the course of

5b23parh.txt

10    the trial that we have the actual forms that were used to open

11    the PO box, and on them is the name Aafia Siddiqui and Majid

12    Khan.  In addition, we are going to call a representative from

13    the post office who actually opened the PO box when Aafia

14    Siddiqui came in that day and filled out the documents.  She's

15    clearly a relevant player.

16              MR. WILFORD:  Your Honor, I don't know about all over

17    the statement.  There's a small portion where there's a

18    reference to Aafia Siddiqui and that's in response to a

19    question by one of the agents with respect to Siddiqui and what

20    she would do.

21              The government is taking knowledge with respect to the

22    agent and transforming it on to Mr. Paracha.  That's not what

23    happened here.  The whole thing about Aafia Siddiqui is she was

24    on the paperwork.  If she was on the paperwork, it was about

25    the box in Maryland, not that she is somehow connected to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

208

5B23PARH

1    defendant.  There is no indication that Mr. Paracha had any

2    knowledge about this woman.

3              MR. BRUCE:  That's not true.

4              MR. WILFORD:  And that's the real crux of what was

5    said in the statement.  He didn't say oh yeah, I knew Aafia

6    Siddiqui, I know she is the person on the box.  That's not what

7    occurred here.  I'd ask the Court -- excuse me, Mr. Bruce.  I'd

8    ask the Court, before you rule on this subject, that you in

9    fact look at the statement in its entirety which relates to the

10    initial statement by Mr. Paracha, and specifically the portion

11    of it which deals with Aafia Siddiqui.

Page 191

5b23parh.txt
12          THE COURT:   I'll go back and focus on that.

13          MR. BRUCE:   I'll indicate, your Honor, that I believe

14   the agent's testimony will be that the defendant brought up the

15   name Aafia Siddiqui, not them, and the agents then questioned

16   him about who Aafia Siddiqui was.   And for example, to test his

17   knowledge of who she was, they asked him is she -- is she al

18   Qaeda and I don't know what was the specific response to that.

19   But they asked is she the kind of person who, if asked to do

20   so, would accept anthrax in the mail, and he indicated yes I

21   think she would.

22          THE COURT:   Last slide.   This is a duplicate.   The

23   last page I have is just a duplicate.

24          MR. WILFORD:   Right.

25          THE COURT:   Mr. Wilford, make your argument, if you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                       209
5B23PARH

1    wish, on methodology.   Because at the start of this discussion

2    you said assuming, your Honor, that the methodology is

3    accepted.

4           MR. WILFORD:   Yes, however Mr. Ricco is making

5    argument.

6           THE COURT:   Either one.   I don't want to have the

7    government double teamed.

8           MR. RICCO:   We understand.

9           THE COURT:   Loud whispering will not be stopped

10   because it's been going on all afternoon.   Go ahead.

11          MR. RICCO:   I really want to get to the crux of the

12   issue as best I can.   There is no question, your Honor, that

13   the proposed expert witness is a very knowledgeable individual.

14   And he has obtained a great deal of knowledge about cases tried

Page 192

5b23parh.txt

15    in this district, cases tried in other districts, that he has

16    knowledge about the Internet and he has formed opinions based

17    upon the knowledge he has obtained.

18         However, when we discuss the concept of expert

19    testimony, we want to know what he's going to be testifying

20    about, how he came about getting that information, and then

21    whether or not it's appropriate expert testimony.

22         We believe, Judge, quite simply, that his methodology,

23    methodology, is really very different from what you have in a

24    regular organized crime case where you're getting information

25    about an organized crime family and individuals.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              210
     5B23PARH

1          What we have in this case is a person who's put forth

2     as an independent witness, who has really obtained his opinion

3     for the most part from government documents.  Government

4     pleadings.  As set forth in the exhibits in the case, as set

5     forth in the footnotes.  We have a witness whose methodology

6     consists of reviewing the bill of particulars, reviewing the

7     government's responses, reviewing other government documents.

8          THE COURT:  He also testified to original sources of

9     what he called open source documents that were original

10    documents, as well as the interviews, and when he was

11    referencing the 9/11 Commission report, he was also referencing

12    original sources within that report, if I recall correctly.

13    So, your argument would have more force if he was only using

14    government documents, but you must agree that he testified to

15    using original source non-government documents.

16         MR. RICCO:  Right.  I would also agree he wasn't able

                              Page 193

5b23parh.txt

17      to identify any of those documents so we could have an

18      independent basis of determining whether or not that's true.

19      When we look at his summary report, and I'll just give the

20      Court one example.

21              Your Honor, go back and look at his assessment of

22      al-Baluchi.  Every sentence in that report, with the exception

23      of one sentence, has a reference, and every one of those

24      references is to either a government document, a court

25      document, or generically saying the 9/11 report.

211

5B23PARH

1               THE COURT:  Mr. Wilford made that point.

2               MR. RICCO:  So, Judge, what happens, and what is of

3       concern in this case, is that we can't look at the witness's

4       general knowledge about al Qaeda.  We have to look at

5       specifically what he's offering testimony to, and then

6       determine with respect to each one of these specifics, is there

7       a methodology that supports what he wants to testify to.

8               It becomes particularly critical in this case because

9       we have the absence of factual testimony about the subject

10      matters that he is going to discuss.

11              I've tried two of these cases and I would say in both

12      cases there were testimony about the existence of al Qaeda and

13      the relationship of its various members.  However, we as the

14      defense had an opportunity to cross-examine the person who was

15      offering that testimony to determine whether or not it was

16      accurate and reliable.  We don't have that in this case.

17              What we have in this case is factual testimony, for

18      example, bombing attacks against the United States, being

19      offered as opinion testimony.  Therefore depriving the defense

Page 194

5b23parh.txt

20      of an opportunity to fully cross-examine on that -- on those

21      subject matters.

22              He said he made a reference to the Osama bin Laden

23      trial.  Well, the people who testified to those cells in that

24      case were not expert witnesses, Kurt Shoe was a witness and

25      Jamal Alfadil, who was a government witness, who testified,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

212

5B23PARH

1       both of those individuals were cross-examined by the defense.

2               What happens here is almost tantamount to a Crawford

3       problem, because we are getting specific factual information as

4       to which the jury is being asked to rely upon as opinion, but

5       is actually factual evidence such as al Qaeda was established

6       on a certain date, such as KSM is this leader, and so-and-so is

7       connected to him in this way.

8               THE COURT:  Isn't that what happens in the traditional

9       organized crime cases where somebody gets on as an expert

10      witness and says there are five families, this person is the

11      head of it, they have capos, they have consiglieres; isn't that

12      exactly what comes in Bocassio and the other cases?

13              MR. RICCO:  Yes, Judge, but there's a slight

14      difference.  The government cites Domra and Hammoud.  In those

15      cases expert testimony was allowed, but in both of those cases

16      when you look at those cases, the issue of the relationship

17      between the defendant and the charges required expert

18      testimony.  In Domra, the defendant denied that he was ever

19      affiliated, so expert testimony was needed to show the

20      affiliation.  And Hammoud, the defendant was traveling and

21      recruiting people in camps in Afghanistan with one organization

Page 195

5b23parh.txt

22    that was protecting al Qaeda, so naturally the jury needed that

23    type of information.

24           In our regular organized crime cases, those cases

25    involve racketeering.   Therefore, the jury is hearing expert

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

213

5B23PARH

1     testimony about how the individuals associate with one another

2     so they can understand relationship to those individuals.

3            Judge, I take the position that some of what this

4     witness testified to might arguably be expert testimony at this

5     point.  I don't think anybody would dispute that there is an

6     organization called al Qaeda.  I don't think anybody would

7     dispute that that organization is led by Osama bin Laden.  To a

8     certain extent, your Honor, some testimony about that structure

9     is relevant for the jury to understand Mr. Paracha's contact

10    with these individuals.

11           When we move beyond that, as exhibited in these bullet

12    points, and the witness is now talking about specific

13    incidents, we no longer are talking about the kinds of

14    testimony that we hear and what happens in what the Court calls

15    the routine organized crime case, by expert testimony.  That

16    expert testimony would always come from an informant.  The

17    hierarchical testimony would come from an agent like Agent

18    McCabe or George Gabriel one of the other FBI agents who

19    testified.

20           THE COURT:  As fact witnesses or as expert witnesses?

21           MR. RICCO:  The specifics would come from fact

22    witnesses.

23           THE COURT:  The hierarchical?

24           MR. RICCO:  The hierarchical comes from expert
                          Page 196

5b23parh.txt

25      witnesses in the cases I've been in.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

214

5B23PARH

1               THE COURT:  But the hierarchy expert testimony

2       involves identification of particular individuals.

3               MR. RICCO:  Judge, I don't disagree with that.

4               THE COURT:  Does that go to Khan and Ammar al-Baluchi

5       as well?

6               MR. RICCO:  Judge, no.

7               THE COURT:  Why?

8               MR. RICCO:  Because the testimony that the witness is

9       prepared to give in this case really goes to factual evidence

10      about what it is they are doing, in a case where the jury is

11      going to have substituted statements from those very same

12      individuals.  So the danger is that the jury will put more onus

13      or more weight on the expert testimonies -- expert witness's

14      testimony.

15              THE COURT:  I think that point goes to Ammar

16      al-Baluchi and Khan alone, but it does go to those two.

17              MR. RICCO:  Yes, sir.  And one other point.  Judge,

18      the danger with social science expert testimony is that there's

19      no accepted methodology for social sciences.  As in the NAACP

20      v. Florida Department of Corrections case, there has to be,

21      your Honor, some parameters that allows one court from another

22      to determine that there is a standard that is being used that

23      allows expert testimony about social science information.

24              THE COURT:  I understand.

25              MR. RICCO:  So, for example -- I'm sorry, sir.  For

SOUTHERN DISTRICT REPORTERS, P.C.
Page 197

5b23parh.txt
(212) 805-0300

5B23PARH

1    example, this witness is being put forward as an expert witness

2    in terrorism.  Okay.  What makes a witness an expert in

3    terrorism?  The amount of times they appear on the TV show?

4    What they studied in college?  Who they interviewed in a mosque

5    in connection with a graduate program?  How many times they

6    stay on the Internet?  That qualifies a person as an expert?  A

7    book that they wrote for sale?  That qualifies them as a

8    terrorist expert?

9              That would not qualify a person as an expert in any

10   fields because the Court would have no independent way -- yes,

11   Mr. Wilford was saying, let's see those reports.  Because this

12   Court would have no independent way of determining the ultimate

13   reliability, the gatekeeping reliability, of what the witness

14   is being offered.

15             THE COURT:  I agree with you that to a certain extent

16   I am limited in testing the reliability.  Just as the Court

17   isn't required in order to fulfill its gatekeeping function to

18   read all of the sources he read, and just as for example,

19   hearsay sources can be used by an expert in forming an ultimate

20   conclusion, nonetheless we do know something about his

21   methodology and we have several hours' worth of

22   cross-examination and direct of the methodology.  We know that

23   he did what he did.  We know he went to open sources, we know

24   he did interviews, we know he studied this, we know he's done

25   theses.  We know that he has read government reports.  And yes,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH

5b23parh.txt

1    he read things prepared by the government in litigations.  We

2    know to the extent -- I accept that he did cross checking to

3    take things out of his analysis that were he deemed unreliable.

4    We know to the extent I find it credible that it was peer

5    reviewed.  You would argue with the extent of the peer review.

6    Those are the traditional Daubert tests that we look at to see

7    if it's reliable under 702.  And admissible under I guess it's

8    702 and 703.  So we know some of that.

9             MR. RICCO:  But --

10            THE COURT:  Are you arguing with that methodology,

11   that is his sources, his peer review, his cross checking?

12            MR. RICCO:  Yes, Judge, because we don't know enough

13   about it.  We don't know enough about the cross checking.

14   We're not concerned when he is offering testimony as to whether

15   or not there's al Qaeda.  Or whether or not bin Laden is the

16   head of al Qaeda.  He could cross check that anywhere he wants

17   to.  That's not something -- that's in common knowledge of

18   everybody.  And we don't need an expert for that either.  But

19   when we start moving away from that, then we don't have any

20   theory or technique that can be tested.  He doesn't have one.

21            THE COURT:  I think really, to be specific on the

22   slide that you're talking about is on slide number three, you

23   have the problem with the third level.  You don't have a

24   problem with the first and second levels, but you have a

25   problem with the third level.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              217

5B23PARH

1             MR. RICCO:  Yes, sir.  Judge, just one other point and

2    Mr. Wilford is nudging me about, is that we also don't even

Page 199

5b23parh.txt

3    know about an error rate here.  The potential for an error

4    rate.

5         THE COURT:  In a social science it's not susceptible

6    to a scientific error rate.  It would be nice if it were.

7    Social science experts are allowed in by the Courts -- I'm

8    sorry I may have misstated on the slide that says 2001-2003;

9    did you have a problem with the third level?  It's unclear in

10   my notes.

11        MR. RICCO:  Yes, Judge.

12        THE COURT:  That is al-Baluchi and Majid Khan.

13        MR. RICCO:  Yes.

14        THE COURT:  Go ahead.

15        MR. RICCO:  Also the point I was previously making

16   where there is a lack of standards for the review of a

17   so-called terrorist expert, is why we have the same man who is

18   rejected as an expert in the same charge, because the Budor Ali

19   case in the Eastern District charges a violation of 18 United

20   States Code 2339(b) and the 1705.  We have here in our case

21   same expert, same charges.

22        THE COURT:  I don't know.

23        MR. RICCO:  Rejected in one case; accepted in another.

24        THE COURT:  I'd like to know the reasoning of that

25   judge so I can submit it to my peer review process.  But we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                            218

5B23PARH

1    don't know anything about the reasoning, and the only thing

2    I've been told is that no Daubert hearing was held.  He didn't

3    know as much as all of us now know about this expert.

4         MR. RICCO:  Or he knows as much as we do know.

5    Because essentially we know what was written in these reports.

Page 200

5b23parh.txt

6      No more, no less.

7              THE COURT:   All right.   Mr. Bruce, I'd like you to

8      respond to the methodology point, I'd like you to respond to

9      the point we don't need an expert in this, and Mr. Ricco

10     touched on a point that I'm concerned about.   In regard to

11     Ammar al-Baluchi and Majid Khan.   That is as follows:   The

12     witness testified that he used the unclassified summaries in

13     arriving at his opinion as to the role of al-Baluchi and Majid

14     Khan.   He did not rely on them in connection with KSM.   The

15     purpose of the unclassified summaries is a compromise set forth

16     in Moussaoui to permit -- well, to accommodate the

17     constitutional rights that are in issue.   When because of

18     national security concerns, the defense is not permitted to

19     have a Rule 15 deposition, and not allowed to have a judge sign

20     a writ for testimony.   So, the accommodation is look, if it's

21     material, necessary, normally you'd get the Rule 15 and maybe

22     exceptional circumstances or you'd get the Rule 15 deposition.

23     Or you get the writ to have him testify.   Here, however,

24     assuming I accept the government's claim of national security

25     doesn't allow us to do that because it would be too dangerous

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

219

5B23PARH

1      to bring them here, there's a compromise that's worked out.

2      And the compromise is, all right look, we're depriving the

3      defense of the ability to question these people, specifically

4      al-Baluchi and Majid Khan.   Because that's unfair, we are going

5      to balance that with allowing them to use affirmatively

6      exculpatory statements that are in the possession of the

7      government.

5b23parh.txt

8           Hence, the unclassified summaries, the last part of

9    that analysis, is we can't allow classified information out so

10   unclassified summaries are arrived at.  But we don't allow the

11   government to use those affirmatively.  It's only the defense

12   that can introduce those, because if the government is going to

13   affirmatively put in evidence from those witnesses, well then

14   by gosh and golly, they probably ought to be here for

15   cross-examination.

16           So what the use of the unclassified summaries under

17   the Moussaoui analysis, as I understand it, is the use by the

18   defense.  Exactly why I'm not letting this man testify to the

19   disinformation campaign.  Okay.

20           That seems to be subverted by his use of the

21   unclassified summaries to come up with his analysis of the role

22   of al-Baluchi and Majid Khan.  Because he went specifically

23   through Exhibits 4 and 5 and said the use he was making of them

24   and he's the government witness.  Doesn't that subvert the

25   Moussaoui compromise?

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                               220
     5B23PARH

1            MR. BRUCE:  I don't see how, your Honor.  Do you want

2    me to take in order or take the last one first?

3            THE COURT:  Start with the last one.

4            MR. BRUCE:  Let me start with the last one.  Your

5    Honor, in that respect it's no different than a 302 or any

6    other report from the government.  Moussaoui is concerned with

7    confrontation rights, and things of that nature, and hearsay

8    rights.  He also testified that he relied on 302s, government

9    reports from family members of Majid Khan.  It's hearsay.  You

10   know, we couldn't just put a sticker on those reports and admit

5b23parh.txt

11      them as evidence here.  But that's what experts do.  They

12      collect everything out in the public arena, and once these are

13      declassified summaries, whether it be for Moussaoui purposes or

14      for anything else, it's public documents that are out there.  I

15      believe it may have even been filed as a public record with

16      this case.  It's something he can go out and grab, look at,

17      cross check and vet --

18              THE COURT:  It's also something that the government,

19      had I allowed them to testify, would have been arguing that

20      these can't be reliable, but he's relying on them.

21              MR. BRUCE:  In certain respects.  He explained why he

22      thought different pieces of it were more reliable than others.

23      He used the catch phrase admission against interest.  He said

24      in my opinion, it's more reliable for Ammar al-Baluchi to say

25      I'm al Qaeda, but so-and-so didn't know about it.  The I'm al

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

221

5B23PARH

1       Qaeda part, in his opinion, was more reliable than the

2       necessarily about the he didn't know about it.  And that's in

3       the rules of evidence.  The admission against interest concept.

4       And he's used that in his expert methodology.

5               I don't see how it's any different than all of the

6       other hearsay which he's permitted to rely upon as an expert.

7       I don't see how it is any different than in organized crime

8       experts who would rely on 302s in hundreds of witnesses, former

9       Mafia members, interviews with former Mafia members, to bring

10      it all together, collect it, cross check it, vet it, and come

11      out with an expert opinion.  If he can't rely on that, then

12      it's really just saying experts shouldn't be able to rely on

Page 203

5b23parh.txt

13    hearsay, which is not what the rules provide.

14           THE COURT:  That's the last point.

15           MR. BRUCE:  Let me circle back to the first point.

16    With respect to methodology, your Honor, I don't know how Mr.

17    Ricco can say there is no criteria or there is no standards

18    with which he can be judged.  The cases we've cited for your

19    Honor, Hammoud and Damra, both in the Fourth Circuit and the

20    Sixth Circuit, have said these are social sciences as your

21    Honor indicated, there's a different methodology.  It's not a

22    pure science.  But there is a methodology to it.

23           The witness has testified at length now about his

24    methodology.  It's basically very similar if not identical to

25    the methodology that Matthew Leavitt used in both of those two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

222

5B23PARH

1     cases.  Where they do what I just said, try to get as much

2     information as possible.  Indeed, they would be probably not

3     doing their job as well as they could if they didn't try to get

4     their hands on everything they could.  And they come out with

5     an expert opinion.  I think there are standards and there is

6     guidance for the Court to look at in those decisions.

7            This  witness, your Honor, I think we made clear, did

8     a lot more than just sit around and read the Internet or read

9     the newspaper.

10           THE COURT:  I am comfortable with the methodology.

11    I'm concerned about the use of the unclassified summaries.  You

12    don't have to say more on the methodology.  It has limitations

13    but I think it's reliable under Daubert.

14           MR. BRUCE:  Let me say --

15           THE COURT:  The reason I said you did cite the cross

Page 204

5b23parh.txt

16    checking, it was peer reviewed, to the extent he testified to

17    it, he sought original sources.  And so forth.  Go ahead.

18              MR. BRUCE:  Let me say a couple more words then, your

19    Honor, about the things he would testify to and if I could make

20    reference to the organizational chart, if your Honor has it in

21    front of you.

22              THE COURT:  Yes.

23              MR. BRUCE:  What I keep hearing from the defense

24    basically is that, you know, no objection and no real dispute

25    there's something called al Qaeda, that there is a hierarchy,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

223

5B23PARH

1     that there is a structure, that Osama bin Laden is the head of

2     it.  I seriously doubt we are going to hear any dispute at

3     trial that Khalid Sheikh Mohammed was the chief operational

4     planner for al Qaeda.

5               So we basically get down to the point where we're

6     talking about Ammar al-Baluchi and Majid Khan.

7               THE COURT:  That's why I was focusing Mr. Ricco on

8     that third level.  I think you're right for discussion

9     purposes, Mr. Ricco, I think you can by large agree with what

10    Mr. Bruce just said.  Right?

11              MR. RICCO:  I am going have to hear the very last part

12    of what he said.

13              MR. BRUCE:  It's basically the idea on the

14    organizational chart.

15              THE COURT:  Your only difference really, your only

16    point of difference is the third level on the chart that says

17    2001-2003.

Page 205

5b23parh.txt

18      MR. RICCO:   Yes.

19      THE COURT:   Okay.   You're not contesting the origin or

20   history or organizational structure or existence of al Qaeda or

21   the fact it's led by bin Laden, and not even in the second

22   level that is of al-Masri, al-Zawahiri, and KSM.

23      MR. RICCO:   No, sir.

24      MR. BRUCE:   Let me address that then those two players

25   are obviously very important players.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

224

5B23PARH

1      THE COURT:   Al-Baluchi and Khan.

2      MR. BRUCE:   Correct.

3      THE COURT:   Right.   They're important for this case.

4      MR. BRUCE:   Exactly.   With respect to his opinion on

5   those two players, I want to specifically visit, you know, what

6   he reviewed with respect to Ammar al-Baluchi.   We have the 9/11

7   Commission report.

8      THE COURT:   Let me tell you what my notes say.   We

9   have the 9/11 report, we have the government permitted him to

10   review money transfers signed by al-Baluchi, we have the

11   summaries of unclassified statements.   For Majid Khan, we have

12   open source documents, unclassified summaries, and FBI

13   interviews with family members.   Is that it?

14      MR. BRUCE:   That's correct.   Except within open

15   sources for both of those people, he referred to news articles,

16   for example, with respect to Majid Khan he talked about a

17   Newsweek article and a CNN document, and it's in his report

18   that reports what Khalid Sheikh Mohammed has said about Majid

19   Khan.   So the universe of open sources includes a number of

20   different things.

Page 206

5b23parh.txt

21          But, with that qualification, I think what your Honor
22   has said is correct.
23          And let me return back to a point I made earlier about
24   reliability.  Your Honor in your gatekeeping role has to
25   satisfy yourself that what he is saying is reliable.  With

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

225

5B23PARH

1    respect to al-Baluchi, you can't get a more comprehensive
2    report than the 9/11 Commission report.  Which is replete with
3    a March al-Baluchi's role in the 9/11 plot.
4          THE COURT:  You are not going to argue that it's
5    appropriate expert testimony for somebody to get up here and
6    summarize government documents, right?
7          MR. BRUCE:  In part, yes.  I mean, if that was the
8    only thing he was doing, no.  But, to rely on that as one of
9    the things he looks at, yes.  That's why we have the list, we
10   have the 9/11 report, and a host of open sources, number one.
11   We have him reviewing actual wire transfers attributed to Ammar
12   al-Baluchi going to the hijackers, hard fact, hard data he's
13   looked at.  Okay.  Number two.  Number three, we have the
14   unclassified summaries where Ammar al-Baluchi makes admissions
15   about his own role in al Qaeda.
16          Those three things and each of them is a group, at
17   least a few of them are groups, make this very reliable, your
18   Honor.  And let me add one more very important point about
19   reliability.  I don't think that the defense in this case is
20   going to be that Ammar al-Baluchi and Majid Khan were not al
21   Qaeda.  Because if it was, Mr. Wilford wouldn't have stood up
22   on Friday and said we're willing to stipulate that they're al

Page 207

5b23parh.txt

23    Qaeda .  So when we're talking about reliability, you have a

24    very solid foundation for why these things are reliable.  With

25    respect to al-Baluchi, I just went through it.  With respect to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

226

5B23PARH

1    Majid Khan, you have similar findings of things.  You have the

2    public source materials I just talked about which attribute

3    statements to Khalid Sheikh Mohammed.  You have the

4    unclassified admissions of Majid Khan with respect to his role

5    in al Qaeda.  And his plot on behalf of al Qaeda.  And there

6    you have 302s, government reports of family members which he

7    indicated buttressed his report and his conclusion that indeed

8    Majid Khan was al Qaeda.  I think for this purpose, the 302s

9    are not different than the unclassified summaries.

10          When you put all that together, these are very rock

11    solid conclusions about these men's role in al Qaeda.  And as I

12    said, I don't think it's going to be disputed at trial.  We had

13    an offer of a stipulation from the defense.  If it's

14    unreliable, why would they have offered to stipulate to it?

15          MR. RICCO:  The government is missing the point.

16    Stipulating that a person is a member of al Qaeda is one thing.

17    Using the unclassified documents to undercut the substituted

18    statements is an entirely different statement, and the

19    government hasn't addressed that.  This is different from the

20    organized crime case that Mr. Bruce was talking about because

21    in those cases government is not holding back the underlying

22    witnesses on the grounds of national security.  In those cases

23    we would be allowed to get a writ and get Tony Bow Ties or

24    whoever into the courtroom.  But the particular circumstances

25    of this case require the Court to complete its gatekeeping

5b23parh.txt

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

227

5B23PARH

1    function.   The government is focusing on one aspect of the

2    gatekeeping function.   The second part is to determine whether

3    it's proper expert testimony in the context of this case.   Even

4    if it does, whether or not 403 says it should stay out, even if

5    the Court were to find it's proper.

6            THE COURT:   The 403 analysis I think goes to the issue

7    of the other attacks.   I don't think the 403 analysis goes to

8    admission of this expert's opinion on the role of al-Baluchi or

9    Majid Khan.

10           MR. RICCO:   I think the Court is right.   But --

11           THE COURT:   Go ahead, sir.

12           MR. RICCO:   Judge, bottom line is that if we are going

13   to have Moussaoui substitute statements in this case, then an

14   expert testimony cannot be used in the manner in which it is

15   proposed.

16           THE COURT:   You agree.

17           MR. RICCO:   Yes, sir.   We are not saying no expert

18   testimony.   We are just saying on this subject.

19           THE COURT:   I understand, and obviously you were

20   echoing my point.   That's my concern that you've stated here.

21           MR. METZNER:   If the Court doesn't mind, I'd like to

22   address that specific point.   I think some chronology is

23   relevant to this discussion.

24           THE COURT:   I was listening to the chronology on his

25   testimony about the difference between his use of the FBI

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 209

5b23parh.txt

5B23PARH

1    family interviews and the unclassified summaries.  He said he

2    did use the unclassified summaries in coming up with his expert

3    report.

4         MR. METZNER:  That's actually right.  The chronology I

5    was referring to is the generation of these documents in first

6    place.  Here's what I mean.  The government released this

7    information not as part of any sort of litigation strategy, but

8    because we had an obligation to produce it pursuant to our

9    Brady obligations.  Therefore the government had an obligation

10   to turn over any evidence that could be deemed exculpatory to

11   the defense.  In there is no way that the government could then

12   have plotted ahead of time to make such disclosures in a way we

13   could then give them to an expert so an expert could take

14   advantage of them to somehow undermine them or that it was some

15   idea of the government's to somehow go back on whatever the

16   ultimate remedy is going to be about the use of that

17   information at trial pursuant to the Moussaoui approach.  The

18   fact this information is out there is a consequence of the

19   government's Brady obligations to the defense.

20        THE COURT:  I think that's right.  I don't have any

21   disagreement with that.  I wasn't indicating that you were

22   being tricky in its use.  I'm just concerned about its use.

23        MR. METZNER:  I understand, your Honor.  I don't think

24   there is any real reason to be concerned in the vein you have

25   articulated, because what's going on is just information that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5B23PARH

1    is information that the expert here would rely on as he

Page 210

5b23parh.txt

2    explained as he considers to be reliable in certain parts.

3    Nevertheless the fact that it is going to be used in some

4    respects perhaps pending your Honor's final ruling on this at

5    the trial as a substitution for the live testimony of these

6    witnesses, I don't think is inconsistent with its use by an

7    expert.  Simply because the two are going to be used for the

8    same purpose doesn't undercut the use I don't believe.

9         THE COURT:  Its use is permitted only by the defense.

10        MR. METZNER:  Your Honor --

11        THE COURT:  I think that's right.

12        MR. METZNER:  I think the use at trial of that

13   information is clearly limited to the use by the defense

14   because for reasons you articulated, the government has

15   declined to identify whether these witnesses are in custody,

16   etc.  But I don't think that -- and the government couldn't

17   make affirmative use of those statements for the same reason.

18   I don't think this qualifies as that same universe of material.

19   This is again, as Mr. Bruce well articulated, I won't bother to

20   repeat, one of several items that Mr. Kohlmann relied on in

21   forming his opinion and again, as your Honor knows, the

22   chronology that you referred to, his opinion was formed

23   initially when he wrote the report without having seen these at

24   all.

25        THE COURT:  No.  His opinion was formed when he wrote

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

230

5B23PARH

1    the report in part by a reference to the unclassified

2    summaries.  What he had not seen was the family member FBI

3    reports.

Page 211

5b23parh.txt
4          MR. METZNER:   My apologies.

5          THE COURT:   Mr. Metzner or Mr. Bruce, is this witness

6    doing anything more than summarizing factual information that

7    he's reviewed?

8          MR. BRUCE:   I don't know what you mean, your Honor.

9          THE COURT:   I'm trying to really understand what his

10   expert opinion is.  Is he simply summarizing the facts in

11   documents that he has looked at and repeating them back to the

12   jury as opposed to being a true expert giving a specialized

13   knowledge that the jury doesn't have?

14         MR. BRUCE:   On which particular point?

15         THE COURT:   On anything.

16         MR. BRUCE:   On anything?  No.  I mean I think he sat

17   face to face with members and associates of al Qaeda,

18   interviewed them in person, you heard he's gone to meetings of

19   al Muhajiroun which were sort of group meetings of people

20   involved in that group.  He's gone out to the field and gone to

21   mosques, places where hijackers lived, he's gone to Bosnia, and

22   reviewed places there.  So it's lot more than sitting at your

23   desk and just reading things your Honor.  I don't know if that

24   responds to your question.

25         THE COURT:   All right.  Is there anything else?  If

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                              231
     5B23PARH

1    not --

2          MR. RICCO:   No, Judge.  I don't want to belabor my

3    point.  I feel that the Court understands our position here.

4    We're really focusing on the al-Baluchi and the Majid Khan

5    statements and this proposed witness definitely didn't sit down

6    with them face to face.  He is only testifying with respect to
                              Page 212

5b23parh.txt

7    those conclusions based upon the review of the documents that
8    he testified to at the hearing, Judge.
9         One final point.  I know we're ending, but Uzair has
10   to break fast and he's already an hour over.
11        THE COURT:  We'll finish up right now.
12        MR. RICCO:  Thank you.
13        MR. BRUCE:  I don't disagree that he never sat and
14   interviewed Ammar al-Baluchi and Majid Khan, but he doesn't
15   have to, is my point, in order for him to give expert testimony
16   in that regard.
17        THE COURT:  I've got to think through his use of those
18   unclassified summaries.  I appreciate the argument.  You can
19   dismiss Mr. Kohlmann and come in at three on Friday and I'll
20   try to --
21        MR. WILFORD:  I'm sorry, your Honor.  Both Mr. Ricco
22   and myself will be attending a conference in Pittsburgh.  We
23   will not be in the city.  We're leaving tomorrow afternoon.  We
24   can come in Monday morning.
25        THE COURT:  I need to make rulings here on a number of

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              232
5B23PARH

1    these 403 issues and the expert testimony.
2         MR. RICCO:  Judge, just so you know, we are
3    available -- we have to fly out of Newark at -- we have to be
4    in Newark by 3:30.  We're available all day up until that time.
5    And Judge, just so you know, it's not just a conference.  It is
6    in connection with the same capital case that has the January 9
7    trial date.  We're on a lot of pressure to do that.  Otherwise
8    we would --

                            Page 213

5b23parh.txt

9      THE COURT:   You have to leave here at 3:30?

10     MR. RICCO:   Judge, we have to be at Newark by about

11   3:30.   We can check the specific times of the flight and call

12   the chambers back as soon as we get to the office.

13     MR. BRUCE:   Or just as a suggestion, I don't know what

14   it entails, maybe one counsel could go and one could stay.

15     THE COURT:   Is anything happening in Pittsburgh

16   tomorrow night?

17     MR. WILFORD:   No, Judge.   The conference starts early

18   in the morning.   We have prepaid tickets.   We already bought

19   our tickets.   We do have the tickets purchased already.   I

20   believe that I can -- the flight may be a little bit later.   We

21   may have a little leeway.   I just have to check the exact time

22   when I get back to the office.

23     THE COURT:   You can't do it on Friday.

24     MR. WILFORD:   We're not going to be in New York.   The

25   conference is all day Friday.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

233

5B23PARH

1      THE COURT:   Gentlemen, what were you going to do if

2   the trial was on?   You didn't want it on Friday.

3     MR. RICCO:   It isn't we didn't want the case on

4   Friday, Judge.   He is a Muslim.   He is a practicing Muslim.

5   It's because of that, that we agreed to participate on that

6   day.   But for that, we would not have agreed to participate on

7   that day.

8      THE COURT:   One of you should take the latest flight

9   out tomorrow night.   Does your conference start Friday morning?

10     MR. RICCO:   Yes.

11     THE COURT:   You should take the latest flight out

Page 214

5b23parh.txt

12    Thursday night or the earliest flight out Friday morning that

13    will get you there.  All right?

14        Let's set a conference for tomorrow at 3 p.m. and if

15    you want, if you can't do that, let my chambers know and we'll

16    move it up.  I really want to think about these issues

17    obviously.

18        MR. WILFORD:  We appreciate that, Judge.

19        THE COURT:  One of you should try to be able to be

20    available so we can spend the latter part of tomorrow afternoon

21    with these issues.

22        MR. WILFORD:  That's fine, Judge.  We'll make the

23    accommodation.

24        THE COURT:  All right.  So 3 o'clock unless that's

25    absolutely impossible then let me know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

234

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    EVAN KOHLMANN

4    Direct By Mr. Bruce . . . . . . . . . . . .    10

5    Cross By Mr. Wilford . . . . . . . . . . .    95

6    Redirect By Mr. Bruce  . . . . . . . . . .   166

7    Recross By Mr. Wilford . . . . . . . . . .   184

8                    GOVERNMENT EXHIBITS

9    Exhibit No.                          Received

10   1   . . . . . . . . . . . . . . . . . .     39

11   2   . . . . . . . . . . . . . . . . . .     40

12   3   . . . . . . . . . . . . . . . . . .     44

13   4   . . . . . . . . . . . . . . . . . .     82

Page 215

```
                        5b23parh.txt
14     5    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .    89

15     6    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   179

16                    DEFENDANT EXHIBITS

17   Exhibit No.                              Received

18    3501-B     .  .  .  .  .  .  .  .  .  .  .  .  .   156

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300