UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Euro Brokers, et al. v. Al Baraka, et al.,* 04 CV 7279 (RCC)
*World Trade Center Properties LLC, et al. v. Al Baraka, et al.,* 04 CV 7280 (RCC)
*Federal Insurance Company, et al. v. Al Qaida, et al.,* 03 CV 6978 (RCC)
*New York Marine and General Insurance Co. v. Al Qaida, et al.,* 04 CV 6105 (RCC)
*Thomas E. Burnett, Sr., et al., v. Al Baraka Investment & Development Corp., et al.,* 03-CV-9489 (S.D.N.Y.)

PLAINTIFFS' CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO
MOTION TO DISMISS OF YOUSEF ABDUL LATIF JAMEEL

September 16, 2005

# TABLE OF CONTENTS

*Page*

INTRODUCTION ...................................................................................................................1

ARGUMENT.........................................................................................................................1

I.  SUMMARY OF FACTUAL ALLEGATIONS AGAINST YOUSEF JAMEEL ............................... 1

    A.  **Yousef Jameel Has Long-Standing Involvement in Fostering Islamic Extremism and Osama bin Laden** ............................................................................ 1

    B.  **Contacts With and Presence in the United States** ............................................ 5

II.  FED. R. CIV. P. 12(B)(2) STANDARD ............................................................................ 5

III.  FED. R. CIV. P. 12(B)(6) STANDARD ............................................................................ 6

IV.  DEFENDANT YOUSEF JAMEEL IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES ................................................................................................................... 7

    A.  **Jameel Was Properly Served by Publication, Does Not Dispute That Service Was Proper and Effective, and Improperly Asserts the Application of the New York Long-Arm Statutes.**................................................................................ 7

    B.  **The Exercise of Jurisdiction Over Jameel Comports with Due Process Because Jameel, Who Purposefully Directed His Conduct at the United States, Could Reasonably Expect to be Haled Into Court Here.**................................................ 8

        1.  *Standard for Satisfying Due Process* ..................................................... 8

        2.  *The Allegations and Prime Facie Evidence Against Jameel Demonstrate He Purposefully Directed His Conduct at the United States and is Therefore Subject to Jurisdiction of the Court.* ......................................................... 9

        3.  *Plaintiffs herein have made prima facie showing as to the golden chain collection of documents.* ......................................................................... 10

    C.  **Jameel Is Also Subject to Jurisdiction in This Court Because He Conspired With al Qaeda to Attack the United States** ................................................................ 16

V.  THE COMPLAINT SUFFICIENTLY ALLEGES A CAUSAL CONNECTION BETWEEN JAMEEL AND THE INJURIES AND DEATHS THAT OCCURRED ON SEPTEMBER 11, 2001 ............................ 17

    A.  **Plaintiffs Have Sufficiently Alleged Acts of International Terrorism, and Therefore Have Stated a Valid Cause of Action Under the ATA.**....................................... 17

    B.  **The Complaint Sufficiently Alleges Violations of the ATA**................................ 18

    C.  **The Complaint Sufficiently Alleges that Jameel Knowingly and Intentionally Violated the ATA.** ....................................................................................... 20

D.    **Jameel's Conduct Is Not Too Remote to Constitute the Proximate Cause of Plaintiffs' Injuries.** ........................................................................................ **20**

E.    **Plaintiffs' Non-ATA Claims Against Jameel.** ..................................................... **22**

F.    **All of the Property Damage Plaintiffs Properly State RICO Claims** .............................. **22**

**CONCLUSION** ............................................................................................................................ **25**

# TABLE OF AUTHORITIES

*Page*

## CASES

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) ................................8

*Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ....................25

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) ....................................................................23, 24

*Baisch*, 346 F.3d at 376 ......................................................................................24

*Bao Ge v. Li Peng*, 201 F. Supp. 2d 14 (D.D.C. 2000) ....................................................22

*Boim*, 291 F.3d 1000 .....................................................................................19, 21

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ..........................................................8

*Calder v. Jones*, 465 U.S. 783 (1984) ....................................................................6

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ........................16

*Conley v. Gibson*, 355 U.S. 41 (1957) ..................................................................6, 7

*Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ..............................................6

*De Falco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ........................................................23

*Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 974 F.2d 270 (2d Cir. 1992) .....................................................................................16

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001) ......................................6

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158 (S.D. N.Y. 2003) ..............................23

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ................................23

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) ........................................8

*Friedman v. Hartmann*, 1994 WL 376058, *2 (S.D. N.Y. July 15, 1994) ....................................24

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ......................................................7

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ..................................................19, 20

*Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258 (1992) ............................................25

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ........................................19

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ................................6

*In Re Terrorist Attacks on September 11, 2001, 349 F.Supp. 765 (2005)* .............................. passim

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ............................................7, 8

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) ......................................6

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ..........................................................22

*Kurowski v. City of Bridgeport*, 1988 WL 25417 (D. Conn. Mar. 14, 1988) ................................22

*Lamarca v. United States*, 31 F. Supp. 2d 110 (E.D.N.Y. 1998) ..........................................21

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ................................................24

*Linde v. Arab Bank*, --- F. Supp. 2d ----, 2005 WL 2108690 ..........................................20, 21

*Meyers v. Epstein*, 282 F. Supp. 2d 151 (S.D.N.Y. 2003) ................................................21

*Michael v. Clark Equipment Co.*, 380 F.2d 351 (2d. Cir. 1967) ..........................................15

*Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y. 1993) ......................................................24

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ......................................................6

*National Asbestos Workers*, 74 F. Supp. 2d at 225 ....................................................24, 25

*Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) ............................................7

*Palestine Info. Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) ..........................................8

*PDK Labs v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) ..................................................6

*Pelman ex rel v. McDonalds Corp.*, 396 F.3d. 508 (2d. Cir. 2005) ....................................15, 16

*Rasul v. Bush*, 124 S. Ct. 2686 (2004) ..................................................................23

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................................24

*Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95 (E.D.N.Y. 2000) ........................................16

*Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217 (S.D.N.Y. 2003) ...............................18
*Sosa v. Alvarez-Machain*, 542 U.S. 692; 124 S. Ct. 2739, 2766 n.20 (2004) ...........................22
*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ............................................................................7
*U.S. v. LaRouche Campaign, et al.*, 695 F. Supp 1265 (D.C. Mass. 1988) ...........................14
*United States v. Allen*, 155 F.3d 35 (2d Cir. 1998) ...................................................................23
*United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226 (N.D. Ill. Feb. 4, 2003) ..........10, 11
*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ..........................................................23
*United States v. Turkette*, 452 U.S. 576 (1981) ........................................................................23
*Von Bulow v. Von Bulow*, 634 F. Supp. 1284 (S.D. N.Y. 1986) .............................................25
*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ..........................................8
*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ..................................................................6, 7

## STATUES

18 U.S.C. § 1962 ............................................................................................................22, 23, 24
18 U.S.C. § 2333 ............................................................................................................17, 18, 20
18 U.S.C. § 2336(a) .................................................................................................................17
18 U.S.C. § 2339A .............................................................................................................17, 18
18 U.S.C. § 2339B ...................................................................................................................19
28 U.S.C. § 1653 .......................................................................................................................6

## LEGISLATIVE HISTORY

45A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE, § 1351, at 253-59 (2d ed. 1990) ............................................................................................................................18
5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure sec. 1218, at 276 (3d ed 2004) ....21
S. Rep. No. 342, 1992 WL 187372, *22 ..........................................................................18, 19, 22
W. Page Keeton et al., Prosser & Keeton on the Law of Torts, § 43, p. 299 (5th ed. 1984) ..........................21

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(2) ....................................................................................................... passim
Fed. R. Civ. P. 12(b)(6) ....................................................................................................... passim
Fed. R. Civ. P. 4(k)(2) ...............................................................................................................7
Fed. R. Civ. P. 8(a)(2) ...............................................................................................................7

## RESTATEMENTS

Restatement (Third) of Torts § 29 cmt. f. .................................................................................21

## INTRODUCTION

> Those who finance terrorist attacks, and rejoice in the murder of innocent victims, are no different from those who plant the bombs or carry the backpacks.  Money is the lifeblood of terrorism . . .

Statement of United States Attorney Roslynn R. Mauskopf on Sentencing of Mohammed Al Hassan Al-Moayad, July 28, 2005.

Defendant Yousef Abdul Latif Jameel (D#201) (hereinafter "Jameel") moves the Court to dismiss the above-referenced Complaints pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).  Memorandum of Law in Support of Motion to Dismiss (hereinafter "Memo") filed 07/16/05, MDL 1570, Docket #977.  The Court should deny Jameel's Motion to Dismiss for the reasons stated herein.

Defendant Jameel's Memo contains blatantly misleading statements of both law and fact.  First, as much as Jameel might wish to align himself with the Saudi royal family for purposes of deciding this motion, he cannot.[1]  He does not enjoy sovereign immunity.  Second, the repeated refrain that the Plaintiffs' allegations contain "no facts, only conclusions" no matter how many times it is regurgitated, is simply untrue.  Third, the notion that al Qaeda and Osama bin Laden's intentions were somehow a secret until after September 11, 2001, and that Jameel had no idea his ongoing support was aiding and abetting international terrorism, is also demonstrably false.[2]  Fourth, Jameel misleads this Court on what Plaintiffs have alleged and submitted.  Additionally, the Plaintiffs have  made a *prima facie* showing of personal jurisdiction over Jameel based on both his general business dealings in the United States and under a specific jurisdiction analysis.

## ARGUMENT

**I.    SUMMARY OF FACTUAL ALLEGATIONS AGAINST YOUSEF JAMEEL**

### A.    Yousef Jameel Has Long-Standing Involvement in Fostering Islamic Extremism and Osama bin Laden

Yousef Jameel has a long-standing and detailed history of sponsoring Osama bin Laden:

> Beginning in the 1980s, Jameel contributed money and equipment to a number of extremist groups and organizations known to be Osama bin Laden supporters, including the Red Crescent Society and the Saudi High Commission.  *Burnett* MDS ¶¶ 21, 23, 24.

---

[1] Jameel claims that a "straightforward application" of this Court's January 18, 2005, Order mandates his dismissal and cites to this Court's decision on Princes Turki and Sultan.  Memo at  4, 7.

[2] *See* Notice Timeline prepared by counsel for plaintiffs including the public fatwahs of Osama bin Laden published in 1996 and 1998, Exhibit 2 and 8 to Declaration of Jodi Westbrook Flowers (or "Flowers Dec.").

In 1988, Yousef Jameel is identified in the golden chain document[3] as a sponsor of al Qaeda. Flowers Dec., Exhibit 1, Draper Aff. at Attachment G.[4]  Next to Jameel's name on the golden chain document is the name Batterjee.  *Id.*[5]  "Usama" appears after seven of the listings and "Baterji" appears after an additional six listings.  *Id.*  The U. S. Treasury also stated:  "Adel Batterjee has ranked as one of the world's foremost terrorist financiers who employed his private wealth and a network of charitable fronts to bankroll the murderers agenda of al Qaida."  *Id.* at Attachment U.

In 1990, Yousef Jameel donated a check for $1 million to the Abassi Madani and Islamic Salvation Front of Algeria (or "FIS").  The Guardian, April 11, 1994.  Madani served 12 years in jail for his involvement with criminal Islamic terrorism.  The FIS was banned in 1992. Jameel's donations were made during the same time period in which Osama bin Laden was making donations to Islamic radicals in Algeria who were planning terrorist attacks against innocent civilians in France.  Many of these Algerians fought with Osama bin Laden against the Soviets during the war in Afghanistan years before.  Algeria was one of the locations through which members of the Golden Chain supported global jihad.  Federal RICO Statement Attachment A, Flowers Dec. Ex. 3.

In 1993, when Osama bin Laden was stripped of his Saudi citizen status, Jameel's donation to the Islamic Salvation Front was publicly cited as another example of bankrolling militant Islamic extremism.  Flowers Dec. Ex. 4; Youssef M. Ibrahim, "Saudis Strip Citizenship from Backer of Militants," New York Times, April 9, 1994.

In 1995, the Jameel Group donated vehicles to the Saudi High Commission for Donations and Collections for Bosnia Herzegovina, the Bosnian offices of which serve as a front for radical and terrorism-related activities.  *Burnett* More Definite Statement (MDS) ¶¶ 33, 36-37.

In 1996, Sami Al-Arian sent a fax to Yousef Jameel's company ALJ Co. regarding providing bomb-making materials identical to those that were used in the 1993 WTC Bombing. Indictment of Sami Al-Arian, ¶ 191, Flowers Dec. Ex. 5.

In April 1999, Jameel donated 8 million in Saudi riyals, along with vehicles, to known Bosnian-based front groups sponsoring Islamic extremism and al Qaeda.  *Burnett* MDS at 8, 9; WTC RICO statement at Exhibit A,  Federal RICO Statement, Exhibit A, p. 11-14.  Jameel's ongoing material support includes financial sponsorship of the Saudi High Commission (or "SHC") that channeled millions of dollars to al Qaeda.  When the SHC office in Bosnia was raided in October 2001, investigators found computer hard drives of photographs of the World Trade Center before and after its destruction, maps of Washington, DC with prominent buildings marked, photographs of the United States Embassies bombed by al Qaeda in Africa, the U.S.S. Cole, information on airplanes and how to make fake U.S. State Department badges. *Federal* RICO Statement, Attachment A, p. 14-15.

---

[3] The Golden Chain document is but one of several hundred seized in the raid of a so-called charity which has been designated by the United States Government as S.D.G.T. and whose U.S. head received a 20-year federal prison sentence.

[4] Jameel does not deny that his name appears on this document.  Exhibit 2 to Memo p. 2.

[5] According to U.S. Department of Treasury: Evidence  of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices. These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization. Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain." It follows by stating that "This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor."  Draper Aff. Attachment U.

In 1999, Jameel gave at least 1.5 million Saudi riyals to S.D.G.T.'s al Haramain Foundation and WAMY. *Federal* RICO Stmt, Exhibit A at 16-17, WTC and Eubrokers RICO Attachment A.

In 2001, Yousef Jameel's name and contact information was found in a phone book seized by Swiss authorities from S.D.G.T. Yousef Nada. Flower Dec. Ex. 6.

FBI Informant and former top al Qaeda member Jamal Al-Fadl identified Yousef Jameel as having purchased a satellite phone for Osama bin Laden. WTC and Eurobrokers RICO Statements, Attachment A at 4; Draper Aff., Attachment E at 23.

Al-Fadl had a specific conversation with the treasurer of al Qaeda (Madani Al Tayyib) in which the treasurer identified Jameel as donating funds to al Qaeda. *Id.*

Moreover, Mr. Jameel's credibility should seriously be examined in light of his defiance of the United Kingdom court system in the kidnapping of his daughter; Jameel swore out an affidavit that he would not kidnap her and that he would abide by the decisions of the Court. After years of illegal activity directed at his former wife, he defied the Court's order and abducted the girl. Flowers Dec. Ex. 7, The Guardian, "Kidnap Punches Hole in Law: Thatcher to be the last line of appeal in parents' tussle over girl", July 18, 1988; The Guardian, "Howe May Seek Saudi King's Help Over Kidnap," July 19, 1988. Jameel's ***ad hominem*** attacks on Messrs. Brisard and Kohlmann are not unexpected given his reputation for both cruelty and dishonesty as described in the public record. *Id.*

Defendant Jameel provided material and financial support to the Raza Academy, a radical group which condemned the United States for the war in Afghanistan in October of 2001, voices support for suicide bombers in Palestine, sent human shields to Iraq, and supported fighters in Bosnia and Chechnya. WTC Complaint ¶ 951.

These are not bald or conclusory allegations. Nor are they random or coincidental; they are specific, detailed and examples of a long-standing pattern of conduct by Jameel of providing material support to Osama bin Laden's terror network. In arguing all plaintiffs' allegations are conclusory, Jameel tells this Court that "Plaintiffs in Eurobrokers make no mention whatsoever of Mr. Jameel in their complaint." Memo at 9. In so arguing, Jameel fails to mention or respond to the detailed RICO statement filed in *Eurobrokers* on June 3, 2005. Docket #971. In ignoring or attempting to recast the allegations against him, Jameel fails to respond to the actual allegations: For Eurobrokers he ignores the entire RICO statement, for all other complaints, he pulls out any allegations that can be deemed conclusory and then restates them as if they were <u>all</u> that were alleged. Memo at 6; *see also* Reply Memorandum of Yousef Jameel ("Reply Memo") at Exhibit V, containing all general allegations in one exhibit. This is entirely misleading.

Jameel also repeatedly complains that he had no knowledge that Osama bin Laden was engaged in terrorist activity prior to 9/11. The timeline that he submits as somehow exonerating him on knowledge or

notice is self-serving, selective, and more to the point it ignores the public nature of Osama bin Laden's stated evil intentions.  Exhibit H to Reply Memo.  Plaintiffs have attached a timeline which more fully illustrates the number and public nature of these intentions.  *See* Exhibit 2 to Flowers Dec.  This information was notoriously public.  Indeed, the 1993 article that reported Osama bin Laden had been stripped of his Saudi citizenship for acts of Islamic militant extremism identifies Yousef Jameel's financial activities as another example of the problem of financing Islamic terrorists.  Flowers Dec., Ex. 4.  As a global businessman and "prominent" member of Saudi society, Jameel knew or had to know that not only was Osama bin Laden sponsoring hatred and destruction of America, Jameel was accused of doing the same.[6]

Jameel also attempts to distort the allegations regarding satellite telephones.  Memo at 16 – 18.  Here is the language from the Statement of Jamal al-Fadl that Jameel argues Mr. Kohlmann somehow "fabricated":

> Source identified the individual listed next to number 4, Yousef Jameel, as purchasing a satellite phone for Bin Laden. . . Source had a specific conversation with Madani Al Tayyib during which Madani Al Tayyib informed Source that both Yousif Jameel and Saleh Kamel donated their zakat funds, via the 'Golden Chain' to Bin Laden's al Qaeda group.  Draper Aff. Ex. E.

Al Fadl specifically stated that Jameel both donated funds to al Qaeda and purchased a satellite phone. *See* Brisard Aff. at ¶ 7, Draper Aff. Ex. E.  Jameel confuses the issue of satellite phones; apparently because other satellite phones were utilized by Osama bin Laden, or other transactions involving satellite phones are at issue, Jameel's purchase of one for Osama bin Laden is irrelevant.  Jameel's attempt to discredit Mr. Kohlman's affidavit concerning Jameel's purchase of a satellite phone is totally unfounded.  As the U. S. government explained, Aranout <u>provided</u> the phone for Osama bin Laden that Jameel paid for.  Arnaout delivered and assembled the phone at issue.  WTC ¶ 347.  Aranout lacked sufficient resources to purchase a satellite phone worth over $80,000.  Aranout acquired the phone using the funds provided by a member of the Golden Chain - Jameel.  Jamal Al Fadl, a member of al Qaeda who testified on behalf of the U.S. government, stated in his 302 that defendant Yousef Jameel purchased a satellite phone for bin Laden.  Draper Aff., Ex. E.  Al Fadl did not say that Jameel picked the phone out, provided it or delivered it to Osama bin Laden; he paid for it.  The video described by Mr. Kohlmann awas prepared as a "thank you"

---

[6] This is particularly true given the fact that Osama bin Laden published his fatwahs out of London, where Jameel resided and

4

from Osama bin Laden to Jameel.  Moreover, Osama bin Laden and his network required more than a <u>single</u> satellite phone.  In fact, within Al Fadl's testimony in the Embassy Bombings case, cited by Jameel as somehow exonerating him, Al Fadl testified that while in Sudan al Qaeda had many means of communication amongst its members including radios and cell phones.

### B.  Contacts With and Presence in the United States

Jameel's contacts with the United States include, but are not limited to:

Defendant Jameel, through his company, Abdul Latif Jameel Group (or "ALJ") (or "Jameel Group") has donated funds to American Universities:  "The ALJ is also sponsoring scholarships at Massachusetts Institute of Technology as well as other educational and training programs."  Arab News, Jameel Donates $1,000,000 to AUC, March 8, 2000, Flowers Dec., Ex. 10, WTC RICO Exhibit "A", Eurobrokers RICO Exhibit "A".

Jaymont Properties, Inc. is a wholly-owned subsidiary of ALJ that develops and manages real estate in the United States.  *Federal* RICO Statement Exhibit A.  Jaymont (USA) Inc. is incorporated in the State of Florida.  *Id.*  Jaymont Properties buys and sells high-end commercial real estate in San Francisco, New York, Boston, Miami and other cities. *Id.*

Jameel is a former board member and the largest individual shareholder of Global National Resources, Inc. based in Houston, Texas.  *Federal* RICO Statement Exhibit A.[7]

The Jameel Group is engaged in international shipping, consumer finance, investments and trade.  WTC ¶911.[8]

## II.  FED. R. CIV. P. 12(B)(2) STANDARD

Jameel has moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  Each alleged basis for dismissal is to be considered under its own discreet legal standard provided below.  On a motion to dismiss under Rule 12(b)(2), the plaintiff bears the minimal burden of showing a

---

owned property.  See 1996 and 1998 fatwas by Osama bin Laden declaring his intentions, Flowers Dec. Ex. 2; Ex. 8.

[7] Jameel attempts to make much out of a different <u>spelling</u> of the ALJ entity as alleged by the NY Marine plaintiffs.  Memo at 21-24.  This argument is without merit.

[8] Plaintiffs also allege that the Jameel Group provided material support to charity front groups that directly supported al Qaeda and terrorist activities worldwide, including S.D.G.T. Benevolence International Foundation ("BIF"), Saudi Red Crescent Society, the Saudi Joint Relief Committee, Saudi High Commission for Donations and Collections for Bosnia Herzegovina ("Saudi High

factual basis upon which the court may exercise personal jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003). In this regard, at the pleading stage, the plaintiff need only make a *prima facie* showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion. *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). In ruling on the motion, the Court should resolve factual discrepancies appearing in the record in favor of the Plaintiffs. *Id.* at 84.

In making their *prima facie* case for personal jurisdiction, however, plaintiffs are not limited to their pleadings. Rather, that case may be established through pleadings and affidavits. *See Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Moreover, plaintiffs are not required to know or to plead all possible jurisdictional grounds from the outset of the case. To the contrary, the relevant statutory scheme anticipates and allows for liberal amendments as to jurisdiction. *See* 28 U.S.C. § 1653. That is particularly true where the factual predicates are complex and the parties numerous, as herein. Moreover, in evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997). In addition, the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).

The D.C. Circuit concluded that "[t]he defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court." *Id.* at *9. *Mwani v. Bin Laden,* 417 F.3d 1, 12-13 (D.C. Cir. 2005); *Calder v. Jones,* 465 U.S. 783, 789-790 (1984).

## III.   FED. R. CIV. P. 12(B)(6) STANDARD

Jameel also moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler*

---

Commission"), S.D.G.T. Al Haramain Islamic Foundation Inc., the International Islamic Relief Organization ("IIRO"), and the World Assembly of Muslim Youth ("WAMY"). *Burnett* MDS ¶¶ 2, 17.

*v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating the motion to dismiss, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of Plaintiffs.  *Wynder*, 360 F.3d at 77.

Relatedly, Fed. R. Civ. P. 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  "Under *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002), Rule 8 pleading is extremely permissive. 534 U.S. at 512-13, 122 S. Ct. 992.  As the Supreme Court there noted, Rule 8(a)(2) provides (a) that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and (b) that such a statement simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'  534 U.S. at 512, 122 S. Ct. 992 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957))."  *Wynder*, 360 F.3d at 77.

## IV.   DEFENDANT YOUSEF JAMEEL IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES

Jameel moves pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss the claims against him in the Complaint claiming that Plaintiffs have not sufficiently alleged a basis upon which the Court can exercise personal jurisdiction over him.  Jameel's arguments are based on flawed legal premises and a misreading of the allegations.  As a threshold matter, it is well settled that a federal court may exercise personal jurisdiction over a non-resident defendant when: (1) the defendant is amenable to service of process pursuant to a statute or rule of court that authorizes such an exercise; and (2) such an exercise is consistent with due process of law. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  These factors are satisfied here and are addressed in turn.

### A.   Jameel Was Properly Served by Publication, Does Not Dispute That Service Was Proper and Effective, and Improperly Asserts the Application of the New York Long-Arm Statutes.

Jameel does not contend that service upon him was improper or ineffective.  Jameel was served by publication, in compliance with the Transferor Court's March 25, 2003 Order, indicating that it was appropriate to serve defendants located in Saudi Arabia, Sudan and the United Arab Emirates by publication. Here, service of process was properly made under Fed. R. Civ. P. 4(k)(2).  Although Jameel does not raise a service of process challenge, he does incorporate by reference his prior motion in *Burnett* (Memo at 7),

Plaintiffs similarly incorporate herein their response in that case.  Plaintiffs' Memorandum of Law in

Opposition to Motion to Dismiss of Yousef Abdul Latif Jameel (filed October 18, 2004), *Burnett* docket #505

or ("Burnett Opp.") at 4-6.

      **B.**    **The Exercise of Jurisdiction Over Jameel Comports with Due Process Because Jameel, Who Purposefully Directed His Conduct at the United States, Could Reasonably Expect to be Haled Into Court Here.**

          *1.*    *Standard for Satisfying Due Process*

Jameel is subject to personal jurisdiction here because, in providing support to Osama bin Laden and

al Qaeda, which had long publicly announced its intentions to attack the United States, Jameel purposefully

directed his conduct here.  *In Re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 410.  Each case

should be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of

jurisdiction complies with "fair play and substantial justice."  *International Shoe Co.*, 326 U.S. at 316.  The issue

is whether the defendant should "reasonably anticipate being haled into court."  *World-Wide Volkswagen Corp.*

*v. Woodson*, 444 U.S. 286, 297 (1980); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102

(1987).

The Supreme Court has further stated that reasonableness "considerations sometimes serve to

establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise

be required."  *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985); *see Palestine Info. Office v. Shultz*, 853 F.2d 932,

942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind

statute giving terrorism victims remedy "could significantly lower the threshold of constitutional

requirements").  The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in

light of the horrific manner in which U.S. residents were attacked for no reason other than that they were in

the United States.  The policies of "fair play" and "substantial justice" cannot be applied without recognizing

the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims.  However, the case law makes clear that

where terrorists target Americans, they should reasonably foresee being haled into court in the United States,

such that due process is not violated by the exercise of jurisdiction.  *In Re Terrorist Attacks on September 11,*

*2001,* 349 F.Supp. 2d. 765, 807-12 (2005).

The record before this Court demonstrates that bin Laden and al Qaeda had publicly and repeatedly announced their intention to attack the United States from the early 1990s on, and that during the time Jameel provided material support to Osama bin Laden and known al Qaeda financiers.  Flowers Dec., Ex. 2. Jameel knew or had to know that providing such support would further acts of international terrorism directed at the United States.  As the 9/11 Commission Report found:

> When bin Laden arrived in Afghanistan, he relied on the Taliban until he was able to reinvigorate his fundraising efforts by drawing on ties to wealthy Saudi individuals that he had established during the Afghan War in the 1980's.

> Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fundraisers, primarily in the Gulf countries and particularly in Saudi Arabia.  Some individuals surely knew...the ultimate destination of their donations.

Final Report of the 9/11 Commission, at 170.  In this context, Jameel's conduct amounts to purposeful direction at the United States sufficient to satisfy the "minimum contacts" test.  No more is required to satisfy the "minimum contacts" test and subject Jameel to jurisdiction in the United States.

      2.    *The Allegations and Prime Facie Evidence Against Jameel Demonstrate He Purposefully Directed His Conduct at the United States and is Therefore Subject to Jurisdiction of the Court.*

This Court has already ruled:

> Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a *prima facie* showing that personal jurisdiction exists.  Plaintiffs may rely entirely on factual allegations, and they will prevail even if Defendants make contrary arguments.  In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs.

*In Re Terrorist Attacks on September 11, 2001*, 349 F.Supp 2d 765, at 804, *citations omitted*.

Based on this standard, Plaintiffs herein satisfy their burden to make a *prima facie* showing that jurisdiction exists over Jameel.  The Complaints specifically allege that Jameel directed his activities at the United States and to persons and entities long associated with al Qaeda, and that he provided material support to al Qaeda and its sponsors with the knowledge of al Qaeda's terrorist intentions and that the funds would be used to support al Qaeda's international terrorist agenda in attacking the United States.  *Burnett* MDS ¶¶ 9-11, *Federal, WTC and Eurobrokers* RICO Statements at Exhibit A.  As is summarized above, and set forth in detail in the relevant pleadings and attachments hereto, Plaintiffs have satisfied this *prima facie* burden.

3.   *Plaintiffs herein have made prima facie showing as to the golden chain collection of documents.*

The Plaintiffs respectfully disagree with this Court's conclusion:  "The 'Golden Chain' does not say what the Plaintiffs argue it says.  It is only a list of names found in a charity's office."  *In Re Terrorist Attacks on September 11, 2001*, 349 F.Supp. 2d at 818.  The "charity" at issue, BIF, is not a beneficient society – it is a specially designated global terrorist entity.  Plaintiffs are compelled to point out that no evidentiary hearing was held as to the "Golden Chain" documents; nor was one ever heard in the United Kingdom as Jameel seems to suggest.[9]  Jameel's statement that other courts have agreed with this Court as to the Golden Chain is entirely misleading:  what the U.K. Court did was cite from the decision of <u>this</u> Court as stated above not make an independent evidentiary determination.  See Ex. 1 to Memo at ¶ 20.

Plaintiffs herein submit materials in support of a *prima facie* showing to support a finding of jurisdiction, and to provide the Court with additional information and evidence about the Golden Chain – a single document in a larger series of documents utilized by various government agencies in the war on terrorism.  As demonstrated below, these documents, which include the "Golden Chain" list of sponsors, were introduced and relied on in *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003).  Contrary to this Court's conclusions about the "Golden Chain's" relevance or admissibility, it has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the 9/11 Commission's Final Report and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists, a decision not lightly taken by the Executive branch of the government.  Moreover, a former member of al Qaeda and key government witness, Jamal al Fadl (D236) has reviewed and confirmed that names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI.  Jamal al Fadl specifically identified Yousef Jameel (and others) as a direct financier and facilitator of al Qaeda.

---

[9] The proceedings in the United Kingdom were brought by Yousef Jameel against a newspaper for libel.  The Court denied the equivalent of the newspaper's motion for summary judgment and stated that the case could proceed to trial.  Evidence in the case was limited to only those matters that the reporter had available when he wrote the article.  The reporter never had access to the statement provided by Al Fadl declaring that Jameel contributed money to Osama bin Laden via the Golden Chain.  Moreover, the case settled before trial and before any effort by the newspaper to authenticate the "Golden Chain."  Defendants in this lawsuit have long sought to liberally use the pro-defendant libel laws in the United Kingdom to obtain favorable rulings in an effort to

The "Golden Chain" list is but one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain co-conspirator statements. The Illinois Court ruled that the proffer cannot be linked to a specific conspiracy and the documents were therefore not admissible under the co-conspirator exception to the hearsay rule. *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at \*2. Merely because a certain document is ruled inadmissible in one proceeding, does not render the document unable to be authenticated (or made relevant) forever. In fact, the documents were later submitted by the United States government and considered by the Illinois Court at the sentencing of Enaam Arnaout in imposing a sentence upon this al Qaeda supporter who pled guilty.[10] As explained in detail below, the "Golden Chain" list and related documents demonstrate the role of Yousef Jameel (and others) in founding and funding al Qaeda.

On November 14, 2002, the U.S. District Court for the District of Columbia issued a Letters Rogatory request to the Supreme Court of the Federation of Bosnia and Herzegovina, requesting copies of documents that had been seized from the office of Benevolence International Foundation (hereinafter "BIF"), a Specially Designated Global Terrorist Group. *Burnett, et al. v. al Baraka Investment and Development Corporation, et al.*, 02-CV-01616, Docket #24 (JR) (DDC) (November 14, 2002). The Bosnian government, however, previously released all copies of these documents to the United States government. The Bosnian Supreme Court, therefore, issued an order requesting that the United States government turn over the records to Plaintiffs for use in this litigation.[11] In recognition of the request of the Bosnian Supreme Court and the issuance of the Letters Rogatory request, the U.S. Attorneys Office for the Northern District of Illinois sent a partial set of the seized evidence from Bosnia to Plaintiffs' counsel.[12]

---

discredit plaintiffs' proceedings in the United States. Tellingly, even though there have been in excess of 10 libel cases in the United Kingdom directed at plaintiffs' experts and other terrorism experts, no such cases have been brought in the United States.

[10]   *See* "Government's Response to Defendant's Position Paper as to Sentencing Factors" *U.S. v. Enaam M. Arnaout*. Case No. 02CR 892 (ND Ill.) (SBC), p. 32. June 12, 2003; Exhibit 4 to the Affidavit of Evan F. Kohlmann (or "Kohlmann Aff."), attached as Attachment A to the Affidavit of David K. Draper ("Draper Aff.").

[11]   Order, Supreme Court of Bosnia and Herzegovinia, Case Number 09-12/5-04-3-1483 (February 25, 2003), Exhibit 8 to Kohlmann Aff.

[12]   Letter from Assistant U.S. Attorney John Kocoras (March 10, 2003), Exhibit 9 to Kohlmann Aff.

The documents seized from the offices of BIF were not, as this Court seemed to imply from its Opinion and Order, a smattering of random materials collected from the office of some ill-described charity in Bosnia. The seized materials, to members of al Qaeda, are the equivalent of the Declaration of Independence to the founding fathers of the United States. The documents "historically annotate[] the formation and development of Al Qaida." *See*, Kohlmann Aff., at ¶19, attached as Attachment A to the Draper Aff. Al Qaeda was so concerned with the security of these historical formation documents that they secreted them from Afghanistan to Bosnia and placed them in the care of a former Bosnian intelligence officer and member of al Qaeda, Munib Zahiragic. *Id.* ¶ 12. The documents "were deemed too important to accidentally fall in enemy hands . . . ." *Id.* Mr. Zahiragic was the head of the BIF office in Bosnia, and he turned these documents over to Bosnian officials when their offices were raided in March of 2002.

The documents include handwritten meeting minutes:

> On August 11, 1988, the notes describe 'a discussion regarding the establishment of a new military group…Qaida (the base).'" The meeting concludes that within six months of Al Qaida (the base), 314 brothers will be trained and ready.[13]

> Shortly thereafter in a subsequent meeting an advisory council was established. Bin Laden stated that "Al Qaida is basically an organized Islamic faction. Its goal will be to lift the word of God to make His religion victorious." The council also established a set of requirements to enter Al Qaida and a pledge or an oath that each member was required to declare. The meeting concluded by stating that the "work of Al Qaida commenced on September 10, 1988...."[14]

> The advisory council established a list of action items for the new al Qaeda movement which sought to "keep[] alive the jihadist's spirit among Muslims in general and the Arabs in particular, by opening bases for their jihad along with maintaining contact lines with them."[15]

Draper Aff., Attachment B, BOS000067-74. Al Qaeda even printed its declaration: "the only solution is the continuation of the armed jihad." Draper Aff., Attachment B, BOS000070.

> Included in the seized documents along with the "Golden Chain" are numerous letters written, signed and dated by Osama bin Laden requesting donations for al Qaeda or the distribution of funds.[16] Osama bin Laden's signature which appears throughout these

---

[13] Kohlmann Aff. ¶ 20; *citing*, Meeting Minutes Seized from Bosnia (August 11, 1988), Tareekhosama/50/Tareekh Osama 122-123, Exhibit 5.

[14] Kohlmann Aff. ¶ 20; *citing*, Meeting Minutes Seized from Bosnia, Tareekhosama/50/Tareekh Osama 127-127a (August 20, 1988), Exhibit 6.

[15] Kohlmann Aff. ¶ 20; *citing*, Action Items Seized from Bosnia, Tareekhosama/29/Tareekh Osama 91-92a.

[16] Kohlmann Aff. ¶ 21; *citing*, Collection of Osama bin Laden Letters Seized from Bosnia, Tareekhosama/19/Tareekh Osama 79; Tareekhosama/33/Tareekh Osama 99; Tareekhosama/12/ Tareekh Osama 68; Tareekhosama/36/Tareekh Osama 102;

documents was identified and authenticated by Jamal al Fadl in 2001. Draper Aff., Attachment C. The cache of documents also includes memoranda and meeting notes written on the letterhead of various Islamic charities including the Muslim World League, the International Islamic Relief Organization and Al Birr (the predecessor to Benevolence International Foundation) referring to them as "umbrellas" al Qaeda can stay under.[17]

One of these documents seized in the Bosnian office of BIF is a handwritten memo on BIF letterhead stationery providing a detailed expense report for months in 1990. Among the transactions described are wage payments to "the Jihad Department;" and to "Usama's . . . (illegible) account."[18] Al Qaeda was concerned about the secrecy of this cache of documents because it described and historically annotated al Qaeda's birth. Releasing the information would expose Osama bin Laden's financial life-line, his "Golden Chain" of support.

In the same cache of documents, among the materials which contemporaneously describe the historical formation of al Qaeda, is a document which has been described by al Qaeda operative Jamal Ahmed al Fadl in an FBI Interrogation Report as the "Golden Chain."[19] Al-Fadl is a critical and historical al Qaeda eyewitness:

> Osama bin Laden selected Al-Fadl to move with him to Sudan in 1991. In Sudan, Al Fadl was given a budget of Two-Hundred Fifty Thousand U.S. Dollars ($250,000.00) to rent and purchase properties for the Al Qaeda Shura council. Jamal Al Fadl also managed the finances for several front companies formed by Usama Bin Laden in Sudan. While in Sudan, Jamal Al Fadl provided extensive financial services for Usama Bin Laden and high ranking members of Al Qaeda. Brisard Aff., at ¶ 3.

In 1996, the same year that Osama bin Laden publicly issued his fatwah against the United States, Jamal al Fadl, by then a top al Qaeda lieutenant, had a dispute with Osama bin Laden over embezzled al Qaeda finances and turned himself in to the U.S. government and volunteered to be an inside informant. *See,* Kohlmann Aff. ¶ 14. Jamal al Fadl provided detailed testimony concerning Osama bin Laden's financial network as the U.S. Justice Department's lead witness at the federal trial of Osama bin Laden in the Southern District of New York in February 2001. *Id.*

---

Tareekh Osama 80; Tareekhosama/38/ Tareekh Osama 105; Tareekhosama/39/Tareekh Osama 106; Tareekhosama/34/Tareekh Osama 100; Tareekh Almusadat 41.

[17]   Kohlmann Aff. ¶ 22; *citing,* Meeting Minutes Seized from Bosnia, Tareekhosama/49/Tareekh Osama 121.

[18]   Kohlmann Aff. ¶ 6, 22; *citing,* Internal BIF Memoranda Seized from Bosnia, BOS000394-400.

In August 2002, the FBI discussed the materials seized in Bosnia with al Fadl and prepared a report concerning the interview.  *See,* Draper Aff., Attachment E; FBI 302 Statement (or "FBI 302").  "The Federal Bureau of Investigation has adopted a practice of preparing memoranda of interviews recording potentially 'testimonial' matters in a form designated as FD-302."  *U.S. v. LaRouche Campaign, et al.,* 695 F. Supp 1265, 1268 (D.C. Mass. 1988).  *See also Confidential Witness Interview,* p. 29, line 3-4, Draper Aff., Attachment F, wherein an FBI witness concludes that the al Fadl FBI 302 Statement is authentic.  *Id.* at p. 29, line 5-7.

In this statement, Al Fadl reviewed the al Qaeda meeting minutes seized in Bosnia, (which included the "Golden Chain") Tareekhosama/54/Tareekh Osama 127-127a, and confirmed that the date in which al Qaeda was formed was on September 10, 1988.  Draper Aff., Exhibit E.  Most importantly for purposes of this motion, Jamal al Fadl was shown document 108 contained in folder 41.  "While reviewing the document, source indicated that some of the names appearing on the document appeared to be members of a group who source (al Fadl) referred to as the "Golden Chain."  FBI 302 at 23-24.  According to the source the "Golden Chain" consisted of "wealthy individuals from the Gulf region who provided Bin Laden and al Qaeda with money on a regular basis."  FBI 302 at 23.  As discussed above, Al Fadl identified Defendant Yousef Jameel as purchasing a satellite phone for bin Laden.  *Id.*

Al Fadl ("Source" in the statement) had a specific conversation with al Qaeda treasurer Madani Al Tayyib wherein he informed al Fadl that "both Yousef Jameel and Saleh Kamel donated their zakat funds, via the "Golden Chain" to bin Laden's Al Qaeda group."  *Id.*

> Jamal al Fadl also stated that he had conversations wherein he learned that "Bin Laden would never fight or attempt to change the governments of any Gulf state because members of the "Golden Chain" [including Jameel] -- reside in those states."  *Id.*

*See also,* Attachment R to Draper Aff., at 1-2, corroborating this strategy.  The Final Report of the 9/11 Commission also cites to the "Golden Chain":

> [Osama] Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization.  This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states.  Donations flowed through charities or other nongovernmental organizations (NGOs).  Bin Ladin and the 'Afghan Arabs' drew largely on

---

[19]  Al Fadl has been allowed to testify in numerous USG prosecutions of al Qaeda and its supporters including the U.S. District Court and the Southern District of New York.

funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'[20]

The Congressional Research Service reported that "Saudi individuals and other financiers associated with the "Golden Chain" enabled bin Laden and al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996."[21]  This support proved critical as Osama bin Laden provided funds to the Taliban in return for his safe harbor in the amount of ten to twenty million dollars a year.[22]  Moreover, the CIA estimates that "it cost al Qaeda about $30 million per year to sustain its activities before September 11th and that this money was raised almost entirely through donations." 9/11 Report at 170.  The 9/11 Commission Report also stated that "al Qaeda found fertile ground in Saudi Arabia, where extreme religious views are common and charitable giving was both essential to the culture and subject to very limited oversight."  9/11 Commission Final Report at 171.

The United States Department of Treasury cited the "Golden Chain" in its decision to designate Adel Batterjee as a Specially Designated Global Terrorist pursuant to Executive Order 13224:

> [I]n March 2002 searches by Bosnian authorities of [BIF's] Sarajevo offices…uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization.  Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."
>
> This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor.  "Usama" appears after seven of the listings and "Batterji" appears after an additional six listings.  Draper Aff., Exhibit U, U.S. Treasury Dept., at 2.

Even if the Court in weighing this evidence does not believe that the document is what Plaintiffs allege or the government concludes it is, this is not the stage in the proceedings where the Court engages in this type of analysis.  *Pelman ex rel v. McDonalds Corp.*, 396 F.3d. 508 (2d. Cir. 2005); *Michael v. Clark Equipment Co.*, 380 F.2d 351 (2d. Cir. 1967).  Plaintiffs have alleged sufficient facts and have even provided a sampling of some of the evidence that they have collected to support their allegations.  At this stage of the proceeding, the

---

[20]  The 9/11 Commission Final Report ("9/11 Report"), July 2004, Attachment S to Draper Aff., at p. 55.

[21]  Alfred B. Prados and Christopher M. Blanchard, "Saudi Arabia: Terrorist Financing Issues," CRS Report for Congress, pp. 2, 3 (December 8, 2004); *citing*, 9/11 Commission Report, at 66.

[22]  9/11 Staff Report to the Commission, Monograph on Terrorist Financing, p 28, Exhibit T to Draper Aff.

Court must adopt Plaintiffs allegations as true. Plaintiffs respectfully but strenuously object to the Court's imposition of a more severe and stringent evidentiary standard at this embryonic pleading state than the law requires. *Pelman ex rel v. McDonalds Corp.,* 396 F.3d 508 (2d. Cir. 2005).

In short, al Qaeda made no secret that its intended target was citizens and residents of the United States. Flowers Dec. Ex. 2. Indeed, the crux of Plaintiffs' allegations is that Jameel (and others) "purposefully directed" his activities at the United States by providing material support to those whose "activities" included killing innocent people for no other reason than they were Americans. Given al Qaeda's explicit direction of terrorist activities at the United States and at Americans everywhere, as alleged, it can hardly be said that Jameel had no warning that he might be answerable in an American court for his conduct in supporting these acts. Thus, the exercise of personal jurisdiction over Jameel would comport with due process.

### C. Jameel Is Also Subject to Jurisdiction in This Court Because He Conspired With al Qaeda to Attack the United States

In the alternative, this Court has recognized that the law supports an exercise of personal jurisdiction under conspiracy and that this analysis requires a mixed question of law and fact. *In Re Terrorist Attacks on September 11, 2001,* 349 F.Supp. 2d, at 805.

Plaintiffs have made a factual showing of conspiracy between Jameel and al Qaeda. A factual showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991); *see also Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000). With regard to each of these elements, the Complaint alleges that:

(1)     Jameel and al Qaeda, as well as co-Defendants Adel Abdul Batterjee, Benevolence International Foundation, Saudi Red Crescent Society, the Saudi Joint Relief Committee, Saudi High Commission for Donations and Collections for Bosnia Herzegovina, Al Haramain Islamic Foundation, Inc., the IIRO, WAMY, and the MWL (among others), agreed to injure the United States through acts of international terrorism, *see, e.g., Burnett* MDS ¶¶ 9-11, 15, 17-18, 20-21, 30-32;[23]

---

[23] For a civil conspiracy, tacit understanding is sufficient to infer agreement. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 774 F. Supp. 802, 813 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 974 F.2d 270 (2d Cir. 1992).

(2)     the September 11 attacks were acts done in furtherance of that common scheme, *see, e.g.*, TAC, Introduction, ¶¶ 6-11; *Burnett* MDS ¶ 44;

(3)     Jameel actively participated and cooperated in that conspiracy by knowingly and intentionally providing such material support as currency, communications equipment (a phone), and transportation (vehicles) to al Qaeda and several al Qaeda front charities to launch terrorist attacks against America, *see Burnett* MDS ¶¶ 9, 12, 13, 14, 19, 21, 23, 24, 25, 30, 31, 32, 36, 38-40, 41; and

(4)     the September 11 attacks caused Plaintiffs' decedents' deaths and injuries, *see, e.g.*, TAC at ¶¶ 4, 11.

Accordingly, the Complaint makes a *prima facie* showing of conspiracy between Jameel and his conspirators to injure the United States through terrorist attacks.[24]

## V.     THE COMPLAINT SUFFICIENTLY ALLEGES A CAUSAL CONNECTION BETWEEN JAMEEL AND THE INJURIES AND DEATHS THAT OCCURRED ON SEPTEMBER 11, 2001

Jameel also moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the primary ground that the Complaint fails to state a claim against him under the ATA.  He argues that: (1) the Plaintiffs' claim cannot be maintained under 18 U.S.C. § 2333 because the September 11 attacks were acts of domestic terrorism and also constituted an "act of war" under 18 U.S.C. § 2336(a); (2) the ATA does not create a cause of action for providing "material support" to the September 11 hijackers in violation of 18 U.S.C. § 2339A, or aiding and abetting or conspiring with them; and (3) his alleged conduct is too remote to constitute the proximate cause of Plaintiffs' injuries.

### A.     Plaintiffs Have Sufficiently Alleged Acts of International Terrorism, and Therefore Have Stated a Valid Cause of Action Under the ATA.

As an initial matter, Jameel's argument that the September 11 attacks were acts of domestic terrorism for which section 2333 of the Anti-Terrorism Act ("ATA") does not provide a cause of action is unavailing. *In Re Terrorist Attacks on September 11, 2001*, 349 F.Supp. 2d at 828-29.  This Court has held that the ATA permits a private cause of action for injuries resulting from international terrorism. *Id.* 18 U.S.C. § 2333.

The Complaints make clear that al Qaeda operated a global terrorist organization that drew its funding and other material support from around the world for the purpose of carrying out a jihad that ultimately

---

[24] If the Court determines that Plaintiffs' allegations are not enough to establish personal jurisdiction, then Plaintiffs seek leave to conduct discovery to further determine the extent of Jameel's contacts with the United States.  *See* 45A Charles A. Wright & Arthur

resulted in the September 11, 2001 attacks.  As discussed previously, Plaintiffs have alleged that Jameel provided funding, telecommunications equipment and vehicles to al Qaeda in support of its terrorist agenda. These allegations fall squarely within the ATA's definition of "international terrorism."  Indeed, Judge Baer has already concluded in *Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 221-22 (S.D.N.Y. 2003), that the facts underlying the September 11 attacks fall within the statute's definition of "international terrorism" and this Court has agreed.  *In Re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d. at 829.

Jameel argues, albeit in a footnote, that the ATA does not provide a remedy for the September 11, 2001 attacks because such attacks constitute an "act of war" as defined in § 2331(4) and are therefore excluded from the purview of § 2333.  Jameel's argument is nonsense.[25]  Even if al Qaeda were deemed a "military force" for purposes of § 2331(4)(C), the ATA exception requires an "armed conflict *between* military forces."  (Emphasis added.)  Jameel certainly cannot suggest that the individuals who were killed or injured in the September 11, 2001 attacks were a "military force."  The fact that the United States has used military force *in response to* the September 11, 2001 attacks on innocent people does not render the September 11, 2001 attacks acts themselves as acts of war as Jameel argues.  Memo at 14.

Finally, it would be nonsensical to conclude that a group of terrorists could organize themselves in such a way to be considered a "military force," attack innocent citizens and residents of the United States, and have such an attack considered an "armed conflict between military forces of any origin," thereby taking themselves and their supporters out of the scope of the Anti-Terrorism Act, which, as Congress expressly directed, is intended to "impos[] liability at any point along the causal chain of terrorism."  S. Rep. No. 342, 1992 WL 187372, *22 (emphasis added).

## B.      The Complaint Sufficiently Alleges Violations of the ATA.

Jameel argues that the ATA does not provide a cause of action for: (1) providing "material support" to the September 11, 2001 hijackers in violation of 18 U.S.C. § 2339A; (2) aiding and abetting the hijackers; or (3) conspiring with the hijackers.  Simply put, Jameel ignores the relevant case law and legislative history that

---

R. Miller, FEDERAL PRACTICE & PROCEDURE, § 1351, at 253-59 (2d ed. 1990) (court has discretion to allow jurisdictional discovery and hold 12(b)(2) motion in abeyance); *In Re Terrorist Attacks on September 11, 2001*, 349 F.Supp. at 811-12.

provides that such support need not be given directly to the hijackers themselves.  *See* e.g. Gershon opinion

Aiding and abetting liability is available under the ATA … "Advice or encouragement to act operates as a

moral support to a tortfeasor and if the act encouraged is known to be tortuous it has the same effect upon

the liability of the adviser as participation or physical assistance."  Under the ATA, defendants are liable if

they provided any material support to al Qaeda with knowledge of its terrorist agenda or if they aided and

abetted al Qaeda or Osama bin Laden in their course of terrorist conduct.  *In Re Terrorist Attacks on September

11, 2001,* 349 F.Supp. 2d at 828-29.  *See Boim*, 291 F.3d 1000; *Humanitarian Law Project v. Reno*, 205 F.3d 1130,

1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983); however, Section 2333 does not limit

the imposition of civil liability only to those who directly engage in terrorist acts.

Moreover, Plaintiffs need not allege that Jameel provided his support directly to the terrorists who

carried out the September 11, 2001 attacks.  Rather, as previously noted, Congress expressly stated its

intention that the ATA be used to "interrupt, or at least imperil, the flow of money" to terrorists through the

"imposition of liability at any point along the causal chain of terrorism."  S. Rep. No. 342, 1992 WL 187372,

*22 (emphasis added).  Thus, it is sufficient that Jameel knowingly provided material support to those who

instigated and planned the September 11, 2001 attacks.  Nor is it necessary for Plaintiffs to show that the

specific dollars, telecommunications equipment or vehicles that Jameel provided were used in the September

11, 2001 attacks.  As the Ninth Circuit held in *Humanitarian Law Project*, 205 F.3d at 1136, the knowing

provision of "material support" to a designated terrorist entity violates § 2339B regardless of whether the

donor intended to support the terrorist activities of the group and regardless of whether the particular

support provided to the organization can be traced to the resulting acts of terrorism.  The court explained:

> [A]ll material support given to such organizations aids their unlawful goals.  Indeed, as the
> government points out, terrorist organizations do not maintain open books.  Therefore, when
> someone makes a donation to them, there is no way to tell how the donation is used. . . . More
> fundamentally, money is fungible; giving support intended to aid an organization's peaceful
> activities frees up resources that can be used for terrorist acts.

*Id.*  Plaintiffs allege that Jameel helped to support al Qaeda and its terrorist agenda.  Plaintiffs need not allege

that this Defendant purchased the specific "weapons" for the September 11, 2001 attacks when he helped

---

[25] Rather than repeat the argument advanced previously in response to this contention, plaintiffs incorporate their prior briefing on

provide the financing that allowed bin Laden to train terrorists and to set up a vast terrorist infrastructure, which in turn enabled multiple acts of international terrorism, including those attacks. *See Gershon* opinion, *Linde v. Arab Bank,* --- F. Supp. 2d ----, 2005 WL 2108690, * 9. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff. *See Halberstam*, 705 F.2d at 487… An act may constitute an offense under the statute without a showing that the funds were actually used to carry out the predicate act of terrorism. 18 U.S.C. § 233C(a)(3).

## C. The Complaint Sufficiently Alleges that Jameel Knowingly and Intentionally Violated the ATA.

In this case, Plaintiffs have sufficiently alleged a cause of action under 18 U.S.C. § 2333 against Jameel as explained above. The Complaint alleges that Jameel <u>knowingly</u> aided, abetted or otherwise conspired to provide material support to Osama bin Laden and al Qaeda with Osama bin Laden, Adel Abdul Batterjee, Benevolence International Foundation, Al Haramain Islamic Foundation, Inc., the World Assembly of Muslim Youth, the Muslim World League and others. *See Burnett* MDS ¶¶ 10-11, 15, 17, 20, 22, 31, WTC ¶¶ 909 – 952. Jameel's material support to al Qaeda is alleged to have come in the form of currency, communications equipment (a satellite phone), and transportation (vehicles). *Id.* The Complaints state an ATA claim against Jameel.[26]

## D. Jameel's Conduct Is Not Too Remote to Constitute the Proximate Cause of Plaintiffs' Injuries.

Jameel argues that all Plaintiffs rely on is "bald" assertions on causation. Memo at 19. The Complaints do indeed include legal conclusions, but they are not bare of facts. *See supra*. They have sufficient factual bases to inform Jameel of the nature of the claim against him. A leading treatise summarizes the current state of the law as follows: [T]he federal rules require a short and plain statement of a claim for relief

---

this point. Burnett memorandum in Opposition to Motion to Dismiss of Yousef Jameel filed October 18, 2004.

[26] The appropriate standard, of course, is whether Jameel know or should have known that his support would fund al Qaeda's terrorist agenda against the United States. Throughout the Complaints are allegations that Jameel's material support to al Qaeda and al Qaeda sponsors was given with the *contemporaneous* knowledge that such support would be used in furtherance of al Qaeda's terrorist agenda against the United States. *See, e.g., Burnett* MDS ¶¶ 10-11, 23-24. Specifically, however (and by way of example, Plaintiffs allege that Jameel intentionally and knowingly provided financial support to (among others) the World Assembly of Muslim Youth ("WAMY") *in December, 1999. See Burnett* MDS ¶ 25. Plaintiffs also allege that WAMY has been officially identified as a "suspected terrorist organization" by the FBI *since 1996. Burnett* MDS ¶ 29. Osama bin Laden was a known supporter of terrorism long before his fatwah in 1996 and his designation in 1998. These allegations are sufficient under the case law and Rule 8 to support Plaintiffs' claims.

that provides fair notice to the opposing party; it does not make any difference whether the pleader accomplishes this by stating 'conclusions,' 'ultimate facts,' or 'evidence.'" 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> sec. 1218, at 276 (3d ed 2004).

Jameel contends that Plaintiffs cannot satisfy their burden of showing that his conduct was a proximate cause of the September 11, 2001 attacks under the ATA.  However, the ATA "extend[s] civil liability for acts of international terrorism to the full reaches of traditional tort law, . . . causation may be demonstrated as it would be in traditional tort law." *Boim*, 291 F.3d at 1010, 1015.  The scope of ATA liability involves, therefore, traditional notions of proximate cause and reasonable foreseeability.  In order to establish proximate cause,

> The requirement that the injury must be one that was reasonably to be foreseen does not mean that the exact occurrence or the precise injury resulting from the act need be foreseen; all that is necessary is that the person charged with [the wrongful act] should have been able to foresee that some injury to some person might result from his act.

*Lamarca v. United States*, 31 F. Supp. 2d 110, 127 (E.D.N.Y. 1998); [cite] *see also* Gershon opinion *Linde v. Arab Bank,* --- F. Supp.2d ----, 2005 WL 2108690, *10:

> Just as there was no requirement for aiding and abetting liability in *Halberstam* that the murderer would not have acted as he did but for his co-defendant's conduct, there is no requirement of a finding that the suicide bomber would not, or could not, have acted but for the assistance of [Defendant].  *See also* W. Page Keeton et al., Prosser & Keeton on the Law of Torts, § 43, p. 299 (5th ed. 1984) Restatement (Third) of Torts § 29 cmt. f.  Furthermore, the concept of reasonable foreseeability is applied more broadly in the context of intentional torts and reckless torts, as compared to negligence.  *See Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003).

Applying these principles of proximate cause and reasonable foreseeability, it becomes clear that the Complaints make a *prima facie* showing of proximate cause.  *See* Gershon opinion, *Linde v. Arab Bank,* --- F.Supp.2d ----, 2005 WL 2108690, *11:

> To the extent that defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiffs must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and betting and conspiracy.

Knowingly providing financial and material support to al Qaeda (i.e., an act of international terrorism under the ATA) is indisputably tortious, because Jameel should have foreseen that his support increased the risk that al Qaeda would intentionally kill Americans in terrorist attacks.  The hijackers' criminal acts do not

supersede Jameel's conduct and break the chain of causation, as Congress expressly directed that the ATA is intended to "impos[] liability at any point along the causal chain of terrorism." S. Rep. No. 342, 1992 WL 187372, *22 (emphasis added).

### E. Plaintiffs' Non-ATA Claims Against Jameel.

Jameel halfheartedly argues that Plaintiffs' non-ATA claims against him should also be dismissed for failure to state a claim. Memo at 14. First, regarding Plaintiffs' claim under the ATCA, Jameel's challenge should be dismissed as inadequately briefed. *See Kurowski v. City of Bridgeport*, 1988 WL 25417 (D. Conn. Mar. 14, 1988). In any event, Jameel improperly states the law. He states that the ATCA does not impose liability on private, non-state actors. That is incorrect. *See Kadic v. Karadzic*, 70 F.3d 232, 239-40 (2d Cir. 1995) (citing examples); *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 22 n.5 (D.D.C. 2000); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692; 124 S. Ct. 2739, 2766 n.20 (2004). Jameel argues that even "the September 11, 2001 hijackers did not violate the ATS" [or Alien Tort Statute or ATCA.] Memo at 14. In addition to being morally repugnant, it is legally incorrect, as *Sosa* makes clear. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (finding aircraft hijacking clearly a violation of the ATS). Nor is Jameel willing to admit that the 9/11 hijackers violated the Torture Victim Protection Act: "even if the 9/11 hijackers violated the TVPA. . ." Jameel cannot be held responsible. Memo at 14. Jameel wants to argue this both ways; that is, that the attacks themselves were an "act of war" and thus exempt under the ATA, but the attacks were not done "under actual or apparent authority or color of law of any foreign nation" under the TVPA. Despite this illogic, one thread runs through this -- Jameel apparently supports the actions of the hijackers as justifiable acts of war. Jameel ignores the common sense ruling of this Court as to the ATCA: "The Court finds that aircraft hijacking is generally recognized as a violation of international law." *In Re Terrorist Attacks on September 11, 2001,* 349 F.Supp. 2d at 826. This Court went on to hold that actions based on theories of aiding and abetting and conspiracy under the ATCA have been "almost unanimously permitted" and will be permitted here. *Id.*

### F. All of the Property Damage Plaintiffs Properly State RICO Claims

Jameel also contends that none of the plaintiffs have properly pled their RICO claims. Jameel is wrong. Plaintiffs' complaints and RICO Statements assert RICO claims against Jameel pursuant to 18 U.S.C. §§ 1962(a), (c) and (d).

The enterprise – Osama bin Laden and the al Qaeda movement - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. *See, e.g., WTC* Complaint ¶¶ 909-952; *WTC* RICO Statement; *Euro Brokers* RICO Statement; *Federal* RICO Statement. Its well documented purpose is to perpetrate acts of terrorism. Thus, plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO statements further allege that Jameel engaged in conduct in furtherance of the enterprise which is actionable under § 1962(a). Pursuant to that section: "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1962(a). The *WTC* and *Euro Broker* Complaints and RICO statements allege that Jameel derived income through a pattern of racketeering activity, including multiple acts of mail and wire fraud, and invested that income in the enterprise. As the Supreme Court has explicitly recognized that al Qaeda's terrorist endeavors, including the September 11, 2001 attacks, directly affect interstate commerce, plaintiffs have undeniably stated RICO claims under Section 1962(a). *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004) (stating that the September 11, 2001 attacks "severely damaged the U.S. economy").

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by Jameel in the enterprise to sustain claims under both §§ 1962(c) and (d). Although a plaintiff asserting a civil claim under § 1962(c) must allege that the defendant participated in the operation or management of the enterprise, *see Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D. N.Y. 2003), such "discretionary authority" has been described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear." *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general rule, it may not be "reasonable to expect that when a defrauded plaintiff frames

23

his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 WL 376058, *2 (S.D. N.Y. July 15, 1994).

With respect to a RICO conspiracy under § 1962(d), the requirements "are less demanding." *Baisch*, 346 F.3d at 376.  All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Thus, "[a]lthough parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

Here, the plaintiffs have satisfied the pleading standards applicable to their § 1962(c) and § 1962(d) claims.  The plaintiffs allege that Jameel conceived and carried out a calculated global campaign to: (1) raise and distribute funds for Osama bin Laden and to al Qaeda; (2) finance al Qaeda operations; and (3) purchase weapons for al Qaeda.  *See Federal* 1AC ¶¶ 66, 101, 503; *Euro Brokers* RICO Statement Exhibit A; *WTC* Complaint ¶¶ 909-952; *NY Marine* ¶ 45.  Plaintiffs have adequately alleged that Jameel played a direct and active role in the management and operation of al Qaeda's fundraising scheme and that Jameel was a central figure in the enterprise in the years leading up to the attack.  Plaintiffs have, accordingly, met their pleading burden in relation to their claims under §§ 1962(c) and 1962(d), especially given the fact that plaintiffs have not been afforded the opportunity to take discovery.

Plaintiffs also have adequately alleged proximate cause under RICO.  This requirement is satisfied if plaintiffs allege that defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003).  Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is generally imprudent.  *National Asbestos Workers*, 74 F. Supp. 2d at 225.  This Court's decision "should be guided by a flexible, case-by-case approach."  *Id.* (citing *Associated Gen'l Contractors of Cal.,*

24

*Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983) and *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)).  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures."  *Id.*  Further, failure to explain the alleged injury in detail is not fatal.  *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986).  Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12 (b)(6).  *Id.*  The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts."  *Id.* (citations omitted).

Here, plaintiffs allege that they were directly harmed by Jameel's participation in al Qaeda's campaign to attack the United States, and in particular, by its provision of "material support and resources to al Qaeda."  *Federal* 1AC ¶ 226; *Federal* RICO Stmt, *see also Euro Brokers* Complaint ¶¶ 159-178; *WTC* Complaint ¶¶ 1143-1150, WTC and *Euro Brokers* RICO Stmts.  Jameel participated extensively in al Qaeda's global operations and specifically in furthering al Qaeda's goal of committing acts of terrorism against the United States by providing al Qaeda with the "financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack."  *Federal* 1AC ¶ 74.  Accordingly, plaintiffs have sufficiently pled causation for purposes of their RICO claims.[27]

## CONCLUSION

For the foregoing reasons, this Court should deny Jameel's motion to dismiss in its entirety.

Dated: New York, NY                    Respectfully submitted,
      September 16, 2005

                                         /s/
                                         Ronald L. Motley, Esq. (SC Bar #4123)
                                         Jodi Westbrook Flowers, Esq. (SC Bar #66300)
                                         Donald A. Migliori, Esq. (RI Bar #4936)

---

[27] Moreover, while the *Federal* action also asserts subrogation claims arising from payments made in compensation for personal injuries and deaths suffered by victims of the September 11th attacks (in addition to the claims for property damages discussed above), the *Federal* Plaintiffs clearly have standing to pursue recovery under RICO for those claims as well.  *See National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F.Supp.2d 221 (E.D.N.Y. 1999).  In *National Asbestos Workers*, Judge Weinstein allowed the plaintiff health insurers to bring subrogated RICO claims against tobacco manufacturers for the cost of treating their subrogors' smoking-related illnesses.  *Id.* at 228. According to Judge Weinstein, "[t]he equitable doctrine of subrogation allows insurers, analogous in some respects to the plaintiffs, to bring their own claims for the recovery of the economic damages incurred as a result of tortious injury to their insureds."  *Id.* Subrogation functions as a form of assignment, and RICO claims are assignable. *Id.*

Michael Elsner, Esq. (NY & VA Bar #ME-8337)
Robert T. Haefele, Esq. (NJ-58293; PA-57937)
Justin B. Kaplan, Esq. (TN-022145)
John Eubanks, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
112 Madison Avenue, 7th Floor
New York, NY  10016-7416
Tel:  (212) 784-6400

*Attorneys for Plaintiffs*
*Euro Brokers, et al. and World Trade Center Properties*
   *LLC, et al.*

Sean P. Carter, Esq.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103-3508
Tel:  (215) 665-2000

*Attorneys for Plaintiffs*
*Federal Insurance Company, et al.*

Robert Kaplan, Esq.
FERBERT FROST CHAN & ESSNER, LLP
530 Fifth Avenue
New York, NY 10177-1211
Tel:  (212) 944-2200

Frank J. Rubino, Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, NY 10017
Tel:  (212) 983-8500

*Attorneys for Plaintiff*
*NY Marine & General Insurance Company*