# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACK
ON SEPTEMBER 11, 2001

Civil Action No. 03 MDL 1570 (RCC)
ECF Case

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-CV-6977

---

## MEMORANDUM OF LAW OF MUHAMMAD ASHRAF, M. OMAR ASHRAF, IQBAL UNUS, MOHAMMED JAGHLIT, AHMED TOTONJI AND YAQUB MIRZA IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM

---

Nancy Luque (NL-1012)
Jay Hanson (admitted *pro hac vice*)
Steven K. Barentzen (SB-8777)
**DLA PIPER RUDNICK GRAY CARY US LLP**
1200 Nineteenth Street, N.W.
Washington, DC  20036-2247
Tel: 202-861-3900
Fax: 202-223-2085

*Attorneys for Muhammad Ashraf, M. Omar Ashraf,
Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji
and Yaqub Mirza*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

PROCEDURAL HISTORY ....................................................................................................3

   I.     THE COURT'S JANUARY 18, 2005 DECISION ................................................3

   II.    THE COURT'S SEPTEMBER 21, 2005 OPINION AND ORDER......................3

ARGUMENT..........................................................................................................................6

   I.     THE STANDARD APPLICABLE TO THESE MOTIONS TO
       DISMISS ............................................................................................................6

   II.    PLAINTIFFS' CLAIMS AGAINST THE MOVING DEFENDANTS
       SHOULD BE DISMISSED FOR FAILURE TO STATE CLAIMS ......................7

       A.    M. OMAR ASHRAF, MUHAMMAD ASHRAF,  IQBAL
           UNUS AND MOHAMMED JAGHLIT......................................................7

       B.    AHMED TOTONJI ................................................................................9

       C.    YAQUB MIRZA ................................................................................13

CONCLUSION ....................................................................................................................17

## TABLE OF AUTHORITIES

**Page**

Cases

*Boim v. Quranic Literary Inst. and Holy Land Foundation for Relief and Development*, 291 F.3d 1000  (7th Cir. 2002) ...............................................................passim

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65  (2d Cir. 1996) .....................................................15

*Harlem River Consumer Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251  (S.D.N.Y. 1976) ...........................................................12, 14, 16

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ...........................................................................................2, 3, 4, 6

*In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) ..............................................................................................................1

*Jackson v. BellSouth Telecomms.*, 372 F.2d 1250 (4th Cir. 2004) .................................................15

Statutes

18 U.S.C. § 2339 .......................................................................................................................11

Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji and Yaqub Mirza (the "Moving Defendants"), by and through undersigned counsel, hereby submit this Memorandum of Law in Support of their Motions to Dismiss all of the claims asserted against each of them in the *Ashton* Plaintiffs' Sixth Amended Consolidated Master Complaint (the "Complaint") pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[1]

## PRELIMINARY STATEMENT

The Moving Defendants are six U.S. citizens and scholars, teachers and businessmen who are moderate and progressive voices in American Islam and who denounce and teach against all forms of terrorism. The claims against the Moving Defendants should be dismissed because these U.S. citizens have never supported Al Qaeda nor assisted or funded terrorism of any kind, and Plaintiffs have not alleged that they have done so.[2]

Plaintiffs' primary basis for asserting liability against the Moving Defendants is their alleged involvement in the so-called "SAAR Network."[3] But on January 18, 2005, the Court considered the *Federal Insurance* Plaintiffs' allegations as to the existence of a so-called "SAAR Network" and found that they had "provided scant basis for linking these entities under the

---

[1] In June 2004, the *Ashton* Plaintiffs voluntarily dismissed the claims it had asserted against so-called "SAAR Network" Defendants African Muslim Agency, Heritage Education Trust, International Institute of Islamic Thought, Mena Corporation, Reston Investments, Sterling Charitable Gift Fund, Sterling Management Group and York Foundation.

[2] On October 18, 2005, Mohammed Jaghlit and Ahmed Totonji moved to dismiss the claims in the *Federal Insurance* action. On October 28, 2005, Yaqub Mirza, Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit and Ahmed Totonji filed an Omnibus Memorandum of Law seeking to dismiss claims in *Burnett, New York Marine, Euro Brokers, Continental* and *World Trade Center*. For the Court's convenience, attached hereto as Exhibit A, is a chart showing the status of all of the Moving Defendants in each action in the MDL.

[3] The Court has used the phrase "SAAR Network Defendants" solely for convenience, and not because Plaintiffs have alleged the existence of such a network. *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539 at n. 15 (S.D.N.Y. 2005) ("*In re Terrorist Attacks II*").

SAAR Network title." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 823 ("*In re Terrorist Attacks I*").

The Court took that analysis to its logical conclusion in its September 21, 2005 Opinion and Order, and dismissed the claims against four of the Moving Defendants, Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus and Yaqub Mirza, in the *Federal Insurance* action, based upon allegations that are similar to the allegations at issue here, because "the complaint does not adequately provide these Defendants with notice as to how they provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at 572.[4]

On September 30, 2005, with the benefit of explicit guidance from the Court's September 21, 2005 Opinion and Order concerning precisely what they must allege to survive a motion to dismiss, Plaintiffs amended the Complaint. Yet, Plaintiffs still have not stated claims against the four Moving Defendants that were dismissed in *Federal Insurance*. The two other Moving Defendants, Mohammed Jaghlit and Ahmed Totonji, should be dismissed because the allegations asserted against them are even weaker than the vague and conclusory allegations the Court already found do not state a claim against other so-called "SAAR Network Executives" in its September 21, 2005 Opinion and Order.

Plaintiffs have not and cannot assert that the Moving Defendants ever have knowingly or intentionally supported Al Qaeda or any form of terrorism. Because Plaintiffs have failed to come forward with even a single factual allegation connecting any one of them with terrorism

---

[4] The Court also dismissed the so-called "SAAR Network Entity" International Institute of Islamic Thought ("IIIT") from *Ashton* and *Burnett*. *In re Terrorist Attacks, II*, at 571. The Court also dismissed the claims against African Muslim Agency, Grove Corporate, Heritage Education Trust, Mar-Jac Investments, Reston Investments, Safa Trust and York Foundation in the *Burnett* action, and the claims against Mar-Jac Poultry in *Ashton*, *Burnett* and *Federal Insurance*. *Id.* at 570-571.

2

financing or the events of September 11, 2001, the Complaint fails to state claims and must be dismissed.

## PROCEDURAL HISTORY

### I.    THE COURT'S JANUARY 18, 2005 DECISION

On January 18, 2005, the Court ruled on motions to dismiss made by numerous defendants, including the motions filed by some of the so-called "SAAR Network Defendants" to dismiss the *Federal Insurance* complaint for lack of personal jurisdiction and pursuant to Rule 12(b)(6). The Court considered all of the *Federal Insurance* complaint's allegations concerning the existence of a so-called "SAAR Network" and concluded that Plaintiffs had "provided scant basis for linking these entities under the SAAR Network title." *In re Terrorist Attacks I*, at 823.

But the Court found that its "analysis of the [Defendant's] arguments in favor of 12(b)(6) dismissal depend[ed] on a predicate finding of which entities are subject to this Court's personal jurisdiction and which entities--and under what circumstances--transferred money to terror fronts." *Id*. at 837. Accordingly, the Court denied Defendants' Rule 12(b)(6) motion to dismiss without prejudice but noted that it could be "renewed upon completion of personal jurisdiction discovery." *Id.* The Court also dismissed Plaintiffs' claims for Civil RICO, the Torture Victim Protection Act, assault and battery, intentional infliction of emotional distress and negligence. *Id.* at 837-38.

### II.   THE COURT'S SEPTEMBER 21, 2005 OPINION AND ORDER

On September 21, 2005, the Court issued another Opinion and Order, this time dismissing the *Federal Insurance* claims against four of the Moving Defendants, Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus and Yaqub Mirza, and another so-called "SAAR Network Executive," Taha Al-Alwani. The Court also dismissed the claims against eight so-called "SAAR Network Entities," African Muslim Agency, Grove Corporate, Heritage Education Trust,

IIIT, Mar-Jac Investments, Reston Investments, Safa Trust and York Foundation in the *Burnett* action, and dismissed the claims against IIIT from *Ashton* as well. *In re Terrorist Attacks II*, at 576.[5]

As an initial matter, the Court dismissed all of the Torture Victim Protection Act ("TVPA") and negligence claims against all of the Defendants moving for dismissal under Rule 12(b)(6). *Id.* at 566. The Court also dismissed all of the *Federal Insurance* Plaintiffs' claims for assault and battery and intentional infliction of emotional distress. *Id.* The Court noted that it would review each complaint individually to determine whether each stated a claim for relief under the Antiterrorism Act ("ATA") and RICO. The Court noted that if "Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival, the *Federal* Plaintiffs will have stated a claim for trespass, and the *Ashton* and *Burnett* Plaintiffs will have stated claims for intentional infliction of emotional distress. Plaintiffs who are aliens will have also stated a claim for relief under the [Alien Tort Claims Act]." *Id.*

The Court analyzed the allegations against the "SAAR Network Defendants," noting that Plaintiffs' claims against the "SAAR Network Entities" in both the *Ashton* and *Burnett* actions "rely primarily on their allegations against the 'SAAR Foundation and network.'" *Id.* at 569. Plaintiffs alleged that the "SAAR Network" was formed "by a group of Muslim scholars and scientists" and that its "largest donor is the al Rajhi family of Saudi Arabia." *Id.* The complaints further alleged that many of the "SAAR Network" organizations' offices in Herndon were raided

---

[5] The Court dismissed the claims against another purported "SAAR Network Entity" Mar-Jac Poultry, from *Ashton, Burnett* and *Federal Insurance*. *Id.* After reviewing the allegations against Mar-Jac, including those allegations in the *Federal Insurance* RICO Statement applicable to SAAR Network Entities that alleged Mar-Jac Poultry donated money to African Muslim Agency which the Plaintiffs claim was later "laundered," and that it donated money to unnamed SAAR Network Entities that was later forwarded to al Qaeda, the Court dismissed the RICO claim against Mar-Jac Poultry because Plaintiffs did not allege that Mar-Jac had any role in directing an enterprise. *Id.* at 571. The Court dismissed the remainder of the claims because the complaints did "not provide Mar-Jac Poultry with notice as to how it could be liable for the terrorist attacks." *Id.*

in March 2002 as part of Operation Greenquest to investigate "potential money laundering and tax evasion activities and their ties to terrorist groups such as ... al Qaeda as well as individual terrorists ... (including) Osama bin Laden." [6]  *Id.* at 570.

The Court dismissed the *Federal Insurance* claims against the alleged "SAAR Network Executives" Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus and Yaqub Mirza, and Taha Al-Alwani, because "reading the complaint as a whole and considering the overlap of executives among the SAAR Network entities, the complaint does not adequately provide these Defendants with notice as to how they provided material support to al Qaeda terrorists." *In re Terrorist Attacks II,* at 572.[7]

The Court also dismissed the *Burnett* Plaintiffs' claims against the "SAAR Network Entities" because the allegations against them were only a "legal conclusion that the SAAR Network entities conspired with the SAAR Network" and Plaintiffs failed to provide Defendants with "notice of the factual grounds on which Plaintiffs' claims of conspiracy are based." *Id.* at 570.

The Court also dismissed the claims against IIIT in *Ashton.*  Although the *Ashton* complaint alleged that IIIT financed two charities, the complaint did not allege that IIIT knew that the charities it allegedly financed "were Islamic Jihad cells or whether and how these cells participated in or contributed to al Qaeda's agenda of terror." *Id.* at 571.

---

[6] Plaintiffs have sought to infer liability against the Moving Defendants from the existence of this highly publicized mass raid. That raid, however, occurred over three and a half years ago and during that time the government has not handed down one indictment, made one arrest, designated any Moving Defendant as a sponsor of terrorism or frozen or seized a single account or asset. To the contrary, the government has returned to the Moving Defendants all of the hundreds of boxes of documents and dozens of computers it confiscated during the raid. The only reasonable inferences that can be drawn from the government's investigation and raid is that it has failed to yield even a single iota of evidence showing that any of the Moving Defendants are part of a "SAAR Network" or have anything to do with funding or supporting terrorism.

## ARGUMENT

## I.    THE STANDARD APPLICABLE TO THESE MOTIONS TO DISMISS

In its January Opinion, the Court found that Plaintiffs had provided "scant" basis for linking defendants under a "SAAR Network" title, *In re Terrorist Attacks I*, at 823, and stated that the "SAAR Network" Defendants' liability would be predicated on "which entities--and under what circumstances--transferred money to terror fronts." *Id.* at 837.

In its September Opinion, the Court provided Plaintiffs with further guidance, holding that to survive a motion to dismiss, Plaintiffs must allege that that each Moving Defendant knew of al Qaeda's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II*, at 564 (*citing Boim v. Quranic Literary Inst. and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1023-24 (7th Cir. 2002)). Applying this rule, the Court found that the *Federal Insurance* Plaintiffs' vague and conclusory allegations concerning the "SAAR Network Executives" failed to "provide these Defendants with notice as to how they provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at 572.

On September 30, 2005, with the benefit of the road map provided by the Court's earlier decisions stating precisely what Plaintiffs must do to state claim, Plaintiffs filed the Complaint. The Complaint, however, still fails to provide the Moving Defendants with notice of the claims against them. Instead, Plaintiffs continue to rely largely on the same vague and conclusory allegations that the Court already has found to be insufficient to state a claim.

---

[7] The Court also found that Plaintiffs' allegations against another so-called "SAAR Network Executive," Jamal Barzinji, provided Mr. Barzinji with "sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda." *In re Terrorist Attacks II*, at 572.

## II.   PLAINTIFFS' CLAIMS AGAINST THE MOVING DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO STATE CLAIMS

### A.   M. OMAR ASHRAF, MUHAMMAD ASHRAF, IQBAL UNUS AND MOHAMMED JAGHLIT

Plaintiffs allege that Muhammad Ashraf "established over 100 entities including non-profits, charities, and businesses," and is one of the "[c]o-conspirators, material sponsors, and/or aiders and abettors of the SAAR network." (Compliant, at ¶¶ 251, 269.)  Plaintiffs also allege that he is "personally acquainted" with and "maintained relationships" with Ahmed Idriss Nasreddin.  (*Id.*, at ¶ 258.)  Plaintiffs also allege that he has worked with Yousef Nada at a company called the International Islamic Charitable Organization.  (*Id.*, at ¶ 259.)

Plaintiffs allege that M. Omar Ashraf "established over 100 entities including non-profits, charities, and businesses." (*Id.*, at ¶ 251.)  Plaintiffs also allege that he is one of the "[c]o-conspirators, material sponsors, and/or aiders and abettors of the SAAR network." (*Id.*, at ¶ 269.)

Plaintiffs allege that Iqbal Unus "established over 100 entities including non-profits, charities, and businesses," and that he is one of the "[c]o-conspirators, material sponsors, and/or aiders and abettors of the SAAR network."  (*Id.*, at ¶¶ 251, 269.)  Plaintiffs also allege that he worked with Yousef Nada in a company called the International Islamic Charitable Organization (*Id.*, at ¶ 259.)

Plaintiffs allege that Mohammad Jaghlit "signed SAAR Network checks that were issued to terror sponsoring organizations."  (*Id.*, at ¶ 257.)  Plaintiffs also allege that he is one of the "[c]o-conspirators, material sponsors, and/or aiders and abettors of the SAAR network." (*Id.*, at ¶ 269.)

The great majority of the allegations against these individuals concern their purported role in the so-called "SAAR Network."  But, these allegations are all similar to -- or in some

7

instances, weaker than -- the vague and conclusory factual allegations that the *Federal Insurance* Plaintiffs asserted against the Moving Defendants and that the Court already found fail to state claims in its September 21, 2005 Opinion and Order.  Accordingly, all of the claims against M. Omar Ashraf, Muhammad Ashraf, Iqbal Unus and Mohammed Jaghlit should be dismissed because "reading the complaint[s] as a whole and considering the overlap of executives among the SAAR Network entities, the complaint does not adequately provide these Defendants with notice as to how they provided material support to al Qaeda terrorists."  *In re Terrorist Attacks II,* at 572.

The only allegations asserted by the *Ashton* Plaintiffs that were not asserted by the *Federal Insurance* Plaintiffs is that Dr. Unus and Dr. Ashraf worked with Yousef Nada in a company called the International Islamic Charitable Organization (Complaint, at ¶ 259), and that Dr. Ashraf is "personally acquainted" with and "maintained relationships" with Ahmed Idriss Nasreddin.  Both Nada and Nasreddin are alleged to be  "Specially Designated Global Terrorists."  (*Id.*, at ¶ 258.)  However, these allegations fall far short of stating a claim.

The International Islamic Charitable Organization that Dr. Unus and Dr. Ashraf are alleged to have worked at with Nada is not a defendant in this action -- or any action in this MDL -- and is not alleged by Plaintiffs to have done anything at all, much less support terrorism or the September 11th attacks.  The Complaint does not allege when Dr. Unus and Dr. Ashraf allegedly worked with Yousef Nada at this entity, or *that at that time*, that they *knew* that Nada was a sponsor of terrorist activities.  Nada was not designated until November 2001.  Even had Dr. Unus and Dr. Ashraf worked at this alleged "SAAR entity" with Nada, this allegation does not support a claim against Dr. Unus and Dr. Ashraf absent the additional allegation that the International Islamic Charitable Organization is a front for or sponsor of terrorism *and* that while

8

working there with Nada, Dr. Unus and Dr. Ashraf took some action to intentionally and knowingly assist it, or Nada, in providing support for the September 11th attacks or Al Qaeda. *See Terrorist Attacks I*, at 826 (defendant may be responsible for the September 11 attacks only *if Plaintiffs allege that he knowingly and intentionally provided material support to al Qaeda*) (emphasis added).

The allegation that Dr. Ashraf is "personally acquainted" with and "maintained relationships" with Nasreddin is also insufficient to state a claim.  Bare allegations of a vague "acquaintance" or "relationship" do not provide Dr. Ashraf with notice of the claim against him. Plaintiffs have not alleged either that Dr. Ashraf knew Nasreddin to be a sponsor of terrorism (Nasreddin was not designated until 2002) or that he took some act to support Nasreddin.  Again, Plaintiffs have failed to allege, as they must to survive a motion to dismiss, that Dr. Ashraf knew of al Qaeda's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities."  *In re Terrorist Attacks II*, at 564 (*citing Boim*, 291 F.3d at 1023-24).

### B.   AHMED TOTONJI

Plaintiffs allege that: 1) in 1972, Ahmed Totonji founded the World Assembly of Muslim Youth ("WAMY") (Complaint, at ¶¶ 203, 264);  2) in the early 1980s, Ahmed Totonji started the SAAR Foundation as well as other entities, and that over the ensuing two decades, he established over 100 entities including non-profits, charities, and businesses, that he signed SAAR Network checks that were issued to terror sponsoring organizations, and that Ahmed Totonji is a co-conspirator, material sponsor, and/or aider and abettor of the SAAR network (*Id.*, at ¶¶ 251, 257, 269); 3) *prior* to establishing the SAAR Foundation in the early 1980's Ahmed Totonji worked for Sulaiman Al Rajhi at the Al Rajhi Bank as a financial consultant (*Id.*, ¶ 251); 4) Ahmed Totonji also worked for Yousef Nada *prior* to founding the SAAR Foundation (*Id.*, at ¶ 254); 5)

9

in 1988, Ahmed Totonji recommended two SAAR Network officers to Yousef Nada as prospective officers of Bank Al Taqwa (*Id.*, at ¶ 255); and 6) Ahmed Idriss Nasreddin is personally acquainted with and maintained a relationship with Ahmed Totonji (*Id.*, ¶ 258).

These allegations against Ahmed Totonji are also insufficient to state a claim. Again, the primary allegations against Dr. Totonji concern his alleged involvement in the so-called "SAAR Network." (Complaint, at ¶¶ 251, 257 at 269.) The only allegations against Dr. Totonji that is different than those asserted by the *Federal Insurance* plaintiffs is that he signed SAAR Network checks that were issued to terror sponsoring organizations. (*Id.*, at ¶ 258)[8] Plaintiffs do not allege what purported "SAAR Network" entities' check was signed or that Dr. Totonji knew the check was going to a "terror sponsoring organization." Moreover, Plaintiffs do not identify who that "terrorist sponsoring organization" was, or that this intentionally unidentified "terror sponsoring organization" had anything to do with the September 11th Attacks. Indeed, if the alleged "terror sponsoring organization" were Hamas or the Palestinian Islamic Jihad, the allegation would not support a claim because neither of those entities has anything to do with Al Qaeda or the September 11th attacks. *In re Terrorist Attacks I*, at 833 ("Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11"); *In re Terrorist Attacks II*, at 571 (dismissing claims against IIIT because the complaint did not allege that IIIT knew that the charities it allegedly financed "were Islamic Jihad cells or whether and how these cells participated in or contributed to al Qaeda's agenda of terror.")

Plaintiffs' vague and conclusory allegations concerning Dr. Totonji's alleged involvement in the so-called "SAAR Network" are insufficient to state a claim because they do

---

[8] Plaintiffs asset the same allegation against Mohammad Jaghlit as well. (*Id.*)

"not adequately provide [Dr. Totonji] with notice as to how [he] provided material support to al Qaeda terrorists." *In re Terrorist Attacks II,* at 572.

Plaintiffs also alleged that Dr. Totonji worked for Yousef Nada *prior* to founding the SAAR Foundation in the early 1980's. (*Id.,* ¶ 254.) Even if the allegation that Dr. Totonji worked for Nada almost 25 years ago were true, the Complaint fails to state a claim because it does not allege that, *at that time,* 1) Nada, or his organization, were engaged in terrorist activities; 2) that Mr. Totonji *knew* that Nada, or his organization, were engaged in terrorist activities -- indeed Nada was not designated as a financier of terrorism until after the September 11, 2001 attacks; or 3) that Dr. Totonji transferred funds to Nada or knowingly or intentionally engaged in any other act to support Nada, or his organization's activities. The Court has held that a defendant may be responsible for the September 11 attacks only *if Plaintiffs allege that he knowingly and intentionally provided material support to al Qaeda. See Terrorist Attacks I,* at 826 (emphasis added). Even if Dr. Totonji were an officer in one of Nada's organizations in the 1970's, he could not possibly be liable for the September 11th attacks on this basis as Al Qaeda was not even formed until the 1980's.

Nor does the allegation that, in 1988, Dr. Totonji recommended two "SAAR Network officers" to Nada as prospective officers of Bank Al Taqwa support a claim. (Complaint, ¶ at 255.) Again, Plaintiffs have failed to allege that at that time, 1) Nada, or his organization, were engaged in terrorist activities; or 2) that Dr. Totonji *knew* that Nada, or his organization, were engaged in terrorist activities. Moreover, the "recommendation" of any employee is not the type of knowing material support of terrorism that is necessary to support a claim under the ATA. *See* 18 U.S.C. § 2339A (defining "material support" of terrorism to include "property, tangible or intangible, or service, including currency or monetary instruments or financial securities,

financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself) and transportation").

Plaintiffs also allege that Ahmed Idriss Nasreddin is personally acquainted with and maintained a relationship with Dr. Totonji. (*Id.*, ¶ 258). But, as stated above, bare allegations of a vague "acquaintance" or "relationship" do not provide Dr. Totonji with notice of the claim against him. Plaintiffs have not alleged either that Dr. Totonji knew Nasreddin to be a sponsor of terrorism or that he took some act to support Nasreddin. Again, Plaintiffs have failed to allege, as they must to survive a motion to dismiss, that Dr. Totonji knew of al Qaeda's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II*, at 564 (*citing Boim*, 291 F.3d at 1023-24.

Plaintiffs also allege that in 1972, Ahmed Totonji founded WAMY, and prior to coming to the U.S. to start the SAAR Foundation worked for Sulaiman Al Rajhi at the Al Rajhi Bank as a financial consultant. (Complaint, at ¶¶ 203, 251, 264). These allegations, even if true, do not allege that Dr. Totonji knowing and intentionally participated in some action for which he could be held liable for the September 11th attacks. Dr. Totonji is not alleged to have done anything for WAMY or Al Rajhi Bank, much less some action in support of the September 11th attacks or Al Qaeda. Dr. Totonji's alleged liability is based solely on his status as an officer, director or employee of these entities, and therefore the allegations are insufficient to state a claim. *See Harlem River Consumer Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1271 (S.D.N.Y. 1976) ("A corporate officer or director is not liable for the illegal actions of others in the corporation merely by virtue of his position or office. He may become liable if he knowingly participates in such actions."); *see also In re Terrorist Attacks II*, at 567-68 (sustaining *Federal*

12

*Insurance* complaint against Abdulrahman Alamoudi because those plaintiffs alleged that he "funneled money to al Qaeda through the charities with which he was involved," and dismissing claims of other plaintiffs who only asserted he was associated with certain entities).  Moreover, any actions that Dr. Totonji would have taken on behalf of WAMY or Al Rajhi Bank in the 1970's could not support a claim because they would have occurred well before Al Qaeda even existed.

### C.    YAQUB MIRZA

Plaintiffs allege that: 1) Yaqub Mirza is the secretary and treasurer of the Virginia Office of the Muslim World League ("MWL") in the United States (Complaint, at ¶ 220, 221), 2) he is at the financial center of the SAAR network, that his house was raided in March, 2002 by federal authorities investigating his alleged connections to Al Qaeda and the September 11, 2001 attacks, that Dr. Mirza established over 100 entities including non-profits, charities, and businesses in the SAAR Network, that Dr. Mirza is the predominant signatory for the SAAR Network with signatory authority over at least 27 accounts and a co-conspirator, material sponsor, and/or aider and abettor of the SAAR network (*Id.*, at ¶¶ 220, 221, 251, 257, 258 and 269); 3) Dr. Mirza is an officer/director of Sanabel Al Kheer Inc. and Sana-Bell Inc. (*Id.*, at ¶ 236); 4) in 1992-1998, Dr. Mirza "handled" Sana-Bell Inc.'s  $3.7 million investment with Soliman S. Biheiri and companies he controlled in the U.S.  (*Id.*, at ¶ 239); 5) Dr. Mirza is a co-conspirator, material sponsor and/or aider and abettor and member of the terrorist enterprise of the International Islamic Relief Organization ("IIRO") (*Id.*, at ¶ 250); 6) Dr. Mirza is an officer and board member of "numerous companies and charities" involved in sponsoring terror who are defendants in this action and elsewhere (*Id.*, at ¶ 237); 7) in February 2001, Mena Estates, a SAAR Network entity loaned $500,000 to Yousef Nada, and that at that time Yaqub Mirza was

the vice president of Mena Estates (*Id.*, at ¶ 256); and 8) Nasreddin had a business relationship with Yaqub Mirza (*Id.*, at ¶ 258).

The bulk of the allegations against Dr. Mirza, as with the other Moving Defendants, concern his purported role in the ill-defined "SAAR Network." (Complaint, ¶¶ 220, 221, 251, 257, 258 and 269.) These allegations are virtually identical to those already considered by the Court in dismissing the *Federal Insurance* claims and do not "adequately provide [Dr. Mirza] with notice as to how [he] provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at 572.

Plaintiffs also allege that Dr. Mirza is an officer or director, or otherwise associated with, various entities are somehow responsible for the September 11th attacks. For example, Dr. Mirza is alleged to be: the secretary and treasurer of the Virginia office of the MWL (Complaint, at ¶ 220, 221); an officer and director of Sana-Bell, Inc. and Sanabel al-Kheer (*Id.*, ¶ 236); a co-conspirator, material sponsor and/or aider and abettor of the International Islamic Relief Organization ("IIRO") (*Id.*, at ¶ 250); and an officer and board member of "numerous companies and charities" involved in sponsoring terror who are defendants in this action and elsewhere. (*Id.*, at ¶ 237.) However, there is no allegation that Dr. Mirza allegedly did anything to support or aid these entities. To state a claim against Dr. Mirza as an officer or director of an entity, Plaintiffs must allege that Dr. Mirza knowingly and intentionally participated in some action on behalf of that entity for which it could be held liable for the September 11th attacks. Dr. Mirza is not alleged to have done anything for any of these entities, rather his alleged liability is based solely on his status as an officer or director of the company. That is insufficient to state a claim. *See Harlem River Consumer Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1271 (S.D.N.Y. 1976) ("A corporate officer or director is not liable for the illegal actions of others in

the corporation merely by virtue of his position or office. He may become liable if he knowingly participates in such actions."); *see also In re Terrorist Attacks II*, at 567-68 (sustaining *Federal Insurance* complaint against Abdulrahman Alamoudi because those plaintiffs alleged that he "funneled money to al Qaeda through the charities with which he was involved," and dismissing claims of other plaintiffs who only asserted he was associated with certain entities).

Plaintiffs do not even allege that the Virginia branch of the MWL that Dr. Mirza was allegedly an officer of -- as opposed to the Saudi based MWL -- did anything at all, let alone anything to aid Al Qaeda or the September 11th attacks. Similarly, Plaintiffs allege only in the most general and conclusory manner that Dr. Mirza is co-conspirator and aider and abettor of the IIRO. (Complaint, at ¶ 250). These general and conclusory allegations fail as a matter of law. *See In re Terrorist Attacks I*, at 833 (*quoting De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) "[A] complaint which consists of conclusory allegations unsupported by factual assertions fails even on the liberal standard of Rule 12(b)(6)); *In re Terrorist Attacks II*, *18 (*quoting Jackson v. BellSouth Telecomms.*, 372 F.2d 1250, 1270-71 (4th Cir. 2004) (pleading that "contained only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based" cannot withstand motion to dismiss)).

Plaintiffs also allege that in 1992-1998, Dr. Mirza "handled" Sana-Bell Inc.'s $3.7 million investment with Soliman S. Biheiri and companies he controlled in the U.S. (Complaint, at ¶ 239.) This vague and confusing allegation also fails to state a claim. Plaintiffs do not state what it means to "handle" an investment. But, even if Dr. Mirza had some role in this alleged investment, Plaintiffs have not alleged that Dr. Mirza knew either Sana-Bell or Biheiri were sponsors or supporters of terrorism. Indeed, other than allegedly investing money with Biheiri, it is not clear what Plaintiffs even allege Sana-Bell did wrong. There is no allegation that Dr.

Mirza had any relationship with Biheiri or knew anything about him.  Because Plaintiffs have not alleged that Dr. Mirza knew that either Sana-Bell or Biheiri were engaging in activities supporting Al Qaeda or terrorism of any kind, or took any action in furtherance of any terrorist activities, Plaintiffs have failed to allege that Dr. Mirza knew of al Qaeda's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II*, at *19 (*citing Boim*, 291 F.3d at 1023-24).

Plaintiffs also allege that in February 2001, Mena Estates, an alleged  "SAAR Network" entity, loaned $500,000 to Yousef Nada, and that at that time Yaqub Mirza was the vice president of Mena Estates.  (*Id.*, ¶ 256).  But, again, this allegations fails to state a claim.  First, Mena Estates, the entity that allegedly transferred funds to Nada is not even a defendant in this, or any other action in this MDL.  Moreover, Plaintiffs have not alleged that 1) Dr. Mirza had any responsibility for or knowledge of this transfer, 2) at this time Nada, or his organization, were engaged in terrorist activities; or 3) that Dr. Mirza *knew* that Nada, or his organization, were engaged in terrorist activities.  Plaintiffs have simply alleged that Dr. Mirza was the vice-president of Mena Estates, not that Dr. Mirza knew of Nada's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II* at *19 (*citing Boim*, 291 F.3d at 1023-24); *Harlem River Consumer Coop., Inc*, 408 F. Supp. at 1271 ("A corporate officer or director is not liable for the illegal actions of others in the corporation merely by virtue of his position or office.  He may become liable if he knowingly participates in such actions.")

Plaintiffs also allege that Ahmed Idriss Nasreddin is personally acquainted with and maintained a relationship with Dr. Mirza.  (Complaint, at ¶ 258.)  But, as stated above, this bare allegation of a vague "acquaintance" or "relationship" is insufficient to put Dr. Mirza on notice

16

of the claims against him.  Again, Plaintiffs have failed to allege, as they must to survive a

motion to dismiss, that Dr. Mirza knew of al Qaeda's illegal activities, "desired to help those

activities succeed, and . . . engaged in some act of helping the illegal activities."  *In re Terrorist*

*Attacks II*, at 564 (*citing Boim*, 291 F.3d at 1023-24).

## CONCLUSION

For all the foregoing reasons, the Moving Defendants respectfully request that the Court

grant their motions and dismiss all of the claims asserted against them in *Ashton* with prejudice.

Respectfully submitted,


Dated:   December 7, 2005          By:  /s/ Nancy Luque
                                        Nancy Luque (NL-1012)
                                        Jay Hanson (admitted *pro hac vice*)
                                        Steven K. Barentzen (SB-8777)
                                        DLA PIPER RUDNICK GRAY CARY US LLP
                                        1200 Nineteenth Street
                                        Washington, DC  20036-2247
                                        Tel: 202-861-3900
                                        Fax: 202-223-2085

                                        *Attorneys for Muhammad Ashraf, M. Omar Ashraf,*
                                        *Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji*
                                        and *Yaqub Mirza*

# EXHIBIT A

| | ASHTON | BURNETT | FEDERAL | NY MARINE | EURO BROKERS | CONTINENTAL | WTC |
|---|---|---|---|---|---|---|---|
| M. Ashraf | Moving Defendant | MTD filed 10/28/05 | **Dismissed 9/21/05** | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| M. Omar Ashraf | Moving Defendant | MTD filed 10/28/05 | **Dismissed 9/21/05** | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| Mirza | Moving Defendant | **Voluntarily Dismissed 1/05** | **Dismissed 9/21/05** | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| Unus | Moving Defendant | MTD filed 10/28/05 | **Dismissed 9/21/05** | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| Totonji | Moving Defendant | MTD filed 10/28/05 | MTD filed 10/18/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| Jaghlit | Moving Defendant | MTD filed 10/18/05 | MTD filed 10/18/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 | MTD filed 10/28/05 |
| African Muslim Agency | **Vol. Dismissed 6/04** | **Dismissed 9/21/05** | MTD Filed 10/18/05 | MTD Filed 10/21/05 | | MTD Filed 10/21/05 | |
| Grove Corp. | MTD filed 10/21/05 | **Dismissed 9/21/05** | MTD Filed 10/18/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 |
| Heritage Education Trust | **Vol. Dismissed 6/04** | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 |
| IIIT | **Dismissed 9/21/05** | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Mar-Jac Investments | | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Mena Corp. | **Vol. Dismissed 6/04** | MTD filed 10/21/05. | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Reston Investments | **Vol. Dismissed 6/04** | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Safa Trust | MTD filed 10/21/05 | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Sterling Charitable Gift Fund | **Vol. Dismissed 6/04** | MTD filed 10/21/05. | MTD filed 10/18/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 |
| Sterling Management Group | **Vol. Dismissed 6/04** | MTD filed 10/21/05. | MTD filed 10/18/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 | MTD filed 10/21/05 |
| York Foundation | **Vol. Dismissed 6/04** | **Dismissed 9/21/05** | MTD filed 10/18/05 | MTD filed 10/21/05 | | MTD filed 10/21/05 | |
| Mar-Jac Poultry | **Dismissed 9/21/05** | **Dismissed 9/21/05** | **Dismissed 9/21/05** | MTD Pending | | Dismissed by Stipulation | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2005, I caused an electronic copy of the foregoing Memorandum of Law of Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji And Yaqub Mirza In Support Of Motion To Dismiss Pursuant To Rule 12(B)(6) For Failure To State A Claim to be served by the Court's electronic filing system upon all parties scheduled for electronic notice.

/s/  Steven K. Barentzen
Steven K. Barentzen (SB-8777)