UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to AL SHAMAL ISLAMIC BANK** |

*This document relates to:*            *Federal Insurance Co. v. al Qaida*
                                       03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO AL SHAMAL ISLAMIC BANK

  Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Al Shamal Islamic Bank.

  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is Al Shamal Islamic Bank. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| conspiracy to commit murder | NY CLS Penal § 105.15; |
|---|---|

|  | NY CLS Penal § 125.25(xi) |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

    (b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Al Shamal Islamic Bank | Al Shamal Islamic Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Al Shamal Islamic Bank | Al Shamal Islamic Bank undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |

| | | |
|---|---|---|
| early 1990s to 9/11/2001 | Al Shamal Islamic Bank | Al Shamal Islamic Bank agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

   (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al Shamal Islamic Bank fit

3

    neatly into this framework by raising and providing funds and banking services for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c) No.

    (d) Al Shamal Islamic Bank is associated with the Enterprise.

    (e) Al Shamal Islamic Bank is a member of the Enterprise, and are separate and distinct from the Enterprise.

    (f) Al Shamal Islamic Bank intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Al Shamal Islamic Bank is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Shamal Islamic Bank furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al Shamal Islamic Bank, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Al Shamal Islamic Bank, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also

relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Al Shamal Islamic Bank. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Al Shamal Islamic Bank. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Shamal Islamic Bank. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Al Shamal Islamic Bank also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| I | Trespass |
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20. Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Shamal Islamic Bank | The government of Sudan granted approval to Al Shamal Islamic Bank (herein "Al Shamal") in April 1983 in response to a request from the Northern State Government (under the control of the NIF and Hassan Al Turabi), Al Shamal Investment and Development Company and Saleh Abdullah Kamel. The bank received an initial capitalization of USD $20 million. Al Shamal issued subscription shares in April 1984. The Northern State Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and co-Defendant Faisal Islamic Bank (Sudan) purchased shares in this initial offering.<br><br>A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps.... Jihad has now become an obligation that comes before any other duty." ("Sudanese students enroll for controversial military service," AP News (June 6, 1998); AP News (August 4,1998).)<br><br>The government granted final approval to Al Shamal in July 1988. Chaired by Dr. Wahab Osman Sheikh Mosa, Al Shamal's provisional board included Al Baraka Investment and Development Corporation as well as co-Defendants Faisal Islamic Bank (Sudan) and Tadamon Islamic Bank. The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (USD $3.9 million).<br>As of late 2001, co-Defendants Al-Bir International Organization (Benevolence | 1962(a), 1962(c), 1962(d) |

International Foundation), Faisal Islamic Bank (Sudan), Tadamon Islamic Bank and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal.

Al Shamal is heavily invested in the Sudanese import/export sector and posted revenues of $6.2 million and total assets of $63.1 million in 2000.

Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America. In the United States, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and CitiBank in New York. Al Shamal shareholders also maintain significant U.S. operations. Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States, as detailed in the RICO statements and other pleadings already filed against DMI Trust and incorporated herein by reference.

In addition, Al Shamal Chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially Designated Global Terrorist entity, in the United States in 1992.

Al Shamal knowingly and intentionally provided financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and facilitating weapons and military equipment purchases for al Qaida.

Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hassan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaida. Bin Laden

even provided the institution with USD $50 million in capital. According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
>
> *$1,200 a month.*
>
> For how long did you work for him [Osama bin Laden]?
>
> *Almost two years.*
>
> What Banks did he keep his money at?
>
> *Bank Al Shamar.*

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank. Al-Fadl also described acting as courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?.
>
> *Abu Fadhl, he bring it from Shamal Bank*

9

*and he bring it to me.*

Abu Fadhl brought it from the Shamal Bank?

*Yes.*

Is that a bank in the Sudan?

*Yes.*

In the same trial, another former al Qaida operative stated that Al Qaida used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting Bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route. The witness took the check to Al Shamal and cashed it.

The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities. According to reports from a leading intelligence publication, Bin Laden remained a shareholder in Al Shamal as late as 2000. A 2002 Congressional Research Service

Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist ("SDGT") Adel Abdul Jalil Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaida network. In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaida.

Co-Defendant Yasin Al-Qadi wired more than $22 million from Swiss Bank accounts to al Qaida operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al-Shamal Bank.

In March 1991, Hassan Al Turabi's government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces; and providing for martyrs' families.

The ISSF jihad fund's largest public and private contributors were Prince Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal, which contributed 7 million Sudanese Pounds, and

Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

*Batterjee*

Co-Defendant, SDGT and Al Shamal Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999, and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization, whose American branch, Benevolence International Foundation (BIF), was subject to a criminal complaint in U.S. District Court on April 29, 2002.

Co-Defendant Enaam M. Arnaout, Chairman of Batterjee's BIF, had a relationship with Osama Bin Laden and key associates dating back more than a decade. The foundation is used by al Qaida for logistical support. Terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaida have contacts with the foundation and its office personnel. On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding BIF donors by diverting funds to pay for supplies to jihadists active in Bosnia and Chechnya.

Documents recovered from March 2002 raids of BIF's offices in Bosnia illustrate Batterjee's instrumental role in the founding of al Qaida. The Government's Evidentiary Proffer in *United States v. Enaam Arnaout* describes a document called the "Golden Chain": BIF possessed in the file a handwritten draft list of the people referred to within al Qaida as the "Golden Chain," wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: "And spend for God's cause." The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." "Baterji", LBI's and BIF's founder, appears after six of the listings.

Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator."

In a book published in 2002, Batterjee writes that the West is morally corrupt and that its war on terrorism is just an excuse to try to stop Muslims from spreading Islam. According to Batterjee, Muslims have tried to peacefully expand Islam throughout the world, but those attempts have always met armed opposition. So Muslims have a right to fight back. More and more clashes with the West are inevitable, he writes, predicating that they will culminate in a final military encounter. "Does any doubt remain that the great confrontation...is certainly coming?"

*Faisal Islamic Bank (Sudan)*

The Faisal Islamic Bank (Sudan) (herein "FIBS") was chartered in Khartoum in 1983. Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of co-Defendant Hassan Al Turabi. In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system.

FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of co-Defendant DMI Trust. The Islamic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed Al Faisal Al Saud, as is DMI Trust and the Faisal Islamic Bank (Sudan).

Prince Mohammed Al Faisal Al Saud played a critical role in the development of Islamic banking, founding Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaida, and other extremist groups.

Hassan Al Turabi's friendship with Prince Mohammed Al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan. FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members. In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters. Through this association, Turabi's party became the best financed in the Sudan.

Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan:

> Where were the accounts [of al Qaida] held? In what countries?
>
> *(...) we got account in Bank Faisl Islami [Faisal Islamic Bank].*
>
> Is that also in Khartoum?
>
> *Yes.*

*Tadamon Islamic Bank.*

Founded on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank") became a major shareholder of Al Shamal on March 26, 1986. Tadamon Islamic Bank continued to hold a significant stake in Al Shamal through September 11, 2001.

According to testimony from former al Qaida financier Jamal Ahmed Mohamed al-Fadl, Tadamon Islamic Bank held accounts for al

Qaida operatives. During the 1998 embassy bombings trial, al-Fadl testified on February 20, 2001, that Osama Bin Laden's assistant, Abdouh al Mukhlafi, used the bank at Bin Laden's behest:

> Do you recall anyone else that had bank accounts in their name for al Qaida?
>
> *Abdouh al Mukhlafi.*
>
> Who was this person named Abdouh al Mukhlafi?
>
> *He is from Yemen.*
>
> What role did he play for Bin Laden?
>
> *He goes with Bin Laden when Bin Laden travel outside or inside Sudan.*
>
> What role did he play for Bin Laden when Bin Laden traveled?
>
> *He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.*
>
> Did he handle money during the travel?
>
> *Yes*
>
> Where were the accounts held? In what countries?
>
> *In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."*

*Islamic Investment Company of the Gulf (Bahrain)*

Islamic Investment Company of the Gulf, the parent of Al Shamal shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan), is based in Bahrain. The bank recently merged with Faisal Islamic Bank group, creating a new entity called Al-Shamil Islamic Bank. Al-Shamil Islamic Bank is a direct subsidiary of DMI Trust. One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

*Dar Al Maal Al Islami Trust*

| | Dar Al Maal Al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981. In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.<br><br>DMI is the predecessor-in-interest to DMI Trust and DMI S.A. DMI S.A. is located in Geneva, Switzerland. The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions." These continents include North America, Europe, Africa and Asia.<br><br>DMI S.A. provides assistance to the Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology."<br><br>Therefore, DMI Trust and DMI S.A. directly participate in the oversight and management of DMI Trust's subsidiary and associate entities. DMI Trust owns 100% of DMI S.A. DMI S.A. is both a wholly owned subsidiary and an agent of DMI Trust. DMI S.A. and DMI Trust are referred to collectively herein as "DMI."<br><br>The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money"). DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal | |
|---|---|---|

Islamic Bank.

DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

Asset management is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure strict conformity with Islamic principles, all DMI operations are reviewed and approved by its Religious Board. The Trust's administrator, DMI Administrative Services S.A., located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."

DMI S.A. is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust. DMI S.A. acts as one of DMI Trust's operational arms. Since its establishment, DMI has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modern era. DMI was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."

According to its spokesmen, DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise." "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim. The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge,

surrendering the way to seeds of evil."

Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen. As Mujahid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to 9 financial jihad: "May Allah bless your Jihad and all your efforts. May He aid you and affirm your faith." Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).

DMI Trust laundered money for al Qaida, knowingly and intentionally providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

Also, DMI Trust's *Zakat* accounts have been used to support al Qaida. In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization.

Both the United States and the Kingdom of Saudi Arabia have designated as al Qaida terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaida. DMI Administrative Services S.A. handled accounts

|  | of Specially Designated Global Terrorists Yassin Al Kadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaida goals. |  |
|---|---|---|