UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to ARADI, INC.** |

*This document relates to:*     *Federal Insurance Co. v. al Qaida*
                                 03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO ARADI, INC.

        Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Aradi, Inc.

        Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.   The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.   The name of the defendant to whom this RICO statement pertains is Aradi, Inc. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.   Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.   The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.   (a)  <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
|---|---|
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Aradi, Inc. | Aradi, Inc. conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Aradi, Inc. | Aradi, Inc. undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |
| early 1990s to 9/11/2001 | Aradi, Inc. | Aradi, Inc. agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple |

|  |  | acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

   (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Aradi, Inc. fit neatly into this framework by raising and providing funds and banking services for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

   (c) No.

3

    (d) Aradi, Inc. is associated with the Enterprise.

    (e) Aradi, Inc. is a member of the Enterprise, and are separate and distinct from the Enterprise.

    (f) Aradi, Inc. intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Aradi, Inc. is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Aradi, Inc. through the SAAR Network furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Aradi, Inc. through the SAAR Network, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Aradi, Inc., to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

    The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious

indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Aradi, Inc.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Aradi, Inc.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Aradi, Inc.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Aradi, Inc. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent |

|      | Infliction of Emotional Distress |
|------|----------------------------------|
| **VII**  | Conspiracy                    |
| **IX**   | Aiding and Abetting           |
| **XI**   | Negligence                    |
| **XII**  | Punitive Damages              |

20.　　Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Aradi, Inc. | Aradi Inc. ("Aradi"), a Delaware corporation, is part of the terror-financing SAAR Network of entities. | 1962(a), 1962(c), 1962(d) |
| | The SAAR Network is a group of Muslim charities, think tanks and related companies, including Aradi, the vast majority of which shared a common address at 555 Grove Street, Herndon, Virginia. The Network's name is derived from the initials of defendant Suleiman Abdul Aziz al Rajhi, who was involved in establishing and funding many of them. The entities comprising the SAAR Network are linked by overlapping boards of directors, shared offices and the circular movement of money, according to tax forms and federal investigators. Indeed, major Aradi officials are also officers with multiple other entities in the SAAR Network. | |
| | For example, Aradi's corporate officers include defendants Abdullah Sulaiman al Rajhi (President), Hisham Al Talib (Vice President/Treasurer) and Cherif Sedky (Secretary). Hisham Al-Talib was also an officer of African Muslim Agency, Grove Corporate, IIIT, Mar-Jac Investments, Inc., Mar-Jac Poultry, Mena Corporation, Reston Investments, Inc., SAAR Foundation, SAAR International, and Safa Trust; and Cherif Sedky was also an officer of Grove Corporate and SAAR Foundation. | |
| | Aradi aided and abetted, conspired with and provided material support and resources to al Qaida and affiliated terrorist organizations through the SAAR Network. In particular, Aradi knowingly used its corporate structure | |

and close relationships with the other SAAR Network entities as tools to generate and surreptitiously transfer funds to terrorist organizations, including al Qaida.

On March 20 and 21, 2002, federal authorities raided the offices of the SAAR Network entities, the vast majority of which were located at a single address in Herndon, Virginia, as well as the residences of several prominent SAAR Network officials, pursuant to a search warrant issued by the United States District Court for the Eastern District of Virginia. The ongoing investigation of the SAAR network entities, which prompted the March 2002 searches, has revealed that SAAR entities' funds have been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under Executive Order 13224 based on their material support and sponsorship of al Qaida. The funds were transferred through Bank al-Takwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin. Both of those banks have been designated by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including Hamas and al Qaeda, both before and after the September 11th attack. As of late September 2001, al Qaida continued to receive financial assistance from Nada, through entities he controlled.

Defendant Aradi is related to a similarly named corporation, Aradi 1212 New York Avenue Inc., which was incorporated on September 25, 1990 in Washington D.C. Cherif Sedky was also listed as the Registered Agent. Again, Abdullah Sulaiman Al Rajhi was listed as a director of Aradi 1212 New York Avenue Inc., and listed his address as 11919 Safa Court, Herndon, Virginia. Another director of Aradi 1212 New York Avenue Inc. was Fahad Sulayman Abdul Aziz who listed his address as P.O. Box 28, Riyadh, Saudi Arabia, which was the address of Al Rajhi Banking and Investment Corporation. As

|  | |  |
|---|---|---|
| | explained, Aradi's President, Abdullah Suleiman Al-Rajhi, is General Manager of the Al-Rajhi Banking & Investment Corp., and member of its executive committee, and is inextricably tied to the actions of Al Rajhi Banking and Investment Corporation. Through Abdullah Suleiman Al-Rajhi and Fahad Sulayman Abdul Aziz, the SAAR Network had access to a bank and banking officials for purposes of producing checks purportedly for SAAR's charitable purposes but which actually went towards the benefit of al Qaida.  These connections between organizations comprising the SAAR Network and Al Rajhi Banking and Investment Corporation provided a financial conduit for the movement of money to the terrorist groups these businesses, individuals, and charities supported.<br><br>As a result, Aradi, Inc. knowingly, for a period of many years, provided critical financial and logistical support to al Qaida.  Absent the material support and sponsorship provided by Aradi, Inc. to the Enterprise, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. | |