# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                                 )
In Re TERRORIST ATTACKS on        )      03 MDL 1570 (RCC)
SEPTEMBER 11, 2001             )      ECF Case
                                 )
_____)

This document relates to:

> *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-CV-1076
> (RCC)

## O'NEILL PLAINTIFFS' RESPONSE TO THE DEFENDANT, TAHA AL' ALWANI'S MOTION FOR SANCTIONS
## PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULE 11

LAW OFFICES OF JERRY S.
    GOLDMAN & ASSOCIATES, P.C.

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

*Attorneys for the Plaintiffs,*
*Estate of John P. O'Neill, et al.*

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Gina M. MacNeill, Esquire (GM 0581)
Frederick J. Salek, Esquire (FJS 8565)

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 2

FACTUAL BACKGROUND ........................................................................................ 3

ARGUMENT ................................................................................................................. 4

I.   THE LEGAL STANDARD FOR RULE 11 SANCTIONS. ..................................... 4

II.   THE AMENDED COMPLAINT AND MORE DEFINITE STATEMENT AND/OR
RICO STATEMENT DID NOT VIOLATE RULE 11. ..................................................... 7

   A.   UNDER THE SAFE HARBOR RULE OF 11(C)(1)(A) SANCTIONS SHOULD
   NOT BE IMPOSED.................................................................................................. 18

      1.   PLAINTIFFS HAS SOUGHT TO WITHDRAW SOME OF THE
      ALLEGATIONS CONTAINED WITHIN THE PLEADING. ................................. 19

      2.   RICO STATEMENT OF AUGUST 26, 2005. ................................................. 19

III.   THE FCC AND MORE DEFINITE STATEMENTS/ADDITIONAL
ALLEGATIONS DO NOT VIOLATE RULE 11. .......................................................... 21

IV.   IT WAS THE DEFENDANT, WHO DISREGARDED THE COURT'S RULES..
   .................................................................................................................... 22

V.   SANCTIONS SHOULD BE IMPOSED AGAINST THE DEFENDANT - THE
PLAINTIFFS SHOULD BE AWARDED LEGAL FEES AND EXPENSES OF
DEFENDING THIS PROCEEDING. ............................................................................ 23

CONCLUSION............................................................................................................. 25

APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO TAHA JABIR AL
ALWANI ..................................................................................................................... 26

APPENDIX II – RELIEF SOUGHT IN CROSS MOTION ........................................... 36

APPENDIX III  – PARAGRAGHS 41, 63, AND 276 .................................................... 38

CERTIFICATE OF SERVICE ...................................................................................... 40

i

## TABLE OF AUTHORITIES

### *CASES*

*A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F. Supp. 2d 485 (S.D.N.Y. 1998) ........................................................................................... 20

*Allen v. New World Coffee, Inc.,* 2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001) ........... 20

*Anayanwu v. CBS*, 887 F. Supp. 690 (S.D.N.Y. 1995) ....................................................... 5

*Bonacci v. Lone Star Int'l Energy, Inc.,* 1990 U.S. Dist. LEXIS 1564, No. 98 Civ. 0634 (S.D.N.Y. Feb. 16 1999) ............................................................................................... 23

*Business Guides, Inc. v. Chromatic Communications Entrs., Inc*., 498 U.S. 533 (1991)... 6

*Callahan v. Schoppe,* 864 F.2d 44 (5th Cir. 1989) ............................................................. 7

*Carlton Group, Ltd.  v. William David Tobin*, 02 Civ 5065 (SAS), 2003 US Dist. LEXIS 13332 (July 31, 2003) ................................................................................ 5, 6, 23, 24

*Colon v. Mack*, 56 F.3d 5 (2d Cir. 1995) ...................................................................... 5, 25

*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384 (1990)............................................. 4, 5, 7

*De La Fuente v. DCI Telecom, Inc*., 259 F. Supp. 2d 250 (S.D.N.Y. 2003) ..................... 6

*Dempsey v. Sanders,* 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ........................................... 20

*Draper and Kramer, Inc. v. Baskin-Robbins, Inc.,* 690 F. Supp. 728 (N.D. Ill. 1988)..... 25

*Eastway Constr. Corp. v. City of New York*, 762 F.3d 243 (2d Cir. 1985 ................... 5, 24

*Einhorn Yaffee Prescott Architecture & Eng'g v. Turpin*, No. 95-7552, 1996 U.S. App. LEXIS 3947, at 2-3 (2d Cir. Mar. 5, 1996), *cert. denied*, 519 U.S. 929 (1996)........... 25

*Hadges v. Yonkers Racing Corp.*, 48 F3d 1320 (2d Cir. 1995) ................................. 18, 19

*Healy v. Chelsea Res., Ltd.,* 947 F.2d 611 (2d Cir. 1991) .................................................. 6

*In re Ames Dep't Stores*, 76 F.3d 66 (2d Cir. 1996) ....................................................... 25

*In re Frontier Ins. Group Secs. Litig*., 172 F.R.D. 31 (E.D.N.Y. 1997)............................ 6

*Jawbone, LLC v. James P. Donohue*, 01-Civ. 8066 (CSH), 2002 U.S. Dist. LEXIS 11806 (S.D.N.Y. June 28, 2002)........................................................................................... 23

*Kamen v. AT&T*, 791 F.2d 1006 (2nd Cir. 1986)................................................................ 7

*Knipe v. Skinner*, 19 F.3d 72 (2d Cir. 1994) ....................................................................... 5

*Lapidus v. Vann*, 112 F.3d 91 (2d Cir. 1997), cert. *denied*, 522 U.S. 932 (1997) ............ 25

*Linde, et al. v. Arab Bank, P.L.C.*, 2005 U.S. LEXIS 18864 (E.D.N.Y. September 2, 2005) ................................................................................................................................ 20

*MacDraw, Inc. V. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253 (2d Cir. 1996)................. 24

*McDraw, Inc. v. CIT Group Equip. Fin. Co.*, 73 F.3d 1253 (2d Cir. 1996) ................... 4, 6

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992)..................................................... 20

*Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999) ............................................................................................................... 20

*Mendoza v. Zirkle Fruit Co.*, 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000)................ 20

*Montgomery v. University of Chicago*, 132 F.R.D. 200 (N.D. I11. 1990) ......................... 7

*Morales v. Zondo, Inc.*, 204 F.R.D. 50 (S.D.N.Y. 2001)................................................... 24

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ................................................... 20

*Nakash v. United States Dep't. of Justice*, 708 F. Supp. 1354 (S.D.N.Y. 1988).............. 23

*Oliveri v. Thompson*, 803 F2d 1265 (2d Cir. 1986).......................................................... 24

*Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) .......................................... 23

*Pelman v. McDonald's Corp.*, 306 F.3d 508 (2d Cir. 2005) ............................................. 20

*Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002)..................................................... 20

*Polar Int'l Brokerage Corp. v. Reeve*, 196 F.R.D. 12 (S.D.N.Y. 2000)............................ 5

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) ...................................................... 23

*Rodick v. City of Schenectady*, 1 F.3d 1341 (2d Cir. 1993)............................................... 6

*Safe-Strap Company, Inc., v. Koala Corp.*, 270 F. Supp. 2d 407 (S.D.N.Y. 2003) ... 23, 25

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999) ................ 5

*Sepenuk v. Marshall*, 98 CV 1569 (RCC), 2000 U.S. Dist. LEXIS 17823 (S.D.N.Y. 2000). ................................................................................................................................ 7

*Sgarlata v. Viacom, Inc.*, 2005 U.S. Dist. LEXIS 4435 (S.D.N.Y. 2005) .......................... 4

*Siegel v. Pro-Ex Secs.,* No. 02 Civ. 610, 2002 U.S. Dist. LEXIS 9960 (S.D.N.Y. May 31, 2002) ..................................................................................................................... 18

*Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997 (2d Cir. 1988) .............................................. 6

*Storey v. Cello Holdings, LLC,* 347 F.3d 370 (2nd Cir. 2003) ................................... passim

*Swierkiewicz v. Dorema, N.A.,* 534 U.S. 506 (2002) ........................................................ 20

*Tenay v. Culinary Teacher's Association of Hyde Park, New York, Inc.*, 225 F.R.D. 483 (S.D.N.Y. 2005) .......................................................................................................... 7

*Twombly v. Bell Atlantic Corp.,* 425 F.3d 99 (2d Cir. 2005) ............................................ 20

*United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457 (1957) ...................... 10

*W.K. Webster & Co. v. American President Lines, Ltd.,* 32 F.3d 665 (2d Cir. 1994) ........ 5

*Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101  (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004) ......................................................................................................................... 20

## ***STATUTES***

28 U.S.C. Sec. 1927 .......................................................................................................... 24

## ***OTHER AUTHORITIES***

Affidavit in Support of Criminal Complaint relative to Abdurahman Muhammad Alamoudi, the United States Department of Justice, United States Attorneys Office for the Eastern District of Virgina, October 2003, http://www.usdoj.gov/usao/vae/ArchivePress/OctoberPDFArchive/03/alamoudiaffid100103.pdf .................................................................................................................. 11

Affidavit in Support of the Search Warrant of 555 Grove Street, Herndon, Virginia, and Related Locations, posted at the United States Department of Justice, United States Attorney's Office for the Eastern District of Virginia, October 2003, http://www.usdoj.gov/usao/vae/ArchivePress/2003/oct03.html................................... 11

Douglas Farah and John Mintz, *Top U.S. Muslim groups linked to terrorism money: Moderates insulted,* Calgary Herald, p A1/Front, (10/7/2002).............................. 13, 15

Fed. R. Civ. Proc. 11, Advisory Committee's Notes to 1963 Amendments (1993)... 19, 23

Forward by Dr. Al Alwani to *Crisis in the Muslim Mind*, http://www.witness-pioneer.org/vil/Books/AA_cmm/default.htm (as appeared on 12/08/05) ..................... 9

iv

Gaffney, *The Fifth Column Syndrome*, Washington Times, p. 17 (3/25/2003)................ 15

Gerlin and Nelson, *Three more Iraqis on 'most wanted' list in custody¸* The San Diego Union Tribune, p. A-1 (May 3, 2003)........................................................... 15

Hanley*, Grenade attack wounds seven U..S. soldiers in Iraq as Bush readies speech declaring major combat over*, Associates Press (5/1/2003) ......................................... 15

Harry de Quetteville, *Shiekhs agree to peace deal with coalition troops*, Daily Telegraph (London), p 14 (8/9/03) .............................................................................. 15

http://campusministry.georgetown.edu/MuslimMinistry/BoardandCommittee.html (12/8/05).................................................................................................. 9

http://www.mcrcnet.org/Reports/2003/102003/civilrightsreport102003category.htm (as appeared  on 12/08/08, with a last update date of 10/31/03) ......................................... 9

http://www.mwlcanada.org/canada/scholarsconnection.htm (as appeared on 12/8/05)..... 9

Hudson, *Soldiers Hurt in Grenade Attack at Base,* The Scotsman*,* p 15 (5/2/2003)........ 15

Jackman, *N. Va. Sites Raided in Probe of Terrorism; Federal Agencies Seek Information on Funds*, Washington Post, 3/21/02, Metro, p 01 ................................................. 12, 15

Jacoby *Muslim linked to Al-Arian trained military chaplains*, St. Petersburg Times, p. 7a (3/27/2003)................................................................................................. 15

Jacoby, *Saudi form of Islam wars with moderates¸* St. Petersburg Times*,* p.A1 (3/11/2003) ........................................................................................................................ 15

Jerry Seper, *U.S. deports Saudi director of Virginia Muslim charity*, Washington Times (12/13/2005),  http://washingtontimes.com/national/20051212-110500-7469r.htm.... 14

Lawrence Wright, *Profiles: The Counter-Terrorist – John O'Neill,* New Yorker (1/14/02), online at http://www.newyorker.com/fact/content/?020114fa_FACT1 ........ 1

Murray Weiss, *The Man Who Warned America: The Life and Death of John O'Neill, the FBI's Embattled Counterterror Warrior*, ReganBooks (2003) ...................................... 1

Nayla Razzouk, *US pursues crackdown after attacks in flashpoint Iraqi town*, Agence France Presse- English (9/20/03)................................................................... 15

Niko Price, *Iraqi town where US troops fired on crowds still tense, but quiet¸* Associated Press Worldstream (5/15/2003) ..................................................................... 15

*Provisional Constitution of Iraq*, http://www.iraqigovernment.org/constitution_en.htm. 16

Stewart Bell, *Quebec group tied to al-Qaeda money web: Virginia office raided; Aid agency accused of funneling Saudis' riches to Terrorists*, , National Post (Canada), All but Toronto/Late Edition, p. A1 (3/21/02)............................................................ 12, 15

*The Man Who Knew*, Frontline, WGBH (2002), available on line at http://www.pbs.org/wgbh/pages/frontline/shows/knew ................................................. 1

Thomas Wagner, *Iraqi Expatriates Cast Votes for Assembly*, December 13, 2005, AP, http://dailynews.att.net/cgi-bin/news?e=pri&dt=051213&cat=news&st=newsd8efg4l80&src=ap........................ 16

Tom Hamburger and Glenn R. Simpson, *Reaching Out: In Difficult Times, Muslims Count On Unlikely Advocate --- Mr. Norquist, Famed Tax Foe, Offers Washington Access, Draws Conservative Flak --- Meeting an Alleged Terrorist,* Wall Street Journal p A-1 (June 11, 2003) ........................................................................... 11, 15

Uwe Siemon-Netto, *Analysis: Ramadan Rigor In America* Washington Times, 10/18/04, http://www.washtimes.com/upi-breaking/20041015-012652-9665r.htm (as appeared on 12/08/05) ................................................................................................................ 9

## **RULES**

Fed. R. Civ. Proc. Rule 11 .................................................................................. passim

Fed. R. Civ. Proc. Rule 12(b)(6) ............................................................................ 2, 4, 22

Fed. R. Civ. Proc. Rule 12(e) ............................................................................... 21

Fed. R. Civ. Proc. Rule 6(b)............................................................................... 4, 21, 36

Fed. R. Civ. Proc. Rule 8(a) ............................................................................... 20

Fed. R. Civ. Proc. Rule 83(a) ............................................................................. 23

The Estate of John P. O'Neill, Sr., *et al*, by and through their undersigned counsel, hereby submits this Memorandum of Law along with the Declarations of Gina M. MacNeill, Esquire ("MacNeill"), Jerry S. Goldman, Esquire ("Goldman") and Joshua Ambush, Esquire, ("Ambush") in opposition to Defendant Taha Al-Alwani's motion for sanctions pursuant to Rule 11, and further requests sanctions, attorneys fees and expenses, as a result of his filing.

## **PRELIMINARY STATEMENT**

John P. O'Neill, Sr., spent his career protecting the country he loved so well.  Advancing through the ranks of the FBI, he ultimately coordinated the Bureau's actions relative to terrorism out of the National Office, and then managing all national security division matters of the New York field Office.[1]  His knowledge and expertise gathered in connection with the Khobar Towers bombing, the Embassy bombings, and the attack on the Cole, resulted in his unheeded calls to fight this grave terrorist threat.  Shortly after his retirement from the Bureau, he started his new job as security director at the World Trade Center.  He was murdered as a direct result of the broad conspiracy[2] as alleged in the pleadings[3] in this, and the companion *O'Neill* cases.[4]

---

[1] For general biographical information on Plaintiff, see Murray Weiss, *The Man Who Warned America: The Life and Death of John O'Neill, the FBI's Embattled Counterterror Warrior*, ReganBooks (2003); *The Man Who Knew*, Frontline, WGBH (2002), available on line at http://www.pbs.org/wgbh/pages/frontline/shows/knew/; Lawrence Wright, *Profiles: The Counter-Terrorist – John O'Neill,* New Yorker (1/14/02), online at http://www.newyorker.com/fact/content/?020114fa_FACT1.

[2] Attached as an appendix to the Plaintiffs' Mem. of Law in Resp. to the Deft.'s Mot. to Dism., docket 1468, 1492, 1493, 1494, was a factual index to many of the pertinent allegations in the pleadings, which is annexed hereto, and incorporated herein, as Appendix I.  The broad conspiracy allegations are discussed in paras. 1-33, 50-61.  These are the allegations *prior* to the amendments proposed in the Plaintiffs' previously filed cross motion, docket 1495, 1496, 1497, 1498, 1499 ("Cross Motion").  Attached hereto and incorporated herein as App. II, is a summary of the relief sought in the Cross Motion, including the text of the proposed amendments.  The conspirators are described as to include those defendants named in the O'Neill litigation (as described in footnote 4, *infra*) (including the John Does), and those named in the cases of the co-plaintiffs which are part of the instant multidistrict litigation.  See, First Consolidated Complaint ("FCC"), Exhibit G, para.2.  See note 40, *infra.*  Attached to Goldman Declaration, as Exhibit One (1) is an annotated time line setting forth the material facts related to the Rule 11 issue.  App. III, reproduces portions of the complaint.

[3] The FCC was electronically served and then filed with the Clerk on September 30, 2005, supersedes the earlier

ii

Defendant Dr. Taha Al-Alwani, after having been served on July 29, 2005, filed his Motion to Dismiss, ninety-eight (98) days later, on November 4, 2005 (docket 1468-70), served his proposed Rule 11 Motion upon counsel on November 11, 2005, and filed same on December 2, 2005, (1526-8) (Rule 11 Motion), essentially complaining, notwithstanding that he was named in *Ashton* and *Burnett,* and is already appearing in *Federal, New York Marine*, *EuroBrokers* and *WTC Properties*, that the wrong person was served, seeking to dismiss under 12(b)(6), and to impose Rule 11 sanctions based upon that 'improper service,' as well as the purported improper filing of a RICO Statement, a MDS, and the FCC.

The Plaintiffs have responded to the Motion to Dismiss; have filed a cross motion seeking *inter alia* leave to amend the pleadings to withdraw and clarify certain allegations, and, if an application to file the RICO Statement under Rule 6 is denied, to withdraw it, under the safe-harbor provision of Rule 11; and have Responded herein to the Rule 11 motion.

Defendant's request for sanctions in this case is without merit. To the contrary, their rabid attacks on counsel, together with their meritless protestations that the Plaintiffs served the 'wrong person,' culminating in the instant motion can not be condoned. We suggest, to the contrary, that this is but an inappropriate sideshow seeking to divert the court's attention, and to delay the adjudication of this case on the merits. Accordingly, as demonstrated below, the Defendant and his counsel should be sanctioned for violating the Rule 11, and Plaintiffs should be awarded their attorney fees and expenses incurred in defending against this spurious motion.

pleadings, such as the several amended complaints and the various RICO Statements and More Definite Statements/Additional Allegations per CMO 2, para. 13 ("MDS"). All references to "Docket" will be to the docket for the multi-district litigation, unless specifically referenced. See 220(g).

[4] The instant case, *Estate of John P. O'Neill, et. al. v. Republic of Iraq, et al.,* 04 CV 1076 (RCC) (*Iraq* or *O'Neill-Iraq)* is one of the O'Neill cases which are part of *In re Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (RCC) *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp.,* et al., 04-CV- 1923 (RCC) ("*Al Baraka*") and *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et al.,* 04-CV-1922 (RCC) (collectively *O'Neill cases* or *O'Neill Litigation).*

## FACTUAL BACKGROUND

During the summer of 2003, Joshua Ambush drafted the original complaint in the above-referenced matter.  Ambush ¶¶ 3-5.  He then caused it to be filed, on or about August, 20, 2003, before the United States District Court of the District of Columbia.  ¶6.  At that time, one "Taha Al Alwani" was already named in at least the *Ashton* and *Burnett* cases.  The *O'Neill* complaint similarly listed, as a Defendant, one Taha Al-Alwani, who Mr. Ambush intended to be an individual, who he then believed was living in northern Virginia, and who he understood was born in Iraq.  Ambush ¶¶7-9.  He had no knowledge, at that time, nor does he today, of any other individual, by the name of Taha Al-Alwani, who had any connection with the 9/11 conspiracy.  Ambush ¶11.   The person served on July 29, 2005, and who was named in *Federal, NY Marine, Ashton, EuroBrokers,* and *Burnett,* was the person who he included in the complaint.

On October 14, 2004, the *O'Neill* Plaintiffs sought to have counsel who represented the Defendant in the companion cases, accept service, in *O'Neill*.  They refused, claiming that the they were 'quite certain' that the person who the Plaintiffs sought to serve was not their client; rather, he was some Iraqi, possibly the mayor of Fallujah.[5]   Goldman ¶10; MacNeill Ex. 3.  Thereafter, a waiver of service was unsuccessfully sought. O'Neill MacNeill.  On July 29, 2005, in the Virginia, the Defendant was personally served.  MacNeill, Exhibit 12.

On August 26, 2005, docket no. 1157, Plaintiff electronically filed and served an MDS under CMO 2, Para. 13, Applicable to Taha Al' Alwani.  On that same date, the Plaintiffs also filed a RICO Statement applicable to the same Defendant.    Docket 1158.  On  September 30, 2005, docket no. 1360, Plaintiff electronically filed and served a MDS pertaining to the Defendant.   Such document contained substantially the same information as was previously

---

[5] They provided the name Taha *Badwi Hamid* Al-Alwani in the fall of 2005.  In some correspondence they refer to him as 'the' mayor (e.g., Exhibit 3); in others, as the 'former mayor.'

disclosed in docket nos. 1157 and 1158.  On September 30, 2005, Plaintiff manually filed and electronically served on counsel its First Consolidated Complaint (FCC) in the instant matter, in accordance with CMO 2, Para. 13 (last sentence).  Incorporated within such pleadings were numerous allegations against the Defendant, as reflected, in part in the MDS of September 30, 2006, docket 1360.  See, FCC Para. 220 (g), Exhibit G.

On November 4, 2005, Defendant filed a motion to dismiss, under Fed. R. Civ. Proc. 12(b)(6) without leave to file it out of time pursuant to Rule 6(b).  On November 11, 2005, he served, but did not file, the proposed Rule 11 Motion.  On November 18, 2005, the Plaintiffs filed their response to the Defendant's dismissal motion and the Cross Motion.  On November 30, 2005, Plaintiffs contacted Defendant's counsel to determine if they were still going to pursue and/or modify the Rule 11 motion in light of the proposed amendments; they responded that they would do so, unchanged.  Goldman ¶¶11-2.  On December 2, 2005, the Rule 11 Motion was prematurely filed by the Defendant, without having sought a pre-motion conference.

## ARGUMENT

## I.  THE LEGAL STANDARD FOR RULE 11 SANCTIONS.

Rule 11 of the Federal Rules of Civil Procedure authorizes a court, in its discretion, to impose sanctions upon an attorney who violates its terms. *See* Fed.R.Civ.P. 11; *McDraw, Inc. v. CIT Group Equip. Fin. Co.,* 73 F.3d 1253, 1258 (2d Cir. 1996).  Rule 11 is violated when "(1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; or (3) no reasonable argument has been made to extend, modify or reverse the law as it stands." *Sgarlata v. Viacom, Inc.*, 2005 U.S. Dist. LEXIS 4435, *23-24 (S.D.N.Y. 2005).  The purpose of sanctions under Rule 11 is to deter frivolous litigation and filings. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393 (1990).  Thus, when a District

4

Court determines that a sanction is warranted to violating Rule 11, the sanction imposed should be the minimum necessary to deter future violations.   *See Colon v. Mack*, 56 F.3d 5,7 (2d Cir. 1995); *Anayanwu v. CBS*, 887 F. Supp. 690, 694 (S.D.N.Y. 1995).

An attorney or unrepresented party who presents a pleading, motion, or other paper to a Federal District Court by signing, filing, submitting, or later advocating it certifies all of the following matters:

      i.     That it is not being presented for an improper purpose such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.   Fed. R. Civ. P. 11(b)(1);

      ii.     That its legal contentions are warranted by existing law or by a nonfrivolous argument to change existing law or establish new law.   Fed. R. Civ. P. 11(b)(2); and,.

      iii.     That its factual contentions (including denials) have, or, if specifically so identified, likely will have, evidentiary support Fed. R. Civ. Proc. 11(b)(3), 11(b)(4); *See, Polar Int'l Brokerage Corp. v. Reeve*, 196 F.R.D. 12, 18 (S.D.N.Y. 2000).

A pleading, motion or other paper violates Rule 11 either when it "had been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and warranted by existing law. *Carlton Group, Ltd.  v. William David Tobin*, 02 Civ 5065 (SAS), 2003 US Dist. LEXIS 13332, *8 (July 31, 2003); *W.K. Webster & Co. v. American President Lines, Ltd.,* 32 F.3d 665, 679 (2d Cir. 1994); *Eastway Constr. Corp. v. City of New York*, 762 F.3d 243, 254 (2d Cir. 1985).

A decision to impose a Rule 11 sanction should be made with restraint and discretion. *See Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir. 1994); *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999); *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 387 (2nd Cir. 2003).   Rule 11 must be "read in light of concerns that it will…chill vigorous advocacy."

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  All doubts must be resolved in favor of the signer of the pleading.  *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993); *Carlton* at *8.

The attorney's signature certifies, among other things, that to the best of the attorney's knowledge, information and belief after reasonable inquiry, the allegations and facts are or will be supported by the evidence.  See, *In re Frontier Ins. Group Secs. Litig.*, 172 F.R.D. 31, 44 (E.D.N.Y. 1997). With regard to factual allegations, sanctions should only be imposed "where it is patently clear that a claim has absolutely no chance of success;" that is, when the allegation is utterly lacking in support.  *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 388 (2nd Cir. 2003) ; *Healy v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991); *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1005 (2d Cir. 1988); *Carlton Group* at *8.

With regard to assertions as to matter of law, there, too, an extremely high threshold is imposed.  Merely incorrect legal statements are not sanctionable; rather, sanctionable legal contentions must not be warranted either by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law.  *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 391 (2nd Cir. 2003).   Rule 11 is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.  *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993); *De La Fuente v. DCI Telecom, Inc.*, 259 F. Supp. 2d 250, 274 (S.D.N.Y. 2003).

In determining whether a Rule 11 violation has transpired, the court must use an objective standard of reasonableness.  *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 387 (2nd Cir. 2003); *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1257 (2d Cir. 1996);

*Business Guides, Inc. v. Chromatic Communications Entrs., Inc*., 498 U.S. 533, 548-9 (1991) (In evaluating whether the signer of a filing has violated Rule 11, the district court applies an objective standard of reasonableness, examining whether, under the circumstances of a given case, the signer has conducted a "reasonable inquiry" into the basis of a filing).  This is measured at the time that the paper was submitted.  *Kamen v. AT&T,* 791 F.2d 1006, 1011-12 (2nd Cir. 1986).  In making a determination of objective reasonableness, the Court considers all relevant circumstances.  *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401-402 (1990).

Under this standard, sanctions are only appropriate only when it is patently clear that a pleading has no chance of success.  The test is whether the parties' arguments are wholly without merit or that they had no chance of success.  *Sepenuk v. Marshall*, 98 CV 1569 (RCC), 2000 U.S. Dist. LEXIS 17823, *18-19 (S.D.N.Y. 2000).

## II.  THE AMENDED COMPLAINT AND MORE DEFINITE STATEMENT AND/OR RICO STATEMENT DID NOT VIOLATE RULE 11.

The crux of the Defendant's position, as Plaintiffs understand it, is that the Dr. Taha Jabir al' Alwani, named in the Complaint is not the Dr. Taha Jabir al' Alwani who was personally served, notwithstanding the fact that he is also named in the six of the companion cases in the multi-district litigation, that he is the person who the drafter of the original complaint intended to sue, that his factual background matches that as set forth in the MDS, and that he is the person the Plaintiffs allege was involved in this horrendous conspiracy.[6]

As set forth in the Plaintiffs' Supporting Declarations, he is the person who, from the very beginning, the scrivener of the original complaint intended to sue.  When Ambush drafted

---

[6] We suggest  that the cases cited by Defendant, in his Rule 11 Motion, such as *Callahan v. Schoppe,* 864 F.2d 44 (5th Cir. 1989); *Tenay v. Culinary Teacher's Association of Hyde Park, New York, Inc.*, 225 F.R.D. 483, 484 (S.D.N.Y. 2005); *Montgomery v. University of Chicago,* 132 F.R.D. 200, 201 (N.D. I11. 1990), are all inapplicable, as the Plaintiffs' have served the person they intended to sue.

and filed the original complaint, he intended to sue the Taha Al'Alwani who was in Northern Virginia.  Ambush ¶¶7-9, 10.  Plaintiffs' believe that a determination of who the Plaintiff sought to sue is a subjective determination- who was Mr. Ambush intending to sue when he drafted, signed and filed the complaint.   As stated in the Goldman and Ambush declarations, the first time Plaintiffs' counsel ever heard of another Al-Alwani was upon reviewing defense counsel's letter of October 25, 2005. Ambush ¶¶11-5, 17; see ¶10.  In that letter, Defendant's allege, that they were "quite certain" that the Plaintiffs' had confused the person that they sought to sue- the same person already sued in *Ashton* and *Burnett* - with the mayor of Fallujah, notwithstanding the fact that pleadings on their face, specifically refer to "Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani" (FCC para. 36; Exhibit G per para. 220).[7, 8, 9]

They apparently divined Plaintiffs' intent from their review of para. 36, ignoring the rest of the Complaint, and the detailed description of the Defendant's name, let alone the then historical context.  Such a 'story' is similar to a defense that one would see down the street at at 100 Centre Street; then again, this case is also about a murder, or rather, the allegations of the defendant's role in 3000 murders.

<u>The name of the person served matches the name in the Complaint.</u>

In para. 36, of the FCC he is specifically called 'Dr. Taha Jabir Al' Alwani,' and not

---

[7] The Plaintiffs' cross motion is also seeking, in part, leave to amend, paragraph 41, where there is an additional reference to "Taha al Alwani," to read "Taha al Alwani a/k/a Dr. Tahan Jabir al' Alwani" and to amend the caption to correct a typographical error to fix "Taha Al Alwani a/k/a Dr. Taha Jabi<u>r</u> al'Alwani" *to* "Taha Al Alwani a/k/a Dr. Taha Jabir_al'Alwani."

[8] Counsel for Dr. Al Alwani who had appeared in the *Federal* action was first contacted several weeks *after* the filing of the amended pleading containing the 'a/k/a,' seeking an acceptance of service, by way of a letter dated October 14, 2004, sent to Ms. Luque.  MacNeill para. 3.  On or about October 25, 2004, Mr. Hanson, another attorney for the Defendant, replied and advised that he believed that we were seeking to serve the incorrect person.

[9]  He apparently became mayor of Fallujah *after* the United States military action in that country, and there is no evidence of his participation in the conspiracy, as charged, provided by either the Defendant or his counsel. *See,* e.g., Goldman Exhibits E, F; I-2, discussed at pp 14-16, *infra*. What his position was on or before September 11, 2001, is unknown to Plaintiffs.

"Taha Badwi Hamid Al-Alwani," the name of the person who became Fallujah's mayor after the US incursion.   When Mr. Ambush originally drafted the complaint, he was called Taha Al'Alwani, which is the same name which appeared in the *Ashton* case filed months early. Subsequently, *but before any contact with the Defendant's counsel,* among other amendments to the complaint, "Jabir" was inserted.   The name *Taha Badwi Hamid Al-Alwani* does not appear anywhere.[10, 11]   Moreover, the other "al' Alwani," *Taha Badwi Hamid Al-Alwani* as portrayed by defense counsel, is never apparently referred to "Dr.", unlike the person served, and as specifically described in both the caption and Paragraph 36 of the Plaintiffs' Complaint as of record <u>prior</u> to the communication from counsel for the Defendant.

<u>The allegations in *Iraq* are Similar to Those in the Other Complaints.</u>

The allegations in the para. 36 of the Complaint are similar to those in the previously filed *Ashton* case.  Moreover, in *Ashton*, as in *O'Neill* there is the alternative allegations.[12]   The allegations set forth in that alternative paragraph are similar, as well, to the allegations set forth

---

[10] There are various other instances where the person served in this case has been referred to simply as 'Taha al' Alwani' without the inclusion of the name "Jabir." See, e.g., http://www.mwlcanada.org/canada/scholarsconnection.htm (as appeared on 12/8/05); http://campusministry.georgetown.edu/MuslimMinistry/BoardandCommittee.html (12/8/05); http://www.mcrcnet.org/Reports/2003/102003/civilrightsreport102003category.htm (as appeared  on 12/08/08, with a last update date of 10/31/03) (MCRC is the Muslim Civil Rights Center); http://www.ccmw.com/publications/books_of_interest.htm (as appeared  on 12/08/05, last updated 12/04) (Al Alawani, Taha J) (CCMW is the Canadian Council of Muslim Women); Uwe Siemon-Netto, *Analysis: Ramadan Rigor In America,* Washington Times,  10/18/04,  http://www.washtimes.com/upi-breaking/20041015-012652-9665r.htm (as appeared on 12/08/05) ("Taha al-Alwani, president of the North American Fiqh (jurisprudence) Council").

[11] There are also variations in the English spelling of the Defendant's Arabic name. Dr. Taha <u>Jibir</u> al Alwani, President, IIIT, DhulHijjah 1314AH/June 1993AC Herndon, Virginia USA, (emphasis added) (compared with Jabir). - Forward by Dr. Al Alwani to *Crisis in the Muslim Mind*, http://www.witness-pioneer.org/vil/Books/AA_cmm/default.htm (as appeared on 12/08/05).

In fact, in an email from Defendant's very own lawyer, of August 24, 2004, at 10:13 AM, including in Defendant's Counsel's declaration, he refers to his client as Mr. Al-Alwani.  Not <u>Dr.</u>  Not Mr. Taha <u>Jabir</u> Al' Alwani.  A review of the whole package of emails from his counsel indicates that the Re: is simply "Taha Al Alwani." *See also*, email of Barentzen, 8/25/04, 1:52 P.M. ("<u>Mr.</u>-Al-Alwani"; "Mr...Al-Alana" (sic)).  (emphasis added).

[12] Compare, for example *Ashton* FAC paras. 15, 16, and 154, 156, with *O'Neill*  paras. 36 and 41.  In the *Ashton* pleadings, he was also described, at one point, as an Iraqi and as an employee of that regime; in another location his ties to Saudi Arabia were discussed.

in *New York Marine, Burnett*, *Federal,* and *O'Neill* paragraph 41 (see also, paras. 63 and 276).

Yet, in both their motion to dismiss and their Rule 11 motion, the Defendant's appear to have

ignored these alternative pleadings.   There was no confusion as to who the Defendant was

seeking to sue; the same person as in the other cases.   Moreover, to the extent that there are any

differences between the allegations of Paragraphs 36 or 41[13] (or elsewhere, for that matter) in the

pleadings, such is clearly permissible under Rule 8(e)(2).   *United States Gypsum Co. v. National*

*Gypsum Co.*, 352 U.S. 457, 467 (1957).   Furthermore, there is other objective indicia to indicate

that the person the Defendant sought to sue was not the new mayor of Fallujah, *Taha Badwi*

*Hamid Al-Alwani;* rather it was the Defendant who was served.

SAFA Group/SAAR Network.

On p 4 of Defendant's Mem. of Law in Supp. of their Mot. to Dism., they state that the

Plaintiffs allege that the defendant 'associated with certain so-called 'Safa Group' entities and

that through his involvement with this 'SAAR affiliates' funneled' funds to terrorists.   They

indicated in a note that "[p]resumably the "Safa Group' is akin to what other Plaintiffs have

called the "SAAR Network."   Defense counsel's unfamiliarity with the term is rather puzzling in

light of the fact that  his counsel, Nancy Luque, Esquire was previously quoted, as saying

"[n]either Safa nor anyone connected with *Safa* has ever aided or knowingly funded terrorism,"

Wall Street Journal, Tom Hamburger and Glenn R. Simpson, *Reaching Out: In Difficult Times,*

---

[13]   For example, para. 41 of the FCC alleges –

> *...and/or are natural persons (or the personal representatives of their estates), organizations,*
> *banks, and charities located all over the world, who participated in the acts and conspiracy*
> *described below, in their individual capacities and while acting in the course and scope of their*
> *employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran, and the*
> *Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order*
> *to support and finance their terrorist activities including, but not limited to, the September 11th*
> *attacks.*

See also Paras. 63 and 276 of the FCC.

Appendix III to this Memorandum has the relevant paragraphs of the pleadings.

*Muslims Count On Unlikely Advocate --- Mr. Norquist, Famed Tax Foe, Offers Washington Access, Draws Conservative Flak --- Meeting an Alleged Terrorist,* p A-1 (6/11/2003). Furthermore, in the affidavit for the search warrant of the Defendant's home on Safa Street, released on the Justice Department web-site, the Government refers to the underlying investigation as one into the "SAFA Group." [14]  In fact, in the October press archives for the US Attorney's Office for the Eastern District of Virginia, the affidavit is filed under "SAFA Group."[15]

The O'Neill Plaintiffs did not know the name that the conspirators themselves called their sub-organization when the MDS was prepared.  While we know that SAFA Group, has been used by the government investigators; SAFA Group and SAAR Network have both been the names used in open-source, media documents to refer to this grouping.

We do know that, on information and belief, on March 20, 2002, prior to the filing of the

---

[14] In the *Affidavit in Support of Criminal Complaint relative to Abdurahman Muhammad Alamoudi*, Brett Gentrup a Special Agent of United States ICE affidavit posted at the Department of Justice, United States Attorneys Office for the Eastern District of Virgina, October 2003, an reproduced in the Goldman Declaration as Exhibits H1-2, http://www.usdoj.gov/usao/vae/ArchivePress/OctoberPDFArchive/03/alamoudiaffid100103.pdf, it is referred to the case as the "*Safa* Group" investigation.  Affidavit, p. 2, Para. 3.  (emphasis added).

Similarly, the *Affidavit in Support of the Search Warrant of 555 Grove Street, Herndon, Virginia,* and Related Locations, posted at the United States Department of Justice, United States Attorney's Office for the Eastern District of Virginia, October 2003, an reproduced in the Goldman Declaration as Exhibits G 1-4, is posted on the website as the "Safa Group" and in David Kane's, SSA USCS, refers to the 'web of companies and charities controlled by these inviduals as the "Safa Group," when referring to the joint FBI-USCS-IRS investigation ongoing since December 2001.  March, 2002.  P. 2, para 3.  The words "Safa Group" appear elsewhere in the affidavit. Eg., p. 4; 6 ("For purposes of this affidavit, this group of individuals and the organizations that they operate will be referred to as the "Safa Group'.  One of the locations to be search was "[t]he residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia."  Al-Alwani was described as "an officer and/or director of Safa Group companies including International Institute of Islamic Thought (IIIT), FIQH Council of North America (FIQH"), Graduate School of Islamic & Social Sciences ("GSISS") (formerly known as the School of Islamic and Social Sciences ("SISS")) and Heritage Education Trust."  P. 5.  Al-Alwani's name comes up a number of times times in the affidavit showing probable cause to search relative to the support of the allegations of funding terrorism. http://www.usdoj.gov/usao/vae/ArchivePress/2003/oct03.html.

[15] Interestingly, 1105 *Safa* St, Herndon VA 20170 is the address of the *Alwani* Family Limited Partnership, formed under Virginia law on 11/19/2003, filing L-018130, with one *Taha J Al-Alwani*, with a registered office at 1105 *Safa* Street as the registered agent.  Similarly, Qurtaba, LLC, is a Virginia limited liability company, formed on 12/30/2002, with a mailing address at 1105 *Safa* Street, and a registered office same place, with a registered agent of *Taha Al-Alwani*, of 1105 *Safa* Street.

complaint, according to an article published in the Washington Post, federal agents raided 14 sites across Northern Virginia seizing boxes of documents in an ongoing investigation of the funding of terrorist groups.   "Government sources said the investigation is looking at charities and other organizations that may have contributed money to international groups that sponsor terrorist activities."  Jackman, *N. Va. Sites Raided in Probe of Terrorism; Federal Agencies Seek Information on Funds*, Washington Post, 3/21/02, Metro, p 01 (reproduced as part of Goldman Exhibit I-2).  One of the locations raided was at the International Institute of Islamic Thought, on Grove Street, in Herndon, Virginia, which, on information and belief, also had branches in at least 12 countries in addition to its United States headquarters.  Also raided was the Graduate School of Islamic and Social Sciences in Leesburg, Virginia.  According to the *Post* article, one "Taha al-alwani, president of the school, said authorities arrived…and began searching computers and financial records."

Stewart Bell, reporting in the National Post (Canada), *Quebec group tied to al-Qaeda money web: Virginia office raided; Aid agency accused of funneling Saudis' riches to Terrorists*, All but Toronto/Late Edition, p. A1 (3/21/02), stated '[t]he directors of a Canada aid group are being investigated by U.S. authorities probing a web of Muslim charities suspected of laundering money to <u>al-Qaeda</u> and Palestinian terrorists, the National Post has learned.  (emphasis added).  The article went on to state that executives of a Canadian foundation (SAAR Foundation Canada) "operate a group of intertwined charities and companies with suspected ties to Osama bin Laden's al-Qaeda network as well as the Palestinian terror groups Islamic Jihad and Hamas.[16]  The investigation appears to be the first major probe since Sept. 11 alleging a possible

---

[16] While Hamas is not specifically named in the *O'Neill* cases, it is specifically named in companion cases in *In re Terrorist Attacks on September 11, 2001*.  Our description of the participants includes those named in the companion cases.  See, eg., FCC Exhibit G, para.2.  Moreover, on information and belief, Hamas is either a branch, affiliate  or otherwise related to a named defendant, Muslim Brotherhood.

Canada link to the complex web of charities that secretly fee bin Laden's global terror operation." According to the article, the SAAR Foundation had dissolved in 2001, and that the corporate records showed that the US organizations "were intimately tied to SAAR Canada through common directors and money transfers." According to that article, the executives and directors of SAAR's Canadian office include "Taha Al Alwani, administrator, an Iraqi educated in Cairo who taught in Saudi Arabia. He is a founder of both the council of the Muslim World League and the International Institute of Islamic Thought." Finally, according to the article, the "SAAR Foundation appears to have dissolved its U.S. operations in December, 2000," that one of the office buildings raided in Virginia was also the home of the aforementioned Muslim World League (a defendant in *O'Neill-Al Baraka*), which operates the International Islamic Relief Organization (IIRO) (also a defendant in the *Al Baraka* case), whose offices were also raided and was 'suspected of having links to Islamic extremists, particularly the bin Laden network.' Six months later, again, prior to the commencement of this lawsuit, an article in the Calgary Herald, by Douglas Farah and John Mintz, *Top U.S. Muslim groups linked to terrorism money: Moderates insulted*, p A1/Front, (10/7/2002), followed up on that investigation. According to that article, which referred to the raids on and seizures from 'offices and homes affiliated with the Herndon, VA.-based SAAR Foundation, a tight-knit cluster of prominent Muslim groups funded by wealthy Saudis" the investigators were looking at transfers of millions of dollars from the "SAAR network" to two overseas bankers designated as terrorist financers, the network officials' ties to the 'militant Muslim Brotherhood' and whether $1.8 billion truly passed through the network or whether that was a clerical error on a tax form. In fact, after quoting the defendant's current attorney in the article, Dr. Al-Alwani reported as complaining of the searches as reminding him of the tactics of the secret police in his 'native Iraq." The article

further noted that investigators claimed that 'they have uncovered information…that in recent years some SAAR entities' funds have moved to two men, *Youssef Nada* and Ahmed *Idris Nasreddin*, designated by the United States as terrorist financiers."  Both individuals are defendants in the *O'Neill* litigation.  The article goes on to report that the funds moved through *Bank al Taqwa* and *Akida Bank Private, Ltd.*, which are not only defendants in the O'Neill litigation, but when designated conduits for terrorist funds by the United States, the they reported to have been financing such groups as Hamas and al-Qaeda.[17]

With those public source articles out there, prior to the institution of the O'Neill suit, we respectfully submit that there was an appropriate basis for the allegations contained in the law suit, and the case is made even stronger, as a result of the publication of the affidavit in support of the warrant in October, 2003.  Certainly, an affidavit of probable cause to search a premises, in accordance with the Fourth Amendment, which ultimately lead to the issuance of a federal search warrant, mandates a higher standard of 'knowledge' than for a Rule 11 allegation.

<u>Other Open Source Media References</u>.

Furthermore, a review of open-source media, in general, would reveal no reasonable likelihood of confusion between the defendant named and served and the person wrongfully accused by the Defendant.

As set forth in the Goldman declaration, on December 11, 2005, a search was run in the Lexis-Nexis database "Mega News-all English- Full Text" using the search terms "Taha /4 Alwani" for a period starting on September 11, 2001 through August 20, 2003 (when the suit was filed), which revealed 134 entries (including duplicate entries)[18] bearing the name.[19]  A review of

---

[17] For a recent development in this investigation, see, Jerry Seper, *U.S. deports Saudi director of Virginia Muslim charity*, Washington Times (12/13/2005),  http://washingtontimes.com/national/20051212-110500-7469r.htm.

[18] For example, certain wire services have multiple entries for the same basic story (e.g., 48-9, 50-54 (and also reprinted at 64); 56-8 (also reprinted at 63); 61-2, 74-5; 80, 82; 83, 85).

that literature reveals, unequivocally the hollowness of Defendant's claim.   Based upon that open source literature we learn that as to Taha Bedaiwi al-Alwani:

- All are 'positive' and portray as cooperating with the US in Iraq;[20]

- None describe him as a terrorist or allegedly being involved with terrorists; and,

- They describe him having taken his position as mayor *subsequent* to the US incursion (i.e., not before 9/11/2001).[21, 22]

The articles about the person served, the Defendant herein, on the other hand, include not only the ones discussed above[23] but others repeatedly setting forth purported links to terrorism, including the funneling of money to Al-Qaida and other terrorist groups.[24]   Looking at it objectively, there could be no reasonable basis for confusion on the part of Mr. Ambush when he

---

[19] Attached as Exhibit I-1 to the Goldman Declaration is a cite list of the search results; I-2 is the full text of the English language media articles.

[20] Examples include  "the key to bridging the cultural divide between local tribal leaders and the Americans" ( Harry de Quetteville, *Shiekhs agree to peace deal with coalition troops*, Daily Telegraph (London), p 14 (8/9/03);  the person who convinced the tribes to work with the Americans (same); the person who accused the insurgents of being 'thieves' and 'Saddam loyalists' (Nayla Razzouk, *US pursues crackdown after attacks in flashpoint Iraqi town*, Agence France Presse- English (9/20/03) ; Niko Price, *Iraqi town where US troops fired on crowds still tense, but quiet*, Associated Press Worldstream (5/15/2003) (same);  the person shown in a photograph with a local United States 3rd Armored Cavalry Regiment Lt. Col. speaking 'about how to stabilize the city' of Fallujah,  Gerlin and Nelson, *Three more Iraqis on 'most wanted' list in custody*, The San Diego Union Tribune, p. A-1 (May 3, 2003); condemning violence.  *See also*, Goldman Exhibits E and F; Ambush ¶16.

[21] Hudson, *Soldiers Hurt in Grenade Attack at Base*, The Scotsman, p 15 (5/2/2003); as having assumed his office *after* the fall of Saddam Hussein;  *Soldiers Hurt in Grenada Attack at Base, 5/3/2003, supra;* the new US recognized mayor of Fallujah, Hanley, *Grenade attack wounds seven U..S. soldiers in Iraq as Bush readies speech declaring major combat over*, Associates Press (5/1/2003). *See also*, Goldman Exhibits E and F.

[22] All were published in a 3 ½ month period of time, and none of which are any earlier than April 30, 2003.

[23] Tom Hamburger and Glenn R. Simpson, *Reaching Out: In Difficult Times, Muslims Count On Unlikely Advocate --- Mr. Norquist, Famed Tax Foe, Offers Washington Access, Draws Conservative Flak --- Meeting an Alleged Terrorist*, Wall Street Journal, p A-1 (June 11, 2003).  Jackman, *N. Va. Sites Raided in Probe of Terrorism; Federal Agencies Seek Information on Funds*, Washington Post, 3/21/02, Metro, p 01; Stewart Bell, *Quebec group tied to al-Qaeda money web: Virginia office raided; Aid agency accused of funneling Saudis' riches to Terrorists*, National Post (Canada) All but Toronto/Late Edition, p. A1 (3/21/02); Douglas Farah and John Mintz,, *Top U.S. Muslim groups linked to terrorism money: Moderates insulted*, Calgary Herald, p A1/Front, (10/7/2002).

[24] E.g., Jacoby *Muslim linked to Al-Arian trained military chaplains*, St. Petersburg Times, p. 7a (3/27/2003); Gaffney, *The Fifth Column Syndrome*, Washington Times, p. 17 (3/25/2003) (referring to the raid on the Graduate School of Islamic and Social Sciences, which trained many of the military's chaplains and which was one of the entities raided in 2002, of which "Taha Al-Alwani" was raided); discussing ties with purported terrorism funding, Jacoby, *Saudi form of Islam wars with moderates* St. Petersburg Times, p.A1 (3/11/2003); *accord* 10/7 article above from Calgary Herald; Bell above.  *See also*, Ambush Exhibit A; Goldman Exhibits A-D

drafted the complaint or the Plaintiffs' attorneys when they subsequently amended the complaint and served the Defendant.  See also, Ambush ¶ 10 and Ex. A.

Iraqi National.

The Plaintiffs alleged that he was an Iraqi national.  The Defendant, in his papers, indicates that he is a US citizen, and claimed that the allegation of nationality showed that Plaintiffs served the wrong person.  Such status, however, is *not* mutually exclusive.    In his declaration, Defendant admits to being born in Iraq, that is, as a matter of nationality, or national origin, he is a 'natural person' of Iraq (i.e., an Iraqi), and there are numerous references, to his nationality on the web, including biographical information presumably provided by the Defendant him in connection with his participation at the World Economic Forum (WEF) of Davos, Switzerland, and the organization which he purportedly runs.  Goldman Exhibits A-D.  While the Defendant alleges that he is a naturalized United States citizen, claiming to have moved permanently to the United States in 1984, he never alleges that he renounced his Iraqi citizenship.  Curiously, in none of his own published biographical information, where he portrays his Iraqi nationality, does he apparently ever represent his United States citizenship, or even his residency.  It appears, under present law, that he may, in fact, still be an Iraqi citizen. For example, on information and belief, under the text of the Article 18 of the Iraqi Constitution, it appears [25] as if  Dr. Alwani, is, in fact, an Iraqi citizen.[26] *See* Goldman Exhibits A-D.

---

[25] Ultimately, the Court need not make a determination, whether, as a matter of United States and Iraqi law, one can be a citizen of both the United States and Iraq.  Rather, the question is whether based upon the public source description of the Defendant as Iraqi, Plaintiffs were complying with Rule 11 in describing him as a potential Iraqi national or citizen in the Complaint.  Obviously, discovery and further investigation will determine if, in fact, he was and is a United States citizen, an Iraqi citizen, a Saudi citizen, a citizen of some other state or body, and/or some combination thereof.

[26] Article 18 of the Iraqi Constitution reads provides "An Iraqi is anyone who has been born to an Iraqi father or an Iraqi mother.  Iraqi nationality is a right to all Iraqis and it is the basis of their citizenship.  It shall be forbidden to withdraw the Iraqi citizenship from an Iraqi by birth for any reason….Every Iraqi has the right to carry more than one citizenship."  http://www.iraqigovernment.org/constitution_en.htm.  *See also*, http://www.iraqvote.org/ (the

<u>Iraqi Employee</u>.

The Defendant attacked Plaintiff's allegation that the Defendant was an employee of Iraq. In his declaration, para. 4, and in counsel's letter of November 2, Alwani claims that he never was an employee of Iraq. The plaintiffs' pleadings, after proposed amendment deletes, at this point, any allegations to present employment by Iraq. However, on information and belief, the sources of which include his published biography at the World Economic Forum, indicates, in fact previous employment by Iraq, at the Military Academy in Baghdad (and later by the Kingdom of Saudi Arabia in its Ministry of Interior).[27, 28, 29] While this is a discussion of the support for the allegations contained in the pleadings, and a demonstration why Defendant's contention that Plaintiffs' served the wrong person so as to warrant the imposition of Rule 11 sanctions is without merit, it should be noted that this is the status of the matter at what is the very beginning of litigation, and prior to discovery.

Had Plaintiffs served Mr. Taha <u>Badwi</u> <u>Hamid</u> al' Alwani, the person who the Defendant has somehow determined the Plaintiffs meant, as opposed to the Dr. Taha Jabir Al' Alwani who was named in the Complaint, then that individual could properly have made a motion to quash service (or even potentially ignored the matter), and had Plaintiffs insisted on pursuing *that* case,

---

official Iraqi voting website); Thomas Wagner, *Iraqi Expatriates Cast Votes for Assembly*, Associated Press (12/13/05), http://dailynews.att.net/cgi-bin/news?e=pri&dt=051213&cat=news&st=newsd8efg4l80&src=ap.

[27] A biographical sketch from the World Economic Forum, copyrighted 2003 and last updated December 5, 2004, indicates that from 1963-9, he was a Lecturer of Islamic Studies, "*Military Academy, Baghdad, Iraq*" (and was also a lecturer at the Islamic College in Baghdad (1965-6). Thereafter he was a 'founder-member' of the *Council of the Muslim World League*, as well as a professor in Saudi Arabia, including serving as "Legal Adviser, *Interior Ministry* & Lecturer in the Inst. Of *Officers of Security*" (1975), as well as other positions within the Kingdom, on information and belief, from 1976-1984. *See* Goldman Exhibit A-D. (Emphasis added).

[28] Iraq, formerly part of the Ottoman Empire, when it became a state, post British mandate, was a Hàshimite Kingdom. The monarchy was overthrown by the "Free Officers" on July 14, 1958. In February, 1963, the Free Officers were replaced by the Ba'th Party, which in turn was succeeded by another regime. The Ba'th Party regained control in July 17, 1968, all while the Defendant was apparently working for the Government.

[29] In his declaration, the Defendant indicates that he 'moved permanently to the United States in 1984' (Al-Alwani Declaration para. 3). In his biography, Exhibit B, it indicates that he was a founding member of the IIIT in Herndon starting in 1981, which appears to overlap his time Riyadh at the Univ. of Imam Muhammad ibn Saud.

then sanctions may very well been appropriate.

The standards of Rule 11 were met- the correct person was served and the allegations were, to the best of counsel's knowledge, information and belief, after reasonable inquiry, matters that we believe will be supported by evidence, following discovery.   Certainly they are not claims for which there is utterly no chance of success, and utterly lacking in support.  In any event, any potential defect was cured as a result of the amendments which the Plaintiffs have timely sought, as discussed below.

Moreover, as the Second Circuit has taught us, any sort of premature action is unwarranted as the Plaintiffs have the right to conduct additional discovery.  By way of example, in the instant case, as part of the Plaintiffs on-going investigations, have found apparent un-pled links between the instant Defendant and two other defendants in the companion *O'Neill-Al Baraka et al.*, case (e.g., Muslim World League and Council on American Islamic Relations), as well as with a defendants in the companion O'Neill-Kingdom of Saudi Arabia *et. al.*, case (the Kingdom and the Minister of Interior), all of which certainly will be pursued in discovery. *Commer. Cleaning Servs., supra*.

### A.  UNDER THE SAFE HARBOR RULE OF 11(c)(1)(A) SANCTIONS SHOULD NOT BE IMPOSED.

Under Fed. R. Civ. Proc. 11(c)(1)(A) a party will not be subject to sanctions unless, after receiving the motion, it refuses to withdraw that position or acknowledge candidly that it does not currently have evidence to support a specified allegation.   If the challenged papers is withdrawn or corrected within the prescribed period, the motion for sanctions may not be filed. Fed. R. Civ. P. 11(c)(1)(A); *See Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995).  Non-compliance with the safe harbor provisions of Rule 11 requires the denials of the Rule 11 Motion. *Siegel v. Pro-Ex Secs.,* No. 02 Civ. 610, 2002 U.S. Dist. LEXIS 9960, at *8-*9

(S.D.N.Y. May 31, 2002).

### 1.   Plaintiffs Has Sought to Withdraw Some of the Allegations Contained Within the Pleading.

Plaintiffs are withdrawing, by way of the proposed amendments contained within the cross motion, the allegation that, the participation in the conspiracy was necessarily part of the 'course and scope of' the Defendant's present agency or employment with Iraq. Fed. R. Civ. Proc. 11(c)(1)(A); Fed. R. Civ. Proc. 11 Advisory Committee's Note (1993); *Hadges v. Yonkers Racing Corp.*, 48 F3d 1320, 1328 (2d Cir. 1995).  We are not withdrawing any of the other substantive allegations in the amended pleading.[30, 31]

Specifically, within the prescribed period of time, Plaintiffs' filed its cross motion, seeking *inter alia*, leave to amend the complaint, pursuant to CMO 2, para. 13 and Rule 15 to remove a allegations which *may* not be supportable, at the present time (para. 36),  and to clarify other aspects of the pleading.[32]  Based upon Plaintiffs' withdrawals as provided for in the cross-motion, sanctions may not be imposed.

### 2.   RICO Statement of August 26, 2005.

As to the RICO Statement, in the event that the requests for reconsideration and/or an extension of time to file under Rule 6, were denied, in our Cross Motion, we requested that it be stricken.  Plaintiffs have thus complied with the safe-harbor provision.

In the abundance of caution, within thirty (30) days of service, in accordance with the

---

[30] The proposed amendments are set forth in Appendix II.

[31] The Defendant's alleged in their Rule 11 Motion that the conflicting allegations are a *per se* violation of Rule 11. Plaintiffs suggest to the contrary, that, *as amended,* they are clearly permissible alternative pleadings.  We suggest that even if we had not sought such an amendment, in light of the public literature, at this stage prior to discovery, sanctions would not be permissible; however, we need not reach this issue, as we are withdrawing the allegation, without prejudice, obviously subject to seeking permission to amend after discovery.  As this Court is aware, discovery is but starting in the litigation.

[32] Under CMO 2, Para. 13, Plaintiffs' could not unilaterally amend the Complaint without leave of the Court, in accordance with Rule 15.  The Cross Motion seeks such relief.

Plaintiffs' interpretation of your Honor's rulings, and the applicable case law,[33] Plaintiffs filed both a RICO Statement *and* a More Definite Statement/Additional Allegations on August 26, 2005 (docket nos. 1158 and 1157, respectively).  On the eve of filing same, on August 22, 2005, docket no. 1144, this Court had entered an order apparently limiting the applicability of CMO 2, para. 14, relative to RICO Statements for all Plaintiffs other than *Federal.*  Plaintiff filed the RICO Statement (1158), as an offer of proof, in the event that this Court reconsidered[34] its ruling, permitted a later filing on motion under Rule 6(b), or it was otherwise deemed permissible.  An MDS, as specifically provided for by the CMO 2, Para. 13, was similarly separately filed and docketed (1157) containing additional allegations as to the Defendant, including RICO allegations.[35]  See Goldman, ¶¶ 39-40.

Accordingly, on its face, the Plaintiffs' RICO Statement *only* was not filed timely. Defendants are seeking Rule 11 sanctions for this filing.

In their Cross Motion, however, Plaintiffs have sought reconsideration based upon the facts and circumstances of this particular case (i.e., the inability of the Plaintiffs to have complied with the provision, as this case was filed in the District of Columbia in August, 2003,

---

[33] RICO Statements are to be construed as pleadings.  *McLaughlin v. Anderson,* 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.,* 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001); *Dempsey v. Sanders,* 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999); *A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).

[34] In the Plaintiffs Cross Motion (see, Mem of Law at pp. 17-18), Plaintiffs requested a reconsideration of the Court's determination with regard to the applicability of CMO No. 2, Para. 14 as specifically applied to the facts and circumstances of this Defendant.  Shortly thereafter, Plaintiffs' Executive Committee Proposed CMO 4 raised this issue globally.  The latter was denied by the Court.

[35] A RICO Statement is not required.  *Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys.,* 271 F. 3d 374, 387 (2d Cir. 2001); *Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101, 1107-1109 (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004); *Mendoza v. Zirkle Fruit Co.,* 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000).  Under Rule 8(a) and the notice pleading case law, as set forth in the Mem. of Law in Opp. to the Motion to Dismiss, no heightened pleading standards are permitted for either RICO or the ATA. *See, Swierkiewicz v. Dorema, N.A.,* 534 U.S. 506, 512-3 (2002); *Phelps v. Kapnolas*, 308 F.3d 180, 184, 186-7 (2d Cir. 2002); *Pelman v. McDonald's Corp.,* 306 F.3d 508, 512 (2d Cir. 2005); *Twombly v. Bell Atlanic Corp.,* 425 F.3d 99, 106-7 (2d Cir. 2005); *Linde, et al. v. Arab Bank, P.L.C.,* 2005 U.S. LEXIS 18864 (E.D.N.Y. September 2, 2005). It does not appear as if one was required when the case was pending in the District of Columbia.

and was not transferred to your Honor's court until March, 2004), or leave, under Rule 6(b) to

file it late.  The Cross Motion further specifically provided that if the Court declined both

requests, that it be stricken.  Accordingly, the Plaintiffs believe that there was an objective basis

for pursuing such reconsideration or Rule 6(b) filing, based upon the facts and circumstances of

this particular case, as outlined in the Memorandum of Law in support of the cross-motion.  In

any event, in the event that we were unsuccessful, the alternative relief sought that it be

withdrawn and stricken.  Accordingly, Rule 11 sanctions would not be appropriate as we have

sought that it be withdrawn within the 21 days, under the safe-harbor provision.[36]

## III. THE FCC AND MORE DEFINITE STATEMENTS/ADDITIONAL ALLEGATIONS DO NOT VIOLATE RULE 11.

Defendant further contends that the filing of the MDS and the FCC violated Rule 11.  He

is wrong.   The MDS filed in August (docket 1157) and in September 2005, (docket 1360) [37,38]

were, as set forth in Plaintiff's Mem. in Opp. to Defendant's Motion to Dismiss (docket 1468), in

full compliance with that provision in the CMO.[39]

On September 30, 2005, Plaintiffs served on counsel and filed with the Clerk the First

---

[36] It would appear under CMO 2, para. 13, that changes in the pleadings may require the approval of the Court. Accordingly, the cross-motion sought such approval.  The Defendant has opposed the amendments.

[37] In light of the statement in CMO 2, Para. 13, as amended, that Plaintiffs were to file on September 30, 2005 "an amended complaint that includes all amendments *prior to that*, whether made pursuant to Rule 12(e) or *otherwise*" in the abundance of caution, the substance of each of the intended exhibits was separately filed with the clerk, pursuant to Para. 13, prior to the submission of the FCC (emphasis added).   While it may have been an unnecessary step, certainly Rule 11 is not designed to penalize a party which was trying to diligently comply with the Court's directives and which could not improperly prejudice any party.

[38] The last date for both the filing of amendments/ additional allegations/ more defendant statements, as of right, as well as consolidated complaint date, was extended by order of the Court dated July 27, 2005, to September 30, 2005.

[39] CMO 2, Para. 13 provides:

> Plaintiffs may file more definite statements and/or additional allegations against existing defendants by filing statements to that effect, which would be treated and accepted as pleadings and deemed amendments to previously-filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint.
>
> On {September 30, 2005}, the plaintiffs shall file an amended complaint that includes all amendments made prior to that date, whether made pursuant to Rule 12 (e) or otherwise.

Consolidated Complaint, which included all such amendments, by reference each and every one of the More Definite Statements (and certain RICO Statements, relative to dismissed Defendants), as exhibits.  The text of such additional pleadings (the exhibits), was physically included in the service sets and the set filed with the Clerk, specifically identified.[40]

As such, and for the reasons set forth in our Mem. In Response to the Defendants 12(b)(6) motion, such filings were proper.

To the extent that this Court decides otherwise, Plaintiffs submit that under an objective standard of reasonableness, the position taken was frivolous, or had absolutely no chance of success.  *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 391 (2nd Cir. 2003); *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993).   Rather, it was a reasonable, good faith position, and to the extent erroneous, not subject to Rule 11 sanctions.[41]

## IV. IT WAS THE DEFENDANT, WHO DISREGARDED THE COURT'S RULES.

The Defendant tendered the proposed Rule 11 motion on November 11, 2005, via email, and then filed it, prematurely, without seeking a pre-filing conference, on December 2, 2005.[42]

---

[40] Paragraph 220 of the instant FCC (which as bound and submitted to the Court consisted of a single volume), states "Attached hereto as Exhibits and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations:….(g) Exhibit G- Taha al Alwani."  Exhibit G, the last exhibit in the FCC, consists of  9 pages and 33 sequentially numbered paragraphs, which can easily be referenced.

[41] The Defendant also argues that sanctions are required as Plaintiffs pursue this litigation after the *Federal* decision was announced. This is not a basis for Rule 11 sanctions.  First, the allegations in our September 30, 2005 filing (MDS/Additional Allegations) mirrored those in our August filing.   Second, We respectfully disagree with the Court's decision as to *Federal*, and believe, in any event, that should this Court grant a motion to dismiss the instant complaint on those same grounds, it should do so in the same manner as it did in *Federal's* case – that is, without prejudice and with leave to amend.  Third, we believe that it is inappropriate for the Defendant to be taking this position with regard to *O'Neill* and not with regard to *New York Marine* which has similar allegations.  In the *New York Marine* case the Defendant filed a Rule 12(b)(6) motion and did *not* seek sanctions. Fourth, in their Rule 11 motion, Defendants failed to specifically identify the alleged short-comings in the pleading (except for the 'wrong person' defense).  Finally, to the extent that we are incorrect as a matter of law as to the sufficiency of the allegations as to the Defendant, that does not mean it rises to the level of sanctionable Rule 11 conduct.

[42] Under the safe harbor provision of Rule 11, a motion for sanctions may not be filed any sooner than 21 days after submission to a party, so as to give him time to cure, if need be.  Service via email (as opposed, to personal service) adds an additional three (3) days.  Fed. R. Civ. Proc. 5(b)(2)(D); Rule 6(e).  Hence, the date for filing it with the Court should have been Monday, December 5, 2005, *not* December 2, 2005.

Under the individual rules of this Court, such a conference is obligatory.  Ind. Rules, Section 2A; *c.f.*, MDL Docket 243 (process utilized by attorney McGuire; court denied leave to file the motion).  As a result of such apparently willful disregard of the Court's rules, the Defendant's Motion must be stricken. *See*, Fed. R. Civ. Proc. 83(a); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980).

## V.  SANCTIONS SHOULD BE IMPOSED AGAINST THE DEFENDANT - THE PLAINTIFFS SHOULD BE AWARDED LEGAL FEES AND EXPENSES OF DEFENDING THIS PROCEEDING.

Plaintiffs are requesting from the Court the imposition on the Defendant and his counsel sanctions, attorneys fees and costs, in light of the meritless nature of this Rule 11 proceeding, in light of the facts and circumstances of this case.

A party may seek reimbursement for its reasonable expenses and attorney's fees incurred in opposing a frivolous Rule 11 motion without filing a cross motion.  *Carlton Group, Ltd., at*, *23-*24;  *Jawbone, LLC v. James P. Donohue*, 01-Civ. 8066 (CSH), 2002 U.S. Dist. LEXIS 11806 (S.D.N.Y. June 28, 2002);  *Safe-Strap Company, Inc., v. Koala Corp.,* 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001); Fed. R. Civ. Proc. 11, Advisory Committee Note to 1993 Amendments ("service of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails on a motion under Rule 11…reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion"). Requests for sanctions pursuant to Rule 11, in such a circumstance, are subject to the same Rule 11 analysis as all other motions. *Carlton Group, Ltd* at *24;  *Bonacci v. Lone Star Int'l Energy, Inc.,* 1990 U.S. Dist. LEXIS 1564, No. 98 Civ. 0634 (S.D.N.Y. Feb. 16 1999); *Nakash v. United States Dep't. of Justice*, 708 F. Supp. 1354, 1368 (S.D.N.Y. 1988).

The standard is whether, at the time that the request was signed, a competent attorney would have concluded that it 'was destined to fail'. *Carlton* at \*24; *Eastway*, 762 F.2d at 254; *Oliveri v. Thompson*, 803 F2d 1265, 1274 (2d Cir. 1986). If so, then pursuing the sanctions itself constitutes a violation of Rule 11. *Carlton* at \*24-5. Alternatively, based upon these facts, the Defendant's counsel should be sanctioned under 28 U.S.C. Sec. 1927, for unreasonably and vexatiously multiplying the proceedings in this case in bad faith. *See Morales v. Zondo, Inc.,* 204 F.R.D. 50, 53 (S.D.N.Y. 2001); *MacDraw, Inc. V. CIT Group Equip. Fin., Inc.,* 73 F.3d 1253, 1261 (2d Cir. 1996). Legal fees and expenses unnecessarily incurred by Plaintiffs' counsel should be assessed.

This is particularly appropriate in the case at bar, in light of the nature and substance of the underlying motion to dismiss, the Defendant's refusal to acknowledge the exercise of the safe harbor provision, the Defendant's refusal to negotiate in good faith, the Defendant's willful disregard of the Court's requirements as to pre-motion conferences, the Defendant's rejection of your Honor's directive to *negotiate* a resolution to the scheduling issues, the mis-statements of fact, and the lack of any meaningful factual or legal support for the instant motion, all of which has simply been at attempt to divert attention from their willful disregard of the time limits of Rule 12 and their desire to unnecessarily delay the proceeding and incur substantial costs and fees. See, *Jawbone, LLC v. James P. Donohue*, 01-Civ. 8066 (CSH), 2002 U.S. Dist. LEXIS 11806 at \*23-4 (S.D.N.Y. June 28, 2002) (numerous submissions). As amply described in the time line (Goldman Exhibit One) and the accompanying declarations, such behavior has been typical of the actions of the Defendant and his counsel. It is time to stop shifting the blame for the improper litigating behavior of the Defendant and his counsel.

"Rule 11 is not a toy. A lawyer who transgresses the rule abuses the special role our

24

legal system has entrusted to him." *Safe-Strap Company, Inc., v. Koala Corp.,* 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003), quoting, *Draper and Kramer, Inc. v. Baskin-Robbins, Inc.,* 690 F. Supp. 728, 732 (N.D. Ill. 1988).[43]   Rule 11 sanctions can be imposed if a proceeding is brought for an improper purpose, such as the Defendant's attempts to harass a party and cause delay and needless increase in the cost of litigation –e.g., a party with greater resources seeking to wear down his adversary.  See, *Storey* at 393.  Attorneys fees and costs should be imposed on the movant.

## **CONCLUSION**

For all the foregoing reasons, the Estate of John P. O'Neill respectfully request a due process hearing[44] and that the Court deny Defendant, Taha Al-Alwani's request for Sanctions, and, instead, sanction Defendant, and his attorney and award them the attorney's fees and costs incurred in defending this frivolous Rule 11 Motion.

Respectfully submitted,

Dated:  December 19, 2005          By:  _____

Jerry S. Goldman, Esquire (JSG 8445)
Gina M. Mac Neill, Esquire (GM 0581
Fred Salek, Esquire (FS 8565)
Law Offices of Jerry S. Goldman &
  Associates, P.C.
111 Broadway, 13th Floor
New York, NY 10006
Tel:  212-242-2232/Fax:  212-346-4665
*Attorneys for The Estate of John P.*
      *O'Neill, Sr., et al.*

---

[43] The Declarations of Plaintiffs' counsel, with supporting exhibits and the Time Line (Goldman Exhibit One), Plaintiffs' respectfully submit, provide ample factual support in support of this position.

[44] A hearing is requested as to all factual matters raised, and argument is sought on the motion.  *See Einhorn Yaffee Prescott Architecture & Eng'g v. Turpin*, No. 95-7552, 1996 U.S. App. LEXIS 3947, at 2-3 (2d Cir. Mar. 5, 1996), *cert. denied*, 519 U.S. 929 (1996) in order to properly determine the factual record and to comply with the due process clause of the United States Constitution. *In re Ames Dep't Stores*, 76 F.3d 66, 70 (2d Cir. 1996).  *See Colon v. Mack*, 56 F.3d 5, 7 (2d Cir. 1995); *See*, *Lapidus v. Vann*, 112 F.3d 91, 97 (2d Cir. 1997), *cert. denied*, 522 U.S. 932 (1997).

## APPENDIX I:  Summary of Pleadings References To TAHA JABIR AL ALWANI

*(prior to the proposed safe-harbor amendments, except as noted))*

**The Conspiracy.**[45],[46]

1.    On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill v. Iraq First Consolidated Complaint ("O'Neill Iraq FCC" or "FCC") ¶ 1; O'Neill v. Al Baraka First Consolidated Complaint ("O'Neill Al Baraka FCC") ¶¶ 1, 6-10 22-5, Tremsky ¶ 120, WTC ¶ 365.

2.    The conspirators consist of the Defendants named in the in the three O'Neill actions (O'Neill v. Al Baraka, et al, 04 CV 1923 (RCC), O'Neill v. Kingdom of Saudi Arabia, 04 CV 1922 (RCC), O'Neill v. Iraq, 04 CV 1076) (with such complaints also including 'John Does', as well as the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL- 1570 (RCC) and others. O'Neill Iraq FCC, Exhibit G, ¶ 2.

3.    The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Iraq FCC ¶62; O'Neill Al Baraka FCC ¶27.

4.    On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Iraq FCC ¶ 3-7; O'Neill Al Baraka FCC ¶ 6-9.

5.    All 19 hijackers were members of the al Qaida network. O'Neill Iraq FCC ¶ 7; O'Neill Al Baraka FCC ¶6-9.

6.    All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. O'Neill Iraq FCC ¶ 7; O'Neill Al Baraka FCC ¶10.

---

[45] There are references preceding the various substantive causes of actions incorporating the various paragraphs in the pleadings without setting them forth at length.  See, e.g., FCC ¶221.

[46] The pleadings consist of the First Consolidated Complaint, filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15.  Incorporated into the First Consolidated Complaint are the various other pleadings filed in the matter, such as the RICO Statements and the More Definite Statements/Additional Allegations (MDS).  These items, all separately docketed, were physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record. Paragraph 220 of the FCC lists these various Exhibits.  The More Definite Statement-Additional Allegations pertaining to the instant Defendant were, pursuant to FCC Para. 220 (g), appended as Exhibit G (hereinafter cited as "MDS" or "Exhibit G").

7.      The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. O'Neill Iraq FCC ¶¶ 23, 38, 41, 63, 83, 250, 251; Burnett ¶¶ 649, 650, 654, Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622.

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. O'Neill Iraq FCC ¶ 38; Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509.

9.      Absent the material support and resources provided by the co-Defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74.

10.      The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. O'Neill Iraq FCC ¶ 252; Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Al Baraka FCC ¶ 144.

11.      Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett ¶ 649; Continental Casualty ¶¶605, 613, 617; Federal Insurance FAC ¶¶594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144.

12.      Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks. O'Neill Iraq FCC ¶ 38; O'Neill Al Baraka FCC ¶22

13.      Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities. O'Neill Al Baraka FCC ¶ 23.

14.      Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24.

15.      The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks. O'Neill Iraq FCC ¶¶ 38, 41.

16.      The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail

herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. Burnett ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶¶ 270-272; O'Neill Al Baraka FCC ¶¶177-180.

17.    As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 23, 251; O'Neill Al Baraka FCC ¶157.

18.    As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-252; O'Neill Al Baraka FCC ¶158.

19.    As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶159.

20.    The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance ¶¶ 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶¶160, 163, 167.

21.    As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding O'Neill Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶161.  As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as set forth in O'Neill Iraq FCC ¶¶ 254, 270, 271.

22.    Through the material support and resources provided to al Qaida, the Defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162.

23.    OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Iraq FCC ¶¶ 223, 228, 242; O'Neill Al Baraka FCC ¶165.

24.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. O'Neill Iraq FCC ¶ 251; O'Neill Al Baraka FCC ¶168.

25.     By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance ¶642; O'Neill Al Baraka FCC ¶169.

26.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and

extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance ¶ 628, O'Neill Iraq FCC ¶267; O'Neill Al Baraka FCC ¶177.

27.     The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett 662, O'Neill Iraq FCC ¶267; O'Neill 272; Al Baraka FCC ¶ ¶178-180.

28.     The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶162.

29.     The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶163.

30.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett ¶ 674, Continental Casualty ¶ 604, Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

31.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett ¶ 673, Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶152, 169.

32.     The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill Iraq FCC ¶263, 264, 265; O'Neill Iraq FCC, Exhibit G, ¶6a.

33.     The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitute an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. O'Neill Al Baraka FCC  ¶¶ 139, 172.


**The Relationship between Taha Jabir al Alwani and the Conspiracy.**

34. The Defendant is referred to in the caption of the FCC Complaint as "TAHA AL ALWANI a/k/a Dr. Taha Jabit al'Alwani", and is referred to as "Taha Jabir Al Alwani" in the MDS.  O'Neill Iraq FCC; O'Neill Plaintiffs' More Definite Statement /Additional Allegations as to Defendant Taha Al Alwani a/k/a Dr. Taha Jabir Al'Alwani ("MDS") Para. 22

35. The Defendant is alleged to be one of the Defendants who, along with Defendants Saddam Hussein and a long list of Iraqis, "are natural persons, subjects and/or citizens of

Iraq and/or leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, and/or are the personal representatives of their estates, and, as to the agents, employees, leaders and officials" who participated in the acts and conspiracy described in the pleadings. O'Neill Iraq FCC ¶ 36 (as amended).

36. The Defendant is alleged to be one of the Defendants who, along with Defendants Saddam Hussein and others, "are natural persons(or the personal representatives of their estates), subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency or other agents or instrumentalities of Iraq and/or are natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees of Iran and/or its Intelligence Agency or other agents or instrumentalities of Iran and/or are *natural persons* (or the personal representatives of their estates), organizations, banks, and charities located all over the world, *who participated in the acts and conspiracy described below, in their individual capacities and while acting in the course and scope of their employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks*. Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as front organizations for Hezbollah and Al Qaeda and actively support its terrorist activities. Some of those organizations are purely a sham front for Hezbollah and Al Qaeda." O'Neill Iraq FCC ¶ 41. (emphasis added).

37. "The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Saddam Hussein ….Taha Al Alwani …[and others who] … have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more." O'Neill Iraq FCC ¶ 63.

38. "Defendants Saddam Hussein … Taha Al Alwani … [and others] … caused the extrajudicial killing of John Patrick O'Neill, Sr." O'Neill Iraq FCC ¶ 276.

39. Taha Jabir Al Alwani (Al Alawani) is President of the Graduate School of Islamic and Social Sciences (GSISS) in Leesburg, Virginia. The Graduate School for Social and Islamic Sciences (GSISS), trains Islamic clerics to minister to Muslim soldiers in the U.S. military, however, it is suspected by the U.S. government of raising funds for terrorism. O'Neill Plaintiffs' More Definite Statement /Additional Allegations as to Defendant Taha Al Alwani a/k/a Dr. Taha Jabir Al'Alwani. Exhibit G Para. 22.

40. Al Alwani is also a founding member and president of the International Institute of Islamic Thought ("IIIT"). The IIIT is a self-described "Islamic think tank" started by Sami Al-Arian, who was arrested by the U.S. government and is awaiting trial on charges that he was a key figure in the terrorist group Palestinian Islamic Jihad. MDS Para. 23.

41. Taha Jabir Alawani was publicly identified in an affidavit by U.S. Customs special agent David Kane ("Kane") as a director of "Safa Group companies including International Institute of Islamic Thought (IIIT), FIQH council of North America, Graduate School of Islamic & Social Sciences, and Heritage Education Trust." In the affidavit, Kane wrote that "there is probable cause to believe that Alawani, along with others, conspired to

commit various offenses, including the providing of material support or resources to foreign terrorist organizations in violation of 18 U.S.C. Para 2339B." MDS para. 24.

42. The Articles of Incorporation for the IIIT, dated October 8, 1980, which were included with the IIIT Application for Recognition of Exemption from Federal Income Tax (Form 1023), dated June 3, 1982, identify other individuals who were directors of WAMY, a co-Defendant, at that time. These include Dr. Taha Jaber, whom I (Kane) believe to be the same as Taha Jaber Al- Alwani, Dr. Abdul Hamid Abu Sulayman, and Dr. Jamal Barzinji." On this document Al- Alwani, Barzinji and Abu Sulayman listed their address as World Assembly of Muslim Youth, P.O. Box 5472, Riyadh, Saudi Arabia. MDS para. 25.

43. According to a second affidavit filed by Kane in the US District Court in Eastern Virginia, Al-Awani's home was listed as a location to be searched: "The Residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia 1105 Safa Street in Herndon is the residence of Taha Jabir Al-Alwani, an officer and/or director of Safa Group companies including International Institute of Islamic Thought ("IIIT"), FIQH Council of North America ("FIQH"), Graduate School of Islamic & Social Sciences ("GSISS") (formerly known as the School of Islamic and Social Sciences ("SISS")) and Heritage Education Trust." MDS para. 26.

44. Kane further stated: "Various documents and videotapes obtained in Tampa searches show that Al Alwani, attended and spoke at Islamic Concern Project ("ICP") conferences with Al- Arian, Shallah, Sheik Odeh (spiritual leader and co-founder of Palestinian Islamic jihad ("PIJ")) and Sheik Rahman (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995). Inasmuch as ICP conferences were, in essence, PIJ conferences, I know that Al-Alwani has long been a supporter of PIJ." MDS para. 27.

45. Additionally, Kane said, "In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa 36 (declaration) signed by Al-Alwani at some point between December 1988 and November 1989, proclaiming the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them." MDS para. 28.

46. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

47. Public documents show that the SAAR network was the primary backer of the PIJ front groups in the United States, World and Islam Studies Enterprise ("WISE") and Islamic Concern Project ("ICP"). MDS para. 29.

48. In fact, previously released correspondence and bank checks reveal that SAAR affiliates IIIT and Safa Trust funneled tens of thousands of dollars to the PIJ fronts. Al Alwani, in his capacity as President of the International Institute of Islamic Thought and an officer of the Heritage Education Trust and Safa Trust, has committed multiple acts of

conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America. MDS para. 30.

49. As the foregoing demonstrates, Al Alwani thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Alwani's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. MDS para. 31.

## Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.

50. At all relevant times, all Defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce. That enterprise, which is the association-in-fact of Defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶ 609.

51. At all times relevant hereto, each of Defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c). This pattern of racketeering activity entailed at least two acts of racketeering activity by each Defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶ 610.

52. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud. Federal Insurance ¶ 619; O'Neill Iraq FCC ¶ 267; O'Neill Al Baraka FCC ¶177.

53. The acts of racketeering activity (predicate acts) include:

a. acts that involve murder and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

b. acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents) and are within the scope of 18 U.S.C. § 1961(1)(B);

c. acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. §

1961(l)(B);

d.  acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

e.  acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

f.  acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

g.  acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B)

O'Neill Iraq FCC, Exhibit G, ¶ 5(a); Continental Casualty ¶ 611.

54.   Each of Defendants' racketeering activities was taken for the purpose of furthering Defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies.  Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty ¶ 612.  The pattern of racketeering is more fully set forth in O'Neill Iraq FCC, Exhibit G, ¶ 5(b), (f), and (g)

55.   As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶ 613.

56.   The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. Federal Insurance ¶ 620; O'Neill Iraq FCC ¶ 272.

57.   The enterprise ("Radical Muslim Terrorism") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("al Qaida") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.*

33

(SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  *See e.g.,* O'Neill Iraq FCC, Exhibit G, ¶ 6; O'Neill Iraq FCC ¶ 263-5.

58.     The Enterprise is described, at length, in O'Neill Iraq FCC, Exhibit G, ¶ 6(b), (c).

59.     The activities of the Enterprise relate to the commission of world-wide terrorism.  The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack. The usual activities of the Enterprise include recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of.  O'Neill Iraq FCC, Exhibit G, ¶¶ 7-10.

60.     Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in Paragraph 12 of O'Neill Iraq FCC, Exhibit G.

61.     The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in Paragraph 13 of O'Neill Iraq FCC, Exhibit G.

## Consequences of the Conspiracy.

62.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[47]

63.     These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance FAC ¶¶ 80, 118, 187, 234, 361, 459, 501; O'Neill Iraq FCC ¶ 38, 41; O'Neill Al Baraka FCC ¶ 25.

64.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

65.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Iraq FCC ¶ 276; O'Neill Al Baraka FCC ¶153.

66.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail

---

[47] A list of the decedents is contained within Exhibit A.

herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶ 272.

67.   The Defendants intended to cause damage to business and property.  O'Neill Iraq FCC ¶ 271; O'Neill Al Baraka FCC ¶ 178.

68.   Plaintiffs suffered damage to business and property as a result of the Defendants actions. O'Neill Iraq FCC ¶¶ 270,271; O'Neill Al Baraka FCC ¶¶ 179, 180.

69.   The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  O'Neill Iraq FCC ¶¶ 271; O'Neill Al Baraka FCC ¶ 146; O'Neill Iraq FCC, Exhibit G ¶¶ 14-15.

                                                                              ***

## APPENDIX II – RELIEF SOUGHT IN CROSS MOTION

1. Relative to the Plaintiffs' RICO Statement pertaining to Dr. Taha Jabir Al' Alwani:

    a) Granting an Enlargement of Time pursuant to Rule 6(b) to Filing of a RICO Statement as to Dr. Taha Jabir Al' Alwani;  *or, in the alternative*[48]*,*

    b) Allowing Plaintiff to Withdraw its Previously Filed RICO Statement;

2. Striking Defendant Taha Al' Alwani's Motion to Dismiss;

3. Granting Leave to Amend the Plaintiffs' Complaint in certain respects (as set forth below); and/or,

4.  Granting Leave to Amend the Plaintiffs' Complaint in the Event that the Court finds a Deficiency in Pleading under Rule 12(b)(6).

The proposed amendments to the FCC are as follows (with the changes marked in bold):

PROPOSED AMENDMENT 1: Modification of Caption to Correct Typographical Error:

    Current Version

    Taha al Alwani a/k/a Dr. Taha Jabit Al'Alwani

    Current Version

    Taha al Alwani a/k/a Dr. Taha Jabi**r** Al'Alwani

PROPOSED AMENDMENT 2: Modification of Para 36 of the FCC:

    Current Version

    36. Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan, Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul Latif are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, or are the personal representatives of their estates,

---

[48] The in the text of the Memorandum of Law, there is alternatively framed a request for a reconsideration based upon the facts and circumstances of this particular case.  Such request was filed *prior* to the issuance of CMO 4.

who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

<u>Proposed Modified Version</u>

36.  Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan, Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul Latif are natural persons, subjects and**/or** citizens of Iraq and**/or** leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, **and/**or are the personal representatives of their estates, who participated in the acts and conspiracy described below, **and as to those employees, leaders, officials and agents only,** while acting in the course and scope of their employment **and/or position**.

<u>PROPOSED AMENDMENT 3- Modification of Para 41, l. 5 of FCC (the full text of Para. 41 is at note 5, *infra*</u>:

<u>Current Version</u>**:**

Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abwaiel, Osama Bin Laden

<u>Proposed Modified Version</u>:

Laden, Haqui Ismail, Taha Al Alwani **a/k/a Dr. Taha Jabir al'Alwani**, Abu Agab, and Abwaiel, Osama Bin Laden

**APPENDIX III  – FCC PARAGRAGHS 41, 63, and 276**

**FCC Para. 41 alleges, in pertinent part:**

*Defendants* Saddam Hussein, the Estate of  Quasy Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, *Taha Al Alwani*, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Suqami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, …., *and John Does 1-67 are* natural persons(or the personal representatives of their estates), subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency or other agents or instrumentalities of Iraq and/or are natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees of Iran and/or its Intelligence Agency or other agents or instrumentalities of Iran *and/or are natural persons (or the personal representatives of their estates), organizations, banks, and charities located all over the world, who participated in the acts and conspiracy described below, in their individual capacities and while acting in the course and scope of their employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11*[th] *attacks*.  Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as front organizations for Hezbollah and Al Qaeda and actively support its terrorist activities.  Some of those organizations are purely a sham front for Hezbollah and Al Qaeda.   (emphasis added).

**FCC Para. 63 alleges, in pertinent part:**

The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency,

Egyptian Islamic Jihad, ….., and John Does 1-67, who have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. (emphasis added).

FCC Para. 276 alleges that Taha al' Alwani and others caused the extrajudicial killing of John Patrick O'Neill, Sr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of December, 2005, I caused an electronic copy of the foregoing Memorandum of Law in Opposition to the Defendant's Motion for Sanctions Pursuant to Rule 11 to be served by e-mail upon all parties scheduled for electronic notice.

 

 

_____

JERRY S. GOLDMAN, ESQUIRE

 

X:\Clients\ONeill v. Saudi arabia\Motions\Rule 11\Taha\Final Plaintiffs Documents\Plaintiffs Memo of Law- Final\Response to Motion for SanctionsFINAL.doc