**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977
*Burnett v. Al Baraka Invest. & Devel. Corp.*, 03-CV-9849
*Burnett v. Al Baraka Inves.t & Devel. Corp.* 03-CV-5738
*Cantor Fitzgerald & Co. v. Akida Bank Private Ltd.*, 04-CV-7065
*Continental Casualty Co. v. Al Qaeda*, 04-CV-5970
*Estate of O'Neill v. Al Baraka Invest. & Devel. Corp.*, 04-CV-1923
*Euro Brokers, Inc. v. Al Baraka Invest. & Devel. Corp.*, 04-CV-7279
*Federal Ins. Co. v. Al Qaida*, 03-CV-6978
*New York Marine and General Ins. Co. v. Al Qaida*, 04-CV-6105
*World Trade Center Properties LLC v. Al Baraka Invest. & Devel. Corp.*, 04-CV-7280

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS OF DMI ADMINISTRATIVE SERVICES, S.A. AND DAR AL-MAAL AL-ISLAMI TRUST

December 19, 2005

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

SUMMARY OF ALLEGATIONS AGAINST DMI ............................................................... 2

APPLICABLE LEGAL STANDARDS ................................................................................. 7

    F.R.C.P. 12(b)(6) ................................................................................................ 7

    F.R.C.P. 12(b)(2) ................................................................................................ 9

ARGUMENT ................................................................................................................ 10

    I.      PLAINTIFFS HAVE STATED CLAIMS AGAINST DMI ............................................ 10

            A.     Plaintiffs Claims Are Sufficiently Definite for Defendants to Understand What They Are Accused Of ................................................... 10

            B.     Plaintiffs State Claims Against DMI under the Anti-Terrorism Act ........ 11

            C.     Plaintiffs' RICO Claims Should Not Be Dismissed ................................. 15

                  1.     *The O'Neill Plaintiffs Have Standing To Assert RICO Claims.* .... 15

                  2.     *The Complaints Properly State RICO Claims Against DMI* ......... 16

            D.     DMI Is Not Entitled to Dismissal of Plaintiffs' Other Claims ................. 19

    II.     THIS COURT HAS JURISDICTION OVER DMI S.A. .................................................. 22

            A.     A Non-Resident Alien Without Substantial Contact with the United States May Not Invoke the Protections of the Fifth Amendment ............................................................................................ 22

            B.     DMI S.A. Has Sufficient Contact with the United States Because It Purposefully Directed Its Conduct Here ................................................... 23

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

*Page*

**Cases**

*131 Main Street Assoc. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995)........................................ 18

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987) ............... 24

*Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).................................................................................................................. 19

*Baker v. Great Socialist People's Libyan Arab Jamahiriya*, Civil Action No. 03-749, *slip op.* (D.D.C. June 30, 2005) ...................................................................................................... 23

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ............................................... 21

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ................................. 11, 12, 21

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ......................................................................... 24

*Burnett v. Al Baraka Invest. & Develop. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003).................... 19

*Calder v. Jones*, 465 U.S. 783 (1984)......................................................................................... 24

*Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112 (5th Cir. 1987) .................................... 17

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ....................................................................... 8

*Conley v. Gibson*, 355 U.S. 41 (1957) .......................................................................................... 7

*Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ...................................................... 9

*Daliberti v. Iraq*, 97 F.Supp.2d 38 (D.D.C. 2000)....................................................................... 25

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005)................................................................................ 16

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001)........................................... 9

*Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158 (S.D. N.Y. 2003) .......................... 17

*Filartiga v. Pena*, 577 F. Supp. 860 (E.D.N.Y. 1984)................................................................... 22

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998).............................................. 24

*Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727 (S.D. N.Y. 1994)...................................... 17

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ........................................................................ 8

*Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258 (1992) .................................................. 19

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. LEXIS 3829 (S.D.N.Y. 2004) ............................................................................................................... 21

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ............................... 9

*In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y. 2005).......... passim

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ....................................................... 23

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001) .............................. 23

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993)....................................... 10

*Jifry v. F.A.A*, 370 F.3d 1174 (D.C. Cir. 2004).......................................................................... 22

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)............................................................................ 23

*Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir. 1996).................................................................. 21

*Jones v. R.R. Donnelly & Sons Co.*, 124 S. Ct. 1836 (2004) ....................................................... 21

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993)................................................................... 8

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ........................................................... 18

*Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306 (E.D. La. 1994) ........... 21

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983)........................................................... 16

*National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221 (E.D.N.Y. 1999) ......................................................................................................................... 19

*Palestine Info. Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) .................................................. 24

*Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994)....................................................................... 22

*Pauling v. McElroy*, 278 F.2d 252 (D.C.Cir.1960)..................................................................... 23

*PDK Labs v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997)............................................................ 10

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ......................................................... 8

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002)................................................................... 7, 8

*Pittman v. Grayson*, 149 F.3d 111 (2d Cir.1998) ...................................................................... 15

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) .............. 25

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) ...................................................................... 25

*Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004) ........................................................................ 20

*State of New York v. O'Hara*, 652 F. Supp. 1049 (W.D.N.Y. 1987) ............................................ 17

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ............................................................................... 8

*Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005) ................................................... 8, 9

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................................................................... 23

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) .............................................................. 16

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) .......................................... 23

*United States v. Louie*, 625 F. Supp. 1327 (S.D.N.Y. 1985) ....................................................... 17

*United States v. Roth*, 860 F.2d 1382 (7th Cir. 1988) ................................................................. 17

*United States v. Turkette*, 452 U.S. 576 (1981) ........................................................................... 16

*Von Bulow v. Von Bulow*, 634 F. Supp. 1284 (S.D. N.Y. 1986) ................................................. 19

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ......................................... 8

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .............................................. 24

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ..................................................................... 7, 8

*Yamataya v. Fisher*, 189 U.S. 86 (1903) ..................................................................................... 23

*Yeadon v. New York Transit Authority*, 719 F. Supp. 204 (S.D.N.Y. 1989) ............................... 21

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................................... 23

*Zola v. Gordon*, 685 F. Supp. 354 (S.D.N.Y. 1988) ................................................................... 18

**Statutes**

18 U.S.C. § 1961 ............................................................................................................................ 18

18 U.S.C. § 1962 ...................................................................................................................... 16, 17

18 U.S.C. § 2339A ......................................................................................................................... 18

18 U.S.C. § 2339B .................................................................................................................... 14, 18

18 U.S.C. § 2339C ......................................................................................................................... 18

28 U.S.C. § 1350 .................................................................................................. 20

28 U.S.C. § 1653 .................................................................................................. 10

Torture Victims Protection Act, 28 U.S.C. § 1350 note ................................... 19

**Rules**

F.R.C.P. 12(b)(2) ............................................................................................... 2, 9

F.R.C.P. 12(b)(6) .......................................................................................... 7, 8, 19

F.R.C.P. 4 ....................................................................................................... 22, 23

F.R.C.P. 8 .................................................................................................... 8, 9, 16

F.R.C.P. 9 ............................................................................................................. 8

# INTRODUCTION

In 10 separate motions to dismiss, defendants Dar Al-Maal Al-Islami Trust ("DMI Trust") and DMI Administrative Services, S.A. ("DMI S.A.") have moved to dismiss the various actions against them.[1]  (Together, DMI Trust and DMI S.A. are referred to as "DMI").   As nearly every defendant in this case has done, DMI expresses its sympathy for the plaintiffs, condemns the September 11 attacks,[2] but insists that all of this has nothing to do with DMI. Everyone is sorry, but no one is responsible, not even those who organized and funded the banks that financed al Qaeda, as DMI is alleged to have done.

DMI's protestations of innocence, and its crocodile tears, should be rejected.  In these lawsuits, plaintiffs allege that DMI provided Osama bin Laden with the funding, banking services, and financial infrastructure that he used to establish al Qaeda training camps, train terrorists, and carry out terrorist attacks against the United States.  Acting through a web of subsidiaries and interlocking companies, DMI helped establish Al Shamal Bank, which bin Laden then capitalized, using the guise of the bank both to launder his funds and to provide the financial infrastructure that allowed him to pay his operatives and build his terrorist training facilities.  Plaintiffs further allege that DMI provided this assistance knowingly *knowingly and intentionally*.   No more is required to satisfy the pleading requirements under F.R.C.P. 8 and F.R.C.P. 12(b)(6).

---

[1]  A chart showing the docket numbers of each of the motions, and the actions to which they pertain, is included in Appendix 1.  Additionally, plaintiffs have included in Appendix 1 a chart of the operative pleadings at issue on these 10 motions.  Plaintiffs note that, although DMI S.A. challenges this Court's jurisdiction while DMI Trust does not, and despite minor variations in each argument, the 10 briefs filed by DMI are substantially identical.  Plaintiffs here respond with a single consolidated brief opposing all 10 motions.

[2] The use of either the singular or the plural form of the word "attack" in this memorandum should not be taken as a position or concession by any of the plaintiffs on the question of whether the events of September 11, 2001 constituted one attack or multiple attacks.

The major thrust of DMI's argument (repeated with minor variations throughout its ten briefs) is that DMI cannot be held liable because DMI did not, itself, carry out the September 11 attacks. But, as this Court is well aware, the Anti-Terrorism Act ("ATA") provides a cause of action against those who provide "material support" to terrorist organizations. Moreover, principles of aiding and abetting recognize that those who provide substantial assistance to wrongdoers, with knowledge of the wrongful nature of the activities they are supporting, may be held liable along with the principal actors. As detailed below, that is what plaintiffs have alleged. DMI's motion to dismiss should be denied so that plaintiffs can proceed to take the necessary discovery and prove their claims.

## SUMMARY OF ALLEGATIONS AGAINST DMI

DMI Trust is an Islamic financial institution founded in 1981. As described in its 1994 Annual Report, "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies. *Burnett* More Definite Statement ¶ 3; *WTCP & Euro Brokers* RICO Statements, Ex. A at 1; *Federal* RICO Statement, Ex. A at 8; *Cantor* 1AC ¶¶ 123-124; *Continental* 2AC, Addendum at 133. DMI S.A. is the trust's administrator. It focuses on group strategy, corporate activities, legal and financial affairs, and provides audit and technical assistance to subsidiaries. DMI S.A. is a wholly-owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions, and policies of the DMI Trust. DMI S.A. acts as one of DMI Trust's operational arms. *Id.; Federal* RICO Statement, Ex. A at 8. DMI's other main subsidiaries are Islamic Investment Co. of the Gulf, Faisal Islamic Bank, and Faisal Finance. *See NY Marine* 2AC ¶ 287; *Cantor* 1AC ¶¶ 123-124;

*Federal* RICO Statement, Ex. A at 7.

As alleged in the various complaints, DMI was one of several banking entities with overlapping ownership and management that, in the early 1990's, set up a financial infrastructure in Sudan for Osama bin Laden and his growing terrorist organization. *Federal* RICO Statement, Ex. A at 9-13.  Plaintiffs have alleged that DMI "conspired with Osama bin Laden and al Qaida to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks." *See O'Neill* FCC ¶ 22.  Plaintiffs further allege that "DMI is a primary vehicle for Saudi financing of the international Islamic fundamentalist movement," and that "DMI's knowing and intentional conduct enabled al Qaeda to plan, orchestrate and carry out violent anti-American, anti-democratic activity, including the September 11th attack that injured plaintiffs." *Burnett* More Definite Statement ¶¶ 25-26; *WTCP & Euro Brokers* RICO Statements Ex. A at 8; *Cantor* RICO Statement at 1-2; *Cantor* 1AC ¶ 127; *Continental* 2AC, Addendum at 134.

Significantly, plaintiffs allege that DMI provided support to bin Laden *knowingly*:

> DMI's misconduct includes laundering money for al Qaida, *knowingly and intentionally* providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

*Burnett* More Definite Statement ¶ 22; *WTCP & Euro Brokers* RICO Statements Ex. A at 7 (emphasis added); *Cantor* RICO Statement ¶ 2; *Federal* RICO Statement, Ex. A at 11; *O'Neill* FCC, Ex. P at ¶ 29; *see also Burnett* More Definite Statement ¶ 25; *Continental* 2AC, Addendum at 134.

Thus, plaintiffs do not allege merely that DMI and its financial infrastructure were unwittingly used by bin Laden and al Qaeda; rather, plaintiffs allege that DMI *conspired* with bin Laden and *knowingly* laundered money and provided financial services for al Qaeda.

Specifically, plaintiffs allege that, once ensconced in Sudan, bin Laden set up terrorist recruitment and training facilities, funded by, or under the guise of, legitimate business enterprises. *Burnett* 3AC at p. 211. These enterprises, and the terrorist recruitment and training they were designed to support, were funded by a cluster of inter-related banks and banking parent companies, including DMI and Islamic Investment Bank of the Gulf, Faisal Islamic Bank, Tadamon Islamic Bank ("Tadamon") and Al Shamal Islamic Bank ("Al Shamal"), all of which are related to DMI.[3]   Thus, plaintiffs have alleged that "DMI has involved itself in al Qaida financing through several of its subsidiaries, including, but not limited to, Islamic Investment Bank of the Gulf, Defendant Faisal Islamic Bank, Defendant Tadamon Islamic Bank, and Defendant Al Shamal Islamic Bank."  *O'Neill* FCC ¶ 45; *see also Burnett* 3AC ¶ 97-98; *WTCP* ¶ 234-35; *Ashton* 6AC at ¶¶ 42-43, 48-51, 56-58, 436; *Cantor* RICO Statement ¶ 2; *Cantor* 1AC ¶¶ 127-135; *N.Y. Marine* 2AC ¶ 290; *Continental* 2AC ¶ 379.

Complex layers of direct and indirect subsidiaries, related companies and interlocking management and investors work to conceal the relationship between DMI and al Qaeda.  Indeed, plaintiffs allege that "DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden." *Burnett* More Definite Statement ¶ 64; *WTCP* & *Euro Brokers* RICO Statements, Ex. A at 18; *Federal* RICO Statement Ex. A at 7; *see also Cantor* RICO Statement, Ex. A at 3; *Continental* 2AC, Addendum at 133.   Nonetheless, an examination of some of the banks that facilitated the growth of al Qaeda show that DMI was omnipresent through a variety

---

[3] DMI has numerous connections with individuals that have been listed by the U.S. Department of Treasury as Specially Designated Global Terrorists, such as Yousef Nada, who was a large shareholder in Faisal Islamic Bank  - Sudan, a associated company of DMI. *Ashton* 6AC ¶ 437.  Further, Bank al Taqwa, a terror financing bank controlled by Yousef Nada, is registered in the Bahamas at the same address as DMI. *Ashton* 6AC ¶ 438.

of vehicles.

For example, as plaintiffs have alleged, Al Shamal Bank "regularly provided financial and account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles." *Burnett* More Definite Statement ¶ 23; *Continental* 2AC, Addendum at 136; *Federal* RICO Statement, Ex. A at 11-13. Osama bin Laden himself helped establish Al Shamal and capitalized it with $50 million. *Id.*; *Burnett* 3AC at p. 211; *Cantor* 1AC ¶ 128; *Continental* 2AC, Addendum at 136. In September, 2001, Senator Carl Levin, Chairman of the Senate Armed Services Committee on Investigation of the Governmental Affairs Committee, stated that Al Shamal Islamic Bank operations were continuing and that there was evidence that Osama bin Laden was still the bank's leading shareholder and might still be using the bank's facilities. *Burnett* More Definite Statement ¶ 81; *Federal* RICO Statement, Ex. A at 13.

DMI is a major shareholder of Al Shamal. Of even greater significance, Faisal Islamic Bank ("Faisal Bank"), an indirect subsidiary of DMI, was one of the main founders of Al Shamal Bank. *Burnett* 3AC ¶¶ 73, 98-100. Another DMI subsidiary, Tadamon Islamic Bank, was also a founding shareholder of Al Shamal. *See Burnett* More Definite Statement ¶¶ 75, 83; *WTCP & Euro Brokers* RICO Statements, Ex. A at 7-8, 22; *Federal* RICO Statement, Ex. A at 12-13; *Cantor* 1AC ¶ 126; *Continental* 2AC, Addendum at 136.

The al Qaeda accounts at Al Shamal are not an instance of bin Laden opening an account at a bank (and getting a free toaster, as DMI would have it, *see, e.g.*, DMI Trust *Ashton* Br. at 6

n.4), but rather of bin Laden using his own money to *set up* (with the assistance of DMI and at least two of its subsidiaries) a bank that could then be used to finance al Qaeda.  In short, plaintiffs allege that DMI and its subsidiaries founded the entity, bin Laden capitalized it, and the entity went on to provide banking services to al Qaeda.

Nor was Al Shamal the only vehicle through which DMI assisted al Qaeda.  Faisal Bank has been separately implicated in al Qaeda's terrorist activities: in a 2001 trial in the United States arising from the 1998 bombings of two U.S. embassies in East Africa, Faisal Bank was identified as holding and managing bank accounts for al Qaeda operatives in connection with those bombings.  *Federal* RICO Statement, Ex. A at 11.  Similarly, another DMI subsidiary, Faisal Finance, held 23 accounts for defendants Wa'el Julaidan and Yasin Al Kadi.[4]  Swiss authorities froze these accounts in November 2001.  *Ashton* 6AC ¶ 439.  But Julaidan's connection to bin Laden was well known long before September 11 -- in 1999, Osama bin Laden acknowledged on al Jazeera TV his close ties to Julaidan.  Nevertheless, DMI, via its wholly-owned subsidiary, Faisal Finance, knowingly and intentionally continued to provide numerous accounts to Julaidan.  *Ashton* 6AC ¶ 440.

Similarly, at the criminal trial concerning the 1998 Embassy bombings, Jamal Al-Fadl testified that Tadamon Bank, also a DMI subsidiary, was used by members of al Qaeda to fund terrorist attacks and to generally support the network.  *WTCP & Euro Brokers* RICO Statements, Ex. A at 22; *Federal* RICO Statement, Ex. A at 13; *Continental* 2AC, Addendum at 136-37.  The testimony at that trial further indicated that Tadamon "managed the financial accounts of al

---

[4] Both Wa'el Julaidan and Yasin Al Kadi have been named Specially Designated Global Terrorists by the U.S. Department of Treasury. *Ashton* 6AC ¶ 439.  Strikingly, despite DMI's knowledge of Wa'el Julaidan's close ties to Osama Bin Laden, DMI continued to provide financial services and accounts to Wa'el Julaidan. *Ashton* 6AC ¶ 439-440.  Further, as far back as 1988, DMI knew that Al Kadi held terrorist-related accounts at Faisal Finance. *Ashton* 6AC ¶ 440.

Qaeda operatives." *O'Neill* FCC ¶ 52.  Moreover, plaintiffs have alleged that "Tadamon Islamic Bank was aware that al Qaida cells maintained accounts with the bank, and that those accounts were being used to launder and distribute funds for al Qaida operations and terrorist attacks" and that "[d]espite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Tadamon Islamic Bank continued to maintain those accounts." *N.Y. Marine* 2AC ¶ 318-319.  Accordingly, plaintiffs allege, "Tadamon Islamic Bank knowingly provided financial services and other forms of material support to al Qaida." *Id.* at 319; Cantor 1AC ¶¶ 127, 133.

Although DMI is alleged to have provided financial support for al Qaeda through its various subsidiaries, it is important to note that "DMI Trust and DMS S.A. directly participate in the oversight and management of DMI Trust's subsidiary and associate entities." *See, e.g.,* WTCP & *Euro Brokers* Rico Statements, Ex. A at 1.  Moreover, the sheer number of connections between DMI and al Qaeda – through Tadamon, through Faisal Finance, through Faisal Islamic Bank, through Al-Shamal, through the overlapping interconnection among all these entities – more than suggests that DMI was not simply a passive provider of financial services, but rather was engaged in actively assisting bin Laden and al Qaeda by providing the terrorist network with financial services through a network of subsidiaries created, at least in part, for that purpose.

## APPLICABLE LEGAL STANDARDS

### F.R.C.P. 12(b)(6)

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the

Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) . In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

A motion pursuant to F.R.C.P. 12(b)(6) motion is analyzed in the context of the requirements of F.R.C.P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id*. Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to F.R.C.P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v. McDonald's Corp.*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October, 2005, the Second Circuit re-iterated and re-affirmed the notice pleading standard set forth in Rule 8 as applied to a Rule 12(b)(6) motion to dismiss. *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005).  In *Twombley*, the Second Circuit reversed a district

court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."  425 F.3d at 107.  In the context of anti-trust pleading, the Court reminded that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116.  The district court may not add create higher pleading standards than those set forth in the Federal Rules.  Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit unequivocally held that "[i]f that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so."  425 F.3d at 117.

### F.R.C.P. 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the minimal burden of showing a factual basis upon which the court may exercise personal jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003). In this regard, at the pleading stage, the plaintiff need only make a prima facie showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion. *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). In ruling on the motion, the Court should resolve factual discrepancies appearing in the record in favor of the Plaintiffs. *Id*. at 84.

In making their prima facie case for personal jurisdiction, however, plaintiffs are not limited to their pleadings. Rather, that case may be established through pleadings and affidavits. *See Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Moreover, plaintiffs are not required to know or to plead all possible jurisdictional grounds from the outset of the case.

To the contrary, the relevant statutory scheme anticipates and allows for liberal amendments as to jurisdiction. *See* 28 U.S.C. § 1653. That is particularly true where the factual predicates are complex and the parties numerous, as herein. Moreover, in evaluating plaintiffs' prima facie showing of jurisdiction, the Court must construe all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlande*r, 103 F.3d 1105, 1108 (2d Cir. 1997). In addition, the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).

**ARGUMENT**

## I.   PLAINTIFFS HAVE STATED CLAIMS AGAINST DMI

### A.   Plaintiffs Claims Are Sufficiently Definite for Defendants to Understand What They Are Accused Of

DMI claims that it cannot discern from plaintiffs' complaints what it is being charged with. *See, e.g.,* DMI Trust *Burnett* Br. at 5; DMI Trust *Federal Ins.* Br. at 5; DMI S.A. *WTCP and Euro Brokers* Br. at 11.   But, although voluminous, plaintiffs' claims are not lacking in specificity.   As noted above, plaintiffs allege:

> DMI's misconduct includes laundering money for al Qaida, knowingly and intentionally providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

*Burnett* More Definite Statement at ¶ 22; *WTCP & Euro Brokers* RICO Statements Ex. A at 7; *Federal* RICO Statement, Ex. A at 9; Cantor RICO Statement at 1-3; *Continental* 2AC, Addendum at 134.   This succinct statement is more than sufficient to apprise DMI of plaintiffs' claims and to satisfy the pleading standards of F.R.C.P. 8.   But plaintiffs have provided even more detail -- plaintiffs also allege that DMI, acting with and through various of its subsidiaries,

10

established and controlled Al Shamal Bank, and that Al Shamal:

> regularly provided financial and account services to al Qaeda operatives -- six of whom held bank accounts at Al Shamal Bank. Osama Bin Laden paid al Qaeda members from Al Shamal Bank accounts. Moreover, money from these Al Shamal accounts was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Osama Bin Laden to be used to transport missiles.

*See Burnett* DMI More Definite Statement, ¶ 23; *see also WTCP* & *Euro Brokers* RICO Statements, Ex. A at 8; *Federal* RICO Statement, Ex. A at 12; *Cantor* RICO Statement at 1-3; *Continental* 2AC, Addendum at 136.  Plaintiffs further provide that two DMI subsidiaries were founders of Al Shamal, which bin Laden then capitalized with his own money. *Continental* 2AC, Addendum at 136.

These allegations are quite specific about DMI's role in providing assistance to Osama bin Laden and al Qaeda. No more is required at the pleading stage of this action.

**B.      Plaintiffs State Claims Against DMI under the Anti-Terrorism Act**

Under the ATA, DMI is liable if it provided material support to al Qaeda with knowledge of its terrorist agenda or if it aided and abetted al Qaeda or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002). DMI claims that plaintiffs have failed to allege that DMI provided material support to al Qaeda or bin Laden, and that plaintiffs fail to allege a causal connection between any acts of DMI and the September 11 attacks.  The complaints and RICO statements demonstrate otherwise.

As noted above, plaintiffs allege that DMI's misconduct includes laundering money for al Qaida, knowingly and intentionally providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda. Plaintiffs also allege that DMI "conspired with Osama bin Laden and al Qaida to raise,

launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks," *see O'Neill* FCC ¶ 22.   These allegations are plainly sufficient to state a claim for the provision of material support.   Indeed, this Court has already recognized that, under the ATA, "material support includes money [and] financial services . . . ." *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 825 (S.D.N.Y. 2005).

Plaintiffs also properly allege that DMI's support and assistance was a proximate cause of the September 11 attacks.   Plaintiffs allege that "[t]he attacks of September 11, 2001 . . . could not have been accomplished without the knowing and intentional financial support lent to Al Qaeda and its leaders by a global network of banks, financial institutions, charities, relief organizations, businesses, individual financiers, foreign governments and foreign governmental officials." *EuroBrokers* Complaint ¶ 5; *accord* WTCP Complaint ¶ 1; *Cantor* 1AC ¶¶ 11, 92; Continental 1AC ¶ 29; *N.Y. Marine* 2AC ¶ 53; Federal 1AC ¶ 74; *Continental* 2AC ¶ 26.   *See also Boim*, 291 F.3d at 1021 ("[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence.").

DMI asserts that there is no indication, from the pleadings, that bin Laden's bank accounts in Sudan in the 1990's were in any way instrumental in the September 11 attacks, *see, e.g.,* DMI Trust *Burnett* Brf. at 14. But this Court has already held that "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In Re Terrorist Attacks*, 349 F.Supp.2d at 826.

Even if more specific allegations of causation were required, plaintiffs have provided

such allegations.  For example, plaintiffs allege that "During the early 1990s, while Osama bin Laden was being harbored in Sudan, al Qaeda grew into a sophisticated international terrorist organization," and that during this period "Osama bin Laden and al Qaeda became fully operational, expanding their terrorist network." *Burnett* 3AC at ¶¶ 474, 477.   New al Qaeda recruits "were given military training and sponsorship in training camps set up" in Sudan in the 1990's.  *Id.* at p. 211.   Indeed, plaintiffs allege that the funds raised and laundered with the assistance of DMI "were used to, among other things, operate terrorist training camps in Sudan, Afghanistan and elsewhere, at which some recruits were trained in conventional warfare but the best and most zealous recruits received terrorist training."  *Federal* RICO Statement at ¶ 14. Moreover, "[f]rom the ranks of these recruits the nineteen perpetrators of the [September 11] Attack were selected."  *Id.*   And, plaintiffs allege, "[n]one of this would have been possible without the support provided by participants and conspirators like Dar Al Maal Al Islami Trust and DMI Administrative Services, S.A."  *Id.*

Plaintiffs also allege that Al Shamal provided "overall support for the growing al Qaeda presence," and that, following Al Shamal's establishment, "[o]ver the next five years, terrorist training activities and recruitment fueled by these economic developments continued . . . ."  *Id.* Plaintiffs further allege that bin Laden's businesses in Sudan "enabled him to offer safe haven and employment in Sudan to al Qaeda members," *id.*  at ¶ 71, and that "Al Shamal Bank is an instrumental bank in Osama bin Laden's financial support network."  *Id.* at ¶ 365.  Fairly read, the complaints allege that Osama bin Laden arrived in Sudan with no terrorist organization to speak of; that, with the help of various banks and financial institutions, including DMI, he built a terrorist network and terrorist training camps from scratch while in Sudan; and that by the time he left Sudan for Afghanistan, he had a fully-functioning terrorist network that had begun

carrying out terrorist attacks, including the 1993 attack on American soldiers in Somalia, *see Burnett* 3AC at ¶ 481, and the 1993 attack on the World Trade Center, *see id.* at p. 212; *see also Continental* 2AC, Addendum at 135.

DMI claims that the September 11 attacks were not a foreseeable consequence of the money provided for al Qaeda to establish terrorist training camps, but this is nonsense.  This was not a summer camp that DMI was helping bin Laden set up, nor were bin Laden's goals a secret. It is entirely foreseeable that a terrorist training program will result in terrorist attacks.  It is also foreseeable that a terrorist training program whose avowed target is the United States will train terrorists to attack the United States.  That it took bin Laden several years to train those terrorists and to come up with the September 11 plot does not in any way reduce the causal connection between the camps where the terrorists were trained – and the funds that permitted those camps to be established – and the terrorist attacks that al Qaeda was ultimately able to carry out. Finally, as this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *In re Terrorist Attacks*, 349 F.Supp.2d at 829.

That DMI did not itself fly the planes on September 11, but rather acted in concert with al Qaeda, which actually carried out the terrorist attacks, does not insulate it from liability.  To begin with, by its own terms, the ATA applies to those who provide "material support" to terrorist organizations, and not merely to those who personally perpetrate terrorist attacks.  *See* 18 U.S.C. § 2339B.  Moreover, this Court has already recognized that concerted action liability "is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer ... are equally liable with him.'" *In re Terrorist Attacks*,

349 F.Supp.2d at 826, *quoting Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir.1998).  Here, as described above, plaintiffs have alleged all the elements necessary to satisfy the requirements of concerted action liability:  that DMI provided substantial assistance and/or encouragement and that it did so with knowledge of the wrongful nature of bin Laden's and al Qaeda's conduct. Both elements are specifically pleaded, *see, e.g., Burnett* More Definite Statement ¶ 22, 25-26; *WTCP* & *Euro Brokers* RICO Statements, Ex. A at 7, 8; *Cantor* RICO Statement ¶ 2; *O'Neill* FCC, Ex. P at ¶ 29; *see also Burnett* More Definite Statement ¶ 25.  No more is required at this stage of the case.

### C.    Plaintiffs' RICO Claims Should Not Be Dismissed

#### 1.    *The O'Neill Plaintiffs Have Standing To Assert RICO Claims.*

DMI challenges the standing of the *O'Neill* plaintiffs to pursue RICO claims, arguing that these Plaintiffs lack standing as their injuries are personal injuries.[5]  DMI's argument is flawed. Plaintiffs, in the FCC, specifically alleged that the Defendants intended to cause damage to business and property, and did in fact intend to cause damage to business and property.  *See O'Neill* FCC ¶¶ 176, 178-80.  The Plaintiffs further detailed certain elements of the damages: "including a. Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of prospective inheritance …."  *See O'Neill* FCC ¶ 146. Furthermore, in the *O'Neill* DMI More Definite Statement and the *O'Neill* RICO Statement filed in connection with the Defendant (now incorporated into the FCC as Exhibit P), the Plaintiffs elaborated on the various factual elements of such damages, which we submit are not required for Rule 8(f) notice pleadings, to include direct pecuniary losses, past and future wage losses and

---

[5] DMI also challenges the standing of the *Ashton* and the *Burnett* plaintiffs, but plaintiffs in those actions are not pursuing RICO claims against these defendants.

profits, losses of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. *See, e.g.*, FCC ¶¶ 146, 178, Ex. O at 14-15.   Accordingly, such allegations have not only met, but exceeded the pleading threshold set in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (*e.g.*, damages to tangible personal property).

### 2.  *The Complaints Properly State RICO Claims Against DMI*

Even where DMI concedes that plaintiffs have standing to assert RICO claims, DMI argues that plaintiffs' pleadings are insufficient.  DMI is wrong.  The *O'Neill* plaintiffs and the Property Damage plaintiffs have properly pled their RICO claims, which should not be dismissed.

Plaintiffs' complaints and RICO Statements assert RICO claims against DMI pursuant to 18 U.S.C. §§ 1962(c) and (d). The enterprise - the al Qaeda movement, also referred to as Radical Muslim Terrorism - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. *See Cantor* 1AC ¶¶ 35-42. Its well documented purpose is to perpetrate acts of terrorism. *See Federal* RICO Statement ¶ 5, *Cantor* 1AC ¶ 36; *WTCP* RICO Statement ¶ 8.  Thus, plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by DMI in the enterprise to sustain claims under both §§ 1962(c) and (d). A plaintiff asserting a civil claim under § 1962(c) must allege that the defendant participated in the operation or management of the enterprise. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983);

*Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). To sustain a claim under § 1962(d), the plaintiff must allege that the defendant was a "central figure" in the underlying scheme. *Id*. at 165. However, "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'" *United States v. Louie*, 625 F. Supp. 1327, 1333 (S.D.N.Y. 1985) (*citing* 18 U.S.C. § 1962(c)).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise."  *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994).

Here, the plaintiffs have satisfied these pleading standards. Plaintiffs allege that DMI conceived and carried out a calculated global campaign to finance al Qaeda operations. *Continental* 2AC, Addendum at 133-34; *Cantor* RICO Statement at 3; *O'Neill* FCC, Ex. P at ¶¶ 7-10; *WTCP* RICO Statement ¶ 14 & Ex. A.  Thus, DMI's financial relationship with al Qaeda satisfies the 1962(c) operation or management test. *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir. 1988); (carrying bribes to judges constitutes association with enterprise); *Casperone v. Landmark Oil & Gas Corp*., 819 F.2d 112, 115 (5th Cir. 1987) (attorney providing legal services to enterprise associated with enterprise); *State of New York v. O'Hara*, 652 F. Supp. 1049, 1053 (W.D.N.Y. 1987) (submitting bids to city enterprise satisfies association test).

In addition, plaintiffs sufficiently plead that DMI conducted or participated in the affairs of the al Qaeda enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1961 (defining racketeering activity to include the provision of "material support" to terrorists under

17

18 U.S.C. §§ 2339A and 2339B, such as sending currency or giving financial services, and alternatively, "directly or indirectly" providing or "collecting" funds earmarked for terrorism under 18 U.S.C. § 2339C). Plaintiffs assert that DMI financially participated in al Qaeda's global operations, and specifically furthered al Qaeda's goal of committing acts of terrorism against the United States, by knowingly and intentionally laundering money for al Qaeda, providing financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and/or facilitating weapons and military equipment purchases and money transfers for al Qaeda, all of which were relied upon by Al Qaeda to prepare for and commit the September 11th attacks. *Continental* 2AC, Addendum at 134; *Cantor* RICO Statement at 2; *WTCP* RICO Statement, Ex. A at 7. Plaintiffs further allege that DMI participated in al Qaeda's affairs by collecting and distributing funds used by Al Qaeda, engaging in financial transactions for, and advertising, maintaining and servicing accounts on behalf of, several of al Qaeda's known charity fronts and entering into business partnerships with prominent al Qaeda supporters. *Continental* 2AC, Addendum at 134; *Cantor* 1AC ¶ 190, 235; *O'Neill* FCC ¶ 45. *See Zola v. Gordon*, 685 F. Supp. 354 (S.D.N.Y. 1988) ("Civil RICO liability can be predicated on aiding and abetting the commission of the predicate acts by the primary offender."); *131 Main Street Assoc. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995) ("One might reasonably infer intent to aid a primary violation from allegations of substantial assistance.").

Plaintiffs also have adequately alleged proximate cause under RICO — that the defendant's injurious conduct is both the factual and the proximate cause of plaintiffs' injury. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003). Here, plaintiffs allege that they were directly harmed by DMI's participation in al Qaeda's campaign to attack the United States,

and in particular, by its provision of "material support and resources to al Qaeda." *Cantor* RICO Statement at 3, 5, 6; *see also WTCP* RICO Statement ¶¶ 15-17; *Federal* RICO Statement ¶¶ 15-17.   As noted above, plaintiffs further allege that, absent the material support and resources provided by DMI, al Qaeda would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack.  *See* Point I.B, *supra*.  These allegations more than satisfy plaintiffs' burden at the pleading stage, as "[t]he legal concept of proximate causation mandates a multifaceted and highly fact-specific inquiry," and dismissal at the pleadings stage of a RICO claim is therefore imprudent.  *National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 225 (E.D.N.Y. 1999).[6]

### D.   DMI Is Not Entitled to Dismissal of Plaintiffs' Other Claims

The remainder of plaintiffs' claims similarly ought not be dismissed.[7]   Many of DMI's

---

[6]  In a RICO case, this Court's decision "should be guided by a flexible, case-by-case approach." *National Asbestos Workers*, 74 F.Supp.2d at 225, *citing Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983) and *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992). Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static: as society, its needs, and its norms change, so too must the contours of tort liability and enforcement procedures." *Id.* Further, failure to explain the alleged injury in detail is not fatal. *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986). Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6). *Id.* The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts." *Id.* (citations omitted).

[7]  Plaintiffs recognize that this Court has already held that the Torture Victims Protection Act, 28 U.S.C. § 1350 note ("TVPA") provides a cause of action only against individuals. *See In Re Terrorist Attacks*, 349 F.Supp.2d at 828. Similarly, in *Burnett v. Al Baraka Invest. & Develop. Corp.*, 274 F. Supp. 2d 86, 108-109 (D.D.C. 2003), the court dismissed the *Burnett* plaintiffs' negligence claims against certain defendants on the basis that defendants owed no duty to plaintiffs. This Court has reached a similar conclusion.  *See also In re Terrorist Attacks*, 349 F.Supp.2d at 830-31. Plaintiffs respectfully disagree with these rulings and refer this Court to the prior briefing on these issues.

In addition, defendant argues for the dismissal of claims for contribution and indemnity by plaintiff Port Authority of New York and New Jersey ("Port Authority").  The Port Authority's legal and factual arguments in support of its contribution and indemnity claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein.  *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic (footnote continued on next page)

arguments to the contrary are entirely derivative of its arguments concerning causation, addressed here in connection with plaintiffs' ATA claims. Thus, DMI argues that plaintiffs claims under the Alien Tort Claims Act ("ATCA")[8], and their claims for Wrongful Death and Survival should be dismissed because plaintiffs have failed to allege an underlying tort and, additionally, with respect to the ATCA, because plaintiffs have not alleged that DMI participated in the tort.   As described above, however, plaintiffs have sufficiently alleged DMI's role in supporting al Qaeda and its responsibility for the terrorist acts that resulted from the support to satisfy the pleading requirements for plaintiffs' underlying tort claims (including claims for Wrongful Death and Survival) *and* for plaintiffs claims under the ATCA.   In the same vein, DMI argues that claims for Intentional Infliction of Emotional Distress should be dismissed because plaintiffs have not alleged that DMI engaged in any wrongful conduct or that the conduct was outrageous.  This argument is not merely wrong, it is offensive; providing support to terrorist training camps is both wrongful *and* outrageous and plaintiffs are entitled to call DMI to account for this conduct.

DMI also argues that it cannot be liable for Trespass or for Assault because it did not directly carry out these acts.  As noted above, however, DMI may be held liable for aiding and abetting al Qaeda.  Nor are plaintiffs' claims for assault and battery and for intentional infliction of emotional distress time-barred, for two reasons. First, these claims are subsumed within

---

Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112).

[8]   Plaintiffs have pleaded these claims under the ATCA, but the source of these claims is perhaps more accurately described as being "the law of nations," or international law.  *See* 28 U.S.C. § 1350; *see also Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2755-59 (2004).   Nonetheless, for consistency with the pleadings and prior briefings, plaintiffs continue to refer to these claims are claims under the ATCA.  The legal and factual arguments in support of Plaintiffs' ATCA claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein.  *See, e.g.*, Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112).

plaintiffs' claims under the Anti-Terrorism Act, which imports into that federal cause of action "the remedies of American tort law." *See* 137 Cong. Rec. S4511 04 (April 16, 1991); *see also Boim*, 291 F.3d at 1010 (language and history of ATA "evidence[] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"). To the extent that these claims have been "federalized" under the Anti-Terrorism Act, they are governed by federal law. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute).[9]   State statutes of limitation are inapplicable to federal common law claims. *See Jones v. R.R. Donnelly & Sons Co.*, 124 S. Ct. 1836 (2004). *See also Louisiana Land & Exploration Co. v. Unocal Corp.*, 863 F. Supp. 306, 309 (E.D. La. 1994) (holding that suits to enforce equitable rights created by federal law are not subject to state statutes of limitations, even when brought by private parties).

Moreover, all of plaintiffs' claims arise from DMI's s participation in the conspiracy to conduct terrorist attacks against the United States, a conspiracy designed to hide the identity of the participants from disclosure to the outside world. As a result, the statute of limitations was tolled until plaintiffs reasonably should have become aware of DMI's involvement within the conspiracy, itself a question of fact to be determined through discovery. *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D.N.Y. 2004); *see also*. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid

---

[9] Should plaintiffs' claims under the ATA fail for any reason, however, the common law claims also exist as separate claims arising under state law.

inequitable circumstances").

Finally, DMI seeks dismissal of plaintiffs' claim for punitive damages on the ground that, under New York law, punitive damages are a remedy, not a cause of action. DMI presents no argument that plaintiffs are not entitled to recover punitive damages in this lawsuit.[10] Since it is clear that punitive damages are available in connection with the claims that plaintiffs assert, and because the question of what law governs plaintiffs' claims remains open, this Court should not dismiss plaintiffs' claim for punitive damages because of this technicality of New York law. The same is true with respect to plaintiffs' claims for conspiracy. If plaintiffs have properly pleaded a conspiracy theory of liability against DMI , the claim should not be dismissed at this time merely because, under New York, this is an alternate basis of liability rather than a separate claim, as it may turn out that New York law does not govern plaintiffs' claims.

## II.   THIS COURT HAS JURISDICTION OVER DMI S.A.

### A.   A Non-Resident Alien Without Substantial Contact with the United States May Not Invoke the Protections of the Fifth Amendment

DMI S.A.'s argument that this Court lacks jurisdiction under F.R.C.P. 4(k)(2) proceeds from the assumption that the assertion of jurisdiction over it must comport with the guarantee of "due process" found in the Fifth Amendment to the Constitution.[11]   But, as the D.C. Circuit recently reminded, "The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." *Jifry v. F.A.A,* 370 F.3d 1174 (D.C. Cir. 2004), *citing Johnson v. Eisentrager*, 339 U.S. 763, 771

---

[10]   Plaintiffs are fully entitled to recover punitive damages with respect to their ATCA claims. *Filartiga v. Pena*, 577 F. Supp. 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law); *Paul v. Avril*, 901 F. Supp. 330, 335-36 (S.D. Fla. 1994) ("Both compensatory and punitive damages are recoverable for violations of international law) (*citing Filartiga*,  577 F.Supp. 860).

[11] DMI Trust has not challenged this Court's jurisdiction.

(1950); *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886);  *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); *Pauling v. McElroy*, 278 F.2d 252, 253 n. 3 (D.C.Cir.1960).  *See also U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990) (aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country). If DMI S.A. is entirely lacking in contact with the United States, it has no rights under the Fifth Amendment and, accordingly, the "due process" clause places no limits on this Court's exercise of jurisdiction under Rule 4(k)(2).  *See Baker v. Great Socialist People's Libyan Arab Jamahiriya*, Civil Action No. 03-749, *slip op.* at 10-11 (D.D.C. June 30, 2005) (A copy of the *Baker* decision is annexed hereto as Appendix 2).

### B.      DMI S.A. Has Sufficient Contact with the United States Because It Purposefully Directed Its Conduct Here

Alternatively, if DMI S.A. is entitled to due process protection under the Constitution, DMI S.A. is subject to personal jurisdiction under Rule 4(k)(2) here because, in providing support to Osama bin Laden and al Qaeda, which had long publicly announced its intentions to attack the United States, DMI S.A. purposefully directed its conduct here.[12]

The Supreme Court has held that, with respect to personal jurisdiction, each case should be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The issue is whether the defendant should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

---

[12]   The "minimum contacts" required to satisfy the requirements of due process where jurisdiction is invoked under Rule 4(k)(2) are with the United States as a whole.  *See In re Terrorist Attacks*, 349 F.Supp.2d at 807; *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001).

297 (1980); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987). The Supreme Court has further stated that reasonableness "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985); *see Palestine Info. Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements"). The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the horrific manner in which U.S. residents were attacked for no reason other than that they were in the United States. The policies of "fair play" and "substantial justice" cannot be applied without recognizing the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims. However, the case law makes clear that where terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the exercise of jurisdiction. *In Re Terrorist Attacks*, 349 F.Supp. 2d. 765, 807-12 (2005).

        In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if none of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984). The *Calder* court held that jurisdiction was warranted because the defendants' intentional, and allegedly tortious, actions were "expressly aimed at" the forum." *Id*. Because they knew that plaintiff would suffer injury in the state in which she lived and worked, the Court held that defendants should "reasonably anticipate being haled into court there to answer for" their tortious conduct. 465 U.S. at 790. *See also Rein v. Socialist People's Libyan*

*Arab Jamahiriya*, 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) (Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) (where plane that defendants destroyed was on an international flight and expected to stop in several nations before reaching its final destination, individual defendants "could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die," including courts of the U.S., as it was foreseeable that some Americans would be on board); *Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns).

These cases provide the relevant analysis here. DMI is alleged to have knowingly and intentionally provided material support to Osama bin Laden and al Qaeda.  In so doing, it purposefully directed its conduct at the United States, bin Laden's avowed target.  This conduct is sufficient to subject it to jurisdiction here.[13]

---

[13]  In *Pugh*, the defendants were found to have purposefully directed their conduct at the U.S. even though the plane they attacked was a French carrier and the flight was not scheduled to, nor did it, take off or land in the U.S. Here, the entire September 11 attack was focused specifically on the U.S.  Moreover, in *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans took place abroad. In none of the three cases were the defendants alleged to have taken any steps in the U.S. in furtherance of the plots. In all three cases, however, the court found that defendants had sufficiently targeted Americans, and that defendants had sufficient notice that U.S. law and U.S. courts would subject them to liability so that the assertion of personal jurisdiction was constitutional. Here, the attacks in question took place on American soil and were thus specifically focused on the U.S.

## CONCLUSION

For the foregoing reasons, this Court should deny DMI's motions to dismiss in their entirety.

Dated: New York, NY              Respectfully submitted,
       December 19, 2005

                       /s/_____
                       Ronald L. Motley, Esq. (RM-2730)
                       Jodi Westbrook Flowers, Esq.
                       Donald A. Migliori, Esq.
                       Michael Elsner, Esq. (ME-8337)
                       Justin B. Kaplan, Esq.
                       MOTLEY RICE LLC
                       28 Bridgeside Boulevard
                       P.O. Box 1792
                       Mount Pleasant, South Carolina 29465
                       Telephone:  (843) 216-9000

                       James P. Kreindler, Esq.
                       Justin T. Green, Esq.
                       Andrew Maloney, Esq.
                       KREINDLER & KREINDLER LLP
                       100 Park Avenue
                       New York, New York 10017-5590
                       Telephone: (212) 687-8181

                       Stephen A. Cozen, Esq.
                       Elliott R. Feldman, Esq.
                       Sean P. Carter, Esq.
                       Adam C. Bonin, Esq.
                       COZEN O'CONNOR
                       1900 Market Street
                       Philadelphia, PA 19103
                       Tele: (215) 665-2000

                       Paul J. Hanly, Jr., Esq. (PH-5486)
                       Jayne Conroy, Esq. (JC-8611)
                       Andrea Bierstein, Esq. (AB-4618)
                       HANLY CONROY BIERSTEIN & SHERIDAN, LLP
                       112 Madison Avenue
                       New York, NY 10016
                       Telephone:  (212) 784-6400

Plaintiffs' Executive Committees
on behalf of all Plaintiffs

# Appendix 1

**Motions to Dismiss Filed by DMI Trust and DMI S.A.:**

| MDL Docket # | Defendant | Cases to Which Motion Applies |
|---|---|---|
| 1375 | DMI Trust | *Ashton*, 02 CV 6977 |
| 1400 | DMI Trust | *Burnett*, 03 CV 5738 <br> *Burnett*, 03 CV 9849 |
| 1373 | DMI Trust | *Cantor Fitzgerald*, 04 CV 7065 |
| 1264 | DMI Trust | *Continental Casualty*, 04 CV 5970 <br> *New York Marine*, 04 CV 6105 |
| 1402 | DMI Trust | *Federal Ins.*, 03 CV 6978 |
| 1404 | DMI Trust | *O'Neill*, 04 CV 1923 |
| 1397 | DMI Trust | *World Trade Center Properties*, 04 CV 7280 <br> *Euro Brokers*, 04 CV 7279 |
| 1239 | DMI S.A. | *Burnett*, 03 CV 5738 <br> *Burnett*, 03 CV 9849 |
| 1262 | DMI S.A. | *Federal Ins.*, 03 CV 6978 |
| 1241 | DMI S.A. | *World Trade Center Properties*, 04 CV 7280 <br> *Euro Brokers*, 04 CV 7279 |

**Operative Pleadings:**

| Case | Pleadings |
|---|---|
| *Ashton* | Sixth Amended Complaint ("*Ashton* 6AC") |
| *Burnett* | Third Amended Complaint ("*Burnett* 3AC"); Plaintiffs' More Definite Statement As To Defendants DMI Administrative Services S.A. and Daar Al-Maal Al-Islami Trust ("*Burnett* More Definite Statement") |
| *Cantor Fitzgerald* | First Amended Complaint ("*Cantor* 1AC"); RICO Statement ("*Cantor* RICO Statement") |
| *Continental Casualty* | Second Amended Complaint ("*Continental* 2AC")[1] |
| *Euro Brokers* | Complaint ("*Euro Brokers*"); RICO Statement ("*Euro Brokers* RICO Statement") |
| *Federal Insurance* | First Amended Complaint ("*Federal* 1AC"); Amended RICO Statement ("*Federal* RICO Statement") |
| *New York Marine* | Second Amended Complaint ("*N.Y. Marine* 2AC"); *Federal* RICO Statement (adopted and incorporated by reference into *N.Y. Marine* 2AC, *see* 2AC ¶ 290 n.35. |
| *O'Neill* | *O'Neill v. Al Baraka* First Consolidated Complaint ("*O'Neill* FCC"). |
| *WTCP* | Complaint ("*WTCP*"); RICO Statement ("*WTCP* RICO Statement") |

---

[1]  As set forth in the accompanying Declaration of Robert M. Kaplan, DMI contends that the *Continental* 2AC was not filed until October 6, 2005, and thus was untimely under CMO #2.  In fact, the date- and time-stamped cover sheet of the Second Amended Complaint shows that the document was timely filed on September 30, 2005 at 6:39 p.m.  *See* Kaplan Dec., Ex. A.

Appendix 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

PATRICK SCOTT BAKER, <u>et</u> <u>al.</u>,          )
                                                )
              Plaintiffs,                        )
                                                )
      v.                                         )
                                                )          Civil Action No. 03-749 (GK)
GREAT SOCIALIST PEOPLE'S                         )
LIBYAN ARAB JAMAHIRIYA, _____ )
<u>et</u> <u>al.</u>,                                      )
                                                )
              Defendants.                        )
                                                )

---

<u>MEMORANDUM OPINION</u>

Plaintiffs, three of the passengers on board EgyptAir Flight 648, which was hijacked by the Abu Nidal Organization ("ANO") on November 23, 1985, and their families,[1] bring this suit against various foreign Defendants[2] under the state-sponsored terrorism

---

[1] Plaintiffs are EgyptAir Flight 648 passenger Patrick Scott Baker; Jerry Baker; Lois Baker; Craig Baker; Craig Baker, as the Personal Representative for the Estate of David Baker; Stacie Baker; Hetty E. Peterson, as Executrix and Successor in Interest of the Estate of EgyptAir Flight 648 passenger Scarlett M. Rogencamp; Patricia A. Henry, as Guardian of Hetty E. Peterson; Valerie Peterson, as Executor of the Estate of Vernon W. Peterson; Patricia A. Henry; Katharine D. Doris; Paul G. Peterson; Michelle Y. Holbrook; EgyptAir Flight 648 passenger Jackie Nink Pflug; Jim Olsen; Jim Olsen, as Friend and Next of Kin of Tanner Olsen; Rylma Nink; Eugene Nink; Gloria Nink; Mary Nink; and Scott Pflug.

[2] Defendants are the Great Socialist People's Libyan Arab Jamahiriya ("Libya"); Libyan Internal Security ("LISO"); Libyan External Security ("LESO"); Mu'ammar al-Qadhdhafi, Supreme Leader of Libya; Major Abdallah al-Sanusi, Chief of LISO; and Ibrahaim al-Bishari, Chief of LESO. The Syrian Arab Republic ("Syria"); Syrian Air Force Intelligence; and General Muhammed Al Khuli, Chief of Syrian Air Force Intelligence were originally named as Defendants. On October 16, 2003, however, a default judgment was entered against them. The Republic of Iraq ("Iraq"); General Intelligence; (continued...)

exception, 28 U.S.C. § 1605(a)(7), to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602, et seq..

This matter is now before the Court on the Motion to Dismiss filed by Libya, LISO, LESO, Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari.[3]  Upon consideration of the Motion, Opposition, Reply, Surreply, and the entire record herein, and for the reasons stated below, the Libyan Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

**I.   BACKGROUND**

On November 23, 1985, three ANO terrorists boarded EgyptAir Flight 648 in Athens, Greece "for the purpose of accomplishing the mission of hijacking the plane."  Pls.' More Definite Statement ¶ 5.  A typically multinational and multicultural mix of passengers, including three Americans, Plaintiff Patrick Scott Baker, Plaintiff Jackie Nink Pflug, and decedent Scarlett M. Rogencamp, was on board the plane.  Id. ¶¶ 7, 8.  Twenty-two minutes into the flight, the terrorists hijacked the plane "us[ing]

---

[2](...continued)
Military Intelligence; Saddam Hussein, then-President of Iraq; Major General Sabir Abde al-Aziz al Duri, Chief of General Intelligence; Colonel Abd Hasan al Majid, Chief of General Intelligence; and Major General Fanar Zibin Hasam al Tikriti, Chief of Military Intelligence, were also originally named as Defendants. On March 3, 2004, however, they were voluntarily dismissed from the Complaint for inability to serve them.

[3] These Defendants are collectively referred to herein as the "Libyan Defendants."  Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari are collectively referred to herein as the "individual Defendants."

weapons provided by Libyan government agents which had been transported in Libyan diplomatic pouch(es)." Id. ¶ 9. The hijackers then instructed the passengers to surrender their passports. Id. ¶ 20.

A shootout then ensued between an Egyptian Sky Marshall and one of the hijackers. Id. ¶ 21. The shootout resulted in the death of a hijacker, the wounding of the Sky Marshall and two stewardesses, and the piercing of the fuselage. Id. The plane was subsequently diverted to Malta. Id. At first, the tower at Malta's International Airport refused to allow the plane to land, but the Maltese authorities relented after the pilot informed them that the plane was in imminent danger of crashing into the sea as it was nearly out of fuel. Id. ¶ 22. The hijackers forced the pilot to land the plane in Malta on a runway without lights and with a gun to his head. Id. ¶ 23. The tower ordered the pilot to taxi to a remote parking area; four police buses then blocked both ends of the runway. Id. ¶ 24.

The hijackers demanded that the Maltese airport authorities refuel the plane, but they refused. Id. ¶¶ 25, 26. In response, the hijackers threatened to shoot one passenger every fifteen minutes until they acquiesced. Id. ¶ 27. Meanwhile, at the pilot's request, the hijackers agreed to release eleven women: seven Filipinos and four Egyptians. Id. ¶ 28.

The hijackers then asked the two Israeli women on board the plane to identify themselves. Id. ¶ 29. In response, Tamar Artzi, one of the Israeli women on board, stepped forward, thinking that

-3-

she too would be released.  She was, however, shot in the head
thrown from the plane and onto the tarmac.[4]  Id. ¶ 30.  The
hijackers identified Nitzan Mendelson, the other Israeli woman on
board the plane, from her passport photo.  They tied her hands and
dragged her to the open doorway of the plane where they shot her in
the head and threw her body onto the tarmac.[5]  Id. ¶ 33.

According to Plaintiffs, the three American passengers on
board the plane were "[n]ext on the terrorist agenda."  Id. ¶ 35.
Plaintiffs claim that "[t]he terrorists had specific advance
instructions to use the American passengers in their attempt to
obtain fuel to fly the plane to their desired destination, and to
kill each of them if their demands were not met."  Id.  One by one,
each of the Americans were brought to the front of the plane where
they were shot in the head and then thrown out of the plane and
onto the tarmac.  Id. ¶ 36.

Patrick Scott Baker was the first American to be shot and
thrown from the plane onto the tarmac.  While he was injured and
laying on the tarmac, the hijackers actually carried him back up
the stairs, only to shoot him again and throw him back down.  This
time, Mr. Baker pretended he was dead and waited for the hijackers
to return to the plane.[6]  Id. ¶ 37.  Scarlett M. Rogencamp was
next.  She, like the three prior victims, was shot in the head and

---

[4] Ms. Artzi survived her injuries.  Id. ¶ 34.

[5] Ms. Mendelson never regained consciousness.  She was
pronounced dead three days later.  Id. ¶ 34.

[6] Mr. Baker survived his injuries.  Id. ¶ 37.

thrown from the plane onto the tarmac.[7]  Finally, Jackie Nink Pflug was shot in the head and thrown from the plane onto the tarmac.[8]  Plaintiffs claim that "[e]ach time the leader of the terrorists shot a passenger, he danced and sang and made jokes to his comrades."  Id. ¶ 42.

Twenty-four hours after the hijacking began, Egyptian troops stormed the plane.  Id. ¶ 43.  Fifty-seven additional passengers died during the rescue attempt.  Id. ¶ 44.

According to Plaintiffs, "[a]t the time of the hijacking, the [ANO] had previously received and was then receiving direct and/or material support from defendants, Libya and Syria."  Id. ¶ 11.  See id. ¶¶ 12-19.  Specifically, they claim that "[t]he substantial material support to and sponsorship of ANO by the government of Libya included, but [was] not limited to, assisting and/or providing the following: (a) funds, (b) facilities, (c) airline tickets, (d) free and unobstructed entry into, safe haven in, and exit from Libya by members of ANO, (e) terrorist training in Libyan camps, (f) use of the privilege of Libya's 'diplomatic pouch,' (g) use of Libya's diplomatic freight privileges, (h) official documents of all kinds, and (i) actual operational assistance in pre-positioning of people and supplies for the conduct of the hijacking of Flight 648."  Id. ¶ 2.  See id. ¶¶ 14-19.  Plaintiffs also claim that "[t]he sponsorship [of ANO] by the government of

---

[7] Ms. Rogencamp did not survive her injuries.  Id. ¶ 39.

[8] Ms. Pflug survived her injuries but she continues to suffer from permanent and severe brain damage.  Id. ¶ 41.

Syria included, <u>inter</u> <u>alia</u>, the providing of training in Syrian sponsored ANO terrorist training camps, military and general intelligence, [and] safe haven and free passage in and through Syrian controlled territory." <u>Id.</u> ¶ 3. <u>See</u> <u>id.</u> ¶¶ 12, 13.

On March 25, 2003, Plaintiffs filed the instant action seeking recovery against all Defendants for battery, assault, false imprisonment, wrongful death, intentional infliction of emotional distress (including solatium), civil conspiracy and aiding and abetting. <u>See</u> Compl. ¶¶ 81-94, 98-103. In addition, they asserted claims against all Defendants for survival damages; economic damages; and punitive damages. <u>See</u> <u>id.</u> ¶¶ 95-97, 104-109. On May 12, 2004, the Libyan Defendants filed the instant Motion to Dismiss.

## II. STANDARD OF REVIEW

The Foreign Sovereign Immunities Act ("FSIA") renders a foreign state immune from suit unless the case falls within one of the statutory exceptions to immunity. <u>See</u> 28 U.S.C. §§ 1605, 1607. "'In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376 F.3d 1123, 1131 (D.C. Cir. 2004) (quoting <u>Phoenix Consulting, Inc. v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000) (internal quotation and citations omitted)). A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that the plaintiff can prove no set

-6-

of facts in support of her claims that would entitle her to relief. See Peterson v. Royal Kingdom of Saudi Arabia, 332 F.Supp.2d 189, 195 (D.D.C. 2004) (citing Daliberti v. Republic of Iraq, 97 F.Supp.2d 38, 42-43 (D.D.C. 2000)).

On a motion to dismiss a FSIA case, a defendant may challenge either the legal sufficiency or the factual underpinning of an exception to foreign-state immunity. Phoenix Consulting, 216 F.3d at 40. If a defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the court "should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." Id. at 39 (internal citations omitted). If, however, the defendant challenges the factual underpinning of the court's jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." Id. at 40. Instead, the "court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Id.

In the instant case, the Libyan Defendants challenge only the legal sufficiency of Plaintiffs' jurisdictional allegations. Thus, the Court must take Plaintiffs' factual allegations as true and determine whether they bring the instant case within the exception Plaintiffs have invoked to foreign-state immunity, namely, the state-sponsored terrorism exception, codified at 28 U.S.C.

-7-

§ 1605(a)(7), enacted as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (April 24, 1996).[9]  It provides that foreign sovereigns are not immune when

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605(a)(7).  This exception applies only if (1) the foreign state was designated by the State Department as a state sponsor of terrorism at the time the act occurred or was designated as such as a result of such an act; (2) the foreign state was afforded a reasonable opportunity to arbitrate the claim regarding an act which occurred within that state's borders; and (3) either the claimant or the victim was a United States national at the time the act occurred.  Id. §§ 1605(a)(7)(A)-(B).

## III. ANALYSIS

   A.   **The Court Has Personal Jurisdiction Over Libya and the Non-Resident Alien Individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-**

---

[9] Our Circuit has noted that this standard is similar to that applied under Federal Rule of Civil Procedure 12(b)(6), where dismissal is warranted only if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002).

**Bishari because the Due Process Protections of the Fifth Amendment Do Not Extend to Those Defendants**

While the Libyan Defendants challenge the Court's assertion of personal jurisdiction over Libya as violative of the Due Process Clause of the Fifth Amendment, they acknowledge that our Circuit has recently conclusively held that foreign states may not cloak themselves in the protections of the Due Process Clause of the Fifth Amendment. See TMR Energy Ltd. v. State Property Fund of Ukraine, -- F.3d --, 2005 WL 1412415 at *3 (D.C. Cir. 2005) ("it is not to the due process clause but to international law and to the comity among nations, as codified in part by the FSIA, that a foreign state must look for protection in the American legal system") (citing Price); Price, 294 F.3d at 99 ("[W]e are unwilling to interpret the Due Process Clause as conferring rights on foreign nations that States of the Union do not possess.  Neither the text of the Constitution, Supreme Court decisions construing the Due Process Clause, nor long standing tradition provide a basis for extending the reach of this constitutional provision for the benefit of foreign states.").  In light of our Circuit's clear and binding precedent on this point, the Court concludes that it has personal jurisdiction over Libya.

The Libyan Defendants also challenge the Court's assertion of personal jurisdiction over the individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari on the ground that they "lack[] minimum contacts with the United States."

-9-

Def.s' Mot. at 6.  This challenge fails because it is premised upon the flawed assumption that the due process protections of the Fifth Amendment are available to these Defendants.[10]

In fact, however, "[t]he Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections." Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (internal citations omitted).  See People's Mojahedin Org. of Iran v. United States Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) ("'[A]liens receive constitutional protections only when they have come within the territory of the United States and developed substantial connections with this country.'") (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271 (1990)).  By their own admission, the individual Defendants in this case "have no presence in the United States, do not conduct any businesses in the United States, either directly or through an agent, and do not have any affiliating contacts with the United States." Def.s' Mot. at 6. The individual Defendants in this case may not, therefore, claim

_____

[10] Due process requires that if, as in this case, "the defendant is not present within the forum territory, ... 'he have certain minimum contacts with [the forum territory] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" El-Hadad v. Embassy of the United Arab Emirates, 69 F.Supp.2d 69, 78 (D.D.C. 1999) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Here, Defendants do not have even the minimum contacts with the United States that would entitle them to Fifth Amendment protections.

-10-

the due process protections of the Fifth Amendment.[11]  Accordingly, the Court concludes that it has personal jurisdiction over the non-resident alien individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari.[12]

      **B.**    **The Court Has Subject-Matter Jurisdiction because Plaintiffs' Allegations of Libya's General Sponsorship of ANO Are Sufficient to Bring Libya within the State-Sponsored Terrorism Exception to Foreign Sovereign Immunity**

---

[11] The Libyan Defendants cite <u>Pugh v. Socialist People's Libyan Arab Jamahiriya</u>, 290 F.Supp.2d 54, 58 (D.D.C. 2003), in support of their claim that the individual Defendants "are entitled to the protections of the Due Process Clause of the Constitution." Def.s' Reply at 2.  <u>Pugh</u>, however, is distinguishable, given that the individual Defendants in this case, by their own admission, "have no presence in the United States."  Def.s' Mot. at 6.  <u>See</u> <u>Pugh</u>, 290 F.Supp.2d at 58 ("[A]lien individuals, even suspected terrorists -- <u>at least those who have a 'presence' in the United States</u> -- are [] entitled ... to the protections of the Due Process Clause of the United States Constitution.") (emphasis added).

[12] The Libyan Defendants argue that "[t]he 1996 Amendment to the FSIA is unconstitutional in that it grants personal jurisdiction over an individual defendant simply through service of process, under 28 U.S.C. § 1608, absent and without regard for any of the <u>constitutionally</u> required contacts." Def.s' Mot. at 11 (emphasis in original). However, in <u>TMR Energy Ltd.</u>, -- F.3d --, 2005 WL 1412415 at *3, the Court of Appeals made it clear that "[t]he FSIA confers upon district courts subject matter jurisdiction as to 'any claim for relief in personam with respect to which the foreign state is not entitled to immunity,' 28 U.S.C. § 1330(a), and personal jurisdiction follows where proper 'service has been made under § 1608.'" (quoting 28 U.S.C. § 1330(a)).  <u>See</u> <u>Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543, 1548, n.11 (D.C. Cir. 1987) ("under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction").

The Libyan Defendants claim that the Court lacks subject matter jurisdiction because Plaintiffs have failed to show that the "material support or resources" provided by Libya to ANO was used by ANO to directly fund the specific acts giving rise to Plaintiffs' claims, as required by 28 U.S.C. § 1605(a)(7). Def.s' Mot. at 13.  Subsequent to the parties' briefing on this issue, this argument was rejected by our Court of Appeals in Kilburn.  The court reasoned that "imposing a jurisdictional requirement that a state sponsor's financial assistance to a terrorist organization must be directly traceable to a particular terrorist act would likely render § 1605(a)(7)'s material support provision ineffectual.   Money, after all, is fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records." Kilburn, 376 F.3d at 1130.  See Wyatt v. Syrian Arab Republic, 362 F.Supp.2d 103, 111, n.1 (D.D.C. 2005) ("A nation loses immunity even if the support it provides does not directly fund the particular terrorist act that injured or killed the victim.  The only requirement is that the provision of support proximately causes the terrorist act.") (citing Kilburn); Collett v. Socialist Peoples' Libyan Arab Jamahiriya, 362 F.Supp.2d 230, 236 (D.D.C. 2005) (same).  Consequently, the Libyan Defendants' argument that the material support provided by a foreign state to a terrorist organization must fund the specific acts that caused the alleged injury must be rejected.

-12-

The Court, therefore, concludes that it has subject matter jurisdiction because Plaintiffs' allegations of Libya's general sponsorship of ANO are sufficient to bring Libya within the state-sponsored terrorism exception to foreign sovereign immunity.

    **C.** **Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted but They Will Be Allowed to Amend Their Complaint**

        **1.** **Plaintiffs cannot state a valid cause of action against Libya under the Flatow Amendment through Section 1606**

In addition to challenging the Court's jurisdiction, the Libyan Defendants also seek dismissal of Plaintiffs' Complaint on the ground that Plaintiffs have failed to state a claim upon which relief can be granted.  In particular, they rely on Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004) which held that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government."  Plaintiffs respond that the Flatow Amendment should be read to apply to foreign states through 28 U.S.C. § 1606.[13]  See Pl.s' Opp'n at 23-29.  The reasoning of Judge Bates in his comprehensive opinion in Dammarell v. Islamic Republic of Iran, 2005 WL 756090 (D.D.C. 2005) persuasively demonstrates that Congress did not intend to create a cause of action against foreign states under the Flatow Amendment

_____

[13] 28 U.S.C. § 1606 states, in relevant part, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."

through Section 1606.   In <u>Dammarell</u>, the court rested its conclusion that Congress did not intend to allow the Flatow Amendment to be expanded to foreign states through Section 1606 on the following factors:

> (i) the text of the statute applies only to foreign state officials or agents but not the foreign state itself, (ii) the legislative history does not evince any intent that the statute would apply to foreign states, (iii) section 1605(a)(7) was enacted only five months before the statute, and the legislative history nonetheless does not indicate any anticipation or understanding that the statute would be applied to foreign states, and (iv) [] the statute does not obviously extend to private individuals within the meaning of section 1606.  Indeed, it would be odd if, as <u>Cicippio-Puleo</u> held, the combination of section 1605(a)(7) and the Flatow Amendment did not create a private right of action against foreign states, but the combination of section 1606 and the Flatow Amendment (despite congressional silence) somehow did.  For all these reasons, the cause of action in the Flatow Amendment cannot be read to apply to foreign states through section 1606.

<u>Id.</u> at 30.   <u>See also</u> <u>Roeder v. Islamic Republic of Iran</u>, 195 F.Supp.2d 140, 174 (D.D.C. 2002) (rejecting argument that plaintiffs "unambiguously have a cause of action against Iran by virtue of ... § 1606," because "the Supreme Court has made clear that this provision does not impact the substantive liability of a foreign government") (internal citation omitted).   For all the reasons discussed in <u>Dammarell</u>, the Court concludes that Plaintiffs cannot state a valid cause of action against Libya under the Flatow Amendment through Section 1606.

> **2.   Plaintiffs have failed to allege viable state or federal common law causes of action against Libya, LISO and LESO**

The Libyan Defendants also seek dismissal of the Complaint on the ground that Plaintiffs have asserted no state law causes of action.  See Def.s' Mot. at 15, n.5.

"Section 1605(a)(7) only removes the immunity of a foreign state; it does not itself describe a cause of action against the foreign state."  Dammarell, 2005 WL 756090 at *7 (citing Cicippio, 353 F.3d at 1033).  Thus, a plaintiff must look elsewhere for the source of her cause of action.

In the instant case, Plaintiffs maintain that causes of action exist under state common law.  See Pl.s' Opp'n at 30-31.  Although Plaintiffs state traditional, generalized claims for battery, assault, false imprisonment, intentional infliction of emotional distress, etc., they fail to specify whether these claims are grounded in state common law, state or federal statutory law, or foreign law.  See Bettis v. Islamic Republic of Iran, 315 F.3d 325, 332-333 (D.C. Cir. 2003).  The Complaint, therefore, fails to "identify a particular cause of action arising out of a specific source of law," and thus falls short of the standard set by the D.C. Circuit in Acree v. Republic of Iraq, 370 F.3d 41, 58-59 (D.C. Cir. 2004) (plaintiffs cannot state a right of action under the "generic common law" or merely "allude[] to the traditional torts ... in their generic form" but instead must "identify a particular cause of action arising out of a specific source of law").

However, in light of considerations of judicial economy and Plaintiffs' clearly stated desire to press their state law claims, see Pl.s' Opp'n at 30-31, the Court will allow Plaintiffs an opportunity to amend their Complaint to plead state law causes of action with the detail required by our appellate case law.[14]   See Cicippio, 353 F.3d at 1036 (allowing plaintiffs an opportunity to amend their complaint where they alleged only generic common law torts); Dammarell, 2005 WL 756090 at *32 (same); Simpson v. Socialist People's Libyan Arab Jamahiriya, 2005 WL 517850 at *1 (D.D.C.) (same); Welch v. The Islamic Republic of Iran, 2004 WL 2216534 at *4 (D.D.C.) (same); Owens v. Republic of Sudan, 2005 WL 724592 at *19 (D.D.C.) (same).

Plaintiffs in this case also maintain that causes of action exist under federal common law.   See Pl.s' Opp'n at 31-32.   In light of Bettis, supra, which cautioned against the creation of a

---

[14] The Libyan Defendants argue that Plaintiffs should identify "which one of the common laws of the fifty states of the Union they intend to rely on."  Def.s' Reply at 6.   The notice pleading standard of Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," does not require Plaintiffs to include their specific choice of law determination in their amended complaint. Fed. R. Civ. P. 8(a).  See Hanson v. Hoffman, 628 F.2d 42, 53 (D.C. Cir. 1980) ("The liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories.").  See also Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1118 (D.C. Cir. 2000) ("Under Rule 8, all that is required is that the complaint give [] the defendants fair notice of each claim and its basis.") (internal quotation and citation omitted). Moreover, the Court is "unaware of any law, either in the FSIA setting or out, that would require such a result."  Dammarell v. Islamic Republic of Iran, 370 F.Supp.2d 218, 221 (D.D.C. 2005).

federal common law remedy in this context,[15] the Court concludes that "federal common law should not serve as a rule of decision in the run of section 1605(a)(7) cases."[16]  <u>Dammarell</u>, 2005 WL 756090 at *23.

### D.  No Plaintiffs Will Be Dismissed from this Case for Failure to Allege a Valid Cause of Action

The Libyan Defendants argue that certain Plaintiffs should be dismissed from this case for failure to allege a valid cause of action.

Specifically, they claim that Valerie Peterson, as Executor of the Estate of Vernon W. Peterson, the father of EgyptAir Flight 648

---

[15] In <u>Bettis</u>, our Circuit noted that, because Section 1606 of the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," it in effect instructs federal courts "to find the relevant law, not to make it." <u>Bettis</u>, 315 F.3d at 333.  It then explained that federal courts could look to state common law to determine the meaning of a cause of action. <u>See id.</u> Thus, our Circuit appears to be "cautioning courts not to create new federal common-law claims for use against foreign sovereigns while at the same time condoning the use of pre-existing common-law claims." <u>Kilburn v. Republic of Iran</u>, 277 F.Supp.2d 24, 36 (D.D.C. 2003).

[16] <u>Dammarell</u> also articulated other persuasive reasons for this conclusion:

> [T]he Court does not find this to be one of the 'few and restricted' cases where it is appropriate to fashion federal common law as the rule of decision.  The desire for uniformity alone is not a sufficient reason to create federal common law, no other unique federal interest is implicated, and there is no significant conflict between some important federal policy or interest and the application of state law.

<u>Id.</u>, 2005 WL 756090 at *28.

passenger Scarlett M. Rogencamp, should be dismissed because "[i]t is unclear to [Defendants] how an estate of a deceased father can assert a cause of action for infliction of emotional distress and loss of solatium." Def.s' Mot. at 16.  They also claim that the Court should dismiss Scott Pflug, the ex-husband of EgyptAir Flight 648 passenger Jackie Nink Pflug, from this case because "an ex husband ... may not bring suit against [Defendants] for emotional distress or the loss of solatium as he is no longer married to her and there is no further legal obligation between the individuals." Id.  In addition, they claim that Jim Olsen, who married EgyptAir Flight 648 passenger Jackie Nink Pflug twelve years after the EgyptAir Flight 648 hijacking, and Jim Olsen, as Friend and Next of Kin of Tanner Olsen, Jackie Nink Pflug's son who was born twelve years after the hijacking, should be dismissed.  They argue that "[t]he assertion of a cause of action on behalf of a husband who married plaintiff Jackie Nink Pflung 12 years after the alleged incident, or a son born over 12 years after the incident for emotional distress and the loss of solatium has no basis under any relevant [] statutes."  Id.

In light of the Court's holding supra, that Plaintiffs have failed to state a claim upon which relief can be granted because their Complaint fails to plead state law causes of action with the detail required by our appellate case law, it would be premature to dismiss individual Plaintiffs from this case before Plaintiffs have

had an opportunity to amend their Complaint.  Accordingly, no Plaintiffs will be dismissed from this case for failure to allege a valid cause of action at this stage in the litigation.

   E.   **Plaintiffs May Not Bring a Claim for Punitive Damages Against LISO and LESO; They May Bring Such a Claim Against the Individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi and Ibrahaim al-Bishari**

   The Libyan Defendants argue that Plaintiffs may not sustain a claim for punitive damages against them pursuant to 28 U.S.C. § 1606.  Section 1606 of the FSIA provides, in relevant part, that "a foreign state, except for an agency or instrumentality thereof shall not be liable for punitive damages."  28 U.S.C. § 1606 (emphasis added).  Thus, while the FSIA does not permit the award of punitive damages against a foreign state,[17] see Weinstein v. Islamic Republic of Iran, 184 F.Supp.2d 13, 24, n.1 (D.D.C. 2002), it does allow for the award of such damages against an "agency or instrumentality thereof."[18]  Our Circuit has adopted "a categorical approach: if the core functions of the entity are governmental, it

_____

   [17] It is clear that the FSIA does not permit the award of punitive damages against Libya.  See 28 U.S.C. § 1606.

   [18] An "agency or instrumentality" of a foreign state means any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country."  28 U.S.C. § 1603(b).

is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 149-50 (D.C. Cir. 1994)).

The Libyan Defendants argue that LISO and LESO must be treated as the state of Libya itself rather than as its agent, and thus, that they may not be held liable for punitive damages.  Plaintiffs fail to respond to this argument.  See Pl.s' Opp'n at 36-37.  The Court thus treats the Libyan Defendants' argument as conceded.  See United States v. Real Property Identified As: Parcel 03179-005R, 287 F.Supp.2d 45, 61 (D.D.C. 2003) ("If the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded.") (internal citation omitted), and cases cited therein. Plaintiffs' claim for punitive damages against LISO and LESO must, therefore, be dismissed.  See Roeder, 333 F.3d at 234 (citing Transaero, Inc., 30 F.3d at 149-50).

It is, however, "well-settled that individuals who act in their official capacities on behalf of a foreign sovereign 'are considered agencies or instrumentalities of a foreign state.'" Global Index, Inc. v. Mkapa, 290 F.Supp.2d 108, 110 (D.D.C. 2003) (quoting Jungquist v. Sheikh Sultan Bin Khalifa, 115 F.3d 1020, 1027 (D.C. Cir. 1997)).  In the instant case, the Libyan Defendants

concede that "Plaintiffs have [] not asserted any causes of action against the individual Libyans named as defendants in their individual capacities[.]"  Def.s' Mot. at 14, n.4.  Accordingly, the Court concludes that Plaintiffs may sustain a claim for punitive damages against the individual Defendants Mu'ammar al-Qadhdhafi, Major Abdallah al-Sanusi, and Ibrahaim al-Bishari pursuant to 28 U.S.C. § 1606.

## III. CONCLUSION

Accordingly, for the foregoing reasons, the Libyan Defendants' Motion to Dismiss is **granted in part** and **denied in part.**

An Order will issue with this Memorandum Opinion.


June 30, 2005                         /s/_____
                                      GLADYS KESSLER
                                      United States District Judge