UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
: 03 MD 1570 (RCC)
: ECF Case
:
In re Terrorist Attacks on September 11, 2001 :
:
:
:
---------------------------------------------------------x

This document relates to: *Continental Casualty Co. et al. v. Al Qaeda Islamic Army*, 04-CV-5970 (RCC)

# RICO STATEMENT APPLICABLE TO DEFENDANT
# AL SHAMAL ISLAMIC BANK

Based on information currently available, plaintiffs submit this RICO Statement with respect to their claims against defendant Al Shamal Islamic Bank (the "Bank"). Given the complicated nature of the wrongdoing that led to the terrorist attack of September 11, 2001 (the "Attack"), much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned and verified through discovery and otherwise.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(c) and (d).

2.      This RICO Statement pertains to the Bank and the alleged misconduct and the basis for liability for said defendant is indicated on the attached Exhibit A.

3.      All known wrongdoers are named as defendants in this action. Plaintiffs separately will file RICO Statements with respect to the misconduct of these other defendants. Given the complicated nature of the wrongdoing that led to the Attack, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned through discovery and otherwise.

4.      The victims are Continental Casualty Company, Transcontinental Insurance Company, Transportation Insurance Company, Valley Forge Insurance Company, National Fire Insurance Company of Hartford and American Casualty Company of Reading, Pennsylvania. The plaintiffs are all insurance companies which insured properties and businesses which were located at or near the World Trade Center premises in New York City and were damaged as a result of the Attack. Plaintiffs' insureds suffered damages to their property interests and damages to their ability to conduct their business. Plaintiffs, pursuant to policies that were issued to the insureds, made payments to their insureds and as a result became subrogated to the

insureds and are now permitted to bring these claims for the damages to their insureds' property and business interests as well as for the damage to their own business and property.

5.  (a)

| | |
|---|---|
| conspiracy to commit murder | New York Penal Law § 105.15; New York Penal Law § 125.25(xi) |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| providing material support of terrorism | 18 U.S.C. §§ 2332B, 2339A and 2339B |

(b)  From the early 1990s to September 11, 2001, the Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaeda movement to perpetrate radical Muslim terrorism, which conspiracy culminated in the Attack.

The Bank used banking and financial operations to knowingly and intentionally provide financial services and material support to al Qaeda and its members, as well as organizations which it knew were providing material support to the Enterprise.

The Bank undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, Radical Muslim Terrorism and al Qaeda, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support it supplied.

The Bank agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts in furtherance of a pattern of racketeering activity in connection with the Enterprise.

(c) See Exhibit A.

Further, given the complicated nature of the wrongdoing by the Bank and others that led to the events of September 11, 2001, additional information relating to the circumstances constituting the activities of the Bank likely will be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO Statement as information is learned through discovery and otherwise.

(d) No.

(e) No.

(f)  The predicate acts form a pattern of racketeering in that they are repeated, continuous, and are a part of the Enterprise's regular way of doing business.  From the early 1990s through September 11, 2001, the Bank consistently and constantly laundered money, provided material support for terrorism, committed wire fraud and mail fraud and engaged in illegal transactions in monetary instruments.

(g)  The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each predicate act allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaeda, which conspiracy culminated in the Attack.

6.

(a)     The enterprise (the "Enterprise") is comprised of the defendants named in the Second Amended Complaint and is a collection of persons, organizations, businesses, and nations associated in fact.

(b)     The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaeda." Al Qaeda was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaeda had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  The Bank fit neatly into this framework by providing funding to and otherwise providing material support for the members of the Enterprise who ultimately engaged in the Attack.

(c)     No.

(d)     The Bank is associated with the Enterprise.

(e)      The Bank is a member of the Enterprise and is separate and distinct from the Enterprise.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. The Bank adopted the goal of furthering and/or facilitating the criminal activity of the Enterprise, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by the Bank is separate from the existence of radical Muslim terrorism, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Bank furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by having sufficient resources available to spread its ideology, to suppress other forms of Islam, and to attack its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by the Bank, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce, by imposing serious damage upon the national economy.

11. Not applicable.

12. Not applicable.

13. (a) The Enterprise "employs" certain individuals, only a few of whose identities are known, including defendant Bin Ladin.

(b) The liable "person" is the Bank and the "enterprise" is the association-in-fact of the defendants.

14. The history of the conspiracy behind radical Muslim terrorism could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaeda has relied on well-placed financial facilitators and logistical sponsors, including the Bank, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaeda also relied heavily on certain imams at mosques who were willing to divert the *zakat,* the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Sudan and Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other material assistance supplied by participants and conspirators like the Bank. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including the Bank. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaeda needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Bank and the other defendants. The Bank, with knowledge and intent, agreed to the overall objectives of the conspiracy, agreed to commit at least two predicate acts and agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out.

16. The Bank's uninterrupted financial and material support of terrorism, mail fraud, wire fraud, money laundering, and substantial assistance, enabled the Enterprise to plan, orchestrate, and carry out the Attack that injured plaintiffs. Therefore, the conduct of the Bank proximately resulted in the Attack. Plaintiffs suffered injury to their property by reason of the above conduct of the Bank.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff.

18. RICO, 18 U.S.C. §§ 1962(c), 1962(d).

19. Trespass.

20. Not applicable.

**EXHIBIT A**

The Bank, which began operations in 1990, was founded by, among others, defendants Sheik Saleh Abdullah Kamel and Al Baraka for Investment and Development. Initial shareholders of the Bank included the predecessor of defendant Benevolence International Foundation and defendants Al Baraka for Investment and Development, Sheik Saleh Abdullah Kamel, Faisal Islamic Bank of Sudan and Tadamon Islamic Bank.

A spokesman and shareholder for the Bank issued a statement in 1998 promoting jihad, urging "all those who are able to carry a gun to join the [military training] camps .... Jihad has now become an obligation that comes before any other duty."

The Bank knowingly and intentionally provided financial services to al Qaeda (including maintaining and servicing al Qaeda bank accounts and accounts used to fund and support al Qaeda), and facilitating weapons and military equipment purchases for al Qaeda.

Osama Bin Laden used the Bank extensively during his five-year stay in Sudan. At the invitation of Hassan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at the Bank used by these front companies and al Qaeda. Bin Laden invested $50 million in the Bank.

The Bank regularly provided financial and account services to al Qaeda operatives, six of whom held bank accounts at the Bank. Bin Laden paid al Qaeda members from accounts at the Bank. Moreover, money from these accounts at the Bank was deposited, housed, and transferred to other al Qaeda members to buy military equipment including an airplane which was delivered to Bin Laden to be used to transport missiles.

Jamal Ahmed Al-Fadl, a former financial officer for Bin Laden, testified in the 1998 Africa Embassy bombings trial that Bin Laden and at least six al Qaeda operatives held accounts in their own names at the Bank. Wadih El-Hage, former personal secretary to Bin Laden convicted for his role in the bombings, also testified that Bin Laden kept accounts at the Bank.

Al-Fadl also testified that he transferred USD $100,000.00 on Bin Laden's behalf to an al Qaeda representative in Jordan. In the same trial, another former al Qaeda operative stated that the Bank was used for al Qaeda's operational purposes. The witness was wired USD $250,000.00 via the Bank of New York for the purchase of stinger missiles and an airplane which he delivered to Osama bin Laden. Upon presenting Bin Laden with keys to the aircraft, the witness received a check from the Bank covering compensation for the trip and expenses incurred en route. The witness took the check to the Bank and cashed it.

The General Manager of the Bank acknowledged in a September 2001 press release that Bin Laden had two accounts in the bank. The accounts were opened on March 30, 1992 for the

company Al-Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A third account was opened in 1993 under the name of Bin Laden's holding company, Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, was founded by prominent National Islamic Front members and exercises a monopoly over major agricultural exports from the Sudan.

Senator Carl Levin stated that evidence suggests that Bin Laden "remains the leading shareholder" of the Bank through trustees and may still use the Bank's facilities. According to reports from a leading intelligence publication, Bin Laden remained a shareholder in the Bank as late as 2000. A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors of Terrorism estimates that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

The Chairman of the Bank was defendant and Specially Designated Global Terrorist ("SDGT") Adel Abdul Jalil Baterjee, a wealthy Saudi Arabian businessman and founder of the Benevolence International Foundation. Adel Baterjee is a close associate of Bin Laden; so close, in fact, that he was selected by Bin Laden to collect funds on behalf of the al Qaeda network. In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaeda.

Defendant Yasin Al-Qadi wired more than $22 million from Swiss bank accounts to al Qaeda operatives and entities between 1990 and 2003 and Al-Qadi transferred nearly half of these funds through the Bank.

In March 1991, Al Turabi's government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad). The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief. . .mobilization and training of the popular defence forces; and providing for martyrs' families.

The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank, which gave 7 million Sudanese Pounds, along with the Bank, which contributed 7 million Sudanese Pounds and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

The Bank maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America. In the United States, the Bank maintains correspondent bank accounts at Arab American Bank, American Express Bank and Citibank in New York. The Bank's shareholders also maintain significant U.S. operations. Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust ("DMI Trust"), a

64971                                                        7

financial institution that maintains significant holdings and business contacts in the United States, as detailed in the RICO statements and other pleadings already filed against DMI Trust and incorporated herein by reference.

In addition, Bank chairman Adel Abdul Jalil Baterjee established Benevolence International Foundation, now a Specially Designated Global Terrorist entity, in the United States in 1992.