**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                            )
In Re TERRORIST ATTACKS on          )          03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                     )          ECF Case
_____)

*This document relates to:*

   *Estate of O'Neill, et al. v. Republic of Iraq, et al.*, 04-CV-1076 (RCC)

### Declaration of Jerry S. Goldman, Esquire, Esquire Relating to Taha Al Alwani's Motion Seeking Sanctions under Fed. R. Civ. Proc. 11

JERRY S. GOLDMAN, ESQUIRE, on this 19th day of December, 2005, hereby declares pursuant to 28 United States Code Section 1746, and under penalties of perjury, that the foregoing is true and correct:

Introduction

1. I am an attorney at law, licensed to practice law in the State of New York, the Commonwealth of Pennsylvania, the Commonwealth of Massachusetts, the United States District Courts for the District of Massachusetts, Eastern and Southern Districts of New York, Eastern District of Pennsylvania, the United States Court of Appeals for the 2nd and 3rd Circuits, and the United States Supreme Court. I have practiced law, predominately in New York and Pennsylvania, since 1976.

2. I, along with Gina MacNeill, Esq. and Joshua Ambush, Esq. and others, am attorney of record in the instant matter.

3. I am submitting this Declaration in Opposition to a Motion by the Defendant, Taha Al' Alwani, seeking sanctions under Fed. R. Civ. Proc. 11.

<u>The Pleadings</u>

4. On March 10, 2004, I, along with Joshua Ambush, Esquire, an attorney from Baltimore, Maryland, who, at that time, had practiced law, on information and belief, for about 3 ½ years, filed the cases of *Estate of John P. O'Neill, Sr. et al. v. Kingdom of Saudi Arabia, et al.*, 04-CV-1922 (RCC) ("KSA" or "O'Neill-Kingdom") <u>and</u> *Estate of John P. O'Neill, Sr. et al., v. Al Baraka Investment and Development Corporation, et al.,* 04 –CV-1923 (RCC) ("*Al Baraka")*. My role was initially as local counsel.[1]

5. I learned that there was a third case, *Estate of John P. O'Neill Sr. et al., v. Republic of Iraq, et al.*, ("Iraq" or "O'Neill Complaint" or "O'Neill"), which I was informed was filed with the United States District Court for the District of Columbia, 03-1766, on or about August 20, 2003, according to the docket, and which I understood was being transferred to the Southern District of New York. It is my understanding, based upon a review of the docket, that the *Iraq* case was transferred in and made part of the instant multi-district litigation on or about March 11, 2004 (MDL docket 18). It is my understanding, based upon a review of the docket, that CMO 1 does not reference any of the O'Neill cases (apparently as it was entered the day that *KSA* and *Al Baraka* are filed, and before Iraq is transferred in). It is my further understanding that on the initial counsel list of Peter Kahn, Esquire, of March 30, 2004 (Docket 89), the neither myself, nor any

---

[1] Having received no communications from the Court, by way of a letter dated June 4, 2004, I apprised the Court of this circumstance. I subsequently appeared, on behalf of the *O'Neill KSA* and *O'Neill Al Baraka* cases at the July 30, 2004 and September 13, 2004 court proceedings.

of the three *O'Neill cases* are referenced; it is my further understanding, based upon a review of the docket, that the Order referencing the process to promulgate CMO 2, on April 5, 2004, docket 91, does not reference either *KSA* or *Al Baraka,* although it does include *Iraq.*

6. Over the next few months, I spoke with others, including Mr. Ambush, relative to the *Iraq* case. I entered my appearance in that case on or about September 22, 2004.

7. At the time I entered my appearance, several other cases within the multi-district litigation had already named *Taha Al' Alwani*, including *Burnett, Ashton, Federal, New York Marine, EuroBrokers* and *World Trade Center Properties.* The docket appeared to indicate service by at least *Federal.*

8. Shortly after I entered my appearance in *Iraq* we filed the FAC in *Iraq*[2] on or about September 28, 2004, and my office began assisting in the preparation of other pleadings, service issues, and other functions.

Attempts to Serve Dr. Taha Jabir Al' Alwani

9. On October 14, 2004, I caused a letter to be sent to Nancy Luque, Esquire, via fax, first class mail and email, then of Gray Cary, attorney of record for Taha Al Alwani a/k/a Dr. Taha Jabir Al Alwani ("Taha Al Alwani") in the multi-district litigation 03 MDL 1570 (RCC), requesting that defense counsel accept service on behalf of her client, as she had, 'in a companion case, subject to the above Multi-

---

[2] From time to time, other amendments were made to the pleadings in *Iraq* and *Al Baraka*, by way of amendments, and the RICO Statements and More Definite Statements/Additional Allegations, and the naming of Additional Defendants pursuant to the Case Management Order.

District litigation…accepted service, and/or that your client was already served in a companion case, and/or you have otherwise entered an appearance.'   MacNeill Exhibit 1.

10. On October 25, 2004, a letter from Jay D. Hanson, Esquire, from Gray Cary, was received by our office in which Mr. Hanson declared that "[w]e are quite certain that the Taha Al Alwani you seek to serve in your case against Iraq is not our client, but rather an Iraqi living and associated with Iraqi governmental affairs, quite possibly the Mayor of Fallujah, who has this name." MacNeill Exhibit 2.

11. This is the first time I had heard of another Al'Alwani.  After conferring with Mr. Ambush and others, I believed that counsel for the Defendant was mistaken; rather, our intended defendant was and always had been Ms. Luque's client, Taha Jabir al' Alwani, who was then apparently based in Virginia- the same person named in the other *September 11* cases pending before Judge Casey.

12. On February 2, 2005, Ms. Gina MacNeill, an associate in my office who was engaged in coordinating service, sent out a service package to Dr. Taha Jabir Al' Alwani, at 1105 Safa Street, Herndon, VA 20170, via Federal Express, tracking #8507 5919 9999, requesting a waiver of service of summons and which included:

   a.  One (1) Notice of Lawsuit and Request for Waiver of Service of Summons ("Notice");

   b.  Two (2) copies of a Waiver of Service of Summons ("Waiver");

   c.  Two (2) copies of the Original Complaint;

   d.   Two (2) Copies of the First Amended Complaint;

    e.   Two (2) Copies of the Second Amended Complaint; and

    f.   A Federal Express Return Envelope.

A true and accurate copy of the transmittal letter is MacNeill Exhibit 3.

13. We did not receive a response from either Dr. Al Alwani, or his counsel who were named as attorney of record in the other companion cases in the multi-district litigation, 03 MDL 1570 (RCC).[3]

14. Accordingly, my office arranged for a process server to serve the defendant.[4]

15. On July 29, 2005, the Defendant Dr. Taha Jabir Al-Alwani was personally served with O'Neill Summons and Complaint in Virginia, as set forth in the affidavit of service, Docket 1145.  Mac Neill Exhibit 12.

16. Eleven days later, at approximately 6:30 P.M, of August 10, 2005, I received a telephone call, from one of Dr. Al' Alwani's attorneys, Steven Barentzen, Esquire, seeking a scheduling stipulation.  He indicated that they would raise the defense that this is the wrong person.   After a conversation relating to the stipulation, I advised that we would tender him a draft stipulation the next day, then instructed Ms. MacNeill to draft a stipulation comparable to those we had entered into with the vast majority of participating Defendants, and advised other members of the O'Neill team of the issues he raised.   I sent Mr. Barentzen an

---

[3] We were never served with a notice or entry of appearance on behalf of Dr. Al' Alwani in the instant case.  This is because there appears to be no provision for such an entry of appearance in either the Federal Rules of Civil Procedure *or* the local rules of this District.  The CMO references entries of appearance in a particular action as a trigger point for certain matters.  See, CMO 2, para. 14 (time to file RICO Statements starts upon entry of appearance in the *Federal* action).

[4] I understand that *New York Marine* utilized a process server to serve the Defendant in Virginia.

email confirming that a stipulation would be sent in the next morning.

17. On August 11, 2005, at approximately 11:00 a.m., Ms. MacNeill tendered a proposed stipulation via e-mail to Steven Barentzen which provided for a RICO statement to be filed within 30 days of the Court approval of the stipulation, thereafter, the Defendants would have 45 days to respond to the complaint, the Plaintiffs would have 45 days to respond to the Defendant's responsive filing, and the Defendant would have 15 days to file their reply.  MacNeill Exhibit 4.

18. On August 11, 2005, at approximately 2:50 p.m. Mr. Barentzen responded to Ms. MacNeill, via email (MacNeill, Exhibit 5) indicating that two of the items were unacceptable 1) the provision permitting the filing of a RICO statement, and 2) refusing to waive the argument relating to waiver of service as a defense.  I know we had discussed the former in our conversation; I did not believe we had raised the latter.  In his letter, he stated "[i]f you remove those two paragraphs we can agree to the stipulation.  If you will not agree to these revisions, please let me know immediately, as we intend to write to Judge Casey…"

19. In response, on August 11, 2005, I sent an e-mail to Mr. Barentzen indicating that if the Plaintiffs' options were *either* agreeing to all of the Defendant's demands and removing all of the Plaintiffs' requests <u>or</u> have Defendant contact the Court, as set forth in the Defendant's email, the Defendant should contact the Court (""I suggest, then, that you contact the court.").  MacNeill Exhibit 6.

20. On August 12, 2005 Mr. Barentzen sent a letter to the Court addressing his demand that RICO Statements were inappropriate under CMO 2, Para. 14, but *not* addressing the time to respond, even though his response was rapidly approaching

(August 18).  MacNeill Exhibit 7.   I sent a response to the Court addressing the RICO issue.[5]

21. On August 22, 2005, the Court issued an Order regarding the RICO statements denying Mr. Goldman's request for a blanket amendment of 14 on CMO #2. MacNeill Exhibit 8, p. 3.  Docket # 1144.

22. On August 23, 2005, at 7:06 p.m. Steven Barentzen sent the undersigned an email with a new stipulation.  This proposed stipulation again sought to deny both of Plaintiffs' requests- the RICO Statement provision and the waiver of service argument provision.  MacNeill Exhibit 9.  Under its terms Defendant would be cured of his Rule 12 default, have another approximate 45-50 days to file a

---

[5] An overwhelming majority of participating counsel in the *O'Neill* cases (and, on information and belief, based upon a review of the dockets, in the other companion cases in the above captions multi-district litigation, *In re Terrorist Attacks of September 11, 2001*) had entered into stipulations governing the time for filing RICO Statements, Motions to Dismiss, responses to such motions, replies, and in many cases, means and methods of service.   A few were done by way of letter.  Some did not have all of these provisions (particularly service).  To the best of the undersigned's knowledge,  Peter Kahn, Esquire, by way of a letter addressed to the Court dated July 18, 2005, in response to and on behalf of solely of his client, a letter submitted by Sean Carter, Esquire, dated July 15, 2005, on behalf of all of the Plaintiffs, seeking an extension of the then July 31, 2005 amendment as of right deadline, raised the issue of the applicability of  the provision in CMO 2, pertaining to RICO Statements, Para. 14, to defendants other than *Federal*, apparently for the first time.  If a blanket rule applied for example in the *Iraq* case, that RICO Statements needed to be filed within 20 days of the filing of the pleading, the plaintiffs would have been potentially out of time, without stipulations, consent, waiver or other acceptance or acquiescence, as the *Iraq* case was not transferred to Judge Casey for approximately 7 months post filing; similarly, by the time the issue was resolved and the CMO promulgated in *KSA* and *Al Baraka*, it was past the potential time period, absent stipulations, consent, waiver or other acceptance or acquiescence. This particular issue was responded to, on behalf of the Plaintiffs, by Jerry S. Goldman, Esquire, by way of a letter dated July 19, 2005.   Mr. Kahn submitted another communication dated August 8, 2005, which was responded to by Mr. Goldman on August 9, 2005.   In any event, the *O'Neill* Plaintiffs have filed More Definite Statements/Additional Allegations per CMO 2, Para. 13, including allegations in support of their RICO claims.

response, and would be permitted to raise the service defense, while the Plaintiff would be potentially barred (absent a court reconsideration of its decision on the particular facts and circumstances of *Iraq* and/or Rule 6(b) relief) of filing a RICO Statement.[6]

23. On August 24, 2005, at 8:55 a.m., I sent an e-mail to Steven Barentzen, in response, acknowledging receipt of the communication of the previous evening and that I would get back to him.  I raised with him, again, the service issue, and offered, again, to grant him a concession on the filing of his response to the complaint under Rule 12, in exchange for a concession on the time for filing a RICO statement.  MacNeill Exhibit 10.

24. On August 24, 2005, Mr. Barentzen, at 9:15 a.m., responded, by way of an email, with the position that that they will "oppose any RICO Statement you submit," and steadfastly refused to negotiate on the subject. They further refuse any discussion on the Plaintiffs' waiver of service request.   MacNeill 11.

25. Given their absolute unwillingness to negotiate, in response, by way of an email of August 24, 2005, 9:15 a.m., in light of their position that our pleading (the RICO Statement) was past due and they would oppose any filing, we would, likewise, take the position that their "answer was already well past due and we will oppose it as being filed out of time."  As to the service issue, I told him that as I understood that his argument was that the 'wrong person' was brought before court, that would be a substantive defense, not a service process issue; hence, I

---

[6] As it had been almost a month since service, in effect the proposal called for the Defendant to file his motion 2 ½ months after he was served.

could not understand while they were refusing to consent to our service waiver. MacNeill 11.

26. Following that exchange of emails, I had a telephone conversation, that morning, with Mr. Barentzen.  In that communication, I insisted on the RICO relief and the service waiver; he insisted on the extension of time to file.

27. On August 24, 2005, following that conversation, I received an email from Mr. Barentzen (10:13 AM) accusing me of raising a 'frivolous' position (i.e., that a defendant who waited 26 days after service of complaint and still had not responded had violated Rule 12) and that I had 'no intention' of acting in 'good faith.'  In a fit of revisionist history, Mr. Barentzen advised that he went to seek judicial relief, previously, because of my admonition, rather, than, as the record plainly reveals, because of the defendant's counsel refusal to negotiate (the 'time honored' threat of unless you agree to my demands, I'm going to call the judge; and the 'time honored' response- go call the judge).  See ¶¶ 19-20, i*nfra*.  In the letter, Mr. Barentzen threatens to seek sanctions, if Plaintiffs' file for a default, accuses Plaintiffs' counsel of playing games, and again threatens to contact the court ("I think it is in both party's interests not to disturb the Judge with this issue").  Notably he refers to his client, as "Mr. (sic) Al-Alwani." MacNeill Exhibit 11.

28. The affidavit of service on Dr. Taha Jabir Al' Alwani was docketed at some point on that date.  Exhibit 12.

29. On August 25, 2005, 11:11 a.m. Mr. Steven Barentzen sent me an e-mail, following up on a voice mail message left some time earlier that morning,

seeking, apparently, to make a record in an attempt to either account for their negligent delay in responding to the duly served complaint, their own refusal to enter into good faith negotiations, or otherwise, Defendant's counsel advised that the lack of a return call or email was indicative of the Plaintiffs' refusal to negotiate. Exhibit 13.   Yet, again, Defendant's counsel indicated that they intended to contact the Court, unless the Plaintiffs' acceded to their demands, by unilaterally submitting the 'stipulation'[7] to the Court for approval and offering to submit the Plaintiffs' response simultaneously.

30. On August 25, 2005, at 12:25 p.m., I responded, advising that I was in meetings during the morning and had to evaluate the Defendant's present posturing.  I reminded Mr. Barentzen that negotiation was 'one of give and take' and that we had two issues which we insisted upon (the service issues and the RICO issue) and that they had one (the time period to file a response under Rule 12).  In attempt to break the deadlock and to engage in bona fide and good faith negotiations, I offered to waive their delay in filing a response to the complaint under Rule 12 in exchange for their 'waiver' of the 'delay' in our filing the RICO Statement under individual rules.[8]  If, despite this concession, the Defendant's

---

[7] **stip·u·la·tion**:  1 : an act of stipulating;  2 : something stipulated: as a : *an agreement between parties* regarding some aspect of a legal proceeding <a *stipulation* of facts> <admitted the charges in a prehearing *stipulation —New York Law Journal*> b : a condition, requirement, or item specified in a legal instrument; *specifically*: Merriam-Webster's Dictionary of Law, © 1996 Merriam-Webster, Inc. (emphasis added).

[8] Rather than seek judicial relief on an 'as applied' basis for the timeliness of this particular RICO Statement under 6(b), we thought that this exchange was more than appropriate.  Our understanding of the Court's decision in August was that it declined to make a blanket expansion of the *Federal* rule in CMO 2, ¶ 14, to all Plaintiffs; it was not that this Court would refuse to hear, on a case by case basis, an application for such an extension of time, as we have later sought in the Cross Motion.  To the extent that we

were to remain adamant, and refuse to negotiate, Plaintiffs requested a copy of Defendant's threatened transmittal to the Court and requested 24 hours to put together a response. MacNeill Exhibit 14.

31. On August 25, 2005, at 1:52 p.m., Mr. Barentzen e-mailed me acknowledging the Plaintiffs' concession on the service issue and setting forth their recollection and interpretation of the historical record.  After calling Plaintiffs' RICO Statement request 'unreasonable,' and denying that they were untimely in filing a responsive pleading, they accused Plaintiffs of engaging conduct that was 'at best' 'a thinly veiled effort to exert improper leverage… to obtain back door relief from the Court's Order.  At worst, it is tantamount to extortion.'  Finally, Defendant's counsel declined to send a draft of their proposed letter to the Court so that Plaintiffs' counsel could properly prepare.  MacNeill Exhibit 14.  Defendant has not budged since his initial demands of August 11, 2005, despite the significant and bona fide concessions by the Plaintiff.[9]

32. Notwithstanding his statement early that day, on August 25, 2005, at 7:23 p.m. Mr. Barentzen sent via e-mail a draft of letter to be sent to the Court by the close

---

could remove such scheduling matters and disputes from the Court's docket and concentrate on major matters of law, as to liability and damages, we thought would be in the interests of both the Court, and potentially, the parties.

[9] In fact, upon reflection, perhaps the proper remedy for the Defendant to present his claim that the wrong person was sued, aside from summary judgment or a trial on the merits, *potentially* could have been a motion to strike service, as opposed to the 12(b)(6) motion to dismiss based upon the facial insufficiency of the pleadings, which he filed and which we opposed.   While we never believed his claim had factual support or legal merit, we withdrew our demand of a service waiver so that this 'theoretical' position was preserved.  That is, if he filed such a motion, we believe that we would have prevailed as a matter of law and as a matter of fact and we do not believe that it could have been sanctionable under Rule 11.

of business August 26, 2005.  MacNeill Exhibit 15.

33. On August 26, 2005, at 1:39 p.m. I emailed Mr. Barentzen "[i]n response to a communication to the Executive Committee, we will not be tendering a response to your letter to your letter application to the court.  Rather, we are simply tendering the following directly to the Court."  MacNeill Exhibit 16.

34. On August 26, 2005, at 1:50 Mr. Barentzen replied via inquiring if that meant that the Plaintiffs' were "agreeing to sign our stipulation?"   MacNeill Exhibit 16.

35. On August 26, 2005, at 2:12 P.M., I sent an e-mail to Mr. Barentzen declining to sign that one-sided stipulation and again, in an effort to move the process along, sought to effectuate the compromise which Plaintiffs' had tendered on August 25. To help the Defendant's better understand the position, I provided certain aspects of our factual argument relative to the RICO argument which we later raised, in seeking a particular finding and extension in our cross motion, namely that the O'Neill plaintiffs could *not* have complied with Judge Casey's individual rules relative to the serving of a RICO Statement within 20 days of the filing of a pleading, as the case was pending for approximately 210 days in the District of Columbia before a different judge.  Plaintiffs' counsel advised that they had been accommodating, by offering an extension of time and removing the service request, in exchange for a concession relative to the RICO Statement.  Plaintiffs suggested that the Defendant that they 'carefully examine' their position and 'come to the realization that this is more than reasonable (sic) resolution to a dispute that need not take up the Court's valuable time.  MacNeill Exhibit 18.

36. On August 26, 2005, Mr. Barentzen sent his letter to the court.  MacNeill Exhibit

17.  Mr. Goldman also sent a letter to the court stating that "I understand that the Court does not want to receive a flurry of correspondence…I will not respond to the recent letters."  Mac Neill 23.  While he complained of Plaintiffs' counsel, the Defendant never made an application for leave to file his response to the Complaint at a later date under Rule 6.

37.  On that date, I sent our letter to the Court advising that we were not going to respond to these types of letters unless the Court requested same. MacNeill, ¶ 22, Exhibit 23.

38.  The Court declined to intervene.

RICO Statement/More Definite Statement

39.  On August 26, 2005, our office filed, on behalf of the Plaintiffs' a More-Definite Statement/Additional Allegations, pursuant to CMO 2, ¶ 13.  We caused it to be docketed as a More Definite Statement. (MDS).  Docket #1157.   We believed that this document could help explain to the Defendant, and his counsel, that we did, in fact, serve the correct person.  We believed that it provided additional support for the allegations contained in our complaint, as amended, as an additional pleading.   We believed that it provided additional support for the allegations containing in our complaint, as amended, as an additional pleading, relative to the RICO count.

40.  On August 26, 2005, our office also filed, on behalf of the Plaintiffs' a RICO Statement, pursuant to CMO 2, ¶ 14.  We caused it to be docketed as a RICO Statement.  Docket #1158.   Substantively it was comparable to the MDS.  We

believed that this document could help explain to the Defendant, and his counsel, that we did, in fact, serve the correct person. We believed that it provided additional support for the allegations contained in our complaint, as amended, as an additional pleading. We believed that it provided additional support for the allegations containing in our complaint, as amended, as an additional pleading, relative to the RICO count. We further believed that it would serve as an offer of proof in the event that the Plaintiffs' global application to the Court to reconsider its August 22 decision relative to RICO Statements (which was, in fact done, as part of the submission to CMO 4) caused a change in the decision.[10] We further believed that it would serve as an offer of proof, in the event that Plaintiffs' intended motion to reconsider or provide an extension of time as to this particular Defendant or the *Iraq* case under Rule 6, was granted. Such relief was specifically sought in our cross motion. In such cross motion, we specifically requested that this filing be withdrawn if either the reconsideration or the 6(b) requests were denied.[11]

---

[10] We filed it prior to 30 days after service in the event that such a favorable decision was made, either globally or as specifically applied to either *Iraq* or this particular Defendant.

[11] At the time we filed it, we believed that there would be some sort of global attempt on the part of the Executive Committee to have the court revisit this issue. That ultimately took place in the form of the CMO 4 proposal on this point. We also intended, to seek a court determination, which we did not believe was precluded by the judge's global determination not to change CMO 2, para. 14, as applied to the particular facts and circumstances of *Iraq* or by way of Rule 6(b) relief (e.g., the fact that it would have been impossible for the Plaintiffs to have filed a RICO Statement within 20 days of filing a complaint under Judge Casey's rules, as the case was pending, for approximately the first 210 days in front of a different judge in a different District, and when it finally arrived, all matters appear to have been stayed pending discussions over CMO 2). The cross-motion specifically sought this relief.

The Second Threat of Rule 11 Sanctions

41. Having already threatened to seek Rule 11 sanctions in the event that a default was sought, on September 2, 2005, well over a month after service, Mr. Barentzen sent me a letter threatening Rule 11 sanctions.  MacNeill Exhibit 19 ("RICO letter").   In this letter, Defendant's counsel, indicates that its basis is that Plaintiffs' served the wrong person, based upon certain statements contained within Paragraph 36 of the Complaint.   Curiously, they ignored the other allegations in the Complaint, as well as those in the MDS and RICO Statement,[12] as to the identity of the Defendant.[13]

42. In the letter, counsel stated that their client 'never has been' an 'employee of Iraq.'  The emphatically stated that '[h]e has never been employed by Iraq.'

43. I consulted with Mr. Ambush and others about this, and other allegations.  I, and others, conducted additional research.

44. As set forth in the documents appended to ¶ 64, *infra.*, we believe that the person served, Dr. Alwani, was born in Iraq, has referred to himself as an Iraqi, and, appears to have worked, at least at one point in time, for the Government of Iraq.

45. In the RICO letter, they indicated that the "Al-Alwani named in your complaint is—from we can determine—the former Mayor of Fallujah who coincidentally

---

[12] They alleged in the RICO letter that we could not have filed a MDS, as one was not sought under Rule 12(e), notwithstanding the specific permission granted to file additional allegations by this Court, in the CMO 2, ¶ 13.

[13] To the extent that they did then, and do now, threaten Rule 11 sanctions based upon the sufficiency of the case as a whole, we note that they have not sought such sanctions against the other Plaintiffs' in the case, such as *Federal*, *New York Marine, EuroBrokers,* or *WTCP*.  We can only assume that this is further evidence of their intentional misuse of this entire process.

shares the same name as our client."  Notably, they declined to identify, in this communication the precise name of the 'former Mayor of Fallujah,'[14] although in their Rule 11 Motion they specifically named this person *Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani.*

46. Such person, did not share the same name- our Defendant is "Taha al' Alwani a/k/a Dr. Taha Jabir Al' Alwani"; the person served is generally referred to as either "Taha Al' Alwani"[15] or "Dr. Taha Jaber Al' Alwani"; the *then* (not former) mayor of Fallujah is Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani.  In fact, Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani, according to the media, far from being former, he did not assume his position until after the United States incursion, and, according to the media (as discussed below), was on friendly terms with the United States authorities, unlike the person described in our complaint, who we allege was involved in a conspiracy to murder thousands of Americans and other innocent people on September 11, 2001.

47. The additional factual investigations, include, but is not limited to, the matters set forth in ¶¶ 64, 65-7 and 68, *infra*.   Mr. Ambush also addresses this in his declaration and the accompanying exhibit.

48. On September 30, 2005, a response was sent to Mr. Barentzen whereby I agreed

---

[14] In the instant letter, counsel refers to him as the 'former mayor;' in the October 25, 2004 letter, Defendant's counsel refers to him as "the Mayor.'   Plaintiffs' counsel does not know whether Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani is still serving as Mayor; Plaintiffs' counsel know that he is not the person Mr. Ambush intended to sue when the complaint was drafted.

[15] In fact his own lawyer refers to his client, in many of the emails, as either <u>Mr</u>. Alwani (sic) or Mr. Al' Alwani. (emphasis added).

to withdraw the RICO statement, without prejudice, subject to leave to re-file, refusing to withdraw the Amended Complaints or the More Definite Statements, and noting legal support for the position that they are proper.  MacNeill Exhibit 21.

49. On October 12, 2005, Mr. Barentzen sent me an e-mail to Mr. Goldman with a proposed draft briefing stipulation with a provision regarding a Rule 11 motion. MacNeill Exhibit 20.

September MDS and First Consolidated Complaint

50. On September 30, 2005, we filed a superseding MDS, Docket #1360, whose allegations mirrored those in the August MDS.

51. On September 30, 2005, we served (electronically) and then filed a hard copy with the Clerk, pursuant to CMO 2, ¶ 13, the First Consolidated Complaint (FCC) in this (and the other O'Neill actions).  Paragraph 220 incorporates a number of Exhibits into the Complaint, each of which was physically appended to the bound (and electronically served) volume of the document.[16]  Exhibit G contains certain additional allegations as to Taha Al' Alwani.

The Motion to Dismiss and the Cross Claim

52. On October 28, 2005, the Defendant docketed a Motion to Dismiss against the Plaintiffs other than *O'Neill.* Docket #1405, 1453.

53. On November 4, 2005, the Defendant docketed a Motion to Dismiss the *Iraq*

---

[16] *Al Baraka* consisted of two volumes, when printed and bound; *Iraq* and *KSA* consisted of single volumes.

complaint pursuant to Rule 12(b)(6) (Docket #1468), with Memorandum (Docket #1469) of Law and Declaration of S Barentzen (Docket #1470).  Included was information provided the Mayor of Fallujah's full name Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani  (for the first time), and a declaration by the Defendant, under penalties of perjury, that he was never an employee of Iraq,

54. On November 18, Plaintiffs filed Opposition to the Defendant's Motion to Dismiss (Docket #1468), along with Declarations of Ambush (Docket #1492), MacNeill (Docket #1493) and Goldman (Docket #1494). [17]

55. Similarly, on November 18, 2005, Plaintiffs filed a Cross Motion (Docket #1495), along with Memorandum of Law (Docket #1496) and Declarations (Ambush-(Docket #1497); MacNeill – (Docket #1498) and Goldman (Docket 1499)).[18] Such Cross Motion, in part dealt with certain safe harbor issues, under Rule 11, discussed below.  The Cross Motion, *inter alia,* sought a reconsideration of the RICO Statement issue as applied to *O'Neill* as well as relief under Rule 6(b).

56. On December 1, 2005, the Defendant filed and served his Reply to Plaintiffs' Opposition to Motion to Dismiss filed (Docket #1530).[19]

57. Defendant  filed  and  served  his  Response  to  Plaintiffs'  Cross  Motion  (Docket

---

[17] The declarations were re-filed on December 1, 2005, as the copies of the scanned declarations did not bear the signatures (MacNeill, Docket #1517; Goldman Docket #1518).

[18] The declarations were re-filed on December 1, 2005, as the copies of the scanned declarations did not bear the signatures (MacNeill, Docket #1519; Goldman Docket #1520).

[19] While this was filed on December 5, 2005, we understand that Defendant attempted, unsuccessfully, to properly file and have it on December 1, 2005, and do not object to its late filing.

#1531),[20] along with Declarations of Steven Barentzen in Support of Response to Motion to Strike (Docket #1525).

58. On December 9, Plaintiffs Reply Memorandum of Law in Support of Cross Motion was filed and served electronically.   (Docket #1544).

Rule 11 Motion

59. On November 11, 2005, Defendant served, on all counsel, but did not file a proposed Motion for Rule 11 Sanctions.

60. As set forth above, on November 18, 2005, Plaintiffs filed a Cross Motion (Docket #1495), along with Memorandum of Law (Docket #1496) and Declarations (Ambush- (Docket #1497); MacNeill – (Docket #1498) and Goldman (Docket 1499)).[21]   Such Cross Motion, in part dealt with certain safe harbor issues, under Rule 11, including withdrawing the RICO Statement of August, 2005, if the Court declined to reconsider its ruling as applied to the particular facts of O'Neill or denied relief under Rule 6(b), as well as seeking certain amendments to the Complaint, pursuant to Rule 15(a).

61. On November 30, 2005, Plaintiffs' counsel inquire of Defendant's counsel if Rule 11 was still pursued or otherwise modified in light of the Cross-Motion and its impact on the Rule 11 safe harbor provision.

---

[20] While this was filed on December 5, 2005, we understand that Defendant attempted, unsuccessfully, to properly file and have it on December 1, 2005, and do not object to its late filing.

[21] The declarations were re-filed on December 1, 2005, as the copies of the scanned declarations did not bear the signatures (MacNeill, Docket #1519; Goldman Docket #1520).

62. Defendant, through his attorneys, indicated that it was going to pursue to such Motion as previously tendered, notwithstanding the Cross-Motion. The undersigned never received notice of a request for a pre-motion conference under the Individual Rules of the Hon. Richard Conway Casey; on information and belief, the source of which is a review of the docket, one was never sought.

63. On December 2, Defendant filed and served electronically his Rule 11 Motion filed (Docket #1526) with Memorandum of Law (Docket #1527) and Declaration of Steven Barentzen (Docket #1528). This was prior to 24 days after the electronic service of November 11, 2005.[22]

Additional Factual Investigation:

a. <u>Public Biographical Information Relating to the Defendant Taha Jabir Al Alwani (the person served) as Compared with Taha Bdewi Hamid Al-Alwani</u>

64. Attached hereto and incorporated herein are true and correct copies of certain public source documents relating to Taha Al Alwani a/k/a Dr. Taha Jabir Al Alwani ("Defendant"), which provide certain purported biographical information as to him, including information which would support allegations that that the Defendant was born in Iraq and lived for many years in Iraq, and, in fact, worked for what appear to be government agencies or institutions, in Iraq and in the Kingdom of Saudi Arabia, that were found on the corresponding webpages:

   a. Center for the Sturdy of Islam & Democracy,
      www.islam-democracy.org/alalwani_bio.asp
      (Goldman Exhibit A);

---

[22] Twenty one (21) days after service per Rule 11; if electronic service under Rule 5(b)(2)(D) is utilized, three (3) additional days are to be added per Rule 6(e).

    b.  World Economic Forum,
www.weforum.org/site/knowledgenavigator.nsf/Content/Alalwani%20Taha%Jabir

(Goldman Exhibit B);

    c.  Taha Jabit Al Alwani -
www.islamicweb.com/beliefs/fiqh/alalwani_usulalfiqh/taha.htm

(Goldman Exhibit C);

    d.  Discover the Network, *and*,

www.discoverthenetwork.org/printindividualProfile.asp?indid=1230

(Goldman Exhibit D).

65. Attached hereto and incorporated herein are true and correct copies of certain documents relating to the mayor of Fallujah, Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani, who IS NOT the Defendant named in this case, which demonstrates that the named defendant, Taha Al Alwani a/k/a Dr. Taha Jabir Al Alwani ("Defendant") was properly served in this case, that were found on the corresponding webpages:

    a.  News.telegraph
www.telegraph.co.uk/news/main.jhtml?xml=/news/2003/08/09/wirq09.xml
(Goldman Exhibit E); *and*,

    b.  Common Dreams News Center
www.comnmondreams.org/headlines03/0430-01.htm
(Goldman Exhibit F).

b.  <u>The United States Attorneys Office for the Eastern District of Virginia</u>

66. I further accessed the website of the United States Attorney for the Eastern District of Virginia and searched certain archived items within the public media section of that site.

67. Attached hereto and incorporated herein as Exhibits G1-G4 is the affidavit

(redacted) in support of the search warrant relating to the SAFA Group investigation, as released in October, 2003. http://www.usdoj.gov/usao/vae/ArchivePress/2003/oct03.html

68. Attached hereto and incorporated herein as Exhibits H 1-2 is the complaint and affidavit relating to Alamoudi, also from http://www.usdoj.gov/usao/vae/ArchivePress/2003/oct03.html

c.   The Media Search of December 11, 2005

69.  On December 11, 2005, utilizing the Lexis Mega News (All English) database, I performed a search utilizing the parameters Taha /4 Alwani for the time period of September 11, 2001 through August 20, 2003 (the date Mr. Ambush filed the suit in Washington).  Attached  hereto as Exhibit I-1 is a cite list showing the results of such search; attached hereto and incorporated herein as Exhibit I-2 are the news articles themselves, which I believe clearly distinguish the person who was served from Taha Bdewi Hamid Al-Alwani a/k/a Taha Bedaiwi al-Alwani, as set forth in our Memorandum of Law.

Time Line

70. I, and members of my staff, prepared a time line, incorporating factual allegations from the instant declaration, the declaration of Mr. Ambush, the declaration of Ms. MacNeill, and the court's docket, which is attached hereto and incorporated herein as Exhibit One (1).

Time and Expense

71. Plaintiffs' counsel has had to devote substantial time and expense dealing with the

matters set forth herein, including defending against the Rule 11 motion.

_____
Jerry S. Goldman, Esquire
111 Broadway, 13th Floor
New York, NY. 10006

X:\Clients\ONeill v. Saudi arabia\Motions\Rule 11\Taha\Final Plaintiffs Documents\Goldman Declaration-
Final\GoldmanDeclarationFinal.doc