## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____x

In re Terrorist Attacks on September 11, 2001          **03 MDL 1570**
_____x

*This filing applies to the Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq et. al., 04 CV 1076 (RCC)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | |
| **Estate of JOHN PATRICK O'NEILL,** ) | |
| **SR., on behalf of JOHN PATRICK** ) | |
| **O'NEILL, SR., deceased, and on behalf** ) | |
| **of decedent's heirs-at-law** ) | |
| ) | |
| **JOHN PATRICK O'NEILL, JR.** ) | |
| ) | |
| **CHRISTINE IRENE O'NEILL** ) | |
| ) | |
| **CAROL O'NEILL** ) | |
| ) | |
| **DOROTHY A. O'NEILL,** ) | **Civil Action No: 04-1076 (RCC)** |
| ) | |
| **Plaintiffs,** ) | |
| ) | **First Consolidated Complaint** |
| **v.** ) | **Jury Trial Demanded** |
| ) | |
| **THE REPUBLIC OF IRAQ** ) | |
| ) | |
| **IRAQI INTELLIGENCE AGENCY** ) | |
| a/k/a/ THE MUKHABARAT a/k/a/ THE ) | |
| FEDAYEEN a/k/a/ AL-'QARE a/k/a/ ) | |
| "UNIT 999" a/k/a/ "M-8 SPECIAL ) | |
| OPERATIONS" ) | |

**SADDAM HUSSEIN**                    )
                                     )
**HUSHAM HUSSEIN**                    )
                                     )
**THE ESTATE OF QUSAY HUSSEIN**       )
                                     )
**THE ESTATE OF UDAY HUSSEIN**        )
                                     )
**ABDEL HUSSEIN** a/k/a/ **"THE GHOST"**  )
                                     )
**AHMED KAHLIL IBRAHIM SAMIR**        )
**AL-ANI**                            )
                                     )
**FARUQ AL-HIJAZI**                   )
                                     )
**HABIB FARIS ABDULLAH AL-**          )
**MAMOURI**                           )
                                     )
**TAHA YASSIN RAMADAN** a/k/a         )
TAHYA YASSIN RAMADAN                  )
                                     )
**MUHAMMED MADHI SALAH** a/k/a        )
MUHHAMED MAHDI SALAH                  )
                                     )
**SALAH SULEIMAN**                    )
                                     )
**HAQI ISMAIL** a/k/a HAQUI ISMAIL    )
                                     )
**TAHA AL ALWANI** a/k/a DR. TAHA     )
JABIT AL'ALWANI                       )
                                     )
**ABU AGAB**                          )
                                     )
**ABU WAIEL** a/k/a  ABU AW'EL A/K/A  )
SADOUN ABUDL LATIF                    )
                                     )
**ABU SAYYAF**                        )
                                     )
**HAMSIRAJI SALI** a/k/a ESTATE OF    )
HAMSIRAGI SALI                        )
                                     )
                                     )
                                     )
                                     )
                                     )

**AL QAEDA ISLAMIC AGENCY** a/k/a )
AL QAEDA a/k/a AL QAEDA ISLAMIC )
ARMY a/k/a AL QAEDA ISLAMIC )
ARMY FOR THE LIBERATION OF THE )
HOLY PLACES a/k/a ISLAMIC ARMY )
FOR THE LIBERATION OF THE HOLY )
PLACES )
)
**OSAMA BIN LADEN** a/k/a USAMA )
BIN LADEN )
)
**SAAD BIN LADEN** )
)
**AYMAN ZAWAHIRI** a/k/a AYMAN )
AL-ZAWAHIRI )
)
**ABU HAFS THE MARITANIAN** )
)
**SAIF AL-ADIL** a/k/a SAIF AL-ADEL )
a/k/a MUHAMAD IBRAHIM MUKKAWI )
a/k/a IBRAHIM AL-MADANI a/k/a SEIF )
AL ADEL a/k/a SAYF AL-ADL )
)
**ISLAMIC REPUBLIC OF IRAN** )
)
**HEZBOLLAH** a/k/a HIZBALLAH )
)
**IMAD MUGHNIYEH** )
)
**HEZBOLLAH SECRETARY** )
**GENERAL** )
**HASSAN NASRALLAH** )
)
**IRANIAN SUPREME LEADER** )
**AYATOLLAH ALI HOSEINI-** )
**KHAMENEI.** a/k/a AYATOLLAH ALI )
KHAMENEI )
)
**USBAT AL-ANSAR** )
)
**IRANIAN MINISTRY OF** )
**INTELLIGENCE AND SECURITY** )
**(MOIS)** )
)
)
)

3

|   | ) |
|---|---|
| **IRANIAN MINISTER OF** | ) |
| **INTELLIGENCE AND SECURITY** | ) |
| **ALI FALLAHIAN** | ) |
|   | ) |
| **IRANIAN REVOLUTIONARY** | ) |
| **GUARD CORPS (IRGC)** | ) |
|   | ) |
| **IRANIAN REVOLUTIONARY** | ) |
| **GUARD CORPS – QODS FORCE** a/k/a | ) |
| QODS DIVISION a/k/a JERUSALEM | ) |
| FORCE | ) |
|   | ) |
| **IRANIAN REVOLUNTIONARY** | ) |
| **GUARD CORPS DEPUTY** | ) |
| **COMMANDER BRIG GENERAL** | ) |
| **MOHAMMAD BAQER ZOLQADR** | ) |
|   | ) |
| **AHMAD VAHEDI** | ) |
|   | ) |
| **HOSSEIN MOSLEH** | ) |
|   | ) |
| **MORTEZA REZA'I** | ) |
|   | ) |
| **SALAH HAJIR** | ) |
|   | ) |
| **ADIB SHA'BAN** a/k/a ADEEB | ) |
| SHABAAN | ) |
|   | ) |
| **ABU MUSAB ZARQAWI** a/k/a ABU | ) |
| MUSAB AL-ZARQAWI | ) |
|   | ) |
| **EGYPTIAN ISLAMIC JIHAD** | ) |
|   | ) |
| **AL-GAMMAAH AL ISLAMIAH** a/k/a | ) |
| AL GAMA'A AL-ISLAMIYYA | ) |
|   | ) |
| **ABU ZUBAYDH** | ) |
|   | ) |
| **KHALID SHEIKH MOHAMMED** a//k/a | ) |
| KHALED SHAIKH MOHAMMED | ) |
|   | ) |
| **ABU ABDUL RAHMAN** | ) |
|   | ) |
| **ABDUL RAHMAN YASIN** | ) |
|   | ) |
|   | ) |

**SCHREIBER & ZINDEL**     )
Treuhand-Anstalt     )
Kirchstrasse 39     )
FL-9490 Vaduz, Liechtenstein     )
     )
**DR. FRANK ZINDEL**     )
Sonnblickstrasse 7     )
9490 Vaduz, Liechtenstein     )
     )
**ENGELBERT SCHREIBER**     )
Schreiber & Zindel     )
Treuhand-Anstalt     )
Kirkstrasse 39     )
9490 Vaduz, Liechtenstein     )
     )
**ENGELBERT SCHREIBER, JR.**     )
Schreiber & Zindel     )
Treuhand-Anstalt     )
Kirkstrasse 39     )
9490 Vaduz, Liechtenstein     )
     )
**MARTIN WACHTER**     )
Asat Trust Reg.     )
Altenbach 8, Vaduz 9490     )
Liechtenstein     )
     )
**ERWIN WACHTER**     )
Asat Trust Reg.     )
Altenbach 8, Vaduz 9490     )
Liechtenstein     )
     )
**SERCOR TREUHAND ANSTALT**     )
Kirkstrasse 39     )
9490 Vaduz, Liechtenstein     )
     )
**ALBERT FRIEDRICH ARMAND**     )
**HUBER,** a/k/a AHMED HUBER  a/k/a     )
ALBERT HUBER a/k/a ARMAND     )
ALBERT FRIEDRIC  a/k/a ARMAND     )
HUBER a/k/a/ AHMAD HUBER-EL     )
BIALI     )
c/o Nada Management Organization     )
Viale Stefano Franscini 22,     )
Lugano CH-6900 TI     )
Switzerland     )
     )

**ALI GHALEB HIMMAT**                               )
Via Posero 2, Campione d'Italia CH-6911,            )
Switzerland                                         )
                                                    )
**AL TAQWA BANK** a/k/a BANK AL                     )
TAQWA**,** a/k/a BANK AL TAQWA                      )
LIMITED a/k/a BANK OF TAQWA                         )
LIMITED**,**                                        )
c/o Arthur D. Hanna & Company                       )
10 Deveaux Street                                   )
P.O. Box N-4877                                     )
Nassau, Bahamas                                     )
                                                    )
**AL TAQWA TRADE, PROPERTY**                        )
**AND INDUSTRY, LTD.** a/k/a AL                     )
TAQWA TRADE, PROPERTY AND                           )
INDUSTRY COMPANY LIMITED**,** a/k/a                 )
AL TAQWA TRADE, PROPERTY AND                        )
INDUSTRY ESTABLISHMENT a/k/a                        )
HIMMAT ESTABLISHMENT a/k/a                          )
HOCHBURG a/k/a WALDENBURG a/k/a                     )
AL TAQWA TRADE, PROPERTY AND                        )
INDUSTRY LIMITED                                    )
 c/o Asat Trust Reg.,                               )
Altenbach 8                                         )
Baduz 9490                                          )
Liechtenstein                                       )
                                                    )
**AKIDA BANK PRIVATE LIMITED**                      )
                                                    )
**AKIDA INVESTMENT CO. LTD**                        )
                                                    )
**NADA MANAGEMENT**                                 )
**ORGANIZATION, S.A.**                              )
Viale Stefano Franscini 22,                         )
Lugano CH-6900 TI                                   )
Switzerland                                         )
                                                    )
**YOUSSEF M. NADA** a/k/a YOUSSEFF                  )
MUSTAFA NADA a/k/a YOUSSEF                          )
NADA                                                )
Via Arogno 32                                       )
Campione d'Italia 6911 Switzerland                  )
                                                    )
**YOUSSEF M. NADA & CO.**                           )
**GESELLSCHAFT, M.B.H.**                            )

c/o Youssef M. Nada                              )
Via Riasc 4                                      )
Campione d'Italia 6911 Switzerland               )
                                                 )
**NADA INTERNATIONAL ANSTALT**                   )
                                                 )
**YOUSSEF M. NADA & CO.**                        )
                                                 )
**NASCO BUSINESS RESIDENCE**                     )
                                                 )
**CENTERSAS DI NASREDDIN**                       )
**AHMED IDRIS EC**                               )
                                                 )
**NASCO NASREDDIN HOLDING A.S.**                 )
                                                 )
**NASCOSERVICE S.R. L.**                         )
                                                 )
**NASCOTEX S.A.**                                )
                                                 )
**BARZAN E-TIKRITI** a/k/a/ BARZAN               )
IBRAHIM HASAN a/k/a BARZAN                        )
IBRAHIM HASAN AL-TIKRITI                          )
                                                 )
**METALOR** a/k/a LA GROUPE                       )
METALOR a/k/a LA GROUE METALOR                    )
TECHNOLOGIES a/k/a METALOR                        )
GROUP A/K/A METALOR                               )
TECHNOLOGIES SA                                   )
B.P. 29                                          )
Rue des Aquées                                    )
28190 Courville sur Eure                          )
France                                            )
                                                 )
**BANCA DEL GOTTARDO** a/k/a                      )
BANCA DEL'GOTTARDO                                )
Viale S. Franscini 8                              )
CH-6901 Lugano                                    )
Switzerland                                       )
                                                 )
**NASREDDIN COMPANY NASCO SAS**                  )
**DI AHMED IDRIS NASREDDIN EC**                  )
                                                 )
**NASREDDIN FOUNDATION**                         )
                                                 )
**NASREDDIN GROUP**                              )
**INTERNATIONAL HOLDING**                        )

**LIMITED**                                              )
                                                         )
**NASREDDIN INTERNATIONAL**                              )
**GROUP LIMITED HOLDING**                                )
                                                         )
**AHMAD I. NASREDDIN** a/k/a  HADJ                       )
AHMED NASREDDIN a/k/a AHMED                              )
IDRISS NASREDDIN *AND*                                   )
**NASREDDIN GROUP**                                      )
**INTERNATIONAL LIMITED**                                )
**HOLDINGS** a/k/a NASREDDIN                             )
INTERNATIONAL GROUP HOLDINGS                             )
LIMITED *a/k/a* NASREDDIN                                )
INTERNATIONAL GROUP LTD.                                 )
c/o Rechta Treuhand-Anstalt                              )
Kirkstrasse 39                                           )
9490 Vaduz, Liechtenstein                                )
                                                         )
**ASAT TRUST REG.**                                      )
Altenbach 8, Vaduz 9490                                  )
Liechtenstein                                            )
                                                         )
**TERRORIST HIJACKERS:**                                 )
                                                         )
**The Estate of ABDULAZIZ AL OMARI**                     )
                                                         )
**The Estate of WAIL AL SHEHRI**                         )
                                                         )
**The Estate of WALEED M. AL**                           )
**SHEHRI**                                               )
                                                         )
                                                         )
**The Estate of SATAM M.A. AL**                          )
**SUQAMI**                                               )
                                                         )
**The Estate of MOHAMMED ATTA**                          )
                                                         )
**The Estate of FAYEZ AHMED** a/k/a/                     )
BANIHAMMAD FAYEZ                                         )
                                                         )
**The Estate of AHMED AL-GHAMDI**                        )
                                                         )
**The Estate of HAMZA AL-GHAMDI**                        )
                                                         )
**The Estate of MARWAN AL-SHEHHI**                       )
                                                         )

**The Estate of MOHALD AL-SHEHRI** )
)
**The Estate of KHALID AL-MIDHAR** )
)
**The Estate of NAWAF AL-HAZMI** )
)
**The Estate of SALEM AL-HAZMI** )
)
**The Estate of HANI HANJOUR** )
)
**The Estate of MAJED MOQUED** a/k/a )
MAJED MOQED )
)
**The Estate of SAEED AL GHAMDI** )
)
**The Estate of AHMED IBRAHIM A. AL** )
**HAZNAWI** )
)
**The Estate of AHMED AL NAMI** )
)
**The Estate of ZIAD SAMIR JARRAH** )
)
**ZACARIAS MOUSSAUI** a/k/a )
ZACARIAS MOUSSAOUI )
)
**ESTATE OF MUHAMMAD ATEF** a/k/a )
MUHAMMAD ATEF a/k/a )
MUHAMMAD ATIF a/k/a ESTATE OF )
MUHAMMAD ATIF )
)
**THE TALIBAN** )
)
**MUHHAMAD OMAR** a/k/a )
MUHAMAD OMAR a/k/a MUHAMMAD )
OMAR )
)
**MUSLIM BROTHERHOOD:** )
)
**SYRIAN BRANCH** )
)
**EGYPTIAN BRANCH** )
)
**JORDANIAN BRANCH** )
)
**KUWAITI BRANCH** )
)

IRAQI BRANCH )
)
*AND*, )
)
JOHN DOES 1-67, )
)
Defendants. )
_____ )
)
)
)
)
)
)
)
)
)
)
)
)
)

**FIRST CONSOLIDATED COMPLAINT CONTAINING MORE DEFINITE STATEMENTS, RICO STATEMENTS AND ADDITIONAL ALLEGATIONS FILED PURSUANT TO CMO 2, PARAGRAPH 13[1]**

**INTRODUCTION**

1.      On September 11, 2001, Islamic terrorists perpetrated an attack on the United States that was unprecedented in history.  On that day, over 3,000 Americans were killed in simultaneous attacks on the World Trade Center in New York City and the Pentagon in Arlington, Virginia.   The attacks were not isolated incidents, but rather a coordinated effort by Islamic Terrorist Organizations.  The attacks of September 11, 2001 had been planned for years by an extensive network of Islamic militants with the support, aid and assistance of banks, governments, and individuals.  Plaintiffs are the Estate and

_____
[1] This pleading shall not be construed to add any additional allegations as to any dismissed defendants.

immediate family of John Patrick O'Neill Sr., former head of the Federal Bureau of Investigation's (F.B.I.) counterterrorism division and former Special Agent in Charge of the National Security Division of the New York Office of the FBI, and the world's foremost expert on Islamic terrorism and Osama Bin Laden's terror network.  John Patrick O'Neill, Sr. was killed in the attacks on the World Trade Center.

2.     John Patrick O'Neill, Sr. became Chief of Security for the World Trade Center less than two weeks prior to the September 11th attacks. On the morning of September 11, 2001, John Patrick O'Neill Sr. was in his office on the 34th Floor in the South Tower, Tower 2, at the time the first plane hit the North Tower, Tower 1. He immediately left his office and headed to the lobby of the North Tower to determine what had happened, and to assess the damage.  A command post was set up in the lobby of the North Tower from where he was able to direct the rescue efforts of the first responders. When the second plane hit the South Tower, he returned there to coordinate the rescue efforts in that building, and was killed when that building collapsed.

3.     On the morning of September 11, 2001,  Mohammed Atta, Abdul Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower (Tower One) of the World Trade Center in New York.

4.     On the morning of September 11, 2001, Marwan al-Sheehhi, Fayez Ahmed a/k/a/ Bamihammad Fayez, Ahmed al-Ghamdi, Hazma al- Ghamdi, and Molahd al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower (Tower Two) of the World Trade Center in New York.

5.     On the morning of September 11, 2001, Khalid al-Midhar, Nawalf al-Hazmi, Salem al-Hazmi, Hani Hanjour, and Majed Moqued a/k/a Majed Moqed hijacked American Airlines Flight 77, bound from Dulles Airport in Sterling, Virginia, to Los Angeles, California and crashed it into the Pentagon in  Arlington, Virginia.

6.     On September 11, 2001, Zihad Jarrah, Ahmed Al-Haznawi, Saeed Al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark, New Jersey to San Francisco, California with the intention of crashing that plane into either the United States Capitol building or the White House.  In a heroic act of defiance and courage, the passengers of Flight 93 overtook the hijackers, and the plane crashed in Shanksville, Pennsylvania prior to reaching its target in Washington, D.C.

7.     All nineteen (19) hijackers were members of Osama Bin Laden's Al Qaeda network.  All received sponsorship, funding and training through the Al Qaeda network.

8.     Plaintiffs move for judgment against Defendants, jointly and severally.  In support of their Complaint, Plaintiffs allege as follows:

## JURISDICTION, VENUE AND CHOICE OF LAW

9.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1330(a), 1331, and 1332(a)(2).  Venue is proper in this District Court pursuant to 28 U.S.C. §1391(f)(4).

10.     Actions for wrongful death, personal injury, and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents – within the meaning of  28 U.S.C. §1605(a)(7) – are unique causes of actions arising out of federal counter-terrorism statutes and are controlled by federal law.

11.     By its actions and the actions of its agencies and instrumentalities, Defendant the Republic of Iraq and its agencies and instrumentalities forfeited their right to claim immunity under the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and 1605(a)(7).  Pursuant to 28 U.S.C. §1605(a)(7) and Pub L. 104-208, Div. A., Title I, §101(c), 110 Stat. 3008-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)), all defendants who are officials, employees, or agents of the foreign state defendants are individually liable to Plaintiffs for damages caused by their acts which resulted in the death  of John Patrick O'Neill, Sr.

12.     By its actions and the actions of its agencies and instrumentalities, Defendant the Republic of Iran and its agencies and instrumentalities forfeited their right to claim immunity under the Foreign Sovereign Immunities Act 28 U.S.C. §§ 1605(a)(2), 1605(a)(5) and 1605(a)(7).  Pursuant to 28 U.S.C. §1605(a)(7) and Pub L. 104-208, Div. A., Title I, §101(c), 110 Stat. 3008-172 (reprinted at 28 U.S.C. § 1605 note (West Supp.)), all defendants who are officials, employees, or agents of the foreign state defendants are individually liable to Plaintiffs for damages caused by their acts which resulted in the death  of John Patrick O'Neill, Sr.

13.     Defendant the Republic of Iraq by its actions and the actions of its agencies and instrumentalities described herein, conducted commercial activity that had a direct effect on the United States, and they are not immune pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. §1605(a)(2).

14.     Defendant the Republic of Iran by its actions and the actions of its agencies and instrumentalities described herein, conducted commercial activity that had a

direct effect on the United States, and they are not immune pursuant to the Foreign

Sovereign Immunities Act 28 U.S.C. §1605(a)(2).

15.     Defendant the Republic of Iraq and its agencies and instrumentalities

described herein, are subject to liability for said acts resulting in personal injury and

death in the United States caused by the tortious act or omission of the foreign state and

its officials and employees while acting within the scope of their office or employment

and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. §1605(a)(5).

16.     Defendant the Republic of Iran and its agencies and instrumentalities

described herein, are subject to liability for said acts resulting in personal injury and

death in the United States caused by the tortious act or omission of the foreign state and

its officials and employees while acting within the scope of their office or employment

and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. §1605(a)(5).

17.     Defendant the Republic of Iraq is a foreign state and was designated a

state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of

1979 (50 U.S.C. App. § 2405(j)) and section 602(A) of the Foreign Assistance Act of

1961 (22 U.S.C. §2371) – from the passage of the Act in 1979 until 1982, and from 1990

until May 7, 2003,[2] and was so designated at the time the acts complained of herein

occurred.  Iraq provided material support and resources to the Al Qaeda terrorist

organization.  Iraq funded, directed, and trained Al Qaeda terrorists and is therefore a

sponsor of Al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605 note.

---

2 On April 16, 2003, Congress enacted the Emergency Wartime Supplemental Appropriations
Act § 1503 Public Law 108-11, 115 Stat. 579.  On May 7, 2003, the President exercised the
authority granted to him by Congress in the Act, and, in effect made seized Iraqi assets
unavailable for satisfying judgments in suits against the Republic of Iraq.

18.     Defendant the Republic of Iran is a foreign state and was designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) and section 602(A) of the Foreign Assistance Act of 1961 (22 U.S.C. §2371) –, and was so designated at the time the acts complained of herein occurred.  Iran provided material support and resources to the Al Qaeda terrorist organization.  Iran funded, directed, and trained Al Qaeda terrorists and is therefore a sponsor of Al Qaeda within the meaning of 28 U.S.C. §§1605(a)(7) and 1605 note.

19.     Defendant the Republic of Iraq was designated a state sponsor of terrorism at the time the acts complained of herein occurred, and is therefore subject to liability for said acts and for provision of material support for said acts resulting in injury and death in the United States as a result of torture, extrajudicial killings and aircraft sabotage, and has forfeited its right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. §1605(a)(7).

20.     Defendant the Republic of Iran was designated a state sponsor of terrorism at the time the acts complained of herein occurred, and is therefore subject to liability for said acts and for provision of material support for said acts resulting in injury and death in the United States as a result of torture, extrajudicial killings and aircraft sabotage, and has forfeited its right to claim immunity pursuant to the 1996 Anti Terrorism Effective Death Penalty Act codified as 28 U.S.C. §1605(a)(7).

21.     The actions of Defendants as described herein subjected the Plaintiffs' decedent John Patrick O'Neill, Sr., to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act, Pub.L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)).

22.     In carrying out these terrorist acts that resulted in the injury and extrajudicial killing of John Patrick O'Neill, Sr., the actions of each Defendant were conducted under actual or apparent authority, or under color of law.

23.     As set forth above and below, Defendants, jointly and severally, aided, abetted, sponsored, materially supported, and conspired to proximately cause the death and injury of John Patrick O'Neill, Sr., through and by reason of acts of international terrorism.  These terrorist activities constitute violations of the law of nations otherwise referred to as contemporary international law, including those international legal norms prohibiting torture, genocide, air piracy, terrorism, and mass murder as repeatedly affirmed by the United Nations Security Council.

24.     As a result of Defendants' sponsorship of terrorism in violation of the law of nations and contemporary principles of international law, the Plaintiffs suffered injury and damages as set forth herein.  Violations of the law of nations and of international agreements include but are not limited to:

   a.     The Universal Declaration of Human Rights, Dec 10, 1956 G.A. Res. 217(A)(III), U.N. Doc A/810, at 71 (1948);

   b.     The International Covenant of Political and Civil Rights, art. 6 (right to life), U.N. Doc. A/6316, 999 U.N.T.S. (1992);

   c.     The Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, 28 U.S.T. 1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. § 112;

        d.       The General Assembly Resolutions on Measures to Prevent

International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/158

(1987); and,

        e.       The Convention on the High Seas, arts. 14-22 (piracy) 13 U.S.T.

2312, T.I.A.S. No. 5200 (1962).

## THE PARTIES

25.    Plaintiff John Patrick O'Neill, Jr. is a United States citizen and domiciliary of the State of Maryland. He is the son of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

26.    Plaintiff Christine Irene O'Neill is a United States citizen and a domiciliary of the State of New Jersey. She is the widow of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

27.    Plaintiff Carol O'Neill is a United States citizen and a domiciliary of the state of New Jersey. She is the daughter of John Patrick O'Neill, Sr. who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

28.    Plaintiff Dorothy A. O'Neill is a United States citizen and a domiciliary of the State of New Jersey. She is the mother of John Patrick O'Neill Sr., who was killed in the September 11, 2001 terrorist attack on the World Trade Center.

29.    Plaintiffs' decedent John Patrick O'Neill, Sr. was a United States citizen and domiciliary of the State of New Jersey. He was killed in the September 11, 2001 attacks on the World Trade Center.

30.    Plaintiff the Estate of John Patrick O'Neill, Sr. is the legal entity created to recover damages on behalf of John Patrick O'Neill, Sr., deceased, and his heirs-at-law

arising from the September 11, 2001 terrorist attack on the World Trade Center.
Plaintiffs John Patrick O'Neill, Jr. and Christine Irene O'Neill are Co-Executors of the
Estate of John Patrick O'Neill Sr., deceased.

31.     Defendant, the Republic of Iraq (hereinafter "Iraq") [3] is a foreign
sovereign state located in the Middle East and shares borders with Saudi Arabia, Jordan,
Syria, Turkey, Iran and Kuwait on September 11, 2001. The United States did not have
formal diplomatic relations with the former government of Iraq, which maintained an
office in New York, the Permanent Representative of Iraq to the United Nations, 14 East
59th Street, New York, NY, 10021.  This court should take judicial notice that Defendant
The Republic of Iraq has been found to be liable as a foreign state supporting
international terrorism under 28 U.S.C. § 1605(a)(7) to victims of state sponsored
terrorism for the acts and actions of Defendant Al Qaeda in cases before this court,
namely *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D DC 2000). Defendant the
Republic of Iraq is *collaterally estopped* in this action from denying that it is liable for
the acts and actions of Defendant Al Qaeda.

32.     Defendant, the Iraqi Intelligence Agency, also known as ("a/k/a")
Mukhabarat, a/k/a the Fedayeen, a/k/a Al-Qare, a/k/a "Unit 999," a/k/a "M-8 Special
Operations," was the intelligence and operational entity in charge of conducting
clandestine operations for the Iraqi government and was an agency, instrumentality,
and/or organ of the Iraqi government.

33.     Defendant, the Islamic Republic of Iran (hereinafter "Iran")  is a foreign
sovereign state located in the Middle East and shares borders with Armenia, Azerbaijan,

Turkmenistan, Afghanistan, Pakistan, Iraq and Turkey.  The United States has not had formal diplomatic relations with Iran since April 7, 1980.  Iran maintains an office in New York, the Permanent Representative of Iran to the United Nations, 14 East 59th Street, New York, NY, 10021.  Iran maintains an Interest Section in the Embassy of Pakistan, located at 2209 Wisconsin Avenue, NW, Washington, DC 20007.

34.    The Government of Iran, along with its associated terrorist group, Hezbollah a/k/a Hizballah, forged an alliance with Osama bin Laden a/k/a Usama bin Laden and Al Qaeda for the purpose of working together against their perceived common enemies in the West, particularly the United States.

35.    Defendant Hezbollah's involvement in the terrorist attacks on September 11, 2001 has been alleged by both American and Israeli military intelligence to have been based on the methodology of Hezbollah's previous terrorist activity.

36.    Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan, Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul Latif are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, or are the personal representatives of their estates, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

3 In April 2003, U.S. Armed forces overthrew the regime of Saddam Hussein.  Any successor government of Iraq remains liable for the state-sponsored acts of terrorism of its predecessor

37.    Defendants Abu Hafs the Maritanian, Saif al-Adil a/k/a Saif al-Adel a/k/a Muhamad Ibrahim Mukkawi a/k/a Ibrahim al-Madani a/k/a Seif Al Adel a/k/a Sayf al-Adl, Imad Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme Leader Ayatollah Ali Hoseini-Khamenei a/k/a Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir, Iranian Minister of Intelligence and Security Ali Fallahian, Iranian Revoluntionary Guard Corps Deputy Commander Brig General Mohammad Baqer Zolqadr, and Adib Sha'ban a/k/a Adeeb Shabaan are natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees of Iran and/or its Intelligence Agency, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

38.    Defendants the Iranian Ministry of Intelligence and Security (MOIS), Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division a/ka Qods Force a/k/a Jerusalem Force, Iranian Minister of Intelligence and Security Ali Fallahian , Iranian Revoluntionary Guard Corps Deputy Commander Brig General Mohammad Baqer Zolqadr, Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC,  Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, The Al Qaeda Islamic Agency a/ka Al Qaeda a/k/a Al Qaedi Islamic Army a/k/a Al Qaeda Islamic Army for the Liberation of the Holy Places a/k/a Islamic Army for the Liberation of Holy Places, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali a/k/a Estate of Hamsiraji Sali, Abu Musab Zarqawi a/k/a Abu Musab al-Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed

---

government.

a/k/a Khaled Shaikh Mohammed, Abu Abdul Rahman,  Schreiber & Zindel, Dr. Frank

Zindel, Engelbert  Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter,

Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin a/k/a Hadj Ahmed

Nasreddin a.k.a Ahmed Idriss Nasreddin and Nasreddin Group International Limited

Holdings a/k/a Nasreddin International Group Holdings Limited a/k/a Nasreddin

International Group, Ltd., Al Taqwa Bank a/k/a **,** a/k/a Bank Al Taqwa, a/k/a Bank Al

Taqwa Limited a/k/a Bank of Taqwa Limited, Al Taqwa Trade, Property, and Industry,

Ltd. a/k/a  Al Taqwa Trade, Property and Industry Company Limited, a/k/a Al Taqwa

Trade. Property and Industry Establishment, a/k/a Himmat Establishment a/k/a Hochburg

a/k/a Waldenburg a/k/a Al Taqwa Property and Industry Limited, Al-Gammah Al

Islamiah , a/k/a Al Gama'a al-Islamiyya , Ayman al-Zawahiri, Albert Freidrich Armand

Huber a/k/a/ Armand Huber, a/k/a Ahmed Huber  a/k/a Albert Huber a/k/a Armand

Albert Friedric a/k/a Armand Huber, Ali Ghaleb Himmat, Asat Trust Reg., Nada

Management Organization, S.A., Yousef M. Nada a/k/a Yousseff Mustafa Nada a/k/a

Youssef Nada,Yousef M. Nada & Co, Gesellschaft, M.B.H, Youssef M. Nada & Co.,

Nada International Anstalt, Barzan e-Tikriti a/k/a Barzan Ibrahim Hasan a/k/a Barzan

Ibrahim Hasan Al-Tikriti, Metalor a/k/a La Groupe Metalor a/k/a  La Groupe Metalor

Technologies a/k/a  Metalor Group a/k/a Metalor Technologies, SA,, Banca del Gottardo

a/k/a Banca del'Gottardo,  Saad Bin Laden, The Terrorist Hijackers, Estate of Abdulaziz

al Omari, Estate of Wail al Shehri, Estate of Waleed M. Al Shehri, Estate of Satam M.A.

al Suqami, Estate of Mohammed Atta, Estate of Fayez Ahmed a/k/a Banihammad Fayez,

Estate of Ahmed al-Ghamdi, Estate of Hamza al-Ghamdi, Estate of Marwan al-Shehhi,

Estate of Mohald al-Shehri, Estate of Khalid al-Midhar, Estate of Nawaf al-Hazmi, Estate

of Salem al-Hazmi, Estate of Hani Hanjour, Estate of Majed Moqued a/k/a Majed

Moqed, Estate of Saeed al Ghamdi, Estate of Ahmed Ibrahim A. al Haznawi, Estate of

Ahmed al Nami, Ziad Samir Jarrah, Zacarias Moussaui a/k/a Zacarias Moussaoui, Estate

of Muhammad Atef a/k/a Muhammad Atef a/k/a Muhammad Atif a/k/a Estate of

Muhammad Atif, The Taliban, Muhammad Omar a/k/a Muhamad Omar a/k/a Muhhamad

Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch,

Muslim Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch,

Muslim Brotherhood – Iraqi Branch, and John Does 1-67  are natural persons(or the

personal representatives of their estates), organizations, banks, and charities located all

over the world who conspired with Osama Bin Laden, Al Qaeda, Iraq and the Taliban to

raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to

support and finance their terrorist activities including, but not limited to, the September

11th attacks.  Some of the businesses, banks and charities operate legitimately but also

maintain a secret dual role as Al Qaeda front organizations and actively support its

terrorist activities.  Some of those organizations are purely a sham front for Al Qaeda.

     39.    Defendant Imad Mughniyeh, a Palestinian who operates directly on behalf

of Iranian intelligence, is regarded as the mastermind of Hezbollah kidnappings, suicide

bombings and violent airplane hiackings.

     40.    Defendant Dr. Ayman al Zawahiri is leader of the Egyptian Islamic Jihad

and Bin Laden's second in command.  American and Israeli intelligence have named both

him and defendant Imad Mughinyeh, as one of the masterminds behind the September

11, 2001 attacks.

41.     Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of

Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah,

Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris

Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin

Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden,

The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu

Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al

Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert

Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand

Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade,

Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert

Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg.,

Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co,

Gesellschaft, M.B.H, Youssef M. Nada & Co., Nada International Anstalt, Barzan e-

Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al

Shehri, Satam M.A. al Suqami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad

Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri,

Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued,

Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah,

Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim

Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim

Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim

Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security, Iranian

Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division, Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil. Imad Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme Leader Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir and Adib Sha'ban a/k/a Adeeb Shabaan, Hezbollah a/k/a Hizballah, Iranian Minister of Intelligence and Security Ali Fallahian, Iranian Revoluntionary Guard Corps Deputy Commander Brig General Mohamma Baqer Zolqadr, and John Does 1-67 are natural persons(or the personal representatives of their estates), subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency or other agents or instrumentalities of Iraq and/or are natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees of Iran and/or its Intelligence Agency or other agents or instrumentalities of Iran and/or are natural persons (or the personal representatives of their estates), organizations, banks, and charities located all over the world, who participated in the acts and conspiracy described below, in their individual capacities and while acting in the course and scope of their employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah, Iran, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks.  Some of the businesses, banks and charities operate legitimately but also

maintain a secret dual role as front organizations for Hezbollah and Al Qaeda and actively support its terrorist activities.  Some of those organizations are purely a sham front for Hezbollah and Al Qaeda.

42.    In a similar fashion, some of the individual Defendants operate apparently legitimate businesses, while maintaining a secret dual role as Hezbollah and Al Qaeda operatives, and others are full-fledged members of Hezbollah and Al Qaeda who operate openly.

43.    Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.  Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd.  and The Asat Trust.

44.    Upon information and belief, the Al Taqwa Defendants have financed and laundered money for Arab and Islamic political and militant groups including the Algerian Armed Islamic Group (GIA) and the Egyptian Gala'a al-Islamiya, Islamic terrorist groups with links to Bin Laden and his Al Qaeda organization.  Additionally, international investigations indicate that Al-Taqwa facilitated the movement of Bin Laden's money around the world in the late 1990's, a task made easier because its complex structure was designed to prevent scrutiny of its operations.

45.     The Al Taqwa Defendants were founded by Defendant Yousef M. Nada, and its other principals are Defendants Ali G. Himmat, Ahmed Huber and Mohamed Mansour.  Defendants Huber and Mansour are senior members of the Muslim Brotherhood.

46.     Defendant Al Taqwa Bank is part of Defendant Al Taqwa Trade, Property and Industry Company which is located in Vaduz, Liechtenstein.  This entity is also known as Himmat Establishment, run by a partner of Nada who, like Nada, is a member of the Egyptian Islamic Brotherhood.  Although Egyptian-born, Mr. Nada is a naturalized citizen of Italy.  Mr. Nada also is a member of Jamaa al-Islamiya, which is directly allied to Al Qaeda through Dr. Ayman al Zawahiri, second in command to Osama Bin Laden.

47.     Shortly after dual U.S. Embassy bombings in Kenya and Tanzania by Al Qaeda in 1998, U.S. intelligence agencies tracked telephone contact between Al Taqwa, members of Bin Laden's inner circle, and Albert "Ahmed" Huber, a convert to Islam in the 1960's who has publicly expressed support for Al Qaeda.  Huber has acknowledged that Ahmad I. Nasreddin, a/k/a Hadj Ahmed Nasreddin, a/k/a Ahmed Idriss Nasreddin, is, in fact, an Al Taqwa founding member and bank shareholder who was very active in financing and operating the Islamic Cultural Institute of Milan, which follows the violent teachings of convicted terrorist Omar Abdul Rahman.  The Institute was frequently visited by known Al Qaeda terrorists.  Upon information and belief, the Institute is known in Western intelligence communities as one of the main Al Qaeda stations in Europe and was used to move weapons, men, and money around the world. After September 11, 2001, Al Taqwa changed its name to the Nada Management Organization SA in an attempt to avoid scrutiny.  Al Taqwa and the Nada group, as well

as their four principals – Nada, Himmat, Huber, and Mansour, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of Al Qaeda.

48.     Defendant Schreiber & Zindel of Vaduz, Liechtenstein, is a legal entity involved in money laundering activities on behalf of Al Qaeda and Al Taqwa Bank, according to documents from the Government of Liechtenstein.  Upon information and belief, revenues from the sale of Iraqi oil under the United Nation's food-for-oil program were laundered to help finance Al Qaeda.  Laundering activity, undertaken with the knowledge of Iraqi officials including Defendant the late Uday Hussein, the eldest son of Saddam Hussein, was undertaken through many of the same middlemen in Switzerland, Liechtenstein, and Italy that administered funds on behalf of sanctioned Al Taqwa bank and other fiduciaries associated with the Muslim Brotherhood.

49.     Defendant Asat Trust Reg. of Baduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001. Defendant Yousef M. Nada founded and operated Asat Trust Reg. Defendants Martin Wachter and Erwin Wachter of the Defendant firm Sercor Treuhand Anstalt based in Liechtenstein, represented Asat Trust Reg.

50.     Upon information and belief, Defendants Martin Wachter, Erwin Wachter, and Schreiber and Zindel engaged in money laundering on behalf of Al Taqwa and Al Qaeda.  Their assets have not been frozen by the United States after the events of September 11, 2001.

51.     Defendant Barzan e-Tikriti is Defendant Saddam Hussein's half-brother and the former finance chief for Saddam Hussein's private financial empire.  For twenty

years, e-Tikriti ran Hussein's network from Lugano, Switzerland while simultaneously acting as Iraq's chief delegate to the United Nations' local Swiss headquarters.   Upon information and belief, Defendant e-Tikriti laundered money through the Swiss bank Defendant Banca del Gottardo and through the holding company, Mediterranean Enterprises Development Projects (MEDP), moving approximately five billion dollars annually from Switzerland to offshore companies in Liechtenstein, Panama and the Bahamas, and eventually transferred some of those funds to the Al Qaeda network.   In addition, e-Tikriti used a Swiss metallurgy firm, Defendant Metalor, to store and transform gold into gold bars, which were then sold for currency.   Upon information and belief, Defendant Hussein's financial network was utilized to support Al Qaeda and the terrorism network.

52.   Following its defeat in the 1991 Gulf War, Iraq's approach to dealing with the United States was to resort to terrorism.   To achieve its goals, Iraq associated with various terrorist groups.   One was the Iranian opposition group Mujahideen-e-Khalq (MEK), that had ties to Ramzi Yousef, who had entered New York in 1992 using an Iraqi passport, and was later convicted in the 1993 World Trade Center bombing.   The MEK reportedly also assisted Osama Bin Laden.   The MEK reportedly assisted Osama Bin Laden's escape to Eastern Iran after the attacks of September 11, 2001.   Eastern Iran is controlled by a Sunni Muslim enclave that was under heavy Iraqi influence.

53.   Ramzi Yousef also gave Iraq a channel to Defendant Khalid Sheikh Mohammed who is a high level Al Qaeda operative and Yousef's uncle.   Defendant Mohammed is regarded to be the mastermind of the 1993 World Trade Center bombing

and the September 11th attacks as well.  Iraq maintained a direct link to Al Qaeda and Khalid Sheikh Mohammed through Ramzi Yousef.

54.     A direct link between Iran and the joint activities of Hezbollah and Al Qaeda is the Al-Taqwa bank of Switzerland and Liechtenstein.  The link primarily is through Ahmad Huber-El Biali (aka Ahmed Huber).  Huber is a principal shareholder of Al-Taqwa bank which was sanctioned by the U.S. government for helping to finance Al Qaeda.     Since 1983, Huber has repeatedly visited Iran.  In 1988, Huber first met Youssef Nada in Iran.  Nada, an Egyptian belongs to the Muslim Brotherhood.  Like Nada, Huber embraced the Muslim Brotherhood.  At a conference in Iran in 1988, Nada asked Huber to participate in the founding of al-Taqwa. Al-Taqwa bank has been a funding source for activities involving Hamas, which has received direct funding from Iran.  Hamas, an outgrowth of Palestinian Muslim Brotherhood founder Abdullah Azzam, is closely associated with Hezbollah.  Azzam, along with Osama bin Laden, were cofounders of the Maktab al-Khidamir (MAK), a precursor to Al Qaeda.  Iran is known to have appointed Hezbollah's terrorist chief, Imad Mughniyeh as coordinator of Iran's activities with the Hamas and the Palestinian Islamic Jihad in Lebanon.

55.     Defendant Asat Trust Reg. of Baduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001.  Defendant Yousef M. Nada founded and operated Asat Trust Reg.

56.     Defendant Abu Musab Zarqawi is a senior Al Qaeda member who escaped through Iran to Iraq following the U.S. attack on Afghanistan.  While in Iraq, Zarqawi received medical attention in Baghdad where he remained to recuperate for several

months.  During the months Zarqawi remained in Iraq, he was protected and shielded from U.S. government efforts to arrest him by the Iraqi regime.

57.     Defendant Zarqawi was also a leader of the Ansar al-Islam which operated in Northern Iraq to assist the Iraqi regime in going after Kurdish dissidents.  Defendant Abu Waiel was a senior Iraq Intelligence agent who, along with Defendant Zarqawi, operated the Ansar al-Islam camp.

58.     Defendant The Muslim Brotherhood numbers some 70 branches around the world.  Defendant Egyptian Islamic Jihad is part of the Egyptian branch of the Muslim Brotherhood, to which most of the September 11th hijackers belonged. Defendant Mohammad Atta belonged to three professional engineering associations controlled by the Muslim Brotherhood.  Defendants Mohammad Zammar and Mouman Darkazanli were two Al Qaeda operatives who belonged to the Syrian Branch of the Muslim Brotherhood, and who directed the Al Qaeda cell in Hamburg, Germany.  Both Zammar and Darkazanli were closely associated with Atta.  Zammar was Atta's mentor and is credited with recruiting Atta into Al Qaeda.    Defendant Khalid Mohammed is known to have met with Defendant Atta in Hamburg, Germany.

59.     The relationship of the Syrian Muslim Brotherhood members with Osama Bin Laden and later Al Qaeda goes back more than 20 years.  Over the years, Osama Bin Laden and his brother Mahrous have provided financial assistance to the Syrian Muslim Brotherhood.

60.     The Syrian Muslim Brotherhood was established to undermine the regime of the late Syrian President Hafez al-Assad.  During the 1980's Iraq worked with the Syrian Muslim Brotherhood, a group with intellectual leanings similar to Al Qaeda,

against the regime of Syria's President Assad. The Baath party, secular in nature, was the ruling party of both Syria's President Assad and Iraqi President Saddam Hussein. Despite the Muslim Brotherhood's antipathy toward Baath secularism, Iraqi support for the Syrian Muslim Brotherhood continued until the end of the Saddam Hussein's regime in April 2003.  As such, Iraqi support of the Hamburg cell comprising the September 11th hijackers flowed to their Syrian Muslim Brotherhood backers, all of whom belonged to Al Qaeda.  Defendants Faroq Hijazi and Ma'Amouri, members of the Iraqi Intelligence Agency, frequently met with Defendant Atta in Hamburg. In effect, Mohammed Atta, through his close connections to Iraqi intelligence and his activities as a conduit of information and funding, became an agent of the Iraqi Intelligence Agency.

61.    Defendant Abu Sayyaf was founded more than a decade ago with help from Jamal Mohammad Khalifa, a brother-in-law of Al Qaeda leader Osama Bin Laden.

62.    Defendants John Does 1-67 are other officials, employees, and/or agents of the Republic of Iraq or of the Islamic Republic of Iran, or others, whose identities are presently unknown, who performed acts that resulted in acts of terrorism, including the actions relating to the attacks on the World Trade Center on September 11, 2001 which caused the extrajudicial killing of Plaintiffs' decedent John Patrick O'Neill, Sr. Defendants John Does 1-67 acted as agents, performed acts within the scope of their office, employment  and/or agency, within the meaning of 28 U.S.C. § 1605 note, which caused the extrajudicial killings described below.

## COMMON FACTUAL ALLEGATIONS RELEVANT TO ALL OF THE COUNTS OF THE COMPLAINT.

63.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden, The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman, Al Jazeera, Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property, and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg., Nada Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft, M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al Shehri, Waleed M. Al Shehri, Satam M.A. al Suqami, Mohammed Atta, Fayez Ahmed a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi, Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour, Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar, Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim Brotherhood – Jordanian Branch,

Muslim Brotherhood – Kuwaiti Branch, Muslim Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security, Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division, Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC,  Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil. Imad Mughniyeh, Hezbollah Secretary General Hassan Nasrallah, Iranian Supreme Leader Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir and Adib Sha'ban (A/K/A Adeeb Shabaan),   and John Does 1-67, who have conspired for many years to attack the United States and murder United States' citizens.  Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more.

64.     Iraq has sworn revenge against the United States since 1992 for Iraq's humiliating defeat in the Persian Gulf War.  Since Iraq could not defeat the U.S. Military, it resorted to terror attacks on U.S. citizens.  In order to avoid another confrontation with U.S. military forces, Iraq contracted with or sponsored Islamic fundamentalists who were willing to commit terrorist attacks on Iraq's behalf.  Indeed, in 1993, Iraqi agents tried to destroy the World Trade Center by planting a bomb in the World Trade Center parking garage.

65.     For many years, Al Qaeda wanted to drive the United States from the Arabian Peninsula, topple Middle Eastern governments supported by the United States,

including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran.  Over the years, Al Qaeda has grown, as it absorbed or became allied with other like-minded Islamic terrorist groups, including the Egyptian Islamic Jihad.

66.     Over the past 10 years, Iraq's leadership, Iran's Leadership and Al Qaeda shared a virulent hatred of the United States.

67.     As early as 1992, Al Qaeda terrorists established close working relations with Iraqi Intelligence agents in Iraq, the Sudan, Afghanistan, and elsewhere.  Soon thereafter, Iraqi Intelligence decided to support Al Qaeda and to employ Al Qaeda terrorists willing to carry out Iraq's terror attacks.  The Iraq-Al Qaeda relationship benefited Iraq because it provided that state with trained terrorists willing to die in terror attacks.  As a secular state, Iraq does not have a large number of citizens wishing to become martyr warriors.  In addition, by using Al Qaeda suicide terrorists, Iraq could disavow involvement in attacks and avoid retribution.  The relationship benefited Al Qaeda who received support, funding, facilities, and training that it needed to carry out its terror campaigns.

68.     During the mid-1990's Iraq began actively supporting Al Qaeda operations by providing intelligence, training, weapons, supplies, passports, travel documents, and financial support to co-conspirators,  Significantly, one of Iraq's training camps contained the fuselage of a Boeing 707 used to train Al Qaeda terrorists in hijacking a commercial aircraft.  The training camp was established at Salman  Pak by members of the Iraqi intelligence service (Mukhabarat), who had contact with some of the September 11th hijackers.  The terrorist training camp adjoins a facility at Salman Pak

used for chemical weapons development.  Al Qaeda members who were at Salman Pak

may have also received training in chemical weapons.

69.    Al Qaeda, backed by Iraq, Iran and others, carried out the September 11th

terror attacks with the financial and logistical support of numerous individuals and

organizations.  These individuals and organizations provided Al Qaeda with the means to

recruit, train, and employ thousands of terrorists, including the twenty assigned to the

heinous mission to murder United States citizens and destroy U.S. landmarks on

September 11, 2001.

70.    This lawsuit seeks to strip the assets of Iraq, Iran, Hezbollah, Al Qaeda,

Bin Laden, and those individuals and organizations who participated in or supported the

September 11th terror attacks and to recover compensatory and punitive damages for the

Plaintiffs.  By doing so, Plaintiffs hope to obtain a measure of justice and to deter future

acts of terrorism.

## The Birth of Al Qaeda

71.    Starting in 1989, an international terrorist group emerged dedicated to

opposing non-islamic governments with brutal force and terrifying violence.  This

organization grew out of the "mekhtab al khidernat" (the "Azzam Service Center")

organization which maintained offices in Peshawar, Pakistan, and received funds from

Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal

enterprises, among others.

72.    Under the leadership of Defendants Bin Laden, Muhammad Atef, a/k/a

"Abu Hafs al Masry," Sheikh Tasyir Abdullah, Abu Fatima, Abu Khadija, together with

"Abu Ubaidah al Banshiri" (Deceased in 1996), Ayman al Zawahiri and others, the

Azzam Service Center expanded, created terrorist cells in various parts of the world, including Afghanistan, Pakistan, and the United States, financed and supported other terrorist groups dedicated to committing acts of violence, murder, destruction and mayhem.  From approximately 1989 until the present, this terrorist group called itself "Al Qaeda" ("the Base").

73.     At all relevant times, Al Qaeda was led by Bin Laden.  Members of Al Qaeda pledged an oath of allegiance (called a "bayat") to Bin Laden and Al Qaeda, committing them to become martyrs in their depraved cause.

74.     Al Qaeda actively and vehemently opposed the United States for several reasons.  First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam.  Second, it believed the United States was providing essential support for other "infidel" nations and organizations, particularly the government of Egypt, Israel, and the United Nations, which Al Qaeda regarded as enemies.  Third, Al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in Muslim-dominated countries afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993.  Al Qaeda viewed these as pretextual preparations for an American occupation of Islamic Countries.  In particular, Al Qaeda opposed the continued presence of American Military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War.  Fourth, Al Qaeda opposed the United States Government because of the arrest, conviction, and imprisonment of Al Qaeda members or other terrorists, with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman who was convicted of conspiring to bomb bridges and tunnels in New

York City.  Fifth, Al Qaeda believed United Nation sanctions against Iraq were

orchestrated by the United States out of eagerness to destroy Iraq.

75.     One of the Al Qaeda's principal goals was to use violence to drive the

United States armed forces out of Saudi Arabia and Somalia.  Members of Al Qaeda

issued fatwas (rulings on Islamic law) stating that attacks on the United States were both

proper and necessary.

76.     At least as early as 1991, Bin Laden and Al Qaeda began working closely

with Defendant Ayman al Zawahiri, a/k/a "Abdel Muaz," a/k/a Dr. Ayman al Zawahiri,"

a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a/ "Abu Mohammed," a/k/a "Dr.

Mohammed Nur Al-Deen" whose Egyptian Islamic Jihad terrorist group shared Bin

Laden and Al Qaeda's goals.  Bin Laden had met Zawahiri in Peshawar, Pakistan, in

1987 during the Afghan-Soviet war.

77.     From in or about 1987, until in or about December 1997, Ayman al

Zawahiri led  the Egyptian Islamic Jihad, a group dedicated to the forceful overthrow of

the Egyptian Government and committing violence against the United States, in part, for

what Zawahiri believed to be the United States support of the Egyptian Government.

Members of the Egyptian Islamic Jihad pledged allegiance to al Zawahiri.  Many of the

leading members of the Egyptian Islamic Jihad ultimately became influential members of

Al Qaeda, including Ayman al Zawahiri and Muhammad Atef.  By February 1998, the

Egyptian Islamic Jihad led by Al Zawahiri had effectively merged with Al Qaeda and had

joined with Al Qaeda in targeting United States citizens.  In turn, Al Qaeda and the

Egyptian Islamic Jihad in February 1998 founded an umbrella terrorist organization

called the "International Islamic Front for the Jihad Against Jews and Crusaders."   In

May 1998, Bin Laden declared a fatwa in the name of the "International Islamic Front for the Jihad against Jews and Crusaders,"   to "kill the Americans and their allies – civilians and military."

78.     Al Qaeda had a command and control structure which included a "majalis al shura" (consultation council) of 10 members that discussed and approved major undertakings, including terrorist operations.  Bin Laden, Muhammad Atef, a/k/a "Abu Hafs," Ayman al Zawahiri, Saif al Adel, Mamdouh Mahmud Salim a/k/a/ "Abu Hajer" a/k/a Abu Hajer al Iraqi and Abdullah Ahmed Abdullah, a/k/a "Abu Mohammed el Masry," a/k/a "Saleh," among others, sat on the majalis al shura (or consultation council) of Al Qaeda.  Its affiliate, the Egyptian Islamic Jihad, had a Founding Council, on which Ibrahim Eidarous sat.

79.     Al Qaeda also maintained a "military committee" which considered and approved "military" matters.  Defendant Muhammad Atef sat on the military committee and was one of Bin Laden's two principal military commanders, together with "Abu Ubaidah al Banshiri," until his death in May 1996.  Muhammad Atef had the principal responsibility for supervising the training of Al Qaeda members.  Saif al Adel also served on the military committee reporting to Muhammed Atef.  He took over the military committee after Atef's death.

80.     Al Qaeda functioned both on its own and as a conduit for other terrorist organizations in other parts of the World that shared its ideology, such as the Egyptian Islamic Jihad, Ahmed Refai Taha, a/k/a "Abu Yasser al Masri," and a member of jihad terrorist groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan,  Bosnia, Croatia, Albania, Algeria,

Tunisia, Lebanon, Indonesia, the Philippines, Tajikistan, Azerbaijan, the Kashmiri region

of India and the Chechnyan region of Russia.  Al Qaeda camps were used to train

terrorists to fight in Islamic causes, such as supporting Pakistan in its dispute with India

over the province of Kashmir.  Al Qaeda maintained terrorist cells and personnel in a

number of countries to facilitate its activities, including Kenya, Germany, Tanzania, the

United Kingdom, Canada, and the United States.

81.     Bin Laden and Al Qaeda also forged alliances with the National Islamic

Front in the Sudan and with representatives of the government of Iran, and its associated

terrorist group Hezbollah, for the purpose of working together against their perceived

common enemies in the West, particularly the United States.

82.     At various times from as early as 1989, Bin Laden, and others known and

unknown, ran terrorist training "camps and guesthouses" in various areas, including

Afghanistan, Iraq, Iran, Pakistan, the Sudan, Somalia, Kenya, Malaysia, Philippines, and

Germany for the use of Al Qaeda and its affiliated groups.  Mamdouh Mahmud Salim

a/k/a Abu Hajer al Iraqi managed some of these training camps and guesthouses in

Afghanistan and Pakistan.

83.     Since 1991, Bin Laden, Al Qaeda, and many of their co-defendants

unlawfully, willfully and knowingly combined, conspired, confederated, and agreed to

murder and injure United States citizens throughout the world, including in the United

States, and to conceal their activities and methods by, among other things, establishing

front companies, providing false identity and travel documents, financing terrorist

operations, engaging in coded correspondence, providing false information to the

authorities in various countries, and seeking to detect and kill informants.

39

**Iraqi Terrorism**

84.      Since the early 1990s, Iraq and Iraqi Intelligence have used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for Iraq's Gulf War defeat.  Al Qaeda was Iraq's favorite partner in terror.

85.      Upon information and belief, there have been numerous meetings between Iraqi Intelligence agents and high-ranking Al Qaeda terrorists to plan terror attacks.  One such meeting occurred in 1992, when Defendant Zawahiri (Egyptian Islamic Jihad leader and Al Qaeda officer) met with Iraqi Intelligence agents in Baghdad, Iraq over several days.  An Iraqi serving with the Taliban who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that Iraqi contacts with Al Qaeda began in 1992.  In fact, Abu Iman al-Maliki, who spied on the Kurds as an Iraqi intelligence officer for 20 years, said that the 1992 meeting not only included Iraqi intelligence officers, but also Defendant Dr. al-Zawahiri, top lieutenant of Bin Laden, who was known to have met with Saddam Hussein.

**The 1993 World Trade Center Bombing**

86.      On February 26, 1993, a bomb was detonated in the World Trade Center underground parking lot, killing six (6) U.S. citizens and injuring close to one thousand (1,000).  Iraqi sponsored terrorists planned, financed, executed and carried out that World Trade Center bombing.

87.      The 1993 World Trade Center bombing took place on the Friday before the two year anniversary of Iraq's defeat in Kuwait, which was February 28, 1991.  The anniversary in 1993 was a Sunday, and few people would have been working at the

World Trade Center that day; and Iraq and the terrorists wanted to maximize the number of American casualties.

88.     During the initial planning of the World Trade Center bombing, Mahmud Abu Halima (who was later convicted for his role in the bombing), was in regular and frequent contact with his uncle, Kadri Abu Bakr, who lived in Iraq and had been a member of a PLO faction allied with Saddam Hussein.  Shortly after these calls, the mastermind of the bombing, Ramzi Ahmed Yousef, on information and belief, an Iraqi Intelligence agent and/or asset and/or associate,  traveled to the United States using travel documents forged in Kuwait during the Iraqi occupation of that country in 1991.

89.     Ramzi Yousef arrived in New York on September 1, 1992 using an Iraqi passport and requesting asylum.  On December 31, 1992, he presented photocopies of passports for Abdul Basit at the Pakistani consulate in New York, claiming to be Basit and requesting replacement of his "lost" passport.  The real Basit was a Pakistani citizen who had moved to Kuwait and disappeared during the Iraqi occupation in August 1990. Iraqi Intelligence had access to the Kuwaiti Interior Ministry files and upon information and belief, inserted Yousef's fingerprints into the file and provided him with photocopies of two older passports from Basit's file.  The Pakistani Consulate, accordingly, provided Yousef a temporary passport, based on the false documents.  This provided Yousef with a means to escape the U.S. two days after the World Trade Center bombing.  In fleeing the United States after the bombing, Yousef first traveled through Baluchistan, an uncontrolled region of Iran straddling the border of Iran and Pakistan with strong ties to Iraq.  By the following year, 1994, Yousef was living in the Philippines.  He fled from there, however, after authorities discovered a plan he was working on to bomb United

States' airliners.  Yousef fled to Pakistan and was eventually sheltered at an Al Qaeda guesthouse.  He was arrested in February 1995 in Pakistan and transported to the U.S. for prosecution and was eventually convicted in the 1993 World Trade Center bombing conspiracy.

90.     Abdul Rahaman Yasin, who was born in the United States to Iraqi parents but had been raised in Iraq, was questioned in New York and New Jersey in connection with the World Trade Center bombing, but was released after appearing to cooperate with U.S. officials.  He fled the country the next day and traveled to Baghdad, Iraq.  U.S. prosecutors later learned that he, along with others, had prior training in bomb making, and had mixed the chemicals and constructed the bomb that was used on the World Trade Center.  Iraqi intelligence knew of Yasin's presence in Iraq and provided him with refuge.  On August 4, 1993, Yasin was indicted in absentia for the World Trade Center bombing.

91.     In June 1994, Yasin was seen in Baghdad by an ABC news correspondent who was told that Yasin worked for the Iraqi government.  U.S. law enforcement officials confirmed that fugitive Yasin worked for the Iraqi government.  U.S. law enforcement officials confirmed that fugitive Yasin has been sheltered in Iraq, a continuing violation of United Nations Security Council Resolution 687, which makes it unlawful to harbor a suspected terrorist.  In June 2002, Yasin was interviewed in Baghdad by Leslie Stahl from CBS.  Upon information and belief, Yasin still remains in Iraq.

92.     Ramzi Ahmed Yousef, Mohammed Salameh, Nidal Ayyad, Mahmud Abu Halima and Ahmad Mohammed Ajaj were all eventually convicted in the Southern District of New York for the 1993 conspiracy to bomb the World Trade Center.

93.     Following his arrest in 1995, Ramzi Yousef told U.S. investigators that his intent was to create an explosion that would cause one of the World Trade Center Towers to fall over onto the other, destroying both and causing massive American casualties. Yousef had also planned to use sodium cyanide to create a toxic cyanide gas cloud throughout the area that would poison those in the building.  Fortunately, the sodium cyanide was consumed in the blast and vaporized.  Before the Gulf War, Iraq had the largest and most diversified terrorist chemical weapons program in stockpiles of sodium cyanide, and had experience in the late 1980's using chemical weapons against its Kurdish population.  Upon information and belief, it was Iraq that supplied Yousef with the sodium cyanide and/or trained him in the use and/or manufacture of chemical weapons.

94.     Upon information and belief, Al Qaeda terrorists met and conspired in November, 1995, with Iraqi Intelligence and the Iranian Hezbollah to bomb the Khobar towers complex located in Dhahran, Saudi Arabia.  Their plan called for the detonation of a truck bomb outside an apartment complex that was used as a barracks for United States servicemen.  The resultant attack on Khobar Towers of June 25, 1996, took the lives of 19 U.S. Servicemen.  Fearing further attacks by Bin Laden and Al Qaeda, some Saudi government officials and businessmen agreed to provide financial support to Al Qaeda and began funneling millions of dollars to charities that would then forward the money to Al Qaeda.  Some of these charities were Madras schools that preached a form of Islam that is intolerant of non-Muslims and provided new recruits for terrorism.

**Bin Laden's Return to Afghanistan**

95.     In 1996, Bin Laden was asked to leave the Sudan by Sudanese officials pressured by the United States to crack down on terrorism.  Bin Laden returned to Afghanistan after the Taliban seized control of most of that country.  The number of Al Qaeda members and terrorist training camps in Afghanistan grew rapidly following Bin Laden's return.  Al Qaeda actively supported the Taliban and violently suppressed all opposition to the Taliban.  Bin Laden and Omar developed a very close relationship.

96.     From 1996 until 2001, Bin Laden with the financial and logistical support of  Omar and others in the Taliban and Iraq and Iraqi Intelligence, created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking their enemies throughout the world.  These camps trained men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives.  Classes were also given in "how to kill a policeman" and "traps, murder, and terrorist moves."

97.     On August 23, 1996, a strengthened Bin Laden issued another *fatwa* declaring a jihad against Americans present in Muslim lands.  The message was disseminated throughout all Al Qaeda cells and associated terrorist groups, such as the Egyptian Islamic Jihad.  The London Al Qaeda cell, run by Khalid Al Fawwaz under the name Advice and Reformation Committee, and the Egyptian cell, run by al Zawahiri and Abdel Barry, were used to send the *fatwa* to Muslims living in the Western World.  Wadih El Hage was also used by Bin Laden in order to deliver messages, money and terrorist material to Al Qaeda operatives in the U.S. and U.K.

**The Public Merger of Iraqi and Al Qaeda Interests**

98.     In February 1997, Bin Laden publicly expressed his support for Iraq in its conflict with the United States, stating:

> "The hearts of the Muslims are filled with hatred towards the United States of America and the American President for American conduct towards Iraq."

99.     Having decided to carry out acts of terrorism, Saddam Hussein, with the advice and prompting of his son and Iraqi Intelligence chief, the late Qusay Hussein and his other son, the late Uday Hussein, head of an Iraqi Intelligence Subdivision known as the "Fedayeen" and "Al-Qare," concluded that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining Iraqi revenge.

100.    Upon information and belief, Iraq agreed to supply arms to Al Qaeda and provide Al Qaeda with access to and training in the use of chemical and biological weapons.  Iraq also agreed to instruct Al Qaeda terror trainers at its Salman Pak camp in Baghdad that contained a Boeing 707 used to practice hijacking.  Iraq also agreed to supply Al Qaeda terrorists with new identities and passports from Yemen and the United Arab Emirates.

101.    In exchange, Al Qaeda agreed to provide protection from political opponents to Iraq and Saddam Hussein, and to commit assassinations and other acts of violence to create instability in regions of Iraq, particularly Kurdistan, to assist the regime of Saddam Hussein.  Al Qaeda further agreed to provide trained terrorists, assassins, and martyrs to carry out terror attacks in concert with Iraq against their common enemies, including the United States.

102.    On February 22, 1998, Bin Laden, Khalid Al Fawwaz, and Ayman al Zawahiri of the Egyptian Islamic Jihad issued a fatwa published in the Arabic newspaper Al-Quds stating:

> "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it…"

103.    In their February 22, 1998 fatwa, Bin Laden and Al Qaeda expressly referenced the United States' "continuing aggression" towards Iraq as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" they are found:

> "The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless."

104.    The Bin Laden and Al Qaeda fatwa also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States' alleged "eagerness to destroy Iraq."

105.    Additional fatwas of a similar nature were issued in May 1998 and published in Al-Quds under the banner of the Ulema Union Of Afghanistan.  A May 29, 1998 Fatwa issued by Bin Laden called to the use of a nuclear bomb to "terrorize the Jews and Crusaders who were enemies of God."  At the time Bin Laden was seeking to obtain nuclear material from Iraq and others who possessed nuclear material and was in the process of developing nuclear weapons.

106.    Between April 25 and May 1, 1998, two of Bin Laden's senior military commanders, Muhammad Abu-Islam and Abdullah Qassim visited Baghdad for

discussions with Saddam Hussein's son – Qasay Hussein – the "czar" of Iraqi Intelligence.

107.     The late Qusay Hussein's participation in those meetings highlights the importance of the talks in both symbolic and practical terms.  Upon information and belief, as a direct result of those meetings, Iraq again made commitments to provide training, intelligence, clandestine Saudi border crossings, financial support and weapons and explosives to Al Qaeda.

108.     Iraqi Intelligence officials met with Bin Laden in Afghanistan several more times.  A second group of Bin Laden and Al Qaeda operatives from Saudi Arabia were then trained by Iraqi Intelligence in Iraq to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence.  A third group of Bin Laden and Al Qaeda operatives received a month of sophisticated guerilla operations training from Iraqi Intelligence officials later in the Summer of 1998.

109.     Despite philosophical and religious differences with Saddam Hussein, Bin Laden continually sought to strengthen and reinforce the support he and Al Qaeda received from Iraq.

110.     Upon information and belief, documents recently found in the bombed headquarters of the Mukhabarat, Iraq's intelligence service, reveal that an Al Qaeda envoy was invited clandestinely to Baghdad in March 1998.  The documents reveal that the purpose of the meeting was to establish a relationship between Baghdad and Al Qaeda based on their mutual hatred of America and Saudi Arabia.  The meeting

apparently went so well that it ended with arrangements being discussed for Bin Laden to visit Baghdad.

111.     In March 1998, Bin Laden had reportedly visited Baghdad for consultations.  According to Giovanni DeStafant, an international lawyer visiting Baghdad on business, he encountered Bin Laden in the lobby of the five-star Al-Rashid Hotel in Baghdad.  They engaged in light conversation.

112.     In mid-July, 1998, Bin Laden sent Dr. Ayaman al-Zawahiri, the Egyptian co-founder of Al Qaeda, to Iraq to meet with senior Iraqi officials, including the Iraqi vice-president Taha Yassin Ramadan.  Upon information and belief, the purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign in the United States.  Five months later, the American embassies in Kenya and Tanzania were bombed.

113.     Upon information and belief, Iraqi Intelligence officials pledged Iraq's full support and cooperation in exchange for a promise that Bin Laden and Al Qaeda would not incite the Iraqi Muslim Brotherhood inside Iraq to oppose, undermine or attack the regime of Iraqi dictator Saddam Hussein.

114.     During the July 1998 visit, Zawahiri toured a potential site for a new headquarters for Bin Laden and Al Qaeda, and went to an Iraqi military base and nuclear and chemical weapons facility near al-Fallujah in Iraq.  Upon information and belief, Dr. Zawahiri observed training by Iraqi Intelligence officials of Al Qaeda operatives at the al-Nasiyirah military and chemical weapons facility in Iraq.  In recognition of Bin Laden's and Al Qaeda's leadership role in the terrorist war against the United States, Iraqi officials allowed Zawahiri to assume formal command over the al-Nasiyirah training camp in the name of Bin Laden and Al Qaeda.

## U.S. Embassy Bombings

115.     To demonstrate its commitment to Iraq and its anti-U.S. policies, in the Spring of 1998, Al Qaeda planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya, and Dar Es Salaam, Tanzania.  Khalfan Khamis Mohamed, Mustafa Mohamed Fadhil, Mohamed Rashed Daoud Al-'Owali, Sheikh Ahmed Salim Swedan, Fahid Mohamed Aly Msalam and an individual known as Abdulla Azzam were chosen as some of the Al Qaeda terrorists who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

116.     In July and early August 1998, Al Qaeda terrorist Mustafa Mohamed Fadhil, Khalfan Khamis Mohamed, Ahmed Khalfan Ghailini, Fahid Mohammed Ally Msalam, Ahmed the German, Sheikh Ahmed Salim Swedan, Mohamed Sadeek Odeh and Fazul Abdullah Mohammed were stationed in Dar es Salaam where they purchased a 1987 Nissan Atlas truck and outfitted it with oxygen, acetylene tanks, TNT, batteries, detonators, fertilizer and sand bags, creating a massive bomb to be driven into the U.S. Embassy.  Odeh, Fazul Adullah Mohammed and others who participated in the bombings had been with Bin Laden since the early 1990s and Bin Laden's days in the Sudan.

117.     On July 30, 1998, Iraq warned it would take action unless the United Nations embargo was lifted.  Iraq blamed the United States for the United Nations embargo.  On August 4, 1998, Iraq refused to cooperate with the United Nations embargo.  On August 4, 1998, Iraq refused to cooperate with United Nations weapons inspectors in Iraq and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

118.     Three days later, on August 7, 1998, at approximately 10:30 a.m., Fazul, Al-'Owhali and Azzam drove a Toyota Dyna truck (outfitted similarly to a Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya, and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4.500 people.

119.     On August 7, 1998, at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and Ahmed the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania, severely damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

120.     On August 6, 1998, shortly before the bombing, Eidarous, an Al Qaeda member in London, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, UAE, claiming responsibility for the embassy bombings under the fictitious name Islamic Army for the Liberation of Holy Places.

121.     At the trial in New York of some of the Al Qaeda-U.S. Embassy bombers, some of the defendants elicited testimony in their defense that cited the poor living conditions in Iraq.  They blamed those conditions on the U.S.-U.N. sanctions, and used it as motivation and explanation for the Al Qaeda attacks on the Embassies.

### The 1998 U.S. Air Strikes on Al Qaeda

122.     On August 20, 1998, the United States initiated a pre-emptive and retaliatory air strike with cruise missiles on Al Qaeda training camps in Khost, Afghanistan and a factory in Khartoum, Sudan, believed at the time to be a chemical

weapons plant used by the Sudanese and Iraqi governments to manufacture weapons for their use and that of Al Qaeda terrorists.

123.     On August 20, 1998, President Clinton issued a statement on the air strike:

"Our target was terror…our mission was clear to strike at the network of radical groups affiliated with and funded by Bin Laden, perhaps the preeminent organizer and financier of international terrorism in the world today."

124.     By mid-November, 1998, Saddam Hussein reportedly came to the conclusion (with the advice and prompting of his son and intelligence chief, the late Qusay Hussein) that a campaign of terrorist attacks against the United States, under the banner of Bin Laden and Al Qaeda, was the most effective means of deflecting U.S. attempts to topple his regime.

125.     Shortly thereafter, Iraqi intelligence officials reportedly met with Bin Laden in Afghanistan.  Bin Laden, Al Qaeda, and Iraq reportedly agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States.  Iraq also reportedly agreed to provide Bin Laden and Al Qaeda with the assistance of an expert in chemical weapons, and Bin Laden reportedly agreed to hunt down Iraqi opposition leaders who cooperated with the United States against Hussein.  In furtherance of this agreement, Bin Laden reportedly dispatched four hundred of Al Qaeda's "Afghan" Arabs to Iraq to fight Kurdish dissidents.

126.     In December 1998, after a standoff between the U.N. and Iraq and a discovery of weapons violations in Iraq, the United States with U.N. approval, led a coalition of allies in a four-day air strike on Iraq.  Iraqi Trade Minister Muhammed Madhi Salah then stated that he expected terrorist activities against the United States to

*increase* as a result of the bombing of Iraq.  The Arabic language daily newspaper Al-Quds Al-Arabi a/k/a Al Quds cited the cooperation between Iraq, Bin Laden and Al Qaeda in a late December 1998 editorial which predicted that

> "President Saddam Hussein, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama Bin Laden, whom the United States considers to be the most wanted person in the world."

127.    The editorial noted that this type of cooperation was already taking place, considering that "Bin Laden was planning on moving to Iraq before the recent strike."

128.    Following the December 1998 air strikes on Iraq, Saddam Hussein dispatched Faruq al-Hijazi to Kandahar, Afghanistan in order to meet with Bin Laden and plot their revenge.  Al-Hijazi also offered Bin Laden terrorist resources and asylum in Iraq.

129.    The late Qusay Hussein had also dispatched representatives to follow-up with Bin Laden and obtained his firm commitment to exact revenge against the United States for the December 1998 bombing campaign.  Iraq offered Bin Laden and Al Qaeda an open-ended commitment to joint operations against the United States and its "moderate" Arab allies in exchange for an absolute guarantee that Bin Laden, Al Qaeda and their allies would not attempt to overthrow Saddam Hussein's regime in Iraq.

130.    To demonstrate Iraq's commitment to Bin Laden and Al Qaeda, Hijazi presented Bin Laden with a pack of blank, official Yemeni passports, supplied to Iraqi Intelligence from their Yemeni contacts.  Hijazi's visit to Khandahar was followed by a contingent of Iraqi Intelligence officials who provided additional training and instruction to Bin Laden and Al Qaeda operatives in Afghanistan.

131.   Upon information and belief, Bin Laden, Al Qaeda and Iraq agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States.

132.   "Unit 999" was located at Salman Pak, south of Baghdad.  It was here that training would be given to Al Qaeda fighters to use chemical and biological weapons in sabotage operations in Europe and across the United States.

133.   In 1998, reports revealed that Saudi and Palestinian dissidents were trained in Iraq at secret camps run by an Iraqi Intelligence group known as Unit 999.

134.   A trainer at Unit 999, Abu Mohammad, who had escaped Iraq, confirmed that such training was underway on how to lay bombs and how to use chemical and biological weapons in operations in the Middle East and the West.  Unit 999 ran a course for a number of extremist Middle Eastern groups, including Al Qaeda.  Mohhamad was recruited into Saddam Fedayeen in 1998 and had his first encounter with Bin Laden fighters that year at Salman Pak.

135.   Iraq maintained an advanced chemical and biological weapons program, part of which was located at Salman Pak.  Iraq is one of only three countries in the world producing a highly developed weaponized anthrax.  Sometime during or after 1998, Iraq agreed to help Bin Laden and Al Qaeda develop a laboratory in Afghanistan designed to produce anthrax.

136.   In addition to the al-Nasiriyah and Salman Pak training camps, by January 1999, Bin Laden and Al Qaeda operatives were being trained by Iraqi Intelligence and military officers at other training camps on the outskirts of Baghdad.

137.     Those locations were the Nahrawan camp at the old Diyala Bridge, southeast of Baghdad and Tell Aswad Ridhwaniya, northwest of Baghdad.  The Mukhabarat (Iraqi Intelligence Agency) runs the training facilities at both locations. Relocation occurred due to publicity surrounding Salman Pak, where kamikaze, explosives, and assassination training included "foreigners" said to be Palestinians and Iranians from the Mujahedin-e Khalq (MEK).  Iraq supports the anti-Iranian terrorist group, MEK, to which Ramzi Yousef was connected due to his Iraqi background.  Bin Laden also reportedly is being sheltered by the Iranian guerilla fighters of the MEK in the eastern portion of Iran.  He and close associates reportedly crossed into Iran using smuggling routes with the help of the MEK, and took refuge in caves said to be more extensive and sophisticated than those of the Tora Bora mountain chain in Afghanistan. The MEK, who are fighting a war against the Shiite government of Tehran, are minority Sunnis.  They maintain good relations with certain Afghan and Pakistani tribes.  When the Iranian government cracks down on the group, MEK members take refuge in the Pakistani or Afghani tribal areas.

138.     In January 1999, Iraq began reorganizing and mobilizing Iraqi Intelligence front operations throughout Europe in support of Bin Laden and Al Qaeda.  Haqi Ismail, believed to be a member of Iraq's Mukhabarat Secret Service, left Iraq to train in an Afghanistan Al Qaeda camp.  Ismael was believed to be a liaison between Iraq, the Taliban, and Al Qaeda and was rewarded with a position in the Taliban Foreign Ministry.

## Attack on the U.S.S. Cole DDG-67

139.     In the spring of 2000, Iraqi Intelligence began planning to attack United States warships in the Persian Gulf in an effort to prompt a United States withdrawal.

Iraq sought suicide bombers who would employ small boats packed with explosives to ram United States' warships.

140.     On October 12, 2000, Iraqi Intelligence and members of Al Qaeda including Bin Laden, Jamal al-Badawi, Khalid al-Midhar, Mohammed Omar al –Harazi, Walid al Sourori, Fatha Abdul Rahman, Yasser Al-Azzani, Jamal Ba Khorsh, Ahmad Al-Shinni, Raed Hijazi, Jamil Quasim Saeed Mohammed, as well as the two suicide boat bombers Abd Al-Mushin Al-Taifi (deceased) (and a suspect in the August 1998 Embassy bombings) and Hassan Said Awadh Khemeri (deceased) carried out their plan to bomb the U.S.S. Cole by ramming a small boat loaded with explosives into the side of the ship as it was anchored in the harbor at Aden, Yemen, resulting in the deaths of 17 American sailors and injuring an additional 39.

141.     The Yemeni government investigation reported that the terrorists behind the attack were Islamic extremists who fought the Soviets in the Afghan war and who were tied to the Egyptian Islamic Jihad and Al Qaeda and who were trained in Afghanistan.  Four were arrested in Yemen.  Jamil Qaseri Saeed Mohammed was arrested a year later in Pakistan.  After his arrest, Al-Badawi admitted that he received his instructions to bomb the U.S.S. Cole from Al Qaeda member Al-Harazi whom he had met during the war in Afghanistan.

## Al Qaeda Hijacking of Saudi Airline

142.     On October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 from Saudi Arabia and it had flown to Baghdad, Iraq.  The hijackers were given "asylum" in Iraq.  They were extensively interviewed in the Iraqi press and criticized the Saudi government.

143.     Upon information and belief, this hijacking was a message between Bin Laden and Iraq intended to demonstrate that Al Qaeda terrorists could seize control of large commercial aircraft that could be used as a weapon in the hands of suicide terrorists, foreshadowing a coordinated attack that was less than a year away.

### Iraqi Launch of Terror War

144.     On January 22, 2001, the Arab language newspaper Al Watan Al Arabi, reported that Saddam Hussein and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies."  The newspaper characterized Hussein's statement as calling for an uncompromising campaign and "scorched earth policy."

145.     In May 2001, Al Qaeda operatives in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with Saddam Hussein.  The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan.  This benefited the Hussein regime in Iraq.

146.     Also in May 2001, Iraqi physician and kidney specialist Dr. Mohammed Khyal was dispatched from Baghdad to Afghanistan for three days to treat Bin Laden's kidney problem, further demonstrating the important relationship between Iraq and Bin Laden less than four months before the single largest terrorist attack in history.

147.     During the May 2001 trial of some of the Al Qaeda defendants who bombed the U.S. Embassies in Africa, the defendants expressed sympathy, solidarity, and support for Iraq, and further expressed condemnation of the United States as their motivation for the bombings.

148.     On May 29, 2001, Wadih El-Hage, a U.S. citizen believed to be Bin Laden's personal secretary, was convicted in the Southern District of New York, along with Mohamed Sadeek Odeh, Mohammed Rashed Daoud Al-'Owali and Khalfan Khamis Mohamed, for participating in the conspiracy to bomb the Untied States Embassies in Nairobi and Dar es Salaam in August of 1998.  Bin Laden and other Al Qaeda members were indicted but still remain at large.

## Iraqi Involvement in the September 11th Attacks

### *Al Nasiriyah News Article*:

149.     Iraq knew in advance that Al Qaeda was planning to attack U.S. landmarks and civilians in September 2001 in Washington and New York and supported the planned attacks.

150.     Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with Iraqi intelligence since the early 1980s.  As such, he has commented on matters of Iraqi political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah.  On September 1, 2001, he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by Saddam Hussein.  In addition, Al Nasiriyah contains a military base that is believed to house a chemical weapons storage facility. Iraq had previously denied access to this base to U.N. weapons inspectors.  It was visited by Zawahiri as early as 1998 and Al Qaeda terrorists trained there for several years.

151.     On July 21, approximately six weeks before the September 11th attacks, Iraqi columnist Mulhalhal reported that Bin Laden was making plans to "demolish the Pentagon after he destroys the White House."

152.   Mulhalhal's July 21 article further informed that Bin Laden would strike America "on the arm that is already hurting."  Upon information and belief, this references a second Iraqi sponsored attack on the World Trade Center.  This interpretation is further bolstered by another reference to New York as "[Bin Laden] will curse the memory of Frank Sinatra every time he hears his songs." (e.g. "New York, New York") identifying New York, New York as a target.

153.   Mulhalhal further indicated "The *wings* of a dove and the *bullet* are all but one in the same in the heart of a believer." (Emphasis supplied).  This appears to be a reference to the use of commercial aircraft as a weapon.  The information was reported in an Iraqi newspaper whose editor-in-chief served as secretary to the late Uday Hussein's Iraqi Syndicate of Journalists.  The article expressed Iraqi admiration and support for Bin Laden's plans and its appearance in the newspaper would clearly have to be endorsed by Saddam Hussein himself.

154.   All Iraqi news media were strictly controlled and censored by the government of Saddam Hussein and were under the direct oversight of the late Uday Hussein.  Various members of Iraqi intelligence worked at and controlled the context of each and every newspaper published inside Iraq.

155.   The information contained in Mulhalhal's published statements was known prior to the events of September 11th, as was the fact that Mulhalhal had ties to Iraqi intelligence.  His actions and words demonstrated foreknowledge of the planned attacks by Bin Laden and indicated support by Iraqi co-conspirators.

156.   Iraq's July 21 public statements also exemplify the Bin Laden pattern of publicly threatening violent strikes against the United States prior to and after committing

them.  For example, weeks before the August 1998 Al Qaeda attacks on the U.S. embassies in Africa, Bin Laden threatened U.S. civilians and shortly thereafter bombed the embassies in Kenya and Tanzania within minutes of each other, killing 223 civilians.

157.    Additionally, after the suicide boat bombing of the U.S.S. Cole in Yemen in October 2000, Bin Laden publicly threatened violence against America while wearing traditional Yemeni clothing including a Yemeni war dagger.  Bin Laden sought media attention to taunt the United States and to recruit additional Muslim supporters.

### *Preparation For September 11th Attacks*

158.    According to U.S. and foreign intelligence officials, in the Spring of 2000, Iraqi Intelligence agents met with September 11th plot hijackers Zaid Samir Jarrah and Marwan al-Shehhi in Dubai, UAE in order to advance the hijacking of U.S. aircraft to commit terrorist acts.  Not long after the meeting, al-Shehhi entered the United States on May 29 and Jarrah entered on June 27 to begin preparations for the attacks.

159.    According to Czech intelligence sources, on June 2, 2000, co-conspirator and Defendant Mohammad Atta, a pilot and the operational leader of the September 11th terrorist attacks, traveled to Prague to meet other co-conspirators.  The following day, Atta arrived at Newark International Airport in the United States.

160.    According to the FBI, from July 2000 through March 2001, Atta, Shehhi, Hanjour, Jarran and Hamzi traveled to the U.S., where they resided and took pilot courses to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the Al Qaeda Iraqi conspiracy to hijack U.S. aircraft to commit terrorist acts.

161.    Upon information and belief, between April 8-11, 2001, Atta left Florida where he was a flight student, to again meet in Prague with Iraqi Intelligence agent al-

Ani.  Czech Interior Minister Stanislav Gross confirmed that Atta met with al-Ani in early April 2001 in Prague.  Atta returned to Florida and within two weeks opened a Sun Trust Bank account with $100,000 sent through a money changer in the UAE.  Later in 2001, al-Ani was expelled from the Czech Republic for espionage activities.  Other intelligence reports indicate that al-Ani met with another September 11th hijacker, Khalid al Midhar as well.  Atta reportedly also met with the Iraqi ambassador to Turkey and former Iraqi Deputy Intelligence director Farour al-Hijaziin in Prague sometime in early April, 2001.

162.    Italian security sources reported that Iraq made use of its embassy in Rome to foster and cultivate Iraq's partnership with Bin Laden and Al Qaeda.  Habib Faris Abdullah al-Mamouri, a general in the Iraqi Secret Service, and a member of Iraq's M-8 Special Operations branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats.  Al-Mamouri met with September 11th pilot hijacker Mohammed Atta in Rome, Hamburg, and Prague.  Al-Mamouri has not been seen in Rome since July 2001, shortly after he last met with Atta.

163.    Al-Mamouri's meeting with Atta was in keeping with his previous duties at Salman Pak.  Al-Hijazihad recommended to Saddam Hussein the appointment of al-Mamouri to head the Special Operations Branch at Salman Pak.  Al-Mamouri's working relationship with al-Hijazihad had been strengthened when they worked together at Salman Pak to devise a new range of terrorist methods.  It is here that the plan of controlling a civilian airplane with full fuel tanks by teams of five using items that can be

easily carried aboard a plane and using the plane as a guided missile was developed by al-Mamouri and al-Hijazi at Salman Pak, sometime before 1995.

164.    At Salman Pak, al-Mamouri was placed in charge of coordinating activities with fundamentalist Islamic movements in Pakistan, Afghanistan, the Persian Gulf Countries and Sudan.  This came about after Saddam Hussein had decided to seek links with the Islamic terrorist network after the Gulf War.  From 1982 to 1990, al-Mamouri worked for the secret service's Special Operations Branch at Salman Pak.  In 1990, he was put in charge of relations with the various Islamic fundamentalist movements.  Until 1996, al-Mamouri then traveled to strengthen his relations with various fundamentalist organizations under the auspices of Section M4, the clandestine division of the Mukhabarat.  Saddam Hussein, realizing that he could not defeat the U.S in a conflict, decided to resort to terrorism.  He then realized that the simplest and most effective way was to resort to Kamikaze terrorism.  He gave instructions to the Mukhabarat to establish contacts with those fundamentalist groups, including the Hamburg cell, thereby making Atta a co-optee of the Iraqi Mukhabarat.

165.    Between on or about April 23, 2001 and on or about June 29, 2001, Satam M.A. al-Suqami (Flt. 11), Waleed al Shehri (Flt. 11), Ahmed al Ghamdi (Flt. 175), Majeed Moqued (Flt. 77), Ahmed al Nami (Flt. 93), Hamza al Ghamdi (Flt. 175), Mohald al Shehri (Flt. 175), Wael al Shehri (Flt. 11), Ahmed al Haznawi(Flt. 93), and Fayez Ahmed(Flt. 175), traveled from various points in the world to the United States.

166.    The FBI has reported that Atta visited commercial crop dusting aircraft facilities in Florida in March and August of 2001.  In the wake of the September 11th attacks, authorities concluded that Atta was investigating the possibility of spraying

chemical or biological weapons on U.S. civilians.  In July and August 2001, on several

occasions several other Middle Eastern men also visited the same crop dusting facility.

167.    On July 7, 2001, two members of the Iraqi Mukhabarat, Abu Agab and

Abu Wa'el traveled together from Germany to Afghanistan and eventually to Kurdistan.

Abu Wa'el trained at Al Qaeda terror camps and became the authority for fundamentalist

groups operating in Kurdistan intent on crushing opposition to Saddam Hussein.  The

Iraqi Mujabarat agent, Abu Wa'el is regarded as the real leader of Arsar al-Islam, a

Taliban-style group of radical Islamists with links, including financial, to Osama  Bin

Laden and Saddam Hussein.  Indeed, former Anser al-Islam leader Mallah Krekar, while

in detention in Norway, told ABC News that he would bring Abu Wa'el who is in

Baghdad to the United States for an interview.  Ansar al-Islam reportedly had received

more than $600,000 from Bin Laden.

168.    The FBI reported that in furtherance of his participation in the hijacking

conspiracy, Zacarias Moussoui purchased flight deck videos for the Boeing 747 on June

20, 2001 and took a three day Boeing 747 simulator course in Minneapolis, Minnesota on

August 13-15, 2001.  He also purchased two knives in Oklahoma City, Oklahoma on

August 3, 2001.  Moussaoui received approximately $14,000 from Ramzi Bin al-Shibh

on August 1-3, 2001.

169.    U.S. government officials reported that in the summer of 2001, Fayez

Banihammad (Flt. 175), Saeed Al Ghamdi (Flt. 93), Hamza Al Ghamdi (Flt. 175),

Waleed al Shehri (Flt. 11), Ziad Jarrah (Flt. 93), Satam Al Suqami (Flt. 11), Mohald al-

Shehri (Flt. 175), Ahmed al Ghamdi (Flt. 93) and Ahmed al Hanzawi (Flt. 93) each

opened a Florida Sun Trust Bank account with a cash deposit.  These and other bank

accounts were used by the September 11th hijackers for living expenses, travel, pilot training, weapons, and other incidentals and served as places where Al Qaeda operatives could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

170.    On September 9, 2001, Bin Laden and other Al Qaeda members, Omar and other members of the Taliban, carried out their plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years.  Al Qaeda terrorists posed as television journalists seeking an interview with Masood.  The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

171.    This assassination solidified Bin Laden's asylum and protection in Taliban controlled Afghanistan and cleared the way for Al Qaeda's unprecedented attack on the United States two days later.  The Taliban would continue to refuse to surrender Bin Laden or Al Qaeda members to the United States after the September 11th attacks.

## Hezbollah and its Leaders

172.    Hezbollah receives its principal financing of some $100 million a year and logistical support and training from the government of Iran.   This assistance is funneled to Hezbollah through the Iranian Republican Guard (IRGC) and the Ministry of Intelligence and Security (MOIS) with the knowledge of the Iranian Supreme leader Ayatollah Ali Hoseini-Khamenei.  In addition, Hezbollah earns tens of millions of dollars a year from the drug trade.  To show the closeness of Hezbollah to the Government of

Iran, the website for "Hezbollah Party of God" pictures Hezbollah Secretary General Hassan Nasrallah along with the late Iranian Supreme Leader Ayatollah Khomeni and the current Supreme Leader Ayatollah Ali Hoseini-Khamenei. . In 1997, the United States placed the Hezbollah on the State Department terrorist list.

173.    Iran, through Hezbollah, has provided direct assistance to groups connected to the Palestinian conflict and, although Shiite, shares many of the goals of Al Qaeda and the International Islamic Front for the Jihad Against Jews and Crusaders.  For example, the capture of the Karine A, a vessel loaded with more than 50 tons of high quality arms and explosives, points to the very close cooperation on an official level between Iran and the Palestinian Authority.  The assistance came through Iran's primary subcontractor and proxy, Hezbollah.

174.    For 18 years, with financial and intelligence support from Iran, Hezbollah fought to end Israel's military occupation of a buffer zone in southern Lebanon.  It attacked American targets through suicide attacks in an attempt to drive the United States from the country.  In the past 20 years, Hezbollah has killed some 300 Americans overseas, including 241 U.S. Marines in the suicide attack on the U.S. Marine barracks in Beirut in 1983.  In a bench trial, U.S. District Judge Royce C. Lamberth concluded that Hezbollah was formed under the auspices of the Iranian government, was completely reliant on Iran in the 1983 attack and assisted Iranian Ministry of Intelligence and Security agents in carrying out the operation.

175.    Imad Mughniyeh, who heads the terrorist wing of Hezbollah and Dr. Ayman-Alzawahiri, senior member of Al-Qaeda directed the terrorist attacks on September 11, 2001, according to Israeli intelligence.

176.    Defendant Mughniyeh is regarded as being behind the terrorist attack that took more than 300 American lives in Beirut durng the 1980s.  Mughniyeh also oversaw the kidnapping, torture and death of the CIA Beirut station chief William Buckley and the kidnapping, torture and death of Lt.Col. William Higgins, a Marine officer serving with UN forces in Lebanon. Mughniyeh now is said to reside in Iran and has had significant contact with bin Laden's leadership, including Ayman al-Zawahiri. The September 11, 2001 hijackings show a remarkable similarity to Mughniyeh's methods.  According to the U.S. Justice Department, Imad Mughniyeh has close ties to bin Laden.  Contacts between Imad Mughniyeh and Osama bin Laden, for example, mainly have occurred through Usbat al-Ansar, a Palestinian Sunni Islamist group operating primarily  at the Ein al-Hilweh Palestinian refugee camp in the southern Lebanese port of Sidon and the Nahr al-Bared camp in northern Lebanon.  Usbat al-Ansar received considerable financing during the late 1990s from bin Laden.  In addition, dozens of Palestinian refugees in Lebanon were sent to bin Laden's training camps in Afghanistan under the auspices of Usbat al-Ansar.

177.    A recent defector, Hamid Reza Zakeri, has linked Iran's Revolutionary Guards and Ministry of Intelligence with Al Qaeda.  Zakeri said that Al Qaeda also had contacts with an Iranian elite military unit which has helped terrorists train and plot attacks against Americans.  Zakeri said that Al Qaeda leader Ayman Zawahiri maintained close ties with the Islamic Revolutionary Guards Corps (IRGC) – Qods Division, said to be Iran's Islamic shock troops.  Zakeri said that Zawahiri is close to Revolutionary Guards deputy commander Brig. General Mohammad Baqer Zolqadr.

178.     Zolqadr has ties to other Revolutionary Guards, or IRGC Qods Forces commanders including Ahmad Vahedi and Hossein Mosleh who are the Guards' former commander in Lebanon.  The IRGC Qods forces are a special operations unit that conducts terrorist operations abroad.  Separate information also reveals that Zawahiri was a frequent guest of Iran's Minister of Intelligence and Security, Ali Fallahian, in addition to Ahmad Vahedi, whose position as commander of Qods forces places him as the head of foreign terrorist operations.  Zakeri confirms the relationship of Al Qaeda to Hezbollah dating back to the 1990s.  Zakeri said that Mughniyah remained the liaison officer with Zawahiri and other fundamentalist organizations' leaders.   Zakeri confirms reports of other informants that there were models of the two towers of the World Trade Center in New York and the Pentagon in Washington.  In addition, there were models of the White House and CIA headquarters.  Zakeri said that Mughniyeh had come to Iran and met with some senior officials and had brought with him a message from Zawahiri.  That message said that Al Qaeda needed help to "carry out an extremely serious operation in the Great Satan's country."  While Iranian officials didn't want any direct involvement, Zakeri said that the head of his department had asked Mughniyeh to maintain his ties with Zawahiri.  Iranian knowledge of the Septembert 11, 2001 terrorist attack coincides with comments made by another Iranian national, Abdolghassem Meshabi who resides in Munich, Germany.

179.     Meshabi claims that a friend of his in Tehran with access to intelligence plans in Tehran sent an urgent message on/about 02 September 2001.  It warned that Iranian-backed terrorists, interpreted by Meshabi to be members of Hezbollah, planned to hijack commercial airlines with plans to crash them into major U.S. targets.  Meshabi

said that his friend, who is part of the Iranian intelligence service (MOIS), had told him that the MOIS had received a coded message signifying that an attack was imminent. The coded message read: "Shaitan der artash," (The U.S.) Satan in flames." Meshabi said he received a second such message on 05 September 2001. Zakeri maintains that Imad Mughniyeh still is in Iran and believes that he organized escape of dozens of Al Qaeda into Iran. Zakeri's belief that Mughniyeh is in Iran coincides with separate, independent reports. Zakeri further asserts that Osama bin Laden could have entered Iran with Mughniyeh's help. This prospect reinforces separate information by knowledgeable sources that bin Laden may have escaped into eastern Iran, a part of Baluchestan under heavy influence from Iraq due to its Sunni influence to offset the Shiite government in Tehran. Zakeri's linkage of Mughniyeh to Zawahiri reinforces earlier analysis by the Israeli military intelligence service, Aman, that Mughniyeh and Zawahiri *directed* the suicide attacks against the World Trade Center towers and the Pentagon, while Iraq *sponsored* the attacks.

180.    In addition to Iran's close ties to Hezbollah, an Iraqi intelligence officer, Salah Suleiman who was captured by the Pakistanis near the border with Afghanistan, said that Iraq also had established strong ties with Imad Mughniyeh. This reinforces information from other sources which reveal that Mughniyeh, who is a Palestinian, in his past had been a bodyguard for Yasser Arafat and had lived in Baghdad. According to Israeli intelligence, Israel had put out a warning some six weeks prior to September 11, 2001 that an "unprecedented massive terror attack" was expected. Israeli sources said that one indication was that Mughniyeh met with agents on a secret trip to Germany. Despite the fact that Mughniyeh is known to have been going back and forth to Iran, the

Aman believes the operational brains behind the 9-11 attacks were Mughniyeh and Zawahiri.  In turn, they probably were financed and received logistical support from both the Iranian and Iraqi intelligence services, as well as financial contributions from Saudi Arabia.

## Hezbollah's Relationship with Al Qaeda

181.    The relationship between Al Qaeda and the Government of Iran goes back to at least 1992 in Albania when they both supported the Kosovo Liberation Army to fight in the Muslim province of Kosovo in neighboring Serbia.  U.S. intelligence has acknowledged bin Laden's al Qaeda link to the KLA and had "both trained and financially supported" the Albanians and that the Kosovo border had been infiltrated by Bosnian, Chechnyn and Afghan mujaheedin…"  Other information suggests bin Laden's support for KLA from Albania began in 1994, after telling the Albanian government that he headed a Saudi humanitarian agency to help Albania.

182.    In a December 18, 2001 statement, J. T. Caruso, then Acting Assistant Director of the Counter-Terrorism Division of the Federal Bureau of Investigation, testified that a witness recounted how the Al Qaeda network had privately declared war on America and was operating both on its own and as an umbrella for other terrorist groups.  The FBI witness, who is a former member of bin Laden's Al Qaeda network, recounted that bin Laden and Al Qaeda were seeking to obtain nuclear and chemical weapons and that the organization engaged in sophisticated training.  The witness also revealed that Al Qaeda obtained specialized terrorist training from and worked with Iranian government officials and the terrorist group Hezbollah.  Considerable information is available to show that there not only was ideological but operational connections

between Hezbollah and Al Qaeda.  U.S. officials report that they had first detected the alliance of Hezbollah and Al Qaeda in early 2002.  In March, envoys from Al Qaeda, Hamas and Hezbollah had met in Lebanon's Bekaa Valley to discuss strategy.  The officials said that by April 2002, Hezbollah leaders were meeting with Al Qaeda operatives who had escaped Afghanistan for Iran.  In expressing concern over the link, U.S. officials said that the Hezbollah-Al Qaeda links are tactical and involve mid- and low-level operatives from both groups.  They add that this cooperation between the two groups mutes years of rivalry between Hezbollah, which is Shiite, and Al Qaeda, which is predominantly Sunni.  U.S. officials also believe that the assets and organization of Hezbollah's formidable militant wing will enable a hobbled Al Qaeda network to increase its ability to attack American targets.  Although Hezbollah and Al Qaeda have their differences, their alliance shows that they share the goals of crippling the United States, forcing the U.S. military out of the Middle East and Israel out of Palestinian territory.  In testimony in the East Africa embassy bombings trial, it was revealed that there were connections between Al Qaeda and the Iranian government, along with an unidentified senior Iranian religious leader and Hezbollah beginning in the early 1990s.

183.    Trial transcripts reveal that by 1998, the U.S. Government was aware that on various occasions during the early to mid-1990s, high-ranking Al Qaeda members met with Iranian officials and that Osama bin Laden himself met with the Imad Mughniyeh, leader of the terrorist wing of Hezbollah, to "cooperate against the perceived common enemy," the United States.   Ali Mohammed, bin Laden's security chief and a former U.S. army intelligence analyst, stated during the guilty plea in the embassy bombings case in October 2000 that "I was aware of certain contacts between al Qaeda and

Egyptian Islamic Jihad on one side and Iran and Hezbollah on the other side.  I arranged

security for a meeting in the Sudan between Mughniyeh, Hezbollah's chief and bin

Laden.

184.    Hezbollah provided explosives training for al Qaeda and Egyptian Islamic

Jihad.  Iran supplied Egyptian Jihad with weapons.  Iran also used Hezbollah to supply

explosives that were disguised to look like rocks."Upon information and belief, such

disguised explosives were used extensively by Hezbollah against Israeli army patrols in

South Lebanon.  Mohamed testified that "much of this type of training is actually carried

out at a training camp there, in Iran, run by the Iranian Ministry of Information and

Security."

185.    A former CIA official has been cited as saying that Al Qaeda relied on

experts from Hezbollah to build the shaped charge that badly damaged the U.S.S. Cole in

Yemen in October 2000.  According to UPI:

> "A U.S. government official told (UPI) that the blast was a
> 'cone-shaped charge' tht used 'moldable high explosives
> such as SEMTEX H,' shaped to create a high-speed, high
> temperature blast wave.  During the first state of the blast,
> the explosion 'forces all the air out with tremendous force,'
> creating a vacuum, but as air rushes back in, it creates
> another tremendous force that causes further damage.  'It's
> a trademark of bombs made by Hezbollah and raises the
> question of the involvement of Iran,' he said.  A former
> CIA official agreed: 'We have to start looking at Iran's
> involvement in the incident.  The evidence warrants this.'"

186.    Ali Mohammed also stated that Mughniyeh had discussed how Hezbollah

had forced the United States out of Beirut by blowing up the Marine barracks.

Mohammed added that al Qaeda planned to "use the same method to force the United

States out from Saudi Arabia."  Mohammed further testified that Al Qaeda's method for

driving the United States out of the Middle East was to be modeled on the successes of the Lebanese Hezbollah, which implied suicide bombings.

187.   Magnus Ranstorp, deputy director of the Centre for the Study of Terrorism and Political Violence at the University of St. Andrews in Scotland, stated that the suspects in the East Africa embassy bombings mentioned individuals who had gone to Lebanon for explosives training from Hezbollah.  "The military manuals of Al Qaeda showed innovation in the making of explosives including RDX and C4," he said, "but there was an admission that some of its members had gone to Lebanon to get that expertise."  Such expertise would have come from the Hezbollah.

188.   The meetings between Al Qaeda and an Iranian religious leader took place in Sudan with Mamdouh Mahmud Salim a/k/a Abu Hajer al Iraqi, Osama bin Laden's former financial manager, representing Al Qaeda.  The meetings took place at various times between 1992 and 1996, according to trial prosecutors, and the bin Laden meeting with Mughniyeh, held in 1994 took place in the Sudan.  Prosecutors further stated that the meetings held "at various times" between 1992 and 1996 were to arrange a tripartite agreement among Al Qaeda, the National Islamic Front of Sudan and elements of the government of Iran "to work together against the United States, Israel and other western countries."

189.   U.S. intelligence has stated that Osama bin Laden's operatives had approached Iranian Ministry of Intelligence and Security agents in 1995 and again in 1996, offering to join forces against the United States.  Phone records obtained by U.S. officials investigating the 1998 embassy bombings in Kenya and Tanzania reveal that 10 percent of the calls made from the Compact-M satellite phone used by bin Laden and his

key lieutenants were to Iran.  In its 1998 indictment, the U.S. Justice Department said that

bin Laden, working through al Qaeda, forged alliances with government officials in Iran,

the National Islamic Front in the Sudan and the Iranian terrorist organization Hezbollah.

### Hezbollah's Connection with the International Islamic Front for the Jihad against Jews and Crusaders

190.    Al Qaeda, Al-Gamma Al-Islamiyya and the Egyptian Islamic Jihad,

formed the International Islamic Front ("The Front") for the Jihad Against Jews and

Crusaders in 1988.  Among other things, the goal of Al Qaeda and purpose of the Front is

support of the Palestinians against Israel, as well as expulsion of non-Muslims from

Muslim countries.  The Front is a group of some 50 independent terrorist organizations

from such countries as Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti,

Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the

Philippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyn

region of Russia.  Those Iranian-supported organizations that belong to the Front include

the Gama'a al-Islamiyah, the Egyptian al-Jihad, the Algerian GIA and the Egyptian

Islamic Jihad whose leader, Ayman Zawahiri, is the second in command in Al Qaeda.

While Muslims of the Iranian Government are Shiites, the organizations which belong to

the Front and supported by Iran are Sunni.

191.    Among the prominent groups belonging to the Front is the Hezbollah,

which is regarded as Iran's proxy army and serves as the chief tool for the

implementation of Iran's foreign policy.  In turn, Hezbollah is funded, armed and trained

by the Iranian Revolutionary Guards.  Lebanon's Hezbollah movement was founded by

Ali Akbar Mohtashemi, an Iranian Shiite cleric, in the aftermath of the 1982 Israeli

invasion of Lebanon.  Its purpose is to support the Palestinians in Lebanon and fight against Israeli occupation of Lebanon.

### Iranian Provision of Safe Haven to Al Qaeda Fugitives

192.    Iran has become a safe haven to senior al Qaeda fugitives.  There have also been reports that Iranian Revolutionary Guards assisted al Qaeda commanders in entering Iran from Afghanistan to Iran.  In addition to being a transit route, Iran also has allowed Al Qaeda to use the country as a staging area.

193.    On February 15, 2002, Turkish police arrested two Palestinians and a Jordanian who entered Turkey illegally from Iran on their way to conduct bombing attacks in Israel.  Turkish police said the three had fought for the Taliban, receiving terrorist training from Afghanistan and were members of Beyyiat el-Imam, a group linked to al Qaeda.  The terrorists said they were acting on orders from Abu Musaab, whom Israeli intelligence has identified as Abu Musaab Zarqawi.  U.S. and Israeli intelligence agencies say that Zarqawi had fled Afghanistan in October 2001 and later turned u n Tehran under the protection of Iranian security forces.

194.    Upon information and belief, Zarqawi then left for Iraq where he received medical treatment for one of his legs.  He then went to Syria.  Zarqawi also is linked with Hezbollah.

195.    Although Iran was against the Taliban in Afghanistan prior to U.S. action, that opposition did not translate into opposition to Osama bin Laden or Al Qaeda.  Under the watchful surveillance of Iran's military and intelligence services, U.S. intelligence has detected what it describes as a suspected Al Qaeda training camp in a remote area of eastern Iran along the border with Afghanistan.  Overhead imagery shows a training

camp complete with a terrorist obstacle course and a rifle range, much like those Al Qaeda used in Afghanistan to train for assassinations.

196.     For some time, the U.S. Government believes, Iranian officials who control the military and intelligence services are working with Al Qaeda.  In April 2002, Defense Secretary Donald Rumsfeld said "there is no question but that Al Qaeda has moved into Iran, out of Iran to the south and dispersed to some other countries."  Israeli intelligence also has told U.S. officials that it had strong evidence that Al Qaeda members went through Iran and Iraq to the Bekaa Valley of Lebanon and teamed up with Hezbollah.

197.     In a February 6, 2002 *Christian Science Monitor* article, a Saudi captive, Haji Mohamad Akram, a chef to Osama bin Laden, said in an interview that bin Laden had escaped to Iran following the bombing of Tora Bora in November 2001.  The captured Saudi chef further claims that bin Laden had three offers of escape. "One from Iraq, one from Iran, and another from some mafia types…We received a lot of Iranian currency, and the commanders distributed it to the soldier," he said, adding that he received 700,000 rials ($1,400) for personal use.

198.     Western intelligence sources also say that Al Qaeda has extended its involvement in the Palestinian areas by transferring a base of operation from Afghanistan to Lebanon and seeking to develop operatives and recruit personnel.  On 1 February 2002, the British daily, *The Times*, reported that a senior al Qaeda operative traveled to Lebanon in January 2002 to discuss the relocation with Hizballah leaders.  The operative was identified as a Yemeni national traveling under the alias of Salah Hajir.  He

reportedly had discussed relocating with Hezbollah in Palestinan camps, particularly Ein al-Hilweh in southern Lebanon.

199.    Western intelligence agencies confirm that Syria has allowed between 150 and 200 al Qaeda operatives to settle in Ein el-Hilweh since the start of the U.S. offensive in Afghanistan.  These sources report that the group, including senior Al Qaeda commanders, arrived from Afghanistan through Iran and went directly to Lebanon.

200.    In August 2002, fighting had erupted when Al Qaeda operatives tried to gain control over the camp.  Lebanese officials said that the fighting was initiated by Al Qaeda in the camps, three of whom were killed.  There have been at least 19 bombings in Ein al-Hilweh since the end of September 2002. Usbat al-Ansar is seen as the culprit behind the violence.

201.    Upon information and belief, Al Qaeda terrorists have escaped to eastern Iran following U.S. action in Afghanistan, in addition to western Pakistan.  Both areas are known for a concentration of Sunni Muslims.  The area encompasses the region called Baluchestan, with the eastern part of Iran being a haven for Sunni Arabs under heavy influence of Iraq to offset the Shiite regime in Tehran.  The Iranian Ministry of Intelligence and Security (MOIS) is aware of the concentration of Al Qaeda terrorists in the region but has taken no action against them.  MOIS began to monitor the eastern part of Iran due to the Mujahedin-E-Khalq (MEK), which is anti-Iranian but pro-Iraqi.  The MEK has assisted the escape of members of Al Qaeda into Iran.  In February 2003, U.S. intelligence agencies reported that Osama bin Laden's oldest son, Saad, is in Iran along with other senior al Qaeda terrorists.  Saad bin Laden had been spotted in Iran in January 2003, according to U.S. officials.  Saad bin Laden is believed to be a key leader of the Al

Qaeda terrorist network since U.S. and allied forces ousted the ruling Taliban militia in

Afghanistan.  In testimony before the U.S. Senate in February 2003, CIA Director

George Tenet said that "we see disturbing signs that al Qaeda has established a presence

in both Iran and Iraq."

202.     Defense Secretary Donald H. Rumsfeld also said in a Senate hearing in

September 2002 that the Iranian government is "currently harboring reasonably large

numbers of al Qaeda."   The al Qaeda (is) functioning in that country, both transiting and

located, and operating, "Secretary Rumsfeld told the Senate Armed Services Committee.

### Cooperation among Hezbollah, Al Qaeda, Iran, and Iraq

203.     Intelligence officials said Iran's support for terrorists, including al Qaeda,

in the past was carried out by agents of the Ministry of Intelligence and Security, and the

Islamic Revolutionary Guards Corps Qods Force a/k/a Qods Division a/k/a  a/k/a

Jerusalem Force.  The Defense Intelligence Agency in 2000 uncovered information

linking al Qaeda to Iran's government.   Such cooperation among Iran, Iraq and the

Hezbollah and Al Qaeda terrorist groups they support became publicly apparent in a

February 18, 2003 Al-Zaman article in which Uday Hussein, son of deposed Iraqi

President Saddam Hussein, conveyed messages to Hezbollah.    Adib Sha'ban (also

spelled Adeeb Shabaan), trade and press secretary to Uday Hussein, reportedly conveyed

messages to leaders of Hezbollah and other influential organizations and figures in

Lebanon.    In a speech in Beirut in the presence of the Iranian ambassador to Lebanon,

Hezbollah Secretary General Shaykh Hasan Nasrallah reportedly had called on the Iraqi

opposition groups to reconcile with the Iraqi regime.  Uday Hussein urged Hezbollah and

other Lebanese leaders to coordinate with party militias and Uday's organization, called

the "fedayeen commandos of Saddam" if the United States launched a war against Iraq. Uday reportedly also had invited some of the leaders to a secret meeting in Iraq to discuss cooperation to carry out joint operations against U.S. interests in the world.

204.     In addition to Al Qaeda training bases, intelligence reports in August 2002 revealed that Al Qaeda leaders Abu Hafs the Mauritanian and Saif al-Adil were in eastern Iran. *The Washington Post* reported that the two may have been planning Al Qaeda operations from Iran. This information coincides with reports of Zarqawi also going to Iran but leaving for Iraq and then Syria and possibly to Syrian-controlled territory in Lebanon where Hezbollah operates. This complicated picture mirrors an observation by Zakeri that Iranian Guards' intelligence under Morteza Reza'i had a close connection with Iraq. Zakeri said that Reza'i had established commercial companies to create jobs for the Iranian Republican Guard. He said that these companies started to deal with the Babil Company that had been chaired by Qusay Hussein since the mid-1990s. In addition to smuggling and marketing Iraqi oil, the Iranian companies also smuggled Iraqi dates.

205.     In published accounts, Zakeri asserts that smuggling and trade cooperation between the Guards' intelligence and Iraq stopped about a year ago. However, the Guards' intelligence had maintained some ties with Hussein and Iraqi intelligence up until U.S. action against Iraq. In a further indication of Iranian-Iraqi intelligence cooperation, Zakeri said that there was coordination between the two on issues like confining the Kurds and confronting the United States. Zakeri also revealed that the Ansar al-Islam organization in northern Iraq had the support and protection of the Iranian Guards and the Iraqi intelligence services. Separately, it is known that members of Ansar

al-Islam went back and forth to Iran and had as one of its leaders Abu Wa'il, whom

separate data reveals was an Iraqi intelligence officer in Baghdad assisting Ansar al-

Islam.

### Iranian Assistance to Other Islamic Terrorist Organizations

206.    According to claims made by Albanian authorities and the U.S. Central

Intelligence Agency in 1998, Osama bin Laden set up the terrorist network in Albania, a

Muslim country, to be used as a springboard for operations in Europe.   On March 22,

1998, the *Times of London* confirms that Bin Laden and the Iranian Revolutionary

Guards had "joined forces" by signing a pact on 16 February 1998 in Tehran to

consolidate their operations in Albania and Kosovo, hoping "to turn the region into their

main base for Islamic armed activity in Europe."

207.    These fighters were bolstered by hundreds of Iranian fighters, called

Mujahadeen, who infiltrated from nearby Albania and called themselves the Kosovo

Liberation Army.  Separate reporting reveals that the Iranian Revolutionary Guard

operated from Albania to train KLA members.  Iran also used Albania as a base from

which it smuggled arms and ammunition to the KLA.   According to Ephraim Kam,

deputy director of Tel Aviv University's Jaffee Center for Strategic Studies, "Iran has

been active in helping out the Kosovo rebels.  Iran sees Kosovo and Albania as

containing Moslem communities that require help and Teheran is willing to do it."  In

Albania, Iranian and Saudi representatives opened foundations to provide patronage.  An

Islamic bank was launched in the Albanian capital of Tirana.  In Skadar, Iranian agents

opened the Society of Ayatollah Khomeini.  In the Kosovo town of  Prizren, Islamic

fundamentalists formed a society funded by the Iranian Culture Center in Belgrade.

Selected groups of Albanians were sent to Iran to study that country's version of militant Islam.  Based on U.S. congressional sources, the former Clinton administration was fully aware of Iranian activities in Bosnia and Kosovo, but looked the other way to maintain the 1995 Dayton Accords.  One congressional source asserts that the Clinton administration wanted "to keep the lid on the pot at all costs.  And if that means that Iran benefits and operates freely in the region," he added, "so be it.  Needless to say, the Europeans have been quite upset by this."

### The Terrorist Attacks on September 11, 2001

208.    On September 11, 2001, Defendants Mohammed Atta, Abdul Aziz al-Omari, Wa'il al-Shehri, Waleed al-Shehri, and Satam Al Suqami hijacked American Airlines flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the North Tower (also known as Tower 1) of the World Trade Center in New York.

209.    On September 11, 2001, Defendants Marwan al-Shehhi, Fayez Ahmed a/k/a/ "Banihamad Fayez," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohaud al-Shehri hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m. crashed it into the South Tower (also known as Tower 2) of the World Trade Center in New York.

210.    On September 11, 2001, Defendants Khalid al-Mihdhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi and Majed Moqed hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 AM, crashed it into the Pentagon.

211.    On September 11, 2001, Defendants Zihad Jarrah, Ahmed al-Haznawu, Saeed al-Ghamdi, and Ahmed al-Nami hijacked American Airlines flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., probably the White House or U.S. Capitol.  At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

212.    At approximately 9:59 a.m. the South Tower of the World Trade Center (2 World Trade Center) collapsed; at approximately 10:28 a.m. the North Tower of the World Trade Center (1 World Trade Center) collapsed.  Defendants intentionally caused the deaths of and injuries to thousands of innocent persons, including Plaintiffs' decedent John Patrick O'Neill, Sr.

213.    The hijackings referenced above were the culmination of a conspiracy among the defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks.

## AFTERMATH OF SEPTEMBER 11th

214.    On two videotapes made by Al Qaeda in September and October 2001, Bin  Laden took credit for the September 11th attacks and stated that the attacks went better than expected.

215.    Saddam Hussein is the only national leader who publicly praised the attacks and said that the United States of America deserved them.  Iraq has offered sanctuary to Bin Laden and Taliban leaders.  Abu Zeinab al-Quarairy, an Iraqi defector who was an officer in the Mukhabarat and was familiar with its operations, reported that

when he learned about the World Trade Center attacks on September 11th, he turned to a friend and said "That's ours."

216.     Upon information and belief, several hundred Al Qaeda members, including Abu Abdul Rahman, fled Afghanistan for Kurdistan in Iraq to try to take control of towns not under the control of Saddam Hussein and Iraq, including Halabja, Tawela, and Biyarah.  On September 23, 2001, Kurdish forces ousted Ansar al-Islam from Halabja, but the Islamic fundamentalist group remained in control of Tawela and Biyarah.

217.     Israeli intelligence sources verify that for the past two years, Iraqi Intelligence officers have been shuttling back and forth between Baghdad and Afghanistan.  According to the Israelis, one of these Iraqi Intelligence officers, Salah Suleiman, was captured in October 2001 by Pakistani officials near the border between Pakistan and Afghanistan.

218.     The British Government has also identified at least two individuals who are Iraqi Intelligence officers trained in Iraq in the use of terror against the Kurds in Northern Iraq.  They are Fowzi Saad al-Obeijdi, a/k/a Abu Zubair and Abu Omer al-Kurdi, a/k/a Rafid Fatah.  Although they are Iraqi Intelligence officers still linked to the former Hussein Iraqi government, they are also Al Qaeda operatives.  In its published dossier to show Iraq's links to Osama Bin Laden, the British government added that Iraq had allowed al-Qaeda and Bin Laden to train in Iraq.

219.     In March 2002, U.S. and allied forces discovered a laboratory near Khandahar, Afghanistan that was designed to produce weapons-grade anthrax.  Upon information and belief, Iraqi Intelligence were supplying technology, materials, and

training to develop this facility in coordination with Al Qaeda and the Taliban.
Instruction documents on an artillery weapon known as the "Super Gun" were found in
Al Qaeda camps when they were captured by U.S. forces in the winter of 2001-2002.
Iraq is the only state known to have purchased and assembled the Super Gun, a weapon
so large it must be constructed in segments.  It has a range of several hundred miles.
U.S. Government officials, including the U.S. Defense Secretary, confirm the relationship
between Al Qaeda and the Iraqi regime.  The Secretary of Defense as recently as March
2003 stated that there is "solid evidence" that senior Al Qaeda operatives have visited
Baghdad and that the intelligence on these activities is "current."

220.    Attached hereto as Exhibits and incorporated herein as if set forth at length
are the following More Definite Statements/Additional Allegations:

a)      Exhibit A- Victims List

b)      Exhibit B- More Definite Statement- Erwin Wachter

c)      Exhibit C- More Definite Statement- Martin Wachter

d)      Exhibit D- More Definite Statement- Schreiber & Zindel, Frank
        Zindel, Engelbert Schreiber, and Engelbert Schreiber, Jr.

e)      Exhibit E- More Definite Statement- Sercor Trehand Anstalt

f)      Exhibit F- Asat Trust Reg.

g)      Exhibit G- Taha Al Alwani

## CAUSES OF ACTION

## *AS AND FOR THE FIRST CAUSE OF ACTION*

## COUNT I
## WRONGFUL DEATH

221.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 220 of this Complaint, as though the same were fully and completely set forth herein.

222.    As a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, John Patrick O'Neill, Sr. was killed by the attack upon and subsequent collapse of the World Trade Center in New York City.

223.    Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade Center.

224.    As a proximate result of these acts, Plaintiffs have suffered injury and loss, including both economic and non-economic damages, in an amount to be proven at trial. The economic damages, include, but are not limited to, losses to business and property, loss of income, loss of support, loss and/or damage to personal property, and funeral and burial expenses.

225.    For the reasons stated above, Defendants are jointly and severally liable to Plaintiffs.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS

($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE SECOND CAUSE OF ACTION*

## COUNT II
## ACTION FOR SURVIVAL DAMAGES

226.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 225 of this Complaint, as though the same were fully and completely set forth herein.

227.    Immediately before his death, Decedent John Patrick O'Neill, Sr. suffered extreme bodily pain and suffering as a result of the attack upon and subsequent collapse World Trade Center thereby entitling his Estate to compensatory damages.

228.    Defendants are directly and vicariously responsible for the attack upon and subsequent collapse of the World Trade Center because they funded, trained, and directed the terrorist hijackers and acted in concert in sponsoring the terrorist attack on the World Trade Center.

229.    As a proximate result of these acts, Plaintiffs have suffered injury and loss in an amount to be proven at trial.

230.    For the reasons stated above, Defendants are jointly and severally liable to Decedent's estate.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE THIRD CAUSE OF ACTION*

## COUNT III
## ACTION FOR ECONOMIC DAMAGES

231.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 230 of this Complaint, as though the same were fully and completely set forth herein.

232.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs incurred economic damages through the deprivation of Decedent's income in an amount to be proven at trial.

233.     Defendants are directly and vicariously responsible for the terrorists' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center. As a proximate result of these acts, Plaintiffs have suffered injury and loss.

234.     For the reasons stated above, Defendants are jointly and severally liable to the Decedent's Estate.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

## *AS AND FOR THE FOURTH CAUSE OF ACTION*

## COUNT IV
## ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

235.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 234 of this Complaint, as though the same were fully and completely set forth herein.

236.     The act of crashing two airplanes into the twin towers of the World Trade Center in New York, NY with the intent to kill Americans, and which, in fact, did kill American John Patrick O'Neill, Sr. constituted extreme and outrageous conduct on the part of the Defendants.

237.     Plaintiff John Patrick O'Neill Jr. was on his way to visit his father at the World Trade Center at the time the attacks occurred.  He was on a New York-bound commuter train from New Jersey, when a fellow passenger told him that a plane had just struck the World Trade Center.  Plaintiff John Patrick O'Neill, Jr. reached his father by cell phone at 9:17 A.M., and confirmed that the Center had been attacked and that his father was alive and well.   When the commuter train got nearer to Manhattan, John Patrick O'Neill Jr. could see the smoke billowing from the World Trade Center site. John Patrick O'Neill, Jr. arrived at Penn Station, and immediately ran downtown towards the World Trade Center.  John Patrick O'Neill, Jr. made it to the vicinity of St. Vincent's hospital from where he watched in horror as the first of the towers collapsed, knowing that his father was probably inside.  From there he ran to the police station known as Southern District of Manhattan, First Precinct, which is approximately four blocks away from the Trade Center.  From there he witnessed the collapse of the second tower.  John

Patrick O'Neill, Jr. repeatedly tried to call his father's cell phone number, and could not get through. When he finally did get through, he only reached his father's voicemail. He would have been inside his father's office and become a casualty himself had he taken an earlier train.

238.    Plaintiff Christine Irene O'Neill received a call from John Patrick O'Neill, Sr. at 8:53 A.M., less then ten minutes after the first plane struck. He told her what had occurred and that he was alive and well. She turned on the television and was horrified as she watched the live coverage of the second plane striking and of the subsequent collapses of both towers.

239.    Plaintiff Carol O'Neill is the daughter of the late John Patrick O'Neill, Sr. She was in her high school class in New Jersey at the time of the attacks on September 11, 2001. When the first plane hit the World Trade Center, classes were interrupted and every student in the school was given access to a television to watch the events unfold. Soon thereafter, she watched the Second plane hit the World Trade Center, and then watched both Towers collapse. She knew that her father was in one of the two Towers, and was fearful for his life.

240.    Plaintiff Dorothy A. O'Neill was the mother of John Patrick O'Neill, Sr. John Patrick O'Neill, Sr. was her only son. She was at her home in New Jersey at the time of the attacks of September 11, 2001. She was watching television when the news interrupted the show she was watching, to show the first plane hit the World Trade Center. She subsequently watched the second plane hit the World Trade Center, and then both Towers collapsing. She knew that her only son was in one of the two Towers, and was fearful for his life.

241.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, Plaintiffs suffered extreme emotional distress, including extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

242.    Defendants are directly and vicariously responsible for the terrorist hijackers' actions, because they funded, trained and directed the terrorist hijackers and acted in concert in sponsoring the attack upon and subsequent collapse of the World Trade Center.

243.    As a proximate result of these acts, Plaintiffs have suffered injury and loss.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and  severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

### *AS AND FOR THE FIFTH CAUSE OF ACTION*

### COUNT V
### ACTION FOR LOSS OF CONSORTIUM

244.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 243 of this Complaint, as though the same were fully and completely set forth herein.

245.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, Plaintiff Christine Irene O'Neill was deprived of the assistance, society, companionship, and consortium of her husband, John Patrick O'Neill, Sr.  This caused Plaintiff Christine Irene O'Neill to suffer, among other things,

extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff.

### *AS AND FOR THE SIXTH CAUSE OF ACTION*

### COUNT VI
### ACTION FOR LOSS OF SOLATIUM

246.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 245 of this Complaint, as though the same were fully and completely set forth herein.

247.     As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the terrorist hijackers, John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill, and were deprived of the assistance, society, and companionship of their father, husband and son, respectively, John Patrick O'Neill, Sr. This loss caused John Patrick O'Neill, Jr., Christine Irene O'Neill, Carol O'Neill and Dorothy A. O'Neill to suffer, among other things, extreme mental anguish and emotional and physical pain and suffering in an amount to be proven at trial.

248.     For the reasons stated above, and pursuant to 28 U.S.C. §1605, which specifically authorizes a cause of action of solatium in civil actions for money damages resulting from terrorist acts, Defendants are jointly and severally liable to Plaintiffs.

WHERFORE, Plaintiffs demand that judgment be entered against Defendants, jointly and severally, in compensatory damages, plus interest, costs, punitive damages, and such other monetary and equitable relief as is just and proper for each Plaintiff, in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) for each Plaintiff.

### *AS AND FOR THE SEVENTH CAUSE OF ACTION*

### COUNT VII
### CONSPIRACY

249.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 248 of this Complaint, as though the same were fully and completely set forth herein.

250.     As set forth above, the defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs.

251.     As set forth above, the defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror.

252.     As set forth above, Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme.

253.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs.

254.    As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount in excess of ONE HUNDRED MILLION DOLLARS ($100,000,000.00) in compensatory damages, plus interest, punitive damages, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## *AS AND FOR THE EIGHTH CAUSE OF ACTION*

## COUNT VIII
## 18 U.S.C. §2333-TREBLE DAMAGES FOR U.S. NATIONALS

255.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 254 of this Complaint, as though the same were fully and completely set forth herein.

256.    As set forth above, Defendants, jointly, severally and proximately caused the deaths and injuries of Plaintiff's person, property and business through and by reason of acts of international terrorism.

257.    As set forth above, Defendants provided material support and assistance to Osama bin Laden, Al Qaeda and the September 11, 2001 terrorists, enabling them to carry out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks.

258.     As a result of Defendants' acts in furtherance of international terrorism, Plaintiff suffered damages as set forth herein.

259.     Pursuant to 18 U.S.C. §2333, et. seq., the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

WHEREFORE, Plaintiffs, who are nationals of the United States, demand judgment in their favor against all Defendants, jointly, severally, and/or individually, and demand treble damages in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00), plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

### *AS AND FOR THE NINTH CAUSE OF ACTION*

### COUNT IX
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1964

260.     Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 259 of this Complaint, as though the same were fully and completely set forth herein.

261.     Non-sovereign Defendants are each "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

262.     The Defendant charities, banks, and terrorists are each an "enterprise" within the meaning of RICO, the activities of which affects interstate and foreign commerce.

263.     The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

264.     *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076(RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

265.     *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and is a collection of the persons, organizations, businesses, and nations associated in fact.

266.     "Radical Muslim Terrorism", "al Qaida", and "The International Islamic Front for Jihad against Jews and Crusaders" are each an "enterprise" within the meaning of RICO, the activities of which affects interstate and foreign commerce.

267.     By virtue of the predicate acts described in this Complaint, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, Osama bin Laden and Al Qaeda, along with other non-sovereign Defendants herein, transferred, received, and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(b), (c) and/or (d).

268.     The non-sovereign Defendants herein conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Such defendants conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

269.     The Enterprise was formed and funded for the purpose of extortion:  to force the United States, Israel, and other Western nations, and their citizens, to discontinue support of certain governments in the Middle East and otherwise to disengage from the Middle East.  The extortion was carried out under the threat and practice of the predicate acts of murder, kidnapping, piracy, bombing, and other crimes

directed at the citizens, business, and economic infrastructure of the target countries. Over time, these threats have escalated into threats and accompanying efforts to inflict the maximum possible damage through each such predicate act.

270.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(b), (c) and/or (d). , Plaintiffs suffered the loss of valuable property, financial services and support, and suffered other pecuniary damages in an amount to be determined at trial, and are entitled to bring this action pursuant to 18 U.S.C. Sec. 1964(c).

271.     Plaintiffs and Plaintiffs' Decedent's loss of business and property included loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, personal property, support, funeral and burial expenses, prospective inheritance, and the other economic contributions that the Decedents would have made to the Plaintiffs' households.  Such losses were intended by Defendants, whose purpose was to inflict the maximum possible damage on the United States, its citizens, residents, visitors, businesses, and property.

272.     The loss of life and the damages to business and property related thereto that resulted from the actions of the defendants are a direct causal result of the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise."

273.     Each defendant is jointly and severally liable for all damages sustained by each plaintiff in the loss of life and damage to business and property related thereto.

WHEREFORE, Plaintiffs demand judgment in their favor against all Defendants, jointly, severally, and/or individually, in an amount to be determined at trial, but not less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00) and for treble damages in an amount in excess of THREE HUNDRED MILLION DOLLARS ($300,000,000.00) plus interest, costs, legal fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent  Defendants from ever again committing such terrorist acts.

### *AS AND FOR THE TENTH CAUSE OF ACTION*

### COUNT X
### ACTION FOR PUNITIVE DAMAGES

274.    Plaintiffs repeat, allege and hereby incorporate by reference the preceding allegations contained in Paragraphs 1 through 273 of this Complaint, as though the same were fully and completely set forth herein.

275.    The actions of Defendants, acting in concert to carry out their unlawful objectives, were malicious and willful, wanton and reckless in their disregard of the life of John Patrick O'Neill, Sr. and the other victims of the September 11 terrorist attacks. Defendants intended to carry out actions that would end the lives of persons at the World Trade Center, including the life of John Patrick O'Neill, Sr.

276.    Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan, Muhammed Madhi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Osama Bin Laden, Saad Bin Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abu Waiel, Osama Bin Laden,

The Al Qaeda Islamic Agency, Egyptian Islamic Jihad, Abu Sayyaf, Hamsiraji Sali, Abu

Musab Zarqawi, Abu Zubaydh, Khalid Sheikh Mohammed, Abu Abdul Rahman,

Mohammed Jasmin al-Ali, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber,

Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt,

Abdul Rahman Yasin, Ahmad I. Nasreddin, Al Taqwa Bank, Al Taqwa Trade, Property,

and Industry, Ltd., Al-Gammah Al Islamiah, Ayman al-Zawahiri, Albert Freidrich

Armand Huber a/k/a/ "Armand Huber," Ali Ghaleb Himmat, Asat Trust Reg., Nada

Management Organization, S.A., Yousef M. Nada, Yousef M. Nada & Co, Gesellschaft,

M.B.H, Barzan e-Tikriti, Metalor, Banca del Gottardo, Abdulaziz al Omari, Wail al

Shehri, Waleed M. Al Shehri, Satam M.A. al Squami, Mohammed Atta, Fayez Ahmed

a/k/a Banihammad Fayez, Ahmed al-Ghamdi, Hamza al-Ghamdi, Marwan al-Shehhi,

Mohald al-Shehri, Khalid al-Midhar, Nawaf al-Hazmi, Salem al-Hazmi, Hani Hanjour,

Majed Moqued, Saeed al Ghamdi, Ahmed Ibrahim A. al Haznawi, Ahmed al Nami, Ziad

Samir Jarrah, Zaracias Moussaui, Muhammad Atef, The Taliban, Muhammad Omar,

Muslim Brotherhood – Syrian Branch, Muslim Brotherhood – Egyptian Branch, Muslim

Brotherhood – Jordanian Branch, Muslim Brotherhood – Kuwaiti Branch, Muslim

Brotherhood – Iraqi Branch, Iranian Ministry of Intelligence and Security (MOIS),

Iranian Revolutionary Guard Corps, Iranian Revolutionary Guard Corps – Qods Division,

Akida Bank Private Limited, Akida Investment Co. Ltd, Nasco Business Residence,

CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice

S.R. L., Nascotex S.A., Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC,

Nasreddin Foundation, Nasreddin Group International Holding Limited, Nasreddin

International Group Limited Holding, Abu Hafs the Maritanian, Saif al-Adil. Imad

Mughniyeh, Hezbollah Secretary General  Hassan Nasrallah, Iranian Supreme Leader Ayatollah Ali Khamenei, Usbat al-Ansar, Ahmad Vahedi, Hossein Mosleh, Morteza Reza'i, Salah Hajir and Adib Sha'ban a/k/a Adeeb Shabaan,  Hezbollah, Iranian Minister of Intelligence and Security Ali Fallahian, Iranian Revoluntionary Guard Corpos Deputy Commander Brig General Mohammad Baqer Zolqadr, Ayman al-Zawarhiri, Ali Ghaleb Himmat, Nada International Anstalt, Youssef M. Nada & Co., and John Does 1-67, caused the extrajudicial killing of John Patrick O'Neill, Sr.

277.    For the reasons stated above, and pursuant to 28 U.S.C. §1605 note and 28 U.S.C. §1606, which specifically authorizes a cause of action for punitive damages in civil actions for money damages resulting from terrorist acts, Defendants are jointly and severally liable to Plaintiffs.

WHEREFORE, Plaintiffs collectively demand that judgment in their favor be entered against Defendants, jointly and severally, in the amount of ONE BILLION DOLLARS ($1,000,000,000.00) in punitive damages, costs, and such other monetary and equitable relief as this Court deems appropriate to prevent Defendants from ever again committing terrorist acts.

## **RELIEF REQUESTED**

278.    WHEREFORE, Plaintiffs request that the court grant judgment in their favor and against Defendants, jointly and severally, on Counts I through X, and grant plaintiffs:

a.    Compensatory Damages against Defendants, for each cause of action in the amounts described above, including Counts I, II, III, IV, V, VI, VII, and IX, as established at trial;

b.      Punitive damages against Defendants, as provided for in Counts I-

VII, and X, inclusive,  in the amount of ONE BILLION DOLLARS

($1,000,000,000.00), as determined by the trier of fact;

c.      Treble damages as provided for by law as to counts VIII and IX;

d.      Reasonable costs and expenses;

e.      For prejudgment and post-judgment interest on those damages as

allowed by law;

f.      Reasonable attorneys' fees; and,

g.      Such other and further relief that the court may determine to be just

and equitable under the circumstances.

Dated:  September 30, 2005

Respectfully submitted,


/_____
Jerry S. Goldman, Esquire
LAW OFFICES OF JERRY S. GOLDMAN
        AND ASSOCIATES, P.C.
111 Broadway, 13thFloor
New York, New York 10006
Tel:(212)385-1005
Fax: (212) 346-4665
S.D.N.Y. Bar No. JG 8445
*Attorneys for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____x

*In re Terrorist Attacks on September 11, 2001*　　　　*03 MDL 1570*
_____x


_____

ESTATE OF JOHN P. O'NEILL, *et al.*,　　　　　:
　　　　　　　　Plaintiffs,　　　　　　　　:　　　2004 CV 1076
　　　　　　　　　　　　　　　　　　　　:
　　　　　v.　　　　　　　　　　　　　:　　　DEMAND
　　　　　　　　　　　　　　　　　　　:　　　FOR  JURY TRIAL
　　　　　　　　　　　　　　　　　　　:
REPUBLIC OF IRAN, *et. al.*　　　　　　　　:
　　　　　　　　Defendants.　　　　　　　:
_____　　_:


Plaintiffs hereby demands trial by jury pursuant to the Federal Rules of Civil

Procedure, Rule 38(b) on all issues properly heard by a jury.


Dated:  September 30, 2005

　　　　　　　　　　　　　　　LAW OFFICES OF JERRY S. GOLDMAN
　　　　　　　　　　　　　　　　& ASSOCIATES, P.C.



　　　　　　　　　　　By:_____
　　　　　　　　　　　　　Jerry S. Goldman, Esquire (JG 8445)
　　　　　　　　　　　　　The Trinity Building
　　　　　　　　　　　　　111 Broadway
　　　　　　　　　　　　　13th Floor
　　　　　　　　　　　　　New York, New York, 10006
　　　　　　　　　　　　　Telephone:  (212) 242 2232
　　　　　　　　　　　　　Fax: (212) 346-4665

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that, I caused to be served a copy of the foregoing First

Consolidated Complaint on counsel as set forth on the attached lists of defendants'

counsel and plaintiffs' counsel, who have entered appearances in In re Terrorist Attacks

on September 11, 2001, 03 MDL 1570,  by the email to the addresses set forth therein, on

this date.

Dated: September 30, 2005

_____
JERRY S. GOLDMAN, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\First Consolidated Complaintl.doc

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO ALL O'NEILL
DEFENDANTS

VICTIMS LIST

1.  The name of the defendants to whom this Statement pertains is *all Defendants.*[1]

2.  The names of each victim ("Victims List") are as set forth in Exhibit A, which is attached hereto and incorporated herein.

3.  Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

---

[1] The instant pleading shall not apply to any defendant who has been dismissed in the instant action, without further leave of the Court.

**EXHIBIT**

**A**

EXHIBIT "A"

VICTIMS LIST

## World Trade Center

Gordon McCannel Aamoth, 32, New York, N.Y.
Maria Rose Abad, 49, Syosset, N.Y.
Edelmiro (Ed) Abad, 54, New York, N.Y.
Andrew Anthony Abate, 37, Melville, N.J.
Vincent Abate, 40, New York, N.Y.
Laurence Christopher Abel, 37
William F. Abrahamson, 58, Cortland Manor, N.Y.
Richard Anthony Aceto, 42, Wantagh, N.Y.
Erica Van Acker, 62, New York, N.Y.
Heinrich B. Ackermann, 38, New York, N.Y.
Paul Andrew Acquaviva, 29, Glen Rock, N.J.
Donald L. Adams, 28, Chatham, N.J.
Shannon Lewis Adams, 25, New York, N.Y.
Stephen Adams, 51, New York, N.Y.
Patrick Adams, 60, New York, N.Y.
Ignatius Adanga, 62, New York, N.Y.
Christy A. Addamo, 28, New Hyde Park, N.Y.
Terence E. Adderley, 22, Bloomfield Hills, Mich.
Sophia B. Addo, 36, New York, N.Y.
Lee Adler, 48, Springfield, N.J.
Daniel Thomas Afflitto, 32, Manalapan, N.J.
Emmanuel Afuakwah, 37, New York, N.Y.
Alok Agarwal, 36, Jersey City, N.J.
Mukul Agarwala, 37, New York, N.Y.
Joseph Agnello, 35, New York, N.Y.
David Scott Agnes, 46, New York, N.Y.
Joao A. Aguiar Jr., 30, Red Bank, N.J.
Lt. Brian G. Ahearn, 43, Huntington, N.Y.
Jeremiah J. Ahern, 74, Cliffside Park, N.J.
Joanne Ahladiotis, 27, New York, N.Y.
Shabbir Ahmed, 47, New York, N.Y.
Terrance Andre Aiken, 30, New York, N.Y.
Godwin Ajala, 33, New York, N.Y.
Gertrude M. Alagero, 37, New York, N.Y.
Andrew Alameno, 37, Westfield, N.J.
Margaret Ann (Peggy) Jezycki Alario, 41, New York, N.Y.
Gary Albero, 39, Emerson, N.J.
Jon L. Albert, 46, Upper Nyack, N.Y.
Peter Craig Alderman, 25, New York, N.Y.

Jacquelyn Delaine Aldridge, 46, New York, N.Y.
Grace Alegre-Cua, 40, Glen Rock, N.J.
David D. Alger, 57, New York, N.Y.
Ernest Alikakos, 43, New York, N.Y.
Edward L. Allegretto, 51, Colonia, N.J.
Eric Allen, 44, New York, N.Y.
Joseph Ryan Allen, 39, New York, N.Y.
Richard Lanard Allen, 30, New York, N.Y.
Richard Dennis Allen, 31, New York, N.Y.
Christopher Edward Allingham, 36, River Edge, N.J.
Janet M. Alonso, 41, Stony Point, N.Y.
Anthony Alvarado, 31, New York, N.Y.
Antonio Javier Alvarez, 23, New York, N.Y.
Telmo Alvear, 25, New York, N.Y.
Cesar A. Alviar, 60, Bloomfield, N.J.
Tariq Amanullah, 40, Metuchen, N.J.
Angelo Amaranto, 60, New York, N.Y.
James Amato, 43, Ronkonkoma, N.Y.
Joseph Amatuccio, 41, New York, N.Y.
Christopher Charles Amoroso, 29, New York, N.Y.
Kazuhiro Anai, 42, Scarsdale, N.Y.
Calixto Anaya, 35, Suffern, N.Y.
Jorge Octavio Santos Anaya, 25, Aguascalientes, Aguascalientes, Mexico
Joseph Peter Anchundia, 26, New York, N.Y.
Kermit Charles Anderson, 57, Green Brook, N.J.
Yvette Anderson, 53, New York, N.Y.
John Andreacchio, 52, New York, N.Y.
Michael Rourke Andrews, 34, Belle Harbor, N.Y.
Jean A. Andrucki, 42, Hoboken, N.J.
Siew-Nya Ang, 37, East Brunswick, N.J.
Joseph Angelini, 38, Lindenhurst, N.Y.
Joseph Angelini, 63, Lindenhurst, N.Y.
Laura Angilletta, 23, New York, N.Y.
Doreen J. Angrisani, 44, New York, N.Y.
Lorraine D. Antigua, 32, Middletown, N.J.
Peter Paul Apollo, 26, Hoboken, N.J.
Faustino Apostol, 55, New York, N.Y.
Frank Thomas Aquilino, 26, New York, N.Y.
Patrick Michael Aranyos, 26, New York, N.Y.
David Gregory Arce, 36, New York, N.Y.
Michael G. Arczynski, 45, Little Silver, N.J.
Louis Arena, 32, New York, N.Y.
Adam Arias, 37, Staten Island, N.Y.
Michael J. Armstrong, 34, New York, N.Y.
Jack Charles Aron, 52, Bergenfield, N.J.
Joshua Aron, 29, New York, N.Y.

Richard Avery Aronow, 48, Mahwah, N.J.
Japhet J. Aryee, 49, Spring Valley, N.Y.
Carl Asaro, 39, Middletown, N.Y.
Michael A. Asciak, 47, Ridgefield, N.J.
Michael Edward Asher, 53, Monroe, N.Y.
Janice Ashley, 25, Rockville Centre, N.Y.
Thomas J. Ashton, 21, New York, N.Y.
Manuel O. Asitimbay, 36, New York, N.Y.
Lt. Gregg Arthur Atlas, 45, Howells, N.Y.
Gerald Atwood, 38, New York, N.Y.
James Audiffred, 38, New York, N.Y.
Kenneth W. Van Auken, 47, East Brunswick, N.J.
Louis F. Aversano, Jr, 58, Manalapan, N.J.
Ezra Aviles, 41, Commack, N.Y.
Ayodeji Awe, 42, New York, N.Y
Samuel (Sandy) Ayala, 36, New York, N.Y.
Arlene T. Babakitis, 47, Secaucus, N.J.
Eustace (Rudy) Bacchus, 48, Metuchen, N.J.
John James Badagliacca, 35, New York, N.Y.
Jane Ellen Baeszler, 43, New York, N.Y.
Robert J. Baierwalter, 44, Albertson, N.Y.
Andrew J. Bailey, 29, New York, N.Y.
Brett T. Bailey, 28, Bricktown, N.Y.
Tatyana Bakalinskaya, 43, New York, N.Y.
Michael S. Baksh, 36, Englewood, N.J.
Sharon Balkcom, 43, White Plains, N.Y.
Michael Andrew Bane, 33, Yardley, Pa.
Kathy Bantis, 44, Chicago, Ill.
Gerard Jean Baptiste, 35, New York, N.Y.
Walter Baran, 42, New York, N.Y.
Gerard A. Barbara, 53, New York, N.Y.
Paul V. Barbaro, 35, Holmdel, N.J.
James W. Barbella, 53, Oceanside, N.Y.
Ivan Kyrillos Fairbanks Barbosa, 30, Jersey City, N.J.
Victor Daniel Barbosa, 23, New York, N.Y.
Colleen Ann Barkow, 26, East Windsor, N.J.
David Michael Barkway, 34, Toronto, Ontario, Canada
Matthew Barnes, 37, Monroe, N.Y.
Sheila Patricia Barnes, 55, Bay Shore, N.Y.
Evan J. Baron, 38, Bridgewater, N.J.
Renee Barrett-Arjune, 41, Irvington, N.J.
Arthur T. Barry, 35, New York, N.Y.
Diane G. Barry, 60, New York, N.Y.
Maurice Vincent Barry, 49, Rutherford, N.J.
Scott D. Bart, 28, Malverne, N.Y.
Carlton W. Bartels, 44, New York, N.Y.

Guy Barzvi, 29, New York, N.Y.
Inna Basina, 43, New York, N.Y.
Alysia Basmajian, 23, Bayonne, N.J.
Kenneth William Basnicki, 48, Etobicoke, Ontario, Canada
Lt. Steven J. Bates, 42, New York, N.Y.
Paul James Battaglia, 22, New York, N.Y.
W. David Bauer, 45, Rumson, N.J.
Ivhan Luis Carpio Bautista, 24, New York, N.Y.
Marlyn C. Bautista, 46, Iselin, N.J.
Jasper Baxter, 45, Philadelphia, Pa.
Michele (Du Berry) Beale, 37, Essex, Britain
Paul F. Beatini, 40, Park Ridge, N.J.
Jane S. Beatty, 53, Belford, N.J.
Larry I. Beck, 38, Baldwin, N.Y.
Manette Marie Beckles, 43, Rahway, N.J.
Carl John Bedigian, 35, New York, N.Y.
Michael Beekman, 39, New York, N.Y.
Maria Behr, 41, Milford, N.J.
Yelena Belilovsky, 38, Mamaroneck, N.Y.
Nina Patrice Bell, 39, New York, N.Y.
Andrea Della Bella, 59, Jersey City, N.J.
Debbie S. Bellows, 30, East Windsor, N.J.
Stephen Elliot Belson, 51, New York, N.Y.
Paul Michael Benedetti, 32, New York, N.Y.
Denise Lenore Benedetto, 40, New York, N.Y.
Bryan Craig Bennett, 25, New York, N.Y.
Oliver Duncan Bennett, 29, London, England
Eric L. Bennett, 29, New York, N.Y.
Margaret L. Benson, 52, Rockaway, N.J.
Dominick J. Berardi, 25, New York, N.Y.
James Patrick Berger, 44, Lower Makefield, Pa.
Steven Howard Berger, 45, Manalapan, N.J.
John P. Bergin, 39, New York, N.Y.
Alvin Bergsohn, 48, Baldwin Harbor, N.Y.
Daniel D. Bergstein, 38, Teaneck, N.J.
Michael J. Berkeley, 38, New York, N.Y.
Donna Bernaerts-Kearns, 44, Hoboken, N.J.
David W. Bernard, 57, Chelmsford, Mass.
William Bernstein, 44, New York, N.Y.
David M. Berray, 39, New York, N.Y.
David S. Berry, 43, New York, N.Y.
Joseph J. Berry, 55, Saddle River, N.J.
William Reed Bethke, 36, Hamilton, N.J.
Timothy D. Betterly, 42, Little Silver, N.J.
Edward F. Beyea, 42, New York, N.Y.
Paul Michael Beyer, 37, New York, N.Y.

4

Anil T. Bharvaney, 41, East Windsor, N.J.
Bella Bhukhan, 24, Union, N.J.
Shimmy D. Biegeleisen, 42, New York, N.Y.
Peter Alexander Bielfeld, 44, New York, N.Y.
William Biggart, 54, New York, N.Y.
Brian Bilcher, 36, New York, N.Y.
Carl Vincent Bini, 44, New York, N.Y.
Gary Bird, 51, Tempe, Ariz.
Joshua David Birnbaum, 24, New York, N.Y.
George Bishop, 52, Granite Springs, N.Y.
Jeffrey D. Bittner, 27, New York, N.Y.
Balewa Albert Blackman, 26, New York, N.Y.
Christopher Joseph Blackwell, 42, Patterson, N.Y.
Susan L. Blair, 35, East Brunswick, N.J.
Harry Blanding, 38, Blakeslee, Pa.
Janice L. Blaney, 55, Williston Park, N.Y.
Craig Michael Blass, 27, Greenlawn, N.Y.
Rita Blau, 52, New York, N.Y.
Richard M. Blood, 38, Ridgewood, N.J.
Michael A. Boccardi, 30, Bronxville, N.Y.
John Paul Bocchi, 38, New Vernon, N.J.
Michael L. Bocchino, 45, New York, N.Y.
Susan Mary Bochino, 36, New York, N.Y.
Bruce Douglas (Chappy) Boehm, 49, West Hempstead, N.Y.
Mary Katherine Boffa, 45, New York, N.Y.
Nicholas A. Bogdan, 34, Browns Mills, N.J.
Darren C. Bohan, 34, New York, N.Y.
Lawrence Francis Boisseau, 36, Freehold, N.J.
Vincent M. Boland, 25, Ringwood, N.J.
Alan Bondarenko, 53, Flemington, N.J.
Andre Bonheur, 40, New York, N.Y.
Colin Arthur Bonnett, 39, New York, N.Y.
Frank Bonomo, 42, Port Jefferson, N.Y.
Yvonne L. Bonomo, 30, New York, N.Y.
Sean Booker, 35, Irvington, N.J.
Sherry Ann Bordeaux, 38, Jersey City, N.J.
Krystine C. Bordenabe, 33, Old Bridge, N.J.
Martin Boryczewski, 29, Parsippany, N.J.
Richard E. Bosco, 34, Suffern, N.Y.
John Howard Boulton, 29, New York, N.Y.
Francisco Bourdier, 41, New York, N.Y.
Thomas H. Bowden, 36, Wyckoff, N.J.
Kimberly S. Bowers, 31, Islip, N.Y.
Veronique (Bonnie) Nicole Bowers, 28, New York, N.Y.
Larry Bowman, 46, New York, N.Y.
Shawn Edward Bowman, 28, New York, N.Y.

Kevin L. Bowser, 45, Philadelphia, Pa.
Gary R. Box, 37, North Bellmore, N.Y.
Gennady Boyarsky, 34, New York, N.Y.
Pamela Boyce, 43, New York, N.Y.
Michael Boyle, 37, Westbury, N.Y.
Alfred Braca, 54, Leonardo, N.J.
Sandra Conaty Brace, 60, New York, N.Y.
Kevin H. Bracken, 37, New York, N.Y.
David Brian Brady, 41, Summit, N.J.
Alexander Braginsky, 38, Stamford, Conn.
Nicholas W. Brandemarti, 21, Mantua, N.J.
Michelle Renee Bratton, 23, Yonkers, N.Y.
Patrice Braut, 31, New York, N.Y.
Lydia Estelle Bravo, 50, Dunellen, N.J.
Ronald Michael Breitweiser, 39, Middletown Township, N.J.
Edward A. Brennan, 37, New York, N.Y.
Frank H. Brennan, 50, New York, N.Y.
Michael Emmett Brennan, 27, New York, N.Y.
Peter Brennan, 30, Ronkonkoma, N.Y.
Thomas M. Brennan, 32, Scarsdale, N.Y.
Capt. Daniel Brethel, 43, Farmingdale, N.Y.
Gary L. Bright, 36, Union City, N.J.
Jonathan Eric Briley, 43, Mount Vernon, N.Y.
Mark A. Brisman, 34, Armonk, N.Y.
Paul Gary Bristow, 27, New York, N.Y.
Victoria Alvarez Brito, 38, New York, N.Y.
Mark Francis Broderick, 42, Old Bridge, N.J.
Herman C. Broghammer, 58, North Merrick, N.Y.
Keith Broomfield, 49, New York, N.Y.
Janice J. Brown, 35, New York, N.Y.
Lloyd Brown, 28, Bronxville, N.Y.
Capt. Patrick J. Brown, 48, New York, N.Y.
Bettina Browne, 49, Atlantic Beach, N.Y.
Mark Bruce, 40, Summit, N.J.
Richard Bruehert, 38, Westbury, N.Y.
Andrew Brunn, 28
Capt. Vincent Brunton, 43, New York, N.Y.
Ronald Paul Bucca, 47, Tuckahoe, N.Y.
Brandon J. Buchanan, 24, New York, N.Y.
Greg Joseph Buck, 37, New York, N.Y.
Dennis Buckley, 38, Chatham, N.J.
Nancy Bueche, 43, Hicksville, N.Y.
Patrick Joseph Buhse, 36, Lincroft, N.J.
John E. Bulaga, 35, Paterson, N.J.
Stephen Bunin, 45, New York, N.Y.
Thomas Daniel Burke, 38, Bedford Hills, N.Y.

Capt. William F. Burke, 46, New York, N.Y.
Matthew J. Burke, 28, New York, N.Y.
Donald James Burns, 61, Nissequogue, N.Y.
Kathleen A. Burns, 49, New York, N.Y.
Keith James Burns, 39, East Rutherford, N.J.
John Patrick Burnside, 36, New York, N.Y.
Irina Buslo, 32, New York, N.Y.
Milton Bustillo, 37, New York, N.Y.
Thomas M. Butler, 37, Kings Park, N.Y.
Patrick Byrne, 39, New York, N.Y.
Timothy G. Byrne, 36, Manhattan, N.Y.
Jesus Cabezas, 66, New York, N.Y.
Lillian Caceres, 48, New York, N.Y.
Brian Joseph Cachia, 26, New York, N.Y.
Steven Cafiero, 31, New York, N.Y.
Richard M. Caggiano, 25, New York, N.Y.
Cecile M. Caguicla, 55, Boonton, N.J.
Michael John Cahill, 37, East Williston, N.Y.
Scott W. Cahill, 30, West Caldwell, N.J.
Thomas J. Cahill, 36, Franklin Lakes, N.J.
George Cain, 35, Massapequa, N.Y.
Salvatore B. Calabro, 38, New York, N.Y.
Joseph Calandrillo, 49, Hawley, Pa.
Philip V. Calcagno, 57, New York, N.Y.
Edward Calderon, 44, Jersey City, N.J.
Kenneth Marcus Caldwell, 30, New York, N.Y.
Dominick E. Calia, 40, Manalapan, N.J.
Felix (Bobby) Calixte, 38, New York, N.Y.
Capt. Frank Callahan, 51, New York, N.Y.
Liam Callahan, 44, Rockaway, N.J.
Luigi Calvi, 34, East Rutherford, N.J.
Roko Camaj, 60, Manhasset, N.Y.
Michael Cammarata, 22, Huguenot, N.Y.
David Otey Campbell, 51, Basking Ridge, N.J.
Geoffrey Thomas Campbell, 31, New York, N.Y.
Sandra Patricia Campbell, 45, New York, N.Y.
Jill Marie Campbell, 31, New York, N.Y.
Robert Arthur Campbell, 25, New York, N.Y.
Juan Ortega Campos, 32, New York, N.Y.
Sean Canavan, 39, New York, N.Y.
John A. Candela, 42, Glen Ridge, N.J.
Vincent Cangelosi, 30, New York, N.Y.
Stephen J. Cangialosi, 40, Middletown, N.J.
Lisa B. Cannava, 30, New York, N.Y.
Brian Cannizzaro, 30, New York, N.Y.
Michael R. Canty, 30, Schenectady, N.Y.

Louis A. Caporicci, 35, New York, N.Y.
Jonathan N. Cappello, 23, Garden City, N.Y.
James Christopher Cappers, 33, Wading River, N.Y.
Richard M. Caproni, 34, Lynbrook, N.Y.
Jose Cardona, 32, New York, N.Y.
Dennis M Carey, 51, Wantagh, N.Y.
Edward Carlino, 46, New York, N.Y.
Michael Scott Carlo, 34, New York, N.Y.
David G. Carlone, 46, Randolph, N.J.
Rosemarie C. Carlson, 40, New York, N.Y.
Mark Stephen Carney, 41, Rahway, N.J.
Joyce Ann Carpeneto, 40, New York, N.Y.
Alicia Acevedo Carranza, Teziutlan, Puebla, Mexico
Jeremy M. Carrington, 34, New York, N.Y.
Michael T. Carroll, 39, New York, N.Y.
Peter Carroll, 42, New York, N.Y.
James J. Carson, 32, Massapequa, N.Y.
James Marcel Cartier, 26, New York, N.Y.
Vivian Casalduc, 45, New York, N.Y.
John F. Casazza, 38, Colts Neck, N.J.
Paul Cascio, 23, Manhasset, N.Y.
Kathleen Hunt Casey, 43, Middletown, N.J.
Margarito Casillas, 54, Guadalajara, Jalisco, Mexico
Thomas Anthony Casoria, 29, New York, N.Y.
William Otto Caspar, 57, Eatontown, N.J.
Alejandro Castano, 35, Englewood, N.J.
Arcelia Castillo, 49, Elizabeth, N.J.
Leonard M. Castrianno, 30, New York, N.Y.
Jose Ramon Castro, 37, New York, N.Y.
Richard G. Catarelli, 47, New York, N.Y.
Christopher Sean Caton, 34, New York, N.Y.
Robert J. Caufield, 48, Valley Stream, N.Y.
Mary Teresa Caulfield, 58, New York, N.Y.
Judson Cavalier, 26, Huntington, N.Y.
Michael Joseph Cawley, 32, Bellmore, N.Y.
Jason D. Cayne, 32, Morganville, N.J.
Juan Armando Ceballos, 47, New York, N.Y.
Marcia G. Cecil-Carter, 34, New York, N.Y.
Jason Cefalu, 30, West Hempstead, N.Y.
Thomas J. Celic, 43, New York, N.Y.
Ana M. Centeno, 38, Bayonne, N.J.
Joni Cesta, 37, Bellmore, N.Y.
Jeffrey M. Chairnoff, 35, West Windsor, N.J.
Swarna Chalasani, 33, Jersey City, N.J.
William Chalcoff, 41, Roslyn, N.Y.
Eli Chalouh, 23, New York, N.Y.

8

Charles Lawrence (Chip) Chan, 23, New York, N.Y.
Mandy Chang, 40, New York, N.Y.
Mark L. Charette, 38, Millburn, N.J.
Gregorio Manuel Chavez, 48, New York, N.Y.
Jayceryll M. de Chavez, 24, Carteret, N.J.
Pedro Francisco Checo, 35, New York, N.Y.
Douglas MacMillan Cherry, 38, Maplewood, N.J.
Stephen Patrick Cherry, 41, Stamford, Conn.
Vernon Paul Cherry, 49, New York, N.Y.
Nestor Chevalier, 30, New York, N.Y.
Swede Joseph Chevalier, 26, Locust, N.J.
Alexander H. Chiang, 51, New City, N.Y.
Dorothy J. Chiarchiaro, 61, Glenwood, N.J.
Luis Alfonso Chimbo, 39, New York, N.Y.
Robert Chin, 33, New York, N.Y.
Wing Wai (Eddie) Ching, 29, Union, N.J.
Nicholas P. Chiofalo, 39, Selden, N.Y.
John Chipura, 39, New York, N.Y.
Peter A. Chirchirillo, 47, Langhorne, Pa.
Catherine E. Chirls, 47, Princeton, N.J.
Kyung (Kaccy) Cho, 30, Clifton, N.J.
Abul K. Chowdhury, 30, New York, N.Y.
Mohammed Salahuddin Chowdhury, 38, New York, N.Y.
Kirsten L. Christophe, 39, Maplewood, N.J.
Pamela Chu, 31, New York, N.Y.
Steven Paul Chucknick, 44, Cliffwood Beach, N.J.
Wai-ching Chung, 36, New York, N.Y.
Christopher Ciafardini, 30, New York, N.Y.
Alex F. Ciccone, 38, New Rochelle, N.Y.
Frances Ann Cilente, 26, New York, N.Y.
Elaine Cillo, 40, New York, N.Y.
Edna Cintron, 46, New York, N.Y.
Nestor Andre Cintron, 26, New York, N.Y.
Lt. Robert Dominick Cirri, 39, Nutley, N.J.
Juan Pablo Alvarez Cisneros, 23, Weehawken, N.J.
Gregory Alan Clark, 40, Teaneck, N.J.
Mannie Leroy Clark, 54, New York, N.Y.
Thomas R. Clark, 37, Summit, N.J.
Eugene Clark, 47, New York, N.Y.
Benjamin Keefe Clark, 39, New York, N.Y.
Christopher Robert Clarke, 34, Philadelphia, Pa.
Donna Clarke, 39, New York, N.Y.
Michael Clarke, 27, Prince's Bay, N.Y.
Suria R.E. Clarke, 30, New York, N.Y.
Kevin Francis Cleary, 38, New York, N.Y.
James D. Cleere, 55, Newton, Iowa

Geoffrey W. Cloud, 36, Stamford, Conn.
Susan M. Clyne, 42, Lindenhurst, N.Y.
Steven Coakley, 36, Deer Park, N.Y.
Jeffrey Coale, 31, Souderton, Pa.
Patricia A. Cody, 46, Brigantine, N.J.
Daniel Michael Coffey, 54, Newburgh, N.Y.
Jason Matthew Coffey, 25, Newburgh, N.Y.
Florence Cohen, 62, New York, N.Y.
Kevin Sanford Cohen, 28, Edison, N.J.
Anthony Joseph Coladonato, 47, New York, N.Y.
Mark J. Colaio, 34, New York, N.Y.
Stephen J. Colaio, 32, Montauk, N.Y.
Christopher M. Colasanti, 33, Hoboken, N.J.
Michel Paris Colbert, 39, West New York, N.J.
Kevin Nathaniel Colbert, 25, New York, N.Y.
Keith Eugene Coleman, 34, Warren, N.J.
Scott Thomas Coleman, 31, New York, N.Y.
Tarel Coleman, 32
Liam Joseph Colhoun, 34, Flushing,, N.Y.
Robert D. Colin, 49, West Babylon, N.Y.
Robert J. Coll, 35, Glen Ridge, N.J.
Jean Marie Collin, 42, New York, N.Y.
John Michael Collins, 42, New York, N.Y.
Michael L. Collins, 38, Montclair, N.J.
Thomas J. Collins, 36, New York, N.Y.
Joseph Collison, 50, New York, N.Y.
Patricia Malia Colodner, 39, New York, N.Y.
Linda M. Colon, 46, Perrineville, N.J.
Soledi Colon, 39, New York, N.Y.
Ronald Comer, 56, Northport, N.Y.
Jaime Concepcion, 46, New York, N.Y.
Albert Conde, 62, Englishtown, N.J.
Denease Conley, 44, New York, N.Y.
Susan Clancy Conlon, 41, New York, N.Y.
Margaret Mary Conner, 57, New York, N.Y.
John E. Connolly, 46, Allenwood, N.J.
Cynthia L. Connolly, 40, Metuchen, N.J.
James Lee Connor, 38, Summit, N.J.
Jonathan (J.C.) Connors, 55, Old Brookville, N.Y.
Kevin P. Connors, 55, Greenwich, Conn.
Kevin Francis Conroy, 47, New York, N.Y.
Brenda E. Conway, 40, New York, N.Y.
Dennis Michael Cook, 33, Colts Neck, N.J.
Helen D. Cook, 24, New York, N.Y.
John A. Cooper, 40, Bayonne, N.J.
Joseph J. Coppo, 47, New Canaan, Conn.

Gerard J. Coppola, 46, New Providence, N.J.
Joseph Albert Corbett, 28, Islip, N.Y.
Alejandro Cordero, 23, New York, N.Y.
Robert Cordice, 28, New York, N.Y.
Ruben D. Correa, 44, New York, N.Y.
Danny A. Correa-Gutierrez, 25, Fairview, N.J.
James Corrigan, 60, New York, N.Y.
Carlos Cortes, 57, New York, N.Y.
Kevin M. Cosgrove, 46, West Islip, N.Y.
Dolores Marie Costa, 53, Middletown, N.J.
Digna Alexandra Rivera Costanza, 25, New York, N.Y.
Charles Gregory Costello, 46, Old Bridge, N.J.
Michael S. Costello, 27, Hoboken, N.J.
Conrod K.H. Cottoy, 51, New York, N.Y.
Martin Coughlan, 54, New York, N.Y.
Sgt. John Gerard Coughlin, 43, Pomona, N.Y.
Timothy John Coughlin, 42, New York, N.Y.
James E. Cove, 48, Rockville Centre, N.Y.
Andre Cox, 29, New York, N.Y.
Frederick John Cox, 27, New York, N.Y.
James Raymond Coyle, 26, New York, N.Y.
Michelle Coyle-Eulau, 38, Garden City, N.Y.
Anne M. Cramer, 47, New York, N.Y.
Christopher Seton Cramer, 34, Manahawkin, N.J.
Denise Crant, 46, Hackensack, N.J.
Robert James Crawford, 62, New York, N.Y.
James L. Crawford, 33, Madison, N.J.
Joanne Mary Cregan, 32, New York, N.Y.
Lucia Crifasi, 51, Glendale, N.Y.
Lt. John Crisci, 48, Holbrook, N.Y.
Daniel Hal Crisman, 25, New York, N.Y.
Dennis A. Cross, 60, Islip Terrace, N.Y.
Helen Crossin-Kittle, 34, Larchmont, N.Y.
 Thomas G. Crotty, 42, Rockville Centre, N.Y.
John Crowe, 57, Rutherford, N.J.
Welles Remy Crowther, 24, Upper Nyack, N.Y.
Robert L. Cruikshank, 64, New York, N.Y.
Francisco Cruz, 47, New York, N.Y.
John Robert Cruz, 32, Jersey City, N.J.
Kenneth John Cubas, 48, Woodstock, N.Y.
Richard Joseph Cudina, 46, Glen Gardner, N.J.
Neil James Cudmore, 38, Port Washington, N.Y.
Thomas Patrick Cullen, 31, New York, N.Y.
Joan McConnell Cullinan, 47, Scarsdale, N.Y.
Joyce Cummings, 65
Brian Thomas Cummins, 38, Manasquan, N.J.

11

Nilton Albuquerque Fernao Cunha, 41
Michael Joseph Cunningham, 39, Princeton Junction, N.J.
Robert Curatolo, 31, New York, N.Y.
Laurence Curia, 41, Garden City, N.Y.
Paul Dario Curioli, 53, Norwalk, Conn.
Beverly Curry, 41, New York, N.Y.
Sgt. Michael Curtin, 45, Medford, N.Y.
Gavin Cushny, 47, Hoboken, N.J.
Caleb Arron Dack, 39, Montclair, N.J.
Carlos S. DaCosta, 41, Elizabeth, N.J.
John D'Allara, 47, Pearl River, N.Y.
Vincent D'Amadeo, 36, East Patchoque, N.Y.
Thomas A. Damaskinos, 33, Matawan, N.J.
Jack L. D'Ambrosi, 45, Woodcliff Lake, N.J.
Jeannine Marie Damiani-Jones, 28, New York, N.Y.
Patrick W. Danahy, 35, Yorktown Heights, N.Y.
Nana Kwuku Danso, 47, New York, N.Y.
Mary D'Antonio, 55, New York, N.Y.
Vincent G. Danz, 38, Farmingdale, N.Y.
Dwight Donald Darcy, 55, Bronxville, N.Y.
Elizabeth Ann Darling, 28, Newark, N.J.
Annette Andrea Dataram, 25, New York, N.Y.
Lt. Edward Alexander D'Atri, 38, New York, N.Y.
Michael D. D'Auria, 25, New York, N.Y.
Lawrence Davidson, 51, New York, N.Y.
Michael Allen Davidson, 27, Westfield, N.J.
Scott Matthew Davidson, 33, New York, N.Y.
Titus Davidson, 55, New York, N.Y.
Niurka Davila, 47, New York, N.Y.
Clinton Davis, 38, New York, N.Y.
Wayne Terrial Davis, 29, Fort Meade, Md.
Calvin Dawson, 46, New York, N.Y.
Anthony Richard Dawson, 32, Southampton, Hampshire, England
Edward James Day, 45, New York, N.Y.
Emerita (Emy) De La Pena, 32, New York, N.Y.
Melanie Louise De Vere, 30, London, England
William T. Dean, 35, Floral Park, N.Y.
Robert J. DeAngelis, 48, West Hempstead, N.Y.
Thomas P. Deangelis, 51, Westbury, N.Y.
Tara Debek, 35, Babylon, N.Y.
Anna Debin, 30, East Farmingdale, N.Y.
James V. DeBlase, 45, Manalapan, N.J.
Paul DeCola, 39, Ridgewood, N.Y.
Simon Dedvukaj, 26, Mohegan Lake, N.Y.
Jason Christopher DeFazio, 29, New York, N.Y.

David A. Defeo, 37, New York, N.Y.
Jennifer DeJesus, 23, New York, N.Y.
 Monique E. DeJesus, 28, New York, N.Y.
Nereida DeJesus, 30, New York, N.Y.
Donald A. Delapenha, 37, Allendale, N.J.
Vito Joseph Deleo, 41, New York, N.Y.
Danielle Delie, 47, New York, N.Y.
Colleen Ann Deloughery, 41, Bayonne, N.J.
Francis (Frank) Albert DeMartini, 49, New York, N.Y.
Anthony Demas, 61, New York, N.Y.
Martin DeMeo, 47, Farmingville, N.Y.
Francis X. Deming, 47, Franklin Lakes, N.J.
Carol K. Demitz, 49, New York, N.Y.
Kevin Dennis, 43, Peapack, N.J.
Thomas F. Dennis, 43, Setauket, N.Y.
Jean C. DePalma, 42, Newfoundland, N.J.
Jose Nicolas Depena, 42, New York, N.Y.
Robert J. Deraney, 43, New York, N.Y.
Michael DeRienzo, 37, Hoboken, N.J.
David Paul Derubbio, 38, New York, N.Y.
Jemal Legesse DeSantis, 28, Jersey City, N.J.
Christian L. DeSimone, 23, Ringwood, N.J.
Edward DeSimone, 36, Atlantic Highlands, N.J.
Lt. Andrew Desperito, 44, Patchogue, N.Y.
Michael Jude D'Esposito, 32, Morganville, N.J.
Cindy Ann Deuel, 28, New York, N.Y.
Jerry DeVito, 66, New York, N.Y.
Robert P. Devitt, 36, Plainsboro, N.J.
Dennis Lawrence Devlin, 51, Washingtonville, N.Y.
Gerard Dewan, 35, New York, N.Y.
Simon Suleman Ali Kassamali Dhanani, 62, Hartsdale, N.Y.
Michael L. DiAgostino, 41, Garden City, N.Y.
Matthew Diaz, 33, New York, N.Y.
Nancy Diaz, 28, New York, N.Y.
Obdulio Ruiz Diaz, 44, New York, N.Y.
Lourdes Galletti Diaz, 32, New York, N.Y.
Michael Diaz-Piedra, 49
Judith Belguese Diaz-Sierra, 32, Bay Shore, N.Y.
Patricia F. DiChiaro, 63, New York, N.Y.
Joseph Dermot Dickey, 50, Manhasset, N.Y.
Lawrence Patrick Dickinson, 35, Morganville, N.J.
Michael David Diehl, 48, Brick, N.J.
John DiFato, 39, New York, N.Y.
Vincent F. DiFazio, 43, Hampton, N.J.
Carl DiFranco, 27, New York, N.Y.
Donald J. DiFranco, 43, New York, N.Y.

Debra Ann DiMartino, 36, New York, N.Y.
Stephen P. Dimino, 48, Basking Ridge, N.J.
William J. Dimmling, 47, Garden City, N.Y.
Christopher Dincuff, 31, Jersey City, N.J.
Jeffrey M. Dingle, 32, New York, N.Y.
Anthony DiOnisio, 38, Glen Rock, N.J.
George DiPasquale, 33, New York, N.Y.
Joseph DiPilato, 57, New York, N.Y.
Douglas Frank DiStefano, 24, Hoboken, N.J.
Ramzi A. Doany, 35, Bayonne, N.J., Jordanian
John J. Doherty, 58, Hartsdale, N.Y.
Melissa C. Doi, 32, New York, N.Y.
Brendan Dolan, 37, Glen Rock, N.J.
Neil Dollard, 28, Hoboken, N.J.
James Joseph Domanico, 56, New York, N.Y.
Benilda Pascua Domingo, 37, New York, N.Y.
Charles (Carlos) Dominguez, 34, East Meadow, N.Y.
Geronimo (Jerome) Mark Patrick Dominguez, 37, Holtsville, N.Y.
Lt. Kevin W. Donnelly, 43, New York, N.Y.
Jacqueline Donovan, 34, New York, N.Y.
Stephen Dorf, 39, New Milford, N.J.
Thomas Dowd, 37, Monroe, N.Y.
Lt. Kevin Christopher Dowdell, 46, New York, N.Y.
Mary Yolanda Dowling, 46, New York, N.Y.
Raymond M. Downey, 63, Deer Park, N.Y.
Joseph M. Doyle, 25, New York, N.Y.
Frank Joseph Doyle, 39, Englewood, N.J.
Randy Drake, 37, Lee's Summit, Mo.
Stephen Patrick Driscoll, 38, Lake Carmel, N.Y.
Mirna A. Duarte, 31, New York, N.Y.
Luke A. Dudek, 50, Livingston, N.J.
Christopher Michael Duffy, 23, New York, N.Y.
Gerard Duffy, 53, Manorville, N.Y.
Michael Joseph Duffy, 29, Northport, N.Y.
Thomas W. Duffy, 52, Pittsford, N.Y.
Antoinette Duger, 44, Belleville, N.J.
Jackie Sayegh Duggan, 34
Sareve Dukat, 53, New York, N.Y.
Christopher Joseph Dunne, 28, Mineola, N.Y.
Richard A. Dunstan, 54, New Providence, N.J.
Patrick Thomas Dwyer, 37, Nissequogue, N.Y.
Joseph Anthony Eacobacci, 26, New York, N.Y.
John Bruce Eagleson, 53, Middlefield, Conn.
Robert D. Eaton, 37, Manhasset, N.Y.
Dean P. Eberling, 44, Cranford, N.J.
Margaret Ruth Echtermann, 33, Hoboken, N.J.

Paul Robert Eckna, 28, West New York, N.J.
Constantine (Gus) Economos, 41, New York, N.Y.
Dennis Michael Edwards, 35, Huntington, N.Y.
Michael Hardy Edwards, 33, New York, N.Y.
Lisa Egan, 31, Cliffside Park, N.J.
Capt. Martin Egan, 36, New York, N.Y.
Michael Egan, 51, Middletown, N.J.
Christine Egan, 55, Winnipeg, Manitoba, Canada
Samantha Egan, 24, Jersey City, N.J.
Carole Eggert, 60, New York, N.Y.
Lisa Caren Weinstein Ehrlich, 36, New York, N.Y.
John Ernst (Jack) Eichler, 69, Cedar Grove, N.J.
Eric Adam Eisenberg, 32, Commack, N.Y.
Daphne F. Elder, 36, Newark, N.J.
Michael J. Elferis, 27, College Point, N.Y.
Mark J. Ellis, 26, South Huntington, N.Y.
Valerie Silver Ellis, 46, New York, N.Y.
Albert Alfy William Elmarry, 30, North Brunswick, N.J.
Edgar H. Emery, 45, Clifton, N.J.
Doris Suk-Yuen Eng, 30, New York, N.Y.
Christopher S. Epps, 29, New York, N.Y.
Ulf Ramm Ericson, 79, Greenwich, Conn.
Erwin L. Erker, 41, Farmingdale, N.Y.
William J. Erwin, 30, Verona, N.J.
Sarah (Ali) Escarcega, 35, New York, N.Y.
Jose Espinal, 31
Fanny M. Espinoza, 29, Teaneck, N.J.
Francis Esposito, 32, New York, N.Y.
Lt. Michael Esposito, 41, New York, N.Y.
William Esposito, 51, Bellmore, N.Y.
Brigette Ann Esposito, 34, New York, N.Y.
Ruben Esquilin, 35, New York, N.Y.
Sadie Ette, 36, New York, N.Y.
Barbara G. Etzold, 43, Jersey City, N.J.
Eric Brian Evans, 31, Weehawken, N.J.
Robert Edward Evans, 36, Franklin Square, N.Y.
Meredith Emily June Ewart, 29, Hoboken, N.J.
Catherine K. Fagan, 58, New York, N.Y.
Patricia M. Fagan, 55, Toms River, N.J.
Keith G. Fairben, 24, Floral Park, N.Y.
William Fallon, 38, Coram, N.Y.
William F. Fallon, 53, Rocky Hill, N.J.
Anthony J. Fallone, 39, New York, N.Y.
Dolores B. Fanelli, 38, Farmingville, N.Y.
John Joseph Fanning, 54, West Hempstead, N.Y.
Kathleen (Kit) Faragher, 33, Denver, Colo.

Capt. Thomas Farino, 37, Bohemia, N.Y.
Nancy Carole Farley, 45, Jersey City, N.J.
Elizabeth Ann (Betty) Farmer, 62, New York, N.Y.
Douglas Farnum, 33, New York, N.Y.
John W. Farrell, 41, Basking Ridge, N.J.
Terrence Patrick Farrell, 45, Huntington, N.Y.
John G. Farrell, 32, New York, N.Y.
Capt. Joseph Farrelly, 47, New York, N.Y.
Thomas P. Farrelly, 54, East Northport, N.Y.
Syed Abdul Fatha, 54, Newark, N.J.
Christopher Faughnan, 37, South Orange, N.J.
Wendy R. Faulkner, 47, Mason, Ohio
Shannon M. Fava, 30, New York, N.Y.
Bernard D. Favuzza, 52, Suffern, N.Y.
Robert Fazio, 41, Freeport, N.Y.
Ronald C. Fazio, 57, Closter, N.J.
William Feehan, 72, New York, N.Y.
Francis J. (Frank) Feely, 41, Middletown, N.Y.
Garth E. Feeney, 28, New York, N.Y.
Sean B. Fegan, 34, New York, N.Y.
Lee S. Fehling, 28, Wantagh, N.Y.
Peter Feidelberg, 34, Hoboken, N.J.
Alan D. Feinberg, 48, New York, N.Y.
Rosa Maria Feliciano, 30, New York, N.Y.
Edward T. Fergus, 40, Wilton, Conn.
George Ferguson, 54, Teaneck, N.J.
Henry Fernandez, 23, New York, N.Y.
Judy H. Fernandez, 27, Parlin, N.J.
Jose Manuel Contreras Fernandez, El Aguacate, Jalisco, Mexico
Elisa Giselle Ferraina, 27, London, England
Anne Marie Sallerin Ferreira, 29, Jersey City, N.J.
Robert John Ferris, 63, Garden City, N.Y.
David Francis Ferrugio, 46, Middletown, N.J.
Louis V. Fersini, 38, Basking Ridge, N.J.
Michael David Ferugio, 37, New York, N.Y.
Bradley James Fetchet, 24, New York, N.Y.
Jennifer Louise Fialko, 29, Teaneck, N.J.
Kristen Fiedel, 27, New York, N.Y.
Samuel Fields, 36, New York, N.Y.
Michael Bradley Finnegan, 37, Basking Ridge, N.J.
Timothy J. Finnerty, 33, Glen Rock, N.J.
Michael Curtis Fiore, 46, New York, N.Y.
Stephen J. Fiorelli, 43, Aberdeen, N.J.
Paul M. Fiori, 31, Yorktown Heights, N.Y.
John Fiorito, 40, Stamford, Conn.
Lt. John R. Fischer, 46, New York, N.Y.

16

Andrew Fisher, 42, New York, N.Y.
Thomas J. Fisher, 36, Union, N.J.
Bennett Lawson Fisher, 58, Stamford, Conn.
John Roger Fisher, 46, Bayonne, N.J.
Lucy Fishman, 37, New York, N.Y.
Ryan D. Fitzgerald, 26, New York, N.Y.
Thomas Fitzpatrick, 35, Tuckahoe, N.Y.
Richard P. Fitzsimons, 57, Lynbrook, N.Y.
Salvatore A. Fiumefreddo, 47, Manalapan, N.J.
Christina Donovan Flannery, 26, New York, N.Y.
Eileen Flecha, 33, New York, N.Y.
Andre G. Fletcher, 37, North Babylon, N.Y.
Carl Flickinger, 38, Conyers, N.Y.
John Joseph Florio, 33, Oceanside, N.Y.
Joseph W. Flounders, 46, East Stroudsburg, Pa.
David Fodor, 38, Garrison, N.Y.
Lt. Michael N. Fodor, 53, Warwick, N.Y.
Steven Mark Fogel, 40, Westfield, N.Y.
Thomas Foley, 32, West Nyack, N.Y.
David Fontana, 37, New York, N.Y.
Chih Min (Dennis) Foo, 40, Holmdel, N.J.
Del Rose Forbes-Cheatham, 48, New York, N.Y.
Godwin Forde, 39, New York, N.Y.
Donald A. Foreman, 53, New York, N.Y.
Christopher Hugh Forsythe, 44, Basking Ridge, N.J.
Claudia Alicia Martinez Foster, 26, New York, N.Y.
Noel J. Foster, 40, Bridgewater, N.J.
Ana Fosteris, 58, Coram, N.Y.
Robert J. Foti, 42, Albertson, N.Y.
Jeffrey L. Fox, 40, Cranbury, N.J.
Virginia Fox, 58, New York, N.Y.
Virgin (Lucy) Francis, 62, New York, N.Y.
Pauline Francis, 57, New York, N.Y.
Joan Francis
Gary J. Frank, 35, South Amboy, N.J.
Morton Frank, 31, New York, N.Y.
Peter Christopher Frank, 29, New York, N.Y.
Richard K. Fraser, 32, New York, N.Y.
Kevin Joseph Frawley, 34, Bronxville, N.Y.
Clyde Frazier, 41, New York, N.Y.
Lillian I. Frederick, 46, Teaneck, N.J.
Andrew Fredericks, 40, Suffern, N.Y.
Tamitha Freemen, 35, New York, N.Y.
Brett O. Freiman, 29, Roslyn, N.Y.
Lt. Peter L. Freund, 45, Westtown, N.Y.
Arlene E. Fried, 49, Roslyn Heights, N.Y.

Alan Wayne Friedlander, 52, Yorktown Heights, N.Y.
Andrew K. Friedman, 44, Woodbury, N.Y.
Gregg J. Froehner, 46, Chester, N.J.
Peter Christian Fry, 36, Wilton, Conn.
Clement Fumando, 59, New York, N.Y.
Steven Elliot Furman, 40, Wesley Hills, N.Y.
Paul James Furmato, 37, Colts Neck, N.J.
Fredric Gabler, 30, New York, N.Y.
Richard S. Gabrielle, 50, West Haven, Conn.
James Andrew Gadiel, 23, New York, N.Y.
Pamela Gaff, 51, Robinsville, N.J.
Ervin Vincent Gailliard, 42, New York, N.Y.
Deanna L. Galante, 32, New York, N.Y.
Grace Galante, 29, New York, N.Y.
Anthony Edward Gallagher, 41, New York, N.Y.
Daniel James Gallagher, 23, Red Bank, N.J.
John Patrick Gallagher, 31, Yonkers, N.Y.
Cono E. Gallo, 30, New York, N.Y.
Vincenzo Gallucci, 36, Monroe Township, N.J.
Thomas Edward Galvin, 32, New York, N.Y.
Giovanna (Genni) Gambale, 27, New York, N.Y.
Thomas Gambino, 48, Babylon, N.Y.
Giann F. Gamboa, 26, New York, N.Y.
Peter J. Ganci, 55, North Massapequa, N.Y.
Claude Michael Gann, 41, Roswell, Ga.
Lt. Charles William Garbarini, 44, Pleasantville, N.Y.
Cesar Garcia, 36, New York, N.Y.
David Garcia, 40, Freeport, N.Y.
Jorge Luis Morron Garcia, 38, New York, N.Y.
Juan Garcia, 50, New York, N.Y.
Marlyn C. Garcia, 21, New York, N.Y.
Christopher Gardner, 36, Darien, Conn.
Douglas B. Gardner, 39, New York, N.Y.
Harvey J. Gardner, 35, Lakewood, N.J.
Thomas A. Gardner, 39, Oceanside, N.Y.
Jeffrey B. Gardner, 36, Hoboken, N.J.
William Arthur Gardner, 45, Lynbrook, N.Y.
Francesco Garfi, 29, New York, N.Y.
Rocco Gargano, 28, Bayside, N.Y.
James M. Gartenberg, 36, New York, N.Y.
Matthew David Garvey, 37
Bruce Gary, 51, Bellmore, N.Y.
Palmina Delli Gatti, 33, New York, N.Y.
Boyd A. Gatton, 38, Jersey City, N.J.
Donald Richard Gavagan, 35, New York, N.Y.
Terence D. Gazzani, 24, New York, N.Y.

18

Gary Geidel, 44, New York, N.Y.
Paul Hamilton Geier, 36, Farmingdale, N.Y.
Julie M. Geis, 44, Lees Summit, Mo.
Peter Gelinas, 34, New York, N.Y.
Steven Paul Geller, 52, New York, N.Y.
Howard G. Gelling, 28, New York, N.Y.
Peter Victor Genco, 36, Rockville Centre, N.Y.
Steven Gregory Genovese, 37, Basking Ridge, N.J.
Alayne F. Gentul, 44, Mountain Lakes, N.J.
Edward F. Geraghty, 45, Rockville Centre, N.Y.
Suzanne Geraty, 30, New York, N.Y.
Ralph Gerhardt, 33, New York, N.Y.
Robert J. Gerlich, 56, Monroe, Conn.
Denis P. Germain, 33, Tuxedo Park, N.Y.
Marina R. Gertsberg, 25, New York, N.Y.
Susan M. Getzendanner, 57, New York, N.Y.
James Gerard Geyer, 41, Rockville Centre, N.Y.
Joseph M. Giaccone, 43, Monroe, N.J.
Lt. Vincent Francis Giammona, 40, Valley Stream, N.Y.
Debra L. Gibbon, 43, Hackettstown, N.J.
James A. Giberson, 43, New York, N.Y.
Craig Neil Gibson, 37, New York, N.Y.
Ronnie Gies, 43, Merrick, N.Y.
Laura A. Giglio, 35, Oceanside, N.Y.
Andrew Clive Gilbert, 39, Califon, N.J.
Timothy Paul Gilbert, 35, Lebanon, N.J.
Paul Stuart Gilbey, 39, Chatham, N.J.
Paul John Gill, 34, New York, N.Y.
Mark Y. Gilles, 33, New York, N.Y.
Evan H. Gillette, 40, New York, N.Y.
Ronald Gilligan, 43, Norwalk, Conn.
Sgt. Rodney C. Gillis, 34, New York, N.Y.
Laura Gilly, 32, New York, N.Y.
Lt. John F. Ginley, 37, Warwick, N.Y.
Jeffrey Giordano, 46, New York, N.Y.
John Giordano, 46, Newburgh, N.Y.
Donna Marie Giordano, 44, Parlin, N.J.
Steven A. Giorgetti, 43, Manhasset, N.Y.
Martin Giovinazzo, 34, New York, N.Y.
Kum-Kum Girolamo, 41, New York, N.Y.
Salvatore Gitto, 44, Manalapan, N.J.
Cynthia Giugliano, 46, Nesconset, N.Y.
Mon Gjonbalaj, 65, New York, N.Y.
Dianne Gladstone, 55, New York, N.Y.
Keith Alexander Glascoe, 38, New York, N.Y.
Thomas I. Glasser, 40, Summit, N.J.

Harry Glenn, 38, Piscataway, N.J.
Barry H. Glick, 55, Wayne, N.J.
Steven Lawrence Glick, 42, Greenwich, Conn.
John T. Gnazzo, 32, New York, N.Y.
William (Bill) Robert Godshalk, 35, New York, N.Y.
Michael Gogliormella, 43, New Providence, N.J.
Brian Fredric Goldberg, 26, Union, N.J.
Jeffrey Grant Goldflam, 48, Melville, N.Y.
Michelle Herman Goldstein, 31, New York, N.Y.
Monica Goldstein, 25, New York, N.Y.
Steven Goldstein, 35, Princeton, N.J.
Andrew H. Golkin, 30, New York, N.Y.
Dennis James Gomes, 40, New York, N.Y.
Enrique Antonio Gomez, 42, New York, N.Y.
Jose Bienvenido Gomez, 45, New York, N.Y.
Manuel Gomez, 42, New York, N.Y.
Wilder Gomez, 38, New York, N.Y.
Jenine Gonzalez, 27, New York, N.Y.
Joel Guevara Gonzalez, 23, Aguascalientes, Aguascalientes, Mexico
Rosa J. Gonzalez, 32, Jersey City, N.J.
Mauricio Gonzalez, 27, New York, N.Y.
Calvin J. Gooding, 38, Riverside, N.Y.
Harry Goody, 50, New York, N.Y.
Kiran Reddy Gopu, 24, Bridgeport, Conn.
Catherine Carmen Gorayeb, 41, New York, N.Y.
Kerene Gordon, 43, New York, N.Y.
Sebastian Gorki, 27, New York, N.Y.
Thomas E. Gorman, 41, Middlesex, N.J.
Kieran Gorman, 35, Yonkers, N.Y.
Michael Edward Gould, 29, Hoboken, N.J.
Yugi Goya, 42, Rye, N.Y.
Jon Richard Grabowski, 33, New York, N.Y.
Christopher Michael Grady, 39, Cranford, N.J.
Edwin John Graf, 48, Rowayton, Conn.
David M. Graifman, 40, New York, N.Y.
Gilbert Granados, 51, Hicksville, N.Y.
Elvira Granitto, 43, New York, N.Y.
Winston Arthur Grant, 59, West Hempstead, N.Y.
Christopher Stewart Gray, 32, Weehawken, N.J.
James Michael Gray, 34, New York, N.Y.
Linda Mair Grayling, 44, New York, N.Y.
John Michael Grazioso, 41, Middletown, N.J.
Timothy Grazioso, 42, Gulf Stream, Fla.
Derrick Arthur Green, 44, New York, N.Y.
Wade Brian Green, 42, Westbury, N.Y.
Elaine Myra Greenberg, 56, New York, N.Y.

Gayle R. Greene, 51, Montville, N.J.
James Arthur Greenleaf, 32, New York, N.Y.
Eileen Marsha Greenstein, 52, Morris Plains, N.J.
Elizabeth (Lisa) Martin Gregg, 52, New York, N.Y.
Donald H. Gregory, 62, Ramsey, N.J.
Florence M. Gregory, 38, New York, N.Y.
Denise Gregory, 39, New York, N.Y.
Pedro (David) Grehan, 35, Hoboken, N.J.
John M. Griffin, 38, Waldwick, N.J.
Tawanna Griffin, 30, New York, N.Y.
Joan D. Griffith, 39, Willingboro, N.J.
Warren Grifka, 54, New York, N.Y.
Ramon Grijalvo, 58
Joseph F. Grillo, 46, New York, N.Y.
David Grimner, 51, Merrick, N.Y.
Kenneth Grouzalis, 56, Lyndhurst, N.J.
Joseph Grzelak, 52, New York, N.Y.
Matthew J. Grzymalski, 34, New Hyde Park, N.Y.
Robert Joseph Gschaar, 55, Spring Valley, N.Y.
Liming (Michael) Gu, 34, Piscataway, N.J.
Jose A. Guadalupe, 37, New York, N.Y.
Yan Zhu (Cindy) Guan, 25, New York, N.Y.
Geoffrey E. Guja, 47, Lindenhurst, N.Y.
Lt. Joseph Gullickson, 37, New York, N.Y.
Babita Guman, 33, New York, N.Y.
Douglas B. Gurian, 38, Tenafly, N.J.
Philip T. Guza, 54, Sea Bright, N.J.
Barbara Guzzardo, 49, Glendale, N.Y.
Peter Gyulavary, 44, Warwick, N.Y.
Gary Robert Haag, 36, Ossining, N.Y.
Andrea Lyn Haberman, 25, Chicago, Ill.
Barbara M. Habib, 49, New York, N.Y.
Philip Haentzler, 49, New York, N.Y.
Nizam A. Hafiz, 32, New York, N.Y.
Karen Hagerty, 34, New York, N.Y.
Steven Hagis, 31, New York, N.Y.
Mary Lou Hague, 26, New York, N.Y.
David Halderman, 40, New York, N.Y.
Maile Rachel Hale, 26, Cambridge, Mass.
Richard Hall, 49, Purchase, N.Y.
Vaswald George Hall, 50, New York, N.Y.
Robert John Halligan, 59, Basking Ridge, N.J.
Lt. Vincent Gerard Halloran, 43, North Salem, N.Y.
James D. Halvorson, 56, Greenwich, Conn.
Mohammad Salman Hamdani, 23, New York, N.Y.
Felicia Hamilton, 62, New York, N.Y.

Robert Hamilton, 43, Washingtonville, N.Y.
Frederic Kim Han, 45, Marlboro, N.J.
Christopher James Hanley, 34, New York, N.Y.
Sean Hanley, 35, New York, N.Y.
Valerie Joan Hanna, 57, Freeville, N.Y.
Thomas Hannafin, 36, New York, N.Y.
Kevin James Hannaford, 32, Basking Ridge, N.J.
Michael L. Hannan, 34, Lynbrook, N.Y.
Dana Hannon, 29, Suffern, N.Y.
Vassilios G. Haramis, 56, New York, N.Y.
James A. Haran, 41, Malverne, N.Y.
Jeffrey P. Hardy, 46, New York, N.Y.
Timothy John Hargrave, 38, Readington, N.J.
Daniel Harlin, 41, Kent, N.Y.
Frances Haros, 76, New York, N.Y.
Lt. Harvey L. Harrell, 49, New York, N.Y.
Lt. Stephen Gary Harrell, 44, Warwick, N.Y.
Stewart D. Harris, 52, Marlboro, N.J.
Aisha Harris, 22, New York, N.Y.
John Patrick Hart, 38, Danville, Calif.
John Clinton Hartz, 64, Basking Ridge, N.J.
Emeric J. Harvey, 56, Montclair, N.J.
Capt. Thomas Theodore Haskell, 37, Massapequa, N.Y.
Timothy Haskell, 34, Seaford, N.Y.
Joseph John Hasson, 34, New York, N.Y.
Capt. Terence S. Hatton, 41, New York, N.Y.
Leonard William Hatton, 45, Ridgefield Park, N.J.
Michael Helmut Haub, 34, Roslyn Heights, N.Y.
Timothy Aaron Haviland, 41, Oceanside, N.Y.
Donald G. Havlish, 53, Yardley, Pa.
Anthony Hawkins, 30, New York, N.Y.
Nobuhiro Hayatsu, 36, Scarsdale, N.Y.
Philip Hayes, 67, Northport, N.Y.
William Ward Haynes, 35, Rye, N.Y.
Scott Hazelcorn, 29, Hoboken, N.J.
Lt. Michael K. Healey, 42, East Patchogue, N.Y.
Roberta Bernstein Heber, 60, New York, N.Y.
Charles Francis Xavier Heeran, 23, Belle Harbor, N.Y.
John Heffernan, 37, New York, N.Y.
Howard Joseph Heller, 37, Ridgefield, Conn.
JoAnn L. Heltibridle, 46, Springfield, N.J.
Mark F. Hemschoot, 45, Red Bank, N.J.
Ronnie Lee Henderson, 52, Newburgh, N.Y.
Janet Hendricks, 48, New York, N.Y.
Brian Hennessey, 35, Ringoes, N.J.
Michelle Marie Henrique, 27, New York, N.Y.

Joseph P. Henry, 25, New York, N.Y.
William Henry, 49, New York, N.Y.
John Henwood, 35, New York, N.Y.
Robert Allan Hepburn, 39, Union, N.J.
Mary (Molly) Herencia, 47, New York, N.Y.
Lindsay Coates Herkness, 58, New York, N.Y.
Harvey Robert Hermer, 59, New York, N.Y.
Claribel Hernandez, 31, New York, N.Y.
Norberto Hernandez, 42, New York, N.Y.
Raul Hernandez, 51, New York, N.Y.
Gary Herold, 44, Farmingdale, N.Y.
Jeffrey A. Hersch, 53, New York, N.Y.
Thomas Hetzel, 33, Elmont, N.Y.
Capt. Brian Hickey, 47, New York, N.Y.
Ysidro Hidalgo-Tejada, 47, New York, N.Y., Dominican Republic
Lt. Timothy Higgins, 43, Farmingville, N.Y.
Robert D. Higley, 29, New Fairfield, Conn.
Todd Russell Hill, 34, Boston, Mass.
Clara Victorine Hinds, 52, New York, N.Y.
Neal Hinds, 28, New York, N.Y.
Mark D. Hindy, 28, New York, N.Y.
Richard Bruce Van Hine, 48, Greenwood Lake, N.Y.
Katsuyuki Hirai, 32, Hartsdale, N.Y.
Heather Malia Ho, 32, New York, N.Y.
Tara Yvette Hobbs, 31, New York, N.Y.
Thomas A. Hobbs, 41, Baldwin, N.Y.
James L. Hobin, 47, Marlborough, Conn.
Robert Wayne Hobson, 36, New Providence, N.J.
DaJuan Hodges, 29, New York, N.Y.
Ronald George Hoerner, 58, Massapequa Park, N.Y.
Patrick Aloysius Hoey, 53, Middletown, N.J.
Stephen G. Hoffman, 36, Long Beach, N.Y.
Marcia Hoffman, 52, New York, N.Y.
Frederick J. Hoffmann, 53, Freehold, N.J.
Michele L. Hoffmann, 27, Freehold, N.J.
Judith Florence Hofmiller, 53, Brookfield, Conn.
Thomas Warren Hohlweck, 57, Harrison, N.Y.
Jonathan R. Hohmann, 48, New York, N.Y.
Joseph Francis Holland, 32, Glen Rock, N.J.
John Holland, 30
Elizabeth Holmes, 42, New York, N.Y.
Thomas P. Holohan, 36, Chester, N.Y.
Bradley Hoorn, 22, New York, N.Y.
James P. Hopper, 51, Farmingdale, N.Y.
Montgomery McCullough Hord, 46, Pelham, N.Y.
Michael Horn, 27, Lynbrook, N.Y.

Matthew D. Horning, 26, Hoboken, N.J.
Robert L. Horohoe, 31, New York, N.Y.
Aaron Horwitz, 24, New York, N.Y.
Charles J. Houston, 42, New York, N.Y.
Uhuru G. Houston, 32, Englewood, N.J.
George Howard, 45, Hicksville, N.Y.
Steven L. Howell, 36, New York, N.Y.
Michael C. Howell, 60, New York, N.Y.
Jennifer L. Howley, 34, New Hyde Park, N.Y.
Milagros "Millie" Hromada, 35, New York, N.Y.
Marian Hrycak, 56, New York, N.Y.
Stephen Huczko, 44, Bethlehem, N.J.
Kris R. Hughes, 30, Nesconset, N.Y.
Melissa Harrington Hughes, 31, San Francisco, Calif.
Thomas F. Hughes, 46, Spring Lake Heights, N.J.
Timothy Robert Hughes, 43, Madison, N.J.
Paul R. Hughes, 38, Stamford, Conn.
Robert T. "Bobby" Hughes, 23, Sayreville, N.J.
Susan Huie, 43, Fair Lawn, N.J.
Mychal Lamar Hulse, 30, New York, N.Y.
William C. Hunt, 32, Norwalk, Conn.
Joseph G. Hunter, 31, South Hempstead, N.Y.
Robert Hussa, 51, Roslyn, N.Y.
Capt. Walter Hynes, 46, Belle Harbor, N.Y.
Thomas E. Hynes, 28, Norwalk, Conn.
Joseph Anthony Ianelli, 28, Hoboken, N.J.
Zuhtu Ibis, 25, Clifton, N.J.
Jonathan Lee Ielpi, 29, Great Neck, N.Y.
Michael Patrick Iken, 37, New York, N.Y.
Daniel Ilkanayev, 36, New York, N.Y.
Capt. Frederick Ill, 49, Pearl River, N.Y.
Abraham Nethanel Ilowitz, 51, New York, N.Y.
Anthony P. Infante, 47, Chatham, N.J.
Louis S. Inghilterra, 45, New Castle, N.Y.
Christopher N. Ingrassia, 28, Watchung, N.J.
Paul Innella, 33, East Brunswick, N.J.
Stephanie V. Irby, 38, New York, N.Y.
Douglas Irgang, 32, New York, N.Y.
Todd A. Isaac, 29, New York, N.Y.
Erik Hans Isbrandtsen, 30, New York, N.Y.
Taizo Ishikawa, 50
Aram Iskenderian, 41, Merrick, N.Y.
John Iskyan, 41, Wilton, Conn.
Kazushige Ito, 35, New York, N.Y.
Aleksandr Valeryerich Ivantsov, 23, New York, N.Y.
Virginia Jablonski, 49, Matawan, N.J.

Brooke Alexandra Jackman, 23, New York, N.Y.
Aaron Jacobs, 27, New York, N.Y.
Jason Kyle Jacobs, 32, Mendham, N.J.
Michael Grady Jacobs, 54, Danbury, Conn.
Ariel Louis Jacobs, 29, Briarcliff Manor, N.Y.
Steven A. Jacobson, 53, New York, N.Y.
Ricknauth Jaggernauth, 58, New York, N.Y.
Jake Denis Jagoda, 24, Huntington, N.Y.
Yudh V.S. Jain, 54, New City, N.Y.
Maria Jakubiak, 41, Ridgewood, N.Y.
Gricelda E. James, 44, Willingboro, N.J.
Ernest James, 40, New York, N.Y.
Mark Jardim, 39, New York, N.Y.
Mohammed Jawara, 30, New York, N.Y.
Francois Jean-Pierre, 58, New York, N.Y.
Maxima Jean-Pierre, 40, Bellport, N.Y.
Paul E. Jeffers, 39, New York, N.Y.
Joseph Jenkins, 47, New York, N.Y.
Alan K. Jensen, 49, Wyckoff, N.J.
Prem N. Jerath, 57, Edison, N.J.
Farah Jeudy, 32, Spring Valley, N.Y.
Hweidar Jian, 42, East Brunswick, N.J.
Eliezer Jimenez, 38, New York, N.Y.
Luis Jimenez, 25, New York, N.Y.
Charles Gregory John, 44, New York, N.Y.
Nicholas John, 42, New York, N.Y.
Scott M. Johnson, 26, New York, N.Y.
LaShawana Johnson, 27, New York, N.Y.
William Johnston, 31, North Babylon, N.Y.
Arthur Joseph Jones, 37, Ossining, N.Y.
Allison Horstmann Jones, 31, New York, N.Y.
Brian L. Jones, 44, New York, N.Y.
Christopher D. Jones, 53, Huntington, N.Y.
Donald T. Jones, 39, Livingston, N.J.
Donald W. Jones, 43, Fairless Hills, Pa.
Linda Jones, 50, New York, N.Y.
Mary S. Jones, 72, New York, N.Y.
Andrew Jordan, 35, Remsenburg, N.Y.
Robert Thomas Jordan, 34, Williston, N.Y.
Ingeborg Joseph, 60, Germany
Karl Henri Joseph, 25, New York, N.Y.
Stephen Joseph, 39, Franklin Park, N.J.
Albert Joseph, 79
Jane Eileen Josiah, 47, Bellmore, N.Y.
Lt. Anthony Jovic, 39, Massapequa, N.Y.
Angel Luis Juarbe, 35, New York, N.Y.

Karen Susan Juday, 52, New York, N.Y.
The Rev. Mychal Judge, 68, New York, N.Y.
Paul W. Jurgens, 47, Levittown, N.Y.
Thomas Edward Jurgens, 26, Lawrence, N.Y.
Kacinga Kabeya, 63, McKinney, Texas
Shashi Kiran Lakshmikantha Kadaba, 25, Hackensack, N.J.
Gavkharoy Mukhometovna Kamardinova, 26, New York, N.Y.
Shari Kandell, 27, Wyckoff, N.J.
Howard Lee Kane, 40, Hazlet, N.J.
Jennifer Lynn Kane, 26, Fair Lawn, N.J.
Vincent D. Kane, 37, New York, N.Y.
Joon Koo Kang, 34, Riverdale, N.J.
Sheldon R. Kanter, 53, Edison, N.J.
Deborah H. Kaplan, 45, Paramus, N.J.
Alvin Peter Kappelmann, 57, Green Brook, N.J.
Charles Karczewski, 34, Union, N.J.
William A. Karnes, 37, New York, N.Y.
Douglas G. Karpiloff, 53, Mamaroneck, N.Y.
Charles L. Kasper, 54, New York, N.Y.
Andrew Kates, 37, New York, N.Y.
John Katsimatides, 31, East Marion, N.Y.
Sgt. Robert Kaulfers, 49, Kenilworth, N.J.
Don Jerome Kauth, 51, Saratoga Springs, N.Y.
Hideya Kawauchi, 36, Fort Lee, N.J.
Edward T. Keane, 66, West Caldwell, N.J.
Richard M. Keane, 54, Wethersfield, Conn.
Lisa Kearney-Griffin, 35, Jamaica, N.Y.
Karol Ann Keasler, 42, New York, N.Y.
Paul Hanlon Keating, 38, New York, N.Y.
Leo Russell Keene, 33, Westfield, N.J.
Joseph J. Keller, 31, Park Ridge, N.J.
Peter Rodney Kellerman, 35, New York, N.Y.
Joseph P. Kellett, 37, Riverdale, N.Y.
Frederick H. Kelley, 57, Huntington, N.Y.
James Joseph Kelly, 39, Oceanside, N.Y.
Joseph A. Kelly, 40, Oyster Bay, N.Y.
Maurice Patrick Kelly, 41, New York, N.Y.
Richard John Kelly, 50, New York, N.Y.
Thomas Michael Kelly, 41, Wyckoff, N.J.
Thomas Richard Kelly, 38, Riverhead, N.Y.
Thomas W. Kelly, 51, New York, N.Y.
Timothy C. Kelly, 37, Port Washington, N.Y.
William Hill Kelly, 30, New York, N.Y.
Robert C. Kennedy, 55, Toms River, N.J.
Thomas J. Kennedy, 36, Islip Terrace, N.Y.
John Keohane, 41, Jersey City, N.J.

Lt. Ronald T. Kerwin, 42, Levittown, N.Y.
Howard L. Kestenbaum, 56, Montclair, N.J.
Douglas D. Ketcham, 27, New York, N.Y.
Ruth E. Ketler, 42, New York, N.Y.
Boris Khalif, 30, New York, N.Y.
Sarah Khan, 32, New York, N.Y.
Taimour Firaz Khan, 29, New York, N.Y.
Rajesh Khandelwal, 33, South Plainfield, N.J.
SeiLai Khoo, 38, Jersey City, N.J.
Michael Kiefer, 25, Hempstead, N.Y.
Satoshi Kikuchihara, 43, Scarsdale, N.Y.
Andrew Jay-Hoon Kim, 26, Leonia, N.J.
Lawrence Don Kim, 31, Blue Bell, Pa.
Mary Jo Kimelman, 34, New York, N.Y.
Andrew Marshall King, 42, Princeton, N.J.
Lucille T. King, 59, Ridgewood, N.J.
Robert King, 36, Bellerose Terrace, N.Y.
Lisa M. King-Johnson, 34, New York, N.Y.
Takashi Kinoshita, 46, Rye, N.Y.
Chris Michael Kirby, 21, New York, N.Y.
Howard (Barry) Kirschbaum, 53, New York, N.Y.
Glenn Davis Kirwin, 40, Scarsdale, N.Y.
Richard J. Klares, 59, Somers, N.Y.
Peter A. Klein, 35, Weehawken, N.J.
Alan D. Kleinberg, 39, East Brunswick, N.J.
Karen J. Klitzman, 38, New York, N.Y.
Ronald Philip Kloepfer, 39, Franklin Square, N.Y.
Yevgeny Kniazev, 46, New York, N.Y.
Thomas Patrick Knox, 31, Hoboken, N.J.
Andrew Knox, 30, Adelaide, Australia
Rebecca Lee Koborie, 48, Guttenberg, N.J.
Deborah Kobus, 36, New York, N.Y.
Gary Edward Koecheler, 57, Harrison, N.Y.
Frank J. Koestner, 48, New York, N.Y.
Ryan Kohart, 26, New York, N.Y.
Vanessa Lynn Kolpak, 21, New York, N.Y.
Irina Kolpakova, 37, New York, N.Y.
Suzanne Kondratenko, 27, Chicago, Ill.
Abdoulaye Kone, 37, New York, N.Y.
Bon-seok Koo, 42, River Edge, N.J.
Dorota Kopiczko, 26, Nutley, N.J.
Scott Kopytko, 32, New York, N.Y.
Bojan Kostic, 34, New York, N.Y.
Danielle Kousoulis, 29, New York, N.Y.
John J. Kren, 52
William Krukowski, 36, New York, N.Y.

Lyudmila Ksido, 46, New York, N.Y.
Shekhar Kumar, 30, New York, N.Y.
Kenneth Kumpel, 42, Cornwall, N.Y.
Frederick Kuo, 53, Great Neck, N.Y.
Patricia Kuras, 42, New York, N.Y.
Nauka Kushitani, 44, New York, N.Y.
Thomas Joseph Kuveikis, 48, Carmel, N.Y.
Victor Kwarkye, 35, New York, N.Y.
Kui Fai Kwok, 31, New York, N.Y.
Angela R. Kyte, 49, Boonton, N.J.
Amarnauth Lachhman, 42, Valley Stream, N.Y.
Andrew LaCorte, 61, Jersey City, N.J.
Ganesh Ladkat, 27, Somerset, N.J.
James P. Ladley, 41, Colts Neck, N.J.
Daniel M. Van Laere, 46, Glen Rock, N.J.
Joseph A. Lafalce, 54, New York, N.Y.
Jeanette LaFond-Menichino, 49, New York, N.Y.
David LaForge, 50, Port Richmond, N.Y.
Michael Patrick LaForte, 39, Holmdel, N.J.
Alan Lafrance, 43
Juan Lafuente, 61, Poughkeepsie, N.Y.
Neil K. Lai, 59, East Windsor, N.J.
Vincent A. Laieta, 31, Edison, N.J.
William David Lake, 44, New York, N.Y.
Franco Lalama, 45, Nutley, N.J.
Chow Kwan Lam, 48, Maywood, N.J.
Stephen LaMantia, 38, Darien, Conn.
Amy Hope Lamonsoff, 29, New York, N.Y.
Robert T. Lane, 28, New York, N.Y.
Brendan M. Lang, 30, Red Bank, N.J.
Rosanne P. Lang, 42, Middletown, N.J.
Vanessa Langer, 29, Yonkers, N.Y.
Mary Lou Langley, 53, New York, N.Y.
Peter J. Langone, 41, Roslyn Heights, N.Y.
Thomas Langone, 39, Williston Park, N.Y.
Michele B. Lanza, 36, New York, N.Y.
Ruth Sheila Lapin, 53, East Windsor, N.J.
Carol Ann LaPlante, 59, New York, N.Y.
Ingeborg Astrid Desiree Lariby, 42, New York, N.Y.
Robin Larkey, 48, Chatham, N.J.
Christopher Randall Larrabee, 26, New York, N.Y.
Hamidou S. Larry, 37, New York, N.Y.
Scott Larsen, 35, New York, N.Y.
John Adam Larson, 37, Colonia, N.J.
Gary E. Lasko, 49, Memphis, Tenn.
Nicholas C. Lassman, 28, Cliffside Park, N.J.

Paul Laszczynski, 49, Paramus, N.J.
Jeffrey Latouche, 49, New York, N.Y.
Cristina de Laura
Oscar de Laura
Charles Laurencin, 61, New York, N.Y.
Stephen James Lauria, 39, New York, N.Y.
Maria Lavache, 60, New York, N.Y.
Denis F. Lavelle, 42, Yonkers, N.Y.
Jeannine M. LaVerde, 36, New York, N.Y.
Anna A. Laverty, 52, Middletown, N.J.
Steven Lawn, 28, West Windsor, N.J.
Robert A. Lawrence, 41, Summit, N.J.
Nathaniel Lawson, 61, New York, N.Y.
Eugen Lazar, 27, New York, N.Y.
James Patrick Leahy, 38, New York, N.Y.
Lt. Joseph Gerard Leavey, 45, Pelham, N.Y.
Neil Leavy, 34, New York, N.Y.
Leon Lebor, 51, Jersey City, N.J.
Kenneth Charles Ledee, 38, Monmouth, N.J.
Alan J. Lederman, 43, New York, N.Y.
Elena Ledesma, 36, New York, N.Y.
Alexis Leduc, 45, New York, N.Y.
Myung-woo Lee, 41, Lyndhurst, N.J.
David S. Lee, 37, West Orange, N.J.
Gary H. Lee, 62, Lindenhurst, N.Y.
Hyun-joon (Paul) Lee, 32, New York, N.Y.
Jong-min Lee, 24, New York, N.Y.
Juanita Lee, 44, New York, N.Y.
Lorraine Lee, 37, New York, N.Y.
Richard Y.C. Lee, 34, Great Neck, N.Y.
Yang Der Lee, 63, New York, N.Y.
Kathryn Blair Lee, 55, New York, N.Y.
Stuart (Soo-Jin) Lee, 30, New York, N.Y.
Linda C. Lee, 34, New York, N.Y.
Stephen Lefkowitz, 50, Belle Harbor, N.Y.
Adriana Legro, 32, New York, N.Y.
Edward J. Lehman, 41, Glen Cove, N.Y.
Eric Andrew Lehrfeld, 32, New York, N.Y.
David Ralph Leistman, 43, Garden City, N.Y.
David Prudencio LeMagne, 27, North Bergen, N.J.
Joseph A. Lenihan, 41, Greenwich, Conn.
John J. Lennon, 44, Howell, N.J.
John Robinson Lenoir, 38, Locust Valley, N.Y.
Jorge Luis Leon, 43, Union City, N.J.
Matthew Gerard Leonard, 38, New York, N.Y.
Michael Lepore, 39, New York, N.Y.

Charles Antoine Lesperance, 55
Jeffrey Earle LeVeen, 55, Manhasset, N.Y.
John D. Levi, 50, New York, N.Y.
Alisha Caren Levin, 33, New York, N.Y.
Neil D. Levin, 47, New York, N.Y.
Robert Levine, 56, West Babylon, N.Y.
Robert M. Levine, 66, Edgewater, N.J.
Shai Levinhar, 29, New York, N.Y.
Adam J. Lewis, 36, Fairfield, Conn.
Margaret Susan Lewis, 49, Elizabeth, N.J.
Ye Wei Liang, 27, New York, N.Y.
Orasri Liangthanasarn, 26, Bayonne, N.J.
Daniel F. Libretti, 43, New York, N.Y.
Ralph M. Licciardi, 30, West Hempstead, N.Y.
Edward Lichtschein, 35, New York, N.Y.
Steven B. Lillianthal, 38, Millburn, N.J.
Carlos R. Lillo, 37, Babylon, N.Y.
Craig Damian Lilore, 30, Lyndhurst, N.J.
Arnold A. Lim, 28, New York, N.Y.
Darya Lin, 32, Chicago, Ill.
Wei Rong Lin, 31, Jersey City, N.J.
Nickie L. Lindo, 31, New York, N.Y.
Thomas V. Linehan, 39, Montville, N.J.
Robert Thomas Linnane, 33, West Hempstead, N.Y.
Alan Linton, 26, Jersey City, N.J.
Diane Theresa Lipari, 42, New York, N.Y.
Kenneth P. Lira, 28, Paterson, N.J.
Francisco Alberto Liriano, 33, New York, N.Y.
Lorraine Lisi, 44, New York, N.Y.
Paul Lisson, 45, New York, N.Y.
Vincent Litto, 52, New York, N.Y.
Ming-Hao Liu, 41, Livingston, N.J.
Nancy Liz, 39, New York, N.Y.
Harold Lizcano, 31, East Elmhurst, N.Y.
Martin Lizzul, 31, New York, N.Y.
George A. Llanes, 33, New York, N.Y.
Elizabeth Claire Logler, 31, Rockville Centre, N.Y.
Catherine Lisa Loguidice, 30, New York, N.Y.
Jerome Robert Lohez, 30, Jersey City, N.J.
Michael W. Lomax, 37, New York, N.Y.
Laura M. Longing, 35, Pearl River, N.Y.
Salvatore P. Lopes, 40, Franklin Square, N.Y.
Daniel Lopez, 39, New York, N.Y.
Luis Lopez, 38, New York, N.Y.
Manuel L. Lopez, 54, Jersey City, N.J.
George Lopez, 40, Stroudsburg, Pa.

Joseph Lostrangio, 48, Langhorne, Pa.
Chet Louie, 45, New York, N.Y.
Stuart Seid Louis, 43, East Brunswick, N.J.
Joseph Lovero, 60, Jersey City, N.J.
Michael W. Lowe, 48, New York, N.Y.
Garry Lozier, 47, Darien, Conn.
John Peter Lozowsky, 45, New York, N.Y.
Charles Peter Lucania, 34, East Atlantic Beach, N.Y.
Edward (Ted) H. Luckett, 40, Fair Haven, N.J.
Mark G. Ludvigsen, 32, New York, N.Y.
Lee Charles Ludwig, 49, New York, N.Y.
Sean Thomas Lugano, 28, New York, N.Y.
Daniel Lugo, 45, New York, N.Y.
Marie Lukas, 32, New York, N.Y.
William Lum, 45, New York, N.Y.
Michael P. Lunden, 37, New York, N.Y.
Christopher Lunder, 34, Wall, N.J.
Anthony Luparello, 62, New York, N.Y.
Gary Lutnick, 36, New York, N.Y.
Linda Luzzicone, 33, New York, N.Y.
Alexander Lygin, 28, New York, N.Y.
Farrell Peter Lynch, 39, Centerport, N.Y.
James Francis Lynch, 47, Woodbridge, N.J.
Louise A. Lynch, 58, Amityville, N.Y.
Michael Lynch, 34, New York, N.Y.
Michael F. Lynch, 33, New Hyde Park, N.Y.
Michael Francis Lynch, 30, New York, N.Y.
Richard Dennis Lynch, 30, Bedford Hills, N.Y.
Robert H. Lynch, 44, Cranford, N.J.
Sean Patrick Lynch, 36, Morristown, N.J.
Sean Lynch, 34, New York, N.Y.
Michael J. Lyons, 32, Hawthorne, N.Y.
Patrick Lyons, 34, South Setauket, N.Y.
Monica Lyons, 53, New York, N.Y.
Robert Francis Mace, 43, New York, N.Y.
Jan Maciejewski, 37, New York, N.Y.
Catherine Fairfax MacRae, 23, New York, N.Y.
Richard B. Madden, 35, Westfield, N.J.
Simon Maddison, 40, Florham Park, N.J.
Noell Maerz, 29, Long Beach, N.Y.
Jeannieann Maffeo, 40, New York, N.Y.
Joseph Maffeo, 30, New York, N.Y.
Jay Robert Magazine, 48, New York, N.Y.
Charles Wilson Magee, 51, Wantagh, N.Y.
Brian Magee, 52, Floral Park, N.Y.
Joseph Maggitti, 47, Abingdon, Md.

Ronald E. Magnuson, 57, Park Ridge, N.J.
Daniel L. Maher, 50, Hamilton, N.J.
Thomas Anthony Mahon, 37, East Norwich, N.Y.
William Mahoney, 38, Bohemia, N.Y.
Joseph Maio, 32, Roslyn Harbor, N.Y.
Takashi Makimoto, 49, New York, N.Y.
Abdu Malahi, 37, New York, N.Y.
Debora Maldonado, 47, New York, N.Y.
Myrna T. Maldonado-Agosto, 49, New York, N.Y.
Alfred R. Maler, 39, Convent Station, N.J.
Gregory James Malone, 42, Hoboken, N.J.
Edward Francis (Teddy) Maloney, 32, Darien, Conn.
Joseph E. Maloney, 46, Farmingville, N.Y.
Gene E. Maloy, 41, New York, N.Y.
Christian Maltby, 37, Chatham, N.J.
Francisco Miguel (Frank) Mancini, 26, New York, N.Y.
Joseph Mangano, 53, Jackson, N.J.
Sara Elizabeth Manley, 31, New York, N.Y.
Debra M. Mannetta, 31, Islip, N.Y.
Terence J. Manning, 36, Rockville Centre, N.Y.
Marion Victoria (vickie) Manning, 27, Rochdale, N.Y.
James Maounis, 42, New York, N.Y.
Joseph Ross Marchbanks, 47, Nanuet, N.Y.
Peter Edward Mardikian, 29, New York, N.Y.
Edward Joseph Mardovich, 42, Lloyd Harbor, N.Y.
Lt. Charles Joseph Margiotta, 44, New York, N.Y.
Kenneth Joseph Marino, 40, Monroe, N.Y.
Lester Vincent Marino, 57, Massapequa, N.Y.
Vita Marino, 49, New York, N.Y.
Kevin D. Marlo, 28, New York, N.Y.
Jose J. Marrero, 32, Old Bridge, N.J.
John Marshall, 35, Congers, N.Y.
James Martello, 41, Rumson, N.J.
Michael A. Marti, 26, Glendale, N.Y.
Lt. Peter Martin, 43, Miller Place, N.Y.
William J. Martin, 35, Rockaway, N.J.
Brian E. Martineau, 37, Edison, N.J.
Betsy Martinez, 33, New York, N.Y.
Edward J. Martinez, 60, New York, N.Y.
Jose Angel Martinez, 49, Hauppauge, N.Y.
Robert Gabriel Martinez, 24, New York, N.Y.
Lizie Martinez-Calderon, 32, New York, N.Y.
Lt. Paul Richard Martini, 37, New York, N.Y.
Joseph A. Mascali, 44, New York, N.Y.
Bernard Mascarenhas, 54, Newmarket, Ontario, Canada
Stephen F. Masi, 55, New York, N.Y.

Nicholas G. Massa, 65, New York, N.Y.
Patricia A. Massari, 25, Glendale, N.Y.
Michael Massaroli, 38, New York, N.Y.
Philip W. Mastrandrea, 42, Chatham, N.J.
Rudolph Mastrocinque, 43, Kings Park, N.Y.
Joseph Mathai, 49, Arlington, Mass.
Charles William Mathers, 61, Sea Girt, N.J.
William A. Mathesen, 40, Morristown, N.J.
Marcello Matricciano, 31, New York, N.Y.
Margaret Elaine Mattic, 51, New York, N.Y.
Robert D. Mattson, 54, Green Pond, N.J.
Walter Matuza, 39, New York, N.Y.
Charles A. (Chuck) Mauro, 65, New York, N.Y.
Charles J. Mauro, 38, New York, N.Y.
Dorothy Mauro, 55, New York, N.Y.
Nancy T. Mauro, 51, New York, N.Y.
Tyrone May, 44, Rahway, N.J.
Keithroy Maynard, 30, New York, N.Y.
Robert J. Mayo, 46, Morganville, N.J.
Kathy Nancy Mazza-Delosh, 46, Farmingdale, N.Y.
Edward Mazzella, 62, Monroe, N.Y.
Jennifer Mazzotta, 23, New York, N.Y.
Kaaria Mbaya, 39, Edison, N.J.
James J. McAlary, 42, Spring Lake Heights, N.J.
Brian McAleese, 36, Baldwin, N.Y.
Patricia A. McAneney, 50, Pomona, N.Y.
Colin Richard McArthur, 52, Howell, N.J.
John McAvoy, 47, New York, N.Y.
Kenneth M. McBrayer, 49, New York, N.Y.
Brendan McCabe, 40, Sayville, N.Y.
Michael J. McCabe, 42, Rumson, N.J.
Thomas McCann, 46, Manalapan, N.J.
Justin McCarthy, 30, Port Washington, N.Y.
Kevin M. McCarthy, 42, Fairfield, Conn.
Michael Desmond McCarthy, 33, Huntington, N.Y.
Robert Garvin McCarthy, 33, Stony Point, N.Y.
Stanley McCaskill, 47, New York, N.Y.
Katie Marie McCloskey, 25, Mount Vernon, N.Y.
Tara McCloud-Gray, 30, New York, N.Y.
Charles Austin McCrann, 55, New York, N.Y.
Tonyell McDay, 25, Colonia, N.J.
Matthew T. McDermott, 34, Basking Ridge, N.J.
Joseph P. McDonald, 43, Livingston, N.J.
Brian G. McDonnell, 38, Wantagh, N.Y.
Michael McDonnell, 34, Red Bank, N.J.
John F. McDowell, 33, New York, N.Y.

Eamon J. McEneaney, 46, New Canaan, Conn.
John Thomas McErlean, 39, Larchmont, N.Y.
Daniel F. McGinley, 40, Ridgewood, N.J.
Mark Ryan McGinly, 26, New York, N.Y.
Lt. William E. McGinn, 43, New York, N.Y.
Thomas H. McGinnis, 41, Oakland, N.J.
Michael Gregory McGinty, 42, Foxboro, Mass.
Ann McGovern, 68, East Meadow, N.Y.
Scott Martin McGovern, 35, Wyckoff, N.J.
William J. McGovern, 49, Smithtown, N.Y.
Stacey S. McGowan, 38, Basking Ridge, N.J.
Francis Noel McGuinn, 48, Rye, N.Y.
Patrick J. McGuire, 40, Madison, N.J.
Thomas M. McHale, 33, Huntington, N.Y.
Keith McHeffey, 31, Monmouth Beach, N.J.
Denis J. McHugh, 36, New York, N.Y.
Dennis P. McHugh, 34, Sparkill, N.Y.
Michael Edward McHugh, 35, Tuckahoe, N.Y.
Ann M. McHugh, 35, New York, N.Y.
Robert G. McIlvaine, 26, New York, N.Y.
Donald James McIntyre, 38, New City, N.Y.
Stephanie McKenna, 45, New York, N.Y.
Barry J. McKeon, 47, Yorktown Heights, N.Y.
Evelyn C. McKinnedy, 60, New York, N.Y.
Darryl Leron McKinney, 26, New York, N.Y.
Robert C. McLaughlin, 29, Westchester, N.Y.
George Patrick McLaughlin, 36, Hoboken, N.J.
Gavin McMahon, 35, Bayonne, N.J.
Robert Dismas McMahon, 35, New York, N.Y.
Edmund M. McNally, 41, Fair Haven, N.J.
Daniel McNeal, 29, Towson, Md.
Walter Arthur McNeil, 53, Stroudsburg, Pa.
Sean Peter McNulty, 30, New York, N.Y.
Christine Sheila McNulty, 42, Peterborough, England
Robert William McPadden, 30, Pearl River, N.Y.
Terence A. McShane, 37, West Islip, N.Y.
Timothy Patrick McSweeney, 37, New York, N.Y.
Martin E. McWilliams, 35, Kings Park, N.Y.
Rocco A. Medaglia, 49, Melville, N.Y.
Abigail Cales Medina, 46, New York, N.Y.
Ana Iris Medina, 39, New York, N.Y.
Deborah Medwig, 46, Dedham, Mass.
William J. Meehan, 49, Darien, Conn.
Damian Meehan, 32, Glen Rock, N.J.
Alok Kumar Mehta, 23, Hempstead, N.Y.
Raymond Meisenheimer, 46, West Babylon, N.Y.

Manuel Emilio Mejia, 54, New York, N.Y.
Eskedar Melaku, 31, New York, N.Y.
Antonio Melendez, 30, New York, N.Y.
Mary Melendez, 44, Stroudsburg, Pa.
Yelena Melnichenko, 28, Brooklyn, N.Y.
Stuart Todd Meltzer, 32, Syosset, N.Y.
Diarelia Jovannah Mena, 30, New York, N.Y.
Charles Mendez, 38, Floral Park, N.Y.
Lizette Mendoza, 33, North Bergen, N.J.
Shevonne Mentis, 25, New York, N.Y.
Steve Mercado, 38, New York, N.Y.
Wesley Mercer, 70, New York, N.Y.
Ralph Joseph Mercurio, 47, Rockville Centre, N.Y.
Alan H. Merdinger, 47, Allentown, Pa.
George C. Merino, 39, New York, N.Y.
Yamel Merino, 24, Yonkers, N.Y.
George Merkouris, 35, Levittown, N.Y.
Deborah Merrick, 45
Raymond J. Metz, 37, Trumbull, Conn.
Jill A. Metzler, 32, Franklin Square, N.Y.
David Robert Meyer, 57, Glen Rock, N.J.
Nurul Huq Miah, 35, New York, N.Y.
William Edward Micciulli, 30, Matawan, N.J.
Martin Paul Michelstein, 57, Morristown, N.J.
Luis Clodoaldo Revilla Mier, 54
Peter T. Milano, 43, Middletown, N.J.
Gregory Milanowycz, 25, Cranford, N.J.
Lukasz T. Milewski, 21, New York, N.Y.
Craig James Miller, 29, Va.
Corey Peter Miller, 34, New York, N.Y.
Douglas C. Miller, 34, Port Jervis, N.Y.
Henry Miller, 52, Massapequa, N.Y.
Michael Matthew Miller, 39, Englewood, N.J.
Phillip D. Miller, 53, New York, N.Y.
Robert C. Miller, 55, Hasbrouck Heights, N.J.
Robert Alan Miller, 46, Matawan, N.J.
Joel Miller, 55, Baldwin, N.Y.
Benjamin Millman, 40, New York, N.Y.
Charles M. Mills, 61, Brentwood, N.Y.
Ronald Keith Milstein, 54, New York, N.Y.
Robert Minara, 54, Carmel, N.Y.
William G. Minardi, 46, Bedford, N.Y.
Louis Joseph Minervino, 54, Middletown, N.J.
Thomas Mingione, 34, West Islip, N.Y.
Wilbert Miraille, 29, New York, N.Y.
Domenick Mircovich, 40, Closter, N.J.

Rajesh A. Mirpuri, 30, Englewood Cliffs, N.J.
Joseph Mistrulli, 47, Wantagh, N.Y.
Susan Miszkowicz, 37, New York, N.Y.
Lt. Paul Thomas Mitchell, 46, New York, N.Y.
Richard Miuccio, 55, New York, N.Y.
Frank V. Moccia, 57, Hauppauge, N.Y.
Capt. Louis Joseph Modafferi, 45, New York, N.Y.
Boyie Mohammed, 50, New York, N.Y.
Lt. Dennis Mojica, 50, New York, N.Y.
Manuel Mojica, 37, Bellmore, N.Y.
Manuel Dejesus Molina, 31, New York, N.Y.
Kleber Rolando Molina, 44, New York, N.Y.
Fernando Jimenez Molinar, 21, Oaxaca, Mexico
Carl Molinaro, 32, New York, N.Y.
Justin J. Molisani, 42, Middletown Township, N.J.
Brian Patrick Monaghan, 21, New York, N.Y.
Franklin Monahan, 45, Roxbury, N.Y.
John Gerard Monahan, 47, Wanamassa, N.J.
Kristen Montanaro, 34, New York, N.Y.
Craig D. Montano, 38, Glen Ridge, N.J.
Michael Montesi, 39, Highland Mills, N.Y.
Cheryl Ann Monyak, 43, Greenwich, Conn.
Capt. Thomas Moody, 45, Stony Brook, N.Y.
Sharon Moore, 37, New York, N.Y.
Krishna Moorthy, 59, Briarcliff Manor, N.Y.
Abner Morales, 37, New York, N.Y.
Carlos Morales, 29, New York, N.Y.
Paula Morales, 42, New York, N.Y.
Luis Morales, 46, New York, N.Y.
John Moran, 43, Rockaway, N.Y.
John Christopher Moran, 38, Haslemere, Surrey, England
Kathleen Moran, 42, New York, N.Y.
Lindsay S. Morehouse, 24, New York, N.Y.
George Morell, 47, Mount. Kisco, N.Y.
Steven P. Morello, 52, Bayonne, N.J.
Vincent S. Morello, 34, New York, N.Y.
Arturo Alva Moreno, 47, Mexico City, Mexico
Yvette Nicole Moreno, 25, New York, N.Y.
Dorothy Morgan, 47, Hempstead, N.Y.
Richard Morgan, 66, Glen Rock, N.J.
Nancy Morgenstern, 32, New York, N.Y.
Sanae Mori, 27, Tokyo, Japan
Blanca Morocho, 26, New York, N.Y.
Leonel Morocho, 36, New York, N.Y.
Dennis G. Moroney, 39, Eastchester, N.Y.
Lynne Irene Morris, 22, Monroe, N.Y.

Seth A. Morris, 35, Kinnelon, N.J.
Stephen Philip Morris, 31, Ormond Beach, Fla.
Christopher M. Morrison, 34, Charlestown, Mass.
Ferdinand V. Morrone, 63, Lakewood, N.J.
William David Moskal, 50, Brecksville, Ohio
Manuel Da Mota, 43, Valley Stream, N.Y.
Marco Motroni, 57, Fort Lee, N.J.
Iouri A. Mouchinski, 55, New York, N.Y.
Jude J. Moussa, 35, New York, N.Y.
Peter C. Moutos, 44, Chatham, N.J.
Damion Mowatt, 21, New York, N.Y.
Christopher Mozzillo, 27, New York, N.Y.
Stephen V. Mulderry, 33, New York, N.Y.
Richard Muldowney, 40, Babylon, N.Y.
Michael D. Mullan, 34, New York, N.Y.
Dennis Michael Mulligan, 32, New York, N.Y.
Peter James Mulligan, 28, New York, N.Y.
Michael Joseph Mullin, 27, Hoboken, N.J.
James Donald Munhall, 45, Ridgewood, N.J.
Nancy Muniz, 45, New York, N.Y.
Carlos Mario Munoz, 43
Francisco Munoz, 29, New York, N.Y.
Theresa (Terry) Munson, 54, New York, N.Y.
Robert M. Murach, 45, Montclair, N.J.
Cesar Augusto Murillo, 32, New York, N.Y.
Marc A. Murolo, 28, Maywood, N.J.
Robert Eddie Murphy, 56, New York, N.Y.
Brian Joseph Murphy, 41, New York, N.Y.
Christopher W. Murphy, 35, Easton, Md.
Edward C. Murphy, 42, Clifton, N.J.
James F. Murphy, 30, Garden City, N.Y.
James Thomas Murphy, 35, Middletown, N.J.
Kevin James Murphy, 40, Northport, N.Y.
Patrick Sean Murphy, 36, Millburn, N.J.
Lt. Raymond E. Murphy, 46, New York, N.Y.
Charles Murphy, 38, New York, N.Y.
John Joseph Murray, 32, Hoboken, N.J.
John Joseph Murray, 52, Colts Neck, N.J.
Susan D. Murray, 54, Summit, N.J.
Valerie Victoria Murray, 65, New York, N.Y.
Richard Todd Myhre, 37, New York, N.Y.
Lt. Robert B. Nagel, 55, New York, N.Y.
Takuya Nakamura, 30, Tuckahoe, N.Y.
Alexander J.R. Napier, 38, Morris Township, N.J.
Frank Joseph Naples, 29, Cliffside Park, N.J.
John Napolitano, 33, Ronkonkoma, N.Y.

Catherine A. Nardella, 40, Bloomfield, N.J.
Mario Nardone, 32, New York, N.Y.
Manika Narula, 22, Kings Park, N.Y.
Narender Nath, 33, Colonia, N.J.
Karen S. Navarro, 30, New York, N.Y.
Joseph M. Navas, 44, Paramus, N.J.
Francis J. Nazario, 28, Jersey City, N.J.
Glenroy Neblett, 42, New York, N.Y.
Marcus R. Neblett, 31, Roslyn Heights, N.Y.
Jerome O. Nedd, 39, New York, N.Y.
Laurence Nedell, 51, Lindenhurst, N.Y.
Luke G. Nee, 44, Stony Point, N.Y.
Pete Negron, 34, Bergenfield, N.J.
Ann Nicole Nelson, 30, New York, N.Y.
David William Nelson, 50, New York, N.Y.
James Nelson, 40, Clark, N.J.
Michele Ann Nelson, 27, Valley Stream, N.Y.
Peter Allen Nelson, 42, Huntington Station, N.Y.
Oscar Nesbitt, 58, New York, N.Y.
Gerard Terence Nevins, 46, Campbell Hall, N.Y.
Christopher Newton-Carter, 51, Middletown, N.J.
Kapinga Ngalula, 58, McKinney, Texas
Nancy Yuen Ngo, 36, Harrington Park, N.J.
Jody Tepedino Nichilo, 39, New York, N.Y.
Martin Niederer, 23, Hoboken, N.J.
Alfonse J. Niedermeyer, 40, Manasquan, N.J.
Frank John Niestadt, 55, Ronkonkoma, N.Y.
Gloria Nieves, 48, New York, N.Y.
Juan Nieves, 56, New York, N.Y.
Troy Edward Nilsen, 33, New York, N.Y.
Paul R. Nimbley, 42, Middletown, N.J.
John Ballantine Niven, 44, Oyster Bay, N.Y.
Katherine (Katie) McGarry Noack, 30, Hoboken, N.J.
Curtis Terrence Noel, 22, Poughkeepsie, N.Y.
Daniel R. Nolan, 44, Hopatcong, N.J.
Robert Walter Noonan, 36, Norwalk, Conn.
Daniela R. Notaro, 25, New York, N.Y.
Brian Novotny, 33, Hoboken, N.J.
Soichi Numata, 45, Irvington, N.Y.
Brian Felix Nunez, 29, New York, N.Y.
Jose R. Nunez, 42, New York, N.Y.
Jeffrey Nussbaum, 37, Oceanside, N.Y.
James A. Oakley, 52, Cortlandt Manor, N.Y.
Dennis O'Berg, 28, Babylon, N.Y.
James P. O'Brien, 33, New York, N.Y.
Scott J. O'Brien, 40, New York, N.Y.

Timothy Michael O'Brien, 40, Brookville, N.Y.
Michael O'Brien, 42, Cedar Knolls, N.J.
Captain Daniel O'Callaghan, 42, Smithtown, N.Y.
Richard J. O'Connor, 49, Poughkeepsie, N.Y.
Dennis J. O'Connor, 34, New York, N.Y.
Diana J. O'Connor, 38, Eastchester, N.Y.
Keith K. O'Connor, 28, Hoboken, N.J.
Amy O'Doherty, 23, New York, N.Y.
Marni Pont O'Doherty, 31, Armonk, N.Y.
Douglas Oelschlager, 36, New York, N.Y.
Takashi Ogawa, 37, Tokyo, Japan
Albert Ogletree, 49, New York, N.Y.
Philip Paul Ognibene, 39, New York, N.Y.
James Andrew O'Grady, 32, Harrington Park, N.J.
Joseph J. Ogren, 30, New York, N.Y.
Lt. Thomas O'Hagan, 43, New York, N.Y.
Samuel Oitice, 45, Peekskill, N.Y.
Patrick O'Keefe, 44, Oakdale, N.Y.
Capt. William O'Keefe, 49, New York, N.Y.
Gerald Michael Olcott, 55, New Hyde Park, N.Y.
Gerald O'Leary, 34, Stony Point, N.Y.
Christine Anne Olender, 39, New York, N.Y.
Elsy Carolina Osorio Oliva, 27, New York, N.Y.
Linda Mary Oliva, 44, New York, N.Y.
Edward K. Oliver, 31, Jackson, N.J.
Leah E. Oliver, 24, New York, N.Y.
Eric T. Olsen, 41, New York, N.Y.
Jeffrey James Olsen, 31, New York, N.Y.
Maureen L. Olson, 50, Rockville Centre, N.Y.
Steven John Olson, 38, New York, N.Y.
Matthew Timothy O'Mahony, 39, New York, N.Y.
Toshihiro Onda, 39, New York, N.Y.
Seamus L. Oneal, 52, New York, N.Y.
John P. O'Neill, 49, New York, N.Y.
Sean Gordon Corbett O'Neill, 34, Rye, N.Y.
Peter J. O'Neill, 21, Amityville, N.Y.
Michael C. Opperman, 45, Selden, N.Y.
Christopher Orgielewicz, 35, Larchmont, N.Y.
Margaret Orloske, 50, Windsor, Conn.
Virginia A. Ormiston, 42, New York, N.Y.
Kevin O'Rourke, 44, Hewlett, N.Y.
Juan Romero Orozco, Acatlan de Osorio, Puebla, Mexico
Ronald Orsini, 59, Hillsdale, N.J.
Peter K. Ortale, 37, New York, N.Y.
Emilio (Peter) Ortiz, 38, New York, N.Y.
David Ortiz, 37, Nanuet, N.Y.

Paul Ortiz, 21, New York, N.Y.
Sonia Ortiz, 58, New York, N.Y.
Alexander Ortiz, 36, Ridgewood, N.Y.
Pablo Ortiz, 49, New York, N.Y.
Masaru Ose, 36, Fort Lee, N.J.
Robert W. O'Shea, 47, Wall, N.J.
Patrick J. O'Shea, 45, Farmingdale, N.Y.
James Robert Ostrowski, 37, Garden City, N.Y.
Timothy O'Sullivan, 68, Albrightsville, Pa.
Jason Douglas Oswald, 28, New York, N.Y.
Michael Otten, 42, East Islip, N.Y.
Isidro Ottenwalder, 35, New York, N.Y.
Michael Chung Ou, 53, New York, N.Y.
Todd Joseph Ouida, 25, River Edge, N.J.
Jesus Ovalles, 60, New York, N.Y.
Peter J. Owens, 42, Williston Park, N.Y.
Adianes Oyola, 23, New York, N.Y.
Angel M. Pabon, 54, New York, N.Y.
Israel Pabon, 31, New York, N.Y.
Roland Pacheco, 25, New York, N.Y.
Michael Benjamin Packer, 45, New York, N.Y.
Deepa K. Pakkala, 31, Stewartsville, N.J.
Jeffrey Matthew Palazzo, 33, New York, N.Y.
Thomas Anthony Palazzo, 44, Armonk, N.Y.
Richard (Rico) Palazzolo, 39, New York, N.Y.
Orio Joseph Palmer, 45, Valley Stream, N.Y.
Frank A. Palombo, 46, New York, N.Y.
Alan N. Palumbo, 42, New York, N.Y.
Christopher M. Panatier, 36, Rockville Centre, N.Y.
Dominique Pandolfo, 27, Hoboken, N.J.
Paul Pansini, 34, New York, N.Y.
John M. Paolillo, 51, Glen Head, N.Y.
Edward J. Papa, 47, Oyster Bay, N.Y.
Salvatore Papasso, 34, New York, N.Y.
James N. Pappageorge, 29, Yonkers, N.Y.
Vinod K. Parakat, 34, Sayreville, N.J.
Vijayashanker Paramsothy, 23, New York, N.Y.
Nitin Ramesh Parandkar, 28, Waltham, Mass.
Hardai (Casey) Parbhu, 42, New York, N.Y.
James Wendell Parham, 32, New York, N.Y.
Debra (Debbie) Paris, 48, New York, N.Y.
George Paris, 33, New York, N.Y.
Gye-Hyong Park, 28, New York, N.Y.
Philip L. Parker, 53, Skillman, N.J.
Michael A. Parkes, 27, New York, N.Y.
Robert Emmett Parks, 47, Middletown, N.J.

40

Hasmukhrai Chuckulal Parmar, 48, Warren, N.J.
Robert Parro, 35, Levittown, N.Y.
Diane Marie Moore Parsons, 58, Malta, N.Y.
Leobardo Lopez Pascual, 41, New York, N.Y.
Michael J. Pascuma, 50, Massapequa Park, N.Y.
Jerrold H. Paskins, 56, Anaheim Hills, Calif.
Horace Robert Passananti, 55, New York, N.Y.
Suzanne H. Passaro, 38, East Brunswick, N.J.
Victor Antonio Martinez Pastrana, 38, Tlachichuca, Puebla, Mexico
Manish K. Patel, 29, Edison, N.J.
Avnish Ramanbhai Patel, 28, New York, N.Y.
Dipti Patel, 38, New Hyde Park, N.Y.
Steven B. Paterson, 40, Ridgewood, N.J.
James Matthew Patrick, 30, Norwalk, Conn.
Manuel Patrocino, 34
Bernard E. Patterson, 46, Upper Brookville, N.Y.
Cira Marie Patti, 40, New York, N.Y.
Robert Edward Pattison, 40, New York, N.Y.
James R. Paul, 58, New York, N.Y.
Sharon Cristina Millan Paz, 31, New York, N.Y.
Patrice Paz, 52, New York, N.Y.
Victor Paz-Gutierrez, 43, New York, N.Y.
Stacey L. Peak, 36, New York, N.Y.
Richard Allen Pearlman, 18, New York, N.Y.
Durrell Pearsall, 34, Hempstead, N.Y.
Thomas E. Pedicini, 30, Hicksville, N.Y.
Todd D. Pelino, 34, Fair Haven, N.J.
Michel Adrian Pelletier, 36, Greenwich, Conn.
Anthony Peluso, 46, New York, N.Y.
Angel Ramon Pena, 45, River Vale, N.J.
Richard Al Penny, 53, New York, N.Y.
Salvatore F. Pepe, 45, New York, N.Y.
Carl Allen Peralta, 37, New York, N.Y.
Robert David Peraza, 30, New York, N.Y.
Jon A. Perconti, 32, Brick, N.J.
Alejo Perez, 66, Union City, N.J.
Angel Perez, 43, Jersey City, N.J.
Angela Susan Perez, 35, New York, N.Y.
Ivan Perez, 37, New York, N.Y.
Nancy E. Perez, 36, Secaucus, N.J.
Anthony Perez, 33, Locust Valley, N.Y.
Joseph John Perroncino, 33, Smithtown, N.Y.
Edward J. Perrotta, 43, Mount Sinai, N.Y.
Lt. Glenn C. Perry, 41, Monroe, N.Y.
Emelda Perry, 52, Elmont, N.Y.
John William Perry, 38, New York, N.Y.

Franklin Allan Pershep, 59, New York, N.Y.
Daniel Pesce, 34, New York, N.Y.
Michael J. Pescherine, 32, New York, N.Y.
Davin Peterson, 25, New York, N.Y.
William Russel Peterson, 46, New York, N.Y.
Mark Petrocelli, 28, New York, N.Y.
Lt. Philip S. Petti, 43, New York, N.Y.
Glen Kerrin Pettit, 30, Oakdale, N.Y.
Dominick Pezzulo, 36, New York, N.Y.
Kaleen E. Pezzuti, 28, Fair Haven, N.Y.
Lt. Kevin Pfeifer, 42, New York, N.Y.
Tu-Anh Pham, 42, Princeton, N.J.
Lt. Kenneth John Phelan, 41, New York, N.Y.
Michael V. San Phillip, 55, Ridgewood, N.J.
Eugenia Piantieri, 55, New York, N.Y.
Ludwig John Picarro, 44, Basking Ridge, N.J.
Matthew Picerno, 44, Holmdel, N.J.
Joseph O. Pick, 40, Hoboken, N.J.
Christopher Pickford, 32, New York, N.Y.
Dennis J. Pierce, 54, New York, N.Y.
Joseph A. Della Pietra, 24, New York, N.Y.
Bernard T. Pietronico, 39, Matawan, N.J.
Nicholas P. Pietrunti, 38, Belford, N.J.
Theodoros Pigis, 60, New York, N.Y.
Susan Elizabeth Ancona Pinto, 44, New York, N.Y.
Joseph Piskadlo, 48, North Arlington, N.J.
Christopher Todd Pitman, 30, New York, N.Y.
Josh Michael Piver, 23, New York, N.Y.
Joseph Plumitallo, 45, Manalapan, N.J.
John M. Pocher, 36, Middletown, N.J.
William Howard Pohlmann, 56, Ardsley, N.Y.
Laurence M. Polatsch, 32, New York, N.Y.
Thomas H. Polhemus, 39, Morris Plains, N.J.
Steve Pollicino, 48, Plainview, N.Y.
Susan M. Pollio, 45, Long Beach Township, N.J.
Joshua Poptean, 37, New York, N.Y.
Giovanna Porras, 24, New York, N.Y.
Anthony Portillo, 48, New York, N.Y.
James Edward Potorti, 52, Princeton, N.J.
Daphne Pouletsos, 47, Westwood, N.J.
Richard Poulos, 55, Levittown, N.Y.
Stephen E. Poulos, 45, Basking Ridge, N.J.
Brandon Jerome Powell, 26, New York, N.Y.
Shawn Edward Powell, 32, New York, N.Y.
Tony Pratt, 43, New York, N.Y.
Gregory M. Preziose, 34, Holmdel, N.J.

Wanda Ivelisse Prince, 30, New York, N.Y.
Vincent Princiotta, 39, Orangeburg, N.Y.
Kevin Prior, 28, Bellmore, N.Y.
Everett Martin (Marty) Proctor, 44, New York, N.Y.
Carrie B. Progen, 25, New York, N.Y.
David Lee Pruim, 53, Upper Montclair, N.J.
Richard Prunty, 57, Sayville, N.Y.
John F. Puckett, 47, Glen Cove, N.Y.
Robert D. Pugliese, 47, East Fishkill, N.Y.
Edward F. Pullis, 34, Hazlet, N.J.
Patricia Ann Puma, 33, New York, N.Y.
Hemanth Kumar Puttur, 26, White Plains, N.Y.
Edward R. Pykon, 33, Princeton, N.J.
Christopher Quackenbush, 44, Manhasset, N.Y.
Lars Peter Qualben, 49, New York, N.Y.
Lincoln Quappe, 38, Sayville, N.Y.
Beth Ann Quigley, 25, New York, N.Y.
Lt. Michael Quilty, 42, New York, N.Y.
Ricardo Quinn, 40, New York, N.Y.
James Francis Quinn, 23, New York, N.Y.
Carol Rabalais, 38, New York, N.Y.
Christopher Peter A. Racaniello, 30, New York, N.Y.
Leonard Ragaglia, 36, New York, N.Y.
Eugene J. Raggio, 55, New York, N.Y.
Laura Marie Ragonese-Snik, 41, Bangor, Pa.
Michael Ragusa, 29, New York, N.Y.
Peter F. Raimondi, 46, New York, N.Y.
Harry A. Raines, 37, New York, N.Y.
Ehtesham U. Raja, 28, Clifton, N.J.
Valsa Raju, 39, Yonkers, N.Y.
Edward Rall, 44, Holbrook, N.Y.
Lukas (Luke) Rambousek, 27, New York, N.Y.
Julio Fernandez Ramirez, 51, New York, N.Y.
Maria Isabel Ramirez, 25, New York, N.Y.
Harry Ramos, 41, Newark, N.J.
Vishnoo Ramsaroop, 44, New York, N.Y.
Lorenzo Ramzey, 48, East Northport, N.Y.
A. Todd Rancke, 42, Summit, N.J.
Adam David Rand, 30, Bellmore, N.Y.
Jonathan C. Randall, 42, New York, N.Y.
Srinivasa Shreyas Ranganath, 26, Hackensack, N.J.
Anne Rose T. Ransom, 45, Edgewater, N.J.
Faina Rapoport, 45, New York, N.Y.
Robert Arthur Rasmussen, 42, Hinsdale, Ill.
Amenia Rasool, 33, New York, N.Y.
Roger Mark Rasweiler, 53, Flemington, N.J.

David Alan James Rathkey, 47, Mountain Lakes, N.J.
William Ralph Raub, 38, Saddle River, N.J.
Gerard Rauzi, 42, New York, N.Y.
Alexey Razuvaev, 40, New York, N.Y.
Gregory Reda, 33, New Hyde Park, N.Y.
Sarah Prothero Redheffer, 35, London, England
Michele Reed, 26, Ringoes, N.J.
Judith A. Reese, 56, Kearny, N.J.
Donald J. Regan, 47, Wallkill, N.Y.
Lt. Robert M. Regan, 48, Floral Park, N.Y.
Thomas M. Regan, 43, Cranford, N.J.
Christian Michael Otto Regenhard, 28, New York, N.Y.
Howard Reich, 59, New York, N.Y.
Gregg Reidy, 26, Holmdel, N.J.
Kevin O. Reilly, 28, New York, N.Y.
James Brian Reilly, 25, New York, N.Y.
Timothy E. Reilly, 40, New York, N.Y.
Joseph Reina, 32, New York, N.Y.
Thomas Barnes Reinig, 48, Bernardsville, N.J.
Frank B. Reisman, 41, Princeton, N.J.
Joshua Scott Reiss, 23, New York, N.Y.
Karen Renda, 52, New York, N.Y.
John Armand Reo, 28, Larchmont, N.Y.
Richard Rescorla, 62, Morristown, N.J.
John Thomas Resta, 40, New York, N.Y.
Sylvia San Pio Resta, 26, New York, N.Y.
Eduvigis (Eddie) Reyes, 37, New York, N.Y.
Bruce A. Reynolds, 41, Columbia, N.J.
John Frederick Rhodes, 57, Howell, N.J.
Francis S. Riccardelli, 40, Westwood, N.J.
Rudolph N. Riccio, 50, New York, N.Y.
AnnMarie (Davi) Ricconboni, 58, New York, N.Y.
Eileen Mary Rice, 57, New York, N.Y.
David Rice, 31, New York, N.Y.
Kenneth F. Rice, 34, Hicksville, N.Y.
Lt. Vernon Allan Richard, 53, Nanuet, N.Y.
Claude D. Richards, 46, New York, N.Y.
Gregory Richards, 30, New York, N.Y.
Michael Richards, 38, New York, N.Y.
Venesha O. Richards, 26, North Brunswick, N.J.
James C. Riches, 29, New York, N.Y.
Alan Jay Richman, 44, New York, N.Y.
John M. Rigo, 48, New York, N.Y.
Theresa (Ginger) Risco, 48, New York, N.Y.
Rose Mary Riso, 55, New York, N.Y.
Moises N. Rivas, 29, New York, N.Y.

44

Joseph Rivelli, 43, New York, N.Y.
Isaias Rivera, 51, Perth Amboy, N.J.
Linda Rivera, 26, New York, N.Y.
Juan William Rivera, 27, New York, N.Y.
Carmen A. Rivera, 33, Westtown, N.Y.
David E. Rivers, 40, New York, N.Y.
Joseph R. Riverso, 34, White Plains, N.Y.
Paul Rizza, 34, Park Ridge, N.J.
John Frank Rizzo, 50, New York, N.Y.
Stephen Louis Roach, 36, Verona, N.J.
Joseph Roberto, 37, Midland Park, N.J.
Leo A. Roberts, 44, Wayne, N.J.
Michael Roberts, 30, New York, N.Y.
Michael Edward Roberts, 31, New York, N.Y.
Donald Walter Robertson, 35, Rumson, N.J.
Catherina Robinson, 45, New York, N.Y.
Jeffrey Robinson, 38, Monmouth Junction, N.J.
Michell Lee Robotham, 32, Kearny, N.J.
Donald Robson, 52, Manhasset, N.Y.
Antonio Augusto Tome Rocha, 34, East Hanover, N.J.
Raymond J. Rocha, 29, Malden, Mass.
Laura Rockefeller, 41, New York, N.Y.
John M. Rodak, 39, Mantua, N.J.
Antonio Jose Carrusca Rodrigues, 35, Port Washington, N.Y.
Anthony Rodriguez, 36, New York, N.Y.
Carmen Milagros Rodriguez, 46, Freehold, N.J.
Marsha A. Rodriguez, 41, West Paterson, N.J.
Richard Rodriguez, 31, Cliffwood, N.J.
Gregory E. Rodriguez, 31, White Plains, N.Y.
David B. Rodriguez-Vargas, 44, New York, N.Y.
Matthew Rogan, 37, West Islip, N.Y.
Karlie Barbara Rogers, 25, London, England
Scott Rohner, 22, Hoboken, N.J.
Keith Roma, 27, New York, N.Y.
Joseph M. Romagnolo, 37, Coram, N.Y.
Elvin Santiago Romero, 34, Matawan, N.J.
Efrain Franco Romero, 57, Hazleton, Pa.
James A. Romito, 51, Westwood, N.J.
Sean Rooney, 50, Stamford, Conn.
Eric Thomas Ropiteau, 24, New York, N.Y.
Aida Rosario, 42, Jersey City, N.J.
Angela Rosario, 27, New York, N.Y.
Fitzroy St. Rose, 40, New York, N.Y.
Mark H. Rosen, 45, West Islip, N.Y.
Linda Rosenbaum, 41, Little Falls, N.J.
Brooke David Rosenbaum, 31, Franklin Square, N.Y.

Sheryl Lynn Rosenbaum, 33, Warren, N.J.
Lloyd D. Rosenberg, 31, Morganville, N.J.
Mark Louis Rosenberg, 26, Teaneck, N.J.
Andrew I. Rosenblum, 45, Rockville Centre, N.Y.
Joshua M. Rosenblum, 28, Hoboken, N.J.
Joshua A. Rosenthal, 44, New York, N.Y.
Richard David Rosenthal, 50, Fair Lawn, N.J.
Daniel Rossetti, 32, Bloomfield, N.J.
Norman Rossinow, 39, Cedar Grove, N.J.
Nicholas P. Rossomando, 35, New York, N.Y.
Michael Craig Rothberg, 39, Greenwich, Conn.
Donna Marie Rothenberg, 53, New York, N.Y.
Nick Rowe, 29, Hoboken, N.J.
Timothy A. Roy, 36, Massapequa Park, N.Y.
Paul G. Ruback, 50, Newburgh, N.Y.
Ronald J. Ruben, 36, Hoboken, N.J.
Joanne Rubino, 45, New York, N.Y.
David Michael Ruddle, 31, New York, N.Y.
Bart Joseph Ruggiere, 32, New York, N.Y.
Susan Ann Ruggiero, 30, Plainview, N.Y.
Adam K. Ruhalter, 40, Plainview, N.Y.
Gilbert Ruiz, 57, New York, N.Y.
Stephen P. Russell, 40, Rockaway Beach, N.Y.
Steven Harris Russin, 32, Mendham, N.J.
Lt. Michael Thomas Russo, 44, Nesconset, N.Y.
Wayne Alan Russo, 37, Union, N.J.
John J. Ryan, 45, West Windsor, N.J.
Edward Ryan, 42, Scarsdale, N.Y.
Jonathan Stephan Ryan, 32, Bayville, N.Y.
Matthew Lancelot Ryan, 54, Seaford, N.Y.
Kristin A. Irvine Ryan, 30, New York, N.Y.
Tatiana Ryjova, 36, South Salem, N.Y.
Christina Sunga Ryook, 25, New York, N.Y.
Thierry Saada, 27, New York, N.Y.
Jason E. Sabbag, 26, New York, N.Y.
Thomas E. Sabella, 44, New York, N.Y.
Scott Saber, 36, New York, N.Y.
Joseph Sacerdote, 48, Freehold, N.J.
Mohammad Ali Sadeque, 62, New York, N.Y.
Francis J. Sadocha, 41, Huntington, N.Y.
Jude Elias Safi, 24, New York, N.Y.
Brock Joel Safronoff, 26, New York, N.Y.
Edward Saiya, 49, New York, N.Y.
John Patrick Salamone, 37, North Caldwell, N.J.
Hernando R. Salas, 71, New York, N.Y.
Juan Salas, 35, New York, N.Y.

Esmerlin Salcedo, 36, New York, N.Y.
John Salvatore Salerno, 31, Westfield, N.J.
Richard L. Salinardi, 32, Hoboken, N.J.
Wayne John Saloman, 43, Seaford, N.Y.
Nolbert Salomon, 33, New York, N.Y.
Catherine Patricia Salter, 37, New York, N.Y.
Frank Salvaterra, 41, Manhasset, N.Y.
Paul R. Salvio, 27, New York, N.Y.
Samuel R. Salvo, 59, Yonkers, N.Y.
Carlos Samaniego, 29, New York, N.Y.
Rena Sam-Dinnoo, 28, New York, N.Y.
James Kenneth Samuel, 29, Hoboken, N.J.
Hugo Sanay-Perafiel, 41, New York, N.Y.
Alva Jeffries Sanchez, 41, Hempstead, N.Y.
Jacquelyn P. Sanchez, 23, New York, N.Y.
Erick Sanchez, 43, New York, N.Y.
Eric Sand, 36, Westchester, N.Y.
Stacey Leigh Sanders, 25, New York, N.Y.
Herman Sandler, 57, New York, N.Y.
James Sands, 39, Bricktown, N.J.
Ayleen J. Santiago, 40, New York, N.Y.
Kirsten Santiago, 26, New York, N.Y.
Maria Theresa Santillan, 27, Morris Plains, N.J.
Susan G. Santo, 24, New York, N.Y.
Christopher Santora, 23, New York, N.Y.
John Santore, 49, New York, N.Y.
Mario L. Santoro, 28, New York, N.Y.
Rafael Humberto Santos, 42, New York, N.Y.
Rufino Conrado F. (Roy) Santos, 37, New York, N.Y.
Kalyan K. Sarkar, 53, Westwood, N.J.
Chapelle Sarker, 37, New York, N.Y.
Paul F. Sarle, 38, Babylon, N.Y.
Deepika Kumar Sattaluri, 33, Edison, N.J.
Gregory Thomas Saucedo, 31, New York, N.Y.
Susan Sauer, 48, Chicago, Ill.
Anthony Savas, 72, New York, N.Y.
Vladimir Savinkin, 21, New York, N.Y.
John Sbarbaro, 45, New York, N.Y.
Robert L. Scandole, 36, Pelham Manor, N.Y.
Michelle Scarpitta, 26, New York, N.Y.
Dennis Scauso, 46, Dix Hills, N.Y.
John A. Schardt, 34, New York, N.Y.
John G. Scharf, 29, Manorville, N.Y.
Fred Claude Scheffold, 57, Piermont, N.Y.
Angela Susan Scheinberg, 46, New York, N.Y.
Scott M. Schertzer, 28, Edison, N.J.

Sean Schielke, 27, New York, N.Y.
Steven Francis Schlag, 41, Franklin Lakes, N.J.
Jon S. Schlissel, 51, Jersey City, N.J.
Karen Helene Schmidt, 42, Bellmore, N.Y.
Ian Schneider, 45, Short Hills, N.J.
Thomas G. Schoales, 27, Stony Point, N.Y.
Marisa Di Nardo Schorpp, 38, White Plains, N.Y.
Frank G. Schott, 39, Massapequa Park, N.Y.
Gerard P. Schrang, 45, Holbrook, N.Y.
Jeffrey Schreier, 48, New York, N.Y.
John T. Schroeder, 31, Hoboken, N.J.
Susan Lee Kennedy Schuler, 55, Allentown, N.J.
Edward W. Schunk, 54, Baldwin, N.Y.
Mark E. Schurmeier, 44, McLean, Va.
Clarin Shellie Schwartz, 51, New York, N.Y.
John Schwartz, 49, Goshen, Conn.
Mark Schwartz, 50, West Hempstead, N.Y.
Adriane Victoria Scibetta, 31, New York, N.Y.
Raphael Scorca, 61, Beachwood, N.J.
Randolph Scott, 48, Stamford, Conn.
Christopher J. Scudder, 34, Monsey, N.Y.
Arthur Warren Scullin, 57, New York, N.Y.
Michael Seaman, 41, Manhasset, N.Y.
Margaret Seeliger, 34, New York, N.Y.
Carlos Segarra, 54, New York, N.Y.
Anthony Segarra, 52, New York, N.Y.
Jason Sekzer, 31, New York, N.Y.
Matthew Carmen Sellitto, 23, Morristown, N.J.
Howard Selwyn, 47, Hewlett, N.Y.
Larry John Senko, 34, Yardley, Pa.
Arturo Angelo Sereno, 29, New York, N.Y.
Frankie Serrano, 23, Elizabeth, N.J.
Alena Sesinova, 57, New York, N.Y.
Adele Sessa, 36, New York, N.Y.
Sita Nermalla Sewnarine, 37, New York, N.Y.
Karen Lynn Seymour-Dietrich, 40, Millington, N.J.
Davis (Deeg) Sezna, 22, New York, N.Y.
Thomas Joseph Sgroi, 45, New York, N.Y.
Jayesh Shah, 38, Edgewater, N.J.
Khalid M. Shahid, 25, Union, N.J.
Mohammed Shajahan, 41, Spring Valley, N.Y.
Gary Shamay, 23, New York, N.Y.
Earl Richard Shanahan, 50, New York, N.Y.
Shiv Shankar, New York, N.Y.
Neil G. Shastri, 25, New York, N.Y.
Kathryn Anne Shatzoff, 37, New York, N.Y.

Barbara A. Shaw, 57, Morris Township, N.J.
Jeffrey J. Shaw, 42, Levittown, N.Y.
Robert J. Shay, 27, New York, N.Y.
Daniel James Shea, 37, Pelham Manor, N.Y.
Joseph Patrick Shea, 47, Pelham, N.Y.
Linda Sheehan, 40, New York, N.Y.
Hagay Shefi, 34, Tenafly, N.J.
John Anthony Sherry, 34, Rockville Centre, N.Y.
Atsushi Shiratori, 36, New York, N.Y.
Thomas Shubert, 43, New York, N.Y.
Mark Shulman, 47, Old Bridge, N.J.
See-Wong Shum, 44, Westfield, N.J.
Allan Shwartzstein, 37, Chappaqua, N.Y.
Johanna Sigmund, 25, Wyndmoor, Pa.
Dianne T. Signer, 32, New York, N.Y.
Gregory Sikorsky, 34, Spring Valley, N.Y.
Stephen Gerard Siller, 34, West Brighton, N.Y.
David Silver, 35, New Rochelle, N.Y.
Craig A. Silverstein, 41, Wyckoff, N.J.
Nasima H. Simjee, 38, New York, N.Y.
Bruce Edward Simmons, 41, Ridgewood, N.J.
Arthur Simon, 57, Thiells, N.Y.
Kenneth Alan Simon, 34, Secaucus, N.J.
Michael John Simon, 40, Harrington Park, N.J.
Paul Joseph Simon, 54, New York, N.Y.
Marianne Simone, 62, New York, N.Y.
Barry Simowitz, 64, New York, N.Y.
Jeff Simpson, 38, Lake Ridge, Va.
Roshan R. (Sean) Singh, 21, New York, N.Y.
Khamladai K. (Khami) Singh, 25, New York, N.Y.
Thomas E. Sinton, 44, Croton-on-hudson, N.Y.
Peter A. Siracuse, 29, New York, N.Y.
Muriel F. Siskopoulos, 60, New York, N.Y.
Joseph M. Sisolak, 35, New York, N.Y.
John P. Skala, 31, Clifton, N.J.
Francis J. Skidmore, 58, Mendham, N.J.
Toyena Corliss Skinner, 27, Kingston, N.J.
Paul A. Skrzypek, 37, New York, N.Y.
Christopher Paul Slattery, 31, New York, N.Y.
Vincent R. Slavin, 41, Belle Harbor, N.Y.
Robert Sliwak, 42, Wantagh, N.Y.
Paul K. Sloan, 26, New York, N.Y.
Stanley S. Smagala, 36, Holbrook, N.Y.
Wendy L. Small, 26, New York, N.Y.
Catherine T. Smith, 44, West Haverstraw, N.Y.
Daniel Laurence Smith, 47, Northport, N.Y.

George Eric Smith, 38, West Chester, Pa.
James G. Smith, 43, Garden City, N.Y.
Joyce Smith, 55, New York, N.Y.
Karl Trumbull Smith, 44, Little Silver, N.J.
Kevin Smith, 47, Mastic, N.Y.
Leon Smith, 48, New York, N.Y.
Moira Smith, 38, New York, N.Y.
Rosemary A. Smith, 61, New York, N.Y.
Sandra Fajardo Smith, 37, New York, N.Y.
Jeffrey Randall Smith, 36, New York, N.Y.
Bonnie S. Smithwick, 54, Quogue, N.Y.
Rochelle Monique Snell, 24, Mount Vernon, N.Y.
Leonard J. Snyder, 35, Cranford, N.J.
Astrid Elizabeth Sohan, 32, Freehold, N.J.
Sushil Solanki, 35, New York, N.Y.
Ruben Solares, 51, New York, N.Y.
Naomi Leah Solomon, 52, New York, N.Y.
Daniel W. Song, 34, New York, N.Y.
Michael C. Sorresse, 34, Morris Plains, N.J.
Fabian Soto, 31, Harrison, N.J.
Timothy P. Soulas, 35, Basking Ridge, N.J.
Gregory T. Spagnoletti, 32, New York, N.Y.
Donald F. Spampinato, 39, Manhasset, N.Y.
Thomas Sparacio, 35, New York, N.Y.
John Anthony Spataro, 32, Mineola, N.Y.
Robert W. Spear, 30, Valley Cottage, N.Y.
Maynard S. Spence, 42, Douglasville, Ga.
George E. Spencer, 50, West Norwalk, Conn.
Robert Andrew Spencer, 35, Red Bank, N.J.
Mary Rubina Sperando, 39, New York, N.Y.
Frank J. Spinelli, 44, Short Hills, N.J.
William E. Spitz, 49, Oceanside, N.Y.
Joseph P. Spor, 35, Yorktown Heights, N.Y.
Klaus Johannes Sprockamp, 42, Muhltal, Germany
Saranya Srinuan, 23, New York, N.Y.
Michael F. Stabile, 50, New York, N.Y.
Lawrence T. Stack, 58, Lake Ronkonkoma, N.Y.
Capt. Timothy Stackpole, 42, New York, N.Y.
Richard James Stadelberger, 55, Middletown, N.J.
Eric A. Stahlman, 43, Holmdel Township, N.J.
Gregory M. Stajk, 46, Long Beach, N.Y.
Corina Stan, 31, Middle Village, N.Y.
Alexandru Liviu Stan, 34, New York, N.Y.
Mary D. Stanley, 53, New York, N.Y.
Joyce Stanton
Patricia Stanton

Anthony M. Starita, 35, Westfield, N.J.
Jeffrey Stark, 30, New York, N.Y.
Derek James Statkevicus, 30, Norwalk, Conn.
Craig William Staub, 30, Basking Ridge, N.J.
William V. Steckman, 56, West Hempstead, N.Y.
Eric Thomas Steen, 32, New York, N.Y.
William R. Steiner, 56, New Hope, Pa.
Alexander Robbins Steinman, 32, Hoboken, N.J.
Andrew Stergiopoulos, 23, New York, N.Y.
Andrew Stern, 41, Bellmore, N.Y.
Martha Jane Stevens, 55, New York, N.Y.
Richard H. Stewart, 35, New York, N.Y.
Michael James Stewart, 42, New York, N.Y.
Sanford M. Stoller, 54, New York, N.Y.
Lonny J. Stone, 43, Bellmore, N.Y.
Jimmy Nevill Storey, 58, Katy, Texas
Timothy Stout, 42, Dobbs Ferry, N.Y.
Thomas S. Strada, 41, Chatham, N.J.
James J. Straine, 36, Oceanport, N.J.
Edward W. Straub, 48, Morris Township, N.J.
George Strauch, 53, Avon-by-the-Sea, N.J.
Edward T. Strauss, 44, Edison, N.J.
Steven R. Strauss, 51, Fresh Meadows, N.Y.
Steven F. Strobert, 33, Ridgewood, N.J.
Walwyn W. Stuart, 28, Valley Stream, N.Y.
Benjamin Suarez, 36, New York, N.Y.
David S. Suarez, 24, Princeton, N.J.
Ramon Suarez, 45, New York, N.Y.
Yoichi Sugiyama, 34, Fort Lee, N.J.
William Christopher Sugra, 30, New York, N.Y.
Daniel Suhr, 37, Nesconset, N.Y.
David Marc Sullins, 30, New York, N.Y.
Lt. Christopher P. Sullivan, 38, Massapequa, N.Y.
Patrick Sullivan, 32, New York, N.Y.
Thomas Sullivan, 38, Kearney, N.J.
Hilario Soriano (Larry) Sumaya, 42, New York, N.Y.
James Joseph Suozzo, 47, Hauppauge, N.Y.
Colleen Supinski, 27, New York, N.Y.
Robert Sutcliffe, 39, Huntington, N.Y.
Selina Sutter, 63, New York, N.Y.
Claudia Suzette Sutton, 34, New York, N.Y.
John F. Swaine, 36, Larchmont, N.Y.
Kristine M. Swearson, 34, New York, N.Y.
Brian Edward Sweeney, 29, Merrick, N.Y.
Kenneth J. Swensen, 40, Chatham, N.J.
Thomas F. Swift, 30, Jersey City, N.J.

Derek O. Sword, 29, New York, N.Y.
Kevin T. Szocik, 27, Garden City, N.Y.
Gina Sztejnberg, 52, Ridgewood, N.J.
Norbert P. Szurkowski, 31, New York, N.Y.
Harry Taback, 56, New York, N.Y.
Joann Tabeek, 41, New York, N.Y.
Norma C. Taddei, 64, New York, N.Y.
Michael Taddonio, 39, Huntington, N.Y.
Keiji Takahashi, 42, Tenafly, N.J.
Keiichiro Takahashi, 53, Port Washington, N.Y.
Phyllis Gail Talbot, 53, New York, N.Y.
Robert R. Talhami, 40, Shrewsbury, N.J.
Sean Patrick Tallon, 26, Yonkers, N.Y.
Paul Talty, 40, Wantagh, N.Y.
Maurita Tam, 22, New York, N.Y.
Rachel Tamares, 30, New York, N.Y.
Hector Tamayo, 51, New York, N.Y.
Michael Andrew Tamuccio, 37, Pelham Manor, N.Y.
Kenichiro Tanaka, 52, Rye Brook, N.Y.
Rhondelle Cherie Tankard, 31, Devonshire, Bermuda
Michael Anthony Tanner, 44, Secaucus, N.J.
Dennis Gerard Taormina, 36, Montville, N.J.
Kenneth Joseph Tarantino, 39, Bayonne, N.J.
Allan Tarasiewicz, 45, New York, N.Y.
Ronald Tartaro, 39, Bridgewater, N.J.
Darryl Taylor, 52, New York, N.Y.
Donnie Brooks Taylor, 40, New York, N.Y.
Lorisa Ceylon Taylor, 31, New York, N.Y.
Michael M. Taylor, 42, New York, N.Y.
Paul A. Tegtmeier, 41, Hyde Park, N.Y.
Yeshavant Moreshwar Tembe, 59, Piscataway, N.J.
Anthony Tempesta, 38, Elizabeth, N.J.
Dorothy Temple, 52, New York, N.Y.
Stanley L. Temple, 77, New York, N.Y.
David Tengelin, 25, New York, N.Y.
Brian J. Terrenzi, 29, Hicksville, N.Y.
Lisa Marie Terry, 42, Rochester, Mich.
Goumatie T. Thackurdeen, 35, New York, N.Y.
Harshad Sham Thatte, 30, Norcross, Ga.
Thomas F. Theurkauf, 44, Stamford, Conn.
Lesley Anne Thomas, 40, Hoboken, N.J.
Brian T. Thompson, 49, Dix Hills, N.Y.
Clive Thompson, 43, Summit, N.J.
Glenn Thompson, 44, New York, N.Y.
Perry Anthony Thompson, 36, Mount Laurel, N.J.
Vanavah Alexi Thompson, 26, New York, N.Y.

Capt. William Harry Thompson, 51, New York, N.Y.
Nigel Bruce Thompson, 33, New York, N.Y.
Eric Raymond Thorpe, 35, New York, N.Y.
Nichola A. Thorpe, 22, New York, N.Y.
Sal Tieri, 40, Shrewsbury, N.J.
John Patrick Tierney, 27, New York, N.Y.
Mary Ellen Tiesi, 38, Jersey City, N.J.
William R. Tieste, 54, Basking Ridge, N.J.
Kenneth F. Tietjen, 31, Matawan, N.J.
Stephen Edward Tighe, 41, Rockville Centre, N.Y.
Scott C. Timmes, 28, Ridgewood, N.Y.
Michael E. Tinley, 56, Dallas, Texas
Jennifer M. Tino, 29, Livingston, N.J.
Robert Frank Tipaldi, 25, New York, N.Y.
John J. Tipping, 33, Port Jefferson, N.Y.
David Tirado, 26, New York, N.Y.
Hector Luis Tirado, 30, New York, N.Y.
Michelle Titolo, 34, Copiague, N.Y.
John J. Tobin, 47, Kenilworth, N.J.
Richard J. Todisco, 61, Wyckoff, N.J.
Vladimir Tomasevic, 36, Etobicoke, Ontario, Canada
Stephen K. Tompsett, 39, Garden City, N.Y.
Thomas Tong, 31, New York, N.Y.
Azucena de la Torre, 50, New York, N.Y.
Doris Torres, 32, New York, N.Y.
Luis Eduardo Torres, 31, New York, N.Y.
Amy E. Toyen, 24, Newton, Mass.
Christopher M. Traina, 25, Bricktown, N.J.
Daniel Patrick Trant, 40, Northport, N.Y.
Abdoul Karim Traore, 41, New York, N.Y.
Glenn J. Travers, 53, Tenafly, N.J.
Walter (Wally) P. Travers, 44, Upper Saddle River, N.J.
Felicia Traylor-Bass, 38, New York, N.Y.
Lisa L. Trerotola, 38, Hazlet, N.J.
Karamo Trerra, 40, New York, N.Y.
Michael Trinidad, 33, New York, N.Y.
Francis Joseph Trombino, 68, Clifton, N.J.
Gregory J. Trost, 26, New York, N.Y.
William Tselepis, 33, New Providence, N.J.
Zhanetta Tsoy, 32, Jersey City, N.J.
Michael Patrick Tucker, 40, Rumson, N.J.
Lance Richard Tumulty, 32, Bridgewater, N.J.
Ching Ping Tung, 44, New York, N.Y.
Simon James Turner, 39, London, England
Donald Joseph Tuzio, 51, Goshen, N.Y.
Robert T. Twomey, 48, New York, N.Y.

Jennifer Tzemis, 26, New York, N.Y.
John G. Ueltzhoeffer, 36, Roselle Park, N.J.
Tyler V. Ugolyn, 23, New York, N.Y.
Michael A. Uliano, 42, Aberdeen, N.J.
Jonathan J. Uman, 33, Westport, Conn.
Anil Shivhari Umarkar, 34, Hackensack, N.J.
Allen V. Upton, 44, New York, N.Y.
Diane Maria Urban, 50, Malverne, N.Y.
John Damien Vaccacio, 30, New York, N.Y.
Bradley H. Vadas, 37, Westport, Conn.
William Valcarcel, 54, New York, N.Y.
Mayra Valdes-Rodriguez, 39, New York, N.Y.
Felix Antonio Vale, 29, New York, N.Y.
Ivan Vale, 27, New York, N.Y.
Santos Valentin, 39, New York, N.Y.
Benito Valentin, 33, New York, N.Y.
Manuel Del Valle, 32, New York, N.Y.
Carlton Francis Valvo, 38, New York, N.Y.
Edward Raymond Vanacore, 29, Jersey City, N.J.
Jon C. Vandevander, 44, Ridgewood, N.J.
Frederick T. Varacchi, 35, Greenwich, Conn.
Gopalakrishnan Varadhan, 32, New York, N.Y.
David Vargas, 46, New York, N.Y.
Scott C. Vasel, 32, Park Ridge, N.J.
Santos Vasquez, 55, New York, N.Y.
Azael Ismael Vasquez, 21, New York, N.Y.
Arcangel Vazquez, 47, New York, N.Y.
Peter Anthony Vega, 36, New York, N.Y.
Sankara S. Velamuri, 63, Avenel, N.J.
Jorge Velazquez, 47, Passaic, N.J.
Lawrence Veling, 44, New York, N.Y.
Anthony M. Ventura, 41, Middletown, N.J.
David Vera, 41, New York, N.Y.
Loretta A, Vero, 51, Nanuet, N.Y.
Christopher Vialonga, 30, Demarest, N.J.
Matthew Gilbert Vianna, 23, Manhasset, N.Y.
Robert A. Vicario, 40, Weehawken, N.J.
Celeste Torres Victoria, 41, New York, N.Y.
Joanna Vidal, 26, Yonkers, N.Y.
John T. Vigiano, 36, West Islip, N.Y.
Joseph Vincent Vigiano, 34, Medford, N.Y.
Frank J. Vignola, 44, Merrick, N.Y.
Joseph B. Vilardo, 44, Stanhope, N.J.
Sergio Villanueva, 33, New York, N.Y.
Chantal Vincelli, 38, New York, N.Y.
Melissa Vincent, 28, Hoboken, N.J.

54

Francine A. Virgilio, 48, New York, N.Y.
Lawrence Virgilio, 38
Joseph G. Visciano, 22, New York, N.Y.
Joshua S. Vitale, 28, Great Neck, N.Y.
Maria Percoco Vola, 37, New York, N.Y.
Lynette D. Vosges, 48, New York, N.Y.
Garo H. Voskerijian, 43, Valley Stream, N.Y.
Alfred Vukosa, 37, New York, N.Y.
Gregory Wachtler, 25, Ramsey, N.J.
Gabriela Waisman, 33, New York, N.Y.
Wendy Alice Rosario Wakeford, 40, Freehold, N.J.
Courtney Wainsworth Walcott, 37, New York, N.Y.
Victor Wald, 49, New York, N.Y.
Benjamin Walker, 41, Suffern, N.Y.
Glen J. Wall, 38, Rumson, N.J.
Mitchel Scott Wallace, 34, Mineola, N.Y.
Lt. Robert F. Wallace, 43, New York, N.Y.
Roy Michael Wallace, 42, Wyckoff, N.J.
Peter G. Wallace, 66, Lincoln Park, N.J.
Jean Marie Wallendorf, 23, New York, N.Y.
Matthew Blake Wallens, 31, New York, N.Y.
John Wallice, 43, Huntington, N.Y.
Barbara P. Walsh, 59, New York, N.Y.
James Walsh, 37, Scotch Plains, N.J.
Jeffrey Patrick Walz, 37, Tuckahoe, N.Y.
Ching H. Wang, 59, New York, N.Y.
Weibin Wang, 41, Orangeburg, N.Y.
Lt. Michael Warchola, 51, Middle Village, N.Y.
Stephen Gordon Ward, 33, Gorham, Maine
James A. Waring, 49, New York, N.Y.
Brian G. Warner, 32, Morganville, N.J.
Derrick Washington, 33, Calverton, N.Y.
Charles Waters, 44, New York, N.Y.
James Thomas (Muddy) Waters, 39, New York, N.Y.
Capt. Patrick J. Waters, 44, New York, N.Y.
Kenneth Watson, 39, Smithtown, N.Y.
Michael H. Waye, 38, Morganville, N.J.
Walter E. Weaver, 30, Centereach, N.Y.
Todd C. Weaver, 30, New York, N.Y.
Nathaniel Webb, 56, Jersey City, N.J.
Dinah Webster, 50, Port Washington, N.Y.
Joanne Flora Weil, 39, New York, N.Y.
Michael Weinberg, 34, New York, N.Y.
Steven Weinberg, 41, New City, N.Y.
Scott Jeffrey Weingard, 29, New York, N.Y.
Steven Weinstein, 50, New York, N.Y.

Simon Weiser, 65, New York, N.Y.
David T. Weiss, 50, New York, N.Y.
David M. Weiss, 41, Maybrook, N.Y.
Vincent Michael Wells, 22, Redbridge, England
Timothy Matthew Welty, 34, Yonkers, N.Y.
Christian Hans Rudolf Wemmers, 43, San Francisco, Calif.
Ssu-Hui (Vanessa) Wen, 23, New York, N.Y.
Oleh D. Wengerchuk, 56, Centerport, N.Y.
Peter M. West, 54, Pottersville, N.J.
Whitfield West, 41, New York, N.Y.
Meredith Lynn Whalen, 23, Hoboken, N.J.
Eugene Whelan, 31, Rockaway Beach, N.Y.
John S. White, 48, New York, N.Y.
Edward James White, 30, New York, N.Y.
James Patrick White, 34, Hoboken, N.J.
Kenneth W. White, 50, New York, N.Y.
Leonard Anthony White, 57, New York, N.Y.
Malissa White, 37, New York, N.Y.
Wayne White, 38, New York, N.Y.
Adam S. White, 26, New York, N.Y.
Leanne Marie Whiteside, 31, New York, N.Y.
Mark Whitford, 31, Salisbury Mills, N.Y.
Michael T. Wholey, 34, Westwood, N.J.
Mary Lenz Wieman, 43, Rockville Centre, N.Y.
Jeffrey David Wiener, 33, New York, N.Y.
William J. Wik, 44, Crestwood, N.Y.
Alison Marie Wildman, 30, New York, N.Y.
Lt. Glenn Wilkinson, 46, Bayport, N.Y.
John C. Willett, 29, Jersey City, N.J.
Brian Patrick Williams, 29, New York, N.Y.
Crossley Williams, 28, Uniondale, N.Y.
David Williams, 34, New York, N.Y.
Deborah Lynn Williams, 35, Hoboken, N.J.
Kevin Michael Williams, 24, New York, N.Y.
Louis Calvin Williams, 53, Mandeville, La.
Louie Anthony Williams, 44, New York, N.Y.
Lt. John Williamson, 46, Warwick, N.Y.
Donna Wilson, 48, Williston Park, N.Y.
William E. Wilson, 58, New York, N.Y.
Cynthia Wilson, 52, New York, N.Y.
David H. Winton, 29, New York, N.Y.
Glenn J. Winuk, 40, New York, N.Y.
Thomas Francis Wise, 43, New York, N.Y.
Alan L. Wisniewski, 47, Howell, N.J.
Frank T. Wisniewski, 54, Basking Ridge, N.J.
David Wiswall, 54, North Massapequa, N.Y.

Sigrid Charlotte Wiswe, 41, New York, N.Y.
Michael R. Wittenstein, 34, Hoboken, N.J.
Christopher W. Wodenshek, 35, Ridgewood, N.J.
Martin P. Wohlforth, 47, Greenwich, Conn.
Katherine S. Wolf, 40, New York, N.Y.
Jenny Seu Kueng Low Wong, 25, New York, N.Y.
Jennifer Y. Wong, 26, New York, N.Y.
Siu Cheung Wong, 34, Jersey City, N.J.
Yin Ping (Steven) Wong, 34, New York, N.Y.
Yuk Ping Wong, 47, New York, N.Y.
Brent James Woodall, 31, Oradell, N.J.
James J. Woods, 26, New York, N.Y.
Patrick Woods, 36, New York, N.Y.
Richard Herron Woodwell, 44, Ho-Ho-Kus, N.J.
Capt. David Terence Wooley, 54, Nanuet, N.Y.
John Bentley Works, 36, Darien, Conn.
Martin Michael Wortley, 29, Park Ridge, N.J.
Rodney James Wotton, 36, Middletown, N.J.
William Wren, 61, Lynbrook, N.Y.
John Wright, 33, Rockville Centre, N.Y.
Neil R. Wright, 30, Asbury, N.J.
Sandra Wright, 57, Langhorne, Pa.
Jupiter Yambem, 41, Beacon, N.Y.
Suresh Yanamadala, 33, Plainsboro, N.J.
Matthew David Yarnell, 26, Jersey City, N.J.
Myrna Yaskulka, 59, New York, N.Y.
Shakila Yasmin, 26, New York, N.Y.
Olabisi L. Yee, 38, New York, N.Y.
Edward P. York, 45, Wilton, Conn.
Kevin Patrick York, 41, Princeton, N.J.
Raymond York, 45, Valley Stream, N.Y.
Suzanne Youmans, 60, New York, N.Y.
Jacqueline (Jakki) Young, 37, New York, N.Y.
Barrington L. Young, 35, New York, N.Y.
Elkin Yuen, 32, New York, N.Y.
Joseph Zaccoli, 39, Valley Stream, N.Y.
Adel Agayby Zakhary, 50, North Arlington, N.J.
Arkady Zaltsman, 45, New York, N.Y.
Edwin J. Zambrana, 24, New York, N.Y.
Robert Alan Zampieri, 30, Saddle River, N.J.
Mark Zangrilli, 36, Pompton Plains, N.J.
Ira Zaslow, 55, North Woodmere, N.Y.
Kenneth Albert Zelman, 37, Succasunna, N.J.
Abraham J. Zelmanowitz, 55, New York, N.Y.
Martin Morales Zempoaltecatl, 22, New York, N.Y.
Zhe (Zack) Zeng, 28, New York, N.Y.

Marc Scott Zeplin, 33, Harrison, N.Y.
Jie Yao Justin Zhao, 27, New York, N.Y.
Ivelin Ziminski, 40, Tarrytown, N.Y.
Michael Joseph Zinzi, 37, Newfoundland, N.J.
Charles A. Zion, 54, Greenwich, Conn.
Julie Lynne Zipper, 44, Paramus, N.J.
Salvatore J. Zisa, 45, Hawthorne, N.J.
Prokopios Paul Zois, 46, Lynbrook, N.Y.
Joseph J. Zuccala, 54, Croton-on-Hudson, N.Y.
Andrew Steven Zucker, 27, New York, N.Y.
Igor Zukelman, 29, New York, N.Y.

## AMERICAN AIRLINES FLIGHT 11

### Crew

Barbara Arestegui, 38, Marstons Mills, Massachusetts
Jeffrey Collman, 41, Novato, Calif.
Sara Low, 28, Batesville, Arkansas
Karen A. Martin, 40, Danvers, Mass.
First Officer Thomas McGuinness, 42, Portsmouth, New Hampshire
Kathleen Nicosia, 54, Winthrop, Mass.
John Ogonowski, 52, Dracut, Massachusetts
Betty Ong, 45, Andover, Massachusetts
Jean Roger, 24, Longmeadow, Massachusetts
Dianne Snyder, 42, Westport, Massachusetts
Madeline Sweeney, 35, Acton, Massachusetts

### Passengers

Anna Williams Allison, 48, Stoneham, Massachusetts
David Angell, 54, Pasadena, California
Lynn Angell, 45, Pasadena, California
Seima Aoyama, 48, Culver City, Calif.
Myra Aronson, 52, Charlestown, Massachusetts
Christine Barbuto, 32, Brookline, Massachusetts
Carolyn Beug, 48, Los Angeles, California
Kelly Ann Booms, 24, Brookline, Mass.
Carol Bouchard, 43, Warwick, Rhode Island
Neilie Anne Heffernan Casey, 32, Wellesley, Massachusetts
Jeffrey Coombs, 42, Abington, Massachusetts
Tara Creamer, 30, Worcester, Massachusetts
Thelma Cuccinello, 71, Wilmot, New Hampshire
Patrick Currivan, 52, Winchester, Mass.
Brian Dale, 43, Warren, New Jersey
David DiMeglio, 22, Wakefield, Mass.
Donald Americo DiTullio, 49, Peabody, Mass.
Albert Dominguez, 66, Sydney, Australia
Paige Farley-Hackel, 46, Newton, Mass.
Alex Filipov, 70, Concord, Massachusetts
Carol Flyzik, 40, Plaistow, N.H.
Paul Friedman, 45, Belmont, Massachusetts
Karleton D.B. Fyfe, 31, Brookline, Massachusetts
Peter Gay, 54, Tewksbury, Massachusetts
Linda George, 27, Westboro, Massachusetts
Edmund Glazer, 41, Los Angeles, California
Lisa Fenn Gordenstein, 41, Needham, Massachusetts
Andrew Peter Charles Curry Green, 34, Santa Monica, Calif.

59

Peter Hashem, 40, Tewksbury, Massachusetts
Robert Hayes, 37, from Amesbury, Massachusetts
Edward (Ted) R. Hennessy, 35, Belmont, Mass.
John A. Hofer, 45, Los Angeles, Calif.
Cora Hidalgo Holland, 52, of Sudbury, Massachusetts
Nicholas Humber, 60, of Newton, Massachusetts,
Waleed Iskandar, 34, London, England
John Charles Jenkins, 45, Cambridge, Mass.
Charles Edward Jones, 48, Bedford, Mass.
Robin Kaplan, 33, Westboro, Massachusetts
Barbara Keating, 72, Palm Springs, Calif.
David P. Kovalcin, 42, Hudson, New Hampshire
Judy Larocque, 50, Framingham, Mass.
Natalie Janis Lasden, 46, Peabody, Mass.
Daniel John Lee, 34, Van Nuys, Calif.
Daniel C. Lewin, 31, Charlestown, Mass.
Susan A. MacKay, 44, Westford, Massachusetts
Christopher D. Mello, 25, Boston, Mass.
Jeff Mladenik, 43, Hinsdale, Illinois
Antonio Jesus Montoya Valdes, 46, East Boston, Mass.
Carlos Alberto Montoya, 36, Bellmont, Mass.
Laura Lee Morabito, 34, Framingham, Massachusetts
Mildred Rose Naiman, 81, Andover, Mass.
Laurie Ann Neira, 48, Los Angeles, Calif.
Renee Newell, 37, of Cranston, Rhode Island
Jacqueline J. Norton, 61, Lubec, Maine
Robert Grant Norton, 85, Lubec, Maine
Jane M. Orth, 49, Haverhill, Mass.
Thomas Pecorelli, 31, of Los Angeles, California
Berinthia Berenson Perkins, 53, Los Angeles, Calif.
Sonia Morales Puopolo, 58, of Dover, Massachusetts
David E. Retik, 33, Needham, Mass.
Philip M. Rosenzweig, 47, Acton, Mass.
Richard Ross, 58, Newton, Massachusetts
Jessica Sachs, 22, Billerica, Massachusetts
Rahma Salie, 28, Boston, Mass.
Heather Lee Smith, 30, Boston, Mass.
Douglas J. Stone, 54, Dover, N.H
Xavier Suarez, 41, Chino Hills, Calif.
Michael Theodoridis, 32, Boston, Mass.
James Trentini, 65, Everett, Massachusetts
Mary Trentini, 67, Everett, Massachusetts
Pendyala Vamsikrishna, 30, Los Angeles, Calif.
Mary Wahlstrom, 78, Kaysville, Utah
Kenneth Waldie, 46, Methuen, Massachusetts
John Wenckus, 46, Torrance, Calif.

Candace Lee Williams, 20, Danbury, Conn.
Christopher Zarba, 47, Hopkinton, Massachusetts

## AMERICAN AIRLINES FLIGHT 77

### Crew

Charles Burlingame, 51, Herndon, Va.
David M. Charlebois, 39, Washington, D.C
Michele Heidenberger, 57, Chevy Chase, Md.
Jennifer Lewis, 38, Culpeper, Virginia
Kenneth Lewis, 49, Culpeper, Virginia
Renee A. May, 39, Baltimore, Md

### Passengers

Paul Ambrose, 32, Washington, D.C.
Yeneneh Betru, 35, Burbank, Calif
Mary Jane (MJ) Booth, 64, Falls Church, Va.
Bernard Curtis Brown, 11, Washington, D.C.
Suzanne Calley, 42, San Martin, Calif.
William Caswell, 54, Silver Spring, Md.
Sarah Clark, 65, Columbia, Md.
Zandra Cooper, Annandale, Va.
Asia Cottom, 11, Washington, D.C.
James Debeuneure, 58, Upper Marlboro, Md.
Rodney Dickens, 11, Washington, D.C.
Eddie Dillard, Alexandria, Va.
Charles Droz, 52, Springfield, Va.
Barbara G. Edwards, 58, Las Vegas, Nev.
Charles S. Falkenberg, 45, University Park, Md.
Zoe Falkenberg, 8, University Park, Md.
Dana Falkenberg, 3, of University Park, Md.
James Joe Ferguson, 39, Washington, D.C.
Wilson "Bud" Flagg, 63, Millwood, Va.
Darlene Flagg, 63, Millwood, Va.
Richard Gabriel, 54, Great Falls, Va.
Ian J. Gray, 55, Columbia, Md.
Stanley Hall, 68, Rancho Palos Verdes, Calif.
Bryan Jack, 48, Alexandria, Va.
Steven D. Jacoby, 43, Alexandria, Va.
Ann Judge, 49, Great Falls, Va.
Chandler Keller, 29, El Segundo, Calif.
Yvonne Kennedy, 62, Sydney, New South Wales, Australia
Norma Khan, 45, Reston, Va.
Karen A. Kincaid, 40, Washington, D.C.
Dong Lee, 48, Leesburg, Va.
Dora Menchaca, 45, of Santa Monica, Calif.
Christopher Newton, 38, Anaheim, Calif.

Barbara Olson, 45, Great Falls, Va
Ruben Ornedo, 39, Los Angeles, Calif.
Robert Penniger, 63, of Poway, Calif.
Robert R. Ploger, 59, Annandale, Va.
Lisa J. Raines, 42, Great Falls, Va.
Todd Reuben, 40, Potomac, Maryland
John Sammartino, 37, Annandale, Va.
Diane Simmons, Great Falls, Va.
George Simmons, Great Falls, Va.
Mari-Rae Sopper, 35, Santa Barbara, Calif.
Robert Speisman, 47, Irvington, N.Y
Norma Lang Steuerle, 54, Alexandria, Va.
Hilda E. Taylor, 62, Forestville, Md
Leonard Taylor, 44, Reston, Va.
Sandra Teague, 31, Fairfax, Va.
Leslie A. Whittington, 45, University Park, Maryland.
John D. Yamnicky, 71, Waldorf, Md.
Vicki Yancey, 43, Springfield, Va.
Shuyin Yang, 61, Beijing, China
Yuguag Zheng, 65, Beijing, China

## UNITED AIRLINES FLIGHT 175

### Crew

Robert Fangman, 33, Claymont, Del.
Michael R. Horrocks, 38, Glen Mills, Pa.
Amy N. Jarret, 28, North Smithfield, R.I.
Amy R. King, 29, Stafford Springs, Conn.
Kathryn L. LaBorie, 44, Providence, R.I.
Alfred Gilles Padre Joseph Marchand, 44, Alamogordo, N.M.
Capt. Victor Saracini, 51, Lower Makefield Township, Pa.
Michael C. Tarrou, 38, Stafford Springs, Conn.
Alicia Nicole Titus, 28, San Francisco, Calif.

### Passengers

Alona Avraham, 30, Asdod, Israel.
Garnet Edward (Ace) Bailey, 54, Lynnfield, Mass.
Mark Bavis, 31, West Newton, Mass.
Graham Andrew Berkeley, 37, Boston, Mass.
Touri Bolourchi, 69, Beverly Hills, Calif.
Klaus Bothe, 31, Linkenheim, Baden-Wurttemberg, Germany
Daniel R. Brandhorst, 41, Los Angeles, Calif
David Reed Gamboa Brandhorst, 3, Los Angeles, Calif.
John Brett Cahill, 56, Wellesley, Mass.
Christoffer Carstanjen, 33, Turner Falls, Mass.
John (Jay) J. Corcoran, 43, Norwell, Mass
Dorothy Alma DeAraujo, 80, Long Beach, Calif.
Ana Gloria Pocasangre de Barrera, 49, San Salvador, El Salvador
Lisa Frost, 22, Rancho Santa Margarita, Calif.
Ronald Gamboa, 33, Los Angeles, Calif.
Lynn Catherine Goodchild, 25, Attleboro, Mass.
Peter Morgan Goodrich, 33, Sudbury, Mass.
Douglas A. Gowell, 52, Methuen, Mass.
The Rev. Francis E. Grogan, 76, of Easton, Mass.
Carl Max Hammond, 37, Derry, N.H.
Peter Hanson, 32, Groton, Mass.
Sue Kim Hanson, 35, Groton, Mass.
Christine Lee Hanson, 2, Groton, Mass.
Gerald F. Hardacre, 61, Carlsbad, Calif.
Eric Samadikan Hartono, 20, Boston, Mass.
James E. Hayden, 47, Westford, Mass.
Herbert W. Homer, 48, Milford, Mass.
Robert Adrien Jalbert, 61, Swampscott, Mass.
Ralph Francis Kershaw, 52, Manchester-by-the-Sea, Mass.
Heinrich Kimmig, 43, Willstaett, Germany

Brian Kinney, 29, Lowell, Mass.
Robert George LeBlanc, 70, Lee, N.H.
Maclovio Lopez, Jr., 41, Norwalk, Calif.
Marianne MacFarlane, MacFarlane, 34, Revere, Mass.
Louis Neil Mariani, 59, Derry, N.H.
Juliana Valentine McCourt, 4, New London, Conn.
Ruth Magdaline McCourt, 45, New London, Conn.
Wolfgang Peter Menzel, 59, Wilhelmshaven, Germany
Shawn M. Nassaney, 25, Pawtucket, R.I.
Marie Pappalardo, 53, Paramount, Calif.
Patrick Quigley, 40, of Wellesley, Mass.
Frederick Charles Rimmele, 32, Marblehead, Mass.
James M. Roux, 43, Portland, Maine
Jesus Sanchez, 45, Hudson, Mass.
Mary Kathleen Shearer, 61, Dover, N.H.
Robert Michael Shearer, 63, Dover, N.H.
Jane Louise Simpkin, 36, Wayland, Mass.
Brian D. Sweeney, 38, Barnstable, Mass.
Timothy Ward, 38, San Diego, Calif.
William M. Weems, 46, Marblehead, Mass.

## UNITED AIRLINES FLIGHT 93

### Crew

Lorraine G. Bay, 58, East Windsor, N.J.
Sandra W. Bradshaw, 38, Greensboro, N.C.
Jason Dahl, 43, Denver, Colo.
Wanda Anita Green, 49, Linden, N.J.
Leroy Homer, 36, Marlton, N.J.
CeeCee Lyles, 33, Fort Myers, Fla.
Deborah Welsh, 49, New York, N.Y.

### Passengers

Christian Adams, 37, Biebelsheim, Germany
Todd Beamer, 32, Cranbury, N.J.
Alan Beaven, 48, Oakland, CA
Mark K. Bingham, 31, San Francisco, Calif.
Deora Frances Bodley, 20, San Diego, Calif.
Marion Britton, 53, New York, N.Y.
Thomas E. Burnett Jr., 38, San Ramon, Calif.
William Cashman, 57, North Bergen, N.J.
Georgine Rose Corrigan, 56, Honolulu, Hawaii
Patricia Cushing, 69, Bayonne, N.J.
Joseph Deluca, 52, Ledgewood, N.J.
Patrick Joseph Driscoll, 70, Manalapan, N.J.
Edward P. Felt, 41, Matawan, N.J.
Jane C. Folger, 73, Bayonne, N.J.
Colleen Laura Fraser, 51, Elizabeth, N.J.
Andrew Garcia, 62, Portola Valley, Calif.
Jeremy Glick, 31, Hewlett, N.J.
Lauren Grandcolas, 38, San Rafael, Calif.
Donald F. Greene, 52, Greenwich, Conn.
Linda Gronlund, 46, Warwick, N.Y.
Richard Guadagno, 38, of Eureka, Calif.
Toshiya Kuge, 20, Nishimidoriguoska, Japan
Hilda Marcin, 79, Budd Lake, N.J.
Nicole Miller, 21, San Jose, Calif.
Louis J. Nacke, 42, New Hope, Pa.
Donald Arthur Peterson, 66, Spring Lake, N.J.
Jean Hoadley Peterson, 55, Spring Lake, N.J.
Waleska Martinez Rivera, 37, Jersey City, N.J.
Mark Rothenberg, 52, Scotch Plains, N.J.
Christine Snyder, 32, Kailua, Hawaii
John Talignani, 72, New York, N.Y.

Honor Elizabeth Wainio, 27, Watchung, N.J.
Olga Kristin Gould White, 65, New York, N.Y.

## THE PENTAGON

Spc. Craig Amundson, 28, Fort Belvoir, Va.
Melissa Rose Barnes, 27, Redlands, Calif.
(Retired) Master Sgt. Max Beilke, 69, Laurel, Md.
Kris Romeo Bishundat, 23, Waldorf, Md.
Carrie Blagburn, 48, Temple Hills, Md.
Lt. Col. Canfield D. Boone, 54, Clifton, Va.
Donna Bowen, 42, Waldorf, Md.
Allen Boyle, 30, Fredericksburg, Va.
Christopher Lee Burford, 23, Hubert, N.C.
Daniel Martin Caballero, 21, Houston, Texas
Sgt. 1st Class Jose Orlando Calderon-Olmedo, 44, Annandale, Va.
Angelene C. Carter, 51, Forrestville, Md.
Sharon Carver, 38, Waldorf, Md.
John J. Chada, 55, Manassas, Va.
Rosa Maria (Rosemary) Chapa, 64, Springfield, Va.
Julian Cooper, 39, Springdale, Md.
Lt. Cmdr. Eric Allen Cranford, 32, Drexel, N.C.
Ada M. Davis, 57, Camp Springs, Md.
Capt. Gerald Francis Deconto, 44, Sandwich, Mass.
Lt. Col. Jerry Don Dickerson, 41, Durant, Miss.
Johnnie Doctor, 32, Jacksonville, Fla.
Capt. Robert Edward Dolan, 43, Alexandria, Va.
Cmdr. William Howard Donovan, 37, Nunda, N.Y.
Cmdr. Patrick S. Dunn, 39, Springfield, Va.
Edward Thomas Earhart, 26, Salt Lick, Ky.
Lt. Cmdr. Robert Randolph Elseth, 37, Vestal, N.Y.
Jamie Lynn Fallon, 23, Woodbridge, Va.
Amelia V. Fields, 36, Dumfries, Va.
Gerald P. Fisher, 57, Potomac, Md.
Matthew Michael Flocco, 21, Newark, Del.
Sandra N. Foster, 41, Clinton, Md.
Capt. Lawrence Daniel Getzfred, 57, Elgin, Neb.
Cortz Ghee, 54, Reisterstown, Md.
Brenda C. Gibson, 59, Falls Church, Va.
Ron Golinski, 60, Columbia, Md.
Diane M. Hale-McKinzy, 38, Alexandria, Va.
Carolyn B. Halmon, 49, Washington, D.C.
Sheila Hein, 51, University Park, Md.
Ronald John Hemenway, 37, Shawnee, Kan.
Maj. Wallace Cole Hogan, 40, Fla.
Jimmie Ira Holley, 54, Lanham, Md.
Angela Houtz, 27, La Plata, Md.
Brady K. Howell, 26, Arlington, Va.
Peggie Hurt, 36, Crewe, Va.

Lt. Col. Stephen Neil Hyland, 45, Burke, Va.
Robert J. Hymel, 55, Woodbridge, Va.
Sgt. Maj. Lacey B. Ivory, 43, Woodbridge, Va.
Lt. Col. Dennis M. Johnson, 48, Port Edwards, Wis.
Judith Jones, 53, Woodbridge, Va.
Brenda Kegler, 49, Washington, D.C.
Lt. Michael Scott Lamana, 31, Baton Rouge, La.
David W. Laychak, 40, Manassas, Va.
Samantha Lightbourn-Allen, 36, Hillside, Md.
Maj. Steve Long, 39, Ga.
James Lynch, 55, Manassas, Va.
Terence M. Lynch, 49, Alexandria, Va.
Nehamon Lyons, 30, Mobile, Ala.
Shelley A. Marshall, 37, Marbury, Md.
Teresa Martin, 45, Stafford, Va.
Ada L. Mason, 50, Springfield, Va.
Lt. Col. Dean E. Mattson, 57, Calif.
Lt. Gen. Timothy J. Maude, 53, Fort Myer, Va.
Robert J. Maxwell, 53, Manassas, Va.
Molly McKenzie, 38, Dale City, Va.
Patricia E. (Patti) Mickley, 41, Springfield, Va.
Maj. Ronald D. Milam, 33, Washington, D.C.
Gerard (Jerry) P. Moran, 39, Upper Marlboro, Md.
Odessa V. Morris, 54, Upper Marlboro, Md.
Brian Anthony Moss, 34, Sperry, Okla.
Ted Moy, 48, Silver Spring, Md.
Lt. Cmdr. Patrick Jude Murphy, 38, Flossmoor, Ill.
Khang Nguyen, 41, Fairfax, Va.
Michael Allen Noeth, 30, New York, N.Y.
Diana Borrero de Padro, 55, Woodbridge, Va.
Spc. Chin Sun Pak, 25, Lawton, Okla.
Lt. Jonas Martin Panik, 26, Mingoville, Pa.
Maj. Clifford L. Patterson, 33, Alexandria, Va.
Lt. J.G. Darin Howard Pontell, 26, Columbia, Md.
Scott Powell, 35, Silver Spring, Md.
(Retired) Capt. Jack Punches, 51, Clifton, Va.
Joseph John Pycior, 39, Carlstadt, N.J.
Deborah Ramsaur, 45, Annandale, Va.
Rhonda Rasmussen, 44, Woodbridge, Va.
Marsha Dianah Ratchford, 34, Prichard, Ala.
Martha Reszke, 36, Stafford, Va.
Cecelia E. Richard, 41, Fort Washington, Md.
Edward V. Rowenhorst, 32, Lake Ridge, Va.
Judy Rowlett, 44, Woodbridge, Va.
Robert E. Russell, 52, Oxon Hill, Md.
William R. Ruth, 57, Mount Airy, Md.

Charles E. Sabin, 54, Burke, Va.
Marjorie C. Salamone, 53, Springfield, Va.
Lt. Col. David M. Scales, 44, Cleveland, Ohio
Cmdr. Robert Allan Schlegel, 38, Alexandria, Va.
Janice Scott, 46, Springfield, Va.
Michael L. Selves, 53, Fairfax, Va.
Marian Serva, 47, Stafford, Va.
Cmdr. Dan Frederic Shanower, 40, Naperville, Ill.
Antoinette Sherman, 35, Forest Heights, Md.
Don Simmons, 58, Dumfries, Va.
Cheryle D. Sincock, 53, Dale City, Va.
Gregg Harold Smallwood, 44, Overland Park, Kan.
(Retired) Lt. Col. Gary F. Smith, 55, Alexandria, Va.
Patricia J. Statz, 41, Takoma Park, Md.
Edna L. Stephens, 53, Washington, D.C.
Sgt. Maj. Larry Strickland, 52, Woodbridge, Va.
Maj. Kip P. Taylor, 38, McLean, Va.
Sandra C. Taylor, 50, Alexandria, Va.
Karl W. Teepe, 57, Centreville, Va.
Sgt. Tamara Thurman, 25, Brewton, Ala.
Lt. Cmdr. Otis Vincent Tolbert, 38, Lemoore, Calif.
Willie Q. Troy, 51, Aberdeen, Md.
Lt. Cmdr. Ronald James Vauk, 37, Nampa, Idaho
Lt. Col. Karen Wagner, 40, Houston, Texas
Meta L. Waller, 60, Alexandria, Va.
Staff Sgt. Maudlyn A. White, 38, St. Croix, Virgin Islands
Sandra L. White, 44, Dumfries, Va.
Ernest M. Willcher, 62, North Potomac, Md.
Lt. Cmdr. David Lucian Williams, 32, Newport, Ore.
Maj. Dwayne Williams, 40, Jacksonville, Ala.
Marvin R. Woods, 57, Great Mills, Md.
Kevin Wayne Yokum, 27, Lake Charles, La.
Donald McArthur Young, 41, Roanoke, Va.
Lisa L. Young, 36, Germantown, Md.
Edmond Young, 22, Owings, Md.

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT ERWIN WACHTER

1. The name of the defendant to whom this Statement pertains is Erwin Wachter.
The alleged misconduct and basis for liability is set forth below as well as
described elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka,
et al.* (SDNY 04-CV-1923 (RCC)), other cases brought by other plaintiffs in *In Re
Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others.
Plaintiffs will separately file Statements with respect to the misconduct of certain
of the other defendants. Given the vastly complicated nature of the conspiracy
and other wrongdoing that led to the events of September 11, 2001, however,
much information is unavailable to plaintiffs, and the identities of other
wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore
reserve the right to amend this Statement as information is learned and verified
and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as can be found on
the More Definite Statement, Victims List ("Victims List"). The victims consist
of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the
World Trade Center in New York, NY, the Pentagon Building in Arlington County,
Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist
attacks on September 11, 2001 (with the events at the World Trade Center in New
York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner
crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related
thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal
representatives (including executors, estate administrators and trustees) entitled to
bring legal action on behalf of any individual who died as the result of terrorist
attacks on September 11, 2001; but excluding (3) all individuals, and all spouses,
children, parents, siblings, and legal representative of individuals identified by the
Attorney General of the United States or otherwise shown to have perpetrated, aided
and abetted, conspired in regard to, or otherwise supported the terrorist attacks of
September 11, 2001. Victims List sets forth the names of the decedents killed by the
attackers, with the category of "victims" further including their spouses, children,
parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**EXHIBIT**

**B**

5.  Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a.  The predicate acts and statutes in question include:

        • Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

        • Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

        • Fraud with Identification - 18 U.S.C. § 1028

        • Mail Fraud - 18 U.S.C. § 1341

        • Wire Fraud - 18 U.S.C. § 1343

        • Financial Institution Fraud - 18 U.S.C. §1344

        • Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

        • Money Laundering - 18 U.S.C. § 1957

        • Defrauding the United States Government - 18 U.S.C. § 371

        • Travel Act - 18 U.S.C. § 1952

        • Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

        • Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

        • Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b.  In the Mid 1990's to September 11, 2002, Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Erwin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Erwin Wachter conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Erwin Wachter, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of

Page 3

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\B_EWachter- More Definite Statement - Iraqjsg.doc

racketeering outlined herein.    Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Erwin Wachter fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Erwin Wachter, and illegal activity to generate material support to continue its terrorist operations.

    c.   Erwin Wachter was not an employee, officer or director of the Enterprise, based upon present information available.  Erwin Wachter is associated with the alleged Enterprise.  Erwin Wachter is a member of the Enterprise, and is separate and distinct from the Enterprise.  Erwin Wachter intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by Erwin Wachter is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Erwin Wachter funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Erwin Wachter, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,   and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Erwin Wachter acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic

Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Erwin Wachter, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Erwin Wachter, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Erwin Wachter, of both those goals and the uses to which the Funds were put.

b. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c. The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Erwin Wachter. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Erwin Wachter. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic

Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Erwin Wachter.  Erwin Wachter, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Erwin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Erwin Wachter also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Erwin Wachter are as follows: Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows: Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Erwin Wachter has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Erwin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Erwin Wachter has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Erwin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Erwin Wachter _conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Erwin Wachter is the head of Asat Trust, a co-defendant in the above-referenced cases.[1]   Additionally, available information reveals a pattern of activity over a period of many years of the Wachters, including both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust.

---

[1] Specific misconduct regarding Asat Trust, a co-defendant herein, is provided via More Definite Statement Applicable to Asat Trust.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Asat Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

23. He is also an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases.[2]

24. As owner and head of Asat Trust and Secor Treuhand Anstalt, Erwin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

25. Erwin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Erwin Wachter continued to permit, make available, assist, and maintain those accounts.

26. Available information demonstrates that there has been activities between the Wachters and Al Taqwa Bank, a co-defendant in the above- referenced cases who has been significantly linked to activities and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order  #13224.  Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

27. There is also information which links the Wachters to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Nasreddin, and Albert Friedrich Armand Huber, co-defendants in the above-referenced cases which have been linked to funding and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

28. Based upon information and belief, the Wachters were involved in laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa.

29. As the foregoing demonstrates, Erwin Wachter thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's

---

[2] Specific misconduct regarding Sercor Treuhand Anstalt, a co-defendant herein, is provided via More Definite Statement Applicable to Sercor Truehand Anstalt. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sercor Truehand Anstalt, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

Page 9

global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Erwin Wachter's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

30. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 29, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT MARTIN WACHTER

1. The name of the defendant to whom this Statement pertains is Martin Wachter. The alleged misconduct and basis for liability is set forth below as well as described elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as  can be found on the More Definite Statement, Victims List ("Victims List"). The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

**EXHIBIT**

**C**

a.   The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)
- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15
- Fraud with Identification - 18 U.S.C. § 1028
- Mail Fraud - 18 U.S.C. § 1341
- Wire Fraud - 18 U.S.C. § 1343
- Financial Institution Fraud - 18 U.S.C. §1344
- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956
- Money Laundering - 18 U.S.C. § 1957
- Defrauding the United States Government - 18 U.S.C. § 371
- Travel Act - 18 U.S.C. § 1952
- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)
- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)
- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

b.   In the Mid 1990's to September 11, 2002, Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself.  Martin Wachter  conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Throughout this period, Martin Wachter conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.   The predicate act is not based upon a criminal conviction.

Page 2

e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Martin Wachter, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that

Page 3

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\C_MWachter- More Definite Statement - Iraqjsg.doc

are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Martin Wachter fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Martin Wachter, and illegal activity to generate material support to continue its terrorist operations.

c.  Martin Wachter was not an employee, officer or director of the Enterprise, based upon present information available. Martin Wachter is associated with the alleged Enterprise. Martin Wachter is a member of the Enterprise, and is separate and distinct from the Enterprise. Martin Wachter intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Martin Wachter is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Martin Wachter funds that activity, which activity culminated in the

Page 4

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\C_MWachter- More Definite Statement - Iraqjsg.doc

Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Martin Wachter, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Martin Wachter acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is

Page 5

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\C_MWachter- More Definite Statement - Iraqjsg.doc

offered.   After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Martin Wachter, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Martin Wachter, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Martin Wachter, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.   All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Martin Wachter.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Martin Wachter.   In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been

available to it without the assistance provided by Martin Wachter. Martin Wachter, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Martin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Martin Wachter also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Martin Wachter are as follows:  Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows:  Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Martin Wachter has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Martin Wachter conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Martin Wachter conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Martin Wachter is the director of Asat Trust, a co-defendant in the above-referenced cases.[1]  Additionally, available information reveals a pattern of activity over a period of many years of the Wachters, both Martin Wachter and his father, Erwin Wachter (collectively referred to as "Wachters"), working at the same address registered to Asat Trust.

22. Martin Wachter is an owner of Sercor Treuhand Anstalt, a co-defendant in the above-referenced cases.[2]

---

[1] Specific misconduct regarding Asat Trust, a co-defendant herein, is provided via a More Definite Statement Applicable to Asat Trust.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Asat Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Sercor Treuhand Anstalt ("Sercor"), a co-defendant herein, is provided via More Definite Statement Applicable to Sercor Treuhand Anstalt.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Sercor, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

23. As a director and owner of Asat Trust and Secor Treuhand Anstalt, Martin Wachter oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

24. Martin Wachter has long known that accounts, under his control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Martin Wachter continued to permit, make available, assist, and maintain those accounts.

25. Available information demonstrates that there has been activities between the Wachters and Al Taqwa Bank, a co-defendant in the above- referenced cases who has been significantly linked to activities and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Taqwa's assets were frozen by the Office of Foreign Assets Control, as a Designated Terrorist Organization, by Executive Order #13224.  Additionally, there is information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

26. There is also information which links the Wachters to Al Taqwa and its executives, Youssef M. Nada, Ali Ghaleb Himmat, Nasreddin, and Albert Friedrich Armand Huber, co-defendants in the above-referenced cases which have been linked to funding and supporting the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

27. Based upon information and belief, the Wachters were involved in laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa.

28. As the foregoing demonstrates, Martin Wachter thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Martin Wachter's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANTS SCHREIBER AND ZINDEL, FRANK ZINDEL, ENGELBERT SCHREIBER, AND ENGELBERT SCHREIBER, JR.

1. The name of the defendant to whom this Statement pertains is Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr..   The alleged misconduct and basis for liability is set forth below as well as described elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as  can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**EXHIBIT**

**D**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impairthe due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra* 5, affairs and participated in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the

Page 2

Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c.   The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.   The predicate act is not based upon a criminal conviction.

e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., and illegal activity to generate material support to continue its terrorist operations.

c.   Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. was not an employee, officer or director of the Enterprise, based upon present information available. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. is associated with the alleged Enterprise. Schreiber and Zindel, Frank Zindel, Engelbert

Schreiber and Engelbert Schreiber, Jr. is a member of the Enterprise, and is separate and distinct from the Enterprise.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.  Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

Page 5

b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., of both those goals and the uses to which the Funds were put.

b.  The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.  The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the

Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.  The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr..  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr..  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr..  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the

Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The Federal Causes of Action Against Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. are as follows:  Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows:  Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly

Page 8

or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. For many years, the firm of Schreiber and Zindel has been used to launder money for Abdullah Omar Naseef, an individual associated with the SAAR Foundation and Rabita Trust[1], both of which are co-defendants in the above-referenced actions. Laundering the money occurred through the Al Taqwa Bank, also a co-defendant in the above-referenced cases. All three entities, SAAR, Rabita Trust and Al Taqwa Bank have been sanctioned by the U.S. Government.

23. Documents from the Government of Liechtenstein reveal that Schreiber and Zindel were "gatekeepers" for laundering funds through Al Taqwa for terrorist recipients, for many years. Some sources in Liechtenstein say that Schreiber and Zindel were instrumental in establishing Al Taqwa Bank as a shell for this purpose.

24. Schreiber and Zindel is run by Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.

25. Liechtenstein officials and separate documentation from a variety of sources also claim that Schreiber and Zindel were involved in laundering money from the Iraqi Oil-For-Food Program, along with the Al Qaida.

26. According to a published report, Engelbert Schreiber and Engelbert Schreiber, Jr. are listed on corporate documents for Nasreddin International Group Ltd. Holding, a co-defendant in this case, and a company which was also sanctioned by the United States Government. This company is owned by Ahmed Idris

---

[1] Specific misconduct regarding Rabita Trust, a co-defendant herein, is provided via More Definite Statement. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Nasreddin, the principal owner of Al Taqwa Bank, is an individual who has also been sanctioned United States Government.  Since 1993, Engelbert Schreiber, who was later replaced by his son, Engelbert Schreiber, Jr., have been trustees of Nasreddin Group International Limited Holdings, also known as Nasreddin International Group Ltd.

27. In April 1999, the German intelligence service (BND) reported that Engelbert Schreiber was arrested in August 1997 for money laundering.  The 1999 BND report identified Engelbert Schreiber as a significant money launderer, who has had a close relationship with the Caracas/Venezuela mafia families Cuntrera-Caruana-Caldarella.

28. As owners and directors of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

29. Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long known that accounts, under their control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. continued to permit, make available, assist, and maintain those accounts.

30. As the foregoing demonstrates, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.'s participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

31. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT D_NAME

1. The name of the defendant to whom this Statement pertains is D_Name.  The
   alleged misconduct and basis for liability is set forth below as well as described
   elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the
   defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
   al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka,
   et al.* (SDNY 04-CV-1923 (RCC)), other cases brought by other plaintiffs in *In Re
   Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others.
   Plaintiffs will separately file Statements with respect to the misconduct of certain
   of the other defendants.  Given the vastly complicated nature of the conspiracy
   and other wrongdoing that led to the events of September 11, 2001, however,
   much information is unavailable to plaintiffs, and the identities of other
   wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore
   reserve the right to amend this Statement as information is learned and verified
   and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as  can be found on
   the More Definite Statement, Victims List ("Victims List").  The victims consist
   of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the
   World Trade Center in New York, NY, the Pentagon Building in Arlington County,
   Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist
   attacks on September 11, 2001 (with the events at the World Trade Center in New
   York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner
   crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related
   thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal
   representatives (including executors, estate administrators and trustees) entitled to
   bring legal action on behalf of any individual who died as the result of terrorist
   attacks on September 11, 2001; but excluding (3) all individuals, and all spouses,
   children, parents, siblings, and legal representative of individuals identified by the
   Attorney General of the United States or otherwise shown to have perpetrated, aided
   and abetted, conspired in regard to, or otherwise supported the terrorist attacks of
   September 11, 2001.  Victims List sets forth the names of the decedents killed by the
   attackers, with the category of "victims" further including their spouses, children,
   parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by
   death, and all economic damages resulting from such deaths, and actions of the
   defendants and their co-conspirators as described herein.

5. Please find below a description, in detail, of the pattern of racketeering activity
   for each RICO claim:

**EXHIBIT**

**E**

a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

b. In the Mid 1990's to September 11, 2002, D_Name conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. D_Name conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, D_Name conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d. The predicate act is not based upon a criminal conviction.

e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including D_Name, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

a.   The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that

Page 3

are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.   Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. D_Name fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including D_Name, and illegal activity to generate material support to continue its terrorist operations.

c.   Sercor Treuhand Anstalt was not an employee, officer or director of the Enterprise, based upon present information available.  Sercor Treuhand Anstalt is associated with the alleged Enterprise.  Sercor Treuhand Anstalt is a member of the Enterprise, and is separate and distinct from the Enterprise.  Sercor Treuhand Anstalt intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by Sercor Treuhand Anstalt is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.   The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sercor Treuhand Anstalt funds that activity, which activity

culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sercor Treuhand Anstalt, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. D_Name acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a. Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b. The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a. The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is

Page 5

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\E_Sercor - More Definite Statement - Iraqjsg.doc

offered.   After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Sercor Treuhand Anstalt, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.   They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.   Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.   The money raised from these various sources (the "Funds"), including Sercor Treuhand Anstalt, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Sercor Treuhand Anstalt, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.   The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.   The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.   The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.   All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.   From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Sercor Treuhand Anstalt.   Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Sercor Treuhand Anstalt. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select

from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sercor Treuhand Anstalt. Sercor Treuhand Anstalt, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Sercor Treuhand Anstalt also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Sercor Treuhand Anstalt are as follows: Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.*; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows:  Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Sercor Treuhand Anstalt has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.   Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.   Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

21. Sercor Treuhand Anstalt has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.   Sercor Treuhand Anstalt conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.   Sercor Treuhand Anstalt conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Sercor Treuhand Anstalt is owned and managed by Martin Wachter[1] and Erwin Wachter[2], co-defendants in the above-referenced case.

---

[1] Specific misconduct regarding Martin Wachter, a co-defendant herein, is provided via RICO Statement Applicable to Martin Wachter.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Martin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Erwin Wachter, a co-defendant herein, is provided via RICO Statement Applicable to Erwin Wachter.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Erwin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

Page 8

23. As the foregoing demonstrates, Sercor Treuhand Anstalt thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Sercor Treuhand Anstalt's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

24. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO ASAT TRUST REG.

1. The name of the defendant to whom this Statement pertains is Asat Trust Reg. ("Asat").  The alleged misconduct and basis for liability is set forth below as well as described elsewhere in the Complaint, as amended.

2. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of certain of the other defendants.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.  Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

3. The name of each victim is indicated on the attached hereto as  can be found on the More Definite Statement, Victims List ("Victims List").  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

4. The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

**EXHIBIT**

**F**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Asat conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Asat, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.  A description of the Enterprise is as follows:

a.  The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating

Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Asat fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Asat, and illegal activity to generate material support to continue its terrorist operations.

c.  Asat was not an employee, officer or director of the Enterprise, based upon present information available.  Asat is associated with the alleged Enterprise.  Asat is a member of the Enterprise, and is separate and distinct from the Enterprise.  Asat intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Asat is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Asat funds that activity, which activity culminated in the Attack.

Page 4

The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Asat, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Asat acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is

offered.   After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Asat, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.   The money raised from these various sources (the "Funds"), including Asat, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Asat, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.   The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.   The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.   All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.   From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Asat.   Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Asat.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance

provided by Asat.  Asat, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Asat also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Asat are as follows:  Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows:  Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Plaintiffs hereby incorporate all allegations and counts contained in the complaint as amended in *Estate of John P. O'Neill, Sr., et al. v. Iraq, et al.* (04-CV-1076 (RCC)), including all of the allegations and claims contained therein.

20. Asat has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Asat conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Asat conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

22. Asat Trust was designated by the United States and the United Nations as a terrorist-related entity.  The Office of Foreign Assets Control, of the United States Treasury, froze their assets due to their links to Al Taqwa, their individual activities to support terrorism and their financial support of the Al Qaida.

23. Asat Trust has been involved with the Al Taqwa network during the last thirty (30) years, registering changes in company names, personnel and financial structure, along with many other duties.  Al Tawqa is a co-defendant in the above-referenced cases.  In fact, many of the transactions of Al Taqwa and the Himmat Establishment were undertaken in care of Asat Trade Regulation.

24. Al Taqwa has also been designated as a terrorist-related entity and has been linked to significant support of the al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. At the time of the Bank's designation President George Bush declared, "Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world.  Al Taqwa raises funds for Al Qaeda."

25. Asat Trust is owned by Youssef M. Nada, a co-defendant in the above-referenced cases.  Youssef M. Nada has been designated as a person who supports terrorism by the Department of the Treasury, Office of Foreign Assets Control.  He was sanctioned as a sponsor of al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

26. Asat Trust, based in Liechtenstein, is headed and directed by Martin Wachter[1] and Erwin Wachter[2] (collectively referred to as the "Wachters"). Additionally, available information reveals a pattern of activity over a period of many years of the Wachters working at the same address registered to Asat Trust.

27. Both Wachters, Erwin and Martin, also own Sercor Treuhand Anstalt, a co-defendant in this action. As owners and heads of Asat Trust and Sercor Treuhand Annstalt, the Wachters oversaw the activities and had knowledge of the activities that supported the al Qaida.

28. Bothe Wachters have long known that accounts, under the control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

29. Despite this knowledge, the Wachters continued to permit, make available, assist and maintain those accounts.

30. There is additional information which links the Wachters and Asat Trust to Al Taqwa and its executives Youssef M. Nada, Ahmed Idris Nasreddin, Albert Friedrich Armand Huber, and Ali Ghaleb Himma, co-defendants who have been linked to funding al Qaida.

31. Via Galp International Trading Establishment, which Asat Trust also represented, the Wachters and Asat Trust have also been linked in news reports to laundering funds on behalf of the Food-for-Oil program and moving the money through Al Taqwa Enterprise.

32. As the foregoing demonstrates, Asat thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Asat's

---

[1] Specific misconduct regarding Martin Wachter, a co-defendant herein, is provided via More Definite Statement Applicable to Martin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Martin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

[2] Specific misconduct regarding Erwin Wachter, a co-defendant herein, is provided via More Definite Statement Applicable to Erwin Wachter. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite statement Applicable to Erwin Wachter, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* 04-CV 1076.

participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

33. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
    GINA M. MAC NEILL, ESQUIRE (GM 0581)
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS
TO DEFENDANT TAHA AL ALWANI A/K/A DR. TAHA JABIR AL'ALWANI

1. The name of the defendant to whom this Statement pertains is Taha Al Alwani
a/k/a Dr. Taha Jabir Al'Alwani (referred to as "Al Alwani").  The alleged
misconduct and basis for liability is set forth below as well as elsewhere in the
Complaint.

2. All known wrongdoers are named as defendants in this action, as well as the
defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et
al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, Sr., et al. v. Al
Baraka Investment and Development Corp. at al., Civil Action No.: 04-CV- 1923
(RCC)*, other cases brought by other plaintiffs in *In Re Terrorist Attacks on
September 11, 2001* (03-MDL-1570 (RCC)), and others.  Plaintiffs will separately
file Statements with respect to the misconduct of certain of the other defendants.
Given the vastly complicated nature of the conspiracy and other wrongdoing that
led to the events of September 11, 2001, however, much information is
unavailable to plaintiffs, and the identities of other wrongdoers may be revealed
through discovery or otherwise.  Plaintiffs therefore reserve the right to amend
this Statement as information is learned and verified and after discovery or other
information is obtained.

3. The name of each victim can be found on the More Definite Statement, Victims
List ("Victims List").  The victims consist of (1) all spouses, children, parents,
siblings, or heirs of any individual who died at the World Trade Center in New York,
NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in
Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001
(with the events at the World Trade Center in New York, N.Y., the Pentagon
Building in Arlington County, Virginia, and the airliner crash in Shanksville,
Pennsylvania, on September 11, 2001, and activities related thereto, collectively
referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including
executors, estate administrators and trustees) entitled to bring legal action on behalf of
any individual who died as the result of terrorist attacks on September 11, 2001; but
excluding (3) all individuals, and all spouses, children, parents, siblings, and legal
representative of individuals identified by the Attorney General of the United States or
otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or
otherwise supported the terrorist attacks of September 11, 2001.  The Victims List
sets forth the names of the decedents killed by the attackers, with the category of
"victims" further including their spouses, children, parents, siblings or heirs as set forth
above.

4. The manner in which the victims were injured consists of death, suffering caused by
death, and all economic damages resulting from such deaths, and actions of the
defendants and their co-conspirators as described herein.

**EXHIBIT**

**G**

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY Penal § 105.15; NY Penal § 125.25 (xi)

- Conspiracy to commit arson - NY Penal § 105.15; NY Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1),(2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

    b. In the Mid 1990's to September 11, 2002, Al Alwani conducted or participated, directly or indirectly, in the conduct of the Enterprise's, as defined *supra*, affairs and participated in the operation or management of the operation of the Enterprise itself. Al Alwani conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Throughout this period, Al Alwani conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

    c. The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

    d.   The predicate act is not based upon a criminal conviction.

    e.   Civil litigation has not yet resulted in a judgment regarding the predicate acts.

    f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

    g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Al Alwani, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.   A description of the Enterprise is as follows:

    a.   The Enterprise ('Radical Muslim Terrorism' or "al Qaida" or 'International Islamic Front for the Jihad Against Jews and Crusaders') ('Enterprise') is comprised of the defendants named in the Original Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

    b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ('Bin Ladin') formed an organization called 'The Foundation' or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that

are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Al Alwani fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Al Alwani, and illegal activity to generate material support to continue its terrorist operations.

   c. Al Alwani was not an employee, officer or director of the Enterprise, based upon present information available. Al Alwani is associated with the alleged Enterprise. Al Alwani is a member of the Enterprise, and is separate and distinct from the Enterprise. Al Alwani intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Al Alwani is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Alwani funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment,

Page 4

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\G_Taha - More Definite Statement - Iraq_92805.doc

indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Al Alwani, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11. Al Alwani acquired or maintained an interest or control in the Enterprise.

12. With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

   a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

   b.  The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13. The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

   a.  The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida

Page 5

established itself in Afghanistan, and relied on well-placed financial facilitators, including Al Alwani, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the 'Funds'), including Al Alwani, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Al Alwani, of both those goals and the uses to which the Funds were put.

b.   The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

c.   The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the 'Operatives') and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

d.   The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Al Alwani.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Al Alwani.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Alwani.  Al Alwani, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at

Page 6

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Iraq\Iraq4\Exhibits\G_Taha - More Definite Statement - Iraq_92805.doc

least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Al Alwani   conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Al Alwani conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al Alwani also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14. The injuries to business or property suffered by the O'Neill Plaintiffs resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiffs jobs, businesses, and livelihoods.

15. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the 'reasonably foreseeable victims of a RICO violation' and the 'intended victims of the racketeering enterprise,' (that is, terrorism, the culmination of which was the Attack).

16. Each defendant is jointly and severally liable for all damages sustained by each plaintiff  subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17. The federal causes of action against Al Alwani are as follows:  Count Eight, Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*.; Count Nine, RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d).

18. The state causes of action are as follows:  Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19. Plaintiffs hereby incorporate all allegations, claims and counts contained in Plaintiff's Complaint, as amended.

20. Al Alwani has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Alwani conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Al Alwani conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

21. Al Alwani has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al Alwani conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al Alwani conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

22. Taha Jabir Al Alwani (Al Alawani) is President of the Graduate School of Islamic and Social Sciences (GSISS) in Leesburg, Virginia. The Graduate School for Social and Islamic Sciences (GSISS), trains Islamic clerics to minister to Muslim soldiers in the U.S. military, however, it is suspected by the U.S. government of raising funds for terrorism.

23. Al Alwani is also a founding member and president of the International Institute of Islamic Thought ("IIIT). The IIIT is a self-described "Islamic think tank" started by Sami Al-Arian, who was arrested by the U.S. government and is awaiting trial on charges that he was a key figure in the terrorist group Palestinian Islamic Jihad.

24. Taha Jabir Alawani was publicly identified in an affidavit by U.S. Customs special agent David Kane ("Kane") as a director of *"Safa Group companies including International Institute of Islamic Thought (IIIT), FIQH council of North America, Graduate School of Islamic & Social Sciences, and Heritage Education Trust."* In the affidavit, Kane wrote that "there is probable cause to believe that Alawani, along with others, conspired to commit various offenses, including the

Page 8

providing of material support or resources to foreign terrorist organizations in violation of 18 U.S.C. Para 2339B."

25. The Articles of Incorporation for the IIIT, dated October 8, 1980, which were included with the IIIT Application for Recognition of Exemption from Federal Income Tax (Form 1023), dated June 3, 1982, identify other individuals who were directors of WAMY,[1] a co-defendant, at that time. "These include Dr. Taha Jaber, whom I (Kane) believe to be the same as Taha Jaber Al- Alwani, Dr. Abdul Hamid Abu Sulayman, and Dr. Jamal Barzinji." On this document Al- Alwani, Barzinji and Abu Sulayman listed their address as World Assembly of Muslim Youth, P.O. Box 5472, Riyadh, Saudi Arabia.

26. According to a second affidavit filed by Kane in the US District Court in Eastern Virginia, Al- Awani's home was listed as a location to be searched: "The Residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia 1105 Safa Street in Herndon is the residence of Taha Jaber Al-Alwani, an officer and/or director of Safa Group companies including International Institute of Islamic Thought ('IIIT'), FIQH Council of North America ('FIQH'), Graduate School of Islamic & Social Sciences ('GSISS') (formerly known as the School of Islamic and Social Sciences ('SISS')) and Heritage Education Trust."

27. Kane further stated: "Various documents and videotapes obtained in Tampa searches show that Al Alwani, attended and spoke at Islamic Concern Project ('ICP') conferences with Al- Arian, Shallah, Sheik Odeh (spiritual leader and co-founder of Palestinian Islamic jihad ('PIJ')) and Sheik Rahman (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995). Inasmuch as ICP conferences were, in essence, PIJ conferences, I know that Al-Alwani has long been a supporter of PIJ."

28. Additionally, Kane said, 'In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa 36 (declaration) signed by Al-Alwani at some point between December 1988 and November 1989, proclaiming the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them."

29. Public documents show that the SAAR network was the primary backer of the PIJ front groups in the United States, World and Islam Studies Enterprise ('WISE') and Islamic Concern Project ('ICP').

---

[1]Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

Page 9

30. In fact, previously released correspondence and bank checks reveal that SAAR affiliates IIIT and Safa Trust funneled tens of thousands of dollars to the PIJ fronts. Al Alwani, in his capacity as President of the International Institute of Islamic Thought and an officer of the Heritage Education Trust and Safa Trust, has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America.

31. As the foregoing demonstrates, Al Alwani thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Alwani's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

32. The September 11th Attack was a direct, intended and foreseeable product of Al Alwani's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

33. Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date: September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232