**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to the Ministry of State for Internal Affairs for the Kingdom of Saudi Arabia** |

*This document relates to:*       Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*
                                                  04 CV 01922 (RCC)

**RICO STATEMENT APPLICABLE**
**TO THE MINISTRY OF STATE FOR INTERNAL AFFAIRS**
**FOR THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for the Ministry of State for Internal Affairs for the Kingdom of Saudi Arabia.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

109. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

110. The names of the defendants, to whom this RICO statement pertains is the Ministry of State for Internal Affairs for the Kingdom of Saudi Arabia ("Internal Affairs"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

111. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. the Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), along with others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

112. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in

217

regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, loss of and/or damage to tangible and intangible personal property, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

113.

    a.   <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15;  NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15;  NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. § 1344 |
| Relating to Unlawful Procurement of Citizenship or Naturalization Papers | 18 U.S.C. § 1425 |
| Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers | 18 U.S.C. § 1426 |
| Relating to the Sale of Naturalization or Citizenship Papers | 18 U.S.C. § 1427 |
| Obstruction of Justice | 18 U.S.C. § 1503 |
| Obstruction of a Criminal Investigation | 18 U.S.C. § 1510 |
| Obstruction of State or Local Law Enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| Fraud or Misuse of Visa Permits or Other Documents | 18 U.S.C. § 1546 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | |

|  | 18 U.S.C. § 1952 |
|---|---|
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B); 18 U.S.C. § 2339A;          18 U.S.C. § 2339B;          18 U.S.C. § 2339C |

b.   Dates of, the participants in, and a description of the facts surrounding the predicate acts:

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| mid-1990s to 9/11/2001 | The Kingdom of Saudi Arabia (the "Kingdom") and/or its Agencies, including the Directorate of Intelligence, the General Staff, Intelligence Section (G-2), _**the Ministry of State for Internal Affairs ("Internal Affairs")**_, the Ministry of Interior, the Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Council of Ministers, and the Special Committee of the Council of Ministers (collectively known as "Agencies"), and/or its Agents, including but not limited to certain charities such as Muslim World League, the Internal Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi Joint Relief Committee, the | Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Internal Affairs and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |

| | | |
|---|---|---|
| | Benevolence Foundation, and certain individuals including but not limited to Prince Abdullah Al Faisal bin Abdulaziz Al Saud, Prince Bandar bin Sultan bin Abdulaziz Al Saud, Prince Naif bin Abdulaziz Al Saud, Prince Salman bin Abdul Aziz Al Saud, Prince Sultan bin Abdulaziz Al Saud, Prince Turki Al Faisal Al Saud, and certain commercial entities including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom of Saudi Arabia (these charities, individuals, commercial entities and other actors are collectively referred to as "Agents") | |
| Late 1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Internal Affairs,  and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Internal Affairs, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, undertook actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agencies, specifically referring to the Internal Affairs, and/or its Agents. |
| Mid-1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Internal Affairs, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Internal Affairs, and/or its Agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990's to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | The Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or its Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

| | | |
|---|---|---|
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agencies, specifically referring to the Internal Affairs, and/or its Agents. |
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Internal Affairs, and/or Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | In violation of 18 U.S.C. § 371, the Kingdom, through its Agencies, specifically referring to the Internal Affairs, and/or Agents, conspired to and did defraud the United States Government of taxes legally due. |
| Mid-1990s to 9/11/2001 | The Kingdom,  through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agencies, specifically referring to the Internal Affairs, and/or Agents, conspired to and did file false or materially false tax returns. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Internal Affairs, and/or its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agencies, specifically referring to the Internal Affairs, and/or Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws. |

      c.   Not applicable.

      d.   No.

      e.   No.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.  The Kingdom, through its Agencies, specifically referring to the Internal Affairs, and Agents consistently, evenly, constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.  The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically including the Kingdom , directly and through its Agencies, specifically referring to the Internal Affairs, and Agents, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

114.

a.  The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts,

the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    c.   No.

    d.   The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents are associated with the alleged enterprise.

    e.   The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents are a member of the Enterprise, and are separate and distinct from the Enterprise.

    f.   The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

115. The pattern of racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents are separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but were a necessary component to the Attack.

116. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

117. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

118. The Enterprise, and the racketeering activities conducted by the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.   Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

119. Not applicable.

120. Not applicable to this defendant.

121.

    a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

b.  The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

122. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents.  The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  The Kingdom, its Agencies, specifically referring to the Internal Affairs, and its Agents also, with knowledge and intent, agreed to and did aid and abet all of the above illegal

activities, RICO predicate acts, and RICO violations.

123. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

124. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

125. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.   The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

126.

| | |
|---|---|
| **Count One** | Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 |
| **Count Two** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Three** | Alien Tort Claims Act 28 U.S.C. §1350 |
| **Count Ten** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
| **Count Eleven** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Thirteen** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| | |
|---|---|
| **Count Four** | Wrongful Death |
| **Count Five** | Survival |
| **Count Six** | Negligent and Intentional Infliction or Emotional Distress |

| Count Seven | Conspiracy |
|---|---|
| Count Eight | Aiding and Abetting |
| Count Nine | Negligence |
| Count Twelve | Punitive Damages |

26.   Not applicable

Date: February 9, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____          GINA M.
MAC NEILL, ESQUIRE
(GM 0581)

BY: _____          JERRY S.
GOLDMAN,  ESQUIRE
(JG 8445)

Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Ministry of State for Internal Affairs for the Kingdom of Saudi Arabia ("Internal Affairs") | Based upon information and belief, Internal Affairs is a ministry involved in Saudi Intelligence.<br><br>Saudi Intelligence has provided covert aid to various factions in Lebanon and Syria as well as serves as the channel for aid to Palestinian suicide bombers.  There is evidence which links Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders to Intelligence officers in the Saudi regime.  In particular, Saudi Intelligence has served as bin Laden's nexus to the Wahhabi charities, foundations and other funding networks. It must be noted that Wahhabism is a form of extreme, strict and conservative Muslim belief, which many equate to being a form of Radical Muslim religion.  Wahhabism is the primary religion within Saudi Arabia.<br><br>The growth and development of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia, specifically the Internal Affairs, and members of its royal family.<br><br>The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's, specifically the Internal Affairs, participation.<br><br>Kingdom of Saudi Arabia, specifically the Internal Affairs, controlled elements of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom, specifically the Internal Affairs. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom of | The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various | |

| Saudi Arabia | Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing justice, criminal investigations, and local law enforcement efforts with respect to the activities of the Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
|---|---|---|

In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government. This Special Committee of the Council of Ministers is funded entirely from Saudi government funds. The Special Committee decides which "charities" to fund and provides grants to selected entities.

Additionally, in 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission. As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd") set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups. The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.

The 9/11 Commission report states that:

> "The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities. Charitable giving, or *zakat*, is one of the five pillars of Islam. It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. Funding charitable works is an integral function of the governments in the Islamic world. ***It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax.*** Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Addionally, the 9/11 Commission report states that the "Saudi domestic charities (ex. Muslim World League) are regulated by the Ministry of Labor and Social Welfare, while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of

Islamic Affairs."  (comment in parenthesis added).

The Saudi Arabian government thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

According to intelligence experts and officials of the United States Government, Saudi Arabia has channeled millions of dollars to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. These funds are directed to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and  Crusaders  through  various  Saudi-based "charities" which, as described above, are under the Saudi Arabian government's effective control. Such charities include, but are not limited to, the Muslim World  League,  al-Haramain  Islamic  Foundation, International Islamic Relief Organization (IIRO), Benevolence  International  Foundation,  Blessed Relief (Muwafaq) Foundation, Rabita Trust, SAAR Foundation, Safa Trust, International Institute for Islamic Thought (niT), Sanabel Al Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim Youth (WAMY).

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, *I work for the Government of Saudi Arabia*. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means ***we are controlled in all our activities and plans by the Government of Saudi Arabia***. Keep that in mind, please … I am paid by my organization which is

funded by the [Saudi] Government. . . *The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.* If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, stating as follows:

> "It would be incorrect to view these charities as purely non-governmental organizations . . . . [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi Cabinet Member, chairs the Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable contributions from the Saudi Royal Family that have been detailed in Saudi periodicals.

In a separate report, U.S. intelligence reports revealed that Saudi officials began supporting  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden in 1996.

According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy, "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader."

In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd. Among the items

found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo. Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities" were funneling contribution to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations. Defendant Saudi Arabia knew, or should have known, that  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties would materially benefit from those contributions, and use the funds received from those "charities" to finance terrorist attacks against the United States, its nationals and allies.

Despite its express awareness, for several years prior to September 11, 2001 that Saudi "charities" were funneling contributions to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi failed to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them from continuing to finance terrorism, in violation of its obligations under United Nations Security Council Resolutions 49/60, 1269, 133, and 1363. In this regard, an Independent Task Force sponsored by the Council on  Foreign Relations to investigate the sources of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders funding concluded as follows:

"[I]t is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaida; and for years, Saudi officials

have turned a blind eye to this problem."

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated terrorist organizations, persons, organizations, commercial entities, and other parties would materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate the "charities" which were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and otherwise prevent those "charities" from continuing to finance terrorism.

Defendant Saudi Arabia has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, but not limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity Committee, the Islamic Society, and Egyptian Islamic Jihad. By virtue of its affiliation with other foreign terrorist organizations sponsored by Saudi Arabia, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would materially benefit from its sponsorship of other foreign terrorist organizations, and that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden. The support provided by Saudi Arabia to Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders assisted in and contributed to the preparation and execution of the plans

| | | |
|---|---|---|
| | that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.<br><br>The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>The growth and development of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia and members of its royal family.<br><br>The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's participation.<br><br>Kingdom of Saudi Arabia controlled elements of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom. | |
| The Kingdom, through its Agent National Commercial Bank ("NCB") | The Kingdom's Agent NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' preferred banks for many years, maintaining accounts for many of the charity defendants that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise.  NCB knowingly facilitates Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' fundraising by advertising the existence and numerical designations of the accounts it maintains for Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' cooperating charities throughout the Muslim world, so that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders supporters can deposit funds directly into those accounts for the benefit of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through the International Islamic Relief Organization, and also transferred significant funding to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through Blessed Relief Foundation accounts it maintained. | |
| The Kingdom, through its Agent the Saudi American Bank |   The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in the Sudan during the years that the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport.

  Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. | 18 U.S.C. §§

1962 (b),

1962(c),

1962(d) |
| The Kingdom, through its Agent the Saudi High Commission |   The Saudi High Commission has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support | 18 U.S.C. §§ |

| | | |
|---|---|---|
| | infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated Foreign Terrorist Organizations. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Muslim World League (the "MWL") | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust.<br><br>The MWL has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated FTOs. The MWL has provided substantial material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence International Foundation.<br><br>The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:<br><br>    "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

|  | employee of that government. Second, the IIRO is a relief branch of that organization which means we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."<br><br>  The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government. |  |
|---|---|---|
| The Kingdom, through its Agent International Islamic Relief Organization (the "IIRO") |   The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure, and the IIRO has long operated as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training.  Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent the Rabita Trust |   The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and | 18 U.S.C. §§<br><br>1962 (b), |

| | | |
|---|---|---|
| | Crusaders. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent the Benevolence International Foundation (the "BIF") | BIF is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs BIF operations, appoints and terminates BIF personnel, provides BIF with virtually all of its funding, determines how funds will be distributed throughout the World, and otherwise stringently controls BIF's operations. In many countries, BIF conducts operations from the local Saudi Embassy, under the supervision of the embassy's Islamic Affairs Division.<br><br>BIF is an apparent charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League, and has frequently shared common officers and directors with that organization.<br><br>BIF has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. On November 19,2002, BIF was designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and/or affiliated foreign terrorist organizations, associations, organizations or persons.<br><br>Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. On January 6, 2003, federal prosecutors filed a proffer in the criminal prosecution of Enaam Arnaout which details at length the pervasive | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

involvement, and material support of BIF, and of its executives and employees, in sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations. This support included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters, and sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders camps throughout the World.

BIF played a pivotal role in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders affiliated fighters. BIF also facilitated the movement of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters into the region by falsely representing to authorities that those terrorists would be working as BIF relief workers. In March 2002, Basonian police raided BIF's Sarajevo offices and recovered extensive documentation relating to the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations, including contributions of various individuals and charities to the terrorist organizations development and expansion.

BIF also played an equally important role in the infrastructure supporting the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in Chechnya. BIF provided material support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters supporting Chechnya mujihadeen by supplying military informs, financing, and anti-mine boots.

BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities.

BIF used the U.S. financial system, mainly through BIF's US operation, extensively to launder money for Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of

| | the funds to a known source. | |
|---|---|---|
| The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY") | WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders's financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership in Afghanistan and operational cells throughout the world.<br><br>The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a General Assembly and President who is appointed by the Saudi government. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent, the Saudi Red Crescent (the "SRC") | The SRC has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.<br><br>Prior to its dissolution, Al Haramain was one of the principle | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | Islamic non-governmental organizations that provided support for the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its website, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | |
| The Kingdom, through its Agent Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince Abdullah") | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror. Further, Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities in Europe, served for many years as Prince Abdullah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership. Thus, through his official and personal acts, Prince Abdullah has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that this support would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") | In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, thereby providing critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against | 18 U.S.C. §§ 1962 (b), 1962(c), |

| | | |
|---|---|---|
| | Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(d) |
| The Kingdom, through its Agent Prince Naif bin Abdulaziz Al Saud ("Prince Naif") | In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders members and loyalists.  Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' presence and operations in Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure. Remarkably, Prince Naif publicly denied Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' responsibility for the Attack. Further, Prince Naif has also made large personal contributions to Saudi-based charities for the purpose supporting terrorism, with the knowledge and intent the contributions he made would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, has donated substantial funds to several other charities that operate within  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund  Radical Muslim terrorism, and/or the al | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, Through its Agent Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan) | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, which Saudi-based charities were providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Rather than intervening to stem the flow of money and support from the charities to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations Prince Sultan knew and intended that the contributions he made to these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, but has nonetheless provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

Prince Sultan further made substantial contributions to certain charities which sponsored or supported Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, without limitation, IIRO, Al Haramain, Muslim World League and WAMY.

Prince Sultan directly aided and abetted and materially | 18 U.S.C. §§

1962 (b),

1962(c),

1962(d) |

<table>
<tr><td></td><td>sponsored  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Islamic terrorism, through these contributions and supervised the charities, or, in the alternative, was grossly negligent in supervising the charities, knowing they would be used to sponsor terrorism.<br><br>  Prince Sultan has been Minister of Defense and Aviation, Chairman of the Supreme Council of Islamic Affairs, Second Deputy Prime Minister of the Council of Ministers, and, on information and belief, is the Third highest ranking member of the Saudi Government, and a brother of the King.</td><td></td></tr>
<tr><td>The Kingdom, through its Agent Prince Turki Al Faisal Al Saud ("Prince Turki")</td><td>  During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time,  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, and coordinated the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by several wealthy members of Saudi society, knowing that all such contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.<br><br>  Prince Turki was aware of the terrorist threat originating from Osama Bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>  Prince Turki met several times with Osama Bin Laden and or Osama Bin Laden's representatives on behalf of the Saudi Government and offered not to extradite him and otherwise provide him and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders with support, in exchange for protection.</td><td>18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d)</td></tr>
</table>

| | | |
|---|---|---|
| | Prince Turki facilitated money transfers from wealthy Saudi's to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban.<br><br>Prince Turki made contributions to charities he knew were sponsors or affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | |

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to the Saudi Committee for the Support of the Intifada for the Kingdom of Saudi Arabia** |

*This document relates to:*     Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*
04 CV 01922 (RCC)

**RICO STATEMENT APPLICABLE**
**TO THE SAUDI COMMITTEE FOR THE SUPPORT OF THE INTIFADA**
**FOR THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for the Saudi Committee for the Support of the Intifada for the Kingdom of Saudi Arabia.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

127. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b), 1962(c) and/or (d).

128. The names of the defendants, to whom this RICO statement pertains is the Saudi Committee for the Support of the Intifada for the Kingdom of Saudi Arabia ("Support of the Intifada"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

129. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. the Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), along with others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

130. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney

245

General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, loss of and/or damage to tangible and intangible personal property, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

131.

 a. <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY  Penal § 105.15;      NY  Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY  Penal § 105.15;      NY  Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. § 1344 |
| Relating to Unlawful Procurement of Citizenship or Naturalization Papers | 18 U.S.C. § 1425 |
| Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers | 18 U.S.C. § 1426 |
| Relating to the Sale of Naturalization or Citizenship Papers | 18 U.S.C. § 1427 |
| Obstruction of Justice | 18 U.S.C. § 1503 |
| Obstruction of a Criminal Investigation | 18 U.S.C. § 1510 |
| Obstruction of State or Local Law Enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| Fraud or Misuse of Visa Permits or Other Documents | 18 U.S.C. § 1546 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |

| | |
|---|---|
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B); 18 U.S.C. § 2339A;        18 U.S.C. § 2339B;        18 U.S.C. § 2339C |

b. Dates of, the participants in, and a description of the facts surrounding the predicate acts:

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | The Kingdom of Saudi Arabia (the "Kingdom") and/or its Agencies, including the Directorate of Intelligence, the General Staff, Intelligence Section (G-2), the Ministry of State for Internal Affairs, the Ministry of Interior, ***the Saudi Committee for Support of the Intifada ("Support for the Intifada")***, the Supreme Council of Islamic Affairs, the Council of Ministers, and the Special Committee of the Council of Ministers (collectively known as "Agencies"), and/or its Agents, including but not limited to certain charities such as Muslim World League, the Internal Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi | Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Support of the Intifada and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |

| | | |
|---|---|---|
| | Joint Relief Committee, the Benevolence Foundation, and certain individuals including but not limited to Prince Abdullah Al Faisal bin Abdulaziz Al Saud, Prince Bandar bin Sultan bin Abdulaziz Al Saud, Prince Naif bin Abdulaziz Al Saud, Prince Salman bin Abdul Aziz Al Saud, Prince Sultan bin Abdulaziz Al Saud, Prince Turki Al Faisal Al Saud, and certain commercial entities including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom of Saudi Arabia (these charities, individuals, commercial entities and other actors are collectively referred to as "Agents"). | |
| Late 1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Support of the Intifada,  and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Support of the Intifada, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, undertook actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agencies, specifically referring to the Support of the Intifada, and/or its Agents. |
| Mid-1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Support of the Intifada, and/or its Agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990's to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | The Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection |

| | | with the Enterprise. |
|---|---|---|
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agencies, specifically referring to the Support of the Intifada, and/or its Agents. |
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Support of the Intifada, and/or Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | In violation of 18 U.S.C. § 371, the Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and/or Agents, conspired to and did defraud the United States Government of taxes legally due. |
| Mid-1990s to 9/11/2001 | The Kingdom,  through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and/or Agents, conspired to and did file false or materially false tax returns. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and/or its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and/or Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws. |

c.   Not applicable.

d.   No.

e.    No.

f.    The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. The Kingdom, through its Agencies, specifically referring to the Support of the Intifada, and Agents consistently, evenly, constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.    The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically including the Kingdom , directly and through its Agencies, specifically referring to the Support of the Intifada, and Agents, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

132.

a.    The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example,

had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    c.   No.

    d.   The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents are associated with the alleged enterprise.

    e.   The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents are members of the Enterprise, and are separate and distinct from the Enterprise.

    f.   The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

133. The pattern of racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents are separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but were a necessary component to the Attack.

134. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents fund that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

135. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

136. The Enterprise, and the racketeering activities conducted by the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

137. Not applicable.

138. Not applicable to this defendant.

139.

    a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

140. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents. The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Kingdom, its Agencies, specifically referring to the Support of the Intifada, and its Agents also, with knowledge and intent, agreed to and did aid and

abet all of the above illegal activities, RICO predicate acts, and RICO violations.

141. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

142. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

143. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.   The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

144.

| Count One | Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 |
|---|---|
| Count Two | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| Count Three | Alien Tort Claims Act 28 U.S.C. §1350 |
| Count Ten | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
| Count Eleven | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| Count Thirteen | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| Count Four | Wrongful Death |
|---|---|
| Count Five | Survival |
| Count Six | Negligent and Intentional Infliction or Emotional Distress |
| Count Seven | Conspiracy |

| Count Eight | Aiding and Abetting |
|---|---|
| Count Nine | Negligence |
| Count Twelve | Punitive Damages |

27.  Not applicable

Date: February 9, 2005

LAW OFFICES OF JERRY S. GOLDMAN
    & ASSOCIATES, P.C.

BY:_____          GINA M.
        MAC NEILL, ESQUIRE
        (GM 0581)

BY: _____          JERRY S.
        GOLDMAN,  ESQUIRE
        (JG 8445)

        Attorneys for the Plaintiffs
        111 Broadway, 13th Floor
        New York, N.Y. 10006
        212.242.2232

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Saudi Committee for the Support of the committee Intifada for the Kingdom of Saudi Arabia ("Support of the Intifada") | The Saudi Committee for the Support of the Intifada for the Kingdom of Saudi Arabia represented that this committee provided general humanitarian aid.<br><br>However, it was discovered that the Saudis provided funds to the Palestinians for payments to martyrs and their families, referring to Palestinian suicide attacks, in the amount of 154,709,000 Saudi Riyals.<br><br>This committee was established and is headed by Prince Naif bin Abdul Aziz ("Prince Naif"). More information relating to Prince Naif is below.<br><br>The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia, specifically the Support of the Intifada, and members of its royal family.<br><br>The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's, specifically the Support of the Intifada, participation.<br><br>Kingdom of Saudi Arabia, specifically the Support of the Intifada, controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom, specifically the Support of the Intifada. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom of Saudi Arabia | The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing justice, criminal investigations, and local law enforcement efforts with respect to the activities of the | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c), |

| | | |
|---|---|---|
| | Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent. | 1962(d) |

In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government. This Special Committee of the Council of Ministers is funded entirely from Saudi government funds. The Special Committee decides which "charities" to fund and provides grants to selected entities.

Additionally, in 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission. As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd") set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups. The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.

The 9/11 Commission report states that:

"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities. Charitable giving, or *zakat*, is one of the five pillars of Islam. It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. Funding charitable works is an integral function of the governments in the Islamic world. *It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax*. Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Addionally, the 9/11 Commission report states that the "Saudi domestic charities (ex. Muslim World League) are regulated by the Ministry of Labor and Social Welfare, while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs." (comment in parenthesis added).

The Saudi Arabian government thus had direct supervision and control regarding the destination of

government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

According to intelligence experts and officials of the United States Government, Saudi Arabia has channeled millions of dollars to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. These funds are directed to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through various Saudi-based "charities" which, as described above, are under the Saudi Arabian government's effective control. Such charities include, but are not limited to, the Muslim World League, al-Haramain Islamic Foundation, International Islamic Relief Organization (IIRO), Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation, Rabita Trust, SAAR Foundation, Safa Trust, International Institute for Islamic Thought (niT), Sanabel Al Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim Youth (WAMY).

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, *I work for the Government of Saudi Arabia*. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means *we are controlled in all our activities and plans by the Government of Saudi Arabia*. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . *The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of*

257

*the Government of Saudi Arabia*. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, stating as follows:

> "It would be incorrect to view these charities as purely non-governmental organizations . . . . [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi Cabinet Member, chairs the Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable contributions from the Saudi Royal Family that have been detailed in Saudi periodicals.

In a separate report, U.S. intelligence reports revealed that Saudi officials began supporting  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden in 1996.

According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy, "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader."

In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd. Among the items found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State

Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo. Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities" were funneling contribution to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations. Defendant Saudi Arabia knew, or should have known, that  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties would materially benefit from those contributions, and use the funds received from those "charities" to finance terrorist attacks against the United States, its nationals and allies.

Despite its express awareness, for several years prior to September 11, 2001 that Saudi "charities" were funneling contributions to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi failed to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them from continuing to finance terrorism, in violation of its obligations under United Nations Security Council Resolutions 49/60, 1269, 133, and 1363. In this regard, an Independent Task Force sponsored by the Council on  Foreign Relations to investigate the sources of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders funding concluded as follows:

> "[I]t is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaida; and for years, Saudi officials have turned a blind eye to this problem."

Defendant Saudi Arabia knew, or should have known, that

Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated terrorist organizations, persons, organizations, commercial entities, and other parties would materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate the "charities" which were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and otherwise prevent those "charities" from continuing to finance terrorism.

Defendant Saudi Arabia has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, but not limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity Committee, the Islamic Society, and Egyptian Islamic Jihad. By virtue of its affiliation with other foreign terrorist organizations sponsored by Saudi Arabia, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would materially benefit from its sponsorship of other foreign terrorist organizations, and that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden. The support provided by Saudi Arabia to Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

|  | The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. |  |
|---|---|---|
|  | The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia and members of its royal family. |  |
|  | The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's participation. |  |
|  | Kingdom of Saudi Arabia controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them. |  |
|  | All activities of members of the royal family were done on behalf of or at the behest of the Kingdom. |  |
| The Kingdom, through its Agent National Commercial Bank ("NCB") | The Kingdom's Agent NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' preferred banks for many years, maintaining accounts for many of the charity defendants that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise. NCB knowingly facilitates Radical Muslim terrorism, and/or the al Qaida, and/or the | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | International Islamic Front for the Jihad Against Jews and Crusaders' fundraising by advertising the existence and numerical designations of the accounts it maintains for Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' cooperating charities throughout the Muslim world, so that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders supporters can deposit funds directly into those accounts for the benefit of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through the International Islamic Relief Organization, and also transferred significant funding to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through Blessed Relief Foundation accounts it maintained. | |
| The Kingdom, through its Agent the Saudi American Bank | The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in the Sudan during the years that the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport.<br><br>Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent the Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c), |

| | | |
|---|---|---|
| | Crusaders and affiliated Foreign Terrorist Organizations. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | 1962(d) |
| The Kingdom, through its Agent the Muslim World League (the "MWL") | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust.<br><br>The MWL has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated FTOs. The MWL has provided substantial material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence International Foundation.<br><br>The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:<br><br>"Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means we | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League." <br><br> The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government. | |
| The Kingdom, through its Agent International Islamic Relief Organization (the "IIRO") | The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure, and the IIRO has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Rabita Trust | The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of Radical Muslim terrorism, | 18 U.S.C. §§ 1962 (b), 1962(c), |

| | | |
|---|---|---|
| | and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 1962(d) |
| The Kingdom, through its Agent the Benevolence International Foundation (the "BIF") | BIF is an agency, instrumentality and organ of the Kingdom of Saudi Arabia.  The Kingdom controls and directs BIF operations, appoints and terminates BIF personnel, provides BIF with virtually all of its funding, determines how funds will be distributed throughout the World, and otherwise stringently controls BIF's operations.  In many countries, BIF conducts operations from the local Saudi Embassy, under the supervision of the embassy's Islamic Affairs Division.<br><br>BIF is an apparent charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League, and has frequently shared common officers and directors with that organization.<br><br>BIF has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. On November 19,2002, BIF was designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and/or affiliated foreign terrorist organizations, associations, organizations or persons.<br><br>Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  On January 6, 2003, federal prosecutors filed a proffer in the criminal prosecution of Enaam Arnaout which details at length the pervasive involvement, and material support of BIF, and of its executives | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

and employees, in sponsoring  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations.  This support included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters, and sponsoring  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders camps throughout the World.

BIF played a pivotal role in  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' efforts to establish operations in Bosnia.  BIF provided food, clothing, money and communications' equipment to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders affiliated fighters.  BIF also facilitated the movement of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters into the region by falsely representing to authorities that those terrorists would be working as BIF relief workers.  In March 2002, Basonian police raided BIF's Sarajevo offices and recovered extensive documentation relating to the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations, including contributions of various individuals and charities to the terrorist organizations development and expansion.

BIF also played an equally important role in the infrastructure supporting the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in Chechnya.   BIF provided material support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters supporting Chechnya mujihadeen by supplying military informs, financing, and anti-mine boots.

BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities.

BIF used the U.S. financial system, mainly through BIF's US operation, extensively to launder money for  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source.

| | | |
|---|---|---|
| The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY") | WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders's financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership in Afghanistan and operational cells throughout the world.<br><br>The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a General Assembly and President who is appointed by the Saudi government. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent, the Saudi Red Crescent (the "SRC") | The SRC has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.<br><br>Prior to its dissolution, Al Haramain was one of the principle Islamic non-governmental organizations that provided support | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | for the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its website, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | |
| The Kingdom, through its Agent Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince Abdullah") | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror. Further, Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities in Europe, served for many years as Prince Abdullah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership. Thus, through his official and personal acts, Prince Abdullah has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that this support would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") | In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, thereby providing critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and | 18 U.S.C. §§ 1962 (b), 1962(c), |

| | | |
|---|---|---|
| | intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(d) |
| The Kingdom, through its Agent Prince Naif bin Abdulaziz Al Saud ("Prince Naif") | In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders members and loyalists. Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' presence and operations in Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure. Remarkably, Prince Naif publicly denied Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' responsibility for the Attack. Further, Prince Naif has also made large personal contributions to Saudi-based charities for the purpose supporting terrorism, with the knowledge and intent the contributions he made would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, has donated substantial funds to several other charities that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | Against Jews and Crusaders' global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, Through its Agent Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan) | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, which Saudi-based charities were providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Rather than intervening to stem the flow of money and support from the charities to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations Prince Sultan knew and intended that the contributions he made to these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, but has nonetheless provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

Prince Sultan further made substantial contributions to certain charities which sponsored or supported Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, without limitation, IIRO, Al Haramain, Muslim World League and WAMY.

Prince Sultan directly aided and abetted and materially sponsored Radical Muslim terrorism, and/or the al Qaida, | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

|  | and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Islamic terrorism, through these contributions and supervised the charities, or, in the alternative, was grossly negligent in supervising the charities, knowing they would be used to sponsor terrorism.<br><br>Prince Sultan has been Minister of Defense and Aviation, Chairman of the Supreme Council of Islamic Affairs, Second Deputy Prime Minister of the Council of Ministers, and, on information and belief, is the Third highest ranking member of the Saudi Government, and a brother of the King. |  |
| --- | --- | --- |
| The Kingdom, through its Agent Prince Turki Al Faisal Al Saud ("Prince Turki") | During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time,  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, and coordinated the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by several wealthy members of Saudi society, knowing that all such contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.<br><br>Prince Turki was aware of the terrorist threat originating from Osama Bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>Prince Turki met several times with Osama Bin Laden and or Osama Bin Laden's representatives on behalf of the Saudi Government and offered not to extradite him and otherwise provide him and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders with support, in exchange for protection. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | Prince Turki facilitated money transfers from wealthy Saudi's to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban.<br><br> Prince Turki made contributions to charities he knew were sponsors or affiliated with  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | |

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to the Special Committee of the Council of Ministers for the Kingdom of Saudi Arabia** |

*This document relates to:*        Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*
                                                04 CV 01922 (RCC)

**RICO STATEMENT APPLICABLE**
**TO THE SPECIAL COMMITTEE OF THE COUNCIL OF MINISTERS**
**FOR THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for the Special Committee of the Council of Ministers for the Kingdom of Saudi Arabia.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

145. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b), 1962(c) and/or (d).

146. The name of the defendants, to whom this RICO statement pertains is the Special Committee of the Council of Ministers for the Kingdom of Saudi Arabia ("Special Committee"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

147. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. the Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), along with others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

148. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney

273

General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, loss of and/or damage to tangible and intangible personal property, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

149.

    a.    <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15;   NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15;   NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. § 1344 |
| Relating to Unlawful Procurement of Citizenship or Naturalization Papers | 18 U.S.C. § 1425 |
| Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers | 18 U.S.C. § 1426 |
| Relating to the Sale of Naturalization or Citizenship Papers | 18 U.S.C. § 1427 |
| Obstruction of Justice | 18 U.S.C. § 1503 |
| Obstruction of a Criminal Investigation | 18 U.S.C. § 1510 |
| Obstruction of State or Local Law Enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| Fraud or Misuse of Visa Permits or Other Documents | 18 U.S.C. § 1546 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |

| | |
|---|---|
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B); 18 U.S.C. § 2339A;        18 U.S.C. § 2339B;        18 U.S.C. § 2339C |

b.   Dates of, the participants in, and a description of the facts surrounding the predicate acts:

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| mid-1990s to 9/11/2001 | The Kingdom of Saudi Arabia (the "Kingdom") and/or its Agencies, including the Directorate of Intelligence, the General Staff, Intelligence Section (G-2), the Ministry of State for Internal Affairs, the Ministry of Interior, the Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Council of Ministers, and *the Special Committee of the Council of Ministers ("Special Committee")* (collectively known as "Agencies"), and/or its Agents, including but not limited to certain charities such as Muslim World League, the Internal Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi | Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Special Committee and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |

| | | |
|---|---|---|
| | Joint Relief Committee, the Benevolence Foundation, and certain individuals including but not limited to Prince Abdullah Al Faisal bin Abdulaziz Al Saud, Prince Bandar bin Sultan bin Abdulaziz Al Saud, Prince Naif bin Abdulaziz Al Saud, Prince Salman bin Abdul Aziz Al Saud, Prince Sultan bin Abdulaziz Al Saud, Prince Turki Al Faisal Al Saud, and certain commercial entities including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom of Saudi Arabia (these charities, individuals, commercial entities and other actors are collectively referred to as "Agents"). | |
| Late 1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Special Committee,  and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Special Committee, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, undertook actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agencies, specifically referring to the Special Committee, and/or its Agents. |
| Mid-1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Special Committee, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Special Committee, and/or its Agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990's to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or its Agents | The Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with |

| | | the Enterprise. |
|---|---|---|
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agencies, specifically referring to the Special Committee, and/or its Agents. |
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions, the Kingdom, directly and/or through its Agencies, specifically referring to the Special Committee, and/or Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Special Committee, and/or its Agents | In violation of 18 U.S.C. § 371, the Kingdom, through its Agencies, specifically referring to the Special Committee, and/or Agents, conspired to and did defraud the United States Government of taxes legally due. |
| Mid-1990s to 9/11/2001 | The Kingdom,  through its Agencies, specifically referring to the Special Committee, and/or its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agencies, specifically referring to the Special Committee, and/or Agents, conspired to and did file false or materially false tax returns. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Special Committee, and/or its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agencies, specifically referring to the Special Committee, and/or Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws. |

     c.   Not applicable.

     d.   No.

e.   No.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. The Kingdom, through its Agencies, specifically referring to the Special Committee, and Agents consistently, evenly, constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically including the Kingdom , directly and through its Agencies, specifically referring to the Special Committee, and Agents, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

150.

a.   The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example,

had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    c.   No.

    d.   The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents are associated with the alleged enterprise.

    e.   The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents are members of the Enterprise, and are separate and distinct from the Enterprise.

    f.   The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

151. The pattern of racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents are separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but were a necessary component to the Attack.

152. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents fund that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

153. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

154. The Enterprise, and the racketeering activities conducted by the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

155. Not applicable.

156. Not applicable to this defendant.

157.

    a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

158. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents.  The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.  The Kingdom, its Agencies, specifically referring to the Special Committee, and its Agents also, with knowledge and intent, agreed to and did aid and abet all of

the above illegal activities, RICO predicate acts, and RICO violations.

159. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

160. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

161. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

162.

| Count One | Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 |
|---|---|
| Count Two | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| Count Three | Alien Tort Claims Act 28 U.S.C. §1350 |
| Count Ten | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
| Count Eleven | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| Count Thirteen | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| Count Four | Wrongful Death |
|---|---|
| Count Five | Survival |
| Count Six | Negligent and Intentional Infliction or Emotional Distress |

281

| Count Seven | Conspiracy |
|---|---|
| Count Eight | Aiding and Abetting |
| Count Nine | Negligence |
| Count Twelve | Punitive Damages |

28.  Not applicable

Date: February 9, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____            GINA M.
MAC NEILL, ESQUIRE
(GM 0581)

BY: _____            JERRY S.
GOLDMAN,  ESQUIRE
(JG 8445)

Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Special Committee of the Council of Ministers of Islamic Affairs for the Kingdom of Saudi Arabia ("Special Committee") | In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government. This Special Committee of the Council of Ministers is funded entirely from Saudi government funds.  The Special Committee decides which "charities" to fund and provides grants to selected entities.<br><br>The 9/11 Commission report states that:<br><br>"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities.  Charitable giving, or *zakat*, is one of the five pillars of Islam.  It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence.  The Western notion of the separation of civic and religious duty does not exist in Islamic cultures.  Funding charitable works is an integral function of the governments in the Islamic world. ***It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax***.  Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."<br><br>Additionally, the 9/11 Commission report states that the "Saudi domestic charities (ex.  Muslim World League) are regulated by the Ministry of Labor and Social Welfare,  while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs."  (comment in parenthesis added).<br><br>The Special Committee thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>   The growth and development of al Qaida was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia, specifically the Special Committee, and members of its royal family.<br><br>   The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's, specifically the Special Committee participation.<br><br>   Kingdom of Saudi Arabia, specifically the Special Committee, controlled elements of al Qaida's financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>   All activities of members of the royal family were done on behalf of or at the behest of the Kingdom, specifically the Special Committee. | |
| The Kingdom of Saudi Arabia |   The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing justice, criminal investigations, and local law enforcement efforts with respect to the activities of the Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent.<br><br>   In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government. This Special Committee of the Council of Ministers is funded entirely from Saudi government funds.  The Special Committee decides which "charities" to fund and provides grants to selected entities.<br><br>   Additionally, in 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission.  As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd")  set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups.   The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.<br><br>   The 9/11 Commission report states that:<br><br>       "The Kingdom is one of the world's most | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities.  Charitable giving, or *zakat*, is one of the five pillars of Islam.  It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence.  The Western notion of the separation of civic and religious duty does not exist in Islamic cultures.  Funding charitable works is an integral function of the governments in the Islamic world. ***It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax***.  Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Additionally, the 9/11 Commission report states that the "Saudi domestic charities (ex.  Muslim World League) are regulated by the Ministry of Labor and Social Welfare,  while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs."  (comment in parenthesis added).

The Saudi Arabian government thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

According to intelligence experts and officials of the United States Government, Saudi Arabia has channeled millions of dollars to  Radical Muslim terrorism,  and/or  the  al  Qaida,  and/or  the International Islamic Front for the Jihad Against Jews and Crusaders. These funds are directed to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and  Crusaders  through  various  Saudi-based "charities" which, as described above, are under the Saudi Arabian government's effective control. Such charities include, but are not limited to, the Muslim World League, al-Haramain Islamic Foundation,

International Islamic Relief Organization (IIRO), Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation, Rabita Trust, SAAR Foundation, Safa Trust, International Institute for Islamic Thought (niT), Sanabel Al Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim Youth (WAMY).

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, *I work for the Government of Saudi Arabia*. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means *we are controlled in all our activities and plans by the Government of Saudi Arabia*. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . *The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia*. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, stating as follows:

> "It would be incorrect to view these charities as purely non-governmental organizations .... [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also a Saudi Cabinet Member, chairs the Constituent Council of the Muslim World League. The Saudi

Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable contributions from the Saudi Royal Family that have been detailed in Saudi periodicals.

In a separate report, U.S. intelligence reports revealed that Saudi officials began supporting  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden in 1996.

According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy, "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader."

In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd. Among the items found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo. Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities" were funneling contribution to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations. Defendant Saudi Arabia knew, or should have known, that  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties

would materially benefit from those contributions, and use the funds received from those "charities" to finance terrorist attacks against the United States, its nationals and allies.

Despite its express awareness, for several years prior to September 11, 2001 that Saudi "charities" were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi failed to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them from continuing to finance terrorism, in violation of its obligations under United Nations Security Council Resolutions 49/60, 1269, 133, and 1363. In this regard, an Independent Task Force sponsored by the Council on Foreign Relations to investigate the sources of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders funding concluded as follows:

> "[I]t is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaida; and for years, Saudi officials have turned a blind eye to this problem."

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated terrorist organizations, persons, organizations, commercial entities, and other parties would materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate the "charities" which were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and otherwise prevent those "charities" from continuing to finance terrorism.

Defendant Saudi Arabia has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, but not limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity Committee, the Islamic Society, and Egyptian Islamic Jihad. By virtue of its affiliation with other foreign terrorist organizations

sponsored by Saudi Arabia, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would materially benefit from its sponsorship of other foreign terrorist organizations, and that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden. The support provided by Saudi Arabia to Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia and members of its royal family.

The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's participation.

| | | |
|---|---|---|
| | Kingdom of Saudi Arabia controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom. | |
| The Kingdom, through its Agent National Commercial Bank ("NCB") | The Kingdom's Agent NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' preferred banks for many years, maintaining accounts for many of the charity defendants that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise. NCB knowingly facilitates Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' fundraising by advertising the existence and numerical designations of the accounts it maintains for Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' cooperating charities throughout the Muslim world, so that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders supporters can deposit funds directly into those accounts for the benefit of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through the International Islamic Relief Organization, and also transferred significant funding to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through Blessed Relief Foundation accounts it maintained. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| The Kingdom, through its Agent the Saudi American Bank | The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in the Sudan during the years that the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport.<br><br>Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated Foreign Terrorist Organizations. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The | |

291

| the Muslim World League (the "MWL") | MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust.<br><br>   The MWL has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated FTOs. The MWL has provided substantial material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence International Foundation.<br><br>   The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:<br><br>   "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."<br><br>   The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |
| The Kingdom, through its Agent | The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL | |

| International Islamic Relief Organization (the "IIRO") | provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure, and the IIRO has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Rabita Trust | The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Benevolence International Foundation (the "BIF") | BIF is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs BIF operations, appoints and terminates BIF personnel, provides BIF with virtually all of its funding, determines how funds will be distributed throughout the World, and otherwise stringently controls BIF's operations. In many countries, BIF conducts operations from the local Saudi Embassy, under the supervision of the embassy's Islamic Affairs Division.<br><br>BIF is an apparent charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League, | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

and has frequently shared common officers and directors with that organization.

BIF has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. On November 19,2002, BIF was designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and/or affiliated foreign terrorist organizations, associations, organizations or persons.

Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. On January 6, 2003, federal prosecutors filed a proffer in the criminal prosecution of Enaam Arnaout which details at length the pervasive involvement, and material support of BIF, and of its executives and employees, in sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations. This support included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters, and sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders camps throughout the World.

BIF played a pivotal role in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders affiliated fighters. BIF also facilitated the movement of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters into the region by falsely representing to authorities that those terrorists would

| | | |
|---|---|---|
| | be working as BIF relief workers.  In March 2002, Basonian police raided BIF's Sarajevo offices and recovered extensive documentation relating to the   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations, including contributions of various individuals and charities to the terrorist organizations development and expansion.<br><br>  BIF also played an equally important role in the infrastructure supporting the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in Chechnya.   BIF provided material support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters supporting Chechnya mujihadeen by supplying military informs, financing, and anti-mine boots.<br><br>  BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities.<br><br>  BIF used the U.S. financial system, mainly through BIF's US operation, extensively to launder money for  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source. | |
| The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY") |   WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders's financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership in Afghanistan and operational cells throughout the world.<br><br>  The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a General Assembly and President who is appointed by the Saudi government. | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| The Kingdom, through its Agent, the Saudi Red Crescent (the "SRC") | The SRC has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.<br><br>Prior to its dissolution, Al Haramain was one of the principle Islamic non-governmental organizations that provided support for the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its website, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince Abdullah") | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad | 18 U.S.C. §§ 1962 (b), 1962(c), |

| | | |
|---|---|---|
| | Against Jews and Crusaders' global operations and acts of terror. Further, Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities in Europe, served for many years as Prince Abdullah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership.  Thus, through his official and personal acts, Prince Abdullah has provided critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that this support would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(d) |
| The Kingdom, through its Agent Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") | In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, thereby providing critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Naif bin Abdulaziz Al Saud ("Prince Naif") | In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders members and loyalists.  Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' presence and operations in Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | infrastructure. Remarkably, Prince Naif publicly denied Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' responsibility for the Attack. Further, Prince Naif has also made large personal contributions to Saudi-based charities for the purpose supporting terrorism, with the knowledge and intent the contributions he made would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, has donated substantial funds to several other charities that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, Through its Agent Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan") | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, which Saudi-based charities were providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Rather than intervening to stem the flow of money and support from the charities to Radical Muslim terrorism, and/or the al Qaida, | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations Prince Sultan knew and intended that the contributions he made to these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, but has nonetheless provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.<br><br>Prince Sultan further made substantial contributions to certain charities which sponsored or supported Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, without limitation, IIRO, Al Haramain, Muslim World League and WAMY.<br><br>Prince Sultan directly aided and abetted and materially sponsored Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Islamic terrorism, through these contributions and supervised the charities, or, in the alternative, was grossly negligent in supervising the charities, knowing they would be used to sponsor terrorism.<br><br>Prince Sultan has been Minister of Defense and Aviation, Chairman of the Supreme Council of Islamic Affairs, Second Deputy Prime Minister of the Council of Ministers, and, on information and belief, is the Third highest ranking member of the Saudi Government, and a brother of the King. | |
| The Kingdom, through its Agent Prince Turki Al Faisal Al Saud ("Prince Turki") | During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

materially benefit  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, and coordinated the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by several wealthy members of Saudi society, knowing that all such contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

Prince Turki was aware of the terrorist threat originating from Osama Bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Prince Turki met several times with Osama Bin Laden and or Osama Bin Laden's representatives on behalf of the Saudi Government and offered not to extradite him and otherwise provide him and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders with support, in exchange for protection.

Prince Turki facilitated money transfers from wealthy Saudi's to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban.

Prince Turki made contributions to charities he knew were sponsors or affiliated with  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**Applicable to the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia** |

*This document relates to:*     Estate of O'Neill, *et al.* v. Kingdom of Saudi Arabia, *et al.*
04 CV 01922 (RCC)

**RICO STATEMENT APPLICABLE**
**TO THE SUPREME COUNCIL OF ISLAMIC AFFAIRS**
**FOR THE KINGDOM OF SAUDI ARABIA**

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004, and Judge Casey's individual rules, for the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified through discovery and otherwise.

163. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

164. The names of the defendants, to whom this RICO statement pertains is the Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia ("Supreme Council"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

165. Not applicable. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. the Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), along with others. Plaintiffs will separately file RICO statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery or other information is obtained.

166. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in

301

regard to, or otherwise supported the terrorist attacks of September 11, 2001.  Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, loss and/or damage to tangible and intangible personal property, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein.

167.

    a.   <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY  Penal § 105.15;       NY  Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY  Penal § 105.15;       NY  Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. § 1344 |
| Relating to Unlawful Procurement of Citizenship or Naturalization Papers | 18 U.S.C. § 1425 |
| Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers | 18 U.S.C. § 1426 |
| Relating to the Sale of Naturalization or Citizenship Papers | 18 U.S.C. § 1427 |
| Obstruction of Justice | 18 U.S.C. § 1503 |
| Obstruction of a Criminal Investigation | 18 U.S.C. § 1510 |
| Obstruction of State or Local Law Enforcement | 18 U.S.C. § 1511 |
| Travel Act | 18 U.S.C. § 1952 |
| Fraud or Misuse of Visa Permits or Other Documents | 18 U.S.C. § 1546 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | |

|  | 18 U.S.C. § 1952 |
| --- | --- |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B); 18 U.S.C. § 2339A;        18 U.S.C. § 2339B;        18 U.S.C. § 2339C |

b.   Dates of, the participants in, and a description of the facts surrounding the predicate acts:

| DATES | PARTICIPANTS | FACTS |
| --- | --- | --- |
| mid-1990s to 9/11/2001 | The Kingdom of Saudi Arabia (the "Kingdom") and/or its Agencies, including the Directorate of Intelligence, the General Staff, Intelligence Section (G-2), the Ministry of State for Internal Affairs, the Ministry of Interior, the Saudi Committee for Support of the Intifada, *the Supreme Council of Islamic Affairs ("Supreme Council")*, the Council of Ministers, and the Special Committee of the Council of Ministers (collectively known as "Agencies"), and/or its Agents, including but not limited to certain charities such as Muslim World League, the Internal Islamic Relief Organization, the World Assembly of Muslim Youth, Al Haramain Islamic Foundation, the Saudi High Commission for Aid to Bosnia and Herzegovina, the Rabita Trust, the Saudi Red Crescent, Saudi Joint Relief Committee, the | Throughout this period, the Kingdom, a monarchy, and/or its Agencies, specifically referring to the Supreme Council and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |

| | | |
|---|---|---|
| | Benevolence Foundation, and certain individuals including but not limited to Prince Abdullah Al Faisal bin Abdulaziz Al Saud, Prince Bandar bin Sultan bin Abdulaziz Al Saud, Prince Naif bin Abdulaziz Al Saud, Prince Salman bin Abdul Aziz Al Saud, Prince Sultan bin Abdulaziz Al Saud, Prince Turki Al Faisal Al Saud, and certain commercial entities including but not limited to National Commercial Bank and Saudi American Bank, and other actors who served as agents of the Kingdom of Saudi Arabia (these charities, individuals, commercial entities and other actors are collectively referred to as "Agents"). | |
| Late 1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents, including so-called charities funded and controlled by the Kingdom and/or its Agencies, undertook actions constituting racketeering as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by the Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents. |
| Mid-1990s to 9/11/2001 | The Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| Mid-1990's to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

| | | |
|---|---|---|
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 1956, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents conspired to and did conduct financial transactions knowing that the property involved in those financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving the charities and/or for-profit corporations owned by or related to the Kingdom and/or its Agencies, specifically referring to the Supreme Council, and/or its Agents. |
| Mid-199s to 9/11/2001 | The Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 1957, on multiple occasions the Kingdom, directly and/or through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to and did knowingly engage or attempt to engage in monetary transactions in criminally derived property that was of value greater than $10,000. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 18 U.S.C. § 371, the Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to and did defraud the United States Government of taxes legally due. |
| Mid-1990s to 9/11/2001 | The Kingdom,  through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 26 U.S.C. § 7206(1), (2), the Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to and did file false or materially false tax returns. |
| Mid-1990s to 9/11/2001 | The Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or its Agents | In violation of 26 U.S.C. § 7212(a), the Kingdom, through its Agencies, specifically referring to the Supreme Council, and/or Agents, conspired to or did file false or materially false tax returns, in furtherance of a corrupt endeavor to impede and impair the due administration of the internal revenue laws. |

    c.   Not applicable.

    d.   No.

e.   No.

f.   The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.   The Kingdom, through its Agencies, specifically referring to the Supreme Council, and Agents consistently, evenly, constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscates their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g.   The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and/or money laundering and/or tax evasion allowed certain of the defendants, specifically including the Kingdom , directly and through its Agencies, specifically referring to the Supreme Council, and Agents, to surreptiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

168.

a.   The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the First Amended Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b.   The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed and organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida, for example,

had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack.

    c.  No.

    d.  The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are associated with the alleged enterprise.

    e.  The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are members of the Enterprise, and are separate and distinct from the Enterprise.

    f.  The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

169. The pattern of racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents are separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but were a necessary component to the Attack.

170. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents fund that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

171. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

172. The Enterprise, and the racketeering activities conducted by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents, rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere.  Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

173. Not applicable.

174. Not applicable to this defendant.

175.

    a.  Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

b. The enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

176. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by the Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Kingdom, its Agencies, specifically referring to the Supreme Council, and its Agents also, with knowledge and intent, agreed to and did aid and abet all of the above

illegal activities, RICO predicate acts, and RICO violations.

177. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.

178. Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

179. Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.   The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

180.

| Count One | Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 |
|---|---|
| Count Two | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| Count Three | Alien Tort Claims Act 28 U.S.C. §1350 |
| Count Ten | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq.* |
| Count Eleven | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| Count Thirteen | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19.

| Count Four | Wrongful Death |
|---|---|
| Count Five | Survival |
| Count Six | Negligent and Intentional Infliction or Emotional Distress |

| | |
|---|---|
| **Count Seven** | Conspiracy |
| **Count Eight** | Aiding and Abetting |
| **Count Nine** | Negligence |
| **Count Twelve** | Punitive Damages |

29.  Not applicable

Date: February 9, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____          GINA M.
MAC NEILL, ESQUIRE
(GM 0581)

BY: _____          JERRY S.
GOLDMAN,  ESQUIRE
(JG 8445)

Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

310

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| The Supreme Council of Islamic Affairs for the Kingdom of Saudi Arabia ("Supreme Council") | In 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission.  As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd")  set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups.   The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.

The 9/11 Commission report states that:

"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities.  Charitable giving, or *zakat*, is one of the five pillars of Islam.  It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence.  The Western notion of the separation of civic and religious duty does not exist in Islamic cultures.  Funding charitable works is an integral function of the governments in the Islamic world. *It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax*.  Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Additionally, the 9/11 Commission report states that the "Saudi domestic charities (ex.  Muslim World League) are regulated by the Ministry of Labor and Social Welfare,   while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs."  (comment in parenthesis added).

The Supreme Council thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that | 18 U.S.C. §§

1962 (b),

1962(c),

1962(d) |

|  | several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.<br><br>The growth and development of al Qaida was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia, specifically the Supreme Council, and members of its royal family.<br><br>The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's, specifically the Supreme Council participation.<br><br>Kingdom of Saudi Arabia, specifically the Supreme Council, controlled elements of al Qaida's financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom, specifically the Supreme Council. |  |
|---|---|---|
| The Kingdom of Saudi Arabia | The Kingdom itself participated in the Enterprise by fraudulently issuing identification documents to various Operatives; through various acts of mail fraud, wire fraud, and financial institution fraud; by assisting Operatives with the procurement of false citizenship or naturalization papers; by obstructing justice, criminal investigations, and local law enforcement efforts with respect to the activities of the Operatives; and by fraudulently providing or assisting in the procurement of visa permits and other documents necessary to the Enterprise's nefarious intent.<br><br>In 1962, the Special Committee of the Council of Ministers was established as a department of the Saudi Government. This Special Committee of the Council of Ministers is funded entirely from Saudi government funds. The Special Committee decides which "charities" to fund and provides grants to selected entities.<br><br>Additionally, in 1994, Saudi Arabia issued a royal decree banning the collection of money in the Kingdom of Saudi Arabia for charitable causes without official permission. As a result, the King and the Prime Minister Fahd bin Abd al-Aziz Al Saud ("King Fahd") set up a Supreme Council of Islamic Affairs, to centralize, supervise and review aid requests from Islamic groups. The Supreme Council was established to control charity financing and distribution of donations to eligible Muslim groups.<br><br>The 9/11 Commission report states that: | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

"The Kingdom is one of the world's most religiously conservative societies, and its identity is closely bound to its religious links, especially its position as the guardian of Islam's two holiest cities. Charitable giving, or *zakat*, is one of the five pillars of Islam. It is broader and more pervasive than Western ideas of charity - functioning also as a form of income, educational assistance, foreign aid, and a source of political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. Funding charitable works is an integral function of the governments in the Islamic world. ***It is so ingrained in Islamic culture that in Saudi Arabia, for example, a department within the Saudi Ministry of Finance and National Economy collects zakat directly, much as the U.S. Internal Revenue Service collects payroll withholding tax***. Closely tied to zakat is the dedication of the government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

Addionally, the 9/11 Commission report states that the "Saudi domestic charities (ex. Muslim World League) are regulated by the Ministry of Labor and Social Welfare, while the international charities and relief agencies, such as the World Assembly of Muslim Youth, are regulated by the Ministry of Islamic Affairs." (comment in parenthesis added).

The Saudi Arabian government thus had direct supervision and control regarding the destination of government charity funding and knew, or should have know, that several entities which were funded by Saudi Arabia financed the Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

According to intelligence experts and officials of the United States Government, Saudi Arabia has channeled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. These funds are directed to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through various Saudi-based "charities" which, as described above, are under the Saudi Arabian government's effective control. Such

313

charities include, but are not limited to, the Muslim World League, al-Haramain Islamic Foundation, International Islamic Relief Organization (IIRO), Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation, Rabita Trust, SAAR Foundation, Safa Trust, International Institute for Islamic Thought (niT), Sanabel Al Kheer, Inc. a/k/a The Sanabel, Inc., and World Assembly of Muslim Youth (WAMY).

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

> "Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, *I work for the Government of Saudi Arabia*. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means ***we are controlled in all our activities and plans by the Government of Saudi Arabia***. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . *The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia*. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

During a July 31, 2003 hearing before the Senate Committee on Governmental Affairs regarding terrorism financing, Dr. Dore Gold, the former Israeli Ambassador to the United Nations, similarly confirmed the Saudi Government's control over several Saudi-based "charities" responsible for funding Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, stating as follows:

> "It would be incorrect to view these charities as purely non-governmental organizations …. [A]t the apex of each organization's board is a top Saudi official. The Saudi Grand Mufti, who is also

a Saudi Cabinet Member, chairs the Constituent Council of the Muslim World League. The Saudi Minister of Islamic Affairs chairs the Secretariat of the World Assembly of Muslim Youth and the Administrative Council of Al-Haramain. All three organizations have received large charitable contributions from the Saudi Royal Family that have been detailed in Saudi periodicals.

In a separate report, U.S. intelligence reports revealed that Saudi officials began supporting  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden in 1996.

According to a briefing presented July 10, 2002 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advises the Department of Defense on policy, "The Saudis are active at every level of the terror chain, from planners to financiers, from cadre to foot-soldier, from ideologist to cheerleader."

In October 2001, NATO forces raided the Saudi High Commission for Aid to Bosnia, founded by Prince Selman bin Abd al-Aziz and supported by King Fahd. Among the items found at the Saudi charity were before and after photographs of the World Trade Center, U.S. embassies in Kenya and Tanzania, and the U.S.S. Cole; materials for forging U.S. State Department badges; files on the use of crop duster aircraft; and anti-Semitic and anti-American material geared toward children. An employee of the Saudi High Commission for Aid to Bosnia is incarcerated at Guantanamo Bay's Camp X-Ray for plotting an attack on the U.S. embassy in Sarajevo. Authorities are attempting to track down $41 million, which are missing from the commission's operating funds.

Despite its express awareness, for several years prior to September 11, 2001, that Saudi "charities" were funneling contribution to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi Arabia continued to donate enormous sums of money to those organizations. Defendant Saudi Arabia knew, or should have known, that  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews

and Crusaders and affiliated foreign terrorist organizations, persons, organizations, commercial entities and other parties would materially benefit from those contributions, and use the funds received from those "charities" to finance terrorist attacks against the United States, its nationals and allies.

Despite its express awareness, for several years prior to September 11, 2001 that Saudi "charities" were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other terrorist causes, Saudi failed to take appropriate and necessary steps to regulate those "charities" and otherwise prevent them from continuing to finance terrorism, in violation of its obligations under United Nations Security Council Resolutions 49/60, 1269, 133, and 1363. In this regard, an Independent Task Force sponsored by the Council on Foreign Relations to investigate the sources of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders funding concluded as follows:

> "[I]t is worth stating clearly and unambiguously what official U.S. Government spokespersons have not: For years, individuals and charities based in Saudi Arabia have been the most important source of funds for al Qaida; and for years, Saudi officials have turned a blind eye to this problem."

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated terrorist organizations, persons, organizations, commercial entities, and other parties would materially benefit from Saudi Arabia's failure to take appropriate and necessary steps to regulate the "charities" which were funneling contributions to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and otherwise prevent those "charities" from continuing to finance terrorism.

Defendant Saudi Arabia has long provided material support and resources to a variety of foreign terrorist organizations which are affiliated with Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, but not limited to, Hezbollah, Palestine Islamic Jihad, HAMAS, Tulkarm Charity

Committee, the Islamic Society, and Egyptian Islamic Jihad. By virtue of its affiliation with other foreign terrorist organizations sponsored by Saudi Arabia, Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders has materially benefited from Saudi Arabia's sponsorship of those other terrorist organizations.

Defendant Saudi Arabia knew, or should have known, that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would materially benefit from its sponsorship of other foreign terrorist organizations, and that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders would employ the technical, logistical and financial resources obtained from foreign terrorist organizations to commit terrorist attacks against the United States, its nationals and allies.

Saudi Arabia acted through its officials, officers, agents, employees, agencies and instrumentalities in providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Osama bin Laden. The support provided by Saudi Arabia to Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders assisted in and contributed to the preparation and execution of the plans that culminated in the attacks of September 11th and the extrajudicial killing of the Decedents.

The Saudi Committee for Support of the Intifada, the Supreme Council of Islamic Affairs, the Supreme Council of Islamic Affairs, the Council of Ministers, the Special Committee of the Council of Ministers, the Directorate of Intelligence, the General Staff, the Intelligence Section (G-2), the Ministry of State for Internal Affairs, and the Ministry of Interior have participated in providing such material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

The growth and development of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders was made possible by the logistical, financial and other support provided by Kingdom of Saudi Arabia and members of its royal family.

317

| | | |
|---|---|---|
| | The events of 9/11 were a direct and intended and foreseeable result of Kingdom of Saudi Arabia's participation.<br><br>Kingdom of Saudi Arabia controlled elements of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial infrastructure, including the charities, knew of the threats to the United States and did nothing to stop them.<br><br>All activities of members of the royal family were done on behalf of or at the behest of the Kingdom. | |
| The Kingdom, through its Agent National Commercial Bank ("NCB") | The Kingdom's Agent NCB has been implicated in many corrupt practices, including the manipulation of financial markets, arms trafficking and sponsorship of international terrorism, including handling the finances of Abu Nidal and his terrorist organization. Moreover, NCB has served as one of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' preferred banks for many years, maintaining accounts for many of the charity defendants that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, including the International Islamic Relief Organization, the Muslim World League, the World Association of Muslim Youth, the Benevolence International Foundation, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. Under the supervision of Suleiman Abdul Aziz al-Rajhi, NCB also managed the budget of the Saudi Joint Relief Committee, another so-called charity that provided funding to the Enterprise. NCB knowingly facilitates Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' fundraising by advertising the existence and numerical designations of the accounts it maintains for Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' cooperating charities throughout the Muslim world, so that Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders supporters can deposit funds directly into those accounts for the benefit of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and its cells throughout the world. During the 1990s, NCB channeled in excess of $74 million to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through the International Islamic Relief Organization, and also transferred significant funding to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through Blessed Relief Foundation accounts it | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | | |
|---|---|---|
| | maintained. | |
| The Kingdom, through its Agent the Saudi American Bank | The Saudi American Bank has long provided financial services and other forms of material support to terrorist organizations, including Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Saudi American Bank is a financial institution headquartered in Riyadh, Saudi Arabia. The Saudi American Bank was established by royal decree in 1980. The Saudi American Bank financed many of the projects undertaken by Osama bin Laden and Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in the Sudan during the years that the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership structure operated from that country, including the construction of major roads and the Port of Sudan airport.<br><br>Defendants Saudi Bin Laden Group and Mohamed Bin Laden Organization provided technical assistance on these projects. Further, from 1996 through 2001, the Saudi American Bank funneled money to and/or from the Spanish Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Saudi High Commission | The Saudi High Commission has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated Foreign Terrorist Organizations. The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the Saudi High Commission as a front for radical and terrorism-related activities. The Saudi High Commission worked closely with and largely funded Taibah International, which has been directly implicated in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations outside of Bosnia, including the 1998 United States Embassy bombings in Kenya and Tanzania. Between 1992 and 2002, the Saudi High Commission funneled millions of dollars to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations in Bosnia alone. The Saudi High Commission caused and/or allowed phony relief workers to use its name as "cover" when they traveled, to infiltrate sensitive areas. Approximately $41 million donated to the Saudi High Commission remains unaccounted for. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| The Kingdom, through its Agent the Muslim World League (the "MWL") | The MWL is among the world's largest Islamic charitable organizations, with offices in more than thirty countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the IIRO, the World Assembly of Muslim Youth, al Haramain & al Aqsa Mosque Foundation, Benevolence International Foundation and the Rabita Trust. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

The MWL has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated FTOs. The MWL has provided substantial material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders through its subsidiary bodies, including the IIRO, the World Association of Muslim Youth, the Rabita Trust, and Benevolence International Foundation.

The Director of IIRO in Canada and a full-time employee of the Muslim World League, Arafat Al-Asahi, confirmed the Saudi Government's control over the Muslim World League and IIRO during Canadian court proceedings, testifying as follows:

"Let me tell you one thing. The Muslim World League, which is the mother of DRO, is a fully government-funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government. Second, the IIRO is a relief branch of that organization which means we are controlled in all our activities and plans by the Government of Saudi Arabia. Keep that in mind, please … I am paid by my organization which is funded by the [Saudi] Government. . . The [DRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."

The Muslim World League's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The Muslim World League's annual budget is funded by an annual grant from the Saudi government.

| | | |
|---|---|---|
| The Kingdom, through its Agent International Islamic Relief Organization (the "IIRO") | The IIRO is a subsidiary body of the MWL, with offices throughout the globe. According to MWL officials, the MWL provides "humanitarian assistance" through the arms of the IIRO. In reality, the IIRO is one of the charities operating within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure, and the IIRO has long operated as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. According to the recently declassified 1996 CIA report regarding the involvement of Islamic charities in the sponsorship of terrorism, the IIRO funded six al Qaida training camps in Afghanistan, including camps from which Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders planned, approved and coordinated the Attack, and at which some or all of the September 11 hijackers received indoctrination and training. Moreover, forty to fifty percent of the IIRO's charitable funds were used to finance terrorist training camps in Afghanistan and Kashmir. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Rabita Trust | The Rabita Trust is a subsidiary body of the MWL, with headquarters in Lahore, Pakistan and offices throughout the world. The Rabita Trust was designated by President Bush as an organization that provided logistical and financial support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust was led by defendant Wa-el Hamza Julaidan, a founder of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Rabita Trust has, for a period of many years and in diverse regions throughout the world, provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in relation to that terrorist organization's global jihad, knowing that such support would result in an attack like the one that occurred on September 11, 2001. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent the Benevolence International Foundation (the "BIF") | BIF is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs BIF operations, appoints and terminates BIF personnel, provides BIF with virtually all of its funding, determines how funds will be distributed throughout the World, and otherwise stringently controls BIF's operations. In many countries, BIF conducts operations from the local Saudi Embassy, under the supervision of the embassy's Islamic Affairs Division. | 18 U.S.C. §§ 1962 (b), 1962(c), |

1962(d)

BIF is an apparent charity, with offices located throughout the world, and is a subsidiary body of the Muslim World League, and has frequently shared common officers and directors with that organization.

BIF has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations, with the full knowledge of and intent that its support give rise to an attack on the United States like that which occurred on September 11th, 2001. On November 19,2002, BIF was designated as a supporter and associate of terrorists by the U.S. government, pursuant to Executive Order 13224, based on its material support and sponsorship of, or affiliation with, defendant Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and/or affiliated foreign terrorist organizations, associations, organizations or persons.

Enaam Arnaout, BIF's chief executive officer and a member of the Board of Directors, pled guilty to racketeering conspiracy, in violation of Section 1962(d); conspiracy to provide material support to persons, organizations and groups engaged in violent activities, in violation of 18 U.S.C. § 371; conspiracy to launder proceeds of unlawful activity, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1956; and mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. On January 6, 2003, federal prosecutors filed a proffer in the criminal prosecution of Enaam Arnaout which details at length the pervasive involvement, and material support of BIF, and of its executives and employees, in sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations. This support included purchasing large quantities of weapons, operating radio communications, providing physical assets and false travel documents to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters, and sponsoring Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders camps throughout the World.

BIF played a pivotal role in Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' efforts to establish operations in Bosnia. BIF provided food, clothing, money and communications' equipment to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders affiliated fighters. BIF also facilitated the movement of Radical Muslim terrorism,

| | | |
|---|---|---|
| | and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters into the region by falsely representing to authorities that those terrorists would be working as BIF relief workers.  In March 2002, Basonian police raided BIF's Sarajevo offices and recovered extensive documentation relating to the   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders operations, including contributions of various individuals and charities to the terrorist organizations development and expansion.<br><br>  BIF also played an equally important role in the infrastructure supporting the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders in Chechnya.   BIF provided material support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders fighters supporting Chechnya mujihadeen by supplying military informs, financing, and anti-mine boots.<br><br>  BIF worked closely with several other purported charities, including the World Assembly of Muslim Youth, Muslim World League, International Islamic Relief Organization, and Al Haramain Foundation, in connection with its efforts to sponsor  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities.<br><br>  BIF used the U.S. financial system, mainly through BIF's US operation, extensively to launder money for  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and support its terrorist operations throughout the world. Further, BIF substantially understated the amount of funds it received in its 2000 tax returns, and did not attribute a substantial portion of the funds to a known source. | |
| The Kingdom, through its Agent the World Assembly of Muslim Youth ("WAMY") |   WAMY is a subsidiary body of the MWL, with more than sixty offices throughout the world. WAMY has long acted as a fully integrated component of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders's financial and logistical infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Among other things, WAMY has served as a distribution channel for training documentation between the  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders leadership in Afghanistan and operational cells throughout the world.<br><br>  The World Assembly of Muslim Youth ("WAMY") was established by Royal Decree in 1972 and receives direct support from the Saudi government. WAMY is governed by a | 18 U.S.C. §§<br><br>1962 (b),<br><br>1962(c),<br><br>1962(d) |

| | General Assembly and President who is appointed by the Saudi government. | |
|---|---|---|
| The Kingdom, through its Agent, the Saudi Red Crescent (the "SRC") | The SRC has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent, the al Haramain Foundation ("al Haramain") | Al Haramain has long acted as a fully integrated component of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' logistical and financial support infrastructure, and provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and affiliated foreign terrorist organizations. Indeed, as a result of AHF's pervasive sponsorship of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, the United States has designated every al Haramain branch office, including the headquarters in Saudi Arabia, a Foreign Terrorist Organization pursuant to Executive Order 13224. After consistently denying for many years Al Haramain's involvement in sponsoring terrorism, the Kingdom finally acknowledged reality, and bowed to international pressure and dissolved the organization on June 2, 2004.

Prior to its dissolution, Al Haramain was one of the principle Islamic non-governmental organizations that provided support for the Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders network and promoted its militant Islamic doctrine worldwide. Also prior to its dissolution, Al Haramain raised almost $30 million a year in donations and had an annual budget of $80 million. According to its website, it had active branches in about fifty countries. Al Haramain provided funding to terrorist organizations designated by the United States, including but not limited to Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah, and also permitted those organizations to use Al Haramain as a front for fundraising and operational activities. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Abdullah Al Faisal bin Abdulaziz Al Saud ("Prince | Prince Abdullah has made significant personal contributions to Saudi-based charities that he knew to be sponsors of Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, knowing and intending that those contributions | 18 U.S.C. §§ 1962 (b), |

| | | |
|---|---|---|
| Abdullah") | would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror. Further, Prince Abdullah engaged in transactions with Mushayt for Trading establishment, the funding mechanism for the Spanish  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders cell. Still further, Muhammed Galeb Klaje Zouaydi, who founded the network of companies which served as a vehicle for financing  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' activities in Europe, served for many years as Prince Abdullah's accountant. During the period of time that Mushayt for Trading was laundering money for the Spanish cell, Prince Abdullah and Zouaydi maintained a business partnership.  Thus, through his official and personal acts, Prince Abdullah has provided critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that this support would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Bandar bin Sultan bin Abdulaziz al Saud ("Prince Bandar") |    In his capacity as Ambassador to the United States, Prince Bandar has directed millions of dollars in embassy funds and of his personal wealth to charities operating within  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, thereby providing critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, through its Agent Prince Naif bin Abdulaziz Al Saud ("Prince Naif") |    In his capacity as Minister of Interior, Prince Naif has been, for many years, responsible for the oversight of charities based within Saudi Arabia. Under Prince Naif's direction, the Saudi Joint Relief Commission diverted $74 million to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders members and loyalists.  Through the Saudi Committee for Relief to Afghans, Prince Naif has channeled substantial financial and logistical support to sustain  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' presence and operations in Afghanistan. Further, Prince Naif has used his position as Minister of the Interior to protect  Radical Muslim | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

| | | |
|---|---|---|
| | terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' support infrastructure. Remarkably, Prince Naif publicly denied Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' responsibility for the Attack. Further, Prince Naif has also made large personal contributions to Saudi-based charities for the purpose supporting terrorism, with the knowledge and intent the contributions he made would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Thus, Prince Naif has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | |
| The Kingdom, through its Agent Prince Salman bin Abdul Aziz Al Saud ("Prince Salman") | In his capacity as founder of the Saudi High Commission, Prince Salman has long provided material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, has donated substantial funds to several other charities that operate within Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' infrastructure, and has been instrumental in raising funds for these charities from third parties. Prince Salman knew and intended that the contributions he made to, and funds he raised on behalf of, these charities would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism. Prince Salman thus has provided critical financial and logistical support to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack. | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |
| The Kingdom, Through its Agent Prince Sultan bin Abdulaziz Al Saud ("Prince Sultan) | In his capacity as the Chairman of the Supreme Council for Islamic Affairs, established by King Fahd in 1994 to oversee and control charitable organizations with operations within the Kingdom of Saudi Arabia, Prince Sultan has known, for a period of many years, which Saudi-based charities were providing material support and resources to Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Rather than | 18 U.S.C. §§ 1962 (b), 1962(c), |

| | | |
|---|---|---|
| | intervening to stem the flow of money and support from the charities to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, Prince Sultan has used his authority as Chairman of the Supreme Council to facilitate and ensure the continuing sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by those charities. In addition, Prince Sultan provided substantial funding, in both his official and private capacities, to several charities deeply involved in the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations Prince Sultan knew and intended that the contributions he made to these charities would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, but has nonetheless provided critical financial and logistical support to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders for a period of many years, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

  Prince Sultan further made substantial contributions to certain charities which sponsored or supported   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, including, without limitation, IIRO, Al Haramain, Muslim World League and WAMY.

  Prince Sultan directly aided and abetted and materially sponsored   Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and Islamic terrorism, through these contributions and supervised the charities, or, in the alternative, was grossly negligent in supervising the charities, knowing they would be used to sponsor terrorism.

  Prince Sultan has been Minister of Defense and Aviation, Chairman of the Supreme Council of Islamic Affairs, Second Deputy Prime Minister of the Council of Ministers, and, on information and belief, is the Third highest ranking member of the Saudi Government, and a brother of the King. | 1962(d) |
| The Kingdom, through its Agent Prince Turki Al Faisal Al Saud ("Prince Turki") |   During Prince Turki's tenure as head of Saudi Arabia's general intelligence service, the Istakhbarat, between 1977 and 2001, the Istakhbarat provided massive financial aid and material support to the Taliban. At the time,  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban maintained a symbiotic and mutually supportive relationship. Prince Turki | 18 U.S.C. §§

1962 (b),

1962(c), |

| | | |
|---|---|---|
| | knew and intended that the support provided to the Taliban by the Kingdom of Saudi Arabia under his direction would materially benefit  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, by virtue of the close relationship and near identity between the two organizations. Additionally, Prince Turki made significant personal contributions to Saudi-based charities that he knew to be sponsors of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations, and coordinated the sponsorship of  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders by several wealthy members of Saudi society, knowing that all such contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of international terrorism, knowing and intending that those contributions would be used to fund  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders' global operations and acts of terror, the foreseeable culmination of which was the Attack.

Prince Turki was aware of the terrorist threat originating from Osama Bin Laden and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

Prince Turki met several times with Osama Bin Laden and or Osama Bin Laden's representatives on behalf of the Saudi Government and offered not to extradite him and otherwise provide him and  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders with support, in exchange for protection.

Prince Turki facilitated money transfers from wealthy Saudi's to  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and the Taliban.

Prince Turki made contributions to charities he knew were sponsors or affiliated with  Radical Muslim terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. | 1962(d) |

---

i This pleading shall not be construed to add any additional allegations as to any dismissed defendants.

PLAINTIFFS' MORE DEFINITE STATEMENT AS TO ALL O'NEILL
DEFENDANTS

VICTIMS LIST

1.  The name of the defendants to whom this Statement pertains is *all Defendants.*[1]

2.  The names of each victim ("Victims List") are as set forth in Exhibit A, which is attached hereto and incorporated herein.

3.  Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  September 30, 2005

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

BY:_____
GINA M. MAC NEILL, ESQUIRE (GM 0581)
JERRY S. GOLDMAN, ESQUIRE (JG 8445)
FREDERICK J. SALEK, ESQUIRE (FS 8565)
Attorneys for the Plaintiffs
111 Broadway, 13th Floor
New York, N.Y. 10006
212.242.2232

---

[1] The instant pleading shall not apply to any defendant who has been dismissed in the instant action, without further leave of the Court.

X:\Clients\ONeill v. Saudi arabia\Complaints\English\Al Baraka\AB3\Exhibits\A_All Victims-  - More Definite Statement - KSA_.doc

EXHIBIT "A"

VICTIMS LIST

### World Trade Center

Gordon McCannel Aamoth, 32, New York, N.Y.
Maria Rose Abad, 49, Syosset, N.Y.
Edelmiro (Ed) Abad, 54, New York, N.Y.
Andrew Anthony Abate, 37, Melville, N.J.
Vincent Abate, 40, New York, N.Y.
Laurence Christopher Abel, 37
William F. Abrahamson, 58, Cortland Manor, N.Y.
Richard Anthony Aceto, 42, Wantagh, N.Y.
Erica Van Acker, 62, New York, N.Y.
Heinrich B. Ackermann, 38, New York, N.Y.
Paul Andrew Acquaviva, 29, Glen Rock, N.J.
Donald L. Adams, 28, Chatham, N.J.
Shannon Lewis Adams, 25, New York, N.Y.
Stephen Adams, 51, New York, N.Y.
Patrick Adams, 60, New York, N.Y.
Ignatius Adanga, 62, New York, N.Y.
Christy A. Addamo, 28, New Hyde Park, N.Y.
Terence E. Adderley, 22, Bloomfield Hills, Mich.
Sophia B. Addo, 36, New York, N.Y.
Lee Adler, 48, Springfield, N.J.
Daniel Thomas Afflitto, 32, Manalapan, N.J.
Emmanuel Afuakwah, 37, New York, N.Y.
Alok Agarwal, 36, Jersey City, N.J.
Mukul Agarwala, 37, New York, N.Y.
Joseph Agnello, 35, New York, N.Y.
David Scott Agnes, 46, New York, N.Y.
Joao A. Aguiar Jr., 30, Red Bank, N.J.
Lt. Brian G. Ahearn, 43, Huntington, N.Y.
Jeremiah J. Ahern, 74, Cliffside Park, N.J.
Joanne Ahladiotis, 27, New York, N.Y.
Shabbir Ahmed, 47, New York, N.Y.
Terrance Andre Aiken, 30, New York, N.Y.
Godwin Ajala, 33, New York, N.Y.
Gertrude M. Alagero, 37, New York, N.Y.
Andrew Alameno, 37, Westfield, N.J.
Margaret Ann (Peggy) Jezycki Alario, 41, New York, N.Y.
Gary Albero, 39, Emerson, N.J.
Jon L. Albert, 46, Upper Nyack, N.Y.
Peter Craig Alderman, 25, New York, N.Y.

Jacquelyn Delaine Aldridge, 46, New York, N.Y.
Grace Alegre-Cua, 40, Glen Rock, N.J.
David D. Alger, 57, New York, N.Y.
Ernest Alikakos, 43, New York, N.Y.
Edward L. Allegretto, 51, Colonia, N.J.
Eric Allen, 44, New York, N.Y.
Joseph Ryan Allen, 39, New York, N.Y.
Richard Lanard Allen, 30, New York, N.Y.
Richard Dennis Allen, 31, New York, N.Y.
Christopher Edward Allingham, 36, River Edge, N.J.
Janet M. Alonso, 41, Stony Point, N.Y.
Anthony Alvarado, 31, New York, N.Y.
Antonio Javier Alvarez, 23, New York, N.Y.
Telmo Alvear, 25, New York, N.Y.
Cesar A. Alviar, 60, Bloomfield, N.J.
Tariq Amanullah, 40, Metuchen, N.J.
Angelo Amaranto, 60, New York, N.Y.
James Amato, 43, Ronkonkoma, N.Y.
Joseph Amatuccio, 41, New York, N.Y.
Christopher Charles Amoroso, 29, New York, N.Y.
Kazuhiro Anai, 42, Scarsdale, N.Y.
Calixto Anaya, 35, Suffern, N.Y.
Jorge Octavio Santos Anaya, 25, Aguascalientes, Aguascalientes, Mexico
Joseph Peter Anchundia, 26, New York, N.Y.
Kermit Charles Anderson, 57, Green Brook, N.J.
Yvette Anderson, 53, New York, N.Y.
John Andreacchio, 52, New York, N.Y.
Michael Rourke Andrews, 34, Belle Harbor, N.Y.
Jean A. Andrucki, 42, Hoboken, N.J.
Siew-Nya Ang, 37, East Brunswick, N.J.
Joseph Angelini, 38, Lindenhurst, N.Y.
Joseph Angelini, 63, Lindenhurst, N.Y.
Laura Angilletta, 23, New York, N.Y.
Doreen J. Angrisani, 44, New York, N.Y.
Lorraine D. Antigua, 32, Middletown, N.J.
Peter Paul Apollo, 26, Hoboken, N.J.
Faustino Apostol, 55, New York, N.Y.
Frank Thomas Aquilino, 26, New York, N.Y.
Patrick Michael Aranyos, 26, New York, N.Y.
David Gregory Arce, 36, New York, N.Y.
Michael G. Arczynski, 45, Little Silver, N.J.
Louis Arena, 32, New York, N.Y.
Adam Arias, 37, Staten Island, N.Y.
Michael J. Armstrong, 34, New York, N.Y.
Jack Charles Aron, 52, Bergenfield, N.J.
Joshua Aron, 29, New York, N.Y.

Richard Avery Aronow, 48, Mahwah, N.J.
Japhet J. Aryee, 49, Spring Valley, N.Y.
Carl Asaro, 39, Middletown, N.Y.
Michael A. Asciak, 47, Ridgefield, N.J.
Michael Edward Asher, 53, Monroe, N.Y.
Janice Ashley, 25, Rockville Centre, N.Y.
Thomas J. Ashton, 21, New York, N.Y.
Manuel O. Asitimbay, 36, New York, N.Y.
Lt. Gregg Arthur Atlas, 45, Howells, N.Y.
Gerald Atwood, 38, New York, N.Y.
James Audiffred, 38, New York, N.Y.
Kenneth W. Van Auken, 47, East Brunswick, N.J.
Louis F. Aversano, Jr, 58, Manalapan, N.J.
Ezra Aviles, 41, Commack, N.Y.
Ayodeji Awe, 42, New York, N.Y
Samuel (Sandy) Ayala, 36, New York, N.Y.
Arlene T. Babakitis, 47, Secaucus, N.J.
Eustace (Rudy) Bacchus, 48, Metuchen, N.J.
John James Badagliacca, 35, New York, N.Y.
Jane Ellen Baeszler, 43, New York, N.Y.
Robert J. Baierwalter, 44, Albertson, N.Y.
Andrew J. Bailey, 29, New York, N.Y.
Brett T. Bailey, 28, Bricktown, N.Y.
Tatyana Bakalinskaya, 43, New York, N.Y.
Michael S. Baksh, 36, Englewood, N.J.
Sharon Balkcom, 43, White Plains, N.Y.
Michael Andrew Bane, 33, Yardley, Pa.
Kathy Bantis, 44, Chicago, Ill.
Gerard Jean Baptiste, 35, New York, N.Y.
Walter Baran, 42, New York, N.Y.
Gerard A. Barbara, 53, New York, N.Y.
Paul V. Barbaro, 35, Holmdel, N.J.
James W. Barbella, 53, Oceanside, N.Y.
Ivan Kyrillos Fairbanks Barbosa, 30, Jersey City, N.J.
Victor Daniel Barbosa, 23, New York, N.Y.
Colleen Ann Barkow, 26, East Windsor, N.J.
David Michael Barkway, 34, Toronto, Ontario, Canada
Matthew Barnes, 37, Monroe, N.Y.
Sheila Patricia Barnes, 55, Bay Shore, N.Y.
Evan J. Baron, 38, Bridgewater, N.J.
Renee Barrett-Arjune, 41, Irvington, N.J.
Arthur T. Barry, 35, New York, N.Y.
Diane G. Barry, 60, New York, N.Y.
Maurice Vincent Barry, 49, Rutherford, N.J.
Scott D. Bart, 28, Malverne, N.Y.
Carlton W. Bartels, 44, New York, N.Y.

3

Guy Barzvi, 29, New York, N.Y.
Inna Basina, 43, New York, N.Y.
Alysia Basmajian, 23, Bayonne, N.J.
Kenneth William Basnicki, 48, Etobicoke, Ontario, Canada
Lt. Steven J. Bates, 42, New York, N.Y.
Paul James Battaglia, 22, New York, N.Y.
W. David Bauer, 45, Rumson, N.J.
Ivhan Luis Carpio Bautista, 24, New York, N.Y.
Marlyn C. Bautista, 46, Iselin, N.J.
Jasper Baxter, 45, Philadelphia, Pa.
Michele (Du Berry) Beale, 37, Essex, Britain
Paul F. Beatini, 40, Park Ridge, N.J.
Jane S. Beatty, 53, Belford, N.J.
Larry I. Beck, 38, Baldwin, N.Y.
Manette Marie Beckles, 43, Rahway, N.J.
Carl John Bedigian, 35, New York, N.Y.
Michael Beekman, 39, New York, N.Y.
Maria Behr, 41, Milford, N.J.
Yelena Belilovsky, 38, Mamaroneck, N.Y.
Nina Patrice Bell, 39, New York, N.Y.
Andrea Della Bella, 59, Jersey City, N.J.
Debbie S. Bellows, 30, East Windsor, N.J.
Stephen Elliot Belson, 51, New York, N.Y.
Paul Michael Benedetti, 32, New York, N.Y.
Denise Lenore Benedetto, 40, New York, N.Y.
Bryan Craig Bennett, 25, New York, N.Y.
Oliver Duncan Bennett, 29, London, England
Eric L. Bennett, 29, New York, N.Y.
Margaret L. Benson, 52, Rockaway, N.J.
Dominick J. Berardi, 25, New York, N.Y.
James Patrick Berger, 44, Lower Makefield, Pa.
Steven Howard Berger, 45, Manalapan, N.J.
John P. Bergin, 39, New York, N.Y.
Alvin Bergsohn, 48, Baldwin Harbor, N.Y.
Daniel D. Bergstein, 38, Teaneck, N.J.
Michael J. Berkeley, 38, New York, N.Y.
Donna Bernaerts-Kearns, 44, Hoboken, N.J.
David W. Bernard, 57, Chelmsford, Mass.
William Bernstein, 44, New York, N.Y.
David M. Berray, 39, New York, N.Y.
David S. Berry, 43, New York, N.Y.
Joseph J. Berry, 55, Saddle River, N.J.
William Reed Bethke, 36, Hamilton, N.J.
Timothy D. Betterly, 42, Little Silver, N.J.
Edward F. Beyea, 42, New York, N.Y.
Paul Michael Beyer, 37, New York, N.Y.

Anil T. Bharvaney, 41, East Windsor, N.J.
Bella Bhukhan, 24, Union, N.J.
Shimmy D. Biegeleisen, 42, New York, N.Y.
Peter Alexander Bielfeld, 44, New York, N.Y.
William Biggart, 54, New York, N.Y.
Brian Bilcher, 36, New York, N.Y.
Carl Vincent Bini, 44, New York, N.Y.
Gary Bird, 51, Tempe, Ariz.
Joshua David Birnbaum, 24, New York, N.Y.
George Bishop, 52, Granite Springs, N.Y.
Jeffrey D. Bittner, 27, New York, N.Y.
Balewa Albert Blackman, 26, New York, N.Y.
Christopher Joseph Blackwell, 42, Patterson, N.Y.
Susan L. Blair, 35, East Brunswick, N.J.
Harry Blanding, 38, Blakeslee, Pa.
Janice L. Blaney, 55, Williston Park, N.Y.
Craig Michael Blass, 27, Greenlawn, N.Y.
Rita Blau, 52, New York, N.Y.
Richard M. Blood, 38, Ridgewood, N.J.
Michael A. Boccardi, 30, Bronxville, N.Y.
John Paul Bocchi, 38, New Vernon, N.J.
Michael L. Bocchino, 45, New York, N.Y.
Susan Mary Bochino, 36, New York, N.Y.
Bruce Douglas (Chappy) Boehm, 49, West Hempstead, N.Y.
Mary Katherine Boffa, 45, New York, N.Y.
Nicholas A. Bogdan, 34, Browns Mills, N.J.
Darren C. Bohan, 34, New York, N.Y.
Lawrence Francis Boisseau, 36, Freehold, N.J.
Vincent M. Boland, 25, Ringwood, N.J.
Alan Bondarenko, 53, Flemington, N.J.
Andre Bonheur, 40, New York, N.Y.
Colin Arthur Bonnett, 39, New York, N.Y.
Frank Bonomo, 42, Port Jefferson, N.Y.
Yvonne L. Bonomo, 30, New York, N.Y.
Sean Booker, 35, Irvington, N.J.
Sherry Ann Bordeaux, 38, Jersey City, N.J.
Krystine C. Bordenabe, 33, Old Bridge, N.J.
Martin Boryczewski, 29, Parsippany, N.J.
Richard E. Bosco, 34, Suffern, N.Y.
John Howard Boulton, 29, New York, N.Y.
Francisco Bourdier, 41, New York, N.Y.
Thomas H. Bowden, 36, Wyckoff, N.J.
Kimberly S. Bowers, 31, Islip, N.Y.
Veronique (Bonnie) Nicole Bowers, 28, New York, N.Y.
Larry Bowman, 46, New York, N.Y.
Shawn Edward Bowman, 28, New York, N.Y.

Kevin L. Bowser, 45, Philadelphia, Pa.
Gary R. Box, 37, North Bellmore, N.Y.
Gennady Boyarsky, 34, New York, N.Y.
Pamela Boyce, 43, New York, N.Y.
Michael Boyle, 37, Westbury, N.Y.
Alfred Braca, 54, Leonardo, N.J.
Sandra Conaty Brace, 60, New York, N.Y.
Kevin H. Bracken, 37, New York, N.Y.
David Brian Brady, 41, Summit, N.J.
Alexander Braginsky, 38, Stamford, Conn.
Nicholas W. Brandemarti, 21, Mantua, N.J.
Michelle Renee Bratton, 23, Yonkers, N.Y.
Patrice Braut, 31, New York, N.Y.
Lydia Estelle Bravo, 50, Dunellen, N.J.
Ronald Michael Breitweiser, 39, Middletown Township, N.J.
Edward A. Brennan, 37, New York, N.Y.
Frank H. Brennan, 50, New York, N.Y.
Michael Emmett Brennan, 27, New York, N.Y.
Peter Brennan, 30, Ronkonkoma, N.Y.
Thomas M. Brennan, 32, Scarsdale, N.Y.
Capt. Daniel Brethel, 43, Farmingdale, N.Y.
Gary L. Bright, 36, Union City, N.J.
Jonathan Eric Briley, 43, Mount Vernon, N.Y.
Mark A. Brisman, 34, Armonk, N.Y.
Paul Gary Bristow, 27, New York, N.Y.
Victoria Alvarez Brito, 38, New York, N.Y.
Mark Francis Broderick, 42, Old Bridge, N.J.
Herman C. Broghammer, 58, North Merrick, N.Y.
Keith Broomfield, 49, New York, N.Y.
Janice J. Brown, 35, New York, N.Y.
Lloyd Brown, 28, Bronxville, N.Y.
Capt. Patrick J. Brown, 48, New York, N.Y.
Bettina Browne, 49, Atlantic Beach, N.Y.
Mark Bruce, 40, Summit, N.J.
Richard Bruehert, 38, Westbury, N.Y.
Andrew Brunn, 28
Capt. Vincent Brunton, 43, New York, N.Y.
Ronald Paul Bucca, 47, Tuckahoe, N.Y.
Brandon J. Buchanan, 24, New York, N.Y.
Greg Joseph Buck, 37, New York, N.Y.
Dennis Buckley, 38, Chatham, N.J.
Nancy Bueche, 43, Hicksville, N.Y.
Patrick Joseph Buhse, 36, Lincroft, N.J.
John E. Bulaga, 35, Paterson, N.J.
Stephen Bunin, 45, New York, N.Y.
Thomas Daniel Burke, 38, Bedford Hills, N.Y.

Capt. William F. Burke, 46, New York, N.Y.
Matthew J. Burke, 28, New York, N.Y.
Donald James Burns, 61, Nissequogue, N.Y.
Kathleen A. Burns, 49, New York, N.Y.
Keith James Burns, 39, East Rutherford, N.J.
John Patrick Burnside, 36, New York, N.Y.
Irina Buslo, 32, New York, N.Y.
Milton Bustillo, 37, New York, N.Y.
Thomas M. Butler, 37, Kings Park, N.Y.
Patrick Byrne, 39, New York, N.Y.
Timothy G. Byrne, 36, Manhattan, N.Y.
Jesus Cabezas, 66, New York, N.Y.
Lillian Caceres, 48, New York, N.Y.
Brian Joseph Cachia, 26, New York, N.Y.
Steven Cafiero, 31, New York, N.Y.
Richard M. Caggiano, 25, New York, N.Y.
Cecile M. Caguicla, 55, Boonton, N.J.
Michael John Cahill, 37, East Williston, N.Y.
Scott W. Cahill, 30, West Caldwell, N.J.
Thomas J. Cahill, 36, Franklin Lakes, N.J.
George Cain, 35, Massapequa, N.Y.
Salvatore B. Calabro, 38, New York, N.Y.
Joseph Calandrillo, 49, Hawley, Pa.
Philip V. Calcagno, 57, New York, N.Y.
Edward Calderon, 44, Jersey City, N.J.
Kenneth Marcus Caldwell, 30, New York, N.Y.
Dominick E. Calia, 40, Manalapan, N.J.
Felix (Bobby) Calixte, 38, New York, N.Y.
Capt. Frank Callahan, 51, New York, N.Y.
Liam Callahan, 44, Rockaway, N.J.
Luigi Calvi, 34, East Rutherford, N.J.
Roko Camaj, 60, Manhasset, N.Y.
Michael Cammarata, 22, Huguenot, N.Y.
David Otey Campbell, 51, Basking Ridge, N.J.
Geoffrey Thomas Campbell, 31, New York, N.Y.
Sandra Patricia Campbell, 45, New York, N.Y.
Jill Marie Campbell, 31, New York, N.Y.
Robert Arthur Campbell, 25, New York, N.Y.
Juan Ortega Campos, 32, New York, N.Y.
Sean Canavan, 39, New York, N.Y.
John A. Candela, 42, Glen Ridge, N.J.
Vincent Cangelosi, 30, New York, N.Y.
Stephen J. Cangialosi, 40, Middletown, N.J.
Lisa B. Cannava, 30, New York, N.Y.
Brian Cannizzaro, 30, New York, N.Y.
Michael R. Canty, 30, Schenectady, N.Y.

Louis A. Caporicci, 35, New York, N.Y.
Jonathan N. Cappello, 23, Garden City, N.Y.
James Christopher Cappers, 33, Wading River, N.Y.
Richard M. Caproni, 34, Lynbrook, N.Y.
Jose Cardona, 32, New York, N.Y.
Dennis M Carey, 51, Wantagh, N.Y.
Edward Carlino, 46, New York, N.Y.
Michael Scott Carlo, 34, New York, N.Y.
David G. Carlone, 46, Randolph, N.J.
Rosemarie C. Carlson, 40, New York, N.Y.
Mark Stephen Carney, 41, Rahway, N.J.
Joyce Ann Carpeneto, 40, New York, N.Y.
Alicia Acevedo Carranza, Teziutlan, Puebla, Mexico
Jeremy M. Carrington, 34, New York, N.Y.
Michael T. Carroll, 39, New York, N.Y.
Peter Carroll, 42, New York, N.Y.
James J. Carson, 32, Massapequa, N.Y.
James Marcel Cartier, 26, New York, N.Y.
Vivian Casalduc, 45, New York, N.Y.
John F. Casazza, 38, Colts Neck, N.J.
Paul Cascio, 23, Manhasset, N.Y.
Kathleen Hunt Casey, 43, Middletown, N.J.
Margarito Casillas, 54, Guadalajara, Jalisco, Mexico
Thomas Anthony Casoria, 29, New York, N.Y.
William Otto Caspar, 57, Eatontown, N.J.
Alejandro Castano, 35, Englewood, N.J.
Arcelia Castillo, 49, Elizabeth, N.J.
Leonard M. Castrianno, 30, New York, N.Y.
Jose Ramon Castro, 37, New York, N.Y.
Richard G. Catarelli, 47, New York, N.Y.
Christopher Sean Caton, 34, New York, N.Y.
Robert J. Caufield, 48, Valley Stream, N.Y.
Mary Teresa Caulfield, 58, New York, N.Y.
Judson Cavalier, 26, Huntington, N.Y.
Michael Joseph Cawley, 32, Bellmore, N.Y.
Jason D. Cayne, 32, Morganville, N.J.
Juan Armando Ceballos, 47, New York, N.Y.
Marcia G. Cecil-Carter, 34, New York, N.Y.
Jason Cefalu, 30, West Hempstead, N.Y.
Thomas J. Celic, 43, New York, N.Y.
Ana M. Centeno, 38, Bayonne, N.J.
Joni Cesta, 37, Bellmore, N.Y.
Jeffrey M. Chairnoff, 35, West Windsor, N.J.
Swarna Chalasani, 33, Jersey City, N.J.
William Chalcoff, 41, Roslyn, N.Y.
Eli Chalouh, 23, New York, N.Y.

Charles Lawrence (Chip) Chan, 23, New York, N.Y.
Mandy Chang, 40, New York, N.Y.
Mark L. Charette, 38, Millburn, N.J.
Gregorio Manuel Chavez, 48, New York, N.Y.
Jayceryll M. de Chavez, 24, Carteret, N.J.
Pedro Francisco Checo, 35, New York, N.Y.
Douglas MacMillan Cherry, 38, Maplewood, N.J.
Stephen Patrick Cherry, 41, Stamford, Conn.
Vernon Paul Cherry, 49, New York, N.Y.
Nestor Chevalier, 30, New York, N.Y.
Swede Joseph Chevalier, 26, Locust, N.J.
Alexander H. Chiang, 51, New City, N.Y.
Dorothy J. Chiarchiaro, 61, Glenwood, N.J.
Luis Alfonso Chimbo, 39, New York, N.Y.
Robert Chin, 33, New York, N.Y.
Wing Wai (Eddie) Ching, 29, Union, N.J.
Nicholas P. Chiofalo, 39, Selden, N.Y.
John Chipura, 39, New York, N.Y.
Peter A. Chirchirillo, 47, Langhorne, Pa.
Catherine E. Chirls, 47, Princeton, N.J.
Kyung (Kaccy) Cho, 30, Clifton, N.J.
Abul K. Chowdhury, 30, New York, N.Y.
Mohammed Salahuddin Chowdhury, 38, New York, N.Y.
Kirsten L. Christophe, 39, Maplewood, N.J.
Pamela Chu, 31, New York, N.Y.
Steven Paul Chucknick, 44, Cliffwood Beach, N.J.
Wai-ching Chung, 36, New York, N.Y.
Christopher Ciafardini, 30, New York, N.Y.
Alex F. Ciccone, 38, New Rochelle, N.Y.
Frances Ann Cilente, 26, New York, N.Y.
Elaine Cillo, 40, New York, N.Y.
Edna Cintron, 46, New York, N.Y.
Nestor Andre Cintron, 26, New York, N.Y.
Lt. Robert Dominick Cirri, 39, Nutley, N.J.
Juan Pablo Alvarez Cisneros, 23, Weehawken, N.J.
Gregory Alan Clark, 40, Teaneck, N.J.
Mannie Leroy Clark, 54, New York, N.Y.
Thomas R. Clark, 37, Summit, N.J.
Eugene Clark, 47, New York, N.Y.
Benjamin Keefe Clark, 39, New York, N.Y.
Christopher Robert Clarke, 34, Philadelphia, Pa.
Donna Clarke, 39, New York, N.Y.
Michael Clarke, 27, Prince's Bay, N.Y.
Suria R.E. Clarke, 30, New York, N.Y.
Kevin Francis Cleary, 38, New York, N.Y.
James D. Cleere, 55, Newton, Iowa

Geoffrey W. Cloud, 36, Stamford, Conn.
Susan M. Clyne, 42, Lindenhurst, N.Y.
Steven Coakley, 36, Deer Park, N.Y.
Jeffrey Coale, 31, Souderton, Pa.
Patricia A. Cody, 46, Brigantine, N.J.
Daniel Michael Coffey, 54, Newburgh, N.Y.
Jason Matthew Coffey, 25, Newburgh, N.Y.
Florence Cohen, 62, New York, N.Y.
Kevin Sanford Cohen, 28, Edison, N.J.
Anthony Joseph Coladonato, 47, New York, N.Y.
Mark J. Colaio, 34, New York, N.Y.
Stephen J. Colaio, 32, Montauk, N.Y.
Christopher M. Colasanti, 33, Hoboken, N.J.
Michel Paris Colbert, 39, West New York, N.J.
Kevin Nathaniel Colbert, 25, New York, N.Y.
Keith Eugene Coleman, 34, Warren, N.J.
Scott Thomas Coleman, 31, New York, N.Y.
Tarel Coleman, 32
Liam Joseph Colhoun, 34, Flushing,, N.Y.
Robert D. Colin, 49, West Babylon, N.Y.
Robert J. Coll, 35, Glen Ridge, N.J.
Jean Marie Collin, 42, New York, N.Y.
John Michael Collins, 42, New York, N.Y.
Michael L. Collins, 38, Montclair, N.J.
Thomas J. Collins, 36, New York, N.Y.
Joseph Collison, 50, New York, N.Y.
Patricia Malia Colodner, 39, New York, N.Y.
Linda M. Colon, 46, Perrineville, N.J.
Soledi Colon, 39, New York, N.Y.
Ronald Comer, 56, Northport, N.Y.
Jaime Concepcion, 46, New York, N.Y.
Albert Conde, 62, Englishtown, N.J.
Denease Conley, 44, New York, N.Y.
Susan Clancy Conlon, 41, New York, N.Y.
Margaret Mary Conner, 57, New York, N.Y.
John E. Connolly, 46, Allenwood, N.J.
Cynthia L. Connolly, 40, Metuchen, N.J.
James Lee Connor, 38, Summit, N.J.
Jonathan (J.C.) Connors, 55, Old Brookville, N.Y.
Kevin P. Connors, 55, Greenwich, Conn.
Kevin Francis Conroy, 47, New York, N.Y.
Brenda E. Conway, 40, New York, N.Y.
Dennis Michael Cook, 33, Colts Neck, N.J.
Helen D. Cook, 24, New York, N.Y.
John A. Cooper, 40, Bayonne, N.J.
Joseph J. Coppo, 47, New Canaan, Conn.

Gerard J. Coppola, 46, New Providence, N.J.
Joseph Albert Corbett, 28, Islip, N.Y.
Alejandro Cordero, 23, New York, N.Y.
Robert Cordice, 28, New York, N.Y.
Ruben D. Correa, 44, New York, N.Y.
Danny A. Correa-Gutierrez, 25, Fairview, N.J.
James Corrigan, 60, New York, N.Y.
Carlos Cortes, 57, New York, N.Y.
Kevin M. Cosgrove, 46, West Islip, N.Y.
Dolores Marie Costa, 53, Middletown, N.J.
Digna Alexandra Rivera Costanza, 25, New York, N.Y.
Charles Gregory Costello, 46, Old Bridge, N.J.
Michael S. Costello, 27, Hoboken, N.J.
Conrod K.H. Cottoy, 51, New York, N.Y.
Martin Coughlan, 54, New York, N.Y.
Sgt. John Gerard Coughlin, 43, Pomona, N.Y.
Timothy John Coughlin, 42, New York, N.Y.
James E. Cove, 48, Rockville Centre, N.Y.
Andre Cox, 29, New York, N.Y.
Frederick John Cox, 27, New York, N.Y.
James Raymond Coyle, 26, New York, N.Y.
Michelle Coyle-Eulau, 38, Garden City, N.Y.
Anne M. Cramer, 47, New York, N.Y.
Christopher Seton Cramer, 34, Manahawkin, N.J.
Denise Crant, 46, Hackensack, N.J.
Robert James Crawford, 62, New York, N.Y.
James L. Crawford, 33, Madison, N.J.
Joanne Mary Cregan, 32, New York, N.Y.
Lucia Crifasi, 51, Glendale, N.Y.
Lt. John Crisci, 48, Holbrook, N.Y.
Daniel Hal Crisman, 25, New York, N.Y.
Dennis A. Cross, 60, Islip Terrace, N.Y.
Helen Crossin-Kittle, 34, Larchmont, N.Y.
 Thomas G. Crotty, 42, Rockville Centre, N.Y.
John Crowe, 57, Rutherford, N.J.
Welles Remy Crowther, 24, Upper Nyack, N.Y.
Robert L. Cruikshank, 64, New York, N.Y.
Francisco Cruz, 47, New York, N.Y.
John Robert Cruz, 32, Jersey City, N.J.
Kenneth John Cubas, 48, Woodstock, N.Y.
Richard Joseph Cudina, 46, Glen Gardner, N.J.
Neil James Cudmore, 38, Port Washington, N.Y.
Thomas Patrick Cullen, 31, New York, N.Y.
Joan McConnell Cullinan, 47, Scarsdale, N.Y.
Joyce Cummings, 65
Brian Thomas Cummins, 38, Manasquan, N.J.

Nilton Albuquerque Fernao Cunha, 41
Michael Joseph Cunningham, 39, Princeton Junction, N.J.
Robert Curatolo, 31, New York, N.Y.
Laurence Curia, 41, Garden City, N.Y.
Paul Dario Curioli, 53, Norwalk, Conn.
Beverly Curry, 41, New York, N.Y.
Sgt. Michael Curtin, 45, Medford, N.Y.
Gavin Cushny, 47, Hoboken, N.J.
Caleb Arron Dack, 39, Montclair, N.J.
Carlos S. DaCosta, 41, Elizabeth, N.J.
John D'Allara, 47, Pearl River, N.Y.
Vincent D'Amadeo, 36, East Patchoque, N.Y.
Thomas A. Damaskinos, 33, Matawan, N.J.
Jack L. D'Ambrosi, 45, Woodcliff Lake, N.J.
Jeannine Marie Damiani-Jones, 28, New York, N.Y.
Patrick W. Danahy, 35, Yorktown Heights, N.Y.
Nana Kwuku Danso, 47, New York, N.Y.
Mary D'Antonio, 55, New York, N.Y.
Vincent G. Danz, 38, Farmingdale, N.Y.
Dwight Donald Darcy, 55, Bronxville, N.Y.
Elizabeth Ann Darling, 28, Newark, N.J.
Annette Andrea Dataram, 25, New York, N.Y.
Lt. Edward Alexander D'Atri, 38, New York, N.Y.
Michael D. D'Auria, 25, New York, N.Y.
Lawrence Davidson, 51, New York, N.Y.
Michael Allen Davidson, 27, Westfield, N.J.
Scott Matthew Davidson, 33, New York, N.Y.
Titus Davidson, 55, New York, N.Y.
Niurka Davila, 47, New York, N.Y.
Clinton Davis, 38, New York, N.Y.
Wayne Terrial Davis, 29, Fort Meade, Md.
Calvin Dawson, 46, New York, N.Y.
Anthony Richard Dawson, 32, Southampton, Hampshire, England
Edward James Day, 45, New York, N.Y.
Emerita (Emy) De La Pena, 32, New York, N.Y.
Melanie Louise De Vere, 30, London, England
William T. Dean, 35, Floral Park, N.Y.
Robert J. DeAngelis, 48, West Hempstead, N.Y.
Thomas P. Deangelis, 51, Westbury, N.Y.
Tara Debek, 35, Babylon, N.Y.
Anna Debin, 30, East Farmingdale, N.Y.
James V. DeBlase, 45, Manalapan, N.J.
Paul DeCola, 39, Ridgewood, N.Y.
Simon Dedvukaj, 26, Mohegan Lake, N.Y.
Jason Christopher DeFazio, 29, New York, N.Y.

David A. Defeo, 37, New York, N.Y.
Jennifer DeJesus, 23, New York, N.Y.
 Monique E. DeJesus, 28, New York, N.Y.
Nereida DeJesus, 30, New York, N.Y.
Donald A. Delapenha, 37, Allendale, N.J.
Vito Joseph Deleo, 41, New York, N.Y.
Danielle Delie, 47, New York, N.Y.
Colleen Ann Deloughery, 41, Bayonne, N.J.
Francis (Frank) Albert DeMartini, 49, New York, N.Y.
Anthony Demas, 61, New York, N.Y.
Martin DeMeo, 47, Farmingville, N.Y.
Francis X. Deming, 47, Franklin Lakes, N.J.
Carol K. Demitz, 49, New York, N.Y.
Kevin Dennis, 43, Peapack, N.J.
Thomas F. Dennis, 43, Setauket, N.Y.
Jean C. DePalma, 42, Newfoundland, N.J.
Jose Nicolas Depena, 42, New York, N.Y.
Robert J. Deraney, 43, New York, N.Y.
Michael DeRienzo, 37, Hoboken, N.J.
David Paul Derubbio, 38, New York, N.Y.
Jemal Legesse DeSantis, 28, Jersey City, N.J.
Christian L. DeSimone, 23, Ringwood, N.J.
Edward DeSimone, 36, Atlantic Highlands, N.J.
Lt. Andrew Desperito, 44, Patchogue, N.Y.
Michael Jude D'Esposito, 32, Morganville, N.J.
Cindy Ann Deuel, 28, New York, N.Y.
Jerry DeVito, 66, New York, N.Y.
Robert P. Devitt, 36, Plainsboro, N.J.
Dennis Lawrence Devlin, 51, Washingtonville, N.Y.
Gerard Dewan, 35, New York, N.Y.
Simon Suleman Ali Kassamali Dhanani, 62, Hartsdale, N.Y.
Michael L. DiAgostino, 41, Garden City, N.Y.
Matthew Diaz, 33, New York, N.Y.
Nancy Diaz, 28, New York, N.Y.
Obdulio Ruiz Diaz, 44, New York, N.Y.
Lourdes Galletti Diaz, 32, New York, N.Y.
Michael Diaz-Piedra, 49
Judith Belguese Diaz-Sierra, 32, Bay Shore, N.Y.
Patricia F. DiChiaro, 63, New York, N.Y.
Joseph Dermot Dickey, 50, Manhasset, N.Y.
Lawrence Patrick Dickinson, 35, Morganville, N.J.
Michael David Diehl, 48, Brick, N.J.
John DiFato, 39, New York, N.Y.
Vincent F. DiFazio, 43, Hampton, N.J.
Carl DiFranco, 27, New York, N.Y.
Donald J. DiFranco, 43, New York, N.Y.

Debra Ann DiMartino, 36, New York, N.Y.
Stephen P. Dimino, 48, Basking Ridge, N.J.
William J. Dimmling, 47, Garden City, N.Y.
Christopher Dincuff, 31, Jersey City, N.J.
Jeffrey M. Dingle, 32, New York, N.Y.
Anthony DiOnisio, 38, Glen Rock, N.J.
George DiPasquale, 33, New York, N.Y.
Joseph DiPilato, 57, New York, N.Y.
Douglas Frank DiStefano, 24, Hoboken, N.J.
Ramzi A. Doany, 35, Bayonne, N.J., Jordanian
John J. Doherty, 58, Hartsdale, N.Y.
Melissa C. Doi, 32, New York, N.Y.
Brendan Dolan, 37, Glen Rock, N.J.
Neil Dollard, 28, Hoboken, N.J.
James Joseph Domanico, 56, New York, N.Y.
Benilda Pascua Domingo, 37, New York, N.Y.
Charles (Carlos) Dominguez, 34, East Meadow, N.Y.
Geronimo (Jerome) Mark Patrick Dominguez, 37, Holtsville, N.Y.
Lt. Kevin W. Donnelly, 43, New York, N.Y.
Jacqueline Donovan, 34, New York, N.Y.
Stephen Dorf, 39, New Milford, N.J.
Thomas Dowd, 37, Monroe, N.Y.
Lt. Kevin Christopher Dowdell, 46, New York, N.Y.
Mary Yolanda Dowling, 46, New York, N.Y.
Raymond M. Downey, 63, Deer Park, N.Y.
Joseph M. Doyle, 25, New York, N.Y.
Frank Joseph Doyle, 39, Englewood, N.J.
Randy Drake, 37, Lee's Summit, Mo.
Stephen Patrick Driscoll, 38, Lake Carmel, N.Y.
Mirna A. Duarte, 31, New York, N.Y.
Luke A. Dudek, 50, Livingston, N.J.
Christopher Michael Duffy, 23, New York, N.Y.
Gerard Duffy, 53, Manorville, N.Y.
Michael Joseph Duffy, 29, Northport, N.Y.
Thomas W. Duffy, 52, Pittsford, N.Y.
Antoinette Duger, 44, Belleville, N.J.
Jackie Sayegh Duggan, 34
Sareve Dukat, 53, New York, N.Y.
Christopher Joseph Dunne, 28, Mineola, N.Y.
Richard A. Dunstan, 54, New Providence, N.J.
Patrick Thomas Dwyer, 37, Nissequogue, N.Y.
Joseph Anthony Eacobacci, 26, New York, N.Y.
John Bruce Eagleson, 53, Middlefield, Conn.
Robert D. Eaton, 37, Manhasset, N.Y.
Dean P. Eberling, 44, Cranford, N.J.
Margaret Ruth Echtermann, 33, Hoboken, N.J.

Paul Robert Eckna, 28, West New York, N.J.
Constantine (Gus) Economos, 41, New York, N.Y.
Dennis Michael Edwards, 35, Huntington, N.Y.
Michael Hardy Edwards, 33, New York, N.Y.
Lisa Egan, 31, Cliffside Park, N.J.
Capt. Martin Egan, 36, New York, N.Y.
Michael Egan, 51, Middletown, N.J.
Christine Egan, 55, Winnipeg, Manitoba, Canada
Samantha Egan, 24, Jersey City, N.J.
Carole Eggert, 60, New York, N.Y.
Lisa Caren Weinstein Ehrlich, 36, New York, N.Y.
John Ernst (Jack) Eichler, 69, Cedar Grove, N.J.
Eric Adam Eisenberg, 32, Commack, N.Y.
Daphne F. Elder, 36, Newark, N.J.
Michael J. Elferis, 27, College Point, N.Y.
Mark J. Ellis, 26, South Huntington, N.Y.
Valerie Silver Ellis, 46, New York, N.Y.
Albert Alfy William Elmarry, 30, North Brunswick, N.J.
Edgar H. Emery, 45, Clifton, N.J.
Doris Suk-Yuen Eng, 30, New York, N.Y.
Christopher S. Epps, 29, New York, N.Y.
Ulf Ramm Ericson, 79, Greenwich, Conn.
Erwin L. Erker, 41, Farmingdale, N.Y.
William J. Erwin, 30, Verona, N.J.
Sarah (Ali) Escarcega, 35, New York, N.Y.
Jose Espinal, 31
Fanny M. Espinoza, 29, Teaneck, N.J.
Francis Esposito, 32, New York, N.Y.
Lt. Michael Esposito, 41, New York, N.Y.
William Esposito, 51, Bellmore, N.Y.
Brigette Ann Esposito, 34, New York, N.Y.
Ruben Esquilin, 35, New York, N.Y.
Sadie Ette, 36, New York, N.Y.
Barbara G. Etzold, 43, Jersey City, N.J.
Eric Brian Evans, 31, Weehawken, N.J.
Robert Edward Evans, 36, Franklin Square, N.Y.
Meredith Emily June Ewart, 29, Hoboken, N.J.
Catherine K. Fagan, 58, New York, N.Y.
Patricia M. Fagan, 55, Toms River, N.J.
Keith G. Fairben, 24, Floral Park, N.Y.
William Fallon, 38, Coram, N.Y.
William F. Fallon, 53, Rocky Hill, N.J.
Anthony J. Fallone, 39, New York, N.Y.
Dolores B. Fanelli, 38, Farmingville, N.Y.
John Joseph Fanning, 54, West Hempstead, N.Y.
Kathleen (Kit) Faragher, 33, Denver, Colo.

Capt. Thomas Farino, 37, Bohemia, N.Y.
Nancy Carole Farley, 45, Jersey City, N.J.
Elizabeth Ann (Betty) Farmer, 62, New York, N.Y.
Douglas Farnum, 33, New York, N.Y.
John W. Farrell, 41, Basking Ridge, N.J.
Terrence Patrick Farrell, 45, Huntington, N.Y.
John G. Farrell, 32, New York, N.Y.
Capt. Joseph Farrelly, 47, New York, N.Y.
Thomas P. Farrelly, 54, East Northport, N.Y.
Syed Abdul Fatha, 54, Newark, N.J.
Christopher Faughnan, 37, South Orange, N.J.
Wendy R. Faulkner, 47, Mason, Ohio
Shannon M. Fava, 30, New York, N.Y.
Bernard D. Favuzza, 52, Suffern, N.Y.
Robert Fazio, 41, Freeport, N.Y.
Ronald C. Fazio, 57, Closter, N.J.
William Feehan, 72, New York, N.Y.
Francis J. (Frank) Feely, 41, Middletown, N.Y.
Garth E. Feeney, 28, New York, N.Y.
Sean B. Fegan, 34, New York, N.Y.
Lee S. Fehling, 28, Wantagh, N.Y.
Peter Feidelberg, 34, Hoboken, N.J.
Alan D. Feinberg, 48, New York, N.Y.
Rosa Maria Feliciano, 30, New York, N.Y.
Edward T. Fergus, 40, Wilton, Conn.
George Ferguson, 54, Teaneck, N.J.
Henry Fernandez, 23, New York, N.Y.
Judy H. Fernandez, 27, Parlin, N.J.
Jose Manuel Contreras Fernandez, El Aguacate, Jalisco, Mexico
Elisa Giselle Ferraina, 27, London, England
Anne Marie Sallerin Ferreira, 29, Jersey City, N.J.
Robert John Ferris, 63, Garden City, N.Y.
David Francis Ferrugio, 46, Middletown, N.J.
Louis V. Fersini, 38, Basking Ridge, N.J.
Michael David Ferugio, 37, New York, N.Y.
Bradley James Fetchet, 24, New York, N.Y.
Jennifer Louise Fialko, 29, Teaneck, N.J.
Kristen Fiedel, 27, New York, N.Y.
Samuel Fields, 36, New York, N.Y.
Michael Bradley Finnegan, 37, Basking Ridge, N.J.
Timothy J. Finnerty, 33, Glen Rock, N.J.
Michael Curtis Fiore, 46, New York, N.Y.
Stephen J. Fiorelli, 43, Aberdeen, N.J.
Paul M. Fiori, 31, Yorktown Heights, N.Y.
John Fiorito, 40, Stamford, Conn.
Lt. John R. Fischer, 46, New York, N.Y.

Andrew Fisher, 42, New York, N.Y.
Thomas J. Fisher, 36, Union, N.J.
Bennett Lawson Fisher, 58, Stamford, Conn.
John Roger Fisher, 46, Bayonne, N.J.
Lucy Fishman, 37, New York, N.Y.
Ryan D. Fitzgerald, 26, New York, N.Y.
Thomas Fitzpatrick, 35, Tuckahoe, N.Y.
Richard P. Fitzsimons, 57, Lynbrook, N.Y.
Salvatore A. Fiumefreddo, 47, Manalapan, N.J.
Christina Donovan Flannery, 26, New York, N.Y.
Eileen Flecha, 33, New York, N.Y.
Andre G. Fletcher, 37, North Babylon, N.Y.
Carl Flickinger, 38, Conyers, N.Y.
John Joseph Florio, 33, Oceanside, N.Y.
Joseph W. Flounders, 46, East Stroudsburg, Pa.
David Fodor, 38, Garrison, N.Y.
Lt. Michael N. Fodor, 53, Warwick, N.Y.
Steven Mark Fogel, 40, Westfield, N.Y.
Thomas Foley, 32, West Nyack, N.Y.
David Fontana, 37, New York, N.Y.
Chih Min (Dennis) Foo, 40, Holmdel, N.J.
Del Rose Forbes-Cheatham, 48, New York, N.Y.
Godwin Forde, 39, New York, N.Y.
Donald A. Foreman, 53, New York, N.Y.
Christopher Hugh Forsythe, 44, Basking Ridge, N.J.
Claudia Alicia Martinez Foster, 26, New York, N.Y.
Noel J. Foster, 40, Bridgewater, N.J.
Ana Fosteris, 58, Coram, N.Y.
Robert J. Foti, 42, Albertson, N.Y.
Jeffrey L. Fox, 40, Cranbury, N.J.
Virginia Fox, 58, New York, N.Y.
Virgin (Lucy) Francis, 62, New York, N.Y.
Pauline Francis, 57, New York, N.Y.
Joan Francis
Gary J. Frank, 35, South Amboy, N.J.
Morton Frank, 31, New York, N.Y.
Peter Christopher Frank, 29, New York, N.Y.
Richard K. Fraser, 32, New York, N.Y.
Kevin Joseph Frawley, 34, Bronxville, N.Y.
Clyde Frazier, 41, New York, N.Y.
Lillian I. Frederick, 46, Teaneck, N.J.
Andrew Fredericks, 40, Suffern, N.Y.
Tamitha Freemen, 35, New York, N.Y.
Brett O. Freiman, 29, Roslyn, N.Y.
Lt. Peter L. Freund, 45, Westtown, N.Y.
Arlene E. Fried, 49, Roslyn Heights, N.Y.

Alan Wayne Friedlander, 52, Yorktown Heights, N.Y.
Andrew K. Friedman, 44, Woodbury, N.Y.
Gregg J. Froehner, 46, Chester, N.J.
Peter Christian Fry, 36, Wilton, Conn.
Clement Fumando, 59, New York, N.Y.
Steven Elliot Furman, 40, Wesley Hills, N.Y.
Paul James Furmato, 37, Colts Neck, N.J.
Fredric Gabler, 30, New York, N.Y.
Richard S. Gabrielle, 50, West Haven, Conn.
James Andrew Gadiel, 23, New York, N.Y.
Pamela Gaff, 51, Robinsville, N.J.
Ervin Vincent Gailliard, 42, New York, N.Y.
Deanna L. Galante, 32, New York, N.Y.
Grace Galante, 29, New York, N.Y.
Anthony Edward Gallagher, 41, New York, N.Y.
Daniel James Gallagher, 23, Red Bank, N.J.
John Patrick Gallagher, 31, Yonkers, N.Y.
Cono E. Gallo, 30, New York, N.Y.
Vincenzo Gallucci, 36, Monroe Township, N.J.
Thomas Edward Galvin, 32, New York, N.Y.
Giovanna (Genni) Gambale, 27, New York, N.Y.
Thomas Gambino, 48, Babylon, N.Y.
Giann F. Gamboa, 26, New York, N.Y.
Peter J. Ganci, 55, North Massapequa, N.Y.
Claude Michael Gann, 41, Roswell, Ga.
Lt. Charles William Garbarini, 44, Pleasantville, N.Y.
Cesar Garcia, 36, New York, N.Y.
David Garcia, 40, Freeport, N.Y.
Jorge Luis Morron Garcia, 38, New York, N.Y.
Juan Garcia, 50, New York, N.Y.
Marlyn C. Garcia, 21, New York, N.Y.
Christopher Gardner, 36, Darien, Conn.
Douglas B. Gardner, 39, New York, N.Y.
Harvey J. Gardner, 35, Lakewood, N.J.
Thomas A. Gardner, 39, Oceanside, N.Y.
Jeffrey B. Gardner, 36, Hoboken, N.J.
William Arthur Gardner, 45, Lynbrook, N.Y.
Francesco Garfi, 29, New York, N.Y.
Rocco Gargano, 28, Bayside, N.Y.
James M. Gartenberg, 36, New York, N.Y.
Matthew David Garvey, 37
Bruce Gary, 51, Bellmore, N.Y.
Palmina Delli Gatti, 33, New York, N.Y.
Boyd A. Gatton, 38, Jersey City, N.J.
Donald Richard Gavagan, 35, New York, N.Y.
Terence D. Gazzani, 24, New York, N.Y.

Gary Geidel, 44, New York, N.Y.
Paul Hamilton Geier, 36, Farmingdale, N.J.
Julie M. Geis, 44, Lees Summit, Mo.
Peter Gelinas, 34, New York, N.Y.
Steven Paul Geller, 52, New York, N.Y.
Howard G. Gelling, 28, New York, N.Y.
Peter Victor Genco, 36, Rockville Centre, N.Y.
Steven Gregory Genovese, 37, Basking Ridge, N.J.
Alayne F. Gentul, 44, Mountain Lakes, N.J.
Edward F. Geraghty, 45, Rockville Centre, N.Y.
Suzanne Geraty, 30, New York, N.Y.
Ralph Gerhardt, 33, New York, N.Y.
Robert J. Gerlich, 56, Monroe, Conn.
Denis P. Germain, 33, Tuxedo Park, N.Y.
Marina R. Gertsberg, 25, New York, N.Y.
Susan M. Getzendanner, 57, New York, N.Y.
James Gerard Geyer, 41, Rockville Centre, N.Y.
Joseph M. Giaccone, 43, Monroe, N.J.
Lt. Vincent Francis Giammona, 40, Valley Stream, N.Y.
Debra L. Gibbon, 43, Hackettstown, N.J.
James A. Giberson, 43, New York, N.Y.
Craig Neil Gibson, 37, New York, N.Y.
Ronnie Gies, 43, Merrick, N.Y.
Laura A. Giglio, 35, Oceanside, N.Y.
Andrew Clive Gilbert, 39, Califon, N.J.
Timothy Paul Gilbert, 35, Lebanon, N.J.
Paul Stuart Gilbey, 39, Chatham, N.J.
Paul John Gill, 34, New York, N.Y.
Mark Y. Gilles, 33, New York, N.Y.
Evan H. Gillette, 40, New York, N.Y.
Ronald Gilligan, 43, Norwalk, Conn.
Sgt. Rodney C. Gillis, 34, New York, N.Y.
Laura Gilly, 32, New York, N.Y.
Lt. John F. Ginley, 37, Warwick, N.Y.
Jeffrey Giordano, 46, New York, N.Y.
John Giordano, 46, Newburgh, N.Y.
Donna Marie Giordano, 44, Parlin, N.J.
Steven A. Giorgetti, 43, Manhasset, N.Y.
Martin Giovinazzo, 34, New York, N.Y.
Kum-Kum Girolamo, 41, New York, N.Y.
Salvatore Gitto, 44, Manalapan, N.J.
Cynthia Giugliano, 46, Nesconset, N.Y.
Mon Gjonbalaj, 65, New York, N.Y.
Dianne Gladstone, 55, New York, N.Y.
Keith Alexander Glascoe, 38, New York, N.Y.
Thomas I. Glasser, 40, Summit, N.J.

19

Harry Glenn, 38, Piscataway, N.J.
Barry H. Glick, 55, Wayne, N.J.
Steven Lawrence Glick, 42, Greenwich, Conn.
John T. Gnazzo, 32, New York, N.Y.
William (Bill) Robert Godshalk, 35, New York, N.Y.
Michael Gogliormella, 43, New Providence, N.J.
Brian Fredric Goldberg, 26, Union, N.J.
Jeffrey Grant Goldflam, 48, Melville, N.Y.
Michelle Herman Goldstein, 31, New York, N.Y.
Monica Goldstein, 25, New York, N.Y.
Steven Goldstein, 35, Princeton, N.J.
Andrew H. Golkin, 30, New York, N.Y.
Dennis James Gomes, 40, New York, N.Y.
Enrique Antonio Gomez, 42, New York, N.Y.
Jose Bienvenido Gomez, 45, New York, N.Y.
Manuel Gomez, 42, New York, N.Y.
Wilder Gomez, 38, New York, N.Y.
Jenine Gonzalez, 27, New York, N.Y.
Joel Guevara Gonzalez, 23, Aguascalientes, Aguascalientes, Mexico
Rosa J. Gonzalez, 32, Jersey City, N.J.
Mauricio Gonzalez, 27, New York, N.Y.
Calvin J. Gooding, 38, Riverside, N.Y.
Harry Goody, 50, New York, N.Y.
Kiran Reddy Gopu, 24, Bridgeport, Conn.
Catherine Carmen Gorayeb, 41, New York, N.Y.
Kerene Gordon, 43, New York, N.Y.
Sebastian Gorki, 27, New York, N.Y.
Thomas E. Gorman, 41, Middlesex, N.J.
Kieran Gorman, 35, Yonkers, N.Y.
Michael Edward Gould, 29, Hoboken, N.J.
Yugi Goya, 42, Rye, N.Y.
Jon Richard Grabowski, 33, New York, N.Y.
Christopher Michael Grady, 39, Cranford, N.J.
Edwin John Graf, 48, Rowayton, Conn.
David M. Graifman, 40, New York, N.Y.
Gilbert Granados, 51, Hicksville, N.Y.
Elvira Granitto, 43, New York, N.Y.
Winston Arthur Grant, 59, West Hempstead, N.Y.
Christopher Stewart Gray, 32, Weehawken, N.J.
James Michael Gray, 34, New York, N.Y.
Linda Mair Grayling, 44, New York, N.Y.
John Michael Grazioso, 41, Middletown, N.J.
Timothy Grazioso, 42, Gulf Stream, Fla.
Derrick Arthur Green, 44, New York, N.Y.
Wade Brian Green, 42, Westbury, N.Y.
Elaine Myra Greenberg, 56, New York, N.Y.

Gayle R. Greene, 51, Montville, N.J.
James Arthur Greenleaf, 32, New York, N.Y.
Eileen Marsha Greenstein, 52, Morris Plains, N.J.
Elizabeth (Lisa) Martin Gregg, 52, New York, N.Y.
Donald H. Gregory, 62, Ramsey, N.J.
Florence M. Gregory, 38, New York, N.Y.
Denise Gregory, 39, New York, N.Y.
Pedro (David) Grehan, 35, Hoboken, N.J.
John M. Griffin, 38, Waldwick, N.J.
Tawanna Griffin, 30, New York, N.Y.
Joan D. Griffith, 39, Willingboro, N.J.
Warren Grifka, 54, New York, N.Y.
Ramon Grijalvo, 58
Joseph F. Grillo, 46, New York, N.Y.
David Grimner, 51, Merrick, N.Y.
Kenneth Grouzalis, 56, Lyndhurst, N.J.
Joseph Grzelak, 52, New York, N.Y.
Matthew J. Grzymalski, 34, New Hyde Park, N.Y.
Robert Joseph Gschaar, 55, Spring Valley, N.Y.
Liming (Michael) Gu, 34, Piscataway, N.J.
Jose A. Guadalupe, 37, New York, N.Y.
Yan Zhu (Cindy) Guan, 25, New York, N.Y.
Geoffrey E. Guja, 47, Lindenhurst, N.Y.
Lt. Joseph Gullickson, 37, New York, N.Y.
Babita Guman, 33, New York, N.Y.
Douglas B. Gurian, 38, Tenafly, N.J.
Philip T. Guza, 54, Sea Bright, N.J.
Barbara Guzzardo, 49, Glendale, N.Y.
Peter Gyulavary, 44, Warwick, N.Y.
Gary Robert Haag, 36, Ossining, N.Y.
Andrea Lyn Haberman, 25, Chicago, Ill.
Barbara M. Habib, 49, New York, N.Y.
Philip Haentzler, 49, New York, N.Y.
Nizam A. Hafiz, 32, New York, N.Y.
Karen Hagerty, 34, New York, N.Y.
Steven Hagis, 31, New York, N.Y.
Mary Lou Hague, 26, New York, N.Y.
David Halderman, 40, New York, N.Y.
Maile Rachel Hale, 26, Cambridge, Mass.
Richard Hall, 49, Purchase, N.Y.
Vaswald George Hall, 50, New York, N.Y.
Robert John Halligan, 59, Basking Ridge, N.J.
Lt. Vincent Gerard Halloran, 43, North Salem, N.Y.
James D. Halvorson, 56, Greenwich, Conn.
Mohammad Salman Hamdani, 23, New York, N.Y.
Felicia Hamilton, 62, New York, N.Y.

Robert Hamilton, 43, Washingtonville, N.Y.
Frederic Kim Han, 45, Marlboro, N.J.
Christopher James Hanley, 34, New York, N.Y.
Sean Hanley, 35, New York, N.Y.
Valerie Joan Hanna, 57, Freeville, N.Y.
Thomas Hannafin, 36, New York, N.Y.
Kevin James Hannaford, 32, Basking Ridge, N.J.
Michael L. Hannan, 34, Lynbrook, N.Y.
Dana Hannon, 29, Suffern, N.Y.
Vassilios G. Haramis, 56, New York, N.Y.
James A. Haran, 41, Malverne, N.Y.
Jeffrey P. Hardy, 46, New York, N.Y.
Timothy John Hargrave, 38, Readington, N.J.
Daniel Harlin, 41, Kent, N.Y.
Frances Haros, 76, New York, N.Y.
Lt. Harvey L. Harrell, 49, New York, N.Y.
Lt. Stephen Gary Harrell, 44, Warwick, N.Y.
Stewart D. Harris, 52, Marlboro, N.J.
Aisha Harris, 22, New York, N.Y.
John Patrick Hart, 38, Danville, Calif.
John Clinton Hartz, 64, Basking Ridge, N.J.
Emeric J. Harvey, 56, Montclair, N.J.
Capt. Thomas Theodore Haskell, 37, Massapequa, N.Y.
Timothy Haskell, 34, Seaford, N.Y.
Joseph John Hasson, 34, New York, N.Y.
Capt. Terence S. Hatton, 41, New York, N.Y.
Leonard William Hatton, 45, Ridgefield Park, N.J.
Michael Helmut Haub, 34, Roslyn Heights, N.Y.
Timothy Aaron Haviland, 41, Oceanside, N.Y.
Donald G. Havlish, 53, Yardley, Pa.
Anthony Hawkins, 30, New York, N.Y.
Nobuhiro Hayatsu, 36, Scarsdale, N.Y.
Philip Hayes, 67, Northport, N.Y.
William Ward Haynes, 35, Rye, N.Y.
Scott Hazelcorn, 29, Hoboken, N.J.
Lt. Michael K. Healey, 42, East Patchogue, N.Y.
Roberta Bernstein Heber, 60, New York, N.Y.
Charles Francis Xavier Heeran, 23, Belle Harbor, N.Y.
John Heffernan, 37, New York, N.Y.
Howard Joseph Heller, 37, Ridgefield, Conn.
JoAnn L. Heltibridle, 46, Springfield, N.J.
Mark F. Hemschoot, 45, Red Bank, N.J.
Ronnie Lee Henderson, 52, Newburgh, N.Y.
Janet Hendricks, 48, New York, N.Y.
Brian Hennessey, 35, Ringoes, N.J.
Michelle Marie Henrique, 27, New York, N.Y.

Joseph P. Henry, 25, New York, N.Y.
William Henry, 49, New York, N.Y.
John Henwood, 35, New York, N.Y.
Robert Allan Hepburn, 39, Union, N.J.
Mary (Molly) Herencia, 47, New York, N.Y.
Lindsay Coates Herkness, 58, New York, N.Y.
Harvey Robert Hermer, 59, New York, N.Y.
Claribel Hernandez, 31, New York, N.Y.
Norberto Hernandez, 42, New York, N.Y.
Raul Hernandez, 51, New York, N.Y.
Gary Herold, 44, Farmingdale, N.Y.
Jeffrey A. Hersch, 53, New York, N.Y.
Thomas Hetzel, 33, Elmont, N.Y.
Capt. Brian Hickey, 47, New York, N.Y.
Ysidro Hidalgo-Tejada, 47, New York, N.Y., Dominican Republic
Lt. Timothy Higgins, 43, Farmingville, N.Y.
Robert D. Higley, 29, New Fairfield, Conn.
Todd Russell Hill, 34, Boston, Mass.
Clara Victorine Hinds, 52, New York, N.Y.
Neal Hinds, 28, New York, N.Y.
Mark D. Hindy, 28, New York, N.Y.
Richard Bruce Van Hine, 48, Greenwood Lake, N.Y.
Katsuyuki Hirai, 32, Hartsdale, N.Y.
Heather Malia Ho, 32, New York, N.Y.
Tara Yvette Hobbs, 31, New York, N.Y.
Thomas A. Hobbs, 41, Baldwin, N.Y.
James L. Hobin, 47, Marlborough, Conn.
Robert Wayne Hobson, 36, New Providence, N.J.
DaJuan Hodges, 29, New York, N.Y.
Ronald George Hoerner, 58, Massapequa Park, N.Y.
Patrick Aloysius Hoey, 53, Middletown, N.J.
Stephen G. Hoffman, 36, Long Beach, N.Y.
Marcia Hoffman, 52, New York, N.Y.
Frederick J. Hoffmann, 53, Freehold, N.J.
Michele L. Hoffmann, 27, Freehold, N.J.
Judith Florence Hofmiller, 53, Brookfield, Conn.
Thomas Warren Hohlweck, 57, Harrison, N.Y.
Jonathan R. Hohmann, 48, New York, N.Y.
Joseph Francis Holland, 32, Glen Rock, N.J.
John Holland, 30
Elizabeth Holmes, 42, New York, N.Y.
Thomas P. Holohan, 36, Chester, N.Y.
Bradley Hoorn, 22, New York, N.Y.
James P. Hopper, 51, Farmingdale, N.Y.
Montgomery McCullough Hord, 46, Pelham, N.Y.
Michael Horn, 27, Lynbrook, N.Y.

Matthew D. Horning, 26, Hoboken, N.J.
Robert L. Horohoe, 31, New York, N.Y.
Aaron Horwitz, 24, New York, N.Y.
Charles J. Houston, 42, New York, N.Y.
Uhuru G. Houston, 32, Englewood, N.J.
George Howard, 45, Hicksville, N.Y.
Steven L. Howell, 36, New York, N.Y.
Michael C. Howell, 60, New York, N.Y.
Jennifer L. Howley, 34, New Hyde Park, N.Y.
Milagros "Millie" Hromada, 35, New York, N.Y.
Marian Hrycak, 56, New York, N.Y.
Stephen Huczko, 44, Bethlehem, N.J.
Kris R. Hughes, 30, Nesconset, N.Y.
Melissa Harrington Hughes, 31, San Francisco, Calif.
Thomas F. Hughes, 46, Spring Lake Heights, N.J.
Timothy Robert Hughes, 43, Madison, N.J.
Paul R. Hughes, 38, Stamford, Conn.
Robert T. "Bobby" Hughes, 23, Sayreville, N.J.
Susan Huie, 43, Fair Lawn, N.J.
Mychal Lamar Hulse, 30, New York, N.Y.
William C. Hunt, 32, Norwalk, Conn.
Joseph G. Hunter, 31, South Hempstead, N.Y.
Robert Hussa, 51, Roslyn, N.Y.
Capt. Walter Hynes, 46, Belle Harbor, N.Y.
Thomas E. Hynes, 28, Norwalk, Conn.
Joseph Anthony Ianelli, 28, Hoboken, N.J.
Zuhtu Ibis, 25, Clifton, N.J.
Jonathan Lee Ielpi, 29, Great Neck, N.Y.
Michael Patrick Iken, 37, New York, N.Y.
Daniel Ilkanayev, 36, New York, N.Y.
Capt. Frederick Ill, 49, Pearl River, N.Y.
Abraham Nethanel Ilowitz, 51, New York, N.Y.
Anthony P. Infante, 47, Chatham, N.J.
Louis S. Inghilterra, 45, New Castle, N.Y.
Christopher N. Ingrassia, 28, Watchung, N.J.
Paul Innella, 33, East Brunswick, N.J.
Stephanie V. Irby, 38, New York, N.Y.
Douglas Irgang, 32, New York, N.Y.
Todd A. Isaac, 29, New York, N.Y.
Erik Hans Isbrandtsen, 30, New York, N.Y.
Taizo Ishikawa, 50
Aram Iskenderian, 41, Merrick, N.Y.
John Iskyan, 41, Wilton, Conn.
Kazushige Ito, 35, New York, N.Y.
Aleksandr Valeryerich Ivantsov, 23, New York, N.Y.
Virginia Jablonski, 49, Matawan, N.J.

Brooke Alexandra Jackman, 23, New York, N.Y.
Aaron Jacobs, 27, New York, N.Y.
Jason Kyle Jacobs, 32, Mendham, N.J.
Michael Grady Jacobs, 54, Danbury, Conn.
Ariel Louis Jacobs, 29, Briarcliff Manor, N.Y.
Steven A. Jacobson, 53, New York, N.Y.
Ricknauth Jaggernauth, 58, New York, N.Y.
Jake Denis Jagoda, 24, Huntington, N.Y.
Yudh V.S. Jain, 54, New City, N.Y.
Maria Jakubiak, 41, Ridgewood, N.Y.
Gricelda E. James, 44, Willingboro, N.J.
Ernest James, 40, New York, N.Y.
Mark Jardim, 39, New York, N.Y.
Mohammed Jawara, 30, New York, N.Y.
Francois Jean-Pierre, 58, New York, N.Y.
Maxima Jean-Pierre, 40, Bellport, N.Y.
Paul E. Jeffers, 39, New York, N.Y.
Joseph Jenkins, 47, New York, N.Y.
Alan K. Jensen, 49, Wyckoff, N.J.
Prem N. Jerath, 57, Edison, N.J.
Farah Jeudy, 32, Spring Valley, N.Y.
Hweidar Jian, 42, East Brunswick, N.J.
Eliezer Jimenez, 38, New York, N.Y.
Luis Jimenez, 25, New York, N.Y.
Charles Gregory John, 44, New York, N.Y.
Nicholas John, 42, New York, N.Y.
Scott M. Johnson, 26, New York, N.Y.
LaShawana Johnson, 27, New York, N.Y.
William Johnston, 31, North Babylon, N.Y.
Arthur Joseph Jones, 37, Ossining, N.Y.
Allison Horstmann Jones, 31, New York, N.Y.
Brian L. Jones, 44, New York, N.Y.
Christopher D. Jones, 53, Huntington, N.Y.
Donald T. Jones, 39, Livingston, N.J.
Donald W. Jones, 43, Fairless Hills, Pa.
Linda Jones, 50, New York, N.Y.
Mary S. Jones, 72, New York, N.Y.
Andrew Jordan, 35, Remsenburg, N.Y.
Robert Thomas Jordan, 34, Williston, N.Y.
Ingeborg Joseph, 60, Germany
Karl Henri Joseph, 25, New York, N.Y.
Stephen Joseph, 39, Franklin Park, N.J.
Albert Joseph, 79
Jane Eileen Josiah, 47, Bellmore, N.Y.
Lt. Anthony Jovic, 39, Massapequa, N.Y.
Angel Luis Juarbe, 35, New York, N.Y.

Karen Susan Juday, 52, New York, N.Y.
The Rev. Mychal Judge, 68, New York, N.Y.
Paul W. Jurgens, 47, Levittown, N.Y.
Thomas Edward Jurgens, 26, Lawrence, N.Y.
Kacinga Kabeya, 63, McKinney, Texas
Shashi Kiran Lakshmikantha Kadaba, 25, Hackensack, N.J.
Gavkharoy Mukhometovna Kamardinova, 26, New York, N.Y.
Shari Kandell, 27, Wyckoff, N.J.
Howard Lee Kane, 40, Hazlet, N.J.
Jennifer Lynn Kane, 26, Fair Lawn, N.J.
Vincent D. Kane, 37, New York, N.Y.
Joon Koo Kang, 34, Riverdale, N.J.
Sheldon R. Kanter, 53, Edison, N.J.
Deborah H. Kaplan, 45, Paramus, N.J.
Alvin Peter Kappelmann, 57, Green Brook, N.J.
Charles Karczewski, 34, Union, N.J.
William A. Karnes, 37, New York, N.Y.
Douglas G. Karpiloff, 53, Mamaroneck, N.Y.
Charles L. Kasper, 54, New York, N.Y.
Andrew Kates, 37, New York, N.Y.
John Katsimatides, 31, East Marion, N.Y.
Sgt. Robert Kaulfers, 49, Kenilworth, N.J.
Don Jerome Kauth, 51, Saratoga Springs, N.Y.
Hideya Kawauchi, 36, Fort Lee, N.J.
Edward T. Keane, 66, West Caldwell, N.J.
Richard M. Keane, 54, Wethersfield, Conn.
Lisa Kearney-Griffin, 35, Jamaica, N.Y.
Karol Ann Keasler, 42, New York, N.Y.
Paul Hanlon Keating, 38, New York, N.Y.
Leo Russell Keene, 33, Westfield, N.J.
Joseph J. Keller, 31, Park Ridge, N.J.
Peter Rodney Kellerman, 35, New York, N.Y.
Joseph P. Kellett, 37, Riverdale, N.Y.
Frederick H. Kelley, 57, Huntington, N.Y.
James Joseph Kelly, 39, Oceanside, N.Y.
Joseph A. Kelly, 40, Oyster Bay, N.Y.
Maurice Patrick Kelly, 41, New York, N.Y.
Richard John Kelly, 50, New York, N.Y.
Thomas Michael Kelly, 41, Wyckoff, N.J.
Thomas Richard Kelly, 38, Riverhead, N.Y.
Thomas W. Kelly, 51, New York, N.Y.
Timothy C. Kelly, 37, Port Washington, N.Y.
William Hill Kelly, 30, New York, N.Y.
Robert C. Kennedy, 55, Toms River, N.J.
Thomas J. Kennedy, 36, Islip Terrace, N.Y.
John Keohane, 41, Jersey City, N.J.

Lt. Ronald T. Kerwin, 42, Levittown, N.Y.
Howard L. Kestenbaum, 56, Montclair, N.J.
Douglas D. Ketcham, 27, New York, N.Y.
Ruth E. Ketler, 42, New York, N.Y.
Boris Khalif, 30, New York, N.Y.
Sarah Khan, 32, New York, N.Y.
Taimour Firaz Khan, 29, New York, N.Y.
Rajesh Khandelwal, 33, South Plainfield, N.J.
SeiLai Khoo, 38, Jersey City, N.J.
Michael Kiefer, 25, Hempstead, N.Y.
Satoshi Kikuchihara, 43, Scarsdale, N.Y.
Andrew Jay-Hoon Kim, 26, Leonia, N.J.
Lawrence Don Kim, 31, Blue Bell, Pa.
Mary Jo Kimelman, 34, New York, N.Y.
Andrew Marshall King, 42, Princeton, N.J.
Lucille T. King, 59, Ridgewood, N.J.
Robert King, 36, Bellerose Terrace, N.Y.
Lisa M. King-Johnson, 34, New York, N.Y.
Takashi Kinoshita, 46, Rye, N.Y.
Chris Michael Kirby, 21, New York, N.Y.
Howard (Barry) Kirschbaum, 53, New York, N.Y.
Glenn Davis Kirwin, 40, Scarsdale, N.Y.
Richard J. Klares, 59, Somers, N.Y.
Peter A. Klein, 35, Weehawken, N.J.
Alan D. Kleinberg, 39, East Brunswick, N.J.
Karen J. Klitzman, 38, New York, N.Y.
Ronald Philip Kloepfer, 39, Franklin Square, N.Y.
Yevgeny Kniazev, 46, New York, N.Y.
Thomas Patrick Knox, 31, Hoboken, N.J.
Andrew Knox, 30, Adelaide, Australia
Rebecca Lee Koborie, 48, Guttenberg, N.J.
Deborah Kobus, 36, New York, N.Y.
Gary Edward Koecheler, 57, Harrison, N.Y.
Frank J. Koestner, 48, New York, N.Y.
Ryan Kohart, 26, New York, N.Y.
Vanessa Lynn Kolpak, 21, New York, N.Y.
Irina Kolpakova, 37, New York, N.Y.
Suzanne Kondratenko, 27, Chicago, Ill.
Abdoulaye Kone, 37, New York, N.Y.
Bon-seok Koo, 42, River Edge, N.J.
Dorota Kopiczko, 26, Nutley, N.J.
Scott Kopytko, 32, New York, N.Y.
Bojan Kostic, 34, New York, N.Y.
Danielle Kousoulis, 29, New York, N.Y.
John J. Kren, 52
William Krukowski, 36, New York, N.Y.

Lyudmila Ksido, 46, New York, N.Y.
Shekhar Kumar, 30, New York, N.Y.
Kenneth Kumpel, 42, Cornwall, N.Y.
Frederick Kuo, 53, Great Neck, N.Y.
Patricia Kuras, 42, New York, N.Y.
Nauka Kushitani, 44, New York, N.Y.
Thomas Joseph Kuveikis, 48, Carmel, N.Y.
Victor Kwarkye, 35, New York, N.Y.
Kui Fai Kwok, 31, New York, N.Y.
Angela R. Kyte, 49, Boonton, N.J.
Amarnauth Lachhman, 42, Valley Stream, N.Y.
Andrew LaCorte, 61, Jersey City, N.J.
Ganesh Ladkat, 27, Somerset, N.J.
James P. Ladley, 41, Colts Neck, N.J.
Daniel M. Van Laere, 46, Glen Rock, N.J.
Joseph A. Lafalce, 54, New York, N.Y.
Jeanette LaFond-Menichino, 49, New York, N.Y.
David LaForge, 50, Port Richmond, N.Y.
Michael Patrick LaForte, 39, Holmdel, N.J.
Alan Lafrance, 43
Juan Lafuente, 61, Poughkeepsie, N.Y.
Neil K. Lai, 59, East Windsor, N.J.
Vincent A. Laieta, 31, Edison, N.J.
William David Lake, 44, New York, N.Y.
Franco Lalama, 45, Nutley, N.J.
Chow Kwan Lam, 48, Maywood, N.J.
Stephen LaMantia, 38, Darien, Conn.
Amy Hope Lamonsoff, 29, New York, N.Y.
Robert T. Lane, 28, New York, N.Y.
Brendan M. Lang, 30, Red Bank, N.J.
Rosanne P. Lang, 42, Middletown, N.J.
Vanessa Langer, 29, Yonkers, N.Y.
Mary Lou Langley, 53, New York, N.Y.
Peter J. Langone, 41, Roslyn Heights, N.Y.
Thomas Langone, 39, Williston Park, N.Y.
Michele B. Lanza, 36, New York, N.Y.
Ruth Sheila Lapin, 53, East Windsor, N.J.
Carol Ann LaPlante, 59, New York, N.Y.
Ingeborg Astrid Desiree Lariby, 42, New York, N.Y.
Robin Larkey, 48, Chatham, N.J.
Christopher Randall Larrabee, 26, New York, N.Y.
Hamidou S. Larry, 37, New York, N.Y.
Scott Larsen, 35, New York, N.Y.
John Adam Larson, 37, Colonia, N.J.
Gary E. Lasko, 49, Memphis, Tenn.
Nicholas C. Lassman, 28, Cliffside Park, N.J.

Paul Laszczynski, 49, Paramus, N.J.

Jeffrey Latouche, 49, New York, N.Y.

Cristina de Laura

Oscar de Laura

Charles Laurencin, 61, New York, N.Y.

Stephen James Lauria, 39, New York, N.Y.

Maria Lavache, 60, New York, N.Y.

Denis F. Lavelle, 42, Yonkers, N.Y.

Jeannine M. LaVerde, 36, New York, N.Y.

Anna A. Laverty, 52, Middletown, N.J.

Steven Lawn, 28, West Windsor, N.J.

Robert A. Lawrence, 41, Summit, N.J.

Nathaniel Lawson, 61, New York, N.Y.

Eugen Lazar, 27, New York, N.Y.

James Patrick Leahy, 38, New York, N.Y.

Lt. Joseph Gerard Leavey, 45, Pelham, N.Y.

Neil Leavy, 34, New York, N.Y.

Leon Lebor, 51, Jersey City, N.J.

Kenneth Charles Ledee, 38, Monmouth, N.J.

Alan J. Lederman, 43, New York, N.Y.

Elena Ledesma, 36, New York, N.Y.

Alexis Leduc, 45, New York, N.Y.

Myung-woo Lee, 41, Lyndhurst, N.J.

David S. Lee, 37, West Orange, N.J.

Gary H. Lee, 62, Lindenhurst, N.Y.

Hyun-joon (Paul) Lee, 32, New York, N.Y.

Jong-min Lee, 24, New York, N.Y.

Juanita Lee, 44, New York, N.Y.

Lorraine Lee, 37, New York, N.Y.

Richard Y.C. Lee, 34, Great Neck, N.Y.

Yang Der Lee, 63, New York, N.Y.

Kathryn Blair Lee, 55, New York, N.Y.

Stuart (Soo-Jin) Lee, 30, New York, N.Y.

Linda C. Lee, 34, New York, N.Y.

Stephen Lefkowitz, 50, Belle Harbor, N.Y.

Adriana Legro, 32, New York, N.Y.

Edward J. Lehman, 41, Glen Cove, N.Y.

Eric Andrew Lehrfeld, 32, New York, N.Y.

David Ralph Leistman, 43, Garden City, N.Y.

David Prudencio LeMagne, 27, North Bergen, N.J.

Joseph A. Lenihan, 41, Greenwich, Conn.

John J. Lennon, 44, Howell, N.J.

John Robinson Lenoir, 38, Locust Valley, N.Y.

Jorge Luis Leon, 43, Union City, N.J.

Matthew Gerard Leonard, 38, New York, N.Y.

Michael Lepore, 39, New York, N.Y.

29

Charles Antoine Lesperance, 55
Jeffrey Earle LeVeen, 55, Manhasset, N.Y.
John D. Levi, 50, New York, N.Y.
Alisha Caren Levin, 33, New York, N.Y.
Neil D. Levin, 47, New York, N.Y.
Robert Levine, 56, West Babylon, N.Y.
Robert M. Levine, 66, Edgewater, N.J.
Shai Levinhar, 29, New York, N.Y.
Adam J. Lewis, 36, Fairfield, Conn.
Margaret Susan Lewis, 49, Elizabeth, N.J.
Ye Wei Liang, 27, New York, N.Y.
Orasri Liangthanasarn, 26, Bayonne, N.J.
Daniel F. Libretti, 43, New York, N.Y.
Ralph M. Licciardi, 30, West Hempstead, N.Y.
Edward Lichtschein, 35, New York, N.Y.
Steven B. Lillianthal, 38, Millburn, N.J.
Carlos R. Lillo, 37, Babylon, N.Y.
Craig Damian Lilore, 30, Lyndhurst, N.J.
Arnold A. Lim, 28, New York, N.Y.
Darya Lin, 32, Chicago, Ill.
Wei Rong Lin, 31, Jersey City, N.J.
Nickie L. Lindo, 31, New York, N.Y.
Thomas V. Linehan, 39, Montville, N.J.
Robert Thomas Linnane, 33, West Hempstead, N.Y.
Alan Linton, 26, Jersey City, N.J.
Diane Theresa Lipari, 42, New York, N.Y.
Kenneth P. Lira, 28, Paterson, N.J.
Francisco Alberto Liriano, 33, New York, N.Y.
Lorraine Lisi, 44, New York, N.Y.
Paul Lisson, 45, New York, N.Y.
Vincent Litto, 52, New York, N.Y.
Ming-Hao Liu, 41, Livingston, N.J.
Nancy Liz, 39, New York, N.Y.
Harold Lizcano, 31, East Elmhurst, N.Y.
Martin Lizzul, 31, New York, N.Y.
George A. Llanes, 33, New York, N.Y.
Elizabeth Claire Logler, 31, Rockville Centre, N.Y.
Catherine Lisa Loguidice, 30, New York, N.Y.
Jerome Robert Lohez, 30, Jersey City, N.J.
Michael W. Lomax, 37, New York, N.Y.
Laura M. Longing, 35, Pearl River, N.Y.
Salvatore P. Lopes, 40, Franklin Square, N.Y.
Daniel Lopez, 39, New York, N.Y.
Luis Lopez, 38, New York, N.Y.
Manuel L. Lopez, 54, Jersey City, N.J.
George Lopez, 40, Stroudsburg, Pa.

Joseph Lostrangio, 48, Langhorne, Pa.
Chet Louie, 45, New York, N.Y.
Stuart Seid Louis, 43, East Brunswick, N.J.
Joseph Lovero, 60, Jersey City, N.J.
Michael W. Lowe, 48, New York, N.Y.
Garry Lozier, 47, Darien, Conn.
John Peter Lozowsky, 45, New York, N.Y.
Charles Peter Lucania, 34, East Atlantic Beach, N.Y.
Edward (Ted) H. Luckett, 40, Fair Haven, N.J.
Mark G. Ludvigsen, 32, New York, N.Y.
Lee Charles Ludwig, 49, New York, N.Y.
Sean Thomas Lugano, 28, New York, N.Y.
Daniel Lugo, 45, New York, N.Y.
Marie Lukas, 32, New York, N.Y.
William Lum, 45, New York, N.Y.
Michael P. Lunden, 37, New York, N.Y.
Christopher Lunder, 34, Wall, N.J.
Anthony Luparello, 62, New York, N.Y.
Gary Lutnick, 36, New York, N.Y.
Linda Luzzicone, 33, New York, N.Y.
Alexander Lygin, 28, New York, N.Y.
Farrell Peter Lynch, 39, Centerport, N.Y.
James Francis Lynch, 47, Woodbridge, N.J.
Louise A. Lynch, 58, Amityville, N.Y.
Michael Lynch, 34, New York, N.Y.
Michael F. Lynch, 33, New Hyde Park, N.Y.
Michael Francis Lynch, 30, New York, N.Y.
Richard Dennis Lynch, 30, Bedford Hills, N.Y.
Robert H. Lynch, 44, Cranford, N.J.
Sean Patrick Lynch, 36, Morristown, N.J.
Sean Lynch, 34, New York, N.Y.
Michael J. Lyons, 32, Hawthorne, N.Y.
Patrick Lyons, 34, South Setauket, N.Y.
Monica Lyons, 53, New York, N.Y.
Robert Francis Mace, 43, New York, N.Y.
Jan Maciejewski, 37, New York, N.Y.
Catherine Fairfax MacRae, 23, New York, N.Y.
Richard B. Madden, 35, Westfield, N.J.
Simon Maddison, 40, Florham Park, N.J.
Noell Maerz, 29, Long Beach, N.Y.
Jeannieann Maffeo, 40, New York, N.Y.
Joseph Maffeo, 30, New York, N.Y.
Jay Robert Magazine, 48, New York, N.Y.
Charles Wilson Magee, 51, Wantagh, N.Y.
Brian Magee, 52, Floral Park, N.Y.
Joseph Maggitti, 47, Abingdon, Md.

Ronald E. Magnuson, 57, Park Ridge, N.J.
Daniel L. Maher, 50, Hamilton, N.J.
Thomas Anthony Mahon, 37, East Norwich, N.Y.
William Mahoney, 38, Bohemia, N.Y.
Joseph Maio, 32, Roslyn Harbor, N.Y.
Takashi Makimoto, 49, New York, N.Y.
Abdu Malahi, 37, New York, N.Y.
Debora Maldonado, 47, New York, N.Y.
Myrna T. Maldonado-Agosto, 49, New York, N.Y.
Alfred R. Maler, 39, Convent Station, N.J.
Gregory James Malone, 42, Hoboken, N.J.
Edward Francis (Teddy) Maloney, 32, Darien, Conn.
Joseph E. Maloney, 46, Farmingville, N.Y.
Gene E. Maloy, 41, New York, N.Y.
Christian Maltby, 37, Chatham, N.J.
Francisco Miguel (Frank) Mancini, 26, New York, N.Y.
Joseph Mangano, 53, Jackson, N.J.
Sara Elizabeth Manley, 31, New York, N.Y.
Debra M. Mannetta, 31, Islip, N.Y.
Terence J. Manning, 36, Rockville Centre, N.Y.
Marion Victoria (vickie) Manning, 27, Rochdale, N.Y.
James Maounis, 42, New York, N.Y.
Joseph Ross Marchbanks, 47, Nanuet, N.Y.
Peter Edward Mardikian, 29, New York, N.Y.
Edward Joseph Mardovich, 42, Lloyd Harbor, N.Y.
Lt. Charles Joseph Margiotta, 44, New York, N.Y.
Kenneth Joseph Marino, 40, Monroe, N.Y.
Lester Vincent Marino, 57, Massapequa, N.Y.
Vita Marino, 49, New York, N.Y.
Kevin D. Marlo, 28, New York, N.Y.
Jose J. Marrero, 32, Old Bridge, N.J.
John Marshall, 35, Congers, N.Y.
James Martello, 41, Rumson, N.J.
Michael A. Marti, 26, Glendale, N.Y.
Lt. Peter Martin, 43, Miller Place, N.Y.
William J. Martin, 35, Rockaway, N.J.
Brian E. Martineau, 37, Edison, N.J.
Betsy Martinez, 33, New York, N.Y.
Edward J. Martinez, 60, New York, N.Y.
Jose Angel Martinez, 49, Hauppauge, N.Y.
Robert Gabriel Martinez, 24, New York, N.Y.
Lizie Martinez-Calderon, 32, New York, N.Y.
Lt. Paul Richard Martini, 37, New York, N.Y.
Joseph A. Mascali, 44, New York, N.Y.
Bernard Mascarenhas, 54, Newmarket, Ontario, Canada
Stephen F. Masi, 55, New York, N.Y.

Nicholas G. Massa, 65, New York, N.Y.
Patricia A. Massari, 25, Glendale, N.Y.
Michael Massaroli, 38, New York, N.Y.
Philip W. Mastrandrea, 42, Chatham, N.J.
Rudolph Mastrocinque, 43, Kings Park, N.Y.
Joseph Mathai, 49, Arlington, Mass.
Charles William Mathers, 61, Sea Girt, N.J.
William A. Mathesen, 40, Morristown, N.J.
Marcello Matricciano, 31, New York, N.Y.
Margaret Elaine Mattic, 51, New York, N.Y.
Robert D. Mattson, 54, Green Pond, N.J.
Walter Matuza, 39, New York, N.Y.
Charles A. (Chuck) Mauro, 65, New York, N.Y.
Charles J. Mauro, 38, New York, N.Y.
Dorothy Mauro, 55, New York, N.Y.
Nancy T. Mauro, 51, New York, N.Y.
Tyrone May, 44, Rahway, N.J.
Keithroy Maynard, 30, New York, N.Y.
Robert J. Mayo, 46, Morganville, N.J.
Kathy Nancy Mazza-Delosh, 46, Farmingdale, N.Y.
Edward Mazzella, 62, Monroe, N.Y.
Jennifer Mazzotta, 23, New York, N.Y.
Kaaria Mbaya, 39, Edison, N.J.
James J. McAlary, 42, Spring Lake Heights, N.J.
Brian McAleese, 36, Baldwin, N.Y.
Patricia A. McAneney, 50, Pomona, N.Y.
Colin Richard McArthur, 52, Howell, N.J.
John McAvoy, 47, New York, N.Y.
Kenneth M. McBrayer, 49, New York, N.Y.
Brendan McCabe, 40, Sayville, N.Y.
Michael J. McCabe, 42, Rumson, N.J.
Thomas McCann, 46, Manalapan, N.J.
Justin McCarthy, 30, Port Washington, N.Y.
Kevin M. McCarthy, 42, Fairfield, Conn.
Michael Desmond McCarthy, 33, Huntington, N.Y.
Robert Garvin McCarthy, 33, Stony Point, N.Y.
Stanley McCaskill, 47, New York, N.Y.
Katie Marie McCloskey, 25, Mount Vernon, N.Y.
Tara McCloud-Gray, 30, New York, N.Y.
Charles Austin McCrann, 55, New York, N.Y.
Tonyell McDay, 25, Colonia, N.J.
Matthew T. McDermott, 34, Basking Ridge, N.J.
Joseph P. McDonald, 43, Livingston, N.J.
Brian G. McDonnell, 38, Wantagh, N.Y.
Michael McDonnell, 34, Red Bank, N.J.
John F. McDowell, 33, New York, N.Y.

Eamon J. McEneaney, 46, New Canaan, Conn.
John Thomas McErlean, 39, Larchmont, N.Y.
Daniel F. McGinley, 40, Ridgewood, N.J.
Mark Ryan McGinly, 26, New York, N.Y.
Lt. William E. McGinn, 43, New York, N.Y.
Thomas H. McGinnis, 41, Oakland, N.J.
Michael Gregory McGinty, 42, Foxboro, Mass.
Ann McGovern, 68, East Meadow, N.Y.
Scott Martin McGovern, 35, Wyckoff, N.J.
William J. McGovern, 49, Smithtown, N.Y.
Stacey S. McGowan, 38, Basking Ridge, N.J.
Francis Noel McGuinn, 48, Rye, N.Y.
Patrick J. McGuire, 40, Madison, N.J.
Thomas M. McHale, 33, Huntington, N.Y.
Keith McHeffey, 31, Monmouth Beach, N.J.
Denis J. McHugh, 36, New York, N.Y.
Dennis P. McHugh, 34, Sparkill, N.Y.
Michael Edward McHugh, 35, Tuckahoe, N.Y.
Ann M. McHugh, 35, New York, N.Y.
Robert G. McIlvaine, 26, New York, N.Y.
Donald James McIntyre, 38, New City, N.Y.
Stephanie McKenna, 45, New York, N.Y.
Barry J. McKeon, 47, Yorktown Heights, N.Y.
Evelyn C. McKinnedy, 60, New York, N.Y.
Darryl Leron McKinney, 26, New York, N.Y.
Robert C. McLaughlin, 29, Westchester, N.Y.
George Patrick McLaughlin, 36, Hoboken, N.J.
Gavin McMahon, 35, Bayonne, N.J.
Robert Dismas McMahon, 35, New York, N.Y.
Edmund M. McNally, 41, Fair Haven, N.J.
Daniel McNeal, 29, Towson, Md.
Walter Arthur McNeil, 53, Stroudsburg, Pa.
Sean Peter McNulty, 30, New York, N.Y.
Christine Sheila McNulty, 42, Peterborough, England
Robert William McPadden, 30, Pearl River, N.Y.
Terence A. McShane, 37, West Islip, N.Y.
Timothy Patrick McSweeney, 37, New York, N.Y.
Martin E. McWilliams, 35, Kings Park, N.Y.
Rocco A. Medaglia, 49, Melville, N.Y.
Abigail Cales Medina, 46, New York, N.Y.
Ana Iris Medina, 39, New York, N.Y.
Deborah Medwig, 46, Dedham, Mass.
William J. Meehan, 49, Darien, Conn.
Damian Meehan, 32, Glen Rock, N.J.
Alok Kumar Mehta, 23, Hempstead, N.Y.
Raymond Meisenheimer, 46, West Babylon, N.Y.

Manuel Emilio Mejia, 54, New York, N.Y.
Eskedar Melaku, 31, New York, N.Y.
Antonio Melendez, 30, New York, N.Y.
Mary Melendez, 44, Stroudsburg, Pa.
Yelena Melnichenko, 28, Brooklyn, N.Y.
Stuart Todd Meltzer, 32, Syosset, N.Y.
Diarelia Jovannah Mena, 30, New York, N.Y.
Charles Mendez, 38, Floral Park, N.Y.
Lizette Mendoza, 33, North Bergen, N.J.
Shevonne Mentis, 25, New York, N.Y.
Steve Mercado, 38, New York, N.Y.
Wesley Mercer, 70, New York, N.Y.
Ralph Joseph Mercurio, 47, Rockville Centre, N.Y.
Alan H. Merdinger, 47, Allentown, Pa.
George C. Merino, 39, New York, N.Y.
Yamel Merino, 24, Yonkers, N.Y.
George Merkouris, 35, Levittown, N.Y.
Deborah Merrick, 45
Raymond J. Metz, 37, Trumbull, Conn.
Jill A. Metzler, 32, Franklin Square, N.Y.
David Robert Meyer, 57, Glen Rock, N.J.
Nurul Huq Miah, 35, New York, N.Y.
William Edward Micciulli, 30, Matawan, N.J.
Martin Paul Michelstein, 57, Morristown, N.J.
Luis Clodoaldo Revilla Mier, 54
Peter T. Milano, 43, Middletown, N.J.
Gregory Milanowycz, 25, Cranford, N.J.
Lukasz T. Milewski, 21, New York, N.Y.
Craig James Miller, 29, Va.
Corey Peter Miller, 34, New York, N.Y.
Douglas C. Miller, 34, Port Jervis, N.Y.
Henry Miller, 52, Massapequa, N.Y.
Michael Matthew Miller, 39, Englewood, N.J.
Phillip D. Miller, 53, New York, N.Y.
Robert C. Miller, 55, Hasbrouck Heights, N.J.
Robert Alan Miller, 46, Matawan, N.J.
Joel Miller, 55, Baldwin, N.Y.
Benjamin Millman, 40, New York, N.Y.
Charles M. Mills, 61, Brentwood, N.Y.
Ronald Keith Milstein, 54, New York, N.Y.
Robert Minara, 54, Carmel, N.Y.
William G. Minardi, 46, Bedford, N.Y.
Louis Joseph Minervino, 54, Middletown, N.J.
Thomas Mingione, 34, West Islip, N.Y.
Wilbert Miraille, 29, New York, N.Y.
Domenick Mircovich, 40, Closter, N.J.

Rajesh A. Mirpuri, 30, Englewood Cliffs, N.J.
Joseph Mistrulli, 47, Wantagh, N.Y.
Susan Miszkowicz, 37, New York, N.Y.
Lt. Paul Thomas Mitchell, 46, New York, N.Y.
Richard Miuccio, 55, New York, N.Y.
Frank V. Moccia, 57, Hauppauge, N.Y.
Capt. Louis Joseph Modafferi, 45, New York, N.Y.
Boyie Mohammed, 50, New York, N.Y.
Lt. Dennis Mojica, 50, New York, N.Y.
Manuel Mojica, 37, Bellmore, N.Y.
Manuel Dejesus Molina, 31, New York, N.Y.
Kleber Rolando Molina, 44, New York, N.Y.
Fernando Jimenez Molinar, 21, Oaxaca, Mexico
Carl Molinaro, 32, New York, N.Y.
Justin J. Molisani, 42, Middletown Township, N.J.
Brian Patrick Monaghan, 21, New York, N.Y.
Franklin Monahan, 45, Roxbury, N.Y.
John Gerard Monahan, 47, Wanamassa, N.J.
Kristen Montanaro, 34, New York, N.Y.
Craig D. Montano, 38, Glen Ridge, N.J.
Michael Montesi, 39, Highland Mills, N.Y.
Cheryl Ann Monyak, 43, Greenwich, Conn.
Capt. Thomas Moody, 45, Stony Brook, N.Y.
Sharon Moore, 37, New York, N.Y.
Krishna Moorthy, 59, Briarcliff Manor, N.Y.
Abner Morales, 37, New York, N.Y.
Carlos Morales, 29, New York, N.Y.
Paula Morales, 42, New York, N.Y.
Luis Morales, 46, New York, N.Y.
John Moran, 43, Rockaway, N.Y.
John Christopher Moran, 38, Haslemere, Surrey, England
Kathleen Moran, 42, New York, N.Y.
Lindsay S. Morehouse, 24, New York, N.Y.
George Morell, 47, Mount. Kisco, N.Y.
Steven P. Morello, 52, Bayonne, N.J.
Vincent S. Morello, 34, New York, N.Y.
Arturo Alva Moreno, 47, Mexico City, Mexico
Yvette Nicole Moreno, 25, New York, N.Y.
Dorothy Morgan, 47, Hempstead, N.Y.
Richard Morgan, 66, Glen Rock, N.J.
Nancy Morgenstern, 32, New York, N.Y.
Sanae Mori, 27, Tokyo, Japan
Blanca Morocho, 26, New York, N.Y.
Leonel Morocho, 36, New York, N.Y.
Dennis G. Moroney, 39, Eastchester, N.Y.
Lynne Irene Morris, 22, Monroe, N.Y.

Seth A. Morris, 35, Kinnelon, N.J.
Stephen Philip Morris, 31, Ormond Beach, Fla.
Christopher M. Morrison, 34, Charlestown, Mass.
Ferdinand V. Morrone, 63, Lakewood, N.J.
William David Moskal, 50, Brecksville, Ohio
Manuel Da Mota, 43, Valley Stream, N.Y.
Marco Motroni, 57, Fort Lee, N.J.
Iouri A. Mouchinski, 55, New York, N.Y.
Jude J. Moussa, 35, New York, N.Y.
Peter C. Moutos, 44, Chatham, N.J.
Damion Mowatt, 21, New York, N.Y.
Christopher Mozzillo, 27, New York, N.Y.
Stephen V. Mulderry, 33, New York, N.Y.
Richard Muldowney, 40, Babylon, N.Y.
Michael D. Mullan, 34, New York, N.Y.
Dennis Michael Mulligan, 32, New York, N.Y.
Peter James Mulligan, 28, New York, N.Y.
Michael Joseph Mullin, 27, Hoboken, N.J.
James Donald Munhall, 45, Ridgewood, N.J.
Nancy Muniz, 45, New York, N.Y.
Carlos Mario Munoz, 43
Francisco Munoz, 29, New York, N.Y.
Theresa (Terry) Munson, 54, New York, N.Y.
Robert M. Murach, 45, Montclair, N.J.
Cesar Augusto Murillo, 32, New York, N.Y.
Marc A. Murolo, 28, Maywood, N.J.
Robert Eddie Murphy, 56, New York, N.Y.
Brian Joseph Murphy, 41, New York, N.Y.
Christopher W. Murphy, 35, Easton, Md.
Edward C. Murphy, 42, Clifton, N.J.
James F. Murphy, 30, Garden City, N.Y.
James Thomas Murphy, 35, Middletown, N.J.
Kevin James Murphy, 40, Northport, N.Y.
Patrick Sean Murphy, 36, Millburn, N.J.
Lt. Raymond E. Murphy, 46, New York, N.Y.
Charles Murphy, 38, New York, N.Y.
John Joseph Murray, 32, Hoboken, N.J.
John Joseph Murray, 52, Colts Neck, N.J.
Susan D. Murray, 54, Summit, N.J.
Valerie Victoria Murray, 65, New York, N.Y.
Richard Todd Myhre, 37, New York, N.Y.
Lt. Robert B. Nagel, 55, New York, N.Y.
Takuya Nakamura, 30, Tuckahoe, N.Y.
Alexander J.R. Napier, 38, Morris Township, N.J.
Frank Joseph Naples, 29, Cliffside Park, N.J.
John Napolitano, 33, Ronkonkoma, N.Y.

Catherine A. Nardella, 40, Bloomfield, N.J.
Mario Nardone, 32, New York, N.Y.
Manika Narula, 22, Kings Park, N.Y.
Narender Nath, 33, Colonia, N.J.
Karen S. Navarro, 30, New York, N.Y.
Joseph M. Navas, 44, Paramus, N.J.
Francis J. Nazario, 28, Jersey City, N.J.
Glenroy Neblett, 42, New York, N.Y.
Marcus R. Neblett, 31, Roslyn Heights, N.Y.
Jerome O. Nedd, 39, New York, N.Y.
Laurence Nedell, 51, Lindenhurst, N.Y.
Luke G. Nee, 44, Stony Point, N.Y.
Pete Negron, 34, Bergenfield, N.J.
Ann Nicole Nelson, 30, New York, N.Y.
David William Nelson, 50, New York, N.Y.
James Nelson, 40, Clark, N.J.
Michele Ann Nelson, 27, Valley Stream, N.Y.
Peter Allen Nelson, 42, Huntington Station, N.Y.
Oscar Nesbitt, 58, New York, N.Y.
Gerard Terence Nevins, 46, Campbell Hall, N.Y.
Christopher Newton-Carter, 51, Middletown, N.J.
Kapinga Ngalula, 58, McKinney, Texas
Nancy Yuen Ngo, 36, Harrington Park, N.J.
Jody Tepedino Nichilo, 39, New York, N.Y.
Martin Niederer, 23, Hoboken, N.J.
Alfonse J. Niedermeyer, 40, Manasquan, N.J.
Frank John Niestadt, 55, Ronkonkoma, N.Y.
Gloria Nieves, 48, New York, N.Y.
Juan Nieves, 56, New York, N.Y.
Troy Edward Nilsen, 33, New York, N.Y.
Paul R. Nimbley, 42, Middletown, N.J.
John Ballantine Niven, 44, Oyster Bay, N.Y.
Katherine (Katie) McGarry Noack, 30, Hoboken, N.J.
Curtis Terrence Noel, 22, Poughkeepsie, N.Y.
Daniel R. Nolan, 44, Hopatcong, N.J.
Robert Walter Noonan, 36, Norwalk, Conn.
Daniela R. Notaro, 25, New York, N.Y.
Brian Novotny, 33, Hoboken, N.J.
Soichi Numata, 45, Irvington, N.Y.
Brian Felix Nunez, 29, New York, N.Y.
Jose R. Nunez, 42, New York, N.Y.
Jeffrey Nussbaum, 37, Oceanside, N.Y.
James A. Oakley, 52, Cortlandt Manor, N.Y.
Dennis O'Berg, 28, Babylon, N.Y.
James P. O'Brien, 33, New York, N.Y.
Scott J. O'Brien, 40, New York, N.Y.

Timothy Michael O'Brien, 40, Brookville, N.Y.
Michael O'Brien, 42, Cedar Knolls, N.J.
Captain Daniel O'Callaghan, 42, Smithtown, N.Y.
Richard J. O'Connor, 49, Poughkeepsie, N.Y.
Dennis J. O'Connor, 34, New York, N.Y.
Diana J. O'Connor, 38, Eastchester, N.Y.
Keith K. O'Connor, 28, Hoboken, N.J.
Amy O'Doherty, 23, New York, N.Y.
Marni Pont O'Doherty, 31, Armonk, N.Y.
Douglas Oelschlager, 36, New York, N.Y.
Takashi Ogawa, 37, Tokyo, Japan
Albert Ogletree, 49, New York, N.Y.
Philip Paul Ognibene, 39, New York, N.Y.
James Andrew O'Grady, 32, Harrington Park, N.J.
Joseph J. Ogren, 30, New York, N.Y.
Lt. Thomas O'Hagan, 43, New York, N.Y.
Samuel Oitice, 45, Peekskill, N.Y.
Patrick O'Keefe, 44, Oakdale, N.Y.
Capt. William O'Keefe, 49, New York, N.Y.
Gerald Michael Olcott, 55, New Hyde Park, N.Y.
Gerald O'Leary, 34, Stony Point, N.Y.
Christine Anne Olender, 39, New York, N.Y.
Elsy Carolina Osorio Oliva, 27, New York, N.Y.
Linda Mary Oliva, 44, New York, N.Y.
Edward K. Oliver, 31, Jackson, N.J.
Leah E. Oliver, 24, New York, N.Y.
Eric T. Olsen, 41, New York, N.Y.
Jeffrey James Olsen, 31, New York, N.Y.
Maureen L. Olson, 50, Rockville Centre, N.Y.
Steven John Olson, 38, New York, N.Y.
Matthew Timothy O'Mahony, 39, New York, N.Y.
Toshihiro Onda, 39, New York, N.Y.
Seamus L. Oneal, 52, New York, N.Y.
John P. O'Neill, 49, New York, N.Y.
Sean Gordon Corbett O'Neill, 34, Rye, N.Y.
Peter J. O'Neill, 21, Amityville, N.Y.
Michael C. Opperman, 45, Selden, N.Y.
Christopher Orgielewicz, 35, Larchmont, N.Y.
Margaret Orloske, 50, Windsor, Conn.
Virginia A. Ormiston, 42, New York, N.Y.
Kevin O'Rourke, 44, Hewlett, N.Y.
Juan Romero Orozco, Acatlan de Osorio, Puebla, Mexico
Ronald Orsini, 59, Hillsdale, N.J.
Peter K. Ortale, 37, New York, N.Y.
Emilio (Peter) Ortiz, 38, New York, N.Y.
David Ortiz, 37, Nanuet, N.Y.

Paul Ortiz, 21, New York, N.Y.
Sonia Ortiz, 58, New York, N.Y.
Alexander Ortiz, 36, Ridgewood, N.Y.
Pablo Ortiz, 49, New York, N.Y.
Masaru Ose, 36, Fort Lee, N.J.
Robert W. O'Shea, 47, Wall, N.J.
Patrick J. O'Shea, 45, Farmingdale, N.Y.
James Robert Ostrowski, 37, Garden City, N.Y.
Timothy O'Sullivan, 68, Albrightsville, Pa.
Jason Douglas Oswald, 28, New York, N.Y.
Michael Otten, 42, East Islip, N.Y.
Isidro Ottenwalder, 35, New York, N.Y.
Michael Chung Ou, 53, New York, N.Y.
Todd Joseph Ouida, 25, River Edge, N.J.
Jesus Ovalles, 60, New York, N.Y.
Peter J. Owens, 42, Williston Park, N.Y.
Adianes Oyola, 23, New York, N.Y.
Angel M. Pabon, 54, New York, N.Y.
Israel Pabon, 31, New York, N.Y.
Roland Pacheco, 25, New York, N.Y.
Michael Benjamin Packer, 45, New York, N.Y.
Deepa K. Pakkala, 31, Stewartsville, N.J.
Jeffrey Matthew Palazzo, 33, New York, N.Y.
Thomas Anthony Palazzo, 44, Armonk, N.Y.
Richard (Rico) Palazzolo, 39, New York, N.Y.
Orio Joseph Palmer, 45, Valley Stream, N.Y.
Frank A. Palombo, 46, New York, N.Y.
Alan N. Palumbo, 42, New York, N.Y.
Christopher M. Panatier, 36, Rockville Centre, N.Y.
Dominique Pandolfo, 27, Hoboken, N.J.
Paul Pansini, 34, New York, N.Y.
John M. Paolillo, 51, Glen Head, N.Y.
Edward J. Papa, 47, Oyster Bay, N.Y.
Salvatore Papasso, 34, New York, N.Y.
James N. Pappageorge, 29, Yonkers, N.Y.
Vinod K. Parakat, 34, Sayreville, N.J.
Vijayashanker Paramsothy, 23, New York, N.Y.
Nitin Ramesh Parandkar, 28, Waltham, Mass.
Hardai (Casey) Parbhu, 42, New York, N.Y.
James Wendell Parham, 32, New York, N.Y.
Debra (Debbie) Paris, 48, New York, N.Y.
George Paris, 33, New York, N.Y.
Gye-Hyong Park, 28, New York, N.Y.
Philip L. Parker, 53, Skillman, N.J.
Michael A. Parkes, 27, New York, N.Y.
Robert Emmett Parks, 47, Middletown, N.J.

Hasmukhrai Chuckulal Parmar, 48, Warren, N.J.
Robert Parro, 35, Levittown, N.Y.
Diane Marie Moore Parsons, 58, Malta, N.Y.
Leobardo Lopez Pascual, 41, New York, N.Y.
Michael J. Pascuma, 50, Massapequa Park, N.Y.
Jerrold H. Paskins, 56, Anaheim Hills, Calif.
Horace Robert Passananti, 55, New York, N.Y.
Suzanne H. Passaro, 38, East Brunswick, N.J.
Victor Antonio Martinez Pastrana, 38, Tlachichuca, Puebla, Mexico
Manish K. Patel, 29, Edison, N.J.
Avnish Ramanbhai Patel, 28, New York, N.Y.
Dipti Patel, 38, New Hyde Park, N.Y.
Steven B. Paterson, 40, Ridgewood, N.J.
James Matthew Patrick, 30, Norwalk, Conn.
Manuel Patrocino, 34
Bernard E. Patterson, 46, Upper Brookville, N.Y.
Cira Marie Patti, 40, New York, N.Y.
Robert Edward Pattison, 40, New York, N.Y.
James R. Paul, 58, New York, N.Y.
Sharon Cristina Millan Paz, 31, New York, N.Y.
Patrice Paz, 52, New York, N.Y.
Victor Paz-Gutierrez, 43, New York, N.Y.
Stacey L. Peak, 36, New York, N.Y.
Richard Allen Pearlman, 18, New York, N.Y.
Durrell Pearsall, 34, Hempstead, N.Y.
Thomas E. Pedicini, 30, Hicksville, N.Y.
Todd D. Pelino, 34, Fair Haven, N.J.
Michel Adrian Pelletier, 36, Greenwich, Conn.
Anthony Peluso, 46, New York, N.Y.
Angel Ramon Pena, 45, River Vale, N.J.
Richard Al Penny, 53, New York, N.Y.
Salvatore F. Pepe, 45, New York, N.Y.
Carl Allen Peralta, 37, New York, N.Y.
Robert David Peraza, 30, New York, N.Y.
Jon A. Perconti, 32, Brick, N.J.
Alejo Perez, 66, Union City, N.J.
Angel Perez, 43, Jersey City, N.J.
Angela Susan Perez, 35, New York, N.Y.
Ivan Perez, 37, New York, N.Y.
Nancy E. Perez, 36, Secaucus, N.J.
Anthony Perez, 33, Locust Valley, N.Y.
Joseph John Perroncino, 33, Smithtown, N.Y.
Edward J. Perrotta, 43, Mount Sinai, N.Y.
Lt. Glenn C. Perry, 41, Monroe, N.Y.
Emelda Perry, 52, Elmont, N.Y.
John William Perry, 38, New York, N.Y.

Franklin Allan Pershep, 59, New York, N.Y.
Daniel Pesce, 34, New York, N.Y.
Michael J. Pescherine, 32, New York, N.Y.
Davin Peterson, 25, New York, N.Y.
William Russel Peterson, 46, New York, N.Y.
Mark Petrocelli, 28, New York, N.Y.
Lt. Philip S. Petti, 43, New York, N.Y.
Glen Kerrin Pettit, 30, Oakdale, N.Y.
Dominick Pezzulo, 36, New York, N.Y.
Kaleen E. Pezzuti, 28, Fair Haven, N.Y.
Lt. Kevin Pfeifer, 42, New York, N.Y.
Tu-Anh Pham, 42, Princeton, N.J.
Lt. Kenneth John Phelan, 41, New York, N.Y.
Michael V. San Phillip, 55, Ridgewood, N.J.
Eugenia Piantieri, 55, New York, N.Y.
Ludwig John Picarro, 44, Basking Ridge, N.J.
Matthew Picerno, 44, Holmdel, N.J.
Joseph O. Pick, 40, Hoboken, N.J.
Christopher Pickford, 32, New York, N.Y.
Dennis J. Pierce, 54, New York, N.Y.
Joseph A. Della Pietra, 24, New York, N.Y.
Bernard T. Pietronico, 39, Matawan, N.J.
Nicholas P. Pietrunti, 38, Belford, N.J.
Theodoros Pigis, 60, New York, N.Y.
Susan Elizabeth Ancona Pinto, 44, New York, N.Y.
Joseph Piskadlo, 48, North Arlington, N.J.
Christopher Todd Pitman, 30, New York, N.Y.
Josh Michael Piver, 23, New York, N.Y.
Joseph Plumitallo, 45, Manalapan, N.J.
John M. Pocher, 36, Middletown, N.J.
William Howard Pohlmann, 56, Ardsley, N.Y.
Laurence M. Polatsch, 32, New York, N.Y.
Thomas H. Polhemus, 39, Morris Plains, N.J.
Steve Pollicino, 48, Plainview, N.Y.
Susan M. Pollio, 45, Long Beach Township, N.J.
Joshua Poptean, 37, New York, N.Y.
Giovanna Porras, 24, New York, N.Y.
Anthony Portillo, 48, New York, N.Y.
James Edward Potorti, 52, Princeton, N.J.
Daphne Pouletsos, 47, Westwood, N.J.
Richard Poulos, 55, Levittown, N.Y.
Stephen E. Poulos, 45, Basking Ridge, N.J.
Brandon Jerome Powell, 26, New York, N.Y.
Shawn Edward Powell, 32, New York, N.Y.
Tony Pratt, 43, New York, N.Y.
Gregory M. Preziose, 34, Holmdel, N.J.

Wanda Ivelisse Prince, 30, New York, N.Y.
Vincent Princiotta, 39, Orangeburg, N.Y.
Kevin Prior, 28, Bellmore, N.Y.
Everett Martin (Marty) Proctor, 44, New York, N.Y.
Carrie B. Progen, 25, New York, N.Y.
David Lee Pruim, 53, Upper Montclair, N.J.
Richard Prunty, 57, Sayville, N.Y.
John F. Puckett, 47, Glen Cove, N.Y.
Robert D. Pugliese, 47, East Fishkill, N.Y.
Edward F. Pullis, 34, Hazlet, N.J.
Patricia Ann Puma, 33, New York, N.Y.
Hemanth Kumar Puttur, 26, White Plains, N.Y.
Edward R. Pykon, 33, Princeton, N.J.
Christopher Quackenbush, 44, Manhasset, N.Y.
Lars Peter Qualben, 49, New York, N.Y.
Lincoln Quappe, 38, Sayville, N.Y.
Beth Ann Quigley, 25, New York, N.Y.
Lt. Michael Quilty, 42, New York, N.Y.
Ricardo Quinn, 40, New York, N.Y.
James Francis Quinn, 23, New York, N.Y.
Carol Rabalais, 38, New York, N.Y.
Christopher Peter A. Racaniello, 30, New York, N.Y.
Leonard Ragaglia, 36, New York, N.Y.
Eugene J. Raggio, 55, New York, N.Y.
Laura Marie Ragonese-Snik, 41, Bangor, Pa.
Michael Ragusa, 29, New York, N.Y.
Peter F. Raimondi, 46, New York, N.Y.
Harry A. Raines, 37, New York, N.Y.
Ehtesham U. Raja, 28, Clifton, N.J.
Valsa Raju, 39, Yonkers, N.Y.
Edward Rall, 44, Holbrook, N.Y.
Lukas (Luke) Rambousek, 27, New York, N.Y.
Julio Fernandez Ramirez, 51, New York, N.Y.
Maria Isabel Ramirez, 25, New York, N.Y.
Harry Ramos, 41, Newark, N.J.
Vishnoo Ramsaroop, 44, New York, N.Y.
Lorenzo Ramzey, 48, East Northport, N.Y.
A. Todd Rancke, 42, Summit, N.J.
Adam David Rand, 30, Bellmore, N.Y.
Jonathan C. Randall, 42, New York, N.Y.
Srinivasa Shreyas Ranganath, 26, Hackensack, N.J.
Anne Rose T. Ransom, 45, Edgewater, N.J.
Faina Rapoport, 45, New York, N.Y.
Robert Arthur Rasmussen, 42, Hinsdale, Ill.
Amenia Rasool, 33, New York, N.Y.
Roger Mark Rasweiler, 53, Flemington, N.J.

David Alan James Rathkey, 47, Mountain Lakes, N.J.
William Ralph Raub, 38, Saddle River, N.J.
Gerard Rauzi, 42, New York, N.Y.
Alexey Razuvaev, 40, New York, N.Y.
Gregory Reda, 33, New Hyde Park, N.Y.
Sarah Prothero Redheffer, 35, London, England
Michele Reed, 26, Ringoes, N.J.
Judith A. Reese, 56, Kearny, N.J.
Donald J. Regan, 47, Wallkill, N.Y.
Lt. Robert M. Regan, 48, Floral Park, N.Y.
Thomas M. Regan, 43, Cranford, N.J.
Christian Michael Otto Regenhard, 28, New York, N.Y.
Howard Reich, 59, New York, N.Y.
Gregg Reidy, 26, Holmdel, N.J.
Kevin O. Reilly, 28, New York, N.Y.
James Brian Reilly, 25, New York, N.Y.
Timothy E. Reilly, 40, New York, N.Y.
Joseph Reina, 32, New York, N.Y.
Thomas Barnes Reinig, 48, Bernardsville, N.J.
Frank B. Reisman, 41, Princeton, N.J.
Joshua Scott Reiss, 23, New York, N.Y.
Karen Renda, 52, New York, N.Y.
John Armand Reo, 28, Larchmont, N.Y.
Richard Rescorla, 62, Morristown, N.J.
John Thomas Resta, 40, New York, N.Y.
Sylvia San Pio Resta, 26, New York, N.Y.
Eduvigis (Eddie) Reyes, 37, New York, N.Y.
Bruce A. Reynolds, 41, Columbia, N.J.
John Frederick Rhodes, 57, Howell, N.J.
Francis S. Riccardelli, 40, Westwood, N.J.
Rudolph N. Riccio, 50, New York, N.Y.
AnnMarie (Davi) Riccoboni, 58, New York, N.Y.
Eileen Mary Rice, 57, New York, N.Y.
David Rice, 31, New York, N.Y.
Kenneth F. Rice, 34, Hicksville, N.Y.
Lt. Vernon Allan Richard, 53, Nanuet, N.Y.
Claude D. Richards, 46, New York, N.Y.
Gregory Richards, 30, New York, N.Y.
Michael Richards, 38, New York, N.Y.
Venesha O. Richards, 26, North Brunswick, N.J.
James C. Riches, 29, New York, N.Y.
Alan Jay Richman, 44, New York, N.Y.
John M. Rigo, 48, New York, N.Y.
Theresa (Ginger) Risco, 48, New York, N.Y.
Rose Mary Riso, 55, New York, N.Y.
Moises N. Rivas, 29, New York, N.Y.

Joseph Rivelli, 43, New York, N.Y.
Isaias Rivera, 51, Perth Amboy, N.J.
Linda Rivera, 26, New York, N.Y.
Juan William Rivera, 27, New York, N.Y.
Carmen A. Rivera, 33, Westtown, N.Y.
David E. Rivers, 40, New York, N.Y.
Joseph R. Riverso, 34, White Plains, N.Y.
Paul Rizza, 34, Park Ridge, N.J.
John Frank Rizzo, 50, New York, N.Y.
Stephen Louis Roach, 36, Verona, N.J.
Joseph Roberto, 37, Midland Park, N.J.
Leo A. Roberts, 44, Wayne, N.J.
Michael Roberts, 30, New York, N.Y.
Michael Edward Roberts, 31, New York, N.Y.
Donald Walter Robertson, 35, Rumson, N.J.
Catherina Robinson, 45, New York, N.Y.
Jeffrey Robinson, 38, Monmouth Junction, N.J.
Michell Lee Robotham, 32, Kearny, N.J.
Donald Robson, 52, Manhasset, N.Y.
Antonio Augusto Tome Rocha, 34, East Hanover, N.J.
Raymond J. Rocha, 29, Malden, Mass.
Laura Rockefeller, 41, New York, N.Y.
John M. Rodak, 39, Mantua, N.J.
Antonio Jose Carrusca Rodrigues, 35, Port Washington, N.Y.
Anthony Rodriguez, 36, New York, N.Y.
Carmen Milagros Rodriguez, 46, Freehold, N.J.
Marsha A. Rodriguez, 41, West Paterson, N.J.
Richard Rodriguez, 31, Cliffwood, N.J.
Gregory E. Rodriguez, 31, White Plains, N.Y.
David B. Rodriguez-Vargas, 44, New York, N.Y.
Matthew Rogan, 37, West Islip, N.Y.
Karlie Barbara Rogers, 25, London, England
Scott Rohner, 22, Hoboken, N.J.
Keith Roma, 27, New York, N.Y.
Joseph M. Romagnolo, 37, Coram, N.Y.
Elvin Santiago Romero, 34, Matawan, N.J.
Efrain Franco Romero, 57, Hazleton, Pa.
James A. Romito, 51, Westwood, N.J.
Sean Rooney, 50, Stamford, Conn.
Eric Thomas Ropiteau, 24, New York, N.Y.
Aida Rosario, 42, Jersey City, N.J.
Angela Rosario, 27, New York, N.Y.
Fitzroy St. Rose, 40, New York, N.Y.
Mark H. Rosen, 45, West Islip, N.Y.
Linda Rosenbaum, 41, Little Falls, N.J.
Brooke David Rosenbaum, 31, Franklin Square, N.Y.

Sheryl Lynn Rosenbaum, 33, Warren, N.J.
Lloyd D. Rosenberg, 31, Morganville, N.J.
Mark Louis Rosenberg, 26, Teaneck, N.J.
Andrew I. Rosenblum, 45, Rockville Centre, N.Y.
Joshua M. Rosenblum, 28, Hoboken, N.J.
Joshua A. Rosenthal, 44, New York, N.Y.
Richard David Rosenthal, 50, Fair Lawn, N.J.
Daniel Rossetti, 32, Bloomfield, N.J.
Norman Rossinow, 39, Cedar Grove, N.J.
Nicholas P. Rossomando, 35, New York, N.Y.
Michael Craig Rothberg, 39, Greenwich, Conn.
Donna Marie Rothenberg, 53, New York, N.Y.
Nick Rowe, 29, Hoboken, N.J.
Timothy A. Roy, 36, Massapequa Park, N.Y.
Paul G. Ruback, 50, Newburgh, N.Y.
Ronald J. Ruben, 36, Hoboken, N.J.
Joanne Rubino, 45, New York, N.Y.
David Michael Ruddle, 31, New York, N.Y.
Bart Joseph Ruggiere, 32, New York, N.Y.
Susan Ann Ruggiero, 30, Plainview, N.Y.
Adam K. Ruhalter, 40, Plainview, N.Y.
Gilbert Ruiz, 57, New York, N.Y.
Stephen P. Russell, 40, Rockaway Beach, N.Y.
Steven Harris Russin, 32, Mendham, N.J.
Lt. Michael Thomas Russo, 44, Nesconset, N.Y.
Wayne Alan Russo, 37, Union, N.J.
John J. Ryan, 45, West Windsor, N.J.
Edward Ryan, 42, Scarsdale, N.Y.
Jonathan Stephan Ryan, 32, Bayville, N.Y.
Matthew Lancelot Ryan, 54, Seaford, N.Y.
Kristin A. Irvine Ryan, 30, New York, N.Y.
Tatiana Ryjova, 36, South Salem, N.Y.
Christina Sunga Ryook, 25, New York, N.Y.
Thierry Saada, 27, New York, N.Y.
Jason E. Sabbag, 26, New York, N.Y.
Thomas E. Sabella, 44, New York, N.Y.
Scott Saber, 36, New York, N.Y.
Joseph Sacerdote, 48, Freehold, N.J.
Mohammad Ali Sadeque, 62, New York, N.Y.
Francis J. Sadocha, 41, Huntington, N.Y.
Jude Elias Safi, 24, New York, N.Y.
Brock Joel Safronoff, 26, New York, N.Y.
Edward Saiya, 49, New York, N.Y.
John Patrick Salamone, 37, North Caldwell, N.J.
Hernando R. Salas, 71, New York, N.Y.
Juan Salas, 35, New York, N.Y.

Esmerlin Salcedo, 36, New York, N.Y.
John Salvatore Salerno, 31, Westfield, N.J.
Richard L. Salinardi, 32, Hoboken, N.J.
Wayne John Saloman, 43, Seaford, N.Y.
Nolbert Salomon, 33, New York, N.Y.
Catherine Patricia Salter, 37, New York, N.Y.
Frank Salvaterra, 41, Manhasset, N.Y.
Paul R. Salvio, 27, New York, N.Y.
Samuel R. Salvo, 59, Yonkers, N.Y.
Carlos Samaniego, 29, New York, N.Y.
Rena Sam-Dinnoo, 28, New York, N.Y.
James Kenneth Samuel, 29, Hoboken, N.J.
Hugo Sanay-Perafiel, 41, New York, N.Y.
Alva Jeffries Sanchez, 41, Hempstead, N.Y.
Jacquelyn P. Sanchez, 23, New York, N.Y.
Erick Sanchez, 43, New York, N.Y.
Eric Sand, 36, Westchester, N.Y.
Stacey Leigh Sanders, 25, New York, N.Y.
Herman Sandler, 57, New York, N.Y.
James Sands, 39, Bricktown, N.J.
Ayleen J. Santiago, 40, New York, N.Y.
Kirsten Santiago, 26, New York, N.Y.
Maria Theresa Santillan, 27, Morris Plains, N.J.
Susan G. Santo, 24, New York, N.Y.
Christopher Santora, 23, New York, N.Y.
John Santore, 49, New York, N.Y.
Mario L. Santoro, 28, New York, N.Y.
Rafael Humberto Santos, 42, New York, N.Y.
Rufino Conrado F. (Roy) Santos, 37, New York, N.Y.
Kalyan K. Sarkar, 53, Westwood, N.J.
Chapelle Sarker, 37, New York, N.Y.
Paul F. Sarle, 38, Babylon, N.Y.
Deepika Kumar Sattaluri, 33, Edison, N.J.
Gregory Thomas Saucedo, 31, New York, N.Y.
Susan Sauer, 48, Chicago, Ill.
Anthony Savas, 72, New York, N.Y.
Vladimir Savinkin, 21, New York, N.Y.
John Sbarbaro, 45, New York, N.Y.
Robert L. Scandole, 36, Pelham Manor, N.Y.
Michelle Scarpitta, 26, New York, N.Y.
Dennis Scauso, 46, Dix Hills, N.Y.
John A. Schardt, 34, New York, N.Y.
John G. Scharf, 29, Manorville, N.Y.
Fred Claude Scheffold, 57, Piermont, N.Y.
Angela Susan Scheinberg, 46, New York, N.Y.
Scott M. Schertzer, 28, Edison, N.J.

Sean Schielke, 27, New York, N.Y.
Steven Francis Schlag, 41, Franklin Lakes, N.J.
Jon S. Schlissel, 51, Jersey City, N.J.
Karen Helene Schmidt, 42, Bellmore, N.Y.
Ian Schneider, 45, Short Hills, N.J.
Thomas G. Schoales, 27, Stony Point, N.Y.
Marisa Di Nardo Schorpp, 38, White Plains, N.Y.
Frank G. Schott, 39, Massapequa Park, N.Y.
Gerard P. Schrang, 45, Holbrook, N.Y.
Jeffrey Schreier, 48, New York, N.Y.
John T. Schroeder, 31, Hoboken, N.J.
Susan Lee Kennedy Schuler, 55, Allentown, N.J.
Edward W. Schunk, 54, Baldwin, N.Y.
Mark E. Schurmeier, 44, McLean, Va.
Clarin Shellie Schwartz, 51, New York, N.Y.
John Schwartz, 49, Goshen, Conn.
Mark Schwartz, 50, West Hempstead, N.Y.
Adriane Victoria Scibetta, 31, New York, N.Y.
Raphael Scorca, 61, Beachwood, N.J.
Randolph Scott, 48, Stamford, Conn.
Christopher J. Scudder, 34, Monsey, N.Y.
Arthur Warren Scullin, 57, New York, N.Y.
Michael Seaman, 41, Manhasset, N.Y.
Margaret Seeliger, 34, New York, N.Y.
Carlos Segarra, 54, New York, N.Y.
Anthony Segarra, 52, New York, N.Y.
Jason Sekzer, 31, New York, N.Y.
Matthew Carmen Sellitto, 23, Morristown, N.J.
Howard Selwyn, 47, Hewlett, N.Y.
Larry John Senko, 34, Yardley, Pa.
Arturo Angelo Sereno, 29, New York, N.Y.
Frankie Serrano, 23, Elizabeth, N.J.
Alena Sesinova, 57, New York, N.Y.
Adele Sessa, 36, New York, N.Y.
Sita Nermalla Sewnarine, 37, New York, N.Y.
Karen Lynn Seymour-Dietrich, 40, Millington, N.J.
Davis (Deeg) Sezna, 22, New York, N.Y.
Thomas Joseph Sgroi, 45, New York, N.Y.
Jayesh Shah, 38, Edgewater, N.J.
Khalid M. Shahid, 25, Union, N.J.
Mohammed Shajahan, 41, Spring Valley, N.Y.
Gary Shamay, 23, New York, N.Y.
Earl Richard Shanahan, 50, New York, N.Y.
Shiv Shankar, New York, N.Y.
Neil G. Shastri, 25, New York, N.Y.
Kathryn Anne Shatzoff, 37, New York, N.Y.

Barbara A. Shaw, 57, Morris Township, N.J.
Jeffrey J. Shaw, 42, Levittown, N.Y.
Robert J. Shay, 27, New York, N.Y.
Daniel James Shea, 37, Pelham Manor, N.Y.
Joseph Patrick Shea, 47, Pelham, N.Y.
Linda Sheehan, 40, New York, N.Y.
Hagay Shefi, 34, Tenafly, N.J.
John Anthony Sherry, 34, Rockville Centre, N.Y.
Atsushi Shiratori, 36, New York, N.Y.
Thomas Shubert, 43, New York, N.Y.
Mark Shulman, 47, Old Bridge, N.J.
See-Wong Shum, 44, Westfield, N.J.
Allan Shwartzstein, 37, Chappaqua, N.Y.
Johanna Sigmund, 25, Wyndmoor, Pa.
Dianne T. Signer, 32, New York, N.Y.
Gregory Sikorsky, 34, Spring Valley, N.Y.
Stephen Gerard Siller, 34, West Brighton, N.Y.
David Silver, 35, New Rochelle, N.Y.
Craig A. Silverstein, 41, Wyckoff, N.J.
Nasima H. Simjee, 38, New York, N.Y.
Bruce Edward Simmons, 41, Ridgewood, N.J.
Arthur Simon, 57, Thiells, N.Y.
Kenneth Alan Simon, 34, Secaucus, N.J.
Michael John Simon, 40, Harrington Park, N.J.
Paul Joseph Simon, 54, New York, N.Y.
Marianne Simone, 62, New York, N.Y.
Barry Simowitz, 64, New York, N.Y.
Jeff Simpson, 38, Lake Ridge, Va.
Roshan R. (Sean) Singh, 21, New York, N.Y.
Khamladai K. (Khami) Singh, 25, New York, N.Y.
Thomas E. Sinton, 44, Croton-on-hudson, N.Y.
Peter A. Siracuse, 29, New York, N.Y.
Muriel F. Siskopoulos, 60, New York, N.Y.
Joseph M. Sisolak, 35, New York, N.Y.
John P. Skala, 31, Clifton, N.J.
Francis J. Skidmore, 58, Mendham, N.J.
Toyena Corliss Skinner, 27, Kingston, N.J.
Paul A. Skrzypek, 37, New York, N.Y.
Christopher Paul Slattery, 31, New York, N.Y.
Vincent R. Slavin, 41, Belle Harbor, N.Y.
Robert Sliwak, 42, Wantagh, N.Y.
Paul K. Sloan, 26, New York, N.Y.
Stanley S. Smagala, 36, Holbrook, N.Y.
Wendy L. Small, 26, New York, N.Y.
Catherine T. Smith, 44, West Haverstraw, N.Y.
Daniel Laurence Smith, 47, Northport, N.Y.

George Eric Smith, 38, West Chester, Pa.
James G. Smith, 43, Garden City, N.Y.
Joyce Smith, 55, New York, N.Y.
Karl Trumbull Smith, 44, Little Silver, N.J.
Kevin Smith, 47, Mastic, N.Y.
Leon Smith, 48, New York, N.Y.
Moira Smith, 38, New York, N.Y.
Rosemary A. Smith, 61, New York, N.Y.
Sandra Fajardo Smith, 37, New York, N.Y.
Jeffrey Randall Smith, 36, New York, N.Y.
Bonnie S. Smithwick, 54, Quogue, N.Y.
Rochelle Monique Snell, 24, Mount Vernon, N.Y.
Leonard J. Snyder, 35, Cranford, N.J.
Astrid Elizabeth Sohan, 32, Freehold, N.J.
Sushil Solanki, 35, New York, N.Y.
Ruben Solares, 51, New York, N.Y.
Naomi Leah Solomon, 52, New York, N.Y.
Daniel W. Song, 34, New York, N.Y.
Michael C. Sorresse, 34, Morris Plains, N.J.
Fabian Soto, 31, Harrison, N.J.
Timothy P. Soulas, 35, Basking Ridge, N.J.
Gregory T. Spagnoletti, 32, New York, N.Y.
Donald F. Spampinato, 39, Manhasset, N.Y.
Thomas Sparacio, 35, New York, N.Y.
John Anthony Spataro, 32, Mineola, N.Y.
Robert W. Spear, 30, Valley Cottage, N.Y.
Maynard S. Spence, 42, Douglasville, Ga.
George E. Spencer, 50, West Norwalk, Conn.
Robert Andrew Spencer, 35, Red Bank, N.J.
Mary Rubina Sperando, 39, New York, N.Y.
Frank J. Spinelli, 44, Short Hills, N.J.
William E. Spitz, 49, Oceanside, N.Y.
Joseph P. Spor, 35, Yorktown Heights, N.Y.
Klaus Johannes Sprockamp, 42, Muhltal, Germany
Saranya Srinuan, 23, New York, N.Y.
Michael F. Stabile, 50, New York, N.Y.
Lawrence T. Stack, 58, Lake Ronkonkoma, N.Y.
Capt. Timothy Stackpole, 42, New York, N.Y.
Richard James Stadelberger, 55, Middletown, N.J.
Eric A. Stahlman, 43, Holmdel Township, N.J.
Gregory M. Stajk, 46, Long Beach, N.Y.
Corina Stan, 31, Middle Village, N.Y.
Alexandru Liviu Stan, 34, New York, N.Y.
Mary D. Stanley, 53, New York, N.Y.
Joyce Stanton
Patricia Stanton

Anthony M. Starita, 35, Westfield, N.J.
Jeffrey Stark, 30, New York, N.Y.
Derek James Statkevicus, 30, Norwalk, Conn.
Craig William Staub, 30, Basking Ridge, N.J.
William V. Steckman, 56, West Hempstead, N.Y.
Eric Thomas Steen, 32, New York, N.Y.
William R. Steiner, 56, New Hope, Pa.
Alexander Robbins Steinman, 32, Hoboken, N.J.
Andrew Stergiopoulos, 23, New York, N.Y.
Andrew Stern, 41, Bellmore, N.Y.
Martha Jane Stevens, 55, New York, N.Y.
Richard H. Stewart, 35, New York, N.Y.
Michael James Stewart, 42, New York, N.Y.
Sanford M. Stoller, 54, New York, N.Y.
Lonny J. Stone, 43, Bellmore, N.Y.
Jimmy Nevill Storey, 58, Katy, Texas
Timothy Stout, 42, Dobbs Ferry, N.Y.
Thomas S. Strada, 41, Chatham, N.J.
James J. Straine, 36, Oceanport, N.J.
Edward W. Straub, 48, Morris Township, N.J.
George Strauch, 53, Avon-by-the-Sea, N.J.
Edward T. Strauss, 44, Edison, N.J.
Steven R. Strauss, 51, Fresh Meadows, N.Y.
Steven F. Strobert, 33, Ridgewood, N.J.
Walwyn W. Stuart, 28, Valley Stream, N.Y.
Benjamin Suarez, 36, New York, N.Y.
David S. Suarez, 24, Princeton, N.J.
Ramon Suarez, 45, New York, N.Y.
Yoichi Sugiyama, 34, Fort Lee, N.J.
William Christopher Sugra, 30, New York, N.Y.
Daniel Suhr, 37, Nesconset, N.Y.
David Marc Sullins, 30, New York, N.Y.
Lt. Christopher P. Sullivan, 38, Massapequa, N.Y.
Patrick Sullivan, 32, New York, N.Y.
Thomas Sullivan, 38, Kearney, N.J.
Hilario Soriano (Larry) Sumaya, 42, New York, N.Y.
James Joseph Suozzo, 47, Hauppauge, N.Y.
Colleen Supinski, 27, New York, N.Y.
Robert Sutcliffe, 39, Huntington, N.Y.
Selina Sutter, 63, New York, N.Y.
Claudia Suzette Sutton, 34, New York, N.Y.
John F. Swaine, 36, Larchmont, N.Y.
Kristine M. Swearson, 34, New York, N.Y.
Brian Edward Sweeney, 29, Merrick, N.Y.
Kenneth J. Swensen, 40, Chatham, N.J.
Thomas F. Swift, 30, Jersey City, N.J.

Derek O. Sword, 29, New York, N.Y.
Kevin T. Szocik, 27, Garden City, N.Y.
Gina Sztejnberg, 52, Ridgewood, N.J.
Norbert P. Szurkowski, 31, New York, N.Y.
Harry Taback, 56, New York, N.Y.
Joann Tabeek, 41, New York, N.Y.
Norma C. Taddei, 64, New York, N.Y.
Michael Taddonio, 39, Huntington, N.Y.
Keiji Takahashi, 42, Tenafly, N.J.
Keiichiro Takahashi, 53, Port Washington, N.Y.
Phyllis Gail Talbot, 53, New York, N.Y.
Robert R. Talhami, 40, Shrewsbury, N.J.
Sean Patrick Tallon, 26, Yonkers, N.Y.
Paul Talty, 40, Wantagh, N.Y.
Maurita Tam, 22, New York, N.Y.
Rachel Tamares, 30, New York, N.Y.
Hector Tamayo, 51, New York, N.Y.
Michael Andrew Tamuccio, 37, Pelham Manor, N.Y.
Kenichiro Tanaka, 52, Rye Brook, N.Y.
Rhondelle Cherie Tankard, 31, Devonshire, Bermuda
Michael Anthony Tanner, 44, Secaucus, N.J.
Dennis Gerard Taormina, 36, Montville, N.J.
Kenneth Joseph Tarantino, 39, Bayonne, N.J.
Allan Tarasiewicz, 45, New York, N.Y.
Ronald Tartaro, 39, Bridgewater, N.J.
Darryl Taylor, 52, New York, N.Y.
Donnie Brooks Taylor, 40, New York, N.Y.
Lorisa Ceylon Taylor, 31, New York, N.Y.
Michael M. Taylor, 42, New York, N.Y.
Paul A. Tegtmeier, 41, Hyde Park, N.Y.
Yeshavant Moreshwar Tembe, 59, Piscataway, N.J.
Anthony Tempesta, 38, Elizabeth, N.J.
Dorothy Temple, 52, New York, N.Y.
Stanley L. Temple, 77, New York, N.Y.
David Tengelin, 25, New York, N.Y.
Brian J. Terrenzi, 29, Hicksville, N.Y.
Lisa Marie Terry, 42, Rochester, Mich.
Goumatie T. Thackurdeen, 35, New York, N.Y.
Harshad Sham Thatte, 30, Norcross, Ga.
Thomas F. Theurkauf, 44, Stamford, Conn.
Lesley Anne Thomas, 40, Hoboken, N.J.
Brian T. Thompson, 49, Dix Hills, N.Y.
Clive Thompson, 43, Summit, N.J.
Glenn Thompson, 44, New York, N.Y.
Perry Anthony Thompson, 36, Mount Laurel, N.J.
Vanavah Alexi Thompson, 26, New York, N.Y.

Capt. William Harry Thompson, 51, New York, N.Y.
Nigel Bruce Thompson, 33, New York, N.Y.
Eric Raymond Thorpe, 35, New York, N.Y.
Nichola A. Thorpe, 22, New York, N.Y.
Sal Tieri, 40, Shrewsbury, N.J.
John Patrick Tierney, 27, New York, N.Y.
Mary Ellen Tiesi, 38, Jersey City, N.J.
William R. Tieste, 54, Basking Ridge, N.J.
Kenneth F. Tietjen, 31, Matawan, N.J.
Stephen Edward Tighe, 41, Rockville Centre, N.Y.
Scott C. Timmes, 28, Ridgewood, N.Y.
Michael E. Tinley, 56, Dallas, Texas
Jennifer M. Tino, 29, Livingston, N.J.
Robert Frank Tipaldi, 25, New York, N.Y.
John J. Tipping, 33, Port Jefferson, N.Y.
David Tirado, 26, New York, N.Y.
Hector Luis Tirado, 30, New York, N.Y.
Michelle Titolo, 34, Copiague, N.Y.
John J. Tobin, 47, Kenilworth, N.J.
Richard J. Todisco, 61, Wyckoff, N.J.
Vladimir Tomasevic, 36, Etobicoke, Ontario, Canada
Stephen K. Tompsett, 39, Garden City, N.Y.
Thomas Tong, 31, New York, N.Y.
Azucena de la Torre, 50, New York, N.Y.
Doris Torres, 32, New York, N.Y.
Luis Eduardo Torres, 31, New York, N.Y.
Amy E. Toyen, 24, Newton, Mass.
Christopher M. Traina, 25, Bricktown, N.J.
Daniel Patrick Trant, 40, Northport, N.Y.
Abdoul Karim Traore, 41, New York, N.Y.
Glenn J. Travers, 53, Tenafly, N.J.
Walter (Wally) P. Travers, 44, Upper Saddle River, N.J.
Felicia Traylor-Bass, 38, New York, N.Y.
Lisa L. Trerotola, 38, Hazlet, N.J.
Karamo Trerra, 40, New York, N.Y.
Michael Trinidad, 33, New York, N.Y.
Francis Joseph Trombino, 68, Clifton, N.J.
Gregory J. Trost, 26, New York, N.Y.
William Tselepis, 33, New Providence, N.J.
Zhanetta Tsoy, 32, Jersey City, N.J.
Michael Patrick Tucker, 40, Rumson, N.J.
Lance Richard Tumulty, 32, Bridgewater, N.J.
Ching Ping Tung, 44, New York, N.Y.
Simon James Turner, 39, London, England
Donald Joseph Tuzio, 51, Goshen, N.Y.
Robert T. Twomey, 48, New York, N.Y.

Jennifer Tzemis, 26, New York, N.Y.
John G. Ueltzhoeffer, 36, Roselle Park, N.J.
Tyler V. Ugolyn, 23, New York, N.Y.
Michael A. Uliano, 42, Aberdeen, N.J.
Jonathan J. Uman, 33, Westport, Conn.
Anil Shivhari Umarkar, 34, Hackensack, N.J.
Allen V. Upton, 44, New York, N.Y.
Diane Maria Urban, 50, Malverne, N.Y.
John Damien Vaccacio, 30, New York, N.Y.
Bradley H. Vadas, 37, Westport, Conn.
William Valcarcel, 54, New York, N.Y.
Mayra Valdes-Rodriguez, 39, New York, N.Y.
Felix Antonio Vale, 29, New York, N.Y.
Ivan Vale, 27, New York, N.Y.
Santos Valentin, 39, New York, N.Y.
Benito Valentin, 33, New York, N.Y.
Manuel Del Valle, 32, New York, N.Y.
Carlton Francis Valvo, 38, New York, N.Y.
Edward Raymond Vanacore, 29, Jersey City, N.J.
Jon C. Vandevander, 44, Ridgewood, N.J.
Frederick T. Varacchi, 35, Greenwich, Conn.
Gopalakrishnan Varadhan, 32, New York, N.Y.
David Vargas, 46, New York, N.Y.
Scott C. Vasel, 32, Park Ridge, N.J.
Santos Vasquez, 55, New York, N.Y.
Azael Ismael Vasquez, 21, New York, N.Y.
Arcangel Vazquez, 47, New York, N.Y.
Peter Anthony Vega, 36, New York, N.Y.
Sankara S. Velamuri, 63, Avenel, N.J.
Jorge Velazquez, 47, Passaic, N.J.
Lawrence Veling, 44, New York, N.Y.
Anthony M. Ventura, 41, Middletown, N.J.
David Vera, 41, New York, N.Y.
Loretta A, Vero, 51, Nanuet, N.Y.
Christopher Vialonga, 30, Demarest, N.J.
Matthew Gilbert Vianna, 23, Manhasset, N.Y.
Robert A. Vicario, 40, Weehawken, N.J.
Celeste Torres Victoria, 41, New York, N.Y.
Joanna Vidal, 26, Yonkers, N.Y.
John T. Vigiano, 36, West Islip, N.Y.
Joseph Vincent Vigiano, 34, Medford, N.Y.
Frank J. Vignola, 44, Merrick, N.Y.
Joseph B. Vilardo, 44, Stanhope, N.J.
Sergio Villanueva, 33, New York, N.Y.
Chantal Vincelli, 38, New York, N.Y.
Melissa Vincent, 28, Hoboken, N.J.

Francine A. Virgilio, 48, New York, N.Y.
Lawrence Virgilio, 38
Joseph G. Visciano, 22, New York, N.Y.
Joshua S. Vitale, 28, Great Neck, N.Y.
Maria Percoco Vola, 37, New York, N.Y.
Lynette D. Vosges, 48, New York, N.Y.
Garo H. Voskerijian, 43, Valley Stream, N.Y.
Alfred Vukosa, 37, New York, N.Y.
Gregory Wachtler, 25, Ramsey, N.J.
Gabriela Waisman, 33, New York, N.Y.
Wendy Alice Rosario Wakeford, 40, Freehold, N.J.
Courtney Wainsworth Walcott, 37, New York, N.Y.
Victor Wald, 49, New York, N.Y.
Benjamin Walker, 41, Suffern, N.Y.
Glen J. Wall, 38, Rumson, N.J.
Mitchel Scott Wallace, 34, Mineola, N.Y.
Lt. Robert F. Wallace, 43, New York, N.Y.
Roy Michael Wallace, 42, Wyckoff, N.J.
Peter G. Wallace, 66, Lincoln Park, N.J.
Jean Marie Wallendorf, 23, New York, N.Y.
Matthew Blake Wallens, 31, New York, N.Y.
John Wallice, 43, Huntington, N.Y.
Barbara P. Walsh, 59, New York, N.Y.
James Walsh, 37, Scotch Plains, N.J.
Jeffrey Patrick Walz, 37, Tuckahoe, N.Y.
Ching H. Wang, 59, New York, N.Y.
Weibin Wang, 41, Orangeburg, N.Y.
Lt. Michael Warchola, 51, Middle Village, N.Y.
Stephen Gordon Ward, 33, Gorham, Maine
James A. Waring, 49, New York, N.Y.
Brian G. Warner, 32, Morganville, N.J.
Derrick Washington, 33, Calverton, N.Y.
Charles Waters, 44, New York, N.Y.
James Thomas (Muddy) Waters, 39, New York, N.Y.
Capt. Patrick J. Waters, 44, New York, N.Y.
Kenneth Watson, 39, Smithtown, N.Y.
Michael H. Waye, 38, Morganville, N.J.
Walter E. Weaver, 30, Centereach, N.Y.
Todd C. Weaver, 30, New York, N.Y.
Nathaniel Webb, 56, Jersey City, N.J.
Dinah Webster, 50, Port Washington, N.Y.
Joanne Flora Weil, 39, New York, N.Y.
Michael Weinberg, 34, New York, N.Y.
Steven Weinberg, 41, New City, N.Y.
Scott Jeffrey Weingard, 29, New York, N.Y.
Steven Weinstein, 50, New York, N.Y.

Simon Weiser, 65, New York, N.Y.
David T. Weiss, 50, New York, N.Y.
David M. Weiss, 41, Maybrook, N.Y.
Vincent Michael Wells, 22, Redbridge, England
Timothy Matthew Welty, 34, Yonkers, N.Y.
Christian Hans Rudolf Wemmers, 43, San Francisco, Calif.
Ssu-Hui (Vanessa) Wen, 23, New York, N.Y.
Oleh D. Wengerchuk, 56, Centerport, N.Y.
Peter M. West, 54, Pottersville, N.J.
Whitfield West, 41, New York, N.Y.
Meredith Lynn Whalen, 23, Hoboken, N.J.
Eugene Whelan, 31, Rockaway Beach, N.Y.
John S. White, 48, New York, N.Y.
Edward James White, 30, New York, N.Y.
James Patrick White, 34, Hoboken, N.J.
Kenneth W. White, 50, New York, N.Y.
Leonard Anthony White, 57, New York, N.Y.
Malissa White, 37, New York, N.Y.
Wayne White, 38, New York, N.Y.
Adam S. White, 26, New York, N.Y.
Leanne Marie Whiteside, 31, New York, N.Y.
Mark Whitford, 31, Salisbury Mills, N.Y.
Michael T. Wholey, 34, Westwood, N.J.
Mary Lenz Wieman, 43, Rockville Centre, N.Y.
Jeffrey David Wiener, 33, New York, N.Y.
William J. Wik, 44, Crestwood, N.Y.
Alison Marie Wildman, 30, New York, N.Y.
Lt. Glenn Wilkinson, 46, Bayport, N.Y.
John C. Willett, 29, Jersey City, N.J.
Brian Patrick Williams, 29, New York, N.Y.
Crossley Williams, 28, Uniondale, N.Y.
David Williams, 34, New York, N.Y.
Deborah Lynn Williams, 35, Hoboken, N.J.
Kevin Michael Williams, 24, New York, N.Y.
Louis Calvin Williams, 53, Mandeville, La.
Louie Anthony Williams, 44, New York, N.Y.
Lt. John Williamson, 46, Warwick, N.Y.
Donna Wilson, 48, Williston Park, N.Y.
William E. Wilson, 58, New York, N.Y.
Cynthia Wilson, 52, New York, N.Y.
David H. Winton, 29, New York, N.Y.
Glenn J. Winuk, 40, New York, N.Y.
Thomas Francis Wise, 43, New York, N.Y.
Alan L. Wisniewski, 47, Howell, N.J.
Frank T. Wisniewski, 54, Basking Ridge, N.J.
David Wiswall, 54, North Massapequa, N.Y.

Sigrid Charlotte Wiswe, 41, New York, N.Y.
Michael R. Wittenstein, 34, Hoboken, N.J.
Christopher W. Wodenshek, 35, Ridgewood, N.J.
Martin P. Wohlforth, 47, Greenwich, Conn.
Katherine S. Wolf, 40, New York, N.Y.
Jenny Seu Kueng Low Wong, 25, New York, N.Y.
Jennifer Y. Wong, 26, New York, N.Y.
Siu Cheung Wong, 34, Jersey City, N.J.
Yin Ping (Steven) Wong, 34, New York, N.Y.
Yuk Ping Wong, 47, New York, N.Y.
Brent James Woodall, 31, Oradell, N.J.
James J. Woods, 26, New York, N.Y.
Patrick Woods, 36, New York, N.Y.
Richard Herron Woodwell, 44, Ho-Ho-Kus, N.J.
Capt. David Terence Wooley, 54, Nanuet, N.Y.
John Bentley Works, 36, Darien, Conn.
Martin Michael Wortley, 29, Park Ridge, N.J.
Rodney James Wotton, 36, Middletown, N.J.
William Wren, 61, Lynbrook, N.Y.
John Wright, 33, Rockville Centre, N.Y.
Neil R. Wright, 30, Asbury, N.J.
Sandra Wright, 57, Langhorne, Pa.
Jupiter Yambem, 41, Beacon, N.Y.
Suresh Yanamadala, 33, Plainsboro, N.J.
Matthew David Yarnell, 26, Jersey City, N.J.
Myrna Yaskulka, 59, New York, N.Y.
Shakila Yasmin, 26, New York, N.Y.
Olabisi L. Yee, 38, New York, N.Y.
Edward P. York, 45, Wilton, Conn.
Kevin Patrick York, 41, Princeton, N.J.
Raymond York, 45, Valley Stream, N.Y.
Suzanne Youmans, 60, New York, N.Y.
Jacqueline (Jakki) Young, 37, New York, N.Y.
Barrington L. Young, 35, New York, N.Y.
Elkin Yuen, 32, New York, N.Y.
Joseph Zaccoli, 39, Valley Stream, N.Y.
Adel Agayby Zakhary, 50, North Arlington, N.J.
Arkady Zaltsman, 45, New York, N.Y.
Edwin J. Zambrana, 24, New York, N.Y.
Robert Alan Zampieri, 30, Saddle River, N.J.
Mark Zangrilli, 36, Pompton Plains, N.J.
Ira Zaslow, 55, North Woodmere, N.Y.
Kenneth Albert Zelman, 37, Succasunna, N.J.
Abraham J. Zelmanowitz, 55, New York, N.Y.
Martin Morales Zempoaltecatl, 22, New York, N.Y.
Zhe (Zack) Zeng, 28, New York, N.Y.

Marc Scott Zeplin, 33, Harrison, N.Y.
Jie Yao Justin Zhao, 27, New York, N.Y.
Ivelin Ziminski, 40, Tarrytown, N.Y.
Michael Joseph Zinzi, 37, Newfoundland, N.J.
Charles A. Zion, 54, Greenwich, Conn.
Julie Lynne Zipper, 44, Paramus, N.J.
Salvatore J. Zisa, 45, Hawthorne, N.J.
Prokopios Paul Zois, 46, Lynbrook, N.Y.
Joseph J. Zuccala, 54, Croton-on-Hudson, N.Y.
Andrew Steven Zucker, 27, New York, N.Y.
Igor Zukelman, 29, New York, N.Y.

## AMERICAN AIRLINES FLIGHT 11

### Crew

Barbara Arestegui, 38, Marstons Mills, Massachusetts
Jeffrey Collman, 41, Novato, Calif.
Sara Low, 28, Batesville, Arkansas
Karen A. Martin, 40, Danvers, Mass.
First Officer Thomas McGuinness, 42, Portsmouth, New Hampshire
Kathleen Nicosia, 54, Winthrop, Mass.
John Ogonowski, 52, Dracut, Massachusetts
Betty Ong, 45, Andover, Massachusetts
Jean Roger, 24, Longmeadow, Massachusetts
Dianne Snyder, 42, Westport, Massachusetts
Madeline Sweeney, 35, Acton, Massachusetts

### Passengers

Anna Williams Allison, 48, Stoneham, Massachusetts
David Angell, 54, Pasadena, California
Lynn Angell, 45, Pasadena, California
Seima Aoyama, 48, Culver City, Calif.
Myra Aronson, 52, Charlestown, Massachusetts
Christine Barbuto, 32, Brookline, Massachusetts
Carolyn Beug, 48, Los Angeles, California
Kelly Ann Booms, 24, Brookline, Mass.
Carol Bouchard, 43, Warwick, Rhode Island
Neilie Anne Heffernan Casey, 32, Wellesley, Massachusetts
Jeffrey Coombs, 42, Abington, Massachusetts
Tara Creamer, 30, Worcester, Massachusetts
Thelma Cuccinello, 71, Wilmot, New Hampshire
Patrick Currivan, 52, Winchester, Mass.
Brian Dale, 43, Warren, New Jersey
David DiMeglio, 22, Wakefield, Mass.
Donald Americo DiTullio, 49, Peabody, Mass.
Albert Dominguez, 66, Sydney, Australia
Paige Farley-Hackel, 46, Newton, Mass.
Alex Filipov, 70, Concord, Massachusetts
Carol Flyzik, 40, Plaistow, N.H.
Paul Friedman, 45, Belmont, Massachusetts
Karleton D.B. Fyfe, 31, Brookline, Massachusetts
Peter Gay, 54, Tewksbury, Massachusetts
Linda George, 27, Westboro, Massachusetts
Edmund Glazer, 41, Los Angeles, California
Lisa Fenn Gordenstein, 41, Needham, Massachusetts
Andrew Peter Charles Curry Green, 34, Santa Monica, Calif.

Peter Hashem, 40, Tewksbury, Massachusetts
Robert Hayes, 37, from Amesbury, Massachusetts
Edward (Ted) R. Hennessy, 35, Belmont, Mass.
John A. Hofer, 45, Los Angeles, Calif.
Cora Hidalgo Holland, 52, of Sudbury, Massachusetts
Nicholas Humber, 60, of Newton, Massachusetts,
Waleed Iskandar, 34, London, England
John Charles Jenkins, 45, Cambridge, Mass.
Charles Edward Jones, 48, Bedford, Mass.
Robin Kaplan, 33, Westboro, Massachusetts
Barbara Keating, 72, Palm Springs, Calif.
David P. Kovalcin, 42, Hudson, New Hampshire
Judy Larocque, 50, Framingham, Mass.
Natalie Janis Lasden, 46, Peabody, Mass.
Daniel John Lee, 34, Van Nuys, Calif.
Daniel C. Lewin, 31, Charlestown, Mass.
Susan A. MacKay, 44, Westford, Massachusetts
Christopher D. Mello, 25, Boston, Mass.
Jeff Mladenik, 43, Hinsdale, Illinois
Antonio Jesus Montoya Valdes, 46, East Boston, Mass.
Carlos Alberto Montoya, 36, Bellmont, Mass.
Laura Lee Morabito, 34, Framingham, Massachusetts
Mildred Rose Naiman, 81, Andover, Mass.
Laurie Ann Neira, 48, Los Angeles, Calif.
Renee Newell, 37, of Cranston, Rhode Island
Jacqueline J. Norton, 61, Lubec, Maine
Robert Grant Norton, 85, Lubec, Maine
Jane M. Orth, 49, Haverhill, Mass.
Thomas Pecorelli, 31, of Los Angeles, California
Berinthia Berenson Perkins, 53, Los Angeles, Calif.
Sonia Morales Puopolo, 58, of Dover, Massachusetts
David E. Retik, 33, Needham, Mass.
Philip M. Rosenzweig, 47, Acton, Mass.
Richard Ross, 58, Newton, Massachusetts
Jessica Sachs, 22, Billerica, Massachusetts
Rahma Salie, 28, Boston, Mass.
Heather Lee Smith, 30, Boston, Mass.
Douglas J. Stone, 54, Dover, N.H
Xavier Suarez, 41, Chino Hills, Calif.
Michael Theodoridis, 32, Boston, Mass.
James Trentini, 65, Everett, Massachusetts
Mary Trentini, 67, Everett, Massachusetts
Pendyala Vamsikrishna, 30, Los Angeles, Calif.
Mary Wahlstrom, 78, Kaysville, Utah
Kenneth Waldie, 46, Methuen, Massachusetts
John Wenckus, 46, Torrance, Calif.

Candace Lee Williams, 20, Danbury, Conn.
Christopher Zarba, 47, Hopkinton, Massachusetts

## AMERICAN AIRLINES FLIGHT 77

### Crew

Charles Burlingame, 51, Herndon, Va.
David M. Charlebois, 39, Washington, D.C
Michele Heidenberger, 57, Chevy Chase, Md.
Jennifer Lewis, 38, Culpeper, Virginia
Kenneth Lewis, 49, Culpeper, Virginia
Renee A. May, 39, Baltimore, Md

### Passengers

Paul Ambrose, 32, Washington, D.C.
Yeneneh Betru, 35, Burbank, Calif
Mary Jane (MJ) Booth, 64, Falls Church, Va.
Bernard Curtis Brown, 11, Washington, D.C.
Suzanne Calley, 42, San Martin, Calif.
William Caswell, 54, Silver Spring, Md.
Sarah Clark, 65, Columbia, Md.
Zandra Cooper, Annandale, Va.
Asia Cottom, 11, Washington, D.C.
James Debeuneure, 58, Upper Marlboro, Md.
Rodney Dickens, 11, Washington, D.C.
Eddie Dillard, Alexandria, Va.
Charles Droz, 52, Springfield, Va.
Barbara G. Edwards, 58, Las Vegas, Nev.
Charles S. Falkenberg, 45, University Park, Md.
Zoe Falkenberg, 8, University Park, Md.
Dana Falkenberg, 3, of University Park, Md.
James Joe Ferguson, 39, Washington, D.C.
Wilson "Bud" Flagg, 63, Millwood, Va.
Darlene Flagg, 63, Millwood, Va.
Richard Gabriel, 54, Great Falls, Va.
Ian J. Gray, 55, Columbia, Md.
Stanley Hall, 68, Rancho Palos Verdes, Calif.
Bryan Jack, 48, Alexandria, Va.
Steven D. Jacoby, 43, Alexandria, Va.
Ann Judge, 49, Great Falls, Va.
Chandler Keller, 29, El Segundo, Calif.
Yvonne Kennedy, 62, Sydney, New South Wales, Australia
Norma Khan, 45, Reston, Va.
Karen A. Kincaid, 40, Washington, D.C.
Dong Lee, 48, Leesburg, Va.
Dora Menchaca, 45, of Santa Monica, Calif.
Christopher Newton, 38, Anaheim, Calif.

Barbara Olson, 45, Great Falls, Va
Ruben Ornedo, 39, Los Angeles, Calif.
Robert Penniger, 63, of Poway, Calif.
Robert R. Ploger, 59, Annandale, Va.
Lisa J. Raines, 42, Great Falls, Va.
Todd Reuben, 40, Potomac, Maryland
John Sammartino, 37, Annandale, Va.
Diane Simmons, Great Falls, Va.
George Simmons, Great Falls, Va.
Mari-Rae Sopper, 35, Santa Barbara, Calif.
Robert Speisman, 47, Irvington, N.Y
Norma Lang Steuerle, 54, Alexandria, Va.
Hilda E. Taylor, 62, Forestville, Md
Leonard Taylor, 44, Reston, Va.
Sandra Teague, 31, Fairfax, Va.
Leslie A. Whittington, 45, University Park, Maryland.
John D. Yamnicky, 71, Waldorf, Md.
Vicki Yancey, 43, Springfield, Va.
Shuyin Yang, 61, Beijing, China
Yuguag Zheng, 65, Beijing, China

## UNITED AIRLINES FLIGHT 175

### Crew

Robert Fangman, 33, Claymont, Del.
Michael R. Horrocks, 38, Glen Mills, Pa.
Amy N. Jarret, 28, North Smithfield, R.I.
Amy R. King, 29, Stafford Springs, Conn.
Kathryn L. LaBorie, 44, Providence, R.I.
Alfred Gilles Padre Joseph Marchand, 44, Alamogordo, N.M.
Capt. Victor Saracini, 51, Lower Makefield Township, Pa.
Michael C. Tarrou, 38, Stafford Springs, Conn.
Alicia Nicole Titus, 28, San Francisco, Calif.

### Passengers

Alona Avraham, 30, Asdod, Israel.
Garnet Edward (Ace) Bailey, 54, Lynnfield, Mass.
Mark Bavis, 31, West Newton, Mass.
Graham Andrew Berkeley, 37, Boston, Mass.
Touri Bolourchi, 69, Beverly Hills, Calif.
Klaus Bothe, 31, Linkenheim, Baden-Wurttemberg, Germany
Daniel R. Brandhorst, 41, Los Angeles, Calif
David Reed Gamboa Brandhorst, 3, Los Angeles, Calif.
John Brett Cahill, 56, Wellesley, Mass.
Christoffer Carstanjen, 33, Turner Falls, Mass.
John (Jay) J. Corcoran, 43, Norwell, Mass
Dorothy Alma DeAraujo, 80, Long Beach, Calif.
Ana Gloria Pocasangre de Barrera, 49, San Salvador, El Salvador
Lisa Frost, 22, Rancho Santa Margarita, Calif.
Ronald Gamboa, 33, Los Angeles, Calif.
Lynn Catherine Goodchild, 25, Attleboro, Mass.
Peter Morgan Goodrich, 33, Sudbury, Mass.
Douglas A. Gowell, 52, Methuen, Mass.
The Rev. Francis E. Grogan, 76, of Easton, Mass.
Carl Max Hammond, 37, Derry, N.H.
Peter Hanson, 32, Groton, Mass.
Sue Kim Hanson, 35, Groton, Mass.
Christine Lee Hanson, 2, Groton, Mass.
Gerald F. Hardacre, 61, Carlsbad, Calif.
Eric Samadikan Hartono, 20, Boston, Mass.
James E. Hayden, 47, Westford, Mass.
Herbert W. Homer, 48, Milford, Mass.
Robert Adrien Jalbert, 61, Swampscott, Mass.
Ralph Francis Kershaw, 52, Manchester-by-the-Sea, Mass.
Heinrich Kimmig, 43, Willstaett, Germany

Brian Kinney, 29, Lowell, Mass.
Robert George LeBlanc, 70, Lee, N.H.
Maclovio Lopez, Jr., 41, Norwalk, Calif.
Marianne MacFarlane, MacFarlane, 34, Revere, Mass.
Louis Neil Mariani, 59, Derry, N.H.
Juliana Valentine McCourt, 4, New London, Conn.
Ruth Magdaline McCourt, 45, New London, Conn.
Wolfgang Peter Menzel, 59, Wilhelmshaven, Germany
Shawn M. Nassaney, 25, Pawtucket, R.I.
Marie Pappalardo, 53, Paramount, Calif.
Patrick Quigley, 40, of Wellesley, Mass.
Frederick Charles Rimmele, 32, Marblehead, Mass.
James M. Roux, 43, Portland, Maine
Jesus Sanchez, 45, Hudson, Mass.
Mary Kathleen Shearer, 61, Dover, N.H.
Robert Michael Shearer, 63, Dover, N.H.
Jane Louise Simpkin, 36, Wayland, Mass.
Brian D. Sweeney, 38, Barnstable, Mass.
Timothy Ward, 38, San Diego, Calif.
William M. Weems, 46, Marblehead, Mass.

## UNITED AIRLINES FLIGHT 93

### Crew

Lorraine G. Bay, 58, East Windsor, N.J.
Sandra W. Bradshaw, 38, Greensboro, N.C.
Jason Dahl, 43, Denver, Colo.
Wanda Anita Green, 49, Linden, N.J.
Leroy Homer, 36, Marlton, N.J.
CeeCee Lyles, 33, Fort Myers, Fla.
Deborah Welsh, 49, New York, N.Y.

### Passengers

Christian Adams, 37, Biebelsheim, Germany
Todd Beamer, 32, Cranbury, N.J.
Alan Beaven, 48, Oakland, CA
Mark K. Bingham, 31, San Francisco, Calif.
Deora Frances Bodley, 20, San Diego, Calif.
Marion Britton, 53, New York, N.Y.
Thomas E. Burnett Jr., 38, San Ramon, Calif.
William Cashman, 57, North Bergen, N.J.
Georgine Rose Corrigan, 56, Honolulu, Hawaii
Patricia Cushing, 69, Bayonne, N.J.
Joseph Deluca, 52, Ledgewood, N.J.
Patrick Joseph Driscoll, 70, Manalapan, N.J.
Edward P. Felt, 41, Matawan, N.J.
Jane C. Folger, 73, Bayonne, N.J.
Colleen Laura Fraser, 51, Elizabeth, N.J.
Andrew Garcia, 62, Portola Valley, Calif.
Jeremy Glick, 31, Hewlett, N.J.
Lauren Grandcolas, 38, San Rafael, Calif.
Donald F. Greene, 52, Greenwich, Conn.
Linda Gronlund, 46, Warwick, N.Y.
Richard Guadagno, 38, of Eureka, Calif.
Toshiya Kuge, 20, Nishimidoriguoska, Japan
Hilda Marcin, 79, Budd Lake, N.J.
Nicole Miller, 21, San Jose, Calif.
Louis J. Nacke, 42, New Hope, Pa.
Donald Arthur Peterson, 66, Spring Lake, N.J.
Jean Hoadley Peterson, 55, Spring Lake, N.J.
Waleska Martinez Rivera, 37, Jersey City, N.J.
Mark Rothenberg, 52, Scotch Plains, N.J.
Christine Snyder, 32, Kailua, Hawaii
John Talignani, 72, New York, N.Y.

Honor Elizabeth Wainio, 27, Watchung, N.J.
Olga Kristin Gould White, 65, New York, N.Y.

## THE PENTAGON

Spc. Craig Amundson, 28, Fort Belvoir, Va.
Melissa Rose Barnes, 27, Redlands, Calif.
(Retired) Master Sgt. Max Beilke, 69, Laurel, Md.
Kris Romeo Bishundat, 23, Waldorf, Md.
Carrie Blagburn, 48, Temple Hills, Md.
Lt. Col. Canfield D. Boone, 54, Clifton, Va.
Donna Bowen, 42, Waldorf, Md.
Allen Boyle, 30, Fredericksburg, Va.
Christopher Lee Burford, 23, Hubert, N.C.
Daniel Martin Caballero, 21, Houston, Texas
Sgt. 1st Class Jose Orlando Calderon-Olmedo, 44, Annandale, Va.
Angelene C. Carter, 51, Forrestville, Md.
Sharon Carver, 38, Waldorf, Md.
John J. Chada, 55, Manassas, Va.
Rosa Maria (Rosemary) Chapa, 64, Springfield, Va.
Julian Cooper, 39, Springdale, Md.
Lt. Cmdr. Eric Allen Cranford, 32, Drexel, N.C.
Ada M. Davis, 57, Camp Springs, Md.
Capt. Gerald Francis Deconto, 44, Sandwich, Mass.
Lt. Col. Jerry Don Dickerson, 41, Durant, Miss.
Johnnie Doctor, 32, Jacksonville, Fla.
Capt. Robert Edward Dolan, 43, Alexandria, Va.
Cmdr. William Howard Donovan, 37, Nunda, N.Y.
Cmdr. Patrick S. Dunn, 39, Springfield, Va.
Edward Thomas Earhart, 26, Salt Lick, Ky.
Lt. Cmdr. Robert Randolph Elseth, 37, Vestal, N.Y.
Jamie Lynn Fallon, 23, Woodbridge, Va.
Amelia V. Fields, 36, Dumfries, Va.
Gerald P. Fisher, 57, Potomac, Md.
Matthew Michael Flocco, 21, Newark, Del.
Sandra N. Foster, 41, Clinton, Md.
Capt. Lawrence Daniel Getzfred, 57, Elgin, Neb.
Cortz Ghee, 54, Reisterstown, Md.
Brenda C. Gibson, 59, Falls Church, Va.
Ron Golinski, 60, Columbia, Md.
Diane M. Hale-McKinzy, 38, Alexandria, Va.
Carolyn B. Halmon, 49, Washington, D.C.
Sheila Hein, 51, University Park, Md.
Ronald John Hemenway, 37, Shawnee, Kan.
Maj. Wallace Cole Hogan, 40, Fla.
Jimmie Ira Holley, 54, Lanham, Md.
Angela Houtz, 27, La Plata, Md.
Brady K. Howell, 26, Arlington, Va.
Peggie Hurt, 36, Crewe, Va.

Lt. Col. Stephen Neil Hyland, 45, Burke, Va.
Robert J. Hymel, 55, Woodbridge, Va.
Sgt. Maj. Lacey B. Ivory, 43, Woodbridge, Va.
Lt. Col. Dennis M. Johnson, 48, Port Edwards, Wis.
Judith Jones, 53, Woodbridge, Va.
Brenda Kegler, 49, Washington, D.C.
Lt. Michael Scott Lamana, 31, Baton Rouge, La.
David W. Laychak, 40, Manassas, Va.
Samantha Lightbourn-Allen, 36, Hillside, Md.
Maj. Steve Long, 39, Ga.
James Lynch, 55, Manassas, Va.
Terence M. Lynch, 49, Alexandria, Va.
Nehamon Lyons, 30, Mobile, Ala.
Shelley A. Marshall, 37, Marbury, Md.
Teresa Martin, 45, Stafford, Va.
Ada L. Mason, 50, Springfield, Va.
Lt. Col. Dean E. Mattson, 57, Calif.
Lt. Gen. Timothy J. Maude, 53, Fort Myer, Va.
Robert J. Maxwell, 53, Manassas, Va.
Molly McKenzie, 38, Dale City, Va.
Patricia E. (Patti) Mickley, 41, Springfield, Va.
Maj. Ronald D. Milam, 33, Washington, D.C.
Gerard (Jerry) P. Moran, 39, Upper Marlboro, Md.
Odessa V. Morris, 54, Upper Marlboro, Md.
Brian Anthony Moss, 34, Sperry, Okla.
Ted Moy, 48, Silver Spring, Md.
Lt. Cmdr. Patrick Jude Murphy, 38, Flossmoor, Ill.
Khang Nguyen, 41, Fairfax, Va.
Michael Allen Noeth, 30, New York, N.Y.
Diana Borrero de Padro, 55, Woodbridge, Va.
Spc. Chin Sun Pak, 25, Lawton, Okla.
Lt. Jonas Martin Panik, 26, Mingoville, Pa.
Maj. Clifford L. Patterson, 33, Alexandria, Va.
Lt. J.G. Darin Howard Pontell, 26, Columbia, Md.
Scott Powell, 35, Silver Spring, Md.
(Retired) Capt. Jack Punches, 51, Clifton, Va.
Joseph John Pycior, 39, Carlstadt, N.J.
Deborah Ramsaur, 45, Annandale, Va.
Rhonda Rasmussen, 44, Woodbridge, Va.
Marsha Dianah Ratchford, 34, Prichard, Ala.
Martha Reszke, 36, Stafford, Va.
Cecelia E. Richard, 41, Fort Washington, Md.
Edward V. Rowenhorst, 32, Lake Ridge, Va.
Judy Rowlett, 44, Woodbridge, Va.
Robert E. Russell, 52, Oxon Hill, Md.
William R. Ruth, 57, Mount Airy, Md.

Charles E. Sabin, 54, Burke, Va.
Marjorie C. Salamone, 53, Springfield, Va.
Lt. Col. David M. Scales, 44, Cleveland, Ohio
Cmdr. Robert Allan Schlegel, 38, Alexandria, Va.
Janice Scott, 46, Springfield, Va.
Michael L. Selves, 53, Fairfax, Va.
Marian Serva, 47, Stafford, Va.
Cmdr. Dan Frederic Shanower, 40, Naperville, Ill.
Antoinette Sherman, 35, Forest Heights, Md.
Don Simmons, 58, Dumfries, Va.
Cheryle D. Sincock, 53, Dale City, Va.
Gregg Harold Smallwood, 44, Overland Park, Kan.
(Retired) Lt. Col. Gary F. Smith, 55, Alexandria, Va.
Patricia J. Statz, 41, Takoma Park, Md.
Edna L. Stephens, 53, Washington, D.C.
Sgt. Maj. Larry Strickland, 52, Woodbridge, Va.
Maj. Kip P. Taylor, 38, McLean, Va.
Sandra C. Taylor, 50, Alexandria, Va.
Karl W. Teepe, 57, Centreville, Va.
Sgt. Tamara Thurman, 25, Brewton, Ala.
Lt. Cmdr. Otis Vincent Tolbert, 38, Lemoore, Calif.
Willie Q. Troy, 51, Aberdeen, Md.
Lt. Cmdr. Ronald James Vauk, 37, Nampa, Idaho
Lt. Col. Karen Wagner, 40, Houston, Texas
Meta L. Waller, 60, Alexandria, Va.
Staff Sgt. Maudlyn A. White, 38, St. Croix, Virgin Islands
Sandra L. White, 44, Dumfries, Va.
Ernest M. Willcher, 62, North Potomac, Md.
Lt. Cmdr. David Lucian Williams, 32, Newport, Ore.
Maj. Dwayne Williams, 40, Jacksonville, Ala.
Marvin R. Woods, 57, Great Mills, Md.
Kevin Wayne Yokum, 27, Lake Charles, La.
Donald McArthur Young, 41, Roanoke, Va.
Lisa L. Young, 36, Germantown, Md.
Edmond Young, 22, Owings, Md.