**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Continental Cas. Co. v. Al Qaeda*, 04-CV-5970 (RCC)
*Federal Ins. v. Al Qaida*, 03-CV-6978 (RCC)
*New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)

<br>

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION**
**TO THE MOTION TO DISMISS OF ABDULRAHMAN BIN MAHFOUZ**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THIS UNITED STATES COURT HAS PERSONAL JURISDICTION OVER
      ABDULRAHMAN BIN MAHFOUZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Applicable Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    This Court Has Personal Jurisdiction Over ABM Who Knowingly &
            Intentionally Provided Financial Support To Al Qaeda To Attack America . . . . . 7

      C.    This Court Has Personal Jurisdiction Over ABM Who Knew & Intended
            That The Acts Of His Al Qaeda Co-Conspirators Would Impact America . . . . . . 9

      D.    Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery . . . . . . . . . 11

III.  PLAINTIFFS STATE CLAIMS AGAINST ABDULRAHMAN BIN MAHFOUZ
      UPON WHICH RELIEF CAN BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Applicable Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Plaintiffs State A Claim Against ABM Under The Anti-Terrorism Act . . . . . . . 16

      C.    Plaintiffs Claims Are Not Barred by Corporate Law Principles . . . . . . . . . . . . 18

      D.    Plaintiffs Claims Are Not Barred by The First Amendment . . . . . . . . . . . . . . . 19

      E.    Plaintiffs Claims Are Not Barred by The Volunteer Protection Act . . . . . . . . . . 20

      F.    Plaintiffs State RICO Claims Against ABM . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      G.    Plaintiffs State A Claim Against ABM Under The Alien Tort Claims Act . . . . . 22

      H.    Plaintiffs State Common Law Claims Against ABM . . . . . . . . . . . . . . . . . . . . 23

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i


## TABLE OF AUTHORITIES

*Page*

### CASES

*Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899
(S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Boim v. Quranic Lit. Institute*, 291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . 16, 17

*Burnett v. Al Baraka Investment & Development Corp.*,
274 F. Supp.2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

*Chance v. Armstrong*, 143 F.3d 698 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 23

*Conley v. Gibson*, 355 U.S. 31 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Cutco Industries, Inc. v. Naughton*, 806 F.2d 361
(2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Daliberti v. Iraq*, 97 F. Supp.2d 38 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Desiderio v. National Association of Sec. Dealers, Inc.*,
191 F.3d 198 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
774 F. Supp. 802 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dixon v. Mack*, 507 F. Supp. 345 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Geisler v. Petrocelli*, 616 F.2d 636 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp.2d 765 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . 6, 7, 9, 11, 16, 17, 18, 22, 24

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) . . . . . . . . . . . . . . . . . . . 9, 10

ii

*Investment Properties International, Ltd. v. IOS, Ltd.*,
459 F.2d 705 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049
(2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kamen v. America Telegraph & Telegraph Co.*, 791 F.2d 1006
(2nd Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Linde, et al. v. Arab Bank, PLC*, 2005 U.D. Dist. LEXIS 18864 (E.D.N.Y. 2005) . . . . . 15

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899
(2nd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*PDK Laboratories v. Friedlander*, 103 F.3d 1105
(2nd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 15

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Pittman v. Grayson*, 149 F.3d 111 (2nd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp.2d 54 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sparrow v. United Airlines, Inc.*, 216 F.3d 1111
(D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Turkette*, 452 U.S. 576 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iii

*Woodford v. Community Action Agency*, 239 F.3d 517
(2nd Cir. 2001) ............................................................ 13

*World Wide Volkswagen Corp.*, 444 U.S. 286 (1980) ........................ 6, 9, 10

*Wynder v. McMahon*, 360 F.3d 73 (2nd Cir. 2004) ............................. 13

## FEDERAL STATUTES

Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350 ......................... 22, 23

Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq* ................. 7, 16, 17, 18

Racketeer Influenced & Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1962 ......................................................... 21

Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note ................ 24

## FEDERAL RULES

Fed. R. Civ. P. 8(a) .............................................. 13, 14, 15

Fed. R. Civ. P. 9(b) ..................................................... 14

Fed. R. Civ. P. 12(b)(2) .......................................... 6, 7, 11

Fed. R. Civ. P. 12(b)(6) ......................................... 12, 13, 15

## LEGISLATIVE HISTORY

S. Rep. 102-342 at 22 ..................................................... 1

## INTERNATIONAL LAW

United Nations Security Council Resolution 1373 ........................... 1

## MISCELLANEOUS

MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) .................... 11

iv

## I.   INTRODUCTION

Abdulrahman Bin Mahfouz ("ABM") is subject to civil liability in this United States

Court for knowingly providing financial support to al Qaeda for a decade leading up to the

September 11 attacks.  *See Boim v. Quranic Lit. Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002)("The

only way to imperil the flow of money and discourage the financing of terrorist acts is to impose

liability on those who knowingly and intentionally supply the funds to the persons who commit

the violent acts.")(*citing* S. Rep. 102-342 at 22 (by imposing "liability at any point along the

causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for attacks on

America)).

ABM's deliberate financing of al Qaeda terror cells worldwide violated international law.

On September 28, 2001, the United Nations Security Council declared in Resolution 1373 that

"all States shall . . . prevent and suppress the financing of terrorist acts."  The United States

Executive Branch backs Resolution 1373:

> The international community has recognized the need to take action against terrorism and
> has condemned such acts of terrorism in the United Nations Security Council
> [R]esolutions 1368 of September 12, 2001, 1373 of September 28, 2001, and 1390 of
> January 16, 2002.  These resolutions, taken together, obligate UN Member states, among
> other things to take necessary steps to *prevent the financing of terrorism*, to deny safe
> haven to terrorists, and to restrict the transfer of arms and arms-related material to
> terrorists.

Periodic Report on the National Emergency With Respect To Persons Who Commit, Threaten to
Commit, or Support Terrorism (President George W. Bush)(Apr. 9, 2002) at 5 (emphasis added).

1

ABM is the son of Khalid Bin Mahfouz and is the heir apparent to the Bin Mahfouz family businesses, including the Muwaffaq Foundation (a/k/a the Blessed Relief Foundation, and hereinafter "Blessed Relief") and the National Commercial Bank ("NCB"). ABM's role in these entities is detailed below, but a mere cursory review of the organizational structure of Blessed Relief and the NCB revels that ABM worked closely with his father, KBM, and had taken over the leadership.

As detailed in plaintiffs' opposition to KBM's motion to dismiss, KBM directed and controlled the NCB from 1986 to 1999 as its President, CEO and majority shareholder. *Ashton* 6AC ¶ 423. KBM also endowed and ran Blessed Relief. *Ashton* 6AC ¶ 341.

Through his role as a leader of the NCB and Blessed Relief, KBM, with the help of his son, ABM, channeled approximately $77 million to al Qaeda front organizations. *Ashton* 6AC ¶¶ 342 & 429. Indeed, KBM's support of terrorists and terrorist activities was so widely known that his name appeared on the Golden Chain list of al Qaeda sponsors. *See Ashton Opposition to KBM's Motion to Dismiss, fn 28.* KBM was eventually dismissed from NCB in 1999 and placed under house arrest, presumably for his role in funneling money to terrorists. *Ashton* 6AC ¶ 431. Nonetheless, as discussed below, KBM's son, ABM, continued to support his father's goal of aiding terrorism.

Specifically, plaintiffs[1] allege that ABM was a Director of Blessed Relief, and that he was the Deputy General Manager, Deputy Chairman of the Executive Committee and a Director of the NCB. *Ashton* 6AC ¶¶ 341, 423, 432 & 433; *Federal Plaintiffs'* First Amended Complaint

---

[1] ABM has moved to dismiss the claims of plaintiffs in *Ashton* (02-6977), *Continental Casualty* (04-5970), *Federal Insurance* (03-6978), *and New York Marine* (04-6105) (collectively, "Plaintiffs"). Plaintiffs file this consolidated Opposition brief to ABM's motion, and plaintiffs in each action incorporate the arguments made herein.

with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental

Pleadings, filed in accordance with Paragraph 13 of Case Management Order Number 2.

("*Federal* FAC") at ¶ 488, and the *Federal Plaintiffs'* Amended RICO Statement Applicable to

Abdulrahman Khaled bin Mahfouz at Exhibit A ("*Federal* RICO ABM"). Plaintiffs further

allege that ABM ran the NCB and participated in the management of Blessed Relief. *Ashton*

6AC ¶¶ 342 & 433; *Federal* FAC at ¶ 488, and *Federal* RICO ABM at Exhibit A.

Plaintiffs allege that Blessed Relief is widely known as an al Qaeda front that transfers

millions of dollars from wealthy Saudi businessmen to Osama bin Laden..[2] *Ashton* 6AC ¶¶ 340

& 342; *Federal* FAC at ¶ 488, and *Federal* RICO ABM at Exhibit A. Blessed Relief was run by

ABM as well as by Yassin al Qadi, who was named by the United States Government as a

Specially Designated Global Terrorist for his activities as the head of Blessed Relief. *Ashton*

6AC ¶ 340. Indeed, plaintiffs assert that bin Laden himself has acknowledged Blessed Relief's

important role in his terrorist organization. *Ashton* 6AC ¶ 343.

Plaintiffs further allege that NCB was al Qaeda's "financial arm, operating as a financial

conduit for Osama Bin Laden's operations." *Ashton* 6AC ¶ 424; *Federal* FAC at ¶ 296, and the

*Federal Plaintiffs'* Amended RICO Statement Applicable to NCB at Exhibit A ("*Federal* RICO

---

[2] The U.S. Department of Treasury has confirmed that Blessed Relief is an al Qaeda front. *See* Affidavit of John Fawcett at ¶¶ 3 & 4, attached as Ex. 1 to the Affirmation of William O. Angelley. ABM's motion to dismiss suggests that the Treasury Department's October 12, 2001 press release and accompanying affidavit are somehow suspect. To the contrary, the documents referenced in Exhibit 1 of the first Affidavit of John Fawcett in the Ashton opposition to the motion to dismiss of Khalid Bin Mahfouz are well sourced. They were referenced, often verbatim, and cited as U.S. Treasury Department documents in numerous press accounts immediately following their release on October 12, 2001. Excerpts have been entered at least twice into the Congressional record, once by Lee Wolosky, a former director of Transnational Threats at the National Security Council, and once by Senator Diane Feinstein. *See* Affidavit of John Fawcett at ¶¶ 4 & 5. Through the attempted denigration of the validity of these documents, ABM is merely trying to distract attention from an even stronger Treasury Department document relating to Blessed Relief. In a November 29, 2001 letter from Treasury General Counsel David Aufhauser to Swiss prosecutor Claude Nicati, Aufhauser outlined numerous examples of Blessed Relief's support for al Qaeda and terror, and notes that upon its dissolution, Blessed Relief "merged with al-Qa'ida."

NCB"). Based on the October 2001 Congressional testimony of a former CIA counter-terrorism expert, plaintiffs allege that the financial support ABM channeled through NCB enabled "al Qaeda [to] fund its worldwide network of cells and affiliated groups. . . . There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel." *Ashton* 6AC ¶ 424.

A 1998 audit of NCB revealed that over a ten-year period, $74 million dollars was funneled by the bank's Zakat Committee to the IIRO, a known terrorist organization. *Ashton* 6AC ¶ 429; *Federal* FAC at ¶ 292, and *Federal* RICO NCB at Exhibit A. The audit also uncovered a $3 million transfer to Blessed Relief. *Ashton* 6AC ¶ 431; *Federal* FAC at ¶ 292, and *Federal* RICO NCB at Exhibit A. Plaintiffs respectfully submit that the *specific fact* that $3 million was channeled through NCB – which ABM ran – to Blessed Relief – which ABM managed – supports the inference that this $3 million transfer was knowingly and intentionally made by ABM in direct support of terrorists and terrorist organizations.

Moreover, the $3 million NCB-to-Blessed Relief transfer, which occurred while ABM exercised operational control over both entities, occurred after Osama bin Laden's 1995 statement specifically identifying Blessed Relief as a source of funding *within* Osama's "support network." *Ashton* 6AC ¶ 343 ("In a 1995 interview, Osama Bin Laden identified Blessed Relief's place in his support network. . ."). This Court may take judicial notice that Osama bin Laden's "support network" *is* al Qaeda, and thus that Osama bin Laden told the world in 1995 that *Blessed Relief is al Qaeda.* Hence, when ABM channeled $3 million to Blessed relief in 1998, ABM directly and knowingly provided $3 million to al Qaeda itself.

4

Plaintiffs further allege that the $3 million NCB-to-Blessed Relief transfer occurred after Osama Bin Laden issued his 1996 *fatwah* declaring *jihad* on Americans. *see Ashton* 6AC ¶ 125 (bin Laden declaring: "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it. . . ."). Hence, the $3 million transfer occurred after ABM knew that al Qaeda was waging war on America.

Likewise, plaintiffs allege that the $74 million NCB-to-IIRO transfer occurred after ABM knew that al Qaeda declared war on America in 1996. *Ashton* 6AC ¶ 125. And lest there be any doubt that the $74 million NCB -to-IIRO transfer directly supported terror attacks on America, plaintiffs allege that IIRO knowingly and intentionally provided al Qaeda and the Taliban $60 million to fund terrorist training camps in Afghanistan, where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America. *Ashton* 6AC ¶¶ 234; *Federal* FAC at ¶ 134. Plaintiffs further allege that IIRO bankrolled al Qaeda attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks. *Ashton* 6AC ¶¶ 5, 227 & 231; *Federal* FAC at ¶¶ 136, 139 & 140. Based on these pleaded facts, plaintiffs are entitled to the inference that a substantial portion of the $74 million NCB-to-IIRO transfer was used in al Qaeda attacks on America.

After considering all of the above facts, plaintiffs plainly allege in their complaints that "[f]rom his positions as an officer of both [NCB] and [Blessed Relief], [ABM] provided financial and other support to Osama bin Laden and al Qaeda." *Ashton* 6AC ¶ 433; *Federal*

5

RICO ABM at Exhibit A.  Plaintiffs also clearly stated that the agents and employees of NCB, obviously including ABM, "knew or should have known they were materially sponsoring, aiding and abetting al Qaeda, Osama bin Laden, and international terrorism." *Ashton* 6AC ¶ 430.

Regardless of any other inferences that ABM might wish to ascribe to them, the facts alleged give rise to inference (and, if these allegations are proven, a jury could find) that ABM knowingly and intentionally provided financial support to al Qaeda for a decade leading up to the September 11 attacks.  Moreover, as this Court has already recognized:  "In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005).   ABM's motion to dismiss should be denied and plaintiffs should be given the opportunity to prove their case against him.

## II.   THIS UNITED STATES COURT HAS PERSONAL JURISDICTION OVER ABDULRAHMAN BIN MAHFOUZ.

ABM moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), insisting that he lacks any contacts with the Unites States. ABM Br. at 6-7.  Plaintiffs respectfully disagree.  When ABM knowingly provided financial support to al Qaeda waging war on America, and when ABM participated in a conspiracy that culminated in the September 11 attacks, he not only made "minimum contacts" with America, but he engaged in conduct that he knew would have devastating impact on America.  Hence, ABM "should [have] reasonably anticipate[d] being haled into court there." *World Wide Volkswagen Corp.*, 444 U.S. 286, 297 (1980).

A.    **Applicable Legal Standard**

To defeat a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction

made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings

and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d

Cir. 1986).  In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe

all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in

plaintiffs' favor. *PDK Labs v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  In addition, the

Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE*

*AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993).

B.    **This Court Has Personal Jurisdiction Over ABM Who Knowingly &**
      **Intentionally Provided Financial Support To Al Qaeda To Attack America.**

In its jurisdictional analysis of "whether the defendant has minimum contacts with the

United States as a whole" in this ATA case, this Court has already resolved that "Plaintiffs may

rely on their 'purposefully directed' theory to establish these minimum contacts." *In re Terrorist*

*Attacks on September 11*, 349 F. Supp.2d at 806, 809; *accord, Burnett,* 274 F. Supp. 2d at 95-96

(personal jurisdiction proper in ATA case where defendants have minimum contacts with United

States as a whole); *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp 54, 59-

60 (D.D.C. 2003)(upholding personal jurisdiction over individual Libyan defendants in their

personal capacities who "should have anticipated the possibility of being haled into court in the

United States" for conspiring to bomb a French plane flying from Congo to Paris "at the risk of

killing Americans"); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330

(E.D.N.Y. 1998)(exercising personal jurisdiction over Libyan defendants based on their

"intentional, tortious acts that were expressly aimed at the United States" through their support of

terrorists who bombed a United States flag aircraft over Lockerbie, Scotland); *Daliberti v. Iraq*,

97 F. Supp. 2d 38, 54 (D.D.C. 2000)(holding it reasonable for foreign terror supporter to "be held

to answer in a United States court for acts of terrorism against United States citizens").

The "purposefully directed" theory of personal jurisdiction in the terror-litigation context

was recently confirmed by the D.C. Circuit in *Mwani v. Bin Laden*, 2005 WL 1844423 (D.C.

Cir. Aug. 5, 2005), which arose from al Qaeda's 1998 bombing attack on the U.S. Embassy in

Kenya. The district court had dismissed claims against Osama Bin Laden and al Qaeda for lack

of personal jurisdiction, finding that plaintiffs did not "establish sufficient contacts between the

defendants and the [U.S.] forum to permit the exercise of personal jurisdiction. . . ." *Id.* at * 2.

The D.C. Circuit reversed, holding that Osama Bin Laden and al Qaeda were subject to

jurisdiction in a United States Court because defendants had

> engaged in unabashedly malignant actions directed at and felt in this forum. . . . The
> defendants' decision to purposefully direct their terror at the United States, and the fact
> that the plaintiffs' injuries arose out of one of those terrorists activities, should suffice to
> cause the defendants to 'reasonably anticipate being haled into' an American court.

*Id.* * 8-9 (internal cites omitted).

Faced with this clear precedent, ABM falls back to his position that Plaintiffs allege no

facts from which to infer that Mr. Bin Mahfouz purposefully directed any conduct at the United

States. ABM Br. at 10-11. Plaintiffs disagree.

As described above, plaintiffs allege specific facts from which it can be inferred that

ABM knowingly and intentionally channeled millions of dollars to al Qaeda, which was at war

with America. Those allegations include the specific facts that through 1999 ABM knew of

8

and/or participated in the channeling of $3 million to al Qaeda front Blessed Relief, which

Osama Bin Laden himself in 1995 had publically identified as part of his "support network."

Those allegations further include the specific facts that through 1999 ABM knew of and/or

participated in the channeling of $74 million to al Qaeda front IIRO that financed multiple

attacks against America, including the 1995 plot to blow up twelve American airplanes

simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S.

Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India,

and the September 11 attacks.  Because these pleaded facts give rise to the inference that ABM

purposefully provided financial support for al Qaeda attacks targeting United States citizens, it is

reasonable that ABM be held to account in this United States Court.  And because ABM should

have anticipated as much, the exercise of personal jurisdiction over ABM would "not offend

'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp.*, 444

U.S. at 292 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[3]

### C.    This Court Has Personal Jurisdiction Over ABM Who Knew & Intended That The Act Of His Al Qaeda Co-Conspirators Would Impact America.

This Court has already resolved that it may exercise personal jurisdiction over foreign

defendants pursuant to a conspiracy theory.  *In re Terrorist Attacks on September 11*, 349 F.

Supp.2d at 805 ("acts committed in New York by the co-conspirator of an out-of-state defendant

---

[3] On June 30, 2005, in asserting personal jurisdiction over non-resident alien individual defendants allegedly responsible for the hijacking of EgyptAir Flight 648, U.S. District Judge Gladys Kessler held that the due process protections of the Fifth Amendment do not extend to such defendants: "The Libyan Defendants also challenge the Court's assertion of personal jurisdiction over the individual Defendants . . . on the ground that they 'lack[] minimum contacts with the United States.'. . .  This challenge fails because it is premised upon the flawed assumption that the due process protections of the Fifth Amendment are available to these Defendants." *Baker v. Socialist People's Libyan Arab Jamahiriya*, Civ. Action. No. 03-749 (GK) (June 30, 2005) at * 9-10.

pursuant to a conspiracy theory may subject the out-of-state defendant to jurisdiction")(citing *Chrysler Capital Corp.*, 778 F. Supp. at 1266.

And by imputing forum acts of their co-conspirators to non-resident defendants, this District has held that such non-resident defendants have sufficient minimum contacts with the forum to satisfy due process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) (imputation of forum acts of co-conspirator to non-resident defendant "supplies the necessary minimum contacts [under] *International Shoe*, 326, U.S. 310, 316 (1945)."); *Andre Emmerich Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17 (S.D.N.Y. 1997)(same).  Because when non-resident defendants enter into a conspiracy knowing that acts of their co-conspirators would impact the forum, such non-resident defendants should "reasonably anticipate being haled into court there." *Dixon,* 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. 16899 at * 17 (both citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)).

Faced with this clear precedent, ABM falls back to his position that plaintiffs do not "make a prima facie case of conspiracy, *allege specific facts* warranting the inference that the defendant was a member of the conspiracy, and show that the defendants' co-conspirator committed a tort in New York." ABM Brief at 9-10. (emphasis in original).  Again, plaintiffs disagree.

As demonstrated above, plaintiffs' complaints make a *prima facie* showing of conspiracy between ABM and al Qaeda to injure America.  Specifically, plaintiffs allege that (i) ABM's financing of al Qaeda supports an inference that ABM and al Qaeda made an agreement to injure America through terror attacks, (ii) for a decade leading up to the September 11 attacks, ABM participated in that agreement by knowingly channeling $77 million to al Qaeda fronts, (iii)  the

10

September 11 attacks carried out by al Qaeda were acts done in furtherance of that agreement, and (iv) the September 11 attacks caused injury to plaintiffs' decedents.  Hence, by imputing the September 11 forum contacts of his al Qaeda co-conspirators to ABM, this Court may assert jurisdiction over ABM.

**D.      Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery.**

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (District Court may permit jurisdictional discovery to resolve Rule 12(b)(2) motion); MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ("Generally, the District Court should allow discovery if the jurisdictional claim has a reasonable basis and it appears that pertinent facts may be uncovered.").  And as this Court has already recognized:  "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 812 (internal cites omitted).

Especially where, as here, pertinent jurisdictional facts lie within the control and knowledge of the defendant contesting jurisdiction, it would be unfair to deny plaintiffs the opportunity to conduct jurisdictional discovery. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party"); *Investment Properties Intl., Ltd. v. IOS, Ltd.*, 459 F.2d 705, 707-08 (2d Cir.

11

1972) (error to deny plaintiffs "opportunity to utilize discovery to develop basic jurisdictional

facts from data solely within the defendants' possession").

In this case, there is every reason to believe that jurisdictional discovery will expose

substantial contacts between ABM and the United States.  Specifically, jurisdictional discovery

will, at a minimum, show that:

- ABM was the founder of a company called Nimir Petroleum, which had a presence in the United States from 1991 through at least 2000.  *See* Affidavit of John Fawcett at ¶ 6;

- ABM's Nimir Petroleum company borrowed money from United States banks in the 1990s.  *See* Affidavit of John Fawcett at ¶ 7;

- ABM had a Texas driver's license with an address in Houston, Texas.  *See* Affidavit of John Fawcett at ¶ 8;

- ABM invested up to $30 million dollars in a United States company.  *See* Affidavit of John Fawcett at ¶ 9.

Plaintiffs submit that limited jurisdictional discovery would reveal the nature and extent

of ABM's systematic and continuous activities in the United States, therefore leaving no question

that this Court may exercise personal jurisdiction over ABM in accordance with due process.

Furthermore, plaintiffs are entitled to discover facts in support of their conspiracy jurisdiction

argument that by imputing the September 11 forum contacts of his al Qaeda co-conspirators to

ABM, this Court may assert personal jurisdiction over ABM.

## III.   PLAINTIFFS STATE CLAIMS AGAINST ABDULRAHMAN BIN MAHFOUZ UPON WHICH RELIEF CAN BE GRANTED.

### A.   Applicable Legal Standard

ABM moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S.

31, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*,

308 F.3d 180, 184 (2d Cir. 2002)(*per curiam*).  The Court's role is "not to assay the weight of the

evidence which might be offered in support" of the Complaint, but "merely to assess the legal

feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In

evaluating whether plaintiffs ultimately could prevail, the Court must "accept all of Plaintiffs'

factual allegations in the complaint as true and draw inferences from those allegations in the light

most favorable to the Plaintiffs." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198,

202 (2d Cir. 1999).  Plaintiffs are not required to prove their case at the pleading stage; indeed,

the Second Circuit has instructed that "[t]he pleading of evidence should be avoided." *Woodford*

*v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001).  The issue on a Rule 12(b)(6)

motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is

entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d

Cir. 1998).

    A Rule 12(b)(6) motion is analyzed in the context of the liberal pleading requirements of

Fed.R.Civ. P. 8(a)(2). *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).  Indeed, Rule

8(a)(2) provides that a complaint must include only "a short and plain statement of the claim

showing that the pleader is entitled to relief" and that such a statement simply shall "give the

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*

(quoting *Conley*, 355 U.S. at 47); *Wynder*, 360 F.3d at 77; *see also, Sparrow v. United Airlines,*

*Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002) (allegation "I was turned down for a job because of

my race" is sufficient to survive a Rule 12(b)(6) motion).  Further, in the absence of averments of

13

fraud or mistake, which must be pleaded with particularity pursuant to Fed.R.Civ.P. 9(b), a

federal court is prohibited from imposing more demanding requirements than those prescribed

under Rule 8(a). *Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

Two recent Second Circuit cases affirm these principles. In *Phelps,* the plaintiff alleged

that the employees of the prison where he was incarcerated had violated his Eight and Fourteenth

Amendment rights by inflicting cruel and unusual punishment. *Phelps*, 308 F.3d at 182.

Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the

defendants had placed him on was inadequate and would cause him pain and suffering. *Id.* The

District Court dismissed that complaint, finding that it failed to state a claim, in part because the

plaintiff had not sufficiently alleged that defendants acted with the requisite *scienter*, deliberate

indifference. The District Court found plaintiff's allegations of *scienter* conclusory, and held that

plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge.

*Id.* at 184. The Second Circuit reversed, holding that a District Court "may not go beyond FRCP

8(a) to require the plaintiff to supplement his pleadings with additional facts that support his

allegations of knowledge either directly or by inference." *Id.* at 186-87. The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement
> Phelps's basic allegations with additional facts to support them by inference, for it
> does not appear from the face of the complaint beyond doubt that Phelps "can
> prove no set of facts in support of his claim which would entitle him to relief."

*Id.* at 187 (*quoting Conley*, 355 U.S. at 45-46). Moreover, the Court explained that dismissal

was improper because, through discovery, the plaintiff might uncover direct evidence to support

his allegations. *Phelps*, 308 F.3d at 187. Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point,
> courts must take care lest judicial haste [in dismissing a complaint] in the long run

> makes waste.  Untimely dismissal may prove wasteful of the court's limited
> resources rather than expeditious, for it often leads to a shuttling of the lawsuit
> between the district and appellate courts.

*Id.* at 185 (internal citations omitted).

More recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second

Circuit again vacated a District Court's 12(b)(6) dismissal and reiterated the minimal pleading

standards to be applied.  In *Pelman*, the District Court had dismissed because, it ruled, plaintiffs

had failed to "draw an adequate causal connection between their consumption of McDonald's

food and their alleged injuries." *Id.* at 511.  The Second Circuit rejected that approach, and held

that the information the District Court found to be missing in the Complaint was "the sort of

information that is appropriately the subject of discovery, rather than what is required to satisfy

the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512.  Quoting the U.S.

Supreme Court's unanimous decision in *Swierkiewicz*, the Second Circuit instructed:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery
> rules and summary judgment motions to define disputed facts and issues and to
> dispose of unmeritorious claims.  The provisions for discovery are so flexible and
> the provisions for pretrial procedure and summary judgment so effective, that
> attempted surprise in federal practice is aborted very easily, synthetic issues
> detected, and the gravamen of the dispute brought frankly into the open for the
> inspection of the court.

*Id.* (citing *Swierkiewicz*, 534 U.S. at 512-13); see also *Linde, et al. v. Arab Bank, PLC,* 2005 U.S.

Dist. LEXIS 18864 (E.D.N.Y. 2005) (rejecting heightened pleading requirements in a case with

factual and legal issues similar to the present action); *Twombly v. Bell Atlantic Corp.*, 425 F.3d

99 (2d Cir. 2005) (rejecting heightened pleading requirements in a case alleging conspiracy).

**B.    Plaintiffs State A Claim Against ABM Under The Anti-Terrorism Act.**

Taking an overly narrow view of the ATA's causation standard, ABM claims that plaintiffs have failed to "allege the necessary direct relationship" between his conduct and the September 11 attacks.  ABM Br. at 12-13.  ABM further contends that plaintiffs have failed to allege specific facts that show that ABM knew or should have known that he was providing material assistance to al Qaeda.  ABM Br. at 13.  ABM's arguments, however, miss the mark.

Under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, ABM is liable if he provided material support to al Qaeda with knowledge of its terrorist agenda to attack America, or if ABM aided and abetted al Qaeda in the course of its terrorist conduct.  *See Boim*, 291 F.3d at 1014-1016.[4]

Like *Boim*, this Court has already recognized that under the ATA, "material support includes money [and] financial services[.]"  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d at 825.  As demonstrated above, plaintiffs have alleged that ABM knowingly and intentionally provided money and financial services to al Qaeda by channeling $77 million to al Qaeda fronts Blessed Relief and IIRO for a decade leading up to the September 11 attacks.

---

[4] The Seventh Circuit explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A [defining 'material support or resources' as 'currency or . . . safehouses, . . . facilities, weapons . . . personnel"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333:

> If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333 . . . .Such acts would give rise to civil liability under section 2333 so long as knowledge and intent are also shown. . . The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability under section 2333 by proving that [defendants] provided material support to terrorist organizations.

*Boim*, 291 F.3d at 1015-16.  ATA Section 2333 provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism. . ."  18 U.S.C. §2333.

16

Moreover, the ATA entails aiding and abetting liability.  As put by *Boim*:

> [I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence. . . . [A]iding and abetting liability is both appropriate and called for by the language, structure and legislative history of [ATA] section 2333.

*Boim*, 291 F.3d at 1021.  Because the pleaded facts discussed above show that ABM deliberately provided substantial financial assistance to al Qaeda, with knowledge that al Qaeda was waging war on America, ABM is subject to aiding and abetting liability under the ATA.

And, Plaintiffs properly allege that ABM's provision of financial support and assistance to al Qaeda was a proximate cause of the September 11 attacks.  This Court has already resolved that "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826.

Contrary to ABM's insistence that proximate cause is not well pleaded unless plaintiffs allege with specificity that ABM had a direct role in or participated in the September 11 attacks, ABM Br. at 12-13, this Court has already resolved that "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829.

Moreover, this Court has made clear that proximate cause may be supported by plaintiffs allegations that ABM aided and abetted or conspired with the al Qaeda terror network for a decade leading up to the September 11 attacks: "[A]ll those who, in pursuance of a common

17

plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . *are equally liable with him*." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826 (emphasis added)(citing *Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998)).

Accordingly, under the standards set forth by this Court, plaintiffs have properly alleged proximate cause and facts sufficient to support their ATA allegations against ABM. The September 11 terror attacks were a natural and probable consequence of ABM's financial support of the al Qaeda terror network – of his actions *in concert* with al Qaeda – for a decade leading up to the September 11 attacks. Hence, plaintiffs' ATA claim against ABM is well pleaded.

### C.    Plaintiffs' Claims Are Not Barred by Corporate Law Principles.

Citing cases applying the laws of New York and the District of Columbia, ABM argues that plaintiffs fail to allege facts sufficient to show that he knowingly participated in, authorized or knew of the tortious conduct of the NCB and Blessed relief. ABM Br. at 15-16. ABM, however, is wrong, and his interpretation of the cited cases is misplaced.

In New York, a corporate officer who participates in the commission of a tort may be held individually responsible regardless of whether he acts on behalf of the corporation and in the course of his corporate duties. *LaLumia v. Schwartz*, 257 N.Y.S.2d 348, 350 (2d Dep't 1965). The law in D.C., if applicable at all, is essentially the same, but ABM presents only part of the standard. ABM Br. at 15; *See also Lawlor v. Dist, of Columbia*, 758 A.2d 964, 977 (D.C. 2000). As noted by ABM, the *Lawlor* court stated:

> An officer's liability is not based **merely** on the officer's position
> in the corporation; it is based on the officer's behavior and whether
> that behavior indicates that the tortious conduct was done within

18

> the officer's area of affirmative official responsibility and with the
> officer's consent or approval.

ABM Br. at 15; *Lawlor*, 758 A.2d at 977 (emphasis added).  The *Lawlor* court continues,

however, with a clarification that is omitted from ABM's argument:

> Liability must be premised upon a corporate officer's meaningful
> participation in the wrongful acts.  'Sufficient [meaningful]
> participation can exist when there is an act or omission by the
> officer which logically leads to the **inference** that he or she had a
> **share** in the wrongful acts of the corporation which constitutes the
> offense.'

*Lawlor*, 758 A.2d at 977 (emphasis added) (internal citations omitted).

Plaintiffs' actions against ABM are not based on his official positions in the NCB and

Blessed Relief, they are based on the substantive, affirmative actions he took, oversaw, and/or

condoned in furtherance of terrorism against the United States and its citizens.  As stated

previously, plaintiffs have sufficiently alleged that ABM's provision of financial support and

assistance to al Qaeda, through the NCB and Blessed relief, was a proximate cause of the

September 11 attacks.  Accordingly, ABM's argument fails.

**D.      Plaintiffs' Claims Are Not Barred by The First Amendment.**

In an argument that is logically similar to his "corporate law principles" assertion, ABM

contends the First Amendment to the United States Constitution prevents him from being held

liable for plaintiffs' damages based solely on his association with the NCB and Blessed Relief.

ABM Br. at 18-19.  Once again, however, ABM misconstrues or misrepresents the allegations in

plaintiffs' complaints.  Plaintiffs suit against ABM is not based upon his association with the

NCB or Blessed relief.  Instead, plaintiffs' action is based entirely on ABM's use of these

organizations to channel money to al Qaeda.  As discussed herein, plaintiffs' have set forth the

19

acts upon which their claims are based, and such allegations show ABM's First Amendment argument to be spurious.

### E.    Plaintiffs' Claims Are Not Barred by The Volunteer Protection Act.

Contrary to ABM's assertion, the Volunteer Protection Act, 42 U.S.C. §§ 14501, et seq. ("VPA"), does not bar plaintiffs' claims.  As an initial matter, the VPA does not protect any action taken by ABM in his role as head of the NCB.  The VPA applies only to "nonprofit organizations," which include only 501(c)(3) entities and not-for-profit organizations "conducted for public benefit and operated primarily for charitable, civic, educational, religious, welfare, or health purposes ..." 42 U.S.C. §§ 14503(a) and 14505(4).  As is clearly stated in plaintiffs' complaints, the NCB is a commercial bank.  *Ashton* 6AC ¶ 423.

With regard to Blessed Relief, ABM misrepresents the definition of "volunteer."  42 U.S.C. § 14505(6) defines a volunteer as:

> ... an individual performing services for a nonprofit organization or a governmental entity who does not receive -
>
> (A) compensation (other than reasonable reimbursement or allowance for expenses actually incurred); or
>
> (B) any other thing of value in lieu of compensation, in excess of $500 per year, and such term includes a **volunteer** serving as a director, officer, trustee, or direct service volunteer.

(emphasis added).  ABM would have the Court believe that he is a "volunteer" for purposes of the VPA simply because he is a director of Blessed Relief.  That, however, is clearly not what is contemplated in § 14505(6)(B).  The last portion of sub-part (B) obviously includes directors of organizations, but it clearly only applies to directors who are also "volunteers."

Whether ABM was a "volunteer" pursuant to 14505(6) is a fact question that has yet to be resolved because no discovery has been completed. However, if ABM seriously contends that he received no compensation or other value for his services at Blessed Relief, plaintiffs would request the opportunity to conduct limited discovery on that issue.

Even if ABM is found to be a true "volunteer," however, the protections of the VPA will not shield him from liability in the present case. 42 U.S.C. § 14503(a)(3) makes clear that the VPA's limitation of liability does not apply to harm caused by "willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer ..." ABM's provision of financial support and assistance to al Qaeda through the NCB and Blessed Relief, as described herein, places him squarely within this exception to the VPA. Therefore, ABM's VPA argument fails.

**F.    Plaintiffs State RICO Claims Against ABM.**

ABM also contends that none of the plaintiffs have properly pleaded their RICO claims. ABM is wrong. Plaintiffs' complaints and RICO Statements assert RICO claims against ABM pursuant to 18 U.S.C. §§ 1962(a), (c) and (d). The enterprise - the al Qaeda movement, also referred to as Radical Muslim Terrorism - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. Its well documented purpose is to perpetrate acts of terrorism. Thus, plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs have further sufficiently alleged that ABM engaged in conduct in furtherance of that enterprise. For instance, in his role as Director of Blessed Relief, ABM had a central role in deliberately and fraudulently raising and transferring funds to al Qaeda through one of its primary fronts. Thus, plaintiffs allege that ABM derived income through a pattern of racketeering activity and invested that income in the enterprise. Moreover, by virtue of his direct role in two of al Qaeda's primary fronts (Blessed Relief and NCB), ABM is a direct and central participant of the enterprise.

Plaintiffs have previously addressed the RICO argument in their *Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Perouz Sedaghaty*. Rather than repeat that argument here, plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

**G.      Plaintiffs State A Claim Against ABM Under The Alien Tort Claims Act.**

The title of Sub-section F of ABM's motion indicates that he argues that plaintiffs have failed to state a claim under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA").  The text of that sub-section, however, includes no substantive contentions to that effect.  ABM simply makes the broad assertion that "[p]laintiffs' remaining causes of action fail to state a claim ... for reasons largely addressed in the Court's prior decisions in *Terrorist Attacks I and II*."

Nonetheless, ABM fails to mention the fact that the Court, in *Terrorist Attacks I*, expressly allowed ATCA claims based on theories of aiding and abetting and conspiracy.  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005).  Here, plaintiffs make a *prima facie* aiding-and-abetting claim by alleging:  (I) ABM knowingly and substantially assisted al Qaeda to attack America by channeling $77 million to al Qaeda fronts

22

for a decade leading up to the September 11 attacks, (ii) ABM knew that al Qaeda declared war

on America, and (iii) al Qaeda carried out the September 11 attacks causing plaintiffs' decedents'

deaths.[5]  And plaintiffs make a *prima facie* conspiracy claim by alleging: (I) ABM's financing of

al Qaeda supports an inference that ABM and al Qaeda made an agreement[6] to injure America

through terror attacks, (ii) for a decade leading up to the September 11 attacks, ABM participated

in that agreement by knowingly channeling $77 million to al Qaeda fronts, (iii)  the September

11 attacks carried out by al Qaeda were acts done in furtherance of that agreement, and (iv) the

September 11 attacks caused injury to plaintiffs' decedents.[7]  Hence, concerted-action liability

against ABM is well pleaded and the ATCA claim stands.

### H.    Plaintiffs State Common Law Claims Against ABM.

ABM argues that the plaintiffs' intentional tort claims should be dismissed for failure to

allege (1) ABM's direct involvement in 9/11 attacks; and (2) conduct by ABM directed at the

plaintiffs themselves."  ABM Br. at 22.  Such argument ignores the ruling of this Court that if the

plaintiff's allegations sufficiently allege that Defendants supported, aided and abetted, or

---

[5] To state a *prima facie* case of aiding and abetting, plaintiffs need only plead facts that show: (i) the party whom defendant aids must perform a wrongful act that causes an injury; (ii) the defendant must be generally aware of wrongful nature of the primary actor's course of conduct; and (iii) the defendant must knowingly and substantially assist the principal violation.  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983).

[6]  In *Burnett I*, Judge Robertson found that "plaintiffs' allegations about Al-Haramain's financing of al Qaeda support an inference that there was an *agreement* concerning the commission of terrorist acts."  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003)(upholding conspiracy claims).  Likewise, plaintiffs' allegations (that ABM knowingly provided financial support to al Qaeda at war with America) imply agreement between ABM and al Qaeda to injure America through terrorist attacks.  *See also, Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (to establish civil conspiracy, "[p]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement.  A court may infer agreement.").

[7] To state a *prima facie case* of conspiracy, plaintiffs need only plead facts entailing the primary tort and the following four elements: (i) a corrupt agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance of a plan or purpose, and (iv) the resulting damage.  *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

23

conspired with the September 11 terrorists, they will have also stated a claim for intentional infliction of emotion distress [and] they will have also stated claims for wrongful death and survival. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829-830. As demonstrated above, plaintiffs allege that ABM supported, aided and abetted, and conspired with the September 11 terrorists by channeling $77 million to al Qaeda for a decade leading up to the September 11 attacks. Hence, plaintiffs' common law claims are well pleaded.[8]

## IV.    CONCLUSION

For the above reasons, ABM's motion to dismiss should be denied with prejudice.

Dated: December 22, 2005
New York, New York

---

[8] Plaintiffs recognize that this Court has dismissed plaintiffs' negligence and negligent infliction of emotion distress claims on the basis that defendants owned no duty to plaintiffs. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 831. Plaintiffs also recognize that this Court held that the *Federal Insurance* plaintiffs claims for assault and battery and intentional infliction of emotion distress are time-barred. *Id.* at 829. Plaintiffs respectfully disagree with these rulings and refer this Court to plaintiffs' prior briefings on these issues.

Specifically, with regard to the claims of negligence and negligent infliction of emotional distress, plaintiffs have addressed this argument in *Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sami Omar Al-Hussayen*. Rather than repeat that argument here, plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

Additionally, with regard to the claims for assault, battery and intentional infliction of emotional distress, plaintiffs have addressed this argument in *Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Perouz Sedaghaty*. Rather than repeat that argument here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

Plaintiffs also note that they do not currently intend to pursue their claim under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note, against this defendant. Plaintiffs reserve the right to re-plead this claim against ABM should additional information become available in discovery demonstrating that he acted "under actual or apparent authority or color of law, of any foreign nation" in connection with his support of al Qaeda.

ABM also seeks dismissal of plaintiffs claims for punitive damages. Plaintiffs have addressed this argument in their *Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Perouz Sedaghaty* and in their *Memorandum of Law in Opposition to the Consolidated Motion to Dismiss of the Saudi Red Crescent and Dr. Abdul Rahman Al Swailem*. Rather than repeat the arguments here, plaintiffs instead respectfully refer the Court to, and incorporate by reference, those discussions.

24

Respectfully submitted,

/s/
James P. Kreindler (JK7084)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
Vincent I. Parrett (VP5092)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone (212) 687-8181


/s/
Ronald L. Motley, Esq. (RM2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME8337)
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Phone (843) 216-9000


/s/
Paul J. Hanly, Jr., Esq. (PH5486)
Jayne Conroy, Esq. (JC8611)
Andrea Bierstein, Esq. (AB4618)
Hanly Conroy Bierstein & Sheridan LLP
112 Madison Avenue, 7th floor
New York, New York 10016
Phone (212) 784-6400


/s/
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone (215) 665-2000

25