UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Cantor Fitzgerald & Co. v. Akida Bank Private Ltd.*, 04-CV-7065
*Continental Casualty Co. v. Al Qaeda*, 04-CV-5970
*Estate of O'Neill v. Al Baraka Invest. & Devel. Corat*, 04-CV-1923
*Euro Brokers, Inc. v. Al Baraka Invest. & Devel. Corat*, 04-CV-7279
*New York Marine and General Ins. Co. v. Al Qaeda*, 04-CV-6105
*World Trade Center Properties LLC v. Al Baraka Invest. & Devel. Corat*, 04-CV-7280

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS OF SALEH ABDULLAH KAMEL, AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION AND DALLAH AL BARAKA

December 23, 2005

TABLE OF CONTENTS

*Page*

I.    INTRODUCTION .........................................……………………………1

II.   SUMMARY OF ALLEGATIONS AGAINST KAMEL, ABIDC, AND DAB...................3

   A.    Allegations Against Al Qaeda's Partners in the International Banking System .......3

   B.    Summary of Allegations Against Defendants………………………………………..4

   C.    Summary of Golden chain Allegations Against Kamel………………………………9

III.  ARGUMENT………………………………………………………………………13

   A.    Applicable Standards on a Motion to Dismiss……………………...........................13

        1.    *Rule 12(b)(1)*………………………………………………...........................13

        2.    *Rule 12(b)(6)*………………………………………………...........................14

   B.    This Court Has Subject-Matter Jurisdiction Over the Defendants ....................16

   C.    Defendants' Failure to State a Claim Arguments Fail Because They Wrongly Apply A Heightened Pleading Standard and Seek to Prematurely Test the Evidence...........................................................................................................16

   D.    Plaintiffs Have Sufficiently Alleged Claims Under the Anti-Terrorism Act ...........................................................................................................................18

        1.    *The Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles*.....................................................19

        2.    *Plaintiffs Adequately Allege Claims Based Upon Defendants' Criminal Violations* .............................................................................20

        3.    *Plaintiffs Sufficiently Aver Causation*................................................21

   E.    Plaintiffs' ATCA and International Law Claims are Adequately Pled.................23

   F.    Plaintiffs' RICO Claims are Correctly Asserted………………………………...23

IV.   CONCLUSION...........................................................................................................25

TABLE OF AUTHORITIES

*Page*

## CASES

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002)..............................................18-21

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ..................................................................14

*Conley v. Gibson*, 355 U.S. 41 (1957)......................................................................................14

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980).....................................................................14

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)..................................................................21

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000)...............................................18

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765 (2005)......................10, 19, 22, 23

*Kreindler & Kreindler v. United Techs. Corp,*, 985 F.2d 1148 (2d Cir. 1993) .................................13

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993)..................................................................14

*Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y 2005).........................................15, 16, 19

*Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529 (S.D. N.Y. 1985).....................................................21

*Magee v. Nassau County Medical Center*, 27 F. Supp. 2d 154, 158 (EDNY 1998)..............................13

*Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129 (2d Cir. 1998) ....................................13

*Sparrow v. United Airlines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2002) ..............................................14

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ........................................................14, 16, 17, 20

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ...........................................14

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ...............................................................14, 16

*Yilmaz v. McElroy*, No. 00-CV-7542 (RCC), 2001 WL 1606886 (S.D. N.Y. Dec. 17, 2001)...............13

## RULES, STATUTES AND RESTATEMENTS

18 U.S.C. § 2331...............................................................................................................16, 19

18 U.S.C. § 2333....................................................................................................................20

18 U.S.C. §§ 2339A, 2339B, 2339C....................................................................................18, 20, 23

Fed. R. Civ. AT 8(a) ........................................................................................................................10

## I.    INTRODUCTION

Plaintiffs have sued Saleh Abdullah Kamel ("Kamel"), Al Baraka Investment and Development Corporation ("ABIDC"), and Dallah Al Baraka ("DAB") (hereinafter "Defendants") based on their participation in a global conspiracy to conduct terrorist attacks against the United States, spearheaded by al Qaeda, of which the September 11 attacks was a natural, intended and foreseeable product. *WTCP* ¶¶ 58, 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90, 91, 192; *WTCP & Euro Brokers* RICO Statements ¶ 5(b), 6(f), 8; *Cantor* FAC ¶¶ 11, 41-42, 61, 98-105; *O'Neill Al Baraka* FCC ¶¶ 22-4, 25, 144, 158-9, 160-63; 170; *Continental* 2AD ¶¶ 26, 27, 29, 486, 602; *Continental* RICO ¶¶ 5(b), 6(f), 8;

As part of their defense, Defendants contend that the plaintiffs "rely heavily on general and conclusory allegations" that Defendants "supported international terrorism," and that Plaintiffs "have made only a few specific factual allegations" about the Defendants "which have no causal nexus to the 9/11 tragedy." *See* K & A Brief at 2-3. That assertion is contradicted by the facts and allegations in the Complaints.[1]   Specifically, in their Memorandum of Law in Support of their Motion to Dismiss, Defendants broke down Plaintiff's allegations by Defendant and by category in an attempt to convince the Court that Plaintiffs' allegations are insufficient to state a claim. Any comprehensive look at the totality of the allegations against these Defendants shows otherwise.

Defendants make essentially two arguments. First, that "banks cannot be held liable on a 'funnel' theory, i.e. the provision of ordinary banking services." K & A Brief at 3. As is clear from Plaintiffs' allegations and as set forth more fully below, Defendants are alleged to have committed far more than "ordinary banking services." In a recent Eastern District of New York case Defendants co-defendant in this case, Arab Bank, was alleged to have provided material and financial to terrorists by collecting and receiving account funds for the benefit of designated terrorists groups. Arab Bank, like the instant Defendants, attempted to recast Plaintiffs' allegations as evidence of merely "routine banking services."

---

[1] In order to comply with the Court's 25-page limit on briefs, the Defendants not only incorporate more than six prior briefs (one of which was a 62-pages brief with many pages of attachments) into their Memorandum in Support of their Motion to Dismiss, but also they felt it was necessary to attach an additional 23 pages of dual column charts in 10-point font containing additional allegations about their clients because there are in fact so many. That hardly seems like "only a few" specific allegations.

In an order dated September 2, 2005, Judge Nina Gershon correctly disagreed, and held "[n]othing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant," and that although the Bank would like this court to find that it is engaged in routine banking services "given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing 'routine' about the services the Bank is alleged to provide." *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571, 588 (E.D.N.Y 2005).  Thus, contrary to the Defendants, Plaintiffs factually allege that Kamel, ABIDC and DAB sponsored terrorists whose participation in al Qaeda's global conspiracy to kill and destroy Americans and their property at home and abroad led to the September 11 attacks. *WTCP* ¶¶ 58, 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90, 91, 192; *WTCP & Euro Brokers* RICO Statements ¶ 5(b), 6(f), 8; *Cantor* FAC at ¶¶ 11, 61, 92, 98-105; *O'Neill Al Baraka* FCC ¶ 22, 23; *Continental* 2AD ¶¶ 26, 27, 29, 486, 602, Addendum at 27-55; *Continental* RICO ¶¶ 5(b), 6(f), 8.  Indeed, the complaints uniformly allege that Kamel, ABIDC and DAB knowingly and intentionally aided and abetted, conspired with, and provided material support and resources to al Qaeda and/or affiliated foreign terrorist organizations, associations, organizations or persons which resulted in the September 11 attacks. *WTCP* ¶¶ 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90, 91; *WTCP & Euro Brokers* RICO Statements ¶ 5(b), 6(f), 8; *Cantor* FAC ¶ 98-105; *O'Neill Al Baraka* FCC ¶ 22, 23; *Continental* 2AD ¶¶ 26, 27, 29, 486, 602, Addendum at 27-55; *Continental* RICO ¶¶ 5(b), 6(f), 8.

Second, Defendants argue that Plaintiffs' legal theory is nothing more than an attempt to make "the al Baraka Defendants liable for their investments," such that it would "extend liability, third party or otherwise, to an untenably large group of shareholders and investors," and that it would "hold all stockholder in the banks which provided services to alleged terrorists liable for the attacks of September 11, 2001." *See* K & A Brief at 3-4.  Not unlike Defendants' wrongful attempt to recast Plaintiffs' factual allegations relating to the provision of material and financial support to al Qaeda, this argument also fails because it ignores and mischaracterizes the numerous allegations plead against Defendants supporting Plaintiffs' theory of the case.  To this end, the Defendants are not responsible for Plaintiffs' injuries

2

because they were *unwitting* shareholders or investors in a financial institution; they are alleged to be *knowing* and *intentional* supporters of al Qaeda based upon numerous pieces of factual evidence which, when taken together, more than satisfies Plaintiffs' burden at the pleadings stage.

## II.    SUMMARY OF ALLEGATIONS AGAINST KAMEL, ABIDC, AND DAB.[2]

### A.    Allegations Against Al Qaeda's Partners in the International Banking System

The September 11 attacks required years of planning, training and most of all, a massive budget to accomplish the plot.  It has been estimated that al Qaeda had an annual budget of approximately $30 million in the years leading up to the September 11 attacks. *National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission.* Bin Laden's success in accumulating the necessary resources required that he foster relationships with individuals operating within the Islamic banking system that shared his and al Qaeda's perverse worldview; and it required him to develop mechanisms within the international banking system to raise, launder and distribute funds to support the global operations of individuals and entities operating within the al Qaeda infrastructure without triggering any of the regulatory devices developed by the international banking system to identify money laundering and illicit financial transactions.

Defendants played a knowing and intentional and material role in providing him with such a mechanism.  Plaintiffs allege that Defendants provided Osama bin Laden with the funding, banking services and financial infrastructure that he used to establish al Qaeda training camps, train terrorists, and carry out terrorist attacks against the United States. Furthermore, Defendants were not *unwitting* actors in Osama bin Laden's grand plot to attack the United States on September 11th.   Instead, they took

---

[2] Defendants argue in passing that only the Plaintiffs in *NY MAGIC, O'Neill*, and *Continental Casualty* filed an amended complaint "which changes to the numbered paragraphs alleging additional actions on the part of the Defendants," K & A Brief at 16, and appear to be implying that the September 30, 2005, filings of *WTCP Properties,* and *Euro Brokers* were somehow improper.  The Defendants do note that they have discussed the issue with the Defense Counsel and that a "coordinated motion to reject these so-called amendments and ensure that the RICO Statements are limited to their correct application will be forthcoming." K & A Brief at 17.  Rather than attempt to guess what the Defendant's theory for such an assertion may be and respond to it here, the Plaintiffs believe it would be more prudent to wait until such a motion is filed and address the issue then.  Plaintiffs believe those filings were indeed proper under the Court's Case Management Order #2.

*deliberate* steps to become fully integrated components of al Qaeda's financial and logistical infrastructure by *knowingly* maintaining accounts for individuals and organizations involved in al Qaeda's plot, *directly* funding al Qaeda's operations through personal donations and by becoming *substantially involved* in other banks and organizations actively supporting al Qaeda, all the while knowing that the material support they were providing to Osama bin Laden was assisting him and al Qaeda in their goal to attack the United States.

### B.    Summary of Allegations Against Defendants

[3]Saleh Kamel's ("Kamel") material support of terrorism and al Qaeda began years ago when he was developing financial institutions that could operate both as profitable banking and investment centers and serve as financial vehicles for transferring millions of dollars to Islamic militants around the world. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A, at 2; *O'Neill Al Baraka* FCC Ex. T, ¶ 29; *Continental* 2AD, Addendum at 27. In 1982 Kamel created Dallah Al Baraka ("DAB"), and Kamel and DAB began directing tens of millions of dollars in funds to at least 20 non-governmental organizations – including Osama bin Laden's Mekhtab al Khidmat – the predecessor to al Qaeda, which began carrying out attacks against the United States in the early 1990's. *Id.* at 3; *Id.* at ¶ 30 . During this time, Kamel also established Al Baraka Investment and Development Corporation as a central financial clearing house for Islamic terrorism. *Id.* at 4; *Id.* at ¶ 39. ABIDC is a wholly owned subsidiary and financial arm of DAB and is also headed by Kamel. *WTCP* ¶ 95, 99; *Euro Brokers* ¶ 87, 88; *Cantor* FAC ¶¶ 98-105; *O'Neill Al Baraka* FCC ¶ 28.

---

[3] Throughout their brief, defendants dispute the truth of plaintiffs' allegations, which is entirely improper in a 12(b)(6) motion where the Court must accept the allegations of the Complaint as true. Nor is there any reason to believe that defendants' version of events, as opposed to plaintiffs', is correct. For example, defendants take issue with the allegation that Osama bin Laden invested in Al Shamal Bank. *See* K & A Br. at 10, fn 5. But although defendants claim that "complete stock registries and other list of shareholder information . . . show conclusively that neither Osama bin Laden, al Qaeda, nor any 'front' were ever investors in the bank," and although they contend that the Library of Congress has "assured them it will exclude the disputed 1996 State Department fact sheet [the source of plaintiff's allegations] from its future publications," they have provided no evidence for their claims, not even copies of the registries or shareholder lists they claim to have seen and the "assurance" they claim to have received from the Library of Congress. This is not to say that defendants ought to submit their evidence at this stage of proceedings, but rather to note that the facts are very much contraverted and that a motion to dismiss is not the place for the Court to attempt to resolve this dispute.

In 1991, Kamel, Yassin Al-Qadi and Prince Mohamed Al Faisal visited Sudan with other Saudi businessmen to examine Sudanese foreign investment opportunities and participate in an event hosted by the Sudanese government. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 11; *O'Neill Al Baraka FCC* Ex. T, ¶ 75; *Continental* 2AD, Addendum at 33. Kamel and ABIDC entered into joint "symbiotic business" investments with Bin Laden entities and the government of Sudan. *Id.* at 15; *Id.* at ¶ 38. An Al Baraka annual report from 1996 shows how Kamel and Al Baraka had "numerous major projects, such as the maintenance and operation of airports, [and] construction of roads ...." *Id.* at 16; *Id.* at ¶ 83. During this time, Osama Bin Laden was overseeing a number of major road and airport construction projects in Sudan and manufacturing light equipment in the country. *Id.* A portion of Kamel's investment revenues in Sudan were annually required to be committed to Zakat. *Id; Id.* at ¶ 88 . Osama Bin Laden was using these diverted Zakat funds, provided by Kamel and other major investors in the Sudanese economy, to train al Qaeda recruits and expand his network of jihadist fighters in preparation for attacks on U.S. targets. *Id.* at 17; *Id.* at ¶ 92. Therefore, both Kamel and ABIDC were materially supporting Osama Bin Laden and his al Qaeda network of front companies, farms, and factories in Sudan. *Id.* at 15; *Id.* at ¶ 38. This support assisted al Qaeda in its attacks against U.S. interests throughout the 1990's, leading up to and including the al Qaeda attacks carried out on September 11th, 2001. *Id.* at 17.

Kamel, in fact, voiced his support for al Qaeda's preparation, which would eventually culminate in the September 11 attacks, as early as 1993 when he made clear that the real underlying purpose of his global network of Islamic banks was to finance and materially support a violent holy war against non-Muslims throughout the world via his banking institutions located in 43 countries, including the U.S. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 3. During the 1993 closure of Dallah Al Baraka (UK) London by the Bank of England for illegal operations, Kamel stated that he looked at Al Baraka as a jihad, regardless of the low return to its shareholders. *Id.* at 3-4. Kamel and ABIDC have been able to carry out this worldwide jihad and material sponsorship of al Qaeda, because ABIDC has *knowingly* maintained accounts for many of the charity defendants that operate within al Qaeda's

infrastructure and advertised the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 4; *O'Neill Al Baraka* FCC Ex. T, at ¶ 23.  ABIDC *provided* a mechanism to all of al Qaeda's supporters to deposit funds directly into those accounts, *directly* facilitating al Qaeda's fundraising efforts providing the financial resources al Qaeda needed to plan and carry out the September 11 attacks. *WTCP* ¶ 97, 109; *Euro Brokers* ¶ 90; *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 4.  These accounts maintained by ABIDC on behalf of the charities operating within al Qaeda's infrastructure have been used to transfer funds to al Qaeda cells throughout the world who were responsible for the plotting and coordination of the September 11 attacks. *O'Neill Al Baraka* FCC Ex. T, at ¶ 23; *Cantor* ABIDC RICO Statement at ¶¶ 2, 5.

Kamel and DAB provided additional material support to the Spanish al Qaeda cell which directly funded and helped coordinate the September 11th hijacker cell. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 27; *O'Neill Al Baraka* FCC Ex. T, at ¶ 188, 189; *Continental* 2AD, Addendum at 51. Muhammed Galeb Kalaje Zouaydi, financial head of the cell, used Al Baraka Bank Finance House in Turkey to transfer money to Mohamed Bahaiah, aka Abu Khaled, courier of Osama bin Laden in Europe, and brother-in-law of Zouaydi. *Id.*

Kamel has not only assisted al Qaeda-related charities in maintaining accounts, but he is one of al Qaeda's principal individual financiers. *WTCP* ¶ 150; *Euro Brokers* ¶ 87; *Cantor* FAC ¶61.  The U.S. has long suspected Kamel of materially supporting transnational terrorist groups such as the Muslim Brotherhood and al Qaeda. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 3; *O'Neill Al Baraka* FCC Ex. T, at ¶ 41.  In fact, the U.S. has been investigating him for his material support of al Qaeda along with numerous other defendants since the September 11 attacks. *Id.;Continental* 2AD, Addendum at 28.  Kamel has made substantial contributions to many of the charities operating within al Qaeda's infrastructure, with full knowledge that those funds would be used to support al Qaeda's global operations and terrorist attacks, including the attack on September 11th.  Kamel contributed $100,000 in 1992 to Sanabil Al-Khair, the North American financial arm of IIRO which was established to receive,

invest, and generate funds for the operations of the defendant International Relief Organization (IRO) – the 'United States arm' of IIRO. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 4-5; *Continental* 2AD, Addendum at 31-32. Futhermore, Sanabel al Khair/IIRO's 1989 articles of incorporation list Saleh Kamel as a board member in their Washington, DC office. *Id.* at 5; *O'Neill Al Baraka* FCC Ex. T, at ¶ 64; *Continental* 2AD, Addendum at 31. Both Sanabil Al-Khair and IIRO have long diverted their legitimate funds to support terrorism. *Id.; Id.* at ¶ 65; *Cantor* Saleh Kamel et al., RICO Statement at ¶¶ 2, 5, 7-8.

Saleh Kamel's own investment portfolio includes a wholly owned subsidiary specializing in aviation services, Dallah Avco Trans-Arabia Co Ltd., formed in 1975 and based in Jeddah, Saudi Arabia. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 18; *O'Neill Al Baraka* FCC Ex. T, at ¶ 35; *Continental* 2AD, Addendum at 28. Saudi national and Defendant Omar Al Bayoumi, who secured housing for the 9/11 hijackers, was Assistant to the Director of Finance for Dallah Avco.[4] *Id.; Id.* at ¶ 180. In March 2000, Al-Bayoumi's monthly allowances from his Ercan job rose eight-fold from $465 to $3,700 per month, even though he only worked for them once (see above). *Id.* at 19. The payments remained at that level until December 2000, when al-Hazmi left for Arizona. *Id.* From March 2000 to December 2000, al-Bayoumi received nearly $30,000 more than he ordinarily would have received for the "ghost job" that he never attended. *Id.* During 2001-2002, the FBI was silently investigating possible ties between Dallah Avco and the Al Qaeda network, and Dallah Avco is currently being investigated by the U.S. State Department for its connection to Al Qaeda. *Id.*

Kamel, DAB and ABIDC provided substantial assistance to al Qaeda through subsidiaries and affiliates, including Al Shamal Islamic Bank (ASIB), Tadamon Islamic Bank and al Aqsa Bank. *WTCP* ¶ 106, 120, 124, 245, 246, 247; *Euro Brokers* ¶ 112, 113,114, 115; *O'Neill Al Baraka* FCC Ex. T, at ¶ 25;

---

[4] Although Defendants dispute the veracity of this allegation, Former Senator Bob Graham, a longtime member of the Senate Intelligence Committee and Co-Chair of the Congressional Joint Inquiry into the September 11th Attacks, recently published a book in which he affirms his belief, based on evidence amassed by the Joint Inquiry, that al Bayoumi knowingly supported two of the September 11th hijackers. Furthermore, in a recent interview, Graham stated that he would swear to that opinion under oath.

7

*Continental* 2AD, Addendum at 36, 38-39, 42, 48-50.  Kamel and DAB continue to maintain joint investments, shares, finances, and correspondent bank accounts with ASIB even after it was widely known that the bank was materially supporting international terrorism and Osama Bin Laden and that Bin Laden was a major investor in the bank.  *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 7. Specifically, Kamel used DAB as a financial conduit for covertly directing funds/financial transfers to al Qaeda.  *Id.*  Kamel would have major terrorist financiers such as Yassin Al-Qadi funnel monies through DAB to end-point financial institutions such as ASIB, which would then distribute funds to the Bin Laden network. *Id.* at 11; *O'Neill Al Baraka* FCC Ex. T, at ¶ 130; *Continental* 2AD, Addendum at 28.

In the 2001 U.S. trial regarding the 1998 African embassy bombings, former Bin Laden associate, Jamal Ahmed Al-Fadl, testified that Osama Bin Laden and at least 6 al Qaeda operatives held ASIB accounts under their real names. *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 7; *O'Neill Al Baraka* FCC Ex. T, at ¶ 122.  Al-Fadl also testified that al Qaeda operatives received monthly checks of several hundred dollars from ASIB accounts. *Id.* at 8; *Id.* at ¶ 122.  During the course of the same 2001 trial, Essam Al-Ridi (another associate of Bin Laden) testified that the bank was used for operational purposes.  Al-Ridi testified that "$250,000 was wired from ASIB" via Bank of New York to a Bank of America account held in Dallas, Texas – where he used it to "buy a plane delivered to bin Laden...intended to transport Stinger missiles...." in 1993. *Id.* at 9; *Id.* at ¶ 125.  According to SDGT Yassin Al-Qadi, an ASIB shareholder and "social friend" of Kamel, Osama Bin Laden was allowed to maintain accounts as an investor in ASIB even though "[b]y February 1994 bin Laden had already been stripped of his Saudi nationality and was a well-known supporter of Islamic terrorist causes." *Id.* at 15.

Furthermore, in 1995, it was reported that Saleh Kamel and Al Baraka Bank had "major investments" in Bank Al-Taqwa, the Bahamas-based specially designated global terrorist entity. *WTCP & Euro Brokers* Kamel RICO Statements Ex. A at 25; *Continental* 2AD, Addendum at 45.  On November 7, 2001, in announcing the designation of Bank Al-Taqwa as a global terrorist entity, President Bush stated that "Al Taqwa is an association of offshore banks and financial management firms that have helped al Qaeda shift money around the world.  Bank-Al Taqwa raises money for Al Qaeda.  They manage, invest,

8

distribute those funds…They present themselves as legitimate businesses, but they skim money from every transaction for the benefit of terrorist organizations." *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 23-24; *O'Neill Al Baraka FCC* ¶ 122. In 2002, US Treasury Secretary Paul O'Neill stated in a U.S. Treasury Department report that as of October 2000, "Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Usama bin Laden and as of late September 2001, Usama bin Laden and his Al Qaeda organization received financial assistance from Youssef M. Nada [director of the bank]." *Id.* at 24 ; *Id.* at ¶ 144. The same document mentions Saleh Abdullah Kamel as being a member of the board of directors of the bank. *Id.* at 28. The co-director of Bank Al-Taqwa, Specially Designated Global Terrorist, Youssef Nada, who has been a senior leader of the Muslim Brotherhood terrorist movement for decades and principal financier of Al Qaeda, has explicitly acknowledged that "I manage [Bank Al-Taqwa] portfolios myself." *Id.* at 24; *Id.* at ¶ 145. Saleh Abdullah Kamel also appears in a phone book seized during searches of Al Taqwa director Youssef Nada's house in December 1999. *Id.*; *Id.*at ¶ 147.; Youssef Nada acknowledges that Bank Al-Taqwa was publicly under investigation for financing terrorism as early as 1995. Thus, as early as 1995, Saleh Kamel knew or should have known that Bank Al-Taqwa was under investigation for financing terrorism and that his finances were very possibly being diverted to terrorist entities. *Id.*

Plaintiffs' allegations, when taken as a whole, show that Defendants knowingly and intentionally aided and abetted, conspired with, and long provided material support and resources to al Qaeda and/or affiliated foreign terrorist organizations, associations or persons. *WTCP* ¶¶ 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90, 91; *Cantor* FAC ¶¶ 11, 41-42, 61, 98-105; *O'Neill Al Baraka* FCC ¶ 220.

### C.    Summary of Golden Chain Allegations Against Kamel

Kamel is identified in the "Golden Chain" documents as one of al Qaeda's principal financiers. According to the U.S. Government, the Golden Chain documents list "people referred to within al Qaeda as the "Golden Chain of wealthy donors to mujahideen efforts." *WTCP* ¶ 921; *Euro Brokers* ¶ 48; *WTCP & Euro Brokers* ABIDC RICO Statements Ex. A at 6; *Cantor* FAC ¶61; *Cantor* ABIDC RICO Statement at ¶ 2; *O'Neill Al Baraka* FCC ¶ 42; *Continental* 2AD, Addendum at 30. Plaintiffs acknowledge that this

9

Court has previously noted that: "with no indication who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 817 (2005). Respectfully, Plaintiffs maintain their position that proof of authenticity of the "Golden Chain" documents is not necessary pursuant to the notice pleading requirements of Fed. R. Civ. Pro. 8(a) which governs determination of these motions to dismiss for failure to state a claim; imposing a heightened pleading standard is simply notcalled for under the Federal Rules.[5]

Plaintiffs also point out that the list referred to by the Court is a single document in a larger series of documents utilized by various government agencies in the war on terrorism. These documents, which include the "Golden Chain" list were introduced and relied on in *United States v. Arnaout*, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003). Contrary to this Court's conclusions about the "Golden Chain's" relevance or admissibility, it has been referenced and included as a resource to be used in the sentencing hearing of al Qaeda sponsor Enaam Arnaout; cited by the 9/11 Commission's Final Report in July 2004 and the Congressional Research Service in their reports; and has been used by the U.S. Treasury in designating persons as Specifically Designated Global Terrorists, a decision not lightly taken by the Executive branch of the government. Most importantly, however, a former member of al Qaeda, Jamal al Fadl (D236) has reviewed and confirmed that names on the list are members of Osama bin Laden's "Golden Chain" in a 302 Statement taken by the FBI. Jamal al Fadl specifically identified Saleh Kamel (as well as Defendants Yousef Jameel, Wael Jelaidan, Adel Batterjee, and others) as direct financiers and facilitators of al Qaeda.

The "Golden Chain" list is but one exhibit among 248 exhibits cited and attached to a proffer filed by the United States government supporting the admissibility of certain co-conspirator statements. The Illinois Court ruled that the proffer cannot be linked to a specific conspiracy and the documents were

---

[5] Plaintiffs hereby incorporate by reference the arguments set forth in detail in Plaintiffs' Supplemental Memorandum of Law in Opposition to Motions to Dismiss of Wa'el Hamza Jelaidan, Khalid bin Mahfouz and Yousef Jameel, Docket # 977, and the Affidavit of David K. Draper in Support of Plaintiffs' Supplemental Memorandum of Law in Opposition to Motions to Dismiss of We'el Hamza Jelaidan, Khalid bin Mahfouz and Yousef Jameel, *Id*.

therefore not admissible under the co-conspirator exception to the hearsay rule. *Arnaout*, 2003 WL 255226 at \*2.  Merely because a certain document is ruled inadmissible in one proceeding, does not render the document unable to be authenticated (or made relevant) forever.  In fact, the documents were later submitted by the United States government and considered by the Illinois Court at the sentencing of Enaam Arnaout in imposing a sentence upon this al Qaeda supporter who pled guilty.[6]

In fact, on November 2, 2005, Judge Kevin Duffy, United States District Judge for the Southern District of New York, upheld the conviction of Wadih El-Hage in *United States v. Bin Laden, et al.*, Case No. S7R 98 Cr. 1023 (KTD), 2005 WL 2875320. In doing so, the Court found that statements made by Jamal al-Fadl, the same witness on whose statements Plaintiffs in these proceedings rely with respect to the "Golden Chain" documents found in raids on the Bosnian office of Defendant Benevolence International Foundation, were "significantly corroborated" and rejected attacks on al-Fadl's credibility. 2005 WL 2875320 at \*40.

In denying El Hage's motion for a new trial, Judge Duffy addressed allegations by counsel for El Hage that previously undisclosed statements of al-Fadl would serve to conclusively impeach the credibility of his direct testimony used to convict El Hage.  Rejecting El Hage's argument, the Court held: "al-Fadl's testimony regarding al Qaeda's violent intentions toward the United States prior to [Bin Laden's August 1996 declaration of "Holy War Against the Americans Who are Occupying the Land of the Two Holy Places"] was significantly corroborated." *Id.* at \*38.  In assessing the credibility of al-Fadl's testimony in "establishing the structure and history of al Qaeda" in light of the undisclosed videotapes, the Court further held:  "[A]s with al-Fadl's other testimony, his testimony on these subjects was significantly corroborated (and in many cases, surpassed) by other evidence." *Id.* at \*40.

On November 3, 2005 *Daubert* ruling by Judge Sidney Stein, United States District Judge for the Southern District of New York, issued a *Daubert* ruling in *United States v. Uzair Paracha*, Case No. 03

---

[6] *See* "Government's Response to Defendant's Position Paper as to Sentencing Factors" *U.S. v. Enaam M. Arnaout.* Case No. 02CR 892 (ND Ill.) (SBC), at 32. June 12, 2003; Exhibit 4 to the Affidavit of Evan F. Kohlmann (or "Kohlmann Aff."), attached as Attachment A to the Affidavit of David K. Draper ("Draper Aff.").

Cr. 1197 (SHS), qualifying Evan Kohlmann as an expert on the origin and structure of al Qaeda. (A copy

of the November 3, 2005 transcript is attached hereto as Exhibit B.)  Mr. Kohlmann is the same expert on

whom plaintiffs in these proceedings rely in presenting evidence about the origin and structure of al

Qaeda.  In qualifying Mr. Kohlmann, Judge Stein ruled from the bench as follows:

> The government has met its burden of establishing by a preponderance of the proof that
> its proposed expert, Evan Kohlmann, has sufficient education, training, and knowledge to
> be qualified as an expert, and that Kohlmann's methodology - - that is, his process of
> gathering sources, including a variety of original and secondary sources, cross-checking
> sources against each other, and subjecting his opinions and conclusions to peer review - -
> is sufficiently reliable to meet the standards for the admissibility of expert testimony set
> by the Federal Rules of Evidence.

Tr. at 8.

> Furthermore, Judge Stein held:

> The second finding is that the government has met its burden of establishing by a
> preponderance that Kohlmann reliably applied that methodology in reaching his
> conclusions about the origins and structure of al Qaeda, the identification of its leaders
> and its use of cells as a means of operating and its use of individuals to provide logistical
> support, and that testimony will be permitted, assuming the government chooses to
> adduce it.

Tr. at 10-11.

In detailing Kohlmann's application of his professional methodology, Judge Stein provides

justification for expert reliance on source documents that may be based on hearsay evidence.  Tr. at 9-10.

In the *Daubert* hearing conducted by Judge Stein, Mr. Kohlmann testified that his sources regarding the

origins and structure of al-Qaeda included documents seized by federal authorities on the hard drive of a

computer in the Bosnian office of Defendant Benevolence International Foundation including the files

"known as the Tareekh al-Musadat or the Tareekh Osama file."  *United States v. Paracha*, Case No. 03

Cr. 1197 (SHS), Nov. 2, 2005, Tr. at 133 (Cross-Examination of Evan F. Kohlmann).  (A copy of the

November 2, 2005 transcript is attached hereto as Exhibit C.)  The "Golden Chain" document is one of

the many documents found in the Tareekh Osama directory of the computer hard drive.  Plaintiffs

respectfully submit that Judge Stein's allowance of the expert testimony of Mr. Kohlmann regarding the

"origins and structure of al Qaeda" provides further support for the use of documents found in the

[...] Osama directory, including the "Golden Chain" document, to establish the causal chain of al-Qaeda activity, including the raising of funds for al-Qaeda activity.

The "Golden Chain" list and related documents demonstrate the role of Saleh Kamel (as well as Defendants Wa'el Jelaidan, Yousef Jameel, Adel Batterjee, and others) in the founding and funding al Qaeda. These documents provide substantial evidence that these defendants directed their conduct at the United States by funding an organization dedicated to attacking the United States.

## III. ARGUMENT

### A. Applicable Standards on a Motion to Dismiss[7]

#### 1. Rule 12(b)(1)

In ruling on those parts of the Defendants' Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, this Court must presume that all of the Plaintiffs' allegations are true and read the Complaint in the light most favorable to the Plaintiffs. See *Yilmaz v. McElroy*, No. 00-CV-7542 (RCC), 2001 WL 1606886, at * 2 (S.D.N.Y., Dec 17, 2001) (*citing Shipping Financial Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)). In most cases, the Court will consider a motion brought under Rule 12(b)(1) before ruling on any other motions to dismiss, since dismissal of an action for lack of subject-matter jurisdiction will render all other accompanying defenses and motions moot. *Id.* at * 2 (*citing Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993)). Consequently, a court confronted with a motion to dismiss pursuant to Rule 12(b)(1), as well as Rule 12(b)(6), must decide the jurisdictional questions first because "a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Id.* at * 2 (*quoting Magee v. Nassau County Medical Ctr.*, 27 F. Supp. 2d 154, 158 (E.D. N.Y. 1998)).

---

[7] The Defendants, through incorporation, seek to have the Plaintiffs respond to arguments put forth in their 20 page memorandum filed in the Federal Case, their 21 page memorandum filed in the Ashton case, and their 62 page memorandum of law filed in the Burnett case. See K & A Br. at 1. As a result, the Plaintiffs only respond to those arguments found in the "summary version" filed in the Plaintiffs' case. The Plaintiffs cannot be expected to respond to all six memoranda (consisting of the memoranda and reply memoranda), including a 62 page memorandum with footnotes, in the 25 pages allowed by this Court. The Plaintiffs therefore incorporate the arguments advanced by the Plaintiffs in the Federal, Burnett, and Ashton actions.

2.      **Rule 12(b)(6)**

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) . In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of F.R.C.A.T 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (*quoting Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002) (allegation "I was turned down for a job because of my race" would be sufficient to survive a Rule 12(b)(6) motion.). Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to F.R.C.A.T 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v. McDonald's Corat*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff

need not draw causal connection between allegations and injuries in the complaint, but rather it may rely on discovery to flesh out claim).

In October, 2005, the Second Circuit re-iterated and re-affirmed the notice pleading standard set forth in Rule 8 as applied to a Rule 12(b)(6) motion to dismiss. *See Twombley v. Bell Atlantic Corat*, 425 F.3d 99 (2d Cir. 2005). In *Twombley*, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." 425 F.3d at 107. In the context of anti-trust pleading, the Court reminded that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116. The district court may not add create higher pleading standards than those set forth in the Federal Rules. Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit unequivocally held that "[i]f that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so." 425 F.3d at 117.

Similarly, in another case not addressed by these Defendants, the United States District Court for the Eastern District of New York rejected the defendant's invitation to impose a heightened pleading requirement in a similar case. In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations. 384 F.Supp.2d at 575-579. Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent." *Id.* at 585. The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure:

15

> To the extent the defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

*Id.*  The *Linde* court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, defendant attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  *Id.* at 588.

### B.      This Court Has Subject-Matter Jurisdiction Over the Defendants

This Court has subject-matter jurisdiction pursuant to the ATA, 18 U.S.C. § 2331, *et seq*. Defendants therefore wrongly assert that the causal connection between their actions and the attacks on September 11 is a question of subject-matter jurisdiction,[8] K & A Br. at 4-5, 24.  Plaintiffs' therefore incorporate the legal arguments advanced in the Opposition brief filed by the *Federal* Plaintiffs, and ask the Court to reject the Defendants' effort to transform their ATA into a jurisdictional argument.

### C.      Defendants' Failure to State a Claim Arguments Fail Because They Wrongly Apply A Heightened Pleading Standard and Seek to Prematurely Test the Evidence

Defendants first argue that the allegations in the Complaints are legally insufficient because they are legal conclusions "couched" as factual allegations. *See* K & A Br. at 6.  The Complaints give the Defendants fair notice of the Plaintiffs' claims and the grounds upon which they are based. *See Wynder*, 360 F.3d at 77. Moreover, the allegations set forth in the Complaints are sufficient to state a claim under the liberal pleading standards allowed by Rule 8 and discussed above. *See Swierkiewicz*, 534 U.S. at 521-13.

---

[8] Although the Defendants assert that subject-matter jurisdiction in this case is dependent on direct causation, the Plaintiffs address the specific allegations linking the Defendants to al Qaeda and the September 11th attacks in the discussion of the Defendants' Rule 12(b)(6) argument. See Part III, D, 3, *infra*. The Plaintiffs take this approach because, other than a challenge to the ATA itself, the Defendants discussion of causation is more akin to a challenge to the allegations pled in the Complaints.

The Defendants' second argument is that any allegation that they invested in the international banking system that funded al Qaeda's terrorist campaign against the U.S. is barred because banks, acting as funnels, cannot be held liable. The arguments advanced by the Defendants misconstrue the nature of the allegations made against the Defendants in this case. Plaintiffs do not allege some passive involvement on the part of these Defendants in the conspiracy that led to the September 11 attacks. Rather, the Complaints assert that these Defendants knowingly and intentionally provided financial services and other forms of material support to al Qaeda, in an effort to further that organization's global *jihad* directed at the United States of America, as is set forth in detail in the discussion *supra* in Section II. Such material support is precisely the kind of conduct actionable under the ATA.

The Defendants assert that there is not a sufficient causal connection between investments made by the Defendants in the early 1980's and the September 11 attacks. K & A Br. at 5. The allegations relating to the establishment of Islamic banks in the early 1980's serves to place the material support and resources provided by the Defendants into a historical context and assist with describing the relations between the Defendants and al Qaeda's global organization.[9] Furthermore, the allegations in the Complaints should be read as alleging that the Defendants provided continual support and resources – as opposed to one instance – to al Qaeda in the years leading up to the horrific attacks.

At this stage of the litigation, the Defendants are entitled to no more than "a short and plain statement of the facts" supporting the Plaintiffs' claims. *Swierkiewicz*, 534 U.S. at 512-13. The Complaints provide them with this and more as each allege that the Defendants knowingly provided material support and resources to al Qaeda, that al Qaeda would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the attacks absent the sponsorship of Kamel and ABIDC and the other defendants, and that the Defendants thus knowingly participated in the conspiracy with the

---

[9] Plaintiffs also note that Defendants' argument that the COMPLAINTS allege only instances of investment in the early 1980's is an attempt to recast their subject-matter jurisdiction argument, in which they contend that subject-matter jurisdiction is dependent on a direct link.

intent to advance the commission of terrorist attacks against the United States, of which the Attack was a natural, intended and foreseeable consequence. *WTCP* ¶¶ 58, 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90, 91, 192; *WTCP* and *Euro Brokers* RICO Statements Ex. A; *Continental* 2AD ¶¶ 26, 27, 29, 486, 602.

### D.     Plaintiffs Have Sufficiently Alleged Claims Under the Anti-Terrorism Act

Defendants' assertion that the Plaintiffs have failed to state a sufficient causal connection between their actions and the September 11 attacks is without merit. K & A Br. at 3-18, 20.    Plaintiffs have properly alleged that Kamel, ABIDC, and DAB's support and assistance was a proximate cause of the September 11 attacks.  Plaintiffs allege that "[t]he attacks of September 11, 2001 . . . could not have been accomplished without the knowing and intentional financial support lent to Al Qaeda and its leaders by a global network of banks, financial institutions, charities, relief organizations, businesses, individual financiers, foreign governments and foreign governmental officials." *EuroBrokers* Complaint ¶ 5; *accord WTCP* Complaint ¶ 1; *Cantor* 1AC ¶¶ 11, 92; *Continental* 1AC ¶ 29; *N.Y. Marine* 2AC ¶ 53; *Continental* 2AC ¶ 26.  *See also Boim*, 291 F.3d at 1021 ("[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence.").

That Defendants did not themselves fly the planes on September 11, but rather acted in concert with al Qaeda, which actually carried out the terrorist attacks, does not insulate them from liability.  To begin with, by its own terms, the ATA applies to those who provide "material support" to terrorist organizations, and not merely to those who personally perpetrate terrorist attacks.  *See* 18 U.S.C. § 2339B.  Under the ATA, the Defendants are liable if they provided *any* material support to al Qaeda with knowledge of its terrorist agenda. *See Humanitarian Law Project v. Reno*, 205 F.3d  1130, 1136 (9th Cir. 2000).[10]  Moreover, this Court has already recognized that concerted action liability "is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively

---

[10] In *Humanitarian Law Project*, the Court of Appeals for the Ninth Circuit stated that any contribution to a terrorist organization gives rise to criminal responsibility, regardless of whether the support given is intended for or flows directly to the organization's terrorist activities. 205 F.3d at 1136.

take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer ... are equally liable with him.'" *In re Terrorist Attacks*, 349 F.Supp.2d at 826, *quoting Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir.1998).

Plaintiffs have satisfied all of the elements of concerted action liability by alleging that Kamel, ABIDC, and DAB provided substantial assistance and/or encouragement and that they did so with knowledge of the wrongful nature of bin Laden's and al Qaeda's conduct. *See, e.g., WTCP & Euro Brokers* RICO Statements, Ex. A. No more is required at this stage of the case.

A plaintiff may assert a valid claim under the ATA, 18 U.S.C. § 2331, *et seq.*, under either of two alternative approaches: (1) pursuant to general tort principles, including concerted action theories of liability; or (2) by demonstrating that the defendant violated the ATA's criminal standards, and that the defendant's violation was a substantial factor in bringing about plaintiff's injuries. *Boim*, 291 F.3d at 1015 & 1020. Plaintiffs have done both.

### 1. The Plaintiffs Have Adequately Alleged Claims Under the ATA Pursuant to General Tort Principles

In *Boim*, the Court of Appeals for the Seventh Circuit held that the legislative history of the ATA evinces a clear intent by Congress to codify general common law tort principles, and to impose civil liability for acts of international terrorism to the full reaches of traditional tort law. 291 F.3d at 1010. Accordingly, the *Boim* court specifically embraced the use of concerted action theories of liability, such as aiding and abetting and conspiracy, to establish liability over a defendant under the ATA.[11] *Id.* at 1020. *See also Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y 2005).

When read as a whole, the complaints plainly and adequately state claims against the Defendants pursuant to aiding and abetting and conspiracy theories. At the threshold, the complaints allege that both Kamel and ABIDC have aided and abetted, conspired with, and provided material support and resources to, defendant al Qaeda and/or affiliated FTOs, associations, organizations or persons. *WTCP* and *Euro*

---

[11] The *Boim* court reasoned that "although the words 'aid and abet' do not appear in the statute, Congress purposely drafted the statute to extend liability to all points along the causal chain of terrorism." 291 F.3d at 1019-20.

19

RICO Statements Ex. A. Further, the complaints allege that the attacks were "a direct, intended and foreseeable product of a larger conspiracy among the defendants, to commit acts of international terrorism against the United States, its nationals and allies." *WTCP* ¶ 1172. Describing the conspiracy, the complaints state that it "included the provision of material support and resources to defendant al Qaeda and affiliated foreign states, FTOs, persons, organizations, commercial entities and other parties." *O'Neill* Al Baraka FCC ¶157.

The Complaints also discuss the consequences of the Defendants' participation, in that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaeda would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11 attacks." *Continental* 2AD ¶26. Thus, the Complaints detail the specific role of both Kamel and ABIDC in al Qaeda's conspiracy to commit terrorist attacks against the United States. *WTCP* ¶¶ 58, 97, 107, 109, 150; *Euro Brokers* ¶¶ 48, 87, 89, 90.

Read collectively, the Complaints unambiguously allege that the Defendants knowingly and intentionally aided and abetted and conspired with al Qaeda, and that the September 11th attack was a direct, intended and foreseeable product of the Defendants' conduct. This more than suffices to state a claim under the ATA under both conspiracy and aiding and abetting theories of tort liability. *See Swierkiewicz*, 534 U.S. at 512-13.

### 2. Plaintiffs Adequately Allege ATA Claims Based Upon Defendants' Criminal Violations

The Plaintiffs have also adequately pled claims against Kamel, ABIDC and DAB under the ATA based upon the Defendants' violations of the ATA's criminal standards. See 18 U.S.C. §§ 2339A, 2339B, and 2339C.[12] The *Boim* court concluded that the ATA's criminal provisions are a clear indication of

---

[12] Section 23339A makes it unlawful to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" numerous criminal statutes. Section 2339B prohibits the knowing provision of "material support or resources to a foreign terrorist organization." In regard to both sections, "material support or resources" is defined as currency or monetary assistance, safehouses, false documentation or

Congress' intent to deem financial support of a terrorist organization to be itself an act of international terrorism. 291 F.3d at 1015. Therefore, because the Complaints allege that the Defendants provided financial and logistical support to al Qaeda and organizations that helped to sustain al Qaeda, the Plaintiffs have stated a cause of action against the Defendants pursuant to the criminal provisions of the ATA. See Part II, *supra*.

### 3.    Plaintiffs' Sufficiently Aver Causation

The heart of almost all of Defendants' causations arguments is that the Plaintiffs have not adequately pled a link between their illicit conduct and the attacks. *See* K & A Brief at 3-18, 20. Defendants's arguments are misplaced, however, because Defendants fundamentally misconstrue Plaintiffs' theories of concerted action. Moreover, the Defendants' argument ignores the numerous allegations in the various Complaints and RICO Statements.

Under New York law, "those who aid and abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme." *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D. N.Y. 1985) (citations omitted). Consistent with this rule, the causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." *Halberstam*, 705 F.2d at 477 (emphasis added). Similarly, a plaintiff need only allege that the defendant provided substantial assistance to the wrongdoer to establish tort liability based on the defendant's aiding and abetting of the principal tortfeasor. *Id.*

Pursuant to these standards, Defendants' participation in al Qaeda's conspiracy to commit terrorist attacks against the United States and their aiding and abetting of that terrorist organization ties

---

identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials. 18 U.S.C. § 2339A. The term material," as used in these sections, "relates to the type of aid provided rather than whether it is substantial or considerable." *Boim*, 291 F.3d at 1015. Finally, section 2339C makes it unlawful to provide or collect funds "with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" terrorist attacks.

them inextricably to the Attack.[13] As the Plaintiffs' injuries are indisputably the result of the September 11 attacks, the Plaintiffs have properly and adequately alleged causation. Accordingly, the Defendants' causation-based arguments must be rejected.[14]   Alternatively, causation is more than satisfied here because the Complaints specifically allege that the Attack would not have been possible absent the sponsorship and support provided by Kamel and ABIDC and DAB.   Of equal import to alleging causation, the Complaints clearly allege that the Attack was a foreseeable consequence of both the conspiracy in which the Defendants knowingly participated and the Defendants' aiding and abetting of al Qaeda. Indeed, the Complaints unambiguously assert that the Attack was a "direct, intended and foreseeable product" of that conspiracy. *WTCP* ¶¶ 58; *Euro Brokers* ¶¶ 192.

While Defendants continue to claim that the September 11 attacks were not a foreseeable consequence of the material support they provided to al Qaeda, this is nonsense.  Bin Laden's goals were certainly not secret. *WTCP* ¶ 24; *Euro Brokers* ¶ 23; *Continental* 2AD ¶109, 115, 121, 122.  It is entirely foreseeable that the material support provided by the Defendants to al Qaeda and bin Laden, as detailed in the Complaints and Plaintiffs' RICO statements, would proximately result in terrorist attacks against the United States.  That it took bin Laden several years to train those terrorists and to come up with the September 11th plot does not in any way reduce the causal connection between the infrastructure support provided during the years leading up to September 11 and those terrorist attacks that al Qaeda was ultimately able to carry out.  Finally, as this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *In re Terrorist Attacks*, 349 F.Supp.2d at 829.

Nor does the fact that Defendants did not themselves fly the planes on September 11 insulate them from liability.  By its own terms, the ATA applies to those who provide "material support" to

---

[13]  The United States Supreme Court has held that, in cases that involve alleged conspiracy among multiple actors involving multiple acts, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).
[14] Section 403 of the Restatement, upon which the Defendants rely for support of their causation argument, does not alter the foregoing analysis. See Part III, A, 1, *supra*.

terrorist organizations, and not merely to those who personally perpetrate terrorist attacks. *See* 18 U.S.C. § 2339B. Further, this Court has already recognized that concerted action liability "is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer ... are equally liable with him.'" *In re Terrorist Attacks*, 349 F.Supp.2d at 826, *quoting Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir.1998). Here, Plaintiffs have alleged all the elements necessary to satisfy the requirements of concerted action liability: that the Defendants provided substantial assistance and/or encouragement and that they did so with knowledge of the wrongful nature of bin Laden's and al Qaeda's conduct. Both elements are specifically pleaded, *see, e.g., WTCP & Euro Brokers* RICO Statements, Ex. A. Nothing more is required.

### E.   PLAINTIFFS' ATCA AND INTERNATIONAL LAW CLAIMS ARE ADEQUATELY PLED

Defendants' motion to dismiss Plaintiffs ATCA and international law related claims lacks any merit. This Court has already found several "Plaintiffs in these actions are aliens" *In re Terrorist Attacks*, 349 F.Supp.2d at 826, and that "the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here." *Id.* For the reasons set forth above on causation, the Defendants' second argument that the ATCA and international law claims must be dismissed for "lack of causation, actual and proximate" is similarly without merit.[15]

### F.   PLAINTIFFS' RICO CLAIMS ARE CORRECTLY ASSERTED

The Defendants also fail to address Plaintiffs' properly-pled RICO claims. Plaintiffs' complaints and RICO Statements assert RICO claims against the Defendants pursuant to 18 U.S.C. §§ 1962 (a), (c) and (d). The enterprise – Osama bin Laden and the al Qaeda movement - is an association in fact of

---

[15] The legal and factual arguments in support of the Cantor Fitzgerald's Plaintiffs' international law claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein. See e.g., *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112). In addition, all Plaintiffs possessing ATCA and international law claims are fully entitled to recover punitive damages. *Filartiga v. Pena*, 577 F. Supat 860, 863, 865 (E.D.N.Y. 1984) (Nickerson, J.) (looking to federal common law "remedies to implement the rights secured by the Constitution" to grant punitive damages for violations of international law); *Paul v. Avril*, 901 F. Supat 330, 335-36 (S.D. Fla. 1994) ("Both compensatory and punitive damages are recoverable for violations of international law. (citing *Filartiga v. Pena-Irala*, *supra*).

terrorists and an ongoing terrorist organization with a definitive structure. *See, e.g., WTCP* Complaint ¶¶ 909-952; *WTCP* RICO Statement; Euro Brokers RICO Statement; *Continental* 2AD ¶609, Continental RICO Statements. Its well documented purpose is to perpetrate acts of terrorism. Thus, plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO statements further allege that the Defendants engaged in conduct in furtherance of the enterprise which is actionable under § 1962 (a). Pursuant to that section: "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . . to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1962(a). As the Supreme Court has explicitly recognized that al Qaeda's terrorist endeavors, including the September 11, 2001 attacks, directly affect interstate commerce, plaintiffs have undeniably stated RICO claims under Section 1962(a). *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004) (stating that the September 11, 2001 attacks "severely damaged the U.S. economy").

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by the Defendants in the enterprise to sustain claims under both §§ 1962 © and (d). Although a plaintiff asserting a civil claim under § 1962 © must allege that the defendant participated in the operation or management of the enterprise, *see Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D. N.Y. 2003), such "discretionary authority" has been described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear." *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general

:::, i: may not be "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 WL 376058, *2 (S.D. N.Y. July 15, 1994).

With respect to a RICO conspiracy under § 1962 (d), the requirements "are less demanding." *Baisch*, 346 F.3d at 376. All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id*. at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)). Thus, "[a]lthough parties who do not control the organization cannot be liable under § 1962©, they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993). Thus, Plaintiffs allege that the Defendants invested racketeering income in an enterprise, operated an enterprise through a pattern of racketeering, and conspired to do so.

[16]IV.   **CONCLUSION**

For the reasons stated above, the Plaintiffs respectfully request that the joint Motion to Dismiss filed by Saleh Abdullah Kamel, Al Baraka Investment and Development Corporation, and Dallah Al Baraka be denied in all respects, with prejudice.

---

[16] Plaintiffs do not currently intend to pursue their claims under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, against these defendants. Plaintiffs reserve the right to replead this claim against these Defendants should additional information become available in discovery demonstrating it acted "under actual or apparent authority or color of law, of any foreign nation" in connection with its support of Al Qaeda. Plaintiffs also recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs. Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue.

In addition, insofar as Defendants argue for the dismissal of claims for contribution and indemnity by Plaintiff Port Authority of New York and New Jersey ("Port Authority"). The Port Authority's legal and factual arguments in support of its contribution and indemnity claims are well advanced in earlier pleadings, and are incorporated and reasserted in full herein. *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112).

Tel:  (212) 983-8500

*Attorneys for Plaintiff*
*NY Marine & General Insurance Company*

27

Dated:  December 23, 2005

Respectfully Submitted,

_____/s/_____

Ronald L. Motley, Esq. (SC Bar #4123)
Jodi Westbrook Flowers, Esq. (SC Bar #66300)
Donald A. Migliori, Esq. (RI Bar #4936)
Michael Elsner, Esq. (NY & VA Bar #ME-8337)
Robert T. Haefele, Esq. (NJ-58293; PA-57937)
Justin B. Kaplan, Esq. (TN-022145)
John Eubanks, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
112 Madison Avenue, 7th Floor
New York, NY  10016-7416
Tel:  (212) 784-6400

*Attorneys for Plaintiffs Burnett; Euro Brokers, et al; and World Trade Center Properties LLC, et al.*

Kenneth L. Adams (admitted *pro hac vice*)
Christopher Leonardo (CL 3043)
DICKSTEIN, SHAPIRO, MORIN & OSHINKSKY, LLP
1177 Avenue of the Americas
41st Floor
New York, NY  10036-2714
Tel:  (212) 835-1400
*Attorneys for Cantor Plaintiffs*

Robert Kaplan, Esq.
FERBER FROST CHAN & ESSNER, LLP
530 Fifth Avenue
New York, NY 10177-1211
Tel:  (212) 944-2200

*Attorneys for Plaintiff Continental Casualty Co.*

Frank J. Rubino, Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, NY 10017

26