**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                )
In Re TERRORIST ATTACKS on            )        03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                          )        ECF Case
                                                )
_____)

This document relates to:

 _Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al._, 04-CV-1923 (RCC)

**O'NEILL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTION TO DISMISS OF**
**COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR)**

**LAW OFFICES OF JERRY S. GOLDMAN &**
**ASSOCIATES, P.C.**

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

_Attorneys for the Plaintiffs_

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Frederick J. Salek, Esquire (FJS 8565)
Gina M. MacNeill, Esquire (GM 0581)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................... 2

ARGUMENT ......................................................................................................... 3

I.   GENERAL STANDARDS RELATIVE TO THE SUFFICIENCY OF THE PLEADINGS - THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ......................................................................... 3

   A.  A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT. ...................................................................... 3

   B.  PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FIRST AMENDENT..................... ...................................................................................................................... 6

   C.  THE PLAINTIFFS PROPERLY FILED THEIR RICO STATEMENT AND MORE DEFINITE STATEMENT AND FIRST CONSOLIDATED COMPLAINT. ................................... 12

II.   THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR FEDERAL CAUSES OF ACTION. ...................................................................................................................... 13

   A  THE PLAINTIFFS ADEQUATELY ALLEGE THE DEFENDANT'S ROLE AS A MEMBER OF THE CONSPIRACY. .................................................................................... 13

      1.  THE O'NEILL PLEADINGS ADEQUATELY DEMONSTRATE THE CONSPIRACY AND THE DEFENDANT'S ROLE THEREIN. ...................................................... 14

   B.  KNOWLEDGE AND INTENT, AS WELL AS CAUSATION MAY BE PLEADED GENERALLY. ............................................................................................... 16

   C.  PLAINTIFFS OTHERWISE PROPERLY ALLEGE A CAUSE OF ACTION UNDER THE ATA. ............................................................................................................ 19

   D.  THE COMPLAINT STATES A CLAIM AGAINST CAIR UNDER THE ATCA. ................. ...................................................................................................................... 20

   E  PLAINTIFFS PROPERLY STATE RICO CLAIMS AGAINST CAIR.............................. ...................................................................................................................... 21

**III.     PLAINTIFFS SUFFICIENTLY PLEAD THEIR COMMON LAW CLAIMS.** ..................... 23

**CONCLUSION** ............................................................................................................... 25

**APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR)** ...................................................................................... 26

**CERTIFICATE OF SERVICE** ....................................................................................... 42

# TABLE OF AUTHORITIES

## CASES

*A. Terzi Prods. V. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998) ....... 12

*Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001) ...................................... 12

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215 (S.D.N.Y. 1992) ............................................. 14

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) ............................................................................... 22, 23

*Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ............................................................ 25

*Boim v. Quranic Literacy Institute and Holy Land Foundation For Relief and Development*, 291 F.3d 1000, 1009 (7th Cir. 2002) ................................................................................................... 9, 19, 20

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................................................................... 6, 7

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998) ................................................................................................................................................... 4

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991) ........................... 14

*Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys.*, 271 F. 3d 374 (2d Cir. 2001) ............................... 13

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................................... 3, 4

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ................................................................... 12

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) .......................................................................................... 21

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp.2d 158 (S.D.N.Y. 2003) ........................................ 22

*F.D.I.C. v. McSweeney*, 976 F.2d 532 (9th Cir. 1992), *cert denied*, 508 U.S. 950 (1993) ..................... 24

*Falco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) ........................................................................................ 22

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ........................................... 22

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998) ........................................................ 18

*Friedman v. Hartmann*, 91 Civ 1523 (PKL), 1994 U.S. Dist. LEXIS 9727, *4 (S.D.N.Y. July 15, 1994) 23

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ................................................................................... 3

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .............................................................................. 18

*Hance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998 .......................................................................................................................................................... 4

*Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1334 (C.D. CA. 2005) ........................................ 8

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ................................................. 10, 18, 20

*Humanitarian Law Project v. United States Dept. of Justice*, 352 F.3d 382 (9th Cir.2003) ................ 10, 11

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 00 Civ. 7804 (LMM), 2004 U.S. Dist. LEXIS 3892 (S.D.N.Y. Mar. 12, 2004) .................................................................................................. 25

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765 (S.D.N.Y. 2005) ............................. 14

*Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir. 1996) .............................................................................. 25

*Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004) ........................................................................ 25

*Kilburn v. Socialist People's Libyan Arab Jamhiriya*, 376 F.3d1123 (D.C. Cir. 2004) ........................... 18

*Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005) .............. 6

*Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529 (S.D.N.Y. 1985) ................................................................. 17

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992) ........................................................................... 12

*Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999) ...... 12

*Mendoza v. Zirkle Fruit Co.*, 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000) ......................................... 13

*Morin v. Trupin*, 832 F. Supp. 93 (S.D.N.Y. 1993) ................................................................................. 23

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) .......................................................................... 12

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 866 (1982) ........................................................................ 6

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ................................................................. 5, 17

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) ............................................................................ 3, 4, 5

*Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) ................... 11

*Resolution Trust Corp. v. Hess*, 820 F. Supp. 1359 (D. Utah 1993) ......................................................... 24

*Salinas v. United States*, 522 U.S. 52 (1997) ........................................................................................... 23

*Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95 (E.D.N.Y. 2000) ............................................................ 14

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984) ................................................................................... 14

*Sparrow v. United Airlines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000), *appeal dismissed after remand*, 2001 WL 936257 (D.C. Cir. July 12, 2001) ................................................................................................... 4

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002) ............................................................................. 4, 5

*Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005) ............................................................ 5, 6

*United States ex rel. Epton v. Nenna*, 446 F.2d 363 (2d Cir. 1971) ............................................... 7

*United States v. Allen*, 155 F.3d 35 (2d Cir. 1998) ...................................................................... 22

*United States v. Bell*, 414 F.3d 474 (3d Cir. 2005) ...................................................................... 7

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ............................................................. 22

*United States v. Hammoud, 381 F.3d 316 (4th Cir. 2004)* ......................................................... 8

*United States v. Kahn, 309 F. Supp. 2d 789 (E.D. Va. 2004)* ................................................... 10

*United States v. Marzook*, 2005 U.S. Dist. LEXIS 28835 (N.D. Ill., November 17, 2005) ....................... 10

*United States v. Rahman*, 189 F.3d 88 (2d Cir 1999) ............................................................ 7, 8, 11

*United States v. Rowlee II*, 899 F.2d 1275 (2d Cir. 1990) ............................................................ 7

*United States v. Turkette*, 452 U.S. 576 (1981) .......................................................................... 22

*United States. v. Sattar, 2005 U.S. Dist. LEXIS 25079 (S.D.N.Y. Oct 24, 2005)* ......................... 7

*Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101  (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004) ........... 13

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ................................................. 17

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ........................................ 4

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ................................................................... 3, 4

*Yeadon v. New York Transit Authority*, 719 F. Supp. 204 (S.D.N.Y. 1989) .............................. 25

## STATUTES

18 U.S.C. § 1961 *et seq.* .......................................................................................................... 3, 21

18 U.S.C. § 1962(b) .................................................................................................................... 22

18 U.S.C. § 1962(c) ................................................................................................................ 22, 23

18 U.S.C. § 1962(d) ................................................................................................................ 22, 23

18 U.S.C. § 2339A ...................................................................................................................... 19

18 U.S.C. § 2339B, ...................................................................................................................... 19

## OTHER AUTHORITIES

137 Cong. Rec. S4511 04 (April 16, 1991) ................................................................................. 25

*International Criminal Tribunal for Yugoslavia (ICTY Statute)*, Art. 5, adopted by the U.N. Security Council in Resolution No. 955, U.N. Doc. S/INF/50 (1994) ................................................................. 21

Joseph C. Cyrulik, *Asymmetric Warfare and the Threat to the American Homeland*,  Association of the US Army, Institute of Land Warfare (Nov. 1999), http://www.ausa.org/PDFdocs/lpe99-8.pdf ........... 15

*Restatement (Third) of the Foreign Relations Law of the United States* (1987) ........................................ 20

*Rome Statute of the International Criminal Court* (ICC Statute), art. 7, July 1998, UN Doc. A/CONF. 183/9 ................................................................................................................................................ 21

S. Rep. No. 102-342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22 ................................................. 17

*Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831 (1993) ................... 24

William J. Hartman, *Globalization and Asymmetrical Warfare*, Air Command and Staff College, Air University (4/2002), http://www.au.af.mil/au/awc/awcgate/acsc/02-053.pdf. ....................................... 15

## RULES

Fed. R. Civ. Proc. 12(e) ........................................................................................................................ 13

Fed. R. Civ. Proc. Rule 15(a) ............................................................................................................... 13

Fed. R. Civ. Proc. Rule 8(a) .......................................................................................................... passim

Fed. R. Civ. Proc. Rule 9(b) ............................................................................................................ 4, 6

Fed. R. Crim. Proc. Rule 29 .................................................................................................................... 9

## CONSTITUTIONAL PROVISIONS

First Amendment ............................................................................................................................ passim

Due Process Clause ........................................................................................................................ passim

## INTRODUCTION

On September 11, 2001, thousands of innocent men, women, and children, in New York City, at the Pentagon, and aboard four airliners were horribly murdered – burned, suffocated, crushed, and otherwise - as a result of an invidious criminal conspiracy targeting American lives and property.  They experienced extraordinary pain and suffering.  They died.  They lost the opportunity to see their children and their grandchildren.  They were deprived of the chance to grow old with their spouses.  They lost their property and their livelihoods.  Thousands of others – their spouses, children, parents and other loved ones - had their lives irreparably shattered.

This lawsuit seeks to utilize the American system of justice to recompense them for this tragedy and to help prevent other families from suffering similar terrible losses.

This is what the O'Neill cases[1] are all about.

***

Defendant Council on American-Islamic Relations (CAIR) filed its Motion to Dismiss for failure to state a claim upon which relief can be granted.  Defendants' Motion is based on Defendants' disagreement with the facts alleged in the Complaint, and what Plaintiffs believe to be a misunderstanding of the applicable standard of pleading and a misinterpretation of the governing law.  The Defendants cannot escape liability for the horrendous events of September

---

[1] The instant case, *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC) ("*Al Baraka*") one of the cases which are part of the instant multi-district litigation.  The decedent, John P. O'Neill, Sr., was murdered on September 11, 2001 as a result of the activities committed by the Defendants named herein, and those named in the companion cases of *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et al.*, 04-CV-1922 (RCC) ("*KSA*"), and the *Estate of John P. O'Neill, et al. v. Republic of Iraq, et al.*, 04-CV-1076 (RCC) ("*Iraq*"),(with *Al Baraka, KSA* and *Iraq* collectively the "*O'Neill* cases") (including the John Does) *as well as* the other cases part of the instant multi-district litigation, as alleged in the pleadings.  See, e.g., First Consolidated Complaint ("FCC") Exhibit H, ¶ 2.  The named Plaintiffs consist of the Estate of the Decedent, together with certain named heirs at law, and a proposed class consisting of others similarly situated.  FCC ¶¶ 14, 16, 18, 19, 20, 21, 128. Class certification has not yet been sought.  The present pleadings consist of the FCC, filed on September 30, 2005. Attached to the FCC, as exhibits, and incorporated therein, under ¶127, are a series of exhibits, with additional allegations as to many of the defendants.  The substance of these exhibits were previously in the RICO Statements and More Definite Statements/Additional Allegations (MDS).  Such RICO Statements were filed in accordance with the Plaintiff's understanding of CMO 2, ¶ 14, and, in many cases, including as to the Defendant herein, by way of stipulation.  The MDS' were filed pursuant to CMO 2, ¶ 13, as was the FCC.

1

11, 2001, by way of this Motion.  The causes of action in the complaint are adequately pled and presented in accordance with the requirements of Rule 8(a) and the applicable law.

## FACTS

It is alleged that the Defendants participated in a world-wide conspiracy which culminated, for purposes of this case, in the attacks of September 11, 2001, causing massive death and destruction in New York, Pennsylvania, and the Washington, D.C. area. To seek monetary compensation for the wrongs committed by the conspirators, in the form of actual and punitive damages, the O'Neill Plaintiffs have brought this action in a United States Court.  The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the Defendants and others who have conspired for many years to attack the United States, to destroy American property,  and murder innocent United States' citizens. Defendants supported, conspired, aided and abetted, and sponsored those who planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. FCC ¶¶ 1, 2; See Appendix I, hereof Sec. 1-34, 50-61. [2]

In essence, as described at length in the pleadings, and discussed in part below, the Defendants conspired with Osama Bin Laden ("Bin Laden"), al Qaida, foreign states, and other defendants to raise, launder, transfer, distribute, and hide funds for Bin Laden and the rest of the Enterprise, to discourage law enforcement personnel from scrutinizing the Enterprise's activities, to provide material support in the form of funding, favorable publicity and intimidation of opponents of the Enterprise in order to promote the financing and execution of terrorist operations including, but not limited to, the September 11th attacks. See, e.g., FCC ¶¶ 22, 23, 25, 44, 144.  Exhibit H ¶¶ 35-48.

---

[2] Attached hereto and incorporated herein as Appendix I is a table summarizing the factual allegations contained in the pleadings relevant to the Defendants and the issues raised herein.

Defendants' concert of action and conspiracy to support and promote Bin Laden and al

Qaida were a proximate cause of the September 11, 2001 terrorist attacks that killed and injured

the Plaintiffs, and damaged and/or destroyed their property. FCC ¶¶140, 144, 170, 173. As a

result, Plaintiffs have suffered damages as set forth in the pleadings. FCC ¶¶146, 179-80; Exhibit

H ¶¶ 14-15, 62-9.

## ARGUMENT

### I.   GENERAL STANDARDS RELATIVE TO THE SUFFICIENCY OF THE PLEADINGS - THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Plaintiffs have sufficiently alleged claims under federal causes of action (ATA, ATCA,

and RICO)  and the common law.[3]  These claims should not be dismissed.

### A.  A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT.

Defendants moves to dismiss the Complaint pursuant to Fed. R. Civ. Proc. 12(b)(6), for

failure to state a claim upon which relief could be granted.  Such a motion must be denied unless

"it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*,

360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per

curiam*).  The Court's role is "not to assay the weight of the evidence which might be offered in

support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  *Geisler

v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  Plaintiffs are not required to prove their case at

the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence

---

[3] The cause of action under the TVPA (count 1), 28 U.S.C. § 1350, against this defendant, is not being pursued at this time.  Plaintiffs reserve the right to replead this claim against CAIR should additional information become available in discovery demonstrating it acted "under actual or apparent authority or color of law, of any foreign nation" in connection with its support of Al Qaeda.

should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on Rule 12(b)(6) motion "is not whether a plaintiff is likely to likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Hance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

In determining whether Plaintiffs could ultimately prevail, the Court must accept as true the facts alleged in the pleadings and draw all reasonable inferences in Plaintiffs' favor. *Wynder*, 360 F.3d at 78; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage. Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001). The issue in a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. Proc. 8(a), which are extremely permissive. *Swierkiewicz,* 534 U.S. at 512-13 (2002) . Indeed, Rule 8(a)(2) provides that a complaint only need include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the Defendants fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id*. at 512 (quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), *appeal dismissed after remand*, 2001 WL 936257 (D.C. Cir. July 12, 2001) (allegation "I was turned down for a job because of my race" would be sufficient to survive a Rule 12(b)(6) motion). Furthermore, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. Proc. 9(b), a federal court is prohibited from imposing more demanding requirements than those

proscribed under Rule 8(a).  *Leatherman*, 507 U.S. at 168-69 (1993); *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 106-7 (2d Cir. 2005).

Several recent Second Circuit cases underscore and re-affirm these cardinal principles. [4] In *Phelps*, the Court of Appeals held that a district court "may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." *Id.* at 186-87.  The Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations.  *Phelps*, 308 F.3d at 187.

In *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied.  Quoting the unanimous Supreme Court ruling in *Swierkiewiez*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13 ).

Finally, in *Twombly*, the Court of Appeal reiterated that Rule 8(a) requires only (i) a short and plain statement of the grounds of the court's jurisdiction; (ii) a short and plain statement of the claim showing that the pleader is entitled to relief; and (iii) a demand for judgment for the relief which the pleader seeks.  *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 106-7 (2d Cir. 2005).  All that is required is that the pleading provide a Defendants with "fair notice" of the claim and the grounds upon which it rests; it is not meant to impose a great burden upon the

---

[4] Defendant, in his motion, argues for a heightened standard of pleading, and the requirement of factual pleadings. See, e.g.,  Mem. 1-2.

plaintiff, or require the pleading of facts except in exceptional circumstances.  *Twombly*, 425 F. 3d at 106-7, 106-113 (heightened pleading standard for fraud and mistake only; not in anti-trust cases); Fed. R. Civ. Proc. 9(b).[5]

Defendant, in its Memorandum of Law, appears to confuse these notice pleading[6] standards with a review of a complaint upon a motion for summary judgment.  This is not a sufficiency of the fact; rather, it is a review of the sufficiency of the pleadings.  Not only do the Rules differentiate the approach, but, obviously, no discovery has taken place.  Thus, Defendant's factual allegations contained within their Memorandum must play no role.  Moreover, such 'facts' are mere, un-sworn, untested, allegations.

Defendant does not, and can not, claim that it did not receive fair notice.  Defendant clearly knows what has been alleged.  Because the pleadings provide fair notice, there is no basis for a dismissal at this time.

### B.  PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FIRST AMENDENT.[7]

Defendant argues that Plaintiffs' claims infringe on CAIR's freedoms of speech and association, relying on *NAACP v. Claiborne Hardware Co.,* 458 U.S. 866 (1982) and *Brandenburg v. Ohio*, 395 U.S. 444 (1969).  Defendants ignore the extensive jurisprudence on the exceptions to these principals, including *United States v. Rowlee II*, 899 F.2d 1275, 1278 (2d

---

[5] Notably, in *Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005), the District Court rejected the Defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here.  In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations.  Id. at *11-23.  Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent."  Id. at *42.  The *Linde* court likewise rejected the Defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, Defendants attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  *Id.* at *50.

[6] See Deft. Mem. At pp. 2-3, 9.

[7] This was raised in Defendant's Memorandum at pp 11-13.

6

Cir. 1990) ("It rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute") and *United States ex rel. Epton v. Nenna*, 446 F.2d 363 (2d Cir. 1971) (upholding defendant's conviction for conspiracy to riot even where the overt acts alleged in the indictment were all constitutionally protected speech).

In *Epton*, the Second Circuit reasoned that, when a defendant is convicted of conspiracy to commit an unlawful act, "it is not the 'speech' that is made criminal, but rather the agreement, and whether the overt act is constitutionally protected speech would be irrelevant." *Id.* at 366-7.

Likewise, Defendant's reliance on *Brandenburg* is unavailing;  as noted recently in *United States. v. Sattar*, 2005 U.S. Dist. LEXIS 25079, at *63 (S.D.N.Y. Oct 24, 2005), "*Brandenburg* analysis does not apply to unlawful speech-acts such as conspiracy or aiding and abetting.  *United States v. Bell*, 414 F.3d 474, 482 n.8 (3d Cir. 2005)."

In *United States v. Rahman,* 189 F.3d 88 (2d Cir 1999), the Court of Appeals affirmed the conviction of the "Blind Sheik" Omar Abdel Rahman for the first World Trade Center bombing against his arguments that his conviction was based on his religious and political point of view as expressed in his writings and sermons, commenting that:

> "It remains fundamental that while the state may not criminalize the expression of views--even including the view that violent overthrow of the government is desirable--it may nonetheless outlaw encouragement, inducement, or conspiracy to take violent action… freedom of speech and of religion do not extend so far as to bar prosecution of one who uses a public speech or a religious ministry to commit crimes. Numerous crimes under the federal criminal code are, or can be, committed by speech alone…. Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching." 189 F.3d at 115, 117.

The question then is whether, in this case, Plaintiff has adequately alleged a conspiracy to

take violent action.[8]

Defendants ignore a host of cases holding defendants civilly or criminally liable for providing spoken or written support to terrorist organizations and activities, for example:

In *Boim v. Quranic Literacy Inst.,* 291 F.3d 1000 (7th Cir. 2002), the Court held that the Boims could succeed in their 18 U.S.C. §2333 claims against the organizational defendants by proving that they "provided material support to terrorist organizations." On the question of whether 18 U.S.C. §2333 is broad enough to cover the conduct of persons who, like CAIR, did not themselves commit the violent acts complained of, the court held that "aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of section 2333," because "the only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Id.* at 1021. As to the First Amendment issue, the Court held that civil liability for supporting a foreign terrorist organization does not offend the First Amendment so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping.  *Id.,* at 1028. The court held that this did not, as the defendants argued, amount to

---

[8]  Obviously the standards are far higher if the Government directly takes action, as opposed to a private litigant; certainly, too, the standards for First Amendment protection must be higher in a criminal case, as opposed to a civil matter.  We must also balance the Plaintiffs' due process rights.

Criminal statutes are given additional scrutiny because they impose a "prior restraint" that may have a "chilling effect" on free speech. For example, in *Humanitarian Law Project v. Gonzales,* 380 F. Supp. 2d 1334, 1150-52 (U.S.D.C. C. D. Calif., July 25, 2005), the Court concluded that blanket prohibitions on providing "training", "service", and "expert advice or assistance" to terrorist organizations were impermissibly vague. Here, in contrast, the Court is not asked to determine in advance whether general categories, such as "advocacy", "civil rights" or "outreach" in support of terrorist enterprises are grounds for civil liability.  Rather the Court is asked to hold Defendants accountable for specific acts in support of a terror campaign, which would "chill", if anything, only that specific behavior and the terror campaign, and not speech or advocacy generally.  Several criminal convictions for providing "material support" to FTO's have been sustained against First Amendment vagueness challenges where the defendant's conduct was not within the arguably vague categories. *See United States v. Hammoud*, 381 F.3d 316, 330 (4th Cir. 2004); *United States v. Rahman, supra*, at 116.

imposing "guilt by association" in violation of the First Amendment: "that Hamas may also engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if [the Defendants] knew about Hamas' illegal operations, and intended to help Hamas accomplish those illegal goals when they contributed money to the organization." *Id.* at 1024 (citing *NAACP v. Claiborne Hardware Co., supra,* and other leading cases). The court also rejected defendants' argument that liability could not be imposed under §2333 if, as contended, the defendants provided support to Hamas with the sole intent of contributing to the organization's humanitarian and charitable programs, rather than its military or terrorist factions: "terrorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress thus was compelled to attach liability to all donations to foreign terrorist organizations." *Id.* at 1027. Significantly, noting that the case was before it on a Motion to Dismiss, the court dismissed the defendants' self-serving claim to have been supporting only the humanitarian mission of Hamas as a fact question that could not be resolved at this early stage of the litigation. *Id.,* at 1025.[9]

In *Sattar,* attorney Lynne Stewart was convicted for providing "material support" to terrorism for communicating messages to and from co-defendant Omar Abdel Rahman. Her conviction was sustained, under Criminal Rule 29, against her arguments that: 1) Her conduct was protected speech, or was the protected speech of Rahman. *Id.* at *37; 2) That carrying messages could not constitute "material support". *Id.* at 41' and 3) That she did not provide "personnel", the Court holding that, by carrying messages, she was supporting Rahman in his position as leader of the conspiracy. *Id.* at 57. The Court found that the fact that Abdel Rahman

---

[9] In the latest reported phase of this litigation, partial summary judgment was granted against the defendants for aiding and abetting a murder committed by Hamas because they had, among other things, contributed money and, as CAIR is alleged to have done, encouraged others to do so, published and distributed pro-Hamas documents and held annual pro-Hamas conferences. *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885 (N.D. Ill. 2004).

participated in the conspiracy by his words does not make his participation constitutionally protected. The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech.  Id. at 59-60.  See, *United States v. Rahman*, 1994 U.S. Dist. LEXIS 10151, S3 93 Cr. 181, 1994 WL 388927, at *1-2 (S.D.N.Y. July 22, 1994) (internal citation omitted).

In United States v. Kahn, 309 F. Supp. 2d 789 (E.D. Va. 2004) a group of Muslim activists was convicted of a conspiracy, inter alia, to provide material support to a terrorist organization based on their organization and operation of a series of paintball games in the Virginia woods.  The Court described the elements of the accused conspiracy as follows: "1) a conspiracy;  2) to knowingly provide material support or resources to a foreign terrorist organization;  3) within the United States or subject to the jurisdiction of the United States", citing 18 U.S.C. § 2339B.10  In Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000), the Ninth Circuit held that a Federal statute prohibiting the provision of "material support" to terrorist organizations did not violate the First Amendment freedoms of speech or expression, noting that pure advocacy alone was not included within the scope of "material support".   Significantly, in reaching its conclusion, the Ninth Circuit held that "intermediate scrutiny" applied because the restrictions were content-neutral. [11]

In *Planned Parenthood v. American Coalition of Life Activists,* 290 F.3d 1058, 1079-82

---

[10] See also, *United States v. Marzook*, 2005 U.S. Dist. LEXIS 28835 (ND Ill., November 17, 2005),where the defendant was indicted for RICO violations for allegedly transferring large sums of money on behalf of Hamas, debriefing a co-conspirator, collecting and disseminating various documents, and participating in phone conversations related to Hamas activity. The court determined that the indictment did not infringe defendant's First Amendment rights of freedom of speech and association because racketeering *conduct* was not protected under the First Amendment. *Id.,* at *23-*28.

11 In a later phase of that same litigation, the Court of Appeals held that there is sufficient "mens rea" to support a conviction if the Defendant provided material support knowing of the organization's designation as a terrorist organization or of the unlawful activities that caused it to be so designated, and a statute criminalizing such support does not violate either the Fifth Amendment right to Due Process or the First Amendment rights of free speech and association. *Humanitarian Law Project v. United States Dept. of Justice*, 352 F.3d 382 (9th Cir.2003).

(9th Cir. 2002) (the "Nuremburg Files" case), the Ninth Circuit held, in an en banc decision, that threats and intimidation may be actionable without violating the First Amendment, and that there is no freedom of association for the purpose of making such threats and intimidation.[12]

Defendants argue that the Complaint "defames" CAIR with allegations that lack "any legal merit whatsoever".  Def. Memo at 4. To the contrary, the extensive allegations are both relevant and admissible at trial.  As the Second Circuit said in *Rahman*, the Government was free to demonstrate Rahman's resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States, and thus could place in evidence many instances of Rahman's writings and speeches in which Rahman expressed his opinions within the protection of the First Amendment.  *Rahman*, 189 F.3d at 118.  Similarly, in disposing of  summary judgment motions in *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, the Magistrate Judge, applying the Seventh Circuit's ruling that the defendants could be held liable without violating the First Amendment if the defendants knew about Hamas' illegal operations, and intended to help Hamas accomplish those illegal goals (291 F.3d at 1024), accepted as evidence a wide variety of public documents (at 915), Arabic Language news articles (at 915), bank documents (at 916), foreign government documents (at 917), and wire transfer reports and State Department cables (at 920) as demonstrating the defendants' association with Hamas, and drew adverse inferences from those documents and from the defendants' actions, such as sponsoring speakers favoring Hamas and their failure to explicitly condemn suicide bombing (at 912).

---

[12] To further guard against a "chilling effect", this Court has the power to construe statutes narrowly to avoid unnecessary constitutional conflict, to set guidelines for proof and evidence and to issue jury instructions to mitigate any concerns over the unnecessary encroachment on free speech or association.  See, e.g., *Humanitarian Law Project v. United States Dept. of Justice*, 352 F.3d 382 (statute construed to have an element of *mens rea* to preserve constitutionality).  As we are presently at the pleading stage, this need not be addressed, at this time.

For purposes of pleading, the assertion of Plaintiffs' due process rights are not precluded by any bona fide First Amendment claim.

### C.  THE PLAINTIFFS PROPERLY FILED THEIR RICO STATEMENT AND MORE DEFINITE STATEMENT AND FIRST CONSOLIDATED COMPLAINT.

In their Memorandum, Defendant curiously attacks the use of the RICO Statement and the More Definite Statement ("MDS").[13]  The RICO Statement was properly filed pursuant to a stipulation entered into by the Defendant; the MDS/Additional Allegations was properly filed in accordance with CMO 2, Para. 13.[14]  The case law and the CMO are clear that they are to be treated as pleadings.  They must be considered in evaluating the sufficiency of the pleadings.

Following the service on the Defendant, the parties entered into a stipulation, including the timing of the RICO Statement.  Defendant in its motion contests the use of same.  In light of the stipulation, the argument is without merit.  Moreover, judicial precedent uniformly hold that RICO Statements should be treated as part of the pleadings. See, e.g., *McLaughlin v. Anderson,* 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.,* 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001); *Dempsey v. Sanders,* 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999); *A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).[15]

---

[13] CAIR raised this at pp 18-20. For a further discussion of the More Definite Statement issue, as well as the RICO Statement issue,  the Court's attention is directed towards the Plaintiff's response in the *Iraq* case to the Motion to Dismiss filed by Taha Al' Alwani, and their response to the Motion for Sanctions brought by Dr. Alwani.  Unlike, however, the *Alwani* situation, the Defendant herein stipulated to the filing of the RICO Statement.

[14] The allegations contained within the RICO Statement were incorporated both into the MDS filed on September 30, 2005 ("MDS"), which was then incorporated into Exhibit H of the FCC, served and filed shortly after the docketing of the MDS.

[15]The *Al Baraka*  case, as set forth in Goldman's declaration in Opposition to the Motion for Sanctions relative to Taha Al Alwani was, filed on March 10, 2001, and was apparently not listed on the cases which were to participate in the formation of CMO 2.  The undersigned, then serving as local counsel, did not receive notice of such conferences, and only certain of the communications among the parties, and so notified the Court, as set forth therein.  Mr. Ambush apparently received some of the notifications.  In any event, when the Court entered its  Order

Defendant further contends that the MDS filed on or about September 30, 2005  was improper, as they purported did not comport with the Federal Rules of Civil Procedure. Defendant is correct when it claims that it never moved, under 12(e) for a More Definite Statement.   However, CMO 2, para. 13, clearly permitted the filing of "…more definite statements and/or additional allegations against existing Defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to the previously-filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint."   Ultimately, this and the substance of the other MDS were included in the First Consolidated Complaint filed on September 30, 2005.[16] They must be considered.

## II.   THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR FEDERAL CAUSES OF ACTION.

### A.  THE PLAINTIFFS ADEQUATELY ALLEGE THE DEFENDANT'S ROLE AS A MEMBER OF THE CONSPIRACY.

As set forth the pleadings, the events of 9/11, was the product of a world-wide conspiracy in which the Defendants is alleged to have participated.  E.g., FCC ¶¶ 1, 6-10, 22-5, 144.  By joining a conspiracy,[17] knowing that acts in furtherance of the conspiracy have taken place or will take place within the United States, the Defendants assumes liability, for both jurisdictional and substantive purposes.  *See, e.g., Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574,

---

relative to RICO Statements as to *Federal* only and relegated the other cases to the Individual Rules, *O'Neill* then accordingly would have been out of time, as more than twenty (20) days had past (the due date for RICO Statements) since the filing of the pleadings.  Certainly this Court did not intend to preclude the Plaintiff from effectively pursuing a RICO claim. *Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys.,* 271 F. 3d 374, 387 (2d Cir. 2001); *Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101, 1107-1109 (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004); *Mendoza v. Zirkle Fruit Co.,* 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000).  However, in light of the stipulation, the Court need not reach this issue.  In any event, the Plaintiffs have included all of the allegations set forth on the Court's website relative to RICO Statements in the MDS and later in the FCC.

[16] For a discussion of the FCC, see Plaintiff's memoranda of law in response to the Mot. To Dism. of Taha Al 'Alwani, and the Mot. For Sanctions filed by Dr. Alwani.

[17] The Second Circuit has held that claims of conspiracy in an anti-trust prosecution need not be pled by way of evidentiary allegations. The complaint merely needs to avoid the extremes of 'bare bones' or 'implausibility.' *Twombly*, 2005 U.S. App. LEXIS at *27-34.

581-2 (E.D.N.Y. 1998); *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215, 220-222 & n.6 (S.D.N.Y. 1992); *Singer v. Bell*, 585 F. Supp. 300, 302-3 (S.D.N.Y. 1984); [18] *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp.2d 431, 446 (S.D.N.Y. 2000).  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial  Corp*, 527 F.2d 87, 93 (2d Cir. 1975).

The prima facie showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt at in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital*, 778 F. Supp. at 1267.  This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy, plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 805 (S.D.N.Y. 2005) (citations omitted).

### 1.  THE O'NEILL PLEADINGS ADEQUATELY DEMONSTRATE THE CONSPIRACY AND THE DEFENDANT'S ROLE THEREIN.

The Defendants was a part of a conspiracy to attack the United States.  Fairly read, the pleadings allege that the Defendants knowingly assisted in the attempting to manipulate US legal systems, silence critics and analysts, hampering governmental anti-terrorism efforts, engaging in

---

[18] The district court notes that a conspiracy can rarely be proved by direct evidence and usually is established by circumstantial evidence and the totality of conduct of the parties and the reasonable inferences which can be drawn therefrom; mere speculation and conjecture are not enough. *Singer,* 585 F. Supp. at 303-4.

propaganda and otherwise provide material support in furtherance of the conspiracy.[19]
Moreover, al Qaida's ambition to attack the United States, and New York in particular, was well
known for many years prior to the September 11th Attacks.  Thus, the potential effects in the
United States of assisting al Qaida were undeniably foreseeable to that terrorist organization's
sponsors and supporters, including the Defendants.  Further, the Plaintiffs have alleged that the
September 11th Attack was a direct, intended and foreseeable product of the material support
provided by the Defendants and al Qaida's other sponsors and facilitators. FCC ¶163.  Indeed,
given that al Qaida had repeatedly declared that its primary objective was to conduct terrorist
attacks against the United States, it is self evident that the entities and people who chose to
knowingly assist, aid or sponsor al Qaida did so in order to assist that terrorist organization in
mounting successful attacks, and that the individuals chosen to carry out such attacks, and that
the individuals chosen to carry out such attacks act "for the benefit" and "on behalf" of all of the
organization's members and sponsors.  When read in a light most favorable to the Plaintiffs, the
allegations of the pleadings give rise to a reasonable inference that the Defendants was a member
of al Qaida's conspiracy to attack America.  For example, as demonstrated at length in Appendix
I, the activities described in FCC 86-8, and Exhibit H 20-28, in particular (see generally App. 1,
para 35-49) were engaged in[20] on behalf of the conspiracy, including, without limitation, on

---

[19] See, FCC 86-88; see generally Appendix I. Information warfare and propaganda is a critical element in asymmetrical warfare.  See, e.g., Joseph C. Cyrulik, *Asymmetric Warfare and the Threat to the American Homeland*,  Association of the US Army, Institute of Land Warfare (Nov. 1999), at page 4, http://www.ausa.org/PDFdocs/lpe99-8.pdf; William J. Hartman, *Globalization and Asymmetrical Warfare*, Air Command and Staff College, Air University (4/2002), at page 29, http://www.au.af.mil/au/awc/awcgate/acsc/02-053.pdf.  This obviously, will be a question of proof, by way of experts, for both summary judgment and trial purposes.

[20] Defendant complains that they were discussed in approximately 4 of the paragraphs of the Complaint.  However, under notice pleading practice, that is all that is required.  Moreover, it ignored that such 4 paragraphs were supplemented by the materials contained within the RICO Statement/MDS/Exhibit to the FCC.  At page 6, it complains that the Plaintiffs failed to allege facts in support of its allegations.  To the contrary, certain facts were, in alleged; however, more to the point, the Plaintiffs respectfully submit that under Rule 8(a), fact pleading is not necessary.

behalf of al Qaida,  and that the hijackings, causing the death and destruction on September 11, were the culmination of a conspiracy among the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks.   FCC ¶¶2, 22, 25.   The attacks of September 11, 2001 were not isolated incidents, but rather the coordinated effort of a terrorist organization, after years of planning, and utilizing an extensive network of support and aid, by various individuals, including the Defendants herein. FCC ¶2.   The Defendants, who conspired with each other, knew or should have known that their actions in furtherance of a conspiracy to commit international terrorist acts against the United States and its nationals, including the events of September 11, would result in the murder of innocent persons. FCC ¶¶ 151, 152.

### B.  KNOWLEDGE AND INTENT, AS WELL AS CAUSATION MAY BE PLEADED GENERALLY.

 Defendant argues (Mem. pp. 6-9) that Plaintiffs have failed to sufficiently plead detailed facts to substantiate claims that they acted knowingly, as well as the issue of causation.  The Plaintiffs need not plead facts; the pleadings, as demonstrated in App. 1, more than adequately plead knowledge, intent and causation, as outlined above, in Argument I-A.

In its decisions in the post Swierkiewicz era, the Second Circuit has consistently and uniformly the notice pleading standards to hold that a plaintiff is not required to plead particularized facts regarding a defendant's state of mind.  For example, in Phelps, the Second Circuit reversed a district court ruling which had dismissed a complaint for failure to plead specific facts in support of allegations of the defendant's knowledge, holding instead that such a heightened pleading standard was "unwarranted" under Fed. R. Civ. P. 8(a).  Phelps, 308 F.3d at 186.  "A plaintiff's allegation of knowledge is itself a particularized factual allegation, which he will have the opportunity to demonstrate at the appropriate time 'in the usual ways'."  Id. at 187

n. 6 (<u>citing Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994)). <u>Pelman v. McDonald's Corp.</u>, 396 F.3d 508 (2d Cir. 2005),[21] <u>Linde, et al v. Arab Bank, PLC</u>, 2005 U.S. Dist. Lexis 18864 (E.D. N.Y. Sept. 2, 2005). See, also, *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (the D.C. Circuit employed nearly identical reasoning to that of <u>Phelps</u> in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge).

> a)   <u>The Plaintiffs Have Adequately Alleged the Necessary Causal Link</u>.

Defendant claims that Plaintiffs have failed to plead a sufficient causal connection between its actions and the September 11 terrorist attacks to sustain a claim under the ATA, or any other cause of action. In making this argument, CAIR completely ignores Congress' express direction that the ATA is intended to "impose.. liability *at any point along the causal chain* of terrorism." S. Rep. No. 102-342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 *22. (Emphasis added.)  In making this argument, CAIR fundamentally misapprehends the elements of plaintiffs' conspiracy theory and ignored the allegations of the FCC.  Moreover, under New York law, "those who aid or abet or conspire in tortuous conduct are jointly and severally liable with other participants in the tortuous conduct, regardless of the degree of their participation pr culpability in the overall scheme." *Lumbard v. Maglia, Inc*., 621 F. Supp. 1529 (S.D.N.Y. 1985).[22]

---

[21] In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id*. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a)." *Id*. at 512.

[22] A causation analysis in a civil conspiracy action focuses solely on whether the plaintiff's injuries were caused by "an unlawful overt act performed by *one of the parties* to the agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)(emphasis added). Pursuant to this standard, CAIR's participation in the conspiracy to commit terrorist attacks against the United States, and aiding and abetting of that terrorist organization, ties it inextricably to the Attack.  As Plaintiffs' injuries are indisputably the direct result of that Attack, Plaintiffs have properly and adequately alleged causation. Accordingly, CAIR's causation-based arguments must be rejected.  It is sufficient that Plaintiffs plead, as they have, that this Defendant knowingly provided material support to al Qaida and/or aided and abetted al Qaida in its terrorist agenda. Moreover, the law is clear that the assistance provided by CAIR need not have been used directly in the actual September 11 attacks. Under the ATA, defendant is liable if they provided any

In keeping with the foregoing principles, as discussed in prior Plaintiffs' Memoranda, including *Banca Del Gottardo*, which are incorporated herein, courts repeatedly have held that victims of terrorism are entitled to recover from the knowing facilitators and sponsors of the terrorist organization responsible for carrying out the plot that produced their injuries, and need not demonstrate any direct involvement by the defendant in that specific plot. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998); *Boim v. Quranic Literact Inst.*, 291 F.3d 1000, 1023 (7th Cir. 2002), (plaintiffs who are victims of terrorism need show only that the defendant knew of the terrorist organization's illegal activities, desired to help those activities, and engaged in some affirmative act in support thereof); *Kilburn v. Socialist People's Libyan Arab Jamhiriya*, 376 F.3d1123, 1130 (D.C. Cir. 2004) (the 'but for' standard of causation improper)..

Here, the FCC alleges that Defendant provided "material support" to al Qaida in its terrorist enterprise, as described above. Under *Boim*, these allegations state claims against CAIR for violations of the Anti-Terrorism Act.[23,24]

---

material support to al Qaida with knowledge of its terrorist agenda or if they aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).

[23] While unnecessary to establish liability over CAIR given the conspiracy theory alleged by Plaintiffs, it should be noted that the FCC does specifically allege that the Attack was only possible because of the support of numerous individuals and organizations. According to the FCC, these individuals and organizations provided AL QAIDA with the means to recruit, train and employ United States citizens and destroy U.S. Landmarks on September 11, 2001. FCC ¶¶1, 22-3, 144, 157-9, 16, 163, 167. CAIR conveniently ignores these and similar allegations of the FCC in its motion to dismiss. For purposes of the present motion, however, the allegations of the FCC must be accepted as true. The FCC also sufficiently alleges that the Attack was a foreseeable product of the conspiracy in which CAIR knowingly participated, and of CAIR's aiding and abetting of al Qaida. Indeed, the FCC unambiguously asserts that the Attack was a direct, intended and foreseeable product of that conspiracy (FCC ¶¶160, 163, 167). While at this stage it is not necessary for the plaintiffs to provide evidence of its allegations, it should be noted that al Qaida had unequivocally declared, through statements and actions, that the primary objective of its global conspiracy was to attack the United States and kill its citizens. For example, in 1996 and 1998, al Qaida issued fatwas, or religious decrees, authorizing attacks against the United States and its citizens. In the 1998 fatwas. Osama bin Laden asserted that it was the duty of all Muslims to kill United States citizens, civilian or military, "in any country in which it is possible to do it . . . ".During the years before the September 11 Attack, al Qaida followed though on its threats, plotting and carrying out a series of calculated and increasingly violent attacks against U.S. interests, including: the first World Trade Center bombing in 1993; the simultaneous bombings of he U.S. Embassies in Kenya and Tanzania

### C. PLAINTIFFS OTHERWISE PROPERLY ALLEGE A CAUSE OF ACTION UNDER THE ATA.

Defendant CAIR argues that Plaintiffs failed to adequately allege that it knowingly provided material support to terrorist activities, or that it committed acts of international terrorism sufficient to support a cause of action under the ATA. Its argument is without merit.

The ATA permits a private cause of action for inquiries resulting from international terrorism. There can be no doubt that the acts of September 11 were acts of "international terrorism" within the meaning of §2333 and CAIR does not meaningfully contend otherwise.

The Seventh Circuit Court of Appeals recently interpreted these provisions, as discussed, above. *Boim v. Quranic Literacy Institute and Holy Land Foundation For Relief and Development*, 291 F.3d 1000, 1009 (7th Cir. 2002). The court, recognized two theories of liabilities a under which the plaintiffs' complaint could be sustained under § 2333.

Under the ATA, a defendant is liable if it provided any material support to al Qaida with knowledge of its terrorist agenda or if it aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct. *See Boim*, 291 F.3d at 1021 ("[I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence."). A plaintiff may recovered under § 2333 if he can prove that the defendants violated 18 U.S.C. §§ 2339B, 2339A, and 2339B, which criminalize the provision of "material support or resources" to terrorist and foreign terrorist organizations, respectively. *Boim*, 291 F.3d at 1012-13. The second theory of liability endorsed by the Seventh

---

in 1998; the Millennium plot to bomb the Los Angeles International Airport; the plot to attack a U.S. Naval ship in Yemen in January of 2000; and the actual suicide attack on the USS Cole in October of 2000. As the conduct of the terrorist acts against the United States and its citizens was, for many years prior to September 11, 2001, al Qaida's declared objective, it is inconceivable to suggest that the Attack was unforeseeable to any party who knowingly provided material support and resources to al Qaida, as CAIR is alleged to have done.

[24] Plaintiffs respectfully refer the Court to the more detailed discussions of the causation requirements of the ATA in the memoranda of law submitted by Co-Plaintiffs in opposition to dismiss.

Circuit permits recovery under § 2333 where the plaintiffs have proven that the defendants have aided and abetted an act of international terrorism. *Boim*, 291 F.3d at 1021. The Ninth Circuit held similarly in *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000), and flatly rejected the argument that specific intent to aid an organization's illegal activities must be proven before liability would attach. *Id*. at 1134.

In the instant case, the Plaintiffs have sufficiently alleged a cause of action 18 U.S.C. § 2333 against Defendant CAIR. In this regard the FCC repeatedly  alleged, for example, in FCC ¶¶ 22, 57-8, 59-60, 76, 78-9, 81-5, Exhibit H ¶¶ 19-21-7 that Defendant CAIR was a co-conspirator who aided and abetted al Qaida and others. See generally App. I, ¶¶ 1-34 (pleading references to a description of the conspiracy, in general); ¶¶ 50-61 (RICO in general and in specific; other aspects of the conspiracy); ¶¶ 35-49 (the Defendant's role);    ¶¶ 62-69 (consequences of the conspiracy).

### D.  THE COMPLAINT STATES A CLAIM AGAINST CAIR UNDER THE ATCA.

CAIR offers several arguments in support of its contention that the Plaintiff fails to state a claim under the ATCA.[25] Plaintiffs, in general, and specifically the *O'Neill* Plaintiffs have addressed this issue a number of times in other Memoranda,[26] and do not desire to burden the Court with a repetition of those arguments.  We are, therefore, incorporating those arguments herein, and merely summarizing the applicable principals.  For the reasons set forth therein, none of CAIR's arguments prevail. [27,28]

---

[25] Count Two, which alleges claims under the Alien Tort Claims Act, is brought on behalf of "plaintiffs who are estates, survivors, and heirs of non-United States citizens . . ." FCC at p. 5.

[26] See, e.g., Plaintiffs' Mem. of Law in Opp. To Mot. To Dism. of *Banca Del Gottardo*.

[27] The Court's attention is directed to the numerous briefs of the co-plaintiffs as to the various theories as to how the 9/11 attacks violated customary law, which are incorporated herein, as if set forth in full. For further authority, *see*, e.g., *Islamic Salvation Front*, 993 F. Supp. at 7-8;  Restatement (Third) of the Foreign Relations Law of the United States (1987) § 404 (1987); see *Karadzic*, 70 F.3d at 240;   U.N. Security Council Resolution 1373 (September 28, 2001); the Statute of the International Criminal Tribunal for Yugoslavia (ICTY Statute), Art. 5, which was adopted

### E.  PLAINTIFFS PROPERLY STATE RICO CLAIMS AGAINST CAIR.

a)  <u>Plaintiffs Have Standing To Assert RICO Claims</u>.

CAIR challenges the standing of the Plaintiffs to pursue RICO claims, arguing that these Plaintiffs lack standing as their injuries are personal injuries.  CAIR's argument is flawed.  The Plaintiffs, in the FCC, specifically alleged that the Defendant intended to cause damage to business and property, and did in fact intend to cause damage to business and property.  *See* FCC ¶¶ 176, 178-80.  The Plaintiffs further detailed certain elements of the damages: "including a. Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of prospective inheritance …."  *See* FCC ¶ 146.  Furthermore, in the More Definite Statement (Exhibit "H" incorporated pursuant to FCC ¶ 127) and RICO Statement filed in connection with the Defendants, the  Plaintiffs elaborated on the various factual elements of such damages, which we submit are not required for Rule 8(f) notice pleadings, to include direct pecuniary losses, past and future wage losses and profits, losses of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  *See, e.g.*, FCC ¶146, 178, Exhibit H ¶¶ 14-15.[29,  30]   Accordingly, such allegations have not only met, but exceeded the pleading threshold set in *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (e.g., damages to tangible personal property), and the  Plaintiffs have established standing.

b)  <u>The Plaintiffs Have Properly Stated RICO Claims</u>.

---

by the U.N. Security Council in Resolution No. 955, U.N. Doc. S/INF/50 (1994);  *Presbyterian Church of Sudan v. Talisman Energy*, 244 F. Supp.2d 289 (S.D.N.Y.2003); the Rome Statute of the International Criminal Court (ICC Statute), art. 7, July 1998, UN Doc. A/CONF. 183/9.

[28] This was specifically pled in FCC ¶¶ 139, 152, 169, 172.

[29] For a more extensive discussion of this issue, *see*  Plaintiffs' Mem. of Law In Opp. to Al Haramain Islamic Foundation, Inc.'s Motion to Dismiss Pertaining to Certain RICO Issues Only," Docket No. 810, pp. 13-17.

[30] Alternatively, the Plaintiffs seek leave to amend to specifically provide such factual detail as to such losses.

Defendant also contends that the Plaintiffs have failed to properly plead their RICO claims.  CAIR is wrong.   Plaintiffs' complaint and RICO Statement assert RICO claims against CAIR pursuant to 18 U.S.C. §§ 1962(b), (c) and (d).  The enterprise – alternatively, Radical Muslim Terrorism, al Qaida, and/or the International Islamic Front For the Jihad Against Jews and Crusaders (Exhibit F, ¶6)- - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure.  *See* Exhibit H ¶¶ 6, 7-10.   Its well documented purpose is to perpetrate acts of terrorism.  Thus, Plaintiffs have sufficiently pled that al Qaida is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' similarly allege sufficient involvement by CAIR in the enterprise to sustain claims under both §§ 1962(c), as alleged in ¶12 of Exhibit H,  and 1962(d), as alleged in ¶ 13 of Exhibit H.  Although a plaintiff asserting a civil claim under § 1962(c)  must allege that the defendant participated in the operation or management of the enterprise, *see Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp.2d 158, 164 (S.D.N.Y. 2003), such "discretionary authority" has been described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear."  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998).  Moreover, as a general rule, it may not be "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise."  *Friedman v. Hartmann*, 91

Civ 1523 (PKL), 1994 U.S. Dist. LEXIS 9727, *4 (S.D.N.Y. July 15, 1994). With respect to a RICO conspiracy under § 1962(d), the requirements "are less demanding." *Baisch*, 346 F.3d at 376. All that is required is that the conspirators "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)). Thus, "[a]lthough parties who do not control the organization cannot be liable under § 1962(c) , they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

These allegations are more than enough to support a reasonable inference that, as alleged in the Complaints, Defendant CAIR "supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks". *See generally*, Appendix I. CAIR had such intentions and goals. Plaintiffs have, accordingly, met their pleading burden in relation to their claims under §§ 1962(c) and 1962(d), particularly given the fact that Plaintiffs have not been afforded the opportunity to take discovery. The RICO count, as supplemented by the RICO Statement and/or the MDS and/or Exhibit H, was sufficiently pled. [31]

## III.   PLAINTIFFS SUFFICIENTLY PLEAD THEIR COMMON LAW CLAIMS.

The Plaintiffs have properly alleged negligence in Count 8.[32] Defendant CAIR posits that he had no duty of care to Plaintiffs. However, this argument ignores the fact that Plaintiffs' Complaint alleges that Defendant CAIR breached the duties encompassed in the norms of conduct found in international law. Defendant CAIR further argues that he was not involved in international terrorism or mass murder, and as such, Plaintiffs have not sufficiently alleged a negligence claim. Defendant CAIR is again mistaken. Plaintiffs pled that Defendant CAIR was a

---

[31] For additional material, see Plaintiffs Mem. Of Law regarding RICO filed as to Al Haramain in the *Al Barkaka*.
[32]  Plaintiffs recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs. *See* January 18 Order, 349 F. Supp.2d at 830-31.

conspirator in the provision of propaganda and other aspects of information warfare and that such activities were a proximate cause of Plaintiffs' damages.  These allegations constitute adequate notice if a claim for negligence. The truth of these allegations must be determined at trial, not in the context of a motion to dismiss.  Plaintiffs recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs.  *See* January 18 Order, 349 F. Supp.2d at 830-31.  Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing and arguments on this issue, including its Mem. Of Law in Opp. to the Mot. To Dismiss of *Banca Del Gottardo*.[33]

The wrongful death/survival/punitive damages/aiding and abetting and conspiracy claims should not be dismissed. Defendant correctly argue that no independent causes of action exist under New York law for conspiracy, wrongful death, survival, aiding and abetting or punitive damages; rather they are elements of a substantive claim or a remedy.  However, at this stage of these proceedings, the substantive law governing each of Plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss those causes of action at this time. Moreover, there can be little dispute that Plaintiffs' are entitled to recover punitive damages in the event that they prevail against this Defendant under the theories advanced.  Under these circumstances, dismissal of the conspiracy, aiding and abetting and punitive damages counts would be inappropriate.[34]

Contrary to the Defendant's assertion, certain of the Plaintiffs' claims are not demonstrably time-barred.  This issue, as well, has been substantially briefed, and Plaintiffs

---

[33] These include including, without limitation, the negligence per se argument under ATA, ATCA, and RICO.  See, *Use of Federal Statutes in State Negligence Per Se Actions*, 13 Whittier L. Rev. 831 (1993); *Resolution Trust Corp. v. Hess*, 820 F. Supp. 1359 (D. Utah 1993); *F.D.I.C. v. McSweeney*, 976 F.2d 532, 538 n. 7 (9th Cir. 1992), *cert denied*, 508 U.S. 950 (1993).

[34] Plaintiff would, in the alternative, seek leave to incorporate or re-plead the allegations contained within the conspiracy, wrongful death, survival, punitive damages, aiding and abetting, and/or any other dismissed counts as part of the allegations applicable to the surviving causes of action.

respectfully will rely upon the arguments which they have previously raised. [35]

## CONCLUSION

For the reasons set forth herein, and as addressed at argument, which is requested, the Defendants's Motion should be denied, with prejudice. If the Court finds Plaintiffs' pleading deficient in any way, Plaintiffs should be given leave to replead.

Dated:  December 23, 2005

Respectfully submitted

LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, P.C.

By: _____
    JERRY S. GOLDMAN, ESQ. (JG8445)
    FREDERICK J. SALEK, ESQ. (FS8565)
    GINA M. MAC NEILL, ESQ. (GM0581)
    *Attorneys for the Plaintiffs,*
    *Estate of John P. O'Neill, Sr. et al.*

    111 Broadway, 13TH Floor
    New York, N.Y. 10006
    212.242.2232

---

[35] These include the question of choice of law;  the operation of the ATA;  See 137 Cong. Rec. S4511 04 (April 16, 1991) (imports into that federal cause of action "the remedies of American tort law."); *see also Boim*, 291 F.3d at 1010  (language and history of ATA evidence [] an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law"); *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (federal law determines the "extent and nature" of claims brought under a federal statute;  *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004)( State statutes of limitation are inapplicable to federal common law claims); and the continuing conspiracy/conspiracy to conceal/unreasonable to have ascertained such information (tolling).  *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D.N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 00 Civ. 7804 (LMM), 2004 U.S. Dist. LEXIS 3829 *17-18 (S.D.N.Y. 2004); *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996)(holding that "[e]quitable tolling allows courts to extent the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").

# APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO COUNCIL ON AMERICAN-ISLAMIC RELATIONS (CAIR)

### The Conspiracy[36, 37, 38]

1.   On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC" or "O'Neill Al Baraka FCC" or "Al Baraka FCC") ¶¶ 1, 6-10 22-5, Tremsky ¶ 120, WTC ¶ 365.

2.   The conspirators consist of the defendants named in the in the three O'Neill actions (Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka Investment & Development Corporation, *et al.*, 04 CV 1923 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Kingdom of Saudi Arabia, *et al.*, 04 CV 1922 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Republic of Iraq, *et al.,* 04- CV 1076) ("O'Neill Iraq") (with such complaints also including 'John Does'), as well as in the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL- 1570 (RCC), and others. Exhibit H, ¶ 2.[39]

---

[36] The pleadings consist of the First Consolidated Complaint, filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15.  Incorporated into the First Consolidated Complaint are various other pleadings filed in the matter, such as the RICO Statement and the More Definite Statements/Additional Allegations (MDS).   These items, all separately docketed, were, in substance, physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record.  Paragraph 127 of the FCC lists these various Exhibits.  The More Definite Statement/Additional Allegations pertaining to the instant Defendant was, pursuant to FCC ¶ 127 (H), appended as Exhibit (H) (hereinafter cited as "MDS" or "Exhibit H").

[37] There are references preceding the various substantive causes of actions in the FCC incorporating the various paragraphs in the pleadings without setting them forth at length.  See, e.g., FCC ¶134.

[38] References herein to *First Consolidated Complaint* or *FCC* or *Al Baraka FCC* or *O'Neill Al Baraka FCC* are to the First Amended Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.*

[39] Paragraph 127 of the FCC pleads as follows:

> Attached hereto as Exhibit and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations/RICO Statements:
>
> A) More Definite Statements/Additional Allegations - Victims List

3.      The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶27.

4.      On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Al Baraka FCC ¶¶ 6-9.

5.      All 19 hijackers were members of the al Qaida network. O'Neill Al Baraka ¶¶6-9.

6.      All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. FCC ¶10.

7.      The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett ¶¶ 649, 650, 654, O'Neill Iraq ¶¶ 23, 38, 41, 63, 83, 250, 251; O'Neill Al Baraka FCC ¶¶ 22-4, 25, 144, 158-9, 162.   Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622.

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509

9.      Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74.

10.     The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Iraq FCC ¶ 252; O'Neill Al Baraka FCC ¶ 144.

11.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, ¶ 649; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144.

12.     Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks.  O'Neill Iraq ¶ 38; O'Neill Al Baraka FCC ¶22

...

H)    More Definite Statements/Additional Allegations - Council on American – Islamic Relations (CAIR) and CAIR  - Canada.

13.     Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities.  O'Neill Al Baraka FCC ¶ 23.

14.     Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24.

15.     The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 25.

16.     The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶27.

17.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett, ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Al Baraka FCC ¶ ¶177-180.

18.     As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 19, 23, 251; O'Neill Al Baraka FCC ¶157.

19.     As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-2; O'Neill Al Baraka FCC ¶158.

20.     As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶159.

21.     The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶160, 163, 167.

22.     As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶161; O'Neill Iraq FCC ¶¶ 254, 270, 271.

23.     Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162.

24.     OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Al Baraka

28

FCC ¶165; O'Neill Iraq FCC ¶¶ 223, 228, 242.

25.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka FCC ¶168; Iraq FCC ¶251.

26.    By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance 642; Al Baraka FCC ¶169.

27.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance 628; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

28.    The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett ¶ 662, O'Neill Al Baraka FCC ¶ ¶178-180; O'Neill Iraq FCC ¶¶ 267, 272.

29.    The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Al Baraka FCC ¶162; O'Neill Iraq FCC ¶63.

30.    The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶163.

31.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett ¶ 674; Continental Casualty ¶ 604; Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

32.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett ¶ 673; Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶¶ 152, 169.

33.    The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill Al Baraka, Exhibit H ¶ 6a; O'Neill Iraq FCC ¶¶ 263-5.

34.     The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. Al Baraka FCC ¶¶ 139, 172.

## **The Relationship between CAIR and CAIR (CANADA) and the Conspiracy**

35.     Defendants Saleh Abdullah Kamel, Abdul-Matin Tatari, Mazin M.H. Bahareth, Shahir Abdulraoof Batterjee, Hassan Bahfzallah a/k/a Hassan A.A. Hahfzallah, Mohammed Majed Said a/k/a Mohammed Mljed Said, Hamed al- Barakati, Yassin Abdullah al Qadi a/k/a Yassin Al-Qadi a/k/a Yassin al Kadi a/k/a Yasin al-Qadi, Youssef M. Nada a/k/a YoussefNada a/k/a Youssef Mustafa Nada, Khalid bin Mahfouz a/k/a Khaded Bin Mahfous a/k/a Khalid bin Mahfouz, Sulaiman Abdul Aziz al-Rajhi a/k/a Suleiman Abdel Aziz Al Rajhi a/k/a Sulaiman Abdel Aziz Al Rajhi, Mohammed al Faisal al Saud and Enaam Mahmoud Arnaout a/k/a Abdel Samil a/k/a Abu Mahmoud a/k/a Amu Mahmoud Al Suri a/k/a Abu Mahmoud Al Hamawi, Council on American Islamic Relations (CAIR) and CAIR-Canada are all businessmen, bankers, financiers, organizations, and operatives who have conspired with Osama bin Laden and al Qaeda to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks or otherwise assisted them in their terrorist activities. O'Neill Al Baraka FCC ¶ 23.

36.     Council on American Islamic Relations and CAIR Canada (collectively, CAIR), have aided, abetted, and materially sponsored and al Qaeda and international terrorism.  CAIR is an outgrowth of the Hamas front group the Islamic Association of Palestine. The FBI's former associate director in charge of Investigative and Counter-Intelligence Operations described the Islamic Association of Palestine as an organization that has directly supported Hamas military goals and is a front organization for Hamas that engages in propaganda for Islamic militants. It has produced videotapes that are very hate-filled, full of vehement propaganda. It is an organization that has supported direct confrontation. O'Neill Al Baraka FCC ¶ 86.

37.     CAIR and CAIR-Canada have, since their inception, been part of the criminal conspiracy of radical Islamic terrorism. These organizations play a unique role in the terrorist network.  They emanate from the notorious HAMAS terrorist organization and like so many of the terrorism facilitating charities named and indicted by the United States government they are engaged in fund raising under the guise of assisting humanitarian causes they are, in reality, a key player in international terrorism. The unique role played by CAIR and CAIR-Canada is to manipulate the legal systems of the United States and Canada in a manner that allows them to silence critics, analysts, commentators, media organizations, and government officials by leveling false charges of discrimination, libel, slander and defamation.  In addition, both organizations have actively sought to hamper governmental anti-terrorism efforts by direct propaganda activities aimed at police, first responders, and intelligence agencies through so-called sensitivity training.  Their goal is to create as much self-doubt, hesitation, fear of name-calling, and litigation within police departments and intelligence agencies as possible so as to render such authorities

ineffective in pursuing international and domestic terrorist entities.   O'Neill Al Baraka FCC ¶ 87.

38.   The role of CAIR and CAIR-Canada is to wage PSYOPS (psychological warfare) and disinformation activities on behalf of Whabbi-based Islamic terrorists throughout North America.  They are the intellectual "shock troops" of Islamic terrorism.  In the years and months leading up to the terrorist attacks on September 11, 2001 these organizations were very effective in helping to ensure that North American law enforcement and intelligence officials were sufficiently deaf, dumb, and blind to help pave the way for the attacks on the United States.  The role played by these entities is an absolutely essential part of the mix of forces arrayed against the United States as they help soften-up targeted countries so as to facilitate and enhance the likelihood for a successful attack. O'Neill Al Baraka FCC ¶ 88.

39.   CAIR has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Exhibit H ¶ 20.

40.   CAIR has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  CAIR conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Exhibit H ¶ 21.

41.   CAIR is a non-governmental organization whose mission statement is to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims and build coalitions that promote justice and understanding.  Exhibit H ¶ 22.

42.   However, the true purpose for CAIR is to legitimize the activities of Islamic militants and to neutralize opposition to Islamic extremism.  They serve as perception management in support of Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Their purpose is to create propaganda, misinformation, misdirection, marginalize opposition, silence critics and deceive governments.  In February 2000, expert Sheikh Professor Abdul Hadi Palazzi, addressing the International Conference on Countering Suicide Terrorism sponsored by the Institute for Counter-terrorism of the Interdisciplinary Center in Herzlyia, Israel:

> "The Council for American–Islamic Relations is a Muslim Brotherhood front organization.  It works in the United States as a lobby against radio, television and print media journalists who dare

to produce anything about Islam that is at variance with their fundamental agenda. CAIR opposes diversity in Islam: They are aggressive and closed-minded. Notwithstanding CAIR's evident connection to Hamas, they are regarded by the US. Administration as legitimate representatives of the Muslim American community."

Exhibit H ¶ 23.

43.  CAIR has links to both Hamas and the Muslim Brotherhood.[40]  Terrorism expert, Steve Emerson has stated before Congress that CAIR is a front for Hamas. CAIR was founded in 1994 as an offshoot of the Islamic Association for Palestine ("IAP"). It was founded by two former leaders of the IAP, Hamas supporters, Omar Ihmad and Nihad Amad. Additionally, a founding director of CAIR is Rafeeq Jabur, the president of IAP. IAP is a front for the Palestinian terrorist organization, Hamas. In 2002, Judge Gladys Kessler declared, "[t]here is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP") has acted in support of the HAMAS." Holy Land Foundation for Relief & Development v. Ashcroft, 219 F.Supp.2d 57, 70 (D.C. Dist. 2002). Also, founder Omar Ihmad was previously a key leader of the Palestinian Muslim Brotherhood. Exhibit H ¶ 24.

44.  CAIR was founded by donations from the Holy Land Foundation ("HLF"), which is a Specially Designated Global Terrorist Organization, World Assembly of Muslim Youth ("WAMY"),[41] and International Islamic Relief Organization ("IIRO").[42]  WAMY and IIRO are co-defendants herein. Exhibit H ¶ 25.

45.  CAIR is funded by terrorists. The International Institute of Islamic Thought,[43] an organization linked to the Muslim Brotherhood, donated money in 2003, according to its tax filings. Additionally, the Saudi-based Islamic Development Bank ("IDB") gave CAIR $250,000 in August 1999. The IDB also manages funds for the Al-Quds which

---

[40] Muslim Brotherhood is a Defendant in the instant action. On information and belief, Hamas is at least affiliated with if not a chapter of the Muslim Brotherhood. Hamas is a Defendant in at least one Co-Plaintiffs case (Federal), which are made part of the instant conspiracy. See Exhibit H, ¶ 2.

[41] Specific misconduct regarding WAMY, a co-defendant herein, is provided via More Definite Statement/ Additional Allegations Applicable to WAMY. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC). Exhibit Y; See also FCC ¶¶ 123-5

[42] Specific misconduct regarding IIRO, a co-defendant herein, is provided via More Definite Statement / Additional Allegations Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to Estate of John P. O'Neill, et al. v. Al Baraka, et al., 04-CV-1923 (RCC). Exhibit B.

[43] On information and belief, IIIT is part of the SAFA Group or SAAR Network. See More Definite Statements/Additional Allegations applicable to them, including, without limitation, Exhibit G (Taha Al 'Alwani) in the Iraq case.

finance suicide bombings against Israeli civilians by providing funds to the families of Palestinian "martyrs." Exhibit H ¶ 26.

46.    CAIR has proven links to Islamic Terrorists.  Examples include:

**Ghassin Elashi**

a.    Elashi was the founder of CAIR's Texas chapter.  He was convicted in July 2004 of shipping computers to Libya and Syria, two designated state sponsors of terrorism.  In April 2005, he was also convicted of *knowingly* doing business with Mousa Abu Marzook, a senior Hamas leader and Specially Designated Terrorist. On July 27, 2004, he was indicted for providing material support to Hamas, engaging in prohibited financial transactions with a Specially Designated Global Terrorist, money laundering, conspiracy and filing false tax returns.[44]

**Randall (Ismail) Royer**

b.    In 1997, Royer began working as CAIR's "Communications Specialist" and continues to work there through October 2001.  He also served as "Civil Rights Coordinator."  He was indicted on charges of conspiring to help Al Qaida and the Taliban to battle American troops in Afghanistan.  On January 16, 2004, he pled guilty to lesser offenses and was convicted of weapons and explosives charges in connection to a terrorist related offense.[45]

**Bassam Khafasi**

c.    As late as November 1, 2002, Khafagi served as CAIR's Director of Community Relations.  In January 2003, he was arrested and indicted in January 2003 on bank fraud charges.[46]  In September 2003, Kahfagi pleaded guilty to visa fraud and bank fraud,[47] for passing bad checks for substantial amounts in early 2001, and he was deported.[48]

d.    Khafagi also served as founding member and President of the Islamic Assembly of North America ("IANA").  IANA is under investigation un the U.S. for money laundering and recruiting terrorists over the Internet.[49]   The FBI raided their offices in February 2003.

---

[44] U.S. v. Holy Land Foundation, (N.D. Texas), indictment filed July 27, 2004.

[45] "Two Defendants in Virginia Jihad Case Plead Guilty to Weapons Charges, Will Cooperate with Ongoing Investigations,"  U.S. Department of Justice News Release, January 16, 2004.

[46] U.S. v. Khafagi, Case No. 03-CR-80087 (E.D. Mich.), indictment filed February 13, 2003.

[47] "Ex-Head of Islamic Charity Pleads Guilty," Associated Press, September 10, 2003.

[48] "Former Head of Islamic Charity Sentenced in Fraud Case," Associated Press, November 13, 2003.

[49] "Saudi National Charged with Conspiracy to Provide Material Support to Hamas and Other Violent Jihadists,"  U.S. Department of Justice News Release, March 4, 2004.

**Rabih Hadid**

    e.   Haddad served as a CAIR fundraiser. Haddad was co-founder of the Global Relief Foundation ("GRF"). GRF was designated by the US Treasury Department for financing the Al Qaida and other terrorist organizations and its assets were frozen by the US Government on December 14, 2001.[50]

    f.   On this same date, Haddad was taken into custody based upon terrorism related charges.

    g.   According to the Treasury Department, Haddad was a member of Makhtab Al-Khidamat, the precursor to Al Qaida.[51]

    h.   In July 2003, Haddad was deported to Lebanon.[52]

**Mohammad Nimer**

    i.   Nimer was the director of CAIR's Research Center. He also served as a member of the Board of Directors of the United Association for Studies and Research ("UASR"). The UASR is the strategic arm of Hamas in the United States.

**Imam Siraji Wahaj**

    j.   Wahaji is a member of CAIR's Board of Advisors. Named in 1995 by U.S. Attorney Mary Jo White as a possible unindicted co-conspirator in the World Trade Center bombing case. He serves as the spiritual leader of the al-Taqwa Mosque in Brooklyn, and provided a forum for Sheik Omar Abdel Rahman, who was convicted as the master-mind of the conspiracy.

    k.   He is also the Vice President of the Islamic Society of North America, a group which embraces the elements of the Muslim Brotherhood.

**Holy Land Foundation and Global Relief Foundation**

    l.   Both HLF and GRF were listed on the US Treasury Specially Designated Global Terrorist list and their assets were frozen.

    m.   Prior to this designation, CAIR actually solicited money for these organizations. Immediately after the attacks on September 11, 2001, on the home page of the CAIR website, it featured a section telling readers "what you can do for the victims of the WTC and Pentagon attacks." CAIR advised: "Donate through Global Relief Foundation" and "Donate through the Holy Land Foundation," providing the links to the groups' websites.

---

[50] OFAC Designations of BIF and GRF, December 14, 2001.

[51] "Treasury Department Facts Sheet on the Global Relief Foundation."

[52] Sarah Freemean, "Haddad Deported, Family Remains in the U.S." Associated Press, July 16, 2003.

n.  Additionally, in December 2001, the FBI raided several offices of the HLF, under the order of the President of the United States, as suspects of the main North American fundraiser for Palestinian Islamic terrorist organization Hamas.  CAIR issued a public statement, along with the Islamic Association for Palestine ("IAP") and the Muslim Student Association ("MSA"), denouncing the President's order and insisting that these actions were taken without any evidence.

Exhibit H ¶ 27.

47.  CAIR has consistently opposed the US Government action against individuals suspected of involvement in terrorism:

**Sami Al-Arian**

a.  CAIR vehemently defended the alleged Palestinian Islamic Jihad mastermind Sami Al-Arian and alleged that his arrest was based on "political considerations." On February 20, 2003, a South Florida professor Sami al-Arian was indicted for allegedly serving as North American leader of Palestinian Islamic Jihad ("PIJ"),[53] a government-designated terrorist organization that was labeled by Attorney General Joh Ashcroft as "one of the most violent organizations in the world," and which is allegedly responsible for the deaths of two Americans and over 100 Israelis.

b.  Despite Al-Arian's documented history of extremism, CAIR officials have consistently defended him since his arrest.

**Fawaz Damra**

c.  Damra was convicted for concealing his involvement in groups that advocated "violent terrorist attacks against Jews and others" on his citizenship application.

d.  CAIR-Ohio's Executive Director defended Damra as a "great interfaith leader." CAIR Spokesman Ibrahim Hooper stated, "we're concerned that all of his due process is maintained and evidence be free of religious or ethnic stereotyping… We're always concerned when prominent leaders of the American Islamic community are charged, or detained, or harassed."

**Musa Abu Marzook**

e.  On August 7, 1995, the Deputy US Attorney for the SDNY requested the arrest and extradition to Israel of IAP founder Marzook (who was formerly the chief and is currently deputy chief of the Hamas Political Bureau.)  Marzook was arrested at Kennedy airport.

---

[53] U.S. v. Al-Arian, (M.D. Fl. 03-CR-77), indictment filed February 20, 2003.

    f.   CAIR came out in support of Marzook by stating, "[t]he arrest, detention and extradition is politically motivated… [and] this campaign has been orchestrated to serve as a wedge between America and Islamic countries."[54]

    g.   In June 1996, CAIR signed an open letter to then Secretary of State Warren Christopher that railed against "the injustice that has prevailed against Dr. Marzook" and alleged that "our judicial system has been kidnapped by Israeli interests." The letter additionally stated, "Dr. Abu Marzook is a political leader; no more, no less than any other political leader in the world.[55] CAIR also labeled Marzook's incarceration a hate crime in a 1996 report.[56]

## Jamil Al-Amim

    h.   CAIR responded to the arrest and conviction of Jamil Al-Amim by praising him, by raising funds for him and then denying his guilt after his conviction for the murder of an Atlanta policeman.

## Imam Wagdy Ghoneim

    i.   Ghoneim is a radical Egyptian cleric who has been videotaped calling for suicide bombings at radical Islamic conferences. He has been denied entrance to Canada after immigration officials determined he was a member of Hamas and the Muslim Brotherhood.[57]

    j.   In May 1998, he led an audience in a song with lyrics, "No to the Jews, descendants of the apes," at the CAIR co-sponsored rally at Brooklyn college.

    k.   After Ghoneim was arrested, CAIR's Southern California Executive Director Hussam Ayloush defended him: "[t]he whole Muslim community today is under a microscope of scrutiny. Committing a mistake that would invite a slap on the wrist for anyone else could lead to prison or deportation fro a Muslim."[58]

## Sheik Yusuf Al Qaradawi

    l.   Qaradawi is a leader of the Muslim Brotherhood, who has issued fatwas calling for attacks on American forces and killing Jews and mandating Jihad. In 2000,

---

[54] Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[55] Open letter of Mr. Christopher Warren, Secretary of State, Signed by CAIR, Reprinted in Justice Forum: Newsletter of the Marzook Legal Fund, June 1996.

[56] The Price of Ignorance, American Muslim Research Center, 1996 and Laurie Goodstein, "Harassment of Muslims," The Washington Post, April 20, 1996.

[57] Ellen Van Wageningen, "Egyptian Religious Leader Denied Canadian VISA," The Ottawa Citizen January 10, 1999.

[58] Ben Fox, "Arrest of Orange County Mosque Leader a 'Mistake,' Supporters Say," Associated Press, November 9, 2004.

Qaradawi was banned from visiting the United States.  However, CAIR has repeatedly championed Qaradawi, for example, CAIR's legal director Arsalan Iftikhar said: "if you look at Sheikh Yusuf Al-Qaradawi, the ---one of the most famous Muslim scholars in Cairo, Egypt, he has said unequivocally that people who commit suicide bombings and --- and acts of terror are completely outside the bounds of Islam."[59]

m.   However, the following are fatwas and pronouncements of Qaradawi:

n.   Only July 13, 2004, on his weekly program on the Arab satellite channel Al-Jazeera Qaradawi accused "the Jews" of permitting the spilling o f Arab blood and of being oppressors, and he concluded by stating, "There is no dialogue between us except by the sword and the rifle…"[60]

o.   In August, 2004, Qaradawi signed a statement calling for the support of the terrorist "resistance" in Iraq to the American and Coalition forces.[61]

p.   In March 2002, Qaradawi issued a fatwa on the "liberation" of "Muslim lands" from "disbelievers."[62]

Exhibit H ¶ 28.

48.   As the foregoing demonstrates, CAIR thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Exhibit H ¶ 29.

49.   As the foregoing demonstrates, CAIR thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Exhibit H ¶ 30.

---

[59] July 26, 2005 interview of CAIR's legal director Arsalan Iftikhar on MSNBC.

[60] MEMRI Special Dispatch Series No. 753, Sheikh Yousef Al-Qaradhawi: 'There is No Dialogue between Us and the Jews Except by the Sword and the Rifle,' July 27, 2004.

[61] ABC News Online, "Senior Muslim Figures Back Iraqi Insurgents," August 23, 2004.

[62] IslamOnline, Fatwa mandating Jihad against Christians, Jews and pagans to "liberate Muslim lands from the grips of disbelievers," March 20, 2002.

**Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.**

50.　At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶609.

51.　At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶610.

52.　In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation:  acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance ¶619; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

53.　The acts of racketeering activity (predicate acts) include:

　　　a.　acts that involve murder arson and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

　　　b.　acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents), 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (financial institution fraud), 18 U.S.C. § 371 (government fraud) and are within the scope of 18 U.S.C. § 1961(1)(B);

　　　c.　acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

　　　d.　acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

　　　e.　acts indictable under 18 U.S.C. § 1952 and are within the scope of 18 U.S.C. § 1961

　　　f.　acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

38

g.  act indictable under 26 U.S.C. § 7212(a), 26 U.S.C. § 7206 (1), (2) (tax) and are within the scope of 18 U.S.C. § 1961;

h.  acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961l)(B); and

i.  acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B).

Al Baraka FCC Exhibit H, ¶5(a); Continental Casualty ¶611.

54.  Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies.  Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612.  The pattern of racketeering is more fully set forth in Exhibit H, ¶¶5(b), (f), and (g)

55.  As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶613.

56.  The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance ¶620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 180..

57.  The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  *See e.g.,* Exhibit H, ¶ 6.

58.   The Enterprise is described, at length, in Exhibit H, ¶¶ 6(b) and (c).

59.   The activities of the Enterprise relate to the commission of world-wide terrorism.  The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack.   The usual activities of the Enterprise includes recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of.  Exhibit H, ¶¶ 7-10.

60.   Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in ¶ 12 of Exhibit H.

61.   The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in ¶ 13 of Exhibit H.

**Consequences of the Conspiracy**

62.   Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[63]

63.   These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance ¶¶80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶25.

64.   All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶606; O'Neill Al Baraka FCC ¶152.

65.   The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Al Baraka FCC ¶153; O'Neill Iraq FCC ¶ 275.

66.   The damages suffered by plaintiffs, as described in greater detail in the pleadings, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶620; O'Neill Iraq FCC ¶272; O'Neill Al Baraka FCC ¶¶ 137, 140, 144-6, 150, 154, 161, 164, 170, 174, 180.

---

[63] A list of the decedents is contained within Exhibit A of the FCC.  See, FCC ¶ 127 (a).

67.     The Defendants intended to cause damage to business and property.  O'Neill Al Baraka FCC ¶178; O'Neill Iraq FCC ¶ 271.

68.     Plaintiffs suffered damage to business and property as a result of the Defendants actions. Al Baraka FCC ¶¶ 179-180; O'Neill Iraq FCC ¶¶ 270, 271.

69.     The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Al Baraka FCC ¶ 146; Exhibit H ¶¶ 14-15; O'Neill Iraq FCC ¶ 271.

X:\Clients\ONeill v. Saudi arabia\Motions to Dismiss\Cair\PLaintiffs' Final Mem of Law\CAIR_Memo of Law - Final-.doc

## CERTIFICATE OF SERVICE

I, JERRY S. GOLDMAN, ESQUIRE, do hereby certify that I served the within Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion to Dismiss, on this date, on all of the parties in the case via filing with the Court's electronic case filing (ECF) system.

Dated: December 23, 2005

_____
JERRY S. GOLDMAN, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\Motions\Motions to Dismiss\Cair\PLaintiffs' Final Mem of Law\CAIR_Memo of Law - Final-.doc