# EXHIBIT 1

**<u>Plaintiffs' Response to Al Rajhi's Motion for More Definite Statement</u>**

Upon information and belief:

***Background Allegations***

    1.    Al Qaeda, and other international terrorist organizations, raise money from a variety of sources and move money in a variety of manners.  Once the system is in place to raise the money, a set of mechanisms is necessary to move the money.  "The first, and most simple, is the ubiquitous and highly efficient global financial system, including the interconnected network of banks and other financial institutions that undergird the global economy.  For years, Al Qaeda has been particularly attracted to operating in under-regulated jurisdictions, places with limited bank supervision, no anti-money laundering laws, ineffective law enforcement institutions, and a culture of no-questions-asked bank secrecy." "*Terrorist Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations*" ("*Terrorist Financing Report*"), pg. 14, Maurice R. Greenberg, Chair, 2002.

    2.    Al Qaeda has infiltrated and abused the Islamic banking system, a typically legitimate form of investment and finance that abides by Shariah, or Islamic law, which prohibits the earning or payment of interest.  "Many prominent Islamic banks operate under loose regulatory oversight, in part because they are based in jurisdictions without proper controls, but also because their religious nature often allows them a greater degree of autonomy owing to obvious domestic considerations.  Islamic banks regularly commingle funds from depositors to place them within group investments by fund managers, creating ready opportunities for anonymous money transfers and settlement.  Moreover, Al Qaeda and other terrorist groups that use Islam to justify their activities are also more likely to find willing collaborators within the Islamic banking system." *Terrorism Financing Report*,  pg.15.  Al Rajhi Banking & Investment

Corporation ("Al Rajhi") is one such willing Al Qaeda collaborator, aider and abettor.

3.     Al Qaeda and other terrorist groups, in partnership with banks, financial entities and charities, have successfully implemented a global financing system to collect and distribute money to terrorist individuals, cells and networks in every corner of the world by perverting and taking advantage of every Muslim's religious duty - - payment of Zakat.

4.     One of the so-called "five pillars" of Islam is Zakat or almsgiving.  The Quran requires every Muslim, individuals and corporations, to give Zakat for specific charitable purposes identified in the Quran.  The standard rate for Zakat is 2.5% of current assets and other items of income.  In Saudi Arabia, Muslims are legally required to fulfill their Zakat obligation. The Kingdom of Saudi Arabia's Department of Zakat and Income Tax (DZIT), under the auspices of the Kingdom's Ministry of Finance, organizes, audits, and collects Zakat from all individuals and companies holding Saudi citizenship.

5.     Each year, every able Muslim Saudi citizen and Saudi company is obligated to donate 2.5% of his or its assets, in money or kind, to the poor and indigent as specified in the Quran.  This legal and religious duty is generally satisfied by yearly donations to charities that operate both within the Kingdom of Saudi Arabia and elsewhere.  Many of these charities have financed and continue to finance international terrorism under the cover of supporting Islamic schools, mosques, or orphanages.

6.     It is estimated that hundreds of Saudi-based charitable organizations distribute as much as $4 billion dollars each year.  Under Islamic law, there are no taxes, and the Zakat money serves as a social support system.  Zakat funds are often provided in cash to prominent, trusted community leaders, or to institutions such as banks, which then commingle and disperse donated monies to persons or charities that they deem worthy.  These practices have allowed

unscrupulous front groups or charities to fund violent, extremist Islamic groups, including Al Qaeda. Al Qaeda and its mentors, sponsors, and facilitators are responsible for the horrific acts of terror on September 11, 2001. The charities that Al Rajhi has sponsored include, but are not limited to, Muwafaq Foundation, Al Haramain, Benevolence International Foundation, International Islamic Relief Organization ("IIRO"), Muslim World League, and World Assembly of Moslem Youth ("WAMY").

7.       Islamic banks are major donors to Islamic charities as a result both of their own corporate Zakat obligations as well as their guidance and involvement in the distribution of the Zakat payments of their individual depositors. Most Islamic banks maintain a Zakat Department. This department selects the recipients for the bank's own Zakat donations and is charged with ensuring that the Zakat is in fact distributed to worthy and appropriate recipients so that the donation satisfies the bank's religious obligation as set forth in the Quran and under Shariah law. As a result, Islamic religious charities have tremendous influence and power in the Middle East, in Saudi Arabia, and throughout the world.

8.       Islamic banks, through their Zakat Departments, also typically provide services to individual depositors to assist them in selecting recipients for their Zakat funds and also to facilitate the actual donations. Depositors make use of these services and do so in reliance on the banks to ensure that the donation is made to worthy recipients so that the donation complies with Shariah law and satisfies the depositor's Zakat obligation. Al Rajhi engages in the provision of banking and Zakat services as described above.

9.       Islamic banks that adhere to Shariah principles must also calculate the percentage of unlawful or unacceptable income that is collected but is considered unacceptable according to Shariah principles. This income is referred to as "Hararm," or forbidden. Examples of Hararm

income include, among other things, any interest that is earned as a result of an account holder's credit balance and any income derived by a corporation from impure activities such as gambling or the sale of liquor.  Hararm income that must be given away cannot count as a virtuous or charitable act.  As such, it cannot fulfill a Muslim's Zakat obligation.  Donations of Hararm income, then, are made in addition to donations made to satisfy the Zakat requirement.

10.     In addition to the actual monetary donations to charities, Islamic banks like Al Rajhi also provide a broad range of facilities, material support, and banking services to charities. These activities include assistance in the actual distribution of both individual and corporate Hararm and Zakat obligations, the maintenance of numerous bank accounts for various charities and individuals associated with the charities, accounts specifically set up for the collection of donations; inclusion in a charities' advertisements meant to raise donations  and/or website of a bank's name and account information where donations can be sent directly; and the facilitation of wire transfers to and from various entities and charities.

11.     Islamic law prohibits the collection of interest.  As a result, investors must invest funds either in private businesses or partnerships rather than in traditional interest-bearing accounts.  Under this system, Islamic banks serve as an active business partner and agent with their customers in a partnership or collaboration to manage and invest the customer's capital in a mutually beneficial way.  According to the Al Rajhi Banking & Investment Corp. website:

> Unlike their counterparts elsewhere, Islamic bankers do not expect to advance money and receive a predetermined sum on a fixed date in the future.  Under the Shariah, the bedrock of the Islamic faith, they are instead responsible for ensuring that money is invested in viable projects, with reliable borrowers.  If the project succeeds the banker shares in the profit.  If it fails he suffers the losses.

(*See* Al Rajhi website profile; www.alrajhibank.com.)

12.     As partners, the bank and its partners, co-conspirators or agents have a close and

collaborative relationship that requires that the bank be aware of the project or business involved in the transactions, the source of its funding and its goals, successes and failures.  In other words, the Islamic bank's relationship to its investment "customer" is akin to the relationship between Western business partners, and completely unlike the more arms-length Western banking relationship between customers and banks.

13.     Charities that directly (or through indirect channels) sponsor, fund, materially support, conspired to cause, aid and/or abet international terrorism rely extensively on funds from both Zakat and Hararm donations made by and/or passed through Islamic banks on behalf of themselves and/or their depositors, and they rely on banks, including Al Rajhi, to facilitate the illicit transfer of funds.

14.     Since at least 1998, Osama bin Laden made open and public calls for Muslims to donate through the Zakat system to his terrorist organization.   In December 1998, during an interview with ABC News, Osama bin Laden said "Muslims and Muslim merchants, in particular, should give their Zakat and their money in support of this state [the Taliban Regime] which is reminiscent of the state of Medina (Al-Munawwarah), where the followers of Islam embraced the Prophet of God."

15.     On August 21, 1998, the President of the United States signed an Executive Order blocking the assets of Osama bin Laden and his terrorist cells, including Al Qaeda, as international terrorists.  Osama bin Laden, his sponsors and followers, were known to openly promoting hatred and violence against innocents long before this time.  On September 23, 2001, in direct response to the terrorist acts on September 11, the President signed Executive Order 13224, which ordered the blocking of property of and prohibition of transactions with persons who commit, threaten to commit, or provide financial or other support to support terrorism.  The

list of these "specially designated global terrorists" or terrorist organizations ("SDGT") included Osama bin Laden and Al Qaeda.

16.     Early in the formation of Al Qaeda, at a time when its objective was global Jihad, warfare and bloodshed envisaging terrorist attacks against "Western" targets, Osama bin Laden received financial support from a group of wealthy donors from the Gulf areas known as the Golden Chain.   The list of donors includes Defendants Ibrahim Afandi, Saleh Kamel, Bin Mahfouz, and Al-Rajhi.   Defendant Adel Batterjee is also listed on the Golden Chain of financiers for Al Qaeda, alongside Osama bin Laden.

17.     In full recognition of Islamic banking principles, Osama bin Laden and his al Qaeda organization, in partnership with several Saudi and Gulf Islamic banks, founded banking institutes in The Republic of Sudan that provided funding and support for international terrorist operations and organizations.

### Al Rajhi Banking & Investment Corporation

18.     Al Rajhi Banking and Investment Corporation [or "Al Rajhi"] is a Saudi Joint Stock Company.   It was formed and licensed as a commercial bank pursuant to Saudi Royal Decree on June 30, 1987.   Its headquarters are in Riyadh, Saudi Arabia.

19.     Al Rajhi is one of the leading financial institutions in the Kingdom of Saudi Arabia and one of the largest companies in the Middle East.   It provides a range of corporate and personal banking services in Saudi Arabia and has the largest retail branch network in the Kingdom.   By the end of 2002, Al Rajhi had 377 branches within the Kingdom and the largest number of ATM machines of any bank in the Kingdom.   Al Rajhi also continues to expand its international network.   Al Rajhi has correspondent banking relationships with numerous U.S. banks, including Bank of America, N.A., American Express Bank, J.P. Morgan Chase Bank and

Wachovia Bank, N.A.  In addition, Al Rajhi manages and operates seventeen subsidiaries across the world, and maintains a global presence.

20.     Al Rajhi operates under Islamic principles, paying no interest on deposits, and performing financial transactions in line with Shariah, a set of rules and laws that guide economic, social, political, and cultural aspects of the daily lives of Muslims.  Shariah originates from both the rules dictated by the Quran, its teachings and sayings (also called "hadith") of the Prophet Muhammed.

21.     As explained on its website, Al Rajhi established a Shariah Board; "to substantiate and materialize the Islamic role of the Corporation and to implement Shariah rules and principles.  The Board reviews all our investment and lending schemes and advises us on their validity in the light of the Shariah." (Website profile of Al Rajhi, www.alrajhibank.com.sa/shariahboard.htm).

22.     Al Rajhi sought and seeks depositors from the general public in Saudi Arabia and throughout the world.  It also sought and seeks capital from its shareholders.  Al Rajhi makes its money from investing its depositor's money and from investing its own and others' capital.  Al Rajhi, as other Islamic banks, pays no interest to its depositors, but makes its money through active partnership with them.

23.     As one of the largest Muslim banks in the Middle East, and as an Islamic bank particularly known for its adherence to Shariah, Al Rajhi was and is a bank of choice for many major charities in Saudi Arabia.  Al Rajhi consistently touts its widespread involvement in cultural and social charity activities organized by Academic, Scientific and Health Authorities in the Kingdom of Saudi Arabia.  According to its website, Al Rajhi "is present in all cultural and social occasions starting from donations to charity and Holy Quran recitation societies,

sponsorship to cultural, scientific and health activities and allocation of scholarships on Islamic banking studies." (See Al Rajhi website, www.alrajhibank.com.sa/finPortal/published/aboutus/content/culture.htm).

24.     Consistent with Al Rajhi's public statements that all of its activities are in compliance with Shariah rules, questions and inquiries concerning Islamic law are submitted by Al Rajhi to its own Shariah Board and/or Authority for guidance and oversight.  The Al Rajhi Shariah Board issues religious and legal recommendations in connection with Al Rajhi's banking and investment activities and services.  In addition, Al Rajhi's Shariah Monitoring Department follows up on implementation of these decisions with field inspections.

25.     Members of the Al Rajhi Shariah Board as of February 2003 include:

> Sheikh Abdullah bin Aqull, Chairman
> Sheikh Abdullah bin Minea', Deputy Chairman
> Sheikh Abdullah bin Bassam
> Sheikh Abdullah Al-Zayid
> Sheikh Saleh bin Humaid
> Sheikh Ahmad Al-Mubaraki
> Sheikh Abdul-Rahman Al-Atram

26.     As a Saudi Arabian entity, Al Rajhi has its own Zakat obligation.  Each year, it is obligated to donate 2.5% of its current assets and other items to recipients who fall within one of the categories for almsgiving set forth in the Quran.  Rather than provide charity directly to the poor or needy, Al Rajhi satisfied, and continues to satisfy, its Zakat obligation by donating to charities of its own choosing for disbursement.  The charities are then to disburse the money. The charities to which Al Rajhi has contributed or otherwise supported in this fashion include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and the Saudi Joint Relief Committee.  These charities and the individuals they sponsor cannot function or operate without the support of banks, including Al Rajhi.

27.     Accounting with respect to Zakat is based on Zakat rules and regulations in the Kingdom of Saudi Arabia.  As of January 1, 2001, Al Rajhi considers Zakat a liability of its shareholders to be deducted by Al Rajhi from dividend distributions.

28.     Al Rajhi has made its Zakat payments to the extent it believes is required for the years up to and including December 31, 2000.

27.     Al Rajhi has made its Zakat payments to the extent it believes is required for the years up to and including December 31, 2000.

28.     Islamic banks identify and calculate Hararm income for their depositors and investors. Islamic banks typically maintain a Department to oversee and distribute Hararm income for themselves as well as for their individual depositors and to ensure that both the donation amount and its subsequent distribution comply with Shariah law. As a result of those obligations and services, Islamic banks were and are directly involved in the selection of beneficiaries and the donation of billions of their own and their depositors' dollars to charities that sponsor terrorism.

29.     In addition, Al Rajhi has its own Hararm obligation that must be calculated and subsequently donated to charity.  Rather than provide charity directly to the needy, Al Rajhi satisfied, and continues to satisfy, its Hararm obligation by donating to charities of its own choosing.  The charities, in theory, are to disburse the money to the needy.  The charities to which Al Rajhi has contributed in order to satisfy its Hararm obligation include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee.  These charities cannot function without the support of banks, including Al Rajhi.

30.     Through its Zakat department, Al Rajhi assists individual depositors and account holders who, like Al Rajhi, wish to satisfy their Zakat and Hararm obligations by donating to

charitable organizations, rather than by direct contribution to the needy.  Al Rajhi selects, or participates in the selection of, the charities that will receive and distribute the Zakat and Hararm payments of both Al Rajhi itself and the Al Rajhi depositors and account holders who make use of this service.

31.     Through its Zakat Department, Al Rajhi was and is directly involved in the selection of beneficiaries and the donation of billions of its own and its investors' and depositors' money.  The charities selected by Al Rajhi's Zakat department to receive these donations include, among others, Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee.  Al Rajhi knew or had to know that the funds that it collected for and distributed to Al Haramain, IIRO, Muslim World League, WAMY, Saudi Joint Relief Committee and other charities materially supported, aided and abetted Al Qaeda, international terrorists and their activities.

32.     In order to ensure that it's Zakat and Hararm contributions, and those of its depositors and accountholders will, in fact, satisfy their religious obligations under Islam, Al Rajhi is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat.   As a result, Al Rajhi knew or had to know the intent and purpose of these charities, the individuals who control them, including board members and trustees, the sources of their funding, the beneficiaries and uses of the donations collected and their respective amounts.  In making these determinations, Al Rajhi is assisted by the fact that many of the charities maintain accounts with Al Rajhi.  Al Rajhi had ready access to records of checks and wire transfers made by the charities that it can examine to ensure that the money dispersed or spent by the charities has actually been used for the purpose of charity.

33.     Al Rajhi acts as a partner or collaborator with the charities with respect to the management and accounting of the donations (that flow both to and from the charity), the collection of Zakat and Hararm, the selection of beneficiaries, and the investment of capital for the charities and their board members, directors and officers.  As stated above, Al Rajhi knew or had to know the intent, purpose or goals of these charities, the individuals who control the charities, including board members and trustees, the sources of their funding, the beneficiaries of the funds collected and their respective amounts.

34.     Al Rajhi knew or had to know that Al Qaeda was an international terrorist organization that was widely and publicly known to openly promote indiscriminate violence against America and that its target was and remains the United States.  Al Rajhi also knew or had to know that Al Qaeda was and is the manager and recipient of millions of dollars from charities, including Al Haramain, IIRO, Muslim World League, WAMY, Saudi Joint Relief Committee and others.  As such, Al Rajhi aided, abetted, acted in concert with and/or materially supported al Qaeda terrorists and international terrorist activities.

35.     As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were using funds collected to support and sponsor al Qaeda terrorists and international terrorist activities.  As such, Al Rajhi aided, abetted and materially supported the al Qaead terrorists and international terrorist activities.

36.     As a result of its obligation to inquire and its ready access to information about the charities in question Al Rajhi knew or had to know that the funds that it collected on behalf of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi

Joint Relief Committee, were likely to be used for terrorist activities against the United States, its citizens, and for other illegal terrorist-related purposes.   As such, Al Rajhi aided, abetted, conspired with and materially supported al Qaeda terrorists and terrorist activities.

37.     As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it managed, on its own behalf and on behalf of its depositors and accountholders, of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for terrorist activities and terrorist-related purposes against the United States.   As such, Al Rajhi aided, abetted and materially supported such terrorists and terrorist activities.

38.     Despite the actual and/or implied knowledge that money contributed to these charities was being used to support terrorist activities, Al Rajhi continued to send funds to these charities in the form of Zakat and Hararm contributions on its own behalf and on behalf of its depositors and accountholders.   Through these contributions, Al Rajhi aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.   Al Rajhi provided additional material support in the form of wire transfers of money from charities to terrorists and in the form of links from certain websites that permitted donors to send their contributions directly to Al Rajhi accounts maintained by these charities.

39.     Al Rajhi knew or had to know knowledge that certain of its depositors, and in particular, the defendant charities herein, were material supporters of terrorism and terrorist activities.   Despite this knowledge, Al Rajhi continued its partnership and collaboration with these charities and as a result, Al Rajhi itself aided, abetted, conspired with and/or materially supported international terrorism and terrorist activities.

40.     As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were using a portion of the funds they collected to support and sponsor terrorists and terrorist activities.  As such, Al Rajhi aided, abetted and materially supported terrorists and terrorist activities.

41.     As a result of its obligation to inquire and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it collected on behalf of certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.  As such, Al Rajhi aided, abetted and materially supported international terrorists and terrorist activities.

42.     As a result of its obligation to inquire, and its ready access to information about the charities in question, Al Rajhi knew or had to know that the funds that it managed or contributed, on its own behalf and on behalf of its depositors and accountholders, to certain charities, including Al Haramain, IIRO, Muslim World League, WAMY, and Saudi Joint Relief Committee, were reasonably foreseeable and/or likely to be used for international terrorist activities and terrorist-related purposes.

43.     One of the hijackers in the September 11 attack, Abdulaziz al-Omari, who was aboard American Airlines Flight 11, maintained an account with Al Rajhi numbered 162608010366080 and was issued a Visa debit card number 4909-8016-2002-5457.  Mohammed Atta, the lead hijacker on flight 11 and leader of the September 11 operation, made a transfer to this Al Rajhi account held by Al Omari.  As such, Al Rajhi facilitated, aided, abetted and materially supported terrorists and terrorist activities.

### *Al Rajhi Relationship with Al Haramain*

44.     At all relevant times, Al Rajhi maintained and provided services for a large number of bank accounts for Al Haramain Islamic Foundation.   Al Rajhi continues the maintenance of Al Haramain's accounts despite the fact that Al Haramain was banned from Kenya in September 1998 as a result of national security concerns following the 1998 terrorist attacks on the United States embassies in Tanzania and Kenya.  Al Rajhi continues to maintain Al Haramain's accounts despite Al Haramain's designation on March 11, 2002 as terrorist organizations by both the United States and Saudi Arabian authorities for its diversion of "charitable funds" to al Qaeda and international terrorism prior to September 11, through its Somalia and Bosnia-Herzegovina branches.

45.     Al Rajhi knew or had to know that certain of its depositors, and in particular, Al Haramain, were material supporters of terrorism and terrorist activities.  Despite the open and public nature of this information, Al Rajhi continued its partnership and collaboration with Al Haramain and as a result, Al Rajhi itself aided, abetted, conspired with and/or materially supported terrorism and terrorist activities.

46.     The relationship between Al Rajhi and Al Haramain is, among other things, a collaboration that maximizes donations for Al Haramain and profits for Al Rajhi.  This benefit to Al Rajhi is a result of Al Haramain's involvement in and support of terrorist activities.

### *Al Rajhi Relationship with WAMY*

47.     At all relevant times, Al Rajhi maintained and provided services for WAMY including at least two bank accounts; 111/6 (branch of Shahar Quarter, 335) and 66-1 (Al Mazra'a branch (2), Riyahd, 446).

48.     Al Rajhi knew or had to know that certain of its depositors, and in particular,

WAMY, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with WAMY and as a result, Al Rajhi itself aided, abetted and materially supported the resulting acts of international terrorism and terrorist activities.

49.     The relationship between Al Rajhi and WAMY is, among other things, a collaboration that maximizes donations for WAMY and profits for Al Rajhi. This benefit to Al Rajhi is a result of WAMY's involvement in and support of terrorist activities.

**Al Rajhi Relationship with Muslim World League**

50.     At all relevant times, Al Rajhi maintained and provided services to Muslim World League, including the maintenance of accounts numbered 3206080100870-40 and 8885.

51.     Al Rajhi knew or had to know that certain of its depositors, and in particular, Muslim World League, were material supporters of terrorism and terrorist activities. Despite this knowledge, Al Rajhi continued its partnership and collaboration with Muslim World League and as a result, Al Rajhi itself aided, abetted and materially supported terrorism and terrorist activities.

52.     The relationship between Al Rajhi and Muslim World League is, among other things, a collaboration that maximizes donations for Muslim World League and profits for Al Rajhi. This benefit to Al Rajhi is a result of Muslim World League's involvement in and support of terrorist activities.

**Al Rajhi Relationship with International Islamic Relief Organization**

53.     At all relevant times, Al Rajhi maintained accounts and provided services to IIRO, including account number 77700. In addition, the Saudi Embassy website in 2000 reported in a press release that IIRO was launching a campaign to assist Palestinians.

Specifically, IIRO called for the payment of $1,000 for the family of each "martyr."  The press release also reported that an account was set up at Al Rajhi to accept funds. (http://www.saudiembassy.net/press_release/00_spa/10-12-mideast.html)

54.    Al Rajhi oversees and facilitates the donations to IIRO by providing account services for that express purpose and by allowing IIRO to advertise both the existence of the account and its banking relationship with Al Rajhi.

55.    Al Rajhi knew or had to know that certain of its depositors, and in particular, IIRO, were material supporters of terrorism and terrorist activities.  Despite this knowledge, Al Rajhi continued its partnership and collaboration with IIRO and as a result, Al Rajhi itself aided, abetted and materially supported international terrorism and terrorist activities.

56.    The relationship between Al Rajhi and IIRO is, among other things, a collaboration that maximizes donations for IIRO and profits for Al Rajhi.  This benefit to Al Rajhi is a result of IIRO's involvement in and support of terrorist activities.

***Al Rajhi Relationship with Saudi Joint Relief Committee***

57.    From at least 1999, Al Rajhi oversees and facilitates the donations to the Saudi Joint Relief Committee ("SJRC") by providing account services for that express purpose and by allowing SJRC to advertise both the existence of the account and its banking relationship with Al Rajhi.  SJRC was directed by a founder of Al Qaeda, Wa'el Julaidan.

58.    Al Rajhi oversees and facilitates the donations to SJRC by providing account services for that express purpose and by allowing SJRC to advertise both the existence of the account and its banking relationship with Al Rajhi.

59.    Al Rajhi knew or had to know that certain of its depositors, and in particular, SJRC, were material supporters of terrorism and terrorist activities.  Despite this knowledge, Al

Rajhi continued its partnership and collaboration with SJRC and as a result, Al Rajhi itself aided, abetted and materially supported terrorism and terrorist activities.

60.     The relationship between Al Rajhi and SJRC is, among other things, a collaboration that maximizes donations for SJRC and profits for Al Rajhi.  This benefit to Al Rajhi is a result of SJRC's involvement in and support of terrorist activities.

***Al Rajhi Relationship with Other International Terrorist Organizations***

61.     Al Rajhi has engaged in a common course of conduct as it relates to knowing sponsorship of international terrorism.  HAMAS is a radical Islamic organization formed in 1987.  It origins were the Muslim Brotherhood, an international Islamic extremist movement which sought the creation of one Arab nation governed by Shariah law.  HAMAS perpetrates suicide attacks against civilians and military targets.

62.     HAMAS has been on the U. S. State Department's List of Designated Foreign Terrorist Organizations since December 1995.

63.     In the 1970's, members of the Muslim Brotherhood began creating an international banking network that would operate out of the reach of Middle Eastern governments which opposed the Muslim Brotherhood and provide material support to HAMAS, and later to Al Qaeda.  The network was headed by Youseff Nada.  His terrorist-related activities led to his recognition as a sponsor of international terrorism, and his ultimate designation by the United States as a Specially Designated Global Terrorist ("SDGT") on November 7, 2001.

64.     Like Al Qaeda, HAMAS obtains funds through a number of charities and humanitarian organizations, in particular, The Holy Land Foundation for Relief and Development (designated as SDGT on December 4, 2001) and Al Aqsa Educational Fund.

65.     Another organization that provided funding to HAMAS is a Texas organization,

Infocom.  One of its founders was Chairman of the Board of Holy Land Foundation for Relief and Development.  As a result of its ties to HAMAS, and dealings with HAMAS leader and designated terrorist Mousa Marzouk and his personal secretary, Nasser Al Khatib, Infocom was raided by the FBI, and United States Customs Immigration and Naturalization on September 6, 2001 and its assets blocked by the United States Treasury.

66.     Al Rajhi chose Infocom to host its website notwithstanding that it knew that Infocom company was owned and operated by HAMAS leader and SDGT Mousa Marzook (designated in 1995) and his relations.   Payments of $706,566 were made to Marzook from an Al Rajhi account between January 1989 and December 1991.  Marzook and one of his agents made a total of 11 wire transfers totaling $2,003,659 into an Al Rajhi bank account from January 1989 through September 1992.  In 1992 five transfers totaling $1,295,093 were made from an account with Al Rajhi to Al Khatib.  Between 1991 and 1997, 48 wire transfers totaling $1,542,804 were made from an account with Al Rajhi to Infocom which cannot be attributed to fees for website handling.

67.     Al Rajhi acts as a partner or collaborator with investors and depositors such as Marzook.  At all relevant times, Al Rajhi knew or had to know that Marzook was engaged in acts of terrorism.   As such, Al Rajhi has historically aided, abetted and materially supported international terrorists and terrorist activities.

### *Al Rajhi Relationship with Al Qadi*

68.     Abdul Aziz Al-Khereiji, an executive on the Board of Al Rajhi between April 3, 1999 and autumn 2000, was, at the same time, one of four shareholders of Isle of Man company, Muwaffaq Limited (a/k/a/ Blessed Relief Foundation), an organization collecting and distributing funds for al Qaeda.  One of the two directors and a fellow shareholder of Muwaffaq

Limited was Yasin al Qadi.  On November 22, 1999, when al Qadi resigned as director, Al-Khereiji took his place on the board.  The use of Muwaffaq Limited as an Al Qaeda front to receive funding from Saudi businessmen resulted in the freezing of al Qadi's assets by the United States Treasury and his designation as a SDGT in October 2001.  In addition, al Qadi and Yaqub Mirza were business partners in a company based in Boston, Massachusetts, called Ptech, Inc.

69.     At all relevant times, Al Rajhi knew or had to know that its Director Al-Khereiji was also a Director of a terrorist front, Muwaffaq Limited.  As such, Al Rajhi aided, abetted and materially supported terrorists and terrorist activities.

### Al Rajhi's Knowledge

70.     Directors and advisory members of Al Rajhi and its Shariah Boards share directorships and advisory positions with charities that are defendants in this case.  The knowledge of these bank directors, officers, and board members, of the terrorist activities of the individuals and charities, will be directly imputed to Al Rajhi.

### Al Rajhi Payments to Terrorists

71.     On or about December 1999, Al Rajhi directly funded Tulkarm Charity Committee, a known front for HAMAS, in checks drawn from the Chase Manhattan Bank account of Al Rajhi Banking & Investment Corporation.  Al Rajhi knew or had to know that these payments were likely to be used for terrorist activities and terrorist-related purposes.

### Al Rajhi's Failure to Meet Banking Industry Standards

72.     Most of the countries in the Middles East, including Saudi Arabia, have ineffective and/or rudimentary bank supervisory, anti-money laundering laws and anti-terrorist financing in place.   In the countries that do have such laws, implementation is weak or non-

existent.   To address this problem, strategic initiatives were undertaken by the United States Congress and Administration, and the international community to help change the environment that facilitates and advances terrorist financial and support networks.   These efforts have included multilateral initiatives through the United Nations Counter-Terrorism Committee (CTC), the International Monetary Fund (IMF), the World Bank, and the Financial Action Task Force (FATF)  - - a twenty-nine member intergovernmental organization established by the G-7 in 1989 to set international anti-money laundering standards.   In 1995, international efforts resulted in the formation of the Egmont Group, which is intended to knit together like-minded nations focused on preventing financial crimes through the work of the Financial Intelligence Unit (FIU) in each member nation.

73.     The Kingdom of Saudi Arabia is neither a member of FATF nor Egmont Group. Its banks, including Al Rajhi Investment and Banking Corporation, likewise do not comply with FATF and/or Egmont Group regulations. Al Rajhi is obliged to follow the Accounting Standards for Commercial Banks issued by the Saudi Arabian Monetary Agency ("SAMA"), the Central Bank of Saudi Arabia, and the International Accounting Standards ("IAS").   Al Rajhi is regulated and supervised by SAMA.  Since 1999, it has been required to cooperate with SAMA concerning investigations into terrorist financing.

74.     Although FATF requirements have not been adopted by SAMA or any other regulatory body within Saudi Arabia, they are nevertheless recognized throughout the world as the minimum banking standards by which all such institutions should practice.  The purpose of these regulations is to both insure that criminals and terrorists do not manipulate banks to fund their terrorist schemes and to prevent banks from assisting terrorists and terrorist acts.

75.     In 1999, William Weschler of the National Security Council and Richard

Newcomb of the Office of Foreign Assets Control (OFAC) traveled to Saudi Arabia to specifically warn SAMA and Al Rajhi that their financial systems were being manipulated or utilized to fund terrorist organizations such as Al Qaeda. In addition, FATF, the U.S. Treasury Department and a number of other international financial bodies specifically warned SAMA and other officials within the government of Saudi Arabia that they must adopt "know your customer" and anti-money laundering and anti-terrorist financing regulations and to comply with FATF's other provisions.

76.     In spite of all these warnings, Al Rajhi failed to adopt even the most minimal standards which are utilized by even the smallest banks throughout the world. This is true even though Al Rajhi and all other Islamic banks have in their possession and are required to keep meticulous records of the full details of their own and their customers Zakat and Hararm donations and investment collaborations.

77.     Al Rajhi's disregard of the warnings and total failure to implement even minimal industry standards with respect to anti-terrorist and money laundering safeguards, and "know your customer" regulations, resulted in the use of Al Rajhi as an instrument of terror and a material supporter, aider and abettor of al Qaeda terrorists and international terrorists activities.

78.     In the wake of September 11, and as a result of a worldwide awareness that Saudi Arabia and Al Rajhi have repeatedly refused and failed to implement anti-terrorist and money laundering safeguards and "know your customer" regulations, Saudi Arabia has recently admitted that the implementation of such regulations by its banks is and was feasible and desirable. As such, any delay on the part of Al Rajhi in the implementation of the regulations was intentional, reckless, and negligent.

***The al-Rajhi Family***

79.     Al Rajhi is majority owned and controlled by the al-Rajhi Family ("al-Rajhi Family") who derive from it much of their immense wealth.  Family members also make up the majority of its board of directors and executive committee.  The Chairman, Managing Director and largest stake holder is Sulaiman Abdul Aziz al-Rajhi and one of his brothers, Saleh Abdul Aziz al-Rajhi, has the second largest holding and is also a director.  In addition, he has been closely linked to Osama bin Laden's personal  secretary, Wadih el-Hage.  When the Kenyan house of Osama bin Laden's personal secretary was raided in 1997, evidence regarding Saleh al-Rajhi was discovered.  Wadih el-Hage was convicted for the 1998 United States Embassies bombings in Kenya and Tanzania by al Qaeda.  Other members of the executive committee include Abdullah Sulaiman al-Rajhi, Salah Ali Aba Al-Khalil, Naser Mohammed Al-Subai'y and Mohammed Abdul Aziz Al Rajhi.

80.     The al-Rajhi Family is the biggest donor to the SAAR Foundation.  SAAR is an acronym for Sulaiman Abdul Aziz al-Rajhi.  The SAAR organization was incorporated in Herndon, Virginia as a non-profit organization on July 29, 1983 and voluntarily dissolved on December 28, 2000.  It was incorporated at 555 Grove Street, Herndon, Virginia.  It was operated by Yacub Mirza (President and Registered Agent, CEO and Trustee), Mohammed Jaghlit (Treasurer and Director), Cherif Sedky (Secretary, Trustee and Director), Hisham Al-Talib (Registered Agent), Jamal Barzinji (Chairman) and Ahned Toronji (CFO and previously employed by Al Rajhi as an executive at its Majlis-al-Shura branch bank).  Another associate of the al-Rajhi Family is Abdullah al Obaid, employed as Deputy General Manager of Al Watania Poultry, a substantial Saudi company owned by the al-Rajhi Family from 1994 to the present. All of these defendants do business in and have significant business presence in the United States through al-Watania Poultry, one of the World's largest poultry businesses, and through defendant

Mar-Jac Poultry, Inc., Mar-Jac Investments, Inc. and Piedmont Poultry in the United States.

81.   Virginia Secretary of State corporate records indicate that a network of more than 100 intricately-linked and mutually-supporting organizations were based with the SAAR Foundation at 555 Grove Street.  The organizations at 555 Grove Street had intertwining and constantly changing directorships, with the same individuals serving as executives on the boards of a number of companies.  These organizations are known or reasonably suspected terrorist organizations.  The SAAR Foundation was at the center of this network with its operators performing multiple roles within the network.

82.   The stated purpose of the SAAR Foundation was to fund anti-hunger, educational and technological projects in developing Islamic countries.  It has or had substantial funds, and made substantial payments and donations, but appears to have undertaken very little, if any, fund raising activities.  Contrary to its lawyer's representation to the Internal Revenue Service that "its source of funds will be general public rather than a very small group of donors and contributors [and] the general public will be regularly approached," there is little evidence of this.  In the year 1998, SAAR reported donations of over $1.7 billion, the highest yearly total for a charitable organization in United States history.

83.   On December 14, 2001 both the United States Customs and the IRS received information that the SAAR Foundation and related organizations and individuals were involved in the funding of terrorist activity.  Acting on such information, United States authorities carried out investigations into the network of organizations centered around 555 Grove Street.  As a result, on March 21st and 22nd, 2002, 555 Grove Street was raided by Special Agents supporting Operation Green Quest along with other addresses linked to the network and its officers.  Search warrants were applied for and issued by the District Court of the Eastern District of Virginia on

the basis of evidence presented to it by Operation Green Quest.

84.     The al-Rajhi Family is the principal financier of the SAAR Foundation network, and as such, is implicated by, among other things, the SAAR network raids in March 2002 for its ties to international terrorism, Al Qaeda and Osama bin Laden.

85.     The al-Rajhi Family is closely associated with other members of the Golden Chain, the wealthy donors to Osama bin Laden's cause at a time when it was known by them that he advocated war against the United States and its citizens.  In 1998, Sulaiman Abdul Aziz Al Rajhi was on the executive council of IIRO with Ibrahim Afandi.  In 1989, Sulaiman Saleh Al Rajhi was on the Board of Trustees of Sanabel Inc. (a company registered in the District of Columbia) with Ibrahim Afandi and Saleh Kamel and the same three persons that incorporated Sanabel al-Kheer, the investment arm of IIRO based at 555 Grove Street, Herndon, Virginia. Yacub Mirza, an officer of the SAAR Foundation, was another Trustee on the board of Sanabel, Inc. and in 2002, together with an al-Rajhi Family employee, Abdullah Al Obaid, was an executive of Sanabel al-Kheer.

86.     Al Rajhi Banking and Investment, by and through the al-Rajhi Family which owns and controls it, has extensive dealings and connections with individuals and organizations linked, or reasonably believed to have links to international terrorism.  Given the nature and extent of these links, it is alleged that Al Rajhi has knowingly or materially provided or channeled funds for terrorist-related activity and/or has intentionally, recklessly or negligently allowed itself to be used to facilitate the funding of such activities.

87.     At all times relevant, the al-Rajhi Family members have been in control of Al Rajhi bank.  The knowledge of these family members with respect to the terrorist activities of the charities and individuals holding Al Rajhi accounts, and receiving Al Rajhi Zakat and Hararm

donations are maintained in collaboration, and with Al Rajhi will be directly imputed to Al Rajhi and vice versa.

88.     At all relevant times, Al Rajhi and its officers, directors and/or Board of Directors, through their failure to prevent the al-Rajhi Family from engaging in the material support of terrorism through their use and manipulation of Al Rajhi, actively aided, abetted, conspired with and/or materially supported al Qaeda terrorists and international terrorist activities.

89.     At all relevant times, Al Rajhi and its Board of Directors, by ignoring the al-Rajhi Family's ties to terrorists, terrorist activities and terrorist organizations, actively aided, abetted, conspired with and/or materially supported international terrorism and al Qaeda.