# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al v. al Qaida, et al.*, 03 CV 06978 (RCC)
*Continental Casualty Co., et al. v. al Qaeda Islamic Army, et al.,*04 -CV-05970 (RCC)
*Euro Brokers, Inc., et al. v. al Baraka Invest. and Development Corp.,et* al, 04 CV 07279 (RCC)
*World Trade Center Properties, LLC, et al. v. al Baraka Invest. and Development Corp., et al.,*
04 CV 07280 (RCC)
*New York Marine and General Insurance Co. v. al Qaida, et al.,*04 CV 6105 (RCC)

### THE PROPERTY DAMAGE PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED OF THE WORLD ASSEMBLY OF MUSLIM YOUTH SAUDI ARABIA AND THE WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL

January 23, 2006

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY ................................ 1

III.  APPLICABLE LEGAL STANDARDS ........................................................ 10

IV.   LEGAL ARGUMENT ........................................................................ 15

      A.   Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And
           Spirit Of The Federal Rules And Case Management Order No. 2 ......................... 15

      B.   Plaintiffs Have Stated Claims Against WAMY In Accordance With The
           Notice Pleading Requirements Of The Federal Rules Of Civil Procedure............. 16

           1.   Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The
                Federal Rules ...................................................................... 17

           2.   Plaintiffs Claims Do Not Abridge On Any Rights Protected By The First
                Amendment........................................................................ 19

      C.   Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of
           Action Against WAMY ................................................................. 21

           1.   Plaintiffs State A Valid Claim Against WAMY Under The Anti-
                Terrorism Act..................................................................... 21

           2.   Plaintiffs State Valid Claims Against WAMY Under Their Common
                Law Theories Of Liability .................................................. 22

           3.   The Euro Brokers And WTC Plaintiffs Have Asserted A Cause Of
                Action Under International Law ........................................ 23

           4.   Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages
                Counts Should Not Be Dismissed....................................... 24

           5.   Plaintiffs' RICO Claims Should Not Be Dismissed ......................... 24

V.    CONCLUSION................................................................................ 25

## TABLE OF AUTHORITIES

Page

### CASES

Allen v. New World Coffe, Inc.,
    2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001).................................................................16

Boim v. Quranic Literacy Institute,
    291 F.3d 1000 (7th Cir. 2002) ......................................................................................21

Chance v. Armstrong,
    143 F.3d 698 (2d Cir. 1998), *aff'd on appeal after remand*,
    159 F.3d 1345 (2d Cir. 1998).........................................................................................11

Conley v. Gibson,
    355 U.S. 41 (1957)...............................................................................................10, 11

DM Research, Inc. v. College of American Pathologists,
    170 F.3d 53 (1st Cir. 1999)............................................................................................14

Farmer v. Brennan,
    511 U.S. 825 (1994).......................................................................................................12

Leatherman v. Tarrant County,
    507 U.S. 163 (1993).......................................................................................................11

Linde, et al v. Arab Bank, PLC,
    2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. Sept. 2, 2005).................................................13

McLaughlin v. Anderson,
    962 F.2d 187 (2d Cir. 1992)...........................................................................................16

Moses v. Martin,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004).............................................................................16

Nagler v. Admiral Corp.,
    248 F.2d 319 (2d Cir. 1957)...........................................................................................14

Pelman v. McDonald's Corp.,
    396 F.3d 508 (2d Cir. 2005)...................................................................................... 12-13

Phelps v. Kapnolas,
    308 F.3d 180 (2d Cir. 2002).................................................................... 10-12, 17

Swierkiewicz v. Sorema,
    534 U.S. 506 (2002) .................................................................................11

In Re Terrorist Attacks on September 11, 2001,
    349 F. Supp. 2d at 826 ............................................................ 18-19, 21-22

Twombly v. Bell Atlantic Corp.,
    425 F.3d 99 (2d Cir. Oct. 3, 2005) ..........................................................14

United States ex rel. Epton v. Nenna,
    446 F.2d 363 (2d Cir. 1971) ....................................................................20

United States v. Bell,
    414 F.3d 474 (3d Cir. 2005) ....................................................................21

United States v. Rahman,
    189 F.3d 88 (2d Cir. 1999) ......................................................................20

United States v. Rowlee II,
    899 F.2d 1275 (2d Cir. 1990) ..................................................................20

United States. v. Sattar,
    2005 U.S. Dist. LEXIS 25079 (S.D.N.Y. Oct. 24, 2005) ......................21

Warren v. District of Columbia,
    353 F.3d 36 (D.C. Cir. 2004) ..................................................................12

Woodford v. Community Action Agency,
    239 F.3d 517 (2d Cir. 2001) ....................................................................11

Wynder v. McMahon,
    360 F.3d 73 (2d Cir. 2004) ...............................................................10, 11

## RULES AND STATUTES

18 U.S.C. § 2339(A) .........................................................................................22

18 U.S.C. §2339(b) ..........................................................................................23

Fed. R. Civ. P. 8(a) ............................................................................11, 14, 15

Fed. R. Civ. P. 9(b) ...........................................................................................11

Fed. R. Civ. P. 10(b) .........................................................................................15

Fed. R. Civ. P. 10(c) .........................................................................................16

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 10, 11, 19

**OTHER**

5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990) ......................................12

## I.    INTRODUCTION

The World Assembly of Muslim Youth (WAMY)[1] has moved to dismiss the above-referenced Complaints pursuant to Fed. R. Civ. P. 12(b)(6).  While WAMY's Motion professes to raise several distinct legal grounds for dismissal, a single argument lies at the core of virtually all of the theories WAMY advances:  that the allegations set forth in the pleadings against WAMY are conclusory, and fail to present sufficient facts to state a claim upon which relief can be granted.  As will be demonstrated below, that argument rests on fundamentally erroneous constructions of the applicable pleading requirements and standards of review, as well as a transparent mischaracterization of the allegations presented against WAMY.  Accordingly, WAMY's Motion to Dismiss should be denied.

## II.    SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY[2]

WAMY is a multi-national organization which has been at the forefront of the global *jihadist* movement for more than twenty years.  Headquartered in Saudi Arabia and with more than sixty offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular the needs of Muslim youth.  In reality, WAMY is an extremist organization, dedicated to spreading a

---

[1] In the Motion to Dismiss, WAMY draws a distinction between WAMY of Saudi Arabia (WAMY S.A.), WAMY of the United States (WAMY U.S.A.) and WAMY International.  In their Complaints, plaintiffs expressly alleged that WAMY operates as a single international organization, and that all of its activities are conducted under the direction and supervision of the headquarters in Saudi Arabia.  Given these detailed factual allegations regarding WAMY's organizational structure, WAMY's efforts to distinguish among its various offices can do no more than raise a factual dispute, and therefore should be ignored for purposes of deciding the present Motion to Dismiss.  As used in this Opposition, the term WAMY refers to all international offices and operational arms of WAMY, including the offices located in Saudi Arabia and the United States of America.

[2] The allegations against WAMY in each of the cases are quite extensive, and a complete recitation of the allegations against WAMY cannot be accomplished within this brief given the applicable page limitations.  The representative summary set forth herein is derived from the *Federal* Amended RICO Statement Applicable to WAMY at Exhibit A, the *WTC* RICO Statement Applicable to WAMY at Exhibit A, the *Euro Brokers* RICO Statement Applicable to WAMY at Exhibit A, and the *Continental* RICO Statement Applicable to WAMY at Exhibit A.

radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts.  In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

WAMY's dedication to al Qaida's global jihadist agenda is evident in the organization's own publications, and the statements of its senior officials.  According to a WAMY policy statement, "[a] Christian should be asked to repent.  If he does not he must be killed."  Similarly, the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid."   Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars."  "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."   *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed.  You should say they are infidels."

Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere.  WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement.  Under the guise of charity and humanitarian relief, WAMY has, among other things:  raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated

groups. Through these criminal activities, WAMY has further helped al Qaida to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…. The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

4

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service (FSB)].
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area.  According to a 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists….  Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone.

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media.  For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan…"  The report, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control.

Prior to the September 11th Attack,  WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya.  For example, in a January 15, 2000 article, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1.  The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2.  **They need money to buy arms and ammunition. (emphasis supplied)**
>
> I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere.  The timing and character of al Jahari's statements thus confirm that WAMY is a front for al Qaida's militant activities, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack.  For example, in January of 1999, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao.  MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of

1999.  In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida activities in Kashmir.  In 1995, a leader of an al Qaida affiliated military faction in Kashmir publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India."  Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaida umbrella.  Well before September 11, 2001, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

Q:      In your conferences, you have openly eulogized Osama bin Laden.

A:      Not once, but dozens of times.  We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

In March of 2003, al Qaida military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well.  In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism.  WAMY was among the organizations whose "employees" were specifically targeted by the measure.  Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices

approximately one year later, as part of ongoing counter-terrorism efforts.  WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida.  During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida  training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack.  The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales.  The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida.  WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden.  Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities, also known as the Safa Group.  Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack,  the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party.  According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani.  Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. The plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania, which, according to Romanian intelligence officials, receives most of its funds from WAMY.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on July 13, 2005, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda…  Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq."  Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.

For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world.  To begin with, as detailed above, the misconduct of

WAMY's offices throughout the world was widely reported in the media prior to September 11, 2001.  Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices.  Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans.  Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya.  WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

## III.   APPLICABLE LEGAL STANDARDS

WAMY moves to dismiss the property damage complaints pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8 (2d Cir. 2004); Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*).

In evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in

Plaintiffs' favor.  <u>Wynder</u>, 360 F.3d at 77; <u>Phelps</u>, 308 F.3d at 184.  Plaintiffs are not required to prove their case at the pleading stage.  Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." <u>Woodford v. Community Action Agency</u>, 239 F.3d 517 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." <u>Chance v. Armstrong</u>, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive.  <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint need only include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Id</u>. (quoting <u>Conley</u>, 355 U.S. at 47 (1957)).  Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a).  *See, e.g.,* <u>Leatherman v. Tarrant County</u>, 507 U.S. 163, 168-69 (1993).  In keeping with this concept, Rule 9 expressly provides that "malice, intent, knowledge and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).

In its decisions in the post <u>Swierkiewicz</u> era, the Second Circuit has consistently and uniformly held that the notice pleading standards do not require a plaintiff to plead particularized facts regarding a defendant's state of mind.  For example, in <u>Phelps</u>, the Second Circuit reversed a district court ruling which had dismissed a complaint for failure to plead specific facts in support of allegations of the defendant's knowledge, holding instead that such a heightened pleading standard was "unwarranted" under Fed. R. Civ. P. 8(a).  <u>Phelps</u>, 308 F.3d at 186.  "A

plaintiff's allegation of knowledge is itself a particularized factual allegation, which he will have the opportunity to demonstrate at the appropriate time 'in the usual ways'." Id. at 187 n. 6 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).

As the Phelps Court further instructed: "However unlikely it may appear to a court from a plaintiff's complaint that he will ultimately be able to prove an alleged fact such as mental state, the court may not go beyond Fed. R. Civ. P. 8(a) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." Phelps, at 186-87.

In Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of Phelps in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge. Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." Id. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

More recently, in Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. In Pelman, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." Id. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was

"the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." Id. at 512. [3]

Similarly, in Linde, et al v. Arab Bank, PLC, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. Sept. 2, 2005), the United States District Court for the Eastern District of New York rejected the defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here. In Linde, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations. Id. at *11-23. Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent." Id. at *42. The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure:

> To the extent the defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard. It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

Id. The Linde Court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims. "Once again, defendant attempts to impose a standard of pleading beyond that required by the rules. It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof." Id. at *50.

---

[3] The Pelman Court further held that, to the extent there is any deficiency in a plaintiff's pleading, the proper remedy is to require the plaintiff to file a More Definite Statement, and not to dismiss the action. Pelman, 396 F.3d at 512. Consistent with that ruling, plaintiffs request leave to amend their pleading to cure any perceived deficiencies in their allegations against WAMY.

That Plaintiffs' claims are predicated on conspiracy theories does not alter the well established standards discussed above.  Indeed, subsequent to this Court's ruling of September 21, 2005, the Second Circuit affirmed that no heightened pleading requirement applies to conspiracy claims.  In <u>Twombly v. Bell Atlantic Corp.</u>, 425 F.3d 99 (2d Cir. Oct. 3, 2005), the Second Circuit overturned a district court's dismissal of a class action complaint alleging unlawful conspiracy in the antitrust context, holding instead that  Fed. R. Civ. P. 8(a) required a short and plain statement of the claim, nothing more:

> If a pleaded conspiracy is implausible on the basis of the facts as pleaded -- if the allegations amount to no more than "unlikely speculations" -- the complaint will be dismissed. <u>DM Research, Inc. v. College of American Pathologists</u>, 170 F.3d 53, 56 (1st Cir. 1999).  But short of the extremes of "bare bones" and "implausibility," a complaint in an antitrust case need only contain the "short and plain statement of the claim showing that the pleader is entitled to relief"  that Rule 8(a) requires.

<u>Twombly</u>, 425 F.3d at 111.  The Court further held that the emphasis should be on notice pleading, and not a preemptive display of all the possible evidence:

> The complaint should not "be burdened with possibly hundreds of specific instances" of the antitrust violations alleged. <u>Nagler v. Admiral Corp.</u>, 248 F.2d 319, 326 (2d Cir. 1957). "Such pleading of the evidence is surely not required and is on the whole undesirable." <u>Id</u>. "It is a matter for the discovery process, not for allegations of detail in the complaint." <u>Id</u>.

Finally, the Second Circuit addressed concerns regarding whether Defendants had an undue burden under this standard of facing potentially meritless claims:

> We are not unsympathetic to these concerns, but we find the arguments based on them ultimately unconvincing. **At the pleading stage, we are concerned only with whether the defendants have "fair notice" of the claim**, and the conspiracy that is alleged as part of the claim, against

<u>Twombly</u> at 116 (emphasis added).

IV.    **LEGAL ARGUMENT**

      A.    **Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And Spirit Of The Federal Rules And Case Management Order No. 2**

As a preliminary matter, WAMY argues that the pleadings filed by the *Euro Brokers*, *WTC*, *Continental* and *N.Y. Marine* plaintiffs on September 30, 2005 do not comply with the Federal Rules or requirements of Case Management Order #2.[4]  In particular, WAMY argues that the *Euro Brokers*, *WTC*, and *N.Y. Marine* were not permitted to use RICO Statements as a means to amend their pleadings, reasoning that CMO #2 affords that right only to the *Federal* plaintiffs.  Further, WAMY argues that Fed. R. Civ. P. 8 and Fed. R. Civ. P. 10(b) bar the *Euro Brokers*, *WTC*, *Continental* and *N.Y. Marine* plaintiffs from incorporating by reference prior pleadings or exhibits into their Complaints.  Both of these arguments lack merit.

WAMY's argument that the *Euro Brokers*, *WTC*, and *N.Y. Marine* were not permitted to amend their pleadings via RICO Statement is frivolous, at best.  Pursuant to a Stipulation between WAMY and plaintiffs, endorsed as an Order of this Court on July 26, 2005, WAMY expressly "STIPULATED AND AGREED that plaintiffs pursuing claims for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") shall serve their respective RICO Statements concerning WAMY, on or before August 31, 2005."  At the time the parties entered into that agreement, there can be no doubt that both WAMY and plaintiffs understood that any such RICO Statements would serve to augment and amend the allegations against WAMY, as evidenced by the fact that WAMY was not required to file its Motion to Dismiss until after the deadline for submission of RICO Statements.  Having stipulated to the filing of the relevant RICO Statements, WAMY should not be permitted to side step its agreement with plaintiffs and contest the validity of those pleadings on collateral grounds.  Regardless, judicial precedent

---

[4] Contrary to WAMY's assertion, the *Continental* plaintiffs did file their Amended Complaint in a timely manner on September 30, 2005.  On this point, the *Continental* plaintiffs respectfully refer the Court to the Affirmation of Robert Kaplan, Esquire, submitted in support of Plaintiffs' Opposition to the Motion to Dismiss of Dar Al Maal Al Islami Trust.

uniformly hold that RICO Statements should be treated as part of the pleadings.  See, e.g.,

McLaughlin v. Anderson, 962 F. 2d 187, 195 (2d Cir. 1992); Moses v. Martin, 360 F. Supp. 2d

533, 539 n. 22 (S.D.N.Y. 2004); Allen v. New World Coffee, Inc., 2001 U.S. Dist. LEXIS 3269,

n. 3 (S.D.N.Y. 2001).

Moreover, the incorporation of the RICO and More Definite Statements into plaintiffs'

Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules.

Fed. R. Civ. P. 10(c), which WAMY notably avoids reference to, provides:

> Statements in a pleading may be adopted by reference in a
> different part of the same pleading or in another pleading or in any
> motion.  A copy of any written instrument which is an exhibit to a
> pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c).  In view of the plain language of Rule 10(c), plaintiffs incorporation of the

RICO and More Definite Statements into their Complaints, by reference or attachment as

exhibits, complies with both the letter and spirit of the Federal Rules.[5]

### B.   Plaintiffs Have Stated Claims Against WAMY In Accordance With The Notice Pleading Requirements Of The Federal Rules Of Civil Procedure

In its Motion to Dismiss, WAMY also urges this Court to find that the complaints fail to

state a claim upon which relief can be granted, and should therefore be dismissed.  In support of

that argument, WAMY asserts that the plaintiffs' pleadings are conclusory and fail to present

factual allegations sufficient to establish WAMY's mental state and proximate cause.  In

addition, focusing only on a partial and unspecified group of the allegations against it, WAMY

suggests that plaintiffs' claims are somehow barred by the First Amendment to the U.S.

Constitution.  As will be demonstrated below, WAMY ignores the relevant pleading standards

and applies a fundamentally improper test for causation.  Moreover, the First Amendment does

not serve as a substantive legal bar to plaintiffs' claims because : (1) WAMY fails to meet its

---

[5] Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

burden to establish, even as a preliminary matter, that plaintiffs' claims implicate any protected speech or activity; and (2) the First Amendment does not immunize WAMY for speech or activity used to further a conspiracy or to further conduct in violation of valid criminal statute.

### 1.   Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The Federal Rules

WAMY's contention that plaintiffs have failed to adequately plead WAMY's mental state and the causation element of their claims is factually and legally flawed.

Contrary to WAMY's assertion, plaintiffs' pleadings do contain competent *allegations* regarding WAMY's knowing and intentional participation in al Qaida's conspiracy to attack America.[6]  For example, plaintiffs allege that "[f]or more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts," and that "[f]or many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world."  *Federal* Amended RICO Statement, Exhibit A; *Continental* 2AC, Addendum at 11 and 17, *Continental* RICO Statement, Exhibit A.  These direct allegations regarding WAMY's knowledge and intent are themselves "particularized factual allegations," and satisfy the relevant pleading standards applicable to plaintiffs' claims.  Phelps, 308 F.3d at 187 n.6.

While plaintiffs are not required to provide more detailed factual allegations regarding WAMY's knowledge and intent, they have done so here.  The pleadings detail the widespread media reporting, prior to September 11, 2001, of WAMY's partnership with al Qaida and associated militant Islamic extremists, and set forth specific evidence that WAMY's senior leadership closely monitored the activities of all WAMY offices and the media reports

---

[6] Under the relevant pleading standards, as articulated by the 2nd Circuit, plaintiffs respectfully submit that they would sufficiently state a claim against WAMY merely by *alleging* that WAMY knowingly and intentionally provided material support and resources to al Qaida, both directly and indirectly.

discussing their activities.  *Federal* Amended RICO Statement, Exhibit A; *WTC* RICO Statement, Exhibit A; *Euro Brokers* RICO Statement, Exhibit A.  Plaintiffs also present detailed allegations regarding the direct involvement of senior WAMY officials, such as designated terrorist sponsor and long time WAMY official Adel Batterjee, in WAMY's terrorist activities. *WTC* RICO Statement, Exhibit A; *Euro Brokers* RICO Statement, Exhibit A.  Moreover, the Complaints and other relevant pleadings present factual allegations from which it is logical to infer that officials of the Saudi government would have raised concerns about the involvement of the organization in extremist and terrorist activity with senior WAMY officials.  *Federal* Amended RICO Statement, Exhibit A.  Even under the erroneous pleading standard WAMY advocates, these allegations are more than sufficient to establish the scienter element of plaintiffs' claims.

WAMY's contention that plaintiffs have failed to sufficiently allege proximate cause is equally unconvincing.  As this Court has recognized, "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda."  In Re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 826.  Consistent with this holding, plaintiffs' consistent and specific averments of WAMY's knowing and intentional sponsorship of al Qaida are, in and of themselves, sufficient to establish causation at this stage of the litigation.

Even if more specific allegations of causation were required, plaintiffs have met that burden.  For example, the *Federal* plaintiffs allege that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September

11th Attack." *Federal* FAC 74, *Continental* 2AC ¶ 26.  Similarly, the *WTC* plaintiffs assert that al Qaida's training "camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan in preparation for the September 11, 2001 Attacks.  None of this would have been possible without the funds and sponsorship supplied by participants and conspirators including the World Assembly of Muslim Youth." *WTC* RICO Statement at ¶ 14.   Thus, although unnecessary, the plaintiffs' pleadings specifically allege that al Qaida could not have successfully carried out the September 11th Attack absent the support of WAMY.

Finally, that WAMY *maintains* that it was not specifically aware of the September 11th plot, or that it did not directly participate in the Attack itself, is irrelevant.  As this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 829.

For the foregoing reasons, WAMY's argument that plaintiffs have failed to meet the simple notice pleading requirements of the Federal Rules is manifestly devoid of merit.  Stated simply, plaintiffs have alleged the existence of the a conspiracy (the existence of which is beyond dispute), WAMY's knowing and intentional participation in that conspiracy, and the forms of material support WAMY provided in furtherance of the conspiracy's objectives.  These allegations serve to provide WAMY with "fair notice" of the claims against it.

> 2.   **Plaintiffs Claims Do Not Abridge On Any Rights Protected By The First Amendment**

WAMY's First Amendment defense also fails as a grounds for dismissal pursuant to Rule 12(b)(6).  To being with, while WAMY generically asserts that "Many of the activities alleged against WAMY…constitute 'speech or conduct'" protected by the First Amendment," WAMY does not identify with particularity each activity or statement underlying plaintiffs' claims that it

believes to be protected by the First Amendment.  Absent specific identification of the statements or activities at issue, WAMY cannot carry its preliminary burden as the party seeking dismissal to show that the First Amendment protections apply.  In fact, by invoking the First Amendment only with respect to "Many of the activities alleged," WAMY necessarily acknowledges that much of the conduct underlying the plaintiffs' claims does not implicate the First Amendment in any respect.  Thus, by WAMY's own admission, the First Amendment cannot serve as a basis for dismissal of plaintiffs' claims.[7]

Moreover, the few examples WAMY alludes to in its brief do not appear to implicate the First Amendment in any respect.  For instance, WAMY refers to plaintiffs' allegations regarding hate speech contained in several WAMY publications.  However, it appears that most, if not all, of the examples cited relate to publications or speeches outside of the United States, and not involving citizens of the United States.  Obviously, the protections of the First Amendment do not extend to speech or activity of foreign citizens outside of the United States, and the allegations pertaining thereto consequently do not implicate any First Amendment right.

Even were WAMY's First Amendment argument not plagued by the fundamental problems discussed above, it would fail because the First Amendment does not immunize a party for speech or activity used to further a conspiracy or to further conduct in violation of valid criminal statute.  See United States v. Rowlee II, 899 F.2d 1275, 1278 (2d Cir. 1990) ("It rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute"); United States v. Rahman, 189 F.3d 88 (2d Cir 1999); United States ex rel. Epton v. Nenna, 446 F.2d 363 (2d Cir. 1971) (upholding defendant's conviction for conspiracy to riot even where the overt acts

---

[7] To the extent WAMY is attempting to raise an evidentiary dispute regarding the admissibility of WAMY's statements and publications, its arguments are without merit.  At a minimum, WAMY's statements are admissible to show its hostility towards America and democratic societies, and the identity between its worldview and that of al Qaida, to demonstrate WAMY's motive for assisting al Qaida.  Rahman, 189 F.3d at 118.

alleged in the indictment were all constitutionally protected speech); <u>United States. v. Sattar</u>, 2005 U.S. Dist. LEXIS 25079, at *63 (S.D.N.Y. Oct 24, 2005) (First Amendment does not bar prosecution "for unlawful speech-acts such as conspiracy or aiding and abetting") (<u>quoting</u> <u>United States v. Bell</u>, 414 F.3d 474, 482 n.8 (3d Cir. 2005). As plaintiffs' pleadings make clear, WAMY used its publications and speeches as instruments to advance al Qaida's conspiracy to attack America, and as tools to solicit personnel, funds, arms and other forms of material support for al Qaida. Under the well settled standards discussed above, the claims relating to such publications, statements and activities are not barred by the First Amendment.

Moreover, plaintiffs claims do not rest on a "guilt by association" theory of liability, as WAMY suggests. To the contrary, plaintiffs' claims are predicated on the theory that WAMY conspired with, aided and abetted and provided material support to al Qaida, a fact WAMY implicitly recognizes in its own brief when it challenges the sufficiency of plaintiffs' allegations with respect to those theories of liability. The imposition of liability for conspiring with, aiding and abetting or materially supporting a terrorist organization does not constitute "guilt by association" in violation of the First Amendment. <u>Boim v. Quranic Literacy Inst.</u>, 291 F.3d 1000, 1024 (7th Cir. 2002).[8]

### C. Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of Action Against WAMY

#### 1. <u>Plaintiffs State A Valid Claim Against WAMY Under The Anti-Terrorism Act</u>

For purposes of these proceedings, plaintiffs state a claim against a defendant under the Anti-terrorism Act (ATA) by alleging that the defendant knowingly conspired with, aided and abetted or provided material support or resources to al Qaida. <u>In re Terrorist Attacks on</u>

---

[8] For a further discussion of these First Amendment principles, plaintiffs respectfully refer the Court to the discussion on pp. 6-12 of the *O'Neill* Plaintiffs Memorandum of Law in Opposition to the Motion to Dismiss of the Council on American-Islamic relations, incorporated herein by reference.

September 11, 2001, 349 F. Supp. 2d at 828-29.  The ATA defines the term "material support and resources" to include, among other things:  funds in any form; financial services; personnel; weapons; communication equipment; safehouses; and false identification.  18 U.S.C. § 2339(A). Plaintiffs' pleadings regarding WAMY's support of al Qaida specifically allege that WAMY knowingly provided funds, and financial services to al Qaida.  Plaintiffs further allege that WAMY knowingly provided al Qaida members with documents falsely identifying them as WAMY aid workers, to assist those al Qaida operatives to gain access to conflict regions.  Given these and other allegations, and for the reasons stated above, plaintiffs have asserted valid claims against WAMY under the ATA.

> **2.      Plaintiffs State Valid Claims Against WAMY Under Their Common Law Theories Of Liability**

WAMY's arguments in favor of dismissal of plaintiffs' common law theories are, in large part, derivative of the general arguments it raises regarding the sufficiency of plaintiffs' allegations regarding WAMY's knowledge and intent and causation.  In this vein, WAMY asserts that plaintiffs' trespass, intentional infliction of emotional distress, assault and battery, wrongful death, and survival claims should be dismissed on the grounds that plaintiffs have failed to allege facts sufficient to establish WAMY's knowing and intentional support of al Qaida, or facts sufficient to establish a causal link between WAMY's conduct and the September 11th Attack.  See WAMY's Memorandum of Law at pp. 16-19.  However, this Court has already found that plaintiffs state valid common law causes of action under these common law theories by alleging that a defendant knowingly conspired with, or aided and abetted, al Qaida.  In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 829-30.  For the reasons set forth above, plaintiffs have more than met the pleading requirements applicable to the concerted action theories advanced against WAMY, and have therefore stated valid claims under trespass,

intentional infliction of emotional distress, assault and battery, wrongful death and survival theories.

Moreover, contrary to the defendant's assertion, plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not demonstrably time-barred.  On this point, plaintiffs respectfully refer the Court to the discussion of this issue on pages 19-20 of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Dr. Abdullah al Turki, incorporated herein by reference.

Plaintiffs have stated a valid claim in negligence against WAMY under the liberal pleading requirements of Rule 8 as well.  International terrorism is a serious and deadly problem that threatens the health, safety and welfare of people throughout the world, and the vital interests of the United States.  *See* 18 U.S.C. §2339(b), n.(a)(1).  Given that fact, it is clear that WAMY owed a duty to refrain from materially supporting al Qaida, as reflected in the ATA and numerous international agreements.  Plaintiffs have alleged that WAMY breached that duty by providing material support to al Qaida, and that their injuries were the foreseeable and proximate result of WAMY's conduct.  *Federal* FAC at ¶ 74.  In view of these allegations, plaintiffs have stated a valid cause of action in negligence against WAMY, the resolution of which is not appropriate in the context of a motion to dismiss.

### 3.     The Euro Brokers And WTC Plaintiffs Have Asserted A Cause Of Action Under International Law

The legal and factual arguments in support of the international law claims advanced by the *Euro Brokers* and *WTC* plaintiffs are well advanced in earlier pleadings.  In lieu of restating those same arguments herein, those plaintiffs respectfully refer the Court to the pertinent discussion in *Cantor Fitzgerald* and *Port Authority* Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank, incorporated herein by reference.

### 4.     Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages Counts Should Not Be Dismissed

Defendant correctly argues that no independent causes of action exist under New York law for conspiracy, aiding and abetting or punitive damages.  However, at this stage of these proceedings, the substantive law governing each of plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss those causes of action at this time. Moreover, there can be little dispute that plaintiffs' have alleged that WAMY conspired with and aided and abetted al Qaida, or that plaintiffs are entitled to recover punitive damages in the event that they prevail against this defendant under the theories advanced.  Under these circumstances, dismissal of the conspiracy, aiding and abetting and punitive damages counts would be inappropriate.

### 5.     Plaintiffs' RICO Claims Should Not Be Dismissed

In support of its argument that plaintiffs' RICO claims should be dismissed, WAMY argues that plaintiffs fail to adequately allege:  (1) investment of racketeering income in the enterprise; (2) active management or operation of the enterprise; (3) WAMY's role as a central figure in the enterprise; or (4) causation.[9]  Fairly read, plaintiffs' pleadings allege that WAMY knowingly acted as one of al Qaida's primary fronts for raising and distributing funds, arms and other physical assets.  Plaintiffs' further allege that WAMY fraudulently raised funds throughout the world on behalf of al Qaida, through international mail and other communications vehicles, under the guise of charity.  In these respects, WAMY's role in the enterprise closely mirrors that of Al Haramain Islamic Front (AHIF), one of al Qaida's other principal charity fronts. Accordingly, plaintiffs respectfully refer the Court to the discussion of RICO liability set forth on pp. 13-17 of the Property Damage Plaintiffs' Consolidated Memorandum of Law in

---

[9] WAMY also argues that the *NY Marine* plaintiffs' RICO claims should be dismissed based on their failure to file a RICO Statement.  However, a plaintiff's failure to file a RICO Statement does not constitute a basis for dismissing a valid RICO claim, particularly under the unique circumstances of this case.  On this point, the *NY Marine* plaintiffs respectfully refer the Court to the relevant discussion on p. 22 of Plaintiffs' Memorandum of Law in Opposition to the Consolidated Motion to Dismiss of the Saudi Red Crescent Society, incorporated herein by reference.

Opposition to the Motion to Dismiss of Al Haramain Islamic Foundation, Inc., incorporated herein by reference.

## V.   CONCLUSION

For the foregoing reasons, the Property Damage Plaintiffs respectfully request that WAMY's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

Dated: January 23, 2006                BY: _____/s/_____

Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
1900 Market Street
Philadelphia, PA 19103
Tele: (215) 665-2000
Fax: (215) 665-2013

Attorneys for *Federal Insurance* Plaintiffs

Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN &
    SHERIDAN, LLP
415 Madison Avenue
New York, NY 100 17-11 1 1
Telephone: (212) 401-7600

Attorneys for *EuroBrokers* and
*WTC Properties* Plaintiffs

Robert M. Kaplan (RK1428)
FERBER FROST CHAN & ESSNER, LLP
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
(212) 944-2200

Attorneys for *Continental* Plaintiffs

Attorney for the O'Neill Plaintiffs
David H. Fromm, Esq. (DH-9334)
Frank J. Rubino, Jr., Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, New York 10017
(212) 983-8500

Attorneys for Plaintiff *New York Marine And
General Insurance Company*

Phila1\2419115\1 00000.0000.000117430.000

26