## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.* No. 02-CV-6977
*Burnett, et al. v. Al Baraka Invest. & Develop. Corp., et al.,* No. 03-CV-5738, 03-CV-9849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al.,* No. 04-CV-1923

## THE PERSONAL INJURY PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH BELIEF MAY BE GRANTED OF THE WORLD ASSEMBLY OF MUSLIM YOUTH  SAUDI ARABIA AND THE WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL

January 23, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY ........................... 1

III.    APPLICABLE LEGAL STANDARDS ................................................................ 10

IV.    LEGAL ARGUMENT ....................................................................................... 11

        A.     Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And Spirit Of the Federal Rules And Case Management Order No. 2 ............................ 12

        B.     Plaintiffs Have Stated Claims Against WAMY In Accordance With The Notice Pleading Requirements Of The Federal Rules Of Civil Procedure .... 13

               1.     Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The Federal Rules ............................................................................ 14

               2.     Plaintiffs' Claims Do Not Abridge On Any Rights Protected By The First Amendment ...................................................................... 16

        C.     Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of Action Against WAMY ................................................................................ 17

               1.     Plaintiffs State A Valid Claim Against WAMY Under The Anti-Terrorism Act ........................................................................... 17

               2.     Plaintiffs State Valid Claims Against WAMY Under Their Common Law Theories Of Liability .................................................. 17

               3.     Plaintiffs State A Valid Claim Against WAMY Under The Alien Tort Claims Act ............................................................................... 19

               4.     Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages Counts Should Not Be Dismissed .................................... 19

               5.     Plaintiffs' RICO Claims Should Not Be Dismissed ............................ 19

        D.     Burnett Plaintiffs Have Properly Served WAMY ........................................... 21

V.      CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Alfa Corp. v Alfagres, S.A.,* 385 F. Supp. 2d 1230 (M.D. Ala. 2005) .......................................... 23

*Benny v. Piples*, 799 F.2d 489 (9th Cir. 1986), *amended*, 807 F.2d 485 (6th Cir. 1987), *cert. denied*, 484 U.S. 870 (1987) ................................................................................................ 22

*Brunn v. Xtra Superfood Centers, Inc.,* 2001 WL 180136 (D. Virgin Islands Jan. 4. 2001)........ 23

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ..................................................................... 11

*Citadel Management Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133 (S.D.N.Y. 2000) .............. 23

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................................. 10, 11

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005)............................................................................... 20

*Fashion Page, Ltd. v. Zurich Ins. Co.,* 428 N.Y.S.2d 890 (N.Y. Ct. App. 1980)........................ 23

*Friday v. U.S. Dept of Justice*, 1993 WL 430547 (D. Or. Oct. 21, 1993) ................................... 22

*Gleason v. McBride*, 869 F.2d 688 (2d Cir. 1989) ...................................................................... 21

*Henderson v. United States*, 517 U.S. 654 (1996) ...................................................................... 22

*Heritage House Frame & Molding Co. v. Boyce Highlands Furniture Co.*, 88 F.R.D. 172 (E.D.N.Y. 1980)..................................................................................................................... 24

*In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765 (S.D.N.Y. 2005)... 15, 16, 18

*KLM – Royal Dutch Airlines v. Curtiss-Wright Corp.,* 17 F.R.D. 49 (S.D.N.Y. 1955) .............. 23

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993)................................................................... 11

*Linde, et al v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005)...................................... 11

*Lutin v. New Jersey Field Corp.*, 1996 WL 636037 (S.D.N.Y. Nov. 1, 1996)............................ 22

*Maryland National Bank v. M/V Tanicorp I,* 796 F. Supp 188 (D. Md. 1992) ........................... 22

*McLaughlin v. Anderson,* 962 F. 2d 187 (2d Cir. 1992)............................................................... 12

*Michaelson v. Hudson*, 530 N.Y.S.2d 225 (App. Div. 2nd Dept. 1988)................................ 22, 24

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ............................................................. 12

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ........................................................ 11

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002).................................................................. 10, 11

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)............................................................................. 11

*Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005)....................................................... 11

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)................................................... 11

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ........................................ 10

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ........................................................ 10

## Statutes

18 U.S.C. § 2339(A) ...................................................................................... 17

18 U.S.C. §2339 ........................................................................................... 18

28 U.S.C. § 1350 ...................................................................................... 17, 19

Fed. R. Civ. P. 10(b) ..................................................................................... 12

Fed. R. Civ. P. 10(c) ..................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ......................................................................... 1, 10, 16

Fed. R. Civ. P. 4(e)(1) .................................................................................... 22

Fed. R. Civ. P. 4(h) ....................................................................................... 22

Fed. R. Civ. P. 8 ................................................................................. 12, 18, 20

Fed. R. Civ. P. 8(a)(2) .................................................................................... 11

Fed. R. Civ. P. 9(b) ....................................................................................... 11

N.Y McKinney's CPLR § 311 ........................................................................ 23

## I.   INTRODUCTION

The World Assembly of Muslim Youth (WAMY)[1] has moved to dismiss the above-referenced Complaints pursuant to Fed. R. Civ. P. 12(b)(6).  While WAMY's Motion professes to raise several distinct legal grounds for dismissal, a single argument lies at the core of virtually all of the theories WAMY advances:  that the allegations set forth in the pleadings against WAMY are conclusory and fail to present sufficient facts to state a claim upon which relief can be granted.  As will be demonstrated below, that argument rests on fundamentally erroneous constructions of the applicable pleading requirements and standards of review, as well as a transparent mischaracterization of the allegations presented against WAMY.  Accordingly, WAMY's Motion to Dismiss should be denied.

## II.   SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY[2]

WAMY is a multi-national organization which has been at the forefront of the global *jihadist* movement for more than twenty years.  Headquartered in Saudi Arabia and with more than sixty offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular the needs of Muslim youth.  In reality, WAMY is an extremist organization, dedicated to spreading a

---

[1]    In the Motion to Dismiss, WAMY draws a distinction between WAMY of Saudi Arabia (WAMY S.A.), WAMY of the United States (WAMY U.S.A.) and WAMY International.  In their Complaints, plaintiffs expressly alleged that WAMY operates as a single international organization, and that all of its activities are conducted under the direction and supervision of the headquarters in Saudi Arabia.  Given these detailed factual allegations regarding WAMY's organizational structure, WAMY's efforts to distinguish among its various offices can do no more than raise a factual dispute, and therefore should be ignored for purposes of deciding the present Motion to Dismiss.  As used in this Opposition, the term WAMY refers to all international offices and operational arms of WAMY, including the offices located in Saudi Arabia and the United States of America.

[2] The allegations against WAMY in each of the cases are quite extensive, and a complete recitation of the allegations against WAMY cannot be accomplished within this brief given the applicable page limitations.  The representative summary set forth herein is derived from the *O'Neill* More Definite Statement/Additional Allegations as to WAMY at Exhibit A.  See also the *O'Neill* First Consolidated Complaint ("FCC") ¶¶ 50, 94, 111, 118-125; and Appendix 1 – *O'Neill* Summary of Pleadings References to WAMY, attached hereto as Exhibit 1.  Similar allegations regarding WAMY's misconduct appear in the Ashton 6th Amended Complaint at ¶¶ 198-200, 203, 211, 233, 264, 269, 300, 348, 382 and the Burnett 3rd Amended Complaint at ¶¶ 156, 172, 229, 231-233, 244, 362.

radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts.  In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

WAMY's dedication to al Qaida's global jihadist agenda is evident in the organization's own publications, and the statements of its senior officials.  According to a WAMY policy statement, "[a] Christian should be asked to repent.  If he does not he must be killed."  Similarly, the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid."  Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars."  "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."  *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed.  You should say they are infidels."

Consistent with its extremist agenda, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere.  WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and has continuously adapted to serve the expanding jihadist movement.  Under the guise of charity and humanitarian relief, WAMY has, among other things:  raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups.  Through these criminal activities, WAMY has helped al Qaida to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented before September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….
> The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….

> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service (FSB)].
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area.  According to a 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists….  Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone.

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were widely reported in the mainstream media.  For instance, in August of 1999, NBC News reported that "Osama bin Laden is financing the Chechen operation in Dagestan…" The report, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control.

Before the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya.  For example, in a January 15, 2000 article, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote:

[I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1.  The question that must be asked is: What do the Chechen Muslims need from us today?

2.      *They need money to buy arms and ammunition. (emphasis supplied)*

I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere.  The timing and character of al Jahari's statements thus confirm that WAMY is a front for al Qaida's militant activities, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years before the September 11th Attack.  For example, in January of 1999, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao.  In January of 1999, MILF bombed and attacked several remote Philippine villages, forcing 400 civilians to flee.  In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida activities in

Kashmir.  In 1995, a leader of an al Qaida affiliated military faction in Kashmir publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India."  Other articles published before September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the al Qaida umbrella. Well before September 11, 2001, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q:    In your conferences, you have openly eulogized Osama bin Laden.
> A:    Not once, but dozens of times.  We believe he has shown great character in standing up to the Americans, the biggest terrorists in the World.

In March of 2003, al Qaida military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well.  In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism.  WAMY was among the organizations whose "employees" were specifically targeted by the measure.  Pakistani intelligence officials, operating in conjunction with United States FBI agents, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts.  WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand-delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was later recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under

the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. The plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania, which, according to Romanian intelligence officials, receives most of its funds from WAMY.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on July 13, 2005, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.

For many years before the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media before September 11, 2001. Given the senior leadership's close supervision of the activities of the regional offices, high ranking WAMY officials were certainly aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices.  Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans.  Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya.  WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

## III.   APPLICABLE LEGAL STANDARDS

WAMY moves to dismiss the personal injury complaints pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8 (2d Cir. 2004); Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*).

In evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in Plaintiffs' favor.  Wynder, 360 F.3d at 77; Phelps, 308 F.3d at 184.  Plaintiffs are not required to prove their case at the pleading stage.  Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."

Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint need only include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (quoting Conley, 355 U.S. at 47 (1957)). Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g.,* Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993). In keeping with this concept, Rule 9 expressly provides that "malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

The Second Circuit has consistently and uniformly held that the notice pleading standards do not require a plaintiff to plead particularized facts regarding a defendant's state of mind in its post-Swierkiewicz era. Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002); Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005). See also Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004); Linde, et al v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005). Similarly, the Second Circuit has recently clarified that no heightened pleading requirement applies to civil conspiracy claims. Twombly v. Bell Atlantic Corp., 425 F.3d 99 (2d Cir. 2005).[3]

## IV.    LEGAL ARGUMENT

---

[3] For further discussion of these decisions, please see Property Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant WAMY.

**A.**      **Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And Spirit
Of the Federal Rules And Case Management Order No. 2**

As a preliminary matter, WAMY argues that the pleadings filed by the *Burnett* and

*O'Neill* plaintiffs on September 30, 2005 do not comply with the Federal Rules or requirements

of Case Management Order #2.[4]  In particular, WAMY argues that the *Burnett* and *O'Neill*

plaintiffs were not permitted to use RICO Statements as a means to amend their pleadings,

reasoning that CMO #2 affords that right only to the *Federal* plaintiffs.  Further, WAMY argues

that Fed. R. Civ. P. 8 and Fed. R. Civ. P. 10(b) bar the *Burnett* and *O'Neill* plaintiffs from

incorporating by reference prior pleadings or exhibits into their Complaints.  Both of these

arguments lack merit.

WAMY's argument that the plaintiffs were not permitted to amend their pleadings via

RICO Statement is frivolous, at best.[5]  Pursuant to a Stipulation between WAMY and plaintiffs,

endorsed by this Court on July 26, 2005, WAMY expressly "STIPULATED AND AGREED

that plaintiffs pursuing claims for relief under the Racketeer Influenced and Corrupt

Organizations Act ("RICO") shall serve their respective RICO Statements concerning WAMY,

on or before August 31, 2005."   At the time the parties entered into that agreement, there can be

no doubt that both WAMY and plaintiffs understood that any such RICO Statements would serve

to augment and amend the allegations against WAMY, as evidenced by the fact that WAMY was

not required to file its Motion to Dismiss until after the deadline for submission of RICO

Statements.  Regardless, judicial precedent uniformly hold that RICO Statements should be

treated as part of the pleadings. See, e.g., McLaughlin v. Anderson, 962 F. 2d 187, 195 (2d Cir.

1992); Moses v. Martin, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); Allen v. New World

Coffee, Inc., 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001).  Having stipulated to the filing

---

[4] WAMY does not argue that the *Ashton* plaintiffs' September 30, 2005 filing was improper.

[5] On September 30, 2005, *prior* to filing the FCC, the *O'Neill* plaintiffs filed numerous More Definite
Statements/Additional Allegations ("MDS") pursuant to CMO 2, para 13.  The substance of such allegations were
incorporated into exhibits and the FCC pursuant to such provision.  WAMY was Exhibit Y.  See FCC, para. 127(y).

of the relevant RICO Statements, WAMY should not be permitted to side step its agreement with

plaintiffs and contest the validity of those pleadings on collateral grounds.

Moreover, the incorporation of the RICO and MDS into plaintiffs' Complaints, by

reference or attachment as Exhibits, is expressly authorized by the Federal Rules.  Fed. R. Civ. P.

10(c), which WAMY notably avoids reference to, provides:

> Statements in a pleading may be adopted by reference in a
> different part of the same pleading or in another pleading or in any
> motion.  A copy of any written instrument which is an exhibit to a
> pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c).  In view of the plain language of Rule 10(c), plaintiffs' incorporation of the

RICO and MDS into their Complaints, by reference or attachment as exhibits, complies with

both the letter and spirit of the Federal Rules.[6]

### B.    Plaintiffs Have Stated Claims Against WAMY In Accordance With The Notice Pleading Requirements Of The Federal Rules Of Civil Procedure

WAMY also urges this Court to find that the complaints fail to state a claim upon which

relief can be granted, and should therefore be dismissed.  In support of that argument, WAMY

asserts that the plaintiffs' pleadings are conclusory and fail to present factual allegations

sufficient to establish WAMY's mental state and proximate cause.  In addition, focusing only on

a partial and unspecified group of the allegations against it, WAMY suggests that plaintiffs'

claims are somehow barred by the First Amendment to the U.S. Constitution.  As will be

demonstrated below, WAMY ignores the relevant pleading standards and applies a

fundamentally improper test for causation.  Moreover, the First Amendment does not serve as a

substantive legal bar to plaintiffs' claims because : (1) WAMY fails to meet its burden to

establish, even as a preliminary matter, that plaintiffs' claims implicate any protected speech or

---

[6] Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

activity; and (2) the First Amendment does not immunize WAMY for speech or activity used to further a conspiracy or to further conduct in violation of valid criminal statute.

1.   **Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The Federal Rules**

WAMY's contention that plaintiffs have failed to adequately plead WAMY's mental state and the causation element of their claims is factually and legally flawed.

Contrary to WAMY's assertion, plaintiffs' pleadings do contain competent allegations regarding WAMY's knowing and intentional participation in al Qaida's conspiracy to attack America.[7]  For example, plaintiffs allege that "[f]or more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts," and that "[f]or many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world."   These direct allegations regarding WAMY's knowledge and intent are themselves particularized factual allegations, and satisfy the relevant pleading standards applicable to plaintiffs' claims.

While plaintiffs are not required to provide more detailed factual allegations regarding WAMY's knowledge and intent, they have done so here.  The pleadings detail the widespread media reporting, prior to September 11, 2001, of WAMY's partnership with al Qaida and associated militant Islamic extremists, and set forth specific evidence that WAMY's senior leadership closely monitored the activities of all WAMY offices and the media reports discussing their activities.  Plaintiffs also present detailed allegations regarding the direct involvement of senior WAMY officials, such as designated terrorist sponsor and long time

---

[7] Under the relevant pleading standards, as articulated by the 2nd Circuit, plaintiffs respectfully submit that they would sufficiently state a claim against WAMY merely by **_alleging_** that WAMY knowingly and intentionally provided material support and resources to al Qaida, both directly and indirectly.

WAMY official Adel Batterjee, in WAMY's terrorist activities.  Moreover, the Complaints and other relevant pleadings present factual allegations from which it is logical to infer that officials of the Saudi government would have raised concerns about the involvement of the organization in extremist and terrorist activity with senior WAMY officials.  Even under the erroneous pleading standard WAMY advocates, these allegations are more than sufficient to establish the scienter element of plaintiffs' claims.

WAMY's contention that plaintiffs have failed to sufficiently allege proximate cause is equally unconvincing.  As this Court has recognized, "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." In Re Terrorist Attacks on September 11, 2001, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005).  Consistent with this holding, plaintiffs' consistent and specific averments of WAMY's knowing and intentional sponsorship of al Qaida are, in and of themselves, sufficient to establish causation at this stage of the litigation.

Even if more specific allegations of causation were required, plaintiffs have met that burden.  For example, the *Federal* plaintiffs allege that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack." *O'Neill* FCC 159-63, 177-80; *Ashton* 6AC at 478.  Similarly, the plaintiffs assert that al Qaida's training "camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan in preparation for the September 11, 2001 Attacks.  None of this would have been possible without the funds and sponsorship supplied by participants and conspirators

including the World Assembly of Muslim Youth."  Thus, although unnecessary, the plaintiffs'
pleadings specifically allege that al Qaida could not have successfully carried out the September
11th Attack absent the support of WAMY.

Finally, that WAMY *maintains* that it was not specifically aware of the September 11th
plot, or that it did not directly participate in the Attack itself, is irrelevant.  As this Court has
previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about
the September 11 attacks or that they committed any specific act in furtherance of that attack."
In re Terrorist Attacks on September 11, 2001, 349 F. Supp.2d at 829.

For the foregoing reasons, WAMY's argument that plaintiffs have failed to meet the
simple notice pleading requirements of the Federal Rules is manifestly devoid of merit.  Stated
simply, plaintiffs have alleged the existence of a conspiracy (the existence of which is beyond
dispute), WAMY's knowing and intentional participation in that conspiracy, and the forms of
material support WAMY provided in furtherance of the conspiracy's objectives.  These
allegations serve to provide WAMY with "fair notice" of the claims against it.

## 2.    Plaintiffs' Claims Do Not Abridge On Any Rights Protected By The First Amendment

WAMY's First Amendment defense also fails as a grounds for dismissal pursuant to Rule
12(b)(6).  Plaintiffs have addressed this argument in the Property Damage Plaintiffs'
Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant
WAMY.  Rather than repeat that argument here, the Personal Injury Plaintiffs instead
respectfully refer the Court to, and incorporate by reference, that discussion.

### C.      Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of Action Against WAMY[8]

#### 1.      Plaintiffs State A Valid Claim Against WAMY Under The Anti-Terrorism Act

For purposes of these proceedings, plaintiffs state a claim against a defendant under the Anti-Terrorism Act (ATA) by alleging that the defendant knowingly conspired with, aided and abetted or provided material support or resources to al Qaida.  The ATA defines the term material support and resources to include, among other things:  funds in any form; financial services; personnel; weapons; communication equipment; safehouses; and false identification. 18 U.S.C. § 2339(A).  Plaintiffs' pleadings regarding WAMY's support of al Qaida specifically allege that WAMY knowingly provided funds and financial services to al Qaida.  Plaintiffs further allege that WAMY knowingly provided al Qaida members with documents falsely identifying them as WAMY aid workers, to assist those al Qaida operatives to gain access to conflict regions.  Given these and other allegations, and for the reasons stated above, plaintiffs have asserted valid claims against WAMY under the ATA.

#### 2.      Plaintiffs State Valid Claims Against WAMY Under Their Common Law Theories Of Liability

WAMY's arguments in favor of dismissal of plaintiffs' common law theories are, in large part, derivative of the general arguments it raises regarding the sufficiency of plaintiffs' allegations regarding WAMY's knowledge and intent and causation.  In this vein, WAMY asserts that plaintiffs' intentional infliction of emotional distress, assault and battery, wrongful death, and survival claims should be dismissed on the grounds that plaintiffs have failed to allege facts sufficient to establish WAMY's knowing and intentional support of al Qaida, or facts sufficient to establish a causal link between WAMY's conduct and the September 11th Attack.

---

[8] Plaintiffs do not currently intend to pursue their claims under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, against this defendant.  Plaintiffs reserve the right to replead this claim against WAMY should additional information become available in discovery demonstrating it acted "under actual or apparent authority or color of law, of any foreign nation" in connection with its support of al Qaida.

See WAMY's Memorandum of Law at pp. 16-19.  However, this Court has already found that plaintiffs state valid common law causes of action under these theories by alleging that a defendant knowingly conspired with, or aided and abetted, al Qaida.  In re Terrorist Attacks on September 11, 2001, 349 F. Supp.2d at 829-30.  For the reasons set forth above, plaintiffs have more than met the pleading requirements applicable to the concerted action theories advanced against WAMY, and have therefore stated valid claims under intentional infliction of emotional distress, assault and battery, wrongful death and survival theories.

Moreover, contrary to the defendant's assertion, plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not demonstrably time-barred.  On this point, plaintiffs respectfully refer the Court to the discussion of this issue on pages 19-20 of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Dr. Abdullah al Turki, incorporated herein by reference.

Plaintiffs have stated a valid claim in negligence against WAMY under the liberal pleading requirements of Rule 8 as well.  International terrorism is a serious and deadly problem that threatens the health, safety and welfare of people throughout the world, and the vital interests of the United States.  See 18 U.S.C. §2339(b) n.(a)(1).  Given that fact, it is clear that WAMY owed a duty to refrain from materially supporting al Qaida, as reflected in the ATA and numerous international agreements.  Plaintiffs have alleged that WAMY breached that duty by providing material support to al Qaida, and that their injuries were the foreseeable and proximate result of WAMY's conduct.  In view of these allegations, plaintiffs have stated a valid cause of action in negligence against WAMY, the resolution of which is not appropriate in the context of a motion to dismiss.

3. **Plaintiffs State A Valid Claim Against WAMY Under The Alien Tort Claims Act**

WAMY contends that the plaintiffs' claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, should be dismissed because WAMY is not a state actor and did not engage in "egregious forms of misconduct."  However, the ATCA does not require that the defendant act under color of law and "egregious forms of misconduct" is not the test for when a plaintiff may assert a claim under the ATCA.  Plaintiffs have addressed this argument in Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank-Sudan.  Rather than repeat that argument here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

4. **Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages Counts Should Not Be Dismissed**

WAMY correctly argues that no independent causes of action exist under New York law for conspiracy, aiding and abetting or punitive damages.  However, at this stage of these proceedings, the substantive law governing each of plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss those causes of action at this time.  Moreover, there can be little dispute that plaintiffs' have alleged that WAMY conspired with and aided and abetted al Qaida, or that plaintiffs are entitled to recover punitive damages in the event that they prevail against this defendant under the theories advanced.  Under these circumstances, dismissal of the conspiracy, aiding and abetting and punitive damages counts would be inappropriate.

5. **Plaintiffs' RICO Claims Should Not Be Dismissed**

WAMY first challenges the standing of the *O'Neill* Plaintiffs to pursue RICO claims, arguing that these Plaintiffs lack standing as their injuries are personal injuries.[9]  WAMY's

---

[9] Defendant challenges the standing of the *Burnett* Plaintiffs to pursue RICO claims.  Those Plaintiffs do not intend to pursue those claims at this time, and therefore do no address the defendant's standing argument herein.

argument is flawed.  The *O'Neill* Plaintiffs, in the FCC, specifically alleged that the Defendants intended to cause damage to business and property, and did in fact intend to cause damage to business and property.  *See O'Neill* FCC ¶¶176, 178-80.  The Plaintiffs further detailed certain elements of the damages: "including a. Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of prospective inheritance …."  *See O'Neill* FCC ¶ 146; Exhibit Y, ¶¶ 14-5.  Furthermore, in their MDS and RICO statements, the *O'Neill* Plaintiffs elaborated on the various factual elements of such damages, which we submit are not required for Rule 8(f) notice pleadings, to include direct pecuniary losses, past and future wage losses and profits, losses of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  FCC Exhibit Y, ¶¶ 14-5.  *See also* RICO Statement, Para 15-16.[10][11]  Accordingly, such allegations have not only met, but exceeded the pleading threshold set in <u>Diaz v. Gates</u>, 420 F.3d 897 (9th Cir. 2005) (e.g., damages to tangible personal property), and the *O'Neill* Plaintiffs have established standing.

In further support of its argument that plaintiffs' RICO claims should be dismissed, WAMY argues that plaintiffs fail to adequately allege (1) investment or racketeering income in the enterprise; (2) active management or operation of the enterprise; (3) that WAMY was a central figure in the enterprise; or (4) causation.  Fairly read, plaintiffs' pleadings allege that WAMY knowingly acted as one of al Qaida's primary fronts for raising and distributing funds, arms and other physical assets.  Plaintiffs' further allege that WAMY fraudulently raised funds throughout the world on behalf of al Qaida, through international mail and other communications

---

[10] For a more extensive discussion of this issue, *see* "O'Neill Plaintiffs' Memorandum of Law In Opposition to Al Haramain Islamic Foundation, Inc's Motion to Dismiss Pertaining to Certain RICO Issues Only," Docket No. 810, pp. 13-17.
[11] Alternatively, the *O'Neill* Plaintiffs seek leave to amend to specifically provide such detail as to such losses.

vehicles, under the guise of charity.  In these respects, WAMY's role in the enterprise closely mirrors that of Al Haramain Islamic Front (AHIF), one of al Qaida's other principal charity fronts.  Accordingly, plaintiffs respectfully refer the Court to the discussion of RICO liability set forth on pp. 13-17 of the Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Al Haramain Islamic Foundation, Inc., incorporated herein by reference.

### D.    Burnett Plaintiffs Have Properly Served WAMY[12]

Although WAMY recites the applicable rules for service of process, WAMY omits information showing the lengths to which it went to ignore and evade service of process.  These efforts are similar to those tried by other defendants but which the Court rejected and described as "a bit of a dance" and an attempt to put "form over substance."  Exhibit 2, Affirmation of Robert T. Haefele, Exhibit A, hereinafter "Haefele Aff., Exhibit __".  Here, an independent process server served process at WAMY's self-recognized office address, namely 5134 Leesburg Pike, Alexandria, Virginia – the address that WAMY itself has identified to the Virginia Secretary of State as the address for service of process, Haefele Aff., Exh. D – by successfully serving a copy of the summons and complaint upon a person who acknowledged both that she

---

[12] It is also worth reiterating that both WAMY SA and WAMY International are one and the same.  Although it is significant for this service issue that they both share the same counsel and the same address, *cf.* Gleason v. McBride, 869 F.2d 688, 693 (2d Cir. 1989) (in rule 15 context, where two defendants share attorney and attorney has reason to believe second defendant will be added, second defendant is presumed to be on notice), the interchangeability runs much deeper.  For example, WAMY's current website explains that it is headquartered in Saudi Arabia, and has various branches outside Saudi Arabia.  Those in the United States interested in contacting either WAMY SA or WAMY International, although once instructed to do so by contacting WAMY at the same Falls Church, Virginia address counsel has identified as belonging to WAMY International, are now instructed to do so by contacting the Saudi Arabia headquarters.  (Compare attached printouts of contact information printed from www.waybackmachine.org for www.wamy.org, Haefele Aff., Exh. E, and www.wamyusa.org, Haefele Aff., Exh. F, with printouts from another current WAMY site, Haefele Aff. Exh. G.)  Similarly, both the WAMY SA and WAMY International website registrations evidence that, while WAMY SA is the registrant for both internet sites, WAMY USA (listing the Virginia post office box address and telephone number) is the administrator for the WAMY SA site and WAMY SA (listing the Saudi Arabian address and telephone number) is the administrator for the WAMY USA site.  (Compare attached WHOIS printouts for WAMY.ORG and WAMYUSA.ORG from Register.com., Haefele Aff., Exh. H.)

had some familiarity with the litigation and that she was generally someone authorized to accept service of legal documents for WAMY.  Haefele Aff., Exhibit B.  WAMY does not contest that this is its principle place of business in the United States.  Moreover, service was thereafter sent to WAMY at this same self-recognized office address via the United States Postal Service, demonstrated by delivery confirmation.  Haefele Aff., Exhibit C.  Despite all efforts to ignore and evade service, WAMY has obviously received actual notice of the suit, no rights have been prejudiced, and WAMY should not be rewarded for its efforts to ignore and evade process.

The proper rules governing service of process on corporations are found in Fed. R. Civ. P. 4(h).  Rule 4 is a flexible rule intended to be construed liberally to ensure fulfillment of the real purpose of the rule; namely, to ensure that a party receives sufficient notice of the complaint. Friday v. U.S. Dept of Justice, 1993 WL 430547 (D. Or. Oct. 21, 1993) (quoting Benny v. Piples, 799 F.2d 489, 492 (9th Cir. 1986), amended, 807 F.2d 485, 493 (6th Cir. 1987), cert. denied, 484 U.S. 870 (1987)); see also Henderson v. United States, 517 U.S. 654, 672 (1996), Michaelson v. Hudson, 530 N.Y.S.2d 225, 271 (App. Div. 2nd Dept. 1988) (The core function of service is to ensure that the corporation is given notice that a suit has commenced so that the defendant has a fair opportunity to answer the complaint).  Where the defendant has actual notice, not every technical violation of the service rules, or failure of strict compliance with the rules, will invalidate service of process.  See Lutin v. New Jersey Field Corp., 1996 WL 636037 (S.D.N.Y. Nov. 1, 1996) (quoting Maryland National Bank v. M/V Tanicorp I, 796 F. Supp 188, 190 (D. Md. 1992)).

Although WAMY cited to the appropriate rule for service of process, Rule 4(h), pursuant to Rule 4 (e)(1), service was also permitted "pursuant to the law of the state in which the district court is located, or in which service is effected…;"  thus, here, service was permitted pursuant to either New York or Virginia law.  The New York rule explicitly extends the list of those who

may be served to include "an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service."  N.Y McKinney's CPLR § 311.  Consistent with the real purpose of ensuring that the defendant is given fair notice that suit has commenced, New York law recognizes service is proper where service was done "in a manner which, objectively considered, is calculated to give the corporation fair notice of the suit."  <u>Citadel Management Inc. v. Telesis Trust, Inc.</u>, 123 F. Supp. 2d 133, 145 (S.D.N.Y. 2000).

Two independent, non-party process servers have attested to their efforts to serve process on Defendants.  According to the process server who went to defendants business address to serve process, when he knocked on the door, the person who answered the door identified herself as someone generally authorized to accept service of legal documents, thus holding herself out to the process server as someone who held a position capable of ensuring that the documents served would be forwarded to the proper authorities within defendant's organization.  <u>See</u> <u>KLM – Royal Dutch Airlines v. Curtiss-Wright Corp.</u>, 17 F.R.D. 49, 51 (S.D.N.Y. 1955); <u>Brunn v. Xtra Superfood Centers, Inc.</u>, 2001 WL 180136 (D. Virgin Islands Jan. 4. 2001).  The process server, who cannot be expected to know WAMY's internal practices, should be permitted reasonably to rely upon her own acknowledgement that she is generally someone who has accepted service in the past.  <u>Fashion Page, Ltd. v. Zurich Ins. Co.</u>, 428 N.Y.S.2d 890, 893-894 (N.Y. Ct. App. 1980).

Instead of acknowledging service, counsel for WAMY, though obviously aware that WAMY was sued and familiar with the fact that process was served at WAMY's place of business, insists on raising alleged technical flaws.  But the objective facts support the truth that WAMY was served, and any alleged flaw caused no prejudice and is therefore harmless error. <u>See</u> <u>Alfa Corp. v Alfagres, S.A.</u>, 385 F. Supp. 2d 1230, 1239 (M.D. Ala. 2005) ("The court finds

that service of process … was in substantial compliance with the Federal and [state] Rules of Civil Procedure and that any defects in service of process have not prejudiced [the defendant] and are therefore harmless error.")

Moreover, the alleged flaws that counsel has raised, instead of proving that Defendants' due process has been prejudiced, do more to highlight Defendants efforts to ignore and evade service of process.  For example, according to the process server, although the person who answered the door confirmed that she is generally authorized to accept service, she advised that she had been told not to accept service in this case and, when she was given the papers, she threw them back at the process server.  See Heritage House Frame & Molding Co. v. Boyce Highlands Furniture Co., 88 F.R.D. 172, 174-175 (E.D.N.Y. 1980) (the process server must merely "tender" the summons, which includes hand delivery *near, but not necessarily to,* a person who *appears* to be a "managing or general agent"). Similarly, although she insisted that, in this case, service of process had to be made upon Defendants' counsel; counsel has flat out refused to accept service in the *Burnett* matter – notwithstanding that counsel has accepted service of process by other plaintiffs in other cases.  Instead, in this case, counsel insisted that service be made via mail to a post office box.  Plaintiffs assert that personal service at an address identified to the Virginia Secretary of State for service of process, followed by confirmed postal service at the same address, must be considered eminently more reasonable efforts to serve Defendants than a simple mailing to a post office box.  See, e.g., Michaelson v. Hudson, 530 N.Y.S.2d 225 (2nd Dept 1988) (service of process was defective where it consisted solely of mailing to a P.O. Box with no explanation to suggest why process was not affixed to the defendant's door).

Because the process servers acted reasonably in serving process at Defendants' business address, which Defendants have identified as the proper place for legal service, upon a person

who the process server had a reasonable basis to believe was an employee of Defendants generally authorized to accept service of legal documents and capable of ensuring the documents were given to the proper persons within the organization, and service was followed up by sending an additional copy of the document to the Defendants' address via the United States Postal Service, Plaintiffs request that service be upheld.

**V.     CONCLUSION**

For the foregoing reasons, the Personal Injury Plaintiffs respectfully request that WAMY's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

|  | MOTLEY RICE LLC |
|---|---|
| Dated: January 23, 2006 | BY: _____/s/_____<br>      Ronald L. Motley, Esq. (RM-2730)<br>      Jodi Westbrook Flowers, Esq.<br>      Donald A. Migliori, Esq.<br>      Michael Elsner, Esq. (ME-8337)<br>      Robert T. Haefele (NJ-58293, PA-57937)<br>      Justin Kaplan (TN-022145)<br>      MOTLEY RICE LLC<br>      28 Bridgeside Boulevard<br>      P.O. Box 1792<br>      Mount Pleasant, South Carolina 29465<br>      Telephone: (843) 216-9000 |

| | |
|---|---|
| | Paul J. Hanly, Jr., Esq. (PH-5486)<br>Jayne Conroy, Esq. (JC-8611)<br>Andrea Bierstein, Esq. (AB-4618)<br>HANLY CONROY BIERSTEIN &<br>  SHERIDAN, LLP<br>415 Madison Avenue<br>New York, NY 100 17-11 1 1<br>Telephone: (212) 401-7600<br><br>Attorneys for *Burnett* Plaintiffs |
| | James P. Kreindler, Esq. (JK7084)<br>Justin T. Green, Esq. (JG0318)<br>Andrew J. Maloney III, Esq. (AM8684)<br>Vincent Ian Parrett, Esq. (VP5092)<br>KREINDLER & KREINDLER LLP<br>100 Park Avenue<br>New York, NY  10017-5590<br>(212) 687-8181<br><br>Attorneys for *Ashton* Plaintiffs |
| | Jerry S. Goldman (JG8445)<br>LAW OFFICES OF JERRY S. GOLDMAN<br>  AND ASSOCIATES, P.C.<br>111 Broadway, 13th Floor<br>New York, New York 10006<br>Tel.: (212) 385-1005<br>Fax: (212) 346-4665<br><br>Attorney for *O'Neill* Plaintiffs |