# EXHIBIT 1

## APPENDIX I:

### O'NEILL SUMMARY OF PLEADINGS REFERENCES TO WORLD ASSEMBLY OF MUSLIM YOUTH, *A/K/A* WAMY INTERNATIONAL, INC., *A/K/A* WORLD ASSOCIATION FOR MUSLIM YOUTH *AND* WORLD ASSEMBLY OF MUSLIM YOUTH OF SAUDI ARABIA *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (RIYADH, SAUDI ARABIA) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (JEDDAH, SAUDI ARABIA) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (LONDON, UNITED KINGDOM) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (FALLS CHURCH, VIRGINIA, USA)

<u>**The Conspiracy**</u>[1, 2, 3]

1.  On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC" or "O'Neill Al Baraka FCC" or "Al Baraka FCC") ¶¶ 1, 6-10 22-5, Tremsky ¶ 120, WTC ¶ 365.

2.  The conspirators consist of the defendants named in the in the three O'Neill actions (Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka Investment & Development Corporation, *et al.*, 04 CV 1923 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Kingdom of Saudi Arabia, *et al.*, 04 CV 1922 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Republic of Iraq, *et al.*, 04- CV 1076) ("O'Neill Iraq")

---

[1] The pleadings consist of the O'Neill First Consolidated Complaint ("FCC"), filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15. Incorporated into the First Consolidated Complaint are various other pleadings filed in the matter, such as the O'Neill RICO Statement and the More Definite Statements/Additional Allegations (MDS). These items, all separately docketed, were, in substance, physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record. Paragraph 127 of the FCC lists these various Exhibits. The More Definite Statement/Additional Allegations pertaining to the instant Defendant was, pursuant to FCC ¶ 127 (Y), appended as Exhibit (P) (hereinafter cited as "MDS" or "Exhibit Y").

[2] There are references preceding the various substantive causes of actions in the FCC incorporating the various paragraphs in the pleadings without setting them forth at length. See, e.g., FCC ¶134.

[3] References herein to "FCC" or *Al Baraka FCC* or *O'Neill Al Baraka FCC* are to the First Consolidated Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.* filed on September 30, 2005.

(with such complaints also including 'John Does'), as well as in the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL-1570 (RCC), and others. Exhibit Y, ¶ 2.[4]

3. The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11. O'Neill Al Baraka FCC ¶27.

4. On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Al Baraka FCC ¶¶ 6-9.

5. All 19 hijackers were members of the al Qaida network. O'Neill Al Baraka ¶¶6-9.

6. All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. FCC ¶10.

7. The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett ¶¶ 649, 650, 654, O'Neill Iraq ¶¶ 23, 38, 41, 63, 83, 250, 251; O'Neill Al Baraka FCC ¶¶ 22-4, 25, 144, 158-9, 162. Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622.

8. The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509

9. Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74.

10. The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page

---

[4] Paragraph 127 of the FCC pleads as follows:

> Attached hereto as Exhibit and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations/RICO Statements:
>
> A) More Definite Statements/Additional Allegations- Victims List
>
> …
>
> Y) More Definite Statement/Additional Allegations- World Assembly of Muslim Youth (Wamy).

217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Iraq FCC ¶ 252; O'Neill Al Baraka FCC ¶ 144.

11.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, ¶ 649; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144.

12.    Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks.  O'Neill Iraq ¶ 38; O'Neill Al Baraka FCC ¶22

13.    Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities. O'Neill Al Baraka FCC ¶ 23.

14.    Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24.

15.    The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 25.

16.    The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶27.

17.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett, ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Al Baraka FCC ¶ ¶177-180.

18.    As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 19, 23, 251; O'Neill Al Baraka FCC ¶157.

19.    As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-2; O'Neill Al Baraka FCC ¶158.

20.    As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶159.

21.    The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies. Federal Insurance 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶160, 163, 167.

22.    As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶161; O'Neill Iraq FCC ¶¶ 254, 270, 271.

23.    Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162.

24.    OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Al Baraka FCC ¶165; O'Neill Iraq FCC ¶¶ 223, 228, 242.

25.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka FCC ¶168; Iraq FCC ¶251.

26.    By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance 642; Al Baraka FCC ¶169.

27.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud. Federal Insurance 628; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

28.    The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the

Defendants, acting individually and in concert with each other. Burnett ¶ 662, O'Neill Al Baraka FCC ¶ ¶178-180; O'Neill Iraq FCC ¶¶ 267, 272.

29.    The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Al Baraka FCC ¶162; O'Neill Iraq FCC ¶63.

30.    The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶163.

31.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries. Burnett ¶ 674; Continental Casualty ¶ 604; Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

32.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent. Burnett ¶ 673; Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶¶ 152, 169.

33.    The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders. O'Neill Al Baraka, Exhibit P ¶ 6a; O'Neill Iraq FCC ¶¶ 263-5.

34.    The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. Al Baraka FCC ¶¶ 139, 172.

### The Relationship between the World Assembly of Muslim Youth (as defined herein) and the Conspiracy

35.    Defendants International Islamic Relief Organization a/k/a Islamic Relief Organization a/ka International Relief Organization, … World Assembly of Muslim Youth a/k/a WAMY International, Inc. a/k/a World Association For Muslim Youth (including World Assembly of Muslim Youth of Saudi Arabia, as well as any and all subsidiary, affiliate, related and/or branch offices thereof, including without limitation, World Assembly of Muslim Youth (Riyadh, Saudi Arabia), World Assembly of Muslim Youth (Jeddah, Saudi Arabia), World Assembly of Muslim Youth (London, United Kingdom) and World Assembly of Muslim Youth (Falls Church, Virginia, USA) (collectively "World Assembly of Muslim Youth" or "WAMY")) … and and Muwaffaq Foundation a/k/a Blessed Relief Foundation a/k/a Blessed Relief are all charities and charitable foundations which are used as terrorist fronts to mask money transfers and provide cover for terrorist operatives and operations. O'Neill Al Baraka FCC ¶ 24.

36.     Defendant Adel Batterjee was also chairman of a Saudi charity, the World Assembly of Youth ("WAMY"), which is the subject of an F.B.I, investigation for terrorist activities. O'Neill Al Baraka FCC ¶ 50.[5]

37.     In 2000, Defendant Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO[6] and the al Haramain Foundation.[7] O'Neill Al Baraka FCC ¶ 67.

38.     Defendant IIRO works in concert with other charities, including Defendants BIF and WAMY, to fund and support al Qaeda. O'Neill Al Baraka FCC ¶ 94.

39.     Defendant al-Haramain is a charity front for al Qaeda and Osama bin Laden and provides direct material support to al Qaeda. In December 1999, al-Haramain conducted a joint fundraising event with Defendants ERG and WAMY in Riyadh. O'Neill Al Baraka FCC ¶ 111.

40.     Defendant Benevolence International Foundation ("BIF"), was originally founded in the 1980's by a wealthy Saudi Arabian, Adel Abdul Jalil Batterjee, an associate of Osama bin Laden. It is headquartered in Palos Hills, Illinois, and has offices in numerous Asian countries. It purports to be an international charity, but is actually an al Qaeda affiliate engaged in support of terrorist activities. O'Neill Al Baraka FCC ¶ 118.[8]

41.     One of BIF's directors is Defendant Adel Abdul Jalil Batterjee; Defendant Enaam Arnaout, a known associate of Osama bin Laden's, has also been affiliated with BIF. O'Neill Al Baraka FCC ¶ 119.[9]

42.     Defendant BIF is tightly connected with Defendant WAMY, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaeda network.  O'Neill Al Baraka FCC ¶ 120.

43.     Defendant BIF has been deeply involved in financing, supporting, and facilitating al Qaeda terror operations through provision of money, equipment, and information, and by concealing and fabricating information and evidence concerning same.  O'Neill Al Baraka FCC ¶ 121.

44.     Defendant BIF's involvement in support and financing for al Qaeda terrorist

---

[5] See More Definite Statement/Additional Allegations – Saudi American Bank, O'Neill Al Baraka FCC Exhibit V, as set forth at length; See also O'Neill Al Baraka FCC ¶ 65-7.

[6] See More Definite Statement/Additional Allegations – International Islamic Relief Organization (IIRO), O'Neill Al Baraka FCC Exhibit B, as if set forth at length.

[7] See More Definite Statement/Additional Allegations – Al Haramain Islamic Foundation, Inc., et al., O'Neill Al Baraka FCC Exhibit I.

[8] See generally, O'Neill Al Baraka FCC ¶¶ 117-122 re BIF.

[9] See generally, O'Neill Al Baraka FCC ¶¶ 109-116 regarding Al Haramain.

operations is disguised as charitable activities. O'Neill Al Baraka FCC ¶ 122.

45.     As referred to herein, World Assembly of Muslim Youth a/k/a WAMY International, Inc. a/k/a World Association For Muslim Youth includes World Assembly of Muslim Youth of Saudi Arabia, as well as any and all subsidiary, affiliate, related and/or branch offices thereof, including without limitation, World Assembly of Muslim Youth (Riyadh, Saudi Arabia), World Assembly of Muslim Youth (Jeddah, Saudi Arabia), World Assembly of Muslim Youth (London, United Kingdom) and World Assembly of Muslim Youth (Falls Church, Virginia, USA) (collectively "World Assembly of Muslim Youth" or "WAMY"). O'Neill Al Baraka FCC ¶ 123.

46.     Defendant World Assembly of Muslim Youth ("WAMY") is tightly connected with Defendant BIF, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations.  One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaeda network. O'Neill Al Baraka FCC ¶ 124.

47.     Defendant WAMY is an al Qaeda front. In particular, it is involved in the production and/or distribution of al Qaeda training manuals, propaganda, and hate literature aimed against Americans, Christians, and Jews. O'Neill Al Baraka FCC ¶ 125.

48.     WAMY has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al Baraka FCC Exhibit Y, ¶20.

49.     World Assembly of Muslim Youth (WAMY) is a multi-national organization which hasbeen at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements. Al Baraka FCC Exhibit Y, ¶21.

50.     In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical

assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies. Al Baraka FCC Exhibit Y, ¶22.

## WAMY'S ORGANIZATIONAL STRUCTURE

51.     Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League (MWL).[10] Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization (IIRO),[11] and Rabita Trust.[12] Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the

---

[10] Specific misconduct regarding Muslim World League. ("MWL"), a co-defendant herein, has been provided via More Definite Statement Applicable to MWL.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), FCC Exhibit C. See also, O'Neill Al Baraka FCC ¶¶ 96-9.

[11] Specific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, has been provided via More Definite Statement Applicable to IIRO.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC Exhibit B..

[12] Specific misconduct regarding Rabita Trust, a co-defendant herein, has been provided via More Definite Statement Applicable to Rabita Trust.  Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC Exhibit V.

Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC). Al Baraka FCC
Exhibit Y, ¶23.

52.   Although WAMY claims non-governmental organization (NGO) status, WAMY
      is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia.
      WAMY was established by MWL, itself an agency, instrumentality or organ of
      the Kingdom, with the formal approval of high ranking officials of the Kingdom.
      The vast majority of WAMY's funding is provided by the Kingdom. In addition,
      WAMY's leadership is dominated by high ranking officials of the Kingdom. For
      example, Dr. Maneh el Johani simultaneously served as both the Secretary
      General of WAMY and a member of the Kingdom's Shura Council. The Shura
      Council, known formerly as the Majlis al Shura, is a consultative body which
      provides advice to the King on issues of importance to the Kingdom. While head
      of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a
      chairman of WAMY and al Haramain Islamic Foundation.[13] Al Baraka FCC
      Exhibit Y, ¶24.

53.   The Kingdom extensively supervises and controls WAMY's activities. On the
      macrolevel, the Kingdom exercises supervisory control over WAMY through the
      Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise
      and review aid requests from Islamic groups, including WAMY. The Supreme
      Council determines the extent of WAMY's public funding, as well as the causes
      to which private and public funds are applied by WAMY.  WAMY's operations
      also fall under the supervision of the Ministry of Islamic Affairs, Endowments,
      Dawa and Guidance. The Ministry of Islamic Affairs is, among other things,
      responsible for the dissemination and propagation of Wahhabi Islam throughout
      the world. Al Baraka FCC Exhibit Y, ¶25.

54.   Outside of Saudi Arabia, the operations of WAMY's branch offices are directed
      and closely supervised by local Saudi embassies. According to Dr. Abdullah
      Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides
      us with protection abroad through Saudi embassies and consulates, in addition to
      financial support." In testimony during Canadian court proceedings, Arafat el
      Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies
      closely monitor the activities of the Saudi-based charities and persons associated
      with those charities, including any press reports relating to those organizations:

          If I give any statement in the Canadian papers that goes against the
          policy of my organization, I would not stay in my office 11 years
          as I did. That gives me an indication that everybody is within —
          there is also an embassy in every country. In Pakistan there is a

---

[13] Specific misconduct regarding Al Haramain Islamic Foundation. ("Al Haramain"), a co-defendant
herein, has been provided via More Definite Statement Applicable to Al Haramain.  Plaintiffs herein
incorporate by reference throughout this document the factual averments and arguments which will be
contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P.
O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC, Exhibit I.

> Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.

Al Baraka FCC Exhibit Y, ¶26.

55. The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches. Al Baraka FCC Exhibit Y, ¶27.

## THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS

56. Osama bin Laden's al Qaida organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaida's terrorist activities garner the most attention, terrorist attacks represent but one of many vehicles through which al Qaida seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaida views the confrontation with the West to have two distinct, but equally important fronts:(1) cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

> The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own

hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad – The Various Threats From Radical Islam to the Democratic LegalOrder,* General Intelligence and Security Service of the Netherlands, December 2004. Al Baraka FCC Exhibit Y, ¶28.

57.   As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaida engages in militant and violent operations throughout the World. Al Qaida's military activities are by no means limited to terrorist attacks.   In fact, in establishing al Qaida, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaida's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaida has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaida's participation in these regional conflicts takes many forms. Al Qaida provides funding and logistical assistance to local extremist organizations, in support of their military and terrorist activities. In addition, al Qaida deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks.   Al Baraka FCC Exhibit Y, ¶29.

58.   Through its military activities in these "regional" conflicts, al Qaida aims to establish and support radical Islamic regimes, a critical component of al Qaida's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaida's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:[al Qaida] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination. The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic(predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

*Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report"). Al Baraka FCC Exhibit Y, ¶30.

59.   Al Qaida also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the organization's image among local Muslim communities, and represent an integral component of al Qaida's ongoing recruiting and fundraising efforts. Al Qaida's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West. In fact, several of the September 11 hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaida's growth and development cannot be overstated. Perhaps more than any other factor, al Qaida's participation in these "regional" conflicts has enabled al Qaida to extend its sphere of influence throughout the globe. Al Baraka FCC Exhibit Y, ¶31.

## WAMY'S ROLE IN ADVANCING THE AL QAIDA MOVEMENT

60.   For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.  Al Baraka FCC Exhibit Y, ¶32.

61.   Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels." Al Baraka FCC Exhibit Y, ¶33.

62.    The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps,* prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!

> Al Baraka FCC Exhibit Y, ¶34.

63.    Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaida movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaida's cultural assault on the United States and democratic institutions throughout the world. Al Baraka FCC Exhibit Y, ¶35.

64.    Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere. WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups. Through these criminal activities, WAMY has further helped al Qaida to expand its sphere of influence throughout the globe. Al Baraka FCC Exhibit Y, ¶36.

65.    WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….

The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

"Since August, most of the money raised for relief has been turned over to the Bosnians for weapons"….The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

*Muslims From Afar Joining "Holy War" in Bosnia, New York Times*, December 5, 1992.

Al Baraka FCC Exhibit Y, ¶37.

66. Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11,2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224. Al Baraka FCC Exhibit Y, ¶38.

67. In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….

Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service(FSB)].

> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS*, May 19, 2000. Al Baraka FCC Exhibit Y, ¶39.

68.     Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

> 1998 Defense Department Report.

> Al Baraka FCC Exhibit Y, ¶40.

69.     By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" *U.S. Links bin Laden to Chechnya, MSNBC.com*, August 15,1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control. *Id.* Al Baraka FCC Exhibit Y, ¶41.

70.     Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

[I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.

1. The question that must be asked is: What do the Chechen Muslims need from us today?

2. *The need money to buy arms and ammunition. (emphasis supplied)*

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory. *The Chechen Tragedy –*

*The Reality and the Required Role*, Dr. Maneh al Jahari, *al Jazeera*, January 15, 2000. Al Baraka FCC Exhibit Y, ¶42.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Al Baraka FCC Exhibit Y, ¶43.

71.    Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19,1999 article in the *Australian General News*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News*, January 15,1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that

MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism – 1999*, United States Department of State, April 2000. Al Baraka FCC Exhibit Y, ¶44.

72. Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips*, December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizbul Mujahideen, three violent jihadist groups operating under the broader al Qaida umbrella. *See SIMI: Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q: In your conferences, you have openly eulogized Osama bin Laden.
>
> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World. *SIMI: Nursery of Hate, India Today*, April 2, 2001.
>
> Al Baraka FCC Exhibit Y, ¶45.

73. In March of 2003, al Qaida military chief Abu Zubaydah[14] was arrested at a Lahkar-e-Taibah safe house in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations. Al Baraka FCC Exhibit Y, ¶46.

74. WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were

---

[14] Abu Zubaydah is a Defendant in O'Neill v. Republic of Iraq, et al., See, e.g. Iraq FCC ¶¶ 38, 41.

revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online*, December 9, 2002. Al Baraka FCC Exhibit Y, ¶47.

75.    That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled *"Military Lessons In The Jihad Against The Tyrants,"* was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998. Al Baraka FCC Exibit Y, ¶48.

76.    Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden.  Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida. Al Baraka FCC Exhibit Y, ¶49.

77.    Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad. Al Baraka FCC Exhibit Y, ¶50.

78.    In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar*, June 11, 2002. Al Baraka FCC Exhibit Y, ¶51.

79.    In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the

Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire*, September 5, 2003. Al Baraka FCC Exhibit Y, ¶52.

80.    Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda... Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.[15] *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury*, Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005. Al Baraka FCC Exhibit Y, ¶53.

**WAMY'S KNOWLEDGE**

81.    For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11,2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.  Al Baraka FCC Exhibit Y, ¶54.

82.    In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military

---

[15]  Under Congressional procedures, the full transcript of this hearing will not be available for approximately five months. Plaintiffs believe that the full transcript may contain further details regarding WAMY's involvement in the sponsorship of al Qaida and other fundamentalist organizations, and reserve their right to supplement the record with a copy of that transcript as soon as it is available.

groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani. Al Baraka FCC Exhibit Y, ¶55.

83.    Given the close ties between WAMY's senior leadership and high level officials of the Kingdom,[16] it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th. During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from 1997 forward.  Al Baraka FCC Exhibit Y, ¶56.

84.    The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well. Al Baraka FCC Exhibit Y, ¶57.

85.    A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, *whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals*...." (emphasis supplied). The *International Convention*

---

[16] The Kingdom is a Defendant in O'Neill v. Kingdom of Saudi Arabia.

*for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack. Al Baraka FCC Exhibit Y, ¶58.

86.    In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and ideological support to al Qaida and affiliated groups, for a period of many years leading up to the September 11thAttack. Al Baraka FCC Exhibit Y, ¶59.

87.    As the foregoing demonstrates, WAMY thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al Baraka FCC Exhibit Y, ¶60.

## Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.

88.    At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶609.

89.    At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c). This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶610.

90.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation:  acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations;

and financial institution and mail fraud.   Federal Insurance ¶619; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

91.  The acts of racketeering activity (predicate acts) include:

    a.  acts that involve murder arson and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

    b.  acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents), 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (financial institution fraud), 18 U.S.C. § 371 (government fraud) and are within the scope of 18 U.S.C. § 1961(1)(B);

    c.  acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

    d.  acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

    e.  acts indictable under 18 U.S.C. § 1952 and are within the scope of 18 U.S.C. § 1961

    f.  acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

    g.  act indictable under 26 U.S.C. § 7212(a), 26 U.S.C. § 7206 (1), (2) (tax) and are within the scope of 18 U.S.C. § 1961;

    h.  acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

    i.  acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B).

    Al Baraka FCC Exhibit Y, ¶5(a); Continental Casualty ¶611.

92.  Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies.   Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612.   The pattern of racketeering is more fully set forth in Exhibit Y, ¶¶5(b), (f), and (g)

93.  As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶613.

94.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance ¶620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 180..

95.     The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively,* the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively,* the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *See e.g.,* Exhibit Y, ¶ 6.

96.     The Enterprise is described, at length, in Exhibit Y, ¶¶ 6(b) and (c).

97.     The activities of the Enterprise relate to the commission of world-wide terrorism. The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack.   The usual activities of the Enterprise includes recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of.  Exhibit Y, ¶¶ 7-10.

98.     Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in ¶ 12 of Exhibit Y.

99.     The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in ¶ 13 of Exhibit Y.

## Consequences of the Conspiracy

100.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; FAC ¶¶ 594, 608, 617, 620, 622, 623, 624,

634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[17]

101.   These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance ¶¶80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶25.

102.   All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶606; O'Neill Al Baraka FCC ¶152.

103.   The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Al Baraka FCC ¶153; O'Neill Iraq FCC ¶ 275.

104.   The damages suffered by plaintiffs, as described in greater detail in the pleadings, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶620; O'Neill Iraq FCC ¶272; O'Neill Al Baraka FCC ¶¶ 137, 140, 144-6, 150, 154, 161, 164, 170, 174, 180.

105.   The Defendants intended to cause damage to business and property.  O'Neill Al Baraka FCC ¶178; O'Neill Iraq FCC ¶ 271.

106.   Plaintiffs suffered damage to business and property as a result of the Defendants actions.  Al Baraka FCC ¶¶ 179-180; O'Neill Iraq FCC ¶¶ 270, 271.

107.   The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Al Baraka FCC ¶ 146; Exhibit Y ¶¶ 14-15; O'Neill Iraq FCC ¶ 271.

---

[17] A list of the decedents is contained within Exhibit A of the FCC.  See, FCC ¶ 127 (a).

X:\Clients\ONeill v. Saudi arabia\Motions\Motions to Dismiss\Wamy\WAMY Facts Appendix draft JSG 12.05.05.doc