**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                                          )
In re Terrorist Attacks on September 11, 2001        )        No. 03-MD-1570 (RCC)
_____)

*This document relates to:*

*Ashton v. Al Qaeda*, No. 02-CV-6977 (RCC)
*Federal Insurance v. Al Qaida*, No. 03-CV-6978 (RCC)
*World Trade Center v. Al Baraka*, No. 04-CV-7280 (RCC)
*Continental Casualty v. Al Qaeda*, No. 04-CV-5970 (RCC)
*Euro Brokers v. Al Baraka*, No. 04-CV-7279 (RCC)
*New York Marine v. Al Qaida*, No. 04-CV-6105 (RCC)
*Burnett v. Al Baraka*, No. 03-CV-5738 (RCC)


**MEMORANDUM IN SUPPORT OF DEFENDANTS BAKR BINLADIN,**
**OMAR BINLADIN, TARIQ BINLADIN, MOHAMMAD BINLADIN COMPANY,**
**AND BINLADIN GROUP INTERNATIONAL COMPANY LTD.'S**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES ................................................................................................. ii

BACKGROUND ....................................................................................................................2

PLAINTIFFS' FACTUAL ALLEGATIONS .........................................................................4

    A.   THE COURT SHOULD DISREGARD ALLEGATIONS MADE IN PLEADINGS FILED IN VIOLATION OF CASE MANAGEMENT ORDER #2 AND THE FEDERAL RULES .................................................4

    B.   OPERATIVE ALLEGATIONS AGAINST BAKR, OMAR, AND TARIQ BINLADIN ...................................9

    C.   OPERATIVE ALLEGATIONS AGAINST MBC AND BGI ...............................................................11

ARGUMENT .......................................................................................................................11

I.     THIS COURT LACKS PERSONAL JURISDICTION OVER THE BINLADINS................................11

    A.   PLAINTIFFS HAVE FAILED TO ALLEGE MINIMUM CONTACTS WITH THE UNITED STATES...........12

    B.   PLAINTIFFS CANNOT ESTABLISH PERSONAL JURISDICTION ON A CONSPIRACY THEORY ............13

    C.   PLAINTIFFS FAIL TO ALLEGE THAT THE BINLADIN DEFENDANTS "PURPOSEFULLY DIRECTED" THEIR CONDUCT AT THE UNITED STATES................................................................................14

        1.  *Plaintiffs Allege No Facts Supporting An Inference That Either Bakr, Omar, Or Tariq Binladin Directed His Conduct At The United States* .................................................14

        2.  *Plaintiffs Allege No Facts To Suggest MBC And BGI Purposefully Directed Their Conduct At The United States* ................................................................................................19

    D.   PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY ............................................21

II.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE BINLADIN DEFENDANTS....................21

    A.   THE ALLEGATIONS AGAINST THE BINLADIN DEFENDANTS DO NOT STATE A CLAIM UNDER THE ANTI-TERRORISM ACT ("ATA")...............................................................................................21

    B.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER RICO, THE TORTURE VICTIM PROTECTION ACT, THE ALIEN TORT STATUTE, OR ANY STATE LAW CAUSE OF ACTION ...............................23

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allojet PLC v. Vantage Assocs.*,
    No. 04 Civ. 05223, 2005 U.S. Dist. LEXIS 4006 (S.D.N.Y. Mar. 15, 2005).................. 21

*In re Baan Co. Sec. Litigation*,
    245 F. Supp. 2d 117 (D.D.C. 2003) ....................................................................13

*Burnett v. Al Baraka Investment & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) (*"Burnett I"*)................................................23

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    292 F. Supp. 2d 9 (D.D.C. 2003) (*"Burnett II"*) ..............................................17

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994) ...............................................................................15

*Jazini v. Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998) ...............................................................................21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
    No. 91 CIV. 2923, 1994 WL 88129 (S.D.N.Y. 1994) ........................................15

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ...............................................................................15

*Shady Records, Inc. v. Source Enterprises, Inc.*,
    351 F. Supp. 2d 74 (S.D.N.Y. 2004)...................................................................15

*Steego Corp. v. Ravenal*,
    830 F. Supp. 42 (D. Mass. 1993) ........................................................................12

*In re Terrorist Attacks on September 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*Terrorist Attacks I*") ................................. *passim*

*In re Terrorist Attacks on September 11, 2001*,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ("*Terrorist Attacks II*").................................. *passim*

*United States v. Paracha*,
    No. 03 CR. 1197, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ............................................23

## FEDERAL STATUTES

18 U.S.C. §§ 1962(a), (c), (d) (2000)...........................................................................23

## **FEDERAL RULES**

Fed. R. Civ. P. 10..................................................................................................................5

## **MISCELLANEOUS**

The 9/11 Commission Report (July 22, 2004) ...........................................................2

Exec. Order No. 12947, 60 Fed. Reg. 5,079 (Jan. 25, 1995)..........................................4

Exec. Order No. 13067, 62 Fed. Reg. 59,989 (Nov. 5, 1997) .......................................20

Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 25, 1998) ......................................4

This motion is submitted on behalf of three half-brothers of Osama Bin Laden ("OBL") previously dismissed from the *Burnett* case[1] – Bakr, Omar, and Tariq Binladin – and two family companies – Mohammad Binladin Company ("MBC") and Binladin Group International Company Ltd. ("BGI") (collectively "the Binladin Defendants").[2]  The operative allegations against Bakr, Omar, and Tariq, *see infra*, pp. 9-11, are essentially the same kinds as those this Court has already found insufficient to establish personal jurisdiction.  While Plaintiffs have sought to hide that deficiency behind a mass of disorganized, irrelevant, and often grossly distorted claims in numerous improper RICO Statements, the specific, relevant facts directed against the moving Defendants are nothing more than this Court has rejected before.

It is not enough that the Binladins are blood relatives of OBL, given the family's complete break from him in 1993, well before he declared war on the United States.  It is not enough that Bakr, Omar, and Tariq are alleged to have held various corporate positions through which, without any specific facts, Plaintiffs assert that the three supported al Qaeda.  It is not enough that some are alleged to have contributed to or been involved with a legitimate Islamic charity, without any specific allegations suggesting any knowledge of or intent to support terrorist goals.  It is not enough that the now-thoroughly discredited "Golden Chain" document is alleged (falsely, by Plaintiffs' own translation) to name Bakr Binladin.

---

[1] *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 822 ("*Terrorist Attacks I*").  The Court ruled on the *Burnett* Complaint originally filed in the District of Columbia, *Burnett v. Al Baraka*, No. 02-CV-1616/No. 03-CV-9849 ("*Burnett*"), which is materially identical to *Burnett v. Al Baraka*, No. 03-CV-5738 ("*Burnett NY*").  *See Terrorist Attacks I*, 349 F. Supp. 2d at 780 n.2.  Because the Court has already ruled on those allegations, this motion will not address *Burnett NY* in detail.

[2] MBC is the successor to the Mohammad Binladin Establishment, sometimes also known as the Mohammad Binladin Organization ("MBO"), founded by Mohammad Awad Binladin.  Although Plaintiffs have named MBO as a Defendant here, rather than MBC, we assume that their reference reflects an alternative translation of the Arabic name of the company.  One Complaint names a "Saudi Bin Laden International Company," but there is not and never has been an entity by that name.  We assume Plaintiffs intended to refer to Binladin Group International Company Ltd., which was incorporated in 1995 and became BGI in 1997.

The Complaints in which each of the Binladin Defendants is currently named and the operative allegations as to that Defendant are identified in the chart attached as Ex. A.

The Court need not break new ground here.  Such allegations did not support personal jurisdiction against Bakr, Omar, or Tariq Binladin in *Burnett*, have not supported it against any other defendant in this litigation, and do not support it now.  Moreover, the claims against MBC and BGI rest upon the demonstrably false assertion that either was involved in a construction project in the Sudan in the early 1990s.  Although such an allegation would, even if true, be woefully inadequate to support jurisdiction, it is abundantly clear that Plaintiffs have identified the wrong companies, and their claim of jurisdiction therefore is supported by nothing.  Apart from the lack of personal jurisdiction, the pleaded facts are also wholly inadequate to state a claim against any of the Binladin Defendants.

## BACKGROUND

The Court is by now familiar with the Binladin family's relationship to OBL and the fact that the Binladin family severed ties with him in 1993,[3] a break that various Complaints acknowledge.[4]  The United States has never designated as a terrorist, nor seized or frozen the assets of, any member of the Binladin family (other than OBL) or any entity owned by a Binladin family member.  Instead, the United States government has long worked with the Binladins and their companies, including during the first Gulf War.[5]  We will not restate that history here, but address several facts of particular relevance to the moving Defendants.

---

[3] *See* Memorandum of Law in Support of Defendant Saudi Binladin Group, Bakr Binladin, Omar Binladin, and Tariq Binladin's Motion to Dismiss the Complaint or in the Alternative for More Definite Statement (*Burnett* D.D.C. Docket # 317) ("*Burnett* MTD") at 2-3; *see also* The 9/11 Commission Report (July 22, 2004) ("9/11 Report") at 170 (confirming that OBL's assets were divested and frozen by the Binladin family and the Saudi government in 1994).

[4] *See Ashton v. Al Qaeda*, No. 02-CV-6977 ("*Ashton*"), Sixth Amended Consolidated Master Complaint (MDL Docket #1463) ("*Ashton* 6AC") ¶ 402; *World Trade Center v. Al Baraka*, No. 04-CV-7280 ("*WTC*"), Complaint (WTC Docket #1) ("*WTC* Compl.") ¶ 631; *Continental Casualty v. Al Qaeda*, No. 04-CV-5970 ("*Continental Casualty*"), First Amended Complaint (*Continental Casualty* Docket #4) ("*Contin. Cas.* 1AC") ¶ 338 (all referring to the notion that OBL had been "disowned" by the family).

[5] *See Burnett* MTD at 3-4; 70 Fed. Reg. 38,256 (July 1, 2005); http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf (last visited Jan. 26, 2006).  Affidavit of Omar Binladin ("Omar Aff.") ¶ 9 (Jan. 25, 2006) ("Ex. B") (noting SBG's assistance to the U.S. military in Saudi Arabia).

Defendant MBC is the successor company to the Mohammad Binladin Establishment ("MBE"), founded in 1931.  In approximately 1989, MBE was restructured to create MBC; the Saudi Binladin Group ("SBG") was established in the same year.[6]  MBC is not a subsidiary or branch of SBG.  The two companies are separate and distinct both legally and operationally.[7]  OBL, like all of the 54 children of Mohammad Binladin, inherited an interest in his father's company and he therefore at one time held a small ownership interest in MBC.  He also became a shareholder, along with nineteen of his half-brothers, in SBG when it was formed in 1989.  In June 1993, however, in response to OBL's increasingly strident criticism of the Saudi government, the owners of MBC and SBG passed resolutions stripping OBL of his interest in both companies.[8]  The value of those interests was placed, at the direction of Saudi authorities, in an account outside OBL's control.[9]  OBL has never had access to these funds, nor has he received any other distributions from SBG, MBC, or any affiliated company – or any support from Bakr, Tariq, or Omar – since prior to June 1993.[10]  In early 1994, Bakr Binladin publicly condemned OBL in a widely reported statement made on behalf of the Binladin family and companies.[11]  The Binladins took these steps long before OBL began publicly targeting United States interests, and years before OBL was designated as a terrorist.[12]

---

[6] Affidavit of Bakr Binladin ("Bakr Aff.") ¶¶ 4-5  (Jan. 25, 2006) ("Ex. C"); Affidavit of Tariq Binladin ("Tariq Aff.") ¶ 4 (Jan. 25, 2006) ("Ex. D").

[7] Bakr Aff. ¶ 5; Omar Aff. ¶ 7.

[8] *See* Bakr Aff. ¶ 7 and Exs. 1 & 2 (Partners' Resolution Pertaining to the First Amendment of the Articles of Association of Mohammad Binladin Company, under the Tradename Mohammad Binladin Establishment (June 16, 1993); Shareholders Resolution to Effect the Fourth Amendment to the Articles of Association of Binladin Saudi Group (June 16, 1993)); *see also* Omar Aff. ¶ 16; Tariq. Aff. ¶ 6.

[9] *See* Bakr Aff. ¶ 8.

[10] *See* Bakr Aff. ¶ 10; Omar Aff. ¶ 16; Tariq Aff. ¶ 7; Affidavit of Yves Bruderlein ("Bruderlein Aff.") ¶ 9 (Jan. 24, 2006) ("Ex. E").  *See also* 9/11 Report at 170.

[11] Bakr Aff. ¶ 9 and Ex. 3; *see also id.* ¶ 12 and Ex. 4.

[12] *See, e.g., WTC* Compl. ¶ 770 (alleging OBL announced his intention to target United States personnel in Saudi Arabia in August and November of 1996); *Burnett* Third Amended Complaint (Burnett 1616 Docket #29) ("*Burnett* 3AC") ¶ 453 (same); *Federal Insurance v. Al Qaida*, No. 03-CV-6978 ("*Federal Insurance*"), First

## PLAINTIFFS' FACTUAL ALLEGATIONS

A.    **The Court Should Disregard Allegations Made In Pleadings Filed In Violation Of Case Management Order #2 And The Federal Rules**

In what cannot be excused as a minor procedural defect, Plaintiffs have concealed the dearth of well pleaded allegations beneath a mass of disorganized, redundant, and irrelevant allegations contained in lengthy RICO Statements and other filings, which they pretend are part of their Complaints.  Case Management Order #2 ("CMO #2") required that Plaintiffs file amended complaints by September 30, 2005, a requirement which Plaintiffs recognized meant that "any and all additional allegations contained in More Definite Statements or other filings would be incorporated into a single pleading in each of the cases."[13]  Yet only one of the Plaintiffs groups (*Ashton*) complied.  The others either filed "Notices of Consolidation of Pleadings" listing all previously filed documents that they now "deem" to be part of their Complaints,[14] or filed Amended Complaints that largely mirror previous complaints but purport to "incorporate by reference" scores of More Definite Statements ("MDSs") and RICO Statements.[15]  Apart from violating CMO #2's amended complaint requirement, the RICO

---

(continued…)

Amended Complaint (MDL Docket #111) ("*Fed. Ins.* 1AC") ¶ 42 (alleging that al Qaeda issued a fatwa in February 1998 saying it was the duty of Muslims to kill United States citizens, including civilians); *Contin. Cas.* 1AC ¶ 120 (same).  *Compare* Exec. Order No. 12947, 60 Fed. Reg. 5,079 (Jan. 25, 1995) (silent as to OBL), *with* Exec. Order No. 13099, 63 Fed. Reg. 45,167 (Aug. 25, 1998) (designating OBL).

[13] Letter from Sean P. Carter to The Honorable Richard C. Casey, July 15, 2005; *see also* CMO #2 (MDL Docket #247); Endorsed Letter, July 27, 2005 (MDL Docket #1073).

[14] *See Burnett/Burnett NY*, Notice of Consolidation of Pleadings (MDL Docket #1377); *Euro Brokers* Notice of Consolidation of Pleadings (MDL Docket #1378); *WTC* Notice of Consolidation of Pleadings (MDL Docket #1379).

[15] *See Federal Insurance* First Amended Complaint with Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed in Accordance with Paragraph 13 of Case Management Order Number 2 (MDL Docket #1380) ("*Fed. Ins.* 1AC with Incorp."); *Continental Casualty* Second Amended Complaint (MDL Docket #1406) ("*Contin. Cas.* 2AC") (attaching an unnumbered addendum that appears to be a collection of various RICO Statements filed in the *Federal Insurance* action); *New York Marine v. Al Qaida*, No. 04-CV-6105 ("*NY Marine*"), Second Amended Complaint (NY Marine Docket #234) ("*NY Marine* 2AC") (while adding substantive allegations, also adding footnotes purporting to incorporate various RICO Statements filed in *Federal Insurance*).

Although CMO #2 did provide that RICO Statements in the *Federal Insurance* case (and only that case) would be considered amendments to the Complaint, *see* CMO #2, ¶ 14; Endorsed Letter, Aug. 22, 2005 (MDL

4

Statements Plaintiffs purport to "incorporate by reference" do not comply with this Court's rules governing RICO Statements nor with basic pleading standards.  The RICO Statements contain boilerplate lists of alleged predicate acts which make no attempt to tie the statutory citations to any factual allegations or any particular Defendant.[16]  Each also includes dozens of pages of rambling factual narrative, in most cases undifferentiated by Defendant, and some purport to themselves incorporate by cross-reference "all relevant factual statements" in other RICO Statements.[17]  Any pretense that such Statements, which comply with neither the letter nor the spirit of this Court's orders, are now part of the Amended Complaints would be a clear violation of the Federal Rules of Civil Procedure.[18]

Plaintiffs' willful refusal to distill their claims into a "single pleading" is plainly designed to conceal the absence of specific facts supporting their claims against these Defendants.  Indeed, Plaintiffs' RICO Statements appear to result from a massive "data dump" of secondary source material, often of dubious reliability and tenuous relevance.  Frequently, Plaintiffs try to cloak

---

(continued…)

Docket #1144), it did not exclude *Federal Insurance* from the requirement that all prior allegations, whether in RICO Statements or otherwise, be consolidated into a final amended complaint.  Because the *Federal Insurance* Plaintiffs failed to comply with that requirement, the allegations in their RICO Statements, like those of the other Plaintiffs, are not properly before the Court.

[16] *See Fed. Ins.* RICO Statement Applicable To Saudi Bin Laden Group, Abdullah Bin Laden, Bakr Bin Laden, Tarek Bin Laden, Omar Bin Laden and the Mohammad Bin Laden Organization (MDL Docket #1120) ("*Fed. Ins.* RICO (SBG, et al.)"); *WTC* RICO Statement Applicable to Bakr Bin Laden, Tarek Bin Laden, and Omar Bin Laden (MDL Docket #1125); *Euro Brokers* RICO Statement Applicable to Bakr Bin Laden, Tarek Bin Laden, and Omar Bin Laden (MDL Docket #1123).  Because the relevant *WTC* and *Euro Brokers* RICO Statements are identical, we will cite them collectively as "*WTC/Euro Brokers* RICO (Binladins)."

[17] *See, e.g., WTC/Euro Brokers* RICO (Binladins), Ex. A (containing 24 pages of single-spaced, unnumbered narrative); *WTC/Euro Brokers* RICO Statement Applicable to SBG (MDL Docket #1124/1122) ("*WTC/Euro Brokers* RICO (SBG)"), Ex. A. (containing 34 pages of such narrative); *Fed. Ins.* RICO (SBG, et al.) Ex. A (containing 15 pages of such narrative); *see WTC/Euro Brokers* RICO (Binladins) at 1, n.1 (incorporating by reference "all relevant factual statements" in the RICO Statement applicable to SBG); *WTC/Euro Brokers* RICO (SBG) at 1, n.1 (incorporating by reference "all relevant factual statements" in the RICO Statement applicable to Bakr, Omar, and Tariq Binladin).  In some cases, Plaintiffs dispense with an express cross-reference and simply insert allegations regarding individual Defendants in the RICO Statements of unrelated Defendants.  *See, e.g., WTC/Euro Brokers* RICO Statement Applicable to the World Assembly of Muslim Youth (MDL Docket #1166/1165), Ex. A at 4-5, 16-20, 20-24.

[18] *See* Fed. R. Civ. P. 10 (requiring that "[a]ll averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances").

the irrelevance with inflammatory characterizations that bear little relationship to the material

cited.[19]  They rarely identify the source of their allegations – even those that appear as

quotations[20] – but when, through counsel's own research, the source can be identified, it often

becomes clear that key contextual language has been omitted or words have been added to

intentionally mislead the Court.  An example can be found in Plaintiffs' selective use and

misquotation of evidence regarding alleged ties between Cambridge Engineering and al Qaeda.

The *WTC* and *Euro Brokers* Plaintiffs assert that:

> Yves Bruderlerin [*sic*], the director of Cambridge Engineering, Ltd., a SBG
> subsidiary suspected of having financial connections to Osama Bin Laden and al
> Qaeda, notes substantial financial connections between Bakr, Omar, and Tarek
> Bin Laden, as leaders of the Bin Laden family financial empire, and SDGT Bank
> al- Taqwa[.][21]

Plaintiffs then attempt to support this claim with a quotation from Yves Bruderlein, which we

have determined comes from minutes of an interview with Swiss authorities in October 2001.

However, Plaintiffs omit, without ellipses, the italicized text below:

> Q: Do you have connections with the company known as Al-Taqwa Bank owned
> by [SDGT Youseff] Nada?
>
> *No.*

---

[19] For example, Plaintiffs make the inflammatory and wholly unsupportable claim that a "UBS account was one of 54 shell accounts used by Yeslam, Tarek, Omar, Bakr, and Osama Bin Laden to hide Bin Laden family assets and provide a secret infrastructure for illicitly transferring funds to Osama bin Laden throughout the 1990s." *WTC/Euro Brokers* RICO (Binladins), Ex. A at 18-19.  The specific facts they allege, however, expressly refute that claim.  Plaintiffs themselves state that the account was opened in August 1990 at UBS in Switzerland for the benefit of OBL with $450,000, and that $482,000 was transferred back to Saudi Arabia to an account in the name of Haydar Binladin little more than a year later, in October 1991.  *WTC/Euro Brokers* RICO (SBG), Ex. A at 31-32; *WTC/Euro Brokers* RICO (Binladins), Ex. A at 18.  Plaintiffs allege no facts to suggest that OBL received any of these funds, much less that they were intended for any illicit purpose.  Instead, as explained in the affidavits of Yeslam Binladin and Omar Binladin, this sub-account was one of more than 50 such accounts set up for each of the children of Mohammad Binladin in the wake of Saddam Hussein's invasion of Kuwait.  The account was essentially empty by October 1991, years before OBL became known as a terrorist.  Affidavit of Yeslam Binladin ¶ 12-15 (Oct. 27, 2005) ("Ex. F"); Omar Aff. ¶ 8.  The timing and circumstances surrounding the transaction preclude any inference that the account was set up with the intent to provide material support years later for terrorist attacks against the United States.  These are not well pled allegations and, indeed, they do not even meet the good faith pleading standards of Rule 11.

[20] *See, e.g.*, *WTC/Euro Brokers* RICO (Binladins), Ex. A at 3, 6-7, 9-17, 19-24.

[21] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 21.

> *Have any of the transactions which the Saudi Bin Laden Group has asked you to perform ever seemed strange to you?*
>
> A: No.  There are important transfers of several million dollars, but they are always transfers within Saudi Binladin Group or its subsidiary companies or with the profits of its leaders.  *I have not witnessed any suspicious transactions.*[22]

Even Plaintiffs' version provides no support for their claim that Bruderlein "notes substantial connections between *Bakr, Omar, and Tarek Bin Laden . . .* and SDGT Bank al-Taqwa." (Emphasis added).  But Plaintiffs falsely suggest a connection between SBG and Bank al-Taqwa by omitting Bruderlein's flat denial and the intervening question.  And they omit the concluding sentence denying any suspicious transactions in order to bolster that false connection.

Even more fundamentally, although Plaintiffs quote extensively from Bruderlein's interview, they omit his sworn denial that Cambridge had any connections to OBL or al Qaeda, a denial that was backed up with account records he provided to Swiss authorities.[23]  Although Plaintiffs make much of the investigation launched in the immediate aftermath of September 11 because of alleged suspicions that certain Cambridge accounts may have been used to transfer funds to an account in Pakistan for the benefit of OBL, they fail to disclose that the Swiss and U.S. governments' inquiries in late 2001 regarding those Cambridge accounts went nowhere: No charges have ever been brought and no accounts have ever been frozen or seized, for the simple reason that the suspicions – like many of the false leads frantically pursued in the weeks after those horrific events – had no basis.  Such blatant manipulations of sources need not and cannot be accepted as well pleaded allegations.[24]

---

[22] *Compare WTC/Euro Brokers* RICO (Binladins), Ex. A at 21-22, *with* Bruderlein Aff. ¶ 12 and Ex. 1 at 4 (Minutes of Witness Statement of Yves Bruderlein (Oct. 9, 2001)) (emphasis added).

[23] These denials are repeated in Mr. Bruderlein's affidavit submitted with this motion.  *See* Bruderlein Aff. ¶ 12 and Ex. 1 at 3.  Mr. Bruderlein also denied that Yeslam Binladin had any dealings with Cambridge, but that did not stop Plaintiffs from repeating that baseless allegation.  *Compare* Bruderlein Aff., Ex. 1 at 3, *with WTC/Euro Brokers* RICO Statement Applicable to Yeslam Bin Laden (MDL Docket #898/900), Ex. A at 3.

[24] Space limitations prevent the Binladin Defendants from responding to all such distortions in the more than 100 single-spaced pages of narrative in the RICO Statements, but examples are numerous.

Beyond the outright fabrications, Plaintiffs generally eschew any effort to clarify or distinguish the wrongful conduct alleged against specific individuals.  For example, after repeating the allegation that this Court has already rejected in *Burnett* regarding Tariq Binladin's "prominent role in 1990 at the IIRO" where he "work[ed] quietly for the orphans," they recite numerous allegations regarding the IIRO's claimed terrorist conduct in the mid- to late-1990s with no mention of Tariq whatsoever.[25]  In other instances, Plaintiffs simply add the refrain "Bakr, Omar, and Tariq" to general conclusory assertions regarding the "Binladin family" or various family companies without any explanation of how these individuals supposedly participated in the alleged conduct.[26]  Finally, Plaintiffs' RICO Statements contain dozens of allegations about contacts and events that have no conceivable relevance to Plaintiffs' claims but which appear designed simply to cast the Defendants in a bad light, such as the claims:  that Tariq Binladin gave money to Russia's Grand Mufti, who has no alleged connection to OBL or al Qaeda and who purportedly issued an anti-American fatwa two years *after* the events at issue here;[27] that "it was reported that the Bin Laden brothers deployed fighters to Jordan" in 1993 in an effort to disrupt the peace process with Israel;[28] and that the Binladins "raised millions of

---

[25] *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 16-17; *Fed. Ins.* RICO (SBG, et al.) at 14-15.

[26] *E.g., WTC/Euro Brokers* RICO (Binladins), Ex. A at 11-14 (alleging that "SBG, and [OBL's] brothers Tarek, Omar and Bakr" supported OBL in the Sudan, with no specific facts regarding how they did so); *see also id.* at 6 (alleging Bakr's, Omar's, and Tariq's involvement "[a]s officers of [MBC]" in recruiting mujahideen via MBC's offices in Cairo); *Fed. Ins.* RICO (SBG, et al.) at 5 (alleging without any detail that al Qaeda "relied on well-placed financial facilitators and logistical sponsors" such as SBG, MBC, Bakr, Omar, and Tariq).

[27] *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 17.

[28] *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 7.  In fact, the article on which Plaintiffs apparently rely for this "report," "Jordanian Militants Train in Afghanistan to Confront Regime," Agence France Presse (May 30, 1993) ("Ex. G"), refers to OBL but makes no mention of the "Bin Laden brothers" at all.

dollars" for the Saudi royal family and "granted [them] free shares in the SBG Companies."[29]
None of these allegations are true, and they are entirely beside the point.[30]

All of these deficiencies require the conclusion that the Court should disregard the
allegations found in Plaintiffs' RICO Statements:  They were not properly filed, do not conform
with the Federal Rules, were not properly included in Amended Complaints, and do not in any
event meet the minimum standards for good faith pleading.

### B.    Operative Allegations Against Bakr, Omar, And Tariq Binladin

The allegations in Plaintiffs' operative Complaints (those filed in compliance with CMO
#2) against Bakr, Omar, and Tariq Binladin are similar, if not materially identical, to those the
Court has already found deficient as to them in the *Burnett* case and as to other Defendants.  For
example, Plaintiffs continue to rely on allegations (1) that Bakr, Omar, and Tariq Binladin held
corporate positions in family companies, three of which are alleged to have supported OBL in
Afghanistan in the late 1980s or in Sudan in the early 1990s;[31] (2) that Tariq Binladin allegedly
served as a "supervisor" of the IIRO in the early 1990s;[32] (3) that unspecified brothers and other
family members visited OBL for unspecified purposes while he was in the Sudan;[33] and (4) that,

---

[29] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 22.

[30] Much of the RICO Statements is devoted to events long before OBL became a terrorist, much less one who was targeting the United States.  *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 6-7, 11-16.  Other allegations, most notably the assertion that after September 11th the family "dedicated 50 million Saudi Riyals to the protection" of OBL, post-date the September 11 attacks and therefore could not be causally related.  *WTC/Euro Brokers* RICO (Binladins), Ex. A at 22; *see also id*. at 23; *WTC/Euro Brokers* RICO (SBG), Ex. A at 31.  Bakr, Omar, and Tariq have each specifically denied the payment of any "protection" before or after September 11th.  Bakr Aff. ¶ 13; Omar Aff. ¶ 16; Tariq Aff. ¶ 7.

[31] *Compare Burnett* 3AC ¶¶ 313-325 (alleging various positions held by Bakr, Omar, and Tariq Binladin at SBG and MBC, which, along with "Saudi Binladin International Company," allegedly provided support to OBL during the Afghan-Soviet conflict in the 1980s and through public works projects in Sudan in the early 1990s), *with Fed. Ins.* 1AC ¶¶ 380-85, 505; *Ashton* 6AC ¶¶ 397-409; *Contin. Cas.* 1AC ¶¶ 334-345; *WTC* Compl. ¶¶ 624-38; *NY Marine* 2AC ¶¶ 353-58, 469 (all alleging the same).  The *Euro Brokers* Complaint does not contain any allegations as to any of the Binladin Defendants.

[32] *Compare Burnett* 3AC ¶¶ 326-27 (alleging Tariq Binladin's "prominent" role as "supervisor" in IIRO), *with Ashton* 6AC ¶¶ 410-11 (same), *Contin. Cas.* 1AC ¶¶ 346-47 (same), *and WTC* Compl. ¶¶ 639-40 (same).  In truth, Tariq Binladin never held any leadership position with the IIRO.  *See* Tariq Aff. ¶ 8.

[33] *Compare Burnett* 3AC ¶ 318, *with Ashton* 6AC ¶ 402, *Contin. Cas.* 1AC ¶ 338, *and WTC* Compl. ¶ 631.

based solely on Plaintiffs' beliefs about "Islamic culture," the Binladin family never really severed ties with OBL.[34]  The Court has already rejected every one of these allegations as a basis for personal jurisdiction over Bakr, Omar, and Tariq Binladin.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 822.

Plaintiffs have also added allegations that this Court has found insufficient regarding other Defendants.  For example, they allege that Bakr Binladin is named in the so-called "Golden Chain" document[35] and made charitable contributions in 1992 to the IIRO for Bosnian relief.[36] Plaintiffs also assert that Bakr Binladin held in an Islamic bank an account that was closed three years *before* the bank was designated by the U.S. government in November 2001.[37]  They allege no misconduct by Bakr with respect to the account, and do not claim that his account had any connection to OBL or al Qaeda.  Finally, Plaintiffs make unsupported and conclusory allegations that Bakr, Omar, and Tariq Binladin, along with the rest of the Defendants, "aided and abetted, conspired with, and provided material support and resources to" al Qaeda and OBL.[38]

---

[34] *Compare Burnett* 3AC ¶ 318, *with Ashton* 6AC ¶¶ 401-02; *Contin. Cas.* 1AC ¶¶ 337-38; *WTC* Compl. ¶¶ 630-31, 644.

[35] *Fed. Ins.* 1AC ¶¶ 101, 505; *NY Marine* 2AC ¶¶ 80, 469.  *Cf. Terrorist Attacks I*, 349 F. Supp. 2d at 817-18.  In fact, Bakr's name does not appear in Plaintiffs' own translation of the document, which vaguely refers only to "Bin Laden Brothers."  *See infra*, p. 16 and n.60.

[36] *See WTC* Compl. ¶ 390, *Fed. Ins.* 1AC ¶¶ 505-06, *NY Marine* 2AC ¶¶ 469-70 (all alleging Bakr Binladin was one of largest donors to a July 1992 fundraiser sponsored by IIRO).  *Cf. In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 558-59 (S.D.N.Y. 2005) ("*Terrorist Attacks II")* (holding allegations Prince Salman contributed to and raised funds for IIRO insufficient to support personal jurisdiction).

[37] *See Ashton* 6AC ¶ 388 (alleging that Bakr Binladin and his brother Ghalib Binladin were investors and account holders in Bank al-Taqwa); *WTC/Euro Brokers* RICO (Binladins), Ex. A at 19 (alleging that Bakr Binladin's Bank al-Taqwa account was closed in 1998).  *Cf. Terrorist Attacks I*, 349 F. Supp. 2d at 813-14 (ties to later-designated organizations insufficient without specific factual allegations of knowledge).

[38] *See NY Marine* 2AC ¶¶ 45, 51-53; *Fed. Ins.* 1AC ¶¶ 66, 72-74; *see also Ashton* 6AC ¶¶ 5, 22, 153; *WTC* Compl. ¶¶ 1, 35; *Contin. Cas.* 1AC ¶¶ 11, 26.  *Cf. Terrorist Attacks I*, 349 F. Supp. 2d at 805 (rejecting conclusory allegations lodged against "all Defendants," including *Fed. Ins.* 1AC ¶¶ 66, 72-74).

### C.     Operative Allegations Against MBC And BGI

Only two actions name MBC as a Defendant:  *NY Marine* and *Federal Insurance*.[39]
Apart from a boilerplate assertion – previously found insufficient by this Court – that MBC
"aided and abetted, conspired with, and provided material support and resources to" al Qaeda or
its affiliates,[40] the only allegation either makes against MBC is the unelaborated assertion that it
provided "technical assistance" to OBL on the construction of major roads and the Port Sudan
airport in the Sudan in the early 1990s.[41]

BGI (incorrectly sued as "Saudi Bin Laden International Company"), on the other hand,
is named as a Defendant only in the *Continental Casualty* case.[42]  The only allegation asserted
against BGI is the demonstrably untrue claim that it was a party to the agreement with the
Sudanese government for the construction of the Port Sudan airport.[43]

### ARGUMENT

The Binladin Defendants' motion to dismiss should be granted both because Plaintiffs
cannot establish personal jurisdiction over these foreign Defendants and because they have failed
to state a claim upon which relief can be granted.

## I.     THIS COURT LACKS PERSONAL JURISDICTION OVER THE BINLADINS

To survive a Rule 12(b)(2) motion to dismiss, Plaintiffs must make a *prima facie* factual
showing that personal jurisdiction exists.  *Terrorist Attacks I*, 349 F. Supp. 2d at 804; *Terrorist
Attacks II*, 392 F. Supp. 2d at 556.  Plaintiffs do not and cannot make such a showing here.

---

[39] MBC is also named as a Defendant in *Salvo*, but has not been served in that case.

[40] *Fed. Ins.* 1AC ¶ 66; *NY Marine* 2AC ¶ 45.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 805.

[41] *See Fed. Ins.* 1AC ¶ 367; *NY Marine* 2AC ¶ 340.

[42] Although the *Ashton*, *Federal Insurance*, and *Salvo* Plaintiffs originally named "Saudi Bin Laden International Company" as a Defendant, those groups later voluntarily dismissed it.

[43] *See Contin. Cas.* 1AC ¶ 340.  BGI was not incorporated until 1995 and so did not even exist when the Port Sudan airport was built.  *See* Omar Aff. ¶¶ 14-15.  The airport contract was executed in 1989 with Binladin Overseas (Pvt. Ltd.), and the work was performed by a division of SBG.  *See* Omar Aff. ¶ 10.

### A.    Plaintiffs Have Failed To Allege Minimum Contacts With The United States

Plaintiffs cannot establish general jurisdiction, and barely try.  As this Court has said, to support general jurisdiction, Plaintiffs must allege a "considerably higher level of contacts" with New York or the United States than would be required for specific jurisdiction.  *Terrorist Attacks I*, 349 F. Supp. 2d at 811; *Terrorist Attacks II*, 392 F. Supp. 2d at 558.  The operative Complaints, however, do not allege that these Defendants had *any* U.S. contacts.

Only in two of the improper RICO Statements do Plaintiffs allege U.S. contacts, but those concern only two Defendants, Bakr and Omar Binladin, and they are either demonstrably false or irrelevant.  First, this Court has already rejected attendance at a U.S. university in the 1970s[44] as a basis for personal jurisdiction.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 814, 816.  Neither Bakr nor Omar has lived in the U.S. since they left college some 30 years ago.[45]  Although Plaintiffs claim that Omar lived in Virginia with Defendant Abdullah Binladin in the 1990s,[46] they have the wrong "Omar."  It was Defendant Omar Binladin's much younger nephew (also named Omar) who lived in Virginia.[47]  Second, it is well established that charitable donations, such as Plaintiffs allege Bakr made to Harvard University,[48] do not subject one to general jurisdiction.  *See, e.g.*, *Steego Corp. v. Ravenal*, 830 F. Supp. 42, 51 (D. Mass. 1993).  Third, this Court has already rejected passive investments in U.S. companies[49] as grounds for general jurisdiction.  *See Terrorist Attacks II*, 392 F. Supp. 2d at 559 ("ownership of shares in

---

[44] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 2.

[45] Bakr Aff. ¶ 3; Omar Aff. ¶ 4.

[46] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 2; *Fed. Ins.* RICO (SBG, et al.) at 12.

[47] Omar Aff. ¶ 5; Affidavit of Abdullah Awad Binladin ¶ 5 (Nov. 19, 2005) ("Ex. H").

[48] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 2.

[49] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 2-3 (asserting Bakr Binladin's "control[]" of SBG's passive investment in the Carlyle Group and a personal investment in a Saudi-based business that partnered with Microsoft in Saudi Arabia); *id.* at 2 (asserting that Omar Binladin made a passive investment in a Massachusetts-based company, Worldcare Ltd.).  This latter allegation is false.  *See* Omar Aff. ¶ 6.

Texas corporations, on its own, cannot be considered sufficiently systematic and continuous to establish general jurisdiction"). Finally, Plaintiffs' nebulous claim that Bakr, Omar, and Tariq Binladin collectively profit from SBG's dealings with U.S. companies[50] cannot constitute a contact with the United States for jurisdictional purposes. *See Terrorist Attacks I*, 349 F. Supp. 2d at 812 (rejecting sufficiency of allegations that Prince Sultan held position in or profited from investments in companies doing business in the United States); *see also In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 130 (D.D.C. 2003).

> **B.     Plaintiffs Cannot Establish Personal Jurisdiction On A Conspiracy Theory**

Similarly, Plaintiffs' allegations cannot support the exercise of personal jurisdiction over the Binladin Defendants on a conspiracy theory. Plaintiffs allege in various forms that *all* Defendants in these actions conspired with the al Qaeda terrorists to perpetrate the attacks of September 11.[51] This Court has already held, however, that such allegations are insufficient to establish personal jurisdiction over Bakr, Omar, and Tariq Binladin. *See Terrorist Attacks I*, 349 F. Supp. 2d at 822 (dismissing on personal jurisdiction grounds because "[t]he [] Complaint does not contain any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer . . . that they were members of a conspiracy"); *see also id.* at 805. Because the Complaints (with or without the improper RICO Statements) contain no specific factual allegations permitting an inference that any of the moving Defendants directed, controlled, or requested al Qaeda to undertake its attacks in the United States, the conspiracy claims must be dismissed. *See id.* at 806.

---

[50]  *WTC/Euro Brokers* RICO (Binladins), Ex. A at 2.

[51]  *See, e.g., NY Marine* 2AC ¶¶ 45, 51-53; *Fed. Ins.* 1AC ¶¶ 66, 72-74; *Ashton* 6AC ¶¶ 5, 22, 153; *WTC* Compl. ¶¶ 1, 35; *Contin. Cas.* 1AC ¶¶ 11, 26.

### C.    Plaintiffs Fail To Allege That The Binladin Defendants "Purposefully Directed" Their Conduct At The United States

The focus of Plaintiffs' jurisdictional argument to date has been that various Defendants have "purposefully directed" their conduct at the United States.  As to the Binladin Defendants, such a claim must fail because Plaintiffs have not alleged the required "*personal or direct participation* by the Defendants in the conduct giving rise to their claims."  *Terrorist Attacks I*, 349 F. Supp. 2d at 809 (emphasis added); *Terrorist Attacks II*, 392 F. Supp. 2d at 558 (same).

### 1.    Plaintiffs Allege No Facts Supporting An Inference That Either Bakr, Omar, Or Tariq Binladin Directed His Conduct At The United States

In *Burnett*, this Court held that Plaintiffs had not put forward "any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer that they purposefully directed their activities at the United States . . . ."  *Terrorist Attacks I*, 349 F. Supp. 2d at 822.  As described below, Plaintiffs' allegations do not differ in kind from those the Court has already rejected.  The Court should therefore reach the same conclusion again.

First, this Court previously rejected the sufficiency of allegations that Bakr, Omar, and Tariq Binladin held corporate positions in SBG and other Binladin companies, which allegedly supported OBL both in Afghanistan in the 1980s and in public works projects in the Sudan in the early 1990s.  *See id.* at 821-22.  In addition to restating essentially the same *Burnett* allegations,[52] Plaintiffs have added more corporate positions, but include no new facts tying any of these positions to specific conduct.[53]  Plaintiffs cannot fill this gap simply by tacking the mantra of "Bakr, Omar, and Tariq Binladin" onto allegations directed at the corporations or the family.[54]

---

[52] *Compare Burnett* 3AC ¶¶ 313-25, *with Fed. Ins.* 1AC ¶¶ 380-85, 505; *NY Marine* 2AC ¶¶ 353-58, 469; *Ashton* 6AC ¶¶ 397-409; *Contin. Cas.* 1AC ¶¶ 334-345; *WTC* Compl. ¶¶ 624-38.

[53] *See, e.g., Ashton* 6AC ¶ 409; WTC Compl. ¶¶ 281, 638, 657; *Contin. Cas.* 1AC ¶¶ 345, 525.  Plaintiffs' improperly filed RICO Statements add positions in still other Binladin companies, but allege no specific conduct in those capacities.  *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 5-6, 17.

[54] *See, e.g., WTC/Euro Brokers* RICO (Binladins), Ex. A at 3-5, 6-8, 11-13, 15, 17-19, 21, 22, 23-24.

This Court has already rejected such improper group pleading and instead has required specific allegations regarding the individual's participation in an organization's conduct. *See Terrorist Attacks I*, 349 F. Supp. 2d at 816 ("Plaintiffs must either allege personal acts by [Defendant] . . . or demonstrate that the acts of the [entities] he chaired can be imputed to him.").[55]

Second, this Court's earlier ruling acknowledged that Tariq Binladin allegedly served as a "supervisor" of the IIRO in the early 1990s, but nevertheless found no basis in that allegation to exert personal jurisdiction over him. *See id.* at 821, 822. Plaintiffs repeat the identical deficient allegations,[56] but they add nothing that would justify a different conclusion. Third, this Court found a lack of jurisdiction as to Bakr, Omar, and Tariq Binladin despite conclusory allegations in *Burnett* that the Binladin family continued to sponsor OBL after the family break in 1993, and that unspecified brothers and other family members visited OBL for unspecified purposes while he was in the Sudan. *See id.* at 822. Those allegations, repeated by Plaintiffs in at least three other Complaints,[57] should be rejected again.[58]

---

[55] *See also Shady Records, Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 74, 78 (S.D.N.Y. 2004) ("It is elementary that a corporation is a separate legal person from its officers, directors or shareholders, and that those individual persons are not liable for the acts of the corporation simply because they can be said to 'control' it") (citations omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91 Civ. 2923, 1994 WL 88129, at *20 (S.D.N.Y. Mar. 15, 1994) (dismissing claims on the ground that Plaintiffs had failed to comply with Rule 8(a) because "the Complaint never distinguishes between the three individuals and the one corporation who comprise [the corporate Defendant group] . . . [n]o facts are stated which connect any particular defendant to any identified act."); *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (allowing officer liability for corporate fraud only where the officer participates in or has actual knowledge of the fraud); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (holding claim not properly pled against directors where Plaintiffs failed to allege personal knowledge or participation).

[56] *See, e.g., Ashton* 6AC ¶¶ 410-11 (alleging Tariq Binladin's "prominent" role as "supervisor" in IIRO); *Contin. Cas.* 1AC ¶¶ 346-47 (same); *WTC* Compl. ¶¶ 639-40 (same).

[57] *See Ashton* 6AC ¶¶ 401-02, *Contin. Cas.* 1AC ¶¶ 337-38, *and WTC* Compl. ¶¶ 630-31.

[58] Although this Court need not even consider allegations in the improper RICO Statements, it should be noted that Plaintiffs' claims that Bakr visited OBL in 1994 and 1996 and that "Bakr, Omar, and Tariq have continued to communicate with" OBL, *WTC/Euro Brokers* RICO (Binladins), Ex. A at 6, 9, are false. *See* Bakr Aff. ¶ 2, 11 (last saw OBL in 1992); Omar Aff. ¶ 3 (has not seen OBL since 1990 and only spoke to him briefly on one occasion since then, when in 1995 OBL called to express condolences on the death of Omar's sister); Tariq Aff. ¶ 5 (has not seen or communicated with OBL since late 1992 or early 1993). Even on their face, however, the allegations, which offer no facts about the substance or purpose of such communications, provide no basis to infer that they were intended to or did in fact advance OBL's terrorist agenda.

Beyond those allegations already rejected as to Bakr, Omar, and Tariq Binladin themselves, Plaintiffs have merely added allegations that this Court has found insufficient regarding other Defendants.

*"Golden Chain."*  Plaintiffs allege that Bakr Binladin is named in the so-called "Golden Chain" document.[59]  This allegation is, of course, false:  Plaintiffs' own translation of the document does not mention Bakr.[60]  Moreover, Plaintiffs themselves have dated the document to 1988, at a time when OBL was still fighting for the U.S.-sponsored mujahideen in Afghanistan.[61] In any case, this Court has recognized that "with no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters." *Terrorist Attacks I*, 349 F. Supp. 2d at 817.

*Charitable Contribution.*  Plaintiffs allege that Bakr Binladin made a contribution to Bosnian relief through the IIRO in 1992.[62]  Yet as this Court has held on multiple occasions, "[d]onating money to established humanitarian organizations that may or may not have been diverting funds to support al Qaeda cannot be considered primary participation in intentional wrongdoing expressly aimed at the United States." *Terrorist Attacks II*, 392 F. Supp. 2d at 559. Plaintiffs allege the conclusion that Bakr Binladin had "full knowledge that the contributed funds would be used to support al Qaida's operations and terrorist attacks,"[63] but they allege no facts

---

[59] *Fed. Ins.* 1AC ¶¶ 101, 96, 505; *NY Marine* 2AC ¶¶ 80, 469.

[60] Without conceding its accuracy or relevancy, we note Plaintiffs' translation is in the record as Affirmation of Andrea Bierstein in Opposition to Motion to Dismiss of Hamad Al-Husaini, Ex. 2 (June 30, 2004) (MDL Docket #272).

[61] *See In re Terrorist Attacks on September 11, 2001*, Oct. 14, 2004 Hearing Transcript at 102:23-25 (MDL Docket #524).  There can be no dispute that the United States government was supporting the Afghan rebels at that time.  *See United States v. Usama Bin Laden, et al.*, 98-CR-1023 (S.D.N.Y.), Trial Transcript of Feb. 14, 2001 at 539:22-23 ("Ex. I") (government stipulation that U.S. funded Afghan mujahideen "[f]rom shortly after the start of the Soviet invasion in Afghanistan in 1979, through September 1991").

[62] *See WTC* Compl. ¶ 390, *Fed. Ins.* 1AC ¶¶ 505-06, *NY Marine* 2AC ¶¶ 469-70 (all alleging Bakr Binladin was one of largest donors to a 1992 IIRO fundraiser for Bosnian relief).

[63] *Fed. Ins.* 1AC ¶ 505; *NY Marine* 2AC ¶ 469.

explaining how Bakr supposedly acquired such knowledge at this early date.  This Court rejected a nearly identical allegation of knowledge against Prince Turki on the ground that "[c]onclusory allegations that he donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice."  *Terrorist Attacks I*, 349 F. Supp. 2d at 786, 813-14.  Nor do the operative Complaints or the RICO Statements allege any facts permitting an inference that Bakr Binladin intended, by making a donation at a July 1992 Saudi fundraiser for Bosnian humanitarian relief, to support al Qaeda's as yet unannounced terrorist agenda against the United States.[64]  Therefore, as in the case of Plaintiffs' claims that Prince Sultan knowingly contributed to Islamic charities  – including the IIRO – that allegedly funded al Qaeda, their allegations as to Bakr Binladin "'stop[] well short of alleging [Defendant's] actions were "expressly aimed" or "purposefully directed" at the United States.'"  *Terrorist Attacks I*, 349 F. Supp. 2d at 784-85, 813 (quoting *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 23 (D.D.C. 2003) (*Burnett II*)).[65]

*Bank Account.*  Third, Plaintiffs vaguely claim that Bakr Binladin, along with his brother Ghalib (who is not a Defendant), placed $1 million in an account at Bank al-Taqwa.[66]  Although Plaintiffs then make an assortment of allegations against Bank al-Taqwa, they say nothing else about that account or Bakr's role in it.  Most importantly, they do not allege that Bakr actually used the account to engage in any illicit activity or to support terrorism.  To the contrary,

---

[64] Indeed, he has given a sworn affidavit to the contrary.  *See* Bakr Aff. ¶ 14.

[65] Even farther afield is Plaintiffs' RICO Statement allegation that Bakr Binladin contributed $1.5 million to the Arab Thought Foundation ("ATF").  *WTC/Euro Brokers* RICO (Binladins), Ex. A at 22.  Plaintiffs do not allege that ATF is itself in any way tied to al Qaeda, but claim merely that ATF also received a substantial donation from another individual, Sheikh Kamel, who Plaintiffs allege is a "terrorism financier and member of the Golden Chain."  *Id.*  In reality, the ATF is a well respected, non-sectarian organization that is well known for promoting peace and condemning extremism in the Arab world.  *See* "'Feeling of Frustration' Makes Arab World an Explosive Region," The New York Times (Sept. 13, 2002) at A17.  If a donation to ATF implicated Bakr Binladin, it would also implicate such corporate sponsors as Starbucks, The Coca-Cola Company, and Reader's Digest.  *See* http://www.arabthought.org/ATF/English/FourthACSponsorsEnPage.html (last visited Jan. 26, 2005) ("Ex. J").

[66] *See Ashton* 6AC ¶ 388.

Plaintiffs acknowledge that the account was closed in 1998,[67] three years before the U.S. government listed Bank al-Taqwa as an SDGT in November 2001.[68]  Seeking to taint Bakr merely for being a customer of a bank whose managers or other customers were later accused of engaging in wrongful conduct is even more attenuated than a claim based on donations to a legitimate charity later accused of supporting terrorist activities, and should be rejected for the same reason.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 786, 813-14 (rejecting claims relating to Prince Turki's alleged donations to Benevolence International Foundation ("BIF") and Al Haramain prior to their designation as terrorist supporters by the U.S. government).[69]

*Conclusory Allegations.*  Finally, this Court has flatly rejected the sufficiency of broad conclusory allegations that Bakr, Omar, or Tariq Binladin were, in vague and unsubstantiated ways, financiers of terrorism who aided and abetted, conspired with, and provided material support and resources to al Qaeda and OBL.[70]  Although prevalent throughout Plaintiffs' Complaints, the most stark example is this vague, conclusory and, frankly, incomprehensible allegation in the *WTC* and *Euro Brokers* RICO Statements:

> Bakr, Omar and Tarek Bin Laden collaborated with their brother Yeslam Bin Laden to activate an international network of couriers and intermediaries who moved money between the Middle East and al Qaeda operations in Afghanistan, Pakistan, Bosnia, and Chechnya via banks such as National Commercial Bank and Al Rajhi Banking and Investment.[71]

Plaintiffs allege no facts indicating when or how such money was "moved," the identity of the persons who sent or received such funds, what role Bakr, Omar, Tariq, NCB, or Al Rajhi

---

[67] *See WTC/Euro Brokers* RICO (Binladins), Ex. A at 19.

[68] *See* http://www.ustreas.gov/press/releases/po771.htm (last visited Jan. 26, 2006).

[69] As noted above, *see supra*, pp. 6-7, two of Plaintiffs' improper RICO Statements manufacture claims regarding accounts at Deutsche Bank in the name of Cambridge Engineering and at UBS in the name of the Binladin siblings.  For the reasons already stated, however, they cannot support an inference that any of the Binladin Defendants directed their conduct at the United States.

[70] *See, e.g.*, *NY Marine* 2AC ¶¶ 45, 470; *Fed. Ins.* 1AC ¶ 66; *see also WTC/Euro Brokers* RICO (Binladins), Ex. A at 1, 6, 8, 15, 17, 19, 24.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 805, 813.

Banking allegedly played in this "network," or what "al Qaeda operations" were involved.  As this Court aptly held, "'[l]egal conclusions done up as factual allegations are not facts and cannot substitute for facts.'"  *See Terrorist Attacks I*, 349 F. Supp. 2d at 813 (citation omitted).

### 2. Plaintiffs Allege No Facts To Suggest MBC And BGI Purposefully Directed Their Conduct At The United States

Plaintiffs have likewise failed to allege any facts from which the Court could infer that BGI and MBC purposefully directed their activities at the United States.  Their assertions that BGI and/or MBC worked with OBL on the construction of the Port Sudan airport, and that MBC assisted OBL's company, Al Hijra Construction, on the Tahaddi road project in the Sudan in the early 1990s[72] are demonstrably false in several respects.  First, the contract for performance of the Port Sudan airport project was with Binladin Overseas (Pvt. Ltd.), and the work was performed by the Public Buildings and Airports Division of SBG, not by MBC.[73]  BGI did not even exist in the 1989-92 period when the project was bid and the work was substantially completed.[74]  Second, OBL was not involved in any way with the Port Sudan airport construction project, and neither SBG, MBC, BGI nor any company affiliated with them, nor any other Binladin Defendant, was involved in constructing the Tahaddi road on which OBL reportedly did work.[75]

Plaintiffs' allegations are based on distortions or mischaracterizations of the very evidence they quote.  For example, Plaintiffs assert that SBG has "publicly confirmed" MBC's

---

(continued…)

[71] *WTC/Euro Brokers* RICO (Binladins), Ex. A at 19.

[72] *See Cont. Cas.* 1AC ¶ 340; *Fed. Ins.* 1AC ¶ 367; *NY Marine* 2AC ¶ 340; *Fed. Ins.* RICO (SBG, et al.) at 11, 15.

[73] *See* Omar Aff. ¶ 10.

[74] BGI was not incorporated until 1995, and the airport was inaugurated in 1992.  *See* Omar Aff. ¶¶ 10, 13, 14-15 and Ex. 4.

[75] *See* Omar Aff. ¶¶ 11-12.

collaboration with OBL on the Tahaddi road project,[76] but the statements attributed to SBG

contain no mention of the Tahaddi road project, much less MBC's purported role in it.[77]

Similarly, Plaintiffs allege that "Osama Bin Laden stated that he was involved in the construction

of the Airport" but then quote a passage from an interview of OBL which makes no mention of

the Port Sudan airport.[78]  Even if there were any truth to Plaintiffs' false allegation about OBL's

role in the Port Sudan project, however, such involvement could not possibly give rise to an

inference that any Binladin Defendant directed its activities at the United States.  The Port Sudan

project was awarded in 1989, the work began in February 1990, and the airport was inaugurated

in June 1992.[79]  All of this work was completed before OBL was identified as a terrorist, and

long before he began targeting the United States.[80]  Plaintiffs have not alleged any facts from

which one could infer that the legitimate Port Sudan airport project could have been intended to

– or did in fact – provide support for terrorist attacks on the United States.  There is therefore no

basis to infer that MBC "purposefully directed" its conduct at the United States.[81]

---

[76] *Fed. Ins.* RICO (SBG, et al.) at 11, 15.

[77] *WTC/Euro Brokers* RICO (SBG), Ex. A at 25-26.

[78] *WTC/Euro Brokers* RICO (SBG), Ex. A at 27.  Similarly, Plaintiffs' RICO Statements contain lengthy but irrelevant quotes from the "official testimony" of a former al Qaeda operative, Jamal al Fadl, at the Embassy bombing trial about OBL's business ventures in the Sudan.  *Id.*, Ex. A at 28-29; *WTC/Euro Brokers* RICO (Binladins), Ex. A at 14.  But they fail to mention that, when asked to identify the construction projects Al Hijra worked on in the Sudan, Mr. al Fadl identified two *road* construction projects, but made no mention of the Port Sudan airport.  *United States v. Usama Bin Laden, et al.*, No. S (7) 98 Cr. 1023 (S.D.N.Y.), Transcript of Testimony of Jamal Ahmed Al-Fadl of Feb. 6, 2001 at 240-41 and of Feb. 7, 2001 at 351-52 ("Ex. K").  They also fail to mention that Mr. al Fadl's testimony provided no support for their claims of any involvement by SBG or MBC in any of Al Hijra's road construction projects.

[79] Omar Aff. ¶¶ 10, 13.

[80] The work was also completed before the Sudan was designated by the U.S. government as a state sponsor of terrorism.  *See* Exec. Order No. 13067, 62 Fed. Reg. 59,989-90 (November 5, 1997); http://www.ustreas.gov/offices/enforcement/ofac/sanctions/t11sudan.pdf (last visited January 26, 2006) (noting that the U.S. imposed a trade embargo against Sudan and a total asset freeze against the Government of Sudan on November 3, 1997).

[81] The *Federal Insurance* Plaintiffs' RICO statement, although not their Amended Complaint, also alleges that MBC "sponsored" Mohammad Jamal Khalifa's visa application in 1994.  *Fed. Ins.* RICO (SBG, et al.) at 15.  Even if the Court considered the RICO statement as an appropriate amendment, the allegation does not support an inference that MBC thus directed its conduct at the United States.  Plaintiffs do not allege that anyone at MBC knew of, intended to support, or did support Khalifa in any alleged terrorist activities.  In fact, MBC routinely processed visa applications for members of the Binladin family, their spouses, and MBC employees.  *See* Affidavit of Eulalio Dela Paz ("Dela Paz Aff.") ¶ 3-4 (Dec. 1, 2005) ("Ex. L").  Khalifa obtained assistance by virtue of being married to

### D.      Plaintiffs Are Not Entitled To Jurisdictional Discovery

Having failed to allege any facts to support jurisdiction over the Binladin Defendants, Plaintiffs should not be permitted to conduct jurisdictional discovery in the hopes of finding some.  This Court has already rejected the *Burnett* Plaintiffs' request for jurisdictional discovery as to Bakr, Omar, and Tariq Binladin.  *Terrorist Attacks I*, 349 F. Supp. 2d at 822.  Since that ruling, Plaintiffs still have not alleged a single relevant contact between any of the Binladin Defendants and the United States, nor have Plaintiffs alleged any specific conduct by the Binladin Defendants themselves that could conceivably be construed as an agreement to engage in the 9/11 conspiracy or as "purposeful direction" toward the United States.  Plaintiffs cannot simply make up facts and then claim entitlement to jurisdictional discovery.[82]  Where, as here, Plaintiffs' unsupported jurisdictional allegations are not well pled or are rebutted by specific evidence, jurisdictional discovery should be denied.  *See Allojet PLC v. Vantage Assocs.*, No. 04 Civ. 05223, 2005 U.S. Dist. LEXIS 4006, at *11-12 (S.D.N.Y. Mar. 15, 2005).[83]

## II.      PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE BINLADIN DEFENDANTS

### A.      The Allegations Against The Binladin Defendants Do Not State A Claim Under The Anti-Terrorism Act ("ATA")

The *Ashton*, *Euro Brokers*, *Federal Insurance*, *NY Marine*, *Burnett NY* and *WTC* Plaintiffs' ATA claims are fundamentally flawed because they fail to allege any specific facts

---

(continued…)

one of the daughters of Mohammad Binladin, and there was nothing unusual about the application.  Dela Paz Aff. ¶ 8.  The MBC employee who processed the application did not communicate with Khalifa and he had no reason to suspect that Khalifa had any alleged ties to terrorism.  Dela Paz Aff. ¶ 5.  Plaintiffs do not allege any facts to the contrary.  That isolated interaction does not come close to constituting conduct "purposefully directed" at the United States or conduct intended to further al Qaeda's terrorist agenda.

[82] *See In re Terrorist Attacks on September 11, 2001*, October 12, 2004 Hearing Transcript at 79:19-22 (MDL Docket #521) (Statement by the Court:  "Do you maintain that anybody can just make up any sort of claims and conclusions and, therefore, you're entitled to discovery?  That isn't quite what the law is, is it?").

[83] *See also Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185-86 (2d Cir. 1998) (denial of jurisdictional discovery of foreign entity where Plaintiffs made only "conclusory, non-fact-specific jurisdictional allegations").

that could give rise to an inference that the Binladin Defendants knowingly and intentionally provided material assistance to al Qaeda.  This Court made clear that for Plaintiffs' ATA claims to survive, they must allege specific facts showing that Defendants knew of, intended to aid, and did in fact aid the terrorists' illegal activities.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 828.  Here, however, Plaintiffs offer no facts to support their bald assertions that the Binladin Defendants supported al Qaeda, much less did so knowingly and intentionally.

As discussed above, the allegations against Bakr, Omar, and Tariq Binladin are either completely conclusory, unrelated to terrorism or al Qaeda, too remote to be relevant to the September 11 attacks, or demonstrably false.  For the same reasons Plaintiffs are unable to establish jurisdiction under a purposefully directed theory, their ATA claims also fail.

Likewise, as explained above, neither MBC nor BGI had any involvement in any construction projects in the Sudan, much less any project involving OBL.[84]  Indeed, BGI did not even exist when the alleged projects were performed.  Even if Plaintiffs' made-up allegations were taken as true, those allegations would not permit an inference that either company provided material support to terrorism, much less to terrorist attacks on the United States.  Plaintiffs offer no facts to support an inference that the alleged work on construction projects for the Sudanese government between 1989 and 1992 benefited OBL at all.  Nor do they even suggest that during this time, the corporate Binladin Defendants knew about and intended to support some as yet unannounced future plan by OBL to engage in violent attacks on the United States.[85]

The defects in these allegations reflect the fundamental flaw in Plaintiffs' case.  One cannot infer that anyone who had any dealings, however innocent, with persons later accused of

---

[84] *See supra* pp. 19-20; *see also* Omar. Aff. ¶¶ 12, 15.

[85] Likewise, as explained above, *supra*, n. 81, Plaintiffs' RICO Statement allegation that MBC "sponsored" Mohammad Jamal Khalifa's visa application in 1994 is insufficient because Plaintiffs fail to allege any facts suggesting that MBC knew that Khalifa was allegedly involved in, or intended to support, terrorism.

terrorism is culpable for providing material support to terrorism. Thus, for example, this Court held that even Al Rajhi Bank's provision of banking services to one of the September 11 hijackers, without more, provided no basis for liability. *Terrorist Attacks I*, 349 F. Supp. 2d at 831, 833. Similarly, another judge of this district recently held that, for purposes of § 2339B, a Defendant must "'knowingly provide[] material support or resources to a foreign terrorist organization,' and not merely to individuals who happen to be members of that organization." *United States v. Paracha*, No. 03 CR. 1197, 2006 WL 12768, at *29 (S.D.N.Y. Jan. 3, 2006) (citation omitted). Plaintiffs' effort to cobble together allegations that, even if true, indicate nothing more than legitimate business and family contacts with persons who were not designated as terrorists until many years later (if at all), cannot state a claim under the ATA. The Binladin family is not liable for the acts of OBL just because they are blood relatives. Their early, aggressive action to sever ties with him conclusively negates any suggestion that any benefit OBL may have previously derived from his family ties was intended to support terrorism.

### B.    Plaintiffs Have Failed To State A Claim Under RICO, The Torture Victim Protection Act, The Alien Tort Statute, Or Any State Law Cause Of Action

Plaintiffs' remaining causes of action fail to state a claim against the Binladin Defendants for reasons largely addressed in the Court's January 18, 2005 and September 21, 2005 opinions and orders. First, Plaintiffs in six actions have brought civil RICO claims against at least some of the Binladin Defendants for violations of 18 U.S.C. §§ 1962(a), (c), and/or (d).[86] These RICO claims fail because Plaintiffs do not – and cannot – allege that the Binladin Defendants were in any way involved in directing the alleged al Qaeda enterprise or consciously agreed to the

---

[86] Plaintiffs allege RICO violations in the *Continental Casualty*, *Euro Brokers*, *Federal Insurance*, *NY Marine*, *Burnett NY* and *WTC* actions. Because the *Continental Casualty*, *Burnett NY* and *NY Marine* Plaintiffs failed to file RICO Statements as required by standing order of this Court and do not set forth the requisite elements of a RICO claim in their Complaints, those claims must be dismissed. Indeed, the *Burnett* Plaintiffs' identical RICO claims were already dismissed as to all Defendants by Judge Robertson. *See Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100-01 (D.D.C. 2003) ("*Burnett I*").

relevant conspiracy, or that Plaintiffs' injuries resulted from their investment of racketeering income.  *See Terrorist Attacks II*, 392 F. Supp. 2d at 565 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)); *Terrorist Attacks I*, 349 F. Supp. 2d at 826-28.

The *Ashton*, *Burnett NY* and *Federal Insurance* Plaintiffs' Torture Victim Protection Act ("TVPA") claims must be dismissed because they fail to allege any facts suggesting that the Binladins acted under color of law and because only individuals may be sued under the TVPA. *See Terrorist Attacks I*, 349 F. Supp. 2d at 828.  Likewise, the *Burnett NY* Alien Tort Statute ("ATS") claim also should be dismissed for failure to allege conspiracy to commit or aiding and abetting a violation of international law[87] and because the ATS does not create secondary liability among private actors.

With respect to Plaintiffs' state law claims, the *Federal Insurance* and *Burnett NY* Plaintiffs' common law intentional tort claims are time-barred for reasons this Court has already addressed.  *See id.* at 829-30.  The *Ashton* Plaintiffs' intentional tort claims against the individual Binladin Defendants, on the other hand, should be dismissed for failure to allege (1) direct involvement in the 9/11 attacks; (2) "extreme and outrageous conduct" on the part of the Binladin Defendants themselves; and (3) conduct by the Binladin Defendants directed at Plaintiffs themselves.  The *Federal Insurance*, *Burnett NY* and *NY Marine* Plaintiffs' negligence claims should be dismissed for failing to "allege or identify a duty owed to Plaintiffs" by the Binladin Defendants.  *Terrorist Attacks II*, 392 F. Supp. 2d at 566; *Terrorist Attacks I*, 349 F. Supp. 2d at 831.  Finally, Plaintiffs' remaining state law claims for wrongful death, survival, aiding and abetting, conspiracy, and trespass should be dismissed because, as explained above,

---

[87] For this reason, the *WTC* and *Euro Brokers* Plaintiffs' claims for violations of international law also fail.

Plaintiffs fail to allege specific facts to support their conclusory claims that the Binladin

Defendants knowingly and intentionally supported or assisted al Qaeda.

## CONCLUSION

For the foregoing reasons, the *Ashton*, *Burnett NY*, *Federal Insurance*, *WTC*, *Continental Casualty*, *Euro Brokers*, and *NY Marine* Complaints should be dismissed, in their entirety, as to Defendants Bakr Binladin, Omar Binladin, Tariq Binladin, MBC, and BGI.


Dated:  January 27, 2006                          Respectfully submitted,

                                                  /s/ Geoffrey S. Stewart

                                                  _____
                                                  Geoffrey S. Stewart (GS-5413)
                                                  JONES DAY
                                                  222 East 41st Street
                                                  New York, New York  10017-6702
                                                  Tel:  (212) 326-3939
                                                  Fax:  (212) 755-7306

                                                  Stephen J. Brogan
                                                  Mary Ellen Powers
                                                  Timothy J. Finn
                                                  Jonathan C. Rose
                                                  James E. Gauch
                                                  Michael P. Gurdak
                                                  JONES DAY
                                                  51 Louisiana Avenue, N.W.
                                                  Washington, D.C.  20001
                                                  Tel:  (202) 879-3939
                                                  Fax:  (202) 626-1700

                                                  *Attorneys for Defendants Bakr Binladin, Omar Binladin, Tariq Binladin, Mohammad Binladin Company, and Binladin Group International Company Ltd.*

# CERTIFICATE OF SERVICE

     I hereby certify that on January 27, 2006, I caused an electronic copy of Defendant Bakr Binladin, Omar Binladin, Tariq Binladin, Mohammad Binladin Company, and Binladin Group International Company Ltd.'s Motion to Dismiss Plaintiffs' Complaints and the accompanying Memorandum of Law In Support to be served by the Court's Electronic Case Filing System.


Date:   January 27, 2006


                                   /s/ Stephen J. Brogan
                                   Stephen J. Brogan