**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02-CV-6977 (RCC)

### ASHTON PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE RULE 12(B)(6) MOTION OF SAAR NETWORK EXECUTIVES YAQUB MIRZA, AHMED TOTONJI, MOHAMMED JAGHLIT, MOHAMED ASHRAF, M. OMAR ASHRAF, & IQBAL YUNUS

Respectfully submitted by,

James P. Kreindler, Esq. (JK7084)
Justin T. Green, Esq. (JG0318)
Andrew J. Maloney III, Esq. (AM8684)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone:     (212) 687-8181
Facsimile:  (212) 972-9432
*Attorneys for Ashton Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PLAINTIFFS STATE CLAIMS AGAINST THESE SAAR NETWORK EXECUTIVES
      UPON WHICH RELIEF CAN BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Applicable Pleading Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            1.    Fed.R.Civ.P. 12(b)(6) & Rule 8(a)(2)

            2.    Anti-Terrorism Act Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            3.    Wrongful Death, Survival, & Common Law Claims . . . . . . . . . . . . . . . . 4

            4.    Alien Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Plaintiffs State Claims Against Yaqub Mirza
            Upon Which Relief Can Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Plaintiffs State An Anti-Terrorism Act Claim Against Yaqub Mirza . . . . 5

            2.    Plaintiffs State Wrongful Death, Survival, & Common Law Claims
                  Against Yaqub Mirza . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            3.    Plaintiffs Who Are Aliens State A Claim Against Yaqub Mirza
                  Under The Alien Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.    Plaintiffs State Claims Against Ahmed Totonji
            Upon Which Relief Can Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    Plaintiffs State An Anti-Terrorism Act Claim Against Ahmed Totonji . 11

            2.    Plaintiffs State Wrongful Death, Survival, & Common Law Claims
                  Against Ahmed Totonji . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    Plaintiffs Who Are Aliens State A Claim Against Ahmed Totonji
                  Under The Alien Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . 14

D.    Plaintiffs State Claims Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus Upon Which Relief Can Be Granted . . . . . . . . . . . . . . . . 14

        1.    Plaintiffs State An Anti-Terrorism Act Claim Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus . . . . . . . . . . . . . . 14

        2.    Plaintiffs State Wrongful Death, Survival, & Common Law Claims Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.    Plaintiffs Who Are Aliens State A Claim Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus Under The Alien Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## TABLE OF AUTHORITIES

### CASES                                             *Page*

*Boim v. Quranic Lit. Institute*, 291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Conley v. Gibson*, 355 U.S. 31 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Terrorist Attacks on September 11, 2001*, ("*In re Terrorist Attacks I*")
        349 F. Supp.2d 765 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6, 10, 13, 15

*In re Terrorist Attacks on September 11, 2001*, ("*In re Terrorist Attacks II*")
        392 F. Supp.2d 539 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . 1, 2, 3, 4, 5, 8, 9, 10, 13, 15, 16

*Kadic v. Karadazic*, 70 F.3d 232 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Presbyterian Church of Sudan v. Talisman Energy Inc.*, 244 F. Supp.2d 289 (S.D.N.Y. 2003) . . 5

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### FEDERAL STATUTES

Alien Tort Claims Act ("ATCA"), 28 U.S.C. §1350 . . . . . . . . . . . . . . . . . . . 4, 10, 11, 14, 16, 17

Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*  . 1, 2, 3, 4, 5, 8, 10, 11, 12, 13, 14, 15, 16

### FEDERAL RULES

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 10, 13, 15, 16

### LEGISLATIVE HISTORY

S. Rep. 102-342 at 22 (on Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*) . . . . . . . . . . . . . . . . . 1

### MISCELLANEOUS

Remarks by Vice President Richard Cheney to the Heritage Foundation (October 10, 2003)
Http://www.heritage.org/Research/MiddleEast/DickCheneySpeech.cfm . . . . . . . . . . . . . . . . . . 1

iii

## I.      INTRODUCTION

The SAAR Network executives Yaqub Mirza, Ahmed Totonji, Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf, and Iqbal Yunus each are subject to civil liability for knowingly and intentionally providing financial support to al Qaeda. *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp.2d 539, 564 (S.D.N.Y. 2005)("*In re Terrorist Attacks II*") ("Defendants may be responsible for the September 11 attacks if they knowingly and intentionally provided material support to al Qaeda."); *see also* S. Rep. 102-342 at 22 (U.S. Congress declaring that by imposing "liability at any point along the causal chain of terrorism [under the Anti-Terrorism Act], it would interrupt, or at least imperil, the flow of money" for terror attacks on America.).

Plaintiffs agree with Vice President Richard B. Cheney that "[a]ny person . . . that supports, protects or harbors terrorists is complicit in the murder of the innocent and will have to be held to account.  Http://www.heritage.org/Research/MiddleEast/DickCheneySpeech.cfm (October 10, 2003, Heritage Foundation Lecture).

It is time to hold these SAAR Network executives to account.

## II.     PLAINTIFFS STATE CLAIMS AGAINST THESE SAAR NETWORK EXECUTIVES UPON WHICH RELIEF CAN BE GRANTED

### A.      Applicable Pleading Standards

#### 1.      Fed.R.Civ.P. 12(b)(6) & Rule 8(a)(2)

In this Rule 12(b)(6) motion for failure to state a claim, "the Court must accept as true the factual allegations in the Complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999).  Such a motion must be denied

1

unless, after viewing plaintiffs' allegations in this favorable light, "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Id.*; *see also*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.")

A Rule 12(b)(6) motion is analyzed in the context of the liberal pleading requirements of Fed.R.Civ. P. 8(a)(2). *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

## 2.      Anti-Terrorism Act Claim

Under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, these SAAR Network executives are liable if they provided material support to al Qaeda with knowledge of its terrorist agenda to attack America. *Boim v. Quranic Lit. Inst.*, 291 F.3d 1000, 1014-16 (7th Cir. 2002).[1]

Like *Boim*, this Court holds that under the ATA, "Defendants may be responsible for the September 11 attacks if they knowingly and intentionally provided material support to al Qaeda."

---

[1] *Boim* explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A ["material support or resources" includes "currency"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333:

> If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333. . . . The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability under section 2333 by proving that [defendants] provided material support to terrorist organizations.

*Boim*, 291 F.3d at 1015-16.

2

*In re Terrorist Attacks II*, 392 F. Supp.2d at 564 (citing *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005)("*In re Terrorist Attacks I*")).  Providing "material support" under the ATA includes providing money or financial services.  *In re Terrorist Attacks I*, 349 F. Supp.2d at 825 (citing ATA, 18 U.S.C. § 2339A).

To state an ATA claim, this Court "require[s] that Plaintiffs plead that Defendant knew of al Qaeda's illegal activities, 'that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities.'"  *In re Terrorist Attacks II*, 392 F. Supp.2d at 564 (citing *Boim*, 291 F.3d at 1023-24).

For example, an ATA claim was properly stated against fellow SAAR Network executive Jamal Barzinji where it was alleged that Barzinji:  (1) "controlled several bank accounts"; (2) "allegedly transmitted money internationally for terrorist purposes"; and (3) "allegedly made these transfers to support al Qaeda."  *In re Terrorist Attacks II*, 392 F. Supp.2d at 572.  Denying Barzinji's Rule 12(b)(6) motion, the Court found that these allegations gave Barzinji "sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda."  *Id.*  That is enough to state an ATA claim.

Regarding causation, this Court has ruled that "[i]n light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda."  *In re Terrorist Attacks I,* 349 F. Supp. 2d at 826.

Contrary to defendants' insistence that plaintiffs' ATA claims are not well pleaded unless plaintiffs specifically allege that a defendant engaged in "some action in support of the September 11 attacks," SAAR Network Executives' Brief at 12, this Court has already held that

"Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks *or that they committed any specific act in furtherance of that attack*." *In re Terrorist Attacks I*, 349 F. Supp. 2d at 829 (emphasis added).

In sum, plaintiffs state an ATA claim if it may be reasonably inferred from the Complaint's allegations that defendant intentionally provided money or financial services to al Qaeda, knowing that al Qaeda was at war with America. *In re Terrorist Attacks II*, 392 F. Supp.2d at 564; *In re Terrorist Attacks I*, 349 F. Supp.2d at 826.

### 3.  Wrongful Death, Survival, & Common Law Claims

The Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival . . . and the *Ashton* and *Burnett* plaintiffs will have stated claims for intentional infliction of emotional distress." *In re Terrorist Attacks II*, 392 F. Supp.2d at 566; *see also, In re Terrorist Attacks I*, 349 F. Supp.2d at 829-830 (if *Ashton* plaintiffs' "allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11 terrorists, they will have also stated claims for wrongful death and survival [and] they will have also stated a claim for intentional infliction of emotional distress.")

### 4.  Alien Tort Claims Act

The Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), "provides a basis for relief when an alien sues for a tort committed in violation of the law of nations." *In re Terrorist Attacks II*, 392 F. Supp.2d at 565 (citing *Kadic v. Karadazic*, 70 F.3d 232, 238 (2d Cir. 1985)). Aircraft hijacking violates international law, and this Court permits ATCA actions "premised on a theory of aiding and abetting and conspiracy." *In re Terrorist Attacks II*, 392 F. Supp.2d at 565

(citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 311 (S.D.N.Y. 2003)).  Hence, the alien-plaintiffs may state concerted-action claims for relief under the ATCA by alleging that defendants knowingly and intentionally provided financial support to al Qaeda, bringing death and destruction through hijacked aircraft on September 11th.  *In re Terrorist Attacks II*, 392 F. Supp.2d at 566 ("If Plaintiffs state a claim for relief under the ATA . . . [p]laintiffs who are aliens will have also stated a claim for relief under the ATCA").

### B.   Plaintiffs State Claims Against Yaqub Mirza Upon Which Relief Can Be Granted

#### 1.   Plaintiffs State An Anti-Terrorism Act Claim Against Yaqub Mirza

The Ashton Sixth Amended Complaint ("6AC") gives Yaqub Mirza sufficient notice of the ATA claim against him regarding his provision of financial support to al Qaeda, knowing that al Qaeda was waging war on America.

The 6AC alleges that "[i]n February 2001, Mena Estates, a SAAR Network entity, loaned $500,000 to Yousef Nada" and "[a]t that time, there were only three people affiliated with Mena Estates.  They were Jamal Barzinji, president, **M. Yaqub Mirza**, vice-president, and Hisham al Talib, secretary treasurer." 6AC ¶ 256 (emphasis added).  The 6AC further alleges that "Yousef Nada [is] a Specially Designated Global Terrorist, who, according to the United States Department of the Treasury, provided financial assistance to Osama Bin Laden and al Qaeda, prior to and even after September 11, 2001."  6AC ¶ 253.  The Complaint further alleges that a "document which describes the [$500,000] loan and believed by US Customs to be written by Nada, was recovered by US Officials in a March 2002 raid of the SAAR network premises.  The document begins by saying 'The eggs are in several baskets' and later says; 'to avoid crimes we

have to perfect information (terrorism, money-laundering).'" 6AC ¶ 256. It is reasonable to

infer from these allegations that Mirza knowingly and intentionally provided al Qaeda financial

support through that $500,000 transfer, especially given the allegation that Mirza was one of only

three persons who comprised, directed, and controlled Mena Estates at the time of that $500,000

transfer. *Id.*

Plaintiffs further allege that this February 2001 $500,000 transfer to al Qaeda financier

Nada occurred long after al Qaeda's well-publicized declarations of war against the United

States. *See* Ashton 6AC ¶ 119 ("In 1992 and 1993 . . . Bin Laden issued a fatwas urging

Muslims to attack the U.S. . . ."); Ashton 6AC ¶ 125 at p. 136 ("On August 23, 1996, a

strengthened Bin Laden issued a fatwas declaring a jihad against Americans. . . ."); Ashton 6AC

¶ 125 at p. 137 ("On February 22, 1998, Bin Laden . . . issued a fatwas published in the Arabic

newspaper Al-Quds stating: 'The ruling to kill the Americans and their allies – civilians and

military – is an individual duty for every Muslim who can do it in any country in which it is

possible to do it. . . ."); *see also In re Terrorist Attacks I,* 349 F. Supp. 2d at 826 ("In light of al

Qaeda's public acknowledgments of its war against the United States, the September 11 attacks

may be the natural and probable consequence of knowingly and intentionally providing material

support to al Qaeda."). It is reasonable to infer from these allegations that Mirza knew al Qaeda

was at war with America at the time of that $500,000 transfer to al Qaeda financier Nada in

February 2001.

The 6AC further alleges that Mirza is one of the "[c]o-consiprators, material sponsors,

and/or aiders and abettors of the SAAR network", 6AC ¶ 269, and that the "SAAR network and

6

the more than one-hundred businesses and individuals that comprise it are fronts for, and a

sponsor of, al Qaeda and international terror." 6AC ¶ 267.

The 6AC further alleges that "Mirza, the secretary and treasurer of the MWL in the

United States, is at the financial center of the SAAR network." 6AC ¶ 221.  More specifically,

the 6AC alleges that "Mirza is the predominant signatory for the SAAR network with signatory

authority over at least 27 [SAAR Network bank] accounts", 6AC ¶ 257, and that "Mirza [is]

considered . . . to be the financial advisor and the controller of finances for the SAAR Foundation

and SAAR Network", 6AC ¶ 258, and that "[b]y the early 1990s . . . Mirza [and other SAAR

Network executives] established over 100 entities including non-profits, charities, and business"

that comprise the SAAR network, 6AC ¶ 251, and that "[f]rom the outset, this SAAR Network

was intended to be a source of funds to support terror as well as provide the mechanism by which

the funding trail could be laundered and obscured."  6AC ¶ 251.

The 6AC further alleges that "[o]n March 20-21, 2002, the offices of many SAAR

network organizations, along with the residences of their top executives, were raided by the

Untied States Government's joint terrorism taskforce. . .", 6AC ¶ 265, and specifically that

"Yaqub Mirza's house was raided in March, 2002 by federal authorities investigating his alleged

connections to al Qaeda and September 11, 2001."  6AC ¶ 221.  It is reasonable to infer from

these allegations that Mirza knowingly and intentionally provided al Qaeda financial support as

the "predominant signatory authority" and "controller of finances" for the SAAR Network, which

provided financial support to al Qaeda for a decade leading up to the September 11 attacks.

The 6AC further alleges that Mirza was an officer and director of Sana-Bell Inc., 6AC ¶

236, and that "[f]rom 1992-1998, Sana-Bell Inc. invested $3.7 million with Soliman S. Biheiri

and companies he controlled in the US," 6AC ¶ 239, and that this $3.7 million transfer to Biheiri was personally "handled by M. Yaqub Mirza." 6AC ¶ 239.  The 6AC further alleges that Biheiri through his BMI bank "knowingly transferred funds for terrorists [including] Yassin al Kadi . . . the head of Muwaffaq/Blessed Relief, a charity involved in funneling millions of dollars to Osama Bin Laden and al Qaeda", and that funds transferred from BMI to al Qaeda "may have been used to finance the [1998] embassy bombings in Africa."  6AC ¶ 241.[2]  It is reasonable to infer from these allegations that Mirza knowingly and intentionally provided al Qaeda financial support through this $3.7 Million transfer to notorious al Qaeda financier Biheiri, especially given the allegation that Mirza himself handled that $3.7 Million transfer in 1992-1998, after al Qaeda publicly declared war on America. *See In re Terrorist Attacks II*, 392 F. Supp.2d at 568-69 (finding ATA claim against Abulrahman Alamoudi well stated where it was alleged that "Mr. Alamoudi funneled money to al Qaeda through the charities with which he was involved.  This claim puts Mr. Alamoudi on notice that he is alleged to have provided financial support to al Qaeda.")(internal quote to ATA, 18 U.S.C. § 2339A, omitted).

In addition to alleging that Mirza is an officer and director of Sana-Bell Inc., 6AC ¶ 236, the 6AC further alleges that Mirza is also an officer and director of Sanabel al Kheer, Inc., 6AC ¶ 236, which combined are the U.S. tentacles of Sanabil al-Khair, which "is an endowment fund established and located in Saudi Arabia in order to provide stable financing for the activities of the IIRO." 6AC ¶ 235.  The alleged "activities" of IIRO include providing al Qaeda and the

---

[2]   The 6AC further alleges that "[o]n Biheiri's computer authorities discovered contact information for Yousef Nada", 6AC ¶ 243 – the same al Qaeda financier to whom it is reasonable to infer that Mirza knowingly and intentionally provided a $500,000 loan through Mena Estates in February 2001. *See* 6AC ¶ 256 *and* discussion of $500,000 Mirza-to-Nada loan, *supra*

Taliban $60 million to fund terrorist training camps in Afghanistan where several of the September 11 hijackers were trained and indoctrinated in *jihad* against America, and bankrolling al Qaeda attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks. 6AC ¶¶ 166, 227, 228, 231, 234, 410, 478. The 6AC further alleges that less than thirty percent (30%) of IIRO funds go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaeda. 6AC ¶ 229.

And not only does the 6AC allege that the SAAR Network, of which Mirza is the "predominant signatory authority" and "controller of finances", 6AC ¶¶ 257, 258, is "closely inter-twined with Defendants IIRO, MWL", 6AC ¶¶ 268, and that Mirza is an officer/director of "Muslim World League ('MWL'), the parent of IIRO," 6AC ¶ 236, but the 6AC also specifically alleges that the $3.7 Million transfer to al Qaeda financier Biheiri described above "originated from IIRO in Saudi Arabia and was handled by M. Yaqub Mirza." 6AC ¶ 239. (emphasis added). From these allegations it may reasonably be inferred that Mirza himself knowingly and intentionally participated in the transfer of $3.7 Million from terror charity IIRO through Sana-Bell Inc. to al Qaeda terror financier Biheiri from 1992-1998, *see* 6AC ¶¶ 236, 239, 257, 258, who funneled that money through BMI to al Kadi to Muwaffaq to al Qaeda. 6AC ¶ 241.

Regardless of any other inferences that Mirza might wish to ascribe to them, the above allegations give rise to the reasonable inference that Mirza knowingly and intentionally provided financial support to al Qaeda for a decade leading up to the September 11 attacks. *See In re Terrorist Attacks II*, 392 F. Supp.2d at 572. (finding allegations that SAAR Network executive

9

Barzinji (1) "controlled several bank accounts"; (2) "allegedly transmitted money internationally for terrorist purposes", and (3) "allegedly made these transfers to support al Qaeda" gave "sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda."). And "[i]n light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks I,* 349 F. Supp.2d at 826. Hence, plaintiffs' ATA claim against Mirza is well stated, and his Rule 12(b)(6) motion fails.

### 2. Plaintiffs State Wrongful Death, Survival, & Common Law Claims Against Yaqub Mirza.

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival . . . and the *Ashton* and *Burnett* plaintiffs will have stated claims for intentional infliction of emotional distress." *In re Terrorist Attacks II*, 392 F. Supp.2d at 566. Here, since the allegations in the 6AC give rise to the reasonable inference that Mirza knowingly and intentionally supported al Qaeda for a decade leading up to the September 11 attacks, the *Ashton* plaintiffs have stated claims for wrongful death, survival, and intentional infliction of emotion distress.

### 3. Plaintiffs Who Are Aliens State A Claim Against Yaqub Mirza Under The Alien Tort Claims Act

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA . . . [p]laintiffs who are aliens will have also stated a claim for relief under the ATCA". *In re Terrorist Attacks II*, 392 F. Supp.2d at 566. Here, since the allegations in the 6AC give rise to the reasonable inference that Mirza knowingly and intentionally supported al Qaeda for a

10

decade leading up to the September 11 attacks, the *Ashton* plaintiffs who are aliens state a claim for relief against Mirza under the ATCA.

**C.      Plaintiffs State Claims Against Ahmed Totonji
         Upon Which Relief Can Be Granted**

**1.      Plaintiffs State An Anti-Terrorism Act Claim Against Ahmed Totonji**

The 6AC gives Ahmed Totonji sufficient notice of the ATA claim against him regarding his provision of financial support to al Qaeda, knowing that al Qaeda was waging war on America.

The 6AC alleges that by the early 1990s, "Totonji [and other SAAR Network executives] established over 100 entities including non-profits, charities, and business" that comprise the SAAR Network.  6AC ¶ 251.  The 6AC further alleges that "[f]rom the outset, this SAAR Network was intended to be a source of funds to support terror as well as provide the mechanism by which the funding trail could be laundered and obscured.  Ahmed Totonji was well suited for the task as he had previously worked for Sulaiman al Rajhi at the al Rajhi Bank as a financial consultant", 6AC ¶ 251, and "Totonji worked for [Specially Designated Global Terrorist] Yousef Nada prior to being dispatched to the United States to secretly found the SAAR Foundation and network." 6AC ¶ 254.

The 6AC further alleges that Totonji is one of the "[c]o-consiprators, material sponsors, and/or aiders and abettors of the SAAR network", 6AC ¶ 269, and that the "SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for, and a sponsor of, al Qaeda and international terror."  6AC ¶ 267.

11

More specifically, the 6AC alleges that Totonji "signed SAAR Network checks that were issued to terror sponsoring organizations."  6AC ¶ 257.

The 6AC further alleges that "Totonji recommended two of their SAAR Network fellow officers to Yousef Nada as prospective officers of Bank Al Taqwa [which] is designated a Specially Designated Global Terrorist, for financially supporting al Qaeda and according to the US Treasury, 'appeared to be providing a clandestine line of credit for a close associate of Usama Bin Laden.'"  6AC ¶ 255.

So not only does the 6AC allege that Totonji signed SAAR Network checks issued to terrorists, 6AC ¶ 257, and put forward personnel to Bank Al Taqwa supporting al Qaeda, 6AC ¶ 255, but the 6AC further alleges that Totonji "is personally acquainted with and maintained relationships with . . . Ahmed Idriss Nasreddin, a Specially Designated Global Terrorist [who . . .] was also a major shareholder and officer of the Specially Designated Global Terrorist Bank Al Taqwa",  6AC ¶¶ 258, 260 – that same terrorist bank to which Totonji was recommending and offering personnel from the ranks of Totonji's SAAR Network.  6AC ¶ 255.  *See* 18 U.S.C. § 2339A(b) (under ATA, the term "material support" includes "**personnel** (1 or more individuals who may be or include oneself)").[3]

_____

[3] Totonji protests repeatedly that plaintiffs' allegations against him are "vague."  SAAR Network Executives' Brief at 10, 12.  Not so.  Not only do the above-described allegations of Totonji offering financial support and personnel to terrorists for a decade leading up to the September 11 attacks give Totonji fair notice of plaintiffs' ATA claim under the liberal pleading standards of the Federal Rules of Civil Procedure, but also these allegations are firmly grounded in fact.  For example, Totonji's relationship with designated terrorist Nasreddin is well-documented:  Totonji founded Gulf Chamber a.k.a. MIGA, which facilitates financial activity between the Middle East, Europe, Africa and South East Asia.  Gulf Chamber is a Specially Designated Global Terrorist.  Totonji himself provided a Power of Attorney to Ahmed Nasreddin to manage Gulf Chamber.  Upon information and belief, Totonji never withdrew from Gulf Chamber/MIGA or cancelled  Nasreddin's Power of Attorney, even after Ahmed Nasreddin and Gulf Chamber/MIGA were named on April 19, 2002 and August 29, 2002, respectively, by the US Department of the Treasury as Specially Designated Global Terrorists for providing financial support to al Qaeda.  Plaintiffs look forward to the opportunity to confirm and further explore these facts through discovery.

12

Regardless of any other inferences that Totonji might wish to ascribe to them, the above allegations give rise to the reasonable inference that Totonji knowingly and intentionally provided financial support and personnel to al Qaeda for a decade leading up to the September 11 attacks. *See In re Terrorist Attacks II*, 392 F. Supp.2d at 572. (finding allegations that SAAR Network executive Barzinji (1) "controlled several bank accounts"; (2) "allegedly transmitted money internationally for terrorist purposes", and (3) "allegedly made these transfers to support al Qaeda" gave "sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda."). And "[i]n light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks I,* 349 F. Supp.2d at 826. Hence, plaintiffs' ATA claim against Totonji is well stated, and his Rule 12(b)(6) motion fails.

2.    **Plaintiffs State Wrongful Death, Survival, & Common Law Claims Against Ahmed Totonji**.

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival . . . and the *Ashton* and *Burnett* plaintiffs will have stated claims for intentional infliction of emotional distress." *In re Terrorist Attacks II*, 392 F. Supp.2d at 566. Here, since the allegations in the 6AC give rise to the reasonable inference that Totonji knowingly and intentionally supported al Qaeda for a decade leading up to the September 11 attacks, the *Ashton* plaintiffs have stated claims for wrongful death, survival, and intentional infliction of emotion distress.

13

### 3. Plaintiffs Who Are Aliens State A Claim Against Ahmed Totonji Under The Alien Tort Claims Act

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA . . . [p]laintiffs who are aliens will have also stated a claim for relief under the ATCA". *In re Terrorist Attacks II*, 392 F. Supp.2d at 566. Here, since the allegations in the 6AC give rise to the reasonable inference that Totonji knowingly and intentionally supported al Qaeda for a decade leading up to the September 11 attacks, the *Ashton* plaintiffs who are aliens state a claim for relief against Totonji under the ATCA.

### D. Plaintiffs State Claims Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus

#### 1. Plaintiffs State An Anti-Terrorism Act Claim Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus

The 6AC alleges that Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf and Iqbal Yunus are "[c]o-consiprators, material sponsors, and/or aiders and abettors of the SAAR network", 6AC ¶ 269, and that the "SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for, and a sponsor of, al Qaeda and international terror." 6AC ¶ 267.

More specifically, the 6AC alleges that Jaghlit "signed SAAR Network checks that were issued to terror sponsoring organizations."  6AC ¶ 257.

The 6AC further alleges that "Mohamed Ashraf, M. Omar Ashraf and Iqbal Yunus [and other SAAR Network executives] established over 100 entities including non-profits, charities, and business" that comprise the SAAR Network, 6AC ¶ 251, and that "[f]rom the outset, this

14

SAAR Network was intended to be a source of funds to support terror as well as provide the mechanism by which the funding trail could be laundered and obscured."   6AC ¶ 251.

The 6AC further alleges that Mohamed Ashraf and Iqbal Yunus worked with Specially Designated Global Terrorists Yousef Nada and Ghaleb Himmat in the SAAR network entity International Islamic Charitable Organization.  6AC ¶ 259.

The 6AC further alleges that Mohamed Ashraf "is personally acquainted with and maintained relationships with . . . Ahmed Idriss Nasreddin, a Specially Designated Global Terrorist [who] had a business relationship with M Yaqub Mirza and considered him to be the financial advisor and the controller of finances for the SAAR Foundation and the SAAR Network.  Nasreddin was aware of the loan made to Yousef Nada", 6AC ¶ 258, i.e.,, the $500,000 loan[4] made in February 2001 by the SAAR Network to "Yousef Nada, a Specially Designated Global Terrorist, who according to the United States Department of the Treasury, provided financial assistance to Osama Bin Laden and al Qaeda, prior to and even after September 11, 2001."  6AC ¶ 253.

Regardless of any other inferences that Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus might wish to ascribe to them, the above allegations give rise to the reasonable inference that Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus each knowingly and intentionally provided financial support to al Qaeda for a decade leading up to the September 11 attacks.  *See In re Terrorist Attacks II*, 392 F. Supp.2d at 572. (finding allegations that SAAR Network executive Barzinji (1) "controlled several bank accounts"; (2) "allegedly transmitted money internationally for terrorist purposes", and (3) "allegedly made

---

[4] *See* 6AC ¶ 256, discussed above.

15

these transfers to support al Qaeda" gave "sufficient notice of the claims against him regarding his alleged provision of material support in the form of financial transactions to al Qaeda.").  And "[i]n light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks I,* 349 F. Supp.2d at 826.  Hence, plaintiffs' ATA claims against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus are well stated, and their Rule 12(b)(6) motion fails.

> **2.     Plaintiffs State Wrongful Death, Survival, & Common Law Claims Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus**

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA, they will have also stated a claim for wrongful death and survival . . . and the *Ashton* and *Burnett* plaintiffs will have stated claims for intentional infliction of emotional distress." *In re Terrorist Attacks II*, 392 F. Supp.2d at 566.  Here, since the allegations in the 6AC give rise to the reasonable inference that Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus knowingly and intentionally supported al Qaeda for a decade leading up to the September 11 attacks, the *Ashton* plaintiffs have stated claims for wrongful death, survival, and intentional infliction of emotion distress.

> **3.     Plaintiffs Who Are Aliens State A Claim Against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus Under The Alien Tort Claims Act**

As explained above, the Court has ruled that "[i]f Plaintiffs state a claim for relief under the ATA . . . [p]laintiffs who are aliens will have also stated a claim for relief under the ATCA". *In re Terrorist Attacks II*, 392 F. Supp.2d at 566.  Here, since the allegations in the 6AC give

16

rise to the reasonable inference that Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus knowingly and intentionally supported al Qaeda for a decade leading up to the September 11 attacks, the *Ashton* plaintiffs who are aliens state a claim for relief against Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus under the ATCA.

## III.   CONCLUSION

For the above reasons, the Rule 12(b)(6) motion of the SAAR Network executives Yaqub Mirza, Ahmed Totonji, Mohammed Jaghlit, Mohamed Ashraf, M. Omar Ashraf & Iqbal Yunus should be denied with prejudice.

Dated:  January 30, 2006
New York, New York                    Respectfully submitted,


_____/S/_____
James P. Kreindler, Esq. (JK7084)
Justin T. Green, Esq. (JG0318)
Andrew J. Maloney III, Esq. (AM8684)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone (212) 687-8181

17