UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977
*Burnett v. Al Baraka Invest. & Devel. Corp.*, 03-CV-9849 & 03-CV-5738
*Continental Casualty Co. v. Al Qaeda*, 04-CV-5970
*Euro Brokers, Inc. v. Al Baraka Invest. & Devel. Corp.*, 04-CV-7279
*Federal Ins. Co. v. Al Qaida*, 03-CV-6978
*New York Marine and General Ins. Co. v. Al Qaida*, 04-CV-6105
*World Trade Center Properties LLC v. Al Baraka Invest. & Devel. Corp.*, 04-CV-7280

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF ABDULLAH BINLADIN

January 30, 2006

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION ............................................................................................................1

APPLICABLE LEGAL STANDARDS ....................................................................................5

    F.R.C.P. 12(b)(6) ...............................................................................................5

    F.R.C.P. 12(b)(2) ...............................................................................................7

ARGUMENT ...................................................................................................................8

    I.      THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THIS COURT'S CASE
            MANAGEMENT ORDER ...............................................................................8

    II.    PLAINTIFFS' AMENDED PLEADINGS AND RICO STATEMENTS SUFFICIENTLY STATE
            CLAIMS AGAINST ABDULLAH BINLADIN ...............................................11

          A.      Plaintiffs State Claims Under the Anti-Terrorism Act ..............................11

          B.      Plaintiffs State Claims Under RICO .........................................................12

          C.      Plaintiffs State Claims Under the ATCA and the Common Law ..............14

    III.   THIS COURT HAS JURISDICTION OVER ABDULLAH BINLADIN BECAUSE PLAINTIFFS'
            CLAIMS AGAINST HIM ARISE FROM HIS CONDUCT IN THE UNITED STATES ...........16

CONCLUSION................................................................................................................19

APPENDIX ....................................................................................................................A

## TABLE OF AUTHORITIES

*Page*

**Cases**

*131 Main Street Assoc. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995).........................................14

*A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998) .........................................................................................................................11

*Allen v. New World Coffee, Inc.*, 2001 WL 293683 (S.D.N.Y. March 27, 2001) .................10, 11

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ...............................................11

*Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255 (5th Cir. 1994)....................16

*Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112 (5th Cir. 1987) ....................................14

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) ......................................................................5

*Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122 (D.D.C. 1984)........................................16

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................................5, 9

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ........................................................11

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001)..........................................8

*Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158 (S.D. N.Y. 2003) ...........................13

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001).......16

*Foman v. Davis*, 371 U.S. 178 (1962) .........................................................................................10

*Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727 (S.D. N.Y. 1994)......................................13

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ........................................................................5

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ................................8

*In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y. 2005).......... passim

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993)....................................................................6

*Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99 (2d Cir. 1999) .............................5

*Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y. 2005)...................................................7

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992) ........................................ 10, 11

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ................................................ 11

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983) ............................................... 13

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) .............................................. 6

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) .......................................................... 5

*Polite v. Casella*, 901 F.Supp. 90 (N.D.N.Y. 1995) ....................................................... 10

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y.2003) .. 15

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) ......................................................... 16

*State of New York v. O'Hara*, 652 F. Supp. 1049 (W.D.N.Y. 1987) ............................... 14

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) ................................................................ 6

*Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005) ..................................... 6, 7

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ................................................ 13

*United States v. Int'l Bhd. of* Teamsters, 945 F.Supp. 609 (S.D.N.Y.1996) .................... 16

*United States v. Louie*, 625 F. Supp. 1327 (S.D.N.Y. 1985) ......................................... 13

*United States v. Roth*, 860 F.2d 1382 (7th Cir. 1988) .................................................. 14

*United States v. Turkette*, 452 U.S. 576 (1981) ............................................................ 13

*Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902 (2d Cir. 1977) ............................... 9

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ...................................... 7

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ........................... 5

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) ........................................................ 5

*Zola v. Gordon*, 685 F. Supp. 354 (S.D.N.Y. 1988) ..................................................... 14

**Rules**

F.R.C.P. 10 .................................................................................................................. 11

F.R.C.P. 12(b)(6) ....................................................................................................... 5, 6

F.R.C.P. 8 ..................................................................................................................... 6

F.R.C.P. 9 .................................................................................................................. 6

**Other Authorities**

Wright & Miller, Federal Practice & Procedure  (2d ed. 1990) ..................................................... 7

## INTRODUCTION

In his motion to dismiss, Abdullah Binladin ("ABL") claims that the only reason he has been named in these lawsuits is because of his last name, *see* ABL Mem. at 1, but the remainder of his motion papers demonstrates otherwise.  As Mr. Binladin[1] himself points out, Osama Bin Laden has more than 50 brothers and sisters and uncounted numbers of nieces and nephews.  *See* ABL Mem. at 1.  No complaint in this case names more than eight members of this extraordinarily large family; most name even fewer.[2]  Nor were the defendant members of the Binladen family chosen at random – the same names recur in most of the complaints.  Abdullah Binladen, along with Osama Bin Laden and Bakr Bin Laden, is named in every case.  Moreover, the rest of his motion to dismiss confirms that ABL has not been singled out because he is named Binladen – rather, Abdullah Binladen is a defendant in this action because:  (a) as he himself admits, ABL established, and served as president of, the U.S. branch of the World Assembly of Muslim Youth ("WAMY"), an organization that plaintiffs allege was created for the purpose of

---

[1] In his motion to dismiss, ABL spells his last name "Binladin."  Other members of the family spell it differently; moreover, in the complaints in this action the name is, for the most part, spelled Binladen (or, in the case of Osama, "Bin Laden").  In this Memorandum of Law, plaintiffs will adhere to their policy of referring to moving defendants by the names (and spellings) they themselves use in their motions, as plaintiffs assume this reflects defendant's own preferences.  Other members of the family, however, will be referred to by the names (and spellings) used in the complaints.  Variations among the complaints may result in some orthographic inconsistency, which plaintiffs trust will not confuse the Court.

[2] The *Ashton* plaintiffs have sued Abdullah Bin Laden, Bakr Bin Laden, and Osama Bin Laden; the *Burnett* plaintiffs name Abdullah Bin Laden (D77), Osama Bin Laden (D78), Tarek Bin Laden (D79), Bakr Bin Laden (D180), Omar Bin Laden (D181), and Yeslam Bin Laden (D182); the *Continental* plaintiffs have sued Abdullah Bin Laden, Bakr Bin Laden, Haydar Mohamed Bin Laden, Omar Bin Laden, Osama Bin Laden, Saleh Mohamed Bin Laden, Tarek Bin Laden, and Yeslam Bin Laden; in *Euro Brokers*, plaintiffs have named Abdullah Bin Laden, Osama Bin Laden, Tarek Bin Laden, Omar Bin Laden, Bakr Bin Laden, and Yeslam Bin Laden, the same six Bin Ladens also named in *Federal Ins.* and in *World Trade Center Properties*; the *NY Marine* plaintiffs included  Abdullah Bin Laden, Bakr Bin Laden, Salem Bin Laden, Omar Bin Laden, Osama Bin Laden, Saleh Mohamed Bin Laden, Tarek Bin Laden, and Yeslam Bin Laden

providing support to al Qaeda; and (b) ABL was a founder and director of Taibah International Aid Association, an organization that has "long acted as a fully integrated component of al Qaeda's financial and logistical infrastructure . . . ." *Federal* 1AC ¶ 239; *Continental* 2AC Addendum at 397; *see also Burnett* 3AC ¶ 299; *Ashton* 6AC ¶ 287.[3]   As alleged in the pleadings, these two organizations are alleged to have played substantial and leading roles raising money to support, and diverting money to, al Qaeda:

- "WAMY is one of the principal players in the charity-based funding and sponsorship of al Qaida." *Federal* ABL RICO Statement, Ex. A , p.1

- WAMY has been officially identified as a "suspected terrorist organization" by the FBI since 1996 and has been the subject of numerous governmental investigations for terrorist activities." *Burnett* 3AC ¶ 362.

- "The U.S. Government has frozen the assets of WAMY . . . because of [its] role in funneling money to AL QAEDA." *Continental* 2AC ¶ 376.

- "WAMY has long acted as a fully integrated component of al Qaida's financial and logistical infrastructure, and provided material support and resources to al Qaida and affiliated [Foreign Terrorist Orgnizations]." *NY Marine* 2AC ¶ 132

- "Through its offices in Peshawar, Pakistan, WAMY has provided extensive support to al Qaida operatives, Afghan warlords and al Qaida affiliated Khasmiri terrorists. In November 2001, Pakistani intelligence officials, operating in conjunction with the Federal Bureau of Investigation, raided WAMY's Peshawar, Pakistan offices, based on its suspected ties to al Qaida militants. The close relationship between that WAMY office and al Qaida was vividly confirmed shortly after the search, when an employee of the office hand-delivered a recorded message from Osama bin Laden to the local media." *NY Marine* 2AC ¶ 133.

- "WAMY also has served as a distribution channel for training documentation between the al Qaida leadership in Afghanistan and operational cells throughout the world." *NY Marine* 2AC ¶ 138.

- "World Assembly of Muslim Youth ("WAMY") is a multi-national organization which has been at the forefront of the global jihadist movement for more than twenty (20) years." *Continental* 2AC Addendum at p. 181.

---

[3]   A chart of the operative pleadings in the cases to which the motion is addressed, and the abbreviations used to refer to them, is contained in the Appendix.

- "WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (7) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies." *Continental* 2AC Addendum at p. 181.

- "WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida. WAMY's U.S. operations were raided by federal authorities in conjunction with the ongoing investigation of the SAAR Network's material sponsorship of al Qaida and affiliated [Foreign Terrorist Organizations]." *Federal* ABL RICO Statement, Ex. A at 14; *see also Federal* 1AC ¶ 160; *Euro Brokers* WAMY RICO Statement at 5; *WTCP* WAMY RICO Statement at 5.

- "The World Assembly of Muslim Youth used banking and financial operations to knowingly and intentionally provide financial services and material support to al Qaeda and its members, as well as organizations which it knew were providing material support to [al Qaeda]." *Euro Brokers* WAMY RICO Statement ¶ 5(b); *WTCP* WAMY RICO Statement ¶ 5(b).

- "Although it purports to be a humanitarian organization, the Taibah International Aid Association furthers the aims and materially supports Osama bin Laden and al Qaeda." *Burnett* 3AC ¶ 299; *Continental* 2AC ¶ 576; *Ashton* 6AC ¶ 287; *WTCP* ¶ 474.

- "Through the actions of its agents, officers and employees, Taibah has provided financial and material support to al Qaeda. The strong affiliation that Taibah maintains with many other al Qaeda front-groups demonstrates its place as a highly

connected component of Osama bin Laden's financial and logistical support network." *Burnett* 3AC ¶ 299; *Continental* 2AC ¶ 576; *Ashton* 6AC ¶ 287; *WTCP* ¶ 474; *see also* Federal 1AC ¶ 239.

- Based on substantial evidence of pervasive involvement in al Qaida's activities within Bosnia, police raided the offices of Taibah International on December 13, 2001. The raid and subsequent investigation of Taibah International's financial records confirmed that Taibah International diverted donated funds to al Qaida and al Qaida affiliated militants in Bosnia. . . . The investigation further revealed that Taibah International facilitated the entry of al Qaida members into Bosnia by falsely claiming that those terrorists would be serving as employees for the organization in the region." *Federal* 1AC ¶¶ 241-242.

Indeed, the U.S. office of WAMY is alleged to have been "created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida." *Federal* 1AC ¶ 160; *Euro Brokers* WAMY RICO Statement at 5; *WTCP* WAMY RICO Statement at 5. Moreover, ABL was not a minor functionary at WAMY or at Taibah – rather, as noted above, he founded the U.S. offices of both entities and acted as President of WAMY in the United States and a director of Taibah. Thus, plaintiff specifically allege that "[i]n 1992, Abdullah Bin Laden, Osama bin Laden's brother, established a WAMY office within the United States, in Falls Church, Virginia. At least through 1998, Abdullah Bin Laden served as the president of WAMY's U.S. operations." *Federal* 1AC ¶ 160; *WTCP* WAMY RICO Statement, Ex. A at 4; *Euro Brokers* WAMY RICO Statement, Ex. A at 4. Plaintiffs further allege that "Taibah was co-founded by Abdullah A. Bin Laden in 1991." *Federal* 1AC ¶ 238; *see also Ashton* 6AC ¶ 261, 264; *Burnett* 3AC ¶ 296; *WTCP* ¶ 471; *Continental* 2AC ¶ 573 & Addendum at 236, 359 ¶ 44, 394; *N.Y. Marine* 2AC ¶ 139; 217, 471. Plainly, if, as plaintiffs allege, WAMY was created to provide support to al Qaeda, it was ABL who so created it for that purpose. These allegations are more than sufficient to support jurisdiction over ABL in this country and to state

claims against him under the Anti-Terrorism Act, RICO, and the common law.[4]

## APPLICABLE LEGAL STANDARDS

### F.R.C.P. 12(b)(6)

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) . In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

A motion pursuant to F.R.C.P. 12(b)(6) motion is analyzed in the context of the

---

[4] ABL has submitted an affidavit to deny some of these allegations, but that affidavit cannot be considered in connection with ABL's motion to dismiss for failure to state a claim. "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99 (2d Cir. 1999). Moreover, as described below, in deciding the motion, the Court must accept all the allegations of the Complaints as true. *See Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004).

requirements of F.R.C.P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id*. Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to F.R.C.P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v. McDonald's Corp.*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October, 2005, the Second Circuit re-iterated and re-affirmed the notice pleading standard set forth in Rule 8 as applied to a Rule 12(b)(6) motion to dismiss. *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005). In *Twombley*, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." 425 F.3d at 107. In the context of anti-trust pleading, the Court reminded that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116. The district court may not add create higher pleading standards than those set forth in the Federal Rules. Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit

unequivocally held that "[i]f that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so."  425 F.3d at 117.

Moreover, while the Court need not accept conclusions of law, that the *factual* allegations of the Complaint may be deemed "conclusory" provides no basis for dismissal at the pleading stage.  As the D.C. Circuit explained in *Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004), applying reasoning essentially identical to those of the Second Circuit in *Phelps:*

> It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory.  Many well-pleaded complaints are conclusory.  And while we do not have to accept conclusions of law as true, conclusions of fact are another matter.

353 F.3d at 39 (*citing* 5 Wright & Miller, Federal Practice & Procedure § 1218 (2d ed. 1990)).[5]

**F.R.C.P. 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the minimal

---

[5] In *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y. 2005), Judge Gershon in the Eastern District rejected the defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here.  In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations.  384 F.Supp.2d at 575-79.  Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent."  *Id.* at 585.  The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure:

> To the extent the defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

*Id.*  The *Linde* Court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, defendant attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  *Id.* at 588.

burden of showing a factual basis upon which the court may exercise personal jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003). In this regard, at the pleading stage, the plaintiff need only make a prima facie showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion. *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). In ruling on the motion, the Court should resolve factual discrepancies appearing in the record in favor of the Plaintiffs. *Id.* at 84.

ARGUMENT

## I.   THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THIS COURT'S CASE MANAGEMENT ORDER

Like other defendants in this case, ABL can't make up his mind whether plaintiffs have pleaded too many details or too few – he argues simultaneously that plaintiffs have failed to apprise him of the nature of the allegations against him and also that the very pleadings that contain the details of those allegations should be stricken.  Plaintiffs' amended pleadings – which gather into one place all of the allegations against all of the defendants in each action – comply with both the letter and spirit of CMO #2.  More important, ABL is not prejudiced by any technical non-compliance and indeed, he does not even contend otherwise.

As the Court will remember, Case Management Order #1 permitted plaintiffs to add defendants without pleading specific allegations against those defendants; the order then permitted any defendant as to whom the complaint contains no allegations to seek a "more definite statement," specifying the nature of the claims asserted.  Case Management Order #2 ("CMO #2) then expanded on this procedure, providing:

> Plaintiffs may file more definite statements and/or additional allegations against existing defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to previously filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint.

8

CMO #2, ¶ 13.  The order then required plaintiffs to gather all such more definite statements into a single document and to "file an amended complaint that includes all amendments made prior to that date, whether made pursuant to Rule 12(e) or otherwise."  *Id.*  The order further provided for the filing of RICO Statements in accordance with this Court's Individual Practices.  As a result, the pleadings against each defendant were scattered over various documents filed on different days, in complaints, more definite statements, and RICO Statements. Plaintiffs' amended pleadings, filed on or about September 30, 2005, incorporated all of these various filings into consolidated documents.

Although the plaintiffs in the various cases took different approaches to the requirements of CMO #2, all of the amended pleadings complied with the Order and none should be stricken. Plaintiffs *Ashton* filed a "Sixth Amended Consolidated Master Complant," while plaintiffs in *Burnett*, *EuroBrokers*, and *World Trade Center Properties* each filed a "Notice of Consolidated Pleading" incorporating by reference all of the previously-filed amendments to their respective complaints.  Each such document "includes all amendment made prior to" the requisite date, just as required by the Court.  More important, the "Notice of Consolidated Pleading" permits each defendant to find in a single place all of plaintiffs' allegations. The approach taken by the plaintiffs in *New York Marine, Continental* and *Federal*, incorporating and/or attaching, RICO statements and/or more definite statements, achieves precisely the same result.

ABL's argument that this Court should disregard all of the allegations contained in the amended pleadings represents a return to a gamesmanship approach to pleading that, as the Second Circuit has recognized, the Federal Rules of Civil Procedure reject.  Rather, "the purpose of pleading is to facilitate a proper decision on the merits."  *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 906 (2d Cir. 1977), *quoting Conley v. Gibson*, 355 U.S. 41, 48 (1957); *see*

*also Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities"); *Polite v. Casella*, 901 F.Supp. 90, 94 (N.D.N.Y. 1995) ("lawsuits should be determined on their merits and according to the dictates of justice"). Plaintiffs' amended pleadings and RICO Statement contain allegations that should not be disregarded by this Court simply because Mr. Binladin does not like how they are organized.

Similarly, ABL's argument that the allegations against him in the *Federal Insurance* RICO Statement are not properly before the Court is frivolous, at best.  Pursuant to a Stipulation between ABL and plaintiffs, endorsed as an Order of this Court on July 27, 2005, ABL expressly "STIPULATED AND AGREED … the Plaintiffs pursuing claims for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") shall serve their respective RICO Statements concerning the Bin Laden Family Defendants [including ABL], MBO, and SBIC on or before August 15, 2005."   At the time the parties entered into that agreement, there can be no doubt that both ABL and plaintiffs understood that any such RICO Statements would serve to augment and amend the allegations against ABL, as evidenced by the fact that ABL was not required to file his Motion to Dismiss until after the deadline for submission of RICO Statements.  Having stipulated to the filing of the relevant RICO Statements, ABL should not be permitted to side-step his agreement with plaintiffs and contest the validity of those pleadings on collateral grounds.  And, in any event, judicial precedent uniformly holds that RICO Statements should be treated as part of the pleadings.  *See, e.g., McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); Moses v. Martin, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New*

*World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001). [6]

Moreover, the incorporation of the RICO and More Definite Statements into plaintiffs' Complaints, by reference or attachment as exhibits, is expressly authorized by the Federal Rules. Rule 10(c) of the Federal Rules of Civil Procedure provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

F.R.C.P. 10(c). In view of the plain language of Rule 10(c), the *Federal Insurance* plaintiffs' incorporation of the RICO Statement applicable to ABL into their Amended Complaint, by reference or attachment as an exhibit (*see* Exhibit 40), complies with both the letter and spirit of the Federal Rules.

## II.   PLAINTIFFS' AMENDED PLEADINGS AND RICO STATEMENTS SUFFICIENTLY STATE CLAIMS AGAINST ABDULLAH BINLADIN

### A.   Plaintiffs State Claims Under the Anti-Terrorism Act

Under the ATA, ABL is liable if he provided material support to al Qaeda with knowledge of its terrorist agenda or if he aided and abetted al Qaeda or Osama bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002). ABL argues that plaintiffs have failed to state claims against him because, he contends, plaintiffs fail to allege any specific facts that could give rise to an inference that ABL knowingly and intentionally provided material assistance to al Qaeda. The complaints and RICO statements demonstrate otherwise.

---

[6] *All* of the RICO Statements are without a doubt part of the pleadings, not merely those in *Federal* filed pursuant to this Court's CMO #2, as ABL would have it. *See McLaughlin*, 962 F. 2d at 195; *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen*, 2001 WL 293683, * 2 n. 3; *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).

As noted above, plaintiffs allege that ABL founded WAMY's U.S. branch and Taibah and then acted as WAMY's president and a director of Taibah.  Plaintiffs further allege that WAMY-U.S. and Taibah were both important financial supporters of al Qaeda and that both organizations diverted funds to, and laundered money for, al Qaeda.  Significantly, plaintiffs allege that "WAMY's U.S. office was affiliated with the SAAR Network of businesses and charities *created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida.*"  *Federal* ABL RICO Statement, Ex. A at 14; *Federal* 1AC ¶ 160; *Euro Brokers* WAMY RICO Statement at 5; *WTCP* WAMY RICO Statement at 5.  That is to say, the very purpose for which WAMY's U.S. office was created was to provide funding, money laundering and material support to al Qaeda.  And the person who created that office was ABL.  That ABL founded the U.S. office of WAMY in order to provide funding, money laundering and material support to al Qaeda and then, in his capacity as president of that office, saw to it that WAMY carried out the mission for which it was founded hardly requires an inference. Indeed, given plaintiffs' allegations concerning (a) ABL's role in founding WAMY's U.S. office; (b) the purpose for which WAMY and other SAAR-related entities were founded; (c) ABL's role in running WAMY's U.S. office; and (d) WAMY's actions in providing support to al Qaeda, it would be unreasonable *not* to infer that ABL knowingly and intentionally provided material support to al Qaeda.  These allegations are sufficient to state claims under the ATA.

## B.    Plaintiffs State Claims Under RICO

Plaintiffs' complaints and RICO Statements assert RICO claims against ABL pursuant to 18 U.S.C. §§ 1962(c) and (d). The enterprise – the "al Qaida movement" - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. *See Federal* ABL RICO Statement; *Federal* WAMY RICO Statement; *Euro Brokers* WAMY RICO

Statement; *WTCP* WAMY RICO Statement.  Its well documented purpose is to perpetrate acts of terrorism.  *Id.*  Thus, plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by ABL in the enterprise to sustain claims under both §§ 1962(c) and (d). A plaintiff asserting a civil claim under § 1962(c) must allege that the defendant participated in the operation or management of the enterprise. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). To sustain a claim under § 1962(d), the plaintiff must allege that the defendant was a "central figure" in the underlying scheme. *Id*. at 165. However, "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'" *United States v. Louie*, 625 F. Supp. 1327, 1333 (S.D.N.Y. 1985) (*citing* 18 U.S.C. § 1962(c)).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise."  *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994).

Here, the plaintiffs have satisfied these pleading standards. Plaintiffs allege that ABL set up U.S. offices for WAMY and Taibah and that these organizations carried out a calculated global campaign to finance al Qaeda operations.  *See Federal* 1AC ¶ 160, 238; *Ashton* 6AC ¶

261, 264; *Burnett* 3AC ¶ 296; *WTCP* ¶ 471; *Continental* 2AC ¶ 573 & Addendum at 236, 359 ¶ 44, 394; *N.Y. Marine* 2AC ¶ 139; 217, 471.  Thus ABL's role in raising and laundering money for al Qaeda satisfies the 1962(c) operation or management test. *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir. 1988); (carrying bribes to judges constitutes association with enterprise); *Casperone v. Landmark Oil & Gas Corp*., 819 F.2d 112, 115 (5th Cir. 1987) (attorney providing legal services to enterprise associated with enterprise); *State of New York v. O'Hara*, 652 F. Supp. 1049, 1053 (W.D.N.Y. 1987) (submitting bids to city enterprise satisfies association test).

In addition, plaintiffs sufficiently plead that ABL conducted or participated in the affairs of the al Qaeda enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1961 (defining racketeering activity to include the provision of "material support" to terrorists under 18 U.S.C. §§ 2339A and 2339B, such as sending currency or giving financial services, and alternatively, "directly or indirectly" providing or "collecting" funds earmarked for terrorism under 18 U.S.C. § 2339C.  Plaintiffs allege that ABL participated in al Qaeda's affairs through the U.S. offices of WAMY and Taibah, which collected and distributed funds used by al Qaeda, and otherwise provided material support. *See Zola v. Gordon*, 685 F. Supp. 354 (S.D.N.Y. 1988) ("Civil RICO liability can be predicated on aiding and abetting the commission of the predicate acts by the primary offender."); *131 Main Street Assoc. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995) ("One might reasonably infer intent to aid a primary violation from allegations of substantial assistance.").

### C.    Plaintiffs State Claims Under the ATCA and the Common Law

ABL argues that alien plaintiffs' claims under the ATCA should be dismissed because, ABL contends, ATCA does not create secondary liability among private actors. This Court has already rejected this argument, noting in *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 826 (S.D.N.Y. 2005), that "courts, including the Second Circuit, have almost

unanimously permitted actions premised on a theory of aiding and abetting and conspiracy." 349 F.Supp.2d at 826 (S.D.N.Y. 2005), *citing Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 311 (S.D.N.Y.2003). Thus, this Court has concluded, "the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here." 349 F.Supp.2d at 826. Moreover, plaintiffs' claims under the ATCA properly plead defendant's liability under concerted action theories of liability, for the same reasons that plaintiffs' ATA claims are properly pleaded.

Finally, the *Burnett* plaintiffs properly plead intentional tort claims because the conduct of ABL in setting up U.S. offices of WAMY and Taibah for the purpose of providing financial support to terrorist attacks on the United States was, in fact, "extreme and outrageous"; Mr. Binladin's suggestion to the contrary is offensive to any civilized standard of outrage. Moreover, there can be no doubt that, in setting up vehicles for the support of al Qaeda, ABL was directing his conduct at the plaintiffs, as citizens and/or residents of the United States, because the target of Uncle Osama's terrorist agenda was well known at the time ABL was creating entities to provide funding and other financial services for him.[7]

---

[7] Plaintiffs recognize that they do not now state claims against Mr. Binladin under the Torture Victims Protection Act because they have not alleged that he acted under color of law. *See In re Terrorist Attacks on September 11*, 349 F.Supp.2d at 828. Plaintiffs further recognize, but respectfully disagree with, this Court's prior holdings concerning the intentional tort claims of the *Federal* and *WTCP* plaintiffs and the negligence claims of the *Federal* and *N.Y. Marine* plaintiffs, *see id.* at 829, 831. Rather than repeat arguments presented at length elsewhere on these latter two points, plaintiffs respectfully refer this Court to Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Perouz Sedaghaty (with respect to the issue of intentional torts) and to Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sami Omar Al-Hussayen (with respect to negligence), both of which are hereby incorporated by reference.

### III.   THIS COURT HAS JURISDICTION OVER ABDULLAH BINLADIN BECAUSE PLAINTIFFS' CLAIMS AGAINST HIM ARISE FROM HIS CONDUCT IN THE UNITED STATES

ABL argues that this Court may not exercise personal jurisdiction over him, but under this Court's prior holdings, it is clear that ABL is subject to jurisdiction in the United States. Plaintiffs assert claims against ABL under the federal Anti-Terrorism Act and under RICO, both of which provide for nationwide service of process.   As ABL himself recognizes, the constitutional requirement of "minimum contacts" for such claims is measured by contacts with the United States as a whole.  *See In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 807 (S.D.N.Y. 2005) (exercise of jurisdiction under F.R.C.P. 4(k)(2) for federal claim requires that defendant have sufficient contacts with the United States as a whole such that the exercise of jurisdiction does not violate Fifth Amendment due process); *see also Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *United States v. Int'l Bhd. of* Teamsters, 945 F.Supp. 609, 617 (S.D.N.Y.1996); .*Estates of Ungar ex rel. Strachman v. Palestinian Auth*., 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Combs v. Adkins & Adkins Coal Co*., 597 F. Supp. 122, 125 (D.D.C. 1984).

Here, the requirements of due process are satisfied because plaintiffs' claims arise directly from Mr. Binladin's activities in the United States.   Plaintiffs allege that, while living in the United States, Mr. Binladin established Taibah and the U.S. branch of WAMY.  *See Federal* 1AC ¶ 160, 238; *Ashton* 6AC ¶ 261, 264; *Burnett* 3AC ¶ 296; *WTCP* ¶ 471; *Continental* 2AC ¶ 573 & Addendum at 236, 359 ¶ 44, 394; *N.Y. Marine* 2AC ¶ 139; 217, 471.   Plaintiffs further allege that ABL was the president of the U.S. branch of WAMY and a director of Taibah. Moreover, plaintiffs allege that both of these organizations, which ABL was instrumental in running while he lived in the United States, were charity fronts that provided substantial

16

assistance to al Qaeda.  Because ABL provided support to al Qaeda through these two U.S.

entities while he was living in the United States, he has sufficient contacts with the United States

such that this Court may exercise jurisdiction over him.  *See In re Terrorist Attacks on*

*September 11*, 349 F.Supp.2d at 811 (specific jurisdiction exists when the forum exercises

jurisdiction over the defendant in a suit arising out of the defendant's contacts with that forum).

That ABL claims to have left the United States in 2000 in no way undermines this

Court's assertion of jurisdiction over him.  The money that al Qaeda used to set up its terrorist

training camps, to plan the September 11 attacks, to train the hijackers, and to carry out the

attacks, was raised long before the attacks themselves were carried out.  Money raised on

September 10, 2001, or laundered and sent abroad to al Qaeda on that date, would have arrived

much too late to support these particular attacks, for which false travel documents and money for

living expenses (to say nothing of the extensive training the hijackers received) were needed

months, and indeed, years in advance.  It was the money raised in the late 1990's, and in 2000,

that provided the material support needed to carry out the September 11 attacks.  That is

precisely when ABL was in the United States, acting as president of WAMY and a director of

Taibah and, through both organizations, providing material support to al Qaeda.[8]

---

[8] Nor is ABL correct that Rule 4(k)(2) is inapplicable because his activities in support of al Qaeda give rise to jurisdiction, if at all, in Virginia.  Although ABL was resident in Virginia, plaintiffs do not allege general jurisdiction over him based on that residency, as defendant was no longer residing in Virginia at the time plaintiffs filed their claims against him. Rather, plaintiffs allege that Mr. Binladin is subject to specific jurisdiction based on his activities in the United States that give rise to plaintiffs' claims. But those activities were not focused on Virginia, but rather on providing support for al Qaeda to attack the United States.  Moreover, if ABL were subject to jurisdiction in Virginia, he would also be subject to jurisdiction in New York, a target of the September 11 attacks and one of the places where the effects of Mr. Binladin's conduct were felt.  This Court would then have jurisdiction over ABL without regard to Rule 4(k)(2).  All of the actions that are the subject of this motion, except one of the *Burnett* actions (03-CV-9849), were commenced in New York, so this Court's jurisdiction is proper (footnote continued on next page)

ABL relies on this Court's ruling with respect to Abdulrahman Bin Mahfouz, but Mr. Mahfouz's situation was not at all analogous to ABL's.  Although Mr. Bin Mahfouz was alleged to have provided support to al Qaeda through a charity front organization of which he was director, that organization was not based in the United States and, of greater significance, was not founded in the United States while its director was resident here.  Mr. Mahfouz was alleged to have directed his conduct *at* the United States from abroad; Mr. Binladin is alleged to have lived *in* the United States and to have provided his support to al Qaeda while living here.[9]

---

under *either* Rule 4(k)(2) *or* New York law.  Even as to the D.C. *Burnett* action, pursuant to 28 U.S.C. § 1631, if the D.C. court lacked jurisdiction over ABL, the action against him could be transferred to this Court, where it has already been transferred for pretrial proceedings.  At the end of all this procedural maneuvering, Mr. Binladin, who provided support to al Qaeda while living in this country, is, in any case, subject to jurisdiction in the United States and to MDL proceedings in this Court.

[9] Even if plaintiffs' claims did not arise out of ABL's activities in the United States, this Court could still assert jurisdiction over him because he is alleged purposefully to have directed his conduct at the United States.  Plaintiffs have previously briefed the issue of jurisdiction based on conduct purposefully directed at the United States and this Court has previously recognized that due process "is satisfied if the defendant has 'purposefully directed' his activities at the residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *In re Terrorist Attacks of September 11*, 349 F.Supp.2d at 810.  Plaintiffs will not repeat those arguments here, but rather respectfully refer this Court to plaintiffs' memoranda of law in opposition to motions to dismiss filed by DMI Administrative Services, S.A. and Dar Al-Maal Al-Islami Trust; and by Yousef Abdul Latif Jameel; Rabita Trust; and Khalid Bin Mahfouz, which are hereby incorporated by reference.

## CONCLUSION

For the foregoing reasons, this Court should deny defendants' motion to dismiss in its

entirety.

Dated: New York, NY               Respectfully submitted,
       January 30, 2006

                                 /s/ Andrea Bierstein_____
                                 Ronald L. Motley, Esq. (RM-2730)
                                 Jodi Westbrook Flowers, Esq.
                                 Justin B. Kaplan, Esq.
                                 MOTLEY RICE LLC
                                 28 Bridgeside Boulevard
                                 P.O. Box 1792
                                 Mount Pleasant, South Carolina 29465
                                 Telephone:  (843) 216-9000

                                 James P. Kreindler, Esq.
                                 Justin T. Green, Esq.
                                 Andrew Maloney, Esq.
                                 KREINDLER & KREINDLER LLP
                                 100 Park Avenue
                                 New York, New York 10017-5590
                                 Telephone: (212) 687-8181

                                 Stephen A. Cozen, Esq.
                                 Elliott R. Feldman, Esq.
                                 Sean P. Carter, Esq.
                                 COZEN O'CONNOR
                                 1900 Market Street
                                 Philadelphia, PA 19103
                                 Tele: (215) 665-2000

                                 Paul J. Hanly, Jr., Esq. (PH-5486)
                                 Jayne Conroy, Esq. (JC-8611)
                                 Andrea Bierstein, Esq. (AB-4618)
                                 HANLY CONROY BIERSTEIN & SHERIDAN, LLP
                                 112 Madison Avenue
                                 New York, NY 10016
                                 Telephone:  (212) 784-6400

                                 Plaintiffs' Executive Committees
                                 on behalf of *Ashton*, *Burnett*, *Continental*, *Euro Brokers*,
                                 *Federal Ins.*, *N.Y. Marine*, and *WTCP* Plaintiffs

APPENDIX

**Operative Pleadings:**

| Case | Pleadings |
|---|---|
| *Ashton* | Sixth Amended Complaint ("*Ashton* 6AC") |
| *Burnett* | Third Amended Complaint ("*Burnett* 3AC"); |
| *Continental Casualty* | Second Amended Complaint ("*Continental* 2AC") |
| *Euro Brokers* | Complaint ("*Euro Brokers*"); Rico Statement Applicable to the World Assembly of Muslim Youth ("*Euro Brokers* WAMY RICO Statement") |
| *Federal Insurance* | First Amended Complaint ("*Federal* 1AC"); Rico Statement Applicable to Saudi Bin Laden Group, Abdullah Bin Laden, Bakr Bin Laden, Tarek Bin Laden, Omar Bin Laden and The Mohammed Bin Laden Organization (*Federal* ABL RICO Statement"); Rico Statement Applicable to World Assembly of Muslim Youth ("*Federal* WAMY RICO Statement") |
| *New York Marine* | Second Amended Complaint ("*N.Y. Marine* 2AC"); *Federal* ABL RICO Statement (adopted and incorporated by reference into *N.Y. Marine* 2AC, *see* 2AC ¶ 358 n.40 & Exhibit 28); *Federal* WAMY RICO Statement (adopted and incorporated by reference into *N.Y. Marine* 2AC, *see* 2AC ¶ 144, n.20 & Exhibit 11) |
| *WTCP* | Complaint ("*WTCP*"); RICO Statement Applicable to the World Assembly of Muslim Youth ("*WTCP* WAMY RICO Statement") |