**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*

> *Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case Nos. 03-CV-5738 and 03-CV-9849 (originally 1:02-1616 USDC (JR)) (S.D.N.Y.)
>
> *Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)
>
> *Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)
>
> *Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)
>
> *New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)
>
> *World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT YESLAM BINLADIN'S MOTION TO DISMISS PLAINTIFFS' COMPLAINTS AND MEMORANDUM IN SUPPORT

February 3, 2006

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT .......................................................................................................3

   A.   PERSONAL JURISDICTION ...............................................................................3

   B.   F.R.C.P. 12(B)(2) .........................................................................................3

   C.   GENERAL JURISDICTION .................................................................................3

        1.   Yeslam's Extensive Network of Companies Includes U.S. Corporations Which He Heads .................................................................4

        2.   SICO Conducts Business in the United States ...................................5

        3.   SBG/MBO Relationship .....................................................................9

        4.   The California Property .....................................................................10

        5.   Defendant is a U.S. Registered Pilot With a U.S. Registered Private Airplane ............................................................................................11

        6.   Sufficient Minimum Contacts Exist for this Court to Exercise General Jurisdiction Over Yeslam Binladin ....................................11

   D.   SPECIFIC JURISDICTION ................................................................................12

        1.   The Joint Bank Account with Osama Bin Laden ..............................13

        2.   The Various Criminal Investigations into Yeslam Binladin's Activities Continue ..........................................................................14

   E.   THE DEFENDANT'S ATTACKS ON JEAN-CHARLES BRISARD ARE UNFOUNDED ...16

        1.   Yeslam's Argument About his "Half" Brothers is Unfounded ........17

   F.   SWISS LAW DOES NOT PREVENT YESLAM FROM APPEARING BEFORE THIS COURT ........................................................................................................18

   G.   THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THE COURTS' CASE MANAGEMENT ORDERS ...............................................................................19

III. PLAINTIFFS' PLEADINGS SUFFICIENTLY STATE CLAIMS AGAINST YESLAM BINLADIN UNDER 12(B)(6) ................................................................21

   A.   PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT ...................22

   B.   PLAINTIFFS STATE CLAIMS UNDER RICO .....................................................22

   C.   PLAINTIFFS STATE CLAIMS UNDER THE ATCA AND THE COMMON LAW ...................23

IV.  CONCLUSION ..................................................................................................24

i

# TABLE OF AUTHORITIES

## CASES

*A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998) ................................................................................................................20

*Allen v. New World Coffee, Inc.*, 2001 WL 293683, * 2 n. 3 (S.D.N.Y. March 27, 2001) ..........20

*Arden Way Associates v. Boesky*, 664 F.Supp. 855 (S.D.N.Y. 1987)............................................16

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ...........................................22

*Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985)...................................................7, 15

*Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112 (5th Cir. 1987)....................................23

*Conley v. Gibson*, 355 U.S. 41 (1957) ...........................................................................................20

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ........................................................20

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001)..........................................3

*Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ...........................23

*Foman v. Davis*, 371 U.S. 178 (1962) ...........................................................................................20

*Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994)..............................23

*Goldberg v. Kelly* 397 U.S. 254 (1970) .........................................................................................15

*Hanson v. Denckla,* 357 U.S. 235 (1958) .......................................................................................15

*In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493 (S.D.N.Y. 1987)................16

*In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204 (2d Cir. 2003) ...............................3

*In re Terrorist Attacks of September 11*, 349 F.Supp.2d 765 ................................................12, 24

*International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945) ...........................................11

*Kulko v. California Superior Court*, 436 U.S. 84 (1978) ..............................................................15

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992)................................................................20

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) ..............................................................20

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983)..............................................................23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y. 2003) ................................................................................................................................24

*State of New York v. O'Hara*, 652 F. Supp. 1049 (W.D.N.Y. 1987)............................................23

*Stipo v. Town of North Castle*, 205 A.D.2d 608 (N.Y.A.D. 1994)...............................................16

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)...............................................................23

*United States v. Louie*, 625 F. Supp. 1327 (S.D.N.Y. 1985) ........................................................23

*United States v. Roth*, 860 F.2d 1382 (7th Cir. 1988)...................................................................23

*United States v. Turkette*, 452 U.S. 576 (1981) ...........................................................................23

*Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902 (2d Cir. 1977) ...........................................20

**OTHER AUTHORITIES**

1 Stephenson, Conn.Civ.Proc. (2d Ed. 1982 Sup.) § 108d p. S 73.................................................15

**UNITED STATES CODE**

18 U.S.C. § 1962....................................................................................................................22, 23

# I.    INTRODUCTION

The argument advanced by Defendant Yeslam Binladin (or "Yeslam" or "Defendant") in support of his motion to dismiss is that the Plaintiffs' factual allegations are false,[1] misleading or immaterial.  As is detailed below, Plaintiffs beg to differ.  As with every other Defendant in this lawsuit to date, Yeslam claims he is completely innocent of any involvement in the material support or aiding and abetting of Osama Bin Laden and the Plaintiffs are just on some sort of unsubstantiated witch-hunt.  As with every other member of the Bin Laden family, Yeslam claims this Court has no jurisdiction over him.  And as with every other Defendant, Yeslam claims to abhor terrorism and that he had no idea what his brother Osama was up to.  Apparently, if Defendants are to be believed, Osama Bin Laden acted alone.

Despite the zeal of Defendant's bluster and rhetoric about falsehoods, and no matter how many times the Defendant states that the allegations against him are false, the Plaintiffs have a good faith basis for naming him in this action.  Plaintiffs have submitted pleadings with specific and detailed allegations based on factual information regarding Defendant's conduct that is more than sufficient to withstand Fed.R.Civ.P. 12 scrutiny.  The allegations set out in the Complaints, the RICO statements, the Fed.R.Civ.P. 12(e) More Definite Statements, and the *prima facie* jurisdictional showing on Yeslam, submitted herein, extensively detail both his contacts with the United States and the material support he provided to his brother Osama Bin Laden which satisfy the pleading standards of Fed.R.Civ.P. 12.[2]

---

[1] *E.g.*, Memorandum in Support of Defendant Yeslam Binladin's Motion to Dismiss Plaintiffs' Complaints ("Memo") regarding Plaintiffs' allegations: "false," "not true," "dead wrong," "falsely," "false," "simply false," "not true," "false," and "simply false."  *See* Memo at 7, 8, 12, 15, 18, 20, and 22.

[2] See *Burnett* 3AC (Burnett 3AC Filed on 11/22/02); *WTC* Complaint (Filed on 9/10/04); *Euro Brokers* Complaint (Filed on 9/10/04); *Burnett* Plaintiffs 12(e) More Definite Statement (Filed on 3/21/05); *WTC* RICO Statement (Filed on 5/10/05); *Euro Brokers* RICO Statement (Filed on 5/10/05); *Fed.* 1AC; *Fed.* RICO Statement; *Continental* 2AC; *NY Marine* 2AC.

Because Defendant has challenged the jurisdiction of the Court, and in so doing submitted material beyond the pleadings, Plaintiffs respond in kind herein with a *prima facie* showing that supports an exercise of jurisdiction under either a general or specific jurisdictional analysis. Declaration of Jodi Westbrook Flowers (or "Flowers Dec.") and exhibits attached thereto. Yeslam clearly has sufficient minimum contacts with the United States to subject himself to the jurisdiction of this Court under a general or specific analysis. *Id.* No amount of smear tactics, oversimplifications, or spinning of the truth will change the facts as alleged. Defendant would have this Court ignore the Plaintiffs' pleadings, skip past any discovery, ignore the summary judgment rules and engage in an immediate trial on the ultimate facts of this case – facts that are – *at a bare minimum* – in dispute. Over and over, the papers filed on behalf of Yeslam demonstrate how his Motion turns on determination of what is true rather than what is alleged. Such determinations of ultimate fact that go to the underlying claims brought by Plaintiffs and the jurisdiction of this Court are grossly improper for determination through Fed.R.Civ.P. 12.

In his Motion, Yeslam claims that the only reason he has been named in these lawsuits is because of his last name. *See* Memo, at 1. As Defendant likes to argue in his defense, the Bin Laden family has 54 brothers and sisters with the last name Bin Laden. However, no Complaint in the consolidated cases names more than eight members of this large family; most name fewer.[3] The suggestion that the Defendant was sued only because of his last name is both

---

[3] The *Ashton* plaintiffs have sued Abdullah Bin Laden, Bakr Bin Laden, and Osama Bin Laden; the *Burnett* plaintiffs name Abdullah Bin Laden (D77), Osama Bin Laden (D78), Tarek Bin Laden (D79), Bakr Bin Laden (D180), Omar Bin Laden (D181), and Yeslam Bin Laden (D182); the *Continental* plaintiffs have sued Abdullah Bin Laden, Bakr Bin Laden, Haydar Mohamed Bin Laden, Omar Bin Laden, Osama Bin Laden, Saleh Mohamed Bin Laden, Tarek Bin Laden, and Yeslam Bin Laden; in *Euro Brokers*, plaintiffs have named Abdullah Bin Laden, Osama Bin Laden, Tarek Bin Laden, Omar Bin Laden, Bakr Bin Laden, and Yeslam Bin Laden, the same six Bin Ladens also named in *Federal Ins.* and in *World Trade Center Properties*; the *NY Marine* plaintiffs included Abdullah Bin Laden, Bakr Bin Laden, Salem Bin Laden, Omar Bin Laden, Osama Bin Laden, Saleh Mohamed Bin Laden, Tarek Bin Laden, and Yeslam Bin Laden.

ludicrous and unsubstantiated.  It is not by coincidence that the same Bin Laden defendants recur throughout the complaints.

## II.  ARGUMENT

### A.  PERSONAL JURISDICTION

In addition to arguing that everything Plaintiffs allege is false, Yeslam argues he does not have minimum contacts with the United States sufficient to warrant a finding that the Court has personal jurisdiction over him. This contention is directly controverted by both the facts and the law.

### B.  F.R.C.P. 12(B)(2)

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the minimal burden of showing a factual basis upon which the court may exercise personal jurisdiction over the defendant. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003). In this regard, at the pleading stage, the plaintiff need only make a prima facie showing of personal jurisdiction in order to defeat a defendant's 12(b)(2) motion. *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). In ruling on the motion, the Court should resolve factual discrepancies appearing in the record in favor of the Plaintiffs. *Id*.

### C.  GENERAL JURISDICTION

Yeslam denies any contacts with the United States after 1981.  The facts demonstrate otherwise.  Through his company SICO (a company he admits he owns and operates), Yeslam is engaged in systematic and continuous contact with the United States through a complex investment network of businesses that includes U.S. corporations headed by Yeslam.  Plaintiffs have so far located Yeslam's businesses, corporations or trusts in Delaware, New York, North Carolina, and South Carolina.

3

The self-serving affidavit proffered by Yeslam conveniently attempts to refute the factual allegations pled, recasting the facts in a light most favorable to Defendant, by summarily dismissing the Plaintiffs' allegations against him or attempting to explain them away.  In fact, Yeslam has a long history of transferring assets in an effort to hide them from the jurisdiction of the Courts.  Affidavit of Carmen Bin Ladin (or "Carmen Aff.") at 12-13, 23, 25, Flowers Dec., Ex. A.   The Court must take a close look at the nature and extent of Yeslam's business dealings in the United States, as well as his other contacts here, in considering this motion to dismiss for lack of personal jurisdiction.  Unfortunately, either by omission or sheer fabrication, Defendant neglects to advise the Court of the true extent of his contacts with the United States.  Contrary to Yeslam's claims that he has had no presence or contact in the United States, he maintains U.S. corporations and holds himself out as both a U.S. real estate developer and an investor.

1.  **Yeslam's Extensive Network of Companies Includes U.S. Corporations Which He Heads**

Yeslam intentionally set up corporations and at least one trust in the United States to manage his investments and business dealings in the United States.  Setting aside his families businesses for a moment, Yeslam alone has over 76 companies, 11 of which are U.S. businesses. Carmen Aff. at ¶ 14, SICO records appended as Exhibit 1 to the Carmen Affidavit.

Carmen Bin Ladin married Defendant Yeslam in 1974 and they remained married until 1994.  Carmen Aff. at ¶ 4, 10.  Throughout their marriage, Carmen was privy to numerous business dealings and relationships of her husband including his contacts with the United States and the extent to which he will go to protect his interests.  Carmen Aff. at ¶ 9.

Ms. Bin Ladin states that the divorce procedure in the Geneva courts, which has lasted for more than ten years, has been characterized by misleading statements from Yeslam and outright lies.  Carmen Aff. at ¶ 10.  Yeslam and the other Bin Laden brothers protect one another

4

through false affidavits.  In addition, they move assets between one another through the hundreds of companies that they own and manage throughout the World to protect their financial and personal interests.  Carmen Aff. at ¶ 12.

As Carmen states in her affidavit, "Yeslam has endeavored to hide the vast extent of his wealth. . . . I found myself obliged to begin a private investigation into Yeslam's and the Bin Laden family's holdings.  I have investigated these financial activities for the past 8 years and discovered Yeslam's and the Bin Laden family's management of hundreds of various companies in the United States, Europe and offshore."  Carmen Aff. at ¶ 13.  "I also have first hand experience on how the bin Laden brothers transfer assets between one another in order to evade detection."  Carmen Aff. at ¶23.  "This is the common practice of the Bin Laden brothers to switch assets between one another at their convenience to protect their interests."  Carmen Aff. at ¶ 25.

### 2.    SICO Conducts Business in the United States

Yeslam Bin Laden established Cygnet SA, later renamed Saudi Investment Company (or "SICO"), in May 1980 in Geneva, Switzerland.   "SICO has served as the international investment arm of the Saudi Binladin Group (SBG), the bin Laden family business based in Jeddah, Saudi Arabia, and has most recently begun managing SBG's investments in New York."  Declaration of Jean-Charles Brisard, Exhibit B, at ¶ 11, emphasis added.  SICO owns and manages many other companies owned by Yeslam and is itself under Falken Ltd., a Cayman Island holding company owned by Yeslam Binladin and his "direct siblings" Ibrahim, Fawzia, and Khalil.  Brisard  Dec. at ¶ 11.

Yeslam has used SICO as a front for his personal business in the United States.  Yeslam stated in a sworn affidavit that "all of my contacts in California have been in my capacity as a

Chairman of Saudi Investment Company S.A. (SICO)."[4]   In addition, he swore that "SICO, through its subsidiaries, has invested in real property located in the United States, including California."   Brisard Dec. at ¶ 12.   According to one of SICO's business pamphlets, SICO controls numerous subsidiaries, including Radisson NV, Sabin Inc., Aldema Inc., Bayon, Inc. under the management of Yeslam, and that it has made significant real-estate investments, particularly in the United States.   Brisard Dec. at ¶ 14.   In 2002, Yeslam stated that "SICO is now a services company whose only activity is the monitoring and management of investments made for us (members of the bin Laden family) by brokers in New York."[5]   Brisard  Dec. at ¶ 16.

Despite this, Yeslam has often publicly professed that SICO had no subsidiaries in Switzerland, abroad, or offshore.   *Id.*, at ¶ 13.   The truth is that SICO was advertising that "together with Daniel Realty Corporation, one of the leading U.S. real estate firms, we [SICO] also created a unique concept of investing in American property."   Exhibit 2 to Affidavit of Carmen Bin Ladin.   While brashly claiming that this Court cannot exercise jurisdiction over him, Yeslam purposefully availed himself of the State of New York by setting up a trust here to manage his real estate investments.   Brisard Dec. at ¶ 12. As SICO put it:  "Our main target was to dispose of the idea that one has to live on Wall Street in order to make money."  Exhibit 2 to Affidavit of Carmen Bin Ladin.   In one advertisement, SICO boasts that it created a department specifically to specialize in United States markets and consummated a deal to allow SICO "unlimited access to the United States."   Carmen Aff. at 16, 17, and quoting Exhibit 2.

This is a textbook example of what and why the minimum contacts test exists in our law: Individuals should not be allowed the benefit of doing business in the forum but hide behind numerous corporate business entities and agency relationships in an effort to escape from

---

[4] Declaration of Yeslam Mohammed Bin Laden, filed in *Carmen bin Laden v. Ibrahim Mohhamed bin Laden*, Case No. B C212648 (November 22, 1999).
[5] "Yeslam bin Laden:  What I know About My Half-Brother Usama," <u>Le Temps</u> (January 25, 2002).

criminal or civil prosecution.  Defendant's conduct and connection to the forum are such that he should reasonably anticipate being haled into this Court.  *Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985).

Not only has Yeslam been a longtime United States investor, businessman, and property owner, but he and the company he admits to running, SICO, have also engaged in real estate transactions in the United States through additional U.S. corporations which he started.  Yeslam has incorporated at least six U.S. companies to manage real estate development and investments through the Delaware incorporated Alabama-based Daniel Realty Corporation.  Brisard Dec. at ¶¶ 20-24.  For example, Yeslam sold two office buildings in West Palm Beach, Florida to Daniels Realty Corporation for $20 million dollars in December of 1988.  Brisard Dec. at ¶ 24.  Yeslam did so through one of his many companies, Reflection Properties, a company which is based in the U.S. and does business in Florida according to Palm Beach Court Records.  *Id.*, *see also*, Palm Beach County Clerk and Comptroller, Ex. C to Flowers Dec.  Real estate records for Daniel Realty Company show that it was a purchaser of U.S. real estate from, at least, 1998 until 2002.  Brisard Dec. at ¶ 24.  Yeslam also engages in business activities through an offshore company called Falken Limited in the Cayman Islands, a company with numerous U.S. subsidiaries including Tropiville Inc., incorporated in 1986 in the State of South Carolina.  Brisard Dec at ¶ 18.

Between 1986 and 1998, Yeslam was the President of at least two U.S. Corporations which are listed on FBI and foreign governmental terrorist suspect lists.  Brisard Dec. at ¶ 19.  According the State of Delaware records, Yeslam was President of the Knutstorp Corporation from 1986 until 1998.  Flowers Dec., Ex. D and E, Annual Reports.  Knutstorp Inc. was also registered in the State of North Carolina on July 10, 1987.  Brisard Dec. at ¶ 19.  Knutstorp, Inc.

and Kinnekule were both incorporated in Delaware on August 8, 1986 by Yeslam as President, his signature is found on each annual report available from the State of Delaware between 1986 and 1998.  Flowers Dec., Exs. D and E, Delaware Annual Reports.

In February of 1997, Knutstorp merged with Kinnekule.  Brisard Dec. at ¶ 20; Flowers Dec., Ex. F, merger documents.  The mailing address of Knutstorp Inc. in Alabama is identical – the same P.O. Box – to that of Daniel Property Investors Inc. Brisard Dec. at ¶ 20.

In December of 1998, Kinnekule merged with Falken Ltd. (or "Falken") incorporated in the Cayman Islands.  Brisard Dec. at ¶ 21, Flowers Dec., Ex. F.  Yeslam employed a U.S. attorney John West, Jr. of Camden, South Carolina, to facilitate the merger of these companies and to act as his personal lawyer.  Brisard Dec. at ¶ 23.  John West also accepts service of process for Kinnekule.  Brisard Dec. at ¶ 17.

Three of Yeslam's U.S. corporations – Kinnekule, Knutstorp, and Daniel Realty - are suspected by U.S. law enforcement officials of terrorism.  Brisard Dec. at ¶ 22.  According to documents produced by the Italian criminal authorities and available on the internet, the FBI listed all three U.S. corporations, Knutstorp, Kinnekule, and Daniel Realty on the FBI's international terrorism suspect list in the wake of 9/11.  Flowers Dec. Exhibits G, FBI Suspect List dated January 31, 2002, as transmitted to the Italian terrorism Money Laundering Division, *see also* Brisard Dec. at ¶ 22.  The only other individual listed on these corporate records with Yeslam acting as Vice President and only other officer/director is named Akberali Moawalla. *See* Flowers Dec., Exs. D and E, State of Delaware Ann. Reports.

Corporate records from the State of Delaware for Knutstorp Inc. and Kinnekule attest that in 1986 Yeslam and another supporter of OBL started these corporations listing Yeslam as President and Moawalla as Vice President.  Flowers Dec., Ex. F; Brisard Dec. at ¶¶ 19-20.  No

other officers, directors or board members are identified.  These corporations filed annual reports containing Yeslam's signature until at least 1998 – with Yeslam signing the annual reports each year as President.  The registered agent and director of Cambridge Engineering Systems Ltd. is Akbar Ali M. Moawalla, who is also the former treasurer and Chief Financial Officer of the Saudi Binladin Group (or "SBG").  Brisard Dec. at ¶ 28.  Cambridge Engineering, according to U.S. government documents is alleged to have transferred 300 million dollars to Osama Bin Laden.  Brisard Dec. at ¶ 29, 67.   Intelligence officials in Europe have stated that Yeslam directed these transactions.  Brisard Dec. at ¶ 29, 67.

On board the charter aircraft carrying members of the Bin Laden family that fled the United States eight days after the 9/11 attacks was the same Akberali Moawalla, an official with the investment company run by Yeslam bin Laden, another of Osama bin Laden's half brothers. The Washington Post "Plane Carried 13 Bin Ladens, Manifest of Sept. 19, 2001, Flight From U.S. Is Released," July 22, 2004.  Flowers Dec., Ex. H.

### 3.    SBG/MBO Relationship

Yeslam swears he "never held any position as an officer or director of SBG or any of its subsidiaries . . .".  Yeslam Aff. at 9.  Yeslam also swears he "was appointed a member of the Board of the Mohammed Binladin Organization" (or "MBO").  Yeslam Aff. at 10.   The affidavit on its face is contradicting since MBO is a wholly-owned subsidiary of SBG, according to SBG's own records.   Flowers Dec., Ex. I, "SBG Directory; Construction, "Infrastructure Division":  Mohammed Binladin Organization.  Yeslam was a shareholder, board member and was the financial director of MBO, a fully-owned subsidiary of the Saudi Binladin Group for 13 years before moving to Switzerland.  Brisard Dec. at ¶ 33.  Yeslam's lawyers in Switzerland pled that through 1986 Yeslam played a critical role and was given several important functions in the bin Laden family construction companies.  As late as 1999, Yeslam declared shares in the Saudi

Binladin Group in his tax forms.  Yeslam has a continuing role with the bin Laden organizations, businesses and companies through 2005.  Carmen Aff. at ¶ 21.

Yeslam's extensive investment, business, real estate, and corporate dealings alone would give rise to a *prima facie* showing of minimum contacts with the United States.  In addition to his role as President of at least three U.S. corporations, Yeslam is a long-time U.S. property owner, businessman, investor, real estate developer, FAA-licensed pilot, perfume salesman, and even a would-be designer of the Binladin fashion line.  All of these endeavors have significant contacts in the U.S.  *See* Flowers Dec. Ex. J.   Interview of Yeslam Binladin as appeared in The French Weekly Magazine "VSD" dated 11/30/05 – 12/06/05.

> In November of 2005 Yeslam was asked about marketing his products in the US:
>
> VSD [Interviewer and affiant herein]:  Do you think that the American government will allow you to open a boutique in Manhattan for example?
>
> Yeslam:  I also hope to launch my perfumes and my leather goods there.

Flowers Dec., Ex. J.  Interview of Yeslam Binladin as appeared in The French Weekly Magazine "VSD" dated 11/30/05 – 12/06/05.

Yet Yeslam Binladin claims to have been absent from the United States since 1981.  Affidavit of Yeslam Binladin, Exhibit A to Motion at ¶ 5.  This is simply not supported by the record.

### 4.      The California Property

Whether he lived there or not, in addition to all of his business dealings in the United States, Yeslam owned at least one residence in the United States.  Yeslam offers an explanation for the transfer of the California residence he purchased in 1983 to his brother Ibrahim in 1988, saying it was always Ibrahim's and that he decided to transfer it back to him.  The real reason that Yeslam transferred the California property to his brother was to protect it from asset distribution to his former wife, Carmen Bin Ladin, after they began divorce proceedings.

Carmen Aff. at ¶¶ 23, 24, 25.  Carmen sued Yeslam in California in conjunction with their long divorce proceeding for distribution of the property.  The original deed, which Defendant chose not to provide, lists only Yeslam as the properties' purchaser in 1983 and it contains no mention of an agency relationship for Ibrahim or anyone else. Flowers Dec. Ex K, State of California Original Deed.

### 5. Defendant is a U.S. Registered Pilot With a U.S. Registered Private Airplane

Defendant's private plane is registered with the FAA, Yeslam is an FAA-licensed pilot, and his plane is owned by another Delaware Corporation – set up by Yeslam's Swiss lawyer Jurg Brand – Roxbury Technologies (US) Inc.  Dec Brisard at ¶¶ 8-9, *see also* Exhibit L to Flowers Dec.  Roxbury is an affiliate of Falken Ltd.  Brisard Dec. at ¶ 9.  This is another striking example of Yeslam's continuous contacts with the United States.

### 6. Sufficient Minimum Contacts Exist for this Court to Exercise General Jurisdiction Over Yeslam Binladin

Certainly for purposes of the minimum contacts analysis, Yeslam has maintained systematic and continuous contacts in the United States to satisfy the minimum contacts test:

> [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.  The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).

Plaintiffs have established a *prima facie* showing of jurisdiction over this Defendant under both a general minimum contacts analysis and a purposefully directed activities specific

jurisdiction analysis.[6]   What Defendant is looking for from the Court is the equivalent of diplomatic or sovereign immunity.   Under his theory of jurisdiction, as long as he ordered a hit man to commit a murder in the United States, safe from his consulate in Geneva, he could never be haled into U.S. court for the resulting murder.   Nor could he be touched if any of his business or personal conduct or business activities led to an actionable claim by a U.S. citizen or corporation.   This simply cannot be.

### D.       SPECIFIC JURISDICTION

Even if plaintiffs' claims did not arise out of Yeslam's activities in the United States, this Court could still assert jurisdiction over him because he is alleged to have purposefully directed his conduct at the United States.   Plaintiffs have previously briefed the issue of jurisdiction based on conduct purposefully directed at the United States and this Court previously recognized that due process "is satisfied if the defendant has 'purposefully directed' his activities at the residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities."   *In re Terrorist Attacks of September 11*, 349 F.Supp.2d 765, 810.[7]

Plaintiffs maintain that Yeslam is liable for his actions carried out in support of his brother Osama Bin Laden.   Yeslam protests his own innocence here while publicly proclaiming his ongoing willingness to financially support his brother Osama Bin Laden in other venues. Yeslam claims he had no idea that his brother Osama was involved in Islamic extremism prior to 9/11, and he even questions whether Osama was responsible for 9/11.   *See* The French Weekly

---

[6] Defendant incorrectly continues to attempt to recast Plaintiffs' theory of jurisdiction as one involving "conspiracy jurisdiction."   Rather than explain to the Court once again why this is an incorrect reading of both the law and Plaintiffs' arguments, Plaintiffs will simply incorporate by reference previous briefing on their jurisdictional theories, *e.g.*   Plaintiffs' Consolidated Memorandum of Law in Opposition to Motion to Dismiss of Abdullah Binladin, docket # 1653, filed 1/30/06.

[7]  Plaintiffs will not repeat those arguments here, but rather respectfully refer this Court to Plaintiffs Memorandum of Law in Opposition to Motions to Dismiss filed by Abdullah Binladin, which are hereby incorporated by reference.

Magazine "VSD" dated 11/30/05 – 12/06/05, Flowers Dec., Ex. J.  His wife of twenty years has testified and publicly declared that the bin Ladin family was close-knit and well-informed of each others activities including the radical and outspoken Osama bin Laden and his terrorist activities and intentions.  Carmen Aff. at ¶¶ 30, 39, 40.

           **1.**        **The Joint Bank Account with Osama Bin Laden**

Yeslam bin Laden attempts to distance himself from his infamous brother in his motion and affidavit yet he admittedly was a co-signatory with Osama Bin Laden and managed a Swiss bank account that benefited Osama Bin Laden.  Brisard Dec. at ¶¶ 50-59; cf. Yeslam Aff. at ¶¶ 11-14.  As Brisard attests:

> In a statement made during an interview published by the French weekly magazine "VSD" of November 30, 2005, when Yeslam was asked about his joint account with Usama Bin Laden, he answered "Nonsense, I've never shared a joined UBS account with my half-brother Usama Bin Laden".  Brisard Dec. at ¶ 53.

> According to well established evidence, including a letter from the UBS to the Swiss anti money-laundering authority, Yeslam Bin Laden and Usama Bin Laden were signatories on a UBS account from 1990 until 1997.  I was recently able to review the opening of account forms in the French judge's office and I fully confirm under penalty of perjury that both Yeslam Bin Laden and Usama Bin Laden had been granted individual authority on UBS account # CO-565167.  This account was maintained until October 9, 1997, more than 6 years after the first country issued an arrest warrant against Usama Bin Laden and more than one year after the US government had publicly recognized him as financier of Islamic terrorism.  Brisard Dec. at ¶ 54.

Defendant has the audacity to try and distance himself for purposes of this Court's jurisdiction despite his making public offers to pay for the legal defense of his famous terrorist brother should he ever be caught as recently as six months ago.  Brisard Dec. at ¶ 59; "Usama bin Laden's half-brother will pay to defend terror mastermind if he's ever captured" Associated Press, July 3, 2005; "Osama's brother offers to pay for defence," Pak Tribune July 5, 2005.  Flowers Dec., Ex. M.

### 2.     The Various Criminal Investigations into Yeslam Binladin's Activities Continue

Yeslam claims that he has never had any assets frozen nor bank accounts seized. He neglects to disclose, however, that public records support Plaintiffs' allegations that Swiss authorities raided and seized documents from Yeslam's four Swiss residences and from nine of his Swiss companies. Defendant attempts to claim that because Swiss authorities have yet to bring a criminal proceeding against Yeslam that he is innocent. First, anyone monitoring the Moussaoui trial can attest to the speed of criminal investigations. Second, the standard for civil liability is far lower than the standard for a Swiss prosecution. Lastly and most importantly, the reason Defendant can claim he has not been criminally indicted to date in Switzerland is that he has exchanged his cooperation for the Swiss version of a non-prosecution agreement or plea deal in the United States. The evidence points to the reasonable inference that Yeslam has offered his cooperation in exchange for a non-prosecution agreement. Moreover, the very document that Yeslam claims holds him harmless in the Swiss criminal prosecution of the financing of al Qaeda does not state that he has been cleared permanently; it states "[u]p till today," it had not instituted such action. Yeslam Binladin Aff., Ex. 7.

Yeslam is currently under intense criminal investigations for his financing of terrorism in France, Italy, Netherlands, Switzerland and the U.S. Brisard Dec. at ¶ 47, 48.

The former editor of the French publication *Le Monde,* Guillame Dasquie provides a statement that confirms that both the CIA and the Swiss intelligence services were investigating Yeslam's "hidden ties with his brother Osama Bin Laden." Exhibit N to Flowers Dec., Statement of Guillame Dasquie, 1/19/06, and Article "U.S. Pressure on Bin Laden's brother" Intelligence Online, 12/21/01. Mr. Dasquie affirms the contents of his original articles that after the Cole bombing "the U.S. intelligence community considers there are links – notably financial

– between the Saudi Investment company [SICO] and the terrorist chief [OBL]."  According to Mr. Dasquie, when he became aware of Yeslam's attempts to gain dual citizenship in Switzerland in 2000, he was informed that the "CIA at the American Embassy in Bern was interceding on this file with the Swiss administration based on the fact that Yeslam Binladin, via the actions of his various activities – of which SICO was the most visible element – kept hidden ties with his brother Osama Bin laden."  Dasquie Statement at 2.  Dasquie goes on to report that he was informed that these activities included the purchase of arms for extremists in Afghanistan.  *Id.*, at 3.

Defense counsel for Yeslam argue that the facts as alleged by are so false, inconsequential or inconclusive as to warrant dismissal.  Apparently their client, Mr. Binladin felt differently in that he apparently attempted to sue counsel for Plaintiffs in Swiss Courts for just serving him with the 12(e) allegations at issue – as ordered by this Court – while he was proceeding *pro se*.

These are not differences in law or legal interpretation.  These are factual issues.  The ultimate determination of which version of the facts is true is premature, improper and erroneous at this stage.  A determination of whether sufficient minimum contacts exist is a fact question.  *See Kulko v. California Superior Court*, 436 U.S. 84 (1978)*; Hanson v. Denckla,* 357 U.S. 235 (1958); *Burger King v. Rudzewicz,* 471 U.S. 462 (1985).   "[A]ffidavits are insufficient to determine the facts unless, like the summary judgment, they disclose that no genuine issue as to a material fact exists." 1 Stephenson, Conn.Civ.Proc. (2d Ed. 1982 Sup.) § 108d p. S 73.  "'In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.' *Goldberg v. Kelly* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970)."  As the Southern District put it, "vigorous

denials of the truth, sufficiency, and the particularity of the claims as pleaded" are not sufficient nor appropriate nor an "appropriate vehicle by which to decide what fundamentally are factual disputes" under Rule 12. *Arden Way Associates v. Boesky*, 664 F.Supp. 855, 857-858 (S.D.N.Y. 1987). In a similar context in a case involving a dispute over an assertion of qualified immunity citing the Second Circuit, a N.Y. Court found that where "the affidavits and documents in the record demonstrate that there are sharp factual disputes regarding these [core] issues . . . [and] the parties have submitted conflicting evidence [on] potential liability . . .  the question of whether the appellants are entitled to qualified immunity cannot be resolved on the present record and must await discovery or, if necessary, a plenary trial." *Stipo v. Town of North Castle*, 205 A.D.2d 608, 609 (N.Y.A.D. 1994) (citations omitted). Where there is a factual dispute, the issues should be resolved only following discovery; *see also In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493 (S.D.N.Y. 1987).

Plaintiffs have alleged, and have demonstrated through *prima facie* evidence a good faith basis for Yeslam to be a party to this lawsuit. He has engaged, and continues to engage, in material support of his brother Osama Bin Laden. He has systematic and continuous contacts with the United States. Defendant's claim that he had no knowledge of the terrorist intentions of Osama Bin Laden is refuted by Plaintiffs' allegations, the public record, his own public statements, the Brisard Dec. at ¶ 56 and the Affidavit of Carmen Bin Ladin at ¶¶ 30, 39, 40.

### E. THE DEFENDANT'S ATTACKS ON JEAN-CHARLES BRISARD ARE UNFOUNDED

In response, Yeslam chooses to attack one of his favorite subjects, French investigator and counter-terrorism expert Jean-Charles Brisard. Yeslam completely misstates the nature of the Swiss prosecutor's relationship with Jean-Charles Brisard, and the various legal actions that Defendant has attempted to intimidate him. Brisard Dec. at ¶¶ 69-78. As Brisard states:

"Yeslam has engaged in a ruthless campaign to harass and intimidate me."  Brisard Dec. at ¶ 76. Nevertheless, Yeslam has <u>lost</u> every action he has lodged against him.  Brisard Dec. at ¶ 75.

Mr. Brisard and his publisher were never "forced" to remove sections from Mr. Brisard's book as Yeslam asserts.  Brisard Dec. at ¶¶ 72-74.  Nor was Mr. Brisard in any way implicated in the "leaking" of any documents:  "I have never been accused of having wrongfully leaked investigative materials to MDL Plaintiffs' counsel by any Court.  On the contrary, I've won a case where Yeslam Binladin wrongfully accused me of having leaked investigative materials." Brisard Dec. at ¶ 71, *see also Id. at ¶¶* 69-78.

### 1.      Yeslam's Argument About his "Half" Brothers is Unfounded

Despite Yeslam's attempts to align himself with three of his "half" brothers for purposes of dismissal in this Motion, Yeslam is simply not in same position as other Bin Laden family members previously dismissed by this Court any more than Osama Bin Laden is covered by those rulings.  Memo at 1.  The allegations here are different and distinct from the prior ruling on Yeslam's brothers.[8]  Moreover, the "half-brother" distinction is meaningless.  As Carmen Bin Ladin states:

> The bin Laden family including Yeslam and Osama were very close.  In spite of Yeslam's recent claims, and based on my experiences in Saudi Arabia, there is no distinction in Saudi society between "half" brothers.  Consistent with this practice, Yeslam and Osama have never treated one another as "half" brothers. . . . The family bonds of the bin Laden family are extremely close.

Carmen Aff. at ¶¶ 30, 40.

Three and a half years have passed since the filing of the initial lawsuit.  Plaintiffs have not had access to discovery and have been forced to rely on public records and private investigations to piece together the case against this Defendant.  Defendant's suggestion that the

---

[8] Plaintiffs in no way concede that the Court was correct in its application of the pleading standard as to these three members of the Bin Laden clan.

only investigation involved in this case is that of Jean-Charles Brisard is both presumptuous and incorrect.  In return for actually investigating the facts, counsel for Plaintiffs' are met with Defendant's counsel's unprofessional and unfounded accusation of Plaintiffs veracity.  Meanwhile, Yeslam has attempted to deceive this Court has to his true contacts with the United States.

### F.   SWISS LAW DOES NOT PREVENT YESLAM FROM APPEARING BEFORE THIS COURT

Yeslam argues to this Court that only the Swiss Court can possibly police his conduct; yet he argues to the Swiss Court that only the Saudi Arabia legal system can police his conduct.  These and other similar discrepancies are significant for purposes for Yeslam's Motion.  As Jean-Charles Brisard explains:

> Yeslam Bin Laden claims that article 129-1 of the Private International Law of Switzerland - Switzerland's Federal Code on Private International Law (CPIL) of December 18, 1987 - denies jurisdiction of US courts over him.  Brisard Dec. ¶ 5.  As noted in his filing, Yeslam Bin Laden refers only to general principles of the law and not to specific jurisdictional rules.  For example, paragraph 3 of the law provides that "If several defendants can be sued in Switzerland and if the claims are based essentially on the same facts and grounds, an action may by brought against all of them before any judge having jurisdiction; the judge before whom suit is first brought shall have exclusive jurisdiction…."  Article 133 b-2 of the same law finally provides, in the case of an absence of a choice of law, that "If the tortfeasor and the injured party do not have their place of habitual residence in the same State, the claims shall be governed by the law of the State in which the tort was committed."[9]

Brisard Dec. at ¶ 6, emphasis in original.  The notion that Yeslam can only answer to a Swiss court is ridiculous.  As Carmen Bin Ladin points out, Yeslam only became a Swiss citizen in 2001, despite having lived there for years.  As Osama's terrorist attacks against the west intensified and were publicized it became important for Yeslam to obtain Swiss citizenship.  This is evidence that Yeslam was aware of Osama's threat to the West.

---

[9] **http://www.umbricht.ch/pdf/SwissPIL.pdf**

> In our two decade marriage, Yeslam was never interested in becoming a Swiss citizen. As I am Swiss, it would have been very easy for him to attain this citizenship earlier, during our marriage. Nevertheless, he remained uninterested until after bin Laden's attacks against the West. Yeslam became a Swiss citizen in May of 2001 – four months before the September 11th attacks.

Carmen Aff. at ¶ 36. He could have become a Swiss citizen long before he finally did in early 2001, but instead moved to do so in 2000 and was initially denied and appealed. *See* Dasquie Statement, Flowers Dec., Ex. N. The Swiss may offer him immunity from prosecution there, but they simply do not have the power to determine this jurisdiction of the U.S. courts.

### G. THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THE COURTS' CASE MANAGEMENT ORDERS

Like other defendants in this case, Defendant Yeslam can't make up his mind whether Plaintiffs have pled too many details or too few – he argues simultaneously that Plaintiffs have failed to apprise him of the nature of the allegations against him and also that the very pleadings that contain the details of those allegations should be deemed false. Plaintiffs' amended pleadings – which gather into one place all of the allegations against all of the defendants in each action – comply with both the letter and spirit of Case Management Order #2. Yeslam is not prejudiced by any perceived technical non-compliance and indeed, he does not even contend otherwise.

As the Court will remember, Case Management Order #1 permitted Plaintiffs to add defendants without pleading specific allegations against those defendants; the order then permitted any defendant as to whom the complaint contains no allegations to seek a "more definite statement," specifying the nature of the claims asserted. Case Management Order #2 ("CMO #2) then expanded on this procedure, providing:

> Plaintiffs may file more definite statements and/or additional allegations against existing defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to previously filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint.

CMO #2, ¶ 13.  The order then required Plaintiffs to gather all such more definite statements into a single document and to "file an amended complaint that includes all amendments made prior to that date, whether made pursuant to Rule 12(e) or otherwise."  *Id.*  The order further provided for the filing of RICO Statements in accordance with this Court's Individual Practices.  As a result, the pleadings against each Defendant were scattered over various documents filed over time on different days, in complaints, more definite statements, and RICO Statements.[10]  Pursuant to the Court's directive, Plaintiffs' final amended pleadings, filed on or about September 30, 2005, incorporated all of these various filings into consolidated documents.  Although Plaintiffs in the various cases took different approaches to the requirements of CMO #2, all of the amended pleadings complied with the Order and none should be stricken.[11]

Yeslam's argument that this Court should disregard all of the allegations contained in the amended pleadings represents a return to a gamesmanship approach to pleading that, as the Second Circuit has recognized, the Federal Rules of Civil Procedure reject.  Rather, "the purpose of pleading is to facilitate a proper decision on the merits."  *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 906 (2d Cir. 1977), *quoting Conley v. Gibson*, 355 U.S. 41, 48 (1957); *see also Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities").  Plaintiffs' amended pleadings and RICO Statements contain

---

[10] *All* of the RICO Statements are without a doubt part of the pleadings, not merely those in *Federal* filed pursuant to this Court's CMO #2, as Yeslam would have it. *See McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 WL 293683, * 2 n. 3 (S.D.N.Y. March 27, 2001); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).

[11] Plaintiffs in *Burnett*, *EuroBrokers*, and *World Trade Center Properties* each filed a "Notice of Consolidated Pleading" incorporating by reference all of the previously-filed amendments to their respective complaints.  Each such document "includes all amendment made prior to" the requisite date, just as required by the Court.  More important, the "Notice of Consolidated Pleading" permits each defendant to find in a single place all of plaintiffs' allegations. The approach taken by the plaintiffs in *New York Marine* and *Continental* achieves precisely the same result.

allegations that should not be disregarded by this Court simply because Yeslam does not like how they are organized.

## III.   PLAINTIFFS' PLEADINGS SUFFICIENTLY STATE CLAIMS AGAINST YESLAM BINLADIN UNDER 12(B)(6)

The Plaintiffs have alleged a lengthy and detailed factual basis for apprising Defendant of the claims against him.  In summary, Plaintiffs have alleged as to Yeslam that:

The Mohammed Binladin Organization (or "MBO") is a wholly-owned subsidiary of SBG.  *Burnett* 3AC ¶ 325, *WTC Properties* ¶ 638; *Federal* RICO Ex. A, p. 8.

At all relevant times, Yeslam Binladin was on the Board of MBO.  *WTC Properties* Complaint ¶ 657; *Federal* RICO Ex. A, p. 8.

Yeslam owns property in the United States and has significant contacts with and presence in the United States.  *WTC* and *Euro Brokers* RICO Statements, filed 5/10/05, Exhibit A, *Burnett* MDS, ¶ 1, filed 3/21/05; *Federal* RICO Ex. A, p. 12.

Yeslam Binladin is an international businessman who runs SICO, among other businesses, that does business in the United States.  *WTC* and *Euro Brokers* RICO Statements, Exhibit A, *Burnett* MDS ¶ 3.

SICO received funding from SBG.  *Id.*, *Burnett* MDS at ¶ 6; *Federal* RICO Ex. A, pp. 1-2.

Yeslam Binladin was the co-signatory with Osama Bin Laden on a Swiss bank account between 1991-1997.  *Id., Burnett* MDS at ¶ 7; *Federal* RICO Ex. A, p. 8.

According to U.S. investigators, Osama Bin Laden received funds from two accounts at Deutsche Bank in Geneva, Switzerland held in the names of Cambridge Engineering and the Saudi bin Ladin Group.  *Id, Burnett* MDS, ¶ 8; *Federal* RICO Ex. A, p. 8.

Yeslam Binladin was the account manager for both accounts and nearly $300 million was transferred through that account.  *Id., Burnett* MDS ¶ 8; *Federal* RICO Ex. A, p. 8.

Yeslam is under investigation for suspicion of money laundering based on suspicious activity reports filed by banks in the U.K., France, and the British Virgin Islands.  *Id., Burnett* MDS ¶ 9; *Federal* RICO Ex. A, p. 9.

Through the use of joint accounts and wire transfers, Yeslam had provided material support to Osama Bin Laden. *Id., Burnett* MDS ¶ 11, *Federal* RICO Ex. A, p. 10.

Yeslam has been providing financial support to Osama for a long period of time. *Id., Burnett* MDS ¶ 4.

Yeslam Bin Laden was aware he was providing material support through his financial dealings to Osama Bin Laden, and with knowledge of his brothers intentions and goals, he continued to provide support to OBL. *Id., Burnett* MDS ¶¶ 18-19; *Federal* RICO Ex. A, p. 12.

The Plaintiffs have sufficiently alleged a claim against Yeslam pursuant to Fed.R.Civ.P. 12(b)(6).

### A.   PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT

Under the ATA, Yeslam is liable if he provided material support to al Qaeda with knowledge of its terrorist agenda or if he aided and abetted al Qaeda or Osama Bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002). Yeslam argues that Plaintiffs have failed to state claims against him because, he contends, Plaintiffs fail to allege any specific facts that could give rise to an inference that he knowingly and intentionally provided material assistance to al Qaeda. The complaints and RICO statements cited *supra* in footnote two demonstrate otherwise.

### B.   PLAINTIFFS STATE CLAIMS UNDER RICO

Plaintiffs' complaints and RICO Statements assert RICO claims against Yeslam pursuant to 18 U.S.C. §§ 1962 (c) and (d). The enterprise – the "al Qaida movement" - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. *See WTC Properties* RICO Statement 5(b); 5(f); 5(g). Its well documented purpose is to perpetrate acts of terrorism. *See WTC Properties* RICO Statement ¶¶ 8, 14; *Federal* RICO Statement ¶ 6. Thus, Plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576,

583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints and RICO Statements similarly allege sufficient involvement by Yeslam in the enterprise to sustain claims under both §§ 1962 (c) and (d). A plaintiff asserting a civil claim under § 1962 (c) must allege that the defendant participated in the operation or management of the enterprise. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). To sustain a claim under § 1962 (d), the plaintiff must allege that the defendant was a "central figure" in the underlying scheme. *Id*. at 165. However, "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'" *United States v. Louie*, 625 F. Supp. 1327, 1333 (S.D.N.Y. 1985) (*citing* 18 U.S.C. § 1962(c)).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994).

Here, the plaintiffs have satisfied these pleading standards. Plaintiffs allege that Yeslam set up U.S. corporations and that these organizations carried out a calculated global campaign to transfer assets in support of.  Thus Yeslam's role in raising and laundering money for al Qaeda satisfies the 1962(c) operation or management test. *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir. 1988); *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987); *State of New York v. O'Hara*, 652 F. Supp. 1049, 1053 (W.D.N.Y. 1987).

### C.   PLAINTIFFS STATE CLAIMS UNDER THE ATCA AND THE COMMON LAW

Yeslam argues that alien plaintiffs' claims under the ATCA should be dismissed because

ATCA does not create secondary liability among private actors. Memo at 25. This Court has already rejected this argument, noting in *In re Terrorist Attacks on September 11* that "courts, including the Second Circuit, have almost unanimously permitted actions premised on a theory of aiding and abetting and conspiracy." 349 F.Supp.2d at 826, *citing Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 311 (S.D.N.Y. 2003). Thus, this Court has concluded, "the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here." 349 F.Supp.2d at 826.

Finally, Plaintiffs properly pled intentional tort claims because the conduct of Yeslam in setting up corporations for the purpose of providing financial material support to Osama Bin Laden was, in fact, "extreme and outrageous"; suggestions to the contrary are offensive to any civilized standard of outrage. Moreover, there can be no doubt that, in setting up vehicles for the support of al Qaeda, Yeslam was directing his conduct at the plaintiffs, as citizens and/or residents of the United States, because the target of Osama's terrorist agenda was well known at the time Yeslam was creating entities to provide funding and other financial services for him.[12]

## IV.   CONCLUSION

Plaintiffs' allegations and the *prima facie* showing presented herein make clear that their arguments are well-founded and must be decided, by making ultimate determinations regarding complex factual disputes. The law provides that the facts are to be construed in the favor of the Plaintiffs at this point in the proceeding. There can be no serious contention that this motion is justified under the existing allegations against Yeslam and the *prima facie* showing of jurisdiction presented herewith. Defendant's Motion to Dismiss, therefore, should be denied.

---

[12] Plaintiffs recognize that they do not now state claims against Defendant under the Torture Victims Protection Act because they have not alleged that he acted under color of law. *See In re Terrorist Attacks on September 11*, 349 F.Supp.2d at 828. Plaintiffs further recognize, but respectfully disagree with, this Court's prior holdings concerning the intentional tort claims of the *Federal* and *WTCP* plaintiffs and the negligence claims of the *Federal* and *N.Y. Marine* plaintiffs. *See id.* at 829, 831.

Dated: New York, NY                          Respectfully submitted,
          February 3, 2006


/s/_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
Justin B. Kaplan, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
112 Madison Avenue
New York, NY 10016
Telephone:  (212) 784-6400

Plaintiffs' Executive Committee
on behalf of *Burnett*, *WTCP, Euro Brokers*, *Continental*,
*N.Y. Marine* and *Federal* Plaintiffs