**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to AL AQSA ISLAMIC BANK** |

*This document relates to:*           *Federal Insurance Co. v. al Qaida*
                                                   03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO AL AQSA ISLAMIC BANK

       Based on information currently available, and pursuant to the Case Management Order dated June 15, 2004, plaintiffs submit this RICO statement for defendant Al Aqsa Islamic Bank.

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.      The name of the defendant to whom this RICO statement pertains is Al Aqsa Islamic Bank, a/k/a Al Aqsa Al-Islami Bank.  The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable.  All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.      (a)  list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; |

|  | NY CLS Penal § 125.25(xi) |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Al Aqsa Islamic Bank | Al Aqsa Islamic Bank conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Al Aqsa Islamic Bank | Al Aqsa Islamic Bank undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support each supplied. |

| | | |
|---|---|---|
| early 1990s to 9/11/2001 | Al Aqsa Islamic Bank | Al Aqsa Islamic Bank agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

   (c)  not applicable

   (d)  No.

   (e)  No.

   (f)  The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

   (g)  The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.   (a)  The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

   (b)  The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Al Aqsa Islamic Bank fit

neatly into this framework by raising and providing funds and banking services for and otherwise providing material support for al Qaida, Hamas and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c) No.

    (d) Al Aqsa Islamic Bank is associated with the Enterprise.

    (e) Al Aqsa Islamic Bank is a member of the Enterprise, and are separate and distinct from the Enterprise.

    (f) Al Aqsa Islamic Bank intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.    The pattern of racketeering activity conducted by Al Aqsa Islamic Bank is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Aqsa Islamic Bank furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.    The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.    The Enterprise, and the racketeering activities conducted by Al Aqsa Islamic Bank rely heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  <u>See Rasul v. Bush</u>, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.    The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14.    The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Al Aqsa Islamic Bank, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Al Aqsa Islamic Bank  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Al Aqsa Islamic Bank  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Aqsa Islamic Bank  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Al Aqsa Islamic Bank also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|

| | |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.    Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Aqsa Islamic Bank | Al Aqsa Islamic Bank is the banking arm of Hamas, the radical Palestinian terrorist organization which has its shared fundraising networks with and collaborated with Al Qaida on passport forgery and other schemes designed to support global terrorism. Al Aqsa's notorious support for international terrorism led to its designation by the U.S. government under Executive Order 13224, blocking its U.S. assets and denying its access to American markets. | 1962(a), 1962(c), 1962(d) |
| | Al Aqsa Islamic Bank was formed in 1998, in Al-Beireh in the West Bank, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were the Dallah Al Baraka Group (DABG) and the Jordan Islamic Bank. | |
| | Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al-Aqsa, according to Al-Aqsa's acting general manager, Mohammed Sarsour. In a statement, DABG chair Saleh Abdullah Kamel acknowledged that DABG owns another 12 percent. | |
| | Since 1998, Israel has refused to approve the bank, citing its obvious ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country even visited Citibank's headquarters in New York — Al Asqa's correspondent in the United States — to warn its directors of the nature of the bank's activities. | |
| | According to the Israelis, financial support for Hamas was largely derived from the U.S.-based Muslim charity Holy Land Foundation | |

for Relief and Development into Al Aqsa Islamic Bank. Because of their links to global terrorism, on December 4, 2001, the assets of Al Aqsa Islamic Bank, Holy Land Foundation and Beit el-Mal Holdings were frozen by the United States pursuant to Executive Order 13224. According to the Department of the Treasury statement:

"Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit el-Mal, and the two share senior officers and directors. In addition, a majority of its shareholders and senior officials have ties to Hamas. Individuals associated with the Bank have been previously arrested and charged with financing Hamas activities in the Middle East. Soon after the bank opened in 1998 its connection to Hamas extremists became evident and a number of banks refused to clear its transactions."

Assets of Beit El-Mal Holdings (translated, "the house of money"), a 20% shareholder, were frozen as well. The White House fact sheet stated that:

"Beit el-Mal Holdings is a public investment company with locations in East Jerusalem, the West Bank, and the Gaza strip. Although its stated business activities are making loans and investing in economic and social development projects, Beit el-Mal has extensive ties to Hamas. The majority of its founders, shareholders, and employees are associated with Hamas. Persons identified with Hamas hold a majority of the company's stock, and it has invested in projects in Gaza and the West Bank that are owned or managed by Hamas activists. Beit el-Mal transfers money to and raises funds for associations that the Palestinian Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas."

According to the May 18, 2004 testimony of Steven Emerson, Executive Director of The

Investigative Project, before House Financial Services Subcommittee on Oversight and Investigations, Al Aqsa Islamic Bank plays a crucial role in terrorist money laundering and banking:

"In 1997 $30 million vanished from a Hamas-controlled bank account in Europe. In response, and to protect its remaining and future assets, Hamas established Al Aqsa Islamic Bank that year. Hamas was also operating through another bank, Beit al-Ma'al, for many of its transactions, and al-Aqsa Bank was not used as a conduit until 1999, after Israeli authorities closed down Beit al-Ma'al. Al-Aqsa then became a means of circumventing Israeli prohibitions on the activities of Beit al-Ma'al, and a means of evading banking regulations in general. Beit al-Ma'al invested $4,000,000 in al-Aqsa Bank.

"After Israel banned al-Aqsa/Beit al-Ma'al's operations, Hamas again bypassed Israeli restrictions and made its funds accessible to Hamas operatives in Israel and the territories by embarking on joint projects with Citibank, intertwining itself with Citibank's Israel division. As part of that relationship, monies deposited into al-Aqsa accounts in Europe or the Middle-East became accessible from Israel through Citibank.

"Israeli counterterrorism officials met with Citibank executives in January 2001 when Citibank sought to expand its operation in Israel. A Citigroup executive then sent a letter requesting guidance from the U.S. Treasury to Richard Newcomb, Director of the Office of Foreign Assets Control (OFAC), saying "Let me be clear: Citibank would never knowingly do business with a terrorist organization.""

Since the U.S. designations, the assets of Al Aqsa Islamic Bank have also been frozen in countries as diverse as Canada, Italy, Turkey, India and Japan, all on account of the bank's support for international terrorism.

That Hamas and al Qaida are linked entities

9

cannot seriously be questioned.  Indeed, a 1998 Department of Defense Intelligence Report discussing al Qaida's strategies and objectives confirms that al Qaida cooperates with Hamas on logistical and financial fronts in furtherance of their common interests, stating that Al Qaida's goal was to "establish a worldwide Islamic state capable of directly challenging the U.S., China, Russia, and what it views as Judeo-Christian and Confucian domination" by a variety of means, including a policy of providing "coordination and financial support" to a variety of terrorist organizations, specifically including Hamas ("Khamas") in Palestine, the National Islamic Front in Sudan and cells around the world.

Such shared and overlapping fundraising and money laundering infrastructure and support between Hamas and al Qaida has been confirmed by various international investigations, some of the conclusions of which are detailed in the following paragraphs excerpted from Plaintiffs' First Amended Complaint With Incorporated More Definite Statements, RICO Statements And Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2:

Paragraph 53: "Defendant, HAMAS, is a designated FTO, pursuant to §219 of the Immigration and Nationality Act, as amended by the Anti-terrorism and Effective Death Penalty Act of 1996.  HAMAS operates in concert, conspires, exchanges material support and resources, and is otherwise affiliated with al Qaida."

Paragraph 146: "The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida.  In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and

Washington based charities and for-profit enterprises within the SAAR Network. Through that investigation, the details of which are further discussed herein, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaida and Hamas."

Paragraphs 228-229: "The ongoing investigation of the SAAR network entities, which prompted the March 2002 searches, has revealed that SAAR entities' funds have been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under Executive Order 13224 based on their material support and sponsorship of al-Qaida. The funds were transferred through Bank al-Takwa and Akida Bank Private Ltd., two Bahamas based banks controlled by Nada and Nasreddin. Both of those banks have been designated by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including Hamas and al Qaida, both before and after the September 11th attack.

"The ongoing investigation of the SAAR Network has also revealed that SAAR entities, including the U.S. branch of the IIRO and Sana-bell, Inc., engaged in financial transactions with Bait Ul-mal, Inc., (BMI, Inc.) an Islamic investing firm established by defendant Soliman Biheiri in New Jersey in 1996. According to federal authorities, BMI and its affiliates have transferred funds to terrorists and terrorist organizations, including al Qaida, Yasin al-Qadi, Musa Abu Marzook, Mohammad Salah and Hamas."

Paragraph 266: "Bank Al Taqwa, for which Nasreddin is a Director, was established in 1988 with significant backing from the Muslim Brotherhood. They have been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al

Qaida organization.  Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada Management Organization.  In 1997, it was reported that the $60 million collected annually for Hamaas was moved to Bank Al Taqwa accounts.  As of October, 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his al Qaida organization received financial assistance from Youssef M. Nada."

Paragraphs 360-361: "Arab Bank also maintains accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others. The Kingdom of Saudi Arabia uses these accounts to fund al Qaida operations, and as the principal vehicle for supporting Palestinian suicide attacks.

"More recently, Israeli officials seized funds associated with several accounts maintained by Arab Bank on behalf of known Hamas fronts. These accounts were identified to Israeli officials by Arab Bank employees, confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity."

Al Aqsa Islamic Bank knowingly, for a period of many years, was a part of the shared financial and logistical infrastructure which supported al Qaida and Hamas.  Absent the material support and sponsorship provided by Al Aqsa Islamic Bank to the Enterprise, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level.