**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT**<br>**applicable to AL BARAKA BANCORP** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                        03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO AL BARAKA BANCORP

       Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Al Baraka Bancorp, a/k/a "Al Baraka Bankcorp".

       Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.      The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.      The name of the defendant to whom this RICO statement pertains is Al Baraka Bancorp. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.      Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.      The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.      (a)  <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
|---|---|
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Al Baraka Bancorp | Al Baraka Bancorp conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Al Baraka Bancorp | Al Baraka Bancorp undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s | Al Baraka Bancorp | Al Baraka Bancorp agreed to form and associate itself with the Enterprise and |

| | | |
|---|---|---|
| to 9/11/2001 | | agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.        (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Al Baraka Bancorp fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c)  No.

(d)  Al Baraka Bancorp is associated with the Enterprise.

(e)  Al Baraka Bancorp is a member of the Enterprise, and are separate and distinct from the Enterprise.

(f)  Al Baraka Bancorp intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.  The pattern of racketeering activity conducted by Al Baraka Bancorp is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.  The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Al Baraka Bancorp furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.  The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.  The Enterprise, and the racketeering activities conducted by Al Baraka Bancorp, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.  Not applicable.

12.  Not applicable.

13.  The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14.  The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Al Baraka Bancorp, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist

training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Al Baraka Bancorp.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Al Baraka Bancorp.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Al Baraka Bancorp.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Al Baraka Bancorp also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.   As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.   Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.   Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.   pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |

| V | Intentional and Negligent Infliction of Emotional Distress |
|---|---|
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |
| XII | Punitive Damages |

20.   Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Al Baraka Bancorp | Headquartered in Chicago, Al Baraka Bancorp is the U.S.-based wholly-owned subsidiary of defendant Al Baraka Investment & Development Corporation, which itself is a wholly owned subsidiary of defendant Saudi Dallah Al Baraka Group LLC ("DABG"), based in Jeddah, Saudi Arabia<br><br>DABG is at the center of a complex banking system through which, beginning in the early 1980s, radical Islamist elements within Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical brand of Islam at the heart of the al Qaida ideology. Endowed with enormous funding, Saudi Dallah Al Baraka Group LLC gave extensive support for radical Islamic causes.<br><br>DABG itself has long provided financial support and other forms of material support to terrorist organizations including the al Qaida movement. DABG conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. DABG conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>DABG itself is a diversified conglomerate based in Jeddah, Saudi Arabia. The group includes Al Baraka Bancorp and twenty-two other banks mostly located in the Arab and Islamic countries, in addition to several investment and financial companies. | 1962(a), 1962(c), 1962(d) |

This company was established in 1969 by defendant Sheikh Saleh Abdullah Kamel.

Upon information and belief, one of Al Baraka Bancorp's fellow subsidiaries, Saudi Dallah Al Baraka Group LLC Avco, directly financed some of the September 11th hijackers.

According to senior officials within the United States government, the Joint Congressional Inquiry into the September 11th attack revealed that a Saudi intelligence official named Omar al Bayoumi provided direct assistance to Kalid al-Midhar and Nawaf Al Hazmi, two of the September 11th hijackers. When al-Midhar and Al Hazmi arrived in Los Angeles, Al-Bayoumi, a Saudi citizen and prominent member of San Diego's Muslim community, traveled to Los Angeles to meet them. Immediately before doing so, Al-Bayoumi visited the Saudi consulate in Los Angeles. At the consulate, Al-Bayoumi met with Fahad Al-Thumairy, a Saudi diplomat who was stripped of his diplomatic visa and later barred from the United States, based on suspected ties to terrorism. Following their meeting, Al-Bayoumi facilitated the future hijackers' settlement in the San Diego community, and paid two months rent for an apartment on their behalf. According to various sources, Al-Bayoumi is an intelligence agent of the Kingdom of Saudi Arabia. There is substantial credible evidence to support this conclusion. In or around 1994, Al-Bayoumi was hired by Saudi Dallah Al Baraka Group LLC Avco, a division of the DABG al-Baraka business group, to work on an aviation project commissioned by the Saudi government. Al-Bayoumi remained in the employment of Saudi Dallah Al Baraka Group LLC Avco for the next seven years.

For five of those seven years, the Saudi government reimbursed Saudi Dallah Al Baraka Group LLC Avco for Al-Bayoumi's salary and Al-Bayoumi was considered a Saudi civil servant. Mysteriously, although the project for which Al-Bayoumi was allegedly

hired was based in Saudi Arabia, Al-Bayoumi moved to the United States in August 1994 and began taking English classes at San Diego State University's College of Extended Studies. Saudi Dallah Al Baraka Group LLC Avco records indicate that, as of 1999, Saudi Dallah Al Baraka Group LLC Avco sought to terminate Al-Bayoumi's annual employment contracts. To that end, a Saudi Dallah Al Baraka Group LLC Avco official wrote to the Saudi aviation authority saying "the company is not willing to renew the period for another year and we wish this to be known." In response, the aviation authority sent an urgent letter advising Saudi Dallah Al Baraka Group LLC Avco that the Saudi government wanted Al-Bayoumi's contract renewed "as quickly as possible."

Witnesses have reported that Al-Bayoumi had access to "seemingly endless" funds while in the United States. In fact, despite the modest salary he was paid as a Saudi Dallah Al Baraka Group LLC Avco employee, Al-Bayoumi was able to front $400,000 for the purchase of a mosque. The Joint Inquiry's investigation also revealed that Al-Bayoumi received monthly checks in January 1999 from Princess Haifa, wife of Prince Bandar, through an intermediary named Osama Basnan. Some of the money Al-Bayoumi received from Princess Haifa ended up in the hands of the two September 11th hijackers.

As the Wall Street Journal reported, "U.S. intelligence and counterterrorism officials say they have information linking the [Saudi Arabian] Dallah al Baraka Group to transactions by al Qaeda and other extremist groups. One U.S. official said al Qaeda is suspected of using the banking services of one of the group's biggest subsidiaries, the Jidda-based al Baraka Bank, which has offices across the Middle East and Asia. Officials wouldn't give specific information about what transactions caught their interest. But Dallah's chairman, Saleh Abdullah Kamel, is a

longtime investor in a Sudanese bank used during the 1990s by al Qaeda." (Wall Street Journal, November 2, 2001).

Headed by defendant Kamel, Al Baraka Bank is a wholly owned subsidiary of DABG. Al Baraka Bank has for many years knowingly maintained accounts for many of the so-called charities that operate within al Qaida's infrastructure. Al Baraka Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts.

Al Baraka Bank investments include forty-three (43) subsidiaries which are mainly banks in Arab and Islamic countries. Al Baraka Bank has knowingly maintained accounts for many of the alleged charities which operate within the Al Qaida infrastructure.

A memo from the Russia Federations Security Service details the role of Al Baraka in funding Al Haramain, another co-defendant in this case. Aqeel al-Aqeel, Al Haramain's chairman, confirmed the use of Al Baraka by Al Haramain by stating that Al Haramain maintained accounts at Al Baraka Bank in Saudi Arabia. Al Baraka facilitates the fundraising efforts by the Enterprise.

Al Baraka Bank has advertised and does advertise the existence of and the numerical designations of the accounts it maintains for the alleged charities throughout the Muslim world and provides a mechanism for Al Qaida supporters to deposit funds directly into those accounts. These accounts that are maintained by Al Baraka Bank have been used to transfer funds to support the cells of the Enterprise. For example, it was reported by the Bosnian Intelligence Agency that Al Baraka Bank provided support to Al Haramain. This memorandum was titled "Some illegal activities of humanitarian organizations

investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina: Records available for 1998 show a flow of money into the so-called operating account of the Humanitarian Organizations at the Deposti Bank, Sarajevo, from the main account, sent from Saudi Arabia via the Deutsche Bank and the Al Baraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million]."

Al Baraka Bank had knowledge that the accounts it maintained were used to fund terrorism and the Enterprise. However, despite this knowledge, Al Baraka continued to maintain the accounts and thereby knowingly provided financial services and other forms of material support to the Enterprise.

Through this mechanism, Al Baraka Bank has facilitated al Qaida's fundraising efforts. The accounts maintained by Al Baraka Bank on behalf of the so-called charities have been used to transfer funds to al Qaida cells throughout the world. Despite its knowledge that the accounts it maintains were being used to fund terrorism, Al Baraka Bank has continued to maintain those accounts, and has knowingly provided financial services and other forms of material support to al Qaida.

Along with Kamel, Al Baraka Bank is also a shareholder in Tadamon Islamic Bank, which has long provided financial services and other forms of material support to al Qaida. Along with Kamel, Al Baraka Bank is an investor in Al Shamal Bank, along with Osama bin Laden, Omar Abdullah Kamel, al Faisal Islamic Bank and the Sudanese Government.

DABG was a founder of Al Aqsa Islamic Bank. Presently, DAGB directly owns 12% of Aqsa Islamic Bank. Since 1998, Israel refuses to approve the bank, citing its obvious ties with Hamas and acts of terrorism.

In addition, Kamel is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v Enaam Arnaout*, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

By both establishing its own financial institutions in under-regulated jurisdictions and fostering relationships with banks like Al

Baraka Bancorp and individuals and entities operating within the Islamic banking system like DABG that shared al Qaida's perverse worldview and were willing collaborators in al Qaida's global *jihad*, al Qaida was able to gain access to the international banking system and conceal the illicit nature of the transactions that it conducted through that system.

The financial institutions established by al Qaida and its partner banks within the Islamic banking system operated as fully integrated components of al Qaida's financial and logistical infrastructure. These banks knowingly maintained accounts for individuals and organizations operating within al Qaida's infrastructure, and facilitated transfers between those entities. Once funds had been deposited with or laundered through one of the banks operating within al Qaida's infrastructure, al Qaida could move funds throughout the world by exploiting correspondent banking relationships.

Absent the material support and sponsorship provided by banks and individuals within the Islamic banking system like Al Baraka Bancorp, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level.