UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to DALLAH AVCO TRANS ARABIA** |

*This document relates to:*   *Federal Insurance Co. v. al Qaida*
                             03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO DALLAH AVCO TRANS ARABIA

  Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Dallah Avco Trans Arabia.

  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is Dallah Avco Trans Arabia. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| | |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) <br> 18 U.S.C. § 2339A <br> 18 U.S.C. § 2339B <br> 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Dallah Avco Trans Arabia | Dallah Avco Trans Arabia conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Dallah Avco Trans Arabia | Dallah Avco Trans Arabia undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s | Dallah Avco Trans Arabia | Dallah Avco Trans Arabia agreed to form and associate itself with the Enterprise and |

2

| | | |
|---|---|---|
| to 9/11/2001 | | agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

  (c) not applicable

  (d) No.

  (e) No.

  (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

  (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

  (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Dallah Avco Trans Arabia fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

    (c) No.

    (d) Dallah Avco Trans Arabia is associated with the Enterprise.

    (e) Dallah Avco Trans Arabia is a member of the Enterprise, and is separate and distinct from the Enterprise.

    (f) Dallah Avco Trans Arabia intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Dallah Avco Trans Arabia is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Dallah Avco Trans Arabia furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Dallah Avco Trans Arabia, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Dallah Avco Trans Arabia, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

       The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

       The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Dallah Avco Trans Arabia.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Dallah Avco Trans Arabia.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Dallah Avco Trans Arabia.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Dallah Avco Trans Arabia also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |

5

| | |
|---|---|
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.    Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Dallah Avco Trans Arabia | Dallah Avco Trans Arabia ("Dallah Avco") is a wholly owned subsidiary of defendant Saudi Dallah Al Baraka Group LLC ("DABG"), specializing in aviation services. The company was formed in 1975 and is based in Jeddah, Saudi Arabia. | 1962(a), 1962(c), 1962(d) |
| | Many of the allegations against Dallah Avco stem from the actions of its Assistant to the Director of Finance, Saudi national Omar Al Bayoumi. Bayoumi lived in the United States from the mid 1990s until 2001, moving to San Diego after years working in the Saudi Ministry of Defense and Aviation. | |
| | Al Bayoumi moved to the United States in 1994. Documents show that Omar Al Bayoumi was initially hired for an aviation project by order of the Saudi government. For seven years, he worked for the finance department of a Saudi Civil Aviation Presidency project called Air Navigation Systems Support (ANSS). The project was managed by Dallah Avco, which for five of the seven years was reimbursed by the government agency for Al Bayoumi's salary. | |
| | Al Bayoumi's work on the ANSS project started in June 1995, when he was hired as a senior data-processing technician at the direction of the aviation authority. He was paid SR11,546 (approximately $3000 U.S. dollars) monthly. Still, according to *Newsweek*, "He also seemed to have access to an unlimited supply of cash. One day he arrived at a local mosque, plunked down a check for $400,000 and bought it. He explained that he was acting as the agent of a wealthy Riyadh | |

businessman." The Joint Congressional Inquiry into the Terrorist Attacks on September 11, 2001 similarly concluded that Al Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."

His employment through Dallah Avco was deemed a "ghost job" by observers. During his "employment" at Dallah Avco, Al Bayoumi reportedly showed up for work only once. In September 1998, the FBI opened a counterterrorism investigation on Al Bayoumi, which discovered that he was in contact with several other people being investigated for terrorist support. After a search of Al Bayoumi's residence, the FBI concluded that "he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist." The inquiry into Al Bayoumi was closed for unknown reasons in 1999.

Several FBI officials involved in the investigation into the September 11 attack concluded that Omar Al Bayoumi was an al Qaida advance man who helped lay the groundwork for the Sept. 11, 2001, attacks in New York City and Washington. The *Los Angeles Times* reported that Al Bayoumi's source of employment was something of a mystery: "He told people he was a student of international business, but it seemed unlikely because he was already 40 years old and he never went to school. He didn't work, either. He explained that by telling some people he received a monthly stipend from his former employer, an aviation company in his native Saudi Arabia, and telling others he had a Saudi government scholarship."

Al Bayoumi gave direct assistance to two of the 9/11 hijackers, Nawaf al Hazmi and Khalid al Mihdhar. Starting in early 2000, Al Hazmi and Al Mihdhar received funding from Al Bayoumi, who shared his home with them and paid their house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a

suspect wanted by the FBI in connection with the September 11 attacks.

Al Bayoumi was well-known in San Diego's Muslim community, and used his influence to help the two future hijackers acclimate to the area. Among other things, Al Bayoumi threw a welcome party for them when they first arrived and found and paid for apartments and other lodging for them.

Al Bayoumi asked several people to assist the future hijackers with translation and other matters. Those approached include material witness Mohdar Abdallah, a former San Diego State student from Yemen who awaits sentencing for immigration violations.

The FBI also found that his salary while working for the Saudi Aviation Authority was approved by al Qaeda.

Al Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

Al Bayoumi left the United States two months before the Sept. 11 attacks and moved to England. Based on evidence that Al Bayoumi had provided funds and logistical support to the September 11 hijackers, British authorities arrested him in the wake of the attack. According to *Newsweek:*

> Two months before September 11, al-Bayoumi suddenly left San Diego and moved to study in Birmingham, England. On Sept. 20, he was picked up by New Scotland Yard and extensively interrogated by British and U.S. officials. Al-Bayoumi claimed he had helped Alhazmi and Almihdhar in the spirit of Muslim brotherhood, and said

he had no idea they were terrorists. Al-Bayoumi insisted that he had met the two men by accident when he happened to overhear them speaking in Arabic at a restaurant near the Los Angeles airport. But the congressional report notes that one FBI source recalled that al-Bayoumi said he drove to Los Angeles that day "to pick up visitors." . . . One former top FBI official who helped oversee the al-Bayoumi investigation went one step further: "We firmly believed that he had knowledge [of the 9/11 plot]," he told NEWSWEEK, "and that his meeting with them that day was more than coincidence."

Under apparent pressure from the Saudi Embassy in London, British authorities released Al Bayoumi, and he is now believed to be back in Saudi Arabia.

\* \* \*

In sum, Dallah Avco served as a front for al Bayoumi, an al Qaida conspirator who participated directly in the preparations for the September 11th Attack and materially assisted two of the September 11th hijackers. Al Bayoumi used his ostensible employment with Dallah Avco as a cover for his illicit activities, and employed the funding he received from Dallah Avco to advance al Qaida's conspiracy to attack America.

Moreover, the evidence confirmed that Dallah Avco was specifically aware of al Bayoumi's illicit conduct at all times material hereto. In fact, al Bayoumi's immediate supervisor in the United States at one point complained that al Bayoumi should be fired for failing to show up for work. However, superiors in Saudi Arabia immediately affirmed that al Bayoumi must remain on the payroll despite the fact that he performed no work relevant to the project.

Dallah Avco is by no means the only company with the DABG network to be implicated in material sponsorship of al Qaida. In fact,

|  | DABG is at the center of a complex banking system through which, beginning in the early 1980s, radical Islamist elements within Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical brand of Islam at the heart of the al Qaida ideology. Endowed with enormous funding, Saudi Dallah Al Baraka Group LLC gave extensive support for radical Islamic causes. |  |
|---|---|---|
|  | DABG itself has long provided financial support and other forms of material support to terrorist organizations including the al Qaida movement. DABG conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. DABG conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. |  |
|  | DABG itself is a diversified conglomerate based in Jeddah, Saudi Arabia. The group includes Dallah Avco Trans Arabia and twenty-two other banks mostly located in the Arab and Islamic countries, in addition to several investment and financial companies. |  |
|  | This company was established in 1969 by defendant Sheikh Saleh Abdullah Kamel. |  |
|  | Headed by defendant Kamel, Al Baraka Bank is a wholly owned subsidiary of DABG. Al Baraka Bank has for many years knowingly maintained accounts for many of the so-called charities that operate within al Qaida's infrastructure. Al Baraka Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts. |  |
|  | Al Baraka Bank investments include forty-three (43) subsidiaries which are mainly banks in Arab and Islamic countries. Al Baraka Bank |  |

| | has knowingly maintained accounts for many of the alleged charities which operate within the Al Qaida infrastructure. | |
| --- | --- | --- |
| | A memo from the Russia Federations Security Service details the role of Al Baraka in funding Al Haramain, another co-defendant in this case. Aqeel al-Aqeel, Al Haramain's chairman, confirmed the use of Al Baraka by Al Haramain by stating that Al Haramain maintained accounts at Al Baraka Bank in Saudi Arabia. Al Baraka facilitates the fundraising efforts by the Enterprise. | |
| | Al Baraka Bank has advertised and does advertise the existence of and the numerical designations of the accounts it maintains for the alleged charities throughout the Muslim world and provides a mechanism for Al Qaida supporters to deposit funds directly into those accounts. These accounts that are maintained by Al Baraka Bank have been used to transfer funds to support the cells of the Enterprise. For example, it was reported by the Bosnian Intelligence Agency that Al Baraka Bank provided support to Al Haramain. This memorandum was titled "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina: Records available for 1998 show a flow of money into the so-called operating account of the Humanitarian Organizations at the Deposti Bank, Sarajevo, from the main account, sent from Saudi Arabia via the Deutsche Bank and the Al Baraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million]." | |
| | Al Baraka Bank had knowledge that the accounts it maintained were used to fund terrorism and the Enterprise. However, despite this knowledge, Al Baraka continued to maintain the accounts and thereby knowingly provided financial services and other forms of material support to the Enterprise. | |

|  | Through this mechanism, Al Baraka Bank has facilitated al Qaida's fundraising efforts. The accounts maintained by Al Baraka Bank on behalf of the so-called charities have been used to transfer funds to al Qaida cells throughout the world. Despite its knowledge that the accounts it maintains were being used to fund terrorism, Al Baraka Bank has continued to maintain those accounts, and has knowingly provided financial services and other forms of material support to al Qaida.<br><br>Along with Kamel, Al Baraka Bank is also a shareholder in Tadamon Islamic Bank, which has long provided financial services and other forms of material support to al Qaida. Along with Kamel, Al Baraka Bank is an investor in Al Shamal Bank, along with Osama bin Laden, Omar Abdullah Kamel, al Faisal Islamic Bank and the Sudanese Government.<br><br>DABG was a founder of Al Aqsa Islamic Bank. Presently, DAGB directly owns 12% of Aqsa Islamic Bank. Since 1998, Israel refuses to approve the bank, citing its obvious ties with Hamas and acts of terrorism.<br><br>In addition, Kamel is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US |  |

government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v Enaam Arnaout*, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

By both establishing its own financial institutions in under-regulated jurisdictions and fostering relationships with banks like Dallah Avco Trans Arabia and individuals and entities operating within the Islamic banking system like DABG that shared al Qaida's perverse worldview and were willing collaborators in al Qaida's global *jihad*, al Qaida was able to gain access to the international banking system and conceal the illicit nature of the transactions that it conducted through that system.

The financial institutions established by al Qaida and its partner banks within the Islamic banking system operated as fully integrated components of al Qaida's financial and logistical infrastructure. These banks knowingly maintained accounts for individuals and organizations operating within al Qaida's infrastructure, and facilitated transfers between those entities. Once funds had been deposited

|  | with or laundered through one of the banks operating within al Qaida's infrastructure, al Qaida could move funds throughout the world by exploiting correspondent banking relationships.<br><br>Absent the material support and sponsorship provided by banks and individuals within the Islamic banking system like Dallah Avco Trans Arabia, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. |  |
|---|---|---|