UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to SANA-BELL, INC.** |

*This document relates to:*  *Federal Insurance Co. v. al Qaida*
                             03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO SANA-BELL, INC.

Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Sana-Bell, Inc. ("Sana-Bell").

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1. The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2. The name of the defendant to whom this RICO statement pertains is Sana-Bell, Inc. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3. Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4. The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5. (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| | |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Sana-Bell | Sana-Bell conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Sana-Bell | Sana-Bell undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Sana-Bell | Sana-Bell agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple |

2

|  |  | acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6. (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Sana-Bell fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

3

  (d) Sana-Bell is associated with the Enterprise.

  (e) Sana-Bell is a member of the Enterprise, and is separate and distinct from the Enterprise.

  (f) Sana-Bell intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Sana-Bell is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Sana-Bell furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Sana-Bell, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Sana-Bell, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

  The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

> The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Sana-Bell. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Sana-Bell. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Sana-Bell. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Sana-Bell also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |

| XI | Negligence |
|---|---|
| XII | Punitive Damages |

20. Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Sana-Bell, Inc. | Sana-Bell Inc. was incorporated in the District of Columbia and operated in Herndon, Virginia. Sana-Bell was established to generate funds for and funnel funds to the IRO, the United States arm of defendant International Islamic Relief Organization, through which millions were to go to Al Qaida and related organizations. As part of the SAAR Network/Safa Group of organizations, it disbursed at least $3.7 million to Al Qaida over the years.<br><br>**The Sana-Bell/IIRO/BMI Relationship**<br><br>In the summer of 1985, soon after his arrival in the United States, Egyptian national Soliman Biheiri first met Sulaiman Al-Ali, the eventual executive officer of IIRO/IRO's U.S. branch. Sulaiman Al-Ali was very familiar to Biheiri because he had given lectures in Muslim conventions and conferences in the United States. They developed both a personal and business relationship. Al-Ali frequently acted as a consultant to Biheiri's BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia. During this time, Biheiri paid "tens of thousands" of dollars to Al-Ali, and has testified that the "assistance he gave me on occasions, introducing BMI Finance and Investment Group to important institutions, important personalities. And when that resulting in any business for BMI Finance and Investment Group, we have paid him a fee. You can call it a commission or a fee, but that is how it is."<br><br>At the beginning of 1989, during a visit to the U.S., Al-Ali told Biheiri of his plans to move | 1962(a), 1962(c), 1962(d) |

permanently to the United States and establish IRO, a non-profit organization, which would be headquartered in Virginia as the U.S. branch of the IIRO. He further told him that he was also involved in forming a D.C. nonprofit corporation to be named **"The Sana-Bell, Inc."** which "would act as a funding source for IRO**."** According to Dr. Al-Ali, he was or would be a founding member of the Board of Directors of Sana-Bell, Inc.  Officials believe that the U.S. Sana-Bell branch was part of a global effort to manage the IIRO's assets through an international endowment fund known as the Sanabel-al-Kheer.

In July 1991, Sulaiman Al-Ali moved to the U.S. and established IRO as a Virginia corporation. He told Biheiri that through Sana-Bell, IRO had received a $10,000,000 donation from the International Islamic Relief Organization (IIRO) located in Jeddah, Saudi Arabia. According to Al-Ali, he was to invest that money through Sana-Bell, and then use the return of the income generated from these investments to cover the costs of IRO's operations.

This then also became tied in with the SAAR Network of entities.  M. Yaqub Mirza is, or has been, an officer and/or director of twenty-nine SAAR Network Entities, including Sana-Bell (of which he was an officer and director) and maintained signatory authority over seventeen different bank accounts associated with fifteen different SAAR Network Entities. (Mirza is also the first organizer of the U.S offices of Muslim World League, notorious for its close association with and support of al Qaida.)  Section VI of Sana-Bell's articles of incorporation further indicate that upon dissolution, Sana-Bell's assets were to be distributed to several SAAR-related organizations.

**Sana-Bell's "Investments"**

From 1992-98, Mirza invested $3.7 million of

Sana-Bell money with Soliman S. Biheiri into BMI. BMI then transferred the funds for terrorists including Yassin al Kadi, the head of Muwaffaq/Blessed Relief, a charity involved in funneling millions of dollars to Osama Bin Laden and al Qaida (as well as a BMI Founder), and funds transferred from BMI to al Qaida may have been used to finance the 1998 embassy bombings in Africa. According to FBI agent Robert Wright, the founders of BMI include SDGT's Musa Abu Marzook (a Hamas leader) Al-Kadi and two Bin Laden brothers.

Through Mirza, Sana-Bell knowingly and intentionally provided al Qaida financial support through this $3.7 million transfer to Biheiri, and Mirza himself handled that $3.7 million transfer from 1992- 1998 even after al Qaida publicly declared war on America.

As of February 2000, Sana-Bell had only made a total of four investments. Significantly, there was never a meeting of either Sana-Bell's Investment Committee or the Board of Trustees to discuss or formally approve any of these investments. The four were as follows:

- Property at 360 S. Washington St. in Falls Church, Virginia where Al-Ali established IRO's office. For a number of years, Sulaiman Al-Ali and IRO managed the office building on the property at 360 S. Washington St. Al-Ali signed leases on behalf of Sana-Bell, Inc. and collected the rent. IRO and Al-Ali occupied the third floor of the building for only "nominal rent," resulting in Sana-Bell's inability to cover the building's carrying costs from the building's rental income. The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sana-Bell paid cash for the building and, therefore, had no mortgage expenses associated with the building. Its only carrying costs were real estate taxes, utilities, and maintenance. The decision to

9

|  | charge IRO only a nominal rent, insufficient to permit Sana-Bell to cover its costs through the building's rental income, was never the subject of a Trustee meeting, an Investment Committee meeting.<br><br>• Residential real estate building lots in Prince Georges County, Maryland for which BMI Real Estate and Development, Inc. (BMI REDI) acted as a general agent and a general contractor of houses. In mid-1993, Sana-Bell purchased 15 developed residential building lots in Prince Georges County, Maryland. At Al-Ali's suggestion, Sana-Bell entered into a management agreement with BMI REDI to build, market, and sell those houses for Sana-Bell's account. Al-Ali was Sana-Bell's only point of contact with BMI with respect to all matters relating to Sana-Bell's role in the project.<br><br>• 200 limited partnership units, valued at $1 million, in BMI Leasing Limited Partnership (BMI Leasing).<br><br>• 20 limited partnership units, valued at $1.1 million, in BMI Construction Fund Limited Partnership (BMI Construction).<br><br>All of BMI's dealings with respect to Sana-Bell were through Sulaiman Al-Ali at the IRO office at 360 S. Washington St. At Al-Ali's direction, all the tax matters were sent to Yaqub Mirza at his office at 555 Grove St. in Herndon, Virginia, headquarters of the SAAR Network of entities. According to Biheiri, Al-Ali located, negotiated, and decided what investments Sana-Bell would make "because the benefit of those investments were designed to go to IRO, and not to [Sana-Bell]. The building purchase was designed to benefit IRO, not Sana-Bell, D.C. [Sana-Bell] operated as a mere conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia."<br><br>In 1992, IIRO/IRO invested $2 million in BMI through Sana-Bell. By a subscription agreement executed on December 1, 1992, Sana-Bell purchased 20 units of limited |  |
|---|---|---|

10

partnership interests in BMI Construction Fund Limited Partnership of New Jersey (valued at $1.1 million). The declared purpose of the formation of the limited partnership with BMI Construction Fund was "acquiring and developing land and constructing dwellings for sale to the public at a profit."

By another subscription agreement executed by Sana-Bell on December 12, 1992, Sana-Bell purchased 200 units of limited partnership interests in BMI Leasing Limited Partnership, a New Jersey limited partnership. The declared purpose for the formation of the limited partnership with BMI Leasing was "purchasing and leasing capital equipment, instruments, machinery, vehicles, computers, office systems and related software to the public at a profit."

**The Lawsuit**

But the $2 million from Sana Bell soon disappeared from BMI's books. A month after the al Qaida embassy bombing in North Africa in August 1998, Sana-Bell filed suit against BMI in federal court in Maryland. Sana-Bell claimed that it had uncovered several accounting irregularities in BMI's financial records—including the disappearance of the $2 million. More specifically, Sana Bell alleged that BMI illegally disbursed Sana Bell's investment in BMI at the direction of IIRO/IRO officer Suliman Al Ali. Since Sana Bell was an operating subsidiary of IIRO/IRO, the plaintiff and the defendant in the case were essentially part of the same corporate entity. Sana Bell obtained a judgment of $2.3 million in the lawsuit but it never collected on its judgment. Federal investigators believe that IIRO/IRO's lawsuit was intended to create an explanation for the disappearance of the funds and conceal any financial ties between BMI and Islamic extremists.

Although the final destination of the $2 million is not clear, authorities believe that the end result of the transaction was Biheiri and Al-Ali liquidating and splitting the $2.1 million cash investment by Sana-Bell, Inc. at an

11

indeterminate time between 1996 and 1998 and never giving any form of compensation to Sana-Bell. Biheiri never attempted to contact anyone else affiliated with Sana-Bell to authorize or verify the changes authorized by Sulaiman Al-Ali.

**What is the IIRO?**

IIRO is an al Qaida "charity" front that knowingly and intentionally provided al Qaida funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.

Less than thirty percent (30%) of the funds distributed by IIRO go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaida. Not only did IIRO finance al Qaida, but IIRO also actively recruited and provided new personnel for al Qaida to carry out terrorist attacks against the United States, and IIRO bankrolled sanctuaries for al Qaida operatives around the world. Indeed, one of the September 11 hijackers declared that he worked for Fazeh Ahed of IIRO.

IIRO in Southeast Asia became a center of al Qaida financing activity – collecting, laundering, and providing funds for al Qaida operations against the United States, including al Qaida's 1993 World Trade Center bombing and the 1995 plot to blow up twelve American airlines.  After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government de-registered IIRO in Kenya.

After the September 11 attacks, Pakistan deported scores of IIRO workers who were "aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaida."  These official Government actions

| | confirm the open and notorious fact reported by the Arab publication *Rose Al-Yusuf* that "IIRO is firmly entrenched with Osama Bin Laden's al Qaida organization." | |
| --- | --- | --- |
| | In the United States, IIRO financed al Qaida terrorist attacks against America from IIRO's office in Virginia before, on, and after September 11, 2001. IIRO calls its Virginia office International Relief Organization ("IRO"). IRO and IIRO are the *same* entity. IIRO's Virginia office sends money back and forth between the Virginia Office and IIRO in Saudi Arabia. IIRO's Virginia office also sends money to related terrorist organizations targeting the United States. After the September 11 attacks financed by IIRO and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of al Qaida. | |
| | IIRO works with numerous other al Qaida affiliated charities. The U.S.-based Success Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz, an al Qaida financier. Success Foundation sends money back and forth from the United States to IIRO; the Success Foundation also sends money to terrorist organizations targeting the United States. | |
| | IIRO also provides financial support to the Saudi Joint Relief Committee, an al Qaida charity in Bosnia and elsewhere. | |
| | IIRO, through Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaida charity front. And IIRO provides funding for other al Qaida fronts posing as "humanitarian organizations" that have materially sponsored, aided and abetted and conspired with al Qaida to attack America, including: Global Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth. | |
| | IIRO's links to terrorism also extend through | |

Sana-Bell. Sana-Bell received and transferred funds on behalf of and as directed by IIRO. In the 1990's, IIRO and Sana-Bell spearheaded fundraising for the Bosnian Muslims. On 1996 U.S. tax forms, IIRO listed $4.5 million in total grants and allocations; $3.9 million went to "Emergency relief supplies (medical supplies) to International Islamic Relief in Bosnia."

**The Golden Chain**

Sana-Bell was founded by defendants Saleh Abdullah Kamel and Ibrahim Afandi. Both men are Saudi nationals who appear on a list of wealthy Al Qaida donors referred to by Al Qaida as the "Golden Chain." Golden Chain financiers donated funds earmarked for Osama Bin Laden directly and also through charities. Sana-Bell's Washington, D.C. branch was founded by two known al Qaida financiers, Saleh Kamel and Ibrahim Afandi. Yaqub Mirza is also listed as a founding trustee.

The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.

The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v Enaam Arnaout*,

14

| | | |
|---|---|---|
| | No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003). | |
| | The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm | |
| | Former al Qaida operatives have explained how Golden Chain financiers would donate funds earmarked for bin Laden by way of the Saudi evangelical charity the Muslim World League. Both Sana-Bell and IIRO are operational arms of the Muslim World League. | |
| | The Golden Chain was established at the time of al Qaida's formation in 1988; Sana-Bell's DC branch was organized only months later. | |
| | Absent the material support and sponsorship provided by banks and financial services companies within the Islamic financial system like Sana-Bell, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level. | |