# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACK
ON SEPTEMBER 11, 2001

Civil Action No. 03 MDL 1570 (RCC)
ECF Case

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-CV-6977

---

## REPLY MEMORANDUM OF LAW OF MUHAMMAD ASHRAF, M. OMAR ASHRAF, IQBAL UNUS, MOHAMMED JAGHLIT, AHMED TOTONJI AND YAQUB MIRZA IN FURTHER SUPPORT OF THEIR MOTIONS TO DISMISS PURSUANT TO RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM

---

Nancy Luque (NL-1012)
Jay Hanson (admitted *pro hac vice*)
Steven K. Barentzen (SB-8777)
**DLA PIPER RUDNICK GRAY CARY US LLP**
1200 Nineteenth Street, N.W.
Washington, DC  20036-2247
Tel: 202-861-3900
Fax: 202-223-2085

*Attorneys for Muhammad Ashraf, M. Omar Ashraf,
Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji and
Yaqub Mirza*

Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji and Yaqub Mirza (the "Moving Defendants"), by and through undersigned counsel, hereby submit this Reply Memorandum of Law in Further Support of their Motions to Dismiss the claims asserted against them by the *Ashton* Plaintiffs pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Plaintiffs assert that the Moving Defendants are liable for the September 11th attacks as a result of their alleged participation in the so-called "SAAR Network." But in support of this theory of liability, Plaintiffs offer up little more than the same allegations that the Court already has found "provided scant basis" for inferring the existence of a "SAAR Network." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 823 (S.D.N.Y. 2005) ("*In re Terrorist Attacks I*"). Further, Plaintiffs' particularized allegations against the Moving Defendants, like those the Court already found do not state claims in *Federal Insurance*, do not state claims here either because Plaintiffs fail to allege that any Moving Defendant knowingly engaged in any activity in support of Al Qaeda or the September 11th attacks. *See In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 569-72 (S.D.N.Y. 2005) ("*In re Terrorist Attacks II*").[1]

Because Plaintiffs have had an opportunity to amend their Complaint with the benefit of the Court's two opinions which detail precisely what Plaintiffs must allege to survive a motion to dismiss, Plaintiffs' claims should not only be dismissed, but dismissed with prejudice and without further leave to amend.

---

[1] In its September 21, 2005 Opinion, the Court dismissed claims against alleged "SAAR Network" Executives Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Yaqub Mirza and Taha Al-Alwani and Entities African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sterling Charitable Gift Fund, Sterling Management Group, Inc. and York Foundation in *Burnett*. The Court also dismissed the claims against International Institute of Islamic Thought in *Ashton* and *Burnett*, and Mar-Jac Poultry in *Ashton*, *Burnett* and *Federal Insurance*.

## ARGUMENT

I.  **PLAINTIFFS HAVE FAILED TO STATE CLAIMS
    AGAINST THE MOVING DEFENDANTS**

A.  **Yaqub Mirza**

Plaintiffs allege that Dr. Mirza is at the "financial center" of the so-called "SAAR

Network." (*Ashton* Plaintiffs' Memorandum of Law in Opposition To The Rule 12(B)(6)

Motion of SAAR Network Executives, MDL Docket # 1652 ("Plaintiffs' Opp.") at 7.)

Plaintiffs' allegations in support of this theory, however, are no different than those asserted by

the *Federal Insurance* Plaintiffs that the Court already has found do not state a claim against Dr.

Mirza.  For example, Plaintiffs allege that Dr. Mirza is the "predominant signatory" for the so-

called "SAAR Network" and had his house raided as part of the government's Operation

Greenquest.  (Plaintiffs' Opp., 6-8.)  But Plaintiffs do not allege what either the so-called "SAAR

Network" or Dr. Mirza did to knowingly aid Al Qaeda or cause the September 11th attacks.

Plaintiffs' allegations concerning Dr. Mirza's alleged involvement in the so-called "SAAR

Network" do not state a claim because they do not "adequately provide [Dr. Mirza] with notice

as to how [he] provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at

572.[2]

Plaintiffs also argue that Dr. Mirza should be liable because he was the Vice-President of

a company called Mena Estates[3] that, in February 2001, allegedly loaned $500,000 to purported

---

[2] Plaintiffs allege that Dr. Mirza was the secretary and treasurer of alleged "SAAR Network" member Muslim World League ("MWL") in Virginia.  (Plaintiffs' Opp., at 7.)  However, there is no allegation that Dr. Mirza allegedly did anything on behalf of the MWL, much less anything to knowingly and intentionally support Al Qaeda or the September 11th attacks.  In fact, Plaintiffs have not even alleged any actions taken by the Virginia office of the MWL to support Al Qaeda or the September 11th attacks.

[3] As noted in the Motion to Dismiss, none of the Plaintiffs in this MDL have brought claims against Mena Estates.

terrorist financier Youseff Nada.[4]  But Plaintiffs have not alleged -- as they must to state a claim -- that *at the time* of this loan Dr. Mirza knew that Nada was a financier of terrorism or that the purpose of the loan was to support terrorism.  Nada was not designated as a "Specially Designated Global Terrorist" ("SDGT") and alleged to be a financier of terrorism by the United States government until November 2001, after the September 11th Attacks.  There is nothing in the Complaint even suggesting that Dr. Mirza knew, or for that matter could of known, that Nada was a financier of terrorism at the time of the purported loan in February 2001, nine months prior to his designation.  Nor have Plaintiffs alleged that the loan was intended to support Al Qaeda or the September 11th attacks.

Moreover, Plaintiffs' assertion that Nada is a financier of terrorism is based upon his designation by the U.S. Government as a SDGT.  But serious questions remain as to the validity of this allegation.  Following his designation as a SDGT by the U.S. Government in November 2001, the Swiss Government[5] began its own investigation into the terrorism charges against Nada.  In June 2005, following a three and a half year investigation, the Swiss authorities concluded their investigation of Nada without bringing any charges against him.  (Declaration of Steven K. Barentzen, dated March 2, 2006, (the "Barentzen Decl.") at Exhibit A.)  This strongly suggests, notwithstanding Plaintiffs' bald assertions to the contrary, that there is little evidence, if any, connecting Nada to Al Qaeda or any terrorist activities.  Accordingly, Plaintiffs have not even alleged that Nada engaged in any terrorist activities, much less that Dr. Mirza knew of such

_____

[4] In support of this alleged loan, Plaintiffs cite to a document allegedly "recovered by US Officials in a March 2002 raid of the SAAR network premises." (Plaintiffs' Opp., at 5.)  Plaintiffs did not attach a copy of this document as an exhibit to the complaint or otherwise provide Defendants or the Court a copy of this document to permit an analysis of the validity of this allegation.  Moreover, Plaintiffs have not explained how they obtained a copy of  a document that was purportedly obtained Government during a confidential investigation.  As noted in the Motion to Dismiss, this investigation has lasted nearly four years, but has not lead to a single charge, indictment, conviction, designation or the freezing of a single asset or account.

[5] Nada apparently lives in Switzerland.

illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II,* at 564 (*citing Boim v. Quranic Literary Inst. and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1023-24 (7th Cir. 2002)).

Plaintiffs also allege that Dr. Mirza was an officer and director of Sana-Bell Inc., and that from 1992-1998, Sana-Bell invested $3.7 million with Soliman Biheiri.  Plaintiffs assert liability against Dr. Mirza because Mr. Biheiri allegedly transferred these funds – through a company called BMI – to Yassin al Kadi who then, through Muwaffaq/Blessed Relief, funneled the funds to Osama Bin Laden and Al Qaeda.  (Plaintiffs' Opp., at 7-8.)

This allegation fails to state a claim because it does not allege that *at the time of the alleged investments* in 1992-1998, Dr. Mirza *knew* that, or possibly could have known, that Soliman Biheiri was transferring funds to Yassin al Kadi or otherwise supporting terrorism. Plaintiffs assert that Soliman Biheiri is a "notorious al Qaeda financier."  (Plaintiffs' Opp., at 8.) But there is no factual support for this allegation.  To the contrary, the U.S. Government has investigated Mr. Biheiri for three years, and twice brought him to trial on various criminal charges.  But none of those charges were terrorism charges.  (Barentzen Decl., Exhibit B.)  It goes without saying that if there was any evidence that Mr. Biheiri is a financier of Al Qaeda, as Plaintiffs plead, that the government would have leveled those charges against him.  As with Nada, Plaintiffs simply have not alleged that Mr. Biheiri's engaged in any illegal activities, much less that Dr. Mirza knew of such illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities."  *In re Terrorist Attacks II*, at 564 (*citing Boim*, 291 F.3d at 1023-24).

Moreover, Plaintiffs have not alleged that, at the time of the alleged investments, Dr. Mirza *knew* that any of the funds Sana-Bell was allegedly investing with Biheiri were being

transferred to BMI, Yassin al Kadi or Muwaffaq/Blessed Relief. Moreover, that is no allegations that at that time Dr. Mirza *knew* of any illegal activities of BMI, Yassin al Kadi or Muwaffaq/Blessed Relief, or engaged in some action to assist them. Plaintiffs' allegations concerning Dr. Mirza's alleged role in Sana-Bell's alleged investment with Biheiri is simply too attenuated to state a claim against Dr. Mirza for the September 11th attacks.

Plaintiffs also allege that Dr. Mirza is an "officer and director of Sanabil al-Khair" which provides financing for IIRO which in turn supports al Qaeda. (Plaintiffs' Opp., at 8.) But, to state a claim against Dr. Mirza based on his status as an officer or director of Sanabil al-Khair, Plaintiffs would have to allege that Dr. Mirza knowingly and intentionally participated in some action on behalf of that entity for which it could be held liable for the September 11th attacks. Dr. Mirza is not alleged to have done anything for this entity. Rather his alleged liability is based solely on his status as an officer or director of the company, and that is insufficient to state a claim. *See Harlem River Consumer Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1271 (S.D.N.Y. 1976) ("A corporate officer or director is not liable for the illegal actions of others in the corporation merely by virtue of his position or office. He may become liable if he knowingly participates in such actions."); *see also In re Terrorist Attacks II*, at 567-68 (sustaining *Federal Insurance* complaint against Abdulrahman Alamoudi because those plaintiffs alleged that he "funneled money to al Qaeda through the charities with which he was involved," and dismissing claims of other plaintiffs who only asserted he was associated with certain entities).

Moreover even if Dr. Mirza did participate in some transfer of funds from Sanabil al-Khair to IIRO -- and there is no allegation that he did -- Plaintiffs' allegations would still fail to state a claim because they have not alleged, as they must, that Dr. Mirza *knew* that IIRO would

use those funds to finance Al Qaeda or the September 11th Attacks.

## B.   AHMED TOTONJI

Plaintiffs' claims against Dr. Totonji also predominantly concern his alleged involvement in the so-called "SAAR Network," and again, these generic allegations fail to state a claim because Plaintiffs have not alleged what acts undertaken by the "SAAR Network" or Dr. Totonji knowingly aided Al Qaeda or caused the September 11th attacks.  These allegations are not materially different from the allegations made by the *Federal Insurance* Plaintiffs against the other Moving Defendants and fail to state a claim because they do not "adequately provide [Dr. Totonji] with notice as to how [he] provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at 572.

Plaintiffs also argue that Dr. Totonji should be held liable for the September 11th attacks because he "signed checks that were issued to terror sponsoring organizations." (Plaintiffs' Opp., 12.)  But even if this allegation were true, it fails to state a claim because Plaintiffs have not alleged, as they must, that Dr. Totonji knew that the entities to which these the checks were written were terror sponsoring organizations.  In fact, Plaintiffs do not even identify these "terror sponsoring organization" or allege that they are organizations that sponsor Al-Qaeda or the September 11th Attacks.

Not all "terror sponsoring organizations" are linked to Al-Qaeda or are responsible for the September 11th Attacks.  Two alleged "terror sponsoring organization" are Hamas and the Palestinian Islamic Jihad, and neither Plaintiffs nor anyone else has alleged that these entities had anything to do with Al Qaeda or the September 11th attacks.  *In re Terrorist Attacks I*, at 833 ("Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11"); *In re Terrorist Attacks II*, at 571 (dismissing claims against IIIT because the

7

complaint did not allege that IIIT knew that the charities it allegedly financed "were Islamic
Jihad cells or whether and how these cells participated in or contributed to al Qaeda's agenda of
terror.") Because Plaintiffs do not specify the "terror sponsoring organizations" that Dr. Totonji
allegedly wrote checks to, this allegation can not possibly state a claim against him.

Plaintiffs also argue that Dr. Totonji "put forward personnel to Bank Al Taqwa."
(Plaintiffs' Opp., at 12.) But this oblique allegation is not found in the Complaint. What the
Complaint actually alleges is that Dr. Totonji "recommended" two "SAAR Network" officers to
Youseff Nada as prospective officers of Bank Al Taqwa. (Complaint, at ¶ 255.) The
"recommendation" of persons for employment falls far short of the provision of personnel
necessary to support an ATA claim pursuant to 18 U.S.C. § 2339A. Moreover, there is no
allegation that *at that time* of this alleged recommendation that Dr. Totonji knew Nada or Bank
Al Taqwa to be sponsors of terrorism. Indeed, as noted in the discussion above concerning Dr.
Mirza, Nada was not designated until *after* the September 11th attacks, and to this day there
remain serious questions whether he is a financier of Al Qaeda at all.[6] (*See supra.* at 4.)

Plaintiffs also allege that Dr. Totonji is "personally acquainted" with designated sponsor
of terrorism Ahmed Nasreddin. But this bare allegation of a vague "acquaintance" or
"relationship" does not provide Dr. Totonji with the requisite notice necessary to state a claim
against him. Plaintiffs have not alleged either that Dr. Totonji knew Nasreddin to be a financier
of terrorism -- Nasreddin was not designated until 2002 -- or that he took some act to support
Nasreddin. Again, Plaintiffs have failed to allege, as they must to survive a motion to dismiss,
that Dr. Totonji knew of al Qaeda's illegal activities, "desired to help those activities succeed,
and . . . engaged in some act of helping the illegal activities." *In re Terrorist Attacks II*, at 564

---

[6] Plaintiffs also allege that Dr. Totonji worked with Yousef Nada in the late 1970's or early 1980's. (Plaintiffs'
Opp., at 11.) But this allegation cannot possibly support a claim because Al Qaeda did not even exist at that time.

(*citing Boim*, 291 F.3d at 1023-24.)[7]

### C.   MOHAMMED JAGHLIT, MUHAMMAD ASHRAF, M. OMAR ASHRAF & IQBAL UNUS

Plaintiffs' allegations against Mohammed Jaghlit, Muhammad Ashraf, M. Omar Ashraf and Iqbal Unus fail to state claims because they are primarily generic allegations -- once again -- concerning their involvement in the so-called "SAAR Network" that do not "adequately provide [them] with notice as to how [they] provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, at 572.

Plaintiffs also allege that Muhammad Ashraf and Iqbal Unus worked with Youseff Nada and Ghaleb Himmat. (Plaintiffs' Opp., at 14-15.) The Complaint does not allege *when* Dr. Unus and Dr. Ashraf allegedly worked with these individuals, or *that at that time* that they knew that Nada and Himmat were financiers of terrorist activities. Indeed, as noted above, these individuals were not designated by the U.S. government until November 2001, and the Swiss government's investigation into Nada's alleged terrorist activities has been concluded without any action. (*See supra.* at 4.)

The allegation that Dr. Ashraf is "personally acquainted" with and "maintained relationships" with Nasreddin, without reference to any time frame, is also insufficient to state a claim. This bare statement concerning a vague "acquaintance" or "relationship" does not provide Dr. Ashraf with notice of the claim against him. Plaintiffs have not alleged either that Dr. Ashraf *knew* Nasreddin to be a financier of terrorism (Nasreddin was not designated until

---

[7] Plaintiffs also allege, for the first time and without any support, that Dr. Totonji founded a company called Gulf Chamber a.k.a. MIGA, a Specially Designated Global Terrorist, and that Dr. Totonji provided Nasreddin a power of attorney to run the company. (Plaintiffs' Opp., at n.3.) But this "allegation" is not found in the Complaint and therefore must be disregarded by the Court on this Motion to Dismiss. *In re Terrorist Attacks II*, at 564. Moreover, the allegation fails to state a claim against Dr. Totonji because it does not allege that Dr. Totonji had any knowledge of, or involvement in, any of the acts that led Gulf Chamber to be designated as a terrorist organization.

2002) or that he took some action to support Nasreddin in his alleged activities.  Again, Plaintiffs have failed to allege, as they must to survive a motion to dismiss, that Dr. Ashraf knew of al Qaeda's illegal activities, "desired to help those activities succeed, and . . . engaged in some act of helping the illegal activities."  *In re Terrorist Attacks II*, at 564 (*citing Boim*, 291 F.3d at 1023-24).

## II.     THE CLAIMS AGAINST THE MOVING DEFENDANTS ALL SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs had the opportunity to amend their complaint on September 30, 2005 with the benefit of the Court's September 21, 2005 Opinion and Order detailing precisely what they must allege to withstand a motion to dismiss.  It would be futile to provide Plaintiffs yet another opportunity to amend their pleading, as it is clear that if Plaintiffs could state a claim against the Moving Defendants they would have done so by now.

## CONCLUSION

For these reasons, the Moving Defendants respectfully request that the Court grant their Motions to Dismiss and dismiss all of the claims asserted against them in *Ashton* with prejudice.

Respectfully submitted,

Dated:   March 2, 2006

By:  /s/ Nancy Luque_____
Nancy Luque (NL-1012)
Jay Hanson (admitted *pro hac vice*)
Steven K. Barentzen (SB-8777)
DLA PIPER RUDNICK GRAY CARY US LLP
1200 Nineteenth Street
Washington, DC  20036-2247
Tel: 202-861-3900
Fax: 202-223-2085

*Attorneys for Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji and Yaqub Mirza*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March, 2006, I caused an electronic copy of the foregoing Reply Memorandum of Law in Further Support of Motions To Dismiss Of Muhammad Ashraf, M. Omar Ashraf, Iqbal Unus, Mohammed Jaghlit, Ahmed Totonji and Yaqub Mirza Pursuant To Rule 12(B)(6) For Failure To State a Claim to be served by the Court's electronic filing system upon all parties scheduled for electronic notice.

/s/  Steven K. Barentzen
Steven K. Barentzen (SB-8777)