**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to**<br>**YASIN ABDULLAH AL-QADI** |

*This document relates to:*　　　　　*Federal Insurance Co. v. al Qaida*
　　　　　　　　　　　　　　　　　03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO YASIN ABDULLAH AL-QADI

   Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Yasin Abdullah Al-Qadi (a/k/a "Yasin Al-Qadi", "Yasin Al-Kadi").

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is Yasin Abdullah Al-Qadi  The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable.  All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery.  Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) list of predicate acts and specific statutes violated:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |

| | |
|---|---|
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Yasin Abdullah Al-Qadi | Yasin Abdullah Al-Qadi conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Yasin Abdullah Al-Qadi | Yasin Abdullah Al-Qadi undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support he supplied. |
| early 1990s | Yasin Abdullah Al-Qadi | Yasin Abdullah Al-Qadi agreed to form and associate himself with the Enterprise and |

| to 9/11/2001 | | agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

(c) not applicable

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.    (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel. The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Yasin Abdullah Al-Qadi fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) Yasin Abdullah Al-Qadi is associated with the Enterprise.

(e) Yasin Abdullah Al-Qadi is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f) Yasin Abdullah Al-Qadi intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Yasin Abdullah Al-Qadi is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Yasin Abdullah Al-Qadi furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Yasin Abdullah Al-Qadi, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Yasin Abdullah Al-Qadi, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds and other support supplied by participants and conspirators like Yasin Abdullah Al-Qadi.  Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Yasin Abdullah Al-Qadi.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Yasin Abdullah Al-Qadi.  These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly.  Yasin Abdullah Al-Qadi also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party.  Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| I | Trespass |
|---|---|

| **II** | Wrongful Death |
|---|---|
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   Not applicable

**EXHIBIT "A"**

**RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Yasin Abdullah Al-Qadi | Yasin Abdullah Al-Qadi is one of Saudi Arabia's most prominent businessmen, and also one of al Qaida's chief global financiers. He is involved in a multitude of global business investments in a variety fields— including real estate, financial services, trading, manufacturing, healthcare, animation productions and the services sector, all of which spun off revenues that were directed towards al Qaida. Indeed, for a period of many years, Al-Qadi has used his global business interests and wealth to knowingly advance al Qaida's global jihad, as described in further detail below.<br><br>On October 12, 2001 according to Executive Order 13224, President George W. Bush designated Yasin Al-Qadi as a terrorist entity for financially supporting al Qaida. Al-Qadi's assets were frozen in the United States, Europe, Albania and Turkey.<br><br>Al-Qadi has spent his entire career intentionally surrounding himself with individuals who either participate in or financially support Islamic terrorism. He is firmly embedded in the Islamic terrorist financing community through his business investments as well as his professional and personal relationships. Indeed, Al-Qadi openly admits that he knows Osama Bin Laden and has met with him on several occasions. According to a 2004 report by the Office of Foreign Assets Control (OFAC) a letter found in 2002 that was addressed to Osama bin Laden referenced Al-Qadi's managing money for Bin Laden in Sudan. The letter also referred to Al-Qadi as one of Bin Laden's | 1962(a), 1962(c), 1962(d) |

former managers.

On September 21, 2005, The European Union and Commission of the European Communities refused to hear Yasin Al-Qadi's appeal against the freezing of his assets; holding that the European Community is obligated to adhere to the U.N. Security Council—which is outside EU jurisdiction and which supersedes the right of an individual (Al-Qadi) to have his case heard tried before the courts. Although the Court's decision initially appears to be based on the issue of jurisdiction, the EU justifies its ruling as an international security measure—"The applicants' interest in having a court hear their case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council." This decision is an implicit acknowledgement of Al Qadi's guilt.

Al-Qadi has knowingly provided material assistance to Islamic terrorist groups such as al Qaida, Hamas and terrorist outfits in Bosnia-Herzegovina and Albania through his involvement with the charities and corporations detailed below.

**Maram and Al Iman**

Bank records show that between January 1998 and August 1998 Al-Qadi transferred $1.25 million dollars to Maram, a Turkish travel and trading firm that has significant ties to al Qaida. Maram was founded in December of 1996 as an Istanbul travel agency by Mamduh Salim—a former al Qaida financial officer who is now serving time in a U.S. prison for his involvement in the bombing the U.S. Embassies in Kenya and Tanzania in August 1998. In 1997, all of Salim's shares in Maram were transferred to Wael Julaidan, a longtime friend of Al-Qadi, and his partner Mohamed Bayazid.

While Al-Qadi claims that his donation to Maram was used solely to aid in the

construction of Al Iman, a religious school in Yemen, Al Iman has extensive ties to Islamic militancy. Al Iman was founded by Sheikh Abdul Mejid Al Zindani. Zindani fought alongside Bin Laden in Afghanistan, leads the Yemen chapter of the Muslim Brotherhood and has been designated by the U.S. as an active supporter of terrorism. According the U.S. Treasury Department, all Al Iman students are "suspected of being responsible, and were arrested, for recent terrorist attacks, including the assassination of three American missionaries." John Walker Lindh, the American Taliban, is a former student of Al Iman.

**Wael Julaidan**

Al-Qadi's close friend, Wael Julaidan, is an associate of Osama bin Laden and a high ranking member of IIRO and the Muslim World League (MWL), both of which are front organizations for al Qaida. On September 6, 2002, the U.S. government designated Julaidan as a supporter of international terrorism and his assets were frozen. The U.S. Treasury Department asserts that Julaidan is "one of the founders of al Qaida."

Al-Qadi has had a close relationship with Julaidan since the early 1980's and has not only employed Julaidan but he has also provided him with personal and professional financial assistance.

Al-Qadi's main Albanian firm was Karavan Construction and Development. In 1996, Al-Qadi promoted Karavan's Egyptian engineer, Amr Abd' al-Wahab Selem al-Zaini to be the director of Karavan and Al-Qadi's financial representative in Albania. Al-Qadi had al-Zaini provide unlimited support to Julaidan during his visit to Albania for the Laprake hospital construction project in the late 1990's.

In another instance, Karavan provided aid to the Saudi NGO Saudi Joint Relief Committee (SJRC) for Kosovo. SJRC's Chief at the time was Julaidan.

Julaidan was provided an office in the Karavan corporate building. Al-Qadi and Julaidan were "involved in a small-scale travel company named Abrar of Saudi Arabia. The focus of this business was to provide services to Muslim pilgrims especially during the pilgrimage season (Hajj) and throughout the year, for minor pilgrimages."

Al-Qadi gave shares of a business he owned, KA Stan, to Julaidan as a "reward for the assistance he provide to [Al-Qadi's] charitable activities in Bosnia."

By his account, Al-Qadi helped fund housing units for the Al Eman University in Sanaa, Yemen, transferring $1.25 million between February 24, 1998, and August 3, 1998. He accomplished this transfer by sending money from the account of his company Karavan Development Group directly to Julaidan. The founder of Al Eman University, Sheikh Abdel Majid Zindani, was labeled as a SDGT by President Bush on February 24, 2004.

Al-Qadi also claims that Julaidan was entrusted with the implementation of "the University Housing Project" and executed the Project through Julaidan's company, Maram. Maram was responsible for executing a contract with another company, Vefa, which constructed the housing.

That Julaidan is a major Al Qaida supporter is clear. Julaidan publicly embraced the notion of jihad in forums for militant Islamic thinking. Wael Julaidan's photograph appears in the pages of *Al-Jihad Magazine*, a publication edited by Azzam, in a section discussing the reconstruction of Afghanistan. *Al-Jihad* was a publication of Mekhtab al Khidemat, a pre-Al Qaida group formed by Osama Bin Laden and Abdullah Azzam to support jihadi fighters in Afghanistan. Additionally, Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When

referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wael Julaidan."

According to U.S. officials, Julaidan's role in al Qaida is best described as a logistics chief, charged with the responsibility of moving people, ammunition and supplies from one place to another. Edward Turzanski, a national security analyst and political scientist at LaSalle University, states that capturing Julaidan would be—"like getting a hold of Al Capone's bookkeeper…He knows where all the accounts are, he knows where he spends his money, he knows who gets it."

Julaidan withdrew from graduate studies at the University of Arizona on March 20, 1985 and soon surfaced in Peshawar, Pakistan. Authorities claim that it was during his time in Peshawar that Julaidan became involved with the individuals that would eventual evolve into al Qaida, as he joined forces with bin Laden's mentor, the late Palestinian scholar Abdullah Azzam, in an organization referred to as the Alkifah Refugee Center. The group served primarily to provide financial and logistical support to the mujihadeen in Afghanistan.

Wael Julaidan headed the MWL in Peshawar and also served as the Secretary-General of the Rabita Trust, an operating division of MWL . The Rabita Trust had its assets frozen after it was labeled a Specially Designated Global Terrorist Entity by President Bush on October 12, 2001.

U.S. authorities have also alleged personal contacts between Julaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah. Under interrogation by U.S. authorities, the latter claimed that he accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Julaidan met personally with Usama bin Laden

and former Al Qaida military chief Mohammed Atef (a.k.a. Abu Hafs Al-Masri).

Julaidan also has extensive links to terrorist activity in Bosnia Herzegovina. A BBC report in April 2000 cited a confidential memo sent to UN police forces in Kosovo titled "Secret: US office only-Release to UNMIK." The document named MWL representative Wa'el Julaidan as an associate of Osama bin Laden and stated that Julaidan had directly assisted Bin Laden in moving "money and men to and from the Balkans."

Seik Ajadi, former director of the Saudi humanitarian organization Muwafaq's offices in Croatia and Bosnia Herzegovina, who also has been -- since October of last year -- on the list of those suspected of supporting terrorism, first registered Euroinvest--a construction, trade, import, and export company--as an individually owned company, and then as a corporation under the ownership of Sefik Ajadi and Yasin Kadi. In October 1997, Julaidan also became of a co-owner of this company with 10 percent of its capital. Local sources claim that Julaidan was authorized to withdraw money from the account of the Al Haramain humanitarian organization and that he was the supervisor of Saudi humanitarian aid in Bosnia Herzogovina. Therefore, it is very likely that most of the money Al Haramain invested into Euroinvest ended up in the hands of Islamic terrorists in Bosnia Herzegovina.

Julaidan also has ties to the Benevolence International Foundation (BIF), which was classified as a Specially Designated Global Terrorist by the U.S. Treasury Department on November 19, 2002.

Julaidan fought with bin Laden in Afghanistan in the 1980s. Julaidan is also associated with other individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Muhammad Atef; and the organizations: Makatab al Khidmat, the Rabita Trust, and Gama'at Al Islamiyya. These individuals and

entities have been previously designated under President Bush's Executive Order and by the United Nations.

**Mohamed Bayazid**

Julaidan's partner in Maram, Mohamed Bayazid, is also a member of al Qaida. The Justice Department believes that Bayazid is one of al Qaida's top leaders. In the East Africa bombing trial, a former member of al Qaida recalled how he once went with Bayazid and Mamdouh Mahmud Salim (who was convicted in the East Africa bombing trial) to receive a cylinder of purported uranium. Bayazid has publicly issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.  On September 9, 2001, Bayazid carried out a plan (along with Bin Laden, other al Qaida members, and other members of the Taliban) to assassinate Ahmed Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the Taliban for many years. Al Qaida terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmed Shah Masood, one of the suicide terrorists and other high ranking members of the Afghanistan Northern Alliance opposition forces.

**Qadi International and the Quranic Literary Institute**

Yasin Al-Qadi also owns a company named Al-Qadi International that has provided material assistance to Hamas.

According the affidavit of Immigration and Customs Enforcement Special Agent David Kane, the Vice President of Qadi International is Dr. Tareq Al-Swaiden. Al-Swaiden is a Kuwaiti businessman and lecturer who has several times publicly encouraged jihad against the U.S. and Israel and praised Palestinian

suicide bombers.

Al-Qadi was mentioned in a civil asset forfeiture proceeding in Chicago in 1998 as a result of a donation he made to an Islamic organization that was funding Hamas. In 1991, Qadi International donated $820,000 dollars to the Quranic Literacy Institute (QLI). The FBI claims that the Chairman of QLI, Ahmed Zaki, is a conduit for terror money, and in 2004, a federal jury ruling in the matter of *Boim v Quranic Literacy Institute* ordered QLI and three other defendants to pay $156 million to the family of an American teenager shot to death in Israel by Hamas on account of QLI's financing of terrorist activities.

QLI used Qadi's money to purchase several acres in Woodridge, a small town southwest of Chicago. In 1994 QLI sold the institute for more than the price of the initial purchase but never repaid Al-Qadi the $820,000 dollars. In 1998 QLI's assets were frozen by the government on the grounds that it was using the income generated by the Woodridge investment to finance a member of Hamas.

The Hamas operative in question is Mohammad Salah, an employee of QLI. According to an affidavit by FBI Agent Robert Wright, Salah received almost all of the $110,000 that the Woodridge property generated. Salah was arrested in 1993 and charged with being a member and financer of Hamas. Salah pled guilty in an Israeli court in 1995 and was sentenced to seven years in prison.

In addition to the $820,000 donation to QLI, Al-Qadi also used Qadi International to transfer money directly to Mohammed Salah. Bank records show that Al-Qadi sent $27,000 directly to Salah in March 1992. Qadi International also executed transfers of $107,000 and $60,000 to bank account number 8060700 of First National Bank of Chicago, which was held by Salah.

During the time period that Al-Qadi was

providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for Hamas. In August and September of 1992, Salah flew to the Middle East on a sixteen day trip to Israel and the Occupied Territories. During this trip, Salah funneled approximately $100,000 in funds to Hamas leader Mousa Abu Marzook. According to Salah, these funds were intended for and used for to purchase weapons to carry out specified terrorist actions against Israel.

Despite Al-Qadi's knowledge of Saleh's involvement with Hamas and the ultimate forfeiture case brought by the United States against QLI and Salah, Al-Qadi never attempted to reclaim the $820,000 provided to QLI for the land deal. Nor did he stop further payments to QLI. Indeed, he states that "following Mohammed Salah's arrest I had agreed to with Dr. Zaki to provide additional support directly to QLI." Al-Qadi further admits that "at the express request of Dr. Zaki, I transferred between 1991 and 1997, sums totaling $210,000 to Dr. Zaki for charitable purposes of QLI and for his own personal account." Al-Qadi's involvement with QLI continued through at least 2002.

### BMI

In the 1980's Soliman Biheiri established BMI Investments Services, Inc., which was the holding company for three occupational companies all located at the same address: BMI Real Estate Development, BMI Leasing and BMI Trade and Investment. Biheiri's intention was to use BMI Real Estate Development to "purchase residential lots, construct houses on those lots, and sell the newly constructed houses."

Until 1996, Al-Qadi was an investor in an Islamic Bank named Arabic Beit ul Mal (BMI) which shared offices with Al-Qadi's Qadi International in Secaucus, N.J. BMI's other investors included a Syrian Hamas leader named Mousa Abu Marzouk and Tarek Swaiden, an alleged member of the Muslim

Brotherhood.

BMI also has ties to the Bin Laden family. Defendant Abdullah Bin Laden invested a total of $500,000 with BMI Real Estate Development Limited Partnership and BMI Construction Fund Limited Partnership. Abdullah Bin Laden was also the incorporator and head of the United States branch of the Defendant World Assembly of Muslim Youth (WAMY) in northern Virginia. WAMY has extensive ties to Islamic terrorism and openly recruits and indoctrinates Muslim youth. According to the article "The Roots of Terror" dated December 5, 2002 and published on National Review online (www.nationalreviewonline.com), the WAMY book entitled *Islamic View* states:

"*Teach our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah.*"

According to FBI agent Robert Wright, a former BMI accountant contacted the FBI in 1999 and expressed concerns that his employer transferred money overseas to finance the "embassy bombings in Africa." Moreover, the 1996 IRS 990 form for IRO revealed that it donated $153, 768 to Mercy International, Canada. It came to light during the prosecution of the al Qaida operatives involved in the embassy bombings that Mercy International's Nairobi branch provided assistance in the attack. Additionally, a German intelligence report states that Mercy International is a front for the Muslim Brotherhood. Omar Al-Qadi, a member of Yasin Al-Qadi's family, is the director of Mercy International's U.S. branch.

BMI has ties to Islamic terrorism not only through its personal but also through its financial relations with the northern Virginia charity named International Relief Organization (IRO), the U.S. arm of the known al Qaida financer International Islamic Relief

Organization (IIRO).

**IIRO**

IIRO is an al Qaida "charity" front that knowingly and intentionally provided al Qaida funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President William Jefferson Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.

Less than thirty percent (30%) of the funds distributed by IIRO go to legitimate public works, the rest going toward the purchase of weapons by and for al Qaida. Not only did IIRO finance al Qaida, but IIRO also actively recruited and provided new personnel for al Qaida to carry out terrorist attacks against the United States, and IIRO bankrolled sanctuaries for al Qaida operatives around the world. Indeed, one of the September 11 hijackers declared that he worked for Fazeh Ahed of IIRO.

IIRO in Southeast Asia became a center of al Qaida financing activity – collecting, laundering, and providing funds for al Qaida operations against the United States, including al Qaida's 1993 World Trade Center bombing and the 1995 plot to blow up twelve American airlines.   After the 1998 U.S. Embassy bombing in Kenya, the Kenyan Government de-registered IIRO in Kenya.

After the September 11 attacks, Pakistan deported scores of IIRO workers who were "aiding, abetting, funding, otherwise conspiring with, sponsoring and/or supporting al Qaida."   These official Government actions confirm the open and notorious fact reported by the Arab publication *Rose Al-Yusuf* that "IIRO is firmly entrenched with Osama Bin

Laden's al Qaida organization."

In the United States, IIRO financed al Qaida terrorist attacks against America from IIRO's office in Virginia before, on, and after September 11, 2001. IIRO calls its Virginia office International Relief Organization ("IRO"). IRO and IIRO are the *same* entity. IIRO's Virginia office sends money back and forth between the Virginia Office and IIRO in Saudi Arabia. IIRO's Virginia office also sends money to related terrorist organizations targeting the United States. After the September 11 attacks financed by IIRO and others, the FBI raided IIRO's Virginia office seeking evidence documenting its support of al Qaida.

IIRO works with numerous other al Qaida affiliated charities. The U.S.-based Success Foundation, IIRO's sister company, is also funded by Khaled bin Mahfouz, an al Qaida financier. Success Foundation sends money back and forth from the United States to IIRO; the Success Foundation also sends money to terrorist organizations targeting the United States.

IIRO also provides financial support to the Saudi Joint Relief Committee, an al Qaida charity in Bosnia and elsewhere.

IIRO, through Osama's Bin Laden's brother-in-law Mohamad Jamal Khalifa, sponsors, aids and abets Benevolence International Foundation, the al Qaida charity front. And IIRO provides funding for other al Qaida fronts posing as "humanitarian organizations" that have materially sponsored, aided and abetted and conspired with al Qaida to attack America, including: Global Relief Foundation, Taibah International, Islamic African Relief Agency, and the World Assembly of Muslim Youth.

IIRO's links to terrorism also extend through Sana-Bell. Sana-Bell received and transferred funds on behalf of and as directed by IIRO. In the 1990's, IIRO and Sana-Bell spearheaded

fundraising for the Bosnian Muslims. On 1996 U.S. tax forms, IIRO listed $4.5 million in total grants and allocations; $3.9 million went to "Emergency relief supplies (medical supplies) to International Islamic Relief in Bosnia."

**Abrar Group International**

Al-Qadi is Vice Chairman of Abrar Group International. Abrar is headquartered in Stamford, Connecticut, has a strong presence in Malaysia and deals mainly in the financial service sector. The Abrar Group has been implicated in providing material assistance to Hamas through its financial dealings with IIRO/IRO and the Chicago, Illinois based Global Chemicals Inc.

According to FBI agent Valerie Donahue's 1997 affidavit, Abrar and IIRO/IRO jointly invested $2 million in Global Chemical Corp., which allegedly produced household and pool cleaning supplies. Abrar invested $250,000 by itself and $345,000 on behalf of one of its top clients. IIRO/IRO fronted the remaining amount of money, as two of its top officials owned 20% of Global Chemicals.

The president of Global Chemicals was Mohammed Mabrook, a Libyan immigrant who had worked for a pro-Palestinian group headed by Marzouk—the Syrian Hamas leader who invested in BMI with Al-Qadi. Although Global Chemicals had a warehouse full of toxic chemicals, it did not have any customers. In 1997 the FBI asked Dennis J. Reutter, a government employed chemical weapons expert, to investigate the chemical purchases of Global Chemicals. Reutter issued a report stating that the company's purchases—"do not appear to be consistent with R&D for formulation of commercial cleaning products or for quality control of commercial cleaning products…the purchases appear to be more consistent with support" of a laboratory performing biochemistry or "organic synthesis." Organic synthesis is a term used to describe the process for manufacturing some

19

explosives.

Although U.S. law enforcement officials did not find any direct evidence of bomb making materials at Global Chemicals facilities, in January of 1997 the Chicago fire department confiscated the company's chemicals and Marbrook left the U.S. for Saudi Arabia. At roughly the same time, Abrar vacated its Connecticut office. In response to pressure from the U.S., Saudi Arabia returned Marbrook to the U.S. in June of 1999. Many FBI officials believed that he had ties to Hamas; however, he was ultimately convicted on fraud charges for taking money from IIRO/IRO under false pretenses. In August 2001 he was sentenced to 51 months in jail. The U.S. government is still trying to determine the final destination of the money that Abrar and IIRO/IRO invested in Global Chemicals.

**Muwafaq Ltd**

Muwafaq Ltd is an Islamic charity that transferred millions of dollars from wealthy Saudi businessmen to al Qaida. Al-Qadi was the director and one of four shareholders for Muwafaq. In cooperation with Talal M.M. Bradkook and Dr. Mohaman Ali Elgari, Al-Qadi incorporated Muwafaq in Delaware in 1992 and operated the charity until 1997. During that time Al-Qadi spent roughly 15-20 million dollars of his own money on the day to day operations of Muwafaq.

Muwafaq Ltd. was founded in 1991 as a private company in the Isle of Man but its primary headquarters was located in Jeddah, Saudi Arabia. In 1992, the charity registered as a trust in the Isle of Jersey, a Great Britain tax haven. The corporation was endowed by Khalid bin Mahfouz, a known al Qaida financer. Muwafaq quickly started relief work in Bosnia, Somalia, Sudan, Pakistan, Ethiopia, Albania and Afghanistan and opened branches in Germany and Austria; however, the charity

also functioned as a financing tool for al Qaida as well as the general Islamic fundamentalist movement.

Al-Qadi has stated that he selected the managers responsible for the various countries. Al-Qadi took an active role in the activities of each regional branch of the Muwafaq foundation and admits that he would visit each project country three to four times a year.

Al-Qadi states that there was little auditing performed by the foundation and that in several of the countries that Muwafaq had a presence, there "are no meaningful financial records available." Even in countries where there was a requirement that audits be filed, e.g. Pakistan, Al-Qadi can not confirm that the results of the audits were filed as required.

Muwafaq's ties to Islamic terrorism, specifically Osama bin Laden and al Qaida, are widespread and pervasive.

Al-Qadi hired Chafiq Ayadi, an SDGT since October 12, 2001, to head Muwafaq's European operation upon the recommendation of Julaidan in late 1992. According to a 2004 report from the Office of Foreign Assets Control (OFAC), the U.S. government has information that demonstrates this hiring occurred shortly after Ayadi's expulsion from Tunisia for belonging to an Islamic extremist group. During the mid-1990's, Ayadi also headed the Muwafaq branch in Bosnia. Ayadi was employed as director in charge of Muwafaq's European activities from 1992 to 1995 or 1996, and during that time Al-Qadi transferred substantial sums to Ayadi's personal account. Al-Qadi states that these transfers were for the sole purpose of the charitable objectives of the Muwafaq.

At the time of his appointment by Al-Qadi to be Muwafaq's European director, evidence indicates that Ayadi was operating under agreements to help Osama bin Laden. According to information available to the U.S. Government, Ayadi was one of the principal

leaders of the Tunisian Islamic Gront, the military wing of the extremist Al-Nadha movement. Ayadi reportedly went to Afghanistan in the early 1990's to receive paramilitary training, and went to Sudan along with suspected Tunisian terrorist Muhammad Harrath and Abdallah Jajji in order to meet with Osama bin Laden. Later, according to information available to the U.S. Government, they met bin Laden a second time, in the presence of Hassan Turabi, where they secured Bin Laden's agreement for Bin Laden collaborators in Bosnia to receive Tunisian Al-Nadha mujaheddin from Italy.

A considerable number of foreign and U.S. intelligence reports list Muwafaq as a primary source of funding for Islamic terrorist groups in several theatres of the globe. A U.S. intelligence report states Muwafaq has ties to the extremist group al Gama'at Al Islamiyya and that it funds Egyptian terrorists in Bosnia. Similarly, an internal memorandum by Spanish External Intelligence also found that Muwafaq maintained contacts with the Egyptian Gama'at Al Islamiyya. According to information available to the U.S. Government, in 1995, the then-leader of Gama'at Al Islamiyya, Talad Fuad Kassem, said that Muwafaq had provided logistical support and financial support for a mujahadin battalion in Bosnia.

Russia has also documented Muwafaq's terrorist activities. In a classified document that was released in 2003, the Counter-Terrorism Center for the Commonwealth and the Independent States, a unit of the Russian Ministry of Defense, states that—"the Muwafaq Foundation was set up to give assistance to the families of Islamic terrorists....The headquarters are located in Jeddah, KSA."

A European intelligence source found that Khamir Amer Ballayth, an associate of Osama bin Laden, transferred between $200,000 to $250,000 to the Muwafaq foundation through

the account of the Bin Jaad establishment at the Faysal Bank in Peshawar. According to a foreign intelligence document, the Muwafaq foundation provided capital Osama bin Laden's personally owned Animal Resources Bank of Sudan.

Together Al-Qadi and Khalid bin Mahfouz formed two offshoot subsidiaries, the National Management Consultancy Center (NMCC) and the National Commercial Bank (NCB), to help conceal Muwafaq's financial ties to Osama bin Laden and al Qaida.

In similar fashion to Muwafaq, NMCC was registered in Isle of Man but managed from Jeddah, Saudi Arabia. Al-Qadi delegated managerial power over NMCC to Sharia scholar Mohammed Ali Al Gari and appointed himself as co-executive director and primary share holder. Additionally, Al Gari was also appointed NCB Sharia Board Advisor—giving him authority over the use and attribution of the Zakat (money to be given to charity) funds. Ali Gari was also a member of Muwafaq Foundation Council. Essentially, Al-Qadi and his associates were able to maintain control over NCB and NMCC and use them to consolidate and transfer money to Muwafaq and other charities that served as front organizations for al Qaida.

For instance, an audit of NCB revealed that over a ten year period the bank's Zakat Committee gave $74 million dollars to the International Islamic Relief Organization, which at the time was operated by Osama bin Laden's brother in law and documented as a primary source of funding for Osama bin Laden. During a Congressional Hearing in October of 2001, former CIA Chief of Counter-terrorism Vincent Cannistraro stated that NCB operated as a "financial conduit" for Osama bin Laden and helped him fund training camps in Sudan. Similarly, another audit of the National Commercial Bank of Saudi Arabia revealed that $3 million was pulled from the accounts of several wealthy Saudi businessmen

and placed in Muwafaq's account for Osama bin Laden.

Many of Muwafaq's employees are either members of or associated with Islamic terrorist groups. For instance, a European intelligence source found that al Qaida operative Mahmond Mehdi was once a member of Muwafaq, as was an Afghan fighter and suspected Hamas member named Husam Tayeh. The same source alleged that Muwafaq opened a branch in Manila in 1994 in cooperation with Muhammad Jamal Khalifa, who is involved in the Abu Sayyaf Group and the Moro Islamic Liberation Front. Additionally, Jamal Khalifa is Osama Bin Laden's brother in law.

Along the same lines, in 1995 Muwafaq's Islamabad office in Pakistan was raided by the police and its local director, Amir Mehdi, arrested due to suspicions of connections with Ramzi Yousef, the man behind the bombing of the WTC in 1993. Although the director was released three months later and no charges were brought against the charity, its operations in Pakistan were terminated. Upon his arrest, Mehdi was informed that telephone numbers, including a telephone number installed at his residence, had allegedly been used for contact by associates of terrorists operating in Pakistan and abroad.

In 1993, Abdel Latif Saleh became partner of Yasin Al Qadi in Loks-Holl company, Medicare Sh.P.K and Karavan company. In 1994, he founded the Albanian branch of the Muwafaq Foundation. According to a Turkish intelligence report, Saleh was previously a member of the International Islamic Relief Organization—a know al Qaida front organization. In the 1998 "Returnees from Albania" Egyptian military trials, many of the Albanian extremists who testified identified Abdul Latif Saleh as a primary supporter of the extremist movement in Albania. In 1999, in cooperation with the U.S. government, he was arrested and deported by Albanian officials based on suspicion of his involvement with the

Egyptian Islamic Jihad and al Qaida.

According to information available to the U.S. Government, Saleh founded and organized the Albanian Islamic Jihad (AIJ). As early as 1999, Al-Qadi was known to be an active supporter of, and fund raiser for, the AIJ. Muwafaq operated an Islamic school in Kukes until 1997, and several of the most radical students from the school were selected for membership in AIJ.

OFAC found numerous documents and correspondence between Al-Qadi and Saleh. Saleh was named as an official signatory for Karavan bank accounts. Saleh was the general manager of all Al-Qadi businesses in Albania. Saleh was the only person who had authorization to withdraw money directly from Al-Qadi's bank account and transfer the funds whenever the situation required it.

Large wire transfers were seen through these documents coming into and out of Al- Qadi's personal accounts in Albania. As well, large cash withdrawals were paid to Saleh. Similarly, the April/May 1998 edition of Defense and Foreign Affairs' Strategy Policy states that Muwafaq is mainly used to— "recruit and train Albanian Mujahedin."

Muwafaq employees also have ties to terrorist activity in Sarajevo, Bosnia-Herzegovina. Karim Merjri is listed at the Head Officer of Muwafaq's division in Kosevsko, Sarajevo. The Bosnian Financial Police have tied Mejri to al-Haramian Al-Aqsa, another Arab foundation that has financial ties to Islamic terrorism. Moreover, foreign Muslim volunteers en route to Bosnia to join the resistance often stayed at Muwafaq safe houses in Croatia. Croatian authorities conducted several raids on these houses and seized illegal arms.

According to information available to the U.S. Government, Muwafaq transferred $500,000 to terrorist organizations in the Balkans. According to information available to the U.S.

Government, Al-Qadi continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996. The primary recipients of Al-Qadi's support in the Balkans were Defendants Al-Haramain, the Revival of Islamic Heritage Society, Alwaqf al-Islamiya and the World Association of Islamic Youth. The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices were designated as SDGT's on January 9, 2002. The Bosnia-Herzegovina branch of the Al-Haramain Foundation was designated as an SDGT on March 11, 2002.

In 2001, according to information available to the U.S. Government, Al-Qadi acknowledged that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkens.

Finally, a German intelligence report states that Al-Qadi uses the following companies to transfer money on behalf of the Muwafaq Brigade militia in Bosnia and Kosovo: Abrar International of Kula Lumpur, Malaysia, BMI of Istanbul, Turkey, Loxall of Tirana, Albania, and Medicare of Tirana, Albania.

According to a press report, Al-Qadi asserted at the time of his designation as a global terrorist that Muwafaq had terminated operations in 1996 or 1997. However, according to one of Al-Qadi's submission, as of late 2002, Muwafaq continued to be registered in Holland and Belgium.

**Vakufska Banka D.D. and Depozitna Banka D.D**

Vakufska Banka and Depozitna Banka have supported, facilitated and participated in terrorism financing on the territory of Bosnia Herzegovina. Moreover, the banks have provided financial support to several organizations acting as fronts for al Qaida, including Muwafaq, Al Haramian Islamic Foundation and the Saudi High Commission for Releif in Bosnia Herzegovina.

Al-Qadi has played a central role in the ownership and management of Vakufska and Depozitna. Depozitna was based in Sarajevo and owned by Al-Qadi, Chafiq Ayadi and Mahmal Investment Company—an Isle of Man based corporation that is currently under Bosnian investigation by the Financial Police and Federal Banking Agency. While he was a co-owner of the bank, Chafiq Ayadi used the bank to transfer $2.5 million to the account of the Muwafaq Foundation. Ayadi sold his shares of the bank to Al-Qadi in September of 2000.

In August 2002 Vakufska merged with Depozitna Banka, as the Banking Agency had rescinded Depozitna's banking permit on March 30, 2001. At the time, Vakufska was already partially owned by both Al-Qadi and Mahmal Investment Company, the same two groups that owned Vakufska.

Aside from Al-Qadi and Mahmal, several of Vakufska's past shareholders have financial ties to Islamic terrorist organizations. For instance, El Tarik Oil D.O.O., an oil company based in Sarajevo, was a shareholder with 8% bank capital in 2000. A Bosnian Financial Police report from 2002 documents that El Tarik regularly provides financial assistance to the Saudi High Commission and al Haramian al Aqsa foundation in Sarajevo, both of whom consistently offer logistical support to al Qaida.

The involvement of Al-Qadi in both Depozitna Banka and Vakufska Banka with the financial backing of Mahmal Investment Co. Limited has provided a financial arm to Islamic charities and terrorist organizations operating in Bosnia Herzegovina. A 2002 Bosnian Intelligence report describes Vakufska Banka as a financial base for al Haramian Islamic Foundation and, subsequently, al Qaida:

*"The al Haramian Islamic Foundation spent around 13 KM ($7, 647,000) between its foundation in 1997 and the end of last year (2000). Financial transactions were through*

*accounts at the Depozitna Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering."*

The Bosnian intelligence report then establishes the link between al Haramian Islamic Foundation and Osama bin Laden:

*"Al Haramain...has acted as a channel for financing the activities of terrorist organizations...According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamija, while members of Bin Laden's El Itihad al Islamija terrorist groups were employed at theSomalia offices, which also financed their operations."*

The Bosnian Financial Police have documented that Vakufska Banka is involved in terrorist financing through financial transactions between the Saudi High Commission for Relief and a company named Engra. From 1998 to 2000, Engra conducted financial transactions of behalf of an organization linked to Osama bin Laden through the following bank accounts: account number 1604205500000502 at the Vakufska Banka in Sarajevo, Zenica Branch and account number 1602000000869046, which was opened at the Depozitna Banka.

According to information available to the U.S. Government, planning sessions for an attack against a U.S. facility in Saudi Arabia during the mid 1990's may have taken place at Depozitna Bank.

Chafiq Ayadi held Al-Qadi's shares in Depozitna Bank as the nominee for Al-Qadi from 1996 to 1998, and had a position with the bank until the end of 1998.

**Ptech**

In 1998 Yasin Al-Qadi invested 14 million in Ptech, a privately owned Massachusetts based technology company. By 2001, Al-Qadi was one of the company's top investors and

managers..

Along with Al-Qadi, Ptech has several other disconcerting ties to Islamic terrorism. Defendant Yaqub Mirza is on Ptech's Board of Directors. Mirza shares links with several individuals and groups under investigation for terrorist funding or activity.

Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. The SAAR Foundation is the organizational epicenter of a network of terrorist financing charities that were raided by the FBI in March of 2002. Mirza is the director of Sterling Advisory, a SAAR organization which controlled Ptech Fund LLC.

Mirza is listed as the President and CEO of Mar Jac Investments, Inc. Mar Jac Poultry, a Georgia based operating division of Mar Jac Investments is under investigation by U.S. authorities for its role in terrorist financing.

In August of 2000, Mirza registered the defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Islamic terrorists. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to the 1998 Embassy bombings. Lastly, Mirza is involved with the Wahabbi Lobby, an influential Saudi based organization that promotes Islamic extremism through the World Association of Muslim Youth.

Soliman Biheiri is also a founding member of Ptech. Biheiri ran BMI Real Estate Development, a Virginia based group that is affiliated with the IIRO and suspected of financing the 1998 Embassy bombings. Two of Ptech's employees, Suheil Laher and Muhamed Mubayyid, are affiliated with Care International, an organization that is co-located in Boston and Sudan and is under investigation due to its financial ties to bin Laden. Both of the two above mentioned employees subscribe

to al Qaida's radical interpretation of Islam. Indeed, a Muslim cleric at Harvard University described Laher as "over the top" with regards to his religious beliefs.

Husssein Ibrahim, a co-founder and chief scientist at Ptech is also an officer of the above

mentioned BMI Real Estate. Ptech's Middle Eastern branch, Horizons, is also involved in the Islamic fundamentalist movement, as there client list includes the Saudi bin Laden Company and the Afghan based BTC Bin Laden Telecom. In December of 2002 the FBI raided Ptech and the investigation is still pending.

**Additional Business Assets and ties to Islamic Terrorism**

Al-Qadi is an executive with a Saudi company, MM Badkook, that supplied 15,000 meals a day to Kuwaiti and U.S. troops during the Gulf war. Talal Badkook , the company's founder, is also a member of the Al-Mustaqbal group along with Saleh Mohammed bin Laden, son of Mohammed bin Laden, and Abdullah Saleh Kamel, son of Saleh Kamel who is the chairman of the Dallah al-Baraka.

Al-Qadi is Vice President of Jamjoon, a Saudi Arabian company that has investments in a number of different industries. The company's owner, Shaykh Ahmad Salah Jamjoom, is related to the deputy chairman of Faisal Islamic Bank—Ahmed Shah Jamjoom.

Al-Qadi is the Director of Global Diamond Resources (GDR), a Nevada based company that manages three mines in South Africa. More specifically, Al-Qadi sits on GDR's board as a representative of New Diamond Holdings—a firm which has a controlling interest in GDR. Initially, Al-Qadi invested initially invested $3 million into GDR but as of October 2001 his investment had diminished to roughly $750,000. GDR has strong ties with the Islamic fundamentalist movement. Several representatives of the bin Laden family invested heavily in GDR and serve on the

board of directors with Al-Qadi. Al-Qadi was introduced and recommended to GDR through an executive of the Saudi bin Laden Group.

Al-Qadi serves on the Board of Directors of Shifa International Hospitals in Pakistan along with M. Saleem Khanani. Saleem Khanani is on the Board of Directors with Barakat Corporation and Barakat International in Florida. Although they were not targeted, these two businesses are part of the Barakaat Hawala Network that had its assets frozen on November 7th for funneling money to al Qaida.

Investors in the Al-Qadi investment Alintid Holding Company included major al-Haramain contributors, and a major contributor to al-Waqf and al-Haramain NGO's, according to information available to the U.S. Government. Albanian law enforcement officials seized Alintid documents during an October 2001 raid of the Tirana, Albania headquarters of al-Waqf al-Islami—an NGO that has personal linked to terrorist and extremist groups.

Absent the material support and sponsorship provided by banks and financial services companies within the Islamic financial system like Yasin Abdullah Al-Qadi, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist attacks on a global level.