**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MD 1570 (RCC)<br>ECF Case |

*This document relates to:*

    *Thomas E. Burnett, Sr., et al. v. Al Baraka Investment & Development Corp., et al.*, Case Nos. 03-CV-9849 and 03-CV-5738 (S.D.N.Y.)
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)
*Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)
*Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)
*New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)
*World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)


**MEMORANDUM IN SUPPORT OF DEFENDANT YESLAM BINLADIN'S MOTION TO STRIKE THE DECLARATION OF JEAN-CHARLES BRISARD, THE AFFIDAVIT OF CARMEN BIN LADIN, AND THE STATEMENT OF GUILLAUME DASQUIÉ**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 1

I.   JEAN-CHARLES BRISARD'S DECLARATION SHOULD BE STRICKEN IN ITS
     ENTIRETY ................................................................................................................ 2

     A.   Brisard's Declaration Demonstrates That It Is Not Based On Personal Knowledge
          Of Any Issues Relevant To Yeslam Binladin's Motion To Dismiss ...................... 2

     B.   Brisard's Hearsay Declaration Is Transparently Intended To Mislead The Court . 5

II.  CARMEN BIN LADIN'S AFFIDAVIT MUST BE STRICKEN IN ITS ENTIRETY
     BECAUSE IT IS NOT BASED ON PERSONAL KNOWLEDGE.................................. 9

III. GUILLAUME DASQUIÉ'S UNSWORN STATEMENT MUST BE STRICKEN IN ITS
     ENTIRETY BECAUSE IT IS NOT BASED ON PERSONAL KNOWLEDGE ............ 12

CONCLUSION.................................................................................................................. 13

## TABLE OF AUTHORITIES

### CASES

*Abdullahi v. Pfizer, Inc.*,
  No. 01 Civ. 8118 (WHP), 2005 WL 1870811 (S.D.N.Y. Aug. 9, 2005) ............................. 1

*Brown v. McClellan*,
  No. 93-CV-0901E(F), 1996 U.S. Dist. LEXIS 8164 (W.D.N.Y. June 11, 1996) .............. 12

*Hollander v. Am. Cyanamid Co.*,
  172 F.3d 192 (2d Cir. 1999) .............................................................................. 2, 9, 11, 12

*Levine v. Fed. Deposit Ins. Corp.*,
  136 F.R.D. 544 (D. Conn. 1991) ...................................................................................... 2

*Patterson v. County of Oneida*,
  375 F.3d 206 (2d Cir. 2004) ......................................................................................... 2, 3

*Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*,
  No. 98 Civ. 4799 (RPP), 1998 WL 614185 (S.D.N.Y. Sept. 14, 1998) ............................. 2

*SEC v. Princeton Econ. Int'l Ltd.*,
  Nos. 99 Civ 9667, 99 Civ 9669, 2000 U.S. Dist. LEXIS 15210
  (S.D.N.Y. Oct. 19, 2000) ................................................................................................. 13

*Sellers v. M.C. Floor Crafters, Inc.*,
  842 F.2d 639 (2d Cir. 1988) ............................................................................................. 2

*Sterling Fifth Assocs. v. Carpentile Corp., Inc.*,
  No. 03 Civ. 6568 (HB), 2003 U.S. Dist. LEXIS 16922 (S.D.N.Y. Sept. 26, 2003) ......... 12

### FEDERAL STATUTES

28 U.S.C. § 1746 (2000) ............................................................................................................. 12

### FEDERAL RULES

Fed. R. Evid. 602 .................................................................................................................... 1, 2

Fed. R. Evid. 701 .................................................................................................................... 1, 5

## INTRODUCTION

Plaintiffs' opposition to Yeslam Binladin's Motion to Dismiss relies almost entirely on the written "testimony" of purported fact witnesses Jean-Charles Brisard (Plaintiffs' paid consultant), Carmen Bin Ladin (Yeslam's estranged wife), and Guillaume Dasquié (Brisard's co-author).[1]  Under clear Second Circuit law, the submitted documents are legally deficient and should be stricken.  Brisard and Carmen *claim* that they have limited their comments to areas of their "personal knowledge," (Brisard Decl. ¶ 4; Carmen Aff. ¶ 1), but their submissions are self-evidently, and often admittedly, based on "information and belief," secondary sources, hearsay, and pure speculation.  Moreover, Dasquié does not even pretend that his unsworn statement is limited to matters within his personal knowledge, but readily admits that he is recounting second-hand information from unnamed sources.  As proffered fact witnesses, declarants are limited to testifying about matters within their "personal knowledge," Fed. R. Evid. 602, and are prohibited from testifying as to opinions not based on first-hand knowledge or observation.  Fed. R. Evid. 701.  Because these alleged fact witnesses have no personal knowledge on any relevant issues, this Court should exercise its inherent authority to strike the Brisard Declaration, the Carmen Affidavit, and Dasquié's unsworn statement.

## LEGAL STANDARD

Affidavits and declarations lacking personal knowledge cannot be considered upon a Rule 12 motion.  *See, e.g.*, *Abdullahi v. Pfizer, Inc.*, No. 01 Civ. 8118 (WHP)**,** 2005 WL 1870811, at *16-17 (S.D.N.Y. Aug. 9, 2005) (rejecting for purposes of a Rule 12 motion an affidavit premised on "hearsay and not based on . . . personal knowledge" and a declaration

---

[1] The Declaration of Jean-Charles Brisard ("Brisard Declaration" or "Brisard Decl."); Affidavit of Carmen Bin Ladin ("Carmen Affidavit" or "Carmen Aff."); and Guillaume Dasquié's Statement ("Dasquié Statement" or "Dasquié Stmt.") were attached as Exhibit B, Exhibit A, and Exhibit N, respectively, to the Declaration of Jodi Westbrook Flowers (Feb. 4, 2006) (MDL Docket # 1665) ("Flowers Decl."), which was submitted in connection with Plaintiffs' Consolidated Memorandum Of Law In Opposition To Defendant Yeslam Binladin's Motion To Dismiss Plaintiffs' Complaints And Memorandum In Support (Feb. 4, 2006) (MDL Docket # 1664) ("Pl. Opp.").

containing allegations that were "speculative and not based on personal knowledge"); *Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, No. 98 Civ. 4799 (RPP), 1998 WL 614185, at *1 (S.D.N.Y. Sept. 14, 1998) (Plaintiff's affidavit, which made assertions of jurisdictional contacts "'[o]n information and belief,'" but did so "without indicating the grounds for such a belief," amounted to nothing more than "conclusory allegations" that were "insufficient to support a claim of jurisdiction.").[2]  Submission of such testimony in opposition to a motion to dismiss for lack of personal jurisdiction "constitutes bad faith and tends to mislead the court." *Levine v. Fed. Deposit Ins. Corp.*, 136 F.R.D. 544, 549 n.3 (D. Conn. 1991) (also holding that an affidavit asserting facts "upon information and belief" was "not based upon the personal knowledge" of the affiant, who was not "competent to testify as to the facts set forth therein"). Thus, a motion to strike is appropriate and should be granted when an affidavit is "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge," and "more resemble[s] an adversarial memorandum than a *bona fide* affidavit."  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) (internal quotations and citations omitted).

## I. JEAN-CHARLES BRISARD'S DECLARATION SHOULD BE STRICKEN IN ITS ENTIRETY

### A. Brisard's Declaration Demonstrates That It Is Not Based On Personal Knowledge Of Any Issues Relevant To Yeslam Binladin's Motion To Dismiss

Jean-Charles Brisard, Plaintiffs' paid consultant, claims that his Declaration is "limited to areas of [his] personal knowledge," Brisard Decl. ¶ 4, but even a cursory review reveals that this is not the case.  Brisard admits that he first began investigating matters relating to Osama Bin

---

[2] *Cf.* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief'"); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) (finding insufficient an affidavit claimed to be partially based "'upon information and belief as to matters conveyed to [the declarant]'" because "a hearsay affidavit is not a substitute for the personal knowledge of a party").

2

Laden and al Qaeda in 1997, *see id*. ¶ 1, and yet purports to testify from personal knowledge about events that transpired years and even decades earlier.  Although Brisard only occasionally identifies and even more rarely provides copies of his sources, it is readily apparent that he is purporting to testify based on media reports he has read, unidentified documents he has reviewed, and information provided to him from unnamed sources of unknown competence.  None of this testimony is admissible.

The Second Circuit has held that the "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"  *Patterson*, 375 F.3d at 219.  Yet on no less than ten occasions, Brisard premises his "testimony" on just that: nothing more than "information and belief."  *See* Brisard Decl. ¶¶ 9, 17, 21, 24, 29, 34, 36, 40, 47, 61.  In many more paragraphs, although he does not say it in so many words, the context makes clear that he is relying on third-party information rather than personal knowledge.  For example, Brisard testifies repeatedly about "information" he received from, and "beliefs" held by, others:

> *according to information* from [unidentified] US authorities, Usama Bin Laden ["OBL"] has received funding from two accounts at Deutsche Bank in Geneva, Switzerland, in the names of Cambridge Engineering and Saudi Bin Ladin Group.  These authorities *suspect* that an amount of $300 million US has been transferred through these accounts to [OBL].  It is also my *understanding* that authorities *believe* that the account at Cambridge Engineering Systems Ltd was managed by Yeslam Bin Ladin.

*Id*. ¶ 67 (emphasis added); *see also id*. ¶¶ 26, 29 (others' "belie[fs]"); *id*. ¶¶ 50, 68 (information that has "come to [his] attention"); *id*. ¶ 66 ("details" "provided" by Carmen Bin Ladin); *id*. ¶¶ 47-48 (matters he was allegedly "informed" of by a French judge, including information about actions that judge purportedly intends to take in the future); *id*. ¶ 49 (matters he was allegedly "informed" of by a Swiss prosecutor).  Brisard similarly purports to testify about issues ranging from the jurisdictional contacts of a company associated with Yeslam to the construction projects

3

of the Saudi Binladin Group in Sudan in the early 1990s based solely on media reports and other "public fact[s]" that he claims to have found on websites. *See id*. ¶¶ 13, 16, 35-40, 52-53, 56, 59, 62-63, 75.  Likewise, Brisard purports to testify about the contents of governmental, corporate, and legal documents, most of which he does not identify or submit. *See id*. ¶¶ 8, 10, 12, 14-15, 18-22, 24, 29, 33, 39, 40, 44, 47, 54.  On none of these matters does Brisard have, or even specifically claim to have, personal knowledge, despite his assertion that the entire affidavit is "limited to areas of [his] personal knowledge." *Id*. ¶ 4.

Even where Brisard does not refer to his sources, it is apparent that he cannot possibly have personal knowledge of the matters about which he purports to testify.  For example, Brisard swears that the "[r]elationships between the three entities: [OBL], Sudan Government and Saudi BinLadin Group[,] were stressed during the inauguration ceremony of the [Port Sudan] airport" in 1992.  *Id*. ¶ 39.  But Brisard does not claim that he attended that ceremony, and his statement that he first began investigating issues relating to al Qaeda in 1997 makes it extremely unlikely that he did attend.[3]  Numerous other allegations addressing Yeslam's business activities also cannot conceivably be based on first-hand knowledge.  *See id*. ¶¶ 11, 23, 25-28, 30, 43, 45, 64-65, 78.  Brisard even goes so far as to offer his claimed personal knowledge regarding Yeslam Binladin's *state of mind*: "[b]y agreeing [in 1990] to be a signatory on an account [at UBS Bank in Switzerland] whose unique economic beneficiary was [OBL], Yeslam Bin Laden *knowingly* agreed that these funds could be used to carry out a terrorist attack." *Id*. ¶ 56 (emphasis added).  Brisard cannot possibly have direct knowledge of, and thus testify competently to, Yeslam Binladin's knowledge or intentions in 1990-91 or, for that matter, at any other time.

---

[3] In fact, Brisard's claims regarding the events at the Port Sudan airport inauguration are contradicted by the first-hand testimony of Omar Binladin.  *See* Affidavit of Omar Binladin, Jan. 25, 2006 ("Omar Aff.") ¶ 13, Ex. 3 (Ex. A).

4

Finally, Brisard includes in his Declaration his unsubstantiated personal beliefs and opinions, which is also improper. *See id.* ¶ 10 ("it is my opinion . . ."); *see also id.* ¶¶ 12, 15, 31, 40-42, 55-56, 59, 65. The Federal Rules of Evidence prohibit fact witnesses from giving opinion testimony not based on first-hand knowledge or observation. Fed. R. Evid. 701. Brisard offers no evidence of first-hand knowledge or observation to support his opinions, nor could he, for the reasons explained above. Additionally, although holding himself out as a fact witness, Brisard proffers legal opinions regarding the jurisdiction of Swiss courts and the scope of the International Convention for the Suppression of the Financing of Terrorism of 1999. *See* Brisard Decl. ¶¶ 6, 55. To our knowledge, Brisard is not qualified to practice as a lawyer in his native France nor is there any indication that he is qualified as a lawyer anywhere else. *See* Translations of Letter from Jacques Lecuyer to Julie Raignault (April 5, 2004) (Ex. B); Letter from Hervé de Bechade to Julie Raignault (April 5, 2004) (Ex. C). As a fact witness, Brisard is not competent to express legal opinions on either of these subjects. Nor does he have any recognized expertise – other than self-proclaimed – in any subject that would qualify him to opine on the myriad of topics about which he expresses "beliefs."

### B. Brisard's Hearsay Declaration Is Transparently Intended To Mislead The Court

Brisard's Declaration amply demonstrates the wisdom of the rule against hearsay evidence. Although Brisard's Declaration is often based on unidentified sources that neither Defendant nor this Court can assess,[4] where Brisard does reveal or submit his sources, it

---

[4] *See* Brisard Decl. ¶¶ 12, 14-15, 18 (relying on unidentified records from Yeslam and Carmen's divorce proceedings); *id.* ¶ 54 (discussing and asserting conclusions based upon "well established evidence" he "review[ed] . . . in the French judge's office"); *id.* ¶¶ 44, 47 (characterizing legal proceedings and rulings, which he does not identify or submit); *id.* ¶¶ 10 (unidentified customs forms and travel records), ¶ 17 (a record from the 2005 Curacao corporate registry, which is not provided), ¶ 20 (North Carolina corporate record dated June 12, 2003, which is not provided); ¶ 21 (reference to unidentified partnership agreements); ¶ 22 (unspecified "FBI reports covering the September 11th attacks"), ¶ 24 (unspecified real estate transaction records for Daniel Realty Company (Partnership)), ¶ 26 (unspecified "bank transfer orders" for Colmar), ¶ 33 (unspecified corporate records in Saudi Arabia).

5

becomes clear that he is mischaracterizing them and distorting their context, or is simply making things up. In some cases, the documents themselves are of dubious origin. For example, Brisard cites to a so-called "FBI Suspect List" that was attached as an exhibit to Plaintiffs' opposition. *See* Brisard Decl. ¶ 22; Flowers Decl., Ex. G. Plaintiffs concede that the source of this document is an anti-war website, not any government-sanctioned source. *See* Flowers Decl. ¶ 8 (citing http://www.antiwar.com/justin/CI-08-02.pdf). Moreover, the document's doubtful authenticity is apparent on its face: the purported transmittal from the U.S. government is dated January 31, 2002, yet the "attached" suspect list is dated four months later, May 22, 2002. Brisard offers no explanation for the discrepancy, but it is obvious that the list is not what Brisard purports it to be.[5]

In other cases, Brisard distorts the content of his sources, which actually contradict his claims. For example, in support of his claim that OBL "undertook the construction of the Port Sudan Airport from 1990 to 1992" with the Saudi Binladin Group ("SBG"), Brisard asserts that OBL "stated that he was involved in the construction of the *Airport* and the Challenge Road linking Khartoum to Port Sudan." Brisard Decl. ¶ 39 (emphasis added). As authority, he provides a long quotation from a media interview OBL purportedly gave in 1993. *See id*. The quotation, however, does not mention any airport construction projects:

> I am a construction engineer and an agriculturalist. If I had training camps here in Sudan, I couldn't possibly do this job (the Challenge road) [. . .] personally neither I nor my brothers saw evidence of American help. When my mujahedin were victorious and the Russians were driven out, differences started [between the

---

[5] Brisard, in the past, has also misrepresented his own credentials. Alfonso Valdivieso, Permanent Representative of Columbia at the United Nations from 1999 to 2003 and President of the U.N. Security Council in December 2002, has recounted that, during that month, his office received an unsolicited "report" from Brisard, which Brisard claimed to the media had been "'commissioned' by the Security Council or by the President of the Council." Letter from Alfonso Valdivieso to Kendall Freeman (March 12, 2004), *available at* http://www.binmahfouz.info/ faqs_5.html (last visited March 10, 2006) (Ex. D). Valdivieso thereafter publicly confirmed his opinion that "Mr. Brisard's conduct and attitude is totally deceitful and marked by the intention to mislead," as neither Valdivieso nor the U.N. had ever commissioned such a report. *Id.*

> guerrilla movements] so I returned to road construction in Taif and
> Abha.   I brought back the equipment I had used to build tunnels
> and roads for the mujahedin in Afghanistan.  Yes, I helped some of
> my comrades to come here to Sudan after the war.

*Id.* (quoting from "Interview of Usama Ben Laden by Robert Fisk," The Independent (December 6, 1993)).  Likewise, Brisard claims that SBG has "publicly confirmed" that the Mohammad Binladin Organization ("MBO"), properly named the Mohammed Binladin Company ("MBC"), "was providing technical assistance to the [aforementioned] road construction" for OBL.  *Id.* ¶ 38.  Once again, the block quotations that Brisard provides to support this assertion – allegedly from a now-defunct SBG website – do not even mention OBL, the road in question (Tahaddi or Challenge), or MBC:

> Over the years the [Public Buildings and Airports] Division has
> undertaken various challenging projects, large and medium scale,
> including complete airports and roads . . . The projects executed
> include . . . Port Sudan Airport.
>
> SBG's skills in all of these areas has been recognized and utilized
> in the United Arab Emirates, Jordan, Yemen and Sudan.

*See id*. (quoting from the "Saudi Binladin Group Website" at http://saudbinl01.uuhost.uk.uu.net/pbad.htm and http://saudbinl01.uuhost.uk.uu.net/mbo.htm).[6]

Beyond misrepresenting his sources, Brisard's argumentative declaration distorts Yeslam Binladin's testimony in a futile attempt to challenge his credibility.  For example, he disputes Yeslam's statement that he has never been an officer or director of SBG or any of its subsidiaries by arguing that before Yeslam moved to Switzerland in 1985 he was the financial officer of

---

[6] Even more starkly, Brisard's assertions regarding various corporations supposedly tied to Yeslam Binladin are directly contradicted by Brisard's source documents.  Brisard asserts that two Delaware corporations, Knutstorp Inc. and Kinnekulle Inc., were established in the 1980s to make real estate investments in the United States.  Brisard Decl. ¶¶ 19-20.  Plaintiffs submit documents showing that Knutstorp merged into Kinnekulle in 1996, and that Kinnekulle merged into Falken, Ltd. (a Cayman entity) in 1998.  Flowers Decl., Ex. F.  Thus, according to Plaintiffs' own exhibits, both Delaware corporations had ceased to exist by 1998.  Nevertheless, Brisard asserts in his declaration that Knutstorp Inc. remained active until June 2003 (Brisard Decl. ¶ 20) – a legal impossibility and an assertion for which he supplies no evidence.

MBO, which he characterizes as a wholly owned subsidiary of SBG. *Id*. ¶ 45. In fact, it is undisputed that SBG did not come into being until 1989[7] – several years after Yeslam moved to Switzerland – and MBO is not and never has been a subsidiary of SBG.[8] Brisard chooses to ignore the available first-hand evidence and instead makes bald assertions, founded on nothing but his subjective and unshakeable belief to the contrary.

Similarly, Brisard can find no fault in Yeslam's *sworn* statements about the Swiss UBS bank account over which Yeslam acknowledges he had a power of attorney in August 1990, so he instead attacks Yeslam for purportedly denying in the media that he ever owned a "joint account" with OBL. *Id*. ¶¶ 51-54. Brisard "confirm[s] under penalty of perjury" that he has reviewed the opening of account forms for the UBS account "in the French judge's office" and that these forms show that "both Yeslam Bin Laden and [OBL] had been granted individual authority" on the account. *Id.* ¶ 54. But the undisputed facts – as demonstrated by the UBS account records previously submitted to this Court by Omar Binladin, as well as the affidavits of Omar and Yeslam – are that the "joint holders" of the account were Omar and Haydar Binladin. *See* Omar Aff. ¶ 8, Ex. 1; Yeslam Aff. ¶ 12. The sole beneficial owner of the account was OBL. *Id.* Omar and Haydar signed documents granting powers of attorney to Yeslam and OBL – each with the power to act individually – but, as UBS confirmed, OBL failed to provide a signature on the power of attorney and, as a result, he in fact had no authority over the account. *See* Yeslam Aff., Ex. 5; Omar Aff., Ex. 1. Thus, Yeslam clearly never held a "joint account" with OBL, as Brisard claims. Brisard's effort to manufacture phony disputes on collateral issues is further evidence that he seeks to mislead the Court by obscuring the real problem with Plaintiffs' claims:

---

[7] Affidavit of Bakr Binladin, Jan. 25, 2006 ("Bakr Aff.") ¶¶ 4-5 (Ex. E).

[8] *See* Bakr Aff. ¶ 5 and Exs. 1 & 2; Omar Aff. ¶ 7. In fact, as the SBG and MBC shareholder records submitted by Bakr Binladin demonstrate, both companies have different, although overlapping, sets of individual owners. Yeslam is one of the 59 record shareholders of MBC, but he is not one of the 19 record shareholders of SBG. *See* Bakr. Aff., Exs. 1 & 2.

*i.e.* that neither Plaintiffs nor Brisard have any admissible evidence that the account was established in 1990 with knowledge of, or for the purpose of supporting, OBL's later-threatened terrorist attacks against the United States.

In sum, the Brisard Declaration, which is "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on [Brisard's] personal knowledge," and which "more resemble[s] an adversarial memorandum than a *bona fide* affidavit," should be stricken from the record. *Hollander*, 172 F.3d at 198 (internal quotation and citation omitted).

## II. CARMEN BIN LADIN'S AFFIDAVIT MUST BE STRICKEN IN ITS ENTIRETY BECAUSE IT IS NOT BASED ON PERSONAL KNOWLEDGE

Carmen Bin Ladin, the estranged wife of Defendant Yeslam Binladin who acknowledges that she is still locked in a bitter, decade-long divorce battle with him, submits an affidavit in which she purports to testify about the current status of Yeslam's business arrangements; his alleged contacts with the United States; his relationship with his family and the family businesses; and most importantly, the Binladin family's relationship with their ostracized half-brother, OBL. Although she claims that her testimony is based on "[her] own personal knowledge," Carmen Aff. ¶ 1, the undisputed facts show that it too rests on speculation and hearsay.

Seeking to derive credibility from her relationship with Yeslam, Carmen makes a variety of inflammatory claims regarding OBL's supposedly continuing ties to the Binladin family. She swears that the Binladin family has "remained extremely close to [OBL] and supported him financially. The clan ties are sacred. The bin Laden's have not turned their back on Osama and never will." Carmen Aff. ¶ 35. She also asserts that "[m]y ex-husband, Yeslam bin Ladin, and the entire bin Laden family were aware of the extremist intentions of Osama bin Laden," *id.* ¶ 39, and that "[o]f course, Yeslam and the bin Laden family were aware of Osama's statements

9

before they were publicly made" in 1996 and 1998. *Id.* ¶ 34. It is apparent, however, that Carmen has no more personal knowledge of these supposed facts than any member of the public. Her affidavit acknowledges that she has not been in Saudi Arabia since 1985, *id.* at ¶ 9, and in a recent tell-all book she states that her relationship with Yeslam effectively ended in 1988, and that since that time "[n]one of the Bin Ladens" ever contacted her.[9] It is therefore impossible that she would have first-hand knowledge about the activities of the Binladin family since at the latest 1988 – a time when OBL was still enjoying the support of the U.S. government[10] and years before the family broke its ties with OBL in June 1993.[11]

Although Carmen insists in this Court that her claims rest on "personal knowledge," she has, outside these proceedings, admitted that her claims regarding the Binladin family's ties to OBL are merely opinions and speculation. Asked on CNN if she believes that the Binladin family "support[s]" OBL "financially," she admitted: "I don't have any proof, but, for me, it's very difficult to believe they have let [sic] their brother in need."[12] And asked several years earlier by ABC if she "know[s] *for a fact* whether money has gone from the bin Laden family to Osama bin Laden," she responded, "For a – if you ask me, bring me the proof. I don't believe that, you know, that – *I don't know that*. But I – I – my opinion is yes. And *this is my personal opinion*."[13]

---

[9] Carmen Bin Ladin, "Inside the Kingdom: My Life in Saudi Arabia" (2004) at 193-94 (Ex. G); *see also* Carmen Aff. ¶ 7 (referencing her authorship of this book). Moreover, Carmen admitted in a televised media interview that she has not even so much as spoken to Yeslam since 1994. *See* Transcript of "CNN Late Edition With Wolf Blitzer" Interview (July 18, 2004), *available at* http://transcripts.cnn.com/TRANSCRIPTS/0407/18/le.00.html (last visited March 9, 2006) ("[T]he last time I talked with my husband it was in '94.") (Ex. F).

[10] *See* Defendants Bakr Binladin, et al., Motion to Dismiss Plaintiffs' Complaints and accompanying Memorandum in Support (Jan. 27, 2006) (MDL Docket # 1644-1645) at 16, n.61.

[11] *See* Bakr Aff. ¶¶ 7-10, Exs. 1-4.

[12] Transcript of "Paula Zahn NOW" Interview with Carmen Bin Laden (July 19, 2004) ("CNN Zahn Interview"), *available at* http://cnnstudentnews.cnn.com/TRANSCRIPTS/0407/19/pzn.00.html (last visited March 9, 2006) (Ex. H).

[13] Transcript of "PrimeTime Thursday" Interview with Diane Sawyer (Oct. 25, 2001) (Ex. I) (emphasis added).

10

Contradicting any pretense of personal knowledge, Carmen admits that much of her testimony comes from her own "investigation" into Yeslam's affairs conducted in connection with her bitter divorce proceeding. Carmen Aff. ¶ 13; *see id.* ¶¶ 13-14, 16-20 (testifying about documents collected in her "investigation files");[14] *see also id.* ¶¶ 21-22 (testifying about alleged statements by "Yeslam's lawyers in Switzerland"); *id.* ¶¶ 15, 22 (testifying about statements she read "in the press"); *id.* ¶ 24 (testifying about real estate holdings she "discovered"). In fact, virtually all of her "testimony" pertains to events that purportedly transpired after she left Saudi Arabia and lost contact with Yeslam and the Binladin family nearly two decades ago. *See, e.g.*, *id.* ¶¶ 12-15, 20-25, 30, 32-36, 38-39, 41, 43. Many of her statements are obviously not derived from her personal knowledge or even from her investigation, but more likely are based on widespread media reports. For example, Carmen swears under oath that "[a]fter the outbreak of the Gulf War in 1991, Osama offered to raise an army to fight against Saddam Hussein. King Fahd declined Osama's offer and chose to have the Americans assist in protecting Saudi Arabia. After this perceived rebuke, Osama turned against the Americans for sending troops to Saudi Arabia." Carmen Aff. ¶ 32. Given that Carmen was not in Saudi Arabia in 1991, Carmen Aff. ¶ 9, and her assertions about the marginalized role of women in Saudi society and OBL's strict adherence to those societal rules,[15] it is inconceivable that Carmen was present for this alleged conversation between OBL and King Fahd.

Because Carmen's Affidavit is rife with such opinions and speculation rather than personal knowledge about what transpired after she left Saudi Arabia and lost contact with Yeslam and the Binladin family, her affidavit should be stricken. *See Hollander*, 172 F.3d at 198

---

[14] The documents Carmen obtained in her investigation and attaches to her affidavit are dated in the early 1980s, *see* Carmen Aff., Exs. 2 & 4, thus further confirming how outdated and irrelevant is her information.

[15] *See, e.g.*, Carmen Aff. ¶ 28 ("When I first met Osama bin Laden, I greeted him at my door with my face uncovered. Osama froze in shock because he could not bear to see my naked face."); CNN Zahn Interview (stating that when Carmen and OBL met he "would not sit in a room with me and talk with me").

(upholding the striking of portions of an affidavit "clearly not made on the affiant's personal knowledge").

### III. GUILLAUME DASQUIÉ'S UNSWORN STATEMENT MUST BE STRICKEN IN ITS ENTIRETY BECAUSE IT IS NOT BASED ON PERSONAL KNOWLEDGE

The "statement" of Guillame Dasquié should be stricken both because it is not based on personal knowledge, and indeed does not pretend to be, and because it is not submitted under penalty of perjury as required by 28 U.S.C. § 1746.

Unlike Brisard and Carmen Binladin, Dasquié does not attempt to hide his lack of personal knowledge. Rather, he merely explains the "conditions" under which he wrote an article appearing in an "Intelligence Newsletter" and openly acknowledges that his statement is based on information obtained from an unnamed "correspondent in Geneva," an unnamed "source[] within the Swiss intelligence services," and an unnamed "BTP engineer" who worked "along side the Saudi Bin Laden Group" and purported to have overheard undated conversations among unnamed "various members of the Bin Laden family." *See* Translation of Dasquié Stmt. (Flowers Decl., Ex. N). These are just the sort of unattributed hearsay and conclusory statements the Second Circuit forbids district courts to consider as evidence. *See Hollander*, 172 F.3d at 198 (2d Cir. 1999).

Dasquié's unsworn statement should also be stricken because it is not "subscribed . . . as true under penalty of perjury." 28 U.S.C. § 1746 (2000); *see Sterling Fifth Assocs. v. Carpentile Corp., Inc.*, No. 03 Civ. 6568 (HB), 2003 U.S. Dist. LEXIS 16922, at *16 (S.D.N.Y. Sept. 26, 2003); *Brown v. McClellan*, No. 93-CV-0901E(F), 1996 U.S. Dist. LEXIS 8164, at *5 n.4 (W.D.N.Y. June 11, 1996) ("Because this affidavit is unsworn and also not submitted under penalty of perjury pursuant to 28 U.S.C. § 1746, its evidentiary value is nil."). Where a handwritten statement is "not subscribed to under the penalty of perjury," it "must be

12

disregarded." *SEC v. Princeton Econ. Int'l Ltd.*, Nos. 99 Civ. 9667, 99 Civ. 9669, 2000 U.S. Dist. LEXIS 15210, at *12 (S.D.N.Y. Oct. 19, 2000).  Accordingly, Dasquié's statement, based entirely on admitted, unattributed hearsay and lacking the required certification of truthfulness, should also be stricken.

## CONCLUSION

For the foregoing reasons, Jean-Charles Brisard's Declaration, Carmen Bin Ladin's Affidavit, and Guillaume Dasquié's Statement should be stricken from the record.

Dated:  March 10, 2006                                  Respectfully submitted,

/s/ Geoffrey S. Stewart
_____
Geoffrey S. Stewart (GS-5413)
JONES DAY
222 East 41st Street
New York, New York  10017-6702
Tel:  (212) 326-3939
Fax:  (212) 755-7306

Stephen J. Brogan
Mary Ellen Powers
Timothy J. Finn
Jonathan C. Rose
James E. Gauch
Michael P. Gurdak
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700

Lawrence Schoenbach (S.D.N.Y. #LS8497)
Law Offices of Lawrence H. Schoenbach
The Trinity Building
111 Broadway, 13th Floor
New York, New York  10006
Tel:  (212) 346-2400
Fax:  (212) 346-2400

*Attorneys for Defendant Yeslam Binladin*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2006, I caused an electronic copy of Defendant Yeslam Binladin's Motion to Strike the Declaration of Jean-Charles Brisard, the Affidavit of Carmen Bin Ladin, and the Statement of Guillaume Dasquié and the accompanying Memorandum of Law In Support to be served by the Court's Electronic Case Filing System.

Date:   March 10, 2006

                                                         /s/ Stephen J. Brogan
                                                       Stephen J. Brogan