**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) ECF Case<br><br>**RICO STATEMENT Applicable to**<br>**Tadamon Islamic Bank** |

*This document relates to:*

> Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka, *et al.*
> 04 CV 01923 (RCC)

## RICO STATEMENT APPLICABLE TO TADAMON ISLAMIC BANK

Based on information currently available, plaintiffs submit this RICO statement pursuant to the Case Management Order dated June 15, 2004 and Judge Casey's individual rules and pursuant to a stipulation agreed to by both Plaintiffs and the Defendant (Docket #1690), for defendant Tadamon Islamic Bank ("Tadamon").

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

This filing is a supplemental pleading in accordance with 03 MDL 1570, CMO-2, Paragraph 13-14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time, and is not to be construed as revoked, in whole or in part, as a result of any subsequent amendment of the complaint.

1. The unlawful conduct is in violation of 18 U.S.C. §§ 1962(b)**,** 1962(c) and/or (d).

2. The name of the defendant to whom this Statement pertains is Tadamon Islamic Bank ("Tadamon"). The alleged misconduct and basis for liability is set forth in Exhibit "A."

3. All known wrongdoers are named as defendants in this action, as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et*

*al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), other cases brought by other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570(RCC)), and others. Plaintiffs will separately file Statements with respect to the misconduct of the other defendants. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise. Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

4. The name of each victim is indicated on the attached hereto as Exhibit "B." The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001. Exhibit "B" sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including without limitation Paragraph 17 hereof.

5. Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    a. <u>List of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| Conspiracy to commit murder | NY Penal § 105.15;<br>NY Penal § 125.25 (xi) |
| Conspiracy to commit arson | NY Penal § 105.15;<br>NY Penal § 150.15 |
| Fraud with Identification Documents | 18 U.S.C. § 1028 |

2

| | |
|---|---|
| Mail Fraud | 18 U.S.C. § 1341 |
| Wire Fraud | 18 U.S.C. § 1343 |
| Financial Institution Fraud | 18 U.S.C. §1344 |
| Illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| Money laundering | 18 U.S.C. § 1957 |
| Defrauding the United States Government | 18 U.S.C. § 371 |
| Travel Act | 18 U.S.C. § 1952 |
| Filing false or materially false tax returns | 26 U.S.C. § 7206(1),(2) |
| Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws | 26 U.S.C. § 7212(a) |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |

     b.   <u>Dates of, the participants in, and a description of the facts surrounding the predicate acts:</u>

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| Early 1990's to 9/11/2001 | Tadamon | Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tadamon |

| | | |
|---|---|---|
| | | conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Throughout this period, Tadamon conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. |
| Early 1990's to 9/11/2001 | Tadamon | Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Tadamon undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would |

4

| | | |
|---|---|---|
| | | commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Tadamon. |
| Early1990's to 9/11/2001 | Tadamon | Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Tadamon agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

c.  The individual times, places, and contents of the alleged misrepresentations are not particularly known at this time.

d.  The predicate act is not based upon a criminal conviction.

e.  Civil litigation has not yet resulted in a judgment regarding the predicate acts.

f.  The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical

5

Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

g. The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including Tadamon, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6. A description of the alleged enterprise follows:

a. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First Consolidated Complaint and any additionally complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First Consolidated Complaint and any additionally complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First Consolidated Complaint and any additionally complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

b. The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International

6

Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.   Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of:  (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel.  Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.    Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Tadamon fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Enterprise relies upon a global network of banks and financial institutions, including Tadamon, and illegal activity to generate material support to continue its terrorist operations.

c.  Tadamon was not an employee, officer or director of the Enterprise, based upon present information available.

d.  Tadamon is associated with the alleged enterprise.

e.  Tadamon is a member of the Enterprise, and is separate and distinct from the Enterprise.

7

      f.   Tadamon intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.   The pattern of racketeering activity conducted by Tadamon is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.   The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Tadamon funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

9.   The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.  The Enterprise, and the racketeering activities conducted by Tadamon, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated, and/or controlled assets in the United States and elsewhere. Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11.  Plaintiffs do not allege a violation of 19 U.S.C. § 1962(a).

12.  Tadamon acquired or maintained an interest or control in the Enterprise.

13.  With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

      a.   Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

      b.   The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill,*

8

*Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact. The liable persons are the enterprise and that which makes up the enterprise.

14. Description of Conspiracy in violation of 18 U.S.C. §1962(d): The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Tadamon, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Tadamon, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Tadamon, of both those goals and the uses to which the Funds were put.

The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like Tadamon. Indeed, the Enterprise would not have been successful without enthusiastic

participation of all of the conspirators, including Tadamon.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Tadamon.   Tadamon, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Tadamon also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiffs' jobs, businesses, and livelihoods.

16. Causation: Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party.   The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

17. Damages: Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit "B," subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.   The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

18.  Below, please find a list of all federal causes of action:

| | |
|---|---|
| **Count One** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **Count Two** | Alien Tort Claims Act, 28 U.S.C. §1350 |
| **Count Nine** | Anti-Terrorism Act, 18 U.S.C. § 2331, 2333, *et. seq*. |
| **Count Ten** | RICO, 18 U.S.C. § 1962(b),1962(c), 1962(d) |
| **Count Twelve** | Foreign State Agencies and Instrumentalities, 28 U.S.C.§ 1605(a)(7), 1606 |

19. Below, please find all state causes of action:

| | |
|---|---|
| **Count Three** | Wrongful Death |
| **Count Four** | Survival |
| **Count Five** | Negligent and Intentional Infliction or Emotional Distress |
| **Count Six** | Conspiracy |
| **Count Seven** | Aiding and Abetting |
| **Count Eight** | Negligence |
| **Count Eleven** | Punitive Damages |

20.  At this time, there is no additional information to further assist the Court in adjudicating the RICO claims.

Date: March 15, 2006

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
    GINA M. MAC NEILL, ESQUIRE
    (GM 0581)


BY: _____/s/_____
    JERRY S. GOLDMAN, ESQUIRE
    (JG 8445)
    Attorneys for the Plaintiffs
    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

**EXHIBIT "A"**

**MORE DEFINITE STATEMENT/RICO STATEMENT**

**QUESTION # 2**

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Tadamon | Tadamon has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Founded in Sudan[1] on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank" or "Tadamon") lists its address as Al-Tadamon Tower, Al-Baladia Avenue, Khartoum. Tadamon knowingly and intentionally provided material support in the form of financial services to al Qaida, including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida.<br><br>In 2000, Tadamon operated through its head office in Khartoum and nineteen branches scattered throughout Sudan. The bank's corporate structure included four sub-branched and three subsidiary companies: Tadamon Islamic Co. for Trade and Investment, Ltd., Tadamon Islamic Company for Agricultural Development, Ltd., and El Tadamon Real Estate Company, Ltd. In addition, Tadamon held material investments in fifteen entities engaged in service and industrial sectors in Sudan. The bank is listed on | 18 U.S.C. §§ 1962 (b), 1962(c), 1962(d) |

13

the Khartoum Stock Exchange as a public company.

Current and former shareholders of Tadamon Islamic Bank include co-defendants Osama Bin Laden, Al Baraka Investment and Development Company[2], Faisal Islamic Bank (Sudan)[3], Dubai Islamic Bank[4], and Mohammed Hussein Al Amoudi. Along with co-Defendants Dar al Maal al Islami Trust[5] and Faisal Islamic Bank (Sudan), Tadamon is a major shareholder in co-Defendant Al Shamal Islamic Bank ("Al Shamal").[6] Tadamon joined the Provisional Board of Directors of Al Shamal in July 1988 and has been a shareholder since March 26, 1986.

Tadamon reported total assets of 83.5 billion Sudanese Dinars (US $326 million) in 1999. The bank's primary holdings were in import/export, industrial and agricultural sectors.

Tadamon has become a magnet for Sudanese nationals with business in overseas markets. The bank receives daily transfers from Saudi Arabia, Oman, United Arab Emirates and Yemen and maintains correspondent relationships with banks in Asia, Europe and the Middle East.

Since commencing operations on March 24, 1983, Tadamon Islamic Bank has adhered to a set of Islamic banking principles defined by Shari 'a. Six Islamic banks opened in Sudan between 1978 and 1984, of which Tadamon was the second. Only a month after the bank began operating, co-Defendant Al Shamal Islamic Bank obtained banking authorization from the Sudanese government.

As stated above, Tadamon is a major shareholder in Al Shamal Islamic Bank. Al Shamal maintains correspondent banking accounts in the United States with Citibank, Arab American Bank and American Express Bank. In addition, Dar al Maal al Islami Trust, an indirect parent company of Tadamon, oversees significant holdings and maintains considerable business contacts with the

14

United States.

**Activities with the Enterprise**

According to Khalid Khalil Assad's biography of Osama bin Ladin, *A Fighter from Mecca* (2000), bin Ladin himself owned shares in several Sudanese enterprises including Tadamon and Faisal Islamic Bank and Al Shamal Islamic Bank.

Testimony from former al Qaida financier and expert government witness Jamal Ahmed Mohamed al-Fadl confirms that Tadamon Islamic Bank knowingly maintained accounts for al Qaida operatives.   During the 1998 embassy bombings trial, 98-CR-1023 (LBS) SDNY, al-Fadl testified on February 6, 2001, that Osama bin Ladin's assistant, Abdouh al Mukhlafi, used the bank at bin Laden's behest:

> Do you recall anyone else that had bank accounts in their name for al Qaida?
>
> *Abdouh al Mukhlafi.*
>
> Who was this person named Abdouh al Mukhlafi?
>
> *He is from Yemen.*
>
> What role did he play for bin Laden?
>
> *He goes with bin Laden when bin Laden travel outside or inside Sudan.*
>
> Did he handle money during the travel?
>
> *Yes.*
>
> Where were the accounts held? In what countries?
>
> *In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank].*
>
> Where else?

15

*Also we got account in Bank Faisl Islami.*

In March 1991, Hassan Al Turabi's National Islamic Front ruling government in Sudan instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No 239 dated March 7, 1991. The Fund's stated purpose:

"aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces, and providing for martyrs' families."

The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal Islamic Bank, which contributed 7 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

**Al Shamal Islamic Bank**

The government of Sudan granted approval to Al Shamal Islamic Bank in April 1983 in response to a request from the Northern State Government (under the control of the NIF and Hassan al Turabi), Al Baraka Investment and Development Company and Saleh Abdullah Kamel.[7] The bank received an initial capitalization of USD $20 million. Al Shamal issued subscription shares in April 1984. The Northern States Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and Faisal Islamic Bank (Sudan) purchased shares in this initial offering.

Governor Mutasim Abdul—Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-

16

founder of and major shareholder in Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps…Jihad has now become an obligation that comes before any other duty." AP News (August 4, 1998).

The Sudanese government granted final approval to Al Shamal in July 1988. Chaired by Dr. Wahab Osman Sheikh Mosa, Al Shamal's provisional board included Al Baraka Investment and Development Corporation as well as co-Defendants Faisal Islamic Bank (Sudan) and Tadamon. The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (US $3.9 million). As of late 2001, Al-Bir International Organization (Benevolence International Foundation, a co-defendant in this matter), Faisal Islamic Bank (Sudan), Tadamon, and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal.

Al Shamal is heavily invested in the Sudanese import/export sector and posted revenues of $6.2 million and total assets of $63.1 million in 2000.

Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America. In the United States, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and Citibank in New York. Al Shamal shareholders also maintain significant U.S. operations. Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States, as detailed in the RICO statements and other pleadings already filed against DMI Trust and incorporated herein by reference.

In addition, Al Shamal Chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially

17

Designated Terrorist entity, in the United States in 1992.

**Al Shamal and al Qaida**

Al Shamal knowingly and intentionally provided financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and facilitating weapons and military equipment purchases for al Qaida.

Osama bin Laden used Al Shamal extensively during his five-year stay in Sudan.   At the invitation of Hassan Al Turabi, leader of Sudan's governing National Islamic Front party, bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises.  Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaida.  Bin Laden even provided the institution with USD $50 million in capital.  According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum.  Bin Laden invested $50 million in the bank."

As set forth previously, according to Khalid Khalil Assad's biography of Osama bin Laden, *A Fighter from Mecca* (2000), bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to bin Laden convicted for this rile in the bombings, also testified before a Grand Jury, which testimony of was admitted at trail on Feb. 20, 2001, that bin Laden kept accounts at Al

18

Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
>
> *$1200 a month.*
>
> For how long did you work for him [Osama bin Laden]?
>
> *Almost two years.*
>
> What Banks did he keep his money at?
>
> *Bank el Shamar.*

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank. Al-Fadl also described acting as a courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?
>
> *Abu Fahl, he bring it from Shamal Bank and he bring it to me.*
>
> Abu Fadl brought it from the Shamal Bank?
>
> *Yes.*
>
> Is that the bank in the Sudan?
>
> *Yes.*

In the same trial, another former al Qaida operative stated that al Qaida used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to

19

Osama bin Laden.  Upon presenting bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses occurred en route.  The witness took the check to Al Shamal and cashed it.

The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank.  Bin Laden opened the first account on March 30, 1992 for the company Al Hijrah for Construction and Development Ltd.  According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.  This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

Senator Carl Levin, Chairman of the Senate Armed Services Committee n Investigation of the Governmental Affairs Committee, states that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities.  According to reports from a leading intelligence publication, bin Laden remained a shareholder in Al Shamal as late as 2002.  A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama bin Laden's businesses in Sudan] may still be operating."

The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist Adel Abdul Jalil Batterjee, a wealthy Saudi Arabian businessman and founder of Benevolence International Foundation.  Adel Batterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaida

20

network. In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism. The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaida.

Co-Defendant Yasin al-Qadi[8] wired more than $22 million from Swiss Bank accounts to al Qaida operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al Shamal.

**Faisal Islamic Bank, major shareholder of Tadamon Islamic Bank**

The Faisal Islamic Bank (Sudan) ("FIBS") was chartered in Khartoum in 1983. Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood, a co-defendant in this *Estate of O'Neill, et al. v. Republic of Iraq, et al.* 04-CV-1076(RCC), and a friend of co-Defendant Hassan Al Turabi. In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system.

FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of so-Defendant DMI Trust. The Islamic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed al Faisal al Saud, as is DMI Trust and Faisal Islamic Bank (Sudan).

Prince Mohammed al Faisal al Saud[9] played a critical role in the development of Islamic banking, founding Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaida, and other extremist groups.

Hassan Al Turabi's friendship with Prince Mohammed al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan. FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members.   In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters.  Through this association, Turabi's party became the best financed in the Sudan.

Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan:

> Where were the accounts [of al Qaida] held?  In what countries?
>
> *(…) we got account in Bank Faisl Islami [Faisal Islamic Bank].*
>
> Is that in Khartoum?
>
> *Yes.*

**Dar al Maal al Islami Trust**

Dar al Maal al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981.  In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship." Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies.  DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.

DMI in the predecessor-in-interest to DMI Trust

22

and DMI Administrative Services SA ("DMI SA"). DMI SA is located in Geneva, Switzerland. The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions." These continents include North America, Europe, Africa and Asia.

DMI SA provides assistance to the Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology."

Therefore, DMI Trust and DMI SA directly participate in the oversight and management of DMI Trust's subsidiary and associate entities. DMI Trust owns 100% of DMI SA. DMI SA is both a wholly owned subsidiary and an agent of DMI Trust. DMI SA and DMI Trust are referred to collectively herein as "DMI."

The network of DMI companies or entities are or were also known or referred to as "Dar al Maal al Islami" (or "House of Islamic Money"). DMI's main subsidiaries and affiliates are DMI SA, Islamic Investment Company of the Gulf, Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamal Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank.

DMI and its related companied are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

Asset management is the Group's core business activity. "The Trust's policy is determined by its fifteen-member Board of Supervisors. To ensure conformity with Islamic principles, all SMI operations are reviewed and approved by its Religious Board. The trust's administrator, DMI

23

Administrative Services SA, located in Geneva, Switzerland focuses on group strategy, corporate activities, legal and financial affairs, audit and technical assistance to subsidiaries."

SMI SA is a wholly owned subsidiary directly controlled by DMI Trust that puts into action the investments, strategies, distributions and policies of the DMI Trust. DMI SA acts as one of DMI Trust's operational arms. Since its establishment, DMI has advocated and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in the modern era. DMI was founded "to remove the blemish that strikes at financial and economic transactions of Muslims in the contemporary era."

According to its spokesmen, DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise." "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim. The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."

Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen. As Mujihid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).

In a 1984 letter to the Directors of DMI Trust,

Chairman Mohammed al Faisal al Saud reaffirmed DMI's commitment to a financial jihad: "May Allah bless your Jihad and all your efforts. May He aid you and affirm your faith." Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.

Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).

DMI Trust laundered money for al Qaida, knowingly and intentionally providing financial services to the al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

Also, DMI Trust's *Zakat* accounts have been used to support al Qaida. In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization.

Both the United States and the Kingdom of Saudi Arabia have designated as al Qaida terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaida. DMI Administrative Services S.A. handled accounts of Specially Designated Global Terrorists Yassin Al Qadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaida goals.

Absent the material support and sponsorship provided by banks and financial services companies within the Islamic financial system like Tadamon Islamic Bank, al Qaida would have remained a regional extremist organization incapable of conducting large scale terrorist

|  | attacks on a global level.<br><br>As the foregoing demonstrates, Tadamon thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.    The September 11th Attack was a direct, intended and foreseeable product of Tadamon's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. |  |

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the attached More Definite Statement Applicable to Tadamon

Islamic Bank was served on all counsel of record by way of electronic filing in the

Southern District of New York on March 15, 2006.

Dated: March 15, 2006

BY:_____

GINA M. MAC NEILL, ESQUIRE

---

[1] Sudan is a co-defendant in the O'Neill actions, listed as a defendant, along with certain named Sudanese government agencies, in *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia*, 04-CV-1922(RCC).

[2] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Al Baraka Investment and Development, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[3] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Faisal Islamic Bank, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[4] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Dubai Islamic Bank, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[5] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Dar al Maal al Islami, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[6] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statement applicable to co-defendant Al Shamal, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Saleh Abdullah Kamel ,

X:\Clients\ONeill v. Saudi arabia\RICO Statements\Tadamon Islamic Bank.doc

relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[8] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Yassin al Qadi , relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[9] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Mohammed al Faisal al Saud, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).