**APPENDIX I**
**Summary Table of References in the Pleadings to the Conspiracy and to**
*Al Shamal Islamic Bank*[1]

**The Conspiracy**[2,3]

1. On September 11, 2001, approximately 3,000[4] individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network

---

[1] This table is presented as an index, serving as a guide to indicate where, in the various pleadings which are part of the instant multi-district litigation certain allegations are located. It is not all inclusive, but serves merely as a reference table.

[2] The pleadings referenced in this Appendix include (1) the O'Neill Al Baraka First Consolidated Complaint (O'Neill Al Baraka FCC), filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15; (2) the O'Neill Plaintiffs' RICO Statement filed on or about December 16, 2005, Docket No. 1550, pursuant to a stipulation of the parties approved by the Court, Docket #1461 ("O'Neill RICO Statement"); (3) the Federal Insurance First Amended Complaint as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15; (4) the Federal Ins. Co. Plaintiffs' RICO Statement filed on or about December 16, 2005 pursuant to Case Management Order No. 4 ("Federal RICO Statement"); (5) the Ashton Sixth Amended Complaint ("Ashton") filed on September 30, 2005, as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (6) the Cantor Fitzgerald plaintiff's First Amended Complaint ("Cantor FAC") as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (7) the Continental RICO Statement filed on or around December 16, 2005 pursuant to the stipulation; (8) the Burnett Third Amended Complaint ("Burnett"), as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (9) the Cantor Fitzgerald plaintiffs' RICO Statement filed on or about December 16, 2005 ("Cantor RICO Statement") pursuant to Case Management Order No. 4; (10) the Continental Complaint as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (11) the More Definite Statement filed by the Burnett plaintiffs, the Euro Brokers plaintiffs and the World Trade Center plaintiffs on September 27, 2005 ("Burnett, Euro Brokers, and WTC MDS"); (12) the World Trade Center Complaint ("WTC"), as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (13) the Euro Brokers complaint, as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; and, (14) the New York Marine Second Amended Complaint ("NYMSAC") as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15.

[3] There are references preceding the various substantive causes of actions in the FCC incorporating the various paragraphs in the pleadings without setting them forth at length. See, e.g., FCC ¶ 134.

[4] Paragraph 127 of the FCC pleads as follows:

> Attached hereto as Exhibit and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations/RICO Statements:
>
> A) More Definite Statements/Additional Allegations - Victims List

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("Federal FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC" or "O'Neill Al Baraka FCC" or "Al Baraka FCC") ¶¶ 1, 6-10 22-5; Tremsky ¶ 120; WTC ¶ 365; Cantor FAC ¶¶ 4-11.

2.      The conspirators consist of the defendants named in the in the three O'Neill actions (Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka Investment & Development Corporation, *et al.*, 04 CV 1923 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Kingdom of Saudi Arabia, *et al.*, 04 CV 1922 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Republic of Iraq, *et al.,* 04- CV 1076) ("O'Neill Iraq FCC") (with such complaints also including 'John Does'), as well as in the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL-1570 (RCC), and others. O'Neill RICO Statement, ¶ 3.

3.      The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶ 27; Cantor FAC ¶¶ 158-161.

4.      On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Al Baraka FCC ¶¶ 6-9.

5.      All 19 hijackers were members of the al Qaida network. O'Neill Al Baraka ¶¶ 6-9.

6.      All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. O'Neill Al Baraka FCC ¶ 10.

7.      The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett ¶¶ 649, 650, 654, O'Neill Iraq FCC ¶¶ 23, 38, 41, 63, 83, 250, 251; O'Neill Al Baraka FCC ¶¶ 22-4, 25, 144, 158-9, 162; Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

9.      Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

10.     The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Iraq FCC ¶ 252; O'Neill Al Baraka FCC ¶ 144; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158..

11.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, ¶ 649; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

12.    Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Lade (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks.  O'Neill Iraq FCC ¶ 38; O'Neill Al Baraka FCC ¶ 22; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; Cantor RICO Statement.

13.    Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities.  O'Neill Al Baraka FCC ¶ 23; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

14.    Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

15.    The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 25; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 231-233.

16.    The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶ 27; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

17.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Al Baraka FCC ¶¶ 177-180; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 177-224.

18.    As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 19, 23, 251; O'Neill Al Baraka FCC ¶ 157; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 231-33.

19.     As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-2; O'Neill Al Baraka FCC ¶ 158; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

20.     As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 159; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 177-224.

21.     The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance ¶¶ 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 160, 163, 167; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224.

22.     As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶ 161; O'Neill Iraq FCC ¶¶ 254, 270, 271; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224.

23.     Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

24.     OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Al Baraka FCC ¶ 165; O'Neill Iraq FCC ¶¶ 223, 228, 242; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

25.     The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. O'Neill Al Baraka FCC ¶ 168; O'Neill Iraq FCC ¶ 251; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

26.     By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance FAC ¶ 642; O'Neill Al Baraka FCC ¶ 169; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

27.     In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery,

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance FAC ¶ 628; O'Neill Al Baraka FCC ¶ 177; O'Neill Iraq FCC ¶ 267; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

28. The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett ¶ 662, O'Neill Al Baraka FCC ¶¶ 178-180; O'Neill Iraq FCC ¶¶ 267, 272; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 162-176, 177-224, 234-56.

29. The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Al Baraka FCC ¶162; O'Neill Iraq FCC ¶ 63; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 162-176, 177-224, 234-56.

30. The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶ 163; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

31. All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett ¶ 674; Continental Casualty ¶ 604; Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

32. The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett ¶ 673; Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶¶ 152, 169; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

33. The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill RICO Statement, ¶ 6a; O'Neill Iraq FCC ¶¶ 263-5; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56; Cantor RICO Statement.

34. The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. O'Neill Al Baraka FCC ¶¶ 139, 172; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 234-56; Cantor RICO Statement.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

**The Relationship between Al Shamal Islamic Bank and the Conspiracy**

35.     Defendants Al Baraka Investment & Development Corporation a/k/a Al Baraka Bank
a/k/a Dallah Albaraka Group, LLC, National Commercial Bank, a/k/a National
Commercial Bank of Saudi Arabia *AND* SNCB Corporate Finance Ltd., *AND* SNCB
Securities Limited (with National Commercial Bank, SNCB Corporate Finance Ltd. And
SNCB Securities Limited collectively referred to herein as "NCB" or "National
Commercial Bank"),  Faisal Islamic Bank – Sudan a/k/a Faysal Islamic Bank- Sudan
a/k/a Faisal Islamic Bank a/k/a Faysal Islamic Bank, Al Rajhi Banking and Investment
a/k/a/ Al Rajhi Bank, Al Barakaat Exchange LLC a/k/a al Barakaat Bank, Dar al Maal al
Islami a/k/a a/k/a Dar-Al-Mall Al Islami a/k/a Dar al-Maal al- Islami *(DMI) and* Dar al
Maal Administrative Services SA a/k/a DMI Administrative Services SA *and* Dar Al
Maal Islami Trust (collectively "DMI" or "Dar al Mall Islami"), **Al Shamal Islamic
Bank a/k/a Shamel Bank a/k/a/ Bank el Shamar,** Tatex Trading GmbH, Triple-B
Trading GmbH, Tadamon Islamic Bank, Arab Bank, PLC, Dubai Islamic Bank, Bank al-
Taqwa, Ltd. a/k/a Bank of Taqwa a/k/a Bank Al-Taqwa a/k/a Bank of Taqwa Limited,
Nada International Anstalt a/k/a Yousef M. Nada & Co Gesellschaft MBH a/k/a Youssef
M. Nada Establishment, Saudi American Bank, Youssef M Nada & Co. Yousef M. Nada
& Co Gesellschaft MBH a/k/a Youssef M. Nada Establishment, Schreiber & Zindel, Dr.
Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin
Wachter, Sercor Treuhand Anstalt, Albert Friedrich Armand Huber, a/k/a Ahmed Huber
a/k/a Albert Huber a/k/a Armand Albert Friedric  a/k/a Armand Huber a/k/a/ Ahmad
Huber-el Biali, Ali Ghaleb Himmat, al Taqwa bank a/k/a Bank Al Taqwa, a/k/a Bank al
Taqwa Limited a/k/a Bank of Taqwa Limited, al Taqwa Trade, Property and Industry,
Ltd. a/k/a al Taqwa Trade, Property and Industry Company Limited, a/k/a al Taqwa
Trade, Property and Industry Establishment a/k/a Himmat Establishment a/k/a Hochburg
a/k/a Waldenburg a/k/a Al Taqwa Trade, Property and Industry Limited, Akida Bank
Private Limited, Akida Investment Co. Ltd, NADA Management Organization, S.A.,
Youssef M. Nada a/k/a Yousseff Mustafa Nada a/k/a Youssef Nada, Youssef M. Nada &
CO. Gesekkscgaft, M.B.H., Nada International Anstalt, Youssef M. Nada & Co., Nasco
Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin
Holding A.S., Nascoservice S.R. L., Nascotex S.A., Barzan E-Tikriti a/k/a/ Barzan
Ibrahim Hasan a/k/a Barzan Ibrahim Hasan al-Tikriti, Metalor a/k/a La Groupe Metalor
a/k/a La Groue Metalor Technologies a/k/a Metalor Group a/k/a Metalor Technologies
SA, Babca Dek Gottardo a/k/a Banca Del'Gottardo, Nasreddin Company Nasco SAS DI
Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group, International
Holding Limited, Nasreddin International Group Limited Holding,  Ahmad I. Nasreddin
a/k/a  Hadj Ahmed Nasreddin a/k/a Ahmed Idriss Nasreddin *AND* Nasreddin Group
International Limited Holdings a/k/a Nasreddin International Group Holdings Limited
*a/k/a* Nasreddin  International Group Ltd., Asat Trust Reg., and Islamic Investment
Company of the Gulf (Bahrain) EC, are banks, financial organizations, and companies
located all over the world who have conspired with Osama bin Laden and al Qaeda to
raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

order to support and finance their terrorist activities including, but not limited to, the
September 11th attacks. O'Neill Al Baraka FCC ¶ 22; Cantor FAC ¶¶ 1, 11, 33-42, 49-50,
90-92, 122-135, 141-158; 162-176, 185-192, 234-56; Cantor RICO Statement.

36.   Defendant Faisal Islamic Bank was one of the five main founders of al Shamal Islamic
      Bank. Defendant Mohammed al Faisal al Saud is heavily involved in the sponsorship of
      terror through Faisal Islamic Bank - Sudan.  O'Neill Al Baraka FCC ¶ 36; Cantor FAC ¶¶
      1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement.

37.   Defendant Faisal Islamic Bank was implicated in the management of al Qaeda operatives'
      bank accounts by the testimony of a former finance manager of al Qaeda during the trial
      on the 1998 U.S. embassy bombings in Africa.  O'Neill Al Baraka FCC ¶ 37; Cantor
      FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement.

38.   Al Shamal Islamic Bank was formed in the Republic of the Sudan in April 1983, and
      started operations on January 2, 1990, in part with a capital contribution of some $50
      million by Osama bin Laden. In or about 1984, Osama bin Laden moved several of his
      Saudi businesses and assets, or extended the reach of those businesses and assets, into the
      Sudan.  O'Neill Al Baraka FCC ¶ 46; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135;
      Cantor RICO Statement; Burnett; WTC ¶ 19, 106, 114.

39.   Osama bin Laden and other al Qaida operatives had bank accounts with al Shamal
      Islamic Bank and used al Shamal to fund terrorist activities.  O'Neill Al Baraka FCC ¶
      47; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement.

40.   In April 1984, al Shamal Islamic Bank issued shares to major shareholders, among
      others, the Northern State Government, Omer Abdallah Kamel, Defendant Saleh
      Abdullah Kamel, Defendant al Baraka Investment and Development Corporation and
      Defendant Faisal Islamic Bank.  Cantor MDS ¶ 2; O'Neill Al Baraka FCC ¶ 48; Cantor
      FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement; Burnett, Euro Brokers, and
      WTC MDS ¶ 3; Burnett ¶ 58; WTC ¶ 119.

41.   The chairman and a major shareholder of al Shamal Islamic Bank is Adel Abdul Jalil
      Batterjee, who is also chairman of al-Bir Saudi Organization, who's U.S. Branch,
      Benevolence International Foundation is also a front for al Qaida sponsorship.  Ashton ¶
      43; O'Neill Al Baraka FCC ¶ 49; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor
      RICO Statement; Burnett ¶ 75; WTC ¶ 122, 123.

42.   Batterjee was also chairman of a Saudi charity, the World Assembly of Youth
      ("WAMY"), which is the subject of an F.B.I, investigation for terrorist activities.  O'Neill
      Al Baraka FCC ¶ 50; Burnett ¶ 76.

43.   The Enterprise would not have been successful without enthusiastic participation of all of
      the conspirators, including Al Shamal.  In order to identify nineteen individuals willing,
      able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al
      Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders
      needed to select from a vast pool of recruits and trainees, which pool would not have
      been available to it without the assistance provided by Al Shamal.  Al Shamal, with
      knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to
      commit at least two predicate acts and all agreed to participate in the conspiracy, either

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

expressly or impliedly. Al Shamal conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Al Shamal conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al Shamal also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations. Federal RICO Statement ¶ 14; Continental RICO Statement ¶ 14; O'Neill RICO Statement ¶ 14; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement.

44.     Al Shamal has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Al Shamal conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Al Shamal conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. O'Neill RICO Statement, Exhibit "A", at p.13; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement.

45.     The government of Sudan granted approval to Al Shamal Islamic Bank (herein "Al Shamal") in April 1983 in response to a request from the Northern State Government (under the control of the NIF and Hassan Al Turabi), Al Shamal Investment and Development Company and Saleh Abdullah Kamel.  The bank received an initial capitalization of USD $20 million. Al Shamal issued subscription shares in April 1984. The Northern State Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel, and co-Defendant Faisal Islamic Bank (Sudan) purchased shares in this initial offering. Federal RICO Statement Exhibit "A", at p.7; Ashton ¶ 40, 41; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement; ; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill RICO Statement, Exhibit "A", at p.13; Burnett ¶¶ 58, 67, 72; Euro Brokers ¶ 108; WTC ¶¶ 106, 119, 120, 1221; Burnett, Euro Brokers, and WTC MDS ¶ 2.

46.     A spokesman and shareholder for Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps…Jihad had now become an obligation that comes before any other duty."  ("Sudanese students enroll for controversial military service," AP News (June 6, 1998); AP News (August 4, 1998).) Federal RICO Statement Exhibit "A", at p.7; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill RICO Statement, Exhibit "A", at p.13.

47.     The government granted final approval to Al Shamal in June 1988.  Chaired by Dr. Wahab Osman Sheikh Mosa, Al Shamal's provisional board included Al Baraka Investment and Development Corporation as well as co-defendants Faisal Islamic Bank (Sudan) and Tadamon Islamic Bank.  The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (USD $3.9 million).  As of late 2001, co-defendants Al-Bir International Organization (Benevolence International Foundation), Faisal Islamic Bank (Sudan), Tadamon Islamic Bank and Adel Abdul Jalil Batterjee

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

remained major shareholders in Al Shamal. Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135;
Cantor RICO Statement; Federal RICO Statement Exhibit "A", at p.7; O'Neill RICO
Statement, Exhibit "A", at p.14; Burnett ¶ 67; WTC ¶ 114; Burnett, Euro Brokers, and
WTC MDS ¶ 4, 5.

48.     Al Shamal is heavily invested in the Sudanese import/export sector and posted revenues
        of $6.2 million and total assets of $63.1 million in 2000.  Cantor FAC ¶¶ 1, 11, 33-42,
        90-92, 122-135; Cantor RICO Statement; Federal RICO Statement Exhibit "A", at p.8;
        O'Neill RICO Statement, Exhibit "A", at p.14; Burnett, Euro Brokers, and WTC MDS ¶
        6.

49.     Al Shamal maintains correspondent banking relationships with institutions throughout
        Africa, Asia, Europe, the Middle East, and North America.  In the United States, Al
        Shamal holds correspondent bank accounts at Arab American Bank, American Express
        Bank and CitiBank in New York.  Al Shamal shareholders also maintain significant U.S.
        operations.  Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a
        financial institution that maintains significant holdings and business contacts in the
        United States, as detailed in the RICO statements and other pleadings already filed
        against DMI Trust and incorporated herein by reference. Federal RICO Statement Exhibit
        "A", at p.8; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement;
        Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A",
        at p.14; Burnett, Euro Brokers, and WTC MDS ¶ 8, 9.

50.     In addition, Al Shamal Chairman Adel Abdul Jalil Batterjee established Benevolence
        International Foundation, a Specially Designated Terrorist entity, in the United States in
        1992. Federal RICO Statement Exhibit "A", at p.8; O'Neill RICO Statement, Exhibit
        "A", at p.14; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-135; Cantor RICO Statement; WTC
        ¶ 122; Burnett, Euro Brokers, and WTC MDS ¶ 9.

51.     Al Shamal knowingly and intentionally provided financial services to al Qaida (including
        maintaining and servicing al Qaida bank accounts and accounts used to fund and support
        al Qaida), and facilitating weapons and military equipment purchases for al Qaida.
        Federal RICO Statement Exhibit "A", at p.8; Cantor FAC ¶¶ 1, 11, 33-42, 90-92, 122-
        135; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill
        RICO Statement, Exhibit "A", at p.15; Burnett, Euro Brokers, and WTC MDS ¶ 10.

52.     Osama bin Laden used Al Shamal extensively during his five-year stay in Sudan.  At the
        invitation of Hassan Al Turabi, leader of Sudan's governing National Islamic Front party,
        bin Laden moved to Khartoum in 1991 and developed a complex set of business and
        terrorist enterprises.  Bin Laden built highways and other infrastructure for Al Turabi,
        establishing accounts at Al Shamal used by these front companies and al Qaida.  Bin
        Laden even provided the institution with USD $50 million in capital.  According to a
        1996 State Department report, "Bin Laden and wealthy National Islamic Front members
        capitalized the Al Shamal Islamic Bank in Khartoum.  Bin Laden invested $50 million in
        the bank." Federal RICO Statement Exhibit "A", at p.8; Cantor FAC ¶¶ 1, 11, 33-42, 90-
        92, 122-135; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 6;
        Ashton Sixth Consolidated Complaint ("Ashton") ¶ 38; O'Neill RICO Statement, Exhibit

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

"A", at p.15;Burnett ¶ 69, 70; Euro Brokers ¶ 114; WTC ¶ 116, 117; Burnett, Euro Brokers, and WTC MDS ¶11.

53.     Osama bin Laden's involvement in business transactions in the Sudan, including the Al Shamal Bank, were confirmed by a 2002 Congressional Research Service Report:

> *In 1991, bin Laden relocated to SUDAN with the approval of SUDAN National Islamic Front (NIF) leader Hasan Al Turabi. There, in concert with NIF leaders, [bin Laden] built a network of businesses, including an Islamic Bank (al Shamal), an import-export firm, and firms that exported agricultural products. An engineer by training, bin Laden also used his family connections in the construction business to help SUDAN build roads and airport facilities. The business in SUDAN . . . enabled him to offer safe haven and employment in SUDAN to AL QAEDA members, promoting their involvement in radical Islamic movements in their countries of origin (especially Egypt) as well as anti-US terrorism.*

Ashton Sixth Amended Complaint ("Ashton") ¶ 39; Burnett ¶ 71; WTC ¶ 117.

54.     According to Khalid Khalil Assad's biography of Osama bin Laden, *A Fighter from Mecca* (2000), bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank. Federal RICO Statement Exhibit "A", at p.9; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.15; Burnett, Euro Brokers, and WTC MDS ¶12.

55.     Al Shamal Bank has repeatedly been used to fund criminal and terrorist activities.  A former associate of Osama bin Laden, Jamal Ahmad al-Fadhl, testified during the United States trial on the 1998 embassy bombings in Africa, that Osama bin Laden and at least six al Qaeda operatives held bank accounts in Al Shamal under their real names:

> While you were in the Sudan, did you handle money for Osama Bin Laden?
>
> *Could you repeat the question.*
>
> Did you work on the finances while you were in the Sudan?
>
> *Yes.*
>
> Did you know where the bank accounts of Osama bin Laden and al Qaida were?
>
> *Yes.*
>
> Do you know whose names they were in?
>
> *The Bank account under Osama bin Laden Bank Shamel [al Shamel Islamic Bank], Khartoum.*
>
> That was under Osama bin Laden's true name?
>
> *Yes.*
>
> Were there accounts in other names?

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

> *Yes. Afad Makkee got account also.*
>
> Afad Makkee, the account that he had under his name, do you know what that name is?
>
> *I remember Madani Sidi al Tayyib.*
>
> Do you know of any other persons who had al Qaeda money in their accounts?
>
> *Abu Rida al Suri.*
>
> Do you know his true name?
>
> *Nidal.*
>
> Anyone else that you knew had al Qaeda money in bank accounts in their name?
>
> *Abu Hajer al Iraqi.*
>
> Do you know his true name?
>
> *Mamdouh Slaim.*
>
> Do you have any accounts in your name?
>
> *Shared with Abu Fadhl.*
>
> So you had accounts in your name that were shared with Abu Fadhl?
>
> *Yes.*
>
> Do you recall anyone else that had bank accounts in their name for al Qaeda?
>
> *Abdouh al Mukhlafi.*
>
> Burnett ¶ 79; WTC ¶ 126.

56.   Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank.  Wadih El-Hage, former personal secretary to bin Laden convicted for his role in the bombings, also testified, before a Grand Jury[5] that bin Laden kept accounts at Al Shamal Bank:

> When you worked for Osama bin Laden in the Sudan, how much were you paid?
>
> *$1200 a month.*
>
> For how long did you work for him [Osama bin Laden]?
>
> *Almost two years.*
>
> What Banks did he keep his money at?
>
> *Bank Al Shamar.*

Federal RICO Statement Exhibit "A", at p.9; Ashton ¶ 46; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill RICO Statement, Exhibit "A",

---

[5] The testimony was introduced at Wadi el Hage's trial before the United States District Court for the Southern District of New York.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

at p.15;  Burnett ¶ 80; Euro Brokers ¶ 115; WTC ¶ 127; Burnett, Euro Brokers, and WTC MDS ¶13.

57.    In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.  Al-Fadl also described acting as a courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan.  Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership.  When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?
>
> Abu Fahl, he bring it from Shamal Bank and he bring it to me.
>
> Abu Fadl brought it from the Shamal Bank?
>
> *Yes.*
>
> Is that the bank in the Sudan?
>
> *Yes.*

Federal RICO Statement Exhibit "A", at p.9; Ashton ¶ 47; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill RICO Statement, Exhibit "A", at p.16; Burnett ¶81; WTC ¶ 128; Burnett, Euro Brokers, and WTC MDS ¶14.

58.    In the same trial, another former al Qaida operative stated that al Qaida used Al Shamal for operational purposes.  The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden.  Upon presenting bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses occurred en route.  The witness took the check to Al Shamal and cashed it. Federal RICO Statement Exhibit "A", at p.10; Ashton ¶ 65; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.16; Burnett ¶82; Euro Brokers ¶ 115; WTC ¶ 129; Burnett, Euro Brokers, and WTC MDS ¶ 15.

59.    The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank.  Bin Laden opened the first account on March 30, 1992 for the company Al Hijrah for Construction and Development Ltd.  According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.  This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports. Federal RICO Statement Exhibit "A", at p.10; Ashton ¶ 44, 45; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 6; O'Neill RICO Statement, Exhibit "A", at p.17; Burnett ¶ 77, 78; WTC ¶ 124, 125; Burnett, Euro Brokers, and WTC MDS ¶ 16.

60.    Senator Carl Levin, Chairman of the Senate Armed Services Committee Investigation of the Governmental Affairs Committee, states that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

bank's facilities.  According to reports from a leading intelligence publication, bin Laden remained a shareholder in Al Shamal as late as 2002.  A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama bin Laden's businesses in Sudan] may still be operating." Federal RICO Statement Exhibit "A", at p.10; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A", at p.17; Burnett ¶83; WTC ¶ 130; Burnett, Euro Brokers, and WTC MDS ¶ 17, 18.

61.     The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist Adel Abdul Jalil Batterjee, a wealthy Saudi Arabian businessman and founder of Benevolence International Foundation.  Adel Batterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaida network.  In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism.  The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaida. Federal RICO Statement Exhibit "A", at p.11; Ashton¶ 43; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A", at p.17; Burnett ¶ 75; Burnett, Euro Brokers, and WTC MDS ¶ 19.

62.     Co-Defendant Yasin al-Qadi wired more than $22 million from Swiss Bank accounts to al Qaida operatives and entities between 1990 and 2003.  Al-Qadi transferred nearly half of these funds through Al Shamal. Federal RICO Statement Exhibit "A", at p.11; Cantor RICO Statement; Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A", at p.18; Burnett, Euro Brokers, and WTC MDS ¶ 20.

63.     In March 1991, Hassan Al Turabi's government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. 239 dated March 7, 1991.  The Fund's stated purpose: aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces; and providing for martyrs' families. Federal RICO Statement Exhibit "A", at p.11; Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A", at p.18; Burnett, Euro Brokers, and WTC MDS ¶ 21.

64.     The ISSF jihad fund's largest public and private contributors were Prince Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad. Federal RICO Statement Exhibit "A", at p.11; Continental RICO Statement, Exhibit "A", at p. 7; O'Neill RICO Statement, Exhibit "A", at p.18; Burnett, Euro Brokers, and WTC MDS ¶22.

### *Batterjee*

65.     SDGT and Al Shamal Chairman Adel Abdul Jalil Batterjee shareholder in person since June 7, 1999, and through Al-Bir Organization since October 13, 1998, is the Chairman

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

of Al-Bir Saudi Organization, whose American branch, Benevolence International Foundation (BIF), was subject to a criminal complaint in U.S. District Court on April 29, 2002. Federal RICO Statement Exhibit "A", at p.12; Cantor FAC ¶¶ 90-92, 122-135, Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.18; Burnett ¶ 75; WTC ¶ 122; Burnett, Euro Brokers, and WTC MDS ¶ 23.

66.    Bank Chairman Batterjee established Bank, now a Specially Designated Global Terrorist entity, in the United States in 1992.  Continental RICO Statement, Exhibit "A", at p. 8; Burnett ¶ 75; Euro Brokers ¶ 117; WTC ¶ 122.

67.    Benevolence International Foundation held accounts at Al Shamal from 1991-2002. These accounts were used for the benefit of al Qaida.  Ashton ¶ 48.

68.    Co-Defendant Enaam M. Aranout, Chairman of Batterjee's BIF, had a relationship with Osama bin Laden and key associates dating back to mare than a decade.  The foundation is used by al Qaida for logistical support.  Terrorists attempting to obtain chemical and nuclear weapons on behalf of al Qaida have contacts with the foundation and its office personnel.  On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding BIF donors by diverting funds to pay for supplies to jihadists active in Bosnia and Chechnya. Federal RICO Statement Exhibit "A", at p.12; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.18; Burnett, Euro Brokers, and WTC MDS ¶ 24.

69.    Documents recovered from March 2002 raids of BIF's offices in Bosnia illustrates Batterjee's instrumental role in the founding of al Qaida.  The Government's Evidentiary Proffer in *United States v. Enaam Aranout* describes a document called the "Golden Chain": BIF possessed in the file a handwritten draft list of the people referred to within al Qaida as the "Golden Chain," wealthy donors to mujahideen efforts.  At the top of the list is a Koranic verse stating:  "And spend for God's cause."  The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor.   Usama" appears after seven of the listings, including the listing "Bin Laden Brothers."  "Baterji", LBI's and BIF's founder, appears after six of the listings. Federal RICO Statement Exhibit "A", at p.12; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.19; Burnett, Euro Brokers, and WTC MDS ¶ 25.

70.    Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida.  A Worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator." Federal RICO Statement Exhibit "A", at p.13; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.19; Burnett, Euro Brokers, and WTC MDS ¶ 26.

71.    In a book published in 2002, Batterjee writes that the West is morally corrupt and that its war on terrorism is just an excuse to try to stop Muslims from spreading Islam. According to Batterjee, Muslims have tried to peacefully expand Islam throughout the world, but those attempts have always met armed opposition.  So Muslims have a right to

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

fight back.  More and more clashes with the West are inevitable, he writes, predicating that they will culminate in a final military encounter.  "Does any doubt remain that the great confrontation…is certainly coming?"  Federal RICO Statement Exhibit "A", at p.13; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.19; Burnett, Euro Brokers, and WTC MDS ¶ 27.

### *Faisal Islamic Bank*

72.  The Faisal Islamic Bank (Sudan) ("FIBS") was chartered in Khartoum in 1983.  Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of co-Defendant Hassan Al Turabi.  In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system. Federal RICO Statement Exhibit "A", at p.13; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p. 20; Burnett, Euro Brokers, and WTC MDS ¶ 28.

73.  FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.  Federal RICO Statement Exhibit "A", at p.13; Ashton ¶ 42, 49; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p. 20; Euro Brokers ¶111; Burnett, Euro Brokers, and WTC MDS ¶ 29.

74.  FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of so-Defendant DMI Trust.  The Islamic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed al Faisal al Saud, as is DMI Trust and Faisal Islamic Bank (Sudan). Federal RICO Statement Exhibit "A", at p.13; Ashton ¶ 42; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.20; Euro Brokers ¶ 111; Burnett, Euro Brokers, and WTC MDS ¶ 30.

75.  Prince Mohammed al Faisal al Saud played a critical role in the development of Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaida, and other extremist groups.  Federal RICO Statement Exhibit "A", at p.14; O'Neill RICO Statement, Exhibit "A", at p.20; Burnett, Euro Brokers, and WTC MDS ¶ 31.

76.  Hassan Al Turabi's friendship with Prince Mohammed al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan.  FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members.  In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters.  Through this association, Turabi's party became the best financed in the Sudan. Federal RICO Statement Exhibit "A", at p.14; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.20; Burnett, Euro Brokers, and WTC MDS ¶ 32.

77.  Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan:

>  Where were the accounts [of al Qaida] held?  In what countries?

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

> (…) we got account in Bank Faisl Islami [Faisal Islamic Bank].
>
> Is that in Khartoum?
>
> Yes.

Federal RICO Statement Exhibit "A", at p.14; Ashton ¶ 50; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.21; Euro Brokers ¶ 118; Burnett, Euro Brokers, and WTC MDS ¶ 33.

### *Tadamon Islamic Bank*

78.  Founded on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank") became a major shareholder of Al Shamal on March 26, 1986.  Tadamon Islamic Bank continues to hold a significant stake in Al Shamal through September 11, 2001. Federal RICO Statement Exhibit "A", at p.14; Ashton ¶ 55, 58; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.21; Euro Brokers ¶ 112; Burnett, Euro Brokers, and WTC MDS ¶ 34.

79.  According to testimony from former al Qaida financier Jamal Ahmed Mohamed al-Fadl, Tadamon Islamic Bank held accounts for al Qaida operatives.  During the 1998 embassy bombings trial, al-Fadl testified on February 20, 2001, that Osama bin Laden's assistant, Abdouh al Mukhlafi, used the bank at bin Laden's behest:

> Do you recall anyone else that had bank accounts in their name for al Qaida?
>
> *Abdouh al Mukhlafi.*
>
> Who was this person named Abdouh al Mukhlfi?
>
> *He is from Yemen.*
>
> What role did he play for bin Laden?
>
> He goes with bin Laden when bin Laden travel outside or inside Sudan
>
> Did he handle money during the travel?
>
> *Yes.*
>
> Where were the accounts held? In what countries?
>
> In Sudan and is in Bank Tadamon Islami [Tadamon Islmic Bank].

Federal RICO Statement Exhibit "A", at p.14; Ashton 57; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.21; Euro Brokers ¶ 119; Burnett, Euro Brokers, and WTC MDS ¶ 35.

### *Islamic Investment Company of the Gulf (Bahrain)*

80.  Islamic Investment Company of the Gulf, the parent of Al Shamal shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan), is based in Bahrain.  The bank recently merged with Faisal Islamic Bank group, creating a new entity called Al-Shamal Bank.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

Al-Shamal Bank is a direct subsidiary of DMI Trust.  One of Al-Shamal's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama bin Laden. Federal RICO Statement Exhibit "A", at p.15; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.22; Euro Brokers ¶ 108; Burnett, Euro Brokers, and WTC MDS ¶ 36.

### *Dar al Maal al Islami Trust*

81.   Dar al Maal al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981.  In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."   Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies.  DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement. Federal RICO Statement Exhibit "A", at p.15; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.22; Burnett, Euro Brokers, and WTC MDS ¶ 37.

82.   DMI in the predecessor-in-interest to DMI Trust and DMI SA.  DMI SA is located in Geneva, Switzerland.  The DMI Trust has an "extensive network stretching over four continents, with well integrated regional subsidiaries enabling it to respond to local business needs and conditions."  These continents include North America, Europe, Africa and Asia. Federal RICO Statement Exhibit "A", at p.16; Ashton ¶435; O'Neill RICO Statement, Exhibit "A", at p.22.

83.   DMI SA provides assistance to the Board of Supervisors of DMI Trust, and "under its direction to subsidiaries, in particular in the areas of legal and financial control, audit and risk management and information technology." Federal RICO Statement Exhibit "A", at p.16; O'Neill RICO Statement, Exhibit "A", at p.23.

84.   Therefore, DMI Trust and DMI SA directly participate in the oversight and management of DMI Trust's subsidiary and associate entities.  DMI Trust owns 100% of DMI SA.  DMI SA is both a wholly owned subsidiary and an agent of DMI Trust.  DMI SA and DMI Trust are referred to collectively herein as "DMI." Federal RICO Statement Exhibit "A", at p.16; O'Neill RICO Statement, Exhibit "A", at p.23.

85.   The network of DMI companies or entities are or were also known or referred to as "Dar al Maal al Islami" (or "House of Islamic Money").  DMI's main subsidiaries and affiliates are DMI SA, Islamic Investment Company of the Gulf, Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamal Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank. Federal RICO Statement Exhibit "A", at p.16; O'Neill RICO Statement, Exhibit "A", at p.23; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

86.   DMI and its related companied are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden. Federal RICO Statement Exhibit "A", at p.17; O'Neill RICO Statement, Exhibit "A", at p.23.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

87.  Asset management is the Group's core business activity.  "The Trust's policy is
determined by its fifteen-member Board of Supervisors.  To ensure conformity with
Islamic principles, all SMI operations are reviewed and approved by its Religious Board.
The trust's administrator, DMI Administrative Services SA, located in Geneva,
Switzerland focuses on group strategy, corporate activities, legal and financial affairs,
audit and technical assistance to subsidiaries." Federal RICO Statement Exhibit "A", at
p.17; O'Neill RICO Statement, Exhibit "A", at p.23.

88.  DMI SA is a wholly owned subsidiary directly controlled by DMI Trust that puts into
action the investments, strategies, distributions and policies of the DMI Trust.  DMI SA
acts as one of DMI Trust's operational arms.  Since its establishment, DMI has advocated
and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in
the modern era.  DMI was founded "to remove the blemish that strikes at financial and
economic transactions of Muslims in the contemporary era." Federal RICO Statement
Exhibit "A", at p.17; O'Neill RICO Statement, Exhibit "A", at p.24.

89.  According to its spokesmen, DMI is one important element of an "entire series of
measures aimed at setting up an integrated network of institutions that will form the basis
of an Islamic economy and announce to the Umma (Muslim Community) that an era of
prosperity and power in the world is opening up to it, God willing, the path to paradise."
"It is in Islam in all its power and its momentum that the Lord blesses; there resides the
difference between the strong Muslim and the weak Muslim.  The strong engages in
jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the
weak renounces all form of jihad and prefers to hide away, choosing rituals as his only
refuge, surrendering the way to seeds of evil." Federal RICO Statement Exhibit "A", at
p.17; O'Neill RICO Statement, Exhibit "A", at p.24; Cantor FAC ¶¶ 90-92, 122-135;
Cantor RICO Statement.

90.  Significantly, the DMI spokesman quoted above refers to his brothers in the banking
industry as Mujahideen.  As Mujihid (singular of mujahideen) is the title given to a
warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to
advance a violent form of jihad through his comments, and not merely a peaceful and
legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of
Islam). Federal RICO Statement Exhibit "A", at p.18; O'Neill RICO Statement, Exhibit
"A", at p.24.

91.  In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed al Faisal al Saud
reaffirmed DMI's commitment to a financial jihad:  "May Allah bless your Jihad and all
your efforts.  May He aid you and affirm your faith."  Although the DMMI Trust website
lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the
Bahamas (as the Dar Al-Maal Al-Islami Trust) Registered Office), 10 Deveaux Street,
P.O. Box N-9935, Nassau) as of 1981. Federal RICO Statement Exhibit "A", at p.18;
O'Neill RICO Statement, Exhibit "A", at p.24.

92.  Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon
Islamic Bank and Faisal Islamic Bank (Sudan). Federal RICO Statement Exhibit "A", at
p.18; Cantor MDS ¶ 35; O'Neill RICO Statement, Exhibit "A", at p.25; Burnett, Euro
Brokers, and WTC MDS ¶ 38.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

93.  DMI Trust laundered money for al Qaida, knowingly and intentionally providing financial services to the al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida. Federal RICO Statement Exhibit "A", at p.18; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.25; Burnett, Euro Brokers, and WTC MDS ¶ 39.

94.  Also, DMI Trust's *zakat* accounts have been used to support al Qaida.  In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization. Federal RICO Statement Exhibit "A", at p.18; O'Neill RICO Statement, Exhibit "A", at p.25; Cantor FAC ¶¶ 90-92, 122-135, Cantor RICO Statement (Dec. 16, 2005); Euro Brokers ¶ 120.

95.  Both the United States and the Kingdom of Saudi Arabia have designated as al Qaida terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaida.  DMI Administrative Services S.A. handled accounts of Specially Designated Global Terrorists Yassin Al Qadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaida goals. Federal RICO Statement Exhibit "A", at p.18; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement; O'Neill RICO Statement, Exhibit "A", at p.25.

96.  As the foregoing demonstrates, Al Shamal thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Al Shamal's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. O'Neill RICO Statement, Exhibit "A", at p.25.

**Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.**

97.  At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶ 609; Cantor RICO Statement.

98.  At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶ 610; Cantor RICO Statement.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

99.     In furtherance of their conspiracy to commit acts of international terrorism against the
        United States, its nationals and allies, the defendants engaged in a pattern of racketeering
        activity which included, without limitation:  acts of murder, kidnapping, arson, robbery,
        and extortion; dealings in controlled substances and listed chemicals; the falsification of
        identification documents; the unlawful procurement, reproduction, sale and use of
        naturalization and citizenship papers, passports and visas; the obstruction of federal and
        state criminal investigations; and financial institution and mail fraud.  Federal Insurance
        FAC ¶ 619; O'Neill Al Baraka FCC ¶ 177; O'Neill Iraq FCC ¶ 267; Cantor RICO
        Statement.

100.    The acts of racketeering activity (predicate acts) include:

        a.   acts that involve murder arson and robbery which are chargeable under State Law
             and punishable by imprisonment for more than one year and are within the scope
             of 18 U.S.C. § 1961(l)(B);

        b.   acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection
             with identification documents), 18 U.S.C. § 1341 (relating to mail fraud), 18
             U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (financial institution
             fraud), 18 U.S.C. § 371 (government fraud) and are within the scope of 18 U.S.C.
             § 1961(1)(B);

        c.   acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to
             forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. §
             1961(l)(B);

        d.   acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money
             laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

        e.   acts indictable under 18 U.S.C. § 1952 and are within the scope of 18 U.S.C. §
             1961

        f.   acts that are indictable under 18 U.S.C. § 2314 (relating to interstate
             transportation of stolen property) and are within the scope of 18 U.S.C. §
             1961(1)(B);

        g.   act indictable under 26 U.S.C. § 7212(a), 26 U.S.C. § 7206 (1), (2) (tax) and are
             within the scope of 18 U.S.C. § 1961;

        h.   acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction
             of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

        i.   acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to
             acts of terrorism and providing material support to terrorism) and are within the
             scope of 18 U.S.C. §1961(1)(B).

        Al Baraka FCC Exhibit AC, ¶ 5(a); Continental Casualty ¶ 611; Cantor RICO
Statement.

101.    Each of defendants' racketeering activities was taken for the purpose of furthering
        defendants' common scheme to commit acts of terrorism against the United States, its
        nationals and its allies.  Each racketeering act had similar purposes, involving the same or

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

similar participants and methods of commission and had similar results. Continental
Casualty 612.  The pattern of racketeering is more fully set forth in O'Neill RICO
Statement, ¶¶5(b), (f), and (g) and Cantor RICO Statement.

102.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in their
business and property in an amount to be determined at trial but believed to be in excess
of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental
Casualty ¶ 613.

103.    The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail
herein and in the Exhibits attached hereto, were the direct and proximate result of the
aforesaid pattern of racketeering activity by the defendants, acting individually and in
concert with one another. Federal Insurance ¶ 620; O'Neill Iraq FCC ¶ 272; O'Neill Al
Baraka FCC ¶ 180; Cantor RICO Statement.

104.    The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in
the Complaint, the First Amended Complaint, the Second Amended Complaint, the First
Consolidated Complaint and any additionally complaints filed in *Estate of John P.
O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill,
Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of
John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a
collection of the persons, organizations, businesses, and nations associated in fact.
*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the
Complaint, the First Amended Complaint, the Second Amended Complaint, the First
Consolidated Complaint and any additionally complaints filed in *Estate of John P.
O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill,
Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of
John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a
collection of the persons, organizations, businesses, and nations associated in fact.
*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and
Crusaders") is comprised of the defendants named in the Complaint, the First Amended
Complaint, the Second Amended Complaint, the First Consolidated Complaint and any
additionally complaints filed in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*
(SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi
Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et
al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons,
organizations, businesses, and nations associated in fact.  *See e.g.,* O'Neill RICO
Statement ¶ 6; Cantor RICO Statement.

105.    The Enterprise is described, at length, in O'Neill RICO Statement ¶¶ 6(b), (c) and Cantor
RICO Statement.

106.    The activities of the Enterprise relate to the commission of world-wide terrorism.  The
Defendant's activities help in the funding of such Enterprise, which culminated in the
Attack.  The usual activities of the Enterprise include recruitment, provisioning, operating
of training camps, all of which were funded by the Racketeering activities complained of.
O'Neill RICO Statement ¶¶ 7-10; Cantor RICO Statement.

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

107.  Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in ¶ 12 of O'Neill RICO Statement and Cantor RICO Statement.

108.  The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in ¶ 13 of O'Neill RICO Statement.

## Consequences of the Conspiracy

109.  Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173; Cantor RICO Statement.[6]

110.  These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance FAC ¶¶ 80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶ 25; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

111.  All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

112.  The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Al Baraka FCC ¶ 153; O'Neill Iraq FCC ¶ 275; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

113.  The damages suffered by plaintiffs, as described in greater detail in the pleadings, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶¶ 137, 140, 144-6, 150, 154, 161, 164, 170, 174, 180; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

---

[6] A list of the decedents is contained within Exhibit A of the FCC.  See, O'Neill Al Baraka FCC ¶ 127(a).

APPENDIX I:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *AL SHAMAL ISLAMIC BANK*

114.    The Defendants intended to cause damage to business and property.  O'Neill Al Baraka FCC ¶ 178;  O'Neill Iraq FCC ¶ 271;  Cantor FAC ¶¶ 90-92, 122-135;  Cantor RICO Statement.

115.    Plaintiffs suffered damage to business and property as a result of the Defendants actions.  O'Neill Al Baraka FCC ¶¶ 179-180; O'Neill Iraq FCC ¶¶ 270, 271; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

116.    The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  Al Baraka FCC ¶ 146; O'Neill RICO Statement ¶¶ 14-15; O'Neill Iraq FCC ¶ 271; Cantor FAC ¶¶ 90-92, 122-135; Cantor RICO Statement.

\*\*\*