UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**AMENDED RICO STATEMENT**<br>**applicable to Asat Trust** |

*This document relates to:*         *Federal Insurance Co. v. al Qaida*
                                    03 CV 06978 (RCC)


**AMENDED RICO STATEMENT**
**APPLICABLE TO ASAT TRUST**

   Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Asat Trust, a/k/a "Asat Trust Registered", "Asat Trust Regulation".

   Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.  The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.  The name of the defendant to whom this RICO statement pertains is Asat Trust. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.  Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

4.  The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.  (a) <u>list of predicate acts and specific statutes violated</u>:

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15; NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15; NY CLS Penal § 150.15 |
| fraud with identification documents | 18 U.S.C. § 1028 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B) 18 U.S.C. § 2339A 18 U.S.C. § 2339B 18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Asat Trust | Asat Trust conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Asat Trust | Asat Trust undertook the above-named actions as part of a conspiracy to commit murder and arson, in that it knew that the Enterprise in which it was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |

2

| early 1990s to 9/11/2001 | Asat Trust | Asat Trust agreed to form and associate itself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
|---|---|---|

      (c) not applicable

      (d) No.

      (e) No.

      (f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business.  Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

      (g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.      (a) The enterprise (the "Enterprise" or "the al Qaida movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

      (b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida."  Al Qaida was intended to serve as a foundation upon which to build a global Islamic army.  The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein.  Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; and (iii) punishing Israel, and the United States for its perceived support of Israel.  The al Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success.  Thus, although al Qaida had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations.  Asat Trust fit neatly into this framework by raising and providing funds for and otherwise providing material

3

        support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

      (c) No.

      (d) Asat Trust is associated with the Enterprise.

      (e) Asat Trust is a member of the Enterprise, and is separate and distinct from the Enterprise.

      (f) Asat Trust intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7. The pattern of racketeering activity conducted by Asat Trust is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Asat Trust furthers and facilitates that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9. The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10. The Enterprise, and the racketeering activities conducted by Asat Trust, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce. Additionally, the Attack itself affected commerce. See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11. Not applicable.

12. Not applicable.

13. The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14. The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Asat Trust, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity. Al Qaida also relied heavily on certain imams at mosques who were willing to divert the *zakat*, the mandatory charitable contributions required of all Muslims.

       The funds thus raised were used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

       The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Asat Trust. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Asat Trust. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Asat Trust. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Asat Trust also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15. As the subrogees of both individual and property claimants, plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16. Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17. Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "C".

18.

| | |
|---|---|
| **VI** | Torture Victim Protection Act, 28 U.S.C. § 1350 |
| **VIII** | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| **X** | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19. pendent state claims:

| | |
|---|---|
| **I** | Trespass |
| **II** | Wrongful Death |

5

Case 1:03-md-01570-GBD-SN   Document 1736   Filed 03/22/06   Page 6 of 18

| | |
|---|---|
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   Not applicable

6

| | |
|---|---|
| **III** | Survival |
| **IV** | Assault & Battery |
| **V** | Intentional and Negligent Infliction of Emotional Distress |
| **VII** | Conspiracy |
| **IX** | Aiding and Abetting |
| **XI** | Negligence |
| **XII** | Punitive Damages |

20.   Not applicable

# EXHIBIT "A"

# RICO STATEMENT

# QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Asat Trust | Based in the tiny principality of Liechtenstein, Asat Trust has provided critical financial, logistical and technical support to al Qaida in relation to that terrorist organization's global jihad. Through its connections to companies including Al-Taqwa – a cluster of financial entities spanning the globe from the Bahamas to Italy and controlled by members of the Muslim Brotherhood – Asat Trust has played a key role in financing the al Qaida enterprise. For that reason, on November 7, 2001, Asat Trust was designated as a Specially Designated Global Terrorist ("SDGT") by the United States Department of the Treasury.<br><br>**History and Structure**<br><br>The late Ben Moustafa Nada, who helped finance and structure the Muslim Brotherhood fleeing Egypt, created Asat Trust in Liechtenstein in 1970 to finance the Brotherhood's objectives by opening several entities under Asat Trust's direction and control. Ahmed Idris Nasreddin, a wealthy Ethiopian banker, went on to join Nada's son Yousef Nada by financing numerous entities under Asat Trust's direction and control. Nada employed a cadre of accountants and lawyers including Liechtenstein residents, Erwin and Martin Wachter, Engelbert Schreiber Sr. and Englebert Schreiber Jr., to create and operate sophisticated funding mechanisms.<br><br>Over the years Asat Trust added dozens of companies, foundations, Islamic religious groups and financial institutions with offices located around the world. Asat Trust became a global network of financial, religious, business | 1962(c)<br>1962(d) |

|  | and charitable institutions for the Muslim Brotherhood, and its structure also financed other extremist Islamic organizations, including Osama bin Laden and al Qaida, moving and laundering funds for Islamic terrorist activities. |  |
|---|---|---|
|  | Entities operating with or under the umbrella of Asat Trust include Akida Bank Private Ltd. a/k/a Akida Islamic Bank, International Limited a/k/a Iksir International Bank Imited, Akida Commodity Limited, Akida Investment Company Limited, Akita Management and Trust a/k/a Akida Islamic Bankers' Trustee and Management, Al Taqwa Trade Property and Company Limited a/k/a Al Taqwa Trade Property and Company Establishment a/k/a Himmat Establishment, Al Taqwa Zaka Establishment, Asat Trust Registered, Ba Taqwa for Commerce and Real Estate Limited a/k/a Ba Taqwa for Commerce and Real Estate Establishment a/k/a Ben M. Nada Establishment a/k/a Yousef M. Nada Establishment, Bank Al Taqwa Limited a/k/a Al Taqwa Bank, Cemsteel Impex Establishment, Gulf Center S.R.L., Iksir Limited Holding, MIGA – Malaysian Swiss, Gulf and African Chamber a/k/a Camera di Commercio, Industria e Turismo Per Gli Stati Arabi del Golfo e la Svizzera, Nada International Anstalt a/k/a Nada Group International Anstalt, Nada Management Organization S.A. a/k/a Al Taqwa Management Organization, Nasco Business Residence Center SAS di Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding S.A., Nascoservice S.R.L, Nascotex S.A. a/k/a Industrie Generale de Filature et Tissage a/k/a Industrie Generale de Textile, Nasreddin Charitable Foundation, Nasreddin Company Nasco SAS di Ahmed Idris Nasreddin EC Nasreddin Foundation a/k/a Nasreddin Stiftung, Nasreddin Group International Holding Limited, Nasreddin International Group, Limited Holding a/k/a Middle Easte and Turkey Investment Holding Limited, Raw Mat Service and Management S.A., Yousef M. |  |

Nada Establishment a/k/a Yousef M. Nada Anstalt, and Yousef M. Nada & Co. Gesellschaft MBH.

Asat Trust is owned by Youssef M. Nada, a co-defendant here and himself designated as a SDGT on November 7, 2001 along with Asat Trust itself and other entities. It is headed and directed by Martin Wachter and Erwin Wachter. Additionally, available information reveals a pattern of activity over a period of many years of the Wachters working at the same address registered to Asat Trust.

**Al Taqwa, Nada and Nasreddin**

Copies of business registration documents on file with authorities in Liechtenstein attest the close connection over the last three decades between Asat Trust and the Al Taqwa (translated: "Fear of God") network, registering changes in company names, personnel and financial structure, along with many other duties. In fact, many of the transactions of Al Taqwa and the Himmat Establishment were undertaken in care of Asat Trust.

In turn, Al Taqwa's executives include Nada, Nasreddin, Ali Ghaleb Himmat, and Albert Friedrich Armand Huber. The two principals of Al Taqwa, Nada and Himmat, are members of the Egyptian Muslim Brotherhood who acquired Italian nationality and live in a small Italian enclave close to the Swiss town of Lugano. Nada, Himmat and Huber were added to the SDGT list on November 7, 2001; Nasreddin on April 19, 2002.

Himmat's ties to al Qaida include his documented presence at a conference of other Islamic fundamentalists near an al Qaida training camp in Afghanistan in March 1993. Huber is a Swiss convert to Islam who has expressed pro-Nazi views. Huber was quoted in 2002 in the Swiss weekly L'Hebdo as saying that Nada enjoyed friendly relationships with numerous Muslim leaders, including Saddam Hussein.

Defendant Bakr bin Laden and his brother, Ghalib M. bin Laden, brothers off Osama bin Laden, are investors and account holders in Bank Al Taqwa. Ghalib made an original deposit of $1 million U.S. in Al Taqwa.

Back in 1996, the Italian anti-terrorist agency DIGOS (Division of General Intelligence and Special Operations) indicated that Al Taqwa and the Nasreddin companies were backers of Islamic groups including former Afghan mujihadeen in Bin Laden's camps, the Palestine Liberation Organization, Hamas, the Algerian Armed Islamic Group and the Egyptian Gama'a al-Islamiya, the group that eventually "merged" with Al Qaeda in 1998. They did so through suspicious business activities and a maze of Islamic charities and centers, according to reports.

The Report concluded that the business activities of Nasreddin's import-export companies lacked commercial logic and asserted that it is—"legitimate to imagine the existence of a corporate network, located both in Italy and abroad, which operates for different purposes that could better be described…with access to bank movements."

The report based its conclusions on the "heterogeneity and untimely character of the transactions, as well as the absence of corporate logic." Similarly, the report notes that "the places of destination of the exports are significant, in countries which are surely at risk due to possible illegal activities , such as former Yugoslavia, Libya and Nigeria," all of which have been occupied by al Qaida operatives at one time or another:

Both Nada and Nasreddin served on the boards of each others' banks and companies, and in many cases shared the same locations and employees. Both were actively engaged in financial transactions, import-export businesses, and real estate ventures. Both had close relationships with the same investors in Saudi Arabia, UAE, Kuwait, Iraq, and other Middle East and North African Countries.

| | Both were tied to several Islamic charities and business ventures, which had been linked to al-Qaida financing, including the Milan Islamic Centre, a major al Qaida recruiting centre. Indeed, the Centre follows the violent teachings of convicted terrorist Omar Abdel Rahman, and was frequently visited by known al Qaida terrorists. The Institute is known in Western intelligence communities as one of the main al Qaida stations in Europe and was used to move weapons, men and money around the world. | |
| --- | --- | --- |
| | Nada himself openly admits that he knew as early as 1995 that Al-Taqwa Bank may be financing the activities of terrorist outfits. | |
| | Al-Taqwa Bank has an account for Mamdouh Mahmoud Salim, an al Qaida operative who is in U.S. custody for his role in the 1998 Embassy bombings. U.S. investigators believe that the account has been used to finance terrorist activity. | |
| | According to an article in *Newsweek*, Al-Taqwa's Bahamian banking license allowed Al Taqwa officers to "open commercial correspondent accounts with established European banks — paying the larger institutions fees to make cash transfers around the world for them, without calling attention to themselves." According to counterterrorism experts and government officials, such convoluted banking practices are a red flag for money laundering and terrorist financing. | |
| | Nada and Nasreddin jointly owned the Akida Bank in the Bahamas, which has been designated for providing financial assistance to al Qaida. Additionally, one of the employees at Akida Bank was al Qaida financer and Defendant Sulaiman Abdul Aziz al-Rajhi. The Al-Rajhi family is a financial cornerstone for Osama Bin Laden's terrorist network. They have provided substantial aid to al Qaida through the Al-Rajhi Banking & Investment Corporation as well through the infamous SAAR Foundation—the organizational epicenter of a network of terrorist financing | |

| | charities that were raided by the FBI in March 2002. | |
|---|---|---|
| | (Throughout the late 1990s, the SAAR Foundation completed many large multi-million dollar transfers to a number of Specially Designated Global Terrorist (SDGT) financing entities, including Akida Bank and Bank al-Taqwa. In blatant disregard for U.S. anti-terrorism laws, the SAAR Defendants have admitted to providing Youssef Nada at least one financial loan in early 2001. As the *Washington Post* reported, "an individual connected to SAAR arranged for funds to be moved from a joint account of several SAAR executives to Nada as a loan." Youssef Nada has admitted to receiving a $500,000 loan in February 2001 from Mena Estates, a SAAR network organization. Much of this money was transferred by Nada to Arthur Hanna, Bank al-Taqwa's financial manager in the Bahamas. In the March 20, 2000 raid on the SAAR network offices, federal investigators discovered a letter written by Youssef Nada describing the $500,000 loan. In regard to the loan, Nada's letter states that the "eggs are in several baskets." Nada's letter went on to describe the investigation of Bank al-Taqwa and stated, "to avoid crimes, we have to perfect information (terrorism, money laundering)." Furthermore, U.S. officials have stated that they believe the SAAR network entities have transferred a "total of about $20 million to offshore accounts, much of it through Bank al Taqwa and Akida Bank to Nada and Nasreddin firms.") | |
| | Nasreddin, for his part, worked for the Bin Laden Group, was an honorary counsel of Kuwait in Milan, board member of the Islamic Center in Milan, which was Al-Qaeda's base of operations in Europe, and president of the Islamic Community of Ticino. Nasreddin's other business holdings under the Asat Trust umbrella include: Akida Bank, Miga-Malaysian Swiss Gulf and African Chamber (Lugano), Gulf Centre S.R.L.(Milan, Italy), Nascoservice S.R.L. (Milan, Italy), NASCO | |

Business Residence Centre SAS (Milan, Italy), Nasreddin Company Nasco SAS (Istanbul Turkey and Milan, Italy), Nasreddin Foundation (Lichtenstein), Nascotex (Tangiers, Morocco) and Nasreddin International Group Limited Holding (Nassau, Bahamas and Milan, Italy).

After September 11, 2001, Al Taqwa Management Organization changed its name to the Nada Management Organization, S.A. Al Taqwa and the Nasreddin Group, as well as their four principals (Nada, Himmat, Huber and Nasreddin) have had their assets frozen by the U.S. Government.

**The Wachters**

Both Wachters also own Sercor Treuhand Anstalt, a co-defendant in this case.  As owners and heads of Asat Trust and Secor Treuhand Anstalt, the Wachters oversaw the activities and had knowledge of the activities that supported al Qaida.. Both Wachters have long known that accounts, under their control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida.

Despite this knowledge, the Wachters continued to permit, make available, assist, and maintain those accounts. Available information demonstrates that there have been activities between the Wachters and Al Taqwa Bank, including information which places the Wachters at working on behalf of Al Taqwa Bank in Nassau, Bahamas.

Via another Liechtenstein-based company, Galp International Trading Establishment (controlled by the Portuguese national oil company, Galp Energia, and for which Asat Trust was also the legal representative) the Wachters and Asat Trust have also been linked in news reports to laundering funds on behalf of the Iraqi Food-for-Oil program and moving the money through Al Taqwa to the Enterprise. Martin Wachter confirmed that Galp International was one of the companies

13

represented by Asat Trust and that Galp was dealing with Iraq under the oil-for-food program. Many believe that Iraq quietly funneled money to Al Qaeda by deliberately choosing an oil company working with one of the terrorist group's financial backers. As one news article explained:

*Although the oil sales in question were legal and approved by the U.N., several observers say the system involved kickbacks and was used by Saddam to buy political support and to finance intelligence activities and even terrorist groups.*

*"It seems very plausible that some of the oil money went to terrorism financing," a terrorism-financing expert closely monitoring Iraq said on condition of anonymity. "I believe this actually happened."*

**Governmental Inquiries**

George B. Wolfe, the Deputy General Counsel of the United States Department of Treasury, sent a letter to prosecutors in Switzerland that claimed the following:

*"…we have reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist related organizations…The Malt and Lugano, Switzerland branch offices of Al Taqwa Management Organization receive money that 'pours in' from Kuwait and the United Arab Emirates for Usama bin Laden…As of late September 2001, bin Laden and his Al Qaida organization received financial assistance from Youssef M. Nada…"*

*As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit for a close associate of Usama Bin Laden. This bin Laden lieutenant had a line of credit with a Middle East financial institution that drew on an identical account number as Al Taqwa. Unlike other accounts—even accounts of private banking customers—this account was blocked by the computer system and special*

14

| | *privileges were required to access it. No identifiable names were associated with the account. These circumstances are highly unusual, and may have been done to conceal the association of the bin Laden organization with Bank Al Taqwa."* | |
|---|---|---|
| | A report by the United Nations Security Council's Monitoring Group on Sanctions against al Qaida, the Taliban and their associates stated that Nada and Nasreddin— "Both, through their various commercial holding, operated extensive financial networks that provided support to al Qaida related activities." | |
| | The United Nations Security Council's Monitoring Group on Sanctions against al Qaida, the Taliban and their associates paints a similar picture of Al Taqwa, and Nada and Nasreddin's other business holdings, as a money laundering vehicle: | |
| | "*For a long time Nada and Nasredden resided and worked out of a small Italian enclave, Campione d'Italia, neighboring Lugano (Switzerland)…Many of their businesses were registered as offshore companies through local trusts in Lichtenstein.* | |
| | *These arrangements were usually made through the auspices of so-called "gate keepers," in most cases one or two law firms in Lugano, specializing in establishing such offshore shell companies…There was no requirement to identify or profile the ownership…or assets of the company being represented locally. No record was kept regarding activities or transactions on behalf of these companies."* | |
| | Al-Taqwa Bank has a close relationship with another organization owned by Nada: Al-Taqwa Management Company (eventually renamed Nada Management Company). Al Taqwa Bank relied heavily on Al-Taqwa Management Organization to conduct audits and feasibility studies concerning the bank. As a result, Al Taqwa Bank often transferred large | |

15

sums of money to Al Taqwa Management Organization. Furthermore, Al Taqwa Bank often transferred money throughout Nada and Nasreddin's many other corporations and investments as well as into various Islamic charities.

According to U.S. authorities, the bank's convoluted structure "made it easy to use as a money laundering mechanism." Juan Zarate, a senior U.S. Treasury official, has testified before Congress that Hamas had transferred $60 million into Al Taqwa accounts in 1997 and that intelligence agencies possess evidence that in late September 2001 — after the attacks on American soil — Al Qaeda continued to receive financial assistance from Nada.

**The United States and United Nations Sanctions Against Asat Trust**

Asat Trust and the Al Taqwa network were designated by the United States as a Specially Designated Global Terrorists on November 7, 2001. The Office of Foreign Assets Control of the United States Treasury, froze their assets. Swiss and Italian police raided the homes and offices of the top Al Taqwa officials the same day, as well as those of Erwin Wachter, the head of Asat Trust. At the time of the Bank's designation President George Bush explained, "Al Taqwa is an association of offshore banks and financial management firms that have helped Al Qaeda shift money around the world. Al Taqwa raises funds for Al Qaeda."

Treasury Secretary Paul O'Neill added in his statement announcing the designations:

*Al Taqwa and al-Barakaat are financiers of terror. The President's September 23 Order [Executive Order 13224] made plain that those who underwrite violence bear equal culpability to those who perpetrate it. Feigned indifference, willful blindness, and the appearance of normalcy and status in the world of business or commerce will no longer provide cover or safe harbor – here or abroad.*

*The al Taqwa group has long acted as*

16

*financial advisers to al Qaeda, with offices in Switzerland, Lichenstein, Italy and the Caribbean.*

Al-Taqwa and Nada's assets were frozen, al-Taqwa's headquarters, two of its satellite offices and a few of the executive's residences were raided as part of an international investigation into the bank's relationship with Osama bin Laden and al Qaida.

The United Nations followed suit on November 9, 2001, as its Security Council Committee established pursuant to U.N. Resolution 1267 (1999) concerning al Qaida and the Taliban ("the 1267 Committee") concurred in adding Asat Trust to its list of "individuals and entities belonging or related to the Taliban, Usama Bin Laden and the Al-Qaida organization" for which global sanctions and asset freezes were necessary.

On April 19, 2002, Treasury added Nasreddin, Huber, Himmat and others to the SDGT list for providing direct support for Youssef Nada and Bank Al Taqwa., noting again Al Taqwa's provision of investment advice and cash transfer mechanisms for al Qaida and other radical Islamic groups. On August 29, 2002, fourteen more companies affiliated with Al-Taqwa Bank, Yousef Nada and Ahmed Nasreddin had their assets frozen by President Bush as a result of their financial relations with al Qaida.

As the foregoing demonstrates, Asat Trust thereby knowingly has, for a period of many years, provided critical financial and logistical support to the al Qaida movement, to support the terrorist organization's global jihad.

The September 11th Attack was a direct, intended and foreseeable product of Asat Trust's participation in the jihadist campaign for the al Qaida movement. Asat Trust conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise

17

|  | itself. Asat Trust conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>Through all this, Asat Trust knowingly and actively participated in continuous efforts to advance al Qaida's terrorist ambitions, and used his financial position as an effective mechanism for raising funds for, and providing other forms of material support to, al Qaida. By virtue of its active role in the Enterprise's wrongdoing, Asat Trust is personally responsible for the resulting harm. |  |
|---|---|---|

.