**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*
>   *Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978 (S.D.N.Y.)
>   *Continental Casualty Co., et al. v. Al Qaeda Islamic Army, et al.*, Case No. 04-CV-05970-UA (S.D.N.Y.)
>   *Estate of John P. O'Neill, Sr., on behalf John P. O'Neill, Sr., deceased, and on behalf of decedent's hearis-at-law, et al. v. Al Baraka Inv. And Dev. Corp., et al.*, Case No. 04-CV-1023 (RCC)
>   *Euro Brokers, Inc., et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-07279-UA (S.D.N.Y.)
>   *New York Marine and General Insurance Co. v. Al Qaida, et al.*, Case No. 04-CV-6105 (S.D.N.Y.)
>   *World Trade Center Properties, LLC, et al. v. Al Baraka Investment and Development Corp., et al.*, Case No. 04-CV-7280 (S.D.N.Y.)

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT YASSIN ABDULLAH KADI'S MOTION TO DISMISS PLAINTIFFS' COMPLAINTS AND MEMORANDUM IN SUPPORT**

April 11, 2006

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    SERVICE OF PROCESS WAS EFFECTIVE ON DEFENDANT KADI........................2

    A.   THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THE COURT'S CASE MANAGEMENT ORDERS ................................................................5

III.   SUMMARY OF DEFENDANT YASSIN KADI'S SUPPORT FOR AL QAEDA...........7

    A.   DEFENDANT KADI HAS BEEN DESIGNATED BY THE U.S. GOVERNMENT AS A SPECIALLY DESIGNATED GLOBAL TERRORIST (SDGT).............................7

    B.   KADI AND THE MUWAFAQ FOUNDATION ..................................................9

    C.   KADI'S SUPPORT FOR THE AL IMAN UNIVERSITY.....................................11

    D.   KADI'S RELATIONSHIP WITH WAEL JELAIDAN AND MOHAMED LOAY BAYAZID.................................................................................13

    E.   KADI'S INVOLVEMENT WITH P-TECH...................................................14

IV.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT KADI.........15

    A.   KADI IS SUBJECT TO THE JURISDICTION OF THIS COURT UNDER A THEORY OF GENERAL JURISDICTION.......................................................16

    B.   KADI IS SUBJECT TO THE JURISDICTION OF THIS COURT UNDER A THEORY OF SPECIFIC JURISDICTION. ......................................................18

        1.   KADI PURPOSEFULLY DIRECTED HIS CONDUCT AT THE UNITED STATES. ...18

        2.   JURISDICTION OVER KADI CAN BE ESTABLISHED ON A CONSPIRACY THEORY. .................................................................................19

        3.   PLAINTIFFS CAN UTILIZE THE PROVISION OF THE ATA WHICH PROVIDES FOR NATIONWIDE SERVICE OF PROCESS...................................20

V.    PLAINTIFFS' PLEADINGS SUFFICIENTLY STATE CLAIMS AGAINST KADI UNDER 12(B)(6)........................................................................21

    A.   PLAINTIFFS' CLAIMS WITH RESPECT TO MR. KADI'S VOLUNTEER ACTIVITIES ARE NOT BARRED BY THE VOLUNTEER PROTECTION ACT. ....................................21

    B.   THE VICTIMS' COMPENSATION FUND DOES NOT AFFECT THE RIGHTS OF THE PLAINTIFFS IN THESE CASES TO ASSERT CLAIMS AGAINST KADI. ..........................22

    C.   PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT...............................23

    D.   PLAINTIFFS STATE CLAIMS UNDER RICO................................................23

    E.   PLAINTIFFS STATE CLAIMS UNDER THE ATCA......................................24

    F.   PLAINTIFFS ASSERT VALID CLAIMS UNDER STATE LAW .......................25

VI.   CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998)..............................................................................................................................10

*Allen v. New World Coffee, Inc.*, 2001 WL 293683 (S.D.N.Y. March 27, 2001) ......................10

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ........................................28

*Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112 (5th Cir. 1987) ................................29

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................................10

*Dempsey v. Sanders*, 132 F. Supp. 2d 222 (S.D.N.Y. 2001)....................................................10

*Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158 (S.D.N.Y. 2003)...........................29

*Foman v. Davis*, 371 U.S. 178 (1962).....................................................................................10

*Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727 (S.D.N.Y. 1994) ...................................29

*Grannis v. Ordean*, 234 U.S. 385 (1914)..................................................................................8

*In re Terrorist Attacks on September 11, 2001,* 349 F.Supp. 2d 765 (S.D.N.Y. 2005).........passim

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992) ...........................................................10

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004)...........................................................10

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir. 1983) ........................................................29

*Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306 (1950)..........................................................8

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) ...................................................................26

*S.E.C. v. Tome*, 833 F.2d 1086 (2d Cir. 1987) .....................................................................7, 8

*State of New York v. O'Hara*, 652 F. Supp. 1049 (W.D.N.Y. 1987)............................................29

*Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005)....................................................26

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991) ..........................................................28

*United States v. Louie*, 625 F. Supp. 1327 (S.D.N.Y. 1985)......................................................29

*United States v. Roth*, 860 F.2d 1382 (7th Cir. 1988) .............................................................29

*United States v. Turkette*, 452 U.S. 576 (1981) ......................................................................28

*Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902 (2d Cir. 1977) ..........................................10

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) .......................................26

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004)...................................................................26

**STATUTES**

42 U.S.C.A. § 14503(a)(3) .....................................................................................................27

**OTHER AUTHORITIES**

45A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990) ..................................................................................................................22

**RULES**

Fed. R. Civ. P. 10(c)..............................................................................................................10

Fed. R. Civ. P. 12...............................................................................................................3, 4

Fed. R. Civ. P. 12(b)(1)............................................................................................................4

Fed. R. Civ. P. 12(b)(2)............................................................................................................4

Fed. R. Civ. P. 12(b)(6)............................................................................................................4

Fed. R. Civ. P. 12(e)................................................................................................................9

Fed. R. Civ. P. 8...................................................................................................................26

**UNITED STATES CODE**

18 U.S.C. § 1962(c) ...................................................................................................29

18 U.S.C. § 1962(d) ..................................................................................................29

18 U.S.C. § 2331 ...........................................................................................25, 26, 28

## I.    INTRODUCTION

The argument advanced by Defendant Yassin Abdullah Kadi[1] (or "Kadi" or "Defendant" or "Defendant Kadi") in support of his motion to dismiss is, at its core, that the Plaintiffs' factual allegations are false.   See Memo of Law in Support of Defendant Yassin Abdullah Kadi's Motion to Dismiss (hereinafter "Kadi Memo") at p. 1 ("Plaintiffs' allegations are not only insufficient to state a claim and establish personal jurisdiction, but are, for the most part, patently false.").   As with almost every other Defendant in this lawsuit to date, Kadi claims he is completely innocent of any involvement in the material support or aiding and abetting of Osama Bin Laden and the Plaintiffs are just on some sort of unsubstantiated witch-hunt.   Apparently, if Defendants are to be believed, Osama Bin Laden acted alone.

Plaintiffs possess a good-faith basis for naming him in this action.   The allegations set out by Plaintiffs in the Complaints, the RICO statements, the Rule 12(e) More Definite Statements, and the *prima facie* jurisdictional showing on Kadi, submitted herein,[2] extensively detail both his contacts with the United States and the material support he provided to Al Qaeda and Osama bin Laden which are more than sufficient to satisfy the pleading standards of Fed. R. Civ. P. 12.[3]

Defendant would have this Court ignore the Plaintiffs' pleadings, skip past any discovery, ignore the summary judgment rules and engage in an immediate trial on the ultimate facts of this case – facts that are – *at a bare minimum* – in dispute.   Defendant Kadi was designated by President George W. Bush's Executive Order 13224 as a Specially Designated Global Terrorist

---

[1] Defendant's surname is also frequently seen as Qadi or al-Qadi.

[2] Because Defendant has challenged the jurisdiction of the Court, and in so doing  submitted material beyond the pleadings, Plaintiffs respond in kind herein with a *prima facie* showing that supports an exercise of jurisdiction under either a general or specific jurisdictional analysis.  *See* Declaration of Justin Braun Kaplan (or "Kaplan Dec.") and exhibits attached thereto.

[3] See *Burnett* 3AC (Burnett 3AC Filed on 11/22/02); *WTC* Complaint (Filed on 9/10/04); *Euro Brokers* Complaint (Filed on 9/10/04); *Burnett, Euro Brokers, and WTC*  Plaintiffs' More Definite Statement as to Defendant Yassin Abdullah al Kadi (Filed on 9/27/05); *Fed.* 1AC; *Fed.* RICO Statement (Filed on 3/6/06); *O'Neill* First Consolidated Complaint (FCC)  (Filed on 9/30/05), which incorporated, pursuant to para. 127 (AC) the MDS (filed on 9/30/05), which was attached as Exhibit AC,; *Continental* 2AC; *NY Marine* 2AC.

responsible for funding al Qaeda. Kaplan Dec., Exhibit 1, Attachment 3. The United Nations Security Council Committee on Afghanistan also placed Defendant Kadi on a list of individuals and entities "associated with Usama bin Laden, including those in the Al-Qaida organization." Kaplan Dec., Exhibit 1, Attachment 4. Because of these allegations and the investigation by the Plaintiffs, Defendant Kadi is a party in this matter. Defendant Kadi urges the Court to dismiss the Complaints against him, pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). The Court should deny Defendant Kadi's Motion to Dismiss because: 1) service of process was demonstrably effective in this matter; 2) plaintiffs have stated claims against Kadi for which relief can be granted; and 3) the Court has personal jurisdiction over Defendant Kadi.

## II.   SERVICE OF PROCESS WAS EFFECTIVE ON DEFENDANT KADI

Defendant Kadi argues that "publication in the *International Herald Tribune* (published in English) and *Al Quds Al-Arabi* (published in Arabic) were circulated widely in Saudi Arabia and provided insufficient notice to him. This misapprehends the applicable standard. Memo at p. 24. In denying a similar assertion by Defendant Adel Batterjee, this court held:

> Plaintiffs reasoned that *Al-Quds Al-Arabia* had published Osama bin Laden's fatwas in the past and could, therefore, reach his supporters regardless of their location. Further, *the International Herald Tribune* is available to the world community. Additionally, Plaintiffs submit that these cases have been widely reported in the Arabic media and the complaints have been available on numerous websites for over two years. In light of these considerations and Judge Robertson's March 23, 2003, order approving service by publication for Defendants including Mr. Batterjee, the Court denies Mr. Batterjee's motion to quash service.

*In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 824-825 (S.D.N.Y. 2005).

Prior to consolidation and transfer pursuant to the MDL Panel's Transfer Order, the *Burnett* Plaintiffs requested leave to serve by publication Defendants in the Gulf States region, which included Defendants located in Saudi Arabia, Sudan and United Arab Emirates. Transferor Docket No. 95 ¶ 3. The motion set out the *necessity* of such service based on the

Affidavit of Nelson Tucker, Plaintiffs' process server.  The Court granted the Plaintiffs' motion on March 25, 2003, indicating that it was appropriate for the Plaintiffs to attempt to serve such geographically located Defendants by publication.  Among those to be served by publication was Defendant Kadi, who lives in Saudi Arabia.  Plaintiffs properly served Defendant Kadi by publication, in compliance with the Court's Order of March 25, 2003.  Mr. Kadi appeared through counsel and filed a motion to dismiss in the *Burnett* case on July 15, 2004.

After the transfer and consolidation of the case before this Court, the Plaintiffs requested an Order authorizing Plaintiffs to effectuate service by publication on Defendants specified in the accompanying attachment "for whom an address or location to serve the Summons and Complaint is unknown and cannot be ascertained through reasonable means or was attempted or rejected or otherwise not responded to at an address that was discovered, " MDL 1570 Docket No. 445.  The Court, by granting Plantiffs' request on September 15, 2004, indicated that it was appropriate for the Plaintiffs to attempt to serve the Defendants on the accompanying attachment by publication.  Among those to be served by publication again was Defendant Kadi, who lives in Saudi Arabia.  Plaintiffs properly served Defendant Kadi by publication, in compliance with the Court's Order of September 15, 2004.  *See* attached proof of publication, Kaplan Dec., Exhibit 2.[4]  Defendant Kadi, therefore, has been served twice in these related cases.[5]  There is no doubt from his pleading that he is aware that he has been designated an al Qaeda terrorist and

---

[4] It is significant to point out that Defendant Kadi was represented by counsel in the consolidated action (03 MDL 1570) at the time of the September 15, 2004 Order permitting publication and was arguably notified that the Plaintiffs intended to serve him in this manner.  Actual publication did not begin until December 22, 2004.  During that three month period, multiple defendants (both foreign and domestic) who were identified on the publication list came forward to negotiate service agreements and briefing schedules.  Counsel for defendant could have similarly contacted the Plaintiffs to discuss a service agreement on behalf of their client but failed to do so.  The MDL docket clearly shows that Defendant Kadi had counsel of record in the consolidated action as of March 3, 2004 when this Court signed defense counsel's *pro hac* admissions.  *See* MDL 1570 Docket entries #10 and #14.  Defendant Kadi was sufficiently on notice of the Plaintiffs' claims against him at that time, and has been for the past **26** months.

[5] In addition, contrary to Defendant Kadi's suggestions that he is easily attainable via international post (Kadi Memo at 23), the *O'Neill* and *Federal Insurance* Plaintiffs attempted to serve Kadi and mailed the Summons and Complaints via international registered mail to the same address in Saudi Arabia in June 2005 and September 2005, respectively.  The *O'Neill* Plaintiffs' service package was returned unopened.  Kaplan Dec., Exhibit 16. The status of the *Federal* Plaintiffs' service package has to date remained undetermined.

facilitator.  It is also hard to believe that he did not receive notice of these lawsuits, when he has retained counsel, appeared and filed a motion to dismiss.

The Second Circuit stated the following in *S.E.C. v. Tome*, 833 F.2d 1086, 1089 (2d Cir. 1987):

> To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend.

In addition, as Justice Jackson stated:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314 (1950).  The question before the Court is whether publication in the *International Herald Tribune* and *Al-Quds Al-Arabi* was "reasonably calculated" to notify Defendant Kadi of the suit against him.  Defendant Kadi's appearance in this case demonstrates that service by publication was adequate.  Furthermore, Plaintiffs have uncovered dozens of articles that have been published in the Saudi media specifically discussing the on-going litigation before this Court, including detailed reports of Your Honor's Opinions and Orders, named defendants, and other recent developments.  Indeed, these Saudi media reports provide an additional channel for Defendant Kadi and others to become apprised of the lawsuit against them.  Kaplan Dec., Exhibit 3.

The Second Circuit stated in *Tome*: "The 'reasonably calculated' analysis need not be relied on exclusively in this case because we are not dealing with the question of the adequacy of *constructive notice.*"  *Tome*, 833 F.2d at 1089.  In this instance there is constructive notice, because Defendant Kadi has appeared to defend this action.  As the Supreme Court stated in *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), "the fundamental requisite of due process of law

4

is the opportunity to be heard."   The record in this matter establishes that Defendant Kadi *did* receive notice of the suit, understood that he had to hire counsel, and understood his rights because he instructed said counsel to file a motion to dismiss.  This demonstrates the adequacy of the notice by publication.  This further satisfies Justice Jackson's concerns in *Mullane* as Defendant Kadi has obviously been apprised of the pendency of the action and has been afforded an opportunity to present his objections.  Without question, the notice in this case accomplished the goal of informing Defendant Kadi of the instant action and allowing him to appear and defend.

### A.   THE AMENDED PLEADINGS ARE IN COMPLIANCE WITH THE COURT'S CASE MANAGEMENT ORDERS

Plaintiffs' amended pleadings – which gather into one place all of the allegations against all of the defendants in each action – comply with both the letter and spirit of Case Management Order #2.   Furthermore, Defendant Kadi is not prejudiced by any perceived technical non-compliance and indeed, he does not even contend otherwise.

As the Court will remember, Case Management Order #1 permitted Plaintiffs to add defendants without pleading specific allegations against those defendants; the order then permitted any defendant as to whom the complaint contains no allegations to seek a "more definite statement," specifying the nature of the claims asserted.  Case Management Order #2 ("CMO #2) then expanded on this procedure, providing:

> Plaintiffs may file more definite statements and/or additional allegations against existing defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to previously filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint.

CMO #2, ¶ 13.  The order then required Plaintiffs to gather all such more definite statements into a single document and to "file an amended complaint that includes all amendments made prior to

that date, whether made pursuant to Rule 12(e) or otherwise." *Id.*  The order further provided for

the filing of RICO Statements in accordance with this Court's Individual Practices. [6]  Pursuant

to the Court's directive, Plaintiffs' final amended pleadings, filed on or about September 30,

2005, incorporated all of these various filings into consolidated documents.  Although Plaintiffs

in the various cases took different approaches to the requirements of CMO #2, all of the

amended pleadings complied with the Order and none should be stricken.[7]

Rather than gamesmanship as argued by Defendant Kadi, "the purpose of pleading is to

facilitate a proper decision on the merits."  *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902,

906 (2d Cir. 1977), *quoting Conley v. Gibson*, 355 U.S. 41, 48 (1957); *see also Foman v. Davis*,

371 U.S. 178, 181 (1962) ("It is too late in the day and entirely contrary to the spirit of the

Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . .

mere technicalities").

The incorporation of the RICO and More Definite Statements into Plaintiffs' Complaints,

by reference or attachment as exhibits, is expressly authorized by the Federal Rules. Rule 10(c)

of the Federal Rules of Civil Procedure provides:  "Statements in a pleading may be adopted by

reference in a different part of the same pleading or in another pleading in any motion.  A copy

of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."

F.R.C.P. 10(c).  In view of the plain language of Rule 10(c), the Plaintiffs' incorporation of the

---

[6] *All* of the RICO Statements and More Definite Statements are without a doubt part of the pleadings, *See McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 WL 293683, * 2 n. 3 (S.D.N.Y. March 27, 2001); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *A. Terzi Prods. v. Theatrical Protective Union, Local No. One*, 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).

[7] Plaintiffs in *Burnett*, *EuroBrokers*, and *World Trade Center Properties* each filed a "Notice of Consolidated Pleading" incorporating by reference all of the previously-filed amendments to their respective complaints.  Each such document "includes all amendment made prior to" the requisite date, just as required by the Court.  More important, the "Notice of Consolidated Pleading" permits each defendant to find in a single place all of plaintiffs' allegations. The approach taken by the plaintiffs in *New York Marine* and *Continental* achieves precisely the same result.  O'Neill took a similar approach, filing a Consolidated Complaint incorporating and attaching the MDS as exhibits.  Attached hereto is an appendix providing an index to the applicable citations of the allegations in the pleadings. Kaplan Dec., Exhibit 4.

RICO Statements and More Definite Statements applicable to Kadi into their Consolidated or Amended pleadings, by reference or attachment as an exhibit complies with both the letter and spirit of the Federal Rules. The Plaintiffs' consolidated or amended pleadings, More Definite Statements, and RICO Statements contain allegations that should not be disregarded by this Court simply because Kadi does not like how they are organized.

## III.   SUMMARY OF DEFENDANT YASSIN KADI'S SUPPORT FOR AL QAEDA.

In his motion to dismiss, Defendant Kadi attempts to paint a picture of himself as simply an innocent philanthropist who is caught up in this litigation because he was being charitable in a Muslim community. Kadi Memo at 1. This is not only ludicrous, but it is not supported by the facts on this record. Defendant Kadi claims that he has merely provided food, clothing, shelter, education and other charitable provisions, but an in-depth look at the activities of the real Yassin Abdullah Al Kadi shows that these assertions cannot mask the investments, transactions and donations Defendant Kadi has made to *knowingly* and *intentionally* provide material support to al Qaeda whose terrorist activities were targeted at the United States.

### A.   DEFENDANT KADI HAS BEEN DESIGNATED BY THE U.S. GOVERNMENT AS A SPECIALLY DESIGNATED GLOBAL TERRORIST (SDGT).

President George W. Bush designated Defendant Kadi immediately after September 11 as a Specially Designated Global Terrorist (SDGT) and his assets were frozen in the United States, Europe, Albania and Turkey because the U.S. Treasury Department concluded, based on overwhelming evidence, that Defendant Kadi had **financially supported al Qaeda,** and that his financial support of al Qaeda enabled the terrorist organization to plan and execute the attacks on September 11.[8]

---

[8] WTC ¶ 614; MDS ¶ 30.

In an attempt to downplay the significance of being designated a SDGT by the United States Government for his material support of al Qaeda, Defendant Kadi arrogantly claims that the designation proves nothing and asserts that designation "is an administrative step with no real due process or judicial review available." Kadi Memo at 7. To support this outrageous assertion, Defendant Kadi includes a quote from David Aufhauser, Office of Foreign Assets Control's (OFAC) General Counsel at the time of the attacks, in which Aufhauser *generalizes* about the designation process by saying it was a listing of the "usual suspects." Kadi Memo at 7. Defendant Kadi fails to point out to the Court, however, that it was the same David Aufhauser who *specifically* referred to Defendant Kadi when he wrote that: "**The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qa'ida and other terrorist organizations.**" Correspondence from David Aufhauser of the U.S. Treasury Department dated November 29, 2001. Kaplan Dec., Exhibit 1, Attachment 2. A misreading of what Aufhauser said regarding OFAC's designation process cannot mask the fact that when it came to Defendant Kadi, Aufhauser specifically identified him as a financial supporter of al Qaeda in conjunction with that designation.

Kadi's SDGT designation is backed by ample evidence. As recently as January of 2002, Albanian authorities seized control of a construction project after the government confirmed Defendant Kadi was using the project to launder money for al Qaeda. Kaplan Dec., Exhibit 1, Attachment 2. In announcing that the Albanian government had seized control of the project, a spokesman for The Albanian Prosecutor-General's Office said of Defendant Kadi, that "The Finance Ministry has charged him [Kadi] with money laundering, and he is suspected of having financed terrorist members of the Al-Qaeda organization." Kaplan Dec., Exhibit 1, Attachment 2. The Prime Minister of Albania, Ilir Meta, also noted that "his government has frozen the bank

accounts and property of Kadi…Meta said: 'We identified the financial entities active in our country that are financially linked to the Al-Qaeda network.'" *Id.*

On September 21, 2005, The European Union ("EU") and Commission of the European Communities refused to hear Defendant Kadi's appeal against the freezing of his assets. Although the Court's decision initially appears to be based on the issue of jurisdiction, the EU justifies its ruling as an international security measure—"The applicants' interest in having a court hear their case on its merits is not enough to outweigh the essential public interest in the maintenance of international peace and security in the face of a threat clearly identified by the Security Council." MDS at 6.

### B.    KADI AND THE MUWAFAQ FOUNDATION

Defendant Kadi was the founder and director of Muwafaq, an Islamic "charity" that transferred millions of dollars from wealthy Middle Eastern businessmen to al Qaeda.[9]  It cannot reasonably be argued that Kadi's involvement in Muwafaq can be characterized as his having "served as an officer or director," as he would have this Court believe.  Kadi Memo at 15. Muwafaq's ties to Osama bin Laden and al-Qaeda are widespread and pervasive," MDS at 71, and Kadi took an active role in the activities of each regional branch of Muwafaq regularly visiting each project country, and hand selecting the managers responsible for Muwafaq in the various countries in which the foundation operated.  MDS at 69, 71.

Muwafaq's ties to Islamic terrorism, specifically to Osama bin Laden and to al Qaeda, are widespread and pervasive.  Richard Clarke in his testimony before the Senate on October 22, 2003, said "Qadi was the head of Muwafaq, a Saudi relief organization that reportedly transferred at least $3 million, on behalf of Khalid bin Mahfouz, to Usama bin Laden and

---

[9] WTC ¶ 615-616; MDS ¶ 67-68.

assisted al Qaida [sic.] fighters in Bosnia."[10]   David Aufhauser noted in his November 29, 2001, letter to Switzerland's Attorney General that Muwafaq fronted for, and funded, al Qaeda and Makhtab al-Khidamat (MK), the predecessor to al Qaeda.   The U.S. government has stated that "following the dissolution of [Makhtab Al Khidamat,] and its absorption into Al Qaida, a number of NGOs formerly associated with [Makhtab Al Khidamat], including Muwafaq, also merged with Al-Qaida."[11]   FBI Special Agent David Kane, in an Affidavit filed in the U.S. District Court for the Eastern District of Virginia dated August 14, 2003, confirmed the 1996 CIA Memorandum mentioning Muwafaq as being specifically one of the financiers of at least one terrorist training camp in Afghanistan.[12]

The Muwafaq Foundation was endowed by Khalid bin Mahfouz, a known al Qaeda financer, and Defendant Kadi incorporated Muwafaq in Delaware in 1992 and operated the charity until 1997.[13]   During that time, Defendant Kadi spent roughly 15-20 million dollars of his own money on the day to day operations of Muwafaq.[14]   While Defendant Kadi was pumping so much of his own money into Muwafaq, Osama bin Laden identified Muwafaq in a 1996 interview as one of his major funding sources and an al Qaeda supporter.[15]   Therefore, contrary to what Defendant Kadi purports in his motion to dismiss, it seems quite "logical" that a significant amount of Defendant Kadi's funding went into Osama bin Laden's hands.   According to a 2004 report by the Office of Foreign Assets Control (OFAC), a letter found in 2002 that was addressed to Osama bin Laden referenced Kadi's managing money for Bin Laden in Sudan.  The

---

[10] Testimony of Former National Security Advisor Richard A. Clarke before the United States Senate Banking Committee, October 22, 2003.  Kaplan Dec., Exhibit 5.
[11] Kaplan Dec., Exhibit 1, Attachment 2.
[12] Kaplan Dec., Exhibit 6.
[13] WTC ¶ 618, MDS ¶ 68.
[14] WTC ¶ 616, MDS ¶ 68.
[15] "Osama Bin Laden: I bought the Jihad groups with my own money," *Ruz al-Yusuf*, June 17, 1996. Kaplan Dec., Exhibit 7.

letter also referred to Kadi as one of Bin Laden's former managers.  O'Neill Exhibit AC ¶ 24, Kaplan Dec., Exhibit 4.

Although Defendant Kadi repeatedly claims that Muwafaq activities were stopped in 1997, offices of this organization were still running until 2003.  The Muwafaq office in the Netherlands for example, which was registered on July 10, 1995, appears to have remained open until May 1, 2003.[16]  According to a submission of Defendant Kadi himself, Muwafaq continued to be registered in Holland and Belgium as of 2002. Exhibit AC ¶ 122; Kaplan Dec., Exhibit 4. Despite Defendant Kadi's claims to the contrary, it is clear that Defendant Kadi was designated in part because a "charity" he founded and funded, Muwafaq, was actually an Al Qaeda front.

### C.    KADI'S SUPPORT FOR THE AL IMAN UNIVERSITY.

Kadi wildly asserts that "Probably most outrageous in plaintiffs' litany of malicious claims is the assertion that Mr. Kadi's *1998* donation to build a school is somehow evidence of a terrorist agenda…" Kadi Memo at 19.   The Al Iman University was hardly a normal school.  Al Iman was founded by Sheikh Abdul Majid Al-Zindani, who also serves as rector.  Zindani is a U.S.-designated terrorism supporter, and the Treasury Department has stated that:

> Al-Zindani has a long history of working with bin Laden, notably serving as one of his spiritual leaders.  In this leadership capacity, he has been able to influence and support many terrorist causes, including actively recruiting for al Qaeda training camps.  Most recently, he played a key role in the purchase of weapons on behalf of al Qaeda and other terrorists.[17]

In addition to having fought alongside bin Laden in Afghanistan, Zindani leads the Yemen chapter of the Muslim Brotherhood.  According to the U.S. Treasury Department, Al Iman students are "suspected of being responsible, and were arrested, for recent terrorist attacks,

---

[16] Muwafaq Netherlands, official abstract, 2005.  Kaplan Dec., Exhibit 8.
[17] http://www.treas.gov/press/releases/js1190.htm.  Kaplan Dec., Exhibit 9.

including the assassination of three American missionaries…". *Id.* In fact, John Walker Lindh, the American who fought with the Taliban, is a former student of Al Iman.[18]

Kadi points to the fact that the donation was made in 1998 as if that somehow makes it irrelevant and brazenly argues that "A donation, which plaintiffs concede went to build a school in 1998, cannot be tied to the actions of students of that school years later." Kadi Memo at 19. Kadi's support for the school took place during the same year that al Qaeda organization issued a fatwa calling it a religious duty to kill Americans everywhere in the world, be they civilians or military.[19] Khalid Sheikh Mohammed has referred to 1998 as the year when a critical planning meeting to set up the September 11 plot took place at which Osama bin Laden specifically requested Khalid Sheikh Mohammed's assistance "in developing an operation designed to drive aircraft into targets".[20] It cannot be seriously argued that support knowingly provided to Al Qaeda during that time period is irrelevant.

In an effort to deflect attention away from his support of al Qaeda, Defendant Kadi attempts to justify a transfer of $1.25 million to the school from his bank account as a gift meant merely to help build the university.[21] See Kadi Memo at 19. Kadi even argues that according to a U.S. State Department website, during the time Defendant Kadi made his donation, USAID was also sending $8.5 million to Yemen to support literacy projects and provide access to the Internet in schools. Kadi Memo at 19-20. However, Defendant Kadi neglects to mention two significant facts which distinguish his support of terrorism from USAID's support of Yemeni education generally.

---

[18] *Ibid.*
[19] WTC page 25.
[20] Substitution for the Testimony of Khalid Sheikh Mohammed, Exhibit DX-0941; US v. Moussaoui. Kaplan Dec., Exhibit 10.
[21] MDS ¶ 9, 12

D.   KADI'S RELATIONSHIP WITH WAEL JELAIDAN AND MOHAMED LOAY BAYAZID.

Unlike USAID's support, Defendant Kadi's donations were specifically earmarked for support of the radical al Iman University.  Kadi transferred a large sum of money from the account of his company Caravan Development Group by way of at least two co-founders of al Qaeda, Wael Julaidan and Mohamed Loay Bayazid, who were partners in the Maram company in Istanbul, Turkey, previously owned by Mamdouh Mahmoud Salim.[22]  These individuals had direct access to both the leader of al Qaeda, Osama Bin Laden, and its military chief, Mohamed Atef aka Abu Hafs Al-Masri.[23]  Bayazid personally and publicly issued fatwas stating that attacks on the United States were both proper and necessary.  MDS at 32.

Kadi's relationship with Al Qaeda founder and supporter Defendant Wael Julaidan is quite extensive.  Wael Julaidan is an associate of Osama bin Laden and a high ranking member of both the International Islamic Relief Organization (IIRO) and the Muslim World League (MWL), both of which are front organizations for al Qaeda, and on September 6, 2002, the U.S. government designated Julaidan as a supporter of international terrorism and his assets were frozen.[24]  Kadi's main Albanian firm was Karavan Construction and Development.[25]  Karavan provided aid to the Saudi NGO Saudi Joint Relief Committee (SJRC) for Kosovo.[26]  SJRC's Chief at the time was Julaidan. In addition, Julaidan was provided an office in the Karavan corporate building. Kadi gave shares of a business he owned, KA Stan, to Julaidan as a "reward for the assistance he provide to [Kadi's] charitable activities in Bosnia."[27]  According to an OFAC report on Kadi's activities in Europe, faxes with the letterhead of Julaidan's company in Jeddah were recovered during the same period of time as being sent directly from the fax

---

[22] MDS ¶ 31
[23] MDS ¶ 19
[24] MDS ¶ 13
[25] MDS ¶ 24
[26] MDS ¶ 25
[27] MDS ¶ 27

machine of Caravan Ltd (controlled by Kadi) in Istanbul with Julaidan's specific handwritten instructions and signature for the transfers to be executed on his personal account.[28] Furthermore, on January 20, 1999, the manager of a Kadi company, Cavallo Limited, sent a fax on which appear the following mentions: "Copy: Yassin Kadi Est, Att: Mr. Wa'el Julaidan", further illustrating the fact that Jelaidan was still working within the Yassin Kadi Establishment in Saudi Arabia.[29]

### E.    KADI'S INVOLVEMENT WITH P-TECH.

Kadi is directly involved in Ptech, a Massachusetts-based technology company crawling with investors and managers with alleged connections to al Qaeda financing.  In 1998, Defendant Kadi invested $14 million in Ptech - $9 million of which was invested through BMI, an Islamic investment company with significant ties to international terror financing.[30]  By 2001, Defendant Kadi was one of the company's top investors and managers.[31]  An FBI raid of Ptech in December 2002, following a tip from an employee who suspected that the company was connected to the September 11 attacks, jumpstarted an investigation into the alleged terrorist financial network which is still pending.[32]

Ptech's founder is Abdurahman Muhammad Alamoudi, who, according to the U.S. Treasury Department, "had a close relationship with al Qaida and had raised money for al Qaida in the United States."[33]  Two of Ptech's employees, Suheil Laher and Muhamed Mubayyid, are affiliated with Care International, an organization that is co-located in Boston and Sudan and is under criminal investigation due to its financial ties to Osama bin Laden.  Former Ptech board member Soliman Biheiri, who was convicted of lying to investigators regarding his affiliations

---

[28] "Albania: Officials Crack Down on Terror Suspects," RFE/RL, January 27, 2002.  Kaplan Dec., Exhibit 11.

[29] Cavallo Limited, Fax of Waleed Abu Sheikha of January 20, 1999.  Kaplan Dec., Exhibit 12.

[30] MDS ¶ 110

[31] *Ibid.*

[32] MDS ¶ 121

[33] U.S. Treasury Department Press Release, "Treasury Designates MIRA for Support to Al Qaida," July 14, 2005.  Kaplan Dec., Exhibit 13

with known terrorists, was in charge of the now-defunct New Jersey-based BMI, which according to court documents was used as a financial conduit for al Qaeda supporters.[34]  Biheiri has also been accused of using BMI to funnel $3.7 million from the SAAR Foundation to Islamist terrorists.[35]  Yaqub Mirza, who was also on Ptech's board of directors, is the president and CEO of the defendant SAAR Foundation.[36]  Ptech, Defendant Kadi, Biheiri, Ibrahim, BMI, Mirza, and SAAR all maintained financial connections with one another, as well as with other organizations and fronts allegedly connected to money laundering and terrorist financing, such as al Taqwa, the Safa Trust, IIRO, and others.

Defendant Kadi submits that "The complaints against Mr. Kadi are at best an attempt to find a successful Saudi from whom to seek recovery, and at worst, the legitimizing of cultural prejudices."  Kadi Memo at 25.  Plaintiffs have alleged that Kadi "knew or had to know that he was providing financial assistance to al-Qaeda" and that "this financial assistance was [the] proximate cause of the September 11, 2001, attacks and the damages suffered by the Plaintiffs."  MDS at ¶128.  Plaintiffs respectfully submit that the complaints against Mr. Kadi are in fact an attempt to hold one of al Qaeda's biggest financial supporters responsible for the attainment of its ultimate goal, the damage and destruction of American citizens and businesses.

## IV.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT KADI

As this Court has already noted, "Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists…and they will prevail even if Defendants make contrary arguments."  *In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 804 (S.D.N.Y. 2005).

---

[34] MDS ¶ 43, 46
[35] Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements", USA v. Arnaout (USDC, Northern District of Illinois, Eastern Division), January 29, 2003.  Kaplan Dec., Exhibit 6.
[36] MDS ¶¶ 112, 113

As a preliminary matter, Kadi argues that contacts occurring in the 1990's are too "remote" to satisfy due process. Kadi Memo at 13. That argument is absurd. The money that al Qaeda used to set up its terrorist training camps, to plan the September 11 attacks, to train the hijackers, and to carry out the attacks, was raised long before the attacks themselves were carried out. Money raised on September 10, 2001, or laundered and sent abroad to al Qaeda on that date, would have arrived much too late to support these particular attacks, for which false travel documents and money for living expenses (to say nothing of the extensive training the hijackers received) were needed months, and indeed, years in advance. The provision of material support to an organization which publicly proclaimed its intent to attack the United States in the 1990's is of course sufficient to satisfy due process. That is precisely when Kadi is alleged to have provided material support to al Qaeda.

### A.   KADI IS SUBJECT TO THE JURISDICTION OF THIS COURT UNDER A THEORY OF GENERAL JURISDICTION.

Kadi's contacts with the United States are extensive and ongoing from the early 1990's until at least 2001. Kadi set up and incorporated Blessed Relief, aka Muwafaq, in Delaware in 1992. Kaplan Dec., Exhibit 1, Attachment 6. Defendant Kadi invested over five million dollars in a Quincy Massachusetts company P-Tech, which was raided by federal agents on December 5, 2002. Kaplan Dec., Exhibit 1, Attachment 7. Kadi transferred the money through a subsidiary company, Sarmany Ltd., controlled by Kadi. Kaplan Dec., Exhibit 1, Attachment 8. Additionally, Defendant Kadi sits on the Board of Directors of Global Diamond Resources, a Nevada corporation. Kaplan Dec., Exhibit 1, Attachment 9. The Chicago FBI Terrorist Task Force found probable cause to believe that Defendant Kadi transferred money to individuals in the United States who transferred money in support of domestic and international terrorist activities. *See,* Affidavit of FBI Special Agent Robert Wright, dated June 8, 1998. Kaplan Dec., Exhibit 1, Attachment 10.

16

Defendant Kadi invested in other companies affiliated with the SAFA group, including Sterling Ptech Fund LLC and Sterling Packetstream Company, both companies controlled by Defendant Yakub Mirza and based at 555 Grove Street, Herndon, Virginia.   Kaplan Dec., Exhibit 14.   According to the United States government, Sterling Ptech Fund LLC was formed in August 2000 by the SAFA group in order to invest in Ptech.   *Id.*   The representative of the Sterling Ptech Fund LLC is Muhammad Ashraf, who also represents the International Islamic Charitable Organization, affiliated with the MWL and the IIRO.   *Id.*   Defendant Kadi invested over $15 million in Sterling Ptech Fund LLC through his companies Caravan Development Group and Safa Company Limited.   According to the United States Government, Defendant Kadi also made transfers to Sterling Packetstream Company, also affiliated with the SAFA Group.   "Qadi made an investment in another United States company called Packetstream, Inc. On February 9, 2001 Caravan wire transferred $100,000 from the account at Faisal Finance to account number 515 220 1224 in the name of the Sterling Packetstream Fund, LLC, at Branch Banking and Trust Co. in Maryland."   Kaplan Dec., Exhibit 14.

The United States Government stated in 2002, "The evidence is that Yassin Qadi has had an interest in and continues to have an interest in various entities in which members of the Safa Group have an ownership interest or managerial control."   Kaplan Dec., Exhibit 14.   In addition, as of April 23, 2001, Defendant Kadi had an investment of $200,000 in a real estate project in Boston known as "99 High Street," and as of October 16, 2001, Defendant Kadi's investments portfolio included an investment of $340,000 in Radnor Properties in Pennsylvania.[37]   Kadi's assertions that he "has no business contacts in the United States" or that "any relationship stopped years before 9/11" are at best misleading and at worst false.   This

---

[37] YAK Investments Portfolio abstract, 10/16/2001, Kaplan Dec., Exhibit 15.

evidence is more than sufficient at this point to provide a basis that Defendant Kadi has contacts with the United States or directs others under his control to have contacts in this country.[38]

**B.   KADI IS SUBJECT TO THE JURISDICTION OF THIS COURT UNDER A THEORY OF SPECIFIC JURISDICTION.**

**1.   KADI PURPOSEFULLY DIRECTED HIS CONDUCT AT THE UNITED STATES.**

Even if Plaintiffs' claims did not arise out of Kadi's activities in the United States, this Court could still assert jurisdiction over him because he is alleged to have purposefully directed his conduct at the United States.  As this Court has previously ruled, "In light of al Qaeda's public declarations of war against the United States, someone who is alleged to be a founder, an admitted associate, and a provider of financial and logistical support to al Qaeda, has purposefully directed his activities at the United States such that the exercise of personal jurisdiction over him is reasonable."[39]  Plaintiffs have previously briefed the issue of jurisdiction based on conduct purposefully directed at the United States and this Court previously recognized that due process "is satisfied if the defendant has 'purposefully directed' his activities at the residents of the forum . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *In re Terrorist Attacks of September 11*, 349 F.Supp.2d 765, 810.[40]

This Court noted in its Opinion denying Defendant Adel Batterjee's Motion to Dismiss that "While perhaps not dispositive on its own, Mr. Batterjee's designation as a terrorist lends substantial weight to Plaintiffs' claims that he purposefully directed his activities at the United States and that the exercise of personal jurisdiction over him comports with due process." *In re:*

---

[38] If the Court determines that Plaintiffs' allegations are not enough to establish personal jurisdiction, then Plaintiffs seek leave to conduct discovery to determine the extent to which Defendant Kadi handles the administration and direction of his company's activities in the United States and his personal contacts with the United States. "[A] district court has discretion whether to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction to enable a party to conduct discovery. 45A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1351, at 253-59 (2d ed. 1990).

[39] *In re: Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 at 826.

[40]   Plaintiffs will not repeat those arguments here, but rather respectfully refer this Court to Burnett Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss filed by Defendant Kadi, as well as to Plaintiffs Memorandum of Law in Opposition to Motions to Dismiss filed by Abdullah Binladin, which are hereby incorporated by reference.

*Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 826.   Although he attempts to downplay its significance, the United States Government designated Kadi as an SDGT as a result of his support of Al Qaeda, the Albanian government has accused Kadi of utilizing business ventures to funnel money to Al Qaeda, and numerous countries including Switzerland, the United States and Albania have frozen Kadi's assets.   In addition to his designation and the freezing of his assets, however, the Plaintiffs have laid out in detail in their pleadings and above, the activities of Defendant Kadi knowingly and intentionally carried out in support of Al Qaeda and its terrorist agenda.

Just as this Court found when it held that Defendant Adel Batterjee purposefully directed his activity at the United States so that "the exercise of personal jurisdiction over him comports with due process," so too should this Court find that the designation of Kadi as a supporter of al Qaeda and the decision made by multiple countries to seize his assets warrant the same determination.

### 2.   JURISDICTION OVER KADI CAN BE ESTABLISHED ON A CONSPIRACY THEORY.

Even if the Court finds that it cannot exercise jurisdiction over Kadi under theories of general jurisdiction or under a directed activity theory, this Court should still find that it has jurisdiction over Kadi under a conspiracy theory of jurisdiction.   As this Court has held, all that is necessary for Plaintiffs to establish personal jurisdiction on a conspiracy theory is for Plaintiffs to "make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York."   *In re Terrorist Attacks on September 11, 2001,* 349 F.Supp.2d 765, 826.   As is detailed above and throughout the Plaintiffs' pleadings, Plaintiffs have alleged sufficient facts warranting the inference that Kadi was a member of the al Qaeda conspiracy, and

that he conspired with others who committed a tort in New York.  Accordingly, this Court can exercise jurisdiction over him on a conspiracy theory.

### 3.    PLAINTIFFS CAN UTILIZE THE PROVISION OF THE ATA WHICH PROVIDES FOR NATIONWIDE SERVICE OF PROCESS.

In a last ditch effort to convince this Court that it cannot assert jurisdiction over him, Kadi half-heartedly contends that Plaintiffs cannot rely on the ATA for nationwide service of process.  Kadi Memo at 16-17.  Amazingly, and without a sense of the irony of his position, Kadi argues that the ATA only applies to international terrorism and that the events of September 11, 2001, were not international terrorism.    Defendant Kadi, in unabashed linguistics deconstructionalism, attempts to rewrite the definition of "international terrorism" as it is defined in 18 U.S.C. § 2331 (1).   Kadi claims that "With due respect for this Court's prior holdings, the ATA does not apply to terrorist acts which occur in the United States, and thus is inapplicable in this case."  Kadi Memo at p. 16.  In its January 18, 2005 opinion, the Court noted that: "the Court assumes the attacks of September 11 were an act of international terrorism."  *In re: Terrorist Attacks on September 11, 2001*, 249 F.Supp.2d 765, 829.  The 9/11 Commission Final Report further concurred, tracing the financing and organizing of the plot to Hamburg, Germany, and Saudi Arabia.  Plaintiffs respectfully see no reason why that finding should be altered.

The defect in Defendant Kadi's analysis is the very definition of international terrorism on which he relies:

> Occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate to seek asylum.  (Def. brief p. 7)

Defendant Kadi incredibly loses sight of the language, "transcend national boundaries in terms of the means by which they are accomplished …."  The Plaintiffs' pleadings make clear that al Qaeda operated a world-wide international terrorist organization which drew its funds from

20

across the globe for the purpose of carrying out a jihad that ultimately resulted in the attacks of September 11, 2001.  Plaintiffs and the United States have alleged that Defendant Kadi funneled millions of dollars to al Qaeda, the money that made the attacks possible.  Contrary to what Mr. Kadi would have this Court believe, the allegations against Defendant Kadi fall squarely under the ATA's definition of international terrorism.

## V.   PLAINTIFFS' PLEADINGS SUFFICIENTLY STATE CLAIMS AGAINST KADI UNDER 12(B)(6)

Plaintiffs respectfully incorporate all prior arguments asserted in prior briefs and also remind the Court that in October of 2005, the Second Circuit re-iterated and re-affirmed the "notice pleading" standard set forth in Fed. R. Civ. P. 8 as applied to a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005).  In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them.  *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002). Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001).

### A.   PLAINTIFFS' CLAIMS WITH RESPECT TO MR. KADI'S VOLUNTEER ACTIVITIES ARE NOT BARRED BY THE VOLUNTEER PROTECTION ACT.

Kadi asserts that the Volunteer Protection Act, an act designed to protect firefighters and participants in the Big Brother program, somehow exculpates him from civil liability for terrorist financing.  This argument is beyond specious.  The Volunteer Protection Act ("VPA"), by its terms, does not apply when the harm at issue "was caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer." 42 U.S.C.A. § 14503(a)(3).  The statute also states

that "Nothing in this section shall be construed to affect the liability of any nonprofit organization or governmental entity with respect to harm caused to any person." *Id* at (c). Finally, and most importantly, the statute provides for exceptions to the limitations on liability set forth in the statute including "any misconduct that…constitutes a[n]…act of international terrorism (as that term is defined in section 2331 of Title 18) for which the defendant has been convicted in any court". *Id* at (f)(1)(A). Although Defendant Kadi has, at least to date, not been convicted in any court, Plaintiffs have specifically, and in incredible detail, alleged that Kadi knowingly provided material support to Al Qaeda in violation of §2331 *et al.*, throughout the myriad of pleadings filed to date which are referenced in Footnote 2 *supra* and re-iterated throughout this complaint. Despite his attempts to cast himself as such, Mr. Kadi is hardly the sort of "volunteer of a nonprofit organization or governmental entity" which Congress intended to protect when it passed this statute.

### B. THE VICTIMS' COMPENSATION FUND DOES NOT AFFECT THE RIGHTS OF THE PLAINTIFFS IN THESE CASES TO ASSERT CLAIMS AGAINST KADI.

Although it is difficult to ascertain with certainty, it appears that Kadi is arguing that those individual who elected to go into the Victims' Compensation Fund somehow conceded that that there is no defendant who is a "knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act." Kadi goes so far as to claim that no such plaintiff "could in good faith allege" that Kadi was a "knowing participant" in the conspiracy since that plaintiff elected to go into the Victim's Compensation Fund. Preliminarily, Plaintiffs point out that the majority of the Plaintiffs whose motions are at issue presently are not individual victims who had the opportunity to go into the VCF, but rather are business and insurance companies who suffered financial and other property losses as a result of the actions of Mr. Kadi and his fellow al Qaeda co-conspirators which resulted in the horrific attacks of September 11. Secondly, Plaintiffs

assert that the provision of the Act to which Kadi points was specifically designed to provide Plaintiffs with the option of going into the Victims' Compensation Fund and still filing a civil lawsuit against anyone or any entity which Plantiffs contend to have been a "knowing participant" in the September 11 attacks which Plaintiffs herein have alleged Kadi to be.

### C.   PLAINTIFFS STATE CLAIMS UNDER THE ANTI-TERRORISM ACT

Under the ATA, Kadi is liable if he provided material support to al Qaeda with knowledge of its terrorist agenda or if he aided and abetted al Qaeda or Osama Bin Laden in their course of terrorist conduct. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002); *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 828.   Kadi argues that Plaintiffs have failed to state claims against him because, he contends, Plaintiffs fail to allege any specific facts that could give rise to an inference that he knowingly and intentionally provided material assistance to al Qaeda.  The complaints, RICO statements, and More Definite Statements filed by the Plaintiffs as well as the facts laid out above, demonstrate otherwise.

### D.   PLAINTIFFS STATE CLAIMS UNDER RICO

Plaintiffs' complaints, RICO Statements and More Definite Statements assert RICO claims against Kadi pursuant to 18 U.S.C. §§ 1962 (c) and (d).). The enterprise – the "al Qaida movement" - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure. Its well documented purpose is to perpetrate acts of terrorism. *See e.g. Federal* RICO Statement at pages 2-3.  Thus, Plaintiffs have sufficiently pled that al Qaeda is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs' complaints, RICO Statements and More Definite Statements similarly allege sufficient involvement by Kadi in the enterprise to sustain claims under both §§ 1962 (c) and (d).

A plaintiff asserting a civil claim under § 1962 (c) must allege that the defendant participated in the operation or management of the enterprise. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *Dubai Islamic Bank v. Citibank*, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). To sustain a claim under § 1962 (d), the plaintiff must allege that the defendant was a "central figure" in the underlying scheme. *Id.* at 165. However, "a proper RICO allegation does not require that each member agree with the actions taken by other members of the enterprise but only that they intended to 'participate in the enterprise.'" *United States v. Louie*, 625 F. Supp. 1327, 1333 (S.D.N.Y. 1985) (*citing* 18 U.S.C. § 1962(c)).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS 9727, 4-5 (S.D. N.Y. 1994).

Here, the plaintiffs have satisfied these pleading standards. Plaintiffs allege that Kadi set up, managed, directed and/or materially supported U.S. corporations and other entities and that these organizations carried out a calculated global campaign to transfer assets in support of. Thus Kadi's role in raising and laundering money for al Qaeda satisfies the 1962(c) operation or management test. *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir. 1988); *Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987); *State of New York v. O'Hara*, 652 F. Supp. 1049, 1053 (W.D.N.Y. 1987).

### E.    PLAINTIFFS STATE CLAIMS UNDER THE ATCA

Although Kadi purports to challenge the alien Plaintiffs' assertion of a valid claim against Kadi under the ATCA he sets forth no argument in support of that allegation, so Plaintiffs respectfully refer the Court to the discussion contained in the *Burnett* Plaintiffs' Memorandum of

Law in Opposition to the Motion to Dismiss filed by Kadi.

### F.   PLAINTIFFS ASSERT VALID CLAIMS UNDER STATE LAW

Finally, Plaintiffs properly pled intentional tort claims because the conduct of Kadi in setting up, providing significant support for, managing and or directing corporations, individuals, and other entities for the purpose of providing financial material support to Osama Bin Laden was, in fact, "extreme and outrageous"; suggestions to the contrary are offensive to any civilized standard of outrage. Moreover, there can be no doubt that, in setting up and supporting vehicles for the support of al Qaeda, Defendant Kadi was directing his conduct at the plaintiffs, as citizens and/or residents of the United States, because the target of Osama's terrorist agenda was well known at the time Kadi was creating entities to provide funding and other financial services for him.[41]

## VI.   CONCLUSION

Service of process on Defendant Kadi was demonstrably adequate, as evidenced by his counsel's appearance and motion to dismiss on his behalf. The Court has personal jurisdiction over Defendant Kadi by virtue of the Plaintiffs' allegations that the illegal activities he engaged in or supported were purposefully targeted at the United States. Moreover, the Complaint makes sufficient allegations against Defendant Kadi to satisfy the Rule 12 standard. This Court should deny Defendant Kadi's motion to dismiss in its entirety.

Dated: New York, NY
      April 11, 2006

Respectfully submitted,

/s/_____
Ronald L. Motley, Esq. (RM-2730)
Jodi Westbrook Flowers, Esq.

---

[41] Plaintiffs recognize that they do not now state claims against Defendant under the Torture Victims Protection Act because they have not alleged that he acted under color of law. *See In re Terrorist Attacks on September 11*, 349 F.Supp.2d at 828. Plaintiffs further recognize, but respectfully disagree with, this Court's prior holdings concerning the intentional tort claims of the *Federal* and *WTCP* plaintiffs and the negligence claims of the *Federal* and *N.Y. Marine* plaintiffs. *See id.* at 829, 831.

Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME-8337)
Justin B. Kaplan, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Paul J. Hanly, Jr., Esq. (PH-5486)
Jayne Conroy, Esq. (JC-8611)
Andrea Bierstein, Esq. (AB-4618)
HANLY CONROY BIERSTEIN & SHERIDAN, LLP
112 Madison Avenue
New York, NY 10016
Telephone:  (212) 784-6400

Plaintiffs' Executive Committee
on behalf of *Burnett*, *WTCP, Euro Brokers*, *Continental*,
*N.Y. Marine* and *Federal* Plaintiffs