# Attachment 10

COUNTY OF COOK        )
                      )   SS
STATE OF ILLINOIS     )

## AFFIDAVIT OF ROBERT WRIGHT

I, Robert Wright, being duly sworn, do hereby depose and state:

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI) assigned to the Chicago Division.  I have been a Special Agent with the FBI since 1990.  I am currently assigned to the Chicago Division Counter-Terrorism Task Force In this capacity, I have become familiar with techniques used by international terrorist organizations to surreptitiously move and launder money in and out of the United States, including through use of domestic financial institutions, in support of extortionate terrorist and paramilitary activities and operations in the United States and abroad, including the State of Israel and elsewhere.

2.   The Chicago FBI Terrorist Task Force has been conducting an investigation into activity dating back to 1989 and continuing to the present involving the transfer or transmission of money from Europe and the Middle East to a network of individuals and organizations in the United States, including, in the Chicago area, Mohammad Salah, Azita Salah, and the Quranic Literacy Institute ("QLI").  There is probable cause to believe that some of these transfers or transmissions have been of money intended for use in support of domestic and international terrorist activities, thus rendering the transfers or transmissions violative of the money laundering statute, 18

U.S.C. § 1956(a)(2), and thereby rendering such money and assets traceable to such money forfeitable pursuant to 18 U.S.C. § 981. As set forth in greater detail below, the illegal transfers have supported specific terrorist activities involving the extortion, kidnaping and murder of the citizens and government of the State of Israel as part of an ongoing movement and campaign publicly pledged to the goal of forcing, through coercive and violent means, the State and citizens of Israel to cede, physical and political control and dominion over the lands comprising Israel and the occupied territories of the West Bank and the Gaza Strip.

3.    The specific items for which there is probable cause for seizure and forfeiture are as follows:

a.    With respect to QLI:

i.    All funds held in bank account number 12310153, at the First National Bank of Chicago, First National Plaza, Chicago, Illinois 60670, in the name of Quranic Literacy Institute, General Fund, P.O. Box 1467, Bridgeview, Illinois 60455.

ii.    All funds held in bank account number 0010930021133, at the Midland Federal Savings & Loan Association, 8929 South Harlem, Bridgeview, Illinois 60455, in the name of the Quranic Literacy Institute Building Fund.

iii.    All funds held in bank account number 1412446, at the First National Bank of Evergreen Park, 9400 South Cicero Avenue, Oak Lawn, Illinois 60453 in the name of Quranic Literacy Institute.

iii.    One 1997 E35 Ford Van, VIN: 1FBJS31L3VHB70844

b.    With respect to Mohammad Salah and Azita Salah:

i.    all funds held in bank accounts number 5580349268 and number 239328806, at the Standard Bank & Trust, 7800 West 95th Street, Hickory Hills, Illinois 60805, in the names of Mohammad and Azita Salah and Azita Salah TRF, (and their minor children Ahmad M or

2

Yusuf M or Salma Asmaa M Salah), P.O. Box 2616, Bridgeview, Illinois 60455, respectively.

ii.  all funds in safe deposit box number 207 (in the name of Azita Salah), and safe deposit box number 4019 (in the name of Mohammad Salah), at the Standard Bank & Trust, 7800 West 95th Street, Hickory Hills, Illinois 60805,

iii.  all funds held in bank account number 8060700, at the First National Bank of Chicago, First National Plaza, Chicago, Illinois 60670, in the names of Mohammad and Azita Salah.

iv.  all funds held in bank account number 022034532, at the LaSalle Bank, F.S.B. (formerly known as LaSalle Talman), 135 South LaSalle, Chicago, Illinois 60674, in the names of Mohammad and Azita Salah.

v.  the property commonly referred to as 9229 S. Thomas, Bridgeview, Illinois with the legal description:

Lot 5 in Mosque Foundation and Center Area, Subdivision of part of the Southeast quarter of Section 1, Township 37 North, Range 12, East of the Third Principal Meridian, in Cook County, Illinois.
PIN 23-01-404-012.

## MOHAMMED SALAH, QLI, AND THEIR RELATIONSHIP

4.  On January 25, 1993, Mohammad Salah, a naturalized American citizen and Chicago area resident, was arrested in Israel for his membership and participation in the HAMAS terrorist organization ("HAMAS").[1]  In January of 1995, Salah pled

---

[1]HAMAS is an acronym of the Arabic term for "The Islamic Resistance Movement"--Harakat al Muqawama al Islamiyya.  It is an independent political organization founded in the Israeli Occupied Territories in 1987 at the beginning of the Intifada, the Palestinian-led campaign to resist Israeli political dominion over the occupied territories. Organizationally, HAMAS is divided into two operational branches or bureaus--a political branch and a military branch.  The political branch has among its publicly stated purposes the establishment of a Palestinian identity and homeland.  To that end, the organization is involved in community

3

guilty in an Israeli military court to belonging to HAMAS and illegally channeling funds to the outlawed HAMAS organization, including funds transferred through one of the subject accounts he held jointly with his wife Azita, at LaSalle Talman Bank in Chicago.  For his crimes, the Israelis sentenced Salah to five years imprisonment.  Salah was released from an Israeli prison in November of 1997, at which time he was permitted to return to the United States.

5.  On July 27, 1995, while Salah was incarcerated by Israeli authorities, the United States Treasury Department's Office of Foreign Assets Control added Mohammad Salah to the list of Specially Designated Terrorists, (published at 60 Fed. Reg. 44932, August 29, 1995), because of his facilitation of terrorist activities in the Middle East.

6.  A review of bank records obtained by the FBI demonstrates that Salah previously has claimed to be an employee of the Quranic Literacy Institute ("QLI") of Oak Lawn, Illinois.

---

building activities in Israel and abroad.  However, acting through its military branch, which receives instruction and support from its political branch, HAMAS also has been engaged in a more than decade-long campaign of subversive and violent activity--commonly denominated as terrorist activity--undertaken primarily in Israel, and supported in part by illegal activities in the United States including, among other things, money laundering in violation of 18 U.S.C. § 1956, including some that are the subject of this affidavit.  These terrorist activities, for which HAMAS has repeatedly and publicly claimed credit, have as their broadly represented purpose the undermining the Israeli-Palestinian peace process, and, more generally, of forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories, and replacing the Jewish political authority over these lands with an Islamic government.

4

QLI represents itself to be a not-for-profit research institute devoted to the translation and publication of sacred Islamic texts and to scholarly research devoted to such topics.  QLI's principals include its President, Ahmad Zaki Hameed ("Zaki"), Corporate Secretary and Trustee Amer Haleem, and Treasurer Abraham Abusharif.

7.  Bank records obtained by the FBI include an employment verification letter issued for Mohammad Salah by QLI to the Standard Bank & Trust Co of Evergreen Park, Illinois.  The letter, printed on QLI organizational letterhead and signed by Amer Haleem, states that Salah began working for QLI as a computer analyst on January 1, 1991, at a salary of $36,000.  The letter was provided to Standard Bank & Trust by QLI in support of Salah's securing of a mortgage loan in excess of $100,000 for his residence at  9229 S. Thomas, Bridgeview, Illinois.  In making application for the loan, Salah claimed as his only employment the purported job with QLI.

8.  Bank records further show that Salah also claimed an employment relationship with QLI when he opened his subject account with First National Bank of Chicago, (account number 8060700), in late July of 1991.  The bank obtained an oral verification of Salah's employment with QLI from QLI treasurer Abraham Abusharif.

9.  Other information obtained by the FBI indicates that Salah either was not employed by the QLI in the capacity claimed or that QLI is seeking to conceal and disguise the relationship

it has with Salah.  QLI initially responded to FBI and INS
inquiries by refusing to discuss Salah's employment status.  FBI
review of QLI business records did not reflect any type of
regular periodic payments to Mohammad Salah, such as paychecks or
tax withholding records, that would reflect the existence of the
employment relationship claimed in the employment verification
letter submitted to Standard Bank.  Additionally, speaking
through its attorney Ralph Brown during a February 6, 1998,
telephone conversation with FBI agents, QLI has expressly denied
having employed Salah at any time.  Salah's wife, Azita Salah, in
an interview with FBI agents, denied that her husband was
employed by QLI and stated that he merely performed volunteer
work for the organization.

10.  Tax records obtained in the course of the investigation
indicate that Salah secured a mortgage from Standard Bank & Trust
not only through misrepresenting his employment status and
relationship with QLI, but also through tendering falsified tax
returns for the 1988, 1989 and 1990 tax years which he
represented to be copies of filed returns.  IRS tax information
revealed that the Salahs in fact did not file tax returns for the
1988 tax year and that the tax returns they filed for the 1989
and 1990 tax years materially differed from the returns tendered
to Standard Bank & Trust as part of the mortgage application
process.

### SALAH'S AUGUST 1992 TRIP TO ISRAEL FOR HAMAS

11.  Salah's statements to Israeli authorities after his

6

arrest in January 1993 suggests that Salah's claimed employment with QLI was likely a cover for his position as a high-level HAMAS military operative.

12.   While in Israeli custody after his arrest on January 25, 1993, Salah made a series of statements to Israeli authorities in which he admitted his activities in the United States and abroad as a HAMAS military operative prior to and during the period he was claiming to be a computer analyst for QLI.  According to Salah, his involvement with HAMAS began approximately in 1988 and continued through to the date of his arrest by Israeli authorities on January 25, 1993.  Salah further divulged that his activities for HAMAS, domestically and internationally, included recruiting and training new candidates for membership in HAMAS military cells in the Israeli Occupied Territories and to perform terrorist acts, primarily in the State of Israel. Salah told Israeli authorities that his recruitment activities included, among other things, conducting interviews and background checks, as well as identifying and sorting prospective candidates on the basis of expertise and skills relating to, among other things, knowledge of chemicals, explosives and the construction of terrorist devices that might be used in HAMAS military operations in Israel and elsewhere. His training activities for HAMAS, according to Salah, included mixing poisons, development of chemical weapons, and preparing remote control explosive devices.

13.   Salah also admitted having served as a financial

7

conduit for HAMAS operations.  Relatedly, he admitted to directly
financing domestic and international travel and terrorism
training for new HAMAS members.  Airline records obtained by the
FBI show that Salah purchased airlines tickets for travel between
the United States and sites in the Middle East for himself and
other suspected HAMAS terrorists, including Alwan Shareef and
Razick Saleh Abdel Razick, both of whom flew from the United
States to Syria with tickets purchased by Salah in September of
1992.  A review of the Salahs' bank records revealed that Salah
paid for the airfare by executing a check, dated September 29,
1992, drawn from the subject LaSalle Bank account that Salah
jointly held with his wife Azita.  Additionally, Salah has
acknowledged in statements to Israeli authorities that these
trips were taken for the purpose of receiving training in
preparation for HAMAS military and terrorist operations in
Israel.

14.   Bank and airline records obtained by the FBI and
reviewed in conjunction with statements to Israeli authorities by
Salah and other HAMAS operatives indicate that between June 18,
1991 and December 30, 1992, Mohammad Salah expended in excess of
$100,000 in direct support of HAMAS military activities.

15.   For example, Salah admitted to Israeli authorities that
in September of 1992, he gave in excess of $48,000 to Salah Al-
Arouri ("Al-Arouri"), an admitted HAMAS military operative and
student at Hebron University in the Israeli-occupied West Bank.
According to Salah, the money was to be used to purchase weaponry

8

to be used to carry out attacks against Israel.

16.   Salah's admission is corroborated by a number of
independent sources, including statements of Salah Al-Arouri.to
Israeli authorities in early 1993.  Al-Arouri has related that he
received approximately $96,000 from Salah during a face to face
meeting at Hebron University late in the summer of 1992.
According to Al-Arouri, Salah gave him the money specifically for
the procurement of weapons and the financing of the activities of
HAMAS military apparatus in Hebron.  Al-Arouri further related
that  weapons were in fact purchased with the money provided by
Salah.

17.   As recounted by Al-Arouri, Al-Arouri gave an individual
named Musa Dudin approximately $45,000 of the money he received
from Salah so that Dudin could purchase weapons in September of
1992.  Among the weapons Musa Dudin purchased were one short M-16
rifle; two Kalashnikovs, two Uzis, a number of 9 millimeter
pistols, and  numerous magazines and hundreds of rounds of
ammunition for the various weapons. Al-Arouri further related
that the weapons purchased with the money from Salah were
subsequently used in terrorist attacks, including a suicide
attack resulting in the murder of an Israeli soldier in Hebron in
October of 1992.  According to Al-Arouri, the attack was carried
out with the short.M-16 rifle purchased with the money he
received from Salah.  Al-Arouri related that shortly after
purchasing the rifle with the Salah money, he gave it to HAMAS
operatives Bashir Hamada and Talal Salah, who used the weapon in

9

their October 1992 murder of an Israeli soldier. Al-Arouri further related that after the attack, he assisted Hamada and Talal Salah in evading Israeli authorities who had initiated a massive manhunt for the two HAMAS killers. According to subsequent published news reports based on Israeli military sources, the two men soon thereafter escaped to Egypt by sea in a rubber dinghy launched from the border town of Rafah in the occupied territory of Gaza.

18.   In statements to Israeli authorities in January and April of 1993, Musa Dudin confirmed his role in the events revealed by Al-Arouri as summarized in the previous paragraph. Additionally, Musa Dudin admitted his involvement in the planning and execution of a HAMAS terrorist attack in Hebron on December 12, 1992, which resulted in the killing of Israeli soldier Yuval Tutanji. Musa Dudin stated that one of the weapons used in the ambush attack was a Kalashnikov rifle from the Hebron military squad. Al-Arouri indicated in his account of his dealings with Mohammad Salah that funds given to him by Salah were used to provide the Hebron squad with weapons, which included Kalashnikov rifles, clips and ammunition, and additional money to support their terrorist attacks.

19.   Salah's transaction of HAMAS business with Al-Arouri is supported by Israeli border control records which, according to Israeli police, show that Salah entered Israel's Ben Gurion Airport from the United States on August 25, 1992, and departed from Israel Ben Gurion Airport on September 9, 1992.

10

20. Additionally, bank records from subject LaSalle Bank account number 02-203453-2, held in the names of Mohammed and Azita Salah (and one of the subject accounts against which seizure and forfeiture is sought), corroborate the statements of Salah and Al-Arouri regarding their dealings.  Specifically, the bank records reveal that from August 12 through September 12, 1992, deposits in an amount exceeding $52,000 were received in Salah's LaSalle Talman account.  Within that same period, on September 3, 1992, while in Israel, Salah withdrew $50,000 from his LaSalle Bank account by executing ten (10) $5000.00 checks made out to "Cash."  The reverse side of each check indicates that it was cleared through the central branch of an Israeli bank in Tel Aviv on September 8, 1992, and debited against Salah's LaSalle Bank account in the United States the following day.

## QLI-RELATED SOURCES MADE LARGE STRUCTURED TRANSFERS OF MONEY DIRECTLY TO SALAH

21. A review of bank records further indicates that QLI and QLI-related entities or individuals likely were a source of funds for Salah's HAMAS-related expenditures between 1991 and his arrest in January of 1993 and beyond.  They also suggest that the QLI-related transfers of funds to Salah were, in significant part, structured in an effort to conceal QLI as the source of the funds.

22. For example, bank records show that on each of October 29, 30 and 31, 1991, Salah received a $6,000 check, ($18,000 in total), executed by Ahmad Zaki Hameed, the President of QLI.  The checks were not drawn on QLI bank accounts, but rather from

11

Zaki's personal bank account.

23.  A review of bank records similarly revealed that on
June 18, 1991, Salah received $40,500.00 in the form of five.(5)
cashier's checks, each in the amount of $8,100.00, drawn from an
account held by the George Washington Savings and Loan
Association of Oak Lawn, Illinois with the First National Bank of
Evergreen Park, Illinois.  Bank records show that the cashier's
checks were obtained for and given to Salah by Linda Abusharif,
the sister of QLI Treasurer Abraham Abusharif.  Bank records
further reflect that the five cashier's checks were counter-
signed by Salah who deposited them into his LaSalle Bank account.

### OLI'S SCHEME TO GENERATE INCOME FOR HAMAS ACTIVITIES

24.  Bank records further suggest that the planned source of
the funds that were relayed to Salah by QLI related entities was,
at least in part, the proceeds of a local land deal involving QLI
and Golden Marble Corp. that was financed with funds transferred
from a Swiss account of a Saudi Arabian entity into the United
States.

25.  In interviews with the FBI, Golden Marble President Dr.
Tamer Al-Rafai ("Al-Rafai") has related that beginning in March
of 1991, he met with QLI President Ahmad Zaki Hameed who
represented himself to be a possible investor in a land
development project Al-Rafai hoped to start.  An outcome of the
meetings was that Al-Rafai was instructed to bid on land for the
project and, if the bid was accepted, QLI would arrange to
finance the project.

12

26.- Accordingly, in May of 1991, Al-Rafai made a bid of $820,000 for a large unimproved lot located at Route 53 and Hobson Road in Woodridge, Illinois. The bid was accepted, after which Zaki informed Al-Rafai that he had identified a source for the funds necessary to close the deal. Zaki further told Al-Rafai that QLI would handle all business matters regarding the investment and the investor, who Zaki indicated was from Saudi Arabia.

27. According to Al-Rafai, on July 19, 1991, Saudi Arabian businessman Yassin Kadi, acting pursuant to specific instructions from Zaki, wire transferred $820,000 to Golden Marble from a Swiss bank. Bank records corroborate the wire transfer. Shortly thereafter, on July 22, 1991, Golden Marble used these funds to purchase the Woodridge, Illinois property. Both the wire transfer from Kadi to Golden Marble and the land purchase were consummated without the prior execution of any kind of mortgage or loan note. Indeed, QLI was not signified as a party to, or otherwise referenced in the papers concerning, these transactions.

28. However, on July 18, 1991, prior to the closing on the purchase of the Woodridge property, Zaki, in his capacity as QLI's president, established a land trust (Trust No. 1206-0) at the Midland Federal Savings & Loan Association. The bank trust documents specify the Woodridge property as the only asset of the trust and designate QLI as the sole trust beneficiary. This specification was nominally false at the time it was made,

13

because the property had not been purchased yet, (and would not be until four days later). And when it was purchased, it was purchased by Golden Marble, not QLI. Moreover, the documents establishing the QLI/Midland Federal Bank trust, which have been reviewed by the FBI, do not recognize or otherwise reference Al-Rafai, Golden Marble, Yassin Kadi, or Kadi International as a party in interest, or otherwise connected to, the Woodridge property.

29. On July 23, 1991, the day after Golden Marble closed on the Woodridge property, QLI and Golden Marble executed a Lease and Sale Agreement. The agreement, which is signed by Ahmad Zaki for QLI and Tamer Al-Rafai for Golden Marble, states QLI to be the owner of the Woodridge property, and provides that Golden Marble would lease the property from July 22, 1991 through July 21, 1993 for $164,000. The agreement specified that the rent was to be paid in a lump sum of $150,000 on July 22, 1991, with the remaining $14,000 due three months later. The agreement further specified that Golden Marble was to purchase the property within two years--i.e. by July 1993--for a price of $970,000.

30. Bank records reflect that the day the lease and sale agreement was executed--July 23, 1991--Al-Rafai, on behalf of Golden Marble, executed three checks payable to QLI totaling $101,000. Each of the three drafts, which according to Al-Rafai were payments against the $150,000 rent due at the inception of the lease, were returned for insufficient funds after being deposited by QLI into its Oak Lawn National Bank account. Zaki

14

Hameed demanded immediate payment. However, QLI ultimately granted Al-Rafai forbearance on the payment until September 1991. On September 11, 1991, Al-Rafai, for Golden Marble, wrote a check for $22,000 to QLI. On the following day, Al-Rafai executed a check for $88,000 to QLI.[2]

31. Bank records reviewed by the FBI indicate that QLI did not cash or deposit the two September 1991 checks from Al-Rafai totaling $110,000 for six months, until March 11, 1992, when Zaki Hameed of QLI endorsed the checks over to a third party.[3] Within days after Zaki Hameed's endorsing of the checks, Mohammad Salah received the first in a series of three substantial overseas wire transfers into his First National Bank of Chicago account that is a subject of this seizure and forfeiture action totaling just under $110,000. Specifically, bank records for Mohammad Salah's First National Bank of Chicago account number 8060700 show that on March 16, 1992, within five days of Zaki Hameed's endorsing of the Golden Marble rent, Salah received an overseas wire transfer of $27,000 into his First Chicago account

---

[2] The balance of the $150,000 rent payment was paid on November 27, 1992, when Al-Rafai wrote QLI a check for $40,000.

[3] Tamer Al-Rafai has related that he was told by Zaki Hameed that the checks were not cashed during this period because QLI was waiting for the conferral of tax-exempt status from the IRS. In fact, the delayed endorsement of the checks on March 11, 1992, correlates with QLI's attaining status as a 26 U.S.C. § 501(c)(3) tax-exempt organization in March of 1992. Prior to that time, and including the summer of 1991, QLI did not have tax exempt status. It therefore should have reported the rental income from the Woodridge property as a non-tax exempt organization for the 1991 tax year. A review of tax records indicates that QLI did not report the rental income, or any other income, for the 1991 tax year as it was required to do.

15

from Faisal Financial of Geneva, Switzerland.   That wire was followed by two additional wire transfers from Faisal Financial of Geneva of $30,000 on July 3, 1992[4], and $50,000 on October 7, 1992.

32.   Also on July 23, 1991, Zaki Hameed and Amer Haleem of QLI brought Al-Rafai to the Midland Federal Bank, at which time Zaki had Al-Rafai execute a document transferring the Woodridge property to Midland Land Trust No. 1206-0, of which QLI was the only beneficiary.

33.   A title search for the Woodridge property obtained by the FBI does not reflect Golden Marble having ever been recorded as owner or party in interest to the Woodridge property at the time of the land deal in July of 1991.   The title search instead shows ownership of the property as being held by Midland Federal Land trust 1206-0.   This chain of transactions, (which according to Al-Rafai was directed by Zaki, QLI's President), resulted in QLI gaining possession and ownership of the Woodridge property in a manner that obscured its connection to the overseas transfer of $820,000 from the Saudi entity Yadi International with which the deal was financed.

_____

[4]      On July 5, 1992, two days after the July 3, 1992, $30,000 wire transfer from Faisal Financial of Geneva Switzerland was received into his  First Chicago account, Mohammad Salah signed a lease for Standard Bank & Trust Safe Deposit Box Number 4019.   On July 9, 1992, Salah drew on the wired funds by withdrawing $10,000 from the First Chicago account.   According to Standard Bank & Trust personnel, Azita Salah has paid the yearly rent for Box Number 4019 through to the present, including the 4 year ten month period during which Mohammad Salah was incarcerated in Israel.

16

34.  Indeed, QLI's relationship to the loan extended by Kadi
International for the July 1991 purchase of the Woodridge
property was not reflected in any notes or agreements until .
December 1991, five and a half months after the wire transfer and
closing of the land deal.  Specifically, on December 17, 1991,
QLI, through Zaki, instructed Midland Federal, as Trustee of
Trust No. 1206-0, to execute a mortgage respecting the Woodridge
property in the amount of $820,000 in favor of Kadi
International, due and payable on December 31, 1993.  On December
31, 1991, Midland Savings did so by executing a note specifying
that $820,000 was due and payable on December 31, 1993, and
providing that "All payments are to be made to Kadi International
Corp., c/o BMI, Inc., One Harmon Plaza, Secaucus, New Jersey,
Attn:  Gamal Ahmed."  Richard Taylor, Vice President of Midland
Federal, who signed and notarized the document advised the FBI
that he understood the note as signifying that QLI was planning
to borrow $820,000 from Kadi International Corp. and use the Land
Trust #1206-0 as collateral for the loan.  The bank officer who
served as trustee related to the FBI that at the time he prepared
and executed the note, he was not aware that it was referencing
an unsecured loan that occurred five and one half months earlier.

35.  Notably, Kadi International and its related entity,
BMI, Inc., has disavowed any relationship with QLI.  A
representative of BMI, Inc.,(specified as payee in the QLI
"Note"), testified that Kadi International Corp. had no records
or any relation to QLI, its president, Zaki Hameed, or Midland

17

Trust No.-1206-0.  The representative also testified that BMI was
nqt aware of the note or mortgage executed in favor of Kadi
International.  Additionally, a review of title records for the
property indicates that the note or mortgage was never record as
a lien against the property, which had the effect of further
concealing from public notice the relationship between QLI and
the oversees transfer of funds from Kadi in Saudi Arabia.[5]

### MOHAMMAD SALAH'S TRIP TO ISRAEL IN JANUARY OF 1993

36.  Mohammad Salah has related to Israeli authorities that
in December of 1992, he was ordered by Mousa Mohammad Abu Marzook
("Abu Marzook") to travel to Israel's West Bank in January of
1993 to carry out five missions on behalf of HAMAS.

37.  Abu Marzook is the leader of the political bureau of
HAMAS.  According to records of the United States Customs Service
and the Immigration and Naturalization Service, Abu Marzook is a
native of Rafia, Gaza, who moved to the United States in 1973,
and eventually settled in the Washington, D.C./Northern Virginia
area as a resident alien until 1993. . Between 1993 and 1995, he
resided principally in Jordan, which deported him in June of 1995
for his involvement and senior position in HAMAS.  In July of
1995, after making trips to Iran and Syria, Abu Marzook attempted

---

[5]  A review of tax records reveals that for the tax years
1991 through 1995, QLI never filed the annual IRS Form-990
required of tax exempt organizations.  This failure acted to
further conceal and obscure QLI's business dealings generally,
its effective receipt of $820,000 internationally transferred
into the United States by Kadi for the purchase of the Woodridge
property, and the income QLI received in the form of rents from
Golden Marble between 1991 and 1994.

18

to reenter the United States at which time he was arrested by
Customs and INS officials at the request of the Israeli
government which sought to prosecute Abu Marzook for numerous
crimes in connection with his leadership of HAMAS.

In October of 1995, acting at the request of the Israeli
government, the United States initiated extradition proceedings
against Abu Marzook based on pending Israeli criminal charges
that included, murder, attempted murder and conspiracy stemming
from HAMAS sponsored terrorist acts on civilian targets in Israel
and the Occupied Territories between July of 1990 and October of
1994.  These terrorist acts resulted in the killing of over 30
Israeli citizens, the injuring or kidnaping variously of scores
of other innocent civilians, including an American citizen, and
the wounding of scores of Israeli soldiers.

In the resulting extradition proceedings in the spring of
1996, the United States District Court for the Southern District
of New York found probable cause to believe that HAMAS was the
perpetrator of numerous of the crimes for which the Israeli's
sought to prosecute Abu Marzook, including the April 4, 1994,
suicide bombing of a passenger bus in Afula, Israel, which killed
eight civilian passengers and seriously wounded 44 civilians and
two Israeli soldiers, and the April 13, 1994 bombing of another
passenger bus between Afula and Tel Aviv, which killed six
persons, including four civilians and one Israeli soldier, and
wounded an additional 12 civilians and 18 Israeli soldiers.  In
the district court proceedings, Abu Marzook expressly

19

acknowledged his position as the leader of the political branch of HAMAS.  The court found probable cause to believe that Abu Marzook, in his leadership capacity, had knowledge of these and other terrorist acts, that he had promoted and defended them publicly, and that he had directed underlying activities in support of HAMAS terrorist activities, including the activities of Salah in both the United States and Israel.  The district court's decision is published in In the Matter of the Extradition of Abu Marzook v. Christopher, 924 F. Supp. 565 (S.D.N.Y. 1996).

38.  Salah's relationship with Abu Marzook is independently corroborated by bank records showing more than $752,800 flowing from Abu Marzook (or accounts controlled by Abu Marzook) to Salah between 1989 and January 1993.[6]

39.  According to Salah, he was first contacted by Abu Marzook about the proposed January 1993 missions through a series of telephone calls placed by Abu Marzook in December of 1992. According to Salah, Abu Marzook called him after a succession of calls by Abu Marzook to Syria, Lebanon and Sudan through which Abu Marzook received information from, and consulted with, HAMAS operatives regarding the mass deportations by the Israeli government of 415 HAMAS operatives in Israel and the Occupied Territories on December 17, 1992.  In public statements, the

---

[6] Among the transfers, the largest of which are set forth in the following paragraphs, was a check executed by Abu Marzook for $5,000 and dated August 8, 1992, just two weeks prior to Salah's trip to Israel to provide weapons money to HAMAS operative Salah Al-Arouri.  See ¶¶ 15-20.  In the extradition proceedings, Abu Marzook acknowledged this transfer to Mohammad Salah.

Israeli government indicated that the mass deportation was a
direct response to the murder of a number of members of Israeli
military and police units in the previous weeks for which HAMAS
had claimed credit,[7] and the last of which was the December 15,
1992, dumping of the stabbed and mutilated body of a kidnaped
Israeli border police officer in the West Bank on the main road
between Jerusalem and Jericho.  The discovery of the body was the
precipitating event for Israel's immediate arrest and detention
of approximately 1200 Palestinians, followed on December 17, 1992
by the Israeli deportation of approximately 400 suspected HAMAS
members.

40.  According to Salah, Abu Marzook reported to him in the
immediate wake of these events that HAMAS' situation inside
Israel was serious because the mass deportations and arrests had
decimated the organization within the Occupied Territories.  Abu
Marzook characterized the situation as most serious in Ramallah
and Hebron because of the sudden removal of H^MAS leadership
structure in those areas.

41.  Salah further related that Abu Mar?ook instructed that
due to the mass deportation by the Israeli government, it was
necessary that Salah go to Israel to assist in reorganizing and
restaffing the military cells in Hebron, Ramallah, Nablus,
Bethlehem, Jericho and Jerusalem.  Salah also stated that Abu

---

[7] Among these precipitating incidents was the murder of
Israeli soldier Yuval Tutanji in which Musa Dudin assisted, and
which was undertaken by the Hebron military cell of HAMAS that
was supported with weapons and money provided by Al-Arouri with
funds he received from Salah in September of 1992.  See ¶ 18.

46.  According to Salah, he provided Abu Marzook with the account number to the LaSalle Talman Savings checking account he held with his wife so that Abu Marzook could wire him the funds to be distributed to HAMAS operatives in the Middle East.

47.  Bank records reviewed by the FBI reflect that on December 29, 1992, Ismail Selim Elbarasse ("Elbarasse"), who, according to Salah is a HAMAS operative in the United States, wire transferred $300,000.00 to Salah's LaSalle Bank account. The Elbarasse wire originated from an account at the First American Bank of McLean, Virginia, which Elbarasse jointly held with Abu Marzook.[9]

48.  In the days just prior to this wire transfer there was a substantial influx of money principally from international sources into the First American Bank of Virginia account jointly held by Elbarasse and Abu Marzook.  On December 23, 1992, $99,985 was wire transferred into the account by an individual named Gazi Abu Camah from an as yet unspecified source.  It was followed with a December 23, 1992 wire transfer of $200,000 from Faisal Financial of Geneva, Switzerland,[10] and a December 29, 1992 wire

---

[9]  A review of bank records indicates that the account was the same one from which Abu Marzook had drawn from in executing a $5,000 check to Salah on August 8, 1992 that is discussed in footnote 2.  It is also the same account from which Abu Marzook wrote a November 27, 1992 check to Salah in the amount of $2,110 (which Abu Marzook also acknowledged in his extradition proceedings).

[10]  This is the same entity that transmitted a total of $107,000 directly into Salah's subject First Chicago account through a series of three substantial wire transfers from Geneva Switzerland between March and October of 1992.  See ¶ 31.

transfer of $73,475.77 from Dubai, United Arab Emirates.

49.  Bank records indicate that in early January of 1993,
Salah withdrew a significant portion of the $300,000.00 placed
into his account by Elbarasse.  Specifically, bank records
reviewed by the FBI show that on January 7, 1993, just days prior
to flying to Jerusalem on January 13, 1993, Salah wrote a check
for $3,000 to Amer Haleem of QLI [11]  They also show that on
January 12, 1993, the day before his departure, Salah withdrew an
additional $2,000 in cash from his account.  The largest
withdrawal, of $200,000, was directed by Salah from Israel.

50.  Salah has related to Israeli authorities that he
arrived in Jerusalem on January 14, 1993 for the purpose of
meeting other HAMAS operatives to coordinate, among other things,
a terrorist attack against Israeli.  Salah further related that
on January 19, 1993, subsequent to his initial round of meetings
with various HAMAS operatives, some of whom Salah met with
pursuant to Abu Marzook's instructions, he placed an
international call from Israel to his wife Azita in Chicago and
instructed her to wire $200,000.00 from their joint LaSalle Bank
account to First Chicago Bank of Ravenswood account number
678006002654-4 held in the name of Rihbe Abdel Rahman.  According
to Salah, Rahman was an unlicensed money changer.  Bank records
reviewed by the FBI indicate that Azita Salah carried out her

---

[11]  Bank records reviewed by the FBI also reveal that on
January 12, 1993, the day before Salah left Chicago for the
Middle East  Zaki Hameed of QLI executed check for $1,040 to
Salah's travel agent, Ghada Sharif.

25

husband's instructions on the same day.  According to Salah the
$200,000.00 was then transferred from the Abdel Rahman account to
the Middle East.

51.  According to bank records reviewed by the FBI, the
successful transfer of the $200,000.00 on January 20, 1993 was
closely followed by a succession of large wire transfers from
HAMAS-related sources into Mohammad and Azita's LaSalle Bank
account.  Records from the Salahs' LaSalle Bank account and the
First American account of Elbarasse and Abu Marzook show that on
January 20, 1993, Elbarasse wire transferred $135,000 into the
Salahs' La Salle Bank account, and followed it with another wire
transfer of $300,000 on January 25, 1993.

52.  Bank records for the First American Bank of Virginia
account held jointly by Abu Marzook and Elbarasse show a further
influx of overseas money just prior to this second round of wire
transfers to the Salahs' LaSalle Bank account.  On January 4,
1993, a second $99,985 wire transfer was received into the First
American account from an individual named Gazi Abu Samah.  On
January 22, 1993, the First American account was credited another
$665,000 from a wire transfer from Faisal Financial of Geneva
Switzerland.

53.  FBI review of bank records also show that during the
same period, Nasser Al-Khatib (Al-Khatib"), a United States-based
supporter and financial backer of HAMAS and close associate of
Abu Marzook, wire transferred additional funds into Salah-
controlled accounts in Chicago.  In an interview with the FBI in

26

March of 1994, Al-Khatib acknowledged being a supporter of HAMAS, and that he donated money to HAMAS causes.  Al-Khatib further related that prior to leaving the United States in June of 1993, he was an  employee of Abu Marzook, serving essentially as Abu Marzook's personal secretary.  In that capacity, Al-Khatib, explained, he had access to and was a signatory to some of Abu Marzook's financial accounts, and that he had made financial transactions on Abu Marzook's behalf.[12]

54.  A review of bank records reveals that on January 21, 1993, Al-Khatib wired $50,000 into Salah's La Salle Bank account. On the same day, he wired an additional $30,000 into Standard Bank & Trust account number 2393288006-2 held jointly by Salah and his wife.  Standard Trust Bank records reflect that the wire from Al-Khatib was credited in Azita Salah's name.  Al-Khatib followed with a $170,000 wire transfer on January 22, 1993 into the Salah's Standard Trust Bank account number 239328006-2.

55. On January 25, 1993, Salah was arrested by Israeli military authorities.  At the time of his arrest, he was found in possession of $97,400.  Salah also was in possession of extensive notes he had compiled from his meetings with over 40 HAMAS operatives and contacts in Israel and the occupied territories over the preceding 11 days.

_____

[12]Al-Khatib had previously written a check to Salah on August 21, 1992, immediately prior to Salah's trip to Israel during which he gave money to Salah Al-Arouri for the purchase of arms for HAMAS military operations See ¶¶ 15-20.  Bank records indicate that the check was deposited by Salah into the subject LaSalle Bank account that he jointly held with his wife, Azita.

## THE REMAINING MONEY TRAIL

56. Bank records show that on January 29, 1993 four days after Mohammad Salah's arrest by the Israelis, an unidentified individual attempted to cash a check for $299,950, made payable to Nasser Al-Khatib, purportedly executed by Salah and drawn from the LaSalle Talman account he held jointly with his wife. LaSalle Talman declined to clear the check when the unidentified individual attempted to cash it. A cursory examination of a copy of the check obtained from LaSalle Talman bank records indicates that it was executed in handwriting that substantially differed from Mohammad Salah's handwriting appearing in checks and drafts known to have been executed by Salah.

57. Bank records reviewed by the FBI further show that of the $985,000 wire transferred into Salah's account in Between December 29, 1992 and January 25, 1993, $723,541.18 was transferred out through the following transactions. On February 1, 1993, Azita Salah withdrew $723,541.18 from the Salahs' two accounts and deposited $717,041.18 into a new savings account, Standard Bank & Trust Account No. 56002850-0. Bank records for the account show that Azita Salah then began to draw substantial amounts of money

58. Standard Bank & Trust bank records for the account show the following withdrawal activity on April 2, 1993, $4,500.00 was withdrawn from the account. On April 2, 1993, Azita Salah signed a lease for Standard Bank & Trust safe deposit box No. 207. That is the only day of any logged transactions for the box.

59.  Bank records further reflect that on April 6, 1993, Azita Salah transferred $97,067.93 from the account to pay the outstanding balance of the Salahs' mortgage on their 9229 S. Thomas, Bridgeview, Illinois residence.

60.  In a subsequent interview with the FBI, Azita Salah, accompanied by counsel, stated that she believed the money placed into the joint LaSalle Bank and Standard Bank & Trust accounts she held with her husband was intended for distribution by her husband to charitable organizations overseas. However, Azita Salah stated that she decided to keep the money herself after her husband was arrested in Israel. Azita Salah further stated that she transferred the money into a new account because she feared the United States Government might attempt to take it.

61.  On February 10, 1995, the Office of Foreign Asset Control, U.S. Department of Treasury, having reason to believe that Mohammad Salah acted on behalf of an organization (HAMAS) designated by U.S. President William J. Clinton, in Executive Order 12947, as a terrorist organization threatening to disrupt the Middle East Peace Process, ordered the freeze of all of Mohammad and Azita Salah's known bank accounts containing $372,572.39.

62.  Among the accounts frozen by the order was Azita Salah's Standard Bank & Trust savings account number 56002850-0 which she had opened on February 1, 1993 with $717,041.18 in funds internationally wire transferred to Mohammad Salah for HAMAS purposes. Standard Bank & Trust personnel informed the FBI

29

that after the account was frozen, Standard Bank & Trust
transferred the funds in the account into a new account, Standard
Bank & Trust Account No. 560249500-3.  On March 31, 1995, those
funds, totaling $233,973.00, were in turn, transferred to a
Standard Bank & Trust certificate of deposit account, which has
been periodically renewed every six months, the remainder of
which presently is held in Standard Bank & Trust Account No.
5580349268.  Since the transfer to a certificate of deposit
account, the Office of Foreign Asset Control has, on a monthly
basis, licensed withdrawal of a living stipend from the
certificate of deposit account to Azita Salah.  On a monthly
basis Azita Salah has deposited the living stipend into Standard
Bank & Trust Account No. 239328806 for subsequent use.

63.  Bank records show that on July 9, 1993, a certified
check debited from Golden Marble's Account Number 60609146 (at
the Midland Federal Savings & Loan Association) was drawn and
made payable to the QLI in the amount of $169,000.[13]  On
September 24, 1993, that check was deposited into the QLI
Building Fund Account, #0010930021133, at the Midland Federal
Savings & Loan Assoc.  As of December, 1997, the $169,000 plus
interest of approximately $25,000 was in the account.  According
to bank records, the $169,000 deposit is the only transaction to
have taken place in this account.

64.  One June 30, 1994, the Woodridge property was sold, by

_____

[13] According to Tamer Al-Rafai, the $169,000 check was
payment for a one year lease extension on the Woodridge property
negotiated between QLI and Golden Marble.

the QLI, for $1,050,000. The net proceeds of $988,500 were deposited directly into the QLI General Fund Account #12310153 at the First National Bank of Chicago. Since the deposit of the land sale proceeds, the account has been maintained with a balance at all times in excess of $820,000, the amount that was initially transmitted by Saudi corporation Kadi International in July of 1991 for the purchase of the Woodridge site. At present, the account, which is merely a simple interest bearing checking account, has a balance of approximately $876,300.54

65. A review of bank records reveals that since the deposit of the land sale proceeds into the QLI General Fund Account, QLI has only intermittently transacted business from the account.

66. One of the transactions made from the account was the execution of a check dated October 21, 1996, by QLI Treasure Abraham Abusharif, in the amount of $25,112.40 and made payable to Hawkinson Ford Co. 6100 West 95th Street, Oak Lawn, Illinois, for the purchase outright of a 1997 Ford Club Wagon XLT, VIN: 1FBJS31LXVHA40608. On May 22, 1997, QLI returned the vehicle to Hawkinson Ford due to mechanical problems covered under warranty, and was given a replacement vehicle, a grey 1997 Ford Van E35, VIN: 1FBJS31L3VHB70844, which QLI currently owns and possesses.

67. Shortly after Mohammad Salah's return to the Chicago area after having served his Israeli-imposed prison term for his involvement with HAMAS, QLI transferred money from the General Fund Account. Specifically, on February 2, 1998, $50,000 was withdrawn from the account and transferred into First National

31

Bank of Evergreen Park Account No. 1412446, held in the name of The Quranic Literacy Institute, which was opened by Zaki Hammed and Abusharif.

### CONCLUSION

68.   Based on the preceding information, there is sufficient probable cause to believe that the QLI funds in First National Bank of Chicago account number 12310153, QLI funds in First National Bank of Evergreen Park account number 1412446, and One 1997 E35 Ford Van, VIN: 1FBJS31L3VHB70844, are funds involved in financial transactions or property traceable to transactions in violation of the Money Laundering Statute, 18 U.S.C. § 1956. These assets were derived from an $820,000 wire transfer from Yassin Kadi in Saudi Arabia to Golden Marble, Inc., for the purchase of the Woodridge property, which was subsequently sold for $1,050,000 with the net proceeds of $988,500 deposited into the subject account.   The illegally transferred funds also were used to generate income (in the form of rent and sales profits) to facilitate the activities of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks, including the extortion, kidnaping and murder of and against the citizens and government of the State of Israel, in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process, and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories.

The foregoing defendant funds and vehicle also represent the proceeds of monetary transactions in excess of $10,000 with the illegally transferred funds, in violation of 18 U.S.C. § 1957, thereby rendering the defendant funds and vehicle forfeitable pursuant to 18 U.S.C. § 981.

69. Based on the preceding information, there is probable cause to believe that the QLI-held funds in Midland Federal Savings & Loan account number 001093002113 are funds involved in or traceable to financial transactions in violation of the Money Laundering Statute, 18, U.S.C., § 1956(a)(2), and are therefore subject to civil forfeiture pursuant to Title 18, U.S.C. § 981(a)(1)(A). The subject funds are rents collected by QLI from Golden Marble pursuant to the terms of the Lease and Sales Agreement for the Woodridge property. As such these funds were derived from the $820,000 wire illegally transferred from Saudi Arabia by Yassin Kadi of Kadi International with the intent of generating income for the use of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks, including the extortion, kidnaping and murder of and against the citizens and government of the State of Israel, in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories.

Additionally, the foregoing defendant funds also represent

33

the proceeds of monetary transactions in excess of $10,000 with
the illegally transferred funds, in violation of 18 U.S.C. §
1957, thereby rendering the defendant funds and vehicle
forfeitable pursuant to 18 U.S.C. § 981.

70.   The funds in the Salahs' bank accounts--Standard Bank &
Trust Account Number 5580349268 and Account Number 239328806;
LaSalle Bank, F.S.B. Account Number 022034532; First National
Bank of Chicago Account Number 8060700, (each of which is
currently frozen pursuant to order of the Office of Foreign Asset
Control, U.S. Department of Treasury, as authorized under
Executive Order 12947 and based on reason to believe that
Mohammad Salah acted on behalf of and in concert with the HAMAS
terrorist organization); Standard Bank & Trust Safe Deposit Box
Number 207; and Standard Bank & Trust Safe Deposit Box Number
4019, were involved in financial transactions in violation of the
Money Laundering Statute, 18 U.S.C. § 1956(a)(2).  The subject
funds are moneys transferred, or traceable to moneys transferred
from outside the United States, into the United States, with the
intent of supporting HAMAS in the commission of specified
unlawful activity, involving extortion, kidnaping and murder of
and against the citizens and government of the State of Israel,
in furtherance of HAMAS' publicly declared goals of undermining
the Israeli-Palestinian peace process and forcing the State and
citizens of Israel to cede physical and political control and
dominion over the lands comprising Israel and the occupied
territories.  The subject funds are therefore subject to civil

34

forfeiture·pursuant to 18 U.S.C. § 981(a)(1)(A).  The subject

funds were deposited via wire transfers from Ismail Selim

Elbarasse & Abu Marzook's joint bank account in McLean, Virginia,

and from Nasser Al-Khatib, which, in turn, had been deposited via

wire transfers from Geneva, Switzerland and Dubai, U.A.E.  No

other legitimate source of income has been determined to exist

for either Mohammad or Azita Salah to account for their

possession of these funds.

71.  There is probable cause to believe that the real

property commonly referred to as 9229 S. Thomas, Bridgeview,

Illinois with the legal description:

> Lot 5 in Mosque Foundation and Center
> Area, Subdivision of part of the
> Southeast quarter of Section 1, Township
> 37 North, Range 12, East of the Third
> Principal Meridian, in Cook County,
> Illinois.  PIN 23-01-404-012.

was acquired through, and constitutes the proceeds of bank fraud

in violation of 18 U.S.C. § 1014, and therefore is forfeitable

pursuant to 18, U.S.C. § 981(a)(1)(C).  The subject property,

(which is currently frozen pursuant to order of the Office of

Foreign Asset Control, U.S. Department of Treasury, as authorized

under Executive Order 12947 and based on reason to believe that

Mohammad Salah acted on behalf of and in concert with the HAMAS

terrorist organization), was acquired by the Salahs through a

residential mortgage loan obtained from Standard Bank & Trust of

Evergreen Park, Illinois based upon false information provided to

the bank by Mohammad Salah in the form of false claims regarding

his employment relationship with QLI and falsified federal tax

returns.

Additionally, the mortgage loan was paid with funds
transferred into the United States from abroad with the intention
that they be used to support HAMAS domestic and international
terrorist activities, including the extortion, kidnaping and
murder of and against the citizens and government of the State of
Israel in furtherance of HAMAS' publicly declared goals of
undermining the Israeli-Palestinian peace process, and forcing
the State and citizens of Israel to cede physical and political
control and dominion over the lands comprising Israel and the
occupied territories, thus rendering the house property traceable
to moneys transferred in violation of the money laundering
statute, 18 U.S.C. § 1956(a)(2), and therefore forfeitable
pursuant to 18 U.S.C. § 981.  Additionally, the purchase of the
property constitutes a monetary transaction valued in excess of
$10,000 with proceeds of a violation of 18 U.S.C. § 1956(a)(2),
in violation of 18 U.S.C. § 1957, thereby rendering the property

forfeitable pursuant to 18 U.S.C. § 981.

Special Agent Robert Wright
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 8th day of June 1998.

Notary Public

"OFFICIAL SEAL"
Cynthia A. Meinke
Notary Public, State of Illinois
My Commission Exp. 04/30/2000

37