# Exhibit 5

*Statement of Richard A. Clarke*

*Before the United States Senate*

*Banking Committee*

*22 October 2003*

Mr. Chairman, It is an honor to be asked to appear here today to offer some thoughts about the continuing problem of terrorist financing.  Before I begin, I want to recall that you, Mr. Chairman, were a leader in the Congress in counter-terrorism long before September 11th and I had the privilege of working with you on the threat from al Qida when you chaired the Senate Intelligence Committee.  Those of us who knew of your work then are greatly encouraged to have you leading the Senate's examination of terrorist financing.

Mr. Chairman, I am a private citizen and what I say here today are my personal views. They do not draw on access to current intelligence information, but do benefit from reviewing media reports, court documents, and discussions with those in government and in the banking and finance sector.

Despite the fact that CIA used to tell us that terrorist groups like al Qida do not need much money, we know now they do.  Money is the mother's milk of terrorism.  There are five specific points on which I would like to focus.

First, al Qida is an on-going significant threat despite early reports of its demise.  The chief of Britain's MI5 recently warned the threat posed by al Qida to security may remain for many years. Director-General Eliza Manningham-Buller said there was no prospect of a significant reduction in the threat from Islamist terrorism over the next five years.  Ms

Manningham-Buller said she feared the danger would not diminish within five years and then it will remain for a "considerable number of years thereafter."  She admitted that it was a "bleak assessment" and that she was "personally concerned."  Ms Manningham-Buller described al Qida as "sophisticated and particularly resilient" and its members were able to blend into society by living normal, routine lives until called upon for specific tasks.

Second, what we know as al Qida is a small part of the overall challenge we face from radical terrorist groups which associate themselves with Islam.  Autonomous cells, regional affiliate groups, radical Palestinian organizations, and groups sponsored by Iran's Revolutionary Guards are engaged in mutual support arrangements, including funding.

Third, although significant progress has been made in dealing with the terrorism financing problem since September 11th, there remain organizational problems in the U.S. Because of the transfers of agencies to create the Department of Homeland Security, there have been dislocations within the Executive Branch agencies which have the skills to address terrorist financing.  A MoU developed without the participation of the concerned components of the new Department yielded the exclusive lead in terrorism financing investigation to the FBI.  On an issue as important as this, we need a second opinion.  We should not sideline or subjugate the considerable expertise in financial crimes of the United States Secret Service and the intelligence and enforcement personnel

of the former U.S. Customs Service.  A report on terrorist financing activities by the new Department was due to the White House last month, but did not appear.

The reorganization also eliminated the senior position in the Treasury for enforcement, despite the fact that two organizations crucial to fighting terrorist financing remain in Treasury:  the Office of Foreign Assets Control (OFAC) and the Financial Crimes Enforcement Center (FINCEN).  These two organizations need to be strengthened by giving them as a coordinator a new Assistant Secretary for Enforcement.  They should also be strengthened by the addition of forensic accountants and bank examiners.

Fourth, although the Patriot Act requires U.S. financial institutions and the Federal government to cooperate among each other in exchanging information on possible terrorist financing, there has thus far been little information from the government to the institutions and little flow of information among the institutions.  This committee may wish to turn its oversight attention to Section 314 of the Patriot Act.

Fifth , while many governments are now better cooperating in the search for terrorism financing, we need to sanction those who do not.  The President should be required annually to report to the Congress in a detailed, classified document what each nation is doing in the international effort against terrorist financing, including their laws, their cooperation, and the degree of vigor with which they are looking for terrorist fronts and funds.  Nations which are not adequately cooperating should be subject to sanctions, such as having all of their financial institutions made ineligible for clearing dollar accounts. The President should have the ability to defer these sanctions, but only by notifying the Congress why he wants them deferred and what he proposes to do to get the nation cooperating.

Mr. Chairman, many Governments, including are own, have been manipulated by terrorist fronts seeking funds. Dating back to the 1980's, Islamist terrorist networks have developed a sophisticated and diversified financial infrastructure in the United States. In the post September 11th environment, it is now widely known that every major Islamist terrorist organization, from Hamas to Islamic Jihad to al Qida, has leveraged the financial resources and institutions of the United States to build their capabilities. We face a highly developed enemy in our mission to stop terrorist financing. While the overseas operations of Islamist terrorist organizations are generally segregated and distinct, the opposite holds in the United States. The issue of terrorist financing in the United States is a fundamental example of the shared infrastructure levered by Hamas, Islamic Jihad and al Qida, all of which enjoy a significant degree of cooperation and coordination within our borders. The common link here is the extremist Muslim Brotherhood – all of these organizations are descendants of the membership and ideology of the Muslim Brothers.

With a number of critical government seizures, indictments, deportations and enforcement actions since 9-11, greater light has been shed on the means and methods of terrorist financing in the homeland. Without question, the law enforcement powers and tools created by the Patriot Act have contributed to the mounting successes in the financial War on Terrorism. For example, the ability to utilize information gathered during intelligence investigations in criminal prosecutions has enabled several critical arrests, including Sami al Arian (the alleged North American leader of the Palestinian Islamic Jihad) and the Portland Seven (who allegedly attempted to wage war against American troops in Afghanistan). Additionally, under to the Patriot Act, Rule 41 of the Federal Rules of Criminal Procedure now authorizes warrants to be issued by a Federal magistrate judge in any district in which activities related to terrorism may have occurred, for property outside the district. This provision has meaningfully aided several financial terrorism investigations, including the "Safa Group" located in Northern Virginia, suspected of financing Hamas, Islamic Jihad and al Qida.

5

However, as al Qida and the like continue to target the United States and our allies, we are in no position to rest on our laurels.  Careful review reveals that continued vigilance and determination is required to shutter the money stores of our terrorist enemies.  From magazines to mosques and charities, the agents of terrorism are well rooted in the United States, exploiting the strengths and weaknesses of our financial backbone.  The network of terrorist leaders and operatives in the United States has built a highly diversified arsenal of funding sources, including unwitting governments.

To demonstrate what I mean, Mr. Chairman, allow me to summarize some of the recent developments reported in the media and in court filings.  While I am not in a position to vouch for the veracity of all of these reports, I believe the pattern they indicate is extremely disturbing and means we must do more. Some specifics:

- o From his home and office in Tampa Florida, Sami al-Arian, the indicted North American leader of the Palestinian Islamic Jihad, allegedly coordinated the movement of fund from the government of Iran to suicide bombers in West Bank and Gaza.

- o Abdurahman Alamoudi, allegedly senior figure in the Muslim Brotherhood in the United States and professed supporter of Hamas and Hizbollah, was recently indicted for taking $340,000 from Muammar Qaddafi and the Libyan government, a designated state sponsor of terrorism. According to federal prosecutors, Alamoudi's organization American Muslim Foundation funneled money to members of the Portland Seven cell.

- o In a recent federal affidavit, Senior Special Agent David Kane confirmed, "I know that terrorists who have attacked or tried to attack the United States around the world have been associated with … IIRO."  The U.S. offices of IIRO were raided in 1997 and again in 2002, in connection with federal fraud and terrorism investigations.  IIRO has reportedly received funding from the Saudi government.

o Human Concern International (HCI) reportedly received at least $250,000 in funding from the Canadian government. The Pakistan office of HCI was headed by Egyptian Islamic Jihad leader and al Qida founder Ahmed Said Khadr. Khadr has been described by Canadian intelligence services as a close associate of Usama bin Laden and senior al Qida money man.

Khadr and HCI convinced Canadian government funding agencies to sponsor "charitable project" for "Afghan refugees" when in fact the funds were used to provide financial and operational support to Jihad forces. The Pakistani government also alleged that Khadr siphoned moneys that contributed the 1995 bombing of the Egyptian Embassy in Pakistan.

o The Kuwaiti government allegedly provides substantial funding to charities controlled by the Kuwait Muslim Brotherhood, such as Lajnat al-Dawa.  The U.S. Department of Treasury and the United Nations Security Council designated Lajnat al-Dawa on January 9, 2003 as a supporter of al Qida.  Lajnat al-Dawa and its affiliates had offices in the U.S. in Michigan, Colorado and Northern Virginia.

o When U.S. and Bosnia authorities raided the offices of Benevolence International Foundation (BIF) in 2002, a cache of internal al Qida records were reportedly recovered. Among those documents was allegedly the "Golden Chain", a list of bin Laden's top Jihad financiers drafted in 1989. BIF's international headquarters were located in Chicago, Illinois, until its assets were frozen by the Treasury Department and its leader indicted by the Department of Justice.

o While reportedly in charge of finances for the Palestinian Islamic Jihad, Sami al Arian allegedly sent a letter to Ismail Shatti requesting funds for additional suicide bombings targeting Israel.  Ismail Shatti is reported to be a leading figure in the Kuwaiti Muslim Brotherhood.

- o Yasin al Qadi is allegedly the financier behind several U.S. organizations which have been tied to terrorist support. Qadi has been identified in court papers as the banker behind a convoluted real estate transaction in Illinois where proceeds where siphoned off to Hamas operatives. Qadi has also been reported to be a lead investor in BMI, a New Jersey based Islamic investment bank catering to ranking members of the Muslim Brotherhood, including Hamas and al Qida backers.

  In October 2001, the Treasury department listed Yasin al Qadi as a designated terrorist for his financial support of al Qida. Qadi was the head of Muwafaq, a Saudi "relief organization" that reportedly transferred at least $3 million, on behalf of Khalid bin Mahfouz, to Usama bin Laden and assisted al Qida fighters in Bosnia.

- o Following the events of September 11th, 2001, the Treasury Department designated several U.S. based and international NGOs as supporters of terrorism. Typically, such organizations offered "relief" services in conflict areas as cover for providing financial and operational support to terrorist operations. One of these organizations, the Holy Land Foundation for Relief and Development, was reportedly approved to receive supplemental funding by the United States Agency for International Development. Another of these groups, Global Relief Foundation, was reportedly registered with USAID as a private nonprofit organization providing "relief, education and religious" services in Kosovo, Chechnya, Afghanistan and Kashmir.

- o Terrorist leaders have also allegedly established private schools in the United States, and used these schools to pay the salaries of their operatives. In Tampa, Florida, Sami al-Arian established the Islamic Academy of Florida. The February 2003 indictment against al-Arian says the school was used as a base of support for the Palestinian Islamic Jihad "in order to assist its engagement in, and promotion of, violent attacks designed to thwart the Middle East Peace Process."

The Islamic Academy of Florida reportedly received at least $350,000 from the State of Florida through a program that diverts State money to pay private school tuition.

o   Terrorist fronts operating under the false cover of charities and relief organizations have raised millions of dollars from the American public, some of whom perhaps knew the intended purpose of their contributions and some of whom do not. Designated terrorist entities such as Holy Land Foundation, Benevolence International Foundation and Global Relief Foundation have employed a number of means to solicit tax-deductible donations.  Methods of soliciting donations include targeted newsletters, advertisements in Islamic magazines and journals, and fundraising sessions at mosques and conferences.  Often, local representatives will organize smaller fundraising dinners or events.  Donors are encouraged to seek matching gifts from their employers or associations.

Terrorist groups use a variety of means to move funds, including charities, private companies, offshore accounts, U.S. accounts, real estate transactions, blank checks and bulk cash couriers.  Often, a combination of these channels are employed to accomplish several goals:

1.   Obfuscate the sources of funds. By way of example, Saudi citizens who are suspected of supporting terrorism are closely monitored by the Saudi Arabian authorities.  As result, these individuals are prohibited from sending money to terrorists via direct bank transfers from Saudi Arabian accounts.  Alternate methods and routes of supplying funds are required.  This often involves utilizing overseas entities to support extremist causes.  Traveling electronically through the world, these money flows are often very complex and involve significant "layering."

In the United States, this pattern was allegedly practiced by the International Islamic Relief Organization (IIRO).  IRO's Virginia branch would reportedly draw funds on Saudi Arabian accounts.  These funds were allegedly channeled through front companies operating as chemical manufacturers, real estate

9

developers, book publishers and social groups.  In the form of investment proceeds, funds would reportedly return to IIRO, which would in turn send the money back to Saudi Arabia.

2.  Hide the ultimate use of the funds. Interviews with senior al Qida operatives have reportedly revealed the methods by which terrorist front organizations conceal the destination of their funds. Monies are transferred from Gulf, U.S. or European accounts to bank account in conflict zones, such as Chechnya, Bosnia, Kashmir or Israel.  In most cases, funds are transferred through several accounts in several different countries, making them difficult to trace.  Terrorist operatives then withdraw large sums of money in cash and provide phony receipts for medical supplies, food or disaster relief.  The cash and it ultimate use becomes virtually untraceable.

3.  Move funds into otherwise inaccessible territories.  Whether by their host governments or by the Israeli government, individuals and organizations throughout the Islamic world often are barred from sending money to individuals and organizations in Israel and/or the West Bank and Gaza.  One way that supporters of terrorism in Israel deliver money to terrorists in Israel and/or the West Bank and Gaza is by first transporting the money to the United States and only later sending it to Israel and/or the West Bank and Gaza from the United States.  Accordingly, while terrorist financing money collected in the United States is simply transported abroad, terrorist financing money collected abroad may enter the United States either to enable its later transport to terrorist organizations abroad or simply to fund terrorist activity in the United States.

On October 9th, 2003, Soliman Biheiri was convicted on federal immigration charges in the Eastern District of Virginia. Biheiri is the first person convicted in connection with an alleged financial terrorism investigation centered on a group of Islamic businesses, charities and missionary groups in Northern Virginia.

Biheiri was the President and founder of BMI, Inc., an investment bank specializing in Islamically permissible investments.  In the 1980's and 90's, BMI offered a series of financial services to Muslims in America.

BMI solicited funds for real estate investments and offered leasing services for wealthy Muslim business owners.  By 1992, BMI boasted over $1 million in medical equipment and automobile leases under management, and advertised housing developments in Maryland and Indiana with projected revenues in excess of $25 million.

While BMI held itself out publicly as a financial services provider for Muslims in the United States, its investor list suggests the possibility this facade was just a cover to conceal terrorist support. BMI's investor list reads like a who's who of designated terrorists and Islamic extremists.

- BMI investors reportedly include designated Hamas leader Musa abu Marzook and designated al Qida financier Yasin al-Qadi.

- BMI allegedly engaged in financial transactions with Bank al-Taqwa and it founders Yousef Nada and Ghaleb Himmat. Bank al-Taqwa and its founder Youssef Nada were designated SDGT's pursuant to Executive Order 13224, on November 7, 2001. Al-Taqwa and its members have been described by the federal government as the financial advisors to al Qida.

- BMI allegedly received a $500,000 investment from Baraka Group. Baraka Group, headed by Saleh Kamel, is reportedly a founder of a Sudanese Islamic bank which housed several accounts for senior al-Qida operatives.

- Biheiri was a personal friend of Youssef Al Qaradawi, allegedly a high-ranking member of the extremist Muslim Brotherhood who has been barred entry into the United States. Qaradawi is reportedly a shareholder of al-Taqwa and a member of its Sharia board.

- Biheiri's computer reportedly contained contact information for Sami al-Arian, the indicted North American leader of the Palestinian Islamic Jihad.

- The Kuwait Finance House was allegedly an investor in BMI.  The Kuwait Finance House is reported to be the financial arm of the Muslim Brotherhood in Kuwait. Several al Qida operatives have allegedly been associated with the Kuwaiti Muslim Brotherhood, including Khalid Sheikh Mohammed, Suliman abu Ghaith, Wadih el Hage and Ramsi Yousef.

  On January 9, 2003, the Treasury Department designated the Kuwaiti Lajnat al-Dawa as a terrorist entity. Lajnat al-Dawa reportedly spawned out of and is controlled by the Kuwaiti Muslim Brotherhood.

- Tareq Suwaidan, a leading member of the Kuwaiti Muslim Brotherhood, reportedly engaged in financial transactions with BMI.

While one might expect BMI to operate out of Qatar, the Cayman Islands or Lichtenstein, it was actually based out of Secaucus, New Jersey, organized as a New Jersey corporation in March 1986.  Although BMI ceased operating in October 1999, investigators continue to probe its financial dealings.

Thus, Mr. Chairman, we face an on going problem that is here in the United States as well as abroad.  It is a problem that we have just begun to dent, one which needs continued Congressional oversight and pressure.  If we are to win the war on terrorism, there are many things that we must do.  Drying up the money going to terrorists is one of the most important parts of winning that war.