**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Federal Ins. v. Al Qaida*, 03-CV-6978 (RCC)
*World Trade Center Properties v. Al Baraka,* No. 04-CV-7280 (RCC)
*Continental Cas. Co. v. Al Qaeda*, 04-CV-5970 (RCC)
*Euro Brokers v. Al Baraka*, No. 04-CV-7279 (RCC)
*New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)
*Burnett v. Al Baraka*, No. 03-CV-5738 (RCC)

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTION TO DISMISS OF BAKR BIN LADIN, OMAR BIN LADIN,
TARIQ BIN LADIN, MOHAMMAD BIN LADIN COMPANY, AND BIN LADIN
<u>GROUP INTERNATIONAL COMPANY LTD.'S</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

I.      INTRODUCTION ........................................................................1

II.     PLAINTIFFS HAVE PROPERLY SUPPLEMENTED THEIR
        PLEADINGS ...............................................................................2

III.    PLAINTIFFS ALLEGE THAT DEFENDANTS PROVIDED
        SUBSTANTIAL SUPPORT TO OSAMA BIN LADEN
        AND AL QAEDA ........................................................................3

IV.     THIS COURT HAS PERSONAL JURISDICTION
        OVER DEFENDANTS. ................................................................9

        A.    Applicable Legal Standard ..................................................9

        B.    Defendants' Conduct Was Sufficiently Directed at the
              United States to Satisfy the "Minimum Contacts" Test ......................10

        C.    This Court Has Personal Jurisdiction Over BBL and TBL, Who
              Knowingly And Intentionally Provided Financial Support To
              Al Qaeda To Attack America. ..............................................12

        D.    This Court Has Personal Jurisdiction Over Defendants Who Knew &
              Intended That The Act Of Their Al Qaeda Co-Conspirators
              Would Impact America. ....................................................14

        E.    Plaintiffs Should Be Allowed To Conduct Jurisdictional
              Discovery...................................................................15

V.      PLAINTIFFS STATE CLAIMS AGAINST DEFENDANTS
        UPON WHICH RELIEF CAN BE GRANTED.............................................17

        A.    Applicable Legal Standard ................................................17

        B.    Plaintiffs State A Claim Against Defendants Under The
              Anti-Terrorism Act.........................................................20

        C.    Plaintiffs State RICO Claims Against Defendants. ...........................22

        D.    Plaintiffs State A Claim Against Defendants Under
              The Alien Tort Claims Act. ................................................23

i

E.      Plaintiffs State Common Law Claims Against Defendants.................24

VI.    CONCLUSION ................................................................................................25

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Allen v. New World Coffee, Inc.,*
  2001 U.S.Dist. LEXIS 3269 (S.D.N.Y. 2001)............................................................2

*Andre Emmerich Gallery v. Segre,*
  1997 U.S.Dist. LEXIS 16899 (S.D.N.Y. 1997).........................................................14

*Baisch v. Gallina,*
  346 F.3d 366 (2d Cir. 2003) ......................................................................................22

*Boim v. Quranic Lit. Inst.,*
  291 F.3d 1000 (7th Cir. 2002) ...................................................................................20

*Burger King v. Rudzewicz,*
  471 U.S. 462 (1985) ..............................................................................................10, 11

*Burnett v. Al Baraka Investment & Development Corp.,*
  274 F.Supp.2d 86 (D.D.C. 2003)...............................................................................24

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,*
  367 U.S. 886 (1961) ...................................................................................................10

*Calder v. Jones,*
  465 U.S. 783 (1984) ...................................................................................................11

*Chance v. Armstrong,*
  143 F.3d 698 (2d Cir. 1998) ......................................................................................17

*Chrysler Capital Corp. v. Century Power Corp.,*
  778 F. Supp. 1260 (S.D.N.Y. 1991) .....................................................................14, 24

*Conley v. Gibson,*
  355 U.S. 31 (1957) .........................................................................................17, 18, 19

*Cutco Industries, Inc. v. Naughton,*
  806 F.2d 361 (2d Cir. 1986) ........................................................................................9

*Daliberti v. Iraq,*
  97 F. Supp.2d 38 (D.D.C. 2000)...........................................................................12, 13

*De Falco v. Bernas,*
  244 F.3d 286 (2d Cir. 2001) ......................................................................................22

*Desiderio v. National Association of Sec. Dealers, Inc.,*
191 F.3d 198 (2d Cir. 1999) ........................................................................17

*Diduck v. Kaszycki & Sons Contractors, Inc.,*
774 F. Supp. 802 (S.D.N.Y. 1991) ..............................................................24

*Dixon v. Mack,*
507 F. Supp. 345 (S.D.N.Y. 1980) ..............................................................14

*Dubai Islamic Bank v. Citibank, N.A.,*
256 F. Supp.2d 158 (S.D.N.Y. 2003) ...........................................................22

*First Capital Asset Management v. Satinwood, Inc.,*
385 F.3d 159 (2d Cir. 2004) ........................................................................22

*Flatow v. Islamic Republic of Iran,*
999 F. Supp. 1 (D.D.C. 1998)......................................................................10

*Friedman v. Hartmann,*
1994 U.S.Dist. LEXIS 9727 (S.D.N.Y. July 15, 1994)................................22

*Geisler v. Petrocelli,*
616 F.2d 636 (2d Cir. 1980) ........................................................................17

*Halberstam v. Welch,*
705 F.2d 472 (D.C. Cir. 1983)....................................................................24

*IUE AFL-CIO Pension Fund v. Herrmann,*
9 F.3d 1049 (2d Cir. 1993) ..........................................................................10

*International Shoe Co. v. Washington,*
326 U.S. 310 (1945) ....................................................................10, 13, 14

*Investment Properties International, Ltd. v. IOS, Ltd.,*
459 F.2d 705 (2d Cir. 1972) ........................................................................15

*Kamen v. America Telegraph & Telegraph Co.,*
791 F.2d 1006 (2d Cir. 1986) ......................................................................15

*Leatherman v. Tarrant County,*
507 U.S. 163 (1993) ....................................................................................18

*Linde, et al. v. Arab Bank, PLC,*
2005 U.S.Dist. LEXIS 18864 (E.D.N.Y. 2005) ...........................................19

*Marine Midland Bank, N.A. v. Miller,*
    664 F.2d 899 (2d Cir. 1981) ................................................................................15

*McLaughlin v. Anderson,*
    962 F.2d 187 (2nd Cir. 1992)..................................................................................2

*Morin v. Trupin,* 832 F.Supp.
    93 (S.D.N.Y. 1993)................................................................................................23

*Moses v. Martin,*
    360 F. Supp.2d 533 (S.D.N.Y. 2004) ......................................................................2

*PDK Laboratoriess v. Friedlander,*
    103 F.3d 1105 (2d Cir. 1997) ...............................................................................10

*Palestine Information Office v. Shultz,*
    853 F.2d 932 (D.C. Cir. 1988)..............................................................................10

*Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005) .................................................................................19

*Phelps v. Kapnolas,*
    308 F.3d 180 (2d Cir. 2002) ...............................................................17, 18, 19

*Pittman v. Grayson,*
    149 F.3d 111 (2d Cir. 1998) .................................................................................22

*Rein v. Socialist People's Libyan Arab Jamahiriya,*
    995 F. Supp. 325 (E.D.N.Y. 1998)................................................................12, 13

*Salinas v. United States,*
    522 U.S. 52 (1997) ................................................................................................23

*Swierkiewicz v. Sorema,*
    534 U.S. 506 (2002) .......................................................................................17, 19

*In re Terrorist Attacks on September 11, 2001,*
    349 F. Supp.2d 765 (S.D.N.Y. 2005) .....................12, 14, 15, 20, 21, 22, 23, 24, 25

*Twombly v. Bell Atlantic Corp.,*
    425 F.3d 99 (2nd Cir. 2005).................................................................................19

*United States v. Allen,*
    155 F.3d 35 (2d Cir. 1998) ...................................................................................22

*Woodford v. Community Action Agency*,
    239 F.3d 517 (2d Cir. 2001) ........................................................................ 17

*World Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ........................................................................ 9, 13, 14

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004) ................................................................... 17, 18

## FEDERAL STATUTES

18 U.S.C. § 2331 ............................................................................................. 20

18 U.S.C. §2333 ....................................................................................... 20, 21

Fed. R. Civ. P. 8............................................................................................... 2

Fed. R. Civ. P. 10............................................................................................. 2

Fed. R. Civ. P. 12....................................................................................... 9, 17

## MISCELLANEOUS

MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ......................................... 15

## I.    **INTRODUCTION**

Defendants Bakr Bin Ladin ("BBL"), Omar Bin Ladin ("OBL"), Tariq Bin Ladin

("TBL"), Mohammad Bin Ladin Company ("MBLC") and Bin Ladin Group International

Company LTD.'s (a/k/a Saudi Bin Ladin Group and hereinafter "SBG") (collectively hereinafter

"defendants") are subject to civil liability in this United States Court for knowingly providing

financial and material support to Osama Bin Laden ("Bin Laden") and al Qaeda.[1]   Such support

led directly or indirectly to the attacks of September 11, 2001.

Defendants' motion is based on a fundamentally flawed premise – that a motion to

dismiss offers an appropriate stage for their presentation of one-sided affidavits and "evidence"

prior to Plaintiffs' ability to conduct discovery capable of rebutting same.  A motion to dismiss is

supposed to challenge the sufficiency of the *pleadings*, not the validity of the overall case.  The

facts supporting plaintiffs' claims have been alleged properly in their various complaints and

must be taken as true here, and as such correctly establish defendants' amenability to personal

jurisdiction and their liability under the Anti-Terrorism Act ("ATA"), the Alien Tort Claims Act

("ATCA"), RICO, the Torture Victim Protection Act ("TVPA") and state law.  Accordingly,

defendants' motion to dismiss must be denied.

---

[1]        Plaintiffs are filing a consolidated response to this motion to dismiss based upon an agreed
briefing schedule and because these moving defendants have filed their motion to dismiss as a single document.
Nonetheless, in spite of the fact that this is a consolidated response, it should be noted that not all plaintiffs have
sued all defendants.  The *Ashton* plaintiffs have sued only BBL and SBG.  The *Burnett, World Trade Center
Properties* and *Euro Brokers* plaintiffs have sued BBL, OBL, TBL and SBG.  The *Continental Casualty* plaintiffs
have sued BBL, OBL, TBL and SBG.  The *Federal Insurance* and *New York Maritime* plaintiffs have sued BBL,
OBL, TBL, and MBLC.

Additionally, it is vitally important to note that SBG previously moved for dismissal in the *Ashton*
and *Burnett* suits.  SBG's motion to dismiss was denied in those cases.  Accordingly, the only suit in which SBG has
a pending motion to dismiss is in the *Continental Casualty* action.

## II.   PLAINTIFFS HAVE PROPERLY SUPPLEMENTED THEIR PLEADINGS

As a preliminary matter, Defendants argue pleadings filed by Plaintiffs on September 30, 2005 fail to comply with the Federal Rules or requirements of Case Management Order #2, and must therefore be this regarded.  In particular, they argue that plaintiffs' RICO statements were structurally deficient, and that both Fed. R. Civ. P. 8 and Fed. R. Civ. P. 10(b) barred plaintiffs from incorporating by reference prior pleadings or exhibits into their Complaints.  Both arguments lack merit.

Defendants cite no case law in support of their proposition that this Court must now reject RICO statements submitted in the format, which it has accepted throughout this litigation; there is none.  Indeed, judicial precedent uniformly holds that such RICO Statements should be treated as part of the pleadings.  *See, e.g., McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001).

Moreover, the incorporation of the RICO and More Definite Statements into plaintiffs' Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules. Fed. R. Civ. P. 10(c), which Defendants studiously avoid referring to, provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c).  In view of the plain language of Rule 10(c), plaintiffs' incorporation of the RICO and More Definite Statements into their Complaints, by reference or attachment as exhibits, complies with both the letter and spirit of the Federal Rules.  The factual allegations contained therein are a full part of plaintiffs' pleadings which this Court must consider in evaluating whether these claims may proceed to discovery.

### III.   PLAINTIFFS ALLEGE THAT DEFENDANTS PROVIDED SUBSTANTIAL SUPPORT TO OSAMA BIN LADEN AND AL QAEDA

In their Motion to Dismiss defendants state they 'severed' relations with their family member Osama Bin Laden.  This is simply not true.  Defendants even go so far as to misstate plaintiffs' complaint in backing-up their false claim - "[t]he Court is by now familiar with the Binladin family's relationship to Bin Laden and the fact that the Binladin family severed ties with him in 1993, a break that various Complaints acknowledge."  *Motion to Dismiss*, p. 2 (incorrectly citing *Ashton* 6AC ¶ 402).  The Ashton complaint actually states, "The notion that OSAMA BIN LADEN had been somehow 'disowned' by the BIN LADEN family is not supported by the facts . . ." *Ashton* 6AC ¶ 402.

In fact the Bin Laden family has never severed ties with Osama Bin Laden and has actively supported his jihadist and terror activities since his early days in Afghanistan.  *Burnett* 3AC ¶¶ 314-316.  As officers of MBLC, BBL, OBL and TBL assisted in the recruitment and movement of mujahideen fighters for Bin Laden in Afghanistan from their office in Cairo. *Burnett,* RICO Statement Applicable to Bakr Bin Laden, Tarek Bin Laden, Omar Bin Laden, Ex. A.  According to the US State Department, Bin Laden went back to work for the family firm in Saudi Arabia at the end of the war against the Soviets in Afghanistan.  *Burnett* 3AC ¶ 317.  In 1991, Bin Laden moved to Sudan, where he was hosted by the radical Islamic government which had seized power two years earlier. *Ashton* 6AC ¶¶ 36-37.  The Sudanese government was later declared a State Sponsor of Terror by the United States for the support provided to Bin Laden and al Qaeda.

Shortly after his move to Sudan, the defendants found several ways to assist Bin Laden.[2]

---

[2]   See the Declaration of Jean-Charles Brisard for a discussion of additional support that defendants provided to Bin Laden and Al Qaeda.

3

Exhibits submitted by defendants in their Motion to Dismiss bolster the Plaintiffs' claim that the family did not disown Bin Laden.  In Exhibit C to the Affidavit of Bakr Binladin, which is attached to defendants' Motion to Dismiss,[3] BBL states that both SBG and MBLC removed Bin Laden from their shareholder list.  *Def. Ex. C*, ¶ 7.  However, Exhibits 1 and 2 to Defendants' Exhibit C contain "Shareholder Resolutions" in which it is written merely that Bin Laden, via his lawyer, 'wishes to assign all of his shares. . . to Ghaleb Muhamad Awadh Binladin [Bin Laden's brother] who has accepted this assignment together with all the rights and obligations pertaining thereto."[4]  *Def. Ex. C, 1*, pp. 2-3; *Def. Ex. C, 2*, p.2.

Defendants' Exhibits C, 1 and C, 2 are also rife with errors relevant to the transfer of these shares.  Both Shareholder Resolutions of the SBG and MBLC cite a Power of Attorney issued by Bin Laden.  *Def. Ex. C, 1*, pp. 1-2; *Def. Ex. C, 2*, pp.1-2.  The date of the Power of Attorney postdates that of the Shareholder Resolutions, which is a chronological inconsistency.  *Id.*  The error appears to be in both the English translation and the Arabic versions.

Additionally, in Defendants' Exhibit C, 2 there is a shareholder list of MBLC reflecting the holdings of the various shareholders after Bin Laden's requested transfer of shares to his brother Ghaleb.  *Def. Ex. C, 2*, p.11.  The value of each of Ghaleb's shares is now listed as 16,000 Saudi Riyals, while the values of other shares are listed as 1,000 or 4,000 Saudi Riyals.  *Id.*  There are also some apparent anomalies on the signature page.  *Def. Ex. C, 2*, pp.13-14 & 22 (page 22 is actually unnumbered, but it is the 22nd page of the exhibit).  Four of the ten signatures appear to be the same and Omar Bin Ladin appeared to sign for Zeenat M Binladin but not for

---

[3]     Exhibit C to defendants' Motion to Dismiss will be cited herein as *Def. Ex. C.*  Defendants' Exhibit C, confusingly, also has numbered exhibits attached to it.  In this brief, plaintiffs cite to Exhibits 1 and 2 of Exhibit C. The numbered exhibits to Defendant's Exhibit C will therefore be cited herein as *Def. Ex. C, 1* and *Def. Ex. C, 2.*

[4]     For the Court's convenience, the relevant pages from Defendants' Exhibit C (and from Exhibits 1 and 2 thereto) are attached to this brief.  However, to avoid confusion, plaintiffs will cite to these exhibits as if they were only attached to defendants' Motion to Dismiss.

4

himself. *Id.*

According to defendants, the 'removal' of Bin Laden from the list of shareholders of

SBG and MBLC took place on June 16, 1993. *Def. Ex. C*, ¶ 7.  Ghaleb Bin Ladin and BBL

jointly invested with Yousef Nada's Bank al Taqwa, late in 1993, mere months after their brother

Osama Bin Laden directed that his shares be transferred to Ghaleb.   Bank al Taqwa was named

by the US Department of Treasury as being a Specially Designated Global Terrorist. *Ashton* 6AC

¶¶ 388, 391 and Affidavit of John Fawcett at ¶ 3.

The bank's founder, Yousef Nada is also designated a terrorist by the United States

Department of the Treasury.  *Ashton* 6AC ¶ 391  According to the Treasury Department, Nada

has been 'providing indirect investment services for Al Qaeda, investing funds for Bin Laden,

and making cash deliveries on request to the Al Qaeda organization.'  Affidavit of John Fawcett

at ¶ 3.  The Bin Laden brothers' investment was still in Bank al Taqwa until at least March 2000.

Affidavit of John Fawcett at ¶ 4.  At all relevant times, BBL was the head of the Bin Laden

family, directed both SBG and MBC, and as noted in his affidavit, had personal knowledge of

the matters stated therein.

BBL, the brother of Bin Laden, runs SBG.  *Ashton* 6 AC ¶ 395, *Burnett* ¶ 313,

*Continental Cas.* ¶ 334, *Fed. Ins.* ¶ 381, *New York Marine* ¶ 354, *WTC* ¶ 624.  OBL and TBL are

on SBG's Board of Directors.  *Ashton* 6 AC ¶ 410, *Burnett* ¶ 313, *Continental Cas.* ¶ 334, *Fed.*

*Ins.* ¶ 381, *New York Marine* ¶ 354, *WTC* ¶ 624.  SBG played an integral role in developing al

Qaeda.  As noted above SBG's support of Bin Laden and al Qaeda began in Afghanistan and

continued in the Sudan, a country designated by the U.S. as a "State Sponsor of Terrorism" that

has supported, encouraged, sponsored, aided and abetted and conspired with groups that use

terror to attain their goals. *Ashton* 6 AC ¶ 17; *Federal* RICO at Ex. A.  Bin Laden centered his

operations in Sudan from 1991 through 1996. *Id.* at ¶ 59.  With the support and encouragement of the Sudanese government, Bin Laden ran terrorist training camps and "guest houses" in Sudan. *Id.* at ¶ 34.  The support encompassed financing, logistical support, training, protection and weapons for Bin Laden and al Qaeda. *Id.* at ¶¶ 36-76.  At one time, there were 1000 to 2000 al Qaeda members in Sudan. *Id.*  The government of Sudan welcomed Bin Laden, when he embarked on infrastructure projects and business ventures with or on behalf of the government. *Ashton* 6 AC  ¶¶ 36-39; *Federal* RICO at Ex. A.

Under the control of BBL, OBL and TBL, SBG provided substantial support to Bin Laden and al Qaeda, including financial assistance and engineering support for Sudanese construction projects. *Ashton* 6 AC ¶¶ 399- 04, *Federal Ins.* ¶ 505, *New York Marine* ¶ 469.[5]

SBG subsidiary Al Hijra was headed by Muslim activists who were directly involved with al Qaeda. *Ashton* 6 AC ¶¶ 402 & 406; *Federal* RICO at Ex. A.  SBG, through Al Hijra, provided Bin Laden financial assistance and engineering support for al Qaeda's Sudanese construction projects.  *Id.* at 402; *Federal* RICO at Ex. A.

The board members of the MBLC include BBL, TBL and OBL.  *Ashton* 6 AC ¶ 409, *Burnett* ¶ 325, *Continental Cas.* ¶ 345, *WTC* ¶ 638.  MBLC worked closely with SBG to provide technical assistance on projects under taken by Bin Laden and al Qaeda in the Sudan, including the construction of major roads and the Port of Sudan airport. *Federal Ins.* ¶ 340, *New York Marine* ¶ 367.  It was a group of Bin Ladin's companies that carried out the project of the new and modern airport that cost huge amounts of money." *Ashton* 6AC, ¶ 403-405, *Burnett* 3AC, ¶319-321.

---

[5]    SBG directly engaged in construction projects involving the Tahaddi road and the Port Sudan airport through two of its subsidiaries. *Ashton 6* AC ¶ 403.  The airport was built by SBG in conjunction with the Sudanese government.  *Id.* at ¶ 404, *Continental Cas.* ¶ 340.

SBG sheltered and directly supported al Qaeda operatives, including Mohammed Jamal Khalifa, an official in the International Islamic Relief Organization ("IIRO"), a "charity" fronting for al Qaeda. *Burnett* 3AC at ¶324; *Federal* RICO at Ex. A.  Khalifa has also been implicated as a central al Qaeda figure in several international terrorist plots.  *Id.*  Yet, Khalifa was taken in by a branch of SBG, the MBLC, a wholly owned subsidiary of SBG.  *Burnett* 3AC ¶ 324; *Federal* RICO at Ex. A.  Indeed, the address listed on Khalifa's visa application was the same as MBLC's.  *Id.* at ¶ 324; *Federal* RICO at Ex. A.[6]

Yassin Abdullah al-Kadi is a United States designated terrorist and Director of Global Diamond Resources, based in Nevada. Along with Yassin al-Kadi, serving on the board of directors were representatives of the Bin Laden family who invested in Global Diamond Resources. Yassin al-Kadi was introduced to Global Diamond Resource's Chairman by an executive at SBG. *Ashton* 6AC, ¶ 345; *Burnett* 3AC, ¶ 328.

BBL has made substantial contributions to many of the charities operating within al Qaeda's infrastructure.  *Federal Ins.* ¶¶ 505-06, *New York Marine* ¶ 469-70.  These contributions were made with full knowledge that the contributed funds would be used to support al Qaeda's operations and terrorist attacks. *Id.*  Indeed, BBL was one of the largest single donors to a 1992 fundraiser for the IIRO, which raised 19 million Saudi Riyals for Bosnian relief efforts. *Federal Ins.* ¶ 505, *New York Marine* ¶ 469, *WTC* ¶ 390.  BBL is also identified in the Golden Chain as one of al Qaeda's principal sponsors.  *Federal Ins.* ¶ 101 & 505, *New York Marine* ¶¶ 80 & 469.

---

[6]  In a protracted footnote, defendants attempt to explain away the issue by introducing a self-serving affidavit from a purported staff member of MBC in the Philippines. *See* Mot. to Dismiss at 20 n 81 and Exh. L, Affidavit of Eulalio Dela Paz.  At most, it disclaims any personal knowledge on Ms. Dela Paz's part as to Khalifa's deep ties to al Qaeda at the time of the application.  However, it is silent as to the knowledge and complicity of other members of the MBC staff, including defendants herein.  For that reason alone, defendants' contention should be given no weight.  Furthermore, defendants' contention is emblematic of the failings of its Motion to Dismiss.  Factual disputes like this can only be resolved after both sides have had their opportunity under the Federal Rules to conduct discovery and assemble the evidence; they cannot be determined at the pleadings stage.

Tarek Bin Ladin was the general supervisor of the IIRO, a charity that has materially supported al Qaeda. *Ashton* 6 AC ¶ 410, *Burnett* ¶ 326-27, *Continental Cas.* ¶ 346-47, *WTC* ¶ 639-40. IIRO was involved in the plots to assassinate President Clinton and Pope John Paul II, the plot to blow up twelve U.S. airliners simultaneously (which ultimately formed the blueprint for the September 11, 2001 attacks), and the 1998 embassy bombings in Kenya and Tanzania. *Id.* at ¶ 227. IIRO was headquartered in Sudan, near Bin Laden's personal office. *Id.* at ¶ 230.

In the days following September 11, 2001, the U.S. Department of Justice issued a request for judicial assistance to the Government of Switzerland regarding its investigation of Bin Laden family companies and affiliated bank accounts and financial transactions in Europe. The Department of Justice wrote:

> Investigators believe that Usama Bin Laden has received funding from two accounts at Deutsche Bank in Geneva, Switzerland, in the names of Cambridge Engineering and the Saudi Bin Laden Group. The Saudi Bin Laden Group is the holding company for the Bin Laden family interests in the United States. It is believed that Cambridge Engineering Systems, Ltd., is the account through which the Saudi Bin Laden Group conducted its private banking and whose account holders are believed to be the the half brothers of Usama Bin laden. The investigation thus far reflects that Usama Bin Laden was a shareholder in the Saudi Bin Laden Group and received a buyout payment which, if it occurred, may assist in establishing a violation of U.S. laws that make it illegal to provide material support to foreign terrorist organizations.

*Burnett,* RICO Statement Applicable to Bakr Bin Laden, Tarek Bin Laden, Omar Bin Laden, Ex A.

Along with Bakr Bin Laden, the Saudi Bin Laden Group is listed as a 100 percent beneficial owner of Cambridge Engineering Systems Ltd. As such, the Saudi Bin Laden Group and its officers, including Omar, Bakr, and Tarek Bin Laden, had ultimate control over the funds in these accounts which were used to divert large sums of covert funding to Osama Bin Laden throughout the 1990s after it was widely known that he was sponsoring terrorist attacks

8

against United States interests. *Burnett,* RICO Statement Applicable to Bakr Bin Laden, Tarek

Bin Laden, Omar Bin Laden, Ex A.

In sum, defendants BBL, OBL and TBL, and MBLC, along with numerous other

defendants, aided, abetted and conspired with, and provided material support and resources to, al

Qaeda and its related associations, affiliations or persons. *Federal Ins.* ¶ 66, *New York Marine* ¶

45.  Additionally, under the control of BBL, OBL and TBL, SBG, directly and through its

subsidiaries, is a co-conspirator which intentionally, willfully and knowingly financed, supported

and worked with Bin Laden and al Qaeda, thereby enabling al Qaeda to attack the U.S. and its

citizens.

**IV.**     **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.**

Defendants move to dismiss pursuant to Fed. R. Civ. P.  12(b)(2), insisting that they lack

any contacts with the Unites States.  Plaintiffs respectfully disagree.  When defendants

knowingly provided financial and material support to al Qaeda waging war on America, and

when they participated in a conspiracy that culminated in the September 11 attacks, they not only

made "minimum contacts" with America, but he engaged in conduct that they knew would have

devastating impact on America.  Hence, defendants "should [have] reasonably anticipate[d]

being haled into court there." *World Wide Volkswagen Corp. v. Woodson* , 444 U.S. 286, 297

(1980).

**A.**     **Applicable Legal Standard**

To defeat a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction

made before discovery, plaintiffs "need make only a *prima facie* showing by [their] pleadings

and affidavits that jurisdiction exists." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d

Cir. 1986).  In evaluating plaintiffs' *prima facie* showing of jurisdiction, the Court must construe

all pleadings and affidavits in the light most favorable to plaintiffs and resolve all doubts in plaintiffs' favor. *PDK Labs v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997). In addition, the Court "must read the Complaint liberally, drawing all inferences in favor of the pleader." *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993).

### B.  Defendants' Conduct Was Sufficiently Directed at the United States to Satisfy the "Minimum Contacts" Test

Asserting jurisdiction over defendants is consistent with due process because, as alleged in plaintiffs' complaints, defendants materially supported terrorists who targeted the U.S. The horrific events of September 11, 2001 must be considered as part of the due process analysis. As the Supreme Court has explained, "'[d]ue process' is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895 (1961). Consequently, the Supreme Court has rejected using a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an evaluation of each case's own unique facts and circumstances. *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

The Supreme Court has also stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz,* 471 U.S. 462, 483-84 (1985). Following this logic, the D.C. Circuit has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz,* 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

10

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from injuries that 'arise out of or relate to' those activities." 471 U.S. at 472 (citations omitted).  Physical presence in the forum is *not* a requirement. *Id.* at 475.

Intentional conduct calculated to cause injury in the forum satisfies the due process requirements for jurisdiction, even if the defendants' conduct occurred outside the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984).  In *Calder*, defendants were employees of a national weekly newspaper in Florida that was alleged to have printed a libelous story. *Id.* at 785-86.  Plaintiff was a California resident and entertainer with a television career centered in California. *Id.* at 783.  Defendants had no contacts with California other than occasional trips and phone calls. *Id.* at 785-86.  Nonetheless, the court held that assertion of jurisdiction in California comported with due process because the article was drawn from California sources and "the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788-89.

*Calder* distinguished intentional torts from allegations of "untargeted negligence" and held that jurisdiction was warranted because the defendants' intentional actions were "expressly aimed at California." 465 U.S. at 788-89.  Because defendants knew that plaintiff would suffer injury where she lived and worked, the court held that defendants should reasonably anticipate being haled into court in California. *Id.* at 790.

Like the *Calder* defendants, the defendants herein are accused of intentional tortious acts. Bin Laden and al Qaeda targeted the U.S; the locations of the September 11, 2001 attacks were not incidental.  Therefore, as alleged in the plaintiffs' complaints and detailed in Section II

11

above, by supporting and aiding Bin Laden and al Qaeda, defendants directed their tortious activity at the U.S.

Two cases involving terrorism against U.S. citizens further demonstrate that due process is not violated when those who deliberately target the U.S. are made to answer in U.S. courts. In *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998), the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland were sufficient to establish the requisite contacts for personal jurisdiction. *Id.* Similarly, in *Daliberti v. Iraq*, 97 F. Supp.2d 38, 53-54 (D.D.C. 2000), the court found that state sponsors of terrorism were provided sufficient warning of the seriousness with which the U.S. views terrorist attacks against Americans that it was reasonable for them to be held accountable for such acts in U.S. courts. Accordingly, the court found that the assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" and that defendant's targeting of Americans provided a sufficient nexus with the U.S. to satisfy due process concerns. *Id.*

In *Rein* and *Daliberti* the terrorists targeted U.S. citizens abroad. Here, by contrast, the terrorists and their sponsors murdered U.S. citizens on U.S. soil. Persons or entities who provide the means, financial or otherwise, for terrorists to come to the U.S. and commit acts of murder cannot be said to lack sufficient contacts to make them amenable to jurisdiction in this country.

C.      **This Court Has Personal Jurisdiction Over BBL and TBL, Who Knowingly And Intentionally Provided Financial Support To Al Qaeda To Attack America.**

This Court has already resolved that "Plaintiffs may rely on their 'purposefully directed' theory to establish minimum contacts." *In re Terrorist Attacks on September 11*, 349 F. Supp.2d

12

765, 806-09 (S.D.N.Y. 2005); *accord, Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998) (exercising personal jurisdiction over Libyan defendants based on their "intentional, tortious acts that were expressly aimed at the United States" through their support of terrorists who bombed a United States flag aircraft over Lockerbie, Scotland); *Daliberti*, 97 F. Supp. 2d at 54 (holding it reasonable for foreign terror supporter to "be held to answer in a United States court for acts of terrorism against United States citizens").

As described above, plaintiffs allege specific facts from which it can be inferred that defendants BBL and TBL knowingly and intentionally channeled millions of dollars to al Qaeda, which was at war with America. Those allegations include the following specific facts: (1) that BBL was an investor and account holder in Bank Al Taqwa, a terrorist financing organization; (2) that BBL was the largest single donor to a 1992 fund raising drive sponsored by the terrorist front, IIRO; (3) that BBL has made substantial donations to many charities operating within al Qaeda's infrastructure; and (4) that TBL served as the general supervisor for the IIRO, an al Qaeda front that financed multiple attacks against America, including the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President Bill Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. Consulates in India, and the September 11 attacks.

Because these pleaded facts give rise to the inference that BBL and TBL purposefully provided financial support for al Qaeda attacks targeting United States citizens, it is reasonable for these defendants to be held to account in this district court. And because BBL and TBL should have anticipated as much, the exercise of personal jurisdiction over them would "not offend 'traditional notions of fair play and substantial justice.'" *World-Wide Volkswagen Corp.*, 444 U.S. at 292 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

13

**D.     This Court Has Personal Jurisdiction Over Defendants Who Knew &
Intended That The Act Of Their Al Qaeda Co-Conspirators Would Impact
America.**

This Court has already resolved that it may exercise personal jurisdiction over foreign

defendants pursuant to a conspiracy theory. *In re Terrorist Attacks on September 11*, 349 F.

Supp.2d at 805 ("acts committed in New York by the co-conspirator of an out-of-state defendant

pursuant to a conspiracy theory may subject the out-of-state defendant to jurisdiction")(citing

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991)).

Further, by imputing forum acts of their co-conspirators to non-resident defendants, this

Court has held that such non-resident defendants have sufficient minimum contacts with the

forum to satisfy due process. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980)

(imputation of forum acts of co-conspirator to non-resident defendant "supplies the necessary

minimum contacts [under] *International Shoe*, 326, U.S. 310, 316 (1945)."); *Andre Emmerich

Gallery v. Segre*, 1997 U.S. Dist. LEXIS 16899 at * 17 (S.D.N.Y. 1997)(same). Because when

non-resident defendants enter into a conspiracy knowing that acts of their co-conspirators would

impact the forum, such non-resident defendants should "reasonably anticipate being haled into

court there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 U.S. Dist. 16899 at * 17 (both

citing *World-Wide Volkswagen Corp.*, 444 U.S. at 295 (1980)).

As demonstrated above, plaintiffs' complaints make a *prima facie* showing of conspiracy

between defendants and al Qaeda to injure America. Specifically, plaintiffs allege (1) that

defendants' intentionally nurtured and developed al Qaeda and Bin Laden's terrorist network,

which directly furthered their terrorist operations; and (2) that BBL and TBL knowingly and

intentionally helped finance al Qaeda and Bin Laden's operations through the specific acts

alleged. Such allegations support an inference that defendants and al Qaeda were involved in an

14

agreement to further terror and to injure America through terrorist attacks. The September 11 attacks carried out by al Qaeda were acts done in furtherance of that agreement, and such attacks obviously caused injury to plaintiffs' decedents. Hence, by imputing the September 11 forum contacts of their al Qaeda co-conspirators to defendants, this Court may assert jurisdiction over defendants.

### E.     Plaintiffs Should Be Allowed To Conduct Jurisdictional Discovery.

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (District Court may permit jurisdictional discovery to resolve Rule 12(b)(2) motion); MOORE'S FEDERAL PRACTICE § 12.31[7] (3d ed. 2003) ("Generally, the District Court should allow discovery if the jurisdictional claim has a reasonable basis and it appears that pertinent facts may be uncovered."). And as this Court has already recognized:  "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 812 (internal cites omitted).

Especially where, as here, pertinent jurisdictional facts lie within the control and knowledge of the defendants contesting jurisdiction, it would be unfair to deny plaintiffs the opportunity to conduct jurisdictional discovery. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986) ("Under Rule 12(b) . . . in resolving claims that they lack jurisdiction, courts . . . have required that the party asserting jurisdiction be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party"); *Investment Properties Intl., Ltd. v. IOS, Ltd.*, 459 F.2d 705, 707-08 (2d

Cir. 1972) (error to deny plaintiffs "opportunity to utilize discovery to develop basic jurisdictional facts from data solely within the defendants' possession").

In this case, there is every reason to believe that jurisdictional discovery will expose substantial contacts between defendants and the United States.  Specifically, jurisdictional discovery will, at a minimum, show that:

- SBG maintained a corporate prescence in the US;

- SBG's website was maintained by a US company, indicted for connections to terror;

- The United States is a significant market for SBG products;

- BBL attended university in the US and along with SBG has donated millions of dollars to a US university;

- BBL and SBG invest in US based entities, including Global Diamond Resources with designated terrorist Yassin al Kadi;

- BBL and SBG are the owners of at least one business that is suspected of financing Bin Laden; and,

- BBL and SBG controlled a bank account in the US suspected of being used to support Bin Laden.

Plaintiffs submit that limited jurisdictional discovery would reveal the nature and extent of defendants' systematic and continuous activities in the United States, therefore leaving no question that this Court may exercise personal jurisdiction over them in accordance with due process.  Furthermore, plaintiffs are entitled to discover facts in support of their conspiracy jurisdiction argument that by imputing the September 11 forum contacts of their al Qaeda co-conspirators to defendants, this Court may assert personal jurisdiction over defendants.

16

## V.   PLAINTIFFS STATE CLAIMS AGAINST DEFENDANTS UPON WHICH RELIEF CAN BE GRANTED.

### A.   Applicable Legal Standard

Defendants move to dismiss various claims pursuant to Fed. R. Civ. P. 12(b)(6).  Such motions must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 31, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether plaintiffs ultimately could prevail, the Court must "accept all of Plaintiffs' factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the Plaintiffs." *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999).  Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has instructed that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2).  *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).  Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.*
(quoting *Conley*, 355 U.S. at 47); *Wynder*, 360 F.3d at 77; *see also, Sparrow v. United Airlines,
Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2002) (allegation "I was turned down for a job because of
my race" is sufficient to survive a Rule 12(b)(6) motion). Further, in the absence of averments of
fraud or mistake, which must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b), a
federal court is prohibited from imposing more demanding requirements than those prescribed
under Rule 8(a). *Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

Two recent Second Circuit cases affirm these principles. In *Phelps,* the plaintiff alleged
that the employees of the prison where he was incarcerated had violated his Eight and Fourteenth
Amendment rights by inflicting cruel and unusual punishment. *Phelps*, 308 F.3d at 182.
Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the
defendants had placed him on was inadequate and would cause him pain and suffering. *Id.* The
District Court dismissed that complaint, finding that it failed to state a claim, in part because the
plaintiff had not sufficiently alleged that defendants acted with the requisite *scienter*, deliberate
indifference. The District Court found plaintiff's allegations of *scienter* conclusory, and held that
plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge.
*Id.* at 184. The Second Circuit reversed, holding that a District Court "may not go beyond FRCP
8(a) to require the plaintiff to supplement his pleadings with additional facts that support his
allegations of knowledge either directly or by inference." *Id.* at 186-87. The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement
> Phelps's basic allegations with additional facts to support them by inference, for it
> does not appear from the face of the complaint beyond doubt that Phelps "can
> prove no set of facts in support of his claim which would entitle him to relief."

*Id.* at 187 (*quoting Conley*, 355 U.S. at 45-46). Moreover, the Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations. *Phelps*, 308 F.3d at 187. Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point, courts must take care lest judicial haste [in dismissing a complaint] in the long run makes waste. Untimely dismissal may prove wasteful of the court's limited resources rather than expeditious, for it often leads to a shuttling of the lawsuit between the district and appellate courts.

*Id.* at 185 (internal citations omitted).

More recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a District Court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. In *Pelman*, the District Court had dismissed because, it ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id.* at 511. The Second Circuit rejected that approach, and held that the information the District Court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512. Quoting the U.S. Supreme Court's unanimous decision in *Swierkiewicz*, the Second Circuit instructed:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Id.* (citing *Swierkiewicz*, 534 U.S. at 512-13); see also *Linde, et al. v. Arab Bank, PLC,* 2005 U.S. Dist. LEXIS 18864 (E.D.N.Y. 2005) (rejecting heightened pleading requirements in a case with factual and legal issues similar to the present action); *Twombly v. Bell Atlantic Corp.*, 425 F.3d

19

99 (2d Cir. 2005) (rejecting heightened pleading requirements in a case alleging conspiracy).

### B.     Plaintiffs State A Claim Against Defendants Under The Anti-Terrorism Act.

Under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, defendants are liable if

they provided material support to al Qaeda with knowledge of its terrorist agenda to attack

America, or if defendants aided and abetted al Qaeda in the course of its terrorist conduct. *See*

*Boim v. Quranic Lit. Inst.*, 291 F.3d 1000, 1014-1016 (7th Cir. 2002).[7] As detailed in Section II

above, it is clear that defendants provided material support to al Qaeda and Bin Laden through

the construction, engineering and other assistance rendered to help al Qaeda grow and flourish

while in the Sudan. Such support was critical in allowing al Qaeda to export their terrorist

activities abroad.

Additionally, this Court has recognized that under the ATA, "material support includes

money [and] financial services[.]" *In re Terrorist Attacks on September 11, 2001*, 349 F.

Supp.2d at 825. As demonstrated above, plaintiffs have alleged that defendants BBL and TBL

knowingly and intentionally provided money and financial services to al Qaeda by channeling

funds to the group through Bank Al Taqwa, the IIRO and other terrorist fronts during the years

leading up to the September 11 attacks.

---

[7]       The Seventh Circuit explained that ATA sections 2339B ["knowingly provid[ing] material support or resources to foreign terrorist organizations"] and 2339A [defining 'material support or resources' as "currency or . . . safehouses, . . . facilities, weapons . . . personnel"] "elucidate" and "amplify what Congress meant by 'international terrorism'" subject to civil liability under ATA section 2333:

> If the plaintiffs could show that [defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under section 2333 . . . .Such acts would give rise to civil liability under section 2333 so long as knowledge and intent are also shown. . . The Boims may thus show that [defendants] committed an act of international terrorism subject to civil liability under section 2333 by proving that [defendants] provided material support to terrorist organizations.

*Boim*, 291 F.3d at 1015-16. ATA Section 2333 provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism. . ." 18 U.S.C. §2333.

Moreover, the ATA encompasses aiding and abetting liability.  As put by *Boim*:

> [I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence. . . . [A]iding and abetting liability is both appropriate and called for by the language, structure and legislative history of [ATA] section 2333.

*Boim*, 291 F.3d at 1021.  Because the pleaded facts discussed above show that BBL and

TBL deliberately provided substantial financial assistance to al Qaeda, with knowledge that al

Qaeda was waging war on America, they are subject to aiding and abetting liability under the

ATA.

Moreover, Plaintiffs have properly alleged that defendants' provision of material and

financial support to al Qaeda was a proximate cause of the September 11 attacks.  This Court has

already resolved that "[i]n light of Al Qaeda's public acknowledgments of its war against the

United States, the September 11 attacks may be the natural and probable consequence of

knowingly and intentionally providing material support to al Qaeda." *In re Terrorist Attacks on*

*September 11, 2001*, 349 F. Supp. 2d at 826.  This Court has already resolved that "Plaintiffs do

not have to allege that defendants knew specifically about the September 11 attacks or that they

committed any specific act in furtherance of that attack." *In re Terrorist Attacks on September*

*11, 2001*, 349 F. Supp. 2d at 829.

Moreover, this Court has made clear that proximate cause may be supported by plaintiffs

allegations that defendants aided and abetted or conspired with the al Qaeda terror network

during the years leading up to the September 11 attacks:  "[A]ll those who, in pursuance of a

common plan or design to commit a tortious act, actively take part in it, or further it by

cooperation or request, or who lend aid or encouragement to the wrongdoer . . . *are equally*

*liable with him." In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 826
(emphasis added)(citing *Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998)).

Accordingly, under the standards set forth by this Court, plaintiffs have properly alleged
proximate cause and facts sufficient to support their ATA allegations against defendants. The
September 11 terror attacks were a natural and probable consequence of defendants' material and
financial support of the al Qaeda terror network. Hence, plaintiffs' ATA claims against
defendants are well pleaded.

### C.    Plaintiffs State RICO Claims Against Defendants.

Defendants' contentions regarding the RICO claim are largely derivative of their general
arguments regarding the pleadings. Because conspiracy and knowledge have been well pleaded,
the RICO claims are valid.

Defendants are correct that a plaintiff asserting a civil claim under 1962(c) must allege
that the defendant participated in the operation or management of the enterprise. *Dubai Islamic
Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). But they are mistaken as to
the implications. Such "discretionary authority" generally has been described as "a relatively
low hurdle for plaintiffs to clear" in the Second Circuit. *See First Capital Asset Mgmt. v.
Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377
(2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*,
155 F.3d 35, 42-43 (2d Cir. 1998). Moreover, as a general rule, it is not "reasonable to expect
that when a defrauded plaintiff frames his complaint, he will have available sufficient factual
information regarding the inner workings of a RICO enterprise to determine whether [a
defendant] was merely 'substantially involved' in the RICO enterprise or participated in the
'operation or management' of the enterprise." *Friedman v. Hartmann*, 1994 U.S. Dist. LEXIS

22

9727, at *4 (S.D.N.Y. July 15, 1994). Through discovery, this allegation will be supplemented, and this Court cannot dismiss this claim while defendants are in sole possession of many relevant facts.

Moreover, "[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." *Baisch*, 346 F.3d at 376. All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)). "Although parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

Each defendant had such intentions and goals. The Plaintiffs have satisfied the pleading standards applicable to their 1962(a), 1962(c), and 1962(d) claims, as set forth above.

**D.     Plaintiffs State A Claim Against Defendants Under The Alien Tort Claims Act.**

The Court, in *Terrorist Attacks I*, expressly allowed ATCA claims based on theories of aiding and abetting and conspiracy. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005). Here, plaintiffs make *prima facie* aiding-and-abetting claims by alleging: (i) that defendants knowingly and substantially assisted al Qaeda to attack America by providing them with, among other things, construction, engineering, and financial support; (ii) that defendants knew that al Qaeda declared war on America, and (iii) that al Qaeda carried out the September 11 attacks causing plaintiffs' decedents' deaths.[8] Plaintiffs make a *prima facie*

---

[8]     To state a *prima facie* case of aiding and abetting, plaintiffs need only plead facts that show: (i) the

conspiracy claim by alleging:  (i) that defendants' material and financial assistance to al Qaeda supports an inference that defendants and al Qaeda made an agreement[9] to injure America through terror attacks, (ii) that during the years leading up to the September 11 attacks, defendants participated in that agreement by nurturing the growth of al Qaeda, through physical and financial support, which helped them export their terrorist activities abroad; (iii) that the September 11 attacks carried out by al Qaeda were acts done in furtherance of that agreement, and (iv) the September 11 attacks caused injury to plaintiffs' decedents.[10]  Hence, concerted-action liability against defendants is well pleaded and the ATCA claim stands.

### E.    Plaintiffs State Common Law Claims Against Defendants.

This Court has held that if the plaintiff's allegations sufficiently allege that defendants supported, aided and abetted, or conspired with the September 11 terrorists, plaintiffs will have also stated a claim for intentional infliction of emotion distress [and] they will have also stated claims for wrongful death and survival. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829-830.  As demonstrated above, plaintiffs allege that defendants supported, aided and abetted, and conspired with the September 11 terrorists by providing, among other things, construction, engineering and financial support to al Qaeda and Bin Laden during the years

---

party whom defendant aids must perform a wrongful act that causes an injury; (ii) the defendant must be generally aware of wrongful nature of the primary actor's course of conduct; and (iii) the defendant must knowingly and substantially assist the principal violation. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983).

[9]     In *Burnett I*, Judge Robertson found that "plaintiffs' allegations about Al-Haramain's financing of al Qaeda support an inference that there was an *agreement* concerning the commission of terrorist acts."  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003)(upholding conspiracy claims). *See also*, *Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F. Supp. 802, 813 (S.D.N.Y. 1991) (to establish civil conspiracy, "[p]roof of tacit, as opposed to explicit, understanding is sufficient to show agreement.  A court may infer agreement.").

[10]     To state a *prima facie case* of conspiracy, plaintiffs need only plead facts entailing the primary tort and the following four elements: (i) a corrupt agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance of a plan or purpose, and (iv) the resulting damage.  *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

leading up to the September 11 attacks. Hence, plaintiffs' common law claims are well pleaded.[11]

## VI.    **CONCLUSION**

For the above reasons, Defendants' motion to dismiss should be denied with prejudice.


Dated: April 18, 2006
New York, New York

Respectfully submitted,

 /s/

James P. Kreindler (JK7084)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
Vincent I. Parrett (VP5092)
Kreindler & Kreindler LLP
100 Park Avenue
New York, NY  10017-5590
Phone (212) 687-8181

---

[11]    Plaintiffs recognize that this Court has dismissed plaintiffs' negligence and negligent infliction of emotion distress claims on the basis that defendants owned no duty to plaintiffs. *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 831. Plaintiffs also recognize that this Court held that the *Federal Insurance* plaintiffs' claims for assault and battery and intentional infliction of emotion distress are time-barred. *Id.* at 829. Plaintiffs respectfully disagree with these rulings and refer this Court to plaintiffs' prior briefings on these issues.

Specifically, with regard to the claims of negligence and negligent infliction of emotional distress, plaintiffs have addressed this argument in *Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sami Omar Al-Hussayen*. Rather than repeat that argument here, plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

Additionally, with regard to the claims for assault, battery and intentional infliction of emotional distress, plaintiffs have addressed this argument in *Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Perouz Sedaghaty*. Rather than repeat that argument here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

  /s/
Ronald L. Motley, Esq. (RM2730)
Jodi Westbrook Flowers, Esq.
Donald A. Migliori, Esq.
Michael Elsner, Esq. (ME8337)
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Phone (843) 216-9000


  /s/
Paul J. Hanly, Jr., Esq. (PH5486)
Jayne Conroy, Esq. (JC8611)
Andrea Bierstein, Esq. (AB4618)
Hanly Conroy Bierstein & Sheridan LLP
112 Madison Avenue, 7th floor
New York, New York 10016
Phone (212) 784-6400


  /s/
Elliott R. Feldman, Esq.
Sean P. Carter, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Phone (215) 665-2000

26