# Exhibit C

## 3rd Amended Consolidated Master Complaint

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

KATHLEEN ASHTON, as Administrator
of the Estate of Thomas Ashton, Deceased
and on behalf of all survivors of Thomas Ashton;

**THIRD AMENDED
CONSOLIDATED
MASTER COMPLAINT**

JOSEPHINE ALGER and FREDERICK ALGER, as Co-
Executors of the Estate of David D. Alger, Deceased
and on behalf of all of survivors of David D. Alger;

**02 CV 6977(RCC)**

ANGELICA ALLEN, as Administrator
of the Estate of Eric Allen, Deceased
and on behalf of all survivors of Eric Allen;

**Kreindler & Kreindler LLP**

GEORGE ANDRUCKI and MARY ANDRUCKI, as co-
Administrators of the Estate of Jean Andrucki, Deceased
and on behalf of all survivors of Jean Andrucki;

ALEXANDER PAUL ARANYOS and
WINIFRED ARANYOS, as co-Administrators
of the Estate of Patrick Michael Aranyos, Deceased
and on behalf of all survivors of Patrick Michael Aranyos;

MARGARET ARCE, as Administrator
of the Estate of David Gregory Arce, Deceased
and on behalf of all survivors of David Gregory Arce;

VICKIE ROSE ARESTEGUI, as Legal Representative
of the Estate of Barbara Jean Arestegui, Deceased
and on behalf of all survivors of Barbara Jean Arestegui;

MARGIT ARIAS, as Administrator
of the Estate of Adam Peter Arias, Deceased,
and on behalf of all survivors of Adam Peter Arias;

EVELYN ARON, as Executor
of the Estate of Jack Charles Aron, Deceased
and on behalf of all survivors of Jack Charles Aron;

NANCY BADAGLIACCA, as Administrator
of the Estate of John J. Badagliacca, Deceased
and on behalf of all survivors of John J. Badagliacca;

CHRISTINA BAKSH, as Executor
of the Estate of Michael S. Baksh, Deceased
and on behalf of all survivors of Michael S. Baksh;

JOANNE BARBARA, as Executor
of the Estate of Gerard Barbara, Deceased
and on behalf of all survivors of Gerard Barbara;

DANIEL F. BARKOW, as Administrator
of the Estate of Colleen Ann Barkow,  Deceased
and on behalf of all survivors of Colleen Ann Barkow;

NINA BARNES, as Administrator
of the Estate of Durrell Pearsall, Deceased
and on behalf of all survivors of Durrell Pearsall;

JEANNINE P. BARON, as Executor
of the Estate of Evan J. Baron, Deceased
and on behalf of all survivors of Evan J. Baron;

JANE BARTELS, as Executor
of the Estate of Carlton Bartels, Deceased
and on behalf of all survivors of Carlton Bartels;

KIMBERLY KAIPAKA BEAVEN, as Executor
of the Estate of Alan Beaven, Deceased
and on behalf of all survivors of Alan Beaven;

MICHELLE BEDIGIAN, as Administrator
of the Estate of Carl Bedigian, Deceased
and on behalf of all survivors of Carl Bedigian;

SUSAN BERGER, as Administrator
of the Estate of Steven Howard Berger, Deceased
and on behalf of all survivors of Steven Howard Berger;

MADELINE BERGIN, as Administrator
of the Estate of John Bergin, Deceased
and on behalf of all survivors of John Bergin;

MIRIAM M. BIEGELEISEN, as Administrator
of the Estate of Shimmy D. Biegeleisen, Deceased
and on behalf of all survivors of Shimmy D. Biegeleisen;

CHRISTINE BINI, as Administrator,
of the Estate of Carl Bini, Deceased
and on behalf of all survivors of Carl Bini;

NEIL B. BLASS, as Administrator
of the Estate of Craig M. Blass,  Deceased
and on behalf of all survivors of Craig M. Blass;

KRIS A. BLOOD, as Executor
of the Estate of Richard M. Blood, Deceased
and on behalf of all survivors of Richard M. Blood;

DOROTHY ANN BOGDAN, as Administrator
of the Estate of Nicholas Andrew Bogdan, Deceased
and on behalf  of all survivors of Nicholas Andrew Bogdan;

MARIA TERESA BOISSEAU, as Proposed Personal
Representative of the Estate of Lawrence Boisseau, Deceased
and on behalf of all survivors of Lawrence Boisseau;

TRACI BOSCO, as Administrator
of the Estate of Richard Edward Bosco, Deceased
and on behalf of all survivors of Richard Edward Bosco;

KATHLEEN BOX, as Administrator
of the Estate of Gary R. Box, Deceased
and on behalf of all survivors of Gary R. Box;

JAMES BOYLE, as Administrator
of the Estate of Michael Boyle, Deceased
and on behalf of all survivors of Michael Boyle;

DAVID BRACE, as Administrator
of the Estate of Sandra Conaty Brace, Deceased
and on behalf of all survivors of Sandra Conaty Brace;

JENNIFER E. BRADY, as Administrator
of the Estate of David B. Brady, Deceased
and on behalf of all survivors of Jennifer E. Brady;

CURTIS FRED BREWER, as Executor
of the Estate of Carol Keyes Demitz, Deceased
and on behalf of all survivors of Carol Keyes Demitz;

3

HILLARY A. BRILEY, as Administrator
of the Estate of Jonathan E. Briley, Deceased
and on behalf of all survivors of Jonathan E. Briley;

URSULA BROGHAMMER, as Executor
of the Estate of Herman C. Broghammer, Deceased
and on behalf of all survivors of Herman C. Broghammer;

JoANNE  BRUEHERT, as Administrator
of the Estate of Richard G. Bruehert, Deceased
and on behalf of all survivors of Richard G. Bruehert;

JUAN B. BRUNO, as Administrator
of the Estate of Rachel Tamares, Deceased
and on behalf of all survivors of Rachel Tamares;

SUSAN E. BUHSE, as Administrator
of the Estate of Patrick Joseph Buhse, Deceased
and on behalf of all survivors of Patrick Joseph Buhse;

ELIZABETH R. BURNS, as Administrator
of the Estate of Donald J. Burns, Deceased
and on behalf of all survivors of Donald J. Burns;

JAMES C. CAHILL, as Administrator
of the Estate of Scott Walter Cahill, Deceased
and on behalf  of all survivors of Scott Walter Cahill;

JAMES W. CAHILL and KATHLEEN CAHILL, as co-
Administrators of the Estate of Thomas Cahill, Deceased
and on behalf of all survivors of Thomas Cahill;

DEBORAH CALDERON, as Administrator
of the Estate of Edward Calderon, Deceased
and on behalf of all survivors of Edward Calderon;

JANET CALIA, as Administrator
of he Estate of Dominick Enrico Calia, Deceased
and on behalf of all survivors of Dominick Enrico Calia;

JACQUELINE CANNIZZARO, as Administrator
of the Estate of Brian Cannizzaro, Deceased
and on behalf of all survivors of Brian Cannizzaro;

TONI ANN CARROLL, as Executor
of the Estate of Peter J. Carroll, Deceased
and on behalf of all survivors of Peter J. Carroll;

JUDITH CASORIA, as Administrator
of the Estate of Thomas Anthony Casoria, Deceased
and on behalf of all survivors of Thomas Anthony Casoria;

TRACY ANN TABACK CATALANO, as Executor
of the Estate of Harry Taback, Deceased
and on behalf of all survivors of Harry Taback;

SANTA CATARELLI, as Executor
of the Estate of Richard G. Catarelli, Deceased
and on behalf of all survivors of Richard G. Catarelli;

GINA CAYNE, as Administrator
of the Estate of Jason Cayne, Deceased
and on behalf of all survivors of Jason Cayne;

SUK TAN CHIN, as Administrator
of the Estate of Robert Chin, Deceased
and on behalf of all survivors of Robert Chin;

EDWARD P. CIAFARDINI, as Administrator
of the Estate of Christopher Ciafardini, Deceased
and on behalf of all survivors of Christopher Ciafardini;

LISA DiLALLO CLARK, as Administrator
of the Estate of Thomas R. Clark, Deceased
and on behalf of all survivors of Thomas R. Clark;

YUKO CLARK, as Personal Representative
of the Estate of Gregory A. Clark, Deceased
and on behalf of all survivors of Gregory A. Clark;

MARYANN COLIN, as Administrator
of the Estate of Robert Dana Colin, Deceased
and on behalf of all survivors of Robert Dana Colin;

JULIA COLLINS, as Administrator
of the Estate of Thomas J. Collins, Deceased
and on behalf of all survivors of Thomas J. Collins;

5

PATRICIA COPPO and JOHN R. BRENNAN, as
Co-Executors of the Estate of Joseph J. Coppo, Jr.,  Deceased
and on behalf of all survivors of Joseph J. Coppo, Jr.;

PATRICIA COUGHLIN, as Personal Representative
of the Estate of John Coughlin, Deceased
and on behalf of all survivors of John Coughlin;

EDITH CRUZ, as Administrator
of the Estate of Angela Rosario, Deceased
and on behalf of all survivors of Angela Rosario;

ILDEFONSO A. CUA, as Administrator
of the Estate of Grace Alegre Cua, Deceased
and on behalf of all survivors of Grace Alegre Cua;

LINDA CURIA, as Executor
of the Estate of Laurence Curia, Deceased
and on behalf of all survivors of Laurence Curia;

DAVID EDWARD CUSHING, as Administrator
of the Estate of Patricia Cushing, Deceased
and on behalf of all survivors of Patricia Cushing;

LOUISA D'ANTONIO, as Administrator
of the Estate of Mary D'Antonio, Deceased
and on behalf of all survivors of Mary D'Antonio;

BERIL SOFIA DeFEO, as Administrator
of the Estate of David DeFeo, Deceased
and on behalf of all survivors of David DeFeo;

VINCENT J. DELLA BELLA, as Administrator
of the Estate of Andrea Della Bella, Deceased
and on behalf of all survivors of Andrea Della Bella;

MICHAEL DELOUGHERY, as Personal Representative
of the Estate of Colleen Ann Deloughery, Deceased
and on behalf of all survivors of Colleen Ann Deloughery;

TODD DeVITO, as Administrator
of the Estate of Jerry DeVito, Deceased
and on behalf of all survivors of Jerry DeVito;

6

MILAGROS DIAZ, as Administrator
of the Estate of Lourdes Janet Galletti, Deceased
and on behalf of all survivors of Lourdes Janet Galletti;

ANDY DINNOO and DHANMATEE SAM, as
co-Administrators of the Estate of Rena Sam-Dinnoo, Deceased
and on behalf of all survivors of Rena Sam-Dinnoo;

MARIA DiPILATO, as Administrator
of the Estate of Joseph DiPilato, Deceased
and on behalf of all survivors of Joseph DiPilato;

STACEY FRAN DOLAN, as Executor
of the Estate of Brendan Dolan, Deceased
and on behalf  of all survivors of Brendan Dolan;

JOSEPH DOWNEY, as Administrator
of the Estate of Raymond M. Downey, Deceased
and on behalf of all survivors of Raymond M. Downey;

JAY CHARLES DUNNE, as Personal Representative
of the Estate of Christopher Joseph Dunne, Deceased
and on behalf of all survivors of Christopher Joseph Dunne;

STANLEY ECKNA, as Personal Representative
of the Estate of Paul Robert Eckna, Deceased
and on behalf of all survivors of Paul Robert Eckna;

DENISE ESPOSITO, as Administrator
of the Estate of Michael Esposito, Deceased
and on behalf of all survivors of Michael Esposito;

DENNIS EULAU, as Executor (Ad Prosequendum)
of the Estate of the Michele Coyle Eulau, Deceased
and on behalf of all survivors of Michele Coyle Eulau;

JEANNE M. EVANS, as Personal Representative
of the Estate of Robert Evans, Deceased
and on behalf of all survivors of Jeanne M. Evans;

AMY FARNUM, as Personal Representative
of the Estate of Douglas Jon Farnum, Deceased
and on behalf of all survivors of Douglas Jon Farnum;

7

MARYANNE FARRELL, as Administrator
of the Estate of John Farrell, Deceased
and on behalf of all survivors of John Farrell;

MELISSA VAN NESS FATHA, as Administrator Ad
Prosequendum of the Estate of Syed Abdul Fatha, Deceased
and on behalf of all survivors of Syed Abdul Fatha;

STEVEN FEIDELBERG, as Administrator
of the Estate of Peter Adam Feidelberg, Deceased
and on behalf of all survivors of Peter Adam Feidelberg;

WENDY FEINBERG, as Executor
of the Estate of Alan Feinberg, Deceased
and on behalf of all survivors of Alan Feinberg;

CHARLENE FIORE, as Administrator
of the Estate of Michael Fiore, Deceased
and on behalf of all survivors of Michael Fiore;

BRIAN FLANNERY, as Personal Representative
of the Estate of Christina Donovan Flannery, Deceased
and on behalf of all survivors of Christina Donovan Flannery;

LORI FLETCHER, as Personal Representative
of the Estate of Andre G. Fletcher, Deceased
and on behalf of all survivors of Andre G. Fletcher;

CLAUDIA FLYZIK and NANCY WALSH, , as co-
Administrators of the Estate of Carol Flyzik, Deceased
and on behalf of all survivors of Carol Flyzik;

ROBERT T. FOLGER, as Administrator
of the Estate of Jane Claire Folger, Deceased
and on behalf of all survivors of Jane Claire Folger;

KURT FOSTER, as Executor
of the Estate of Claudia Foster, Deceased
and on behalf of all survivors of Claudia Foster;

CAROL FRANCOLINI, as Personal Representative
of the Estate of Arthur Joseph Jones, III, Deceased
and on behalf of all survivors of Arthur Joseph Jones, III;

8

HELEN FRIEDLANDER as Executor
of the Estate of Alan W. Friedlander, Deceased
and on behalf of all survivors of Alan W. Friedlander;

LISA FRIEDMAN, as Administrator
of the Estate of Andrew Friedman, Deceased
and on behalf of all survivors of Andrew Friedman;

ANNE GABRIEL, as Executor
of the Estate of Richard Gabriel, Deceased
and on behalf of all survivors of Richard Gabriel;

MONICA M. GABRIELLE, as Administrator
of the Estate of Richard Gabrielle, Deceased
and on behalf of all survivors of Richard Gabrielle;

KRISTIN GALUSHA-WILD, as Executor
of the Estate of Michael Stewart, Deceased
and on behalf of all survivors of Michael Stewart;

KATHLEEN GANCI, as Executor
of the Estate of Peter J. Ganci, Jr., Deceased
and on behalf of all survivors of Peter J. Ganci, Jr.;

DOROTHY GARCIA, as Executor
of the Estate of Andrew Garcia, Deceased
and on behalf of all survivors of Andrew Garcia;

HECTOR GARCIA and CARMEN GARCIA, as co-
Administrators of the Estate of Marlyn C. Garcia, Deceased
and on behalf of all survivors of Marlyn C. Garcia;

ELIZABETH GARDNER, as Administrator
of the Estate of Thomas Gardner, Deceased
and on behalf of all survivors of Thomas Gardner;

MATHILDA GEIDEL, as Personal Representative
of the Estate of Gary Geidel, Deceased
and on behalf of all survivors of Gary Geidel;

DIANE GENCO, as Administrator
of the Estate of Peter Genco, Deceased
and on behalf of all survivors of Peter Genco;

PHILIP GERMAIN, as Proposed Administrator
of the Estate of Denis Germain, Deceased
and on behalf of all survivors of Denis Germain;

CAROL GIES, as Administrator
of the Estate of Ronnie Gies, Deceased
and on behalf of all survivors of Ronnie Gies;

JOHN J. GILL, as Administrator
of the Estate of Paul John Gill, Deceased
and on behalf of all survivors or Paul John Gill;

SERINA GILLIS, as Prospective Administrator
of the Estate of Rodney Gillis, Deceased
and on behalf of all survivors of Rodney Gillis;

ARMINE GIORGETTI, as Personal Representative
of the Estate of Steven A. Giorgetti, Deceased
and on behalf of all survivors of Steven A. Giorgetti;

ANGELA GITTO, as Administrator
of the Estate of Salvatore Gitto, Deceased
and on behalf of  all survivors of Salvatore Gitto;

MEG BLOOM GLASSER, as Executor
of the Estate of Thomas Glasser, Deceased
and on behalf of all survivors of Thomas Glasser;

SHARON COBB-GLENN, as Administrator
of the Estate of Harry Glenn, Deceased
and on behalf of all survivors of Harry Glenn;

HELENE PARISI-GNAZZO, as Administrator
of the Estate of John T. Gnazzo, Deceased
and on behalf of all survivors of John T. Gnazzo;

JODIE GOLDBERG, as Administrator
of the Estate of Brian Goldberg, Deceased
and on behalf of  all survivors of Brian Goldberg;

MIA GONZALEZ, as Administrator
of the Estate of Lydia Bravo, Deceased
and on behalf of all survivors of Lydia Bravo;

DEBORAH GRAZIOSO, as Personal Representative
of the Estate of Timothy Grazioso, Deceased
and on behalf of all survivors of Timothy Grazioso;

CLAUDETTE B. GREENE, as Executor
of the Estate of Donald F. Greene, Deceased
and on behalf of all survivors of Donald F. Greene;

PETER GREENLEAF, as Administrator
of the Estate of James Arthur Greenleaf, Deceased
and on behalf of all survivors of James Arthur Greenleaf;

REGAN GRICE-VEGA , as Personal Representative
of the Estate of Peter Vega, Deceased
and on behalf of all survivors of Peter Vega;

JOANNE GROSS, as Administrator
of the Estate of Thomas Foley, Deceased
and on behalf of all survivors of Thomas Foley;

MARY HAAG, as Fiduciary
of the Estate of Gary Haag, Deceased
and on behalf of all survivors of Gary Haag;

GORDON G. HABERMAN, as Administrator
of the Estate of Andrea Lyn Haberman, Deceased
and on behalf of all survivors of Andrea Lyn Haberman;

PATRICIA HAN, as  Administrator
of the Estate of Frederic K. Han, Deceased
and on behalf of all survivors of Frederic K. Han;

RENEE BACOTTI HANNAFIN, as Administrator
of the Estate of Thomas Hannafin, Deceased
and on behalf of all survivors of Thomas Hannafin;

RACHEL R. HARRELL, as Administrator
of the Estate of Harvey Harrell, Deceased
and on behalf of all survivors of Harvey Harrell;

ELINORE HARTZ, as Personal Representative
of the Estate of John Clinton Hartz, Deceased
and on behalf of all survivors of Elinore Hartz;

11

JENNIFER L. HARVEY, as Administrator
of the Estate of Emeric Harvey, Deceased
and on behalf of all survivors of Emeric Harvey;

KELLY HAYES, as Executor
of the Estate of Scott J. O'Brien, Deceased
and on behalf of all survivors of Scott J. O'Brien;

VIRGINIA HAYES, as Executor
of the Estate of Philip Thomas Hayes, Deceased
and on behalf of all survivors of Philip Thomas Hayes;

ANN R. HAYNES, as Administrator
of the Estate of William Ward Haynes, Deceased
and on behalf of all survivors of William Ward Haynes;

THERESA HEALEY, as Administrator
of the Estate of Michael Healey, Deceased
and on behalf of all survivors of Michael Healey;

SHIRLEY HENDERSON and HASHIM A. HENDERSON,
as co-Administrators of the Estate of Ronnie Lee Henderson,
Deceased and on behalf of all survivors of Ronnie Lee Henderson;

KAREN HINDS, as Administrator
of the Estate of Neil Hinds, Deceased
and on behalf of all survivors of Neil Hinds;

DENNIS L. HOBBS and DIXIE M. HOBBS,
as co-Administrators of the Estate of Tara Yvette Hobbs,
Deceased and on behalf of all survivors of Tara Yvette Hobbs;

PAMELA HOHLWECK, as Administrator
of the Thomas W. Hohlweck, Jr., Deceased
and on behalf of all survivors of Thomas W. Hohlweck, Jr.;

KATHLEEN HOLLAND, as Administrator
of the Estate of Joseph F. Holland, III, Deceased
and on behalf of all survivors of Joseph F. Holland, III;

RUBINA COX-HOLLOWAY, as Administrator
of the Estate of Darryl Leron McKinney, Deceased
and on behalf of all survivors of Darryl Leron McKinney;

12

COLLEEN HOLOHAN, Administrator
of the Estate of Thomas P. Holohan, Deceased
and on behalf of all survivors of Thomas P. Holohan;

JOANN T. HOWARD, as Administrator
of the Estate of Joseph Howard, Deceased
and on behalf of all survivors of Joseph Howard;

BRIDGET HUNTER , as Administrator
of the Estate of Joseph Hunter, Deceased
and on behalf of all survivors of Joseph Hunter;

KATHRYN J. HUSSA, as Executor
of the Estate of Robert R. Hussa, Deceased
and on behalf of all survivors of Robert R. Hussa;

YESENIA IELPI, as Administrator
of the Estate of Jonathan Ielpi, Deceased
and on behalf of all survivors of Jonathan Ielpi;

FREDERICK IRBY, as Administrator
of the Estate of Stephanie Irby, Deceased
and on behalf of all survivors of Stephanie Irby;

MARGARET P. ISKYAN, as Executor
of the Estate of John Francis Iskyan, Deceased
and on behalf of all survivors of John Francis Iskyan;

JENNIFER RUTH JACOBS, as Administrator
of the Estate of Ariel Louis Jacobs, Deceased
and on behalf of all survivors of Ariel Louis Jacobs;

KAZIMIERZ JAKUBIAK, as Personal Representative
of the Estate of Maria Jakubiak, Deceased
and on behalf of all survivors of Maria Jakubiak;

LEILA M. JOSEPH and WOODLY JOSEPH, as co-
Administrators of the Estate of Karl Joseph, Deceased
and on behalf of all survivors of Karl Joseph;

PAUL KAUFMAN, as Executor
of the Estate of Scott Martin McGovern, Deceased
and on behalf of all survivors of Scott Martin McGovern;

13

ELIZABETH H. KELLER, as Administrator of
the Estate of Chandler Raymond Keller, Deceased
and on behalf of all survivors of Chandler Raymond Keller;

ROBERTA KELLERMAN, as Personal Representative
of the Estate of Peter Kellerman, Deceased
and on behalf of all survivors of Peter Kellerman;

PATRICIA KELLETT, as Administrator
of the Estate of Joseph P. Kellett, Deceased
and on behalf of all survivors of Joseph P. Kellett;

EMMET P. KELLY, as Administrator
of the Estate of Thomas Richard Kelly, Deceased
and on behalf of all survivors of Thomas Richard Kelly;

ROSEMARY KEMPTON, as Administrator
of the Estate of Rosemary A. Smith, Deceased
and on behalf of all survivors of Rosemary A. Smith;

DONALD FRANCIS KENNEDY, as Executor
of the Estate of Yvonne Estelle Kennedy, Deceased
and on behalf of all survivors of Yvonne Estelle Kennedy;

THERESA KING, as Administrator
of the Estate of Robert King, Jr., Deceased
and on behalf of all survivors of Robert King, Jr.;

VERONICA KLARES, as Executor
of the Estate of Richard J. Klares, Deceased
and on behalf of all survivors of Richard J. Klares;

RICHARD I. KLEIN, as Executor
of the Estate of Julie Lynne Zipper, Deceased
and on behalf of all survivors of Julie Lynne Zipper;

FRANCES LaFORTE, as Executor
of the Estate of Michael P. LaForte, Deceased
and on behalf of all survivors of Michael P. LaForte;

EDLENE C. LaFRANCE, as Administrator of the
Estate of Alan Charles LaFrance, Deceased
and on behalf of all survivors of Alan Charles LaFrance;

14

COLETTE M. LAFUENTE, as Fiduciary
of the Estate of Dr. Juan M. Lafuente, Deceased
and on behalf of all survivors of Dr. Juan M. Lafuente;

MORRIS D. LAMONSOFF, as Administrator
of the Estate of Amy Hope Lamonsoff, Deceased
and on behalf of all survivors of Amy Hope Lamonsoff;

LAURIE S. LAUTERBACH, as Personal Representative
of the Estate of Carlos Cortes a/k/a Carlos Cortes-Rodriguez,
Deceased and on behalf of all survivors of Carlos Cortes
a/ka Carlos Cortes-Rodriguez;

ANDREA N. LeBLANC, as Administrator
of the Estate of Robert G. LeBlanc, Deceased
and on behalf of all survivors of Robert G. LeBlanc;

DONALD LEISTMAN, as Executor
of the Estate of David R. Leistman, Deceased
and on behalf of all survivors of David R. Leistman;

INGRID M. LENIHAN, as Executor
of the Estate of Joseph Anthony Lenihan, Deceased
and on behalf of all survivors of Joseph Anthony Lenihan;

ELAINE LEINUNG, as Administrator
of the Estate of Paul Battaglia, Deceased
and on behalf of all survivors of Paul Battaglia;

ROBERTA J. LEVINE, as Administrator Ad Prosequendum
of the Estate of Robert M. Levine, Deceased
and on behalf of all survivors of Robert M. Levine;

JERLINE LEWIS, as Personal Representative
of the Estate of Sherry Ann Bordeaux, Deceased
and on behalf of all survivors of Sherry Ann Bordeaux;

JEFFREY LOVIT, as Executor
of the Estate of Jacqueline Norton, Deceased
and on behalf of all survivors of Jacqueline Norton;

JEFFREY LOVIT, as Executor
of the Estate of Robert G. Norton, Deceased
and on behalf of all survivors of Robert G. Norton;

15

KATHLEEN KEELER LOZIER, as Executor
of the Estate of Garry W. Lozier, Deceased
and on behalf of all survivors of Garry W. Lozier;

ANNE MacFARLANE, as Administrator
of the Estate of Marianne MacFarlane, Deceased
and on behalf of all survivors of Marianne MacFarlane;


LISANNE MacKENZIE, has been or will be
appointed as Personal Representative
of the Estate of James P. O'Brien, Deceased
and on behalf of all survivors of James P. O'Brien;

ANDREA MAFFEO, as Administrator
of the Estate of Jennieann Maffeo, Deceased
and on behalf of all survivors of Jennieann Maffeo;

PAMELA ANN MAGGITTI, as Administrator
for the Estate of Joseph Vincent Maggitti, Deceased
and on behalf of all survivors of Joseph Vincent Maggitti;

NATALIE MAKSHANOV, as Administrator
of the Estate of Jason M. Sekzer, Deceased
and on behalf of all survivors of Jason M. Sekzer;

REBECCA L. MARCHAND, as Personal Representative
of the Estate of Alfred G. Marchand, Deceased
and on behalf of all survivors of Alfred G. Marchand;

BETTYANN MARTINEAU, as Executor
of the Estate of Brian Martineau, Deceased
and on behalf of all survivors of Brian Martineau;

LORI MASCALI, as Administrator
of the Estate of Joseph Mascali, Deceased
and on behalf of all survivors of Joseph Mascali;

DOROTHY MAURO, as Administrator
of the Estate of Charles A. Mauro, Deceased
and on behalf of all survivors of Charles A. Mauro;

MERYL MAYO, as Executor

16

of the Estate of Robert Mayo, Deceased
and on behalf of all survivors of Robert Mayo;

MARGARET DONOGHUE McGINLEY, as Executor
of the Estate of Daniel Francis McGinley, Deceased
and on behalf of all survivors of Daniel Francis McGinley;

ILIANA McGINNIS, as Administrator of the
Estate of Thomas Henry McGinnis, Deceased
and on behalf of all survivors of Thomas Henry McGinnis;

CYNTHIA F. McGINTY, as Administrator
of the Estate of Michael Gregory McGinty, Deceased
and on behalf of all survivors of Michael Gregory McGinty;

VIRGINIA McKEON, as Personal Representative
of the Estate of Barry J. McKeon, Deceased
and on behalf of all survivors of Barry J. McKeon;

PATRICIA H. McDOWELL, as Administrator
of the Estate of John F. McDowell, Deceased
and on behalf of all survivors of John F. McDowell;

THERESA McGOVERN, as Executor
of the Estate of Ann McGovern, Deceased
and on behalf of all survivors of Ann McGovern;

JOANN MEEHAN, as Administrator
of the Estate of Damian Meehan, Deceased
and on behalf of all survivors of Damian Meehan;

OLGA MERINO, as Personal Representative
of the Estate of George C. Merino, Deceased
and on behalf of all survivors of George C. Merino;

FRYDERYK MILEWSKI and ANNA MILEWSKI, as co-
Administrators of the Estate of Lukasz Milewski, Deceased
and on behalf of all survivors of Lukasz Milewski;

AMBER MILLER and JAMIE MILLER, as co-Administrators
of the Estate of Karen Juday, Deceased
and on behalf of all survivors of Karen Juday;

DIANE MILLER, as Administratrix

17

of the Estate of Henry Miller, Deceased
and on behalf of all survivors of Henry Miller;

FAITH MILLER, as Executor
of the Estate of Robert Alan Miller, Deceased
and on behalf of  all survivors of Robert Alan Miller;

BARBARA MINERVINO, as Executor
of the Estate of Louis J. Minervino, Deceased
and on behalf of all survivors of Louis J. Minervino;

JOANNE MODAFFERI, as Administrator
of the Estate of Louis Modafferi, Deceased
and on behalf of all survivors of Louis Modafferi;

ANNA MOJICA, as Administrator
of the Estate of Manuel Mojica, Deceased
and on behalf of all survivors of Manuel Mojica;

SARADHA MOORTHY, as Administrator
of the Estate of Krishna Moorthy, Deceased
and on behalf of all survivors of Krishna Moorthy;

ELIZABETH ANN MOSS, as Personal Representative
of the Estate of Linda Oliva, Deceased
and on behalf of all survivors of Linda Oliva;

EMILY MOTRONI, as Administrator
of the Estate of Marco Motroni, Deceased
and on behalf of all survivors of Marco Motroni.

LAUREN MURPHY, as Administrator
of the Estate of Matthew T. O'Mahony, Deceased
and on behalf of all survivors of Matthew T. O'Mahony;

ELVIRA  P. MURPHY, as Administrator
of the Estate of Patrick Sean Murphy, Deceased
and on behalf of all survivors of Patrick Sean Murphy;

RICHARD B. NAIMAN, as Administrator
of the Estate of Mildred R. Naiman, Deceased
and on behalf of all survivors of Mildred R. Naiman;

EDWARD NAVARRO, as Administrator

of the Estate of Karen Susan Navarro, Deceased
and on behalf of all survivors of Karen Susan Navarro;

WILLIAM NELSON, as Administrator
of the Estate of Theresa Risco, Deceased
and on behalf of all survivors of Theresa Risco;

MERRILLY E. NOETH, as Administrator
of the Estate of Michael Allen Noeth, Deceased
and on behalf of all survivors of Michael Allen Noeth;

DANA NOONAN, as Administrator
of the Estate of Robert Walter Noonan, Deceased
and on behalf of all survivors of Robert Walter Noonan;

WILLIAM B. NOVOTNY and MICHAEL J. NOVOTNY,
as co-Administrators of the Estate of Brian C. Novotny, Deceased
and on behalf of all survivors of Brian C. Novotny;

WILLIAM O'CONNOR, as Executor
of the Estate of Diana O'Connor, Deceased
and on behalf of all survivors of Diana O'Connor;

JAMES WALLACE O'GRADY, as Executor
of the Estate of James Andrew O'Grady, Deceased
and on behalf of  all survivors of James Andrew O'Grady;

SHERYL J. OLIVER, as Administrator
of the Estate of Edward Kraft Oliver, Deceased
and on behalf of all survivors of Edward Kraft Oliver;

HARRY ONG, JR., as Legal Representative
of the Estate of Betty Ann Ong, Deceased
and on behalf of all survivors of Betty Ann Ong;

LISA PALAZZO, as Administrator
of the Estate of Jeffrey Palazzo, Deceased
and on behalf of all survivors of Jeffrey Palazzo;

DONNA PAOLILLO, as Administrator
of the Estate of John Paolillo, Deceased
and on behalf of all survivors of John Paolillo;

HELENE S. PASSARO, as Administrator

19

of the Estate of Suzanne H. Passaro, Deceased
and on behalf of all survivors of Suzanne H. Passaro;

MARY GOLA PEREZ, as Executor
of the Estate of Anthony Perez, Deceased
and on behalf of all survivors of Anthony Perez;

LINDA PICKFORD, as Administrator
of the Estate of Christopher Pickford, Deceased
and on behalf of all survivors of Christopher Pickford;

NANCY PICONE, as Administrator
of the Estate of Arturo Sereno, Deceased
and on behalf of all survivors of Arturo Sereno;

JEAN OSLYN POWELL, as Administrator
of the Estate of Shawn E. Powell, Deceased
and on behalf of all survivors of Shawn E. Powell;

KAREN PRINCIOTTA, as Legal Representative
of the Estate of Vincent Princiotta, Deceased
and on behalf of all survivors of Vincent Princiotta;

MICHAEL PUCKETT, as Administrator
of the Estate of John F. Puckett, Deceased
and on behalf of all survivors of John F. Puckett;

DOMINIC J. PUOPOLO, SR., as Administrator
of the Estate of Sonia Mercedes Morales Puopolo, Deceased
and on behalf of all survivors of Sonia Mercedes Morales Puopolo;

PATRICIA QUIGLEY, as Executor
of the Estate of Patrick Quigley, Deceased
and on behalf of all survivors of Patrick Quigley;

FRANCINE RAGGIO, as Administrator
of the Estate of Eugene Raggio, Deceased
and on behalf of all survivors of Eugene Raggio;

DEBORAH RANCKE, as Proposed Personal Representative
of the Estate of Alfred Todd Rancke, Deceased
and on behalf of all survivors of Alfred Todd Rancke;

MARYANN RAND, as Administrator

of the Estate of Adam David Rand, Deceased
and on behalf of all survivors of Adam David Rand;

SADIQ RASOOL, as Administrator
of the Estate of Amenia Rasool, Deceased
and on behalf of all survivors of Amenia Rasool;

SUSAN RASWEILER, as Administrator
of the Estate of Roger Rasweiler, Deceased
and on behalf of all survivors of Roger Rasweiler;

CATHERINE T. REGENHARD, as Administrator
of the Estate of Christian Michael Regenhard, Deceased
and on behalf of all survivors of Christian Michael Regenhard;

ELIZABETH REGO, as Administrator
of the Estate of Leah E. Oliver, Deceased
and on behalf of all survivors of Leah E. Oliver;

WILLIAM D. ROBBINS, as Personal Representative
of the Estate of Clarin Schwartz, Deceased
and on behalf of all survivors of Clarin Schwartz;

EVELYN RODRIGUEZ, as Administrator
of the Estate of Anthony Rodriguez, Deceased
and on behalf of all survivors of Anthony Rodriguez;

MARTIN ROSENBAUM, as Administrator
of the Estate of Brooke David Rosenbaum, Deceased
and on behalf of all survivors of Brooke David Rosenbaum;

GLENNA M. ROSENBERG, as Administrator
of the Estate of Lloyd Daniel Rosenberg, Deceased
and on behalf of all survivors of Lloyd Daniel Rosenberg;

JILL ROSENBLUM, as Executor
of the Estate of Andrew I. Rosenblum, Deceased
and on behalf of all survivors of Andrew I. Rosenblum;

JUDI A. ROSS, as Executor
of the Estate of Richard Ross, Deceased
and on behalf of all survivors of Richard Ross;

CLAUDIA RUGGIERE, as Administrator

of the Estate of Bart Joseph Ruggiere, Deceased
and on behalf of all survivors of Bart Joseph Ruggiere;

GILBERT RUIZ, JR., as Administrator
of the Estate of Gilbert Ruiz, Deceased
and on behalf of all survivors of Gilbert Ruiz;

ANDREA RUSSIN, as Administrator
of the Estate of Steven Russin, Deceased
and on behalf of all survivors of Steven Russin;

DIANE RYAN, as Administrator
of the Estate of Edward Ryan, Deceased
and on behalf of all survivors of Edward Ryan;

MARGARET RYAN, as (Ad Prosequendum)
of the Estate of Matthew Ryan, Deceased
and on behalf of all survivors of Matthew Ryan;

DELPHINE SAADA, as Administrator
of the Estate of Thierry Saada, Deceased
and on behalf of all survivors of Thierry Saada;

PEDRO SALAME, as Administrator, and
MARY LYNN SANTOS, Individually,
of the Estate of Carmen Milly Rodriguez, Deceased
and on behalf of all survivors of Carmen Milly Rodriguez;

BARBARA SCARAMUZZINO, as Administrator
of the Estate of Nicholas Rossomando, Deceased
and on behalf of all survivors of Nicholas Rossomando;

JANLYN SCAUSO, as Administrator
of the Estate of Dennis P. Scauso, Deceased
and on behalf of all survivors of Dennis P. Scauso;

PHYLLIS SCHREIER, as Administrator
of the Estate of Jeffrey H. Schreier, Deceased
and on behalf of all survivors of Jeffrey H. Schreier;

NANCY SHEA, as Personal Representative
of the Estate of Joseph P. Shea, Deceased
and on behalf of all survivors of Joseph P. Shea;

MAUREEN SHERRY, as Administrator
of the Estate of John Anthony Sherry, Deceased
and on behalf of all survivors of John Anthony Sherry;

LORI SHULMAN, as Executor
of the Estate of Mark Shulman, Deceased
and on behalf of all survivors of Mark Shulman;

HOLLI SILVER, as Personal Representative
of the Estate of David Scott Silver, Deceased
and on behalf of all survivors of David Scott Silver;

EILEEN SIMON, as Executor
of the Estate of Michael J. Simon, Deceased
and on behalf of all survivors of Michael J. Simon;

DHANRAJ SINGH, as Administrator
of the Estate of Khamladai K. Singh, Deceased
and on behalf of all survivors of Khamladai K. Singh;

MARK J. SISKOPOULOS, as Administrator
of the Estate of Muriel F. Siskopoulos, Deceased
and on behalf of all survivors of Muriel F. Siskopoulos;

DONNA SMITH, as Executor
of the Estate of James Gregory Smith, Deceased
and on behalf of all survivors of James Gregory Smith;

BARBARA SOHAN, as Administrator
of the Estate of Astrid Elizabeth Sohan, Deceased
and on behalf of all survivors of Astrid Elizabeth Sohan;

ROBERT SPADAFORA, ESQ., as Executor
of the Estates of Mary B. Trentini and James A. Trentini,
Deceased and on behalf of all survivors of Mary B.
Trentini and James A. Trentini;

LAURIE SPAMPINATO, as Administrator
of the Estate of Donald Spampinato, Deceased
and on behalf of all survivors of Donald Spampinato;

THERESA A. STACK, as Administrator (Ad Prosequendum)
of the Estate of Lawrence T. Stack, Deceased
and on behalf of all survivors of Lawrence T. Stack;

23

GREGORY STEVENS, as Executor
of the Estate of Lisa Terry, Deceased
and on behalf of all survivors of Lisa Terry;

EDWARD J. SWEENEY, Administrator
of the Estate of Brian E. Sweeney, Deceased
and on behalf of all survivors of Brian E. Sweeney;

EILEEN TALLON, as Fiduciary
of the Estate of Sean Patrick Tallon, Deceased
and on behalf of all survivors of Sean Patrick Tallon;

PATRICIA TARASIEWICZ, as Administrator
of the Estate of Allan Tarasiewicz, Deceased
and on behalf of all survivors of Allan Tarasiewicz;

EVELYN TEPEDINO, as Administrator
of the Estate of Jody Nichilo, Deceased
and on behalf of all survivors of Jody Nichilo;

RAJ THACKURDEEN & SAT THACKURDEEN, as co-
Administrators of the Estate of Goumatie Thackurdeen, Deceased
and on behalf of all survivors of Goumatie Thackurdeen;

ROBIN THEURKAUF, Personal Representative
of the Estate of Thomas F. Theurkauf, Jr., Deceased
and on behalf of all survivors of Thomas F. Theurkauf, Jr.;

ROSANA THOMPSON, as Administrator
of the Estate of Nigel Bruce Thompson, Deceased
and on behalf of all survivors of Nigel Bruce Thompson;

JOSEPH A. TIESI, as Personal Representative
of the Estate of Mary Ellen Tiesi, Deceased
and on behalf of all survivors of Mary Ellen Tiesi;

KIMBERLY TRIMINGHAM-AIKEN, as Administrator
of the Estate of Terrance Aiken,  Deceased
and on behalf of all survivors of Terrance Aiken;

MARIE TWOMEY, as Administrator
of the Estate of Robert T. Twomey, Deceased
and on behalf of all survivors of Robert T. Twomey;

24

VICTOR UGOLYN, as Administrator
of the Estate of Tyler V. Ugolyn, Deceased
and on behalf of all survivors of Tyler V. Ugolyn;

FELICIANA UMANZOR, as Administrator
of the Estate of Elsy C. Osoria, Deceased
and on behalf of all survivors of Elsy C. Osoria;

VIRGINIA LORENE ROSSITER VALVO, as Administrator
of the Estate of Carlton F. Valvo, II, Deceased
and on behalf of all survivors of Carlton F. Valvo, II;

JASMINE VICTORIA and DAWN TORRES BROWN, as co-
Administrators of the Estate of Celeste Torres Victoria,
Deceased and on behalf of all survivors of
Celeste Torres Victoria;

RICHARD VILLA, as Administrator
of the Estate of Sharon Christina Milan, Deceased
and on behalf of all survivors of Sharon Christina Milan;

ANTHONY VINCELLI, as Administrator
of the Estate of Chantal Vincelli, Deceased
and on behalf of all survivors of Chantal Vincelli;

LUCY VIRGILIO, as Administrator
of the Estate of Lawrence J. Virgilio, Deceased
and on behalf of all survivors of Lawrence J. Virgilio;

BENHARDT R. WAINIO, as Personal Representative
of the Estate of Honor Elizabeth Wainio, Deceased
and on behalf of all survivors of Honor Elizabeth Wainio;

DIANE WALL, as Executor
of the Estate of Glen J. Wall, Deceased
and on behalf of all survivors of Glen J. Wall;

DIANNE M. WALSH, as Administrator
of the Estate of Christine J. Barbuto, Deceased
and on behalf of all survivors of Christine J. Barbuto;

AMY L. WEAVER, as Administrator
of the Estate of Todd Christopher Weaver, Deceased
and on behalf of all survivors of Todd Christopher Weaver;

DELIA WELTY, as Administrator
of the Estate of Timothy Matthew Welty, Deceased
and on behalf of all survivors of Timothy Matthew Welty;

LENA WHITTAKER, as Administrator
of the Estate of Karen E. Hagerty, Deceased
and on behalf of all survivors of Karen E. Hagerty;

PATRICIA WISWALL, as Executor
of the Estate of David Wiswall, Deceased
and on behalf of all survivors of David Wiswall;

ANNE M. WODENSHEK, as Administrator
of the Estate of Christopher W. Wodenshek, Deceased
and on behalf of all survivors of Christopher W. Wodenshek;

CELLA WOO-YUEN, as Administrator
of the Estate of Elkin Yuen, Deceased
and on behalf of all survivors of Elkin Yuen;

SIEW-SIM YEOW, as Administrator
of the Estate of Michael Waye, Deceased
and on behalf of all survivors of Michael Waye;

MADELEINE A. ZUCCALA, as Personal Representative
of the Estate of Joseph J. Zuccala, Deceased
and on behalf of all survivors of Joseph J. Zuccala;

ERICA ZUCKER, as Executor
of the Estate of Andrew Zucker, Deceased
and on behalf of all survivors of Andrew Zucker;

NANCY LYNN ZUCKERMAN, as Administrator
of the Estate of Alan Jay Lederman, Deceased
and on behalf of all survivors of Alan Jay Lederman;

ALDO ADISSI; EDWARD ARANCIO and
KATHLEEN M. ARANCIO; LEONARD ARDIZZONE
and BARBARA ARDIZZONE; THOMAS BAEZ;
JOSEPH BELTRANI; ANDREW BRAUN; ANDRZEJ
CIESLIK; JAMES CIZIKE; THOMAS CONROY, JR.;
GIBSON A. CRAIG; BRADLEY DALY; DOMENICK
DAMIANO; ROBERT J. D'ELIA; THOMAS
DONNELLY; CHARLES DOWNEY; JOSEPH R.

26

DOWNEY;  TIMOTHY L. FROLICH and IRENE
FROLICH; STEVEN M. GILLESPIE; JOSEPH
HANDS; JOHN HASSETT; WARREN HAYES;
JAMES D. HODGES, II; NETTA ISSACOF;
ARNOLD LEDERMAN and PHYLLIS LEDERMAN;
MICHAEL J. LINDY; SANDY AMRITA MAHABIR;
WILLIAM MARTIN; KEVIN McARDLE; JAMES
McGETRICK; OWEN McGOVERN; WARREN
MONROE; KEVIN MOUNT;
KEVIN G. MURPHY;  JANICE O'DELL; TIMOTHY
PARKER; KEVIN QUINN; HOWARD RICE; LOUIS
SCHAEFER; CHARLES SCHMID; SCOTT
SCHRIMPE; RICHARD TING; GEORGE LUIS
TORRES; ROBERT V. TRIVIGNO; RUSSELL J.
VOMERO; EDWARD WALSH; PHILIP J. ZEISS;


EMILY AMARANTO, as Administrator
of the Estate of Angelo Amaranto, Deceased
and on behalf of all survivors of Angelo Amaranto;

LORI ANN ARCZYNSKI, as Executor
of the Estate of Michael G. Arczynski, Deceased
and on behalf of all survivors of Michael G. Arczynski;

LOUANNE BAILY, as Administrator
of the Estate of Brian Paul Dale, Deceased
and on behalf of all survivors of Brian Paul Dale;

MONICA BARBELLA, as Administrator
of the Estate of James Barbella, Deceased
and on behalf of all survivors of James Barbella;

MARCEL BIRNBAUM, as Personal Administrator
of the Estate of Joshua Birnbaum, Deceased
and on behalf of all survivors of Joshua Birnbaum;

SHARON BOOKER, as Administrator
of the Estate of SEAN BOOKER, Deceased
and on behalf of all survivors of Sean Booker;

FREDERICK BOWERS, JR., as Administrator
of the Estate of Kimberly S. Bowers, Deceased
and on behalf of all survivors of Kimberly S. Bowers;

JEAN BRACA, as Administrator
of the Estate of Alfred J. Braca, Deceased
and on behalf of all survivors of Alfred J. Braca;

RODNEY CALLUM, as Administrator
of the Estate of Michell Robotham, Deceased
and on behalf of all survivors of Michell Robotham;

NANCY E. CARROLL, as Administrator
of the Estate of Michael T. Carroll, Deceased
and on behalf of all survivors of Michael T. Carroll;

DAVID J. CHAZIN, as Administrator
of the Estate of Ruth Lapin, Deceased
and on behalf of all survivors of Ruth Lapin;

MARIANNE CRUIKSHANK, as Administrator
of the Estate of Robert L. Cruikshank, Deceased
and on behalf of all survivors of Robert L. Cruikshank;

TANYA KIM DAVIS, as Administrator
of the Estate of Mannie Leroy Clark, Deceased
and on behalf of all survivors of Mannie Leroy Clark;

JOAN E. DINCUFF and FRANK DINCUFF, as co-Administrators
of the Estate of Christopher M. Dincuff, Deceased,
and on behalf of all survivors of Christopher M. Dincuff;

NGORAN DJE, as Administrator
of the Estate of Irina Buslo, Deceased
and on behalf of all survivors of Irina Buslo;

SAM ELLIS, as Representative
of the Estate of Valerie Silver Ellis, Deceased
and on behalf of all survivors of Valerie Silver Ellis;

EILEEN ERWIN, as Representative
of the Estate of William John Erwin, Deceased
and on behalf of all survivors of William John Erwin;

MARY L. FERGUSON, as Executor
of the Estate of George J. Ferguson, Deceased
and on behalf of all survivors of George J. Ferguson;

28

TIERNEY FRAWLEY, as Administrator
of the Estate of Kevin Frawley, Deceased
and on behalf of all survivors of Kevin Frawley;

LARRY GIUGLIANO, as Administrator
of the Estate of Cynthia Giugliano, Deceased
and on behalf of all survivors of Cynthia Giugliano;

MARY JO GRILLO, as Administrator
of the Estate of Joseph Grillo, Deceased
and on behalf of all survivors of Joseph Grillo;

DIGNA HERNANDEZ, as Administrator
of the Estate of Raul Hernandez, Deceased
and on behalf of all survivors of Raul Hernandez;

KATHERINE M. HOORN and DENNIS J. HOORN,
as Administrators of the Estate of Bradley Hoorn, Deceased
and on behalf of all survivors of Bradley Hoorn;

JOSEPH WALTER HROMADA, as Administrator
of the Estate of Milagros Hromada, Deceased
and on behalf of all survivors of Milagros Hromada;

KAREN R. HUGHES, as Administrator
of the Estate of Timothy Hughes, Deceased
and on behalf of all survivors of Timothy Hughes;

YELENA ILKANAYEV, as Personal Representative
of the Estate of Daniel Ilkanayev, Deceased
and on behalf of all survivors of Daniel Ilkanayev;

EMILY LIZCANO, as Administrator
of the Estate of Harold Lizcano, Deceased
and on behalf of all survivors of Harold Lizcano;

JEANNE McALARY, as Administrator
of the Estate of James J. McAlary, Deceased
and on behalf of all survivors of James J. McAlary;

ANN McCARTHY, as Administrator
of the Estate of Robert Garvin McCarthy, Deceased
and on behalf of all survivors of Robert Garvin McCarthy;

DEBRA McSWEENEY, as Administrator
of the Estate of Timothy McSweeney, Deceased
and on behalf of all survivors of Timothy McSweeney;

LLOYD C. MAIR, as Personal Representative
of the Estate of Linda Catherine Mair Grayling, Deceased
and on behalf of all survivors of Linda Catherine Mair Grayling;

MARY JEAN McCARTHY O'LEARY, as Administrator
of the Estate of Gerald Thomas O'Leary, Deceased,
and on behalf of all survivors of Gerald Thomas O'Leary;

DEBORAH OPPERMAN, as Administrator
of the Estate of Michael Opperman, Deceased
and on behalf of all survivors of Deborah Opperman;

PERRY S. ORETZKY, as Personal Representative
of the Estates of David L. Angell and Lynn E. Angell, Deceased
and on behalf of all survivors of David L. Angell and Lynn E. Angell;

KANTILAL PATEL, as Representative
of the Estate of Manish Patel, Deceased
and on behalf of all survivors of Manish Patel;

NICOLE REDA, as Administrator
of the Estate of Gregory Reda, Deceased
and on behalf of all survivors of Gregory Reda;

NILSA RIVERA, as Executrix
of the Estate of Isaias Rivera, Deceased
and on behalf of all survivors of Isaias Rivera;

RICKY VIDER RIVERS, as Administrator
of the Estate of David E. Rivers, Deceased
and on behalf of all survivors of David E. Rivers;

EILEEN A. SHANAHAN, as Administrator
of the Estate of Earl R. Shanahan, Deceased
and on behalf of all survivors of Earl R. Shanahan;

SAMANTHA TAYLOR, as Legal Representative
of the Estate of Sandra Carol Taylor, Deceased
and on behalf of all survivors of Sandra Carol Taylor;

BARBARA TIRADO, as Administrator
of the Estate of David L. Tirado, Deceased
and on behalf of all survivors of David L. Tirado;

ANNE VANDEVANDER, as Administrator
of the Estate of Jon Vandevander, Deceased
and on behalf of all survivors of Jon Vandevander;

REMA WAISER, as Administrator
of the Estate of SIMON V. WEISER, Deceased
and on behalf of all survivors of Simon V. Weiser;

JANICE C. WILLIAMS, as Administrator
of the Estate of Louis Calvin Williams, III, Deceased
and on behalf of all survivors of Louis Calvin Williams, III;

DEBBIE WILLIAMS, as Administrator
of the Estate of Pauline Francis, Deceased
and on behalf of all survivors of Pauline Francis;

JOHN CITARELLA; DOUGLAS F. COPP;
BRIAN ROCOVICH; STEVE SULLIVAN;
WILLIAM WALSH;

EDELMIRO ABAD, as Personal Representative
of the Estate of Lorraine Abad, Deceased
and on behalf of all survivors of Lorraine Abad;

MARY ELIZABETH ADDERLEY and
TERENCE E. ADDERLEY, as Co-Administrators
of the Estate of Terence E. Adderley, Jr., Deceased
and on behalf of all survivors of Terence E. Adderley, Jr.;

CARMEN AGNES, as Personal Representative
of the Estate of David S. Agnes, Deceased
and on behalf of all survivors of David S. Agnes;

MILTIADIS AHLADIOTIS, as Personal Representative
of the Estate of Joanne Maria Ahladiotis, Deceased
and on behalf of all survivors of Joanne Maria Ahladiotis;

DONNA ALBERT, as Executor
of the Estate of Jon Albert, Deceased

31

and on behalf of all survivors of Jon Albert;

JOSEPH BERARDI, as Personal Representative
of the Estate of Dominick J. Berardi, Deceased
and on behalf of all survivors of Dominick J. Berardi;

VALERIE BETHKE, as Legal Representative
of the Estate of William R. Bethke, Deceased
and on behalf of all survivors of William R. Bethke;

DEBORAH BLANDING, as Administrator
of the Estate of Harry A. Blanding, Deceased
and on behalf of all survivors of Harry A. Blanding;

GAIL BRENNAN, as Administrator
of the Estate of Edward A. Brennan, Deceased
and on behalf of all survivors of Edward A. Brennan;

DAWN BRYFOGLE, as Administrator
of the Estate of Mark Bruce, Deceased
and on behalf of all survivors of Mark Bruce;

JULIE BURKE, as Administrator
of the Estate of Thomas Daniel Burke, Deceased
and on behalf of all survivors of Thomas Daniel Burke;

MARTHA C. BUTLER, as Administrator
of the Estate of Thomas M. Butler, Deceased
and on behalf of all survivors of Thomas M. Butler;

SHARON CAHILL, as Executor
of the Estate of John B. Cahill, Deceased
and on behalf of all survivors of John B. Cahill;

SUSAN CALCAGNO, as Personal Representative
of the Estate of Philip V. Calcagno, Deceased
and on behalf of all survivors of Philip V. Calcagno;

MICHELLE and VINCENT CANGELOSI, as
Personal Representatives of the Estate of
Vincent A. Cangelosi, Deceased and on behalf
of all survivors of Vincent A. Cangelosi;

LORI CAPORICCI, as Personal Representative

of the Estate of Louis Caporicci, Deceased
and on behalf of all survivors of Louis Caporicci;

JEAN CAREY, as Administrator
of the Estate of Dennis M. Carey, Deceased
and on behalf of all survivors of Dennis M. Carey;

CATHY CARILLI-STINTON, as Administrator
of the Estate of Thomas E. Sinton, III, Deceased
and on behalf of all survivors of Thomas E. Sinton;

PATRICIA CARRINGTON, as Administrator
of the Estate of Jeremy Carrington, Deceased
and on behalf of all survivors of Jeremy Carrington;

LEONARD A. CASTRIANNO, as Administrator
of the Estate of Leonard M. Castrianno, Deceased
and on behalf of all survivors of Leonard M. Castrianno;

GERALDINE CEFALU, as Administrator
of the Estate of Jason Cefalu, Deceased
and on behalf of all survivors of Jason Cefalu;

BOB CHEATHAM, as Personal Representative
of the Estate of Delrose Cheatham, Deceased
and on behalf of all survivors of Delrose Cheatham;

JOHN FRANCIS CLARKE, as Personal Representative
of the Estate of Michael J. Clarke, Deceased
and on behalf of all survivors of Michael J. Clarke;

ROBERT CLARK, as Personal Representative
of the Estate of Eugene Clark, Deceased
and on behalf of all survivors of Eugene Clark;

CHARLES CLYNE, as Personal Representative
of the Estate of Susan M. Clyne, Deceased
and on behalf of all survivors of Susan M. Clyne;

VINCENT J. COAKLEY and CAROLINE COAKLEY, as
Administrators of the Estate of Steven Coakley, Deceased
and on behalf of all survivors of Steven Coakley;

FELICIA A. CORBETT, as Personal Representative

33

of the Estate of Joseph A. Corbett, Deceased
and on behalf of all survivors of Joseph A. Corbett;

PAULA COTTOY, as Administrator
of the Estate of Conrod Cottoy, Sr., Deceased
and on behalf of all survivors of Conrod Cottoy, Sr.;

MARIANN COYLE, as Personal Representative
of the Estate of Andrew Gilbert, Deceased
and on behalf of all survivors of Andrew Gilbert;

JOHN CRANT, as Administrator
of the Estate of Denise Crant, Deceased
and on behalf of all survivors of Denise Crant;

LISA B. CRAWFORD, as Personal Representative
of the Estate of James L. Crawford, Jr., Deceased
and on behalf of all survivors of James L. Crawford;

MARIA CRIFASI, as Administrator
of the Estate of Lucy Crifasi, Deceased
and on behalf of all survivors of Luch Crifasi

JOANN CROSS, as Administrator
of the Estate of Dennis Cross, Deceased
and on behalf of all survivors of Dennis Cross;

MARIA CRUZ, as Personal Representative
of the Estate of Eduvigis Reyes, Jr., Deceased
and on behalf of all survivors of Eduvigis Reyes, Jr.;*

FREDERICK CURRY, as Personal Representative
of the Estate of Beverly Crew Curry, Deceased
and on behalf of all survivors of Beverly Crew Curry;

PATRICIA DeANGELIS, as Administrator
of the Estate of Thomas DeAngelis, Deceased
and on behalf of all survivors of Thomas DeAngelis;

MARION S. DeBLASE, as Personal Representative
of the Estate of James V. DeBlase, Jr., Deceased
and on behalf of all survivors of James V. DeBlase, Jr.;

VIOLETTA a/k/a VIVI DEMAS, as Personal Representative

34

of the Estate of Anthony Demas, Deceased
and on behalf of all survivors of Anthony Demas;

BROOKE DEMING, as Personal Representative
of the Estate of Francis X. Deming, Deceased
and on behalf of all survivors of Francis X. Deming;

CHRISTEL DeSIMONE, as Personal Representative
of the Estate of Christian DeSimone, Deceased
and on behalf of all survivors of Christian DeSimone;

ROBERT P. DEVITT, SR., as Administrator
of the Estate of Robert Devitt, Jr., Deceased
and on behalf of all survivors of Robert Devitt, Jr.;

DONNA DiAGOSTINO, as Personal Representative
of the Estate of Michael L. DiAgostino, Deceased
and on behalf of all survivors of Michael L. DiAgostino;

DAVID A. DiSTEFANO, as Personal Representative
of the Estate of Douglas F. DiStefano, Deceased
and on behalf of all survivors of Douglas F. DiStefano;
DAVID EGAN, as Personal Representative
of the Estate of Lisa Egan, Deceased
and on behalf of all survivors of Lisa Egan;

DAVID EGAN, as Personal Representative
of the Estate of Samantha Egan, Deceased
and on behalf of all survivors of Samantha Egan;

GAIL EAGLESON, as Administrator
of the Estate of John Bruce Eagleson, Deceased
and on behalf of all survivors of John Bruce Eagleson;

LUIS ESPINOZA, as Personal Representative
of the Estate of Fanny Espinoza, Deceased
and on behalf of all survivors of Fanny Espinoza;

LAURA FALLON, as Executor
of the Estate of William L. Fallon, Jr., Deceased
and on behalf of all survivors of William L. Fallon, Jr.;

PATRICIA FALLONE, as Personal Representative
of the Estate of Anthony J. Fallone, Deceased

35

and on behalf of all survivors of Anthony J. Fallone;

MAUREEN FANNING, as Administrator
of the Estate of John Fanning, Deceased
and on behalf of all survivors of John Fanning;

JEANINE LONG FRAZIER, as Administrator
of the Estate of Clyde Frazier, Jr., Deceased
and on behalf of all survivors of Clyde Frazier, Jr.;

ROBIN A. FREUND, as Fiduciary
of the Estate of Peter L. Freund, Deceased
and on behalf of all survivors of Peter L. Freund;

KENNETH R. FRIED, as Administrator
of the Estate of Arlene E. Fried, Deceased
and on behalf of all survivors of Arlene E. Fried;

MEREDITH FRY, as Executor
of the Estate of Peter C. Fry, Deceased
and on behalf of all survivors of Peter C. Fry;

FRANCINE GALLAGHER, as Administrator
of the Estate of John Patrick Gallagher, Deceased
and on behalf of all survivors of John Patrick Gallagher;

CANDY GALSER, as Administrator
of the Estate of Edmund Glazer, deceased
and on behalf of all survivors of Edmund Glazer;

ANTONIA GARGANO, as Personal Representative
of the Estate of Rocco Nino Gargano, Deceased
and on behalf of all survivors of Rocco Nino Gargano;

JILL GARTENBERG, as Administrator
of the Estate of James M. Gartenberg, Deceased
and on behalf of all survivors of James M. Gartenberg;

MICHELLE GELINAS, as Personal Representative
of the Estate of Peter Gelinas, Deceased
and on behalf of all survivors of Peter Gelinas;*

DEBRA GELLER, as Administrator
of the Estate of Steven Paul Geller, Deceased

and on behalf of all survivors of Steven Paul Geller;

SONDRA GIACCONE, as Personal Representative
of the Estate of Joseph Giaccone, Deceased
and on behalf of all survivors of Joseph Giaccone;

LACHANZE GOODING, as Personal Representative
of the Estate of Calvin Joseph Gooding, Deceased
and on behalf of all survivors of Calvin Joseph Gooding;

ROXANNE GREEN, as Administrator
of the Estate of Wade Green, Deceased
and on behalf of all survivors of Wade Green;

SUSAN MALLERY GURIAN, as Personal Representative
of the Estate of Douglas Brian Gurian, Deceased
and on behalf of all survivors of Douglas Brian Gurian;

THOMAS HANNON, as Personal Representative
of the Estate of Dana R. Hannon, Deceased
and on behalf of all survivors of Dana R. Hannon;

CAROL HARAN, as Personal Representative
of the Estate of James Haran, Deceased
and on behalf of all survivors of James Haran;

SHEILA G. HARRIS, as Executor
of the Estate of Stewart D. Harris, Deceased
and on behalf of all survivors of Stewart D. Harris;

WANDA HERNANDEZ, as Proposed Personal Representative
of the Estate of Monique DeJesus, Deceased
and on behalf of all survivors of Monique DeJesus;

ALLISON HOBBS, as Personal Representative
of the Estate of Thomas A. Hobbs, Deceased
and on behalf of all survivors of Thomas A. Hobbs;

JAMES S. HOFFMAN, as Personal Representative
of the Estate of Marcia Hoffman, Deceased
and on behalf of all survivors of Marcia Hoffman;

ROSEMARIE HOHMANN, as Executor
of the Estate of Jonathan R. Hohmann, Deceased

37

and on behalf of all survivors of Jonathan R. Hohmann;

CHRISTOPHER HOWARD, as Administrator
of the Estate of George Howard, Deceased
and on behalf of all survivors of George Howard;

BARRY JABLONSKI, as Administrator
of the Estate of Virginia Jablonski, Deceased
and on behalf of all survivors of Virginia Jablonski;

ROBERT B. JACKMAN, as Personal Representative
of the Estate of Brooke Alexandra Jackman, Deceased
and on behalf of all survivors of Brooke Alexandra Jackman;

JU-HSIU JIAN, as Administrator
of the Estate of Hweidar Jian, Deceased
and on behalf of all survivors of Hweidar Jian;

JAN L. KANDELL, as Personal Representative
of the Estate of Shari Kandell, Deceased
and on behalf of all survivors of Shari Kandell;

GEORGE KATSIMATIDES, as Personal Representative
of the Estate of John Katsimatides, Deceased
and on behalf of all survivors of John Katsimatides;

JUDITH KEANE, as Personal Representative
of the Estate of Richard Keane, Deceased
and on behalf of all survivors of Richard Keane;

JULIE E. KELLY, as Personal Representative
of the Estate of Timothy C. Kelly, Deceased
and on behalf of all survivors of Timothy C. Kelly;

SUSAN KELLY, as Personal Representative
of the Estate of Joseph Anthony Kelly, Deceased
and on behalf of all survivors of Joseph Anthony Kelly;

PAUL KIEFER, as Personal Representative
of the Estate of Brian Warner, Deceased
and on behalf of all survivors of Brian Warner;

DONNA KLITZMAN & SUSAN KLITZMAN, as
Personal Representatives of the Estate of Karen

38

Klitzman, Deceased and on behalf of all survivors
of Karen Klitzman;

HARLENE LARRY, as Adminstrator
of the Estate of Hamidou Larry, Deceased
and on behalf of all survivors of Hamidou Larry;

ANN LEAVY, as Personal Representative
of the Estate of Neil Leavy, Deceased
and on behalf of all survivors of Neil Leavy;

KAREN LEE, as Personal Representative
of the Estate of Richard Yun-Choon Lee, Deceased
and on behalf of all survivors of Richard Yun-Choon Lee;

DELORES LEGREE, as Personal Representative
of the Estate of Anthony Hawkins, Deceased
and on behalf of all survivors of Delores Legree;

MARIA LEGRO, as Personal Representative
of the Estate of Adriana Legro, Deceased
and on behalf of all survivors of Adriana Legro;

SUSAN LENOIR, as Executor
of the Estate of John Robinson Lenoir, Deceased
and on behalf of all survivors of John Robinson Lenoir;

CHRISTINE E. LeVEEN, as Personal Representative
of the Estate of Jeffrey E. LeVeen, Deceased
and on behalf of all survivors of Jeffrey E. LeVeen;

MARIE LUKAS, as Personal Representative
of the Estate of Marie Lukas, Deceased
and on behalf of all survivors of Marie Lukas;

MICHELLE LUNDEN, as Administrator
of the Estate of Michael Patrick Lunden, Deceased
and on behalf of all survivors of Michael Patrick Lunden;

LORRAINE MARCHESE, as Personal Representative
of the Estate of Laura A. Giglio a/k/a
Laura Marchese, Deceased, and on behalf of all
survivors of Laura A. Giglio a/k/a Laura Marchese;

JUAN MARTINEZ, as Personal Representative
of the Estate of Waleska Martinez, Deceased
and on behalf of all survivors of Waleska Martinez;

PEARL MAYNARD, as Representative
of the Estate of Keithroy Maynard, Deceased
and on behalf of all survivors of Keithroy Maynard;

BETTY ANN McCARTHY, as Personal Representative
of the Estate of Justin McCarthy, Deceased
and on behalf of all survivors of Justin McCarthy;

WILLIAM McCARTHY, as Personal Representative
of the Estate of Michael McCarthy, Deceased
and on behalf of all survivors of Michael McCarthy;

SUSAN McDERMOTT, as Personal Representative
of the Estate of Matthew J. McDermott, Deceased
and on behalf of all survivors of Matthew J. McDermott;

MARY BETH McERLEAN, as Personal Representative
of the Estate of John T. McErlean, Jr., Deceased
and on behalf of all survivors of John T. McErlean, Jr.;

MARY S. McGOVERN, as Administrator
of the Estate of William McGovern, Deceased
and on behalf of all survivors of William McGovern;

GEORGE McLAUGHLIN, as Personal Representative
of the Estate of George McLaughlin III, Deceased
and on behalf of all survivors of George McLaughlin III;

ANNE McNEIL, as Executor
of the Estate of Martin Michelstein, Deceased
and on behalf of all survivors of Martin Michelstein;

KOULA MERKOURIS, as Administrator
of the Estate of George Merkouris, Deceased
and on behalf of all survivors of George Merkouris;

DIANE MONAHAN, as Personal Representative
of the Estate of John Monahan, Deceased
and on behalf of all survivors of John Monahan;

ROBERTA MORELL, as Personal Representative
of the Estate of George Morell, Deceased
and on behalf of all survivors of George Morell;

NANCY MORONEY, as Administrator
of the Estate of Dennis Moroney, Deceased
and on behalf of all survivors of Dennis Moroney;

LORRAINE MOSICAL, as Personal Representative
of the Estate of William Mosical, Deceased
and on behalf of all survivors of William Mosical;

ELIZABETH MURPHY, as Personal Representative
of the Estate of Charles A. Murphy, Deceased
and on behalf of all survivors of Charles A. Murphy;

JUDITH BRAM MURPHY, as Personal Representative
of the Estate of Brian Murphy, Deceased
and on behalf of all survivors of Brian Murphy;

GAIL MYHRE, as Personal Representative
of the Estate of Richard Todd Myhre, Deceased
and on behalf of all survivors of Richard Todd Myhre;

ENRICA NACCAROTO, as Personal Representative
of the Estate of Lorraine Lisi, Deceased
and on behalf of all survivors of Lorraine Lisi;

DAVID DWIGHT NELSON and SHARON
BAKER-GUAL, as co-Personal Representatives
of the Estate of Kerene Gordon, Deceased
and on behalf of all survivors of Kerene Gordon;

MANUELA OCTAVIA NITA-GALLO, as Administrator
of the Estate of Cono Gallo, Deceased
and on behalf of all survivors of Cono Gallo;

ARLINE NUSSBAUM, as Personal Representative
of the Estate of Jeffrey Nussbaum, Deceased
and on behalf of all survivors of Jeffrey Nussbaum;*

DENNIS O'CONNOR, as Administrator
of the Estate of Dennis O'Connor, Jr., Deceased
and on behalf of all survivors of Dennis O'Connor, Jr.

41

LYNNE O'CONNOR, as Personal Representative
of the Estate of Richard O'Connor, Deceased
and on behalf of all survivors of Richard O'Connor;

JOSEPH O'KEEFE, as Administrator
of the Estate of Lesley Thomas, Deceased
and on behalf of all survivors of Lesley Thomas;

HOLLY D. O'NEILL, as Administrator
of the Estate of Sean Gordon O'Neill, Deceased
and on behalf of all survivors of Sean Gordon O'Neill;

SHEILA MARIE G. ORNEDO, as Representative
of the Estate of Ruben S. Ornedo, Deceased
and on behalf of all survivors of Ruben S. Ornedo;

TRACY ORR, as Administrator
of the Estate of Alexander Steinman, Deceased
and on behalf of all survivors of Alexander Steinman;

JOANNA OSTROWSKI, as Administrator
of the Estate of James Robert Ostrowski, Deceased
and on behalf of all survivors of James Robert Ostrowski;

KENNETH OSWALD, as Personal Representative
of the Estate of Jason Oswald, Deceased
and on behalf of all survivors of Jason Oswald;

SUSAN OU, as Personal Representative
of the Estate of Michael Ou, Deceased
and on behalf of all survivors of Michael Ou;

KATHLEEN OWENS, as Personal Representative
of the Estate of Peter Owens, Deceased
and on behalf of all survivors of Peter Owens;*

YVETTE PABON, as Personal Representative
of the Estate of Angel Pabon, Deceased
and on behalf of all survivors of Angel Pabon;

BLANCA GUTIERREZ DE PAZ, as Personal Representative
of the Estate of Victor Hugo Paz Gutierrez, Deceased
and on behalf of all survivors of Victor Hugo Paz Gutierrez;

42

BOBBIE CATHERINE PEAK, as Administrator
of the Estate of Stacey Peak, Deceased
and on behalf of all survivors of Stacey Peak;

SOPHIE PELLETIER, as Personal Representative
of the Estate of Mike Pelletier, Deceased
and on behalf of all survivors of Mike Pelletier;

LOURDES PEREZ-BERKELEY, as Personal Representative
of the Estate of Michael J. Berkeley, Deceased
and on behalf of all survivors of Michael J. Berkeley;

PATRICIA PERRONCINO, as Administrator
of the Estate of Joseph Perroncino, Deceased
and on behalf of all survivors of Joseph Perroncino;

JOSEPH PERROTTA, as Personal Representative
of the Estate of Edward Joseph Perrotta, Deceased
and on behalf of all survivors of Edward Joseph Perrotta;

BERNARD PHAIR, as Personal Representative
of the Estate of Joann Cregan, Deceased
and on behalf of all survivors of Joann Cregan;

MURRAY C. PITT and ERIN PITT RICHARDS,
as Co-Administrators of the Estate of Gregory
Richards, Deceased and on behalf of all survivors
of Gregory Richards;

SUSAN PRUNTY, as Administrator
of the Estate of Richard Prunty, Deceased
and on behalf of all survivors of Richard Prunty;

JODI RIVERSO, as Administrator
of the Estate of Joseph R. Riverso, Deceased
and on behalf of all survivors of Joseph R. Riverso;

ELAINE RIZZA, as Administrator
of the Estate of Paul Rizza, Deceased
and on behalf of all survivors of Paul Rizza;

KATHERINE ROBSON, as Personal Representative
of the Estate of Donald A. Robson, Deceased
and on behalf of all survivors of Donald A. Robson;

43

ESTHER RODRIGUEZ, as Public Administrator
of the Estate of Peter A. Bielfeld, Deceased
and on behalf of Brittany Bielfeld, a minor and
Therese Clarner, individually and as guardian
ad litem for Brittany Bielfeld;

RONALD R. ROHNER, as Administrator
of the Estate of Scott W. Rohner, Deceased
and on behalf of all survivors of Ronald R. Rohner;

ALISSA ROSENBERG-TORRES, ad Administrator
of the Estate of Luis Eduardo Torres, Deceased
and on behalf of all survivors of Luis Eduardo Torres;

MICHELE SAND, as Personal Representative
of the Estate of Eric Sand, Deceased
and on behalf of all survivors of Eric Sand;

JOSEPH SANTO, as Administrator
of the Estate of Susan Santo, Deceased
and on behalf of all survivors of Susan Santo;

SHEILA SCANDOLE, a Personal Representative
of the Estate of Robert L. Scandole, Deceased
and on behalf of all survivors of Robert L. Scandole;

KENNETH G. SCHIELKE, as Personal Representative
of the Estate of Sean Schielke, Deceased
and on behalf of all survivors of Sean Schielke;

JEFFREY SCHORPP, as Administrator
of the Estate of Marisa DiNardo, Deceased
and on behalf of all survivors of Marisa DiNardo;

PATRICIA B. SCHWARTZ, as Administrator
of the Estate of Mark Schwartz, Deceased
and on behalf of all survivors of Mark Schwartz;

CHARLES SCIBETTA, as Personal Representative
of the Estate of Adrianne Scibetta, Deceased
and on behalf of all survivors of Adrianne Scibetta;

CATHERINE SCULLIN, as Personal Representative

of the Estate of Arthur Warren Scullin, Deceased
and on behalf of all survivors of Arthur Warren Scullin;

LEONOR SHAHID and SYED SHAHID, as
co-Administrators of the Estate of Khalid Shahid, Deceased
and on behalf of all survivors of Khalid Shahid;

JYOTHI SHAH, as Administrator
of the Estate of Jayesh Shah, Deceased
and on behalf of all survivors of Jayesh Shah;

BENJAMIN SHAMAY, as Administrator
of the Estate of Gary Shamay, Deceased
and on behalf of all survivors of Gary Shamay;

JANINE SNYDER, as Administrator
of the Estate of Leonard Snyder, Deceased
and on behalf of all survivors of Leonard Snyder;

LAWAN SRINUAN and CHALERMCHAI SRINUAN,
as Co-Administrators of the Estate of Saranya Srinuan
and on behalf of all survivors of Saranya Srinuan;

DANIEL STAN, as Administrator
of the Estate of Alexandru Stan, Deceased
and on behalf of all survivors of Alexandru Stan;

PATRICIA A. STRAINE, as Personal Representative
of the Estate of James J. Straine, Jr., Deceased
and on behalf of all survivors of James J. Straine;

SUZANNE SWAINE, as Personal Representative
of the Estate of John F. Swaine, Deceased
and on behalf of all survivors of John F. Swaine;

MIDORI TAKAHASHI, as Personal Representative
of the Estate of Keiji Takahashi, Deceased
and on behalf of all survivors of Keiji Takahashi;

EMILY TERRY, as Personal Representative
of the Estate of Andrew Kates, Deceased
and on behalf of all survivors of Andrew Kates;

THOMAS EDWARD TIGHE, as Personal Representative

45

of the Estate of Diane T. Lipari, Deceased
and on behalf of all survivors of Diane T. Lipari;

KATHLEEN TRANT, as Administrator
of the Estate of Daniel Trant, Deceased
and on behalf of all survivors of Daniel Trant;

MARY TSELEPIS, as Personal Representative
of the Estate of William P. Tselepis, Deceased
and on behalf of all survivors of William P. Tselepis;

JULIE UMAN, as Personal Representative
of the Estate of Jonathan Uman, Deceased
and on behalf of all survivors of Jonathan Uman;

PATRICIA VILARDO, as Administrator
of the Estate of Joseph Vilardo, Deceased
and on behalf of all survivors of Joseph Vilardo;

STANLEY WEINSTEIN, as Administrator
of the Estate of Lisa Karen Orfi-Ehrlich, Deceased;
and on behalf of all survivors of Lisa Karen Orfi-Ehrlich;

CAROL WISNIEWSKI, as Administrator
of the Estate of Frank Thomas Wisniewski, Deceased
and on behalf of all survivors of Frank Thomas Wisniewski;

KATHLEEN M. WIK, as Administrator
of the Estate of William J. Wik, Deceased
and on behalf of all survivors of William J. Wik;

CHARLES WOLFE, as Administrator
of the Estate of Katherine Wolfe, Deceased
and on behalf of all survivors of Katherine Wolfe;

KAREN WORTLEY, as Administrator
of the Estate of Martin Wortley, Deceased
and on behalf of all survivors of Martin Wortley;

DYAN ZINZI, as Personal Representative
of the Estate of Michael Zinzi, Deceased
and on behalf of all survivors of Michael Zinzi;

CAROL ZION, as Personal Representative

of the Estate of Charles A. Zion, Deceased
and on behalf of all survivors of Charles A. Zion;

WILLIAM STEVEN GOLDSTEIN
TIMOTHY MOLCZYK
JOHN DRISCOLL
LADWIN BRISSETT*
ELLEN McQUEEN*
MARIE POLITE*
CHRISTOPHER SPARCIA*
JILL FENWICK*
SEAN GENOVESE
DANIEL J. PRITZKER
BRIAN J. SULLIVAN
THOMAS McHUGH
JAMES J. BARANEK
ROBERT RENODE, JR.
GEORGE E. MANNING
HILDA VALENTINE
HARRY WAIZER
MARIA WARD
PETER MOLNAR
* Co-Counsel Soberman & Rosenberg


DEBORAH AMATO, as Personal Representative
of the Estate of James A. Amato, Deceased
and on behalf of all survivors of James A. Amato;

SANDRA BURNSIDE, as Personal Representative
of the Estate of John P. Burnside, Deceased
and on behalf of all survivors of John P. Burnside;

WARREN COLODNER, as Executor
of the Estate of Patricia M. Colodner, Deceased
and on behalf of all survivors of Patricia M. Colodner;

JEAN C. FISCHER, as Personal Representative
of the Estate of John R. Fischer, Deceased
and on behalf of all survivors of John R. Fischer;

LISA PALAZZO, as Personal Representative
of the Estate of Thomas Palazzo, Deceased

47

and on behalf of all survivors of Thomas Palazzo;

RICHARD A. PITINO, as Executor
of the Estate of William G. Minardi, Deceased and
on behalf of all survivors of William G. Minardi;

WILLIAM F. REILLY, as Administrator of the
Estate of James Brian Reilly, Deceased and on
behalf of all survivors of James Brian Reilly;

LINDA SARLE, as Adminstrator of the
Estate of Paul F. Sarle, Deceased and on
behalf of all survivors of Paul F. Sarle;

ELLEN SHEA, as Executor of the Estate of Daniel
James Shea, Deceased, and on behalf of all survivors of
Daniel James Shea;

LORRAINE SPEAR, as Personal Representative
of the Estate of Robert W. Spear, Deceased
and on behalf of all survivors of Robert W. Spear;

DIANE STARITA, as Personal Representative of
the Estate of Anthony Starita, Deceased and on behalf of
all survivors of Anthony Starita;

HARUMI TAKAHASHI,as Personal Representative of
the Estate of Keiichiro Takahashi, Deceased
and on behalf of all survivors of Keiichiro Takahashi,


MARIA ARYEE, as Administrator
of the Estate of Japhet Aryee, Deceased
and on behalf of all survivors of Japhet Aryee;

JoANN ATLAS, as Personal Representative
of the Estate of Gregg Arthur Atlas, Deceased
and on behalf of all survivors of Gregg Arthur Atlas;

VLADIMIR BASIN, as Administrator
of the Estate of Inna Basin, Deceased
and on behalf of all survivors of Inna Basin;

48

PAULINE and CHARLES LESLIE BERKELEY,
as Personal Representatives of the Estate of
Graham Berkeley, Deceased  and on behalf of all
survivors of Graham Berkeley;**

PAULA BERRY, as Administrator
of the Estate of David S. Berry, Deceased
and on behalf of all survivors of David S. Berry;

JOLANTA BOYARSKY, as Administrator
of the Estate of Gennady Boyarsky, Deceased
and on behalf of all survivors of Gennady Boyarsky;

PHILIP G. BRADSHAW, as Executor
of the Estate of Sandra W. Bradshaw, Deceased
and on behalf of all survivors of Sandra W. Bradshaw;

SUSAN CARROLL, as Administrator
of the Estate of Kevin Colbert, Deceased
and on behalf of all survivors of Kevin Colbert;

PATRICIA DEAN, as Personal Representative
of the Estate of WILLIAM DEAN, Deceased
and on behalf of all survivors of William Dean;

WILLIAM A. DREIER and MARY WRIGHT, as
Co-Administrators of the Estate of Neil Wright, Deceased
and on behalf of all survivors of Neil Wright;

IRINA DUBENSKAYA, as Administrator
of the Estate of Eugueni Kniazev, Deceased
and on behalf of all survivors of Eugueni Kniazev;

ZHANNA GALPERINA, as Administrator
of the Estate of Arkady Zaltsman, Deceased
and on behalf of all survivors of Arkady Zaltsman;

RANULFO and RENEE GAMBOA, as Personal
Representatives of the Estate of David R. Brandhorst
Gamboa, Deceased and on behalf of all survivors of

49

David R. Brandhorst**

RACHEL W. GOODRICH, as Personal Representative
of the Estate of Peter M. Goodrich, Deceased
and on behalf of all survivors of Peter M. Goodrich;

BOBBY GRIFFIN, as Personal Representative
of the Estate of Tawanna Griffin, Deceased
and on behalf of all survivors of Tawanna Griffin;**

GWYNETTA HURST, as Personal Representative
of the Estate of Shannon Lewis Adams, Deceased
and on behalf of all survivors of Shannon Lewis Adams,

LILLIAN ILLOWITZ, as Administrator
of the Estate of Abraham Ilowitz, Deceased
and on behalf of all survivors of Abraham Ilowitz;

ELLA KHALIF, as Administrator
of the Estate of Boris Khalif, Deceased
and on behalf of all survivors of Boris Khalif;

JIN HEE KIM, as Personal Representative of the
Estate of Hyun Joon Lee, Deceased, and
on behalf of all survivors of Hyun Joon Lee;

PAUL KIM, as Personal Representative of the
Estate Andrew Jay-Hoon Kim, Deceased, and
on behalf of all survivors of Andrew Jay-Hoon Kim;

ARSEN KOLPAKOV, as Administrator
of the Estate of Irina Kolpakova, Deceased
and on behalf of all survivors of Irina Kolpakova;

NADADUR S. KUMAR, as Administrator
of the Estate of Pendyala Vamsikrishna, Deceased
and on behalf of all survivors of Pendyala Vamsikrishna;

NADADUR S. KUMAR, as Administrator
of the Estate of Prasanna Kalahasthi, Deceased

50

and on behalf of all survivors of Prasanna Kalahasthi;

NATALYA LOGINOVA, as Administrator
of the Estate of Alexey Razuvaev, Deceased
and on behalf of all survivors of Alexey Razuvaev;

SHARI MAIO, as Personal Representative
of the Estate of Joseph Daniel Maio, Deceased
and on behalf of all survivors of Joseph Daniel Maio;**

RAYNETTE MASCARENHAS, as Executor
of the Estate of Bernard Mascarenhas, Deceased
and on behalf of all survivors of Bernard Mascarenhas
including Sven Herman Mascarenhas and
Jaclyn Anne Marie Mascarenhas;

MARJORIE BETH MILLER, as Administrator
of the Estate of Joel Miller, Deceased
and on behalf of all survivors of Joel Miller;

SURI MORGENSTERN, as Administrator
of the Estate of Nancy Morgenstern, Deceased
and on behalf of all survivors of Nancy Morgenstern;

CATHY MUROLO, as Personal Representative
of the Estate of Marc Murolo, Deceased
and on behalf of all survivors of Marc Murolo,

MARY NICHOLSON, as Personal Representative
of the Estate of M. Kathleen Shearer, Deceased
and on behalf of all survivors of M. Kathleen Shearer;

MARY NICHOLSON, as Personal Representative
of the Estate of Robert Shearer, Deceased
and on behalf of all survivors of Robert Shearer;

GEORGE NICOSIA, as Administrator
of the Estate of Kathleen Anne Nicosia, Deceased,
and on behalf of all survivors of Kathleen Anne Nicosia,

51

FRANK K. PEZZUTI, as Personal Representative
of the Estate of Kaleen E. Pezzuti, Deceased
and on behalf of all survivors of Kaleen E. Pezzuti,

VIVIAN BETH REUBEN, as Personal Representative
of the Estate of Todd H. Reuben, Deceased
and on behalf of all survivors of Todd H. Reuben;**

VASILIY RIJOV, as Administrator
of the Estate of Tatiana Rijov Deceased
and on behalf of all survivors of Tatiana Rijov;

ILIA RODRIGUEZ, as Personal Representative
of the Estate of Carlos R. Lillo, Deceased
and on behalf of all survivors of Carlos R. Lillo;**

LAUREN ROSENZWEIG, as Administrator
of the Estate of Philip Rosenzweig, Deceased
and on behalf of all survivors of Philip Rosenzweig

MARIA L. RYAN, as Administrator
of the Estate of Jonathan S. Ryan, Deceased
and on behalf of all survivors of Jonathan S. Ryan;

KIM STATKEVICUS, as Administrator of
the Estate of Derek J. Statkevicus, Deceased
and on behalf of all survivors of Derek J. Statkevicus,

JILL K. TARROU, as Personal Representative
of the Estate of Michael C. Tarrou, Deceased
and on behalf of all survivors of Michael C. Tarrou;**

FRANK TAYLOR, as Personal Representative
of the Estate of Lorisa Taylor, Deceased
and on behalf of all survivors of Lorisa Taylor;

KIMBERLY TRUDEL, as Administrator
of the Estate of Fred Rimmele, Deceased
and on behalf of all survivors of Fred Rimmele;

**Co-Counsel Podhurst Orseck

LAURA BACARELLA
ISRAEL HALPERN,

---------------------------------------------------------------------x
ARLENE BEYER, as Representative
of the Estate of Arlene Beyer, Deceased
and on behalf of all survivors of Arlene Beyer;                    **02 CV 6978 (RCC)**

SUSAN CORREA, as Representative                        **Kreindler & Kreindler LLP**
of the Estate of Ruben Correa, Deceased                **Barasch McGarry Salzman**
and on behalf of all survivors of Ruben Correa;        **Penson & Lim**

EILEEN GERATY, as Administrator
of the Estate of Suzanne Geraty, Deceased
and on behalf of all survivors of Suzanne Geraty;

DONNA HICKEY, as Representative
of the Estate of Brian Hickey, Deceased
and on behalf of all survivors of Brian Hickey;

JENNIFER MINGIONE, as Representative
of the Estate of Thomas Mingione, Deceased
and on behalf of all survivors of Thomas Mingione;

PATRICK J. MULLAN, as Representative
of the Estate of Michael Mullan, Deceased
and on behalf of all survivors of Patrick J. Mullan;

JENNIFER REILLY, as Representative
of the Estate of Kevin Reilly, Deceased
and on behalf of all survivors of Kevin Reilly;

MARY ILL, as Representative
of the Estate of Frederick J. Ill, Jr., Deceased
and on behalf of all survivors of Frederick J. Ill, Jr.;

MARCELLA LEAHY, as Representative
of the Estate of James P. Leahy, Deceased
and on behalf of all survivors of James P. Leahy;

JOY & WILLIAM JOHNSON, as Representatives
of the Estate of William Johnson, Jr., Deceased

and on behalf of all survivors of William Johnson, Jr.;

STEPHEN SAUCEDO, as Representative
of the Estate of Gregory Saucedo, Deceased
and on behalf of all survivors of Gregory Saucedo;

DENA SMAGALA, as Representative
of the Estate of Stanley Smagala, Deceased
and on behalf of all survivors of Stanley Smagala;

CARMEN SUAREZ, as Representative
of the Estate of Ramon Suarez, Deceased
and on behalf of all survivors of Ramon Suarez;

PAULETTE ROBERTS and THOMAS ROBERTS as
Co- Representatives of the Estate of Michael E. Roberts,
Deceased and on behalf of all survivors of Michael E. Roberts

BARBARA ANN SWAT, as Representative
of the Estate of Gerald Thomas Atwood, Deceased,
and on behalf of all survivors of Gerald Thomas Atwood

LAURA WEINBERG, as Representative
of the Estate of Richard Aronow, Deceased,
and on behalf of all survivors of Richard Arnow

**FDNY**
ANTHONY ACCARDO, LUIS ACEVEDO, PETER
ACQUAFREA, MICHAEL AGOVINO, KENNETH
AHLERS, THOMAS AKERBERG, RICHARD ALLES,
ROBERT ANNUNZIATO, VINCENT ANDERSON,
ANDREW ANSBRO, HARRY ANTONOPOULOS,
SALVATORE ANZALONE, LAWRENCE ARCHER,
JOSEPH ASTARITA, CHRISTOPHER ATTANASIO,
ANTHONY AUCIELLO, JOSEPH BACHERT,
MICHAEL  BAILEY, AUGUSTIN BALARAM,
WEST BALLOU, RICHARD BANAT, PAUL
BARBARA, PAUL BARDO, THOMAS BAROZ,
ROBERT BARRETT, BRUCE BARVELS, STEVEN
BASCELLI, PAUL BASSO, ANDREW BEARD,
MARIO BELL, JOHN BELMONTE, TIMOTHY
BENNETT, JOSEPH BENNETT, JAMES BERGEN,
JOSEPH BERING, CHARLES BERNARDI, DANIEL

54

BEYAR, GEORGE BEYER, GREGORY BIERSTER,
JOSEPH BISERTA, WILLIAM BLAICH, PETER BLAICH,
SUSAN BLAKE, MARK BLANCHARD, GODFREY BLYTHE,
JOHN BONGIORNO, REGINALD BONNER, MARK
BONSANTI, ROBERT BORNHOEFT, NICHOLAS BORRILLO,
GEORGE BRAADT, MANUEL BRACERO, JAMES BRADY,
THOMAS BRADY, JOSEPH BREEN, GERALD BRENKERT,
JAMES BRENNAN, RONALD BRENNEISEN, VITO
BRINZO, MICHAEL BRODY, CHRISTOPHER
BROUGHTON, PETER BROWN, RAYMOND BROWN,
JAMES BRUNO, GREG BRUNO, DAVID BRUNSDEN,
JOHN BYRNES, MICHAEL BUCKLEY, VINCENT
BUONOCORE, MATTHEW BUONO, JAMES BURKE,
WILLIAM BURKE, THOMAS BURKE, ROBERT BURNS,
FRANCIS CALABRO, ROBERT CALISE, RICHARD
CAMIOLO, ERNANDO CAMACHO, RONALD
CAMMARATA, RICHARD CAMPBELL, BRYAN
CAMPBELL, ATTHEW CAMPISI, VINCENT CANALE,
VICTOR CANTELMO, MICHAEL CAPASSO,
CHARLES CAPLE, DAVID CAPUTO, HARRY
CARDIO,  PATRICK CAREY, PETER CARINO,
WILLIAM CARLSON, ANGEL CARRERO,
WILLIAM CARLSON, WILLIAM CARROLL,
JOHN CARROLL, ROBERT CARUSO, JOSEPH
CASALIGGI, DONALD CASEY, JAMES CASH,
STEPHEN CASSE, JOHN CASSIDY, STEPHEN
CASSIDY, GREGORY CASTELLANO,  JOSEPH
CESTARI, ANTHONY CHAIMOWITZ, DINO CHIRCO,
SHERWIN CHOW, JEFFREY CHRISTENSEN,
ROBERT CHRISTY, FRANK CIARAVINO, RAYMOND
CLANCY, DONALD CLARK, DENNIS CLARKE,
BRIAN CLARO, JAMES CODY, ROBERT COLLIGAN,
CARMELO COMPOSTO, STEPHEN CONKLIN,
DAVID CONLIN, KEVIN CONNELLY, THOMAS
CONNOLLY, MICHAEL CONNOLLY, WILLIAM
CONNOLLY, STEVEN CONNOR, KENNETH COOK,
MICHAEL J.CORRIGAN, JR., MICHAEL CORRIGAN,
CHRISTOPHER CORSI, EDWARD COSTELLO,
ROY COTIGNOLA, PATRICK COTTON, JOHN
COUGHLIN, CHRISTOPHER COUGHLIN, RICHARD
COYLE, OMAR CRISOSTOMO, CHARLES CROCCO,
PATRICK CULLEN, RICHARD CURIEL,
EDWARD CUTTING, DENNIS CZECZOTKA,
KENNETH D'ALBERO, PETER D'ANCONA,

DOMINIC D'ARRIGO, STEVEN DAHLSTROM,
JOHN DALY, DANIEL DALY, THOMAS DAMORE,
ARTHUR DARBY, KEVIN DARCY, GERARD DAVAN,
JOSEPH DAWSON, RODNEY DECORT, FRANCIS
DEFEO, WILLIAM DELEHANTY, JAMES DePAOB,
ROBERT DeSANDIS, RAYMOND DIAZ, MARK
DiMAGGIO, RICHARD DIORIO, CHARLES DiRICO,
KEVIN DOHERTY, THOMAS DOHERTY, MICHAEL
DOLAN, MICHAEL DONOHUE, WILLIAM DONOHUE,
MICHAEL DONOVAN, MICHAEL DORGAN, JAMES
DORMAN, JOHN DOUGHERTY, LEONARD DRAVES,
JOSEPH DRISCOLL, RICHARD DRISCOLL, KEVIN
DUFFY, JOHN DUNN, JOSEPH DUNN, THOMAS DUNN,
WILLIAM DUNN, JAMES EFTHIMIADES, ERNEST
EHLBERG, GREG EINSFELD, JAMES ELMENDORF,
KENNETH ERB, DAVID FARRAN, FRANCIS FEEHAN,
JAMES FEELEY, TERRY FELRICE, DANIEL FENNELL,
THOMAS FERRANOLA, TERENCE FINNERMAN,
FRANK FIORE, CHRISTOPHER FISCHER, ROBERT
FITHIAN, DAVID FITTON, MIKE FITZPATRICK,
PATRICK FITZSIMMONS, WILLIAM FLAHERTY,
THOMAS FLEMING, DONALD FLORE, DANIEL
FLORENCO, MICHAEL FLYNN, JOHN FLYNN,
JOSEPH FLYNN, RICHARD FLYNN, WILLIAM FODER,
GREGORY FODOR, DANIEL FOLEY, FRANK
FONTAINO, WARREN FORSYTH, CHARLES
FORTIN, ANTHONY FRACHIOLLA, PETER FRANK,
SCOTT FRAZIER, FREDERICK FUCHS, ALFREDO
FUENTES, DANIEL FURLAND, JOHNNY GAGLIANO,
JOHN GAINE, JACK GALANTE, ANDREW GALASSO,
JAMES GALLICCHIO, ANTHONY GALLO, EDWARD
GANASSA, ANDREW GARGIULO, WAYNE GARGIULO,
JOHN GARNETT, ROBERT GAROFOLO, STEPHEN
GAUDUT, CHRISTOS GEORGE, PAUL GERMANN,
THOMAS GERRISH, PETER GIAMMARINO,
KENNETH GIANNELLI, SALVATORE GIGANTE,
JOSEPH GILDEN, MICHAEL GIMPEL, CRAIG
GIUFFRE, ROBERT GLEASON, WILLIAM
GLEASON, KEVIN GLOCK, PETER GLOWACZ,
DONALD GOLLER, TONY GONZALEZ, JOHN
GORGONE, MICHAEL GORMAN, PATRICK
GORMAN, WILLIAM GORMAN, RICHARD GOULD,
MICHAEL GRACE, CHRISTOPHER GREEN,
WILLIAM GREEN, ROBERT GRELL, DANIEL

GROGUL, KEITH GROSS, KRISTEN GROSS,
DANIEL GROSSI, MICHAEL GUARDINO, FRANK
GUNTHER, MICHAEL GURNICK, LUIS GUTIERREZ,
PAUL HAARMAN, JAMES HALABY, PAUL HALEY,
KENNETH HANSEN, SCOTT HANSON, MICHAEL
HARRIS, ROBERT HARTIE, BRIAN HARVEY,
LEROY HAYNES, MELFORD HAZEL, JAMES HEAL,
GEORGE W. HEAR, STEPHEN HEAVEY, GREGORY
HELFER, EUGENE HENDERSON, THOMAS HENRY,
JOHN HENRICKSEN, JOHN HENRY, WILLIAM HERLIHY,
HERBERT HICKEY, SEAN HICKEY, PATRICK HICKEY,
JOSEPH HIGGINS, WILLIAM HOAG, ROBERT HOFER,
JOHN HOLOHAN, TIMOTHY  HOPPEY, BRYAN HORAN,
MICHAEL HORAN, ANDREW HORNBUCKLE,
ROBERT HOURICAN, EDWARD HRONEC,
ROBERT HUMPHREY, JAMES HURON, MICHAEL
IANNAZZO, MICHAEL INCANTALUPO, LLOYD
INFANZON, WILLIAM INGRAM, EDWARD IRELAND,
PETER JAKUBOWSKI, JOSEPH JANKUNIS, RICHARD
JANOSCAK, MATTHEW JASKO, WILLIAM
JENNERICH, LAWRENCE JENSEN, PETER
JENSEN, STANLEY JESSAMINE, PAUL JOHNSEN,
KEITH JOHNSON, NATHANIAL JOHNSON,
ROBERT JOHNSTON, JEFFREY JONES,
NIELS JORGENSEN, JOHN JOYCE, WILLIAM JUTT,
JOSEPH KADILLAK, GARY KAKEH, WILLIAM,
KALLETTA, THOMAS KANE, JAMES KAY,
DANIEL KEANE, KENNETH KEARNS,
ROBERT KEATING, WILLIAM KEEGAN,
THOMAS KEERY, ROBERT KELLER, JAMES
KELLY, JOHN KELLY, MICHAEL KELLEHER,
JOHN KELTON, DANIEL KEMMET, SR.,
DANIEL KEMMET, JR., MICHAEL KEMPER,
JOSEPH KENNEDY, DENNIS KERBIS, KENNETH
KERR, JOHN KIELTY, JOSEPH KILLEEN,
CHRISTOPHER KING, JOHN KIRK, WINFIELD
KLUTH, WILLIAM KNOTH, ERIC KNUTSEN,
CRAIG KOBES, CHARLES KOTOV, WALTER
KOWALCEZYK, MICHAEL KOZAK, STEVEN
KRAKOWER, RICHARD KUERNER, JOHN
LaBARBERA, ROBERT LACEY, ERIK LAHODA,
LANCE LaMAZZA, RAYMOND LAMBDIN,
RICHARD LANG, MICHAEL LaROSA,
JOSEPH LAVIN, PATRICK LAVIN,

WILLIAM LEAHY, FRANK LEANDRO,
EDWARD LEE,  CHRISTOS LEFKADITIS,
JAMES LEIBMAN, JOSEPH LEMBO,
RICHARD LeMONDA, KEVIN LENAHAN,
JOHN LENIHAN, HUGH LENNON,
JOHN LEVENDOSKY, RONALD LITTLEJOHN,
LANCE LIZZUL, ROBERT LODATO, EDWARD
LOEHMANN, FRANK LOMBARDI, MICHAEL
LOMBARDI, GEORGE LONERGAN, STEPHEN
LONERGAN, ROBERT LOPEZ, MICHAEL
LoPORCARO, VINCENT LOUIS, JOHN LOVETT,
VINCENT LUISI, STEVEN LUISI, ADAM LUTFI,
J. DAVID LYNN, THOMAS LYONS, GREGORY
MACAGNONE, JACK MACALUSO, PATRICK
MAHONEY, ANDRE MAJORS, CECIL MALONEY,
TIMOTHY MALONEY, ROBERT MANDIA,
THOMAS V. MANGUS, WILLIAM MANNION,
DANIEL MANOCHIO, LEON MARASHAJ,
EDMOND MARCOUX, ROBERT MARCOUX,
RICHARD  MARGINO, JOHN MARR, MICHAEL
MARTORANA, DANIEL MATTEO, SHAWN MAY,
ROBERT MAYNES, GARY MAZALATIS,
JOSEPH MAZZARELLO, SEAN McBRIEN,
JAMES McBURNEY, EDWARD McCABE,
KEVIN McCABE, STEVEN McCAFFERY,
THOMAS McCAFFREY, EDWARD McCAMPHILL,
JOHN McCANN, NEIL McCARTHY, IRVING
McCOY, HAROLD McCLUTCHY, JOHN
McDONALD, KELLY McDONALD, KEVIN
McDOWELL, CHARLES McELHONE, PATRICK
McEVOY,  JoANN McFARLAND, PATRICK
McGIVNEY,  JOHN McGONIGLE, CORNELIUS
McGOVERN, KEVIN McGOWAN, ROBERT
McGUIRE, BRIAN McGUIRE,  THOMAS
McKENNA, SHAWN McKEON, JOHN McLAUGHLIN,
CHRISTOPHER McLAUGHLIN, WILLIAM
McLAUGHLIN, PAUL McMENAMY, JAMES
McNAMARA, JOHN McNAMARA, GARY
McNULTY, GERARD McPARLAND, ROBERT
MEADOWS, VINCENT MEDORDI, PAUL
MEDORDI, KEVIN MEEHAN, KEVIN MELODY,
JAMES MELVIN, RICHARD MEO, JOSEPH
MEOLA, NEIL MILLER, MICHAEL MILNER,
DERRICK MILONE, DONALD MIMNAUGH,

LOUIS MINUTOLI, MARK MISSALL,
JOHN MIXON,  JOSEPH MIYNARCZYK,
ANTHONY MODICA, FRANK MOLLICA,
JOHN MONGIELLO, JOSE MONTALVO,
KENNETH MOODY, GARY MOORE,
JAMES MORAN,  WILLIAM MORAN,
DONALD MORMINO, ROBERT MORRIS,
EDWARD MORRISSEY, JOHN MORRONGIELLO,
JOSEPH MOTTOLA, ANTHONY MUIA,
MARK MULLADY, KEVIN MULLANE,
WILLIAM MULLER, HUGH MULLIGAN,
KENNETH MULLIGAN, JAMES MULLINS,
DANIEL MULLINS, BRIAN MULRY,
LEONARD MUNDA, MICHAEL MUNOZ,
JONATHAN MURATH, JESSE MURPHY,
KEVIN MURPHY, ROBERT MURPHY,
PATRICK MURPHY, THOMAS MURPHY,
DANIEL MURRAY, KEVIN MURRAY,
GERARD MURTHA, ARTHUR MYERS,
RICHARD NAPLES, JOSEPH NAPOLI,
REYNALDO NARVAEZ, JOSEPH NARDONE,
ROBERT NEBEL, RALPH NEGRON,
JOHN NEWELL, STEVEN NEWMAN,
GERARD NICOLETTI, ALEXANDER NONEY,
RICHARD O'BRIEN, JOHN O'BRIEN,
SEAN O'BRIEN,  JOSEPH O'BRIEN,
JOHN O'CONNOR,  PATRICK O'CONNOR,
THOMAS O'CONNOR, WILLIAM O'CONNOR,
ROBERT O'DOWD, JOSEPH O'HARA,
BRIAN O'LEARY, THOMAS O'LEARY,
MICHAEL O'ROURKE, THOMAS O'ROURKE,
MICHAEL O'SULLIVAN, SEAN O'SULLIVAN,
RICHARD OBERMAYER, ROBERT OPALECKY,
JOSE ORTIZ, ARTHUR OSCHMANN, HARRY
OSTER, LUIS OSTOLOZAGA, GERARD PACE,
THOMAS PAIR, VINCENT PALMIERI,
RONALD PARKER, GREGORY PARR, SCOTT
PASKEWITZ, JOSEPH PASQUARELLO,
MICHAEL PASQUARELLO, DENNIS
PATTI, CHARLES VAN PELT,  GEORGE PEPE,
FRANK PEREZ, GREGORY PICCONI, ROBERT
PILLARELLA, GLEN PILLARELLA, CHRISTOPHER
PISANO, PERRY PIZZOLO, LEWIS PIZZULLI,
THOMAS PLANE, DEDIE PLASENCIA,

BRYAN PLATT, DOMINICK  POMA,
SALVATORE POMA, STEPHEN POSE,
LARRY PRATHER, KIRK PRITCHARD,
DENNIS PROSICK, ROBERT PUGLIESE,
RICHARD PULZONE, TIMOTHY QUIN,
JOSEPH QUINN, GLENN RADERMACHER,
ANDREW RASAVONGSZUK, LOUIS RAIMONDI,
DAVID RAYMOND, STEVEN RAZICKAS,
JOSUE RECIO, JAMES REDMOND, ROBERT REEG,
SHAUN REEN, JOHN REGAN, ROBERT REGAN,
STEPHEN REILLY,  KEVIN REILLY, MICHAEL
RELAY, MICHAEL REUTTER, ROBERT RICCIARDI,
MICHAEL RICCIARDI, STEPHEN RICCIO, JOHN
RICE, STEPHEN RICE, EUGENE RICE, ROCCO
RINALDI,  DAVID RIVAS, ALFRED RIVERA,
ROBERT RIVERA, THOMAS RIVICCI,
MATTHEW ROACH, GARY ROBBINS,
THOMAS ROBISKY, ROBERT ROCHFORD,
WILLIAM RODGERS, PETER  RODRIGUEZ,
STEVE ROGERS, BRUCE ROSS, DONALD ROZAS,
KEITH RUBY,  STEWART RUETER, JOSEPH
RUGGIRELLO, JAMES RULAND, BRIAN RUSSO,
SALVATORE RUSSO, VITO RUVOLO,  KEVIN
RYAN,  DENIS RYAN, HENRY RYAN,
EDWARD RZEMPOLVCH,JOSEPH SALADIS,
RUDY SANFILIPPO, JOHN SANJURJO,
JOSEPH SAPIENZA, JOSEPH SARDO, ARTHUR
SARTOR, MARK SARNES, LOUIS SARTINI,
PETER SAVARESE,  MICHAEL SCALARD,
THOMAS SCALLY, THOMAS SCAMBONE,
SALVATORE SCARENTINO, JOHN SCARSELLA,
RICHARD SCHLUECK, CLINTON  SCHMITTERER,
MICHAEL SCHREIBER, ROBERT SCHULZ,
VICTOR SCIARAPPA, ROBERT SCOTT,
MICHAEL SCULLY, JOSEPH SEENEY,
RICHARD SERE, WILLIAM SESSELMAN,
DAVID SGROMO, JAMES SHANNON,
MATTHEW SHANNON,  JAMES  SHEA,
KEVIN SHEEHAN, EDWARD SHEEHY,
ALPHONSE SICIGNANO, VINCENT SIMEONE,
DAVID SIMMS, AUGUSTINE SIMONCINI,
DENNIS SIRY, SCOTT SIVERT, ANTHONY
SKOMINA, JOSEPH SKONIECZNY, LEO
SKORUPSKI, GARY SLATTERY,  JAMES

SMAGALA, GERARD SMITH, JAMES SMITH,
MICHAEL SMITH, PATRICK SMITH, WARREN
SMITH, WILLIAM SMITH, GERALD SNELL,
RICHARD SNYDER, MARK SOLARI,
GERARD SOMERVILLE, STEVEN SORGER,
WALTER SORRENTI, DEAN SPADARO,
WILLIAM SPADE, ROBERT SPELLMAN,
ROBERT SPINELLI, BRIAN SPISTO,
THOMAS SPITZBARTH, FRANK SPRING,
BERTRAM SPRINGSTEAD, ROBERT SPUTH,
MICHAEL SPYNTIUK, ANTHONY SROUR,
EUGENE ST. JOHN, CLIFFORD STABNER,
BERTRAM STAHLBERG, JOHN STAIANO,
JAMES STANG, ROBERT STANTON,
JAMES STASIO, LOUIS STRANDBERG,
KEVIN STEININGER, BRIAN STRENGE,
RAY STRONG, BRIAN SULLIVAN, JAMES SULLIVAN,
PATRICK SULLIVAN, STEPHEN SULLIVAN,
STEVEN SUPEK, ERIC SUTTON, EDWARD
SWEENEY, JOSEPH SYKES, DENNIS TAAFFE,
DAVID TANZMAN, JOHN TEDESCO, MICHAEL
TENTEROMANO, LUIS THOMAS, THOMAS
THOMASEN, JAMES THOMPSON, ROBERT
THOMPSON, SCOTT THOMSON, ROBERT
TILEARCIO, THOMAS TILLOTSON, DONALD
TOMM, KEVIN TONKIN, STEVEN TONREY,
RUSSELL TOUHEY, CHARLES TOZZO,
PETER TRAUT, LOUIS TREGLIA, MICHAEL
TREZZA, MICHAEL TRIGLIANOS, JOHN
TROIANIELLO, EDWARD TURNER,
LEONARD TYRELL, THOMAS UBERTINI,
NEIL VAILLANCOURT, SALVATORE
VENTIMIGLIA, CHARLES VAN PELT,
DONALD VASTOLA, STEVEN VERDEROSA,
RICHARD VETLAND, ROBERT VINCIGUERRA,
FREDERICK WALKER, ROBERT WALLEN,
DANIEL WALSH, WILLIAM WALSH,
THOMAS WARD, KEITH WARD, CHRISTOPHER
WARD, GARY WASHINGTON, ALBERT WEBER,
JOHN WEBER, PAUL WEIS, STEVEN WEISNER,
JAMES WELDON, RICHARD WELDON, WILLIAM
WELSH, JAMES WERNER, MICHAEL WERNICK,
JAMES WHITE, ROBERT WIEDMANN, ROBERT
WILDAY, JOHN WILLADSEN, KEVIN WILLIAMS,

61

VANDON WILLIAMS, TYRONE WILLIAMS,
VINCENT WILLIAMS, THOMAS WILLIAMS,
JOHN WILSON, LIEUTENANT JOHN WILSON,
ROBERT WILSON, JAMES WINTERS, DENNIS
WIRBICKAS, MICHAEL WITKOWSKI,
JOHN WROBEL, JOHN YORKS, MARK YOUNGBERG,
STEPHEN ZASA, MICHAEL ZECHEWYTZ,
THOMAS ZELIOS, PATRICK ZODA,


MICHAEL ARMETTA, CHRISTOPHER BACH,
MICHAEL BEHETTE, JAMES BEUERMAN,
HOWARD BISCHOFF, THOMAS BOCCAROSSA,
KENNETH BOHAN, MICHAEL BOYLE,
MICHAEL BROCATO, MICHAEL BROSCHART,
JAMES BROWN, MICHAEL BUDISCHEWSKY,
JOHN BYNRES, EDWARD CACHIA, THOMAS
CANN, FRANK CAPUTO, DAVID CARDINALE,
RICHARD CARLINO, CHRISTOPHER CARRI,
THOMAS CASCIO, GERARD CASEY, JOHN
CATATANO, ANTHONY CATERA, JAMES
CIZIKE, DERMOTT CLOWE, CHRISTOPHER
COEN, JONATHAN COLEMAN, JEFFREY CONTI,
JAMES COONEY, BRIAN CORCORAN, JOHN
COTTON, BRIAN COYLE, JOHN COYLE, GEORGE
CRISCITIELLO, FRANK CSEKO, MARK DAVINO,
GEORGE DEGEWORTH, KEVIN DELANO, FRED
DELGROSSO, JOSEPH DELGROSSO, PHILIP
DEMARIA, RUDOLF DENT, ETIENNE DEVILLIERS,
ROBERT DISANZA, VICTOR DIZ, STEPHEN
DOMINICK, ROBERT DORRITIE, JOSEPH
DREXLER, RICHARD DRISCOLL, DANIEL
DUDDY, KEVIN DUNCAN, JOHN ENGEL,
JOSEPH ENIA, KEVIN FARRELL, THOMAS
FARRELL, ELIZABETH FEATHERSTON,
ROSARIO FERLISI, JAMES FILOMINO,
JAMES FINN, DAVID FISCHBEIN, LEE
FISCHER, LIAM FLAHERTY, JAMES
FLANAGAN, JAMES M. FLANAGAN,
ROBERT FOLEY, VINCENT FORRAS,
LUIS FRAGOSO, CHARLES GAFFNEY,
PETER GANNON, DENNIS GILHOOLY,
JOHN GIUFFRIDA, STEPHEN GRABNER,
STEVEN GUISE, KEVIN GUTFLEISCH,

KEVIN GUY, DOUGLAS HARKINS,
KIRK HARRINGTON, PATRICK HAYDEN,
WILLIAM HENDERSON, MICHAEL
HENNIGNA, JOHN HOGAN, JOHN IAMMATTEO,
ANDREW ISOLANO, JOSEPH JABLONSKI,
JOHN JERMYN, BRIAN JOHNSON, KEITH
KAISER, GERARD KENNEDY, RICHARD KENNY,
ROGER KILFOIL, MARTIN LANG, CHAD
LEACH, DANIEL LIND, THOMAS LONEGAN,
CHARLES LOSACCO, JOHN CUCCIOLA,
CHRISTIAN LYSY, THOMAS LYONS,
MICHAEL MACDONALD, JOSEPH MAGGI,
FRANK MANETTA, CHARLES MANISCALCO,
JAMES MANITTA, WAYNE MANZIE,
WILLIAM MARTINEZ, MICHAEL MAYER
THOMAS MCAREE, JAMES MCCARTHY,
KEVIN MCCUTCHAN, DAVID MCGOVERN,
JAMES MCKAY, WALTER MCKEE, JOHN
MCNAMARA, DENNIS MEYERS, STEVE
MODICA, PAUL MONFRE, JOSEPH
MONTANARO, ROBERT MOORE, JOHN
MUCCIOLA, MICHAEL MURPHY, STEVEN
MURPHY, THOMAS NEWMAN, ALBERT
NOCELLA, DANIEL NOONAN, MICHAEL
O'GORMAN, MICHAEL O'SHEA, GIRARD
OWENS, ROBERT PARKER, FRANK PEPE,
DANIEL PERITORE, RICHARD PICCIOTTO,
JOSEPH POMA, JAMES POWERS, FREDERICK
PREVETE, WILLIAM QUICK, MICHAEL QUINN,
RICHARD RAMAIZEL, THOMAS RAPPE,
DANIEL REDDAN, GERARD REILLY,
LEONARD REINA, JOHN REMENTERIA,
WILLIAM RENDINO, MICAHEL RICCIARDI,
ROGER RICHES, JOSEPH ROCHA, ALAN
ROCKEFELLER, JOHN ROGERS, MICHAEL
ROY, STEPHEN RUSSACK, ROBERT SACCHI,
PETER SANTELLI, JOHN SCHILLINGER,
ROBERT SCHMIDT, ROBERT SCHMUCK,
MICAHEL SFORZA, JOHN SIGNORELLI,
FRANK SOMMA, FRANK SPALDO,
DOUGLAS SPANO, ROBERT STANLEWICZ,
EUGENE ST. JOHN, PETER STRAHL,
DANIEL SURAT, ANGEL TORRES,
JOSEPH TORRILLO, FRANCIS TRAPANI,

63

JAMES TOZZO, VICTOR TROISI, RICHARD
WATTS, CHARLES WEINSHEIMER, JOHN
WHOLIHAN, HERMAN WILLIAMS, VINCENT
YORKS, ROBERT ZAJKOWSKI

THOMAS CALLAGHAN, RAYMOND ARCOS,
KEVIN CALHOUN, HENRY J. CERASOLI,
PATRICK CONNOLLY, THOMAS COURTENAY,
TERENCE COYLE, EDWARD COYLE,
WILLIAM CRAWFORD, KEVIN GRACE,
KENNETH HAMILTON, WILLIAM HARRIS,
THOMAS HARRINGTON, MICHAEL HART,
WILLIAM HENNESSY, ROBERT HOYT,
ROBERT MADDEN, GERARD McMAHON,
JAMES O'DONNELL,GEORGE O'DOHERTY,
CHARLES O'NEILL, CHRISTOPHER G. O'SULLIVAN,
JASON PERRONE, GEORGE PICKETT,
JOHN A. REGAN, TERENCE RIVERA,
JOHN RIZZI, KEVIN SHEROD, JAMES SPENCER,
MICHAEL TORRES, GREGORY WYCKOFF

**NYPD**
RICHARD AGUGLIARO, NICHOLAS BALSAMO,
IRENE BLAICH, IRWIN JOSEPH BRODSKY,
ROBERT  CAPOLONGO, STEPHEN DONNELLY,
SHARON GATTO, MICHAEL GINTY, TODD
HEIMAN, CHRISTOPHER HUNT, ANITA JOHNSON,
FRANK KROPF, MICHAEL KULL, DORIS MARTINEZ,
DARIO MARTINEZ, SHAUN MCGILL, WILLIAM
McNALLY, JEFFREY NIX, MICHELE PAOLINI,
CHRISTOPHER PHILLIPS,

RAYMOND CASCIO, WALTER COOK,
ALAN FORCIER, CHARLES GALLOGY,
PATRICIA LEWIS, VINCENT MEDORDI,
CLARE O'CONNELL, STEPHEN SPINELLI,
JAMES ZADROGA

RICHARD MAYRONNE, PAUL MOLONEY,
PETER NEWEN, SUSAN A. SCOTT

**EMERGENCY MEDICAL SERVICES**
PAUL ADAMS, ROGER AHEE, STEPHEN

ANDERSON, ANTHONY ANDERSON,
FRANK  ANDINO, MARYLOU AURRICHIO,
ANGEL AYALA, BENJAMIN BADILLO,
ARTURO BANCHS,  KEVIN BARRETT,
LORI-ANN BENINSON, RUBEN BERRIOS,
MARVIN BETHEA, ENIS BOYER,  MARTIN BRAUN,
JOZETTE BROWN, JACQUELINE BURTON,
MICHAEL CAHILL, H. CARLTON SMITH,
RICHARD CASALETTO, DAVID CLINGAIN,
STEVEN COSCIA, JOSE COTTI, STEVEN CUEVAS,
KIRK DELNICK, ROLAND DIAZ, MICHAEL DiNATALE,
JAMES DOBSON, BOBBY DUDLEY, RICHARD ERDEY,
ALBERT ESTRADA, JOSEPH FAZZINO,
NICOLE FERRELL, SALVADOR FERRER,
DAVID GEORGE RESTUCCIO, BONNIE GIEBERIED,
NORMAN GILLARD, BRIAN GLEASON,
MICHAEL GLENN, AWILDA GOMEZ,
GLORIA-GIGI GORDON, LLOYD GROSSBERG,
MORRIS HUBBARD, PAIGE HUMPHRIES,
RAFAEL IGLESAIS, EARTHA INGRAM,
VERONICA JACOBS, ABRAHAM LEVINSON,
VERONICA LYNN JACOBS, STEVE MARION,
MARC MASTROS, LORI MAZZEO, BRIAN MCGUIRE,
ALWISH MONCHERY, PHILIP MEDEIROS,
YVETTE MONTALVO, KEVIN MONTGOMERY,
BLANCA MORRONE, KEVIN MORRONE,
BRENDAN MULROY, MURRAY MURAD,
MICHAEL MUSTO, ANDREA NANNA-MONTGOMERY,
NANCY NOBLE, WALTER ODINOKOW,
TROISI ONOFRIO, LUIS PEREZ, OSVALDO PEREZ,
DARRYL PETTIGREW, RON PFEFFER, LORRAINE
PIRILLO, MICHELLE POHL, ROBIN PFEFFER,
ROBIN PRINTY, FRANK PUMA, PABLO QUESADA,
MICHAEL RAIMER, DAVID REEVE, MARK REILLY,
DANIEL RIVERA,  TIMOTHY ROBERTS, DAVID
RUSSELL, PARIS SALEM, STEVEN SAMMIS,
BOBBY SANTIAGO, JEREMY SASSMAN,
PATRICIA SCADUTO-SOTO, PATRICK SCARINGELLO,
STEVEN SCARINZI, JOHN SCHAEFER,
JOHN SCOTCH, II LISA SECKLER- OODE,
RAYMOND SIMONS, GARY SMILEY,
PHILIP SOTO, SYLVESTER STEWART,
MARK STONE,  ISA SWEDIN, MAURICE T. ZUNIGA,
JAMES THOMPSON,  ALVIN TORO, EDITH TORRES,

BARRY TRAVIS, TINA TRESCA, BETTY VIOLETA-LLANO,
CHARLES WELLS,  SPIRO YIORAS,


KEVIN CONNELLY, BENJAMIN FOGEL,
LUIS GUTIERREZ, JOHN JAGODA,
JILL KELLY, WALTER KOWALCZYK,
DANIEL LEFEBVRE, CHRISTOS LEFKADITIS,
JOANN MCFARLAND

**TRADES**
DAVID AROCHO, GEORGE COLUCCI, GERARD
CRAWFORD, WILLIE B. HENDERSON, ELROY
PAGAN, ANTHONY ROCCHIO, GEORGE SMITH,

MICHAEL BURKE, STEPHEN BURKE,
STEVEN BILICH, RICHARD CARLINO,
RICHARD COYNE, SEAN DONAHUE,
CARL FISHER, JOHN GRAHAM, WALTER
JENSEN, JOHN MURPHY, RICHARD
RACCIOPPI, RAINFORD ROBERTS,
JAMES WILLIS

KEVIN DORRIAN, BROOK BUDD,
MICHAEL DePIETRO, RICHARD MULHERN,
JAMES PICONE, DAVID RAPP

**CIVILIAN**
EDITH BEAUJON, RICHARD DuBOIS, ANDREA
HOWELL, SCOTT SCHIELDS,

ALBERT GREENE, JILL KELLEY,
MANUAL LOPEZ, FRANK MYERS,
DEBORAH MANDELL, MARY
MARINELLI

KHEMRAJ SINGH

**FIRE MARSHAL CLIENTS**
WERNER COOK, JOHN COYLE
EMIL HARNISCHFEGER, JOSEPH
MCMAHON, PETER PATTERSON,
JOHN VERACKA

66

**SANITATION CLIENTS**
SALVATORE ANNERINO, FRANK
BERRAN, PAUL BROWN, CHARLES
BURGE, PETER CIAPPA, LAWRENCE
MARCELIS CLARK, JOSEPH CURRAN,
ALBERT D'ALLESANDRO, JIMMIE
DAVIS, ANTHONY GREENE, RAYMOND
HAYWOOD, JEFF HESTNES, WILLIAM
KING, ROCCO MASCIOLO, HENRY
MORRISON, KEVIN MELFI, DAVID
O'NEIL, WILLIAM OROZCO, MARTIN
PROKUP, ANTHONY QUARANTI,
ALCIDES RIVERA, FELIX SANCHEZ,
PETER SHANLEY, ALPHA TARAWALLY,
ERIC TVEDT

**CORRECTIONS**
DANIEL OLIVERI

MICHAEL O'CONNELL, MICHAEL SCHNITZER
---------------------------------------------------------------------x
SHERI G. BURLINGAME, in her capacity as
Administratrix of the Estate of CHARLES FRANK
BURLINGAME, III, Deceased, and in her personal capacity
and as the personal representative of the Estate of
CHARLES F. BURLINGAME, III;                                    **02 CV 7230(RCC)**

RUDY ABAD, Individually, as Personal Representative        **Speiser, Krause, Nolan &**
of the Estate of MARIA ROSE ABAD, Deceased,                **Granito**
and on behalf of all survivors of MARIA ROSE ABAD;

CYNTHIA LYNN BARKWAY, Individually,
as Personal Representative of the Estate of
DAVID MICHAEL BARKWAY, Deceased, and on
behalf of all survivors of DAVID MICHAEL BARKWAY;

MAUREEN BASNICKI, Individually, as
Personal Representative of the Estate of
KENNETH BASNICKI, Deceased, and on behalf of
all survivors of KENNETH BASNICKI;

BHOLA AND BASMATTIE BISHUNDAT, Individually,
and as Personal Representatives of the Estate of

67

KRIS ROMEO BISHUNDAT, Deceased, and on behalf of
all survivors of KRIS ROMEO BISHUNDAT;

THOMAS BOCCHINO, Individually,
as Personal Representative of the Estate of
MICHAEL BOCCHINO, Deceased, and on behalf of
all survivors of MICHAEL BOCCHINO;

IRENE BOEHM, Individually, as Personal Representative
of the Estate of BRUCE BOEHM, Deceased,
and on behalf of all survivors of BRUCE BOEHM;

MANUEL BOURDIER, Individually,
as Personal Representative of the Estate of
FRANCISCO BOURDIER, Deceased, and on behalf of
all survivors of FRANCISCO BOURDIER;

KRISTEN BREITWEISER, Individually,
as Personal Representative of the Estate of
RONALD BREITWEISER, Deceased, and on behalf of
all survivors of RONALD BREITWEISER;

ERICA BRENNAN, Individually, as
Personal Representative of the Estate of
PETER BRENNAN, Deceased, and on behalf of
all survivors of PETER BRENNAN;

KATHLEEN BRUNTON, Individually,
as Personal Representative of the Estate of
VINCENT BRUNTON, Deceased, and on behalf of
all survivors of VINCENT BRUNTON;

DEBORAH RAZZANO, Individually,
as Personal Representative of the Estate of
ANTHONY COLADONATO, Deceased,
and on behalf of all survivors of ANTHONY COLADONATO;

THERESA COVE, Individually, as
Personal Representative of the Estate of
JAMES E. COVE, Deceased, and on behalf of
all survivors of JAMES E. COVE;

JAMES CUDMORE, Individually,
as Personal Representative of the Estate of

68

NEIL CUDMORE, Deceased, and on behalf of
all survivors of NEIL CUDMORE;

AMY WATERS, Individually, as Personal Representative
of the Estate of SCOTT DAVIDSON, Deceased,
and on behalf of all survivors of SCOTT DAVIDSON;

LORRAINE DELAPENHA, Individually,
as Personal Representative of the Estate of
DONALD A. DELAPENHA, Deceased, and on
behalf of all survivors of DONALD A. DELAPENHA;

VIRGINIA DiCHIARA, Individually;

IRENE DICKEY, Individually, as Personal Representative
of the Estate of JOSEPH DICKEY, Deceased,
and on behalf of all survivors of JOSEPH DICKEY;

ROSEMARY DILLARD, Individually,
as Personal Representative of the Estate of
EDDIE DILLARD, Deceased, and on behalf of
all survivors of EDDIE DILLARD;

LESLIE DIMMLING, Individually,
as Personal Representative of the Estate of
WILLIAM DIMMLING, Deceased, and on behalf
all survivors of WILLIAM DIMMLING;

MARGUERITA DOMANICO, Individually,
as Personal Representative of the Estate of
JAMES DOMANICO, Deceased, and on behalf of
all survivors of JAMES DOMANICO;

CHRISTOPHER DOWLING, Individually,
as Personal Representative of the Estate of
MARY YOLANDA DOWLING, Deceased, and on
behalf of all survivors of MARY YOLANDA DOWLING;

CYNTHIA M. DROZ, Individually,
as Personal Representative of the Estate of
CHARLES DROZ, Deceased, and on behalf of
all survivors of CHARLES DROZ;

JACQUELINE EATON, Individually,

as Personal Representative of the Estate of
ROBERT EATON, Deceased, and on behalf of
all survivors of ROBERT EATON;

KEVIN FARRELL, Individually;

CHONG P. FARRELL, Individually;

CATHERINE ANN FAUGHNAN, Individually,
as Personal Representative of the Estate of
CHRISTOPHER FAUGHNAN, Deceased, and on
behalf of all survivors of CHRISTOPHER FAUGHNAN;

MARCO CALLE, Individually,
as Personal Representative of the Estate of
HENRY HOMERO FERNANDEZ, Deceased, and on behalf
of all survivors of HENRY HOMERO FERNANDEZ;

MARY AND FRANK FETCHET, as
Personal Representatives of the Estate of
BRADLEY FETCHET, Deceased, and on behalf of
all survivors of BRADLEY FETCHET;

ERIN FINNEGAN, Individually,
as Personal Representative of the Estate of
MICHAEL FINNEGAN, Deceased, and on behalf of
all survivors of MICHAEL FINNEGAN;

CARLOS GAMBOA, Individually,
as Personal Representative of the Estate of
GIANN F. GAMBOA, Deceased, and on behalf of
all survivors of GIANN F. GAMBOA;

CATHY GEYER, Individually, as Personal Representative
of the Estate of JAMES G. GEYER, Deceased,
and on behalf of all survivors of JAMES G. GEYER;

GERALD GOLKIN, Individually, as Personal Representative
of the Estate of ANDREW H. GOLKIN Deceased,
and on behalf of all survivors of ANDREW H. GOLKIN;

ANA RALEY, Individually, as Executrix
of the Estate of IAN GRAY, Deceased,
and on behalf of all survivors of IAN GRAY;

70

RAYMOND HABIB, Individually,
as Personal Representative of the Estate of
BARBARA HABIB, Deceased, and on behalf of
all survivors of BARBARA HABIB;

THOMAS P. HEIDENBERGER, Individually,
as Personal Representative of the Estate of
MICHELE HEIDENBERGER, Deceased, and on behalf of
all survivors of MICHELE HEIDENBERGER;

BRENDAN RYAN, Individually, as
Personal Representative of the Estate of
KRISTIN IRVINE RYAN, Deceased, and on behalf of
all survivors of KRISTIN IRVINE RYAN;

SHERI ANN ISKENDERIAN, Individually, as
Personal Representative of the Estate of
ARAM ISKENDERIAN, Deceased, and on behalf of
all survivors of ARAM ISKENDERIAN;

JENNIFER L. JARDIM, Individually, as Administratrix
of the Estate of MARK S. JARDIM, Deceased,
and on behalf of all survivors of MARK S. JARDIM;

ELIZABETH JORDAN, Individually, as
Personal Representative of the Estate of
ROBERT JORDAN, Deceased, and on behalf of
all survivors of ROBERT JORDAN;

GEOFFREY JUDGE, Individually, as
Personal Representative of the Estate of
ANN JUDGE, Deceased, and on behalf of
all survivors of ANN JUDGE;

JANET KELLEY, Individually, as Personal Representative
of the Estate of FREDERICK KELLEY, Deceased,
and on behalf of all survivors of FREDERICK KELLEY;

JOANNE KELLY, Individually, as Personal Representative
of the Estate of JAMES KELLY, Deceased,
and on behalf of all survivors of JAMES KELLY;

PAUL AND VIVIAN KOLPAK, Individually, and
as Co-Administrators of the Estate of

71

VANESSA KOLPAK, Deceased, and on behalf of
all survivors of VANESSA KOLPAK;

ELIZABETH KOVALCIN, Individually,
as Personal Representative of the Estate of
DAVID P. KOVALCIN, Deceased, and on behalf of
all survivors of  DAVID P. KOVALCIN;

SANDRA LANG, Individually, as Personal Representative
of the Estate of BRENDAN LANG, Deceased,
and on behalf of all survivors of  BRENDAN LANG;

DONNA CABALLERO, and WILLIAM M. LANG,
Individually, as Personal Representatives of the Estate of
ROSEANN LANG, Deceased, and on behalf of
all survivors of ROSEANN LANG;

CAROLANN LARSEN, Individually, as
Personal Representative of the Estate of
SCOTT LARSEN, Deceased, and on behalf of
all survivors of SCOTT LARSEN;

CAROLE LEAVEY, Individually, as
Personal Representative of the Estate of
JOSEPH GERARD LEAVEY, Deceased, and on behalf of
all survivors of  JOSEPH GERARD LEAVEY;

SUSAN LENOIR, Individually, as Personal Representative
of the Estate of JOHN ROBINSON LENOIR, Deceased, and
on behalf of all survivors of JOHN ROBINSON LENOIR;

JOSEPH J. REITANO, Individually, as
Personal Representative of the Estate of
VINCENT LITTO, Deceased, and on behalf of
all survivors of  VINCENT LITTO;

ELIZABETH DAVILA-LOPEZ, Individually, as
Personal Representative of the Estate of
DANIEL LOPEZ, Deceased, and on behalf of
all survivors of  DANIEL LOPEZ;

EILEEN LYNCH, Individually, as Personal Representative
of the Estate of FARRELL LYNCH, Deceased,
and on behalf of all survivors of  FARRELL LYNCH;

BLANE MAGEE, Individually, as Personal Representative
of the Estate of BRIAN MAGEE, Deceased,
and on behalf of all survivors of BRIAN MAGEE;

BRINLEY MALONEY, Individually, as
Personal Representative of the Estate of
EDWARD F. MALONEY, III, Deceased, and on behalf of
all survivors of EDWARD F. MALONEY, III;

MEGAN MANNING, Individually, as
Personal Representative of the Estate of
TERENCE JOHN MANNING, Deceased, and on behalf
of all survivors of TERENCE JOHN MANNING;

LYNN McGUINN, Individually, as Personal Representative
of the Estate of FRANCIS McGUINN, Deceased, and on
behalf of all survivors of FRANCIS McGUINN;

TARYN McHALE, Individually, as
Personal Representative of the Estate of
THOMAS McHALE, Deceased, and on behalf of
all survivors of THOMAS McHALE;

ELIZABETH McLAUGHLIN, Individually,
as Personal Representative of the Estate of ROBERT
McLAUGHLIN, Deceased, and on behalf of
all survivors of ROBERT McLAUGHLIN;

MARK MORABITO, Individually, as Personal
Representative of the Estate of LAURA LEE
MORABITO, Deceased, and on behalf of all
survivors of LAURA LEE MORABITO;

CATHERINE MORAN, Individually, as
Personal Representative of the Estate of
KATHLEEN MORAN, Deceased, and on behalf of
all survivors of KATHLEEN MORAN;

KIMBERLY A. MARTONE, Individually, as
Personal Representative of the Estate of
CHRISTOPHER M. MORRISON, Deceased, and on
behalf of all survivors of CHRISTOPHER M. MORRISON;

PATRICK MULLAN, Individually, as

73

Personal Representative of the Estate of
MICHAEL D. MULLAN, Deceased, and on behalf of
all survivors of MICHAEL D. MULLAN;

AMY NACKE, Individually, as Personal Representative
of the Estate of LOUIS J. NACKE, Deceased,
and on behalf of all survivors of LOUIS J. NACKE;

AMY NEWTON, Individually, as Executrix
of the Estate of CHRISTOPHER NEWTON, Deceased,
and on behalf of all survivors of CHRISTOPHER NEWTON;

SUSAN NEWTON-CARTER, Individually, as
Personal Representative of the Estate of
CHRISTOPHER NEWTON-CARTER, Deceased,
and on behalf of all survivors of
CHRISTOPHER NEWTON-CARTER;

EDWARD NICHOLLS, Individually;

STACIE NICHOLLS, Individually;

LISA O'BRIEN, Individually, as Personal Representative
of the Estate of TIMOTHY O'BRIEN, Deceased,
and on behalf of all survivors of TIMOTHY O'BRIEN;

ANTOINETTE D. OGNIBENE, Individually, as
Personal Representative of the Estate of
PHILLIP PAUL OGNIBENE, Deceased, and on behalf of
all survivors of PHILLIP PAUL OGNIBENE;

DANIEL ORTH, Individually, as Personal Representative
of the Estate of JANE MARIE ORTH, Deceased,
and on behalf of all survivors of JANE MARIE ORTH;

WANDA GARCIA-ORTIZ, Individually, as
Personal Representative of the Estate of
EMILIO ORTIZ, Deceased, and on behalf of
all survivors of EMILIO ORTIZ;

CAROLYN PANATIER, Individually, as
Personal Representative of the Estate of
CHRISTOPHER M. PANATIER, Deceased, and on behalf
of all survivors of CHRISTOPHER M. PANATIER;

74

NAVILA PATTERSON, Individually, as
Personal Representative of the Estate of
BERNARD E. PATTERSON, Deceased, and on behalf of
all survivors of BERNARD E. PATTERSON;

MICHAEL QUINN, Individually, as Personal
Representative of the Estate of JAMES QUINN, Deceased
and on behalf of all survivors of JAMES QUINN;

MARILYN REICH, Individually, as
Personal Representative of the Estate of
HOWARD REICH, Deceased, and on behalf of
all survivors of HOWARD REICH;

JAMES J. RICHES, Individually, as
Personal Representative of the Estate of
JAMES C. RICHES, Deceased, and on behalf of
all survivors of JAMES C. RICHES;

BERNARD P. SALAMONE, Individually,
as Executor of the Estate of  MARJORIE C.
SALAMONE, Deceased, and on behalf
of all survivors of MARJORIE C. SALAMONE;

DANIELLE SALERNO, Individually, as
Personal Representative of the Estate of
JOHN SALERNO, Deceased, and on behalf of
all survivors of JOHN SALERNO;

SALLY CALVIN, Individually,
as Personal Representative of the Estate of
FRANK SALVATERRA, Deceased, and on behalf of
all survivors of FRANK SALVATERRA;

LYNNE SAN PHILLIP, Individually,
as Personal Representative of the Estate of
MICHAEL V. SAN PHILLIP, Deceased, and on behalf of
all survivors of MICHAEL V. SAN PHILLIP;

DARA SEAMAN, Individually, as Personal Representative
of the Estate of MICHAEL SEAMAN, Deceased,
and on behalf of all survivors of MICHAEL SEAMAN;

MARIA SILVERSTEIN, Individually, as

Personal Representative of the Estate of
CRAIG SILVERSTEIN, Deceased, and on behalf of
all survivors of CRAIG SILVERSTEIN;

LAURIE SIMOWITZ, Individually, as
Personal Representative of the Estate of
BARRY SIMOWITZ, Deceased, and on behalf of
all survivors of BARRY SIMOWITZ;

JAMES P. SLATTERY, Individually, as
Personal Representative of the Estate of
CHRISTOPHER PAUL SLATTERY, Deceased,
and on behalf of all survivors of
CHRISTOPHER PAUL SLATTERY;

SUSAN M. SLIWAK, Individually, as
Personal Representative of the Estate of
ROBERT F. SLIWAK, Deceased, and on behalf of
all survivors of ROBERT F. SLIWAK;

MICHAEL T. JAMMEN, Individually, as
Personal Representative of the Estate of
HEATHER L. SMITH, Deceased, and on behalf of
all survivors of HEATHER L. SMITH;

CHRISTINE SPENCER, Individually, as
Personal Representative of the Estate of
ROBERT A. SPENCER, Deceased, and on behalf of
all survivors of ROBERT A. SPENCER;

BARBARA STECKMAN, Individually, as
Personal Representative of the Estate of
WILLIAM STECKMAN, Deceased, and on behalf of
all survivors of WILLIAM STECKMAN;

LORRAINE SZOCIK, Individually, as
Personal Representative of the Estate of
KEVIN T. SZOCIK, Deceased, and on behalf of
all survivors of KEVIN T. SZOCIK;

BASIL G. THORPE AND VALDA M. BINNS,
Individually, and as Co-Administrators of the Estate of
NICHOLA ANGELA THORPE, Deceased, and on behalf
of all survivors of NICHOLA ANGELA THORPE;

ANNE TODISCO, Individually, as
Personal Representative of the Estate of
RICHARD TODISCO, Deceased, and on behalf of
all survivors of RICHARD TODISCO;

TANJA TOMASEVIC, Individually, as
Personal Representative of the Estate of
VLADIMIR TOMASEVIC, Deceased, and on behalf of
all survivors of VLADIMIR TOMASEVIC;

DORRY GROH-TOMPSETT, Individually, as
Personal Representative of the Estate of
STEPHEN TOMPSETT, Deceased, and on behalf
of all survivors of STEPHEN TOMPSETT;

MARY ELIZABETH TUCKER, Individually,
as Personal Representative of the Estate of
MICHAEL P. TUCKER, Deceased, and on behalf of
all survivors of MICHAEL P. TUCKER;

JENNIFER VAUK, Individually, as
Personal Representative of the Estate of
L. COL. RONALD VAUK, Deceased, and on behalf of
all survivors of L. COL. RONALD VAUK;

NAYDA VOSKERIJIAN, Individually, as
Personal Representative of the Estate of
GARO H. VOSKERIJIAN, Deceased, and on behalf of
all survivors of GARO H. VOSKERIJIAN;

ALLISON WALLICE, Individually, as
Personal Representative of the Estate of
JOHN WALLICE, JR., Deceased, and on behalf of
all survivors of JOHN WALLICE, JR.;

MICHELLE GARTNER, Individually, as
Personal Representative of the Estate of
DINAH WEBSTER, Deceased, and on behalf of
all survivors of DINAH WEBSTER;

MARCIA WEISS, Individually, as Personal Representative
of the Estate of DAVID T. WEISS, Deceased
and on behalf of all survivors of DAVID T. WEISS;

77

PATRICK WELSH, Individually, as
Personal Representative of the Estate of
DEBORAH ANNE WELSH, Deceased, and on behalf of
all survivors of DEBORAH ANNE WELSH;

BENJAMIN WONG, Individually, as Personal
Representative of the Estate of
JENNIFER Y. WONG, Deceased, and on behalf of
all survivors of JENNIFER Y. WONG;

PAMELA WORKS, Individually, as
Personal Representative of the Estate of
JOHN BENTLEY WORKS, Deceased, and on behalf of
all survivors of JOHN BENTLEY WORKS;

ELAINE M. CHEVALIER, as Administrator
of the Estate of Swede Chevalier, Deceased
and on behalf of all survivors of SWEDE CHEVALIER;

MAUREEN S. DOMINGUEZ, as Administrator
of the Estate of Carlos Dominguez, Deceased,
and on behalf of all survivors of CARLOS DOMINGUEZ;

PHYLLIS GILLY and JOSEPH GILLY, as
Administrators of the Estate of Laura Gilly, Deceased,
and on behalf of all survivors of LAURA GILLY;

BRENDAN J. RYAN, as Administrator of the
Estate of Kristin Irvine Ryan, Deceased, and on
behalf of all survivors of KRISTIN IRVINE RYAN;

YONGJIN L. SONG, HYUNGSHIN K. SONG, as
Administrators of the Estate of Daniel W. Song AKA
Won-Hyeong Song, Deceased, and on behalf of all
survivors of DANIEL W. SONG AKA WON-HYEONG SONG;

MARC TADDONIO, as Executor of the Estate
of Michael Taddonio, Deceased, and on behalf of all
survivors of MICHAEL TADDONIO;

ERNST H. BUCK and JOSEPHINE BUCK, as Parents
and Natural Guardians of GREGORY J. BUCK, Deceased
and on behalf of all survivors of Gregory J. Buck;

KENNETH CHU, as Administrator
of the Estate of Pamela Chu, Deceased
and on behalf of all survivors of Pamela Chu;

LOUISA D'ANTONIO, as Administrator
of the Estate of Mary D'Antonio, Deceased
and on behalf of all survivors of Mary D'Antonio;

KATHRYN R. DENNIS, as Administrator
of the Estate of Thomas F. Dennis, Deceased
and on behalf of all survivors of Thomas F. Dennis;

TERESA GOMEZ, as Administrator
of the Estate of Enrique A. Gomez, Deceased
and on behalf of all survivors of Enrique A. Gomez;

BLANCA GOMEZ, as Administrator
of the Estate of Jose B. Gomez, Deceased
and on behalf of all survivors of Jose B. Gomez;

SANDRA MUNRO, as Administrator
of the Estate of Elvira Granitto, Deceased
and on behalf of all survivors of Elvira Granitto;

MARY JEAN HELLER, as Administrator
of the Estate of H. Joseph Heller, Deceased
and on behalf of all survivors of H. Joseph Heller;

EDWARD HENRY AND ALICE HENRY, Individually;

EDWARD HENRY AND ALICE HENRY, as Administrators
of the Estate of Joseph Patrick Henry, Deceased
and on behalf of all survivors of Joseph Patrick Henry;

DOHEE KANG, as Administrator
of the Estate of Joon Koo Kang, Deceased
and on behalf of all survivors of Joon Koo Kang;

ALISON M. KINNEY, as Administrator
of the Estate of Brian Kinney, Deceased
and on behalf of all survivors of Brian Kinney;

ANNA M. KREN, as Executor
of the Estate of John J. Kren, Deceased

79

and on behalf of all survivors of John J. Kren;

DENNIS LEVI and JENNIFER LISITSIN, as
Administrators of the Estate of John Levi, Deceased
and on behalf of all survivors of John Levi;

ERIC LEVINE, individually;

CHRISTINIA LYNCH, as Administrator
of the Estate of Richard D. Lynch, Deceased
and on behalf of all survivors of Richard D. Lynch;

NICHOLAS MAOUNIS, as Administrator
of the Estate of James Maounis, Deceased
and on behalf of all survivors of James Maounis;

SHEILA MARTELLO, as Executor
of the Estate of James Martello, Deceased
and on behalf of all survivors of James Martello;

MADELINE LEW MOY, as Personal Representative
of the Estate of Teddington H. Moy, Deceased
and on behalf of all survivors of Teddington H. Moy;

HEIDI NAPLES, as Administrator
of the Estate of Frank J. Naples, Deceased
and on behalf of all survivors of Frank J. Naples;

MARY DUFF-ORTALE, as Administrator
of the Estate of Peter Keith Ortale, Deceased
and on behalf of all survivors of Peter Keith Ortale;

ALEXANDRA M. ORTIZ, as Administrator
of the Estate of Sonia M. Ortiz, Deceased
and on behalf of all survivors of Sonia M. Ortiz;

MEGAN P. PELINO, as Administrator
of the Estate of Todd Douglas Pelino, Deceased
and on behalf of all survivors of Todd Douglas Pelino;

JANE POLLICINO, as Executor
of the Estate of Steven Pollicino, Deceased
and on behalf of all survivors of Steven Pollicino;

BARBARA ROPITEAU-GALLOWAY, as Administrator
of the Estate of Eric Thomas Ropiteau, Deceased
and on behalf of all survivors of Eric Thomas Ropiteau;

EUGENIA BOGADO, as Administrator
of the Estate of Carlos A. Samaniego, Deceased
and on behalf of all survivors of Carlos A. Samaniego;

JACQUELINE GALLERON, as Executor
of the Estate of Selina Sutter, Deceased
and on behalf of all survivors of Selina Sutter;

JANE TERRENZI, as Executor
of the Estate of Brian Terrenzi, Deceased
and on behalf of all survivors of Brian Terrenzi;

CAROL WALDIE, as Administrator
of the Estate of Kenneth Waldie, Deceased
and on behalf of all survivors of Kenneth Waldie;

LING N. YOUNG and DONALD M. YOUNG, Individually;

PATRICIA FITZSIMONS, as Executor
of the Estate of Richard Fitzsimons, Deceased
and on behalf of all survivors of Richard Fitzsimons;

CHRISTINE O'BERG, as Administrator
of the Estate of Dennis O'Berg, Deceased
and on behalf of all survivors of Dennis O'Berg;

DENNIS O'BERG, individually

JEAN M. PALOMBO, as Administrator
of the Estate of Frank A. Palombo, Deceased
and on behalf of all survivors of Frank A. Palombo;


CORRINE J. EVANS and CHARLES R. EVANS,
as Co-Administrators of the Estate of Eric B. Evans, Deceased
and on behalf of all survivors of Eric B. Evans;

NANCY H. KIMBELL, as Administrator
of the Estate of Mary Booth, Deceased
and on behalf of all survivors of Mary Booth;

CHRISTINIA L. KMINEK, as Personal Representative
of the Estate of Mari-Rae Sopper, Deceased
and on behalf of all survivors of Mari-Rae Sopper;

LORRAINE LYNCH, as Administrator
of the Estate of Sean Lynch, Deceased
and on behalf of all survivors of Sean Lynch;

ELIZABETH McNALLY, as Administrator
of the Estate of Edmund McNally, Deceased
and on behalf of all survivors of Edmund McNally;

JOSEPH RICHARD MICKLEY, as Executor
of the Estate of Patricia E. Mickley, Deceased
and on behalf of all survivors of Patricia E. Mickley;

ELAINE P. MILLER and CORRINE KRACHTUS, as
Personal Representatives of the Estate of Daphne Pouletsos,
Deceased and on behalf of all survivors of Daphne Pouletsos;

ARJAN MIRPURI, as Personal Representative
of the Estate of Rajesh Mirpuri, Deceased
and on behalf of all survivors of Rajesh Mirpuri;

SUSANNE MLADENIK, as Executor
of the Estate of Jeffrey P. Mladenik, Deceased
and on behalf of all survivors of Jeffrey P. Mladenik;


JANICE KAY PUNCHES, as Executor
of the Estate of Capt. Jack D. Punches, USN, Retired, Deceased
and on behalf of all survivors of Capt. Jack D. Punches, USN, Retired;

ABRAHAM SCOTT, as Administrator
of the Estate of Janice M. Scott, Deceased
and on behalf of all survivors of Janice M. Scott;

KATHY A. CORDERO,
VALENCIA L. PARKER,

-------------------------------------------------------------------x
VIRGINIA BAUER, Individually and as
Executrix of the Estate of W. DAVID BAUER,                    **02 CV 7236(RCC)**
Deceased,

CATHY ANN BONNETT, Individually
and as Administratrix of the Estate of
COLIN BONNETT, Deceased,

DEBORAH BOWDEN, Individually and
as Executrix of the Estate of THOMAS
BOWDEN, Deceased,

JENNIFER BOWMAN, Individually and as
Administratrix of the Estate of SHAWN E.
BOWMAN, Deceased,

ELIZABETH CANDELA, Individually and
as Administratrix of the Estate of JOHN
CANDELA, Deceased,

TOMOKO T. SCHLAG, Individually and
as Executrix of the Estate of STEVEN F.
SCHLAG, Deceased,

BETH MURPHY, Individually and as
Administratrix of the Estate of KEVIN J.
MURPHY, Deceased,

ROSEANN ZISA, Individually and as
Administratrix of the Estate of SALVATORE
ZISA, Deceased,

MICHELE JONES, Individually and as Executrix
of the Estate of DONALD JONES, Deceased,

AMY VASEL, Individually and as Administratrix
of the Estate of SCOTT VASEL, Deceased,

MARGARET MEYER, Individually and as
Executrix of the Estate of DAVID R. MEYER,
Deceased,

BARBARA GALLUCCI, Individually and as
Administratrix of the Estate of VINCENZO
GALLUCCI, Deceased,

ARLENE ORSINI, Individually and as
Administratrix of the Estate of RONALD

**Baumeister & Samuels, P.C.**

83

ORSINI, Deceased,

EILEEN HANNAFORD, Individually and as
Administratrix of the Estate of KEVIN
HANNAFORD, Deceased,

JILL GOLDSTEIN, Individually and as
Administratrix of the Estate of STEVEN
GOLDSTEIN, Deceased,

AUDREY MAGNUSON, Individually and as
Executrix of the Estate of RONALD E.
MAGNUSON, Deceased,

KAREN D'AMBROSI, Individually and as
Executrix of the Estate of JACK L. D'AMBROSI,
Deceased,

SUSAN MAGAZINE, Individually and as
Administratrix of the Estate of JAY MAGAZINE,
Deceased,

KATHERINE MAHER, Individually and as
Executrix of the Estate of DANIEL L. MAHER,
Deceased,

ELLEN ROBB, Individually and in her capacity
as Proposed Co-Administrator of the
Estate of KRISTEN MONTANARO, Deceased,

MICHELLE TANNER, Individually and as
Executrix of the Estate of MICHAEL TANNER,
Deceased,

MARIE CARLINO, Individually and as Executrix
of the Estate of EDWARD CARLINO, Deceased,

PANDORA PO BHARVANEY, Individually and
as Administratrix of the Estate of ANIL T.
BHARVANEY, Deceased,

DEBRA ZEPLIN, Individually and as Executrix of
the Estate of MARC SCOTT ZEPLIN, Deceased,

LAURA BUSTILLO, Individually and as
Administratrix of the Estate of MILTON BUSTILLO,
Deceased,

CAROLE DiFRANCO, Individually and as
Administratrix of the Estate of CARL DiFRANCO,
JR., Deceased,

CAMERON F. MACRAE, III, Individually and as
Administrator of the Estate of CATHERINE
FAIRFAX MACRAE, Deceased,

DONALD MAURO, Individually and as Administrator
of the Estate of NANCY T. MAURO, Deceased,

JOHN SANDERS, Individually and as Administrator
of the Estate of STACEY L. SANDERS, Deceased,

JENNIFER PRICE, Individually and as Executrix
of the Estate of JEAN ELIZABETH HOADLEY
PETERSON, Deceased,

SANDRA VALDEZ FELT, Individually and as
Executrix of the Estate of EDWARD P. FELT,
Deceased,

ROSE KELLER, Individually and as Administratrix
Administratrix of the Estate of JOSEPH KELLER,
Deceased,

LYZBETH GLICK, Individually and as Administratrix
of the Estate of JEREMY GLICK, Deceased,

ELSA STRONG, Individually and as Executrix of the
Estate of LINDA GRONLUND, Deceased,

JOHN DiMEGLIO, Individually and as Administrator
of the Estate of DAVID DIMEGLIO, Deceased,

BARBARA RATCHKO, Individually and as
Administratrix of the Estate of BRYAN JACK,
Deceased,

MICHAEL GIORDANO, Individually and as

85

Administrator of the Estate of DONNA GIORDANO,
Deceased,

ROSA CAICEDO, as Mother and Legal Guardian
of LESLIE VARGAS and KEVIN VARGAS, the
Natural Children of DAVID VARGAS, Deceased, and
as Proposed Administratrix and/or personal
representative of the Estate of DAVID
VARGAS, Deceased,

JILL SWIFT, Individually and as Executrix of the
Estate of THOMAS SWIFT, Deceased,

LISA BEAMER, Individually and as Executrix
of the Estate of TODD BEAMER, Deceased,

JENNIFER G. BRENNAN, Individually and as
Administratrix of the Estate of THOMAS M. BRENNAN,
Deceased,

SUSAN BEATINI, Individually and as Administratrix
of the Estate of PAUL F. BEATINI, Deceased,

MARY DANAHY, Individually and as Executrix of
the Estate of PATRICK W. DANAHY, Deceased,

KATHLEEN M. WISNIEWSKI, Individually and as
Administratrix of the Estate of ALAN L. WISNIEWSKI,
Deceased,

TERESA CUNNINGHAM, Individually and as
Administratrix of the Estate of MICHAEL J.
CUNNINGHAM, Deceased,

BEVERLY ECKERT, Individually and as Executrix
of the Estate of SEAN ROONEY, Deceased,

PATRICIA RYAN, Individually and as Executrix
of the Estate of JOHN J. RYAN, Deceased,

LORI KANE, Individually and as Administratrix
of the Estate of HOWARD L. KANE, Deceased,

SUZANNE SISOLAK, Individually and as

86

Administratrix of the Estate of JOSEPH M.
SISOLAK, Deceased,

THOMAS S. JOHNSON, Individually and as
Administrator of the Estate of SCOTT M. JOHNSON,
Deceased,

H. MICHAEL KEDEL, as Executor of the Estate of
Adam Jay Lewis, Deceased,

NANCY FOSTER, as Personal Representative of
the Estate of Noel John Foster, Deceased,

CHIEMI YORK, as Administrator of the
Estate of Kevin Patrick York, Deceased,

JENNIFER TARANTINO, as Executor of the
Estate of Kenneth J. Tarantino, Deceased,

-------------------------------------------------------------------------x

CHERYL SCHNEIDER, in her own right and as
the Executrix of the ESTATE OF IAN
SCHNEIDER, Deceased                                      **02 CV 7209(RCC)**

NANCY DIMINO, in her own right and as                    **Law Firm of Aaron J. Broder**
the Executrix of the ESTATE OF STEPHEN                   **& Jonathan C. Reiter**
DIMINO, Deceased

MATILDE SALCEDO, in her own right and
as the Personal Representative of the ESTATE
OF ESMERLIN SALCEDO, Deceased

SUSAN CONNORS, in her own right and as the
Executrix of the ESTATE OF JONATHAN M.
CONNORS, Deceased

GERARD JEAN BAPTISTE, in his own right and
as the Proposed Personal Representative of the
ESTATE OF GERARD BAPTISTE, Deceased

DEBORA ANN CRISMAN, in her own right and
as Administratrix of the ESTATE OF DANIEL

87

HAL CRISMAN, Deceased

-------------------------------------------------------------------x

MAYORE ESTATES, LLC and
80 LAFAYETTE ASSOCIATES, LLC                     **02 CV 7214(RCC)**

                                                 **Jaroslawicz & Jaros, Esqs.**

                                    Plaintiffs,

                  - against -

**AL QAEDA  ISLAMIC ARMY**
EGYPTIAN ISLAMIC JIHAD
OSAMA  BIN LADEN
ESTATE OF MUHAMMAD ATEF
AYMAN AL ZAWAHIRI
ABU ZUBAYDAH a/k/a ZAYN AL ABIDIN
  MUHAMMAD HUSAYN TARIQ
SAIF AL ADEL a/k/a SAYF AL ADL
KHALID SHEIKH MOHAMMED
ABDULLAH AHMED ABDULLAH
ESTATE OF ABU HAFS a/k/a Khaled Al Shanguiti,
 a/k/a Mafuz Ould Al Walid, "THE MAURITANIAN"
ESTATE OF ABU SALAH AL-YEMENI
ESTATE OF ABU JAFFER AL-JAZIRI
  a/k/a OMAR CHEBBANI
MUHSIN MUSA MATWALLI ATWAH
ANAS AL LIBY
IBN AL-SHAYKH AL-LIBI
FAZUL ABDULLAH MOHAMMED
AHMED MOHAMED HAMED ALI
MOHAMED SULEIMAN AL NALFI
MUSTAFA MOHAMED FADHIL
AHMED KHALFAN GHAILANI
FAHID MOHAMMED ALLY MSALAM
SHEIKH AHMED SALIM SWEDAN
MUHAMMAD ABU-ISLAM
ABDULLAH QASSIM
MUSTAFA MUHAMMED AHMAD a/k/a Shaykh Sai'id
  a/k/a Mustafa Ahmed Al-Hasawi
JAMAL AL-BADAWI
MOHAMMED OMAR AL-HARAZI
WALID AL-SOUROURI

FATHA ADBUL RAHMAN
YASSER AL-AZZANI
JAMAL BAKHORSH
AHMAD AL-SHINNI
RAED HIJAZI
JAMIL QASIM SAEED
ABU ABDUL RAHMAN
MOHAMED BAYAZID
ABU MUSAB ZARQAWI
SHEIKH OMAR BAKRI MUHAMMAD
ABDUL FATTAH ZAMMAR
MAMOUN DARKAZANLI
GHASOUB AL ABRASH GHALYOUN (a/k/a ABU MUSAB)
BENSAYAH BELKACEM
SABIR LAMAR
WADIH EL-HAGE
WALI KHAN AMIN SHAH
ABU SAYEF GROUP (ASG)
JEMAAH ISLAMIYA a/k/a Jam'yah Ta'awun Al Islamia
ALGERIAN ARMED ISLAMIC GROUP (GIA)
EGYPTIAN GAMA'A AL-ISLAMIYA

***Terrorist Hijackers***
THE ESTATE OF MARWAN AL-SHEHHI
THE ESTATE OF FAYEZ AHMED
THE ESTATE OF AHMED AL GHAMDI
THE ESTATE OF HAMZA AL GHAMDI
THE ESTATE OF MOHALD AL SHEHRI
THE ESTATE OF SATAM M. A. AL SUQAMI
THE ESTATE OF ABDULAZIZ AL OMARI
THE ESTATE OF WALEED M. AL SHEHRI
THE ESTATE OF WAIL AL SHEHRI
THE ESTATE OF MOHAMMED ATTA
THE ESTATE OF KHALID AL MIDHAR
THE ESTATE OF NAWAF AL HAZMI
THE ESTATE OF HANI HANJOUR
THE ESTATE OF SALEM AL HAZMI
THE ESTATE OF MAJED MOQED
THE ESTATE OF ZIAD SAMIR JARRAH
THE ESTATE OF AHMED IBRAHIM A. AL HAZNAWI
THE ESTATE OF SAEED AL GHAMDI
THE ESTATE OF AHMED AL NAMI
ZACARIAS MOUSSAOUI

89

**THE TALIBAN**
MUHAMMAD OMAR
MAULVI ABDUL KABIR
JALIL SHINWARI
NOOR JALIL

**THE REPUBLIC OF IRAQ**
IRAQI INTELLIGENCE AGENCY a/k/a The Mukhabarat
 a/k/a The Fedayeen a/k/a Al-'Qare a/k/a"Unit 999"
a/k/a "M-8 Special Operations"
SADDAM HUSSEIN
ESTATE OF QUSAY HUSSEIN
ESTATE OF UDAY HUSSEIN
TAHA YASSIN RAMADAN
MUHAMMED MAHDI SALAH
FARUQ AL-HIJAZI
SALAH SULEIMAN
AHMED KHALIL IBRAHIM SAMIR AL-ANI
HABIB FARIS ABDULLAH AL-MAMOURI
ABDEL HUSSEIN a/k/a The Ghost
ABU AGAB

**THE REPUBLIC OF SUDAN**
MINISTRY OF DEFENSE
MINISTRY OF INTERIOR
SUDANESE INTELLIGENCE SERVICE
NATIONAL ISLAMIC FRONT
HASSAN AL TURABI, Islamic leader
OMAR HASSAN AHMAD AL-BASHIR, President of Sudan
ABDUL RAHIM MOHAMMED HUSSEIN, Interior Minister
ABDEL WAHAB OSMAN, former Sudanese Minister of Industry
ISS EL-DIN EL SAYED, Minister of Finance and National Economy
RAHMAN ABDUL SIRAL-KHATIM, Minister of Defense
AL AMN AL-DAKHILI, Intelligence
AL AMN AL-KHARIJI, Intelligence
FAISAL ISLAMIC BANK
**ISLAMIC REPUBLIC OF IRAN**
ISLAMIC REVOLUTIONARY GUARD ("IRGC")
IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY ("MOIS")
LASHKAR FEDAYAN-E-ISLAMI (ISLAMIC MARTYRS BRIGADE)
AYATOLLAH ALI KHAMENEI, Spiritual Leader of Iran
MOMAMMED MOHAMMADI RAYSHAHRI, special advisor to Spiritual Leader
QORBAN ALI NAJAF-ABADI, Minister of Intelligence
ALI FALAHYAN, Director of Public Intelligence

GENERAL ALI BLOKIAN, former advisor to Hezbollah
AHMAD SALAH (SALIM), member of committee of three of Int'l Hezbollah
MAHDI CHAMRAN SAVEHI, director of International
        Hezbollah and Iranian External Intelligence chief
GENERAL MOHSEN REZA'I, Iranian security director
HOSEYN SHAYKH OL-ESLAM, former Assistant Foreign Minister
GENERAL MOHSEN REZA'I, former commander of the Islamic Revolutionary
 Guard Corps (IRGC) who is now in charge of the reorganization of Iran's security apparatus
GENERAL YAHYA RAHIM SAFAVI, head of the IRGC
QORBAN 'ALI NAJAF 'ABADI, Minister of Information
ALI FALAHYAN, former Minister
MOHAMMED MOHAMMADI RAYSHAHRI, special adviser to Iran's supreme leader Ali Khamene'i

*CO-CONSPIRATORS*
ABD Al-HADI AL-IRAQI
ABD AL-MUSHIN AL-LIBI
ABDUL RAHMAN KHALID BIN MAHFOUZ
ABDUL RAHMAN YASIN
ABDULLA AL OBAID
ABDULA BIN LADEN
ADVICE AND REFORMATION COMMITTEE
AFGHAN SUPPORT COMMITTEE (ASC)
AHMED NUR ALI JUMALE a/k/a Ahmed Nur Ali Jim'ale
AL KHALEEJIA FOR EXPERT PROMOTION AND MARKETING COMPANY
AL RASHID TRUST
AL-BARAKAAT GROUP OF COMPANIES SOMALIA LIMITED
BARAKAAT GROUP OF COMPANIES
AL-GAMMAAH AL ISLAMIAH
AL-HARAMAIN ISLAMIC FOUNDATION
ALI GHALEB HIMMAT
BENEVOLENCE INTERNATIONAL  FOUNDATION, INC.
ENAAM M. ARNANOUT
GLOBAL RELIEF FOUNDATION, INC.
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO)
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT (IIIT)
ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES
ISLAMIC CULTURAL INSTITUTE OF MILAN
ISLAMIC RESCUE ORGANIZATION
JAMAL BARZINJI
KHALED BIN SALIM BIN MAHFOUZ
MOHAMED MANSOUR
MOHAMMED JAMAL KHALIFA
MOHAMMED SALIM BIN MAHFOUZ
MUFTI MOHAMMED RASHID a/k/a RASHID

MUHAMMAD SALAH,
MUSLIM WORLD LEAGUE
MUWAFFAQ FOUNDATION a/k/a BLESSED RELIEF FOUNDATION
NATIONAL COMMERCIAL BANK OF SAUDI ARABIA
PRINCE NAYEF BIN ABDULAZIZ AL SAUD
PRINCE SULTAN BIN ABDULAZIZ AL SAUD
RABIH HADDAH
RABITA TRUST
SAAR FOUNDATION
SAFIQ AYADI
SAUDI SUDANESE BANK
AL SHAMAL ISLAMIC BANK
SHEIKH ABU ABDUL AZIZ NAGI
SHEIK ADEL GALIL BATTERJEE a/k/a
 Batargy
SULEIMAN ABDEL AZIZ AL RAJHI
TABA INVESTMENTS
TANZANITE KING
ULEMA UNION OF AFGHANISTAN
WADI AL AQIQ
WAFA HUMANITARIAN ORGANIZATION
WORLD ASSEMBLY FOR MUSLIM YOUTH
WORLD ASSEMBLY OF ISLAMIC YOUTH
YASSIN AL-QADI a/k/a YASSIN AL-KADI
YOUSAF AHMED ALI
INFOCUS TECH OF MALAYSIA
YAZID SUFAAT OF KUALA LUMPUR MALAYSIA;
AL-SHAYKH AL-IRAQI
ABU HAJER AL IRAQI
PRINCE MOHAMMED AL FAISAL AL SAUD
AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD.
GUM ARABIC CO. LTD.
AL SHAMAL FOR INVESTMENT AND DEVELOPMENT
SALEH ABDULLAH KAMEL
SAUDI DALLAH AL BARAKA GROUP LLC.
OMAR ABDULLAH KAMEL
AL BARAKA INVESTMENT AND DEVELOPMENT
DALLAH AL BARAKA GROUP LLC
ISLAMIC INVESTMENT COMPANY OF THE GULF
DAR-AL-MAAL AL ISLAMI
AL-BIR SAUDI ORGANIZATION
MOHAMMAD S. MOHAMMAD
TADAMON ISLAMIC BANK
NATIONAL ISLAMIC FRONT PARTY

MAMDOUH MAHMUD SALIM
LEBANESE HEZBOLLAH
PALESTINE ISLAMIC JIHAD
HAMAS
MUSTASIM ABDEL-RAHIM
ABDEL WAHAB OSMAN
SUDANESE GOVERNMENT OF NORTHERN STATE
NATIONAL FUND FOR SOCIAL INSURANCE
RAHMAN ABDUL SIRAL-KHATIM
ABDUL-RAHIM MOHAMMED HUSSEIN
AL AMN AL-DAKHILI
AL AMN AL-KHARIJI
ABD AL SAMAD AL-TA'ISH
MOHAMED SADEEK ODEH
ABDEL BARRY
AHMED THE GERMAN
IRAQI SECRET SERVICE
GULBUDDIN HEKMATYAR
IMAD MUGHNIYEH
MAHDI CHAMRAN SAVEHI
MOHAMMED SARKAWI
AL TAWHID
HAJI MOHAMAD AKRAM
MOUNIR EL-MOTASSADEQ
RAMZI MOHAMMED ADBULLAH BINALSHIBH
   a/k/a  Ramzi Mohamed Abdallah Omar
ZAKARIYA ESSABAR
SAID BAHAJI
UMAR FARUQ
IBN SHEIK AL-LIBI
ABDELGHANI MZOUDI
ABD AL-RAHIM AL-NASHIRI a/k/a Bilal Bin Marwan
   a/k/a Umar Mohammed al-Harazi a/k/a Abu Bilal al-Makki, Mullah Bilal
PRINCE TURKI AL FAISAL AL SAUD
PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD (PRINCE ABDULLAH)
PRINCE SALMAN IBN ABDUL AZIZ (PRINCE SALMAN)
ZOUAYDI (MUHAMMED GALEB KALAJE ZOAAYDI AKA ABU TALHA)
MULLAH KREKAR
ABDULAZIS BIN ABDUL RAHMAN AL SAUD
ARAFAT EL-ASAHI
HAYDAR MOHAMED BIN LADEN
MOHAMMED BIN ABDUL RAHMAN AL ARIEFY
FAISAL GROUP HOLDING CO.
ALFAISALIAH GROUP

93

BASHSH HOSPITAL
MUSHAYT FOR TRADING ESTABLISHMENT
ABDULLAH BIN ABDUL MUHSEN AL TURKI (AL TURKI)
SAUDI HIGH COMMISSION (aka The Saudi High Relief Commission)
TAREK AYOUBI
AL ANWA
HELP AFRICAN PEOPLE
IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION
IBRAHIM BIN ABDUL AZIZ,
MERCY INTERNATIONAL RELIEF AGENCY
ISLAMIC MOVEMENT OF UZBEKISTAN (IMU)
SAUDI BIN LADEN GROUP (SBG) a/k/a BIN LADEN CORPORATION
BAKR M BIN LADEN
SALEH GAZAZ
MOHAMMED BAHARETH
ABDULLAH BIN SAID
MOHAMMED NUR RAHIMI
TAREK M. BIN LADEN
OMAR M. BIN LADEN
SALEH MOHAMED BIN LADEN
SAUDI BIN LADEN INTERNATIONAL COMPANY
YESLAM M. BIN LADEN
GLOBAL DIAMOND RESOURCE
TALAL MOHAMMED BADKOOK
MOHAMAN ALI ELGARI
NEW DIAMOND HOLDINGS
M.M. BADKOOK CO. FOR CATERING & TRADING
AL-MUSTAQBAL GROUP
NATIONAL MANAGEMENT CONSULTANCY CENTER (NMCC)
AL-RAJHI BANKING & INVESTMENT CORPORATION
SALEH ABDULAZIZ AL-RAJHI
ABDULLAH SALAIMAN AL-RAJHI
KHALID SULAIMAN AL-RAJHI
SULAIMAN ABDUL AZIZ AL-RAJHI
AL-WATANIA POULTRY
MAR-JAC POULTRY
MAR-JAC INVESTMENTS, INC.
PIEDMONT POULTRY
SNCB CORPORATE FINANCE LTD.
SNCB SECURITIES LTD. IN LONDON
SNCB SECURITIES LTD. IN NEW YORK
SAUDI ECONOMIC AND DEVELOPMENT COMPANY
ZAKAT COMMITTEE
SAUDI RED CRESCENT COMMITTEE

94

ABDULKARIM KHALED UUSUF ABDULLAH
HISHAM (BROTHER OF ENAAM ARNANOUT)
SAIF AL ISLAM EL MASRY
BENEVOLENCE INTERNATIONAL FOUNDATION - U.S.A.
BENEVOLENCE INTERNATIONAL FOUNDATION - CANADA
BENEVOLENCE INTERNATIONAL FUND
SYED SULEMAN AHMER
MAZIN M.H. BAHARETH
SHAHIR ABDULRAOOF BATTERJEE
MUZAFFAR KHAN
SOLIMAN J. KHUDEIRA
JAMAL NYRABEH
SUCCESS FOUNDATION
ABDURAHMAN AL-AMOUDI
AMERICAN MUSLIM FOUNDATION (AMF)
MOHAMMED OMEISH
ADNAN BASHA
MAHMOUD JABALLAH
ARAFAT EL-ASHI
MORO ISLAMIC LIBERATION FRONT (MILF)
MAHMOUD JABALLAH
MOHAMMED KHATIB
SAUDI JOINT RELIEF COMMITTEE
TAIBAH INTERNATIONAL AID ASSOCIATION
ISLAMIC AFRICAN RELIEF AGENCY
TARIK HAMDI
FAZEH AHED
SANABIL AL-KHAIR
SANA-BELL, INC.
SANABEL AL-KHEER, INC.
KHALED NOURI
ABDULLAH M. AL-MAHDI
TAREQ M. AL-SWAIDAN
ABDUL AL-MOSLAH
SALAH BADAHDH
HASSAN A.A. BAHFZALLAH
M. YAQUB MIRZA
IHAB ALI
SAMIR SALAH
IBRAHIM HASSABELLA

ABU SULAYMAN
AHMED TOTONJI
HISHAM AL-TALIB

IQBAL YUNUS
M. OMAR ASHRAF
MOHAMMED JAGHLIT
MUHAMMAD ASHRAF
SHERIF SEDKY
AFRICAN MUSLIM AGENCY
ARADI, INC.
GROVE CORPORATE, INC.

HERITAGE EDUCATION TRUST
MENA CORPORATION
RESTON INVESTMENTS, INC.
SAFA TRUST
STERLING CHARITABLE GIFT FUND
STERLING MANAGEMENT GROUP
YORK FOUNDATION
NATIONAL DEVELOPMENT BANK
DALLAH AVCO TRANS ARABIA CO. LD.
OMAR AL BAYOUMI (AKA ABU IMARD)
AL AQSA ISLAMIC BANK
AQEEL AL-AQEEL
MANSOUR AL-KADI
SOLIMAN H.S. AL-BUTHE
PEROUZ SEDA GHATY
AHMED IBRAHIM AL NAJJAR
ADEL MUHAMMAD SADIQ BIN KAZEM
SAUDI AMERICAN BANK
ABDULAZIZ BIN HAMAD
KHALIL A. KORDI
RASHID M. AL ROMAIZAN
ABDULAZIZ BIN HAMAD AL GOSAIBI
SAUDI CEMENT COMPANY IN DAMMAN
OMAR SULAIMAN AL-RAJHI
ARAB CEMENT COMPANY
MOHAMMED CHEHADE
HAZEM RAGAB
MOHAMMED ALCHURBAJI
MUSTAFA AL-KADIR
ABU AL-MAID

THIRWAT SALAH SHIHATA
ISLAMIC ARMY OF ADEN
MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY
NURJAMAN RIDUAN ISMUDDIN a/k/a HAMBALI

96

MOHAMMED IQBAL ABDURRAHMAN a/k/a ABNU JIBRIL
FOUNDATION SECOURS MONDIAL
WA'EL HAMZA JULAIDAN a/k/a AL HASAN AL MADANI
ABDELKADIR MAHMOUD ES SAYED
KHALID AL FAWAZ
ABU HAMZA AL MASRI
MOHAMED BEN BELGACEM AOUADI
MOKHTAR BOUCHOUCHA
TAREK CHARAABI
SAMI BEN KHEMAIS ESSID
LASED BEN HENI
SALAFIST GROUP FOR CALL AND COMBAT
AL-HAMATI SWEETS BAKERIES
AL-HUR HONEY PRESS SHOPS a/k/a AL-NUR HONEY CENTER
AL SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE
MUHAMMAD AL-HAMATI a/k/a MOHAMMAD
 HAMDI SADIQ AL-AHDAL a/k/a ABU ASIM AL-MAKKI
SAQAR AL JADAWI
AHMAD IBRAHIM AL-MUGHASSIL
AL ITIHAAD AL ISLAMIYA (AIAI)
AMIN AL HAQ a/k/a MUHAMMAD AMIN a/k/a AMIN UL HAQ
ANSAR AL ISLAM a/k/a JUND AL ISLAM
ABU WA'EL a/k/a Sadoun Abdul Latif
AHMAD SA'ID AL KADR
ABDUL AZIZ AL IBRAHIM (or "AL IBRAHIM")
INTERNATIONAL DEVELOPMENT FOUNDATION
SULAIMAN AL-ALI
AHMED IDRIS NASREDDIN, a/k/a NASREDDIN AHMED IDRIS
AKIDA BANK PRIVATE LIMITED a/k/a AKIDA ISLAMIC BANK
INTERNATIONAL LIMITED a/k/a IKSIR
  INTERNATIONAL BANK LIMITED
AKIDA COMMODITY LIMITED
AKIDA INVESTMENT COMPANY LIMITED
AKIDA MANAGEMENT AND TRUST a/k/a/AKIDA ISLAMIC
  BANKERS' TRUSTEE AND MANAGEMENT
ALI GHALEB HIMMAT
AL TAQWA TRADE PROPERTY AND INDUSTRY COMPANY LIMITED,
  a/k/a AL TAQWA TRADE PROPERTY AND INDUSTRY
ESTABLISHMENT, a/k/a HIMMAT ESTABLISHMENT
AL TAQWA ZAKA ESTABLISHMENT
ARMAND ALBERT FRIEDRICH HUBER a/k/a AHMED HUBER
ASAT TRUST REGISTERED

97

BA TAQWA FOR COMMERCE AND REAL ESTATE COMPANY LIMITED,
  a/k/a BA TAQWA FOR COMMERCE AND REAL ESTATE
  ESTABLISHMENT, a/k/a BEN M. NADA ESTABLSIHMENT, a/k/a
YOUSSEF M. NADA ESTABLISHMENT
BANK AL TAQWA LIMITED, a/k/a AL TAQWA BANK
CEMSTEEL IMPEX ESTABLSIHMENT
GULF CENTER S.R.L.
IKSIR LIMITED HOLDING
MIGA – MALAYSIAN SWISS, GULF AND AFRICAN CHAMBER,
  a/k/a CAMERA DI COMMERCIO, INDUSTRIA E TURISMO PER GLI
  STATI ARABI DEL GOLFO E LA SVIZZERA
MOHAMED MANSOUR, a/k/a MOHAMED AL-MANSOUR
NADA INTERNATIONAL ANSTALT, a/k/a NADA GROUP
  INTERNATIONAL ANSTALT
NADA MANAGEMENT ORGANIZATION SA, a/k/a AL TAQWA
  MANAGEMENT ORGANIZATION
NASCO BUSINESS RESIDENCE CENTER SAS
  DI NASREDDIN AHMED IDRIS ED
NASCO NASREDDIN HOLDING SA
NASCOSERVICE S.R.L.
NASCOTEX S.A., a/k/a INDUSTRIE GENERALE DE FILATURE ET
  TISSAGE, A/K/A INDUSTRIE GENERALE DE TEXTILE
NASREDDIN CHARITABLE FOUNDATION
NASREDDIN COMPANY NASCO SAS DI AHMED
  IDRIS NASSNEDDIN EC
NASREDDIN FOUNDATION, a/k/a NASREDDIN STIFTUNG
NASREDDIN GROUP INTERNATIONAL HOLDING LIMITED
NASREDDIN INTERNATIONAL GROUP LIMITED HOLDING a/k/a
  MIDDLE EAST AND TURKEY INVESTMENT HOLDING LIMITED
RAW MAT SERVICE AND MANAGEMENT SA
YOUSSEF MUSTAFA NADA
YOUSSEF M. NADA ESTABLISHMENT,
  a/k/a YOUSSEF M. NADA ANSTALT
YOUSSEF M. NADA & CO. GESELLSCHAFT MBH
ZEINAB MANSOUR a/k/a ZEINAB MANSOUR FATTOUH


AL TIKRITI, BARZAN IBRAHIM
AL QARDAWI, SHEIKH YUSUF
ABDULLAH OMAR NASEEF
BIHEIRI, SOLIMAN S.

ISLAMIC CENTER OF TUCSON
ISLAMIC SOCIETY OF NORTH AMERICA
ISMAIL, HAQI
MUSLIM BROTHERHOOD
NORTH AMERICAN ISLAMIC TRUST

                              Defendants.
-------------------------------------------------------------------x

Plaintiffs, by their attorneys Kreindler & Kreindler, Barasch, McGarry Salzman

Penson & Lim, Speiser, Krause, Nolan & Granito, Baumeister & Samuels, P.C., Law Firm

of Aaron J. Broder & Jonathan C. Reiter and Jaroslawicz & Jaros, Esqs.,  as and for their

Third Amended Consolidated Master Complaint, hereby allege:

1.      Plaintiffs listed in the caption of this action are U.S. citizens, residents or

foreign citizens who are or will be appointed either the Executors, Administrators or

Personal Representatives of the Estates of persons killed, or are persons injured in the

September 11, 2001 terrorist attacks perpetrated by some of the defendants with the support

and assistance of the other defendants, in which four United States' commercial aircraft

were caused to crash into the World Trade Center Towers, the Pentagon and a field in

Shanksville, Pennsylvania (hereinafter "September 11th Attacks") or representatives of

property that was damaged in the attacks.   Plaintiffs' decedents were passengers or crew

members on board American Airlines Flights 11 and 77, United Airlines Flights 175 and

93, and persons present at both Towers of the World Trade Center in New York, or present

at the Pentagon in Virginia and includes personal injury victims and those persons or

entities who suffered property damage at those locations.

## JURISDICTION AND VENUE

2.      Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a) (actions against foreign states), 1331 (federal question), 1332(a)(2), 1350 ("Alien Tort Act"), 1605(a)(2), 1605(a)(5), 1605(a)(7) (the Foreign Sovereign Immunities Act), and the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)), and violation of the International Anti-Terrorism Act, 18 U.S.C. §2333.

3.      Venue is proper in this district pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. § 40101, Title IV, § 408(b)(3), designating the Southern District of New York ("S.D.N.Y.") as the exclusive venue for all civil litigation arising out of, or related to the September 11th Attacks, and 28 U.S.C. 1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, injuries and deaths occurred in the Southern District of New York.

4.      This action for wrongful death, personal injury and related claims perpetrated by the foreign states of IRAQ, the SUDAN, and IRAN through their instrumentalities and their official and unofficial employees, agents and servants alleged herein, falls within the exceptions to immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7) (the Foreign Sovereign Immunities Act).

## DEFENDANTS

5.      Defendants are co-conspirators who intentionally, willfully and knowingly

conspired, planned, financed, supported, executed and carried out a plan to murder, maim and injure United States' citizens, residents and others on September 11, 2001; and all participated directly or indirectly in the September 11, 2001 terrorist attacks on the United States of America.  Defendants fall into three primary categories, (1) AL QAEDA and its members and associates, (2) IRAQ, the SUDAN and IRAN, State Sponsors of AL QAEDA's terrorist activities, and (3) entities or individuals who provided logistical, material, financial or other support to AL QAEDA and its terrorist activities.

6.      Defendant AL QAEDA, a/k/a Islamic Army, is an unincorporated association organized to perpetrate acts of international terrorism, including murder, mayhem, bombings and hijackings against the United States, its citizens and its allies.  AL QAEDA has also encouraged, financed and supported other terrorist groups who targeted U.S. citizens.  AL QAEDA, as of September 11, 2001, was headquartered in Afghanistan, but has a network of terrorist "cells" and affiliated groups throughout the world.

7.      Defendant OSAMA BIN LADEN a/k/a Usama Bin Laden, Abu Abdullah, Mujahid Shaykh Hajjs and Abdul Hay, ("BIN LADEN") was formerly a national of Saudi Arabia with Yemen as his ancestral home, but who is now an alien of unknown nationality. He is last known to have been living in Afghanistan.  At all relevant times, BIN LADEN has headed and directed the terrorist activities of AL QAEDA.

8.      Defendants OSAMA BIN LADEN, MUHAMMAD ATEF, AYMAN AL ZAWAHIRI, ABU ZUBAYDAH, SAIF AL ADEL, KHALID SHEIKH MOHAMMED,

ABDULLAH AHMED ABDULLAH, MAHFOUZ WALAD AL WALID a/k/a ABU HAFS THE MAURITANIAN, MUHSIN MUSA MATWALLI ATWAH, ANAS AL LIBY, FAZUL ABDULLAH MOHAMMED, AHMED MOHAMED HAMED ALI, MOHAMED SULEIMAN AL NALFI, MUSTAFA MOHAMED FADHIL, AHMED KHALFAN GHAILANI, FAHID MOHAMMED ALLY MSALAM, SHEIKH AHMED SALIM SWEDAN, RAMZI BINALSHIBB, HASHIM ABDULRAHMAN, OMAR SHEIKH, JAMAL AL BADAWI, MOHAMMED OMAR AL HARAZI, RAED HIJAZI, JAMIL QASIM SAEED, MOHAMED BAYAZID, and ABD AL HADI AL IRAQI and others named herein are or were natural persons who, on or before September 11, 2001, were leaders or members of AL QAEDA who conspired, acted in concert with, aided and abetted, sponsored and assisted directly and indirectly, in the September 11th terrorist attacks against the United States of America.

9.     MOHAMMED ATTA, MARWAN AL SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, MOHALD AL SHEHRI, SATAM M. A. AL SUQAMI, ABDULLAHZIZ AL OMARI, WALEED M. AL SHEHRI, WAIL AL SHEHRI, KHALID AL MIDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked three commercial aircraft on September 11, 2001 and committed mass murder by deliberately flying the aircraft into the World Trade Center and the Pentagon.   ZIAD SAMIR JARRAH, AHMED IBRAHIM A. AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines

Flight 93 and attempted to deliberately fly the aircraft into the White House or another prominent Washington D.C. landmark but were thwarted by the efforts of heroic passengers, resulting in the aircraft crashing to the ground in Shanksville, Pennsylvania. The "twentieth hijacker," ZACARIAS MOUSSAOUI, was in custody on September 11, 2001, and thus unable to participate in the attacks perpetrated that fatal day. Plaintiffs have named as defendants, the estates of various AL QAEDA members who were killed on September 11th or in armed conflict with allied forces since September 11, 2001.

10.     Defendant TALIBAN, as of September 11, 2001, was an unincorporated association that served as the *de facto* government of Afghanistan from approximately 1996 until shortly after September 11, 2001. The TALIBAN, as of September 11, 2001, was headquartered in Kandahar, Afghanistan and had declared itself to constitute the government of Afghanistan.

11.     Defendant MUHAMMAD OMAR ("OMAR") founded the TALIBAN and since 1996 OMAR was the leader of the TALIBAN's six member ruling council and was responsible for the TALIBAN's financial activities. OMAR, individually and through the TALIBAN organization that he controlled, supplied material and logistical support to AL QAEDA and BIN LADEN in furtherance of their terrorist plans to attack the United States of America and murder U.S. citizens.

12.     AL QAEDA and the TALIBAN were closely linked. OMAR and the TALIBAN afforded BIN LADEN special status in Afghanistan; and BIN LADEN was the

*de facto* head of TALIBAN intelligence and security.  BIN LADEN acted on OMAR's behalf, by providing soldiers to crush opposition to the TALIBAN's ruthless rule inside Afghanistan.  OMAR enabled BIN LADEN to export terrorism to the United States and elsewhere by allowing him to construct and maintain camps in Afghanistan and train AL QAEDA members and other terrorists from around the world in the deadly and depraved methods of committing acts of violence, murder, destruction and mayhem.  OMAR refused to turn BIN LADEN over to the United States after the September 11th attacks and instead, continued to offer sanctuary to BIN LADEN and AL QAEDA members.

13.    Defendant REPUBLIC OF IRAQ  ("IRAQ") at all relevant times prior to and including September 11, 2001, was a foreign sovereign state located in the Middle East and shares borders with Saudi Arabia, Jordan, Syria, Turkey, IRAN and Kuwait.  The acting government of IRAQ is currently in transition.

14.    Defendant IRAQ has, for many years and at all relevant times, been designated by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b) and 18 U.S.C. § 2333.

15.    Defendant, the IRAQI INTELLIGENCE, a/k/a Mukhabarat a/k/a the Fedayeen, a/k/a Al-Qare, a/k/a Unit 999, a/k/a M-8 operations, is the intelligence and operational entity in charge of conducting clandestine operations for the Iraqi government and is an agency, instrumentality and/or organ of the Iraqi government.

16.     Defendant IRAQ sponsored terrorism through its officials, officers, employees and agents, including but not limited to defendants, SADDAM HUSSEIN, QUSAY HUSSEIN, UDAY HUSSEIN, BARZAN AL TIKRITI, TAHA YASSIN RAMADAN, MUHAMMED MAHDI SALAH, FARUQ AL HIJAZI, SALAH SULEIMAN, AHMED KHALIL IBRAHIM SAMIR AL ANI, HABIB FARIS ABDULLAH AL MAMOURI, and ABDEL HUSSEIN, a/k/a "The Ghost," HAQI ISMAIL, TAHA AL ALWANI, ABU AGAB, and ABU WA'EL who are natural persons, subjects and citizens of IRAQ and leaders, agents/or employees of IRAQ  and/or its INTELLIGENCE AGENCY, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

17.     The defendant REPUBLIC OF SUDAN ("SUDAN") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a) and is located on the continent of Africa and borders the Red Sea west of Saudi Arabia and south of Egypt.  The United States does not have formal diplomatic relations with the current government of the defendant SUDAN, which maintains an Embassy in Washington, D.C. located at 2210 Massachusetts Avenue, N.W., Washington, D.C. 20008-2831.

18.     The defendant SUDAN has, for many years and at all relevant times, been designated by the United States Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 18 U.S.C. § 2333.

105

The defendant SUDAN, by and through its agents and instrumentalities including, but not limited to, SUDANESE INTELLIGENCE and Ministries of Interior and Foreign Affairs has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals. The defendant SUDAN has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN, through its officials, officers, employees and agents, including but not limited to MINISTRY OF DEFENSE, MINISTRY OF INTERIOR, NATIONAL ISLAMIC FRONT, HASSAN TURABI, Islamic leader, OMAR HASSAN AHMAD AL BASHIR, President of Sudan, ABDUL RAHIM MOHAMMED HUSSEIN, Interior Minister, ABDEL WAHAB OSMAN, former Sudanese Minister of Industry, and ISS EL-DIN EL SAYED, Minister of Finance and National Economy..

19.     Defendant, the ISLAMIC REPUBLIC OF IRAN (hereinafter referred to as "IRAN"), is a foreign state within the meaning of 28 U.S.C. §1391(f) and 1603(a) and borders Afghanistan to its east and IRAQ to its west. IRAN maintains an Interest Section within the United States at 2209 Wisconsin Avenue, N.W., Washington, D.C. 20007.

20.     Defendant IRAN has for many years, and at all relevant times, been designated as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C.App.§ 2405(i), and the Foreign Assistance Act of 1961, 22 U.S.C. §2371(b) and 18 U.S.C. § 2333.

21.     Defendant IRAN has been found to be liable as a state sponsor of

international terrorism under 28 U.S.C. §1605(a)(7), especially in connection with acts perpetrated by its state sponsored paramilitary terrorist organization known as "HEZBOLLAH," in various cases, including *Anderson v. the Islamic Republic of Iran, 90* F. Supp.2d 107 D.D.C. 2000), and *Cicippio* v. *The Islamic Republic of Iran,* 18 F.Supp 2d 62 (D.D.C. 1998).

22.     Defendant IRAN through its officials, officers, agents and employees, including but not limited to, its MINISTRY OF INTELLIGENCE AND SECURITY ("MOIS"),  IRANIAN REVOLUTIONARY GUARD  ("IRGC"), AYATOLLAH ALI KHAMENEI, Spiritual Leader of IRAN, MOMAMMED MOHAMMADI RAYSHAHRI, special advisor to Spiritual Leader, QORBAN ALI NAJAF-ABADI, Minister of Intelligence, ALI FALAHYAN, Director of Public Intelligence, GENERAL ALI BLOKIAN, former advisor to HEZBOLLAH, AHMAD SALAH (SALIM), member of committee of three of Int'l Hezbollah, MAHDI CHAMRAN SAVEHI, director of International, HEZBOLLAH and Iranian External Intelligence chief, GENERAL MOHSEN REZA'I, Iranian security director HOSEYN SHAYKH OL-ESLAM, former Assistant Foreign Minister, GENERAL MOHSEN  REZA'I, former commander of the IRANIAN REVOLUTIONARY GUARD S CORPS (IRGC) who is now in charge of the reorganization of IRAN's security apparatus, GENERAL YAHYA RAHIM SAFAVI, head of the IRGC, provided material support and resources to defendants AL QAEDA and BIN LADEN both directly and through its surrogate, HEZBOLLAH. The support provided by

107

IRAN to BIN LADEN and AL QAEDA assisted in or contributed to the preparation and execution of the plans that culminated in the September 11 Attacks.

23.     The co-conspirator sponsor defendants are individuals, organizations, banks and charities located in Saudi Arabia and other parts of the world including the United States who conspired with BIN LADEN, AL QAEDA, and the TALIBAN to raise, launder, transfer, distribute and hide funds for BIN LADEN and AL QAEDA in order to support and finance their terrorist activities, including, but not limited to, the September 11th attacks. Some of the individuals, businesses, banks and charities operate legitimate businesses but also maintain a dual role as an AL QAEDA co-conspirator and have actively supported its terrorist activities; while others, including some of the individuals, are a sham front for AL QAEDA or are full fledged members of AL QAEDA.

## SUMMARY OF ALLEGATIONS

24.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving defendants who have conspired for many years to attack the United States and murder United States' citizens and who ultimately conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more and destroyed numerous properties and businesses.

25.     IRAQ has sworn revenge against the United States since 1991 for IRAQ 's humiliating defeat in the Persian Gulf War. Since IRAQ could not defeat the U.S. Military,

it resorted to terror attacks on U.S. citizens.  In order to avoid another confrontation with U.S. Military forces, IRAQ contracted with terrorists and sponsored Islamic fundamentalists who were willing to commit terrorist acts on IRAQ's behalf.

26.     For many years AL QAEDA wanted to drive the United States from the Arabian peninsula, topple Middle East governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran.  Over the years, AL QAEDA has grown as it absorbed or allied with other like-minded Islamic terrorist groups, including the Defendant EGYPTIAN ISLAMIC JIHAD and was supported by and absorbed membmers from the Defendant Muslim Brotherhood.

27.     For more than 10 years, IRAQ's leadership and AL QAEDA shared a virulent hatred of the United States.

28.     As early as 1992, AL QAEDA terrorists established close working relations with IRAQI INTELLIGENCE agents in the SUDAN, Afghanistan, IRAQ and elsewhere. Soon thereafter, IRAQI INTELLIGENCE decided to support AL QAEDA and to employ AL QAEDA terrorists to carry out IRAQ's terror attacks.  The IRAQ-AL QAEDA relationship benefitted IRAQ because it provided that state with trained terrorists willing to die in terror attacks.  As a secular state, IRAQ does not have a large number of citizens wishing to become martyr warriors.  Additionally, by using AL QAEDA suicide terrorists, IRAQ could disavow involvement in attacks and avoid retribution.   The relationship

benefitted AL QAEDA which received the support, funding, facilities and training needed to carry out its terror campaigns.

29.     During the mid 1990's IRAQ began actively supporting AL QAEDA operations by providing intelligence, training, weapons, supplies, passports, travel documents and financial support to co-conspirators.  Significantly, one of IRAQ 's military or terror training camps contained the fuselage of a Boeing 707 used to teach techniques for hijacking commercial aircraft to AL QAEDA terrorists.

30.     AL QAEDA, backed by IRAQ , carried out the September 11th terror attacks with the financial and logistical support of numerous individuals and organizations.  These individuals and organizations provided AL QAEDA with the means to recruit, train, and employ thousands of terrorists, including the twenty assigned the ghastly mission to murder United States citizens and destroy U.S. landmarks on September 11, 2001.

31.     The SUDAN and IRAN have repeatedly sponsored violent terrorist attacks on U.S. and Israeli targets in the Middle East and have supported AL QAEDA financially, materially and logistically for over a decade and support its goals.

32.     This lawsuit seeks to strip the assets of AL QAEDA, BIN LADEN,  IRAQ, SUDAN, IRAN and those individuals, entities and organizations who participated in or supported the September 11th terror attacks and recover compensatory and punitive damages for the September 11th victims.

33.     **THE BIRTH OF AL QAEDA**

110

Starting in 1989, an international terrorist group emerged dedicated to opposing non-Islamic governments with brutal force and terrifying violence. This organization grew out of the "Mekhtab al Khidemat" (the "Azzam Service Center") organization which maintained offices in Peshawar, Pakistan and received funds from Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises, among others during the Soviet-Afghan war.

34.    Under the leadership of BIN LADEN, MUHAMMAD ATEF, a/k/a "Abu Hafs al Masry," Sheikh Taysir Abdullah, Abu Fatima; Abu Khadija; together with "Abu Ubaidah al Banshiri" (deceased in 1996), AYMAN AL ZAWAHIRI and others, the Azzam Service Center expanded, creating terrorist cells in various parts of the world, including Afghanistan, Pakistan and the United States, and financing and supporting other terrorist groups dedicated to committing acts of violence, murder, destruction and mayhem. From approximately 1989 until the present, this terrorist group called itself "AL QAEDA" ("the Base").

35.    At all relevant times, AL QAEDA was led by BIN LADEN. Members of AL QAEDA pledged an oath of allegiance (called a "bayat") to BIN LADEN and AL QAEDA, committing themselves to become martyrs in their depraved cause.

36.    AL QAEDA actively and vehemently opposed the United States for several reasons. First, it regarded the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believed the United

States was providing essential support for other "infidel" nations and organizations, particularly the governments of Egypt, Israel and the United Nations, which AL QAEDA regarded as enemies.  Third, AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in the Middle East afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993.  AL QAEDA viewed these as pretextual preparations for an American occupation of Islamic countries.  In particular, AL QAEDA opposed the continued presence of American military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War. Fourth, AL QAEDA opposed the United States Government because of the arrest, conviction and imprisonment of AL QAEDA members or other terrorists with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman who was convicted of planning to bomb bridges and tunnels in New York City.   Fifth, AL QAEDA believed United Nation sanctions against IRAQ were orchestrated by the United States out of "eagerness to destroy IRAQ".

37.     One of the AL QAEDA's principal goals was to use violence to drive the United States armed forces out of Saudi Arabia and Somalia.  Members of AL QAEDA issued fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

38.     At least as early as 1991, BIN LADEN and AL QAEDA began working closely with AYMAN AL ZAWAHIRI, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al

112

Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," whose EGYPTIAN ISLAMIC JIHAD terrorist group shared BIN LADEN and AL QAEDA's goals.  BIN LADEN had met ZAWAHIRI in Peshawar, Pakistan in 1987 during the Afghan-Soviet War.

39.     From in or about 1987, until in or about December 1997, AYMAN AL ZAWAHIRI, led the EGYPTIAN ISLAMIC JIHAD, a group dedicated to the forceful overthrow of the Egyptian Government and committing violence against the United States, in part, for what ZAWAHIRI believed to be United States support of the Egyptian Government.  Members of EGYPTIAN ISLAMIC JIHAD pledged allegiance to AL ZAWAHIRI.  Many of the leading members of the EGYPTIAN ISLAMIC JIHAD ultimately became influential members of AL QAEDA, including AYMAN AL ZAWAHIRI and MUHAMMAD ATEF.  By February 1998, the EGYPTIAN ISLAMIC JIHAD led by AL ZAWAHIRI and MUHAMMAD ATEF, and including THIRWAT SALAH SHIHATA, and TARIQ ANWAR AL SAYYID AHMAD a/k/a Fathi a/k/a Amr Al Fatih had effectively merged with AL QAEDA and had joined with AL QAEDA in targeting United States' citizens.

40.     AL QAEDA had a command and control structure which included a majalis al shura (or consultation council) that discussed and approved major undertakings, including terrorist operations.  BIN LADEN, MUHAMMAD ATEF, a/k/a "Abu  Hafs," AYMAN AL ZAWAHIRI, SAIF AL ADEL, MAMDOUH MAHMUD SALIM, a/k/a "Abu

113

Hajer," and ABDULLAH AHMED ABDULLAH, a/k/a "Abu Mohamed el Masry," a/k/a

"Saleh," among others, sat on the majalis al shura (or consultation council) of AL QAEDA.

Its affiliate, the EGYPTIAN ISLAMIC JIHAD had a Founding Council, on which Ibrahim

Eidarous sat.

41.     AL QAEDA also maintained a "military committee" which considered and

approved "military" matters.  MUHAMMAD ATEF sat on the military committee and  was

one of BIN LADEN's two principal military commanders together with "Abu Ubaidah al

Banshiri," (until his death in May 1996).  MUHAMMAD ATEF had the principal

responsibility for supervising the training of AL QAEDA members.  SAIF AL ADEL also

served on the military committee reporting to MUHAMMAD ATEF.  AMIN AL HAQ was

an Afghan national who served as security coordinator to OSAMA BIN LADEN.

42.     AL QAEDA functioned both on its own and as a conduit for other terrorist

organizations in other parts of the world that shared its ideology, such as the EGYPTIAN

ISLAMIC JIHAD as described above, and the SALAFIST GROUP FOR CALL AND

COMBAT.  SALAFIST GROUP members including MOHAMED BEN BELGACEM

AOUADI who provided false identify documents for AL QAEDA members and LASED

BEN HENI, TAREK CHARAABI, MOKHTAR BOUCHOUCHA and SAMI BEN

KHEMAIS ESSID, trafficked in arms and explosives for AL QAEDA.  AL QAEDA camps

were used to train terrorists to fight in Islamic causes, such as supporting Pakistan in its

dispute with India over the province of Kashmir.  AL QAEDA maintained terrorist cells

and personnel in a number of countries to facilitate its activities, including Italy, where defendant ABDELKADIR MAHMOUD ES SAYED has been indicted for conspiring to traffic in arms, explosives, chemical weapons, and identity papers from his position as organizer of AL QAEDA's Milan, Italy, cell. ES SAYED is a fugitive under a death sentence, having been convicted of involvement in a 1997 terrorist attack in Luxor, Egypt, carried out by GAMA'AT AL ISLAMIYYA. Defendant MAHMUD ABU AL FATUH MUHAMMAD was a member of the ISLAMIC JIHAD and participated in the ISLAMIC CULTURAL CENTER OF MILAN. He is the owner of AL SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE, which has branches in Peshawar. AL SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE was named a sponsor of terror by the United States and the United Nations. AL QAEDA also maintained terrorist cells in Kenya, Germany, Tanzania, the United Kingdom, Canada and the United States.

43. The ISLAMIC ARMY OF ADEN is a Yemeni group which supports OSAMA BIN LADEN. Its members consist largely of veterans of the Afghanistan war against the Soviet Union who fought with BIN LADEN. The leader of the ISLAMIC ARMY OF ADEN, Abu al Hassan, had contact with AL QAEDA through his relationship with AYMAN AL ZAWAHIRI and the EGYPTIAN ISLAMIC JIHAD. Defendant ABU HAMZA AL MASRI was in contact with BIN LADEN lieutenant defendant ABU ZUBADYA. AL MASRI recruited people for Bin Laden terror training camps and AL QAEDA sponsored acts of terror including ZACARIAS MOUSSAOUI, suspected of

helping to plan the 9-11 attacks and Richard Reid the "shoe bomber" arrested in December

2001. Both terrorists were worshipers at the British mosque where AL MASRI is a cleric.

44.     BIN LADEN and AL QAEDA also forged alliances with the NATIONAL

ISLAMIC FRONT in the SUDAN and with representatives of the government of IRAN,

and its associated terrorist group HEZBOLLAH, for the purpose of working together

against their perceived common enemies in the West, particularly the United States.

45.     At various times from as early as 1989, BIN LADEN, and others known and

unknown, ran terrorist training "camps and guesthouses" in various areas, including

Afghanistan, IRAQ , IRAN, Pakistan, the SUDAN, Somalia, Kenya, Malaysia, Philippines

and Germany for the use of AL QAEDA and its affiliated groups.  MAHMUD SALIM

a/k/a Abu Hajer al Iraqi, and ABD AL HADI AL IRAQI, one of the top 25 AL QAEDA

military advisors, managed some of these training camps and guesthouses in Afghanistan

and Pakistan.

46.     Since 1991, BIN LADEN, AL QAEDA and many of their co-defendants

unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to

murder and injure United States citizens throughout the world, including in the United

States, and to conceal their activities and methods by, among other things, establishing front

companies, providing false identity and travel documents, financing terrorist operations,

engaging in coded correspondence, providing false information to the authorities in various

countries and seeking to detect and kill informants.

## **THE SUDAN**

47.     In 1991, BIN LADEN left Saudi Arabia and relocated in the SUDAN.  He centered his AL QAEDA operations there for the next four years while maintaining offices and orchestrating terrorist recruitment, training and launching attacks in various parts of the world.  Defendant, MUHSIN MUSA MATWALL ATWAH, an Egyptian known as "Abdel Rahman" provided military and intelligence training for AL QAEDA members as early as 1990 in Afghanistan and Pakistan, and then in the Sudan.  BIN LADEN recruited new members in the SUDAN, such as MOHAMED SULEIMAN AL NALFI and at least 200 Afghan Arabs, Saudis, Yemenis and Egyptians who had fought against the Soviets in Afghanistan and who became part of AL QAEDA's cell in the SUDAN.  MAMDOUH MAHMUD SALIM a/k/a Abu Hajer al Iraqi, served as BIN LADEN's top lieutenant in the SUDAN shortly after BIN LADEN's arrival there.

48.     In 1989, Defendant HASSAN AL TURABI installed a radical extremist Islamic government in SUDAN through a *coup.*  Beginning in 1991, he and the Sudanese government provided refuge to BIN LADEN.  A 1996 State Department fact sheet on OSAMA BIN LADEN described his operations in the country beginning in 1991:

> *Bin Laden relocated to SUDAN in 1991, where he was*
> *welcomed by National Islamic Front (NIF) leader Hasan Al*
> *Turabi. . . .  [bin Laden] embarked on several business*
> *ventures in SUDAN in 1990, which began to thrive following*

117

> *his move to Khartoum. Bin Laden also formed symbiotic*
> *business relationships with wealthy NIF members by*
> *undertaking civil infrastructure development projects on the*
> *regime's behalf.*

49.    OSAMA BIN LADEN's close relationship with the new extremist Sudanese

regime became symbiotic and he conducted several business projects with or on behalf of

the NIF.  One of these investments was the Defendant AL SHAMAL ISLAMIC BANK,

as reported by the State Department:

> *Bin Laden and wealthy NIF members capitalized al-Shamal*
> *Islamic Bank in Khartoum. Bin Laden invested $50 million*
> *in the bank.*

50.    OSAMA BIN LADEN's involvement in business transactions in the

SUDAN including the AL SHAMAL ISLAMIC BANK, was confirmed by a 2002

Congressional Research Service Report:

> *In 1991, bin Laden relocated to SUDAN with the approval*
> *of SUDAN National Islamic Front (NIF) leader Hasan Al*
> *Turabi. There, in concert with NIF leaders, [bin Laden]*
> *built a network of businesses, including an Islamic Bank (al*
> *Shamal), an import-export firm, and firms that exported*
> *agricultural products. An engineer by training, bin Laden*
> *also used his family connections in the construction business*
> *to help SUDAN build roads and airport facilities. The*
> *business in SUDAN . . . enabled him to offer safe haven and*
> *employment in SUDAN to AL QAEDA members, promoting*
> *their involvement in radical Islamic movements in their*
> *countries of origin (especially Egypt) as well as anti-U.S.*
> *terrorism.*

51.    Defendant AL SHAMAL ISLAMIC BANK in the SUDAN has been tied to

not only to BIN LADEN and TURABI, but also to shareholder Defendant FAISAL

ISLAMIC BANK which is chaired by Defendant PRINCE MOHAMMED AL FAISAL AL

SAUD and other Saudi investors. AL SHAMAL ISLAMIC BANK was chaired by

Defendant ADEL ABDUL JALIL BATTERJEE who was responsible for funding AL

QAEDA through BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") and

WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY"). BIN LADEN maintained

accounts at AL SHAMAL in his own name and for his Sudanese businesses defendants AL-

HIJRAH CONSTRUCTION AND DEVELOPMENT LTD., WADI AL AQIQ (an

import/export company); TABA INVESTMENT CO. LTD. (agricultural exporter); GUM

ARABIC CO. LTD. (co-owned by BIN LADEN and SUDAN); AL THEWAR (agricultural

company); BLESSED FRUITS CO.; and IKHLAS (Honey)

  52. Defendant AL SHAMAL ISLAMIC BANK was founded in 1983 by three

individuals or entities: (1) AL SHAMAL FOR INVESTMENT AND DEVELOPMENT,

a Sudanese company; (2) Defendant SALEH ABDULLAH KAMEL, Chairman of the

SAUDI DALLAH AL BARAKA GROUP LLC; and (3) the SUDANESE GOVERNMENT

OF NORTHERN STATE, then controlled by Governor MUTASIM ABDUL-RAHIM,

Secretary General of the National Congress Party in Khartoum, and representative of

extremist HASSAN AL TURABI.

  53. In April 1984, the AL SHAMAL ISLAMIC BANK issued shares to its main

founders. They included the SUDANESE GOVERNMENT OF NORTHERN STATE, the

Defendant FAISAL ISLAMIC BANK – SUDAN, Defendant SALEH ABDULLAH

119

KAMEL, his brother OMAR ABDULLAH KAMEL, and Defendant AL BARAKA INVESTMENT AND DEVELOPMENT, a wholly owned subsidiary of DALLAH AL BARAKA GROUP LLC and Defendant SALEH ABDULLAH KAMEL.

54.     Among the shareholders of the AL SHAMAL ISLAMIC BANK was Defendant FAISAL ISLAMIC BANK – SUDAN, a subsidiary of ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC, whose parent company is Defendant DAR-AL-MAAL AL ISLAMI, based in Switzerland. The three entities are chaired by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD, and controlled by Saudi investors.

55.     AL SHAMAL ISLAMIC BANK Chairman and shareholder, Defendant ADEL ABDUL JALIL BATTERJEE, is the Chairman of AL BIR AL DAWALIA, whose United States branch, BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF"), is also a front for AL QAEDA sponsorship.

56.     Defendant ADEL ABDUL JALIL BATTERJEE is both Chairman of the AL SHAMAL ISLAMIC BANK and was also Chairman of the WORLD ASSEMBLY OF MUSLIM YOUTH. BATTERJEE is the subject of an FBI investigation into terrorist activities and has been implicated in the criminal indictment of ENAAM ARNAOUT of BIF (discussed below).

57.     AL SHAMAL ISLAMIC BANK General Manager, MOHAMMAD S. MOHAMMAD, acknowledged in a September 2001 press release that OSAMA BIN

120

LADEN had two accounts in the bank, opened on March 30, 1992 in the name of AL-HIJRAH CONSTRUCTION AND DEVELOPMENT LTD.  This company, according to the United States Department of State, worked directly with Sudanese military officials to transport and provide provisions to terrorists training in OSAMA BIN LADEN's terrorist training camps in northern SUDAN.

58.     A third AL SHAMAL ISLAMIC BANK account was opened in 1993 in the name of OSAMA BIN LADEN's company, WADI AL AQIQ, a company registered in Saudi Arabia. The import-export firm, in conjunction with OSAMA BIN LADEN's TABA INVESTMENT COMPANY LTD., secured a near monopoly over SUDAN's major agricultural exports of gum, corn, sunflower, and sesame products in cooperation with prominent Sudanese NIF members.

59.     Jamal Ahmed Al Fadl (or "Al Fadl"), was the first person called in the trial of four men charged with participating in a terrorism conspiracy led by OSAMA BIN LADEN, that being the 1998 bombings of the American Embassies in Kenya and Tanzania. In February of 2001, Al Fadl's testimony described OSAMA BIN LADEN's global banking network, naming institutions in SUDAN, Malaysia, The United Kingdom, Hong Kong and Dubai where OSAMA BIN LADEN and his international terrorist organization kept money. He also gave a detailed account of OSAMA BIN LADEN's agricultural, construction, transportation and investment companies in SUDAN, which are fronts for terrorist activities. OSAMA BIN LADEN, his co-conspirators, aiders and abettors, and material

121

sponsors have engaged in a global conspiracy aimed at the United States and other Western targets.  AL QAEDA has also acted as a kind of umbrella organization providing support for other terrorist groups and also cooperating with other terrorist organizations like the Iranian-backed HEZBOLLAH.

60.     Al Fadl testified that he helped OSAMA BIN LADEN pay the employees of his companies and AL QAEDA, whose members received monthly checks of several hundred dollars, and that he was sent out to buy five farms in SUDAN for the group to use as training camps.  Al Fadl testified one farm cost $250,000 and another $180,000.

61.     After OSAMA BIN LADEN moved his group to SUDAN in 1991, Al Fadl testified, its activities were greatly aided by SUDANESE INTELLIGENCE and by other government officials.  Al Fadl described several arms shipments, including AL QAEDA's smuggling of Kalishnikov rifles into Egypt from SUDAN on two separate occasions that involved about 50 camels each.  AlFadl also recalled a midnight shipment of four large crates of weapons and explosives to an Islamic group in Yemen, carried on a boat owned by AL QAEDA and accomplished with the help of a SUDANESE INTELLIGENCE officer.

62.     AlFadl testified OSAMA BIN LADEN was surrounded by a group of AL QAEDA associates who participated on a ruling council and ran various committees on military, business and religious matters.

63.     AL SHAMAL ISLAMIC BANK has repeatedly been used to fund criminal

122

and terrorist activities. Al Fadl further testified, that OSAMA BIN LADEN and at least six AL QAEDA operatives held bank accounts in AL SHAMAL ISLAMIC BANK under their real names.

64.    Jamal Ahmed Al Fadl also testified that AL QAEDA operatives received monthly checks of several hundred dollars from AL SHAMAL ISLAMIC BANK accounts and that he transferred $100,000.00 from AL SHAMAL ISLAMIC BANK to an AL QAEDA representative in Jordan.

65.    Defendant FAISAL ISLAMIC BANK – SUDAN, a subsidiary of ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC and DMI, was one of the five main founders of AL SHAMAL ISLAMIC BANK in April 1984 and became member of the board in July 1988.  PRINCE MOHAMMED AL FAISAL AL SAUD is heavily involved in the sponsorship of terror through FAISAL ISLAMIC BANK – SUDAN.

66.    Defendant FAISAL ISLAMIC BANK – SUDAN was also implicated as an AL QAEDA sponsor during the 2001 United States trial on the 1998 embassy bombings in Africa as managing bank accounts for AL QAEDA operatives. Al Fadl, testified:

> Q. Where were the accounts [of AL QAEDA ] held? In what countries?
> A. . . . we got account in Bank Faisal Islami [Faisal Islamic Bank].
> Q. Is that also in Khartoum?
> A. Yes."

67.    Defendant FAISAL ISLAMIC BANK's subsidiary in Turkey is currently under investigation by the Istanbul Prosecutor's Office on charges of tax irregularities concerning seven executives. Prosecutors are demanding three years imprisonment for the

executives including Defendant PRINCE MOHAMMED AL FAISAL AL SAUD.

68.     Defendant TADAMON ISLAMIC BANK was formed in Khartoum, SUDAN on November 28, 1981 and started operations on March 24, 1983, less than one month before AL SHAMAL ISLAMIC BANK obtained banking authorization for its own activities. The TADAMON ISLAMIC BANK is active across the Sudanese territory, through twenty-one different establishments and has several subsidiaries there.

69.     Shareholders of the TADAMON ISLAMIC BANK include AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION (and/or subsidiaries of the DALLAH AL BARAKA GROUP) SALEH ABDULLAH KAMEL, National Company for Development and Trade, and DUBAI ISLAMIC BANK. Defendant FAISAL ISLAMIC BANK SUDAN, a subsidiary of the ISLAMIC INVESTMENT COMPANY OF THE GULF (Bahrain) EC, whose parent is DAR AL MAL AL ISLAMI, was the main shareholder of TADAMON ISLAMIC BANK as of 1995.

70.     TADAMON ISLAMIC BANK facilitated, materially sponsored, aided and abetted, and/or conspired with AL QAEDA and its international terrorists and financial operations. According to testimony of Al Fadl, during the 2001 trial regarding the 1998 Embassy bombings in Africa, TADAMON ISLAMIC BANK managed accounts of AL QAEDA operatives:

> Q "Do you recall anyone else that had bank accounts in their name for AL QAEDA?
> A. Abdouh al Mukhlafi.
> Q. Who was this person named Abdouh al Mukhlafi?

124

A.  He is from Yemen.
Q.  What role did he play for Bin Laden?
A.  He goes with Bin Laden when Bin Laden travel outside or inside SUDAN.
Q.  What role did he play for Bin Laden when Bin Laden traveled?
A.  He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.
Q.  Did he handle money during the travel?
A.  Yes.
Q.  Where were the accounts held? In what countries?
A.  In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]."

71.     TADAMON ISLAMIC BANK is also a shareholder of Defendant AL SHAMAL ISLAMIC BANK, a bank formed in SUDAN and extensively used for AL QAEDA operations. TADAMON ISLAMIC BANK joined the provisional Board of Directors of AL SHAMAL ISLAMIC BANK on July 1988 and has been a major shareholder of AL SHAMAL ISLAMIC BANK since March 26, 1986.

72.     During the 1991-1996 time period, SUDAN abandoned visa requirements for Arabs and actively encouraged Islamic militants to live within its borders. By the end of 1991, there were between 1,000 and 2,000 members of AL QAEDA in the SUDAN. OSAMA BIN LADEN established a headquarters in the Riyadh section of Khartoum, SUDAN, an area heavily populated by Saudis.

73.     OSAMA BIN LADEN was able to establish a powerful military and political presence in the SUDAN in the early 1990s, using a variety of business ventures to finance his activities, aided and abetted and materially sponsored by Defendants and co-conspirators named herein.

74.     In SUDAN, between the years 1990 and 1993, members of AL QAEDA

undertook the task of writing the *Encyclopedia of the Afghan Jihad*. AL QAEDA wrote another terrorist work entitled *Military Studies in the Jihad against the Tyrants*. It was during this period that OSAMA BIN LADEN and AL QAEDA became fully operational, expanding their terrorist network.

75.     OSAMA BIN LADEN organized AL QAEDA into camps dedicated to exportation of terrorism throughout SUDAN (and eventually the world); the main Sudanese training site being a 20-acre site near Soba, 10 kilometers south of Khartoum. OSAMA BIN LADEN and AL QAEDA were sponsored, encouraged and allowed to operate freely in SUDAN. AL QAEDA purchased communications equipment, radios, and rifles for the Sudanese NIF, while the Sudanese government in exchange provided 200 passports to AL QAEDA so that those terrorists could travel internationally with new identities.

76.     In or about the early 1990s, Jamal Al Fadl went to Hilat Koko, a suburb of Khartoum, where he met with representatives of AL QAEDA and the Sudanese army to discuss the joint manufacture of chemical weapons. AL QAEDA and the Sudanese army cooperated in efforts to mount chemical agents on artillery shells. AL QAEDA at this time also began to experiment with biological warfare – injecting or gassing dogs with cyanide.

77.     During the early 1990s, while OSAMA BIN LADEN was being harbored in SUDAN, AL QAEDA grew into a sophisticated international terrorist organization. Several key figures in the organization portrayed AL QAEDA at the time as a multinational

126

corporation complete with a finance committee, investments and well-organized, concealed accounts and operations worldwide.

78.     At various times between in or about 1992 and 1996, OSAMA BIN LADEN and MAMDOUH MAHAMUD SALIM worked together with a ranking official in the NIF to obtain communications equipment on behalf of the SUDANESE INTELLIGENCE SERVICE.

79.     On at least two occasions in the period from in or about 1992 until 1995, members of AL QAEDA transported weapons and explosives from Khartoum to the coastal city of Port Sudan for trans-shipment to the Saudi Arabian peninsula, using vehicles owned by or used in OSAMA BIN LADEN's businesses.

80.     In 1993, AL QAEDA paid $210,000.00 for an airplane in Tucson, Arizona, that was then flown to Khartoum, SUDAN. This plane was intended to transport American stinger anti-aircraft missiles from Pakistan to SUDAN, although that missile transport did not take place as the plane was damaged before the operation could take place.

81.     Because of SUDAN's active and material support of OSAMA BIN LADEN and Al QAEDA, the United States Department of State first put SUDAN on the list of State sponsors of terrorism in 1993, largely because of OSAMA BIN LADEN's residency and activities and the Sudanese connection to a terrorist plot to blow up bridges and tunnels in New York City.

82.     In 1995, Defendant HASSAN ALTURABI organized militant groups from

127

IRAQ, IRAN, Pakistan, Algeria and Tunisia, as well as Palestinian Islamic Jihad and HAMAS, as well as AL QAEDA and hosted meetings.  During the time that AL QAEDA was based in SUDAN, it also forged alliances with EGYPTIAN ISLAMIC JIHAD and other global jihad groups in becoming an international sponsor of terrorism.

83.      HASSAN ALTURABI, under pressure from the United States and others, finally expelled OSAMA BIN LADEN from SUDAN in 1996, but allowed him to relocate and regroup in Afghanistan.  According to a 1998 FBI warrant, even after BIN LADEN left SUDAN, BIN LADEN maintained his businesses there.

84.      The SUDAN continues to be one of the governments that the United States has designated as a State sponsor of international terrorism.  SUDAN serves as a safe-haven for members of AL QAEDA, the Lebanese-Iranian HEZBOLLAH, EGYPTIAN AL-GAMA'A AL-ISLAMIYYA, EGYPTIAN ISLAMIC JIHAD, the PALESTINE ISLAMIC JIHAD, and HAMAS and continued to provide financial support to AL QAEDA through September 11, 2001.  SUDAN still has not complied fully with United Nations Security Council Resolutions 1044, 1054, and 1070, passed in 1996 – which require that SUDAN end all material support to terrorists.  SUDAN has assets frozen by the United States government.

85.      The Sudanese government and Sudanese officials close to OSAMA BIN LADEN co-founded the AL SHAMAL ISLAMIC BANK and were associated with its operations until at least October, 2001.  Among the three founders of the AL SHAMAL

ISLAMIC BANK was the SUDANESE GOVERNMENT OF THE NORTHERN STATE, ruled at that time by MUTASIM ABD RAHIM, the personal representative of HASSAN AL TURABI, leader and principal OSAMA BIN LADEN supporter in the country.

86.     Under Sudanese banking regulations, AL SHAMAL ISLAMIC BANK is considered as a joint ownership commercial bank, and therefore subject to the Central Bank of SUDAN review, supervision and control, according to the provisions of the Banks' Practice Act of 1991.

87.     AL QAEDA operative Jamal Al Fadl testified that his terrorist activities were greatly aided by Sudanese intelligence and by other Sudanese officials.  AL Fadl said that he helped OSAMA BIN LADEN pay the employees of his companies and AL QAEDA, whose members received monthly checks of several hundred dollars from AL SHAMAL ISLAMIC BANK accounts.  He also testified that AL QAEDA  members were granted Sudanese passports and diplomatic privileges by the government.  Such material support constitutes the sponsoring of international terrorism.

88.     These facts fall under the scope of the 1999 International Convention for the Suppression of the Financing of Terrorism, signed by SUDAN on February 29, 2000, and entered in force on April 10, 2002.  THE REPUBLIC OF SUDAN's course of conduct contradicts the General Assembly Resolution 51/210 of December 17, 1996 calling upon the States to "prevent and counteract . . . the financing of terrorists and terrorist organizations, whether such financing is direct or indirect," the United Nations Security

Council Resolution 1373 of September 28, 2001 and the United Nations Security Council

Resolution 1269 of October 19, 1999, calling upon all States to "prevent and suppress in

their territories through all lawful means the preparation and financing of any acts of

terrorism." These resolutions were adopted under Chapter VII of the United Nations

Charter, and are therefore binding on all United Nations member States, including SUDAN.

### The Agencies and Instrumentalities of the Republic of Sudan

89.    As described above, SUDAN acted through its officials, officers, agents,

employees and instrumentalities in aiding, abetting, and providing material support and

resources to OSAMA BIN LADEN, AL QAEDA and international terrorism. The support

provided by the REPUBLIC OF SUDAN to OSAMA BIN LADEN and AL QAEDA

assisted in, or contributed to, the preparation and execution of plans that culminated in the

attacks on September 11, 2001 and to the damages to the Plaintiffs herein.

90.    Lieutenant General OMAR HASSAN AHMAD AL BASHIR is the

President of SUDAN, and is an instrumentality of SUDAN for the purposes of liability and

damages under the Foreign Sovereign Immunities Act. As head of SUDAN, Lieutenant

General OMAR HASSAN AHMAD AL BASHIR is responsible for formulating and

executing SUDAN's policy of supporting terrorism and OSAMA BIN LADEN and AL

QAEDA .

91.    The SUDAN Ministry of Defense, headed by General RAHMAN ABDUL

SIRAL-KHATIM, is an agency of the REPUBLIC OF SUDAN. The Ministry of Defense,

as a government agency, aided and abetted OSAMA BIN LADEN and AL QAEDA as outlined above.

92.     The SUDAN Ministry of the Interior, headed by Major General ABDUL-RAHIM MOHAMMED HUSSEIN, is an agency of SUDAN.  The Ministry of the Interior, as a government agency, aided and abetted OSAMA BIN LADEN and AL QAEDA by providing instructors to the training camps run by OSAMA BIN LADEN and AL QAEDA. He was assisted by ABDEL WAHAB OSMAN, the Minister of Industry and ISS EL-DIN EL SAYED, the Minister of Finance.   In early 1994, OSAMA BIN LADEN was responsible for at least three major terrorist training camps in Northern SUDAN and the SUDANESE INTELLIGENCE SERVICES, AL AMN AL DAKHILI and AL AMN AL KHARIJI, provided the training.  These services are answerable in part to the Ministry of the Interior.

## IRAQI  TERRORISM

93.     Since the early 1990s, IRAQ  and the IRAQI INTELLIGENCE have used both IRAQI agents and independent "contractors" to commit terrorist acts against the United States in revenge for IRAQ 's Gulf War defeat. AL QAEDA  was IRAQ's favorite partner in crime and terror.

94.     While AL QAEDA's presence was growing in the SUDAN in 1992, the Government of IRAQ also had close ties with the Sudanese governemnt.  SUDAN supported IRAQ during the Gulf War and allowed IRAQ to establish a major IRAQI

131

INTELLIGENCE center in the SUDAN through IRAQ's ambassador to Khartoum, AL

SAMAD AL TA'ISH. AL TA'ISH was a highly placed IRAQI INTELLIGENCE agent,

who brought 35 other intelligence officers with him to the SUDAN to establish a base for

IRAQI operations. AL TA'ISH remained in the SUDAN through the summer of 1998.

IRAQ arranged to smuggle scud missiles, chemical weapons and uranium into the SUDAN

using Sudanese diplomatic mail privileges and other means. SUDAN agreed to store this

material for IRAQ for safekeeping after the Gulf War to help circumvent U.N. weapons

inspections.

95.     During the early 1990s, SUDAN's Sheikh HASSAN AL TURABI of the

NATIONAL ISLAMIC FRONT arranged meetings between BIN-LADEN and IRAQI

INTELLIGENCE officials. BIN LADEN met with FARUQ AL HIJAZI, an IRAQI

INTELLIGENCE agent in the SUDAN who would later head IRAQI INTELLIGENCE for

SADDAM HUSSEIN. BIN LADEN again met with IRAQI INTELLIGENCE officers in

1994 and 1995 in the SUDAN.   At these meetings, BIN LADEN and IRAQI

INTELLIGENCE agent FARUQ AL HIJAZI agreed to work together on terrorist projects

directed against the U.S.

96.     During his time in SUDAN, BIN LADEN became interested in using IRAQI

chemical and biological weapons and explored plans to use crop dusting aircraft to disperse

toxins as the IRAQI INTELLIGENCE and military had done earlier in Kurdistan.

97.     Upon information and belief, there have been numerous meetings between

132

IRAQI INTELLIGENCE agents and high-ranking AL QAEDA terrorists to plan terror attacks. One such meeting occurred in 1992, when AYMAN AL ZAWAHIRI (EGYPTIAN ISLAMIC JIHAD leader and AL QAEDA officer) met with IRAQI INTELLIGENCE agents in Baghdad, IRAQ over several days. An Iraqi serving with the TALIBAN who fled Afghanistan in the fall of 2001, was captured in Kurdistan and has corroborated this meeting and confirmed that Iraqi contacts with AL QAEDA began in 1992.

## THE 1993 WTC BOMBING

98.     On February 26, 1993 a bomb was detonated in the World Trade Center underground parking lot, killing six U.S. citizens. IRAQI sponsored terrorists planned, financed, executed and carried out that World Trade Center bombing.

99.     The 1993 WTC bombing, took place on the Friday before the two year anniversary of IRAQ's defeat in Kuwait, which was February 28, 1991. The anniversary in 1993, was a Sunday and few people would have been working at the World Trade Center that day; and IRAQ and the terrorists wanted to maximize the number of American casualties.

100.     During the initial planning of the WTC bombing, Mohammed Salameh (who was later convicted for his role in the bombing) was in regular and frequent contact with his uncle Kadri Abu Bakr, who lived in IRAQ and had been a member of a PLO faction allied with SADDAM HUSSEIN. Shortly after these calls, the mastermind of the bombing,

133

Ramzi Ahmed Yousef a/k/a Abdul Basit, an IRAQI INTELLIGENCE agent, and member

of the MUSLIM BROTHERHOOD, traveled to the United States using identification

documents obtained in Kuwait during the IRAQI occupation of that country in 1991.

101.    Ramzi Yousef arrived in New York on September 1, 1992 using an IRAQI

passport and requesting asylum.   On December 31, 1992, he presented photocopies of

passports for Abdul Basit at the Pakistani consulate in New York claiming to be Basit and

requesting replacement of his "lost" passport.    Basit was a Pakistani citizen who had

moved to Kuwait and disappeared during the Iraqi occupation in August 1990.   IRAQI

INTELLIGENCE had access to the Kuwaiti Interior Ministry files and upon information

and belief, inserted Yousef's fingerprints into the file and provided him with photocopies

of two older passports from Basit's file.  The Pakistani Consulate, accordingly,  provided

Yousef a temporary passport, based on the false documents.  This provided Yousef with a

means to escape the U.S. two days after the World Trade Center bombing.  In fleeing the

United States after the bombing, Yousef first traveled through Baluchistan, an uncontrolled

region of IRAN straddling the border of IRAN and Pakistan with strong ties to IRAQ.   By

the following year, 1994, Yousef was living in the Phillipines.  He left the Phillippines

however, after authorities discovered a plan he was working on to bomb United States'

airliners.   Yousef fled to Pakistan and was eventually sheltered at an AL QAEDA

guesthouse.  He was arrested in February 1995 in Pakistan and extradited to the U.S. for

prosecution and was eventually convicted in the 1993 World Trade Center bombing

conspiracy.

102.    ABDUL RAHMAN YASIN, who was born in the United States to IRAQI parents but had been raised in IRAQ, within days of the 1993 bombing was questioned in New York and New Jersey in connection with the World Trade Center bombing, but was released after appearing to cooperate with U.S. officials.  He fled the country the next day and traveled to Baghdad, IRAQ.  U.S. prosecutors later learned that he, along with others, had prior training in bomb making, and had mixed the chemicals and constructed the bomb that was used in the World Trade Center.  IRAQI INTELLIGENCE  knew of YASIN's presence in IRAQ and provided him refuge.  On August 4, 1993 YASIN was indicted in absentia for the World Trade Center bombing.

103.    In June 1994 YASIN was seen in Baghdad by an ABC news correspondent who was told that YASIN worked for IRAQI government.  U.S. law enforcement officials confirmed that fugitive YASIN has been sheltered in IRAQ, a continuing violation of United Nationals Security Council Resolution 687 which makes it unlawful to harbor a suspected terrorist.  In June 2002, YASIN was interviewed in Baghdad by Leslie Stahl from CBS.  YASIN remains in IRAQ.

104.    Ramzi Ahmed Yousef, Mohammed Salameh, Nidal Ayyad, Mahmud Abu Halima and Ahmad Mohammed Ajaj were all eventually convicted in the Southern District of New York for the 1993 conspiracy to bomb the World Trade Center.

105.    Following his arrest in 1995, Yousef told U.S. investigators that his intent

135

was to create an explosion that would cause one of the World Trade Center Towers to fall over onto the other, destroying both and causing massive American casualties.

106.    During the worldwide hunt for fugitive Yousef, he was living in the Phillippines with KHALID SHEIKH MOHAMMED.  KHALID SHEIKH MOHAMMED's involvement in terror activities became known when law enforcement authorities interrupted a plot to blow up a dozen U.S. commercial airliners flying to the United States from Asian cities.  MOHAMMED's participation in the planning of these acts of terror was uncovered by authorities after he and Yousef accidently started a fire in their apartment in Manila while mixing bomb chemicals.  Filipino authorities were suspicious when they saw chemicals, bomb making instructions and timing devices in the apartment and they seized those items along with a computer containing the details of the airliner bombing plans. MOHAMMED and Yousef fled the country, before they could be arrested.

107.    MOHAMMED eventually found sanctuary in Doha, Qatar.  In early 1996, MOHAMMED was visited in Qatar by BIN LADEN.  Around the same time, FBI director, Louis Freeh, wrote to the Qatari government requesting that it surrender MOHAMMED to U.S. authorities.  Not long after the FBI request, with the assistance of  Qatari officials, MOHAMMED fled to Prague, Czech Republic, foiling U.S. attempts to arrest him.

108.    MOHAMMED's whereabouts after his escape to Prague in May 1996 were not known until his capture in Pakistan in March 2003, but documents and AL QAEDA members captured in Afghanistan identified MOHAMMED as a leader in the AL QAEDA

terror network and actively involved in the planning, logistics and financing of the September 11th attacks.  His participation in the planned hijacking of U.S. commercial airliners was not new for him.  MOHAMMED is a close associate of ABU ZUBAYDAH, a top BIN LADEN associate who was fully aware of the targets of the September 11th hijackers.  ZUBAYDAH is in the custody of United States authorities and is providing some corroborating information about AL QAEDA operations.

## SOMALIA

109.   In 1992 and 1993,  AL QAEDA trained terrorists in Somalia and from nearby SUDAN attempted to incite an Islamic jihad there against U.S. military forces stationed in Mogadishu, Somalia by working with Somali warlord, General Farah Adid. BIN LADEN issued a fatwa urging Muslims to attack the U.S. and U.N. military forces stationed there during Operation Restore Hope.   BIN LADEN, MAMDOUH MAHMUD SALIM,  MUHAMMAD ATEF, SAIF AL ADEL, ABDULLAH AHMED ABDULLAH, MUHSIN MUSA MATWALLI ATWAH, a/ka "Abdel Rahman," FAZUL ABDULLAH MOHAMMED, a/k/a "Harun," AHMED MOHAMED HAMED ALI and MOHAMED SADEEK ODEH, along with Abu Ubaidah Al Banshiri, provided weapons, military training and assistance to the Somali tribes working for Adid who were opposed to the U.N. intervention in Somalia and urged them to attack U.S. military personnel.  On October 3 and 4, 1993, these forces did attack U.S. military personnel in Mogadishu and killed 18 U.S. servicemen.

137

**1994-1996**

110.    In 1994, AL QAEDA member MOHAMED SADEEK ODEH and others

established a cell in Nairobi and Mombasa, Kenya and followed BIN LADEN's SUDAN

model by setting up seemingly legitimate businesses and aid organizations to facilitate their

terrorist missions.  The businesses employed AL QAEDA  terrorists and the proceeds from

those businesses provided money to their terrorist cause.   These businesses and aid

organizations included, but were not limited to, the Asthma, Ltd., TANZANITE KING and

the HELP AFRICAN PEOPLE organization.  ATEF, KHALID AL FAWAZ, a/k/a "Khaled

Abdul Rahman Hamad al FAWAZ," a/k/a "Abu Omar," a/k/a "Hamad," ODEH, WADIH

EL HAGE, FAHID MOHAMMED ALLY MSALAM, ANAS AL LIBY and Ali Mohamed

spent considerable time in Kenya from 1993 through August 1998 solidifying this AL

QAEDA  cell.

111.    In or about 1994, BIN LADEN, working together with KHALID AL

FAWAZ, set up a media information office in London, England hereafter the ("London

office"), which was designed both to publicize BIN LADEN's statements and to provide

a cover for activity in support of AL QAEDA's "military" activities,  including  the

recruitment of trainees, the disbursement of funds and the procurement of equipment and

services.  In addition, the London office served as a communication center for reports on

military, security and other matters from various AL QAEDA cells to AL QAEDA's

headquarters.

112.    In November 1995, upon information and belief, AL QAEDA terrorists conspired with IRANIAN INTELLIGENCE and with the HEZBOLLAH to bomb the Khobar Towers in Saudi Arabia, killing five U.S. servicemen.  Fearing further attacks by BIN LADEN and AL QAEDA, some Saudi government officials and businessmen agreed to provide financial support to AL QAEDA and began funneling millions of dollars to charities that would then forward the money to AL QAEDA.  Some of these charities were madrassas (schools) which by preaching a form of Islam that is intolerant of non-Muslims provided new recruits for terrorism.

## RETURN TO AFGHANISTAN

113.    In 1996, BIN LADEN was asked to leave the SUDAN by Sudanese officials pressured by the United States to crack down on terrorism.  BIN LADEN returned to Afghanistan after the TALIBAN had seized control of most of that country.  The number of AL QAEDA members and terrorist training camps in Afghanistan grew rapidly following BIN LADEN's return.  AL QAEDA  actively supported the TALIBAN and assisted them in violently suppressing all opposition.  BIN LADEN and Defendant MULLAH OMAR developed a very close relationship.

114.    From 1996 until 2001, BIN LADEN with the financial and logistical support of OMAR and others in the TALIBAN and IRAQ and IRAQI INTELLIGENCE, created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking enemies throughout the world. These camps trained men from

139

15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives.  Classes were also given in "how to kill a policeman" and "traps, murder and terrorist moves."

115.    On August 23, 1996, a strengthened BIN LADEN issued a fatwa declaring a jihad against Americans present in Muslim lands.  The message was disseminated throughout all AL QAEDA cells and associated terrorist groups, such as the EGYPTIAN ISLAMIC JIHAD.  The London AL QAEDA cell, run by KHALID AL FAWAZ under the name ADVICE AND REFORMATION COMMITTEE, and the Egyptian cell, run by AL ZAWAHIRI and Abdel Barrry, were used to send the fatwa to Muslims living in the Western World.  WADIH EL HAGE was also used by BIN LADEN to deliver messages, money and terrorist material to AL QAEDA operatives in the U.S. and U.K.  AHMAD SA'ID AL KADR an Egyptian-born aide to BIN LADEN was an associate of defendant AYMAN ZAWAHIRI when he was charged with the 1995 bombing of the Egyptian embassy in Islamabad, Pakistan in which 16 people were killed.  AL KADR was running the Afghanistan operations of the Canadian charity, Human Concern International Society, and sending money to support AL QAEDA.


**IRAQI AND AL QAEDA  INTERESTS PUBLICLY MERGE**

116.    In February 1997, BIN LADEN publicly expressed his support for IRAQ in its conflict with the United States stating:

> *The hearts of the Muslims are filled with hatred towards the*
> *United States of America and the American president for*
> *American conduct towards IRAQ.*

117.    Having decided to carry out acts of terrorism, SADDAM HUSSEIN, with the advice and prompting of his son and IRAQI INTELLIGENCE chief, QUSAY HUSSEIN and his other son UDAY HUSSEIN, head of an IRAQI INTELLIGENCE subdivision known as the "Fedayeen" and "Al-Qare," concluded that a campaign of terrorist attacks against the United States, under the banner of BIN LADEN and AL QAEDA, was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining IRAQI revenge.

118.    IRAQ upon information and belief, agreed to supply arms to AL QAEDA and provide AL QAEDA with access to and training in the use of chemical and biological weapons and agreed to instruct AL QAEDA terror trainers at its Salman Pak camp in Baghdad that contained a Boeing 707 used to practice hijacking.  IRAQ also agreed to supply AL QAEDA terrorists with new identities and passports from Yemen and the United Arab Emirates.

119.    AL QAEDA agreed to provide protection from political opponents to IRAQ and SADDAM HUSSEIN, and to commit assassinations and other acts of violence to create instability in regions of IRAQ, particularly Kurdistan, to assist the regime of SADDAM HUSSEIN.  Defendant ABU WA'EL, an agent of the IRAQ regime, and the Islamic group he directed defendant ANSAR AL ISLAM, used explosives provided by IRAQ to make

141

bombs.  To further SADDAM HUSSEIN'S desire to keep Kurdistan off-balance, ANSAR AL ISLAM attempted three assassinations, killing Kurdish political leader Franso Hariri in February 2001, and Kurdish political party founder Shawkat Haji Mushir in February 2003.  The attempt on the life of PUK Prime Minister Barham Salih during a visit with U.S. officials in April 2002 was unsuccessful.  This cooperation between AL QAEDA and IRAQ is similar to the arrangement between AL QAEDA and Afghanistan in support of its AL QAEDA's host, the defendant  TALIBAN.  AL QAEDA  further agreed to provide trained terrorists, assassins and martyrs to carry out terror attacks in concert with IRAQ against their common enemies, including the United States.  ANSAR AL ISLAM's head outside of IRAQ is MULLAH KREKAR.

120.    On February 22, 1998, BIN LADEN, KHALID AL FAWWAZ and AYMAN AL ZAWAHIRI of the EGYPTIAN ISLAMIC JIHAD issued a fatwa published in the Arabic newspaper Al-Quds stating:

> *The ruling to kill the Americans and their allies - civilians and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it. . . .*

121.    In their February 22, 1998 fatwa, BIN LADEN and AL QAEDA  expressly referenced the United States' "continuing aggression" towards IRAQ as one of their reasons for calling on all Muslims to kill Americans "wherever and whenever" they are found:

> *The best proof of this is the Americans' continuing aggression against the Iraqi people using the [Arabian] Peninsula as a staging post, even though all its rulers are against their territories being used to that end, still they are helpless.*

The BIN LADEN and AL QAEDA fatwa also cited the alleged "great devastation inflicted on the Iraqi people" by the United States, as well as the United States alleged "eagerness to destroy Iraq."

122.    Additional fatwas of a similar nature were issued in May 1998 and published in Al-Quds, the Arabic language newspaper, under the banner of the ULEMA UNION OF AFGHANISTAN.  A May 29, 1998 fatwa issued by BIN LADEN called for the use of a nuclear bomb to "terrorize the Jews and Crusaders who were enemies of God."  At the time BIN LADEN was seeking to obtain nuclear material from IRAQ and others who possessed nuclear material in order to create nuclear weapons.

123.    Between April 25 and May 1, 1998, two of BIN LADEN's senior military commanders, MUHAMMAD ABU ISLAM and ABDULLAH QASSIM, visited Baghdad for discussions with SADDAM HUSSEIN's son -- QUSAY HUSSEIN -- the "czar" of IRAQI INTELLIGENCE.

124.    QUSAY HUSSEIN's participation in those meetings highlights the importance of the talks in both symbolic and practical terms.  Upon information and belief, as a direct result of these meetings, IRAQ again made commitments to provide training, intelligence, clandestine Saudi border crossings, financial support and weapons and explosives to AL QAEDA .

125.    IRAQI INTELLIGENCE officials met with BIN LADEN in Afghanistan several more times.  A second group of BIN LADEN and AL QAEDA operatives from

143

Saudi Arabia were then trained by IRAQI INTELLIGENCE in IRAQ to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence.  A third group of BIN LADEN and AL QAEDA operatives received a month of sophisticated guerrilla operations training from IRAQI INTELLIGENCE officials later in the Summer of 1998.

126.    Despite philosophical and religious differences with SADDAM HUSSEIN, BIN LADEN continually sought to strengthen and reinforce the support he and AL QAEDA received from IRAQ.  In mid-July 1998, BIN LADEN sent Dr. AYMAN AL ZAWAHIRI, the Egyptian co-founder of AL QAEDA, to IRAQ to meet with senior Iraqi officials, including Iraqi vice president TAHA YASSIN RAMADAN.  Upon information and belief, the purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign against the United States.

127.    During the July 1998 visit, ZAWAHIRI  toured an IRAQI military base and nuclear and chemical weapons facility near Al-Fallujah in IRAQ and upon information and belief, observed training by IRAQI INTELLIGENCE officials of AL QAEDA operatives at the *al-Nasiriyah* military and chemical weapons facility in IRAQ.

128.    BARZAN IBRAHIM HASSAN AL TIKRITI is the half brother of SADDAM HUSSEIN.  He was head of the IRAQI INTELLIGENCE in the early 1980s and responsible for the establishment of the international financial network used to make illicit procurement and to fund international terrorist networks.   He later became Iraqi

144

amabassador in Geneva and from there oversaw the functioning of this network, including the financing of AL QAEDA up through September 11, 2001.

129.    Upon information and belief, IRAQI INTELLIGENCE officials pledged IRAQ's full support and cooperation on the condition that BIN LADEN and AL QAEDA promised not to incite those groups inside IRAQ opposed to the regime of Iraqi dictator SADDAM HUSSEIN.


## U.S. EMBASSY BOMBINGS

130.    To demonstrate its commitment to IRAQ and its anti-U.S. policies, in the Spring of 1998, AL QAEDA planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania. FAZUL ABDULLAH MOHAMED, MUSTAFA MOHAMED FADHIL, SHEIKH AHMED SALIM SWEDAN, FAHID MOHAMED ALLY MSALAM, AHMAD IBRAHIM AL MUGHASSIL and an individual known as Abdullah Azzam were chosen as some of the AL QAEDA terrorists who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

131.    In July and early August 1998, AL QAEDA terrorists MUSTAFA MOHAMED FADHIL, AHMED KHALFAN GHAILANI, FAHID MOHAMMED ALLY MSALAM, SHEIKH AHMED SALIM SWEDAN, MOHAMED SADEEK ODEH and FAZUL ABDULLAH MOHAMMED were stationed in Dar es Salaam where they purchased a 1987 Nissan Atlas truck and outfitted it with oxygen, acetylene tanks, TNT,

145

batteries, detonators, fertilizer and sand bags, creating a massive bomb to be driven into the U.S. Embassy. ODEH, FAZUL ABDULLAH MOHAMMED and others who participated in the bombings had been with BIN LADEN since the early 1990s and BIN LADEN's days in the SUDAN.

132. On July 30, 1998, IRAQ warned it would take action unless the United Nations embargo was lifted. IRAQ blamed the United States for the United Nations embargo. On August 4, 1998, IRAQ refused to cooperate with the United Nations weapons inspectors in IRAQ and talks for a resolution of the crisis collapsed, causing U.N. inspectors to leave.

133. Three days later, on August 7, 1998, at approximately 10:30 a.m., Azzam drove a Toyota Dyna truck (outfitted similarly to the Nissan Atlas truck in Dar Es Salaam) to the U.S. Embassy in Nairobi, Kenya and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in the more than 213 deaths (12 Americans) and injuries to more than 4,500 people. Defendant, MUSHIN MUSA MATWALL ATWAH a/k/a "Abdel Rahman" a long time AL QAEDA lieutenant, wired the detonator and explosives in both trucks that exploded at the embassies.

134. On August 7, 1998 at approximately 10:40 a.m., ten minutes after the bombing in Kenya, Khalfan Khamis Mohamed and Ahmed the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania severely

damaging the Embassy building and resulting in the death of 11 people and injuries to more than 85 people.

135.     On August 7, 1998 shortly *before* the bombing, Eidarous, an AL QAEDA member in London, sent a letter to news organizations in Paris, Doha, Qatar and Dubai, UAE claiming responsibility for the Embassy bombings under the fictitious name ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES.

136.     At the trial in New York of some of the AL QAEDA -U.S. Embassy bombers, some defendants elicited testimony in their defense that cited the poor living conditions in IRAQ.  They blamed those conditions on the U.S.- U.N. sanctions, and used it as motivation and explanation for the AL QAEDA attacks on the Embassies.

## THE 1998 U.S. AIR STRIKES ON AL QAEDA

137.     On August 20, 1998, the United States initiated a pre-emptive and retaliatory air strike with cruise missiles on AL QAEDA training camps in Khost, Afghanistan and a factory in Khartoum, SUDAN, believed at the time to be a chemical weapons plant used by the Sudanese and Iraqi governments to manufacture weapons for their use and that of AL QAEDA  terrorists.

138.     On August 20, 1998 President Clinton issued a statement on the air strike

> Our target was terror . . . our mission was clear to strike at the network of radical groups affiliated with and funded by BIN LADEN, perhaps the preeminent organizer and financier of international terrorism in the world today.

147

139.    In December 1998, after a stand off between the U.N. and IRAQ and a discovery of weapons violations in IRAQ, the U.S. led U.N. allies in a four-day air strike on IRAQ.  IRAQI Trade Minister Muhammad Mahdi Salah then stated that he expected terrorist activities against the United States to *increase* as a result of the bombing of IRAQ. The Arabic language daily newspaper Al-Quds Al-Arabi cited the cooperation between IRAQ, BIN LADEN and AL QAEDA in a late December 1998 editorial, which predicted;

> *President Saddam Hussein, whose country was subjected to a four day air strike, will look for support in taking revenge on the United States and Britain by cooperating with Saudi oppositionist Osama Bin-Laden, whom the United States considers to be the most wanted person in the world.*

The editorial noted that this type of cooperation was already taking place, considering that "Bin-Laden was planning on moving to IRAQ before the recent strike."

140.    Following the December 1998 air strikes on IRAQ, SADDAM HUSSEIN dispatched FARUQ AL HIJAZI to Kandahar, Afghanistan in order to meet with BIN LADEN and plot their revenge.

141.    QUSAY HUSSEIN also dispatched representatives to follow-up with BIN LADEN and obtain his firm commitment to exact revenge against the United States for the December 1998 bombing campaign.  IRAQ offered BIN LADEN and AL QAEDA an open-ended commitment to joint operations against the United States and its "moderate" Arab allies in exchange for an absolute guarantee that BIN LADEN, AL QAEDA and their allies would not attempt to overthrow SADDAM HUSSEIN's regime in IRAQ.

148

142.     To demonstrate IRAQ's commitment to BIN LADEN and AL QAEDA, HIJAZI presented BIN LADEN with a pack of blank, official Yemeni passports, supplied to IRAQI INTELLIGENCE from their Yemeni contacts.  HIJAZI's visit to Kandahar was followed by a contingent of IRAQI INTELLIGENCE officials who provided additional training and instruction to BIN LADEN and AL QAEDA operatives in Afghanistan.  These Iraqi officials included members of "Unit 999," a group of elite IRAQI INTELLIGENCE officials who provided advanced sabotage and infiltration training and instruction to AL QAEDA  operatives.

143.     At that meeting, upon information and belief, BIN LADEN, AL QAEDA and IRAQ agreed to join efforts in a detailed, coordinated plan for a protracted terrorist war against the United States.

144.     IRAQ also agreed to provide BIN LADEN and AL QAEDA with the assistance of an expert in chemical weapons; and BIN LADEN agreed to hunt down Iraqi opposition leaders who cooperated with the United States against HUSSEIN. In furtherance of this agreement, BIN LADEN agreed to have a group of AL QAEDA 's "Afghan" Arabs enter IRAQ to fight Kurdish dissidents.

145.     IRAQ maintains an advanced chemical and biological weapons program and is one of only three countries in the world producing a highly developed weaponized anthrax.  Some time during or after 1998, IRAQ agreed to help BIN LADEN and AL QAEDA  develop a laboratory in Afghanistan designed to produce anthrax.

149

146.    In addition to the al-Nasiriyah and Salman Pak training camps, by January 1999, BIN LADEN and AL QAEDA operatives were being trained by IRAQI INTELLIGENCE and military officers at other training camps on the outskirts of Baghdad.

147.    In January 1999, IRAQ began reorganizing and mobilizing IRAQI INTELLIGENCE front operations throughout Europe in support of BIN LADEN and AL QAEDA.   HAQI ISMAIL, believed to be a member of the IRAQ'S IRAQI INTELLIGENCE Secret Service, left IRAQ to train in an Afghanistan AL QAEDA camp. ISMAIL was believed to be a liaison between IRAQ, the TALIBAN and AL QAEDA and was rewarded with a position in the TALIBAN Foreign Ministry.

148.    On or about June 1999, during an interview with an Arabic-language television station, BIN LADEN issued a further threat indicating that all American males should be killed.

## MILLIENIUM PLOT

149.    On December 14, 1999, Ahmed Ressam, an AL QAEDA operative, was arrested while driving a truck from Canada into the United States at Port Angeles, Washington.  The truck was loaded with bomb making materials and detonators.  Ressam later confessed to, and was convicted of conducting an AL QAEDA plan to detonate a large bomb at Los Angeles International Airport on New Year's Day 2000.  AL QAEDA terrorist MAHFOUZ WALAD AL WALID was identified as orchestrating the so called "Millennium Plot."

150

150.    In April 2000, UDAY HUSSEIN, as a birthday gift to his father, SADDAM

HUSSEIN, assembled a squad of 1,200 trained men called AL QARE.  Thirty of them were

dispatched with UAE passports to points around the world to standby for orders to commit

acts of sabotage, urban warfare and hijacking.

## ATTACK ON U.S.S. COLE

151.    In the spring of 2000, IRAQI INTELLIGENCE began planning to attack

United States warships in the Persian Gulf in an effort to prompt a United States

withdrawal.  IRAQ sought suicide bombers who would employ small boats packed with

explosives to ram United States' warships.

152.    On October 12, 2000, IRAQI INTELLIGENCE and members of AL

QAEDA including BIN LADEN, JAMAL AL BADAWI, KHALID AL MIDHAR,

MOHAMMED OMAR AL HARAZI, RAED HIJAZI, JAMIL QASIM SAEED,

MOHAMMAD AL HAMATI a/k/a Mohammad Hamdi Sadiq al Ahdal, a/k/a Abu Asim

al Makki, NURJAMAN RIDUAN ISMUDDIN a/k/a Hambali, and MOHAMMED IQBAL

ABDURRAHMAN as well as the two suicide boat bombers Abd Al  Mushin Al  Taifi

(deceased) (and a suspect in the August 1998 Embassy bombings) and Hassan Said Awadh

Khemeri (deceased) carried out their plan to bomb the U.S.S. Cole by ramming a small boat

loaded with explosives into the side of the ship as it was anchored in the harbor at Aden,

Yemen, resulting in the deaths of 17 American sailors and injuring an additional 39.

153.    The Yemeni government investigation reported that the terrorists behind the

attack were Islamic extremists who fought the Soviets in the Afghan War and who were tied to the EGYPTIAN ISLAMIC JIHAD and AL QAEDA and who were trained in Afghanistan.  Four were arrested in Yemen.  JAMIL QASIM SAEED was arrested a year later in Pakistan.  JAMAL AL BADAWI admitted that he received his instructions to bomb the U.S.S. Cole from AL QAEDA member AL HARAZI who he had met during the war in Afghanistan.

154.     MOHAMMAD AL HAMATI owner of the defendant companies in Yemen, AL HAMATI SWEETS BAKERIES and AL NUR HONEY PRESS SHOPS a/k/a AL NUR HONEY CENTER was one of those Yemenis who served with the Afghan mujahideen. Kuwaiti Intelligence charges that AL HAMATI is a member of AL QAEDA who also helped to plan the bombing of the U.S.S. Cole.  AL HAMATI was held for participation in terrorist activities in Saudi Arabia but released in 1999.   Upon information and belief AL HAMATI allowed AL HAMATI SWEETS BAKERIES and AL NUR HONEY PRESS SHOPS to be used as fronts to facilitate the movement of goods and money for AL QAEDA.

155.     On June 20, 2001, in a videotape released to the press, BIN LADEN appears to boast that his followers bombed the U.S.S. Cole.  The 100-minute tape depicts BIN LADEN, wearing a Yemeni dagger on his belt and reciting a poem to show that he and AL QAEDA were not afraid of attacking the United States military:

> And in Aden, they charged and destroyed a destroyer that
> fearsome people fear, one that evokes horror when it docks

and when it sails.

Video of the damaged destroyer was superimposed with the words in Arabic, "the destruction of the American Destroyer Cole."

155.   AL QAEDA leader ABD AL RAHIM AL NASHIRI, the network's operations chief  in the Persian Gulf, was recently captured by United States officials.  AL NASHIRI is a known high level AL QAEDA operative who carried out spectacular acts of international terrorism including the attack on the U.S.S. Cole in October 2000, the near-simultaneous bombing of two U.S. embassies in Kenya and Tanzania.  AL NASHIRI was involved in the planning of other attacks for AL QAEDA some of which were foiled.

## AL QAEDA -SAUDI HIJACKING

156.   On October 14, 2000, just two days after the attack on the U.S.S. Cole, two Saudis hijacked a Boeing 777 from Saudi Arabia and had it flown to Baghdad, IRAQ.  The hijackers were given "asylum" in IRAQ.  They were extensively interviewed in the Iraqi press and criticized the Saudi government.

157.   Upon information and belief, this hijacking was a message between BIN LADEN and IRAQ intended to demonstrate that AL QAEDA terrorists could seize control of large commercial aircraft that could be used as a weapon in the hands of suicide terrorists, foreshadowing a well coordinated attack in the planning stages at the time and less than a year away from execution.

## IRAQI THREATS

153

158.    On January 22, 2001, the Arab language newspaper Al Watan Al Arabi, reported that SADDAM HUSSEIN and his sons had called for an Arab alliance to "launch a global terrorist war against the United States and its allies." The newspaper characterized HUSSEIN's statement as calling for an uncompromising campaign and "scorched earth policy."

159.    In May 2001, AL QAEDA operatives in Kurdistan assassinated Franso Hariri, a member of the Kurdish Democratic Party, as part of a deal with SADDAM HUSSEIN.  The killing of Hariri created instability in the region by damaging relations between the co-leaders of Kurdistan.  This benefitted the HUSSEIN regime in IRAQ.

160.    In May 2001, Iraqi physician and kidney specialist Dr. Mohammed Khayal was dispatched from Baghdad to Afghanistan for three days to treat BIN LADEN's kidney problem, further demonstrating the important relationship between IRAQ and BIN LADEN less than four months before the single largest terrorist attack in history.

161.    On May 29, 2001, WADIH EL HAGE, a U.S. citizen believed to be BIN LADEN's personal secretary, was convicted in the Southern District of New York, along with MOHAMED SADEEK ODEH, Mohammed Rashed Daoud Al 'Owali and Khalfan Khamis Mohamed, for participating in the conspiracy to bomb the United States Embassies in Nairobi and Dar es Salaam in August of 1998.  BIN LADEN and other AL QAEDA members were indicted but remain at large.

## IRAQI FORE-KNOWLEDGE OF THE SEPTEMBER 11TH ATTACKS

**<u>Al Nasiriyah News Article</u>**

162.     IRAQ knew in advance that AL QAEDA was planning to attack U.S. landmarks and civilians in September 2001 in Washington and New York and supported the planned attacks.

163.     Upon information and belief, Iraqi news columnist Naeem Abd Mulhalhal has been connected with IRAQI INTELLIGENCE since the early 1980s.  He comments on matters of IRAQI political interest for the Al Nasiriyah newspaper, a weekly paper published in the provincial capital city of Al Nasiriyah. On September 1, 2001 he was honored for his "documentation of important events and heroic deeds that proud Iraqis have accomplished" and praised by SADDAM HUSSEIN.   In addition, Al Nasiriyah also contains a military base that is believed to contain a chemical weapons storage facility. IRAQ had previously denied access to this base to UN weapons inspectors.  It was visited by ZAWAHIRI as early as 1998 and AL QAEDA  terrorists trained there for several years.

164.     On July 21, approximately six weeks *before* the September 11th  attacks, IRAQI columnist Mulhalhal reported that BIN LADEN was making  plans to "**demolish the Pentagon after he destroys the White House**."

165.     Mulhalhal's July 21 article further informed that BIN LADEN would strike America **"on the arm that is already hurting."**   Upon information and belief, this references a second Iraqi sponsored attack on the World Trade Center.  This interpretation is further bolstered by another reference to New York as **"[Bin Laden] will curse the**

**memory of Frank Sinatra every time he hears his songs."** (e.g., "New York, New York")  identifying New York, New York as a target.

166.    Mulhalhal further indicated, **"The *wings* of a dove and the *bullet* are all but one and the same in the heart of a believer."** (Emphasis supplied)   This appears to be a reference to the use of commercial aircraft as a weapon. The information was reported in an Iraqi newspaper whose editor-in-chief serves as secretary to UDAY HUSSEIN'S Iraqi Syndicate of Journalists.   The article expressed Iraqi admiration and support for BIN LADEN's plans and its appearance in the newspaper would clearly have to be endorsed by SADDAM HUSSEIN himself.

167.    All Iraqi news media is strictly controlled and censored by the government of SADDAM HUSSEIN and is under the direct oversight of UDAY HUSSEIN. Various members of IRAQI INTELLIGENCE work at and control the content of each and every newspaper published inside IRAQ.

168.    The information contained in Mulhalhal's published statements were known prior to the events of September 11th, and because Mulhalhal has ties to Iraqi intelligence, it demonstrates foreknowledge of the planned attacks by BIN LADEN and indicates support by Iraqi co-conspirators.

169.    IRAQ's July 21, 2001 public statements also exemplify the BIN LADEN pattern of publicly threatening violent strikes against the United States prior to and after committing them. For example, weeks before the August 1998 AL QAEDA attacks on the

156

U.S. embassies in Africa, BIN LADEN threatened U.S. civilians and shortly thereafter, bombed the embassies in Kenya and Tanzania within minutes of each other, killing 223 civilians.

170.     Additionally, after the suicide boat bombing of the U.S.S. Cole in Yemen in October 2000, BIN LADEN publicly threatened violence against America while wearing traditional Yemeni clothing including a Yemeni war dagger.  BIN LADEN sought media attention to taunt the United States and recruit additional Muslim supporters.

## PREPARATION FOR SEPTEMBER 11TH  ATTACKS

171.     According to U.S. and foreign intelligence officials, in the spring of 2000, IRAQI INTELLIGENCE agents met with September 11th pilot hijackers ZAID SAMIR JARRAH and MARWAN AL SHEHHI in Dubai, UAE in order to advance the hijacking of U.S. aircraft to commit terrorist acts.  Not long after the meeting, AL SHEHHI entered the United States on May 29 and JARRAH entered on June 27 to begin preparations for attacks.

172.     According to Czech intelligence sources, on June 2, 2000, MOHAMMAD ATTA a pilot in training and the operational leader of the September 11, 2001 terrorist attacks traveled to Prague to meet other co-conspirators.  The following day, ATTA arrived at Newark International Airport in the United States.

173.     According to the FBI, from July 2000 through March 2001, ATTA, SHEHHI, HANJOUR, JARRAH and HAMZI traveled to the U.S. where they resided and

took pilot courses to learn to fly the Boeing 747, 757, 767 and Airbus A320 in furtherance of the AL QAEDA  Iraqi conspiracy to hijack U.S. aircraft to commit terrorist acts.

174.    Upon information and belief, sometime between April 8-11, 2001, ATTA left Florida where he was a flight student, to again meet in Prague with IRAQI INTELLIGENCE agent AHMED KHALIL IBRAHIM SAMIR AL ANI.  ATTA returned to Florida and within two weeks  opened a Sun County Bank account with $100,000 sent through a money changer in the UAE.  Later in 2001, AL ANI was expelled from the Czech Republic for espionage activities.  Other intelligence reports indicate that AL ANI met with another September 11th hijacker, KHALID AL MIDHAR as well.

175.    Italian security sources reported that IRAQ made use of its embassy in Rome to foster and cultivate IRAQ's partnership with BIN LADEN and AL QAEDA.  HABIB FARIS ABDULLAH AL MAMOURI, a general in the IRAQI SECRET SERVICE, and a member of IRAQ's M-8 Special Operations branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats.  AL MAMOURI met with September 11th pilot hijacker MOHAMMED ATTA in Rome, Hamburg and Prague.  AL MAMOURI has not been seen in Rome since July 2001, shortly after he last met with ATTA.

176.    Sometime between April 23, 2001, and on or about June 29, 2001, SATAM AL SUQAMI (Flt. 11), WALEED AL SHEHRI (Flt. 11), AHMED AL GHAMDI (Flt. 175), MAJED MOQED (Flt. 77),  AHMED AL NAMI (Flt. 93), HAMZA AL GHAMDI

158

(Flt. 175), MOHALD AL SHEHRI (Flt. 175), WAIL AL SHEHRI (Flt. 11), AHMED AL

HAZNAWI (Flt. 93), and FAYEZ AHMED (Flt. 175),  traveled from various points in the

world to the United States.

177.    The FBI has reported that ATTA visited commercial crop dusting aircraft

facilities in Florida in March and August of 2001.  In the wake of the September 11th

attacks, authorities concluded that ATTA was investigating the possibility of spraying

chemical or biological weapons on U.S. civilians.  In July and August 2001, on several

occasions several other Middle Eastern men also visited the same crop dusting facility.

178.    On July 7, 2001 two members of the IRAQI INTELLIGENCE,  ABU

AGAB and ABU WA'EL traveled together from Germany to Afghanistan and eventually

to Kurdistan. ABU WA'EL trained at AL QAEDA terror camps and became the authority

for fundamentalist groups operating in Kurdistan, intent on crushing opposition to

SADDAM HUSSEIN.

179.    The FBI reported that in furtherance of his participation in the hijacking

conspiracy, ZACARIAS MOUSSAOUI purchased flight deck videos for the Boeing 747

on June 20, 2001 and took a three day Boeing 747 simulator course in Minneapolis,

Minnesota on August 13-15, 2001.  He also purchased two knives in Oklahoma City,

Oklahoma on August 3, 2001.   MOUSSAOUI received approximately $14,000 from

RAMZI BINALSHIBH on August 1-3, 2001.

180.    U.S. government officials reported that in the summer of 2001, FAYEZ

159

AHMED (Flt. 175), SAEED ALGHAMDI (Flt. 93), HAMZA AL GHAMDI (Flt. 175),

WALEED AL SHEHRI (Flt. 11), ZIAD JARRAH (Flt. 93),  SATAM AL SUQAMI (Flt.

11), MOHALD AL SHEHRI (Flt. 175), AHMED AL GHAMDI (Flt. 93), and AHMED AL

HAZNAWI (Flt. 93) each opened a Florida Sun Trust Bank account with a cash deposit.

These and other bank accounts were used by the 9/11 hijackers for living expenses, travel,

pilot training, weapons and other incidentals and served as places where AL QAEDA

operatives could wire money to support the terrorist conspiracy in the months and weeks

leading up to September 11, 2001.

181.    On September 9, 2001, BIN LADEN and other AL QAEDA members,

MUHAMMAD OMAR and other members of the TALIBAN, carried out their plan to

assassinate Ahmad Shah Masood,  the military leader of the Afghanistan Northern Alliance

opposition forces that had been fighting the TALIBAN for many years.  AL QAEDA

terrorists posed as television journalists seeking an interview with Masood.  The video

camera was armed with explosives and when detonated at the purported interview, killed

Ahmad Shah Masood, one of the suicide terrorists and other high-ranking members of the

Afghanistan Northern Alliance opposition forces.

182.    This assassination solidified BIN LADEN's asylum and protection in

TALIBAN controlled Afghanistan and cleared the way for AL QAEDA's unprecedented

attack on the United States two days later.  The TALIBAN would continue to refuse to

surrender BIN LADEN or AL QAEDA members to the United States after the September

11th attacks.

## SEPTEMBER 11TH ATTACKS

183.    On September 11, 2001, defendants MOHAMMED ATTA, ABDUL ALZIZ AL OMARI, WAIL AL SHEHRI, WALEED AL SHEHRI, and SATAM AL SUQAMI hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed it into the North Tower of the World Trade Center in New York.

184.    On September 11, 2001, defendants MARWAN AL SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, and MOHALD AL SHEHRI hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m., crashed it into the South Tower of the World Trade Center in New York.

185.    On September 11, 2001, defendants KHALID AL MIHDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked American Airlines Flight 77 carrying 64 persons, bound from Virginia to Los Angeles, and at approximately 9:37 a.m., crashed it into the Pentagon.

186.    On September 11, 2001, defendants ZIAD JARRAH, AHMED AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark to San Francisco with the intention of crashing it into a target in Washington, D.C., such as the White House or the Capitol.  At

approximately 10:10 a.m, because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

187.    At approximately 9:50 a.m., the South Tower of the World Trade Center collapsed; at approximately 10:29 a.m., the North Tower of the World Trade Center collapsed.  Defendants intentionally caused the deaths of and injuries to thousands of innocent persons.

188.    The hijackings referenced above were the culmination of a conspiracy among defendants to attack the United States and murder United States citizens.

## POST SEPTEMBER 11TH

189.    On two videotapes made by AL QAEDA  in September and October 2001, BIN LADEN took credit for the September 11th  attacks and stated that the attacks went better than expected.

190.    SADDAM HUSSEIN is the only national leader in the world who publicly praised the attacks and said that the United States of America deserved them. IRAQ has offered sanctuary to BIN LADEN and TALIBAN leaders. Abu Zeinab Al  Quaraity, an Iraqi defector who was an officer in the IRAQI INTELLIGENCE and was familiar with its operations, reported that when he learned about the World Trade Center attacks on September 11th, he turned to a friend and said, "That's ours."

191.    Upon information and belief, several hundred AL QAEDA members, including Abu Abdul Rachman, fled Afghanistan for Kurdistan in IRAQ to try to take

control of towns not under the control of SADDAM HUSSEIN and IRAQ, including Halabja, Tawela and Biyarah.  These areas were under the control of defendant ANSAR AL ISLAM and its leader, an IRAQI INTELLIGENCE officer and defendant ABU WA'EL. Upon information and belief, ANSAR AL ISLAM was acting on behalf of IRAQ and SADDAM HUSSEIN to destabilize the Kurdish region.  On September 23, 2001, Kurdish forces ousted ANSAR AL ISLAM from Halabja, but the Islamic fundamentalist group remained in control of Tawela and Biyarah.

192.    Israeli intelligence sources verify that for the past two years, IRAQI INTELLIGENCE officers have been shuttling back and forth between Baghdad and Afghanistan.  According to the Israelis, one of these IRAQI INTELLIGENCE officers, SALAH SULEIMAN, was captured in October 2001 by Pakistani officials near the border between Pakistan and Afghanistan.

193.    In March 2002, U.S. and allied forces discovered a laboratory near Kandahar, Afghanistan that was designed to produce weapons grade anthrax.  Upon information and belief, IRAQI INTELLIGENCE agents were supplying technology, materials and training to develop this facility in coordination with AL QAEDA and the TALIBAN.

194.    Instruction documents on an artillery weapon known as the "Super Gun" were found in AL QAEDA camps when they were captured by U.S. forces in the winter of 2001-2002.  IRAQ is the only state known to have purchased and assembled the super gun,

163

a weapon so large it must be constructed in segments.  It has a range of several hundred miles.

195.    ABU ZUBAYDAH was arrested in April 2002 in Pakistan near the border of Afghanistan, along with other AL QAEDA members.  Documents and other evidence were found at the scene of the arrest that demonstrate AL QAEDA plans for past and future terrorist activities.  ABU ZUBAYDAH has made self-incriminating statements about his high level role in AL QAEDA  and his close connection to BIN LADEN.  He has further identified several high level AL QAEDA  officers, including, but not limited to, KHALID SHEIKH MOHAMMED.

196.    On April 22, 2002 during a court appearance in the Eastern District of Virginia, ZACARIAS MOUSSAOUI stated that his Court appointed lawyers had "no understanding of terrorism, Muslims, Mujahideen," that he wanted to "fight against the evil force of the [U.S.] federal government" and called for the destruction of the United States and Israel.

197.    In September 2002, al Jazeera television ran an interview in which KHALED SHEIKH MOHAMMED and RAMZI BINALSHIBH admitted their involvement in the 9/11 terrorist attacks.

**IRAN**

198.    Powerful government officials in IRAN provided long-term assistance to OSAMA BIN LADEN and his army of allied Islamists. IRAN's support enabled BIN

LADEN to maintain a steady course of violent activities against America and American interests culminating on September 11, 2001.

199.    In 1996 when OSAMA BIN LADEN left the SUDAN and enjoyed sanctuary in largely Taliban-controlled Afghanistan, he notably maintained a relationship with the Iranian-supported Taliban opposition leader, defendant GULBUDDIN HEKMATYAR who was residing in Tehran. BIN LADEN and HEKMATYAR met in the 1980s while the Afghani HEKMATYAR was leading Hezb-e-Islami, a Pakistan-based group fighting the Soviet occupation of Afghanistan. Their cooperative relationship lasted over a decade.

200.    In the mid nineties this cooperation consisted of jointly supported military training camps and drug smuggling operations in Afghanistan that provided funding for both Hezb-e-Islami and AL QAEDA.  HEKMATYAR was welcomed in IRAN, because he shared IRAN's opposition to the Taliban government. The religious leaders in IRAN opposed the TALIBAN for two reasons: religious and economic.

201.    In the mid nineties, IRAN as a Shiia Muslim nation was actively competing with Wahabi Muslim Saudi Arabia for influence in the fledgling Islamic nation of Afghanistan. At the same time IRAN was competing with Afghanistan to be the site of a planned gas pipeline from Central Asia to the Caspian Sea.

202.    The conflict between IRAN and the TALIBAN did not, however, prevent Iranian assistance to BIN LADEN's AL QAEDA, directly and through HEKMATYAR. This assistance is ongoing. Following the September 11 attacks, BIN LADEN,

HEKMATYAR and officials from IRAN formed a new alliance called LASHKAR FEDAYAN-E-ISLAMI (ISLAMIC MARTYRS BRIGADE) based in Northeastern Afghanistan with the goal of launching suicide attacks against American troops.

203.    According to a September 26, 2002  interview with Salauddin Safi, a military commander under HEKMATYAR living in Pakistan, IRAN "is helping with money and weapons," for suicide attacks on Americans in Afghanistan. Safi explained the relationship between IRAN and HEKMATYAR saying, "IRAN needs HEKMATYAR because IRAN is an enemy of the United States and HEKMATYAR is too," despite the fact that the United Sates removed the TALIBAN from Afghanistan.  IRAN continues to seek influence and control in Afghanistan and to reject the American presence there and in other parts of the Middle East.

204.    In addition to HEKMATYAR, BIN LADEN maintained associations with other terrorists sponsored by IRAN. The International Policy Institute for Counter Terrorism reports that in 1995 and 1996, BIN LADEN approached IRAN'S MINISTRY OF INTELLIGENCE AND SECURITY (MOIS) and offered to join forces against America. This was followed by a number of meetings between BIN LADEN, operatives from IRAN and leaders of the government of IRAN's proxy army, HEZBOLLAH.  BIN LADEN met with IMAD MUGHNIYA, HEZBOLLAH's director of operations at a meeting sponsored by the Iranian MOIS in IRAN in 1996, but it was not the first or only meeting between those two terrorists.

166

205.    A witness at the United States Federal court trial in New York against some of the United States Embassy terrorist bombers reported that contacts between BIN LADEN and MUGHNIYA began before BIN LADEN even left the SUDAN in 1996.  The former AL QAEDA  member, ALI MOHAMMED testified,

> I arranged security for a meeting in the SUDAN between Mughniyah, Hezbollah's chief, and Bin Laden.
>
> Hezbollah provided explosives training for al-Qaeda and al-Jihad...Iran also used Hezbollah to supply explosives that were disguised to look like rocks.

206.    Yossef Bodansky, Director of the House of Representatives Task Force on terrorism and unconventional warfare, reported that right after a speech on June 7, 1996 in which IRAN's Spiritual Leader AYATOLLAH ALI KHAMENEI declared that HEZBOLLAH  must reach "all continents and countries", IRAN hosted a meeting of international terrorists. At this meeting, a committee called the "Committee Of Three" was created to preside over an International HEZBOLLAH . Leading the committee were IMAD MUGHNIYAH, BIN LADEN and AHMAD SALAH (Salim), of the EGYPTIAN ISLAMIC JIHAD. An Iranian leader, MAHDI CHAMRAN SAVEHI (whose official title with the government is Director of the Foundation for Preservation of the Values of the Sacred Defense), would direct the committee's work in sponsoring terrorist attacks against the United States and others.

207.    At an October 1997 meeting between terrorist organizations and high-level officials from IRAN, including GENERAL MOHSEN REZA'I, former commander of the

167

ISLAMIC REVOLUNTIONARY GUARD CORPS (IRGC) who is now in charge of the reorganization of IRAN's security apparatus; GENERAL YAHYA RAHIM SAFAVI, head of the IRGC; QORBAN ALI NAJAF-ABADI, Information Minister; former minister 'ALI FALAHYAN; MOHAMMED MOHAMMADI RAYSHAHRI, special adviser to IRAN's supreme leader ALI KHAMENE'I; and HOSEYN SHAYKH OL-ESLMAN, former assistant foreign minister, plans were made to increase support of anti U.S. terrorism. The report stated:

> *"Reza'i informed the participants that IRAN would double the amount of material and logistical support for those organizations engaged in defending the revolution."*

"Defending the revolution" is a rallying cry for acts of violence against the west.

208.     On September 14, 1998, the U.S. requested Germany extradite AL QAEDA Member MAMDOUH MAHMUD SALIM, and stated that during the period 1992-1996, while BIN LADEN lived in SUDAN, AL QAEDA and the Sudanese government worked closely together on training and arming terrorists.  According to the FBI, AL QAEDA "agreed to put aside its differences with Shi'a Muslim terrorist organizations, including the Government of IRAN and its affiliated terrorist group HEZBOLLAH, to cooperate against the perceived common enemy, the United States and its allies."

209.     In 1998, prior to the bombings of the U.S. embassies in East Africa, a representative of BIN LADEN reportedly met again with an official of IRAN in order to

establish an "anti-U.S. alliance." By this time, communication between OSAMA BIN

LADEN and Iranians was regular and frequent.  Investigators reported that 10% of the calls

made from BIN LADEN's satellite phone were to IRAN.

210.    Running parallel to their interest in anti-American activities, BIN LADEN

and IRAN were active in promoting an Islamic government in Albania and Kosovo.

According to the *Times of London March 22, 1998*, in February 16, 1998, BIN LADEN and

the IRANIAN REVOLUTIONARY GUARDS signed a pact consolidating their operations

in Albania and Kosovo.  They created financial support networks by setting up banks and

humanitarian organizations.  Small factories and businesses were encouraged with loans

and this helped create jobs and bolster neighborhood economies.

211.    Muslim    proselytizing    organizations    like    AL-HARAMAIN    and

MUWAFFAQ attracted young Albanians who were then recruited for training as holy

warriors at training camps that were being established in remote areas of the country.

212.    This work did not distract the clerics of IRAN from continuing to support

other AL QAEDA missions. German authorities debriefed terrorists in custody and learned

that an important and virulent AL QAEDA combat commander MOHAMMED ZARQAWI

lived and worked in Tehran in the months before September 11, 2001.  Around the time of

the September 11 attacks ZARQAWI traveled to Afghanistan but returned to IRAN before

the American bombing campaign began in the fall of 2001.

213.    ZARQAWI's movements were tracked by monitoring his satellite phone,

169

according to German information. Germany's interest in ZARQAWI is based on its belief that he is involved in a terrorist group called AL TAWHID and that he assisted a hundred or more AL QAEDA fighters who were fleeing Afghanistan by arranging for funds, passports, escape routes (sometimes through IRAN) and sanctuary. Defense Secretary Donald Rumsfield confirmed the flight of AL QAEDA members to or through IRAN.

214.    After the September 11 attacks, IRAN provided an escape route for two Egyptian AL QAEDA members on the FBI's most wanted list, SAIF AL ADEL and MAHFOUZ WALAD AL WALID.   Additionally, American intelligence reports that AL ADEL and top AL QAEDA  leader MAHFOUZ WALAD AL WALID, were in Eastern IRAN where, the Washington Post reported they might be planning further AL QAEDA operations.

215.    Haji Mohamad Akram, a captured BIN LADEN aide told an interviewer from the Christian Science Monitor that BIN LADEN fled Afghanistan to IRAN in November 2001.  Akram said that at the time, BIN LADEN had offers of sanctuary from IRAQ and from IRAN.  Akram claimed that IRAN distributed money to AL QAEDA for distribution to terrorist soldiers and that he himself had received the equivalent of $1400.

216.    Other AL QAEDA terrorists have been located in a dozen camps around Tehran that serve as underground railroads for terrorists and their families en route through IRAN for Beirut and Syria as well as a route for the smuggling of AL QAEDA and HEZBOLLAH  assets, gold and diamonds from Pakistan to SUDAN.

170

217.    ZARQAWI is considered a major player in the IRAN-AL QAEDA activities.  He is also suspected of assisting in the murder of American diplomat Laurence Foley on October 28, 2002 in Amman, Jordan.   Jordan's Foreign Minister, Marwan Muashe, reports that two men who admitted to the killing implicated ZARQAWI, claiming he provided them with machine guns, grenades and money to attack embassies and foreign diplomats in Jordan.

218.    At the time of the September 11 attacks, IRAN's military officers including GENERAL ALI BLOKIAN, formerly an advisor to HEZBOLLAH in Lebanon, were assisting Afghanis on the ground near the Iranian border region.  The bodies of three IRANIAN REVOLUTIONARY GUARDS were found in the west Afghanistan province of Herat after the U.S. air strikes against the TALIBAN.  Ismail Khan, an ally of IRAN, ruled this district.  Because he is working to challenge Kabul's rule, the IRANIAN REVOLUTIONARY GUARDS is providing advice and assistance to Kahn and others.  Afghan defense officials claim that elite forces from the IRANIAN REVOLUTIONARY GUARDS are providing arms and ammunition to Iranian-friendly commanders.

219.    A U.S. government report in 2000, Patterns of Global Terrorism alleged that IRAN remained the most active state sponsor of terrorism."

> *Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals.* (emphasis supplied.)

171

220.    IRAN'S pattern of support FOR terrorism has been ongoing for many years. Indeed, by providing training, facilities, planning, logistics, escape routes and most importantly leadership, IRAN enabled BIN LADEN's army to carry out acts of terrorism it otherwise would be incapable of accomplishing. Likewise, without terrorists like BIN LADEN and HEZBOLLAH, IRAN would lose a most effective weapon against the United States and the West.

## HAMBURG AL QAEDA CELL

221.    On August 28, 2002, German prosecutors brought charges against MOUNIR EL MOTASSADEQ (or "MOTASSADEQ"), a Moroccan man who supported members of the Hamburg AL QAEDA terrorist cell and helped to plan and carry out the September 11, 2001 terrorist attacks.

222.    MOUNIR EL MOTASSADEQ is an AL QAEDA co-conspirator.  His indictment was the first formal criminal charge brought by German authorities in connection with the September 11, 2001 attacks. MOTASSADEQ was arrested in November of 2001 on evidence that he had access to the bank account of one of the suicide hijackers and arranged wire transfers to hijackers while they were learning to fly in the United States.

223.    When arrested in 2001, prosecutors said MOTASSADEQ was a close associate of MOHAMED ATTA, a suspected ringleader of the plot.  In 1996,

MOTASSADEQ was one of the witnesses who signed Mr. ATTA's will. MOTASSADEQ managed the finances of another hijacker, MARWAN AL SHEHHI, and that money was used to help AL SHEHHI pay for his flight lessons in the United States and cover living expenses here. According to the criminal indictment, these funds were used to support members of the terrorist group AL QAEDA .

224.    MOTASSADEQ admitted that he knew the September 11, 2001 hijackers, but he provided conflicting versions of the nature and intensity of those contacts. At times MOTASSADEQ said he knew them only through the Al Quds mosque, which was attended by ATTA and other hijackers. On other occasions, he said he had visited the apartment on Marienstrasse where ATTA lived. MOTASSADEQ and ATTA were both students at Technische Universität Hamburg-Harburg University in Hamburg (TUHH).

225.    In July 2000, MOTASSADEQ traveled to Karachi, Pakistan for a 'vacation.' The Pakistanis later confirmed that he had been in the country at this time and that there were indications that he had visited an AL QAEDA camp in Afghanistan. In May 2001, MOTASSADEQ visited the State nuclear plant near Hamburg, Germany.

226.    The German investigation revealed that in summer of 1999 or earlier, a group of Muslim students in Hamburg joined forces with the express goal of carrying out, in countries of Western culture, especially in the United States, the "Holy War" ("Jihad") by means of international terror. The group's members included MOHAMMED ATTA, MARWAN YOUSEF MOHAMED RASHED AL SHEHHI (or "SHEHHI"), and ZIAD

SAMIR JARRAH (or "JARRAH"), (hijackers, all of whom died in the course of the attacks), co-conspirators, or Defendants RAMZI MOHAMMED ABDULLAH BI NAL SHIBH (a/k/a Ramzi Mohamed Abdallah Omar), ZAKARIYA ESSABAR, SAID BAHAJI, as well as MOUNIR EL MOTASSADEQ.

227.    Initially, the principal meeting point of the Hamburg cell was the apartment rented by ATTA, BAHAJI and BI NAL SHIBH in Hamburg-Marburg, which temporarily served as SHEHHI's residence, too.  MOTASSADEQ, ESSABAR and JARRAH convened for meetings of the group at this location.  In September 1999, the apartment SHEHHI rented nearby served as an alternative base of operations.  In October of 1999, after SHEHHI and ATTA moved into the second apartment, it also became the primary address of MOTASSADEQ.

228.    In October of 1999 or earlier, the group's members finalized their terrorist scheme, which called for the use of airplanes in "jihad" to kill as many "infidels" in the United States as possible.  In order to coordinate details and logistical support with the responsible representatives of the international terrorism network, they resolved to travel to Afghanistan in two groups.

229.    In late November of 1999, the three hijackers (ATTA, SHEHHI and JARRAH) and BIN AL SHIBH traveled on almost identical dates to an AL QAEDA training camp.  Aside from providing training in military operations, the camps served to fuel radical extremist ideology and foster an inner resolve among recruits to sacrifice their

174

own lives fighting the "godless enemies." SHEHHI went back to Hamburg in early January 2000 (through late March 2000). JARRAH did not return to Hamburg until late January. ATTA stayed in Afghanistan until late February and BIN AL SHIBH re-entered Germany in March 2000.

230.    In spring of 2000, a second group traveled to Afghanistan. MOTASSADEQ flew from Hamburg to Karachi on May 22, 2000, and returned on August 1, 2000. In the meantime, he underwent military training in a camp near Kandahar, Afghanistan.

231.    In accordance with the plans for the attacks discussed in Afghanistan, the three terrorists began making arrangements for pilot training in the United States upon their return. Accordingly, in March 2000, ATTA contacted 31 flight schools in the United States via email from Hamburg, inquiring about the possibilities and conditions of flight training for two or three men from different Arab countries. On March 26, 2000, JARRAH signed an agreement to receive pilot training at the Florida Flight Training Center in Venice, Florida, and on March 30, 2000, transferred the amount of 349 German Marks to the account of the flight school's Munich representative.

232.    On May 25, 2000, JARRAH applied for a United States entry visa, which he received without difficulty, as ATTA had before him, on May 18, 2000. SHEHHI had received his United States entry visa from the United States consulate in Dubai, United Arab Emirates (UAE), on January 10, 2000. All three terrorists had previously obtained new passports.

175

233.    Following their entry into the United States (SHEHHI arrived on May 29, 2000, ATTA on June 3, 2000), SHEHHI and ATTA opened a joint bank account on July 18, 2000 with Sun Trust Bank in Venice, Florida, through which they obtained financing and material support for their stay in the United States – from backers within the international terrorist network.  On July 7, 2000, they started taking flight lessons together at the flight school Hoffman Aviation in Venice, Florida. By December 21, 2000, they had successfully completed their training, receiving professional pilot licenses from the Federal Aviation Administration.

234.    ATTA and SHEHHI then put their acquired skills to the test on a Boeing 727 flight simulator at the Simulations Center in Opa-Locka, Florida, in December 2000, and by taking several exercise flights at the Advanced Aviation Flight Training School in Lawrenceville, Georgia, and at the flight school in Decatur, Georgia, in January and February 2001, respectively.

235.    JARRAH entered the United States on June 26, 2000, and, until January 13, 2001, underwent pilot training at the Florida Flight Training Center (F.F.T.C.) in Venice, Florida, where he obtained a private pilot license. Between December 15, 2000, and January 5, 2001, he took flight lessons at the Aeroservice Aviation Center in Virginia Gardens, Florida.

236.    BINALSHIBH's applications for a non-immigrant visa for the United States were denied and he was unable to train in Florida with JARRAH..

237.     To take BIN AL SHIBH's place, ESSABAR was to be sent to the United States to undergo pilot training. Like ATTA, SHEHHI and JARRAH before him, ESSABAR attempted to obscure his visit to Pakistan from U.S. authorities by obtaining a new passport from the Moroccan embassy in Berlin on October 24, 2000.  United States authorities however, denied ESSABAR's visa applications.  His plan to become a suicide hijacker could not be realized.  Instead, ZACARIAS MOUSSAOUI (currently detained and indicted in the United States for his involvement in the preparations for the attacks of September 11, 2001),  traveled to the United States following an eight-week visit to Pakistan, and enrolled in flight school.  However, due to MOUSSAOUI's arrest on August 17, 2001, he never completed his training.

238.     MOTASSADEQ and the other AL QAEDA co-conspirators who remained in Hamburg, remained involved in the preparing for the attacks.  In particular, they were responsible for ensuring that the terrorists and ZACARIAS MOUSSAOUI had sufficient funds for their stay and training in the United States.

239.     Several meetings were held for group members in Germany and Spain for the purpose of coordinating those who remained in Hamburg and those who had traveled to the United States.  Accordingly, BIN AL SHIBH and JARRAH met on January 4, 2001, in Bochum or Dusseldorf.  Later, BIN AL SHIBH traveled to Berlin to meet ATTA, who had arrived there no later than January 6, 2001, after spending time in Spain.  ATTA returned to the United States on January 10, 2001.  Another meeting between ATTA and

BIN AL SHIBH on July 17 or July 18, 2001, in Tarragona, Spain, served the purpose of coordinating the exact times of the attacks.

240.     MOTASSADEQ, together with BAHAJI, acted as the resident administrator of the terror organization in Hamburg.  MOTASSADEQ's chief responsibility consisted of securing funding for the group's terrorist activities. He made use of SHEHHI's account, to financing.  MOTASSADEQ made sure that the account received sizeable support payments from sources in the United Arabian Emirates and elsewhere.  By transferring tuition money to maintain the status of SHEHHI as a student, allowing SHEHHI to remain in Germany.  Shortly before SHEHHI left for Afghanistan, in late November 1999, MOTASSADEQ also gained control over the SHEHHI's bank account and bank card which he used to transact financial and other personal business on behalf of SHEHHI and cover up the latter's absence.  The account and card were also used to distribute funds. MOTASSADEQ transferred funds from SHEHHI's to BIN AL SHIBH's account which the latter passed on to SHEHHI in the United States, this money was used to finance SHEHHI's flight training.  After SHEHHI left Germany, several cash withdrawals were made to provide funding for the intended flight training of BIN AL SHIBH and ESSABAR and to benefit other cell members and promote acts of international terrorism. ABDELGHANI MZOUDI had close and frequent contact with members of the AL QAEDA Hamburg cell who supervised and directed the September 11 attacks. He provided logistical support to defendant ATTA, ESSABAR and other suicide hijackers by making

money available to them to finance flight training in the United States. MZOUDI arranged for living accommodations in a student residence in Germany for defendant SHEHHI his final weeks before leaving Germany for the United States. MZOUDI attended terrorist training camps in Afghanistan in the summer of 2000 with ESSABAR and defendant MOTASSADEQ. MZOUDI provided material and logistical support to defendant RAMZI BIN AL SHIBB and AL QAEDA.

241.   Evidence recovered by the Spanish authorities shows that MUHAMMED GALEB KALAJE ZOUAYDI, a Syrian born businessman, along with several associates in Spain and Europe, funneled money from the Saudi-based company, MUSHAYT FOR TRADING ESTABLSIHMENT (or "MUSHAYT"), through Spanish corporations to entities and individuals known to be associated with the AL QAEDA terrorist organization in Europe.  PRINCE ABDULLAH AL FAISAL BIN ABDULAZIZ AL SAUD is implicated in these financial transactions of material support to AL QAEDA, as is PRINCE TURKI AL FAISAL AL SAUD.

242.   According to Spanish authorities, MUSHAYT received funds and donations from other companies and individuals in Saudi Arabia that were funneled to AL QAEDA through Spain.  This fraudulent scheme provided material, financial support to the GLOBAL RELIEF FOUNDATION in Spain, to ABDUL FATTAH ZAMMAR and MAMOUN DARKAZANLI in Germany, who maintained the bank accounts of hijacker MOHAMED ATTA and other members of the Hamburg AL QAEDA cell.  These co-

conspirators (ZAMMAR and DARKAZANLI) are awaiting trial in Germany on charges of providing financial and logistical support to the organization of the September 11, 2001 attacks.

243.    GHASOUB AL ABRASH GHALYOUN (a/k/a Abu Musab), an associate of ZOUAYDI's in Spain, was observed filming future targets of AL QAEDA in the United States.  In his videotapes, Spanish authorities found pictures of the World Trade Center taken on August 9, 1997.

244.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI (or "AL TURKI") is a Saudi and the former rector of the University of Riyadh (1994),  former minister of Waqf and Islamic Affairs until 2000, and advisor to KING FAHD.  AL TURKI is also Secretary General of the MUSLIM WORLD LEAGUE.

245.    Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI is a counselor to the government of Saudi Arabia and was in contact with AL QAEDA financier ZOUAYDI.  AL TURKI acted as Saudi Minister of Islamic Affairs for many years and was in a position where he knew or should have known about the reach of international terrorism and AL QAEDA.   AL TURKI later became a shareholder in the front organization known as Promociones which bought real estate but did no actual construction work, although listing itself as a construction company.  Instead, that company made direct payments to AL QAEDA cells.

246.    On October 10, 1999, AL TURKI and ZOUAYDI, a senior AL QAEDA

180

financier for Europe, agreed to participate as business partners in a construction project in Madrid, Spain.  A contract was written by ZOUAYDI'S Company in Spain stating that both parties would finance 50% of the project.  The incomes would be split 70/30 between AL TURKI and ZOUAYDI.

247.    ZOUAYDI was part of an international terrorist movement for global jihad which encompassed the AL QAEDA network.  This network channeled money directly to the perpetrators of September 11, 2001.

248.    Several faxes in support of this enterprise, scheme and conspiracy were sent by ZOUAYDI to AL TURKI.  As a guaranty for the Spanish company, ZOUAYDI sent a check of 191 million Pesetas on September 15, 1999 to AL TURKI as beneficiary from Banco Sabadell in Madrid. In a fax sent on October 15, 1999, ZOUAYDI asked AL TURKI to send the money through AL RAJHI BANK (which hold his accounts in Saudi Arabia). On October 22, 1999, a fax was sent to AL TURKI by Prol & Asociados law firm in Madrid referring to a telephone conversation with someone acting on behalf of AL TURKI, named Waleed O. Houssainy, about a project of AL TURKI's to buy 100% of ZOUAYDI's Spanish company.

249.    On February 4, 2000, ZOUAYDI sent a fax to AL TURKI, referring to him as "advisor to KING FAHD."   In his declarations to the Spanish judge on April 26, 2002, ZOUAYDI refered to AL TURKI as "advisor to KING FAHD."

## SAUDI ARABIAN DEFENDANTS

250.    Upon information and belief, there were and are, a large number of Saudi citizens and members of the Saudi Royal Family who support BIN LADEN.  High-ranking officials in the Saudi government and Saudi businessmen have provided money to support BIN LADEN and AL QAEDA .  Money to support BIN LADEN and AL QAEDA  was transferred using charitable institutions, businesses and banks.  In many cases, these entities shared management and or offices, creating an interlocking financing structure that obscures the movement, source and ultimate destination of money.

251.    OSAMA BIN LADEN was born in Saudi Arabia to a wealthy Saudi family which operated a large multi-national construction company.  He and many other Saudis reacted to the Soviet invasion of Afghanistan by taking up arms in the name of Islam. Throughout the 1980's and 1990's and continuing today, many Saudis support and attend the religious schools that preach hatred toward the West.  Indeed, 15 of the 19 September 11th hijackers were from Saudi Arabia.

252.    The close relationship between OSAMA BIN LADEN and certain of the highest members of the Saudi Royal Family stretches back for a long period of time and continues to this day.

253.    OSAMA BIN LADEN met with Defendant PRINCE SULTAN BIN ABDULLAHZIZ AL SAUD (or "PRINCE SULTAN") after IRAQ invaded Kuwait in August 1990.  PRINCE SULTAN is the Second Deputy Prime Minister, Minister of

Defense and Aviation, Inspector General, and Chairman of the Board of Saudi Arabian Airlines, which does business in the United States and internationally. In the meeting, OSAMA BIN LADEN offered the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi militants who BIN LADEN was willing to recruit.

254.   This offer was also made to Defendant PRINCE TURKI AL FAISAL AL SAUD (or "PRINCE TURKI"), the then Chief of Saudi Intelligence, or Istakhbarat. PRINCE TURKI had an ongoing relationship with OSAMA BIN LADEN from the time that they first met in Islamabad, Pakistan at the Saudi embassy, during the Soviet Union's occupation of Afghanistan.

255.   Defendant PRINCE MOHAMMED AL FAISAL AL SAUD (or "PRINCE MOHAMMED" or "PRINCE MOHAMMED AL FAISAL") is involved in the financing, aiding and abetting and material support of OSAMA BIN LADEN, AL QAEDA, and international terrorism in part through FAISAL ISLAMIC BANK and AL SHAMAL ISLAMIC BANK in the Sudan.   PRINCE ABDULLAH AL FAISAL BIN ABDULLAHZIZ AL SAUD (or "PRINCE ABDULLAH" or "PRINCE ABDULLAH AL FAISAL") and PRINCE NAYEF BIN ABDULLAHZIZ AL SAUD (or "PRINCE NAIF") are also engaged in the aiding and abetting or material sponsorship of OSAMA BIN LADEN, AL QAEDA, and international terrorism as described herein.  PRINCE SALMAN IBN ABDUL AZIZ  (or "PRINCE SALMAN") has also provided material support to

183

OSAMA BIN LADEN, and AL QAEDA.

256.   PRINCE TURKI was head of Saudi Arabia's Department of General Intelligence (Istakhbarat) from 1977 until 2001.  As such, he was in a position to know the threat posed by BIN LADEN, AL QAEDA, the TALIBAN, and the extremist and violent perversion of jihad and hatred that the Saudi religious schools were encouraging in young students.  PRINCE TURKI abruptly left his position in or around August 30, 2001, when he was dismissed as chief of Saudi Intelligence just prior to the September 11, 2001 attacks.

257.   PRINCE TURKI met personally with BIN LADEN at least five times while in Pakistan and Afghanistan during the mid-eighties to mid-nineties.  PRINCE TURKI also had meetings with the TALIBAN in 1998 and 1999.  In 1995, while the Saudi Istakhbarat was headed by PRINCE TURKI, he decided to give massive financial and material support to the TALIBAN.

258.   Defendants PRINCE TURKI AL FAISAL AL SAUD and PRINCE MOHAMMED had close financial ties with AL QAEDA financier MUHAMMED GALEB KALAJE ZOUAYDI.

259.   Mullah Kakshar is a senior TALIBAN official who defected and provided a sworn statement regarding the transfer of funds from wealthy Saudis directly to AL QAEDA and BIN LADEN in Afghanistan.  Mullah Kakshar's sworn statement implicates PRINCE TURKI as the facilitator of these money transfers in support of the TALIBAN, AL QAEDA, and international terrorism.

260.    In 1996, according to various intelligence sources, a group of Saudi princes and prominent Saudi business leaders met in Paris and agreed to continue contributing, sponsoring, aiding and abetting BIN LADEN's terrorist network.

261.    In July of 1998, a meeting occurred in Kandahar, Afghanistan that led to an agreement between certain Saudis and the TALIBAN.  The participants were PRINCE TURKI, the TALIBAN leaders, as well as senior Pakistani intelligence officers of the ISI and representatives of BIN LADEN.  The agreement reached stipulated that BIN LADEN and his followers would not use the infrastructure in Afghanistan to subvert the royal families' control of Saudi government and in return, the Saudis would make sure that no demands would be acceded to for the extradition of terrorist individuals, such as BIN LADEN, nor permit the closure of terrorist facilities and camps.  PRINCE TURKI also promised to provide oil and generous financial assistance to both the TALIBAN in Afghanistan and to Pakistan.  After the meeting, 400 new pick-up trucks arrived in Kandahar for the TALIBAN, still bearing Dubai license plates.

262.    PRINCE TURKI was instrumental in arranging a meeting in Kandahar between Iraqi senior intelligence operative, the Ambassador to Turkey FARUQ AL HIJAZI and OSAMA BIN LADEN, in December of 1998.

263.    Istakhbarat served as a facilitator of OSAMA BIN LADEN's network of charities, foundations, and other funding sources. PRINCE TURKI has recently been named as an ambassador from Saudi Arabia to the United Kingdom.

264.     Born in Riyadh, Saudi Arabia in 1924, PRINCE SULTAN is the son of Abdulaziz Bin Abdul Rahman Al Saud, founder of the modern Kingdom of Saudi Arabia and Hussa Bin Ahmad Sudairi.  He is one of the six full brothers of King Fahd Bin Abdulaziz Al Saud.  These seven brothers are referred to as the Sudairi seven.  PRINCE SULTAN was appointed Governor of Riyadh in 1947.

265.     PRINCE SULTAN has been the Second Deputy Prime Minister, Minister of Defense and Aviation since 1962 and Inspector-General of the Kingdom of Saudi Arabia.  In addition, PRINCE SULTAN is Chairman of the Supreme Council for Islamic Affairs which has oversight and control over charities in Saudi Arabia.

266.     Beginning with the Gulf War, PRINCE SULTAN took radical stands against western countries and publicly supported and funded several Islamic charities that were sponsoring OSAMA BIN LADEN and AL QAEDA operations, including the Defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION ("IIRO"), MUSLIM WORLD LEAGUE, WORLD ASSEMBLY OF MUSLIM YOUTH and AL-HARAMAIN.  He was appointed head of the Supreme Council of Islamic Affairs which was responsible for charitable financing.

267.     PRINCE SULTAN has been involved in the sponsorship of international terrorism through the IIRO and other Saudi-funded charities.  Defendant IIRO is a direct arm of the Saudi Royal family, according to Arafat Al Asahi, the Director of the Canadian branch of the IIRO.   Dr. ADNAN AL BASHA, the Secretary General of the IIRO publicly

186

thanked PRINCE SULTAN on December 22, 2000, for his support and aid.

268.    A Saudi embassy press release announced in April 2001 that "Prince Sultan affirms [the] Kingdom's Support" for the Palestinian Intifada, with the generous amount of $40 million already disbursed to "the families of those martyred" and other "worthies."

269.    PRINCE SULTAN personally funded several Islamic charities over the years that sponsor, aid, abet or materially support BIN LADEN and AL QAEDA: the IIRO (and its financial fund SANABEL EL-KHAIR), AL-HARAMAIN, MUSLIM WORLD LEAGUE, and the WORLD ASSEMBLY OF MUSLIM YOUTH.  All of these charities are and/or were involved in the financing of international terrorism. The total of PRINCE SULTAN's personal donations to these entities since 1994 amounts to at least $6,000,000, according to official and public reports.

270.    PRINCE SULTAN's role in the IIRO's financing is of significance.  Since the IIRO's creation in 1978, PRINCE SULTAN donated various gifts to the charity. In 1994 alone, he donated $266,652 to the IIRO.  Since 1994, the amount funneled by PRINCE SULTAN into IIRO alone is reported to be $2,399,868.  PRINCE SULTAN's role in directly contributing to and in the oversight of IIRO evidences his material sponsorship, aiding and abetting of international terrorism.  PRINCE SULTAN maintains close relations with the IIRO organization headquarters and knew or should have known these assets were being diverted to AL QAEDA.

271.    PRINCE SULTAN is also a large financial contributor of the MUSLIM

187

WORLD LEAGUE.  PRINCE SULTAN donated during a television fundraising campaign

for MWL :

> The total collection made as a result of the television campaign was SR 45,000,000, with the Emir of Riyadh, PRINCE SULTAN, donating a million Saudi Royals ($533,304).

272.    PRINCE SULTAN is also a regular donator to the WORLD ASSEMBLY

OF MUSLIM YOUTH (or "WAMY").  WAMY was founded in 1972 by AHMED

TOTONJI in a Saudi effort to prevent the "corrupting" ideas of the western world

influencing young Muslims.  With official backing it grew to embrace 450 youth and

student organizations with 34 offices worldwide.  WAMY has been officially identified as

a "suspected terrorist organization" by the FBI since 1996 and has been the subject of

numerous governmental investigations for terrorist activities.

273.    Shortly after the September 11, 2001 attacks, PRINCE SULTAN publicly

accused the "Zionist and Jewish lobby" of orchestrating a "media blitz" against the Saudi

Kingdom.  PRINCE SULTAN argued against the United States use of Saudi bases to stage

military strikes on Afghanistan after the September 11, 2001 attacks, stating that his

government "will not accept in [Saudi Arabia] even a single soldier who will attack

Muslims or Arabs."  Saudi Minister of Defense PRINCE SULTAN also stated in 2002 that

his country would not permit allied aircraft to launch preventive or major retaliatory strikes

against IRAQ from bases in Saudi Arabia.  PRINCE SULTAN expressed the hope that the

Arab Nationals who have fought alongside the TALIBAN and AL QAEDA will be allowed

to return safely to their respective countries.

274.    PRINCE MOHAMMED is engaged in the sponsorship of international terrorism through DAR AL MAAL AL ISLAMI, THE FAISAL ISLAMIC BANK and AL SHAMAL ISLAMIC BANK in the Sudan.  As detailed *supra*, until 1983, DMI was under M. Ibrahim Kamel's chairmanship.  On October 17, 1983, PRINCE MOHAMMED became CEO of DMI. Under PRINCE MOHAMMED's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices across the world. DMI was founded in 1981 to foster the spread of Islamic banking across the Muslim world and its Board of Directors included HAYDAR MOHAMED BIN LADEN, a half-brother of OSAMA BIN LADEN.  FAISAL ISLAMIC BANK SUDAN was one of the five main founders of AL SHAMAL ISLAMIC BANK.

275.    Prominent Saudi businessman and terrorism financier ADEL ABDUL JALIL BATTERJEE is the Chairman and one of the largest shareholders of AL SHAMAL ISLAMIC BANK in Khartoum, SUDAN. AL SHAMAL ISLAMIC BANK is an instrumental bank in BIN LADEN's financial support network. BIN LADEN used AL SHAMAL BANK for the funding of his AL QAEDA network leading up to the 1998 United States Embassy bombings in Africa.  Defendant FAISAL ISLAMIC BANK was implicated during Al  Fadl's May 2001 United States trial testimony regarding the bombings as holding and managing bank accounts for AL QAEDA operatives (*supra).*

276.    As the head of DMI, PRINCE MOHAMMED knew or should have known

189

of these and other activities and acted as an aider and abettor and material sponsor of AL

QAEDA, BIN LADEN, and international terrorism.

277.    PRINCE ABDULLAH  was born in 1923 and is the son of former King

Faisal.    His brothers include Defendant PRINCE TURKI and Defendant PRINCE

MOHAMMED.

278.    PRINCE ABDULLAH AL FAISAL, a former official of the Saudi Ministry

of Interior, was Minister of Health between 1949 and 1950.  He is Chairman of the Arabian

Establishment for Trade and Shipping Ltd, Qassim Cement Company and owner of

ALFAISALIAH GROUP.  He is also Chairman of the board of trustees of the King Faisal

Foundation.

279.    ALFAISALIAH GROUP (a/k/a Al Faisal Group Holding Co.) (or "AFG")

is based in Riyadh, Saudi Arabia.  Its main shareholder is PRINCE ABDULLAH.  Its

Chairman is MOHAMMED ABDULLAH AL FAISAL, PRINCE ABDULLAH AL

FAISAL's son.

280.    ALFAISALIAH  GROUP  was  reorganized  in  2001  with  PRINCE

ABDULLAH holding 97.5% of the shares, and businessman MOHAMMED BIN

ABDULRAHMAN AL ARIEFY, President, owning 2.5 percent of the shares.  The

company at that time changed its name to AL FAISAL GROUP HOLDING CO., a

successor in interest to ALFAISALIAH GROUP.

281.    Founded in 1970, the ALFAISALIAH GROUP is a large commercial

conglomerate with 3,000 employees and thirteen subsidiaries involved in five business sectors (Food & Beverages, Petrochemicals & Plastics, Entertainment & Multimedia, Consumer Electronics, and High Tech & Information Technology).   ALFAISALIAH GROUP is the representative agent in Saudi Arabia of several international companies, including Sony, Hewlett Packard, MegaStar, Columbia Tristar, 20th Century Fox, Motorola, Toshiba and Danone.   Its main subsidiaries include Modern Electronic Establishment, Modern Petrochemicals Establishment, Al Safi Diary Establishment, Al Faisalia Agricultural Establishment, Al Faisalia Real Estate Establishment and Al Faisalia Computer & Communication Services Establishment.   ALFAISALIAH GROUP maintains branches in Jeddah, Al Khobar, Khamis Mushait, Madinah, Qassim, Arar and Tabuk.

282.   According to FBI records, September 11, 2001, hijacker HANI SALEH H. HANJOUR (a/k/a Hani Saleh Hanjour, Hani Saleh, Hani Hanjour) is a Saudi national from the city of Taif, Saudi Arabia. HANJOUR was one of the hijackers on American Airlines flight 77 that crashed into the Pentagon on September 11, 2001.  His brother Abdulrahman Saleh Hanjour harbored him in Tucson, Arizona, in the months preceding the September 11, 2001 attacks.

283.   The two Hanjour brothers and another AL QAEDA suspect in the attacks, Abdal Monem Zelitny, had a registered address in Taif, Saudi Arabia, under the name of Al Faisaliah, P.O. Box 1717, Taif, Saudi Arabia.  The name and address are the branch office of ALFAISALIAH GROUP in Taif, a subsidiary of the Riyadh based holding

company.   As detailed above, ALFAISALIAH is owned and controlled by PRINCE ABDULLAH AL FAISAL, son of King Faisal, and for whom terrorist financier ZOUAYDI has worked as an accountant in Jeddah, Saudi Arabia.

284.   One of PRINCE ABDULLAH'S accountants in Jeddah, Saudi Arabia was Defendant MUHAMMED GALEB KALAJE ZOUAYDI, (a/k/a Abu Talha) (or "ZOUAYDI") convicted in Spain for financing AL QAEDA operations in Europe. ZOUAYDI set up Spanish companies established during the time he was staying in Saudi Arabia and working for PRINCE ABDULLAH, between 1996 and 2000. ZOUAYDI laundered Saudi money through Spain to an AL QAEDA cell in Germany.

285.   Evidence from eye witnesses indicates that ZOUAYDI was present in offices of PRINCE ABDULLAH in Jeddah.

286.   PRINCE NAYEF is Saudi Minister of Interior and heads the Saudi Committee for relief to Afghans, which supervises the activities of Defendant AL-HARAMAIN FOUNDATION whose sponsorship of terrorism is detailed *infra*.   The Minister of Interior, by function, controls the activities of Islamic Charities and is empowered to verify their legality and conduct.

287.   PRINCE NAYEF is the Chairman of the Saudi Arabian Committee for Support of the Intifada al Quds.  According to documents captured by the Government of Israel in the Palestinian territories during operation Defensive Shield, this committee knowingly transferred large sums of money to the families of Hamas terrorists who had

executed murderous attacks against Israelis. PRINCE NAYEF, along with others in Saudi Arabia, supports suicide martyrs.

288. PRINCE NAYEF has engaged in a pattern of conduct that aids, abets, and materially sponsors international terrorism and AL QAEDA. As with PRINCE SULTAN and PRINCE TURKI, PRINCE NAYEF has engaged in material support, including but not limited to monetary payoffs, to OSAMA BIN LADEN's AL QAEDA.

289. PRINCE SALMAN was named Chairman of the General Donation Committee for Afghanistan (a/k/a Afghan Jihad Support Committee) in 1980 and has a history of funding Islamic extremism. In 1981, the General Donation Committee for Afghanistan gave $39 million dollars to aid the Afghan Mujahideen. PRINCE SALMAN stated the donation was made to "our Afghan brothers."

290. In 1999, PRINCE SALMAN made a donation of $400,000 during a fund-raising event organized for Bosnia Herzegovina and Chechnya by Defendants INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, WORLD ASSEMBLY OF MUSLIM YOUTHS, and AL-HARAMAIN FOUNDATION.

291. A letter seized by the Israeli Defense Forces during Operation Defensive Shield, further evidenced the involvement of PRINCE SALMAN in financing terrorist organizations. The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to PRINCE SALMAN IBN ABDUL AZIZ, Chairman of the Popular Committees for Support of the Palestinian Fighters. The Palestinian ambassador expresses

193

the concern of Yasser Arafat regarding funding of radical organizations.

> *I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.*

292.    The role of certain Saudis in the sponsorship of AL QAEDA is evidenced in the AL QAEDA organization's own words.  Confiscated AL QAEDA documents state that among all the Muslim governments in the world, the government of Saudia Arabia is the only representative model Islamic government, the greatest center of Islam as AL QAEDA moves to expel the Jews and Christians from Arab lands through mass murder.

293.    BIN LADEN is referred to in AL QAEDA documents as the billionaire merchant prince and the beloved member of Saudi Arabia's billionaire family who has been supported by the bin Laden family to aim the Kalishnikov at super power America.

294.    Information found in the possession of AL QAEDA terrorists indicates that financial support of international terrorism by wealthy Saudis is designed to undermine moderate Arab regimes and movements while providing support for Saudi legitimacy as the strict guardians of Mecca and Medina.

295.    These acts described herein constitute a pattern of conduct in sponsoring and

promoting radicals and international terrorism generally, as well as AL QAEDA and

OSAMA BIN LADEN, specifically.  The participation of certain Saudi nationals in the

sponsoring and promotion of terrorism is widely known.  As USA Today reported back in

1999:

> *More than a year after the U.S. Embassy bombings in East Africa, prominent businessmen in Saudi Arabia continue to transfer tens of millions of dollars to bank accounts linked to indicted terrorist Osama Bin Laden, senior U.S. intelligence officials told USA Today.*
>
> The money transfers, which began more than five years ago, have been used to finance several terrorist acts by bin Laden, including the attempted assassination in 1995 of Egyptian President Hosni Mubarak in Ethiopia, the officials said.
>
> Secretary of State Madeleine Albright is expected to raise the issue with Prince Sultan, the Saudi defense minister, during his visit to Washington next week. Saudi Arabia, the main U.S. ally in the Persian Gulf, has pledged to fight terrorism.
>
> According to a Saudi government audit acquired by U.S. intelligence, five of Saudi Arabia's top businessmen ordered the National Commercial Bank (NCB), the kingdom's largest, to transfer personal funds, along with $3 million diverted from a Saudi pension fund, to New York and London banks.
>
> The money was deposited into the accounts of Islamic charities that serve as fronts for bin Laden.
>
> *The businessmen are paying bin Laden "protection money" to stave off attacks on their businesses in Saudi Arabia.*

296.    Certain members of the Saudi Royal family and related persons overtly and covertly

195

aid, abet, and materially support the IIRO and other charities, despite their roles in terrorist financing. Certain members of the Saudi Royal family, along with other wealthy Saudi supporters, contributed to the IIRO and related charities as a way to support AL QAEDA without suffering from the social (and legal) ramifications that such contributions bring. The IIRO received funds which were passed on to terrorists in part from the Zakat payments from individuals and companies in the kingdom of Saudi Arabia. The Saudi Royal family members own substantial assets in the United States of America, and do substantial business in the United States of America, the profits of which in part, are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001.

297.    As the 2002 Report on terrorist financing by the independent task force of the Council on Foreign Relations pointed out: "it is worth stating unambiguously what official U.S. government spokespersons have not: [F]or years, individuals and charities based in Saudi Arabia have been the most important source of funds for AL QAEDA; and for years, Saudi officials have turned a blind eye to this problem." The report goes on to note that this is hardly surprising given that the Saudis possess the greatest concentration of wealth in the area.

## THE MUSLIM WORLD LEAGUE

298.    The MUSLIM WORLD LEAGUE ("MWL") was founded in 1962 in Saudi Arabia, to "disseminate Islamic Dawah and expound the teachings of Islam." One of its

196

founders was Said Ramadan, senior member of the MUSLIM BROTHERHOOD.  The

MWL is the parent organization of the charity INTERNATIONAL ISLAMIC RELIEF

ORGANIZATION (or "IIRO").  MWL uses the IIRO as an operational arm to perform

many of its charitable activities.

299.    The MWL is an organization funded, supported, and financed by persons or

entities of Saudi Arabia.  According to the testimony of Arafat El-Asahi, a MWL

representative in Canada:

> Q. During those eight years that you have been with the
> IIRO here in Canada, have you ever heard anything to the
> effect that the Canadian government has any concern
> whatsoever with respect to your office?
>
> A. Let me tell you one thing. The Muslim World League,
> which is the mother of IIRO, is a fully government funded
> organization. In other words, I work for the Government of
> Saudi Arabia. I am an employee of that government. Second,
> the IIRO is the relief branch of that organization which
> means that we are controlled in all our activities and plans
> by the Government of Saudi Arabia. Keep that in mind,
> please.
>
> Q. I will. Thank you. When you say you work for the
> Government of Saudi Arabia, are you also paid by that
> government?
>
> A. I am paid by my organization which is funded by the
> government. Let me tell you one little thing. Whenever the
> Saudi Embassy in Ottawa required anything, to ask about
> any Muslim project all over Canada, they come to us. They
> ask us about the people who are doing this project. Do you
> get this point?
>
> Q. Yes.

A. Whatever we say is acceptable, fully acceptable, by the
Saudi Embassy and by the government of Saudi Arabia.

Q. Is the Muslim World League the type or organization that
would actually have physical offices in countries throughout
the world?
A. Of course. I said in the beginning that we have over 30
offices all over the world? One is here; one is in Washington, D.C.
They are spread all over, in Europe, in Asia.

Q. When you speak of an office that is an IIRO office, that
counts as a Muslim World League office as well?

A. What happens is that sometimes the IIRO and the Muslim
World League office is one, but sometimes they have two
different offices, although the umbrella organization is the
same, which is the Muslim World League.

300. The MWL has at least two offices in the United States. The New York City

office is currently active, while its main office in Falls Church, Virginia, was the target of

federal raids in early March 2002. Its officers at the Virginia office are President

ABDULLAH BIN SALEH AL OBAID, Vice President HASSAN A. A.

BAHAFZALLAH, and Secretary/Treasurer YAQUB M. MIRZA.

301. ABDULLAH AL OBAID, President of the United States branch of MWL

and former Secretary-General of the worldwide organization, also runs one of the AL

RAJHI family's largest corporations, AL-WATANIA. ABDULLAH AL OBAID also

served as Secretary-General of the RABITA TRUST.

302. YAQUB MIRZA, the secretary and treasurer of the MWL in the United

States, is the financial mastermind of the SAAR network (founded by the AL RAJHI

198

family).  YAQUB MIRZA'S house was raided in March, 2002 by federal authorities

investigating his alleged connections to AL QAEDA  and September 11, 2001.

303.   The MWL has numerous connections with AL QAEDA operatives.

MOHAMMED BAYAZID, an AL QAEDA  operative who fought alongside OSAMA

BIN LADEN and the other Mujahideen in Afghanistan (and has been implicated in a plot

to get nuclear materials for AL QAEDA), described how Defendant MOHAMMED

JAMAL KHALIFA, OSAMA BIN LADEN's brother-in-law, opened a MWL office in

Pakistan for the use of the founders of AL QAEDA :

> *Brother Jamal Khalif (Abu-l-Bara) was the one who started*
> *the educational project, both in the interior of Afghanistan*
> *and abroad. Thanks to Dr. Abdullah Azzam's efforts he*
> *succeeded in getting the approval of the Muslim World*
> *League to open an office for the League in Peshawar as an*
> *umbrella under which the brothers could work and move in*
> *Pakistan freely.*

304.   WA'EL JULAIDAN, whom the United States Treasury Department named

as "one of the founders of AL QAEDA ," headed the MWL in Peshawar, Pakistan and also

served as the Director General of the defendant RABITA TRUST.  JULAIDAN has had his

assets frozen by the United States Treasury Department which characterized JULAIDAN

as having "directed organizations that have provided financial and logistical support to al-

Qa'ida".  WA'EL JULAIDAN operated MWL offices that served in the early days of AL

QAEDA to attract and train holy warriors from around the world for the war in

Afghanistan.  He had contact with BIN LADEN lieutenants, defendants AYMAN AL

199

ZAWAHIRI and ABU ZUBAYDAH.

305.    WADIH EL HAGE, convicted for his role in the 1998 United States Embassy bombings in Africa, stated at his trial that he worked at the MWL in Peshawar, Pakistan in the 1980s.  It was while working at the MWL that EL HAGE met Abdullah Azzam, the mentor of OSAMA BIN LADEN, and a co-founder of AL QAEDA .

306.    IHAB ALI, another AL QAEDA  operative in prison in the United States on perjury charges, also went to work for the MWL in 1987.  IHAB ALI played a large role in the embassy bombings, facilitating communication between OSAMA BIN LADEN and other AL QAEDA members and also piloting OSAMA BIN LADEN's personal jet. In 1993, IHAB ALI took flight lessons at the Airman Flight School in Norman, Oklahoma—the same school ZACARIAS MOUSSAOUI attended and which MOHAMMED ATTA scouted as a possibility for his flight training.

307.    According to the grand jury, IHAB ALI did not disclose the extent to which his pilot training and international travels concerned efforts to assist in AL QAEDA 's terrorist activities.

308.    In conjunction with the attempted assassination of Egyptian President Hosni Mubarak in 1995, one of the would-be assassins admitted: "The Muslim World League bought our travel tickets and gave us spending money before we arrived at the [OSAMA BIN LADEN's] farm in Suba region in southern SUDAN."

309.    Co-conspirators, aiders and abettors of the MWL include Defendants:

200

RABITA AL-ALAM AL-ISLAMI, a/k/a Islamic World League, ABDULLAH BIN SALEH AL OBAID, HASSAN A.A. BAHAFZALLAH, AND YAQUB M. MIRZA, all located, doing business or registered to do business in the United States.

## <u>INTERNATIONAL</u> <u>ISLAMIC</u> <u>RELIEF</u> <u>ORGANIZATION</u>

310.    The INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO") has materially supported terror around the globe, including OSAMA BIN LADEN and AL QAEDA . IIRO's office in the Philippines was headed by OSAMA BIN LADEN's brother-in-law, Defendant MOHAMMED JAMAL KHALIFA and has acted as a center of terrorist financing and training activity – across the globe.   From the IIRO office in the Phillipines, KHALIFA supported the MUSLIM BROTHERHOOD in the Phillipines.   IIRO then evolved into a vast independent terrorist machine – funding, recruiting and aiding and abetting AL QAEDA members around the globe.   IIRO was involved with the plot to assassinate former President William Jefferson Clinton and Pope John Paul II, the plot to blow up twelve American airplanes simultaneously, and the 1998 Embassy bombings in East Africa.

311.    In the United States the IIRO operates under the name of The INTERNATIONAL RELIEF ORGANIZATION (IRO).  The IRO and the MWL maintain offices at the same address, 360 South Washington Street, Falls Church, Virginia.  The IRO sends money back and forth with IIRO.  IIRO sends money to other organizations that

sponsor terror. Another IIRO sister company, the SUCCESS FOUNDATION, sends money back and forth with the IIRO and IRO. The SUCCESS FOUNDATION also sends money to other organizations who sponsor terror.

312.    Several employees of the MUSLIM WORLD LEAGUE ("MWL"), IIRO's parent organization, have explicitly worked with AL QAEDA.  OSAMA BIN LADEN's associates from Afghanistan infiltrated and propagated MWL offices around the world. The RABITA TRUST, another branch of the MWL, had its assets frozen as a Specially Designated Global Terrorist Entity (or "SDGT") of the United States Treasury. WA'EL JULAIDAN, as head of the RABITA TRUST and MWL office in Peshawar, Pakistan has repeatedly aided and abetted terrorists. JULAIDAN has been branded a SDGT by the United States Treasury Department and his assets have been frozen.  The Treasury Department described JULAIDAN as follows at his designation as a terrorist entity:

> *Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaydah, have acknowledged Wa'el Julaidan as a known associate of their operations.  Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network.*

313.    ABDURAHMAN ALAMOUDI, the Secretary of the SUCCESS FOUNDATION, has openly stated his support for HAMAS and HEZBOLLAH, both designated terrorist organizations.  ALAMOUDI is the President of the AMERICAN MUSLIM FOUNDATION (or "AMF"), which receives thousands of dollars from the SUCCESS FOUNDATION,  as stated on the income tax Form 990s for the SUCCESS

202

FOUNDATION. MOHAMMED OMEISH, President of the United States branches of IIRO and IRO, as well as their sister organization the United States-based SUCCESS FOUNDATION, is also Vice-President of the AMERICAN MUSLIM FOUNDATION.

314.   ADNAN BASHA, IIRO's Secretary-General, wrote "The major finance is coming from the generous people of Saudi Arabia, KING FAHD, and the royal family." Arafat Al Asahi, head of IIRO's Canadian branch, testified in the hearing of Mahmoud Jaballah that IIRO and el MWL were intimately connected to and funded by certain Saudi Arabian interests. Arafat Al Asahi stated in his testimony in the Jaballah trial that as a IIRO and MWL employee, he considered himself an employee of the Saudi government.

315.   According to the account of MOHAMMED BAYAZID, AL QAEDA member and associate of OSAMA BIN LADEN, the MWL opened an office in Pakistan for the use of the founders of AL QAEDA.  The MWL initially was funded by OSAMA BIN LADEN, then the government of Saudi Arabia took over the funding.  According to the Arabic periodical publication *Rose Al-Yusuf*, the IIRO is firmly entrenched with OSAMA BIN LADEN's AL QAEDA oganization. As one example, the IIRO supported an AL QAEDA  guest house in Egypt.

316.   MOHAMAD KHALIFA, as the head of IIRO in the Phillipines, used the organization to collect and launder money for AL QAEDA operations. IIRO funded the terrorist AL QAEDA groups MORO ISLAMIC LIBERATION FRONT (or "MILF").  A former ABU SAYYAF member stated: "Less than 30% of the IIRO funds went to

203

legitimate public works, the rest going toward the purchase of weapons." MOHAMAD KHALIFA's branch of the IIRO served as a base to plan and finance AL QAEDA and international terrorism.

317.    IIRO built its office in Khartoum, SUDAN in the same residential neighborhood as OSAMA BIN LADEN's personal office, according to the testimony of a former AL QAEDA member, Jamal Ahmed Mohammed Al Fadl. IIRO also built its Khartoum office near the office of BENEVOLENCE INTERNATIONAL FOUNDATION, another AL QAEDA front, and in the same residential neighborhood where OSAMA BIN LADEN had his personal office.

318.    The IIRO was implicated in the bombing of the United States Embassies in Kenya and Tanzania in 1998. Kenya deregistered the IIRO after the bombing. IIRO Tanzania was reportedly working with AL QAEDA immediately before the United States Embassy bombing. IIRO went on to plot to destroy United States Consulates in India in 1999.

319.    According to Canadian intelligence documents, IIRO funded al-Jihad. Mahmoud Jaballah, an Islamic al-Jihad member tried in Canada, was an IIRO employee. EGYPTIAN AL-JIHAD, led by AL QAEDA's second-in-command, AYMAN AL ZAWAHIRI, is a branch of AL QAEDA .  As an employee of IIRO Canada, MOHAMMED KHATIB founded the Canadian branch of BENEVOLENCE INTERNATIONAL FOUNDATION.

320.    IIRO works with numerous other AL QAEDA affiliated charities. IIRO shares the same address in the UNITED KINGDOM as the INTERNATIONAL DEVELOPMENT FOUNDATION (or "IDF"), a charity affiliated with Defendant KHALID BIN MAFOUZ, a senior AL QAEDA financier (supra).  The SUCCESS FOUNDATION, IIRO's namesake, is also funded by KHALID BIN MAFOUZ. IIRO aids and abets the SAUDI JOINT RELIEF COMMITTEE, an AL QAEDA charity in Bosnia and elsewhere.  IIRO, through KHALIFA, sponsors, aids and abets BENEVOLENCE INTERNATIONAL FOUNDATION, the AL QAEDA sponsoring charity front.  IIRO provides funding for other alleged humanitarian organizations that have materially sponsored, aided and abetted and conspired with AL QAEDA: GLOBAL RELIEF FOUNDATION (or "GRF"), TAIBAH INTERNATIONAL, ISLAMIC AFRICAN RELIEF AGENCY, WORLD ASSEMBLY OF MUSLIM YOUTH  (or "WAMY").

321.    MOHAMMED OMEISH is Vice President of AMERICAN MUSLIM FOUNDATION which according to its tax form 990, filed in 1999,  gave money to TARIK HAMDI. HAMDI helped OSAMA BIN LADEN get a satellite phone and other electronic equipment which was used to coordinate acts of international terrorism.

322.    After September 11, 2001, IIRO's offices in Virginia were raided by the FBI as a result of AL QAEDA  sponsorship. One of the September 11, 2001, hijackers claimed to be going to work for IIRO's Fazeh Ahed.  IIRO also extensively funded the TALIBAN regime.  As stated by Dr. ADAN BASHA, Secretary-General of IIRO, the

IIRO donated more than Sixty Million ($60,000,000) dollars to the TALIBAN Regime and

AL QAEDA in Afghanistan.  The TALIBAN Regime was a known material sponsor, aider

and abettor of AL QAEDA  terrorists. After September 11, 2001, Pakistan deported 89

Arab aid workers from the IIRO and other organizations because they were aiding,

abetting, funding, otherwise conspiring with, sponsoring and/or supporting AL QAEDA

.

323.    SANABIL AL-KHAIR is an endowment fund established and located in

Saudi Arabia in order to provide stable financing for the activities of the IIRO. SANA-

BELL INC was registered in the District of Columbia in July 1989.  It was also

registered at 555 Grove St, in Herndon, Virginia in March 2000.  SANABEL AL-

KHEER INC was registered at 555 Grove St, in Herndon, Virginia in August 2000, and

received its non-profit tax status from the Internal Revenue Service in 2001. The only

declared activity of SANABEL AL-KHEER INC was receiving as a donation, the land

and the building at 360 S. Washington St where its office and several other defendant

charities are located.

324.    HASSAN A.A. BAHFZALLAH, YAQUB M. MIRZA, and

ABDULLAH AL OBAID are the officer/directors of SANABEL AL KHEER INC.

BAHFZALLAH and MIRZA are also officers/directors of SANA-BELL INC.  These

men are also the officers and directors of defendant, MUSLIM WORLD LEAGUE

("MWL"). AL OBAID is the secretary general of MWL worldwide. MWL's Pakistani

branch is RABITA TRUST, an entity named by the United Nations as associated with AL QAEDA. AL OBAID was directly involved in the activities of RABITA TRUST and its funding of AL QAEDA.

325.    BAHFZALLA represented defendant BENEVOLENCE INTERNATIONAL FOUNDATION in Saudi Arabia in the 1990s.  BAHARETH, started the German company Triple-B, which provided assistance to AL QAEDA Hamburg cell.  MIRZA is an officer and board member of numerous companies and charities involved in sponsoring terror who are defendants in this action and elsewhere.

326.    The IRO in the US was managed by SULAIMAN BIN ALI AL ALI, a member of IIRO's executive committee in Saudi Arabia.  From 1992-1998, SANA-BELL INC invested $3.7 million with SOLIMAN S. BIHEIRI and companies he controlled.

327.    SOLIMAN S. BIHEIRI is an Egyptian born businessman active in the US, Europe, and the Middle East.

328.    In 1986, while in the US on a tourist visa, BIHEIRI established Beit Ul-Mal Inc (BMI) in New Jersey.  BMI acted as an investment bank focused on real estate and real estate development along the North East seaboard.

329.    An agent for the Department of Homeland Security alleges that BMI knowingly  transferred funds for terrorists.  The Department's investigation showed financial transactions between BMI and three people designated as terrorists by the United States government, YASSIN AL KADI, Mousa Abu Marzook, and Mohammad Salah.  AL

KADI was the head of MUWAFFAQ/BLESSED RELIEF, a charity involved in funneling millions of dollars to OSAMA BIN LADEN and AL QAEDA.  Federal officials allege that an accountant with BMI said it's funds being transferred overseas "may have been used to finance the embassy bombings in Africa."  After September 11, BIHEIRI's wife claims that she saw BIHEIRI destroying records.

330.   On BIHEIRI's computer authorities discovered contact information for defendants YOUSEF NADA and ALI GHALEB HIMMAT, sponsors of AL QAEDA terror through the MUSLIM BROTHERHOOD, BANK AL TAQWA and other entities.  The computer also contained the name and address for Sami Al Arian, another person designated by the United States as a terrorist.

331.   Currently BIHEIRI is in custody in Virginia, charged with Unlawful Procurement of Naturalization.  SOLIMAN S BIHEIRI knowingly facilitated the transfer of funds to terrorists and sponsors of terror.

332.   Additional co-conspirators, material sponsors and/or aiders and abettors and members of the terrorist enterprise of the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION include Defendants: SUCCESS FOUNDATION, INC., MOHAMED S. OMEISH, ABDURAHMAN AL AMOUDI, KHALED NOURI, SULAIMAN BIN ALI AL ALI, ABDULLAH M. AL MAHDI, TAREQ M. AL SWAIDAN, HASSAN A.A. BAHFZALLAH, and M. YAQUB MIRZA, all located, doing business or registered to do business in the United States.

208

## THE SAAR FOUNDATION

333.   The SAAR FOUNDATION was named after SULAIMAN ABDUL AZIZ AL RAJHI, head of the Saudi Arabian AL RAJHI family, and was formed in the 1970s by a group of Muslim scholars and scientists from the Middle East and Asia. SAAR was incorporated in Herndon, Virginia as a 501c(3) non-profit organization on July 29, 1983, and dissolved as of December 28, 2000. The Saudi Arabian AL RAJHI family is the foundation's biggest donor.  The SAAR network financially supports terrorism and its main contributors, the AL RAJHI Family, has a long history of supporting terrorism.

334.   Virginia Secretary of State corporate records indicate that there are more than one hundred affiliated organizations registered or doing business at just one of SAAR's addresses in Herndon, Virginia.  Most of these organizations do not maintain a physical presence at that address, or elsewhere.  The SAAR FOUNDATION and network is a sophisticated arrangement of non-profit and for-profit organizations that serve as front-groups for extremist Islamic terrorist organizations.

335.   On March 20-21, 2002, the offices of many SAAR network organizations, along with the residences of their top executives, were raided by the joint terrorism task-force, Operation Greenquest. Operation Greenquest was created after September 11, 2001, by the United States Treasury Department as a new multi-agency financial enforcement initiative bringing the full scope of the U.S. Government's financial expertise to bear

209

against sources of terrorist funding.  According to the search warrants issued at nearly twenty locations, the SAAR network was raided for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . AL QAEDA as well as individual terrorists . . . (including) Osama Bin Laden."

336.    The SAAR FOUNDATION reported revenues of over $1.7 billion for the year 1998, which represents more than any other United States charity has ever generated. The SAAR FOUNDATION and its affiliated charities keep a low profile in that they do not conduct fundraising events or publicly reach out to potential donors like most charities.

337.    On November 7, 2001, BANK AL-TAQWA (*infra*) was first designated by President George W. Bush's Executive Order as a Specially Designated Global Terrorist Entity and the United States Department of Treasury and its assets were frozen.  Two SAAR network executives, SAMIR SALAH and IBRAHIM HASSABELLA, were both former executives at BANK AL-TAQWA.  Two other executives in the SAAR Network, JAMAL AL BARZINJI and HISHAM AL TALIB, worked for YOUSEF M. NADA (*infra*), the head of BANK AL-TAQWA who also had his assets frozen.  SULAIMAN AL RAJHI was on the Board of Directors at AHMED IDRIS NASREDDIN's AKIDA BANK in the Bahamas.  People associated with the SAAR FOUNDATION and its network were also implicated in the United States Embassy terrorist bombings in Kenya and Tanzania.

338.    The SAAR network and the more than one-hundred businesses and individuals that comprise it are fronts for the sponsor of AL QAEDA and international

terror.  These organizations are closely inter-twined with Defendants IIRO, MWL and their

related "charities."  The connections between the AL RAJHI family, the SAAR network,

and the terrorist front-groups extends past the financial network to a repetitious pattern of

overlapping officers.  The United States branches of the MWL and its subsidiaries are a part

of the SAAR Network.  The MWL and SAAR share officers and addresses. Both play an

intermediary role between wealthy Saudi financiers and terrorist groups.

339.   Co-conspirators, material sponsors, and/or aiders and abettors of the SAAR

network include Defendants: AHMED TOTONJI, HISHAM AL TALIB, IQBAL YUNUS,

JAMAL AL BARZINJI, M. OMAR ASHRAF, MOHAMMED JAGHLIT, MUHAMMAD

ASHRAF, TAHA JABER AL ALWANI, TARIK HAMDI, YAQUB MIRZA, CHERIF

SEDKY, AFRICAN MUSLIM AGENCY, ARADI, INC., GROVE CORPORATE, INC.,

HERITAGE EDUCATION TRUST, INTERNATIONAL INSTITUTE OF ISLAMIC

THOUGHT, MAR-JAC INVESTMENTS, INC., MAR-JAC POULTRY, INC., MENA

CORPORATION, RESTON INVESTMENTS, INC., SAAR INTERNATIONAL, SAFA

TRUST, STERLING CHARITABLE GIFT FUND, STERLING MANAGEMENT

GROUP, INC., and YORK FOUNDATION, all located doing business or registered to do

business in the United States.

340.   The NORTH AMERICAN ISLAMIC TRUST, ("NAIT") was formed In

May 1973 in Indianapolis, Indiana with the stated intention of holding conferences,

publishing Islamic books, investing and raising funds for building mosques, Islamic

centers and contributing to educational and humanitarian causes. HISHAM AL TALIB and JAMAL AL BARZINJI were founders of NAIT. U.S. authorities believe BARZINJI provided financing to Al QAEDA through WORLD ASSEMBLY OF MUSLIM YOUTH. BARZINJI and AL TALIB worked for YOUSEF NADA, head of AL TAQWA BANK.

341.     The ISLAMIC CENTER OF TUCSON (ICT), established 1966, has its real estate held in trust by NAIT. ICT member WADIH EL HAGE who was OSAMA BIN LADEN's personal secretary until his arrest and had an active role in a Kenyan AL QAEDA cell in 1997.   WA'EL JULAIDAN was president of ICT before leaving for Afghanistan. He headed the MUSLIM WORLD LEAGUE in Peshawar, Pakistan recruiting AL QAEDA soldiers. The US government claims JULAIDAN "directed organizations that have provided financial and logistical support to al-Qa'ida."

342.     Defendant HANI HANJOUR lived in Tucson and attended the center's mosque. HANJOUR piloted American Airlines Flight 77 into the Pentagon on September 11th.

343.     On February 26, 2003, FBI agents arrested SAMI OMAR AL HUSSAYEN, 34, a Saudi citizen, in Moscow, Idaho.  He was a doctoral candidate in computer science at the University of Idaho.  His educational and living expenses were paid by the Saudi government.

344.     AL HUSSAYEN is charged in an indictment with seven counts of visa fraud in the U.S. District Court for Idaho.  The Joint Terrorism Task Force (JTTF) at the FBI's Salt Lake City, Utah, Field Office is investigating the case.  AL HUSSAYEN

has been jailed since his arrest.

345.    FBI investigators found that AL HUSSAYEN provided internet web site posting for two radical Islamic clerics, SALMAN AL OUDA and SAFAR AL HAWALI; both are known to have direct contact with OSAMA BIN LADEN.  The Federal indictment alleges that, among other things, in June 2001, three months before the September 11 attacks, a web site registered to AL HUSSAYEN, www.alasr.ws, published a fatwa (religious proclamation) called "Provision of Suicide Operations" believed to have  been written by Saudi cleric AL OUDA.  An extract from the fatwa reads:

> *The second part is the rule that the Mujahid [holy warrior] must kill himself if he knows that this will lead to killing a great number of the enemies and that he will not be able to kill them without killing himself first, or* ***demolishing a center vital to the enemy or its military force*** *and so on.  This is not possible except by involving the human element in the operation.  In this new era, this can be accomplished with the modern means of bombing or* ***bringing down an airplane on an important location*** *that will cause the enemy great loses.* [Emphasis added.]

346.    According to the U.S. Government, AL HUSSAYEN provided web-site registration, management, administration and maintenance to individuals and organizations, including the Islamic Assembly of North America (IANA) a non-profit organization for the promotion of Islam which has offices in Ann Arbor, Mich.  AL HUSSAYEN was the registered agent for IANA in Idaho since May 2001.  AL

213

HUSSAYEN was the registrant or administrator for several internet web sites which either belonged to or were linked to IANA.  IANA allows these web sites to be used by radical Islamic clerics who advocate death and violence to non-believers.

347.     According to the U.S. indictment, from about August 1994 to the date of the indictment, AL HUSSAYEN maintained at least six banks accounts in the U.S. in which he received approximately $300,000 from inside and outside the U.S.  In a two week period in September 1998, he received two payments totaling $100,000 from his uncle in Saudi Arabia, SALEH ABDEL RAHMAN AL HUSSAYEN.  It further alleges that beginning in November 1999 AL HUSSAYEN made disbursements to IANA and to IANA's officers, including Saudi national MOHAMMED AL AHMARI, president of IANA.  AL HUSSAYEN shared a Michigan bank account with AL AHMARI.  (The indictment alleges that from March 1995 until February 2002, IANA received $3,000,000 into its accounts, including one $300,000 wire transfer from a Swiss bank in May 1998.)

348.     The U.S. Government further alleged that IANA also had a close relationship with BENEVOLENCE INTERNATIONAL FOUNDATION (BIF) and its executive director ENAAM ARNAOUT.  Arnaout pleaded guilty on February 10, 2003, to one count of fraud in the U.S. District Court for the Northern District of Illinois, Chicago, in relation to fraudulently obtaining charitable donations and using them to provide assistance to Muslim fighters in Chechnya.

214

349.    The indictment goes on to allege that the SAMI OMAR AL

HUSSAYEN 's same uncle, SALEH ABDEL RAHMAN AL HUSSAYEN, arrived in

the U.S. just prior to September 11, 2001 and his trip was arranged by Sami Omar.  The

uncle and the uncle's wife visited New York City and then traveled to Michigan to

meet with IANA officials. A few days before September 11, the uncle and his wife

traveled to Herndon, Virginia, where they stayed at a Residence Inn hotel near Dulles

Airport. Three of the hijackers of American Airlines flight 77 (Pentagon attack) stayed

at the same hotel on the night of September 10 while the uncle was there.

350.    Immediately after September 11, FBI agents from the Washington field

office, acting on a tip from the hotel management, responded to the hotel and attempted

to interview the uncle about his knowledge on the 9/11 attacks.  The uncle faked a

seizure and the agents took him to a local hospital where attending physicians could not

find anything wrong with him. The uncle and his wife left the U.S. for Saudi Arabia a

short time later.  The uncle is believed to be an official at the Grand Mosque in Riyadh.

351.    The publicity surrounding SAMI OMAR AL HUSSAYEN's arrest

caused the Saudi Embassy in Washington to issue a statement on March 1, 2003,

acknowledging that in 1996 AL HUSSAYEN received $5000 from Saudi Ambassador

Prince Bandar's personal account, ostensibly as a reward for good grades.

352.    At a detention hearing in Boise, Idaho on March 11, 2003, an FBI agent

testified that agents found "before and after" photos of the September 11 attack on

World Trade Center on the hard drive of SAMI AL HUSSAYEN's computer at the University of Idaho.

353.    The FBI search warrant application for AL HUSSAYEN's Idaho apartment further alleges that AL HUSSAYEN and IANA also had "significant contact" with Help The Needy, (HTN), a charity located in Syracuse, N.Y., founded in 1993 by RAFIL DHAFIR who is alleged also to be vice president of IANA.

354.    DHAFIR and three codefendants are charged in an indictment in the U.S. District Court for the Northern District of New York with violating the U.S. embargo of IRAQ.   DHAFIR and two codefendants were arrested by the FBI on February 26, 2003 in the Syracuse area. Two of DHAFIR's codefendants have pleaded guilty.

355.    The indictment alleges that the Syracuse defendants conspired to illegally transfer more than $2.7 million to IRAQ through the Jordan Islamic Bank in Amman in violation of an Executive Order signed in 1990 prohibiting trade with IRAQ. The indictment notes that checks as large as $100,000 were sent from HTN to individuals in Baghdad.  HTN was established in 1995 as a charity association and was incorporated in November 2001 in N.Y. State.

## THE GLOBAL RELIEF FOUNDATION

356.    The GLOBAL RELIEF FOUNDATION (or "GRF") was incorporated in January 1992 in Illinois. According to its website, GRF "is a non-profit humanitarian

216

organization working to provide care, support and relief to people in need throughout the world."

357.    GRF is active all over the world, providing relief for several countries, including the United States, Afghanistan, Kosova, Lebanon, Bosnia, Kashmir, Turkey, and Chechnya, among others. GRF has branches of its organization, aside from Bridgeview, Illinois, located in Belgium, Yugoslavia, and Serbia.

358.    In 2000, GRF's name appeared on a list being circulated by the government of charities allegedly funding terrorism. On December 14, 2001, federal authorities raided the offices of the GLOBAL RELIEF FOUNDATION as well as the residences of several of its directors.   Simultaneously, the United States Treasury froze GRF's assets. A spokesman for the Treasury Department noted that GRF is aiding terrorism:

> There was coordinated action to block the assets, because this group is suspected of funding terrorist activities.

The Treasury spokesman added that the public's safety was at risk if GRF were allowed to continue to operate:

> This extraordinary action was taken because it's relevant to the health and safety of the American public.

359.    On the same day as the raids in the United States, the NATO-led task force named the Kosova Force (KFOR) stormed two GRF offices in Yugoslavia and Serbia. A statement from KFOR explaining the raids detailed why:

> This afternoon KFOR soldiers, working in close cooperation with UNMIK-Police, carried out a coordinated search

217

operation on the offices of the Global Relief Foundation in Pristine / Pristina and Dakovice.  Dakovica, after receiving credible intelligence information that individuals working for this organization may have been directly involved in supporting worldwide international terrorist activities.

360.    This action was an orchestrated element of a worldwide operation coordinated with governments and law enforcement agencies against the offices of the GLOBAL RELIEF FOUNDATION and other organizations suspected of supporting international terrorists.

361.    GRF by and through its agents has engaged in the planning of attacks against the United States:

The Global Relief Foundation is a worldwide, US based Non-Governmental Organization (NGO), which has headquarters in Chicago, Illinois, USA and a European Headquarters in Brussels, Belgium. It is suspected of supporting worldwide terrorist activities and is allegedly involved in planning attacks against targets in the USA and Europe.

362.    The head of the GLOBAL RELIEF FOUNDATION branch in Belgium received over $200,000 from MUHAMMED GALEB KALAJE ZOUAYDI (a/k/a Abu Talha) (or "ZOUAYDI"), a high level AL QAEDA  financier.   ZOUAYDI, who was arrested by Spanish authorities on April 23, 2002, is a brother-in-law of OSAMA BIN LADEN. A top financier for AL QAEDA, he also served as one of the original terrorists who fought with OSAMA BIN LADEN and the other original founders of AL QAEDA.

363.    On October 12, 2001, the United States Treasury froze the assets of Jam'yah Ta'awun al-Islamia (Society of Islamic Cooperation) and branded it a Specially Designated

Terrorist Entity.  According to the Treasury, the Society of Islamic Cooperation is headed by ZOUYADI, who is also an explosives expert.  Based in Kandahar City, United States Treasury department officials allege that the organization was founded by OSAMA BIN LADEN in early 2001.

364.    ZOUYADI was closely connected to the AL QAEDA cell in Germany that participated in the September 11, 2001 attacks. ZOUYADI also sent money to MAMOUN DARKAZANLI, who had his assets frozen as well as the assets of a company he controlled MAMOUN DARKAZANLI IMPORT-EXPORT COMPANY and both were designated a terrorist entity by the United States government shortly after September 11, 2001. DARKAZANLI is suspected of being a key AL QAEDA pointman in Europe, as is described in more detail *infra*.

365.    GRF's offices have also been raided in Yugoslavia and Serbia as part of international investigations into GRF's support of terrorism.  On at least one occasion, ZOUAYDI transferred 231,664 euros to the head of GRF's Belgium arm, Nabil Sayadi, who is also linked to OSAMA BIN LADEN.

366.    Documents provided by the United States government in defense of its freezing of GRF's assets indicate that known AL QAEDA terrorist WADIH EL HAGE was in direct contact with GRF officials while he was planning international terrorism attacks. Specifically, the government noted in its supporting documents that the FBI reported that evidence introduced at EL HAGE's trial demonstrated that, in the late 1990s, GRF

219

maintained communications with WADIH EL HAGE.

> *Furthermore, the government indicated:*
>
> *At the time, el Hage was in contact with GRF, he resided in Kenya, and played an "active role" in an AL QAEDA terrorist cell operating there. . . .*

367.     During this same period, 1996 and 1997, EL HAGE was also in contact with GRF offices in Belgium and Bridgeview, Illinois.  In particular, documents recovered in a search in Kenya showed that EL HAGE was in contact with GRF in Bridgeview, Illinois after returning from a visit with AL QAEDA leadership in Afghanistan in February 1997.

368.     Evidence provided by the government in freezing GRF's assets corroborates GRF's promotion of martyrdom to kill the "enemies of Islam." The government assessed:

> *Newsletters distributed by GRF and published in 1995 by the Central Information News Agency Network (CINAN), which, like GRF, is operated via a Bridgeview post office box, encourage "martyrdom through JIHAD." The newsletters, written in Arabic and translated by the FBI, include an article soliciting funds for the Bosnian relief effort to assist those suffering from the prolonged agony due to atrocities imposed by the "enemies of Islam." The article refers to the Jihad (struggle) that should be carried out by Muslims and states: "It seems that the Prophet (Mohammad) had linked religion with JIHAD. So when do we awake?   When can we take revenge for God and his religion? When can we rise to defend our rights and self respect?"  The article continued, "God had equated martyrdom through JIHAD with supplying funds for the JIHAD effort," and concluded, "All contributions should be mailed to: GRF.*

369.     GRF newsletters implored individuals to donate money to their organization for the purposes of buying weapons. The government explained:

> *Other GRF newsletters and publications encourage readers to give their Zakat, or charitable tithe, to GRF to assist in the purchase of, inter alia, weaponry. "[F]or God's cause (the Jihad, they [the Zakat Funds] are disbursed for equipping the readers for the purchase of ammunition and food, and for their [the Mujahideen's] transportation so that they can raise God the Almighty's word and protect the gaps…." The article concluded by exhorting Muslims "to make the Global Relief Foundation your messenger of goodness, and we will, God willing, disburse it as specified in Bosnia, Kashmir, Afghanistan, Tajikistan, and Lebanon.*

370. Since GRF's assets were blocked, information gathered about GRF, according to the government, has only reaffirmed that GRF works closely with and in support of terrorist organizations:

> *In addition to this unclassified evidence, the classified material gathered since the date of the blocking has greatly amplified OFAC's [Office of Foreign Asset Control] belief that GRF may have acted in concert with, and in support of, terrorists and terrorist entities.*

371. Several photographs obtained at GRF's offices in Chicago indicate that GRF used its humanitarian cover as means to send expensive communications equipment abroad. The government described what exactly was found during the raids on GRF's offices:

> *A set of photographs and negatives discovered at GRF's Chicago offices indicate types of "humanitarian" supplies that GRF has sent abroad. The photographs display large shipping boxes arrayed under a GRF banner. Other photographs reveal that the boxes contain sophisticated communications equipment: approximately 200 handheld radio transceivers, long range radio antennas, and portable power packs, with an estimated total value of $120,000. Arrayed near the communications equipment are a tool kit, a box of Bushnell binoculars, saddles, and ropes.*

221

372.   Other photographs found in the raids indicate that GRF had an specific interest in munitions:

> *Other photographs in this same set depict fighters armed with automatic rifles, a sand-bagged bunker with a radio mounted outside, and mutilated corpses with the name "KPI" (Kashmiri Press International) printed alongside. Finally, one photograph displays two dead men with the caption "HIZBUL MUJAHIDEEN," a known terrorist organization operating in the Kashmir region between India and Pakistan. On the reverse side of the photograph was handwritten in Arabic, "two martyrs killed by the Indian government.*

373.   MOHAMMED CHEHADE was the founder of GRF and executive director at the time it was frozen by the United States.  RABIH HADDAD was a founder and manager of GRF. HAZEM RAGAB was the treasurer of GRF, and fled the United States after questioning by the FBI in 2000.CHEHADE, HADDAD and RAGAB are aiders, abettors, agents, sponsors and/or co-conspirators of the GLOBAL RELIEF FOUNDATION.


## **TAIBAH INTERNATIONAL AID ASSOCIATION**

374.   TAIBAH INTERNATIONAL AID ASSOCIATION (or "Taibah") is a charitable organization headquartered in Falls Church, Virginia. Established in 1991, Taibah's IRS Form 1023, which serves as an application to the United States Government for tax exempt status, lists ABDULLAH A. BIN LADEN, OSAMA BIN LADEN's half-brother, as a founding officer.  The same form also lists TAIBAH's stated goals as a

humanitarian organization.

375.     From its headquarters in the United States, TAIBAH has a presence around the world through offices, mosques, and educational centers in the following countries: Albania, Bosnia-Herzegovina (BiH), Bulgaria, Gargizia, Kazakhistan, Kosova, Ozpakistan, Russia, Shofishia, Tajikistan and Tataristan, among others.

376.     Despite a well developed website, TAIBAH does not solicit funding through this channel. According to its IRS Form 1023, TAIBAH relies on fundraising trips to the Middle East and mailings sent to Muslims in the United States for its revenue.  As a result, roughly half of the United States arm of TAIBAH INTERNATIONAL's revenue comes from Saudi Arabia. On its year 2000 IRS Form 990, TAIBAH lists a four year aggregate contribution of nearly $150,000 dollars in fund raising from Saudi Arabia.   Also, TAIBAH's Bosnian branch relies on Saudi Arabia for funding.  The Saudi Arabian SAUDI HIGH COMMISSION has been identified by Bosnian intelligence as a source of TAIBAH's funds.

377.     Although it purports to be a humanitarian organization, the TAIBAH INTERNATIONAL AID ASSOCIATION furthers the aims and materially supports OSAMA BIN LADEN and AL QAEDA. Through the actions of its agents, officers and employees, TAIBAH has provided financial and material support to AL QAEDA.  The strong affiliation that TAIBAH maintains with many other AL QAEDA front-groups

223

demonstrates its place as a highly connected component of OSAMA BIN LADEN's financial and logistical support network.

378.    TI ABAH's support of international terrorism and AL QAEDA is ongoing. One of the individuals involved in the October 2001 threat to the American and British Embassies in Bosnia was Mustafa Al Kadir, who was granted Bosnian citizenship based on his employment with TAIBAH INTERNATIONAL.  Al Kadir was still working with TAIBAH at the time of this foiled terrorist attack and ensuing arrests.

379.    The NATO Secretary-General, George Robertson, stated that at least one of the five arrested Algerians (in Bosnia in October 2001) had direct links with AL QAEDA and OSAMA BIN LADEN.  The leader of the group, BENSAYAH BELKACEM, has been identified as a top AL QAEDA lieutenant.  In October 2001, BELKACEM was arrested at his apartment in Zenica, Bosnia where authorities found phony passports and a mobile telephone listing for ABU ZUBAYDAH, AL QAEDA's third-in-command.  According to phone transcripts, BELKACEM was also in phone contact with AL QAEDA military commander ABU AL MAID.

380.    On December 13, 2001, Bosnian police searched the offices of TAIBAH INTERNATIONAL.  Following the raid, an audit and investigation of TAIBAH's financial records was conducted on January 25, 2002.  This audit reveals that TAIBAH's financial records were managed in a way that obscured its true financial status.  The financial records contained flagrant abuses in TAIBAH's allocation of donations and in the manner its

224

expense accounts were maintained.  A March, 2002, Bosnian Intelligence Memo from the

Agency for Investigation & Documentation (AID) that summarizes the audit described the

illegal management of TAIBAH's funds by its executives:

> It is also noteworthy that large cash sums were withdrawn by management individuals at the organization which were never accounted for by any record of expenditure, and which indicates a wide scope for possible illegal spending of money. It is clear that each of these items is for more than 10 thousand marks.

381.    Other discrepancies noted in the audit were the misuse of automobiles,

supplying of fictitious declarations of affiliation and employment, as well as suspicious

requests for visas.

382.    Funding for the Bosnian office of TAIBAH originates from bank accounts

at the AL-RAJHI ISLAMIC BANK.  The flow of money begins with the AL-RAJHI

ISLAMIC BANK in Saudi Arabia, then to TAIBAH via wire transfers through Hypobank

in Germany and Commerce Bank in Bosnia.  The AL-RAJHI ISLAMIC BANK, its agents,

officers, directors, and so-called charities, members of the AL RAJHI family are significant

financial supporters of terrorism as is discussed *supra*.

383.    In Bosnia, TAIBAH INTERNATIONAL works closely with another AL

QAEDA front-group, the charitable organization and Defendant GLOBAL RELIEF

FOUNDATION (or "GRF").  According to the 2002 Bosnian Intelligence Memo, when

GRF was initially registered, it operated in Bosnia under the auspices of TAIBAH

INTERNATIONAL.  TAIBAH's close working relationship with GRF is in accord with

both charities' role as AL QAEDA sponsors and front groups.

384.    The 2002 Bosnian Intelligence Report on non-profit organizations affirms that TAIBAH's Bosnian office received its revenues from another Saudi Arabian charity, the SAUDI RELIEF COMMISSION (a/k/a Saudi High Relief Commission) (or "SRC"). TAIBAH has been implicated in the 1998 United States embassy bombings along with the SRC.

385.    Two officers from TAIBAH INTERNATIONAL's United States branch, SAMIR SALAH and ABDULRAHMAN AL AMOUDI (or "Al Amoudi"), play a large role with United States organizations that have come under scrutiny for their ties to AL QAEDA. Both of them are officers of a number of organizations in the SAAR network. ABDULRAHMAN AL AMOUDI, TAIBAH's Vice-President, is a past employee of the SAAR FOUNDATION, the hub of the SAAR Network, and currently heads a few SAAR networkcharities.  AL AMOUDI also runs the United States operations of the Saudi based INTERNATIONAL ISLAMIC RELIEF ORGANIZATION.  SAMIR SALAH, TAIBAH's Secretary, serves as a director at many SAAR networkorganizations, including CFO at PIEDMONT POULTRY.   SAMIR SALAH also managed the Caribbean branch of the BANK AL-TAQWA.


### BENEVOLENCE INTERNATIONAL FOUNDATION, INC. AND BATTERJEE

386.    BENEVOLENCE INTERNATIONAL FOUNDATION ("BIF") was a Saudi

226

based charity set up by ADEL ABDUL JALIL BATTERJEE (or "BATTERJEE"), chairman of the AL SHAMAL ISLAMIC BANK.  Upon information and belief, BATTERJEE befriended BIN LADEN during the Afghan-Soviet War.

387.    The U.S. State Department reported that BIN LADEN capitalized the AL SHAMAL ISLAMIC BANK with a $50 million investment.  BIN LADEN and companies he set up in the early 1990's, maintained accounts at the AL SHAMAL ISLAMIC BANK. According to U.S. officials, the bank has been used as a conduit for funds to AL QAEDA terrorists along with the charity BATTERJEE created, BENEVOLENCE INTERNATIONAL FOUNDATION.

388.    BIF has a branch in Illinois that purports to provide assistance to Muslim orphanages and hospitals in the United States and abroad, particularly in Bosnia.  The current chief executive of BIF is ENAAM M. ARNAOUT.   BATTERJEE  remains a director of BIF  according to documents filed with the Illinois Secretary of State. ARNAOUT  was arrested in May, 2002 on charges he perjured himself by denying links with BIN LADEN and AL QAEDA.

389.    The organization is also known as AL BIR AL DAWALIA, (or "AL BIR") which translated from Arabic means "Benevolence International."  It was originally founded in the 1980's by BATTERJEE, who was an associate of OSAMA BIN LADEN. Defendant ADEL ABDUL JALIL BATTERJEE later transferred control of the organization to the current Chief Executive Officer ENAAM M. ARNAOUT (or "ARNAOUT").

227

Defendant ENAAM ARNAOUT has been affiliated with BIF since at least 1992, and was criminally indicted for his role in sponsoring AL QAEDA through diversion of charitable funds to sponsor AL QAEDA.

390.    BATTERJEE has investments across a number of different industries including commercial, property, medical, industrial, and contracting.  This business is done primarily through the family's business, the BATTERJEE Group, but also through other investments and businesses.  Recent attempts to locate BATTERJEE in Saudi Arabia have failed and it is currently believed that he may be in the SUDAN.

391.    BATTERJEE  originally met ARNAOUT in 1987 when ARNAOUT was a teenager studying Islam in Pakistan.  BATTERJEE  appointed ARNAOUT as the head of the Bosnian branch in the early 1990s.   According to BENEVOLENCE INTERNATIONAL FOUNDATION's 1992 articles of incorporation, ADEL BATTERJEE is one of the three founders of BIF in the United States.  In 1993, the Saudi Government closed BATTERJEE's charity AL-BIR at the same time it was closing other organizations for ties to terrorism.  Following this closing, BATTERJEE  moved the BIF headquarters to Chicago, Illinois and brought ARNAOUT in from Bosnia to run the organization. BATTERJEE officially transferred control of the organization to ENAAM ARNAOUT on September 15, 1997, and ARNAOUT assumed the Executive Director position.

392.    ADEL  BATTERJEE's  name  does  not  readily  appear  in  any BENEVOLENCE INTERNATIONAL FOUNDATION corporate records after 1994, yet

he continued funding the foundation.  On February 12, 2002, the United States Government recorded a telephone conversation with the then jailed CEO of BIF, ENAAM ARNAOUT, with his brother HISHAM in Saudi Arabia.  During this conversation, ARNAOUT discusses "Abu Sulafa" with his brother.  The United States government has identified the name "Abu Sulafa" as an alias for ADEL BATTERJEE. Using BATTERJEE's alias, ARNAOUT stated that BATTERJEE has been sending money to BENEVOLENCE INTERNATIONAL FOUNDATION's branches.

393.    One Justice Department AL QAEDA expert suggested that this telephone conversation may further elucidate BATTERJEE's role as the source of the "mysterious set of wire transfers" that contributed $30,000 to $40,000 to BIF each month.  Investigators have tracked the wire transfers to a Swiss Bank account registered to a Cayman Islands corporation.

394.    Evidence introduced in the criminal trial of the Embassy bombers (known as  *United States v. Usama Bin Laden, et al*., Case Number S98 Cr. 1023), United States District Court, Southern District of New York, and gathered in the related investigation, demonstrated that AL QAEDA sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other support and expenses.  In addition, AL QAEDA terrorists received training in how to avoid law enforcement and intelligence scrutiny and to travel surreptitiously.

They were also taught to avoid putting matters in writing. AL QAEDA members have held positions with BIF and this charity is one of the organizations utilized by AL QAEDA.

395.    Once money was withdrawn from the bank accounts of relief organizations, its use by AL QAEDA can be virtually untraceable. According to an affidavit of Special Agent Robert Walker of the FBI, an AL QAEDA witness explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing clothing for the poor. According to this affidavit, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were provided to AL QAEDA  for whatever use AL QAEDA deemed necessary. This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York and with the overall evidence. AL QAEDA operatives and supporters have also smuggled money into the United States.

396.    On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. The documents recovered included documents establishing direct communication between ENAAM ARNAOUT and OSAMA BIN LADEN and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which

included scanned images of these documents.

397.    On December 16, 1994, Defendant MOHAMAD JAMAL KHALIFA, while traveling with   MOHAMED BAYAZID, was detained in San Francisco by American officials.  At the time, KHALIFA had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation and the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (or "IIRO").  At the time of his travel, KHALIFA had been convicted in absentia in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan.  Two of the principal participants in the bombing were Jordanians who had spent time with KHALIFA  in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. KHALIFA was then retried – and acquitted – after his extradition from San Francisco to Jordan following the December 1994 stop.  At his Jordanian trial, KHALIFA admitted to the Jordanian authorities that he had known the bombers and had sent them money.

398.    KHALIFA, alias "Abu Baraa," is referenced on a document recovered in the searches of BIF locations in Bosnia in March 2002.  On or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephone contact with a telephone number in Saudi Arabia used by KHALIFA.

399.    Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from

its checking account, number 980110435, in the amount of $685,560.

400.    A folder recovered in another BIF search in December 2001, indicated handwritten notations in Arabic which included the statements:

> Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands.
> Steeds of war projects.

401.    The reference to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies . . . ."

402.    On April 21, 1999, evidence recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the Seattle Times concerning smallpox as a biological terrorism weapon.  The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of smallpox in any country.

403.    BIF claims to be a charitable organization but in fact is engaged in the support of various persons and groups involved in military and international terrorist activity.

404.    ENAAM ARNAOUT has a relationship with OSAMA BIN LADEN and many of his key associates dating back more than a decade, as evidenced by cooperating

witnesses and seized documents. BIF is an organization that AL QAEDA has used for logistical support, including the movement of money to fund international terrorist operations. Various persons involved in terrorist activities, specifically including persons trying to obtain chemical and nuclear weapons on behalf of AL QAEDA have had contacts with BENEVOLENCE INTERNATIONAL FOUNDATION offices and personnel.

405. BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings with representatives of the Chechen insurgents as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. BENEVOLENCE INTERNATIONAL FOUNDATION made efforts to provide the Chechen mujahideen with money, an X-ray machine, and anti-mine boots, among other material support.

406. On December 14, 2001, searches were conducted of the offices of BENEVOLENCE INTERNATIONAL FOUNDATION in Palos Hills, Illinois, and in Newark, New Jersey, along with the home of its chief executive officer, ENAAM M. ARNAOUT, removing materials from each place. According to a government witness, ENAAM M. ARNAOUT was planning in March 2002, to leave for Jeddah, Saudi Arabia.

407. Also on December 14, 2001, the Treasury Department's Office of Foreign Asset Control (or "OFAC") issued an order blocking BENEVOLENCE INTERNATIONAL FOUNDATION's assets and records, pending further investigation into BIF's ties to terrorists. ENAAM M. ARNAOUT, Chairman of BENEVOLENCE INTERNATIONAL FOUNDATION, has a relationship with OSAMA BIN LADEN and

233

key associates dating back more than a decade. The BENEVOLENCE INTERNATIONAL FOUNDATION is used by AL QAEDA for logistical support: terrorists attempting to obtain chemical and nuclear weapons on behalf of AL QAEDA have contacts with the BENEVOLENCE INTERNATIONAL FOUNDATION and its office personnel; and BENEVOLENCE INTERNATIONAL FOUNDATION has had direct dealings with AL QAEDA operatives, providing them with military and financial support.   Defendant ARNAOUT has been criminally indicted for his role in the September 11, 2001 attacks due to his sponsorship of AL QAEDA.

408.    In the latter part of the 1980's, an AL QAEDA organization known as "mekhtab al khidemat" (the "services office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States.  The organization was operated principally by Sheik Abdullah Azzam and OSAMA BIN LADEN for purposes including the providing of logistical support to the mujahideen (fighters) in Afghanistan.

409.    In the mid to late 1980s, Defendant ENAAM ARNAOUT, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for Mekhtab al Khidemat and LBI to provide assistance to various mujahideen including those under the command of OSAMA BIN LADEN.

410.    Within that same time frame, Defendant ARNAOUT served as director of

communications in the "al Masada" mujahideen camp in Jaji, Afghanistan, under the direction of OSAMA BIN LADEN. Defendant ARNAOUT distributed resources, including weapons, at the direction of OSAMA BIN LADEN and others.

411.    Defendant ARNAOUT and his co-conspirators fraudulently solicited and obtained funds from charitable donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

412.    Defendant BIF and ARNAOUT and co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

413.    Defendant ARNAOUT and BIF co-conspirators kept secret from governments and the general public, including a significant number of donors, facts about Defendant ARNAOUT's relationship with organizations engaging in violence, including AL QAEDA and OSAMA BIN LADEN.

414.    Defendant BIF and ARNAOUT and his co-conspirators agreed to conduct financial transactions, affecting interstate and foreign commerce, by wire transferring funds

235

from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, with the intent to promote the carrying on of unlawful activities and material support to organizations engaged in violent activities, in violation of Title 18, United States Code, Section 2339A; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of unlawful activities.  Defendant BIF and ARNAOUT and co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, the material support to organizations involved in violent terrorist activities.

415.    Defendant BIF and ARNAOUT and co-conspirators agreed to provide and attempt to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used in preparation for and in carrying out acts of international terrorism violation of Title 18, United States Code, Section 2339A.

416.    Defendant BIF and ARNAOUT and co-conspirators corruptly endeavored

to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations.

417.    BIF and ARNAOUT engaged in a conspiracy, the method and means of the conspiracy included the following, among other illegal activities.

418.    In or about 1992, Defendant ARNAOUT assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by GULBUDDIN HEKMATYAR and Hezb-e-Islami.

419.    Sometime in 1993 or thereafter, members of the international terrorist conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including AL QAEDA members and soliciting donations to support international terrorism.

420.    On or about June 10, 1995, BIF caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen mujahideen in Baku, Azerbaijan.

421.    In or about November 1995, Defendant ARNAOUT and other members of the BIF conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen.  Defendant ARNAOUT and BIF members solicited donations from the public to purchase additional anti-mine boots for the mujahideen, falsely claiming that the project was for the benefit of civilians.

422.    In or about May 1998, BIF and ARNAOUT facilitated the travel of an

influential founding member of the AL QAEDA network, MAMDOUH MAHMUD SALIM (a/k/a Abu Hajer al Iraqi), to Bosnia-Herzegovina by indicating that SALIM was a director of BIF.

423.    In the latter part of the 1990's, with Defendant ARNAOUT's knowledge, SAIF AL ISLAM EL MASRY, a member of AL QAEDA's majalis al shura (consultation council), as well as a top military expert and instructor, served as an officer of the BIF.

424.    Between June 2000 and September 2001, BIF caused the transfer of approximately $1,414,406.00 via wire from an account at Union Bank of Switzerland to BIF's checking account in the United States.  Those funds were commingled in BIF's checking account with donations the BIF Enterprise received from other sources and disbursed in large part to the BIF Enterprise offices overseas.

425.    In or about October 2001, Defendant ARNAOUT relayed to the BIF founder ADEL BATTERJEE in Saudi Arabia via telephone ARNAOUT's concern that ARNAOUT was under scrutiny of the United States government and in particular the fact that Defendant ARNAOUT had been searched at the airport upon his return to the United States.

426.    In January 2002, following the blocking of BIF's bank accounts by the United States Department of the Treasury, Defendant ARNAOUT spoke via telephone to ADEL BATTERJEE in Saudi Arabia, and BATTERJEE requested Defendant ARNAOUT to relocate with his family to Saudi Arabia.

427.    Beginning at a time unknown through in or about March 2002, Defendant

ARNAOUT, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning OSAMA BIN LADEN and AL QAEDA, including:

> i. a chart of an organization involved in military activity headed by OSAMA BIN LADEN;

> ii. notes summarizing several meetings during which AL QAEDA was formed in Afghanistan in August 1988 (indicating that Osama BinLaden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original bayat (oath of allegiance) made by prospective AL QAEDA members to AL QAEDA ;

> iii. notes reflecting the commencement of AL QAEDA 's "work" on or about September 10, 1988;

> iv. personnel files of the mujahideen trained in the al Masada camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

> v. a list of wealthy sponsors from Saudi Arabia including references to OSAMA BIN LADEN and ADEL BATTERJEE, the founder of the BIF Enterprise;

> vi. various documents reflecting Defendant ARNAOUT's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the al Masada camp;

> vii. various documents in a separate folder reflecting Defendant ARNAOUT's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with Hezb e Islami;

> viii. various newspaper articles including a 1988 article with

a photograph depicting OSAMA BIN LADEN, Defendant ARNAOUT, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning OSAMA BIN LADEN's threats against the United States and the State Department's 1997 list of designated terrorist organizations; and

ix. a handwritten organizational chart placing Defendant ARNAOUT at the top of a jihad organization involved with weapons.

428.    In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, Defendant ARNAOUT falsely and publicly stated that he did not know OSAMA BIN LADEN personally, that Defendant ARNAOUT never fought against the Soviet Union, that Defendant ARNAOUT was never at the al Masada camp.

429.    On March 26, 2002, in an effort to obtain a court order requiring, among other things, the release of BIF funds frozen by the United States Department of the Treasury, BIF and Defendant ARNAOUT submitted a declaration knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings."

430.    On or about April 15, 2002, ARNAOUT spoke to the BIF director in Pakistan and advised him to avoid government scrutiny in Pakistan by fleeing to Afghanistan with the BIF's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

431.    ENAAM M. ARNAOUT conspired with others to provide material support and resources to persons, groups and organizations engaged in violent terrorist activities, including AL QAEDA, and persons engaged in violent confrontations and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out acts of international terrorism.

432.    Defendant ARNAOUT and other members of the BIF conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities.

433.    ENAAM M. ARNAOUT transferring by wire approximately $4,000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transaction represented the proceeds were to be used by terrorists.

434.    Co-conspirators, aiders and abettors of the BENEVOLENCE INTERNATIONAL FOUNDATION (a/k/a al-Birr al-Dawalia), include Defendants: BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (Main Office), BENEVOLENCE INTERNATIONAL FOUNDATION – U.S.A. (East Coast Office), BENEVOLENCE INTERNATIONAL FOUNDATION – Canada, SYED SULEMAN AHMER, ENAAM MAHMOUD ARNAOUT (a/k/a Abdel del Samia, a/k/a Abu Mahmoud), MAZIN M.H. BAHARETH, SHAHIR ABDULRAOOF BATTERJEE, ADEL BATTERJEE, all located, doing business or registered to do business in the United States

241

435.    ARNAOUT initially denied knowing BIN LADEN, but a March 19, 2002, police raid at Bosnian offices and homes related to BIF, uncovered photographs of ARNAOUT with a rifle in his hands and BIN LADEN at his side at what appeared to be an AL QAEDA training facility. Documents found in the raid detail a relationship between ARNAOUT and BIN LADEN going back 15 years.  Both BIF and ARNAOUT have had their assets frozen and are believed, by the United States Department of Justice, to be AL QAEDA co-conspirators.

436.    A former AL QAEDA member informed the FBI that BIF is used by AL QAEDA for logistical support.  Additionally terrorists attempting to obtain chemical and nuclear weapons on behalf of AL QAEDA had direct contacts with BIF and BIF employees and listed the Illinois BIF offices as their residence.

437.    Terrorists who had direct contact with BIF include:  MAMDOUH MAHMUD SALIM, an IRAQI who established links between AL QAEDA and groups in IRAQ, SUDAN and Lebanon.  He was a key BIN LADEN aide who tried to obtain nuclear and chemical weapons for AL QAEDA.  He was arrested in the 1998 AL QAEDA Embassy bombings and was at one time listed as a BIF director.  Other terrorists linked to BIF include:  MOHAMED BAYAZID, who also assisted AL QAEDA attempts to acquire nuclear material; MOHAMAD JAMAL KHALIFA, BIN LADEN's brother-in-law who has been linked to the 1993 World Trade Center bombing and the disrupted plot to bomb 12 American airliners in 1995; and WALI KHAN AMIN SHAH who was convicted for his participation in the plot to bomb American airliners.

242

438.    Upon information and belief, BIF assisted these and other AL QAEDA terrorists with housing, travel documents and/or funding in the United States and abroad. AL QAEDA members were given jobs with the Foundation and used the charity to transfer money to AL QAEDA members.

439.    Using unidentified witnesses who are former AL QAEDA members or terrorists currently in U.S. custody, and documents seized in the raids on the group's offices in Chicago and Bosnia, the U.S. Justice Department has detailed links between BENEVOLENCE INTERNATIONAL and AL QAEDA.

440.    Federal agents stated that BIN LADEN and AL QAEDA members withdrew funds to support terrorist activities from bank accounts held by the charity and that BIF accounts in offices around the world provided a cover for the movement of terror funds.

441.    The WORLD ASSEMBLY OF MUSLIM YOUTH (or "WAMY") and the BENEVOLENCE INTERNATIONAL FOUNDATION (BIF) are tightly connected organizations that share the same leadership and work together on a number of joint projects. ADEL ABDUL JALIL BATTERJEE was the Secretary General of WAMY at the time he founded the AL QAEDA front organization BIF in the United States. Outside of BATTERJEE's role, the two organizations WAMY and BIF have also cooperated in joint-publishing of literature and film that bears both of their logos.

442.    BATTERJEE commissioned the writing of a biography specifically about OSAMA BIN LADEN and the origins of the AL QAEDA network in Arabic. This

biography, *The Arab Volunteers in Afghanistan*, was jointly published in 1991 by the BENEVOLENCE INTERNATIONAL FOUNDATION and the WORLD ASSEMBLY OF MUSLIM YOUTH. The book details OSAMA BIN LADEN's life, including the creation of BIN LADEN's terrorist network, AL QAEDA. On the back cover is a written statement that expresses the ideology of the book, "This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river." *Arab volunteers in Afghanistan.*

443.    The conspirators of the first World Trade Center bombing in February 1993 had in their possession several terrorist training manuals when they were caught. Ahmad Ajaj had in his possession an AL QAEDA manual that detailed how to be an effective terrorist, teaching proper ways to make bombs and remain covert.  It was found in an envelope that had both the WAMY and Lajnat al-Birr logos on it. Ajaj has been convicted for participating in the first World Trade Center attack.

444.    KHALID AL FAWAZ, a senior AL QAEDA leader currently imprisoned in The United Kingdom, had the same manual as Ajaj except for updates that included more recent AL QAEDA knowledge.  AL FAWAZ ran OSAMA BIN LADEN's public relations organization the ADVICE AND REFORMATION COMMITTEE in London and masterminded the 1998 United States Embassy bombings, for which he was indicted by the United States government.  That someone of AL FAWAZ' stature in AL QAEDA possessed manuals that were distributed by WAMY is indicative of the shared ideology and

cooperation between WAMY and AL QAEDA.

445.     Another manual found in Ahmed Ajaj's possession was hate literature against Americans, Christians, and Jews.  This encyclopedia, which glorified the hijacking of busses and the killing of innocent civilians in Israel, was published by WAMY.

## THE SAUDI HIGH COMMISSION

446.     THE SAUDI HIGH COMMISSION, (a/k/a the Saudi High Relief Commission) (or "SHC") was founded in 1993 by PRINCE SALMAN IBN ABDUL AZIZ (or "PRINCE SALMAN"), the Mayor of Riyadh and a son of King Fahd, and a prime supporter of the charity. Hailed as the largest fundraising effort in the Arab and Muslim world, the SAUDI HIGH COMMISSION claims to have spent more than $600 million in aid to Bosnian Muslims impoverished by the country's recent civil war.

447.     SHC has been widely criticized by aid agencies and Bosnian intellectuals for importing the extreme form of Saudi Islam, Wahhabism, which is alien to the more moderate, secular form of Islam found in Bosnia. Bosnian officials claim that the Wahhabis' intolerant and anti-Western form of Islam contradicts and offends Bosnian tradition and undermines the country's rich and diverse religious heritage.

448.     On October 21, 2001, five Algerians were arrested in Bosnia Herzegovina on criminal charges of international terrorism following a threat to the United States embassy.  The incident resulted in the five day closure of the United States and British embassies for what both embassies called "a credible security threat."  The plot was

discovered when United States intelligence intercepted a telephone conversation between two of the accomplices about the mission.  During this telephone conversation, one of the terrorists said, "American interests would be jeopardized within 48 hours."

449.    This group of Algerians is suspected to be a part of the AL QAEDA network. The NATO Secretary-General, George Robertson, stated that at least one of the five had "direct links with AL QAEDA and BIN LADEN."  The leader of the group, BENSAYAH BELKACEM, has been identified as a top AL QAEDA  lieutenant.  In October, 2001, BELKACEM was arrested at his apartment in Zenica, Bosnia, where authorities found phony passports and a mobile telephone listing for ABU ZUBAYDAH, AL QAEDA's third-in-command.  According to phone transcripts, BELKACEM was also in phone contact with an AL QAEDA  military commander ABU AL MAID.

450.    One of the six Algerian terror suspects, SABIR LAMAR, worked for the SAUDI HIGH COMMISSION as an Arabic language teacher.  SABIR LAMAR fought in Afghanistan with the Mujahideen.  He is married to the daughter of a former local employee at the United States embassy in Sarajevo and is believed to have had keys to the building, in which photographs and other information were available.

451.    In October, 2001, United States forces raided the Sarajevo branch of the SAUDI HIGH COMMISSION of Bosnia and Herzegovina and found computer hard drives with photographs of the World Trade Center before and after its collapse as well as photos of United States embassies in Kenya and Tanzania and the U.S.S. Cole.  Additionally,

246

United States forces discovered files on pesticides and crop dusters, information about how to make fake State Department badges as well as photographs and maps of Washington, with government buildings marked.  About $100,000 worth of local currency was found in a safe, as well as anti-Semitic and anti-United States computer material geared toward children.

452.    The Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance analyzed the documents seized from the offices of the SAUDI HIGH COMMISSION and described the organization as a front for radical and terrorism-related activities:

> Members of the SFOR have on premises of the SAUDI HIGH COMMISSION Relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization (various photographs of the World Trade Center, sketches of military bases, certain photographs of military ships, civil airplanes, certain specially protected facilities, and other).

453.    In October 2001, a Bosnian spokesman announced that between 100,000 DM and 200,000 DM in cash were also seized in the offices of the Saudi High Commission. The SAUDI HIGH COMMISSION used 24 vehicles with diplomatic plates to transport members and material inside Bosnia Herzegovina.

454.    Given its level of financing, the SAUDI HIGH COMMISSION does not provide adequate financial aid to the needy.  The SAUDI HIGH COMMISSION was functioning at least until February 2001, when the announcement was made that the

organization provided in a nine-year period a total of $560,900,000 in donations.  Since at least year 2000, funds sent to help Bosnia Herzegovina were diverted for terrorist activities and not charity.  For instance, in September 2000, PRINCE SALMAN was alerted by a letter from the Bosnian association "Mothers of Srebrenica and Podrinje" in which it was clearly claimed that the SAUDI HIGH COMMISSION in Bosnia Herzegovina did not provide charitable assistance.

455.    This Bosnian association stated that while PRINCE SALMAN announced that 200 million DM were collected in only one day after Srebrenica's fall in July 1995, none of  Saudi assistance reached the Srebrenica people.

456.    United States investigative forces are currently reviewing suspicious financial records of the SAUDI HIGH COMMISSION.  SAUDI HIGH COMMISSION financial records fail to account for $41 million dollars.

457.    PRINCE SALMAN knowingly failed to take appropriate actions regarding the management and use of funds of the SAUDI HIGH COMMISSION in Bosnia Herzegovina, as proven by the evidence of non-charitable work discovered in the raids conducted in the Sarajevo office of the organization.


### MUWAFFAQ-BLESSED RELIEF; AL QADI AND BIN MAHFOUZ

458.    One month after the September 11, 2001 attacks, on October 12, 2001, with Executive Order 13224,  President George W. Bush designated Saudi businessman

248

YASSIN AL QADI as a terrorist sponsor for financially supporting AL QAEDA.  As stated

in a United States Department of Treasury Press Release on October 12, 2001:

> *Yassin Al Qadi (heads) the Saudi-based MUWAFFAQ (or "Blessed Relief") Foundation, an AL QAEDA front that transfers millions of dollars from wealthy Saudi businessmen to bin Laden.*

459.    YASSIN AL QADI is a United States designated terrorist and Director of

GLOBAL DIAMOND RESOURCES, based in Nevada.  He sits on the board as a

representative of NEW DIAMOND HOLDINGS, a foreign investor firm that has a

controlling interest in GLOBAL DIAMOND.  Along with YASSIN AL QADI, serving on

the board of directors are representatives of the BIN LADEN family who invested in

GLOBAL DIAMOND RESOURCES.  YASSIN AL QADI was introduced to GLOBAL

DIAMOND RESOURCE's Chairman by an executive at the SAUDI BIN LADEN

GROUP. In regards to the company's decision to let AL QADI join as an investor, the

Chairman said, "I relied on the representations of the BIN LADEN family.  They vouched

for him."

460.    Defendant MUWAFFAQ (or "BLESSED RELIEF") was registered in the

Channel Islands in 1992 but run from Jeddah, Saudi Arabia.  The BLESSED RELIEF

charity had an international presence with offices in Europe, Ethiopia, Pakistan, SUDAN,

Somalia and a post office box in the United States.  BLESSED RELIEF purported to

conduct traditional relief work such as the distribution of food, clothing and medical

equipment to victims of war or famine. MUWAFFAQ-BLESSED RELIEF was endowed

249

by Defendant KHALID BIN SALIM BIN MAHFOUZ, the AL QAEDA financier, and run by YASSIN AL QADI. KHALID BIN SALIM BIN MAHFOUZ's son, ABDUL RAHMAN KHALID BIN SALIM BIN MAHFOUZ, is also a director of the BLESSED RELIEF charity.

461.    YASSIN AL QADI ran BLESSED RELIEF from 1992 until approximately 1997 with $15 to $20 million of his own money, along with contributions from other wealthy associates and according to a June 1998 U.S. Justice Department report, sent $820,000 to buy weapons for HAMAS. Millions of dollars have been transferred to OSAMA BIN LADEN and AL QAEDA through BLESSED RELIEF. During the 1990s an audit of the Defendant NATIONAL COMMERCIAL BANK OF SAUDI ARABIA which was then run by KHALID BIN SALIM BIN MAHFOUZ, revealed the transfer of $3 million for OSAMA BIN LADEN that was moved from the accounts of wealthy Saudi businessmen to BLESSED RELIEF.

462.    In a 1995 interview, OSAMA BIN LADEN identified BLESSED RELIEF's place in his support network, "The bin-Laden Establishment's aid covers 13 countries . . . . this aid comes in particular from the SAUDI HIGH COMMISSION ." OSAMA BIN LADEN went on to list a number of the Human Concern International Society's branches, including the BLESSED RELIEF SOCIETY.

463.    YASSIN AL QADI incorporated the United States branch of BLESSED RELIEF in Delaware in 1992, along with TALAL M. M. BADKOOK and Dr. MOHAMED

ALI ELGARI.  BLESSED RELIEF in the United States was also used as an AL QAEDA front used by wealthy Saudis and others to funnel money to OSAMA BIN LADEN's terrorist network.

464.    YASSIN ABDULLAH AL QADI is the Vice President of the Saudi Arabian company M.M. BADKOOK CO. FOR CATERING & TRADING, owned by his partner in BLESSED RELIEF, and TALAL MOHAMMED BADKOOK. TALAL BADKOOK is also a member of the Al-Mustaqbal group along with SALEH MOHAMED BIN LADEN, son of Mohammed Bin Laden , and ABDULLAH SALEH KAMEL, son of SALEH KAMEL and the Chairman of the DALLAH AL-BARAKA.

465.    YASSIN AL QADI is the Chairman of the NATIONAL MANAGEMENT CONSULTANCY CENTER (or "NMCC") in Jeddah, Saudi Arabia.  The NMCC lists an address in Jeddah, Saudi Arabia, which is the same address listed on BLESSED RELIEF's Delaware corporate records.


**AL-HARAMAIN**

466.    The Saudi Arabian-based AL-HARAMAIN ISLAMIC FOUNDATION INC. (or "AL-HARAMAIN") is a private charitable organization that is supposed to provide a variety of humanitarian services for Muslims worldwide. Established in Riyadh in 1992, AL-HARAMAIN quickly developed a vast network of offices and representatives that now spans over fifty countries, including the United States. AL-HARAMAIN raises most of its

funds from Saudi Arabia where it oversees the distribution of its resources across the world.

467.    Although AL-HARAMAIN operates these branches in many branches but are still controlled primarily from AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL AL AQEEL and MANSOUR AL KADI, both reside in Riyadh, Saudi Arabia where they run all of AL-HARAMAIN worldwide.  Defendant AL-HARAMAIN ISLAMIC FOUNDATION, INC., is a Saudi charity front that has exploited its non-profit status for the benefit of OSAMA BIN LADEN and his terrorist network AL QAEDA, in the furtherance of international terrorism.  In doing so, AL-HARAMAIN has developed an extensive worldwide network. Many of AL-HARAMAIN's foreign branches have been exposed for providing direct and material support to AL QAEDA.  The United States State Department has designated two of AL-HARAMAIN's branches located in Bosnia and Somalia, as terrorist entities and frozen the assets of both.   The leaders of AL-HARAMAIN have direct links to AL QAEDA.

468.    In December of 1999, AL-HARAMAIN conducted a joint fundraising event with a known AL QAEDA front, the Defendant INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO) and the WORLD ASSEMBLY OF MUSLIM YOUTH (WAMY) in Riyadh, Saudi Arabia.  AL-HARAMAIN and its co-conspirators also solicit and operate widely in the United States.

469.    Co-conspirators, aiders and abettors of the AL-HARAMAIN ISLAMIC

252

FOUNDATION doing business or registered to do business in the United States include

Defendants: AL HARAMAIN FOUNDATION; AL HARAMAIN ISLAMIC

FOUNDATION, INC.; AQEEL ABDUL AZEEL AL AQEEL; MANSOUR AL KADI;

SOLIMAN H.S. AL BUTHE; and PEROUZ SEDA GHATY.

## AL-HARAMAIN'S HUMANITARIAN EFFORTS
## USED TO CONCEAL SUPPORT FOR AL QAEDA

470.    AL-HARAMAIN's self-titled "Most Important Aims" include relief work

in areas of the world where Muslims are deprived.  An unwritten, though no less important,

aim of AL-HARAMAIN is providing assistance to OSAMA BIN LADEN's AL QAEDA.

471.    Intelligence officials throughout the world have acknowledged that AL-

HARAMAIN exploited its non-profit status by providing secret aid to terrorist groups.  In

referring to AL-HARAMAIN in a speech given on March 11, 2002, United States Treasury

Secretary Paul O'Neill, stated:

> *Few deceits are more reprehensible than the act of*
> *collecting charity from well-intentioned donors, and then*
> *diverting those funds to support hatred and cruelty. As I said*
> *during my visit to the Gulf, misusing charity funds to support*
> *terrorism harms the people who gave the donation, harms*
> *the people who should have received it and is dangerous to*
> *us all.  Organizations that pervert the name of charity are an*
> *affront to us all, and we will find them, expose them, and*
> *shut them down.*

472.    After the June 2, 2002, raids of AL-HARAMAIN offices in Bosnia, the

Commander of the NATO-led forces in Bosnia, Lieutenant General John Sylvester stated:

> *We detected a pattern here . . . for terrorist cells and those*

253

> *who aid and harbor them to operate behind the shield of*
> *legitimate humanitarian . . . organizations.… They were*
> *preaching good, and sometimes doing good, while plotting*
> *evil.*

473. On March 11, 2002, the United States froze the funds of the Bosnia-Herzegovina and Somalia branches of the AL-HARAMAIN Islamic Foundation. These branches of AL-HARAMAIN were "diverting charitable funds to terrorism." The United States Treasury Department issued a Press Release about the designations that stated:

> *The branch offices of al Haramain in Somalia and Bosnia*
> *are clearly linked to terrorist financing.*

474. Although AL-HARAMAIN in Saudi Arabia was not included in this designation, the Bosnian and Somalian branches receive their funding and guidance from the AL-HARAMAIN headquarters in Riyadh, Saudi Arabia.

475. AL-HARAMAIN's Bosnia and Somalian offices and the rest of AL-HARAMAIN are closely intertwined. AL-HARAMAIN's headquarters provides the funding, management, and direction of the Somalian and Bosnian branches. The headquarters also maintains one website that covers AL-HARAMAIN worldwide and, on occasion, devotes certain pages of its website to certain individual branches.

476. A United States Treasury Department Press Release stated that AL-HARAMAIN worked with the AL QAEDA-linked Somali-based terrorist group AL ITIHAD AL ISLAMIYA. This like-minded Islamic fundamentalist group operated in the AL QAEDA orbit as it sought to establish an Islamic state in Somalia and moved into a terrorist force in the mid 1990s. AIAI's involvement in September 11 includes sharing of

training and personnel with AL QAEDA using money provided by the Saudis through defendant AL HARAMAIN's offices in Bosnia and Somalia.  Defendant the AL BARAKA AT BANK was a financial vehicle for AL QAEDA..  The press release states:

> *The Somalia office of AL-HARAMAIN is linked to Osama Bin Laden's Al Qaeda network and Al-Itihad Al-Islamiya (AIAI), a Somali terrorist group.  Al-Haramain Somalia employed AIAI members and provided them with salaries through Al Barakaat Bank,  which was designated on November 7, 2001 under E.O. 13224 because of its activities as a principal source of funding, intelligence and money transfers for Osama Bin Laden.*

477.   The cooperation between AL QAEDA and AL-ITIHAD AL-ISLAMIYA has not ceased.  The 2002 United States Department of State's Patterns on Global Terrorism report states that AL-ITIHAD AL-ISLAMIYA is a terrorist group that maintains ties to AL QAEDA.  The Treasury Department Press Release about the designation also states that AL-HARAMAIN's support of AL-ITIHAD AL-ISLAMIYA has been concealed under its humanitarian cover:

> *Over the past few years, Al-Haramain Somalia has funneled money to AIAI by disguising funds as if they were intended for orphanage projects or Islamic school and mosque construction. The organization has also employed AIAI members and provided them with salaries through Barakaat Banks and Remittances, a subsidiary of al-Barakaat Bank.*

478.   This concert of action, aiding and abetting of terror and material sponsorship of international terrorism is precisely the hallmark of the offensive upon the United States that culminated on September 11, 2001.

## AL-HARAMAIN'S TIES TO AL QAEDA 'S

255

## 1998 UNITED STATES EMBASSY BOMBINGS

479.     The AL-HARAMAIN Islamic Foundation was banned from Kenya for national security concerns following the 1998 embassy bombings. OSAMA BIN LADEN and AL QAEDA were convicted by the United States in 2001 for plotting and executing these dual attacks in Nairobi, Kenya, and Dar Es Salaam, Tanzania, which killed 224 people, including 12 Americans, and injured more than 4,000.  These indictments and convictions demonstrate the United States government's belief that both OSAMA BIN LADEN and AL QAEDA have committed acts within and outside the United States which trigger the United States District Courts' jurisdiction over such entities.

480.     The United States Treasury Department Press Release following the March 11, 2002, designation of AL-HARAMAIN's Bosnian and Somalian offices, stated the following about its connection to the terrorist group AL-GAMA'A AL-ISLAMIYYA:

> *The Bosnia office of Al-Haramain is linked to Al-Gama'a Al-Islamiyya, an Egyptian terrorist group. Al-Gama'a Al-Islamiyya was designated on November 2, 2001 and it is a signatory to Osama Bin Laden's fatwa dated February 23, 1998, targeting Americans and their allies.*

481.     In March 2002, Bosnian officials raided AL-HARAMAIN's Sarajevo office and discovered more proof of AL-HARAMAIN using its humanitarian image as a cover for terrorism.  A Bosnian intelligence report explains how investigators discovered that AL-HARAMAIN's financial records from 1994 through 1998 had been destroyed and that $1.59 Million dollars had been inexplicably withdrawn from the charity between 1999 and 2001.  The Bosnian intelligence report about the March 2002 raids also stated: "We believe

that the clear lack of any concrete humanitarian projects indicates that the existence of this organization was a fictitious cover for probable links with terrorism." In 2001, the Saudi-based AL-HARAMAIN aided AL QAEDA terrorists groups in Chechnya and elsewhere by providing them with recruits, weapons, and money.

482. AL-HARAMAIN's website used to have a direct link to the AL QAEDA site about the Chechnyian operations (qoqaz.com). The website was one of several AL QAEDA websites, including qoqaz.com, qoqaz.net, and azzam.com (among others) that are part of the AL QAEDA propaganda effort of Azzam Publications. The government of the United States has been tracking the domains of azzam.com and qoqaz.com in an ongoing effort to shut down the sites for their role as an AL QAEDA sponsor, promoter and mouthpiece. FBI Special Agent Robert Walker described qoqaz.net, the English language equivalent of qoqaz.com, in his April 29, 2002, Affidavit in Support of Complaint Against BENEVOLENCE INTERNATIONAL FOUNDATION, Inc. and ENAAM M. ARNOUT. In his Affidavit, Walker stated that qoqaz.net leverages its relationship with charities:

> *In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen mujahideen identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of mujahideen training as well as killed mujahideen. CW-1 has identified Ibn al Khattab as a well-known mujahideen leader with links to Osama Bin Laden. . . . The website condemned America . . .*

483. Shortly after the merger of EGYPTIAN ISLAMIC JIHAD with OSAMA BIN LADEN's AL QAEDA (*see* SUDAN allegations, *infra*), Ahmed Ibrahim Al Najjar,

257

initially a member of the EGYPTIAN ISLAMIC JIHAD, was sent on a new mission to Albania to work for AL-HARAMAIN.  After al Najjar was deported from Albania to Egypt in 1999, he was sentenced to death for acts of terrorism.  In his testimony, al Najjar admitted to being a full-fledged AL QAEDA member who entered Albania with a false passport and who, like many other AL QAEDA operatives, was engaged in purported humanitarian activities while waiting for orders to participate in terror activities.  The case of Al  Najjar is but one example of a senior AL QAEDA operative who not only found refuge from authorities with AL-HARAMAIN, but a platform from which to wage war and promote the use of terror.

484.    AL-HARAMAIN took part in a committee of charitable organizations that formed the SAUDI JOINT RELIEF COMMITTEE (or "SJRC").  Along with AL-HARAMAIN, the SJRC is comprised of the IIRO, WAMY, the SAUDI RED CRESCENT, and the MUSLIM WORLD LEAGUE, among others.  The SJRC has been connected to OSAMA BIN LADEN and two of his top operatives, WA'EL HAMZA JULAIDAN and Adel Muhammad Sadiq bin Kazem.  The United States Treasury Department has branded JULAIDAN a Specially Designated Global Terrorist Entity [SDGT], stating that JULAIDAN is "an associate of Usama bin Laden and a support of al-Qa'ida terror."  AL-HARAMAIN has been able to continue its cooperation with AL QAEDA  for years in large part due to its ostensible appearance as a humanitarian organization.

485.    In the United States, AL-HARAMAIN has three business entities in

258

Ashland, Oregon: AL-HARAMAIN FOUNDATION, and AL-HARAMAIN Islamic Foundations. All three of these separately filed businesses are at the same address and under the same management. These three businesses are one and the same as AL-HARAMAIN's headquarters in Riyadh, Saudi Arabia. The President and Vice-President of the United States branch, AQEEL AL AQEEL and MANSOUR AL KADI, are the Secretary General and Deputy General, respectively, of the Riyadh office. The AL-HARAMAIN branch in Ashland, Oregon, is specifically linked to AL QAEDA operations.

486.    AL-HARAMAIN Ashland states in its year 2000 Form 990 that it operates an Islamic center in Springfield, Missouri. Corporate records reveal that AL-HARAMAIN owns property in Springfield, Missouri.

487.    AL-HARAMAIN has been implicated as providing funds for the bombing of a night club in Bali in 2002. AL-HARAMAIN continues in its illicit pattern of conduct in sponsoring acts of international terrorism.

488.    489.    UMAR FARUQ, an admitted terrorist co-conspirator and a member of the AL QAEDA terrorist organization, was arrested in or about May 2002. According to the confession of ABU ZUBAYDAH, a top AL QAEDA leader detained by the United States authorities, UMAR FARUQ was a senior AL QAEDA representative in Southern Asia. An interrogation of UMAR FARUQ was conducted by United States authorities at the United States Air Force Base in Baghram, Afghanistan, on May 23, 2002.

490.    During a custodial interview on Sept 9, 2002, UMAR FARUQ confirmed

that he was AL QAEDA's senior representative to Southeast Asia and was initially sent to the region by ABU ZUBAYDAH and Ibn Sheik AL LIBI to plan large-scale attacks against United States interests in Indonesia, Malaysia, Philippines, Singapore, Thailand, Taiwan, Vietnam and Cambodia.  In particular, FARUQ prepared a plan to conduct simultaneous car/truck bomb attacks against United States embassies in the region to take place on or about September 11, 2002.

During an interrogation conducted by United States authorities at the United States air force base in Baghram, Afghanistan, on May 23, 2002,  UMAR FARUQ confessed that AL-HARAMAIN was the main financial mechanism for funding terrorists operations in the region, through its Indonesian office director in Jakarta, Ahmed Al  Moudi.  The AL-HARAMAIN organization is said to have planned terrorist attacks in Indonesia.

> *Al Haramayn was the funding mechanism of all operations in Indonesia.  Money was laundered through the foundation by donors from the Middle East.  Money was given to [him] to al Haramayn's branch in Jakarta, which he said is connected to Kompak [Crisis Center Committee or Committee for Crisis Handling of the Dewan Dakwah Islamiyah organization, Islamic Propagation Council in Indonesia].  The two groups plan terrorist activity in Indonesia. The foundation had an office in Makassar where Faruq was introduced to the foundation's head by Agus Dwikarna [Director of Kompak].  Faruq was given orders by Rashid [al-Qaida senior officer] to get money transferred to the foundation's office in Jakarta through Ahmed Al Moudi [head of al Haramayn's office in Jakarta].*

491.   UMAR FARUQ further stated that AL-HARAMAIN received money from a Saudi Sheikh (Sheikh Bandar), who heads the AL-HARAMAIN ISLAMIC

FOUNDATION in Saudi Arabia according to Faruq. Sheikh Bandar gave $99,000 to Faruq

to give to Al Moudi. Faruq said Sheikh Bandar was the head of AL HARAMAIN in Saudi

Arabia.

492.    Furthermore, during a custodial interview on September 9, 2002, UMAR

FARUQ stated that terrorist operations of JEMAAH ISLAMIYA, founded by Abu Bakar

Bashir and directed by his top commander defendant NURJAMAN RIDUAN ISMUDDIN

AKA HAMBALI, and defendant MOHAMMED IQBAL ABDURRAHMAN a/k/a Abu

Jibril, were funded by donations channeled through AL HARAMAIN ISLAMIC

FOUNDATION. JEMAAH ISLAMIYA is an Islamic extremist group closely associated

with AL QAEDA. It's terror activities with AL QAEDA included planning the Bojinka

attack, a foiled attempt to bomb 12 American airliners traveling over the Pacific, and

cooperation in the bombing of the U.S.S. Cole in 2000. HAMBALI is also believed to have

arranged a meeting of September 11 hijackers with other AL QAEDA members in Malaysia

in 2000:

> *AL QAEDA encourages Basyir's [Abu Bakar Bashir] goal*
> *to spark a religious civil war in Indonesia in order to*
> *achieve his vision of a pure Islamic state under Islamic law.*
> *Basyir's plan of training jihadists and massing weapons and*
> *ammunition has been coordinated with Rashid, a senior*
> *lieutenant of Usama bin Ladin. Rashid also acts as a*
> *representative of a committee of Gulf-state sheiks who are*
> *Al Qa'ida financiers and who have committed ample funds,*
> *weapons, ammunition and computers to support this war.*
> *Funds are channeled through the Al-Haramain NGO.*

493.    AL-HARAMAIN is engaged in unlawful aiding, abetting, conspiring with

and offering material support to AL QAEDA which constitutes an unlawful pattern of conduct, illicit scheme and enterprise.

## **MERCY INTERNATIONAL RELIEF AGENCY**

494.    The Saudi-backed MERCY INTERNATIONAL RELIEF AGENCY (a/k/a MERCY INTERNATIONAL, a/k/a MERCY) (or "MIRA") was incorporated in Dublin, Ireland in 1992 with the ostensible purpose of embarking on Muslim charitable activities around the world.  All the shareholders of the charity are all of Saudi nationality and listed their address at Makkah, Saudi Arabia.  MIRA also has branches in Somalia and Kenya. Its Dublin branch dissolved on January 16, 1998.

495.    During the trial and conviction of OSAMA BIN LADEN's personal secretary WADIH EL HAGE, for his role in the 1998 United States Embassy bombings in East Africa, WADIH EL HAGE's testimony before a grand jury established that MIRA was funded by "Saudi merchants":

> "Q.    The grand jury had a couple of quick questions one of which
> is who  funds the Mercy International relief agent in Kenya?
> "A.    Some Saudi merchants in Saudi Arabia.
> "Q.    Merchants in Saudi Arabia?
> "A.    Yes

496.    An AL QAEDA member further maintained that MIRA was also an AL QAEDA sponsor.  L'Houssaine Kherchtou, a 36-year old Moroccan, joined al Qaeda in 1991. He affirmed this in his testimony as a government witness in the United States

Embassy bombings trial.  He worked for AL QAEDA in Kenya, and noted specifically that

MIRA served and sponsored AL QAEDA's activities.  In his testimony, Kherchtou asserted

that several AL QAEDA members were workers at MIRA, received identity cards from

MIRA, and that the organization was dealing directly with OSAMA BIN LADEN himself:

> Q.   And during the time that you were in Nairobi were you familiar with a charity or relief organization known as Mercy International Relief Organization?
>
> A.   Yes.
>
> Q.   And were there any al Qaeda people affiliated with the Mercy International Relief Organization?
>
> A.   Let me just.
>       (Witness consults with interpreter)
>
> A.   Yes, the people of al Qaeda they were dealing with the Mercy International.
>
> Q.   Who were those people? Which al Qaeda people were dealing with Mercy International?
>
> A.   Bin Laden, Mohammad Masry.
>
> Q.   Are you talking about the military commander?
>
> A.   Yes.
>
> Q.   Abu Mohammad, are you talking about Saleh lay again?
>
> A.   Yes.
>
> Q.   Were there any people inside Mercy International who were part of al Qaeda in the past or present?
>
> A.   Well, in the past Abu Jamal he was the manager of that relief agency but he was in the past of al Qaeda.
>
> Q.   You said Abu Jamal?
>
> A.   Yes.
>
> Q.   Anyone else in Mercy International who was a member of al Qaeda in the past or while in Kenya?
>
> A.   The accountant of Mercy International, too, he was of al Qaeda but in the past his name Abu al Kheryemeni.
>
> Q.   Did you ever see any al Qaeda members in Kenya who had identification cards in the Mercy International Relief agency?
>
> A.   No.

> Q.    Did you ever hear whether or not al Qaeda members in
>        Nairobi obtained identification cards from Mercy
>        International Relief agency?
> A.    Yes.
> Q.    Who did you hear obtained those cards?
> A.    I heard that Abu Mohammed Amriki and Bin Laden they
>        had identity card.

497.    MIRA's Kenya Office served as a front for AL QAEDA. Like many
OSAMA BIN LADEN fronts, MIRA was an operating charity.  The organization may have
embarked upon actual charitable work, but only as a cover for their insidious goals.
Following the Embassy bombings, federal authorities raided the offices of MIRA in Kenya
on August 21, 1998, after finding MIRA documents in WADIH EL HAGE's residence.  At
MIRA's office, agents discovered documentary evidence linking it to OSAMA BIN
LADEN.

498.    Some of the documents seized belonged to WADIH EL HAGE and
concerned Abu Ubaidah, a top AL QAEDA leader who died in 1996.  At the Embassy
bombing trial in New York Assistant U.S. Attorney ("AUSA") Patrick Fitzgerald stated:

> *When they searched Mercy International, they found a
> number of documents, included among which Wadih El
> Hage's files and files concerning Abu Ubaidah.*

499.    Documents found on site indicated that MIRA was smuggling weapons into
Kenya from Somalia.  AUSA Fitzgerald noted that authorities found a receipt dated July
24, 1998, on the back of which stated it was related to getting weapons from Somalia.

500.    FBI Special Agent John Michael Anticev interviewed Mohammed Odeh,

264

who was convicted for his role in the 1998 Embassy bombings.  Mr. Anticev testified that

MOHAMMED ODEH explained to him that MIRA was working for AL QAEDA.

> Q.    Did Odeh talk to you at all about an entity known as the
> Mercy International Relief Agency?
> A.    Yes.
> Q.    What did he tell you about the Mercy International Relief
> Agency?
> A.    That was also -- it was run by a guy in Nairobi named Tawhili, and
> that organization had ties to Al Qaeda, and Harun and Abu Ubaidah
> al Banshiri were close to that organization.

501.    The individual referred to above as Tawhili is also known as SHEIKH

AHMAD ALEM SUWEIDAN, one of the FBI's most wanted terrorists.  Therefore, a

fugitive AL QAEDA member ran MIRA at all relevant points up to the Embassy bombings.

Special Agent Anticev further testified that Harun, WADIH EL HAGE's former roommate

who also worked for AL QAEDA, frequented MIRA, typing information for top AL

QAEDA leadership:

> Q.    Did Odeh describe to you any particular tasks that Harun
> performed for Al Qaeda?
> A.    Yes. Harun, he said that Harun was a good typist, and, you
> know, he spent a lot of time at MIRA, the organization we
> just talked about, and he  would  type reports for the
> hierarchy in Al Qaeda.
> Q.    And when you said MIRA, MIRA, are you referring to the
> Mercy International Relief?
> A.    Yes, Mercy International Relief.
> Q.    Did Odeh indicate to you what was contained in those
> reports that he typed for the hierarchy?
> A.    In those reports they were using certain code words to
> conceal what their true intentions were.

502.    An AL QAEDA fugitive was deeply involved in MIRA's Branch in Dublin.

Hamid Aich (or "Aich"), an Algerian who lived in Ireland and volunteered at the MIRA branch in Dublin, was heavily involved in the 2000 bomb plot to destroy Los Angeles International Airport (LAX). Shortly before moving to Ireland, Aich was a roommate of Ahmed Ressam, the man currently in jail for his role in the LAX bomb plot. On December 21, 1999, Aich was arrested by Irish authorities, seizing several personal papers and computer documents, though he was released shortly afterwards, while FBI agents were traveling to interrogate him. Aich fled and went into hiding, and his current whereabouts are unknown.

503. Documents found in MIRA's branch in Dublin link the charity to ZACARIAS MOUSSAOUI. Travel documents found in a raid at a flat which served as one of MIRA's offices in Dublin are linked to forged documents used by alleged 20th hijacker, ZACARIAS MOUSSAOUI, who has been criminally charged in the September 11, 2001 attacks. The documents relate to air travel financed by OMAR SHEIKH a/k/a OMAR SHEIKH a/k/a MUSTAFA MUHAMMED AHMAD a/k/a Shaykh Sai'id a/k/a Mustafa Ahmed Al Hasawi an alleged paymaster of September 11th. The documents show that MOUSSAOUI's travel was financed by OMAR SHEIKH. FBI agents maintain that the evidence found at MIRA's office "proves 'without a shadow of a doubt' that Moussaoui is linked to Osama bin Laden."

**IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION**

266

504.    ABDUL AZIZ AL IBRAHIM (or "AL IBRAHIM") is a Saudi citizen and the brother-in-law of KING FAHD of Saudi Arabia. His sister, Jawhara, is the second wife of KING FAHD.

505.    In 1989 ABDUL AZIZ AL IBRAHIM acquired a portion of the Marina Del Rey real estate venture in Los Angeles, through various offshore companies.  American authorities discovered a loan of $132 million that was granted to AL IBRAHIM at the end of 1989 by BCCI.   AL IBRAHIM was one of BCCI's leading loan beneficiaries.

506.    The registered President of Al Anwa USA is TAREK AYOUBI, who also manages Anwa Hotel & Resort International, Luxury Holdings Inc, MDR Hotel and NY Overnight Inc, all based at the same address in Marina Del Rey.

507.    Al Anwa holding is AL ANWA FOR CONTRACTING ESTABLISHMENT (a/k/a Al Anwae Trading and Contracting Establishment, a/k/a Anwae Contracting Est) a construction company owned by ABDUL AZIZ AL IBRAHIM.   It is a shareholder, along with Defendant DALLAH AL BARAKA (Chaired by Defendant SALEH ABDULLAH KAMEL), of the National Environmental Preservation Co Ltd in Jubail, Saudi Arabia.

508.    In 1990, AZIZ AL IBRAHIM created the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION whose official stated aim is humanitarian assistance. The organization is present in Kenya, Bosnia, Chechnya, South America and Southern Asia. The Foundation has built mosques in Dusseldorf, Gibraltar, Milan and Moscow.

509.    The organization's branch in Nairobi in Kenya was associated with OSAMA

267

BIN LADEN's network according to the FBI's investigation into the attacks against the American embassies on August 7, 1998.

510.    In September 1998, the Kenyan government canceled the registration of five Islamic relief agencies for allegedly supporting terrorism including Defendant AL-HARAMAIN FOUNDATION, HELP AFRICAN PEOPLE, THE ISLAMIC RELIEF ORGANIZATION, THE IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, and MERCY RELIEF INTERNATIONAL.  The authorities claimed that materials for the bomb were smuggled in as relief aid with the help of Islamic relief agencies.

511.    The decision was announced by the Kenyan government's NGO coordinator who declared that:

> *Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered . . . These organizations are supposed to work for the welfare of Kenyans, but are instead endangering Kenyan's lives . . . They had been found to be working against the interests of Kenyans in terms of security.*

512.    After several organizations appealed this decision, Kenya's High Court blocked the de-registration of four of the five non-governmental organizations.  THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION, MUSLIM WORLD LEAGUE, AL-HARAMAIN FOUNDATION, and MERCY INTERNATIONAL RELIEF AGENCY can however, still operate pending an appeal.  Only the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION did not ask the court for an appeal.

268

513. In a study paper dated October 1999, called "The New Azerbaijan Hub: How Islamist operations are targeting Russia, Armenia and Nagorno-Karabagh", Yossef Bodansky, Senior Editor of Defense and Foreign Affairs' Strategic Policy refers to the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION as one of those which provided help to OSAMA BIN LADEN.

> *The key Islamist facilities are concealed as charity and educational organizations affiliated with the web used by bin Laden's networks. Moreover, the headquarters of these organizations are stuffed with Arab "teachers" and "managers" from the ranks of such organizations as the International Muslim Brotherhood, the Islamic Salvation Front, several branches of Islamic Jihad, and the National Islamic Front of Sudan. The key organizations are . . . Al Ibrahim Foundation. Very little is known about this Baku-based charity except that its Arab principals have huge amounts of cash in hard currency. They are involved in acquisition of real estate among other "educational" projects.*

514. Upon information and belief, IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION was funding the ISLAMIC MOVEMENT OF UZBEKISTAN (or "IMU"), an affiliate of AL QAEDA , whose leaders met OSAMA BIN LADEN in 1999 in Kandahar, Afghanistan.  The IMU received $270,000 dollars from the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

515. In 1999, the Russian special services and reconnaissance disseminated a report stating that Chechen militants were allegedly being trained in three paramilitary bases in Azerbaijan and that three Islamic organizations - the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION, WORLD ASSEMBLY OF MUSLIM YOUTHand

269

ISLAMIC RESCUE ORGANIZATION - had taken part in setting up these bases.

516.    During an investigative television program by the Russian NTV, on November 1, 2002, it was disclosed that in July 2002, more than a hundred young men from various regions of Russia, attended a seminar organized by the clerical board of Muslims of the Asian part of Russia at Pervouralsk.  The official goal of the event was to instruct to religious matters. One of the courses was based upon a study in sharia disciplines, published by IBRAHIM BIN ABDUL AZIZ AL IBRAHIM, which emphasized (quote):

> *Armed struggle in the name of Allah, for his word to be above all else. . . . Sacrifice your life in witness of Allah's religion.*

517.    According to a document summarizing the seminar "the main task of the seminar was to select candidates for further instruction at Saudi universities, and to raise the level of Islamic awareness." After the NTV findings, an investigation was conducted and a criminal procedure is pending in Russia.

518.    The seminar took place in the Middle Urals Kaziat Muslim community, where in 1995 Defendant ABDULLAH BIN ABDUL MUHSEN AL TURKI created a Joint Committee for Islamic Action and Studies with representatives from Defendants MUSLIM WORLD LEAGUE, IIRO, WAMY, along with the IBRAHIM BIN ABDUL AZIZ AL IBRAHIM FOUNDATION.

## AFGHAN SUPPORT COMMITTEE (ASC)

519.    The AFGHAN SUPPORT COMMITTEE ("ASC") a/k/a Ahya Ul Turas;

Janiat Ayat-Ur-Rhas Al Islamia; Janiat Ihga Ul Torath Al Islamia; Lajnat Ul Masa Eidatul

Afghania was established by BIN LADEN in the 1990s in a small town outside Peshawar,

Pakistan with offices in Jalalabad, Afghanistan purporting to raise money for charitable

works in Afghanistan and Pakistan.  Upon information and belief, ABD AL MUSHIN AL

LIBI are the officers of ASC who raise money and distribute it to AL QAEDA  terrorists.

 ASC provided travel and other logistical support to AL QAEDA .  The U.S. Treasury has

frozen  the assets of  ASC, AL LIBI and Al Jazir, as they are believed to be  AL QAEDA

co-conspirators.

## AL WAFA

520.    The AL WAFA ORGANIZATION a/k/a Wafa Humanitarian organization;

a/k/a Wafa Al-Igatha Al Islamic charity was headed by Saudi citizen SHEIKH ABO

ABDUL AZIZ NAGI, a high-ranking AL QAEDA official who was captured in

Afghanistan in December 2001.   Upon information and belief, while part of the

organization provided money for humanitarian projects, much of the money was diverted

to AL QAEDA.  AL WAFA was also instrumental in providing AL QAEDA with arms,

supplies and logistical support in Afghanistan before and after September 11, 2001.  AL

WAFA and AZIZ NAGI have been designated as terrorist co-conspirators and have had

271

their assets frozen.

## **RABITA TRUST**

521.     RABITA TRUST  is a charitable organization which was created to organize the

repatriation and rehabilitation of stranded Pakistanis (Biharis) from Bangladesh. Founded in 1988,

the trust fund was started jointly by the government of Pakistan and the Saudi-based charity, the

MUSLIM WORLD LEAGUE.  RABITA TRUST  received the majority of its funding from the

MWL and the Saudis, and been involved with terrorism.

522.     RABITA TRUST was initially granted 250 million Royals from the Pakistani

government as well as 50 million Royals from the MWL to help relocate some 250,000 displaced

Pakistani refugees in Bangladesh. In its 15 years of existence, the Rabita Trust has only managed

to relocate a few hundred Biharis.

523.     RABITA TRUST  is an AL QAEDA front, and the Head of RABITA TRUST  is

a known AL QAEDA member.  A Treasury Department press release issued when RABITA

TRUST 's assets were frozen indicated that:

> *Rabita Trust  is headed by Wa'el Hamza Julaidan, one of the*
> *founders of al-Qaida with bin Laden. He is the logistics chief of bin*
> *Laden's organization and fought on bin Laden's side in Afghanistan.*

524.     According to a biography of BIN LADEN and the original members of AL QAEDA

noted for its accuracy and clarity, the head of RABITA TRUST, WA'EL JULAIDAN, fought

alongside OSAMA BIN LADEN and championed his cause.  The biography, written by a fellow

compatriot of BIN LADEN, noted how AL QAEDA's key founders fought against the Soviets in

Afghanistan during the Soviet-Afghan war of the 1980s.

> *One of the men who led the Arab Afghan Jihad forces came from one*
> *of the wealthiest Saudi families; he was influenced by the Afghan*
> *struggle, who would live together with them and sacrifice everything*
> *for the Afghani jihad. This man was Osama Bin Laden, a young, tall*
> *man who followed Dr. Abdullah Azzam to fight in Afghanistan.*
> *Another Saudi joined together with them; his name was Wa'el*
> *Julaidan, a US student who was studying agriculture and left to fight*
> *jihad in Afghanistan. These three: Osama Bin Laden (a.k.a. 'Abu*
> *Abdallah'), Dr. Abdullah Azzam (a.k.a. Abu Muhammed), and Wa'el*
> *Julaidan (a.k.a. Abu Al Hassen al Madani), gathered together in*
> *December 1979 to create the new Islamic revolution in Afghanistan.*
> *Accordingly, Julaidan was branded a Specially Designated Global*
> *Terrorist Entity by the United States Treasury Department and his*
> *assets have been frozen.*

525.   RABITA TRUST  is the sibling organization of the IIRO as they are both

subsidiaries of the MWL.

526.   RABITA TRUST  is connected to the SAAR network(see above), through two

officers, Dr. ABDULLAH OMAR NASEEF  ABDULLAH AL OBAID.

527.   On October 12, 2001, President George W. Bush's Executive Order designated

Defendant RABITA TRUST  as a Specially Designated Global Terrorist Entity and the Treasury

Department froze its assets.  Its chairman is Defendant ABDULLAH OMAR NASEEF who

founded the Defendant RABITA TRUST  in July 1988 and is currently its chairman.

528.   ABDULLAH OMAR NASEEF ( or "NASEEF") also served as Secretary-General

of the MWL during the time he created RABITA TRUST  and has attempted to spread MWL

offices around the world. Part of his global efforts are found in his involvement in a SAAR network

charity. NASEEF is an officer of Makkah al-Mukarramah, Inc., registered in Virginia as a non-profit organization. A second shared executive is the Vice-Chairman of the Board of Trustees of RABITA TRUST, ABDULLAH AL OBAID, who is also an officer at two of the SAAR network businesses that were raided, the MWL and SANABEL AL-KHEER. Defendant ABDULLAH OMAR AL OBAID is unique in that, not only is he an officer at the MWL and the SAAR Network, but he is also the Deputy General Manager at one of the AL RAJHI's largest businesses, AL-WATANIA POULTRY in Saudi Arabia. AL-WATANIA POULTRY has branches worldwide and in the United States.

## AL RASHID TRUST

529.    The AL RASHID TRUST  was established in Pakistan in 1996 at the time the TALIBAN took control in Afghanistan.  The trust was established by MUFTI MOHAMMED RASHID (a/k/a Rashid) to carry out welfare projects from fundraising in the Pakistani Muslim Community.  The AL RASHID TRUST changed its name to THE AID ORGANIZATION OF THE ULEMA (AOU) following September 11, 2001.  This organization remains active and headquartered in Pakistan where it operates offices.  Upon information and belief, the Trust provides financial aid to jailed Muslim terrorists around the world and is closely aligned to the TALIBAN and BIN LADEN.  The AL RASHID TRUST has been raising funds for the TALIBAN since 1999.  The Trust helped fund radio, newsprint and madrassas (schools) that teach a view of Islam that is anti-western and

274

endorses violence and martyrdom in the name of Allah. The Trust provided money and logistical support to the TALIBAN and AL QAEDA and has had its assets frozen. Upon information and belief, the group conspired with AL QAEDA and Pakistani terrorists to kidnap, torture and murder Wall Street Journal reporter Daniel Pearl, holding him hostage in a two room hut in the AL RASHID compound.

## THE MUSLIM BROTHERHOOD

530.    The MUSLIM BROTHERHOOD was founded in Egypt in 1928 to promote radical Islam. It was crushed by the Egyptian government causing its members to seek refuge in other countries in the Middle East and elsewhere with a majority going to Saudi Arabia where they were welcomed. Today, there are numerous branches of the Brotherhood in several countries. The association is an umbrella organization which supports and sponsors AL QAEDA and other Islamic terror groups both before and after September 11, 2001.

531.    Defendant  SHEIKH YUSUF AL QARDAWI has long been a member of the MUSLIM BROTHERHOOD.  QARDAWI has issued two fatwas regarding the use of violence.  In one he declares suicide bombing to be the highest form of jihad and endorses the abduction of civilians as a legitimate military tactic.

532.    The late Ben Moustafa Nada who helped finance and structure the MUSLIM BROTHERHOOD after fleeing Egypt.  He created ASAT TRUST in 1970 in Liechtenstein

275

to finance the MUSLIM BROTHERHOOD's objectives by opening several entities under ASAT TRUST's direction and control. AHMED IDRIS NASSREDDIN an Ethiopian banker who went on to join YOUSEF NADA in many business enterprises under ASAT TRUST was already doing business in Liechtenstein. YOUSEF NADA employed a cadre of accountants and lawyers including Liechtenstein residents, Erwin and Martin Wachter, Engelbert Schreiber Sr. and Englebert Schreiber Jr., to create and operate sophisticated funding mechanisms.

533.    Over the years ASAT added dozens of companies, foundations, Islamic religious groups and financial institutions with offices located around the world. ASAT TRUST became a global network of financial, religious, business and charitable institutions for the MUSLIM BROTHERHOOD. This structure however, also financed extremist Islamic organizations, including OSAMA BIN LADEN and AL QAEDA and moved and laundered funds for Islamic terrorist activities.

534.    BANK AL TAQWA is an ASAT TRUST company founded by NADA and NASREDDIN.  Its other principals are: ALI G. HIMMAT, AHMED HUBER, YUSUF AL QARDAWI.  Its main office is 10 Deveux Street, PO Box 4877, Nassau Bahamas. An affiliated company at Viale S. Franscini 22 in Lugano, Switzerland, is known as AL TAQWA MANAGEMENT ORGANIZATION. BANK AL TAQWA shares an address with AKIDA ISLAMIC BANK and AKIDA COMMODITY LIMITED both based in the Bahamas. WAMY founder, defendant AHMED TOTONJI, was also a founder of GULF

276

CENTER in Milan along with NASREDDIN.

535.    YUSUF AL QARDAWI is a major shareholder of BANK AL TAQWA and sits on its Islamic Legal Control Committee.

536.    AHMED HUBER has publicly expressed support for AL QAEDA, has acknowledged that he met with members of OSAMA BIN LADEN's terrorist network in Lebanon and claims he funneled money from wealthy Saudi families to the AL TAQWA BANK.  In 1996 and 1997, Italian authorities with assistance from Switzerland first began investigating AL TAQWA BANK and NADA links to terrorists.

537.    Two executives of SAAR, defendants SAMIR SALAH and IBRAHIM HASSABELLA were at one time executives at BANK AL TAQWA.  Defendants JAMAL BARZINJI AND HISHAM AL TALIB worked for NADA (*infra*), the head of BANK AL TAQWA. SULAIMAN AL RAJHI was on the Board of Directors at AKIDA BANK in the Bahamas.

538.    Defendant BAKR MUHAMAD BIN LADEN and his brother, Ghalib M. Bin Laden, brothers of defendant OSAMA BIN LADEN were investors and account holders in BANK AL TAWQA. Ghalib Bin Laden made an original deposit of $1 million U.S. in BANK AL TAQWA. After September 11, 2001 AL TAQWA MANAGEMENT ORGANIZATION changed is name to the NADA MANAGEMENT ORGANIZATION, SA.  AL TAQWA and the NASREDDIN GROUP, as well as their four principles - NADA, HIMMAT, HUBER and NASREDDIN, have had their assets frozen and are believed by

the U.S. Department of Justice to be co-conspirators of AL QAEDA. The United Nations has listed them as individuals belonging to or associated with the AL QAEDA organization.

539.   HIMMAT, HUBER, MANSOUR, ZEINAB MANSOUR-FATTOUH, AHMED ALI JUMALE, AL QARDAWI, NASREDDIN and NADA are aiders, abettors, material sponsors and/or co-conspirators of international terrorism, including AL QAEDA and the attacks of September 11, 2001.

540.   The entities named here operate with or under the umbrella of the Liechtenstein-based ASAT TRUST. AKIDA BANK PRIVATE LIMITED a/k/a AKIDA ISLAMIC BANK, INTERNATIONAL LIMITED a/k/a IKSIR INTERNATIONAL BANK LIMITED, AKIDA COMMODITY LIMITED, AKIDA INVESTMENT COMPANY LIMITED, AKIDA MANAGEMENT AND TRUST a/k/a/ AKIDA ISLAMIC BANKERS' TRUSTEE AND MANAGEMENT, , AL TAQWA TRADE PROPERTY AND INDUSTRY COMPANY LIMITED, a/k/a AL TAQWA TRADE PROPERTY AND INDUSTRY ESTABLISHMENT, a/k/a HIMMAT ESTABLISHMENT, AL TAQWA ZAKA ESTABLISHMENT, ASAT TRUST REGISTERED, BA TAQWA FOR COMMERCE AND REAL ESTATE COMPANY LIMITED, a/k/a BA TAQWA FOR COMMERCE AND REAL ESTATE ESTABLISHMENT, a/k/a BEN M. NADA ESTABLSIHMENT, a/k/a YOUSEF M. NADA ESTABLISHMENT, BANK AL TAQWA LIMITED, a/k/a AL TAQWA BANK, CEMSTEEL IMPEX ESTABLSIHMENT, GULF CENTER S.R.L, IKSIR LIMITED HOLDING, MIGA – MALAYSIAN SWISS, GULF

278

AND AFRICAN CHAMBER, a/k/a CAMERA DI COMMERCIO, INDUSTRIA E TURISMO PER GLI STATI ARABI DEL GOLFO E LA SVIZZERA, NADA INTERNATIONAL ANSTALT, a/k/a NADA GROUP INTERNATIONAL ANSTALT, NADA MANAGEMENT ORGANIZATION SA, a/k/a AL TAQWA MANAGEMENT ORGANIZATION, NASCO BUSINESS RESIDENCE CENTER SAS DI NASREDDIN AHMED IDRIS EC, NASCO NASREDDIN HOLDING SA, NASCOSERVICE S.R.L, NASCOTEX S.A., a/k/a INDUSTRIE GENERALE DE FILATURE ET TISSAGE, A/K/A INDUSTRIE GENERALE DE TEXTILE, NASREDDIN CHARITABLE FOUNDATION, NASREDDIN COMPANY NASCO SAS DI AHMED IDRIS NASREDDIN EC NASREDDIN FOUNDATION, a/k/a NASREDDIN STIFTUNG, NASREDDIN GROUP INTERNATIONAL HOLDING LIMITED, NASREDDIN INTERNATIONAL GROUP, LIMITED HOLDING a/k/a MIDDLE EAST AND TURKEY INVESTMENT HOLDING LIMITED, RAW MAT SERVICE AND MANAGEMENT SA, YOUSEF M. NADA ESTABLISHMENT, a/k/a YOUSEF M. NADA ANSTALT, YOUSEF M. NADA & CO. GESELLSCHAFT MBH. All are participants or associated with ASAT TRUST's activities and operations, which knowingly facilitate and support Al Qaeda's financial network for terror activities.

## SAUDI BIN LADEN GROUP

541.   THE SAUDI BIN LADEN GROUP (or "SBG"), also known as the BIN LADEN CORPORATION, is an expansive global conglomerate.

542.     THE SAUDI BIN LADEN GROUP's website details its history in the following manner:

> *The history of bin Laden began in 1931 when Mohammed bin Laden founded the company. From its humble beginnings as a general contractor, the company has grown and prospered in parallel with the growth and prosperity of the Kingdom of Saudi Arabia. Over the years the company has been entrusted with many major construction projects, projects that helped the Kingdom to develop its resources and expand its infrastructure.*

543.     THE SAUDI BIN LADEN GROUP is based in Jeddah, Saudi Arabia.  The group founded in 1931, is a privately held company wholly owned by the descendants of Mohammed Awad Bin Laden, father of OSAMA BIN LADEN. The international conglomerate is active in the areas of construction, engineering, real estate, distribution, telecommunications and publishing. Construction accounts for more than half of SBG's gross revenue.

544.     SBG or its predecessor in interest, was the first private contractor in Saudi Arabia. SBG's status as an organization makes it exempt from publishing its financial records.  For several years, it was the official and exclusive contractor of the holy sites of Mecca and Medina.

545.     SAUDI BIN LADEN GROUP is run by BAKR M BIN LADEN, son of Mohammed Bin Laden .  Family member Salem Bin Laden ran the group until his accidental death in 1998. SBG's board of directors include SALEH GAZAZ, MOHAMMED BAHARETH, ABDULLAH BIN SAID, MOHAMMED NUR RAHIMI, and TAREK M. BIN LADEN.  Until recently, the SAUDI BIN LADEN GROUP had an address in Rockville, Maryland.

546.     OSAMA BIN LADEN used SBG support and assistance to build necessary

infrastructure in Afghanistan as he did in SUDAN.  In the introduction of his Declaration of War against the Americans in 1996, OSAMA BIN LADEN admitted this family support:

> *Then in 1979, just after he graduated from King Abdul Aziz University in Afghanistan, and the Mujahideen put out an international plea for help,  Usama bin Laden responded by packing himself and several of his family's bulldozers off to Afghanistan.*

547.    The SAUDI BIN LADEN GROUP provided material support and financing to OSAMA BIN LADEN in Afghanistan, as reported by the United States State Department:

> *Under Al Qaeda auspices, Bin Laden imported bulldozers and other heavy equipment to cut roads, tunnels, hospitals, and storage depots Afghanistan's mountainous terrain to move and shelter fighters and supplies.*

> His [Osama Bin Laden's] father backed the Afghan struggle and helped fund it, so when Bin Laden decided to join up, his family responded enthusiastically.

548.    After the Soviets withdrew from Afghanistan in 1989, OSAMA BIN LADEN returned to work in the SAUDI BIN LADEN GROUP's Jeddah-based construction business.  He continued to support militant Islamic Groups until his departure to SUDAN 1991.  After his relocation to SUDAN the same year, OSAMA BIN LADEN maintained close relationships with the SAUDI BIN LADEN GROUP and they remained his sponsor.

> *The relationships between Osama Bin Laden and his family continued, despite claims to the contrary. Dr. Saad Al Fagih, Saudi dissident living in London, and former Afghan combatant, who kept close relationship with Osama Bin Laden for many years, stated in 1994: There's a very interesting thing in Islamic structure of the family: you are obliged to support your family members. Even if they are distant members. If it's a cousin or a niece or a nephew, especially a brother, you have to support them if you are a capable person. And the people feel sinful if they don't let this money go to*

281

*its real owner, in this case, Osama Bin Laden.*

549.     The notion that OSAMA BIN LADEN had been somehow "disowned" by the BIN LADEN's family is not supported by the facts or by the realities of Islamic culture.  In a 1997 interview, OSAMA BIN LADEN revealed that on nine different occasions, his mother, uncle and brothers had visited him in Khartoum in Sudan even though he had been exiled.  The SAUDI BIN LADEN GROUP provided OSAMA BIN LADEN financial assistance and engineering support in Sudanese construction projects.   Various sources confirmed that the Sudanese construction company set up by OSAMA BIN LADEN, AL-HIJRA FOR CONSTRUCTION AND DEVELOPMENT, was a subsidiary of the SAUDI BIN LADEN GROUP. This information is confirmed by an Intelligence Newsletter:

> *These are Wadi al Aqiq, an agricultural company with an investment arm; Al Timar Al Mubarikah, a sugar concern; Al Hijra a building and public works company . . . an affiliate of the powerful Saudi group headed Bin Laden's father.*

550.     In SUDAN, OSAMA BIN LADEN participated in the construction of the Tahaddi road and the Port Sudan Airport.  The SAUDI BIN LADEN GROUP provided support and contributions to these public works through two subsidiaries.  The Public Buildings and Airports Division of the SAUDI BIN LADEN GROUP participated in the construction of the Port Sudan Airport, and the MOHAMED BIN LADEN ORGANIZATION (of SBG) provided technical assistance on the road construction in the Sudan with OSAMA BIN LADEN.  The SAUDI BIN LADEN GROUP confirmed publicly these two collaborations:

> *Over the years the Division has undertaken various challenging projects, large and medium scale, including complete airports and*

282

> *roads. . . . The projects executed include . . . Port Sudan Airport.*
> *SBG's skills . . . has been recognised and utilized in the United Arab*
> *Emirates, Jordan, Yemen and Sudan.*

551.     The agreement for the construction of an airport in Port Sudan was between the

Sudanese Government and the SAUDI BIN LADEN INTERNATIONAL COMPANY.  In 1993,

OSAMA BIN LADEN stated that he was involved in the construction of the road linking Khartoum

to Port Sudan with some of former Afghan fighters who became part of AL QAEDA.

552.     Relationships between the three entities: OSAMA BIN LADEN, the Republic of

SUDAN, and the SAUDI BIN LADEN GROUP were stressed during the inauguration ceremony

of the Port Sudan airport:

> *Meanwhile, Osama Bin Laden, was the first guest invited to attend*
> *the inauguration of the new Port Sudan Airport. He sat in the front*
> *row and was the guest of honor in this ceremony. It was a group of*
> *Bin Laden's companies that carried out the project of the new and*
> *modern airport that cost huge amounts of money.*

553.     Moreover, while OSAMA BIN LADEN was constructing the Tahaddi Road with

SAUDI BIN LADEN GROUP's technical assistance, his own company, AL-HIJRA, was headed

by Muslim activists. The testimony of Jamal Ahmed Al Fadl during the 2001 trial of the 1998

African Embassy Bombings further revealed the nature of AL-HIJRA executives in SUDAN:

> Q.     Do you know who ran the Al-Hijra Company while it was
> in the Sudan?
> A.     At the time, few people. The first one Dr. Sharif al Din Ali-
> Mukhtar.
> Q.     Who else?
> A.     Abu Hassan al Sudani, and Abu Hamman Al Saudi, Abu

Rida Suri and Abu Hajer.

554.    Other AL-HIJRA agents, officers, or executives were directly involved in AL QAEDA and terrorist operations. MAMDOUH MAHMUD SALIM, an AL QAEDA co-conspirator, was on the AL-HIJRA board of directors and is a founding member of AL QAEDA.

555.    The SAUDI BIN LADEN GROUP sheltered and directly supported operatives of the AL QAEDA terrorist organization.  MOHAMMAD JAMAL KHALIFA is a key figure in the network of OSAMA BIN LADEN and has been implicated as a central AL QAEDA figure in several international terrorist plots. Yet KHALIFA was taken in by a branch of SAUDI BIN LADEN GROUP, the MOHAMMED BIN LADEN ORGANIZATION, headed by OSAMA BIN LADEN's brothers.  The address listed on KHALIFA's visa application was the MOHAMMED BIN LADEN ORGANIZATION in Jeddah, Saudi Arabia.

556.    The MOHAMMED BIN LADEN ORGANIZATION is a wholly-owned subsidiary of the SAUDI BIN LADEN GROUP.  The board members include SALEH GAZAZ, MOHAMED BAHARETH, ABDULLAH BIN SAID, MOHAMED NUR RAHIMI, BAKR M. BIN LADEN, TAREK M. BIN LADEN, OMAR M. BIN LADEN, and YESLAM M. BIN LADEN.

.    In the early 1990s, TAREK BIN LADEN served as the general supervisor of the IIRO, a charity that has aided and abetted and materially supported AL QAEDA and international terrorism (*supra*).   During this time, IIRO was rapidly becoming AL QAEDA's foremost charity used as a means to transfer funds, personnel, and other means of material support.  The CIA reported:

> The former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, has been linked to Manila-based plots to target the pope and U.S. airlines; his brother-in-law is Osama Bin Laden.

And

*The IIRO helps fund six militant training camps in Afghanistan.*

557.   According to an Arabic publication, TAREK BIN LADEN had a prominent role in 1990 at the IIRO:

> *Tarek bin Laden has been a member of the IIRO in MWL for ten years.  He has been working quietly for the orphans and the immigrants in the Islamic world. In the past two years the operation of IIRO has grown thanks to the support of the Saudi Royal family. Tarek says that the IIRO relies on donations of the Saudi people and some donations from the Islamic world.*

558.   OSAMA BIN LADEN's name is still listed in the SAUDI BIN LADEN GROUP's corporate records.

YESLAM M. BIN LADEN heads the Saudi Investment Company (SICO) in Geneva, a successor to Cygnet SA, and part of the SAUDI BIN LADEN GROUP. YESLAM BIN LADEN and his Geneva attorney Baudoin Dunand who is also on SICO's board of directors, created SICO.

## AL-RAJHI BANK

559.   Officially founded in 1987, Defendant AL-RAJHI BANKING & INVESTMENT CORPORATION, (or "AL-RAJHI BANK") has a network of nearly 400 branch offices throughout Saudi Arabia and manages seventeen subsidiaries across the world.  Defendant SULAIMAN ABDULLAHZIZ AL RAJHI is the Managing Director of AL-RAJHI BANKING & INVESTMENT CORPORATION and Defendant SALEH ABDULLAHZIZ AL RAJHI is the Chairman.

285

560.     The AL-RAJHI BANKING & INVESTMENT CORPORATION is the primary

bank for a number of charities that serve as AL QAEDA supporters. AL-HARAMAIN ISLAMIC

FOUNDATION, THE MUSLIM WORLD LEAGUE ("MWL"), and the IIRO all funnel terrorism

financing and support through the AL-RAJHI BANKING & INVESTMENT CORPORATION

financial system.  One of the American Airlines Flight 11 hijackers, ABDULLAHZIZ AL OMARI,

held an account with AL-RAJHI BANKING & INVESTMENT CORPORATION.

561.     Defendant SULAIMAN ABDUL AZIZ AL RAJHI has a history of financially

supporting AL QAEDA terrorists. SULAIMAN ABDUL AZIZ AL RAJHI managed the defendant

NATIONAL COMMERCIAL BANK (*infra)* budget of the SAUDI JOINT RELIEF COMMITTEE.

The AL RAJHI family is also the primary financier of the SAAR FOUNDATION  (*infra)* and, as

such, is implicated by the SAAR Network's sponsorship of terrorism and OSAMA BIN LADEN.

 SALEH ABDULLAHZIZ AL RAJHI has been closely linked to OSAMA BIN LADEN's personal

secretary and convicted terrorist, WADIH EL HAGE.  When the Kenyan house of OSAMA BIN

LADEN's personal secretary, WADIH EL HAGE, was raided in 1997, information regarding

SALEH ABDULLAHZIZ AL RAJHI was discovered.  WADIH EL HAGE is an AL QAEDA

member who was convicted for the 1998 United States Embassy bombings in Kenya and Tanzania.

562.     Co-conspirators, agents, aiders and abettors of the AL RAJHI banking

scheme to fund or otherwise materially support terrorism include:  SULAIMAN ABDUL

AZIZ AL RAJHI, SALEH AL RAJHI, ABDULLAH SULAIMAN AL RAJHI, and

KHALID SULAIMAN AL RAJHI.  All of these Defendants do business in and have a

286

significant business presence in the United States, including but not limited to, through AL-WATANIA POULTRY, one of the World's largest poultry businesses, and through Defendants MAR-JAC POULTRY, INC., MAR-JAC INVESTMENTS, INC. and PIEDMONT POULTRY.   They are also material sponsors of international terrorism.

## NATIONAL COMMERCIAL BANK AND BIN MAHFOUZ

563.   The defendant NATIONAL COMMERCIAL BANK (or "NCB") was founded in 1950 by SALIM BIN MAHFOUZ.  Defendant KHALID BIN SALIM BIN MAHFOUZ was born in Hadramaut, Yemen, on September 12, 1928.  Bin Mahfouz says he is only 53 years old. KHALID BIN SALIM BIN MAHFOUZ is the son of SALIM BIN MAHFOUZ, who emigrated to Saudi Arabia in or about 1930.   The NATIONAL COMMERCIAL BANK ("NCB") was the first commercial bank of Saudi Arabia, based in Jeddah. After SALIM BIN MAHFOUZ's death in 1986, his son KHALID   became President and CEO of the NATIONAL COMMERCIAL BANK and remained in that position until 1999, becoming its principal shareholder with control over more than 50% of the bank's capital.  The NCB has several wholly-owned subsidiaries, including SNCB CORPORATE FINANCE LTD. in London, SNCB SECURITIES LTD. in London, and SNCB SECURITIES LTD. in New York City through which it operates an international banking enterprise.

564.   The NATIONAL COMMERCIAL BANK was implicated between 1986 and 1990 in the fraudulent schemes and practices of the Bank of Credit and Commerce

287

International (or "BCCI" scandal).   NCB Chairman KHALID BIN SALIM BIN MAHFOUZ became Chief Operating Officer and major shareholder of BCCI.   A 1992 United States Senate Report on the BCCI scheme detailed the role of NCB in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism.   The NCB was used by OSAMA BIN LADEN and AL QAEDA as a financial arm, operating as a financial conduit for OSAMA BIN LADEN's operations. As a former CIA counter-terrorism expert explained in October 2001:

> *How does the Al Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Much of the money is paid as 'protection' to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism. Now, it appears, that these wealthy individuals are siphoning off funds from their worldwide enterprises in creative and imaginative ways.*

565.   The BIN MAHFOUZ family businesses are organized through a series of "holding" companies, including a conglomerate, SAUDI ECONOMIC AND DEVELOPMENT COMPANY LLC (SEDCO), founded in 1976 and based in Jeddah, and a petroleum company which is chaired by KHALID BIN MAHFOUZ's son.

566.   Between 1986 and 1990, KHALID BIN SALIM BIN MAHFOUZ was Chief Operating Officer of the Bank of Credit and Commerce International (BCCI).   After several fraudulent practices were discovered, KHALID BIN SALIM BIN MAHFOUZ was indicted

288

on July 1, 1992, on charges of participation in a Scheme to Defraud in the First Degree in

violation of New York Penal Law § 190.65, in connection with certain acts and omissions

relative to BCCI Holdings and certain related entities.  The indictment alleged a series of

misrepresentations,  sham loans, and fraudulent conduct in failing to disclose the status of

his interest in BCCI.

567.    Under KHALID BIN SALIM BIN MAHFOUZ,  BCCI was also implicated

in supporting international terrorism, as reported by the United States Senate:

> *In the course of targeting BCCI for laundering drug money,*
> *the CIA learned of BCCI's involvement in manipulating*
> *certain financial markets, in arms trafficking, and in*
> *supporting international terrorism, including handling the*
> *finances of Sabri al Bannah or Abu Nidal, and his terrorist*
> *organization.*

568.    The 1992 Senate investigative Report detailed the initial involvement of

BCCI in terrorism financial supporting terrorism:

> *BCCI's support of terrorism and arms trafficking developed*
> *out of several factors. First, as a principal financial*
> *institution for a number of Gulf sheikhdoms, with branches*
> *all over the world, it was a logical choice for terrorist*
> *organizations, who received payment at BCCI-London and*
> *other branches directly from Gulf-state patrons, and then*
> *transferred those funds wherever they wished without*
> *apparent scrutiny. Secondly,  BCCI's flexibility regarding*
> *the falsification of documentation was helpful for such*
> *activities. Finally, to the extent that pragmatic*
> *considerations were not sufficient of themselves to*
> *recommend BCCI, the bank's pan-third  world and pro-*
> *Islam ideology would have recommended it to Arab terrorist*
> *groups.*

569.    A bank audit of the defendant NATIONAL  COMMERCIAL  BANK

289

conducted in 1998 revealed that over a 10 year period $74 million dollars was funneled by its Zakat Committee to the IIRO, headed by OSAMA BIN LADEN's brother-in-law.

570.    The defendant NCB audit report also stressed various irregularities due to "unreported expenses and loans."  It states that "without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with banking facilities that were not reviewed by the Committee."  Direct donations were received through NCB facilities to the Red Crescent Saudi Committee, IIRO and the MUWAFFAQ Foundation.  NATIONAL COMMERCIAL BANK, its agents and employees knew or should have known they were materially sponsoring, aiding and abetting AL QAEDA, OSAMA BIN LADEN, and international terrorism.

571.    The NCB audit report reflects a $3 million dollar transfer to MUWAFFAQ-BLESSED RELIEF FOUNDATION.  KHALID BIN SALIM BIN MAHFOUZ was dismissed from the NCB in 1999 soon after the release of the bank's audit report and placed under house arrest.  Former CIA Director James Woolsey testified before the Senate Judiciary Committee that, along with the financial ties to and support of OSAMA BIN LADEN, KHALID BIN SALIM BIN MAHFOUZ was OSAMA BIN LADEN's brother-in-law by virtue of BIN LADEN's marriage to bin MAHFOUZ's sister Kaleda. KHALED BIN MAHFOUZ set up various charity organizations around the world since 1991.  Every one of these foundations were linked to AL QAEDA and involved in the financing and

material sponsorship of OSAMA BIN LADEN's international terrorist operations.

572.    KHALED BIN MAHFOUZ is linked to BIN LADEN through several financial and charitable organizations, including, INTERNATIONAL DEVELOPMENT FOUNDATION, SAUDI SUDANESE BANK and AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY and NATIONAL COMMERCIAL BANK.

573.    The BIN MAHFOUZ family controlled the NATIONAL COMMERCIAL BANK in Saudi Arabia, until 1999 when the Saudi Government bought the majority of its ownership.  Upon information and belief that bank has financed the operations of BIN LADEN and reports from Saudi Arabia's NATIONAL COMMERCIAL BANK show that in 1998 MUWAFFAQ provided BIN LADEN with $3 million.

574.    MOHAMMED SALIM BIN MAHFOUZ (Khaled's brother) is the founder of SAUDI SUDANESE BANK in Khartoum, Sudan, which in the early 1990s, shared an address in the SUDAN with the INTERNATIONAL ISLAMIC RELIEF ORGANIZATION (IIRO), which upon information and belief was a recruiting facility for AL QAEDA .  The London IIRO branch shares an address with the INTERNATIONAL DEVELOPMENT FOUNDATION, an organization also believed to be designed to support activities of BIN LADEN and also established by MOHAMMED SALIM BIN MAHFOUZ.

575.    ABDULRAHMAN KHALED BIN MAHFOUZ (son of KHALED) served on the board of directors of MUWAFFAQ FOUNDATION.

291

576.     SALEH SALIM BIN MAHFOUZ managed the AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY, upon information and belief, a company directly linked to BIN LADEN.

577.     Upon information and belief, KHALED BIN MAHFOUZ, is also linked to the SAAR FOUNDATION and its related charities. Offices of the SAAR FOUNDATION, a Saudi financed entity in Herndon, Virginia were searched by Treasury Department investigators in March 2002. SAAR shares a mailing addresses with many Islamic organizations with overlapping offices, donors, directors and significantly, overlapping goals.  Many of the organizations whose offices were searched along with SAAR, have been listed by the U.S. Treasury Department as having links to BIN LADEN or sponsoring terrorism.

578.     JAMAL AL BARZINJI, of WORLD ASSEMBLY OF MUSLIM YOUTH ("WAMY") with an office in Herndon, Virginia was also a target of the Treasury Department raids. The president of WAMY was ABDULLAH BIN LADEN, younger brother to OSAMA BIN LADEN.  The U.S. Government has frozen the assets of WAMY and BARZINJI because of their role in funneling money to AL QAEDA .

579. SAAR provided the bulk of the operating expenses of the INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT ("IIIT") which in turn financed to two Florida charitable organizations accused of being cells for Islamic Jihad in Florida.

## DAR AL MAAL AL ISLAMI

580.    DAR AL MAAL AL ISLAMI (or "House of Islamic Money" or "DMI") is the registered name for DMI ADMINISTRATIVE SERVICES SA. The company is headquartered in Cointrin, Switzerland.  DMI ADMINISTRATIVE SERVICES SA replaced DAR AL MAAL AL ISLAMI on February 5, 2002, and is its successor in interest. DMI activities started July 29, 1981.  Until 1983, DMI was operated under M. Ibrahim Kamel's chairmanship.  On October 17, 1983, PRINCE MOHAMMED AL FAISAL AL SAUD became CEO.   Under PRINCE MOHAMMED AL FAISAL AL SAUD's chairmanship, DMI developed banking, investment and insurance activities in approximately twenty offices around the world. DMI operates broadly in Islamic countries, and investments are conducted strictly under Islamic rules.  DMI's actions and breach of duty have aided, abetted and provided material sponsorship of the spread of international terrorism and AL QAEDA:

> *The $3.5 billion DMI Trust, whose slogan is "Allah is the purveyor of success," was founded 20 years ago to foster the spread of Islamic banking across the Muslim world. Its 12-member board of directors includes Haydar Mohamed bin Laden, a half-brother of Osama Bin Laden.*

581.    DMI is currently chaired by ABDULKARIM KHALED YUSUF ABDULLA who replaced PRINCE MOHAMED AL FAISAL AL SAUD in early 2002. DMI has involved itself in AL QAEDA financing through several of its subsidiaries, including but not limited to, ISLAMIC INVESTMENT COMPANY OF THE GULF,

FAISAL ISLAMIC BANK, TADAMON ISLAMIC BANK, and AL SHAMAL ISLAMIC

BANK in the Sudan.

582.   DMI owns 100% of ISLAMIC INVESTMENT COMPANY OF THE

GULF.   PRINCE MOHAMED chairs ISLAMIC INVESTMENT COMPANY OF THE

GULF. OSAMA BIN LADEN's brother, HAYDAR MOHAMED BIN LADEN, was a

director of the company.   ISLAMIC INVESTMENT COMPANY OF THE GULF

(Bahrain) EC is the main shareholder of FAISAL ISLAMIC BANK OF SUDAN, chaired

by PRINCE MOHAMED.

## AL BARAKA INVESTMENT AND DEVELOPMENT CORP.

583.   AL BARAKA INVESTMENT & DEVELOPMENT CORPORATION (or

"AL BARAKA"), a wholly owned subsidiary of DALLAH ALBARAKA GROUP LLC (or

"DALLAH ALBARAKA"), is based in Jeddah, Saudi Arabia. Its investments include 43

subsidiaries, mainly banks in Arab and Islamic countries.   Most of them are known as or

registered as "al Baraka Bank." United States assets include AL BARAKA  Bancorp Inc.

in Chicago, Illinois, and AL BARAKA  Bancorp Inc. in Houston, Texas.

584.   A memo from the Russia Federation's Security Service details the AL

BARAKA  Bank's role in funding Defendant AL-HARAMAIN:

> *On existing knowledge, part of the obtained financing comes*
> *from the charitable collections (Zakat) and goes to the*
> *personal foreign accounts of field commanders, including*
> *Khattab and Basayef.*

585.   AL BARAKA   provided OSAMA BIN LADEN with financial infrastructures in SUDAN beginning in 1983.  For example, the use of AL BARAKA Bank by AL-HARAMAIN was confirmed by a statement from AL-HARAMAIN chairman, AQUEEL AL AQUEEL, who declared that the charity maintained accounts at AL BARAKA  Bank in Saudi Arabia.

586.   AL BARAKA INVESTMENT & DEVELOPMENT is present in the Sudanese banking sector, through assets held in Algharb Islamic Bank, AL SHAMAL ISLAMIC BANK, FAISAL ISLAMIC BANK, SUDANESE ISLAMIC BANK and TADAMON ISLAMIC BANK.   AL BARAKA   is also affiliated with the National Development Bank in SUDAN.

587.   Defendant SALEH ABDULLAH KAMEL was born in Makkah, Saudi Arabia, in 1941.  After being the adviser to the Saudi Minister of Finance, in 1969 he founded DALLAH ALBARAKA GROUP LLC, quickly establishing himself as one of the leading promoters of an Islamic financial and banking system capable of rivaling large Western institutions.

588.   DALLAH ALBARAKA GROUP LLC, a diversified conglomerate based in Jeddah, Saudi Arabia, is involved in various industries, services and financial activities. The group includes twenty-three banks in Arab and Islamic countries, in addition to several investment and financial companies.

589.   DALLAH ALBARAKA GROUP LLC's portfolio includes a wholly owned

subsidiary specializing in aviation-services, DALLAH AVCO TRANS-ARABIA CO LTD. The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

590.    OMAR AL BAYOUMI, a Saudi national, was Assistant to the Director of Finance for an AL BARAKA company, DALLAH AVCO, a position he gave as a reference in an application for admission to Case Western Reserve University in Cleveland, Ohio in 1998.

591.    On May 5, 1998, OMAR AL BAYOUMI registered a fictitious company name called Masjed al Madinah al Munawarah (a/k/a Masjid al Madinah al Munawarah) based in San Diego, California.  In March 25, 1999 a mosque was registered in the State of Pennsylvania under the name of Masjid al Madinah al Munawarah, Inc.

592.    Two of the hijackers on September 11, 2001, of American Airlines Flight 77, NAWAF AL HAZMI and KHALID AL MIHDHAR, received funding from OMAR AL BAYOUMI who paid their house rent in San Diego. OMAR AL BAYOUMI is listed as a suspect wanted by the FBI in connection with the September 11, 2001 attacks.

593.    DALLAH ALBARAKA GROUP LLC's financial arm is AL BARAKA Investment & Development (or "ABID"), a wholly owned subsidiary based in Jeddah, Saudi Arabia.

594.    SALEH ABDULLAH KAMEL, Chairman of DALLAH AL BARAKA and AL BARAKA Bank, was one of the three founding members of AL SHAMAL ISLAMIC BANK. SALEH ABDULLAH KAMEL founded the bank in 1983, along with a Sudanese

company, AL SHAMAL INVESTMENT AND DEVELOPMENT, and the GOVERNMENT OF NORTHERN STATE, then controlled by Governor MUTASIN ABDEL-RAHIM, representative of HASSAN AL TURABI.

595.    The practice and policy of DALLAH ALBARAKA GROUP LLC and AL BARAKA  Bank is to provide financial support and material assistance to international terrorist organizations including AL QAEDA.

596.    In 1998, AL AQSA ISLAMIC BANK was established with $20 million in capital.  The main shareholders were DALLAH AL BARAKA  GROUP LLC and the Jordan Islamic Bank. Jordan Islamic Bank, a DALLAH AL-BARAKA LLC subsidiary, owns 14 percent of AL-AQSA ISLAMIC BANK.  SALEH ABDULLAH KAMEL acknowledged that DALLAH AL-BARAKA Group LLC owns another twelve percent directly.

597.    Since 1998, Israel has refused to approve the bank, citing its obvious ties with known terrorists. At the beginning of 2001, several antiterrorist authorities from Israel visited Citibank's headquarters in New York to warn its directors of the nature of the bank's activities with respect to international terrorism.

598.    AL BARAKA provided support to the "charity" AL-HARAMAIN operations and helped transfer funds for OSAMA BIN LADEN operations, as reported by the Bosnian Intelligence Agency (Agency for Investigation and Documentation – AID) in a memorandum titled "Some illegal activities of humanitarian organizations investigated

297

by the relevant investigative bodies of the Federation of Bosnia Herzegovina (FbiH)":

> *Records available for 1998 show a flow of money into the so-called "operating" account of the HO [Humanitarian Organization] at the Deposit Bank, Sarajevo, from the "main" account, sent from Saudi Arabia via the Deutsche Bank and the Albaraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million].*

599.    Al Baraka Turkish Finance House, an AL BARAKA  branch in Turkey, is

a subsidiary of DALLAH AL BARAKA  Group LLC.

600.    A Bosnian Intelligence memo regarding the activities of AL-HARAMAIN

states the following:

> *Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover . . .*

601.    The report establishes AL-HARAMAIN's role in financing and assisting

OSAMA BIN LADEN's operations.

> *[t]he Saudi HO [Humanitarian Organization] al-Haramain, . . . has acted as a channel for financing the activities of terrorist organizations. . . . According to available intelligence, the Sarajevo office assisted the terrorist organization Gama al Islamija, while members of bin Laden's el Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.*

## **AL-BARAKAAT AND JUMALE**

602.    The AL-BARAKAT GROUP OF COMPANIES SOMALIA LIMITED and

298

BARAKAAT GROUP OF COMPANIES (BARAKAAT) encompass a money transfer network with operations in 40 countries. These companies were founded in 1989 by SHEIKH AHMED NUR ALI JUMALE, who controls the activities of the BARAKAAT. Defendant BIN LADEN a friend of JUMALE's from the Afghanistan-Soviet war made a significant investment in BARAKAAT. United States Under Secretary for International Affairs John B. Taylor has described BARAKAAT as a premier financial transfer system for AL QAEDA:

> The founder of the organization, Sheikh Ahmed Nur Ali Jumale has close links with Usama bin Laden and has used al Barakaat to facilitate the financing and operations of Al Qaida and other terrorist organizations.

Treasury Secretary O'Neill corroborated BARAKAAT funding of AL QAEDA:

> The al Barakaat companies are the money movers, the quartermasters of terror. At core, it is a hawala conglomerate operating in 40 countries around the world with business ventures in telecommunications, construction, and currency exchange. They are a principal source of funding, intelligence and money transfers for bin Laden.

Defendant JUMALE was able to penetrate the United States banking system using his BARAKAAT companies. Upon information and belief, during the 1990s and in 2000 and 2001, the BARAKAAT financial network moved over $300-$400 million per year in its worldwide network, an estimated $15 to $20 million is believed to have gone to AL QAEDA. BARAKAAT also donated a portion of its commissions to AL QAEDA. From 1979 to 1986, JUMALE worked in Jeddah, Saudi Arabia as a senior employee of the

299

SAUDI AMERICAN BANK.  The bank was founded by Citibank, which owned 40% of it at the time he worked there.  The United States government designated BARAKAAT and its branches as terrorist entities on November 7, 2001, and froze the organization's assets. Two of the United States branches- in Boston, MA, and Alexandria, VA-were accused of racketeering and conspiracy respectively to avoid reporting financial transactions. The members of the Alexandria branch have pled guilty.  All of BARAKAAT group of companies are co-conspirators, aiders and abettors, material sponsors of AL QAEDA, BIN LADEN  and international terrorism.

## SAUDI AMERICAN BANK

603.    SAUDI AMERICAN BANK is based in Riyadh, Saudi Arabia, and was formed in 1980 pursuant to a royal decree to take over the then existing branches of Citibank in Riyadh and Jeddah, Saudi Arabia.  Citibank opened its Jeddah branch in 1955 and its Riyadh branch in 1966. SAUDI AMERICAN BANK was formed in accordance with a program adopted by the Kingdom of Saudi Arabia in the mid-1970's under which all foreign banks were required to sell majority equity interests to Saudi nationals.

604.    SAUDI AMERICAN BANK started operations on July 12, 1980,  based in Riyadh. The SAUDI AMERICAN BANK is chaired by ABDULLAHZIZ BIN HAMAD AL GOSAIBI. KHALIL A. KORDI and RASHID M. AL. ROMAIZAN are among the directors of the bank.  The SAUDI AMERICAN BANK is the second largest bank in Saudi Arabia.

605.    The SAUDI AMERICAN BANK has offices in the United States based in New York.  The Chairman of the bank is ABDULLAHZIZ BIN HAMAD AL GOSAIBI who was born in 1923 is also Chairman of the SAUDI CEMENT COMPANY in Damman, Saudi Arabia.  The SAUDI CEMENT COMPANY shareholders include Defendant OMAR SULAIMAN AL RAJHI.  The SAUDI AMERICAN BANK is also the main banker of ARABIAN CEMENT COMPANY.  The company is owned by AL RAJHI Group and SAUDI BIN LADEN GROUP.  ARABIAN CEMENT COMPANY is managed by several other Defendants including KHALID BIN SALIM BIN MAHFOUZ  and Mohammed Bin Laden .

606.    The SAUDI AMERICAN BANK is the official correspondent of the al Baraka Bank Lebanon, based in Beirut and chaired by Defendant SALEH ABDULLAH KAMEL.  The SAUDI AMERICAN BANK has maintained a partnership with al Baraka financial system since its beginning.

607.    The SAUDI AMERICAN BANK serves as the bank for the DALLAH AL BARAKA Group, named as Defendant herein and chaired by DEFENDANT SALEH ABDULLAH KAMEL.  The SAUDI AMERICAN BANK is close to the Saudi Bin Laden family, and appears on its financial transactions.  Bin Lden for Contracting and Trading is owned by members of the Bin Lade family including BAKR BIN LADEN and Mohammed Bin Laden .

608.    SAUDI AMERICAN BANK financed these Sudanese projects, described

above, by directly providing material support and assistance to OSAMA BIN LADEN. Indeed, SAUDI AMERICAN BANK was the main banker of the SAUDI BIN LADEN GROUP and Bin Laden Organization with respect to Sudanese operations. SAUDI AMERICAN BANK is also the Riyadh correspondent of AL FAISAL ISLAMIC BANK, which is managed by Defendant PRINCE MOHAMMED AL FAISAL AL SAUD. AL FAISAL ISLAMIC BANK has facilitated AL QAEDA terrorist operations as detailed above. The SAUDI AMERICAN BANK is also the main correspondent in Riyadh for a branch of AL SHAMAL BANK, a branch of DMI Trust based in Nassau, involved in the financing of AL QAEDA .

609.    In year 2000, the SAUDI AMERICAN BANK participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO and AL HARAMAIN FOUNDATION.

## SHAYKH SAI'ID

610.    OMAR SHEIKH a/k/a SHAYKH SAI'ID a/k/a MUSTAFA MUHAMMED AHMAD a/k/a MUSTAFA AHMED AL HAWSAWI, (or "SHEIKH")  was one of the paymasters for the September 11th hijackers. Documents show that SHEIKH sent $100,000 from Pakistan to ATTA in the United States. On the morning of September 11, 2001 in United Arab Emirates SHEIKH receives wire transfers of $15,000 from three of the 9-11

hijackers, money that they had not been spent prior to their suicide hijackings. SHEIKH immediately flies from the UAE to Pakistan. SHEIKH's involvement with BIN LADEN dates back to BIN LADEN'S days operating out of Khartoum, SUDAN. SHEIKH, a London educated economist controlled BIN LADEN's many Sudanese businesses, including a financial network called TABA INVESTMENTS that was created with a $50 million dollar contribution from BIN LADEN. SHEIKH was jailed in 1994 for Islamic based terror operations in Kashmir but freed in 1999 in exchange for a release of hostages on an Indian Airlines flight. The aircraft was commandeered in a manner similar to the way the four September 11th aircraft were hijacked in the United States. A passenger was stabbed and hijackers seized control of Flight 814 diverting the aircraft to Kandahar, Afghanistan. Though Afghanistan's TALIBAN government was in control of the area, authorities did not interfere with the hijackers' actions in Kandahar or make efforts to apprehend them later. The passengers were held captive for eight days while the release from an Indian prison of SHEIKH and two other Islamic militants was arranged. Upon his release, SHEIKH and the others fled to Pakistan. SHEIKH has also been convicted of the kidnapping and murder of Wall Street Journal reporter Daniel Pearl.

611. SHEIKH's involvement with BIN LADEN dates back to BIN LADEN'S days operating out of Khartoum, SUDAN. SHEIKH, a London educated economist controlled BIN LADEN's many Sudanese businesses, including a financial network called TABA INVESTMENTS that was created with a $50 million dollar contribution from BIN

LADEN.

## COUNT ONE

## **WRONGFUL DEATH BASED ON INTENTIONAL MURDER**

612.     Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

613.     As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused plaintiffs' decedents' family members to suffer severe and permanent injuries, damages and losses, including but not limited to the following:

614.     Economic damages, including but not limited to, the pecuniary losses suffered by plaintiffs and decedents' remaining survivors, as a result of decedents' deaths, including but not limited to, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance; and

615.     Non-economic damages, including but not limited to, the loss of consortium, solarium, society, companionship, care, comfort and love suffered by plaintiffs and decedents' other survivors.

616.     WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each wrongful death plaintiff in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS, exclusive of interests, costs and fees.

## COUNT TWO

## <u>SURVIVAL DAMAGES BASED ON INTENTIONAL MURDER</u>

602.    Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

603.    As a result of their deaths, decedents lost the enjoyment of life that they would have had if they had not been killed.

604.    Before their deaths, decedents suffered conscious pain and suffering and fear of their impending deaths, entitling their estates to compensatory damages under governing law.

WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the decedents' estates in the sum of TWENTY FIVE MILLION ($25,000,000.00) DOLLARS.

## COUNT THREE

## <u>ASSAULT AND BATTERY</u>

605.    Plaintiffs repeat the allegations of the paragraphs above as if fully set forth at length.

606.    As a result of the September 11, 2001 hijackings and attacks, plaintiffs' decedents and/or personal injury plaintiffs were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily contact, from which they ultimately died or suffered serious permanent personal injury.

305

607.    By reason of all of the foregoing, the surviving personal injury plaintiffs were seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental and emotional pain and injury, and they were rendered sick, sore, lame and disabled, and were otherwise injured, and they were confined to a hospital, and/or to bed and home for a period of time by reason thereof, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and the surviving personal injury plaintiffs were prevented from attending to the duties of their employment and prevented from pursuing the furthering their careers and lost salary and earnings and will lose future salary and earnings thereby.

617.    WHEREFORE, by reason of the foregoing, defendants are liable jointly and severally to each of the personal injury plaintiffs in an amount in excess of FIFTEEN MILLION ($15,000,000.00) DOLLARS.

## COUNT FOUR

## <u>VIOLATION OF ANTI-TERRORISM ACT, 18 U.S.C. § 2333</u>

608.    Plaintiffs reallege above paragraphs as if fully set forth  herein.

609.    Personal injury plaintiffs and plaintiffs' decedents, who are and were at all relevant times citizens of the United States, suffered substantial injuries to their persons, property, and business by reason of the acts of international terrorism  perpetrated by defendants on September 11, 2001 that resulted in the death of plaintiffs' decedents and serious permanent injury to personal injury plaintiffs, a substantial portion of the  planning,

training and preparation for which occurred primarily outside the territorial jurisdiction of the United States.

610.     Defendants provision of material support and assistance to BIN LADEN and AL QAEDA   in Afghanistan, IRAQ and other places as well as their provision of a safe haven and base of operations to BIN LADEN and AL QAEDA  in Afghanistan and other countries from which they carried out terrorist attacks on the United States, including the September 11, 2001 terrorist attacks that resulted in the death of plaintiffs' decedents, also constitutes acts of international terrorism that caused substantial injuries to the persons, property, and business of plaintiffs and plaintiffs' decedents.

618.     WHEREFORE, plaintiffs each demand judgment be entered in favor of plaintiffs acting individually and as the personal representatives of decedents' estates and in favor of the personal injury plaintiffs personally and against defendants, jointly and severally, for an amount THREE TIMES each plaintiff's compensatory damages, plus interests, costs,  attorneys fees,  and such other relief as the Court deems just and proper.

## COUNT FIVE

## <u>TORTURE</u> <u>VICTIM</u> <u>PROTECTION</u> <u>ACT</u>

611.     The Alien Tort Act, 28 U.S.C. § 1350, also known as the Torture Victim Protection Act, creates a cause of action in favor of plaintiffs in this action who are not nationals of the United States, and against the defendants for their violation of international law in torturing and killing the passengers and crew of the aforesaid Flights and victims on

the ground.

612.    The Torture Victim Protection Act, 28 U.S.C. § 1350, creates a cause of action for all plaintiffs in this action against the defendants, for the torture and extrajudicial killing of the decedents and injury to plaintiffs.

613.    The plaintiffs and the estates of each decedent are entitled to recover wrongful death damages, including pecuniary losses, and damages for loss of support, consortium, society, companionship, prospective inheritance, care, love, guidance, training, education, solatium and services, and damages for grief and mental anguish, moral damages, burial expenses and other damages.

614.    By reason of the foregoing, defendants are jointly and severally liable to each plaintiff and each decedent's estate in the sum of FIFTY MILLION ($50,000,000) DOLLARS.

## COUNT SIX

### ANTI TERRORISM AND EFFECTIVE DEATH PENALTY ACT CLAIM, 28 U.S.C. § 1605(A)(7) -- IRAQ, IRAN AND THE SUDAN

615.    Plaintiffs reallege the paragraphs above as if fully set forth herein.

616.    The death of plaintiffs' decedents and injury to personal injury plaintiffs, who were citizens of the United States at the time, resulted from acts of extrajudicial killing, torture and aircraft sabotage.

617.    These acts of extra judicial killing, torture and aircraft sabotage were perpetrated by agents of BIN LADEN and AL QAEDA, who received material support and

308

resources from defendants, TALIBAN, IRAQ, IRAQI INTELLIGENCE, SUDAN, SUDANESE INTELLIGENCE, IRAN, IRANIAN INTELLIGENCE, SUDAN and IRAN.

618.    Agents, officials or employees of defendants, TALIBAN, IRAQ, IRAN and the SUDAN provided material support and resources to BIN LADEN and AL QAEDA while acting in the scope of their offices, agencies, or employment.  Similar conduct, if committed by agents, officials or employees of the United States, would be actionable.

619.    At all relevant times, defendants IRAQ, SUDAN and IRAN  were and are designated by the U.S. Government as a state sponsor of terrorism.

620.    The activities of Islamic Emirate of Afghanistan under the TALIBAN regime, as described in this Complaint, were effectively deemed terrorist activities pursuant to former President Clinton's July 4, 1999, Executive Order No. 13129 and the continuation Order of June 30, 2001, issued by President George W. Bush. In addition, after the terrorist acts on September 11, 2001,  President George W. Bush and other senior U.S., officials clearly designated the Islamic Emirate of Afghanistan as having sponsored and supported the terrorists. For example, see President George W. Bush's September 24, 2001, Executive Order on Terrorist Financing (Executive Order No. 13224).

619.    WHEREFORE, plaintiffs demand judgment be entered in favor of plaintiffs individually and as personal representatives of their decedents' estates and in favor of the personal injury plaintiffs personally and against defendants IRAQ and IRAQI INTELLIGENCE, IRAN and SUDAN and their instrumentalities and agents for an amount

in excess of FIFTY MILLION ($50,000,000.00) DOLLARS for each plaintiff, plus interest, costs, punitive damages, attorneys fees, and such other relief as the Court deems just and proper.

## COUNT SEVEN

## PUNITIVE DAMAGES

621.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

622.    For the reasons stated above, and pursuant to § 28 U.S.C. § 1606, defendants each are liable jointly and severally, to each plaintiff for punitive damages in the amount in excess of THREE HUNDRED MILLION ($300,000,000.00) DOLLARS.

## COUNT EIGHT

## PROPERTY DAMAGE

623.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

624.    As a direct and proximate result of defendants' intentional, willful and malicious acts of terrorism on September 11, 2001, defendants have caused property damage plaintiffs severe and extensive damage in that their building became blighted; physical damage was caused to the building by parts of the World Trade Center which struck the building; asbestos and other materials from the World Trade Center struck plaintiffs' building; the building has become unsafe until the asbestos has been cleaned up; plaintiffs were required to perform extensive asbestos clean-up and clean-up for other toxic materials from the World Trade Center; the plaintiff's building has been closed for a

310

substantial period since September 11, 2001; tenants have not paid rent; many tenants have abandoned and will abandon the building since they claim the building cannot currently safely be occupied as required by the tenants' leases; the exterior and interior of the building will have to be replaced; carpeting in the building has to be torn up and replaced; the value of the building has been blighted and diminished; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

625.    By reason of the foregoing, property damage plaintiffs are entitled to recover all of their damages from the defendant in an amount not to exceed the sum of ONE HUNDRED MILLION ($100,000,000.00) DOLLARS.

### **JURY DEMAND**

Plaintiffs demand  trial by jury on all issues so triable.

WHEREFORE, plaintiffs and each decedents' estate demand

(a)    Count One - Wrongful Death Based on Intentional Murder the total sum of  FIFTY MILLION ($50,000,000) DOLLARS for each wrongful death plaintiff;

(b)    Count Two - Survival Damages Based on Intentional Murder the total sum of  TWENTY FIVE MILLION ($25,000,000) DOLLARS for each wrongful death plaintiff;

(c)    Count Three - Assault and Battery the total sum of FIFTEEN MILLION ($15,000,000) DOLLARS for each plaintiff;

(d)    Count Four - Violation of Anti-terrorism Act, 18 U.S.C. § 2333 for treble damages;

(e)    Count Five - Torture Victim Protection Act the total sum of FIFTY  MILLION ($50,000,000) DOLLARS for each plaintiff;

311

(f)      Count Six - Anti Terrorism and Effective Death Penalty Act
Claim, 28 U.S.C. § 1605(a)(7) – Defendants IRAQ, IRAQI
INTELLIGENCE and the  TALIBAN the total sum of  FIFTY MILLION
($50,000,000) DOLLARS   for each plaintiff;

(g)      Count Seven - Punitive Damages the total sum of THREE
HUNDRED  MILLION ($300,000,000) DOLLARS for each plaintiff; and

(h)      Count Eight - Property damage the total  sum  of ONE
HUNDRED MILLION ($100,000,000.00) DOLLARS for each plaintiff.

plus interests, costs and attorneys fees.

Dated: New York, New York
September 5, 2003

KREINDLER & KREINDLER
Plaintiffs Liaison Counsel

By:      _____/s/_____
James P. Kreindler (JK7084)
Marc S. Moller (MM0143)
Justin T. Green (JG0318)
Andrew J. Maloney, III (AM8684)
100 Park Avenue
New York, NY  10017-5590
(212) 687-8181
(212) 972-9432 (Fax)

Barasch McGarry Salzman Penson & Lim
11 Park Place
New York, NY 10007
(212) 385-8000
(212) 385-7845 (fax)

Baumeister & Samuels, P.C.

312

One Exchange Plaza
New York, NY 10006
(212) 363-1200
(212) 363-1346 (fax)

Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, NY 10017
(212) 661-0011
(212) 953-6483 (fax)

Law Firm of Aaron J. Broder & Jonathan C. Reiter
350 Fifth Avenue, Suite 2811
New York, NY 10118
(212) 244-2000

Jaroslawicz & Jaros, Esqs.
150 William Street
New York, NY 10038
(212) 227-2780