**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO
DISMISS FILED BY DALLAH AVCO TRANS ARABIA CO., LTD.**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.      FACTUAL BACKGROUND ........................................................... 2

    A.   Dallah Avco Trans Arabia ......................................................... 2

    B.   The Dallah Al Baraka Group ..................................................... 5

II.    PLAINTIFFS' FACTUAL PLEADINGS ARE SUFFICIENT ................................... 9

    A.   Standard for Granting Motions to Dismiss .......................................... 9

    B.   The Liberal Requirements of Notice Pleading ...................................... 9

    C.   Plaintiffs Have Properly Supplemented Their Pleadings ............................ 11

    D.   Causation Been Sufficiently Pled .................................................. 12

    E.   "Conclusory" Allegations Are Perfectly Proper ................................... 14

III.   JURISDICTION IS PROPER OVER DALLAH AVCO TRANS ARABIA ............ 14

    A.   Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie* Showing Of Personal Jurisdiction May Be Established Solely By Legally Sufficient Allegations Of Jurisdiction ................................................................. 15

    B.   The Exercise of Personal Jurisdiction Comports With Due Process. .............. 15

    C.   At A Minimum, Jurisdictional Discovery Is Warranted ............................ 19

IV.   CONCLUSION ....................................................................... 20

## TABLE OF AUTHORITIES

### CASES

<u>Page</u>

*A.I. Trade Finance, Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993)................................................................................15

*Allen v. New World Coffee, Inc.*,
    2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001)................................................11

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
    782 F. Supp. 215 (S.D.N.Y. 1992).................................................................18

*Andre Emmerich Gallery v. Segre*,
    1997 WL. 672009 (S.D.N.Y. Oct. 29, 1997)....................................................18

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
    480 U.S. 102 (1987)........................................................................................17

*Ball v. Metallurgie Hoboken Overpelt, S.A.*,
    902 F.2d 194 (2d Cir 1990).............................................................................15

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985)........................................................................................17

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
    11 F.3d 1255 (5th Cir. 1994) ..........................................................................16

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998)..............................................................................9

*Chrysler Capital Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991).................................................................18

*Combs v. Adkins & Adkins Coal Co.*,
    597 F. Supp. 122 (D.D.C. 1984) .....................................................................16

*Conley v. Gibson*,
    355 U.S. 41 (1957)............................................................................................9

*DiStefano v. Carozzi North America, Inc.*,
    286 F.3d 81 (2d Cir. 2001)..............................................................................15

*Dixon v. Mack*,
    507 F. Supp. 345 (S.D.N.Y. 1980)..................................................................18

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*,
    153 F. Supp. 2d 76 (D.R.I. 2001)..................................................................16

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998)......................................................................17

*Geisler v. Petrocelli*,
    616 F.2d 636 (2d Cir. 1980)..........................................................................9

*IUE AFL-CIO Pension Fund v. Herrmann*,
    9 F.3d 1049 (2d Cir. 1993)..........................................................................16

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945)............................................................................... 16-17

*Investment Properties International, Ltd. v. 10S, Ltd.*,
    459 F.2d 705 (2d Cir. 1972).........................................................................19

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998).........................................................................15

*Kamen v. America Telegraph & Telegraph Co.*,
    791 F.2d 1006 (2d Cir. 1986).......................................................................19

*Leatherman v. Tarrant County*,
    507 U.S. 163 (1993)....................................................................................10

*Linde v. Arab Bank,PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................... 12-13

*In re Magnetic Audiotape Antitrust Litigation*,
    334 F.3d 204 (2d Cir. 2003).........................................................................15

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981).........................................................................19

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992).........................................................................11

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004)..........................................................11

*PDK Laboratoriess, Inc. v. Friedlander*,
    103 F.3d 1105 (2d Cir. 1997).......................................................................15

*Palestine Information Office v. Shultz,*
    853 F.2d 932 (D.C. Cir. 1988) ........................................................................17

*Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005)......................................................................10, 12

*Phelps v. Kapnolas,*
    308 F.3d 180 (2d Cir. 2002)...............................................................................9

*SEC v. Carrillo,*
    115 F.3d 1540 (11th Cir. 1997) ........................................................................16

*Simon v. Philip Morris, Inc.,*
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) ................................................................18

*Swierkiewicz v. Sorema,*
    534 U.S. 506 (2002)......................................................................9-10, 12-13

*In Re Terrorist Attacks on September 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)................................................ 12, 15-19

*In re Terrorist Attacks on September 11, 2001,*
    392 F. Supp. 2d 539 (S.D.N.Y. 2005)..............................................................16

*Twombley v. Bell Atlantic Corp.,*
    425 F.3d 99 (2d Cir. 2005).................................................................................10

*Warren v. District of Columbia,*
    353 F.3d 36 (D.C. Cir. 2004)............................................................................14

*Woodford v. Community Action Agency,*
    239 F.3d 517 (2d Cir. 2001)................................................................................9

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)..........................................................................................17

*Wynder v. McMahon,*
    360 F.3d 73 (2d Cir. 2004).................................................................................9

## RULES AND STATUTES

18 U.S.C. § 1965(b) ...................................................................................................16

18 U.S.C. § 2334(a) ...................................................................................................16

Fed. R. Civ. P. 4(k)(2) ...............................................................................................16

Fed. R. Civ. P. 8(a)(2) .............................................................................................9-10

Fed. R. Civ. P. 9(b) ....................................................................................................10

Fed. R. Civ. P. 10(c) ...................................................................................................11

Fed. R. Civ. P. 12(b)(6) ................................................................................................9

Fed. R. Civ. P. 15(d) ...............................................................................................2, 11

In remarks delivered to the Los Angeles World Affairs Council on January 14, 2004, Vice President Richard Cheney spoke about the need to pursue aggressively the corporate and financial sponsors of al Qaida:

> We are also working with governments on every continent to take down the financial networks that support terror -- the hidden bank accounts, front groups, and phony charities that have helped them function. And our government is working closely with intelligence services all over the globe, and our own officers continue to be engaged in some of the most perilous and sensitive intelligence work ever carried out. This work has brought many successes -- including the discovery of terror plots that we were able to stop in their tracks. Americans can be grateful every day for the skillful and the daring service of our nation's intelligence professionals.
>
> On the very night this nation was attacked, President Bush declared that the United States would make no distinction between terrorists and those who support them. This principle, it's come to be known as the Bush doctrine, is now understood by all: any person or government that supports, protects, or harbors terrorists is complicit in the murder of the innocent, and will be held to account.

Dallah Avco Trans Arabia ("Dallah Avco") is among those entities which is now being held to account.  The company's San Diego office served as a willing front for Omar Al Bayoumi, a Saudi national and al Qaida conspirator who participated directly in the preparations for the September 11th Attack by materially assisting two of the September 11th hijackers upon their arrival in the region. Al Bayoumi used his ostensible employment with Dallah Avco as a cover for his illicit activities, and employed the funding he received from Dallah Avco to advance al Qaida's conspiracy to attack America.  All this was done with Dallah Avco's knowledge and overt consent.

Dallah Avco Trans Arabia has filed a motion to dismiss against the <u>Federal</u> plaintiffs which primarily questions the factual sufficiency of the pleadings against it, offering what it claims to be rebuttal "evidence".  Because Dallah Avco misapprehends the requirements of notice pleading and cannot demand more of Plaintiffs than do the Federal Rules of Civil Procedure, that

portion of the motion must be denied.   Dallah Avco's remaining contentions also lack merit, and its motion must be dismissed in its entirety.

## I.     FACTUAL BACKGROUND

This section of the brief reviews the relevant factual pleadings involving Dallah Avco Trans Arabia and its parent company.[1]

### A.     Dallah Avco Trans Arabia

Dallah Avco Trans Arabia Co., Ltd. ("Dallah Avco") is a wholly owned subsidiary of defendant Saudi Dallah Al Baraka Group LLC ("DABG"), specializing in aviation services.  The company was formed in 1975 and is based in Jeddah, Saudi Arabia.

Many of the allegations against Dallah Avco stem from the actions of its Assistant to the Director of Finance, Saudi national Omar Al Bayoumi.  Bayoumi lived in the United States from the mid 1990s until 2001, moving to San Diego after years working in the Saudi Ministry of Defense and Aviation.

Mysteriously, although the project for which Al Bayoumi was allegedly hired was based in Saudi Arabia, Al Bayoumi moved to the United States in August 1994 and began taking English classes at San Diego State University's College of Extended Studies.  For seven years, he worked for the finance department of a Saudi Civil Aviation Presidency project called Air Navigation Systems Support (ANSS). The project was managed by Dallah Avco.

Al Bayoumi's work on the ANSS project started in June 1995, when he was hired as a senior data-processing technician at the direction of the aviation authority. He was paid 11,546

---

[1]     The facts contained within this section are derived from the <u>Federal</u> First Amended Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2, as well as the RICO Statements filed as to Dallah Avco Trans Arabia.

Saudi Riyal (approximately $3000 U.S. dollars) monthly.  Still, according to a source who spoke to *Newsweek*, "He also seemed to have access to an unlimited supply of cash. One day he arrived at a local mosque, plunked down a check for $400,000 and bought it. He explained that he was acting as the agent of a wealthy Riyadh businessman." The Joint Congressional Inquiry into the Terrorist Attacks on September 11, 2001 similarly concluded that Al Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."

His employment through Dallah Avco was deemed a "ghost job" by observers.  During his "employment" at Dallah Avco, Al Bayoumi reportedly showed up for work only once.

In September 1998, the FBI opened a counterterrorism investigation on Al Bayoumi, which discovered that he was in contact with several other people being investigated for support of terrorism. After a search of Al Bayoumi's residence, the FBI concluded that "he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist." The inquiry into Al Bayoumi was closed for unknown reasons in 1999.

Several FBI officials involved in the investigation into the September 11 attack concluded that Omar Al Bayoumi was an al Qaida advance man who helped lay the groundwork for the Sept. 11, 2001, attacks in New York City and Washington. The *Los Angeles Times* reported that Al Bayoumi's source of employment was something of a mystery:  "He told people he was a student of international business, but it seemed unlikely because he was already 40 years old and he never went to school. He didn't work, either. He explained that by telling some people he received a monthly stipend from his former employer, an aviation company in his native Saudi Arabia, and telling others he had a Saudi government scholarship."

Al Bayoumi used his position and income to provide significant direct assistance to two of the 9/11 hijackers, Nawaf Alhazmi and Khalid al-Midhar.  Starting in early 2000, Al Hazmi and Al Mihdhar received funding from Al Bayoumi, who shared his home with them and paid their

house rent in San Diego. Al Bayoumi also supplemented their income which they were receiving from unidentified sources. Al Bayoumi's name was listed as a suspect wanted by the FBI in connection with the September 11 attacks.

Al Bayoumi was well-known in San Diego's Muslim community, and used his influence to help the two future hijackers acclimate to the area.  Among other things, Al Bayoumi threw a welcome party for them when they first arrived and found and paid for apartments and other lodging for them. Al Bayoumi asked several people to assist Nawaf Alhazmi and Khalid al-Midhar with translation and other matters. Those approached include material witness Mohdar Abdallah (a/k/a Al-Mohdar Mohamed Al-Mohdar Zeid), a former San Diego State student from Yemen whose name was found on a slip of paper in the hijackers' rental car parked at Dulles International Airport, and subsequently arrested on immigration charges and deported to Yemen in May 2004.  It was also determined that following Al Bayoumi's request, Abdallah had assisted Alhazmi and al-Midhar obtain Social Security cards, driver licenses, flight school information and rides from Los Angeles International Airport.

The FBI also found that Al Bayoumi's salary while working for the Saudi Aviation Authority was approved by al Qaida.

Al Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia.

Al Bayoumi left the United States two months before the September 11 attacks and moved to England.  Based on evidence that Al Bayoumi had provided funds and logistical support to the

September 11 hijackers, British authorities arrested him in the wake of the attack.  According to

*Newsweek:*

> Two months before September 11, al-Bayoumi suddenly left San Diego and moved to study in Birmingham, England. On Sept. 20, he was picked up by New Scotland Yard and extensively interrogated by British and U.S. officials. Al-Bayoumi claimed he had helped Alhazmi and Almihdhar in the spirit of Muslim brotherhood, and said he had no idea they were terrorists. Al-Bayoumi insisted that he had met the two men by accident when he happened to overhear them speaking in Arabic at a restaurant near the Los Angeles airport. But the congressional report notes that one FBI source recalled that al-Bayoumi said he drove to Los Angeles that day "to pick up visitors." . . .   One former top FBI official who helped oversee the al-Bayoumi investigation went one step further: "We firmly believed that he had knowledge [of the 9/11 plot]," he told *Newsweek*, "and that his meeting with them that day was more than coincidence."

Under apparent pressure from the Saudi Embassy in London, British authorities released

Al Bayoumi, and he is now believed to be back in Saudi Arabia.

With regards to Dallah Avco's contention that such activities were not performed with its

knowledge or consent, the evidence confirms that Dallah Avco was specifically aware of Al

Bayoumi's illicit conduct, and all times material.  In fact, Al Bayoumi's immediate supervisor in

the United States at one point complained that Al Bayoumi should be fired for failing to show up

for work.  However, superiors in Saudi Arabia immediately affirmed that Al Bayoumi must

remain on the payroll despite the fact that he performed no work relevant to the project.

B.     The Dallah Al Baraka Group

Dallah Avco is by no means the only company with the Saudi Dallah Al Baraka Group

network to be implicated in material sponsorship of al Qaida.  In fact, DABG is at the center of a

complex banking system through which, beginning in the early 1980s, radical Islamist elements

within Saudi Arabia channeled massive financial support for the spread of Wahhabism, the radical

brand of Islam at the heart of the al Qaida ideology. Endowed with enormous funding, Saudi Dallah Al Baraka Group LLC gave extensive support for radical Islamic causes.

DABG itself has long provided financial support and other forms of material support to terrorist organizations including the al Qaida movement. DABG itself is a diversified conglomerate based in Jeddah, Saudi Arabia. The group includes Dallah Avco Trans Arabia and twenty-two other banks mostly located in the Arab and Islamic countries, in addition to several investment and financial companies.

This company was established in 1969 by defendant Sheikh Saleh Abdullah Kamel. Some examples of its ties to al Qaida follow.

1. <u>Al Baraka Bank</u>

Headed by defendant Kamel, Al Baraka Bank is a wholly owned subsidiary of DABG. Al Baraka Bank has for many years knowingly maintained accounts for many of the so-called charities that operate within al Qaida's infrastructure. Al Baraka Bank advertises the existence and numerical designations of the accounts it maintains for those charities throughout the Muslim world, and provides a mechanism to allow al Qaida's supporters to deposit funds directly into those accounts.

Al Baraka Bank investments include forty-three (43) subsidiaries which are mainly banks in Arab and Islamic countries. Al Baraka Bank has knowingly maintained accounts for many of the alleged charities which operate within the Al Qaida infrastructure.

A memo from the Russia Federations Security Service details the role of Al Baraka in funding Al Haramain, another co-defendant in this case. Aqeel al-Aqeel, Al Haramain's chairman, confirmed the use of Al Baraka by Al Haramain by stating that Al Haramain maintained accounts at Al Baraka Bank in Saudi Arabia. Al Baraka facilitates the fundraising efforts by the Enterprise.

Al Baraka Bank has advertised and does advertise the existence of and the numerical designations of the accounts it maintains for the alleged charities throughout the Muslim world and provides a mechanism for Al Qaida supporters to deposit funds directly into those accounts. These accounts that are maintained by Al Baraka Bank have been used to transfer funds to support the cells of the Enterprise. For example, it was reported by the Bosnian Intelligence Agency that Al Baraka Bank provided support to Al Haramain. This memorandum stated: "Some illegal activities of humanitarian organizations investigated by the relevant investigative bodies of the Federation of Bosnia Herzegovina: Records available for 1998 show a flow of money into the so-called operating account of the Humanitarian Organizations at the Deposti Bank, Sarajevo, from the main account, sent from Saudi Arabia via the Deutsche Bank and the Al Baraka Bank in Turkey. The amount is 1,059,687 DEM [$2.13 million]."

Al Baraka Bank had knowledge that the accounts it maintained were used to fund al Qaida. However, despite this knowledge, Al Baraka continued to maintain the accounts and thereby knowingly provided financial services and other forms of material support to al Qaida.

Through this mechanism, Al Baraka Bank has facilitated al Qaida's fundraising efforts. The accounts maintained by Al Baraka Bank on behalf of the so-called charities have been used to transfer funds to al Qaida cells throughout the world.  Despite such knowledge, Al Baraka Bank has continued to maintain those accounts, and has knowingly provided financial services and other forms of material support to al Qaida.

> 2.    Other DABG Subsidiaries and Holdings

Along with Kamel, Al Baraka Bank is also a shareholder in Tadamon Islamic Bank, which has long provided financial services and other forms of material support to al Qaida.  Along with Kamel, Al Baraka Bank is an investor in Al Shamal Bank, along with Osama bin Laden, Omar Abdullah Kamel, al Faisal Islamic Bank and the Sudanese Government.

DABG was a founder of Al Aqsa Islamic Bank. Presently, DAGB directly owns 12% of Aqsa Islamic Bank. Since 1998, Israel refuses to approve the bank,  citing its obvious ties with Hamas and acts of terrorism.

        3.      <u>The Golden Chain</u>

In addition, Kamel himself is identified on the Golden Chain as one of al Qaida's principal financiers. The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police. During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida. The "Golden Chain" document was among several hundred documents contained in this computer file. Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, *United States of America v  Enaam Arnaout*, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm .

## II.   PLAINTIFFS' FACTUAL PLEADINGS ARE SUFFICIENT

Dallah Avco offers three arguments against the pleadings: that they are too "conclusory"; that they insufficiently detailed the forms of material support Dallah Avco provided to al Qaida; and that plaintiffs have failed to plead causation sufficiently.  Each of these arguments lacks merit, failing to comprehend properly the notice pleading requirements of the Federal Rules.

### A.   Standard for Granting Motions to Dismiss

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n. 8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in favor of them. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

### B.   The Liberal Requirements of Notice Pleading

A motion pursuant to Fed. R. Civ. P. 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a

statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v. McDonald's Corp.*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October 2005, the Second Circuit reiterated and reaffirmed the notice pleading standard set forth in Rule 8 as applied to a Rule 12(b)(6) motion to dismiss. *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005). In *Twombley*, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." 425 F.3d at 107. In the context of anti-trust pleading, the Court reminded that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116. The district court may not add create higher pleading standards than those set forth in the Federal Rules. Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit unequivocally held that "[i]f that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so." 425 F.3d at 117.

C.      Plaintiffs Have Properly Supplemented Their Pleadings

Dallah Avco attempts to fabricate an issue by questioning the manner in which Plaintiffs have supplemented their pleadings through the RICO Statements and consolidated pleadings pursuant to this Court's case management orders.  It claims again that the pleadings are too "conclusory", and makes the novel argument that Fed. R. Civ. P. 15(d) only permits such pleadings to contain events which occurred following the date of the initial pleading.   However, Paragraph 14 of Case Management Order #2 explicitly authorized the filing of such statements by the Federal plaintiffs, without any such time limitations.

Furthermore, judicial precedent uniformly hold that RICO Statements should be treated as part of the pleadings.  *See*, *e.g.*, *McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001).

Finally, the incorporation of the RICO and More Definite Statements into plaintiffs' Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules.  Fed. R. Civ. P. 10(c), which Dallah Avco avoids reference to, provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c).  In view of the plain language of Rule 10(c), plaintiffs incorporation of the RICO and More Definite Statements into their Complaints, by reference or attachment as exhibits, complies with both the letter and spirit of the Federal Rules.[2]

---

[2]      Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

D.     Causation Been Sufficiently Pled

Dallah Avco attempts to argue that providing material assistance to two of the nineteen September 11 hijackers while they trained to become pilots is insufficient to demonstrate proximate cause.  Not only is this argument factually preposterous, it fails to state the proper pleading standard under the law.

In *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied.  In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries."  *Id.* at 511.  The Second Circuit rejected this approach.  It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P."  *Id.* at 512.  Quoting the unanimous Supreme Court ruling in *Swierkiewicz*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13).

As this Court has recognized, "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." *In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005). Consistent with this holding, plaintiffs' consistent and specific averments of Dallah Avco's knowing and intentional

sponsorship of Al Bayoumi are, in and of themselves, sufficient to establish causation at this stage of the litigation.

On this point, and within the context of allegations of support for terrorism, a recent Eastern District of New York case has already spoken.  In *Linde v. Arab Bank, PLC*, Arab Bank is alleged to have provided material and financial to terrorists by collecting and receiving account funds for the benefit of designated terrorists groups. Arab Bank, like Dallah Avco, attempted to argue that "plaintiffs are required to plead specific facts from which its knowledge of the wrongful acts alleged could be inferred"  *Linde*, 384 F. Supp. 2d 571,  579-80 (E.D.N.Y. 2005). The Court disagreed.  In an order dated September 2, 2005, Judge Nina Gershon noted that "the effect of the Bank's argument would indeed be to impose a higher standard" than the Federal Rules of Civil Procedure, citing *Swierkiewicz*.  The Court concluded "Arab Bank seeks dismissal of the first seven counts of the Linde complaint . . . on the ground that plaintiffs have not sufficiently alleged knowledge and intent. To the extent that defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiffs must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting and conspiracy." *Id.* at 585.

Dallah Avco rests its proximate cause argument upon its knowledge argument and the proposition that it did not authorize Al Bayoumi's support of the September 11 hijackers. Plaintiffs have pleaded otherwise and have even presented evidence to the contrary.  Clearly, this matter of prior knowledge and whether Al Bayoumi acted in furtherance of Dallah Avco's goals cannot be resolved based on the pleadings alone; it is precisely the type of dispute for which further discovery and fact-finding is required.  Merely denying the allegations of the complaint

does not negate them as a matter of law, and is an improper use of a motion to dismiss.  The pleadings are sufficient, and plaintiffs are entitled to proceed with this litigation and take depositions from Dallah Avco officials and Al Bayoumi and perform other discovery in support of these claims.

   E.  <u>"Conclusory" Allegations Are Perfectly Proper</u>

   Dallah Avco protests that the allegations are too "conclusory".  This misapprehends the proper pleading standard, as the above cases demonstrate, which require at this stage of the litigation only fair notice of the relevant allegations, to be fleshed out more fully following full and proper discovery.  Indeed, in *Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of *Phelps* in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge.  Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held:  "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory.  Many well-pleaded complaints are conclusory.  And while we do not have to accept conclusions of law as true, conclusions of fact are another matter."  *Id*. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

**III.  JURISDICTION IS PROPER OVER DALLAH AVCO TRANS ARABIA**

   Dallah Avco argues that plaintiffs lack jurisdiction over it.  This argument lacks merit.  For operating within the United States and participating in a conspiracy directed towards the United States as a whole, Dallah Avco is properly within the jurisdiction of this Court.

   Defendant's argument is bizarre.  Dallah Avco simultaneously denies that it ever operated within the United States, then concedes throughout its argument that it employed Omar Al Bayoumi in San Diego, California, only to deny it later in its brief through an affidavit.  If Dallah Avco cannot determine the facts yet, neither can this court, and discovery is appropriate.

A.     Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie* Showing Of Personal Jurisdiction May Be Established Solely By Legally Sufficient Allegations Of Jurisdiction

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal jurisdiction varies depending upon the procedural posture of the litigation:

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.   At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.   After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted].   At that point, the *prima facie* showing must be factually supported.

*Ball v. Metallurgie Hoboken Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), cert. denied, 498 U.S. 854 (1990).   In order to defeat such a motion, a plaintiff need only present allegations that connect the defendant with the applicable forum – here, the United States.   In deciding such a motion, the plaintiff's jurisdictional averments must be taken as true.   *Id.*; *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).   Moreover, the court must construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor. *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).   As this Court has held:

> Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, *A.I Trade*, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. *PDK Labs*, 103 F.3d at 1108.

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d. at 804.

B.     The Exercise of Personal Jurisdiction Comports With Due Process.

Among the claims against Dallah Avco are claims under the Anti-Terrorism Act ("ATA") and RICO.  It is beyond question that if plaintiffs <u>do</u> state valid claims under those federal statutes, this Court may assert personal jurisdiction over them to adjudicate the ATA and RICO claims as well as all of the other claims asserted in the complaints. The ATA provides that claims may be brought in "any district where any plaintiff resides" and that process "may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). RICO similarly provides that "process … may be served in any judicial district of the United States…" 18 U.S.C. § 1965(b).[3]

Because both statutes provide for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (citations omitted); *see also SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 125 (D.D.C. 1984).

  1. <u>Personal jurisdiction is satisfied under a general jurisdiction standard.</u>

As previously stated, Dallah Avco engaged in business in San Diego, California.  That is unquestionably sufficient to establish minimum contacts in the United States.  Because the court has personal jurisdiction over Dallah Avco with respect to plaintiffs' ATA or RICO claims, then it may also assert pendent personal jurisdiction over the remaining claims that derive from the same events.  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993).

  2. <u>Jurisdiction is proper under an "purposeful direction" theory</u>

---

[3] This Court has furthermore recognized that "In situations in which Defendants were not served in the United States pursuant to the ATA, Rule 4(k)(2) acts as a personal jurisdiction gap-filler 'in the enforcement of federal law.' Fed. R. Civ. P. 4(k)(2) advisory committee's note." *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005).

Dallah Avco is additionally subject to personal jurisdiction here because, in providing support to al Qaeda, which had long publicly announced its intentions to attack the United States, it purposefully directed its conduct here. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 810. Each case should be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The issue is whether the defendant should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987).

The Supreme Court has further stated that reasonableness "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985); *see Palestine Info. Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements"). The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the horrific manner in which U.S. residents were attacked for no reason other than that they were in the United States. The policies of "fair play" and "substantial justice" cannot be applied without recognizing the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims.  Case law makes clear that where terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the exercise of jurisdiction. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 807-12.

The record before this Court demonstrates that bin Laden and al Qaeda had publicly and repeatedly announced their intention to attack the United States from the early 1990s on, and that

during the time Dallah Avco provided significant support to Osama bin Laden and his growing al Qaida enterprise through Al Bayoumi.  Dallah Avco knew that its support would further acts of international terrorism directed at the United States. In this context, Dallah Avco's conduct amounts to purposeful direction at the United States sufficient to satisfy the "minimum contacts" test as well. No more is required to and subject Dallah Avco to jurisdiction in the United States.

>            3.        Additionally, Jurisdiction Is Proper Under Conspiracy Theory

Dallah Avco is subject to jurisdiction here because, as alleged in the complaints and RICO Statements, it and its parent company conspired with al Qaida to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum, including those of the September 11 hijackers. *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (acts committed in New York by co-conspirators subject out of state defendant to jurisdiction under CPLR 302(a)(2)); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over absent defendants pursuant to a conspiracy theory by imputing forum acts of coconspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). The actions of the co-conspirators within the forum serve to establish minimum contacts sufficient to satisfy Due Process over the non-resident defendant. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course complained of in the suit, supplies the necessary minimum contacts."); *Andre Emmerich Gallery v. Segre,* 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to nonresident defendant establishes sufficient minimum contacts).

The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital,* 778 F. Supp. at 1267. This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy," Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (citations omitted). Plaintiffs have met this burden.

C. <u>At A Minimum, Jurisdictional Discovery Is Warranted</u>

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery to clear up Dallah Avco's confusing representations. *See, e.g., Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2) motion); Moore's Federal Practice § 12.31 [7] (3d ed. 2003). This Court has done so with regards to other defendants, and at a minimum should do so here, especially since pertinent jurisdictional facts lie within the control and knowledge of the defendant contesting jurisdiction. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986); *Investment Properties Intl., Ltd. v. 10S, Ltd.,* 459 F.2d 705, 707-08 (2d Cir. 1972).

## IV.    CONCLUSION

Plaintiffs have properly pleaded their case against Dallah Avco Trans Arabia under the Federal Rules of Civil Procedure, and this court has jurisdiction over it.  The motion to dismiss must be denied.

Respectfully submitted,

COZEN O'CONNOR

Dated: May 20, 2006                      BY: _____/s/_____
                                                        Stephen A. Cozen, Esquire
                                                        Elliott R. Feldman, Esquire
                                                        Sean P. Carter, Esquire
                                                        Adam C. Bonin, Esquire
                                                        1900 Market Street
                                                        Philadelphia, PA 19103
                                                        Tele: (215) 665-2000
                                                        Fax: (215) 665-2013

                                                        Attorneys for *Federal Insurance* Plaintiffs