# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* No. 04-CV-1923
*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY TADAMON ISLAMIC BANK

## TABLE OF CONTENTS

**Page**

INTRODUCTION..........................................................................................................1

I.    FACTUAL BACKGROUND .............................................................................2

   A.   Tadamon Islamic Bank ..............................................................................2

   B.   Tadamon and al Qaida ...............................................................................4

   C.   Al Shamal Islamic Bank ............................................................................5

   D.   Al Shamal and al Qaida .............................................................................7

   E.   Faisal Islamic Bank (Sudan) .....................................................................9

   F.   Dar Al Maal Al Islami Trust ....................................................................10

II.   PLAINTIFFS' FACTUAL PLEADINGS ARE SUFFICIENT .....................11

   A.   Standard for Granting Motions to Dismiss ..............................................12

   B.   The Liberal Requirements of Notice Pleading .........................................12

   C.   Plaintiffs Have Properly Supplemented Their Pleadings .........................13

   D.   "Conclusory" Allegations Are Perfectly Proper .....................................15

III.  PLAINTIFFS HAVE PROPERLY PLED THE LEGAL CASE FOR
     TADAMON'S LIABILITY ...............................................................................15

   A.   Extraordinary Banking Services ..............................................................16

   B.   Causation Been Sufficiently Pled ............................................................17

IV.   JURISDICTION IS PROPER OVER TADAMON ISLAMIC BANK ......19

   A.   Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie*
      Showing Of Personal Jurisdiction May Be Established Solely By
      Legally Sufficient Allegations Of Jurisdiction ........................................19

   B.   The Exercise of Personal Jurisdiction Comports With Due Process. ........20

   C.   At A Minimum, Jurisdictional Discovery Is Warranted ..........................24

V.    CONCLUSION .................................................................................................25

## TABLE OF AUTHORITIES
## CASES

**Page**

*A.I. Trade Finance, Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993)........................................................................20

*Allen v. New World Coffee, Inc.*,
  2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001)............................................14

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
  782 F. Supp. 215 (S.D.N.Y. 1992) ..............................................................23

*Andre Emmerich Gallery v. Segre*,
  1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) ........................................ 23-24

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
  480 U.S. 102 (1987).....................................................................................22

*Ball v. Metallurgie Hoboken Overpelt, S.A.*,
  902 F.2d 194 (2d Cir. 1990)................................................................. 19-20

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985).....................................................................................22

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
  11 F.3d 1255 (5th Cir. 1994) ......................................................................21

*Chance v. Armstrong*,
  143 F.3d 698 (2d Cir. 1998).........................................................................14

*Chrysler Capital Corp. v. Century Power Corp.*,
  778 F. Supp. 1260 (S.D.N.Y. 1991)..................................................... 23-24

*Combs v. Adkins & Adkins Coal Co.*,
  597 F. Supp. 122 (D.D.C. 1984) .................................................................21

*Conley v. Gibson*,
  355 U.S. 41 (1957).......................................................................................12

*DiStefano v. Carozzi North America, Inc.*,
  286 F.3d 81 (2d Cir. 2001)...........................................................................20

*Dixon v. Mack*,
  507 F. Supp. 345 (S.D.N.Y. 1980) ..............................................................23

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*,
    153 F. Supp. 2d 76 (D.R.I. 2001) .............................................................21

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) ...............................................................22

*Geisler v. Petrocelli*,
    616 F.2d 636 (2d Cir. 1980) ...................................................................12

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................17

*IUE AFL-CIO Pension Fund v. Herrmann*,
    9 F.3d 1049 (2d Cir. 1993) .....................................................................21

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ................................................................................22

*Investment Properties International, Ltd. v. 10S, Ltd.*,
    459 F.2d 705 (2d Cir. 1972) ...................................................................24

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) ...................................................................20

*Kamen v. America Telegraph & Telegraph Co.*,
    791 F.2d 1006 (2d Cir. 1986) .................................................................24

*Leatherman v. Tarrant County*,
    507 U.S. 163 (1993) ................................................................................12

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y 2005) ............................................... 16-17

*In re Magnetic Audiotape Antitrust Litigation*,
    334 F.3d 204 (2d Cir. 2003) ...................................................................20

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981) ...................................................................24

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992) ...................................................................14

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004) ....................................................14

*PDK Laboratoriess, Inc. v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997)...................................................................................20

*Palestine Information Office v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988)................................................................................22

*Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005).......................................................................... 12-13, 18

*Phelps v. Kapnolas*,
   308 F.3d 180 (2d Cir. 2002)...............................................................................12, 15

*SEC v. Carrillo*,
   115 F.3d 1540 (11th Cir.  1997) .............................................................................21

*Simon v. Philip Morris, Inc.*,
   86 F. Supp. 2d 95 (E.D.N.Y. 2000) ........................................................................24

*Swierkiewicz v. Sorema*,
   534 U.S. 506 (2002)...........................................................................................12, 18

*In Re Terrorist Attacks on September 11, 2001*,
   349 F. Supp. 2d 765 (S.D.N.Y. 2005)................................................................ 18-24

*In re Terrorist Attacks on September 11, 2001*,
   392 F. Supp. 2d 539 (S.D.N.Y. 2005)......................................................................21

*Twombley v. Bell Atlantic Corp.*,
   425 F.3d 99 (2d Cir. 2005)......................................................................................13

*Warren v. District of Columbia*,
   353 F.3d 36 (D.C. Cir. 2004)...................................................................................15

*Woodford v. Community Action Agency*,
   239 F.3d 517 (2d Cir. 2001)....................................................................................12

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980).................................................................................................22

*Wynder v. McMahon*,
   360 F.3d 73 (2d Cir. 2004)................................................................................12, 14

**STATUTES**

18 U.S.C. § 1965(b) ...........................................................................................................21

18 U.S.C. § 2334(a) ...........................................................................................................21

Fed R. Civ. P. 4(k)(2)........................................................................................................21

Fed. R. Civ. P. 8............................................................................................................. passim

Fed. R. Civ. P. 9(b) ...........................................................................................................12

Fed. R. Civ. P. 10(c) .................................................................................................... 14-15

Fed. R. Civ. P. 12(b)(6).....................................................................................................12

Fed. R. Civ. P. 15(d) .........................................................................................................13

New York CPLR 302(a)(2) ...............................................................................................23

**BOOKS AND TREATISES**

Moore's Federal Practice (3d ed. 2003)..............................................................................24

5 Wright & Miller Federal Practice & Procedure (2d ed. 1990) ...........................................15

*Final Report of the Nat'l Commission on Terrorist Attacks Upon the United States*...............7

Khalid Khalil Assad, *A Fighter from Mecca* (2000),............................................................4

In remarks delivered to the Los Angeles World Affairs Council on January 14, 2004, Vice President Richard Cheney spoke about the need to pursue aggressively the financial sponsors of al Qaida:

> We are also working with governments on every continent to take down the financial networks that support terror – the hidden bank accounts, front groups, and phony charities that have helped them function. And our government is working closely with intelligence services all over the globe, and our own officers continue to be engaged in some of the most perilous and sensitive intelligence work ever carried out. This work has brought many successes – including the discovery of terror plots that we were able to stop in their tracks. Americans can be grateful every day for the skillful and the daring service of our nation's intelligence professionals.
>
> On the very night this nation was attacked, President Bush declared that the United States would make no distinction between terrorists and those who support them. This principle, it's come to be known as the Bush Doctrine, is now understood by all: any person or government that supports, protects, or harbors terrorists is complicit in the murder of the innocent, and will be held to account.

Tadamon Islamic Bank ("Tadamon") is among those entities which is now being held to account. Tadamon played a knowing, intentional and material role in providing Osama bin Laden with the banking services he needed to help grow al Qaida in its early years. Tadamon helped provide Osama bin Laden with the funding, banking services and financial infrastructure he employed to establish al Qaida training camps, train terrorists, and carry out terrorist attacks against the United States. Furthermore, Tadamon was not an *unwitting* actor in bin Laden's grand plot to attack the United States on September 1lth. Instead, it took active and deliberate steps to become a fully integrated component of al Qaida's financial and logistical infrastructure by *knowingly* maintaining accounts for individuals and organizations involved in al Qaida's plot, including bin Laden himself, and by becoming *substantially involved* in other banks and

organizations actively supporting al Qaida, fully aware that the material support it provided to

Osama bin Laden was assisting him and al Qaida in their goal to attack America.

Tadamon Islamic Bank has filed a motion to dismiss against the <u>Federal</u> and <u>O'Neill</u>

plaintiffs which primarily questions the factual sufficiency of the pleadings against it, offering

what it claims to be rebuttal "evidence".  Because Tadamon misapprehends the requirements of

notice pleading and cannot demand more of Plaintiffs than do the Federal Rules of Civil

Procedure, that portion of the motion must be denied.  To the extent that Tadamon Islamic Bank

raises other allegations regarding the legal sufficiency of the pleadings and jurisdiction, those

claims too lack merit and must be denied..

## I.    FACTUAL BACKGROUND

This section of the brief reviews the relevant factual pleadings involving Tadamon

Islamic Bank and related entities.[1]

### A.    <u>Tadamon Islamic Bank</u>

Founded in Sudan on November 28, 1981, Bank Al-Tadamon Al-Islami (translated

"Islamic Solidarity Bank," herein "Tadamon Islamic Bank") lists its address as Al-Tadamon

Tower, Al-Baladia Avenue, Khartoum, Sudan. The second-largest bank in Sudan, Tadamon

Islamic Bank knowingly and intentionally provided material support in the form of financial

services to Al Qaida, including maintaining and servicing Al Qaida bank accounts and accounts

used to fund and support Al Qaida.

---

[1]    The facts contained within this section are derived from the <u>Federal</u> First Amended
Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d)
Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order
Number 2, the <u>O'Neill</u> First Consolidated Complaint (with More Definite Statements and RICO
Statements incorporated as Exhibits) as well as the RICO Statements filed by <u>Federal</u> and
<u>O'Neill</u> plaintiffs as to Tadamon Islamic Bank pursuant to court-approved stipulations. *See*
Exhibit A for a compilation of pleadings related to Tadamon Islamic Bank.

Tadamon Islamic Bank operates through its main office in Khartoum and nineteen branches scattered throughout Sudan. The bank's corporate structure included four sub-branches and three subsidiary companies: Tadamon Islamic Co. for Trade and Investment, Ltd., Tadamon Islamic Company for Agricultural Development, Ltd., and El Tadamon Real Estate Company, Ltd. In addition, Tadamon Islamic Bank held material investments in fifteen entities engaged in service and industrial sectors in Sudan. The bank is listed on the Khartoum Stock Exchange as a public company.

Tadamon is believed to be a subsidiary of the Islamic Investment Company of the Gulf (Bahrain), which in turn is part of DMI S.A.  Current and former shareholders of Tadamon Islamic Bank include co-defendants Osama Bin Laden, Al-Baraka Investment and Development Company and Faisal Islamic Bank (Sudan), Dubai Islamic Bank, and Mohammed Hussein Al Amoudi. Along with co-defendants Daar Al-Maal Al-Islami Trust and Faisal Islamic Bank (Sudan), Tadamon Islamic Bank is a major shareholder in co-defendant Al Shamal Islamic Bank. Tadamon Islamic Bank joined the provisional Board of Directors of Al Shamal in July 1988 and has been a shareholder since March 26, 1986.

Tadamon Islamic Bank reported total assets of 83.5 billion Sudanese Dinars (US $326 million) in 1999. The bank's primary holdings were in the import/export, industrial and agricultural sectors.  Tadamon Islamic Bank has become a magnet for Sudanese nationals with business in overseas markets. The bank receives daily transfers from Saudi Arabia, Oman, United Arab Emirates and Yemen and has maintained correspondent relationships with banks in Asia, Europe, the Middle East and the United States of America.

Since commencing operations on March 24, 1983, Tadamon Islamic Bank has adhered to a set of Islamic banking principles defined by Shari'a law. Six Islamic banks opened in Sudan between 1978 and 1984, of which Tadamon Islamic Bank was the second. Only a month after the

3

bank began operating, co-defendant Al-Shamal Islamic Bank obtained banking authorization from the Sudanese government.

As noted above, Tadamon is a major shareholder in Al Shamal Islamic Bank. Al Shamal itself maintains correspondent banking accounts in the United States with Citibank, Arab American Bank and American Express Bank. In addition, Dar al Maal al Islami Trust, an indirect parent company of Tadamon, oversees significant holdings and maintains considerable business contacts with the United States.

      B.    <u>Tadamon and al Qaida</u>

According to Khalid Khalil Assad's biography of Osama Bin Laden, *A Fighter from Mecca* (2000), Bin Laden himself owned shares in several Sudanese enterprises including Tadamon Islamic Bank and co-defendants Faisal Islamic Bank and Al Shamal Islamic Bank.

Testimony from former al Qaida financier and expert government witness Jamal Ahmed Mohamed al-Fadl confirms that Tadamon Islamic Bank knowingly maintained accounts for al Qaida operatives. During the 1998 embassy bombings trial, al-Fadl testified on February 6, 2001, that Osama Bin Laden's assistant, Abdouh al Mukhlafi, used the bank at Bin Laden's behest:

> *Do you recall anyone else that had bank accounts in their name for al Qaida?*
>
> - Abdouh al Mukhlafi.
>
> *Who was this person named Abdouh al Mukhlafi?*
>
> - He is from Yemen.
>
> *What role did he play for Bin Laden?*
>
> He goes with Bin Laden when Bin Laden travel outside or inside Sudan.
>
> *What role did he play for Bin Laden when Bin Laden traveled?*
>
> - He is like bodyguard for him, and also if Bin Laden, he needs bank something, he use account for that.

4

> *Did he handle money during the travel?*
>
> - Yes.
>
> *Where were the accounts held? In what countries?*
>
> - In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank]." [2]

In March 1991, co-defendant Hassan Al Turabi's National Islamic Front ruling government instituted the Islamic *Shariah* Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad) …The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief . . . mobilization and training of the popular defence forces; and providing for martyrs' families."

The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal Islamic Bank, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

C.     Al Shamal Islamic Bank

Because Tadamon Islamic Bank is a major shareholder in Al Shamal Islamic Bank, its activities must be considered as well in determining this motion to dismiss.  The government of Sudan granted approval to Al Shamal Islamic Bank (herein "Al Shamal") in April 1983 in response to a request from the Northern State Government (under the control of the National Islamic Front and Hassan Al Turabi), Al Shamal Investment and Development Company and Saleh Abdullah Kamel.  The bank received an initial capitalization of USD $20 million.  Al Shamal issued subscription shares in April 1984.  The Northern State Government, Omer

---

[2]      Testimony of Jamal Ahmed Al-Fadl, *U.S. v. Usama bin Laden, et al.* (Feb. 6, 2001).

Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and Faisal Islamic Bank (Sudan) purchased shares in this initial offering.

The government granted final approval to Al Shamal in July 1988. Its provisional board included Al Baraka Investment and Development Corporation as well as co-defendants Faisal Islamic Bank (Sudan) and Tadamon Islamic Bank. The bank commenced operation on January 2, 1990, with paid-up capital of approximately $3.9 million. As of late 2001, co-defendants Al-Bir International Organization (Benevolence International Foundation), Faisal Islamic Bank (Sudan), Tadamon Islamic Bank and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal, with Batterjee as its Chairman.

Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-founder of and major shareholder in Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps . . . Jihad has now become an obligation that comes before any other duty."

Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America. In New York, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and Citibank.

Al Shamal shareholders also maintain significant U.S. operations. Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States.[3] In addition, Al Shamal chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially Designated Global Terrorist entity, in the United States in 1992.

---

[3]      As detailed in the RICO statements and other pleadings already filed against DMI Trust, and incorporated herein by reference

D.    Al Shamal and al Qaida

Al Shamal knowingly and intentionally provided financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and facilitated weapons and military equipment purchases for al Qaida.

Osama bin Laden used Al Shamal extensively during his five-year stay in Sudan.  At the invitation of Hassan Al Turabi, leader of the Sudan's governing National Islamic Front party, bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises.  Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaida.  Bin Laden even provided the institution with USD $50 million in capital.[4]  As the 9/11 Commission explained:

> By the fall of 1989, Bin Ladin had sufficient stature among Islamic extremists that a Sudanese political leader, Hassan al Turabi, urged him to transplant his whole organization to Sudan. Turabi headed the National Islamic Front in a coalition that had recently seized power in Khartoum. Bin Ladin agreed to help Turabi in an ongoing war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad. While agents of Bin Ladin began to buy property in Sudan in 1990, Bin Ladin himself moved from Afghanistan back to Saudi Arabia. . . .

> Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaida finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes.

*Final Report of the Nat'l Commission on Terrorist Attacks Upon the United States* at 57.

---

[4]      According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."

As part of Al-Fadl's 2001 testimony, he confirmed that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank.[5]  Wadi el-Hage, former personal secretary to bin Laden convicted for his role in the bombings, also testified before the investigating grand jury that bin Laden kept accounts at Al Shamal Bank:

> When you for Osama bin Laden in the Sudan, how much were you paid?
>
> *$1,200 a month.*
>
> For how long did you work for him [Osama bin Laden]?
>
> *Almost two years.*
>
> What Banks did he keep his money at?
>
> *Bank Al Shamar.[6]*

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank.  Al-Fadl also described acting as courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan.  Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership.  When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?
>
> *Abu Fadhl, he bring it from Shamal Bank and he bring it to me.*
>
> Abu Fadhl brought it from the Shamal Bank?
>
> *Yes.*
>
> Is that a bank in the Sudan?
>
> *Yes.[7]*

In the same trial, another former al Qaida operative stated that al Qaida used Al Shamal for operational purposes.  The witness was wired USD $250,000 via the Bank of New York for

---

[5]    Testimony of Jamal Ahmed Al-Fadl, *U.S. v. Usama bin Laden, et al.* (Feb. 6, 2001).

[6]    The El-Hage testimony was read to the jury on February 20, 2001, during the trial of *U.S. v. Usama bin Laden, et al*.

[7]    Testimony of Jamal Ahmed Al-Fadl, *U.S. v. Usama bin Laden, et al* (Feb. 6, 2001).

the purchase of an airplane which he delivered to Osama bin Laden.  Upon presenting him with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route.  The witness took the check to Al Shamal and cashed it.[8]

The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank.  Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan.  A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia.  This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

Sen. Carl Levin testified before the Senate Committee on Banking, Housing and Urban Affairs that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities,[9]  and a 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimated that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

Co-Defendant Yasin Al-Qadi wired more than $22 million from bank accounts in Switzerland to al Qaida operatives and entities between 1990 and 2003.  Al-Qadi transferred nearly half of these funds through Al Shamal Bank.

E.    Faisal Islamic Bank (Sudan)

The Faisal Islamic Bank (Sudan) ("FIBS") was chartered in Khartoum in 1983.  Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of

---

[8]    Testimony of Essam Al Riddi, *U.S. v. Usama bin Laden, et al* (Feb. 14, 2001).

[9]    Statement of Sen. Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (Sept. 26, 2001).

Hassan Al Turabi.  In 1983, Turabi and the National Islamic Front began to convert Sudanese banks toward an Islamic banking system.  FIBS is a major shareholder of Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

FIBS soon became a key bank for the National Islamic Front and for Turabi.  The bank supplied loans to the National Islamic Front and to its prominent members.  In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters.  Through this association, Turabi's party became the best financed in the Sudan.  Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan.[10]

F.     Dar Al Maal Al Islami Trust

Dar Al Maal Al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981.  Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).[11]  In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."

DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

According to its spokesmen, DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an

---

[10]     Testimony of Jamal Ahmed Al-Fadl, *U.S. v. Usama bin Laden, et al.* (Feb. 6, 2001).

[11]     The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money").  DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank.

Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."  More: "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim.  The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."

Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as "Mujahideen".  As this is the title given to warriors engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).  In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to financial jihad: "May Allah bless your Jihad and all your efforts.  May He aid you and affirm your faith."

In addition, DMI Trust itself laundered money for al Qaida, knowingly and intentionally providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

## II.    PLAINTIFFS' FACTUAL PLEADINGS ARE SUFFICIENT

Tadamon offers three arguments against the factual pleadings lodged against it: that they are too "conclusory"; that they insufficiently detailed the forms of material support Tadamon provided to al Qaida; and that plaintiffs have failed to plead causation sufficiently.  Each of these arguments lacks merit by failing to comprehend properly the notice pleading requirements of the Federal Rules.

11

A.    <u>Standard for Granting Motions to Dismiss</u>

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in plaintiffs' favor. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

B.    <u>The Liberal Requirements of Notice Pleading</u>

A motion pursuant to Fed. R. Civ. P. 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v.*

12

*McDonald's Corp.*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October 2005, the Second Circuit reiterated and reaffirmed the notice pleading standard set forth in Rule 8 as applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005). In *Twombley*, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." 425 F.3d at 107. In the context of antitrust pleading, the Second Circuit reminded litigants that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116. Indeed, a district court may not add create higher pleading standards than those set forth in the Federal Rules. Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit has held unequivocally, "If that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so." 425 F.3d at 117.

C.     Plaintiffs Have Properly Supplemented Their Pleadings

Tadamon attempts to fabricate an issue by questioning the manner in which Plaintiffs have supplemented their pleadings through the RICO Statements and consolidated pleadings pursuant to this Court's case management orders.  It claims again that the pleadings are too "conclusory", and makes the novel and wholly unfounded argument that Fed. R. Civ. P. 15(d)

only permits such pleadings to contain events which occurred following the date of the initial pleading.   They provide no support for this assertion.

On the other hand, paragraph 14 of Case Management Order No. 2 explicitly authorized the filing of such statements by the <u>Federal</u> plaintiffs, and paragraph 13 clearly permitted the filing of " . . . more definite statements and/or additional allegations against existing Defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to the previously-filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint."

Moreover, Tadamon explicitly stipulated with the <u>O'Neill</u> plaintiffs that such statements would be filed "as required in Paragraph 7 of the Court's Standing Rules of Practice and in Paragraph 14 of CMO No. 2, within thirty (30) days of the Court's approval of this stipulation."[12]  Ultimately, this and the material included in the First Consolidated Complaint filed on September 30, 2005, including the substance of the other More Definite Statements incorporated and appended thereto, are pleadings.  They must be considered.

Furthermore, judicial precedent uniformly hold that RICO Statements should be treated as part of the pleadings.  *See*, *e.g.*, *McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001).

Moreover, the incorporation of the RICO and More Definite Statements into plaintiffs' Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules. Fed. R. Civ. P. 10(c), to which Tadamon notably avoids reference, provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

---

[12]      Docket No. 1690, paragraph two (filed 2-14-06).

Fed. R. Civ. P. 10(c).  In view of the plain language of Rule 10(c), the Plaintiffs' incorporation of the RICO and More Definite Statements into their Complaints, by reference or attachment as exhibits, complies with both the letter and spirit of the Federal Rules.[13]  Tadamon was required to consider these additional pleadings in its response; it failed to do so.

> D.  "Conclusory" Allegations Are Perfectly Proper

Tadamon protests that the allegations are too "conclusory".  This misapprehends the proper pleading standard, as the above cases demonstrate, which require at this stage of the litigation only fair notice of the relevant allegations, to be fleshed out more fully following full and proper discovery.  Indeed, in *Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of *Phelps* in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge.  Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory.  Many well-pleaded complaints are conclusory.  And while we do not have to accept conclusions of law as true, conclusions of fact are another matter."  *Id*. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

## III.   PLAINTIFFS HAVE PROPERLY PLED THE LEGAL CASE FOR TADAMON'S LIABILITY

Tadamon disputes whether the provision of "ordinary banking services" to Osama bin Laden and al Qaida could lead to liability, and whether bin Laden's use of the bank or any other investor's behavior could lead to liability.  Beyond that, Tadamon questions whether causation has been properly pleaded.  We now address each contention in turn.

---

[13]     Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

A.      <u>Extraordinary Banking Services</u>

Tadamon's knowing support of Osama bin Laden through the years, both directly and through other institutions it influenced or influencing it, is far more than mere "ordinary banking services."  Given that this court must accept plaintiff's pleadings as true for purposes of ruling on this motion, it must adjudicate these claims based on the facts as pled.  Plaintiffs have alleged that the ruling National Islamic Front of the Sudan and the Northern State Government knowingly and consciously collaborated with bin Laden to provide him with a safe haven for hosting terrorist camps and building al Qaida's infrastructure while using financial institutions like Tadamon Islamic Bank to build and distribute capital, in exchange for bin Laden's assistance with local construction projects.

Contrary to the cases cited by Tadamon, there certainly can be civil liability in this jurisdiction for the knowing provision of such financial services to avowed terrorists. In a recent Eastern District of New York case, *Linde v. Arab Bank, PLC,* Nos. 04-CV-2799, 04-CV-5449, 05-CV-365 (E.D.N.Y.), Arab Bank was alleged to have provided material and financial to terrorists by collecting and receiving account funds for the benefit of designated terrorist groups. Arab Bank, like the instant defendant, attempted to recast Plaintiffs' allegations as evidence of merely "routine banking services."

In an order dated September 2, 2005, Judge Nina Gershon properly disagreed, and held that "[n]othing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant.  Although the Bank would like this court to find . . . that it is engaged in routine banking services . . . given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing 'routine' about the services the Bank is alleged to provide." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y 2005).  As in the *Linde* case, plaintiffs herein have pled that Tadamon knew and intended that the funds it received as deposits and transmitted to various organizations and

individuals, including  bin Laden, were to be used for conducting acts of international terrorism.
Federal RICO Statement, Exhibit "A" at 7; O'Neill RICO Statement, Exhibit "A" at 14.

In addition, the allegations regarding the interrelatedness of all the entities involved in
assisting al Qaida and facilitating al Qaida's growth in Sudan only reinforce the proof of
Tadamon's knowledge and intend to further the conspiracy.

This factual basis demonstrates that Tadamon fits within the existing framework for
establishing conspiracy liability against banks for terrorist support, as the *Linde* decision affirms:

> As to conspiracy, they adequately allege that Arab Bank
> knowingly and intentionally agreed to provide services to
> organizations it knew to be terrorist organizations and that they
> were injured by an overt act which was done in furtherance of the
> common scheme. It is not necessary that they allege that Arab
> Bank either planned, or intended, or even knew about the particular
> act which injured a plaintiff. *See Halberstam*, 705 F.2d at 487. The
> factual allegations of the complaints sufficiently support an
> inference that Arab Bank and the terrorist organizations were
> participants in a common plan under which Arab Bank would
> supply necessary financial services to the organizations which
> would themselves perform the violent acts.

*Linde*, 384 F. Supp. 2d at 584, citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir.
1983).  Plaintiffs have sufficiently pled that Tadamon knew it was assisting bin Laden and al
Qaida, and knew or should have known that their actions in furtherance of the conspiracy to
commit acts of international terrorism against the United States, its nationals and allies, including
the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family
members with severe and permanent physical, psychological, and emotional injuries.  Federal
FAC ¶ 606; O'Neill FCC ¶ 152.  Nothing more is required at the pleadings stage.

B.     Causation Been Sufficiently Pled

Tadamon claims that "Plaintiffs must present sufficient allegations that "Defendant's
conduct . . . was the proximate cause of Plaintiffs' injuries."  This misstates what this Court has
held, and is not what the law requires.

Recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied.  In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id.* at 511.  The Second Circuit rejected this approach.  It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512.  Quoting the unanimous Supreme Court ruling in *Swierkiewicz*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13).

As this Court has recognized, "[i]n light of Al Qaida's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaida." *In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005). Consistent with this holding, plaintiffs' consistent and specific averments of Tadamon's knowing and intentional sponsorship of al Qaida are, in and of themselves, sufficient to establish causation at this stage of the litigation.

Even if more specific allegations of causation were required, plaintiffs have met that burden.  Plaintiffs have sufficiently explored the causal link between Tadamon's eager support of bin Laden and the September 11 Attack.  See, e.g, O'Neill FCC ¶ 22 ("Certain of the

conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks."); Federal FAC ¶¶ 340-342 ("Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Tadamon Islamic Bank continued to maintain those accounts.  In doing so, Tadamon Islamic Bank knowingly provided financial services and other forms of material support to al Qaida.   As the foregoing demonstrates, Tadamon Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Tadamon Islamic Bank's participation in al Qaida's jihadist campaign")

As this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 829.  Plaintiffs have properly pleaded causation.

## IV.   JURISDICTION IS PROPER OVER TADAMON ISLAMIC BANK

Finally, Tadamon argues that plaintiffs lack jurisdiction over it.  This argument lacks merit.  For participating in a conspiracy directed towards the United States as a whole, Tadamon is properly within the jurisdiction of this Court.

A.   Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie* Showing Of Personal Jurisdiction May Be Established Solely By Legally Sufficient Allegations Of Jurisdiction

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal jurisdiction varies depending upon the procedural posture of the litigation:

Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation

> omitted] legally sufficient allegations of jurisdiction.   At that
> preliminary stage, the plaintiff's *prima facie* showing may be
> established solely by allegations.   After discovery, the plaintiff's
> *prima facie* showing, necessary to defeat a jurisdiction testing
> motion, must include an averment of facts that, if credited by the
> trier, would suffice to establish jurisdiction over the defendant.
> [citations omitted].   At that point, the *prima facie* showing must be
> factually supported.

*Ball v. Metallurgie Hoboken Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), <u>cert. denied</u>, 498

U.S. 854 (1990).   In order to defeat such a motion, a plaintiff need only present allegations that

connect the defendant with the applicable forum – here, the United States.   In deciding such a

motion, the plaintiff's jurisdictional averments must be taken as true.  *Id.*;  *In re Magnetic*

*Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).   Moreover, the court must

construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.

*DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).   As this Court has held:

> Because these motions are brought before discovery and decided
> without an evidentiary hearing, Plaintiffs need only make a prima
> facie showing that personal jurisdiction exists. *PDK Labs, Inc. v.*
> *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade*
> *Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993).
> Plaintiffs may rely entirely on factual allegations, *Jazini v. Nissan*
> *Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail
> even if Defendants make contrary arguments, *A.I Trade*, 989 F.2d
> at 79. In resolving the motions, the Court will read the complaints
> and affidavits in a light most favorable to Plaintiffs. *PDK Labs*,
> 103 F.3d at 1108.

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d. at 804.

B.      <u>The Exercise of Personal Jurisdiction Comports With Due Process.</u>

Among the claims against Tadamon are claims under the Anti-Terrorism Act ("ATA")

and RICO.   It is beyond question that if plaintiffs have stated valid claims under those federal

statutes, this Court may assert personal jurisdiction over them to adjudicate the ATA and RICO

claims as well as all of the other claims asserted in the complaints. The ATA provides that claims

may be brought in "any district where any plaintiff resides" and that process "may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). RICO similarly provides that "process … may be served in any judicial district of the United States …" 18 U.S.C. § 1965(b).[14]

Because both statutes provide for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (internal citations omitted); *see also SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 125 (D.D.C. 1984).

1.  <u>Personal jurisdiction is satisfied under a general jurisdiction standard.</u>

As previously stated, Tadamon correspondent relationships with banks in Asia, Europe, the Middle East and the United States, where it maintained a relationship with the Bank of New York.  It is also a major shareholder in Al Shamal Islamic Bank, which maintains correspondent banking accounts in the United States with Citibank, Arab American Bank and American Express Bank.  In addition, Dar al Maal al Islami Trust, an indirect parent company of Tadamon, oversees significant holdings and maintains considerable business contacts with the United States.

Because the court has personal jurisdiction over Tadamon with respect to plaintiffs' ATA or RICO claims, then it may also assert pendent personal jurisdiction over the remaining claims that derive from the same events.  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993).

---

[14]     This Court has furthermore recognized that "In situations in which Defendants were not served in the United States pursuant to the ATA, Rule 4(k)(2) acts as a personal jurisdiction gap-filler 'in the enforcement of federal law.' Fed. R. Civ. P. 4(k)(2) advisory committee's note." *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005).

2.	Jurisdiction is proper under an "purposeful direction" theory

Tadamon is subject to personal jurisdiction here because, in providing support to Osama

bin Laden and al Qaida, which had long publicly announced its intentions to attack the United

States, it and its parent company purposefully directed its conduct here. *In re Terrorist Attacks*

*on September 11, 2001,* 349 F. Supp. 2d at 810. Each case should be evaluated in light of its own

unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with

"fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945). The issue is whether the defendant should "reasonably anticipate being haled into court."

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Asahi Metal Industry*

*Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987).

The Supreme Court has further stated that reasonableness "considerations sometimes

serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts

than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985); *see*

*Palestine Info. Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic*

*Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind statute giving terrorism

victims remedy "could significantly lower the threshold of constitutional requirements"). The

reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of

the horrific manner in which U.S. residents were attacked for no reason other than that they were

in the United States. The policies of "fair play" and "substantial justice" cannot be applied

without recognizing the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims.  Case

law makes clear that where terrorists target Americans, they should reasonably foresee being

haled into court in the United States, such that due process is not violated by the exercise of

jurisdiction. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d. at 807-12.

The record before this Court demonstrates that bin Laden and al Qaida had publicly and

repeatedly announced their intention to attack the United States from the early 1990s on, and that

during the time Tadamon provided significant financial support to Osama bin Laden and his growing al Qaida enterprise.  Because of bin Laden's public urging of violence against American interests as early as 1992 and his arrangement with the Sudanese government and its subsidiaries, Tadamon knew that its support would further acts of international terrorism directed at the United States. In this context, Tadamon's conduct amounts to purposeful direction at the United States sufficient to satisfy the "minimum contacts" test. No more is required to satisfy the "minimum contacts" test and subject Tadamon to jurisdiction in the United States.

      3.      <u>Additionally, Jurisdiction Is Proper Under Conspiracy Theory</u>

Ultimately, Tadamon is also subject to this Court's jurisdiction because, as alleged in the complaints and RICO Statements, it conspired with al Qaida to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum, including those of the September 11 hijackers. *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (acts committed in New York by co-conspirators subject out of state defendant to jurisdiction under CPLR 302(a)(2)); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over absent defendants pursuant to a conspiracy theory by imputing forum acts of coconspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). The actions of the co-conspirators within the forum serve to establish minimum contacts sufficient to satisfy Due Process over the non-resident defendant. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course complained of in the suit, supplies the necessary minimum contacts."); *Andre*

*Emmerich Gallery v. Segre,* 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to nonresident defendant establishes sufficient minimum contacts.

The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital,* 778 F. Supp. at 1267. This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy," Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (citations omitted). Plaintiffs have met this burden.

C.    At A Minimum, Jurisdictional Discovery Is Warranted

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2) motion); Moore's Federal Practice § 12.31 [7] (3d ed. 2003). This Court has done so with regards to other defendants, and at a minimum should do so here, especially since pertinent jurisdictional facts lie within the control and knowledge of the defendant contesting jurisdiction. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986); *Investment Properties Intl., Ltd. v. 10S, Ltd.,* 459 F.2d 705, 707-08 (2d Cir. 1972).

## V.      CONCLUSION

Plaintiffs have properly pleaded their case against Tadamon Islamic Bank under the

Federal Rules of Civil Procedure.  Its motion to dismiss must be denied.


Respectfully submitted,

COZEN O'CONNOR

Dated: May 26, 2006                    BY: _____/s/_____
                                            Stephen A. Cozen, Esquire
                                            Elliott R. Feldman, Esquire
                                            Sean P. Carter, Esquire
                                            Adam C. Bonin, Esquire
                                            1900 Market Street
                                            Philadelphia, PA 19103
                                            Tele: (215) 665-2000
                                            Fax: (215) 665-2013

                                            Attorneys for *Federal Insurance* Plaintiffs
                                            Jerry S. Goldman
                                            LAW OFFICES OF JERRY S. GOLDMAN
                                            AND ASSOCIATES, P.C.
                                            111 Broadway, 13th Floor
                                            New York, New York 10006
                                            Tel.: (212) 385-1005
                                            Fax: (212) 346-4665

                                            Attorney for *O'Neill* Plaintiffs