## EXHIBIT A

**Summary Table of References in the Pleadings to the Conspiracy and to**
***Tadamon Islamic Bank***[1]

**The Conspiracy**[2, 3]

---

[1] This table is presented as an index, serving as a guide to indicate where, in the various pleadings which are part of the instant multi-district litigation certain allegations are located. It is not all-inclusive, but serves merely as a reference table.

[2] The pleadings referenced in this Appendix include (1) the O'Neill Al Baraka First Consolidated Complaint (O'Neill Al Baraka FCC), filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15; (2) the O'Neill Plaintiffs' RICO Statement applicable to the defendant, Tadamon Islamic Bank, filed on or about March 15, 2006, Docket No. 1728, pursuant to a stipulation of the parties approved by the Court, Docket #1690 ("O'Neill RICO Statement"); (3) the Federal Insurance First Amended Complaint as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15; (4) the Federal Ins. Co. Plaintiffs' RICO Statement filed on or about December 16, 2005**,** Docket #1723, pursuant stipulation (Docket # 1667) ("Federal RICO Statement"); (5) the Ashton Sixth Amended Complaint ("Ashton") filed on September 30, 2005, as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (6) the Cantor Fitzgerald/Port Authority plaintiffs' First Amended Complaint ("Cantor FAC") as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (7) the Burnett Third Amended Complaint ("Burnett"), as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (8) the Continental Complaint as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (9) the World Trade Center Complaint ("WTC"), as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; (10) the Euro Brokers complaint, as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15; and, (11) the New York Marine Second Amended Complaint ("NYMSAC") as may be amended from time to time pursuant to Fed. R. Civ. Proc. 15. Tadamon Islamic Bank ("TIB") was served via publication.

In February, 2006, TIB entered into a stipulation with Federal, as referenced above, setting forth a briefing stipulation. This was the first time that TIB had appeared in any action in 03-MDL-1570. On February 14, 2006, this Court approved the stipulation of TIB and the O'Neill Plaintiffs (docket no. 1298). Pursuant to this stipulation, it permitted the filing of a RICO statement which was filed on March 15, 2006 (docket no. 1690). The stipulation specifically authorized the filing of the RICO Statement ("…shall serve their respective RICO Statements, as required by Paragraph 7 of the Court's Standing Rules of Practice and in Paragraph 14 of Case Management Order no. 2…")

[3] There are references preceding the various substantive causes of actions in the O'Neill Al Baraka First Consolidated Complaint incorporating the various paragraphs in the pleadings without setting them forth at length. See, e.g., O'Neill Al Baraka First Consolidated Complaint ¶ 134.

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

1.      On September 11, 2001, approximately 3,000[4] individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("Federal FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC" or "O'Neill Al Baraka FCC" or "Al Baraka FCC") ¶¶ 1, 6-10 22-5; WTC ¶ 365; Cantor FAC ¶¶ 4-11.

2.      The conspirators consist of the defendants named in the three O'Neill actions (Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka Investment & Development Corporation, *et al*., 04 CV 1923 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Kingdom of Saudi Arabia, *et al.*, 04 CV 1922 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Republic of Iraq, *et al.,* 04- CV 1076) ("O'Neill Iraq FCC") (with such complaints also including 'John Does'), as well as in the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL-1570 (RCC), and others. O'Neill RICO Statement, ¶ 3.

3.      The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶ 27; Cantor FAC ¶¶ 158-161.

4.      On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Al Baraka FCC ¶¶ 6-9.

5.      All 19 hijackers were members of the al Qaida network. O'Neill Al Baraka ¶¶ 6-9.

6.      All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. O'Neill Al Baraka FCC ¶ 10.

7.      The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett ¶¶ 649, 650, 654, O'Neill Iraq FCC ¶¶ 23, 38, 41, 63, 83, 250, 251; O'Neill Al Baraka FCC ¶¶ 22-4, 25, 144, 158-9, 162; Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror.

---

[4] Paragraph 127 of the FCC pleads as follows:

> Attached hereto as Exhibits and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations/RICO Statements:
>
> A) More Definite Statements/Additional Allegations - Victims List

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

9.  Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

10. The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Iraq FCC ¶ 252; O'Neill Al Baraka FCC ¶ 144; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158..

11. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, ¶ 649; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

12. Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama Bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks.  O'Neill Iraq FCC ¶ 38; O'Neill Al Baraka FCC ¶ 22; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158;.

13. Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities.  O'Neill Al Baraka FCC ¶ 23; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

14. Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

15. The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 25; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 231-233.

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

16.   The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Al Baraka FCC ¶ 27; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158.

17.   The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Al Baraka FCC ¶¶ 177-180; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 177-224.

18.   As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 19, 23, 251; O'Neill Al Baraka FCC ¶ 157; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 231-33.

19.   As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-2; O'Neill Al Baraka FCC ¶ 158; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

20.   As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 159; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 177-224.

21.   The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance ¶¶ 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 160, 163, 167; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224.

22.   As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶ 161; O'Neill Iraq FCC ¶¶ 254, 270, 271; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224.

23.   Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

24.   OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Al Baraka FCC ¶ 165; O'Neill Iraq FCC ¶¶ 223, 228, 242; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

25.   The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties.

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

O'Neill Al Baraka FCC ¶ 168; O'Neill Iraq FCC ¶ 251; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 234-36.

26.     By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents.  Federal Insurance FAC ¶ 642; O'Neill Al Baraka FCC ¶ 169; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

27.     In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance FAC ¶ 628; O'Neill Al Baraka FCC ¶ 177; O'Neill Iraq FCC ¶ 267; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

28.     The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett ¶ 662, O'Neill Al Baraka FCC ¶¶ 178-180; O'Neill Iraq FCC ¶¶ 267, 272; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 162-176, 177-224, 234-56.

29.     The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Al Baraka FCC ¶162; O'Neill Iraq FCC ¶ 63; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158; 162-176, 177-224, 234-56.

30.     The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶ 163; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

31.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett ¶ 674; Continental Casualty ¶ 604; Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

32.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett ¶ 673; Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶¶ 152, 169; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158, 162-176, 177-224, 234-56.

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

33.     The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the
International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill RICO
Statement, ¶ 6a; O'Neill Iraq FCC ¶¶ 263-5; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-
158, 162-176, 177-224, 234-56; Cantor RICO Statement.

34.     The attacks of September 11, which caused the deaths and damages to the Plaintiffs,
constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331.
O'Neill Al Baraka FCC ¶¶ 139, 172; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 92, 141-158,
162-176, 234-56; Cantor RICO Statement.


**The Relationship between Tadamon Islamic Bank and the Conspiracy**

35.     Defendants Al Baraka Investment & Development Corporation a/k/a Al Baraka Bank
a/k/a Dallah Albaraka Group, LLC, National Commercial Bank, a/k/a National
Commercial Bank of Saudi Arabia *AND* SNCB Corporate Finance Ltd., *AND* SNCB
Securities Limited (with National Commercial Bank, SNCB Corporate Finance Ltd. And
SNCB Securities Limited collectively referred to herein as "NCB" or "National
Commercial Bank"),  Faisal Islamic Bank – Sudan a/k/a Faysal Islamic Bank- Sudan
a/k/a Faisal Islamic Bank a/k/a Faysal Islamic Bank, Al Rajhi Banking and Investment
a/k/a/ Al Rajhi Bank, Al Barakaat Exchange LLC a/k/a al Barakaat Bank, Dar al Maal al
Islami a/k/a a/k/a Dar-Al-Mall Al Islami a/k/a Dar al-Maal al- Islami *(DMI) and* Dar al
Maal Administrative Services SA a/k/a DMI Administrative Services SA *and* Dar Al
Maal Islami Trust (collectively "DMI" or "Dar al Mall Islami"), Al Shamal Islamic Bank
a/k/a Shamel Bank a/k/a/ Bank el Shamar, Tatex Trading GmbH, Triple-B Trading
GmbH, **Tadamon Islamic Bank**, Arab Bank, PLC, Dubai Islamic Bank, Bank al-Taqwa,
Ltd. a/k/a Bank of Taqwa a/k/a Bank Al-Taqwa a/k/a Bank of Taqwa Limited, Nada
International Anstalt a/k/a Yousef M. Nada & Co Gesellschaft MBH a/k/a Youssef M.
Nada Establishment, Saudi American Bank, Youssef M Nada & Co. Yousef M. Nada &
Co Gesellschaft MBH a/k/a Youssef M. Nada Establishment, Schreiber & Zindel, Dr.
Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin
Wachter, Sercor Treuhand Anstalt, Albert Friedrich Armand Huber, a/k/a Ahmed Huber
a/k/a Albert Huber a/k/a Armand Albert Friedric  a/k/a Armand Huber a/k/a/ Ahmad
Huber-el Biali, Ali Ghaleb Himmat, al Taqwa bank a/k/a Bank Al Taqwa, a/k/a Bank al
Taqwa Limited a/k/a Bank of Taqwa Limited, al Taqwa Trade, Property and Industry,
Ltd. a/k/a al Taqwa Trade, Property and Industry Company Limited, a/k/a al Taqwa
Trade, Property and Industry Establishment a/k/a Himmat Establishment a/k/a Hochburg
a/k/a Waldenburg a/k/a Al Taqwa Trade, Property and Industry Limited, Akida Bank
Private Limited, Akida Investment Co. Ltd, NADA Management Organization, S.A.,
Youssef M. Nada a/k/a Yousseff Mustafa Nada a/k/a Youssef Nada, Yousef M. Nada &
CO. Gesekkscgaft, M.B.H., Nada International Anstalt, Youssef M. Nada & Co., Nasco
Business Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin
Holding A.S., Nascoservice S.R. L., Nascotex S.A., Barzan E-Tikriti a/k/a/ Barzan
Ibrahim Hasan a/k/a Barzan Ibrahim Hasan al-Tikriti, Metalor a/k/a La Groupe Metalor

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

a/k/a La Groue Metalor Technologies a/k/a Metalor Group a/k/a Metalor Technologies SA, Babca Dek Gottardo a/k/a Banca Del'Gottardo, Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group, International Holding Limited, Nasreddin International Group Limited Holding,  Ahmad I. Nasreddin a/k/a  Hadj Ahmed Nasreddin a/k/a Ahmed Idriss Nasreddin *AND* Nasreddin Group International Limited Holdings a/k/a Nasreddin International Group Holdings Limited *a/k/a* Nasreddin  International Group Ltd., Asat Trust Reg., and Islamic Investment Company of the Gulf (Bahrain) EC, are banks, financial organizations, and companies located all over the world who have conspired with Osama bin Laden and al Qaeda to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. O'Neill Al Baraka FCC ¶ 22 (emphasis added); Federal Insurance FAC ¶ 66; Cantor FAC ¶¶ 1, 11, 33-42, 49-50, 90-92, 122-135, 141-158; 162-176, 185-192, 234-56.

36.     Defendant Tadamon Islamic Bank was formed in Khartoum, Sudan on November 28, 1981. It has twenty-one different establishments and has several subsidiaries in the Sudan. O'Neill Al Baraka FCC ¶ 51.

37.     Defendant Tadamon Islamic Bank has facilitated, materially sponsored, aided and abetted, and/or conspired with al Qaeda. According to testimony in the 2001 trial of the 1998 U.S. embassy bombings in Africa, Tadamon Islamic Bank managed the financial accounts of al Qaeda operatives. O'Neill Al Baraka FCC ¶ 52.

38.     Defendant Tadamon Islamic Bank is also a shareholder of Defendant al Shamal Islamic Bank which is used extensively to support and finance al Qaeda operations.  O'Neill Al Baraka FCC ¶ 53.

39.     The shareholders of Tadamon Islamic Bank include Al Baraka, Saleh Abdullah Kamel, National Company for Development and Trade, Dubai Islamic Bank and Faisal Islamic Bank of Sudan. Federal Insurance FAC ¶ 335.

40.     Tadamon Islamic Bank has long provided financial services and other forms of material support to Al Qaida. Federal Insurance FAC ¶ 336.

41.     According to Jamal Ahmed Mohamed al Fadl, an al Qaida operative convicted in connection with the 1998 bombings of the U.S. embassies in Kenya and Tanzania, Tadamon Islamic Bank openly managed accounts of al Qaida operatives, including Abdouh al Mukhlafi, who served as Osama bin Laden's bodyguard while al Qaida's leadership structure was in the Sudan.  Federal Insurance FAC ¶ 337.

42.     Tadamon Islamic Bank is also a shareholder of Al Shamal Bank, another institution that has provided material support and sponsorship to al Qaida. Federal Insurance FAC ¶ 338.

43.     At all times material hereto, Tadamon Islamic Bank was aware that al Qaida cells maintained accounts with the bank, and that those accounts were being used to launder and distribute funds for al Qaida operations and terrorist attacks. Federal Insurance FAC ¶ 339.

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

44.  Despite its express knowledge that accounts it maintained were being used to launder and distribute funds for al Qaida operations and terrorist attacks, Tadamon Islamic bank continued to maintain those accounts.  In doing so, Tadamon Islamic Bank knowingly provided financial services and other forms of material support to al Qaida. Federal Insurance FAC ¶ 340.

45.  As the forgoing demonstrates, Tadamon Islamic Bank has, for a period of many years, provided critical financial and logistical support to al Qaida in relation to that terrorist organization's global jihad Federal Insurance FAC ¶ 341.

46.  The September 11th Attack was a direct, intended and foreseeable product of Tadamon Islamic Bank's participation in al Qaida's jihadist campaign. Federal Insurance FAC ¶ 342.

47.  Defendant Dubai Islamic Bank owns a significant equitable interest or shares in Defendant Tadamon Islamic Bank O'Neill Al Baraka FCC ¶ 54; Federal Insurance FAC ¶ 343.

48.  Defendant Dubai Islamic bank has sponsored al Qaida through its interest in Al Shamal Bank, Tadamon Bank and various al Baraka entities. Federal Insurance FAC ¶ 348.

49.  Defendant Al Baraka has provided substantial support to al Qaida through its subsidiaries and affiliates, including Tadamon Islamic Bank. Federal Insurance FAC ¶ 304.

50.  Defendant DMI has actively sponsored and supported the al Qaida movement through several of its subsidiaries, including but not limited to, Tadamon Islamic Bank. Federal Insurance FAC ¶ 311.

51.  Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.  Federal RICO Statement at p.2; O'Neill RICO Statement at p.4.

52.  Throughout the period from the early 1990's to September 11, 2001, Tadamon conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack. O'Neill RICO Statement at p.4.

53.  Tadamon agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise.  Federal RICO Statement at p.2; O'Neill RICO Statement at p.5.

54.  Tadamon has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.   Tadamon conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

Tadamon conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. O'Neill RICO Statement, Exhibit "A", at p.14.

55. Founded in Sudan[5] on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank" or "Tadamon") lists its address as Al-Tadamon Tower, Al-Baladia Avenue, Khartoum. Tadamon knowingly and intentionally provided material support in the form of financial services to al Qaida, including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida. Federal RICO Statement, Exhibit "A", at p.7; O'Neill RICO Statement, Exhibit "A", at p.14.

56. In 2000, Tadamon operated through its head office in Khartoum and nineteen branches scattered throughout Sudan. The bank's corporate structure included four sub-branched and three subsidiary companies: Tadamon Islamic Co. for Trade and Investment, Ltd., Tadamon Islamic Company for Agricultural Development, Ltd., and El Tadamon Real Estate Company, Ltd. In addition, Tadamon held material investments in fifteen entities engaged in service and industrial sectors in Sudan. The bank is listed on the Khartoum Stock Exchange as a public company. Federal RICO Statement, Exhibit "A", at p.7; O'Neill RICO Statement, Exhibit "A", at p.14.

57. Current and former shareholders of Tadamon Islamic Bank include co-defendants Osama Bin Laden, Al Baraka Investment and Development Company[6], Faisal Islamic Bank (Sudan)[7], Dubai Islamic Bank[8], and Mohammed Hussein Al Amoudi. Along with co-Defendants Dar al Maal al Islami Trust[9] and Faisal Islamic Bank (Sudan), Tadamon is a

---

[5] Sudan is a co-defendant in the O'Neill actions, listed as a defendant, along with certain named Sudanese government agencies, in *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia*, 04-CV-1922(RCC).

[6] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Al Baraka Investment and Development, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[7] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Faisal Islamic Bank, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[8] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Dubai Islamic Bank, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

[9] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-

EXHIBIT A:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

major shareholder in co-Defendant Al Shamal Islamic Bank ("Al Shamal").[10]  Tadamon
joined the Provisional Board of Directors of Al Shamal in July 1988 and has been a
shareholder since March 26, 1986.  Federal RICO Statement, Exhibit "A", at p.7; O'Neill
RICO Statement, Exhibit "A", at p.15.

58.    Tadamon reported total assets of 83.5 billion Sudanese Dinars (US $326 million) in 1999.
       The bank's primary holdings were in import/export, industrial and agricultural sectors.
       Federal RICO Statement, Exhibit "A", at p.8; O'Neill RICO Statement, Exhibit "A", at
       p.15.

59.    Tadamon has become a magnet for Sudanese nationals with business in overseas markets.
       The bank receives daily transfers from Saudi Arabia, Oman, United Arab Emirates and
       Yemen and maintains correspondent relationships with banks in Asia, Europe and the
       Middle East.  Federal RICO Statement, Exhibit "A", at p.8; O'Neill RICO Statement,
       Exhibit "A", at p.15.

60.    Since commencing operations on March 24, 1983, Tadamon Islamic Bank has adhered to
       a set of Islamic banking principles defined by Shari 'a.  Six Islamic banks opened in
       Sudan between 1978 and 1984, of which Tadamon was the second.  Only a month after
       the bank began operating, co-Defendant Al Shamal Islamic Bank obtained banking
       authorization from the Sudanese government.  Federal RICO Statement, Exhibit "A", at
       p.8; O'Neill RICO Statement, Exhibit "A", at p.15.

61.    As stated above, Tadamon is a major shareholder in Al Shamal Islamic Bank.  Al Shamal
       maintains correspondent banking accounts in the United States with Citibank, Arab
       American Bank and American Express Bank.  In addition, Dar al Maal al Islami Trust, an
       indirect parent company of Tadamon, oversees significant holdings and maintains
       considerable business contacts with the United States.  Federal RICO Statement, Exhibit
       "A", at p.8; O'Neill RICO Statement, Exhibit "A", at p.15.


**Activities with the Enterprise**


62.    According to Khalid Khalil Assad's biography of Osama bin Ladin, *A Fighter from
       Mecca* (2000), bin Ladin himself owned shares in several Sudanese enterprises including
       Tadamon and Faisal Islamic Bank and Al Shamal Islamic Bank.   Federal RICO
       Statement, Exhibit "A", at p.8; O'Neill RICO Statement, Exhibit "A", at p.16.

63.    Testimony from former al Qaida financier and expert government witness Jamal Ahmed
       Mohamed al-Fadl confirms that Tadamon Islamic Bank knowingly maintained accounts
       for al Qaida operatives.  During the 1998 embassy  bombings trial, 98-CR-1023 (LBS)

---

defendant Dar al Maal al Islami, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*,
04-CV-1923 (RCC).

[10] Plaintiffs herein incorporate by reference throughout this document the factual averments and
arguments contained within its RICO statement applicable to co-defendant Al Shamal, relating to
*Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

SDNY, al-Fadl testified on February 6, 2001, that Osama bin Ladin's assistant, Abdouh al Mukhlafi, used the bank at bin Laden's behest:

Do you recall anyone else that had bank accounts in their name for al Qaida?

*Abdouh al Mukhlafi.*

Who was this person named Abdouh al Mukhlafi?
*He is from Yemen.*

What role did he play for bin Laden?
*He goes with bin Laden when bin Laden travel outside or inside Sudan.*

Did he handle money during the travel?
*Yes.*

Where were the accounts held? In what countries?
*In Sudan and is in Bank Tadamon Islami [Tadamon Islamic Bank].*

Where else?
*Also we got account in Bank Faisl Islami.*

Federal RICO Statement, Exhibit "A", at p.8-9; O'Neill RICO Statement, Exhibit "A", at p.16.

65.     In March 1991, Hassan Al Turabi's National Islamic Front ruling government in Sudan instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No 239 dated March 7, 1991.  The Fund's stated purpose:

> "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad)…The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief…mobilization and training of the popular defence forces, and providing for martyrs' families."

Federal RICO Statement, Exhibit "A", at p.9; O'Neill RICO Statement, Exhibit "A", at p.17.

66.     The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal Islamic Bank, which contributed 7 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.  Federal RICO Statement, Exhibit "A", at p.10 O'Neill RICO Statement, Exhibit "A", at p.17.

**Al Shamal Islamic Bank, in which Tadamon Islamic Bank is major shareholder**

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

67.     The government of Sudan granted approval to Al Shamal Islamic Bank in April 1983 in response to a request from the Northern State Government (under the control of the NIF and Hassan al Turabi), Al Baraka Investment and Development Company and Saleh Abdullah Kamel.[11]   The bank received an initial capitalization of USD $20 million.   Al Shamal issued subscription shares in April 1984.   The Northern States Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and Faisal Islamic Bank (Sudan) purchased shares in this initial offering.   Federal RICO Statement, Exhibit "A", at p. 10; O'Neill RICO Statement, Exhibit "A", at p.17.

68.     Governor Mutasim Abdul—Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-founder of and major shareholder in Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps…Jihad has now become an obligation that comes before any other duty."   AP News (August 4, 1998).   Federal RICO Statement, Exhibit "A", at p. 10; O'Neill RICO Statement, Exhibit "A", at p.17.

69.     The Sudanese government granted final approval to Al Shamal in July 1988.   Chaired by Dr. Wahab Osman Sheikh Mosa, Al Shamal's provisional board included Al Baraka Investment and Development Corporation as well as co-Defendants Faisal Islamic Bank (Sudan) and Tadamon.   The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (US $3.9 million).   As of late 2001, Al-Bir International Organization (Benevolence International Foundation, a co-defendant in this matter), Faisal Islamic Bank (Sudan), Tadamon, and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal.   Federal RICO Statement, Exhibit "A", at p. 10; O'Neill RICO Statement, Exhibit "A", at p.18.

70.     Al Shamal is heavily invested in the Sudanese import/export sector and posted revenues of $6.2 million and total assets of $63.1 million in 2000.   Federal RICO Statement, Exhibit "A", at p. 11; O'Neill RICO Statement, Exhibit "A", at p.18.

71.     Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America.   In the United States, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and Citibank in New York.   Al Shamal shareholders also maintain significant U.S. operations.   Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States, as detailed in the RICO statements and other pleadings already filed

---

[11] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Saleh Abdullah Kamel , relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

against DMI Trust and incorporated herein by reference. Federal RICO Statement, Exhibit "A", at p. 11; O'Neill RICO Statement, Exhibit "A", at p.18.

72.    In addition, Al Shamal Chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially Designated Terrorist entity, in the United States in 1992. Federal RICO Statement, Exhibit "A", at p. 11; O'Neill RICO Statement, Exhibit "A", at p.18.

*Al Shamal and al Qaida*

73.    Al Shamal knowingly and intentionally provided financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and facilitating weapons and military equipment purchases for al Qaida. Federal RICO Statement, Exhibit "A", at p. 11; O'Neill RICO Statement, Exhibit "A", at p.19.

74.    Osama bin Laden used Al Shamal extensively during his five-year stay in Sudan. At the invitation of Hassan Al Turabi, leader of Sudan's governing National Islamic Front party, bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises. Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaida. Bin Laden even provided the institution with USD $50 million in capital. According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank." Federal RICO Statement, Exhibit "A", at p. 11; O'Neill RICO Statement, Exhibit "A", at p.19.

75.    As set forth previously, according to Khalid Khalil Assad's biography of Osama bin Laden, *A Fighter from Mecca* (2000), bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank. Federal RICO Statement, Exhibit "A", at p. 12; O'Neill RICO Statement, Exhibit "A", at p.19.

76.    Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank. Wadih El-Hage, former personal secretary to bin Laden convicted for this rile in the bombings, also testified before a Grand Jury, which testimony of was admitted at trail on Feb. 20, 2001, that bin Laden kept accounts at Al Shamal Bank:

When you worked for Osama bin Laden in the Sudan, how much were you paid?
*$1200 a month.*

For how long did you work for him [Osama bin Laden]?
*Almost two years.*

What Banks did he keep his money at?

- 13-

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

> *Bank el Shamar.*

Federal RICO Statement, Exhibit "A", at p. 12; O'Neill RICO Statement, Exhibit "A", at p.19.

77.    In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank. Al-Fadl also described acting as a courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?
> *Abu Fahl, he bring it from Shamal Bank and he bring it to me.*
>
> Abu Fadl brought it from the Shamal Bank?
> *Yes.*
>
> Is that the bank in the Sudan?
> *Yes.*

Federal RICO Statement, Exhibit "A", at p. 12; O'Neill RICO Statement, Exhibit "A", at p.20.

78.    In the same trial, another former al Qaida operative stated that al Qaida used Al Shamal for operational purposes. The witness was wired USD $250,000 *via* the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting bin Laden with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses occurred en route. The witness took the check to Al Shamal and cashed it. Federal RICO Statement, Exhibit "A", at p. 13; O'Neill RICO Statement, Exhibit "A", at p.20.

79.    The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992 for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports. Federal RICO Statement, Exhibit "A", at p. 13; O'Neill RICO Statement, Exhibit "A", at p.21.

80.    Senator Carl Levin, Chairman of the Senate Armed Services Committee n Investigation of the Governmental Affairs Committee, states that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities. According to reports from a leading intelligence publication, bin

**EXHIBIT A**:  SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

Laden remained a shareholder in Al Shamal as late as 2002.  A 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimates that "some of [Osama bin Laden's businesses in Sudan] may still be operating."  Federal RICO Statement, Exhibit "A", at p. 13; O'Neill RICO Statement, Exhibit "A", at p.21.

81.   The Chairman of the Al Shamal Islamic Bank was co-Defendant and Specially Designated Global Terrorist Adel Abdul Jalil Batterjee, a wealthy Saudi Arabian businessman and founder of Benevolence International Foundation.  Adel Batterjee is a close associate of Osama bin Laden; so close, in fact, that he was selected by bin Laden to collect funds on behalf of the al Qaida network.  In 1993, the Kingdom of Saudi Arabia closed the predecessor to the Benevolence International Foundation for its ties to terrorism.  The assets of the Benevolence International Foundation have been frozen by the United States Treasury Department on suspicion that the charity secretly funded al Qaida.  Federal RICO Statement, Exhibit "A", at p. 14; O'Neill RICO Statement, Exhibit "A", at p.21.

82.   Co-Defendant Yasin al-Qadi[12] wired more than $22 million from Swiss Bank accounts to al Qaida operatives and entities between 1990 and 2003.  Al-Qadi transferred nearly half of these funds through Al Shamal.  Federal RICO Statement, Exhibit "A", at p. 14; O'Neill RICO Statement, Exhibit "A", at p.22.

### *Faisal Islamic Bank, major shareholder of Tadamon Islamic Bank*

83.   The Faisal Islamic Bank (Sudan) ("FIBS") was chartered in Khartoum in 1983.  Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood, a co-defendant in this *Estate of O'Neill, et al. v. Republic of Iraq, et al*. 04-CV-1076(RCC), and a friend of co-Defendant Hassan Al Turabi.  In 1983 Turabi and the leadership of the National Islamic Front began to convert Sudanese bank toward an Islamic banking system.  Federal RICO Statement, Exhibit "A", at p. 14; O'Neill RICO Statement, Exhibit "A", at p.22.

84.   FIBS is a major shareholder of co-Defendant Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.  Federal RICO Statement, Exhibit "A", at p. 14; O'Neill RICO Statement, Exhibit "A", at p.22.

85.   FIBS is a subsidiary of the Islamic Investment Company of the Gulf (Bahrain) which is a wholly-owned subsidiary of co-Defendant DMI Trust.  The Islamic Investment Company of the Gulf (Bahrain) is also chaired by Mohammed al Faisal al Saud, as is DMI Trust and Faisal Islamic Bank (Sudan).  Federal RICO Statement, Exhibit "A", at p. 15; O'Neill RICO Statement, Exhibit "A", at p.22.

---

[12] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Yassin al Qadi , relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

86.     Prince Mohammed al Faisal al Saud[13] played a critical role in the development of Islamic banking, founding Faisal Islamic Bank for the purpose of propagating the fundamentalist strain of Wahhabi Islam espoused by himself, the NIF, al Qaida, and other extremist groups.   Federal RICO Statement, Exhibit "A", at p. 15; O'Neill RICO Statement, Exhibit "A", at p.22.

87.     Hassan Al Turabi's friendship with Prince Mohammed al Faisal allowed the Muslim Brotherhood to obtain Saudi funding in Sudan.   FIBS soon became the bank for the National Islamic Front and for Turabi. The bank supplied loans to the National Islamic Front and to its prominent members.   In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters.   Through this association, Turabi's party became the best financed in the Sudan.   Federal RICO Statement, Exhibit "A", at p. 15; O'Neill RICO Statement, Exhibit "A", at p.23.

88.     Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan:

> Where were the accounts [of al Qaida] held?  In what countries?
> *(…) we got account in Bank Faisl Islami [Faisal Islamic Bank].*
>
> Is that in Khartoum?
> *Yes.*

Federal RICO Statement, Exhibit "A", at p. 15; O'Neill RICO Statement, Exhibit "A", at p.23.

### Dar al Maal al Islami Trust

89.     Dar al Maal al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981.   In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."   Financial and business institutions established by DMI Trust include banking, investment, Takafol (insurance), Retakafol (reinsurance) and business companies.  DMI Trust is also a primary vehicle for Saudi financing of the international Islamic fundamentalist movement.   Federal RICO Statement, Exhibit "A", at p. 16; O'Neill RICO Statement, Exhibit "A", at p.23.

---

[13] Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments contained within its RICO statements and More Definite Statements, which was incorporated into the First Consolidated Complaint on September 30, 2005, applicable to co-defendant Mohammed al Faisal al Saud, relating to *Estate of John P. O'Neill et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

90.     DMI in the predecessor-in-interest to DMI Trust and DMI Administrative Services SA
        ("DMI SA").   DMI SA is located in Geneva, Switzerland.   The DMI Trust has an
        "extensive network stretching over four continents, with well integrated regional
        subsidiaries enabling it to respond to local business needs and conditions."   These
        continents include North America, Europe, Africa and Asia.   Federal RICO Statement,
        Exhibit "A", at p. 16; O'Neill RICO Statement, Exhibit "A", at p.24.

91.     DMI SA provides assistance to the Board of Supervisors of DMI Trust, and "under its
        direction to subsidiaries, in particular in the areas of legal and financial control, audit and
        risk management and information technology."   Federal RICO Statement, Exhibit "A", at
        p. 16; O'Neill RICO Statement, Exhibit "A", at p.24.

92.     Therefore, DMI Trust and DMI SA directly participate in the oversight and management
        of DMI Trust's subsidiary and associate entities.   DMI Trust owns 100% of DMI SA.
        DMI SA is both a wholly owned subsidiary and an agent of DMI Trust.   DMI SA and
        DMI Trust are referred to collectively herein as "DMI."   Federal RICO Statement,
        Exhibit "A", at p. 16; O'Neill RICO Statement, Exhibit "A", at p.24.

93.     The network of DMI companies or entities are or were also known or referred to as "Dar
        al Maal al Islami" (or "House of Islamic Money").   DMI's main subsidiaries and
        affiliates are DMI SA, Islamic Investment Company of the Gulf, Faisal Islamic Bank of
        Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamal Islamic Bank), Faisal
        Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal
        Islamic Bank of Egypt, and Al Shamal Islamic Bank.   Federal RICO Statement, Exhibit
        "A", at p. 16; O'Neill RICO Statement, Exhibit "A", at p.24.

94.     DMI and its related companies are purposefully structured, in part, to conceal the means
        by which they have promoted Islamic radical activities, including those of Osama bin
        Laden.   Federal RICO Statement, Exhibit "A", at p. 17; O'Neill RICO Statement, Exhibit
        "A", at p.24.

95.     Asset management is the Group's core business activity.   "The Trust's policy is
        determined by its fifteen-member Board of Supervisors.   To ensure conformity with
        Islamic principles, all DMI operations are reviewed and approved by its Religious Board.
        The trust's administrator, DMI Administrative Services SA, located in Geneva,
        Switzerland focuses on group strategy, corporate activities, legal and financial affairs,
        audit and technical assistance to subsidiaries."   Federal RICO Statement, Exhibit "A", at
        p. 17; O'Neill RICO Statement, Exhibit "A", at p.24.

96.     DMI SA is a wholly owned subsidiary directly controlled by DMI Trust that puts into
        action the investments, strategies, distributions and policies of the DMI Trust.   DMI SA
        acts as one of DMI Trust's operational arms.   Since its establishment, DMI has advocated
        and pursued, both directly and through its subsidiaries and affiliates, a financial jihad in
        the modern era.   DMI was founded "to remove the blemish that strikes at financial and
        economic transactions of Muslims in the contemporary era."   Federal RICO Statement,
        Exhibit "A", at p. 17; O'Neill RICO Statement, Exhibit "A", at p.25.

97.     According to its spokesmen, DMI is one important element of an "entire series of
        measures aimed at setting up an integrated network of institutions that will form the basis

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise." "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and the weak Muslim.  The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."  Federal RICO Statement, Exhibit "A", at p. 17; O'Neill RICO Statement, Exhibit "A", at p.25.

98.    Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen.  As Mujihid (singular of mujahideen) is the title given to a warrior engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).  Federal RICO Statement, Exhibit "A", at p. 18; O'Neill RICO Statement, Exhibit "A", at p.25.

99.    In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed al Faisal al Saud reaffirmed DMI's commitment to a financial jihad:  "May Allah bless your Jihad and all your efforts.  May He aid you and affirm your faith."  Although the DMI Trust website lists its contact information as DMI SA in Switzerland, the DMI Trust is registered in the Bahamas (as the Dar Al-Maal Al-Islami Trust) (Registered Office), 10 Deveaux Street, P.O. Box N-9935, Nassau) as of 1981.  Federal RICO Statement, Exhibit "A", at p. 18; O'Neill RICO Statement, Exhibit "A", at p.26.

100.    Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).  Federal RICO Statement, Exhibit "A", at p. 18; O'Neill RICO Statement, Exhibit "A", at p.26.

101.    DMI Trust laundered money for al Qaida, knowingly and intentionally providing financial services to the al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.  Federal RICO Statement, Exhibit "A", at p. 18; O'Neill RICO Statement, Exhibit "A", at p.26.

102.    Also, DMI Trust's *Zakat* accounts have been used to support al Qaida.  In addition, DMI Trust has transferred money for Al Haramain, a purported charitable and relief organization.  Federal RICO Statement, Exhibit "A", at p. 18; O'Neill RICO Statement, Exhibit "A", at p.26.

103.    Both the United States and the Kingdom of Saudi Arabia have designated as al Qaida terrorist supporters and/or shut down specially designated global terrorist branches of Al Haramain for financial, material and logistical support provided to al Qaida.  DMI Administrative Services S.A. handled accounts of Specially Designated Global Terrorists Yassin Al Qadi and Wael Jelaidan for Faisal Finance Switzerland in furtherance of violent al Qaida goals.  Federal RICO Statement, Exhibit "A", at p. 19; O'Neill RICO Statement, Exhibit "A", at p.26.

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

104.   Absent the material support and sponsorship provided by banks and financial services
       companies within the Islamic financial system like Tadamon Islamic Bank, al Qaida
       would have remained a regional extremist organization incapable of conducting large
       scale terrorist attacks on a global level.  Federal RICO Statement, Exhibit "A", at p. 19;
       O'Neill RICO Statement, Exhibit "A", at p.26.

105.   As the foregoing demonstrates, Tadamon Islamic Bank thereby knowingly has, for a
       period of many years, provided critical financial and logistical support to al Qaida, and/or
       Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against
       Jews and Crusaders, to support the terrorist organization's global jihad.  The September
       11th Attack was a direct, intended and foreseeable product of Tadamon Islamic Bank's
       participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism,
       and/or the International Islamic Front for the Jihad Against Jews and Crusaders. O'Neill
       RICO Statement, Exhibit "A", at p.27.


**Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the
Complaint.**


106.   At all relevant times, all defendants were associated with an enterprise engaged in, and
       whose activities affected, interstate commerce.  That enterprise, which is the association-
       in-fact of defendants, functioned as a continuing unit and had an existence prior to, and
       separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶
       609.

107.   At all times relevant hereto, each of defendants conducted or participated in, directly or
       indirectly, the affairs of the enterprise through a pattern of racketeering activity within the
       meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering
       activity entailed at least two acts of racketeering activity by each defendant, one of which
       occurred after the 1970 effective date of RICO, and the last of which occurred within ten
       years after the commission of a prior act of racketeering activity. Continental Casualty ¶
       610.

108.   In furtherance of their conspiracy to commit acts of international terrorism against the
       United States, its nationals and allies, the defendants engaged in a pattern of racketeering
       activity which included, without limitation:  acts of murder, kidnapping, arson, robbery,
       and extortion; dealings in controlled substances and listed chemicals; the falsification of
       identification documents; the unlawful procurement, reproduction, sale and use of
       naturalization and citizenship papers, passports and visas; the obstruction of federal and
       state criminal investigations; and financial institution and mail fraud.  Federal Insurance
       FAC ¶ 619; O'Neill Al Baraka FCC ¶ 177; O'Neill Iraq FCC ¶ 267.

109.   The acts of racketeering activity (predicate acts) include:

       a.   acts that involve murder arson and robbery which are chargeable under State Law
            and punishable by imprisonment for more than one year and are within the scope
            of 18 U.S.C. § 1961(l)(B);

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

> b. acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents), 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (financial institution fraud), 18 U.S.C. § 371 (government fraud) and are within the scope of 18 U.S.C. § 1961(1)(B);
>
> c. acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);
>
> d. acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);
>
> e. acts indictable under 18 U.S.C. § 1952 and are within the scope of 18 U.S.C. § 1961
>
> f. acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);
>
> g. act indictable under 26 U.S.C. § 7212(a), 26 U.S.C. § 7206 (1), (2) (tax) and are within the scope of 18 U.S.C. § 1961;
>
> h. acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and
>
> i. acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B).
>
> Al Baraka FCC Exhibit AC, ¶ 5(a); Continental Casualty ¶ 611.

110. Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies. Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612. The pattern of racketeering is more fully set forth in O'Neill RICO Statement, ¶¶5(b), (f), and (g).

111. As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶ 613.

112. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance ¶ 620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 180.

113. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First

**EXHIBIT A**: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

Consolidated Complaint and any additionally complaints filed in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First Consolidated Complaint and any additionally complaints filed in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, the First Consolidated Complaint and any additionally complaints filed in *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *See e.g.,* O'Neill RICO Statement ¶ 6.

114.    The Enterprise is described, at length, in O'Neill RICO Statement ¶¶ 6(b), (c).

115.    The activities of the Enterprise relate to the commission of world-wide terrorism. The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack. The usual activities of the Enterprise include recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of. O'Neill RICO Statement ¶¶ 7-10.

116.    Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in ¶ 12 of O'Neill RICO Statement.

117.    The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in ¶ 13 of O'Neill RICO Statement.

**Consequences of the Conspiracy**

118.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[14]

---

[14] A list of the decedents is contained within Exhibit A of the FCC. See, O'Neill Al Baraka FCC ¶ 127(a).

EXHIBIT A: SUMMARY TABLE OF REFERENCES IN THE PLEADINGS TO THE
CONSPIRACY AND TO *TADAMON ISLAMIC BANK*

119.  These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance FAC ¶¶ 80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶ 25; Cantor FAC ¶¶ 90-92, 122-135.

120.  All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152; Cantor FAC ¶¶ 90-92, 122-135.

121.  The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Al Baraka FCC ¶ 153; O'Neill Iraq FCC ¶ 275; Cantor FAC ¶¶ 90-92, 122-135.

122.  The damages suffered by plaintiffs, as described in greater detail in the pleadings, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶¶ 137, 140, 144-6, 150, 154, 161, 164, 170, 174, 180; Cantor FAC ¶¶ 90-92, 122-135.

123.  The Defendants intended to cause damage to business and property.  O'Neill Al Baraka FCC ¶ 178; O'Neill Iraq FCC ¶ 271; Cantor FAC ¶¶ 90-92, 122-135.

124.  Plaintiffs suffered damage to business and property as a result of the Defendants actions. O'Neill Al Baraka FCC ¶¶ 179-180; O'Neill Iraq FCC ¶¶ 270, 271; Cantor FAC ¶¶ 90-92, 122-135.

125.  The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Al Baraka FCC ¶ 146; O'Neill RICO Statement ¶¶ 14-15; O'Neill Iraq FCC ¶ 271; Cantor FAC ¶¶ 90-92, 122-135.

***