## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

## FEDERAL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY AL AQSA ISLAMIC BANK

# TABLE OF CONTENTS

**Page**

I.    FACTUAL BACKGROUND ................................................................................2

    A.    Ownership and Control of Al Aqsa Islamic Bank ................................. 2

    B.    Al Aqsa and Hamas ................................................................................ 3

    C.    Hamas and al Qaida ............................................................................... 5

II.    PLAINTIFFS' FACTUAL PLEADINGS MUST BE CONSIDERED .............................7

    A.    The Supplemental Pleadings Are Proper ............................................... 7

    B.    Defendant's Further Novel Arguments Must Be Rejected ..................... 8

III.    PLAINTIFFS HAVE STATED VALID CLAIMS ......................................................10

    A.    Standard for Granting Motions to Dismiss .......................................... 10

    B.    The Liberal Requirements of Notice Pleading ..................................... 10

    C.    "Conclusory" Allegations Are Perfectly Proper .................................. 12

    D.    Plaintiffs Have Properly Pled The Legal Case For Al Aqsa's Liability .............. 12

        1.    Extraordinary banking services .................................................. 12

        2.    Causation Been Sufficiently Pled .............................................. 14

IV.    JURISDICTION IS PROPER OVER AL AQSA ISLAMIC BANK ..............................16

    A.    Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie* Showing Of Personal Jurisdiction May Be Established Solely By Legally Sufficient Allegations Of Jurisdiction ................................................. 16

    B.    The Exercise of Personal Jurisdiction Comports With Due Process. ................... 17

        1.    Personal jurisdiction is satisfied under a general jurisdiction standard. ....... 18

        2.    Jurisdiction is proper under an "purposeful direction" theory .................... 18

        3.    Additionally, Jurisdiction Is Proper Under Conspiracy Theory ................. 20

    C.    At A Minimum, Jurisdictional Discovery Is Warranted ...................... 21

V.    CONCLUSION ...........................................................................................21

## TABLE OF AUTHORITIES

### CASES

**Page**

*A.I. Trade Finance, Inc. v. Petra Bank*,
    989 F.2d 76 (2d Cir. 1993)..........................................................................17

*Allen v. New World Coffee, Inc.*,
    2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001)...............................................8

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
    782 F. Supp. 215 (S.D.N.Y. 1992)...............................................................20

*Andre Emmerich Gallery v. Segre*,
    1997 WL. 672009 (S.D.N.Y. Oct. 29, 1997)................................................20

*Asahi Metal Industry Co., Ltd. v. Superior Court of California*,
    480 U.S. 102 (1987)......................................................................................19

*Ball v. Metallurgie Hoboken Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990)..........................................................................16

*Burger King v. Rudzewicz*,
    471 U.S. 462 (1985)......................................................................................19

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
    11 F.3d 1255 (5th Cir. 1994)........................................................................17

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998)..........................................................................10

*Chrysler Capital Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)..............................................................20

*Combs v. Adkins & Adkins Coal Co.*,
    597 F. Supp. 122 (D.D.C. 1984)...................................................................17

*Conley v. Gibson*,
    355 U.S. 41 (1957)........................................................................................10

*DiStefano v. Carozzi North America, Inc.*,
    286 F.3d 81 (2d Cir. 2001)............................................................................16

*Dixon v. Mack*,
    507 F. Supp. 345 (S.D.N.Y. 1980)...............................................................20

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*,
        153 F. Supp. 2d 76 (D.R.I. 2001) ............................................................................17

*Flatow v. Islamic Republic of Iran*,
        999 F. Supp. 1 (D.D.C. 1998) ..................................................................................19

*Geisler v. Petrocelli*,
        616 F.2d 636 (2d Cir. 1980) .....................................................................................10

*Halberstam v. Welch*,
        705 F.2d 472 (D.C. Cir. 1983) .................................................................................14

*IUE AFL-CIO Pension Fund v. Herrmann*,
        9 F.3d 1049 (2d Cir. 1993) .......................................................................................18

*International Shoe Co. v. Washington*,
        326 U.S. 310 (1945) ..................................................................................................18

*Investment Properties International, Ltd. v. 10S, Ltd.*,
        459 F.2d 705 (2d Cir. 1972) .....................................................................................21

*Jazini v. Nissan Motor Co.*,
        148 F.3d 181 (2d Cir. 1998) .....................................................................................17

*Kamen v. America Telegraph & Telegraph Co.*,
        791 F.2d 1006 (2d Cir. 1986) ...................................................................................21

*Leatherman v. Tarrant County*,
        507 U.S. 163 (1993) ..................................................................................................11

*Linde v. Arab Bank, PLC*,
        384 F. Supp. 2d 571 (E.D.N.Y 2005) ...............................................................9, 13-14

*In re Magnetic Audiotape Antitrust Litigation*,
        334 F.3d 204 (2d Cir. 2003) .....................................................................................16

*Marine Midland Bank, N.A. v. Miller*,
        664 F.2d 899 (2d Cir. 1981) .....................................................................................21

*McLaughlin v. Anderson*,
        962 F.2d 187 (2d Cir. 1992) .......................................................................................8

*Moses v. Martin*,
        360 F. Supp. 2d 533 (S.D.N.Y. 2004) .......................................................................8

*PDK Laboratories, Inc. v.  Friedlander*,
    103 F.3d 1105 (2d Cir. 1997)......................................................... 16-17

*Palestine Information Office v. Shultz*,
    853 F.2d 932 (D.C. Cir. 1988)...........................................................19

*Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2005)...................................................... 11, 14-15

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002)...........................................................10

*SEC v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) .......................................................17

*Simon v. Philip Morris, Inc.*,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) ...................................................20

*Swierkiewicz v. Sorema*, ,
    534 U.S. 506 (2002)................................................................. 10-11

*In Re Terrorist Attacks on September 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005).......................................... *passim*

*In re Terrorist Attacks on September 11, 2001*,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005)..................................................17

*Twombley v. Bell Atlantic Corp.*,
    425 F.3d 99 (2d Cir. 2005)......................................................... 11-12

*Warren v. District of Columbia*,
    353 F.3d 36 (D.C. Cir. 2004) .........................................................12

*Woodford v. Community Action Agency*,
    239 F.3d 517 (2d Cir. 2001)...........................................................10

*World-Wide  Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)...................................................................18

*Wynder v. McMahon*,
    360 F.3d 73 (2d Cir. 2004).............................................................10

## RULES AND STATUTES

18 U.S.C. § 1965(b) ..................................................................................................17

18 U.S.C. § 2334(a) ..................................................................................................17

Fed. R. Civ. P. 8(a)(2) ..............................................................................................10

Fed. R. Civ. P. 9(b) ..................................................................................................11

Fed. R. Civ. P. 10(c) ...............................................................................................8-9

Fed. R. Civ. P. 12(b)(6) ........................................................................................9-10

Fed. R. Civ. P. 15(d) ..........................................................................................5, 7, 9

As part of a question-and-answer session in Los Angeles on June 12, 2003, then-National Security Advisor Condoleezza Rice explained the web of organizations America was fighting in the war on terror:

> But very early on we also recognized that the funding of terrorism had become a very complex web -- some of it direct funding, which is actually the easiest to get at. But as you note, there are a number of front organizations, so-called charities that funnel money to terrorist organizations. And so the United States has been on an active program of dealing with those kinds of problems. . . .
>
> So it's an all-out program to try and deal with terrorist financing. I think it will succeed. It is going to have to have, though, the cooperation of the whole world. And particularly on Hamas, people are going to have to take a hard look at what they're doing and ask if they are prepared to continue to treat Hamas as something other than a terrorist organization. We already treat it in that way; others should as well.[1]

Al Aqsa Islamic Bank ("Al Aqsa") has filed a motion to dismiss the <u>Federal Insurance</u> complaint which primarily questions the factual sufficiency of the pleadings against it, offering what it claims to be rebuttal "evidence".  With regards to the principal allegations against it, Al Aqsa argues that such facts (a) need not be entertained at all, or (b) ought to be heard as part of an unrelated matter now pending in the Eastern District of New York. Both contentions are false.

To the extent that Al Aqsa Islamic Bank raises other allegations regarding the legal sufficiency of the pleadings and jurisdiction, those claims too lack merit and must be denied.  Al Aqsa repeatedly misapprehends the requirements of notice pleading and cannot demand more of Plaintiffs than do the Federal Rules of Civil Procedure.

---

[1]      Remarks by National Security Advisor Condoleezza Rice at Town Hall Los Angeles Breakfast (June 12, 2003).

**I.     FACTUAL BACKGROUND**

This section of the brief reviews the relevant factual pleadings involving Al Aqsa Islamic Bank and related entities.[2]

   A.     <u>Ownership and Control of Al Aqsa Islamic Bank</u>

Al Aqsa Islamic Bank is the banking arm of Hamas, the radical Palestinian terrorist organization which has its shared fundraising networks with and collaborated with Al Qaida on passport forgery and other schemes designed to support global terrorism.  Al Aqsa's notorious support for international terrorism led to its designation by the U.S. Government under Executive Order 13224 on December 4, 2001, blocking its U.S. assets and denying its access to American markets.

Al Aqsa Islamic Bank was formed in 1998, in Al-Beireh in the West Bank, by several financial groups and Arab investors. Al Aqsa Islamic Bank was established with $20 million in capital. Its main shareholders were the Dallah Al Baraka Group (DABG) and the Jordan Islamic Bank.  DABG's chairman, Musa Abel Aziz Shihadeh, still sits on Al Baraka's board of directors. Beit el-Mal Holdings (alternate: "Beit al-Ma'al Holdings"), an investment company controlled by Hamas, owns a significant stake in the Bank as well.

Jordan Islamic Bank, a DABG subsidiary, owns 14 percent of Al Aqsa, according to Al Aqsa's acting general manager, Mohammed Sarsour. In a statement, DABG chair Saleh Abdullah Kamel acknowledged that DABG owns another 12 percent.

---

[2]     The facts contained within this section are derived from the <u>Federal</u> First Amended Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2, as well as the RICO Statement filed by <u>Federal</u> as to Al Aqsa Islamic Bank..

B.      Al Aqsa and Hamas

Al Aqsa's pervasive involvement with Hamas has led to its being cast outside the

international community.  Since 1998, Israel has refused to approve the bank, citing its obvious

ties with Hamas. At the beginning of 2001, several antiterrorist authorities from that country

even visited Citibank's headquarters in New York — Al Asqa's correspondent in the United

States — to warn its directors of the nature of the bank's activities.

According to the Israelis, financial support for Hamas was largely channeled from the

U.S.-based Holy Land Foundation for Relief and Development, a co-defendant here, into

accounts at Al Aqsa Islamic Bank.  Because of their links to global terrorism, on December 4,

2001, the assets of Al Aqsa Islamic Bank, Holy Land Foundation and Beit el-Mal Holdings were

frozen by the United States pursuant to Executive Order 13224.  According to the Department of

the Treasury statement:

> Al-Aqsa Islamic Bank, with locations in the West Bank and Gaza
> Strip, is a financial arm of Hamas. Al Aqsa is 20% owned by Beit
> el-Mal, and the two share senior officers and directors. In addition,
> a majority of its shareholders and senior officials have ties to
> Hamas. Individuals associated with the Bank have been previously
> arrested and charged with financing Hamas activities in the Middle
> East. Soon after the bank opened in 1998 its connection to Hamas
> extremists became evident and a number of banks refused to clear
> its transactions.

Assets of Beit El-Mal Holdings (translated, "the house of money"), a 20% shareholder,

were frozen as well. The White House fact sheet stated that:

> Beit el-Mal Holdings is a public investment company with
> locations in East Jerusalem, the West Bank, and the Gaza strip.
> Although its stated business activities are making loans and
> investing in economic and social development projects, Beit el-
> Mal has extensive ties to Hamas. The majority of its founders,
> shareholders, and employees are associated with Hamas. Persons
> identified with Hamas hold a majority of the company's stock, and
> it has invested in projects in Gaza and the West Bank that are
> owned or managed by Hamas activists. Beit el-Mal transfers
> money to and raises funds for associations that the Palestinian

Authority itself has identified as belonging to Hamas, and to known Hamas activists and convicts who are members of Hamas.

According to the May 18, 2004 testimony of Steven Emerson, executive director of The Investigative Project, before House Financial Services Subcommittee on Oversight and Investigations, Al Aqsa Islamic Bank plays a crucial role in terrorist money laundering and banking:

> In 1997 $30 million vanished from a Hamas-controlled bank account in Europe. In response, and to protect its remaining and future assets, Hamas established Al Aqsa Islamic Bank that year. Hamas was also operating through another bank, Beit al-Ma'al, for many of its transactions, and al-Aqsa Bank was not used as a conduit until 1999, after Israeli authorities closed down Beit al-Ma'al. Al-Aqsa then became a means of circumventing Israeli prohibitions on the activities of Beit al-Ma'al, and a means of evading banking regulations in general. Beit al-Ma'al invested $4,000,000 in al-Aqsa Bank.
>
> After Israel banned al-Aqsa / Beit al-Ma'al's operations, Hamas again bypassed Israeli restrictions and made its funds accessible to Hamas operatives in Israel and the territories by embarking on joint projects with Citibank, intertwining itself with Citibank's Israel division. As part of that relationship, monies deposited into al-Aqsa accounts in Europe or the Middle-East became accessible from Israel through Citibank.
>
> Israeli counterterrorism officials met with Citibank executives in January 2001 when Citibank sought to expand its operation in Israel. A Citigroup executive then sent a letter requesting guidance from the U.S. Treasury to Richard Newcomb, Director of the Office of Foreign Assets Control (OFAC), saying "Let me be clear: Citibank would never knowingly do business with a terrorist organization."

Since the U.S. designations, the assets of Al Aqsa Islamic Bank have also been frozen in countries as diverse as Canada, Italy, Turkey, India and Japan, all on account of the bank's support for international terrorism.

4

C.      Hamas and al Qaida

That Hamas and al Qaida are linked entities cannot seriously be questioned.  Indeed, a 1998 Department of Defense Intelligence Report discussing al Qaida's strategies and objectives confirmed that al Qaida was cooperating with Hamas on logistical and financial fronts in furtherance of their common interests, stating that Al Qaida's goal was to "establish a worldwide Islamic state capable of directly challenging the U.S., China, Russia, and what it views as Judeo-Christian and Confucian domination" by a variety of means, including a policy of providing "coordination and financial support" to a variety of terrorist organizations, specifically including Hamas ("Khamas") in Palestine, the National Islamic Front in Sudan and cells around the world.

Such shared and overlapping fundraising and money laundering infrastructure and support between Hamas and al Qaida has been confirmed by various international investigations, some of the conclusions of which are detailed in the following paragraphs excerpted from Plaintiffs' First Amended Complaint With Incorporated More Definite Statements, RICO Statements And Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 of Case Management Order Number 2:

**Paragraph 53:** "Defendant, HAMAS, is a designated FTO, pursuant to §219 of the Immigration and Nationality Act, as amended by the Anti-terrorism and Effective Death Penalty Act of 1996.  HAMAS operates in concert, conspires, exchanges material support and resources, and is otherwise affiliated with al Qaida."

**Paragraph 146:** "The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaida.  In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network.  Through that investigation, the details of which are further discussed herein,

5

federal authorities determined that the IIRO and MWL offices in Washington, DC provided

funding and material support to al Qaida and Hamas."

Paragraphs 228-229: "The ongoing investigation of the SAAR network entities, which

prompted the March 2002 searches, has revealed that SAAR entities' funds have been transferred

to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under

Executive Order 13224 based on their material support and sponsorship of al-Qaida.  The funds

were transferred through Bank al-Takwa and Akida Bank Private Ltd., two Bahamas based

banks controlled by Nada and Nasreddin.  Both of those banks have been designated by the U.S.

government pursuant to Executive Order 13224, based on their involvement in financing radical

groups throughout the world, including Hamas and al Qaida, both before and after the September

11th attack.

"The ongoing investigation of the SAAR Network has also revealed that SAAR entities,

including the U.S. branch of the IIRO and Sana-bell, Inc., engaged in financial transactions with

Bait Ul-mal, Inc., (BMI, Inc.) an Islamic investing firm established by defendant Soliman Biheiri

in New Jersey in 1996.  According to federal authorities, BMI and its affiliates have transferred

funds to terrorists and terrorist organizations, including al Qaida, Yasin al-Qadi, Musa Abu

Marzook, Mohammad Salah and Hamas."

Paragraph 266: "Bank Al Taqwa, for which Nasreddin is a Director, was established in

1988 with significant backing from the Muslim Brotherhood.  They have been involved in

financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and

Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida

organization.  Bank Al Taqwa was established in the Bahamas and is a close affiliate of the Al

Taqwa Management Organization, which changed its name in the spring of 2000 to the Nada

Management Organization.  In 1997, it was reported that the $60 million collected annually for

Hamaas was moved to Bank Al Taqwa accounts.  As of October, 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden and as of late September 2001, Osama bin Laden and his al Qaida organization received financial assistance from Youssef M. Nada."

**Paragraphs 360-361:** "Arab Bank also maintains accounts for many of the charity defendants that operate within al Qaida's infrastructure, including the IIRO, MWL, WAMY, BIF, Blessed Relief (Muwafaq) Foundation and al Haramain, among others.  The Kingdom of Saudi Arabia uses these accounts to fund al Qaida operations, and as the principal vehicle for supporting Palestinian suicide attacks.

"More recently, Israeli officials seized funds associated with several accounts maintained by Arab Bank on behalf of known Hamas fronts.  These accounts were identified to Israeli officials by Arab Bank employees, confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity."

## II.   PLAINTIFFS' FACTUAL PLEADINGS MUST BE CONSIDERED

Al Aqsa's first argument (logically speaking, though it comes last in its brief) is that Plaintiffs' supplemental pleadings, including its RICO Statement, ought not be considered at all by this Court.  It further claims that the pleadings are too "conclusory", and makes the novel and wholly unfounded argument that Fed. R. Civ. P. 15(d) only permits such pleadings to contain events which occurred following the date of the initial pleading.   Finally, Al Aqsa claims that any such claims regarding its ties to Hamas ought to be heard in the Eastern District of New York, where an unrelated case is currently proceeding.  These contentions are unwarranted.

### A.    The Supplemental Pleadings Are Proper

Paragraph 14 of Case Management Order No. 2 explicitly authorized the filing of such statements by the <u>Federal Insurance</u> plaintiffs, and paragraph 13 clearly permitted the filing of

" . . . more definite statements and/or additional allegations against existing Defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to the previously-filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint."

Moreover, Al Aqsa Islamic Bank, after having been declared in default by this Court, entered into a stipulation with the Federal Insurance plaintiffs on February 6, 2006 (docket #1673), relieving the Bank of its default status and explicitly authorized Plaintiffs to file a RICO Statement in exchange for such relief.[3]

Furthermore, judicial precedent uniformly hold that RICO Statements should be treated as part of the pleadings. *See*, *e.g.*, *McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.*, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001).

Moreover, the incorporation of the RICO and More Definite Statements into plaintiffs' Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules. Fed. R. Civ. P. 10(c), to which Al Aqsa notably avoids reference, provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c).

B.    Defendant's Further Novel Arguments Must Be Rejected

Al Aqsa further protests that Plaintiffs' allegations are insufficiently tied to the initial complaint. This is false. Plaintiffs' RICO statement, like the Complaint, begins from the

---

[3]    In light of that agreement, Al Aqsa's argument borders on misrepresentation before this Court. Plaintiffs are confident, however, that its inclusion in this brief constituted a regrettable oversight by counsel for the Defendant in erroneously copying this argument from other motions to dismiss, and does not reflect any malicious intent.

premise that Al Aqsa Islamic Bank is affiliated with Dallah Al Baraka Group, and through that

connection support flowed to al Qaida.[4]  The RICO Statement expands upon that foundation, per

this Court's orders and the Federal Rules, in order to demonstrate more precisely how such

support made its way to al Qaida.  It is all part of one whole.

Finally, Al Aqsa Islamic Bank makes wholly unfounded argument that Fed. R. Civ. P.

15(d) only permits such pleadings to contain events which occurred following the date of the

initial pleading.   They provide no case law in support for this off-hand assertion, and there is

none.  Moreover, this argument is wholly consistent with CMO #2, which explicitly authorized

such pleadings.  It should be rejected by this Court.

In view of the plain language of Rule 10(c), Plaintiffs' incorporation of the RICO and

More Definite Statements into their Complaints, by reference or attachment as exhibits, complies

with both the letter and spirit of the Federal Rules.[5]  Al Aqsa was required to consider these

additional pleadings in its response.[6]

---

[4]  See Federal First Amended Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2 ¶ 304.

[5]  Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

[6]  Al Aqsa Islamic Bank exerts much effort to offer the rather curious argument that this matter ought to be transferred to the Eastern District of New York to be consolidated with the *Linde v. Arab Bank, PLC* proceedings.  Defendant fails to recognize that on December 9, 2003, the Judicial Panel on Multidistrict Litigation ordered that all claims relating to "an array of defendants who allegedly promoted, financed, sponsored or otherwise supported the acts of terrorists that led to the deaths and injuries arising from the September 11, 2001 attacks on the United States" be consolidated in MDL-1570 in the Southern District of New York.

Plaintiffs have alleged that Al Aqsa Islamic Bank is part of this array of defendants.  As such, this matter clearly belongs here, and not in a matter which has nothing to do with the September 11 attacks..

## III.     PLAINTIFFS HAVE STATED VALID CLAIMS

Al Aqsa Islamic Bank next argues that the claims against it should be dismissed because they have been improperly pled, either because they are too "conclusory", insufficiently particular on causation, or because the legal standard of liability for banks is somehow different from that of other entities involved in the knowing support of global terror.  Because all three contentions lack both legal merit and factual merit, especially given defendant's refusal to address any of the allegations connecting it to al Qaida via Hamas, the motion must be denied.

### A.     Standard for Granting Motions to Dismiss

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*, 360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam). The Court's role is "not to assay the weight of the evidence which might be offered in support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in plaintiffs' favor. *Wynder*, 360 F.3d at 77; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

### B.     The Liberal Requirements of Notice Pleading

A motion pursuant to Fed. R. Civ. P. 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. *Swierkiewicz v. Sorema*,

534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id*. Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993); *see also Pelman v. McDonald's Corp.*, 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October 2005, the Second Circuit reiterated and reaffirmed the notice pleading standard set forth in Rule 8 as applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Twombley v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005), *cert. granted*, -- U.S.L.W. --, No. 05-1126 (June 26, 2006). In *Twombley*, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." 425 F.3d at 107. In the context of antitrust pleading, the Second Circuit reminded litigants that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." *Id.* at 116. Indeed, a district court may not add create higher pleading standards than those set forth in the Federal Rules. Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second

Circuit has held unequivocally, "If that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so." 425 F.3d at 117.

      C.      <u>"Conclusory" Allegations Are Perfectly Proper</u>

Al Aqsa protests that the allegations are too "conclusory". This misapprehends the proper pleading standard, as the above cases demonstrate, which require at this stage of the litigation only fair notice of the relevant allegations, to be fleshed out more fully following full and proper discovery. Indeed, in *Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of *Phelps* in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge. Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." *Id*. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

      D.      <u>Plaintiffs Have Properly Pled The Legal Case For Al Aqsa's Liability</u>

Al Aqsa disputes whether the provision of "ordinary banking services" al Qaida could lead to liability. Beyond that, Al Aqsa questions whether causation has been properly pleaded. We now address each contention in turn.

      1.      <u>Extraordinary banking services</u>

Al Aqsa's knowing support of Hamas and al Qaida, both directly and through Beit Al Ma'al Holdings, is far more than mere "ordinary banking services." Given that this court must accept plaintiff's pleadings as true for purposes of ruling on this motion, it must adjudicate these claims based on the facts as pled. Plaintiffs have alleged that the Bank was the financial arm of the terrorist organization Hamas, and has alleged in detail some of the ways in which Hamas has

cooperated with al Qaida on logistical and financial fronts in furtherance of their common goal of "establish[ing] a worldwide Islamic state capable of directly challenging the U.S., China, Russia, and what it views as Judeo-Christian and Confucian domination" by a variety of means, including a policy of providing "coordination and financial support" to a variety of terrorist organizations around the world.  Such coordinated efforts helped build the worldwide terrorist organization responsible for the September 11 attacks.

Contrary to the cases cited by Al Aqsa, there certainly can be civil liability in this jurisdiction for the knowing provision of such financial services to avowed terrorists. In *Linde v. Arab Bank, PLC,* Nos. 04-CV-2799, 04-CV-5449, 05-CV-365 (E.D.N.Y.), as Defendant is well aware, Arab Bank was alleged to have provided material and financial to terrorists by collecting and receiving account funds for the benefit of designated terrorist groups. Arab Bank, like the instant defendant, attempted to recast Plaintiffs' allegations as evidence of merely "routine banking services."

In an order dated September 2, 2005, Judge Nina Gershon properly disagreed, and held that "[n]othing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant.  Although the Bank would like this court to find . . . that it is engaged in routine banking services . . . given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing 'routine' about the services the Bank is alleged to provide." *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y 2005).  As in the *Linde* case, plaintiffs herein have pled that Al Aqsa knew and intended that the funds it received as deposits and transmitted to various organizations and individuals, including Hamas and al Qaida, were to be used for conducting acts of international terrorism.

In addition, the allegations regarding the interrelatedness of all the entities involved in assisting al Qaida and facilitating al Qaida's growth in the Middle East and Sudan only reinforce the proof of Al Aqsa's knowledge and intend to further the conspiracy.

This factual basis demonstrates that Al Aqsa fits within the existing framework for establishing conspiracy liability against banks for terrorist support, as the *Linde* decision affirms:

> As to conspiracy, they adequately allege that Arab Bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was done in furtherance of the common scheme. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff. *See Halberstam*, 705 F.2d at 487. The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts.

*Linde*, 384 F. Supp. 2d at 584, citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  Plaintiffs have sufficiently pled that Al Aqsa knew it was assisting Hamas and al Qaida, and knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Nothing more is required at the pleadings stage.

### 2.    Causation Been Sufficiently Pled

Al Aqsa claims that "Plaintiffs must present sufficient allegations that Defendant's conduct, operating as a retail bank in Ramalla City, was the cause-in-fact of plaintiff's injuries." This overstates what this Court has held, and is not what the law requires.

Recently, in *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading

standards to be applied.  In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id.* at 511.  The Second Circuit rejected this approach.  It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." *Id.* at 512.  Quoting the unanimous Supreme Court ruling in *Swierkiewicz*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13).

As this Court has recognized, "[i]n light of Al Qaida's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaida." *In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005). Consistent with this holding, plaintiffs' consistent and specific averments of Al Aqsa's knowing and intentional sponsorship of al Qaida through Hamas are, in and of themselves, sufficient to establish causation at this stage of the litigation.

Even if more specific allegations of causation were required, plaintiffs have met that burden.  Plaintiffs have sufficiently explored the causal link between Al Aqsa's eager support of Hamas and al Qaida and the September 11 Attack, as detailed in the first section of this memorandum of law.  As this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any

specific act in furtherance of that attack." *In re Terrorist Attacks on September 11, 2001*, 349 F.

Supp. 2d at 829.  Plaintiffs have properly pleaded causation.

## IV.   JURISDICTION IS PROPER OVER AL AQSA ISLAMIC BANK

Finally, Al Aqsa argues that plaintiffs lack jurisdiction over it.  This argument lacks

merit.  For participating in a conspiracy directed towards the United States as a whole, Al Aqsa

is properly within the jurisdiction of this Court.

A.   Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie*
Showing Of Personal Jurisdiction May Be Established Solely By Legally
Sufficient Allegations Of Jurisdiction

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal

jurisdiction varies depending upon the procedural posture of the litigation:

> Prior to discovery, a plaintiff challenged by a jurisdiction testing
> motion may defeat the motion by pleading in good faith, [citation
> omitted] legally sufficient allegations of jurisdiction.  At that
> preliminary stage, the plaintiff's *prima facie* showing may be
> established solely by allegations.  After discovery, the plaintiff's
> *prima facie* showing, necessary to defeat a jurisdiction testing
> motion, must include an averment of facts that, if credited by the
> trier, would suffice to establish jurisdiction over the defendant.
> [citations omitted].  At that point, the *prima facie* showing must be
> factually supported.

*Ball v. Metallurgie Hoboken Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), cert. denied, 498

U.S. 854 (1990).   In order to defeat such a motion, a plaintiff need only present allegations that

connect the defendant with the applicable forum – here, the United States.  In deciding such a

motion, the plaintiff's jurisdictional averments must be taken as true.  *Id*.;  *In re Magnetic

Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).  Moreover, the court must

construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.

*DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).  As this Court has held:

> Because these motions are brought before discovery and decided
> without an evidentiary hearing, Plaintiffs need only make a prima
> facie showing that personal jurisdiction exists. *PDK Labs, Inc. v.*

16

*Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, *Jazini v. Nissan Motor Co*., 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, *A.I Trade*, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. *PDK Labs*, 103 F.3d at 1108.

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d. at 804.

B.      The Exercise of Personal Jurisdiction Comports With Due Process.

Among the claims against Al Aqsa are claims under the Anti-Terrorism Act ("ATA") and RICO.  It is beyond question that if plaintiffs have stated valid claims under those federal statutes, this Court may assert personal jurisdiction over them to adjudicate the ATA and RICO claims as well as all of the other claims asserted in the complaints. The ATA provides that claims may be brought in "any district where any plaintiff resides" and that process "may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). RICO similarly provides that "process … may be served in any judicial district of the United States …" 18 U.S.C. § 1965(b).[7]

Because both statutes provide for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (internal citations omitted); *see also SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 88 (D.R.I. 2001); *Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 125 (D.D.C. 1984).

---

[7]      This Court has furthermore recognized that "In situations in which Defendants were not served in the United States pursuant to the ATA, Rule 4(k)(2) acts as a personal jurisdiction gap-filler 'in the enforcement of federal law.' Fed. R. Civ. P. 4(k)(2) advisory committee's note." *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005).

1.   <u>Personal jurisdiction is satisfied under a general jurisdiction standard.</u>

As previously stated, Al Aqsa Islamic Bank maintained a significant correspondent relationship with Citibank in New York.  This relationship was determined to be so substantial, as noted above, that in early 2001, antiterrorist authorities visited Citibank's headquarters in New York to warn directly its directors of the nature of the activities Al Aqsa was conducting through Citibank.  According to reports, Al Aqsa had been bypassing Israeli restrictions on its activities by engaging in joint ventures with Citibank, depositing funds in Citibank accounts in Europe or elsewhere in the Middle East, thus making its funds accessible to Hamas operatives in Israel and the territories.[8]  Such links to global terrorism led the United States to freeze Al Aqsa's assets on December 4, 2001, pursuant to Executive Order 13224.

Because the court has personal jurisdiction over Al Aqsa with respect to plaintiffs' ATA or RICO claims, then it may also assert pendent personal jurisdiction over the remaining claims that derive from the same events.  *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056-57 (2d Cir. 1993).

2.   <u>Jurisdiction is proper under an "purposeful direction" theory</u>

Al Aqsa is subject to personal jurisdiction here because, in providing support to Hamas and al Qaida, which had long publicly announced its intentions to attack the United States, it purposefully directed its conduct here. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d at 810. Each case should be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The issue

---

[8]      Oddly, Al Aqsa attempts to use Citibank's severing its ties as a positive note, arguing that "Al Aqsa does not maintain any correspondent relationships with any United States based banks since 2001."  Memorandum of Law at 11.  Of course, the reason it has not is because the United States Government has determined that for a United States bank to do so, it would be supporting a financier of international terrorism in violation of federal law.  This is hardly a mark in its favor.

is whether the defendant should "reasonably anticipate being haled into court." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987).

The Supreme Court has further stated that reasonableness "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 487 (1985); *see Palestine Info. Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements"). The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the horrific manner in which U.S. residents were attacked for no reason other than that they were in the United States. The policies of "fair play" and "substantial justice" cannot be applied without recognizing the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims.  Case law makes clear that where terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the exercise of jurisdiction. *In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d. at 807-12.

The record before this Court demonstrates that bin Laden and al Qaida had publicly and repeatedly announced their intention to attack the United States from the early 1990s on, and that during the time Al Aqsa provided significant financial support to Hamas and its work with the growing al Qaida enterprise. Al Aqsa knew that its support would further acts of international terrorism directed at the United States. In this context, Al Aqsa's conduct amounts to purposeful direction at the United States sufficient to satisfy the "minimum contacts" test. No more is required to satisfy the "minimum contacts" test and subject Al Aqsa to jurisdiction in the United States.

3.      Additionally, Jurisdiction Is Proper Under Conspiracy Theory

Ultimately, Al Aqsa is also subject to this Court's jurisdiction because, as alleged in the complaints and RICO Statements, it conspired with al Qaida to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum, including those of the September 11 hijackers. *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (acts committed in New York by co-conspirators subject out of state defendant to jurisdiction under CPLR 302(a)(2)); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over absent defendants pursuant to a conspiracy theory by imputing forum acts of coconspirators done in furtherance of conspiracy); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal jurisdiction over non-resident defendant via conspiracy theory). The actions of the co-conspirators within the forum serve to establish minimum contacts sufficient to satisfy Due Process over the non-resident defendant. *Dixon v. Mack*, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course complained of in the suit, supplies the necessary minimum contacts."); *Andre Emmerich Gallery v. Segre,* 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to nonresident defendant establishes sufficient minimum contacts.

The *prima facie* showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital,* 778 F. Supp. at 1267. This Court has further held that: "[t]o warrant the inference that a

20

defendant was a member of the conspiracy," Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (citations omitted).  Plaintiffs have met this burden.

        C.      <u>At A Minimum, Jurisdictional Discovery Is Warranted</u>

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. *See, e.g., Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2) motion); Moore's Federal Practice § 12.31 [7] (3d ed. 2003). This Court has done so with regards to other defendants, and at a minimum should do so here, especially since pertinent jurisdictional facts lie within the control and knowledge of the defendant contesting jurisdiction. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1010-11 (2d Cir. 1986); *Investment Properties Intl., Ltd. v. 10S, Ltd.,* 459 F.2d 705, 707-08 (2d Cir. 1972).

## V.    CONCLUSION

Plaintiffs have properly pleaded their case against Al Aqsa Islamic Bank under the Federal Rules of Civil Procedure.  Its motion to dismiss must be denied.

Respectfully submitted,

COZEN O'CONNOR

Dated: June 30, 2006        BY: _____/s/_____

                Stephen A. Cozen, Esquire
                Elliott R. Feldman, Esquire
                Sean P. Carter, Esquire
                Adam C. Bonin, Esquire
                1900 Market Street
                Philadelphia, PA 19103
                Tele: (215) 665-2000
                Fax: (215) 665-2013

                Attorneys for *Federal Insurance* Plaintiffs

22