UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In Re:
                                              :        **DISCOVERY ORDER**

TERRORIST ATTACKS ON
SEPTEMBER 11, 2001           :        03 MDL 1570 (RCC)(FM)

------------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

       These consolidated actions arising out of the September 11, 2001 terrorist attacks were referred to me to resolve certain discovery disputes between the <u>Ashton</u> and <u>Burnett</u> plaintiffs (together, the "plaintiffs") and defendant National Commercial Bank ("NCB") regarding the proper scope of the "limited jurisdictional discovery" authorized by prior decisions of the Honorable Richard C. Casey, the District Judge to whom this multidistrict litigation is assigned. As detailed below, the plaintiffs' discovery requests are granted in part and denied in part.

I.      <u>Factual and Procedural Background</u>

       In January 2005, Judge Casey dismissed the complaints against a number of Saudi Arabian banks in their entirety for failure to state a claim. <u>See</u> <u>In re Terrorist Attacks on September 11, 2001</u>, 349 F. Supp. 2d 765, 831-36 (S.D.N.Y. 2005) ("<u>Terrorist Attacks I</u>"). The only bank not dismissed from the case was NCB. <u>Id.</u> at 836. In his decision, Judge Casey declined to address the sufficiency of the plaintiffs' claims against NCB because NCB may be an instrumentality of the Kingdom of Saudi Arabia entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, <u>et</u> <u>seq.</u>

("FSIA").  As he explained, because the applicability of the FSIA to NCB was "not determinable on the current record," which consisted of "self-serving" "affidavits," the plaintiffs were entitled to "limited" discovery concerning the purchase of NCB shares by the Saudi Public Investment Fund, which was the basis for NCB's claim that it is an instrumentality of the Kingdom of Saudi Arabia, and therefore is immune from suit under the FSIA.  Terrorist Attacks I, 349 F. Supp. 2d at 792.  Judge Casey also held that several jurisdictional contacts between NCB and the United States (including the maintenance of a branch office in New York City until 1992 and a subsidiary there until 2001) did not establish sufficient minimum contacts, but that limited jurisdictional discovery might tip the scales in the plaintiffs' favor.  Id. at 820.  The plaintiffs were directed to pursue their FSIA discovery first.

Thereafter, in September 2005, NCB moved for reconsideration of the Court's denial of its motion to dismiss the Ashton and Burnett complaints.  On reconsideration, Judge Casey found that the personal jurisdiction issue raised by NCB's motion to dismiss was more "straightforward" than its alleged entitlement to immunity under the FSIA.  In re Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 575 (S.D.N.Y. 2005) ("Terrorist Attacks II").  Accordingly, "[f]urther inquiry [into the Court's subject matter jurisdiction under the FSIA was] postponed until the parties have completed their personal jurisdiction discovery and this Court has determined whether it has personal jurisdiction over NCB."  Id.

Following <u>Terrorist Attacks II</u>, the parties met on April 11, 2006 to discuss the plaintiffs' jurisdictional discovery requests directed to NCB. (<u>See</u> letter from Ronald S. Liebman, Esq., to the Court, dated May 3, 2006, at 1). Counsel were able to agree upon certain aspects of the proposed discovery, but were unable to resolve all of their disagreements. (<u>Id.</u>). Subsequently, I held a discovery conference on May 4, 2006. (<u>See</u> May 4, 2006 Hr'g Transcript ("Tr.")). As the discussion during the May 4 conference confirms, there are three areas of discovery sought by the plaintiffs that remain in dispute. First, the parties are unable to agree as to the temporal scope of the period that the plaintiffs may review to help them determine whether NCB had a sufficient presence in the United States when this suit was filed to justify the Court's exercise of general jurisdiction over NCB. (Tr. 12-14). Second, the plaintiffs have requested a copy of an audit of NCB that the Saudi government allegedly undertook in 1998, together with all underlying documents referenced therein. (<u>Id.</u> at 12). Finally, the plaintiffs seek the account records of all NCB customers in Saudi Arabia who made regular contributions to organizations purportedly tied to Al Qaeda in the ten-year period prior to the September 11 attacks. (<u>Id.</u> at 20, 26-28). Each request will be considered in relation to the legal theory it arguably supports.

II.   <u>Discussion</u>

The plaintiffs seek to assert personal jurisdiction over NCB under two alternative theories: minimum contacts jurisdiction and conspiracy jurisdiction.

3

    A.    <u>Minimum Contacts Jurisdiction</u>

Under the New York long arm statute, a court may exercise personal jurisdiction over a foreign corporation to the maximum extent permitted by the Fourteenth Amendment Due Process Clause. <u>See</u> <u>Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.</u>, 264 F.3d 32, 36-38 (2d Cir. 2001). One way in which a plaintiff can satisfy the due process requirements for personal jurisdiction over a foreign corporation in a diversity action is to show that the defendant had sufficient "minimum contacts" with the forum state. <u>See</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472-73 (1985). This threshold plainly is met when a foreign defendant regularly does business in a forum state. <u>See</u> N.Y. C.P.L.R. § 302(a)(3)(i) (McKinney 2001); <u>Mario Valente Collezioni</u>, 264 F.3d at 32; <u>Koehler v. Bank of Bermuda, Ltd.</u>, 101 F.2d 863, 865 (2d Cir. 1996). In the alternative, a plaintiff may establish personal jurisdiction under the New York long arm statute by showing that the defendants transacted business in New York State. <u>See</u> N.Y. C.P.L.R. § 302(a)(1) (McKinney 2001); <u>Sunward Elecs., Inc. v. McDonald</u>, 362 F.3d 17, 22 (2d Cir. 2004). This requires a showing that the defendant "purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." <u>Burger King</u>, 471 U.S. at 472-73 (internal citations and quotations omitted).

Where, as here, jurisdiction is also founded on the existence of a federal question, Rule 4(k)(1) of the Federal Rules of Civil Procedure provides a basis for personal

jurisdiction if a defendant lacks sufficient contact with the forum state or any other individual state. Terrorist Attacks I, 349 F. Supp. 2d at 807. In such circumstances, there still must be sufficient contacts with the United States to ensure that the exercise of jurisdiction comports with due process under the Due Process Clause of the Fifth (rather than the Fourteenth) Amendment. See Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc., 86 F. Supp. 2d 137, 142 (E.D.N.Y. 2000); United States v. Int'l Bhd. of Teamsters, 945 F. Supp. 609, 617 (S.D.N.Y. 1996).

NCB does not dispute the plaintiffs' entitlement to explore the degree of its presence in the United States pursuant to Terrorist Attacks I and II. Where it parts company with the plaintiffs is with respect to the appropriate time period to be considered. NCB correctly observes that a defendant's amenability to suit in a particular forum turns on the relevant facts when the suit is filed, not at some earlier time. See, e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 52 (2d Cir. 1991) ("personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed") (internal citation omitted); Ehrenfeld v. A Bin Mahfouz, No. 04 Civ. 9641 (RCC), 2006 WL 1096816, at *3 n.2 (S.D.N.Y. Apr. 26, 2006) ("the Court may only consider a defendant's contacts with the forum state 'at the time the lawsuit was filed' when deciding a motion to dismiss for lack of personal jurisdiction") (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 570 (2d Cir. 1996)).

Nonetheless, a plaintiff seeking to establish a defendant's continued presence in a forum is entitled to more than a snapshot capturing a fixed moment in time. Indeed, NCB does not disagree with this proposition. NCB merely argues that the period that the plaintiffs wish to delve into is overbroad. (Tr. 13-16, 20).

There is no bright line rule capable of helping a court fix the appropriate look-back period for every case. I note, however, that prior to the May 4 discovery conference, NCB had offered the plaintiffs discovery concerning a six-year look-back period, provided that the parties were able to resolve all of their other discovery disputes without the need for judicial intervention. (Id. at 12-13). It probably is no accident that the period proposed was the look-back period approved by the Second Circuit in Metropolitan Life for purposes of determining whether the defendant had "continuous and systematic" contacts with a forum state. Metro. Life, 84 F.3d at 569 (collecting cases). Other cases have approved look-back periods of similar duration. See id. Here, a six-year look-back period does not seem particularly burdensome since NCB claims to have engaged in only limited activities in the United States in recent years. Accordingly, to enable the plaintiffs to determine whether NCB had a presence in the United States sufficient to warrant this Court's exercise of general jurisdiction over it, NCB is directed to provide information concerning its United States contacts for the six-year period preceding the commencement

of these suits.[1]

B. <u>Conspiracy Theory Personal Jurisdiction</u>

The plaintiffs also seek to establish personal jurisdiction over NCB on the theory that NCB "purposefully directed its activities" at the United States by engaging in a conspiracy "directed at" the United States. (<u>See</u> letter from James P. Kreindler, Esq., to the Court ("Kreindler letter"), dated May 3, 2006, at 2-3). "To establish personal jurisdiction on a conspiracy theory, [p]laintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York." <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 805 (citing <u>Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991)).

Under New York law, to recover tort damages on a conspiracy theory, a plaintiff must establish the commission of a tort and the following four elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." <u>Id.</u> "To warrant the inference that a defendant was a member of the conspiracy, [p]laintiffs must show that[:] (a) the defendant had an

---

[1] This ruling should, of course, not be taken as any indication that it ultimately will be appropriate to consider this entire period in determining whether the Court should assert personal jurisdiction over NCB. Indeed, I have no opinion on that subject, which obviously is wholly within Judge Casey's purview.

awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." Id. (internal quotations omitted).

There is no question that Al Qaeda committed a tort – indeed, one of almost unfathomable ill scale – in New York State. There has been no showing, however, that NCB played a direct role in any of the September 11 terrorist attacks. Instead, the plaintiffs argue that "whenever a group of individuals, banks and businesses get together to generate, raise and channel money to Al Qaeda, they are all co-conspirators subject to jurisdiction here." (Tr. 7-8). In an effort to establish the factual predicate – that NCB conspired together with others to bring about the September 11 attacks – the plaintiffs seek two forms of discovery. First, they request the disclosure of the 1998 audit of NCB, together with any documents referred to therein. (Id. at 12). Second, they seek discovery of the bank records of certain NCB customers in Saudi Arabia with alleged ties to Al Qaeda. (Id. at 27). They estimate that there are fewer than "a dozen" such accounts. (Id.).

1. NCB Audit

In the plaintiffs' view, an audit of "NCB's financing of terror charities related to Bin Laden and Al Qaeda . . . would, without doubt, bear precisely on the issues to be considered in assessing the Court's jurisdiction." (Kreindler letter at 3). However, it

8

is by no means clear that NCB was audited in 1998 as the plaintiffs allege.  In fact, during the May 4 conference, NCB's counsel, Ronald S. Liebman, Esq., stated that NCB was unaware of the existence of an audit, but that it had asked the Saudi Arabian Monetary Authority ("SAMA") to investigate whether one exists.  (Tr. 16).

An audit intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States obviously would be directly relevant to the conspiracy liability that the plaintiffs seek to impose on NCB.  Indeed, if it confirmed that NCB knowingly financed terrorist acts against the United States, this alone might be sufficient to persuade the Court to find personal jurisdiction over NCB on the basis of its role in a conspiracy.  For this reason, NCB is directed to confirm with SAMA whether the Saudi government conducted an 1998 audit of NCB.  If such an audit exists, NCB is directed to produce a copy promptly to the plaintiffs.

Even if an audit was conducted, at this stage both the scope of the inquiry and any findings that may have been made remain unknown.  It therefore is entirely possible that disclosure of all of the documents referenced in the audit would lead to discovery vastly more far-reaching than that envisioned by Judge Casey in <u>Terrorist Attacks I and II</u>.  For this reason, the Court will deny without prejudice the plaintiffs' request for the production of all of the documents referenced in the underlying audit.  This request may be renewed if, in fact, there is an audit, and it is shown to shed light on the issues presently before this Court with regard to NCB.

      2.      <u>Customer Bank Records</u>

In <u>Terrorist Attacks I</u>, Judge Casey dismissed the plaintiffs' complaints against every bank other than NCB, finding that there were no allegations that the banks directly supported terrorists. <u>Terrorist Attacks I</u>, 349 F. Supp. 2d at 831-36. The Court went on to observe that the allegations that the banks had reason to know that the defendant charities were supporting terrorism were unsupported and that conclusory allegations to that effect could not survive a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>Id.</u> at 832-36. With respect to NCB, in addition to the sort of boilerplate that the plaintiffs recited in their discussion of the other banks, the <u>Burnett</u> complaint referred to a "1999 United States Senate Report on the [Bank of Credit and Commerce International] scheme [which] detailed the role of [NCB] in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism." <u>Id.</u> at 787 (citing <u>Burnett</u> Compl. ¶ 89) (last brackets in original). Once again, however, these allegations are conclusory. More importantly, they establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with "an awareness of the effects in New York" of such monetary contributions, nor that the co-conspirators in New York – namely, the Al Qaeda terrorists who executed the September 11 attacks – "acted at the direction or under the control or at the request of" NCB. <u>Id.</u> at 805.

Accordingly, the plaintiffs have failed to make a prima facie showing of conspiracy which might warrant inquiry into the accounts of specific NCB customers at this preliminary stage. Their request for an order requiring the disclosure of the bank records of particular NCB customers consequently is denied.[2]

III. Conclusion

The plaintiffs' discovery requests are granted solely to the extent that NCB is directed to produce promptly any 1998 audit of its operations, and for a six-year period preceding the commencement of these suits any documents previously requested by the plaintiffs related to its presence in the United States.

Additionally, because this was the limited purpose for which this matter was referred to me, the Clerk of the Court is respectfully requested to close the reference.

SO ORDERED.

Dated:   New York, New York
         June 28, 2006

_____
FRANK MAAS
United States Magistrate Judge

---

[2] Even if that request had been granted, NCB would likely have to secure the approval of SAMA before complying with the Court's order. (See Tr. 19, 34).

Copies to:

Honorable Richard C. Casey
United States District Judge

Andrew J. Maloney, III, Esq.
Kreindler & Kreindler
(212) 972-9432 (fax)

Ronald S. Liebman, Esq.
Patton Boggs
(202) 457-6315 (fax)

Scott Tarbutton, Esq.
Cozen O'Connor
(215) 665-2013 (fax)

Robert T. Haefele, Esq.
Motley Rice LLC
(843) 216-9450 (fax)

Andrea Bierstein, Esq.
Hanly Conroy
(212) 784-6420 (fax)