**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC) <br> ECF Case |
| --- | --- |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-CV-6978

<u>**FEDERAL PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN
OPPOSITION TO THE MOTIONS TO DISMISS FILED BY SANABIL, INC.,
AND SANABEL AL-KHEER**</u>

## TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ........................................................................................ 1

   A.   Sanabel al-Kheer ......................................................................................... 1

      1.   Sanabel al-Kheer Leadership ........................................................... 2

      2.   Sanabel al-Kheer Activities .............................................................. 2

   B.   Sanabil, Inc. ................................................................................................ 4

      1.   Sanabil, BMI and IIRO ..................................................................... 4

      2.   Sanabil Activities .............................................................................. 5

      3.   Sanabil Money Disappears ............................................................... 7

      4.   Sanabil and the Golden Chain ........................................................... 7

   C.   The IIRO and al Qaida ................................................................................ 9

II.   SANABIL REMAINS A VIABLE DEFENDANT, AND ITS MOTION TO DISMISS
      MUST BE DENIED. ................................................................................................ 9

III.   SANABEL AL-KHEER'S MOTION TO DISMISS MUST BE DENIED .................... 11

   A.   Standard for Granting Motions to Dismiss .................................................... 11

   B.   The Liberal Requirements of Notice Pleading ............................................... 12

   C.   The Supplemental Pleadings Are Proper ...................................................... 13

   D.   Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted ............... 15

      1.   Sanabel al-Kheer's Specific Factual Contentions Miss The Mark .............. 15

      2.   Causation Been Sufficiently Pled ..................................................... 16

IV.   CONCLUSION ....................................................................................................... 17

## TABLE OF AUTHORITIES

Page

### CASES

Boim v. Quranic Lit. Inst.,
    291 F.3d 1000 (7th Cir. 2002) ........................................................................1

Chance v. Armstrong,
    143 F.3d 698 (2d Cir. 1998)..........................................................................12

Conley v. Gibson,
    355 U.S. 41 (1957)........................................................................................11

Gagliardi v. Village of Pawling,
    18 F.3d 188 (2d Cir. 1994)............................................................................10

Geisler v. Petrocelli, ,
    616 F.2d 636 (2d Cir. 1980)..........................................................................12

Gregory v. Daly,
    243 F.3d 687 (2d Cir. 2001)..........................................................................10

Klecher v. Metro. Life Ins. Co.,
    331 F. Supp. 2d 279 (S.D.N.Y. 2004)...........................................................10

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,
    507 U.S. 163, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)....................12, 14

Pelman v. McDonald's Corp.,
    396 F.3d 508 (2d Cir. 2005)................................................................ 12, 16-17

Phelps v. Kapnolas,
    308 F.3d 180 (2d Cir. 2002)................................................................ 11-12, 14

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)............................. 12, 14, 16-17

In re Terrorist Attacks on September 11, 2001,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005).........................................................17

In re Terrorist Attacks on September 11, 2001,
    392 F. Supp. 2d 539 (S.D.N.Y. 2005)...........................................................9

Twombley v. Bell Atlantic Corp.,
    425 F.3d 99 (2d Cir. 2005)................................................................................... 12-13

Warren v. District of Columbia,
    353 F.3d 36 (D.C. Cir. 2004) ......................................................................................14

Woodford v. Community Action Agency,
    239 F.3d 517 (2d Cir. 2001)........................................................................................12

Wynder v. McMahon,
    360 F.3d 73 (2d Cir. 2004).................................................................................... 11-12

## STATUTES

Fed. R. Civ. P. 8(a)(2)........................................................................................12, 16

Fed. R. Civ. P. 9(b) ...................................................................................................12

Fed R. Civ. P. 12(b)(6)................................................................................... 12-13, 16

Fed. R. Civ. P. 12(c) ..................................................................................................12

Fed. R. Civ. P. 15(d) ............................................................................................13, 14

D.C. Code § 29-101.97 ..............................................................................................11

Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990) ....................................14

"The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." *Boim v. Quranic Lit. Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002) (by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for attacks on America) (citing S. Rep. 102-342 at 22).

Sanabel al-Kheer was established as the fundraising and investment wing for co-defendant International Islamic Relief Organization, a "charity" whose motion to dismiss has already been denied by this Court based on the strength of the substantive allegations against it. Still, Sanabel al-Kheer has filed a motion to dismiss the <u>Federal Insurance</u> complaint, as has Sanabil, Inc., its American subsidiary. Sanabel al-Kheer argues that the allegations levied against it are insufficient to sustain a cause of action, while Sanabil argues on the basis of two unauthenticated single-paged documents that it no longer exists and cannot be sued. Neither movant has met its burden of proof, and both motions to dismiss must be denied.

## I.    FACTUAL BACKGROUND

This section reviews the relevant factual pleadings involving Sanabel al-Kheer and Sanabil, Inc., its U.S. subsidiary. It contains allegations as pleaded in the <u>Federal</u> First Amended Complaint With Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2, as well as the RICO Statement filed by <u>Federal</u> as to each defendant.

### A.    <u>Sanabel al-Kheer</u>

Defendant Sanabel al-Kheer (a.k.a. "Seeds of Charity", "Sanabel al-Kheer Al-Kheer", "Sanabil Al-Khayr", "The Charity Bonds Project") was established by co-defendant International Islamic Relief Organization (IIRO) in Saudi Arabia in 1987 to engage in fundraising and make investments designed to support IIRO's "charitable operations". However, Sanabel al-Kheer,

like IIRO itself, has long knowingly used these funds not for legitimate relief purposes but instead to provide massive support for al Qaida and global terrorism.

### 1. Sanabel al-Kheer Leadership

Co-defendants Hassan A.A. Bafhzallah, Yaqub M. Mirza and Abdullah Al Obaid are the officers and directors of Sanabel al-Kheer. Bafhzallah and Mirza are also officers/directors of Sanabil, Inc. (also: "Sana-Bell, Inc."), its U.S. subsidiary. Additionally, these men are also the officers and directors of co-defendant Muslim World League, the parent of IIRO, and Al Obaid is the secretary general of co-defendant Muslim World League.

All these men are well-connected within the terrorist financing network. Bahfzallah represented defendant Benevolence International Foundation in Saudi Arabia in the 1990s. Bahfzallah also founded the German companies Tatex and Triple-B, which provided assistance to the al Qaida cell in Hamburg, Germany from which several of the September 11 hijackers emerged, including plot mastermind Mohammed Atta. Mirza is an officer and board member of numerous companies and charities involved in sponsoring terrorism who are defendants in this action and elsewhere through the SAAR network.

The fiscal oversight of Sanabel al-Kheer and IIRO appears to have been the responsibility of the "number two man" in Jeddah, Ghazi Mahfooz Felemban, IIRO Assistant Secretary-General for Finance and Investment. Felemban is a well known economics professor at King Abdulaziz University and an investment specialist who has worked on key financial programs with the Saudi Arabian Monetary Agency (SAMA), the Islamic Development Bank, Al-Rajhi Banking and Investment Corporation, and the Saudi Cairo Bank.

### 2. Sanabel al-Kheer Activities

The leadership of IIRO aimed to collect 100 million Saudi Riyals annually for 10 years, to create a total base capital investment for Sanabel al-Kheer of 1 billion Saudi riyals ($267

million). The goal was to generate sufficient profits to cover the costs of IIRO's international operations and make it a self-sufficient entity.

Sanabel al-Kheer solicited donations through full-page advertisements run in leading Islamic journals. These advertisements, calling for *zakat* contributions to assist the needy in Chechnya, Bosnia, and other such areas, provided account numbers to facilitate the contribution of funds. These advertisements ran throughout the 1990s and continue to run in such publications as *Al Igatha* and the *Muslim World League Journal* (publications distributed widely throughout the United States). Account numbers additionally appear for defendant Al Baraka Bank, a subsidiary of the Dallah Al-Baraka Group, and defendant Al Rajhi Bank, both collecting so-called "charitable" donations on behalf of Sanabel al-Kheer and depositing the donations into its accounts at each bank.

Between 1992 to 1998, IIRO and Sanabel al-Kheer held numerous high profile fundraising events together in Saudi Arabia:

- In July 1992, Sanabel al-Kheer and IIRO sponsored a fundraising drive in Jeddah for the Muslims of Bosnia. Over SR19 million was collected in one day. The largest single donors reportedly included Bakr Bin Laden. Several months later, Sanabel al-Kheer reported that it had transferred SR12 million collected on July 5 directly to IIRO to underwrite its "charitable operations" in the Balkans.

- In December 1993, Sanabel al-Kheer and IIRO held another yearly fundraising drive to help support embattled Bosnian Muslims. IIRO collected an additional SR15 million, which put the organization on a base capital level of nearly SR82 million.

- In February 1994, IIRO organized another annual Sanabel al-Kheer fundraising convention in Riyadh. Over SR3.7 million was raised in the Saudi Cultural Festival Palace for IIRO/Sanabel al-Kheer. A few months later, IIRO officials stated that in the year 1994, the charity had raised more than SR90 million from wealthy benefactors in Saudi Arabia.

- On February 23, 1995, IIRO held its eighth annual charity festival in Riyadh in conjunction with Sanabel al-Kheer. Donations totalled SR8 million ($2.13 million). On February 5, 1996, the IIRO and Sanabel al-Kheer annual fundraising drive raised more than SR6 million at the Cultural Palace in Riyadh.

3

- In January 1997, Dr. Farid Qurashi organized the tenth annual fundraising drive of IIRO – Sanabil. IIRO collected over SR17 million. Qurashi was quoted as saying that IIRO had successfully raised a grand total of SR2.3 billion (about $615 million) between 1986 and 1995. In addition to that, according to Qurashi, Sanabel al-Kheer's global investments had returned SR425 million in profits by the start of 1997.

- In December 1998, at the 12th annual Sanabel al-Kheer/IIRO charity drive, IIRO netted over SR6 million.

## B.   Sanabil, Inc.

Sanabil ("Sana-Bell") Inc. was incorporated in the District of Columbia, operating in Herndon, Virginia. Sanabil was established by Sanabel al-Kheer to generate funds for and funnel funds to the IRO ("International Relief Organization"), the United States arm of the IIRO, through which millions were to go to al Qaida and related organizations. As part of the SAAR network/Safa Group of organizations, it disbursed at least $3.7 million to al Qaida over the years.

### 1.   Sanabil, BMI and IIRO

In the summer of 1985, soon after his arrival in the United States, Egyptian national Soliman Biheiri first met Dr. Sulaiman Al-Ali, the eventual executive officer of IIRO/IRO's U.S. branch. Dr. Al-Ali was very familiar to Biheiri because he had given lectures in Muslim conventions and conferences in the United States. They developed both a personal and business relationship.  Dr. Al-Ali frequently acted as a consultant to Biheiri's BMI Investment Services, especially with respect to helping it develop business leads in Saudi Arabia.  During this time, Biheiri paid "tens of thousands" of dollars to Dr. Al-Ali, and has testified that the "assistance he gave me on occasions, introducing BMI Finance and Investment Group to important institutions, important personalities.  And when that resulting in any business for BMI Finance and Investment Group, we have paid him a fee. You can call it a commission or a fee, but that is how it is."

At the beginning of 1989, during a visit to the U.S., Dr. Al-Ali told Biheiri of his plans to move permanently to the United States and establish IRO, a non-profit organization, which

4

would be headquartered in Virginia as the U.S. branch of the IIRO. He further told him that he was also involved in forming a D.C. nonprofit corporation to be named "The Sana-Bell, Inc." which "would act as a funding source for IRO." According to Dr. Al-Ali, he was or would be a founding member of the Board of Directors of Sanabil. Government officials now believe that the U.S. Sanabil branch was part of a global effort to manage the IIRO's assets through the international endowment fund Sanabel al-Kheer.

In July 1991, Dr. Al-Ali moved to the U.S. and established IRO as a Virginia corporation. He told Biheiri that through Sanabil, IRO had received a $10,000,000 donation from the IIRO. According to Dr. Al-Ali, he was to invest that money through Sanabil, and then use the return of the income generated from these investments to cover the costs of IRO's operations.

This then also became tied in with the SAAR network of entities. M. Yaqub Mirza is, or has been, an officer and/or director of 29 SAAR network entities, including Sanabil (of which he was an officer and director) and maintained signatory authority over seventeen different bank accounts associated with fifteen different SAAR network entities. (Mirza is also the first organizer of the U.S offices of Muslim World League, notorious for its close association with and support of al Qaida.) Section VI of Sanabil's articles of incorporation further indicate that upon dissolution, Sanabil's assets were to be distributed to several SAAR-related organizations.

### 2.    Sanabil Activities

From 1992-98, Mirza invested $3.7 million of Sanabil money with Biheiri into BMI. BMI then transferred the funds to terrorists including Yasin al-Qadi, a BMI founder and the head of Muwaffaq (Blessed Relief), a charity involved in funneling millions of dollars to Osama Bin Laden and al Qaida. Funds transferred from BMI to al Qaida may have been used to finance the 1998 embassy bombings in Africa. According to FBI agent Robert Wright, the founders of BMI include SDGT's Musa Abu Marzook (a Hamas leader), al-Qadi and two bin Laden brothers.

Through Mirza, Sanabil knowingly and intentionally provided al Qaida financial support through this $3.7 million transfer to Biheiri, and Mirza himself handled that $3.7 million transfer from 1992-1998 even after al Qaida publicly declared war on America. As of February 2000, Sanabil had only made a total of four investments. Significantly, there was never a meeting of either Sanabil's Investment Committee or the Board of Trustees to discuss or formally approve any of these investments. The four investments were as follows:

- Property at 360 S. Washington St. in Falls Church, Virginia where Dr. Al-Ali established IRO's office. For a number of years, Sulaiman Al-Ali and IRO managed the office building on the property at 360 S. Washington St. Dr. Al-Ali signed leases on behalf of Sanabil and collected the rent. [1]

- Residential real estate building lots in Prince Georges County, Maryland for which BMI Real Estate and Development, Inc. (BMI REDI) acted as a general agent and a general contractor of houses. In mid-1993, Sanabil purchased 15 developed residential building lots in Prince Georges County, Maryland. At Dr. Al-Ali's suggestion, Sanabil entered into a management agreement with BMI REDI to build, market, and sell those houses for Sanabil's account. Dr. Al-Ali was Sanabil's only point of contact with BMI with respect to all matters relating to its role in the project.

- 200 limited partnership units, valued at $1 million, in BMI Leasing Limited Partnership (BMI Leasing).

- 20 limited partnership units, valued at $1.1 million, in BMI Construction Fund Limited Partnership (BMI Construction).

All of BMI's dealings with respect to Sanabil were through Dr. Al-Ali at the IRO office at 360 S. Washington St. At Dr. Al-Ali's direction, all tax matters were sent to Yaqub Mirza at his office at 555 Grove St. in Herndon, Virginia, headquarters of the SAAR network of entities.

---

[1]     IRO and Dr. Al-Ali occupied the third floor of the building for only "nominal rent," resulting in Sanabil's inability to cover the building's carrying costs from the building's rental income. The inability of the building's rental income to cover the building's carrying costs is even more remarkable in light of the fact that Sanabil paid cash for the building and, therefore, had no mortgage expenses associated with the building. Its only carrying costs were real estate taxes, utilities, and maintenance. The decision to charge IRO only a nominal rent, insufficient to permit Sanabil to cover its costs through the building's rental income, was never the subject of a Trustee meeting or an Investment Committee meeting.

According to Biheiri, Dr. Al-Ali located, negotiated, and decided what investments Sanabil would make "because the benefit of those investments were designed to go to IRO, and not to [Sanabil]. The building purchase was designed to benefit IRO, not Sanabil, D.C. [Sanabil] operated as a mere conduit to move IIRO funds from Saudi Arabia to IRO's use in Virginia."

### 3.      Sanabil Money Disappears

The $2 million from Sanabil soon disappeared from BMI's books. A month after the al Qaida embassy bombings in Africa in August 1998, Sanabil filed a federal suit against BMI in Maryland. Sanabil claimed that it had uncovered several accounting irregularities in BMI's financial records, including the disappearance of the $2 million. More specifically, Sanabil alleged that BMI illegally disbursed Sanabil's investment in BMI at the direction of IIRO/IRO officer Dr. Al Ali. Since Sanabil was an operating subsidiary of IIRO/IRO, *the plaintiff and the defendant in the case were essentially part of the same corporate entity.* Sanabil obtained a judgment of $2.3 million in the lawsuit but it never collected on its judgment. Federal investigators believe that IIRO/IRO's lawsuit was intended to create an explanation for the disappearance of the funds and conceal any financial ties between BMI and Islamic extremists.

Although the final destination of the $2 million is not clear, authorities believe that the end result of the transaction was Biheiri and Dr. Al-Ali liquidating and splitting the $2.1 million cash investment by Sanabil, Inc. at an indeterminate time between 1996 and 1998 and never giving any form of compensation to Sanabil. Biheiri never attempted to contact anyone else affiliated with Sanabil to authorize or verify the changes authorized by Dr. Al-Ali.

### 4.      Sanabil and the Golden Chain

Among Sanabil's founders in the United States were defendants Saleh Abdullah Kamel and Ibrahim Afandi. Both men are Saudi nationals who appear on a list of wealthy al Qaida

donors referred to as the "Golden Chain."  Golden Chain financiers donated funds earmarked for Osama Bin Laden directly and also through various charities.

The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.

The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the document is "a list of people referred to within al Qaida" as wealthy donors to the movement.  See Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill. filed Jan.6, 2003).

The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report.  See Final Report of the 9/11 Commission, Note 21 to Chapter 2.  The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224.  See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm.

Former al Qaida operatives have explained how Golden Chain financiers would donate funds earmarked for bin Laden by way of the Saudi evangelical charity, the Muslim World League.  Sanabel al-Kheer and IIRO are operational arms of the Muslim World League.

The Golden Chain was established at the time of al Qaida's formation in 1988; Sanabel al-Kheer's D.C. branch was organized only months later.

### C.     The IIRO and al Qaida

In sections II-D and of III-E of its second memorandum and order in this case, this Court has already accepted that plaintiffs have stated valid claims against IIRO as to which relief can be granted.   In re Terrorist Attacks on September 11, 2001, 392 F. Supp.2d 539, 563, 569 (S.D.N.Y. 2005).

In sum, plaintiffs have alleged that IIRO is an al Qaida "charity" front that knowingly and intentionally provided al Qaida funds and recruits for terrorist attacks against America, including the 1993 World Trade Center bombing, the 1995 plot to blow up twelve American airplanes simultaneously, the 1995 plot to assassinate President Clinton, the 1998 U.S. Embassy bombings in Kenya and Tanzania, the 1999 plot to destroy U.S. consulates in India, and the September 11 attacks.  Through its relationship with Mohammed Jamal Khalifa, it has allegedly been involved in several al Qaida attacks and plots for other attacks.  It has allegedly funded the Taliban and al Qaida training camps in Afghanistan.  Through IRO, IIRO operated in the United States until December 2002.  It is alleged to have supported an al Qaida guest house.

IIRO's links to terrorism also extend through Sanabil, which received and transferred funds on behalf of and as directed by IIRO.   In the 1990's, IIRO and Sanabil spearheaded fundraising for the Bosnian Muslims.  On its 1996 U.S. tax forms, for example, IIRO listed $4.5 million in total grants and allocations; $3.9 million went to "Emergency relief supplies (medical supplies) to International Islamic Relief in Bosnia."

## II.    SANABIL REMAINS A VIABLE DEFENDANT, AND ITS MOTION TO DISMISS MUST BE DENIED.

In a brief motion, Sanabil argues that it must be dismissed from this matter because it "assigned all right, title and interest to Sanabel al-Kheer in 2001 and because the corporation no

longer exists."  However, because the documents it submits in support of its motion do not in fact verify this proposition, its motion to dismiss must be denied.

To begin, it is questionable whether such documents can even be considered by this court under the Federal rules.  "When determining the sufficiency of a claim under Rule 12(b)(6), the Court's consideration is limited to the factual allegations in the amended pleadings, as well as 'those contained in documents attached to the pleadings or in documents incorporated by reference.'" Klecher v. Metro. Life Ins. Co., 331 F. Supp. 2d 279, 283 (S.D.N.Y. 2004), quoting Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).  "Under both Rule 12(b) and Rule 12(c), the Court may not consider matters submitted outside the pleadings in dispute, unless notice is given to all parties that the motion is being converted to a motion for summary judgment and the parties are afforded a reasonable opportunity to present additional pertinent information." Gagliardi v. Village of Pawling, 18 F.3d 188, 191 (2d Cir. 1994).

These papers fall far outside such parameters.  Moreover, they lack any indicia of credibility:  no one has authenticated these documents, nor has any witness sworn an affidavit attesting to their veracity.  They ought not be considered at all.

Even if they were to be considered, it is obvious from the face of the documents that they simply do not prove anything like what Sanibel asserts in its brief.  Sanabil disingenuously claims the first document demonstrates that it "assigned all right, title and interest to Sanabel al-Kheer."  A simple reading of Exhibit A demonstrates no such general assignment, only that it assigned, as a charitable donation, its right to collect judgment in the Sana-Bell v. BMI lawsuit referenced above.  No such general transfer is claimed, nor has it been proven.

Its Exhibit B is no more demonstrative of the proposition that Sanabil has ceased to exist. At most, it is a certification from the District of Columbia that its articles of incorporation were revoked for failure to file reports and pay required fees.

Nowhere do these documents attest that Sanabil has merged itself into Sanabel al-Kheer as it claims.  No affidavit has been presented from any company official making that claim.  No formal merger documents have been submitted to this Court, and no corporate minutes suggesting such a merger from either entity have been presented to the Court.

Finally, even it were true that Sanabil no longer exists, the District of Columbia survival statute, D.C. Code § 29-101.97 (2006), permits claims against such entities so long as they are commenced within two years after the date of dissolution.  Given that this lawsuit was filed within one year of that 2002 document, these claims must survive.

In sum, the two documents Sanabil has presented as its "only evidence" ought not be considered by this Court at all, and certainly do not support its claim to no longer exist.  Its motion to dismiss must be denied.

## III.   SANABEL AL-KHEER'S MOTION TO DISMISS MUST BE DENIED

Sanabel al-Kheer raises two arguments in its motion to dismiss.  Its first argument (logically speaking, though it comes last in its brief) is that Plaintiffs' supplemental pleadings, including its RICO Statement, ought not be considered at all by this Court.  From there, it moves on to argue that the allegations against it as a whole are overly conclusory, fail to establish causation and liability, and as a result this Court lacks subject matter jurisdiction over this suit.  All these contentions lack merit, and the motion to dismiss must be denied.

### A.   <u>Standard for Granting Motions to Dismiss</u>

A motion to dismiss for failure to state a claim must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Wynder v. McMahon</u>, 360 F.3d 73, 78 n.8 (2d Cir. 2004); <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam).  The Court's role is "not to assay the weight of the evidence which might be offered in support" of the

Complaint, but "merely to assess the legal feasibility" of the Complaint.  Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).  In evaluating whether the plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaint and draw all reasonable inferences in plaintiffs' favor.  Wynder, 360 F.3d at 77; Phelps, 308 F.3d at 184.  Plaintiffs are not required to prove their case at the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided."  Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998).

B.      **The Liberal Requirements of Notice Pleading**

A motion pursuant to Fed. R. Civ. P. 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002).  Indeed, Rule 8(a)(2) provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Id. Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993); see also Pelman v. McDonald's Corp., 396 F.3d 508, 512-13 (2d Cir. 2005) (plaintiff need not draw causal connection between allegations and injuries in the complaint, but rather may rely on discovery to flesh out claim).

In October 2005, the Second Circuit reiterated and reaffirmed the notice pleading standard set forth in Rule 8 as applied to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). See

Twombley v. Bell Atlantic Corp., 425 F.3d 99 (2d Cir. 2005), cert. granted, -- U.S.L.W. --, No. 05-1126 (June 26, 2006).  In Twombley, the Second Circuit reversed a district court decision applying higher pleading standards than those set forth in Rule 8, holding that "[a] requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation."  425 F.3d at 107.  In the context of antitrust pleading, the Second Circuit reminded litigants that "although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege." Id. at 116.  Indeed, a district court may not add create higher pleading standards than those set forth in the Federal Rules.  Recognizing that Rule 8 represents a balance between the benefits of simple, notice pleadings and the burdens of permitting more cases to go forward, the Second Circuit has held unequivocally, "If that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so."  425 F.3d at 117.

### C.    The Supplemental Pleadings Are Proper

Sanabel al-Kheer contends that Plaintiffs' supplemental pleadings, including the RICO Statement filed against it, cannot be considered because they are too "conclusory".  It further makes the novel and wholly unfounded argument that Fed. R. Civ. P. 15(d) only permits such pleadings to contain events which occurred following the date of the initial pleading.   These contentions are unwarranted.

What Sanabel al-Kheer refers to as "conclusory" allegations are wholly proper at this stage of the pleading process.   The notince pleading standards, as we will explain further on in this memorandum of law, only require at this stage of the litigation fair notice of the relevant allegations, to be fleshed out more fully following full and proper discovery.

Indeed, in <u>Warren v. District of Columbia</u>, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit echoed this Circuit's ruling in <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 184 (2d Cir. 2002) (per curiam), in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge. Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." <u>Id.</u> at 39 (citing <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002); <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)). Here, plaintiffs have pleaded that Sanabel al-Kheer knowingly diverted funds through the IIRO to support Al Qaida and global terrorism, and have provided sufficient background facts to explain the basis of its knowledge. No more is required.

Sanabel al-Kheer further offers the unfounded argument that Fed. R. Civ. P. 15(d) only permits such pleadings to contain events which occurred following the date of the initial pleading. They provide no case law in support for this off-hand assertion, and there is none. Moreover, this argument is wholly inconsistent with CMO #2, which explicitly authorized such pleadings. It should be rejected by this Court.

Plaintiffs' incorporation of the RICO and More Definite Statements into their Complaints, by reference or attachment as exhibits, complies with both the letter and spirit of the Federal Rules in form and substance.[2]  Sanabel al-Kheer was required to consider these additional pleadings in its response, and its failure to do so is fatal to its motion to dismiss.

---

[2]      Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

**D.**      **Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted**

Sanabel al-Kheer's remaining claims pertain to the propriety of the remainder of the pleadings. However, because Sanabel al-Kheer failed to respond to the full array of substantive pleadings levied against it, its memorandum of law woefully misses the mark. By responding to an incomplete set of allegations, Sanabel al-Kheer has left the bulk of the allegations against it uncontested; moreover, even as to the pleadings to which they did choose to respond, its legal arguments lack merit, and its motion to dismiss must be denied.

**1.      Sanabel al-Kheer's Specific Factual Contentions Miss The Mark**

Sanabel al-Kheer's own liability stems not from the sources of its funds, but from its knowing direction of those funds to the IIRO and, thus, al Qaida. While it spends much time focused on the allegations regarding its receipt of funds *from* certain co-defendants, Sanabel al-Kheer failed to mention the IIRO *even once* during its motion to dismiss. Thus, Sanabel al-Kheer fails to address the crux of the allegations against it – that it was established by IIRO to perform fundraising and investment activities on its behalf, with all involved knowing that funds delivered to IIRO would support global Islamic terrorist activity and al Qaida. For the same reasons that IIRO's motion to dismiss has been denied, therefore, so too must Sanabel al-Kheer's.

Furthermore, Sanabel al-Kheer questions the merit of the allegations lodged against it on the basis of the activities of Dr. Sulaiman bin Ali al-Ali, who they pass off as a "former employee". Yet Dr. Ali, as noted above, was the head of Sanabel's U.S. operations, directly involved in all of its decisionmaking as to investments with BMI and disbursements to IIRO.[3]

---

[3]      Indeed, this is included in the Complaint as well as the RICO Statement: Paragraph 475: "Dr. Sulaiman bin Ali al-Ali (a/k/a Sulaiman Kabbara), is a wealthy Saudi businessman, a member of the IIRO Executive Committee, and a member of the Shura Council of the Kingdom of Saudi Arabia. Al-Ali invested approximately $10 million in the U.S. based operations of the IIRO, which operated within the SAAR network of companies established to support al Qaida's global operations. Al-Ali also served as a member of the Sana-Bell, Inc. investment firm, and was responsible for executing and managing Sana-Bell's investments."

His responsibilities covered not only the Global Chemical relationship but its general, everyday support of parent organization IIRO, through which he knowingly financed al Qaida and other Islamic terrorist organizations.  His actions, as the head of Sanabel's U.S. operations, are wholly attributable to Sanabel al-Kheer.

### 2.    Causation Been Sufficiently Pled

Sanabel al-Kheer claims that Plaintiffs have failed to prove causation by not demonstrating that "actions on the part of the Sanabel [...] actually led to the terrorist attacks of September 11, 2001" and that "Sanabel should have been able to foresee the 9/11 attacks from investments going back to the early 1980s."  This overstates what this Court has held, and is not what the law requires.

Recently, in Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005), the Second Circuit vacated a district court's dismissal under Rule 12(b)(6) and reiterated the minimal pleading standards to be applied.  In Pelman, the district court below had dismissed a complaint alleging deceptive fast food marketing practices had led to a rise in childhood obesity, maintaining that plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries."  Id. at 511.  The Second Circuit rejected this approach.  It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P."  Id. at 512.  Quoting the unanimous Supreme Court ruling in Swierkiewicz, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

Pelman, 396 F.3d at 512 (quoting Swierkiewicz, 534 U.S. at 512-13).

As this Court has recognized, "[i]n light of Al Qaida's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaida." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005). Consistent with this holding, plaintiffs' consistent and specific averments of Sanabel al-Kheer's knowing and intentional sponsorship of al Qaida through the IIRO are, in and of themselves, sufficient to establish causation at this stage of the litigation, just as they were as to IIRO itself.

Even if more specific allegations of causation were required, plaintiffs have met that burden. Plaintiffs have sufficiently explored the causal link between IIRO's eager support of al Qaida and the September 11 Attack, as well as other al Qaida terrorist incidents around the globe prior to September 11, 2001. As this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 829. Plaintiffs have properly pleaded causation.

## IV.   CONCLUSION

Plaintiffs have properly pleaded their case against Sanabel al-Kheer and Sanibel, Inc., under the Federal Rules of Civil Procedure. Its motion to dismiss must be denied.

Respectfully submitted,

COZEN O'CONNOR

Dated: July 18, 2006                    BY: _____/s/_____

                                        Stephen A. Cozen, Esquire
                                        Elliott R. Feldman, Esquire
                                        Sean P. Carter, Esquire
                                        Adam C. Bonin, Esquire
                                        1900 Market Street
                                        Philadelphia, PA 19103
                                        Tele: (215) 665-2000
                                        Fax: (215) 665-2013

                                        Attorneys for *Federal Insurance* Plaintiffs