**UNITED STATES DISTRICT COURT**  *ORAL ARGUMENT REQUESTED*
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF case |

*This document relates to*:

> *Ashton v. Al Qaeda Islamic Army, et al.* 02-CV-6977 (RCC)
> *New York Marine & General Insurance Co. v. Al Qaida, et al.* 04-CV-6105 (RCC)
> *Continental Casualty Insurance v. Al Qaeda, et al.* 04-CV-5970 (RCC)
> *Burnett v. Al Baraka Investment & Development Corp., et al.* 03-CV-5738 (RCC)
> *Burnett v. Al Baraka Investment & Development Corp. et al.* 03-CV-9849 (RCC)

## DEFENDANT SHEIKH YUSUF AL-QARADAWI'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINTS WITH PREJUDICE.

Amy Rothstein
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007

*Attorney for Defendant*
*Sheikh Yusuf al-Qaradawi*

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    The New York Marine Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.    The Ashton Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.    Continental Casualty Company Complaint . . . . . . . . . . . . . . . . . . . . . . . . 6

        4.    The Burnett More Definite Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.      THE COURT LACKS PERSONAL JURISDICTION OVER SHEIKH YUSUF
        BECAUSE THE PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT NEW YORK
        LONG-ARM JURISDICTION ON A CONSPIRACY THEORY NOR DO THEY
        SUPPORT A THEORY THAT HE HAS "PURPOSEFULLY DIRECTED" ANY
        ACTIONS TOWARD THE UNITED STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    The Court Has No General Jurisdiction Over Sheikh Yusuf . . . . . . . . . . . . . . . . 11

      B.    The Complaints Fail to Allege Specific Facts Warranting an Inference that Sheikh
           Yusuf was a Member of the Conspiracy to Perpetrate or Aided and Abetted the
           September 11 Attacks or that He "Purposefully Directed" Activities at the United
           States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.    Sheikh Yusuf's Role as Sharia Council Member of BAT and DMI  . . . . 12

          2.    Plaintiffs' Attempts to Connect Sheikh Yusuf to Their Conclusory
              Allegations with Irrelevant Assertions . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     THE COURT LACKS JURISDICTION OVER SHEIKH YUSUF BECAUSE HE WAS
        NOT PROPERLY SERVED IN THESE ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    THE COMPLAINTS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE
        GRANTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.    Plaintiffs' Allegations Against Sheikh Yusuf Do Not State a Claim Under the
      Anti-Terrorism Act ("ATA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    Plaintiffs' Allegations Fail to State a RICO, Torture Victim Protection Act, or
      Any Other Federal or State Tort Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## **TABLE OF AUTHORITIES**

### **CASES**

*Anza v. Ideal Steel Supply Corp.,*
126 S. Ct. 1991 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Boim v. Quranic Literacy Institute,*
291 F. 2d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
274 F. Supp. 2d 86, 104 (D. D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Burnham v. Superior Court of Cal.,*
495 U.S. 604 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Chrysler Capital Corp. v. Century Power Corp.,*
788 F. Supp. 1260 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

*Daventree Limited v. Republic of Azerbaijan*
349 F. Supp. 2d 736 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F. 3d 763, 772 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*GICC Capital Corp. v. Technology Finance Group, In.,*
67 F. 3d 463 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

*Heliocopteros Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Terrorist Attacks on September 11, 2001,*
349 F. Supp. 2d 765 ("Terrorist Attacks I") . . . . . . . . . . . . . 11, 12, 13, 14, 15, 16, 19, 21, 22, 23

*In re Terrorist Attacks on September 11, 2001,*
392 F. supp. 2d 539 ("Terrorist Attacks II") . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15, 18, 19, 21, 22

*Mayes v. UVI Holdings, Inc.,*
280 A.D. 2d 153 (1st Dep't 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Metropolitan Life Ins Co. v. Robertson-Ceco Corp.,*
84 F. 3d 560 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

*Mullane v. Central Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*New York v. New York, N.H. & H.R. Co.,*
  344 U.S. 293 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Small v. Lorillard Tobacco Co., Inc.,*
  94 NY 2d 43 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATUTES AND RULES

18 U.S.C. § 1962 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 1962 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 2333 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 2339 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

F. R. Civ. P. 4(k) (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

New York State Civil Practice Law and Rules 302 (a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

USA Patriot Act of 2001
PL 107-56, 2001 HR 3162 § 805(a)(1) (Oct. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## OTHER AUTHORITIES

Bergen, Peter L., *The Osama bin Laden I Know: An Oral History of al Qaeda's Leader,*
164, Free Press, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S. Department of State "Background Note: Qatar" (Nov. 2005)
http:// www.state.gov/r/pa/ei/bgn/5437.htm   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wright & Miller, 5B Fed. Prac. & Proc. Civ.3d § 1357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iv

## INTRODUCTION

Sheikh Yusuf al-Qaradawi ("Sheikh Yusuf") respectfully submits this memorandum of law in support of his motion to dismiss, with prejudice, the complaints against him in this multi-district litigation arising from the events of September 11, 2001. This memorandum will demonstrate that the Court lacks jurisdiction over the person of Sheikh Yusuf, that service of process was insufficient and in any event, that the complaint fails to state claims upon which relief may be granted.

Sheikh Yusuf, a citizen of Qatar, is "one of the most influential mainstream voices of Islam." "Ministering to the Upwardly Mobile Muslim," *New York Times Magazine*, April 30, 2006, Exh. A to the Declaration of Amy Rothstein, submitted herewith ("Rothstein Decl.") at 14; *see also,* "Why the Mayor of London Will Maintain Dialogues with all of London's Faiths and Communities, a Reply to the Dossier Against the Mayor's Meeting with Dr. Yusuf al-Qaradawi" ("Mayor of London"), Rothstein Decl., Exh. B at 2, 3, 5 and *passim*. Sheikh Yusuf condemned the September 11 attacks two days after their occurrence, saying:

> Our hearts bleed for the attacks that have targeted the World Trade
> Center, as well as other institutions in the United States, despite our strong
> opposition to the American biased policy towards Israel on the military,
> political and economic fronts. Islam, the religion of tolerance, holds the
> human soul in high esteem, and considers the attack against innocent
> human beings a grave sin.

*Id.* at 5.

Sheikh Yusuf was also a member of "[a] panel of prominent Muslim scholars in the Middle East" that issued a fatwa, or religious opinion, denouncing the terrorist attacks on the United States and saying it is the "duty" of Muslims to attempt to bring the terrorists to justice. "A Nation Challenged: the Religious Opinion; Muslim Scholars Back Fight Against Terrorists," *New York Times*, October 12, 2001, Rothstein Decl., Exh. C at 1.

Sheikh Yusuf has repeatedly opposed the actions of al Qaeda; he is no supporter of that organization and is in no way liable for the heinous conduct that gives rise to these lawsuits. *See* Mayor of London, Exh. B to Rothstein Decl., at 8.

## BACKGROUND

Sheikh Yusuf is seventy-nine years old and a citizen of Qatar, where he has an office on the premises of the former Sunna and Sira Council on the Qatar University campus. Declaration of Sheikh Yusuf al-Qaradawi, submitted herewith ("Qaradawi Decl.") ¶¶ 1 and 4. He does not read English well and does not read (nor was he aware of the availability of ) any of the newspapers in which Plaintiffs published the notice purportedly serving him with process in these actions. *Id*. at ¶ 21. On most days he is present in his office on the Qatar University campus and is present at the al Jazeera television station for his weekly live television program. *Id*. at ¶ 22.

As noted above, Sheikh Yusuf is one of the most respected Islamic scholars in the world today. He expresses his views on al-Jazeera television and in various other venues. "Islamic Justice Finds a Foothold in Heart of Europe, *Wall Street Journal*, Aug. 4, 2005, Rothstein Decl., Exh. D at 4. As discussed above, Sheikh Yusuf vociferously condemned the September 11 terrorist attacks and other al Qaeda attacks. Sheikh Yusuf also deplored the April 2002 bombing of a synagogue in Tunisia and termed the Bali bombing later that year a "heinous crime" and an act of "total barbarism." Mayor of London (Exh. B to Rothstein Decl.) at 5-6. It is true, as alleged in most of the complaints, that Sheikh Yusuf has a different view of suicide bombing in

2

Israel, where he considers the Palestinians to have been invaded and oppressed.[1]  Qaradawi
Decl., ¶ 9. With respect to attacks in the United States, however, the Sheikh has clearly expressed
the view that violence is unacceptable.

As stated in the complaints, Sheikh Yusuf was a shareholder of and member of the
Islamic Legal Control Committee, or Sharia (religious) council of Bank al Taqwa ("BAT"). In
fact, until the bank ceased functioning, Sheikh Yusuf was President of BAT's Islamic Legal
Control Committee.[2] However, his duties as Sharia council President did not include decision-
making with respect to which charities would be funded or which organizations BAT would do
business with. The role of the Sharia council was limited to promulgating rules that the bank had
to follow, and the total amount of charitable contributions necessary, in order to be in compliance
with Islamic law. Qaradawi Decl., ¶ 10 .

Until ten or more years ago, Sheikh Yusuf performed a similar role as a member of the
Sharia council of Dar al-Maal al-Islami ("DMI"). *Id*. at ¶ 11. Neither the DMI nor the BAT
Sharia council ever, during Sheikh Yusuf's participation or to his knowledge, had occasion to
approve any specific contributions or transactions. *Id*. at ¶¶ 10 and 11.

### The Complaints

The complaints naming Sheikh Yusuf as a defendant are completely lacking in

---

[1]There is no such allegation in the *New York Marine* complaint.

As alleged in the defective Burnett "Plaintiffs' More Definite Statement as to Defendant Yusuf
Al-Qardawi [sic]" ("Burnett MDS"), Sheikh Yusuf has also issued statements, post 9/11, supporting
violence against United States personnel in Iraq *(see id*. at ¶¶ 5, 10 and 12) although not all of the quotes
attributed to him are accurate (Mayor of London, Exh. B to Rothstein Decl., at 12.)

[2] BAT ceased functioning in early 2001. While Sheikh Yusf was a shareholder in BAT, he was
not a major shareholder, as has been alleged. Qaradawi Decl., ¶ 10.

3

meaningful allegations against him. This Court has already ruled that allegations like those against Sheikh Yusuf are insufficient to support personal jurisdiction or to state a claim. The discussion in this Memorandum demonstrates that the complaints against Sheikh Yusuf are no more legally sufficient than those against Prince Sultan and others, as to whom the Court has dismissed complaints.

      1.     The New York Marine Complaint

      The plaintiffs in *New York Marine and General Insurance Company v. Al Qaida et al*. 04 CV 6105 ("*New York Marine*") assert in conclusory fashion that Sheikh Yusuf and multiple defendants "aided and abetted, conspired with, and provided material support and resources to, defendant al Qaida and/or affiliated FTOs, associations, organizations or persons" to bring about the events of September 11, 2001. *New York Marine* Second Amended Complaint, ¶¶ 45, 55. *New York Marine's* most specific allegation against Sheikh Yusuf, apart from his mere alleged membership in the Muslim Brotherhood, is that he serves on the Sharia board of BAT. *Id*. at ¶ 246. The *New York Marine* Plaintiffs also allege, accurately, that after 9/11 BAT and its "key executives" (but not Sheikh Yusuf) were listed by the U.S. Department of the Treasury as Specially Designated Global Terrorists ("SDGT"). *Id*. at ¶ 243. From this, the *New York Marine* plaintiffs ask the Court to infer Sheikh Yusuf's knowing participation in al Qaeda's activities, since BAT is alleged to have been part of an international banking network that knowingly supported al Qaeda's infrastructure. (*Id*. at ¶¶ 238-48.)

      There is no specific allegation that Sheikh Yusuf engaged in any activity that supported al Qaeda, that he knew of any alleged al Qaeda-related activity on the part of BAT, or that he

4

otherwise participated in a conspiracy with al Qaeda or anyone else to attack people within the United States.

      2.     <u>The Ashton Complaint</u>

The allegations in the *Ashton et al. v. Al Qaeda Islamic Army, et al.* 02 CV 6977 ("*Ashton*") complaint (and the complaint in *Barrera v. Al Qaeda Islamic Army*, 03 CV 7036, which was consolidated with *Ashton*)[3] are similarly sparse in asserting an alleged role for Sheikh Yusuf in support of al Qaeda.  These plaintiffs allege that Sheikh Yusuf is a member of the Muslim Brotherhood and a principal of and major shareholder in BAT, on whose Islamic Legal Control Committee he sits.  They also allege that Sheikh Yusuf is an officer of Dar al-Maal al-Islami ("DMI"), a network of financial institutions said to be affiliated with BAT, and that BAT and DMI have aided and abetted al Qaeda.  (*Ashton* Sixth Amended Consolidated Master Complaint ["*Ashton* 6AC"], ¶¶385, 389, 438, and 441).  The *Ashton* 6AC names several defendants and entities who have been designated by the U.S. Department of the Treasury as SDGTs (*id.* at ¶ 391); this list does not include Sheikh Yusuf, who has not been so designated.

The *Ashton* 6AC alleges that Sheikh Yusuf has spoken in favor of suicide bombing, but no context is given; there is no allegation that such comments were made in support of al Qaeda or of attacks against the United States. *Id.* at ¶389.  And as in *New York Marine*, there is no allegation – apart from the types of wholly conclusory allegations that already have been deemed insufficient by this Court – that Sheikh Yusuf knowingly participated with or supported al Qaeda.  Rather, there is the familiar, rote assertion that Sheikh Yusuf is among the "aiders, abettors,

---

[3] The complaint in *Barrera* contains virtually identical allegations to those in *Ashton* and thus will not be separately addressed in this memorandum.

material sponsors and/or conspirators of international terrorism, including Al Qaida." *Ashton*

6AC, ¶¶392.

> 3.   Continental Casualty Company Complaint[4]

The allegations in the Addendum to the *Continental Casualty Company, et al. v. Al

Qaeda*, 04 CV 5970, Second Amended Complaint, Section P ("*Continental* 2AC") contain more

specific examples of comments by Sheikh Yusuf about suicide bombing. Again, however, there

is no allegation that Sheikh Yusuf supported suicide bombing – or any other type of violence – in

the United States. *Continental* 2AC, ¶¶ 26, 27. Indeed, one of the quotes used in the *Continental*

2AC makes specific reference to "[t]he Islamic resistance in Lebanon and Palestine." *Id*. at ¶27.

Other *Continental* 2AC allegations against Sheikh Yusuf repeat the *Ashton* allegations. Plaintiffs

allege that Sheikh Yusuf is a shareholder, "executive officer" and religious board member of

BAT. *Id*. at ¶¶ 5, 25 and 28. The *Continental* plaintiffs then proceed to speculate that Sheikh

Yusuf "[t]herefore, is not only responsible for providing spiritual advice and guidance to the

bank but he also makes decisions regarding the distribution of the bank's zakat (donations to

charities)." *Id*. at ¶ 28. It is also alleged that Sheikh Yusuf is the "spiritual leader" of the Muslim

Brotherhood, which plaintiffs concede engages in "legitimate humanitarian" activities. *Id*. at ¶¶

7, 25.[5]

---

[4] Although the *Continental* complaint does not contain Sheikh Yusuf's name in the caption, the docket sheet entry for the complaint lists his name.

[5] Although Muslim Brotherhood members may claim Sheikh Yusuf, one of the most respected religious leaders in the Islamic world, as "spiritual leader," he joined the student section of this organization in 1943 but has not been a member for the past twenty years. Qaradawi Decl. at ¶ 12. In any event, plaintiffs concede that the Muslim Brotherhood engages in "legitimately humanitarian" work and they make no allegation, other than the rote, conclusory allegations that typify their complaint, that Sheikh Yusuf participated, by word or deed, in a conspiracy with the Muslim Brotherhood or anyone else

The *Continental* 2AC also alleges that Sheikh Yusuf was barred from entering the United States in 1999 "as a result of his support of terrorism" and that he is seen on a videotape allegedly taken in Afghanistan in March of 1993 "in close proximity to Al Qaida training camps." *Continental* 2AC, ¶¶ 24, 25.[6]

Again, however, there is no allegation that Sheikh Yusuf ever supported suicide bombing or any form of violence in the United States.  Nor is there any factual allegation to support a claim that Sheikh Yusuf acted to support al Qaeda or that he entered into any conspiracy with al Qaeda or anyone else with the aim of terrorist activity in the United States.

The *Continental* 2AC's allegation that Sheikh Yusuf has been barred from entering the United States is contradicted by a recent letter from the United States Embassy in Doha, saying that Sheikh Yusuf's ten-year visa expired in 2005 and that the State Department will entertain future applications by him to enter the country.  Embassy Letter, Exh. E to Rothstein Decl.

As for the March 1993 videotape allegedly made in Afghanistan "in close proximity to Al Qaida training camps," Sheikh Yusuf has been to Afghanistan only once -- in March of 2001, with a delegation of Muslim scholars who attempted to persuade Taliban leaders to cease their destruction of Buddhist shrines.  Qaradawi Decl., ¶ 13.  He was in Pakistan, near the Afghan

---

to support al Qaeda.

[6] Another *Continental* 2AC allegation reads, in part, as follows: "SDGT Defendant Ahmed Nasreddin Defendant Youseff Al-Qardawi [sic], who has been barred from entering the U.S. because of his affiliations with Al-Qaeda, are also executive officers of Al-Taqwa Bank."  *Continental* 2AC, ¶ 5.  Because of the errors in punctuation and grammar, it is not clear whether plaintiffs intend to assert that Sheikh Yusuf, as well as Ahmed Nasreddin, is a SDGT.  In any event, as discussed above, Sheikh Yusuf is not a SDGT and, according the U.S. Embassy in Doha, has not been barred from entering the United States.  *See* June 11, 2006 letter from Lillie J. Kamunu, Chief of Consular Section, American Embassy Doha ("Embassy Letter"), Exh. E to Rothstein Decl.  The above allegation, apparently asserting that Sheikh Yusuf has "affiliations with Al Qaeda," is not elaborated upon anywhere else in the *Continental* 2AC.

7

border, in the late 1980's, at the end of or shortly after the Soviet occupation of Afghanistan, while that country had a Soviet-backed regime that was near collapse. Sheikh Yusuf was part of a delegation with other Muslim scholars and leaders to mediate conflicts among rival mujahideen factions. The visit was a high-profile one and was supported by Western and Muslim governments; the common goal was to achieve peace for Afghanistan. *Id*. at ¶ 14 . Assuming that Sheikh Yusuf actually is depicted in the videotape described by Plaintiffs, it is perhaps this trip to which they refer, because the delegation visited numerous mujahideen sites in an attempt to mediate the conflicts. However, as far as Sheikh Yusuf knows, al Qaeda was not in existence at this time so it is doubtful that he would have had occasion to be "in close proximity to al Qaida training camps." *Id*. at ¶ 14 (*but see Continental* 2AC, ¶ 24).

> 4.    The Burnett More Definite Statement

The Burnett plaintiffs have not properly named Sheikh Yusuf as a defendant. He is not named in either of the *Burnett* complaints (03 CV 9849 or 03 CV 5738) but rather only in the *Burnett* MDS. Although Case Management Order #2 ("CMO 2") permits an MDS to be treated as an amended complaint with respect to "existing defendants," CMO 2, ¶13, the Court presumably intended "existing defendants" to mean those already existing in the captioned case, not in some other case within the MDL. Logically, it is not possible to have a "more" definite statement with respect to a defendant as to whom there never was a statement, definite or otherwise. Additionally, the MDS was never incorporated into an amended complaint, as is also required by CMO 2, ¶13. Rather than file an amended complaint on September 30, 2005, the *Burnett* plaintiffs filed what they termed a "Notice of Consolidation of Pleadings" with multiple

8

attachments, one of which was the Notice of Plaintiffs' MDS.[7]  Thus, the *Burnett* MDS is a

nullity.   However, in an abundance of caution, we address the *Burnett* MDS allegations in case

the Court deems the Burnett MDS to constitute a pleading against Sheikh Yusuf.[8]

Allegations similar to those in *Continental* are found in the *Burnett* MDS.  The *Burnett*

MDS rehashes the allegations about Sheikh Yusuf's associations with the Muslim Brotherhood,

BAT and DMI.[9]  *Burnett* MDS, ¶¶ 2, 13, 14, 17.  The MDS also repeats the allegations made in

other complaints that Sheikh Yusuf has advocated suicide bombing (in Israel and Iraq), was

barred from entering the United States in 1999 because of alleged support of al Qaeda, and is

seen on a videotape in the possession of Swiss authorities, assertedly in Afghanistan in 1993, "in

close proximity" to al Qaeda training camps and "participating in the making of speeches calling

for the use of violence against the United States."[10]

_____

[7] Counsel for Plaintiffs in *Federal Insurance Company, et al. v. Al Qaida Islamic Army*, et. al, 03 CV 6978 ("*Federal*"), acknowledged CMO 2's requirement of a final, amended pleading in each case in its July 25, 2005 letter to the Court. "The clear objective of including the [then] July 31, 2005 deadline for filing amended complaints in CMO 2 was to ensure that any and all additional allegations contained in More Definite Statements or other filings ultimately would be incorporated into a single pleading in each of the cases."

[8] There are additional MDL cases in which complaints, RICO statements, or more definite statements mention Sheikh Yusuf al-Qaradawi in passing, without referring to him as a defendant or naming him in the caption or in the complaint's docket sheet entry: *Federal*; *O'Neill v. Al Baraka Investment* (04 CV 1923); *World Trade Center Properties LLC v. Al Baraka Investment (04 CV 07280);* and *Euro Brokers, Inc. v. Al Baraka Investment (04 CV 07279)*.   Should the Court deem any of those cases to be complaints against Sheikh Yusuf, or should any of those Plaintiffs attempt to treat their pleadings as complaints against Sheikh Yusuf, we respectfully request an opportunity to move with respect to any such action.

[9] It also alleges that Sheikh Yusuf is a "former director of the Islamic Center of Boston."  MDS, ¶ 3.  Sheikh Yusuf recalls visiting the Islamic Center once or twice but is not aware of having been awarded the title of "director."  Qaradawi Decl., ¶ 20.

[10] It is noteworthy that the *Burnett* MDS, which borrows heavily from the *Continental* 2AC, embellishes on the *Continental* Plaintiffs' characterization of the videotape that is alleged to be in the possession of the Swiss authorities.  While the *Continental* plaintiffs allege only that Sheikh Yusuf was

There is also an allegation that Sheikh Yusuf has advocated violence "against the United States and Israel," (*Burnett* MDS, ¶ 5), but the MDS's quotes about suicide bombing do not relate to United States soil, nor are most of them pre-9/11 statements. *Id*. at ¶¶ 6-9, 11. The only quotes about violence toward the United States are limited to the United States presence in Iraq, post-dating 9/11. *Id*. at ¶¶ 10-12.[11] As demonstrated above, the only statements Sheikh Yusuf made relating to 9/11 were in condemnation of the attacks and the perpetrators.[12]

Nearly half of the allegations in the *Burnett* MDS relate primarily to BAT and other individuals, not to Sheikh Yusuf.

---

"also seen on the March 1993 video tape from Afghanistan" (2AC, ¶25]), the *Burnett* plaintiffs go one step further and allege that the videotape held by the Swiss authorities shows Sheikh Yusuf "participating in the making of speeches." While it is unclear precisely what that language is intended to allege, the *Burnett* plaintiffs appear to be attempting to imply more about Sheikh Yusuf's alleged 1993 conduct than the *Continental* plaintiffs deemed appropriate.

[11] Indeed, the assertions in Paragraphs 9 through 12 and 16 of the MDS consist solely of alleged statements and events made or occurring after 9/11.

[12] Additionally, it strains credulity to imagine that a man who had at least one child living in this country as late as 2000 would support the goal of violence in the United States. *See* Qaradawi Decl., ¶ 16.

10

## ARGUMENT

## POINT I

## THE COURT LACKS PERSONAL JURISDICTION OVER SHEIKH YUSUF BECAUSE THE PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT NEW YORK LONG-ARM JURISDICTION ON A CONSPIRACY THEORY NOR DO THEY SUPPORT A THEORY THAT HE HAS "PURPOSEFULLY DIRECTED" ANY ACTIONS TOWARD THE UNITED STATES

Even if Sheikh Yusuf had been properly served in these actions (*see* Point II, below), this

Court would lack personal jurisdiction over him because Plaintiffs have failed to make a "*prima*

*facie* showing that personal jurisdiction exists." *In re Terrorist Attacks on September 11, 2001*,

349 F. Supp. 2d 765 ("Terrorist Attacks I"), 804. Regardless of the basis on which Plaintiffs seek

to have this Court assert personal jurisdiction over Sheikh Yusuf, there is no ground upon which

they can succeed. Due process requirements, whether under the Fifth or Fourteenth Amendment,

cannot be met in Sheikh Yusuf's case.

## A. The Court Has No General Jurisdiction Over Sheikh Yusuf

There are virtually no allegations that Sheikh Yusuf has any contacts, let alone

"continuous and systematic"contacts with New York or the United States that would support a

finding of general jurisdiction. *Heliocopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

408, 416 (1984); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539 ("*Terrorist*

*Attacks II*" ), 558. And indeed the Sheikh has no such contacts. Qaradawi Decl., ¶ 20.[13]  Thus,

---

[13] Only the defective *Burnett* MDS alleges any United States contact whatsoever, asserting that Sheikh Yusuf is the "former director of the Islamic Center of Boston." Not only is no time frame provided, but there are no details about the extent of contact with the United States this alleged association entailed.

11

there can be no long-arm jurisdiction over Sheikh Yusuf on this basis.  *Terrorist Attacks I* at

811.[14]

**B.** **The Complaints Fail to Allege Specific Facts Warranting an Inference that Sheikh**
   **Yusuf Was a Member of the Conspiracy to Perpetrate or Aided and Abetted the**
   **September 11 Attacks or that He "Purposefully Directed" Activities at the United**
   **States.**

Although in assessing whether a plaintiff's allegations are sufficient for a *prima facie*

assertion of personal jurisdiction, the Court will "read the complaints and affidavits in a light

most favorable to Plaintiffs [internal citation omitted], [i]t will not, however, accept legally

conclusory assertions or draw 'argumentative inferences'."  *Id.* at 804, internal citation omitted;

*see also, Terrorist Attacks II* at 556; *First Nationwide Bank v. Gelt Funding Corp.*, 27 F. 3d 763,

772 (2d Cir. 1994) ("Courts do 'not accept conclusory allegations on the legal effect of the events

plaintiff has set out if these allegations do not reasonably follow from his description of what

happened . . . .'" [*quoting* Wright & Miller, *Federal Practice and Procedure*: Civil § 1357].)

In the case of Sheikh Yusuf, there are no allegations from which the legal conclusions

asserted in the complaints reasonably follow.  Apart from speculative assertions, none of the

Plaintiffs makes any allegation to support their conclusions that Sheikh Yusuf knowingly

provided or facilitated financial or other support for al Qaeda.

1.    Sheikh Yusuf's Role as Sharia Council Member of BAT and DMI

Sheikh Yusuf's role on the Islamic Legal Control Committees, or Sharia councils, of BAT

---

[14] Additionally, there is some doubt as to a court's ability to assert general jurisdiction over a
person rather than a corporation.  *See, e.g., Burnham v. Superior Court of Cal.*, 495 U.S. 604, 610 n.1
(1990) (recognizing that "it may be that [general jurisdiction] applies only to corporations").

and DMI cannot serve to render him responsible for the alleged actions of those banks.[15] Plaintiffs ask the Court to reach the conclusion they offer by making the wholly speculative assertion that because Sheikh Yusuf was a member of the bank's religious board, "he also makes decisions regarding the distribution of the bank's zakat (donations to charities)" and has "considerable influence over the bank." *Continental* 2AC, ¶ 28; *Burnett* MDS, ¶¶ 14, 28. Allegations based on speculation will not support a complaint. *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F. 3d 463, 466 (2d Cir. 1995), *cert. den.*, 518 U.S. 1017 (1996). In fact, as the Qaradawi Declaration shows, the BAT and DMI Sharia councils had no role in selecting charities or in determining with which institutions or individuals the banks did business. Their functions were confined to providing rules that the banks had to follow, and determining the total amount of charitable contributions that had to be made, in order to be in compliance with Islamic law.   Qaradawi Decl., ¶¶ 10 and 11.[16]

Nor can the fact that BAT was, after 9/11, designated a SDGT be used to impute knowledge by Sheikh Yusuf, prior to 9/11, of the bank's suspect activities. In *Terrorist Attacks I*, this Court declined to find personal jurisdiction over Princes Sultan and Turki, reasoning, in part, that the designated organizations the Princes were alleged to have supported had not been so designated at the time of the alleged contributions. At 800-01, 813-14. Knowledge of suspect activities cannot reasonably be imputed to Sheikh Yusuf on the basis of a *post hoc* accusation by the United States.

---

[15] Only the *Ashton* 6AC and defective *Burnett* MDS contain allegations against Sheikh Yusuf pertaining to DMI.

[16] Additionally, Sheikh Yusuf's role on DMI's Sharia council ended at least ten years ago. (*Id.* at ¶ 11).

13

Even if Sheikh Yusuf had played a role in determining which charities BAT and DMI would give money to, such actions would not constitute "an awareness of the effects in New York" of [such] activity[,]" *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1269 (S.D.N.Y. 1991); *see also*, *Terrorist Attacks I* at 805; *Daventree Limited v. Republic of Azerbaijan*, 349 F. Supp. 2d 736,763 and n.7, 764 (S.D.N.Y. 2004). Nor would such conduct constitute activities "purposefully directed" at the United States. There is no allegation to support Plaintiffs' conclusion that Sheikh Yusuf knowingly participated in making contributions to charities that he knew would, in turn, support the activities of al Qaeda. *See Terrorist Attacks I* at 812-13.

This Court has already deemed inadequate a far more specific allegation against Prince Sultan, *i.e.*, that he *personally* donated $6 million to several Islamic charities that allegedly supported al Qaeda, including Al-Haramain, an entity that was designated a SDGT (after 9/11), *Terrorist Attacks I* at 784, 806, 813, and about which Judge Robertson found the *Burnett* allegations to be "more than sufficient" to allow an inference that Al-Haramain "provided material support to al Qaeda with knowledge of, and the intent to further, al Qaeda's terrorist activities." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86,104 (D. D.C. 2003). This Court concluded that the allegation that Prince Sultan "purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism" – absent factual support, was nothing more than a "[l]egal conclusio[n] done up as factual allegation[s]." *Terrorist Attacks I* at 813 (internal citation omitted.); *see also, Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F Supp. 2d 9, 22-23 (D.D.C. 2003).

*A fortiori*, there is no basis for personal jurisdiction in the case of Sheikh Yusuf, who is

14

alleged broadly and speculatively to be somehow chargeable with knowingly making donations

to terrorist organizations solely by virtue of his position on the Sharia councils of BAT and DMI,

which *may* have knowingly made donations to charitable organizations which *may* have in turn

knowingly given financial support to al Qaeda in addition to using funds for legitimate charitable

purposes.

The allegations against BAT and DMI, themselves, are not compelling. For instance, the

*Continental* Plaintiffs surmise that "it is very likely that Al-Taqwa was intentionally supporting

Osama Bin Laden and Al-Qaeda." *Continental* 2AC at ¶ 28, *see also* ¶ 50. Other allegations

against BAT include the fact that it was designated a SDGT (after 9/11) (*Burnett* MDS, ¶ 16) and

that it did business with a variety of persons and entities against whom Plaintiffs make other

allegations. *E.g., id.* at ¶¶ 16-19, *Continental* 2AC at ¶¶ 29 *et seq.* The mere fact that BAT and

DMI may have donated money to organizations now deemed suspect would not render those

entities subject to this Court's jurisdiction. "Donating money to established humanitarian

organizations that may or may not have been diverting funds to support al Qaeda cannot be

considered primary participation in intentional wrongdoing expressly aimed at the United

States." *Terrorist Attacks II* at 559.

The allegations against Sheikh Yusuf parallel those against Prince Mohamed, which this

Court has deemed inadequate to sustain personal jurisdiction. Plaintiffs alleged that the Prince

was DMI's chairman or CEO (*Terrorist Attacks I* at 814) and that "[a]s the head of DMI, Prince

Mohamed knew or should have known" that DMI allegedly aided and abetted Osama bin Laden

and al Qaeda. *Id.* at 815. The Court made it clear that the alleged acts of DMI could not be

imputed to Prince Mohamed merely because he was DMI's chairman. *Id.* at 816. Similarly, the

15

allegations pertaining to Sheikh Yusuf's position on the DMI Sharia council (ending

approximately ten years ago) and on BAT's council, cannot suffice to render him responsible for

actions allegedly taken by those banks.

In sum, the allegations about Sheikh Yusuf's connections with BAT and (in *Ashton* and

*Burnett*) DMI, speculative when they are not merely conclusory, cannot support the Plaintiffs'

theory that Sheikh Yusuf aided, abetted, conspired in or knowingly supported al Qaeda activity.

## 2. Plaintiffs' Attempts to Connect Sheikh Yusuf to Their Conclusory Allegations with Irrelevant Assertions

Plaintiffs' dramatic yet irrelevant allegations about Sheikh Yusuf's statements in support

of suicide bombing in Israel and, after 9/11, in Iraq, to the extent they are not misleading, are

simply an obvious ploy to taint Sheikh Yusuf with information not germane to this litigation. In

addition, the allegations in the defective *Burnett* MDS are misleading in that they appear to create

an impression that Sheikh Yusuf has advocated suicide bombing in the United States. *Burnett*

MDS, ¶ 5. However, the quotes that follow do not relate to violence in the United States. *Id.* at

¶¶ 6-12; the only statement related to the United States pertains to U.S. personnel in Iraq, post-

9/11. *Id.* at ¶ 12. Such a statement, by definition, cannot be relevant to this litigation because the

Iraq war and statements pertaining to it all occurred after 9/11. Similarly irrelevant are

statements Sheikh Yusuf has made about suicide bombings in Israel, where he regards the

Palestinian Arabs to be involved in a struggle for their homeland. Qaradawi Decl., ¶ 9. This

Court has already found that an allegation of a connection to Hamas, without an allegation

between Hamas and al Qaeda, did not support a finding of personal jurisdiction against Al Rajhi

Bank. *Terrorist Attacks I* at 833.

16

The *Burnett* plaintiffs do not allege (nor could they) that Sheikh Yusuf has *ever* advocated suicide bombing *in* the United States. The only statements Sheikh Yusuf has made about 9/11, including one just two days after that horrible day, were statements condemning the attacks. Exhs. B at 5 and C at 1 to Rothstein Decl. As discussed above, Sheikh Yusuf has also denounced subsequent al Qaeda attacks. Exhs. B at 5-6, D at 2 to Rothstein Decl. Clearly, Sheikh Yusuf has used his prominence as one of the most respected Muslim scholars and clerics in the Middle East to condemn al Qaeda's violence against those on United States soil.

Similarly irrelevant is the allegation that Sheikh Yusuf is a member or "spiritual leader" of the Muslim Brotherhood. Even if it were accurate (*but see* Qaradawi Decl. ¶ 12), this allegation does not support an inference that Sheikh Yusuf conspired with the Muslim Brotherhood (or anyone else) or that he supported al Qaeda in its plot against the United States. As the court in *Boim v. Quranic Literacy Institute*, 291 F. 2d 1000 (7th Cir. 2002) demonstrated, the First Amendment to the U.S. Constitution forbids imposition of liability solely on the basis of association with or membership in an organization. At 1023. In any event, Sheikh Yusuf has not, for the past twenty years, been a member of the Muslim Brotherhood and is not able to speak to what activities this organization does or does not engage in. Furthermore, the *Continental* 2AC informs the Court that the Muslim Brotherhood engages in "legitimately humanitarian" activities. If, as do so many Muslims in the Middle East, Muslim Brotherhood members follow Sheikh Yusuf's religious pronouncements (*see* Exhs. A at 14, B [*passim*], C at 1 and D at 4 to Rothstein Decl.), this cannot possibly render Sheikh Yusuf liable for any and all actions they may have taken.

Apart from the wholly conclusory allegations sprinkled throughout all of the complaints,

17

the only allegation that possibly asserts any connection between Sheikh Yusuf and al Qaeda is *Continental* 2AC ¶ 5 and *Burnett* MDS ¶2, which appear to allege (the grammar and punctuation of the *Continental* allegation render it unclear) that the United States government barred Sheikh Yusuf from entering this country because of alleged affiliations with al Qaeda. The documentary evidence is otherwise. The U.S. Embassy in Doha states that Sheikh Yusuf had a ten-year visa that expired in 2005 and that his visa eligibility will be determined when he next applies. Exh. E to Rothstein Decl. Interestingly, Sheikh Yusuf has been invited to events at the U.S. Embassy on several occasions since 9/11, most recently at the end of 2005. Qaradawi Decl. at ¶ 18. It is unlikely that the U.S. Embassy would extend invitations to a suspected al Qaeda supporter. Furthermore, even if Plaintiffs' allegation were accurate, it would be nothing more than an allegation about an allegation.

The allegation that Sheikh Yusuf was "seen in close proximity to Al Qaida training camps" in March of 1993 (*see Continental* 2AC, ¶ 24) – seven and a-half years prior to the terrorist attacks on September 11, 2001 – is meaningless not only because of the vast temporal gap between the two events (*see Terrorist Attacks II* at 559; *Metropolitan. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F. 3d 560, 569 (2d Cir. 1996 )) but also because one cannot reasonably infer untoward conduct from "close proximity" to possibly unlawful behavior. In fact, Sheikh Yusuf has explained that in the late 1980's (not 1993) he was in Pakistan, near the Afghan border, on a high-profile mission, supported by Western governments, with other Muslim leaders to reconcile feuding mujahideen factions during the collapse of Soviet control of Afghanistan. Qaradawi Decl., ¶ 18. Plaintiffs' allegation exemplifies the type of drastic leaps in reasoning that Plaintiffs ask the Court to make in order to support their desperate attempts to conjure claims

18

from irrelevant assertions, factual and otherwise.

\*       \*       \*

Plaintiffs' allegations fail to establish the minimum contacts on Sheikh Yusuf's part required by due process and thus by New York State's long arm statute, Rule 302(a)(2) of New York's Civil Practice Law and Rules, and F. R. Civ. P. 4(k)(2). *See Terrorist Attacks II at 557-58; Terrorist Attacks I* at 810.[17]

## POINT II

### THE COURT LACKS JURISDICTION OVER SHEIKH YUSUF BECAUSE HE WAS NOT PROPERLY SERVED IN THESE ACTIONS

As demonstrated in the Qaradawi Declaration, if Plaintiffs had tried to make personal service on Sheikh Yusuf, they would have been able to do so. He could have been served, by mail or by hand, either at his office on the Qatar University campus or at the al Jazeera television station where he is present on a weekly basis to deliver his live television program. Therefore the language of the Court's September 15, 2004 Order permitting service by publication on those defendants "for whom an address or location to serve the Summons and Complaint is unknown and cannot be ascertained through reasonable means or was attempted and rejected or otherwise not responded to at an address that was discovered . . . " does not apply to Sheikh Yusuf. To the extent that the Order represents a finding that Sheikh Yusuf fits the above description, such a

---

[17] "Courts are not obligated to subject a foreign defendant to discovery. . . where the allegations of jurisdictional facts, construed in plaintiffs' favor, fail to state a basis for the exercise of jurisdiction or where discovery would not uncover sufficient facts to sustain jurisdiction. " *Id.* at 812 (internal citations omitted.) *See also*, *id.* at 813. Sheikh Yusuf respectfully submits that no set of Plaintiffs in this litigation has offered anything other than broad, conclusory or wholly speculative allegations to support personal jurisdiction over him. There simply is no basis on which to subject this 79-year-old cleric to the extreme inconvenience of discovery from half-way around the world.

finding was based on a misrepresentation as to Plaintiffs' ability to reach Sheikh Yusuf. The service by publication, therefore, should be deemed a nullity.

Service by publication is disfavored. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). ("It would be idle to pretend that publication alone, as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts.") It is permitted "where it is not reasonably possible or practicable to give more adequate warning." *Id*. at 317; *see also, id*. at 318; *New York v. New York, N.H. & H.R. Co*., 344 U.S. 293, 296 (1953). In the case of Sheikh Yusuf, as demonstrated above, his whereabouts were known and he could have been served personally.

None of the three publications used by Plaintiffs was likely to reach Sheikh Yusuf. His ability to read English is limited and he does not read *Al Quds Al Arabi*, let alone *USA Today* or the *International Herald Tribune*. Until he began working on his Declaration in support of the instant motion, he was not even aware that any of these publications was available in Qatar. His current understanding is that the two English newspapers are available primarily through hotels and Qatar Airways. The three publications selected by Plaintiffs have extremely small circulations in Qatar, ranging from approximately 55 to no more than 2000, insignificant in a country with a population of more than 863,000.[18] *See* Qaradawi Decl. at ¶ 21.

The Supreme Court has made it clear that ". . . when notice is a person's due, process which is a mere gesture is not due process." *Mullane* at 315. The alleged service of process on Sheikh Yusuf was indeed "a mere gesture" and should be quashed.

---

[18] *See* U.S. Department of State's "Background Note: Qatar" (Nov. 2005); available at http://www.state.gov/r/pa/ei/bgn/5437.htm. (Last visited on August 1, 2006).

20

## POINT III

## THE COMPLAINTS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The same deficiencies in pleading and logic that render the complaints inadequate to establish personal jurisdiction over Sheikh Yusuf also compel the conclusion that the complaints fail to state a claim against Sheikh Yusuf upon which relief can be granted.

### A.    Plaintiffs' Allegations Against Sheikh Yusuf Do Not State a Claim Under the Anti-Terrorism Act ("ATA")

In order to state a claim under the ATA, plaintiffs must allege that a defendant provided "material support" to terrorists engaged in acts of international terrorism.  18 U.S.C. § 2333(a); *Terrorist Attacks I* at 828; *Terrorist Attacks II* at 564.  This Court has held that "[t]o adequately plead the provision of material support . . ., a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the defendant engaged in some act of helping those activities." *Terrorist Attacks I* at 828.

Plaintiffs have failed utterly to allege "material support" of al Qaeda by Sheikh Yusuf. They make no allegation regarding Sheikh Yusuf's desire or intent to support al Qaeda except through irrelevant or conclusory allegations, as discussed in Point I.[19]  As discussed at length above, conclusory assertions are no substitute for factual allegations and will not sustain a

---

[19] With respect to the vague allegation that Sheikh Yusuf was seen "in the vicinity of" an al Qaeda camp "participating in the making" of anti-American speeches in 1993, the irrelevance of this assertion, to the extent it constitutes an allegation, is underscored by the fact that 18 U.S.C. § 2339(a), the ATA section on "providing material support to terrorists," was not even enacted until 1994, and was not made applicable to persons acting outside the United States until 2001. PL 107-56, 2001 HR 3162 § 805(a)(1) (Oct. 26, 2001)(striking out "within the United States[.]") Additionally, Osama bin Laden had not yet in 1993 declared his war on the United States; this did not occur until 1996.  Peter L. Bergen, *The Osama bin Laden I Know: An Oral History of al Qaeda's Leader*, 164 (2006).

complaint. Even if Plaintiffs had pled facts that, if true, would establish knowledge and intent on

Sheikh Yusuf's part to aid al Qaeda, the complaints would still fail to plead "material support"

because they allege no facts that would, if true, show that Sheikh Yusuf "engaged in some act of

helping" al Qaeda's activities. *Id*. at 828; *Terrorist Attacks II* at 564.

Plaintiffs' allegations about the role they imagine Sheikh Yusuf must have played as a

member of the Sharia councils of BAT and DMI – *i.e.*, determining to which charities the banks

would contribute – are purely speculative (as well as inaccurate) and thus insufficient. *GICC*

*Capital Corp., supra.* Even if the allegations were based on fact rather than speculation, they

would not constitute a claim that Sheikh Yusuf "engaged in the act of helping" al Qaeda. This

Court has already held that the mere act of donating money to a charity "without knowledge of

the donee's intended criminal use of the funds would impose strict liability[,]" contrary to the

ATA's provisions. *Terrorist Attacks II* at 571, *quoting Boim v. Quranic Literacy Institute*, 291 F.

3d at 1012.

**B.      Plaintiffs Allegations Fail to State a RICO, Torture Victim Protection Act, or Any
           Other Federal or State Tort Claim.**

The *New York Marine, Continental* and *Burnett* Plaintiffs' RICO claims fail because there

are no allegations that would support a conclusion that Sheikh Yusuf engaged in a pattern of

racketeering activity, or that he directly or indirectly invests in or participates in an "enterprise,"

the activities of which affect interstate or foreign commerce. *Terrorist Attacks I* at 826. There is

not even an attempt to allege injury from an alleged investment of racketeering income as

required by 18 U.S.C. § 1962(a). *Id*. at 827. Nor have Plaintiffs alleged the necessary proximate

cause between any action that Sheikh Yusuf allegedly took and the harm that Plaintiffs suffered,

*Anza v. Ideal Steel Supply Corp.*, 126 S. Ct.1991,1998 (2006), or that Sheikh Yusuf had "'some

22

part in directing' the 'operation or management' of the enterprise itself" as required under section 1962(c), *Terrorist Attacks I* at 827-28 [internal citation omitted]; or that he was a "central figur[e] in the underlying schemes" as required by section 1962(d).  *Id*. at 828.

Even if the RICO claims had been properly pled, they would not merit the Court's consideration because Plaintiffs failed to file RICO statements as to Sheikh Yusuf, in violation of this Court's Individual Practice Rule requiring the filing of a RICO statement within twenty days of a complaint making such allegations.

Plaintiffs' remaining claims are likewise without merit, as indicated by this Court's prior rulings.  The *Ashton* and *Burnett* Plaintiffs' Torture Victim Protection Act claims fail because there is no allegation that Sheikh Yusuf acted under color of state law.  *Terrorist Attacks I* at 828. Plaintiffs' remaining tort claims, including the *Burnett* Alien Tort Claims Act claim, fail for the same reason that subject matter jurisdiction and the ATA claims fail: there are no factual allegations that, even if true, would support a conclusion that Sheikh Yusuf engaged in any wrongful conduct, let alone involvement in the 9/11 attacks.  In addition, *New York Marine*'s common law intentional tort claims are time-barred, *see Terrorist Attacks I* at 829, and the negligence claims in *New York Marine, Burnett* and *Continental* are defective for failing to "allege or identify a duty owed to Plaintiffs" by Sheikh Yusuf, *id*. at 831.  There are no independent causes of action for punitive damages *(Mayes v. UVI Holdings, Inc*., 280 A.D. 2d 153, 161 (1st Dep't 2001)), conspiracy *(Chrysler Capital Corp.*, 778 F. Supp. at 1267), or aiding and abetting *(Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y. 2d 43, 57 (1999)).

In sum, Plaintiffs' hodgepodge of claims, based on far-fetched and speculative theories of

23

liability, fail utterly to establish personal jurisdiction over Sheikh Yusuf.  Plaintiffs similarly fail to state any cause of action against Sheikh Yusuf and the purported service of process on him was inadequate.

## **CONCLUSION**

The Complaints against Sheikh Yusuf should be dismissed with prejudice.

Respectfully submitted,

DOAR RIECK KALEY & MACK

Amy Rothstein (AR-3463)
217 Broadway, Suite 707
New York, New York 10007
(212) 619-3730

Dated: New York, New York
    August 4, 2006

24