# EXHIBIT 7

53 of 191 DOCUMENTS

Copyright 1998 Moneyclips GCC Ltd.
Middle East Newsfile

October 23, 1998

**LENGTH:** 200 words

**HEADLINE:** New Executive Council of IIRO

SAUDI GAZETTE

**BODY:**

JEDDAH (SG)—THE newly formed Executive Council of International Islamic Relief Organization (IIRO) held its first meeting here Wednesday.

Dr Abdullah Saleh Al-Obeid, Secretary General of Muslim World League (MWL) and President of IIRO Executive Council said that the IIRO has been carrying out its welfare and humanitarian projects and programs for the Muslim communists and minorities throughout the world. He expressed optimism about the IIRO's future programs and reiterated his confidence in the members of the IIRO's new Executive Council for their cooperation and support to realize the aims and objectives of the Organization.

The following are the IIRO Executive Council members:

Sheikh Osama Abdullah Khayyat, Sheikh Hussain Ali Murfiq, Dr Abdur Rahman Habannakah Al-Maidani, Sheikh Abdul Wahad Douckery, Sheikh Khaled Kiba, Sheikh Muhammad Abdullah Al-Jomeih, Sheikh Suleman Abdul Aziz Al-Rajehi, Sheikh Ibrahim Muhammad Afandi, Sheikh Abdur Rahman Faqeeh, Sheikh Mustafa Muhammad Idrees, Sheikh Datu Tuwan Yaqoub in addition to the IIRO Secretary General, the MWL Assistant Secretary General and the MWL Assistant Secretary General for Administrative and Financial Affairs.

**LOAD–DATE:** November 4, 1998

[14] Q: And it wasn't described in the [15] private investment memorandums that were [16] given to either of those entities, was it?

[17] A: No. It is there.

[18] Q: It is there?

[19] A: Yes.

[20] Q: That he's getting a 1 percent fee?

[21] A: Not he. Any broker who bring an [22] investor interested in that BMI, the general

**Page 90**

[1] partner is going to pay 1 percent. That is [2] by law, I think, that is there. I have to go [3] back to it. It is there.

[4] Q: Perhaps after the break you can [5] show me where it is.

[6] A: I don't know.

[7] Q: You're sure it's there?

[8] A: Yes. I'm sure it is there. I [9] cannot show it to you because it's 150 pages. [10] I don't remember exactly where it is, but it [11] is there.

[12] Q: Do you know if Suleiman Alali is [13] registered as a broker or security salesman [14] anywhere in the United States?

[15] A: No.

[16] Q: Are you?

[17] A: No.

[18] Q: I'm not asking you as a lawyer. [19] Have you and he ever discussed whether either [20] of you should be registered in order to sell [21] securities?

[22] A: No.

**Page 91**

[1] Q: And the payments that you des- [2] cribed over the 13 years have been made both in the [3] United States and in Saudi Arabia?

[4] A: Only here.

[5] Q: Only in the United States?

[6] A: Yes.

[7] Q: Do you know Dr. Saati?

[8] A: Yes.

[9] Q: Who is Dr. Saati?

[10] A: He's a university professor of [11] economics of Saudi Arabia in Jeddah, and he [12] was sometime in 1991 in- troduced to me by [13] Dr. Suleiman Alali around November of 1991.

[14] Q: Do you understand any relation- ship [15] that Dr. Saati has to Sana-Bell?

[16] A: Now, or in the beginning of the [17] relation?

[18] Q: As we sit here today.

[19] A: No. He has absolutely no relation [20] to Sana-Bell today, as we sit here today.

[21] Q: How do you know that?

[22] A: Because he was here. He left in

**Page 92**

[1] August 8th or 9th. He was taking a [2] sabbatical year from the university, vis- iting [3] Harvard here for almost a year, and I have [4] developed through the years quite very good [5] relations. He's an economist himself.

[6] I called him almost every 10 days. [7] He called me, telling me about what he's [8] writing, telling about his project he was [9] working at at Harvard.

[10] So I know for a fact that today he [11] has absolutely no relation with Sana-Bell [12] since a very long time.

[13] Q: Because he told you?

[14] A: Yes.

[15] Q: Did you ask him?

[16] A: I mentioned him the court case and [17] what is going on, yes.

[18] Q: And you said, "I got sued. I'm [19] upset," right?

[20] A: I was angry.

[21] Q: Angry?

[22] A: Yes.

**Page 93**

[1] Q: What did he know about it, Saati? [2] What did he say?

[3] A: He says if he can be of any help as [4] a witness to come and say that — yes.

[5] Q: That what?

[6] A: That Dr. Alali was in charge here, [7] and whatever help I might need from him. As [8] a matter of fact, his capacity, when he came [9] and was introduced to me, was never clear.

[10] Dr. Alali introduced him to me as a [11] welcoming from Saudi Arabia from the office [12] of the International Islamic Relief [13] Organization to visit his office here to find [14] out how he's progressing in establishing the [15] organization here, and also assisting them in [16] buying the building they have bought in Falls [17] Church. But a clear, well-defined rule of [18] Dr. Saati in relation of the IRO has never [19] been established.

[20] My understanding at that time was [21] that because he's an educated econ- omist, [22] professor and volunteering to this

**Page 94**

[1] International Islamic Relief Organ- ization —[2] which I knew at that time that he is [3] volunteering work there part-time; that he is [4] coming here to give them his opinion that [5] everything as stated is fine, and that [6] Dr. Suleiman Alali is a great man, and he's [7] doing great work.

[8] But a well-defined definition of [9] his role as an officer of an advisor of [10] Sana-

Bell or RIO has never been defined to [11] me.

[12] Q: Did you ask him?

[13] A: There was no reason to ask him.

[14] Q: You mean you maintained a close [15] relationship with this man for many years [16] now?

[17] A: Since '91.

[18] Q: That's eight years?

[19] A: Yeah.

[20] Q: And he came to look over projects [21] on behalf of IIRO which you un- derstood was [22] the loosely-affiliated parent in some respect

**Page 95**

[1] of Sana-Bell, and you never asked him [2] if he had a relationship with Sana-Bell?

[3] MR. KREBS: Let me object to the [4] argumentative nature and tone of that [5] question which otherwise would not be [6] apparent.

[7] BY MR. GROSS:

[8] Q: You can answer.

[9] A: Can you ask me the question again, [10] please?

[11] Q: You never asked him in all the [12] years that you knew him what his relationship [13] to Sana-Bell was?

[14] A: No, I didn't. I didn't ask him. I [15] knew. I didn't need to ask him.

[16] Q: What did you know about his [17] relationship?

[18] A: I knew after he was introduced to [19] me maybe one year or two years down the road [20] that he works in the offices of Saudi Arabia [21] Sana-Bell Company. There is another company [22] in Saudi Arabia by the name of Sana-Bell. He

**Page 96**

[1] works there as a volunteer, part-time, in the [2] afternoon. So I came to know this fact. So [3] there was no reason for me to ask him if he [4] has any relation, a formal relation with [5] Sana-Bell Amer- ica.

[6] Q: That's all you know, the informal [7] part-time work for the Saudi branch of [8] Sana-Bell; is that what you're telling us?

[9] MR. KREBS: Objection to the [10] characterization of being a branch.

[11] BY MR. GROSS:

[12] Q: The Saudi sister company is what [13] you used earlier —

[14] A: No, I didn't say sister company.

[15] Q: Arm?

[16] MR. KREBS: A daughter, I believe, [17] is what he said before.

[18] THE WITNESS: I didn't say that. I [19] said arm about the International Relief —

- Virginia State Corporation Commission



Commonwealth
of Virginia

State
Corporation
Commission

Enter

Signoff

Help

Print

WEB#362
TCPO0058    CISM1001    OFFICERS/DIRECTORS AND PRINCIPAL OFFICE          08/27/03
                                                                        13:24:51

                                          CIS
                                    CURRENT AR# 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 DATE 08/23/01

CORPORATE ID: 0544370
CORP NAME: MUSLIM WORLD LEAGUE

STREET: 360 S WASHINGTON STREET SUITE 300
  CITY: FALLS CHURCH         STATE: VA    ZIP: 22046
                                         DIR REQUIRED: Y
                        OFFICERS/DIRECTORS DISPLAY FOR AR# 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
S  C                             NAME                          TITLE
E  A                                                           SIGN
L  T
B      DR ABDULLAH BIN SALEH AL OBAID                    PRESIDENT
B      DR HASSAN A A BAHAFZALLAH                         VICE PRESIDENT
B      DR M YAQUB MIRZA                                  S/T

COMMAND: .................................................

NOTE: Function Key usage varies depending on the Application Screen.
For specifics, refer to Function Key Documentation.

http://ditmvs3.state.va.us:8080/servlet/resqportal/resqportal

8/27/2003

# EXHIBIT 8

# THE SANA BELL INC.
**555 Grove Street**
**Herndon, VA 22070**

FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 1993 & 1994

EBR:   1

# THE SANA BELL INC.

## TABLE OF CONTENTS

Page #

Opinion Letter                                                  1

Balance Sheet                                                   2

Statement of Income & Retained earnings                        3

Statement of Cash Flows                                         4

Notes to Financial Statements                                5 - 6

Schedule  A   - Consolidating Balance Sheet                    7

Schedule  B   - Consolidating Income Statement                 8

EBRAHIM LUNAT
*Certified Public Accountant*

REPORT OF INDEPENDENT PUBLIC ACCOUNTANT

To The President, The Bana Bell Inc.

We have audited the accompanying balance sheet of the The Bana Bell Inc. as of December 31, 1993 & 1994, and the related statements of Revenue & Expenses and Fund Balance, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts, and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the The Bana Bell Inc. as of December 31, 1993 & 1994, and the results of its operations and its cash flows for the years then ended in conformity with the generally accepted accounting principles.

*Elrahim Lunat.*

Ibrahim Lunat
Certified Public Accountant
New York, New York
June 10, 1996

# THE SANA BELL INC.

## CONSOLIDATED BALANCE SHEET

### ASSETS

| | As at Dec 31, 1994 | As at Dec 31, 1993 |
|---|---|---|
| **Current Assets:** | | |
| Cash | $   3,267 | 47,385 |
| Rent Receivable   (???) | -0 | 1,000 |
| Construction Advance - Linda Knolls Proj | 111,274 | 2,000 |
| | 114,541 | 50,385 |
| **Investments:** | | |
| BMI Construction Fund Ltd.  Partnership | 1,196,234 | 1,148,263 |
| BMI Leasing Ltd.  Partnership | 992,932 | 931,558 |
| Ladeva II Construction Project: | | |
| Land - Linda Knolls Div | 327,814 | 327,814 |
| Construction in Progress | 236,063 | 22,337 |
| | 2,753,105 | 2,481,962 |
| **Fixed Assets** | | |
| Building 405 ? Washington Street | 55,571 | 55,571 |
| Accumulated Depreciation - Building | 5,274 | 12,337 |
| | 520,297 | 543,234 |
| **Other Assets** | | |
| Tenant Fixout Expenses | 125,124 | 45,500 |
| Accum  Amortization -  Tenant Fixout | -21,222 | -8,520 |
| **Total Assets** | 1,422,?? | 1,??,??? |

## LIABILITIES & FUND BALANCE

| | | |
|---|---|---|
| **Current Liabilities** | | |
| Accounts Payable & Accrued Expenses | 31,464 | 6,444 |
| Prepaid Income | 1,047 | 7,108 |
| Tenant Security Deposit | 2,272 | 802 |
| | 34,782 | 11,442 |
| **Long Term Debt** | | |
| Intl Islamic Relief Organization | 3,444,274 | 3,162,474 |
| **Fund Balance** | | |
| Accumulated Loss for the Year | -423,??? | -18,???? |
| **Total Liabilities & Fund Balance** | 3,1??,??? | 1,???,??? |

These financial statements are subject to the accompanying notes to financial statements.

EBRAHIM LUN
Certified Public Accountants

# THE SANA BELL INC.

## CONSOLIDATED INCOME STATEMENT

|  | Year Ended Dec 31, 1994 | Year Ended Dec 31, 1993 |
|---|---|---|
| **REVENUES:** | | |
| Income from Banks | 3   148 | 977 |
| Income from Limited Partnerships | 59,777 | 64,292 |
| Gross Rental Income | 12,322 | 4,300 |
| Total Revenues | 72,245 | 69,569 |
| **EXPENSES:** | | |
| Cost of Funds | 201,415 | 170,585 |
| Management Fees - Construction | 15,000 | 30,000 |
| Engineering & Admin - Construction | -0- | 18,000 |
| Real Estate & Other Taxes | 24,135 | 21,054 |
| Insurance | 1,579 | 1,089 |
| Utilities | 12,386 | 5,981 |
| Contributions & Donations | 2,360 | -0- |
| Miscellaneous Expenses | 15,036 | -0- |
| Repairs & Maintenance | 3,924 | 3,742 |
| Professional Fees | 2,835 | 2,250 |
| Other Office Expense | 3 | 4,569 |
| Depreciation & Amortization | 11,113 | 26,132 |
| Total Expenses | 312,321 | 230,410 |
| | | |
| Current Loss | 240,075 | -210,843 |
| Accumulated Deficit beginning of year | -212,091 | -1,248 |
| | | |
| Accumulated Deficit end of year | -132,341 | -212,091 |

EBRAHIM LUNAT
Certified Public Accountan

# THE SANA BELL INC.

## STATEMENT OF CASH FLOWS

### INCREASE <DECREASE> IN CASH & CASH EQUIVALENTS

|  | Year Ended Dec 31, 1994 | Year Ended Dec 31, 1993 |
|---|---|---|
| Cash Flow from Operating Activities |  |  |
| Net Deficit | 215,543. | 210,843. |
| Adjustments to reconcile net deficit to net cash |  |  |
| provided by Amortization | 33,135. | 39,135 |
| Accrued Cost of Funds | 231,413 | 179,585 |
| Accounts Payable & Other Current Liabilities | 22,072 | 14,243 |
| Contribution Advance & Rent Receivable | 33,274. | 21,300. |
| Accrued Expenses | 13,123. | 22,102. |

Cash Flows from Investing Activities

|  |  |  |
| Investment Ltd Partnerships | 57,413. | 1,231,413 |
| Investment Third Party Projects | 333,302. | 339,121 |

Cash Flows from Financing Activities

# THE SANA BELL INC.

## NOTES TO FINANCIAL STATEMENTS
### YEAR ENDED DECEMBER 31, 1994

**ORGANIZATION:**

The Sana Bell Inc. was formed on July 28, 1989 as a non-profit non-stock corporation in the District of Columbia, to carry out charitable, religious, educational and scientific activities and to provide funds to the tax exempt organizations. The application of Sana Bell for exemption under IRC Section 501(c)(3) is pending with the Internal Revenue Service.

Presently, Sana Bell has invested funds in real estate development and rental activities and lease financing, to generate funds for its charitable functions. The funds for the investment are derived from a long term non-exclusive loan.

**BASIS FOR PRESENTATION:**

Consolidated Financial Statements

These financial statements include activities of Ladova II Inc., a wholly owned subsidiary of the Sana Bell Inc.

Summary of significant accounting policies

The company uses accrual method of accounting. Accumulated depreciation method is used for recording depreciation on its fixed assets and is calculated in accordance with IRS rules.

**INVESTMENTS:**

The Sana Bell Inc. has acquired the interests in two limited partnerships:

(1) The interest of BMI Construction Fund Limited Partnership. The partnership is engaged in real estate development and sale of homes in the state of New Jersey. The initial investment in the partnership totalled $1,100,000.

(2) The interest of BMI Leasing Limited Partnership. The partnership is engaged in lease financing. The initial investment in the partnership totalled $1,100,000.

EBRAHIM LUN
Certified Public Account

# THE SANA BELL INC.

## NOTES TO FINANCIAL STATEMENTS
### YEAR ENDED DECEMBER 31, 1994

Sarina II Inc., a wholly owned subsidiary of the Sana Bell Inc., has invested $563,877 is Linda Knolls Project. The project has acquired plots of land for construction of homes in Linda Knolls Division, State of Maryland.

## NOTES PAYABLE:

International Islamic Relief Organization, Saudi Arabia (IIRO) has committed to provide loans of upto $5 million to Sana Bell Inc., for investment to generate funds for its exempt activities. The cost of funds for this loan is calculated at a rate of 1% lower than the organization prime rate. For 1993 and 1994, the cost of funds is determined at 8% p.a. The loan will be repaid when sufficient funds are generated as contribution, upon IRS approval of the organization's exempt status.

As of December 31, 1994, IIRO has provided loans of $3,613,394. Cost of funds of $412,051 has been accrued and added to the loan. Thus, the total amount due to IIRO as of December 31, 1994 is $3,644,105.

## INCOME TAX:

Pending approval of its exempt status, the organization files its federal and state corporation income tax returns. For 1993 and 1994, it has a consolidated net operating loss of $36,443,000 as of December 31, 1994. In accordance with IRS rules, accrued interest expense has not been deducted in the income tax returns.

EBRAHIM LUNAT

# THE SANA BELL INC.

SCHEDULE A

**CONSOLIDATING BALANCE SHEET**
**AT DCEMBER 31, 1994**

| | Sana Bell | Ladova II | Total | Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| | | | | | |
| **Investments** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Prepaid Assets** | | | | | |
| | | | | | |
| TOTAL ASSETS | 3,559,333 | 475,122 | 4,244,331 | 752,123 | 3,492,379 |
| | | | | | |
| **Long Term Debt** | | | | | |
| | | | | | |
| **Fund Balance** | | | | | |
| TOTAL LIABILITIES & FUND DEFICIT | 3,559,333 | 475,122 | 4,244,331 | 752 | 3,492,379 |

# THE SANA BELL INC.

CONSOLIDATING INCOME STATEMENT
YEAR ENDED DECEMBER 31, 1994

SCHEDULE 1

| | Sana Bell | Ladova II | Total | Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Income from Banks | | | | | |
| Income from Limited Partnerships | | | | | 148 |
| Gross Rental Income | | | | | 1,777 |
| | | | | | 15,320 |
| **Total Revenues** | 32,245 | | 32,245 | | 32,245 |
| **Expenses** | | | | | |
| Cost of Funds | | | | | |
| Management Fee | | 15,000 | 15,000 | | 201,415 |
| Real Estate & Other Taxes | | | 15,000 | | 15,000 |
| Insurance | | | | | 24,135 |
| Utilities | | | | | 1,579 |
| General Expenses | | | | | 32,186 |
| Repairs and Maintenance | | | | | 54,916 |
| Professional Fees | | | | | 9,914 |
| Other Office Expenses | | | | | 9,415 |
| Interest Paid | | | | | 45 |
| Depreciation & Amortization | | | | | 9,165 |
| **Total Expenses** | 279,333 | 49,502 | 328,835 | | 328,835 |
| Current Earnings (loss) | 247,588 | 24,552 | 272,140 | | |
| Accumulated Deficit beg. of year | (163,741) | (48,350) | (212,091) | | (216,590) |
| | | | | | (212,091) |
| Accumulated Deficit end of year | (151,423) | (72,952) | (424,481) | | (424,481) |

This schedule is an integral part of the financial statements.

**THE SANA-BELL, INC.**
555 Grove Street
Herndon, Virginia 22070

Application for Recognition of Exemption
(Form 1023)

Exhibit A

**CERTIFICATION**

I, M. Yaqub Mirza, Secretary of The Sana-Bell, Inc., hereby certify that the attached is a true and correct copy of the Articles of Incorporation of The Sana-Bell, Inc., current as of the date hereof, and that I am authorized to make this certification.

M. Yaqub Mirza, Ph.D.
Secretary

Date: November ?, 1???

**Internal Revenue Service**          Department of the Treasury

Washington, DC 20224

Commissioner, Department of Taxation
P.O. Box 6-L
Richmond, VA  23282

Person to Contact:
          Mr. Karcher
Telephone Number:
          (202) 622-8120
Refer Reply to:
          CP:E:EO:T:3
Date:
          FEB 26 1996

Dear Sir or Madam:

    We have enclosed a copy of a letter notifying an
organization that the Internal Revenue Service will not recognize
it as a type described in section 501(c)(3) of the Internal
Revenue Code.  The letter constitutes the notice called for in
section 6104(c) of the Code and applicable regulations.  The
refusal to recognize exemption is based upon:

    (x)  Failure of the organization to respond to a
         request for additional information.

    ( )  A determination on the merits.

    If you wish to inspect the Internal Revenue Service material
used to make this determination, please send a request, in
duplicate, to Commissioner of Internal Revenue, Washington, D.C.
20224, Attn:  EX:D.  Your request must be accompanied by the
following statement:

    As provided by section 6104(c) of the Internal Revenue
    Code and applicable regulations, please make available
    to me, for inspection and copying, Internal Revenue
    material and information relating to the final
    determination of exempt status relating to _____
    _____ _____.  Upon penalty of law,
    I declare that I intend to use the requested material
    solely in fulfilling my function under _____
    _____  State law relating to organizations of the
    type described in section 501(c)(3) of the Code.

    Upon receipt of your request, we will send the file to the
key District Director having jurisdiction.  He or she will then
contact you to arrange a time and place of inspection.

    If you have any questions, please contact the person named
above.

                         Sincerely yours,

                         Edward K. Karcher
                         Chief, Exempt Organizations
                         Technical Branch 3

1  you about whether Sana-Bell, Inc. Had filed tax

2  returns, and you said yes.  Both federal and state?

3      A.    I believe so.

4      Q.    And for all years?

5      A.    Until '95 they have been filed.  '96 and

6  '97 have been prepared, but we have problems

7  reconciling the K-1s with our accounting records, and

8  that's where it sits.  '98, we have not received the

9  K-1s from BMI to complete the tax return.

10     Q.    You haven't received K-1s from BMI for '97

11 either, have you?

12     A.    We received them.  After my repeated

13 request last year they were faxed.  '96 and '97 were

14 faxed together.

15     Q.    When would Sana-Bell's first tax year have

16 been?

17     A.    I believe '89 or '90.  I don't know which

18 one.

19     Q.    So from approximately 1989 or 1990 it did

20 file tax returns through 1995?

21     A.    Yes.

22     Q.    Did Sana-Bell ever qualify as a charitable

23 organization for federal tax purposes?

24     A.    No.

25     Q.    So were these just regular corporation

M. Yaqub Mirza

Washington, DC

October 25, 1999

35

1   returns that were filed, or were they filed assuming

2   that it would receive charitable treatment?

3       A.     They were regular C corporation accounts,

4   yes, waiting until we had the exemption.

5       Q.     And had application been filed for 501 (c)

6   treatment?

7       A.     Correct.  We did file.

8       Q.     When was the application filed?

9       A.     It was a long time ago.  I don't remember

10  the year, but certainly four or five, maybe six years

11  ago.

12      Q.     And what happened?  Did you ever receive a

13  response from the Internal Revenue Service with

14  respect to that application?

15      A.     We did, and they asked if the loans from

16  IIRO would be converted to a contribution upon

17  receiving the exempt status.  I was unable to get the

18  response to that request from Jeddah, and therefore

19  the application just stood unapproved.

20      Q.     What was the source of funds for the

21  purchase of the office building?

22      A.     The same source, IIRO Saudi Arabia

23  transferred the funds.

24      Q.     Did the tax returns that were filed

25  reflect the rental income which would have been

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

1998 DEC 23  A 11: 14

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

---------------------------------------------------------------- x
THE SANA-BELL, INC.,                                            :
a District of Columbia nonprofit corporation,
P.O. Box 9072                                                   :
Jeddah 21413
Kingdom of Saudi Arabia,                                        :

                Plaintiff,                             :

PJM 9 8 CV 4 1 7 7

v.                                                              :   Civil Action No. _____

                                         PJM 98-4177

BMI REAL ESTATE DEVELOPMENT, INC.                               :
4710 Auth Place, Suite 520
Camp Springs, MD  20746,                                        :

BMI LEASING, INC.                                               :
4710 Auth Place, Suite 520
Camp Springs, MD  20746,                                        :

SOLIMAN S. BIHIERI                                              :
4710 Auth Place, Suite 520
Camp Springs, MD  20746, and                                    :

SULEIMAN BIN ALI ALALI                                          :
c/o BMI Real Estate Development, Inc.
4710 Auth Place, Suite 520                                      :
Camp Springs, MD  20746,

                Defendants.                            :
---------------------------------------------------------------- x

## COMPLAINT

    Comes now the Plaintiff The Sana-Bell, Inc. ("Sana-Bell"), by and through counsel, and

for its Complaint alleges the following:

### JURISDICTION AND VENUE

    1.  Plaintiff Sana-Bell is a District of Columbia nonprofit corporation with its principal

place of business in Jeddah, Kingdom of Saudi Arabia.

# EXHIBIT 10

1 of 1 DOCUMENT

Copyright 2003 U.P.I.
All Rights Reserved
ARABIA 2000
Copyright 2003 by Saudi Press Agency. Distributed By UPI.



Saudi Press Agency

November 23, 2003 Sunday  10:43 PM  EST

**LENGTH:** 60 words

**HEADLINE:** SPA-24-general-KingCables

**BYLINE:** Saudi Press Agency

**DATELINE:** Riyadh, November 23

**BODY:**

The Custodian of the two Holy Mosques King Fahd bin Abdulaziz has received cables condemning and deploring the terror incident which recently took place in Riyadh from Dr Salih Al-Samrani, the President of the Islamic Center in Japan, and Abdullah Al-Noshan, the director of the office of the Muslim World League (MWL) in America and its representative at the UN.

**LOAD-DATE:** February 10, 2005



## Companies House
—— *for the record* ——

15.00
436153

**Company Name**
INTERNATIONAL ISLAMIC RELIEF
ORGANISATION

**Company Type**
**Private Company Limited By**
**Guarantee Exempt Under Sect 30**
Company Number
**3131409**
Information extracted from
Companies House records on
**7th February 2002**

Ref: 3131409/15/42

# 363s Annual Return

> Please check the details printed in blue on this statement.
> If any details are wrong, strike them through and write the correct details
> in the "Amended details" column.
> Please use black pen and write in capitals.



A40                                        0108
COMPANIES HOUSE               12/06/02

### Section 1: Company details

| Current details | Amended details |
|---|---|
| > **Registered Office Address** *If any of the details are wrong, strike them through and fill in the correct details in the "Amended details" column.* | **3 Worcester Street**<br>**Oxford**<br>**Oxfordshire**<br>**OX1 2PZ** | Address<br><br><br><br>UK Postcode _ _ _ _  _ _ _ |
| > **Register of Members** *If any of the details are wrong, strike them through and fill in the correct details in the "Amended details" column.* | **Address where the Register is held**<br><br>**At Registered Office** | Address<br><br><br><br>UK Postcode _ _ _ _  _ _ _ |
| > **Register of Debenture Holders** *If any of the details are wrong, strike them through and fill in the correct details in the "Amended details" column.* | **Not Applicable** | Address<br><br><br><br>UK Postcode _ _ _ _  _ _ _ |

| Current details | | Amended details | |
|---|---|---|---|
| > **Principal Business Activities** *If any of the details are wrong, strike them through and fill in the correct details in the "Amended details" column.* | **SIC Code**  **Description**<br><br>**7499**  **Non-trading company** | **SIC CODE**  **Description**<br>_ _ _ _ <br>_ _ _ _ <br>_ _ _ _ <br>_ _ _ _ | |
| > *Please enter additional principal activity code(s) in "Amended details" column. See notes for guidance for list of activity codes.* | | | |

1

Company Number - 3131409



**Companies House**
—— *for the record* ——

# 363s  Annual Return Declaration

> When you have checked all the sections of this form, please complete this page and sign the declaration below.

> If you want to change the made up date of this annual return, please complete 2 below.

## 1. Declaration

☐ I confirm that the details in this annual return are correct as at the made-up-date (shown at 2 below).  I enclose the filing fee of £15.

Signature _____        Date _15, 05, 2002_
              (Director / ~~Secretary~~)

*This date must not be earlier than the return date at 2 below*

**What to do now**
*Complete this page then send the whole of the Annual Return and the declaration to the address shown at 4 below.*

## 2. Date of this return

☐ This AR is made up to **28/11/2001**

If you are making this return up to an earlier date, please give the date here

_ _ / _ _ / _ _ _ _

*Note: The form must be delivered to CH within 28 days of this date*

## 3. Date of next return

☐ If you wish to change your next return to a date earlier than **28th November 2002** please give the new date here:

_ _ / _ _ / _ _ _ _

## 4. Where to send this form

☐ Please return this form to:
Registrar of Companies
Companies House
Crown Way
Cardiff CF14 3UZ

OR

For members of the Hays Document Exchange service
DX 33050 Cardiff

**Have you enclosed the filing fee with the company number written on the reverse of the cheque?**

Cheque  ☑  Postal Order  ☐     Cheque / Postal Order Number  _____

*(Please complete as appropriate)*

## Contact Address

Please give the name and address of the person who should be contacted if there are any queries about this form.

Contact Name
_Wenn Townsend or_
_Robert O'Malley_
Address
_30 St Giles_
_Oxford_

Postcode _OX1 2P2_

Telephone number *inc code*
_01865 722106_

DX number *if applicable*
_4322_

DX exchange
_Oxford_

# EXHIBIT 11

# COMMONWEALTH OF VIRGINIA
## STATE CORPORATION COMMISSION

August 14, 2000

The State Corporation Commission has found the accompanying articles submitted on behalf of

## SANABEL AL KHEER, INC.

to comply with the requirements of law, and confirms payment of all required fees.

Therefore, it is ORDERED that this

## CERTIFICATE OF INCORPORATION

be issued and admitted to record with the articles of incorporation in the Office of the Clerk of the Commission, effective August 14, 2000.

The corporation is granted the authority conferred on it by law in accordance with the articles, subject to the conditions and restrictions imposed by law.

STATE CORPORATION COMMISSION

By _T. V. Morrison_

Commissioner

CORPACPT
CIS0436
00-08-14-0117

# 2001 ANNUAL REPORT CONTINUED

**CORPORATE ID:**     0544858-4

| ☐ NO CHANGE          ☐ REMOVE | ☒ ADDITIONS/CHANGES ONLY |
|---|---|
| OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: | OFFICER ☒  DIRECTOR ☒<br><br>NAME: DR. HASSAN A.A. BAHAFZALLAH<br>TITLE: VICE PRESIDENT/DIRECTOR<br>ADDRESS: 360 S. WASHINGTON STREET, SUITE 300<br><br>CITY/ST/ZIP: FALLS CHURCH, VA  22046 |
| ☐ NO CHANGE          ☐ REMOVE | ☒ ADDITIONS/CHANGES ONLY |
| OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: | OFFICER ☒  DIRECTOR ☒<br><br>NAME: DR. M. YAQUB MIRZA<br>TITLE: SECRETARY/TREASURER/DIRECTOR<br>ADDRESS: 555 GROVE STREET, SUITE 116<br><br>CITY/ST/ZIP: HERNDON, VA  20170 |
| ☐ NO CHANGE          ☐ REMOVE | ☐ ADDITIONS/CHANGES ONLY |
| OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: | OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: |
| ☐ NO CHANGE          ☐ REMOVE | ☐ ADDITIONS/CHANGES ONLY |
| OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: | OFFICER ☐  DIRECTOR ☐<br><br>NAME:<br>TITLE:<br>ADDRESS:<br><br>CITY/ST/ZIP: |

3/3

C8019

**2001 ANNUAL REPORT**
COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION

20162 1416
08-23-2001

(1) CORPORATION NAME:
SANABEL AL KHEER, INC.

(2) REGISTERED AGENT NAME AND OFFICE ADDRESS:   DIR.

M YAQUB MIRZA
555 GROVE ST SUITE 116
HERNDON, VA 20170

(3) CITY OR COUNTY OF VA REGISTERED OFFICE:
129-FAIRFAX COUNTY

(4) STATE OR COUNTRY OF INCORPORATION:
VA-VIRGINIA

DUE DATE:   08/31/01

CORPORATION ID:   0544858-4

(5) STOCK INFORMATION:

| CLASS | AUTHORIZED |
|-------|-----------|
|       |           |
|       |           |
|       |           |

Carefully read the attached instruction sheet.  Type or print in black only.  If item (6) is blank, you must add the principal office address.  If item (7) is blank, you must add the director and officer information (see Section 13.1-775 A 3 or Section 13.1-936 A 3 of the Code of Virginia).

(6) PRINCIPAL OFFICE ADDRESS

| [ ] NO CHANGE | [X] ADDITIONS/CHANGES ONLY |
|---------------|----------------------------|
| ADDRESS:<br><br>CITY/ST/ZIP: , | ADDRESS:   555 GROVE STREET, SUITE 116<br><br>CITY/ST/ZIP:   HERNDON, VA   20170 |

(7) DIRECTORS AND PRINCIPAL OFFICERS
All directors and principal officers must be listed.
One individual may be a director and an officer.

| [ ] NO CHANGE        [ ] REMOVE | [X] ADDITIONS/CHANGES ONLY |
|---------------------------------|----------------------------|
| OFFICER [ ]   DIRECTOR [ ]<br>NAME:<br>TITLE:<br>ADDRESS:<br>CITY/ST/ZIP: | OFFICER [X]   DIRECTOR [X]<br>NAME: DR. ABDULLAH BIN SALEH AL OBAID<br>TITLE:  PRESIDENT/DIRECTOR<br>ADDRESS: 360 S. WASHINGTON STREET, SUITE 300<br>CITY/ST/ZIP: FALLS CHURCH, VA   22046 |

I AFFIRM THAT THE INFORMATION CONTAINED IN THIS REPORT IS ACCURATE AND COMPLETE.

_____
SIGNATURE OF DIRECTOR OFFICER
LISTED IN THIS REPORT

DR. M YAQUB MIRZA, SEC./TREA
PRINTED NAME/TITLE

8/24/01
DATE

It is a Class 1 misdemeanor for any person to sign a document he knows is false in any material respect with intent that the document be delivered to the Commission for filing.
B8019

# EXHIBIT 12

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |
|---|---|---|
| | Under section 501(c) of the Internal Revenue Code (except black lung benefit trust or private foundation) or section 4947(a)(1) charitable trust | **1992** |
| Department of the Treasury Internal Revenue Service | **Note:** *The organization may have to use a copy of this return to satisfy state reporting requirements.* | This Form is Open to Public Inspection |

**A** For the calendar year 1992, or fiscal year beginning _____ , 1992, and ending _____ , 19 _____

| Please use IRS label or print or type. See Specific Instructions. | **B** Name of organization<br>International Relief Organization | **C** Employer identification number<br>52 : 1752452 |
|---|---|---|
| | Number and street (or P.O. box if mail is not delivered to street address) Room/suite<br>P.O. Box 8125        28490303009 3 9 | **D** State registration number<br>0173231-000 |
| | City, town, or post office, state, and ZIP code<br>Falls Church, VA 22041-8125 | **E** If address changed, check box ▶ ☒ |

**F** Check type of organization—Exempt under section ▶ ☒ 501(c)( 3 ) (insert number),
OR ▶ ☐ section 4947(a)(1) charitable trust

**G** If exemption application pending, check box ▶ ☐

**H(a)** Is this a group return filed for affiliates? . . . . . . . . . ☐ Yes ☒ No
**(b)** If "Yes," enter the number of affiliates for which this return is filed: . ▶ _____
**(c)** Is this a separate return filed by an organization covered by a group ruling? ☐ Yes ☒ No

**I** If either box in H is checked "Yes," enter four-digit group exemption number (GEN) ▶ _____

**J** Accounting method: ☐ Cash ☐ Accrual
☐ Other (specify) ▶ _____

**K** Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if it received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return.

Note: *Form 990EZ may be used by organizations with gross receipts less than $100,000 and total assets less than $250,000 at end of year.*

## Part I   Statement of Revenue, Expenses, and Changes in Net Assets or Fund Balances

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| a | Direct public support . . . . . . . . . | 1a | 1,101,818 | |
| b | Indirect public support . . . . . . . . | 1b | 146,000 | |
| c | Government grants . . . . . . . . . | 1c | | |
| d | **Total** (add lines 1a through 1c) (attach schedule—see instructions) | | 1d | 1,247,818 |
| 2 | Program service revenue (from Part VII, line 93) . . . . | | 2 | |
| 3 | Membership dues and assessments (see instructions) . . . | | 3 | |
| 4 | Interest on savings and temporary cash investments . . . . | | 4 | |
| 5 | Dividends and interest from securities . . . . . . . | | 5 | 5,454 |
| 6a | Gross rents . . . . . . . . . . . | 6a | | |
| b | Less: rental expenses . . . . . . | 6b | | |
| c | Net rental income or (loss) . . . . . . . . . | | 6c | |
| 7 | Other investment income (describe ▶ _____ ) | | 7 | |
| 8a | Gross amount from sale of assets other | (A) Securities | (B) Other | |
| | than inventory . . . . . . | 8a | | |
| b | Less: cost or other basis and sales expenses | 8b | | |
| c | Gain or (loss) (attach schedule) . . | 8c | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B)) . | | 8d | |
| 9 | Special fundraising events and activities (attach schedule—see instructions): | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) . . | 9a | | |
| b | Less: direct expenses . . . . . . | 9b | | |
| c | Net income . . . . . . . . . . . | | 9c | |
| 10a | Gross sales less returns and allowances | 10a | | |
| b | Less: cost of goods sold . . . . . | 10b | | |
| c | Gross profit or (loss) (attach schedule) . . . . . . | | 10c | |
| 11 | Other revenue (from Part VII, line 103) . . . . . . . | | 11 | (1,701) |
| 12 | **Total revenue** (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | 12 | 1,251,571 |
| 13 | Program services (from line 44, column (B)) (see instructions) . | | 13 | 504,442 |
| 14 | Management and general (from line 44, column (C)) (see instructions) | | 14 | 192,611 |
| 15 | Fundraising (from line 44, column (D)) (see instructions) . . | | 15 | 201,774 |
| 16 | Payments to affiliates (attach schedule—see instructions) . . | | 16 | |
| 17 | **Total expenses** (add lines 16 and 44, column (A)) . . . . | | 17 | 898,827 |
| 18 | Excess or (deficit) for the year (subtract line 17 from line 12) . | | 18 | 352,744 |
| 19 | Net assets or fund balances at beginning of year (from line 74, column (A)) | | 19 | (97,538) |
| 20 | Other changes in net assets or fund balances (attach explanation) | | 20 | |
| 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | | 21 | 255,206 |

For Paperwork Reduction Act Notice, see page 1 of the separate instructions.        Cat. No. 11282Y        Form **990** (1992)

PUBLIC INS.

1-25-93        Subsidiary of The Bureau of National Affairs, Inc.        990 I

23

Form 990 (1992)

**Part II** Statement of Functional Expenses

All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and 4947(a)(1) charitable trusts but optional for others. (See instructions.)

| | | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|---|
| | Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I. | | | | | |
| 22 | Grants and allocations (attach schedule) | 22 | 332,182 | 332,182 | ///// | ///// |
| 23 | Specific assistance to individuals (attach schedule) | 23 | 58,808 | 58,808 | ///// | ///// |
| 24 | Benefits paid to or for members (attach schedule) | 24 | | | ///// | ///// |
| 25 | Compensation of officers, directors, etc. | 25 | | | | |
| 26 | Other salaries and wages | 26 | 149,622 | 18,105 | 79,698 | 51,819 |
| 27 | Pension plan contributions | 27 | | | | |
| 28 | Other employee benefits | 28 | 18,975 | 2,467 | 10,436 | 6,072 |
| 29 | Payroll taxes | 29 | 16,631 | 2,162 | 9,147 | 5,322 |
| 30 | Professional fundraising fees | 30 | | ///// | ///// | |
| 31 | Accounting fees | 31 | | | | |
| 32 | Legal fees | 32 | 9,758 | 5,000 | 2,522 | 2,236 |
| 33 | Supplies | 33 | | | | |
| 34 | Telephone | 34 | 14,900 | 10,621 | 2,696 | 1,583 |
| 35 | Postage and shipping | 35 | 55,754 | 17,372 | 8,359 | 30,023 |
| 36 | Occupancy | 36 | 36,049 | 7,210 | 15,502 | 13,337 |
| 37 | Equipment rental and maintenance | 37 | | | | |
| 38 | Printing and publications | 38 | 99,326 | 17,361 | 17,361 | 64,604 |
| 39 | Travel | 39 | 41,659 | 24,332 | 10,917 | 6,410 |
| 40 | Conferences, conventions, and meetings | 40 | 17,599 | 5,815 | 2,315 | 9,469 |
| 41 | Interest | 41 | | | | |
| 42 | Depreciation, depletion, etc. (attach schedule) | 42 | 9,455 | | 5,957 | 3,498 |
| 43 | Other expenses (itemize): a  Auto | 43a | 13,473 | | 13,473 | |
| b | Office | 43b | 24,636 | 3,007 | 14,228 | 7,401 |
| c | | 43c | | | | |
| d | | 43d | | | | |
| e | | 43e | | | | |
| f | | 43f | | | | |
| 44 | Total functional expenses (add lines 22 through 43) Organizations completing columns (B)-(D), carry these totals to lines 13-15 . | 44 | 898,827 | 504,442 | 192,611 | 201,774 |

**Reporting of Joint Costs.**—Did you report in column (B) (Program services) any joint costs from a combined educational campaign and fundraising solicitation? . . . . . . . . . . . . . . . . . . ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $_____; (ii) the amount allocated to program services $_____; (iii) the amount allocated to management and general $_____; and (iv) the amount allocated to fundraising $_____.

**Part III** Statement of Program Service Accomplishments (See instructions.)

Describe what was achieved in carrying out the organization's exempt purposes. Fully describe the services provided; the number of persons benefited; or other relevant information for each program title. Section 501(c)(3) and (4) organizations and section 4947(a)(1) charitable trusts must also enter the amount of grants and allocations to others.

| | Expenses (Required for 501(c)(3) and (4) organizations and 4947(a)(1) trusts; optional for others.) |
|---|---|
| a  See Attached Statement | |
| (Grants and allocations $                    ) | 504,442 |
| b | |
| (Grants and allocations $                    ) | |
| c | |
| (Grants and allocations $                    ) | |
| d | |
| (Grants and allocations $                    ) | |
| e  Other program services (attach schedule) . . . (Grants and allocations $         ) | |
| f  Total (add lines a through e) (should equal line 44, column (B)) . . . . . . . . . . . ▶ | 504,442 |

**PUBLIC INS.** ...diary of The Bureau of National Affairs, Inc.

1-25/93

4

INTERNATIONAL RELIEF ORGANIZATION, INC.                                    Page 2
EIN:  52-1752452
FORM 990
DECEMBER 31, 1992


PART II - LINE 22

Schools & Scholarships

Islamic Saudi Academy
8333 Richmond Highway
Alexandria, VA  22309                                              $       3,650

Al-Salam Peace Elementary School
P. O. Box 906111
Tulsa, OK  74112                                                          10,000

MSA
P. O. Box 18813
Washington, DC  20036                                                        750

A-Ghazaly School
17 Park Street
Jersey City, NJ  07304                                                    10,000

    Food, Shelter, Clothing for Disaster Victims and
    Indigent Families

Dar Al Hijrah
3159 Row St.
Falls Church, VA  22044                                                   12,767

Muslim Arab Youth Association
P. O. Box 906125
Tulsa Oklahoma  74112                                                     10,000

Islamic African Relief Agency
P. O. Box 7084
Columbia, MD  65205                                                       10,000

Bosnia & Somalia Relief Funds
P. O. Box 14843
Jeddah 21434
Saudi Arabia                                                             273,000

Bosnia Relief Funds
P. O. Box 14843
Jeddah 21434
Saudi Arabia                                                               2,015

    Hospital fees and medical care for Bosnian children

                                                                   $   332,182

PUBLIC INS.

PRESS ROOM

**FROM THE OFFICE OF PUBLIC AFFAIRS**

October 13, 2004
JS-2025

**Treasury Designates Global Network, Senior Officials of IARA for Supporting bin Laden, Others**

The U.S. Department of the Treasury today designated the worldwide network of the Islamic African Relief Agency (IARA), along with five senior officials, pursuant to E.O. 13224. This action blocks all accounts, funds and assets of IARA in the United States and criminalizes the provision of money or other types of support to any of its offices.

"This is an excellent example of how U.S. Government agencies coordinate their efforts to achieve the maximum impact against supporters of terrorism.  The Treasury Department has been working closely with its colleagues in other agencies to ensure that, as a government, we do everything possible to shut down the flow of money to terrorists," said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

**Islamic Africa Relief Agency (IARA)**

IARA is headquartered in Khartoum , Sudan and maintains over 40 offices throughout the world, including in the United States .

**AKAs:** IARA, Islamic Relief Agency, ISRA, Islamic American Relief Agency, Al-Wakala al-Islamiya l'il-Ighatha , Al-Wakala al-Islamiya al-Afrikia l'il-Ighatha

**IARA Support for Usama bin Laden (UBL), al Qaida and the Taliban**

IARA is identified as a non-governmental organization (NGO) formerly affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.

Information available to the U.S. indicates that international offices of IARA provided direct financial support for UBL. IARA, MK and UBL commingled funds and cooperated closely in the raising and expenditure of funds. IARA engaged in a joint program with an institute controlled by UBL that was involved in providing assistance to Taliban fighters.

In 2000, one of IARA's Afghanistan leaders accompanied the Afghanistan MK leader on a fundraising trip to Sudan and other locations in the Middle East during which $5 million was raised for MK activities.

Information available to the U.S. shows that the overseas branches IARA provided hundreds of thousands of dollars to UBL in 1999. In 1997, there was an individual who acted as a liaison between UBL and terrorist-related NGOs, distributing funds from UBL to MK, IARA and others. Later that year, IARA and MK reportedly provided financial support for a group of Arab terrorists planning to travel to Saudi Arabia to conduct unspecified operations against U.S. military personnel.

Additionally, information identifies a UBL lieutenant and former MK official as having been the director of IARA's operations in Afghanistan . This individual was identified as an expert in terrorism, bomb planning and guerilla operations.

Information indicates an IARA leader was involved in discussions to help relocate UBL to secure safe harbor for him. Among others, these discussions included representatives for UBL and MK, along with Lajnat al-Dawa (LDI), which is listed as

a Specially Designated Global Terrorist pursuant to E.O. 13224, as well as listed by the UN 1267 Sanctions Committee. In addition, a Sudanese individual traveled to Mali and stayed with an IARA director while assessing whether Mali could serve as a safe harbor for UBL.

**IARA Support for Hamas**

As of early 2003, information available to the U.S. shows that IARA was responsible for moving funds to the Palestinian territories for use in terrorist activities, notably serving as a conduit to Hamas in one Western European country. In part, funds were raised through IARA collection boxes marked "Allah" and " Israel ," signaling the funds would be directed towards attacks against Israelis.

Within the last year, IARA was reportedly linked to the Belgium office of the Al-Aqsa Foundation, a Specially Designated Global Terrorist, pursuant to E.O. 13224.

**IARA Support for Al-Ittihad al-Islamiya (AIAI)**

IARA offered financial support for the development of AIAI, which is listed as a Specially Designated Global Terrorist, pursuant to E.O. 13224, as well as listed by the UN 1267 Sanctions Committee.

**Senior Officials**
**Dr. Mohammed Ibrahim Sulaiman**
Position: Secretary General, IARA Headquarters, Khartoum, Sudan
Home Address: House Number 27, Block Number 29, Manishia District, Khartoum, Sudan
Mailing Address: P.O. Box 3372, Khartoum, Sudan

**Jaffar Ahmad Abdullah Makki**
Position: IARA South Asia Region Director
DOB: 1956
POB: Sudan
Passport #1: 079925
Issued: September 7, 1992
Passport #2: A553077
Issued: April 16, 2000

**Abdul Aziz Abbakar Muhamad**
Position: IARA Peshwar, Pakistan Director
DOB: 1961
POB: Sudan
Passport: 562605
Issued: October 28, 1998

Abbakar Muhamad was identified as one of several individuals involved in IARA's terrorist support operations in South Asia. This support was provided to al Qaida, Gammat al Islamiya and the Taliban and reportedly included money, supplies and housing for terrorists in South Asia. He previously served as the Executive Director of the IARA operating from Afghanistan.

**Khalid Ahmad Jumah Al-Sudani**
Position: IARA Middle East Regional Director
Location: Amman, Jordan
Passport: H649956
Issued: April 8, 2002

**Ibrahim Buisir**
Position: IARA Representative in Ireland
Location: Ireland
DOB: circa 1962
POB: Libya

Buisir, originally from Libya, has been IARA's representative in Ireland. Following the 9-11 terrorist attacks, Buisir was arrested by local authorities based on evidence that he provided financial support for the al Qaida network. Information available to the U.S shows that Buisir directed a European al Qaida cell that provided support to operations in Europe by arranging travel and accommodations.

The entities were designated today pursuant to Executive Order 13224 pursuant to paragraphs (d)(i) and (d)(ii) based on a determination that they assist in, sponsor or provide financial, material, or technological support for, or financial or other services to or in support of, or are otherwise associated with, persons listed as subject to E.O. 13224.

Blocking actions are critical to combating the financing of terrorism. When a target is blocked, all of its assets in the formal financial system must be frozen and it can no longer operate as a conduit to move money to illicit purposes. This, in turn, forces terrorist networks to rely on alternative, more costly and higher-risk means of financing their activities. Blocking actions also expose money trails that may point to previously unknown terrorist cells and financiers and serve as a deterrent to other would-be financiers or donors.

The United States has designated 393 individuals and entities as terrorists, their financiers or facilitators. In addition, the global community has frozen over $142 million in terrorist-related assets.

-30-

# EXHIBIT 13

بسم الله الرحمن الرحيم

١ - سليمان رستيد ( أزائك )
٢ - سيد قادر ابكري ( رائك )
٣ - انور ميلاد م ( اساس )
٤ - يوسف جبل ( بربي )
٥ - ابراهيم اقتد ر ( بربي )
٦ - صدع كامل ( ابري )
٧ - ابراهي ( اسان )
٨ - الكبيج حمد ( بربي )
٩ - اسكر سليب ( اسان )
١٠ - بيح الخفن ( اسان )
١١ - بير محمد ظ ( اسان )
١٢ - ( اسان )
١٣ - هدار لمريم بربو جواد ( ماث )
١٤ - احمد ترجكاري ( يكيف )
١٥ - سيد كلف ظاهر ( بربي )

*(Parenthetical remarks in Italic are the translator's)*

*(Document name: TAREEKHOSAMA/41/Tareekh Osama.108)*

In the name of God, the most gracious, the most merciful

And spend for God's cause *(Quraanic verse)*

| | | |
|---|---|---|
| 1) | Suleiman Al-Rashid. | (Wail) |
| 2) | Abdel Qader Bakri. | (Wail) |
| 3) | Bin Laden Brothers. | (Usama) |
| 4) | Yousif Jameel. | (Baterji) |
| 5) | Ibrahim Afandi. | (Baterji) |
| 6) | Saleh Kamel. | (Baterji) |
| 7) | Al-Rajhi. | (Usama) |
| 8) | Al-Jumaih. Jeddah (S.A) | (Baterji) |
| 9) | Al-Sharbatly | (Usama) |
| 10) | *(Illegible)* Al-Naghi | (Usama) |
| 11) | Bin Mahfoodh | (Usama) |
| 12) | Abdel Qader Faqeeh | (Usama) |
| 13) | Salah Al-Din Abdel Jawad | (Wail) |
| 14) | Ahmad Turki Yamani | (Baterji) |
| 15) | Abdel Hadi Taher | (Wail) |
| 16) | Mohammed Omar *(illegible)* | (Baterji) |
| 17) | Al- Kuwait | (Usama) |
| 18) | Ahmad Al-Harbi | (Salem Taher) |

BOS000002

19)  Al-Issaei                          (Salem Taher)

20)  Hamad Al-Husaini           (Abu Mazin)

BOS000003

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA                    )
                                            )
        -v-                                 ) Case No.  **03-365-A**
                                            )
SOLIMAN S. BIHEIRI                          )

<u>DECLARATION IN SUPPORT OF PRE-TRIAL DETENTION</u>

  I, David Kane, a Senior Special Agent with the Bureau of Immigration and Customs

Enforcement ("ICE"), under the Department of Homeland Security in Washington, DC, declare and

state:

I. <u>Professional Experience of Affiant</u>

  1.  I have served as a Special Agent ("SA") with the ICE (and its predecessor the

United States Customs Service ("USCS")) for approximately six years.  I have received training and

gained experience in interviewing and interrogation techniques, arrest procedures, search and seizure,

search warrant application, computer crimes, terrorism, and various other crimes.  I have been the case

agent on complex money laundering investigations that involved the domestic and international transfers

of money, layering processes, falsified records and front organizations.  I have been the case agent on

four cases that were terrorism-related and the affiant on six federal search warrants involving money

laundering violations.

  2.  Prior to joining the USCS, I obtained a B.A. degree in both German Language and

Literature and Government and Politics and a Masters degree in International Transactions from George

Mason University.  I worked as a financial services agent with Prudential Preferred Financial Services,

where I analyzed financial structures and executed financial transactions with complex, international

1

financial instruments on a regular basis.

II.      The Investigation

3.       Since December 2001, I and other agents of the USCS/ICE, the Internal Revenue

Service-Criminal Investigation ("IRS-CI"), and the Federal Bureau of Investigation ("FBI"), have been

investigating a group of individuals that are suspected of providing material support to terrorists, money

laundering, violations of the International Emergency Economic Powers Act and tax evasion through the

use of a variety of related for-profit companies and ostensible charitable entities under their control,

most of which are located at 555 Grove Street, Herndon, Virginia, or at 360 South Washington Street,

Falls Church, VA.

4.       The entities located at 555 Grove Street, include a Virginia Corporation named

Sana-Bell, Inc.  The entities located at 360 S. Washington Street, include the Muslim World League,

Inc. ("MWL") and its various affiliated organizations, including the International Islamic Relief

Organization ("IIRO"), which is also known as International Relief Organization ("IRO").  Central to my

investigation is the financial relationship between these entities and a New Jersey corporation, BMI, Inc.

A.      MWL and IIRO Background

5.       The MWL, based in Saudi Arabia, was founded in 1962 with the goals of

disseminating Islamic philosophy, culture, and religion, and defending Islamic causes.

6.       The head of IIRO in Canada, Arafat El-Asahi, testified in court in Canada in

immigration proceedings against Mahmoud Jabbalah.  I have reviewed portions of the transcript,  a copy

of which is available on the internet, in which El-Asahi confirms MWL is the same entity as the

International Islamic Relief Organization ("IIRO").  Jaballah was arrested in Canada, and at these

proceedings El-Asahi stated, "the IIRO and the Muslim World League is one, but sometimes they have

two offices, although the umbrella organization is the same, which is the Muslim World League."  El-

2

Asahi stated that the organization had offices all over the world, including one in Washington, D.C.  I

believe that he was referring to the office at 360 South Washington Street in Falls Church, Virginia.

7.      According to a CIA report, recently made public in response to a FOIA request, of the

more than 50 Islamic nongovernmental organizations in existence in 1996, "available information

indicates that approximately one-third of these Islamic NGOs support terrorist groups or employ

individuals who are suspected of having terrorist connections."   It lists the IIRO, as having "extremist

connections," including to the Palestinian group Hamas, Algerian radicals, and the Egyptian precursor to

al Qaeda, Al-Gamaat Al-Islamiya.   "The IIRO is affiliated with the Muslim World League, a major

international organization largely financed by the government of Saudi Arabia," the report states,

connecting the IIRO to al Qaeda leader Osama bin Laden and convicted terrorist Ramzi Yousef. "The

former head of the IIRO office in the Philippines, Muhammad Jamal Khalifa, has been linked to

Manila-based plots to target the pope and U.S. airlines; his brother-in-law is Usama bin Ladin," the

report states, using alternate spellings of Mr. bin Laden's names. In addition, "another high- ranking

[IIRO] official in the Philippines leads Hamas meetings, and the majority of Hamas members in the

Philippines are employed by the organization." Finally, it says, "the IIRO helps fund six militant training

camps in Afghanistan, according to a clandestine source."

8.      I know that terrorists who have attacked or tried to attack the United States around the

world have been associated with MWL/IIRO.  For example, a Bangladeshi national by the name of

Sayed Abu Nasir was arrested in India on January 7, 1999 with detonators and more than four pounds of

explosives.  According to Cecilia Dugger's article "Anti-U.S Plot in India is Foiled" in the January 21,

1999 edition of The International Herald Tribune, Karnal Singh, the Deputy Commissioner of Police in

India, stated that Nasir was ordered to launch an attack on the United States Consulate in Madras by

Sheikh Al-Gamdin, President of the IIRO in Asia.

3

9.      I know, based on news reports, that the IIRO was banned in Kenya in September

1998 following the bombings of the U.S. embassies in Kenya and Tanzania in 1998 for suspicion of its

involvement in the bombings.

10.      According to the trial transcripts from the Embassy Bombing trial in United States

District Court in the Southern District of New York in 2001, Ihab Ali, while working for MWL, relayed

messages to Bin Laden and convicted terrorist Wadi EL-Hage in connection with the coordination of the

Kenyan embassy bombing.

11.      According to Richard Chesnoff's story, "It's More Than Just Who Plants the

Explosives," in the July 31, 1996 edition of the <u>New York Daily News</u>, western intelligence sources

traced IIRO money transfers to bank accounts in London and Amman, Jordan, from where the funds

were then channeled to HAMAS in Gaza and the West Bank.  I have found evidence corroborating that

IIRO/IRO has transferred funds to HAMAS through HAMAS fronts such as Holy Land Foundation for

Relief and Development ("HLF").  I have seen IRS Form 990s from IIRO/IRO which reveal that it gave

at least $23,780 to HLF between 1996 and 1997.

B. <u>The MWL and IIRO in Northern Virginia</u>

12.      There are branches of the MWL/IIRO located at  suite 300 at 360 South

Washington Street, Falls Church, Virginia.  The offices of these branches of these organizations were

searched pursuant to warrants issued in this District in March 2002.

13.      Sana-Bell, Inc, is a District of Columbia Corporation established on July 28 , 1989.  As

is discussed below in paragraph 16, it appears that Sana-Bell was established to generate funds for the

operations of a Virginia non-profit corporation known as the International Relief Organization (IRO),

which was the "United States arm" of IIRO.  At the time, IRO was operated out of an office at 360 S.

Washington St. in Falls Church, Virginia by Dr. Sulaiman bin Ali Al-Ali, who, according to a letter

written by Dr. Abdullah Al-Obaid, the Secretary General of the Muslim World League in Saudi Arabia,

was a member of IIRO's Executive Committee in Jeddah, Saudi Arabia.  I have reviewed a portion of

the Al-Obaid letter which was cited in a pleading filed in the civil lawsuit discussed below in paragraph

15.

   14.  The articles of incorporation for BMI, Inc. show that Soliman Biheiri, who was then an

Egyptian citizen visiting the United States on a tourist visa, formed an Islamic investing firm on March

19, 1986, which became known as Bait ul-Mal, Inc. (BMI, Inc.).  Uzra Zeya in the article "Islam in

America: How US Islamic Financial Institutions Provide Interest Free Services" in the March 1990

edition of Washington Report on Middle Eastern Affairs, described BMI as operating as an investment

bank with customers both in the US and abroad focusing its resources in real estate and construction

projects in the New Jersey, Boston and Washington, DC area.  Initially, the article stated, BMI attracted

mostly overseas investors from the Middle East.

   15.  In a deposition conducted in conjunction with a civil suit filed in Federal District Court

in the District of Maryland, a transcript of which I have reviewed, Biheiri testified that BMI was in

existence from 1985 through October 1999.   New Jersey corporate records indicate that the last annual

report filed by BMI was dated April 11, 1997.  According to the corporate records and his deposition

testimony, Bihieri was the President and sole director of BMI, Inc.

   C.  Sana-Bell's Investments in BMI

   16.  In the same deposition Biheiri testified that concurrently with the establishment of the

IRO office in Virginia, Al-Ali told him that he (Al-Ali) was to receive $10 million dollars from IIRO in

Jeddah, Saudi Arabia, which was earmarked to be given to Sana-Bell, Inc. and invested. The return on

the investment to be used to operate IRO, the United States branch of IIRO.

   17.  According to the complaint in the civil lawsuit, during  the years 1992 through 1998,

Sana-Bell, Inc. invested $3.7 million with BMI or one of its affiliates (all Biheiri controlled companies). The plaintiff in the civil lawsuit, Sana-Bell, Inc., the investment arm of IIRO,, was in effect a subsidiary or affiliate of IIRO. The basis of its lawsuit was that BMI had unlawfully disbursed Sana-Bell's investment in BMI at the direction of IIRO officer Suliman Al Ali. Sana-Bell was IIRO's investment arm. Thus, the victim of the fraud (Sana-Bell) and the supposed perpetrator of the fraud (IIRO) were the same.

18.     In the course of the lawsuit, Sana-Bell, Inc. obtained a judgment in the amount of $2.3 million against BMI Leasing, Inc., BMI Real Estate Development, Inc., Soliman S. Biheiri and Suliman Al-Ali. Significantly, Sana-Bell never collected on its judgment. The disposition of Sana-Bell's investment in BMI was never disclosed.

### D.     BMI's Other Connections to the Funding of Terrorism

19.     My investigation demonstrates that BMI and its affiliates may have transferred funds to or for terrorists. I am aware that BMI made or conducted financial transaction with persons who were or are now Specially Designated Terrorists or Specially Designated Global Terrorists, including Yassin Kadi, Mousa Abu Marzook and Mohammad Salah. Most of the transactions for which we currently have evidence occurred prior to these designations.

20.     Under the provisions of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §1701, *et seq.*, the President of the United States may take actions under IEEPA to deal with any "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Accordingly, on January 23, 1995, the President issued Executive Order (EO) 12947 declaring a national emergency regarding the "grave acts of violence committed by foreign terrorists that

6

disrupt the Middle East peace process and constitute an unusual and extraordinary threat to the national security." On January 25, 1995, the Department of the Treasury, Office of Foreign Assets Control (OFAC), issued a list of persons and groups designated by the President under EO 12947 as "Specially Designated Terrorists" (SDTs) threatening the Middle East peace process or found to be owned or controlled by, or to be acting for or on behalf of, these terrorist organizations, including the Islamic Resistance Movement (aka HAMAS).  Subsequently, on August 27, 1995, Mousa Abu Marzook was named an SDT.  The effect of this designation was to make it illegal to deal in property in which Mousa Abu Marzook has an interest or make any contribution of goods or services to Marzook.

21.     Marzook is the self-professed head of the political branch of HAMAS.  In addition, in extradition proceedings against Marzook in the spring of 1996, the United States District Court for the Southern District of New York found probable cause to believe that HAMAS was the perpetrator of numerous acts of terrorism, including the April 4, 1994, suicide bombing of a passenger bus in Afula, Israel, which killed eight civilian passengers and seriously wounded 44 civilians and two Israeli soldiers, and the April 13, 1994 bombing of another passenger bus between Afula and Tel Aviv, which killed six persons, including four civilians and one Israeli soldier, and wounded an additional 12 civilians and 18 Israeli soldiers. In the district court proceedings, Abu Marzook expressly acknowledged his position as the leader of the political branch of HAMAS. The court found that Marzook knew about the terrorist activities and promoted them.  The district court's decision is published in In the Matter of the Extradition of Abu Marzook v. Christopher, 924 F. Supp. 565 (S.D.N.Y. 1996).

21.     Yassin Qadi was named a Specially Designated Global Terrorist ("SDGT") by the United States Secretary of Treasury on October 12, 2001, pursuant to Executive Order 13224.

7

On  September 23, 2001, under the authority of IEEPA, the President issued Executive Order 13224,

which declared a national emergency regarding grave acts of terrorism and threats of terrorism,

including the terrorist attacks in New York, Pennsylvania and the Pentagon committed on September 11,

2001. Under Executive Order 13224 any transaction or dealing by United States persons or within the

United States in property or interests in blocked property is prohibited, including but not limited to the

making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons

designated under the order.  Persons named under EO 13224 are referred to as Specially Designated

Global Terrorists. (SDGT).

22.     The Treasury Department Press Release issued on the date of Yassin Qadi's designation

as an SDGT, and newspaper accounts, such as the October 28, 2001 Chicago Tribune article, "Money

Trail Leads to Saudis," written contemporaneous with Qadi's designation, state that Qadi was named an

SDGT on the basis that he and other well-connected Saudi citizens transferred millions of dollars to

Osama bin Laden through charities and trusts like the Muwafaq Foundation, (also known as Blessed

Relief), supposedly established to feed the hungry, house the poor and alleviate suffering.  Qadi was a

trustee of Muwafaq Foundation.

23.     On July 27, 1995, Mohammad Salah was named a Specially Designated Terrorist by the

United States Department of Treasury pursuant to Executive Order 12947. According to the Affidavit of

FBI Special Agent Robert Wright, dated June 8, 1998, Mohammad Salah, a naturalized American

citizen and Chicago area resident, was arrested in Israel, in June 1993 for his membership and

participation in HAMAS. In January of 1995, Salah pled guilty in an Israeli military court to belonging

to HAMAS and illegally channeling funds to the outlawed HAMAS organization, including funds

transferred through a joint bank account held with his wife Azita, at LaSalle Talman Bank in Chicago.

For his crimes, the Israelis sentenced Salah to five years imprisonment. Salah was released from an

8

Israeli prison in November of 1997, at which time he was permitted to return to the United States.

24.      I also know that the defendant had contact information for three persons named as SDGTs pursuant to EO 13224 in the address book maintained on his laptop computer, which was searched pursuant to his consent in mid-July 2003. One of the SDGTs is Yassin Kadi, who I have discussed above. In addition, I am advised by Special Agent Craig Moldowan of BICE, who conducted the review of the computer, that there was contact information, for Yousef Nada and Ghaleb Himmat, both of whom were named as SDGTs on November 7, 2001, on the basis of their roles with Al Taqwa Bank. In the press release that accompanied the designation of Al Taqwa, the Treasury Department stated: "The Al Taqwa group has long acted as financial advisers to al Qaeda, with offices in Switzerland, Lichenstein, Italy and the Caribbean." The contact entry on the computer for Nada reads "YN," however, I recognize the address listed as Youssef Nada's business address in Switzerland.

25.      In addition, the name and telephone number of Sami al-Arian, who is the North American leader of another SDT, the Palestinian Islamic Jihad, was in the defendant's contacts list. PIJ was designated an SDT on January 25, 1995. Sami al-Arian was indicted in the Middle District of Florida on or about February 20, 2003, for material support to terrorism and a RICO conspiracy based upon his activities on behalf of PIJ in the United States.

26.      In addition I have learned the following information regarding the disposition of funds by BMI. FBI Special Agent Robert Wright was conducting an investigation of terrorist financing in 1999, which focused on BMI, Inc., among others. In an affidavit executed March 21, 2002, SA Wright stated that in the course of that investigation he had subpoenaed both Biheiri and a person identified as the Vice President of BMI. In response to those events, a BMI accountant contacted an FBI Agent and stated that "funds the accountant was transferring overseas on behalf of the company may have been used to finance the embassy bombings in Africa." This is a reference to a possible

funding source for the 1998 bombings of the American Embassies in Kenya and Tanzania which killed 223 people.

  E.  <u>Biheiri Is a Risk of Flight</u>

  27.  On May 28, 2002, I participated in an interview of Soliman Biheiri's estranged wife, Mahshid Fatoohi.  She stated that Biheiri was unemployed for approximately two years and  left the United States in June or July 2002.  According to Ms. Fathoohi, Biheiri is employed at the Lichtenstein Bank in Switzerland, and has not returned to the United States since his departure in 2002.  I interviewed the defendant when he arrived in the United States on June 15, 2003.  The defendant told me that his job involves investment banking with high net worth clients and includes significant travel between Egypt and Saudi Arabia.

  29.  She indicated that Biheiri had planned to come to the United States in November 2002, which he postponed until December 2002 and then further postponed until February 2003 Around that time Biheiri called to explain that he did not feel he could come to the United States because he and BMI had been mentioned in the newspapers connecting it to terrorism, or words to that effect.

  30.  A check of the WestNews electronic database shows that between November 2002 and March 2003, there were approximately two dozen stories that mentioned BMI in connection with federal investigations of terrorist financing.

  31.  According to Ms. Fatoohi, she and Biheiri continued to share the same house until he left the country in 2002.  After the events of September 11, 2001, she witnessed Biheiri destroying records.

  32.  Ms. Fatoohi also told me that the defendant's brother, Ahmed Behairy, had told her that he had heard Biheiri state that some day he would come back and take the kids to the Middle

East.  She thought enough of this threat that she went to both the FBI and the Loudon County Police in March 2003.  I spoke to Detective Ron Weckenham, of Loudon County and he stated she was concerned that Biheiri was coming to kidnap the children.  She also told Detective Weckenham that Bihieri had contacted his daughter and arranged for her to obtain a visa from the Saudi Arabian embassy in Washington, D.C. so that he could travel from Cairo to Saudi Arabia., which Detective Weckenham understood to be part of his work.

33.     I again interviewed Ms. Fatoohi on June 13, 2003.  She indicated that Biheiri has called her and stated that he had a new job, was able to provide for the entire family and indicated that he wanted to take the entire family, Ms. Fatoohi and her 5 children, back to an undetermined country in the Middle East.

34.     When I interviewed the defendant he confirmed that he had returned to the United States with the goal of taking his family with him to the Middle East.  He also stated that he had been unemployed for approximately three years before he departed the United States in June 2002.

35.     A check of property records indicated that Biheiri did not own any property.

I declare, under penalty of perjury that the foregoing is true and correct.


_____

David C. Kane
Senior Special Agent
Bureau of Immigration and Customs Enforcement

Executed in Alexandria, VA
August 14, 2003

12