UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (RCC) |
| | ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-CV-6978

**MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL INSURANCE
PLAINTIFFS' MOTION FOR RECONSIDERATION**

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
Phone:  (215) 665-2000
December 5, 2006

### I.   INTRODUCTION

On November 20, 2006, this Court issued a Memorandum & Order granting defendant Saudi American Bank's ("SAMBA") Motion to Dismiss the claims asserted against it in the *Federal Insurance* First Amended Complaint ("FAC"), reasoning that the *Federal Insurance* plaintiffs failed to allege any facts to support an inference that SAMBA "knew or should have known" that the financing it provided for Osama Bin Laden's construction projects in Sudan would aid Bin Laden's al Qaida terrorist network.  *See* November 20, 2006 Memorandum & Order (MDL Dkt. #1918).  This Court also denied plaintiffs' request for leave to amend the Complaint relative to the allegations asserted against SAMBA.  Presuming that any such amendments would merely restate the information contained in the documents filed as exhibits to Plaintiffs' Memorandum of Law in Opposition to SAMBA's Motion to Dismiss, this Court held that further amendments to the FAC would be unproductive.  In support of that finding, the Court held that those exhibits failed to provide support for plaintiffs' allegation that SAMBA was aware of Osama Bin Laden's purported *quid pro quo* with the Sudanese government.

Pursuant to S.D.N.Y. Local Rule 6.3 and Federal Rule of Civil Procedure 59(e), the *Federal Insurance* plaintiffs move for reconsideration of this Court's November 20, 2006 decision denying them leave to amend the FAC.  Plaintiffs respectfully assert that it was erroneous of this Court to assume the character of the allegations plaintiffs would have asserted against SAMBA had they been permitted leave to amend the Complaint.  In fact, had leave been granted, plaintiffs would not have simply restated the content of the exhibits in question, but would have presented specific allegations substantiating SAMBA's knowledge of Osama Bin Laden's terrorist activities in Sudan from 1991-1996, including Bin Laden's collaborative relationship with the radical Sudanese government.  Indeed, plaintiffs respectfully submit that the proposed amendments to the FAC may have reasonably persuaded this Court to deny SAMBA's

Motion to Dismiss under Rule 12(b)(6). Accordingly, the *Federal Insurance* plaintiffs respectfully request that this Court grant plaintiffs leave to amend their allegations against SAMBA.

## II.     ARGUMENT

### A.     Court Committed Error By Assuming The Character Of The Plaintiffs' Allegations Against Saudi American Bank

Pursuant to Local Rule 6.3 of the Southern District of New York and Rule 59(e) of the Federal Rules of Civil Procedure, the *Federal Insurance* plaintiffs move for reconsideration of this Court's Order granting SAMBA's Motion to Dismiss and further denying plaintiffs' request for leave to amend the FAC. A motion for reconsideration under Local Rule 6.3 or Rule 59(e) is appropriate in those circumstances in which the court has overlooked relevant data or case law, which, had it been considered, might have reasonably altered the result. *In Re: Terrorist Attacks on September 11, 2001*, 2006 U.S. Dist. LEXIS 11741, at *6 (S.D.N.Y. 2006)  A motion for reconsideration may also be granted to "correct a clear error or prevent manifest injustice." *Id.* (citing *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983) (stating that the major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.")). *See also* 11 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 2810.1 (2006).

Reconsideration of the Court's Order denying plaintiffs leave to amend their allegations against SAMBA is appropriate under the foregoing standards. In particular, the assumption underlying that decision – that plaintiffs would merely restate the information contained in the exhibits to their SAMBA opposition if permitted leave to amend – is incorrect. In fact, if permitted leave to amend their allegations against SAMBA, plaintiffs would present particularized allegations to support their claim that SAMBA knew its financial partnerships with

2

Osama Bin Laden would materially benefit and substantially assist al Qaida. Plaintiffs submit that such allegations might alter this Court's reasoning in relation to SAMBA's Motion to Dismiss. The allegations plaintiffs would offer if permitted leave to amend include the following:

1. During the early to mid-1990's, the support and safe haven Osama Bin Laden and al Qaida received from Sudan's ruling National Islamic Front ("NIF") and its leader Hassan al Turabi were directly dependent upon, and made possible by, Bin Laden's access to his personal and family fortunes, and ability to hold his assets in stable currencies in financial institutions outside of Sudan.

2. Shortly after Bin Laden and al Qaida relocated to Sudan, the international community began imposing sanctions on Sudan based on the NIF's role in sponsoring terrorism, including its sheltering and sponsorship of Bin Laden and al Qaida.

3. The international sanctions imposed on Sudan severely damaged Sudan's currency and economy, and thereby threatened the NIF's control over the country.

4. As a result of the economic problems the international sanctions programs posed to the NIF regime, the safe haven and support it provided to Bin Laden and al Qaida increasingly depended upon Bin Laden serving as a personal financier of the NIF, and provider of construction services to the Sudanese government.

5. As reported in the al-Quds al-Arabi newspaper, Bin Laden served as "a moving bank that helped al-Turabi's government and its deteriorating economy, particularly after the United States and the United Nations declared that Sudan was one of the countries that supported and harbored international terrorism."

6. In order to sustain al Qaida's symbiotic relationship with the NIF, Bin Laden performed various infrastructure improvements within Sudan on behalf of the NIF between 1991 and 1996, for which Bin Laden did not receive compensation.

7. In return for the construction services and loans Bin Laden provided to the Sudanese government, the NIF lavished protection and logistical support upon Bin Laden's al Qaida organization, granted bin Laden land for training camps throughout Sudan, and assisted Bin Laden in establishing relationships with other terrorist organizations and supportive foreign regimes.

8. Because the safe haven and sponsorship provided by Sudan to al Qaida were dependent upon the construction services and other support Bin Laden provided to the Sudanese regime, as described above, that safe haven and support would not have been possible without the financing and other support SAMBA provided for those projects.

9. At the time SAMBA entered into its financial partnerships with Osama Bin Laden relative to the aforementioned construction projects in the Sudan, Bin Laden's terrorist ambitions and status as the world's foremost terrorist financier and organizer were the subject of countless governmental and media reports, and widely known within Saudi Arabia and the Arab world.

10. At the conclusion of the conflict with the Soviet Red Army in Afghanistan in 1989, Bin Laden returned to Saudi Arabia, where he was greeted as a hero and prominent public figure as a result of his role as a leader of the mujihadeen forces in Afghanistan. Upon returning to Saudi Arabia, Bin Laden began giving virulently anti-Western speeches and advocating a broader "jihad" against the perceived enemies of Islam.

11. In 1991, Bin Laden was expelled from the Kingdom of Saudi Arabia due to his extremist activities, an action which was widely reported in Saudi Arabia in light of Bin Laden's notoriety.

12. The first arrest warrant for Bin Laden was issued in 1991, and a series of international sanctions against Bin Laden followed in the ensuing years.

13. In early 1992, Bin Laden and the al Qaida leadership issued a *fatwa* calling for *jihad* against the Western "occupation" of Islamic lands, expressly singling out U.S. forces for attack.

14. In 1993, Sudan's role in providing safe haven and other forms of material support to terrorists, including Bin Laden, prompted the United States Department of State to designate Sudan as a State Sponsor of Terrorism under the Export and Administration Act.

15. In 1993, the Kingdom of Saudi Arabia officially sought the arrest of Bin Laden, who was in Khartoum, Sudan at the time.

16. In 1994, Yemeni Interior Minister Yehia al Motawakkel charged Bin Laden with financing terrorist attacks in Yemen.

17. In 1994, Egyptian authorities accused Bin Laden of underwriting terrorist activities in Egypt and other Arab countries, including Algeria, Tunisia, and Yemen.

18. In 1994, Saudi newspapers reported that the Kingdom of Saudi Arabia stripped Bin Laden of his Saudi citizenship as a result of "his irresponsible behavior that contradicts the interests of Saudi Arabia and harms sisterly countries, and his refusal to obey instructions issued to him."

19. In 1994, the Jordanian press reported that Bin Laden masterminded a failed assassination plot of Jordanian Prime Minister Abdul Salam al Majali and was further suspected of financing terror groups to carry out attacks in Egypt and Jordan.

20. In the 1995 annual report on international terrorism, *Patterns of Global Terrorism – 1995*, the U.S. State Department explained that "Khartoum also permitted Usama bin Laden, a denaturalized Saudi citizen with mujahedin contacts, to use Sudan as a shelter for his radical

Muslim followers and to finance and train militant groups. Bin Laden, who lives in Khartoum and owns numerous business enterprises in Sudan, has been linked to numerous terrorist organizations. He directs funding and other logistical support through his companies to a number of extremist causes."

21.     In 1996, Bin Laden and the al Qaida leadership issued another *fatwa*, again declaring a broad *jihad* against the United States, and calling on Muslims throughout the World to take up arms against America.

22.     Given the widespread media and governmental reporting of Osama Bin Laden's terrorist activities and ambitions between 1989 and 1996, SAMBA, as a Saudi domiciled bank, must have known that its financial partnership with Bin Laden would substantially and materially assist Bin Laden in sustaining al Qaida and maintaining al Qaida's symbiotic relationship with the NIF.

As the foregoing demonstrates, it was publicly known that a *quid pro quo* existed between Osama Bin Laden and the Sudanese government when he moved to that country from Saudi Arabia. From 1991 to 1996, the NIF regime permitted Bin Laden to build his global terrorist network, establish al Qaida training camps in Sudan, set up commercial enterprises to move assets and generate revenues, and to use Sudan's state sovereignty to shield al Qaida's operations. In exchange for this refuge, Bin Laden provided extensive financial support to the NIF regime and invested heavily in businesses and construction projects in Sudan, many of which were financed by SAMBA. Moreover, it was during this time period that Bin Laden's terrorist ambitions and status as the world's foremost terrorist financier and organizer became widely known within Saudi Arabia and the Arab world. To suggest that SAMBA was unaware that it was providing critical financial and logistical support to al Qaida's global terrorist network when it financed Bin Laden's construction projects in Sudan is simply not credible.

**III.    CONCLUSION**

        For the reasons stated above, the *Federal Insurance* Plaintiffs respectfully request that this Court grant plaintiffs leave to amend the First Amended Complaint.

                                      Respectfully submitted,

                                      COZEN O'CONNOR

Dated: December 5, 2006          BY:  /s/  J. Scott Tarbutton, Esquire
                                                       Stephen A. Cozen, Esquire
                                                       Elliott R. Feldman, Esquire
                                                       Sean P. Carter, Esquire
                                                       J. Scott Tarbutton, Esquire
                                                       1900 Market Street
                                                       Philadelphia, PA  19103
                                                       Tele: (215) 665-2000
                                                       Fax:  (215) 665-2013

                                                       Attorneys for *Federal Insurance* Plaintiffs

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 5, 2006, the foregoing Notice of Motion for Reconsideration and the Memorandum of Law in Support of the *Federal Insurance* Plaintiffs' Motion for Reconsideration was filed with the Court's electronic filing system. Notice of the filing will be sent to all counsel of record electronically. All parties may access the filing through the Court's system.

                                                     /s/ J. Scott Tarbutton, Esq.
                                                 J. Scott Tarbutton, Esq.