**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

IN RE TERRORIST ATTACKS ON                    Civil Action No.:
SEPTEMBER 11, 2001                            03 MDL 1570 (RCC)

--------------------------------------------------------x

This document relates to:
> *Estate of John P. O'Neill, Sr., et al. v. Republic of Iraq, et al., Civil Action No.*
> *04- CV- 1076 (RCC)*

### O'NEILL PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL ALLEGATIONS AS TO DEFENDANT THE REPUBLIC OF IRAQ

Counsel for the above captioned Plaintiffs hereby provide a more definite statement/additional allegations ("More Definite Statement") as to the above referenced Defendant.  This statement, annexed hereto as Exhibit 1, is hereby incorporated into the Complaint(s) in the above referenced action(s), pursuant to the Court's Case Management No. 1, dated March 10, 2004, and Case Management Order No. 2, dated June 16, 2004, paragraph 13, the Stipulated Scheduling Order entered on November 30, 2006 (as amended), and Attachment 1 to the letter of January 1, 2007 of Timothy Mills, Esquire.

Dated: New York, N.Y.
       March 7, 2007

                                  Respectfully submitted,


                                  _____
                                  Jerry S. Goldman, Esq. (JG-8445)
                                  Frederick J. Salek, Esq. (FS-8565)
                                  LAW OFFICES OF JERRY S. GOLDMAN
                                     & ASSOCIATES, P.C.
                                  111 Broadway, Suite 1305
                                  New York, N.Y. 10006
                                  212.242.2232

                                  *Attorneys for the Plaintiffs*

# EXHIBIT 1

**O'NEILL PLAINTIFFS' MORE DEFINITE STATEMENT/ADDITIONAL
ALLEGATIONS AS TO DEFENDANT THE REPUBLIC OF IRAQ**

**I.      GENERAL OBJECTION.**

The O'Neill plaintiffs object to the requests of the defendant, Republic of Iraq, as
set forth in Attachment 1 to the letter of Timothy Mills, Esq, dated January 1, 2007
("Request")[1] as the responses sought are beyond the scope of Fed. R. Civ. P. 12 (e) which
mandate a more definite statement only where the "pleading to which a responsive
pleading is permitted is so vague or ambiguous that a party cannot reasonably be required
to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First
Consolidated Complaints (including any exhibits to such pleadings), the RICO Statement
and Part I of this More Definite Statement (collectively the "pleadings") are not so
"vague and ambiguous" so that the defendant, Republic of Iraq, "cannot reasonably be
required to frame a responsive pleading" in accordance with the notice pleading standards
of Fed. R. Civ. P. 8 (a), 8 (e) and 8 (f).  Accordingly, plaintiffs submit that Rule 12(e) is
to be viewed narrowly, in light of the fact that pleadings are to be construed liberally to
do substantial justice. *Sanchez v. New York City*, 1992 U.S. Dist. LEXIS 9844 (E.D.N.Y.
1992) (motions under Fed. R. Civ. P. 12(e) are disfavored as they often add little that
discovery can not provide and simply create delay); *Advanced Communs. Techs., Inc. v.
Li*, 2005 U.S. Dist. LEXIS 30135, 7-8 (D.N.Y. 2005) (Sweet, J) (the Rule 'is designed to
remedy unintelligible pleadings, not to correct for lack of detail' and a motion pursuant to
Rule 12(e) should not be granted 'unless the complaint is so excessively vague and
ambiguous as to be unintelligible and as to prejudice the defendant seriously in

---

[1] The Request is attached hereto and incorporated herein as Exhibit "A."

attempting to answer it.'  Motions for a more definite statement are generally disfavored because of their dilatory effect).  Rule 12(e)'s goal is to strike at unintelligibility rather than lack of detail (*FDIC v. Wise*, 758 F. Supp. 1414, 1418 (D. Colo. 1991)) and is not a substitute for discovery.  *Bower v. Weisman*, 639 F. Supp. 532, 538 (S.D.N.Y. 1986) (discovery is appropriate means to deal with general allegations); *Marx v. Gumbinner*, 855 F.2d 783, 792 (11th Cir. 1988).

We suggest that the pleadings appropriately contain the short and plain statements of jurisdiction, claims, and relief requested.  The Rules require that pleadings only provide notice to the defendant of the claims in the form of general allegations rather than detailed fact pleading.  *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S. Ct. 1160 (1993) (rules do not require a claimant to set out detailed facts); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957).

Moreover, to the extent that the requests inquire about the source of the law on which certain claims are based and/or upon which jurisdiction is predicated, it is beyond what is required under either the rules of pleading or Rule 12(e).  The claims asserted in the O'Neill causes of action and jurisdiction arise out of common law sources based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action and basis's for jurisdiction, brought against The Republic of Iraq.

Page 4

The Requests for a More Definite Statement tendered by the Republic of Iraq go beyond the scope of what is required in the form of pleadings, and what is mandated under Rule 12(e) and are, accordingly, objected to.

II.   **MORE DEFINITE STATEMENT- RESPONSE TO DEFENDANT'S REQUEST.**

Notwithstanding the foregoing, without waiving any of such and other objections, the O'Neill Plaintiffs submit the following More Definite Statement:

A.   **RICO ALLEGATIONS IN GENERAL.**

1.   The unlawful conduct is in violation of 18 U.S.C. secs. 1962(b), 1962(c) and/or 1962(d).

2.   The name of the defendant to whom this Statement pertains is The Republic of Iraq.  The alleged misconduct and basis for liability is set forth in Parts II-A and B, and Part III below as well as in the pleadings.

3.   All known wrongdoers are named as defendants in *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.* (SDNY 04-CV-1076 (RCC)), as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) ("Kingdom"), *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp, et al.* (SDNY 04-CV-1923 (RCC)) ("Al Baraka"), other cases brought by the other plaintiffs in *In Re Terrorist Attacks on September 11, 2001* (03-MDL-1570 (RCC)) ("co-plaintiffs"), and others.  The alleged misconduct and basis for liability is set forth in Parts II.A. and B., and Part III below as well as in the pleadings.  Plaintiffs have and will separately file RICO and More Definite Statements with respect to the misconduct of certain of the other defendants as is applicable.  Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery or otherwise.   Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified and after discovery or other information is obtained.

4.   The name of each victim is indicated on the More Definite Statement, Victims List ("Victims List") which is attached hereto and incorporated herein as Exhibit "B."  The victims consist of (1) all spouses, children, parents, siblings, or heirs of any individual who died at the World Trade Center in New York, NY, the Pentagon

Building in Arlington County, Virginia, or in the airliner crash in Shanksville, Pennsylvania, as the result of terrorist attacks on September 11, 2001 (with the events at the World Trade Center in New York, N.Y., the Pentagon Building in Arlington County, Virginia, and the airliner crash in Shanksville, Pennsylvania, on September 11, 2001, and activities related thereto, collectively referred to herein as "Attack" or "Attacks"); and (2) all legal representatives (including executors, estate administrators and trustees) entitled to bring legal action on behalf of any individual who died as the result of terrorist attacks on September 11, 2001; but excluding (3) all individuals, and all spouses, children, parents, siblings, and legal representative of individuals identified by the Attorney General of the United States or otherwise shown to have perpetrated, aided and abetted, conspired in regard to, or otherwise supported the terrorist attacks of September 11, 2001.  The Victims List sets forth the names of the decedents killed by the attackers, with the category of "victims" further including their spouses, children, parents, siblings or heirs as set forth above.

The manner in which the victims were injured consists of death, suffering caused by death, and all economic damages resulting from such deaths, and actions of the defendants and their co-conspirators as described herein, including, without limitation, in this Section II of this More Definite Statement.  The injuries are further described in paras. 14-16, below.

5.      Please find below a description, in detail, of the pattern of racketeering activity for each RICO claim:

    A.      The predicate acts and statutes in question include:

- Conspiracy to commit murder - NY  Penal § 105.15; NY  Penal § 125.25 (xi)

- Conspiracy to commit arson - NY  Penal § 105.15; NY  Penal § 150.15

- Fraud with Identification - 18 U.S.C. § 1028

- Mail Fraud - 18 U.S.C. § 1341

- Wire Fraud - 18 U.S.C. § 1343

- Financial Institution Fraud - 18 U.S.C. §1344

- Relating to Unlawful Procurement of Citizenship or Naturalization - 18 U.S.C. § 1425

- Relating to the Unlawful Reproduction of Naturalization or Citizenship Papers - 18 U.S.C. § 1426

- Relating to the Sale of Naturalization or Citizenship Papers - 18 U.S.C. § 1427

- Obstruction of Justice - 18 U.S.C. § 1503

- Obstruction of a Criminal Investigation - 18 U.S.C. § 1510

- Obstruction of State or Local Law Enforcement - 18 U.S.C. § 1511

- Travel Act - 18 U.S.C. § 1952

- Fraud or Misuse of Visa Permits or Other Documents - 18 U.S.C. § 1546

- Illegal Transactions in Monetary Instruments - 18 U.S.C. § 1956

- Money Laundering - 18 U.S.C. § 1957

- Defrauding the United States Government - 18 U.S.C. § 371

- Travel Act - 18 U.S.C. § 1952

- Filing false or Materially False Tax Returns - 26 U.S.C. § 7206(1), (2)

- Engaging in a corrupt endeavor to impede and impair the due administration of the internal revenue laws - 26 U.S.C. § 7212(a)

- Providing Material Support of Terrorism - 18 U.S.C. § 2332(b)(g)(5)(B), 18 U.S.C. § 2339A, 18 U.S.C. § 2339B, 18 U.S.C. § 2339C

B.    The dates of, participants in and a description of the facts surrounding the predicate acts include the following, and as set forth elsewhere herein and in the pleadings:

| **DATES** | **PARTICIPANTS** | **FACTS** |
|---|---|---|
| (i) mid-1990s to 9/11/2001 | The Republic of Iraq and/or Agencies and agents | The Republic of Iraq and/or its Agencies and/or its agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Republic of Iraq and/or Agencies and agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or |

management of the operation of the Enterprise itself.

Throughout this period, The Republic of Iraq and/or its Agencies and/or its agents conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.

(ii)  Late 1990s to 9/11/2001

The Republic of Iraq and/or Agencies and agents

The Republic of Iraq and/or its Agencies and/or its agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Republic of Iraq and/or Agencies and agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

The Republic of Iraq and/or Agencies and agents undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an

| | | |
|---|---|---|
| | | act of deadly aggression against the United States in the near future, using the resources and support supplied by The Republic of Iraq and/or its Agencies and/or its agents. |
| (iii)  Mid-1990s to 9/11/2001 | The Republic of Iraq and/or Agencies and agents | The Republic of Iraq and/or its Agencies and/or its agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Republic of Iraq and/or its Agencies and/or its agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.<br><br>The Republic of Iraq and/or its Agencies and/or its agents agreed to form and associate with the Enterprise and agreed to commit more than two predicate acts, *i.e.,* multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |
| (iv)  Mid-1990's to 9/11/2001 | The Republic of Iraq | The Republic of Iraq and/or its Agencies and/or its agents, agreed to form and associate themselves with the Enterprise and agreed to commit more than two predicate acts, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

| (v) Mid-1990's to 9/11/2001 | The Republic of Iraq | In violation of 18 U.S.C. § 1956, on multiple occasions the Republic of Iraq, directly and/or through its Agencies and/or agents conspired to an did conduct financial transactions represented the proceeds of previous instances of violations of 18 U.S.C. § 1956, by moving or authorizing the movement of funds through a series of transactions involving, the charities and/or for-profit corporations owned by or related The Republic of Iraq and/or its Agencies and/or its agents. |
|---|---|---|

The actions of the other participants are as set forth in the various pleadings, including, without limitation, More Definite Statements; RICO Statements; and complaints, (including exhibits), all as amended from time to time.

The individual times, places, and contents of the alleged misconduct are not all particularly known at this time.

C.    Any other particularities as described in the RICO Statement Instructions regarding fraud are as set forth in Part II(B)  herein and the other pleadings.

D.    The predicate acts are not based upon a criminal conviction.

E.    Civil litigation has not yet resulted in a judgment regarding the predicate acts.

F.    The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Enterprise's regular way of doing business.

G.    The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services, money laundering, tax evasion and the provision of terrorist recruits, forged documents, weapons and explosives, allowed certain of the defendants, specifically including The Republic of Iraq and/or Agencies and agents, to surreptitiously provide funds and other support to terrorist organizations, including al Qaida, Radical Muslim

Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attacks.

6.    A description of the Enterprise is as follows:

*A description of the Enterprise in General and the names of those who participated in it.*

A.    The Enterprise ("Radical Muslim Terrorism" or "al Qaida" or "International Islamic Front for the Jihad Against Jews and Crusaders") ("Enterprise") is comprised of the defendants named in the First Consolidated Complaint, docket no. 1568 and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) (First Consolidated Complaint, docket no. 1569) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)) (First Consolidated Complaint, docket no. 1570, those named by the co-plaintiffs and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Consolidated Complaint, docket no. 1568, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), docket no. 1569 and *Estate of John P. O'Neill, et al. v. Al Baraka Investment and Development Corp, et al.* (SDNY 04-CV-1923 (RCC)), docket no. 1570, those named by the co-plaintiffs, and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Consolidated Complaint, docket no. 1568, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), docket no. 1569 and *Estate of John P. O'Neill, et al. v. Al Baraka Investment and Development Corp, et al.* (SDNY 04-CV-1923 (RCC)), docket no. 1570, those named by the co-plaintiffs, and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*The Structure, purpose, function, course of conduct and origins of the Enterprise.*

B.    The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was

intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. The Republic of Iraq and/or Agencies and agents fit neatly into this framework by raising funds for and providing funding to and otherwise providing material support for the Enterprise and for the members of the Enterprise who engaged in the Attack.

The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to and provide terrorist recruits, forged documents, weapons and explosives and to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including The Republic of Iraq and/or Agencies and agents, and illegal activity to generate material support to continue its terrorist operations.

C.     The Republic of Iraq and/or Agencies and agents was not an employee, officer or director of the Enterprise, based upon present information

available.  The Republic of Iraq and/or Agencies and agents is associated with the alleged Enterprise.  The Republic of Iraq is a member of the Enterprise, and is separate and distinct from the Enterprise.  The Republic of Iraq and/or Agencies and agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

D.    The Republic of Iraq, and and/or Agencies and agents are associated with the alleged enterprise.

E.    The Republic of Iraq, and and/or Agencies and agents are members of the Enterprise, and is separate and distinct from the Enterprise.

F.    The Republic of Iraq, and and/or Agencies and agents intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack.

7.    The pattern of racketeering activity conducted by The Republic of Iraq and/or Agencies and agents is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the Attack.

8.    The Enterprise conducts terrorism all over the world; the racketeering activity conducted by The Republic of Iraq and/or Agencies and agents supports and funds that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, and the provision of forged documents, weapons and explosives, all of which activities were supported or funded by the racketeering activities described herein.

9.    The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.   The Enterprise, and the racketeering activities conducted by The Republic of Iraq and/or Agencies and agents, relies on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.  The Enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.  Furthermore, activities and actions of the Enterprise affect interstate commerce as demonstrated by the Attack itself, which caused damage to the United States economy and property and businesses situate therein.  *See Rasul v. Bush*, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the Attack "severely damaged the United States economy").

11.     The Republic of Iraq and/or Agencies and agents acquired or maintained an interest or control in the Enterprise.

12.     With respect to the alleged violation of 18 U.S.C. § 1962(c), the following is asserted:

    A.     Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders "employs" certain individuals, only a few of whose identities are known, including defendant Osama Bin Ladin.

    B.     The Enterprise, Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and the Crusaders, is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint and any additional complaints filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Al Baraka, et al.* (SDNY 04-CV-1923 (RCC)), among others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  The liable persons are the enterprise and that which makes up the enterprise.

13.     The conspiracy which violates 18 U.S.C. §1962(d) is described as follows:

    A.     The history of the conspiracy, in violation of 18 U.S.C. § 1962(d), behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including The Republic of Iraq and/or Agencies and agents, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.  They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims.  Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, also collected money from employees of corrupted charities.  The money raised from these various sources (the "Funds"), including The Republic of Iraq and/or Agencies and agents, were used by the Enterprise to accomplish its goals, with the knowledge and awareness of The Republic of Iraq and/or Agencies and agents, of both those goals and the uses to which the Funds were put.

    B.     The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.  The Funds enabled the Enterprise to identify, recruit, groom and

train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses.

C.     The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives. The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

D.     The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers, including the Republic of Iraq and/or Agencies and agents, who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the material support and funds supplied by participants and conspirators like The Republic of Iraq and/or Agencies and agents. Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including The Republic of Iraq and/or Agencies and agents. In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by The Republic of Iraq and/or Agencies and agents. The Republic of Iraq and/or Agencies and agents, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. The Republic of Iraq and/or Agencies and agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. The Republic of Iraq and/or Agencies and agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. The Republic of Iraq and/or Agencies and agents also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

14.   The injuries to business or property suffered by the O'Neill Plaintiff's resulting from the September 11th attack include economic damages, including but not limited to, pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Additionally, the Attack itself was intended to destroy the leading symbol of the United States' leadership in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiff's jobs, businesses, and livelihoods.

15.   Plaintiffs' damages – the loss of life and the damages to business and property related thereto that resulted from the actions of the defendants and their co-conspirators, are a direct causal relationship to the violation of the RICO statute, and are not a derivative claim of damage to a third party. The Plaintiffs, both named and as a class, as described in the complaint, as amended, were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," (that is, terrorism, the culmination of which was the Attack).

16.   Each defendant is jointly and severally liable for all damages sustained by each plaintiff, as set forth in Exhibit B hereof, subject to the description of victims set forth in paragraph 4 hereof, for the loss of life, and the economic damages, including but not limited to, pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the plaintiffs'/decedents' households. The damages for the plaintiffs' collectively are to be determined at trial, and are in excess of $10,000,000,000.00 prior to trebling, punitive damages, interest, legal fees, and the costs of this suit.

17.   The federal causes of action against The Republic of Iraq are as follows: Count Eight, Anti-Terrorism Act, 18 U.S.C. §§ 2331, 2333, *et. seq*.; Count Nine, RICO, 18 U.S.C. §§ 1962(b),1962(c), 1962(d).

18.   The state causes of action are as follows: Count One, Wrongful Death; Count Two, Survival; Count Three, Action for Economic Damages; Count Four, Intentional Infliction of Emotional Distress; Count Five, Loss of Consortium; Count Six, Loss of Solatium; Count Seven, Conspiracy; Count Ten, Punitive Damages .

19.   The Republic of Iraq and/or Agencies and agents has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. The Republic of Iraq and/or Agencies

and agents conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  The Republic of Iraq and/or Agencies and agents conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself.

20.     Plaintiffs hereby incorporate herein all allegations, claims and counts contained in Plaintiffs' First Consolidated Complaint, as amended, along with the Consolidated Complaints filed in the *Kingdom* and *Al Baraka* matters (including any supplemental pleadings filed in such cases), as well as the pleadings (including, without limitation, complaints, RICO Statements and More Definite Statements and all exhibits to such pleadings), filed by the co-plaintiffs.

## B. ALLEGATIONS IN GENERAL AS TO THE REPUBLIC OF IRAQ.

## INTRODUCTION

21.     Prior to the commencement of discovery, the O'Neill Plaintiffs will set forth some of the publicly available evidence on the Iraq-al Qaida relationship and further set forth some of the evidence available in the public domain addressing the relationship between and among the Saddam Hussein regime ("Saddam"), Osama Bin Laden, al Qaida, the Taliban, Sudan's National Islamic Front, and other terrorists and terrorist organizations.

22.     As the debate over the depth of the ties between the Saddam regime and al Qaida rages on, the evidence of such a relationship continues to evolve.  Documents from the Iraqi regime and the Iraqi Intelligence Service continue to be unearthed by U.S. forces on the ground in Iraq.  Translation and analysis by U.S. intelligence, as well as the public, are revealing new insights about Saddam's connections to radical Islamic groups and their mutual disdain for the U.S. and the West.  Interviews with former Iraqi officials under Saddam, including imprisoned Iraqi intelligence agents, further reveal the collaboration between Saddam's intelligence services and certain terror groups.

23.     There presently exists such evidence, and such evidence continues to be discovered.

24.     Such evidence shows, among other things, that Iraq's sponsorship of al Qaida included training in military and intelligence tactics, instruction in the manufacture of explosive devices, technological assistance in the development of weapons of mass destruction, logistic support for terrorist attacks, financial assistance, and offers of safe haven.

25.     The day the 9-11 Commission released their Final Report, Commissioner John Lehman, speaking on the relationship between Iraq and al Qaida and the findings

of the Commission, offered a prophetic warning on the subject in an interview with the Weekly Standard:

> *"There may well be--and probably will be--additional intelligence coming in from interrogations and from analysis of captured records and so forth which will fill out the intelligence picture.  This is not phrased as, nor meant to be, the definitive word on Iraqi Intelligence activities."*

## THE EARLY YEARS OF THE IRAQ-AL QAIDA RELATIONSHIP AND HASAN AL TURABI

26.    According to intelligence reports, contacts between the Iraqi regime and al Qaida began in 1990 with the assistance of the hard-line ideological leader of Sudan's National Islamic Front ("NIF"), Hasan al Turabi.  Shortly after the NIF were able to overthrow the democratically elected government of Prime Minister Sadiq al Mahdi, and on the eve of the first Gulf War, al Turabi reached out to Saddam Hussein in a sign of solidarity.

27.    Indeed, in the days after Iraq's invasion of Kuwait, al Turabi met with Saddam at least twice, according to his cousin Mudawi Turabi.

28.    On October 1, 1990, al Turabi led a delegation of forty Islamic fundamentalist leaders to Jordan to meet with representatives of the Iraqi regime.  Al Turabi served as the spokesman for the meeting and announced to the attendees that Saddam had agreed to release prominent clerics who had been imprisoned by his regime.  Al Turabi further announced that Saddam, who at one time was a leading advocate of secularism, promised to incorporate elements of Islamic law into the Iraqi legal code.

29.    According to a top secret CIA report, internally published on June 21, 2002, a Bin Laden envoy attended the meeting in Jordan, which included leaders of the Muslim Brotherhood.

30.    Following the meeting, al Turabi held a press conference to advise Muslims of their duty to undertake *"a struggle [jihad] to protect their territories and their holy land and their wealth."*  He further warned *"there is going to be all forms of jihad all over the world because it is an issue of foreign troops on sacred ground."*

31.    According to U.S. intelligence, both the Iraqi regime and al Qaida were interesting in pursuing a collaborative relationship with the other.  Bin Laden believed that Iraq could assist in expanding al Qaida's capabilities while Saddam sought al Qaida's help with the shipment of weapons and equipment banned under sanctions imposed by the United Nations.  Indeed, following Iraq's defeat in the 1991 Gulf War, al Turabi would play a key role in facilitating that relationship, initially proposing a non-aggression pact between the parties.

32.    In an October 27, 2003 Memo summarizing intelligence gathered by various U.S. intelligence agencies regarding the relationship between Iraq and al Qaida (the Feith Memo), Undersecretary of Defense for Policy Douglas J. Feith summarized a CIA report on this budding relationship:

> *According to CIA reporting in 1993, National Islamic Front (NIF) leader Hassan al-Turabi helped bin Laden develop a relationship with Iraq.  Bin Laden wanted to expand his organization's capabilities through ties with Iraq.  In a finished report (Al Qaeda in Sudan 1992-1996), CIA maintained that in 1991 Iraq sought Sudan's assistance to establish links to al Qaeda.  At al-Turabi's urging, Bin Laden developed an "understanding" in 1994 with Saddam not to support any anti-Saddam activities. The same source reported that Iraq and Bin Laden agreed to cooperate on unspecified activities.*

33.    Other sources have additionally confirmed al Turabi's important role in the new relationship.  According to U.S. intelligence, the interrogation of a senior Iraqi intelligence officer at the Joint Interrogation Center System in Stuttgart, Germany revealed that al Turabi was instrumental in arranging the Iraqi-al Qaeda relationship, that Iraq sought al Qaeda influence, through its connections with Afghanistan, to facilitate the transshipment of proscribed weapons and equipment to Iraq and, in return, Iraq provided al Qaeda with training and instructors.  This DOD source corroborated the CIA report that al-Turabi helped broker a relationship between bin Laden and the Iraqi regime."

34.    The first meeting between representatives of the Iraqi regime and al Qaeda occurred in 1992.  According to the Feith Memo, senior al Qaida leader Ayman al Zawahiri and IIS deputy director Faruq Hijazi participated in the meeting, the first of many held between 1992 and 1995 in Sudan.

> *4.  According to a May 2003 debriefing of a senior Iraqi intelligence officer, Iraqi intelligence established a highly secretive relationship with Egyptian Islamic Jihad, and later with al Qaeda.  The first meeting in 1992 between the Iraqi Intelligence Service (IIS) and al Qaeda was brokered by al-Turabi.  Former IIS deputy director Faruq Hijazi and senior al Qaeda leader [Ayman al] Zawahiri were at the meeting--the first of several between 1992 and 1995 in Sudan.  Additional meetings between Iraqi intelligence and al Qaeda were held in Pakistan.  Members of al Qaeda would sometimes visit Baghdad where they would meet the Iraqi intelligence chief in a safe house.  The report claimed that Saddam insisted the relationship with al Qaeda be kept secret.  After 9-11, the source said Saddam made a*

> *personnel change in the IIS for fear the relationship would*
> *come under scrutiny from foreign probes.*

35.     Al Zawahiri would later travel to Baghdad in 1998 to meet with Iraqi officials to discuss the establishment of training camps in Iraq.  The Feith Memo stated the following:

> *14.  According to a sensitive reporting [from] a "regular*
> *and reliable source," [Ayman al] Zawahiri, a senior al*
> *Qaeda operative, visited Baghdad and met with the Iraqi*
> *Vice President on 3 February 1998.  The goal of the visit*
> *was to arrange for coordination between Iraq and bin*
> *Laden and establish camps in an-Nasiriyah and Iraqi*
> *Kurdistan under the leadership of Abdul Aziz.*[2]

36.     As the relationship grew with Saddam, Bin Laden reportedly had to overcome internal resistance from members of his terrorist organization, largely because of Saddam's secular ideals.  The CIA referred to this developing internal strife in a report published May 14, 2002.  The Feith Memo summarized the report as follows:

> *5.  A CIA report from a contact with good access, some of*
> *whose reporting has been corroborated, said that certain*
> *elements in the "Islamic Army" of bin Laden were against*
> *the secular regime of Saddam.  Overriding the internal*
> *factional strife that was developing, bin Laden came to an*
> *"understanding" with Saddam that the Islamic Army would*
> *no longer support anti-Saddam activities.  According to*
> *sensitive reporting released in U.S. court documents during*
> *the African Embassy trial, in 1993 bin Laden reached an*
> *"understanding" with Saddam under which he (bin Laden)*
> *forbade al Qaeda operations to be mounted against the*
> *Iraqi leader.*

37.     By the mid 1990's, there was increasing cooperation between the Iraqi Intelligence Service ("IIS") and Bin Laden.  According to U.S. intelligence, the IIS was providing Bin Laden and al Qaida with expert training on sophisticated explosives, including letter bombs and bombs that could be placed on aircraft and detonated by changes in barometric pressure.  Iraqi intelligence's premier explosives expert, Brigadier Salim al Ahmed, was responsible for much of this training and had been personally requested by Bin Laden.  Al Turabi would

---

[2] Al Swahili's visit came during the time that Saddam intensified his defiance of the U.N. inspection.  The United Nations Special Commission ("UNSCOM"), which had been created by the cease-fire agreement following the Gulf War, was demanding access to Saddam's presidential palaces.  Saddam, of course, refused to provide such access.

continue to play a central role in the Iraq-al Qaida relationship during this time. The Feith Memo reported the following:

> 8.  Reporting from a well placed source disclosed that bin Laden was receiving training on bomb making from the IIS's [Iraqi Intelligence Service] principal technical expert on making sophisticated explosives, Brigadier Salim al-Ahmed.  Brigadier Salim was observed at bin Laden's farm in Khartoum in Sept.-Oct. 1995 and again in July 1996, in the company of the Director of Iraqi Intelligence, Mani abd-al-Rashid al-Tikriti.

> 9  . . . Bin Laden visited Doha, Qatar (17-19 Jan. 1996), staying at the residence of a member of the Qatari ruling family.  He discussed the successful movement of explosives into Saudi Arabia, and operations targeted against U.S. and U.K. interests in Dammam, Dharan, and Khobar, using clandestine al Qaeda cells in Saudi Arabia.  Upon his return, bin Laden met with Hijazi and Turabi, among others.

> 10.  The Director of Iraqi Intelligence, Mani abd-al-Rashid al-Tikriti, met privately with bin Laden at his farm in Sudan in July 1996.  Tikriti used an Iraqi delegation traveling to Khartoum to discuss bilateral cooperation as his "cover" for his own entry into Sudan to meet with bin Laden and Hassan al-Turabi.  The Iraqi intelligence chief and two other IIS officers met at bin Laden's farm and discussed bin Laden's request for IIS technical assistance in: a) making letter and parcel bombs; b) making bombs which could be placed on aircraft and detonated by changes in barometric pressure; and c) making false passport [sic].  Bin Laden specifically requested that [Brigadier Salim al-Ahmed], Iraqi intelligence's premier explosives maker--especially skilled in making car bombs--remain with him in Sudan. The Iraqi intelligence chief instructed Salim to remain in Sudan with bin Laden as long as required.

> The time of the visit from the IIS director was a few weeks after the Khobar Towers bombing.  The bombing came on the third anniversary of a U.S. [Tomahawk missile] strike on IIS HQ (retaliation for the attempted assassination of former President Bush in Kuwait) for which Iraqi officials explicitly threatened retaliation.

**THE AL SHIFA CHEMICAL PLANT IN SUDAN – IRAQ'S CONNECTIONS TO THE SUDAN, OSAMA BIN LADEN AND CHEMICAL WEAPONS**

38.     On August 7, 1998, al Qaida terrorists attacked the U.S. embassies in Kenya and Tanzania, killing 257 people, including 12 Americans, and wounding nearly 5,000.  The Clinton Administration determined within five days that al Qaida was responsible for the attacks and moved swiftly to strike targets in Afghanistan.  A second strike would occur in Sudan on the al Shifa pharmaceutical plant in Khartoum, Sudan.

39.     Prior to the U.S. strike on the plant, the CIA had been monitoring the plant for nearly two years, beginning in 1996.  The plant was known to have ties to Sudan's Military Industrial Corporation, and the CIA had gathered intelligence on the budding relationship between Iraqi chemical weapons experts and the plant's top officials.  The intelligence included information that several top chemical weapons specialists from Iraq had attended ceremonies to celebrate the plant's opening in 1996.  Moreover, the National Security Agency had intercepted telephone calls between Iraqi scientists and the plant's general manager.  Iraq also reportedly admitted to having a $199,000 contract with al Shifa for goods under the oil-for-food program, although no goods were ever delivered.

40.     In the spring of 1998, the CIA secretly gathered a soil sample from 60 feet outside of the plant's main gate.   The sample showed high levels of O-ethylmethylphosphonothioic acid, known as EMPTA, which is a key ingredient for the deadly nerve agent VX.  A senior intelligence official, when asked which countries make VX using EMPTA, responded:

> *"Iraq is the only country we're aware of.  There are a variety of ways of making VX, a variety of recipes, and EMPTA is fairly unique."*

41.     On August 20, 1998, the al Shifa plant was destroyed by six Tomahawk missiles. John McWethy, national security correspondent for ABC News, reported the story on August 25, 1998:

> *Before the pharmaceutical plant was reduced to rubble by American cruise missiles, the CIA was secretly gathering evidence that ended up putting the facility on America's target list.   Intelligence sources say their agents clandestinely gathered soil samples outside the plant and found, quote, "strong evidence" of a chemical compound called EMPTA, a compound that has only one known purpose, to make VX nerve gas.*

> *The U.S. had been suspicious for months, partly because of Osama bin Laden's financial ties, but also because of*

*strong connections to Iraq. Sources say the U.S. had intercepted phone calls from the plant to a man in Iraq who runs that country's chemical weapons program.*

42.     Several top Clinton Administration officials cited an Iraq-al Qaida connection as the basis for the retaliatory U.S. strikes against the al Shifa pharmaceutical plant in Sudan. Undersecretary of State Thomas Pickering, one of several Clinton advisers involved in planning the strikes, briefed reporters on August 25, 1998.

> *Q: Ambassador Pickering, do you know of any connection between the so-called pharmaceutical plant in Khartoum and the Iraqi government in regard to production of precursors of VX?*
>
> *PICKERING: Yeah, I would like to consult my notes just to be sure that what I have to say is stated clearly and correctly. We see evidence that we think is quite clear on contacts between Sudan and Iraq. In fact, al Shifa officials, early in the company's history, we believe were in touch with Iraqi individuals associated with Iraq's VX program.*

43.     Ambassador Bill Richardson, in an August 30, 1998 appearance on CNN's "Late Edition with Wolf Blitzer," called the targeting *"one of the finest hours of our intelligence people."*

> *"We know for a fact, physical evidence, soil samples of VX precursor -- chemical precursor at the site," said Richardson. "Secondly, Wolf, direct evidence of ties between Osama bin Laden and the Military Industrial Corporation -- the al Shifa factory was part of that. This is an operation -- a collection of buildings that does a lot of this dirty munitions stuff. And, thirdly, there is no evidence that this precursor has a commercial application. So, you combine that with Sudan support for terrorism, their connections with Iraq on VX, and you combine that, also, with the chemical precursor issue, and Sudan's leadership support for Osama bin Laden, and you've got a pretty clear cut case."*

44.     In a January 23, 1999 article in the *Washington Post*, Richard Clarke, former counterterrorism official under both Clinton and Bush, defended the Clinton Administration's decision to attack the al Shifa plant and was *"sure"* that Iraq had provided a chemical weapons precursor to the al Qaida linked facility in Sudan.

45.     While U.S. intelligence officials disclosed shortly after the missile attack that they had obtained a soil sample from the El Shifa site that contained a precursor of VX

nerve gas, *Clarke said that the U.S. government is "sure" that Iraqi nerve gas experts actually produced a powdered VX-like substance at the plant* that, when mixed with bleach and water, would have become fully active VX nerve gas.

46.   Clarke said U.S. intelligence does not know how much of the substance was produced at El Shifa or what happened to it. But *he said that intelligence exists linking bin Laden to El Shifa's current and past operators, the Iraqi nerve gas experts* and the National Islamic Front in Sudan.

47.   Given the evidence presented to the White House before the air strike, Clarke said, the president *"would have been derelict in his duties if he didn't blow up the facility."*

48.   Also on January 23, 1999, Sandy Berger, then Clinton's national security advisor, stated the following in an op-ed in the *Washington Times*:

> *"To not have acted against this facility would have been the height of irresponsibility," he argued. The Clinton administration had "information linking bin Laden to the Sudanese regime and to the al Shifa plant."*

> *"We had physical evidence indicating that al Shifa was the site of chemical weapons activity."*

> *"Other products were made at al Shifa. But we have seen such dual-use plants before--in Iraq. And, indeed, we have information that Iraq has assisted chemical weapons activity in Sudan."*

49.   On March 23, 2004, former Clinton secretary of defense, William Cohen, affirmed the Baghdad-Sudan connection in testimony before the 9-11 Commission.  Cohen testified that an executive from the al Shifa plant traveled to Baghdad to meet with the father of the Iraqi nerve gas program, Emad al Ani:

> *"But to give you an example, this particular facility, according to the intelligence we had at that time, had been constructed under extraordinary security circumstances, even with some surface-to-air missile capability or defense capabilities; that the plant itself had been constructed under these security measures; that the -- that **the plant had been funded, in part, by the so-called military industrial corporation; that Bin Ladin had been living there; that he had, in fact, money that he had put into this military industrial corporation; that the owner of the plant had traveled to Baghdad to meet with the father of the VX program; and that the CIA had found traces of EMPTA nearby the facility itself.** According to all the*

> *intelligence, there was no other known use for EMPTA at that time other than as a precursor to VX."*

**THE 1998 INDICTMENT OF OSAMA BIN LADEN**

50.     In the Spring of 1998, several months before the U.S. Embassy bombings in Kenya and Tanzania, the Clinton Administration indicted Osama Bin Laden.  The indictment, unsealed several months after its filing, prominently cited al Qaida's agreement to collaborate with Iraq on weapons of mass destruction.  Paragraph #4 of the Indictment read as follows:

> *4.      Al Qaeda also forged alliances with the National Islamic Front in the Sudan and with the government of Iran and its associated terrorist group Hezbollah for the purpose of working together against their perceived common enemies in the West, particularly the United States.*  **In addition, al Qaeda reached an understanding with the government of Iraq that al Qaeda would not work against the government and that on particular projects, specifically including weapons development, al Qaeda would work cooperatively with the Government of Iraq.**

51.     U.S. Attorney Patrick Fitzgerald, in testimony before the 9-11 Commission, said that the intelligence behind that assertion in the indictment above came from Jamal al Fadl, a former high-ranking al Qaida terrorist.  According to Fitzgerald, al Fadl told his interrogators that Bin Laden associate Mamdouh Mahmud Salim (a/k/a Abu Hajer al Iraqi) *"tried to reach a sort of agreement where they wouldn't work against each other--sort of the enemy of my enemy is my friend--and that there were indications that within Sudan when al Qaeda was there, which al Qaeda left in the summer of '96, or the spring of '96, there were efforts to work on jointly acquiring weapons."*

52.     According to the 9-11 Commission's Final Report, the above passage in the Bin Laden indictment had an interesting effect on Richard Clark:

> *This passage led Clarke, who for years had read intelligence reports on Iraqi-Sudanese cooperation on chemical weapons, to speculate to [National Security Adviser Sandy] Berger that a large Iraqi presence at chemical facilities in Khartoum was "probably a direct result of the Iraq-al Qaeda agreement."  Clarke added that VX precursor traces found near al Shifa were the "exact formula used by Iraq."*

**IRAQI REGIME OFFERS OSAMA BIN LADEN ASYLUM**

53.     Several reports suggest that the Iraqi regime contemplated several offers of safe haven to Bin Laden during the late 1990's.  The first occurred during an August 1998 trip to Sudan by Iraqi vice president Taha Yasin Ramadan.  In an August 31, 1998 statement to the Iraqi News Agency, Ramadan said that *"his visit to Sudan comes within the framework of consultation and dialogue over the development of cooperation and coordination between the two fraternal countries in order to face up to the U.S. and Zionist schemes and acts of aggression against the Arab nation.'*  U.S. intelligence believes that Sudanese leaders, acting on behalf of Bin Laden, asked Ramadan if Iraq would give him asylum.

54.     The offer was reported by Sheila MacVicar of ABC News on January 14, 1999:

> *Three weeks after the bombing [of the U.S. Embassies], on August 31, bin Laden reaches out to his friends in Iraq and Sudan, Iraq's vice-president arrives in Khartoum to show his support for the Sudanese after the U.S. attack ... during these meetings, senior Sudanese officials acting on behalf of bin Laden ask if Saddam Hussein would grant him asylum.*

55.     On December 21, 1998, Faruq Hijazi, deputy director of Iraqi intelligence, is alleged to have met with Bin Laden in Afghanistan to offer him safe haven in Iraq.  CIA reporting in the Feith Memo to the Senate Intelligence Committee seems to confirm the meeting:

> *11.  According to sensitive reporting, Saddam personally sent Faruq Hijazi, IIS deputy director and later Iraqi ambassador to Turkey, to meet with bin Laden at least twice, first in Sudan and later in Afghanistan in 1999. . .*
>
> *15.  A foreign government service reported that an Iraqi delegation, including at least two Iraqi intelligence officers formerly assigned to the Iraqi Embassy in Pakistan, met in late 1998 with bin Laden in Afghanistan.*
>
> *16.  According to CIA reporting, bin Laden and Zawahiri met with two Iraqi intelligence officers in Afghanistan in Dec. 1998.*
>
> *17. . . . Iraq sent an intelligence officer to Afghanistan to seek closer ties to bin Laden and the Taliban in late 1998. The source reported that the Iraqi regime was trying to broaden its cooperation with al Qaeda.  Iraq was looking to recruit Muslim "elements" to sabotage U.S. and U.K. interests.  After a senior Iraqi intelligence officer met with*

*Taliban leader [Mullah] Omar, arrangements were made for a series of meetings between the Iraqi intelligence officer and bin Laden in Pakistan.* **The source noted Faruq Hijazi was in Afghanistan in late 1998**.

*18. . . . Faruq Hijazi went to Afghanistan in 1999 along with several other Iraqi officials to meet with bin Laden. The source claimed that Hijazi would have met bin Laden only at Saddam's explicit direction.*

56.     On January 14, 1999, ABC News reported that three intelligence agencies believed that Saddam Hussein had offered safe haven to Bin Laden.

*Intelligence sources say bin Laden's long relationship with the Iraqi's began as he helped Sudan's fundamentalist government in their efforts to acquire weapons of mass destruction … ABC News has learned that in late December, an Iraqi intelligence chief, named Faruq Hijazi, now Iraq's ambassador to Turkey, made a secret trip to Afghanistan to meet with bin Laden.  Three intelligence agencies tell ABC News they cannot be certain what was discussed, but almost certainly, they say, bin Laden has been told he would be welcome in Baghdad.*

57.     On February 13, 1999, CNN.com posted an Associated Press story reporting the Iraqi regime offered asylum to Bin Laden.

*"Iraqi President Saddam Hussein has offered asylum to bin Laden, who openly supports Iraq against the Western powers."*

58.     On February 18, 1999, former chief of CIA counterterrorism operations, Vincent Cannistraro, said the following about Farouk Hijazi during an interview on National Public Radio:

*CANNISTRARO:  Farouk Hijazi, who was the Iraqi ambassador in Turkey, went to Afghanistan in December with the knowledge of the Taliban and met with Osama bin Laden.  It's known through a variety of intelligence reports that the US has, but it's also known through sources in Afghanistan, members of Osama's entourage let it be known that the meeting had taken place.*

*SHUSTER:  Iraq's contacts with bin Laden go back some years, to at least 1994, when, according to one US government source, Hijazi met him when bin Laden lived in Sudan. According to Cannistraro, Iraq invited bin Laden to*

Page 27

> *live in Baghdad to be nearer to potential targets of terrorist attack in Saudi Arabia and Kuwait. There is a wide gap between bin Laden's fundamentalism and Saddam Hussein's secular dictatorship. But some experts believe bin Laden might be tempted to live in Iraq because of his reported desire to obtain chemical or biological weapons. CIA director George Tenet referred to that in recent testimony before the Senate Armed Services Committee when he said bin Laden was planning additional attacks on American targets.*

59.     Finally, the Feith Memo suggests that the Iraqi regime contemplated extending their offer of safe haven to Bin Laden again in 1999:

> *23. . . . Iraqi officials were carefully considering offering safe haven to bin Laden and his closest collaborators in Nov. 1999. The source indicated the idea was put forward by the presumed head of Iraqi intelligence in Islamabad (Khalid Janaby) who in turn was in frequent contact and had good relations with bin Laden.*

## AHMAD HIKMAT SHAKIR – THE MOST INTRIGUING LINK BETWEEN IRAQ, AL QAIDA AND THE SEPTEMBER 11TH ATTACK

60.     Ahmad Hikmat Shakir represents the most puzzling and potential link between the Saddam regime and the September 11th Attack. Shakir is a native Iraqi who worked closely with several high ranking al Qaida terrorists, including two of the chief 9-11 hijackers. Unfortunately, despite being detained twice following 9-11, Shakir is not in custody and his whereabouts are unknown.

61.     According to a classified CIA report, in August 1999, Shakir was offered a job as a "greeter"[3] at the Kuala Lumpur International Airport in Kuala Lumpur, Malaysia. The job of a greeter is a common one in Southeast Asia and the Middle East, and is responsible for escorting VIPs through customs and immigration control checkpoints. During the fall of 1999, Shakir began working for Malaysian Airlines. Reportedly, a contact at the Iraqi Embassy was responsible for getting Shakir his job at the airport. Malaysian Airlines issued his paychecks, but it did not control his schedule. For instructions on when to report to work and when to take a day off, Shakir looked to the Iraqi Embassy in Kuala Lumpur.

62.     His contact at the Iraqi Embassy instructed Shakir to report to work on January 5, 2000. On that day, Shakir greeted Khalid al Midhar and Nawaz al Hamzi (two of the 9-11 hijackers). After helping the men through the airport, Shakir reportedly

---

[3] a/k/a "facilitator"

got into a waiting car with them and traveled to a condominium owned by Yazid Sufaat, an American-educated al Qaida associate.

63. The Kuala Lumpur condo would serve as the site of an important al Qaida meeting, believed to be one of the key planning sessions for both the U.S.S. Cole bombing and the September 11th Attack. Two of the masterminds of those plots -- Tawfiz al Atash and Ramzi Bin al Shibh -- were also present at the condo. The meeting ended on January 8, 2000. Shakir reported to work at the airport on January 9 and January 10, but never showed up again.

64. Al Midhar and Al Hamzi flew from Bangkok, Thailand, to Los Angeles on January 15, 2000. On September 11, 2001, the two men were at the controls of American Airlines Flight 77 when it plunged into the outer ring of the Pentagon.

65. Six days following the September 11th Attack, Shakir was detained in Doha, Qatar, where he had been working as a mid-level employee of the Qatari government's Ministry of Religious Development. Authorities searched Shakir and his apartment and discovered that Shakir had numerous ties to al Qaida and indirect links to the former Iraqi regime. Indeed, Shakir possessed contact information for Islamic radicals involved in many of the most devastating terrorist attacks of the past decade. Those contacts included:

A. Musab Yasin and Ibrahim Suleiman from the 1993 World Trade Center bombing. At the time of that attack, Yasin lived in New Jersey with his brother, Abdul Rahman Yasin. Abdul Rahman Yasin, who badly burned his leg while mixing the chemicals for the World Trade Center bomb, was interviewed by the FBI and, in a costly mistake, released. After realizing their error, the FBI placed him on the list of "Most Wanted" terrorists. Unfortunately, Abdul Rahman Yasin had fled the United States for Iraq. Ibrahim Suleiman was a Kuwaiti native whose fingerprints were found on the bomb-making manuals authorities determined were used in planning the 1993 World Trade Center bombing.

B. Zahid Sheikh Mohammed, brother of Khalid Sheikh Mohammed, the mastermind of the September 11th Attack. Zahid and his brother are both believed to have planned "Operation Bojinka," the 1995 al Qaeda plot to explode 12 airplanes simultaneously over the Pacific Ocean. U.S. intelligence officials believe the aborted plot may have morphed into the September 11th Attack.

C. Ammar al Baluchi, the nephew of Khalid Sheikh Mohammed. Al Baluchi reportedly provided $120,000 to Mohammed Atta and his fellow hijackers and intelligence officials believe al Baluchi may have had a role in planning the attack on the U.S.S. Cole in October 2000.

> D.     Abu Hajer al Iraqi (a/k/a Mamdouh Mahmud Salim), who is suspected of involvement in several of these attacks as well as the 1998 U.S. Embassy bombings.  (The telephone number Shakir had for Abu Hajer was actually a number for Taba Investments, a well-known al Qaida front.)

66.     Despite these findings, the Qataris released Shakir shortly after they detained him. Thereafter, on October 21, 2001, Shakir flew from Doha to Amman, Jordan, where he was scheduled to transfer to a flight to Baghdad.  While waiting for his connection, he was arrested by Jordanian intelligence and held for three months without charge.  Soon after Shakir's detainment, the Iraqi government began exerting pressure on the Jordanians to release him.

67.     During his detainment, CIA officials questioned Shakir, who was generally uncooperative, and concluded that he had been well-trained in counter-interrogation techniques. (One administration official points out that Shakir's counter-interrogation training appears to have been much more sophisticated than that of al Qaida detainees being held at Guantanamo, a detail that, if true, may indicate that his instruction came from a government intelligence service.) Jordanian intelligence concluded not only that Shakir's contact at the Iraqi Embassy in Malaysia was likely from Iraqi intelligence, but that Shakir himself was working on behalf of the IIS.

68.     In one of the most egregious mistakes by U.S. intelligence, CIA officials agreed with the Jordanians to release Shakir on the condition that he agreed to report back on the activities of Iraqi intelligence.  Shakir was released on January 28, 2002 and has not been seen since.[4]

69.     The Feith Memo reports the following on Shakir:

> *24.   According to sensitive reporting, a Malaysia-based Iraqi national (Shakir) facilitated the arrival of one of the Sept 11 hijackers for an operational meeting in Kuala Lumpur (Jan 2000).  Sensitive reporting indicates Shakir's travel and contacts link him to a worldwide network of terrorists, including al Qaeda.  Shakir worked at the Kuala Lumpur airport--a job he claimed to have obtained through an Iraqi embassy employee.*

---

[4] According to a report in the *Wall Street Journal*, Shakir's name appears on three different lists of "Fedayeen Saddam" officers.

## MOHAMED ATTA AND THE IRAQ / AL QAIDA PRAGUE PLOT

70.     According to intelligence reports, in early 2001, Ahmad Khalil Ibrahim Samir al
        Ani,[5] an Iraqi diplomat and intelligence agent, was in Prague, per the regime's
        orders, to recruit a young Islamic radical to conduct a martyrdom operation.

71.     The target was Radio Free Europe/Radio Liberty which had been broadcasting
        from Prague since March 10, 1995.  Radio Free Iraq went on the air on October
        30, 1998 and had been broadcasting news and opinion into Iraq, infuriating the
        Saddam regime.

72.     The Czech Security Information Service (Czech's intelligence service, a/k/a
        "BIS") received a tip in early April from their source in the Iraqi Embassy.
        According to the source, al Ani was scheduled to meet a "student from Hamburg"
        in the next several days.

73.     Concerned that al Ani was planning an attack on Radio Free Iraq, Czech
        intelligence followed him.  When al Ani met with the "student from Hamburg" a
        second time, Czech intelligence became concerned that al Ani was making
        progress toward his goal of destroying Radio Free Europe/Radio Liberty.

74.     Al Ani was subsequently expelled from the country and a positive identification
        of the "student" was not made by Czech intelligence until after 9-11.

75.     After pictures of Atta were shown on television after the September 11th Attack,
        the BIS positively identified him as the person who had met with al Ani in April
        of 2001 regarding the plot to attack Radio Free Europe in Prague.

76.     The FBI would later establish that Atta checked out of the Diplomat Inn in
        Virginia Beach and cashed a check for $8,000 from a SunTrust account on April
        4, 2001, and was never seen again until April 11, 2001, in Florida.  The FBI could
        not account for his movements during this time, or how he used the money, and
        there was no record of Atta using his passport to travel outside the United States.

77.     Although there is no record of Atta using his passport to travel outside the United
        States during the relevant period, U.S. intelligence officials have suggested that he
        may have traveled to Prague under an alias, and Spanish intelligence has in fact
        obtained evidence indicating that Algerian terrorists Khaled Madani and Moussa
        Laouar provided false passports to Atta and Ramzi bin al Shibh.

---

[5] Al Ani was one of Iraq's most highly decorated intelligence officers – a Special Forces veteran
responsible for organizing killings behind Iranian lines during the Iran-Iraq War.  The November 11, 2001
edition of the London's *Observer* stated that al Ani *"went on to a senior post in the unit known as 'M8' –
the department for special operations, such as sabotage, terrorism, and murder."*

78.   Intelligence reported in the Feith Memo suggests that there may have been as many as four meetings between Atta and al Ani, and reveals that Atta's activities were potentially financed by Iraqi intelligence.

> *The Czech counterintelligence service reported that the Sept. 11 hijacker [Mohamed] Atta met with the former Iraqi intelligence chief in Prague, [Ahmed Khalil Ibrahim Samir] al Ani, on several occasions.*
>
> *During one of these meetings, al Ani ordered the IIS finance officer to issue Atta funds from IIS financial holdings in the Prague office.*
>
> *CIA can confirm two Atta visits to Prague--in Dec. 1994 and in June 2000; data surrounding the other two--on 26 Oct 1999 and 9 April 2001--is complicated and sometimes contradictory and CIA and FBI cannot confirm Atta met with the IIS.*
>
> *Czech Interior Minister Stanislav Gross continues to stand by his information.*

## THE IRAQI REGIME'S RELATIONSHIP WITH ABU SAYYAF

### Iraqi Embassy Official With Links To Attacks Conducted By Abu Sayyaf Expelled From The Philippines

79.   Hisham Hussein, the second secretary of the Iraqi Embassy in Manila, and two other Iraqi embassy employees were ordered out of the Philippines on February 14, 2003 for providing material support and resources to terrorist organizations, including Abu Sayyaf and the New People's Army (Communist opposition group on State Department's list of foreign terrorist groups).

80.   On October 2, 2002, Abu Sayyaf conducted a terrorist strike on American soldiers just outside Camp Enrile Malagutay in Zamboanga City, Philippines.  The camp was hosting U.S. troops who were involved in training exercises with Filipino soldiers.  Just outside the gate of the camp was a small café which had become a favorite for the U.S. troops stationed there.  The café sat in the middle of a small strip mall.

81.   According to reports, a man parked his motorcycle in front of the café and began to examine his gas tank.  Seconds later, a bomb within the motorcycle's engine exploded, sending nails in all directions and killing the rider instantly.  The explosion damaged several stores in the strip mall and killed SFC Mark Wayne Jackson and severely injured a fellow U.S. soldier.  Eyewitnesses identified the bomber as a member of Abu Sayyaf.

82.     Abu Sayyaf attempted a second strike just one week after that attack, this time by placing a bomb on the playground of the San Roque Elementary School.  The bomb failed to detonate and authorities recovered the cell phone that was to have set it off.  Filipino investigators analyzed the incoming and outgoing calls.  As expected, they discovered several calls to and from Abu Sayyaf leaders.  But more importantly, they discovered that seventeen hours after the attack that took the life of SFC Jackson, the cell phone was used to place a call to Hisham Hussein at the Iraqi Embassy in Manila.

83.     According to Philippine government sources:

> *"[Hussein] was surveilled, and we found out he was in contact with Abu Sayyaf and also pro-Iraqi demonstrators."  "[Philippine intelligence] was able to monitor their cell phone calls.  [Abu Sayyaf leaders] called [Hussein} right after the bombing. They were always talking."*

84.     Philippine authorities further analyzed Iraqi Embassy phone records and concluded that Hussein had been in regular contact with Abu Sayyaf leaders both before and after the attack that killed SFC Jackson.  Andrea Domingo, immigration commissioner for the Philippines, said Hussein ran an *"established network"* of terrorists in the country.

85.     Moreover, it was discovered that Hussein had also met with members of the New People's Army, a Communist opposition group, in his office at the Iraqi embassy.  According to a Philippine government official, the Philippine National Police uncovered documents in a compound belonging to the New People's Army, indicating the Iraqi Embassy had provided funding for the group.  Hisham Hussein and two other Iraqi Embassy employees were subsequently expelled from the Philippines.

**State Department Links Iraqi Intelligence With Abu Sayyaf**

86.     On March 26, 2003, Matthew Daley, the State Department's deputy assistant secretary of state for East Asian and Pacific affairs, told a subcommittee of the House International Relations Committee that he was worried about Abu Sayyaf.

> *"We're concerned that they have what I would call operational links to Iraqi intelligence services.  And they're a danger, they're an enemy of the Philippines, they're an enemy of the United States, and we want very much to help the government in Manila deal with this challenge."*

> *"There is good reason to believe that a member of the Abu Sayyaf Group who has been involved in terrorist activities*

> *was in direct contact with an IIS officer in the Iraqi*
> *Embassy in Manila.   This individual was subsequently*
> *expelled from the Philippines for engaging in activities that*
> *were incompatible with his diplomatic status."*

87.    That individual was Hisham Hussein, the second secretary of the Iraqi Embassy in
       Manila.

**Abu Sayyaf Leader Admits Group Received Funding From Iraq**

88.    Abu Sayyaf leader, <u>Hamsiraji Sali</u>, publicly boasted that the terrorist organization
       received funding from Iraq.  For instance, on March 2, 2003, Sali told the
       *Philippine Daily* that the Iraqi regime had provided the terrorist group with 1
       million pesos (about $20,000) each year since 2000.  A *Washington Times* article
       published on March 4, 2003, provided the following account.

> *Islamist terrorists in the southern Philippines who have*
> *killed two American hostages in recent years say they are*
> *receiving money from Iraqis close to President Saddam*
> *Hussein.*
>
> Hamsiraji Sali, *a local commander of the terrorist group*
> *Abu Sayyaf on the remote southern island of Basilan, says*
> *he is getting nearly $20,000 a year from supporters in* Iraq.
>
> ***"It's so we would have something to spend on chemicals***
> ***for bomb-making and for the movement of our people,"***
> *Sali told a reporter this week, renewing earlier claims of*
> *support from* Iraq.
>
> *The payments, while small, provide additional evidence of*
> *a link between* Iraq *and the Abu Sayyaf - a group with*
> *long-standing ties to al Qaeda's and its global terror*
> *network.*

**Captured Documents Provide Further Evidence Of The Iraq Regime's Ties**
**To Abu Sayyaf**

89.    Documents recovered following the 2003 invasion of Iraq provide evidence that
       not only was Iraqi intelligence at one point providing money to Abu Sayyaf to
       purchase weapons, but further considered using a Libyan intelligence front to
       provide material support to the terrorist group.

<u>*Iraqi Regime Providing Money to Abu Sayyaf to Purchase Weapons*</u>

90.    On June 6, 2001, the Iraqi ambassador to the Philippines, Salah Samarmad, sent
       an eight-page fax to the Secondary Policy Directorate of the Iraqi Foreign

Ministry in Baghdad, concerned that an Abu Sayyaf kidnapping a week earlier had garnered international attention. Twenty civilians--including three Americans--had been taken from Dos Palmas Resort on Palawan Island in the southern Philippines. Samarmad reported on the events.

> *"After the release of nine of the hostages, an announcement from the FBI appeared in newspapers announcing their desire to interview the escaped Filipinos in order to make a decision on the status of the three American hostages,"* Samarmad wrote to officials in Baghdad.

> *"The embassy stated what was mentioned above.  The three American hostages were a missionary husband and wife who had lived in the Philippines for a while, Martin and Gracia Burnham, from Kansas City, and Guillermo Sobrero, from California. They are still in the hands of the Abu Sayyaf kidnappers from a total of 20 people who were kidnapped from (Dos Palmas) resort on Palawan Island."*

91.     Interestingly, the fax reportedly notes that the Iraqis were now trying to be seen as helpful and keep a safe distance from Abu Sayyaf.  But what is more significant is the fact that Samarmad acknowledges that the Iraqi regime was at one time funding Abu Sayyaf:

> *"The kidnappers were formerly (from the previous year) receiving money and purchasing combat weapons.  From now on we (IIS) are not giving them this opportunity and are not on speaking terms with them."*

> *Iraqi Regime Discusses Using Libyan Intelligence as a Way to Channel Iraqi Support to Abu Sayyaf*

92.     An Iraqi memo, dated March 18, 2001, from the "Republican Presidency, Intelligence Apparatus" to someone identified only as D4/4, discusses the possibility of supporting the work of the Qaddafi Charity Establishment to assist Abu Sayyaf:

> *1. There are connections between the Qaddafi Charity Establishment and the Abu Sayyaf group in the Philippines; meanwhile, this establishment is providing material support to them.*

> *2. This establishment is one of the Libyan Intelligence fronts*

> *3. The Tripoli post has indicated that there is a possibility to form what connections are available with this*

> *establishment as it can offer the premise of providing food supplies to [Ed: word missing] in the scope of the agreement statement*
>
> *Please review . . . it appears of intelligence value to proceed into connections with this establishment and its intelligence investments in the Abu Sayyaf group.*

93.     A short response was received two days later:

> *Mr. Dept. 3:*
>
> *Study this idea, the pros and the cons, the relative reactions, and any other remarks regarding this.*

## THE IRAQI REGIME'S RELATIONSHIP WITH ANSAR AL ISLAM

94.     In support of the U.S. invasion of Iraq, Bush Administration officials claimed that a small group of terrorists in Kurdish-controlled northern Iraq, Ansar Al Islam, represented a key link between the Saddam regime and al Qaida.  Indeed, U.S. intelligence reports in recent years, including interviews with former Iraqi intelligence agents, reveals that Saddam secretly provided material support and resources to Ansar al Islam.

95.     Ansar al Islam was formed in December 2001 as a merger of Jund al Islam ("Soldiers of Islam"), led by Abu Abdallah al Shafi'i, and a splinter group from the Islamic Movement in Kurdistan led by Mullah Krekar.  By early 2003, the group controlled about a dozen villages in northern Iraq on the Iranian border, subjecting the local villagers to strict sharia law.

96.     Ansar al Islam's ties to Osama Bin Laden and al Qaida are not in dispute.  Senior al Qaida member Abu Zubaydah reportedly told interrogators that Bin Laden provided start up money for Jund al Islam, which had been established just 10 days before the September 11th Attack.  Moreover, Bin Laden used his relationships with Kurdish extremists to establish an operating training camp in northern Iraq

97.     Al Qaeda leaders anticipated being driven from Afghanistan after the attacks and sought an alternative base of operations.  Bin Laden had enjoyed good relations with Kurdish extremists for years.  The relationship between al Qaeda and its like-minded Kurdish brethren was constantly evolving, but intensified in 1999 when bin Laden began to establish terrorist training camps in Iraqi Kurdistan.  One of these camps was reportedly operational by the end of that year.  According to several al Qaeda detainees, bin Laden sent word to his allies in Iraqi Kurdistan before the September 11 attacks that the time had come for them to unite.

98.     The 9-11 Commission's Final Report clearly states Bin Laden assisted in the formation of the group in 2001:

> *To protect his own ties with Iraq, [Sudan's Islamist leader] Turabi reportedly brokered an agreement that bin Ladin would stop supporting activities against Saddam. Bin Laden apparently honored this pledge, at least for a time, although he continued to aid a group of Islamist extremists operating in a part of Iraq (Kurdistan) outside of Baghdad's control. In the late 1990s, these extremist groups suffered major defeats by Kurdish forces. In 2001, with Bin Ladin's help they re-formed into an organization called Ansar al Islam. There are indications that by then the Iraqi regime tolerated and may even have helped Ansar al Islam against the common Kurdish enemy.*

99.     On July 9, 2005, the French daily, *Le Monde*, declared that Ansar Al Islam *"was founded in 2001 with the joint help of Saddam Hussein – who intended to use it against moderate Kurds – and al Qaida, which hoped to find in Kurdistan a new location that would receive its members."*

100.    Furthermore, two intercepts (one occurring in May 2002; the other in October 2002), shed light on the Iraqi regime's role in Ansar al Islam. The first intercept revealed than an Iraqi intelligence officer praised the work of Ansar al Islam and passed $100,000 to its leaders. The second intercept, described in a report from the National Security Agency, reported that the Iraqi regime and al Qaida reached an agreement whereby the regime would provide safe haven in northern Iraq to al Qaida terrorists fleeing Afghanistan, including money and weapons.

101.    The Feith Memo reported the following on Iraqi intelligence's provision of weapons to al Qaida members in northern Iraq:

> *31. An Oct. 2002 ... report said al Qaeda and Iraq reached a secret agreement whereby Iraq would provide safe haven to al Qaeda members and provide them with money and weapons. The agreement reportedly prompted a large number of al Qaeda members to head to Iraq. The report also said that al Qaeda members involved in a fraudulent passport network for al Qaeda had been directed to procure 90 Iraqi and Syrian passports for al Qaeda personnel.*
>
> *38. According to sensitive reporting, a contact with good access who does not have an established reporting record: An Iraqi intelligence service officer said that as of mid-March the IIS was providing weapons to al Qaeda*

> *members located in northern Iraq, including rocket*
> *propelled grenade (RPG)-18 launchers. According to IIS*
> *information, northern Iraq-based al Qaeda members*
> *believed that the U.S. intended to strike al Qaeda targets*
> *during an anticipated assault against Ansar al-Islam*
> *positions.*

102.    The Memo further reported on pre-war intelligence which *"claimed that an Iraqi*
*intelligence official, praising Ansar al-Islam, provided it with $100,000 and*
*agreed to continue to give assistance."*

   **Abu Wael (a/k/a Colonel Saadan Mahmoud Abdul Latif al-Aani) -- Critical**
   **Link Between Iraq, Al Qaida And Ansar Al Islam**

103.    One of the more interesting persons connecting Ansar al Islam with the Iraqi
regime is an individual known as Abu Wael.  Wael is a lawyer by training who
worked for several years for Saddam's intelligence service as an outreach
coordinator of sorts to a wide variety of radical Islamic groups.  But more
importantly, Wael was considered among many to be one of the leaders of Ansar
al Islam.  A July 2002 article for the BBC reported on Wael's influence in the
terrorist group:

> *A captured Iraqi intelligence officer of 20 years' standing,*
> *Abu Iman al-Baghdadi, who is held by the PUK, said Abu*
> *Wa'il is actively manipulating the Ansar on behalf of Iraqi*
> *intelligence.*
>
> *"I was captured by the Kurds after Iraqi intelligence sent*
> *me to check what was happening with Abu Wa'il, following*
> *rumours that he'd been captured and handed over to the*
> *CIA," al-Baghdadi said.*
>
> *He added that Baghdad smuggles arms to the Ansar*
> *through the Kurdish area, and is using the group to make*
> *problems for the PUK, one of the opposition factions*
> *ranged against Saddam Hussein.*
>
> *"The Ansar's basic allegiance is to al-Qaeda, but some of*
> *them were trained in Iraq and went Afghanistan," he said,*
> *interviewed in a Kurdish prison.*

104.    Colin Powell addressed the U.N. Security Council on February 5, 2003 and cited
to Wael's link to the terrorist group:

> *But Baghdad has an agent in the most senior levels of the*
> *radical organization, Ansar al-Islam that controls this*
> *corner of Iraq.  In 2000 this agent offered Al Qaida safe*

> *haven in the region.   After we swept Al Qaida from*
> *Afghanistan, some of its members accepted this safe haven.*
> *They remain there today.*

105.   Shortly after Powell's speech, ABC News ran an interview with Mullah Krekar, operational leader of Ansar al Islam.  Krekar was asked about Wael:

> *"I know Abu Wael for 25 years," Krekar said.  "And he is*
> *in Baghdad.  And he is an Arabic member of our shura, our*
> *leadership council also."*

106.   Krekar's statements, while probably unintentional, not only put Wael in Baghdad six weeks before the Iraq War began, but provide further support that an Iraqi intelligence officer was part of Ansar al Islam's leadership council.

**Interviews With Prisoners Provide Links To Saddam Regime**

107.   One of the first detailed reports about the Iraq-al Qaida-Ansar al Islam connection came in a report by journalist Jeffrey Goldberg, writing for *The New Yorker* on March 25, 2003.  In his piece, *"The Great Terror,"* Goldberg writes of his 2002 trip to northern Iraq to report on the Saddam regime's attacks on the Kurds, including detailed accounts of a March 16, 1988 chemical attack on the city of Halabja.   During his visit, Goldberg was invited by the Kurds to interview detainees who were being held for their role in attacks against Kurdish interests. Goldberg wrote the following about his interviews and the prisoners' claims:

> *The allegations include charges that Ansar al-Islam has*
> *received funds directly from Al Qaeda; that the intelligence*
> *service of Saddam Hussein has joint control, with Al Qaeda*
> *operatives, over Ansar al-Islam; that Saddam Hussein*
> *hosted a senior leader of Al Qaeda in Baghdad in 1992;*
> *that a number of Al Qaeda members fleeing Afghanistan*
> *have been secretly brought into territory controlled by*
> *Ansar al-Islam; and that Iraqi intelligence agents smuggled*
> *conventional weapons, and possibly even chemical and*
> *biological weapons, into Afghanistan.  If these charges are*
> *true, it would mean that the relationship between Saddam's*
> *regime and Al Qaeda is far closer than previously thought.*

**<u>Qassem Hussein Mohammed</u>**

108.   Goldberg interviewed an Iraqi intelligence officer named Qassem Hussein Mohammed, a Shiite from Basra, in southern Iraq, and a twenty-year veteran of Iraqi intelligence.   Mohammed was captured by Kurdish forces and was reportedly on assignment from the Mukhabarat to determine if Abu Wael had been captured by U.S. forces.

> *"I was sent by the Mukhabarat to Kurdistan to find Abu Wael or, at least, information about him.  That's when I was captured, before I reached Biyara."*

109.   Regarding Wael, he said the following:

> *"He's an employee of the Mukhabarat.  He's the actual decision-maker in the group [Ansar al Islam] but he's an employee of the Mukhabarat."[6]*

110.   Scott Peterson of the *Christian Science Monitor* similarly filed a report from northern Iraq and said the following in the April 2, 2002 edition:

> *While Ansar is gaining strength in numbers, new information is emerging that ties the organization to both Osama bin Laden's Al Qaeda network and to Iraqi leader Saddam Hussein.  The Al Qaeda contacts allegedly stretch back to 1989, and include regular recruiting visits by bin Laden cadres to Kurdish refugee camps in Iran and to northern Iraq, as well as a journey by senior Ansar leaders to meet Al Qaeda chiefs in Kandahar, Afghanistan, in the summer of 2000.*

111.   Peterson equally had an opportunity to interview Qassem Hussein Mohammed and reported the following:

> *"[Ansar] and Al Qaeda groups were trained by graduates of the Mukhabarat's School 999 – military intelligence."*

> *"My information is that the Iraqi government was directly supporting [Al Qaeda] with weapons and explosives," he says.  "[Ansar] was part of Al Qaeda, and given support with training and money."*

112.   Among other known Ansar leaders, Mohamed says Abu Wa'el was the most influential, was on the Iraqi intelligence payroll, and served as a liaison between Baghdad and Al Qaeda.  Mohamed says his own mission to northern Iraq – during which he was detained by the PUK – is proof of that link.  *"After America attacked Afghanistan, Baghdad lost contact with [Abu Wa'el],"* Mohamed says.  *"They sent me to check out Abu Wa'el, to make sure he was not dead or captured, and to reestablish contact."*

---

[6] According to Goldberg, Muhammad told him that his involvement in Islamic radicalism began in 1992 in Baghdad, when he met Ayman al Zawahiri.  Muhammad said he was one of seventeen bodyguards assigned to protect Zawahiri, who stayed at Bagdhad's Al Rashid Hotel.  One day he escorted Zawahiri to one of Saddam's palaces for what he later learned was a meeting with Saddam himself.

### Haqi Ismail

113.    Goldberg also interviewed a young Iraqi named Haqi Ismail, who was captured as he tried to get into Kurdistan three weeks after the start of the U.S. attack on Afghanistan.   According to Kurdish intelligence, Ismail's family had long-standing ties to Iraqi intelligence; his uncle was a top Mukhabarat official in southern Iraq.   Ismail further admitted to training at an al Qaida camp in Afghanistan.   When asked if he was an employee of Saddam's intelligence service, he replied: *"I prefer not to talk about that."*

### Abdul Rahman al Shamari

114.    In January 2004, Jonathan Schanzer, an Arabic speaking terrorism expert, interviewed Mukhabarat agent Abdul Rahman al Shamari.  Al Shamari admitted that the Mukhabarat provided Ansar al Islam with weapons (*"mostly mortar rounds"*) and further provided them with funding:

> *"On one occasion we gave them ten million Swiss dinars [$700,000]," al-Shamari said, referring to the pre-1990 Iraqi currency.   On other occasions, the Mukhabarat provided more than that.   The assistance, he added, was furnished "every month or two months."*

115.    Schanzer asked him about Abu Wael:

> *His eyes widened and he smiled.   He told me that he knew the man in the picture, but that his graying beard was now completely white.   He said that the man was Abu Wael, whose full name is Colonel Saadan Mahmoud Abdul Latif al-Aani.   The prisoner told me that he had worked for Abu Wael, who was the leader of a special intelligence directorate in the Mukhabarat.   That directorate provided assistance to Ansar al Islam at the behest of Saddam Hussein, whom Abu Wael had met "four or five times."   Al-Shamari added that "Abu Wael's wife is Izzat al-Douri's cousin," making him a part of Saddam's inner circle.   Al-Douri, of course, was the deputy chairman of Saddam's Revolutionary Command Council, a high-ranking official in Iraq's armed forces, and Saddam's right-hand man.*

**Former U.S. Deputy Commander of CENTCOM Discusses Ansar Al Islam, The Saddam-Al Qaida Connection, And Concerns Over Chemical Weapons**

116.    In a February 14, 2006 interview with PBS *Frontline*, Lt. General Michael Delong, former deputy commander of U.S. Central Command during the invasions of Afghanistan and Iraq, discussed U.S. intelligence concerns relating to Ansar al Islam in Northern Iraq, and the production of chemical weapons.

According to Gen. DeLong, the United States had credible intelligence reports of senior Iraqi leaders and Ministry Officials not only being aware of the camp, but meeting with terrorist leaders involved with the camp.

> *Frontline: When are you first aware that Iraq and Saddam Hussein are on somebody's gun sights somewhere and that it may be job two?*
>
> *DeLong: Well, it wasn't lost on us when the secretary on Sept. 12 mentioned Iraq, Iran, Syria, so we knew it could come up at any time.* **We also knew we had thoroughly good intelligence that there was an Al Qaeda base on the Iraq-Iran border, that the Al Qaeda were coming through Iran into Iraq.** *We'll call it a dual-use base; in other words, chemicals that could be used for putting on your crops or chemicals that you could mix together and make a chemical weapon out of.* **We had on the ground intelligence that they were coming through there, and then some of them were meeting with some of the senior people in the Saddam administration, not with Saddam himself. We knew there was a tie to Saddam, to Iraq. And nothing happens in Iraq without Saddam knowing about it, so we knew that was true.**
>
> *Frontline: Were you aware that by the 21st of September, say, Tenet and the CIA had already delivered to the president and to others that there was no Al Qaeda-Saddam connection?*
>
> *DeLong: Yeah,* **we didn't agree.** *Now, the only place we saw it was this one compound on the Iraq-Iran border, which was so troubling to us. We almost took them out three months before the Iraq war started. We almost took that thing, but we were so concerned that the chemical cloud from there could devastate the region that we chose to take them by land rather than by smart weapons.*

## OFFICIAL NEWSPAPER OF SADDAM REGIME PUBLISHES INFORMATION SUPPORTING LINKS BETWEEN IRAQ AND AL QAIDA

117.    In its November 16, 2002, edition, *Babel*, the official newspaper of Saddam Hussein's government, run by his oldest son Uday, published information that appears to support allegations of links between the Saddam regime and al Qaida.

118.    The article identified an Abd-al-Karim Muhammad Aswad[7] as an "intelligence officer," describing him as the ***"official in charge of regime's contacts with Osama bin Laden's group and currently the regime's representative in Pakistan."*** According to reports, a man with that name was the Iraqi ambassador to Pakistan from the fall of 1999 until the fall of the regime in 2003.

119.    *Babel* included Aswad's name in what was called an "*honor list*."  Below that heading, in boldface type, came an introductory comment: *"We publish this list of great men for the sons of our great people to see."*   Directly beneath that declaration the article stated: *"This is a list of the henchmen of the regime.  Our hands will reach them sooner or later.  Woe unto them. A list of the leaders of Saddam's regime, as well as their present and previous posts."*

120.    Then comes the list of regime officials.  It is in alphabetical order until, halfway down the page, it starts over with officials whose names begin with the letter "A."  It includes Baath party leaders, military heroes, ambassadors, intelligence chiefs, the commander of the "Saddam Cubs Training Center," governors of Iraqi provinces, and chemical and biological weapons experts.

121.    U.S. intelligence experts have not conclusively determined what the list means.  Some believe that part of the list came from an opposition source, and that *Babel* republished it as a gesture of defiance.  But the question remains -- why would the Saddam regime, at a time when it was publicly denying any link to al Qaida, publish *anything* admitting such a link?

122.    Also noteworthy, on August 27, 2998, 20 days after al Qaida attacked the U.S. Embassies in Kenya and Tanzania, *Babel* published an editorial proclaiming Osama Bin Laden as *"an Arab and Islamic hero."*

**SADDAM'S TERRORIST TRAINING CAMPS**

123.    In March 2006, the Joint Forces Command in Norfolk, Virginia published a comprehensive study of the inner workings of the government of Saddam Hussein based on certain documents seized in Iraq in 2003 and on interviews with various Iraqi personnel -- known as the "Iraqi Perspectives Project."   According to captured documents cited in the study, the former Iraqi regime was training non-Iraqi Arabs in terrorist techniques.  Page 54 of the reports states:

---

[7] Several weeks following the September 11th Attack, Aswad publicly criticized the United States for rooting out al Qaeda in Afghanistan.  His comments were reported on The Pakistan Newswire of October 29, 2001, which said: "He stressed the U.S. to stop bombardment on Afghanistan resulting in death of innocent children, women and elderly people." The official, who had been in his job since 1999, also expressed doubt that bin Laden was even a terrorist and responsible for 9/11.  He "said the US President Bush should knock the door of international court of justice to address the situation because only court had authority to declare Prime suspect of September 11 tragedy Osama Bin Laden terrorist or not."

> *Beginning in 1994, the Fedayeen Saddam opened its own paramilitary training camps for volunteers, graduating more than 7,200 "good men racing full with courage and enthusiasm" in the first year. Beginning in 1998, these camps began hosting "Arab volunteers from Egypt, Palestine, Jordan, 'the Gulf,' and Syria." It is not clear from available evidence where all of these non-Iraqi volunteers who were "sacrificing for the cause" went to ply their newfound skills. Before the summer of 2002, most volunteers went home upon the completion of training. But these camps were humming with frenzied activity in the months immediately prior to the war. As late as January 2003, the volunteers participated in a special training event called the "Heroes Attack." This training event was designed in part to prepare regional Fedayeen Saddam commands to "obstruct the enemy from achieving his goal and to support keeping peace and stability in the province."*

124.    Some of this training came under the supervision of the Iraqi Intelligence Service's "Division 27." According to the study, the Division 27:

> *"... supplied the Fedayeen Saddam with silencers, equipment for booby-trapping vehicles, special training on the use of certain explosive devices, special molds for explosives, and a variety of explosives timers. The only apparent use for all of this Division 27 equipment was to conduct commando or terrorist operations."*

125.    In an April 13, 2003 article by *Stars and Stripes*, reporter Mark Oliva described a terrorist training camp discovered by the 2nd Battalion, 23rd Marines. The camp, approximately 10 acres in size, was about 10 miles outside of Baghdad, hidden in a cluster of trees in the midst of wheat fields. Flags of the Palestine Liberation Front ("PLF") decorated the walls of the compound. Portraits of Abu Abbas, known terrorist and leader of the PLF, were hung in several rooms. Also discovered were documents bearing the logo of the PLF, including rosters and photos of personnel believed to have trained at the site. According to Capt. Aaron Robertson, a Marine Intelligence officer:

> *"We believe this is a training camp where Iraqi's trained forces for the Palestine Liberation Front. This is what we would refer to as a sensitive site. This is clearly a terrorist training camp, the type Iraq claims did not exist.*
>
> *"Its much more sophisticated than those training camps we found in Afghanistan. It has a permanent obstacle course,*

> *which rivals anything our Marines have back at Camp Pendleton."*

126.    A former captain in the Iraqi Army who worked for at the Salman Pak training camp for six months in the mid-1990's was interviewed by PBS's *Frontline* and the *New York Times* on October 14, 2001.  Sabah Khodada made the following comments about the camp:

> *"This whole camp where their training is run by the Iraqi [security service]... The government organization [that] basically possesses or have control of the camp is the Iraqi intelligence.  But different training people who come, they are headed or sent by different people in the Iraqi government."*

> *"Training is majorly on terrorism.  They would be trained on assassinations, kidnapping, hijacking of airplanes, hijacking of buses, public buses, hijacking of trains and all other kinds of operations related to terrorism."*

> *"Non-Iraqis were trained separately from us.  There were strict orders not to meet with them and not to talk to them. And even when they conduct their training, their training has to occur at times different from the times when we conduct the Iraqis our own training."*

> *"They were special trainers or teachers from the Iraqi intelligence and al-Mukhabarat.  And those same trainers or teachers will train the fedayeen, the Iraqi fedayeen, and also the same group of those teachers will train the non-Iraqis, foreigners who are in the camp.  Personally, my profession is not this kind of training.  My profession is to train people on infantry, typical infantry training, such as training on machine guns, pistols, hand grenades, rocket launchers on the shoulder and this kind of training.  The special training that I'm talking about, such as the kidnapping and so, is conducted by those trainers who are not from the army; they are from ... al-Mukhabarat.  And there was a person who is very famous. They call him Al-Shaba. [ph]. This is Arabic word means 'The Ghost,' who was responsible for all the training, and those trainers or the teachers."*

> *"Nobody came and told us, 'This is Al Qaeda people,' but I know there were some Saudis, there were some Afghanis. There were some other people from other countries getting*

> *trained.  They didn't tell us they were part of Al Qaeda; there's no such thing. ...  In this camp, we know that those are Saudis, or Arabs are getting trained.  Nobody will talk about Al Qaeda or any other organization."*
>
> *"This camp is specialized in exporting terrorism to the whole world."*

127.    In an interview with The Weekly Standard, Lieutenant General Riadh Abdallah stated that he was familiar with a similar training camp at a facility north of Baghdad called Lake Tharthar.  Abdallah left Iraq for the United States in 1999.  The camp at Lake Tharthar was constructed after Salman Pak and was known among Abdallah's Republican Guard colleagues as the "Salman Pak of the Sea."  According to Abdallah, terrorists at Lake Tharthar were instructed in *"diving, how to wire, how to put charges on ships, how to storm the ships, commando operations."*   When asked whether the camp was used primarily for terrorist training or military training, Abdallah responded:

> *"Terrorist.  Not for the military.  They were not Iraqi.  They were all from other countries--maybe just a few Iraqis.  And it's very confidential."*

## OTHER CONNECTIONS BETWEEN THE SADDAM REGIME AND AL QAIDA AND OTHER TERRORIST ORGANIZATIONS

### Abu Musab Al Zarqawi

128.    According to U.S. intelligence, al Zarqawi had an operational alliance with Iraqi intelligence which included access to weapons and explosives, including surface-to-air missiles.

> *37.  Sensitive reporting indicates senior terrorist planner and close al Qaeda associate al Zarqawi has had an operational alliance with Iraqi officials.  As of Oct. 2002, al Zarqawi maintained contacts with the IIS to procure weapons and explosives, including surface-to-air missiles from an IIS officer in Baghdad.  According to sensitive reporting, al Zarqawi was setting up sleeper cells in Baghdad to be activated in case of a U.S. occupation of the city, suggesting his operational cooperation with the Iraqis may have deepened in recent months. Such cooperation could include IIS provision of a secure operating bases [sic] and steady access to arms and explosives in preparation for a possible U.S. invasion.  Al Zarqawi's procurements from the Iraqis also could support al Qaeda operations against the U.S. or its allies elsewhere.*

129.   Indeed, senior al Qaida member Abu Zubaydah, in one of his first debriefings, identified al Zarqawi as *"one of the main people within bin Laden's circle who wanted to work with the Iraqis."*

130.   In late May 2002, al Zarqawi traveled to Baghdad after sustaining a serious injury to his leg during the U.S. invasion of Afghanistan.  Reportedly, al Zarqawi was taken to the Olympic Hospital, known for treating Baghdad's elite, including many high-ranking regime officials.  It was at this hospital that al Zarqawi had his leg amputated and was fitted for a prosthetic limb.  The hospital's director was Saddam's eldest son, Uday Hussein.

131.   The Republic of Iraq provided material support and funding for a number of other known terrorists or supporters of terrorism, including Ibn Sheikh al Libi, Imad Barakat Yarkas, Ahmed J. Ahmed, Abdul Kadham Saad, Mohammed Salameh, Abdul Rahman Yasin, the Armed Islamic Group, Mamdouh Mahmud Ahmed Salim, and Abu Nidal.

## PUBLIC STATEMENTS BY U.S. OFFICIALS REGARDING THE IRAQ-AL QAIDA RELATIONSHIP

132.   In an October 7, 2002 letter from CIA director George Tenet to Senator Bob Graham, Tenet discusses senior level contact between Iraq and al Qaida.

> *"We have solid reporting of senior level contact between Iraq and al Qaeda going back a decade.   Credible information exists that Iraq and al Qaeda have discussed safe haven and reciprocal nonaggression. . . . We have credible reporting that al Qaeda leaders sought contacts in Iraq who could help them acquire WMD capabilities."*

133.   NPR reporter Mike Shuster interviewed Vincent Cannistraro, former head of the CIA's counterterrorism center, and offered this report:

> *Iraq's contacts with bin Laden go back some years, to at least 1994, when, according to one U.S. government source, Hijazi met him when bin Laden lived in Sudan. According to Cannistraro, Iraq invited bin Laden to live in Baghdad to be nearer to potential targets of terrorist attack in Saudi Arabia and Kuwait. . . . Some experts believe bin Laden might be tempted to live in Iraq because of his reported desire to obtain chemical or biological weapons. CIA Director George Tenet referred to that in recent testimony before the Senate Armed Services Committee*

> *when he said bin Laden was planning additional attacks on American targets.*

134.   On July 22, 2004, Thomas Kean, the Republican co-chairman of the 9-11 Commission stated the following:

> *"There was no question in our minds that there was a relationship between Iraq and al Qaeda."*

135.   According to the 9-11 Commission Final Report, in February 1999, Sandy Berger recommended going after Osama Bin Laden with a U2 flight over Pakistan. Richard Clarke objected, arguing that the flight would have to be approved by Pakistan, whose intelligence would likely warn Bin Laden of the impending attacks.  In an e-mail to Berger on February 11, 1999, Clark writes:

> *"Armed with that knowledge, old wily Usama will likely boogie to Baghdad."*

136.   On September 14, 2003, Vice-President Dick Cheney appeared on NBC's *Meet The Press* and discussed the Iraq-al Qaida relationship with host Tim Russert.

> *RUSSERT:   The Washington Post asked the American people about Saddam Hussein, and this is what they said: 69 percent said he was involved in the September 11 attacks.  Are you surprised by that?*
>
> *CHENEY:  No.  I think it's not surprising that people make that connection.*
>
> *RUSSERT:  But is there a connection?*
>
> *CHENEY:  We don't know.  You and I talked about this two years ago.  I can remember you asking me this question just a few days after the original attack.  At the time I said no, we didn't have any evidence of that.  Subsequent to that, we've learned a couple of things.  **We learned more and more that there was a relationship between Iraq and al-Qaida that stretched back through most of the decade of the '90s, that it involved training, for example, on BW and CW, that al-Qaida sent personnel to Baghdad to get trained on the systems that are involved. The Iraqis providing bomb-making expertise and advice to the al-Qaida organization.***
>
> *We know, for example, in connection with the original World Trade Center bombing in '93 that one of the*

> *bombers was Iraqi, returned to Iraq after the attack of '93. And we've learned subsequent to that, since we went into Baghdad and got into the intelligence files, that this individual probably also received financing from the Iraqi government as well as safe haven.*

137.  On March 19, 2003, CIA Director George Tenet, testifying before the Senate Intelligence Committee, said the following about the Iraq-al Qaida connections:

> ***"There is no doubt that there have been (Iraqi) contacts and linkages to the al Qaeda organization.*** *As to where we are on September 11, the jury is still out. As I said carefully in my statement, it would be a mistake to dismiss the possibility of state sponsorship whether Iranian or Iraqi and we'll see where the evidence takes us."*

138.  One month before the 1991 Presidential election, Senator Al Gore, the Democrat's vice presidential candidate accused the first Bush Administration of *"a blantant disregard for brutal terrorism"* and *"a dangerous blindness to the murderous ambitions of a despot."* Making more than a dozen specific references to the Iraq-sponsored terrorism, Gore cited a study by the RAND Corporation that reported ***"an estimated 1,400 terrorists were operating openly out of Iraq."***

139.  In a December 2003 appearance on MSNBC's "Hardball with Chris Matthews," Joe Lieberman, Connecticut Democrat and presidential candidate, discussed the Iraq-al Qaida connections:

> *"I want to be real clear about the connection with terrorists. I've seen a lot of evidence on this.* ***There are extensive contacts between Saddam Hussein's government and al Qaeda and other terrorist groups.*** *I never could reach the conclusion that [Saddam] was part of September 11. Don't get me wrong about that. But there was so much smoke there that it made me worry. And you know, some people say with a great facility, al Qaeda and Saddam could never get together. He is secular and they're theological. But there's something that tied them together. It's their hatred of us."*

140.  In an article running in The Weekly Standard on December 15, 2003, <u>Evan Bayh</u>, a Democrat from Indiana who sits on the Intelligence Committee, said the following about the Saddam-al Qaida relationship:

> *"The relationship seemed to have its roots in mutual exploitation. Saddam Hussein used terrorism for his own ends, and Osama bin Laden used a nation-state for the things that only a nation-state can provide. Some of the*

> *intelligence is strong, and some of it is murky. But that's the nature of intelligence on a relationship like this--lots of it is going to be speculation and conjecture. Following 9/11, we await certainty at our peril."*

141.   Iraq's extensive ties to al Qaida and affiliated terrorist organizations have been corroborated by internal Iraqi government and IIS documents seized since the U.S. invasion of Iraq, as well as by statements of former officials of the Iraqi government.

142.   By virtue of its extensive sponsorship of al Qaida and affiliated terrorist organizations, as described in further detail above, the Republic of Iraq knowingly and intentionally aided, abetted and conspired with al Qaida, in relation to that terrorist organization's campaign to conduct terrorist attacks against the United States.

143.   At all times material hereto, Iraq was specifically aware of al Qaida's ambition and intent to conduct terrorist attacks against the United States, by virtue of Iraq's direct discussions with senior al Qaida officials, the public declarations of al Qaida officials, intelligence and media reports, and the attacks al Qaida successfully conducted against American interests.

144.   The September 11th Attack was a direct, intended and foreseeable product of Iraq's knowing and intentional sponsorship of al Qaida and affiliated terrorist organizations.

## III.   RESPONSES TO SPECIFIC REQUESTS OF THE DEFENDANT, REPUBLIC OF IRAQ.

A. JURISDICTION (pp. 19-20 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f). Moreover, to the extent it inquires about the law on which this lawsuit is based, including, without limitation, a legal analysis of the basis for jurisdiction, is inappropriate for such a Request, and accordingly, the O'Neill plaintiffs will decline to respond to same.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

B. <u>PARTIES</u> (pp 20-1 of the Request):

      The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).  Moreover, to the extent it inquires about the law on which this lawsuit is based, including, without limitation, a legal analysis of the basis for jurisdiction relative to the parties, is inappropriate for such a Request, and accordingly, the O'Neill plaintiffs will decline to respond to same.

      By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

C. <u>COMMON FACTUAL ALLEGATIONS</u>:

<u>Conspiracy</u> (pp. 21-3 of the Request):

      The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

      By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

<u>World Trade Center</u> (pp. 23-4 of the Request):

      The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a

responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

Bin Laden Returns (pp 24 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

Public Merger of Iraqi and Al Qaeda Interests (pp. 24-5 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

U.S. Embassy Bombings (pp 25 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague

and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

<u>The 1998 US Air Strikes on Al Qaeda</u> (pp 25-6 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

<u>The Attack on the USS Cole</u> (pp 26-7 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

<u>The Iraqi Launch of Terror War</u> (p. 27 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More

Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

Aftermath of September 11 (p. 27 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

CAUSES OF ACTION (Items D.1-10, pages 28-33 of the Request):

1. Wrongful Death (p 28 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.1.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same.  The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

2. <u>Survival Action</u> (pp. 28-9 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.2.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same. The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

3. <u>Action for Economic Damages</u> (p. 29 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.3.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same. The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania,

and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

4. <u>Intentional Infliction of Emotional Distress</u> (pp. 29-30 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.4.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same.  The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

5. <u>Loss of Consortium</u> (p. 30):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.5.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the

O'Neill plaintiffs will decline to respond to same.  The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

6. <u>Loss of Solatium</u> (p. 30):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.6.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same.  The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

7. <u>Conspiracy</u> (pp. 30-1):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot  reasonably be required to frame a

responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

Item III.D.7.b. of the Request, to the extent it inquires about the law on which this claim is based, is inappropriate for this Request, and accordingly, the O'Neill plaintiffs will decline to respond to same. The claims asserted in the O'Neill Causes of Action, Counts I through X, arise out of and are based upon International Law, Federal common law, the laws of New York, Pennsylvania, and Virginia, and the laws of such other jurisdictions as the Court may deem applicable, as well as the statutory causes of action brought against The Republic of Iraq.

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

8. <u>Treble Damages of US National</u> (18 USC 2333) (pp. 31-2 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

9. <u>RICO</u> (p. 32 of the Request):

The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

10. <u>Punitive Damages</u> (pp. 32-3 of the Request):

  The response sought is beyond the scope of Fed. R. Civ. P. which a more definite statement only where the "pleading is which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Plaintiffs submit that the pleadings, including the First Consolidated Complaint, the RICO Statement and Part II of this More Definite Statement (including any exhibits to such pleadings) are not so "vague and ambiguous" so that the defendant "cannot reasonably be required to frame a responsive pleading" in accordance with the notice pleading standards of Fed. R. Civ. Proc. 8 (a), 8(e) and 8(f).

  By way of further answer, we incorporate herein all of the O'Neill pleadings and that of the co-plaintiffs, as well as the material set forth in Section II hereof.

{B<small>ALANCE OF</small> P<small>AGE</small> I<small>NTENTIONALLY</small> L<small>EFT</small> B<small>LANK</small>}

## IV.    **<u>RESERVED RIGHTS</u>**.

Given the extraordinarily complex nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery.   Plaintiffs therefore reserve the right to amend this Statement as information is learned and verified through discovery and otherwise.

Date:  New York, N.Y.
         March 7, 2007

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.


BY:_____
    JERRY S. GOLDMAN, ESQUIRE (JG 8445)
    FREDERICK J. SALEK, ESQUIRE (FS 8565)
    111 Broadway, Suite 1305
    New York, N.Y. 10006
    212.242.2232

    *Attorneys for the Plaintiffs,*
    *The Estate of John P. O'Neill, Sr., et al.*

### TABLE OF EXHIBITS TO O'NEILL PLAINTIFF'S MORE DEFINITE STATEMENT

1.      More Definite Statement

A.      Request for More Definite Statement

B.      Victims List

## CERTIFICATION OF SERVICE

I hereby certify that a true and accurate copy of the within More Definite Statement under Federal Rule of Civil Procedure 12(e) and the CMO 1 and CMO 2, and the stipulation between the parties, has been served on all attorneys of record, on this date, by way of the court's Electronic Case Filings (ECF) system.

Dated: March 7, 2007

_____
JERRY S. GOLDMAN, ESQUIRE

X:\Clients\ONeill v. Saudi arabia\More Definite Statements\Iraq\Iraq\Iraq MDS Final Final.doc