# KREINDLER & KREINDLER LLP

Harry E. Kreindler (1919-1984)
Lee S. Kreindler (1949-2003)
Marc S. Moller
Steven R. Pounian
James P. Kreindler
David C. Cook
David Beekman
Blanca I. Rodriguez
Noah H. Kushlefsky
Robert J. Spragg
Brian J. Alexander
Justin T. Green
Andrew J. Maloney, III
Daniel O. Rose
Gretchen M. Nelson*
Stuart R. Fraenkel*

Francis G. Fleming
Paul S. Edelman
Milton G. Sincoff
Mark I. Labaton*
    Counsel

100 Park Avenue
New York, NY 10017-5590
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

Susan A. Friery, M.D.♦
Brendan S. Maher
Susan D. Bainnson
Vincent I. Parrett
William O. Angelley
Michael R. Sherwin⁺
Hilary B. Taylor°

California Office
707 Wilshire Boulevard
Suite 5070
Los Angeles, CA 90017-3613
(213) 622-6469
Fax: (213) 622-6019

*Admitted in CA only
♦Admitted in MA & DC only
⁺Admitted in OH only
°Admitted in CA & LA only



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/1/07

April 30, 2007

**By Hand**

Honorable Frank Maas
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 740
New York, New York 10007-1312

Re:   *In re Terrorist Attacks on September 11, 2001 v. NCB*

Dear Judge Maas:

In light of Your Honor's March 23, 2007 decision ordering an in-camera review of the NCB audit that plaintiffs have sought to obtain, and in light of the wordsmithing in which plaintiffs believe NCB continues to engage, we offer the following information to assist you in assessing both the relevance and the responsiveness of the materials NCB is providing to you. Although plaintiffs' counsel have not been given the opportunity to examine what is being submitted for Your Honor's review, based on the minimal description alone, plaintiffs believe NCB continues to parse words and use improper semantics to avoid production of the information plaintiffs have long sought, and instead is producing a different document than what plaintiffs requested.

As you know, plaintiffs understand that an audit or process review[1] of NCB was

---
[1] Given the defendant's apparent proclivity for parsing of words, plaintiffs wish to be clear that, though we have generally referred to the document sought as an "audit," we have never intended to mean the term in any manner other than that the document is some form of a review or investigation into the process or financial transactions. Any narrowing of the definition by NCB, particularly during the discovery process, would be purely deceptive.

---

*Handwritten annotations:*

The "wordsmithing" allegation set forth in this letter is not new. (See 3/23/07 Tr. at 3-4) ("I got the sense that NCB might be taking advantage of word-smithing."). Moreover, I believe that the colloquy at the 3/23/07 conference sufficiently established the parameters of what was being sought by the plaintiffs and the Court. (Id. at 19-20). I have reviewed the audit report prepared by Arthur Anderson that NCB submitted for my review, and which has been represented to be the only document potentially responsive to the plaintiffs' discovery requests relating to an audit report. Although the report is styled a "Special Examination," I see nothing in the three looseleaf binders that I have received which relates to the issues presently before the Court concerning NCB. Accordingly, I decline to direct any further discovery (not previously ordered) related to NCB.*

/s/ FMaas, USMJ  5/1/07

* Mr. Wiebman should contact my Chambers to make arrangements to retrieve the materials submitted for in camera review.

April 30, 2007
Page 2

undertaken in approximately 1998 and completed in approximately 1999 and that the review, which we understand was conducted outside of the ordinary audit process, resulted in various changes at NCB in 1999 and thereafter. To help identify the audit sought, as part of plaintiffs' initial discovery requests, plaintiffs provided NCB with excerpts of the audit. (These excerpts are attached hereto as *Exhibit A)*.

In denying the existence of the audit, NCB engaged semantic tools to first re-characterize the document requested, and then deny that any such document exists in that form. For example, NCB has characterized the request as being particularly for a "government audit" that was completed in 1998 in the ordinary course and that "alleges terror financing." If "terror financing" was not listed in the title or its stated public purpose, then NCB was free to argue no such audit exists. NCB might even argue this is so if the audit reviewed funding for "freedom fighters" instead of terrorists. But this kind of false distinction was recently recognized and eschewed by the Court in *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 280 (E.D.N.Y. 2007), where the Court rejected such improper reliance on the distinction between terrorism and freedom fighting. In light of these particularized descriptions, it is appropriate for the Court to order the production of any audit or other review of NCB's affairs begun and completed in the 1998 through 1999 time period.

NCB has not denied that an audit or process review was initiated or that an investigation demonstrated that money was sent to suspect charities. Instead, it relies upon its particular characterizations, for example that it was nothing more than the yearly audit. But the special audit's existence has been corroborated by various sources, including testimony before Congress, newspaper articles, former SNCB employees, NCB's own annual report, as well as other sources.

Experts agree that a key component of terror financing is the amount of money given to charitable organizations. An audit that provides a timely, accurate, and complete accounting would clearly show where money had been diverted to various organizations. When Vincent Cannistraro, former chief of counter-terrorism operations for the Central Intelligence Agency, testified before Congress about the history and funding of al Qaeda, he identified NCB as a knowing conduit for funds to charities who were known to send the money to Al Qaeda. He said:

> *"How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident*

April 30, 2007
Page 3

> *that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism."*

Cannistraro's comments, when read in conjunction with, for example, an article from the Chicago Tribune, "Saudi's Cash Funds Terrorism, U.S. Says" published shortly after September 11th, not only show that charitable donations handled within NCB are important to understanding terror-financing, but also provide the rationale for providing discovery into this important area evidencing NCB's organized support for bin Laden. That article contains the following passages:

> In 1998, according to a senior U.S. official, the Saudi government audited the Jiddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Blessed Relief, which allegedly transferred the money to bin Laden.
>
> After the alleged audit, Saudi government agencies bought out Chairman Khalid bin Mahfouz's 50 percent ownership of the bank.
>
> National Commercial Bank senior officials vehemently denied the existence of a government audit showing that money had been diverted to the charity and transferred to bin Laden. "I can tell you absolutely, categorically there was no such audit," one bank executive said. "That never took place."

The excerpts of the audit included in *Exhibit A*, state that, outside of normal banking mechanisms, millions of dollars were sent or "loaned" to various charities, including IIRO and Muwafaq[2], two of the so-called charities that are defendants in this lawsuit. When the excerpts are read in the context of the testimony of Agent Cannistraro and the Chicago Tribune article, they show that some form of an investigation of NCB's activities took place during the period 1998 through 1999. It may have been termed an audit, a process review or given some other name; and it may have been performed by the Saudi Arabian Monetary Authority or at their request by an outside firm.

NCB's own 1998 annual report clearly states that some *new* audit-related procedures were initiated that year:

> **Pursuant to the requirements of SAMA and the Ministry of Trade, NCB**

---

[2] Muwafaq aka Blessed Relief is currently in default and IIRO's motion to dismiss was denied by Judge Casey. According to the U.S. Department of Treasury, Muwafaq, upon its closure, merged with al Qaeda. Two branches of the IIRO have been named by the U.S. Government as Specially Designated Global Terrorists for their long running support of al Qaeda. (See Exhibit B.)

April 30, 2007
Page 4

**has formed a three member audit committee, which commenced its work on the 1ˢᵗ of July, 1998.** (See Excerpt from Annual Report attached as Exhibit C.)

NCB's denials are also in direct conflict with the declaration of Jagan Reddy, a former employee of SNCB. His declaration from March 21, 2007, submitted to the Court on March 23, 2007, states the following:

*During my tenure with SNCB and working for Mr. Baarma, I became familiar with the fact that an audit of NCB's financial dealings was done during the 1998 time period.* ***This audit was done outside the routine auditing that was done of NCB and resulted in Saudi authorities taking regulatory and other action to curb further misconduct by certain directors/managers/owners of the bank.***

At a minimum, serious questions of fact exist and, to date, plaintiffs have not been provided with any of the documents that would routinely be provided in the normal course of discovery under the Federal Rules of Civil Procedure.

Now, after NCB was ordered to produce the audit for in-camera review, plaintiffs understand NCB intends to provide the Court with a *February 1998* "special examination of NCB undertaken by Arthur Anderson & Co. and SAMA's examiners." See Defendant's April 23, 2007 letter and TABS A & B. Setting aside for the moment that NCB has long denied such an audit exists, plaintiffs are reasonably certain that – given the description of the audit in the attached excerpts – the document NCB is producing is clearly not the same audit.

At the March 23ʳᵈ hearing, NCB represented that it was not aware of any non-ordinary course audit. But now NCB is producing for the Court's in-camera review, a February 1998 "*special* examination." NCB does not articulate why a "special examination" was needed, rather, it simply says it was not done to uncover terror financing. The 1998 annual report, as noted above clearly, indicates a new audit process was initiated by SAMA in 1998.

The February 1998 Special Audit that NCB is producing in-camera, though perhaps of interest, is almost certainly not what plaintiffs have requested because, given what we know about the audit requested, it could not have been completed by February 1998. NCB's own affiant, Lawrence Smith, compared the audit excerpts to NCB documents that were completed in 1999 and which looked back to figures for the *entire year* of 1998, as well as to a report sent to NCB in February 1998 and NCB's comments on that report sent to SAMA in May or June 1998. Because the audit included information that post-dated February 1998, the February 1998 Special Audit cannot be the audit from which the excerpts were taken, and therefore cannot be the particular audit sought by the plaintiffs (note, though, that plaintiffs' actual discovery request did include all audits, as well as other information).

April 30, 2007
Page 5

      In regard to other discovery sought by the plaintiffs, we note that in plaintiffs' first set of document requests, from February 2005, plaintiffs asked for documents relating to transfers of money to Muwafaq and IIRO, the two so-called charity defendants (one in default and the other with two branches designated as terrorists by the U.S. government) identified in the audit excerpts as having received millions of dollars in suspicious "loans" outside the normal backing mechanisms. NCB has refused to provide any documents relating to transfers to Muwafaq or IIRO, citing this Court's decision that plaintiffs have not yet made an adequate factual showing to warrant production of "customer account" documents. However, that ruling was not intended to apply to any transfers NCB made to those organizations of *NCB's own* funds or assets or those of its owner Khalid Bin Mahfouz. Nor should it have any bearing on those "customers" specifically identified as terrorist organizations. We note that in the audit excerpts attached, there are zakat payments mentioned as well as loans to the suspect charities. As production of such documents would likely shed further light on the present dispute, and not require the approval of SAMA, plaintiffs respectfully request that the Court order NCB to produce such documents at this time.

      Accordingly, given NCB's various and inconsistent representations, Plaintiffs continue to request that NCB be ordered to produce the results of the investigation that began in approximately 1998 and concluded sometime in the 1998/1999 period as evidenced by the attached excerpts, in whatever form it exists. Moreover, we ask that the Court order NCB to produce requested documents relating to transfers of NCB's own funds or assets or those of Khalid bin Mahfouz and transfers concerning any identified terrorist individual or organization.

                                      Respectfully Submitted,

                                      KREINDLER & KREINDLER LLP
                                      *Counsel for Ashton*

                                      By: _____
                                          Andrew J. Maloney III

cc:    Patton Boggs
        Ron Liebman
        Mitchel BergerCounsel for NCB
        Plaintiffs Executive Committee