# EXHIBIT 4

**CLIFFORD CHANCE US LLP**

2001 K STREET NW
WASHINGTON, DC 20006 - 1001

TEL +1 202 912 5000
FAX +1 202 912 6000
WWW.CLIFFORDCHANCE.COM

**By ECF**

Steven T. Cottreau
Direct Dial: +1 202 912 5109
Steve.Cottreau@cliffordchance.com

The Honorable Frank Maas
United States District Court
Daniel Patrick Moynihan
 United States Courthouse
500 Pearl St.
New York, NY 10007-1312

September 30, 2015

<u>In re Terrorist Attacks on September 11, 2001, 03 MDL 1570 (GBD/FM)</u>

Dear Judge Maas,

We write in reply to two Plaintiffs' Executive Committee July 14, 2015 letters, Dkt. 2973 ("Motion 1") and Dkt. 2974 ("Motion 2") (collectively, "Motions") to your Honor moving to compel Dubai Islamic Bank ("DIB") to produce documents responsive to Plaintiffs' First Set of Requests for Production of Documents, Dkt. 2973-13 ("First RFPs"), and Plaintiffs' Supplemental Requests, Dkt. 2973-18 ("Supplemental RFPs").[1]

As set forth below, DIB engaged in an extensive document collection and production process in the UAE to respond to the relevant requests amongst Plaintiffs' first set of 108 separate document requests (many of which contained subparts). Following repeated meet in confer meetings in March and July 2011, DIB moved forward with its collection and production. Instead of timely raising any disputes, Plaintiffs waited four and a half years since DIB objected to their requests and more than four years since the parties met and conferred on DIB's objections. Indeed, DIB conducted an extensive document collection and completed its document production more than three years ago in August 2012. Nonetheless, the documents

---

[1] In the interest of judicial economy, DIB is submitting a consolidated opposition to both of Plaintiffs' Motions. Because DIB is responding to two letter briefs, our consolidated response is longer than the 12 page limit for a single letter brief, but the response is less than twice the limit for an opposition to a single letter brief.

that Plaintiffs seek are largely irrelevant to their claims and inconsistent with this Court's orders regarding the serving of discovery requests at the outset of merits discovery.

## I. BACKGROUND

### A. DIB Fully and Properly Responded to Plaintiffs' Requests for Production

Approximately one year after the September 11, 2001 attacks, Plaintiffs began filing their claims in this case. Following the Court's resolution of motions to dismiss in the summer of 2010, the Court ordered Plaintiffs to serve their "document requests … by December 10," 2010. Transcript of Record at 6, *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (Oct. 28, 2010) (Dkt. No. 2382) (attached as Ex. 1). Plaintiffs served 108 document requests on DIB on October 15, 2010. *See* Motion 1 Ex. L. DIB filed its Responses and Objections to Plaintiffs' document requests on January 21, 2011. *See* Motion 1 Ex. M.

Counsel for DIB and Plaintiffs then engaged in a six-month negotiation to address DIB's objections and agreed upon a ***search term methodology*** to search DIB's electronic banking records—a methodology that Plaintiffs' Motions completely ignore. The parties initially met and conferred in March and July 2011. The parties then exchanged several letters finalizing that search term agreement. *See* Letter from S. Cottreau (July 7, 2011) (Motion 1 Ex. O); Email from S. Tarbutton (July 15, 2011) (attached as Ex. 2); Letter from S. Cottreau (Sept. 8, 2011) (attached as Ex. 3); & Letter from S. Cottreau (Sept. 22, 2011) (attached as Ex. 4).

Following the resolution of this meet and confer process in 2011, DIB then engaged in a comprehensive document collection effort in the UAE, overseen by counsel for DIB. Following the receipt of permission from Dubai authorities to release banking records, DIB completed its 3,521 page production on August 30, 2012. *See* Letter from S. Cottreau (Aug. 30, 2012) (attached as Ex. 5); *see also infra* n.9.

On July 31, 2012, one month before document discovery was set to close and after DIB's completion of an extensive document collection process, Plaintiffs served an additional 43 document requests. *See* Motion 1 Ex. P. On August 22, 2012, DIB sent a letter to Plaintiffs stating that "Plaintiffs' supplemental requests are untimely and objectionable in their entirety" and "inconsistent with the [search term] agreement [DIB] reached with Plaintiffs over a year ago." Letter from S. Cottreau at 2 (Aug. 22, 2012) (attached as Ex. 6). DIB also reiterated these objections and served specific objections to each request. *See* Motion 1 Ex. Q.

Despite a productive meet and confer process in 2011, Plaintiffs never informed DIB of a single issue Plaintiffs had with DIB's productions until four years later and one day before filing their Motions to Compel on July 14, 2015.

### B.   Plaintiffs' Factual Narrative Is Wrong, Misleading, and Irrelevant

Plaintiffs' Motions never address the search term methodology to which Plaintiffs agreed and skirt DIB's objections, including those based on relevance and undue burden.  Instead, Plaintiffs begin their Motions by misrepresenting the import of a host of scattered hearsay statements in an attempt to misleadingly and wrongfully tarnish DIB before the Court.

As explained more fully below and as will be established as the case progresses, ***DIB never knowingly provided financial services to anyone who brought about the terrible tragedy of 9/11***.  Instead, DIB is and has been owned substantially by the Government of Dubai, which, along with the other Emirates in the United Arab Emirates, has been a key ally of the United States in the Middle East, including in the fight against terrorism.[2]  DIB itself has fully cooperated with all requests from the U.S. and UAE governments in the global fight against terrorism.  Plaintiffs' attempts to imply otherwise are simply false.

Like other well-intentioned banks (including many banks operating in the U.S. with know-your-customer and anti-money laundering procedures in place), DIB unwittingly maintained accounts for people who were later identified as members or supporters of al Qaeda. (Indeed, the U.S. government itself was likewise duped as it permitted the 9/11 hijackers to lawfully enter the United States.)  But Plaintiffs have produced no evidence—and DIB is aware of none—that suggests that DIB ***knowingly*** assisted anyone involved in the 9/11 plot or that such assistance ***proximately caused*** the tragic events of 9/11.  Although DIB is prepared to engage in a point-by-point rebuttal to Plaintiffs' irresponsible accusations to the contrary, we do not believe that Plaintiffs' Motion is the proper place to brief the merits of Plaintiffs' misleading assertions.

---

[2] *See, e.g.*, US State Department, US Relations With United Arab Emirates Fact Sheet (June 11, 2013) ("The UAE plays an influential role in the Middle East, and is a key partner for the United States. The United States and the U.A.E. enjoy strong bilateral cooperation on a full range of issues …. The two countries work together to promote peace and security …. U.A.E. ports host more U.S. Navy ships than any port outside the United States."), available at http://www.state.gov/r/pa/ei/bgn/5444.htm (last visited Sept. 28, 2015).

## II.    PLAINTIFFS' MOTIONS TO COMPEL LACK MERIT

Plaintiffs' Motions seek to compel the production of documents in nine categories, which generally fall within four groupings:

    A.  <u>Additional Accounts</u>

        1.  Documents relating to specific individuals

        2.  Irrelevant accounts frozen following September 11, 2001

        3.  Taliban documents

        4.  Documents related to the 1998 U.S. Embassy bombings

    B.  <u>Transactional Records</u>

        5.  Additional records for produced accounts

    C.  <u>Additional Documents That Plaintiffs Speculate Should Exist</u>

        6.  Additional documents relating to DIB's AML policies and practices

        7.  Additional documents related to a July 1999 Meeting

    D.  <u>Irrelevant Documents and Undue Burden</u>

        8.  Additional documents relating to DIB's Sharia Board

        9.  Plaintiffs' unauthorized Supplemental RFPs

For the reasons set forth below, Plaintiffs' Motions raise meritless and unnecessary objections to DIB's production of responsive and relevant documents.

### A.    **Additional Accounts**

Plaintiffs' motion for additional account documents completely ignores the search term protocol to which they agreed during discovery and seeks on a wholesale basis documents that Plaintiffs agreed to request on a case-by-case basis, but never followed up with any such requests.

Plaintiffs argue that DIB "flatly refuses to provide any documents" and "has failed to produce a single document relating to … specific accounts." Motion 1 at 9-10. Plaintiffs,

however, ***never explain*** to the Court that ***the parties jointly agreed to an extensive search term process*** by which DIB would search and produce its account records.

Plaintiffs sought—and DIB agreed to produce—account information and other documents for anyone relevant to plaintiffs' claims. The issue that confronted the parties was ***how to identify those persons*** who were relevant to this case and determine whether those persons had accounts at DIB. In short, the parties needed to agree on a methodology by which DIB would search its customer and accounts database for relevant information.

Counsel for DIB and Plaintiffs repeatedly met and conferred in March and July 2011 and reached agreement on a search term methodology by which DIB would search its records. *See* Motion 1 Ex. O. On July 7, 2011, DIB sent Plaintiffs a letter summarizing the parties' agreed search protocol:

> Throughout DIB's Responses, DIB proposed using a search term methodology in response to a number of objections that DIB raised to Plaintiffs' Requests. See, e.g., DIB's Responses to Plaintiffs' Request Nos. 1-8, 10, 11, 15, 16-19, 24-26, 29, 30, 32, 37, 38, 43, 44, 69, and 78-82. As set forth in DIB's Responses, DIB explained that it would search certain of its records systems using as search terms of the names of individuals and entities as identified in Plaintiffs' Requests. ***Plaintiffs asked that DIB include additional search terms. DIB agreed*** to do so provided that the additional list of terms was not subject to a valid objection, such as unduly burdensomeness or irrelevance. DIB also suggested that Plaintiffs include on that list (a) names in Arabic because many records are not in English and (b) alternative spellings of both English and Arabic names that [they] would like searched. Plaintiffs agreed to provide for DIB's consideration a proposed list of additional search terms, including terms in Arabic and alternate spellings of terms. We understand that you have been assembling a list of search terms. We believe that time is now of the essence to provide us with that list so that we can attempt to conclude the search process and related pulling of records by the document discovery deadline.

Motion 1 Ex. O at 4 (emphasis added).

As a result of this process, DIB agreed to search for and produce documents related to (1) "names of individuals and entities as identified in Plaintiffs' Requests"[3] and "additional

---

[3] For one individual, Saeed Ahmed Lootah (a DIB founder), the parties agreed that DIB would "search in the accountholder field in its electronic account record keeping system using the search term 'Saeed Ahmad Lootah' … and … produce non-privileged documents, if any exist, describing, detailing, or summarizing transfers of funds between that account and [other specified accounts] from January 1, 1992 to September 11, 2001." Motion 1 Ex. M. at 28.

*(footnote continued)*

search terms" agreed upon by the parties, and (2) all persons identified in DIB's "correspondence from the U.S. or U.A.E. governments that identifies a person as being affiliated with al Qaeda." *Id.* at 4. DIB agreed "to conduct the search for these additional [] search terms in the same fashion as [DIB had] agreed to search the other terms in DIB's Responses [limited to documents from] … January 1, 1992 to September 11, 2001." Ex. 3 at 2-3.

On July 15, 2011, counsel for Plaintiffs, Scott Tarbutton, sent to counsel for DIB an e-mail containing search term lists *with over 2,900 names*:

> As a follow up to our conversation after the conference on July 13, 2011, I am providing you with a draft listing of the individuals and entities plaintiffs are submitting to Dubai Islamic Bank per your client's agreement to conduct a search of its records systems using both English and Arabic names, as well as alternative spellings [including] (1) the United Nations Security Council 1267 Sanctions Committee's Consolidated List of Individuals and Entities Associated with Al Qaeda and the Taliban; and (2) [a list presumably created by Plaintiffs entitled] Other Individuals and Entities Associated with Osama bin Laden and the Al Qaeda Terrorist Organization.

Ex. 2.

A key problem with Plaintiffs' lengthy proposed lists of over 2,900 names was that they contained many individuals who had nothing to do with the September 11, 2001 attacks. For example, many of the individuals on the list joined al Qaeda or other organizations *after* September 11, 2001. As a result, DIB objected to Plaintiffs' Lists as "unduly burdensome" and "overbroad and beyond the scope of discoverable information as set forth in Rule 26." Ex. 3 at 2. DIB explained:

> To search for every member of the Taliban or every person ever affiliated with al Qaeda—no matter the timeframe or relationship to the September 11 attacks—is simply a fishing expedition at DIB's great expense. First, searching the more than 2,900 names on Plaintiffs' Lists is unduly burdensome [because] converting these lists in database search queries is time consuming and thus expensive. Moreover, the cost does not end there.… [E]ach account

---

Plaintiffs have misleadingly implied that Saeed Ahmed Lootah is the person referenced in Jamal al Fadl's FBI witness interview: "[Fadl] further advised that AL-TAYYIB had a relationship with AHMED LOOTAH from the United Arab Emirates." Motion 1 Ex. E at 7. Plaintiffs, however, appear to misread the document on which they rely. Al Fadl did not testify that *Saeed* Ahmed Lootah was the person affiliated with Tayyib. Instead, Fadl testified that another person with the same surname, Ahmed Lootah, was affiliated with Tayyib. Lootah is a common tribal name.

that is identified as a result of each search may not in fact be related to the claims and defenses in this case. This will be the case if an unrelated individual shares the exact same name as an individual included in Plaintiffs' Lists. Accordingly, DIB must sort through the results of the search for each term and determine whether the person is in fact relevant to this case…. Second … the lists include almost 400 search terms for individuals with alleged links to the Taliban with no apparent connection to al Qaeda or the September 11 attacks.

*Id*. at 2. For example, Nayif Bin-Muhammed al Qahtani, born March 25, 1988 (*see* Ex. 2 at 36), was only 13 years old on September 11, 2001. Plaintiffs' Lists also included individuals who did not join al Qaeda, or an affiliate, until after September 11, 2001. For instance, Daniel Martin Schneider was added to the list after he joined the Islamic Jihad Union ("IJU") (an al Qaeda affiliate), but the "[IJU] was founded in 2002"—after the September 11th attacks. U.N. Security Council Committee, Narrative Summaries of Reasons for Listing, http://www.un.org/sc/committees/1267/NSQDi260E.shtml (last visited Sept. 22, 2015).

In an effort to narrow the search term lists to Rule 26's scope of discoverable information, DIB analyzed the 9/11 Commission Report and *narrowed Plaintiffs' Lists* to the "full name search terms (including alternative spellings) for the individuals on Plaintiffs' Lists that [DIB was] able to identify as having been mentioned in the 9/11 Commission's Report as having a connection with the terrorist attacks of September 11, 2001."[4] Ex. 3 at 2. The revised list contained 194 names and alternative spellings. *Id.* at 4-8. DIB also invited Plaintiffs' continued input on the revised list: "if we have omitted any individual on Plaintiffs' Lists that was identified by the 9/11 Commission as being connected with the terrorist attacks of September 11, 2001, please let us know and we will include the search terms related to that individual in our search." *Id.* at 3. Plaintiffs did not respond and *never objected* to DIB's revised list of search terms tailoring the list to individuals having a role in 9/11.

To ensure that DIB could move forward with its search and collection based upon this revised list and to make sure that Plaintiffs did not have any additional names to be searched, *DIB sent a second letter*. On September 22, 2011, DIB explained that it had expanded the list to 261 search terms to account for several additions and modifications, including the "inclusion of

---

[4] The 9/11 Commission report is formally entitled the "Final Report of the National Commission on Terrorist Attacks Upon the United States" and was authored by the National Commission on Terrorist Attacks Upon the United States. DIB's revised search term list was "subject to the same provisos that … were included in DIB's responses: [DIB] will not produce such information if a search term yields a voluminous number of documents for multiple persons or entities with the same name as a search term (in which case DIB will meet and confer with Plaintiffs) or if the documents pertain solely to a person or entity that is not affiliated with al Qaeda." Ex. 3 at 3.

the search terms set forth in DIB's Responses" to Plaintiffs' RFPs and additional spellings of names "because DIB's electronic account record keeping system … may not have reflected special characters present in certain search terms (such as hyphens, periods, parentheses, commas, and accent marks)." Ex. 4 at 1. Again, Plaintiffs *never responded or objected in any way* to the revised search terms DIB's September 22, 2011 letter.

As a result, DIB moved forward with its document collection and production efforts. It searched its records for the 261 search terms as well as for records related to any person identified in "any correspondence from the U.S. or U.A.E. governments that identifies a person as being affiliated with al Qaeda." Motion 1 Ex. O at 7. For each person identified as having an account at DIB, DIB agreed to produce specified related records. *E.g.,* Motion 1 Ex. M at 10.

In the *almost four years* between DIB's September 2011 correspondence and Plaintiffs' July 2015 Motions, *Plaintiffs never raised any objections* to DIB's use of the 261 search terms contained in its letter. Plaintiffs now complain that DIB should have searched for documents for additional names that were not included in the search terms. If Plaintiffs wanted to include additional names or spellings (including Arabic spellings) in the search term protocol, they repeatedly had that opportunity as the Parties had agreed.

Plaintiffs now seek to undo the parties' search term agreement and force DIB to engage in another costly and lengthy document search process. The Court should reject Plaintiffs' attempt to redo the search process.

In any event, even apart from the subverting the search term process to which the parties agreed, the additional documents sought by Plaintiffs are also objectionable on other grounds. Plaintiffs' Motions seek four categories of accounts: (1) documents relating to specific individuals, (2) additional documents relating to DIB accounts frozen following September 11, 2001, (3) Taliban related documents, and (4) documents related to the 1998 U.S. Embassy bombings. In addition to the fact that these requests are untimely and inappropriate in light of the parties' agreed upon search term methodology, these four categories of documents are objectionable on the independent grounds discussed below.

### 1.    Documents Relating to Specific Individuals

Several of Plaintiffs' requests seek documents relating to specific individuals including Mustafa Ahmed Al Hawsawi, Mamdouh Mahmoud Salim, Abdallah Azzam, and Saeed Ahmed Lootah. *See* Request Nos. 12-15, 16-19, 10, and 31-32.

Two of the four individuals for whom Plaintiffs complain DIB produced no records— Mustafa Ahmed Al Hawsawi and Saeed Ahmed Lootah—were included in the final search term list sent to Plaintiffs on September 22, 2011. Ex. 4 at 4, 9. The remaining two individuals— Abdallah Azzam and Mamdouh Mahmoud Salim—are irrelevant to Plaintiffs claims. Abdallah Azzam died in 1989. Plaintiffs have not, and cannot, allege any link between the September 11 attacks and someone who died over 12 years prior. Mamdouh Salim was arrested in Germany in

September 1998, and Plaintiffs have not alleged that he had any role in 9/11.  As the 9/11 Commission has explained, the 9/11 attacks were planned after Salim's arrest.  *See* 9/11 Commission Report at 154 ("KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons.").

### 2.     Irrelevant Accounts Frozen Following September 11, 2001

Plaintiffs' Request Nos. 37-45 seek the production of  "documents relating to the seizure and freezing of any and all DIB accounts following the September 11th attacks."  Motion 2 at 5. Plaintiffs move to compel production responsive to these requests in light of the "clear relevance of the requested documents" and argue DIB "imposes its own *arbitrary* limitations on the discovery requests."  *Id.* (emphasis added).

DIB's objections and limitations are not arbitrary.  DIB agreed and produced account records (and related government correspondence) for all potentially al Qaeda related accounts frozen in the wake of 9/11.  The problem with Plaintiffs' requests is that they are not limited to frozen accounts related to al Qaeda, 9/11, or even to terrorism in general.  Instead, as Plaintiffs themselves characterize the requests, they relate to the "freezing of *any and all* DIB accounts following the September 11th attacks"—regardless of any relationship to terrorism or the events of 9/11.  *Id.* (emphasis added).

Plaintiffs' requests are so broad that they would cover the freezing of accounts for any reason, including accounts that have nothing to do with the subject matter of this litigation.  As is common throughout the world, accounts may have been frozen from 2001 until the present for any number of reasons entirely unrelated to the September 11 attacks.  For example, the Central Bank may have ordered banks to freeze accounts related to narcotics trafficking, sanction programs, judgment enforcement, or money laundering involving groups other than al Qaeda. For these reasons, DIB objected to these requests as overly broad, unduly burdensome, unlimited in temporal scope, and seeking information not relevant to a claim or defense of any party. Motion 1 Ex. M at 50-59.  These objections should be sustained.

### 3.     Taliban Documents

Plaintiffs also seek the production of all documents relating to alleged Taliban accounts at DIB.   Motion 1 at 11.   Specifically, Plaintiffs request "all documents relating to communication by the U.S. to DIB and/or the U.A.E. in 1998 that DIB was providing banking and financial services to the Taliban" (Request #29) and "all documents relating to the DIB-Taliban … accounts identified in response to Request 29" (Request #30).  DIB objected to these requests as "overly broad, unduly burdensome, and seeking information not relevant to a claim or defense of any party on the grounds that it is not reasonably limited in temporal scope." Motion 1 Ex. M at 41-44.  Additionally, DIB objected on the grounds that the request related to "the Taliban" was vague and ambiguous because DIB is unaware of the names of all the people to which this phrase applied.  *Id.* at 42.

Plaintiffs' initial search term proposal of approximately 2900 names contained almost "400 search terms for individuals with alleged links to the Taliban with no apparent connection to al Qaeda or the September 11 attacks." Ex. 3 at 2. All documents related to the Taliban are well beyond the scope of permissible discovery in this case. In fact, Plaintiffs never once mention the Taliban in relation to DIB in their Complaints or Racketeer Influenced and Corrupt Organizations Act ("RICO") statements. Nor did Plaintiffs even propose search terms only for names of Taliban members that they allege had a connection to their claims.

Moreover, Plaintiffs could not—even if they had tried—base their claims on alleged financial services to the Taliban because of the Second Circuit's ruling in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013). In *Rothstein*, plaintiffs brought a claim against UBS for allegedly aiding and abetting Hamas and Hizbollah by providing Iran—a State sponsor of terrorism—with cash in U.S. dollars. Plaintiffs were individuals who were injured, and/or had family members who were injured or killed, in five bombings and several rocket attacks in Israel. Plaintiffs alleged that the ability to carry out the attacks was substantially aided by cash from Iran. The Second Circuit, however, rejected the claims because providing financial services to a State sponsor of terrorism did not satisfy proximate causation: "Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund. We see no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS." *Id.* at 97. Here, the connection is even more remote as Plaintiffs make no allegations whatsoever against DIB involving the Taliban, much less the types of plausible allegations connecting those specific Taliban monies to 9/11 as required by *Rothstein*.

### 4. Documents Related to the 1998 U.S. Embassy bombings

Plaintiffs' Requests Nos. 33-36 seek the production of documents relating to evidence implicating DIB in the 1998 U.S. Embassy bombings in Kenya and Tanzania. Motion 1 Ex. L at 23-24. DIB objected to these requests primarily because the requests are irrelevant. According to the 9/11 Commission Report, "KSM acknowledges formally joining al Qaeda, in late 1998 or 1999, and states that soon afterward, Bin Ladin also made the decision to support his proposal to attack the United States using commercial airplanes as weapons." 9/11 Commission Report at 154. Documents related to the 1998 Embassy bombings, if they even exist, are irrelevant to Plaintiffs' claims regarding the September 11 attacks because the Embassy bombings took place before al Qaeda even began planning the September 11 attacks.

Moreover, the only information in Plaintiffs' motion to compel consists of hearsay statements that "Al Qaida had previously used the Dubai Islamic Bank and local Hawala transfer companies to fund the bombings of the American embassies in Kenya and Tanzania," but provide no names or details. Motion 1 at 3. And, far from suggesting that DIB was a knowing participant (even if it had unnamed and unknown accounts), the sources relied upon by Plaintiffs

make clear that "[t]he emirates were quick to comply when the U.S. asked in 1998 that some Taliban accounts be closed at Dubai Islamic Bank."[5]

To the extent that there is any overlap between persons involved in 9/11 and in the Embassy bombings, the parties' search term protocol attempted to capture all such persons as persons involved in 9/11. To the extent that Plaintiffs are permitted to seek banking records for all al Qaeda members who may have been involved in the U.S. Embassy attacks but who were not involved in 9/11 in any way, DIB is not certain of the names of those persons—and Plaintiffs never proposed any such additions to the parties' final list of search terms.

### B.  Transactional Records

#### 5.  Additional Documents for Produced Accounts

Plaintiffs also seek additional "documents relating to all DIB accounts and financial transactions involving" the DIB account holders that DIB identified using the search term protocol outlined in Section II.A above. Motion 1 at 8-10. For each relevant account identified using that protocol, DIB agreed to produce numerous account related documents:

> non-privileged account opening and closing documents, Know-Your-Customer or other customer due diligence reports, suspicious activity or transaction reports, account numbers, monthly account statements, annual account statements, account notices, real estate records, records of assets, loan records, audit work papers, audit reports, and wire transfers, if any exist, from January 1, 1992 to September 11, 2011.

*E.g.,* Motion 1 Ex. M at 10.

Plaintiffs now apparently seek the production of any additional ***transactional records***—the records backing up each line on the produced account statements (*e.g.*, deposit slips, processed checks, etc.). The parties initially agreed to table the issue of whether DIB would produce transactional records that existed for all transactions on account statements until after DIB had completed its production and Plaintiffs reviewed it. Prior to searching for accounts and accessing the volume of transactions at issue, DIB was unwilling to commit to producing transactional documents for each transaction listed on every responsive account statement because, depending upon the number of transactions, the burden associated with doing so may have been monumental. *See* Motion 1 at 11 n.14. DIB's paper transaction records for the relevant time period are stored in a warehouse and organized in a manner that makes them difficult to retrieve by customer: they are organized by boxes from each branch, by the day the transaction occurred, in bundles of all transactions processed by a particular bank teller that day.

---

[5] Stephen Braun, *Emirates Looked Other Way While Al Qaeda Funds Flowed*, LA Times, January 20, 2002 (cited in Motion 1 at 3).

As a result, retrieving each paper transactional record on an account statement is difficult, because it requires tracing each transaction to a branch and teller, locating and retrieving one or more boxes in the UAE that may contain that record, finding the teller's bundle for the day in question, and searching through all transactions handled by that teller for the one corresponding to a single line on an account statement.

Counsel for DIB and Plaintiffs discussed this situation in 2011, and agreed to table Plaintiffs' request:

> DIB explained that generally checks are stored in transaction records for each branch organized by the date the transaction was processed. As a result, checks are co-mingled with all other checks cashed on the same date by a particular branch. Indeed, even locating the correct box in storage may be difficult. To find a single check, if it exists, is thus very burdensome. Given this recordkeeping situation, ***the parties agreed to address on a case-by-case basis at a later stage the issue of whether DIB needs to pull particular checks*** referenced in account statements that DIB produces.

Motion 1 Ex. O at 5 (emphasis added).

In short, the parties agreed that after Plaintiffs had a chance to review the account statements that DIB produced, Plaintiffs would identify the transactions for which Plaintiffs wanted transactional records. Plaintiffs, however, have never requested that DIB pull any transaction records on a case-by-case basis as the parties agreed in 2011.[6] Nonetheless, in light of the number of transactions at issue, DIB is willing to produce transactional records (to the extent that they exist) for any transactions on account statements that DIB has produced.

### C.  Additional Documents That Plaintiffs Speculate Should Exist

Plaintiffs seek additional documents related to (i) DIB's policies and procedures and (ii) an alleged meeting in July 1999 between US and UAE officials. DIB has already fully complied with its discovery obligations in response to these requests, and Plaintiffs are requesting additional information that they assume, without any evidence, exists.

### 6.  Additional Documents Relating to DIB's AML Policies and Procedures

Plaintiffs issued 17 separate requests (Request Nos. 65-81) for "all documents" related to DIB's anti-money laundering, ("AML"), combating terrorism financing ("CTF"), and know-your-customer ("KYC") policies and procedures. Motion 1 Ex. L at 35-42. In response, DIB

---

[6] In fact, Plaintiffs never raised any objections to DIB's production until July 13, 2015—the day before they filed their Motions to Compel.

agreed to "produce responsive non-privileged documents, if any exist, from January 1, 1992 to September 11, 2001" propounding or sufficient to set forth DIB's

- "policies, practices, procedures, and controls for anti-money laundering and combating the financing of terrorism" (Response to Request 65);

- "responsive non-privileged documents, if any exist, from January 1, 1992 to September 11, 2001." (Response to Request 66);

- "policies, practices, procedures, and controls regarding internal monitoring or reporting of wire transfers" (Response to Request 67);

- "Know-Your-Customer policies, practices, procedures, or programs" (Response to Request 68);

- "account opening policies, practices and procedures" (Response to Request 69);

- "customer acceptance policies, practices, and procedures" (Response to Request 70);

- "each training program concerning anti-money laundering or combating the financing of terrorism policies, practices, procedures, or controls, Know-Your-Customer policies, practices, procedures, or controls, investigating or filing suspicious activity or transaction reports, and compliance with any laws, rules or regulations concerning money laundering, terrorist financing, or suspicious activity reporting" (Response to Request 71);

- "software or internet-based program that Dubai Islamic Bank has used for the detection, monitoring or investigation of money laundering, terrorist financing, suspicious account activity reporting, or compliance with any applicable laws concerning money laundering, terrorist financing, or suspicious activity account reporting" (Response to Request 72);

- "policies and procedures for the filing of suspicious transaction reports or suspicious activity reports" (Response to Request 73);

- "policies and procedures, if any exist, concerning compliance with regulations relating to money laundering or terrorist financing" (Response to Request 74);

- "each speech or presentation, if any exists, given by Dubai Islamic Bank at any conference concerning anti-money laundering, terrorist financing, Know-Your-Customer practices, or suspicious activity or transaction reporting" (Response to Request 75);

- "communications, if any exist, concerning anti-money laundering best practices discussed at any anti-money laundering conference" (Response to Request 76);

- "internal controls concerning money laundering, terrorist financing, Know-Your-Customer policies, practices, and procedures, or suspicious activity or transactions" (Response to Request 77);

- "internal audits, examinations, studies, or investigations conducted by Dubai Islamic Bank" or "by any outside consultants, auditors, accountants or other parties employed or utilized by Dubai Islamic Bank" or "by any agency of Dubai, the United Arab Emirates, the United State or any other foreign government of Dubai Islamic Bank's (i) general policies, practices, procedures, and controls concerning anti-money laundering, combating the financing of terrorism, Know-Your-Customer, suspicious activity or transactions reporting, (ii) anti-money laundering, combating the financing of terrorism, Know-Your-Customer, suspicious activity or transactions reporting policies, practices, procedures, and controls concerning the persons or entities with the names 'Osama bin Laden,' [and numerous other individuals], or (iii) compliance with any laws, rules, regulations, policies, practices, or procedures concerning anti-money laundering, combating the financing of terrorism, Know-Your-Customer, or suspicious activity or transactions reporting as they relate to the persons or entities with the names 'Osama bin Laden,' [and numerous other individuals]" (Response to Requests 78-81);

DIB then undertook a good faith search for all such documents that it agreed to produce. As a result of this process, DIB produced dozens of responsive documents, including:

- Tasks and responsibilities of sections in Dubai Islamic Bank, which discusses DIB's KYC policies and procedures and account opening policies.  (DIB002457-DIB002699).

- Trade and Finance operations training program manual, which describes DIB's KYC and account opening policies and procedures.  (DIB002700-DIB002840).

- Guidebook on DIB's organizational structure, which discusses DIB's account opening policies. (DIB002841-DIB002929).

- DIB Procedure for Backup and Archival, which is related DIB's KYC, AML, and CTF policies. (DIB002930-DIB002956).

- DIB Letter (March 31, 2001) regarding monitoring of transfers (DIB002957).

- DIB Letters (June 17 & 18, 2001) regarding personal accounts and commercial activities (DIB002958).

- 14 -

- Email from Mohammed Al Ameery dated August 5, 2001 regarding incoming SWIFT payments (DIB002960).

- Letter (September 5, 2001) regarding cash deposit transfers in personal accounts (DIB002961).

- Central Bank Forms 2-01/2001 and 2-02/2001, which related to AML (DIB002962-DIB002963).

- DIB Circular 12 (May 8, 2001), which relate to policies and procedures for AML (DIB002964-DIB002965).

- Report (June 30, 2001) regarding AML activities (DIB002966-DIB002969).

- DIB Letter (May 29, 2001) regarding AML (DIB002970-DIB002971).

- Management Decision No. 67 (February 20, 2001), which discusses responsibility for compliance with applicable laws and rules concerning AML, CFT, or suspicious activity and transaction reporting (DIB002972).

- UAE Central Bank Circular 14/93 regarding UAE Central Bank directives (DIB002973-DIB002979).

- Central Bank Circular No. 457, which details and describes UAE Central Bank directives re account opening and other practices (DIB002980).

- UAE Central Bank Circular No. 5/92, which details UAE Central Bank AML and other suspicious activities directives (DIB002981).

- Central Bank Notice 69/83, which details and describes UAE Central Bank AML directives (DIB002982-DIB002983).

- Central Bank Circular No. 24/2000, which details and describes UAE Central Bank directives for AML (DIB002984-DIB003008).

Despite DIB's production, Plaintiffs now claim—without any evidence or specificity—that DIB has failed to produce sufficient documents related to DIB's AML, CTF, and KYC policies and procedures.  In fact, in light of Plaintiffs' Motions, counsel for DIB has rechecked its entire production process and made a limited supplemental production.[7]  Plaintiffs have not

---

[7] On September 17, 2015, DIB made an eight page supplemental production of account statements.  In addition, on September 29, 2015 DIB made a five page supplemental production of documents relating to AML policies and procedures and account statements.

identified any additional documents that they believe should exist but were not produced. Thus, Plaintiffs' assertions appear to have no basis.

### 7. Additional Documents Related to a July 1999 Meeting

Likewise, Plaintiffs also claim that DIB should have produced more written documents regarding an alleged meeting between the US government and UAE officials in July 1999. Plaintiffs' Requests Nos. 22-28 "seek the production of documents regarding the [alleged] meeting(s) held in or around July 1999 in the UAE involving [unspecified] U.S. officials and [unspecified] representatives of the UAE, relative to claims that Osama bin Laden was allowed to funnel money through [DIB] with the approval of DIB officials." Motion 2 at 3.

DIB conducted a good faith search for all responsive documents regarding the alleged 1999 meetings. As Plaintiffs concede, DIB has "produced roughly 101 pages of documents relating to the July 1999 meetings." *Id.* at 4. The documents produced by DIB consist of all known documents responsive to Plaintiffs' requests. In fact, DIB produced internal emails containing communications between the Bank and its US Lawyers in an effort to respond to Plaintiffs' allegations. These documents show that contrary to Plaintiffs' key allegation in this case, ***DIB had "never dealt directly with Osama bin laden, and ha[d] no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB*."** DIB003195-DIB003196 (emphasis added).

DIB has fully complied with its discovery obligations regarding Plaintiffs' alleged meeting. By comparison, Plaintiffs themselves have produced almost nothing save a few media accounts containing hearsay allegations regarding the meeting (Motion 1 Ex. H) and a public State Department press briefing (Motion 1 Ex. G). *See, e.g.,* PECDIB000664 (Beirut Times article).

Plaintiffs may be dissatisfied with DIB's production on this matter because what the DIB's documents systematically show is that ***Plaintiffs' claims that DIB knowingly assisted Osama bin Laden are patently false***. Having your claims undermined by your counterparty's production, however, is not a basis for a motion to compel.

### D. Irrelevant Documents and Undue Burden

Plaintiffs seek information regarding DIB's Sharia Board. In addition, Plaintiffs filed untimely and improper supplemental requests. As explained below, these requests are irrelevant to Plaintiffs claims in this case, and DIB should not be compelled to engage in the burdensome production of irrelevant information.

### 8. Additional Documents Relating to DIB's Sharia Board

In this case, Plaintiffs have alleged that DIB was "involved in providing financial facilities and support to the terrorists for ... the September 11, 2001 attacks." Burnett Complaint at ¶115. Namely, Plaintiffs have alleged that DIB (1) "held accounts" for perpetrators of 9/11

and (2) DIB processed transactions or allowed the "channeling [of] funds" for individuals involved in the 9/11 attacks. *Id.*

Plaintiffs made no allegations about any role by DIB's Fatwa and Sharia Supervisory Board in their complaints or RICO statements. Nevertheless, Plaintiffs issued 19 document requests regarding DIB's Sharia Board. *See* Request Nos. 46-64, Motion 1 Ex. L at 28-34.

DIB is an Islamic Bank. UAE law specifically provides for and regulates banks that want to offer services as Islamic financial institutions. "Islamic banks, financial institutions and investment companies shall mean those whose articles and memorandums [sic] of association include a commitment to abide by the provisions of the Islamic Sharia'h Law, and conduct their activities in accordance therewith." U.A.E. Federal Law no-(6) of 1985 Regarding Islamic Banks, Financial Institutions, and Investment Companies (UAE) at 1 (attached as Ex. 7).

Consistent with UAE law, DIB's Sharia Board passes on the structuring of financial transactions at the Bank to ensure that those transactions are structured to comply with Sharia law (principally to ensure that the bank does not charge "Riba", which includes a prohibition on "the charging of any interest"). *E.g.,* Inst. of Islamic Banking & Ins., Islamic Banking, http://www.islamic-banking.com/what_is_ibanking.aspx (last visited Sept. 30, 2015) ("Islamic banking refers to a system of banking or banking activity that is consistent with the principles of the Shari'ah (Islamic rulings) and its practical application through the development of Islamic economics. The principles which emphasise [sic] moral and ethical values in all dealings have wide universal appeal. Shari'ah prohibits the payment or acceptance of interest charges (riba) for the lending and accepting of money, as well as carrying out trade and other activities that provide goods or services considered contrary to its principles."). Instead of directing anyone at the bank to accept certain customers, the Sharia Board is an independent entity that functions to review "compliance of the Company's transactions with the provisions of and rules of Sharia." DIB Articles of Incorporation at 54 (attached as Ex. 9).

At issue in this litigation is not the permissibility of DIB's products (such as checking accounts, home financing, or automobile financing) under Sharia law. As a result, Plaintiffs' 19 separate document requests seeking almost every record related to or affiliated with DIB's Sharia Board is irrelevant and unduly burdensome. *See* Motion 1 Ex. L at 27-33.

Accordingly, DIB agreed to produce documents sufficient to explain the Sharia Board's role at DIB. Plaintiffs' efforts to obtain additional Sharia Board documents is simply a fishing expedition aimed at issues irrelevant to this litigation and completely divorced from the role of the Sharia Board at the Bank. For example, Plaintiffs move to compel the production of "any and all Fatwa and Shariah Supervisory Board documents relating to the conflicts, crises, or conditions facing Muslim communities in . . . Chechnya . . . Kashmir . . . the Philippines." Motion 1 Ex. L at 32, Request 58. Plaintiffs also seek "any and all Fatwa and Shariah Supervisory Board documents discussing the provision of support to the mujahideen forces in any part of the World." *Id.* at 33, Request 61. None of this has anything to do with whether DIB is legally responsible for causing Plaintiffs' 9/11-related injuries.

CLIFFORD CHANCE US LLP

In fact, as a result of DIB searching for information responsive to other RFPs, Plaintiffs have already received account documents for individuals affiliated with al Qaeda as well as AML policies and procedures responsive to Plaintiffs' core allegations, which have nothing to do with DIB's Sharia Board. *See* DIB002961 ("We have recently implemented a mechanism for confirming the legality of incoming bank drafts before being deposited in the account").

Plaintiffs refer to four individuals that have served or are allegedly affiliated with DIB's Sharia Board (*see* Motion 1 at 9-10)—all of whom are entirely irrelevant to Plaintiffs' claims. First, Plaintiffs allege that Sheikh Yusuf al Qaradawi "was one of the first DIB Sharia advisors." Motion 1 at 2 n.2. Plaintiffs provide no cite for this claim. In fact, DIB was founded in 1975, and Plaintiffs provide no basis for something that occurred in or around 1975 as causing an event 26 years later. Indeed, Qaradawi never served on DIB's Sharia Board. Moreover, Qaradawi was previously a defendant in this case, and Plaintiffs voluntarily dismissed him. Dkt. 1917 (attached as Ex. 9). Second, Plaintiffs use the personal, post-9/11 writings of former DIB Sharia Board members, Dr. Ajeel Jassem al Nashmi and Dr. Ali Muhssein al Din Qaradaghi, in an apparent attempt to prejudice this Court and conflate substance with legal theatrics. These personal statements had nothing to do with their duties at the Bank before 9/11. Sharia Board members do not approve new bank customers or determine whether DIB will continue to bank with them. *See* Exs. 9, 10. Moreover, DIB's own policies (produced to Plaintiffs at DIB002638) provide that "none of the members of the [Sharia] board are permitted to issue an individual fatwa in his capacity as a member of the board." Lastly, Plaintiffs allege that Sharia Board Chairman Dr. Hussain Hamid Hassan provided his personal endorsement to Abdallah Azzam's "Defense of the Muslim Lands" prior to its publication in 1979. Motion 1 at 3 n.3. Even taking such hearsay at face value, Plaintiffs show no connection with events prior to 1979 and the tragic attacks of 9/11.

In any event, DIB is willing to supplement its production to produce to Plaintiffs (1) all DIB Sharia Board members' names and tenures from January 1, 1992 to September 11, 2001, and (2) DIB's Articles of Incorporation outlining Sharia Board legal responsibilities (attached hereto as Ex. 8).

## 9.    **Plaintiffs' Unauthorized Supplemental RFPs**

On July 31, 2012—almost two years after the December 10, 2010 deadline set by this Court for the service of document requests—Plaintiffs served 43 additional document requests. Motion 1 Ex. P. On August 22, 2012, DIB objected to the Second RFPs in their entirety because the requests were "untimely" and "because the requests are not follow-up discovery based upon facts Plaintiffs learned during the course of discovery in this matter; instead, Plaintiffs' Supplemental Requests are merely an end-run around the Court's requirement that Plaintiffs serve document requests by December 10, 2010." Ex. 6 at 2; Motion 1 Ex. Q at 2. These objections should be sustained.

First, Plaintiffs' Second RFPs completely subvert this Court's order issued in October 2010. Shortly after the Court's resolution of motions to dismiss, this Court issued an order requiring that Plaintiffs' "document requests be served by December 10, [2010]." Dkt. 2381.

Plaintiffs have repeatedly expressed understanding the importance of the Court's structuring of document collection and have only reserved the right to ask for reasonable **follow-up** discovery based upon new information. Plaintiffs "ask[ed] for the opportunity to get the collective documents from the defendants and see whether or not [they] have legitimate followup [sic] discovery with some of" the Defendants. Transcript of Record at 40 (Dec. 20, 2013) (Dkt. No. 2822) (attached as Ex. 10). Accordingly, this Court limited its consideration of future follow up requests to "*reasonable requests suggested by that discovery which is produced*." Transcript of Record at 13 (Jun. 28, 2013) (Dkt. No. 2717) (emphasis added) (attached as Ex. 11). None of Plaintiffs' Second RFPs are follow-up related to information suggested by discovery that was unavailable to Plaintiffs at the time they served their initial RFPs in 2010. In fact, Plaintiffs never explain how a single request in their Second RFPs was based upon information that Plaintiffs did not have and could not reasonably have discovered on December 10, 2010.

By issuing Second RFPs completely divorced from any reasonable follow-up based upon new facts learned through prior discovery requests, Plaintiffs sought to completely undermine the Court's ordering of discovery. By requiring Plaintiffs to serve all discovery requests at one time, the Court sought to permit the parties to conduct one comprehensive collection process. Indeed, even with the Court's foresight, a single international document collection and production process that required foreign government permission to process was a substantial undertaking in terms of time and cost. Plaintiffs' Second RFPs seek to force counsel for DIB to commence a second costly and time-consuming collection process in the UAE. The Court should reject Plaintiffs' motion to compel their unauthorized Second RFPs.

Second, Plaintiffs' Second RFPs are completely beyond the scope of discovery set by Rule 26 and are unduly burdensome. In fact, Plaintiffs never even address any of DIB's specific objections (Motion 1 Ex. Q) to their Second RFPs. It is easy to see why they do not defend the requests on their merits. The majority of Plaintiffs' additional 43 requests (Request Nos. 11-33) seek information about *DIB v. Citibank*. Motion 1 Ex. P at 5-9. The *Citibank* litigation is a 2000 litigation involving responsibility for a financial fraud committed against DIB in the mid-1990s that has no relation to 9/11. Additionally, Plaintiffs' Second Request Nos. 2-10 and 39-43 seek account documents for additional individuals and entities that Plaintiffs failed to include in the agreed upon search term methodology as discussed in Section II.A. above. Plaintiffs' Request Nos. 1 and 34 relate to Ali Abdul Aziz Ali—an individual for whom DIB has already produced all responsive documents in its possession.

Finally, Plaintiffs' remaining Request Nos. 35-38 essentially seek "all documents DIB sent to and/or received from any United States governmental agency" "from January 1998 through the present." Motion 1 Ex. P at 9-10. Such a broad sweeping request is not reasonably limited in time or scope. The request on its face has no limitation to documents that have a connection with the claims or defenses in this case. Moreover, DIB already agreed to produce documents, including account statements, for "any correspondence from the U.S. or U.A.E. governments that identifies a person as being affiliated with al Qaeda." *Id.* at 7.

Plaintiffs' Second Requests are simply an end-run around this Court's structuring of discovery and seek to force DIB to complete another expensive, lengthy, and burdensome document collection process.

For all of the these reasons set forth above and in DIB's objections to Plaintiffs' initial and supplemental RFPs, we urge the Court to deny Plaintiffs' Motions.

Respectfully submitted,

/s/ Steven T. Cottreau

Steven T. Cottreau

cc:      MDL-1570 Counsel of Record (via ECF)