# EXHIBIT 1

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 7/11/2018
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

TERRORIST ATTACKS ON
SEPTEMBER 11, 2001

-----------------------------------------------------------------X

03-MDL-1570 (GBD)(SN)

**OPINION AND ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

On October 30, 2017, the Plaintiff's Executive Committees ("PECs") moved to compel Defendant Dubai Islamic Bank ("DIB") to comply with the Court's March 22, 2016 Order and immediately: (1) search its electronic legacy account database for relevant banking and financial records using 37 search terms at issue; (2) search its electronic legacy account database for relevant banking and financial records for the individuals, entities, and accounts previously agreed to by the parties; and (3) search for and produce documents relevant to DIB's alleged involvement in the 1998 U.S. Embassy bombings. ECF No. 3775 at 5–6. The motion is GRANTED in part and DENIED in part.

## BACKGROUND

The PECs allege that DIB provided al Qaeda with "material support," which is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, [or] financial services." 18 U.S.C. § 2339A(b). According to the PECs, after the U.S. government announced that DIB laundered money for Osama bin Laden in 1999, DIB knowingly continued to allow bin Laden and al Qaeda operatives to use DIB's financial services and refused to adhere to banking industry standards designed to thwart the support of terrorist networks. ECF No. 2252 at 48–49. Bin Laden's Chief Financial Officer allegedly used his DIB account to transfer thousands of dollars to two hijackers to cover their flight lessons and other

expenses they incurred before the September 11th attacks. Id. at 49. The PECs allege that DIB provided these banking services to al Qaeda knowing that the services would be used to finance al Qaeda's plan to commit a terrorist act against the United States. Id. at 54–56.

The PECs also allege that al Qaeda and the Taliban had a "symbiotic relationship" before the September 11th attacks. ECF No. 3253 at 16. According to the PECs, the two groups fought alongside one another in Afghanistan, and al Qaeda purportedly gave the Taliban up to $20 million per year. Id. The PECs also note that in the wake of the 1998 U.S. Embassy bombings in Kenya and Tanzania, the United Nations Security Council established the Al-Qaeda and Taliban Sanctions Committee, which recognized the Taliban's role in supporting al Qaeda and directed all nations to freeze financial accounts controlled by the Taliban. Id. at 17. The PECs allege that DIB further supported al Qaeda by allowing members of the Taliban to use DIB's banking services to funnel money to al Qaeda. Id.

On October 15, 2010, the PECs' First Set of Requests for Production of Documents directed DIB to produce:

> (i) banking and financial records for DIB accounts linked to Osama bin Laden, members of al Qaeda, and financiers of the terrorist organization; (ii) banking and financial records for Taliban accounts at DIB; (iii) documents relating to DIB's involvement in the funding of the 1998 U.S. Embassy bombings; (iv) documents relating to the 1998 and 1999 meetings between U.S. officials and representatives of DIB and the [United Arab Emirates ("UAE")] government concerning al Qaeda's use of DIB to launder and move money; and (v) DIB accounts that were frozen following the September 11, 2001 attacks.

ECF No. 3775 at 1. The PECs served supplemental discovery requests on July 31, 2012, and March 21, 2016, which also sought banking records for DIB accounts linked to members of al Qaeda, charities that were allegedly fronts for al Qaeda, associates of bin Laden, and groups allegedly connected to al Qaeda. Id. DIB served responses and objections to the discovery

2

requests on January 21, 2011, September 4, 2012, and April 25, 2016. Id. DIB produced approximately 5,500 pages of documents. Id.

On July 14, 2015, the PECs filed a motion to compel pursuant to Federal Rule of Civil Procedure 37(a), arguing that DIB failed to produce basic account information and other financial records for many DIB bank accounts allegedly used by al Qaeda members, charities connected to al Qaeda, terrorist organizations connected to al Qaeda, and terror financiers. Id. The motion also sought banking records from DIB accounts frozen following the September 11th attacks, accounts associated with the designated terrorist organization Hamas, documents about DIB's alleged involvement in the 1998 U.S. Embassy bombings, and banking records from alleged Taliban accounts DIB was asked to close following the 1998 U.S. Embassy bombings. Id. at 2–3.

The Court held a conference on March 22, 2016, to discuss the discovery disputes. ECF No. 3253. The PECs argued that the searches and records they had requested "go directly to the heart of the nature, origin, and extent of [DIB's] collaboration with al Qaeda and its immediate partners." Id. at 6. In response, DIB explained that it had already produced "any government correspondence that DIB received asking it about accounts that related to al Qaeda," any correspondence that was exchanged in connection with those inquiries, and any account opening statements, records of debits and credits, and additional electronic information for those accounts. Id. at 25–28. After applying this search criteria, DIB had produced documents relating to eight accounts. Id. at 30, 33.

Next, DIB noted that in July 2011, DIB received a list of proposed search terms from the PECs that included over 2,900 names, alternate spellings, and aliases. Id. at 34–35. DIB explained that the list was particularly lengthy because the process of translating names from

Arabic to English often resulted in numerous alternative spellings for a single name, and furthermore, many of the individuals that the PECs had identified used aliases. Id. DIB argued that searching its database for all 2,900 of the proposed names would be unduly burdensome. Id. DIB agreed to search for 261 names from the list, which included alternate spellings and aliases, because those names were identified in the 9/11 Commission Report as having a connection with the September 11th attacks. Id. at 36.

DIB also explained that it had provided the PECs with a copy of a letter from the Central Bank of the United Arab Emirates asking DIB to search for and freeze any accounts associated with 152 individuals and one entity that were purportedly involved with the Taliban. ECF No. 3253 at 11, 37–39. All of the names listed in the letter were redacted. Id. DIB contended that it had redacted the names because the account holders were not members of al Qaeda and the bank wanted to protect their identities. Id. at 38–39.

The Court added up the 261 terms that DIB had agreed to search, the 152 names of alleged Taliban members, and the eight accounts for which documents had already been produced. Id. at 51. The following exchange then occurred:

> THE COURT: Okay. So, there are 421 accounts, eight of which have been produced.
>
> [DIB]: Hold on.
>
> THE COURT: The balance of which.
>
> [DIB]: Search terms, not accounts.
>
> THE COURT: Okay.
>
> [DIB]: The 152 accounts don't exist and the 261 accounts don't exist.
>
> THE COURT: So it may well be that the 261 generates fewer accounts.
>
> [DIB]: It may be that it generates no accounts.
>
> THE COURT: Right. The 152, on the other hand, are accounts.

4

> [DIB]: No. Not necessarily.
>
> THE COURT: Oh okay.
>
> [DIB]: Those are, again, names that were provided in a central bank circular that were affiliated with the Taliban.
>
> THE COURT: Okay. Let me then revert back to [the PECs] and say beyond that universe of 421 today, regardless of how we got there starting with 2,900 what, if anything else, are you looking for?

Id. at 51–52.

The PECs responded that they were also seeking account information for "al Qaeda members involved in the embassy bombings who just didn't happen to be mentioned in the 9/11 Commission Report." Id. at 53. According to the PECs, in the wake of the 1998 U.S. Embassy bombings, authorities asked DIB to close the accounts of 16 members of the Taliban. Id. at 54. The PECs believed records from those accounts were relevant to their claims. Id. DIB explained that it did not know which 16 accounts DIB was allegedly asked to close in connection with the 1998 U.S. Embassy bombings. Id. at 56. The Court then stated that the onus fell on the PECs to provide DIB with further information about those accounts. Id. at 56–57.

After the parties delivered their arguments, the Court issued the following order:

> I indicated there are 421 or so accounts or names perhaps also augmented by the accounts that [the PECs] just spoke about that will relate to the embassy bombings which then there was a specific request that DIB close and perhaps certain other similar requests. For that universe of . . . accounts or names which I gather is larger than 421 but probably no larger than 500, I am going to direct that to the extent it hasn't already been done, the account opening and if there is any account closing paperwork, the periodic statements and the other electronic information that exists such as the wire transfer information that [DIB] alluded to, be produced.

Id. at 55. The Court later clarified that DIB should also provide the PECs with the unredacted list of 152 individuals who were allegedly members of the Taliban. Id. at 59.

In addition, the Court asked whether DIB had undertaken a good faith search for documents relating to any investigations DIB conducted in connection with the 1998 U.S.

5

Embassy bombings. Id. at 62–63. DIB asked whether the Court was referring to the 16 accounts DIB was purportedly asked to close in the wake of the embassy bombings. Id. at 63. The Court responded, "No. We are talking about, I believe, investigations or other responses that the bank may have had in terms of checking whether it had troublesome accounts or relationships." Id. DIB indicated that it had not produced any documents related to any such investigations. Id. Accordingly, the Court directed DIB to "expand the search" to encompass investigatory documents relating to the 1998 U.S. Embassy bombings. Id. at 64.

On October 10, 2016, the PECs provided DIB with their list of individuals, entities, and accounts to be searched in DIB's electronic account database. ECF No. 3776-11. The PECs did not count alternative spellings and aliases towards the limit of 500 names. Id. When alternative spellings and aliases were counted separately, the PECs' list contained 804 total search terms. ECF No. 3788 at 5. After several discussions between the parties, the PECs agreed to eliminate a total of 126 individuals and entities (and all associated aliases) from their list, reducing the total number of search terms to 666. ECF No. 3775 at 5; ECF No. 3788 at 5. DIB continues to object to 37 search terms on that list.[1] ECF No. 3775 at 5. In addition, on October 11, 2017, DIB sent the PECs a letter identifying approximately 800 pages of documents that were "possibly related to the persons involved in the 1998 U.S. embassy bombings." ECF No. 3776-21.

On October 30, 2017, the PECs filed a motion to compel, requesting that the Court direct DIB to search its electronic legacy system for the 37 names in dispute, as well as the individuals, entities, and accounts previously agreed to by the parties. ECF No. 3775 at 5–6. The PECs also contend that DIB has failed to conduct an adequate search for documents related to DIB's

---

[1] DIB asserts that the parties remain in disagreement over 37 search terms. ECF No. 3775 at 5 & n.4. The PECs assert there are 31 individuals and entities in dispute with 6 aliases associated with 2 individuals and 2 entities. Id.

6

investigations into accounts that may have been used in connection with the 1998 U.S. Embassy bombings. Id. at 6. The PECs ask that the Court order DIB to search for and produce additional documents relating to those bombings or face sanctions for its failure to do so. Id.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) states that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "A party may serve on any other party a request" to produce documents within the scope of Rule 26(b). Fed. R. Civ. P. 34(a). "The responding party must produce documents sought in each request or 'state an objection to the request, including the reasons.'" Pegoraro v. Marrero, 281 F.R.D. 122, 132 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 34(b)(2)). "A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if "a party fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B). "If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule . . . 37(a), the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A).

## DISCUSSION

**I.      The 37 Disputed Search Terms**

During the March 22, 2016 conference, the Court directed the PECs to provide DIB with a list of 500 "accounts or names" and directed DIB to search for associated accounts. ECF No. 3253 at 55. DIB argues that the PECs disregarded the Court's order by "(i) removing some of the 421 search terms [the Court] ordered be searched, (ii) failing to count each alias as a search term in order to exceed the 500 term limit, and (iii) ignoring the four categories established by [the

Court]." ECF No. 3788 at 5. Because the PECs' "list is already at 629 terms—129 terms over [the Court's] order of 500 search terms"—DIB argues that it should not be required to produce documents relating to the 37 search terms at issue. ECF No. 3788 at 5.

The PECs respond that the parties were not bound by the four categories discussed during the conference. ECF No. 3797 at 1. According to the PECs, instead of resolving all of the disputes raised by the PECs' requests, the Court used the "categories of relevant documents as a benchmark to construct a practical approach to resolving the dispute. Under that approach, [the Court] simply set a numerical limit on the number of individuals and entities that plaintiffs would be permitted to submit." Id. The PECs also contend that the Court allowed them "to provide DIB with a listing of 500 individuals and/or entities of their choosing, including any and all aliases associated with each of those individuals and/or entities." Id. at 3. In their view, "[i]ncluding every alias as an independent search term would dramatically and artificially reduce the number of 'persons' to be searched well below the limit [the Court] plainly intended." Id.

But the Court's intent is clear from the record. The Court added up: (1) the eight accounts for which DIB had already produced documents; (2) the 261 names, alternative spellings, and aliases that DIB had agreed to search based upon the 9/11 Commission Report; and (3) the 152 names of individuals who were allegedly members of the Taliban. This resulted in a list of 421 accounts and names that DIB would use as search terms. The Court also acknowledged that the list of 421 search terms should be augmented by additional terms related to accounts DIB was asked to close in connection with the 1998 U.S. Embassy bombings and "certain other similar requests." ECF No. 3253 at 55. In other words, the Court did not allow the PECs free rein to determine all 500 of the search terms. The Court provided specific instructions on which terms and subject matters should be included in the list.

The Court also made clear that alternative spellings and aliases would count towards the cap of 500 accounts or names. The Court set the limit of 500 accounts or names precisely because of DIB's concerns that searching for alternative spellings and aliases would dramatically increase the number of searches to be carried out. The list of 500 accounts or names was meant to cut the list of 2,900 names, alternative spellings, and aliases to a more manageable list. Furthermore, during the conference, DIB made clear that the list of 261 names that DIB had agreed to search was inclusive of alternative spellings and aliases. By adopting that list of 261 names, alternative spellings, and aliases as one of the categories that would be searched, the Court demonstrated that alternative spellings and aliases would count towards the total limit of 500 accounts or names. Finally, DIB was careful to explain that the list should include "[s]earch terms," rather than accounts. Id. at 51–52. When the Court stated that "421 accounts" would be searched, DIB clarified that searching for the 261 names on DIB's list and the 152 names on the list of alleged Taliban members might not yield any accounts at all because those lists merely consisted of names that would be used as search terms. Id. The Court then accepted the approach DIB had articulated. These discussions all demonstrate that the Court intended for the PECs to provide a list of 500 search terms—not a list of 500 individuals or entities plus an unlimited number of alternative spellings and aliases.

The 37 names in dispute exceed the 500 search-term limit set by the Court, and the Court will not order further production with respect to those names. The PECs' motion to compel DIB to search its database for the 37 names in dispute and produce documents for accounts found through those searches is DENIED. Within 60 days of the date of this Opinion and Order, however, DIB is ORDERED to search for all of the remaining 629 terms on the list and produce

opening and closing statements, periodic statements, and other electronic information for any accounts that are located through those searches.

## II.  Documentation Related to the 1998 U.S. Embassy Bombings

The PECs also seek documents regarding any DIB investigations into accounts that may have been used in connection with the 1998 U.S. Embassy bombings in Kenya and Tanzania. During the March 22, 2016 conference, the Court directed DIB to search for documents related to any internal investigations DIB may have conducted to determine whether "it had troublesome accounts or relationships" following the bombings. ECF No. 3253 at 63–64. In October 2017, DIB sent the PECs a letter identifying approximately 800 pages of documents that were "possibly related to the persons involved in the 1998 U.S. embassy bombings." ECF No. 3776-21. The PECs note that these documents do not include "any internal memoranda, meeting minutes, investigation records, or other materials a sophisticated financial institution would possess in response to public accusations of involvement in acts of terrorism." ECF No. 3775 at 13. The PECs also note that "the documents in the production have no clear or apparent relationship to the embassy bombings." Id. DIB responds that the documents DIB identified in the October 2017 letter include information relating to an account belonging to Mamdouh Mahmoud Salim, an individual who has been connected to the 1998 U.S. Embassy bombings. ECF No. 3788 at 17–18. DIB also notes that the October 2017 letter stated that certain documents were "possibly related" to the 1998 U.S. Embassy bombings because DIB "does not have independent knowledge about who actually caused the Embassy bombings." Id.

But DIB misconstrues the order the Court gave during the March 22, 2016 conference. DIB states that the Court directed the bank to search for responsive documents "related to DIB's investigation of 'accounts that they were asked to close in the wake of the embassy bombings.'"

Id. at 17 (quoting ECF No. 3253 at 54). Although the Court directed DIB to produce documents relating to accounts that authorities asked DIB to close, the Court separately directed DIB to search for documents relating to "investigations or other responses that the bank may have had in terms of checking whether it had troublesome accounts or relationships." ECF No. 3253 at 63. In other words, the Court directed DIB to produce documents relating to any investigations DIB may have conducted on its own initiative, not merely investigations that were carried out based upon a request by the government. Considering that DIB misunderstood the nature of the order, the Court is not convinced that DIB has searched for and produced all documents in response to the Court's order.

Accordingly, DIB is ORDERED to search for and produce any documents related to internal investigations DIB may have conducted to assess whether any accounts were used in connection with the 1998 U.S. Embassy bombings. Responsive documents may include internal memoranda, meeting minutes, investigation records and reports, communications between DIB and the UAE government, and other similar materials. The Court acknowledges that DIB may not have conducted any internal investigations in connection with the 1998 U.S. Embassy bombings and may have simply closed certain accounts at the request of the UAE government. A renewed search may not result in any additional production. Nonetheless, DIB must search its records in a manner that conforms with the Court's orders and produce any responsive documents within 60 days of the date of this Opinion and Order. In addition, within 60 days of this Opinion and Order, DIB must provide the PECs with a sworn declaration from a DIB officer that complies with 28 U.S.C. § 1746 affirming that DIB has searched for and produced all documents relating to any investigations DIB conducted in connection with the 1998 U.S. Embassy bombings.

## CONCLUSION

The PECs' motion to compel discovery is GRANTED in part and DENIED in part. DIB is ORDERED to search for the 629 terms previously agreed upon by the parties and produce opening and closing statements, periodic statements, and other electronic information for any accounts that are located using those searches. DIB must produce these documents within 60 days of the date of this Opinion and Order. DIB is not required to search for any of the 37 terms that the parties dispute. In addition, DIB must search for and produce any documents relating to any internal investigations DIB may have conducted to determine whether any accounts were used in connection with the 1998 U.S. Embassy bombings. DIB must produce any such documents—and must produce a sworn declaration stating that it has searched for and produced any such documents—within 60 days of the date of this Opinion and Order. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 3774.

**SO ORDERED.**

DATED:   July 11, 2018
         New York, New York

SARAH NETBURN
United States Magistrate Judge