UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case<br><br>**RICO STATEMENT applicable to SAMIR SALAH** |

*This document relates to:*          *Federal Insurance Co. v. al Qaida*
                                   03 CV 06978 (RCC)

## RICO STATEMENT APPLICABLE TO SAMIR SALAH

Based on information currently available, and pursuant to the Case Management Orders applicable to this litigation, plaintiffs submit this RICO statement for defendant Samir I. Salah ("Salah").[1]

Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, much information is presently unavailable to plaintiffs, absent discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

1.       The unlawful conduct is in violation of 18 U.S.C. § 1962(a), (c) and/or (d).

2.       The name of the defendant to whom this RICO statement pertains is Samir Salah. The alleged misconduct and basis for liability is set forth in Exhibit "A".

3.       Not applicable. All known wrongdoers are named as defendants in this action. Given the vastly complicated nature of the conspiracy and other wrongdoing that led to the events of September 11, 2001, however, much information is unavailable to plaintiffs, and the identities of other wrongdoers may be revealed through discovery. Plaintiffs therefore reserve the right to amend this RICO statement as information is learned and verified and after discovery is obtained.

---

[1]       Paragraph 14 of Case Management Order No. 2 authorizes the <u>Federal Insurance</u> plaintiffs to file RICO statements in this litigation. Under normal circumstances, the timing for filing such RICO statements is tied to the filing of an appearance on behalf of that defendant. In the present case, a default judgment had been entered against Mr. Salah on April 7, 2007, before any appearance by counsel on his behalf. As it would have been procedurally improper to file a RICO statement as to Mr. Salah at any point prior to this Court's decision to vacate that default judgment, the <u>Federal Insurance</u> plaintiffs are filing this RICO statement within thirty days of the first appearance of counsel on behalf of Mr. Salah following the Order to vacate the default judgment against him.

4.     The name of each victim and the manner in which each was injured is indicated on the chart attached hereto as Exhibit "B".

5.     (a) <u>list of predicate acts and specific statutes violated:</u>

| | |
|---|---|
| conspiracy to commit murder | NY CLS Penal § 105.15;<br>NY CLS Penal § 125.25(xi) |
| conspiracy to commit arson | NY CLS Penal § 105.15;<br>NY CLS Penal § 150.15 |
| Travel Act | 18 U.S.C. § 1952 |
| illegal transactions in monetary instruments | 18 U.S.C. § 1956 |
| money laundering | 18 U.S.C. § 1957 |
| financial institutions fraud | 18 U.S.C. § 1344 |
| mail fraud | 18 U.S.C. § 1341 |
| wire fraud | 18 U.S.C. § 1343 |
| tax evasion | 26 U.S.C. § 7201 |
| Providing material support of Terrorism | 18 U.S.C. § 2332(b)(g)(5)(B)<br>18 U.S.C. § 2339A<br>18 U.S.C. § 2339B<br>18 U.S.C. § 2339C |
| Anti-Terrorism Act | 18 U.S.C. § 2332b |

(b) dates of, the participants in, and a description of the facts surrounding the predicate acts

| DATES | PARTICIPANTS | FACTS |
|---|---|---|
| early 1990s to 9/11/2001 | Samir Salah | Samir Salah conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in the al Qaida movement, which conspiracy culminated in the Attack. |
| early 1990s to 9/11/2001 | Samir Salah | Samir Salah undertook the above-named actions as part of a conspiracy to commit murder and arson, in that he knew that the |

| | | |
|---|---|---|
| | | Enterprise in which he was participating, the al Qaida movement, planned to and would commit acts of deadly aggression against the United States in the near future, using the resources and support it supplied. |
| early 1990s to 9/11/2001 | Samir Salah | Samir Salah agreed to form and associate himself with the Enterprise and agreed to commit more than two predicate acts, *i.e.*, multiple acts of money laundering, murder and arson, in furtherance of a pattern of racketeering activity in connection with the Enterprise. |

(c) Not applicable.

(d) No.

(e) No.

(f) The predicate acts form a pattern of racketeering in that they are continuous, and are a part of the Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and obfuscate their support of the al Qaida movement.

(g) The predicate acts relate to each other (horizontal relatedness) as part of a common plan because each act of money laundering, technical support and tax evasion allowed certain of the defendants to surreptitiously provide funds to terrorist organizations, including al Qaida, which conspiracy culminated in the Attack.

6.     (a) The enterprise (the "Enterprise", "the al Qaida movement", or "global jihadist movement") is comprised of the defendants named in the First Amended Complaint, and is a collection of persons, organizations, businesses, and nations associated in fact.

(b) The Enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Laden ("Bin Laden") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. The structure of the Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Enterprise utilizes acts of racketeering to further its overall common purposes of: (i) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries; (iii) punishing Israel, and the United States for its perceived support of Israel; and (iv) establishing a pan-Islamic caliphate. The al

Qaida movement does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Enterprise's clandestine nature and its success. Thus, although al Qaida has its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees are not a hierarchical chain of command but are instead a means for coordinating functions and providing material support to operations.  Samir Salah fit neatly into this framework by raising and providing funds for and otherwise providing material support for al Qaida and the members of the Enterprise who planned, coordinated and carried out the Attack.

(c) No.

(d) Samir Salah is associated with the Enterprise.

(e) Samir Salah is a member of the Enterprise, and is separate and distinct from the Enterprise.

(f) Samir Salah intended to further the Attack and adopted the goal of furthering and/or facilitating that criminal endeavor, which criminal activity culminated in the Attack. For example, Samir Salah and other defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of the al Qaida movement to perpetrate radical Muslim terrorism. For example, in one such transaction, in 2000, the Safa Trust, a SAAR Network entity of which Salah was a founder and served as an officer, "donated" $400,000 to another SAAR Network Entity, the York Foundation (located in the same building as Safa Trust), which in turn sent $400,000 to a related entity called York International Trust, a shell company located in the Isle of Man, which is famed for its bank secrecy laws. These layered transactions were carried out in order to covertly channel funds to the Enterprise.

As a further example of layering involving a charitable contribution and loan, in 1996 Safa contributed $8.6 million to the Heritage Education Trust, controlled by another SAAR Network participant. according to the Safa Trust 990. In that same year Heritage loaned $5.5 million to Mar-Jac Holdings, Safa's majority owned subsidiary. In the following year, Heritage transferred $4.1 million to Safa, reporting that this was a return of the 1996 contribution. As there was no reason Safa could not have made the loan directly to Mar-Jac Holdings, its subsidiary, it is apparent that the route the funds traveled, from Safa to Heritage to Mar-Jac, with a portion being returned to Safa, was designed to disguise the true nature of the transaction and the ultimate disposition of these funds.  Indeed, between 1996 and 2000, approximately $26 million was funneled from the SAAR network of charities (including the International Institute for Islamic Thought and the Heritage Education Trust, both of which were controlled by SAAR Network participants) to the York International Trust and Humana Charitable Trust, both Isle of Man entities controlled by other members of the enterprise all working from the same location in Herndon, Virginia. In other words, Samir Salah directed funds through a series of other entities over which they

had influence until those funds ultimately reached a shell company in the Isle of Man, where Salah and the other SAAR Network officers could no longer be tracked by federal authorities. These transactions bear all of the hallmarks of money laundering in support of terrorism. Such money laundering, the filing of false tax returns, and tax evasion were all in furtherance of a conspiracy to commit murder and arson which culminated in the Attack.

7.     The pattern of racketeering activity conducted by Samir Salah is separate from the existence of the al Qaida movement, but was a necessary component to the Attack.

8.     The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Samir Salah furthers and facilitates that activity, which activity culminated in the Attack.  The usual and daily activities of the Enterprise includes recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are furthered and facilitated by the racketeering activities described herein.

9.     The Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies.

10.    The Enterprise, and the racketeering activities conducted by Samir Salah, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.   Additionally, the Attack itself affected commerce.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, * 8 (stating that the Attack "severely damaged the U.S. economy").

11.    Not applicable.

12.    Not applicable.

13.    The al Qaida movement "employs" certain individuals, only a few of whose identities are known, including defendant Osama bin Laden.

14.    The history of the conspiracy behind the al Qaida movement could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  From its inception, al Qaida has relied on well-placed financial facilitators and logistical sponsors, including Samir Salah, to raise, manage and distribute money and resources for the Enterprise under the guise of legitimate banking business activity.  Al Qaida has also relied heavily on certain imams at mosques who were willing to divert the zakat, the mandatory charitable contributions required of all Muslims.

The funds thus raised are used to, among other things, operate terrorist training camps in the Sudan, Afghanistan and elsewhere, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training.  The curriculum in the camps placed great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder.

The camps were able to operate only because of the worldwide network of fundraisers, recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan and the other countries where al Qaida maintained an operational presence. From the ranks of these recruits the nineteen perpetrators of the Attack were selected. None of this would have been possible without the funds and other support supplied by participants and conspirators like Samir Salah. Indeed, the Enterprise would not have been successful without the enthusiastic participation of all of the conspirators, including Samir Salah. In order to identify nineteen individuals willing, able and competent to carry out the Attack, al Qaida needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Samir Salah. These participants, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and agreed to participate in the conspiracy, either expressly or impliedly. Samir Salah also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

15.   Plaintiffs have been harmed in their business and property through the claims that they have paid out or for which they have reserved.

16.   Plaintiffs' damages -- injuries, the loss of life and property damage that resulted from defendants' actions -- are direct in that they are not derivative of damage to a third party. Rather the plaintiffs' insureds' assignees were the "reasonably foreseeable victims of a RICO violation" and the "intended victims of the racketeering enterprise," *i.e.*, terrorism, the culmination of which was the Attack.

17.   Each defendant is jointly and severally liable for the damages suffered by each plaintiff, as set forth in Exhibit "B".

18.

| VI | Torture Victim Protection Act, 28 U.S.C. § 1350 |
|---|---|
| VIII | RICO, 18 U.S.C. § 1962(c), 1962(d) |
| X | Anti-Terrorism Act, 18 U.S.C. § 2333 |

19.   pendent state claims:

| I | Trespass |
|---|---|
| II | Wrongful Death |
| III | Survival |
| IV | Assault & Battery |
| V | Intentional and Negligent Infliction of Emotional Distress |
| VII | Conspiracy |
| IX | Aiding and Abetting |
| XI | Negligence |

| **XII** | Punitive Damages |
| --- | --- |

20.    Not applicable

EXHIBIT "A"

RICO STATEMENT

QUESTION # 2

| DEFENDANT | MISCONDUCT | BASIS OF LIABILITY |
|---|---|---|
| Samir Salah | Samir I. Salah is the Egyptian-born director of the Virginia mosque where two of the September 11 hijackers worshipped, a former director and treasurer of a notorious terror-financing bank, the treasurer for a charity whose Bosnia branch has been designated by the Treasury Department as a Specially Designated Global Terrorist ("SDGT") based on evidence that it funneled money to al Qaida, and an integral member of the SAAR Foundation, whose Virginia offices were among those that the FBI and U.S. Customs officials raided in March 2002 and from which these law enforcement branches seized records which are reported to have revealed a pattern of multi-layered transactions that were designed to confuse law-enforcement authorities and keep them off the money trail.<br><br>**SAAR Network:** The SAAR Network is a group of Muslim charities, think tanks and related companies, the vast majority of which shared a common address at 555 Grove Street, Herndon, Virginia. The Network's name is derived from the initials of defendant Suleiman Abdul Aziz al Rajhi, who was involved in establishing and funding many of them. The entities comprising the SAAR Network are linked by overlapping boards of directors, shared offices and the circular movement of money, according to tax forms and federal investigators. Indeed, Salah is an trusted officer of multiple entities in the SAAR Network.<br><br>On March 20 and 21, 2002, federal authorities raided the offices of the SAAR Network entities, the vast majority of which were located at a single address in Herndon, Virginia, as well as the residences of several prominent SAAR Network officials, pursuant to a search warrant issued by the United States District Court for the Eastern District of Virginia. The ongoing investigation of the SAAR network entities, which prompted the March 2002 searches, has revealed that SAAR entities' funds have been transferred to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under Executive Order | 1962(a), 1962(c), 1962(d) |

13224 based on their material support and sponsorship of al Qaida. The funds were transferred through Bank al-Taqwa and Akida Bank Private Ltd., the former of which was a Bank whose board Salah sat on. Both of those banks have been designated by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including Hamas and al Qaeda, both before and after the September 11th attack.

Samir Salah is an officer of the SAAR Foundation, whose Virginia offices were among those that the FBI and U.S. Custom's officials raided in March 2002. Of $54 million dollars raised by the SAAR Foundation ostensibly for "charity," reports suggest $26 million went to the Isle of Man in the Irish Sea, a notorious location for drug runners and money laundering. Only $20 million made its way to SAAR Network charities. According to David Kane, the federal agent who led the raid, SAAR's intent was "to route money through hidden paths to terrorists, and to defraud the United States by impeding, importing, obstructing, and defeating the lawful functions of the IRS. "

In addition, Salah is a founder and board member of Safa Trust, another one of the SAAR Network entities targeted by the FBI raid. Other co-officers of Safa Trust are defendants Jamal Barzinji, Yaqub Mirza, Ahmed Totonji, and Hisham al Talib, which are all also represented by the same counsel in this litigation. Safa Trust shares the same address as the following entities that are or have been defendants in this litigation, African Muslim Agency, Grove Corporate, Mar-Jac Investments, Mena Corporation, Muslim World League, Reston Investments, Saar Foundation, Sanabel al Kheer, Sana-Bell, Inc., Sterling Management Group, and York Foundation.

Salah is also an officer of Mar-Jac Investments. Other co-officers of Mar-Jac Investments along with defendant Salah are defendants Yaqub Mirza and M. Omar Ashraf, who are also represented by the same counsel. Mar-Jac Investments shares the same address as the following entities that have been defendants in this litigation, African Muslim Agency, Grove Corporate, Mena Corporation, Muslim World League, Reston Investments, Saar Foundation, Safa Trust, Sanabel al Kheer, Sana-Bell, Inc., Sterling Management Group, and York Foundation.

Salah has also been a board member of Amana Mutual Funds with, among others, Iqbal Unus, Jamal Barzinji, and

Yaqub Mirza. Amana is a growth and income mutual fund headquartered in Bellingham, Wash., conveniently near the Canadian border. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. In August 2000, Mirza registered the Defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to Al-Qaeda. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to Al-Qaeda in the 1998 Embassy bombings

Salah has additional ties to the SAAR Foundation as president of Piedmont Trading Corporation and as CFO of Piedmont Poultry.

**Bank Al-Taqwa:** Salah served as a director and treasurer of Bank Al Taqwa (Arabic for "fear of God"), helping to form and manage the Bahamas branch of the Muslim Brotherhood's al-Taqwa Group, a network of banks and shell corporations which is among those entities designated by OFAC as an Specially Designated Global Terrorist on November 7, 2001. Following that designation, Al-Taqwa's assets were frozen, and al-Taqwa's headquarters, two of its satellite offices and a few of its executives' residences were raided as part of an international investigation into the bank's relationship with Osama bin Laden and al-Qaeda. According to various White House and Treasury statements at the time of its designation, Bank al Taqwa has provided investment advice and cash transfer mechanisms for al-Qaida and other radical Islamic groups over the years, with offices in Switzerland, Lichtenstein, Italy and the Caribbean.

The Bank was established in 1988 with significant backing from the Muslim Brotherhood. It has been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida organization.

As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden. Indeed, other Al Taqwa officials – Youssef Nada, Ahmed Idris Nasreddin, Ali Ghaleb Himmat, and Albert Friedrich Armand Huber – were themselves marked with SDGT status in 2001 and 2002, and Nada has openly admitted that he knew as early as 1995 that Al-Taqwa Bank might be financing the activities

of terrorist outfits.

According to Italy's Division of General Intelligence and Special Operations, al-Taqwa handled financing for a number of Arab and Islamic political and militant groups, including former Afghan mujahedin in Bin Laden's camps, the Palestine Liberation Organization, Hamas, the Algerian Armed Islamic Group and the Egyptian Gama'a al-Islamiya. In March of 2001, the Bahamian government revoked Al Taqwa's banking license.

Testifying before Congress in February 2002, Juan Zarate of the Department of the Treasury told lawmakers that U.S. intelligence agencies had evidence that al-Qaeda operatives received financial assistance from Al-Taqwa's chairman as recently as late September 2001—after the 9/11 attacks. Al-Taqwa Bank has an account for Mamdouh Mahmoud Salim, an al-Qaeda operative who is in U.S. custody for his role in the 1998 Embassy bombings. U.S. investigators believe that the account has been used to finance terrorist activity.

According to an article in Newsweek, Al-Taqwa's Bahamian banking license allowed Al Taqwa officers to "open commercial correspondent accounts with established European banks —paying the larger institutions fees to make cash transfers around the world for them, without calling attention to themselves." According to counterterrorism experts and government officials, such convoluted banking practices are a red flag for money laundering and terrorist financing.

Moreover, Al-Taqwa Bank has a close relationship with another organization owned by Nada: Al-Taqwa Management Company (eventually renamed Nada Management Company). Al Taqwa Bank relied heavily on Al-Taqwa Management Organization to conduct audits and feasibility studies concerning the bank. As a result, Al Taqwa Bank often transferred large sums of money to Al Taqwa Management Organization. Furthermore, Al Taqwa Bank often transferred money throughout Nada and Nasreddin's many other corporations and investments as well as into various Islamic charities. According to U.S. authorities, the bank's convoluted structure—"made it easy to use as a money laundering mechanism." U.S. officials have stated that they believe the SAAR network entities have transferred a "total of about $20 million to offshore accounts, much of it through Bank al Taqwa and Akida

Bank to Nada and Nasreddin firms."

Al-Taqwa's vice president, Ali Ghaled Himmat, was labeled as a SDGT by President Bush on November 7, 2001. Authorities in Switzerland have a video cassette showing Himmat in Afghanistan, in March of 1993, in close proximity to Al Qaida training camps and participating in the making of speeches calling for the use of violence against the United States. Himmat is a member of the Syrian chapter of the Muslim Brotherhood.

**Taibah International Aid Association:** Salah has been the treasurer for Taibah International Aid Association, whose Bosnia branch has been designated by the U.S. Office of Foreign Asset Control ("OFAC") as a Specially Designated Global Terrorist based on evidence that Taibah funneled money to al Qaida. Taibah has been the subject of terrorism investigations dating back to 1997, and its branch in Bosnia has been raided twice by the Bosnian government since Sept. 11 because of accusations of terrorist connections.

In 2001, one month after the Sept. 11 attacks in the United States, Taibah's Bosnia office was raided in connection with a terrorist plot to blow up the U.S. Embassy there. It turned out at least one of the six men arrested in the scheme worked for Taibah. In 2002, Taibah was identified by investigators in Bosnia as "under the direction of" the Muslim Brotherhood, one of the oldest Islamic terrorist groups in the world. Both U.S. and Bosnian officials determined Taibah worked hand-in-hand in Bosnia with another Islamic charity, Global Relief Foundation in Bridgeview, Ill., which the United States also named a Specially Designated Global Terrorist in October 2002. According to the U.S. Treasury Department, Global Relief's Arabic newsletter regularly sought donations for armed Islamic jihad, including one solicitation for money "for equipping the raiders, for the purchase of ammunition and food, and for their (the Mujahideen's) transportation so that they can raise God the Almighty's word."

The relationship between Taibah and Global Relief was so close that Taibah stepped in to represent Global Relief's interests in Bosnia after the government there shut down Global Relief for supporting terrorists, FBI records show.

In 1997, Taibah's dealings with the Saudi charity International Relief Organization were scrutinized as part of a federal terrorism, money laundering and fraud probe in Illinois and Virginia, according to testimony before

Congress by Matthew Epstein of the Investigative Project. Both charities operated out of the same address at 360 South Washington Street in Falls Church, Va. Records show the International Relief Organization, which is the U.S.-based arm of the International Islamic Relief Organization, or IIRO, transferred thousands of dollars to another charity called Holy Land Foundation for Relief and Development, which the U.S. government shut down in December 2001 for aiding terrorists.

**Dar al-Hijrah:**  Samir Salah is the founder and a former president of the Dar al-Hijrah, a mosque in Falls Church, Va., which has been both a platform for radical Islamic rhetoric and a magnet for militants. Two of the Sept. 11 hijackers, Nawaf Alhazmi and Hani Hanjour, attended Dar al-Hijrah in March 2001 prior to commandeering United Flight 77 and crashing it into the Pentagon.

As the foregoing demonstrates, Samir Salah has held senior management positions in numerous organizations and business that have served as conduits and fronts for channeling material support and resources to al Qaida and affiliated terrorist organizations.  By virtue of the senior positions he has held in all of these organizations, there can be no dispute that Salah was aware of their illicit activities, and in fact was responsible for directing many of those activities.   Indeed, Salah's continuous and repeated association with organizations established for the purpose of channeling financial and logistical support to al Qaida demonstrates that he has played a central and knowing role in the Enterprise, and is an important architect of al Qaida's financial infrastructure.   Through the organizations he managed and directed, Salah personally devised and executed a variety of schemes to finance and otherwise support the Enterprise, both within the United States and internationally.

Through his actions in furtherance of the Enterprise's goals, Samir Salah agreed to actively participate in the conspiracy which led to the September 11 attack, and materially aided and abetted al Qaida in relation to the Attack.