UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Terrorist Attacks on September 11, 2001 | 03 MDL 1570 |

This document relates to:

*Ashton, et al. v. Al Qaeda Islamic Army, et al.*, Case No. 02 CV 6977(GBD)[1]
*Burnett, et al. V. Al Baraka Inv. & Dev. Corp., et al.*, Case No. 03 CV 9849 (GBD)

### PLAINTIFFS' OBJECTIONS TO ORDERS OF MAGISTRATE JUDGE MAAS DATED SEPTEMBER 18, 2007

Pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(A), for the reasons set forth herein, Plaintiffs object to the Orders of Magistrate Judge Frank Maas dated September 18, 2007 and served upon all consent via ECF on September 19, 2006 (Dkt. #2037-38), attached hereto as Exhibit #1.

### Summary of Objections

Plaintiffs requested permission to depose two former American "consultants" for the National Commercial Bank ("NCB") who were previously employed full time by NCB, and its wholly owned subsidiary, SNCB, which maintained an office in New York at least until some time in 2001. That request was denied by Magistrate Judge Maas.

Plaintiffs further requested that NCB's request for Plaintiffs' responses to contention interrogatories on jurisdiction be adjourned and addressed at the conclusion of all fact discovery

---

[1] Federal Insurance plaintiffs have served additional discovery demands on NCB for which the parties have yet to meet and confer in attempt to resolve separate additional objections by NCB.

regarding jurisdiction over NCB. Judge Maas ordered plaintiffs to answer contention interrogatories by October 16, 2007.

## Argument

NCB is the largest bank in Saudi Arabia and maintains offices throughout the world. From the early 1980's through 1992, NCB maintained a branch office in New York. As a result of the BCCI bank fraud scandal however, NCB was forced to shut down its New York offices - which at the time employed the two deponents in question - Thomas Krohley and Virginia ("Ginger") Pensa. Exhibit 2, Smith dep at p. 26:7. Not coincidentally however, NCB opened a wholly owned subsidiary, SNCB, in New York that same year to perform some of the business that NCB had been conducting in New York and employed many of the same people, including Krohley and Pensa. Exhibit 3, New York Corporate Registry; Exhibit 4, NCB014332.

In 2000, two years after the 1998 U.S. Embassy bombings in Africa and Osama bin Laden's indictment therein, NCB took possession of bin Laden's $9.8 million trust for safe keeping. To plaintiff's knowledge, NCB continues to maintain this account. Plaintiffs have sought more information on the trust for bin Ladin, through SBG, that eventually was deposited at NCB.

Experts agree that a key component of terror financing is the amount of money given to charitable organizations. When Vincent Cannistraro, former chief of counter-terrorism operations for the Central Intelligence Agency, testified before Congress about the history and funding of al Qaeda, he identified NCB as a knowing conduit for funds to charities who were known to send the money to Al Qaeda. He said:

> *"How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to Bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to Bin Laden through this mechanism."*

Cannistraro's comments, when read in conjunction with, for example, an article from the Chicago Tribune, "Saudi's Cash Funds Terrorism, U.S. Says" published shortly after September 11th, not only show that charitable donations handled within NCB are important to understanding terror-financing, but also provide the rationale for providing discovery into this important area evidencing NCB's organized support for bin Laden. That article contains the following passages:

> In 1998, according to a senior U.S. official, the Saudi government audited the Jiddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Blessed Relief, which allegedly transferred the money to bin Laden.
>
> After the alleged audit, Saudi government agencies bought out Chairman Khalid bin Mahfouz's 50 percent ownership of the bank.
>
> National Commercial Bank senior officials vehemently denied the existence of a government audit showing that money had been diverted to the charity and transferred to bin Laden. "I can tell you absolutely, categorically there was no such audit," one bank executive said. "That never took place."

The excerpts of the audit state that, outside of normal banking mechanisms, millions of dollars were sent or "loaned" to various charities, including IIRO and Muwafaq[2], two of the so-

---

[2] Muwafaq aka Blessed Relief is currently in default and IIRO's motion to dismiss was denied by Judge Casey. According to the U.S. Department of Treasury, Muwafaq, upon its closure, merged with al Qaeda. Two branches of the IIRO have been named by the U.S. Government as Specially Designated Global Terrorists for their long running support of al Qaeda. (See Exhibit 5.)

3

called charities that are defendants in this lawsuit. When the excerpts are read in the context of the testimony of Agent Cannistraro and the Chicago Tribune article, they show that some form of an investigation of NCB's activities took place during the period 1998 through 1999. In addition in a Declaration filed with this Court on March 23, 2007, a former NCB employee stated, "This audit was done outside the routine auditing that was done of NCB and resulted in Saudi authorities taking regulatory and other action to curb further misconduct by certain directors/managers/owners of the bank." See Declaration of Jagan Reddy of March 21, 2007. (Exhibit 6.)

NCB however, now asserts plaintiffs have no jurisdiction over it, in part, because by February 2001, SNCB shut down its New York office. Nonetheless, NCB continued to employ Krohley and Pensa as "consultants" for parent NCB beyond February 2001. NCB alleges the consulting was in connection with the SNCB wind down, and later produced documents that showed SNCB was still a New York corporation until October 17, 2001.

Lawrence Smith, an officer at NCB's New York office in the 1980's through 1992 and a consultant to NCB's owner Bin Mafouz family from 1992 through present (and periodic consulting work for NCB in the late 90's) testified at an abbreviated deposition before Judge Maas. Mr. Smith however, claimed to know nothing about SNBC's business in New York or even that of NCB itself after 1992. Accordingly, plaintiffs sought to depose local American citizens who would have that knowledge, namely, Krohley and Pensa.

Judge Maas however, believed that if SNCB and NCB had closed its offices by October 17, 2001, plaintiffs would not be able to exercise *general* jurisdiction over NCB at the time the first complaint was filed 10 months later in August 2002. He therefore concluded that the two

4

depositions would not yield relevant information and denied them. Simultaneously, perhaps believing jurisdictional discovery had been exhausted, he ordered plaintiffs to respond to NCB's contention interrogatories.

As this Court is well aware, a subsidiary that is merely a department or an agent or alter ego of its parent, conducting business in the forum, can give rise to jurisdiction over the parent in that forum. *Mayatextil, S.A. v. Liztex U.S.A., Inc.*, 1995 WL131774 at 4 (SDNY 1995); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984); *Advance Coating v. LEP Chem. Ltd.*, 142 F.R.D. 91, 96 (SDNY 1992). There is evidence of just such a relationship between NCB and SNCB. Judge Maas however, adopted NCB's representation that those ties were cut just after the September 11, 2001 attacks, a year before the lawsuit was filed, making those historical contacts arguably irrelevant because NCB closed the SNCB office in New York. NCB has not provided information as to why it closed the SNCB office. Plaintiffs have not been given the opportunity to depose any one from the SNCB subsidiary, nor the same purported NCB "consultants" to determine if NCB continued to conduct business and/or derive revenue in the United States despite closing the SNCB New York offices. Closing the office alone does not end legitimate inquiry to evaluate NCB's jurisdictional contacts. "Courts sometimes have considered contacts that occurred at least as far as a year before the filing of the complaint. . . ." *Schenker v. Assicurazioni Generali, S.P.A.*, 2002 WL1560788 (SDNY 2002)(year old contacts considered to establish the pattern of contacts that existed when the complaint was filed) *citing, Mayatextil, S.A. v. Liztex U.S.A., Inc., Id. at 2, Fn 1* (available documentary evidence predated the filing of the complaint, but court presumed similar conduct continued).

At first, NCB lawyers asserted that SNCB closed its U.S. operations in February 2001. After contradictory assertions by Plaintiffs, NCB then claimed that SNCB was finally wound up in October, 2001. Judge Maas has accepted NCB's latest representation without cross examination, and stated that any further inquiry by plaintiffs at a deposition would be a "fishing expedition."

Plaintiffs have shown that these same former SNCB employees were also former NCB employees and that some of them continued to work for NCB *after* the initial date that SNCB allegedly closed its New York office. That work was performed in New York and other parts of the U.S. by these former employees who are American citizens. NCB alleges they acted as "independent contractors" for NCB but has not provided definitive information to show when or if that relationship ended.

For example, NCB's counsel stated that Ms. Pena had a 30 day contract that ended February 28, 2001, (see Exhibit 7), but plaintiffs later obtained evidence that shows she worked for NCB in New York through *at least* June 2001. (Exhibit 8). NCB did not provide any additional employment contracts or reveal anything else about her. The repeated discrepancies, ambiguities, and dis-information, warrant further investigation by plaintiffs and the Court. The fairest way to do this is to ask Ms. Pena and Mr. Krohley the questions under oath.

New York Business Corporation Law ("BCL") §§ 1006 and 1007 (Exhibit 9) requires a dissolving New York corporation to publish notice of dissolution and send letters to creditors to give them an opportunity for another 6 months to assert any claims any one may have against the corporation. Failure to publish the notice of dissolution leaves the dissolved corporation open and subject to claims being filed against it at a later date. BCL § 1007. A dissolved corporation

can always be sued for tortious conduct that transpired before dissolution or during the wind down period provided the statute of limitations has not expired. BCL 1006, 1007; *In Re Grand Jury Subpoenas - U.S. v. Roe,* 775 F.2d 43 (2d Cir. 1985); *Independent Investor Protective League v. Time,* 50 N.Y.2d 259 (1980).

Neither NCB nor SNCB has produced any evidence that it published notice of SNCB's dissolution and accordingly has left SNCB open to the instant claims under both general and specific jurisdictional contacts. If SNCB was still present in New York in August 2002, then NCB was present at the time the complaints were filed.

Denying plaintiffs the traditional right to depose material witnesses and cross examine them under oath is fundamentally unfair and not consistent with the spirit of the broad discovery rules in F.R.Civ.P. Rule 30. See e.g., *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)(deposition discovery rules are to be accorded a broad and liberal treatment). This discovery is not cumulative or duplicative and it is the most efficient way to investigate NCB's continued presence in the United States.

Two of these "former" employees, who reside in the U.S., should be cross examined, rather than hide behind affidavits, incomplete document production and arguments of counsel, and will provide the plaintiffs with a much fairer opportunity to develop necessary evidence.

As for contention discovery, Plaintiffs suggest that at the conclusion of jurisdictional discovery, Plaintiffs are required to file a More Definite Statement relating to their view that NCB is subject to the jurisdiction of this Court. Plaintiffs and Defendant would be required to exchange all documents, affidavits, and evidence each would use in filing and responding to

7

NCB's Renewed Motion to Dismiss. Otherwise, NCB may submit new evidence, documents and witness affidavits that have not been provided to Plaintiffs, requiring potential follow-up discovery that undermines judicial economy.

## CONCLUSION

As a matter of fairness and in the interest of justice, Plaintiffs should be permitted to depose Krohley and Pena and both parties should exchange all evidence regarding general jurisdictional contacts, prior to any re-newed motion to dismiss by NCB.

Dated: October _/_, 2007

Respectfully Submitted,

Andrew J. Maloney
KREINDLER & KREINDLER
100 Park Ave.
New York, NY 10017
(212) 687-8181 T
(212) 972-9432 F

210394
v1

8

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2007, I caused a copy of Ashton and Burnett Plaintiffs Objections to the Order of Magistrate Judge Maas dated September 18, 2007 to be served by the Court's Electronic Case Filing System.

Date: October 1, 2007

*Andrew J. Maloney, III*