UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (GBD)<br>ECF Case |

*This document relates to:*
  *Ashton v. Al Qaeda Islamic Army,* 02 CV 6977 (GBD)
  *Burnett v. Al Baraka Investment & Develop. Corp.*, 03 CV 9849 (GBD)

**RESPONSE OF THE NATIONAL COMMERCIAL BANK
TO PLAINTIFFS' OBJECTIONS TO THE DISCOVERY ORDERS
OF MAGISTRATE JUDGE MAAS DATED SEPTEMBER 18, 2007**

Plaintiffs have not carried their heavy burden to demonstrate that Magistrate Judge Maas' September 18 discovery orders were clearly erroneous, contrary to law or an abuse of discretion. Instead, the record demonstrates that, based on his 15-month experience in overseeing jurisdictional discovery as to NCB, Magistrate Judge Maas correctly applied the "fishing expedition" label to plaintiffs' final effort to prolong jurisdictional discovery. Moreover, having afforded plaintiffs a full and fair opportunity to take jurisdictional discovery, and recognizing plaintiffs' burden of proof on jurisdiction, Magistrate Judge Maas quite properly directed plaintiffs to disclose the factual basis for their jurisdictional theories in response to NCB's contention interrogatories. Both discovery orders correctly applied the law to the indisputable facts, and will facilitate the timely renewal and efficient resolution of NCB's motion to dismiss these lawsuits for lack of personal jurisdiction.

**Standard of Review**

"Matters concerning discovery generally are considered 'nondispositive' of the litigation" and thus "are committed to the discretion of the magistrate, reviewable by the district court under the 'clearly erroneous or contrary to law' standard." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990); *see* FED. R. CIV. P. 72(a). Thus, "[i]t is well-settled that a magistrate judge's resolution of a nondispositive matter should be afforded substantial deference and may be

overturned only if found to have been an abuse of discretion." *McAllan v. Von Essen*, --- F. Supp. 2d ---, 2007 WL 2782334, at *2 (S.D.N.Y. Sept. 26, 2007) (citations omitted). Accordingly, "once the Magistrate Judge has ruled on a discovery issue, the party seeking to overturn that ruling has the heavy burden of establishing that it is clearly erroneous." *Just v. Landmark Temporaries, Inc.*, 1998 WL 167328, at *2 (S.D.N.Y. Apr. 8, 1998); *see also Mitchell v. Century 21 Rustic Realty*, 233 F. Supp. 2d 418, 439 (E.D.N.Y. 2002) (finding that plaintiffs "did not satisfy their heavy burden of showing that [the magistrate judge's] decision to deny them that discovery was clearly erroneous or contrary to law."), *aff'd*, 45 Fed. Appx. 59 (2d Cir. 2002).

**I.     THE SEPTEMBER 2007 DISCOVERY ORDERS PROPERLY IMPLEMENT BOTH JUDGE CASEY'S ORDER FOR "LIMITED" DISCOVERY ON PERSONAL JURISDICTION AND MAGISTRATE JUDGE MAAS' EARLIER, UNCHALLENGED DISCOVERY ORDERS.**

    **A.     Judge Casey's Orders.**

On January 18, 2005, Judge Casey denied without prejudice NCB's motions to dismiss the *Burnett* and *Ashton* complaints pending completion of "limited jurisdictional discovery" on both NCB's sovereign immunity and personal jurisdiction defenses. *In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 792, 820 (S.D.N.Y. 2005). Subsequently, on reconsideration, Judge Casey ordered that "limited jurisdictional discovery" concerning "NCB's contacts with the United States" should proceed first so that the Court could "determine[ ] whether it has personal jurisdiction over NCB" before it evaluates whether NCB is entitled to sovereign immunity. *In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 572, 575 (S.D.N.Y. 2005). This limited discovery was intended to facilitate the Court's eventual decision, on NCB's renewed motion to dismiss, of whether the exercise of personal jurisdiction over NCB would "satisfy due process requirements." *Terrorist Attacks I*, 349 F. Supp. 2d at 820.

Plaintiffs served NCB with broad document requests that far exceeded the scope of the limited personal jurisdiction discovery ordered by Judge Casey. When the parties could not

2

informally resolve NCB's objections to those discovery requests, Judge Casey referred the disputes to Magistrate Judge Maas.

### B. Magistrate Judge Maas' June 2006 Discovery Order.

Following briefing and a hearing, Magistrate Judge Maas entered an extensive Discovery Order on June 28, 2006, which sought to establish "the proper scope of the 'limited jurisdictional discovery' authorized by the prior decisions of the Honorable Richard C. Casey… ." Discovery Order (MDL Dkt. #1849), at p.1. Judge Maas noted that "plaintiffs seek to assert personal jurisdiction over NCB under two alternative theories: minimum contacts jurisdiction and conspiracy jurisdiction." *Id.* at 3. He noted that the "threshold" for "minimum contacts" jurisdiction "plainly is met when a foreign defendant regularly does business in a forum state" but also is met when a defendant has "purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* at 4 (internal quotes and citation omitted). Judge Maas observed that "NCB does not dispute the plaintiffs' entitlement to explore the degree of its presence in the United States" but "merely argues that the period that the plaintiffs wish to delve into is overbroad." *Id.* at 5, 6. Based on Second Circuit law, Magistrate Judge Maas accepted NCB's position and "directed [NCB] to provide information concerning its United States contacts for the six-year period preceding the commencement of these suits." *Id.* at 6 (footnote omitted).

The June 2006 Discovery Order noted that, as to plaintiffs' alternative theory of "conspiracy jurisdiction," a plaintiff "must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York." *Id.* at 7 (internal quotes and citations omitted). Judge Maas held that plaintiffs had failed to do so because the "conclusory" allegations of their complaints "establish neither that NCB or its customers contributed funds to organizations

3

serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York—namely, the Al Qaeda terrorists who executed the September 11 attacks—'acted at the direction or under the control or at the request of NCB.'" *Id.* at 10 (quoting *Terrorist Attacks I*, 349 F. Supp. 2d at 805). Accordingly, because "plaintiffs have failed to make a prima facie showing of conspiracy which might warrant inquiry into the accounts of specific NCB customers at this preliminary stage," Judge Maas denied the plaintiffs' request "for disclosure of the bank records of particular NCB customers." *Id.* at 11.

The Discovery Order also acknowledged plaintiffs' allegation—denied by NCB (*id.* at 9)—that there existed a report of "an audit of NCB that the Saudi government allegedly undertook in 1998" that supposedly addressed "NCB's financing of terror charities related to Bin Laden and Al Qaeda… ." *Id.* at 3, 8. Concluding that "[a]n audit intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States obviously would be directly relevant to the conspiracy liability that plaintiffs seek to impose on NCB," Magistrate Judge Maas directed NCB "to confirm with SAMA [the Saudi Arabian Monetary Agency[1]] whether the Saudi government conducted an 1998 audit of NCB" and, if so, "to produce a copy promptly to the plaintiffs." *Id.* at 9.

The Discovery Order accordingly concluded that: "The plaintiffs' discovery requests are granted solely to the extent that NCB is directed to promptly produce any 1998 audit of its operations, and for a six-year period preceding the commencement of these suits any documents previously requested by the plaintiffs related to its presence in the United States." *Id.* at 11.

---

[1] SAMA is the Central Bank and chief bank regulator of banks like NCB that are established and operate in the Kingdom of Saudi Arabia.

4

      **C.**     **NCB Compliance with the June 2006 Discovery Order.**

NCB produced over 60,000 pages of documents to plaintiffs, most of which comprised the operational files of SNCB Securities Inc. ("SNCB"), a Delaware corporation that had been an indirect subsidiary of NCB, but which was dissolved in Delaware in February 2001. NCB also reported that, as directed, it had consulted with SAMA, which had informed NCB that SAMA is "not aware of any audit of NCB undertaken in 1998 intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States or one that confirmed that NCB knowingly financed terrorist acts against the United States." *See* Exh. A, (NCB's Response to Document Request #46, at p.14). NCB further informed plaintiffs that there had been "a February 1998 report of an examination of NCB conducted by Arthur Andersen at the direction of SAMA" but that the report did not contain any reference to "any of the subjects that are within the scope of Plaintiffs' terror-financing allegations against NCB." *See* Exh. B, at p.5 (Mar. 5, 2007 Ltr. to Maas, U.S.M.J.).

      **D.**     **Subsequent Discovery Disputes.**

Plaintiffs nonetheless insisted that NCB produce a copy of the confidential February 1998 examination report. NCB contended that the report was irrelevant to plaintiffs' terror-financing conspiracy allegations, as SAMA itself had confirmed. NCB also noted that the investigator who originally supplied plaintiffs' allegations about a terror-financing audit had retracted his claims, and now "confirm[ed]" that he has "no evidence to suggest that the Saudi Arabian Government ordered a special audit of NCB to address concerns of the American authorities that '*uncovered massive transfers made to charity organizations with ties to Osama bin Laden, some of which were controlled by members of the bin Mahfouz family.*'" (Witness Statement of Jean-Charles Brisard) (MDL Dkt. #1904, ¶ 25.2 (italics in original). Further, NCB cited to a witness statement (originally submitted in an unrelated English court proceeding by a former NCB officer, Lawrence Smith) confirming that the February 1998

5

examination report was a bank "process review" unrelated to any allegations of terror-financing. *See* Exh. B, at p.5 (Mar. 5, 2007 Ltr. to Maas, U.S.M.J.).

The parties were unable to resolve this dispute, or their separate disputes over plaintiffs' requests to take depositions of former SNCB employees and for additional information concerning NCB U.S. "correspondent" bank accounts (used for U.S. Dollar transactions). Plaintiffs accordingly presented these matters to Magistrate Judge Maas, who held a hearing and entered an order resolving the disputes on March 23, 2007.

### E.  Magistrate Judge Maas' March 2007 Discovery Order.

Judge Maas' March 23, 2007 Order: (i) required that NCB produce for *in camera* review the February 1998 SAMA/Arthur Andersen examination report; (ii) required that former NCB officer Lawrence Smith appear for a three-hour deposition before Magistrate Judge Maas, and that NCB produce the exhibits to his English court witness statement; (iii) denied plaintiffs' request to take a deposition of a former employee of SNCB (Virginia Pensa); (iv) denied plaintiffs' request for "further information about NCB's correspondent bank accounts in the United States"; (v) reserved decision on plaintiffs' request to take a deposition of Jagan Mohan Reddy (a former SNCB employee, from whom plaintiffs had obtained an affidavit); and, (vi) reserved decision on NCB's request to propound contention discovery that would require plaintiffs to disclose the evidentiary basis of their theories for personal jurisdiction over NCB. *See* Order (MDL Dkt. #1964).

### F.  NCB's Compliance, Subsequent Disputes, and Magistrate Judge Maas' May 2007 Discovery Order.

On April 23, 2007, NCB submitted the 1998 examination report for the Court's *in camera* inspection. *See* Exh. C (Apr. 23, 2007 Ltr. to Maas, U.S.M.J.). NCB also submitted an April 22, 2007 letter from SAMA stating that (1) SAMA had no knowledge of "any audit or examination of NCB in the general time frame of 1998 or later which examined alleged involvement in financing terrorist activities"; (2) SAMA had "not required any such audit"; and (3) SAMA "had taken no …

adverse regulatory action" against NCB based on "alleged involvement in financing terrorist activities." *Id.*, Tab A. Plaintiffs nonetheless continued to insist that some terror-financing audit of NCB had been conducted, and they requested additional discovery concerning "transfers of NCB's own funds or assets of those of [former NCB executive] Khalid bin Mahfouz and transfers concerning any identified terrorist individual or organization." *See* MDL Dkt. #1971 (plaintiffs' letter). On May 1, 2007, Magistrate Judge Maas reported that his *in camera* review of the 1998 examination report revealed "nothing…which relates to the issues presently pending before the Court concerning NCB" and he "decline[d] to direct any further discovery (not previously ordered) related to NCB." *See* Order (MDL Dkt. #1971).

### G. Completion of Plaintiffs' Jurisdictional Discovery.

As allowed, plaintiffs took the deposition of Lawrence Smith on July 27, 2007 before Magistrate Judge Maas. Consistent with his previously-produced English court witness statement, Mr. Smith testified that: (1) he has no knowledge of any Saudi government or other audit or examination of NCB that relates in any way to plaintiffs' allegations that NCB financed or otherwise supported terrorist activities; (2) he is aware of no facts supporting plaintiffs' allegations that NCB financed or otherwise supported terrorist activities; and (3) NCB did not engage in any banking business in the United States—either on its own or through a subsidiary—after its New York branch closed in 1992. *See* July 27, 2007 Tr. at pp. 127-135.

### H. NCB's Request to Propound Contention Discovery.

The Smith deposition marked the completion of all jurisdictional discovery of NCB that had been ordered by Magistrate Judge Maas. Accordingly, NCB on July 31, 2007 renewed its request (deferred by the March 2007 discovery order) to propound contention discovery requiring plaintiffs to disclose the facts supporting their theories of personal jurisdiction over NCB. Plaintiffs objected, arguing that the request was premature because they wished to renew their previously-denied request

to take depositions of former SNCB employees. They also argued that they should not be required to answer jurisdictional contention discovery because NCB supposedly had the burden of proof on jurisdiction. NCB opposed the renewed request for SNCB employee depositions on the ground that SNCB's activities were irrelevant to jurisdiction over NCB.

### I.    Magistrate Judge Maas' September 2007 Discovery Orders.

On September 18, 2007, Magistrate Judge Maas denied plaintiffs' request to take depositions of former SNCB employees, holding that:

> There is nothing in the materials annexed to [plaintiff's] letter to suggest that SNCB engaged in any activities in the United States—through agents or otherwise—after 2001. Accordingly, … it is clear that the proposed depositions of Virginia Pensa, Frederick Crawford, or Thomas Krohley would be a fishing expedition.

(MDL Dkt. #2038). On the same day, Magistrate Judge Maas granted NCB's request to propound contention discovery to plaintiffs, holding that the requests were not premature (because of the separate order denying SNCB employee depositions) and that, in light of plaintiffs' burden to establish jurisdiction, "[a]t this stage, NCB is entitled to answers to its contention interrogatories." (MDL Dkt. #2037). Plaintiffs were directed to respond by October 16, 2007. *Id.*[2]

### II.   MAGISTRATE JUDGE MAAS' SEPTEMBER 18 ORDERS ARE NOT CLEARLY ERRONEOUS, CONTRARY TO LAW, OR AN ABUSE OF DISCRETION.

#### A.    <u>Depositions of Former SNCB Employees Could Not Be Relevant to Jurisdiction over NCB as a Matter of Law</u>

At least four independent reasons support Magistrate Judge Maas' conclusion that depositions of former SNCB employees would be a jurisdictionally irrelevant "fishing expedition":

---

[2]    Because the plaintiffs have not obtained a stay of the order to answer NCB's contention discovery, their responses remain due on October 16. "In the absence of a stay, the fact that a litigant has appealed to the District Court from a Magistrate Judge's discovery order does not excuse failure to comply with that order." *Herskowitz v. Charney*, 1995 WL 104007, at *3 (S.D.N.Y. Mar. 8, 1995). Moreover, "allowing the automatic stay of magistrate's orders [by filing objections] would not only encourage the filing of frivolous appeals, but, would grind the magistrate system to halt." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 124 F.R.D. 75, 78-79 (S.D.N.Y. 1989).

1.  <u>SNCB dissolved and ceased operating during 2001, before any of the 9/11 lawsuits was filed.  The former activities of a closed subsidiary are "irrelevant for purposes of the 'doing business' inquiry" for general jurisdiction over the parent.</u>  *Data-Stream AS/RS Technologies, LLC v. Acequip Ltd.*, 2002 WL 1683736, at *6 (S.D.N.Y. July 24, 2002) ("'[T]he defendant corporation must be 'here' and therefore subject to the state's power, at the very time of the exercise of the jurisdiction itself.' … There is no need to resolve the dispute as to whether Zimmerman was an agent of [defendant].  Zimmerman ceased his activities … almost a year before this suit was commenced.  Therefore, his activities are irrelevant for purposes of the 'doing business' inquiry.") (internal citations omitted); *accord Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788 at *4 (S.D.N.Y. July 15, 2002) (refusing to exercise personal jurisdiction over a foreign corporation based on the existence of a U.S. subsidiary when the parent corporation had "sold [the subsidiary] and all other U.S. subsidiaries. . . two months before the complaint in this action was filed"; holding that "[t]he only relevant inquiry is whether [the foreign defendant] had an 'agency' or 'mere department' relationship with [the alleged subsidiary] when the complaint was filed, such that any of [the alleged subsidiary's] past or present New York contacts could be attributed to [the defendant].").[3]

Magistrate Judge Maas reviewed the discovery materials proffered by plaintiffs and correctly concluded that they did not "suggest that SNCB engaged in any activities in the United States—through agents or otherwise—after 2001."  (MDL Dkt. #2038).  In relevant part, those materials demonstrated:

- SNCB terminated its New York office lease on February 17, 2001. (MDL Dkt. #170, Exh. 8, Exh. A).

---

[3]  Plaintiffs offer a misleading reading of *Schenker* by only partially quoting a sentence from the opinion. *See* Pltfs. Objs., at 5.  The full quote reads: "Courts sometimes have considered contacts that occurred at least as far as a year before the filing of the complaint, but those contacts are generally considered only to establish a pattern of contacts that existed at the moment the complaint was filed."  2002 WL 1560788, at *4.  If the subsidiary did not exist "at the moment the complaint was filed," then the subsidiary's "contacts with New York cannot form a basis for personal jurisdiction" over the parent.  *Id.*

9

- SNCB filed its Certificate of Dissolution in Delaware on February 28, 2001. (MDL Dkt. #416, Exh. 5, Attachment. A).

- Following SNCB's dissolution, NCB entered into short-term consulting agreements with two former SNCB employees to assist NCB with the "termination" and "liquidation" of SNCB's activities, including the "transfer" of its remaining activities to NCB in Saudi Arabia and the "liquidation of the assets of … an investment vehicle formed by and indirectly controlled by NCB." (Aug. 16, 2007 Letter, Exh. B, at NCB016258-60; 16264-66).

- These activities allowed the calculation of SNCB's final operating gain or loss and the "sending [of the] balance of money to LDN [SNCB Securities Ltd. in London, the direct parent of SNCB Securities Inc.] as dividend payment." (*Id.* at NCB01558).

- All of these activities occurred before the end of June 2001. *Id.*

It is jurisdictionally irrelevant that SNCB did not file its Surrender of Authority in New York until October 17, 2001—a date nearly a year before the filing of the earliest of these lawsuits. *See* Pltsf. Objs., at 4. *Johnson v. Helicopter & Airplane Services Corp.*, 404 F. Supp. 726, 737 (D. Md. 1975) (holding that a defendant's "capacity to be sued in New York did not survive its dissolution in Delaware notwithstanding its failure to surrender its certificate to do business in New York."). Equally irrelevant is plaintiffs' citation—for the first time in these objections—to N.Y. BUSINESS CORP. LAW §§ 1006-1007. *See* Pltfs. Objs., at 6-7. Those statutes govern the winding up of a dissolved corporation, and allow creditors to pursue their claims against that corporation. They have nothing to do with claims against, or jurisdiction over, the foreign parent of a dissolved corporation. Plaintiffs here long ago dismissed their claims against the SNCB companies.[4] (MDL Dkt. ##549, 551, 1465, 1622). Their only interest in SNCB is as a fulcrum to obtain jurisdiction over NCB—but SNCB's 2001 dissolution renders SNCB irrelevant to jurisdiction over NCB.

---

[4] In any event, "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized," FED. R. CIV. P. 17(b), and SNCB was organized in Delaware, not New York. The comparable Delaware statute, 8 DEL. CODE ANN. § 278, likewise is irrelevant to jurisdiction over foreign parent corporations. It merely provides a window for dissolved Delaware corporations to prosecute and defend suits in their own name, "but not for the purpose of continuing the business for which the corporation was organized." *Id.*

2.      <u>Despite extensive discovery, plaintiffs offer no evidence that SNCB was NCB's alter ego, "mere department" or agent in the United States for conducting banking business. Accordingly, SNCB's activities could not provide a basis to exercise general jurisdiction over NCB.</u> *See J.L.B. Equities, Inc. v. Ocwen Financial Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("plaintiff fails to sufficiently state facts showing parental intrusion on personnel decisions, and does not present evidence indicating that corporate identities were compromised. … [P]laintiff is unable to show that [defendant] exerts any significant level of control over the [subsidiary's] marketing and operational policies. … Because [plaintiff] has failed to aver facts showing that the [subsidiary] is either an agent or a mere department of [defendant], the [subsidiary's] contacts with New York do not serve as a basis for exercising jurisdiction over [defendant].").

3.      <u>SNCB's investment-advisory business[5] had nothing to do with the banking business of NCB, on which plaintiffs' claims against NCB are based.[6]  Indeed, NCB was prohibited from engaging in banking business in the United States after its New York branch closed in 1992.[7]  Accordingly, NCB could never be found to be "doing business" relevant to plaintiffs' claims through SNCB.</u>  "[T]he term 'doing business' refers to 'the ordinary business which the corporation was organized to do ... It is not the occasional contact or simple collateral activity which is included.'" *Nelson v. Massachusetts General Hosp.*, 2007 WL 2781241, at *14 (S.D.N.Y. Sep. 20, 2007)

---

[5]   SNCB was organized to: "conduct[ ] limited activities in the U.S. for or on behalf of NCB with respect to the management services performed by NCB for certain off-shore investment funds which services were previously performed by the Investment Management Division of the New York branch office of NCB. These activities include identifying and developing investment products for NCB to market outside the U.S., assisting NCB in evaluating fund advisors and performing some limited administrative and clerical support services for NCB on behalf of the investment funds.  In addition, SNCB may provide investment advisory services to unaffiliated off-shore third parties." Aug. 7 Ltr., Exh. A at NCB014332 (notes to SNCB's audited financial statement).

[6]   *See Burnett* 3AC, ¶¶ 45-46, 94-96; *Ashton* 6AC, ¶¶ 429-433.

[7]   *See* 1992 OCC Enf. Dec. LEXIS 225 at *4 (July 2, 1992) (Enforcement Action of the Office of the Comptroller) (prohibiting NCB from engaging in "any new banking business or holding itself out as available to conduct new banking business; including accepting any new deposits or granting any new loans").

(quoting *Bryant v. Finnish Nat'l Airline*, 253 N.Y.S.2d 215, 219-20 (1st Dep't 1964)); *see In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 2003 WL 1807148, at *4 (S.D.N.Y. Apr. 4, 2003) (same). Because SNCB was not engaged in the ordinary banking business of NCB, its activities could not serve as a basis for general jurisdiction over NCB, even if SNCB had not been dissolved before these lawsuits were commenced.

4. <u>After extensive jurisdictional discovery, plaintiffs do not try to link SNCB in any way to the 9/11 attacks, or to any alleged Al Qaeda front. Accordingly, depositions of SNCB employees could not relate to plaintiffs' alternative theory of "conspiracy jurisdiction."</u> Indeed, jurisdictional discovery has shown no evidence that NCB itself ever supported terrorists generally or the September 11 attacks specifically. Undeterred, plaintiffs nonetheless make an unsupported reference to a deposit of "bin Laden's $9.8 million trust for safe keeping" at NCB. Pltfs. Objs., at 2. Apparently, plaintiffs intend to refer to actions of another defendant, the Saudi Binladin Group ("SBG"), which removed Osama Bin Laden as a shareholder in 1994, and placed the value of his SBG shares into some type of trust account at the direction of the Saudi government. *See* MDL Dkt. #2034, at pp. 5-7.[8] There is no suggestion that NCB did anything other than establish a bank account in the ordinary course of its business—a circumstance that cannot lead to any NCB liability in these actions. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) ("As a general matter, '[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers.'") (quoting *Terrorist Attacks I*, 349 F. Supp. 2d at 830); *Terrorist Attacks I*, 349 F. Supp. 2d at 830 (quoting *Burnett v. Al Baraka Invest. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003), for the proposition that "Plaintiffs offer no support, and we have found none, for the proposition that a

---

[8] Plaintiffs have separately objected Magistrate Judge Maas' order regarding discovery from SBG regarding this trust account. *See* MDL Dkt. ## 2027, 2034. NCB is not involved in that proceeding.

12

bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.").

In sum, when, as here, a FED. R. CIV. P. Rule 12 (b)(2) motion to dismiss for lack of personal jurisdiction will "involve evidence outside the pleadings," a plaintiff pursuing jurisdictional discovery "must show … what facts are sought to resist the motion … [and] why they might reasonably be expected to create a genuine issue of material fact" concerning personal jurisdiction. *Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 504-05 (S.D.N.Y. 2004). The plaintiffs did not identify what jurisdictionally-material facts they sought to elicit through depositions of former SNCB employees, and it is clear, as a matter of law, that SNCB employee depositions could not disclose jurisdictionally-material facts. Accordingly, Magistrate Judge Maas fairly viewed such depositions as a "fishing expedition" and properly prohibited them. *See also In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 392, 400 (S.D.N.Y. 2002) (citing *Rose v. Cont'l AG*, 2001 WL 236738, at *4 (E.D.Pa. Mar. 2, 2001) for the proposition that "plaintiffs who had been served, and received responses to, interrogatories on personal jurisdiction, had had … a fair opportunity" to conduct jurisdictional discovery); *see also Gualandi v. Adams*, 385 F.3d 236, 244-45 (2d Cir. 2004) ("Since appellants were unable to demonstrate that additional discovery was needed in order to decide the jurisdictional issue, the district court did not abuse its discretion in denying plaintiffs' request.").

### B. NCB's Contention Discovery is Appropriate.

"[W]here, as here, the parties have conducted several months of jurisdictional discovery, plaintiffs bear the burden of proving that personal jurisdiction exists by a preponderance of the evidence." *Nelson v. Massachusetts General Hosp.*, 2007 WL 2781241, at *13 (S.D.N.Y. Sep. 20, 2007) (citing *Landoil Resources v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)). Recognizing that the burden is on the plaintiffs, Magistrate Judge Maas properly allowed NCB to discover, through contention interrogatories, the factual basis for plaintiffs' theories of jurisdiction

13

over NCB. That contention discovery will facilitate the efficient resolution of NCB's renewed motion to dismiss by enabling NCB to focus its briefing on the jurisdictional issues that are genuinely in dispute.

In another lawsuit, Judge Casey provided a defendant "an opportunity to conduct discovery" so that it could pursue its right to challenge "the veracity of the facts that purportedly support" the plaintiff's theory of personal jurisdiction. *See, e.g., Digigan, Inc. v. Ivalidate, Inc.*, 2004 WL 203010, at *8 (S.D.N.Y. Feb. 3, 2004) (citing *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir. 1999); *Ball v. Metallurgie Hoboken-Overpelt S.A.*, 902 F.2d 194, 196-97 (2d Cir. 1990)). Consistent with that holding, Judge Casey here held that "[t]he parties should have the opportunity to take discovery of the jurisdictionally relevant facts." *Terrorist Attacks I*, 349 F. Supp. 2d. at 792 (emphasis added). Perhaps in light of these holdings, plaintiffs do not even attempt to argue that Magistrate Judge Maas abused his discretion in allowing NCB to obtain contention discovery from them.

Rather, plaintiffs now suggest that they should be excused from responding to NCB's contention discovery requests, and that both sides instead should "exchange all documents, affidavits, and evidence each would use" in connection with NCB's renewed motion to dismiss for lack of personal jurisdiction. Pltfs. Objs., at 7-8. Plaintiffs did not make this proposal to Magistrate Judge Maas, and they therefore have waived any right to raise it in this Court. *See Abu-Nassar v. Elders Futures, Inc.*, 1994 WL 445638, at *5 n.2 (S.D.N.Y. Aug. 17, 1994) ("These arguments were not raised before [the magistrate judge], and are not submitted as objections but as new arguments. Accordingly, plaintiffs' arguments and evidence are untimely."); *Tenen v. Winter*, 15 F. Supp. 2d 270, 272 (W.D.N.Y. 1998) ("The district judge will normally not consider arguments, case law, or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance"); 14 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 72.11[1][a] (3d ed. 2007) ("A party's failure to present timely arguments, case law, or evidentiary materials to a magistrate judge

14

prior to the magistrate's ruling, thereby depriving the magistrate of the opportunity to rectify any alleged errors, waives that party's right to present those arguments or materials to the district court on appeal from the magistrate's nondispositive order."). Regardless, it was well within Magistrate Judge Maas' discretion to require plaintiffs to provide contention discovery that would disclose the factual basis for their jurisdictional theories, given plaintiffs' burden to prove personal jurisdiction by a preponderance of the evidence following the closure of a lengthy period of jurisdictional discovery.[9] Plaintiffs' Rule 72 Objections to the September 18 discovery orders accordingly should be overruled.

Dated: October 15, 2006  
       Washington, D.C.

Respectfully submitted,

/s/ Ronald S. Liebman  
Ronald S. Liebman (admitted pro hac vice)  
Mitchell R. Berger (MB-4112)  
PATTON BOGGS LLP  
2550 M Street, N.W.  
Washington, D.C. 20037  
Phone: 202-457-6000  
Fax:     202-457-6315  
*Attorneys for Defendant*  
*The National Commercial Bank*

---

[9] The *Federal Insurance* plaintiffs recently attempted to propound their own discovery requests to NCB. *See* Pltfs. Objs., at 1 n.1. This effort to prolong the jurisdictional discovery process as to NCB is improper under the Case Management Orders in this litigation and the discovery orders entered by Magistrate Judge Maas (which bind the *Federal Insurance* plaintiffs), as set out in NCB's Rule 34 Objections to the *Federal Insurance* plaintiffs' discovery requests.

**CERTIFICATE OF SERVICE**

  I hereby certify that on October 15, 2007, I caused copies of the RESPONSE OF THE NATIONAL COMMERCIAL BANK TO PLAINTIFFS' OBJECTIONS TO THE DISCOVERY ORDERS OF MAGISTRATE JUDGE MAAS DATED SEPTEMBER 18, 2007, to be served via the Court's Electronic Case Filing System with a Courtesy Copy via Federal Express to Magistrate Judge Maas.

                /s/ Mitchell R. Berger
                Mitchell R. Berger