# Exhibit B

**(Attachments to Letter Omitted)**

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

March 5, 2007

Ronald S. Liebman
(202) 457-6310
rliebman@pattonboggs.com

<u>VIA FEDERAL EXPRESS</u>

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

Re:   *In re Terrorist Attacks on September 11, 2001*, MDL, 03-1570 (RCC)
*Ashton et al. v. Al Qaeda Islamic Army et al.*, 02-6977 (RCC)
*Burnett et al. v. Al Baraka Investment & Dev. Corp. et al.*, 03-9849 (RCC)

Dear Judge Maas:

On behalf of Defendant, The National Commercial Bank ("NCB"), we are responding to the letter to Your Honor dated February 22, 2007 (but apparently delivered February 23, 2007) from Andrew Maloney, III, one of the counsel for the Plaintiffs in the *Ashton* action ("Pltfs. Feb. Ltr."). By Discovery Order dated June 28, 2006, *In re Terrorist Attacks on September 11, 2001*, 440 F. Supp. 2d 281 (S.D.N.Y. 2006), this Court addressed the parties' prior disputes over the scope of personal jurisdiction discovery directed at NCB pursuant to Judge Casey's order for "limited jurisdictional discovery" concerning "NCB's contacts with the United States." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 792 (S.D.N.Y. 2005) ("*Terrorist Attacks I*").[1] Pursuant to the Discovery Order, NCB: has produced to the Plaintiffs over 60,000 pages of documents, of which Plaintiffs copied more than 16,000 pages; has conducted follow-up searches for documents at Plaintiffs' request; and, as directed by this Court, has obtained confirmation from its regulator, the Saudi Arabian Monetary Agency ("SAMA"), that it has no knowledge of an alleged 1998 Saudi Government audit of NCB addressing financing of terrorism. Despite all of NCB's extensive and expensive compliance with the Discovery Order— and despite new

---

[1]     Judge Casey ordered that the parties focus exclusively on "personal jurisdiction discovery" concerning "NCB's contacts with the United States" so that the Court could "determine[ ] whether it has personal jurisdiction over NCB" before the Court evaluates whether NCB, a Saudi Government-owned bank, is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 572-73 (S.D.N.Y. 2005) ("*Terrorist Attacks II*"). Judge Casey is seeking to resolve whether the exercise of personal jurisdiction over NCB would "satisfy due process requirements." *Terrorist Attacks I*, 349 F. Supp. 2d at 820.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 2
March 5, 2007

evidence expressly disavowing Plaintiffs' allegation about the supposed 1998 Saudi Government audit— Plaintiffs insist that they have not yet reached the limits of the "limited" jurisdictional discovery that Judge Casey intended. We respectfully disagree, as we have explained to the Plaintiffs in numerous "meet and confer" communications.

For the reasons set forth below, NCB respectfully submits that it has fully complied with this Court's Discovery Order and that there is no legal or factual basis to allow Plaintiffs to pursue additional "limited" jurisdictional discovery. In summary:

(1) There is no longer a good faith basis for Plaintiffs to contend that there was a 1998 Saudi Government audit of NCB addressing financing of terrorism.

(2) As a matter of law, additional information about transactions processed through NCB's U.S. correspondent bank accounts could not establish general jurisdiction over NCB. As a factual matter, moreover, even the Plaintiffs do not allege that any NCB correspondent bank account transaction had anything to do with financing of terrorism. Those transactions are therefore also irrelevant to Plaintiffs' theories of specific jurisdiction.

(3) NCB already has provided a full measure of jurisdictional discovery, and the six depositions that Plaintiffs seek go well beyond any reasonable definition of the "limited jurisdictional discovery" that Judge Casey authorized.

## 1. "Terror Financing" Audit of NCB

### a. The Discovery Order

This Court's Discovery Order, quoting Plaintiffs' own May 2006 letter to the Court, focused on Plaintiffs' allegation of "an audit of 'NCB's financing of terror charities related to Bin Laden and Al Qaeda … [which, in Plaintiffs' view] would, without doubt, bear precisely on the issues to be considered in assessing the Court's jurisdiction.'" 440 F. Supp. 2d at 286. This is the only alleged audit whose production Plaintiffs' letter requested. Specifically, that same letter from Plaintiffs' counsel to the Court stated: "In 1998, the Saudi government audited NCB. The audit investigated NCB's financing of terror charities related to Bin Laden and Al Qaeda and would, without doubt, bear precisely on the issues to be considered in assessing the Court's jurisdiction. Plaintiffs should be given not only the audit, but all the underlying documented references in the audit. The audit was a reaction to the 1998 Al Qaeda bombing of two U.S. embassies in Africa." *See* May 3, 2006 Kreindler & Kreindler Letter to the Court, at 3 (emphasis added).

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 3
March 5, 2007

Because of the way in which Plaintiffs framed their discovery request, the Discovery Order focused exclusively on this alleged audit and stated: "An audit intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States obviously would be directly relevant to the conspiracy liability that the plaintiffs seek to impose on NCB. Indeed, if it confirmed that NCB knowingly financed terrorist acts against the United States, this alone might be sufficient to persuade the Court to find personal jurisdiction over NCB on the basis of its role in a conspiracy. For this reason, NCB is directed to confirm with SAMA whether the Saudi government conducted an 1998 audit of NCB. If such an audit exists, NCB is directed to produce a copy promptly to the plaintiffs." 440 F. Supp. 2d at 286 (emphasis added). The general statement in the Discovery Order, *id.* at 287, that "NCB is directed to promptly produce any 1998 audit of its operations" must be read as referring to the audit of the type requested by Plaintiffs and discussed by the Court. This is further confirmed by the Discovery Order's "den[ial] without prejudice [of] the plaintiffs' request for the production of all of the documents referenced in the underlying [alleged] audit. This request may be renewed if, in fact, there is an audit, and it is shown to shed light on the issues presently before this Court with regard to NCB." *Id.* at 286 (emphasis added).

**b.    NCB's Compliance**

As directed by the Discovery Order, NCB posed the Court's inquiry to SAMA. Responding to the Court's focus on the type of audit alleged by Plaintiffs, SAMA informed NCB that "we are not aware of any audit of NCB undertaken in 1998 intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States or one that confirmed that NCB knowingly financed terrorist acts against the United States." *See* Objections and Responses of the National Commercial Bank to Plaintiffs' First Set of Requests for Production of Documents ("NCB's Rule 34 Response") (copy attached as Exhibit A hereto) at page 14 (Request 46).

**c.    New Evidence**

New evidence provided in this litigation after SAMA's response to NCB, moreover, has foreclosed any continued good faith pursuit by Plaintiffs of their allegations about the supposed 1998 Saudi Government audit of NCB. These allegations were first made by the *Burnett* plaintiffs (*see Burnett* Third Amended Complaint, ¶¶ 94-96, 332, *Burnett*, 1:02-cv-1616 (DC) Dkt. #29) and subsequently were adopted by the *Ashton* plaintiffs in their March 2003 Consolidated Master Complaint (*Ashton*, 1:02-cv-6977 Dkt. #11, at ¶¶ 350, 365-67). In turn, the *Burnett* plaintiffs' allegations regarding that supposed 1998 audit appear to have been based upon assertions originally made by Jean-Charles Brisard, the self-described "lead investigator" for the *Burnett* plaintiffs, who has now retracted those allegations under oath. *See* MDL Dkt. #1904, Exh. A, ¶¶ 1, 9. Specifically with respect to the same alleged Saudi Government audit of NCB that was

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 4
March 5, 2007

the subject of Plaintiffs' May 2006 letter to this Court, Mr. Brisard's retraction, which has been filed in these MDL proceedings, states:

> "...I should have said that this document was a summary of what I believed to be an audit document of the NCB. I received this document from the French Intelligence services already translated into English. ... I also acknowledge that the document appears to be a summary of a regular audit of the NCB that all banks carry out on a yearly basis." MDL Dkt. # 1904, Exh. A, ¶ 23.

> "...I had read an interview with [Abdulrahman bin Mahfouz] in which he said that an audit was carried out at the NCB. However, I now understand this to mean that this was a standard audit of the NCB that was carried out on a yearly basis as with all banks." *Id.*, ¶ 24.

Crucially, Brisard's retraction "confirm[s]," *inter alia*, that he has "no evidence to suggest that the Saudi Arabian Government ordered a special audit of the NCB to address the concerns of the American authorities that *'uncovered massive transfers made to charity organizations with ties to Osama bin Laden, some of which were controlled by members of the bin Mahfouz family.'" Id.*, ¶ 25.2, (italics in original).[2]

### d.    Other Audit and Examination Reports

As Plaintiffs acknowledge (Pltfs. Feb. Ltr., at 2), we informed them that there are regular financial statement audits of NCB conducted by NCB's outside auditors, not by the Saudi

---

[2]    We are aware that the Plaintiffs have argued that their allegations about the supposed 1998 audit are not based upon Mr. Brisard's earlier allegations. MDL Dkt. # 1909, at 3. However, the record leaves no real room to doubt that Mr. Brisard is indeed the source of Plaintiffs' "audit" allegations. In their document request for the supposed 1998 "audit" (Plaintiffs' Document Request 46), Plaintiffs asked NCB to produce the full original "audit" of NCB of which supposed "excerpts [had been] previously produced by Khalid bin Mahfouz's counsel." *Id.* Indeed, even in their most recent letter to this Court, Plaintiffs specifically request production of "the audit or review for which plaintiffs provided excerpts." Pltfs. Feb. Ltr., at 3 (emphasis added). Those supposed "excerpts" were referenced in Plaintiffs' Document Request 46, and attached to the Document Requests. Those same "excerpts" had been filed as an attachment to the motion to dismiss the Burnett action filed by Khalid Bin Mahfouz in September 2003— but with the explanation that "[t]he document alleged to be an NCB 'audit report' ... was disclosed by Plaintiffs' 'lead investigator,' Jean-Charles Brisard, in a defamation action filed by Mr. Mahfouz in Europe against an English newspaper." Bin Mahfouz Burnett Motion to Dismiss, Mem. at 8 (Burnett, 1:02-cv-1616 (DC) Dkt. # 319). Further, Mr. Mahfouz's motion attached a copy of Mr. Brisard's May 2003 English court witness statement, to which was attached the same "audit" excerpts referenced in Plaintiffs' Document Request 46. *Id.*, Tab B. Mr. Mahfouz's motion to dismiss (Mem., at 8 n.7) then specifically stated: "Mr. Mahfouz does not concede the authenticity of this document or that it is an audit report." (Emphasis added.) In light of this record, it would be extraordinary, to say the least, for the Ashton plaintiffs to contend that their allegations about the NCB "audit" were based on a document that is not linked to Mr. Brisard, who has now retracted his claims about a special Saudi Government audit of NCB.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 5
March 5, 2007

Government.  In addition, we informed them that there was a February 1998 report of an examination of NCB conducted by Arthur Andersen at the direction of SAMA.  Indeed, the existence of this examination report was previously made a matter of record in English court proceedings brought by Khalid Bin Mahfouz, alleging that he was defamed by the Brisard allegations.  *See supra* n.2.  In those English court proceedings, Brisard submitted a witness statement that he has now retracted, as discussed above.  In a June 2003 response to the Brisard witness statement, the English court was informed that the examination report of NCB was "not an audit" but was instead one of several "independent process reviews of all Saudi banks" and— importantly— the report "mentioned nothing at all about" any terror-financing allegations against NCB "such as discovering illegal transfers to charities by [Bin Mahfouz] or anybody else."[3]

As counsel for NCB, we have reviewed both the financial statement audits of NCB and the report of the 1998 Arthur Andersen examination.  These reports do not contain the purported audit "excerpts" that Brisard now disavows.  Further, these reports do not contain any reference to any of the subjects that are within the scope of Plaintiffs' terror-financing allegations against NCB.

For all of the foregoing reasons, NCB should not be required to produce these reports, nor to seek SAMA approval to disclose the non-responsive report of the 1998 Arthur Andersen examination.

2.    **Correspondent Bank Account Activity**

a.    **NCB's Objections & Document Production; Plaintiffs' Supplemental Request**

NCB objected to Plaintiffs' Document Request No. 23 for information concerning its U.S. correspondent bank accounts on the ground, *inter alia*, that the subject was beyond the scope of the Discovery Order because, as a matter of law, the request did not seek information relating to NCB's "presence in the United States."  In particular:  "Under U.S. law, a foreign bank's U.S. correspondent bank accounts in the United States do not demonstrate the foreign bank's presence in the United States."  NCB Rule 34 Response, at 10, citing, *e.g., In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 819-20 (S.D.N.Y. 2005).  Subject to, and without waiving, that objection, and in an effort to satisfy Plaintiffs' request for some summary information concerning NCB's U.S. correspondent accounts, NCB agreed to, and did, produce "a summary chart identifying the correspondent bank accounts that it maintained with U.S. commercial banks during the six-year period preceding the commencement of these suits."  NCB Rule 34 Response, at 10.  Despite the

---

[3]    Witness Statement of Lawrence Smith (June 9, 2003), ¶ 5, in the matter of *Khalid Salim A Bin Mahfouz v Graeme Beaton et al.*, High Court of Justice, Queen's Bench Division (copy attached hereto as Exhibit B).

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 6
March 5, 2007

jurisdictional irrelevance of NCB's correspondent accounts, Plaintiffs are not satisfied and request additional information, in the form of "the number of transfers per account per year, the total amount of dollars transferred through each account per year, and summaries of any other use made of the correspondent accounts." Pltfs. Feb. Ltr., at 3. Under the Discovery Order, Plaintiffs are not entitled to this additional information.

### b.   The Discovery Order.

The Discovery Order did not specifically address NCB's correspondent bank accounts, as Plaintiffs acknowledge. Pltfs. Feb. Ltr., at 2. To the extent that Plaintiffs' request relates to the Discovery Order at all, it would fall within the portion of the Order that required "NCB ... to provide information concerning its United States contacts for the six-year period preceding the commencement of these suits." 440 F. Supp. 2d at 285; *accord id.* at 287 ("... for a six-year period preceding the commencement of these suits any documents previously requested by the plaintiffs related to its [NCB's] presence in the United States.") (emphasis added).

### c.   Jurisdictional Impact of Correspondent Accounts

As a matter of law, U.S. correspondent bank account activity does not demonstrate a foreign bank's presence in the United States— regardless of the dollar volume or number of transactions processed through such accounts— so long as the bank does not transact "substantially all of its business through" such accounts.[4] "Courts have repeatedly found that a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank." *Semi Conductor Materials v Citibank Int'l PLC*, 969 F. Supp. 243, 245-46 (S.D.N.Y. 1997) (holding that "a United Kingdom corporation[ ] does not satisfy these indicia for 'doing business in New York' because all of its branches, offices and employees are in Europe, it is not registered to do business in New York, ... it does not own any real property in the forum," and it "does not transact 'substantially all' of its business through its [four correspondent] New York bank accounts") (emphasis added); *accord In re Terror Attacks I*, 349 F. Supp. 2d at 819-20.[5]

---

[4]   This is because foreign banks that do not have U.S. branches cannot engage in dollar transactions without U.S. correspondent bank accounts. *See Sigmoil Resources v Pan Ocean Oil Corp.*, 234 A.D.2d 103, 104 (N.Y. App. Div. 1st Dep't 1996) ("Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions.")

[5]   *See also Northrop Grumman Overseas Serv. Corp. v Banco Wiese Sudameris*, 2004 WL 2199547, at *9 (S.D.N.Y. Sep. 29, 2004) (finding no personal jurisdiction over a foreign bank that maintained "correspondent banking relationships in New York with no ... substantial or consistent activity, and ... a New York account with one of those correspondent banks with no ... substantial or consistent activity in relationship to this account."); *Schenker v Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002) ("[A] bank account or trust account in

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 7
March 5, 2007

The uncontested evidence submitted to Judge Casey in support of NCB's motion dismiss demonstrated that NCB does not use its U.S. correspondent bank accounts to conduct substantially all of its business, but rather only "to facilitate international financial transactions or money transfers for itself and its customers." Declaration of Jorge Juco (September 22, 2003), ¶ 12 (MDL Dkt. # 416, Exhibit 5); *see also supra* n.4. Accordingly, under *Semi Conductor Materials* and similar decisions (*see supra* n.5), NCB's U.S. correspondent bank account activity is jurisdictionally insignificant.

Plaintiffs do not challenge either these facts or the law that treats U.S. correspondent bank accounts as insignificant jurisdictional contacts. Instead, they plan to ask Judge Casey to consider NCB's correspondent banking "[i]n weighing the totality of those and other contacts." Pltfs. Feb. Ltr., at 2. This totality-of-the-circumstances argument does not warrant disclosure of any additional information concerning NCB's correspondent bank accounts. Southern District decisions repeatedly hold that insignificant jurisdictional contacts, even when cumulated, cannot establish that a foreign corporation is "doing business" in New York. *See Pieczenik v. Cambridge Antibody Technology Group*, 2004 WL 527045, at *5-*6 (S.D.N.Y. Mar. 16, 2004) (holding that the plaintiff's "scatter-shot" allegations "fail[ed] to satisfy the stringent 'doing business' standard of section 301 because, even when aggregated, they do not suggest that [the defendant] is doing business in New York on a systematic and continuous basis" where the allegations included that the foreign defendant (1) was a defendant in unrelated contract litigation in New York court; (2) listed a non-employee New York investment banker as a contact person on a contract underlying that litigation; (3) had entered into contracts with New York businesses; (4) was 11.28% owned by a New York company; (5) had designated the Secretary of State of New York to receive process of service; and (6) had designated a New York bank as a depository for its American depository receipts and where the defendant did not have "any of the traditional indicia of 'doing business' in New York [insofar as it had] no facilities, operations, employees, assets or bank accounts in New York"); *Reers v. Deutsche Bahn A G*, 320 F. Supp. 2d 140, 153-54 (S.D.N.Y. 2004)

---

New York, standing alone, is not enough, absent extraordinary circumstances, to constitute 'doing business' in New York. ... In those limited cases when a single bank account was found sufficient to establish jurisdiction, that account was central and integral to the defendant's business.") (citing *United Rope Distribs., Inc. v. Kimberly Line*, 785 F. Supp. 446, 450-51 (S.D.N.Y. 1992) (finding personal jurisdiction over a foreign corporation based on a New York bank account through which the corporation received "substantially all" of its income)); *International Telecom, Inc. v. Generadora Electrica del Oriente S.A.*, 2002 WL 465291, at *4 (S.D.N.Y. Mar. 27, 2002) ("The fact that [defendant] also maintains a U.S. dollar account at Citibank in New York does not enhance [plaintiffs'] jurisdictional showing. The Citibank U.S. dollar account is not [defendant's] primary bank account and the company does not use it to pay a significant portion of its operational expenses. [Defendant's] primary bank accounts are located in Guatemala and the company uses those accounts to pay wages and other operational expenses. ... [Defendant's] banking activities with Citibank are not so systematic and central as to conclude that it is doing business in New York."); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1536 (S.D.N.Y. 1983) (holding that numerous correspondent banking relationships, which were "employed solely to facilitate international banking transactions" were insufficient to create general personal jurisdiction).

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 8
March 5, 2007

(holding that numerous "isolated and scattershot contacts [were] not the substantial, continuous, and permanent contacts required to support § 301 jurisdiction").[6]

It is important, additionally, to note that the Plaintiffs do not allege that any NCB correspondent bank account transaction had anything to do with financing of terrorism. Those transactions, therefore, are irrelevant to Plaintiffs' theories of specific jurisdiction.[7]

For all of the foregoing reasons, NCB should not be required to produce additional information concerning its U.S. correspondent bank accounts.

3.    **Depositions of NCB and Former SNCB Securities Inc. Employees**

a.    **The Discovery Order**

The Discovery Order did not authorize any depositions because Plaintiffs did not previously ask this Court to include depositions within the scope of "limited jurisdictional

---

[6]    Even if the Plaintiffs do ask Judge Casey to consider information about the dollar and transaction volume of NCB's correspondent account activity, that information is meaningless— and potentially misleading— because there is no way to place that information into the context of the extent to which foreign banks other than NCB use U.S. correspondent accounts. Such information does not appear to be publicly available. At most, the public record establishes only the widespread use of correspondent bank accounts. *See, e.g.,* Senate Permanent Subcommittee on Investigations: "Correspondent Banking:   A Gateway for Money Laundering," (Feb. 2001) Report at 18. http://www.senate.gov/~govt-aff/psi_finalreport.pdf

> The larger banks in the survey each have, worldwide, over a half trillion dollars in assets, at least 90,000 employees, a physical presence in over 35 countries, and thousands of branches. The smallest bank in the survey operates only in the United States, has less than $300 million in assets, 132 employees and 2 branches. <u>Three fourths of the banks surveyed have over one-thousand correspondent banking relationships and many have even more correspondent banking accounts.  Two foreign banks doing business in the United States had the most correspondent accounts worldwide (12,000 and 7,500, respectively).</u> The U.S. domiciled bank with the most correspondent accounts reported over 3,800 correspondent accounts worldwide.

(Emphasis added).

[7]    We know of no factual basis for Plaintiffs' supposition (Pltfs. Feb. Ltr., at 2-3) that NCB's former New York subsidiary, SNCB Securities Inc., may have "managed" one of NCB's U.S. correspondent accounts.  To the contrary, the SNCB document production establishes that SNCB, pursuant to its arms-length contractual responsibilities to NCB, remitted dollar payments to NCB through a U.S. correspondent bank account.  As previously explained, correspondent accounts are the only mechanism through which dollar transfers to NCB could be made— and that is precisely the reason why the law treats correspondent accounts as jurisdictionally insignificant. *See supra* n.4

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 9
March 5, 2007

discovery."[8]  Instead, the Discovery Order granted Plaintiffs' discovery requests "solely to the extent that NCB is directed to produce" documents as specified in the Order, and otherwise closed the discovery reference from Judge Casey.  440 F. Supp. 2d at 287 (emphasis added). Plaintiffs have not articulated any reason why they require depositions in light of the document production and other information that NCB has provided.  Regardless, neither a Rule 30(b)(6) deposition of an NCB witness "with knowledge of NCB's presence in the United States" nor depositions of former employees of SNCB Securities Inc. ("SNCB")— an indirect subsidiary of NCB that was dissolved in 2001— would be properly within the scope of "limited jurisdictional discovery," despite Plaintiffs' non-specific assurance that those depositions would be "very narrow in scope."[9]

Notably, without awaiting the Court's ruling on this subject, counsel for the *Burnett* plaintiffs on February 27, 2007 issued a subpoena to take the deposition of one of the former SNCB employees, Jagan Reddy, on May 16, 2007.  (A copy of the subpoena is attached as Exhibit C hereto.)  The subpoena does not specify topics for the deposition, nor have the Plaintiffs suggested any limits on the scope of that deposition.

**b.  Plaintiffs Have Not Overcome the Presumption against Jurisdictional Discovery Depositions**

"A plaintiff is generally entitled to a 'fair opportunity' to conduct jurisdictional discovery. Such discovery must, however, be 'limited to the essentials necessary to determining the preliminary question of jurisdiction.'  Plaintiffs may not conduct a fishing expedition, but must 'target[ ] information pertinent to the well established factors involved in a jurisdictional inquiry.'"  *In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 392, 400 (S.D.N.Y. 2002) (emphasis added) (quoting *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1283-85 & n.11 (3d Cir. 1993); citing *Rose v. Cont'l AG*, 2001 WL 236738, at *4 (E.D.Pa. Mar. 2, 2001) (holding that plaintiffs who had been served with responses to interrogatories on personal jurisdiction had had such a fair opportunity)).  Second Circuit precedent generally favors restricting jurisdictional discovery to written forms even when the plaintiff can articulate a specific rationale for such questioning.  *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1343-44 & n.12 (2d Cir. 1972) (requiring interrogatory answers and a deposition on written questions to explore defendant's personal jurisdiction affidavits); *accord Realuyo v. Diaz*, 2000 WL 687585, at *1

---

[8]      NCB had previously objected to Plaintiffs' request to take a deposition on oral questions of a Rule 30(b)(6) designee of the Bank, and, alternatively, to requiring any such designee to travel to the United States for a deposition. *See* NCB's May 3, 2006 Letter to Honorable Frank Maas, at Exhibit A, p.7.

[9]      We note that this Court's Discovery Order with respect to the Saudi Binladen Group (dated January 23, 2007) (MDL Dkt.# 1941) reserved decision on the Plaintiffs' request to take depositions as part of jurisdictional discovery as to that defendant.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 10
March 5, 2007

(S.D.N.Y. 2000). NCB's extensive document production and the information it has obtained from SAMA has provided Plaintiffs with more than a "fair opportunity" for jurisdictional discovery, and NCB's written discovery furnishes an ample record for Judge Casey to address "the well established factors involved in a jurisdictional inquiry." *In re Ski Train Fire*, 230 F. Supp. 2d at 400.[10]

> ### c.    Depositions Would Not Relate to the Well Established Factors in a Jurisdictional Inquiry

It is both uncontested and indisputable that SNCB Securities Inc. was dissolved in 2001. Information concerning the operation and dissolution of SNCB thus is ultimately irrelevant to personal jurisdiction over NCB because the personal jurisdiction inquiry focuses on contacts with the forum that existed <u>as of the date on which the lawsuits were filed</u>. *See Metropolitan Life Ins. Co. v United Dominion Industries, Inc.*, 84 F.3d 560, 569 (2d Cir. 1996); *Schenker v Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *4 (S.D.N.Y. July 15, 2002) ("The only relevant inquiry is whether

---

[10]    *See also Societe Nationale Industrielle Aerospatiale v United States Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 546 (1987) ( "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.    Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests.    When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.    For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence.    Objections to 'abusive' discovery that foreign litigants advance should therefore receive the most careful consideration.").

Moreover, NCB's foreign sovereign immunity defense to jurisdiction awaits resolution by the Court if NCB is not dismissed for lack of personal jurisdiction.    The unresolved FSIA defense provides an additional reason why deposition discovery is improper at this stage.    In the FSIA context, the Southern District of New York has held that "[b]ecause permitting discovery may tend to undercut the immunity from litigation that foreign instrumentalities were intended to enjoy, <u>the court must ensure that fact finding in this case is limited to 'the essentials necessary to determining the preliminary question of jurisdiction.'</u>" *Gabay v Mostazafan Foundation of Iran*, 151 F.R.D. 250, 257 (S.D.N.Y. 1993) (quoting *Gould, Inc. v Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988)) (emphasis added); *see also Filetech S.A. v France Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (holding that the district court did not abuse its discretion in dismissing plaintiff's claims without an evidentiary hearing where plaintiffs provided a "dearth of evidence" in response to defendant's defenses that were "readily ascertainable from the declarations of witnesses"); *Foremost-McKesson, Inc. v Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) ("[I]n making the necessary preliminary determinations the District Court should closely control and limit the discovery and fact-finding so as to 'avoid intrud[ing] the significance and benefit of... immunity from suit.'") (quoting *Gould*, 853 F.2d at 451); *In re Papandreou*, 139 F.3d 247, 252 (D.C. Cir. 1998) ("[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."); *Peterson v Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 196 (D.D.C. 2004) ("To avoid burdening a foreign sovereign that proves to be immune from suit, ... the court should carefully control and limit jurisdictional discovery.").

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

The Honorable Frank Maas
United States Magistrate Judge
Page 11
March 5, 2007

[the foreign parent corporation] had an 'agency' or 'mere department' relationship with [the subsidiary] when the complaint was filed, such that any of [the alleged subsidiary's] past or present New York contacts could be attributed to [the foreign parent corporation]. Because the evidence is clear that [the defendant] had sold any interest it once had in [the subsidiary] as of December 30, 1998, [the subsidiary's] contacts with New York cannot form a basis for personal jurisdiction over [the foreign parent corporation].") (emphasis added).

The earliest of these lawsuits was filed on August 15, 2002, the year after SNCB's dissolution. NCB produced documents concerning the operation and dissolution of SNCB consistent with this Court's decision to allow documentary discovery covering the six-year period preceding the commencement of these suits. Discovery Order, 440 F. Supp. 2d at 285. This Court expressly recognized, however, that the six-year look back period did not mean that information about activities preceding the commencement of these lawsuits ultimately would be relevant "in determining whether the Court should assert personal jurisdiction over NCB." *Id.* at 285 n.1. Plaintiffs have not articulated any reason why deposition questioning of "former SNCB employees who worked in New York in 2000-2001"— a time period that unquestionably predates the filing of these lawsuits— could be relevant in any way to personal jurisdiction over NCB, *see Schenker, supra,* and not cumulative of NCB's document production.

For these same reasons, deposition questioning of an NCB Rule 30(b)(6) designee concerning the operations and dissolution of SNCB would be equally irrelevant to personal jurisdiction and cumulative of NCB's document production. To the extent that Plaintiffs propose, instead, to question a Rule 30(b)(6) designee about the two other topics identified in Plaintiffs' letter— NCB U.S. correspondent bank account activity, and the non-existent 1998 Saudi Government "audit" of NCB— this letter already has explained why any further discovery on those subjects would be inappropriate.

We look forward to addressing any questions that the Court may have at the hearing that Plaintiffs have requested.

Respectfully submitted,

Ronald S. Liebman
*Counsel for Defendant The National Commercial Bank*

cc:     All Counsel