# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978 (GBD)
*Burnett, et al. v. Al Baraka Inv., et al.,* No. 03-CV-9849 (GBD)

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY SAMIR SALAH

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.     FACTUAL BACKGROUND ................................................................................. 2

    A.  SAAR Network .................................................................................................. 3

    B.  Bank Al-Taqwa ................................................................................................... 5

    C.  Taibah International Aid Association ................................................................. 7

    D.  Dar al-Hijrah ..................................................................................................... 10

II.    THE PLEADINGS ARE LEGALLY SUFFICIENT ......................................... 10

    A.  Pleading Standards under *Bell Atlantic* and *Erickson* ..................................... 10

    B.  Pleading Knowledge ......................................................................................... 14

    C.  Salah's Specific Concerns Lack Merit ............................................................. 16

III.   CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

CASES

Bell Atlantic v. Twombly,
    -- U.S. --, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ............................................10-13, 16, 19

Boim v. Quranic Lit. Inst.,
    291 F.3d 1000 (7th Cir. 2002) ..................................................................................1

Erickson v. Pardus,
    127 S. Ct. 2197 (2007).....................................................................................10, 12

Farmer v. Brennan,
    511 U.S. 825 (1994) ..........................................................................................13

Iqbal v. Hasty,
    490 F.3d 143 (2d Cir. 2007) ...........................................................................10-13, 18

Litle v. Arab Bank, PLC,
    2007 U.S. Dist. LEXIS 66415 (S.D.N.Y. Sept. 7, 2007) ......................................................14

Pelman v. McDonald's Corp.,
    396 F.3d 508 (2d Cir. 2005) ..............................................................................15-16

Phelps v. Kanoplas
    308 F.3d 180 (2d Cir. 2002) ..............................................................................14-15

Swierkiewicz v. Sorema NA,
    534 US 506 (2002) ........................................................................................13, 16

Warren v. District of Columbia,
    353 F.3d 36 (D.C. Cir. 2004)..................................................................................15


STATUTES

Fed. R. Civ. P. 8(a) .................................................................................10, 12, 14-16

Fed. R. Civ. P. 9(b) ...........................................................................................14

Fed. R. Civ. P. 12(b)(4) .........................................................................................1

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 11, 13, 15

Fed. R. Civ. P. 12(e) ...................................................................................................13-14

Fed. R. Civ. P. 15(d) ...........................................................................................................2

**OTHER AUTHORITIES**

5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990) ........................15

"The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." Boim v. Quranic Lit. Inst., 291 F.3d 1000, 1021 (7th Cir. 2002) (citing S. Rep. 102-342 at 22) (by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for attacks on America).

Through competent and plausible allegations, Plaintiffs have alleged that Samir Salah played a knowing, intentional and material role in financing al Qaida through a variety of networks, banks and charitable fronts over the years leading up to the September 11 Attack. Given his extensive role in providing al Qaida with funding, financial services and logistical support, it is hardly surprising that two of the September 11 hijackers frequented the Virginia mosque Salah helped establish. Furthermore, Salah was not an *unwitting* actor in bin Laden's grand plot to attack the United States on September 11th. Instead, he took active and deliberate steps to become a fully integrated component of al Qaida's financial and logistical infrastructure by *knowingly* maintaining accounts at Bank Al-Taqwa for individuals and organizations involved in al Qaida's global jihad, and by becoming *substantially involved* in charitable fronts and other organizations actively supporting al Qaida, fully aware that the material support he provided to al Qaida was assisting in its goal to attack America.

Samir Salah has filed a motion to dismiss pursuant to Rule 12(b)(6) which questions the factual sufficiency of the pleadings against him.[1] Because Salah misapprehends the requirements of notice pleading and cannot demand more of Plaintiffs than do the Federal Rules

---

[1] Curiously, Salah does not seek dismissal under Rules 12(b)(4) or (5), for improper or insufficient service, even though such claims constituted the gravamen of his motion to vacate the default judgments entered against him. Plaintiffs respectfully submit that his complete abandonment of those arguments here raises questions regarding the credibility and accuracy of the affidavit he submitted in support of his motion to vacate.

of Civil Procedure, especially in light of the Supreme Court's recent rulings on the subject, the

motion must be denied.

## I.    FACTUAL BACKGROUND

Samir I. Salah is the Egyptian-born director of the Virginia mosque where two of the

September 11 hijackers worshipped, a former director and treasurer of a notorious terror-

financing bank designated by the Treasury Department as a sponsor of global terrorism, the

treasurer for a charity whose Bosnia branch has been designated by the Treasury Department as a

Specially Designated Global Terrorist ("SDGT") based on evidence that it funneled money to al

Qaida, and an integral member of the SAAR Foundation, whose Virginia offices were among

those that the FBI and U.S. Customs officials raided in March 2002 and from which seized

records are reported to have revealed a pattern of multi-layered transactions that were designed

to confuse law-enforcement authorities and keep them off the money trail.[2]

---

[2]    This section contains allegations as pleaded in the Burnett Third Amended Complaint
With Incorporated More Definite Statement and the Federal First Amended Complaint With
Incorporated More Definite Statements, RICO Statements and Rule 15(d) Supplemental
Pleadings, Filed In Accordance With Paragraph 13 Of Case Management Order Number 2
(Docket No. 1380), as well as the RICO Statement filed by Federal as to Samir Salah (Docket
No. 2039). Paragraph 14 of Case Management Order No. 2 authorizes the Federal Insurance
plaintiffs to file RICO statements in this litigation. Additional relevant information is contained
in the RICO Statements pertaining to the SAAR Network Entities (Mar-Jac Poultry, African
Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, Inc., International Institute of
Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa
Trust, Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation)
(Docket No. 307), the SAAR Network Executives (Taha Al-Alwani, Muhammad Ashraf, M.
Omar Ashraf, M. Yaqub Mirza, Iqbal Yunus and Dr. Jamal Barzinji) (Docket No. 306); and the
Amended RICO Statement Applicable to Suleiman Abdel Aziz Al Rajhi, Saleh Abdulaziz Al-
Rajhi, and Abdullah Suleiman Al-Rahji (Docket No. 777). By the terms of the CMO, the RICO
statements amended the Federal Insurance Complaint.

For the Court's convenience, Exhibit A to the RICO statement pertaining to Salah is
attached as Exhibit A to this memorandum of law.

A.    SAAR Network

The SAAR Network is a group of Muslim charities, think tanks and related companies, the vast majority of which shared a common address at 555 Grove Street, Herndon, Virginia. The Network's name is derived from the initials of defendant Suleiman Abdul Aziz al Rajhi, who was involved in establishing and funding many of them. The entities comprising the SAAR Network are linked by overlapping boards of directors, shared offices and the circular movement of money, according to tax forms and federal investigators.  Salah is an officer of multiple entities in the SAAR Network. (Burnett Third Amended Complaint ("Burnett TAC") ¶¶ 261, 307)

On March 20 and 21, 2002, federal authorities raided the offices of the SAAR Network entities, the vast majority of which were located at a single address in Herndon, Virginia, as well as the residences of several prominent SAAR Network officials, pursuant to a search warrant issued by the United States District Court for the Eastern District of Virginia. (Burnett TAC ¶ 263).  The ongoing investigation of the SAAR network entities, which prompted the March 2002 searches, has revealed that one SAAR entity had transferred funds to Youssef Nada and Ahmed Idris Nasreddin, both of whom have been designated under Executive Order 13224 based on their material support and sponsorship of al Qaida.[3]  These transactions include transfers through

---

[3]    Salah attempts to negate the impact of the FBI raid in a footnote which argues that no indictments have stemmed from it.  However, his codefendant Jamal Barzinji, a fellow SAAR Network participant represented by the same counsel as Salah, has argued to the Court in a heavily-redacted Motion to Stay that this criminal investigation is serious and ongoing, requiring him to assert his Fifth Amendment privileges here.  "[T]he Government is, and has been, investigating Dr. Barzinji for his alleged involvement in the so-called and alleged 'SAAR Network' since at least March 2002. The Government's investigation apparently concerns the same acts and occurrences as the allegedly wrongful conduct that forms the basis of Plaintiffs' claims."  Barzinji Memorandum of Law in Support of Motion to Stay (Docket No. 1896) at 2.

Given how many shared activities in which both Barzinji and Salah are involved through the SAAR Network, it is difficult to reconcile counsel's contradictory statements in substance. The only difference seems to be that Mr. Barzinji is currently facing a discovery request which he would prefer to avoid, and Mr. Salah is not.

3

Bank al-Taqwa and Akida Bank Private Ltd.  (Burnett TAC ¶136)  Both of those banks have been designated by the U.S. government pursuant to Executive Order 13224, based on their involvement in financing radical groups throughout the world, including Hamas and al Qaeda, both before and after the September 11th attack.  Notably, in addition to the various positions he held within the SAAR Network, Salah sat on the board of Bank al-Taqwa as its treasurer while it provided banking services to close associates of Osama bin Laden and al Qaida itself.

Samir Salah is an officer of the SAAR Foundation, whose Virginia offices were among those that the FBI and U.S. Custom's officials raided in March 2002.  Of $54 million dollars raised by the SAAR Foundation ostensibly for "charity," reports suggest $26 million went to the Isle of Man in the Irish Sea, a notorious location for drug runners and money laundering.  Only $20 million made its way to SAFA Group charities.  According to David Kane, the federal agent who led the raid, SAAR/SAFA's intent was "to route money through hidden paths to terrorists, and to defraud the United States by impeding, importing, obstructing, and defeating the lawful functions of the IRS. "

In addition, Salah is a founder and board member of Safa Trust, another one of the Herndon, Virginia entities that the FBI raided in March 2002.  Other co-officers of Safa Trust are defendants Jamal Barzinji, Yaqub Mirza, Ahmed Totonji, and Hisham al Talib, all of whom are represented by Salah's counsel in this litigation.  Safa Trust shares the same address as the following entities that are or have been defendants in this litigation, African Muslim Agency, Grove Corporate, Mar-Jac Investments, Mena Corporation, Muslim World League, Reston Investments, Saar Foundation, Sanabel al Kheer, Sana-Bell, Inc., Sterling Management Group, and York Foundation.

Salah is also an officer of Mar-Jac Investments. Other co-officers of Mar-Jac Investments along with defendant Salah are defendants Yaqub Mirza and M. Omar Ashraf, who are also

represented by the same counsel. Mar-Jac Investments shares the same address as the following entities that have been defendants in this litigation, African Muslim Agency, Grove Corporate, Mena Corporation, Muslim World League, Reston Investments, Saar Foundation, Safa Trust, Sanabel al Kheer, Sana-Bell, Inc., Sterling Management Group, and York Foundation.

Salah has also been a board member of Amana Mutual Funds with, among others, Iqbal Unus, Jamal Barzinji, and Yaqub Mirza. Amana is a growth and income mutual fund headquartered in Bellingham, Wash., conveniently near the Canadian border. Mirza served as Vice President and then President of the SAAR Foundation from 1984-2000. In August 2000, Mirza registered the Defendant MWL in Virginia. The MWL and its offshoot organization, the IIRO, both provide substantial financial assistance to al Qaida. Additionally, Mirza was a founding trustee of Sana-Bell, Inc. Sana-Bell is closely affiliated with both the MWL and the IIRO and is suspected of providing financial assistance to al Qaida in the 1998 Embassy bombings.

Salah has additional ties to the SAAR Foundation as president of Piedmont Trading Corporation and as CFO of Piedmont Poultry. (Burnett TAC ¶ 307)

B.    Bank Al-Taqwa

Salah served as a director and treasurer of Bank al-Taqwa (Arabic for "fear of God"), helping to form and manage the Bahamas branch of the Muslim Brotherhood's al-Taqwa Group, a network of banks and shell corporations which is among those entities designated by OFAC as an Specially Designated Global Terrorist on November 7, 2001. (Burnett TAC ¶¶ 128, 265) Following that designation, al-Taqwa's assets were frozen, and al-Taqwa's headquarters, two of its satellite offices and a few of its executives' residences were raided as part of an international investigation into the bank's relationship with Osama bin Laden and al Qaida. According to various White House and Treasury statements at the time of its designation, Bank al-Taqwa has

5

provided investment advice and cash transfer mechanisms for al-Qaida and other radical Islamic groups over the years, with offices in Switzerland, Lichtenstein, Italy and the Caribbean. (Burnett TAC ¶¶ 128-131)

The Bank was established in 1988 with significant backing from the Muslim Brotherhood. It has been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida organization.  (Burnett TAC ¶¶ 124-24, 598)

As of October 2000, Bank al-Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.  Indeed, other al-Taqwa officials – Youssef Nada, Ahmed Idris Nasreddin, Ali Ghaleb Himmat, and Albert Friedrich Armand Huber – were themselves marked with SDGT status in 2001 and 2002, and Nada has openly admitted that he knew as early as 1995 that al-Taqwa Bank might be financing the activities of terrorist outfits. (Burnett TAC ¶ 599).

According to Italy's Division of General Intelligence and Special Operations, al-Taqwa handled financing for a number of Arab and Islamic political and militant groups, including former Afghan mujahedin in Bin Laden's camps, the Palestine Liberation Organization, Hamas, the Algerian Armed Islamic Group and the Egyptian Gama'a al-Islamiya. In March 2001, the Bahamian government revoked al-Taqwa's banking license.

Testifying before Congress in February 2002, Juan Zarate of the Department of the Treasury told lawmakers that U.S. intelligence agencies had evidence that al Qaida operatives received financial assistance from al-Taqwa's chairman as recently as late September 2001 — after the 9/11 attacks.  Al-Taqwa Bank has an account for Mamdouh Mahmoud Salim, an al Qaida operative who is in U.S. custody for his role in the 1998 Embassy bombings.  U.S. investigators believe that the account has been used to finance terrorist activity.

According to an article in Newsweek, al-Taqwa's Bahamian banking license allowed al-Taqwa officers to "open commercial correspondent accounts with established European banks — paying the larger institutions fees to make cash transfers around the world for them, without calling attention to themselves." According to counterterrorism experts and government officials, such convoluted banking practices are a red flag for money laundering and terrorist financing.

Moreover, al-Taqwa Bank has a close relationship with another organization owned by Nada: Al-Taqwa Management Company (eventually renamed Nada Management Company). Al Taqwa Bank relied heavily on Al-Taqwa Management Organization to conduct audits and feasibility studies concerning the bank. As a result, al-Taqwa Bank often transferred large sums of money to Al Taqwa Management Organization. Furthermore, al-Taqwa Bank often transferred money throughout Nada and Nasreddin's many other corporations and investments as well as into various Islamic charities. According to U.S. authorities, the bank's convoluted structure "made it easy to use as a money laundering mechanism." U.S. officials have stated that they believe the SAAR network entities have transferred a "total of about $20 million to offshore accounts, much of it through Bank al Taqwa and Akida Bank to Nada and Nasreddin firms."

Al-Taqwa's vice president, Ali Ghaled Himmat, was labeled as a SDGT by President Bush on November 7, 2001. Authorities in Switzerland have a video cassette showing Himmat in Afghanistan, in March of 1993, in close proximity to al Qaida training camps and participating in the making of speeches calling for the use of violence against the United States. Himmat is a member of the Syrian chapter of the Muslim Brotherhood.

C.    Taibah International Aid Association

Salah has been the treasurer for Taibah International Aid Association, whose Bosnia branch has been designated by the U.S. Office of Foreign Asset Control ("OFAC") as a Specially

Designated Global Terrorist based on evidence that Taibah funneled money to al Qaida.  Taibah has been the subject of terrorism investigations dating back to 1997, and its branch in Bosnia has been raided twice by the Bosnian government since September 11 because of accusations of terrorist connections.

Taibah International, headquartered in the Northern Virginia suburbs of Washington D.C., maintained international branch offices in Sarajevo, Bosnia; Tirana, Albania; and Moscow, Russia.  Taibah's central office in Falls Church, Virginia, was co-founded by, among others, Osama Bin Laden's nephew Abdullah.  Yet, in IRS exemption forms submitted in 1999 and again in 2000, Defendant Abdulrahman Alamoudi is listed as the corporate vice president. Moreover, court documents filed in Alamoudi's case cite financial transfers totaling at least $35,000 from the Success Foundation—a Northern Virginia Muslim charity chaired by Alamoudi — to Taibah International in Bosnia. (Burnett 12e ¶112)

In 2001, one month after the September 11 attacks in the United States, Taibah's Bosnia office was raided in connection with a terrorist plot to blow up the U.S. Embassy there. (Burnett TAC ¶ 302).  It turned out at least one of the six men arrested in the scheme worked for Taibah. In 2002, Taibah was identified by investigators in Bosnia as "under the direction of" the Muslim Brotherhood, one of the oldest Islamic terrorist groups in the world. Both U.S. and Bosnian officials determined Taibah worked hand-in-hand in Bosnia with another Islamic charity, Global Relief Foundation in Bridgeview, Ill., which the United States also named a Specially Designated Global Terrorist in October 2002.  According to the U.S. Treasury Department, Global Relief's Arabic newsletter regularly sought donations for armed Islamic jihad, including one solicitation for money "for equipping the raiders, for the purchase of ammunition and food, and for their (the Mujahideen's) transportation so that they can raise God the Almighty's word."

The relationship between Taibah and Global Relief was so close, Taibah stepped in to represent Global Relief's interests in Bosnia after the government there shut down Global Relief for supporting terrorists, FBI records show. . (Burnett TAC ¶305) Moreover, during the Bosnian anti-terror raids of Taibah shortly after the September 11 attacks, local police discovered contact numbers for senior al Qaeda terrorist recruiters and other phone records indicating 70 calls to various locations in Afghanistan in the one month alone immediately following the September 11 attacks. Many of those implicated in the plot were found to be employees of Saudi-funded Islamic charitable organizations. One such conspirator was Mustafa Ait-Idir, a 31-year old computer specialist working for the Bosnian branch of Taibah International (despite his having falsely obtained Bosnian citizenship). According to an FBI report, Ait-Idir later admitted to investigators that Taibah International was responsible for representing the local interests of the Global Relief Foundation (GRF) after it was officially shut down by the Bosnian government. Ait-Idir added that another Taibah employee, Mohammad Ibrahim, was directly responsible for GRF's concerns in the Sarajevo area.[4]

When Abdurahman Alamoudi was first detained in London in August, his palm pilot contained the contact information for Mohamed Chehade, a former top GRF official in the U.S. Consequently, an official Bosnian investigation on Taibah International cited by The Wall Street Journal found evidence of "fictitious declarations of affiliation and employment" and of visas for entry into Bosnia for suspected militants. It concluded that "large cash sums were withdrawn by [Taibah] management... which were never accounted for," indicating "a wide scope for possible illegal spending." (Burnett 12e ¶113)

---

[4]    Exhibit 1 to Burnett Plaintiffs' More Definite Statement as to Samir Salah, et al. filed September 30, 2005 (Docket No. 1368) ("Burnett 12e") at ¶ 113.

In 1997, Taibah's dealings with the Saudi charity International Relief Organization were scrutinized as part of a federal terrorism, money laundering and fraud probe in Illinois and Virginia, according to testimony before Congress by Matthew Epstein of the Investigative Project. Both charities operated out of the same address at 360 South Washington Street in Falls Church, Va. Records show the International Relief Organization, which is the U.S.-based arm of the International Islamic Relief Organization, or IIRO, transferred thousands of dollars to another charity called Holy Land Foundation for Relief and Development, which the U.S. government shut down in December 2001 for aiding terrorists.

D.   Dar al-Hijrah

Samir Salah is the founder and a former president of the Dar al-Hijrah, a mosque in Falls Church, Va., which has been both a platform for radical Islamic rhetoric and a magnet for militants. Two of the Sept. 11 hijackers, Nawaf Alhazmi and Hani Hanjour, attended Dar al-Hijrah in March 2001 prior to commandeering United Flight 77 and crashing it into the Pentagon.

## II.   THE PLEADINGS ARE LEGALLY SUFFICIENT

Since motions to dismiss were last decided in this case, both the Supreme Court and the Second Circuit have clarified the pleading standards relevant to Salah's motion to dismiss. In sum, these Courts have made clear that notice pleading remains the law of the land, confirming that Salah's knowledge and the other elements of plaintiffs' claims have been sufficiently pleaded.

A.   Pleading Standards under *Bell Atlantic* and *Erickson*

Salah claims that knowledge has not been averred sufficiently. This is incorrect. Between the Supreme Court's decisions in <u>Bell Atlantic v. Twombly</u> and <u>Erickson v. Pardus</u> and their application by the Second Circuit in <u>Iqbal v. Hasty</u>, it is clear that Fed. R. Civ. P. 8(a)

means what it says regarding notice pleading being the law of the land, that no heightened

pleading standard can be applied without express directive from Congress, and knowledge can be

averred in the precise way as it has been done here.

In Bell Atlantic v. Twombly, -- U.S. --, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929

(2007), the Supreme Court grappled with whether some heightened pleading standard was

required for plaintiffs alleging an antitrust conspiracy to exist.  The court determined that

detailed allegations of fact were not needed, but rather only facts sufficient to provide notice of a

plausible grounds for relief.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1964-

65 (internal quotation marks, citations, and alterations omitted).  A plaintiff satisfies this burden

simply by asserting "enough facts to state a claim to relief that is plausible on its face."  Id. at

1974.[5]

Mr. Salah's analysis of the proper pleading standards mysteriously ends at this

chronological point.  See Motion to Dismiss at 6.  However, much has transpired

jurisprudentially in the months since Bell Atlantic Corp. v. Twombly was decided – even in the

next two weeks – and the case's subsequent application by the Supreme Court and Second

Circuit made clear that Twombly did not and could not create the heightened pleadings

framework advocated by Salah.

---

[5]     As amplified by the Second Circuit, this "plausibility standard" is a flexible one,
"oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where
such amplification is needed to render the claim *plausible*."  Iqbal v. Hasty, 490 F.3d 143, 157-
58 (2d Cir. 2007) (emphasis supplied).

Just two weeks after the Twombly decision, the Supreme Court summarily reversed a
10th Circuit decision which had attempted to impose a heightened pleading standard in a Section
1983 prisoner's civil rights case. Erickson v. Pardus, 127 S. Ct. 2197 (2007). The prisoner had
alleged that officials "removed [him] from [his] hepatitis C treatment" in violation of department
protocol, "thus endangering [his] life," and the defendants sought to have the complaint
dismissed as conclusory. As the Supreme Court explained, however:

> The complaint stated that Dr. Bloor's decision to remove petitioner
> from his prescribed hepatitis C medication was "endangering [his]
> life." Petitioner's Complaint 2. It alleged this medication was
> withheld "shortly after" petitioner had commenced a treatment
> program that would take one year, that he was "still in need of
> treatment for this disease," and that the prison officials were in the
> meantime refusing to provide treatment. Id., at 3, 4. This alone
> was enough to satisfy Rule 8(a)(2).

127 S. Ct. at 2200. And, citing Twombly, the Court added, "Federal Rule of Civil
Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader
is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant
fair notice of what the . . . claim is and the grounds upon which it rests.'" 127 S. Ct at 2200,
citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1964.

A few weeks after the Supreme Court's decision in Erickson, the Second Circuit
considered the impact of Twombly on federal court pleading standards in Iqbal v. Hasty, 490
F.3d 143 (2d Cir. 2007). The Iqbal decision concerned a rather wide-ranging conspiracy alleged
by a Muslim-Pakistani who was detained subsequent to September 11 in the New York City area
and allegedly mistreated. The Second Circuit was called upon to determine whether the plaintiff
was required to plead specific facts to overcome a defense of qualified immunity at the motion-
to-dismiss stage.

The Second Circuit answered that question in the negative. In applying the new Bell
Atlantic v. Twombly decision, the panel determined that Fed. R. Civ. P. 8(a) remained in full

force: "We believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations *in those contexts where such amplification is needed to render the claim plausible.*" Iqbal, 490 F.3d at 157-158 (emphasis supplied).[6]

Indeed, the Second Circuit noted, "We are mindful of the Supreme Court's statement in [Swierkiewicz v. Sorema NA, 534 US 506 (2002)] that heightened pleading requirements 'must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.' Absent any indication from the Supreme Court that qualified immunity might warrant an exception to this general approach and the explicit disclaimer of a heightened pleading standard in Bell Atlantic, reinforced by the reversal of the Tenth Circuit's use of a heightened pleading standard in Erickson, we conclude that a heightened pleading rule may not be imposed. However, in order to survive a motion to dismiss under the plausibility standard of Bell Atlantic, a conclusory allegation concerning some elements of a plaintiff's claims might need to be fleshed out by a plaintiff's response to a defendant's motion for a more definite statement. See Fed. R. Civ. P. 12(e)." Iqbal, 490 F.3d at 158.[7]

---

[6]     Here, such amplification is not necessary, and was not sought by Salah, yet this is the path mandated by the Supreme Court for defendants claiming such concerns. "The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement." Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1985 n. 9 (U.S. 2007).

[7]     As this language makes clear, the proper recourse for a defendant who believes the allegations against him are vague or conclusory is to move for a more definite statement under Fed. R. Civ. P. 12(e), and not seek dismissal under Fed. R. Civ. P. 12(b)(6) based on some perceived technical defect in plaintiff's preliminary pleadings. Here, Salah, and other defendants appear to have deliberately ignored the 12(e) procedure in a strategic effort to attack the pleadings against them before plaintiffs would have the opportunity to elaborate upon their misconduct based on additional information that came to light since the early pleadings in this case.

*(cont'd on next page...)*

These decisions have been expressly adopted in the context of actions under the Anti Terrorism Act. Litle v. Arab Bank, PLC, 2007 U.S. Dist. LEXIS 66415, *12-13 (S.D.N.Y. Sept. 7, 2007).

B.    Pleading Knowledge

Salah simply asserts, in conclusory fashion, that heightened pleading of knowledge was required as to all of plaintiffs' claims, without ever even identifying those theories or the substantive elements applicable. As the party moving for dismissal, Salah bears the burden to demonstrate how the pleadings fail to state a claim under *each* of the applicable theories, a burden he clearly cannot meet without ever discussing the elements of those causes of action. In fact, certain of plaintiffs' causes of action do not include a scienter element. For this reason alone, his motion to dismiss should be denied.

Moreover, to the extent that knowledge must be pleaded, the recent decisions of the Supreme Court and Second Circuit confirm that Plaintiffs have pleaded it properly. In these cases, the Second Circuit has uniformly read the plain language of Fed. R. Civ. P. 9(b)[8] and notice pleading standards to hold that a plaintiff is not required to plead particularized facts regarding a defendant's state of mind, contrary to Salah's assertions. For example, in Phelps v. Kanoplas, the Second Circuit reversed a district court ruling which had dismissed a complaint for failure to plead specific facts in support of allegations of the defendant's knowledge, holding instead that such a heightened pleading standard was "unwarranted" under Fed. R. Civ. P. 8(a). 308 F.3d 180, 186 (2d Cir. 2002). "A plaintiff's allegation of knowledge is itself a particularized

Having elected not to pursue the relief available under Rule 12(e), plaintiffs submit that Salah should not be permitted to complain that the allegations against him lack adequate specificity or are conclusory.

[8]    Fed. R. Civ. P. 9(b) expressly states that "Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

factual allegation, which he will have the opportunity to demonstrate at the appropriate time 'in the usual ways'." Id. at 187 n. 6 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).

As the Phelps court further instructed: "However unlikely it may appear to a court from a plaintiff's complaint that he will ultimately be able to prove an alleged fact such as mental state, the court may not go beyond Fed. R. Civ. P. 8(a) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." Phelps, at 186-87. Instead, the court held, the weight of the evidence can only be assessed at the time of summary judgment proceedings. Phelps at 187.[9]

More recently, in Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005), the Second Circuit had again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. In Pelman, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." Id. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." Id. at 512. Quoting the unanimous Supreme Court ruling in Swierkiewicz, the Court reminded:

---

[9]     This view is shared by the U.S. Court of Appeals for the District of Columbia Circuit, which has sharply disagreed with protests that a plaintiff's allegations were too "conclusory". In Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of Phelps in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge. Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held: "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory. Many well-pleaded complaints are conclusory. And while we do not have to accept conclusions of law as true, conclusions of fact are another matter." Id. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

Pelman, 396 F.3d at 512 (quoting Swierkiewicz, 534 U.S. at 512-13).

### C.   Salah's Specific Concerns Lack Merit

Salah raises two fundamental concerns in his motion to dismiss: that Plaintiffs fail to plead knowledge sufficiently; that the factual allegations are vague and conclusory.  Given the applicable pleading standards, and in light of the detailed allegations contained in the Complaint and RICO Statement, there should be little doubt that neither argument is meritorious.  Indeed, the complaint as amended goes well beyond the notice pleading requirements of Fed. R. Civ. P. 8(a) – as explained by Bell Atlantic v. Twombly and other recent cases – to virtually constitute "fact pleading" instead of notice in outlining exactly how Mr. Salah knowingly and deliberately provided material support to al Qaida through each of the various entities which he knowingly joined and in which he assumed leadership roles.

For example, Salah protests that he cannot be held liable for the acts of Bank al-Taqwa which preceded its designation as a terrorist financier in November 2001.  However, Plaintiffs have alleged – and the al-Taqwa designation by the government makes plain – that the Bank's involvement in financing al Qaida long preceded September 11, 2001 and was contemporaneous with Salah's active role within it.  As the Federal RICO Statement pertaining to Salah explains, since its establishment in 1988 (with the significant backing of the notorious Muslim Brotherhood), the Bank has consistently been involved in financing radical groups such as the Palestinian Hamas, Algeria's Islamic Salvation Front and Armed Islamic Group, Tanzania's On-Nahda, and Osama Bin Laden and his al Qaida organization.

As the RICO Statement further reviews, "As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit to a close associate of Osama bin Laden.  Indeed, other Al Taqwa officials – Youssef Nada, Ahmed Idris Nasreddin, Ali Ghaleb Himmat, and Albert Friedrich Armand Huber – were themselves marked with SDGT status in 2001 and 2002, and Nada has openly admitted that he knew as early as 1995 that Al-Taqwa Bank might be financing the activities of terrorist outfits.  According to Italy's Division of General Intelligence and Special Operations, al-Taqwa handled financing for a number of Arab and Islamic political and militant groups, including former Afghan mujahedin in Bin Laden's camps, the Palestine Liberation Organization, Hamas, the Algerian Armed Islamic Group and the Egyptian Gama'a al-Islamiya.  In March of 2001, the Bahamian government revoked Al Taqwa's banking license."

All of this was knowing and intentional on Salah's part and consistent with his role as treasurer of the Bank.  As the RICO Statement avers,

> Samir Salah has held senior management positions in numerous organizations and business that have served as conduits and fronts for channeling material support and resources to al Qaida and affiliated terrorist organizations.  By virtue of the senior positions he has held in all of these organizations, there can be no dispute that Salah was aware of their illicit activities, and in fact was responsible for directing many of those activities.  Indeed, Salah's continuous and repeated association with organizations established for the purpose of channeling financial and logistical support to al Qaida demonstrates that he has played a central and knowing role in the Enterprise, and is an important architect of al Qaida's financial infrastructure.  Through the organizations he managed and directed, Salah personally devised and executed a variety of schemes to finance and otherwise support the Enterprise, both within the United States and internationally.

Salah's similar argument with regards to Taibah International is as easily refuted; while it was not designated as a terrorist financier until May 2004,  Plaintiffs have alleged that Salah served as treasurer for the organization, a trusted officer role from which his knowledge can be

fairly alleged and inferred.[10]  Indeed, in the Iqbal decision itself, the Second Circuit determined that no additional pleading was needed to render plausible even the allegation that the Attorney General of the United States and the Director of the Federal Bureau of Investigation each had personal knowledge of the Plaintiff's circumstances.  "Even as to Ashcroft and Mueller, it is plausible to believe that senior officials of the Department of Justice would be aware of policies concerning the detention of those arrested by federal officers in the New York City area in the aftermath of 9/11 and would know about, condone, or otherwise have personal involvement in the implementation of those policies. … And, like the Form 9 complaint approved in Bell Atlantic, Iqbal's complaint informs all of the Defendants of the time frame and place of the alleged violations."  Iqbal, 490 F.3d at 166.

The RICO Statement further explains that in 1997, Taibah's dealings with the Saudi charity International Relief Organization were scrutinized as part of a federal terrorism, money laundering and fraud probe in Illinois and Virginia regarding the International Relief Organization, which transferred thousands of dollars to another charity called Holy Land Foundation for Relief and Development, which the U.S. government shut down in December 2001 for aiding terrorists.

Plaintiffs have further alleged that Taibah's branch in Bosnia has been raided twice by the Bosnian government since Sept. 11 because of accusations of terrorist connections, and was raided shortly after the Sept. 11 attacks in the United States in connection with a terrorist plot to blow up the U.S. Embassy in Bosnia, with at least one of the six men arrested in the scheme having worked for Taibah.

---

[10]     The list of Taibah founding officers includes Abdullah bin Laden, nephew of Osama.

18

In sum, Plaintiffs have properly laid out the facts from which Salah's knowing, direct and intentional involvement in the sponsorship of al Qaida in the years preceding the September 11 attack sufficient to withstand the motion to dismiss.

## III.    CONCLUSION

Unlike most defendants, Salah did not challenge jurisdiction, nor did he question that the causes of action were stated in a legally proper manner.  Salah challenged the Complaint only on the sufficiency of its fact pleading, and limited his analysis of the legal standards to the <u>Bell Atlantic v. Twombly</u> decision itself, but not the cases which followed.

Based on the applicable law, Plaintiffs have properly pleaded their case against Salah under the Federal Rules of Civil Procedure.  His motion to dismiss must be denied.

Respectfully submitted,

| | |
|---|---|
| Dated:  October 29, 2007 | COZEN O'CONNOR<br><br>BY:  _____ /s/ _____<br>        Stephen A. Cozen, Esquire<br>        Elliott R. Feldman, Esquire<br>        Sean P. Carter, Esquire<br>        Adam C. Bonin, Esquire<br>        1900 Market Street<br>        Philadelphia, PA  19103<br>        Tele:  (215) 665-2000<br>        Fax:  (215) 665-2013<br><br>Attorneys for *Federal Insurance* Plaintiffs |
| | MOTLEY RICE LLC<br><br><br>BY:  _____ /s/ _____<br>        Ronald Motley, Esquire<br>        Jodi Westbrook Flowers, Esquire<br>        Donald Migliori, Esquire<br>        Michael Elsner, Esquire |

|  | Robert T. Haefele, Esquire |
|  | Justin B. Kaplan, Esquire |
|  | 28 Bridgeside Blvd. |
|  | P.O. Box 1792 |
|  | Mt. Pleasant, SC 29465 |
|  | Tele: (843) 216-9000 |
|  | Fax: (843) 216-9450 |
|  | |
|  | Attorneys for the *Burnett* Plaintiffs |