IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE TERRORIST ATTACKS
ON SEPTEMBER 11, 2001

Civil Action No. 03 MDL 1570 (GBD)
ECF Case

This document relates to:

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 03-CV-9849
*Federal Insurance Co., et al. v. Al Qaida, et al.*, Case No. 03-CV-6978

**REPLY MEMORANDUM OF LAW IN SUPPORT OF SAMIR SALAH'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM**

Nancy Luque
Steven K. Barentzen
**DLA PIPER US LLP**
500 8th Street, N.W.
Washington, DC 20004
Tel: 202-799-4520
Fax: 202-799-5520

*Attorneys for Samir Salah*

Dated: December 18, 2007

Plaintiffs open their Consolidated Memorandum of Law in Opposition to the Motion to Dismiss (the "Opposition" or "Opp.") by stating that "the only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who *knowingly and intentionally* supply the funds to the persons who commit the violent acts." (Emphasis added.) Although Plaintiffs apparently intended for this quotation to influence the Court to maintain their claims against Samir Salah, it actually explains precisely why these claims must be dismissed – Mr. Salah never has "knowingly and intentionally" financed or supported persons involved in terrorist activities.

Plaintiffs do not allege that he has. Rather than cite a single fact demonstrating Mr. Salah's knowing and intentional funding support, Plaintiffs instead seek to hold him liable under their previously discredited "guilt by association" theory. For example, Plaintiffs assert that Mr. Salah is a "member" of the so-called "SAAR Network," but do not allege a single illegal activity undertaken by this purported network that Mr. Salah knew about or in which he participated. Judge Casey previously found "scant basis" for inferring the existence of a SAAR Network, and dismissed claims against five other individuals based on the same vague allegations of a purported connection to this non-existent "network." *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 823 (S.D.N.Y. 2005) ("*In re Terrorist Attacks I*"); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 572 (S.D.N.Y. 2005) ("*In re Terrorist Attacks II*").

Plaintiffs also allege that *in the 1980's,* Mr. Salah was a founder and officer of Bank Al-Taqwa, an organization designated as a terrorist financing organization only *after the September 11th attacks in 2001*. Putting aside the fact that the allegation is untrue, it fails to state a claim because it does not allege that Mr. Salah was in a position to know anything about its operations

during the relevant time period, *e.g.*, that he worked for Bank Al-Taqwa at a time during which it was engaged in terrorist financing activities, much less that Mr. Salah actually knew that it was financing terrorism and that he intended to or actively participated in such support.

Indeed, had Mr. Salah had such a role in the purported activities of Bank Al-Taqwa, the government surely would have designated Mr. Salah as well and frozen his assets, as it did with others allegedly associated with the bank's activities. Plaintiffs' efforts to create the illusion of guilt by associating Mr. Salah with Bank Al-Taqwa two decades after any operative fact are unavailing also in light of the government's recent removal of Ahmed Nasreddin -- an individual recently allegedly associated with the bank -- from the list. *See* Exhibit A.

Plaintiffs' allegation that Mr. Salah headed a mosque that two of the September 11th hijackers attended over a year before the September 11th attacks rings particularly hollow. First, the allegation is not contained in the complaints, and second, even if the allegation were in the complaints and had to be deemed true, despite no evidence that it is true, it would be irrelevant. Plaintiffs have not alleged, nor could they, that Mr. Salah knew these individuals *or* that he knew they attended the mosque *or* that they had plans to participate in the September 11th attacks, much less that he knowingly and intentionally assisted them.

Plaintiffs' claims must be dismissed because they do not allege that Mr. Salah "knew of al Qaeda's illegal activities, 'that [he] desired to help those activities succeed, and [he] engaged in some act of helping the illegal activities.'" *In re Terrorist Attacks II*, 392 F. Supp. 2d at 564.

## ARGUMENT[1]

### I. THE COURT SHOULD DISREGARD THE ALLEGATIONS CONTAINED IN THE FEDERAL INSURANCE PLAINTIFFS' RICO STATEMENT BECAUSE IT VIOLATES THE CMO2

Conceding -- as they must -- that the allegations in the *Burnett* Plaintiffs' Third Amended Complaint and the *Federal Insurance* Plaintiffs' First Amended Complaint are insufficient to state claims against Mr. Salah, Plaintiffs' Opposition to the motion to dismiss instead relies primarily on allegations in the *Federal Insurance* Plaintiffs' RICO Statement Applicable to Samir Salah, dated September 21, 2007. The Court should disregard the allegations in the RICO Statement because it does not comply with Case Management Order No. 2, dated June 15, 2004 (the "CMO2").[2]

Paragraph 14 of the CMO2 states in relevant part:

> [T]he Federal Insurance plaintiffs shall file a RICO Statement within thirty (30) days of the filing of an entry of appearance by counsel on behalf of any . . . defendant in the Federal Insurance action. Any such RICO Statement shall be deemed an amendment to the Federal Insurance plaintiffs' Complaint or Amended Complaint, by incorporation by reference.

Mr. Salah's counsel did not file a formal notice of appearance. Instead, it entered its appearance on behalf of Mr. Salah when it filed his Motion to Vacate Default Judgments on

---

[1] Plaintiffs make the bizarre argument that "Salah does not seek dismissal under Rules 12(b)(4) or (5), for improper or insufficient service, even though such claims constituted the gravamen of his motion to vacate" and suggest that Mr. Salah put in false affidavits in support of his successful motion to vacate. (Opp. at n. 1.) But this is a blatant -- and misguided -- attempt to discredit Mr. Salah. Mr. Salah willfully entered his appearance and moved to vacate the default judgment the Court had entered against him on the ground that he did not have *actual notice* of Plaintiffs' claims prior to entry of the default judgment. In so doing, Mr. Salah consented to the Court's jurisdiction and waived any objections he may have had to improper service.

[2] To the extent Plaintiffs attempt to rely upon allegations in RICO Statements filed against other defendants, *see* Opp. at n. 2, the Court should not permit them to do so. The CMO2 set a deadline requiring Plaintiffs to "file an amended complaint that includes all amendments made prior to that date" on or before September 30, 2005. An allegation that is not contained in Plaintiffs' "final" amended complaints do not comply with the CMO2 and may not be considered by the Court.

3

February 21, 2007. *See, e.g., Martha Stewart Living Omnimedia LLC v. Beers Flower Shop*, Civ Act. No. 98cv3398 (RWS), 1990 U.S. Lexis 14738, * 8 (S.D.N.Y. 1998) (defendant enters appearance by "seeking, taking, or agreeing to some step or proceeding in the cause beneficial to himself or detrimental to plaintiff other than one contesting only the jurisdiction"); *Sexton v. M.V. Silver Happiness*, Civ. Act. No. 97cv0148, 1997 U.S. Dist. Lexis 14634, *10 (E.D.N.Y. 1997) (request for time to answer complaint was an appearance); *Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs.*, 1997 U.S. Dist. Lexis 13890, *7 (N.D.N.Y. 1997) (finding an appearance by defendants where attorneys filed a stipulation between opposing counsel extending defendants' time to file an answer); *Bd. of County Comm'n of Sierra County v. Boyd*, 372 P.2d 828 (N. Mex. 1962) ("[Defendants], having filed their motion to set aside the original default judgment and the trial court having acted thereon, entered their appearance in the case."); 10 Wright & Miller, Fed. Prac. and Proc. 3d § 2686 ("Defendant need not respond directly to the complaint in order to be deemed to have made an appearance.").

Accordingly, the RICO Statement was due within 30 days of the filing of the Motion to Vacate, or March 23, 2007. Plaintiffs did not file the RICO Statement until September 21, 2007, nearly six months later -- *after* Mr. Salah filed his motion dismiss. Mr. Salah did not address, nor could he, those allegations contained in the RICO Statement, but not the complaint, in his motion to dismiss. Because the RICO Statement was filed well after the time permitted by the CMO2, it should be disregarded in its entirety.

In the RICO Statement, Plaintiffs argue -- without support -- that "it would have been procedurally improper to file a RICO statement as to Mr. Salah at any point prior to this Court's decision to vacate that default judgment." This claim is in direct contravention of the clear and unambiguous language in the CMO2 and has no merit. Even if Plaintiffs had been precluded

4

from filing file the RICO Statement prior to the default judgment being vacated, Plaintiffs nevertheless should have filed it within 30 days of the Court's Order vacating the judgment on August 3, 2007. Plaintiffs' contention, that the CMO2 permits them to file their RICO Statement *after* Mr. Salah has moved to dismiss, is nonsensical, unfair to Mr. Salah and is an improper attempt to amend the allegations in their complaints after the time for amendment has expired.[3]

## II. PLAINTIFFS' COMPLAINTS SHOULD BE DISMISSED FOR FAILURE TO STATE CLAIMS

Rather than focus on their failure to allege that Mr. Salah knowingly financed the September 11th attacks, Plaintiffs devote much of their Opposition to arguing that a "heightened pleading standard" is not applicable to their claims. (Opp. at 11.) This argument is nothing but a red herring because Mr. Salah has not advocated that the Court adopt a "heightened pleading standard."[4] Rather, Plaintiffs' claims should be dismissed because they have failed to allege, as the Court has held they must, that Mr. Salah "knew of al Qaeda's illegal activities, 'that [he] desired to help those activities succeed, and [he] engaged in some act of helping the illegal activities.'" *In re Terrorist Attacks II*, 392 F. Supp. 2d at 564.

---

[3] To the extent the Court does consider the allegations in the RICO Statement, those allegations are applicable only to the claims of the *Federal Insurance* Plaintiffs, not the *Burnett* Plaintiffs. *See* Paragraph 14 of the CMO2. Additionally, the allegations apply to the *Federal Insurance* Plaintiffs' RICO claims *only*, not to any of their other claims. *See In re Terrorist Attacks II*, 392 F. Supp. 2d at 564 (S.D.N.Y. 2005) (stating that for purposes of motions to dismiss, the "Court limits its review to the facts stated in the complaints, documents attached to the complaints as exhibits, and documents incorporated by reference in the complaints [and] [f]or purposes of the RICO claims, the Court also reviews the RICO statements.")

[4] The Court, however, should be mindful of Judge Casey's admonitions that, "in light of the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of Plaintiffs' allegations as to any particular defendant, to ensure that he -- or it -- does indeed have fair notice of [the claims]." *In re Terrorist Attacks I*, 349 F. Supp. 2d at 831.

### A.    Plaintiffs Misstate The Applicable Pleading Standards

Relying on *Erickson v. Pardus*, 127 S. Ct. 2197 (2007)[5] and *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), Plaintiffs attempt to limit the Supreme Court's recent holding in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), that a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* But Plaintiffs' efforts are futile.

As the Second Circuit instructed in *Iqbal*, *Twombly* requires that a party bringing a claim satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal*, 490 F.3d at 157-58.

A party's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (internal quotation marks and alteration omitted). To state a claim, the factual allegations contained in the pleading "must be enough to raise a right to relief above the speculative level." *Id.* at 1965; *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiffs' claims across the line from conceivable to plausible." (internal quotation marks and alteration omitted)).

When deciding a Rule 12(b)(6) motion to dismiss a claim, a court must take as true the facts as alleged in the complaint and must construe the complaint liberally and draw all reasonable inferences in plaintiff's favor. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d

---

[5] *Erickson* is inapposite. *Erickson* was a *pro se* prisoner case in which the Court is required to construe the complaint liberally. Doing so, the Court found that plaintiff's allegations that defendants' termination of plaintiff's medical treatment for Hepatitis C threatened his life was sufficient to state a Section 1983 claim. *Erickson*, 127 S. Ct. at 2200.

6

184, 191 (2d Cir. 2007). Conclusory statements cannot "substitute for minimally sufficient factual allegations." *Paycom Billing Servs. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 289 (2d Cir. 2006) (internal quotation marks omitted); *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (noting that "bald assertions and conclusions of law will not suffice" to defeat motion to dismiss (internal quotation marks omitted)).

Plaintiffs' extensive discussion of the applicable legal standard is nothing but a diversionary tactic. Regardless of the pleading standard adopted by the Court, as described in detail below, the complaints must be dismissed because Plaintiffs have not pled any facts demonstrating knowing involvement in terrorism financing activities by Mr. Salah.[6]

### B.    Plaintiffs' Factual Allegations Fail To State Claims

Plaintiffs' factual allegations against Mr. Salah fall roughly into four categories, none of which elucidate the claims against him. First, Plaintiffs allege that Mr. Salah should be liable to them because he is as a member of the so-called "SAAR Network." (Opp. at 3-5.) But the Court already has dismissed the claims against five other so-called "SAAR Network" executives in the *Federal Insurance* action based upon allegations virtually identical to the conclusory allegations asserted against Mr. Salah here because "the complaint does not adequately provide these Defendants with notice as to how they provided material support to al Qaeda terrorists." *In re Terrorist Attacks II*, 392 F. Supp. 2d at 572.[7]

---

[6] Plaintiffs argue that "certain of plaintiffs' causes of action do not include a scienter element." (Opp. at 14.) Plaintiffs fail to identify a single such claim. Further, the Court already has found to the contrary, holding that to state a claim *Plaintiffs must allege* that Mr. Salah "knew of al Qaeda's illegal activities, 'that [he] desired to help those activities succeed, and [he] engaged in some act of helping the illegal activities.'" *In re Terrorist Attacks II*, 392 F. Supp. 2d at 564.
[7] Plaintiffs suggest that Mr. Salah is liable because another defendant, Jamal Barzinji, is apparently under criminal investigation by the government and that there are "many shared activities in which both Barzinji and Salah are involved through the SAAR Network." (Opp. at n. 3.) However, Plaintiffs do not identify a single one of these purported shared activities and do

7

Plaintiffs apparently concede that Mr. Salah's purported connections with the non-existent "SAAR Network" fail to support their claims against him as they do not include these allegations in their argument. (*See* Opp. at 16-19.)[8]

Plaintiffs also argue that their allegation that Mr. Salah was a Treasurer of Bank Al-Taqwa at some unspecified period of time and assisted in forming the bank in the 1980's-- which, although it must be assumed to be true for purposes of this motion, is in fact false-- is sufficient to state a claim against him. (Opp. at 5-7, 16-17.) Clearly it is not. Although they dedicate over 4 pages of their Opposition to allegations against Bank Al Taqwa -- *i.e.* that it was designated by the government as a terrorist financing operation *after* the September 11th attacks because it purportedly provided financing to various "radical groups" -- Plaintiffs have failed to allege that Mr. Salah either knew of or participated in these alleged activities. Rather his alleged liability appears to be based solely on his status as a former officer or "founding member" which is insufficient to state a claim. *See Harlem River Consumer Coop., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1271 (S.D.N.Y. 1976); *see also In re Terrorist Attacks II*, 392 F. Supp. 2d at 567-68 (dismissing claims against Abdulrahman Alamoudi based upon claims that he was associated with certain entities).

---

not, because they cannot, allege that Mr. Salah is under criminal investigation. Nor do Plaintiffs allege that the criminal investigation of Dr. Barzinji, which does not relate to charges of terrorism financing, has anything to do with Mr. Salah.

[8] Without citation to any source, Plaintiffs argue that Mr. Salah "has also been a board member of Amana Mutual Funds . . . a growth and income mutual fund headquartered in Bellingham, Wash., conveniently near the Canadian border." (Opp. at 5.) However, this allegation, even if it were credited -- and it should not be because it is not in Plaintiffs' complaints -- is irrelevant. Other than making the ridiculous and unsubstantiated allegation that Amana is engaged in terrorism financing because its headquarters are close to Canada – apparently in Plaintiffs' view any company located near Canada supports terrorism – Plaintiffs do not allege that this mutual fund has done anything illegal, much less that Mr. Salah knew that to be the case and participated in its illegal activities.

Plaintiffs mischaracterize his argument by claiming that Mr. "Salah protests that he cannot be held liable for the acts of Bank al-Taqwa which preceded its designation as a terrorist financier in November 2001." (Opp. at 16.)[9] Instead Mr. Salah has argued, quite properly, that Plaintiffs may not use Bank Al Taqwa's designation in November 2001 to establish that Mr. Salah's knew that Bank Al Taqwa was providing assistance to terrorist organizations twenty years earlier. Plaintiffs have not alleged any fact that would lead to -- let alone compel-- an inference that Bank Al Taqwa was supporting terrorist organizations while Mr. Salah was there, much less that he knew of and participated in such activities. Alleging a decades old association is not enough.[10]

Plaintiffs' allegations concerning Mr. Salah's purported association with Taibah International are also defective. (Opp. at 7-10, 17-18.) Plaintiffs have not alleged that Mr. Salah was even at Taibah International when it purportedly supported terrorism. Indeed, it was not designated as a financier of terrorism until May 2004, nearly three years after the attacks. Moreover, it cannot be inferred from Plaintiffs' allegations that Mr. Salah either knew of, or participated in, terrorism financing undertaken by Taibah because the entity that the United States actually designated is Taibah International (Bosnia). *See* Exhibit B. The entity that Mr. Salah allegedly worked for, Taibah International Aid Association, was a Virginia entity that was

---

[9] At least three individuals allegedly associated with Bank Al Taqwa, Yousef Nada, Ahmed Nasreddin and Ali Ghaleb Himmat, were designated as supporters of terrorism around the same time that Bank Al Taqwa was designated. Mr. Salah was not one of those individuals designated. Notably, the government recently removed of Ahmed Nasreddin from the list. *See* Exhibit A.

[10] Plaintiffs assert that "[b]y virtue of the senior positions he has held in all of these organizations, there can be no dispute that Salah was aware of their illicit activities, and in fact was responsible for directing many of those activities." (Opp. at 17.) However, this quotation is nothing but an excerpt from Plaintiffs' RICO Statement and is simply the argument of Plaintiffs' counsel. It is entirely devoid of any factual assertion and need not be assumed to be true for purposes of this motion.

9

an entirely separate entity from the Bosnia entity that was designated. The Virginia entity that Mr. Salah purportedly worked for has never been designated by the government as a financier of terrorism. Plaintiffs have failed to identify a single action taken by Mr. Salah on behalf of Taibah with the knowing intent to support terrorism, because none exists.

Plaintiffs' final allegation against Mr. Salah, that he is the founder and former president of a mosque that two of the September 11th hijackers attended in March 2001, is preposterous. It should not be considered by the Court because it is not contained in either of Plaintiffs' complaints. But even assuming this allegation to be true -- and there is no evidence that it is -- Plaintiffs have failed to demonstrate that Mr. Salah knew these individuals, knew they attended the mosque, or knew that they had plans to participate in the September 11th attacks, much less that he assisted them in any way.[11]

## CONCLUSION

Prior to stigmatizing Mr. Salah by sending his case into what is likely to be years of costly discovery, the Court should look closely at the paucity of factual support for the heinous allegations in these complaints. If Mr. Salah was as dangerous as Plaintiffs would have this Court believe, why has the government not designated him as a sponsor of terrorism, frozen his assets, investigated or charged him, or taken any action against him, well over six years after the September 11th attacks. The fact that it has not, coupled with the complete lack of any factual allegations that Mr. Salah knew of or supported the attacks in any way, compels the Court to dismiss the claims against him.

---

[11] Plaintiffs suggest that they should be permitted to cure their failure to allege knowledge by filing a More Definite Statement. (*See* Opp. at 13, n. 6 and 7.) But the CMO2 afforded Plaintiffs ample opportunity to amend their complaints, file RICO statements and file more definite statements. If Plaintiffs have been unable to state a claim despite all of these opportunities to do so, it is clear that they will not be able to so even if given yet another chance.

10

Dated: December 18, 2007					Respectfully submitted,

                                          DLA PIPER US LLP

By: /s/ Nancy Luque
    Nancy Luque
    Steven K. Barentzen
    500 8th Street, NW
    Washington, DC  20004
    Telephone: (202) 799-4520
    Facsimile:  (202) 799-5520

*Attorneys for Samir Salah*

## Certificate of Service

I hereby certify that on this 18th day of December, 2007, I caused an electronic copy of Samir Salah's Reply Memorandum in Support of Motion To Dismiss and Supporting Memorandum of Law to be served by the Court's electronic filing system upon all parties scheduled for electronic notice.

/s/ Steven K. Barentzen
Steven K. Barentzen (SB-8777)