# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In Re:
:  **DISCOVERY ORDER**

TERRORIST ATTACKS ON
SEPTEMBER 11, 2001        :  03 MDL 1570 (GBD)(FM)

-----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

These actions arising out of the September 11, 2001 terrorist attacks have been referred to me by the Honorable George B. Daniels, the District Judge to whom this multidistrict litigation is assigned, for the limited purpose of resolving certain jurisdictional discovery disputes between the Ashton and Burnett plaintiffs (together, the "plaintiffs") and defendant Saudi Binladin Group ("SBG"). (Docket No. 2071). As detailed below, the plaintiffs' discovery requests are granted in part and denied in part.

I. Background

In January 2005, the Honorable Richard C. Casey, the District Judge to whom the cases then were assigned, denied SBG's motion to dismiss, without prejudice, in order to permit "limited jurisdictional discovery to investigate whether SBG purposefully directed its activities at the United States and its contact with the United States." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 836 (S.D.N.Y. 2005). Thereafter, both Judge Casey and Judge Daniels have referred specific jurisdictional discovery disputes to me, which has led to a series of conferences and discovery orders. (See Docket Nos. 1939-43, 1975, 1985-86, 1988-89, 2042).

My order dated July 6, 2007,

    (a)    directed SBG to produce documents concerning

        (i)    the separation of Osama bin Laden ("OBL") from SBG, including documents relating to the establishment of a trust to hold certain SBG shares that he owned, and

        (ii)    SBG's relationship with Yassin Abdullah al-Kadi, a Saudi businessman and United States government-designated terrorist;

    (b)    held that the plaintiffs could depose Philip Griffin, a former employee of SBG's former United States subsidiary (SBG-USA) for three hours (which period I subsequently shortened to two hours due to Mr. Griffin's health); and

    (c)    denied, without prejudice, the plaintiffs' application to conduct jurisdictional discovery regarding SBG's relationship with the Mohammed Binladin Company ("MBC").

(Docket No. 1985). In a subsequent order, dated July 26, 2007, I explained that SBG did not need to produce all of its records relating to the trust, but would be required to produce any records reflecting any change in the structure or trustees of the trust or the trust beneficiaries. (Docket No. 1989). The order further stated that the Court's intent was "<u>not</u> to require that records of changes in the assets of the trust be disclosed, unless there were transfers to [OBL]." (Id. (emphasis in original)).

The plaintiffs filed objections to my July 26, 2007 order "to the extent that it relieve[d] SBG of its obligation to produce any document regarding the trust SBG

2

established for [OBL]." (Docket No. 2027 at 2). The plaintiffs also specifically objected to the order because it "prevent[ed them] from obtaining evidence of asset transfers inuring to the benefit of [OBL] and al Qaeda unless the transfers were made directly to [OBL]." (Id.). Judge Daniels overruled these objections on December 20, 2007. (Docket No. 2058).

My original July 6 order further directed the plaintiffs to submit a letter explaining the basis for their application to conduct jurisdictional discovery concerning the relationship between SBG and a company known as Techmaster "or other companies in which SBG has a minority ownership interest or with which SBG is alleged to be affiliated." (Docket No. 1985 ¶ 1). On July 26, 2007, after reviewing letters from counsel, I denied the plaintiffs' request for discovery related to Techmaster. (Docket No. 1988). The plaintiffs did not object to this order, nor did their letter seek discovery regarding any SBG-affiliated company other than Techmaster and another unrelated division of SBG.

II.     Discussion

The plaintiffs now seek an order directing SBG to respond to ninety-five supplemental interrogatories and requests for production of documents, as well as their prior discovery requests regarding Techmaster and another company known as Iridium. (See letter from Robert Haefele, Esq., to the Court, dated Dec. 28, 2007 ("Pls.' Letter")).

3

The plaintiffs also seek to depose Mr. Griffin for an additional five hours and to require him to answer questions concerning his communications with SBG's counsel. (Id.).

    A.    Supplemental Interrogatories and
           Requests for Production of Documents

It has been more than three years since Judge Casey authorized "limited" jurisdictional discovery related to SBG. In re Terrorist Attacks, 349 F. Supp. 2d at 836. During this period, SBG has responded to the plaintiffs' initial discovery demands and supplemented its production at least twice. (See letter from James E. Gauch, Esq., to the Court, dated Dec. 28, 2007 ("Def.'s Letter"), at 4-6). Rather than reaching the end of their discovery, however, the plaintiffs have served SBG with another ninety-five discovery demands, which, taken together, are quite broad.

The plaintiffs contend that the need for this substantial additional discovery is demonstrated by inconsistencies between and among the materials previously furnished to them by SBG. (See Apr. 11, 2008 Tr. ("4/11/08 Tr.") at 9, 20). It would be the rare case, however, in which all of the factual inconsistencies arising during discovery could be resolved before – or for that matter even during – a trial. Accordingly, the mere fact that there may be inconsistencies in the prior positions taken by SBG does not mean that the plaintiffs should be granted a continuing license to engage in open-ended jurisdictional discovery. For example, the plaintiffs allege that there is conflicting evidence as to whether OBL's shares in SBG were transferred to OBL's half-brother Ghaleb bin Laden ("Ghaleb") in 1993 or in 1994. (See Pls.' Letter at 4). However, this

4

difference (if one exists) is of no jurisdictional significance whatsoever in this litigation, which began approximately one decade later.

Furthermore, even if certain of the inconsistencies suggest a need for further discovery, this surely is not a basis for simply ignoring my prior orders. As an example, Interrogatory No. 38 requests "all communications" between Mr. al-Kadi and a subsidiary of SBG. I previously had ruled, however, that "mere communications" between SBG and al-Kadi were not discoverable. (June 29, 2007 Tr. ("6/29/07 Tr.") at 66). Similarly, the plaintiffs have served numerous demands seeking information regarding MBC, even though I previously denied their application to conduct jurisdictional discovery concerning that entity, which has a motion to dismiss pending and, consequently, is not yet at the stage of jurisdictional discovery.[1] (See, e.g., Interrog. Nos. 3, 4, 9; Doc. Req. Nos. 1, 2, 9).

The justification for continuing to go over old ground is that the discovery to date has unearthed many "inconsistencies, discrepancies, and vagaries" which need to be explored. (Pls.' Letter at 5). Many of the inconsistencies cited by the plaintiffs, however, have innocuous explanations. The following discussion is by no means

---

[1] I also previously had ruled that although any trust records which reflected a change in the structure or trustees of the trust holding OBL's SBG shares or its beneficiaries must be produced, the intent "of this directive is not to require that records of changes in the assets of the trust be disclosed, unless there were transfers to [OBL]." (Docket No. 1989). Judge Daniels upheld this order despite the plaintiffs' objection that the order was too narrow. (Docket No. 2058). Yet the plaintiffs have now interposed discovery requests which again seek substantially the same information, arguing that my previous order does not control because it was based on SBG's misrepresentations regarding the formation of the trust. (See generally Pls.' Letter at 5).

inclusive, but serves to illustrate why many of the plaintiffs' discovery requests based on alleged discrepancies lack a solid foundation.

1. <u>Visits to OBL</u>

The plaintiffs claim that inconsistencies exist in documents relating to visits with OBL by Bakr Binladin ("Bakr"), OBL's half-brother, who serves as the chairman of SBG. Bakr previously has represented that he has not seen OBL since 1992. (<u>See</u> Pls.' Letter Ex. 5 (Aff. of Bakr Binladin, sworn to on Jan. 25, 2006 ("Bakr Aff."), ¶ 2)). The plaintiffs allege that this statement is inconsistent with a letter from SBG to the Saudi government which states that "Bakr bin Laden and some of his brothers visited Sudan several times. <u>Most</u> <u>recently</u>, several brothers traveled in the company of their Uncle Abdulla bin Laden and [OBL's] mother to meet [OBL]." (Pls.' Letter at 4-5 n.3 (emphasis in original)). At the outset, there is no indication that Bakr was one of the "several brothers" who recently traveled to meet with OBL. Moreover, the document that the plaintiffs quote indicates that the unnamed "brothers" did not travel to OBL to support him, but, rather, "to disassociate themselves from him and his conduct, and to sever their relationships with him completely." (Defs.' Letter Ex. 8). Consequently, such trips do not support the plaintiffs' theory that further discovery is warranted because they show that SBG materially supported OBL's terrorist activities.

6

2. <u>Transfer of Shares</u>

The plaintiffs also allege that SBG first claimed that OBL's shares in SBG were transferred to the rest of the SBG shareholders, only to state later that they actually were transferred to Ghaleb. Although this is true, it misses the crucial jurisdictional point. The documentary evidence shows that on June 16, 1993, SBG sought approval from Saudi governmental authorities for a shareholder resolution which would remove OBL as a shareholder and transfer his interest in SBG into a trust. (Def.'s Letter Exs. 7, 9; <u>see</u> <u>id.</u> Ex. 1 at 12-14). The fact that OBL's shares may have been held for some period of time in Ghaleb's name, rather than the names of all of the shareholders, does not suggest that SBG failed to remove OBL as a shareholder or that he received any monetary compensation for his shares.

Additionally, although the letter to the governmental authorities indicates that OBL's shares would be transferred to the "rest of the shareholders," the shareholder resolution confirms what actually occurred. (<u>See</u> Def.'s Letter Ex. 7; Docket No. 1645 Ex. C at 10). Thus, the shareholder resolution explains that the company sought to "assign [OBL's] shares . . . to Ghaleb." (Docket No. 1645 Ex. C at 10). The resolution further declares that the "remaining shareholders have agreed to that assignment and [each] has relinquished his right to recover the shares assigned." (<u>Id.</u>). Although the resolution therefore may not be fully consistent with the letter, the differences between

7

the two explanations are not so discordant that they merit further discovery at this preliminary stage.

### 3. Timing of the Trust

The plaintiffs also rely on alleged misrepresentations regarding the date that OBL's shares of SBG were placed into a trust. (Pls.' Letter at 3-5). According to them, Bakr represented that the OBL shares were transferred to the trust in 1993. (Id. at 3). Later, however, SBG represented that the money was placed into the trust in 1994. (Id. at 4). As the plaintiffs explain, it in fact "appears no money was placed into any bank account, let alone a trust, until 2000." (Id.).

These alleged discrepancies are fully explained by SBG in their discovery responses and the documentary evidence that they have provided to the plaintiffs. As the documents confirm, on June 16, 1993, SBG adopted a shareholder resolution that sought to transfer OBL's shares to Ghaleb and to remove OBL from the shareholder roster. (Defs.' Letter Ex. 1 at 13). Before the resolution could take effect, SBG needed governmental approval. Accordingly, Bakr wrote to King Fahd that same day to seek approval. (Id.). Bakr also requested that the value of OBL's interest in SBG be held in a trust outside of OBL's control. (Id. at 14). After the government finally approved this plan of action, the shareholder resolution took effect on May 2, 1994. (Id. at 17). Subsequently, in 2000, following further governmental approval, Ghaleb transferred the

value of the shares into a joint trust account at National Commercial Bank ("NCB"). (Id. at 20).

This sequence of events, which is fully supported by the relevant documents, establishes that the process of transferring OBL's shares began in 1993, received preliminary governmental approval in 1994, and was completed in 2000. That the facts governing the placement of the value of the shares into a trust are complex and that some of the documents are not fully consistent does not mean that SBG has misrepresented the process. Accordingly, the plaintiffs' requests for further discovery concerning the timing of the foregoing transactions is denied.

    4.    <u>Value of the Shares</u>

There nonetheless is one area in which additional discovery seems warranted. As noted previously, the trust that holds the proceeds of OBL's shares of SBG was not funded until 2000. In the interim, Ghaleb held the shares and presumably received any distributions attributable to them. Nonetheless, when Ghaleb turned over the proceeds of the shares to NCB, the amount placed into the trust account reflected the value of the shares in 1993, not any distributions that may have been made to Ghaleb with respect to those shares in the intervening years or any increase in share value. If the plaintiffs are able to show that this was part of an intentional plan whereby SBG diverted funds to Ghaleb, whom they characterize as an OBL sympathizer, the transfer of the shares to Ghaleb might have jurisdictional significance. For this reason, the Court will

9

require that for the period from 1993 through 2000 SBG produce any records in its possession, custody, or control concerning:

(a) The receipt and subsequent disposition of any dividends, distributions, or similar payments arising out of the custody, control, or ownership of OBL's shares of SBG stock; and

(b) Any transfer, assignment, or pledge of the OBL shares, as well as any income derived thereby; and

(c) Any increase in the value of the OBL shares.

I am granting this additional discovery because it responds to questions reasonably raised by SBG's disclosure of the details of the transactions at issue in stages. At the same time, I recognize that jurisdictional discovery must have boundaries and that the Court and counsel have been mired at this preliminary stage for a considerable period of time. Plaintiffs' counsel therefore is cautioned that any further requests for discovery related to the transactions leading to the funding of the trust will likely be denied in the absence of a showing of <u>truly</u> exceptional circumstances. Simply put, we are reaching the end of the line.

B. <u>Griffin Deposition</u>

The plaintiffs also seek to continue the deposition of Mr. Griffin, the sole employee of SBG-USA, for the remainder of the seven-hour period that the Federal Rules of Civil Procedure treat as the presumptively proper time limit for a deposition. (<u>See</u> Pls.' Letter at 6). Mr. Griffin suffers from Parkinson's disease. (Docket No. 2042). After this

10

came to my attention, I reduced the time limit for his deposition, which had originally been fixed as three hours, to two hours. (Id.). The plaintiffs now contend that SBG misrepresented the extent of Mr. Griffin's illness since he met with SBG's counsel to prepare for his deposition for more than two hours and proved "quite capable of expressing himself" during the deposition. (Pls.' Letter at 5-6).

In making this request, the plaintiffs ignore my prior determination that no more than three hours was warranted because SBG-USA closed in 1999 and Mr. Griffin therefore was unlikely to have jurisdictionally relevant information. (6/27/07 Tr. 23). Significantly, the plaintiffs failed to object to either my order setting the three-hour time limit or the one setting the two-hour time limit for Mr. Griffin's deposition. They also have cited nothing in Mr. Griffin's testimony that leads me to conclude that my initial fear that his deposition would prove fruitless was wrong.[2] (See Pls.' Letter at 6).

During Mr. Griffin's deposition, SBG's counsel objected and instructed Mr. Griffin not to answer various questions on the ground of attorney-client privilege. (See Pls.' Letter at 6). These questions related to Mr. Griffin's discussions with SBG's counsel in preparation for the deposition. The plaintiffs challenge these instructions.

---

[2] SBG's counsel permitted the plaintiffs to exceed the two-hour time limit by approximately twenty-five minutes. (Letter from James E. Gauch, Esq., to the Court, dated Jan. 15, 2008 ("Def.'s Reply Letter"), at 9). Notwithstanding this accommodation, there is not the slightest suggestion in the transcript that the attorney conducting the deposition for the plaintiffs was pressed for time.

11

A party asserting attorney-client privilege must show that "there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice."[3] United States v. Constr. Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996). The plaintiffs contend that this privilege therefore is inapplicable because Mr. Griffin was not a "client" of SBG, but, rather, merely a former employee of SBG-USA, SBG's former subsidiary.

The "vast majority of federal cases hold that communications between company counsel and former company employees are protected by the attorney-client privilege if they are focused on exploring what the former employee knows as a result of his prior employment about the circumstances giving rise to the lawsuit." Surles v. Air France, No. 00 Civ. 5004 (RMB)(FM), 2001 WL 815522, at *6 (S.D.N.Y. July 19, 2001) (citing cases). Thus, if Mr. Griffin were a former employee of SBG, his communications with SBG's counsel undoubtedly would be privileged. Mr. Griffin, however, is a former employee of a former SBG subsidiary, not of SBG. During a recent pretrial conference, both sides to this dispute indicated that they were unable to locate any case law squarely addressing this circumstance. (4/11/08 Tr. 50). I also am unaware of any such authority.

---

[3] Because this case involves both federal and state substantive law, federal privilege law applies. See von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987); Lupowitz v. Monetfiore Med. Ctr., No. 95 Civ. 10049 (SAS), 1997 WL 4577, at *1 (S.D.N.Y. Jan. 6, 1997); First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 110 F.R.D. 557, 560 (S.D.N.Y. 1986).

12

Nonetheless, the Court need not resolve this novel issue because the communications here clearly are protected by the work-product doctrine.[4]

The work-product doctrine is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. Under that Rule, to merit protection the material being withheld must "(1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co., No. 96 Civ. 6033 (BSJ)(HBP), 1998 WL 614478, at *11 (S.D.N.Y. June 4, 1998) (quoting In re Grand Jury Subpoenas, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982) (McLaughlin, J.)). Work-product protection is not absolute. Accordingly, even if the material constitutes work product within the meaning of the Rule, a party may secure its disclosure upon a showing of substantial need and that the party could not obtain its substantial equivalent through other means without undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii).

The plaintiffs contend that this work-product protection applies only to documents. (4/11/08 Tr. 52). Although Rule 26(b)(3), by its terms, is limited to the protection of documents, the work-product rule, which traces its roots to Hickman v.

---

[4] SBG did not object to the deposition questioning on this basis, but subsequently raised a work-product claim in papers that it submitted to me. (See Def.'s Reply Letter at 11). It therefore is appropriate to address this alleged basis for withholding the information sought by the plaintiffs. See In re Gulf Oil/Cities Serv. Tender Offer Litig., No. 82 Civ. 5253 (MBM)(MHD), 1990 WL 108352, at *3 (S.D.N.Y. July 20, 1990) ("on discovery motions the courts routinely address privilege theories asserted for the first time in the motion papers, provided, of course, that the party has not waived the privilege by previously disclosing the information").

13

Taylor, 329 U.S. 495 (1947), extends to "all trial preparation activities and all communications made principally for the purpose of preparing for litigation or trial." In re Gulf Oil/Cities, 1990 WL 108352, at *3 (citing Sporck v. Peil, 759 F.2d 312, 316 (3d Cir. 1985)); see Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 112 (S.D.N.Y. 2005) (pre-deposition conversations with former employee entitled to work-product protection to extent that the attorneys "communicated their legal opinions and theories of the case"); Surles, 2001 WL 815522, at *6 (deposition questioning about corporate counsel's meeting with former employee "would likely expose defense counsel's thought processes which are entitled to protection under the work product doctrine"); Morales v. United States, Nos. 94 Civ. 4865 (JSR) & 94 Civ. 8773 (JSR), 1997 WL 223080, at *1 (S.D.N.Y. May 5, 1997) (denying motion to compel because deposition questions concerning attorney's communications with non-party witness may reveal legal strategy). The need for protection is further heightened if the information disclosed would reveal the mental processes of the attorney. In re Gulf Oil/Cities, 1990 WL 108352, at *3.

    As Mr. Griffin explained at his deposition, he met with James E. Gauch, Esq., SBG's counsel, to discuss the matters about which he would testify. Mr. Griffin answered plaintiffs' counsel's deposition questions about the number of meetings he had with Mr. Gauch, the length of each meeting, when the meetings occurred, and who the attendees were. (Griffin Dep. at 123-26). The plaintiffs seek to go beyond these

14

disclosures to learn the content of the communications at the meetings between Messrs. Griffin and Gauch. (See id. at 124). This questioning regarding the content of their communications would likely reveal Mr. Gauch's thought processes and legal strategies. For this reason, and because the plaintiffs have not demonstrated a substantial need for the information, their application to reopen the deposition to question Mr. Griffin further about his meetings with Mr. Gauch is denied on work-product grounds.

SBG also instructed Mr. Griffin not to disclose "anything that he may have learned" when he met with lawyers from Sullivan & Cromwell who were representing SBG in connection with a criminal investigation. (Id. at 116, 119-20). Despite this instruction, Mr. Griffin provided answers to all of the questions posed by plaintiffs' counsel concerning these meetings, including their purpose and the subject matter covered. Mr. Griffin also testified that "no substantive information" was exchanged at the meetings. (See id. at 116-21). In light of that testimony, there is no reason to reopen the deposition for further inquiry concerning this subject.

In sum, the plaintiffs have had nearly two and one-half hours to depose Mr. Griffin. (See supra note 2). Neither the alleged misrepresentation about Mr. Griffin's health nor the plaintiffs' desire to ask further questions about Mr. Griffin's meetings with counsel warrants the reopening of Mr. Griffin's deposition. Accordingly, the plaintiffs' application to reopen the deposition is denied.

C.  Techmaster and Iridium

1.  Techmaster

Techmaster is an engineering, procurement, and construction services company based in the United States. (Pls.' Letter at 7-8). Although I previously denied the plaintiffs' attempt to obtain discovery regarding Techmaster, they contend that such discovery should be permitted now because facts about Techmaster revealed by Mr. Griffin in his deposition suggest a basis for jurisdiction over SBG. (Id. at 8). The plaintiffs cite seven "new" facts, including an alleged overlap between the interests of SBG and Techmaster and that Techmaster's head of operations was one of three SBG-USA directors.

Virtually all of these "facts" were discussed in the plaintiffs' letter to the Court, dated July 9, 2007. (See Def.'s Reply Letter at 11-12 & n.17). As my memorandum endorsement on that letter indicated, even if the plaintiffs' representations are correct, "they do not suggest a basis for jurisdiction over SBG." (Docket No. 1988). The plaintiffs never objected to my denial of their application, nor have they adduced anything new which might warrant a reconsideration of my prior ruling. Accordingly, the plaintiffs' request for discovery regarding Techmaster is denied.

2.  Iridium

The plaintiffs also contend that Mr. Griffin testified to information concerning Iridium, a publicly-traded satellite telecommunications company in which

16

SBG held a small stake, that justifies additional discovery concerning Iridium's link to SBG. (Pls.' Letter at 8-9). On July 6, 2007, I directed the plaintiffs to submit a letter justifying their request for jurisdictional discovery concerning any "companies in which SBG has a minority ownership interest or with which SBG is alleged to be affiliated." (Docket No. 1985 ¶ 1). Public documents available to the plaintiffs at that time, such as Iridium's SEC filings, evidenced the fact that SBG held a minority stake in Iridium. (See Def.'s Reply Letter at 12 n.20). It further is clear that the plaintiffs were aware of Iridium's relationship with SBG before the Griffin deposition because their counsel initiated the discussion of that subject with him. Nonetheless, there was no mention of Iridium in the plaintiffs' July 9 submission to me. In light of that omission, with one exception, I see no reason why the plaintiffs should be granted discovery concerning Iridium at this late date.

This exception relates to a part of Iridium, known as Iridium Middle East ("IME"), which had an office in Washington D.C. (Pls.' Letter at 9). It is unclear whether the plaintiffs knew or should have known in July 2007 that SBG played some role in IME. If IME is a separate entity which was doing business in August 2002 and it was controlled by SBG at the time, this might be relevant to the question of the Court's ability to assert personal jurisdiction over SBG. Accordingly, the plaintiffs' application

17

concerning Iridium is granted, but solely to the extent that SBG is directed to produce documents in its possession, custody, or control sufficient to show:

 (a) whether IME was a separate legal entity;

 (b) if so, whether SBG had a controlling stake in IME in or before August 2002; and

 (c) if so, when IME ceased doing business.

III. <u>Conclusion</u>

As set forth above, the plaintiffs' requests for further discovery are granted in part and denied in part. SBG shall produce any further documentation required by this Discovery Order within four weeks. Additionally, because Judge Daniels' discovery reference to me was for the limited purpose of resolving the issues set forth above, the Clerk of the Court is respectfully requested to close the reference.

 SO ORDERED.

Dated: New York, New York
   May 21, 2008

          _____
          FRANK MAAS
          United States Magistrate Judge

Copies to:

Honorable George B. Daniels
United States District Judge

Andrew J. Maloney, III, Esq.
Kreindler & Kreindler
(212) 972-9432 (fax)

Robert T. Haefele, Esq.
Motley Rice LLC
(843) 216-9450 (fax)

James E. Gauch, Esq.
Jones Day
(202) 626-1700 (fax)