UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────

IN RE:  TERRORIST ATTACKS ON                MDL No. 1570
SEPTEMBER 11, 2001

───────────────────────────────────────

**This document relates to:**
*Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al, Case No. 03 CV 9849 (GBD)*
*Ashton, et al. v Al Qaeda Islamic Army, et al., Case No. 02 CV 6977 (GBD)*

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR OBJECTIONS TO ORDER OF MAGISTRATE JUDGE MAAS DATED MAY 21, 2008

On June 9, 2008, pursuant to Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(A), plaintiffs in the *Burnett* and *Ashton* cases ("Plaintiffs") filed Objections to the May 21, 2008 Discovery Order of Magistrate Judge Frank Maas (served upon all counsel via ECF on May 22, 2008 (Dkt. # 2090), regarding disputes between those Plaintiffs and defendant Saudi Binladin Group ("SBG").  On June 26, 2008, SBG filed a Response to Plaintiffs' Objections.  (Dkt. # 2098.)   Plaintiffs file this Response in further support of their position that Judge Maas' decision denied relevant jurisdictional discovery and was not grounded in any valid, properly supported objections, and therefore represents a departure from the prescribed analytical framework for resolving discovery disputes under the Federal Rules of Civil Procedure.

### Argument

Since the outset of discovery, SBG has worked diligently to convince the Court that, unless severe limitations are imposed, the discovery process will become excessively complex and unwieldy and that the only way to manage this litigation is to place severe restrictions on discovery.  Although SBG attributes the prolonged nature of the discovery process to Plaintiffs,

in truth, the extended nature of the process is the direct product of SBG's multiple unsupported objections to nearly every discovery request, as well as its warnings of artificial discovery complications. SBG's multiple objections have necessitated Plaintiffs seeking the Court's involvement on multiple occasions to obtain information for each set of discovery requests served on SBG. Now SBG is using the results of its own strategy to justify its own denial of discovery. This tactic has not been isolated to SBG; it has been used by all of the defendants engaged in discovery and seems to be part of a broader strategy to inject feigned complexity and procedural obstacles into the discovery process to enable the defendants to the argue that the court must artificially limit discovery to manage the litigation.

The shrewdness of SBG's approach is evident in the manner it responded to Plaintiffs' succeeding sets of discovery. For example, in response to Plaintiffs' earlier discovery requests, SBG asserted multiple objections that the requests were overly broad and overly burdensome. Such objections envision the need for the party seeking discovery to re-draft the discovery into multiple, more narrowly tailored requests. But when Plaintiffs followed up with more specifically tailored requests, SBG's objection was that the discovery was too numerous.[1]

The reality is that SBG could have responded fully to nearly all of the Plaintiffs' requests by providing complete responses essentially to only three areas of inquiry – namely, (1) the steps taken to separate from Osama bin Laden, (2) all communications or contact between SBG and OBL or any of his cohorts, and (3) SBG work on projects in the Sudan. Each of these areas are eminently relevant to Plaintiffs' theories of jurisdiction, inasmuch as they are directly on point with, for example, Plaintiffs' jurisdictional theory that SBG directed its conduct at the United

---

[1] Although the discovery in question was characterized as amounting to 95 discovery requests, that characterization overlooks the fact that 43 of the requests were document requests paired with parallel interrogatories seeking the same information. Ten document requests did not have correlating interrogatories and only four interrogatories did not have correlating document request.

States by supporting OBL after knowing OBL had set his terrorist targets on the United States. These areas of jurisdictional inquiry are especially proper given that the Court granted jurisdictional discovery for the purpose of determining whether SBG provided knowing support to Osama bin Laden and particularly inasmuch as the SBG's work in the Sudan was among the examples Judge Casey specifically singled out as warranting discovery. *In re Terrorist Attacks*, 349 F. Supp. 2d 765, 822 (S.D.N.Y. 2005). But, as indicated above, SBG's strategy has been to object to each request as overly broad, and insist that more specific or more narrowly tailored requests are required.

Similarly, although SBG has interjected objections claiming that the various discovery requests are overly burdensome, not only has SBG offered nothing to substantiate its claim of burden, but the likely truth is that much of the information sought by Plaintiffs has already been collected and collated. Given the long term international attention and the numerous investigations of SBG, in which SBG has apparently participated, it is highly unlikely that SBG has not already collected much or all of the information for other purposes. So the bald assertions of SBG's counsel that the requests are burdensome are not only unsupported by any evidence, but there is good reason to believe that they are not accurate. Nonetheless, to date, SBG has persuaded the Court through constant and completely unsubstantiated warnings that discovery will be unmanageable. It has convinced the Court to accept generalized, evidentially unsupported arguments about nearly every discovery request.

The defendants' arguments supporting artificial discovery limits – that is, without application of the discovery framework outlined in the Plaintiffs' June 9 Objections – have no foundation in the rules that must be applied to the discovery process. The litigation cannot be

managed adequately by indulging the defendants' objections as to every request and allowing the defendants to litigate the plaintiffs' entitlement to nearly every document sought.

Plaintiffs' assertion that the Court must apply a proper framework within which to exercise discretion is not a position that "eviscerate[es] Judge Maas's discretion to limit discovery" or seeks open-ended discovery, as SBG contends. As Plaintiffs noted in their June 9 Objections, Plaintiffs recognize that the Court had discretion in regard to the manner in which it controls discovery. But instead of acceding to the defendants' empty arguments or unsupported assertions, the rules require courts to apply the framework Plaintiffs' previously articulated – and for each disputed request, consider whether it is reasonably calculated to lead to the discovery of admissible evidence. The inquiry is whether the request seeks discovery regarding a matter relevant to a parties' claim or defense. *During v. City Univ. of New York*, 2006 U.S. Dist. Lexis 53684, *8 (S.D.N.Y. 2006) (citing Fed. R. Civ. Pro. 26(b)(1)). Here, for example, one key area of relevant inquiry is SBG's relationship with OBL and its support for the terrorist network after SBG knew OBL had targeted the United States. Unless SBG demonstrates with some evidence a specific reason why it should not, the Court must allow discovery on that issue.

The Second Circuit has recognized that Rule 26 relevance is an "obviously broad rule" that is "liberally construed." *Id*. at *8-9 (citing *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991)). This broad standard applies equally to jurisdictional discovery. *William B. Tabler Architects v. Nordheimer*, 1978 U.S. Dist. Lexis 19145, *14-15 (S.D.N.Y. 1978) (rejecting defendants' petition to limit the scope of jurisdictional discovery where the facts at issue were exclusively within the knowledge of the defendants and "plaintiff should be afforded an opportunity to fully explore those areas as well.").

Here, the breadth of what is relevant for purposes of jurisdictional discovery is broad based on Plaintiffs' theories of jurisdiction. Although the evidence on the theories of jurisdiction may, in some circumstances, overlap with the evidence that is relevant to Plaintiffs' claims on the merits, the jurisdictional discovery cannot be denied on that basis. Where there is overlap between jurisdictional discovery and merits discovery, the jurisdictional discovery must be permitted. In fact, the general rule is that in circumstances where overlap exists, rather than denying jurisdictional discovery, the court should combine the jurisdictional and liability discovery efforts to increase efficiency. *Kinetic Instruments, Inc., v. Lares*, 802 F. Supp 976, 989 (S.D.N.Y. 1992), *see Alosio v. Iranian* Shipping Lines, S.A., 307 F. Supp. 1117, 1120 (S.D.N.Y. 1970) (holding that the overlap between jurisdiction and merit generally requires discovery without limitation); *see also Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) ("where the evidence concerning standing [a particularly jurisdictional issue] overlaps with evidence on the merits, the court might prefer to proceed to trial and make its jurisdictional ruling at the close of the evidence" (citing *Land v. Dollar*, 330 U.S. 731, 739 (1947). Moreover, inasmuch as jurisdiction is also premised on conspiracy claims, the breadth of the discovery is even more broadly interpreted. *See Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991)

Although SBG contends that Plaintiffs' jurisdictional theories have changed, not only are the theories consistent with the discovery Judge Casey granted – namely, whether SBG purposefully directed activities at the United States – but SBG itself has essentially recognized that evidence regarding Plaintiffs' theories is discoverable. Specifically, on page 4 of SBG's Response, although SBG omits to reference Plaintiffs' conspiracy allegations and mischaracterizes the "evidence not uncovered," it does a fair job of articulating a correct

5

understanding of the evidence that is discoverable.  SBG recognizes that the proper scope of discovery includes discovery regarding the issues of whether (1) SBG was "doing business" in the United States, and (2) SBG supported terrorist activities directed against the United States.  Accordingly, any discovery regarding either of these admittedly relevant areas should be permitted absent some evidentiary demonstration by SBG why it should be disallowed.

SBG's argument that the Court must take special care to protect foreign litigants from the danger of unnecessary or unduly burdensome discovery misses important distinctions.  The *Societe Nationale* case concerned merits discovery and not jurisdictional discovery.  *Society Nationale Industrielle Aerospatiale v. United States Dist. Court for the Southern Dist. Of Iowa*, 482 U.S. 522, 546 (1987).  In the case of jurisdictional discovery, the court should balance against the need to protect the foreign litigant the plaintiffs' need for an opportunity to meet its burden of demonstrating the court's jurisdiction.  Moreover, even in *Society Nationale*, the foreign national had the burden to prove that the discovery gave rise for some need of protection.  Here, not only has SBG made no such showing, but the Court should consider that SBG is a huge multinational corporation with business interests worldwide and is represented by one of the United States' largest law firms.  The likelihood of it being burdened by discovery being required to be produced in the United States is minimal.

In various places scattered throughout SBG's Response, in its continuing effort to continue to place the burden on Plaintiff to "prove" Plaintiffs' entitlement to discovery, SBG returns to its arguments rejected by Judge Casey in his January 18, 2005 opinion.  That is, although SBG may not recognize the existence of any genuine issue of jurisdictional fact warranting jurisdictional discovery, the Court has already ruled on that point and granted jurisdictional discovery.  *In re Terrorist Attacks*, 349 F. Supp. 2d at 822.  To require Plaintiffs to

continually come forward with evidence proving every piece of information they are seeking to obtain in discovery before they receive the information is an improper application of the discovery framework, turns the discovery process on its head, and improperly prevents Plaintiffs from obtaining relevant discovery.

SBG similarly returns to its previously rejected argument that Judge Casey's decision limited Plaintiffs' jurisdictional inquiry to only five examples specifically referenced in his decision. That argument was previously rejected by Judge Maas, who found that the decision was not so limited; and SBG never objected to that decision. (Dkt. # 1941.) More to the point though, Judge Casey's decision granted discovery "to determine if SBG purposefully directed its activities at the United States." *In re Terrorist Attacks*, 349 F. Supp. 2d at 822. Accordingly, absent evidence demonstrating a reason why it should be denied, any discovery relevant to that issue should be permitted so Plaintiffs are able to discover the facts relevant to the Court's jurisdiction. To do otherwise would deprive Plaintiffs of the very kind of information needed to prove jurisdiction.

Here, most of Plaintiffs' discovery requests were specific follow-up questions for information either omitted from or raised by SBG's earlier productions. Much of the information sought was necessary to address apparent inconsistencies in SBG's earlier statements, particularly in light of information revealed in documents produced pursuant to earlier court orders. Although Judge Maas elected to read as harmonious several of SBG's apparently inconsistent statements, other equally or more plausible interpretations of the facts and the veracity of the proponents of the statements exist. Plaintiffs respectfully contend that they should not be tied to accepting SBG's self-serving statements or its selective disclosures of certain documents while being forced to forego other relevant discovery targeted and intended to

7

lead to admissible evidence that may both clear up apparent contradictions and provide more truthful information.

Some examples of the continuing gaps and inconsistencies that remain include the following:

(1) SBG has never fully explained why Bakr Binladin represented in a sworn affidavit to this Court that the value of OBL's shares was placed in a trust in 1993 ("the money was placed in a trust outside of Osama's control. . . My family took those actions in June 1993"), when the money was not placed into a bank account until April 2000.  That discrepancy becomes even more significant when coupled with the fact that Bakr Binladin and Ghalib Binladin, using SBG's address, invested substantial sums in Bank Al Taqwa (a defendant and designated terrorist entity) from November 1993 until March 2000, matching the time period that OBL's money is unaccounted for.

(2) Document Request 16 and Interrogatory 13 sought explanation for Bakr Bin Laden's representation that on June 16, 1993 that shareholder resolutions were submitted to the Shariah Court for review and approval and SBG's inability to locate any documents reflecting that submission or approval.  Every time SBG has addressed this request, it has artfully avoided responding to the part of the request that seeks the documents submitted to the Shariah court. For example, even in its most recent explanation, SBG merely explains "SBG does not have and is not aware of the existence of any written opinion or court order addressing the [Shareholder] resolution's compliance with Islamic [Shariah] law." (SBG Response, at p. 15, fn 21.)  But despite multiple requests, SBG has never answered why SBG's request for the approval and the supporting documentation has not been produced.  Given that the issue being presented to the Shariah court was considered both a serious and novel issue, the likelihood of the entire matte

being done without any record or any reason being provided to the Shariah court is highly suspect.

(3)  SBG emphasizes Judge Maas's comments concerning the discrepancies between Bakr Binladin's statements that he had not seen OBL since 1992 and another document produced in discovery that indicated various Binladin brothers had recently visited OBL in Sudan.  ("Bakr bin Ladin and some of his brothers visited Sudan several times.  Most recently, several brothers traveled … to meet him.")  Plaintiffs emphasize that their requests for contact and communications with OBL were not limited to Bakr Binladin, so discovery should not be denied because it is unclear which Binladin brother visited OBL; contact with OBL by any SBG representative is significant for discovery.  But notwithstanding that notion, one plain reading of the statement is that it was intended, in context, at least to imply that Bakr had recently visited OBL several times in Sudan

(4)  SBG points to Judge Maas's harmonious comparison of another statement from a document produced in discovery alleging that the Binladin brother went to meet OBL in the Sudan "to disassociate themselves from him and his conduct, and to sever their relationships with him" with a statement during a CNN interview in which OBL explained his family visits saying they "ask[ed him] to stop and return to Arabia to apologize to King Fahd.").  Despite efforts to read these statements in harmony, the statements are quite contradictory; either the purpose of the Binladin brothers' trip was to disassociate themselves from OBL or to invite him back to Saudi Arabia.  But the interim issue is not which is to be believed; precisely because there is uncertainty, discovery should be allowed.

Several of Plaintiffs requests sought specific information regarding SBG related entity, Mohammed Binladin Corporation ("MBC").  Although Judge Maas had previously denied

plaintiffs' earlier discovery requests for discovery regarding MBC, Plaintiffs new requests were prompted by the fact that within the documents that SBG produced, a number of them were documents on MBC letterhead, demonstrating that SBG and MBC were closely intertwined, at the very least in regard to the issue of their relationship with OBL.  SBG should not be permitted to selectively produce certain documents regarding MBC but then refuse to produce other MBC documents it has in his control.

A number of Plaintiffs' other requests focus on projects in the Sudan, aspects of involvement in the Sudan that the Plaintiffs believe appropriate to investigate SBG's relationship with OBL while OBL was in the Sudan as a guest of the Sudanese government.  These requests are particularly procedurally proper because, although discussed in the June 29, 2007 conference before Judge Maas, Judge Maas did not deny discovery concerning SBG's ties to OBL in the Sudan.  In fact, at the conference, the concern Judge Maas expressed about the discovery concerning SBG's connection with OBL in the Sudan was that he was not prepared to "direct that the kitchen sink … be turned over"  Transcript of June 29, 2007 Hearing, at page 45, lines 6-8, Attached hereto as Exhibit A.  Given that context, it was completely proper, and appropriate, for Plaintiffs to re-draft more focused requests on the issue.  Plaintiffs contend it was what was contemplated.

The discovery regarding the Sudan is another example of SBG arguing that Plaintiffs must prove the information that they seek in discovery before SBG may be required to disclose any information.  SBG's argument is that, although it has objected to the discovery, it should not be required to respond to the discovery because Plaintiffs have not shown evidence demonstrating what the proposed discovery would uncover.  First, that is certainly not the proper framework for denying discovery.  Second, the premise is wrong.  Plaintiffs do have reasonable

bases for believing that SBG provided OBL with assistance in Sudan on particular construction projects.  Merely as an example, in a U.S. State Department factsheet on OBL, issued August 14, 1996, OBL is identified as the builder of both the Port Sudan Airport and Tahaddi road linking Khatoum with Port Sudan were attributed to OBL.  *Rux v. The Republic of Sudan* (Civil Action No. 2:04cv428), 2007 WL 2127210 (E.D.Va.) ("Bin Ladin's company, Al-Hijrah for Construction and Development, Ltd., built the Tahaddi (challenge) road linking Khartoum with Port Sudan, as well as a modern international airport near Port Sudan").  Political and religious leaders of Sudan, Omar Al Bashir and Hassan Al Turabi have also attributed to OBL the work at the Port Sudan Airport and on Tahaddi road.  NBC News, Interview transcript with Omar Al Bashir, conducted on March 19, 2007, aired on July 22, 2007;  BBC Monitoring Service: Middle East, September 12, 1998, Recorded Interview with Sudanese National Assembly Speaker Hasan Al-Turabi.  ("For those who know nothing about Saudi Arabia, Bin Ladin has the biggest family and construction company that builds roads and institutions.  [OBL] came to Sudan as a branch of this company. He built the road linking Khartoum to the north, which could have been extended to reach Port Sudan. He also built the Port Sudan airport.")

When these statements are read together with representations on archived versions of SBG's website taking credit for the Port Sudan Airport as well as substantial roadwork throughout Sudan (*see* http://web.archive.org/web/20010119082400/www.saudi-binladin-group.com/pbad.htm and
http://web.archive.org/web/20010825150427/www.saudi-binladin-group.com/mbo.htm), substantial questions arise that require discovery – discovery which has previously been specifically recognized as both relevant and proper for jurisdictional discovery.

11

Plaintiffs' discovery requests regarding the Sudan were more narrowly tailored from the original jurisdictional discovery requests. But in summary, if Plaintiffs are to be permitted to investigate SBG's support of OBL, it is imperative that they be permitted to investigate the nature of all contact with the terrorist mastermind and all his al Qaeda colleagues, as well as SBG's assistance and support of OBL while he was in the Sudan. Notwithstanding SBG's *ipsa dixit* rejections that it ever supported OBL, Plaintiffs should not be required to trust SBG at face value, but should be permitted to verify the veracity of those self-serving statements through discovery. The need for verification is made more evident based on the multiple instances where SBG's statements both inside and outside of discovery have proved less than entirely accurate or forthcoming.

## Conclusion

For the reasons expressed herein as well as in Plaintiffs June 9 Objections, Plaintiffs respectfully request that the District Court set aside the Order of Magistrate Judge Frank Maas dated May 21, 2008 insofar as the order denied Plaintiffs' Discovery Requests for information and documentation regarding SBG representatives' visits to OBL in the Sudan and regarding the steps and timing of SBG's alleged separation from OBL, and that the Court grant full and complete discovery regarding such issues. Plaintiffs further request that the District Court set aside the Order to the extent that it prohibits Plaintiffs discovery requests which were not addressed or analyzed in the Court's decision and grant full and complete discovery sought in those requests.

Dated: July 11, 2008                    Respectfully submitted,
                                        MOTLEY RICE LLC

                                        By: /s/ Robert T. Haefele
                                            Ronald L. Motley, Esq. (SC Bar #4123)
                                            Jodi Westbrook Flowers, Esq. (SC Bar #66300)

Donald A. Migliori, Esq. (RI Bar #4936)
Michael Elsner, Esq. (NY & VA Bar #ME-8337)
Robert T. Haefele, Esq. (NJ-58293; PA-57937 ; SC-75266)
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000
Plaintiffs' Counsel in *Burnett*

KREINDLER & KREINDLER


By:  /s/ Andrew J Maloney III
Andrew J. Maloney III (AM8684)
100 Park Avenue
New York, NY  10017-5590
Phone:  (212) 687-8181
Plaintiffs' Counsel in *Ashton*