**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ) | |
| In Re TERRORIST ATTACKS on ) | 03 MDL 1570 (GBD)(FM) |
| SEPTEMBER 11, 2001 ) | ECF Case |
| ) | |

*This document relates to:*
        All Cases

## MEMORANDUM OF LAW IN SUPPORT OF THE RENEWED MOTION TO DISMISS OF DEFENDANT NATIONAL COMMERCIAL BANK FOR LACK OF PERSONAL JURISDICTION

Dated: July 22, 2008
        Washington, D.C.

Mitchell R. Berger (MB-4112)
Alan T. Dickey
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315

*Attorneys for Defendant*
*The National Commercial Bank*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   Introduction ................................................................................................. 1

II.   Procedural Background .............................................................................. 1

III.   Generally Applicable Standards and Burdens ........................................ 3

   General Jurisdiction ................................................................................. 3

   Doing Business ........................................................................................ 4

   Time Assessment..................................................................................... 5

   Specific Jurisdiction................................................................................ 6

   Due Process Constraints ........................................................................ 8

   Burden of Proof ...................................................................................... 8

   Post-Discovery Burden .......................................................................... 9

IV.   Plaintiffs Cannot Establish General "Doing Business" Jurisdiction Over NCB

   Based on the Bank's Own Actions ...................................................... 10

   A.  The Traditional Indicia of "Doing Business" Are Absent ........................ 10

   B.  The Activities of NCB's Former New York Branch Do Not Support

      General Jurisdiction .......................................................................... 10

   C.  NCB's Correspondent Bank Accounts Do Not Support General Jurisdiction .......... 11

   D.  NCB's Passive Investments Do Not Support General Jurisdiction ............................. 12

   E.  NCB Did Not Advertise or Otherwise Solicit Business In The United States .......... 13

   F.  Past Litigation Involving NCB Does Not Support General Jurisdiction .................... 14

V.   Plaintiffs Cannot Establish That the U.S. Contacts of Other Entities and Persons Establish a
   Basis for General Jurisdictions Over NCB..................................................... 16

   A.  Activities of NCB's Dissolved Former Subsidiary Are Jurisdictionally Irrelevant ..... 16

   B.  Alternatively, SNCB Was Not A Mere Department or Agent of NCB ...................... 19

    C.  The Activities of Other Non-Subsidiary Entities Do Not Support General Jurisdiction Over NCB .................................................................................................. 24

VI.  The Cumulation of These Alleged Insignificant and Sporadic Contacts Does Not Make Them Significant ................................................................................................................. 26

VII.  Plaintiffs Cannot Establish That NCB Is Subject to Specific Jurisdiction ....................... 26

    A.  Magistrate Judge Maas Previously Held Plaintiffs' Conspiracy Allegations Legally Insufficient ......................................................................................................... 27

    B.  The Non-Existent "Terror Financing" Audit .................................................... 27

    C.  Plaintiffs Have Not Established That Any NCB Employee Acted on Its Behalf to Support The September 11 Attackers ............................................. 30

        1.  Khalid Bin Mahfouz ......................................................................................... 31

        2.  Abdulrahman Bin Mahfouz ............................................................................ 34

        3.  Yassin Kadi and Al Qari Bin Eid ................................................................... 34

Conclusion ................................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accessory Corp. v. Spotless Plastics Pty.,*
  2007 WL 2584963 (S.D.N.Y. Sept. 7, 2007) .......................................................... 9, 15, 24

*Aerotel Ltd. v. Sprint Corp.,*
  100 F. Supp. 2d 189 (S.D.N.Y. 2000) ............................................................................ 4

*Andros Compania Maritima S.A. v. Intertanker Ltd.,*
  714 F. Supp. 669 (S.D.N.Y. 1989) ............................................................................... 15

*Aqua Shield, Inc. v. Inter Pool Cover Team,*
  2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ............................................................... 9

*Art Leather Manufacturing Co. v. Albumx Corp.,*
  888 F. Supp. 565 (S.D.N.Y. 1995) ............................................................................... 9

*Artemide SpA v. Grandlite Design & Manufacturing Co.,*
  672 F. Supp. 698 (S.D.N.Y. 1987) .............................................................................. 14

*Beacon Enterprises v. Menzies,*
  715 F.2d 757 (2d Cir. 1983) .................................................................................... 6, 14

*Bulova Watch Company v. K. Hattori & Co.,*
  508 F. Supp. 1322 (E.D.N.Y. 1981) ........................................................................... 20

*Burger King v. Rudzewicz,*
  471 U.S. 462 (1985) ................................................................................................ 6, 8

*Burnett v. Al Baraka Investment & Development Corp.,*
  274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................................. 30

*Bush v. Stern Bros. & Co.,*
  524 F. Supp. 12 (S.D.N.Y. 1981) ............................................................................... 25

*Calder v. Jones,*
  465 U.S. 783 (1984) ................................................................................................ 6, 7

*Campbell v. Nowlin,*
  1993 WL 205127 (S.D.N.Y. June 9, 1993) ................................................................. 20

*Caremark Therapeutic Servs. v. Leavitt,*
  405 F. Supp. 2d 454 (S.D.N.Y. 2007) ........................................................................ 19

*Century Pacific, Inc. v. Hilton Hotels Corp.,*
  528 F. Supp. 2d 206 (S.D.N.Y. 2007) ........................................................................ 31

*Chamilia, LLC v. Pandora Jewelry, LLC,*
    2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ............................................................... 25

*Chew v. Dietrich,*
    143 F.3d 24 (2d Cir.1998) ............................................................................................. 4

*Chrysler Capital Corp. v. Century Power Corp.,*
    778 F. Supp. 1260 (S.D.N.Y. 1991) ............................................................................. 7

*In re Columbia Sec. Litig.,*
    155 F.R.D. 466 (S.D.N.Y. 1994) ................................................................................. 31

*Craig v. First Web Bill, Inc.,*
    2004 WL 2700128 (E.D.N.Y. Nov. 29, 2004) ............................................................. 6

*CutCo Industries, Inc. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986) ........................................................................................ 16

*Daniel v. American Board of Emergency Medicine,*
    988 F. Supp. 127 (W.D.N.Y. 1997) ......................................................................... 5, 26

*Data-Stream AS/RS Technologies, LLC v. ACEquip Ltd.,*
    2002 WL 1683736 (S.D.N.Y. July 24, 2002) ............................................................. 18

*Doe v. Karadzic,*
    1997 WL 45515 (S.D.N.Y. Feb. 4, 1997) ............................................................... 29, 31

*Dr. Beck & Co., GmbH. v. General Electric Co.,*
    210 F. Supp. 86 (S.D.N.Y. 1962), *aff'd,*
    317 F.3d 538 (2d Cir. 1963) ......................................................................................... 9

*Ehrenfeld v. Bin Mahfouz,*
    2006 WL 1096816 (S.D.N.Y. Apr. 25, 2006), *aff'd,*
    --- F.3d ----, 2008 WL 553560 (2d Cir. Mar. 3, 2008) ........................................... 5, 17

*ESI, Inc. v. Coastal Corp.,*
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) ............................................................................. 22

*Garb v. Republic of Poland,*
    440 F.3d 579 (2d Cir. 2006) ......................................................................................... 2

*Gateway Overseas, Inc. v. Nishat (Chunian) Ltd.,*
    2006 WL 2015188 (S.D.N.Y. July 13, 2006) .......................................................... 7, 10

*Holey Soles Holdings, Ltd. v. Foam Creations, Inc.,*
    2006 WL 1147963 (S.D.N.Y. May 1, 2006) ............................................................... 21

*ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.p.A.,*
    775 F. Supp. 650 (S.D.N.Y. 1991) ............................................................................. 19

*Indemnity Insurance Co. of North America v. K-Line America, Inc.*,
  2007 WL 1732435 (S.D.N.Y. June 14, 2007) ....................................................... 15

*Insight Data Corp. v. First Bank Systems, Inc.*,
  1998 WL 146689 (S.D.N.Y. Mar. 25, 1998) ..................................................... 16, 24

*International Telecom, Inc. v. Generadora Electrica del Oriente S.A.*,
  2002 WL 465291 (S.D.N.Y. Mar. 27, 2002) .......................................................... 12

*Irwin v. ZDF Enterprises GmbH*,
  2006 WL 374960 (S.D.N.Y. Feb. 16, 2006) .......................................................... 22

*Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*,
  160 F. Supp. 2d 722 (S.D.N.Y. 2001) ..................................................... 4, 9, 21, 23

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998) ........................................................... 9, 19, 21, 35

*Jayne v. Royal Jordanian Airlines Corp.*,
  502 F. Supp. 848 (S.D.N.Y. 1980) ..................................................................... 14

*Jerge v. Potter*,
  2000 WL 1160459 (W.D.N.Y. Aug. 11, 2000) ..................................................... 22

*J.L.B. Equities, Inc. v. Ocwen Financial Corp.*,
  131 F. Supp. 2d 544 (S.D.N.Y. 2001) ................................................................ 22

*JN Realty LLC v. Estate of Marvin*,
  268 F. Supp. 2d 231 (S.D.N.Y. 2003) ................................................................ 16

*Kiobel v. Royal Dutch Petroleum Co.*,
  2008 WL 591869 (S.D.N.Y. Mar. 4, 2008) ...................................................... 4, 14

*Klein v. Hongkong & Shanghai Hotels, Ltd.*,
  2007 WL 1098735 (S.D.N.Y. Apr. 9, 2007) ..................................................... 5, 10

*Klinghoffer v. S.N.C. Achille Lauro*,
  937 F.2d 44 (2d Cir. 1991) .............................................................................. 15

*Klonis v. National Bank of Greece, S.A.*,
  492 F. Supp. 2d 293 (S.D.N.Y. 2007) ........................................................... 20, 21

*Koehler v. Bank of Bermuda Ltd.*,
  101 F.3d 863 (2d Cir. 1996) ............................................................................ 19

*Lamarr v. Klein*,
  35 A.D.2d 248, 315 N.Y.S.2d 695 (1st Dep't 1970) .............................................. 7

*Lancaster v. Colonial Motor Freight Line, Inc.,*
    177 A.D.2d 152, 581 N.Y.S.2d 283 (1st Dep't 1992)............................................ 6

*Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,*
    918 F.2d 1039 (2d Cir. 1990) ......................................................................*passim*

*Laufer v. Ostrow,*
    55 N.Y.2d 305, 434 N.E.2d 692 (1982) ................................................................ 14

*Leema Enterprises, Inc. v. Willi,*
    575 F. Supp. 1533 (S.D.N.Y. 1983) .................................................................... 12

*Lehigh Valley Industries, Inc. v. Birenbaum,*
    527 F.2d 87 (2d Cir. 1975) ............................................................................7, 8

*Lodato v. Greyhawk North America, LLC,*
    39 A.D.3d 496, 834 N.Y.S.2d 237 (2d Dep't 2007) .............................................. 18

*Loussier v. Universal Music Group, Inc.,*
    2007 WL 1098687 (S.D.N.Y. Apr. 11, 2007) ...................................................... 25

*In re Magnetic Audiotape Antitrust Litigation,*
    334 F.3d 204 (2d Cir. 2003) ............................................................................ 6

*Meteoro Amusement Corp. v. Six Flags,*
    267 F. Supp. 2d 263 (N.D.N.Y. 2003) ..........................................................13, 20

*Metropolitan Life Insurance  Co. v. Robertson-Ceco Corp.,*
    84 F.3d 560 (2d Cir.1996) ............................................................................5, 8

*Mones v. Commercial Bank of Kuwait, S.A.K.,*
    399 F. Supp. 2d 310 (S.D.N.Y. 2005).............................................................. 11

*Nelson v. Massachusetts General Hospital,*
    2007 WL 2781241 (S.D.N.Y. Sept. 20, 2007) ...............................................*passim*

*Nix v. Hoke,*
    62 F. Supp. 2d 110 (D.D.C. 1999) .................................................................... 4

*Nordic Bank PLC v. Trend Group Ltd.,*
    619 F. Supp. 542 (S.D.N.Y. 1985) .................................................................... 13

*Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries,* 2004 WL 2199547
    (S.D.N.Y. Sept. 29, 2004).............................................................................. 13

*O'Connell Machinery Co. v. M.V. "Americana,"*
    734 F.2d 115 (2d Cir. 1984) ............................................................................ 2

*Overseas Media, Inc. v. Skvortsov,*
    407 F. Supp. 2d 563 (S.D.N.Y. 2006) ........................................................................... 9

*Palmieri v. Estefan,*
    793 F. Supp. 1182 (S.D.N.Y. 1992) ............................................................................ 22

*Pieczenik v. Cambridge Antibody Technology Group,*
    2004 WL 527045 (S.D.N.Y. Mar. 16, 2004) .............................................................. 26

*Pieczenik v. Dyax Corp.,*
    2000 WL 959753 (S.D.N.Y. July 11, 2000) ............................................................... 19

*Reers v. Deutsche Bahn AG,*
    320 F. Supp. 2d 140 (S.D.N.Y. 2004) ..................................................................... 4, 26

*Reiss v. Steigrod,*
    866 F. Supp. 747 (S.D.N.Y. 1994) ............................................................................... 9

*Saraceno v. S.C. Johnson & Son, Inc.,*
    83 F.R.D. 65 (S.D.N.Y. 1979) ................................................................................... 22

*Schenker v. Assicurazioni Generali S.p.A.,*
    2002 WL 1560788 (S.D.N.Y. July 15, 2002) ............................................ 5, 9, 12, 18, 19

*Semiconductor Materials v. Citibank Int'l PLC,*
    969 F. Supp. 243 (S.D.N.Y. 1997) ............................................................................. 11

*Shaffer v. Heitner,*
    433 U.S. 186 (1977) ................................................................................................... 12

*Shanley v. Rorher,*
    2001 WL 1631406 (S.D.N.Y. Dec. 18, 2001) ............................................................... 8

*Shaoulian-Tehrani v. Khatami,*
    2008 WL 1790386 (S.D.N.Y. Apr. 21, 2008) ................................................... 9, 29, 31

*Singer v. Bell,*
    585 F. Supp. 300 (S.D.N.Y. 1984) ............................................................................... 7

*Stutts v. De Dietrich Group,*
    465 F. Supp. 2d 156 (E.D.N.Y. 2006) ............................................................ 19, 22, 23

*In re Terrorist Attacks on September 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ................................................................ *passim*

*In re Terrorist Attacks on September 11, 2001,*
    392 F. Supp. 2d 539 (S.D.N.Y. 2005) ................................................................ *passim*

*Tsegaye v. Impol Aluminum Corp.*,
  2003 WL 221743 (S.D.N.Y. Jan. 30, 2003)...........................................................................21

*United States v. Arnaout*,
  No. 02 Cr. 892, 2003 WL 255226 (N.D. Ill. Feb. 4, 2003).....................................................33

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ...................................................................................................19

*Whitaker v. Fresno Telsat, Inc.*,
  87 F. Supp. 2d 227 (S.D.N.Y. 1999), *aff'd*,
  261 F.3d 196 (2d Cir. 2001) .....................................................................................................6

*Wiwa v. Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) ..................................................................................................5, 10

## Statutes

18 U.S.C. §§ 2331-2339D ...........................................................................................................4

18 U.S.C. §§ 1961-1968 ..............................................................................................................4

N.Y. C.P.L.R. § 301 ..............................................................................................................4, 12

N.Y. C.P.L.R. § 302 .....................................................................................................................4

N.Y. C.P.L.R. § 302(a)(1) ...........................................................................................................6

N.Y. C.P.L.R. § 302(a)(2) .......................................................................................................6, 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In Re TERRORIST ATTACKS on | ) | 03 MDL 1570 (GBD) |
| SEPTEMBER 11, 2001 | ) | ECF Case |
| | ) | |

*This document relates to:*
     All Cases

### MEMORANDUM OF LAW IN SUPPORT OF THE RENEWED MOTION TO DISMISS OF DEFENDANT NATIONAL COMMERCIAL BANK FOR LACK OF PERSONAL JURISDICTION

**I.  INTRODUCTION**

Following several years of jurisdictional discovery, and pursuant to leave of the Court (MDL Dkt. #2106), Defendant The National Commercial Bank ("NCB") moves pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss for lack of personal jurisdiction all of the pending lawsuits in which it has appeared:  *Ashton*; *Burnett*; *Cantor Fitzgerald*; *Continental Casualty*; *Federal Insurance*; *New York Marine General Insurance*; and *O'Neill* (collectively, the "MDL").  As shown below, (i) NCB is not subject to general jurisdiction because it was not doing business in the United States at any relevant time, and (ii) no theory of specific jurisdiction (including "conspiracy" jurisdiction) concerning the September 11 attacks can be sustained as against NCB.

**II.  PROCEDURAL BACKGROUND**

NCB's original motion to dismiss in *Burnett* and *Ashton* was denied without prejudice to renewal following "limited jurisdictional discovery" on issues concerning "NCB's contacts with the United States" so that the Court could determine whether the exercise of personal jurisdiction over NCB would "satisfy due process requirements."  *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 820 (S.D.N.Y. 2005) ("*Terrorist Attacks I*").  Judge Casey held that, once "the parties have completed their personal jurisdiction discovery…this Court [would] determine[ ] whether it has

1

personal jurisdiction over NCB," which he found was a "straightforward" issue.[1]  *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 572, 575 (S.D.N.Y. 2005) ("*Terrorist Attacks II*") (on reconsideration).

Jurisdictional discovery issues as to NCB were referred to Magistrate Judge Maas for supervision in April 2006.  Pursuant to several discovery orders entered by Judge Maas: (i) NCB produced documents concerning its U.S. contacts; (ii) plaintiffs took the deposition of a former NCB officer; (iii) NCB obtained confirmation from its regulator, the Saudi Arabian Monetary Agency ("SAMA") that—contrary to plaintiffs' allegations—NCB had not been audited, examined or investigated for alleged involvement in the financing of terrorism; and (iv) Judge Maas conducted an *in camera* review of a SAMA audit report on NCB and found "nothing…which relates to the issues presently pending before the Court concerning NCB."  MDL Dkt. #1971.

In May 2007, Magistrate Judge Maas expressly "decline[d] to direct any further discovery (not previously ordered) related to NCB."  MDL Dkt. #1971.  In September 2007, Magistrate Judge Maas rejected plaintiffs' request for further jurisdictional discovery, finding that requested additional depositions "would be a fishing expedition."  MDL Dkt. #2038.  Simultaneously, he required

---

[1] NCB also challenged (i) subject matter jurisdiction, because NCB is entitled to immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), and (ii) the legal sufficiency of plaintiffs' claims.  Judge Casey denied without prejudice those other aspects of NCB's original motion to dismiss.  *Terrorist Attacks I*, 349 F. Supp. 2d at 792, 836.  On reconsideration, Judge Casey postponed "[f]urther inquiry into NCB's status as a foreign sovereign," if necessary, until after resolution of the personal jurisdiction issue.  *Terrorist Attacks II*, 392 F. Supp. 2d at 575.  However, if the Court does not dismiss NCB on personal jurisdiction grounds, the Court can entertain NCB's renewed motion to dismiss based on the FSIA without further jurisdictional discovery.  The sole open FSIA question as to NCB is whether it is directly owned by the Saudi government.  *Terrorist Attacks I*, 349 F. Supp. 2d at 792.  The majority of NCB's shares is owned by the Saudi Ministry of Finance through its Public Investment Fund ("PIF").  *Id.*  If that ownership structure means that NCB is directly owned by the Saudi government, then NCB is an agency or instrumentality of a foreign state entitled to FSIA immunity.  *Id.*  Following Judge Casey's 2005 FSIA decision, the Second Circuit, in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), provided guidelines establishing that, on the existing record, the PIF (and the Ministry of Finance of which it is a part) must be held to be an inseparable part of the Saudi central government.  In *Garb*, the Second Circuit held that the FSIA precluded subject matter jurisdiction over the Ministry of the Treasury of Poland because the Ministry is an inseparable part of the Polish state.  In reaching that decision, the Second Circuit reaffirmed the FSIA direct-ownership tests on which NCB had relied, and specifically reaffirmed its earlier *O'Connell* decision, under which an entity just like the PIF—*i.e.*, "a public financial entity which coordinates the management of commercial enterprises of the ... [foreign] Government"—is treated as an inseparable part of the foreign state.  *Id.* at 596 n.21 (citing *O'Connell Machinery Co. v. M.V. "Americana,"* 734 F.2d 115, 116-117 (2d Cir. 1984)).

2

plaintiffs to provide contention discovery, disclosing all of plaintiffs' bases for asserting personal jurisdiction over NCB.  MDL Dkt. #2037.  In December 2007, this Court affirmed those two orders, bringing jurisdictional discovery as to NCB to a close.  MDL Dkt. #2057.  Thereafter, due to deficiencies in plaintiffs' contention discovery responses, Magistrate Judge Maas held that "NCB is entitled to meaningful answers to its contention interrogatories" and required plaintiffs to serve revised answers (MDL Dkt. # 2060), which they did on February 1, 2008.

Now that jurisdictional discovery is complete,[2] the record is ripe for the Court to decide NCB's renewed motion to dismiss for lack of personal jurisdiction.  Second Circuit law governing personal jurisdiction over foreign defendants like NCB is well established.[3]  The facts to which that law will be applied have been fully developed since 2006 under the supervision of Magistrate Judge Maas.  Moreover, plaintiffs' jurisdictional theories as to NCB have now been fully stated in their contention interrogatory answers.[4]

## III.   GENERALLY APPLICABLE STANDARDS AND BURDENS

Plaintiffs contend that NCB is subject to the personal jurisdiction of the Court based on theories of both general and specific jurisdiction.

**General Jurisdiction.**  To subject foreign defendants like NCB to general jurisdiction,

---

[2] The Court's Order granting NCB leave to file this motion also provided:  "To the extent that plaintiffs believe that additional jurisdictional discovery is necessary prior to filing a response, a specific discovery request and a request for a stay or extension of the time in which to respond to the motion should be made to the magistrate judge."  MDL Dkt. #2106.

[3] The MDL 1570 appeals currently pending before the Second Circuit involve issues predominantly concerning subject matter jurisdiction under the FSIA and, to the extent they involve personal jurisdiction, the application of settled Second Circuit law to the facts concerning specific defendants.

[4] The jurisdictional discovery record developed in the *Ashton* and *Burnett* actions, including the contention interrogatory answers, applies equally to all other MDL 1570 lawsuits because the case management orders require all plaintiffs to conduct consolidated discovery, particularly on common issues.  *See* Case Management Order No. 2 (MDL Dkt. # 247), ¶ 20 ("To the extent possible, the parties shall conduct consolidated discovery and all discovery notices served and all responses to all discovery requests in an Individual Action shall be deemed to be part of the Consolidated Action and each Individual Action."); Case Management Order No. 3 (MDL Dkt. # 248), ¶ 9 (Plaintiffs' Executive Committees "shall coordinate and, whenever possible, submit joint discovery demands…and other filings regarding all matters common to the Individual Actions.").

plaintiffs must prove that NCB was "doing business" in the relevant forum.[5]  *Nelson v. Massachusetts Gen. Hosp.*, 2007 WL 2781241, at *14 (S.D.N.Y. Sept. 20, 2007) (citing N.Y. C.P.L.R. § 301; *Aerotel Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 191-92 (S.D.N.Y. 2000) (interpreting N.Y. C.P.L.R. § 301)). "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction 'may be sued in New York on causes of action wholly unrelated to acts done in New York.'" *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001) (internal quotations omitted).  These principles apply equally when the relevant forum is not simply New York State, but the United States as a whole.  *See supra* n.5.

**Doing Business Standard.**  "Casual or occasional activity does not constitute doing business; rather, § 301 requires a showing of 'continuous, permanent, and substantial activity in New York.'"  *Nelson*, 2007 WL 2781241, at *14 (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)); *Kiobel v. Royal Dutch Petroleum Co.*, 2008 WL 591869, at *4 (S.D.N.Y. Mar. 4, 2008) ("The 'continuous and systematic' standard for general jurisdiction is 'stringent,' … and requires plaintiff to prove that defendant's contacts 'approximate physical presence' in the United States.") (citations omitted); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 154 (S.D.N.Y. 2004) ("isolated and scattershot contacts" are insufficient).  In assessing whether a

---

[5] Judge Casey explained that "personal jurisdiction under the New York long-arm statute requires minimum contacts with New York pursuant to the Fourteenth Amendment." *Terrorist Attacks I*, 349 F. Supp. 2d at 810 (emphasis added) (distinguishing the exercise of personal jurisdiction under Fed. R. Civ. P. 4(k), which requires contacts with the United States as a whole pursuant to the Fifth Amendment); *Terrorist Attacks II*, 392 F. Supp. 2d at 558 (same) (citing *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).  However, NCB is not subject to the Court's general personal jurisdiction regardless of whether the Court evaluates NCB's alleged contacts with New York alone or, instead, with the U.S. as a whole.  Plaintiffs have alleged claims under two statutes that entail a Rule 4(k) analysis of contacts with the U.S. as a whole:  the ATA, 18 U.S.C. §§ 2331-2339D (*see Burnett* Third Amended Complaint, ¶¶ 645-52; *Ashton* Sixth Amended Complaint, ¶¶ 476-79) and RICO, 18 U.S.C. §§ 1961-1968 (*see Burnett* Third Amended Complaint, ¶¶ 689-714).  This Court already has dismissed plaintiffs' RICO claims, and that holding applies to NCB. *Terrorist Attacks I*, 349 F. Supp. 2d at 825-28; *see also* 02-CV-01616, D.D.C., Dkt. #224 (Mem. Opn.), at 24-28 (holding that plaintiffs do not have standing to bring RICO claims).  Likewise, plaintiffs fail to state a claim against NCB under the ATA. *See* D.C. Dkt. # 359 *Burnett* Mem., at 57, 72-75, 76; MDL Dkt. # 45 *Burnett* Reply Mem., at 9-10 & n.15.  Without a viable claim under a statute that provides for nationwide service of process, plaintiffs' only basis for asserting personal jurisdiction over NCB is New York law. *See* N.Y. C.P.L.R. §§ 301, 302; *Nix v. Hoke*, 62 F. Supp. 2d 110, 115 (D.D.C. 1999) (failure to state RICO claim precluded application of personal jurisdiction test based on nationwide contacts).  We understand that the Court will not at this time address the legal sufficiency of plaintiffs' claims against NCB.  Accordingly, we demonstrate in this motion that general jurisdiction over NCB cannot be exercised based on NCB's contacts with the U.S. as a whole.

defendant is subject to a court's general jurisdiction, courts apply a "'simple and pragmatic' test"

> in which the courts focus on a "traditional set of indicia" that include (1) the existence of a company office in the state, (2) the presence of bank accounts or property in the state, (3) the maintaining of a phone listing in the state, (4) any public relations work done in the state, and (5) attempts by the company to promote its interests through agents or other individuals permanently located in the state.

*Klein v. Hongkong & Shanghai Hotels, Ltd.*, 2007 WL 1098735, at *4 (S.D.N.Y. Apr. 9, 2007) (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98 (2d Cir. 2000)). "[T]he term 'doing business' refers to 'the ordinary business which the corporation was organized to do ... It is not the occasional contact or simple collateral activity which is included.'" *Nelson*, 2007 WL 2781241, at *14 (quotation omitted); *see also Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 218 (W.D.N.Y. 1997) ("Activities which are incidental to a defendant's primary business do not carry the same jurisdictional weight as the solicitation of such primary business itself.").

**Time of Assessment.**  "[T]he Court may only consider a defendant's contacts with the forum state 'at the time the lawsuit was filed' when deciding a motion to dismiss for lack of personal jurisdiction." *Ehrenfeld v. Bin Mahfouz*, 2006 WL 1096816, at *3 n.2 (S.D.N.Y. Apr. 25, 2006) (Casey, J.) (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 570 (2d Cir. 1996)), *aff'd*, 518 F.3d 102 (2d Cir. 2008).  Here, the relevant date for jurisdictional purposes is August 15, 2002, when the *Burnett* plaintiffs filed the first MDL complaint against NCB.  Pre-lawsuit contacts of a defendant "are generally considered only to establish the pattern of contacts that existed at the moment the complaint was filed." *Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *4 (S.D.N.Y. July 15, 2002).  Thus, the Court may look back in time <u>only</u> to determine whether any business activities <u>ongoing when the lawsuit was filed</u> are continuous, permanent and substantial, and the Court cannot attribute jurisdictional significance to conduct that does not continue up to the time of the lawsuit's

filing.[6]  *See Craig v. First Web Bill, Inc.*, 2004 WL 2700128, at *5 (E.D.N.Y. Nov. 29, 2004) (""[A] fundamental *sine qua non* of all [§ 301] holdings is the requirement that defendant be shown to have been 'doing business' at the time when the action was commenced.'") (quoting *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 156, 581 N.Y.S.2d 283, 286 (1st Dep't 1992)).   Events occurring <u>after</u> the lawsuits were filed also are irrelevant to general jurisdiction.  *See Whitaker v. Fresno Telsat, Inc.*, 87 F. Supp. 2d 227, 234 (S.D.N.Y. 1999), *aff'd*, 261 F.3d 196 (2d Cir. 2001).

**Specific Jurisdiction.**  As an alternative to general jurisdiction, a court may exercise specific jurisdiction when a cause of action "arises out of" or has a "substantial relationship" to one type of contact with the forum that is specified in a long-arm statute.  *See Beacon Enters. v. Menzies,* 715 F.2d 757, 764 (2d Cir. 1983).  Under New York long-arm law, specific jurisdiction could exist over NCB only if: (1) it "transacts any business" or "contracts to supply goods or services" in New York, <u>and</u> plaintiffs' claims <u>arise from</u> those specific transactions (N.Y. C.P.L.R. § 302(a)(1)); or, (2) it "commits a tortious act" within New York, <u>and</u> plaintiffs' claims and injuries <u>arise from</u> that specific tortious act (*id.* at § 302(a)(2)).

An essential aspect of these tests is that a court cannot exercise specific jurisdiction over a foreign defendant unless he "'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (internal citations omitted); *Calder v. Jones*, 465 U.S. 783, 789 (1984) (personal jurisdiction appropriate over non-resident defendants who "expressly aimed" intentionally tortious conduct at residents of forum state); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (defendant must be "a primary participant in intentional wrongdoing—

---

[6] When Magistrate Judge Maas directed NCB to provide jurisdictional discovery concerning its United States contacts for the six-year period preceding the commencement of these suits, he specified that his "ruling should, of course, not be taken as any indication that it ultimately will be appropriate to consider this entire period in determining whether the Court should assert personal jurisdiction over NCB."  MDL Dkt. #1849, at 7 n.1.

albeit extraterritorially—expressly directed at forum.") (citing *Calder*, 465 U.S. at 789-90).

Plaintiffs do not allege that NCB was a "primary participant" in the September 11 attacks, or that their claims "arise from" any act that NCB <u>itself</u> took in the United States. Instead, they proceed on a vicarious theory of specific jurisdiction, contending that NCB was part of a conspiracy that culminated in the attacks of September 11.  Judge Casey held that "'the bland assertion of conspiracy ... is insufficient to establish [specific] jurisdiction for the purposes of section 302(a)(2)'" of New York's long-arm statute.  *Terrorist Attacks I*, 349 F. Supp. 2d at 805 (quoting *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93-94 (2d Cir. 1975); citing *Lamarr v. Klein*, 35 A.D.2d 248, 315 N.Y.S.2d 695, 697-98 (1st Dep't 1970)); *see also Gateway Overseas, Inc. v. Nishat (Chunian) Ltd.*, 2006 WL 2015188, at *7 (S.D.N.Y. July 13, 2006) (Daniels, J.) (holding that a "conclusory allegation [of conspiracy] is insufficient to meet plaintiff's burden of establishing personal jurisdiction in New York….").  "To establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York."  *Terrorist Attacks I*, 349 F. Supp. 2d at 804 (citing *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991); *Singer v. Bell*, 585 F. Supp. 300, 302 (S.D.N.Y. 1984)).  Plaintiffs also must establish that "'(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant."  *Id.* (quoting *Chrysler Capital Corp.*, 778 F. Supp. at 1268-69 (internal quotation omitted).

In an order that the plaintiffs did not appeal to this Court—and that therefore binds plaintiffs—Magistrate Judge Maas held that: "[t]here has been no showing…that NCB played a direct role in any of the September 11 terrorist attacks"; and, plaintiffs' allegations that NCB played

a knowing role in the financing of terrorist activities "are conclusory" and "establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York—namely, the Al Qaeda terrorists who executed the September 11 attacks— 'acted at the direction or under the control or at the request of' NCB.'"  MDL Dkt. #1849 at 8, 10 (quoting *Terrorist Attacks I*, 349 F. Supp. 2d at 805).  *See also infra* at Section VII.A.

**Due Process Constraints.**  Judge Casey previously held as to NCB that, to avoid dismissal for lack of personal jurisdiction, plaintiffs must establish that exercising personal jurisdiction over NCB would "comport with the requirements of due process."  *Terrorist Attacks I*, 349 F. Supp. 2d at 810.  "The due process test for personal jurisdiction has two related components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry.'"  *Id.* (quoting *Metro. Life*, 84 F.3d at 567).  To meet the "minimum contacts" requirement, plaintiffs must establish that NCB engaged in some act by which it "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id.* at 810-11 (quoting *Burger King*, 471 U.S. at 474).  The "minimum contacts" test applies differentially in the contexts of general and specific jurisdiction, as Judge Casey explained:

> For purposes of the minimum contacts inquiry, a distinction is made between specific and general jurisdiction.  Specific jurisdiction exists when the forum exercises jurisdiction over the defendant in a suit arising out of the defendant's contacts with that forum.  General jurisdiction is based on the defendant's general business contacts with the forum; because the defendant's contacts are not related to the suit, a considerably higher level of contacts is generally required.

*Id.* at 811 (citing *Metro. Life Ins.*, 84 F.3d at 567-68; internal citation omitted).

**Burden of Proof.**  "'It is basic that the burden of proving jurisdiction is upon the party who asserts it and that he must show by the complaint and supporting affidavits the essential requirements of the jurisdictional statute.'"  *Shanley v. Rorher*, 2001 WL 1631406, at *1 (S.D.N.Y. Dec. 18, 2001) (Daniels, J.) (quoting *Lehigh*, 527 F.2d at 92).  Any evidence on which plaintiffs rely to

support their jurisdictional allegations must be admissible at trial under the Federal Rules. *See Shaoulian-Tehrani v. Khatami*, 2008 WL 1790386, at *2 (S.D.N.Y. Apr. 21, 2008) (hearsay cannot be used to establish a prima facie case of personal jurisdiction); *Dr. Beck & Co., GmbH. v. General Elec. Co.*, 210 F. Supp. 86, 92 (S.D.N.Y. 1962) ("On a motion to dismiss for lack of jurisdiction, the court may only consider evidence which would be of testimonial value at a trial."), *aff'd*, 317 F.3d 538 (2d Cir. 1963).

**Post-Discovery Burden.** "As this Court has 'allowed the parties to conduct discovery on the jurisdictional issue, [plaintiffs bear] the burden of proving by a preponderance of the evidence that personal jurisdiction exists.'" *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 567 (S.D.N.Y. 2006) (quoting *Landoil*, 918 F.2d at 1043); *Art Leather Mfg. Co., Inc. v. Albumx Corp.*, 888 F. Supp. 565, 567 (S.D.N.Y. 1995) (same); *Reiss v. Steigrod*, 866 F. Supp. 747, 749 (S.D.N.Y. 1994) (same); *see also Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *3 (E.D.N.Y. Dec. 7, 2007) ("[O]nce discovery regarding a defendant's contacts with the forum is conducted, the plaintiff bears a heavier burden. …"). After completion of jurisdictional discovery, as here, "the Court will limit its jurisdictional analysis to the facts presented and must assume that the Plaintiffs have provided all the evidence they possess to support their jurisdictional claims." *Jacobs*, 160 F. Supp. 2d at 731. Allegations that "lack the factual specificity necessary to confer jurisdiction" and "conclusory statements [ ] without any supporting facts" are not sufficient, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) (internal quotations omitted). When—as NCB will do in the remainder of this motion—"a defendant 'rebuts [the] plaintiff[']s' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact [or facts] essential to jurisdiction…the allegation[s] may be deemed refuted.'" *Accessory Corp. v. Spotless Plastics Pty., Ltd.*, 2007 WL 2584963, at *2 (S.D.N.Y. Sept. 7, 2007) (quoting *Schenker*, 2002 WL 1560788, at *3); *see also Jacobs*, 160 F. Supp. 2d at 736.

## IV.   PLAINTIFFS CANNOT ESTABLISH GENERAL "DOING BUSINESS" JURISDICTION OVER NCB BASED ON THE BANK'S OWN ACTIONS

The jurisdictional discovery record confirms that NCB was not engaged in "continuous, permanent, and substantial [business] activity in" the U.S. at the time these lawsuits were filed. *Nelson*, 2007 WL 2781241, at *14 (quotation omitted).

### A.   THE TRADITIONAL INDICIA OF "DOING BUSINESS" ARE ABSENT

None of the traditional indicia of "continuous, permanent, and substantial activity" is satisfied as to NCB.  *See Klein*, 2007 WL 1098735, at *4; *Wiwa*, 226 F.3d at 98.  At the time these lawsuits were filed, NCB: (1) had no office in the U.S., Juco. Decl. ¶ 4; (2) had no bank accounts or property in the U.S. (other than correspondent accounts, which are jurisdictionally immaterial, *see infra*), *id.* ¶¶ 10, 14, 15; (3) maintained no telephone listing in the U.S., *id.* ¶ 8; (4) conducted no advertising or public relations work in the U.S., *id.* ¶ 23; and (5) did not attempt to promote its interests through agents or other individuals permanently located in the U.S.  *Id.* ¶ 24.  The "doing business" test "relies heavily on [these] basic indicia."  *Gateway Overseas*, 2006 WL 2015188, at *5 (emphasis added).  NCB is not, and has not been, registered or licensed to do business in the U.S. at any time since its New York branch was closed in 1992, and it has not been doing business in the U.S. since that time.  Juco. Decl. ¶ 7.

### B.   THE ACTIVITIES OF NCB'S FORMER NEW YORK BRANCH DO NOT SUPPORT GENERAL JURISDICTION

Plaintiffs make conclusory assertions that "NCB has been doing business in New York and other U.S. jurisdictions continuously for over twenty years" and "made loans and issued letters of credit in the U.S. and to U.S. corporations for business activities in the U.S."  Berger Aff. Exh. 36, Int. Resp. #2 at 11, 13 (hereinafter "Int. Resp. #__, at __").  Plaintiffs concede, however, that NCB closed its New York City branch in 1992, a decade before the first of these complaints was filed.  Int. Resp. #2 at 11.  NCB has not had a physical presence in the United States since it closed its

New York branch in 1992.  Juco. Decl. ¶ 4.  NCB also has not made any loans to any U.S. entity since its New York branch closed.  *Id.* ¶ 7.

NCB's long-closed New York branch is irrelevant to personal jurisdiction.  Because personal jurisdiction is assessed as of the time a complaint is filed, "if the New York branch had already closed, then [the bank] was no longer doing business in the state and is not subject to general jurisdiction."  *Mones v. Commercial Bank of Kuwait, S.A.K.*, 399 F. Supp. 2d 310, 316 (S.D.N.Y. 2005) (vacated on other grounds).  Moreover, because "[t]he focus of these courts [is] on physical presence in New York … it will be difficult to convince a court that a constellation of jurisdictionally insignificant contacts … qualifies as sufficiently 'permanent' or 'continuous' for jurisdictional purposes."  *Nelson*, 2007 WL 2781241, at *20.

### C.   NCB'S CORRESPONDENT BANK ACCOUNTS DO NOT SUPPORT GENERAL JURISDICTION

Plaintiffs allege that NCB had "correspondent banking activity" in the U.S.  *See* Int. Resp. #2 at 12.  NCB used correspondent accounts with U.S. banks only to facilitate international financial transactions or money transfers for itself and its customers.  Juco Decl. ¶¶ 14-15.  NCB had no other U.S. bank accounts.  *Id.* ¶ 14.  NCB's primary bank accounts, used to pay its operational expenses, have always been maintained in Saudi Arabia.  *Id.* ¶ 15.  NCB has never received substantially all of its income from its U.S. correspondent accounts, and NCB has never used them to pay a significant portion of its operational expenses.  *Id.*

"Courts have repeatedly found that a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank."  *Semi Conductor Materials v. Citibank Int'l PLC*, 969 F. Supp. 243, 245-46 (S.D.N.Y. 1997) (holding that "a United Kingdom corporation[ ] does not satisfy the[ ] indicia for 'doing business in New York' because all of its branches, offices and employees are in Europe, it is not registered to do business in New York, … it does not own any real property in the

forum," and it "does not transact 'substantially all' of its business through its [four correspondent] New York bank accounts"); *accord Terrorist Attacks I*, 349 F. Supp. 2d at 819-20; *Int'l Telecom, Inc. v. Generadora Electrica del Oriente S.A.*, 2002 WL 465291, at *4 (S.D.N.Y. Mar. 27, 2002) ("The fact that [defendant] also maintains a U.S. dollar account at Citibank in New York does not enhance [plaintiffs'] jurisdictional showing. … [Defendant's] primary bank accounts are located in Guatemala and the company uses those accounts to pay wages and other operational expenses."); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (correspondent banking relationships "employed solely to facilitate international banking transactions" were insufficient to create general personal jurisdiction).

### D.   NCB'S PASSIVE INVESTMENTS DO NOT SUPPORT GENERAL JURISDICTION

Plaintiffs assert that the Court can exercise general jurisdiction over NCB because NCB owns stocks "acquired in U.S. Financial markets." Int. Resp. #2 at 12.  At the jurisdictionally relevant 2002 date, NCB owned $160 million in U.S. investment securities, which accounted for only 1.29% of NCB's total investment portfolio and were held by custodians outside of the U.S.  Juco. Decl. ¶ 18 & Exh. E.  Such share ownership and other passive investments are insufficient to establish general jurisdiction.  *See Shaffer v. Heitner*, 433 U.S. 186, 216 (1977) ("[I]t strains reason ... to suggest that anyone buying securities in a corporation formed in Delaware 'impliedly consents' to subject himself to Delaware's ... jurisdiction on any cause of action."); *Nelson*, 2007 WL 2781241, at *29 ("There are numerous cases in which corporations that raised capital or maintained investments in New York were not deemed subject to general jurisdiction."); *Schenker*, 2002 WL 1560788, at *5-6 ("That [defendant] … makes some New York investments, does not mean that this European company is itself 'doing business' in New York under § 301.").  Even when the amount of U.S. investments by a foreign entity is large in absolute terms, courts apply a proportionality test and decline to exercise jurisdiction when, as here, the amount of those investments is small in the

context of the defendant's entire worldwide business.  *See Landoil*, 918 F.2d at 1043; *Nordic Bank PLC v. Trend Group Ltd.*, 619 F. Supp. 542, 565-66 (S.D.N.Y. 1985) (finding foreign banks not "doing business" in New York although they "marketed in excess of $100 million of commercial paper through New York brokerage firms" and had "underwritten several multi-million dollar securities offerings" in New York); *see also Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, 2004 WL 2199547, at *8 (S.D.N.Y. Sept. 29, 2004) (applying proportionality test to foreign bank's U.S. sale of securities, and declining jurisdiction); *Meteoro Amusement Corp. v. Six Flags*, 267 F. Supp. 2d 263, 270 (N.D.N.Y. 2003) (applying proportionality test to income from a U.S. subsidiary, and declining jurisdiction).

### E.  NCB DID NOT ADVERTISE OR OTHERWISE SOLICIT BUSINESS IN THE UNITED STATES

Plaintiffs contend that certain overseas charities—the International Islamic Relief Organization ("IIRO"), the Muslim World League ("MWL"), the Saudi Joint Relief Committee ("SJRC"), and the Organization of Islamic Countries ("OIC")—ran "fund-raising advertisements in an English-language journal widely distributed in the United States" and that those charities held accounts at NCB to which donors were invited to contribute.  Int. Resp. #2 at 14-15.  Even if true, it is jurisdictionally irrelevant that these third-party charities advertised, and sought donations to, accounts at NCB.

NCB itself has not done any advertising or public relations in the United States at least since the time of the closure of its New York branch in 1992.  Juco Decl. ¶ 23.  NCB was not consulted about, and did not preview or authorize, the advertisements in which these third-party charities sought contributions.  *Id.* ¶ 21.  Further, NCB has no knowledge whether any of these organizations (MWL, OIC, SJRC, or the IIRO) engaged in fundraising in the United States, or whether their fundraising advertisements appeared in publications actually distributed in this country.  *Id.*   NCB does not require its customers to keep secret their NCB account numbers; that decision is entirely

up to the customer.  *Id.* ¶ 22.

Plaintiffs' contentions thus do not establish jurisdictionally-sufficient business solicitation by NCB.  "A court may exercise general jurisdiction over a foreign corporation where the corporation engages in 'extensive public relations' activities in the forum designed to promote the corporation's principal interests."  *Kiobel*, 2008 WL 591869 at *7; *Jayne v. Royal Jordanian Airlines Corp.*, 502 F. Supp. 848, 856 (S.D.N.Y. 1980) (finding foreign corporation's public relations work in the forum, which included hiring a public relations firm and advertising in a forum newspaper, insufficient for general jurisdiction purposes when such work was "incidental" to corporation's primary commercial activities).  The advertisements plaintiffs cite did not promote NCB or its principal business of banking.  These advertisements were by third-parties, not by NCB, and accordingly cannot be attributed to NCB.  *Kiobel*, 2008 WL 591869 at *8 ("[A]lthough Plaintiffs label SPS an 'agent' of [defendant], they allege no facts detailing the purported agency relationship between the two entities. …  SPS's alleged recruiting activities in the United States therefore cannot be attributed to [defendant].").  Regardless, they were "minimal and sporadic."  *Id.*  Solicitation of business must be "substantial and continuous" and, under the "solicitation-plus" rule, additional activities of substance "such as solicitation 'from a permanent locale within the state,'" must support the exercise of general jurisdiction."  *Nelson*, 2007 WL 2781241, at *14 (quoting *Beacon Enters.*, 715 F.2d at 762-63; citing *Laufer v. Ostrow*, 55 N.Y.2d 305, 310, 434 N.E.2d 692 (1982); *Landoil*, 918 F.2d at 1043-44; *Artemide SpA v. Grandlite Design & Mfg. Co.*, 672 F. Supp. 698, 703 (S.D.N.Y. 1987)).

## F.   PAST LITIGATION INVOLVING NCB DOES NOT SUPPORT GENERAL JURISDICTION

Plaintiffs contend that NCB was a party to 21 different lawsuits in the United States.  Int. Resp. #2 at 14, #10 at 37-38.  However, from April 5, 2001 until these MDL suits were commenced, NCB was not a party to any U.S. litigation.  Berger Aff. ¶ 21.  Because none of the prior lawsuits identified by plaintiffs was pending when plaintiffs filed the MDL lawsuits against

NCB, all of those prior suits are irrelevant for jurisdictional purposes.  *See Indem. Ins. Co. of North America v. K-Line America, Inc.*,  2007 WL 1732435, at \*7 (S.D.N.Y., June 14, 2007) ("That Plano once brought suit in New York fifteen years ago does not establish that it is presently doing business in New York.").

Moreover, in most of the prior lawsuits identified by plaintiffs, either NCB was not a party, or the litigation terminated well before the jurisdictionally relevant date (August 15, 2002) when the first of these lawsuits was filed.  Berger Aff. ¶ 31.  Even expanding the analysis to the six-year look-back period used for jurisdictional discovery (*see supra* n.6), NCB was a party to just eight lawsuits in the United States.  *Id.* ¶ 22.  As a matter of law, NCB cannot be deemed to have consented to jurisdiction by being a party to those lawsuits, none of which was related to the claims alleged in this MDL.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991) (consent to jurisdiction in one case does not extend to other lawsuits in the same jurisdiction); *Spotless Plastics*, 2007 WL 2584963, at \*4 (holding that "sporadic use of New York courts" does not establish "systematic and continuous contacts with this jurisdiction."); *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F. Supp. 669, 675 (S.D.N.Y. 1989) (being a party to "a mere handful of arbitrations and litigations in New York … does not approach 'doing business' with the 'fair level of permanence and continuity' required under § 301.").

Tellingly, none of the courts in those eight prior cases determined that NCB was subject to general U.S. jurisdiction.  Berger Aff. ¶ 22.  In four of the prior lawsuits, the same plaintiff filed four substantively identical complaints against NCB in New York, D.C., and Ohio, in which the plaintiff alleged that NCB had provided credit to a Swedish joint venture to construct an oil storage facility for the Kingdom of Saudi Arabia.  *Id.* ¶¶ 23-24.  NCB did not consent to personal jurisdiction in those cases.  *Id.* ¶ 24.  The D.C. lawsuit was dismissed on November 15, 1996, for the plaintiff's failure to prosecute, and the plaintiff voluntarily dismissed the Ohio case on December 10, 1996.  *Id.*

¶ 25.  The two New York cases were dismissed with prejudice on December 23, 1996, after the plaintiff failed to oppose NCB's motion to dismiss for, among other reasons, lack of personal jurisdiction.  *Id.*

NCB also cannot be subject to general jurisdiction here based on the other four prior lawsuits, in which NCB brought claims in connection with contracts entered into in the late 1980s or early 1990s that either involved mortgages on property located in the United States, or contained forum selection or governing law clauses that allowed suit in the United States, or both.  *Id.* ¶¶ 26-30; *see Nelson*, 2007 WL 2781241, at *32 (contractual forum selection and choice of law provisions not relevant for purposes of general jurisdiction) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986); *JN Realty LLC v. Estate of Marvin*, 268 F. Supp. 2d 231, 235-37 (S.D.N.Y. 2003)); *Insight Data Corp. v. First Bank Sys., Inc.*, 1998 WL 146689, at *5 (S.D.N.Y. Mar. 25, 1998) (securing mortgages by real property in New York and foreclosing on such property "is more a matter of fortuity than proof" of "doing business" for general jurisdiction).

## V.    PLAINTIFFS CANNOT ESTABLISH THAT THE U.S. CONTACTS OF OTHER ENTITIES AND PERSONS ESTABLISH A BASIS FOR GENERAL JURISDICTION OVER NCB

### A.    ACTIVITIES OF NCB'S DISSOLVED FORMER SUBSIDIARY ARE JURISDICTIONALLY IRRELEVANT

Plaintiffs also contend that NCB is subject to general jurisdiction because it once had an indirect U.S. subsidiary, SNCB Securities Inc. ("SNCB"), that allegedly performed services previously performed by NCB's New York branch.  Int. Resp. #2 at 11.  Plaintiffs contend that SNCB was wholly owned by NCB; was registered to do business in Delaware and New York; managed an investment portfolio in the U.S. for NCB; used U.S. banks and paid taxes in the U.S.; derived its income from and acted at the direction of NCB; and employed former NCB employees.  Int. Resp. #2 at 11, #11 at 39-41, #12 at 43-45.

These contentions cannot establish general jurisdiction over NCB.  It is uncontested that

SNCB was an indirectly-owned, legally-distinct entity, whose legal existence was terminated before the earliest MDL complaint was filed.  As a matter of law, the Court need not weigh any of plaintiffs' kitchen-sink set of contentions about how SNCB did business because the activities of a subsidiary (SNCB) are irrelevant to jurisdiction over a parent (NCB) when the subsidiary terminates is legal existence before suit is commenced against the parent.  *Ehrenfeld*, 2006 WL 1096816, at *3 n.2. ("the Court may only consider a defendant's contacts with the forum state 'at the time the lawsuit was filed' when deciding a motion to dismiss for lack of personal jurisdiction.").

The incontestable evidence is that SNCB was formally dissolved in Delaware in February 2001.  Juco Decl. ¶¶ 4-5.  Even plaintiffs contend that SNCB was only "in business in Delaware until February of 2001 and in New York until October of 2001."  Int. Resp. #2 at 11.  It therefore is conceded that SNCB ceased to exist well before the first of the lawsuits in this MDL (*Burnett*) was filed on August 15, 2002.

Plaintiffs also contend that SNCB managed a U.S. investment portfolio on behalf of NCB (Int. Resp. #2 at 11, #11 at 39-40, #12 at 43), but this contention is both false and jurisdictionally irrelevant.  The investment portfolio that plaintiffs reference in fact belonged to various legally-distinct British Virgin Island entities that, in turn, held mere legal title to the assets on behalf of the beneficial owners, *i.e.*, NCB mutual fund shareholders in Saudi Arabia.  Juco Decl. ¶ 17; Krohley Aff. ¶¶ 4-5 & Exhs. A & B thereto.  Assets of those mutual funds are not assets of NCB, but instead belong to the mutual fund shareholders.  Berger Aff. ¶ 2, Exh. 6 (Note #31 to 2001 NCB Financial Statement).  As reported in NCB financial statements, assets of NCB mutual funds "are not included in the financial statements of the Bank" because, per International Accounting Standards: "Assets held in trust or in a fiduciary capacity are not treated as assets of the Bank and, accordingly, are not included in these financial statements."  *Id.*, Note #2(q).  In any event, the U.S. holdings of those BVI companies were liquidated long before these lawsuits were commenced.  Krohley Aff. ¶ 7; Juco

Decl. ¶ 19 & Exh. F.[7]  Moreover, because the business of SNCB—as established by arms-length contracts between SNCB and NCB—was to advise NCB with respect to the management of the BVI companies' portfolio (Krohley Aff. ¶¶ 4-5 & Exhs. A & B thereto), SNCB itself shut down operations and closed its doors in December 2000.  *Id.* ¶¶ 4-5, 7.  SNCB's audited financials for 2000, prepared by Ernst & Young, confirm that "[a]s of December 31, 2000, SNCB has ceased operations and is in the process of liquidation."[8]  Berger Aff. ¶ 8.a, Exh. 13, at 6.  SNCB surrendered its office space in January 2001, and was formally dissolved in February 2001.  Juco. Decl. ¶¶ 4-5; Krohley Aff. ¶ 7.

Because all SNCB-related activities had terminated long before the MDL plaintiffs sued NCB, they are irrelevant to jurisdiction over NCB.  The "doing business" rule, requiring continuous, permanent, and substantial business activity in the forum at the time of the filing of a lawsuit, stringently refuses to attribute any jurisdictional significance to subsidiaries that were dissolved, and to business relationships that were terminated, before the lawsuit was filed.  *See Schenker*, 2002 WL 1560788, at *4 (declining personal jurisdiction when a foreign corporation sold its U.S. subsidiary

---

[7] Three other separate legal entities identified by plaintiffs (U.S. Second I.R.E. Management Corp.; U.S. Tampa Management II Corp.; and Medical Equipment Leasing Partners [1, L.P.], Int. Resp. #2 at 12, #13 at 46), which were related to the BVI funds, were dissolved between May 27, 1998 and February 28, 2000.  Berger Aff. ¶¶ 9-11, Exhs. 16-18.  Because the activities of these companies terminated before the earliest of the MDL lawsuits was filed, they are temporally irrelevant to jurisdiction over NCB.  Independent of the timing point, these companies were separate legal entities, and plaintiffs have not made any showing that they were "mere departments" or agents of NCB as would be required for their conduct to support jurisdiction over NCB.  *See Landoil*, 918 F.2d at 1046; *Nelson*, 2007 WL 2781241, at *29-30; *see* Section V.C., *infra*.

[8] For a short period after SNCB's February 2001 dissolution, NCB retained two former officers of SNCB as consultants to assist with SNCB's liquidation.  Berger Aff. ¶¶ 8.b-c, Exhs. 14-15.  SNCB's Certificate of Surrender of Authority in New York was filed with the New York Department of State on October 24, 2001.  *See* Berger Aff. ¶ 12.a, Exh.19.  Magistrate Judge Maas noted that these winding up activities were completed before the end of 2001, prior to the commencement of this litigation.  *See* MDL Dkt. #2038 (finding that "[t]here is nothing in the materials annexed to [plaintiff's] letter to suggest that SNCB engaged in any activities in the U.S.—through agents or otherwise—after 2001.").  In any event, winding-up activities, which are not "the ordinary business which the corporation was organized to do," do not carry the same jurisdictional weight as a company's primary business.  *Nelson*, 2007 WL 2781241, at *14; *cf. Lodato v. Greyhawk North America, LLC*, 834 N.Y.S.2d 237, 238 (2d Dep't 2007) ("A dissolved corporation has no existence, either de jure or de facto, except for a limited de jure existence for the sole purpose of winding up its affairs.").  SNCB's October 2001 surrender of its N.Y. business registration also occurred prior to the commencement of this litigation.

18

just two months before the complaint was filed); *Data-Stream AS/RS Technologies, LLC v. ACEquip Ltd.*, 2002 WL 1683736, at *6 (S.D.N.Y. July 24, 2002) (The alleged agent of defendant "ceased his activities … almost a year before this suit was commenced. Therefore, his activities are irrelevant for purposes of the 'doing business' inquiry."); *Pieczenik v. Dyax Corp.*, 2000 WL 959753, at *3 (S.D.N.Y. July 11, 2000) ("Because these agreements terminated prior to the time this action was commenced, they are irrelevant for jurisdictional purposes."); *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.p.A.*, 775 F. Supp. 650, 652 n.2, 654 (S.D.N.Y. 1991) (finding no general jurisdiction over a foreign corporation, which had hired a sales representative in the forum to solicit customers from June 1987 to September 1989, because "that relationship terminated before the filing of the complaint in December 1989.").

## B. ALTERNATIVELY, SNCB WAS NOT A MERE DEPARTMENT OR AGENT OF NCB

SNCB's activities could not provide a hook for general jurisdiction over NCB even if that dissolved subsidiary had conducted business in New York until this litigation was filed. "For New York courts to have personal jurisdiction [over a foreign parent based on the local activities of a subsidiary], the subsidiary must be either an 'agent' or a 'mere department' of the foreign parent. *Jazini*, 148 F.3d at 184 (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984); *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)). SNCB was neither an agent nor a mere department of NCB.

In determining whether a subsidiary is a "mere department" of its foreign parent:

[C]ourts consider the following factors: (1) common ownership between the parent and subsidiary, which is essential to a "mere department" finding; (2) the "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent."

*Stutts v. De Dietrich Group*, 465 F. Supp. 2d 156, 163-64 (E.D.N.Y. 2006) (quoting *Beech Aircraft*, 751

F.2d at 120-22); *see also Caremark Therapeutic Servs. v. Leavitt*, 405 F. Supp. 2d 454, 464-65 (S.D.N.Y.

2007).  Further:

> To establish that a domestic corporation is an agent for a foreign parent, "the <u>plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.</u>'" … This "mean[s] that a foreign corporation is doing business in New York … when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar activities."

*Klonis v. Nat'l Bank of Greece, S.A.*, 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007) (emphasis added;

quotations omitted).  "Under either the 'agency' test or the 'mere department' test, … '[t]he factors

to be weighed include the significance of the New York business to the defendant's overall

activities." *Campbell v. Nowlin*, 1993 WL 205127, at *3 (S.D.N.Y. June 9, 1993) (quoting *Bulova Watch

Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1334 (E.D.N.Y. 1981)).

By terminating its relationship with SNCB in 2000, NCB demonstrated conclusively that

SNCB was not significant to NCB's business.  *See* Krohley Aff. ¶ 4.  At no time, moreover, were

SNCB's assets and revenues significant to NCB's financial position.  In 2002, when this litigation

was commenced, SNCB had no assets or revenues because it had dissolved in the previous year.

In 2001, SNCB had only $403,168 in total assets and $783,526 in total income.  *See* Berger Aff. ¶ 8.a,

Exh. 13.  Thus, in SNCB's last year of operation, its assets were less than 0.0015% of NCB's total

assets of 106.7 billion Saudi Riyals ($28.4 billion) and 0.065% of NCB's total revenues of 4.5 billion

Saudi Riyals ($1.2 billion) in 2002.  *Id.* ¶ 2, Exh. 7.  NCB received such a small proportion of its

revenues from SNCB's activities that it cannot seriously be claimed that SNCB's "revenue, relative

to the overall revenue generated by [NCB], is large enough that [NCB] would enter the market in the

absence of the subsidiary in order to make up for the financial loss." *Meteoro*, 267 F. Supp. 2d at 270

(a 3% contribution to a parent's income was too small to support the contention that the parent

"would enter the market itself to make up for the loss of revenue generated by" its subsidiary).

In fact, NCB did not "enter the market" after SNCB was dissolved because the sole corporate purpose of SNCB (advice concerning U.S. holdings of the BVI mutual fund companies) no longer existed. Krohley Aff. ¶¶ 7-8. *See supra* at Section V.A. In a similar situation, the Southern District rejected an effort to assert jurisdiction over a foreign defendant when discovery confirmed that "the work of the [alleged local agents] is not 'sufficiently important' to [defendant] that it would use its own employees and resources to perform such tasks," which accounted for "no more than 1 percent of all [its] sales." *Holey Soles Holdings, Ltd. v. Foam Creations, Inc.*, 2006 WL 1147963, at *7 (S.D.N.Y. May 1, 2006) (internal quotation marks omitted).

Without any factual basis, plaintiffs make the conclusory assertion that "SNCB was created to perform services which were previously done by NCB's branch in New York." Int. Resp. #2 at 11, #11 at 39, #12 at 43. However, SNCB could not, and did not, do all of the business that NCB could have done by its own officials in the U.S., and SNCB therefore was not NCB's agent as a matter of law. *See Jazini*, 148 F.3d at 184; *Klonis*, 492 F. Supp. 2d at 301. For example:

- SNCB differed fundamentally from NCB's former New York branch because SNCB did not engage in the business of banking—NCB's primary business. *See* Krohley Aff. ¶ 19; Berger Aff. ¶ 2, Exh. 7 (NCB's 2002 Annual Report).

- SNCB did not engage in all of the bank-related business activities that NCB was authorized to conduct through subsidiaries pursuant to NCB's 1993 settlement agreement with the Federal Reserve Board. *See* Berger Aff. Exh. 12. That agreement authorized NCB to establish a non-bank subsidiary to solicit new business and engage in lending discussions on behalf of NCB; facilitate communication between NCB and its U.S. correspondent banks; and disseminate information about NCB and recruit NCB employees within the U.S. *Id.* SNCB did not do any of these activities.

- The contracts establishing NCB's business relationship with SNCB explicitly provided that "SNCB shall have no power or authority to bind or contract for NCB Jeddah." *See* Krohley Aff. ¶ 21, Exhs. A & B thereto, § 2, ¶ 1 (in both). SNCB, in fact, never entered into any agreements on NCB's behalf. *Id.* ¶ 9. A local entity cannot be found to do all of the business of its foreign parent in the U.S. when the local entity cannot even bind the foreign one. *See Tsegaye v. Impol Aluminum Corp.*, 2003 WL 221743, at *5 (S.D.N.Y. Jan. 30, 2003) (a U.S. subsidiary was not its parent's agent where it did not have power to bind the parent); *Jacobs*, 160 F. Supp. 2d at 737-39 (noting that "[w]here the New York entity is unable to contractually

bind the foreign defendant in New York, the New York entity is 'unable to do all business [the out-of-state defendant] could do' were it in New York.").

Plaintiffs also contend that NCB and SNCB had overlapping officers and directors and that NCB was the source of all of SNCB's income, approved SNCB's annual budget, provided tax advice to SNCB, directed use of SNCB's office space, and approved SNCB's "major and minor decisions." Int. Resp. #2 at 13, #11 at 40, #12 at 43-44. These contentions are legally insufficient to meet the mere department test. "It has been established that overlapping officers and directors are 'intrinsic to the parent-subsidiary relationship,' and that they are not determinative as to whether the subsidiary is a 'mere department' of the parent." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001). Further, "courts require more than merely that a subsidiary derives income from its parent's business to show that the subsidiary is a mere department of the parent for jurisdictional purposes." *See Stutts*, 465 F. Supp. 2d 164; *Jerge v. Potter*, 2000 WL 1160459, at *3 (W.D.N.Y. Aug. 11, 2000) (finding no evidence of financial dependency when parent did not provide day-to-day or annual financing to subsidiary); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 53-54 (S.D.N.Y. 1999) (The "financial dependency of the subsidiary on the parent corporation exists where the parent provides no- or low-interest loans to the subsidiary or extends credit on terms not otherwise available, guarantees the subsidiary's obligations, or provides and pays for insurance coverage or other necessities on behalf of the subsidiary"). Even when a parent "exercises a great deal of control over" its subsidiary, "[s]uch control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the parent." *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 71 (S.D.N.Y. 1979) (recognizing that "under New York law a parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries .... [s]uch control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the parent"); *Irwin v. ZDF Enters. GmbH*, 2006 WL 374960, at *9 (S.D.N.Y. Feb. 16, 2006) (same; quoting *Saraceno*); *Palmieri v. Estefan*, 793 F. Supp. 1182, 1188-89 (S.D.N.Y.

1992) (finding no mere department even where the parent approved major financial decisions, reviewed the budget, controlled key personnel decisions, and guaranteed financial obligations of at least one affiliate).  Generally, by following corporate formalities, including the use of intercompany accounts to track and repay mutual debts, affiliated companies demonstrate that a subsidiary is not a mere department of its parent.  *See Jacobs*, 160 F. Supp. 2d at 736-37.

The contracts between SNCB and NCB establish that the two companies operated at arms length, and that SNCB performed only limited and defined services for NCB in connection with the BVI companies that held Saudi mutual fund assets.  *See* Krohley Aff. ¶¶ 4-6, 21 & Exhs. A & B thereto.  Other facts also establish that SNCB was not a mere department of NCB:

- NCB and SNCB each had its own financial and corporate books, records, and bank accounts.  Berger Aff. ¶ 8.a, Exh. 13 (2000 SNCB Audited Financial Statements); Krohley Aff. ¶ 16.
- NCB and SNCB prepared separate financial statements.  *Id.*
- NCB and SNCB tracked intercompany accounts payable and receivable.  *Id.*
- NCB did not provide any loans to SNCB.  Juco Decl. ¶ 6.
- NCB did not guarantee SNCB's obligations.  *Id.*.
- SNCB had its own accounting and financial policies.  Krohley Aff. ¶ 17.
- The budget oversight of SNCB was primarily performed by SNCB Securities, Ltd.—its direct parent—not by NCB.  *Id.* ¶ 11.
- SNCB made its own decisions as to how to use its funds once they were allocated to its budget.  *Id.* ¶ 21.
- SNCB paid for its own overhead expenses, including its attorney fees.  *Id.* ¶¶ 13, 15.

Even if SNCB had not been dissolved before these lawsuits were filed, it was neither unduly controlled by, nor financially dependent on, NCB and therefore could not be viewed as a mere department or agent of NCB.  *See Stutts*, 465 F. Supp. 2d at 165 (defendant's subsidiary was not a "mere department" of defendant because that subsidiary kept its own books and records, filed its own U.S. tax return, and "otherwise [observ[ed] all corporate formalities"); *Jacobs*, 160 F. Supp. 2d at 736-37 (finding no personal jurisdiction over affiliated companies where they were "separately incorporated entities, which keep their own books, records and accounts, which hire their own

employees, and which operate day-to-day without direction from [the defendant]"; none of the affiliates "received any loans from the … Defendants"; "the Defendants were careful to account separately" for their individual debt obligations when engaging in related transactions; and the defendants and their affiliates "promptly repaid" their mutual debts).

## C.   THE ACTIVITIES OF OTHER NON-SUBSIDIARY ENTITIES DO NOT SUPPORT GENERAL JURISDICTION OVER NCB

Plaintiffs contend that "NCB and/or its subsidiary SNCB did business in the United States and abroad via other controlled subsidiaries registered in the United States," including the following entities:  Euram Group Ltd.; Sedco Services, Inc.; MBKS Inc.; MBKS II Inc.; MBKS III Inc.; Eidetics International, Inc.; Global FBO Holdings Inc.; Ellington MTA, Inc.; and Mid-East Jet, Inc. Int. Resp. #2 at 12, #13 at 46.  This contention is simply false, and therefore jurisdictionally irrelevant, because NCB has never had any ownership interest in those entities.[9]  *See* Bagabir Decl. ¶ 3(c).  Accordingly, and because there is no evidence that those entities acted on NCB's behalf, they cannot be treated as agents or mere departments of NCB.  *See Landoil*, 918 F.2d at 1046 ("A business relationship with a New York entity does not provide a sufficient basis for jurisdiction at least in the absence of a showing that the company has become an agent or division of the company over which the plaintiff seeks to exercise personal jurisdiction."); *Spotless Plastics*, 2007 WL 2584963, at *5 & n.17 ("Plaintiff has offered no basis for suggesting that Spotless New York is controlled by or is a department of Spotless Australia, and Spotless Australia affirms to the contrary. …  Accordingly, there is no reasonable basis for ordering discovery, as requested by plaintiff, into the business

---

[9] NCB divested itself of its temporary, and fortuitous, interest in Southwest Airport Services ("SWAPS"), another company identified by the plaintiffs, in 1996.  Shares of SWAPS had been pledged to secure a $1.4 million loan by NCB's former New York branch in 1990, and the loan went into default.  Berger Aff. ¶ 18, Exh. 34, at 4.  NCB did not conduct business through SWAPS, but rather held the pledged shares until it released the pledge on June 26, 1996, as part of a settlement agreement.  *Id.* ¶ 19, Exh. 35; *see Insight Data Corp.*, 1998 WL 146689, at *5 (foreclosing on assets securing a loan is not proof of "doing business" for general jurisdiction); Section IV.D, *supra* (passive investments are insufficient for general jurisdiction).  Because NCB ceased long ago to have any interest in that company, SWAPS' current activities are irrelevant to jurisdiction over NCB.

relationship between Spotless Australia and Spotless New York.") (emphasis added) (citations omitted).[10]

Plaintiffs also allege that NCB used the services of at least twelve unnamed contracted service providers to do its business in the U.S.  Int. Resp. #2 at 12, #13 at 47.  To the extent that plaintiffs are referring to service providers NCB may have retained to manage NCB's own investments, activities relating to passive investments are insufficient to establish general jurisdiction. *See* Section IV.D, *supra*.  To the extent that plaintiffs are referring to service providers NCB may have retained to manage the U.S. holdings of the BVI mutual funds, all such holdings were liquidated before this litigation was filed.  *See* Section V.A., *supra*.  Further, even if services were being provided as of the date this litigation was filed, any contractual arrangements NCB may have had with U.S. professionals are jurisdictionally insufficient.  "Even where commercial financing and investment activities are at the core of an out-of-state defendant's business …, courts have been loath to find that retaining the services of New York professionals or accessing New York's unique capital markets constitutes 'doing business' in New York so as to confer general jurisdiction over an out-of-state entity."  *Nelson*, 2007 WL 2781241, at *31 (finding defendant's "sporadic use of New York-based law firms, investment banks, rating agencies, and brokerage firms" provided no basis for

---

[10] Based on their mistaken belief that Mid-East Jet was a subsidiary of NCB, plaintiffs allege that NCB's "Saudi Arabia based aviation department" has aircraft and airmen registered in the U.S.  Int. Resp. #2 at 12, #13 at 46-47.  Sworn testimony establishes that NCB has not conducted business in the United States relating to the ownership or operation of aircraft. Bagabir Decl., ¶ 3; Juco. Decl. ¶ 25.  Plaintiffs cite inadmissible chatroom postings on the Professional Pilots Rumour Network website and partially-redacted facsimiles posted on another website to associate NCB with Mid-East Jet.  *See Loussier v. Universal Music Group, Inc.*, 2007 WL 1098687, at *4 (S.D.N.Y. Apr. 11, 2007) (excluding web pages as unauthenticated and inadmissible hearsay; "Furthermore, the postings are made anonymously, and thus are inherently untrustworthy."); *Chamilia, LLC v. Pandora Jewelry, LLC*, 2007 WL 2781246, at *6 n.4 (S.D.N.Y. Sept. 24, 2007) (internet print-out evidence was unauthenticated hearsay).  These websites list NCB's supposed "aviation department" address as 3rd Floor, NCB Khalidiyah Branch Building in Jeddah.  NCB has a branch office in the ground floor of that building, but does not occupy office space on the third floor.  Juco. Decl. ¶ 25.  Further, the P.O. Box, telephone, fax and telex numbers supposedly associated with the "aviation department" that appear on the websites are not P.O. Box, telephone, fax or telex numbers that belong to NCB.  *Id.*  NCB has no record that any of the "airmen" identified on the websites cited by plaintiffs is or ever was employed by NCB.  *Id.* ¶ 26.  NCB has had no ownership interest or investment in any U.S. registered aircraft, including those identified on these websites as belonging to Mid-East Jet.  Bagabir Decl. ¶ 3(e).  NCB also has not derived any revenue from the ownership or operation of aircraft in the United States or from any business that owned or operated aircraft in the United States.  *Id.* ¶ 3(d).

general jurisdiction); *Bush v. Stern Bros. & Co.*, 524 F. Supp. 12, 14 (S.D.N.Y. 1981) ("The location in New York of firms, such as law firms and investment services, which perform services for [defendant] for a fee does not represent activity by [defendant] in New York for jurisdictional purposes."); *Daniel*, 988 F. Supp. at 224 ("Defendant's use of New York companies in issuing bonds to raise capital, the use of investment advisors or other New York professional organizations, and the hiring of New York attorneys ... are not sufficient contacts with New York to provide for jurisdiction....").

## VI.   THE CUMULATION OF THESE ALLEGED INSIGNIFICANT AND SPORADIC CONTACTS DOES NOT MAKE THEM SIGNIFICANT

"While … jurisdictional contacts must be viewed in the aggregate—with no one contact having talismanic significance—simply adding up contacts that carry little or no jurisdictional weight in and of themselves does not provide an adequate basis for jurisdiction." *Nelson*, 2007 WL 2781241, at *17; *see also Pieczenik v. Cambridge Antibody Technology Group*, 2004 WL 527045, at *6 (S.D.N.Y. Mar. 16, 2004) (holding that plaintiff's "scatter-shot" allegations "fail[ed] to satisfy the stringent 'doing business' standard of section 301 because, even when aggregated, they do not suggest that [the defendant] is doing business in New York on a systematic and continuous basis"); *Reers*, 320 F. Supp. 2d at 153-54.  As shown, plaintiffs have collected a series of jurisdictionally-immaterial activities by NCB or its former subsidiary.  As a matter of law, the sum of those parts does not make a jurisdictionally significant whole.

## VII.  PLAINTIFFS CANNOT ESTABLISH THAT NCB IS SUBJECT TO SPECIFIC JURISDICTION

Plaintiffs contend that NCB is subject to this Court's specific jurisdiction under a conspiracy theory, alleging that NCB "purposefully directed its activities at the United States and participated in a conspiracy that culminated in the attacks of September 11." *Terrorist Attacks I*, 349 F. Supp. 2d at 818; Int. Resp. #1 at 4.  Plaintiffs' contention discovery responses, however, reveal that they have no

evidence to support their conclusory conspiracy theory, which fails as a matter of law.

### A. MAGISTRATE JUDGE MAAS PREVIOUSLY HELD PLAINTIFFS' CONSPIRACY ALLEGATIONS LEGALLY INSUFFICIENT

Plaintiffs offer only speculation and hearsay in their effort to link NCB to the Al Qaeda terrorists who committed the September 11 attacks.  Plaintiffs have not produced any facts to sustain their conspiracy theory in the two years since Magistrate Judge Maas held that "[t]here has been no showing…that NCB played a direct role in any of the September 11 terrorist attacks"  and that plaintiffs' allegations that NCB played a knowing role in the financing of terrorist activities "are conclusory" and "establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York—namely, the Al Qaeda terrorists who executed the September 11 attacks—'acted at the direction or under the control or at the request of' NCB.'"  MDL Dkt. #1849 at 8, 10 (quoting *Terrorist Attacks I*, 349 F. Supp. 2d at 805).  It therefore is equally true today that, as Magistrate Judge Maas concluded two years ago: "plaintiffs have failed to make a prima facie showing of conspiracy."  *Id.* at 11.  Having failed to do so, plaintiffs cannot establish the essential statutory prerequisite to specific jurisdiction—*i.e.*, participation in a tort committed in this jurisdiction.  *See supra* at Section III.  Indeed, Magistrate Judge Maas already has thoroughly examined, and comprehensively rejected, plaintiffs' central "conspiracy" allegation—that a Saudi government audit supposedly examined NCB involvement in financing terrorism.

### B. THE NONEXISTENT "TERROR FINANCING" AUDIT

Doggedly, and despite all contrary evidence, plaintiffs contend that a 1998 audit of NCB "demonstrated that mechanisms had been established by NCB officials within NCB to surreptitiously funnel millions of dollars to at least three charities which were supporters of al Qaeda." Int. Resp. #4 at 20.  Magistrate Judge Maas previously considered plaintiffs' allegations concerning a terror financing audit and determined they were baseless.  Moreover, those allegations

have been withdrawn by their original source, and have been repudiated by the Saudi central bank.

Plaintiffs' audit allegations are based upon the assertions of Jean-Charles Brisard, the self-described "lead investigator" for the *Burnett* plaintiffs, who claimed to have "excerpts" of the alleged audit. *See* Berger Aff. ¶ 12.b, Exh. 20 (identified in Int. Resp. #4 at 20); MDL Dkt. #1904, Exh. A, ¶¶ 1, 9.  However, on October 4, 2006, Brisard unequivocally retracted his claims under oath:

> On reflection I should have said that this document was a summary of what I believed to be an audit document of the NCB.  I received this document from the French Intelligence services already translated into English. …  I also acknowledge that the document appears to be a summary of a regular audit of the NCB that all banks carry out on a yearly basis.  …  I had read an interview with [former NCB director Abdulrahman bin Mahfouz] in which he said that an audit was carried out at the NCB.  However, I now understand this to mean that this was a standard audit of the NCB that was carried out on a yearly basis as with all banks. …  I have no evidence to suggest that the Saudi Arabian Government ordered a special audit of the NCB to address concerns of the American authorities that "*uncovered massive transfers made to charity organizations with ties to Osama bin Laden, some of which were controlled by members of the bin Mahfouz family.*"

MDL Dkt. #1904, Exh. A ¶¶ 23, 24, 25.2 (italics in original, referring to his allegations).

Independent of Brisard's retraction, NCB obtained confirmation from its regulator (the Saudi central bank, SAMA) that it was "not aware of any audit of NCB undertaken in 1998 intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States or one that confirmed that NCB knowingly financed terrorist acts against the United States."  *See* Berger Aff. ¶ 3, Exh. 8.  NCB further informed plaintiffs that there had been "a February 1998 report of an examination of NCB conducted by Arthur Andersen at the direction of SAMA," but that the report did not contain any reference to "any of the subjects that are within the scope of Plaintiffs' terror-financing allegations against NCB."  *See* Berger Aff. ¶ 4, Exh. 9, at 4.

On April 23, 2007, NCB submitted that February 1998 examination report to Magistrate Judge Maas for *in camera* inspection.  NCB also submitted an April 22, 2007 letter from SAMA again confirming that (1) SAMA has no knowledge of "any audit or examination of NCB in the general time frame of 1998 or later which examined alleged involvement in financing terrorist activities"; (2)

SAMA had "not required any such audit"; and (3) SAMA "had taken no … adverse regulatory action" against NCB based on "alleged involvement in financing terrorist activities."  *See* Berger Aff. ¶ 5, Exh. 10.  On May 1, 2007, Magistrate Judge Maas found, based on his *in camera* review, that the February 1998 examination report contained "nothing…which relates to the issues presently pending before the Court concerning NCB."  MDL Dkt. #1971.

Undeterred, plaintiffs nonetheless now offer news articles to support their audit contentions. *See* Berger Aff. ¶ 12.c-f, Exhs. 21-24 (identified in Int. Resp. #4 at 20).  "Newspaper articles are simply not evidence of anything other than the fact they were published; they are not admissible to prove the truth of the matter asserted therein."  *Doe v. Karadzic*, 1997 WL 45515, at *6 (S.D.N.Y. Feb. 4, 1997); *Shaoulian-Tehrani v. Khatami*, 2008 WL 1790386, at *2 (S.D.N.Y. Apr. 21, 2008) (newspaper articles are inadmissible hearsay and cannot be used to establish a prima facie case of personal jurisdiction).  Confirming the wisdom of that principle here, there is no dispute that the key article on which plaintiffs rely, from *USA Today*, was fabricated by the reporter.  *See* Berger Aff. ¶ 12.g, Exh. 25 (identified in Int. Resp. #3 at 18).  *USA Today* publicly retracted the article:

> A story on Oct. 29, 1999, titled 'Saudi money aiding bin Laden,' contained several errors. The report … stated that the Saudi royal family ordered an audit of Saudi Arabia's National Commercial Bank and its founder and former chairman, Khalid bin Mahfouz…. USA TODAY has not been able to locate any record of such an audit and has no reason to believe that one was conducted, though other, routine audits may have occurred…. The story was written by Jack Kelley, a reporter who was found recently to have fabricated several high-profile stories. In this case, the story's assertions had been widely reported and subsequently retracted by others.

Berger Aff. ¶ 13, Exh. 29.  The other articles plaintiffs cite contain the same or similar content, and are explicitly or implicitly based on the disavowed *USA Today* article and/or Mr. Brisard's retracted allegations. *See id.* ¶¶ 12.f, h, Exhs. 24, 26.  Plaintiffs have not produced any admissible evidence that a terror financing audit ever occurred, and NCB and its regulator have rebutted that false and unsupported allegation.

### C.   PLAINTIFFS HAVE NOT ESTABLISHED THAT ANY NCB EMPLOYEE ACTED ON ITS BEHALF TO SUPPORT THE SEPTEMBER 11 ATTACKERS

Primarily citing inadmissible hearsay newspaper articles, plaintiffs contend that various persons who were either former officers of, or supposedly consultants to, NCB used those positions "to allow financial transfers" from unspecified persons to certain Islamic charities—IIRO, Saudi Red Crescent, and Muwafaq Foundation (also known as Blessed Relief)—that, in turn, supposedly were fronts for Al Qaeda.[11]   Int. Resp. #1 at 4-7, #5 at 21-23.   However, plaintiffs have not produced any facts linking the actions of these persons to the September 11 attacks, or even demonstrating how any actions of these persons in connection with the named charities can be imputed to NCB on a scope-of-employment theory.

"An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business." *Terrorist Attacks I*, 349 F. Supp. 2d at 836; *see also Burnett v. Al Baraka Invest. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) (plaintiffs must show that a bank official was "acting within the scope of his bank employment when he allegedly provided support to al Qaeda … to impose vicarious liability on the bank for acts of its officers and employees.").   Although the mere act of enabling a transfer of funds by a bank may be within the scope of a bank employee's job, support for terrorist organizations is not.   This Court has held that there is "no basis for a bank's liability for injuries funded by money passing through it on routine banking business."[12]   *Terrorist Attacks I*, 349 F. Supp. 2d at 833; *see also Burnett*, 274 F. Supp. 2d at 109

---

[11] Plaintiffs also contend that NCB is subject to specific jurisdiction because it held accounts for these charities when they ran fund-raising advertisements in the U.S.   Int. Resp. #1 at 6.   As explained in Section IV.E, *supra*, NCB did not review these fund-raising advertisements before they allegedly were run by the charities, and NCB was not consulted about, was not asked to authorize, and did not authorize, any of the advertisements, or the listing of supposed NCB account numbers in the advertisements.   Juco Decl. ¶ 21.

[12] Plaintiffs also allege that, at the direction of the Saudi government, Defendant Saudi Binladin Group ("SBG") established a trust account at NCB in 2000 to hold the value of SBG shares formerly owned by Osama Bin Laden. However, after extensive jurisdictional discovery concerning this trust account, plaintiffs cannot show that NCB

("The act of providing material support to terrorists, or 'funneling' money through banks for terrorists is unlawful and actionable, but … Al Rajhi [Bank] is alleged only to be the funnel. Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.").[13]   Ordinary course banking activity by any NCB employee therefore cannot establish the "tortious act" that is an essential prerequisite to the exercise of specific jurisdiction.  *See supra* Section III.  Nor have plaintiffs provided any admissible evidence that anyone employed by NCB engaged in any tortious act within the scope of their NCB employment, or in furtherance of NCB's business.

       **1.**       **Khalid Bin Mahfouz.**  Plaintiffs cite several inadmissible newspaper articles to assert that Khalid Bin Mahfouz, NCB's former chairman, supported Al Qaeda by providing support to Muwafaq through NCB.  *See Shaoulian-Tehrani*, 2008 WL 1790386, at *2 (newspaper articles are inadmissible hearsay and cannot be used to establish a prima facie case of personal jurisdiction); *Karadzic*, 1997 WL 45515, at *6 (newspaper articles are inadmissible hearsay); *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 217 (S.D.N.Y. 2007); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994).  Most of those articles do not contain any statement that Khalid Bin Mahfouz used NCB to support or transfer money to Muwafaq.  The articles that do mention NCB all appear to be based on the fabricated *USA Today* article containing the retracted audit allegation,

---

provided anything other than routine banking services in connection with this account, which is frozen by order of the Saudi Ministry of Interior.  *See* MDL Dkt. #2098, at 14.

[13] Plaintiffs' allegations that certain persons' activities can be imputed to NCB are substantively the same as plaintiffs' insufficient allegations concerning Al Rajhi Bank, which also were based on the conclusory allegation that the bank "aided and abetted the September 11 terrorists by donating to certain Defendant charities and acting as the bank for these Defendants."  *Terrorist Attacks I*, 349 F. Supp. 2d at 832.  The Court held that "allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business."  *Id.* at 833.  Plaintiffs had alleged that the Al Rajhi family owns and controls Al Rajhi Bank, has ties to Osama bin Laden and donors to Osama bin Laden, and is a major donor to the SAAR Network.  *See id.* at 832.

31

and a claim that Mr. Mahfouz was placed under house arrest.  *See* Berger Aff. ¶¶ 12.g-i, Exhs. 25-27; (all identified in Int. Resp. #1 at 7, 9; #3 at 18).   In *USA Today*'s public retraction of the audit allegation, *USA Today* also acknowledged that "[t]he report also suggested that as a result of the audit, Mahfouz had been placed under "house arrest" while hospitalized.  … USA TODAY has no reason to believe that he was." *Id.* ¶ 13, Exh. 29.

Reinforcing the inaccuracy and unreliability of these newspaper-based contentions, the English High Court of Justice, Queen's Bench Division, declared in a defamation lawsuit by Mr. Mahfouz against Jean-Charles Brisard and others that:

> The Court hereby declares that … the statements made by the Defendants in the publications which are the subject matter of this action are defamatory of [Mr. Mahfouz] and <u>false</u>, namely that: … [Mr. Mahfouz] knowingly supported and assisted in terrorism … as Chairman of the National Commercial Bank, by diverting or being responsible for the diversion of millions of dollars to terrorist organisations, in particular to al-Qaida which was led by Osama bin Laden.

Berger Aff. ¶ 14, Exh. 30, at 2 (emphasis added).[14]

The only item other than newspaper articles that the plaintiffs proffer concerning Mr. Mahfouz is a document referred to as the "Golden Chain."  Int. Resp. #1 at 5, #5 at 23; *see* Berger Aff. ¶ 12.j, Exh. 28 (identified in Int. Resp. #1 at 7).  Plaintiffs contend that the "Golden Chain" lists the names of people who used charities to finance Al Qaeda.  Int. Resp. #1 at 7.  A translated version of the document includes the entry "Bin Mahfoodh" (no first name prefixed).  *See* Berger Aff. ¶ 12.j, Exh. 28.  However, plaintiffs have no evidence of who wrote the list of names, when it was written, or for what purpose.  Plaintiffs also have no evidence that Mr. Mahfouz is the person listed in the document.  The "Golden Chain" does not contain any reference to NCB.  *Id.*

---

[14] Other authors and publishers have retracted similar false allegations about Mr. Mahfouz.  Some of the retractions are detailed in a declaration of falsity ordered by the High Court of Justice, Queen's Bench Division, in a defamation suit Mr. Mahfouz brought against Rachel Ehrenfeld, the author of a book alleging that Mr. Mahfouz used NCB as a conduit for financing Al Qaeda.  *See* Berger Aff. ¶ 15, Exh. 31 (*Khalid Salim Bin Mahfouz v. Dr. Rachel Ehrenfeld*, 2005 WL 1586238 ¶¶ 16, 35-38, 46-48, 59 (QBD May 3, 2005)).

Judge Casey refused to rely upon the "Golden Chain" to exercise personal jurisdiction over defendants in this case, finding that:

> [The plaintiffs' theory of jurisdiction] rests almost entirely on a document with serious foundational flaws. Even assuming, as the Court must, that the "Golden Chain" refers to Mr. Aljomaih, with no indication of who wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap that the document is a list of early al Qaeda supporters.

*Terrorist Attacks I*, 349 F. Supp. 2d at 817. Judge Casey also held that:

> [The "Golden Chain" is] only a list of names found in a charity's office. It does not establish Mr. Aljomaih's involvement in a terrorist conspiracy culminating in the September 11 attacks and it does not demonstrate that he purposefully directed his activities at the United States.

*Id.* at 818.[15]

Moreover, after publishing a book titled *Alms for Jihad* (which contained allegations based "on the so-called Golden Chain document"), the Cambridge University Press acknowledged in a July 30, 2007 letter to Mr. Mahfouz that the Golden Chain "has long been discredited as a reliable source for supporting the allegation that those individuals listed in the document financed terrorism." *See* Berger Aff. ¶ 16, Exh. 32. That letter also states:

> Throughout the Book there are serious defamatory allegations about yourself [Mr. Mahfouz] and your family, alleging support for terrorism through your businesses, family and charities, and directly. As a result of what we now know, we accept and acknowledge that all of those allegations about you and your family, businesses and charities are entirely and manifestly false.

*Id.* Plaintiffs' unfounded speculation, and reliance on inadmissible and discredited hearsay statements about Mr. Mahfouz, cannot support a finding that Mr. Mahfouz engaged in, or materially supported, any tortious conduct in the U.S., let alone as part of his former NCB employment.

---

[15] "The plaintiffs place[d] great weight on the United States' inclusion of the 'Golden Chain' in its proffer of evidence in *United States v. Arnaout*, the government's case against an executive of Defendant charity BIF." *Terrorist Attacks I*, 349 F. Supp. 2d at 818. This Court rejected plaintiffs' position because "[t]he court presiding over that case, however, ruled that the document was inadmissible hearsay." *Id.* (citing *United States v. Arnaout*, 2003 WL 255226, at *1-2 (N.D. Ill. Feb. 4, 2003)).

2.       **Abdulrahman Bin Mahfouz.**  Plaintiffs generally allege that another former NCB official, Abdulrahman Bin Mahfouz, also provided support to Muwafaq, contending that this charity was a "front" for Al Qaeda.   Int. Resp. #1 at 4-5.  Plaintiffs base their allegations on inadmissible newspaper articles—including the fabricated *USA Today* article—which state merely that Mr. Mahfouz was on the board of Muwafaq/Blessed Relief.  *See* Int. Resp. #3 at 18 (citing document MR_NCB000005-6, Berger Aff. ¶ 12.g, Exh. 25).   Notably, plaintiffs named Mr. Mahfouz as a defendant in this MDL, and they relied on his alleged affiliation with Muwafaq to argue that he was a participant in a conspiracy that culminated in the attacks of September 11.  *See Terrorist Attacks I,* 349 F. Supp. 2d at 820.  Judge Casey, however, dismissed the plaintiffs' claims against him for lack of personal jurisdiction because the plaintiffs did not allege "any specific actions by Mr. bin Mahfouz from which the Court could infer that he purposefully directed his activities at the United States."  *Id.*  Because plaintiffs' alleged connections between Mr. Mahfouz and Muwafaq have been found insufficient to establish jurisdiction over Mr. Mahfouz himself, those same allegations cannot establish jurisdiction over NCB simply because it used to employ Mr. Mahfouz.

3.       **Yassin Kadi and al Qari Bin Eid.**  Plaintiffs also contend that Yassin Kadi and Mohamed Al Ali al Qari Bin Eid supported Muwafaq in connection with their supposed NCB employment.   Int. Resp. #1 at 4-5.  These contentions share the same inadmissible documentary basis as the contentions concerning the Mahfouz family.  Mr. Kadi never worked for NCB (Juco Decl. ¶ 27),[16] and plaintiffs contend only that both Kadi and Mr. al Qari Bin Eid helped NCB to establish its capabilities in the Islamic banking business.  Int. Resp. #1 at 4-5.  There is nothing tortious about Islamic banking.  For example, addressing the 2005 Arab Bankers Association of

---

[16]      In a sworn statement to the U.S. Office of Foreign Assets Control ("OFAC"), Mr. Kadi confirmed that: he had been only a consultant to NCB in 1990-1991, and had consulted with other financial institutions including Merrill Lynch and Chase Manhattan; and, that the Muwafaq Foundation "has never had any account with the National Commercial Bank (NCB)."  Berger Aff. Exh. 59 (excerpts of Dec. 19, 2002 Kadi OFAC Stmt.), at 8 ¶ 19 and 19 ¶ 41.

North America Conference on Islamic Finance, the Executive Vice President of the Federal Reserve Bank of New York "emphasize[d] that we—and here I am referring broadly to U.S. regulators—are open to Islamic financial products." Berger Aff. ¶ 17, Exh. 33, at 1.

In the nearly seven years since the September 11 attacks, no governmental body of any kind has ever suggested that NCB aided, abetted, or in any way was aware of those attacks or any other terrorist activity. Indeed, the director of OFAC confirmed in testimony before the U.S. Senate in July 2003 that OFAC had never sought or recommended any sanctions against NCB. Berger Aff. ¶ 33, Exh. 60, at 11.[17] It is no surprise, therefore, that the plaintiffs cannot identify any admissible evidence suggesting that any NCB officer or employee acted in furtherance of NCB's business or within the scope of their employment by lending material support to the September 11 attackers. *See Jazini*, 148 F.3d at 185 (a legal conclusion couched as a factual allegation is insufficient to confer jurisdiction). There is no basis for specific jurisdiction over NCB.

## CONCLUSION

For the foregoing reasons, NCB respectfully submits that its renewed motion to dismiss for lack of personal jurisdiction should be granted.

Dated: July 22, 2008          Respectfully submitted,
       Washington, D.C.

                              _____
                              Mitchell R. Berger (MB-4112)
                              Alan T. Dickey
                              PATTON BOGGS LLP
                              2550 M Street, N.W.
                              Washington, D.C. 20037
                              Phone: 202-457-6000
                              Fax:    202-457-6315
                              *Attorneys for Defendant*
                              *The National Commercial Bank*

---

[17] Similarly, plaintiffs have obtained other OFAC documents through FOIA requests, but none of these contain any statements that NCB has ever aided, abetted or supported terrorist activities.