

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

December 11, 2006

Ronald S. Liebman
202-457-6310
rliebman@pattonboggs.com

**VIA E-MAIL & U.S. MAIL**

Andrew J. Maloney, III, Esq.
Kreindler & Kreindler
100 Park Avenue
New York, NY 10017-5590

      Re:   *In re Terrorist Attacks on September 11, 2001*

Dear Duke:

This letter follows up on our November 21, 2006 "meet and confer" discussion regarding jurisdictional discovery directed to The National Commercial Bank ("NCB"), and responds to your letter dated November 7, 2006 alleging deficiencies in NCB's production of documents pursuant to Magistrate Judge Maas' Discovery Order of June 28, 2006. Your letter raised questions or requested additional discovery with respect to several subjects that we discussed on November 21. Because we were unable to resolve all of our disagreements over these issues, this letter memorializes NCB's position.

## I.    Audit of NCB

Your November 7 letter asked us to confirm either that there was no audit of NCB of any kind in 1998, or to produce any such audit and all related documents. NCB's position is that it has fully complied with the Discovery Order in connection with audits of NCB.

The Discovery Order (at 8), quoting your own letter to the Court, focused on Plaintiffs' allegation of "an audit of 'NCB's financing of terror charities related to Bin Laden and Al Qaeda ... [which allegedly, per Plaintiffs] would, without doubt, bear precisely on the issues to be considered in assessing the Court's jurisdiction.'" Indeed, this is the only alleged audit whose production Plaintiffs requested. At page 3 of your May 3, 2006 letter to Judge Maas, you stated: "In 1998, the Saudi government audited NCB. The audit investigated NCB's financing of terror charities related to Bin Laden and Al Qaeda and would, without doubt, bear precisely on the issues to be considered in assessing the Court's jurisdiction. <u>Plaintiffs should be given not only the audit, but all the underlying documented references in the audit.</u> The audit was a reaction to the 1998 Al Qaeda bombing of two U.S. embassies in Africa." *See* 5/3/06 Letter at 3, emphasis added.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 2

Because of the nature of your discovery request, Judge Maas focused exclusively on this alleged audit in his Discovery Order, in which he stated: "An audit intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States obviously would be directly relevant to the conspiracy liability that the plaintiffs seek to impose on NCB. Indeed, if it confirmed that NCB knowingly financed terrorist acts against the United States, this alone might be sufficient to persuade the Court to find personal jurisdiction over NCB on the basis of its role in a conspiracy. For this reason, NCB is directed to confirm with SAMA whether the Saudi government conducted an 1998 audit of NCB. If such an audit exists, NCB is directed to produce a copy promptly to the plaintiffs." Discovery Order at 9, emphasis added. The general statement (on page 11 of the Discovery Order) that "NCB is directed to promptly produce any 1998 audit of its operations" must be read as referring to the audit of the type requested by Plaintiffs and discussed by the Court. This is further confirmed by the Discovery Order's "den[ial] without prejudice [of] the plaintiffs' request for the production of all of the documents referenced in the underlying [alleged] audit. This request may be renewed if, in fact, there is an audit, and it is shown to shed light on the issues presently before this Court with regard to NCB." Discovery Order at 9, emphasis added.

As directed by the Discovery Order, NCB posed the Court's inquiry to SAMA. In turn, responding directly to the Court's focus on the type of audit alleged by Plaintiffs, SAMA informed NCB that "we are not aware of any audit of NCB undertaken in 1998 intended to explore whether NCB played a knowing role in the financing of terrorist activities directed against the United States or one that confirmed that NCB knowingly financed terrorist acts against the United States." *See* Objections and Responses of the National Commercial Bank to Plaintiffs' First Set of Requests for Production of Documents ("NCB's Rule 34 Response") at page 14 (Request 46).

Subsequent events, moreover, have foreclosed any continued good faith pursuit by Plaintiffs of their allegations about the supposed 1998 audit of NCB. These allegations were first made by the Burnett plaintiffs (*see* Burnett Third Amended Complaint, ¶¶ 94-96, 332) and subsequently adopted by the Ashton plaintiffs in their March 2003 Consolidated Master Complaint (MDL Dkt. # 11, at ¶¶ 350, and 365-367). In turn, the Burnett plaintiffs' allegations regarding that supposed 1998 audit appear to have been based upon assertions originally made by Jean-Charles Brisard, the self-described "lead investigator" for the Burnett plaintiffs, who has now retracted those allegations under oath. Specifically with respect to the same alleged audit of NCB that was the subject of Plaintiffs' proffer to Magistrate Judge Maas, Mr. Brisard's retraction, which has been filed in these MDL proceedings, states:

> "... I should have said that this document was a summary of what I believed to be an audit document of the NCB. I received this document from the French Intelligence services already translated into English. ... I also acknowledge that the document appears to be a

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 3

summary of a regular audit of the NCB that all banks carry out on a yearly basis." Brisard retraction (MDL Dkt. # 1904, Exh. A) ¶ 23.

> "... I had read an interview with [Abdulrahman bin Mahfouz] in which he said that an audit was carried out at the NCB. However, I now understand this to mean that this was a standard audit of the NCB that was carried out on a yearly basis as with all banks." *Id.*, ¶ 24.

> Therefore, Brisard's retraction "confirm[s]," *inter alia*, that he has "no evidence to suggest that the Saudi Arabian Government ordered a special audit of the NCB to address the concerns of the American authorities that '*uncovered massive transfers made to charity organizations with ties to Osama bin Laden, some of which were controlled by members of the bin Mahfouz family.*'" *Id.*, ¶ 25.2, (italics original).

We are aware that the Plaintiffs have argued that their allegations about the supposed 1998 audit are not based upon Mr. Brisard's earlier allegations. MDL Dkt. # 1909, at 3. However, the record leaves no real room to doubt that Mr. Brisard is indeed the source of Plaintiffs' "audit" allegations. In their document request for the supposed 1998 "audit" (Plaintiffs' Document Request 46), Plaintiffs asked NCB to produce the full original "audit" of NCB of which supposed "excerpts [had been] previously produced by Khalid bin Mahfouz's counsel." *Id.* A copy of those supposed "excerpts" was referenced in Plaintiffs' Document Request 46, and attached to the Document Requests. This same document had been filed as an attachment to the motion to dismiss the <u>Burnett</u> action filed by Khalid Bin Mahfouz in September 2003— but with the explanation that "[t]he document alleged to be an NCB 'audit report' ... was disclosed by Plaintiffs' 'lead investigator,' Jean-Charles Brisard, in a defamation action filed by Mr. Mahfouz in Europe against an English newspaper." Bin Mahfouz <u>Burnett</u> Motion to Dismiss, Mem. at 8. Indeed, Mr. Mahfouz's motion attached a copy of Mr. Brisard's May 2003 English court witness statement, to which was attached the same "audit" excerpts referenced in Plaintiffs' Document Request 46. *Id.*, Tab B. Mr. Mahfouz's motion to dismiss (Mem., at 8 n.7) then specifically stated: "Mr. Mahfouz does not concede the authenticity of this document or that it is an audit report." In light of this record, it would be extraordinary, to say the least, for the <u>Ashton</u> plaintiffs to contend that their allegations about the NCB "audit" were based on a document that is not linked to Mr. Brisard, who has now retracted his claims about a special Saudi Government audit of NCB.

There are, of course, regular financial statement audits of NCB, conducted by NCB's outside auditors, not by the Saudi Government. Plaintiffs did not request these regular financial statement audits. Nonetheless, as discussed, we have reviewed those audits, and they contain no reference to any of the subjects that are within the scope of Plaintiffs' terror-financing allegations against NCB.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 4

In addition, as discussed, and as has been previously disclosed in the Mahfouz English libel proceedings, there was a February 1998 report of an examination of NCB conducted by Arthur Andersen at the direction of SAMA. As the English court was informed, and as SAMA has confirmed—and, indeed, as we have independently confirmed from our own review of that examination report—that report contains no reference to any of the subjects that are the scope of Plaintiffs' terror-financing allegations against NCB.

## II.   Correspondent Bank Accounts

NCB objected to Plaintiffs' Request (No. 23) for information concerning its U.S. correspondent bank accounts on the ground, *inter alia*, that the subject was beyond the scope of the Discovery Order because the request did not seek information relating to NCB's "presence in the United States." In particular: "Under U.S. law, a foreign bank's U.S. correspondent bank accounts in the United States do not demonstrate the foreign bank's presence in the United States." NCB Rule 34 Response, at 10, citing, *e.g.*, *In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 819-20 (S.D.N.Y. 2005). Subject to, and without waiving, that objection, and in an effort to satisfy Plaintiffs' request for some summary information concerning NCB's U.S. correspondent accounts, NCB agreed to, and did, produce "a summary chart identifying the correspondent bank accounts that it maintained with U.S. commercial banks during the six-year period preceding the commencement of these suits." NCB Rule 34 Response, at 10.

Plaintiffs now request additional information, including: (1) summaries of the number of transfers on an annual basis for each correspondent bank account; (2) the total amount of dollars transferred on an annual basis for each correspondent account; and, (3) for any other use of the correspondent accounts, such as foreign currency exchange, trade financing, guarantees or letters of credit, summaries for each of the correspondent accounts on an annual basis. *See* Your Nov. 7 Letter at 2.

Our position is that, by producing the summary chart identifying NCB's correspondent accounts, NCB already has provided more information than the Discovery Order requires. To the extent that Plaintiffs' Request 23 relates to the Discovery Order at all, it would fall within the portion of the Order that (at 6) required "NCB ... to provide information concerning its United States contacts for the six-year period preceding the commencement of these suits." *Accord* Discovery Order at 11 ("... for a six-year period preceding the commencement of these suits any documents previously requested by the plaintiffs related to its [NCB's] presence in the United States.").

As noted in our Rule 34 responses (at 10), correspondent bank account activity does not demonstrate a foreign bank's presence in the United States no matter what the dollar volume or number of transactions (i) because foreign banks that do not have U.S. branches cannot engage

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 5

in dollar transactions without U.S. correspondent bank accounts[1], and (ii) so long as the bank does not transact "substantially all of its business through" such accounts. NCB does not use its U.S. correspondent bank accounts to conduct substantially all of its business, but rather "to facilitate international financial transactions or money transfers for itself and its customers." Declaration of Jorge Juco (September 22, 2003), ¶ 12.

The case law uniformly holds that this type of correspondent banking does not amount to a jurisdictionally significant contact between a foreign bank and the United States. "Courts have repeatedly found that a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank." *Semi Conductor Materials v. Citibank Int'l PLC*, 969 F. Supp. 243, 245-46 (S.D.N.Y. 1997) (holding that "a United Kingdom corporation[] does not satisfy these indicia for 'doing business in New York' because all of its branches, offices and employees are in Europe, it is not registered to do business in New York, ... it does not own any real property in the forum," and it "does not transact 'substantially all' of its business through its [four correspondent] New York bank accounts"); *accord In re Terror Attacks I*, 349 F. Supp. 2d at 819-20; *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, 2004 WL 2199547, at *9 (S.D.N.Y. Sep. 29, 2004) (finding no personal jurisdiction over a foreign bank that maintained "correspondent banking relationships in New York with no ... substantial or consistent activity, and ... a New York account with one of those correspondent banks with no ... substantial or consistent activity in relationship to this account."); *Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002) ("[A] bank account or trust account in New York, standing alone, is not enough, absent extraordinary circumstances, to constitute 'doing business' in New York. ... In those limited cases when a single bank account was found sufficient to establish jurisdiction, that account was central and integral to the defendant's business.") (citing *United Rope Distribs., Inc. v. Kimberly Line*, 785 F. Supp. 446, 450-51 (S.D.N.Y. 1992) (finding personal jurisdiction over a foreign corporation based on a New York bank account through which the corporation received "substantially all" of its income)); *International Telecom, Inc. v. Generadora Electrica del Oriente S.A.*, 2002 WL 465291, at *4 (S.D.N.Y. Mar. 27, 2002) ("The fact that [defendant] also maintains a U.S. dollar account at Citibank in New York does not enhance [plaintiffs'] jurisdictional showing. The Citibank U.S. dollar account is not [defendant's] primary bank account and the company does not use it to pay a significant portion of its operational expenses. [Defendant's] primary bank accounts are located in Guatemala and the company uses those accounts to pay wages and other operational expenses. ... [Defendant's] banking activities with Citibank are not so

---

[1]    *See Sigmoil Resources v. Pan Ocean Oil Corp.*, 234 A.D.2d 103, 104 (N.Y. App. Div. 1st Dep't 1996)("Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions.")

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 6

systematic and central as to conclude that it is doing business in New York."); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1536 (S.D.N.Y. 1983) (holding that numerous correspondent banking relationships, which were "employed solely to facilitate international banking transactions" were insufficient to create general personal jurisdiction).

The summary of its correspondent accounts that NCB has produced, which identifies the 16 NCB correspondent accounts during the 6-year look-back period, therefore provides a sufficient amount of discovery given Plaintiffs' position that they seek information about correspondent accounts only so that Plaintiffs can urge the Court to engage in an "overall weighing of various factors ... when deciding the presence of a corporation" within the jurisdiction. *See* Your Nov. 7 Letter, at 2. Insignificant jurisdictional contacts, even when cumulated, cannot establish that a foreign corporation is "doing business" in New York. *See Piazzenik v. Cambridge Antibody Technology Group*, 2004 WL 527045, at *5-*6 (S.D.N.Y. Mar. 16, 2004) (holding that the plaintiff's "scatter-shot" allegations "fail[ed] to satisfy the stringent 'doing business' standard of section 301 because, even when aggregated, they do not suggest that [the defendant] is doing business in New York on a systematic and continuous basis" where the allegations included that the foreign defendant (1) was a defendant in unrelated contract litigation in New York court; (2) listed a non-employee New York investment banker as a contact person on a contract underlying that litigation; (3) had entered into contracts with New York businesses; (4) was 11.28% owned by a New York company; (5) had designated the Secretary of State of New York to receive process of service; and (6) had designated a New York bank as a depository for its American depository receipts and where the defendant did not have "any of the traditional indicia of 'doing business' in New York [insofar as it had] no facilities, operations, employees, assets or bank accounts in New York"); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 153-54 (S.D.N.Y. 2004) (holding that numerous "isolated and scattershot contacts [were] not the substantial, continuous, and permanent contacts required to support § 301 jurisdiction").

Moreover, it would be misleading if the Court were asked to consider information about the dollar and transaction volume of NCB's correspondent account activity without putting that information into the context of the extent to which banks worldwide use U.S. correspondent accounts. That information does not appear to be publicly available. At most, the public record establishes only the widespread use of correspondent bank accounts. *See, e.g.,* Senate Permanent Subcommittee on Investigations: "Correspondent Banking: A Gateway for Money Laundering," (Feb. 2001) Report at 18. http://www.senate.gov/~govt-aff/psi_finalreport.pdf

> The larger banks in the survey each have, worldwide, over a half trillion dollars in assets, at least 90,000 employees, a physical presence in over 35 countries, and thousands of branches. The smallest bank in the survey operates only in the United States, has less than $300 million in assets, 132 employees and 2 branches. <u>Three fourths of the banks surveyed have over one-thousand correspondent banking relationships and many have even more correspondent banking accounts.</u> <u>Two foreign banks doing business in the</u>

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 7

>United States had the most correspondent accounts worldwide (12,000 and 7,500,
>respectively). The U.S. domiciled bank with the most correspondent accounts reported
>over 3,800 correspondent accounts worldwide.

## III.   Closure of SNCB Securities Inc.

As you know, NCB has produced non-privileged, non-customer specific records of SNCB
Securities Inc. that are in its possession, custody or control for the six-year period preceding
commencement of these lawsuits. *See* NCB Rule 34 Response to Requests 17-20.  You have
asked us to confirm whether there are additional documents that may be in the files of NCB
regarding the closing of SNCB Securities Inc., which was dissolved in February 2001, before
these lawsuits were filed.  NCB previously objected that information concerning SNCB Securities
Inc. is irrelevant to the jurisdictional issues before the Court because, *inter alia*, the analysis of
personal jurisdiction focuses on contacts with the forum that existed as of the date on which the
lawsuits were filed.  *See Metropolitan Life Ins. Co. v. United Dominion Industries, Inc.*, 84 F.3d 560, 569
(2d Cir. 1996); *Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *4 (S.D.N.Y. July 15,
2002) ("The only relevant inquiry is whether [the foreign parent corporation] had an 'agency' or
'mere department' relationship with [the subsidiary] when the complaint was filed, such that any
of [the alleged subsidiary's] past or present New York contacts could be attributed to [the foreign
parent corporation].  Because the evidence is clear that [the defendant] had sold any interest it
once had in [the subsidiary] as of December 30, 1998, [the subsidiary's] contacts with New York
cannot form a basis for personal jurisdiction over [the foreign parent corporation].") (emphasis
added).

Nevertheless, because NCB has produced records of SNCB Securities Inc. subject to, and
without waiver of, these objections, we agree to complete additional searches and to produce any
other non-privileged, non-customer specific documents we can reasonably locate concerning the
decision to close SNCB Securities, Inc.

You also have requested "last known contact information" for five individuals who previously
were officers of, or employed by, SNCB Securities, Inc.  We do not believe that this information
is within the scope of any of the discovery requests that Judge Maas was asked to address, and
you have confirmed that Plaintiffs seek this information in order to pursue depositions from
these individuals.  As noted below in connection with your request for deposition testimony from
NCB, we do not believe that the Court (either Judge Casey or Magistrate Judge Maas) has
determined that it would be proper or necessary to take depositions in connection with
adjudication of NCB's personal jurisdiction defense.  Moreover, these individuals are in
possession of privileged information of either NCB or SNCB Securities Inc. (for which we also
have entered an appearance in these lawsuits).  Accordingly, before providing you with NCB's
last known contact information for these individuals, we would require your stipulation that

**PATTON BOGGS**LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 8

Plaintiffs will not attempt to elicit any information that is subject to the attorney-client or other legal privileges of NCB or SNCB. *Polycast Technology Corp. v Uniroyal, Inc.*, 129 F.R.D. 621, 624-29 (S.D.N.Y. 1990); *Miano v A C & R Advertising, Inc.*, 148 F.R.D. 68, 77 n. 8 (S.D.N.Y. 1993) ("[I]t is now widely accepted that except where there is the possibility of disclosure of attorney-client privileged communications, former employees are not considered 'parties' under DR 7-104(A)(2)."); *Muriel Siebert & Co. v Intuit Inc.*, 820 N.Y.S.2d 54, 55 (N.Y. App. Div. 1st Dep't 2006)("… *ex parte* interviews of an adversary's former employee are neither unethical nor legally prohibited, [but] some courts have acknowledged a necessary limitation on this rule, namely, that the attorney must avoid obtaining any privileged information from the adversary's former employee."). Please let us know whether Plaintiffs will enter into such a stipulation.

## IV.    Rule 30(b)(6) Deposition of NCB

Plaintiffs' request to take a Rule 30(b)(6) deposition of an NCB witness "with knowledge of NCB's presence in the United States" is outside the scope of the "limited jurisdictional discovery" that Judge Casey ordered with respect to NCB's personal jurisdiction defense. *See Terrorist Attacks I*, 349 F. Supp. 2d at 820. Although Plaintiffs served a Rule 30(b)(6) deposition notice when it served its requests for production of documents, neither Judge Casey nor Magistrate Judge Maas has authorized any depositions. Moreover, the document production that NCB has provided is sufficient to afford Plaintiffs a fair opportunity to conduct this "limited" discovery and litigate the personal jurisdiction defense. "A plaintiff is generally entitled to a 'fair opportunity' to conduct jurisdictional discovery. Such discovery must, however, be 'limited to the essentials necessary to determining the preliminary question of jurisdiction.' Plaintiffs may not conduct a fishing expedition, but must 'target[ ] information pertinent to the well established factors involved in a jurisdictional inquiry.'" *In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp. 2d 392, 400 (S.D.N.Y. 2002) (quoting *Fed. Ins. Co. v Richard I. Rubin & Co.*, 12 F.3d 1270, 1283-85 & n.11 (3d Cir. 1993); citing *Rose v Cont'l AG*, 2001 WL 236738, at *4 (E.D.Pa. Mar. 2, 2001) (holding that plaintiffs who had been served with responses to interrogatories on personal jurisdiction had had such a fair opportunity); *Arch v Am. Tobacco Co.*, 984 F. Supp. 830, 841 (E.D.Pa. 1997)).

It would be inconsistent with Judge Casey's order to conduct only "limited" jurisdictional discovery if NCB—a defendant over which jurisdiction is not yet established, and far from clear— were required to bring one or more Rule 30(b)(6) designees to the United States for cross-examination, as Plaintiffs request. "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For

**PATTON BOGGS**LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 9

example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to 'abusive' discovery that foreign litigants advance should therefore receive the most careful consideration." *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 546 (1987).[2]

Plaintiffs did not request a deposition as part of jurisdictional discovery either in their May 3, 2006 letter or at the hearing. The Discovery Order (at 11), moreover, granted Plaintiffs' discovery requests "solely to the extent that NCB is directed to <u>produce</u>" documents as specified in the Order, and otherwise closed the discovery reference from Judge Casey. Plaintiffs have not articulated any reason why they require a deposition of an NCB designee in light of the document production NCB has provided.

Separately, NCB previously objected to Plaintiffs' request for a Rule 30(b)(6) jurisdictional discovery deposition of NCB, on grounds that a designee should not be required to travel to the United States for a deposition, and because any deposition that the Court might require should be conducted on written questions. *See* Our 4/4/06 Letter to You, at p. 7, citing *Realuyo v. Diaz*,

---

[2]    Moreover, NCB's foreign sovereign immunity defense to jurisdiction awaits resolution by the Court if NCB is not dismissed for lack of personal jurisdiction. The unresolved FSIA defense provides an additional reason why deposition discovery is improper at this stage. In the FSIA context, the Southern District of New York has held that "[b]ecause permitting discovery may tend to undercut the immunity from litigation that foreign instrumentalities were intended to enjoy, <u>the court must ensure that fact finding in this case is limited to 'the essentials necessary to determining the preliminary question of jurisdiction.</u>'" *Gabay v. Mostazafan Foundation of Iran*, 151 F.R.D. 250, 257 (S.D.N.Y. 1993) (quoting *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988)) (emphasis added); *see also Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (holding that the district court did not abuse its discretion in dismissing plaintiff's claims without an evidentiary hearing where plaintiffs provided a "dearth of evidence" in response to defendant's defenses that were "readily ascertainable from the declarations of witnesses"); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) ("[I]n making the necessary preliminary determinations the District Court should closely control and limit the discovery and fact-finding so as to 'avoid frustrat[ing] the significance and benefit of... immunity from suit.'") (quoting *Gould*, 853 F.2d at 451); *In re Papandreou*, 139 F.3d 247, 252 (D.C. Cir. 1998) ("[S]overeign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."); *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 196 (D.D.C. 2004) ("To avoid burdening a foreign sovereign that proves to be immune from suit, ... the court should carefully control and limit jurisdictional discovery.").

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Andrew J. Maloney, III, Esq.
December 11, 2006
Page 10

2000 WL 687585, at 1. Indeed, Second Circuit precedent generally seems to favor restricting jurisdictional discovery to written forms, including depositions on written questions when the plaintiff can articulate a specific rationale for such questioning. *See Leasco Data Processing Equipment Corp. v Maxwell*, 468 F.2d 1326, 1343-44 & n.12 (2d Cir. 1972) (requiring interrogatory answers and a deposition on written questions to explore defendant's personal jurisdiction affidavits).

## V.    NCB U.S. Investments

In response to Plaintiffs' Document Requests 24-26 & 56, NCB produced a spreadsheet identifying the securities that NCB acquired from a United States source during the six years preceding the commencement of these lawsuits. Your November 7 letter inquired whether these are securities owned by NCB, as opposed to mutual funds that NCB manages. In our discussions, we clarified that the securities on the spreadsheet are owned by NCB itself. Moreover, the spreadsheet provides the percentage (by value) of NCB's overall securities holdings that those U.S.-source securities represented in each of the six-years preceding these lawsuits.

Investments made by NCB mutual funds are not owned by NCB. Those mutual funds are "separate non-U.S. legal entities." Declaration of Jorge Juco (September 22, 2003), ¶ 14. NCB's financial statements make clear that, although NCB offers investment management services to its customers, and that those "services include the management of a variety of mutual funds, ... [t]hese funds ... are not included in the financial statements of the Bank." *See* NCB Notes to 2001 Financial Statement, # 31. This is because, consistent with International Accounting Standards: "Assets held in trust or in a fiduciary capacity are not treated as assets of the Bank and, accordingly, are not included in these financial statements." *Id.*, # 2(q).

## VI.    Banking Services Provided to U.S. Residents

At our meeting, we reconfirmed that, under SAMA rules, NCB cannot and does not open bank accounts for anyone who, at the time their NCB account is established, resides in the United States or indeed anywhere outside Saudi Arabia. Rather, NCB bank accounts can be opened only by Saudi citizens or non-Saudis who lawfully reside in Saudi Arabia. *See* Declaration of Jorge Juco (September 22, 2003), ¶ 10 and Exh. B). As we discussed, there may be examples of *de minimis* use of such NCB bank accounts either by Saudis traveling in the U.S., or by U.S. residents following their return to this country, but any such usage, apart from being immaterial to NCB's business, does not evidence that NCB purposefully availed itself of the opportunity to do business in, or to have contacts with, the United States.

Case 1:03-md-01570-GBD-SN   Document 2115-12   Filed 07/22/08   Page 11 of 11



Andrew J. Maloney, III, Esq.
December 11, 2006
Page 11

Very truly yours,

Ronald S. Liebman