## SETTLEMENT AGREEMENT

This Agreement embodies the promises, understandings, and agreements in existence between the Board of Governors of the Federal Reserve System ("Board") and the National Commercial Bank (Saudi Arabia) ("NCB") regarding the disposition of the administrative enforcement proceeding pending against NCB ("Agreement"):

1. The Board agrees:

(a) to dismiss voluntarily the Notice of Charges and of Hearing Issued Pursuant to Section 8(b) of the Federal Deposit Insurance Act, as amended, Docket Nos. 92-074-CMP-I1, 92-074-CMP-I2, and 92-074-B-FB against NCB (hereafter the "Notice") with prejudice, with each party to bear its own costs and counsel fees;

(b) not to take any other action against NCB which (i) arises out of the facts and circumstances described in the Notice, or the business and affairs of BCCI Holdings (Luxembourg), S.A., Bank and Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas), Ltd., International Credit and Investment Company (Overseas), Ltd., and/or any one or more of either of their direct or indirect affiliates, subsidiaries, or parent companies, including, without limitation, Credit and Commerce American Holdings, N.V., First American Bankshares, and First American Corporation (all of which entities are hereinafter, for purposes of this Agreement only,

collectively referred to as the "BCCI Group"), or (ii) is based, directly or indirectly, on information provided by a person under paragraphs 3 or 4 of the Settlement Agreement between Khalid bin Mahfouz ("Mahfouz"), Haroon Kahlon ("Kahlon"), Eastbrook, Inc., the New York County District Attorney's Office, the Board, and the Federal Reserve Bank of New York (executed December __, 1993) ("Settlement Agreement"); and

(c) to terminate the Written Agreement with NCB and waive all rights to receive payments under Irrevocable Letter of Credit Number SBY501640 issued by Union Bank of Switzerland.

2. The Board shall not require an application from, nor terminate the operation of, a non-bank subsidiary of NCB that will engage solely in any one or more of the activities referred to in Exhibits A and B hereto, provided that NCB agrees that the Board shall be permitted to inspect or examine the books and records of any such subsidiary whenever the Board, in its sole discretion, believes such inspection or examination is appropriate solely to ensure that the subsidiary is limiting its activities to the activities specified in Exhibits A and B hereto.

3. The parties understand and agree that no funds which may be paid from the B/G Settlement Account, created and governed by paragraphs 6-8 of the Settlement Agreement, will

- 3 -

be paid to NCB, its agents, nominees, direct and indirect affiliates, subsidiaries, or parent companies. In particular, NCB expressly waives any right it may have to receive any pro-rata distribution of funds paid out of the B/G Settlement Account, and agrees to execute any document that is reasonably requested as evidence of the waiver by any person who is to distribute such funds. The Board and NCB agree that nothing in this Agreement, including but not limited to the waiver by NCB to receive any pro-rata distribution of funds paid out of the B/G Settlement Account, is intended as a waiver of any claim that NCB may otherwise have against any company that is a part of the BCCI Group.

4. NCB waives any right it may have pursuant to 12 U.S.C. 1818 or 12 C.F.R. Part 263, or otherwise, to a hearing for the purpose of taking evidence with respect to any matter implied or set forth in the Notice, and NCB and the Board waive whatever rights they may have to obtain judicial review of this Agreement. The foregoing notwithstanding, nothing in this Agreement shall, in any way, bar, estop, or otherwise prevent any party from enforcing the terms of this Agreement.

5. The Board will not, on its own initiative, disclose Confidential Supervisory Information Regarding NCB, as defined in this paragraph, to any third party, including a liquidator for

- 4 -

any company that is part of the BCCI Group or a governmental entity of the United States, a State or subdivision thereof, or a foreign country. In the event that any person should attempt, by request, by FOIA request or proceeding, by subpoena, by document request, or by any other legal process, to obtain from the Board information regarding NCB, the Board shall notify NCB of such request or process and, with respect to Confidential Supervisory Information Regarding NCB, as defined in this paragraph, to the extent permitted by law, refrain from complying with such request or process until NCB has had an opportunity to be heard and to take whatever steps it deems necessary to prevent production of such materials. "Confidential Supervisory Information Regarding NCB" means (i) any document, submission, testimony, transcript of deposition (including, but not limited to those of Mahfouz and Kahlon), and any other information produced or disclosed by NCB, with a request for confidential treatment, to the Board in the course of the Board's investigation or prosecution of the matters implied or set forth in the Notice, and (ii) any internal Board memorandum, notes or other documentation containing information that was produced or disclosed by NCB in connection with a request for confidential treatment, in the course of the Board's investigation or prosecution of the matters implied or set forth in the Notice.

- 5 -

6. This Agreement is by way of settlement only with no adjudication of or finding on any issue of fact or law, and NCB, by executing this Agreement or carrying out its terms, does not admit any wrongdoing or liability with respect to any allegations or claims, which allegations or claims NCB denies. Nor shall this Agreement or any provision within it be used or be admissible as evidence of wrongdoing or liability against any party in any pending or to be filed legal proceedings of any nature whatsoever.

7. No amendments to this Agreement shall be effective unless made in a writing signed by all of the parties. No representations, either orally or in writing, except those expressly set forth in this Agreement, were made to induce any of the parties to enter into this Agreement.

8. This Agreement may be executed in one or more identical counterparts. Each such counterpart shall be deemed to be an original for purposes of this Agreement.

9. All communications regarding this Agreement shall be sent to:

   (a)  BOARD:

        William W. Wiles
        Secretary
        Board of Governors of the Federal Reserve System
        Washington, D.C.  20551

- 6 -

with a copy to:

Richard M. Ashton, Esq.
Associate General Counsel
Board of Governors of the Federal Reserve System
Washington, D.C. 20051

(b) NCB:

Gerald A. Feffer, Esq.
Williams & Connolly
725 Twelfth Street, N.W.
Washington, D.C.  20005

| Board of Governors of the Federal Reserve System | National Commercial Bank Saudi Arabia |
|---|---|
| By: _William W. Wiles_ (signature) | By: _____ |
| Title: Secretary | Title: _____ |
| Date: 12/22/93 | Date: _____ |

Exhibit A

(1) Assisting in the development of new investment products for offering in Saudi Arabia.

(2) Representing some of the Funds with third parties (other than investors) such as attorneys, accountants, U.S. banks, securities dealers and, in the case of the real estate Funds, potential sellers and purchasers of properties.

(3) Arranging and hiring, on behalf of the Investment Management Division in Saudi Arabia, third parties (such as attorneys, accountants and investment advisors) to perform functions for the Funds.

(4) Maintaining the principal official corporate books and documents for the Funds and management companies and limited transactional documents pertaining mainly to U.S. real estate Funds; records relating to the Funds' investors or the Funds' books of account will not be maintained by the Company.

(5) Examining potential real estate investments referred to it by the Funds' U.S. investment advisers and submitting proposals to the investment committee of the Investment Management Division in Saudi Arabia; one of the six members of the investment committee, which functions by unanimous vote, will be an officer of the Company.

(6) Inspecting properties in which the real estate Funds have invested.

(7) Supplying some of the officers and directors of some of the Funds on behalf of the Investment Management Division in Saudi Arabia solely for administrative reasons; no management or investment decisions will be made by such officers or directors except that one such individual will be one of the six members of the above-mentioned investment committee.

(8) All relations with investors in the Funds will be handled in Saudi Arabia although staff from the Company will, from time to time, meet investors in Saudi Arabia to update such investors as to the performance of such Funds.

Exhibit B

(1) Soliciting new business on behalf of NCB, all such business to be transacted by NCB outside of the United States.

(2) Engaging in discussions concerning potential lending activities of NCB, however all credit decisions made by NCB shall be made by NCB personnel outside of the United States.

(3) Facilitating the communication and acting as liaison between NCB and NCB's correspondent banks in the United States.

(4) Facilitating the communication and acting as liaison between NCB and NCB's customers in the United States.

(5) Gathering information on behalf of NCB in the United States.

(6) Disseminating information about NCB in the United States.

(7) Recruiting of personnel within the United States to be considered for employment by NCB.