

2005 WL 1586238                                                                                                     Page 1
2005 WL 1586238 (QBD), [2005] EWHC 1156

Khalid Salim Bin Mahfouz, Abdulrahman K S Bin Mahfouz, Sultan K S Bin Mahfouz
v. Dr Rachel Ehrenfeld, Bonus Books Inc
HQ04X01988
[2005] EWHC 1156 (QB)

High Court of Justice Queen's Bench Division

QBD

Before: Mr Justice Eady

Tuesday, 3 May 2005

**Representation**

Mr L Harris (Solicitor Advocate) (of Kendall Freeman) appeared on behalf of the Claimant.

Ms Ehrenfeld and Bonus Books Inc did not appear and were not represented.

**Judgment**

Mr Justice Eady:

**1** This is an application for relief under the summary disposal procedure under Sections 8 to 10 of the Defamation Act 1996. The application notice seeks an order behalf of the claimants for (1) an assessment of damages to be assessed in accordance with that procedure; (2) a declaration that the offending statements were false and defamatory of the claimants; (3) an order that the defendants publish or cause to be published a suitable correction and apology as contemplated by that statutory framework; (4) that there should be an interim payment of costs on account.

**2** The basis for the application, of course, is to be found in the statutory wording. The claimants contend that the defendants have no real prospect of successfully defending the claim. The claimants know of no other reason why the disposal of the claim should await a trial.

**3** The application is supported by a detailed witness statement from Cherif Sedky who is the claimants' legal adviser, and that forms a significant part of the evidence before the court. But there is also important evidence from each of the individual claimants personally dealing head on with the allegations which have been made against them.

**4** I am satisfied that service has been effected upon the defendants, and what is more it is clear that Dr Rachel Ehrenfeld, the first defendant, knows about this application because reference has been made to it in the preface of the new edition of her book to which I shall return shortly.

**5** I propose to adopt the same shorthand references to the three individual claimants as are adopted by Cherif Sedky in his second witness statement of 18 February and I hope that will not be in any way thought to be discourteous.

**6** The first claimant is Khalid Bin Mahfouz (KBM) and the second claimant is his son, Abdul Rahman Bin Mahfouz (ARBM). The third claimant is also a son of the first claimaint, Sultan Bin Mahfouz (SBM).

**7** Each of the claimants is a well-known Saudi businessman. They have extensive business and financial holdings in Saudi Arabia and elsewhere in the world. Their interests cover a wide variety of investments including in the field of energy, that of real estate, and also in financial institutions.

**8** KBM is the second son of the founder of the National Commercial Bank of Saudi Arabia (NCB). He was involved in the management of NCB from about 1990 until July 1992, latterly as the Chief Operating Officer. At that point he resigned from the bank and then returned as Chairman from the summer of 1996 until August 1999.

**9** ARBM was made Deputy General Manager on 12 September 1997 and the Deputy Chairman of the Executive Committee on 27 July 1998. He held those positions until August 1999 when his father sold 50

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

per cent of NCB to the Saudi government in order to prepare the bank for an initial public offering.

**10** ARBM and SBM were members of NCB's board of directors until December 2002 when the family sold their remaining shareholding.

**11** It is also important to note for the purposes of these proceedings that until recently ARBM and SBM were the ultimate owners of Nimir, an oil exploration production company with its headquarters in London at 1 Knightsbridge. They sold their interests in Nimir on 4 August 2004.

**12** With that brief introduction to the claimants I turn now to the first defendant, Dr Rachel Ehrenfeld. She has claimed to be "the world's foremost authority on narcoterrorism ... and a sought after commentator and consultant on the problems of international terrorism". She is the director of an organisation called the American Centre for Democracy.

**13** The second defendant, Bonus Books Incorporated, is a United States publisher. The book which forms the subject matter of this libel litigation is 'Funding Evil, How Terrorism is Financed -- And How to Stop it'. The first defendant is the author of that book and the second defendant its publisher.

**14** In December 2003 it came to the claimants' attention that the book was being published in England and Wales containing defamatory allegations about them. The book was being sold through online retailers such as Amazon.co.uk, Blackwells.co.uk and Amazon.com.

**15** The claimants also discovered that the first chapter of the book was separately available on the ABC News website. The claimants' solicitors, Kendall Freeman, wrote to the defendants setting out the nature of the claimants' complaint. That was by way of letter before action on 23 January 2004. It indicated that the claimants were prepared to dispose of their complaint on the basis that defendants were to provide the undertakings set out in that letter. It is important to bear that in mind in the light of some allegations about them which have subsequently been made by the first defendant, to which I shall return in due course.

**16** I turn now to the nature of the allegations which were made in the book and which form the subject matter of this complaint. As Cherif Sedky points out, they are of the most serious and defamatory kind. The book alleges that the Bin Mahfouz family is one of the main sponsors of Al Qaeda and other terrorist organisations. It also alleges that NCB, which was owned by the Bin Mahfouz family was used as a conduit for financing Al Qaeda. The book also claims that in 1999 the Saudi government audited both NCB and Khalid Bin Mahfouz and revealed that over a ten-year period NCB had channelled money to charities acting as fronts for Al Qaeda.

**17** Cherif Sedky offers the view, not surprisingly, that the connection made in the book to the funding of terrorism would be regarded, by anybody who knew any background information about NCB, as referring to the three individual claimants because they were the main family members involved with the running of the bank as I have described.

**18** The meanings which the claimants themselves attribute to the published allegations are to be found in the Particulars of Claim at paragraph 8 as follows: (1) that the claimants supported and assisted in terrorism; (2) that the claimants were amongst the principal funders of terrorism, contributing millions of dollars to Al Qaeda and other terrorist organisations; (3) that the first claimant deposited tens of millions of dollars in London and New York into accounts held by terrorists who were implicated in the 1998 bombings of the United States Embassies in Kenya and Tanzania in which 254 people were killed and more than 4,000 injured; (4) that the first claimant provided money for the sponsorship of Al Qaeda, Hamas and Hezbollah in their campaign of terrorist atrocities; (5) that the first claimant, as Chairman and General Manager of the National Commercial Bank, assisted in and/or organised the channelling of funds by the National Commercial Bank to fund and support terrorism, including to fund the expansion of Al Qaeda throughout the world; (6) that the second and third claimants as members of the board of directors of NCB assisted in and/or approved of NCB's funding of terrorism including its funding of the expansion of Al Qaeda throughout the world.

**19** Following the initial complaint there was subsequent correspondence which has been exhibited

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

and is before the court today. Suffice it to say that no satisfactory response was received from the defendants and the proceedings were therefore commenced on 30 June of last year. Permission was obtained from Master Fontaine on 9 September to serve out of the jurisdiction and in accordance with that order the claim form and particulars of claim were served on the first defendant on 21 October and the second defendant on 6 October of last year. There are before the court affidavits of United States process servers confirming that service has been effected on the defendants of those documents.

**20** At one point solicitors were acting for the defendants, namely Morgan Lewis, but they were, in due course, disinstructed and the defendants have not acknowledged the proceedings in question.

**21** The claimants therefore obtained a default judgment and an injunction against the defendants. That was achieved by means of an order made by me on 7 December of last year and the defendants were served with that order on 30 December and 17 December respectively. Again, there is evidence before the court of the service of that order in the form of affidavits from United States process servers.

**22** It appears that since 1 July 2003 some 23 hard copies of the book have been sold within this jurisdiction. I should perhaps make it clear that excludes any copies obtained by the claimants' advisers for the purposes of this litigation. However, as I have already indicated, the first chapter was separately available on www.ABCnews.com. There is a printout from that website in evidence before me today.

**23** It has not proved possible, despite their best efforts, for the claimants' solicitors to establish how many hits there have been on chapter 1 of the book by that means. A conversation took place with the Executive Counsel of ABC Inc on 28 June last year and she confirmed that ABCnews.com did not have the technology to provide the required information. Nevertheless it is apparently the case that the number of hits worldwide on ABCnews.com is over 14 million unique visitors per month and Cherif Sedky has been informed by Hill and Knowlton, the claimants' public relations representatives, that according to information provided by a company specialising in measuring internet audiences, called Nielsen Net Ratings, the total number of hits from the UK on ABCnews.com website in the month of March 2004 was 211,000 unique visitors. The inference is thus invited that a significant proportion of those 211,000 UK visitors would have accessed the relevant pages.

**24** It should be made clear at this stage that the stance of the claimants in this litigation is entirely consistent with their statements and actions in the past when such allegations have been made against them. I think it is fair to say that they have done everything they can to demonstrate the falsity of the allegations and to vindicate their reputations.

**25** It is, of course, a complete defence to a libel action in this jurisdiction to prove, on the balance of probabilities, that the defamatory allegations were substantially true. The claimants have indicated that they are quite prepared to meet any such defence on its merits. Unsurprisingly, no one has ever put forward such a defence or any material which would be capable of substantiating a plea of justification. There are, of course, other defences available under English libel law, such as qualified privilege in accordance with the long established common law principles, as developed and supplemented by their Lordships nearly six years ago now in Reynolds v Times Newspapers Limited.

**26** These proceedings represent, in effect, the only steps open to the claimants in this jurisdiction when those who have made the allegations about them fail to respond to their approaches at all. They have never attempted to prevent any person from putting forward a substantive defence.

**27** I should refer at this stage to the evidence of the first claimant which is contained in a witness statement of 31 July last year. I do not propose to read all of it but only certain extracts from it:
   "In summary it is alleged in the Book that I, together with my two sons, am one of the principal supporters of Osama Bin Laden and his terrorist network Al Qaeda. It is further alleged that I provide this support by, amongst other things, contributing millions of dollars to further the campaign of terrorism and atrocities waged by Bin Laden and Al Qaeda.
   These allegations are all entirely false. I do not have, nor have I ever had, any involvement or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

association with the sponsoring of Al Qaeda nor have I ever knowingly financed terrorism of any description and I vehemently deny this. Neither the United Nations, EU, UK, US nor any other government has ever indicated that I am involved in the supporting of terrorism on any report or list. My family and I abhor and unequivocally condemn all acts of terrorism.

My family and I have business interests all over the world. As a banker I consider myself to be well known to the UK financial community. I and my family own five homes here. My sons currently own Nimir Petroleum Limited [that position has changed, as I indicated earlier, since this witness statement was prepared] which is registered in England (which they are in the process of selling). My reputation in the UK and that of my family, is very important to me."

He then goes on to indicate earlier steps which have been taken in relation to similar allegations when made by other people.

**28** The first claimant concludes by saying:

"The allegations that have been made about me in the Book are of the utmost seriousness and are highly damaging to me, both in my personal and business life, particularly in the present global climate. As can be imagined these allegations have also caused me (and my family) great personal distress."

**29** There is no need I think, for the purposes of the judgment, for me to read extracts from the evidence of the other two claimants; suffice to say that they are to similar effect. Let it therefore be clear that these claimants are not depending upon the presumption of falsity which operates under English libel law. They have provided evidence to the court which denies roundly the allegations made about them, having regard to the meanings which they put upon those allegations and which I read out earlier.

**30** At this point I propose to refer to something which has been said by the first defendant in currently pending proceedings in New York about the legal process which the claimants have taken in this jurisdiction. It is at paragraph 24 of the process currently pending in Ehrenfeld v Khalim Salem Ah Bin Mahfouz where she says this:

"The net result of this abuse of the legal process is [the] defendant both hides the truth of his acts behind the screen of English libel law and seriously chills legitimate and good faith investigation into his behaviour and links to terrorism."

**31** In the light of what I have said already about the claimants' case in this jurisdiction, and their consistent stance in proceedings brought here, it may be thought that that brief summary for the benefit of the court in New York is tendentious and something of a misrepresentation of the true position. The claimants are not hiding behind anything and are perfectly willing to meet these defendants, as others, head on as to the merits of the claims made against them.

**32** I also refer to something else which the first defendant has said in the new preface to her book, which has recently come out in this jurisdiction, I believe, and elsewhere. Having regard to the reputation which the first defendant claims for herself it is necessary to bear this in mind. Towards the end of that preface she said this (it being dated November 2004):

"On October 19, 2004, Khalid Bin Mahfouz commenced legal proceedings against me for libel in a British court. Despite the enormous cost involved, I have decided to take it upon myself to challenge Khalid Bin Mahfouz and provide the UK court with evidence that he, the Muwafaq Foundation, and the NCB have in fact supported Al Qaeda and HAMAS.

My challenge of Bin Mahfouz carries even greater repercussions since Prince Turki, the Saudi ambassador to London, is alleged to have said recently that it's important that Bin Mahfouz win because he ' represents all of us' [Saudi Arabia and the Royal Family]'."

**33** Dr Ehrenfeld concluded that new preface by saying that this is a book the Saudis do not want you to read. For the record, therefore, it is important to state that as of today, 3 May 2005, no such evidence has been forthcoming from her or the second defendant.

**34** I have already referred to earlier litigation which has been brought by the claimants in this jurisdiction. As Cherif Sedky describes in his witness statement steps, have been taken to vindicate their reputations and examples are given.

**35** First, KBM brought a libel action, among others, against Associated Newspapers Limited, the publishers of the Mail on Sunday, which concluded

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

with a statement in open court read on 13 January 2004. It was thereby acknowledged by the defendants that there was "No truth whatsoever" in the serious and defamatory allegations made to the effect that KBM supported or funded Osama Bin Laden's terrorist activities. The newspaper agreed to pay KBM substantial damages and costs.

**36** Secondly, KBM, together with Nimir, brought a libel action against the publisher, Pluto Press and the author, Michael Griffin, which concluded with a statement in open court read on 15 March 2004, whereby those defendants offered a comprehensive apology and substantial damages following the publication of the book called Reaping the Whirlwind. That too had alleged that KBM was funder and supporter of Osama Bin Laden and Al Qaeda. Thirdly, KBM and ARBM commenced legal proceedings on 24 April 2003 against the authors of the work called Forbidden Truth -- Talaban's Secret Oil Diplomacy and Failed Hunt for Bin Laden. They were Jean-Charles Brisard and Guillaume Dasquie. The book had made very serious allegations about KBM, and about ARBM also, alleging support for terrorism and, in particular, Osama Bin Laden. Monsieur Dasquie did not acknowledge service of the proceedings and therefore KBM and ARBM obtained a default judgment against him. The case against Monsieur Brisard continues but it appears that he is not defending the case on its merits, but only on the footing that he did not authorise publication within this jurisdiction.

**37** Next KBM brought a libel action against Monsieur Brisard and two of his companies in relation to allegations contained in a report prepared by him and published on a website, www.JCBConsulting.com. The report repeated similar defamatory allegations about KBM to those made in the book. It alleged that KBM was one of the main individual Saudi sponsors of Al Qaeda and Bin Laden who, it was wrongly alleged, was KBM's brother-in-law.

**38** On 30 January 2004 KBM obtained an order entering judgment against all of the defendants in that action in default of acknowledgment of service. The order restrained publication of the defamatory words of the report within this jurisdiction and there was a hearing under Sections 8 to 10 of the Defamation Act which was held on 1 July last year, when I assessed damages of £ 10,000. I also made a declaration of falsity in accordance with that statutory framework to the effect that the defamatory allegations made by Monsieur Brisard in the report were false. There was also, on that occasion, an interim award of costs in the sum of £30,000. Again, in accordance with the statutory framework the defendants were ordered to publish a correction and apology.

**39** Cherif Sedky in his witness statement expands upon the impact of the allegations upon the claimants, already touched upon by them as individuals in their own evidence. He indicated that Nimir has recently encountered great difficulties in securing financing from banks in order to be able to make acquisitions. This was, it seems, a direct result of the bank's concerns about ARBM and SBM's ownership of Nimir and Cherif Sedky confirms, from his own involvement in those discussions, that the banks' concerns were triggered by the fact that the allegation about terrorism existed, irrespective of the baselessness of those charges. He tells me he is certain those concerns can be traced back to allegations such as those contained in the book. He refers, as the individual claimants have, to their significant connections within the United Kingdom. He confirms that their reputations here are important to them and it is not a question, as the first defendant has claimed in the past, of their "forum shopping".

**40** It is for those reasons that the claimants apprehend that there may be further publications of these allegations within this jurisdiction and that the allegations may do continuing harm to their reputations. They attach importance to the objective of vindication through the statutory means and, in particular, to obtaining a declaration of falsity in the light of the evidence which they have put before the court.

**41** Both the claimants' solicitor today, in the hearing before me, and Cherif Sedky in his evidence have, in the context of seeking the declaration of falsity, addressed the potential merits, such as they may be, of a plea of justification. None, of course, has been raised but, as I have already emphasised, they are not content simply to sit back upon the presumption of falsity. They have done their best to address the allegations head on in light of such information as is available to them.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**42** There was a time when the firm Mishcon De Reya were acting for the defendants and in a letter of 5 March last year they put forward what was conceived to be a potential plea of justification at that stage. In that letter there was a section headed 'Merits' and Cherif Sedky has attempted to deal with those individual paragraphs. I will briefly refer to them also in order to make clear what the claimants' case is in relation to each of them.

**43** The first point taken on the defendants' behalf was that the claimants had been named in various United States civil proceedings brought on behalf of the families of victims of the attacks at the World Trade Centre on 11 September 2001. The claimants' response to that point is as follows. SBM is not named as a defendant in those actions. Although KBM and ARBM have been so named, no substantive decision is likely to be made for the foreseeable future. Indeed possibly for several years. KBM and ARBM have been vigorously defending those proceedings and, indeed, as recently as 18 January of this year, ARBM succeeded in having himself dismissed from one of the claims. A copy of the relevant judgment of Judge Casey was included in the evidence before me and I have had the opportunity of considering that. KBM has a motion to dismiss on similar grounds but that has not yet been heard. In the light of that present state of affairs, the claimants seek to place emphasis upon the fact that no international or national government body has ever indicated that KBM, ARBM or SBM are involved in the supporting of terrorism in any published report or list relating to terrorism. As I have already made clear that includes the United Nations, the European Union, the United States and the United Kingdom.

**44** The second point made on the defendants' behalf was simply the assertion that KBM had donated money to a number of charities which are alleged to have links to Al Qaeda. The claimants' response is to this effect: they do not admit having given money to all the charities which the defendants have listed in their letter but, even if they have done so, this would not demonstrate that the claimants, or any of them, were financing terrorism knowingly. Indeed it is apparently the case that Judge Casey has dismissed some of the defendants from United States civil actions on exactly that basis. KBM has publicly admitted donating money to the Muwafaq Foundation at its inception, but he was at no stage involved in the running of the charity.

**45** That foundation was established for the purpose of relieving disease, hunger and ignorance and for other humanitarian purposes and it was for those purposes, genuine charitable purposes, that KBM made his donations. For so long as it existed Muwafaq worked with many other reputable agencies throughout the world, including Unicef, The World Food Programme, Save the Children, UNHCR, YMCA and several other humanitarian organisations. It was as long ago as between 1996 and 1998 that Muwafaq was wound up. It is right to record also, say the claimants, that neither the United Nations nor the European Union, the United States, the United Kingdom or any other government has ever included Muwafaq on any list of organisations suspected of supporting terrorism.

**46** The third point on the defendants' behalf was an allegation to the effect that the former United States Secretary of State, Madeleine Albright, had informed the Saudi Defence Minister, Prince Sultan, that KBM had deposited millions of dollars into terrorist accounts in London and New York, indeed accounts belonging to the same terrorist who had been implicated some years ago in the United States Embassy bombings in Kenya and Tanzania. For this purpose the defendants apparently relied upon an article published by one Kevin Dowling as the source for the statement. Indeed that article was identified in a footnote 80 in the book as being the source.

**47** The claimants response is as follows: the claimants' solicitors, Kendall Freeman, contacted Mr Dowling and he confirmed in a letter of 19 March 2004, which is before the court today in evidence, that this statement, as well as others he had made, were completely false and, what is more, that he never intended that the article in question should be published. Despite that, it has now emerged that in her most recent edition of her book the first defendant continues to refer to Kevin Dowling as the source of that allegation about Madeleine Albright. Footnote 80, in effect, remains unchanged in the new edition of this work.

**48** The claimants' solicitor suggests that this may cast some doubt upon her objectivity and her claims to scholarly integrity. It is not for me to make a final

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

judgment about that but it is right that those facts should be recorded in this judgment because the claimants have done everything they can to nail that particular allegation, which would appear to have some authority since the allegations were attributed to Madeleine Albright. The source, however, has effectively collapsed.

**49** The fourth point made on the defendants' behalf is based upon KBM's involvement in BCCI. It is said that that of itself connects him to terrorism. Again, the claimants make a substantive response to this effect: KBM's connection to BCCI in no way implicated him with the financing of terrorism. The charges brought against KBM were in no sense or in any way as serious as the charges brought against BCCI itself. He was, for example, never accused of being involved in the allegations of money laundering, bribery, arms dealing and the financing of terrorism. He was for a short period a non executive director of the bank. To the extent that there were any allegations made against KBM in the aftermath of the collapse of BCCI they concerned the manner in which he had bought and sold his shareholding in that bank. Those allegations were settled without any admissions having been made on his part.

**50** A subsidiary point made by the defendants is to refer to findings of "The Report to the Committee on Foreign Relations of the United States Senate" by Senators Kerry and Brown concerning the BCCI affair. It is said on the claimants' behalf that there is, in fact, only one reference to KBM in chapter 4 of that report which deals with allegations against BCCI. That reference briefly mentions the purchase of the shares by KBM in BCCI. It was not critical of him and the report itself did not allege that KBM was himself involved in sponsoring international terrorism.

**51** That deals with one body of allegations made on the defendants' behalf as best the claimants can. Since judgment was entered in this action against the defendants, the first defendant has filed a complaint against KBM (only) in the United States District Court, Southern District of New York. It has the docket number 04CV9641. The complaint was filed on 8 December of last year. I have already briefly made reference to one allegation contained in it.

**52** It will be noted that 8 December was one day after default judgment was entered against her in England. Her claim is put on two grounds which may be briefly summarised as follows: (1) that the English default judgment cannot be enforced in the United States and (2) that the United States court should rule that the allegations about KBM contained in the book are not actionable under United States law.

**53** It is worthy of note that the claimants regard the pursuit of these proceedings in England and Wales as valuable, notwithstanding that there may be proceedings pending in the United States, because it is a mechanism for vindicating their reputations. It is also to be noted that the contention made by the defendants in those proceedings in the United States, if they are at some stage determined in the future, will not necessarily determine the issue of truth or falsity which the claimants have tried to address in the current proceedings.

**54** There are a number of allegations which the first defendant makes in those proceedings, some of which reflect allegations already foreshadowed in the solicitors' letter in England. Again, the claimants have attempted through Cherif Sedky to address those allegations in the light of the information available to them.

**55** First it is said that KBM, having been Chief Executive Officer of NCB, provided support for Osama Bin Laden and Al Qaeda in order to carry out the September 11 attacks by providing them with millions of dollars in the 1990s. It is said that according to a former CIA counter terrorism expert NCB was used as a financial conduit before 1999 to finance terrorism and the bank's Zakat Committee funded the Islam Relief Organisation to the extent of $74 million. It being a charity allegedly shown to be a front for Al Qaeda.

**56** To that grave allegation KBM's response is as follows: he does not have, nor did he ever have, any involvement or association with the sponsoring of Al Qaeda or any other terrorist organisation. He repeats that no public, national or international body has ever accused him of doing so despite the investigations which have taken place, with increased intensity, into such matters since 11 September 2001.

**57** The defendants appear to be relying upon an alleged Saudi audit of NCB in 1999. It is said that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:03-md-01570-GBD-SN   Document 2116-22   Filed 07/22/08   Page 8 of 9

2005 WL 1586238                                                                                          Page 8
2005 WL 1586238 (QBD), [2005] EWHC 1156

this audit revealed some payments to charities linked to terrorism. In fact, the claimants emphasise, no such audit has ever been shown to exist. Had the defendants checked with the claimants or with NCB or carried out basic press research on that issue, it is submitted by Cherif Sedky, they would have found, as a result, that there have been extensive denials that this audit ever existed by NCB. Nor has any evidence come to light to contradict those denials.

**58** Senior executives of NCB are on record as having vehemently denied that there was any such audit and in an article appearing the Chicago Tribune on 28 October 2001 an NCB executive said, "I can tell you absolutely, categorically there was no such audit ... That never took place".

**59** There was also published a formal correction in the Washington Post on 3 March 2002 which stated:
   "A representative of Mahfouz also denied ... that an audit of the Saudi bank of which he was director showed links to charities controlled by Bin Laden".
Furthermore, USA Today has printed a correction to an article it published on 29 October 1999 entitled 'Saudi Money Aiding Bin Laden'. It confirmed that USA Today "has not been able to locate any record of such an audit and has no reason to believe that one was conducted'. It stated in the correction that the article contained "errors" and that "the story's assertions have been widely reported and subsequently retracted by others". All of those corrections have been placed in evidence before me.

**60** That is how the evidence stands as of today. It is, once again, recognised that KBM donated money to Muwafaq, which itself has been characterised by the United States Treasury Department as an Al Qaeda front.

**61** The defendants also rely upon the proposition that in 1995 Osama Bin Laden identified Muwafaq as one of the sources of funding for Al Qaeda. Again, KBM's answer here is the same as his substantive response on the allegations relating to Muwafaq, already considered above in the context of the Mischon De Reya letter.

**62** It is fair to say the first defendant has produced no additional evidence that supports her accusation that Bin Laden identified Muwafaq as a funder of Al Qaeda. It is, so far as one can tell, bare assertion.

**63** As to her reliance upon the fact that KBM was a principal shareholder and director of BCCI, KBM's response is as it was in relation to the allegation made by Mischon De Reya earlier.

**64** Cherif Sedky therefore submits the defendants have not raised any matter which would be capable of justifying in any way the allegations in the book and the claimants would be prepared to demonstrate the lack of merit in any plea of justification that the defendants cared to raise. They have, however, not had the opportunity to do so.

**65** The order made on 7 December 2004 has had some mitigating effect in relation to the publications which have taken place. The claimants' solicitors wrote to various retailers and requested that they did not publish the book in this jurisdiction. It seems that, in the light of those letters, some UK retailers have removed the book from sale. However, the hard copy of the book can still be purchased in this jurisdiction through the United States online retailer, Amazon.com. It is fair to record that the defendants have not made any attempt to comply with the orders themselves, although it is apparent that the first defendant is aware of the terms of the injunction because she referred to it in an article published in the Jerusalem Post on 13 December last year.

**66** Cherif Sedky draws attention to the new cheaper paperback edition of the book, to which I have already referred, and in particular to its new preface. The printout has been obtained and it appears that the defendants have changed the front cover of the paperback version of the book to incorporate the phrase, to which I also referred earlier, "The book the Saudis don't want you to read". It appears, therefore, that the defendants are trying to cash in on the fact libel proceedings have been brought against them in this jurisdiction without being prepared to defend them on their merits.

**67** Those are matters of background relied upon to support the need for vindication and for a further injunction to be granted by the court in this jurisdiction.

**68** I have referred briefly to the proceedings started by the first defendant in the United States. It is fair to say that one of her main reasons given to the court

(those proceedings being under the control of Judge Casey also) why she is not defending in England is that she lacks the financial resources to litigate against KBM. Cherif Sedky suggests, however, that this may carry less impact in view of the fact that she has now herself launched potentially time consuming and expensive litigation in the United States.

**69** The interview with the first defendant in the Jerusalem Post published on 13 December 2004 publicises the fact that she is suing KBM in the United States and contains this allegation:

"According to Mahfouz's website he has won many judgments by default -- even against bit American Publications that preferred to apologise and pay fines".

Cherif Sedky points out that this is a misleading account of matters, since KBM only obtained two other default judgments, namely against Guillaume Dasquie and Monsieur Brisard's two companies, those having been obtained because the defendants could not defend the proceedings on any grounds. It is an unfair suggestion that they were forced into settling because they lacked financial muscle.

**70** All the corrections that KBM has obtained so far, without recourse to litigation, are available on the Bin Mahfouz website for anyone to check.

**71** Cherif Sedky also drew my attention to an article in the Jerusalem Post of 19 January of this year written by Caroline Glick. It refers to the first defendant as "Mahfouz's most recent victim" and again takes the point that she is lacking in financial clout so as to be able to defend herself in Britain and says that she would be hard pressed to "emerge victorious given Britain's pro plaintiff libel laws". It is said that "Mahfouz uses his vast wealth to intimidate his critics into silence with a threat of financial and professional ruin".

**72** The purpose of this exercise is fairly obvious, namely to give the impression that any judgment of the English court is of little significance and does nothing to establish that the allegations are false. That is why it is so important, as the claimants appreciate, to go through such allegations as have been made against them in the past on behalf of these defendants in order to demonstrate their lack of merit. That is why this judgment has gone to such length. It is not a purely formal process and the declaration of falsity which I propose to grant shortly is not an empty gesture.

**73** The claimants are anxious for it to be made absolutely clear that the defendants have had every opportunity to defend these proceedings by means of a plea of justification if they thought it appropriate. All they have been able to advance, it is said, is material of a flimsy and unreliable nature, and the claimants have taken the trouble to demonstrate its lack of merit.

**74** I turn, therefore, to the relief which is claimed. I propose to grant first of all the maximum level of damages, in favour of each claimant, which is permitted under the summary procedure of Sections 8 to 9 of the Defamation Act 1996. I do that for fairly obvious reasons. The allegations are very serious and nothing whatever has been done to mitigate the effect of the original publication. Of course it is not suggested that £10,000 would, at the end of a trial, represent the full measure of compensation to which the claimants would be entitled if they succeeded, but it is the top level of compensation permitted under this summary procedure of which the claimants have chosen to avail themselves in the light of the attitude taken by the defendants.

**75** I propose to make a declaration of falsity and to confirm the injunction as being in existence. I will make an order for the costs of these proceedings to be assessed at a detailed assessment, if not agreed, and for there to be a payment on account of those costs within 28 days of £30,000. The defendants will have liberty to apply in respect of the orders I have made, of course, and I shall hear further from the claimants' solicitor as to any other points he wishes to make in relation to the order.

Crown Copyright.

END OF DOCUMENT