SPEECH

## Regulation and Supervision of Islamic Banking in the United States

April 19, 2005

William L. Rutledge, Executive Vice President

**Remarks at the 2005 Arab Bankers Association of North America (ABANA) Conference on Islamic Finance: Players, Products & Innovations in New York City**

Good morning. I am very pleased to be here today, and I thank ABANA for inviting me. From my perspective as a bank supervisor, conferences that promote greater awareness of important developments within international banking are essential. Islamic finance certainly qualifies as such an area, and I expect that today's conference will provide an excellent opportunity to exchange information and ideas on current issues relating to this important sector.

My remarks this morning will focus on the regulation of Islamic banking services in the United States, and I preface them by noting that they are my own and do not necessarily reflect the views of the Federal Reserve. My approach will be to describe some of the most important domestic developments in the industry and to review how we, as U.S. bank regulators, have approached these developments so far. I will also offer some thoughts on the regulatory and supervisory challenges that accompany introducing Islamic financial services into the U.S. framework.

At the outset, I would like to emphasize that we—and here I am referring broadly to U.S. regulators—are open to Islamic financial products. Our mindset is to try to accommodate a variety of approaches to finance, focusing to the extent possible on the underlying substance—that is, focusing on what the implications for safety and soundness and consumer protection would be of a given product. Consistent with that approach, while we are committed to accommodating Islamic finance within the U.S. structure, we will hold Islamic financial institutions to the same high licensing and supervision standards to which we hold conventional ones. Although we are certainly in no position to take a stance on issues of *shari'a* interpretation, it is important that we become more familiar with the principles and practices unique to Islamic finance in order to make our supervisory and regulatory judgments.

Let me highlight that U.S. regulators have already started to make efforts to more fully understand and better foster Islamic finance. I have participated, along with a number of my colleagues at other regulatory agencies, in several conferences such as this one, both in New York and elsewhere, in an effort to stay abreast of developments in this market and to emphasize our continuing interest in this industry. Just last month, the Federal Reserve Bank of New York cosponsored a seminar on Legal Issues in the Islamic Financial Services Industry in Kuwait City. In addition, several of my colleagues from the New York Fed recently participated in a workshop hosted by Harvard Law School's Islamic Finance Project to explore regulatory challenges to the growth of the Islamic finance industry in the United

States. Those colleagues are also with me today, and will help me respond to any comments or questions that you may have after my prepared remarks.

At present, the approach of United States regulators to Islamic banking has been fairly ad hoc—with individual regulators dealing with specific issues as they are presented. This has been the case because the industry is still relatively new in this country. Despite the industry's impressive growth in recent years, there are only a small number of providers and a relatively limited array of services available. At the retail level, Islamic banking has been mostly concentrated in home financing activities; not surprisingly then, a number of the issues raised with U.S. regulators have involved this specific business line.

The first major milestones for the provision of Islamic retail banking services in the United States were two interpretive letters issued by the Office of the Comptroller of the Currency — both letters were issued in the late 1990s in response to proposals submitted by the United Bank of Kuwait. The first approval letter which came out in 1997, involved a residential net lease-to-own home finance product. According to the proposed structure, the bank would purchase the property and hold legal title to it over the course of the agreement. Upon payment of the final lease installment, legal ownership would be transferred to the home buyer. The second OCC interpretive letter was issued in 1999 in response to a proposal to offer certain *murabaha*-based financing products. The proposal was designed to permit the bank to acquire assets (such as commercial inventory, equipment or real estate) and then resell those assets to its customers, on an installment basis, at cost plus a markup. The OCC's analysis was that, because the purchase and sale transactions occurred simultaneously, the bank would be acting as a "riskless principal" in such transactions, and they were therefore permitted.

I think in each of these interpretive letters, the OCC demonstrated its flexibility by looking beyond the form of the transaction to determine that these structures were the economic equivalent of products already being offered by conventional institutions, and thus were permissible under existing banking law. For example, the OCC was able to look beyond the restrictions on bank ownership of real estate to conclude that, in these cases, the risks that drove the general restrictions were not present, because the transactions were equivalent to secured loans or riskless principal transactions. The New York State Banking Department followed much the same logic in issuing similar approvals for HSBC.

My purpose in describing these actions is to demonstrate how a regulatory framework can ensure compliance with the clear substance of general objectives, while still allowing for significant flexibility in how they are met.

This flexible approach has fostered notable development of Islamic banking services in the United States. Although estimates of the potential size of this market vary widely, it is clear from the recent domestic growth of these services that significant demand exists for these products. HSBC, University Bank in Ann Arbor, Michigan, and Devon Bank of Chicago all now offer Islamic banking products in the United States. There are also several non-bank mortgage and finance companies offering these services. Freddie Mac and Fannie Mae have purchased *shari'a*-compliant

mortgages from a number of these providers, supplying crucial liquidity that has enabled these Islamic financial institutions to originate additional mortgages.

Clearly, Islamic financial institutions have identified a real and substantial market need. The financial institutions of this country continually adapt to changing demographics and growing populations, be they Muslim, Hispanic or any other ethnically or religiously defined groups. When a customer base is growing, it is likely to receive attention from companies seeking to serve those expanding markets— either from specialized firms or from broad gauged companies looking to add a targeted set of services to their broader platform.

Despite the progress that has been made in the provision of Islamic financial services here in the United States, not all of the regulatory challenges raised by these institutions have been resolved—challenges that arise from looking to introduce Islamic financial principles into a regulatory framework that was structured without these principles in mind. In the United States, these issues are made even more difficult by our complex system of financial services regulation, which divides responsibility for supervision among a number of federal and state agencies.

Now, what are some of those challenges? One example is that banking organizations in the U.S. and the U.K. have recently sought approval to offer profit-and-loss sharing deposits; not surprisingly, regulatory complications have arisen. Profit-and-loss sharing deposits are typically structured so that the bank has something akin to a joint investment with the depositor, with returns based on a portion of the profits earned and not on a set rate. Most important, in contrast to a conventional deposit, if the bank loses money, so does the account holder. For this reason, offering a profit-and-loss sharing deposit is a particularly difficult proposition under a Western framework, which takes the certainty of deposit principal as a given.

In the United States, this has meant that deposits fully structured according to profit-and-loss sharing have not been permitted. SHAPE Financial Corporation has publicly described having to modify the deposit product it proposed to offer through University Bank, so that principal is guaranteed, and the deposit-holders share only in bank profits, not losses. Somewhat similarly, in the UK, I understand that the Islamic Bank of Britain has made various adjustments to fit its deposit product within the UK strictures. Even so, because its deposit products are covered by the U.K.'s deposit insurance system, customers are advised that their acceptance of full repayment in the case of a loss may not be in compliance with the *shari'a*.

There are several other features of U.S. banking law that could potentially hold back Islamic finance. One example is the set of restrictions placed on the range of permissible investments that commercial banks may hold. To ensure that banks do not assume unnecessary risk, their investments are generally limited to fixed-income, interest-bearing securities, which are prohibited by the *shari'a*. In addition, commercial banks must meet numerous disclosure requirements in order to comply with regulatory policy such as the Truth in Lending Act. These requirements typically mandate advance disclosure of APR and other terms that do not fit the principles on which Islamic finance is structured. On top of these issues, an Islamic financial institution that intends to finance the purchase of a home or a car according to

*murabaha* or *ijara* structures may need to consider whether state law requires the institution to qualify as a licensed leasing company or auto lender.

The difficulty for Muslim consumers in obtaining *shari'a*-compliant insurance presents another hurdle to the accessibility of Islamic finance in Western markets. As I mentioned earlier, both Fannie Mae and Freddie Mac have purchased Islamically structured mortgages. However, both entities require property insurance and private mortgage insurance to be held on the securitized mortgages they purchase. This requirement forces customers of Islamic financial institutions to purchase traditional insurance for these mortgages that I understand is not compliant with the *shari'a*.

Beyond the legal issues regarding the activities a bank is permitted to conduct, bank supervisors have issues to confront in how to assess the safety and soundness of individual Islamic banks. A flexible approach to these issues corresponds with a larger trend toward a more adaptable, risk-oriented strategy in which supervisors are evaluating the specific risks and risk management practices of individual institutions. This manner of supervision can allow for an accommodative approach to Islamic banking that is based on its unique structure and related risks.

Let me elaborate on our supervisory approach. A key starting point in the process of supervising financial institutions is the design of a framework that sets out our supervisory expectations around such key areas as risk management, compliance and control, corporate governance and capital policy. Each country may do that a little differently. Some may be very rules-based in setting out how objectives are to be met, spelling out in considerable detail how a bank must operate.

In the United States, we do have extensive legal and regulatory requirements as I have discussed, and we do incorporate into our supervisory regime some very specific financial requirements (such as those around capital adequacy). But much of our regime is based on examiners making informed judgments on how individual institutions are managing and controlling the risks that result from their specific business strategies. We seek to understand each individual institution – what is its business strategy; what risks arise from that strategy (cutting across such categories as credit risk, market or investment risk, operational risk, and legal risks). We then ask such questions as: how well does management understand, measure, and manage those risks? and how sound is the overall governance and control structure of the firm? We look to train and develop our examiners so that they can make the necessary case by case judgments in a rigorous and fair way.

What we include in our broad framework of approach and how we train and develop our examiners to make those individual judgments is, of course, strongly influenced by supervisory practices developing around the world. I was a member of the Basel Committee for five years and found the sharing of information, and coordinated efforts to address areas of common concern, extremely useful in understanding how we can continue to improve our supervisory processes in the United States.

The opportunity for us to learn from others on supervisory approaches to Islamic banking is particularly great. Bank supervisors from other parts of the world are clearly ahead of us in confronting the challenges in understanding the risks facing

Islamic financial institutions, and how they can be most effectively managed and controlled. The Islamic financial community is in the process of developing international supervisory standards and practices that reflect the specific needs of *shari'a*-compliant finance.

To this end, institutions like the Accounting and Auditing Organization for Islamic Financial Institutions and the Islamic Financial Services Board are serving a critical function. In fact, the IFSB recently released exposure drafts of capital adequacy and risk management standards for Islamic financial institutions. These standards will help regulators both in countries that already have well-developed Islamic financial systems and in Western countries, to understand and supervise Islamic finance.

The IFSB is also working to strengthen the corporate governance framework for the Islamic financial services industry, and the Federal Reserve Bank of New York will be contributing to this process through its participation in an upcoming IFSB-sponsored summit on this topic in Doha, Qatar. Of course, corporate governance issues have become particularly important to us here in the United States over the past few years, and some of the approaches we are taking to address this issue already have much in common with the practices of Islamic finance.

In the same way that *shari'a* supervisory boards of Islamic financial institutions were established in order to review the appropriateness of proposed investments, conventional institutions now too see the wisdom of this process. Thus, many of them have begun instituting "appropriateness" reviews that look beyond legal compliance and toward even more difficult issues of trust, transparency and the ethical nature of their transactions.

Some of the features of *shari'a*-compliant investing may also hold an appeal for Western investors. Islamic funds and investors screen out companies to exclude those that take part in activities that are not considered to be *shari'a*-compliant. In addition, companies that are overleveraged or that rely too heavily on accounts receivable are screened out. Although based on Islamic principles, these filters may serve a broader purpose of excluding firms that may present particular risk. These practices may also be attractive to many non-Muslim investors who are not only interested in the risk/reward relationship of their investment, but who are also concerned with issues of accountability and social responsibility.

In closing, let me emphasize that, as U.S. bank regulators, we have an open mind on how to approach the issues raised by Islamic finance. These issues may not always be easy to resolve, but we are prepared to rise to the challenge. In this regard, it is essential that we not adopt the mindset that the relationship between banks and supervisors is one of action and reaction. Instead, we ought to think collectively through the issues and work together to address them successfully. We recognize that the basic objectives of bank managers and bank supervisors are very similar to one another—we all want to ensure the safe and sound operations of a banking system. But to achieve that objective over time, we need a system that is dynamic – one that can adapt to changing customer needs. Meeting the customer demand for Islamic banking services will require that the industry and the supervisors have a particularly strong dialogue going forward.

Thank you very much.