94-005072

Cause No. _____

| | |
|---|---|
| SANDRA C. BATH, | § IN THE DISTRICT COURT OF |
| | § |
| Plaintiff, | § |
| | § |
| VS. | § |
| | § HARRIS COUNTY, TEXAS |
| NATIONAL COMMERCIAL BANK, | § |
| JEDDAH, PETER JANOVSKY, | § |
| Individually and as Agent for | § |
| NATIONAL COMMERCE BANK, JEDDAH, | § |
| and JAMES R. BATH, | § |
| | § |
| Defendants. | § 151ST JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION FOR DAMAGES AND DECLARATORY RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Sandra C. Bath, Plaintiff, complaining of National Commercial Bank, Jeddah, Peter Janovsky, Individually and as Agent for National Commerce Bank, Jeddah, and James R. Bath, as Defendants, and for cause of action would show unto the Court as follows:

I.

### PARTIES

Plaintiff Sandra C. Bath is an individual resident of Harris County, Texas.

Defendant National Commerce Bank, Jeddah, purports to be a banking corporation that is a successor to the National Commercial Bank - New York Branch, which had its business offices at 245 Park Avenue, New York, New York 10167. This defendant does business in the State of Texas, including the matters complained of herein. The causes of action asserted herein arose from or are connected with purposeful acts committed by the Defendant in Texas

PLEAD000982

because it has entered into a contract with a Texas resident to be performed in this State, in whole or in part, and it has committed a tort in this State, as more particularly described below. Defendant National Commerce Bank, Jeddah has no registered agent for service of process in the State of Texas. Accordingly, it may be served with this Petition through the Secretary of State, provided that the citation and petition are forwarded to any officer of the Bank by certified mail, return receipt requested at the address listed above.

Defendant Peter Janovsky is believed to be an individual resident of the State of New York, whose business address is Zeichner Ellman & Krause, 757 Third Avenue, New York, New York 10017. The causes of action asserted against Mr. Janovsky arose from or are connected with purposeful acts committed by him in Texas, both individually and as agent for National Commercial Bank, Jeddah. He has committed torts in this State, and is otherwise doing business within this State, as more particularly described below. This Defendant does not maintain a place of regular business in Texas and has no designated agent on whom service of citation may be made in this cause. Accordingly, he may be served with this Petition through the Secretary of State, provided that the citation and petition are forwarded to the above address, by certified mail, return receipt requested.

Defendant, James R. Bath ("Bath"), is an individual resident of the State of Texas, and may be served with process at his place of business, J.B.& A., 11 Greenway Summit, Suite 2810,

-2-

PLEAD000983

Houston, Texas  77046, or his residence, 29 Tiel Way, Houston,
Texas  77019.

### II.

### JURISDICTION

The amount in controversy in this matter is within the
jurisdictional limits of this Court.

### III.

### VENUE

Venue is proper in that all parties reside or do business
in Harris County, Texas and the causes of action asserted herein
arose in Harris County, Texas.

### IV.

### FACTUAL BACKGROUND

Plaintiff is the owner of 55% of the outstanding shares
of Southwest Airport Services, Inc.  Plaintiff is also the
President of Southwest Airport Services, Inc. and a member of the
Board of Directors of that Company.  Plaintiff is a salaried
employee of Southwest Airport Services, Inc., and is in charge of
its day-to-day operations.

### V.

Defendant National Commercial Bank, Jeddah holds itself
out to be the successor, through events that are unknown to
Plaintiff, to an entity known as the National Commercial Bank - New
York Branch.  Upon information and belief, the National Commercial
Bank - New York Branch, operated as a subsidiary, sister-bank, or
branch bank of the Bank of Credit and Commerce International

-3-

PLEAD000984

("BCCI").   This bank is or was owned by the Mahfouz family, and apparently serves the Saudi royal family.   This bank apparently ceased operations in this country through and as a part of the series of financial scandals involving BCCI.   It is not known whether the successor bank -- the Defendant here -- has any lawful presence in this country or is even authorized to conduct business in this country.   Nor is it known whether this Bank has any standing to assert rights against any American citizen.

VI.

On or about January 17, 1990, Plaintiff's then-husband, James R. Bath, entered into an agreement styled "Pledge Agreement" with the National Commercial Bank - New York Branch.   Under that Pledge Agreement, James R. Bath, as Pledgor, purportedly pledged to the Bank a first-priority security interest in the shares of Southwest Airport Services, Inc. which he then held for himself and on behalf of Ms. Bath as community property.   Those shares totalled 900, or 90% of the 1,000 then-outstanding shares.   The Pledge was made to secure a loan in the amount of $1.4 million, which Mr. Bath also personally guaranteed.   A true and correct copy of the Pledge Agreement is attached hereto as Exhibit "A".

VII.

Mr. and Ms. Bath were divorced in March of 1992.   By a Final Divorce Decree and an accompanying Agreement Incident to Divorce, the Domestic Relations Court of Harris County awarded to Ms. Bath one-half of the community's interest in the shares of Southwest Airport Services, Inc., *i.e.*, 450 of the then-outstanding

-4-

PLEAD000985

shares.  The Divorce Decree does not recognize any encumbrance upon the shares awarded to Ms. Bath.  Ms. Bath has exercised sole voting rights and control of those shares since the time of the Divorce Decree.  She has freely voted those shares with respect to the business of Southwest Airport Services, Inc., without protest either by James R. Bath or the National Commercial Bank - New York Branch.

VIII.

Upon information and belief, over two years ago the National Commercial Bank - New York Branch purportedly notified James R. Bath of his default under the covenants of the loan agreement whereby the National Commercial Bank - New York Branch loaned the principal amount of $1,400,000.00.  Upon information and belief, The Bank has never taken any action to recover its debt against Mr. Bath, who personally guaranteed the $1.4 million-dollar note.

IX.

On or about January 24, 1994, Mr. Bath purported to give notice of a meeting of the Shareholders of Southwest Airport Services, Inc. to be held at 4:00 p.m. at the offices of Jackson & Walker in Houston, Texas.  A true and correct copy of the Notice received from Mr. Bath is attached as Exhibit "B".  Seven days later, on January 31, 1994, Mr. Peter Janovsky, of the law firm of Zeichner, Ellman & Krause, in New York City, sent a fax communication dated January 28, 1994, to the undersigned counsel, advising that the National Commercial Bank, Jeddah, as successor to

-5-

the National Commercial Bank - New York Branch, requested that the Pledgor under the January 17, 1990, *i.e.*, Mr. Bath, cease to exercise the voting and other consensual rights otherwise available under that Agreement, and contending the Bank then had the sole right to exercise such voting or other consensual rights with respect to the pledged shares. A true and correct copy of Mr. Janovsky's letter is attached hereto as Exhibit "C".

X.

On January 31, 1994, the undersigned counsel contacted Mr. Janovsky in an effort to determine from him what interest the National Commercial Bank - New York Branch purported to take in the affairs of Southwest Airport Services, Inc., what position they intended to take at any upcoming meeting of shareholders, and, specifically, whether they had any understanding of the agenda for the upcoming meeting. Mr. Janovsky advised that he would attempt to ascertain the Bank's position on these matters, and would respond the next day. On February 1, 1994, having received no response from Mr. Janovsky, counsel for Plaintiff contacted him again. Although Mr. Janovsky advised that he had learned the agenda of the shareholder's meeting through a conversation with Mr. Bath's attorney, he refused to disclose anything about Bath's intentions. Instead, he stated that the Bank's posture with respect to the meeting and the voting of shares at that meeting would have to be learned either by asking counsel for Mr. Bath, or by attendance at the Shareholder's meeting.

-6-

PLEAD000987

XI.

As Mr. Janovsky and the National Commercial Bank - Jeddah plainly knew, the Notice of Shareholder's Meeting was fatally defective under the By-laws of Southwest Airport Services, Inc., and the provisions of the Texas Business Corporation Act. Both the By-laws and the Texas Business Corporation Act require notice of any special shareholders' meeting at least 10 days in advance of the meeting. This Notice failed in that respect. Further, both the By-laws and the provisions of the Texas Business Corporation Act require a proper statement in any notice of special shareholder's meeting regarding the purpose for that meeting. The Notice failed in that respect, too.

XII.

Ms. Bath attended the purported Shareholder's Meeting on February 2, and, consistent with her obligation under the By-laws of the Company, chaired that purported meeting. (The meeting was delayed for 30 minutes while Mr. Bath, his three attorneys, Mr. Janovsky, Mr. Bath's friend, and the Bank's counsel met separately.) When the meeting finally began, Ms. Bath distributed to the assembled group her Objection to the Notice of Shareholder's Meeting as stated above. A true and correct copy of this Objection is attached hereto as Exhibit "D". Ms. Bath then advised the group that, by reason of the defects in the Notice, no valid meeting could be called, and therefore terminated all discussion. At the conclusion of Ms. Bath's statement, counsel for Mr. Bath, who appeared to hold in his hands a typed agenda for the meeting, and

-7-

PLEAD000988

with the apparent approval and acquiescence of all representatives in attendance on behalf of the National Commercial Bank, Jeddah, including Mr. Janovsky, stated that these parties intended to proceed with the Shareholder's meeting.   As the Notice of Shareholder's meeting was defective with respect to the purpose and timing of that meeting, and because Mr. Janovsky, acting individually and as the Bank's agent, had already refused to disclose his understanding of the purpose of that meeting, or the Bank's position on any agenda matters, Plaintiff advised all assembled that, as there could be no valid meeting, she would not attend any further.  The undersigned counsel then delivered to Mr. Janovsky a statement of Ms. Bath's position with respect to this matter.   A true and correct copy of that statement is attached hereto as Exhibit "E".  Ms. Bath and her counsel then left the meeting.

### XIII.

At approximately 6:30 p.m. on the evening of February 2, Ms. Bath's counsel contacted one of Mr. Bath's counsel, of the Jackson & Walker firm, to determine from him what action, if any, the National Commercial Bank or Mr. Bath purported to have taken at the purported Shareholder's meeting.  Mr. Bath's counsel stated, verbatim, "You know I can't tell you that." He then stated that he had not been in attendance at the meeting, and referred the undersigned to another of Mr. Bath's counsel, also of the Jackson & Walker firm.  Upon inquiry, the second attorney stated only that the attendees at the meeting had "discussed some things, and

-8-

PLEAD000989

intended to reconvene the next day to discuss others." When asked whether he would disclose the purported agenda for the meeting, he refused. When asked whether any action had been voted or was to be voted on at the meeting, he again refused to respond. He insisted that this information must come from still another of Mr. Bath's attorneys who had attended the meeting. As of the filing of this Petition, the events transpiring or to be conducted at this purported meeting are still unknown to Plaintiff.

XIV.

Plaintiff would show that the National Commercial Bank, Jeddah, its agent, Mr. Janovsky, acting individually and on behalf of the Bank, and Mr. James R. Bath, have embarked upon a course of action designed to subvert and destroy Ms. Bath's rights as a 55% shareholder of Southwest Airport Services, Inc., and to place control of that corporation in the hands of an individual, Mr. Bath, who has demonstrated over time his complete disregard for the best interest of the corporation. Included in Mr. Bath's abuse of his fiduciary obligations to the company over time have been his misappropriation of substantial sums of money for his own use and benefit, his transferral of a substantial corporate opportunity away from the company even after it had been awarded such opportunity, and in favor of a company whose establishment Mr. Bath financed through a loan from Southwest Airport Services, Inc. Mr. Bath for a period of many years also engaged in the disbursement of salary and bonuses unauthorized by the Board of Directors of Southwest Airport Services, Inc., and which bore no relationship to

-9-

services performed by him. He regularly utilized the corporation's funds for payments to third parties to satisfy personal debts and obligations, and engaged in an extended practice of establishing undocumented loans to himself which, at year-end, were recharacterized as income, with all such loan from the company then being forgiven.

### XV.

Each of the named defendants has undertaken their wrongful conduct in defiance of the By-laws of the corporation and the Texas Business Corporation Act by convening an illegal and invalid meeting at which to accomplish these results. Upon inquiry as to their actions and intentions, representatives both of the Bank and Mr. Bath have refused to disclose anything about their conduct or purpose.

### XVI.

The basis for this conspiratorial and secretive conduct lies in the personal friendship between Mr. Bath and Mr. Khalid Bin Mahfouz, who is believed to control the National Commercial Bank, Jeddah. Upon information and belief, Mr. Mahfouz, as owner of National Commercial Bank, hopes to accommodate Mr. Bath's desire to assume control of Southwest Airport Services, Inc., and treat it as his personal "piggy-bank" as he has done over the preceding several years. Although purportedly acting to maximize the value of its collateral, *i.e.*, the shares of Southwest Airport Services, Inc. that were ostensibly pledged to the National Commercial Bank, Jeddah, the Bank and its agents clearly have no such purpose in

PLEAD000991

mind.   The Bank and Mr. Bath's true purpose, on information and belief, is to loot the assets of the corporation to pay Mr. Bath's debt to the Bank -- a debt for which the corporation is not liable. By so doing, Mr. Bath and the Bank will irreparably destroy the corporation's business and prospects and deprive Plaintiff of her livelihood.   The actions taken and threatened by the Bank and Mr. Bath are blatantly unlawful.   Indeed, if there were legitimate goals behind their actions, they would not shroud them in secrecy as they have purported to do, and would not undertake to accomplish them through meetings illegally convened and under agendas that are worded so as to disclose nothing about the true purpose of such meetings.   Because of this secrecy, Ms. Bath has been unable to determine exactly the Bank contends it is entitled to do with her shares, and what actions they have taken to affect the corporation in which she owns the majority interest.   But as Ms. Bath has clearly advised the Bank, these shares are held free and clear of any encumbrance, and the Bank is without any form of effective proxy permitting it to vote her shares.

XVII.

### CIVIL CONSPIRACY

The Defendants' collusion with one another to deprive Ms. Bath of her rightful interest in the shares of Southwest Airport Services, Inc., and her right to vote those shares, constitutes a civil conspiracy under the laws of the State of Texas.   Defendants have undertaken to accomplish this result in an unlawful fashion, by convening unlawful and invalid meetings of the shareholders, and

-11-

by refusing to disclose to the majority shareholder of the company, who is also the President and a Director of the company, exactly what purposes they hope to accomplish without her presence or knowledge. It is the further purpose of this conspiracy to divert funds from Southwest Airport Services, Inc. either to the personal benefit of Mr. Bath, or for the benefit of the National Commercial Bank, Jeddah, to whom Mr. Bath is indebted in a substantial amount.

## XVIII.

### CONVERSION AND ATTEMPTED CONVERSION

Defendants have also converted, or are attempting to convert rights and property interests belonging to Plaintiff, without proper authorization or approval, and through conduct that is unlawful and invalid under Texas law. For such conduct, Plaintiff seeks the recovery of actual damages against each of these defendants in an amount within the jurisdictional limits of the Court.

## XIX.

### TORTIOUS INTERFERENCE

Defendants have tortiously interfered, or are attempting to tortiously interfere with Plaintiff's property rights in the shares of Southwest Airport Services, Inc. For Defendants' wrongful and malicious conduct, Plaintiff seeks the recovery of damages in an amount within the jurisdictional limits of this Court.

PLEAD000993

## XX.

### COMMON LAW FRAUD

Defendants have also engaged in a pattern of withholding information from Plaintiff that is vital to the protection of her interest in Southwest Airport Services, Inc. Defendants have made these concealments knowing that they would work to Plaintiff's prejudice and damage, and with the intention that they would result in such damages. As a result of this fraud, Plaintiff has suffered damages in an amount within the jurisdictional limits of this Court.

## XXI.

### PUNITIVE DAMAGES

Defendants' conduct complained of above was undertaken maliciously, intentionally, and with the specific purpose of causing injury to Plaintiff. Accordingly, Plaintiff seeks the recovery of exemplary damages against all Defendants in an amount not less than four times the actual damages assessed against them, all within the jurisdictional limits of this Court.

## XXII.

### DECLARATORY JUDGMENT

Plaintiff seeks the rendition of a declaratory judgment declaring that any of the Bank of Jeddah's claimed rights in Plaintiff's shares of Southwest Airport Services, Inc. are null and void, including any right to vote those shares, any security interest in those shares, and all other rights claimed by the Bank

PLEAD000994

to affect Plaintiff's ownership or right to exercise voting control of those shares.

## XXIII.

### ATTORNEYS' FEES

Plaintiff seeks the award the recoupment of all attorneys' fees and other expenses incurred in connection with the prosecution of these claims.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that Defendants be served with citation as requested herein, and that upon final trial of this matter the court enter judgment on all claims as requested above, and for the assessment of damages against all Defendants jointly and severally, for pre-judgment and post-judgment interest as allowed by law, for costs of court, and for such other relief to which Plaintiff may be justly entitled.

Respectfully submitted,

Mark K. Glasser
State Bar No. 08014500
700 Louisiana, Suite 3500
Houston, Texas  77002
(713) 226-0600
(713) 228-1331 (Fax)

ATTORNEYS FOR SANDRA C. BATH

9973C:\DOCS\BAT37001\bankpet.001

-14-

PLEAD000995



EXHIBIT A

PLEAD000996

## PLEDGE AGREEMENT

PLEDGE AGREEMENT dated as of January 17, 1990, made by James R. Bath, (the "Pledgor") to The National Commercial Bank - New York Branch (the "Bank").

## W I T N E S S E T H:

WHEREAS, the Pledgor is the legal and beneficial owner of the shares of capital stock of Southwest Airport Services, Inc. (the "Company") described in Schedule I hereto (the "Pledged Shares").

WHEREAS, the Pledgor is the legal and beneficial owner of all the outstanding shares of Express Park, Inc. (the "Borrower").

WHEREAS, the Borrower has issued a note to the Bank in the principal amount of $1,400,000 (the "Note").

WHEREAS, it is a condition precedent to the making of any advances, loans or other financial accommodations by the Bank to the Borrower that the Pledgor shall have executed a guaranty dated the date hereof for the benefit of the Bank and made the pledge contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to make any advances, loans or financial accommodations now or hereafter to the Borrower, the Pledgor hereby agrees with the Bank as follows:

SECTION 1. Pledge. The Pledgor hereby pledges to the Bank, and grants to the Bank a first priority security interest in, the following (the "Pledged Collateral"):

(i)  all of the Pledged Shares;

(ii) all additional shares of stock of the Pledgor from time to time acquired by the Pledgor in any manner including without limitation as a result of the options set forth on Schedule I hereto;

PLEAD000997

(iii) the certificates representing the shares referred to in clauses (i) and (ii) above; and

(iv) all dividends, cash, instruments and other property or proceeds, from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the shares referred to in clauses (i) and (ii) above;

SECTION 2. <u>Security for Obligations</u>. This Agreement secures and the Pledged Collateral is security for the indefeasible payment in full when due, of all obligations and debts of the Pledgor and the Borrower to the Bank now or hereafter existing whether for principal, interest, fees, expenses or otherwise, and all obligations of the Pledgor or the Borrower now or hereafter existing including without limitation obligations under this Agreement, the Note and under the Guaranty (all such obligations of the Pledgor and the Borrower being the "Obligations").

SECTION 3. <u>Delivery of Pledged Collateral</u>. All certificates or instruments representing or evidencing the Pledged Collateral shall be delivered to and held by the Bank pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank or indorsements, all in form and substance satisfactory to the Bank in its reasonable judgment. The Bank shall have the right, at any time in its discretion and without notice to the Pledgor, to transfer to or to register in its name or any of its nominees any or all of the Pledged Collateral, subject only to the revocable rights specified in Section 6(a). In addition, the Bank shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

SECTION 4. <u>Representations and Warranties</u>. The Pledgor represents and warrants as follows:

(a) The Pledged Shares (i) have been duly authorized and validly issued (ii) are fully paid and non-assessable, (iii) have not been cancelled or rescinded, and are in full force and effect, and (iv) constitute at least 90% of the outstanding capital stock of the Company and all

- 2 -

PLEAD000998

of the outstanding capital stock of the Company owned by the Pledgor. As of the date hereof, there are no existing options, warrants, call or commitments of any character whatsoever relating to any Pledged Shares.

(b) The Pledgor is the legal and beneficial owner of the Pledged Collateral free and clear of any lien, charge, encumbrance, mortgage, pledge, hypothecation, security interest or preference priority or security interest of any kind or nature whatsoever (collectively a "Lien") except for the Lien created by this Agreement.

(c) The Pledgor has the right and requisite authority to pledge, assign, transfer, deliver, deposit and set over the Pledged Collateral pledged to the Bank as provided herein.

(d) This Agreement has been duly executed and delivered by the Pledgor and constitutes a legal, valid and binding obligation of the Pledgor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the rights of creditors generally or the application of general equity principles.

(e) The pledge of and granting of a security interest in the Pledged Shares, pursuant to this Agreement creates a valid and perfected first priority security interest in the Pledged Collateral, securing the payment of the Obligations.

(f) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge by the Pledgor, of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Pledgor, or (ii) for the exercise by the Bank of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement except as may be required in connection with the disposition of the Pledged Collateral by laws affecting the offering and sale of security generally.

- 3 -

PLEAD000999

The representations and warranties set forth in this Section 4 shall survive the execution and delivery of this Agreement.

SECTION 5.  <u>Further Assurances; Supplements</u>.

(a)  The Pledgor agrees that at any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Bank may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Bank to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.

(b)  The Pledgor will defend the title to the Pledged Collateral and the Liens of the Bank thereon against the claim of any Person and will maintain and preserve such Liens.

(c)  The Pledgor agrees that he will, upon obtaining any additional shares of capital stock, promptly (and in any event within three (3) Business Days) deliver to the Bank a Pledge Amendment, duly executed by the Pledgor, in substantially the form of Schedule II hereto (a "Pledge Amendment"), in respect of the additional shares which are to be pledged pursuant to this Agreement.  The Pledgor hereby authorizes the Bank to attach each Pledge Amendment to this Pledge Agreement and agrees that all shares listed on any Pledge Amendment delivered to the Bank shall for all purposes hereunder constitute Pledged Collateral.

SECTION 6.  <u>Voting Rights; Dividends; Etc.</u>

(a)  As long as no event referred to in Section 6(d) shall have occurred and be continuing:

(i)  The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement; <u>provided</u>, <u>however</u>, that the Pledgor shall not exercise or refrain from exercising any such right if and when, in the Bank's judgment, such action would have any reasonable likelihood of having a material adverse

- 4 -

PLEAD001000

effect on the value of the Pledged Collateral or any part thereof, and; provided, further, that the Pledgor shall give the Bank at least five (5) days written notice of the manner in which he intends to exercise, or the reasons for refraining from exercising, any such right.

(ii) The Pledgor shall be entitled to receive and retain any and all dividends, interest or partnership revenues paid in respect of the Pledged Collateral, other than any and all

(A) dividends or interest paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral,

(B) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of or return of capital, capital surplus or paid-in-surplus or sale of any stock or other assets of the the Partnership, and

(C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Collateral,

all of which shall be, and all of which shall be forthwith delivered to the Bank to hold as, Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Bank, be segregated from the other property or funds of the Pledgor, and be forthwith delivered to the Bank as Pledged Collateral in the same form as so received (with any necessary indorsement).

(iii) The Bank shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and other rights which he is entitled to exercise

- 5 -

PLEAD001001

pursuant to paragraph (i) above and to receive the dividends which he is authorized to receive and retain pursuant to paragraph (ii) above.

(b)   Upon the occurrence of any of the events referred to in Section 6(d):

(i)   All rights of the Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) above shall cease upon notice by the Bank to the Pledgor, and all such rights shall thereupon become vested in the Bank who shall there upon have the sole right to exercise such voting and other consensual rights.

(ii)   All rights of the Pledgor to receive the dividends which it would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) above shall cease, and all such rights shall thereupon become vested in the Bank who shall thereupon have the sole right to receive and hold as Pledged Collateral such dividends.

(iii)   All dividends which are received by the Pledgor contrary to the provisions of paragraph (i) of this Section 6(b) shall be received in trust for the benefit of the Bank, shall be segregated from other funds of the Pledgor and shall be forthwith paid over to the Bank as Pledged Collateral in the same form as so received (with any necessary indorsement).

(c)   In order to permit the Bank to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 6(b)(i) above, and to receive all dividends, revenues, interest and distributions which it may be entitled to receive under Section 6(b)(ii) above, the Pledgor shall, if necessary, upon written notice of the Bank, from time to time execute and deliver to the Bank appropriate dividend payment orders, indorsements, and other instruments, including, without limitation, proxies, as the Bank may reasonably request.

(d)   The Bank may exercise the voting and other rights referred to in Sections 6(b) and (c) if any of the

- 6 -

following events of default shall occur and be continuing (the "Events of Default"):

(i)  any amount owed by the Pledgor or Borrower to the Bank now or in the future is not paid when it becomes due; or

(ii)  any provision of this Agreement, the Assignment (as defined in the Note) executed by the Company or any other agreement between the Pledgor or the Borrower and the Bank or any note issued by Pledgor or the Borrower to the Bank or any mortgage granted in favor of the Bank by the Pledgor or the Borrower or any other pledge agreement, security agreement, assignment or guaranty made in favor of the Bank by the Pledgor or the Borrower or any other guarantor or third party to secure the payment of Obligations, now or in the future, is violated or any "Event of Default" shall have occurred and is continuing under any of the foregoing or under any Loan Document (as defined in the Note); or

(iii)  the Pledgor dies; or

(iv)  the Pledgor has made or makes any false or misleading statements herein or in any agreement or certificate delivered to the Bank or about the Pledgor's financial affairs or about any other important matter regarding this Agreement or the Pledged Collateral or any loan or any application or any agreement with the Bank.

SECTION 7.  Transfers and Other Liens; Additional Shares.

(a)  The Pledgor agrees that he will not (i) sell, assign or transfer or otherwise dispose of, or grant any option or warrant with respect to, any of the Pledged Collateral, or (ii) create or permit to exist any Lien, security interest, or other charge or encumbrance upon or with respect to any of the Pledged Collateral, except for the Lien in favor of the Bank under this Agreement,

(b)  The Pledgor agrees that he will pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional shares of stock

- 7 -

PLEAD001003

or other securities of the Company which the Pledgor acquires.

SECTION 8. _Bank Appointed Attorney-in-Fact_. The Pledgor hereby appoints the Bank the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in the Bank's discretion to take any action and to execute any instrument which the Bank may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, indorse and collect all instruments made payable to the Pledgor representing any dividend, interest payment, or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.

SECTION 9. _Bank May Perform_. If the Pledgor fails to perform any agreement contained herein, the Bank may itself perform, or cause performance of, such agreement, and the expenses of the Bank incurred in connection therewith shall be payable by the Pledgor under Section 12.

SECTION 10. _Reasonable Care_. The Bank shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Bank accords its own property, it being understood that the Bank shall not have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Bank has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral.

SECTION 11. _Remedies_. If any event specified in Section 6(d) shall have occurred:

(a) The Bank may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party in default under the Uniform Commercial Code (the "Code") in effect in the State of New York at that time, and the Bank may also, without notice except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or

- 8 -

at any of the Bank's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Bank may deem commercially reasonable. The Pledgor agrees that, to the extent notice of sale shall be required by law, at least five (5) days' notice to the Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Bank shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given. The Bank may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Pledgor hereby waives any claims against the Bank arising by reason of the fact that the price at which any Pledged Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Bank accepts the first offer received and does not offer such Pledged Collateral to more than one offeree.

(b) The Pledgor recognizes that, by reason of the requirements and certain prohibitions contained in the Securities Act of 1933, as amended from time to time (the "Securities Act") and applicable state securities laws, the Bank may therefore be compelled, with respect to any sale of all or any part of the Pledged Collateral, to limit purchasers to those who will agree, among other things, to acquire such securities for their own account, for investment, and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that any such sale may result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions and, notwithstanding such circumstances, agrees that any such sale shall be deemed to have been made in a commercially reasonable manner. The Bank shall be under no obligation to delay the sale of any of the Pledged Shares for the period of time necessary to permit the Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if the Pledgor would agree to do so.

(c) If the Bank determines to exercise its rights to sell any or all of the Pledged Collateral, upon written request, the Pledgor shall, from time to time, furnish to the Bank all such information as the Bank may request in

PLEAD001005

order to determine the number of shares and other instruments which may be sold by the Bank as exempt transactions under the Securities Act and rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d) Any cash held by the Bank as Pledged Collateral and all cash proceeds received by the Bank in respect of any sale of, collection from, or other realization upon all or any part of the Pledged Collateral shall be applied by the Bank:

First, to the payment of the costs and expenses of such sale, including reasonable compensation to the Bank and its agent and counsel, and all expenses, liabilities and advances made or incurred by the Bank in connection therewith;

Second, to the payment of any accrued but unpaid interest, and prepayment premium if any, on the Obligations;

Third, to the then outstanding principal amounts of the Obligations in any order the Bank chooses, even if the Obligations are not then due;

Fourth, to the payment of any other Obligations which are then unpaid; and

Finally, after payment in full of all Obligations, to the payment to the Pledgor, or his successors or assigns, or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

SECTION 12.  Expenses.  The Pledgor will upon demand pay to the Bank the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Bank may incur in connection with (i) the administration of this Agreement; (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Pledged Collateral; (iii) the exercise or enforcement of any of the rights of the Bank hereunder; or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof.

- 10 -

PLEAD001006

SECTION 13.  <u>Security Interest Absolute</u>.   All rights of the Bank and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

(i)  any lack of validity or enforceability of any agreement between Pledgor and Bank, any guaranty of the Obligations executed in favor of the Bank, any note issued by Pledgor to the Bank, or any other loan document or any other agreement or instrument relating thereto;

(ii)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any agreement, or note or any other loan documents referred to above;

(iii)  any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; or

(iv)  any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Pledgor or a third party pledgor.

SECTION 14.  <u>Release</u>. The Pledgor consents and agrees that the Bank may at any time, or from time to time, in its discretion (a) renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Obligations and (b) exchange, release and/or surrender all or any of the Pledged Collateral, or any part thereof, by whomsoever deposited, which is now or may hereafter be held by the Bank in connection with all or any of the Obligations; all in such manner and upon such terms as the Bank may deem proper, and without notice to or further assent from such Pledgor, it being hereby agreed that the Pledgor shall be and remain bound upon this Agreement, irrespective of the existence, value or condition of any of the Pledged Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension.  The Pledgor hereby waives notice of acceptance of this Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Obligations, and promptness in commencing

- 11 -

PLEAD001007

suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon such Pledgor. No act or omission of any kind on the Bank's part shall in any event affect or impair this Agreement.

SECTION 15.  Indemnification.  The Pledgor agrees to indemnify and hold the Bank harmless from and against any taxes, liabilities, claims and damages, including reasonable attorney's fees and disbursements, and other expenses incurred or arising by reason of the taking or the failure to take action by the Bank, in good faith, in respect of any transaction effected under this Agreement or in connection with the Lien provided for herein, including without limitation, any taxes payable in connection with the delivery or registration of any of the Pledged Collateral as provided herein.  Whether or not the transactions contemplated by this Agreement shall be consummated, the Pledgor agrees to pay to the Bank all the fees and expenses set forth in Section 12.  The obligations of the Pledgor under this Section 15 shall survive the termination of this Agreement.

SECTION 16.  Waiver.  No delay on the Bank's part in exercising any power of sale, Lien, option or other right hereunder, and no notice or demand which may be given to or made upon the Pledgor by the Bank with respect to any power of sale, Lien, option or other right hereunder, shall constitute a waiver thereof, or limit or impair the Bank's right to take any action or to exercise any power of sale, Lien, option, or any other right hereunder, without notice or demand, or prejudice the Bank's rights as against the Pledgor in any respect.

SECTION 17.  Amendments, Etc.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 18.  Addresses of Notices.  All notices and other communications provided for hereunder shall be in writing (including telegraphic communication) and mailed, telegraphed, telecopied or delivered, if to the Pledgor,

- 12 -

addressed to him, James R. Bath at 11 Greenway Plaza, Suite
2870, Houston, Texas 77046, telecopy number (713) 850-7431;
if to the Bank, addressed to it at 245 Park Avenue, New
York, New York 10167-0063, telecopy number (212) 916-9089,
Attention: Gerald McDuffee, Vice President with a copy to
Zeichner Ellman & Krause, 757 Third Avenue, New York, New
York 10017, (212) 753-0646, Attention: Sandra J. Du Boff,
Esq. or at such other address as shall be designated by such
person in a written notice to each other person complying as
to delivery with the terms of this Section.  All such
notices and other communications shall, when mailed or
telegraphed, respectively, be effective when deposited in
the mails or delivered to the telegraph company,
respectively, addressed as aforesaid and shall, when
delivered or telecopies be effective when received.

   SECTION 19.  <u>Continuing Security Interest; Transfer
of Notes</u>.  This Agreement shall create a continuing first
priority security interest in the Pledged Collateral and
shall (i) remain in full force and effect until indefeasible
payment in full of the Obligations; (ii) continue to be
effective or be reinstated, as the case may be, if at any
time payment and performance of the Obligations, or any part
thereof, is, pursuant to applicable law, rescinded or
reduced in amount, or must otherwise be restored or returned
by the obligee of the Obligations, whether as a "voidable
preference", "fraudulent conveyance", or otherwise, all as
though such payment or performance had not been made;
(iii) be binding upon the Pledgor, his successors and
assigns, heirs, distributees, executor; and (iv) inure,
together with the rights and remedies of the Bank, to the
benefit of the Bank and its respective successors,
transferees and assigns.  Without limiting the generality of
the foregoing clause (iv), the Bank may assign or otherwise
transfer any note or instrument held by it to any other
person or entity or may otherwise transfer the Obligations
to any other person or entity, and such other person or
entity shall thereupon become vested with all the benefits
in respect thereof granted to the Bank herein or otherwise.
Upon the indefeasible payment in full of the Obligations,
the Pledgor shall be entitled to the return, upon his
request and at his expense, of such of the Pledged
Collateral as shall not have been sold or otherwise applied
pursuant to the terms hereof.

- 13 -

SECTION 20. <u>Severability</u>. If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Agreement which are valid.

SECTION 21. <u>Section Titles</u>. The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

SECTION 22. <u>Further Indemnification</u>. The Pledgor agrees to pay, and to save the Bank harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes which may be payable or determined to be payable with respect to any of the Pledged Collateral or in connection with any of the transactions contemplated by this Pledge Agreement. This Section 15 shall survive termination of this Agreement or the indefeasible payment in full of the Obligations.

SECTION 23. <u>Waiver of July Trial, Submission to Jurisdiction</u>. (a) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE NOTE OR ANY LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, PLEDGOR HEREBY ACCEPTS FOR HIMSELF AND IN RESPECT OF HIS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. THE PLEDGOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH HE MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(b) The Pledgor irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Pledgor at its said address, such service to become effective 30 days after such mailing.

(c) Nothing contained in this Section 23 shall affect the right of the Bank or any holder of the Note or any other notes to serve process in any other manner

- 14 -

PLEAD001010

permitted by law or commence legal proceedings or otherwise proceed against the Borrower in any other jurisdiction.

(d)  THE PLEDGOR HEREBY AGREES TO WAIVE ANY RIGHT HE MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATED IN ANY WAY TO THIS AGREEMENT.

SECTION 24.  <u>GOVERNING LAW; TERMS</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS ( AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF NEW YORK.  TERMS DEFINED IN ARTICLES 8 AND 9 OF THE UNIFORM COMMERCIAL CODE IN THE STATE OF NEW YORK ARE USED HEREIN AS THEREIN DEFINED.

SECTION 25. <u>Advice of Counsel</u>. The Pledgor acknowledges and agrees that he and his counsel have reviewed and have had an opportunity to negotiate the terms and provisions of this Pledge Agreement  and the other Loan Documents and have contributed or have been offered the opportunity to contribute to their revision; the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of them; and their terms and provisions shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of these agreements.

IN WITNESS WHEREOF, the Pledgor has duly executed and delivered this Agreement as of the date first above written.

By: _____
                    James R. Bath

18150373 N31

SCHEDULE I
TO PLEDGE AGREEMENT

Attached to and forming a part of that certain Pledge
Agreement dated as of January 17, 1990, by James R. Bath, to
the Bank.

| Stock Issuer | Class of Stock | Stock Certificate No(s). | Par Value | Number of Shares |
|---|---|---|---|---|
| Southwest Airport Services, Inc. | Common | - 3 - | No Par Value | 900 |

18150373 N31

PLEAD001012

SCHEDULE II
TO PLEDGE AGREEMENT

PLEDGE AMENDMENT

This Pledge Amendment, dated _____, 19__ is delivered pursuant to Section 5 of the Pledge Agreement referred to below.  The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge Agreement, dated as of January 17, 1990 and that the shares listed on this Pledge amendment shall be and become part of the Pledged Collateral referred to in said Pledge Agreement and shall secure all obligations of the undersigned under said Pledge Agreement, and all the obligations of James R. Bath (the "Pledgor").

By: _____
    James R. Bath

| Stock Issuer | Class of Stock | Stock Certificate No(s). | Par Value | Number of Shares |
| --- | --- | --- | --- | --- |

18150373 N31

STATE OF _____*Missouri*_____,
COUNTY OF _____*Jackson*_____.


On _____*January 16*_____, 1990, before me
personally came _____*James R Bath*_____, to me known
who, being by me duly sworn, said; that he resides at
_____*Harris County, Texas*_____ and that
deponent is the _____*President*_____ of the corporation
described in, and which executed the foregoing
_____*Pledge Agreement*_____, and that he signed
his name thereto by authority of the board of directors of
said corporation.


_____*Diane K. Track*_____
Notary Public

DIANE R. TRACK
NOTARY PUBLIC STATE OF MISSOURI
CLAY COUNTY
MY COMMISSION EXP. DEC.20,1992

18150373 N31