SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------X
THE NATIONAL COMMERCIAL BANK,        :

               Plaintiff,       :

     -against-                      :

AKORP N.V., BOARD OF MANAGERS OF     :
OLYMPIC TOWER CONDOMINIUM,
OLYMPIC TOWER CONDOMINIUM, THE       :
CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF FINANCE,          :
THE PEOPLE OF THE STATE OF NEW
YORK, THE COMMISSIONER OF            :
TAXATION AND FINANCE OF THE
STATE OF NEW YORK, ADNAN             :
KHASHOGGI, MARIO DASILVA,
AURORA DASILVA, and "JOHN DOE #1" :
through "JOHN DOE #10" inclusive,
the names of the last 10             :
defendants being fictitious,
the true names of said defendants :
being unknown to plaintiff, it
being intended to designate any      :
and all persons in possession of
the mortgaged premises and all       :
other persons or parties having
or claiming any right, title, or     :
interest in or a lien upon the
mortgaged premises described         :
in the complaint herein,
                      :
            Defendants.
------------------------------------X

Index No. 447/91

COMPLAINT

     The plaintiff, The National Commercial Bank ("plaintiff" or "NCB"), by its attorneys, Oppenheimer Wolff & Donnelly, as and for its complaint ("complaint") against the defendants, alleges as follows:

PLEAD015261

## AS AND FOR A FIRST CAUSE OF ACTION

1.  Plaintiff NCB was at all times hereinafter mentioned, and now is, a banking institution organized under the laws of Saudi Arabia, with an office and principal place of business in Jeddah, Saudi Arabia.

2.  Upon information and belief, except as to any tax liens of defendants The City of New York, The New York City Department of Finance, The People of the State of New York, and The Commissioner of Taxation and Finance of the State of New York prior to plaintiff NCB's Mortgage, each of the defendants, except as otherwise indicated, has or claims to have some interest in, or lien upon, the subject premises, or some part thereof, which interest or lien, if any, accrued subsequently to the lien of plaintiff NCB's Mortgage and is subordinate thereto.

3.  Defendant Akorp N.V. (hereinafter referred to as "Akorp") is a corporation organized and existing under the laws of the Netherlands Antilles, with an office and principal place of business at De Ruyterkade 58-A, P.O. Box 837, Willemstead, Curacao, Netherlands Antilles.  Pursuant to the Guaranty Agreement which is a subject of this action, defendant Akorp has agreed to the personal jurisdiction of any state or federal court located in the City of New York with respect to "any legal

2

action or proceeding against it or any of its property in connection with this Guaranty."

4.    Upon information and belief, defendant Board of Managers of Olympic Tower Condominium is the board of managers of defendant Olympic Tower Condominium, a condominium established under the laws of the State of New York, has a principal place of business at 641 Fifth Avenue, New York, New York, and is responsible for the ongoing operation, maintenance, and management of the condominium.  The Board of Managers of Olympic Tower Condominium is named as a defendant in its capacity as acting on behalf of the unit owners of that condominium in filing notices of lien against the mortgaged property which is the subject of this action for allegedly unpaid common charges and interest thereon.

5.    Defendants The City of New York and The New York City Department of Finance are made defendants by reason of the lien, if any, pursuant to § 11-606 and § 11-683 of the Administrative Code of the City of New York, of unpaid general corporation taxes, if any, imposed by said defendants and owing by defendant Akorp, and the lien imposed by the judgment in the amount of $46,920.95, arising out of unpaid general corporation taxes, in favor of The New York City Department of Finance and against defendant Akorp, perfected October 11, 1990 and docketed

PLEAD015263

December 3, 1990 in New York County, and to cut-off such liens to the extent they may be subsequent to the Mortgage of plaintiff.

6. Defendants The City of New York and The New York City Department of Finance are also made defendants by reason of the lien, if any, pursuant to § 1519 of the New York City Charter and § 11-301 of the Administrative Code of the City of New York, of unpaid property taxes and water and sewer rents and charges imposed by said defendants and owing by defendant Akorp, and to cut-off any such lien to the extent it is subsequent to the Mortgage of plaintiff. As of February 15, 1991, said defendants claimed that real property taxes, and sewer and water rents and charges, including interest thereon, are owed on the mortgaged property as follows:

| Tax Lot 1193 | — | $ 663,028.93 |
|---|---|---|
| Tax Lot 1194 | — | 74,132.85 |
| Tax Lot 1196 | — | 104,628.31 |
| Tax Lot 1197 | — | 84,090.25 |
| Tax Lot 1198 | — | 40,997.77 |
| Total | | $ 966,878.11 |

The tax lots referred to above are located in Block 1287, Section 5, Borough of Manhattan, in the Tax Map of the Real Property Assessment Department of the City of New York.

7. Defendants The People of the State of New York and The Commissioner of Taxation and Finance of the State of New

4

York ("State Commissioner") are made defendants herein by reason of the lien, if any, pursuant to §§ 181, 213, and 1092(j) of the Tax Law of the State of New York, of unpaid franchise taxes, or corporation taxes, including maintenance or license fees, if any, imposed by said defendants and owing by defendant Akorp, and to cut-off any such lien to the extent it is subsequent to the Mortgage of plaintiff. As of May 19, 1989, defendants The People of the State of New York and State Commissioner claimed that defendant Akorp owed franchise taxes for the period ended October 31, 1988 and a surcharge, and owed license fees. Upon information and belief, any such lien does not arise by reason of the filing or docketing of a warrant under articles nine or nine-a of said Tax Law.

8.    Upon information and belief, defendant Adnan Khashoggi is a citizen of Saudia Arabia and is in possession of part of the mortgaged property. Pursuant to the Loan Agreement described in paragraph 12 below, defendant Khashoggi has agreed to the personal jurisdiction of any state or federal court located in the City of New York with respect to any legal action or proceeding against him with respect to the Loan Agreement or any other Loan Document, as defined in the aforesaid Loan Agreement, including but not limited to the Guaranty Agreement which is the subject of this action.

PLEAD015265

9.   Upon information and belief, defendants Mario
DaSilva and Aurora DaSilva, husband and wife, reside in the
City, County and State of New York, and are in possession  of
part of the mortgaged property as caretakers.

10.   Included among the defendants named herein are
other persons who may be in possession of portions of the
premises or who may have or claim to have a right, title, or
interest in or lien upon the premises, whose true names are
unknown to plaintiff.  Upon information and belief, each such
person has or may claim to have a leasehold interest or other
interest in possession in, or right, title, or interest in or
lien upon the premises, which leasehold or other interest, or
right, title, interest, or lien, if any, is subject to the lien
held by plaintiff NCB.

11.  This is an action to foreclose a mortgage given
by defendant Akorp to plaintiff NCB, which secures a guaranty
of payment of indebtedness.

12.  On or about August 28, 1986, plaintiff, as lender,
entered into a Loan Agreement (hereinafter referred to as "Loan
Agreement") with defendant Adnan Khashoggi ("Khashoggi"), as
borrower, and various guarantors, whereby plaintiff loaned the
sum of $22,750,000 to Khashoggi, and Khashoggi agreed to repay
the outstanding principal balance of the loan, plus accrued and

6

PLEAD015266

unpaid interest, on demand or, if no demand was made prior thereto, on August 29, 1988, with interest on the outstanding principal balance to be paid commencing on October 1, 1986 and in three-month intervals thereafter.

13. The Loan Agreement provides, at paragraphs 1.3 and 1.4 of Article I thereof, for payment of interest and the rate of interest on the loan from plaintiff NCB to Khashoggi as follows:

"1.3 <u>Payment of Interest</u>

The outstanding principal balance of the Loan shall bear interest from the date hereof at the rate of interest set forth in paragraph 1.4 below and such interest will be payable in immediately available funds to The National Commercial Bank, 245 Park Avenue, New York, New York 10017 for credit and advice to the account of The National Commercial Bank, PO Box 3555, Jeddah, Saudi Arabia, account no. 9600 on each date ("Interest Payment Date") which falls 3 calendar months ("Interest Period") after the preceding Interest Payment Date, provided that the first payment of interest hereunder shall be due on October 1, 1986.

If any Interest Payment Date would otherwise fall on a day which is not a Business Day ("Business Day" means a day on which banks are open for business in London and New York City), it shall be postponed to the next day which is a Business Day.

1.4 <u>Rate of Interest</u>

The rate of interest payable from time to time in respect of the Loan ("Rate of Interest") will be established as follows:-

(i) At or about 11.00 a.m. London time on the second Business Day prior to the first day of each Interest Period (the "Interest Determination Date") Lender will request the principal London offices of three banks

7

**dealing in the London Interbank Market (the "Reference Banks") for the offered rates quoted by such Reference Banks to leading banks in the London Interbank Eurodollar Market** for deposits in U.S. dollars in an amount equal to the outstanding principal balance of the Loan for a period of three months from such Interest Determination Date. Lender's determination of such rates shall (in the absence of manifest error) be deemed conclusive.  The Rate of Interest for such Interest Period shall, subject as provided below, be the rate per annum established by Lender as being one per cent (1%) per annum above the arithmetic mean (rounded upwards to the nearest 1/16 of one per cent) of such offered rates.

(ii)   If on any Interest Determination Date only two of the Reference Banks are quoting offered rates as aforesaid, the Rate of Interest for such Interest Period shall, subject as provided below, be determined on the basis of the rates so offered by such two Reference Banks.  Lenders' determination of such rates shall (in the absence of manifest error) be deemed conclusive.

(iii)  If on any Interest Determination Date only one or none of the Reference Banks are quoting offered rates as aforesaid, then the Rate of Interest for such Interest Period shall, subject as provided below, be the higher of (a) the Rate of Interest in effect for the last preceding Interest Period to which the provisions of subparagraph (i) or subparagraph (ii) of this paragraph 1.4 shall have applied or (b) the Reserve Interest Rate.  The "Reserve Interest Rate" shall be the rate per annum which Lender determines to be (a) one per cent (1%) per annum above the arithmetic mean (rounded upwards to the nearest 1/16 of one per cent) of the highest dollar prime lending rates which three New York City banks selected by Lender are quoting on the Interest Determination Date for the Interest Period in question to the Lender or to the Reference Banks or to those of them (being at least two in number) to which such offered quotations are being so made.  Lender's determination of such rates

8

shall (in the absence of manifest error) be deemed conclusive.

(iv)   In no event shall the Rate of Interest for any Interest Period be less than five per cent (5%) per annum.

(v)   The amount of interest payable on a particular Interest Payment Date shall be calculated by multiplying the outstanding principal amount of the Loan during the Interest Period in question by the Rate of Interest for such Interest Period, multiplying such amount by a fraction the numerator of which is the actual number of days in such Interest Period and the denominator of which is 360 and rounding the resulting amount to the nearest cent (half a cent being rounded upwards). The determination of such amount by Lender shall (in the absence of manifest error) be deemed conclusive.

(vi)   Any principal of or interest on the Loan which is not paid when due (whether at stated maturity, by acceleration or otherwise) shall, subject to the provisions of subparagraph (iv) above and as well after as before any judgment, bear interest at the rate that is two per cent (2%) per annum above the highest Rate of Interest otherwise applicable from to time to the Loan. The determination of such rate by Lender shall (in the absence of manifest error) be deemed conclusive."

14.   Paragraph 3.1(h) of Article 3 of the Loan Agreement provides as follows:

Borrower and Guarantors shall indemnify and defend Lender against, and shall hold Lender harmless from any and all losses, damages (whether general, punitive, or otherwise), liabilities, claims, causes of action (whether legal, equitable or administrative), judgments, court costs and legal or other expenses (including attorney's fees) which Lender may suffer or incur as a direct or indirect consequence of: (i) Lender's performance under this Agreement or under any

9

other Loan Document, including without limitation
Lender's exercise or failure to exercise any rights,
remedies or powers in connection with this Agreement
or any of the other Loan Documents; (ii) Borrower's or
Guarantors' failure to perform any of Borrower's
obligations as and when required by this Agreement or
any of the other Loan documents, including without
limitation, any failure of any representation or
warranty of Borrower or Guarantors to be true and
correct and any failure by Borrower or Guarantors to
satisfy any condition; (iii) any claim or cause of
action of any kind by any person or entity to the
effect that Lender is in any way responsible or liable
for any act or omission by Borrower or Guarantors,
whether on account of any theory of derivative
liability or otherwise; (iv) any act or omission by
Borrower, Guarantors, any contractor, subcontractor of
material supplier, engineer, architect or other person
or entity, except Lender, with respect to any of the
Security Interests; (v) any claim or cause of action
of any kind by any person or entity which would have
the effect of denying Lender the full benefit or
protection of any provision of this Agreement or any
of the other Loan Documents; or (vi) any claim that
Lender is responsible for the payment of a fee,
commission or compensation to a broker, finder or
packager in connection with the Loan or the performance
of the Loan Documents.  Lender's rights of indemnity
shall not be directly or indirectly limited,
prejudiced, impaired or eliminated in any way by any
finding or allegation that Lender's conduct is active,
passive or subject to any theory of any kind, character
or nature as to any act or omission by Borrower or
Guarantor or any other person or entity except Lender.
Borrower, or Guarantors, in the event of default by
Borrower, shall pay any indebtedness arising under said
indemnity to Lender immediately upon demand by Lender.
This indemnity shall survive the payment of all amounts
payable pursuant to the Note and all documents securing
payment of the Note.  Payment by Lender shall not be
a condition precedent to the obligations of Borrower
or Guarantors under this indemnity.


15.  On or about August 28, 1986, Khashoggi executed

and delivered to plaintiff a promissory note (hereinafter

referred to as "the Note") in the principal amount of

$22,750,000, evidencing the indebtedness of Khashoggi to

10

plaintiff NCB for the loan made by plaintiff NCB to him pursuant to the Loan Agreement.  The Note provided for payment of the principal sum of $22,750,000 and accrued and unpaid interest, "at a varying rate per annum equal to the lesser of (a) the maximum amount Payee may lawfully charge . . . or a rate . . ., calculated pursuant to [the Loan Agreement]", upon demand or, if no demand, on August 29, 1988.  A copy of the Note is annexed hereto as Exhibit 1.

16.  The Note provides that if the Note "shall be placed in the hands of an attorney for collection after default or maturity" Khashoggi agrees to pay all costs of collection, including attorneys' fees.

17.  On or about November 21, 1986, defendant Akorp signed the Loan Agreement and Note as a Guarantor.

18.  On or about November 21, 1986, defendant Akorp, with knowledge of the terms of the Loan Agreement and the Note, and in consideration of financial accommodations given or to be given or continued to Khashoggi, entered into a Guaranty Agreement (hereinafter referred to as the "Guaranty Agreement"), whereby, _inter alia_, defendant Akorp unconditionally guaranteed, to plaintiff NCB, payment, when due, of any and all obligations and liabilities of Khashoggi to plaintiff NCB, as described in the Guaranty Agreement, including the indebtedness of Khashoggi

11

PLEAD015271

to plaintiff under the Loan Agreement and the Note, and all interest due thereon and all attorneys' fees, costs and expenses of collection and enforcement incurred by the Lender in enforcing any of such liabilities and/or the terms thereof. Defendant Akorp's liability under the Guaranty Agreement is limited to a maximum amount of $15,000,000. A copy of the Guaranty Agreement which includes defendant Akorp's waiver of presentment, notice of dishonor, and protest is annexed hereto as Exhibit 2.

19. As collateral security for the guaranty given by defendant Akorp pursuant to the Guaranty Agreement, defendant Akorp, on the 21st day of November, 1986, duly executed, acknowledged, and delivered to plaintiff NCB a mortgage (hereinafter referred to as "the Mortgage") bearing that date, entitled "Mortgage (With Security Agreement and Assignment of Rents and Leases)", whereby it mortgaged to plaintiff NCB the premises in the Mortgage, described as follows:

> "All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situated, lying and being in the Borough of Manhattan, City, County and State of New York, more particularly described as follows:
>
> Parcel I Unit No. 46-47A in the Olympic Tower Condominium (hereinafter called the "Condominium"), together with the undivided 1.8179008 percent interest in the common elements of the Condominium appurtenant to said Unit, conveyed to the Mortgagor by Deed recorded in the office of the Register of the

12

PLEAD015272

City of New York, New York County, in Reel
371 at page 1573;

Parcel II   Unit No. 46B in the
Condominium together with the undivided
.1845180 percent interest in the common
elements of the Condominium appurtenant to
said Unit, conveyed to the Mortgagor by Deed
recorded in the office of the Register of the
City of New York, New York County, in Reel
371 at Page 1585;

Parcel III   Unit No. 47D in the
Condominium, together with the undivided
.2604644 percent interest in the common
elements of the Condominium appurtenant to
said Unit, conveyed to the Mortgagor by Deed
recorded in the office of the Register of the
City of New York, New York County, in Reel
371 at page 1609;

Parcel IV   Unit No. 47E in the
Condominium, together with the undivided
.2093882 percent interest in the common
elements of the Condominium appurtenant to
said Unit, conveyed to the Mortgagor by Deed
recorded in the office of the Register of the
City of New York, New York County, in Reel
371 at Page 1621;

Parcel V   Unit No. 47F in the
Condominium, together with the undivided
.1690078 percent interest in the common
elements of the Condominium appurtenant to
said Unit, conveyed to the Mortgagor by Deed
recorded in the office of the Register of the
City of New York, New York County, in Reel
371 at Page 1633."

These parcels are also designated and described as,

respectively, Tax Lot Nos. 1193 [i.e., Parcel I above], 1194

[i.e., Parcel II above], 1196 [i.e., Parcel III above], 1197

[i.e, Parcel IV above], and 1198 [i.e., Parcel V above], Block

1287, Section 5, Borough of Manhattan, on the Tax Map of the

Real Property Assessment Department of the City of New York.

13

PLEAD015273

A copy of the Mortgage is annexed hereto and made a part hereof as Exhibit 3.

20. The Mortgage was duly recorded in the office of the City Register of the City of New York, New York County, State of New York, on the 25th day of November, 1986, in Reel 1148 at Page 1029.

21. At the time of the recording of the Mortgage, there was paid to the City Register of the City of New York the amount of tax imposed on said Mortgage.

22. Pursuant to paragraph 4.1 of Article IV of the Mortgage, defendant Akorp agreed to make all payments required to be made pursuant to the Guaranty Agreement "when due and shall punctually and properly perform all of Mortgagor's covenants, obligations and liabilities under the Loan Instruments to which Mortgagee is a party", including, but not limited to, the Note and Guaranty Agreement.

23. Pursuant to paragraph 7.1 of Article VII of the Mortgage, failure by defendant Akorp to pay pursuant to the Guaranty Agreement when due is an event of default under the Mortgage.

14

PLEAD015274

24. The Mortgage, at paragraph 8.3 of Article VIII, provides that in the event of default, including failure to pay under the Guaranty Agreement when due, plaintiff may, _inter alia_, proceed by suit in equity to foreclose the Mortgage "and to sell the Mortgaged Property as an entirety or otherwise, as Mortgagee [i.e., plaintiff NCB] may determine". The Mortgage, at paragraph 1.2 of Article I, provides, _inter alia_, that "the maximum principal amount of indebtedness secured by this Mortgage at execution or which under any contingency may be secured at any time hereafter is $9,000,000.00."

25. Paragraph 8.12 of Article VIII of the Mortgage provides as follows:

> "8.12 _Fees and Expenses_. In any suit to foreclose the liens and security interests hereof, there shall be allowed and included as additional Indebtedness secured hereby in the decree of sale, to the full extent permitted by law, all costs and expenses which may be paid or incurred by or on behalf of Mortgagee for attorneys' fees, appraiser's fees, receiver's costs and expenses, insurance, taxes, outlays for documentary and expert evidence, costs for preservation of the Mortgaged Property, stenographer's charges, publication cost and costs of procuring all abstracts of title, title searches and examinations, guarantee policies, Certificates of Title issued by the Registrar of Titles (Torrens certificates), and similar data and assurances with respect to title as Mortgagee may deem to be reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or value of the Mortgaged Property or for any other

15

PLEAD015275

reasonable purpose.  The amount of any such costs and expenses which may be paid or incurred after the decree for sale is entered may be estimated and the amount of such estimate may be allowed and included as additional Indebtedness secured hereby in the decree for sale."

26.  The Mortgage further provides that the Mortgagee, plaintiff NCB, is entitled, without notice, and without regard to the adequacy of the mortgage property for repayment of the debt, to make application for the appointment of a receiver of the rents and profits of the mortgaged premises, and that defendant Akorp irrevocably consents to such appointment.

27.  Plaintiff NCB is still the owner and holder of the Note, Guaranty Agreement, and Mortgage, and is still the mortgagee under the Mortgage.

28.  Khashoggi has failed to pay, as required under the Loan Agreement and Note, any part of the sum of $22,750,000, the principal amount of the loan made by plaintiff NCB to him pursuant to the Loan Agreement, which loan became due and payable on August 29, 1988, and has failed to pay the following installments of interest due, under the terms of  the Loan Agreement and Note, on the following dates:

| Amount of Interest | Due Date |
| --- | --- |
| $418,742.19 | February 1, 1987 |
| $415,898.44 | April 2, 1987 |

PLEAD015276

| | |
|---|---|
| $442,084.64 | July 2, 1987 |
| $476,012.15 | October 2, 1987 |
| $556,901.04 | January 4, 1988 |
| $485,214.84 | April 4, 1988 |
| $457,843.75 | July 5, 1988 |
| $519,616.32 | October 5, 1988 |
| $334,535.59 | November 29, 1988 |
| $271,815.10 | January 5, 1989 |
| $700,273.44 | April 5, 1989 |
| $761,967.02 | July 5, 1989 |
| $920,856.84 | November 5, 1989 |
| $939,994.14 | January 5, 1990 |
| $889,410.58 | April 5, 1990 |
| $ 41,323.59 | April 9, 1990 |
| $159,460.96 | July 5, 1990 |
| $165,539.40 | October 5, 1990 |
| $175,330.48 | January 7, 1991 |

The total amount of principal and interest unpaid and owed by Khashoggi to plaintiff NCB, including interest on the overdue and unpaid interest under the Loan Agreement and Note, was, as of April 9, 1990, $32,206,710.67.

29.   In the beginning of July, 1989, plaintiff NCB commenced a proceeding in the Court of First Instance No. 32 in Madrid, Spain to foreclose mortgages on Spanish real properties,

17

given by 14 Spanish and Panamanian entities to plaintiff NCB, because of the failure of said entities to pay NCB, upon written guaranties given by the entities, the sums due under the Loan Agreement and Note.  These mortgages were given as security for guaranties made by these entities under written guaranty agreements signed by these entities.  Pursuant to these guaranties, the entities guaranteed payment of all liabilities of Khashoggi to plaintiff NCB with respect to the loan made by plaintiff NCB to Mr. Khashoggi pursuant to the Loan Agreement, and evidenced by the Note in the principal amount of $22,750,000.  Neither defendant Akorp nor defendant Khashoggi was a party in the foreclosure proceeding in Spain.

30.  By orders dated July 10, 1989, the court in Madrid directed that the mortgages on the Spanish properties be foreclosed.  After two auctions of the Spanish properties, at which no bids were received, the Spanish court, upon plaintiff NCB's petition, transferred the properties to Kalida Finance Inc.

31.  As of January 7, 1991, taking into account the money received by plaintiff NCB from Kalida Finance Inc. upon the transfer of the Spanish properties, the unpaid balance of the principal amount of the indebtedness of Khashoggi to plaintiff NCB under the Loan Agreement and Note, together with interest, totalled $6,213,091.51.

18

PLEAD015278

32. Defendant Akorp has failed to comply with the terms and conditions of the Guaranty Agreement and Mortgage, and has defaulted under the Mortgage, by failing and omitting to pay in whole or in part any of the unpaid balance of the principal amount of the loan, and the interest due and payable by Khashoggi to plaintiff NCB under the Loan Agreement and Note, which unpaid balance of the principal amount and interest totalled $6,213,091.51 as of January 7, 1991, none of which has been paid by any person.

33. At paragraph 4.8 of Article IV of the Mortgage, Akorp covenanted and agreed to "pay, or cause to be paid, all taxes, assessments, sewer rates or water rates. . . against or affecting the Mortgaged Property as the same become due and payable". A breach of that covenant constitutes an event of default under paragraph 7.2 of the Mortgage.

34. Upon information and belief, in violation of the terms and conditions of the Mortgage, Akorp has failed to pay real property taxes, general corporation taxes, sewer and water rents and charges, and interest on such taxes, rents, and charges, which are long past due and which have been imposed by defendants The City of New York and The New York City Department of Finance against or affecting the mortgaged property, and Akorp has thereby defaulted under the Mortgage.

19

35.     There  exists  with  reference  to  the  mortgaged premises the following restrictive covenants and encumbrances:

    a.   Easement in Reel 388, page 108;

    b.   Terms,  covenants,  restrictions,  reservations, reservations  of  easements  and  conditions  of Condominium  Declaration  and  By-Laws  recorded  in Reel 349, page 1356, and re-recorded in Reel 351, page 1, as amended by documents    recorded   in Reel  355,  page  1512,  Reel  360,  page  1746,  Reel 371, page 48, Reel 375, page 404, Reel 394, page 573, Reel 394, page 1849, Reel 397, page 1846, and Reel 397, page 1838;

    c.   Construction  Declaration  recorded  in  Reel  306, page 674;

    d.   Party Wall Agreement recorded on 6/24/45 in Liber 4359, Cp. 277;

    e.   Declaration  by  Arvic  Realty  Corp.  recorded  on 7/17/72 in Reel 246, page 1346, as amended by document in Reel 271, page 1803; and

    f.   Easement  Agreement  recorded  in  Reel  352,  page 1162.

36.  Plaintiff NCB requests that in the event that this action  proceeds  to  judgment  of  foreclosure  and  sale,  the

PLEAD015280

premises be sold subject to the aforesaid restrictive covenants and to the state of facts as appear from a survey, and to other encroachments and projections, if any.

37.   Plaintiff NCB commenced an action to foreclose the Mortgage given by Akorp to plaintiff against the defendants herein on June 14, 1989, in the United States District Court for the Southern District of New York [Civil Action No. 89 Civ. 4208 (WK)], by reason of defendant Akorp's defaults under the Guaranty Agreement and Mortgage with respect to the obligations and liabilities of Khashoggi to pay the principal amount, and interest due thereon, loaned by plaintiff to Khashoggi pursuant to the terms of the Loan Agreement and Note.  That foreclosure action was discontinued, voluntarily and without prejudice, for lack of subject matter jurisdiction by reason of the dismissal of criminal charges against defendant Adnan Khashoggi in the criminal proceeding entitled United States of America v. Ferdinand F. Marcos, et al., 87 CR. 598 (JFK) in which proceeding the United States sought the forfeiture, pursuant to 18 U.S.C. §1963(a), to the United States of America of certain of the real property which is the subject of the Mortgage given by defendant Akorp to plaintiff NCB.  The United States no longer seeks forfeiture of any part of the mortgaged property, and thereby the aforementioned foreclosure action was discontinued, without prejudice, on November 1, 1990.

21

PLEAD015281

38.   No other action or proceeding has been commenced at law or otherwise for the recovery of the sum secured by the Guaranty and Mortgage, arising out of Khashoggi's obligations and liabilities under the Loan Agreement and Note, except as hereinbefore set forth.


AS AND FOR A SECOND CAUSE OF ACTION


39.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "26", and "33" through "36" of this complaint as though fully set forth herein.

40.   Pursuant to the terms of the Guaranty Agreement, Akorp guaranteed payment of "all liabilities, direct or indirect, absolute or contingent, primary or secondary, joint, several or independent, of [Khashoggi] now or hereafter existing, due or to become due to, or held or to be held by, [NCB] for its own account. . .  and all renewals, extensions, increases or modifications thereof."

41.   On or about July 28, 1986, plaintiff, as lender, entered into a Loan Facility Agreement (hereinafter referred to as "Facility Agreement I") with defendant Khashoggi, as borrower, whereby plaintiff loaned the sum of $8,000,000 to Khashoggi, and Khashoggi agreed to repay the outstanding

22

PLEAD015282

principal balance of the loan on July 28, 1988 or earlier in the event of a default under Facility Agreement I.  A copy of Facility Agreement I is annexed hereto and made a part hereof as Exhibit 4.

42.  On or about July 28, 1986, Khashoggi executed and delivered to plaintiff a promissory note (hereinafter referred to as "Facility Note I") in the principal amount of $8,000,000, evidencing the indebtedness of Khashoggi to plaintiff for the loan made by plaintiff to him pursuant to Facility Agreement I. Facility Note I provides that Khashoggi unconditionally and irrevocably promises to pay to plaintiff $8,000,000 on July 28, 1988.  A copy of Facility Note I is annexed hereto as Exhibit 5 and made a part hereof.

43.  On or about March 3, 1987, plaintiff, as lender, entered into a Loan Facility Agreement (hereinafter referred to as "Facility Agreement II") with Khashoggi, as borrower, whereby plaintiff loaned the sum of $9,000,000 to Khashoggi, and Khashoggi agreed to repay the principal balance of the loan on March 3, 1989 or earlier in the event of a default under Facility Agreement II.  A copy of Facility Agreement II is annexed hereto and made a part hereof as Exhibit 6.

44.  On or about March 3, 1987, Khashoggi executed and delivered to plaintiff a promissory note (hereinafter referred

PLEAD015283

to as "Facility Note II") in the principal amount of $9,000,000, evidencing the indebtedness of Khashoggi to plaintiff for the loan made by plaintiff to him pursuant to Facility Agreement II. Facility Note II provides that Khashoggi promises to pay plaintiff $9,000,000 on March 2, 1989. A copy of Facility Note II is annexed hereto as Exhibit 7 and made a part hereof, and an English translation thereof is annexed hereto as Exhibit 8.

45. On or about May 22, 1987, plaintiff, as lender, entered into a Loan Facility Agreement (hereinafter referred to as "Facility Agreement III") with Khashoggi, as borrower, whereby plaintiff loaned the sum of $9,000,000 to Khashoggi, and Khashoggi agreed to repay the principal balance of the loan on May 21, 1989 or earlier in the event of Khashoggi's default under Facility Agreement III. A copy of Facility Agreement III is annexed hereto and made a part hereof as Exhibit 9.

46. On or about May 22, 1987, Khashoggi executed and delivered to plaintiff a promissory note (hereinafter referred to as "Facility Note III") in the principal amount of $9,000,000, evidencing the indebtedness of Khashoggi to plaintiff for the loan made to him by plaintiff pursuant to Facility Agreement III. Facility Note III provides that Khashoggi promises to pay plaintiff $9,000,000 on May 22, 1989. A copy of Facility Note III is annexed hereto and made a part hereof as Exhibit 10.

24

47. Each of the aforementioned Facility Agreements provides that the period for which the loan is outstanding shall be divided into successive commission periods each of which shall start forthwith upon the expiration of the preceding period.

48. Each of the above referenced Facility Agreements provides for Khashoggi's payment of Commission as follows:

4. Commission

The Borrower shall pay Commission on the unpaid and outstanding amount under the Facility. Such Commission shall accrue from day to day and shall be calculated with reference to the Facility amount on the basis of 360 days in a year and actual days elapsed. Such Commission shall be paid in arrears on the last day of each Commission Period. The rate at which such interest is payable for each Commission Period shall be determined by the Bank as being the aggregate of 1% and the rate at which Dollar deposits are offered by the Bank in the London Interbank Eurodollar Market in an amount equal to the amount of the Facility and for a period equal to such Commission Period. Such rate, determined as aforesaid, shall be conclusive and binding on the Borrower.

49. Each of the above referenced Facility Agreements provides that:

7. Events of default

Upon the occurrence or continuation of any of the following Events of Default:

a. The Borrower shall fail to promptly pay any sums due hereunder; or

25

PLEAD015285

b.   any representation/warranty made by the Borrower herein shall prove to be incorrect in any material respect; or

c.   any indebtedness of the Borrower for or in respect of borrowed money is not paid on the due date therefor or any such indebtedness becomes due and payable prior to its specified maturity or any creditor of the Borrower becomes entitled to declare any such indebtedness due and payable prior to its specified maturity; or

                    *            *            *

g.   in the sole judgment of the Bank, a situation shall arise giving reasonable grounds for maintaining that the Borrower cannot comply with the obligations stipulated in this Letter Agreement;

        then and in such event, and at any time thereafter if any such event shall then be continuing, the Bank may declare the Facility to be cancelled forthwith whereupon any amounts outstanding thereunder shall immediately become due and payable together with all accrued Commission thereon and any other amounts due hereunder without presentation, demand, protest or notice of any kind all of which are hereby expressly waived. Additionally, the Bank shall have the entitlement to realize/enforce any security/collateral held by it in or towards repayment of the Facility.

50.   Plaintiff NCB is still the owner and holder of Facility Note I, Facility Note II, Facility Note III, the Guaranty Agreement, and the Mortgage, and is still the mortgagee under the Mortgage.

51.   Khashoggi has failed to pay, as required under Facility Agreement I and Facility Note I, any part of the sum of $8,000,000, the principal amount of the loan by plaintiff to

26

PLEAD015286

him pursuant to Facility Agreement I, which loan became due and payable on July 28, 1988, and has failed to pay the commissions, totalling $2,349,078.53 as of January 3, 1991, due and payable on such principal amount. The total amount of principal and commissions unpaid and owed by Khashoggi to plaintiff under Facility Agreement I, as of January 3, 1991, is $10,349,078.53.

52. Khashoggi has failed to pay, as required under Facility Agreement II and Facility Note II, the sum of $1,968,700.13, the unpaid balance of the principal amount of the loan by plaintiff to him pursuant to Facility Agreement II, which became due and payable on March 3, 1989, and has failed to pay the commissions, totalling $2,080,869.13 as of January 3, 1991, due and payable pursuant to Facility Agreement II. The total amount of principal and commissions unpaid and owed by Khashoggi to plaintiff under Facility Agreement II, as of January 3, 1991, is $4,049,619.26.

53. Khashoggi has failed to pay, as required under Facility Agreement III and Facility Note III, the sum of $4,740,317.23, the unpaid balance of the principal amount of the loan by plaintiff to him pursuant to Facility Agreement III, which became due and payable on May 23, 1989, and has failed to pay the commissions, totalling $1,719,655.16 as of January 3, 1991, due and payable pursuant to Facility Agreement III. The total amount of principal and commissions unpaid and owed by

27

PLEAD015287

Khashoggi to plaintiff under Facility Agreement III, as of January 3, 1991, is $6,459,987.39.

54. Defendant Akorp has failed to comply with the terms and conditions of the Guaranty Agreement and Mortgage by failing and omitting to pay in whole or in part the principal amount and commissions thereon, due and payable to plaintiff by Khashoggi under Facility Agreement I, totalling $10,349,578.53 as of January 3, 1991; by failing and omitting to pay in whole or in part the unpaid balance of the principal amount and commissions thereon, due and payable to plaintiff by Khashoggi under Facility Agreement II, totalling $4,049,619.26 as of January 3, 1991; and by failing and omitting to pay in whole or in part the unpaid balance of the principal amount and commissions thereon, due and payable to plaintiff by Khashoggi under Facility Agreement III, totalling $6,459,987.39 as of January 3, 1991.

55. No other action or proceeding has been commenced at law or otherwise for the recovery of the sums secured by the Guaranty and Mortgage and set forth in paragraph "54" of this complaint.

PLEAD015288

**WHEREFORE, plaintiff NCB demands judgment that:**

1.    The defendants, and each of them, and all persons claiming under them or any of them subsequent to the commencement of this action and the filing of a notice of pendency thereof, and every other person or corporation whose right, title, conveyance, or encumbrance is subsequent or subsequently recorded to the Mortgage given by defendant Akorp to plaintiff, be forever barred and foreclosed of and from all estate, right, title, interest, claim, lien, and equity of redemption of, in and to the mortgaged premises and each and every part and parcel thereof;

2.    The total amount due plaintiff under the Guaranty Agreement and Mortgage be determined;

3.    The premises may be decreed to be sold according to law;

4.    The moneys arising from the sale thereof be brought into Court;

5.    Plaintiff NCB be paid the total amount due to it under the Guaranty Agreement and Mortgage, with interest to the time of such payment and the expenses of such sale, together with its attorneys' fees and other fees, and the costs,

PLEAD015289

allowances, and disbursements of this action, and together with any moneys advanced and paid pursuant to any terms or provision of the Guaranty Agreement or Mortgage described in this complaint, or to protect the lien of plaintiff NCB's Mortgage, and together with any and all taxes, water and sewer rents and charges, insurance premiums, and all other charges and liens on the premises, which are or may be paid by plaintiff NCB, with interest upon those amounts from the dates of the respective payments and advances thereof;

6.    This Court forthwith appoint a receiver of rents and profits of the mortgaged premises, during the pendency of this action, with the usual powers and duties;

7.    Defendants Akorp and Khashoggi be adjudged to pay the whole residue, or so much thereof as the Court may determine to be just and equitable, of the total debt remaining unsatisfied after a sale of the mortgaged premises and the application of the proceeds pursuant to the directions contained in such judgment; and

8.    Plaintiff NCB have such other and further relief as may be just and equitable.

30

PLEAD015290

Dated:  New York, New York
        March 5, 1991

                                    Yours, etc.


                                    OPPENHEIMER WOLFF & DONNELLY
                                    Attorneys for Plaintiff
                                    The National Commercial Bank
                                    845 Third Avenue, 8th Floor
                                    New York, New York  10022
                                    (212) 826-5000

                                    OPPENHEIMER WOLFF & DONNELLY
                                    40 Park Street
                                    London,  W1Y 3PF, England
                                    011-44-71-409-1093

31



Exhibit 1

PLEAD015292

PROMISSORY NOTE

$22,750,000           New York, New York         August 28, 1986

On demand, or if no demand be made, on August 29, 1988, for value received, the undersigned promises to pay to the order of The National Commercial Bank ("Payee") at 245 Park Avenue, New York, New York 10017, for credit and advice to the account of The National Commercial Bank, P.O. Box 3555, Jeddah, Saudi Arabia, account no. 9600 or at such other place as may from time to time be designated by the holder of this Note, in lawful money of the United States of America, and in immediately available funds the principal sum of TWENTY TWO MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS (US $22,750,000), with interest on the principal balance from time to time remaining unpaid from the date of advancement until default or maturity at a varying rate per annum equal to the lesser of (a) the maximum amount Payee may lawfully charge (the "Maximum Rate") or (b) a rate ("Rate of Interest"), calculated pursuant to that certain Loan Agreement of even date herewith ("Loan Agreement") between the undersigned, Payee and certain Guarantors (as therein defined). Each change in the rate to be charged hereunder shall become effective without notice to the undersigned on the effective date of each change in the Maximum Rate of the Rate of Interest, as the case may be. Notwithstanding the foregoing, if, at any time, the Rate of Interest specified in clause (b) preceding shall exceed the Maximum Rate, thereby causing the interest hereon to be limited to the Maximum Rate as provided for in clause (a) preceding, then any subsequent reductions in the rates utilized in calculation of the Rate of Interest shall not reduce the Rate of Interest charged hereunder below the Maximum Rate until the total amount of interest accrued hereon equals the amount of interest which would have accrued hereon if the Rate of Interest in clause (b) preceding had been in effect at all times in the period during which the rate charged hereon was limited to the Maximum Rate. All past due principal and interest shall bear interest from maturity until paid at a rate per annum which from day to day shall equal the sum of the Rate of Interest plus two percent (2%) per annum.

The undersigned and Payee hereby agree that the expression "Maximum Rate" as used herein means the greater of (a) the maximum rate of interest from time to time permitted under federal laws applicable to the indebtedness evidenced hereby or (b) the maximum rate of interest from time to time permitted under laws applicable to the indebtedness evidenced hereby, as amended from time to time.

Payments of interest only shall be due and payable in immediately available funds on each date ("Interest Payment Date") which falls three (3) calendar months ("Interest Period") after the preceding Interest Payment Date, provided that the first payment of interest hereunder shall be due October 1, 1986. Interest shall be paid on the outstanding principal balance hereof up to and including August 29, 1988, when the entire unpaid principal balance hereof, together with all unpaid accrued interest thereon, shall be due and payable. The undersigned may, at his option, prepay all or any part of the principal balance hereunder, subject to payment to Payee of a prepayment premium equal to one percent (1%) of the sum of the principal amount so prepaid plus accrued but unpaid interest thereon. Each payment received by the holder hereof shall be applied first to the payment of accrued interest due hereunder and then to the reduction of the unpaid principal balance hereof.



Upon the failure to pay any installment of interest on this Note, or upon the occurrence of any default under any instrument evidencing, relating to, or guarantying or securing the payment of this Note, the entire principal balance and accrued interest owing hereon shall at once become due and payable without notice, at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. Neither this paragraph nor the enumeration of any Events of Default in any instrument securing or guarantying the payment of this Note shall in any way limit or impair the right of the holder of this Note to demand payment hereof at any time.

The holder of this Note may collect a late charge not to exceed four cents (US $.04) for each one dollar (US $1.00) of each payment of interest or principal more than three (3) days in arrears, to cover the extra expense involved in handling delinquent accounts, provided that, should such late charge constitute interest under applicable law, such late charge shall not, together with other interest to be paid on the indebtedness evidenced by this Note or indebtedness arising under any instrument securing or guarantying the payment hereof, exceed the maximum interest permitted under applicable law.

Except as may be otherwise provided herein or in any instrument securing or guarantying the payment of this Note, the makers, signers, guarantors, sureties, and endorsers of this Note severally waive demand, presentment, notice of dishonor, notice of intent to demand or accelerate payment hereof, notice of acceleration, diligence in collecting, grace, notice, and protest, and agree to one or more extensions for any period or periods of time and partial payments, before or after maturity, without prejudice to the holder; and if this Note shall be collected by legal proceedings or through a probate or bankruptcy court, or shall be placed in the hands of an attorney for collection after default or maturity, the undersigned agrees to pay all costs of collection, including attorney's fees.

Should this Note be signed by more than one party, all of the obligations herein contained shall be the joint and several obligations of each signer hereof.

This Note is issued pursuant to the Loan Agreement of even date herewith between the undersigned, Payee and Guarantors which contains provisions for the acceleration of the maturity hereof upon the happening of certain events described therein.

This Note is guaranteed pursuant to certain Guaranty Agreements ("Guaranty Agreements") between Payee and Guarantors which are secured by certain mortgages ("Mortgages") in favor of Payee, evidencing liens on certain real property described therein, and evidencing a security interest in certain personal property described therein, to which Mortgages and Guaranty Agreements reference is here made for a description of the property covered thereby and the nature and extent of the security and the rights and powers of the holder of this Note with respect to such security.

All agreements between the undersigned and the holder hereof, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity hereof or otherwise, shall the amount contracted for, charged, received, paid or agreed to be paid to the holder hereof for the use, forbearance, or detention of the funds evidenced hereby or otherwise, or for the performance or payment of any covenant or obligation contained in any instrument securing the payment hereof, exceed such maximum amount permissible under applicable law. If, from any circumstance whatsoever, interest would otherwise be payable to the holder hereof in excess of the maximum lawful



PLEAD015294

amount, the interest payable to the holder hereof shall be reduced to the maximum amount permitted under such applicable law; and if from any circumstance the holder hereof shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereof, such excess shall be refunded to the undersigned. All interest paid or agreed to be paid to the holder hereof shall, to the extent permitted by such applicable law, be amortized, prorated, allocated, and spread throughout the full period of the loan evidenced hereby until payment in full of the principal (including the period of any renewal or extension hereof) so that the interest hereon for such full period shall not exceed the maximum amount permitted by applicable law. The term "applicable law" as used herein shall mean the laws of the State of New York or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future. This paragraph shall control all agreements between the undersigned and the holder hereof.

This Note shall be governed by and construed in accordance with the laws of the State of New York and the laws of the United States of America applicable to transactions in New York.

EXECUTED as of the date first set forth above.

MAKER:

_____
Adnan M. Khashoggi

GUARANTORS:

CHATILLON S.A.

By: _____

BANAPART S.A.

By: _____

VALTOR SECURITIES INC.

By: _____

VISIOSYSTEM HOLDING S.A.

By: _____

COSCOJAL S.A.

By: _____

INVESTIMAR S.A.

By: _____

Notwithstanding anything to the contrary herein contained), the obligations as Guarantors hereunder of Coscojal S.A. and of Investimar S.A., but if in other party hereto, shall not be effective until such time as the execution of this Note by Coscojal S.A. and by Investimar S.A. is approved by the Spanish Exchange Control authorities).

PLEAD015295



**Exhibit 2**

PLEAD015296

## GUARANTY AGREEMENT

In consideration of financial accommodations given or to be given or continued to Adnan M. Khashoggi, an individual with an address at P.O. Box 6, Washem Street, Murrabb'a District, Riyadh, Saudi Arabia (herein called the "Borrower"), by The National Commercial Bank, a banking institution organized under the laws of Saudi Arabia with an address at P.O. Box 3555 Jeddah, Saudi Arabia (herein called the "Lender"), AKORP N.V., a corporation organized under the laws of the Netherlands Antilles, with an address at De Ruyterkade 58-A, P.O. Box 837, Willemstaad, Curacao, Netherlands Antilles ("Guarantor") irrevocably and unconditionally guarantees to the Lender payment when due and/or performance when required, as appropriate, whether by acceleration or otherwise, of any and all obligations and liabilities of the Borrower to the Lender (as herein defined), together with all interest thereon and all attorneys' fees, costs and expenses of collection and enforcement incurred by the Lender in enforcing any of such liabilities and/or the terms hereof.

The term "liabilities of the Borrower" shall include all liabilities, direct or indirect, absolute or contingent, primary or secondary, joint, several or independent, of the Borrower now or hereafter existing, due or to become due to, or held or to be held by, the Lender for its own account or as agent for another or others, whether created directly or acquired by assignment or otherwise, and all renewals, extensions, increases or modifications thereof. The liabilities of the Borrower shall include, but shall not be limited to, those set forth in a Loan Agreement and Exhibits thereto dated August 28, 1986, by and between Borrower and Lender and the other parties named therein relating to a loan of US $22,750,000 to Borrower (the "Loan Agreement"). The liabilities of the Guarantor hereunder shall not be reduced or limited by reason of any similar or dissimilar guaranty executed in favor of the Lender by any other person, firm or corporation and this Guaranty shall be enforceable against the Guarantor without regard to such other guaranty or guaranties. Notwithstanding the foregoing, Guarantor's liability under this Guaranty shall be limited to a maximum amount of $ 15,000,000 ₮₩ (₩₩)

The Guarantor waives notice of acceptance of this Guaranty and notice of any liability to which it may apply, and waives presentment, demand of payment, protest, notice of dishonor or non-payment of any such liabilities, suit or taking other action by the Lender against, and any other notice to, any party liable thereon (including the Guarantor). The Guarantor additionally waives and relinquishes any right or remedy which it may have or be able to assert by reason of the provisions of any applicable law, rule, or regulation pertaining to the rights and remedies of sureties.

PLEAD015297

The Lender may at any time and from time to time (whether or not after revocation or termination of this guaranty) without the consent of, or notice (except as shall be required by applicable statute and cannot be waived) to, the Guarantor, without incurring responsibility to the Guarantor, without impairing or releasing the obligations of the Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(1) change the manner, place or terms of payment and/or change or extend the time of payment of, renew or alter any liability of the Borrower, any security therefor, or any liability incurred directly or indirectly in respect thereof, and the Guaranty herein made shall apply to the liabilities of the Borrower as so changed, extended, renewed or altered;

(2) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the liabilities hereby guaranteed or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(3) exercise or refrain from exercising any rights against the Borrower or others (including the Guarantor) or otherwise act or refrain from acting;

(4) settle or compromise any liability hereby guaranteed, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Lender and the Guarantor; and

(5) apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Lender regardless of what liability or liabilities of the Borrower remain unpaid.

No invalidity, irregularity or unenforceability of all or any part of the liabilities hereby guaranteed or of any security therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty is a primary obligation of the Guarantor.

PLEAD015298

This Guaranty is a continuing one and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon; and the circumstance that at any time or from time to time the liabilities of the Borrower may be paid in full shall not affect the liabilities of the Guarantor hereunder with respect to liabilities of the Borrower thereafter incurred.  This Guaranty shall continue until written notice of a request for release of same, signed by the Guarantor, shall have been actually received and approved by the Lender, notwithstanding a complete or partial release for any cause of, the Borrower or of anyone liable in any manner for the liabilities hereby guaranteed or for the liabilities (including those hereunder) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase, decrease or change in personnel of the Guarantor.  No release or termination hereof shall affect in any manner rights arising under this Guaranty with respect to liabilities which shall have been created, contracted, assumed or incurred prior to receipt of Lender's approval of such release or termination; and the sole effect of revocation or termination hereof shall be to exclude from this Guaranty liabilities thereafter arising which are unconnected with liabilities theretofore arising or transactions theretofore entered into.

As to any liabilities of the Borrower which are not guaranteed hereby, whether by operation of the foregoing paragraph or by express written agreement of the Lender, or otherwise, Lender may, without in any manner impairing its rights hereunder, apply all amounts realized by Lender from collateral or security held by Lender for the payment of all such liabilities before applying the same to liabilities of the Borrower guaranteed hereby.

If the Guarantor is or becomes liable for any of the liabilities of the Borrower by endorsement or otherwise than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of the Lender hereunder shall be cumulative of any and all other rights that the Lender may ever have against the Guarantor.  The exercise by the Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.  Without in any way diminishing the generality of the foregoing portion of this paragraph, it is specifically understood and agreed that this Guaranty is given by the Guarantor as an additional guaranty to any and all other guaranties heretofore or hereafter executed and delivered to the Lender by the Guarantor in favor of the Lender relating to the liabilities of the Borrower to the Lender, and nothing herein shall ever be deemed to replace or be in lieu of any other of such previous or subsequent guaranties.

All notices provided to be given to the Lender herein shall be sent by registered or certified air mail, return receipt requested.

-3-

PLEAD015299

Each payment on any of the liabilities of the Borrower shall be deemed to have been made by the Borrower unless express written notice is given to the Lender at the time of such payment that such payment is made by the Guarantor as specified in such notice.

Any and all rights and claims of the Guarantor against the Borrower or any of its property, arising by reason of any payment by the Guarantor to the Lender pursuant to the provisions of this Guaranty, shall be subordinate and subject in right of payment to the prior payment in full of all liabilities of the Borrower to the Lender.

The Guarantor shall, upon execution hereof, deliver to the Lender as security for the liabilities of the Guarantor hereunder collateral security, original or additional, satisfactory to the Lender, as more fully described in, and pursuant to, a mortgage (the "Mortgage"), substantially in the form of Exhibit D to the Loan Agreement.

All property of the Guarantor ("Guaranty Property") shall be held by the Lender subject to a first and prior lien and security interest hereby granted in favor of the Lender, as security for any and all liabilities of the Guarantor to the Lender.  The term "Guaranty Property" shall include all property of every description now or hereafter in the possession or custody of or in transit to the Lender for any purpose, including safekeeping, collection or pledge, for account of the Guarantor, or as to which the Guarantor may have any right or power.  The balance of every account of the Guarantor with, and each claim of the Guarantor against, the Lender existing from time to time shall be subject to a first and prior lien and subject to set off against any and all liabilities of the Guarantor to the Lender, and the Lender may at any time or from time to time at its option and without notice appropriate and apply toward the payment of any of such liabilities the balance of each such account of the Guarantor with, and each such claim of the Guarantor against, the Lender.  The Lender may at any time and from time to time, without notice, transfer into its own name or that of its nominee any of the Guaranty Property of the Guarantor.

The Guarantor hereby subordinates and makes inferior all indebtedness now or at any time hereafter owed by the Borrower to the Guarantor to the liabilities of the Borrower to the Lender and agrees, after the occurrence of any Event of Default under any Loan Document (as such term is defined in the Loan Agreement) between the Borrower and the Lender or any event or condition which, with the passing of time and/or the giving of notice, would result in such an Event of Default, not to permit the Borrower to repay, or to accept payment from the Borrower of, such indebtedness or any part thereof without the prior written consent of the Lender.

-4-

Upon the happening of any of the following events: the occurrence of an Event of Default under the Mortgage or under any Loan Document between the Borrower and the Lender, or the death or insolvency (however evidenced) of the Borrower or of any person who is liable directly or indirectly in respect of any of the liabilities of the Borrower, or an adverse change in the financial condition of the Borrower or any aforesaid person, or suspension of business of the Borrower or any aforesaid person, or the issuance of any warrant, process or order of attachment, garnishment of other lien and/or the filing of a lien as a result thereof against any of the property of the Borrower or any aforesaid person, or the making by the Borrower or any aforesaid person of an assignment for the benefit of creditors, or a trustee or receiver being appointed for the Borrower or for any aforesaid person or for any property of them, or any proceeding being commenced by or against the Borrower or any aforesaid person under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute, or it appears that any representation in any financial or other statement or Security Document of the Borrower or any aforesaid person, delivered to the Lender by or on behalf of the Borrower or such person, is untrue or incomplete, or if the Lender deems itself insecure for any reason, then and in any such event, and at any time thereafter, the Lender may, without notice to the Borrower or any aforesaid person, make the liabilities of the Borrower to the Lender, whether or not then due, immediately due and payable hereunder as to the Guarantor, and the Lender shall be entitled to enforce the obligations of the Guarantor hereunder.

Upon nonpayment when due of any of the liabilities of the Borrower or the Guarantor to the Lender, the Lender shall have the right from time to time, without advertisement or demand upon or notice to the Borrower or the Guarantor or right of redemption except as shall be required by applicable statute which cannot be waived, to sell, resell, assign, transfer and deliver all or part of said Guaranty Property of the Guarantor, at any brokers' board or exchange or at public or private sale, for cash or on credit or for future delivery, and in connection therewith may grant options and may impose reasonable conditions such as requiring any purchaser of any stock so sold to represent that such stock is purchased for investment purposes only. Upon each such sale the Lender, unless prohibited by provisions of any applicable statute which cannot be waived, may purchase all or any part of said Guaranty Property being sold, free from and discharged of all trusts, claims, rights of redemption and equities of the Guarantor.

In the case of each such sale, or any proceedings to collect any liabilities of the Guarantor to the Lender, the Guarantor shall pay all costs and expenses of every kind for collection, sale or delivery, including attorneys' fees, and after deducting

-5-

such costs and expenses from the proceeds of sale or collection, the Lender may apply any residue to pay any of such liabilities of the Guarantor, who shall continue to be liable for any deficiency, with interest at the highest rate permitted by applicable law.

If claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment or on account of any of the liabilities of the Borrower and the Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (b) any settlement or compromise of any such claim effected by the Lender with any such claimant (including the Borrower), then and in such event the Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantor, notwithstanding the cancellation of any note or other instrument evidencing any liability of the Borrower, and the Guarantor shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

Any acknowledgment or new promise, whether by payment of principal or interest or otherwise and whether by the Borrower or others (including the Guarantor), with respect to any of the liabilities of the Borrower, shall, if the statute of limitations in favor of the Guarantor against the Lender shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

The Lender shall have no responsibility for ascertaining, or for informing the Guarantor with respect to, nor be required to take any action concerning, any maturities, calls, conversions, exchanges, offers, tenders or similar matters relating to any of the Guaranty Property of the Guarantor (whether or not the Lender has, or is deemed to have, knowledge of any of the aforesaid), provided that the Lender shall endeavor to take such action as may be requested or authorized by the Guarantor if the Lender determines, in its sole discretion, that such action will not adversely affect the value as collateral of the Guaranty Property of the Guarantor in question and the relative request or authorization is made in writing and is received by the Lender in due time.

The Lender shall not be bound to take any steps necessary to preserve any rights in any of the Guaranty Property of the Guarantor against prior parties who may be liable in connection therewith, and the Guarantor hereby agrees to take such steps. The Lender may nevertheless at any time (a) take any action it may deem appropriate for the care or preservation of such Guaranty Property or of any rights of the Guarantor or the Lender therein, (b) demand, sue for, collect or receive any money or property at any time due, payable or receivable on account of or in exchange

PLEAD015302

for any Guaranty Property of the Guarantor, (c) compromise or settle with any person liable on such Guaranty Property, or (d) extend the time of payment or otherwise change the terms thereof as to any party liable thereon, all without notice to, without incurring responsibility to, and without affecting any of the liabilities hereunder of, the Guarantor.

The Guarantor shall pay to the Lender all costs and expenses, including filing fees and attorneys' fees, incurred by the Lender in connection with the custody, care, preservation or collection of any of the Guaranty Property of the Guarantor or in seeking to enforce any of the liabilities or obligations of the Guarantor hereunder or any of the rights of the Lender hereunder.

The Lender shall have the right, at any time and from time to time, without notice, to (i) transfer into its own name or that of its nominee any of the Guaranty Property of the Guarantor; (ii) notify any obligor on any of such Guaranty Property to make payment to the Lender of any amounts due thereon; or (iii) take control of any proceeds of any of such Guaranty Property.

No delay on the part of the Lender in exercising any of its options, powers or rights, or partial or single exercise thereof, shall constitute a waiver thereof. No waiver of any of its rights hereunder, and no modification or amendment of this Guaranty, shall be deemed to be made by the Lender unless the same shall be in writing, duly signed on behalf of the Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved, and shall in no way impair the rights of the Lender or the obligations of the Guarantor to the Lender in any other respect at any other time. This Guaranty may not be modified orally or by course of conduct. There are no oral conditions to this Guaranty.

This Guaranty and the rights and obligations of the Lender and of the Guarantor hereunder shall be governed and construed in accordance with the laws of the State of New York, without reference to the conflicts of laws or rules thereof, and this Guaranty is binding upon the Guarantor, and upon its successors and assigns, and shall inure to the benefit of the Lender, its successor and assigns. Should the legal status of the Borrower change, this Guaranty shall continue and shall also cover the liabilities of the Borrower under its new status, according to the terms hereof guaranteeing the liabilities of the original Borrower.

The Guarantor hereby irrevocably consents that any legal action or proceeding against it or any of its property in connection with this Guaranty may be brought in any state or federal court located in New York City and hereby submits to and accepts, with regard to any such action or proceeding, for itself and its property, generally and unconditionally the jurisdiction of such courts and the Guarantor hereby irrevocably appoints Wilkie Farr &

-7-

PLEAD015303

Gallagher, One Citicorp Center, 153 East 53rd Street, New York, N.Y. 10022 (Attn: Anthony F. Phillips, Esq.) as its agent for service of process.  Guarantor hereby irrevocably consents to the service of process in any such action or proceeding by the mailing of a copy thereof by postage prepaid, registered airmail to Guarantor at its address set forth above.  The foregoing provisions shall not limit the right of Lender to serve process in any other manner permitted hereunder or by applicable law or to bring any legal proceeding or to obtain execution of judgment in any court of competent jurisdiction in any state or country.  The Guarantor hereby waives any objection which it may now or hereafter have to the laying of the venue in New York City of any suit, action or proceeding arising out of or relating to this Agreement, and hereby further irrevocably waives any claim that New York City is not a convenient forum for any such suit, action or proceeding. The Guarantor agrees that in any judicial proceedings in relation to any matter arising under this Guaranty, the Guarantor will not interpose against Lender (i) any counterclaim (other than a compulsory counterclaim) or setoff of any nature; or (ii) any claim against the Lender for consequential or special damages.

The Guarantor represents and warrants to the Lender that the Guarantor is not insolvent and will not be rendered insolvent by the execution and delivery of this Guaranty; that any and all financial statements of the Guarantor made or to be made available to the Lender are true, complete and correct in all respects; that there has been no adverse change in the financial condition of the Guarantor or in the value of any of the assets described in such financial statements since the date of such statements; and that the Guarantor does not have any material assets or any material liabilities or commitments, direct or contingent, other than those set forth in such financial statements.

The Guarantor acknowledges and confirms to the Lender that the Guarantor has not been induced to execute and deliver this Guaranty as a result of, and is not relying upon, any representations, warranties, agreements or conditions, whether express or implied or written or oral, by the Lender, the Borrower or any other person.  Without limiting the generality of the foregoing or any other provision of this Guaranty, insofar as the Guarantor is concerned:

> (1) the Lender is not obligated to give or to continue any financial accommodations to the Borrower or any other person or to change or extend the time of payment of, or renew or alter, any liability of the Borrower or of any other person, any security therefor or any liability incurred directly or indirectly in respect thereof;

PLEAD015304

(2)   no person, including, without limitation, the
Lender or the Borrower, has made any represen-
tations to the Guarantor as to any matter
which may affect or in any way relate to the
financial condition, relationships or trans-
actions of the Borrower or any other person,
including, without limitation, the business,
assets, liabilities, type or value of any
security therefor, financial condition, man-
agement or control of the Borrower or any
other person;

(3)   the Lender is not obligated to notify the
Guarantor or any other person of any change in
the business, assets, liabilities, type or
value of any security therefor, financial con-
dition, management or control of the Borrower
or of any other person, and none of such
changes shall release or otherwise impair any
of the rights of the Lender against the Guar-
antor; and

(4)   no failure by the Lender to obtain, perfect,
protect, insure or realize upon security for
any of the liabilities of the Borrower or of
any other person or no other act or failure to
act by the Lender shall release or otherwise
impair any of the obligations of the Guarantor
hereunder.

All agreements between the Guarantor, the Borrower and the
Lender, whether now existing or hereafter arising and whether
written or oral, are expressly limited so that in no contingency
or event whatsoever, whether by acceleration of the maturity of
any promissory note or otherwise, shall the amount paid, or agreed
to be paid, to the Lender for the use, forbearance or detention of
the money to be paid hereunder or otherwise pursuant to any Loan
Document, exceed the maximum amount permissible under applicable
law.  If from any circumstances whatsoever fulfillment of any pro-
vision of this Guaranty or of any other document evidencing,
securing or pertaining to the indebtedness guaranteed hereby, at
the time performance of such provision shall be due, shall involve
transcending the limit of validity prescribed by law, then ipso
facto, the obligation to be fulfilled shall be reduced to the
limit of such validity, and if from any such circumstances the
Lender shall ever receive anything of value as interest or deemed
interest by applicable law under this Guaranty or any other docu-
ment evidencing, securing or pertaining to the indebtedness guar-
anteed hereby or executed in connection therewith in an amount
that would exceed the highest lawful rate, such amount that would
be excessive interest shall be applied to the reduction of the
principal amount owing under this Guaranty or on account of any

-9-

PLEAD015305

other indebtedness of the Borrower to the Lender, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of such indebtedness and such other indebtedness, such excess shall be refunded to the parties entitled thereto. All sums paid or agreed to be paid to holder of this Guaranty for the use, forbearance or detention of the indebtedness guaranteed hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full of the principal (including the period of any renewal or extension thereof) so that the interest on account of such indebtedness shall not exceed the maximum amount permitted by applicable law.  The term "applicable law" as used herein shall mean the laws of the State of New York or the laws of the United States, whichever laws allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.  The terms and provisions of this paragraph shall control and supersede every other conflicting provision of all agreements between the Borrower, the Guarantor and the Lender.

Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

This Guaranty has been entered into by the Guarantor after arms-length negotiation between the Guarantor or representatives of the Guarantor and the Lender, the Guarantor having been represented by counsel during such negotiation, and this Guaranty shall not be construed against the Lender on the ground that the Lender has prepared the same.

The Guarantor, if more than one, shall be jointly and severally liable hereunder and the term "Guarantor" wherever used herein shall mean the Guarantor or any one or more of them.  Anyone signing this Guaranty shall be bound hereby, whether or not anyone else signs this Guaranty at any time.  The term "Lender" includes any agent of the Lender acting for it.

THE GUARANTOR HEREBY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE LOAN AGREEMENT AND ASSOCIATED LOAN DOCUMENTS DATED AUGUST 28, 1986, BETWEEN THE BORROWER AND THE LENDER, AND AGREES TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS SET FORTH THEREIN APPLICABLE TO THE GUARANTOR.  THE GUARANTOR FURTHER ACKNOWLEDGES THAT IT HAS COMPLIED WITH ALL OF THE CONDITIONS AND REQUIREMENTS

PLEAD015306

SET FORTH IN THE LOAN AGREEMENT AND FURTHER AFFIRMS THAT ALL REP-
RESENTATIONS AND WARRANTIES SET FORTH IN THAT AGREEMENT ARE TRUE
AND CORRECT.

Dated:   November 21, 1986          AKORP N.V.

                                    By: _____ atty in fact
                                        JORDAN R. Metzger

spa.docs.guar.agmt

-11-

1/25101/0006.docs/guar.agmt

PLEAD015307



Exhibit 3

PLEAD015308

᠁ 1148᠁ 995

MORTGAGE
(WITH SECURITY AGREEMENT AND
ASSIGNMENT OF RENTS AND LEASES)


THIS MORTGAGE (WITH SECURITY AGREEMENT AND ASSIGNMENT OF RENTS AND LEASES) (the "Mortgage") is executed as of the 2( day of November, 1986, by AKORP N.V., a corporation organized under the laws of the Netherlands Antilles ("Mortgagor"), whose address is De Ruyterkade 58-A, P.O. Box 837, Willemstead, Curacao, Netherlands Antilles, to THE NATIONAL COMMERCIAL BANK, a banking institution organized under the laws of Saudi Arabia ("Mortgagee"), whose address is P.O. Box 3555, Jeddah, Saudi Arabia.


RECITALS:

A.   The individual beneficial owner of Mortgagor (the "Borrower"), Mortgagee and certain other parties have entered into a Loan Agreement dated as of August 28, 1986 (said Loan Agreement, together with all amendments, modifications, supplements and restatements thereof being herein referred to as the "Loan Agreement"), which Loan Agreement provides for a loan (the "Loan") to Borrower in the original principal sum of $22,750,000.00;

B.   The Loan is evidenced by a promissory note in the original principal sum of $22,750,000.00 dated as of August 28, 1986, executed and delivered by Borrower, payable to the order of Mortgagee, bearing interest and being payable as set forth therein, and due on demand, or if no demand is made, on August 29, 1988 (said note, and all extensions, amendments, modifications, supplements, increases, restatements and renewals thereof and substitutions therefor being herein referred to as the "Note");

C.   The Note is secured by an irrevocable letter of credit (the "LoC") issued by Credit Commercial de France, a lending institution organized under the laws of the Republic of France ("CCF"), for the account of Borrower to Lender;

D.   Borrower, Lender and CCF have agreed to terminate the LoC on the condition that (i) Borrower satisfy certain indebtedness of Mortgagor to CCF in the original principal amount of $15,000,000.00 (the "CCF Indebtedness") secured by the Mortgaged Property (as hereinafter defined), (ii) CCF release its liens and security interests (the "CCF Security")

-1-

PLEAD015309

against the Mortgaged Property and (iii) Borrower cause Mortgagor to guarantee the Loan and secure its guaranty by a mortgage against the Mortgaged Property;

E. The conditions to the termination of the LoC have now been fulfilled; and

F. As a result of the satisfaction by Borrower of the CCF Indebtedness and the release by CCF of the CCF Security, Mortgagor (i) has now executed and delivered to Mortgagee a Guaranty Agreement dated as of November 21, 1986 (said Guaranty Agreement, and all amendments, modifications, supplements and restatements thereof being herein referred to as the "Guaranty"), pursuant to which Mortgagor has jointly and severally guaranteed the payment of the indebtedness and the performance of the other obligations described in the Loan Agreement and the loan documents executed pursuant thereto and (ii) as additional security for the Guaranty, has agreed to execute and deliver this Mortgage.

AGREEMENTS:

NOW, THEREFORE, Mortgagor, for and in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby MORTGAGE, GRANT, BARGAIN, SELL, ASSIGN and CONVEY unto Mortgagee, its successors and assigns, the real property (the "Land") located in the County and State of New York and more particularly described on Exhibit "A" attached hereto and made a part hereof, subject to the matters set forth on Exhibit "B" attached hereto and made a part hereof (collectively, the "Permitted Exceptions"), together with the following, whether now owned or hereafter acquired by Mortgagor: (a) all improvements now or hereafter placed or erected on the Land (the "Improvements"); (b) all equipment, fixtures and articles of personal property (the "Personal Property") now or hereafter attached to or used in or about the Improvements or which are necessary or useful for the use and occupancy of the Improvements, and all renewals, replacements or substitutions for any of the foregoing; (c) all water and water rights, timber, crops, and mineral interests pertaining to the Land; (d) all building materials and equipment intended to be installed in or on the Land or the Improvements; (e) all plans and specifications for the Improvements; (f) all contracts relating to the Land, the Improvements or the Personal Property; (g) all deposits, bank accounts, contract rights, accounts, commitments, construction contracts, architectural

agreements, general intangibles (including, without limita-
tion, trademarks, trade names and symbols), and instruments
arising from or related to the Land, the Improvements or the
Personal Property; (h) all permits, licenses, franchises,
certificates, and other rights and privileges obtained in
connection with the Land, the Improvements and the Personal
Property; (i) all proceeds from the sale, lease or other
disposition of the Land, the Improvements and the Personal
Property; (j) all proceeds (including premium refunds) of
each policy of insurance relating to the Land, the Improve-
ments or the Personal Property; (k) all proceeds from the
taking of any of the Land, the Improvements, the Personal
Property or any rights appurtenant thereto by right of eminent
domain or by purchase in lieu thereof; (l) all right, title
and interest of Mortgagor in and to all streets, roads,
public places, easements and rights-of-way, existing or
proposed, public or private, adjacent to or used in connection
with, belonging or pertaining to the Land; (m) all of the
leases, rents, royalties, bonuses, issues, profits, revenues
or other benefits of the Land, the Improvements or the Per-
sonal Property, including, without limitation, cash or securi-
ties deposited pursuant to leases to secure performance by
the lessees of their obligations thereunder; (n) all consumer
goods located in, on or about the Land or the Improvements or
used in connection with the use or operation thereof; and
(o) all rights, hereditaments and appurtenances pertaining to
the foregoing.  If the estate of Mortgagor in any of the
above-described property is a leasehold estate (the "Lease-
hold Estate"), this mortgage and conveyance shall include and
the lien created hereby shall encumber all additional title,
estate, interest, and other rights which may hereafter be
acquired by Mortgagor in the property demised under the lease
creating the Leasehold Estate.  The above-described property
is collectively referred to herein as the "Mortgaged Property."

    TO HAVE AND TO HOLD the Mortgaged Property, together
with the rights, privileges and appurtenances thereto belong-
ing, unto Mortgagee and its successors and assigns, forever,
and Mortgagor hereby binds itself and its heirs, executors,
administrators, personal representatives, successors and
assigns to warrant and forever defend the Mortgaged Property
unto Mortgagee and its successors and assigns, against the
claim or claims of all persons claiming or to claim the same
or any part thereof, subject to the Permitted Exceptions.

-3-

PLEAD015311

BOOK 1148 PG 998

## ARTICLE I

### SECURED INDEBTEDNESS

This Mortgage is given to secure the following:

1.1 <u>Guaranty</u>.  Payment and performance by Mortgagor of the indebtedness and other obligations described in the Guaranty.

1.2 <u>Mortgage</u>.  Payment of all sums advanced to or for the benefit of Mortgagor contemplated hereby and performance of all obligations and covenants herein contained.

The obligations above described are hereinafter collectively called the "Indebtedness."  This Mortgage, the Guaranty, and any other instrument given to evidence, govern or further secure the Indebtedness, are herein collectively called the "Loan Instruments."  All payments on the Indebtedness shall be payable at the address of Mortgagee as set forth above or at such other place as may from time to time be designated in writing by the holder of the Indebtedness.  Notwithstanding anything to the contrary contained herein, the maximum principal amount of Indebtedness secured by this Mortgage at execution or which under any contingency may be secured at any time hereafter is $9,000,000.00.

## ARTICLE II

### ASSIGNMENT OF RENTS AND LEASES

2.1 <u>Assignment of Rents, Profits, Etc</u>.  All of the rents, royalties, bonuses, issues, profits, revenue, income, and other benefits derived from the Mortgaged Property or arising from the use or enjoyment of any portion thereof or from any lease or agreement pertaining thereto and liquidated damages following default under such leases, and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by damage to any part of the Mortgaged Property, together with any and all rights that Mortgagor may have against any tenant under such leases or any subtenants or occupants of any part of the Mortgaged Property (hereinafter called the "Rents"), are hereby absolutely and unconditionally assigned to Mortgagee to be applied by Mortgagee in payment of the Indebtedness.  Prior to an Event of Default (as defined in Article VII hereof), Mortgagor shall have a license to collect and receive all Rents as

-4-

PLEAD015312

trustee for the benefit of Mortgagee and Mortgagor, and Mortgagor shall apply the funds so collected first to the payment of the Indebtedness in such manner as Mortgagee elects and thereafter to the account of Mortgagor.

2.2  Assignment of Leases.  Mortgagor hereby assigns to Mortgagee all existing and future leases, including subleases thereof, and any and all extensions, renewals, modifications, and replacements thereof, upon any part of the Mortgaged Property (the "Leases").  Mortgagor hereby further assigns to Mortgagee all guaranties of tenants' performance under the Leases.  Prior to an Event of Default, Mortgagor shall have the right, without joinder of Mortgagee, to enforce the Leases, unless Mortgagee directs otherwise.

2.3  Warranties Concerning Leases and Rents.  Mortgagor represents and warrants that:

(a)  Mortgagor has good title to the Leases and Rents hereby assigned and authority to assign them, and no other person or entity has any right, title or interest therein;

(b)  All existing Leases are valid, unmodified and in full force and effect, except as indicated herein, and no default exists thereunder;

(c)  Unless otherwise provided herein, no Rents have been or will be assigned, mortgaged or pledged;

(d)  No Rents have been or will be anticipated, waived, released, discounted, set off or compromised; and

(e)  Except as indicated in the Leases, Mortgagor has not received any funds or deposits from any tenant for which credit has not already been made on account of accrued Rents.

2.4  Mortgagor's Covenants of Performance.  Mortgagor covenants to:

(a)  Perform all of its obligations under the Leases and give prompt notice to Mortgagee of any failure to do so;

-5-

PLEAD015313

lll 1148 ro 1000

(b)  Give immediate notice to Mortgagee of any notice Mortgagor receives from any tenant or subtenant under any Leases, specifying any claimed default by any party under such Leases;

(c)  Enforce the tenant's obligations under the Leases;

(d)  Defend, at Mortgagor's expense, any proceeding pertaining to the Leases, including, if Mortgagee so requests, any such proceeding to which Mortgagee is a party; and

(e)  Neither create nor permit any encumbrance upon its interest as lessor of the Leases, except this Mortgage and any other encumbrances permitted by this Mortgage.

2.5  Prior Approval for Actions Affecting Leases.  Mortgagor shall not, without the prior written consent of Mortgagee:

(a)  Receive or collect Rents more than one month in advance;

(b)  Encumber or assign future Rents;

(c)  Waive or release any obligation of any tenant under the Leases;

(d)  Cancel, terminate or modify any of the Leases; cause or permit any cancellation, termination or surrender of any of the Leases; or commence any proceedings for dispossession of any tenant under any of the Leases;

(e)  Renew or extend any of the Leases, except pursuant to terms in existing Leases;

(f)  Permit any assignment of the Leases; or

(g)  Enter into any Lease not approved in advance by Mortgagee.

2.6  Rejection of Leases.  Mortgagor agrees that no settlement for damages for termination of any of the Leases under the Federal Bankruptcy Code, or under any other federal,

-6-

PLEAD015314

1148 PG 1001

state, or local statute, shall be made without the prior written consent of Mortgagee, and any check in payment of such damages will be made payable to both Mortgagor and Mortgagee.  Mortgagor hereby assigns any such payment to Mortgagee to be applied to the Indebtedness as Mortgagee may elect and agrees to endorse any check for such payment to the order of Mortgagee.

2.7  <u>Mortgagee in Possession</u>.  Mortgagee's acceptance of this assignment shall not, prior to entry upon and taking possession of the Mortgaged Property by Mortgagee, be deemed to constitute Mortgagee a "mortgagee in possession," nor obligate Mortgagee to appear in or defend any proceeding relating to any of the Leases or to the Mortgaged Property, take any action hereunder, expend any money, incur any expenses, or perform any obligation or liability under the Leases, or assume any obligation for any deposits delivered to Mortgagor by any lessee and not delivered to Mortgagee. Mortgagee shall not be liable for any injury or damage to person or property in or about the Mortgaged Property.

2.8  <u>Appointment of Attorney</u>.  To the extent permitted by applicable law, Mortgagor hereby appoints Mortgagee its attorney-in-fact, coupled with an interest, empowering Mortgagee to subordinate any Leases to this Mortgage.

2.9  <u>Indemnification</u>.  Mortgagor hereby agrees to indemnify and hold Mortgagee harmless from all liability, damage or expense incurred by Mortgagee from any claims under the Leases, including, without limitation, claims by tenants for security deposits or for rental payments more than one (1) month in advance and not delivered to Mortgagee.  All amounts indemnified against hereunder, including reasonable attorneys' fees, if paid by Mortgagee shall bear interest at the interest rate set forth in Section 1.4(vi) of the Loan Agreement (the "Default Rate") and shall be payable by Mortgagor to Mortgagee immediately upon demand and shall be secured hereby.

2.10  <u>Records</u>.  Upon request by Mortgagee, Mortgagor shall deliver to Mortgagee executed originals of all Leases and copies of all records relating thereto.

2.11  <u>Merger</u>.  There shall be no merger of the leasehold estates created by the Leases with the fee estate of the Land without the prior written consent of Mortgagee.

2.12  <u>Right to Rely</u>.  Mortgagor hereby authorizes and directs the tenants under the Leases to pay Rents to Mortgagee

-7-

PLEAD015315