REC'D. & FILED
SUPERIOR COURT
OF NEW JERSEY

JUL 7 1999

*[signature]* Donald F. Phelan
CLERK

ENTERED ON ACMS

JUL 7 1999

GENERAL EQUITY LIST

# 31970

**PERI & STEWART, L.L.C.**
108 Baker Street
Maplewood, New Jersey  07040
(973) 762-5800
Attorneys for Defendants,
JOHN J. HANLY and EILEEN M. HANLY

CONTESTED

-----------------------------X

| | | |
|---|---|---|
| THE NATIONAL COMMERCIAL BANK, | : | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | : | HUNTERDON COUNTY: |
| vs. | : | CHANCERY DIVISION |
| | : | CIVIL ACTION |
| JOHN J. HANLY and EILEEN M. HANLY, husband and wife, and BENEFICIAL NEW JERSEY, INC. d/b/a BENEFICIAL MORTGAGE CO., | : | DOCKET NO. F-1137-99 |
| | : | **ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND DEMAND FOR TRIAL BY JURY** |
| Defendants. | : | |

-----------------------------X

The defendants, JOHN J. HANLY and EILEEN M. HANLY,

(hereinafter referred to as "J. HANLY" and "E. HANLY",

respectively and sometimes collectively referred to as

"HANLY"), by and through their attorneys, PERI & STEWART,

L.L.C., by way of Answer and Affirmative Defenses to the

Complaint of the plaintiff, THE NATIONAL COMMERCIAL BANK

(hereinafter referred to as the "SAUDI BANK") and by way of Counterclaims against the SAUDI BANK, state as follows:

## FIRST COUNT

1. Defendants, HANLY, admit the allegations contained in paragraph one (1) of the First Count of the Complaint.

2. Defendants, HANLY, admit the allegations contained in paragraph two (2) of the First Count of the Complaint.

3. Defendants, HANLY, admit that a document bearing the designation of a mortgage was executed dated of even date with the promissory note alleged in paragraph two (2) of the First Count of the Complaint. Defendants, HANLY, possess insufficient information to admit or deny the balance of the allegations contained in paragraph three (3) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

4. Defendants, HANLY, admit that a document bearing the designation of a First Amendment to the Note and the "Mortgage" was executed on the date alleged by Plaintiff. Defendants, HANLY, possess insufficient information to admit or deny the balance of the allegations contained in paragraph four (4) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

2

PLEAD014256

5.   Defendants, HANLY, admit the allegations contained in paragraph five (5) of the First Count of the Complaint.

6.   Defendants admit the execution of the documents as alleged. Defendants deny any characterization of such documents by plaintiff, SAUDI BANK. Defendants, HANLY, deny the balance of the balance of the allegations contained in paragraph six (6) of the First Count of the Complaint.

7.   Defendants admit the execution of the documents as alleged. Defendants deny any characterization of such documents by plaintiff, SAUDI BANK. Defendants, HANLY, deny the balance of the allegations contained in paragraph seven (7) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

8.   Defendants deny the allegations contained in paragraph eight (8) of the First Count of the Complaint.

9.   Defendants admit the allegations contained in paragraph nine (9) of the First Count of the Complaint to the extent that a document was served captioned Notice of Intention to Foreclose. Defendants, HANLY, deny the balance of the allegations contained in paragraph nine (9) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

3

10. Defendants, HANLY, deny information sufficient to admit or deny the allegations contained in paragraph ten (10) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

11. Defendants, HANLY, admit the allegations contained in paragraph eleven (11) of the First Count of the Complaint.

12. Defendants, HANLY, admit that the mortgage as alleged was executed by these defendants. Defendants deny information sufficient to admit or deny the balance of the allegations contained in paragraph twelve (12) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

13. Defendants, HANLY, admit that the mortgage as alleged was executed by these defendants. Defendants deny information sufficient to admit or deny the balance of the allegations contained in paragraph thirteen (13) of the First Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

14. Defendants, HANLY, deny the allegations contained in paragraph fourteen (14) of the First Count of the Complaint.

WHEREFORE, Defendants, JOHN J. HANLY and EILEEN M. HANLY, demand judgment dismissing the Complaint together with

4

attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just, proper and equitable.

## SECOND COUNT

1.   Defendants, HANLY, repeat and reiterate, their answers to the allegations contained in the First Count of the Complaint as if fully set forth at length herein.

2.   Defendants, HANLY, deny the allegations contained in paragraph two (2) of the Second Count of the Complaint.

3.   Defendants, HANLY, deny the allegations contained in paragraph three (3) of the Second Count of the Complaint.

4.   Defendants, HANLY, admit that they are in possession of the subject premises but deny the balance of the allegations contained in paragraph four (4) of the Second Count of the Complaint. Strict proofs of the allegations are demanded of Plaintiff.

WHEREFORE, Defendants, JOHN J. HANLY and EILEEN M. HANLY, demand judgment dismissing the Complaint together with attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just, proper and equitable.

## AFFIRMATIVE DEFENSES

PLEAD014259

1.   The Complaint fails to state a claim upon which relief may be granted.

2.   The Complaint is barred by the doctrines of equitable and legal estoppel.

3.   The Complaint is barred by the doctrine of waiver.

4.   The Complaint is barred by the doctrine of laches.

5.   The Complaint is barred by the public policy of the State of New Jersey.

6.   The Complaint is barred by the doctrine of unclean hands.

7.   The Complaint is barred by the wilful, intentional unlawful and criminal misconduct of plaintiff and its officers, including but not limited to, Sheik Kahlid Bin Mahfouz.

8.   The Complaint is barred by the fraud of the plaintiff.

9.   The Complaint is barred by the course of dealing established by and between the parties.

10.   The Complaint is barred by the covenants of good faith and fair dealing which doctrines have been breached by plaintiff.

11.   The Complaint is barred by the corporations and banking laws of the State of New Jersey.

PLEAD014260

12. The note, mortgage and any amendments thereto were obtained by the fraud of plaintiff and its agents.

13. The enforcement of the note, mortgage and any amendments thereto or assignments thereof is barred by the counterclaims of the defendant which far exceed the sum sought in the Complaint.

14. The enforcement of the note, mortgage and any amendments thereto or assignments thereof is barred by the laws of the State of New Jersey.

15. These Defendants did not breach any terms and/or conditions of the note and/or mortgage.

16. The Plaintiff anticipatorily breached the terms and/or conditions of the note and/or mortgage.

17. The Complaint is barred by the doctrine of novation.

18. The Complaint is barred by the failure of the Plaintiff to fully and completely comply with the terms and conditions of the employment relationship between J. HANLY and the SAUDI BANK which were material to the interpretation and enforcement of the note and/or mortgage and any amendment thereto and an integral component of said documents.

19. The Complaint is barred by the revocation of the SAUDI BANK's charter and the criminal indictment of its chief

7

PLEAD014261

executive officer, Sheik Kahlid Bin Mahfouz, by the Manhattan District Attorney, Robert Morgenthau, in 1992, resulting in the closure of its New York Branch due to criminal charges of fraud involving some $300 million dollars of depositors' money.

20.   The Plaintiff does not have standing to commence the within action.

21.   The mortgage and note and any amendments thereto or assignments thereof are void due to the violation of the due process rights of the defendant.

22.   The Complaint is barred by the doctrine of recoupment.

23.   The Defendants at all times complied with all applicable laws, regulations and standards.

24.   The Complaint is barred by the doctrine of unconscionability.

25.   The Complaint is barred as to EILEEN M. HANLY by the Equal Credit Opportunity Act (15 U.S.C. §1691(a) et seq.)

26.   The Complaint is barred by the doctrine of duress.

27.   The Complaint is barred by the breach of fiduciary duties to defendants.

28.   The Complaint is barred by the statute of frauds.

29.   The enforcement of the note and/or mortgage and any

8

PLEAD014262

amendments thereto or assignments thereof are barred by the law of the State of New Jersey including but not limited to the Business Corporations Act, N.J.S.A. 14A:1-1 et seq.

30. Any loan documentation, or assignments thereof, are incomplete and unenforceable.

31. The Complaint is barred by 15 U.S.C. §1601 – 1667e and the Regulations promulgated thereunder (collectively the "Federal Truth in Lending Act").

32. The Complaint is barred by 12 U.S.C. §2603 et seq. and the Regulations promulgated thereunder, including but not limited to 24 C.F.R. §3500.7 (collectively the "Real Estate Settlement Procedures Act").

33. The Complaint is barred due to the violation by the plaintiff of N.J.S.A. §56:8-1 et seq. (the "New Jersey Consumer Fraud Act").

34. The Complaint is barred due to the violation by the plaintiff of 15 U.S.C. §2301 et seq. (the "Federal Deceptive Trade Practices Act").

35. The Complaint is barred by 15 U.S.C. §1639 and the Regulations promulgated thereunder (collectively the "Home Ownership and Equity Protection Act" or "HEPA").

36. The Complaint is barred by the plaintiff's violation

9

PLEAD014263

of N.J.S.A. (the "New Jersey Law Against Discrimination" or "NJ LAD").

36.   The Complaint is barred by the plaintiff's violation of 18 U.S.C. § 1961 et seq. (the "Federal Rico Statute").

37.   The Complaint is barred by the plaintiff's violation of N.J.S.A. §2c:41-1 et seq. (the "New Jersey Rico Statute").

38.   The Complaint is barred by the violation of N.J.S.A. §14A:13-14 et seq. (the "New Jersey Business Reporting Act").

39.   The Complaint is barred by the violation of 15 U.S.C. §1692 et seq. (the "Fair Debt Collection Practices Act").

**WHEREFORE,** Defendants, JOHN J. HANLY and EILEEN M. HANLY, demand judgment dismissing the Complaint together with attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just, proper and equitable.


## COUNTERCLAIMS

### THE PARTIES

1.   JOHN J. HANLY is and at all times pertinent to the allegations contained in the Counterclaims, was a resident of the State of New Jersey residing 73 Bissell Road, Lebanon, New Jersey 08833 (hereinafter referred to as "J. HANLY").

10

2.   EILEEN M. HANLY is and at all times pertinent to the allegations contained in the Counterclaims, was a resident of the State of New Jersey residing 73 Bissell Road, Lebanon, New Jersey 08833 (hereinafter referred to as "E. HANLY").

3.   E. HANLY is and at all times pertinent to the allegations contained in the Counterclaims, was the spouse of J. HANLY.

4.   Upon information and belief, THE NATIONAL COMMERCIAL BANK (hereinafter referred to as the "SAUDI BANK") is upon information and belief a company organized under the laws of the Kingdom of Saudi Arabia.

5.   At no time has the SAUDI BANK had any office(s) or place(s) of business located in the State of New Jersey.

6.   The SAUDI BANK presently has no and since August of 1992 has had no office(s) or place(s) of business located in the State of New York.

7.   Upon information and belief, SHEIKH KAHLID BIN MAHFOUZ is an individual residing in the Kingdom of Saudi Arabia (hereinafter referred to as "SHEIKH KAHLID").

8.   SHEIKH KAHLID does not maintain a residence in the State of New Jersey.

9.   SHEIKH KAHLID does not maintain a residence in the

11

PLEAD014265

State of New York.

10. SHEIKH KAHLID, due to his status as a suspected financier of international terrorism does not maintain any residence in any of the States of the United States of America.

**FACTS COMMON TO ALL COUNTS OF THE COUNTERCLAIMS**

11. The Counterclaimants repeat and reiterate the allegations contained in paragraphs 1 through 10 as if fully set forth at length herein.

12. On or about October 1, 1989, J. HANLY was hired by the SAUDI BANK at its New York Branch which then occupied offices located at 245 Park Avenue, New York, New York as its Treasurer and Vice President.

13. SHEIKH KAHLID was at all times pertinent to the allegations contained in the Counterclaims the Chief Executive Officer and majority owner of the SAUDI BANK.

14. Upon information and belief, SHEIKH KAHLID was targeted by the Federal Bureau of Investigation as a suspected financier of the terrorist ISAMA BIN LADEN.

15. J. HANLY was extremely active in the New York financial markets from 1969 until August of 1992 (the date of closure of the New York Branch of the SAUDI BANK). During that time period, the reputation and job levels of J. HANLY had

PLEAD014266

increased with each new position.

16.   While on holiday in Ireland in July of 1992, J. HANLY was directed by Camille A. Chebeir to return to the United States of America due to an emergency situation at the SAUDI BANK, New York Branch.

17.   J. HANLY hurriedly returned to the United States of America on the next available flight, leaving his wife, E. HANLY, in Ireland to return on a separate flight.

18.   The reason for the directive to return to the United States was that SHEIKH KAHLID was indicted by Manhattan District Attorney, Robert Morgenthau, on criminal charges of fraud, involving some **THREE HUNDRED MILLION UNITED STATES DOLLARS** ($300,000,000.00) of depositors money. (True copies of certain of the newspaper accounts of the then breaking story are attached hereto collectively as Exhibit "A" and made a part hereof.) These indictments were part of the scandal commonly known as the "BCCI Scandal".

19.   The charges against the SAUDI BANK and SHEIKH KAHLID ultimately amounted to **THIRTY BILLION UNITED STATES DOLLARS** ($30,000,000,000).

20.   SHEIKH KAHLID ultimately paid over **EIGHT HUNDRED MILLION UNITED STATES DOLLARS** ($800,000,000.00) in cash and

13

forfeitures in exchange for having all charges dropped against him.

21. The SAUDI BANK and SHEIKH KAHLID have been prohibited from operating in the United States of America by the United States government.

22. The charter of the SAUDI BANK to operate within the State of New York was revoked in 1992 due to the criminal charges of an enormous fraud involving depositors funds and as part of an agreement between the District Attorney of New York and SHEIKH KAHLID and the SAUDI BANK. True copies of Supervisory Agreement, Order to Show Cause, Temporary Restraining order and Plan of Liquidation pertaining to the SAUDI BANK are attached hereto collectively as Exhibit "B" and made a part hereof.

23. The SAUDI BANK has not obtained another charter to operate within the State of New York. As of the date hereof, the SAUDI BANK is not licensed to do business in the State of New York and is not otherwise qualified and/or registered to do business in the State of York.

24. The SAUDI BANK has never obtained a charter to operate within the State of New Jersey. As of the date hereof, the SAUDI BANK is not licensed to do business in the State of

14

PLEAD014268

New Jersey and is not otherwise qualified and/or registered to do business in the State of New Jersey.

25. Upon his return to the United States of America, J. HANLY discovered the charges lodged by the Manhattan District Attorney Morgenthau.

26. J. HANLY was directed by Camille A. Chebeir to effectively conduct, on behalf of the SAUDI BANK, an immediate fire-sale of all United States-based Treasury assets and liquidate all contracts with United States banks and foreign banks.

27. In the midst of this high-pressure, highly confused and very disturbing state of affairs, many, if not all of its over 100 employees of the New York Branch of the SAUDI BANK were threatened and intimidated into executing documents relating to their employment, including but not limited to the documents upon which plaintiff relies herein.

28. J. HANLY was advised that if he did not sign all documents presented to him, he would not receive any remaining funds owed to him and would not receive any severance payments and year-end bonus payments.

29. All senior staff of Arabic descent and/or practicing Muslims were placed in other jobs with the SAUDI BANK, or its

15

PLEAD014269

affiliates or companies friendly to the SAUDI BANK. J. HANLY

was not offered a job by the SAUDI BANK, its affiliates or

companies friendly to the SAUDI BANK.

16

PLEAD014270

## FIRST COUNT

### (Breach of Contract)

30. The Counterclaimants repeat and reiterate the allegations contained in paragraphs 1 through 29 as if fully set forth at length herein.

31. On or about October of 1989, J. HANLY was employed by the SAUDI BANK pursuant to the terms of an employment agreement and commenced business dealings with the SAUDI BANK in accordance with the terms of such contract.

32. On or about July of 1992, the SAUDI BANK breached the terms of the agreement as amended by the course of dealing between the parties.

33. J. HANLY has been damaged thereby.

**WHEREFORE**, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

## SECOND COUNT

### (Breach of Covenants of Good Faith and Fair Dealing)

34. J. HANLY and E. HANLY repeat and reiterate the

17

PLEAD014271

allegations contained in paragraphs 1 - 33 of the Counterclaims as if fully set forth at length herein.

35. The covenants of good faith and fair dealing are implied in each and every agreement between the parties.

36. The SAUDI BANK breached said covenants by its actions aforesaid.

37. J. HANLY was damaged thereby.

**WHEREFORE**, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### THIRD COUNT

(Fraud)

38. J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 37 of the Counterclaims as if fully set forth at length herein.

39. In reliance upon the employment agreement, as amended by the course of dealings of the parties, J. HANLY expended significant efforts and resources to develop and promote the SAUDI BANK services and did not pursue other professional

18

opportunities.

40. The SAUDI BANK made knowingly false representations with the intent that J. HANLY rely thereon. Such representations include without limitation: (a) that a mortgage would be granted to J. HANLY and E. HANLY and that a certain written policy related to said mortgage would be applied in the event of J. HANLY's separation from the SAUDI BANK; (b) that employment would be assured at the SAUDI BANK or its affiliates; (c) that employment with the SAUDI BANK or its affiliates would continue so long as J. HANLY performed his job functions satisfactorily; (d) that employment would with the SAUDI BANK and any of its affiliates or branches would not be affected by nationality, race and/or religious affiliation.

42. In addition, the SAUDI BANK encouraged and J. HANLY in reliance thereon initiated and developed and applied new procedures in the Treasury Department of the SAUDI BANK. In addition, HANLY was requested and performed a review of the Treasury Department of the Jeddah Branch of the SAUDI BANK. HANLY's recommendations with respect to such branch were adopted and implemented.

43. The SAUDI BANK made false representations including but not limited to those set forth above to J. HANLY with the

19

PLEAD014273

intention that J. HANLY rely thereon.

44.    J.  HANLY  relied  upon  the  knowingly  false representations of the SAUDI BANK to his detriment and was damaged thereby.

**WHEREFORE**, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### FOURTH COUNT

(Breach of Fiduciary Duties)

45.  J.  HANLY  and  E.  HANLY  repeat  and  reiterate  the allegations contained in paragraphs 1 - 44 of the Counterclaims as if fully set forth at length herein.

46.    The SAUDI BANK owed fiduciary duties to J. HANLY.

47.    The SAUDI BANK breached said duties.

48.    J. HANLY was damaged thereby.

**WHEREFORE**, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and

PLEAD014274

mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### FIFTH COUNT

### (Conversion)

49.   J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 48 of the Counterclaims as if fully set forth at length herein.

50.   The SAUDI BANK has wrongfully acquired possession and control of property/services with the knowledge that same are the property of J. HANLY, to wit certain bonus monies in an amount in excess of TWO HUNDRED NINETY THOUSAND DOLLARS ($290,000.00).

51.   The SAUDI BANK has converted said property.

52.   The SAUDI BANK has benefitted from said conversion and J. HANLY damaged thereby.

**WHEREFORE**, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

PLEAD014275

### SIXTH COUNT

#### (Tortious Interference With Prospective Contractual Relations)

53.   J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 52 of the Counterclaims as if fully set forth at length herein.

54.   J. HANLY reasonably expected to develop and profit from prospective contractual relationships.

51.   The SAUDI BANK intentionally interfered with said relationships without privilege to do so.

52.   J. HANLY has been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### SEVENTH COUNT

#### (Violation of N.J. Law Against Discrimination)

53.   J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 52 of the Counterclaims as if fully set forth at length herein.

22

54.   J. HANLY is a caucasian male who is not of Arabic ancestry and who does not practice and has not practiced the Muslim religion.

55.   E. HANLY is a caucasian female who is not of Arabic ancestry and who does not practice and has not practices the Muslim religion.

55.   In or about March of 1992, J. HANLY suffered a disfiguring stroke.

56.   At the time of his termination by the SAUDI BANK, J. HANLY was forty-seven years of age.

57.   At the time of J. HANLY's termination by the SAUDI BANK, E. HANLY was forty-seven years of age.

58.   At the time of his termination by the SAUDI BANK and at all times thereafter, J. HANLY and E. HANLY, were residents and citizens of the United States of America.

59.   Upon information and belief, the SAUDI BANK discharged all United States citizens from its employ and refused and failed to obtain replacement and/or substitute positions with any of its affiliates for such employees while assuring that all employees of Arabic ancestry and/or practitioners of the Muslim faith were fully employed.

60.   Upon information and belief, the SAUDI BANK

23

discharged loans previously owed to it and mortgages held by it

for all employees of Arabic ancestry and/or practitioners of

the Muslim faith.

61.   The conduct aforementioned was based upon national

origin.

62.   The conduct of the SAUDI BANK aforementioned was

based upon religion.

63.   The conduct of the SAUDI BANK aforementioned was

based upon the gender of E. HANLY.

63.   The conduct of the SAUDI BANK aforementioned was

based upon the physical condition of J. HANLY.

64.   Such conduct violates the New Jersey Law Against

Discrimination.

65.   J. HANLY and E. HANLY have been damaged thereby.

WHEREFORE, Counterclaimants, J. HANLY and E. HANLY, demand

judgment against Counterclaim-Defendant, the SAUDI BANK for

compensatory damages, punitive damages, interest, attorney's

fees, a declaratory judgment discharging the promissory note

and mortgage, costs of suit and such other and further relief

as the Court deems just and proper.

PLEAD014278

## EIGHTH COUNT

### (Intentional Infliction of Emotional Distress)

66    J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 65 of the Counterclaims as if fully set forth at length herein.

67.   The SAUDI BANK wilfully and intentionally took actions that proximately resulted in the infliction of emotional distress upon the defendants, J. HANLY.

68.   Said actions were not privileged.

69.   J. HANLY was damaged thereby.

WHEREFORE, Counterclaimants, J. HANLY and E. HANLY, demand judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

## NINTH COUNT

### (Negligent Infliction of Emotional Distress)

70.   J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 69 of the Counterclaims as if fully set forth at length herein.

71.   The SAUDI BANK owed a duty to J. HANLY not to inflict

25

emotional distress upon the defendants, J. HANLY.

72. The SAUDI BANK breached said duty.

73. J. HANLY was damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### TENTH COUNT

#### (New Jersey Consumer Fraud Act)

74. J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 73 of the Counterclaims as if fully set forth at length herein.

75. J. HANLY is a consumer of services as defined by N.J.S.A 56:8-1 et seq. (the "New Jersey Consumer Fraud Act").

76. The SAUDI BANK is a provider of services as defined by the New Jersey Consumer Fraud Act.

77. The SAUDI BANK violated the New Jersey Consumer Fraud Act by inter alia: (a) failing to provide, without charge or otherwise, a settlement statement relating to the mortgage, mortgage note and any amendments or assignments thereof upon

26

which it relies in its complaint; (b) failing to provide, without charge or otherwise, a true copy of the mortgage, mortgage note, and any amendments or assignments thereof upon which it relies in its complaint; and (c) failing to provide, without charge or otherwise, true copies of any loan documentation relating to the mortgage, mortgage note, and any amendments or assignments thereof upon which it relies in its complaint.

78.   Defendants, J. HANLY and E. HANLY have been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

## ELEVENTH COUNT

### (Violation of Federal Truth In Lending Act)

79.   J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 78 of the Counterclaims as if fully set forth at length herein.

80.   Defendant, the SAUDI BANK, violated 15 U.S.C. §1601 -

27

1667e and the Regulations promulgated thereunder (collectively the "Federal Truth in Lending Act")

81.  E. HANLY and J. HANLY have been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

## TWELFTH COUNT

### (Violation of Homeowner Equity Protection Act)

82.  J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 81 of the Counterclaims as if fully set forth at length herein.

83.  Defendant, the SAUDI BANK, violated 15 U.S.C. §1639 and the Regulations promulgated thereunder (collectively the "Home Ownership and Equity Protection Act" or "HEPA").

84.  E. HANLY and J. HANLY have been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and

mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### THIRTEENTH COUNT

#### (Violation of Real Estate Settlement Procedures Act)

85.   J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 84 of the Counterclaims as if fully set forth at length herein.

86.   Defendant, the SAUDI BANK, violated 12 U.S.C. §2603 et seq. and the Regulations promulgated thereunder, including but not limited to 24 C.F.R. §3500.7 (collectively the "Real Estate Settlement Procedures Act").

87.   E. HANLY and J. HANLY have been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### FOURTEENTH COUNT

#### (Violation of Federal Deceptive Practices Act)

88.   J. HANLY repeats and reiterates the allegations contained in paragraphs 1 - 87 of the Counterclaims as if fully

PLEAD014283

set forth at length herein.

89.   Defendant, the SAUDI BANK, violated 15 U.S.C. §2301 et seq. (the "Federal Deceptive Trade Practices Act").

90.   E. HANLY and J. HANLY have been damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### FIFTEENTH COUNT

#### (Loss of Consortium)

91.   J. HANLY and E. HANLY repeat and reiterate the allegations contained in paragraphs 1 - 90 of the Counterclaims as if fully set forth at length herein.

92.   E. HANLY was damaged by the allegations as aforesaid in that J. HANLY was so affected as to result in loss of consortium.

93.   E. HANLY was damaged thereby.

WHEREFORE, Counterclaimant, J. HANLY, demands judgment against Counterclaim-Defendant, the SAUDI BANK for compensatory damages, punitive damages, interest, attorney's fees, a

PLEAD014284

declaratory judgment discharging the promissory note and mortgage, costs of suit and such other and further relief as the Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Defendants, JOHN J. HANLY and EILEEN M. HANLY, hereby demand a trial by jury as to all issues so triable in connection with the Complaint, Answer to the Complaint, Affirmative Defenses and Counterclaims.

### DESIGNATION OF TRIAL COUNSEL

Defendants, JOHN J. HANLY and EILEEN M. HANLY, hereby designate Michael T. Stewart, Esq., as trial counsel in the above-referenced action.

PERI & STEWART, L.L.C.
Attorneys for Plaintiffs,
JOHN J. HANLY and
EILEEN M. HANLY
108 Baker Street
Maplewood, New Jersey 07040
(973) 762-5800.

By: _____
Michael T. Stewart

Dated: July 6, 1999

MTS\WP51\MISC\JH-NCB.AN1

31

**CERTIFICATION PURSUANT TO R. 4:5-1 and 4:6-2**

Michael T. Stewart, of full age, hereby certifies as follows:

1.   I am an attorney-at-law of the State of New Jersey and a member of the law firm of Peri & Stewart, L.L.C., counsel for the defendants, JOHN J. HANLY and EILEEN M. HANLY. I make this certification pursuant to Rules 4:5-1 and 4:6-2.

2.   The matter in controversy is not the subject of any other action pending in any other Court or of a pending arbitration proceeding to the best of my knowledge, information and belief, except a certain action pending in the Courts of London.

3.   This answer, affirmative defenses and counterclaims have been filed within the time period prescribed by the Rules of Court.

4.   I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Michael T. Stewart, Esq.

Dated: July 6, 1999

September 29, 1998

## Review & Outlook

## Review & Outlook
# BCCI: The Mystery Lingers

Forget the old brain teaser about a tree falling in a forest not making any noise unless there's someone around to hear it. We know that the world's largest bank fraud can go almost unnoticed, except to Manhattan District Attorney Robert Morgenthau. We refer, in case you've forgotten, to the Bank of Credit & Commerce International, which was back in the news in two jurisdictions last week.

In Washington, Clark Clifford and Robert Altman agreed to give up $18.5 million in claims on stock and legal fees connected with First American Bankshares, the BCCI front they once headed in the nation's capital. In Luxembourg, BCCI auditors Price Waterhouse and Ernst & Young agreed to a payment of $125 million to the defunct bank's customers; the creditors will now recover more than half their money--more than quadruple the best estimates at the time BCCI went under.

These people, many of them Pakistani nationals in Britain, will be mighty glad that Mr. Morgenthau pursued the case when the Bank of England, the Justice Department and various others ducked. Yet for all the smoke Mr. Morgenthau uncovered we have only glimmers of the fire that led to it all. There are still unresolved questions about the political patronage that has helped shield BCCI principals from a full reckoning, and in particular about how a crooked Pakistani-Arab bank got control of the largest bank in Washington, D.C.

In this respect, the Altman-Clifford settlement is particularly striking. At issue has always been whether the two knew that BCCI was the real owner of First American, of which they were, respectively, president and chairman. Mr. Altman beat criminal charges of fraud and lying to banking regulators; Mr. Clifford was not charged because of his age and health. When the Federal Reserve Board settled civil fraud charges back in February, the two claimed that the central charges against them were "wholly untrue" and that the "remaining issues would have been resolved in their favor" had they gone to court. Maybe. But their checkbook said otherwise. In the Fed settlement, the two forked over $5 million in stock to compensate BCCI creditors. And last week they agreed to drop all claims to $18.5 million in stock and legal fees, in return for an end to remaining legal action against them.

Yet the essential mystery remains. Doubtless that's just the way many would like to leave it, because the names that pop up read like some kind of Who's Who. There is, to begin with, a large Arkansas connection, since Little Rock investment giant Stephens Inc. assembled the bloc of First American stock for the BCCI front men. Assisting in these transactions was the now-famous Rose Law Firm, then headed by Joseph Giroir, more lately a representative of the Riady family of Indonesia and participant in the notorious September 13, 1995, Oval Office meeting at which John Huang was dispatched to his fund-raising tasks.

Rose Attorney Hillary Rodham represented a Stephens subsidiary, the Systematics bank-data processing firm, in a related lawsuit. James Riady made his first appearance in Little Rock about the time these transactions took place, with his family ending up with a piece of the Stephens-dominated Worthen Bank. Another player was Bert Lance, Jimmy Carter's disgraced head of Office of Management and Budget, who apparently hoped to head First American himself. All of these people deny that they knew anything crooked was taking place, just a group of smart,

PLEAD014287

well-connected Friends of Bill stunningly ignorant about the people they were doing business with.

Yet since the mystery has never been cleared up, you can't blame those of us who followed it from remembering names as they turn up in today's news. Nicholas Katzenbach, for instance, the former Attorney General surfaced last week with two of Mr. Clinton's serial White House counsels, defending the President against impeachment in a New York Times op-ed. We remember that Mr. Katzenbach replaced Mr. Clifford when the latter resigned from First American in 1991.

Ditto for John E. "Jack" Ryan, who ended up as head of the Resolution Trust Company and denied Rep. Jim Leach's request for documents relating to Madison Guaranty Trust, the Whitewater S&L. We remember that it was under Mr. Ryan's watch as head of bank supervision at the Fed that BCCI won approval to buy First American.

For those who worry that a BCCI investigation might be too partisan, we also remember that it was Senator Orrin Hatch who delivered a floor speech praising BCCI for agreeing to a settlement when Tampa prosecutors first found evidence of the bank's involvement in drug running. As head of the Judiciary Committee, of course, Mr. Hatch, would play a key role if an impeachment ever reached the Senate.

Finally, what do we make of the report that the National Commercial Bank of Saudi Arabia has close links with the owner of the suspect pharmaceutical plant bombed in the controversial raid on Sudan. We remember that the bank was run by Khalid bin Mahfouz, one of the BCCI front men in their purchase of First American.

Seven years after BCCI was shut down, the culpability (if any) of all these people remains unclear and unlikely ever to be resolved. What we do know, as Senator Kerry's 1992 report to the Foreign Relations Committee states, is that BCCI was not a good bank that went bad; from the beginning its criminality "was inherent in the bank's philosophy." And that a key component of BCCI's U.S. strategy was the "aggressive use of a series of prominent Americans" to lend "their names and their reputations to BCCI at critical moments." But of course none of these people understood the bank's nature; to believe that defense we must believe that the savviest, most well-connected players in Washington never understood what was going on before their eyes.

**URL for this Article:**
http://interactive.wsj.com/archive/retrieve.cgi?id=SB907022152360146500.djm

Copyright © 1998 Dow Jones & Company, Inc. All Rights Reserved.

Printing, distribution, and use of this material is governed by your Subscription Agreement and copyright laws.

For information about subscribing, go to http://wsj.com

Close Window

PLEAD014288

THE AMERICAN BANKER THURSDAY, JULY 2, 1992

# Saudi Banker Indicted in N.Y. For BCCI Fraud

### By JAMES R. KRAUS

The Manhattan district attorney announced Wednesday that a senior Saudi banker had been indicted as part of that office's ongoing criminal investigation of the Bank of Credit and Commerce International.

The district attorney, Robert M. Morgenthau, said Sheik Khalid Bin Mahfouz, the chief operating officer of the National Commercial Bank of Saudi Arabia, had been indicted along with an associate, Haroon Kahlon, on charges of scheming to defraud depositors of BCCI between 1985 and 1991.

Based in Jeddah, National Commercial Bank is Saudi Arabia's largest bank and is principally owned by the Mahfouz family.

### Banker Issues Denial

In a statement, Mr. Mahfouz rejected the indictment as "completely unwarranted and without justification."

In July last year, BCCI was seized by regulators around the world. The bank has been charged by U.S. law enforcement agencies with engaging in fraud and money laundering.

It is also charged with secretly acquiring control of the Washington-based First American Bankshares.

The district attorney's office last year indicted BCCI's chairman Agha Hasan Abedi and chief executive Swaleh Naqvi for fraud and for falsifying records to hide money laundering.

### Stock Fraud Charged

The latest indictment charges that Mr. Mahfouz, with the assistance of Mr. Kahlon, Mr. Abedi, and Mr. Naqvi, fraudulently sold his shares in BCCI in 1988 and in Credit and Commerce American Holdings, parent company of First American Bankshares, in 1989.

It is charged that as a result of this sale of shares, he received at least $300 million from BCCI that was subsequently booked as loans that were never intended to be repaid. □

PLEAD014289

22 Euromoney | October 1996

## SAUDI ARABIA

# Khalid makes his comeback

Sheikh Khalid bin Mahfouz is back in the driver's seat at Saudi Arabia's National Commercial Bank (NCB), four years after stepping down amid allegations of involvement in one of the century's biggest banking scandals. His return has set tongues wagging in the Gulf, where it is widely assumed that the Saudi royal family prevailed upon local banking authorities to let him back in. But foreign regulators may not be as forgiving; NCB was forced to close its branches in London and New York as a result of the scandal and the family paid more than $400 million to settle charges of wrongdoing.

More immediately, bankers wonder what effect Khalid's return may have on NCB's performance. When he was last in charge, the bank sustained huge loan losses that almost crippled it. Since 1992 it has been recovering steadily under the low-key stewardship of Khalid's younger brother, Mohammed. In the first half of this year, NCB reported net profits of about $120 million, 30% up on last year's results on

an annualized basis. "It's almost impossible to say what may happen," says one analyst.

NCB is the oldest bank in Saudi Arabia and its assets of over $20 billion make it one of the largest privately-owned banks in the world. It was founded by Salim bin Mahfouz, an illiterate Yemeni who moved to Jeddah during World War II and made his name as a successful money-changer there, under the patronage of the Kaaki family. Together, Mahfouz and the Kaakis won permission to establish the kingdom's first locally owned commercial bank in 1953. Since then NCB has dominated the Saudi banking system, mainly because of its government connections, nationwide branch network, close ties with leading merchants and reputation as the royal family's bank.

As the most able and ambitious of Salim's sons, Khalid assumed effective management control of NCB during the 1980s. But he had first caught the attention of the western media a few years earlier, when he was

identified as one of a group of wealthy Saudis who helped finance a disastrous attempt by the Hunt brothers of Texas to corner the silver market.

One analyst recalls that he was "a very dynamic, gung-ho trader" who enjoyed the rush of commodity trading. Even when he was the bank's chief operating officer, he "wanted to call the shots and make the decisions himself", another observer says, citing reports that Khalid would get tips on possible market movements and order the bank's chief dealer to take positions. When oil prices plummeted in the mid-1980s, however, NCB was suddenly confronted with huge amounts of bad loans, many of them reportedly to princes. After 1986, the bank reported losses or zero net profits for five straight years, sacrificed market share and was only saved from collapse by a massive recapitalization in 1992.

But it was Khalid's entanglement with Bank of Credit and Commerce International (BCCI) that proved most damaging to his reputation. Between 1986 and

**Emerging Markets**

◄ 1990, the Mahfouz family owned 20% of BCCI and Khalid served as a BCCI director. The family acquired most of its shares from a Saudi entrepreneur called Ghaith Pharaon (who had played a prominent role in an earlier attempt to corner the silver market) and it was bought out by the ruler of Abu Dhabi. The family also placed deposits with BCCI and received loans from it. Investigators later charged that these share transfers and loans were questionable transactions designed in part to hide BCCI's desperate financial condition and to defraud depositors. In addition, a US Senate committee report claimed that NCB had an "intimate" relationship with BCCI; for example, it alleged, BCCI concealed loans to major customers of more than $500 million by "parking" them with NCB.

BCCI was shut down in mid-1991 by regulators who had concluded that it was little more than a gigantic criminal enterprise. Along with numerous others, Khalid was indicted for fraud by a US grand jury and charged with breaches of banking regulations by the US Federal Reserve.



# NEWS RELEASE

**Comptroller of the Currency**
**Administrator of National Banks**

Washington, D.C.  20219

For: IMMEDIATE RELEASE                    Contact:  202-874-4700

Date: JULY 10, 1992 (DRAFT)

<u>Note to Editors</u>

The Office of the Comptroller of the Currency (OCC) today said it
had entered into a supervisory agreement with the National
Commercial Bank (NCB), Saudi Arabia, under which NCB agrees to
voluntarily liquidate its New York branch.

The agreement includes a detailed plan for the orderly closing of
the branch and replaces the OCC's order of July 2, 1992.

Copies of the supervisory agreement and the liquidation plan are
attached.



# # # # #

PLEAD014292

### UNITED STATES OF AMERICA
### DEPARTMENT OF THE TREASURY
### OFFICE OF THE COMPTROLLER OF THE CURRENCY
### WASHINGTON, D.C.

## SUPERVISORY AGREEMENT

### National Commercial Bank
### New York Federal Branch
### New York, New York

WHEREAS, The Office of the Comptroller of the Currency (OCC) is charged with the responsibility of administering the International Banking Act of 1978 with respect to Federal branches of foreign banks and supervising federal branches licensed thereunder, and is authorized by 12 U.S.C. §§ 3102(b) and 3108(a) to issue appropriate supervisory rules, regulations and orders.

WHEREAS, National Commercial Bank, ("NCB") Jeddah, Saudi Arabia, is a "foreign bank" within the meaning of the International Banking Act of 1978, 12 U.S.C. 3101, et. seq. (the "Act"), headquartered in Jeddah, Saudi Arabia, and is certified by the Ministry of Finance of the Kingdom of Saudi Arabia to conduct all types of banking operations within and without Saudi Arabia.

WHEREAS, NCB maintains a branch office located in New York, New York, ("the Branch") which is a "Federal branch" of NCB within the meaning of 12 U.S.C. § 3101 and is subject to the Act and other laws of the United States governing national banks.

1

PLEAD014293

WHEREAS, the OCC issued an Order to NCB on July 2, 1992 under the provisions of 12 U.S.C. § 3108(a) regarding the operations of its Federal branch in New York, New York.

WHEREAS, NCB has now committed to carry out a plan, which is hereby incorporated by reference and made a part hereof, which has been reviewed and approved by the OCC, to liquidate the operations of its Federal branch as provided for by the provisions of 12 U.S.C. § 3102(i) and governed by the provisions of 12 U.S.C. §§ 181 and 182.

NOW, therefore, in consideration of the above premises, it is hereby agreed, between NCB, by and through its authorized officials acting through its Federal Branch, and the Comptroller, that:

(1)   NCB shall immediately undertake to implement the above-referenced plan of liquidation, as approved.

(2)   Any changes to the plan may only be made with the approval of the Comptroller.

(3)   The Order of July 2, 1992 is terminated and that this Agreement is hereby entered in lieu thereof.

The provisions of this Agreement are immediately effective upon

2

PLEAD014294

JUL 10 '92 09:24 OCC CHIEF COUNSEL                                    P.4/5
· JUL 09 '92 21:14 OCC CHIEF COUNSEL

issuance, and shall remain effective and enforceable except to
the extent that, and until such time as, any provisions of this
Agreement shall have been amended by the mutual consent of the
parties, or suspended, waived, or terminated by the OCC.

This Agreement shall have the same force and effect as an Order
entered into within the meaning of 12 U.S.C. § 3108(a).  The OCC
will monitor compliance with the terms of this Agreement and if,
at any time, the Comptroller of the Currency deems it appropriate
in fulfilling the responsibilities placed upon him by the several
laws of the United States to take any action affecting this
Branch, nothing in this Agreement shall in any way inhibit,
estop, bar or otherwise prevent him from doing so.  Failure to
comply with the provisions of this Agreement may be considered by
the OCC to constitute a violation within the meaning of 12 U.S.C.
§ 3102(i).

In testimony whereof, the undersigned has hereunto set his hand
on behalf of the Office of the Comptroller of the Currency.


_____                    _7/10/92__
Stephen R. Steinbrink                           Date
Acting Comptroller of the Currency

PLEAD014295

In testimony whereof, the undesigned has this date hereunto set

his hand on behalf of National Commercial Bank.

July 9. 1952
Date

Camille A. Chebeir
Branch Manager

4

PLEAD014296

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x      5096

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

              Plaintiff,   :

           v.   :

KHALID BIN MAHFOUZ,   :

           Defendant.   :

- - - - - - - - - - - - - - - - - x

      :   ORDER TO SHOW CAUSE AND
      :   TEMPORARY RESTRAINING
       ORDER

      92 Civ. 5096 ℓ

Upon the motion of the Board of Governors of the Federal Reserve System, the Complaint, the declaration of Thomas C. Baxter, Jr., and the exhibits attached thereto, and the accompanying Memorandum of Law, it is hereby

      ORDERED that defendant Khalid Bin Mahfouz shall appear before the ~~Honorable~~ United States District Judge assigned to this Case ~~District Judge for the Southern District of New York, in Room~~ United States, United States Courthouse, Foley Square, New York, New York, on July 15, 1992, at 10:00 o'clock in the ~~fore~~ noon, or ~~as soon thereafter as counsel may be heard~~ at such other time and date as the assigned judge may choose to show cause why an order should not be entered, pursuant to 12 U.S.C. § 1818(i)(4), 28 U.S.C. § 3001 et seq., and the equitable powers of this Court, for a preliminary injunction to:

      (a) Enjoin Khalid Bin Mahfouz from withdrawing, transferring, removing, dissipating, or disposing of funds, assets or other property which he either owns or controls, said funds, assets or other property being within the jurisdiction of the United States. Such property includes, but is not limited

to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest
in MCorp, and (b) ownership interest in Apartment 31A in the
Olympic Towers, 641 Fifth Avenue, New York, New York (Block No.
1287, Lot No. 1073), and any proceeds deriving from the sale or
transfer thereof.

(b) Enjoin (1) any employee or agent of Khalid Bin
Mahfouz or of any corporation or business entity owned or
controlled by Khalid Bin Mahfouz, or (2) any individual or entity
acting for or in concert with Khalid Bin Mahfouz, his employees
or agents, or any corporation or business entity owned or
controlled by him, from withdrawing, transferring, removing,
dissipating, or disposing of any funds, assets or other property
owned, either directly or indirectly, by Khalid Bin Mahfouz, and
from transferring, removing, or disposing of any funds, assets or
other property in a way which would benefit Khalid Bin Mahfouz,
provided that these individuals or entities receive actual notice
of this order.  Such funds, assets, or property include, but are
not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock
ownership interest in MCorp, and (b) ownership interest in
Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York,
New York (Block No. 1287, Lot No. 1073), and any proceeds
deriving from the sale or transfer thereof.

(c)  Prevent any of the funds, assets or other
property within the jurisdiction of the United States (1) in the
possession of Khalid Bin Mahfouz, (2) in the possession of any
employee or agent of Khalid Bin Mahfouz or of any corporation or

2

business entity owned or controlled by Khalid Bin Mahfouz, or (3) in the possession of any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, from being withdrawn, transferred, removed, disposed of, or dissipated, by any individual or entity with actual notice of this order. Such funds, assets or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof.

(d) Appoint a receiver of all the property owned or controlled, directly or indirectly, by Khalid Bin Mahfouz and direct the receiver to take immediate possession of said property and to hold and manage it until further order of the Court; and it is further

ORDERED that, pending further order of this Court, Khalid Bin Mahfouz shall be and is hereby ~~prohibited~~ restrained from withdrawing, transferring, removing, dissipating, or disposing of funds, assets or other property which he either owns or controls, said funds, assets or other property being within the jurisdiction of the United States. Such property includes, but is not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York,

3

New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof; and it is further

ORDERED that, pending further order of this Court, (a) any employee or agent of Khalid Bin Mahfouz or of any corporation or business entity owned or controlled by Khalid Bin Mahfouz, or (b) any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, shall be and hereby are restrained ~~prohibited~~ from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property owned, either directly or indirectly, by Khalid Bin Mahfouz, and from transferring, removing, or disposing of any funds, assets or other property in a way which would benefit Khalid Bin Mahfouz, provided that these individuals or entities receive actual notice of this order.  Such funds, assets, or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof; and it is further

ORDERED that, pending further order of this Court, any of the funds, assets or other property within the jurisdiction of the United States (a) in the possession of Khalid Bin Mahfouz, (b) in the possession of any employee or agent of Khalid Bin Mahfouz or of any corporation or business entity owned or controlled by Khalid Bin Mahfouz, or (c) in the possession of

4

any individual or entity acting for or in concert with Khalid Bin Mahfouz, his employees or agents, or any corporation or business entity owned or controlled by him, shall be and hereby are prohibited from being withdrawn, transferred, removed, disposed of, or dissipated, by any individual or entity with actual notice of this order.  Such funds, assets, or property include, but are not limited to, Khalid Bin Mahfouz's (a) 4.9 percent stock ownership interest in MCorp, and (b) ownership interest in Apartment 31A in the Olympic Towers, 641 Fifth Avenue, New York, New York (Block No. 1287, Lot No. 1073), and any proceeds deriving from the sale or transfer thereof; and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), service of the Complaint, the Memorandum of Law, the declaration of Thomas C. Baxter, Jr., and this Order may be effected by service upon Michael A. Cooper, Esq., Sullivan & Cromwell, 125 Broad Street, New York, New York  10004, counsel for Khalid Bin Mahfouz, and by service upon Khalid Bin Mahfouz at his last known New York residence, Apt 31A, Olympic Towers, 641 Fifth Avenue, New York, New York; and it is further

ORDERED that service of this Order shall be made on or before July 9, 1992, at 5:00 o'clock in the after-noon.

Dated:  New York, New York
        July 8, 1992
Issued at 4:48 p.m.

Kimba M. Wood
UNITED STATES DISTRICT JUDGE   7-8-92 SS.

5                       Part I

PLEAD014301

040.888

July 9, 1992

## Plan of Liquidation

NCB will voluntarily liquidate the operations of its Federal branch located in New York (the "Branch") in accordance with the plan that follows.  The effective date of the plan will be July 9, 1992.

The Branch has the following types of domestic and foreign liabilities to third parties:  (i) demand deposits (including cashiers checks), (ii) time deposits and certificates of deposits, (iii) call/notice deposits, (iv) short-term borrowings (including securities sold pursuant to agreement to repurchase), (v) liabilities in respect of letters of credit, banker's acceptances, foreign exchange contracts, swap agreements, loan commitments and risk participations in letters of credit, and (vi) accounts payable.

The following are deadlines for the specified actions; NCB will endeavor to complete the actions prior to the deadlines:

As of the Effective Date of this Plan

    (i)    The General Manager of the Branch will be appointed liquidating agent of the Branch pursuant to 12 U.S.C. § 181.

    (ii)    The liquidating agent will submit to the OCC an interim report of the assets and liabilities of the Branch as of the close of business on the date before the effective date of the plan.  The liquidating agent will attest to the validity of the report.

PLEAD014302

(iii)    The Branch will not:

    (a)    accept new deposits, provided that the Branch may accept new deposits into a demand deposit account and call/notice deposit account of an existing customer until the later of the date such customer transfers the account elsewhere or the deadline for such transfers arrives

    (b)    make new loans or loan commitments

    (c)    enter into new foreign exchange or swap transactions

    (d)    enter into new bankers' acceptances

    (e)    issue or confirm new letters of credit or purchase risk participations in new letters of credit

    (f)    enter into any other new business not specifically authorized by this plan or by the OCC

(iv)    The Branch will commence liquidating its assets in an orderly manner.

(v)    The Branch will publish a notice of closure in a newspaper of general circulation in New York for the first time; publication will continue daily for 45 days.

**Fifteen Days From the Effective Date of this Plan**

(i)    The Branch will inform its U.S.-based demand and call/notice deposit customers that they

-2-

PLEAD014303

(ii)    The Branch will pay when due all third party
liabilities that have come due through this
date.

### Forty-five Days From the Effective Date of this Plan

(i)    The Branch will either liquidate or (with the
consent of the counterparty) transfer to a
non-U.S. office all remaining foreign
exchange and swap transactions.

(ii)    The Branch will (with the consent of the
counterparty) transfer to a non-U.S. office
all loan commitments and risk participations
in letters of credit.

(iii)    The Branch will either pay off or (with the
consent of the depositors) transfer to a
non-U.S. office all remaining demand, call/
notice, time deposits and certificates of
deposits.*

(iv)    The Branch will pay all remaining accounts
payable (unless the party involved consents
to the transfer of the Branch's obligation to
a non-U.S. office).

(v)    The Branch will settle or (with the consent
of the beneficiary) transfer to a non-U.S.
office or to an unaffiliated U.S. bank all
letters of credit and bankers' acceptances.

---

\*    The Branch has a deposit from Iraq that is subject to
blockage under U.S. foreign asset control regulations.
The Branch will seek to transfer the deposit to a U.S.
bank in a manner acceptable to the OCC and the Office
of Foreign Assets Control.

-4-

<u>Sixty Days From the Effective Date of this Plan</u>

(i)    The Branch will cease its New York operations and will cease conducting any business other than that necessary for purposes of terminating the Branch's administration of NCB's Cayman Islands branch.

(ii)    The liquidating agent will inform the OCC how the Branch will handle the lease.

<u>Ninety Days From the Effective Date of this Plan</u>

(i)    The Branch will withdraw from the New York Clearing House CHIPS system and will close its accounts with the Federal Reserve Bank of New York.

(ii)    The liquidating agent will submit a final notice of closure of the Branch to the OCC. The notice will include a certification by a certified public accounting firm concerning the claims that have been filed during the voluntary liquidation.

(iii)    The Branch will return to the OCC all Reports of Examination and the Branch license certificate.

(iv)    The Branch will deposit an amount necessary to satisfy any valid unresolved third party direct claims against the Branch (i.e., obligations that would represent a valid enforceable legal obligation against the Branch if the Branch were a separate legal entity) in escrow with a U.S. bank.

PLEAD014305

(v)      The Branch's administration of NCB's Cayman
Island branch will end.

(vi)     The physical operations of NCB's Cayman
Islands branch will be moved to a location
outside the United States.

During the process of liquidation, the Branch will
make transfers to its non-U.S. offices only if (i) the ratio
of (a) third party assets to (b) liabilities to third par-
ties will not fall below 1.63 to 1 and (ii) the net amount
due to non-U.S. offices will not fall below $5 million.  For
these purposes, the Branch's capital equivalency deposit
will not be deemed a third party asset.  The assets
maintained by the Branch would be of high quality.  Payment
of deposits and other obligations to NCB's head office,
other affiliates and controlling shareholders will be made
only with 24 hours prior notice to the OCC or with the OCC's
prior approval, which shall not be unreasonably withheld.
In the absence of objection from the OCC during such 24 hour
period, the payment may be made.

In the event that any deadline under this plan
falls on a date that is not a business day in New York City,
the deadline shall fall on the next succeeding business day
in New York City.

Nothing contained herein shall relieve NCB from
its obligation to comply with the requirements of the
International Banking Act of 1978, including the requirement
to obtain any required approvals under that Act.

-6-

PLEAD014306

**SIDE 2**



# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for initial pleadings (not motions) under Rule 4:5-1

## DOCUMENT TYPES

Complaint
Answer
Answer with Counterclaim
Answer with Crossclaim
Answer with Third-Party Complaint
Answer with Counterclaim & Crossclaim
Answer with Counterclaim & Third-Party Complaint
Answer with Crossclaim & Third-Party Complaint
Answer with Counterclaim, Crossclaim & Third-Party Complaint
Third-Party Complaint
Third-Party Answer
Third-Party Answer with Counterclaim
Third Party Answer with Crossclaim
Third-Party Answer with Counterclaim & Crossclaim
Complaint Intervenor

## CASE TYPES  (Choose one and enter number of case type in appropriate space on the reverse side.)

| AUTO NEGLIGENCE | | INSURANCE CLAIM | | 701 | ACTION IN LIEU OF PREROGATIVE WRITS |
|---|---|---|---|---|---|
| 603 | Pers. Inj. Involved | 506 | PIP Coverage | | |
| 610 | Prop. Damage Only | 505 | Other | 005 | CIVIL RIGHTS |
| | | | | 156 | ENVIRONMENT LITIGATION |
| **MALPRACTICE** | | **CONTRACT** | | | |
| 604 | Medical | 502 | Book Acct. | 151 | NAME CHANGE |
| 607 | Other Professional | 503 | Comm'l Transaction | | |
| | | 509 | Employment | | |
| | | | | 234 | FRT PLYWOOD |
| **OTHER TORT** | | **REAL PROPERTY** | | | |
| 606 | Product Liability | | | **OTHER** | |
| 605 | Other Pers. Inj. | 303 | Mt. Laurel | | |
| 602 | Assault & Battery | 304 | Land Use | | |
| 609 | Defamation | 305 | Construction | 399 | REAL PROPERTY |
| 608 | Toxic Tort | 301 | Condemnation | | |
| 601 | Asbestos | 302 | Tenancy | | |
| 611 | Silicon Implant | | | 599 | CONTRACT |
| 612 | Blood - clotting serum | | | | |
| 613 | Repetitive Stress Syndrome | 175 | FORFEITURE | | |
| | | | | 699 | TORT |
| 614 | Gas Pipe Explosion | | | | |

When completing the **case description** section include such characteristics as: anticipated joinder of parties or issues, need for priority handling due to nature or importance of case or likelihood of early disposition. Be specific.

**Subtracks:** Not all subtracks are utilized in all DCM counties. The subtracks used depends upon case load characteristics, special programs, etc. Please familarize yourself with the subtracks utilized in the counties where you practice.

PLEAD014307

# SUPERIOR COURT OF NEW JERSEY



DONALD F. PHELAN
CLERK

OFFICE OF FORECLOSURE
R.J. HUGHES JUSTICE COMPLEX
PO BOX 971
TRENTON, NEW JERSEY 08625-0971

Date   7/19/99

Re:  The National Commercial Bank

vs.

John J. Hanly   F-1137-99

Hanly

To the Hon._____ John J. Hanly _____ J.S.C.

An answer, filed in behalf of_____ John J. Hanly _____
_____in the above case, has been determined to make
the cause a contested one.

Please, therefore, add this case to the general equity calendar pursuant
to Rule 4:36-2.

Office of Foreclosure

PLEAD014308