UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :
THE NATIONAL COMMERCIAL BANK,
                                   :
                 Plaintiff,
                                   :
          v.
                                   :

MORGAN STANLEY ASSET MANAGEMENT    :
INC., MARK R. VAN VALKENBURGH,
PETER A. NADOSY AND GERALD         :
P. BARTH,
                                   :
                 Defendants.
                                   :
-----------------------------------X

MORGAN STANLEY ASSET MANAGEMENT    :
INC., PETER A. NADOSY AND GERALD
P. BARTH,                          :       94 Civ. 3167 (DC)

        Third-Party Plaintiffs,   :       AMENDED COMPLAINT

              v.                   :       PLAINTIFF DEMANDS
                                           TRIAL BY JURY
OMAR BAJUNAID and ABDULRAOUF       :
 BANAJA,
          Third-Party Defendants.  :

-----------------------------------X

MARK R. VAN VALKENBURGH,           :

        Third-Party Plaintiff,     :

              v.                   :

OMAR BAJUNAID and ABDULRAOUF       :
 BANAJA,

        Third-Party Defendants.    :

-----------------------------------X


         Plaintiff The National Commercial Bank ("NCB"), by its

attorneys, Lankler Siffert & Wohl, for its Amended Complaint

herein alleges as follows:

PLEAD004575

## INTRODUCTION

1.    In this action, The National Commercial Bank ("NCB") sues Morgan Stanley Asset Management Inc. ("MSAM"), Mark R. Van Valkenburgh, a former officer and employee of MSAM, and certain MSAM officers for claims arising from their fraud and gross misconduct in connection with the mismanagement of a $64.5 million discretionary bond account. NCB entrusted the account to MSAM for the express purpose of reducing the risk of the account's initial holding of U.S. Treasury securities and in reliance on MSAM's assurances that it would manage the account in such a way as to reduce its risk and volatility. As a consequence of the defendants' fraud and misconduct, however, the account lost more than $38 million (nearly 60% of its equity) in a single month.

2.    The pattern of fraud and misconduct that generated those losses included that MSAM, through Mark R. Van Valkenburgh, the MSAM portfolio manager assigned to the NCB account, sent NCB a report fraudulently overstating the account's June 1993 value in an attempt to misrepresent the account's performance and hide trading losses. When NCB questioned the report, Mr. Van Valkenburgh continued to fraudulently overstate the account's value, even as, without disclosing it to NCB, he greatly and unreasonably increased the riskiness of his trading in July 1993 in an unsuccessful effort to recoup the previously hidden losses.

3.    In August 1993, while continuing to fraudulently overstate the account's value in reports to NCB for June and

- 2 -

PLEAD004576

July, MSAM, through Mr. Van Valkenburgh, once again increased the riskiness of the trading in the account by accumulating huge leveraged, unhedged short positions in ten and thirty-year Treasury securities. When Mr. Van Valkenburgh's high-risk efforts to recoup the hidden losses once again proved unsuccessful and led to still larger losses, Mr. Van Valkenburgh effectively doubled his bet and took still larger leveraged, unhedged short positions, which, in turn, led to even larger losses. MSAM and Mr. Van Valkenburgh first informed NCB of the nature and results of their trading on or about August 31, 1993, after the account had already lost in excess of $38 million during that one month.

4. Throughout the period of time that the account was under MSAM's management, MSAM's supervisory procedures were so lax that Mr. Van Valkenburgh was effectively given exclusive control over both the trading in the account and the information that was provided to NCB about the account. By thus abdicating its fiduciary and contractual duties to NCB, MSAM made possible the pattern of fraud and misconduct that resulted in losses to NCB of more than $40 million.

### JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

6. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between plaintiff and defendants and the amount in controversy exceeds $50,000, exclusive of interest and costs.

- 3 -

PLEAD004577

7.    Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim, as set forth below, occurred within this District.

### PARTIES

8.    At all times relevant to this Amended Complaint, defendant MSAM has been a Delaware corporation having its principal place of business at 1221 Avenue of the Americas, New York, New York 10020.

9.    MSAM is a registered Investment Adviser under the Investment Advisers Act of 1940, providing investment supervisory services and furnishing investment advice to clients possessing substantial assets.  MSAM's clients include individuals, banks and thrift institutions, investment companies, pension and profit sharing plans, trusts, estates and charitable organizations, corporations and other business entities.  MSAM is a wholly owned subsidiary of Morgan Stanley Group Inc., an international financial services holding company that also owns Morgan Stanley & Co., Incorporated ("Morgan Stanley"), a registered broker-dealer.

10.    From approximately September 1992 until September 1994, defendant Mark R. Van Valkenburgh was employed by MSAM as a Vice President, and worked as a portfolio manager in MSAM's fixed income group.

11.    At all times relevant to this Amended Complaint, defendant Peter A. Nadosy has been President of MSAM, head of

- 4 -

PLEAD004578

MSAM's fixed-income group and a Managing Director of Morgan Stanley.

12.   At all times relevant to this Amended Complaint, defendant Gerald P. Barth has been a principal of Morgan Stanley. Since at least the late spring of 1993, Mr. Barth also has served as deputy head of MSAM's fixed-income group.

13.   Plaintiff NCB is and, at all times relevant to this Amended Complaint, has been a banking institution organized and existing under the laws of Saudi Arabia, with its principal offices in Jeddah, Saudi Arabia.

### OVERVIEW OF THE FIXED-INCOME SECURITIES MARKET

14.   A "debt security" is any security through which the issuer of the security borrows money that must be paid back to the purchaser of the security (who is, in effect, the lender). Corporations and other entities, including the United States government, typically issue debt securities to finance their operations.

15.   The "face amount," "par value," or "principal" of a debt security is the amount of the loan -- the amount that the issuer of the security has agreed to repay at the security's maturity.

16.   Debt securities generally are issued with a specified "coupon" or "nominal" interest rate, which is set for the life of the security.

PLEAD004579

17.   Debt securities are also known as "fixed-income securities." This is because the amount of income that a holder will receive if the security is held to maturity is fixed according to the contractual terms set by the issuer at the time the security is issued.

18.   A coupon-bearing fixed-income security is one in which the issuer is obligated to make a coupon interest payment to the holder of the security on a periodic basis. For example, a fixed-income security with a face amount of $1,000 and a coupon interest rate of 7% pays the holder $70 per year.

19.   Some fixed-income securities do not obligate the issuer to make any coupon payments during the life of the securities, but rather only require that the issuer repay the principal at the time the security matures. This type of fixed-income security frequently is referred to as a "zero coupon" security.

20.   A fixed-income security frequently is not held to its maturity date by one holder, but rather is bought and sold numerous times prior to maturity. Secondary markets have developed to facilitate the trading of fixed-income securities for holders who do not wish to hold securities until their maturity dates.

21.   Prior to its maturity date, a fixed-income security frequently will sell at a market price that differs from its face amount. A fixed-income security that sells at a market price above its face amount is said to be selling at a "premium,"

- 6 -

PLEAD004580

while a security that sells at a price below its face amount is said to be selling at a "discount."  A fixed-income security that sells at its face amount is said to be selling at "par."

22.  The market price of a fixed-income security tends to fluctuate as the prevailing level of market interest rates fluctuates.  If the prevailing level of interest rates rises above the coupon or nominal rate paid by a fixed-income security, the market price of the fixed-income security tends to decline. (The fixed-income security is less attractive because it offers an interest rate below that available elsewhere in the market, and thus the security sells at a discount.)  If, by contrast, the prevailing level of interest rates declines below the coupon or nominal rate paid by a fixed-income security, the market price of the fixed-income security tends to increase. (The fixed-income security is more attractive because it offers an interest rate above that available elsewhere in the market, and thus the security sells at a premium.)  The possibility that changes in market interest rates will cause the market price of a fixed-income security to fluctuate is known as "interest rate risk."

23.  The interest rate risk associated with a particular fixed-income security is affected by the maturity date of the security.  Generally, the longer the term to maturity is for a fixed-income security, the greater the interest rate risk associated with the security.  For example, a fixed-income security maturing in thirty years generally carries more interest rate risk than a fixed-income security of equal par value

- 7 -

PLEAD004581

maturing in ten years, which, in turn, generally carries more interest rate risk than a fixed-income security of equal par value maturing in two years.

24.  Fixed-income securities issued by the United States government often are referred to as "Treasuries," because they are issued by the Treasury Department.  Treasuries generally are classified into three categories:  Treasury Bills (securities issued with a maturity of one year or less), Treasury Notes (securities issued with a maturity from one to ten years), and Treasury Bonds (securities issued with a maturity of more than ten years).

25.  Sometimes, a Treasury security will be "stripped" of its coupons and separate fixed-income securities will be made out of the principal and coupon payments.  Treasury securities stripped of their coupons are often referred to as "zero Treasury strips," "zero-coupon Treasury strips," "strips" or "zeros."

26.  The Government National Mortgage Association is the United States Government's mortgage credit agency.  The Government National Mortgage Association issues fixed-income securities that represent an interest in a pool of mortgage loans and bear the guarantee of that federal agency ("GNMAs" or "Ginnie Maes").

27.  Fixed-income securities, like many other types of securities, can be sold short.  A "short sale" involves the selling of a security not owned by the seller, and the subsequent purchase of the security to "cover" the original sale.  In a

- 8 -

PLEAD004582

short sale, the seller is hoping that the market price of the
security will decline so he can subsequently cover the short sale
at a profit.  In the case of fixed-income securities, which
decline in price as interest rates rise, a short sale will be
profitable if interest rates rise and unprofitable if they
decline.

### FACTS COMMON TO ALL CLAIMS

#### Background

28.  During 1992 and 1993, NCB employed various
professional investment advisory institutions around the world as
fiduciaries to manage portions of its assets.

29.  In September 1992, Mark Van Valkenburgh joined
defendant MSAM as a Vice President and a portfolio manager in the
fixed-income group.

30.  At all times relevant to the conduct alleged
below, Mr. Van Valkenburgh acted as an officer and employee of
MSAM.

31.  At all times relevant to the conduct alleged
below, Mr. Van Valkenburgh acted within the scope and course of
his employment at, and for the benefit of, MSAM and under the
supervision and control of MSAM, Peter Nadosy and Gerald Barth.

32.  On or about September 28, 1992, during his first
month of employment at MSAM, Mr. Van Valkenburgh met with NCB
representatives at NCB's headquarters in Jeddah, Saudi Arabia.

- 9 -

PLEAD004583

33.  At the meeting on or about September 28, Mr. Van Valkenburgh solicited NCB to become a client of MSAM.

34.  Subsequently, NCB agreed to allow MSAM to manage certain of NCB's assets.

35.  This agreement was thereafter memorialized in an asset management agreement (the "Management Agreement") dated October 26, 1992, and signed on behalf of MSAM by Peter Nadosy. A copy of the Management Agreement is annexed as Exhibit A to this Amended Complaint and incorporated herein by reference.

### The Asset Management Agreement

36.  Under the terms of the Management Agreement, NCB appointed MSAM, and MSAM agreed to act, as Investment Manager with full discretion to invest certain of NCB's assets to be held in a custodial account.

37.  Pursuant to the Management Agreement, MSAM explicitly agreed to "at all times act in accordance with the highest standards of professional conduct and integrity commonly adopted by portfolio managers."  (Management Agreement ¶4(A)). MSAM further expressly assumed responsibility for acts and omissions in relation to its duties as portfolio manager "to the extent such act or omission arises from [MSAM's] negligence or willful misconduct of [MSAM], its officers, employees, or delegees."  (Management Agreement ¶7).

38.  Under the Management Agreement, MSAM agreed to provide to "the Custodian, (and to [NCB] if [NCB] shall so request) in respect of each calendar month, detailed accounting

- 10 -

PLEAD004584

statements, prepared at the end of each calendar month, showing actual portfolio income, total return statistics, holdings and transactions." (Management Agreement ¶9(A)). MSAM also agreed to maintain all records related to the Management Agreement and "deliver and/or make available copies of the same to [NCB] and/or its duly authorized representatives as and when required by [NCB]." (Management Agreement ¶9(D)).

39. Under the Management Agreement, MSAM had full discretionary authority to manage NCB's designated assets in accordance with written investment guidelines, to be furnished by NCB, setting forth the "investment objectives and policies to be followed by the Investment Manager and the types and nature of the investments which may or may not be managed by the Investment Manager." (Management Agreement ¶ 2).

40. The assets to be managed by MSAM pursuant to the Management Agreement were to be held in a custodial account at Morgan Guaranty Trust Company of New York ("Morgan Guaranty"), a subsidiary of J.P. Morgan & Co., Incorporated.

41. By Power of Attorney dated November 2, 1992, NCB appointed MSAM as its attorney-in-fact to transact all business on NCB's behalf with respect to NCB's custody account at Morgan Guaranty. A copy of the Power of Attorney is annexed as Exhibit B to this Amended Complaint and incorporated herein by reference.

42. The Management Agreement further provided that, upon request of MSAM, NCB would furnish a list of authorized

- 11 -

PLEAD004585

employees "from whom the Investment Manager may accept instructions."  (Management Agreement ¶ 15).  Mr. Van Valkenburgh requested such a list by letter dated October 26, 1992.

43.  In response to Mr. Van Valkenburgh's request, NCB provided MSAM with a Power of Attorney dated December 2, 1992. That Power of Attorney, a copy of which is annexed as Exhibit C to this Amended Complaint and incorporated herein by reference, designated Abdulhadi Shayif, acting singly, or Abdulraouf Banaja and Omar Bajunaid, acting jointly, as authorized "to act on behalf of [NCB] and in its name, place and stead, in all matters relating to the opening, administration and operation of the discretionary management account with the Manager and to sign all documents, instruments and papers in connection therewith."

44.  Pursuant to the Management Agreement between NCB and MSAM, MSAM undertook discretionary management of a GNMA fixed-income account (the "GNMA Account") for NCB, on or about November 2, 1992.

45.  Throughout the period that MSAM managed the GNMA Account on behalf of NCB, Mr. Van Valkenburgh was the MSAM fixed-income portfolio manager assigned to handle the GNMA Account.

### The Opening of the Long Treasury Account

46.  At the time the GNMA Account was created in November 1992, NCB also held United States zero coupon Treasury strips, maturing in the year 2018 ("zeros"), in a custody account with Morgan Guaranty.  Those zeros had been purchased by NCB several years prior to the inception of NCB's relationship with

PLEAD004586

MSAM.  The zeros had a par value of $450 million and, as of the beginning of November 1992, a market value of approximately $55 million.

47.  From his earliest contacts with NCB while at MSAM, Mr. Van Valkenburgh consistently urged NCB to turn over management of the zeros to him.

48.  Mr. Van Valkenburgh knew, through discussions with NCB representatives, that NCB's then-existing strategy of simply holding the zeros to maturity (a strategy known as a "buy and hold" strategy) resulted in volatility (_i.e._, fluctuations in market value) of up to $3 to $4 million per month, due to the sensitivity of thirty-year zero-coupon Treasuries to fluctuations in interest rates.

49.  Mr. Van Valkenburgh further knew, through discussions with NCB representatives, that NCB considered this degree of volatility unacceptable, and wanted to reduce it.

50.  From in or around September 1992 through in or around February 1993, Mr. Van Valkenburgh repeatedly informed NCB representatives that through "active management," which he described as the use of options and other market devices as hedging strategies, he could greatly reduce the volatility of the zeros holding.

51.  Mr. Van Valkenburgh further repeatedly informed NCB representatives that such active management could greatly reduce the risk of negative returns while achieving the same or

- 13 -

PLEAD004587

even higher investment returns than the buy and hold strategy that NCB was then following.

52.  In a presentation made in November 1992, for example, Mr. Van Valkenburgh represented that, if given the zeros to manage, he would seek to "[p]roduce long term returns well in excess of LIBOR[1] while preserving capital and reducing the short term volatility of returns."

53.  Similarly, in a letter sent in January 1993, Mr. Van Valkenburgh represented that, if given the zeros to manage, he would follow a trading strategy that "would utilize futures and options to maintain most of the upside of the market and greatly reduce the downside risk."

54.  In reliance upon Mr. Van Valkenburgh's repeated assurances that MSAM would reduce the risk of the zeros holding, NCB agreed to retain MSAM to manage the zeros position by means of a discretionary account, which came to be referred to as the Long Treasury Account (the "Long Treasury Account").

55.  NCB's agreement was conveyed to MSAM by letter dated February 15, 1993, addressed to Mr. Van Valkenburgh (the "February 15 Letter").  A copy of the February 15 Letter is annexed as Exhibit D and incorporated herein by reference.

56.  The February 15 Letter accepted Mr. Van Valkenburgh's proposal to reduce the volatility of the zeros

---

[1]"LIBOR" is an acronym for London Interbank Offered Rate, which refers to the rates offered among banks for dollar deposits in the London market.  LIBOR generally is quoted for one-month, three-month, six-month and one-year periods.

PLEAD004588

through active management and summarized the investment objective that had been agreed to as "outperform[ing] the buy-and-hold position."

57. The February 15 Letter also required that MSAM "provide NCB with a monthly statement showing the change in the market value in addition to the trading activities during the month detailing the profit and losses of each trade."

58. MSAM began its management of the Long Treasury Account on or about February 15, 1993.

59. MSAM's management of the Long Treasury Account was pursuant to the Management Agreement (Exhibit A hereto) and subject to its terms, including the terms of the Power of Attorney that had been submitted to MSAM in accordance with the Management Agreement. (Exhibit C hereto).

60. Throughout the period that MSAM managed the Long Treasury Account on behalf of NCB, Mr. Van Valkenburgh was the fixed-income portfolio manager assigned to handle the Account.

61. Pursuant to the Management Agreement, and by virtue of MSAM's position as NCB's investment manager and adviser, and Mr. Van Valkenburgh's position as NCB's portfolio manager, MSAM and Mr. Van Valkenburgh owed fiduciary duties to NCB.

## Early Trading in the Long Treasury Account

62. On February 16, 1993, Mr. Van Valkenburgh sold the zeros that were held in the Long Treasury Account for

PLEAD004589

approximately $64.5 million and began to conduct trades in the Account with the proceeds from the sale.

63.   Between February 16, 1993 and April 7, 1993, Mr. Van Valkenburgh conducted a series of trades in the Long Treasury Account that yielded a net gain of approximately $1.9 million.

64.   By the close of business on April 7, 1993, all open positions in the Long Treasury Account had been closed, and no trading was conducted in the Account between April 8 and April 27, 1993.

### The Drafting of Investment
### Guidelines for the Long Treasury Account

65.   In or about April 1993, NCB determined that, because the zeros that had originally funded the Long Treasury Account had been completely liquidated, the February 15 Letter should be supplemented with investment guidelines.

66.   Thereafter, in or about April or May 1993, Mr. Van Valkenburgh and Omar Bajunaid, who was employed at NCB as an Asset Manager and was Mr. Van Valkenburgh's principal liaison with respect to the Long Treasury Account, discussed the drafting of a set of investment guidelines for the Long Treasury Account.

67.   Mr. Van Valkenburgh subsequently drafted and provided to Mr. Bajunaid proposed investment guidelines for the Long Treasury Account, which recited, among other things, that the performance objective of the Account would be to "produce 3

PLEAD004590

month Treasury Bills + 5% (500 bps) annual[] return[2] through the use of market timing, market arbitrage (yield curve, yield spread), market trading, futures and options while maintaining a portfolio of high quality and liquidity."  The proposed guidelines also stated that the "benchmark will be 8% annually."  A copy of those guidelines is annexed as Exhibit E and incorporated herein by reference.

68.   Mr. Bajunaid made a number of changes to MSAM's proposed investment guidelines.  Among those changes was to define the account's performance objective as being "to obtain 3 month libor plus 500-700 basis points" annually,[3] with a benchmark of "3 month libor + 5%."

69.   Mr. Bajunaid further modified the investment objective by adding the restriction that "[a]bsolute negative return over a 1 year period is not tolerated," thus directing MSAM to pursue the designated rate of return through a trading strategy that would seek to preserve capital.

70.   After obtaining the approval of Abdulhadi Shayif and Abdulraouf Banaja for the revised guidelines, Mr. Bajunaid gave them to Mr. Van Valkenburgh in or around May 1993.  A copy of those investment guidelines is annexed as Exhibit F and incorporated herein by reference.

---

[2]The rate for thirteen-week Treasury bills ranged between 2.82% and 3.06% during April and May 1993.  A basis point equals one one-hundreth of a percentage point.  Five hundred basis points thus equals 5%.

[3]The rate for three-month LIBOR ranged between 3.1875% and 3.375% during April and May 1993.

- 17 -

71. Neither Mr. Van Valkenburgh nor anyone else at MSAM ever requested clarification or modification of the investment objectives specified in the investment guidelines.

72. Indeed, between the time Mr. Bajunaid gave the guidelines to Mr. Van Valkenburgh and August 31, 1993, no one at MSAM even discussed the guidelines with anyone at NCB.

<u>The Trading from May through mid-June</u>

73. In May 1993, Mr. Van Valkenburgh conducted a series of trades in the Long Treasury Account that yielded a net gain of approximately $1.1 million for the month of May.

74. As a result, as of May month-end, the Long Treasury Account had a market value of approximately $67.5 million.[4]

75. Between June 1 and June 17, 1993, Mr. Van Valkenburgh conducted a series of trades in the Long Treasury Account. Those trades yielded, as of the close of business on June 17, net losses of approximately $2.2 million.

76. Between Friday, June 18, 1993, and Tuesday, June 22, 1993, no trading was conducted in the Long Treasury Account, but the market value in the Account declined by more than

---

[4]As used here, the term "market value" refers to the amount calculated by taking the opening equity of the Long Treasury Account, adding any realized or unrealized gains and subtracting any realized or unrealized losses. The figure does not include "sweep interest," <u>i.e.</u>, interest paid by the custodian for any periods of time in which some or all of the funds in the account were not invested in securities and instead held in an overnight account maintained by the custodian. The market values reported by MSAM to NCB for the Long Treasury Account likewise excluded sweep interest.

PLEAD004592

$700,000 due to the decline in value of open positions in the Account.

77.   As of the close of business on June 22, 1993, the Long Treasury Account had nearly $3 million in net losses for the month.  The Long Treasury Account's net losses between June 1 and June 22 thus effectively wiped out the gains that the Account had earned since the zeros were sold on February 16, 1993.

**Concealment of Losses and
Speculative Trading in Late June and July**

78.   MSAM and Mr. Van Valkenburgh failed to disclose to NCB that the Long Treasury Account had suffered a material decline in market value of nearly $3 million between June 1 and June 22, 1993.

79.   Instead, between June 23, 1993, and June 29, 1993, in an apparent effort to recoup that loss before the month's end, Mr. Van Valkenburgh accumulated a series of leveraged, unhedged short positions in GNMAs, ten-year notes and thirty-year bonds that materially and imprudently increased the level of interest rate risk in the Long Treasury Account, and that was inconsistent with NCB's investment guidelines and objectives.[5]

80.   That increase in risk led to a steep increase in the Long Treasury Account's losses for the month.  Thus, between

_____

[5]As used here, a position is "unhedged" if it is not matched with an offsetting position that reduces or eliminates the interest rate risk of the first position, and a position is "leveraged" if its cost exceeds the available equity in the account.  The accumulation of leveraged positions can be used to substantially increase the level of interest rate risk in an account, and it was so used in the case of Long Treasury Account.

- 19 -

PLEAD004593

the close of business on June 22, 1993, and the close of business on June 29, 1993, the Account suffered additional net losses of approximately $2 million, bringing the total for the month to approximately $5 million as of June 29.

81.   MSAM and Mr. Van Valkenburgh failed to disclose to NCB that the interest rate risk in the Long Treasury Account had materially increased between June 22 and 29 through the acquisition of leveraged, unhedged short positions, or that Mr. Van Valkenburgh was trading in a manner that was imprudent and inconsistent with NCB's investment guidelines and objectives.

82.   MSAM and Mr. Van Valkenburgh further failed to disclose to NCB that the Long Treasury Account had suffered a material decline in market value of approximately $5 million between June 1 and June 29.

83.   On June 30, 1993 (the date as of which MSAM and Mr. Van Valkenburgh would be required to report the Long Treasury Account's holdings to NCB), Mr. Van Valkenburgh reversed course and, through the acquisition of long positions in GNMAs and Treasuries, caused the Account to move from a position that was substantially net short, to one that was substantially net long the market.

84.   As of the close of business on June 30, 1993, the losses for the month remained at approximately $5 million, and the Long Treasury Account had thus declined in value during June from nearly $67.5 million to approximately $62.4 million.

- 20 -

85.   In an effort to conceal the losses suffered in the Long Treasury Account in June, MSAM, through Mr. Van Valkenburgh, sent NCB a monthly account statement on July 7, 1993 (the "June Account Statement") that materially misrepresented the market value of the Long Treasury Account.

86.   Specifically, in the June Account Statement, MSAM and Mr. Van Valkenburgh represented that the market value of the Long Treasury Account as of June month-end was $66,137,143.82, and that the Account had lost $1,729,782.77 in June.  Those representations were materially false and misleading.  In truth and in fact, the market value of the Long Treasury Account as of June month-end was approximately $62.4 million and the Account had lost approximately $5 million in June.

87.   In addition, the June Account Statement contained no description whatsoever of the holdings or transactions in the Long Treasury Account in June 1993, and thus failed to disclose that the interest rate risk in the Long Treasury Account had materially increased during the last week of June, or that Mr. Van Valkenburgh had begun trading in a manner that was imprudent and inconsistent with NCB's investment guidelines and objectives.

88.   NCB received a copy of the June Account Statement on or about Thursday, July 8, 1993.  Shortly after receiving the Statement, Mr. Bajunaid called Mr. Van Valkenburgh to express concern about the reported loss of $1.7 million.  After an unsuccessful effort to reach Mr. Van Valkenburgh at MSAM's

PLEAD004595

offices, Mr. Bajunaid spoke with Mr. Van Valkenburgh at the latter's vacation home.

89.   In that conversation, in the course of attempting to reassure Mr. Bajunaid about the loss, Mr. Van Valkenburgh continued to misrepresent the level of loss as being $1.7 million when, in truth and in fact, it was approximately $5 million.

90.   Mr. Van Valkenburgh returned to work on Tuesday, July 13, 1993.  Immediately thereafter, in an apparent effort to recoup the June loss before NCB discovered that he had materially understated its true amount, Mr. Van Valkenburgh embarked on a highly speculative trading strategy, which strategy he and MSAM failed to disclose to NCB and which was inconsistent with NCB's investment guidelines and objectives.

91.   Thus, between July 13 and July 15, Mr. Van Valkenburgh amassed extremely large, highly leveraged, unhedged short positions in GNMAs and Treasuries.  By close of business on July 15, 1993, with only $54.8 million of equity in the Account, Mr. Van Valkenburgh had used leverage to increase the Account's market exposure (i.e., the par value of the positions in the Account) to $1.1 billion in GNMAs, ten-year notes and thirty-year bonds.

92.   Thereafter, between Friday, July 16, 1993, and Friday, July 23, 1993, Mr. Van Valkenburgh maintained extremely large, highly leveraged, unhedged short positions in those same securities, with the market exposure ranging between a total of $600 million and $1.1 billion.

- 22 -

PLEAD004596

93.  Because of the size and maturity of the positions that Mr. Van Valkenburgh had accumulated through the use of leverage, and because those positions were unhedged, the effect was to render the Long Treasury Account extremely sensitive to fluctuations in interest rates.  Stated otherwise, even a small move in interest rates could result in a substantial change in the value of the Account.

94.  As a result, during the latter half of July 1993 (and despite the absence of any unusual movements in interest rates), the market value of the Long Treasury Account fluctuated wildly.  Between July 16 and July 23, 1993, for example, the market value of the Long Treasury Account fluctuated by more than 21%, ranging from a low of approximately $53.4 million to a high of approximately $65 million.

95.  MSAM and Mr. Van Valkenburgh failed to disclose to NCB that the risk and volatility in the Long Treasury Account had materially increased during July 1993, and that Mr. Van Valkenburgh was trading in a manner that was highly speculative and inconsistent with NCB's investment guidelines and objectives.

96.  On July 27, 1993, NCB representatives met with MSAM representatives, including Mr. Van Valkenburgh, at MSAM's offices in New York.

97.  Over the course of the four business days preceding the July 27 meeting, Mr. Van Valkenburgh lowered the market exposure of the leveraged, unhedged short positions in the Long Treasury Account from $950 million to $350 million.

- 23 -

PLEAD004597

98.  At the meeting on July 27, NCB's representatives reiterated the concern expressed earlier in the month by Mr. Bajunaid about the $1.7 million loss reported in the June Account Statement.  In addition, Mr. Bajunaid stated that NCB was considering moving a portion of the equity in the Long Treasury Account from MSAM to other firms.

99.  At the July 27 meeting, MSAM and Mr. Van Valkenburgh continued to mislead NCB by repeating the material misrepresentation that the Long Treasury Account had lost only $1.7 million in June, when in fact the Account had lost approximately $5 million.

100. MSAM and Mr. Van Valkenburgh further misled NCB by failing to disclose, either at the July 27 meeting or at any other time, that the risk and volatility in the Long Treasury Account had materially increased during July 1993, and that Mr. Van Valkenburgh was trading in a manner that was highly speculative and inconsistent with NCB's investment objectives and guidelines.

101. On July 30, 1993, in response to requests from NCB for assistance in attempting to reconcile MSAM's month-end performance figures with those that had been reported by the custodian Morgan Guaranty, MSAM, through Mr. Van Valkenburgh, telefaxed a document to NCB purporting to detail the trades and positions that resulted in the performance reported in the June Account Statement.

- 24 -

PLEAD004598

102. In the July 30 telefax, MSAM and Mr. Van Valkenburgh again materially misled NCB by again representing that the Long Treasury Account's loss in June was $1,729,782.77, when, in truth and in fact, the loss was approximately $5 million.

103. In the July 30 telefax, MSAM and Mr. Van Valkenburgh further represented that the security positions in the Account that remained open as of June month-end (the "June Holdings") had generated gains of $1,576,904.73.

104. That representation was likewise materially false and misleading. In truth and in fact, as of June month-end, the June Holdings had generated substantial losses.

105. The July 30 telefax further misled NCB by providing a purported listing of the holdings and trades for June that was both materially inaccurate and so incomplete and cryptic that it concealed the fact that the risk in the Long Treasury Account had materially increased during late June, and that Mr. Van Valkenburgh had begun trading in a manner that was highly speculative and inconsistent with NCB's investment guidelines and objectives.

### Continued Concealment of Losses and Extraordinarily Speculative Trading in August

106. During the month of August 1993, in a continuation of his apparent efforts to recover the June losses before NCB learned that he had materially understated the true amount of those losses, Mr. Van Valkenburgh resumed his highly speculative strategy of amassing huge, leveraged, unhedged short positions.

- 25 -

PLEAD004599

107. Moreover, when Mr. Van Valkenburgh's efforts to recoup previously hidden losses proved unsuccessful and led instead to still further losses, Mr. Van Valkenburgh responded by using more leverage to effectively double his bet, thereby increasing the market exposure of the leveraged, unhedged short positions in the Long Treasury Account to extraordinarily speculative levels.

108. MSAM, through Mr. Van Valkenburgh, undertook that course of trading without consultation with, or notice to, NCB, and indeed while continuing to deceive NCB about the nature and results of earlier trading in the Long Treasury Account.

109. Thus, during the first two weeks of August, Mr. Van Valkenburgh sold off certain long positions he had acquired immediately before the previous month's end and began once again to accumulate highly leveraged, unhedged short positions in various GNMAs and Treasuries.

110. By Friday, August 6, with an equity of only some $64 million in the Account, Mr. Van Valkenburgh had used leverage to amass unhedged short positions with a market exposure of $675 million in GNMAs and ten-year notes.

111. The size, maturity and unhedged nature of those leveraged positions once again rendered the Long Treasury Account extremely sensitive to fluctuations in interest rates.

112. During that same week, Mr. Van Valkenburgh received a number of telefaxes from NCB representatives. One of the telefaxes advised him that NCB still could not reconcile the

PLEAD004600

performance figures reported by him for June with those reported by the custodian.  Another telefax reported that as of August 31, 1993, NCB intended to change the custodian for all of its externally managed accounts, including the accounts managed by MSAM.

113. On Monday, August 9, MSAM, through Mr. Van Valkenburgh, sent NCB a telefax that purported to provide revised information about the Long Treasury Account's activity in June, but instead continued to include material misrepresentations and omissions.  The August 9 telefax continued, for example, to understate the June 30 market value of the Long Treasury Account by some $3.7 million.  It likewise continued to materially misdescribe the holdings and transactions in the Account during June and continued to be so cryptic and incomplete as to conceal the fact that the risk in the Account had materially increased toward the end of June, and that Mr. Van Valkenburgh's trading had become imprudent and inconsistent with NCB's investment guidelines and objectives.

114. In the week that followed the August 9 telefax, Mr. Van Valkenburgh added to his already sizable accumulation of highly leveraged, unhedged short positions in the Long Treasury Account.

115. MSAM, through Mr. Van Valkenburgh, pursued that course despite the fact that it resulted in repeated realization of losses in the Account, and despite the fact that it rendered

- 27 -

PLEAD004601

the Account even more at risk of incurring further substantial losses from even the slightest fluctuations in interest rates.

116. By close of business on Friday, August 13, the Long Treasury Account had lost more than $3 million in two weeks and had a market exposure of $925 million in GNMAs, ten-year notes and 30-year bonds on an equity of only $61.2 million.

117. MSAM, through Mr. Van Valkenburgh, sent NCB a telefax on August 13. In that telefax, no mention was made of the massive increase in risk that had been taken on in the Long Treasury Account over the course of the week, nor of the $3 million that had been lost in the Account over the previous two weeks.

118. Instead, the telefax merely stated that a "system problem" was delaying production of the July figures for NCB's accounts. Mr. Van Valkenburgh did not specify the nature of the "system problem," nor did he disclose that he was not using MSAM's computerized portfolio management system for the production of his figures, nor that (as alleged below in Paragraphs 160 through 164) the particular "system" that he was using was one that gave him exclusive control over the figures sent to NCB.

119. On Monday, August 16, MSAM, through Mr. Van Valkenburgh, sent NCB the first portion of MSAM's month-end report for July ("the July Account Statement").

120. Like the initial June Account Statement, the July Account Statement contained no description whatsoever of the

PLEAD004602

activity in the Long Treasury Account in July, but instead merely recited the purported month-end market value.

121. Moreover, and again like the June Account Statement, the sole piece of information provided by the July Account Statement about the Long Treasury Account was materially false and misleading.

122. Specifically, the July Account Statement overstated the month-end market value of the Long Treasury Account by more than $3.8 million, thus continuing the concealment of trading losses that had begun with the June Account Statement.

123. The "back up" for the July Account Statement was not telefaxed until August 17, at a time of day that caused it to arrive in Jeddah after close of business.  As a result, the purported back up effectively arrived the day before its addressee (Omar Bajunaid) was, as Mr. Van Valkenburgh knew, scheduled to leave on vacation.

124. The August 17 telefax repeated the previous telefax's material misstatement of the Long Treasury Account's value and (like the back up for the June Account Statement) provided a description of trades that was so cryptic and incomplete that it concealed the fact that the risk in the Long Treasury Account had materially increased, and that Mr. Van Valkenburgh's trading had been highly speculative and inconsistent with NCB's investment guidelines and objectives.

- 29 -

PLEAD004603

125. The August 16 and 17 telefaxes likewise failed to disclose the highly speculative trading that Mr. Van Valkenburgh was currently engaged in, or the substantial losses that had already resulted from that trading.

126. Nor did Mr. Van Valkenburgh disclose that information when he spoke with Omar Bajunaid by telephone during the middle weeks of August.

127. On the contrary, even while discussing his view that it was a good time to short the Treasury market (a view Mr. Bajunaid did not share), Mr. Van Valkenburgh avoided disclosing the size of the short positions he had already taken, the size of any positions he intended to take, or the losses that had already been incurred in the Long Treasury Account during August.

128. During the week that followed the August 16 and 17 telefaxes, against a steadily declining base of equity, Mr. Van Valkenburgh steadily increased the accumulation of leveraged short positions in the Long Treasury Account.

129. On Monday, August 16, for example, Mr. Van Valkenburgh increased the existing short position in ten-year notes from $400 million to $700 million, increased the existing short position in 30-year bonds from $250 million to $450 million, and maintained the existing short position of $275 million in GNMAs.

130. By close of business, the short positions in the Long Treasury Account thus had been leveraged to a market

- 30 -

PLEAD004604

exposure totalling $1.425 billion in GNMAs, ten-year notes and thirty-year bonds on equity of approximately $61.4 million.

131. By mid-week, the equity in the Long Treasury Account had declined by more than $5 million, to which Mr. Van Valkenburgh responded by leveraging the Account even further.

132. Thus, by close of business on Wednesday, August 18, the Long Treasury Account had leveraged short positions of $275 million in GNMAs, $850 million in ten-year notes and $450 million in thirty-year bonds, for a total of $1.575 billion in market exposure on equity of approximately $55.9 million.

133. By the week's end, the leveraged short positions in those securities remained in excess of $1.3 billion and the equity in the Account had plummeted to approximately $49.2 million, a decline of nearly 20% in a single week.

134. Mr. Van Valkenburgh responded to those disastrous results by leveraging the Long Treasury Account still further the following week.

135. On Monday, August 23, Mr. Van Valkenburgh leveraged the Account to a market exposure of $1.775 billion in GNMAs, ten-year notes and thirty-year bonds against an equity of approximately $49.9 million.

136. That massive accumulation of interest rate risk led to losses of nearly $11 million in just three days.

137. By close of business on Wednesday, August 25, the market value of the Long Treasury Account had declined to approximately $38.6 million, a drop of approximately 21.6% since

- 31 -

PLEAD004605

the beginning of the week and 40.1% since the beginning of the month.

138. The following day, the equity in the Account plunged again by more than $12 million, to approximately $25.8 million.

139. The by-now frantic pattern of trading that led to those losses included a $700 million short sale of five-year notes that Mr. Van Valkenburgh entered into on August 24 and covered two days later at a loss of more than $6.8 million.

140. By the week's end, only some $29.4 million remained of the $64.5 million in equity that had been in the Account at the beginning of August.

141. On Monday, August 30, while the Long Treasury Account sustained additional losses of approximately $3.1 million, Mr. Van Valkenburgh spoke to his supervisors and spent several hours seeking legal advice from MSAM's in-house counsel.

142. Early the following day, Mr. Van Valkenburgh called Omar Bajunaid from home and, for the first time, disclosed to a representative of NCB that the Long Treasury Account had suffered massive losses in August. At the time of that call, the losses in the Account had already exceeded $38 million.

143. Later that morning, Mr. Van Valkenburgh spoke again with Mr. Bajunaid and Donald Hill, the Treasurer of NCB.

144. In the course of that conversation, Mr. Hill asked Mr. Van Valkenburgh to tell him the market value of the Long Treasury Account as of the end of the previous day and the level

- 32 -

PLEAD004606

of interest rate risk to which the Account currently was subject.

145. Mr. Van Valkenburgh was unable to answer either question.  Not until later in the day was MSAM able to provide even that most basic information about the account it had been managing as NCB's fiduciary.

146. Upon receiving the necessary information, NCB began the process of dismantling the massive accumulation of short positions in the Long Treasury Account.

147. When the last of the leveraged short positions was closed out, the losses stood at more than $40 million, and the Long Treasury Account had (despite the absence of any unusual movements in interest rates) lost nearly 60% of its equity in a single month.

### MSAM's Failure to Supervise Mr. Van Valkenburgh

148. The fraud and misconduct that resulted in the loss of more than $40 million from the Long Treasury Account was made possible by MSAM's failure to supervise, in any meaningful fashion, Mr. Van Valkenburgh's actions with respect to the Long Treasury Account.

149. Despite the fact that Mr. Van Valkenburgh was, and was held out to be, an officer and employee of MSAM, and despite the fact that MSAM as an institution owed contractual and fiduciary duties to NCB, MSAM effectively left every aspect of the management of the Account (except for the collection of MSAM's management fees) under the exclusive control of Mr. Van Valkenburgh.

PLEAD004607

<u>MSAM's Failure to Supervise the</u>
<u>Trading in the Long Treasury Account</u>

150. At no time prior to August 30, 1993, did Mr. Van Valkenburgh's supervisors or anyone in MSAM's compliance department review Mr. Van Valkenburgh's trading in the Long Treasury Account to determine whether it was consistent either with the February 15 Letter (which authorized MSAM to manage the Account) or the written investment guidelines subsequently provided to Mr. Van Valkenburgh.

151. Indeed, neither Mr. Van Valkenburgh's supervisors, nor MSAM's compliance officer, even read those documents prior to August 30, 1993.

152. Nor, at any time prior to August 30, 1993, did Mr. Van Valkenburgh's supervisors or anyone in MSAM's compliance department review any records of Mr. Van Valkenburgh's trading to determine whether the risk levels of that trading were prudent and appropriate.

153. In fact, although Mr. Van Valkenburgh's supervisors regarded the Long Treasury Account as an unusual one for the fixed-income group, its trading records received less attention than did the records of the group's "core" accounts. With respect to the latter, it was the practice of Mr. Nadosy, the head of MSAM's fixed-income group, to review weekly trading reports with risk calculations.  With respect to the Long Treasury Account, however, Mr. Nadosy's review was limited to periodic glances at the group's daily trading blotter, a document that was (at least with respect to Mr. Van Valkenburgh's trading)

- 34 -

PLEAD004608

not always accurate, and that, in any event, did not contain sufficient information to enable assessment of the risk level in any given account.

154. Nor did Mr. Van Valkenburgh's supervisors or MSAM's compliance department review the trading records for the Long Treasury Account to monitor the amount of any losses occurring in the Account.

155. Instead, to the extent there was any supervision at all of Mr. Van Valkenburgh's trading in the Long Treasury Account, it consisted of ad hoc discussions between Mr. Van Valkenburgh and his supervisors, with little or no effort made by the supervisors to verify the accuracy of the information conveyed to them by Mr. Van Valkenburgh, or to assess the prudence and appropriateness of Mr. Van Valkenburgh's trading.

156. The extraordinary degree of latitude afforded Mr. Van Valkenburgh in managing the Long Treasury Account was particularly unwarranted given that the Account was regarded as a departure from the fixed-income group's core practice, Mr. Van Valkenburgh was a relatively new employee, and no effort had been made to determine from Mr. Van Valkenburgh's previous employer whether he was an appropriate candidate for reduced supervision. Had such an inquiry been made, Mr. Van Valkenburgh's supervisors would have learned that, far from having been given extra latitude, Mr. Van Valkenburgh had been subject to heightened supervision by his previous employer as a result of what his

- 35 -

supervisor there regarded as a tendency toward excessive risk-taking.

### MSAM's Failure to Supervise Performance Reporting for the Long Treasury Account

157. MSAM's supervision of the monthly reports sent to NCB for the Long Treasury Account was equally lax.

158. MSAM's fixed-income group did not require that periodic client reports be sent in any particular form, or from any particular source, or even that they be checked for accuracy by someone other than the portfolio manager.

159. As a result, a portfolio manager who wanted to conceal a poor performance could (as Mr. Van Valkenburgh did) send reports that materially misstated the performance of the account.

160. Unlike the periodic client reports that were sent for most of the other accounts managed by MSAM's fixed-income group (and even for the handful of other accounts that Mr. Van Valkenburgh himself managed), the periodic client reports sent to NCB were not generated by the Data Exchange System, MSAM's computerized portfolio management system (which kept what Mr. Nadosy regarded as the "official" records of MSAM's trading).

161. Instead, the only trading or performance reports sent to NCB were prepared by Mr. Van Valkenburgh himself, from information he either compiled himself manually or had his portfolio assistant compile and deliver to him.

162. At no time prior to August 30, 1993, did Mr. Van Valkenburgh's supervisors or anyone in MSAM's compliance

PLEAD004610

department ever see any of the trading or performance reports that were sent to NCB, much less review them for accuracy.  Nor were the reports reviewed for accuracy by Mr. Van Valkenburgh's portfolio assistant.

163.  In fact, the only MSAM personnel other than Mr. Van Valkenburgh who appear to have seen the reports before they were sent to NCB were the secretaries who typed and telefaxed them.

164.  Mr. Van Valkenburgh thus was permitted to retain, and did retain, complete control of the trading and performance information that was sent to NCB by MSAM.

MSAM's Failure to Supervise<br>Recordkeeping for the Long Treasury Account

165.  MSAM's general indifference with respect to the Long Treasury Account was, in fact, so great that it was not until at least August 30, 1993 that either Mr. Van Valkenburgh's supervisors or MSAM's compliance department learned that MSAM had not maintained a complete, accurate and readily accessible record of the trading and positions in the Long Treasury Account.

166.  During 1993, it was the general practice among fixed-income portfolio assistants at MSAM to enter each trade in their accounts on the Data Exchange System, and many of the trades conducted in the Long Treasury Account were, in fact, entered in at least some fashion on that system.

167.  Early on in his tenure at MSAM, however, Mr. Van Valkenburgh rejected the Data Exchange System as a resource for information about NCB's accounts.  In its stead, Mr. Van

- 37 -

PLEAD004611

Valkenburgh claims to have used a recordkeeping system involving handwritten notations on pads of paper (none of which appears to exist today) and a stack of trading tickets kept in his desk drawer.  It was this "system" that Mr. Van Valkenburgh purportedly used in making trading decisions and in compiling his performance reports to NCB.

168. At no time prior to August 30, 1993, did Mr. Van Valkenburgh's supervisors or MSAM's compliance department attempt to determine whether Mr. Van Valkenburgh's purported recordkeeping "system" was complete and accurate.

169. Nor did Mr. Van Valkenburgh's supervisors or MSAM's compliance department seek, at any time prior to August 30, 1993, to review any Data Exchange reports for the Long Treasury Account.

170. Accordingly, it was not until August 30, 1993 at the earliest that Mr. Van Valkenburgh's supervisors and MSAM's compliance department learned that because of apparent inputting errors, the Data Exchange System could not produce even such basic information as a complete and accurate list of the trades that had occurred in the Long Treasury Account; that MSAM had no other source for a complete, accurate and readily accessible record of the trading and positions in the Long Treasury Account; and that the only means of reconstructing such a record would require time-consuming analysis of many hundreds of trading tickets and broker confirmations.

PLEAD004612

171. As a result, when MSAM advised NCB on August 31 of the massive losses in the Long Treasury Account and was asked for a list of the positions and trades in the Account during August, MSAM was unable, even after at least a day's worth of attempted reconstruction, to produce an accurate list.

172. In fact, nearly a year later, in its Answer to the original Complaint filed in this action, MSAM reported that it still had insufficient knowledge and information to enable it to comment either on the value of the Long Treasury Account or on the trading that had occurred in the Account.

### MSAM's Failure to Disclose Its Lack of Supervision

173. At no time prior to the opening of the Long Treasury Account, or at any point during the management of that Account, did MSAM ever disclose to any representative of NCB any of the deficiencies in supervision of trading, reporting and recordkeeping that are alleged above. On the contrary, as late as September 1, 1993, MSAM assured NCB that MSAM did, in fact, have appropriate "supervisory procedures," and that as soon as MSAM "assemble[d] all that information," someone would "get back" to NCB with the specifics. No one did.

### FIRST CAUSE OF ACTION

### SECURITIES EXCHANGE ACT VIOLATION

174. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

- 39 -

PLEAD004613

175. In order to induce NCB to open the discretionary Long Treasury Account with MSAM and, once opened, to maintain control and discretionary authority over, and make purchases and sales of securities for, the Account, MSAM and Mr. Van Valkenburgh made misrepresentations of, and omitted to state, material facts to NCB.

176. MSAM and Mr. Van Valkenburgh made the misrepresentations of, and omitted to state, material facts in connection with the purchases and sales of securities in the Long Treasury Account.

177. MSAM and Mr. Van Valkenburgh made the misrepresentations of material facts knowing that they were false and misleading, or in reckless disregard of the truth or falsity of the misrepresentations.

178. MSAM and Mr. Van Valkenburgh knowingly or recklessly disregarded the material nature of the omissions of fact that they had a duty to disclose to NCB.

179. MSAM and Mr. Van Valkenburgh made the misrepresentations of, and omitted to state, material facts with the intent to deceive and defraud NCB concerning the value of the securities in the Long Treasury Account, the losses sustained in the Account, the level of risk being taken on in the Account, their failure to manage the Account in a prudent manner, their failure to manage the Account in a manner that was consistent with NCB's investment guidelines and objectives, the degree to which Mr. Van Valkenburgh's trading in the Account was

PLEAD004614

unsupervised, the manner in which information about the Account would be and was being reported, and the accuracy of such information.

180. MSAM and Mr. Van Valkenburgh knowingly used, or caused to be used, instrumentalities of interstate commerce in furtherance of the scheme to defraud, including that the purported account statements, backup documentation and subsequent correspondence concerning the Long Treasury Account were sent via telefax or the mails from New York to NCB representatives in Jeddah, Saudi Arabia, and telephone conversations concerning the Account occurred between Mr. Van Valkenburgh, on behalf of MSAM, in New York and NCB representatives in Jeddah, Saudi Arabia.

181. NCB justifiably relied to its detriment upon the material misrepresentations and omissions of defendants MSAM and Mr. Van Valkenburgh.

182. NCB was induced by the material misrepresentations and omissions to open the discretionary Long Treasury Account with MSAM and, once opened, to allow MSAM and Mr. Van Valkenburgh to maintain discretionary authority over, and to make purchases and sales of securities for, the Account.

183. MSAM and Mr. Van Valkenburgh's conduct violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

184. As a result of MSAM's and Mr. Van Valkenburgh's material misrepresentations and omissions and NCB's justifiable

- 41 -

PLEAD004615

reliance thereon, NCB has been damaged in an amount in excess of $40 million, for which damages MSAM and Mr. Van Valkenburgh are jointly and severally liable.

## SECOND CAUSE OF ACTION

### CONTROLLING PERSON LIABILITY OF NADOSY, BARTH AND MSAM UNDER SECURITIES EXCHANGE ACT

185. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

186. As President and head of the fixed-income group of MSAM and a Managing Director of Morgan Stanley, Mr. Nadosy had and exercised the actual authority to direct the activity of MSAM.

187. Mr. Nadosy directly or indirectly controlled MSAM, as defined under section 20(a), 15 U.S.C. §78t, of the Securities Exchange Act of 1934.

188. Mr. Nadosy also had and exercised the actual authority to direct the activity of Mr. Van Valkenburgh and to supervise Mr. Van Valkenburgh's management of the Long Treasury Account.

189. Mr. Nadosy directly or indirectly controlled Mr. Van Valkenburgh, as defined under section 20(a), 15 U.S.C. §78t, of the Securities Exchange Act of 1934.

190. By serving as deputy head of the fixed-income group of MSAM, and as a Vice President of MSAM and a Principal of Morgan Stanley, Mr. Barth had and exercised the actual authority

PLEAD004616

to direct the activity of Mr. Van Valkenburgh and to supervise his management of the Long Treasury Account.

191. Mr. Barth directly or indirectly controlled Mr. Van Valkenburgh, as defined under section 20(a).

192. As controlling persons under Section 20(a) defendants Mr. Nadosy and Mr. Barth are jointly and severally liable for the acts of Mr. Van Valkenburgh, and defendant Mr. Nadosy is jointly and severally liable for the acts of MSAM constituting violations of Section 10(b) and Rule 10b-5, in an amount in excess of $40 million.

193. MSAM, employing Mr. Van Valkenburgh as its Vice President, had and exercised the actual authority to direct the activity of Mr. Van Valkenburgh, and to supervise Mr. Van Valkenburgh's management of the Long Treasury Account.

194. MSAM directly or indirectly controlled Mr. Van Valkenburgh, as defined under section 20(a), 15 U.S.C. §78t, of the Securities Exchange Act of 1934.

195. As a controlling person under Section 20(a) defendant MSAM is jointly and severally liable for the acts of Mr. Van Valkenburgh constituting violations of Section 10(b) and Rule 10b-5, in an amount in excess of $40 million.

### THIRD CAUSE OF ACTION

### COMMON LAW FRAUD

196. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

PLEAD004617

197. In order to induce NCB to open the discretionary Long Treasury Account with MSAM and, once opened, to maintain control and discretionary authority over, and make purchases and sales of securities for, the Account, MSAM and Mr. Van Valkenburgh made misrepresentations of, and omitted to state, material facts to NCB.

198. MSAM and Mr. Van Valkenburgh made the misrepresentations of material facts knowing that they were false and misleading, or in reckless disregard of the truth or falsity of the misrepresentations.

199. MSAM and Mr. Van Valkenburgh, having a duty to disclose such facts, omitted to state material facts to NCB knowingly or with reckless disregard for the material nature of the omissions.

200. MSAM and Mr. Van Valkenburgh made the misrepresentations of, and omitted to state, material facts with the intent to deceive and defraud NCB concerning the value of the Long Treasury Account, the losses sustained in the Account, the level of risk being taken on in the Account, their failure to manage the Account in a prudent manner, their failure to manage the Account in a manner that was consistent with NCB's investment guidelines and objectives, the degree to which Mr. Van Valkenburgh's trading in the Account was unsupervised, the manner in which information about the Account would be and was being reported, and the accuracy of such information.

PLEAD004618

201. NCB justifiably relied to its detriment upon material misrepresentations and omissions of defendants MSAM and Mr. Van Valkenburgh, and was induced by the misrepresentations and omissions to open the discretionary Long Treasury Account with MSAM and, once opened to allow MSAM and Mr. Van Valkenburgh to maintain discretionary authority over, and to make purchases and sales of securities for, the Account.

202. As a result of defendants MSAM's and Mr. Van Valkenburgh's fraudulent conduct, NCB has been damaged in an amount in excess of $40 million, for which MSAM and Mr. Van Valkenburgh are jointly and severally liable.

203. In addition, defendants MSAM's and Mr. Van Valkenburgh's conduct was gross, wanton, or willful, and plaintiff is entitled to punitive damages against those defendants jointly and severally in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### COMMON LAW CONSTRUCTIVE FRAUD

204. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

205. By making misrepresentations of, and omitting to state material facts, and by engaging in a trading strategy that was highly speculative and contrary to NCB's instructions concerning management of the Long Treasury Account, and by failing to disclose the fact that such highly speculative trading was occurring, MSAM and Mr. Van Valkenburgh misled NCB concerning

- 45 -

PLEAD004619

the value of the Account, the losses sustained in the Account, the level of risk being taken on in the Account, their failure to manage the Account in a prudent manner, their failure to manage the Account in a manner that was consistent with NCB's investment guidelines and objectives, the degree to which Mr. Van Valkenburgh's trading in the Account was unsupervised, the manner in which information about the Account would be and was being reported, and the accuracy of such information.

206. MSAM's and Mr. Van Valkenburgh's conduct breached the duty of care owed to NCB as fiduciaries and operated as a constructive fraud.

207. NCB justifiably relied to its detriment upon the material misrepresentations and omissions of defendants MSAM and Mr. Van Valkenburgh, and was induced by the misrepresentations and omissions to open the discretionary Long Treasury Account with MSAM and, once opened to allow MSAM and Mr. Van Valkenburgh to maintain discretionary authority over, and to make purchases and sales of securities for, the Account.

208. As a result of MSAM's and Mr. Van Valkenburgh's constructive fraud, NCB has been damaged in an amount in excess of $40 million, for which MSAM and Mr. Van Valkenburgh are jointly and severally liable.

PLEAD004620

## FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

209. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

210. MSAM and Mr. Van Valkenburgh breached their fiduciary duties to NCB by engaging in trading that was highly speculative and imprudent and that was inconsistent with NCB's investment guidelines and objectives.

211. MSAM and Mr. Van Valkenburgh further breached their fiduciary duties to NCB by making material misrepresentations of, and omitting to state, material facts relating to the value of the Long Treasury Account, the losses sustained in the Account, the level of risk being taken on in the Account, their failure to manage the Account in a prudent manner, their failure to manage the Account in a manner that was consistent with NCB's investment guidelines and objectives, the degree to which Mr. Van Valkenburgh's trading in the Account was unsupervised, the manner in which information about the Account would be and was being reported, and the accuracy of such information.

212. MSAM further breached its fiduciary duties by failing adequately to supervise Mr. Van Valkenburgh and thus enabling him to engage in the pattern of fraud and misconduct alleged above in Paragraphs 211 and 212.

213. As a result of MSAM's and Mr. Van Valkenburgh's breach of their fiduciary duties, NCB has been damaged in an

- 47 -

PLEAD004621

amount in excess of $40 million, for which MSAM and Mr. Van
Valkenburgh are jointly and severally liable.

214. In addition, defendants MSAM's and Mr. Van
Valkenburgh's conduct was gross, wanton, or willful, and
plaintiff is entitled to punitive damages against those
defendants jointly and severally in an amount to be determined at
trial.

### SIXTH CAUSE OF ACTION

### BREACH OF CONTRACT BY MSAM

215. Paragraphs 1 through 173 are realleged and
incorporated herein by reference.

216. In agreeing to manage the Long Treasury Account,
MSAM was obligated to manage the Account in accordance with the
terms of the Management Agreement.

217. In agreeing to manage the Long Treasury Account on
a discretionary basis, MSAM was obligated to manage the Account
as NCB's fiduciary in accordance with NCB's guidelines and
objectives.

218. MSAM materially breached its contract to manage
the Long Treasury Account by engaging in trading that was highly
speculative and imprudent and that was inconsistent with NCB's
investment guidelines and objectives.

219. MSAM further materially breached its contract to
manage the Long Treasury Account by making material
misrepresentations of, and omitting to state, material facts

- 48 -

relating to the value of the Account, the losses sustained in the Account, the level of risk being taken on in the Account, its failure to manage the Account in a prudent manner, its failure to manage the account in accordance with NCB's investment guidelines and objectives, the degree to which Mr. Van Valkenburgh's trading in the Account was unsupervised, the manner in which information about the Account would be and was being reported, and the accuracy of such information.

220. MSAM further materially breached the contract to manage the Long Treasury Account by failing to carry out its responsibilities as investment adviser in accordance with the highest standards of professional conduct and integrity commonly adopted by portfolio managers.

221. MSAM further materially breached its contract to manage the Long Treasury Account by failing adequately to supervise Mr. Van Valkenburgh and thus enabling him to engage in the pattern of fraud and misconduct alleged above in Paragraphs 218 and 219.

222. As a result of MSAM's breach of contract, NCB has suffered damages in excess of $40 million.

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE

223. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

- 49 -

224. MSAM and Mr. Van Valkenburgh breached the duty of reasonable care that each owed to NCB in managing the Long Treasury Account on a discretionary basis by engaging in trading that was highly speculative and imprudent and that was inconsistent with NCB's investment guidelines and objectives, and by making material misrepresentations of, and omitting to state, material facts relating to its management of the Long Treasury Account.

225. MSAM further breached the duty of reasonable care that it owed to NCB in managing the Long Treasury Account on a discretionary basis by failing adequately to supervise Mr. Van Valkenburgh and thereby enabling him to engage in trading that was highly speculative and imprudent and that was inconsistent with NCB's investment guidelines and objectives, and to make material misrepresentations of, and to omit to state, material facts relating to MSAM's management of the Long Treasury Account.

226. Defendants MSAM's and Mr. Van Valkenburgh's negligence proximately caused NCB damage in an amount in excess of $40 million, for which MSAM and Mr. Van Valkenburgh are jointly and severally liable.

## EIGHTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

227. Paragraphs 1 through 173 are realleged and incorporated herein by reference.

- 50 -

228. MSAM and Mr. Van Valkenburgh made material misstatements of, and omitted to state, material facts with the knowledge and expectation that NCB would rely on the misstatements and omissions in opening the discretionary Long Treasury Account with MSAM and Mr. Van Valkenburgh, would be induced to keep the management of the Account with MSAM and Mr. Van Valkenburgh, and would thereby allow MSAM and Mr. Van Valkenburgh to make purchases and sales of securities for the Account.

229. NCB reasonably relied on the material misstatements and omissions of MSAM and Mr. Van Valkenburgh by allowing defendants to manage NCB's assets, including the Long Treasury Account, and to undertake and continue discretionary management of, and trading in, the Long Treasury Account.

230. As a result of defendants MSAM's and Mr. Van Valkenburgh's negligent misrepresentations, NCB has been damaged in an amount in excess of $40 million, for which MSAM and Mr. Van Valkenburgh are jointly and severally liable.

### RELIEF REQUESTED

WHEREFORE, plaintiff NCB respectfully requests judgment in its favor on the above causes of action as follows:

a.   On the first cause of action, compensatory damages against MSAM and Mr. Van Valkenburgh jointly and severally in an amount in excess of $40 million;

- 51 -

PLEAD004625

b.    On the second cause of action, compensatory damages against Mr. Nadosy, Mr. Barth and MSAM jointly and severally in an amount in excess of $40 million;

c.    On the third cause of action, compensatory damages in an amount in excess of $40 million, and punitive damages in an amount to be determined at trial, jointly and severally against MSAM and Mr. Van Valkenburgh;

d.    On the fourth cause of action, compensatory damages against MSAM and Mr. Van Valkenburgh jointly and severally in an amount in excess of $40 million;

e.    On the fifth cause of action, compensatory damages in an amount in excess of $40 million, and punitive damages in an amount to be determined at trial, jointly and severally against MSAM and Mr. Van Valkenburgh;

f.    On the sixth cause of action, compensatory damages against MSAM in an amount in excess of $40 million;

g.    On the seventh cause of action, compensatory damages against MSAM and Mr. Van Valkenburgh jointly and severally in an amount in excess of $40 million;

h.    On the eighth cause of action, compensatory damages against MSAM and Mr. Van Valkenburgh jointly and severally in an amount in excess of $40 million;

i.    All costs, attorneys fees, and pre- and post-judgment interest allowed by law; and

- 52 -

PLEAD004626

j.   Such other relief as may be proper under the

circumstances.

Dated:     New York, New York
           September 29, 1995

Respectfully submitted,

Helen Gredd (HG 5318)

LANKLER SIFFERT & WOHL
500 Fifth Avenue
New York, New York  10110-3398
(212) 921-8399

Attorneys for Plaintiff
The National Commercial Bank
and Third-Party Defendant
Abdulraouf S. Banaja

- 53 -

PLEAD004627