UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

THE NATIONAL COMMERCIAL BANK,      :

           Plaintiff,      :

    -against-      :      94 Civ. 3167 (DC)

MORGAN STANLEY ASSET MANAGEMENT INC.   :
and MARK R. VAN VALKENBURGH,

         :

        Defendants.

         :

- - - - - - - - - - - - - - - - - - x

MORGAN STANLEY ASSET MANAGEMENT INC.,  :

      Third-Party Plaintiff,      :

     -against-      :

OMAR BAJUNAID,      :

     Third-Party Defendant.      :

- - - - - - - - - - - - - - - - - - x

MARK R. VAN VALKENBURGH,      :

     Third-Party Plaintiff,      :

     -against-      :

OMAR BAJUNAID,      :

     Third-Party Defendant.      :

- - - - - - - - - - - - - - - - - - x

### JOINT MEMORANDUM OF LAW OF MORGAN STANLEY ASSET MANAGEMENT INC. AND MARK R. VAN VALKENBURGH IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York  10017
(212) 450-4000

Attorneys for Morgan Stanley
Asset Management Inc.

PIPER & MARBURY L.L.P.
1251 Avenue of the Americas
New York, New York  10020
(212) 835-6000

Attorneys for
Mark R. Van Valkenburgh

PLEAD005556

TABLE OF CONTENTS

                                                                    Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . .    1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . .     7

        A.   The Parties . . . . . . . . . . . . . . .      7

        B.   The BCCI Crisis and NCB's
             Removal of Assets From the
             U.S. in the Summer of 1992  . . . . . . . .    9

        C.   NCB's New External Investment
             Program in the Fall of 1992 . . . . . . . .   11

        D.   The Investment Management Agreement
             Between NCB and MSAM and the GNMA
             Account . . . . . . . . . . . . . . . . . .   12

        E.   September 1992 - February 1993
             Discussions About NCB's
             Zero Coupon Bonds . . . . . . . . . . . . .   14

        F.   The Opening of the Long Treasury
             Account and the February Guidelines . . . .   17

        G.   Trading in the Long Treasury Account
             From February Through April 1993  . . . . .   18

        H.   Morgan Guaranty's Reports, MSAM's
             Estimates, and NCB's Internal
             Reconciliation Process  . . . . . . . . . .   19

        I.   MSAM's Supervision of
             Mark Van Valkenburgh  . . . . . . . . . . .   23

        J.   The May Guidelines  . . . . . . . . . . . .   24

        K.   The Management Fee for the
             Long Treasury Account . . . . . . . . . . .   27

        L.   Trading in the Long Treasury
             Account in June 1993  . . . . . . . . . . .   28

        M.   Trading in the Long Treasury
             Account in July 1993  . . . . . . . . . . .   31

        N.   Trading in the Long Treasury
             Account in August 1993  . . . . . . . . . .   32

PLEAD005557

|  |  |  | Page |
|---|---|---|---|
| O. | The Closing of the Long Treasury Account . . . . . . . . . . . . . . | | 35 |
| ARGUMENT | . . . . . . . . . . . . . . . . . . . . . | | 36 |
| POINT I: | SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON NCB'S FEDERAL SECURITIES FRAUD CLAIMS . . . . . . . . . . | | 37 |
| A. | NCB Cannot Satisfy the "In Connection With" Requirement . . . . . . . | | 38 |
| | 1. | The Early Statements . . . . . . . . . | 39 |
| | 2. | The June-July Statements . . . . . . . | 42 |
| | 3. | Omissions Concerning Supervision . . . . . . . . . . . . . . | 45 |
| B. | NCB Cannot Prove Causation . . . . . . . . | | 46 |
| | 1. | The Early Statements . . . . . . . . . | 48 |
| | 2. | The June-July Statements . . . . . . . | 48 |
| C. | NCB Cannot Prove Reasonable Reliance . . . | | 49 |
| | 1. | The Early Statements . . . . . . . . . | 50 |
| | 2. | The June-July Statements . . . . . . . | 52 |
| D. | Defendants Had No Duty to Disclose the Allegedly Concealed Facts . . . . . . . | | 53 |
| POINT II: | SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON NCB'S COMMON LAW FRAUD, NEGLIGENT MISREPRESENTATION AND CONSTRUCTIVE FRAUD CLAIMS . . . . . . . | | 56 |
| CONCLUSION | . . . . . . . . . . . . . . . . . . . . . | | 58 |

PLEAD005558

TABLE OF AUTHORITIES

Page

Cases

Abrash v. Fox, 805 F. Supp. 206 (S.D.N.Y. 1992) . . .    38

Anderson v. Liberty Lobby, 477 U.S. 242,
    106 S. Ct. 2505 (1986) . . . . . . . . . . . . . 36-37

Apex Oil Co. v. The Belcher Co. of New York, Inc.,
    855 F.2d 997 (2d Cir. 1988)  . . . . . . . . . .   52

Bank Brussels Lambert, S.A. v. Intermetals Corp.,
    779 F. Supp. 741 (S.D.N.Y. 1991) . . . . . . . .   55

Banque Arabe et Internationale D'Investissement
    v. Maryland Nat'l Bank, 57 F.3d 146
    (2d Cir. 1995) . . . . . . . . . . . . . . . . 53, 56

Basic Inc. v. Levinson, 485 U.S. 224,
    108 S. Ct. 978 (1988) . . . . . . . . . . . . .   53

Bastian v. Petren Resources Corp., 892 F.2d 680
    (7th Cir.), cert. denied, 496 U.S. 906 (1990). .   47

Bennett v. United States Trust Co. of New York,
    770 F.2d 308 (2d Cir. 1985), cert. denied,
    474 U.S. 1058 (1986) . . . . . . . . . . . . . .   46

Bischoff v. G.K. Scott & Co., 687 F. Supp. 746
    (E.D.N.Y. 1986)  . . . . . . . . . . . . . . . 43, 49

Bissell v. Merrill Lynch & Co., Inc.,
    Fed. Sec. L. Rep. (CCH) ¶ 99,298,
    1996 WL 465750 (S.D.N.Y. 1996) . . . . . . . . .   38

Blue Chip Stamps v. Manor Drug Stores,
    421 U.S. 723, 95 S. Ct. 1917 (1975)  . . . . . .   45

Bogart v. Shearson Lehman Bros., Inc.,
    No. 91 Civ. 1036 (LBS), (NG),
    1993 WL 33643 (S.D.N.Y. 1993)  . . . . . . 39-40, 44

Brown v. The E.F. Hutton Group, Inc.,
    991 F.2d 1020 (2d Cir. 1993) . . . . . . . . . .   50

Brown v. The Hutton Group,
    795 F. Supp. 1317 (S.D.N.Y. 1992) . . . . . . .   38

iii

Page

Bruschi v. Brown, 876 F.2d 1526
    (11th Cir. 1989) . . . . . . . . . . . . . . . .    47

Cahill v. Arthur Andersen & Co.,
    659 F. Supp. 1115 (S.D.N.Y. 1986),
    aff'd, 822 F.2d 14 (2d Cir. 1987)  . . . . . . .    43

Capalbo v. PaineWebber, Inc.,
    672 F. Supp. 1048 (N.D. Ill. 1987) . . . . . . . 44-45

Carte Blanche (Singapore) PTE., Ltd. v.
    Diners Club Int'l, Inc., 758 F. Supp. 908
    (S.D.N.Y. 1991)  . . . . . . . . . . . . . . . .    52

Celotex Corp. v. Catrett, 477 U.S. 317,
    106 S. Ct. 2548 (1986) . . . . . . . . . . . . .    36

Citibank, N.A. v. K-H Corp.,
    968 F.2d 1489 (2d Cir. 1992) . . . . . . . . . . 46-48

Congregation of the Passion, Holy Cross
    Province v. Kidder Peabody & Co.,
    800 F.2d 177 (7th Cir. 1986) . . . . . . . . . .    44

Cumis Ins. Soc'y, Inc. v. Citibank, N.A.,
    921 F. Supp. 1100 (S.D.N.Y. 1996)  . . . . . . .    56

Darrell v. Goodson, Fed. Sec. L. Rep. (CCH)
    ¶ 97,349, 1980 WL 1392 (S.D.N.Y. 1980) . . . . .    41

Feinman v. Dean Witter Reynolds, Inc.,
    84 F.3d 539 (2d Cir. 1996) . . . . . . . . . . .    50

Flickinger v. Harold C. Brown & Co.,
    947 F.2d 595 (2d Cir. 1991)  . . . . . . . .    39, 43

Harsco Corp. v. Segui,
    91 F.3d 337 (2d Cir. 1996) . . . . . . . . . 49-50, 56

Huddleston v. Herman & MacLean, 640 F.2d 534
    (5th Cir. 1981), aff'd in part, rev'd in part
    on other grounds, 459 U.S. 375 (1983)  . . . . .    49

In re Drexel Burnham Lambert Group, Inc.,
    151 B.R. 49 (S.D.N.Y. 1993)  . . . . . . . . . .    39

In re JWP Inc. Sec. Litig., 928 F. Supp. 1239
    (S.D.N.Y. 1996)  . . . . . . . . . . . . . . 38, 43

In re Fortune Systems Sec. Litig.,
    680 F. Supp. 1360 (N.D. Cal. 1987) . . . . . . .    48

iv

PLEAD005560

                                                                    Page

In re Integrated Resources Real Estate Limited
    Partnerships Sec. Litig., 850 F. Supp. 1105
    (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . .    47

In re Time Warner Inc. Sec. Litig.,
    9 F.3d 259 (2d Cir. 1993), cert. denied,
    114 S. Ct. 1397 (1994) . . . . . . . . . . . .  37, 53

Jordan v. Duff and Phelps, Inc.,
    815 F.2d 429 (7th Cir. 1987),
    cert. dismissed, 485 U.S. 901 (1988) . . . . . .    53

Kaplan v. Shapiro, 655 F. Supp. 336
    (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . .    42

Kregos v. The Associated Press,
    3 F.3d 656 (2d Cir. 1993),
    cert. denied, 510 U.S. 1112 (1994) . . . . . . .    56

Kushner v. DBG Property Investors, Inc.,
    793 F. Supp. 1161 (S.D.N.Y. 1992) . . . . . .  46, 56

Levitin v. PaineWebber, Inc.,
    933 F. Supp. 325 (S.D.N.Y. 1996) . . . . . . 2, 38, 45

Manufacturers Hanover Trust Co. v. Smith Barney,
    Harris Upham & Co., 770 F. Supp. 176
    (S.D.N.Y. 1991) . . . . . . . . . . . . . . . 38, 45

McCoy v. Goldberg, 748 F. Supp. 146
    (S.D.N.Y. 1990) . . . . . . . . . . . . . . . 39, 40

McGonigle v. Combs, 968 F.2d 810 (9th Cir.),
    cert. dismissed, 506 U.S. 948 (1992) . . . . . .    49

Mechigian v. Art Capital Corp.,
    612 F. Supp. 1421 (S.D.N.Y. 1985) . . . . . . . 41-42

Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,
    716 F. Supp. 1504 (S.D.N.Y. 1989) . . . . . . .    45

Moran v. Kidder Peabody & Co.,
    617 F. Supp. 1065 (S.D.N.Y. 1985),
    aff'd, 788 F.2d 3 (2d Cir. 1986) . . . . . . . .    45

Moss v. Morgan Stanley Inc., 719 F.2d 5
    (2d Cir. 1983), cert. denied,
    465 U.S. 1025 (1984) . . . . . . . . . . . . . 37-38

v

Page

Naye v. Boyd, Fed. Sec. L. Rep. (CCH) ¶ 92,979,
    1986 WL 198 (W.D. Wash. 1986), aff'd,
    804 F.2d 146 (9th Cir. 1987) . . . . . . . . .    46

O'Brien v. Continental Illinois Nat'l
    Bank & Trust Co. of Chicago,
    593 F.2d 54 (7th Cir. 1979) . . . . . . . . . .    44

Orderline Wholesale Distr., Inc. v. Gibbons,
    Green, van Amerongen, Ltd.,
    675 F. Supp. 122 (S.D.N.Y. 1987) . . . . . . . 56-57

Pross v. Katz, 785 F.2d 455 (2d Cir. 1986) . . . . .    39

Rotanelli v. Madden, 172 A.D.2d 815, 569
    N.Y.S.2d 187 (2d Dep't 1991), app. denied,
    79 N.Y.2d 754, 581 N.Y.S.2d 281 (1992) . . . . .    56

S.E.C. v. W.J. Howey Co., 328 U.S. 293,
    66 S. Ct. 1100 (1946) . . . . . . . . . . . . .    41

Savino v. E.F. Hutton & Co., Inc.,
    507 F. Supp. 1225 (S.D.N.Y. 1981) . . . . . . . 41-42

Schoen v. Martin, 187 A.D.2d 253,
    589 N.Y.S.2d 443 (1st Dep't 1992) . . . . . . .    57

Sheppard v. TCW/DW Term Trust 2000,
    No. 94 Civ. 5404 (AGS), 1996 WL 469659
    (S.D.N.Y. Aug. 16, 1996) . . . . . . . . . . . 45, 56

Siegel v. Tucker, Anthony & R.L. Day, Inc.,
    658 F. Supp. 550 (S.D.N.Y. 1987) . . . . . . 39-40, 41

Silverstein v. Merrill Lynch, Pierce,
    Fenner & Smith, Inc., 618 F. Supp. 436
    (S.D.N.Y. 1985) . . . . . . . . . . . . . . . .    41

Troyer v. Karcagi, 476 F. Supp. 1142
    (S.D.N.Y. 1979) . . . . . . . . . . . . . . . 43, 44

Vigilant Ins. Co. v. C. & F. Brokerage Servs.,
    751 F. Supp. 436 (S.D.N.Y. 1990) . . . . . . . 38-39

PLEAD005562

Page

Statutes and Rules

Section 10(b) of the Securities Exchange Act
of 1934, 15 U.S.C. § 78j(b)  . . . . . . . . .  passim

Section 20(a) of the Securities Exchange Act
of 1934, 15 U.S.C. § 78t(a)  . . . . . . . . . . . 1, 37

Rule 10b-5 underlying the Securities Exchange
Act of 1934, 17 C.F.R. § 240.10b-5 . . . . . . .  passim

Federal Rule of Civil Procedure 56  . . . . . . . 1, 36, 57

vii

JOINT MEMORANDUM OF LAW OF MORGAN STANLEY ASSET
MANAGEMENT INC. AND MARK R. VAN VALKENBURGH IN
SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Morgan Stanley Asset Management Inc.
("MSAM") and Mark R. Van Valkenburgh respectfully submit this
joint memorandum of law in support of their motion for partial
summary judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure with respect to certain claims asserted
against them by plaintiff The National Commercial Bank
("NCB").  In this action, NCB asserts causes of action for (i)
federal securities fraud under Section 10(b) of the Securities
Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b),
and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (ii) control
person liability under Section 20(a) of the Exchange Act, 15
U.S.C. § 78t(a); (iii) common law fraud; (iv) constructive
fraud; (v) breach of fiduciary duty; (vi) breach of contract;
(vii) negligence; and (viii) negligent misrepresentation.  By
this motion, defendants seek summary judgment in their favor
with respect to NCB's claims for federal securities fraud,
common law fraud, constructive fraud, and negligent
misrepresentation.  NCB's other claims are not at issue in
this motion.

### PRELIMINARY STATEMENT

This case arises out of losses incurred by NCB, the
largest bank in Saudi Arabia, in an investment account managed
on its behalf by MSAM (the "Long Treasury Account" or the
"Account").  In August 1993, with the encouragement of NCB,
MSAM took large, leveraged short positions in U.S. government

securities in the Account in an attempt to benefit from an
expected increase in interest rates.  Interest rates declined
during the month, however, and the Account suffered losses of
approximately $40 million.[1]

NCB brought this suit in April 1994, alleging
federal securities fraud and numerous common law claims.
Contrary to NCB's allegations, however, the record developed
during discovery shows that NCB made a strategic decision to
create the Long Treasury Account as a high risk/high return
trading account in U.S. government securities.  The evidence
is overwhelming that Omar Bajunaid, a sophisticated senior

---

[1] U.S. government securities are fixed-income
securities issued by the U.S. government.  The prices of
fixed-income securities fluctuate inversely with interest
rates; thus, an increase in interest rates causes the prices
of fixed-income securities to decline, and vice-versa.  See
Expert Report Submitted by Hani K. Findakly on Behalf of
Morgan Stanley Asset Management Inc. and Mark Van
Valkenburgh, dated Jan. 12, 1996 ("Findakly Rep.") (Tab 16),
at 6-7, ¶ 10.  (Citations in the form "Tab __" refer to the
exhibits attached to the Affidavit of James H.R. Windels in
Support of the Motion of Morgan Stanley Asset Management
Inc. and Mark R. Van Valkenburgh for Partial Summary
Judgement, sworn to September 30, 1996.)

An investor sells "short" when he sells securities that
he does not own.  Ordinarily, an investor selling short
expects prices to fall so that by the time delivery of the
securities is required he can purchase them at a lower
price.  See generally Levitin v. PaineWebber, Inc., 933 F.
Supp. 325, 327 (S.D.N.Y. 1996).  Selling securities short is
an appropriate strategy if an investor expects interest
rates to rise and the prices of fixed-income securities to
decline.  Findakly Rep. (Tab 16) 22-23, ¶ 39.

"Leverage" refers to mechanisms by which an investor
increases his investment exposure.  A "leveraged short
position," for example, may describe a short position in an
amount greater than the value of the account.  Findakly Rep.
(Tab 16) 11, ¶ 22.

PLEAD005565

officer of NCB with primary responsibility for supervising NCB's investment accounts, repeatedly urged MSAM to trade the Long Treasury Account aggressively and to take large, leveraged short positions during the summer of 1993.  In particular, Bajunaid has admitted stating to Mark Van Valkenburgh, the portfolio manager at MSAM assigned to the Long Treasury Account, that he should "short the hell out of it" during the month of August.  Despite this evidence, NCB is now attempting to shift responsibility for the August losses to defendants and make them the guarantor of its investments.

While certain of the facts of this case are in dispute, NCB has based its fraud and misrepresentation claims on a limited number of purported affirmative representations and omissions by defendants.  In this motion, defendants argue that as a matter of law these representations and omissions cannot serve as the basis for claims of fraud and negligent misrepresentation.

The affirmative representations alleged by NCB fall into two categories -- (i) statements in the period from September 1992 to February 1993, prior to the opening of the Account on February 15, 1993 (the "Early Statements"); and (ii) statements relating to the value of the Account at the end of June and July 1993 and the transactions which took place during those months (the "June-July Statements").  NCB has not alleged -- and there is no evidence -- that defendants made any fraudulent statements which related directly to the August 1993 transactions and losses at issue in this case.

3

PLEAD005566

As a matter of law, the statements cited by NCB cannot serve as the basis for fraud claims seeking compensation for the August losses.  First, the Early Statements fail to satisfy the "in connection with" requirement of Section 10(b) of the Exchange Act.  Numerous cases hold that statements made to induce a potential investor to open a securities account -- which, interpreting the facts in the light most favorable to NCB, describes the Early Statements -- cannot be "in connection with" specific transactions entered into after the account is opened.  NCB also cannot show that the Early Statements -- which occurred six months prior to the August losses -- either proximately caused the losses or that NCB justifiably relied on the statements.  Because proximate cause and reliance are essential elements of Section 10(b) and NCB's common law claims, defendants should be granted summary judgment with respect to the Early Statements.

The same infirmities render the June-July Statements inactionable as well.  These statements also fail to satisfy the "in connection with" requirement of Section 10(b):  First, the statements concerned trading in the Account in June and July and did not relate in any way to the August transactions or losses.  Second, the statements cannot even be "in connection with" the trading in June and July because they were made _after_ the trading in those months and therefore could not have induced the trading in those months.  Third, case law is clear that a representation or omission which

4

leads an investor to decide underline not to close a discretionary trading account -- which appears to be NCB's theory here -- cannot satisfy the "in connection with" requirement.  The June-July Statements also did not proximately cause the August losses:  At most, NCB can argue that had these statements been accurate, it would have terminated the Account and the losses would not have taken place.  The Second Circuit has held that this type of "but for" causation is insufficient to underpin a claim under Section 10(b).

NCB's fraud claims based on the June-July Statements are particularly defective given that NCB has admitted knowing that there were discrepancies in MSAM's written statements. In a report filed with the Saudi Arabian Monetary Agency (the central bank of Saudi Arabia) NCB stated that it believed there were discrepancies between MSAM's statements and reports received from the custodial agent for the Account, Morgan Guaranty Trust Company of New York ("Morgan Guaranty").[2] Under these circumstances, NCB cannot have reasonably relied on the June-July Statements.

In addition to the affirmative statements described above, NCB also seeks to base its fraud claims on alleged fraudulent omissions.  NCB claims that defendants failed to disclose to it (i) the size of the leveraged short positions in the Account; (ii) the amount of losses in the Account; (iii) the alleged fact that the short positions were imprudent

---

[2] MSAM is not affiliated with Morgan Guaranty or its parent company, J.P. Morgan & Co.

PLEAD005568

and inconsistent with NCB's investment objectives; and (iv)
the alleged fact that MSAM was improperly supervising Van
Valkenburgh in the performance of his duties.

These allegations also fail as a matter of law,
because defendants had no legal duty to make these disclosures
to NCB.  In a written agreement entered into between NCB and
MSAM, the parties agreed that MSAM would report transactions
in the Account to Morgan Guaranty, NCB's custodial agent, and
Morgan Guaranty would furnish reports to NCB.  It is
undisputed that MSAM sent timely notice of every trade in the
Account to Morgan Guaranty.  When Van Valkenburgh asked NCB
whether it wished to receive daily updates on the trading in
the Account from MSAM, NCB declined this offer.  Under these
circumstances, NCB cannot now argue that defendants had a
legal duty to make additional disclosures to NCB concerning
the Account.[3]

The factual background set forth below is more
extensive than is strictly necessary to resolve the pending
motion.  However, defendants respectfully submit that this
background will be helpful in understanding this dispute.

---

[3] Defendants strongly contest the notion that NCB was
unaware of the positions and losses in the Account.  Van
Valkenburgh recalled numerous conversations with Bajunaid in
June, July and August 1993 in which he informed Bajunaid of
the size of the positions and losses in the Account.
Deposition of Mark Van Valkenburgh, dated Dec. 7-9, 12,
1994, Jan. 6-9, 28, 1995 ("Van Valkenburgh Dep.") (Tab 11),
711-14, 746-48, 750-52, 1042-49.

PLEAD005569

STATEMENT OF FACTS

A.    The Parties

NCB is the oldest and largest bank in Saudi Arabia, with its headquarters and principal offices in the city of Jeddah.  Deposition of Abdulraouf Banaja, dated Nov. 29-30, Dec. 1, 1994 ("Banaja Dep.") (Tab 1), 244-45; Deposition of Omar Bajunaid, dated Feb. 13-16, March 7-9, 13-14, 1995 ("Bajunaid Dep.") (Tab 2), 318-19.  NCB is privately owned by two families, the Bin Mahfouz and the Kaaki.  Id.

In the fall of 1992, NCB hired nine investment advisers in Europe and the U.S. to manage approximately $1.5 billion of its assets.  Oct. 20, 1992 Bajunaid and Mian Memorandum (Tab 17).  Omar Bajunaid, who had been employed at NCB since 1990, held the position of Investment Manager and had "overall responsibility" for overseeing these investment accounts.  NCB Policies, Responsibilities and Guidelines Manual, dated Sept. 1992 ("Policies Man.") (Tab 18), N002956; Banaja Dep. (Tab 1) 331, 334 (manual accurately describes Bajunaid's responsibilities); Deposition of Abdulhadi Shayif, dated July 13-14, 1995 ("Shayif Dep.") (Tab 5), 40 (Bajunaid was "in charge" of the asset management unit); Bajunaid Dep. (Tab 2) 248-51, 275-76 (he had "full responsibility" for NCB's investment accounts).  As part of his duties as Investment Manager, Bajunaid was to serve as "[l]iaison with external fund managers to ensure adherence to portfolio guidelines particularly risk/duration."  Policies Man. (Tab 18) N002956.

7

Bajunaid was supervised by Abdulraouf Banaja, who was assistant general manager of NCB.  Banaja Dep. (Tab 1) 8-9, 221-22.  Banaja, in turn, was supervised by Abdulhadi Shayif, deputy general manager, who reported directly to the Chairman of NCB.  Shayif Dep. (Tab 5) 25-26; Banaja Dep. (Tab 1) 220; Bajunaid Dep. (Tab 2) 296 (Shayif was "literally the head of the bank").  Bajunaid was assisted in his duties by two NCB employees, Arif Mian, who had an advanced degree in economics, and Mohammed Zainy, an accountant.  Bajunaid Dep. (Tab 2) 303-10; Deposition of Arif Mian, dated April 11-14, 1995 ("Mian Dep.") (Tab 4), 76-77, 91.  NCB also retained the London office of a U.S.-based financial consultant, Frank Russell Company ("Frank Russell"), which specialized in advising institutions concerning asset management strategies. Banaja Dep. (Tab 1) 301-04, 345-46; Policies Man. (Tab 18) N002955 (consultant will give advice on manager selection, asset allocation, and guidelines and "will monitor the activities of NCB portfolios, audit and verify them").

Bajunaid was educated in the U.S. and had a thorough understanding of financial markets and investments, including fixed-income securities issued by the U.S. Treasury Department ("Treasuries") and the Government National Mortgage Association ("GNMAs") and derivatives of those securities. Banaja Dep. (Tab 1) 236-40; Bajunaid Dep. (Tab 2) 263-72. Bajunaid and the other NCB employees who managed NCB's assets were knowledgeable and well-trained investment professionals, and NCB itself was a large and sophisticated financial

8

PLEAD005571

institution.  Banaja Dep. (Tab 1) 243-44; Shayif Dep. (Tab 5) 27.

MSAM was one of the investment advisers hired by NCB in the fall of 1992 to manage a portion of its assets.  MSAM is a Delaware corporation with its principal place of business in New York City.  Amended Complaint, dated Sept. 29, 1995 ("Compl."), ¶ 8.  MSAM provides investment advice and services to individuals and institutions, including banks, corporations, and charitable organizations.  Compl. ¶ 9.

Mark Van Valkenburgh was the portfolio manager at MSAM who was assigned to manage NCB's accounts.  Compl. ¶ 2. Prior to September 1992, when he was hired by MSAM, Van Valkenburgh worked as a portfolio manager at Union Bank of Switzerland ("UBS") where he also managed accounts for NCB. Van Valkenburgh Dep. (Tab 11) 449-52; Banaja Dep. (Tab 1) 372. Van Valkenburgh and Bajunaid became acquainted in 1990, when Bajunaid joined NCB and Van Valkenburgh was at UBS, and had worked together for over two years by the time MSAM first began to manage assets for NCB.  Bajunaid Dep. (Tab 2) 45-46.

B.    The BCCI Crisis and NCB's
      Removal of Assets From the
      U.S. in the Summer of 1992

In July 1992, U.S. authorities announced that they were investigating possible connections between NCB and the Bank of Credit & Commerce International ("BCCI"), which may have contributed to BCCI's collapse.  On July 1, 1992, the Manhattan District Attorney indicted Sheik Khalid Bin Mahfouz, chief operating officer and an owner of NCB, charging that he

9

was a major investor in BCCI and had misled regulators by
concealing BCCI's losses from depositors and regulators.  The
Wall Street Journal, July 2, 1992, at A3, col. 2 (Tab 19); The
New York Times, July 2, 1992, at D4, col. 1 (Tab 20).  On July
8, 1992, the U.S. Federal Reserve Bank announced that it had
ordered NCB to close its New York office and was seeking a
civil penalty of $170 million from Bin Mahfouz.  The Wall
Street Journal, July 9, 1992, at A3, col. 2 (Tab 21); The New
York Times, July 9, 1992, at D1, col. 3 (Tab 22).

      At the time of these disclosures, NCB had
approximately $940 million invested with several investment
advisers in the U.S.  Oct. 20, 1992 Bajunaid and Mian
Memorandum (Tab 17).  In July 1992, besieged by U.S.
regulators seeking large fines from one of its principal
owners, NCB abruptly liquidated these investment accounts and
withdrew virtually all its assets from the U.S.  Id.
(describing NCB's "policy decision" to liquidate portfolios
after the "July crisis"); Undated Bajunaid and Mian Memorandum
(Tab 23) (stating "[f]ollowing the July 1992 problems with the
Fed in the USA, management was concerned about freezing U.S.
assets of NCB and wanted external portfolios to be
liquidated"); Banaja Dep. (Tab 1) 264-67 (NCB liquidated its
assets in the U.S. due to concerns that they would be seized
by U.S. authorities); Bajunaid Dep. (Tab 2) 335-39 (same);
Shayif Dep. (Tab 5) 71-82, 104-05 (same).  As described below,
NCB's fears that its assets would be seized by U.S.

10

authorities significantly influenced how its external

investments were subsequently structured.

C.    NCB's New External Investment
      Program in the Fall of 1992

        In the fall of 1992, although it remained concerned

about possible asset seizures, NCB decided to reinvest certain

of its assets in U.S. markets.  Banaja Dep. (Tab 1) 270-72.

NCB wanted to take advantage of investment opportunities in

the U.S. while minimizing the risk that its assets would be

seized.  Undated Bajunaid and Mian Memorandum (Tab 23); Banaja

Dep. (Tab 1) 270-72, 316-19; Bajunaid Dep. (Tab 2) 350.  NCB

sought to accomplish this goal by investing with leverage and

using derivatives, including futures, options and other

instruments, which would allow NCB to reap the benefits of

investing in U.S. markets without physically locating

significant assets in the U.S.  Undated Bajunaid and Mian

Memorandum (Tab 23) (describing strategy of using derivatives

to maintain exposure to U.S. markets); Banaja Dep. (Tab 1)

319-20 (describing same strategy).

        Bajunaid, with the assistance of consultants at

Frank Russell, was in charge of setting up the new external

investment program in the fall of 1992.  This process involved

selecting and hiring the fund managers, setting risk

parameters and drafting guidelines for the accounts, and

monitoring investment performance.  Bajunaid Dep. (Tab 2) 397-

400; Banaja Dep. (Tab 1) 303-05, 345-46; Oct. 20, 1992

PLEAD005574

Bajunaid and Mian Memorandum (Tab 17); Policies Man. (Tab 18)
N002955-56.

### D.   The Investment Management Agreement Between NCB and MSAM and the GNMA Account

On September 28, 1992, during his first month of employment at MSAM, Van Valkenburgh, accompanied by John Knox, another portfolio manager at MSAM, met with Bajunaid, Banaja and Mian at NCB's headquarters in Jeddah, Saudi Arabia. Compl. ¶ 32. At the meeting, Van Valkenburgh, Knox and the NCB representatives discussed the possibility of MSAM managing assets for NCB. Compl. ¶ 33. Shortly after this meeting, NCB hired MSAM to manage a portion of its assets, in part because NCB was pleased with Van Valkenburgh's prior work for NCB while he was at UBS. Banaja Dep. (Tab 1) 375, 378-79; Shayif Dep. (Tab 5) 115.

On October 26, 1992, NCB and MSAM entered into an investment management agreement (the "Management Agreement"). The Management Agreement authorized MSAM to manage a portion of NCB's assets "in accordance with written investment guidelines . . . furnished by [NCB]." Management Agr. (Tab 24) 1-2 (granting trading discretion to MSAM). The Management Agreement also provided that the assets managed by MSAM were to be deposited with NCB's "custodial agent." Id.

In a section entitled "Reports," the Management Agreement provided that MSAM would furnish reports to Morgan Guaranty "in sufficient detail to enable the Custodian to prepare monthly consolidated reports of the actual income,

12

value and transactions" in NCB's portfolio.  Id. 4.
Consistent with the provisions of the Management Agreement,
NCB's internal procedures manual provided that the custodian
for NCB's assets was responsible for providing NCB with a
monthly report of cash and securities held in the external
portfolios and their valuation.  Policies Man. (Tab 18)
N002954; Banaja Dep. (Tab 1) 331 (manual accurately reflects
NCB's internal policies and responsibilities).  The procedures
manual also indicated that it was Bajunaid's responsibility to
review daily transaction statements from the custodian for the
external portfolios.  Policies Man. (Tab 18) N002956.

          In early November 1992, pursuant to the Management
Agreement and a set of guidelines furnished by NCB, MSAM began
managing an account for NCB consisting primarily of GNMA
securities (the "GNMA Account").  GNMA Guidelines (Tab 24)
M00111-14; Compl. ¶ 44.[4]  Consistent with its goal of
participating in U.S. markets while minimizing the risk of its
assets being seized, NCB opened the GNMA Account with $5
million in cash and additional collateral worth approximately
$60 million but permitted MSAM to leverage that amount to
simulate an account of $150 million.  GNMA Guidelines (Tab 24)
M00112; Bajunaid Dep. (Tab 2) 470.

---

          [4] NCB has made no allegations regarding MSAM's
management of the GNMA Account, and it is not at issue this
lawsuit.

PLEAD005576

E.    September 1992 - February 1993
      Discussions About NCB's Zero
      Coupon Bonds

        The collateral pledged by NCB for the GNMA Account

was in the form of U.S. Treasury zero coupon bonds held in a

custody account at Morgan Guaranty.  Compl. ¶ 46.[5]  In

September 1992, MSAM and NCB began discussing the possibility

of transferring the zero coupon bonds into a new investment

account to be managed by MSAM.  It is this new account that is

the center of controversy in this case.

        At various times between September 1992 and February

1993, Van Valkenburgh and NCB discussed possible strategies by

which MSAM could improve the performance of the zero coupon

bonds.  These statements (the "Early Statements") are the

first set of alleged misstatements that NCB claims to be

fraudulent.  Briefly stated, NCB alleges that MSAM and Van

Valkenburgh represented that the new account, if opened, would

be managed conservatively.  More specifically, NCB contends

that:

_____

        [5] Zero coupon bonds have no interest coupons attached
and make no interest payments prior to maturity.  They are
created by securities dealers who "strip" the interest
coupons off a bond and sell the interest coupons and the
remaining principal portion of the bond separately -- hence,
they are often referred to as "strips."  At maturity, zero
coupon bonds make a single payment to their holders of the
principal amount of the bond.  Compl. ¶ 25.

        Zero coupon bonds are initially priced below their
principal value and slowly appreciate as they approach
maturity.  Thus, NCB's holding of zero coupon bonds,
although having a par value of $450 million and a maturity
date of 2018, had a market value of well less than $100
million in 1992 and early 1993.

14

PLEAD005577

- At the September 1992 meeting in Jeddah, Van Valkenburgh allegedly represented that MSAM's fixed-income investment philosophy was to "provide a risk averse means of achieving a real rate of return while preserving principal." Responses and Objections of The National Commercial Bank to the Contention Interrogatories of Morgan Stanley Asset Management Inc., dated Dec. 20, 1995 ("NCB Resp. to MSAM Cont. Int.") (Tab 25), No. 23(c).

  In making this allegation, NCB has quoted a fragment of a statement from presentation materials given by Van Valkenburgh and Knox to NCB at the meeting. Sept. 1992 Presentation Materials (Tab 26) M00636. The complete statement reads: "An **intermediate core maturity** portfolio of fixed income securities will provide a **risk averse** means of achieving a **real rate of return** while preserving principal." <u>Id.</u> (emphasis in original). The zero coupon bonds, however, which were to form the corpus of the new account, did not remotely resemble "intermediate core maturity fixed income securities." Thus, the statement had nothing to do with the zeros but rather referred to an entirely different type of standardized investment account offered by MSAM to its pension fund clients. Deposition of John Knox, dated June 22-23, 1995 ("Knox Dep.") (Tab 8), 38-41.

  In addition, Bajunaid does not remember any discussion of the zeros at the meeting. Bajunaid Dep. (Tab 2) 672-73. Mian recalls a general discussion of MSAM's investment philosophy, but he does not recall discussing any specific strategies involving the zeros. Mian Dep. (Tab 4) 616-17, 636-38.

- At a meeting held in London in November 1992, Van Valkenburgh allegedly told Bajunaid that if MSAM were given the zeros to manage, it would seek "to produce long term returns well in excess of LIBOR while preserving capital and reducing the short term volatility of returns."[6] NCB Resp. to MSAM Cont. Int. No. 23(d) (Tab 25).

---

[6] LIBOR (the London Interbank Offered Rate) is the principal rate at which banks loan dollars to each other.

15

PLEAD005578

This quotation is taken from presentation materials given by Van Valkenburgh to Bajunaid at the meeting. Nov. 1992 Presentation Materials (Tab 27) M00658. The page from the presentation materials is entitled "Long US Treasury Proposal" and reflects a suggested strategy for the zeros that was never adopted.

Bajunaid testified that he did not recall the November 1992 meeting or any discussions with Van Valkenburgh in October or November 1992 about the management of the zeros.  Bajunaid Dep. (Tab 2) 707-11.

- In a January 29, 1993 letter to Banaja, Van Valkenburgh stated that "we feel it is an excellent time to implement a more defensive strategy . . . . This strategy would utilize futures and options to maintain most of the upside of the market and greatly reduce the downside risk."  NCB Resp. to MSAM Cont. Int. No. 23(e) (Tab 25); Jan. 29, 1993 Letter (Tab 28).

 This general proposal concerning investment strategy was superseded by the more specific guidelines governing management of the zeros provided by NCB in February and May 1993.  See infra at 17-18, 24-27.

- In a February 1, 1993 letter to Mian, Van Valkenburgh compared the likely returns from holding the zeros to a more active strategy involving GNMA securities and call options.  NCB Resp. to MSAM Cont. Int. No. 23(f) (Tab 25); Feb. 1, 1993 Letter (Tab 29).  As with the January 29 letter, this proposed strategy was superseded by the February and May guidelines.

The Early Statements were all made before the Long Treasury Account was opened and the actual guidelines for the Account were drafted and implemented.  As shown below, the Early Statements are irrelevant to the management of the Account after the more specific guidelines were implemented and, as a matter of law, did not cause or relate in any way to the transactions occurring many months later in August which caused the losses at issue in this case.

16

PLEAD005579

F.    The Opening of the Long Treasury
      Account and the February Guidelines

On February 15, 1993, NCB opened the Long Treasury Account by sending MSAM a letter authorizing it to manage the zero coupon bond position and establishing guidelines for the Account (the "February Guidelines"). February Guidelines (Tab 31). The February Guidelines identified Morgan Guaranty as the custodian for the assets under management. Id. MSAM thereafter retained discretionary authority to manage the Account. Compl. ¶ 54.

The February Guidelines gave MSAM broad leeway in choosing management strategies for the Account, including "[t]he sale and/or the purchase of call and/or put options, futures, options on futures, in order to generate income or to hedge against unfavourable interest rate movements" and "[t]rading of the instrument itself, such as the complete sale in order to be in cash or partial sale in order to reduce the exposure." February Guidelines (Tab 31). The February Guidelines contained no restrictions on the duration, maturity or leverage of the Account.[7] Bajunaid Dep. (Tab 2) 966 (so

---

[7] "Duration," which measures the sensitivity of a portfolio to changes in interest rates, is a fundamental indicator of the risk/return characteristics of a portfolio. Higher duration means greater sensitivity to movements in interest rates and therefore a higher risk/return profile. The use of leverage will generally increase the duration and the risk/return profile of a portfolio. Findakly Rep. (Tab 16) 11, ¶¶ 21-22.

Restrictions on duration and leverage are two of the most commonly used methods to limit the risk of a portfolio. Findakly Rep. (Tab 16) 11-12, ¶ 23. All of NCB's other externally managed portfolios aside from the Long Treasury

17

PLEAD005580

long as a transaction was not prohibited by the February
Guidelines, it was permitted); Van Valkenburgh Dep. (Tab 11)
528-30 (the February Guidelines did not restrict, and
therefore authorized, the use of leverage in the Long Treasury
Account).[8]

G.   Trading in the Long Treasury Account
     From February Through April 1993

          On February 16, 1993, Van Valkenburgh sold the zeros
that were held in the Account for approximately $64.5 million
and began to conduct trades and make investments with the
proceeds from the sale.  Compl. ¶ 62.  According to Marcia
Kramer Mayer, who was retained by NCB to give expert testimony
in this case, the Account lost approximately $744,000, or 1%
of its value, on February 16, the first day of trading.
Deposition of Marcia Kramer Mayer, dated July 23, 25-26, Aug.

---

Account had explicit limits on either leverage or duration
or both in their guidelines.  Guidelines for NCB's Other
Accounts (Tab 30); Guidelines for NCB's Other Accounts
attached to Policies Man. (Tab 18) N002962-79; Findakly Rep.
(Tab 16) 17-18, ¶ 32(vi); Findakly Chart 3 (Tab 16).
However, neither the February Guidelines nor the May
Guidelines for the Long Treasury Account included such
restrictions.  February Guidelines (Tab 31); May Guidelines
(Tab 32).

     [8] Although disputed by NCB and not necessary for
resolution of this motion, defendants contend that the
February Guidelines' objective of "outperforming" the zero
coupon bond position was aggressive and risky.  See Bajunaid
Dep. (Tab 2) 404-05 (February Guidelines created the Long
Treasury Account as a "trading account"), 956-58 (under
February Guidelines, Bajunaid expected MSAM "to take some
risk vis-a-vis the buy and hold"), 1091-92; Van Valkenburgh
Dep. (Tab 11) 536-37 (February Guidelines did not call for a
defensive strategy but rather to outperform the buy and
hold); Deposition of Peter Nadosy, dated May 31, June 1,
Sept. 14, 1995 ("Nadosy Dep.") (Tab 9), 120-22 (to buy and
hold 30-year zeros is "pretty risky").

PLEAD005581

6, 1996 ("Mayer Dep.") (Tab 15), 578.  On February 23, the
Account gained approximately $1.4 million, or 2%, and, after
one month of trading, the Account was up by over $2 million,
or over 3%.  Id. 579-81.  Annualized, that rate of return
would be above 40%.  Id. 582.

Despite this substantial volatility, NCB has not
alleged that the trading from February through April was
improper in any way.  Bajunaid Dep. (Tab 2) 983 (trading from
February through April was not unreasonably speculative).
Indeed, Ronald Karp, also retained by NCB to give expert
testimony in this case, has testified that the Long Treasury
Account was in compliance with the February Guidelines during
the period from February through April 1993.  Deposition of
Ronald Karp, dated March 11-12, July 30, 1996 ("Karp Dep.")
(Tab 14) 232-33.

H.    Morgan Guaranty's Reports,
      MSAM's Estimates, and NCB's
      Internal Reconciliation Process

With respect to both the GNMA Account and the Long
Treasury Account, MSAM provided notification of each trade to
Morgan Guaranty, NCB's custodial agent, prior to the
settlement date of the trade.  Deposition of Vera Shaw, dated
March 25-26, May 24, 1995 ("Shaw Dep.") (Tab 10), 120-21, 295-
98; Bajunaid Dep. (Tab 2) 1370.  Because Morgan Guaranty
actually held the assets in the accounts, trades could not be
settled -- i.e., cash and securities could not be moved into
and out of the accounts -- without Morgan Guaranty being
notified and executing the transfers.  Bajunaid Dep. (Tab 2)

19

PLEAD005582

1507-08; Deposition of Patrick Collins, dated Sept. 29, 1995 ("Collins Dep.") (Tab 13), 180; Shaw Dep. (Tab 10) 296.   NCB and Bajunaid knew that Morgan Guaranty was receiving information from MSAM concerning individual trades in the accounts.   Responses and Objections of The National Commercial Bank to Requests for Admission of Morgan Stanley Asset Management Inc., dated Dec. 20, 1995 ("NCB Adm.") (Tab 33) No. 132; Responses and Objections of Third-Party Defendant Omar Bajunaid to Requests for Admission of Morgan Stanley Asset Management Inc., dated Dec. 20, 1995 ("Bajunaid Adm.") (Tab 34) No. 135.

Morgan Guaranty provided various types of written statements to NCB, including a notice each time a trade settled and monthly reports reflecting the value of the accounts.   Collins Dep. (Tab 13) 85, 91, 163-68; Deposition of Mohammed Zainy, dated May 1-2, 4-5, 1995 ("Zainy Dep.") (Tab 6), 271-80.   Bajunaid testified that while NCB received these reports, he did not read them.   Bajunaid Dep. (Tab 2) 888.

Morgan Guaranty's reports to NCB were prepared on a settlement date basis rather than a trade date basis and showed cash movements in the accounts on settlement dates rather than the securities transactions themselves on the trade date.   Deposition of Parke Bradley, dated July 27, 1995 ("Bradley Dep.") (Tab 12), 60-61, 165-66; Collins Dep. (Tab

PLEAD005583

13) 49-51, 74-77.[9]  Van Valkenburgh alerted NCB to the fact
that Morgan Guaranty was not providing trade date reporting
(Jan. 4, 1993 Letter (Tab 35)); Jan. 15, 1993 Letter (Tab
36)); Bajunaid Dep. (Tab 2) 941), and he and others at MSAM
repeatedly urged Morgan Guaranty to provide NCB with reports
on a trade date basis.  Dec. 1, 1992 Letter (Tab 37); Bradley
Dep. (Tab 12) 165-66 (MSAM was "quite adamant about receiving
trade date information," and "[t]hey were fairly insistent on
making their request more than once"); Collins Dep. (Tab 13)
58-59, 75-77 (Vera Shaw of MSAM asked Morgan Guaranty "[a]t
least half a dozen" times for trade date information, which it
never attempted to provide).  When Morgan Guaranty was unable
to provide trade date information, Van Valkenburgh urged NCB
to retain a custodian that could do so.  Aug. 3, 1993 Letter
(Tab 38).

In addition to the reports sent by Morgan Guaranty
to NCB, at the request of NCB, Van Valkenburgh sent monthly
letters to NCB concerning the performance of the GNMA Account
and the Long Treasury Account.  Van Valkenburgh Dep. (Tab 11)
293-94.  These letters explicitly stated that they were
"estimates."  See, e.g., July 7, 1993 Letter (Tab 39); Aug.
16, 1993 Letter (Tab 40); Aug. 17, 1993 Letter (Tab 41).  The
estimates were created manually and set forth the month-end

---

[9]  The "trade date" is the date a transaction is entered
into, and the "settlement date" is the date the cash and
securities are actually exchanged.  Because many of the
trades in the accounts were for "forward settlement," there
was often a period of several days or weeks between the
trade date and the settlement date.

PLEAD005584

account value and performance on a trade date basis, including estimated values of open forward trades on which the actual profit or loss had not yet been determined.  Van Valkenburgh Dep. (Tab 11) 303-11.  Van Valkenburgh described to Bajunaid and Mian the methods he used to create the estimates.  Id. Bajunaid testified that he was satisfied with the reports received from Van Valkenburgh and that he never asked Van Valkenburgh or MSAM to provide any additional information about the Account, because, in fact, he did not want any more information about the Account than he was already receiving. Bajunaid Dep. (Tab 2) 829-30, 882-84.

On April 6, 1993, Van Valkenburgh wrote to Bajunaid and offered to provide daily updates to NCB on trades executed in the Long Treasury Account.  April 6, 1993 Letter (Tab 42). Bajunaid responded to Van Valkenburgh that he did not wish to receive daily trade updates.  NCB Adm. No. 143 (Tab 33); Bajunaid Adm. Nos. 144-45 (Tab 34); Bajunaid Dep. (Tab 2) 832, 879-80; Van Valkenburgh Dep. (Tab 11) 735-36; see also Zainy Dep. (Tab 6) 146-47 (not interested in receiving information on individual trades from portfolio managers).  There is no evidence that NCB ever asked MSAM or Van Valkenburgh to provide daily trading information for either of the accounts managed by MSAM.

NCB compared the estimates it received from Van Valkenburgh with the reports it received from Morgan Guaranty in order to reconcile any differences between them.  Mian Dep. (Tab 4) 288-89, 317; Zainy Dep. (Tab 6) 224-25, 236-38;

PLEAD005585

Policies Man. (Tab 18) N002958.  If any discrepancies were found, NCB's procedures dictated that it "[r]esolve [the] differences with [the] custodian."  Policies Man. (Tab 18) N002958.

I.   MSAM's Supervision of
     Mark Van Valkenburgh

Van Valkenburgh's management of the Long Treasury Account was supervised by Peter A. Nadosy and Gerald P. Barth of MSAM.  The forms of supervision included (i) reviewing "bond blotters" showing trading activity in the Account, (ii) discussing NCB's investment objectives and strategies with Van Valkenburgh, (iii) discussing NCB's knowledge of the activities and performance of the Account with Van Valkenburgh, and (iv) meeting directly with NCB to discuss the Account.  Nadosy Dep. (Tab 9) 69-70, 386-88, 396-402, 416-19, 406-08; Deposition of Gerald Barth, dated June 7-8, 1995 ("Barth Dep.") (Tab 7), 162-63, 186-95, 207-11, 300-22, 383-84, 510-12.

Despite this evidence, NCB alleges that MSAM committed fraud by failing to disclose to it that Van Valkenburgh was not being adequately supervised. Specifically, NCB has alleged that MSAM failed to disclose that Nadosy and Barth did not review Van Valkenburgh's trading in the Account to determine if it was appropriate and did not review the written estimates prepared by Van Valkenburgh for NCB to determine if they were accurate.  NCB Resp. to MSAM Cont. Int. Nos. 23(z)-(ac) (Tab 25).

23

PLEAD005586

J.   The May Guidelines

In April and May 1993, Bajunaid and Van Valkenburgh discussed NCB's desire for new guidelines for the Long Treasury Account which would supersede the February Guidelines.  Van Valkenburgh Dep. (Tab 11) 649-53; Bajunaid Dep. (Tab 2) 990.  Accordingly, Van Valkenburgh drafted proposed guidelines and sent them to NCB.  Draft May Guidelines (Tab 43); Compl. ¶ 67.  Bajunaid and Mian made revisions to the draft guidelines, including increasing the rate of return objective, removing a restriction on the average portfolio duration, increasing the maximum time for forward settlements, and adding a statement that losses over a one year period would not be tolerated.  Compare Draft May Guidelines (Tab 43) with May Guidelines (Tab 32); NCB Adm. Nos. 56-58 (Tab 33); Bajunaid Dep. (Tab 2) 10-12, 627 (removed duration restriction), 1016-17 (increased rate of return objective).

Bajunaid furnished the revised guidelines to his superiors at NCB, Shayif and Banaja, who reviewed and approved them.  Compl. ¶ 70; Bajunaid Dep. (Tab 2) 15-16, 195, 1035. Bajunaid then sent the revised guidelines to Van Valkenburgh, and they became operative for the Long Treasury Account (the "May Guidelines").

The rate of return objective of LIBOR plus 500-700 basis points established by the May Guidelines was higher than the objectives of NCB's other eleven asset management

24

PLEAD005587

accounts.[10]  Guidelines for NCB's Other Accounts (Tab 30);

Guidelines for NCB's Other Accounts attached to Policies Man.

(Tab 18) N002962-79; Findakly Rep. (Tab 16) 17-18, ¶ 32(vi);

Findakly Chart 3 (Tab 16); see also Nadosy Dep. (Tab 9) 273-75

(objective was "very, very ambitious"); Barth Dep. (Tab 7) 270

(objective was "very aggressive"); Findakly Rep. (Tab 16) 16,

¶ 32(iv).  Achieving that rate of return objective

necessitated taking on significant risk of losses, a fact of

which NCB was aware.  Bajunaid Dep. (Tab 2) 31-32 (Long

Treasury Account was NCB's riskiest account); Van Valkenburgh

Dep. (Tab 11) 245-51 (told Banaja and Bajunaid in July 1993

that NCB "should expect wide fluctuations"); Knox Dep. (Tab 8)

140 (told Bajunaid in May 1993 that NCB "should be prepared to

lose money as well as make money"), 185-88 (discussed risk of

losses with Banaja and Bajunaid in July 1993); Nadosy Dep.

(Tab 9) 266-67 (discussed risk of losses with Bajunaid in May

1993).  The May Guidelines set forth no restrictions on

duration, maturity, or leverage.  May Guidelines (Tab 32).[11]

---

[10] LIBOR was approximately 3% in 1993.  Because a basis
point equals .01%, the Long Treasury Account was seeking
annual returns of approximately 8-10%, or approximately
three times LIBOR.  Findakly Rep. (Tab 16) 16, ¶ 32(iv).

[11] NCB concedes, as it must, that the provision in Van
Valkenburgh's draft of the May Guidelines (Tab 43)
restricting the average duration of the account to 30 years
or less would have unambiguously and expressly prohibited
the large, leveraged positions taken in the Account August
that NCB now complains of.  Karp Dep. (Tab 14) 358.
However, Bajunaid removed this restriction from Van
Valkenburgh's draft (Bajunaid Dep. (Tab 2) 627), thereby
permitting the Account to be substantially leveraged.

PLEAD005588

The aggressive nature of the Long Treasury Account after the May Guidelines were implemented is conceded by NCB in a July 17, 1993 memorandum that Bajunaid wrote to his supervisors, Banaja and Shayif (the "July 17 Memorandum"). July 17, 1993 Memorandum (Tab 44); Bajunaid Dep. (Tab 2) 159; Banaja Dep. (Tab 1) 103. In the memorandum, Bajunaid described the Long Treasury Account as a "trading portfolio" and discussed the performance of the Account since its inception. Bajunaid wrote:

> "This is the one that will show us what a trading means. [sic.] The return since we sold our zero holding on Feb. 17, 93 at $64,516,580 is around 2.5% or $1,620,564 against a return of .78 from holding the position unchanged. The outperformance was due to the month of March where the manager gained 3% against a loss of 1.1% in the zeros market. However, in June he gave up 2.55% loss against a gain of .78. The loss of $1.73 Mi in June cut his gains for the year by half. This kind of volatility is expected with such an aggressive instrument. It has more risk than a straight equity in the US. The comforting fact is that the gains and losses are occurring at opposite times with the gains and losses of the other managers."

July 17, 1993 Memorandum (Tab 44) N000831. Bajunaid explained at his deposition that the annual volatility of equities averages between -15% and +15% and that the Long Treasury Account was more volatile and risky than equities. Bajunaid Dep. (Tab 2) 171-72; see also Banaja Dep. (Tab 1) 110-11 (volatility of Account as described in July 17 Memorandum was expected), 151 (Account was a trading account); Shayif Dep. (Tab 5) 191-92, 294 (same). In this way, the Account was fundamentally different from NCB's other accounts, which were investment accounts rather than trading accounts. Bajunaid

PLEAD005589

Dep. (Tab 2) 401-02, 404-05; Banaja Dep. (Tab 1) 105-06, 412-13.[12]

K.   The Management Fee for
     the Long Treasury Account

MSAM was paid an annual fee for managing the GNMA Account and the Long Treasury Account which was based on a percentage of total assets under management.  For each year that the accounts were managed, MSAM was to be paid 22.5 basis points (0.225%) of the value of the first $150 million of assets under management, 20 basis points (0.2%) of the value of assets between $150 million and $500 million, and 10 basis points (0.1%) of the value of assets over $500 million.  GNMA Guidelines (Tab 24) M00114; May Guidelines (Tab 32).  The fees were to be paid in four quarterly installments.[13]

_____

[12] In addition to the May Guidelines and the July 17 Memorandum -- the substance of which cannot be disputed by NCB -- there is other compelling evidence that NCB wanted the Long Treasury Account to be an aggressive, high risk/high return account.  Most significantly, from April through August 1993, Bajunaid had meetings and conversations with representatives of MSAM, including Van Valkenburgh, Knox, Nadosy and Amr Nosseir, at which the Account was discussed.  The MSAM witnesses uniformly recall that Bajunaid urged MSAM to trade the Account aggressively by taking highly leveraged positions and stated that NCB was using the Account as a hedge against NCB's other accounts. Bajunaid described the assets in the Account as "play money" and represented that NCB would not be concerned if all the money in the Account were lost.  See Answers and Objections of Morgan Stanley Asset Management Inc. to Plaintiff's Second Set of Interrogatories, dated Dec. 20, 1995 (Tab 45), 32-37.  NCB has contested these facts, which are not essential to resolution of defendants' motion for partial summary judgment.

[13] Thus, if MSAM had $150 million of NCB's assets under management, MSAM's annual fee would be $337,500 ($150 million (x) 0.225%).  If MSAM had $151 million of NCB's assets under management, MSAM's annual fee would be $339,500

27

PLEAD005590

L.    Trading in the Long Treasury
      Account in June 1993

In June 1993, Van Valkenburgh took leveraged short positions in the Account.  Van Valkenburgh Dep. (Tab 11) 773-74, 793-94.[14]  If interest rates increased during the month and the value of fixed-income securities declined, these short positions would have made significant profits for the Account.

Because of the volatility of interest rates in June, the value of the Account fluctuated throughout the month, sometimes being in a loss position of several million dollars. Van Valkenburgh Dep. (Tab 11) 746-48.  On July 7, 1993, Van Valkenburgh sent a letter to NCB estimating that the value of the Account at the end of June was approximately $66.1 million, down about $1.7 million or 2.5% from the beginning of the month.  July 7, 1993 Letter (Tab 39).  As it turned out, Van Valkenburgh had underestimated the amount of losses that had occurred during June 1993.[15]

---

(($150 million (x) 0.225%) + ($1 million (x) 0.2%)).

[14] Although disputed by NCB, Van Valkenburgh testified that he told Bajunaid the size of the short positions taken in the Account in June.  Van Valkenburgh Dep. (Tab 11) 746-48, 750-52.

[15] NCB has asserted numerous different (and ever increasing) calculations of the June losses.  See SAMA Report (Tab 46) N007900 (NCB report dated April 1994 to the Saudi Arabian Monetary Authority ("SAMA") stating that June losses "totalled $4.5 million"); Complaint, dated April 24, 1994 (Tab 47), ¶ 55 (alleging that June losses were "in excess of $4.5 million"); Compl. ¶ 86 (alleging that June losses were "approximately $5 million"); Mayer's Jan. 13, 1996 Report (Tab 48) 36 (stating that June losses were $4,594,678.32); Ex. 27 to Mayer's May 16, 1996 Report (Tab 49) (stating that, under various pricing methodologies, June losses were $6,525,090.40, $5,618,683.91, or $5,872,486.41);

28

Van Valkenburgh's underestimation of the June losses is the principal basis for NCB's fraud claim against defendants.  In addition to the July 7 estimate, NCB has also alleged that Van Valkenburgh repeated the same misstatement in subsequent documents and conversations.  NCB Resp. to MSAM Cont. Int. No. 23(j)-(m), (q)-(r), (u) (Tab 25); July 30, 1993 Facsimile (Tab 51) (restating performance estimate for June); Aug. 9, 1993 Letter (Tab 52) (restating same); Aug. 16, 1993 Letter (Tab 40) (restating same).  NCB has also alleged that Van Valkenburgh provided to NCB documents which materially misstated the Account's holdings as of the end of June and the transactions that had occurred in the Account during June. NCB Resp. to MSAM Cont. Int. No. 23(n)-(o), (s)-(t) (Tab 25); July 30, 1993 Facsimile (Tab 51); Aug. 9, 1993 Letter (Tab 52).

However, not only did Van Valkenburgh's estimate of the June losses and statement of the June trades have nothing to do with the August trades and losses at issue in this case, but NCB has admitted to knowing that Van Valkenburgh's estimate of the June losses was understated.  Following its internal procedures, upon receipt of Morgan Guaranty's reports for the month of June, NCB attempted to reconcile those reports against Van Valkenburgh's estimate.  NCB Req. Adm. Nos. 145-49 (Tab 33); Zainy Dep. (Tab 6) 215-16.  NCB was

---

Revised Ex. 27 to Mayer's May 16, 1996 Report (Tab 50) (stating that, under various pricing methodologies, June losses were $6,525,090.31, $5,632,773.68, or $5,848,836.18).

29

PLEAD005592

unable to reconcile the amounts and, in fact, found a discrepancy of approximately $3 million between Morgan Guaranty's and Van Valkenburgh's figures. Bajunaid Dep. (Tab 2) 38-39 (knew of $3 million discrepancy); Zainy Dep. (Tab 6) 215-16 (same); Mian Dep. (Tab 4) 326-27 (in July 1993, Zainy expressed concern whether Van Valkenburgh was giving correct information or "was up to some mischief"); Deposition of Donald Hill, dated May 3, 1995 ("Hill Dep.") (Tab 3), 181-83 (NCB was aware of "serious discrepancies" starting in June). Bajunaid, who was "very concerned" about the lack of reconciliation, testified that it appeared to him that it was Van Valkenburgh's figures, as opposed to Morgan Guaranty's, which were incorrect, and that he wished he had been "more assertive" in resolving the issue. Bajunaid Dep. (Tab 2) 872, 894-95.

In a document signed by Banaja and submitted by NCB in April 1994 to the Saudi Arabian Monetary Agency ("SAMA"), NCB admitted that it knew in July 1993 that Van Valkenburgh's estimate of $1.7 million for the June losses was too low. NCB's report to SAMA stated:

> "The figures MSAM supplied for the end of June could not be reconciled by NCB with the figures supplied by Morgan Guaranty, NCB's custodial agent. MSAM's stated value for the account was approximately $3 million higher than Morgan Guaranty's. In July, NCB questioned Mr. Van Valkenburgh closely about this $3 million disparity."

SAMA Rep. (Tab 46) N007900; Banaja Dep. (Tab 1) 25-26 (report to SAMA is accurate). It cannot be disputed that NCB believed

30

in July 1993 that Van Valkenburgh's estimate of the June losses could be at least $3 million too low.

In addition to its allegations of misstatements concerning the June losses, NCB has alleged more generally that MSAM omitted to disclose to it (i) the declines in market value which took place in the Account in the period June through August 1993, (ii) the existence of leveraged short positions in the Account during that same period, and (iii) the fact that these positions were imprudent and inconsistent with NCB's investment objectives.  NCB Resp. to MSAM Cont. Int. No. 23(g)-(h), (p) (Tab 25).

M.    Trading in the Long Treasury
      Account in July 1993

In July 1993, Van Valkenburgh again took large short positions in the Account in an effort to benefit from expected increases in interest rates.  Van Valkenburgh Dep. (Tab 11) 750-52.  Volatility in the market caused the value of the Account to fluctuate during the month.  According to Mayer, NCB's proposed expert, the Account began the month of July with a portfolio value of $60.9 million, declined to as low as $53.2 million on July 19, and closed out the month at a value of $63.8 million -- up nearly $3 million from the beginning of the month.  Revised Ex. 5 to Mayer's May 16, 1996 Report (Tab 53) 99, 112, 121.[16]

---

[16] Although denied by Bajunaid, Van Valkenburgh recalls that in late July, while Bajunaid was visiting New York, Van Valkenburgh told him that the Account had been down in value by approximately $12-14 million in mid-July before recovering by month's end.  Bajunaid responded that this was

31

In mid-August, Van Valkenburgh sent NCB an estimate of the value of the Account at the end of July and information about transactions in the Account during the month.  Aug. 16, 1993 Letter (Tab 40); Aug. 17, 1993 Letter (Tab 41).  The estimate carried forward the same underestimation in month-end value that had been made at the end of June, thus again understating the value of the Account as of the end of July.  Id.  NCB has also claimed that Van Valkenburgh misstated certain of the transactions in the Account during July.  NCB Resp. to MSAM Cont. Int. No. 23(u)-(x) (Tab 25).

NCB has also alleged more generally that MSAM omitted to disclose to it the existence of leveraged short positions in the Account during that same period and that these positions were allegedly imprudent and inconsistent with NCB's investment objectives.  See NCB Resp. to MSAM Cont. Int. No. 23(p) (Tab 25).

N.    Trading in the Long Treasury
      Account in August 1993

In late July 1993, Alan Greenspan, Chairman of the Federal Reserve Bank and the most influential interest rate

---

acceptable to NCB, and that "when you feel very strongly about something, I want you to stay with your conviction because I have a lot of confidence in you as a manager, and I know that there will be a period where you will make me a great deal of money when other accounts lose."  Van Valkenburgh Dep. (Tab 11) 879-81.  Bajunaid also told Van Valkenburgh that there was no limit on the size of leveraged positions that could be taken in the Account.  Id.  While Bajunaid denies authorizing MSAM to use leverage in the Account, Bajunaid does recall telling asset managers retained by NCB to "stay with their conviction."  Bajunaid Dep. (Tab 2) 1213-14.

PLEAD005595

policy maker in the U.S., testified before Congress concerning the U.S. economy and, of greatest significance for the government securities market, his outlook for inflation and interest rates.  Hearing Before the Subcommittee on Economic Growth and Credit Formation of the Committee on Banking, Finance and Urban Affairs, U.S. House of Representatives, July 20, 1993 (Tab 54).  Based on this testimony, Henry Azzam, NCB's chief economist, wrote in his weekly economic report distributed throughout NCB that "Fed Chairman Greenspan made it quite clear in his testimony to the Congress last week that short-term rates are going to rise."  July 25, 1993 Azzam Report (Tab 55) N08719.

Bajunaid himself had expressed concerns as early as May and June 1993 that interest rates would rise as the Federal Reserve attempted to head off inflation.  June 26, 1993 Letter (Tab 56) (Bajunaid stating to UBS that "[w]e are concerned that any rise in U.S. short term interest rates would hurt the short term component of our portfolio"); June 26, 1993 UBS Memorandum (Tab 57) (describing June 26, 1993 meeting between UBS and NCB stating "Omar [Bajunaid] was concerned that US Dollar interest rates would rise in the 1-3 year sector"); June 7, 1993 Fischer Francis Tree & Watts ("FFT&W") Memorandum (Tab 58) (describing a May 25, 1993 meeting between Bajunaid and FFT&W, an investment advisory firm, stating that "Omar is bearish on both US equities and on interest rates, since he sees the economy as expanding and inflation as apt to be an increasing problem for the next few

33

years"); Van Valkenburgh Dep. (Tab 11) 791-93 (Bajunaid told Van Valkenburgh that he believed that interest rates were going to rise in the summer of 1993).[17] Van Valkenburgh and others at MSAM also believed that the Federal Reserve Bank would raise interest rates at some point in the summer of 1993. Van Valkenburgh Dep. (Tab 11) 773-74, 976-77; Nadosy Dep. (Tab 9) 225.

In early August, Bajunaid and Van Valkenburgh had a conversation about the strategy for the Long Treasury Account for the month. Given the likelihood that interest rates would rise during the month and the prices of U.S. government securities would therefore fall, Bajunaid told Van Valkenburgh that if the yield on the 30-year bond reached between 6.35% and 6.40% -- which, apparently, Bajunaid had identified as being a harbinger of a rate rise -- then Van Valkenburgh should "short the hell out of it." Bajunaid Dep. (Tab 2) 116-17; Van Valkenburgh Dep. (Tab 11) 964-68. Bajunaid testified that he told Van Valkenburgh the following:

> "I said, 'For God' sake, go short the hell out of it. Why are you coming to me? It's your account. Go, and good luck to you. Go short the hell out of it. Go and do it.'"

Bajunaid Dep. (Tab 2) 117. In mid-August, yields reached the levels identified by Bajunaid, and Van Valkenburgh promptly

---

[17] Despite this documentary evidence, Bajunaid now claims that he correctly predicted in the summer of 1993 that interest rates would drop instead of rise. Bajunaid Dep. (Tab 2) 66-71.

34

PLEAD005597

took large short positions in the Account.  Findakly Rep. (Tab
16) 23, ¶ 40; Findakly Chart 10 (Tab 16).

However, instead of rising, interest rates fell
during the month, and the Account suffered significant losses.
On August 23, 1993, Van Valkenburgh spoke again with Bajunaid
by telephone.  Van Valkenburgh reported that there were
"substantial losses" in the Account and told Bajunaid the
current size of the short positions.  Van Valkenburgh Dep.
(Tab 11) 956-58, 1042-48.  Bajunaid replied, "Good luck to
you."  Id. 1044.

O.   The Closing of the Long
     Treasury Account

By the end of August, according to Mayer, the
Account held short positions that had declined in market value
by approximately $40 million.  Revised Ex. 5 to Mayer's May
16, 1996 Report (Tab 53) 143, 145.  In a telephone
conversation on August 31, Van Valkenburgh gave Bajunaid his
estimate of the August losses in the Long Treasury Account.
Bajunaid Dep. (Tab 2) 1288-90.  Bajunaid testified that he was
shocked by this information and reported it to Donald Hill,
who had become Treasurer of NCB just several weeks earlier.
Bajunaid Dep. (Tab 2) 1292.  Hill and Bajunaid then called Van
Valkenburgh and instructed him to reduce the sensitivity of
the Long Treasury Account's existing positions to a specified
maximum sensitivity per basis point.  Aug. 31, 1993 Letter
with Hill's Notations (Tab 59); Bajunaid Dep. (Tab 2) 1322-23.
Hill also instructed Van Valkenburgh to liquidate all

PLEAD005598

remaining positions in the Long Treasury Account if the yield on the ten-year Treasury notes reached certain levels.  Aug. 31, 1993 Letter (Tab 59); NCB Adm. Nos. 82, 89 (Tab 33).

Because yields on the ten-year note reached the levels set by Hill shortly thereafter, MSAM liquidated the short positions prior to their settlement dates in accordance with NCB's instructions.  Bajunaid Dep. (Tab 2) 1331.  On September 7, 1993, NCB closed the Long Treasury Account -- prior to the end of the one-year performance measurement period specified in the May Guidelines.  May Guidelines (Tab 32).

Interest rates began to rise in October 1993 and moved sharply upwards in early 1994.  If the Long Treasury Account had remained open into 1994 and continued its strategy of taking large short positions, it would have returned huge profits for NCB.  Findakly Rep. (Tab 16) 18-19, ¶ 33.

### ARGUMENT

Federal Rule of Civil Procedure 56(c) mandates that a court direct "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). Summary judgment should be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable,

36

or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (citations omitted).

POINT I

SUMMARY JUDGMENT SHOULD BE GRANTED FOR
DEFENDANTS ON NCB'S FEDERAL SECURITIES FRAUD CLAIMS

In order to prevail on its claim under Section 10(b) and Rule 10b-5, NCB must establish that

> "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury."

In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir. 1993), cert. denied, 114 S. Ct. 1397 (1994) (citations omitted). Summary judgment for defendants on NCB's Section 10(b) claim is appropriate because NCB cannot prove three of the essential elements of a claim of federal securities fraud -- (i) misrepresentations or omissions "in connection with" a purchase or sale of securities, (ii) causation, and (iii) justifiable reliance. NCB's inability to establish any one of these elements provides a separate and independent basis on which to grant summary judgment for defendants on the Section 10(b) claim. In addition, NCB's fraudulent omissions claims must fail as defendants had no legal duty to make the disclosures at issue.[18]

---

[18] NCB's claim against MSAM for control person liability under Section 20(a) also fails because there can be no control person liability where there is no primary underlying violation of the securities laws. See Moss v. Morgan Stanley Inc., 719 F.2d 5, 16-17 (2d Cir. 1983), cert.

PLEAD005600

A.    NCB Cannot Satisfy the "In
      Connection With" Requirement

            To satisfy the "in connection with" requirement of

Section 10(b) and Rule 10b-5, "the misrepresentation or

omission must pertain to the securities themselves;

allegations of fraud merely involving securities are not

sufficient." Levitin, 933 F. Supp. at 328. "The law of this

Circuit is clear that unless the alleged fraud concerns the

value of the securities bought or sold, or the consideration

received in return," no claim under Section 10(b) will lie.

Bissell v. Merrill Lynch & Co., Inc., Fed. Sec. L. Rep. (CCH)

¶ 99,298, 1996 WL 465750, *3 (S.D.N.Y. 1996) (attached as Ex.

A to this memorandum); see also In re JWP Inc. Sec. Litig.,

928 F. Supp. 1239, 1251 (S.D.N.Y. 1996) ("the alleged

misrepresentation must have 'direct pertinence' to the

purchase or sale of securities at issue in the case"); Abrash

v. Fox, 805 F. Supp. 206, 208-09 (S.D.N.Y. 1992)

(misrepresentation must involve the "nature or quality" of the

securities); Manufacturers Hanover Trust Co. v. Smith Barney,

Harris Upham & Co., 770 F. Supp. 176, 181 (S.D.N.Y. 1991)

("Misrepresentations or omissions involved in a securities

transaction but not pertaining to the securities themselves

cannot form the basis of a violation of Section 10(b) or Rule

10b-5."); Vigilant Ins. Co. v. C. & F. Brokerage Servs., 751

F. Supp. 436, 438 (S.D.N.Y. 1990) ("the misrepresentation must

_____

denied, 465 U.S. 1025 (1984); Brown v. The Hutton Group, 795
F. Supp. 1317, 1324-25 (S.D.N.Y. 1992).

38

PLEAD005601

relate to the value of the security").  In short, "the 'in connection with' language requires proof that the defendant's alleged fraud was 'integral to the purchase and sale of the security in question.'"  Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 598 (2d Cir. 1991) (quoting Pross v. Katz, 784 F.2d 455, 459 (2d Cir. 1986)).

1.    The Early Statements

Numerous courts have held that general statements concerning investment strategy, even when made in a conscious effort to induce a potential investor to open a securities account, are not made "in connection with" the purchase or sale of securities.  Thus, the "in connection with" requirement is not met where the alleged "representations of conservative management and general investment advisory services manifestly did not pertain to the value or quality of any specific securities purchased by plaintiff but were related to defendants' attempt to gain plaintiff's business." McCoy v. Goldberg, 748 F. Supp. 146, 150 (S.D.N.Y. 1990); see also In re Drexel Burnham Lambert Group, Inc., 151 B.R. 49, 59 (S.D.N.Y. 1993) (dismissing claim where representations prior to account being opened "can not be connected to any particular subsequent transactions and such general misrepresentations can not support a Rule 10b-5 claim"); Bogart v. Shearson Lehman Bros., Inc., No. 91 Civ. 1036 (LBS), (NG), 1993 WL 33643, at *5 (S.D.N.Y. Feb. 3, 1993) (attached as Ex. B to this memorandum) ("general assurances that plaintiff's account would be handled in his best interests and

39

so as to minimize risk . . . are insufficient to form a basis
for a claim under Section 10(b)"); Siegel v. Tucker, Anthony &
R.L. Day, Inc., 658 F. Supp. 550, 553 (S.D.N.Y. 1987)
("promises of conservative stewardship in inducing plaintiff
to invest monies with defendants, as plaintiff alleges here,
are insufficient to state a claim for fraudulent
misrepresentation under Section 10(b) or Rule 10b-5; the key
factor is whether the allegedly fraudulent statements induced
specific investment decisions, and here they did not").

　　　　Here, all of the Early Statements made by MSAM and
Van Valkenburgh were made in the period from September 1992 to
February 1993, prior to the time when NCB opened the Long
Treasury Account and furnished MSAM with the February
Guidelines for the Account.  See supra at 14-16.  Interpreted
in the light most favorable to NCB, these statements
constituted proposals by MSAM to manage NCB's position in zero
coupon bonds so as to reduce risk.  See, e.g., Jan. 29, 1993
Letter (Tab 28); Feb. 1, 1993 Letter (Tab 29).  However, these
statements did not relate to any specific securities
transactions that took place in the account after it was
opened.  To the contrary, the statements related merely to
MSAM's "attempts to gain plaintiff's business" and are
therefore not actionable under Section 10(b).  See McCoy, 748
F. Supp. at 151.

　　　　NCB cannot avoid this clear application of the "in
connection with" requirement by arguing that the Long Treasury
Account was itself a security within the meaning of the

40

PLEAD005603

securities laws and that the Early Statements were made "in connection with" the Account as a whole. The U.S. Supreme Court has held that certain "investment contracts" may be securities for purposes of the securities laws if the contract involves "an investment of money in a common enterprise with profits to come solely from the efforts of others." S.E.C. v. W.J. Howey Co., 328 U.S. 293, 301, 66 S. Ct. 1100, 1104 (1946). Here, because the Long Treasury Account was not a "common enterprise," it cannot be considered a security for purposes of Section 10(b).

Some courts have ruled that a discretionary investment account -- i.e., an account where the investment adviser or broker possesses the discretion to execute trades without pre-clearance by the investor -- may be a "common enterprise" under Howey if either "horizontal commonality" or "vertical commonality" is present. See Siegel, 658 F. Supp. at 553; Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 618 F. Supp. 436, 438-40 (S.D.N.Y. 1985); Savino v. E.F. Hutton & Co., Inc., 507 F. Supp. 1225, 1235-39 (S.D.N.Y. 1981); Darrell v. Goodson, Fed. Sec. L. Rep. (CCH) ¶ 97,349, 1980 WL 1392, *2-3 (S.D.N.Y. 1980) (attached as Ex. C to this memorandum). Horizontal commonality -- which involves the pooling of several investors' assets into a single account -- clearly does not exist in this case. Vertical commonality refers to the sharing of profits and losses between the investor and the investment adviser and also is not present here. See Mechigian v. Art Capital Corp., 612 F. Supp. 1421,

41

1427 (S.D.N.Y. 1985); Savino, 507 F. Supp. at 1237-38.  MSAM's
fees were based on the dollar value of the assets under
management rather than on a share of profits and losses.  See
supra at 27.  Even if the Account suffered losses, MSAM would
still be paid a fee on the remaining assets.  See Kaplan v.
Shapiro, 655 F. Supp. 336, 341 (S.D.N.Y. 1987) ("It is an
important consideration that this one-to-one vertical
investment relationship must involve an interdependence of
both profits and losses of the investment.")

Finally, the Early Statements cannot have been made
"in connection with" the August transactions and losses, where
the Early Statements were made more than six months before
those transactions and prior to the enactment of two sets of
guidelines governing the management of the Account.  Here, NCB
furnished MSAM with both the February Guidelines and the May
Guidelines after the Early Statements occurred.  These
guidelines set forth NCB's instructions concerning how the
Account was to be managed in much greater specificity than any
of the Early Statements and thus broke any "connection"
between the Early Statement and the losing trades in August.

2.   The June-July Statements

NCB's claims that the estimates provided by Van
Valkenburgh and MSAM fraudulently overstated the value of the
Account in June and July 1993 also fail to comply with the "in
connection with" requirement.  First, these estimates related
to the market value of the Account at the end of the months of
June and July and to the transactions which took place in the

42

PLEAD005605

Account during those months.  None of the estimates related in
any way to the August transactions and losses at issue in this
case.  Thus, the "in connection with" requirement cannot be
satisfied.  See Flickinger, 947 F.2d at 598 (fraud must be
"integral to the purchase and sale of the security in
question") (emphasis added); In re JWP Inc., 928 F. Supp. at
1251 ("the alleged misrepresentation must have 'direct
pertinence' to the purchase or sale of securities at issue in
the case") (emphasis added).

   Second, even if NCB's theory is that the June-July
Statements were fraudulent because they misrepresented the
trading in those two months, NCB still would not be able to
satisfy the "in connection with" requirement, because the
allegedly fraudulent estimates were furnished after the
trading in June and July took place.  See Cahill v. Arthur
Andersen & Co., 659 F. Supp. 1115, 1124 (S.D.N.Y. 1986),
aff'd, 822 F.2d 14 (2d Cir. 1987) (misrepresentations not
actionable when made two years after sale of securities);
Troyer v. Karcagi, 476 F. Supp. 1142, 1148 (S.D.N.Y. 1979)
(causal relationship required to satisfy "in connection with"
requirement not present "where the misstatement or omission
occurred after the purchase"); Bischoff v. G.K. Scott & Co.,
687 F. Supp. 746, 752 n.8 (E.D.N.Y. 1986) ("In order to be
actionable, the alleged fraud must have occurred not
subsequent but prior to or contemporaneous with the sale of
securities.").

43

PLEAD005606

Third, NCB's allegation that the June-July Statements and alleged omissions concerning the positions and losses in the Account induced it to keep the Account open (Compl. ¶ 175) is not a proper basis for a fraud claim. Numerous courts have held that a decision not to close a discretionary account, even if induced by a fraudulent statement or omission, is not actionable under Section 10(b) because it is not "in connection with" the purchase or sale of particular securities in the account. See Bogart, 1993 WL 33643, *5 (attached as Ex. B to this memorandum) (broker's representations concerning risk limitations were made to induce investor to keep existing account open but were not "in connection with" specific transactions); Troyer, 476 F. Supp. at 1148 ("where it is alleged that a misrepresentation or omission by [the defendant] induced the 'mere retention' of the discretionary accounts by [the plaintiffs], no claim under Rule 10b-5 can be asserted in connection with the purchase of the investment contracts governing the funds already in those accounts"); Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., 800 F.2d 177, 181-82 (7th Cir. 1986) (alleged misrepresentations were not "in connection with the purchase or sale of securities" where investor's only course of action would have been to terminate the account); O'Brien v. Continental Illinois Nat'l Bank & Trust Co. of Chicago, 593 F.2d 54, 58 (7th Cir. 1979) (same); Capalbo v. PaineWebber, Inc., 672 F. Supp. 1048, 1052 (N.D. Ill. 1987) ("in connection with" requirement not satisfied where "all of the

44

misrepresentations and omissions identified in the complaint relate to the establishment, functioning, and status of the brokerage accounts, not to the sale or purchase of any particular securities. . . .  [T]he very nature of the alleged fraudulent conduct relates to the decision as to whether to retain an investment account, not the decision to purchase or sell securities").[19]

### 3.    Omissions Concerning Supervision

Finally, NCB's claim that MSAM fraudulently failed to disclose to it that it was inadequately supervising Van Valkenburgh must also fail.  Such a failure to disclose is not remotely "in connection with" the purchase or sale of securities.  See Levitin, 933 F. Supp. at 328 (alleged fraudulent omissions must "pertain[] to the securities themselves"); Manufacturers Hanover Trust Co., 770 F. Supp. at 181 (same).  NCB's theory of fraud, if accepted, would turn every alleged negligent act into fraud based on the defendant's failure to disclose its own negligence.  This is not the purpose of the federal securities laws.  See Sheppard v. TCW/DW Term Trust 2000, No. 94 Civ. 5404 (AGS), 1996 WL 469659, *3 (S.D.N.Y. Aug. 16, 1996) (attached as Ex. D to this memorandum) (defendants "not obligated to describe in

---

[19] Similarly, the decision not to sell an individual security or to keep open a non-discretionary account is not a purchase or a sale within the meaning of Rule 10b-5.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737-49, 95 S. Ct. 1917, 1926-32 (1975); Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1525 (S.D.N.Y. 1989); Moran v. Kidder Peabody & Co., 617 F. Supp. 1065, 1067 (S.D.N.Y. 1985), aff'd, 788 F.2d 3 (2d Cir. 1986).

PLEAD005608

pejorative terms" the securities invested in); <u>Kushner v. DBG Property Investors, Inc.</u>, 793 F. Supp. 1161, 1168 (S.D.N.Y. 1992) (no duty to disclose the "particular damning epithet suggested by plaintiffs"); <u>Naye v. Boyd</u>, Fed. Sec. L. Rep. (CCH) ¶ 92,979, 1986 WL 198, *3 (W.D. Wash. 1986), <u>aff'd</u>, 804 F.2d 146 (9th Cir. 1987) (attached as Ex. E to this memorandum) ("Federal securities law does not impose any duty to publicly admit to misconduct or to characterize one's behavior as culpable.").

B.   NCB Cannot Prove Causation

To prevail on its Section 10(b) claim, NCB must establish two types of causation:  First, it must show "transaction causation" (also referred to as "but for" causation), meaning that the alleged misstatements or omissions must have caused it to engage in the transaction in question.  Second, it must show "loss causation" (also referred to as "proximate cause"), meaning that the alleged misstatements or omissions must have proximately caused its losses.  <u>See</u> <u>Citibank, N.A. v. K-H Corp.</u>, 968 F.2d 1489, 1494-96 (2d Cir. 1992); <u>Bennett v. United States Trust Co. of New York</u>, 770 F.2d 308, 313 (2d Cir. 1985), <u>cert. denied</u>, 474 U.S. 1058 (1986).

To establish loss causation, NCB must show that its losses resulted from the alleged misrepresentations and omissions.  Allegations of "but for" causation are not sufficient.  In <u>Citibank</u>, for example, the plaintiff bank alleged that had it known of particular side-agreements

46

between parties to a securities transaction, it would have

refused to extend financing in connection with the

transaction.  The Court held:

> "[W]e agree with the district court that the fourth
> amended complaint's assertion that '[i]f Citibank had
> been aware of the agreements between Fruehauf and
> Stoecker, it would have reacted appropriately, in this
> case by refusing to provide the financing as
> contemplated,' alleged only 'but for' causation."

Citibank, 968 F.2d at 1495.  The Court dismissed the Section

10(b) claims because the plaintiff had not adequately alleged

that the concealed facts were "'the cause of the transaction's

turning out to be a losing one.'"  Id. (quoting Bastian v.

Petren Resources Corp., 892 F.2d 680, 684 (7th Cir.), cert.

denied, 496 U.S. 906 (1990)); see also In re Integrated

Resources Real Estate Limited Partnerships Sec. Litig., 850 F.

Supp. 1105, 1142 (S.D.N.Y. 1994) ("The underlying rationale

for the loss causation requirement is that 'otherwise, the

federal securities laws would establish an insurance program

for every security purchased in reliance on a misstatement,

even if the misstatement bears no relation to the reason for

the decline in the security's value.'") (citation omitted);

Bruschi v. Brown, 876 F.2d 1526, 1530 (11th Cir. 1989) ("if

the particular loss complained of is caused by supervening

general market forces or other factors unrelated to the

defendant's misconduct that operate to reduce the value of the

plaintiff's securities, the plaintiff is precluded from

recovery under Rule 10b-5").

47

1.    The Early Statements

NCB cannot prove loss causation in this case.  With respect to the Early Statements, while NCB may be able to establish that those statements induced it to open the Account, and "but for" those statements there would have been no losses, there is no evidence that the Early Statements proximately caused the losses which occurred months afterwards.  In fact, subsequent to the Early Statements, there were numerous intervening causal factors -- including the implementation of two sets of guidelines, Bajunaid's July 17 Memorandum (Tab 44), Bajunaid's statement to Van Valkenburgh to "short the hell out of it" (Bajunaid Dep. (Tab 2) 117), and the decline in interest rates during August -- which broke any conceivable causal connection between MSAM's generalized statements in January and February and the losses in August.  See In re Fortune Systems Sec. Litig., 680 F. Supp. 1360, 1365 (N.D. Cal. 1987) (intervening causes, including market downturn, responsible for the plaintiff's loss).

2.    The June-July Statements

Similarly, the June-July Statements cannot be the proximate cause of the August losses.  NCB's only possible theory of fraud is that, if Van Valkenburgh's estimates had been accurate and the full extent of the June losses had been disclosed, then NCB would have terminated the Account and the losses would not have occurred.  This theory relies on precisely the type of "but for" causation that the Second

48

PLEAD005611

Circuit has held to be insufficient for a claim under Section 10(b).  <u>See</u> <u>Citibank</u>, 968 F.2d at 1495.

Moreover, the June–July Statements related to the Account in those two months only and had nothing to do with the August transactions or losses.  Under these circumstances, NCB cannot establish proximate cause.  <u>See</u> <u>McGonigle v. Combs</u>, 968 F.2d 810, 821 (9th Cir.), <u>cert. dismissed</u>, 506 U.S. 948 (1992) ("'The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.'") (quoting <u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 549 (5th Cir. 1981), <u>aff'd in part, rev'd in part on other grounds</u>, 459 U.S. 375 (1983)).

Finally, NCB cannot establish that any of the alleged fraudulent omissions caused the August losses.  Because MSAM had ultimate discretionary authority to make investment decisions in the Account, NCB's only course of action, if the allegedly omitted information were disclosed to it, would have been to attempt to terminate the Account.  As stated above, this "but for" causation is an inadequate basis for a claim under Section 10(b).  <u>See</u> <u>Bischoff</u>, 687 F. Supp. at 751 (failure to disclose risks of trading could not be the cause of losses where the broker, not the plaintiff, made the investment decisions).

C.    <u>NCB Cannot Prove Reasonable Reliance</u>

Section 10(b) also requires that the plaintiff prove reasonable reliance.  <u>See</u> <u>Harsco Corp. v. Segui</u>, 91 F.3d 337,

49

342 (2d Cir. 1996); Feinman v. Dean Witter Reynolds, Inc., 84
F.3d 539, 540-41 (2d Cir. 1996).  "An investor may not
justifiably rely on a misrepresentation if, through minimal
diligence, the investor should have discovered the truth."
Brown v. The E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d
Cir. 1993).

1.    The Early Statements

As a matter of law, NCB cannot have justifiably
relied on the Early Statements.  These statements clearly
related to proposals being made by MSAM in connection with
possible management of the zero coupon bond position.  After
the Account was formally opened and two successive sets of
guidelines were drafted and implemented, NCB cannot have
reasonably believed that the Account was being managed
according to the strategies discussed in the Early Statements.

A closer analysis of the Early Statements further
demonstrates that NCB's reliance would be unreasonable.  For
example, NCB claims that the September 1992 presentation
materials described MSAM's investment philosophy as
"provid[ing] a risk averse means of achieving a real rate of
return while preserving principal."  NCB Resp. to MSAM Cont.
Int. No. 23(c) (Tab 25).  However, the complete statement from
the presentation materials makes clear that this investment
philosophy applied to a standardized type of account offered
by MSAM, which was entirely different from the custom-designed
Long Treasury Account:  "An **intermediate core maturity**
portfolio of fixed income securities will provide a **risk**

50

**averse** means of achieving a **real rate of return** while preserving principal." Sept. 1992 Presentation Materials (Tab 26) M00636 (emphasis in original). NCB could not have believed, by any stretch, that the Long Treasury Account was ever "[a]n intermediate core maturity portfolio."

The November presentation materials concerning MSAM's potential management of the zero coupon bonds are clearly identified as a "proposal." Nov. 1992 Presentation Materials (Tab 27) M00658-59. NCB cannot have relied on this proposal to govern the management of the Account after the two sets of guidelines were subsequently implemented. Similarly, the January 29, 1993 letter discusses what a proposed investment strategy "would" or "could" accomplish if NCB decided to follow it. Jan. 29, 1993 Letter (Tab 28). Finally, the February 1, 1993 letter relates to specific proposed GNMA and call option transactions, not the ongoing, long-term management of an account that was yet to be created. Feb. 1, 1993 Letter (Tab 29).

Moreover, while NCB might have believed that MSAM and Van Valkenburgh would follow a conservative management strategy at the time the Early Statements were made, it is clear that by July, NCB considered the Long Treasury Account to be volatile, aggressive, and more risky than equity securities. As Bajunaid wrote in his July 17 Memorandum to Banaja and Shayif:

> "This kind of volatility is expected with such an aggressive instrument. It has more risk than a straight equity in the US."

PLEAD005614

July 17 Memorandum (Tab 44) N000831; see also Bajunaid Dep.
(Tab 2) 30-32 (Long Treasury Account was NCB's riskiest
account).

> 2. The June-July Statements

NCB cannot have justifiably relied on Van
Valkenburgh's estimates when it knew that those estimates were
in conflict with the statements received from Morgan Guaranty.
NCB has conceded that it believed there was a discrepancy of
approximately $3 million between the value of the Account as
reported by Morgan Guaranty, which actually held the assets,
and Van Valkenburgh's self-described estimates.  SAMA Rep.
(Tab 46) N007900 ("[i]n July, NCB questioned Mr. Van
Valkenburgh closely about this $3 million disparity");
Bajunaid Dep. (Tab 2) 38-39, 872, 894-95 (Bajunaid knew of $3
million discrepancy, was "very concerned" about it, and
believed that Van Valkenburgh's figures, as opposed to Morgan
Guaranty's, were incorrect).  Given the strong indication that
there were inaccuracies in Van Valkenburgh's estimates, NCB
cannot have reasonably relied on them.  Cf. Apex Oil Co. v.
The Belcher Co. of New York, Inc., 855 F.2d 997, 1008-09 (2d
Cir. 1988) (no justifiable reliance under common law fraud
where plaintiff had notice that representation was
inaccurate); Carte Blanche (Singapore) PTE., Ltd. v. Diners
Club Int'l, Inc., 758 F. Supp. 908, 916 (S.D.N.Y. 1991)
(same).

PLEAD005615

D.    Defendants Had No Duty to Disclose
      the Allegedly Concealed Facts

There can be no liability under Section 10(b) for an
omission absent a legal duty to disclose the allegedly
concealed facts.  See Basic Inc. v. Levinson, 485 U.S. 224,
239 n.17, 108 S. Ct. 978, 987 n.17 (1988); In re Time Warner,
9 F.3d at 267.  Parties may contract as to the scope and
timing of their disclosure obligations.  See Banque Arabe et
Internationale D'Investissement v. Maryland Nat'l Bank, 57
F.3d 146, 155 (2d Cir. 1995) ("Of course, disclosure
obligations may be modified by contract."); Jordan v. Duff and
Phelps, Inc., 815 F.2d 429, 436 (7th Cir. 1987), cert.
dismissed, 485 U.S. 901 (1988) ("Because the fiduciary duty is
a standby or off-the-rack guess about what parties would agree
to if they dickered about the subject explicitly, parties may
contract with greater specificity for other arrangements. . .
.  We may assume that duties concerning the timing of
disclosure by an otherwise-silent firm also may be the subject
of contract.").

In this case, NCB alleges that defendants failed to
disclose to it the existence of leveraged short positions and
losses in the Account during the months of June, July and
August 1993.  NCB's only claim in this regard must be that
defendants failed to make intra-month disclosures of these
facts, because MSAM did, in fact, make reports to NCB at
months-end.

53

NCB's theory of fraudulent omissions fails, however, because MSAM and NCB expressly contracted as to the scope and timing of the disclosure obligations owed by MSAM to NCB.  In the Management Agreement, MSAM and NCB agreed that MSAM would furnish reports to NCB's custodial agent, Morgan Guaranty, "in sufficient detail to enable the Custodian to prepare monthly consolidated reports of the actual income, value and transactions" in NCB's portfolio.  Management Agr. (Tab 24) M00107 (emphasis added).  While the February Guidelines provided that MSAM would provide NCB with monthly statements as well (Tab 31), there was nothing in the Management Agreement or the February or May Guidelines about intra-month reporting of positions or results.  NCB's internal policies and procedures manual confirms that NCB understood (i) that NCB's external fund managers were to report to NCB's custodial agent which in turn would report to NCB, and (ii) that the custodian's reports would be prepared on a monthly basis. Policies Man. (Tab 18) N002954.

Moreover, on April 6, 1993, Van Valkenburgh wrote to Bajunaid requesting whether NCB wanted "daily trade updates" for the Long Treasury Account.  April 6, 1993 Letter (Tab 42). Bajunaid's response was clear:  NCB did not want such updates (Bajunaid Dep. (Tab 2) 832, 879-80; Van Valkenburgh Dep. (Tab 11) 735-36), and there is no evidence that NCB ever sought to deviate from the reporting procedures actually followed. Bajunaid Dep. (Tab 2) 829-30, 882-84 (Bajunaid satisfied with

PLEAD005617

Van Valkenburgh's estimates and did not want any more information about the Account than he was already receiving).

Given these undisputed facts, it would be incongruous to find that MSAM and Van Valkenburgh had a legal duty to make additional, intra-month disclosures to NCB concerning the Account.  MSAM fully complied with its reporting requirements under the Management Agreement and provided to Morgan Guaranty information about every trade entered into in the Account.  Shaw Dep. (Tab 10) 120-21, 295-98; Bajunaid Dep. (Tab 2) 1370.  If NCB was dissatisfied with the reports it received from Morgan Guaranty, or if it wanted daily trading information directly from MSAM, it should have made those requests in 1993, rather than try to retroactively foist such duties on to MSAM in connection with this litigation.  NCB cannot sue defendants for fraud based on their failure to provide information to NCB which NCB specifically told defendants not to provide it.  See Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F. Supp. 741, 746-47 (S.D.N.Y. 1991) (no duty to disclose risks of trading in discretionary account where evidence showed that plaintiff was sophisticated and understood the potential for losses).

Finally, NCB's claims that MSAM and Van Valkenburgh fraudulently omitted to inform it that the positions in the Account were "imprudent" and "inconsistent with NCB's investment guidelines and objectives" (NCB Resp. to MSAM Cont. Int. No. 23(h), (p), (y) (Tab 25)) also fail on the grounds that there is no legal duty to make such disclosures.  See

-55-

PLEAD005618

Sheppard, 1996 WL 469659, *3 (attached as Ex. D to this memorandum) (defendants "not obligated to describe in pejorative terms" the securities invested in); Kushner, 793 F. Supp. at 1168 (no duty to disclose the "particular damning epithet suggested by plaintiffs").  Summary judgment should thus be granted for defendants on NCB's fraudulent omissions claims.

## POINT II

### SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON NCB'S COMMON LAW FRAUD, NEGLIGENT MISREPRESENTATION AND CONSTRUCTIVE FRAUD CLAIMS

To prevail on its claims of common law fraud, NCB must also establish reasonable reliance and proximate cause. See Banque Arabe, 57 F.3d at 153; Kregos v. The Associated Press, 3 F.3d 656, 665 (2d Cir. 1993), cert. denied, 510 U.S. 1112 (1994) (common law fraud requires that the "losses must be the direct, immediate, and proximate result of the misrepresentation"); Cumis Ins. Soc'y, Inc. v. Citibank, N.A., 921 F. Supp. 1100, 1105 (S.D.N.Y. 1996).  For the reasons set forth above, NCB cannot establish the necessary reliance and causation elements with respect to its common law fraud claims.

Proximate cause and justifiable reliance are also essential elements of claims for negligent misrepresentation (see Harsco Corp., 91 F.3d at 342; Rotanelli v. Madden, 172 A.D.2d 815, 816, 569 N.Y.S.2d 187, 188 (2d Dep't 1991), app. denied, 79 N.Y.2d 754, 581 N.Y.S.2d 281 (1992)) and constructive fraud.  See Orderline Wholesale Distr., Inc. v.

56

PLEAD005619

Gibbons, Green, van Amerongen, Ltd., 675 F. Supp. 122, 130

(S.D.N.Y. 1987) (elements of constructive fraud are the same

as for actual fraud except that scienter need not be shown);

Schoen v. Martin, 187 A.D.2d 253, 254, 589 N.Y.S.2d 443, 444

(1st Dep't 1992) (same).  Because NCB cannot prove that it

justifiably relied on either the Early Statements or the June-

July Statements, summary judgment should be granted for

defendants on NCB's claims of negligent misrepresentation and

constructive fraud.

57

## CONCLUSION

For the foregoing reasons, defendants MSAM and Van Valkenburgh respectfully request that this Court grant summary judgment in their favor on the first (federal securities fraud), third (common law fraud), fourth (constructive fraud), and eighth (negligent misrepresentation) claims of NCB's amended complaint pursuant to Federal Rule of Civil Procedure 56.  In addition, MSAM respectfully requests that this Court grant summary judgment in its favor on the second claim (control person liability) of NCB's amended complaint pursuant to Federal Rule of Civil Procedure 56.

Dated:  New York, New York
        October 1, 1996

DAVIS POLK & WARDWELL

By: _James W.B. Benkard_

James W.B. Benkard
JWBB-4914

Of Counsel:

James H.R. Windels
Anne Berry Howe
Gregory G. Ballard

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

Attorneys for Morgan Stanley
Asset Management Inc.

PLEAD005621

PIPER & MARBURY L.L.P.

By: _____
    Robert A. Meister
    RAM-7408

1251 Avenue of the Americas
New York, New York  10020
(212) 835-6000

Attorneys for
Mark R. Van Valkenburgh

59

PLEAD005622