A

PLEAD005623

--- F.Supp. ----
Fed. Sec. L. Rep. P 99,298
(Cite as: 1996 WL 465750 (S.D.N.Y.))

Page 1

Louis G. BISSELL, Jr., on behalf of himself and all others similarly situated,
Plaintiff,

v.

MERRILL LYNCH & CO., INC., and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.

No. 93CIV8243 (AGS).

United States District Court, S.D. New York.

Aug. 8, 1996.

OPINION AND ORDER

SCHWARTZ, District Judge:

**\*1** This matter is before the Court upon the motion of defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively, "MLPF & S") to dismiss all claims alleged in the Second Amended Class Action Complaint (the "Complaint") under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and the motion of plaintiff Louis G. Bissell, Jr. ("Bissell" or "plaintiff") for class certification. For the reasons set forth below, MLPF & S's motion is granted, and Bissell's motion is denied as moot.

BACKGROUND [FN1]

In this putative class action brought under the federal securities laws and New York statutory and common law, plaintiff seeks damages relating to short sales in his stock brokerage account with defendant MLPF & S. Plaintiff does not allege that MLPF & S deprived him of any investment gains, nor does he seek to hold MLPF & S responsible for any investment losses. Rather, plaintiff asserts that he and the putative class are entitled to all of the "interest, other profits or economic benefits earned [by MLPF & S] on ... [customers'] property pledged as collateral in connection with such short sales...." Complaint ¶ 5.

Plaintiff asserts his claims not under any provisions of federal law specifically regulating short sales and the use of customer collateral [FN2], but under (1) general principles of section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78a et seq., and Securities and Exchange Commission ("SEC") Rules 10b-5 and 10b-16, 17 C.F.R. §§ 240.10b-5 and 240.10b-16, (2) the common law of the State of New York, and (3) provisions of the Uniform Commercial Code.

Bissell opened a margin account with MLPF & S in 1981. Upon becoming a margin customer, Bissell signed MLPF & S's standard margin agreement. In January 1983 Bissell deposited 16,000 shares of common stock of E.I. DuPont de Nemours & Company ("DuPont") into his margin account at MLPF & S, and in 1985 he commenced the practice of selling DuPont short.

Some background on the mechanics and regulation of short sales is necessary to put plaintiff's claims in perspective. In a short sale transaction the customer borrows stock to sell, is credited with the proceeds, and then restores the borrowed stock by purchase, hopefully at a lower price. Thus, a short sale is the sale of a security that the seller does not own, or, if he or she owns it, does not deliver to the buyer. Where the seller owns the security but does not deliver it to the buyer, the transaction is referred to as a "short sale against the box." [FN3] The monthly statements in Bissell's account reflect that all of Bissell's short sales were short sales against the box.

To secure the loan of stock, a short-selling customer is required to provide his or her broker with collateral in the form of cash or securities. In a "regular" short sale (as opposed to a short sale against the box), the collateral for the security loan usually takes the form of the cash proceeds received from the short sale, but securities may be substituted as collateral. [FN4] Whether in the form of cash or securities, however, SEC rules permit the broker-dealer to use the collateral to finance margin loans or security loans for the same or other margin customers. See, e.G., 17 C.F.R. § 240.15c3-3.

**\*2** In short sales against the box, the seller's collateral for the security loan always takes the form of securities, namely, the seller's own long security position "in the box." The cash proceeds from the short sale do not serve as collateral for the security loan in a short sale against the box. [FN5] To protect the integrity of the short sale against the box (i.e., to assure that the long position is not delivered to the buyer), the broker-dealer segregates the seller's long position, thereby removing it from the pool of margin securities otherwise available to it for lending, pledging, hypothecation or any other purpose.

The broker obtains the stock that it loans to the

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005624

--- F.Supp. ---
(Cite as: 1996 WL 465750, *2 (S.D.N.Y.))

customer from its own reserves or by borrowing it from other brokers or other customers, as permitted by standard margin agreements and applicable regulations. See 15 U.S.C. § 78h(c); 17 C.F.R. § 240.15c3-3(a)(3) and (4). When the broker borrows the stock from external sources, the broker must secure the loan with collateral worth at least 100 percent of the market value of the securities borrowed. Regulation T, 12 C.F.R. § 220.16. The funds used to secure the loan of stock may be taken directly or indirectly from the account of the customer engaging in the short sale, and typically are generated by the short sale itself.

Where the broker has provided collateral to another broker or institution to secure the loan of securities, the borrowing broker typically receives a portion of any interest earned on the collateral. The borrowing broker does not usually pass any of the interest on to its customer, although an exception is sometimes made for large or professional customers. Here, the Complaint and monthly account statements make clear that MLPF & S did, in fact, pass on some of this interest to Bissell. In September 1985, MLPF & S agreed to credit Bissell's account with 50 percent of Broker Call Rate ("BCR") interest on the entire short market value ("SMV") of his open short positions. This arrangement is reflected in Bissell's monthly statement for September 1985 and each month thereafter, and was made retroactive to January 1, 1985. In 1989, for example, Bissell's account was credited with $44,255.58 in interest, in effect reducing his 1989 margin interest charges from $94,429.97 to $50,174.39. See Complaint ¶ 32.

In essence, the Complaint in this action alleges that MLPF & S uses its customers' assets, in the form of cash and stock collateral and proceeds of short sales, to earn interest and to obtain other financial benefits without notifying the customer of this practice or sharing the proceeds with them. Based upon these allegations, Bissell and the putative class assert claims for securities fraud, breach of fiduciary duty, violation of the "shingle theory" and principles of trust and agency, breach of implied covenants of good faith and fair dealing, and violation of Article 9 of the Uniform Commercial Code. [FN6]

Although captioned "Second Amended Class Action Complaint," the pending Complaint is actually plaintiff's fourth complaint in this action. It was preceded by a "Substituted Amended Class Action Complaint," an "Amended Class Action Complaint," and an original "Class Action Complaint." Plaintiff

has agreed and this Court has "so ordered" that the pending Complaint is "the final complaint in this action and said complaint may not be amended hereafter for any reason." See Stipulation and Order dated October 11, 1994.

## DISCUSSION

### A. Standard for Motion to Dismiss

*3 In ruling upon MLPF & S's motion to dismiss the Complaint under Rule 12(b)(6), the Court must view the Complaint in the light most favorable to Bissell, accepting all allegations contained in the Complaint as true. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974). All reasonable inferences are to be drawn in the plaintiff's favor, and the claims should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102 (1957).

### B. Securities Fraud Claims

Bissell bases his securities fraud claims upon MLPF & S's alleged violation of two SEC rules promulgated under section 10(b) of the 1934 Act: Rule 10b-5 and Rule 10b-16.

### 1. Rule 10b-5

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir.1993) (quoting Bloor v. Carro, Spanbock. Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir.1985)), cert. denied, --- U.S. ---, 114 S.Ct. 1397 (1994) (internal quotations omitted). The Supreme Court recently stated that Rule 10b-5 should be interpreted strictly to bar "10b-5 challenges to conduct not prohibited by the text of the statute." Central Bank of Denver. N.A. v. First Interstate Bank of Denver. N.A., 511 U.S. 164, ---, 114 S.Ct. 1439, 1446 (1994). The Court emphasized that " 'not every instance of financial unfairness constitutes fraudulent activity under § 10(b).' " Id. (citation omitted).

Here, plaintiff's claim under Rule 10b-5 must be dismissed because it fails to satisfy the requirement

Copr. © West 1996 No claim to orig. U.S. govt. works

that the alleged fraud was "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To satisfy this requirement, the misrepresentation or omission must pertain to the securities themselves; allegations of fraud merely involving securities are not sufficient. See Chemical Bank v. Arthur Anderson & Co., 726 F.2d 930, 943 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253 (1984). Judge Chin of this Court recently dismissed a securities fraud complaint similar to Bissell's, holding that the broker-dealer's alleged "failure to disclose that it earned interest on its customers' collateral and the proceeds of their short sales was not 'in connection with' the purchase or sale of securities." Levitin v. PaineWebber, Inc., No. 95 Civ. 6508, 1996 WL 384912 (S.D.N.Y. July 10, 1996), at *4. I concur with Judge Chin's thorough analysis of the "in connection with" requirement in Levitin and reach the same conclusion here.

The law of this Circuit is clear that unless the alleged fraud concerns the value of the securities bought or sold, or the consideration received in return, such fraud is not "in connection with, the purchase or sale of a security within the meaning of Rule 10b-5. See Chemical Bank, 726 F.2d at 943 (claim against accountants for losses related to loans secured by notes of company audited by the accountants held not to be "in connection with" the purchase or sale of a security); Saxe v. E.F. Hutton & Co., Inc., 789 F.2d 105, 108 (2d Cir.1986) (claim that investor was fraudulently induced to liquidate securities portfolio to invest proceeds with commodities trader held not to be "in connection with" the sale of a security).

*4 In Chemical Bank, a leading decision on the "in connection with" requirement of Rule 10b-5 liability, Judge Friendly described the rationale for this requirement as follows:

The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

* * *

[I]t is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the [purchase or sale] of a security is a part. 726 F.2d at 943. Although some commentators and courts have suggested that the connection between

fraud and a securities transaction can be very tenuous and still satisfy the "in connection with" requirement, Judge Friendly rejected this view in Chemical Bank. He noted that statements to this effect "have usually been made in cases ... where the connection was anything but tenuous. In cases near the borderline, courts have warned that '[i]t is important that the standard be fleshed out by a cautious case-by-case approach.' " Id. at 942 (citations omitted).

Following Chemical Bank, courts in this Circuit have consistently held that "there is no securities law violation unless the misrepresentations or omissions involved in a securities transaction pertain to the securities themselves." Abrash v. Fox, 805 F.Supp. 206, 208 (S.D.N.Y.1992) (clients' claims against attorney for securities fraud held not to be in connection with the purchase of securities where claim alleged that attorney made misrepresentations as to his qualifications and intentions to act as business and legal advisor); see also Pross v. Katz, 784 F.2d 455, 457-58 (2d Cir.1986) (investment manager's alleged breach of promise to perform fiduciary duties held not to be in connection with purchase or sale of securities); Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co., 770 F.Supp. 176, 181 (S.D.N.Y.1991) (alleged embezzlement of securities by broker did not constitute violation of Rule 10b-5; "in connection with" requirement was not satisfied because "Rule 10b-5 is designed to protect market transactions, not trust relationships"); Bosio v. Norbay Sec., Inc., 599 F.Supp. 1563, 1566 (E.D.N.Y.1985) (conversion by broker of proceeds of sale of a security not "in connection with" sale of the security because the broker's misrepresentation related "not to any inducement ... regarding the investment purpose of the sale, but to the arrangements concerning the mechanics of the sale").

Bissell argues that "a fraudulent act need not affect the value of securities" to violate section 10(b) and Rule 10b-5. Opp. Mem. at 18. However, neither of the cases relied on by plaintiff—Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615 (9th Cir.1981), and A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir.1967)—go "so far as [plaintiff] would take us here." Chemical Bank, 726 F.2d at 944. Judge Friendly discussed the reach of both Arrington and Brod in Chemical Bank. He noted that Arrington was "a classic case of misrepresentation by a broker with respect both to the specific securities being purchased and to the lack of risk in margin buying." Id. at 944 n. 24. In Brod, "there was no question that the [defendants'] fraud (placing orders

PLEAD005626

— F.Supp. —
(Cite as: 1996 WL 465750, *4 (S.D.N.Y.))

Page 4

for securities with the fraudulent intent of paying only if those had appreciated by the time payment was due) was in connection with the purchase and sale of securities." Id. Thus, neither Arrington nor Brod supports plaintiff's expansive view of the "in connection with" requirement.

*5 The facts and holding of Vigilant Ins. Co. v. C. & F. Brokerage Serv., 751 F.Supp. 436 (S.D.N.Y.1990), are particularly instructive here. In Vigilant, an exchange specialist firm employed "finders" or middle-men to locate stock from other brokerage houses in order to fund commitments to its own clients and cover its position in the market. The specialist firm provided cash collateral to the finders for the loans. Once the specialist firm covered its position in the market, it returned the stocks and received back the collateral. In addition to receipt of its collateral, the specialist firm was to receive an interest payment or "rebate." The finders allegedly diverted those rebates to themselves. The specialist's fidelity insurer sued the finders for securities fraud under section 10(b), seeking to recover the misappropriated rebates. In dismissing the securities fraud claim, the court held that "to adequately state a cause of action [under section 10(b) and Rule 10b-5], the misrepresentation must relate to the value of the security." 751 F.Supp. at 438. The court further noted that "the fraud alleged regards retention of interest on the collateral [for stock loans] and a diversion of proceeds, neither of which affects the worth of the stocks." Id. Therefore, since the investment value of the stocks involved was not related to the finder's alleged fraud, the court held that the "in connection with" requirement was not satisfied. Id.

Here, as in Vigilant, the alleged fraud relates to the retention of interest on collateral rather than the value of the securities sold by Bissell or the price that he received for selling those securities. As the Second Circuit's decisions in Chemical Bank and Saxe make clear, a fraud is "in connection with" the purchase and sale of securities when the fraud concerns the value of the securities bought or sold, or the consideration received in return. As noted above, Judge Friendly held in Chemical Bank that "it is not sufficient to allege that a defendant has committed [fraud] in a transaction of which the [purchase or sale] of a security is a part." 726 F.2d at 943. Bissell makes no allegation that MLPF & S's allegedly fraudulent practices related in any way to the value of the securities that plaintiff sold short or the consideration he received. Although the "nondisclosure of the interest [MLPF & S] earned on its customer's funds may have affected the customer's decision to open an account with defendant, the interest is not part of the consideration received by the customer for the sale of securities." Levitin, 1996 WL 384912, at * 3 (citing Saxe, 789 F.2d at 108). As Judge Chin held in Levitin, the "alleged nondisclosure at issue ... pertains not to the sale of the securities or the value of the securities themselves, but to the terms of the relationship between the broker and the customer." Id. Accordingly, the alleged nondisclosure does not constitute securities fraud in violation of section 10(b) and Rule 10b-5.

*6 Since MLPF & S's alleged failure to disclose that it earned interest on its customers' collateral and the proceeds of their short sales was not "in connection with" the purchase or sale of securities, plaintiff's securities fraud claim based upon Rule 10b-5 is hereby dismissed. Because I hold that Bissell has failed to satisfy the "in connection with" requirement, I need not reach MLPF & S's arguments that plaintiff has failed to adequately plead other elements of his securities fraud claim.

2. Rule 10b-16

Plaintiff also alleges that MLPF & S violated SEC Rule 10b-16, the SEC analogue to the Truth-in-Lending Act. See 17 C.F.R. § 240.10b-16. Rule 10b-16 prohibits brokers from extending credit to customers in securities transactions without disclosing the terms of the extension of credit, including interest rates, the method of determining balances, and other charges resulting from the extension of credit. See Levitin, 1996 WL 384912, at *5. Plaintiff alleges that MLPF & S's conduct violated Rule 10b-16's requirements concerning disclosure of (a) finance charges, (b) conditions under which annual rates of interest can be charged, (c) rebates, (d) methods of computing interest, (e) methods of determining debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts, (f) other charges resulting from extensions of credit, and (g) the nature of the broker's interest in the security or other property held as collateral and the conditions under which additional collateral can be required. Complaint ¶ 40.

Although Rule 10b-16 does not create an express cause of action for violation of its provisions and the Second Circuit has declined to resolve the issue of whether an implied cause of action exists, see Zerman v. Ball, 735 F.2d 15 (2d Cir.1984), other circuit and

Copr. © West 1996 No claim to orig. U.S. govt. works

district courts have recognized an implied cause of action under section 10(b) of the 1934 Act for violations of Rule 10b- 16. See, e.g., Angelastro v. Prudential-Bache Secs., Inc., 764 F.2d 939, 949-50 (3d Cir.), cert. denied, 474 U.S. 935, 106 S.Ct. 267 (1985); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 539 (9th Cir.1984); Liang v. Dean Witter & Co., 540 F.2d 1107, 1113 n. 25 (D.C.Cir.1976); Metzner v. D.H. Blair & Co., 689 F.Supp. 262 (S.D.N.Y.1988); Slomiak v. Bear Stearns & Co., 597 F.Supp. 676 (S.D.N.Y.1984).

As with the other SEC regulations promulgated under section 10(b) of the 1934 Act, however, "a cause of action for violation of Rule 10b-16 can only be maintained where the claim stems from the enabling statute's prohibition of the use of deceptive and manipulative devices in connection with the purchase or sale of securities." Levitin, 1996 WL 384912, at *4; see Angelastro, 764 F.2d at 946; Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352, 1358 n. 8 (11th Cir.1985) (without deciding issue, court stated that "violations of Rule 10b-16 may give rise to a private cause of action under section 10(b) only to the extent that the violations arise out of the purchase or sale of securities"); cf. Metzner, 689 F.Supp. at 267 (holding that plaintiff stated claim for violation of Rule 10b-16 where it could be inferred that plaintiffs were misled into purchasing securities due to broker's violation of Rule 10b-16). Here, as in Levitin, where the alleged fraud does not pertain to the purchase or sale of securities, Bissell cannot recover under section 10(b) for the alleged violations of Rule 10b-16. Levitin, 1996 WL 384912, at *6.

*7 Even if this Court were to hold that the alleged non-disclosures did pertain to the purchase or sale of securities, three alternative grounds exist for dismissing plaintiff's claims under Rule 10b-16: (1) the statute of limitations for certain claims under Rule 10b-16 has expired; (2) plaintiff does not allege that MLPF & S failed to establish procedures to provide the requisite Rule 10b-16 disclosures; and (3) Rule 10b-16 does not require the specific disclosures which plaintiff contends that MLPF & S failed to make.

The Complaint does not specify which specific provision of Rule 10b-16 was allegedly violated. Subsection (a)(1) requires the broker to establish procedures to assure that each customer is given a written statement disclosing information regarding interest charges at the time an account is opened; subsection (a)(2) requires the broker to establish procedures to assure that each customer is given periodic statements disclosing credit balances, interest charges, and all other charges resulting from the extension of credit.

Plaintiff appears to concede that any claim based on subsection (a)(1) is time-barred, see Opp. Mere. at 21 ("a claim under 10b-16(a)(1) may now be time barred"), and the Court so finds. Litigation under section 10(b) "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilberston, 501 U.S. 350, 363, 111 S.Ct. 2773, 2782 (1991). Bissell opened his margin account in 1981 but did not commence this action until December 1, 1993. Thus, any claim under subsection (a)(1) of Rule 10b-16 based on MLPF & S's alleged failure to disclose credit information when Bissell's account was opened is time-barred because it was filed more than three years after the alleged violation.

In addition, courts recognizing an implied right of action under Rule 10b-16 have required the plaintiff to allege that the defendant failed to establish procedures to provide the requisite Rule 10b-16 disclosures. See Slomiak, 597 F.Supp. at 685; see also Nick v. Shearson/American Express, Inc., 612 F.Supp. 15, 18 (D.Minn.1984) (plaintiff must allege that defendants "failed to establish procedures to provide credit disclosure or that the terms initially established for the ... [plaintiff's] account were changed without the required notice"). Bissell's Complaint fails to make such allegations.

Finally, plaintiff's discussion in his Opposition Memorandum regarding the adequacy of MLPF & S's monthly statements demonstrates that there is no violation of the specific disclosure requirements of subsection (a)(2) of Rule 10b-16. In his memorandum, plaintiff reproduces certain entries from his monthly statement for September 1985. After commenting (with apparent approval) on MLPF & S's disclosures relating to interest charges, plaintiff finds fault with the entries relating to interest credits. Specifically, plaintiff states that

*8 with respect to credit interest ("Cr.Int."), Merrill Lynch simply reported "50% BCR SMV." ("BCR" means "brokers call rate"; "SMV" means "short market value".) Merrill Lynch did not quantify BCR.

Opp. Mem. at 9 (emphasis added). However, unlike disclosures relating to interest charges which do require an itemized breakdown under Rule 10b-16, there is no SEC rule or regulation requiring any

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.Supp. ---

(Cite as: 1996 WL 465750, *8 (S.D.N.Y.))

particular disclosure format with respect to interest credits.

For the foregoing reasons, plaintiff's claim under Rule 10b-16 is hereby dismissed.

**B. Other Claims**

1. Breach of Fiduciary Duty, the Shingle Theory, and Principles of Trust and Agency

In his third claim for relief, plaintiff asserts that under the law of New York, MLPF & S, "as a broker acting as agent for its customers, is under a fiduciary duty to deal fairly and in complete candor with its customers concerning the matters entrusted to the broker, and not to misappropriate the economic benefits of collateral or property of the cestui qui trust." Complaint ¶ 44. In his fourth and fifth claims, plaintiff alleges similarly that MLPF & S violated the "shingle theory" [FN7] and principles of "trust and agency" in connection with his short sales. Since these claims all allege theories of fiduciary law, they will be resolved together.

The issue posed by these related claims is whether MLPF & S owes plaintiff a fiduciary or agency duty with respect to the specific practices regarding collateral in dispute in this action. MLPF & S concedes that it owes a fiduciary duty to the plaintiff-- arising from its role as plaintiff's agent--to execute his securities transactions at the best prices reasonably obtainable. Plaintiff makes no allegation that MLPF & S failed to carry out this obligation. However, MLPF & S disputes that it owes plaintiff a fiduciary duty with respect to the collateral practices in question, arguing that the duty which plaintiff seeks to impose does not implicate MLPF & S's role as plaintiff's agent or fiduciary. Rather, MLPF & S contends, such a duty arises--if at all--from the relationship with MLPF & S recognized in plaintiff's margin agreement, namely, that of debtor and creditor. The Court agrees, for the reasons set forth below.

Under New York law, the " 'mere existence of a broker-customer relationship is not proof of its fiduciary character.' " Rush v. Oppenheimer & Co., 681 F.Supp. 1045, 1055 (S.D.N.Y.1988) (quoting Fey v. Walston & Co., 493 F.2d 1036, 1049 (7th Cir.1974)). The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and "[t]he scope of affairs entrusted to a broker is generally limited to the completion of a transaction." Schenck v. Bear,

Stearns & Co., 484 F.Supp. 937, 947 (S.D.N.Y.1979), overruled on other grounds, Conway v. Icahn & Co., 16 F.3d 504 (2d Cir.1994). In the absence of discretionary trading authority delegated by the customer to the broker--and none is alleged in the case at bar--a broker does not owe a general fiduciary duty to his client. Schenck, 484 F.Supp. at 946-47.

*9 The law of states other than New York is similar. The Arizona Supreme Court has stated that

[t]he agency relationship between customer and broker normally terminates with the execution of the order because the broker's duties, unlike those of an investment advisor or those of a manager of a discretionary account are only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security.... While a broker and a customer have an agent-principal relationship with respect to each transaction to buy or sell, they may also have a separate and distinct relationship as creditor and debtor.

Walston & Co. v. Miller, 100 Ariz. 48, 51-52, 410 P.2d 658, 661 (1966); see also Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561 (9th Cir.1985) (finding no continuing fiduciary relationship where customer had a non-discretionary account with broker); Leib v. Merrill Lynch, Pierce, Fenner & Smith Inc., 461 F.Supp. 951 (E.D.Mich.1978) (finding that broker owed only limited, transactional duties to customer who maintained non-discretionary account), aff'd, 647 F.2d 165 (6th Cir.1981). The SEC has also recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts is that of debtor and creditor. In adopting Rule 15c3-2 governing the use of free credit balances in customer accounts, the SEC explained:

Many customers of broker-dealers are not aware (1) that when they leave free credit balances with a broker-dealer the funds generally are not segregated and held for the customer, but are commingled with other assets of the broker- dealer and used in the operation of the business, and (2) that the relationship between the broker-dealer and the customer as a result thereof is that of creditor-debtor.

Adoption of Rule 15c3-2 under the Securities Exchange Act of 1934, Exchange Act Release No. 34-7325, 1964 SEC LEXIS 131, *2-3 (1964) (emphasis added). See also Newman, SEC No-Action Letter, [1970-71] Fed. Sec. L. Rep. (CCH) ¶ 78,177 (May 6, 1971) (declining to require payment of interest on free credit balances, SEC staff found the

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005629

question "governed by contract between the parties").

Relying primarily on Conway v. Icahn & Co., supra, plaintiff argues that the relationship between plaintiff and MLPF & S is fiduciary in nature in every respect. Although there is language in Conway broadly stating that "[t]he relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature," 16 F.3d at 510, a close analysis of the Conway case reveals that it does not support plaintiff's position.

In Conway, the plaintiff was a customer of a discount brokerage, Icahn & Co., which cleared its transactions through another broker-dealer, Cowen & Co. Conway, 16 F.3d at 505. Cowen & Co., not a party to the lawsuit, extended credit to plaintiff in his margin account. Plaintiff alleged that his relationship with Icahn & Co. was such that he did not permit Icahn & Co. to buy or sell securities in his account without his prior permission. In contrast, plaintiff's margin agreement with clearing broker Cowen & Co. permitted it to liquidate securities in plaintiff's margin account without prior notice to plaintiff. In October 1987, after a precipitous decline in stock prices and a corresponding deterioration in plaintiff's equity in his margin account, Cowen & Co. directed Icahn & Co. to liquidate securities in plaintiff's account to meet Cowen & Co.'s minimum margin requirements. Id. at 505-07. Addressing these facts and the status of Icahn & Co. as introducing broker, the Second Circuit stated the fairly unremarkable position that Icahn & Co. owed a fiduciary duty as an agent of the plaintiff to inform him of Cowen & Co.'s margin call and to give him an opportunity to deposit additional collateral. Id. at 510. The Circuit made clear that Cowen & Co., as plaintiff's creditor, stood in a categorically different relationship with plaintiff.

*10 Here, MLPF & S does not utilize a clearing broker. It is "self-clearing" and as such occupies two roles: that of plaintiff's broker, and that of plaintiff's creditor. As plaintiff's broker, MLPF & S is under a fiduciary duty to execute his transactions at the best prices reasonably available and to offer honest and complete information when recommending the purchase or sale of a security. As plaintiff's creditor, MLPF & S has no fiduciary obligations. This important distinction is lost in plaintiff's argument that MLPF & S had a fiduciary duty to disclose information regarding its retention of interest on collateral and short sale proceeds.

Because the obligations plaintiff seeks to impose on

MLPF & S do not arise from affairs entrusted to the broker as a fiduciary, agent, or trustee of the plaintiff, there can be no claim for breach of fiduciary duty, the "shingle theory," or principles of trust and agency on the facts of this case. Accordingly, plaintiff's third, fourth, and fifth claims are hereby dismissed pursuant to Rule 12(b)(6).

2. Breach of Implied Covenants

In his sixth claim, plaintiff alleges that MLPF & S violated implied covenants of good faith and fair dealing contained in his pledge agreement with MLPF & S. Complaint ¶¶ 51-54. For the reasons set forth below, this claim is also dismissed pursuant to Rule 12(b)(6).

Under New York law, "[a] party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir.1991). "[N]either party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's presumed or reasonable expectations. M/A-COM Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir.1990).

An implied covenant of good faith and fair dealing, however, "arises only out of the known reasonable expectations of the other party which arise out of the agreement entered into. The covenant does not create duties which are not fairly inferable from the express terms of that contract." Interallianz Bank AG v. Nycal Corp., No. 93 Civ. 5024, 1994 WL 177745 (S.D.N.Y.1994), at *8 (citing Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir.1992)).

Here, Bissell attempts to use the implied covenants claim to create additional duties not fairly inferable from the express terms of his pledge agreement with MLPF & S. The customer agreement with MLPF & S that Bissell signed contained the following provision:

Pledge of Securities and Other Property
All securities and other property now or hereafter held, carried or maintained by you in your possession in any of the accounts of the undersigned may be pledged and repledged by you from time to time, without notice to the undersigned, either separately or in common with other such securities

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005630

Page 8

and other property, for any amount due in the accounts of the undersigned, for any greater amount, and you may do so without retaining in your possession or under your control for delivery a like amount of similar securities or other property.

*11 See Exhibit M to Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint ("Def.Mem.").

This pledge agreement does not require payment to plaintiff of any "interest, other profits or economic benefits" earned on customers' property pledged as collateral in connection with short sales, nor does it require disclosure of the fact that MLPF & S may generate revenues from customer collateral and short sale proceeds. Plaintiff's implied covenant theory, if adopted by this Court, would create a duty well beyond the duties inferable from the express terms of the pledge agreement itself. Accordingly, MLPF & S's motion to dismiss Bissell's sixth claim for relief is granted.

3. UCC Claim

In his seventh and final cause of action, plaintiff alleges a claim under New York's Uniform Commercial Code and underlying common law principles. Section 907 of the UCC provides in relevant part:

(2) Unless otherwise agreed, when collateral is in the secured party's possession

* * *

(c) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation....

N.Y. [U.C.C.] Law § 9-207(2)(c) (McKinney 1990). Plaintiff alleges that MLPF & S's practices violate section 9-207(2)(c) of the Code "by neither remitting the profits from the collateral nor by applying such profits in reduction of the secured obligation." Complaint ¶ 58.

Assuming, arguendo, that section 9-207(2)(c) applies to the situation herein [FN8], Plaintiff's claim under section 9-207(2)(c) is clearly barred by the terms of the provision itself. Section 9-207(2)(c) requires the secured party to apply any money received from the collateral to the reduction of the outstanding debt "[u]nless otherwise agreed." See N.Y. [U.C.C.] Law § 9-207(2) (McKinney 1990). The parties here have "otherwise agreed" since at least 1985, when Bissell

arranged with MLPF & S to receive interest based on the short market value of his open short sales. This arrangement is reflected in Bissell's monthly statements, starting with his statement for September 1985. See Exhibit E to Def. Mem. This agreement continued in effect through the filing of MLPF & S's motion to dismiss, and Bissell concedes that he received a total of $44,255.58 in interest in 1989 alone. Complaint ¶ 32. Accordingly, because the parties have "otherwise agreed," Bissell has no claim for relief under section 207 of the UCC, and this claim must be dismissed.

CONCLUSION

For the reasons set forth above, plaintiff's Second Amended Class Action Complaint is dismissed in its entirety with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff's motion for class certification is denied as moot. The Clerk of the Court is directed to close the file in this case.

*12 SO ORDERED.

FN1. The facts alleged in the Complaint are taken as true for the purposes of this motion to dismiss. Facts recited below are derived from the Complaint and from documents to which the Complaint specifically refers, namely, plaintiff's monthly account statements and margin agreement with MLPF & S. Reference to such documents is permitted on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992) (Court may consider documents neither incorporated by reference nor attached to the complaint where the plaintiff "had ... [the documents] either in its possession or had knowledge of ... [them] and upon which [documents] they relied in bringing suit.")

FN2. Although aspects of short sales are regulated by both the SEC and the Federal Reserve Board, no federal law or regulation specifically requires the payment of interest, other profits or economic benefits earned by brokers on customers' property pledged as collateral in connection with short sales. As the SEC staff has stated:

Inasmuch as no NYSE or Commission rule prohibits or explicitly mandates the payment of interest on customer credit balances and monies generated from the lending of customer securities, the payment of such interest is a matter for negotiation between the customer and the broker-dealer.

Singer (Interest to the Client of Short Sales), SEC No-Action Letter, 1979 SEC No-Act LEXIS 3284, at

Copr. © West 1996 No claim to orig. U.S. govt. works

— F.Supp. ——                                                                    Page 9
(Cite as: 1996 WL 465750, *12 (S.D.N.Y.))

*1 (August 12, 1979).

FN3. The rationale for short sales against the box is usually to speculate on the short-term decline of the "shorted" stock while continuing to hold the long position for long-term appreciation, or to defer capital gains taxes (as permitted by the Internal Revenue Code).

FN4. Regulation T of the Federal Reserve Board requires that all short sales be made in a margin account because a short sale, whether a regular short sale or a short sale against the box, involves the collateralized loan of securities on which the broker may charge interest. See Regulation T, 12 C.F.R. 220.4(a). For regular short sales of nonexempt securities, Regulation T requires that customers meet an initial margin requirement of 150 percent of the market value of the security being sold. See 12 C.F.R. § 220.18(c). The New York Stock Exchange ("NYSE") imposes separate maintenance margin requirements for short sales. Se NYSE Rule 431(c); see also Regulation T, 12 C.F.R. § 220.1(b)(2) (permitting exchanges to impose margin requirements above those set by the Federal Reserve Board).

FN5. While there is no initial margin requirement under Regulation T for short sales against the box, the NYSE does impose a maintenance margin requirement on short sales against the box of no less than 5 percent. See NYSE Rule 431(e)(1). NYSE member firms are free to impose higher (but not lower) margin requirements on their own. NYSE Rule 431(d). Thus, in a short sale against the box, the seller is free to withdraw up to 95 percent of the cash proceeds under NYSE Rule 431, but doing so incurs margin debt. See Plaintiff's Memorandum Opposing Defendants' Motion to Dismiss ("Opp.Mem.") at 4. In addition, the remaining five percent of the cash proceeds is available for the broker's use. Id.

FN6. Plaintiff asserts his state law claims under the Court's diversity jurisdiction as well as its supplemental jurisdiction. In a recent letter to the Court, MLPF & S suggests for the first time that the Court reject plaintiff's invocation of diversity jurisdiction and decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367. MLPF & S argues that while the Complaint alleges the parties' diverse domiciles, plaintiff fails to allege the amount in controversy as required under 28 U.S.C. §

1332(a). The Court, however, declines to rule on this basis. The Complaint indicates that the amount in controversy exceeds $50,000. See Complaint ¶ 32 ("Thus, in this single example, MLPF & S misappropriated most, if not all, of $50,174.39 of revenues"). Accordingly, the Court reaches the merits of the arguments regarding dismissal of the state law claims.

FN7. The "shingle theory" denotes the proposition that a broker-dealer, by holding itself out as competent to conduct a brokerage business, owes its customer certain duties, including the duty not to sell securities at prices far in excess of market prices. See, e.g., Charles Hughes & Co., Inc. v. SEC, 139 F.2d 434, 436-37 (2d Cir.1943), cert. denied, 321 U.S. 786, 64 S.Ct. 781 (1944); see also 8 Louis Loss & Joel Seligman, Securities Regulation 3772-98 (3d ed.1991). Recent cases have harmonized the older "shingle theory" cases with the Supreme Court's Rule 10b-5 fraud jurisprudence by identifying both a duty to disclose and a material omission. Loss & Seligman, supra, at 3778. To the extent plaintiff's "shingle theory" claim relies on a violation of section 10(b) and Rule 10b-5, the claim must fail because (1) a breach of fiduciary duty does not give rise to a securities fraud claim merely because it involves a securities transaction, see Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 479-80, 97 S.Ct. 1292, 1304 (1977), and (2) the alleged nondisclosure was not in connection with the purchase or sale of securities, as discussed above. See Levitin, 1996 WL 384912, at *4. To the extent plaintiff merely seeks to rely on breach of a fiduciary duty, the "shingle theory" claim will be considered in tandem with plaintiff's state law fiduciary and agency claims.

FN8. MLPF & S argues that Article 9 of the UCC specifically excludes the transaction in question, that UCC section 9-207(2)(c) does not apply to the "interest, other profits or economic benefits" earned by MLPF & S from its use of plaintiff's collateral, and that Article 9 is preempted by the federal regulatory framework dealing with short sales transactions. However, for the purposes of this motion, the Court will assume that the UCC provision applies and is not preempted, because even if it does apply Bissell still fails to state a claim under the terms of the provision.

END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works



PLEAD005633

Not Reported in F.Supp.
RICO Bus.Disp.Guide 8232
(Cite as: 1993 WL 33643 (S.D.N.Y.))

Page 10

Robert B. BOGART, Plaintiff,

v.

SHEARSON LEHMAN BROTHERS, INC.,
Defendants.

No. 91 Civ. 1036 (LBS), (NG).

United States District Court, S.D. New York.

Feb. 3, 1993.

OPINION AND ORDER

GERSHON, Chief Magistrate Judge:

*1 Plaintiff incurred losses in an options trading account which he maintained at defendant Shearson Lehman Brothers, Inc. ("Shearson"). He now seeks damages from Shearson under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c), 1964 (Claim One), and under various provisions of the securities and commodities laws, 15 U.S.C. §§ 77l (2), 78j(b), 80b-6 (Claims Two, Four and Seven), and 7 U.S.C. § 6o (Claim Six). Relying upon both diversity jurisdiction and pendent jurisdiction, the complaint also alleges that defendant has defrauded plaintiff (Claim Eight), has "acted recklessly" (Claim Nine) and has "acted negligently" (Claim Ten). (Plaintiff has withdrawn Claims Three and Five.)

Defendant seeks dismissal of the complaint. Its post-answer motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure will be treated as a Rule 12(c) motion for judgment on the pleadings. The standard for dismissal remains the same, namely, whether, taking all material facts alleged by plaintiff as true, plaintiff can prove no set of facts which would entitle him to relief. See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir.1977).

The Allegations of the Complaint

Plaintiff alleges that Art Coffin, a broker employed by Shearson, induced him to open an options trading account with Shearson on December 27, 1988, by making the following knowingly false representations:
 a. That Coffin was knowledgeable about options and competent to advise plaintiff about the advisability of various trades;
 b. That Coffin recognized plaintiff to be a small

investor, and that investing with Coffin would be of limited risk because of Coffin's experience, his constant monitoring of the options markets daily on a full time basis, and his various trading strategies;
 c. That Coffin was not like other brokers in that he would never seek to make money by churning; and
 d. All trades by Coffin would be in plaintiff's best interests.

Complaint ¶ 6. Based upon these misrepresentations, plaintiff sent Shearson a check for $200,000. Because of alleged churning of the account, Shearson made commissions of $73,000 and plaintiff sustained "a loss liability (both market value and trading) in the amount of $450,000" on trading in United Airline ("UAL") options. Id. ¶ 8. In early 1990, when plaintiff expressed concern about his potential liability on the UAL options, Coffin made new, false representations to plaintiff in an effort to keep plaintiff's business:
 a. That Coffin would respect plaintiff's explicit request that his entire portfolio not be exposed to risks greater than $100,000 at any time by guaranteeing that no trade would be executed if the "worst case" scenario for that trade, alone or in combination with other trading positions held by plaintiff, permitted a loss of more than $100,000;
 b. That regardless of the $100,000 limit, no trade should ever be executed if there was not enough money in plaintiff's margin account to meet all potential margin calls. In other words, Coffin promised that if plaintiff's margin account, for example, had only $40,000 in it, Coffin would not execute any trade that, alone or in combination with other trading positions held by plaintiff, permitted a loss of more than $100,000; and
 *2 c. That Coffin would make no trade without first informing plaintiff of (i) the present status of his account; and (ii) the "downside" of any such proposed trade.
Id. ¶ 11.

On March 22, 1990, Donald M. Swift, the Shearson Vice-President of Administrative Compliance, wrote to plaintiff to inquire whether plaintiff agreed with the investment strategy being used in his account and plaintiff advised Swift by telephone of the problems described in the complaint. Swift "agreed to look into the matter," but "[t]o plaintiff's knowledge, Swift made no further inquiries thereafter." Id. ¶ 13.

In July and August 1990, the price of UAL stock declined precipitously. As a result, plaintiff instructed Coffin to purchase UAL shares to cover his obligations to buy UAL shares and then to sell all of

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.
(Cite as: 1993 WL 33643, *2 (S.D.N.Y.))

Page 11

his UAL shares as quickly as possible before the price declined further. He also instructed Coffin "to retain plaintiff's UAL 'short puts,' which were rising in value as the price of the stock fell." Id. ¶ 14. Coffin did not comply with these instructions and, on August 30, 1990, "Coffin's superiors at Shearson ordered liquidation of the UAL stock," id. ¶ 15, and, ultimately, contrary to plaintiff's instructions, Shearson closed out plaintiff's account in order to cover the UAL losses. Id. ¶ 18. Plaintiff also alleges, on information and belief, that Coffin hid his misconduct by delaying the mailing of statements to plaintiff. Id. ¶ 17.

Plaintiff identifies as a "Second Scheme to Defraud Plaintiff" the transmittal to him of an arbitration agreement between him and Shearson which bears his forged signature. Id. ¶ 19. He alleges that, "[o]n information and belief, Shearson, either through Coffin or Swift, knowingly provided this forged document to plaintiff in an effort to defraud him of his right to seek redress in the courts." Id. As discussed below, plaintiff's counsel acknowledges that this "Second Scheme," as to which plaintiff has not alleged reliance or injury, is not intended to allege an actionable wrong, but merely to elongate the period of misconduct, for purposes of establishing RICO continuity.

### Shearson's Liability for Securities and Commodities Law Violations
Respondeat Superior.

Shearson's argument that the securities law claims must be dismissed because Shearson cannot be held liable for the acts of its employees is rejected. Under the doctrine of respondeat superior, an employer can be held liable for the securities law violations of its employees. See Marbury Management, Inc. v. Kohn, 629 F.2d 705, 711-16 (2d Cir.), aff'g in part and rev'g in part 470 F.Supp. 509 (S.D.N.Y.1979), cert. denied, 449 U.S. 1011 (1980). A fair reading of the complaint includes sufficient allegations to make it clear that plaintiff is claiming that Shearson, through the securities law violations of Coffin, caused plaintiff to be damaged.

The question to be addressed, however, is whether plaintiff has sufficiently alleged that the securities laws have been violated. The various securities law claims will now be addressed.

### Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6.

*3 Plaintiff correctly notes that the Supreme Court in Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19, 24 & n. 14 (1979), recognized a private right of action for rescission of investment advisory contracts and for restitution of consideration paid under such contracts if they are void under Section 215 of the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-15, for violating a provision of the IAA, including 15 U.S.C. § 80b-6, which plaintiff alleges was violated here. However, plaintiff does not allege that he and Shearson entered into an "investment advisory contract." He merely alleges an agreement he had with Shearson to serve as his broker, and he does not allege that he gave any compensation to Coffin or Shearson other than commissions.

Plaintiff relies on his allegations that he opened an options trading account with Shearson, that Coffin advised him about the advisability of various trades, that Shearson's compliance office wrote to him and asked him to state that he was " 'aware of and in consent with the investment strategy utilized' " in his account and that Shearson sent him a customer agreement which Shearson represented governed the parties' rights. Complaint ¶¶ 6, 8, 13, 19; Pltf.'s Mem. pp. 20-21. From none of these allegations can it be inferred that there existed an investment adviser's agreement with Shearson. On the contrary, it is clear from the complaint that the only consideration alleged to have been paid by plaintiff to Shearson is commissions; there is no allegation of payment of a separate investment adviser's fee.

Plaintiff attempts to overcome this defect by alleging, in paragraph 40 of the complaint that,
> On the basis of Coffin's false representations about his skill and integrity, plaintiff recommended a number of other clients to Coffin. The income derived from these other clients constituted special compensation for Coffin's investment advice to plaintiff, and rendered Shearson an 'investment [adviser]' as that term is defined by 15 U.S.C. § 80b-2(11).

These facts do not allege a contract between plaintiff and Shearson. Nor could plaintiff be entitled to restitution of fees paid by others. The Investment Advisers Act claim is dismissed for failure to state a claim upon which relief may be granted.

### Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.                                                    Page 12
(Cite as: 1993 WL 33643, *3 (S.D.N.Y.))

Section 12(2) imposes liability on persons who offer or sell a security "by means of a prospectus or oral communication" which includes a material omission or misrepresentation. Plaintiff's claim under Section 12(2) relies on oral misrepresentations allegedly made to induce trading by plaintiff of options.

Section 12(2) does not provide a remedy to plaintiff because it does not apply to aftermarket trading. Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 687-93 (3d Cir.), cert. denied, 112 S.Ct. 79 (1991). Accord, e.g., Mix v. E.F. Hutton & Co., Inc., 720 F.Supp. 8 (D.D.C.1989); McCowan v. Dean Witter Reynolds Inc., [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,423 (S.D.N.Y.), appeal dismissed, 889 F.2d 451 (2d Cir.1989); Strong v. Paine Webber, Inc., 700 F.Supp. 4 (S.D.N.Y.1988); SSH Co. v. Shearson Lehman Bros. Inc., 678 F.Supp. 1055 (S.D.N.Y.1987); Ackerman v. Clinical Data, Inc., [1985-86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,207 (S.D.N.Y.1985); Gross v. Diversified Mortgage Investors, 431 F.Supp. 1080, 1095 (S.D.N.Y.1977), aff'd, 636 F.2d 1201 (1980). Contra, e.g., Farley v. Baird, Patrick & Co., 750 F.Supp. 1209, 1218-21 (S.D.N.Y.1990). [FN1]

*4 Plaintiff argues that trading in options closely resembles the purchasing of shares pursuant to an initial public offering, and therefore should receive the protections of Section 12(2). While Section 12(2) will apply in situations analogous to initial offerings, see, e.g., Hedden v. Marinelli, 796 F.Supp. 432, 435-36 (N.D.Cal.1992), plaintiff's attempt to draw a parallel between his trading of options and the initial distribution of securities is unpersuasive. Faced with virtually identical factual allegations, the Court in Mix v. E.F. Hutton & Co., Inc., 720 F.Supp. at 10, observed: "Plaintiffs' Section 12(2) claims, however, are not premised on any misrepresentation or omissions in [the] disclosure documents or in any registration statement, prospectus, or other communication made in connection with the 'initial distribution' of the index options.... [I]t is precisely the lack of such allegations that ... is fatal to plaintiffs' Section 12(2) claims."

Plaintiff has no claim under Section 12(2).

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

Plaintiff alleges that Shearson has engaged in a scheme to defraud him in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §

78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Defendant argues that plaintiff has not adequately pled securities fraud. In order to evaluate this argument, the particular fraud claims made by plaintiff must be analyzed.

A. Churning.

Shearson argues that plaintiff has not adequately pled churning. "Churning is excessive trading in a customer's account, disproportionate to the size and character of the account, for the purpose of increasing the broker's commissions." Franks v. Cavanaugh, 711 F.Supp. 1186, 1190 (S.D.N.Y.1989). If properly pled, allegations of churning can give rise to a claim under Section 10(b). Id. at 1191.

An essential element of a churning claim is that the broker exercised control over the account. Norniella v. Kidder Peabody & Co., Inc., 752 F.Supp. 624, 629 (S.D.N.Y.1990); Franks, 711 F.Supp. at 1191. A plaintiff may satisfy this element either by alleging that his account was discretionary or by pleading other facts which would establish the broker's control. Heller v. Rothschild, 631 F.Supp. 1422, 1425 (S.D.N.Y.1986). See Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1069-70 (2d Cir.1977), cert. denied, 434 U.S. 1035 (1978).

Here, plaintiff has made no allegations that he had a discretionary account or that the broker exercised control over the account. Plaintiff's suggestion that a churning claim can be sustained in the absence of such allegations is rejected.

In sum, in the absence of allegations of control over the account by the broker, plaintiff has not pled churning. And, of course, insofar as plaintiff alleges that Coffin engaged in unauthorized trading in 1990 in UAL stock, he does not allege fraud, but at most breach of contract. Shemtob v. Shearson, Hammill & Co., Inc., 448 F.2d 442, 445 (2d Cir.1971); Pross v. Baird, Patrick & Co., Inc., 585 F.Supp. 1456, 1460 (S.D.N.Y.1984). See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77 (1977).

B. Misrepresentations.

*5 For an action under Section 10(b) to lie, an alleged misrepresentation or omission must have been made "in connection with" the purchase or sale of a security. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). General statements by a broker regarding his ability and skill, made to induce a

Copr. © West 1996 No claim to orig. U.S. govt. works

customer to open an account, are not made "in connection with" the purchase or sale of a security. McCoy v. Goldberg, 748 F.Supp. 146, 150 (S.D.N.Y.1990); Siegel v. Tucker, Anthony & R.L. Day, Inc., 658 F.Supp. 550, 553 (S.D.N.Y.1987). The same applies to general statements made by a broker during the course of a relationship with a customer in order to keep the customer's business. See Siegel, 658 F.Supp. at 552-53. Here, the statements that plaintiff alleges were made by defendant's employee (Complaint ¶¶ 6, 11) are general statements about his knowledge and competence and general assurances that plaintiff's account would be handled in his best interests and so as to minimize risk. They are insufficient to form a basis for a claim under Section 10(b).

C. Forged Arbitration Agreement.

As noted above, although referred to as a "Second Scheme" in the complaint, plaintiff acknowledges that the alleged transmittal of a forged arbitration agreement is not an actionable wrong, as pled, and cannot form the basis for a securities fraud claim.

In sum, none of the plaintiff's claims under the securities laws can withstand the dismissal motion.

Section 4o of the Commodities Exchange Act, 7 U.S.C. § 6o.

Plaintiff's claim of commodities fraud, brought under the Commodities Exchange Act ("CEA"), 7 U.S.C. § 6o, must be dismissed because plaintiff has not shown that he has entered into commodity trades in his Shearson account. Plaintiff correctly argues that trading in stock index futures is covered by the CEA. However, review of plaintiff's account statements, attached to his complaint, reveals no trading in stock index futures. It reveals, rather, trading of "puts" and "calls" of the Standard & Poors 500 Index. By its terms, the CEA does not apply to "any put, call, or other option on one or more securities (as defined in section 77b(1) or 78c(a)(10) of Title 15 on January 11, 1983), including any group or index of such securities, or any interest therein or based on the value thereof." 7 U.S.C. § 2a(i) (emphasis added). Section 78c(a)(10) of Title 15, United States Code, reads (emphasis added): "The term 'security' means any note, stock, treasury stock, ... any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof)...." Thus, in contrast to transactions

involving stock index futures, which are covered by the CEA, transactions involving stock index options are not covered by the CEA. See Chicago Mercantile Exchange v. SEC, 883 F.2d 537, 542-45 (7th Cir.1989), cert. denied, 496 U.S. 936 (1990); Mallen v. Merrill Lynch, Pierce, Fenner & Smith Inc., 605 F.Supp. 1105, 1111 (N.D.Ga.1985).

### RICO

*6 Plaintiff seeks relief under 18 U.S.C. § 1962(c) which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

He alleges that, in furtherance of the fraudulent scheme described in the complaint, "numerous letters were mailed in violation of 18 U.S.C. § 1341, and numerous telephone calls and electronic stock and options trades were made in violation of 18 U.S.C. § 1343." Complaint ¶ 22. Plaintiff identifies, among other things, the monthly statements, annexed as Exhibit A to the complaint, that were mailed to plaintiff and the monies that were mailed or wired by plaintiff to defendant. Id.

Shearson's arguments as to why the plaintiff's RICO claims are insufficient are addressed below. Its arguments that plaintiff has insufficiently pled a RICO enterprise, the requisite predicate acts, continuity and injury are rejected, but, as will be seen, plaintiff has not pled facts from which the liability of Shearson for the acts of misconduct alleged can be inferred, and Shearson cannot be held liable under RICO under the doctrine of respondeat superior.

### 1. Enterprise.

Shearson's argument that plaintiff has not sufficiently pled "enterprise" is based upon a misinterpretation of the requirements for pleading this element of a RICO claim. "Enterprise" is defined in 18 U.S.C. § 1961(4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" Plaintiff alleges that Shearson, Coffin and Swift are an association-in-fact enterprise. This is sufficient under Cullen v. Margiotta, 811 F.2d 698, 729-30 (2d Cir.), cert. denied, 483 U.S. 1021 (1987), where the Court said:

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005637

While we have held that a solitary entity cannot ... simultaneously constitute both the RICO "person" whose conduct is prohibited and the entire RICO "enterprise" whose affairs are impacted by the RICO person, see Bennett v. United States Trust Co., 770 F.2d 308, 315 (2d Cir.1985), cert. denied, [474 U.S. 1058] (1986), we see no reason why a single entity could not be both the RICO "person" and one of a number of members of the RICO "enterprise." ... Indeed, the very terms of [Section] 1962(c) appear to envision that the same entity may be both the RICO "person" and a member of the "enterprise," for the section speaks of a "person ... associated with any enterprise." Thus, though we rejected in Bennett the notion that an entity may be deemed "associated with" only itself, there is neither a conceptual nor a doctrinal difficulty in positing an entity associated with a group of which it is but a part.

2. Mail and Wire Fraud Predicate Acts.

*7 Shearson argues that, having failed to adequately plead securities fraud, plaintiff cannot sustain a claim of mail or wire fraud to establish the necessary predicate acts. This argument is without merit.

Shearson has not moved to dismiss the common law claims, including common law fraud, for failure to state a claim. [FN2] In combination with claims that the alleged fraud was furthered by mailings and wire communications, including the mailings of the account statements attached to the complaint, the complaint adequately states predicate acts. "The offenses of both mail and wire fraud require proof of the same two elements: (1) that defendant participated in a scheme to defraud; and (2) knowingly used the mails (or wires) to further the scheme." Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F.Supp. 411, 424 (S.D.N.Y.1992) (footnote omitted). See, e.g., Beauford v. Helmsley, 865 F.2d 1386 (2d Cir.) (en banc), vacated for reconsideration on unrelated grounds, 492 U.S. 914, original decision adhered to, 893 F.2d 1433 (2d Cir.), cert. denied, 493 U.S. 992 (1989), where common law fraud underlay the predicate act of mail fraud.

3. Continuity.

The Supreme Court in H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989), held that, to satisfy the RICO pattern requirement, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of

continued criminal activity" (emphasis added). In this case, defendant challenges plaintiff's pleading only of the continuity prong of the pattern requirement. "[A] RICO pattern may be adequately pleaded without an allegation that the scheme pursuant to which the racketeering acts were performed is an ongoing scheme having no demonstrable endpoint." Beauford v. Helmsley, 865 F.2d 1386, 1391 (2d Cir.) (en banc), vacated for reconsideration, 492 U.S. 914, original decision adhered to, 893 F.2d 1433 (2d Cir.), cert. denied, 493 U.S. 992 (1989). "What is required is that the complaint plead a basis from which it could be inferred that the acts of racketeering activity were neither isolated nor sporadic." Id. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." H.J. Inc., 492 U.S. at 242.

Plaintiff alleges that he was the victim of a continuing fraudulent scheme beginning in December 1988 when Coffin's misrepresentations induced him to open an account at Shearson. He further alleges that later, in January 1990, Coffin fraudulently induced him to maintain his account. He claims that the misrepresentations were furthered by numerous acts of mail fraud over a twenty- month period continuing until plaintiff's account was closed in August of 1990. See Metromedia Co. v. Fugazy, No. 91-7049, --- F.2d ----, 1992 WL 374039, at *17 (2d Cir. Dec. 17, 1992). Plaintiff also alleges that the transaction of unauthorized trades in his account, in 1990, and the transmittal to him, in December 1990 by fax and in January 1991 by mail, of a forged agreement to arbitrate constitute part of the pattern of racketeering activity. These facts, "external to" the predicate acts, may be used to show continuity and demonstrate the extended period over which a threat of continued racketeering activity existed. United States v. Kaplan, 886 F.2d 536, 542- 44 (2d Cir.1989), cert. denied, 493 U.S. 1076 (1990). Accord Beauford v. Helmsley, 865 F.2d at 1391-92. See Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc., 879 F.2d 10, 17-18 (2d Cir.1989), cert. denied, 493 U.S. 1022 (1990). The allegations of unauthorized trading and forgery amplify the allegations of misrepresentations. Taken together, the totality of the allegations support an inference that the predicate acts were part of continuous conduct sufficient to establish a RICO pattern of racketeering activity.

4. Injury.

*8 Section 1964(c) of Title 18, United States Code,

PLEAD005638

provides a civil cause of action only to "[a]ny person injured in his business or property by reason of a violation of [S]ection 1962."

Shearson's suggestion that a special "RICO injury" must be alleged has been rejected by the Supreme Court. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479 (1985). A plaintiff must show that a violation of Section 1962 proximately caused injury to business or property. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir.1990). Shearson argues that the complaint is inadequate because it does not allege that plaintiff was injured by the sending of the allegedly forged arbitration agreement. But that is of no moment, for plaintiff sufficiently alleges that he was injured by losses in his account that resulted from the violation of Section 1962. No more is required. Sedima, S.P.R.L., 473 U.S. 479; Hecht, 897 F.2d at 23. Cf. Holmes v. Securities Investor Protection Corp., 112 S.Ct. 1311 (1992).

5. Liability of Shearson.

Shearson argues that plaintiff has not pled facts from which its direct liability can be inferred and that the doctrine of respondeat superior is not available under Section 1962(c). Shearson is correct in both arguments.

In arguing that Shearson is directly liable under RICO, plaintiff relies on paragraphs 13, 17, 18 and 23 of the complaint. Paragraph 13, described above at p. 3, can be read to allege that Shearson knowingly permitted Coffin to churn his account even after plaintiff, on one occasion, complained to Donald A. Swift, Shearson Vice-President of Administrative Compliance. This allegation cannot establish Shearson's liability under RICO because plaintiff's allegations do not make out a claim of churning; if plaintiff cannot adequately allege churning by Coffin, he cannot hold Shearson liable under RICO for failing to stop Coffin from churning.

Paragraph 17 alleges that, "On information and belief, Coffin hid this misconduct [unauthorized sales of plaintiff's UAL long puts] by delaying Shearson's mailing of statements to plaintiff. As a result, plaintiff did not know that monies from his Shearson account had been used to meet margin calls." Paragraph 18 alleges that, "Finally, in August of 1990, Shearson, in direct disobedience of plaintiff's orders to the contrary, closed out plaintiff's Shearson accounts and sold plaintiff's $150,000 bond in order to cover the

UAL losses that had been caused by Coffin's misconduct." These allegations do not allege conduct which would support a finding of RICO predicate acts by Shearson. Finally, paragraph 19 alleges that Swift sent plaintiff a forged arbitration agreement, and "On information and belief, Shearson, either through Coffin or Swift, knowingly provided this forged document to plaintiff in an effort to defraud him of his right to seek redress in the courts." Plaintiff acknowledges that this allegation, which does not allege that plaintiff was injured, "is not pleaded for money purposes," but instead is offered solely to establish continuity under the RICO pattern requirement. Pltf.'s Mem. p. 34 n. 11. But even if this allegation were sufficient to establish a predicate act by Shearson, it would be insufficient in itself to establish the required two predicate acts, 18 U.S.C. § 1961(5), and the required pattern of continuous racketeering activity.

*9 Nor may plaintiff rely on the doctrine of respondeat superior to impose liability under Section 1962(c) on Shearson. As stated in Kahn v. Chase Manhattan Bank, N.A., 760 F.Supp. 369, 373 (S.D.N.Y.1991), "The weight of authority in this district and in other circuits is against such an application." E.g., D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964 (7th Cir.), cert. denied, 486 U.S. 1061 (1988); Luthi v. Tonka Corp., 815 F.2d 1229 (8th Cir.1987); Schofield v. First Commodity Corp. of Boston, 793 F.2d 28, 32-34 (1st Cir.1986); Collective Federal Savs. v. Creel, 746 F.Supp. 1307, 1309 (M.D.La.1990); Banque Worms v. Luis A. Duque Pena E Hijos, Ltda., 652 F.Supp. 770 (S.D.N.Y.1986); Levine v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 639 F.Supp. 1391, 1395-96 (S.D.N.Y.1986). I agree that it is not the purpose of RICO to impose liability on legitimate businesses, whose conduct does not establish direct liability, under the doctrine of respondeat superior. See Schofield, 793 F.2d at 31; Levine, 639 F.Supp. at 1395-96.

Common Law Claims

Defendant does not challenge the common law claims except to argue that, in the absence of the federal claims, the common law claims should be dismissed for lack of pendent jurisdiction. Since the complaint asserts diversity jurisdiction under 28 U.S.C. § 1332, and alleges that plaintiff is a citizen of Connecticut and defendant is a Delaware corporation with its principal place of business in New York, diversity jurisdiction will support the common law claims.

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005639

Not Reported in F.Supp.
(Cite as: 1993 WL 33643, *9 (S.D.N.Y.))

Page 16

## CONCLUSION

The motion for judgment on the pleadings is granted to the extent that all claims under the federal securities and commodities laws and under RICO are dismissed. Only the common law claims (identified as the Eighth, Ninth, and Tenth Causes of Action) remain. Any motion for leave to amend the complaint should be made by February 26, 1993.

A pretrial conference will be held on Thursday, March 4, 1993, at 11:30 a.m.

SO ORDERED.

FN1. In Farley, the Court described the issue as "far from clear," 750 F.Supp. at 1221. The Court relied in part on Elysian Federal Savings Bank v. First Interregional Equity Corp., 713 F.Supp. 737 (D.N.J.1989), the reasoning of which was rejected by the Third Circuit in Ballay.

FN2. Shearson did argue that there could be no common law fraud claim based upon plaintiff's allegations of churning (a proposition which plaintiff has not contested). However, Shearson did not challenge the sufficiency of plaintiff's claims of fraudulent misrepresentation in paragraphs six and eleven of the complaint, and on oral argument counsel for Shearson confirmed that Shearson was not arguing that those misrepresentations were insufficient to support a claim of common law fraud.

END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005640

C

PLEAD005641

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 97,349
(Cite as: 1980 WL 1392 (D.C.N.Y.))

Darrell

v.

Goodson.

No. 78 Civ. 5945

United States District Court; S.D. New York.

April 10, 1980

MACMAHON, Chief Judge.

*1 Defendants in this securities fraud case move to dismiss the second amended complaint pursuant to Fed. R. Civ. P. 8, 9(b), 11, and 12(b)(6), and for partial summary judgment, Fed. R. Civ. P. 56.

Plaintiffs, Darrell and Churchill, are former clients of defendant Goodson, Parry, Manko & Costa ("GPMC"), a securities broker-dealer. Defendants Goodson and Parry are two of the firm's principals, and defendant Goodson Farms, Incorporated, is a North Carolina farming corporation.

The original complaint in this action was dismissed December 12, 1978, with leave to file an amended complaint, for failure to allege fraud with particularity as required by Fed. R. Civ. P. 9(b). Plaintiffs' amended complaint was similarly dismissed July 31, 1979, this time pursuant to Fed. R. Civ. P. 8(a)(1), 8(e)(1), and 9(b). Once again we granted plaintiffs leave to replead. The second amended complaint now before the court contains 12 separate claims for relief, relying on federal securities laws, rules of the New York Stock Exchange ("NYSE"), American Stock Exchange ("AMEX"), and the National Association of Securities Dealers ("NASD"), as well as state law.

Counts 1 through 5 sound in fraud, and relate to various practices allegedly used by defendants to attract and retain plaintiff's brokerage business; Count 6 charges defendants with "churning", or excessive purchases and sales in plaintiffs' accounts solely for the purpose of generating brokerage commissions; Counts 7 through 10 relate to the offer and sale of securities in defendant Goodson Farms; Count 11 states a securities fraud claim in connection with the purchase of securities in Alaska Bancorporation; and Count 12 is brought under Section 206 of the Investment Advisers Act, 15 U. S. C. § 80b-6.

We consider first the sufficiency of Counts 1 and 3,

which are fraud claims relating to the opening of plaintiffs' discretionary brokerage accounts at GPMC. They are based on Rule 10b-5 [FN1] as well as the "suitability" and "know your customer" obligations imposed by rules of NYSE, AMEX, and NASD. [FN2] The thrust of these counts is that in order to induce plaintiffs to open brokerage accounts, defendants Goodson, Parry, and GPMC represented to them that their investments would be managed in a conservative and prudent manner, with an emphasis on capital preservation, and that defendants knew when they made them that these representations were false. The complaint goes on to allege that in reliance on these representations, plaintiffs transferred a portion of their investment portfolios to accounts at GPMC in 1976 and 1977. At the time of transfer the market value of Darrell's account was $770,000 and $1,097,000 for Churchill's. Each consisted of cash, tax exempt bonds, U. S. government obligations, and high quality corporate securities.

FN1 15 U. S. C. § 77q(a); 15 U. S. C. § 78j(b); 17 C. F. R. § 240.10b-5.

FN2 NYSE Rule 405; AMEX Rule 411; Article III, §§ 2 and 18 of the NASD Rules of Fair Practice.

*2 Defendants later sold short for plaintiffs' accounts large amounts of Resorts International, Inc., Class A Stock, which was then experiencing extreme price fluctuations. These transactions were assertedly fraudulent in view of the earlier representations as to conservative management. Plaintiffs' positions in this stock were later closed out at substantial losses.

Defendants contend that these claims do not satisfy the requirement for fraud actions brought under Rule 10b-5 that the misrepresentations relied on by plaintiffs be made "in connection with the purchase or sale of a security." [FN3] They argue that any such purchase or sale made in violation of earlier representations was too remote to satisfy the "in connection with" test, citing Wilson v. First Houston Investment Corp. 566 F. 2d 1235 (5th Cir. 1978). [FN4] Wilson involved a promise made to attract a brokerage account that plaintiffs' investments would be managed with the aid of a computer used in market analysis. Several months passed and the value of plaintiff's account declined from over $100,000 to $5,441 without the benefit of a computer. The Court of Appeals for the Fifth Circuit held that any purchase or sale made after plaintiff's account was transferred

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.

(Cite as: 1980 WL 1392, *2 (D.C.N.Y.))

to the defendant investment firm was not closely enough related to the misrepresentations originally alleged to satisfy the "in connection with" requirement.

> FN3 Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723 (1975):

> FN4 See also O'Brien v. Continental Illinois National Bank & Trust Co., 593 F. 2d 54 (7th Cir. 1979).

We agree with this reasoning, and find no significant differences between Wilson and the instant case. The alleged misrepresentations here, consisting of most indefinite promises of conservative management, seem to have been made in connection with defendants' efforts to attract plaintiffs' brokerage business rather than with any subsequent trade in a particular security in plaintiffs' investment portfolios. [FN5]

> FN5 The case primarily relied on by plaintiffs does not require a different conclusion. In Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F. 2d 38 (2d Cir. 1978), a broker-dealer's liability under Rule 10b-5 was premised not on his representations made before the opening of the account as to how it would be invested, but for aiding and abetting the fraud of plaintiff's independent investment adviser.

In the alternative, plaintiffs claim that their discretionary brokerage accounts were themselves "investment contracts" and were therefore "securities" as defined in the Securities Exchange Act of 1934. [FN6] If this is so, then Counts 1 and 3 state valid claims because the misrepresentations alleged in them were clearly made "in connection with" the opening of plaintiffs' accounts.

> FN6 15 U. S. C. § 78c(a)(10).

In SEC v. W. J. Howey Co., 328 U. S. 293 (1946), the Supreme Court defined an investment contract for the purposes of the Securities Act of 1933 as *3 "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." 293 U. S. at 299 (emphasis added). [FN7]

> FN7 Later the Supreme Court indicated that the term "security" is defined virtually identically under the

1933 and 1934 Acts. Tcherepnin v. Knight, 389 U. S. 332, 335-36 (1967).

Although there is some authority to the contrary, [FN8] we believe that a discretionary brokerage account owned by a single customer possesses none of the characteristics of a "common enterprise" required for the existence of an investment contract. A comparison with the Howey case is illuminating in this regard. There, the "common enterprise" was a single citrus farm in which a group of investors bought acreage, and in most cases a service contract as well under which the fruit was raised, harvested and sold. Ownership of the land was clearly secondary to the right to the profits earned from it, and the success of one investor was tied up with that of all the others. Here, in contrast, the success or failure of brokerage accounts at GPMC might vary from individual to individual depending on the particular securities held. There was no pooling of the monies of various investors, which we construe to be necessary to the existence of a "common enterprise." [FN9]

> FN8 Troyer v. Karcagi, CCH FED. SEC. L. REP. P 96,929 (S. D. N. Y. 1979); Johnson v. Arthur Espey, Shearson, Hammill & Co., 341 F. Supp. 764 (S. D. N. Y. 1972); Berman v. Orimex Trading Co., 291 F. Supp. 701 (S. D. N. Y. 1968); Maheu v. Reynolds & Co., 282 F. Supp. 423 (S. D. N. Y. 1967). A number of courts have found the requirement of a "common enterprise" to be satisfied under the theory of "vertical commonality," that is, where the "fortunes of the investor are interwoven with and dependent on the success of those seeking the investments or of third parties." SEC v. Glenn W. Turner Enterprises, Inc., 474 F. 2d 476, 482 n. 7 (9th Cir. 1973). This definition seems to us to ignore the fact that while a broker-dealer may be his customer's agent or fiduciary, in no sense can he fairly be said to be engaged in the same enterprise as his customer, at least where his income is derived solely from commissions and not the relative success of the customer's account.

> FN9 Accord, Hirk v. Agri-Research Council, Inc., 561 F. 2d 96 (7th Cir. 1977); Milnarik v. M-S Commodities, Inc., 457 F. 2d 274 (7th Cir.), cert. denied, 409 U. S. 887 (1972); Wasnowic v. Chicago Board of Trade, 352 F. Supp. 1066 (M. D. Pa. 1972), aff'd without opinion, 491 F. 2d 752 (3d Cir.), cert. denied, 416 U. S. 994 (1974).

Accordingly, we find that plaintiffs' discretionary brokerage accounts were not "securities". Since the misrepresentations attributed to defendants were

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.                                                                    Page 19
(Cite as: 1980 WL 1392, *3 (D.C.N.Y.))

therefore not made "in connection with the purchase or sale" of a security, we grant defendants' motion to dismiss Counts 1 and 3 of the second amended complaint for failure to state a claim upon which relief can be granted. [FN10]

> FN10 The claims brought in Counts 1 and 3 under state law and exchange rules must also be dismissed because they are no longer pendent to a federal claim.

*4 We turn next to Counts 2 and 5. They also are fraud claims based on Rule 10b-5. Count 2 aHeges that in order to retain plaintiff Churchill's brokerage business, defendants GPMC, Goodson, and Parry gave him false "portfolio status reports" which overstated the profits in his account. If the reports had been accurate, Churchill contends, he would have withdrawn his investment portfolio from GPMC. Similarly, Count 5 asserts that in order to retain Darrell's business, defendants promised that no margin transactions would be made in her account. Subsequent trades were made in the accounts of both plaintiffs which are said to be fraudulent in light of these representations.

Defendants maintain that neither of these two counts states a claim upon which relief can be granted because the fraud alleged did not occur in connection with the purchase or sale of a security. [FN11] They correctly point out that the mere retention of a security due to a materially false representation does not by itself constitute a purchase or sale. [FN12] Thus, they go on to assert that the mere retention of plaintiffs' accounts (which we have held in any event are not securities) is insufficient to state a claim under Rule 10b-5.

> FN11 Blue Chip Stamps v. Manor Drug Stores, supra n. 3.

> FN12 Abrahamson v. Fleschner, 568 F. 2d 862 (2d Cir. 1977).

Defendants do not, however, address the question whether subsequent trades of individual securities in plaintiffs' accounts are enough to satisfy the "in connection with" requirement. Reading the complaint in the light most favorable to plaintiffs, we believe they may be. We also find that Counts 2 and 5 are pleaded with sufficient particularity to alert defendants to what plaintiffs' claims are and the grounds upon which they rest, as well as to protect them from harm to their reputations from groundless fraud claims.

[FN13] Accordingly, defendants' motion to dismiss Counts 2 and 5 is denied.

> FN13 Ross v. A. H. Robins Co., No. 79-7106 (2d Cir. September 24, 1979) Slip op. at 18-19.

Defendants next attack the sufficiency of Count 6, which charges "churning" by GPMC, Goodson and Parry. Churning is an excessive amount of trading by a brokerdealer in a client's account in light of its size and purpose, for the sole purpose of generating commission income. Plaintiffs allege that the turnover rate in Darrell's account was 194% in 1977 and 830% in 1978; for Churchill's account the rate is said to have been 420% in 1976, 480% in 1977 and 590% in 1978, resulting in total commissions of $68,662 and $128,363, respectively. Plaintiffs have appended to the second amended complaint a selected list of some of the trades they charge were "churned".

A properly pleaded churning claim is cognizable as a fraud under federal securities law. [FN14] Defendants assert this claim lacks the particularity required by Rule 9(b), however, because plaintiffs have not set out each and every transaction they contend was excessive. We do not agree that it is necessary to do so. The essence of a churning claim is not a particular trade or group of trades, but rather the overall amount of trading in the customer's account in light of such considerations as market conditions, size of commissions and sophistication of the customer. [FN15] The turnover rates in the complaint certainly set out a prima facie case of excessive trading, and we believe it would serve no useful purpose to require plaintiffs to list every transaction. Accordingly, we deny defendants' motion to dismiss Count 6.

> FN14 Newberger Loeb & Co., Inc. v. Gross, 563 F. 2d 1057, 1070 (2d Cir. 1977).

> FN15 See Carras v. Burns, 516 F. 2d 251, 258 (4th Cir. 1975); Fey v. Walston & Co., Inc., 493 F. 2d 1036, 1050 (7th Cir. 1974).

*5 Defendants' next assault on the complaint is aimed at Count 4, which states a fraud claim under Rule 10b-5 based on the allocation of Resorts International shares bought for plaintiff Darrell to the accounts of other customers, and a subsequent allocation to her account of an equal number of shares bought at a higher price. Defendants claim the count is inconsistent with prior pleadings of the same claim, in violation of Fed. R. Civ. P. 11. [FN16]

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.
(Cite as: 1980 WL 1392, *5 (D.C.N.Y.))

Page 20

FN16 Rule 11 provides in pertinent part:
Every pleading of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.
* * * * *
The signature of an attorney constitutes a certificate by him that he has read the pleading;  that to the best of his knowledge, information, and belief there is good ground to support it;  and that it is not interposed for delay.  If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served.

In the first two versions of the complaint, this claim of fraudulent allocation was stated on information and belief;  in the present version it is made on actual knowledge. [FN17]  At this early stage of the action, however, we cannot be sure that such an inconsistency is so great as to render the pleading a "sham" which should be stricken under Rule 11. Accepting as true the allegations of Count 4, moreover, we think it states a clear and particular claim in compliance with Rule 9(b).  We therefore deny the motion to dismiss Count 4.

FN17 As a general rule, fraud claims must be stated on actual knowledge unless the facts giving rise to the claim are peculiarly within the knowledge of the defendant.  Segal v. Gordon, 467 F. 2d 602, 608 (2d Cir. 1972).

Counts 7 through 10 charge defendants with various securities law violations in connection with plaintiffs' purchase of securities in Goodson Farm, Incorporated ("Goodson Farms").  Count 7 alleges that Goodson, GPMC and Goodson Farms made three separate misstatements in connection with their offer of securities in violation of Section 12(2) of the Securities Act of 1933. [FN18]  Defendants contend this count pleads fraud insufficiently in violation of Fed. R. Civ. P. 9(b).

FN18 15 U. S. C. § 77l(2).

A complaint based on Section 12(2), however, need not comply with Rule 9(b) unless its essence is in fact fraud. [FN19]  Count 7 of the second amended complaint satisfies us that it is not a fraud masquerading as something else, and there is consequently no merit to defendants' motion to dismiss.

FN19 Todd v. Oppenheimer & Co., 78 F. R. D. 415

(S. D. N. Y. 1978).

Count 8 asserts that defendants failed to register Goodson Farms securities in violation of Section 12(1) of the Securities Act of 1933. [FN20]  The cases relied on by defendants in support of their motion to dismiss Count 8 are, for various reasons, simply inapposite. [FN21]  Defendants' motion to dismiss it is therefore denied.

FN20 15 U. S. C. § 77l(1).

FN21 Unlike Posner v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 469 F. Supp. 972 (S. D. N. Y. 1979), plaintiffs have made factual allegations to support their claim that defendants violated the registration provisions of the Securities Act of 1933. Dorfman v. First Boston Corp., 336 F. Supp. 1089 (E. D. Pa. 1972), deals only with Section 12(2) of the Act and not Section 12(1), and is therefore inapplicable.

*6 Count 9 asserts that defendants Goodson and Goodson Farms fraudulently induced Churchill to invest $200,000 for Goodson Farms securities, and that neither the shares themselves nor the Stock Purchase agreement evidencing defendants' obligations have ever been delivered.  Although defendants suggest there is "nothing remotely fraudulent, or even improper" raised in these allegations, we disagree and conclude that Count 9 is a well-pleaded claim of fraud.

Count 11 is based on Rule 10b-5 and relates to the allegedly fraudulent failure of GPMC, Goodson, and Parry to disclose to plaintiff Churchill when they arranged his purchase of common stock in Alaska Bancorporation that they suspected that its prospectus was false.  Defendants' motion to dismiss rests on two grounds:  (1) inconsistency with prior pleadings in violation of Fed. R. Civ. P. 11;  and (2) failure to plead fraud adequately, Fed. R. Civ. P. 9(b).

The complaint alleges that Churchill's shares in Alaska Bancorporation were bought "without [his] knowledge or consent."  Defendants contend this is fatally inconsistent with an affidavit submitted by Churchill in opposition to an earlier motion for partial summary judgment, to which was annexed a letter purportedly sent from Churchill to defendant Parry. The letter reads as follows:
I notice that I have a confirmation ticket on Alaska Bank Corporation when, as and if issued.  The confirmation is for 4,000 shares.  If, in fact,

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.                                                    Page 21
(Cite as: 1980 WL 1392, *6 (D.C.N.Y.))

anything adverse turns up on Alaska Bank Corporation, I only want to buy 2,000 shares.

This letter is not wholly inconsistent with the allegation of the complaint that 4,000 shares were later purchased without Churchill's knowledge or consent, although it may serve as at least a partial defense because of Churchill's apparent consent to purchase 2,000 shares in any event. We therefore decline to dismiss Count 11 on the basis of inconsistent pleading.

We are also convinced that Count 11 pleads a claim of fraud upon which relief can be granted. It is certainly difficult to reconcile a broker's suspicion that a prospectus is false with his recommendation that his customer buy the security. It is not necessary for plaintiff to identify what portion of the prospectus was false, since the fraud here alleged lies not in the prospectus but in the broker's failure to reveal his suspicions concerning it. Defendants' motion to dismiss Count 11 is therefore denied.

Finally, defendants move to dismiss Count 12, brought under the Investment Advisers Act, on the ground that they were not "investment advisers" subject to the liabilities imposed by the Act. They also move for partial summary judgment on this count.

While the Act defines an "investment adviser" broadly, [FN22] it excludes from coverage "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." [FN23] Case law interpreting the Act makes clear that in order to have a cause of action, the advisee must make the "special compensation" to the adviser. [FN24] This is the position of the Securities and Exchange Commission as well. [FN25] The complaint does not allege, nor have plaintiffs submitted anything else to suggest, that they paid defendants especially for investment advice. Accordingly, we grant defendants' motion to dismiss Count 12 for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), and deny as moot their motion for partial summary judgment.

FN22 15 U. S. C. § 80b-2(a)(11).

FN23 Id.

FN24 Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, 464 F. Supp. 528, 537-38 (D. Md. 1978); Parsons v. Hornblower & Weeks-Hemphill, Noyes, 447 F. Supp. 482, 487-88 (M. D. N. C. 1977), aff'd, 571 F. 2d 203 (4th Cir. 1978).

FN25 E. F. Hutton & Co., 1979 CCH FED. SEC. L. REP. P 82,000.

*7 To summarize our disposition of the within motions: Defendants' motion to dismiss Counts 1, 3 and 12 of the second amended complaint is granted. The motion to dismiss is denied in all other respects. We also deny as moot defendants' motion for partial summary judgment as to Count 12.

END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works

D

--- F.Supp. ----                                                    Page 28
(Cite as: 1996 WL 469659 (S.D.N.Y.))

Lonnie SHEPPARD, Plaintiff,

v.

TCW/DW TERM TRUST 2000, TCW/DW Term
Trust 2003, Dean Witter Distributors, Inc.,
Dean Witter Intercapital Inc., Dean Witter Reynolds,
Inc., TCW Funds
Management, Inc., Robert A. Day, John C. Argue,
Richard M. DeMartini, Charles
A. Fiumefreddo, John R. Haire, Dr. Manuel H.
Johnson, Paul Kolton, Thomas E.
Larkin, Jr., Michael E. Nugent and David S. Tappan,
Jr., Defendants.
Edmund MERMELSTEIN, Plaintiff,

v.

TCW/DW TERM TRUST 2000, TCW/DW Term
Trust 2003, Dean Witter Distributors, Inc.,
Dean Witter Intercapital Inc., Dean Witter Reynolds,
Inc., TCW Funds
Management, Inc., Robert A. Day, John C. Argue,
Richard M. DeMartini, Charles
A. Fiumefreddo, John R. Haire, Dr. Manuel H.
Johnson, Paul Kolton, Thomas E.
Larkin, Jr., Michael E. Nugent and David S. Tappan,
Jr., Defendants.

No. 94 Civ. 5404 (AGS), 94 Civ. 8865 (AGS).

United States District Court, S.D. New York.

Aug. 16, 1996.

OPINION & ORDER

SCHWARTZ, District Judge:

*1 This is a class action brought by plaintiffs on
behalf of all persons, other than defendants and
related parties, who purchased shares in TCW/DW
Term Trust 2003 ("Trust 2003") during the period
from its inception on or about April 22, 1993 to July
19, 1994 and/or shares in TCW/DW Term Trust 2000
("Trust 2000") during the period from its inception on
or about December 22, 1993 to July 19, 1994 (the
"Class Period"). On behalf of the purported class,
plaintiffs assert violations of Sections 11, 12(2) and 15
of the Securities Act of 1933 (the "1933 Act"), 15
U.S.C. § 77k, 77l(2) and 77o, Section 10(b) of the
Securities Exchange Act of 1934 (the "1934 Act"), 15
U.S.C. §§ 78j(b), and rule 10b-5 thereunder, 17
C.F.R. § 240.10b-5, and Section 13 of the Investment
Company Act of 1940 (the "1940 Act"), 15 U.S.C. §
80a-13.

This matter is before the Court upon defendants'

motion to dismiss the Complaint for failure to state a
claim, pursuant to Federal Rule of Civil Procedure
12(b)(6), and for failure to plead fraud with
particularity, pursuant to Rule 9(b). For the reasons
stated below, defendants' motion is granted.

BACKGROUND

The following facts and contentions appear in the
Complaint and the documents upon which it is largely
based--specifically, the prospectuses for Trust 2000
and Trust 2003. [FN1]

> FN1. The Court shall hereinafter refer to the
> prospectuses for Trust 2000 and Trust 2003 in the
> singular, given that the disclosure in the two
> prospectuses is virtually identical.

Trust 2000 and Trust 2003 are closed-end diversified
management investment companies, commonly known
as Massachusetts business trusts, and were organized
under the laws of the Commonwealth of
Massachusetts (collectively, the "Trusts"). Other
defendants in this action include the Trusts'
investment adviser, TCW Funds Management Inc.;
the manager of the Trusts, Dean Witter InterCapital
Inc.; the underwriter of the offerings, Dean Witter
Distributors, Inc.; the underwriter and manager's
parent, Dean Witter Reynolds, Inc.; and various
individuals who acted, inter alia, as trustees of the
Trusts. Plaintiffs purchased a number of shares in the
Trusts, the value of which declined as interest rates
rose in 1994.

Plaintiffs' allegations of wrong-doing fall into three
categories: (1) the issuance of false statements in
reports filed with the Securities Exchange
Commission ("SEC"), including the prospectus in the
Registration Statements used to market the offerings,
(2) the use of deceptive marketing practices, and (3)
deviation from the fundamental policies of the Trusts
without a shareholder vote. Plaintiffs claim that, had
the defendants accurately disclosed the investment
policies of the Trusts and accurately described the
investments and the composition of the portfolios of
the Trusts and the risks associated therewith, they
would not have invested in the Trusts or would not
have paid the prices they paid. In addition, plaintiffs
assert that, had the defendants adhered to the
fundamental policies of the Trusts, plaintiffs would
not have suffered the loss of over 20% of their
investments.

The investment objectives of the Trusts, as stated in

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.Supp. ----
(Cite as: 1996 WL 469659, *1 (S.D.N.Y.))

the prospectus, were to provide a high level of current income and return $10 per share, the initial public offering price, to shareholders on the termination date. According to statements in the prospectus, these objectives were to be achieved by investing in high quality fixed-income securities, such as mortgage-backed securities, asset-backed securities, zero coupon securities of municipal issuers, other municipal securities and debt securities of non-U.S. issuers, which had a final or expected maturity on or about the termination date of the respective trust. The prospectus stated that, under current market conditions, the Trusts expected that approximately 85% of their total assets would be invested in mortgage-backed securities, such as those issued by the Government National Mortgage Association, the Federal National Mortgage Association, and the Federal Home Loan Mortgage Corporation, private mortgage pass-through securities, collateralized mortgage obligations, including inverse floaters, stripped mortgage-backed securities and asset-backed securities; while approximately 15% of their assets would be invested in zero coupon securities of municipal issuers and other municipal securities. It was further disclosed that the Trusts could invest up to 25-30% (25-40% for Trust 2000) of their assets in inverse floaters. Investors were also informed that the Trusts could borrow or utilize leverage in an amount not to exceed 33.3% of total assets, including the amount borrowed.

*2 Plaintiffs allege that the Trusts were marketed to investors by emphasizing the credit quality of the securities while obscuring the Trusts' reliance on mortgage-backed derivatives and the magnitude of the interest rate risk of the portfolio, which interest rate risk overwhelmed the safety presented by the credit quality of the portfolio. According to plaintiffs, the prospectus failed to disclose that the initial structures of the Trusts' portfolios were biased toward a declining interest rate scenario and that such bias ensured that the Trusts would suffer severe losses in the event of a rise in interest rates. In addition, plaintiffs claim that, although the Trusts' intent to invest in inverse floaters was disclosed, such disclosure was misleading and the potential volatility of inverse floaters was cloaked in "meaningless corporate terms." Compl. ¶ 31. Plaintiffs further allege that the dollar weighted average maturity of the Trusts' portfolios were 21 and 18 years, respectively, and that this represented a departure from the Trusts' fundamental policies, without the Trusts' having conducted the requisite shareholder vote.

Defendants move to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that (1) plaintiffs have failed to allege any material misrepresentations or omissions, (2) plaintiffs have failed to plead facts suggesting scienter, in violation of Federal Rule of Civil Procedure 9(b), and (3) the Trusts have not violated any fundamental policy.

DISCUSSION

In ruling on a motion to dismiss the Complaint for failure to state a claim, plaintiffs' factual allegations must be taken as true, and the Court may only grant the motion where no set of facts could support plaintiffs' claim. International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 71 (2d Cir.1995). The Court may take into consideration documents upon which the Complaint relies and which are integral to the Complaint, such as the trust prospectuses, without converting the motion to one for summary judgment. See id. at 72.

I. Plaintiffs' 1933 Act and 1934 Act Claims

Sections 11 and 12(2) of the 1933 Act, 15 U.S.C. 77k & 77l(2), and Section 10(b) of the 1934 Act and Rule 10(b)(5) thereunder, 15 U.S.C. § 78j, 17 C.F.R. § 240.10b-5, all require plaintiffs to identify a false statement of material fact or the omission of a material fact. See I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir.1991). Section 11 of the 1933 Act holds, inter alia, a signer, officer of an issuer, or underwriter liable for a registration statement "contain[ing] an untrue statement of a material fact or omit[ing] to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(2) of the 1933 Act prohibits any person from offering or selling a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(2). [FN2] To state a claim under Section 10(b) of the 1934 Act, plaintiffs must allege that defendants made a false statement or omitted a material fact, with scienter, and that plaintiffs' reliance on defendants' action caused plaintiffs injury. San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 808 (2d Cir.1996). Because the Court finds that the Trusts truthfully represented and adequately

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.Supp. ---

(Cite as: 1996 WL 469659, *2 (S.D.N.Y.))

disclosed their investment strategies and the inherent risks therein, plaintiffs' claims under these statutes must be dismissed.  See In re Hyperion Secs. Litig., 93 Civ. 7179 (MBM), 1995 WL 422480 *5 (S.D.N.Y. July 14, 1995).

> FN2. Section 15 of the 1933 Act holds controlling persons liable for Section 11 and 12(2) violations "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist."  15 U.S.C. § 77o.

**\*3** Plaintiffs allege that the prospectus "obscur[ed] the Trust's reliance on mortgage backed derivatives and the magnitude of the interest rate risk of the portfolio...."  Compl. ¶ 20.  However, the prospectus twice stated that approximately 85% of trust assets would be invested in mortgage-backed securities and specifically warned potential investors of the risk related to an increase in interest rates.  For example, the prospectus warned:

> mortgage-backed and asset-backed securities may decrease in value as a result of increases in interest rates and may benefit less than corporate debt securities from decreases in interest rates.
>
> Because the Trust is concentrated in mortgage-backed and asset-backed securities, it is more susceptible to factors affecting such securities than is an investment company that is not concentrated in these securities.

Notice of Motion, Ex. A (Trust 2003 prospectus) at 8; see also id. at 20 ("Mortgage-backed securities generally decrease in value as a result of increases in interest rates and may benefit less than other fixed income securities from declining interest rates because of the risk of prepayment").  The prospectus further stated:

> The value of the Trust's portfolio securities, and therefore the Trust's net asset value per share, will increase or decrease due to various factors, principally changes in prevailing interest rates and the ability of the issuers of the Trust's portfolio securities to pay interest and principal on such obligations.  Net asset value generally increases when interest rates decline, and decreases when interest rates rise, although this is not always the case.

Id. at 10.  Thus, the prospectus fully disclosed that the Trusts were particularly susceptible to an increase in interest rates, due to the concentration of their assets in mortgage-backed and asset-backed securities, and that if interest rates were to rise, the net asset value of the Trusts would most likely decline.

Plaintiffs claim that such disclosures were mere boiler-plate and that the prospectus should have characterized the types of mortgage-backed securities in which the Trusts invested as "exotic mortgage derivatives."  In the alternative, plaintiffs argue that the disclosures were buried or not given adequate prominence.

The Court disagrees.  Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested.  See In re Donald J. Trump Casino Secs. Litig., 7 F.3d 357, 375 (3d Cir.1993), cert. denied, 114 S.Ct. 1219 (1994) ("plaintiffs cannot successfully contend that the prospectus is actionable because it failed to describe its debt-equity ratio as either 'unwarranted' or 'excessive' "); Goldberg v. Meridor, 567 F.2d 209, 218, n. 8 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249 (1978) ("We do not mean to suggest that § 10(b) or Rule 10b-5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives").  Nor does the Court find that the prospectus' disclosure of the risks related to such securities constituted "a vague or blanket (boilerplate) disclaimer."  Kline v. First Western Gov't Secs., Inc., 24 F.3d 480, 489 (3d Cir.1994), cert. denied, 115 S.Ct. 613 (1994).  The prospectus described in detail each type of mortgage- backed security in which the Trusts might invest, including collateralized mortgage obligations ("CMO's"), inverse floaters--a class of CMO's, and stripped mortgage-backed securities.  In addition to describing particular risks related to certain types of mortgage-backed securities, the prospectus included a section entitled "Risk Factors Relating to Mortgage-Backed Securities".  The risks recited in this section relate, inter alia, to the rate of prepayment on the underlying mortgage loans, changes in interest rates, and changes in the amounts available for reinvestment by the Trust and are described in a detailed, intelligible manner.  For example, the pre-payment risk was described as follows:

> **\*4** Among the major differences [between mortgage-backed securities and traditional debt securities] are that interest and principal payments are made more frequently, usually monthly, and that principal may be prepaid at any time because the underlying mortgage loans or other assets generally may be prepaid at any time.  As a result, if the Trust purchases such a security at a premium, a prepayment rate that is faster than expected will reduce yield to maturity, while a prepayment rate that is slower than expected will have the opposite

Copr. © West 1996 No claim to orig. U.S. govt. works

effect of increasing yield to maturity. Alternatively, if the Trust purchases these securities at a discount, faster than expected prepayments will increase, while slower than expected prepayments will reduce, yield to maturity.

... [A]s a general rule prepayments on fixed rate mortgage loans will increase during a period of falling interest rates and decrease during a period of rising interest rates. Accordingly, amounts available for reinvestment by the Trust are likely to be greater during a period of declining interest rates and, as a result, likely to be reinvested at lower interest rates than during a period of rising interest rates. Mortgage-backed securities generally decrease in value as a result of increases in interest rates and may benefit less than other fixed income securities from declining interest rates because of the risk of prepayment.

Notice of Motion, Ex. A at 19-20.

In addition to such disclosures relating to mortgage-backed securities, the prospectus described specific risks associated with asset-backed securities, id. at 20 ("credit card receivables generally are unsecured and the debtors are entitled to the protection of a number of state and federal consumer credit laws, including the bankruptcy laws, some of which may reduce the ability to obtain full payment"), zero coupon securities, id. at 21 ("the market prices of zero coupon securities are more volatile than the market prices of securities of comparable quality and similar maturity that pay interest periodically and may respond to a greater degree to fluctuations in interest rates than do such non-zero coupon securities. Many of the types of zero coupon securities in which the Trust may invest are currently categorized as illiquid under guidelines of the staff of the Securities Exchange Commission") and non-U.S. securities, id. at 23 ("risks include fluctuations in foreign exchange rates ..., future political and economic developments, and the possible imposition of exchange controls or other foreign governmental laws or restrictions" ...).

In short, the Court finds that the prospectus sufficiently disclosed the risks related to the types of securities in which the Trusts would invest, including the interest rate risk. Such disclosures were not buried or given inadequate prominence in the prospectus; rather, they constituted an integral part of the information presented to potential investors. Moreover, given the prospectus' repeated statements that approximately 85% of the Trusts' assets would be invested in mortgage-backed securities and that "mortgage-backed and asset- backed securities may

decrease in value as a result of increases in interest rates," id. at 8, 20, the Trusts' alleged "bias" toward a declining interest rate scenario was clear to any potential investor who read the prospectus. The fact that, instead of declining, interest rates rose does not make the prospectus actionable under the securities laws.

*5 Plaintiffs also assert that the Trusts' intent to invest in inverse floaters was disclosed "in a misleading manner so as to leave the impression that inverse floaters were a means to enhance income, hedge the Trusts' portfolios and preserve capital rather than as an integral part of the portfolio." Compl. ¶ 30. To the contrary, the prospectus summary stated up front that "[t]he Trust may also invest in inverse floaters in an amount up to 25-30% [25-40% for Trust 2000] of its total assets." Notice of Motion, Ex. A at 5, Ex. B at 5. There is no support for plaintiffs' contention that the prospectus failed to disclose that inverse floaters would constitute an integral part of the portfolios. [FN3] Moreover, the risks associated with investing in inverse floaters were repeatedly disclosed in the prospectus. See id. at 5 ("[i]nverse floaters exhibit greater price volatility than the majority of mortgage pass-through securities or CMOs"), 18 ("Inverse floaters have coupon rates that typically change at a multiple of the changes of the relevant index rate.... the value of inverse floaters will decrease as interest rates increase.... In addition, some inverse floaters exhibit extreme sensitivity to changes in prepayments").

FN3. Plaintiffs concede that during the Class Period, Trust 2003 had 21% of its total assets invested in inverse floaters, a percentage that is within the range set forth in the prospectus.

Plaintiffs further allege that defendants made material misrepresentations concerning the dollar weighted average maturities of the portfolios. Plaintiffs point to the following passage in the prospectus:

The Trust will seek to return $10 per Share to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] by preserving capital through the active management of its portfolio of securities, by investing in high quality fixed income securities which have a final or expected maturity on or about the termination date of the Trust.... Under current market conditions, the initial dollar weighted average maturity of the Trust's assets is expected to be approximately 8 to 12 years [5 to 10 years for Trust 2000].

Notice of Motion, Ex. A at 4, Ex. B at 4. Plaintiffs

Copr. © West 1996 No claim to orig. U.S. govt. works

state that, during the Class Period, the dollar weighted average maturities of Trust 2003 and Trust 2000's assets was 21 years and 18 years, respectively. See Compl. ¶¶ 23-24. Plaintiffs assert that "[d]efendants failed to disclose that what was being referred to by average maturity was not the maturity date on the face of the instrument (a fixed ascertainable objectively measured date), but was instead a subjective estimation based on uncertain assumptions of prepayments of principle," compl. ¶ 25, and that "[d]efendants concealed from investors the specific prepayment assumptions under which they had calculated that the weighted average life of the securities in the portfolio coincided with the termination date of the Trust," which assumptions were "unreasonable in light of the rising interest rate scenarios prevailing in the United States in late 1993 and 1994." Compl. ¶ 26.

The Court first notes that the prospectus did not refer to the maturity date on the face of the instruments in which the Trusts would invest; rather, it referred to the "final or expected maturity". Nowhere did the prospectus represent that the Trusts would invest only in shorter-term securities or securities that would mature by the Trusts' dates of termination. Nor did the prospectus in any way suggest that the securities in the Trusts' portfolios would, in the aggregate, have a particular weighted average maturity over the entire term of each trust. Indeed, the phrasing of the sentence that followed: [u]nder current market conditions, the initial dollar weighted average maturity of the Trust's assets is expected to be approximately 8 to 12 years, signalled to investors that the term "weighted average maturity" referred to a calculation that shifted as interest rates and market conditions changed. Moreover, this passage must be read in context: the prospectus contained several discussions relating to the prepayment risk of mortgage- backed and asset-backed securities. The prospectus summary, under "Special Risk Considerations", stated "[p]repayment rates are influenced by changes in current interest rates and a variety of other economic, geographic, social and other factors. In general, changes in the rate of prepayments on a mortgage-backed or asset-backed security will change the yield to maturity of the security." Notice of Motion, Ex. A at 7. Thus, it was clear that the dates on which the securities in the Trusts' portfolios would mature depended on the rate at which the underlying mortgages were prepaid, which, in turn, depended on changes in interest rates and other factors.

*6 Second, plaintiffs' allegation that defendants

concealed from investors the specific prepayment assumptions under which they had calculated the weighted average life of the securities in the Trusts' portfolios does not state a claim. Such internal calculations and projections are not material facts that are required to be disclosed. See In re Lyondell Petrochemical Co. Secs. Litig., 984 F.2d 1050, 1052-53 (9th Cir.1993); In re Convergent Technologies Securities Litig., 948 F.2d 507, 516 (9th Cir.1991). Moreover, plaintiffs do not allege that defendants' internal calculations were "belied by [defendants'] actual knowledge of contradictory facts" at the time it was made. Hershfang v. Citicorp, 767 F.Supp. 1251, 1257 (S.D.N.Y.1991). Plaintiffs allege no facts from which one could infer that defendants lacked a good faith basis for the calculations of the portfolios' initial weighted average maturity. Plaintiffs merely assert that defendants' assumptions were "unreasonable in light of the rising interest rate scenarios prevailing in the United States in late 1993 and 1994"--after shares in the Trusts were offered. Compl. ¶ 26. Failure to predict a rise in interest rates does not constitute fraud and cannot be the basis for alleging misrepresentations or omissions of material facts. See Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978) ( "while greater clairvoyance in 1973 might have led to a realization that foreign governments and enterprises might encounter difficulties ... failure to make such perceptions does not constitute fraud").

Plaintiffs attempt to introduce new allegations of misconduct in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaints. "Allegations made outside of the complaint are not properly before the court on a motion to dismiss." In re Colonial Ltd. Partnership Litig., 854 F.Supp. 64, 79 (D.Conn.1994); see also Morgan Distrib. Co., Inc. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir.1989). However, even if the new allegations were properly before the Court, they would not survive defendants' motion.

First, plaintiffs claim that investors were misled by statements in the Trusts' Sales Brochures and prospectus to the effect that the "Trust may borrow or utilize leverage in an amount not exceeding 33 1/3 % of its total assets." Affidavit of Lee Squitieri ("Squitieri Aff."), Ex. 3 & 4. Plaintiffs allege that during the Class Period the Trusts borrowed nearly 1$ for every 2$ of investor funds, for a leverage ratio of nearly 50%. However, such a leverage ratio is not inconsistent with the plain language of the prospectus--the "single most important document and

Copr. © West 1996 No claim to orig. U.S. govt. works

perhaps the primary resource an investor should consult." [FN4] Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1030 (2d Cir.1993). The prospectus twice states that "[t]he Trust may borrow or utilize leverage ... in an amount not exceeding 33 1/3 % of its total assets (including the amount borrowed)." Notice of Motion, Ex. A at 4, 29, Ex. B at 4, 29 (emphasis added). As defendants point out, "[b]ecause (as the quoted language specifies) the percentage of leverage is calculated by including the amount borrowed in the definition of 'total assets,' borrowing one dollar for every two dollars of investor funds is 33 1/3 % leverage, not 50%." Defendants' Reply Mem. of L. at 6.

> FN4. Potential investors in the Trusts were instructed to consult the prospectus "[f]or complete information." Squitieri Aff., Ex. 3 & 4.

*7 Second, plaintiffs belatedly claim that defendants "fail[ed] to disclose the risk of the lack of liquidity of the Trusts' investments." Plaintiffs' Mem. of L. at 2. However, defendants point out that, as stated in the prospectus, the Trusts are closed-end investment companies, which "do not face the prospect of having to liquidate portfolio holdings in the event of net redemptions or having to maintain cash positions to meet potential redemptions." Notice of Motion, Ex. A at 12. [FN5] Moreover, the prospectus disclosed that

> FN5. Investors were also warned of the risk that trust shares could trade at a discount to net asset value: "[t]he Trust cannot predict whether its own Shares will trade at, below, or above net asset value. The Trust is designed primarily as a long-term investment and not as a trading vehicle." Id.

[a]lthough the Adviser expects that substantially all of the Trust's investments will be in securities for which an established resale market exists, there is no overall limitation on the percentage of illiquid securities which may be held by the Trust. Liquidity of a security relates to the ability to easily dispose of the security and the price to be obtained and does not generally relate to the credit risk or likelihood of receipt of cash at maturity. Illiquid securities may trade at a discount from comparable, more liquid securities. Illiquid securities in which the Trust may invest include certain stripped securities, interest rate swaps, certain hedging instruments and restricted securities of corporate and other issuers.

Id. at 9. Thus, the prospectus disclosed that the

Trusts were authorized to invest in illiquid securities and that investment in such securities carried with it certain risks. The Court finds that such disclosure was sufficient.

In sum, the prospectus clearly "bespeaks caution" in that the various risks inherent in purchasing shares in the Trusts were adequately disclosed. Indeed, the disclosures warned potential investors about the very contingency that came to pass--a rise in interest rates. See I. Meyer Pincus, 936 F.2d at 763; In re: Hyperion Securities Litig., 1995 WL 422480 at *7. Accordingly, plaintiffs' claims under the 1933 Act and the 1934 Act fail to state a cause of action and must be dismissed pursuant to Rule 12(b)(6).

In addition, the Court finds that plaintiffs' Section 10(b) claim fails to satisfy the requirements of Federal Rule of Civil Procedure 9(b) as to pleading fraud with particularity and may be dismissed, in the alternative, pursuant to this Rule. [FN6] Rule 9(b) requires that:

> FN6. Defendants argue that plaintiffs' claims under Section 11, 12(2) and 15 of the 1933 Act may also be dismissed pursuant to Rule 9(b). Rule 9(b) applies to claims made under these sections to the extent that such claims "sound[ ] in fraud, a conclusion which may be assumed if the alleged misstatements are those generally referred to earlier in the complaint." Moran v. Kidder Peabody & Co., 609 F.Supp. 661, 666 (S.D.N.Y.1985), aff'd, 788 F.2d 3 (2d Cir.1986). However, in this case, plaintiffs have specifically not incorporated by reference allegations of intentional and/or reckless misconduct in Counts II and III of the Complaint alleging violation of Sections 11, 12(2) and 15. See Compl. ¶¶ 50, 58.

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity....
Fed.R.Civ.P. 9(b).

In order to satisfy the requirements of Rule 9(b) in pleading a cause of action under Section 10(b) and Rule 10b-5, plaintiffs must allege not only in what respects the statements at issue were false, but also "facts that give rise to a strong inference of fraudulent intent." San Leandro, 75 F.3d at 812. Plaintiffs may establish scienter by either (1) identifying circumstances indicating conscious or reckless behavior by the defendants or (2) alleging facts that show a motive for committing fraud and a clear opportunity for doing so. Id. at 813. Plaintiffs need only plead "circumstances that provide at least a

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005653

minimal factual basis for their conclusory allegations of scienter." Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir.1994). However, plaintiffs do not enjoy a license to base claims of fraud on speculation and conclusory allegations. Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990).

*8 Plaintiffs contend that they have alleged facts giving rise to an inference that defendants knew of or recklessly disregarded information that contradicted statements made in the prospectus. However, since the Court finds that the Complaint fails sufficiently to allege that statements in the prospectus were false or misleading (either affirmatively or through omissions), plaintiffs' allegations also fail to establish an inference of reckless or conscious misbehavior on the part of defendants in making such statements. The Complaint also lacks any allegation of facts demonstrating either motive or the opportunity to commit fraud, much less both. Accordingly, plaintiffs have failed to plead fraudulent intent, in violation of Rule 9(b), and their Section 10(b) and Rule 10b-5 claim must be dismissed on this ground as well.

## II. Plaintiffs' 1940 Act Claims

Section 8 of the 1940 Act directs an investment company to recite in its Registration Statement "all investment policies of the registrant ..., which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy." 15 U.S.C. § 80a-8(b)(2) & (3). Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities." 15 U.S.C. § 80a-13.

Plaintiffs allege that defendants deviated from the Trusts' fundamental policies, without shareholder authorization, by investing in fixed income securities other than those "which have a final or expected maturity on or about the termination of the Trust". Plaintiffs refer the Court to the following paragraph in the prospectus:

The investment objectives of the Trust are to provide a high level of current income and return $10 per Share (the initial public offering price) to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] (the termination date of the Trust). The Trust will seek to provide a high level of current income by investing in high quality fixed income securities which are either (i) issued or guaranteed by the U.S. Government or its agencies or instrumentalities or

(ii) at the time of investment rated Aaa by Moody's or AAA by S & P or are determined by the Adviser to be of comparable quality to such rated securities. The Trust will seek to return $10 per Share to shareholders on or about December 31, 2003 [December 31, 2000 for Trust 2000] by preserving capital through the active management of its portfolio securities, by investing in high quality fixed income securities which have a final or expected maturity on or about the termination date of the Trust, and through retaining tax-exempt income from investments in zero coupon securities of municipal issuers and net income earned on any other municipal securities in which it may invest. The foregoing investment objectives are fundamental policies of the Trust and may not be changed without the approval of a majority of the outstanding voting securities of the Trust.

*9 Notice of Motion, Ex. A at 13-14. The prospectus elsewhere refers to the Trusts' "investment objectives" as being (1) to provide a high level of current income and (2) return $10 per share to investors on or about the termination date. See id. at 3, 12.

The Court finds that, under the plain language of the prospectus, the fundamental policies of the Trusts are the two investment objectives noted above. The Trusts' intention to preserve capital by investing in fixed income securities which have a final or expected maturity on or about the time of termination is merely a strategy by which the Trusts will "seek to return $10 per Share to shareholders" at termination, not a fundamental policy. No other interpretation of the quoted text is reasonable. The first sentence of the passage states that the "investment objectives of the Trust are [1] to provide a high level of current income and [2] return $10 per Share (the initial public offering price) to shareholders" on or about the termination date of the Trust. Thus the "investment objectives" constitute these two goals. The language that follows explains the Trusts' strategies for reaching such goals. The last sentence of the paragraph states that "the foregoing investment objectives are fundamental policies" of the Trust. Only the two goals noted above are labelled "investment objectives" in this paragraph and elsewhere in the prospectus; therefore, only these objectives--and not the strategies for attaining them-- are fundamental policies. Plaintiffs do not allege that defendants deviated from these two fundamental policies. Accordingly, plaintiffs' 1940 Act claim must be dismissed. [FN7]

Copr. © West 1996 No claim to orig. U.S. govt. works

--- F.Supp. ----
(Cite as: 1996 WL 469659, *9 (S.D.N.Y.))

FN7. Having found that plaintiffs fail to allege that the Trusts deviated from their fundamental policies, the Court need not address the disputed issue of whether Section 13(a)(3) of the 1940 Act provides a private right of action.

CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), is granted. The Clerk of the Court is directed to close this case.

SO ORDERED.

END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works

E

PLEAD005656

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 92,979
(Cite as: 1986 WL 198 (W.D.Wash.))

Page 22

NAYE, et al.
v.
BOYD, et al.

No. C83-771R.

United States District Court, W.D. Washington.

Oct. 20, 1986.

On Motion for Summary Judgment

ROTHSTEIN, District Judge:

*1 This Matter comes before the court on a motion by defendants Seafirst Corporation and Seattle-First National Bank for summary judgment against class plaintiffs. Defendants Arthur Andersen & Company, John W. Nelson and John R. Boyd join in this motion. Having carefully considered the memoranda and other materials submitted in support of and in opposition to this motion, having heard oral argument, and being fully advised, the court finds and rules as follows:

I. FACTUAL BACKGROUND

This litigation arises as a result of certain large energy loan losses suffered by defendant Seafirst Corporation's principal subsidiary, defendant Seattle-First National Bank (collectively "Seafirst"). A class of investors who purchased Seafirst Corporation common stock during the period from February 16, 1981 to July 13, 1982 ("class plaintiffs") asserts claims for securities fraud under § 10(b) of the Securities Exchange Act, 15 U.S.C. 78j(b), and Securities & Exchange Commission Rule 10b-5, 17 C.F.R. & 240.10b-5, against Seafirst, numerous former officers, directors and employees of Seafirst Corporation or Seattle-First National Bank, and the accounting firm of Arthur Andersen & Company.

More specifically, class plaintiffs allege that Seafirst misrepresented or failed to disclose material facts concerning its energy lending activities in news releases and in corporate publications including its 1980 and 1981 Annual Reports, its quarterly reports issued in 1981 and the first quarter of 1982, and all parallel 10K and 10Q reports filed with the Securities & Exchange Commission. Class plaintiffs further assert, among other things, that in these news releases and publications, Seafirst disseminated false and misleading financial statements which overstated Seafirst's earnings; expressed unjustified optimism about the future of Seafirst; misrepresented various aspects of its energy lending program, including the effectiveness of internal controls on loan quality and documentation as well as the experience and expertise of energy lending personnel; and failed to disclose numerous facts about the management of Seafirst's energy loan portfolio which were necessary to render the statements which Seafirst did make not misleading under the circumstances.

Seafirst now moves for summary judgment on the grounds that: (1) class plaintiffs have alleged no basis for holding corporate entities like Seafirst primarily liable for securities fraud; (2) class plaintiffs' claims are not cognizable under federal securities law because they are essentially allegations of corporate mismanagement; (3) as a matter of law, Seafirst did adequately disclose to the investment market all material facts concerning the energy lending program; and (4) as a matter of law, Seafirst's loan loss reserves were established in good faith on a reasonable basis.

II. LEGAL ARGUMENT

A. Corporate Liability

Seafirst asserts that class plaintiffs have failed to allege any basis on which Seafirst can be held liable for securities fraud. Because corporations are incapable of acting except through their agents, Seafirst argues, they cannot be held primarily under any statute prohibiting conduct undertaken with scienter. Seafirst further argues that the doctrine of respondeat superior, which might otherwise apply to render Seafirst liable for the acts of its agents, is inapplicable in federal securities fraud actions. For purposes of a Rule 10b-5 action, that doctrine has been supplanted by the "controlling person" theory of liability under § 20 of the Securities Exchange Act, 15 U.S.C. § 78t(a). See, e.g., Christoffel v. E.F. Hutton & Co., 588 F.2d 665, 667 (9th Cir.1978). Since class plaintiffs do not allege that Seafirst is a "controlling person," Seafirst contends that they have set forth no basis for liability.

*2 Class plaintiffs simply respond that actions by a corporation's officers or other agents in furtherance of the corporation's business are considered the actions of the corporation itself. However, class plaintiffs do not explain how this principle differs from respondeat superior, which the Ninth Circuit has found to be supplanted in the context of securities fraud suits. Id.

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.
(Cite as: 1986 WL 198, *2 (W.D.Wash.))

Page 23

Seafirst raises an interesting question which does not appear to have been addressed in the caselaw. However, after due consideration, the court concludes that even though a corporation is incapable of action except through agents, it can be held directly responsible for securities fraud under some circumstances.

According to the statutory language, § 10(b) of the Securities Exchange Act prohibits the use of manipulative or deceptive devices by "any person" in connection with the purchase or sale of a registered security. Under § 3(a)(9) of the Act, 15 U.S.C. § 78c(a)(9), the term "person" is defined to include any "company" regardless of incorporation. Thus, the language of the Act appears to contemplate the possibility of violations by a corporation. Like § 10(b), Rule 10b-5 also prohibits securities fraud by "any person," including a corporation.

Numerous Ninth Circuit decisions include findings of direct corporate liability under Rule 10b-5. See, e.g., Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283 (9th Cir.1984); Bell v. Cameron Meadows Land Co., 669 F.2d 1278 (9th Cir.1982); Arrington v. Merrill Lynch, Pierce, Fenner & Smith, 651 F.2d 615 (9th Cir.1981); Little v. Valley National Bank of Arizona, 650 F.2d 218 (9th Cir.1981); Kiernan v. Homeland, Inc., 611 F.2d 785 (9th Cir.1980). These cases contemplate that a corporation may act with scienter, even though scienter on the part of a corporation clearly must derive from the states of mind of those acting on behalf of the corporation. See Kehr, 736 F.2d at 1286; Bell, 669 F.2d at 1282-83; Arrington, 651 F.2d at 619-20; Little, 650 F.2d at 222-23; Kiernan, 611 F.2d at 787-88.

It is true that the scope of potential direct corporate liability for securities fraud may be narrower than that following from the concept of respondeat superior. For example, a corporation might be held directly responsible based on actions by senior management personnel, but not as a result of the conduct of lower level employees. Cf. Sharp v. Coopers & Lybrand, 649 F.2d 175, 182 n. 8 (3d Cir.1981), cert. denied, 455 U.S. 938 (1982) ("Officers are able to make policy and generally carry authority to bind the corporation. Their action in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior.") A corporation might also be held directly responsible for actions that are intrinsically corporate and bear the imprimatur of the corporation itself, such as purchase and sale of corporate assets or issuance of

reports in the name of the corporation. Cf. Securities & Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 857-64 (2d Cir.1968) (en banc), cert. denied sub nom. Coates v. Securities & Exchange Commission, 394 U.S. 976 (1969) (corporate responsibility for press release).

*3 In this case, class plaintiffs allege that Seafirst misrepresented or failed to disclose material facts in certain annual and quarterly reports issued to shareholders as well as in parallel reports filed with the Securities & Exchange Commission. These reports were produced under the guidance of senior management and purported to be communications on behalf of Seafirst as a whole. The court concludes that class plaintiffs have alleged a sufficient basis for finding Seafirst directly liable for securities fraud.

B. Mismanagement

Seafirst seeks summary judgment on the grounds that the central thrust of class plaintiffs' claims is actually not securities fraud but corporate mismanagement and that, therefore, the claims are not cognizable under federal securities law.

The primary authority for Seafirst's position is Santa Fe Industries v. Green, 430 U.S. 462 (1977). In that case, the United States Supreme Court held that federal securities law does not provide a right of action for internal corporate mismanagement or breach of fiduciary duty, which are matters traditionally committed to state law. In other words, federal securities laws are meant to address injuries resulting from transactional fraud and not from corporate mismanagement. Dixon v. Ladish Co., 597 F.Supp. 20, 23 (E.D.Wis.1984), aff'd sub nom. Kademian v. Ladish Co., 792 F.2d 614, 621 (7th Cir.1986). A breach of fiduciary duty without any deception, misrepresentation or nondisclosure does not violate § 10(b) or Rule 10b-5. Santa Fe, 430 U.S. at 476.

Moreover, no degree of artful pleading should be allowed to transform what is essentially a mismanagement case into a securities fraud claim cognizable under federal law. See e.g., Panter v. Marshall Field & Co., 646 F.2d 271, 289 (7th Cir.), cert. denied, 454 U.S. 1092 (1981); Hundahl v. United Benefit Life Insurance Co., 465 F.Supp. 1349, 1365-66 (N.D.Tex.1979); Kademian, supra. Thus, absent some form of deception, allegations that a defendant failed to disclose mismanagement are not sufficient to state a cause of action for securities

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005658

Not Reported in F.Supp.
(Cite as: 1986 WL 198, *3 (W.D.Wash.))

Page 24

fraud. Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978). Federal securities law does not impose any duty to publicly admit to misconduct or to characterize one's behavior as culpable. Atchley v. Qonaar Corp., 704 F.2d 355, 358 (7th Cir.1983); Warner Communications, Inc. v. Murdoch, 581 F.Supp. 1482, 1490 (D.Del.1984). However, this does not alter a defendant's duty to disclose all material facts necessary to cure misleading statements. Id.

The crucial question then in determining whether defendants' actions meet the requirement of deception for purposes of federal securities law is whether the conduct of which class plaintiffs complain involves the omission or misrepresentation of material facts or whether it simply states claims for mismanagement or breach of fiduciary duty under state law. Panter, 646 F.2d at 288.

The court now examines class plaintiffs' specific allegations. In order to facilitate discussion of the many statements which class plaintiffs have alleged to be false or misleading, the court has divided them into six categories:

*4 1. Financial Statements

Class plaintiffs contend that Seafirst's financial statements and other public releases of information concerning loan loss reserves and earnings during the relevant period were false and misleading becasue Seafirst failed to disclose that, in calculating the loan loss reserves, it recklessly did not consider various factors which would have resulted in the establishment of a materially higher loan loss reserve and correspondingly lower earnings.

Pursuant to the ruling in Santa Fe, the court concludes that none of class plaintiffs' allegations concerning the financial statements is cognizable under federal securities law because, putting aside the artful pleading, they have not asserted anything more than state law causes of action for mismanagement. There is no dispute that the published financial statements accurately reflected the amount of loan loss reserves and earnings as calculated by Seafirst; the gist of class plaintiffs' claims is instead that the loan loss reserves themselves were not calculated properly, resulting in overstated earnings. On their face, such claims only raise issues concerning internal corporate mismanagement.

But class plaintiffs seek to clothe their

mismanagement contentions in securities fraud garb by asserting that the financial statements were false and misleading in that defendants did not disclose their reckless failure to take into account factors which, properly considered, would have led to the establishment of a higher loan loss reserve. The law is clear that a plaintiff cannot transform a mismanagement cause of action into a securities fraud case "by alleging that the disclosure philosophy of [§ 10(b) and Rule 10b-5] obligates defendants to reveal either the culpability of their activities, or the impure motives for entering the allegedly improper transaction." Panter, 646 F.2d at 288.

The court finds further support for its conclusion in the fact that any inquiry into class plaintiffs' contentions about the adequacy of the loan loss reserve would require the court to evaluate Seafirst's business judgment to determine whether Seafirst did indeed engage in imprudent banking practices. This sort of inquiry overlaps and poses a distinct possibility of interfering with the province of state corporate law. Such interference is precisely what the ruling in Santa Fe sought to avoid.

2. Characterization of Loan Loss Reserves

Class plaintiffs attack three statements in Seafirst's 1980 and 1981 Annual Reports characterizing the loan loss reserves as maintained "at a conservative level," and a statement by defendant Jenkins in the 1981 Second Quarter Report to the Shareholders that "the provision for loan losses was raised to accommodate a higher level of loan losses associated with current economic conditions." [FN1] Class plaintiffs allege that these statements were false and misleading because they failed to disclose that the loan loss reserves were inadequate and that Seafirst had recklessly not taken into account various factors in the course of calculating the reserves.

*5 Again the court concludes that, with regard to these statements, class plaintiffs are essentially alleging Seafirst's failure to disclose its own mismanagement with regard to the loan loss reserves. Therefore, as discussed above, Section II.B.1., they are not cognizable under federal securities law.

3. Optimistic Prognoses Regarding Seafirst Future

Under this category, the court has grouped a number of statements which, for want of a better term, it will call optimistic prognoses. [FN2] Typical of the tenor of these statements are the following quotes from

PLEAD005659

Not Reported in F.Supp.                                                                 Page 25
(Cite as: 1986 WL 198, *5 (W.D.Wash.))

defendant Jenkins. In Seafirst's 1980 Annual Report, he stated that "Seafirst is a strong regional bank with a significant national and worldwide presence. There is every reason to believe Seafirst will continue to be an important banking institution, and we intend to make that happen. The future belongs to those who anticipate and plan." The following year in the 1981 Annual Report, Jenkins said that "[o]ur record is good in anticipating and dealing with these difficult periods, and I believe we are well prepared to meet the new challenges.... We have been preparing in advance for these changes and we will face them squarely and, I am confident, successfully."

Class plaintiffs contend that these statements and others like them were false and misleading because Seafirst had not anticipated problems and prepared itself adequately for the future. On the contrary, according to class plaintiffs, Seafirst had engaged in imprudent banking practices in connection with its energy loans. Furthermore, Seafirst failed to disclose material facts concerning its energy lending program which were necessary to make the challenged statements not misleading under the circumstances.

The court finds none of Seafirst's optimistic prognoses actionable under federal securities law. For one thing, the statement included in this category are all so vague and devoid of concrete information that the court is hard pressed to believe any reasonable investor would rely on such obvious puffing to make an investment decision.

Furthermore, the gist of class plaintiffs' claims concerning these statements is once again mismanagement and not securities fraud. Stripped to its core, class plaintiffs' complaint in this regard basically alleges that Seafirst failed to disclose its own imprudence and mistakes in the management of its energy lending program; such allegations are not cognizable under federal securities law. To paraphrase Gaines v. Haughton, 645 F.2d 761, 779 (9th Cir.1981), "[a] contrary holding would place an unwarranted premium on the form rather than the substance of [class plaintiffs'] complaint and, moreover, would represent a move toward the federalization of corporate law that the Supreme Court has repeatedly and emphatically rejected."

4. Statements On Earnings and Loan Growth

This category includes various statements favorably characterizing Seafirst's earnings and loan growth. [FN3] For example, in a news release dated July 15,

1981, defendant Jenkins stated that "[o]ur second quarter results reflected fundamental earnings strength." In a news release dated April 15, 1982, Jenkins said: "Seafirst was able to show a good earnings gain over a year ago although this comparison is against a relatively weak quarter a year earlier, ... Loan growth over a year ago was the primary positive factor in the earnings gain."

*6 Again, class plaintiffs allege that these and other similar characterizations were false and misleading in that Seafirst failed to disclose various problems with its energy lending program. And again, the court concludes that the gist of class plaintiffs' contentions is not securities fraud arising as a result of the publication of these statements, but Seafirst's underlying mismanagement of its energy lending portfolio leading to massive loan losses.

5. Experience and Expertise of Energy Lending Personnel

Class plaintiffs point to several statements in Seafirst's 1980 Annual Report which relate to the experience and expertise of its energy lending personnel:

For Seafirst Corporation, involvement in energy production goes back many years. A formal Energy Department devoted exclusively to this area was established shortly after Seattle-First became involved in financing the Alyeska pipeline project in Alaska.

Today we have customers in many areas of the energy industry, including equipment manufacturers, oil field servicers and suppliers, domestic and foreign producers of energy from many different fuel sources.

* * *

... [B]anks will tend to specialize in the future, concentrating on market segments where they have special strengths and where they are most productive, and therefore, most profitable.

* * *

... [S]upport of energy-related businesses [is an] important aspect of Seafirst's commitment to the future. In 1979 Seafirst established an Energy Department within the World Banking Division to work with customers involved in every phase of the energy industry. Seattle-First National is the only bank in the Pacific Northwest with a separate department to meet the financing needs of equipment manufacturers, oil field servicers and suppliers of

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005660

Not Reported in F.Supp.
(Cite as: 1986 WL 198, *6 (W.D.Wash.))

domestic and foreign producers of energy. [FN4]

Seafirst's 1980 Annual Report also stated as follows concerning its provision of direct financing services in the energy lending program:

In terms of the first assignment—supporting the development of new energy production—we have several roles in providing direct financing services for the exploration, production and distribution of energy from coal, gas, oil and nuclear sources. Typical services would include short term credit lines, term loans, production payment loans, equipment leasing, letters of credit, export financing, plus a number of other specialized financial services and bank service consulting. [FN5]

Class plaintiffs allege that the above-quoted statements were false and misleading because they conveyed the false impression that Seafirst had a large amount of experience and expertise in energy lending when, in fact, the supervisors and lending officers of the Energy Department had little or no expertise and there were no petroleum engineers on staff to evaluate proposed loans and collateral. Class plaintiffs also assert that the quote regarding the provision of direct financing services was misleading because in the case of many energy loans, Seafirst purchased participations concerning which it had no contact with the underlying borrowers and performed no credit evaluations.

*7 The court concludes that class plaintiffs have stated a cause of action for securities fraud with regard to these statements. Unlike the allegations involving the preceding categories of statements, class plaintiffs' contentions here focus on specific declarations of fact which are allegedly directly contradictory to the truth of Seafirst's situation. Unlike the preceding allegations, class plaintiffs do more than accuse Seafirst of not having revealed its mismanagement; they point to specific underlying facts which Seafirst allegedly should have disclosed in order to render the statements made not false and misleading.

6. Loan Quality and Documentation

In its 1981 Annual, Report, Seafirst stated as follows:

Loan quality control continues to be a key focus of Seafirst's loan administration. The loan portfolio is monitored by an experienced staff of loan examiners, including both loan site examinations and regular

reporting reviews. Also, a system has been in place for several years to detect potential problem loans and ensure corrective action. Finally, should a loan require specialized attention, a centralized staff of loan specialists is assigned to the loan until problems are resolved. [FN6]

In the same report, Seafirst also said that "[c]onservative policies regarding early charge-off of poor quality credits is reflected in the record of loan loss recoveries as a percentage of total loan losses." [FN7] Class plaintiffs allege that these statements were false and misleading because they conveyed the false impression that Seafirst had internal controls in place to ensure high loan quality, the collection of adequate documentation and the discovery of problem loans when, in fact, controls were seriously deficient or nonexistent. [FN8]

As to these statements and for the same reasons as stated above, Section II.B.5, the court finds that class plaintiffs have stated a sufficient cause of action for securities fraud as opposed to mere mismanagement.

C. Adequate Disclosure

Even assuming that class plaintiffs have stated a cause of action for securities fraud based on the statements they selected from Seafirst's publications and news releases, Seafirst contends that adequate disclosure of all relevant information occurred by other means including briefings to securities analysts, newspaper announcements of energy loan participations, and other news articles concerning Seafirst's energy lending activities. Seafirst contends that the total mix of information available to the investment community through all sources, not just the statements on which class plaintiffs focus, constituted sufficient disclosure.

After considering the evidence submitted by Seafirst in support of its argument, especially the affidavit of Mitchell Day, director of investor public relations for Seafirst, together with class plaintiffs' response, the court concludes that genuine issues of material fact remain to be decided concerning the adequacy of the disclosure. Therefore, summary judgment is not appropriate.

*8 D. Reasonableness of Loan Loss Reserve

Given the result reached above by the court regarding class plaintiffs' allegations of securities fraud as to the loan loss reserves, Section II.B.1., it is not necessary

Copr. © West 1996 No claim to orig. U.S. govt. works

Not Reported in F.Supp.                                                                    **Page 27**
(Cite as: 1986 WL 198, *8 (W.D.Wash.))

to address Seafirst's contention that the establishment      and 72.
of the loan loss reserves was done reasonably and in
good faith.                                                  FN3. See id. at ¶¶ 3, 4, 14, 18, 27, 35, 39, 41, 45,
                                                             51, 56, 57, 60, 65, 66, 69.
III. CONCLUSION
                                                             FN4. See id. at ¶¶ 7, 8 and 9.
 For the reasons stated, the court GRANTS in part
and DENIES in part defendant Seafirst's motion for          FN5. Id. at ¶ 6.
summary judgment.
                                                             FN6. Id. at ¶ 64.
 IT IS SO ORDERED.
                                                             FN7. Id. at ¶ 63.
    FN1. See Part 1., ¶¶ 10, 32 and 61 of Class
    Plaintiffs' Combined Response to Defendants'            FN8. Class plaintiffs also contend that the first
    Interrogatories, Exhibit A to the Affidavit of William  statement quoted tends to convey the false impression
    M. Jenkins in Support of Motion for Summary             that Seafirst had much more experience and expertise
    Judgment filed on January 9, 1986.                      in energy lending than was in fact true.

    FN2. See id. at ¶¶ 2, 5, 22, 31, 48, 49, 55, 58, 59      END OF DOCUMENT

Copr. © West 1996 No claim to orig. U.S. govt. works

PLEAD005662