S. Hrg. 108–245

# TERRORISM FINANCING: ORIGINATION, ORGANIZATION, AND PREVENTION

# HEARING

BEFORE THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

JULY 31, 2003

Printed for the use of the Committee on Governmental Affairs



U.S. GOVERNMENT PRINTING OFFICE

89–039 PDF

WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON GOVERNMENTAL AFFAIRS

SUSAN M. COLLINS, Maine, *Chairman*

| | |
|---|---|
| TED STEVENS, Alaska | JOSEPH I. LIEBERMAN, Connecticut |
| GEORGE V. VOINOVICH, Ohio | CARL LEVIN, Michigan |
| NORM COLEMAN, Minnesota | DANIEL K. AKAKA, Hawaii |
| ARLEN SPECTER, Pennsylvania | RICHARD J. DURBIN, Illinois |
| ROBERT F. BENNETT, Utah | THOMAS R. CARPER, Delaware |
| PETER G. FITZGERALD, Illinois | MARK DAYTON, Minnesota |
| JOHN E. SUNUNU, New Hampshire | FRANK LAUTENBERG, New Jersey |
| RICHARD C. SHELBY, Alabama | MARK PRYOR, Arkansas |

MICHAEL D. BOPP, *Staff Director and Counsel*
DAVID A. KASS, *Chief Investigative Counsel*
MARK R. HEILBRUN, *General Counsel and National Security Advisor to Senator Arlen Specter*
JOYCE A. RECHTSCHAFFEN, *Minority Staff Director and Counsel*
DAVID BARTON, *Minority Professional Staff Member*
AMY B. NEWHOUSE, *Chief Clerk*

# CONTENTS

| Opening statements: | Page |
| --- | --- |
| Senator Collins | 1 |
| Senator Specter | 3 |
| Senator Akaka | 13 |
| Senator Lautenberg | 16 |
| Senator Coleman | 17 |
| Senator Levin | 18 |
| Senator Pryor | 22 |
| Senator Carper | 24 |

## WITNESSES

### Thursday, July 31, 2003

| | |
| --- | --- |
| John S. Pistole, Acting Assistant Director for Counterterrorism, Federal Bureau of Investigation | 4 |
| R. Richard Newcomb, Director, Office of Foreign Assets Control, U.S. Department of the Treasury | 7 |
| Dore Gold, Former Israeli Ambassador to the United Nations, and President, Jerusalem Center for Public Affairs | 25 |
| Jonathan M. Winer, Alston and Bird | 28 |
| Steven Emerson, Executive Director, The Investigative Project | 31 |

### ALPHABETICAL LIST OF WITNESSES

| | |
| --- | --- |
| Emerson, Steven: | |
| Testimony | 31 |
| Prepared statement | 131 |
| Gold, Dore: | |
| Testimony | 25 |
| Prepared statement with attachments | 77 |
| Newcomb, R. Richard: | |
| Testimony | 7 |
| Prepared statement with attachments | 54 |
| Pistole, John S.: | |
| Testimony | 4 |
| Prepared statement | 45 |
| Winer, Jonathan M.: | |
| Testimony | 28 |
| Prepared statement | 110 |

### APPENDIX

| | |
| --- | --- |
| Council on American-Islamic Relations (CAIR), Nihad Awad, Executive Director, prepared statement with an attachment | 176 |
| Questions and Responses for the Record from: | |
| Mr. Pistole | 180 |
| Mr. Newcomb | 185 |
| Mr. Gold | 190 |
| Mr. Winer | 192 |
| Mr. Emerson | 194 |

# TERRORISM FINANCING: ORIGINATION, ORGANIZATION, AND PREVENTION

### THURSDAY, JULY 31, 2003

U.S. SENATE,
COMMITTEE ON GOVERNMENTAL AFFAIRS,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:16 a.m., in room SD–342, Dirksen Senate Office Building, Hon. Susan M. Collins, Chairman of the Committee, presiding.

Present: Senators Collins, Coleman, Specter, Levin, Akaka, Carper, Lautenberg, and Pryor.

### OPENING STATEMENT OF CHAIRMAN COLLINS

Chairman COLLINS. The Committee will come to order.

Today, the Committee on Governmental Affairs is holding a hearing on the financing of terrorism. Terrorism costs money. From funds needed to buy explosives and airline tickets, to living expenses, to payoffs to the families of suicide bombers, terrorists must have constant and untraceable sources of money. Stopping the flow of these funds is a formidable task. Osama bin Laden is an experienced financier who once reportedly boasted that he and other al-Qaeda leaders know the cracks in the Western financial system like the lines on their own hands.

Immediately after the September 11 attacks, the President took strong action to close the gaps in our financial system by issuing Executive Order 13224 to block terrorist funds. Nevertheless, serious questions persist about whether we are doing enough. There are even more serious questions about whether some of our allies are doing enough.

Last year, the Council on Foreign Relations issued a report contending that U.S. efforts to curtail terrorism financing are impeded, "not only by a lack of institutional capacity abroad but by a lack of political will among American allies."

The report concludes that our government appears to have responded to this lack of will with a policy decision not to use the full power of our influence and legal authority to compel greater cooperation.

A key nation in the fight against terrorist financing is Saudi Arabia. It appears that from the joint inquiry by the House and Senate Intelligence Committees, which examined the kingdom's role in terrorist financing, that it is difficult to tell for sure exactly what the extent of the Saudi involvement is because almost an entire chapter regarding foreign support for the September 11 hijackers is classified. Even the parts that were published, however, raise seri-

(1)

7

Saudi officials to address a number of the issues that may arise in this hearing today.

That would conclude my opening statement.

Senator SPECTER. OK. Thank you very much, Mr. Pistole.

Our next witness is Rick Newcomb, who is the Treasury Office of Foreign Assets Control Director. Thank you for joining us, and we look forward to your testimony.

### TESTIMONY OF R. RICHARD NEWCOMB,[1] DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF THE TREASURY

Mr. NEWCOMB. Thank you, Senator Specter, Madam Chairman, Members of the Committee. I am pleased to have the opportunity to testify this morning about our efforts to combat terrorist support networks that threaten U.S. citizens and property worldwide.

The threat of terrorist support networks and financing is real. It has been our mission to help identify and disrupt these networks. There is much we know about how radical Islamic terrorist networks are established and still thrive. Wealthy individuals and influential individuals and families based in the Middle East have provided seed money and support to build a transnational support infrastructure that terrorists have used for their purposes. This network, fueled by deep-pocket donors and often controlled by terrorist organizations, their supporters, and those willing to look the other way, includes or implicates banks, businesses, NGOs, charities, social service organizations, schools, mosques, madrassas, and affiliated terrorist training camps and safe houses throughout the world.

The terrorist networks are well entrenched, self-sustaining, though vulnerable to the United States, allied, and international efforts applying all tools at our disposal. Today, I will explain our efforts being implemented in coordination with other Federal agencies, including the Departments of Defense, State, Justice, Homeland Security, the FBI, the intelligence community, and other agencies to choke off the key nodes in the transnational terrorist support infrastructure.

The primary mission of the Office of Foreign Assets Control of the Treasury Department is to administer and enforce economic sanctions against targeted foreign countries and foreign groups and individuals, such as terrorists, terrorist organizations, and narcotics traffickers, which pose a threat to the national security, foreign policy, or economy of the United States. We act under the general Presidential wartime and national emergency powers, as well as specific legislation, to prohibit transactions and block or freeze assets subject to U.S. jurisdiction. The origin of our involvement in the fight against terrorism stems from the initial conception of terrorism as being solely state-sponsored. Our mandate in the realm of terrorism was to compile available evidence establishing that certain foreign entities or individuals that were owned or controlled by, or acting for or on behalf of, a foreign government subject to an economic sanctions program. Such entities and individuals be-

---

[1] The prepared statement of Mr. Newcomb with attachments appears in the Appendix on page 54.

8

came known as SDNs and are subject to the same sanctions as the foreign government to which they are related.

The President harnessed these powers and authorities in launching the economic war against terrorism in response to the terrorist attack of September 11 and pursuant to the powers available to the President under the International Emergency Economic Powers Act. President Bush issued Executive Order 13224, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," declaring that acts of grave terrorism and threats of terrorism committed by foreign terrorists pose an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. This order prohibits U.S. persons from transacting or dealing with individuals or entities owned or controlled, acting for or on behalf of, assisting or supporting, or otherwise associated with persons listed in the Executive Order and those designated under the Executive Order as specially designated global terrorists.

After the September 11 attacks, President Bush rallied the international community to unite in the economic war on terrorism. The U.S. Government has worked with the United Nations to pass resolutions that parallel U.S. authorities to designate entities supporting al-Qaeda. The international community, including our allies in the Persian Gulf, joined us and have committed to fully cooperating on all fronts against al-Qaeda and its supporters. On a regular basis, for example, the United States works cooperatively with Saudi authorities on issues relating to the war on terrorism. In some areas, cooperation is routine and systematic. In others, especially those touching aspects of terrorist financing and infrastructure, which touches all aspects of government, coordination is more complex.

We have acted with Saudi Arabia and other allies in targeting al-Qaeda and other terrorist infrastructure. These actions have included a number of multilateral efforts that many times resulted in notifying and listing at the United Nations under United Nations Security Council Resolutions 1267 and 1455.

Some of the terrorist supporters we targeted include financial networks, including the al-Barakaat network, a Somalia-based hawala operator that was active worldwide. And the Muslim Brotherhood-backed Nasreddin financial services network. Other efforts have targeted charitable fronts based in the United States, including the Benevolence International Foundation, Global Relief Foundation, and the Holy Land Foundation, and foreign-based charitable fronts including branch offices of the Revival of Islamic Heritage Society and the Afghan Support Committee. We also acted with our allies against major al-Qaeda-affiliated organizations such as Jemaa Islamiyah.

In the coming months, we are seeking to significantly expand these efforts and impact the implementation of the President's authorities under the Executive Order by adopting a more systematic approach to evaluating the activities of major terrorist organizations in various regions. This approach will focus on identifying key nodes that sustain the abilities of terrorist organizations to remain operational despite successful actions by the United States and its

9

allies to capture and arrest terrorists, cell members, leaders, and operational planners.

In furtherance of this end, we have initiated a collaborative effort with the Department of Defense and other agencies to develop information and strategies against terrorist financing and infrastructure. Last fall, we began a pilot project with the U.S. Pacific Command and other DOD elements that identified terrorist support networks in Southeast Asia and selected key nodes or priority targets in these networks. The project focused special attention on al-Qaeda network affiliates in PACOM's AOR, including Jemaa Islamiyah, which subsequently carried out the Bali bombings, and the Abu Sayaff Group and others. This approach identified the key leaders, fundraisers, businessmen, recruiters, companies, charities, mosques, and schools that were part of its support network. Thus far, we have imposed sanctions against two of these key nodes and are coordinating actions against several others.

This process is the model that we are seeking to continue and expand in the collaborative efforts with DOD agencies and the combatant commands. We are working with USEUCOM headquarters. Meetings in the near future are planned to lay the groundwork for a continuing joint project. We also plan to begin projects with the Central Command Southern Command shortly thereafter. Working with these commands and other agencies provides us and DOD partners with, in effect, a force multiplier that brings together a variety of counterterrorism tools and resources to enhance opportunities for future efforts.

Taking a regional approach, following the various command's areas of responsibility, this effort will seek to identify and isolate the key nodes of the transnational terrorist support infrastructure in the respective AORs. This approach seeks to provide the opportunity to cripple an entire organization at one time through our implementation of the President's authority in coordination with possible actions in other departments and agencies and in cooperation with our allies at the UN.

We have already taken steps to implement this approach in some regions. For example, we are working with other DOD agencies, including the Office of Naval Intelligence, to fully identify the terrorism support infrastructure in the Horn of Africa. In this region, shipping and related drug-smuggling activities appear to be strengthening the terrorist networks in this area. Working with ONI provides us the opportunity to work with analysts who have unique experience in other areas less accessible to us.

I have today a few graphical representations of the key nodes approach that could be applicable to a terrorist support network in any region. It is related in Appendix 2 of my written testimony. Charts 1 and 2 are examples of the various steps of the funding process. Donors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist

10

groups or members of the extremist group with responsibility for liaising with charitable organizations.

Chart 2 is a theoretical model of how the key nodes of the terrorist support structure can be more systematically identified in their respective levels of participation in the funding network.

Chart 3 is a model of a terrorist support network with the key nodes highlighted that we believe economic sanctions could effectively impact. These include financial, leadership, and influence nodes, which are color-coded in red, blue, and green. Influence nodes can include individuals and institutions that provide spiritual or other guidance or serve as recruitment centers.

Chart 4 shows theoretically how designation and——

Senator SPECTER. Before you leave Chart 3, what does Chart 3 show?

Mr. NEWCOMB. Chart 3 shows in green the financial targets, in red the leadership targets, in purple the influence targets. And by using an effects-based targeting approach, we are able on an interagency basis to identify who the key leaders of these various participating entities are so that when taking them out, we can result in Chart 4, which shows theoretically how designation will isolate the key nodes of Chart 3 and sever the critical ties within the overall network and thereby disrupt its overall functioning. By removing these key nodes of the support structure, the leadership, the influence, the financial, the terrorist group is unable to mobilize people and resources in support of terrorists, thus rendering it ineffective.

The funds necessary for a terrorist organization to carry——

Senator SPECTER. Mr. Newcomb, you are double time now plus. Would you sum up? And we will go to Q and A.

Mr. NEWCOMB. I have perhaps another minute.

Senator SPECTER. OK.

Mr. NEWCOMB. The funds necessary for a terrorist organization to carry out an attack often are minimal, but the support infrastructure critical for indoctrination, recruitment, training, logistical support, the dissemination of propaganda, and other material requires substantial funding. The President's power under Executive Order 13224, as well as other legislation, provide the United States with authorities that are critical to attacking this threat posed by these terrorist organizations. Our effectiveness in implementing these authorities requires strong coordination with other U.S. departments and agencies and support from U.S. allies under United Nations Security Council Resolutions 1267 and 1455.

Terrorist organizations including al-Qaeda, the Egyptian Islamic Jihad, Jemaa Islamiyah, Al-Ittihad Al-Islamiyya, Hamas, Hizbollah, and others rely on their infrastructure for support and to shield their activities from scrutiny. The secretive nature of their activities and their frequent reliance on charitable, humanitarian, educational, and religious cover are vulnerabilities we can exploit by making designations under the Executive Order. Decisive action against high-impact targets deters others, forcing key nodes of financial support to choose between public exposure of support for terrorist activities or tarnishing their reputation, to the detriment of their business and commercial interest.

Thank you, Senator.

11

Senator SPECTER. We will now proceed with questioning, 5-minute rounds, and the Chairman has deferred to me for the first round.

Mr. Newcomb, in interviews by staff preparatory to your coming here, you advised that a good many of your recommendations for sanctions were rejected. Would you amplify what has happened on that?

Mr. NEWCOMB. Yes, Senator. In identifying key nodes, our responsibility is to identify how these terrorist organizations fit their activities together.

Senator SPECTER. Well, after you have identified them and made the recommendation—I only have 5 minutes. I want to focus very sharply on the rejections on the recommendations which involve Saudi sources. Precisely what has happened on that?

Mr. NEWCOMB. Well, the designation, as we indicated in our discussions, is not the only possible action. There is also law enforcement, intelligence, diplomatic, and military——

Senator SPECTER. Well, let's focus on economic sanctions, which is my question, before we go into other possible actions. I want to know about the recommendations on economic sanctions as to Saudis which have been turned down.

Mr. NEWCOMB. Senator Specter, we have made numerous recommendations, including relating to Saudi Arabia and other terrorist support organizations and groups. This goes through a Policy Coordinating, PCC process, where all the equities of the government come to the table, including——

Senator SPECTER. Well, my question focuses on recommendations which you have made for sanctions as to Saudi organizations which have been rejected.

Mr. NEWCOMB. Well, first let me say it is not—it is the policy not to comment on internal policy deliberations within the government. I can tell you these issues have been discussed with all the key players at the table, and when there is another possible action that can be taken, we have achieved our goal by teeing issues up.

Senator SPECTER. I am not asking about internal deliberations. I am asking you—and let me be specific with some organizations which have been discussed with you by staff prior to your coming here.

Were there recommendations as to the National Commercial Bank of Saudi Arabia for economic sanctions which were rejected?

Mr. NEWCOMB. No, Senator Specter, there was not.

Senator SPECTER. Were there recommendations for sanctions against the World Assembly of Muslim Youth?

Mr. NEWCOMB. There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

Senator SPECTER. Well, what conclusions did you come to on the World Assembly of Muslim Youth?

Mr. NEWCOMB. That along with the whole variety of charitable organizations operating head offices in Saudi are organizations that we are looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities. Rising to the level of a recommendation is a complicated policy——

12

Senator SPECTER. Well, I am not concerned about several hundred others. I would like to know, what about the World Assembly of Muslim Youth? Were they funding terrorist organizations, subject to economic sanctions, without any action being taken?

Mr. NEWCOMB. I can not conclude that in this hearing today. It is an organization that we——

Senator SPECTER. You can or you can not conclude——

Mr. NEWCOMB. Cannot.

Senator SPECTER. At this hearing today?

Mr. NEWCOMB. Well, we did not conclude that in our deliberations, so I can not say that was a recommendation of our office.

Senator SPECTER. How about the International Islamic Relief Organization? Were there recommendations for sanctions there which were rejected by higher officials in the Treasury Department?

Mr. NEWCOMB. This is an issue that we looked at, and, again, your question relates to policy deliberations within the administration which I can not comment on. I can tell you we did look at that organization.

Senator SPECTER. I am not interested in your policy deliberations. What I am interested in is your conclusions. Were there economic sanctions taken against the International Islamic Relief Organization?

Mr. NEWCOMB. To date, there have not been as of this date.

Senator SPECTER. Do you think there should be?

Mr. NEWCOMB. It is something that we would look at very carefully along with the others participating in the policy process.

Senator SPECTER. Well, when you look at it very carefully, how long have you been looking at it up until now?

Mr. NEWCOMB. Certainly since immediately in the aftermath of September 11.

Senator SPECTER. Well, that is almost 2 years. How long will it take you to come to a conclusion?

Mr. NEWCOMB. We can recommend and we can designate, but there is a policy process which takes into account all the variety of——

Senator SPECTER. I have got 16 seconds left. Have you recommended as to any of the organizations I have mentioned to you some tough economic sanctions which were turned down by higher officials, implicitly because they were Saudi organizations?

Mr. NEWCOMB. I can not say it is because they were Saudi organizations.

Senator SPECTER. Well, could you say whether they were turned down?

Mr. NEWCOMB. I can say that there have been some charities and other organizations that we have considered, we have had at the table, and that have been deferred for other actions which I would deem as appropriate.

Senator SPECTER. Well, my red light went on in the middle of your last answer, but I will be back.

Mr. NEWCOMB. OK.

Senator SPECTER. Senator Akaka.