EXHIBITS 1 & 2

Diplomatic Cable Transmissions from Ambassador Poletti

dated July 19, 1999 & July 21, 1999



## TRANSLATION CERTIFICATION

### For Translation From French into English

I, the undersigned, being first duly sworn, declare:

- That I, Kenneth Zwerdling, am the CEO of Foreign Translations, Inc.
- That our translator, Jane Wolfrum, is certified by the American Translators Association and is proficient in French to English translation.
- That our translator, Jane Wolfrum, has translated and edited the following document for Motley Rice, LLC:

Pieces 803-807 - MR-FRE003224-28

HERETO:

I certify that our translator, Jane Wolfrum, has translated and edited the above-mentioned document. I further certify that said documents are, to the best of my knowledge and belief, true and correct translations.

_____
Ken Zwerdling – CEO
Foreign Translations, Inc.

_8/1/08_____
Date

**www.foreigntranslations.com**

Foreign Translations, Inc.   55 Beattie Place   Suite 205   Greenville, SC 29601 USA   800-774-5986   translations@foreigntranslations.com

00803

**Declassified evidence**
**Annex 3**

MR-FRE003224

**00804**

TD RIYADH 142                                                                                                7/19/1999

---

**CONFIDENTIAL DIPLOMACY**

MIN PR1 PM1 CM1 CM2 CM3 SG SGA SGP

CMC

---

[TD] RIYADH 142                              JULY 19, 1999
                                             [1217 DE 16-3799 6 HH65]

                              RIYAD

URGENT
CONFIDENTAL DIPLOMATIC NUMBER
ORIGIN: AMBASSADOR
NB: DISTRIBUTION MESSAGE
        AD DIPLOMACY [159]
NB DIPLOMACY CM3 – CMC – PR – PM
NB [CDINT]
NB
NB
NB TRANSMISSION OF INFORMATION
TXT

SUBJECT: INFORMATION COMING FROM THE CENTRAL SAUDI BANK RELATED TO THE IMPLICATION OF A BANKER IN THE FINANCING OF TERRORISM.

SUMMARY: AN INVESTIGATION OF THE CENTRAL SAUDI BANK (SAMA) AND SAUDI INTELLIGENCE SERVICES REVEAL THE IMPLICATION OF A BANKER KHALEED BIN MAHFOUZ, DIRECTOR OF NATIONAL COMMERCIAL BANK, IN SEVERAL TRANSFERS BENEFITTING ORGANIZATIONS LINKED TO THE TERRORISM OF OSAMA BIN LADEN.

                                             XXX

THE SAUDI AUTHORITIES HAVE UNDERTAKEN, SINCE THE END OF 1998, A SERIES OF INVESTIGATIONS TARGETING THE PRINCIPAL FINANCIAL ESTABLISHMENTS OF THE KINGDOM IN ORDER TO DETERMINE THEIR POSSIBLE IMPLICATION IN THE FINANCING OF TERRORIST ORGANIZATIONS, FOLLOWING INFORMATION OBTAINED FROM AN AMERICAN SOURCE.

THE QUESTION WAS ADDRESSED AT THE HIGHEST LEVEL DURING INTERVIEWS WITH AMERICAN AUTHORITIES.  THE SAUDI PARTY FOR A LONG TIME HAVING REFUSED TO SUPPORT INVESTIGATIONS AGAINST BANKS IN THE KINGDOM, THE CROWN PRINCE ABDALLAH ALLEGEDLY PERSONALLY GAVE HIS GREEN LIGHT AND INTERVENED IN THIS WAY.

A SUMMARY OF THE INVESTIGATION REPORT OF THE SAUDI AUTHORITIES CONCERNING THE NATIONAL COMMERCIAL BANK WAS TRANSMITTED BY THE AMERICAN AUTHORITIES.  IT MAKES REFERENCE TO TRANSFERS EXECUTED FOR THE BENEFIT OF THE ORGANIZATION ISLAMIC RELIEF WORLDWIDE, CREATED OUT OF THE MUSLIM WORLD LEAGUE, AND REPUTEDLY CLOSE TO THE TERRORIST CHIEF OSAMA BIN LADEN.

ACCORDING TO THE SAME SOURCES, THE PRINCIPAL DIRECTOR OF THE NATIONAL COMMERCIAL BANK, ALREADY IMPLICATED IN THE BCCI BANK SCANDAL, STILL HAS PERSONAL AND FAMILY CONTACTS WITH OSAMA BIN LADEN.
SIGNED: POLETTI

Certified copy conforming with the original
The Clerk of Court

# 00805

TD RIYADH 159                                             7/21/1999 9:28 am - 107653

---

**CONFIDENTIAL DIPLOMACY**

MIN
-PR1 PM1 CM1 CM2 CM3 SG SGA SGP
-CMC

---

TD RIYADH 159                    JULY 21, 1999

        RIYADH          1217 July 21, 1999 at [4:18 pm]

URGENT
CONFIDENTAL DIPLOMATIC NUMBER
ORIGIN: AMBASSADOR
NB: DISTRIBUTION MESSAGE
       AD DIPLOMACY [142]
NB DIPLOMACY CM3 – CM[C] – PR – PM
NB CDINT
NB
NB
NB TRANSMISSION OF INFORMATION
TXT

SUBJECT: IMPLICATION OF A SAUDI BANKER IN THE FINANCING OF TERRORISM

REFERENCE: TD RIYADH 142

SUMMARY OF INFORMATION FROM THE SAUDI CENTRAL BANK (SAMA) INVESTIGATION ON THE NATIONAL COMMERCIAL BANK IN ANNEX, COMMUNICATED TODAY.
SIGNED: POLETTI

Certified copy conforming with the original
The Clerk of Court

MR-FRE003226

CONFIDENTIAL

TRANSLATION

Summary of the Saudi National Commercial Bank Audit Report
SAMA SOURCE /AS

[Excerpts from the report]

-------- Audit conducted with the NCB audit committee and Zakat Committee during the second half of year 1998.

-------- The focus of the report concerns Islamic banking practices, Islamic charities accounts and operations within the bank. Accountability practices where also reviewed for establishing a higher control over general operations of the bank by the Saudi authorities.

-------- Preliminary indications show operational revenues to reach SR 6,111.6 million, up from SR 5,675.2 million in 1997. Operational expenditures in 1998 are estimated to SR 5,127.9 million, up from SR 4,699.7 million in the preceding year.

Figures show a 2 per cent rise in net income to SR 1,062 million in 1998.

A net profit of SR 1,043.3 million was reported in 1997, up from SR 915 million in 1996, or an increase of SR 128.3 million.

Loans, advances and discounts (net) stood at SR 56,414.4 million, up from SR 48,296.1 million in 1997. Customer deposits increased to SR 65,743.6 million from SR 61,929.1 million in the year before.

Both assets and liabilities of the bank are balanced at SR 92,930.5 million, up from SR 86,438.1 million on the corresponding date of 1997. Contra accounts totalled SR 89,488.8 million down from SR 90,029.5 million in the year before.

The volume of its loan portfolio amounted at SR56.4 billion compared to SR46.3 billion in 1997. The investment

MR-FRE003227

# CONFIDENTIAL

portfolio also increased from SR16.9 billion to SR19.2 billion.

The total deposits are estimated at SR65.7 billion against SR61.9 billion in 1997 with an increase of SR3.8 billion (6.2 percent).

Shareholders' equity increased to SR 8,027.6 million in 1998 from SR 7,786.7 million in 1997. The equity consisted of SR 6,000 million as paid up capital, SR 2,027.6 million as statutory reserve and SR 0.4 million as retained profits.

NCB's total assets at SR92.9 billion in 1998 against SR86.4 billion in the previous year, registering an increase of SR6.5 billion (7.5 percent).

The board of directors proposed to distribute SR 821.5 million as dividends to shareholders for 1998.

.......... However, current trends show that a provision of SR 646.8 million will be needed to offset losses resulting from doubtful debts, compared to a sum of SR 450.5 million in 1997.

In addition to oil prices impact, the loan loss provision have negatively affected the bank profits since 1996.

.......... We invite to a rapid relocation of assets and a reduction of loans and advances.

The overall result of these two movements will have a beneficial effect on the bank's capital and liquidity ratios, since loans and advances now represent 60 per cent.

.......... Given the current market conditions, the public quotation of NCB will increase the negative impact of the current figures, while 1997 results were already affected by the allocation of SR 450.5 million to offset losses of doubtful debts, which is almost the same as the amount of SR 450.6 million earmarked for doubtful debts in 1996.

.......... Last year economic conditions were as follows : Operational revenues of the bank in 1997 stood at SR 5,675.2 million, up from SR 5,320.3 million in 1996, while operational expenditures rose to SR 4,699.7 million from SR 4,351.2 million in 1996. Both assets and liabilities of the bank as on December 31, 1997 were balanced at SR 86,438.1

MR-FRE003227

# CONFIDENTIAL

million, up from SR #6,052.5 million on the corresponding
date of 1996. Contra accounts, however, dropped to SR
87,816.4 million in 1997 from SR 124,192.7 million in 1996.

--------- Loans and advances (net) stood at SR 46,290.1
million, up from SR 38,171 million in 1996. Customers
deposits reached SR 61,929.1 million from SR 58,304 million
in 1996.

--------- Shareholders' equity slightly rose to SR 7,786.7
million from SR 7,654.8 million in 1996. The equity
consisted of SR 6,000 million as capital, SR 1,761.6
million as statutory reserves and SR 25 million as retained
profits.

--------- The board of directors proposed to distribute the
profits as follows:

-------------------- SR 260.8 million to the statutory
reserves,
-------------------- SR 442.6 million to the partners before
transformation of the bank into a joint stock company,
-------------------- SR 300 million to be distributed as
dividends among shareholders,
-------------------- SR 16.7 million as Zakat,
-------------------- SR 25 million to be carried forward.

--------- Offset losses from doubtful debts resulted from
irregularities due to extensive and unreported loans and
advances granted by and for the bank's directors.

--------- As such, without knowledge of the Zakat
Committee, NCB Directors established over the years credit
and loans facilities for several charitable organizations,
along with banking facilities that were not reviewed by the
Committees.

--------- Direct donations were received through those
facilities to the Red Crescent Saudi Committee,
International Islamic Relief Organisation and Muwafaq
Foundation.

--------- Muwafaq charity received SR 11.38 million in
loans and deposit.

--------- NCB established special relations with the Saudi
Joint Relief Committee for Kosovo and Chechnya and
maintained two shared accounts with Al Rajhi Bank for the

MR-FRE003228

# CONFIDENTIAL

Joint Relief Committee and International Islamic Relief
Organization donations in Kosovo and Chechnya.

.......   The special accounts were not authorized nor
reviewed neither by the Audit Division nor by the Zakat
Committee in 1999. SR 279.5 million were transferred
through these two accounts to the International Islamic
Relief.

.........   We stress the importance of establishing clear
rules for account managers in order to implement severe
control procedures due to the international context,
especially when dealing with charitable organizations.

------------------- -----------

MR-FRE003228

**TD RIYAD 142**

19.07.1999  14H03 - 134562

**00804**

---

## CONFIDENTIEL DIPLOMATIE

MIN
- PR1 PM1 CM1 CM2 CM3 SG SGA SGP
- CMC

---

TD RIYAD 142                    LE 16 JUILLET 1999
              RIYAD        1217  LE 16/07/99 A 11H05

URGENT
CHIFFRE CONFIDENTIEL DIPLOMATIE
ORIGINE : AMBASSADEUR
NB : DISTRIBUTION MESSAGE
    AD DIPLOMATIE 142
NB : DIPLOMATIE : CM3 – CMC – PR – PM
NB : CDINT
NB :
NB :
NB : TRANSMISSION D'INFORMATIONS
TXT :

OBJET : INFORMATIONS EN PROVENANCE DE LA BANQUE CENTRALE SAOUDIENNE RELATIVES A L'IMPLICATION D'UN BANQUIER DANS LE FINANCEMENT DU TERRORISME.

RESUME : UNE ENQUETE DE LA BANQUE CENTRALE SAOUDIENNE (SAMA) ET DES SERVICES DE RENSEIGNEMENT SAOUDIENS REVELERAIT L'IMPLICATION DU BANQUIER KHALEED BIN MAHFOUZ, DIRIGEANT DE NATIONAL COMMERCIAL BANK, DANS PLUSIEURS TRANSFERTS AU PROFIT D'ORGANISATIONS LIEES AU TERRORISTE OUSSAMA BEN LADEN.

X X X

LES AUTORITES SAOUDIENNES ONT ENTREPRIS DEPUIS LA FIN DE L'ANNEE 1998, UNE SERIE D'ENQUETES VISANT LES PRINCIPAUX ETABLISSEMENTS FINANCIERS DU ROYAUME AFIN DE DETERMINER LEUR EVENTUELLE IMPLICATION DANS LE FINANCEMENT D'ORGANISATION TERRORISTES, SUIVANT DES INFORMATIONS OBTENUES DE SOURCE AMERICAINE.

LA QUESTION A ETE ABORDEE AU PLUS HAUT NIVEAU LORS D'ENTRETIENS AVEC LES AUTORITES AMERICAINES, LA PARTIE SAOUDIENNE AYANT LONGTEMPS REFUSE DE DILIGENTER DES ENQUETES CONTRE LES BANQUES DU ROYAUME. LE PRINCE HERITIER ABDALLAH AURAIT PERSONNELLEMENT DONNE SON FEU VERT ET SERAIT INTERVENU EN CE SENS.

UNE SYNTHESE DU RAPPORT D'ENQUETE DES AUTORITES SAOUDIENNES CONCERNANT LA NATIONAL COMMERCIAL BANK A ETE TRANSMISE PAR LES SERVICES AMERICAINS. ELLE FAIT REFERENCE A DES TRANSFERTS OPERES AU PROFIT DE L'ORGANISATION DE SECOURS ISLAMIQUE MONDIAL, ISSUE DE LA LIGUE ISLAMIQUE MONDIALE, ET REPUTEE PROCHE DU CHEF TERRORISTE OUSSAMA BEN LADEN.

SELON LES MEMES SOURCES, LE PRINCIPAL DIRIGEANT DE LA NATIONAL COMMERCIAL BANK, DEJA IMPLIQUE DANS LE SCANDALE DE LA BANQUE BCCI, ENTRETIENDRAIT ENCORE DES LIENS PERSONNELS ET FAMILIAUX AVEC OUSSAMA BEN LADEN.
SIGNE  : POLETTI

Copie certifiée conforme
à l'original
                    Le Greffier

**29863.001**

MR-FRE003225

MR-NCB003257

**TD RIYAD 159**                    23.07.1999 090148 - 107653            **00805**

## CONFIDENTIEL DIPLOMATIE

MIN
- PR1 PM1 CM1 CM2 CM3 SG NGA SGP
- CMC

TD RIYAD 159                    LE 21 JUILLET 1999
              RIYAD        1217  LE 21/07/99 A 16H10

URGENT
CHIFFRE CONFIDENTIEL DIPLOMATIE
ORIGINE : AMBASSADEUR
NB : DISTRIBUTION MESSAGE
     TD DIPLOMATIE: 159
NB : DIPLOMATIE: CM1 – CMC  – PR – PM
NB : CDINT
NB :
NB :
NB : TRANSMISSION D'INFORMATIONS
TXT

          OBJET : IMPLICATION D'UN BANQUIER SAOUDIEN DANS LE FINANCEMENT DU TERRORISME.

          REFERENCE : TD RIYAD 142.

          SYNTHESE DES INFORMATIONS DE L'ENQUETE DE LA BANQUE CENTRALE SAOUDIENNE (SAMA)
SUR LA NATIONAL COMMERCIAL BANK  ANNEXEE, COMMUNIQUEE CE JOUR.
SIGNE :   POLETTI

Copie certifiée conforme
à l'original
                    Le Greffier.

MR-FRE003226

MR-NCB003258

00806

CONFIDENTIAL

ORGANISATION

Summary of the Saudi National Commercial Bank Audit Report
(see source /A/

[Excerpts from the report]

...... Audit conducted with the NCB audit committee and Zakat Committee during the second half of year 1998.

...... The focus of the report concerns Islamic banking practices, Islamic charities accounts and operations within the bank. Accountability practices were also reviewed for establishing a higher control over general operations of the bank by the Saudi authorities.

...... Preliminary indications show operational revenues to reach SR 6,331.6 million, up from SR 5,675.2 million in 1997. Operational expenditures in 1998 are estimated to SR 5,122.9 million, up from SR 4,699.7 million in the preceding year.

Figures show a 2 per cent rise in net income to SR 1,062 million in 1998.

A net profit of SR 1,043.3 million was reported in 1997, up from SR 915 million in 1996, or an increase of SR 128.3 million.

Loans, advances and discounts (net) stood at SR 56,414.4 million, up from SR 46,290.3 million in 1997. Customer deposits increased to SR 65,742.6 million from SR 41,929.1 million in the year before.

Both assets and liabilities of the bank are balanced at SR 92,936.5 million, up from SR 86,418.1 million on the corresponding date of 1997. Contra accounts totalled SR 89,684.0 million down from SR 90,028.5 million in the year before.

The volume of its loan portfolio amounted at SR56.4 billion compared to SR46.3 billion in 1997. The investment

CONFIDENTIAL

portfolio also increased from SR14.9 billion to SR15.2 billion.

The total deposits are estimated at SR65.7 billion against SR61.9 billion in 1997 with an increase of SR3.8 billion (6.2 percent).

Shareholders' equity increased to SR 6,027.6 million in 1998 from SR 7,704.7 million in 1997. The equity contained of SR 6,000 million as paid up capital, SR 2,027.6 million as statutory reserve and SR 6.4 million as retained profits.

NCB's total assets at SR92.9 billion in 1998 against SR86.4 billion in the previous year, registering an increase of SR6.5 billion (7.5 percent).

The board of directors proposed to distribute SR SR21.5 million as dividends to shareholders for 1998.

...... However, current trends show that a provision of SR 450.5 million will be needed to offset remaining from doubtful debts, compared to a sum of SR 450.5 million in 1997.

In addition to oil prices impact, the loan loss provision have negatively affected the bank profits since 1996.

...... We invite to a rapid relocation of assets and a reduction of loans and advances.

The overall result of these two movements will have a beneficial affect on the bank's capital and liquidity ratios, since loans and advances now represent 50 per cent.

...... Given the current market conditions, the public quotation of NCB will increase the negative impact of the current figures. While 1997 results were already affected by the allocation of SR 450.5 million to offset losses of doubtful debts, which is almost the same as the amount of SR 450.5 million earmarked for doubtful debts in 1998.

Last year economic conditions were as follows: Operational revenues of the bank in 1997 stood at SR 5,675.2 million, up from SR 5,320.3 million in 1996, while operational expenditures rose to SR 4,699.7 million from SR 4,345.3 million in 1996. Such amount liquidates some of the bank as on December 31, 1997 were balanced at SR 86,438.1

29863.002

MR-FRE003227

MR-NCB003259

00807

CONFIDENTIAL

million, up from SR 88,952.5 million on the corresponding date of 1996. Loans accounts, however, dropped to SR 87,836.4 million in 1997 from SR 124,132.7 million in 1996.

...... Loans and advances level stood at SR 46,290.1 million, up from SR 38,171 million in 1996. Customers deposits reached SR 61,979.1 million from SR 56,094 million in 1996.

...... Shareholders' equity slightly rose to SR 7,786.7 million from SR 7,694.8 million in 1996. The equity consisted of SR 6,000 million as capital, SR 1,763.4 million as statutory reserves and SR 25 million as retained profits.

...... The board of directors proposed to distribute the profits as follows:

...... SR 160.6 million to the statutory reserves.

...... SR 491.6 million to the partners before transformation of the bank into a joint stock company.

...... SR 300 million to be distributed as dividends among shareholders.

...... SR 16.7 million as Zakat.

...... SR 25 million to be carried forward.

...... Offset losses from doubtful debts resulted from irregularities due to excessive and unexpected loans and advances granted by and for the bank's directors.

...... As such, without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organisations, along with banking facilities that were not reviewed by the Committee.

...... Direct donations were received through those facilities to the Red Crescent, Saudi Committee, International Islamic Relief Organisation and Muwafaq Foundation.

...... Muwafaq charity received SR 11.38 million in loans and deposit.

...... NCB established special relations with the Saudi Joint Relief Committee for Kosovo and Chechnya and maintained two shared accounts with Al Rajhi Bank for the

CONFIDENTIAL

Joint Relief Committee and International Islamic Relief Organisation-Grozicene in Kosovo and Chechnya.

...... The special accounts were not authorised nor reviewed neither by the Audit Division nor by the Zakat transition. In 1996 SR 278.5 million were transferred through these two accounts to the International Islamic Relief.

...... We stress the importance of establishing clear rules for account managers in order to implement severe control procedures due to the international context, especially when dealing with charitable organisations.

EXHIBIT 3

Transcript of March 23, 2007 p.37

1

73nrterc

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ----------------------------x
2
3  In re:  TERRORIST ATTACKS ON
3            SEPTEMBER 11, 2001
4                              03 MDL 1570 (RCC)
4
5  ----------------------------x
5
6                        New York, N.Y.
6                        March 23, 2007
7                        10:00 a.m.
7
8  Before:
8
9        HON. FRANK MAAS
9
10                       Magistrate Judge
10
11
11
12        APPEARANCES
12
13
13
14  KREINDLER & KREINDLER
14  Attorneys for Ashton Plaintiffs
15     100 Park Avenue
15     New York, New York  10017
16     (212)  687-8181
16  BY:  ANDREW J. MALONEY, ESQ.
17
17
18  MOTLEY RICE, LLP
18  Attorneys for Burnett Plaintiffs
19     28 Bridgeside Boulevard
19     Mt. Pleasant, South Carolina  29465
20     (843) 216-9000
20  BY:  ROBERT T. HAEFELE, ESQ.

21

21

22   COZEN O'CONNOR

22   Attorneys for Federal Insurance Plaintiffs

23      1900 Market Street

23      Philadelphia, Pennsylvania 19103

24      (215) 665-2000

24   BY:  SEAN P. CARTER, ESQ.

25

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73nrterc

1  minimum contacts within the jurisdiction.  That's just one of
2  several different criteria that we'd like to take a look at to
3  present to the Court.
4        THE COURT:  I'm going to rule on each of these
5  applications.  I am going to deny the request for correspondent
6  account information for the reason I just discussed with you,
7  Mr. Maloney, and because I think it is really the camel's nose
8  under the tent.  Assuming you got that information, the next
9  step, somewhat understandably, would be to say we need more
10  information to have an understanding what this means.  I do
11  think, without more, that goes too far.
12        With respect to the depositions, it's going to sound
13  like a Solomonic solution, but it's not intended to be.  I'm
14  going to deny the request to take the deposition of Ms. Pensa.
15  However, I am going to grant a deposition of Mr. Smith, who is,
16  as I understand it, no longer an employee and is in the New
17  York City area.
18        However, I'm not going to allow a full day of
19  deposition.  I'm going to allow a 3-hour deposition.  And it
20  will be conducted in the courthouse before me.  To revert to
21  the criminal analogy, since all of us come out of that field, I
22  guess it's akin to a preliminary hearing, where the ground
23  rules may be more constricted.
24        To avoid squabbles about what is and isn't fair game
25  and because I don't think I have clearly in my mind what may or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73nrterc

1  may not be fair, and I certainly don't know the questions you
2  will ask, I think that gives you an opportunity to better
3  understand first-hand from somebody who is in a position of
4  responsibility how NCB and potentially SNCB operated in New
5  York.
6        Mr. Smith presumably can tell you, without disclosing
7  customer names, in broad brush strokes perhaps volume of
8  correspondent account activity and the like without requiring
9  the production of a lot of other documents the defendant.
10        MR. MALONEY:  Your Honor, if I could make one request
11  to supplement that.  Mr. Smith, in advance of his deposition
12  before your Honor, I'd like to get a copy of the documents he
13  refers to in his affidavit in advance of the deposition.
14        MR. LIEBMAN:  Your Honor, I have a request as well.
15  Perhaps that deposition should go forward before your Honor
16  after your Honor has had an opportunity to review the 1998
17  Arthur Andersen examination.
18        THE COURT:  There is no question that that would be
19  the order.
20        MR. LIEBMAN:  Thank you, your Honor.
21        THE COURT:  One question is, when should we schedule
22  that?  I know you have to go to SAMA.
23        MR. LIEBMAN:  Yes.  Should I do that and then report
24  back to the Court, and then we can determine a schedule based
25  upon that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT 4

August 13, 2007 letter from Ron Liebman to Judge Maas



2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 13, 2007

Ronald S. Liebman
202-457-6310
rliebman@pattonboggs.com

**BY FEDERAL EXPRESS**

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

      Re:    *In re Terrorist Attacks on September 11, 2001*, MDL 03-1570 (GBD);
           *Burnett v Al Baraka*, Case No. 03 CV 9849 (S.D.N.Y.)

Dear Judge Maas:

      On behalf of Defendant, The National Commercial Bank ("NCB"), we respectfully submit this response to the August 7, 2007 letter from plaintiffs' counsel, Andrew Maloney (the "Aug. 7 Letter"), opposing the request in our July 31, 2007 letter seeking leave to propound contention discovery concerning plaintiffs' theory of personal jurisdiction over NCB. Although Mr. Maloney's letter purports to raise "two primary reasons" in opposition to contention discovery, in substance his letter raises only one— *i.e*, that contention discovery is "premature" because plaintiffs first wish to proceed with one or more depositions of former employees of SNCB Securities Inc. ("SNCB"), a former indirect U.S. subsidiary of NCB that was dissolved in 2001. (Aug. 7 Letter, at 1.) It does not appear that plaintiffs seriously intend to pursue their alternative argument that contention discovery is "potentially prejudicial" to them because NCB "bears the burden of proof" on personal jurisdiction once "plaintiffs have made a prima facie showing of jurisdiction." *Id*, at 3. The premise for this alternative argument is simply wrong: "The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff." *Hoffritz for Cutlery, Inc. v Amiac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *accord Ball v Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

      Despite plaintiffs' professed uncertainty about Your Honor's authority to resolve these issues (Aug. 7 Letter at 1 n.1), there is no question that the Court's March 23, 2007 Order expressly reserved decision on "NCB's application to serve contention interrogatories." (MDL Dkt. # 1964, at ¶5). In the March 23, 2007 Order, moreover, Your Honor also addressed, and denied, plaintiffs' request to take the deposition of former SNCB employee Virginia Pensa. *Id*, at ¶3. Accordingly—



Honorable Frank Maas
August 13, 2007
Page 2

although plaintiffs now recharacterize their prior request as one to take a deposition of "Virginia Pensa and/or Tom Krohley" (Aug. 7 Letter, at 1)—plaintiffs in substance are seeking reconsideration of that March 23, 2007 Order, and of Your Honor's May 1, 2007 endorsement order, in which the Court "decline[d] to direct any further discovery (not previously ordered) related to NCB." (MDL Dkt. # 1971).

We respectfully submit that there is no basis to reconsider those prior orders, and that the Court therefore should grant NCB leave to propound contention discovery as requested in our July 31 letter. As we previously demonstrated in connection with the disputes that led to entry of the March 23, 2007 Order, plaintiffs' request to take depositions of former SNCB employees is outside the scope of the "limited jurisdictional discovery" concerning "NCB's contacts with the United States" as originally allowed by Judge Casey. *In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 820 (S.D.N.Y. 2005); *In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 575 (S.D.N.Y. 2005).

Specifically, after extensive production of SNCB documents to plaintiffs, there is no dispute that SNCB was dissolved in 2001, before any of the 9/11 lawsuits was filed. Accordingly, SNCB's activities are "irrelevant for purposes of the 'doing business' inquiry." *Data-Stream AS/RS Technologies, LLC v. Acequip Ltd.*, 2002 WL 1683736, at *6 (S.D.N.Y. July 24, 2002) ("'[T]he defendant corporation must be 'here' and therefore subject to the state's power, at the very time of the exercise of the jurisdiction itself.' ... There is no need to resolve the dispute as to whether Zimmerman was an agent of [defendant]. Zimmerman ceased his activities on June 11, 2001, almost a year before this suit was commenced. Therefore, his activities are irrelevant for purposes of the 'doing business' inquiry.")(internal citations omitted); *accord, e.g., Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *3, *4 (S.D.N.Y. July 15, 2002) (refusing to exercise personal jurisdiction over a foreign corporation based on the existence of an alleged U.S. subsidiary where the corporation's parent company had "sold [the subsidiary] and all other U.S. subsidiaries in October 1998-two months before the complaint in this action was filed on December 30, 1998"; holding that "[t]he only relevant inquiry is whether [the foreign defendant or its parent] had an 'agency' or 'mere department' relationship with [the alleged subsidiary] when the complaint was filed, such that any of [the alleged subsidiary's] past or present New York contacts could be attributed to [the defendant]. Because the evidence is clear that [the defendant] had sold any interest it once had in [the alleged subsidiary] as of December 30, 1998, [the alleged subsidiary's] contacts with New York cannot form a basis for personal jurisdiction over [the defendant].").

In connection with its motion to dismiss the *Burnett* and *Ashton* complaints, NCB provided the Court with authenticated copies of the Certificate of Dissolution of SNCB Securities Inc., filed with the Delaware Secretary of State on February 28, 2001. (MDL Dkt. # 416, Exh. 5, Attachment A) (copy attached hereto as Exhibit A). Since that time, NCB has produced over 60,000 pages of documents as part of "limited jurisdictional discovery," and most of those documents comprised the



Honorable Frank Maas
August 13, 2007
Page 3

operational files of SNCB. Plaintiffs' August 7 Letter does not identify any fact to dispute NCB's showing that SNCB was dissolved in 2001.[1]

Accordingly, the Court should not authorize depositions of former SNCB employees because their testimony cannot possibly lead to evidence relevant to personal jurisdiction over NCB. *See Melnick v Adelson-Melnick*, 346 F. Supp. 2d 499, 504-05 (S.D.N.Y. 2004) (in connection with a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "summary judgment practice offers guidance in the handling of such motions when they involve evidence outside the pleadings" and a plaintiff seeking jurisdictional discovery "must file a Rule 56(f) affidavit" that "must show," *inter alia*, "what facts are sought to resist the motion ... [and] why they might reasonably be expected to create a genuine issue of material fact" concerning personal jurisdiction) (emphasis added). Your Honor applied essentially this same analytic framework in denying a recent request for further jurisdictional discovery regarding an alleged U.S.-affiliate of another 9/11 litigation defendant, the Saudi Binladin Group ("SBG"). *See* Order (endorsement) of July 26, 2007 (MDL Dkt. # 1988). There, Your Honor held that, even if plaintiffs' allegations concerning the activities of the U.S. company were credited, "they do not suggest a basis for jurisdiction over SBG" and therefore denied "the request for discovery concerning Techmaster/PCM." *Id.* Likewise, here, even if plaintiffs' allegations concerning SNCB's activities were credited, they would not suggest a basis for jurisdiction over NCB because SNCB was dissolved in 2001, before the 9/11 lawsuits were filed.

Alternatively, even if SNCB's 2001 dissolution did not, by itself, dispose of the request for additional discovery, plaintiffs' assertions regarding the nature of SNCB's activities still would not suggest a basis for jurisdiction over NCB. Plaintiffs' claims against NCB allege that NCB provided banking services to help terrorist groups raise or transfer funds, or made direct donations to charities that were Al Qaeda fronts. *Burnett* 3rd Am. Complt, ¶¶ 45-46, 94-96; *Ashton* 6th Am. Complt., ¶¶ 429-433. Your Honor's June 28, 2006 Discovery Order held that the allegations of the *Burnett* complaint (which the *Ashton* complaint repeats) had "failed to make a prima facie showing of conspiracy" because they "establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York-namely, the Al Qaeda terrorists who executed the September 11 attacks-'acted at the direction or under the control or at the request

---

[1]     We are aware that SNCB filed a Surrender of Authority with the New York Department of Taxation and Finance on October 12, 2001, to which the Commissioner of Taxation and Finance consented on October 17, 2001. As a matter of New York law, these actions do not appear to mean that SNCB remained in existence through October 17, 2001, because "[w]hen a foreign corporation is dissolved ... in the jurisdiction of its incorporation," the certificate of dissolution is supposed to be delivered to the N.Y. Department of State, and thereupon has "the same effect as the filing of a certificate of a surrender of authority under section 1310." N.Y. BUS. CORP. LAW § 1305. We cannot confirm whether the Delaware Certificate of Dissolution of SNCB was filed with the New York Department of State before the Surrender of Authority was filed. Under any set of circumstances, however, the dissolution of SNCB was effective not later than the acceptance of the Surrender of Authority on October 17, 2001, nearly a year before any of the 9/11 lawsuits was filed.



Honorable Frank Maas
August 13, 2007
Page 4

of' NCB." *In re Terrorist Attacks on September 11, 2001*, 440 F. Supp. 2d 281, 287 (S.D.N.Y. 2006)(internal citations omitted). After extensive jurisdictional discovery, plaintiffs cannot point to any evidence to link SNCB to those already deficient allegations, or to show that SNCB was ever involved in any alleged NCB banking services or charitable donations.

"The term 'doing business' is used in reference to foreign corporations to relate to 'the ordinary business which the corporation was organized to do ... It is not the occasional contact or simple collateral activity which is included.'" *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 2003 WL 1807148, at *4 (S.D.N.Y. Apr. 4, 2003) (internal citations omitted). After extensive jurisdictional discovery, plaintiffs can offer no evidence that SNCB was involved in the business of banking— the "ordinary business" that NCB was organized to do. Indeed, NCB was prohibited from engaging in "any new banking business or holding itself out as available to conduct new banking business; including accepting any new deposits or granting any new loans" in the United States after its New York branch closed in 1992. *See* 1992 OCC Enf. Dec. LEXIS 225 at *4 (July 2, 1992) (Enforcement Action of the Office of the Comptroller of the Currency re National Commercial Bank New York Federal Branch).[2]  Consistent with the prohibition on U.S. banking business, the purpose of SNCB— as set out in the audited financial statements of SNCB[3] that plaintiffs have attached to the August 7 Letter— was to "conduct[ ] limited activities in the U.S. for or on behalf of NCB with respect to the management services performed by NCB for certain off-shore investment funds which services were previously performed by the Investment Management Division of the New York branch office of NCB." In particular, as explained in the SNCB audit, SNCB activities included: "... identifying and developing investment products for NCB to market outside the U.S., assisting NCB in evaluating fund advisors and performing some limited administrative and clerical support services for NCB on behalf of the investment funds." (Aug. 7 Letter, attachment.) Those investment-advisory activities have nothing to do with "banking business" as prohibited by the OCC orders, or the type alleged NCB banking services on which plaintiffs' claims against NCB are based. SNCB's activities therefore could not serve as a basis to assert jurisdiction over NCB, even if SNCB had not been dissolved before these lawsuits were commenced.

---

[2]   Plaintiffs questioned Mr. Smith about the OCC orders concerning NCB at his deposition. Mr. Smith also testified that, to his knowledge, NCB did not engage in the business of banking in the United States following the 1992 closure of the New York branch, and that SNCB did not engage in the business of banking on behalf of NCB. Smith Dep. Tr., at 133:11-134:9. Although we understand that credibility determinations are beyond the scope of the issues before Your Honor, there is no basis for plaintiffs' gratuitous assertion that Mr. Smith's testimony "was less than candid about the bank being forced to close under a cloud of criminal conduct and banking fraud and other irregularities." The Comptroller of the Currency Enforcement Action (cited above and marked as an exhibit to Mr. Smith's deposition) refers to the "voluntary liquidation" of NCB's NY branch, which Mr. Smith described, and describes the prohibition that the OCC thereafter imposed on NCB's ability to conduct "any new banking business" in the United States.

[3]   It is worth noting that, consistent with SNCB's corporate separation from NCB, there was an annual outside financial audit of SNCB Securities Inc. that was separate from the annual outside financial audit of NCB. The annual SNCB audit reports were produced to plaintiffs as part of jurisdictional discovery.



Notwithstanding the jurisdictional irrelevance of SNCB's activities, at the March 23, 2007 hearing plaintiffs proffered an affidavit of former SNCB employee Jagan Reddy addressing SNCB's pre-dissolution activities. Plaintiffs apparently plan to rely on the Reddy affidavit to argue for the exercise of jurisdiction over NCB, although NCB has sought leave to propound contention discovery precisely to determine, *inter alia*, whether plaintiffs do indeed plan to rely upon the Reddy affidavit for that purpose.[4] If so, or if plaintiffs' responses to contention discovery otherwise makes it advisable for NCB to do so, then NCB would submit an affidavit of a more knowledgeable former SNCB employee to address the nature and scope of SNCB's operations. However, even if both plaintiffs and NCB opt to submit affidavits concerning SNCB's operations in litigating NCB's renewed motion to dismiss for lack of jurisdiction, there is no reason to authorize depositions of former SNCB employees at this time. Second Circuit law is clear that, following jurisdictional discovery, the district court is free to resolve the jurisdictional question without an evidentiary hearing, based on the pleadings and affidavits submitted in connection with the motion to dismiss. *Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *E-Z Bowz, L.L.C. v. Prof. Prod. Research Co.*, 2003 WL 22064259 at *4 (S.D.N.Y. Sept. 5, 2003). Consequently, the decision whether to authorize depositions of former SNCB employees should be made by the Court when it adjudicates NCB's renewed motion to dismiss for lack of jurisdiction. At that stage, the Court will have the benefit of full legal argument and the evidentiary context that will allow it to evaluate whether the Court needs to reach and resolve any disputed factual issue concerning the activities of SNCB.

In sum, plaintiffs already have received the "'fair opportunity' to conduct jurisdictional discovery" that they seek. (Aug. 7, 2007 Letter, at 2, citing *In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp.2d 392, 400 (S.D.N.Y. 2002)). Plaintiffs' letter, however, fails to provide the full context of "fair opportunity" quote from *Ski Train Fire*, where the Court held that: "Such discovery must, however, be 'limited to the essentials necessary to determining the preliminary question of jurisdiction.' Plaintiffs may not conduct a fishing expedition, but must 'target[ ] information pertinent to the well established factors involved in a jurisdictional inquiry.'" *Id.* (emphasis added; internal citations omitted). As shown above, the activities of SNCB in the United States could not provide a basis for jurisdiction over NCB. Accordingly, plaintiffs' request to take depositions of former SNCB employees could not be "pertinent to the well established factors involved in a jurisdictional inquiry," *id.*, and should be denied, and NCB should be allowed to propound the contention discovery requests submitted for approval with our July 31 letter.

---

[4]    The Court's March 23, 2007 Order reserved decision on "plaintiffs' application to depose Jagan Mohan Reddy." (MDL Dkt. # 1964, at ¶ 5.)



PATTON BOGGS LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 13, 2007
Page 6

Respectfully submitted,

Ronald S. Liebman
Counsel for Defendant The National Commercial Bank

cc:    All Counsel

6

**Exhibit A**



PAGE   1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF DISSOLUTION OF "SNCB SECURITIES INC.", FILED IN THIS OFFICE ON THE TWENTY-EIGHTH DAY OF FEBRUARY, A.D. 2001, AT 9:45 O'CLOCK A.M.



Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

2308697   8100

030417119

AUTHENTICATION: 2492406

DATE: 06-24-03

STATE OF DELAWARE
SECRETARY OF STATE 09:17 FR S&S 16FL #3
DIVISION OF CORPORATIONS
FILED 09:45 AM 02/28/2001
010100793 - 2308697

TO 00334#0644100072 P.02/02

## CERTIFICATE OF DISSOLUTION
### OF
### SNCB SECURITIES INC.

SNCB Securities Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware,

DOES HEREBY CERTIFY:

FIRST: That dissolution was authorized on October 23, 2000.

SECOND: That dissolution has been authorized by the Board of Directors and stockholders of the corporation in accordance with the provisions of subsections (a) and (b) of section 275 of the General Corporation Law of the State of Delaware.

THIRD: That the names and addresses of the directors and officers of SNCB Securities Inc. are as follows:

### DIRECTORS

NAMES
Thomas M. Krohley

Fredrick O. Crawford

Mansour Kaki

ADDRESSES
129 Oldfield Road
Fairfield, CT 06430

Wellington House, 4th Floor
125 Strand
London WC2R OAP
England

NCB Investment Services
A1 Nakeel Center
P.O. Box 15844
Jeddah 21454 Saudi Arabia

### OFFICERS

NAMES
Thomas M. Krohley

Virginia I. Pensa

OFFICES
President, Treasurer

Secretary

ADDRESSES
129 Oldfield Road
Fairfield, CT 06430

45 Tuder City Place, Apt. 619
New York, NY 10017

Executed on the 23rd day of February, 2001.

By _____
Thomas M. Krohley
President

NYDOCS01/758989.1

** TOTAL PAGE.02 **

EXHIBIT 5

NCB Aviation Department – Skyways International Business Card



THE NATIONAL COMMERCIAL BANK

AVIATION DEPARTMENT
SKYWAYS INTERNATIONAL

**KEITH W. MONROE**
Flight Engineer

Tel. : 682-4203 / 682-4426 - Fax : 682-4827 - Telex : 607426  NCBAV SJ

P. O. Box : 9935  Jeddah 21423 - Kingdom of Saudi Arabia

28417

MR-NCB002541

EXHIBIT 6

Saudi Arabian Airlines archived website of January 16, 2008



الخطوط الجوية العربية السعودية
SAUDI ARABIAN AIRLINES

We aim to please you

Choose..

**Home**
**About Us**
**Travel**
**Services**
**Cargo**
**Alfursan**
**Tours**
**Skysales**
**Catering**
**SV News**
**Special Offers**

| JEDDAH | AIRLINE CODE | RIYADH |
|---|---|---|
| Air Afrique | RK | |
| Air Algerie | AH | |
| Air France | AF | Air France |
| Air India | AI | |
| Air Lanka | UL | Air Lanka |
| Air Tanzania | TC | |
| Alitalia | AZ | |
| Ariana Afghan | FG | |
| Biman Bangladesh | BG | Biman Bangladesh |
| British Airways | BA | British Airways |
| Cyprus Airways | CY | Cyprus Airways |
| Daallo Airlines | D3 | |
| Ethiopian Airlines | ET | |
| Garuda | GA | Garuda |
| Kabo Air | KO | |
| KLM | KL | |
| Lufthansa | LH | |
| Malaysia Airlines | MH | |
| Middle East Airlines | ME | Middle East Airlines |
| Olympic Airways | OA | Olympic Airways |
| | PK | Pakistan International |
| | PR | Philippine Airlines |
| Qatar Airways | QZ | |
| Royal Air Maroc | AT | Royal Air Maroc |
| Royal Brunei | BI | |
| Royal Jordanian | RJ | |
| Singapore Airlines | SQ | |
| Sudan Air | SD | |
| Swissair | SR | |
| Tunis Air | TU | |
| Turkish Airlines | TK | Turkish Airlines |
| Yemen Airways | IY | |
| | TW | Transworld Airlines |
| **REGULAR FOREIGN AIRLINES ON-REQUEST CUSTOMERS** | | |
| | AI | Air India |
| Cameroon Airlines | UY | |
| Egypt Air | MS | Egypt Air |
| Emirates Airlines | EK | Emirates Airlines |
| | ET | Ethiopian Airlines |
| Gulf Air | GF | Gulf Air |
| Iran Air | IR | |
| Kuwait Airways | KU | Kuwait Airways |
| | LH | Lufthansa |
| Pakistan International | PK | |
| | RJ | Royal Jordanian |
| | SD | Sudan Air |

ASH007977

| | SR | Swissair |
|---|---|---|
| Syrian Arab Airlines | RB | Syrian Arab Airlines |
| U.A.E. Royal Flights | 6RF | U.A.E. Royal Flights |
| | IY | Yemen Airways |
| PRIVATE AVIATION COMPANIES | | |
| Al-Mubani Aircrafts | AM | |
| Arabasco | AR6 | Arabasco |
| Binladen Aviation | BIN | Binladen Aviation |
| Exec Air Transport | EAT | Exec Air Transport |
| International Aviation | IAC | International Aviation |
| Jet Aviation | JET | Jet Aviation |
| Mustafa Edrees | MEA | Mustafa Edrees |
| NCB Aviation | NCB | NCB Aviation |
| Unasco Travel | UT | |
| OTHERS | | |
| Royal Saudi Air Force | RAF | Royal Saudi Air Force |

| Customer List Summary | | | |
|---|---|---|---|
| JEDHF UNIT | | RUHHF UNIT | |
| 30 | Regular Airlines | 13 | Regular Airlines |
| 9 | On-request customers | 13 | On-request customers |
| 9 | Private Aviation | 7 | Private Aviation |
| 1 | Others | 1 | Others |
| 49 | Total Jeddah Customers | 34 | Total Riyadh Customers |

Copyright © 2007 Saudi Arabian Airlines. All rights reserved.

ASH007978