# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In Re TERRORIST ATTACKS on SEPTEMBER 11, 2001 | ) ) ) ) | 03 MDL 1570 (GBD) ECF Case |

This document relates to:
    *Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (GBD)
    *Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (GBD)

## AFFIDAVIT OF THOMAS M. KROHLEY

1.    My name is Thomas M. Krohley. I was employed as a Vice President at the New York Branch of The National Commercial Bank ("NCB") from 1988 until it was closed in 1992. I was also employed, at various times, as Director, President, C.E.O., Treasurer, and Vice President of SNCB Securities, Inc. ("SNCB") from its inception in 1992 until its dissolution in February 2001. I also worked as an independent contractor consultant to NCB to assist in the winding up of SNCB's business in connection with its dissolution. I have been advised by NCB's counsel that this Affidavit will be submitted in support of NCB's Renewed Motion to Dismiss this lawsuit.

2.    I am advised by NCB's counsel that this Affidavit is not intended by NCB or its counsel to waive, in any way, NCB's claim of immunity from suit or its jurisdictional defenses, and is not intended to be a general appearance by NCB in this lawsuit. I understand and believe the following matters to be true, through the date of this Affidavit, based on my personal knowledge. I have been assisted by NCB's legal counsel in the phrasing of this Affidavit.

3.    Before its dissolution in February 2001, SNCB was a Delaware corporation with its principal place of business in New York City. SNCB was a subsidiary of SNCB Securities, Ltd., an English company headquartered in London. SNCB Securities, Ltd. was a subsidiary of NCB.

4.    I understand from NCB's legal counsel that the Court has required NCB to provide evidence concerning SNCB's activities during the time period from 1996 until the filing of these

1

lawsuits in 2002. During that time period, SNCB's relationship with NCB was established by a Services Agreement and a Realty Services Agreement entered into between NCB and SNCB on December 31, 1995 (collectively, the "1995 Agreements"). Attached as Exhibits A and B are true and correct copies of the 1995 Agreements. Prior versions of the same agreements between NCB and SNCB had been in effect from at or near the time to SNCB's formation in 1992. The only significant difference between the 1992 and 1995 versions of these Agreements was that the amount of fees owing to SNCB under those Agreements decreased in the 1995 version. When those 1992 agreements expired in 1995, NCB and SNCB entered into the 1995 Agreements to continue the relationship between the two companies. Subsequently, the 1995 Agreements were renewed by addenda until both were terminated in December 2000 at the time SNCB ceased doing business. In the addenda to the 1995 Agreements, no material changes were made except that the term of the Agreements were extended and the fees NCB owed to SNCB decreased.

5.     Under the relationship established by the 1995 Agreements, SNCB consulted with, and provided advice to, NCB with respect to the management of various British Virgin Islands investment trusts ("the BVI Trusts"), which held in trust funds belonging to NCB clients located exclusively in Saudi Arabia. Other indirect subsidiaries of NCB acted as trustees for the BVI Trusts, and each of the BVI Trusts owned one or more BVI limited companies ("the Operating Companies"). Each of the Operating Companies held and/or invested NCB client funds on behalf of those investors. The majority of the work performed by SNCB involved providing advisory and consultancy services to NCB relating to interests in U.S. real estate held by the BVI Trusts and the Operating Companies. The only services SNCB provided to NCB during its entire existence that were significantly facilitated by having an office in the U.S. were its advisory services relating to the U.S. real estate interests held by these BVI Trusts and Operating Companies.

6.     My responsibilities at SNCB included providing the advisory services specified in the 1995 Agreements. Initially, SNCB's advisory services to NCB related to the BVI Trusts named in Annex One to the 1995 Agreements and to the Operating Companies named on Annex Two of the 1995 Agreements. Thereafter, SNCB also provided advisory services to NCB in connection with additional open-ended mutual funds that did not hold U.S. real estate interests, but which instead held interests in other assets like commodities, currencies, and corporate equities. SNCB never expanded the scope of its U.S. real estate advisory services beyond what was set out in the 1995 Agreements.

7.     In the 1996 to 1997 time frame, the NCB Investment Committee made the decision to dissolve the United States real estate portfolio held by the BVI Trusts and the Operating Companies. Shortly after that decision, and by no later than the end of 1997, the BVI Trusts and the Operating Companies began the process of liquidating their real estate holdings. Although SNCB filed its certificate of dissolution in Delaware in February 2001, SNCB actually had closed its doors in December 2000 and never again did any business in the United States or elsewhere. As part of that process, SNCB formally surrendered the lease on its New York City office space on February 16, 2001. By the time that SNCB ceased doing business in December 2000, all of the Operating Companies that had held any United States real estate interests either already had been liquidated or were in the final stages of liquidation.

8.     After the liquidation of the Operating Companies that held interests in U.S. real estate, the tasks that remained for SNCB to perform generally involved monitoring of non-real estate assets (like commodities, currencies, and corporate equities) that were held by other Operating Companies. These remaining tasks did not require the type of local oversight that real estate involves, and therefore did not require that SNCB maintain personnel or an office in the United States. Accordingly, those remaining responsibilities were undertaken by NCB's Investment

3

Management Division in Jeddah going forward after SNCB's dissolution. In short, NCB's decision in the 1996 to 1997 time frame to liquidate the real estate-holding Operating Companies ultimately resulted in the decision to liquidate SNCB.

9.     To my knowledge, SNCB never acted as NCB's agent with respect to the BVI Trusts and the Operating Companies, as SNCB never entered into any agreements on NCB's behalf.

10.     NCB personnel, not SNCB personnel, made the investment decisions relating to NCB's interests in the BVI Trusts and the Operating Companies. However, the manner in which those decisions were implemented was up to the discretion of SNCB and its personnel. SNCB provided investment advice, as a consultant, concerning the BVI Trusts and the Operating Companies, and NCB would either accept or reject that advice.

11.     As a direct subsidiary of SCNB Securities, Ltd. in London, and an indirect subsidiary of NCB, SNCB required parent-company approval of major office-leasing decisions, establishment and funding of its budget, and payment of the final bonuses to SNCB's personnel upon SNCB's dissolution. However, SNCB was free to make its own operational decisions as to how to use its own funds once they were allocated to its budget. NCB did not control the operational policies of SNCB or the manner in which SNCB performed its business.

12.     SNCB negotiated its agreements with third-parties separately from NCB, including SNCB's lease agreements.

13.     SNCB retained and paid for its own attorneys for the many types of matters on which SNCB required legal advice. Primarily, SNCB retained Shearman & Sterling in New York as its outside counsel.

14.     SNCB's employees were selected by SNCB's Board of Directors, and NCB did not train or otherwise oversee the hiring of SNCB's employees.

4

15.     SNCB paid for its own overhead expenses as required by sections 4(b)(i)-(ii) of the 1995 Agreements.

16.     SNCB separately maintained its own individual financial and corporate books, records, and financial accounts.  SNCB also maintained detailed accounts payable and accounts receivable showing what money was owed between SNCB and NCB, and both SNCB and NCB ensured that such payments were made and such receivables were collected.

17.     SNCB had its own policies and procedures separate from NCB's, including those relating to SNCB's accounting and financial practices.

18.     To the extent that SNCB declared dividends on its earnings, SNCB paid them directly to its parent company, SNCB Securities, Ltd. in London.

19.     Before working for SNCB, I worked at NCB's New York branch until the time that the branch closed.  Comparing my experience with NCB's New York branch and with SNCB, I can say that SNCB did not operate as a branch of NCB, and did not conduct any banking operations on behalf of NCB.  To my knowledge, following the closure of the New York branch, NCB ceased doing new banking business in the United States, and it wound up the affairs of the New York branch through companies other than SNCB.  SNCB was not engaged in any activities relating to the wind up of NCB's New York branch and was not kept informed of matters relating to that process.  Unlike the New York branch of NCB, SNCB did not have authority to act for, or to bind, NCB, and did not do so.

20.     SNCB did not provide any financing for the BVI Trusts, the Operating Companies or any other NCB investments.

21.     As set forth more fully above, based on my experience working with SNCB for the entire existence of that company, it is my view that SNCB and NCB always complied with the terms of Section 2 of the 1995 Agreements, which provided that SNCB had "no power or authority to

5

bind or contract for NCB," and that SNCB was not "subject to the supervision of either NCB" or any of its subsidiaries, trusts, or funds "in respect of the manner in which SNCB accomplishes the performance of its obligations under [the 1995 Agreements]," because NCB did not control the day-to-day operations of SNCB.

22     I have reviewed the March 21, 2007 Declaration of Jagan Mohan Reddy, which I understand has been submitted in this litigation. I know and, from time to time while employed with SNCB, have worked with Mr. Reddy. Based on my personal knowledge of SNCB, and for the reasons stated above, NCB did not control the day-to-day operations of SNCB. I therefore disagree with Mr. Reddy's statement in ¶ 4 of his Declaration that NCB controlled SNCB and used it as an "operating division within NCB," and I consider those statements to be false.

Thomas M. Krohley

STATE OF NEW MEXICO          )
                             ) ss.
COUNTY OF GRANT              )

Sworn to and subscribed before me
this ____ day of ___June___, 2007.



Notary Public

My Commission Expires: __July 3 2010__

OFFICIAL SEAL
**DORA GONZALES**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: __July 3 2010__

6