**EXHIBIT F** $(2)$

King v. Rudzewicz, 471 U.S. 462, 472, 479 (1985) (explaining jurisdiction is appropriate if defendant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities" and finding minimum contacts existed since dispute arose from a contract with substantial contacts with the forum) (internal quotations and citations omitted); Calder v. Jones, 465 U.S. 783, 789 (1984) (finding personal jurisdiction appropriate over non-resident defendants who "expressly aimed" intentionally tortious conduct at residents of forum state, even where defendants were never physically present in forum); see also Daventree, 2004 WL 2997881, at *22 (finding exercise of personal jurisdiction under Rule 4(k)(2) is appropriate if defendants "purposefully directed their activities at residents of the forum, and the litigation results from alleged injuries that arise out of or related to those activities") Pursuant to the holdings in Burger King, Calder, and three recent terrorism cases – Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y. 1998), Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38 (D.D.C. 2000), and Pugh v. Socialist People's Libyan Arab Jamahiriya, 290 F. Supp. 2d 54 (D.D.C. 2003) – Plaintiffs submit that the moving Defendants knew that the primary target of Osama bin Laden's and al Qaeda's campaign of terror was the United States and that by providing assistance to these terrorists, who Plaintiffs claim were Defendants' co-conspirators, Defendants aimed their conduct at the United States.

In Rein, the court denied defendants' motions to dismiss for lack of subject matter and personal jurisdiction in a case arising from the bombing of Pan Am Flight 103 over Lockerbie, Scotland. The court found it had subject matter jurisdiction over defendant Libya, a designated state sponsor of terror, pursuant to § 1605(a)(7) of the FSIA. Rein, 995 F. Supp. at 329-30. Noting that the FSIA provides for personal jurisdiction as long as subject matter jurisdiction exists and proper service was effected, the court turned to Libya's contacts with the United States. Id. at 330 (citing Burger King, 471 U.S. at 472). It found that Libya's contacts with the United States were sufficient because its allegedly "intentional, tortious actions [were] . . . 'expressly aimed at' the United States," and included "destruction of a United States flag aircraft . . . while en route to the United States . . . with 189 United States nationals on board." Id. (citing Calder, 465 U.S. at 789). The court concluded that its exercise of personal jurisdiction was appropriate since "[a]ny foreign state would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in the United States." Id.

Similarly, in Daliberti the court found it had subject matter jurisdiction over defendant Iraq, a designated state sponsor of terror, in a case stemming from the alleged torture of several United States citizens who were working in Kuwait. Daliberti, 97 F. Supp. 2d at 46. Iraq argued that exercising personal jurisdiction over it would offend constitutional due process since the FSIA "abrogates the minimum contacts requirement." Id. at 52. The court disagreed and explained that "Congress expressly addressed the minimum contacts requirement in enacting the FSIA by providing that '[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction.'" Id. (citing 28 U.S.C. § 1330(b); Shapiro v. Republic of Bolivia, 930 F. 2d 1013, 1020 (2d Cir. 1991)). The court acknowledged that the foreign state's contacts with the United States might be more attenuated in the context of

31

the state sponsor of terrorism exception than in the FSIA's other exceptions, but concluded "in the context of this statute, the purpose for which it was enacted, and the nature of the activity toward which it is directed, . . . it is reasonable that foreign states be held accountable in the courts of the United States for terrorist actions perpetrated against U.S. citizens anywhere." Id. at 54. Finally, it noted that the "detention of these three plaintiffs had a direct effect in the United States and was consciously designed to affect United States policy . . . Iraq cannot now claim surprise at the assertion of jurisdiction by this Court." Id.

Most recently, in Pugh, representatives of passengers killed in the bombing of a French airliner in Africa survived a motion to dismiss by the individual defendants. The court found it had subject matter jurisdiction over seven Libyan officials, including Muammar Qadhafi, pursuant to the state sponsor of terrorism exception of the FSIA outlined in § 1605(a)(7). Pugh, 290 F. Supp. 2d at 58. In its personal jurisdiction analysis, the court concluded that the individuals had sufficient contacts with the United States to satisfy due process since they had "conspired to sabotage" a flight, which was scheduled to "stop in several nations," thus making it foreseeable that "passengers of many nationalities would be on board." Id. at 59. From their actions, the defendants could have expected to be haled into "the courts of those nations whose citizens would die." Id. Given the number of passengers on the plane, it was also foreseeable that Americans would be on board. Id. Finally, the court reasoned that the "interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years." Id. (citing statutes criminalizing terrorist acts). "It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action, exercising civil in personam jurisdiction over those same individuals for the same acts." Id.

The courts in Rein, Daliberti, and Pugh properly exercised personal jurisdiction over each of the defendants in those cases pursuant to the FSIA, which specifically provides that personal jurisdiction exists where proper service and subject matter jurisdiction have been established. 28 U.S.C. § 1330(b); Rein, 995 F. Supp. at 329-30; Daliberti, 97 F. Supp. 2d at 52; Pugh, 290 F. Supp. 2d at 58. While the FSIA is not the basis for personal jurisdiction here, jurisdiction based on the ATA or Rule 4(k)(2) also requires minimum contacts with the United States. Accordingly, Plaintiffs may rely on their "purposefully directed" theory to establish these minimum contacts. But as existed in Burger King, Calder, and the three terrorism cases, Plaintiffs must allege some personal or direct involvement by the Defendants in the conduct giving rise to their claims. See, e.g., Daliberti, 97 F. Supp. 2d at 41 (explaining that defendant Iraq had held and tortured plaintiffs and that three of four plaintiffs were released only after U.S. officials' explicit negotiations with their Iraqi counterparts); Pugh, 290 F. Supp. 2d at 56 (noting that seven individual Libyan defendants were sued in the United States after extensive official French investigation and that these defendants were deemed to be responsible for the bombings in both civil and criminal proceedings); see also In re Magnetic Audiotape, 334 F.3d at 208 (2d (stating a "court may exercise personal jurisdiction over defendant consistent with due process when defendant is primary participant in intentional wrongdoing – albeit extraterritorially – expressly directed at forum" (citing Calder v. Jones, 465 U.S. at 789-90)); Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM), 2003 WL 23018890, at *5 (S.D.N.Y. Dec. 22, 2003) (finding Calder

turned on "personal involvement of the individual defendants in the particular conduct that gave rise to the plaintiff's claim" and granting motion to dismiss because plaintiff had not demonstrated that defendant had had any personal involvement in the events giving rise to the lawsuit). Accordingly, regardless of whether personal jurisdiction is based on the ATA's nationwide service of process provision or Rule 4(k)(2), to satisfy the Fifth Amendment's due process requirements, Plaintiffs must make a prima facie showing of each Defendant's personal or direct participation in the conduct giving rise to Plaintiffs' injuries.

### 3. Mass Torts Theory

In addition to the arguments articulated above, the <u>Federal</u> Plaintiffs submit that the Court should utilize a modified due process standard appropriate for mass torts. <u>See, e.g.,</u> Federal Prince Turki Opp. at 23; Federal Prince Mohammed Opp. at 12; SAAR Network Opp. at 12-13. Courts in the Eastern District of New York have outlined the modified standard in products liability cases as follows: the state's interests in the litigation replace contacts with the forum as the constitutional touchstone and the "reasonableness" inquiry is replaced with a hardship analysis. <u>Smith v. Philip Morris</u>, 86 F. Supp. 2d 95, 129 (E.D.N.Y. 2000); <u>In re DES Cases</u>, 789 F. Supp. 552, 587 (E.D.N.Y. 1992). The Court declines to adopt this standard. There was no question that, at a minimum, the defendants in these products liability actions had substantial contacts with the forum, in these cases being New York, and were involved in the sale or production of the products at issue. <u>In re DES Cases</u>, 789 F. Supp. at 559; <u>Smith</u>, 86 F. Supp. 2d at 99-100. Here, however, there are questions as to the Defendants' contacts with the forum, whether it be the United States generally or New York specifically, and the Defendants' alleged involvement with al Qaeda is much more attenuated.

### B. Due Process Requirements

Any exercise of personal jurisdiction must comport with the requirements of due process. "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996). Depending on the basis for personal jurisdiction, due process under either the Fifth or Fourteenth Amendment applies. "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." <u>Chew v. Dietrich</u>, 143 F.3d 24, 28 n.4 (2d. Cir. 1998). Here, personal jurisdiction under the New York long-arm statute requires minimum contacts with New York pursuant to the Fourteenth Amendment. The exercise of personal jurisdiction under Rule 4(k) requires contacts with the United States as a whole pursuant to the Fifth Amendment.

### 1. Minimum Contacts

Minimum contacts are required so "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945); <u>see also</u> <u>World-Wide Volkswagon Corp. v. Woodson</u>, 444 U.S. 286, 292 (1980). The minimum contacts requirement is also known as "fair warning," such that the defendant's contacts with the forum should be sufficient to make it reasonable to be haled into

33

|

court there. Burger King, 471 U.S. at 474. The "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at the residents of the forum    and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Id. (internal citations omitted); see also World-Wide Volkswagen, 444 U.S. at 297-98 (finding purposefully directed activities where defendant delivered products into stream of commerce with expectation they would be purchased by residents of forum); Caldor, 465 U.S. at 789-90 (finding publishing activities outside of forum were calculated to cause injury to plaintiff in forum where she lived and which also had the highest subscription rate). "Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." Burger King, 471 U.S. at 474 (quoting World-Wide Volkswagon, 444 U.S. at 295). In every case, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

For purposes of the minimum contacts inquiry, a distinction is made between specific and general jurisdiction. Specific jurisdiction exists when the forum exercises jurisdiction over the defendant in a suit arising out of the defendant's contacts with that forum. Metro. Life Ins. 84 F.3d at 567-68. General jurisdiction is based on the defendant's general business contacts with the forum; because the defendant's contacts are not related to the suit, a considerably higher level of contacts is generally required.[34] Id. at 568.

### 2. Reasonableness

In determining whether the exercise of personal jurisdiction is reasonable, a court is to consider:

(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests in the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

Metro. Life, 84 F.3d at 568 (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-16 (1987)). "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Burger King, 471 U.S. at 477.

There obviously are competing policy considerations at play here. In general, "'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" Asahi Metal Indus., 480 U.S. at 115 (quoting United States v. First Nat'l

---

[34] At oral argument, Plaintiffs focused on specific jurisdiction, see Oct. 12, 2004 Transcript at 44, but Plaintiffs include general jurisdiction arguments in many of their opposition briefs, see, e.g., Ashton Opp. to Prince Mohamed at 22-24; Burnett Opp. to Aljomaih at 11. The Court considers all arguments.

34

City Bank, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)). "[T]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Id. at 114. On the other hand, "[t]here is some merit ... to the plaintiffs' argument that no foreign terrorist today can fairly assert a lack of 'fair warning' that it could be 'haled into court' in [this forum.]" Biton v. Palestinian Interim Self-Government, 310 F. Supp. 2d 172, 178 (D.D.C. 2004).

### C. Jurisdictional Discovery

Plaintiffs urge the Court to deny Defendants' motions and order jurisdictional discovery. In evaluating jurisdictional motions, district courts enjoy broad discretion in deciding whether to order discovery. See, e.g., APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (noting a court may "devis[e] the procedures [to] ferret out the facts pertinent to jurisdiction"); Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981) (noting a court has considerable procedural leeway in deciding whether discovery would assist resolution of motion to dismiss for lack of personal jurisdiction); Lehigh Valley Indus. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975) (finding no abuse of discretion in denying discovery where the complaint failed to plead sufficient facts to establish jurisdiction). "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdictional discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." Daventree, 2004 WL 2997881, at *20 (citing In re Magnetic Audiotape, 334 F.3d at 207-08). Courts are not obligated to subject a foreign defendant to discovery, however, where the allegations of jurisdictional facts, construed in plaintiffs' favor, fail to state a basis for the exercise of jurisdiction or where discovery would not uncover sufficient facts to sustain jurisdiction. Id. (citing Jazini, 148 F.3d at 183-85 (granting motion to dismiss and denying jurisdictional discovery where complaint was described as "sparse" and "conclusory")); see also Cornell v. Assicurazioni Generali S.p.A., Consolidated, Nos. 97 Civ. 2262, 98 Civ. 9186 (MBM), 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (granting motion to dismiss and denying request for jurisdictional discovery where the complaint stated, without any supporting facts, that the defendant "participates in a 'multinational insurance arrangement' present in the State of New York"); In re Ski Train Fire in Kaprun, Austria, 230 F. Supp. 2d at 410-413 (granting motion to dismiss and denying jurisdictional discovery where complaint only contained conclusory allegations).

### D. Application of Plaintiffs' Theories to Moving Defendants
#### 1. Prince Sultan

The Court outlined the allegations against Prince Sultan in Part I.B.1. With respect to Prince Sultan's contacts with the United States, Plaintiffs allege that "Saudi Royal family members own substantial assets in the United States of America, and do substantial business in the United States of America, the profits of which in part, are used to fund international terrorist acts, including those which led to the murderous attacks of September 11, 2001." See Ashton Complaint ¶ 296. There is no indication of whether these unspecified members of the Royal family include Prince Sultan. Most Plaintiffs also claim Prince Sultan is the ex-officio Chairman of the Board of Saudi Arabia Airlines, "which does business in the United States and internationally." Burnett Complaint ¶ 340; Ashton Complaint ¶ 253; Barrera Complaint ¶ 255;

Salvo Complaint ¶ 245; Tremsky Complaint ¶ 180. The Federal Plaintiffs do not make a similar allegation

To the extent these allegations are an attempt to establish general jurisdiction over Prince Sultan, they are insufficient. See In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117, 130 (D.D.C. 2003) (refusing to hold that control status in foreign corporation with United States office is sufficient for personal jurisdiction over individual); Cornell, 2002 WL 284222, at * 2 (granting motion to dismiss where complaint contained one conclusory statement regarding jurisdiction); Family Internet, Inc. v. Cybernex, Inc., No. 98 Civ. 0637 (RWS), 1999 WL 796177, at *4 (S.D.N.Y. Oct. 6, 1999) (holding that personal jurisdiction must be individually established over corporate officers even when the court has personal jurisdiction over the corporation itself)

Proceeding under the purposefully directed activities theory of personal jurisdiction, Plaintiffs argue that Prince Sultan knew or should have known the organizations to which he donated were funneling money to al Qaeda and that al Qaeda's primary target was the United States. Consol. Plaintiffs' Opp. at 23. Prince Sultan argues that his alleged actions cannot satisfy the minimum contacts requirement since the Second Circuit's recent description of Calder requires "primary participa[tion] in intentional wrongdoing." See In re Magnetic Audiotape, 334 F.3d at 208

Judge Robertson dismissed without prejudice the claims against Prince Sultan in his personal capacity for lack of personal jurisdiction. Burnett II, 292 F. Supp. 2d at 21-22. He rejected Plaintiffs' argument that Prince Sultan had purposefully directed his alleged activities at the United States. Id. at 22-23. Judge Robertson found that the complaint's claims that Prince Sultan donated money to foundations that allegedly funded al Qaeda "stop[] well short of alleging Prince Sultan's actions were 'expressly aimed' or 'purposefully directed' at the United States." Id. at 23 (citing Burger King and Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774-75 (1984)). Judge Robertson also denied Plaintiffs' request for discovery because they did not provide an "outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery." Id. at 22

This Court's record, which Plaintiffs claim is more extensive than that before Judge Robertson, contains many examples of Osama bin Laden's and al Qaeda's public targeting of the United States. See Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Exs. 1-24. The complaints also contain conclusory allegations that Prince Sultan aided and abetted terrorism. See, e.g., Burnett Complaint ¶ 363; Federal Complaint ¶¶ 429-31. But Plaintiffs do not offer any facts to lend support to their allegation that Prince Sultan purposefully directed his activities at this forum by donating to charities that he knew at the time supported international terrorism. See Exec. Order 13244 (designating certain branches of Al Haramain in 2002 and later) "[L]egal conclusions done up as factual allegations are not facts and cannot substitute for facts." Cornell, 2000 WL 284222, at *2 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). Plaintiffs have note provided an "outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery." Burnett II 292 F. Supp. 2d at 22. Accordingly, Prince Sultan's motions to dismiss the certain consolidated and Federal complaints for lack of personal

36

jurisdiction over the claims concerning his personal acts are granted. Plaintiffs' request for
jurisdictional discovery with respect to Prince Sultan is denied. Daventree, 2004 WL 2997881,
at *20 (finding jurisdictional discovery is not necessary where the allegation of jurisdictional
facts fails to state a basis for the exercise of personal jurisdiction)

### 2. Prince Turki

The allegations against Prince Turki are outlined in Part I.B.2. Because the consolidated
Plaintiffs do not allege any acts taken by Prince Turki in his personal capacity, the Court only
considers the Federal Plaintiffs' claim that Prince Turki made personal donations to certain Saudi
charities. See Federal Complaint ¶ 452. The Federal complaint does not make any specific
jurisdictional allegations against Prince Turki. Rather, these Plaintiffs rely on Calder, Rein,
Daliberti, Pugh, and the modified due process standard for mass torts to argue that the September
11 attacks were a foreseeable result of Prince Turki's alleged support of certain Saudi charities.
See Federal Opp. to Prince Turki's Motion to Dismiss at 22-23.

The Federal Plaintiffs have not presented any specific facts from which this Court could
infer Prince Turki's primary and personal involvement in, or support of, international terrorism
and al Qaeda. Conclusory allegations that he donated money to charities, without specific factual
allegations that he knew they were funneling money to terrorists, do not suffice. See Burnett II,
292 F. Supp. 2d at 23 (citing Burger King and Keeton v. Hustler Magazine, Inc., 465 U.S. at 774-
75); see also Exec. Order 13244 (designating certain branches of Al Haramain and BIF in 2002).
Accordingly, Prince Turki's motion to dismiss the Federal complaint for lack of personal
jurisdiction is granted. Jurisdictional discovery is not appropriate with respect to Prince Turki
because Plaintiffs have not identified any genuine issue of jurisdictional fact. Daventree, 2004
WL 2997881, at *20.

### 3. Prince Mohamed

The Ashton and Federal Plaintiffs allege that Prince Mohamed is or was the chairman or
chief executive officer of three financial institutions in Saudi Arabia: Dar al Maal al Islami
("DMI"), Islamic Investment Company of the Gulf-Bahrain EC ("IICG"), and Faisal Islamic
Bank-Sudan ("FIBS"), which are all shareholders of Defendant Al Shamal Islamic Bank.[35]
Ashton Complaint ¶¶ 51, 54; Federal Complaint ¶¶ 307, 309, 473. They claim that Prince
Mohamed knew or should have known that each of these financial institutions "acted as an aider
and abettor and material sponsor of al Qaeda, Bin Laden, and international terrorism." Ashton
Complaint ¶ 276; Federal Complaint ¶ 472 (alleging Prince Mohamed "has long provided
material support and resources to al Qaeda") The Ashton Plaintiffs claim that Prince Mohamed
is "heavily involved in the sponsorship of terror through Faisal Islamic Bank-Sudan," since at
some point al Qaeda allegedly had an account there. Ashton Complaint ¶¶ 65, 66, 255, 274; see
also Ashton Opp. to Prince Mohamed's Motion to Dismiss at 25 (arguing that al Qaeda operative
Jamal Ahmed Al Fadl used an account at Al Shamal Islamic Bank to transfer $250,000 for

---

[35] Osama bin Laden allegedly capitalized Al Shamal Islamic Bank with $50 million.
Burnett Complaint ¶ 70. Several al Qaeda operatives, including Osama bin Laden, held accounts
there. Id. ¶ 79

Osama bin Laden). These Plaintiffs also claim that Prince Mohamed has financial ties with
alleged al Qaeda financier Muhammed Zouaydi. Ashton Complaint ¶ 258. The Federal
Plaintiffs claim that Prince Mohamed made personal contributions to Saudi-based charities that
he knew or should have known sponsored the terrorist activities of al Qaeda. These charities
include IIRO, MWL, WAMY, BIF, the Saudi High Commission, SJRC, and Al Haramain.
Federal Complaint ¶¶ 475-76.

The Ashton complaint contains an unspecific allegation regarding the Saudi Royal
family's ownership of property in the United States. Ashton Complaint ¶ 296. The Ashton
Plaintiffs argue that general jurisdiction is appropriate because Prince Mohamed attended college
and business school in the United States, gave two interviews in a New York apartment in 1978,
gave a speech at Harvard in 1999, and made investments in American businesses through the
banks he chairs in 2001. Ashton Opp. to Prince Mohamed Motion to Dismiss at 22-23.
Plaintiffs assert jurisdictional discovery is likely to expose further contacts between Prince
Mohamed and the United States.

If general jurisdiction is not established through Prince Mohamed's contacts with the
United States, the Ashton and Federal Plaintiffs claim that jurisdiction exists under either the
New York long-arm conspiracy theory or the purposefully directed activities theory. Ashton
Opp. to Prince Mohamed Motion to Dismiss at 17-22; Federal Opp. to Prince Mohamed Motion
to Dismiss at 6-12. Specifically, the Ashton Plaintiffs bolster their arguments for personal
jurisdiction by citing to paragraphs in the complaint in support of each of the requirements for
conspiracy. See Chrysler Capital Corp. 778 F. Supp. at 1268-69 (outlining cause of action for
conspiracy).

Plaintiffs claim that Prince Mohamed and al Qaeda agreed to injure the United States
through acts of international terrorism. Ashton Complaint ¶¶ 5, 23 (all defendants are co-
conspirators), 51, 105-08 (February 1993 World Trade Center bombing), 120 (February 1998
fatwa), 130-36 (1998 embassy bombings), 152-55 (U.S.S. Cole attack), 188, 255, 274-76, 580
(September 11, 2001 attacks); see also Federal Complaint ¶¶ 66, 72-74 (listing defendants who
have "aided and abetted, conspired with, and provided material support and resources to,
defendant al Qaeda and/or affiliated FTOs, associations, organizations or persons "). Next they
claim the September 11 attacks were perpetrated in furtherance of that common scheme. Ashton
Complaint ¶¶ 23, 188, 610. According to Plaintiffs, Prince Mohamed participated in the
conspiracy by providing funding, financial support, and banking services through FIBS. Id. ¶¶
48-54, 63-66, 255, 274-276, 387, 580, 582. Specifically, Plaintiffs claim:

- On October 17, 1983, Prince Mohamed became CEO of DMI. Under Prince
  Mohamed's chairmanship, DMI developed banking, investment and insurance
  activities in approximately twenty offices across the world. DMI was founded in
  1981 to foster the spread of Islamic banking across the Muslim world and its
  Board of Directors included Haydar Mohamed bin Laden, a half-brother of Osama
  bin Laden. Id. ¶ 274
- Faisal Islamic Bank Sudan was one of the five main founders of Al Shamal
  Islamic Bank … Al Shamal Islamic Bank is an instrumental bank in bin Laden's

financial support network. Bin Laden used Al Shamal Bank for the funding of his al Qaeda network leading up to the 1998 United States embassy bombings in Africa. Defendant Faisal Islamic Bank was implicated during Al Fadl's May 2001 United States trial testimony regarding the bombings as holding and managing bank accounts for al Qaeda operatives. Id. ¶¶ 274-75.

- As the head of DMI, Prince Mohamed knew or should have known of these and other activities and acted as an aider and abettor and material sponsor of al Qaeda, bin Laden, and international terrorism. Id. ¶ 276

- U.S. designated terrorists Wa'el Julaidan and Yassin Kadi had accounts in a DMI subsidiary. Ashton Opp. at 25.

Finally, Plaintiffs allege the that attacks in question caused many deaths, a fact that no one disputes. Ashton Complaint ¶¶ 23, 610.

In response, Prince Mohamed argues that Plaintiffs have failed to demonstrate that he is "present" in the United States for general personal jurisdiction purposes. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 411-12, 416-18 (1984); Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir. 1975) (buying and selling American securities is insufficient to establish that defendant was "doing business" in the United States). Prince Mohamed submits that some of the contacts on which Plaintiffs rely are too far removed in time from September 2001 to be considered by the Court. See Metro. Life, 84 F.3d at 569 (holding courts should examine a defendant's contacts with the forum for a reasonable period prior to the date on which the lawsuit was filed, and finding that six years was reasonable). Prince Mohamed correctly submits that his position as an officer of DMI, IICG, and FIBS would not be a basis for jurisdiction over him even if the Court had personal jurisdiction over these entities. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually."). Finally, Prince Mohamed argues that the conclusory allegation that he participated in a terrorist conspiracy, without specific facts, is insufficient to create personal jurisdiction over him.

The Court agrees that Plaintiffs have not presented a prima facie case of general jurisdiction over Prince Mohamed. In the ten years before the attacks, Prince Mohamed's contacts with the United States consist of one speech and a handful of investments in the United States through the banks with which he is affiliated. These contacts are not sufficiently "systematic and continuous" to maintain general jurisdiction over a defendant in this action [36] See Helicopteros, 464 U.S. at 416 (holding that purchasing in forum, sending personnel for training in forum, and negotiating a contract in forum were not sufficient to establish general jurisdiction).

Plaintiffs have alleged that DMI and FIBS might have been involved in the financing of terrorism. See, e.g., Ashton Complaint ¶¶ 274-75; Ashton Opp. at 25. Even assuming that the Court has personal jurisdiction over these entities, "[t]he mere fact that a corporation is subject to

_____

[36] There is no allegation that Prince Mohamed's investments in the United States are related to any alleged conspiracy or to al Qaeda's activities.

jurisdiction . . . does not mean that individual officer may be hauled before New York courts without any showing that the individuals themselves maintained a presence or conducted business in New York." Family Internet, 1999 WL 796177, at *4. Plaintiffs have not alleged that Prince Mohamed had any knowledge or involvement in any al Qaeda accounts at any of the banks he chaired. FIBS' relationship with Al Shamal Islamic Bank, which purportedly knowingly opened accounts for al Qaeda operatives, including Osama bin Laden, is too remote in time and proximity to implicate Prince Mohamed. To make a prima facie case of personal jurisdiction, Plaintiffs must either allege personal acts by Prince Mohamed by which he purposefully directed his activities at the United States by supporting Osama bin Laden, al Qaeda, or their terrorist agenda, or demonstrate that the acts of the banks he chaired can be imputed to him. Plaintiffs have not met their burden. Thus, Prince Mohamed's motions to dismiss the Ashton and Federal complaints as against him for lack of personal jurisdiction are granted.

### 4. Estate of Mohammad Abdullah Aljomaih

On May 2, 2003 by Second Addition and Removal of Defendants Pursuant to Case Management Order No. 1 imposed by Judge Robertson, the Burnett Plaintiffs added a defendant "Mohammed Bin Abdullah Al-Jomaith." To date, no specific allegations have been added to the complaint with respect to Mr. Aljomaih.

In anticipation of what the claims against him might be, before his death Mr. Aljomaih prepared a declaration in support of his motion to dismiss. He was born in Saudi Arabia in 1915 and lived in Riyadh for most of his life. Aljomaih Decl. ¶ 3. He and his family began a company in the 1940s that now supplies automobiles, soft drinks, construction equipment, and other goods and services to large portions of Saudi Arabia. Id. ¶ 4. In the past ten years he visited the United States three times for medical reasons. Id. ¶¶ 5-6. Prior to these medical visits, he took a short trip to New York City in 1964. Id. ¶ 7. He owned no property, held no bank accounts, and conducted no business in this country. Id. ¶ 10.

Mr. Aljomaih's estate argues that there were problems with his service. He was served pursuant to Judge Robertson's March 25, 2003 approving service by publication. Under that order, Plaintiffs published a list of defendants in two publications, The International Herald Tribune and Al Quds Al Arabia. The notice in The International Herald Tribune contained Mr. Aljomaih's name in English, a language he could not read. Id. ¶ 11. Al Quds Al Arabi is published in Arabic, but is not circulated in Saudi Arabia and the list did not include Mr. Aljomaih's name. Even if service was proper, however, the estate of Mr. Aljomaih claims the Court does not have personal jurisdiction over it.

Plaintiffs submit that Mr. Aljomaih is implicated by the "Golden Chain." Plaintiffs' Opp. at 9. The "Golden Chain" is a group of documents that was discovered by Bosnian authorities searching the offices of charity Defendant BIF in March 2002. Plaintiffs claim the "Golden Chain" contains a list of early direct donors to al Qaeda. Plaintiffs' Opp. at 9; see also Bierstein Aff. in Opp. to Al-Husani Motion to Dismiss, Ex. 2 ("Golden Chain" document). It includes the entry "Al-Jumaih. Jeddah (S.A.)." Plaintiffs do not dispute that "for more than sixty years [Mr.

Aljomaih] lived in Rihadh," not Jeddah, Aljomaih Decl. ¶ 3, yet they insist the document
identifies him as a direct donor to al Qaeda. Additionally, Plaintiffs claim that Mr. Aljomaih's
company donated money to charity Defendant IIRO. Plaintiffs assert there are sufficient
allegations against Mr. Aljomaih in the form of general allegations against all Defendants to put
him on notice of the claims against him. They claim that jurisdiction over Mr. Aljomaih's estate
is proper because he "purposefully directed" his activities at the United States by supporting al
Qaeda. Plaintiffs also submit that Mr. Aljomaih's company does business with General Motors
and Shell Corporation and that, therefore, he must have had contacts with the United States. See
Opp. at 11; Statement of Jamie L. Paye attached to Plaintiffs' Opp.

        The Court finds the Plaintiffs have not established a prima facie case of jurisdiction over
Mr. Aljomaih to defeat his motion or warrant jurisdictional discovery. Their theory of
jurisdiction rests almost entirely on a document with serious foundational flaws. Even assuming,
as the Court must, that the "Golden Chain" refers to Mr. Aljomaih, with no indication of who
wrote the list, when it was written, or for what purpose, the Court cannot make the logical leap
that the document is a list of early al Qaeda supporters. Mr. Aljomaih's motion to dismiss the
Burnett complaint for lack of personal jurisdiction is accordingly granted.

### 5. Sheikh Hamad Al-Husani

        The posture of the Burnett Plaintiffs' case against Sheikh Hamad Al-Husani is similar to
that against Mr. Aljomaih. Mr. Al-Husani was also added to a list of defendants to be served by
publication and the complaint contains no specific allegations against him. Al-Husani Decl. ¶
10. He is a watch retailer residing in Saudi Arabia. Id. ¶¶ 3-4, 7. Mr. Al-Husani has never
visited the United States, owns no real property here, holds no bank accounts or investments in
the United States, and does not engage in transactions with any businesses in the United States.
Id. ¶¶ 3, 5-7. He has never supported any person or organization that he has known to participate
in any terrorist attacks. Id. ¶ 9. Mr. Al-Husani submits that Plaintiffs cannot cure the lack of
allegations in the complaint in its motion papers. Wright v. Ernst & Young, LLP, 152 F.3d 169,
178 (2d Cir. 1998) (explaining a party is not permitted to amend its complaint through
allegations made in motion papers).

        Mr. Al-Husani also claims that he was not properly served because The International
Herald Tribune has a circulation of only 199 in Saudi Arabia and is published in English, and Al
Quds Al Arabia is a London-based paper banned in the Kingdom. Even if service was proper,
however, Mr. Al-Husani submits this Court does not have personal jurisdiction over him.

        The Burnett Plaintiffs claim that Mr. Al-Husani is also implicated by the "Golden Chain,"
and thus an early supporter of al Qaeda. Plaintiffs' Opp. to Al-Husani Motion to Dismiss at 10;
Bierstein Aff. at Ex. 2 (document listing "Hamad Al Husaini," without indicating when list was
written, by whom, or for what purpose). The Plaintiffs place great weight on the United States'
inclusion of the "Golden Chain" in its proffer of evidence in United States v. Arnaout, the
government's case against an executive of Defendant charity BIF. See Bierstein Aff. at Ex. 1
(proffer). The court presiding over that case, however, ruled that the document was inadmissible
hearsay. United States v. Arnaout, No. 02 Cr. 892, 2003 WL 255226, at *1-2 (N.D Ill. Feb. 4,

41

2003)  Nevertheless, by supporting al Qaeda, Plaintiffs assert Mr. Al-Husani purposefully directed his activities toward the United States, making the exercise of personal jurisdiction appropriate  See, e.g. Bierstein Aff. Exs  9-15 (detailing al Qaeda's hatred for and actions against the United States)  Additionally, Plaintiffs claim that one of Mr. Al-Husani's companies is a supporter of Al-Waqf al-Islami Foundation, a Dutch entity whose seminars "have drilled extremist messages into the heads of thousands of young Muslims."  "Radical Foundation: In 'Law' Seminars, A Saudi Group Spreads Extremism," Wall St. J., Apr. 15, 2003, at Bierstein Aff. Ex  6.

Plaintiffs have not established a prima facie showing of jurisdiction over Mr. Al-Husani to survive his motion to dismiss or warrant jurisdictional discovery  The "Golden Chain" does not say what the Plaintiffs argue it says. It is only a list of names found in a charity's office  It does not establish Mr. Aljomaih's involvement in a terrorist conspiracy culminating in the September 11 attacks and it does not demonstrate that he purposefully directed his activities at the United States  Accordingly, Mr. Al-Husani's motion to dismiss the Burnett complaint against him is granted

### 6. NCB

The Court outlined the Ashton and Burnett Plaintiffs' claims against NCB in Part I B 4. For purposes of the personal jurisdiction analysis, the Court will assume at this point that the FSIA does not provide for subject matter and personal jurisdiction over NCB.  Accordingly, the Plaintiffs will have to make a prima facie showing to survive NCB's motion to dismiss  In that vein, Plaintiffs argue that NCB purposefully directed its activities at the United States and participated in a conspiracy that culminated in the attacks of September 11.

Plaintiffs submit NCB has many contacts with the United States, including a wholly-owned subsidiary in New York City through which it operates an international banking business  See, e.g., Aff. of John Fawcett in Support of Ashton Plaintiffs' Opp  to NCB's Motion to Dismiss (hereinafter "Fawcett Aff.") ¶ 3, Exs  2 & 3  NCB has been a party to lawsuits in the Southern District of New York, both as a plaintiff and defendant  Fawcett Aff  ¶ 7  The Muslim World League Journal, a monthly publication distributed in American mosques, ran solicitations from 1998 to 2001 for Islamic Solidarity Fund & Waqf for the Organization of the Islamic Conference and the Khair Funds of the Muslim World League that provided NCB account numbers to which donors could contribute directly. Id. ¶ 8, Ex  5.  Plaintiffs request jurisdictional discovery to explore further contacts.

NCB argues that none of Plaintiffs' submissions satisfy the constitutionally required showing of minimum contacts  NCB closed its New York City branch office in 1992  Decl  of Jorge Juco ("Juco Decl.") ¶ 5, at Berger Aff  in Support of NCB's Motion to Dismiss Ashton and Burnett, Ex  5.  NCB's second-tier subsidiary, SNCB Securities Inc , dissolved in February 2001  Id. (citing Ex  A of Juco Decl., the certified copy of the Certificate of Dissolution); see also Schenker v. Assicurazioni Generali, S.P.A., No  98 Civ  9186 (MBM), 2002 WL 1560788, at * 4 (S.D.N.Y  July 15, 2002) (finding no personal jurisdiction over parent corporation where New York subsidiary was sold two months prior to commencement of action)  NCB submits its

involvement in lawsuits is equally unavailing because both were terminated prior to the filing of this action. See docket Logan Feed v. Nat'l Commercial Bank, No. 92 Civ 7653 (S D.N Y ) (NCB terminated July 24, 1995); docket Nat'l Commercial Bank v. Morgan Stanley Asset Mgmt., Inc., No. 94 Civ. 3167 (S D.N.Y ) (closed Feb 17, 1998). It contends that its consent to personal jurisdiction in one case does not open the door to personal jurisdiction in future cases See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 50 n.5 (2d Cir. 1991); Andros Compania Maritima, S.A. v. Intertanker Ltd., 714 F. Supp. 669, 675 (S.D.N.Y. 1989) (holding lawsuits in the forum do not establish general personal jurisdiction). NCB argues that there is no indication it placed the advertisements in The Muslim World League Journal, or that any donations were deposited into NCB accounts.

In arguing its absence of contacts with the United States, NCB reiterates that it is not domiciled, organized, or maintaining an office in New York. Juco Decl ¶ 3. It is not registered or licensed to do business in the United States and has no property in the United States. Id. ¶ 8 Shares of NCB stock are not sold in the United States, there are no NCB employees or telephone numbers in the United States, and the company does not advertise or solicit business in the United States. Id. ¶ 11. Its website is accessible from United States, but only NCB account holders may access the inter-active services Id. The Saudi Arabian Monetary Agency requires that NCB's account holders be Saudi citizens or residents, Saudi government entities, or business or charity entities with lawful status in Saudi Arabia. Juco Decl ¶ 10.

NCB claims the rare contacts it does have with the United States do not satisfy the requirements of due process Although it maintains correspondent banking relationships with U S. commercial banks, Juco Decl ¶ 12, NCB argues such relationships are insufficient to establish personal jurisdiction over NCB Semi Conductor Material, Inc. v. Citibank Int'l PLC, 969 F Supp 243, 244 (S.D.N.Y. 1997) (holding foreign bank's correspondent banking relationship with New York bank is not sufficient for personal jurisdiction); Casio Computer Co. v. Sayo, No 98 Civ 3772 (WK), 2000 WL 1877516, at *26 (S.D.N.Y Oct 13, 2000) (holding defendant bank's wire transfers to U.S. bank accounts does not create minimum contacts); Leema Enters. Inc. v. Willi, 575 F Supp 1533, 1537 (S.D.N.Y 1983) (holding correspondent banking relationships insufficient to create general personal jurisdiction) NCB offers its customers the opportunity to open accounts directly with United States-based securities broker-dealers, but NCB does not act as a broker-dealer for securities sold in the United States and is not so licensed Juco Decl ¶ 14; Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 998 (2d Cir. 1975) (finding Canadian securities broker not "doing business" in New York when it arranges for its Canadian customers to buy and sell U.S. securities through U.S. broker) In 2002, less than 2% of the securities NCB traded for its own account were issued by U.S. entities. Juco Decl ¶ 15; Schenckler, 2002 WL 1560788, at *3-5 (finding that a single bank account in the United States, constituting small fraction of defendant's total assets, is insufficient to form the basis for personal jurisdiction).

Taken individually, NCB's contacts with the United States would not satisfy due process requirements. However, when they are examined as a whole – the presence of a branch office until 1992, a subsidiary until 2001, taking advantage of the privilege of its presence in New York

43

by instigating a lawsuit in this forum, advertisements in U.S. publications – the Court finds that they may, with the help of limited jurisdictional discovery, comport with due process. NCB's motion to dismiss is therefore denied without prejudice.

### 7. Abdulrahman bin Mahfouz

Abdulrahman bin Mahfouz is a Defendant in the Burnett action. He is the son of Defendant Khalid bin Mahfouz and a director of the Defendant charity Blessed Relief Society, also known as Muwaffaq. Burnett Complaint ¶¶ 331; 445. Blessed Relief is a branch of the Human Concern International Society, which Osama bin Laden identified as a supporter in 1995. Id. ¶ 333. He is a shareholder and the CEO of former Defendant Nimir, LLC, also known as Nimir Petroleum Ltd. Id. ¶ 443 [37] Finally, Plaintiffs claim that Mr. bin Mahfouz was a member of the board and Vice Chairman of the Executive Management Committee of Defendant National Commercial Bank. Id. ¶ 445.

Plaintiffs base their personal jurisdiction arguments on their claim that Mr. bin Mahfouz was a participant in the conspiracy of terror that purposefully directed its conduct at the United States and included the September 11 hijackers. Plaintiffs also claim that he has business interests in the United States. Specifically he is a shareholder in U.S.-based companies, and his company, Al Murjan, allegedly has dealings with the American phone company Hughes Technologies, Inc.

Mr. bin Mahfouz disputes the manner in which he was served. His name appeared in Plaintiffs' notice by publication in The International Herald, which only has circulation of 199 in the entire Kingdom of Saudi Arabia, and Al Quds al-Arabia, which is banned in the Kingdom. He submits that he has no personal contacts with the United States and there is no basis for exercising personal jurisdiction over him.

The Burnett complaint does not contain any specific actions by Mr. bin Mahfouz from which the Court could infer that he purposefully directed his activities at the United States. His affiliations with entities that are alleged to have U.S. contacts will not sustain jurisdiction. Family Internet, 1999 WL 796177, at *4. Finally, being a shareholder in a United States company is not sufficient to establish general personal jurisdiction over Mr. bin Mahfouz. Bersch, 519 F.2d at 998; see also Schenckler, 2002 WL 1560788, at *3-5 (finding single bank account in United States constituting small fraction of defendant's total assets is not a sufficient basis for personal jurisdiction). Mr. bin Mahfouz's motion to dismiss the Burnett complaint as against him for lack of personal jurisdiction is accordingly granted.

### 8. Saudi Binladin Group, Tariq Binladin, Omar Binladin, and Bakr Binladin

The Ashton and Burnett complaints name the Saudi Binladin Group ("SBG") as a Defendant. The Burnett complaint also names Tariq Binladin, Omar Binladin, and Bakr

---

[37] The Burnett Plaintiffs voluntarily dismissed their claims against Nimir LLC. See Mem. in Supp. of Motion to Dismiss Ex. 1.

Binladin, Osama's half-brothers, as Defendants. In both actions, these Defendants move to dismiss the complaint or for a more definite statement.

Based in Jeddah, Saudi Arabia, SBG is the successor to a construction company founded by Mohammed Binladin, the father of Osama bin Laden. Ashton Complaint ¶ 543; Burnett Complaint ¶ 311. It is now one of the largest engineering and construction companies in the Arab world and is managed by Osama bin Laden's half brothers, including defendants Bakr Binladin, who runs SBG, and Tariq Binladin, who holds a position on the board. Ashton Complaint ¶ 545; Burnett Complaint ¶ 313. Tariq Binladin allegedly had a prominent role at IIRO in 1990. Ashton Complaint ¶ 557; Burnett Complaint ¶ 326. Osama bin Laden purportedly used SBG to build an infrastructure in Afghanistan. Ashton Complaint ¶¶ 546, 547; Burnett Complaint ¶¶ 314-316. After the Soviets withdrew from Afghanistan in 1989, Osama bin Laden returned to work with SBG in Jeddah. Ashton Complaint ¶ 548; Burnett Complaint ¶ 317. SBG allegedly continued to support Osama bin Laden after he relocated to Sudan in 1991. Ashton Complaint ¶ 548; Burnett Complaint ¶ 317. For example, SBG, through two subsidiaries allegedly supported Osama bin Laden's participation in the construction of the Tahaddi road and Port Sudan Airport. Ashton Complaint ¶¶ 550; 552, 553; Burnett Complaint ¶¶ 319-322. Plaintiffs claim Osama bin Laden's name is still listed on SBG corporate records. Ashton Complaint ¶ 558; Burnett Complaint ¶ 329. Defendants dispute this and argue he was formally removed from SBG's ownership documents in June 1993. SBG's Mem. in Supp. of Motion to Dismiss Ashton Complaint at 2. Plaintiffs also claim that Osama bin Laden never "broke" with his family after he was exiled to Sudan and that SBG continued to provide him financial assistance and engineering support. Ashton Complaint ¶ 549; Burnett Complaint ¶ 318. Defendants also dispute this statement and argue that Bakr formally ostracized Osama from the family and the company in a February 1994 statement. SBG's Mem. in Supp. of Motion to Dismiss Ashton Complaint at 2.

SBG "sheltered and directly supported operatives of the al Qaeda terrorist organization." Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. Mohammad Jamal Khalifa, allegedly a key al Qaeda operative, was taken in by a branch of SBG, the Mohammed Bin Laden Organization. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. The Mohammed Bin Laden Organization is allegedly a wholly-owned subsidiary of SBG and its board members include defendants Bakr, Tariq, and Omar Binladin. Ashton Complaint ¶ 556; Burnett Complaint ¶ 325. Khalifa listed the Mohammed Bin Laden Organization address on his visa application. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. Additionally, U.S.-designated terrorist Yassin Abdullah al-Kadi was allegedly introduced to the Global Diamond Resource's Chairman by an executive of SBG. Ashton Complaint ¶ 459; Burnett Complaint ¶ 328.

Plaintiffs claim that SBG had an address in Rockville, Maryland until very recently. Ashton Complaint ¶ 545; Burnett Complaint ¶ 313. SBG claims the Rockville address was the headquarters of a separately incorporated company, SBG USA, which was formally dissolved in December 1999. See SBG Memorandum in Support of Motion to Dismiss Ashton Complaint at 7 & Ex. 2 (articles of dissolution); see also Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 52 (2d Cir. 1991) (personal jurisdiction contacts determined at time complaint is filed); but see

Metro. Life, 84 F.3d at 569 (holding courts should examine a defendant's contacts with the forum for a reasonable period prior to year of lawsuit and finding six years was reasonable)

The Burnett complaint does not contain any factual allegations against Tariq, Omar, or Bakr Binladin from which the Court could infer that they purposefully directed their activities at the United States, that they were members of a conspiracy pursuant to the New York long-arm statute, or that they have any general business contacts with the United States. Accordingly, the Burnett complaint against these three individuals is dismissed.

Rather than permitting a 12(e) statement, the Court finds jurisdictional discovery is warranted to determine if SBG purposefully directed its activities at the United States. See Asip v. Nielsen Media Research, No. 03 Civ. 5866 (SAS), 2004 WL 315269, at *2 (S.D.N.Y. Feb. 18, 2004) (noting the purpose of Rule 12(e) is to "strike at unintelligibility rather than want of detail and ___ allegations that are unclear due to lack of specificity are more appropriately clarified by discovery") Specifically, although the complaints are not specific about when, at the very least, SBG provided construction support to Osama bin Laden. Ashton Complaint ¶¶ 550, 552-53; Burnett Complaint ¶¶ 319-22. A branch of SBG allegedly look in an al Qaeda operative who listed the SBG branch address on his visa application. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. It is alleged to have ties to U.S.-designated terrorist Yassin Abdullah Al-Kadi. Ashton Complaint ¶ 459; Burnett Complaint ¶ 328. At this stage, the Court must accept as true Plaintiffs' contentions that SBG still contains Osama bin Laden's name in its corporate documents. Ashton Complaint ¶ 558; Burnett Complaint ¶ 329. Additionally, although it would not satisfy the due process requisites on its own, SBG's presence in Maryland three years before the complaints were filed, also warrants some discovery. Accordingly, SBG's motion to dismiss the Ashton and Burnett complaints are denied without prejudice.

## 9. SAAR Network

The Federal Plaintiffs claim the SAAR Network is a network of "interrelated ostensible charities" that was established in the 1980s "to generate and surreptitiously transfer funds to terrorist organizations, including al-Qaeda." Federal Complaint ¶ 222. Several organizations within the SAAR Network, including SAAR Foundation, SAAR International, Safa Group, Mar-Jac Poultry, Mar-Jac Holdings, Inc., Safa Trust, Inc. and Aradi, Inc., were established, funded or closely affiliated with Defendant Suleiman Abdul Aziz al Rajhi. Id. at ¶ 223. By September 11, 2001, there were allegedly over one hundred entities in this network, "including the U.S. branches of MWL, IIRO and WAMY, [and the SAAR Network Defendants moving to dismiss here,] African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investment, Inc., Mena Corporation, Reston Investment, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., Success Foundation, and York Foundation." Id. ¶ 224. Allegedly, many of the entities are related by common management, few of them maintained a physical presence at their purported place of business, and they all "have long acted as fully integrated components of al Qaeda's logistical and financial support infrastructure." Id. ¶¶ 225, 226.

Plaintiffs argue the Court has personal jurisdiction over the SAAR Network because it

participated in the conspiracy that resulted in catastrophic effects in this district. After an ongoing investigation in the Eastern District of Virginia, federal authorities raided the offices of several of these Defendants in Herndon, Virginia in March 2002. Id. ¶ 227. The investigation has allegedly revealed that SAAR Network funds have been transferred to designated terrorists and al Qaeda operatives Youssef Nada and Ahmed Idris Nasreddin. Id. ¶ 228; see Exec. Order No. 13224 (designating individuals as terrorists). Additionally, Plaintiffs claim that the investigation has revealed that SAAR Network entities have engaged in transactions with Bait Ul-mal, Inc. (BMI), which has transferred funds to terrorist organizations including al Qaeda, and materially supported the 1998 embassy bombings in Africa. Federal Complaint ¶¶ 229-230.

At this stage, the Court must accept as true Plaintiffs' allegations concerning the relationships of the SAAR Network. Id. ¶¶ 222, 226. Defendants correctly argue, however, that Defendants have provided scant basis for linking these entities under the SAAR Network title. Certain of these groups may be subject to personal jurisdiction in light of Plaintiffs' allegation that they purposefully directing its activities at the United States by transferring money to designated terrorists Youssef Nada and Ahmed Idris Nasreddin, particularly if they intended the money to support terrorism. Id. ¶ 228. Additionally, general jurisdiction could be appropriate for the SAAR Network entities having offices in Virginia. Id. ¶ 227. Accordingly, the SAAR Network's motion to dismiss is denied without prejudice. The parties are to engage in jurisdictional discovery to determine which of the Network's entities have a presence in Virginia and which entities transferred money to Nada and Nasreddin.

**10. Adel A. J. Batterjee**
The Burnett Plaintiffs claim that Defendant Adel A. J. Batterjee is an associate of Osama bin Laden. Burnett Complaint ¶ 181. On December 21, 2004, the U.S. Department of Treasury designated Mr. Batterjee as a Specially Designated Global Terrorist. See Dec. 23, 2004 Bierstein letter to Court; Exec. Order No. 13224. Mr. Batterjee is the chairman of Al Shamal Islamic Bank, "an instrumental bank in Osama bin Laden's financial support network." Burnett Complaint ¶ 365. Mr. Batterjee is also chairman of al-Bir Saudi Organization, whose United States branch, Defendant BIF, is allegedly a "front for al Qaeda sponsorship." Burnett Complaint ¶¶ 75, 196, 199. BIF is also a designated terrorist organization. See Exec. Order No. 13224. The Saudi government closed Al-Bir in 1993 "at the same time it was closing other organizations for ties to terrorism." Burnett Complaint ¶ 183. Mr. Batterjee then allegedly moved the charity's headquarters to Chicago in the name of BIF. Id. ¶ 183. Mr. Batterjee is listed as one of BIF's three founders in its articles of incorporation filed in Illinois. Id. ¶ 183. Through an alias, Mr. Batterjee allegedly sent money to BIF's branches. Id. ¶ 184; see also Decl. of Jodi Westbrook Flowers in Opp. to Batterjee Motion to Dismiss ("Flowers Decl.") Att. 5, p. 7 (BIF record showing $48,464 contribution by Abdel Abdul Jalil Batterjee). Mr. Batterjee allegedly transferred control of BIF to Defendant Enaam M. Arnaout, on September 15, 1997 [38] Burnett

---

[38] Mr. Arnaout was "criminally indicted for his role in the September 11, 2001 attacks." Burnett Complaint ¶ 199. But in its "written plea agreement, the government agreed to dismiss sensational and highly publicized charges of providing material support to terrorists and terrorist organizations." United States v. Arnaout, 282 F. Supp. 2d 838, 843 (N.D. Ill. 2003). The Burnett

Complaint ¶ 183. In October 2001, Arnaout allegedly told Batterjee he was worried about being under scrutiny of the U.S. government and in January 2002, Batterjee requested that Aranout relocate his family to Saudi Arabia. Id. ¶¶ 217-218. Plaintiffs also claim that Mr. Batterjee's name is on a BIF list of wealthy Saudi Arabian sponsors of al Qaeda and Osama bin Laden. Id. ¶ 219

Plaintiffs also claim that Defendant charity WAMY and BIF are closely connected and that Mr. Batterjee was the Secretary General of WAMY when he founded BIF in the United States. Id. ¶ 229; see also Flowers Decl Att. 4, p 3 (December 5, 1992 New York Times article quoting Adel A. Batterjee as the chairman of WAMY). In his capacity as Secretary General of WAMY, Mr. Batterjee allegedly commissioned a biography of Osama bin Laden and the origins of al Qaeda, which was jointly published by WAMY and BIF in 1991. Burnett Complaint ¶ 230

With respect to his contacts with the United States, Plaintiffs claim that the documents filed in 1992 in conjunction with the establishment of BIF in Chicago state that Mr. Batterjee is a founder of BIF and that BIF's founders travel to the United States on a regular basis. See Flowers Decl. Att. 2, pp. 2-3. In 1993 BIF filed an application to conduct business in Florida and listed Mr. Batterjee as a director with an address in Florida. See id. at Att. 3, p. 4. BIF's authorization to do business in Florida was revoked on August 26, 1994. Id. at p. 1.

Mr. Batterjee disputes the claims against him in a declaration filed in conjunction with his motion to dismiss. Batterjee Decl. ¶ 8. He states he was born in Saudi Arabia, attended college in the United States in the 1960s, and returned to Saudi Arabia. Id. ¶¶ 3, 5. He claims he was last in the United States in June 2000 for personal reasons. Id. ¶ 5. He denies owning any real property, bank accounts, or investments in the United States. Id. ¶ 6. With respect to the allegations contained in the complaint, Mr. Batterjee claims BIF was never a branch of Al Bir or vice versa. Id. ¶ 9. He claims he never sent money to BIF in all of its history. Id. He states he transferred away all control of BIF in 1993. Id. He claims he never served as an executive of WAMY, never wrote a biography of Osama bin Laden, and denies having any knowledge of Osama bin Laden's or al Qaeda's activities other than what is widely published in the press. Id. ¶¶ 9, 10.

Mr. Batterjee also disputes the manner in which he was served. Plaintiffs reasoned that Al-Quds Al-Arabia had published Osama bin Laden's fatwas in the past and could, therefore, reach his supporters regardless of their location. Further, The International Herald Tribune is available to the world community. Additionally, Plaintiffs submit that these cases have been widely reported in the Arabic media and the complaints have been available on numerous websites for over two years. In light of these considerations and Judge Robertson's March 23, 2003 order approving service by publication for Defendants including Mr. Batterjee, the Court

Plaintiffs allege Mr. Arnaout and Osama bin Laden have ties. For example, law enforcement officials in Bosnia-Herzegovina raided BIF's offices in March 2002 and allegedly recovered documents establishing direct communications between Mr. Arnaout and Osama bin Laden in the late 1980s and early 1990s. Burnett Complaint ¶¶ 188, 196, 199.

denies Mr. Batterjee's motion to quash service

The Court finds the Burnett Plaintiffs made a prima facie showing of personal jurisdiction over Mr. Batterjee. While perhaps not dispositive on its own, Mr. Batterjee's designation as a terrorist lends substantial weight to Plaintiffs' claims that he purposefully directed his activities at the United States and that the exercise of personal jurisdiction over him comports with due process. See Biton, 310 F. Supp. 2d at 178. Mr. Batterjee purportedly commissioned a book about al Qaeda and Osama bin Laden. He is the chairman of Al Shamal Islamic Bank, a bank with admitted and substantial ties to Osama bin Laden. Burnett Complaint ¶¶ 70, 79. Additionally, he is involved in the United States operations of designated terrorist, BIF. In the ten years leading up to the commencement of this action, Mr. Batterjee has had contacts with the United States that could be related to the terrorist attacks inasmuch as BIF participated in those attacks. Specifically, Mr. Batterjee traveled to Chicago for BIF and had an address in Florida for BIF. Accordingly, Mr. Batterjee's motion to dismiss the Burnett complaint for lack of personal jurisdiction is denied.

## III. Failure to State a Claim

In considering Defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6), the Court must "accept all of Plaintiffs' factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the Plaintiffs." Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999). Dismissal is not appropriate unless it appears beyond doubt, "even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." Id.; Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court reinforced these liberal pleading standards in Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (observing the "short and plain statement" required by Rule 8 "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting Conley, 355 U.S. at 47). When presented with a 12(b)(6) motion, the district court may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment. Courtenay Communications Corp. v. Hall, 334 F.3d 210, 213 (2d Cir. 2003); Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000).

### A. Elements of Claims

Plaintiffs' claim that each Defendant provided material support to the al Qaeda terrorists who perpetrated the attacks on September 11, 2001. Under the ATA, material support includes money, financial services, lodging, training, safehouses, and false documentation or identification. 18 U.S.C. §§ 2339A(b), 2339B(g). Assuming such support is alleged, Plaintiffs will have to present a sufficient causal connection between that support and the injuries suffered by Plaintiffs. See Burnett I, 274 F. Supp. 2d at 104. Proximate cause will support this connection. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994) ("Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a

substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence.") In light of al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda. Burnett I, 274 F. Supp. 2d at 104.

Plaintiffs rely on theories of concerted action liability – conspiracy and aiding and abetting – in support of this causal link. "Concerted action liability under New York law is based on the principle that '[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer . . . are equally liable with him.'" Pittman, 149 F.3d at 122 (quoting Bichler v. Eli Lilly & Co., 55 N.Y.2d 571, 580 (1982)). To be liable under either conspiracy or aiding and abetting, however, the defendant "must know the wrongful nature of the primary actor's conduct," id. at 123, and the conduct must be tied to a substantive cause of action, Chrysler Capital Corp., 778 F. Supp. at 1267. In this regard, Plaintiffs rely on the ATCA, RICO, the TVPA, the ATA, and various state laws, including wrongful death, survival, intentional infliction of emotional distress, trespass, assault and battery, negligence, and negligent infliction of emotional distress.

### 1. ATCA

The Alien Tort Claims Act provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. "This statute confers subject matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)." Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995); see also Flores v. Southern Peru Corp., 343 F.3d 140, 143 & n.2 (2d Cir. 2003). Certain Plaintiffs in these actions are aliens and the complaints all allege common law torts. The Court finds that "aircraft hijacking is generally recognized as a violation of international law." Burnett I, 274 F.3d at 100 (citing Kadic, 70 F.3d at 240; Bigio v. Coca-Cola Co., 239 F.3d 440, 447-49 (2d Cir. 2000)). Further, "courts, including the Second Circuit, have almost unanimously permitted actions premised on a theory of aiding and abetting and conspiracy." Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 311 (S.D.N.Y. 2003). Accordingly, the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here. See Burnett I, 274 F. Supp. 2d at 100.

### 2. RICO

"To state a claim under civil RICO, a plaintiff must plead seven elements: '(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.'" Berk v. Tradewell, Inc., Nos. 01 Civ. 9035, 01 Civ. 10068 (MBM), 2003 WL 21664679, at *11 (S.D.N.Y. July 16, 2003) (quoting Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)); see also 18 U.S.C. § 1962. "Civil RICO is an unusually potent weapon . . . 'courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" Katzman v.

50

<u>Victoria's Secret</u>, 167 F.R.D. 649, 655 (S.D.N.Y. 1996).

The <u>Federal</u> complaint asserts a RICO claim under § 1962(a), which states in part: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of 18 U.S.C. § 2, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a). "Because the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff must allege injury from the defendant's investment of the racketeering income to recover under § 1962(a)." <u>Quaknine v. MacFarlane</u>, 897 F.2d 75, 83 (2d Cir. 1990). The <u>Federal</u> Plaintiffs have not done that here and seem to abandon the § 1962(a) claim in their RICO statements. Accordingly, the <u>Federal</u> Plaintiffs have not stated a claim under 18 U.S.C. § 1962(a).

The <u>Federal</u> Plaintiffs' RICO statements against Arab Bank and the SAAR Network assert claims under § 1962(c) and § 1962(d). <u>See</u> 03 MDL 1570 Docket ## 307, 309. Subsection (c) states, in part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "The four elements of Section 1962(c) are '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" <u>U.S. Fire Ins. Co. v. United Limousine Serv., Inc.</u>, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004). "The elements of section 1962(c) must be established as to each individual defendant." <u>Id.</u> Paragraph (d) states that it "shall be unlawful for any person to conspire to violate any provision of" § 1962(a)-(c). 18 U.S.C. § 1962(d). "The Second Circuit has held in the context of a motion to dismiss that to state a claim under [§] 1962(d), the 'complaint must allege some factual basis for a finding of a conscious agreement among the defendants.'" <u>Am. Arbitration Ass'n, Inc. v. DeFonseca</u>, No. 93 Civ. 2424 (CSH), 1996 WL 363128, at *7 (S.D.N.Y. June 28, 1996) (quoting <u>Hecht v. Commerce Clearing House</u>, 897 F.2d 21, 26 n.4 (2d Cir. 1990)); <u>see also</u> <u>Schmidt v. Fleet Bank</u>, 16 F. Supp. 2d 340, 354 (S.D.N.Y. 1998) ("Bare and conclusory allegations are insufficient to withstand a motion to dismiss and a plaintiff must plead facts sufficient to show that each defendant knowingly agreed to participate in the [RICO] conspiracy.")

Assuming for now that the Plaintiffs have pleaded an enterprise, "[u]nder <u>Reeves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993), an alleged RICO defendant must have had 'some part in directing' the 'operation or management' of the enterprise itself to be liable." <u>Dubai Islamic Bank v. Citibank, N.A.</u>, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003). The complaints allege the moving Defendants may have assisted al Qaeda, but they do not allege "anything approaching active 'management or operation.'" <u>Id.</u> Accordingly, the Court finds Plaintiffs have failed to state a RICO claim against the moving Defendants. <u>See</u> <u>id.</u>; <u>Redtail Leasing, Inc. v. Belleza</u>, 95 Civ. 5191 (JFK), 1997 WL 603496, at *5 (S.D.N.Y. 1997) ("A defendant does not 'direct' an

51

enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise"); Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F Supp 449, 466-67 (S.D.N.Y. 1996) (providing services to racketeering enterprise is not directing the enterprise); LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F Supp 1071, 1090 (S.D.N.Y. 1996) (same). Plaintiffs' RICO claim under § 1962(d) fails for the same reason Plaintiffs have not alleged that the moving Defendants were central figures in the underlying schemes or for conspiracy liability under § 1962(d) The RICO claims against the moving Defendants are dismissed.

### 3. TVPA

"The TVPA establishes a cause of action in federal court against an individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture or extrajudicial killing." Arndt v. UBS AG, 342 F Supp 2d 132, 141 (E.D.N.Y. 2004) (citing Flores, 343 F 3d at 153); 28 U.S.C. § 1350 note. Only individuals may be sued under the TVPA. Arndt, 342 F Supp 2d at 141 (citing Friedman v. Bayer Corp., No. 99 Civ 3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec. 15, 1999)). Accordingly, to the extent Plaintiffs have not already withdrawn these claims, the TVPA claims are dismissed against Al Rajhi Bank, Saudi American Bank, Arab Bank, Al Baraka Investment & Development Corp., NCB, Saudi Binladin Group, and the SAAR Network. Similarly, there have been no allegations that Saleh Abdullah Kamel or Adel Batterjee acted under color of law and, therefore, the TVPA claims against these individuals are dismissed as well

### 4. ATA

The ATA provides a civil remedy for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a) [39] To adequately plead the provision of material support under this section, a plaintiff would have to allege that the defendant knew about the terrorists' illegal activities, the defendant desired to help those activities succeed, and the

---

[39] The ATA defines international terrorism as:

activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended – to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum 18 U.S.C. § 2331(1). For now, the Court assumes the attacks of September 11 were an act of international terrorism.

defendant engaged in some act of helping those activities  Boim II, 291 F.3d at 1023; see also Boim v. Quranic Literacy Inst., 340 F. Supp. 2d 885, 906-913 (N.D. Ill. 2004) ("Boim III") (granting summary judgment against two entity defendants where record evidence demonstrated the charities' concession that Hamas used terrorism in pursuit of its goals, the organizations' repeated desire to help Hamas by recruiting donations to the Holy Land Foundation, a known supporter of Hamas, distributing pro-Hamas literature, and featuring pro-Hamas speakers at their meetings); see also Burnett I, 274 F. Supp. 2d at 107 (noting the complaint in Boim was quite specific in its allegation of a causal link). Under a conspiracy theory, the Plaintiffs have to allege that the Defendants were involved in an agreement to accomplish an unlawful act and that the attacks of September 11 were a reasonably foreseeable consequence of that conspiracy  See Boim III, 340 F. Supp. 2d at 895 (framing analysis as what plaintiffs have to prove to succeed on summary judgment)  Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack  Id.

### 5. Wrongful Death and Survival

New York Estates, Powers and Trusts Law governs Plaintiffs' claims of wrongful death and survival. "The personal representative . . . of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death against a person who would have been liable to the decedent by reason of such wrongful conduct if death had not ensued." N.Y. Est. Powers & Trusts § 5-4.1 (McKinney 2002); see also N.Y. Est. Powers & Trusts § 11-3.2(b) (McKinney 2002) (outlining survival claim: "No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed. For any injury an action may be brought or continued by the personal representative of the decedent."). Accordingly, the Court finds that if Plaintiffs are personal representatives and their allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11 terrorists, they will have also stated claims for wrongful death and survival.

### 6. Assault and Battery and Intentional Infliction of Emotional Distress

The Federal Plaintiffs bring claims of assault and battery and intentional infliction of emotional distress  The Burnett and Ashton Plaintiffs also allege claims of intentional infliction of emotional distress  The statute of limitations for assault and battery and intentional infliction of emotional distress is one year  Holmes v. Lorch, 329 F. Supp. 2d 516, 523 (S.D.N.Y. 2004); N.Y. C.P.L.R. 215(3) (McKinney 2002)  The Federal Plaintiffs filed their complaint on September 10, 2003, nearly two years after September 11, 2001  Accordingly, their assault and battery and intentional infliction of emotional distress claims are dismissed against the SAAR Network and Arab Bank

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the

conduct and the injury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993)). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Id. (quoting Howell, 81 N.Y.2d at 122) Courts are to determine whether the alleged conduct is sufficiently extreme and outrageous enough to permit recovery. Stuto, at 827. The attacks on September 11, 2001 were undoubtedly extreme and outrageous. The Court finds that if the Ashton and Burnett Plaintiffs's allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11 terrorists, they will have also stated a claim for intentional infliction of emotional distress. See Burnett I, 274 F. Supp. 2d at 107-08 (analyzing claims under New York law)

### 7. Trespass

The Federal Plaintiffs bring a claim for trespass on the theory that Defendants assisted and encouraged those who intentionally entered the World Trade Center property. New York courts describe this cause of action as "the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." N.Y. State Nat'l Org. for Women v. Terry, 886 F. 2d 1339, 1361 (2d Cir. 1990) (citing Ivancic v. Olmstead, 66 N.Y.2d 349, 352 (1986)). To the extent that the Federal Plaintiffs sufficiently plead that Defendants acted in concert with the September 11 hijackers, they may proceed with this claim. Wantanabe Realty Corp. v. City of New York, 01 Civ. 10137 (LAK), 2003 WL 22862646, at *4 (S.D.N.Y. Dec. 3, 2003) (citing Pittman, 149 F.3d at 122-23).

### 8. Negligence

In New York, a plaintiff may establish negligent infliction of emotional distress under the bystander or direct duty theory. Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000). Under the bystander theory, "a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of shock or fright resulting from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant's conduct on a member of the plaintiff's immediate family in his or her presence." Bovsun v. Sanperi, 61 N.Y.2d 219, 223-24 (1984). Under the direct duty theory, a plaintiff suffers emotional distress caused by "defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety." Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996)

To establish a claim for negligence under New York law, "a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate cause of that breach." King v. Crossland Savings Bank, 111 F. 3d 251, 259 (2d Cir. 1997). The most basic element of a negligence claim is the existence of a duty owed to plaintiffs by defendants. Palsgraf v. Long Island R.R. Co., 248 N.Y. 338, 342 (1928); see also Burnett I, 274 F.2d at 108 (dismissing negligence claims against Defendant Al Haramain Islamic Foundation because complaint failed to allege or identify any duty owed to Plaintiffs). Banks do not owe non-customers a duty to protect them from the intentional torts of their customers. Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH),

1999 WL 47239, at *13 (S D N Y. Feb. 3, 1999) (citing cases); Burnett I, 274 F. Supp. 2d at 109 ("Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service ") The complaints presently before the Court do not allege or identify a duty owed to Plaintiffs by moving Defendants. See Burnett I, 274 F. Supp. 2d at 108-09. Accordingly, the negligence and negligent infliction of emotional distress claims are dismissed for failure to state a claim

### B. Analysis of Claims Against the Moving Defendants

While applying the liberal notice pleading requirements of Rule 8, the Court notes that in light of "the extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of Plaintiffs' allegations as to any particular defendant, to ensure that he–or it–does indeed have fair notice of [the claims]." Id. at 103-04

#### 1. Al Rajhi Bank

Al Rajhi Bank was founded in 1987 and now has a network of nearly 400 branch offices throughout Saudi Arabia and seventeen worldwide subsidiaries  Burnett Complaint ¶ 84  All the banking Defendants are alleged to have "provided essential support to the al Qaeda organization and operations  The banking Defendants in this lawsuit have acted as instruments of terror, in raising, facilitating and transferring money to terrorist organizations " Burnett Complaint ¶ 46 Plaintiffs claim that Al Rajhi Bank is "the primary bank for a number of charities that serve as al Qaeda front groups," including Al Haramain, MWL, WAMY, SJRC, and IIRO. Burnett Complaint ¶ 85; Rule 12(e) Statement ¶ 31. "Al Rajhi continues to maintain Al Haramain's accounts despite Al Haramain's designation on March 11, 2002 as terrorist organizations by both the United States and Saudi Arabian authorities " Rule 12(e) Statement ¶ 44. The Burnett Plaintiffs claim Al Rajhi Bank knew or had to know that its depositors, Defendant charities WAMY, MWL, IIRC, and SJRC were material supporters of terrorism   Rule 12(e) Statement ¶¶ 44-60

The Burnett Plaintiffs claim that Saudi Arabia has "ineffective and/or rudimentary bank supervisory, anti-money laundering laws and anti-terrorist financing in place " Rule 12(e) Statement ¶¶ 72-78.  In 1999, William Weschler of the National Security Council and Richard Newcomb of the Office of Foreign Assets Control traveled to Saudi Arabia to warn Al Rajhi Bank and its regulator, the Saudi Arabian Monetary Agency ("SAMA"), "that their financial systems were being manipulated or utilized to fund terrorist organizations such as Al Qaeda " Id. ¶ 75. The United States encouraged SAMA to adopt "know your customer" rules  Id. "Despite these warnings, Al Rajhi failed to adopt even the most minimal standards, [which] resulted in the use of Al Rajhi as an instrument of terror and a material supporter, aider and abettor of al Qaeda and international terrorist activities." Id. ¶¶ 76-77.

One of the hijackers on board American Airlines Flight 11, Abdulaziz al-Omari, held an account at Al Rajhi Bank  Burnett Complaint ¶ 85; Rule 12(e) Statement ¶ 43  Another hijacker, Mohammed Atta, made a transfer to this account at some time. Rule 12(e) Statement ¶ 43 Plaintiffs claim al Qaeda financier Zouaydi asked Abdullah bin Abdul Muhsen al Turki, a

counselor to the government of Saudi Arabia, to send money through Al Rajhi. Burnett Complaint ¶¶ 388, 538.

The Burnett Plaintiffs also claim that Al Rajhi Bank has relationships with Hamas and other terrorists. Rule 12(e) Statement ¶¶ 61-69. Al Rajhi Bank chose Texas-based Infocom to host its website. Id. ¶¶ 65, 66. Infocom has provided funding to Hamas and is owned and operated by Hamas leader and designated terrorist, Mousa Marzook. Id. There have been transfers made to Marzook and Infocom from Al Rajhi accounts. Id. In "December 1999, Al Rajhi directly funded Tulkarm Charity Committee, a known front for Hamas." Id. ¶ 71.

Members of the Al Rajhi family, which owns and controls Al Rajhi Bank, are alleged to have ties to Osama bin Laden's personal secretary. Id. ¶ 79. The Al Rajhi family is purportedly a major donor to the SAAR Network, a Defendant here, being investigated by federal authorities in Virginia. Id. ¶¶ 80-84. Finally, Al Rajhi family members are allegedly closely associated with wealthy donors to Osama bin Laden. Id. ¶ 85 (alleging ties with the Golden Chain).

Judge Robertson found that the only allegation in the Third Amended Burnett Complaint that stated a claim upon which relief could be granted was that Al Rajhi Bank acted as an instrument "of terror, in raising, facilitating and transferring money to terrorist organizations." Burnett I, 274 F. Supp. 2d at 109 (quoting Burnett Complaint ¶ 46). Judge Robertson noted that there was no support "for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service." Id. In light of the liberal pleading standards, however, Judge Robertson denied Al Rajhi Bank's motion to dismiss and permitted it to request a more definitive statement under Rule 12(e). Id. at 110. The Burnett Plaintiffs provided an 89-paragraph response on August 27, 2003. Thereafter, Al Rajhi Bank renewed its motion to dismiss pursuant to Rule 12(b)(6).

Al Rajhi Bank argues that Plaintiffs offer no factual allegations in support of their conclusion that Al Rajhi Bank had to know that the charities it supported through Zakat and Hararm[40] payments were really fronts for al Qaeda. Al Rajhi Bank contends it had a legal and religious duty to make its charitable donations and any terrorist activity by the recipient charities was unknown to Al Rajhi Bank. See Rule 12(e) Statement ¶¶ 26, 29. Contrary to Plaintiffs' arguments, Al Rajhi Bank submits it did not have a duty, or a right, to inspect the Defendant charities' financial transactions to ascertain the ultimate destination of its donations. But see

---

[40] Under Islamic banking laws, Hararm is forbidden income that must be given away. The disposal of Hararm cannot be considered charitable giving. Rule 12(e) Statement ¶ 9. In the 12(e) statement, the Burnett Plaintiffs explain that al Qaeda takes advantage of the under-regulated Islamic banking system to move and launder money. 12(e) Statement ¶ 1. Plaintiffs allege that al Qaeda has perverted the Zakat and Hararm principles in Islamic banking to collect and distribute money to individuals and cells throughout the world. Id. ¶¶ 4-9; see also Burnett Complaint ¶ 43.

Rule 12(e) Statement ¶ 32 ("Al Rajhi is required to determine that the ultimate recipients of these contributions fall within one of the categories prescribed in the Quran for recipients of Zakat.") Al Rajhi Bank submits that SAMA did not implement any duty to investigate Zakat payments after its meeting with representatives of the National Security Council and Office of Foreign Assets Control.

Plaintiffs do not allege that Al Rajhi Bank provided direct material support to al Qaeda. Rather, Plaintiffs claim Al Rajhi Bank aided and abetted the September 11 terrorists by donating to certain Defendant charities and acting as the bank for these Defendants. New York law and the courts interpreting the ATA in Boim make very clear that concerted action liability requires general knowledge of the primary actor's conduct. See Pittman, 149 F.3d at 123; Boim II, 291 F.3d at 1023; Boim III, 340 F. Supp. 2d at 906. Even with the opportunity to clarify their claims against Al Rajhi Bank, the Burnett Plaintiffs do not offer facts to support their conclusions that Al Rajhi Bank had to know that Defendant charities WAMY, MWL, IIRC, and SJRC were supporting terrorism. See Rule 12(e) Statement ¶¶ 44-60. "[A] complaint which consists of conclusory allegations unsupported by factual assertions fails even on the liberal standard of Rule 12(b)(6)." De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996))

This Court, like Judge Robertson before it, has found no basis for a bank's liability for injuries funded by money passing through it on routine banking business. See Burnett I, 274 F. Supp. 2d at 109. Similarly, allegations concerning the Al Rajhi family cannot support a claim against Al Rajhi Bank because there is no allegation that the family members were acting in furtherance of Al Rajhi Bank business. Tasso v. Platinum Guild Int'l, 94 Civ. 8288 (LAP), 1997 WL 16066, at *6 (S.D.N.Y. Jan. 16, 1997). Plaintiffs attach to their opposition brief a September 2002 SAMA report summarizing the initiatives and actions taken by the Kingdom of Saudi Arabia to combat money laundering and terrorist financing. See Burnett Plaintiffs' Opp. to Al Rajhi Motion to Dismiss, Ex. 2. Neither this document, nor the complaint, alleges that SAMA or Al Rajhi Bank implemented "know your customer" rules that Al Rajhi failed to follow with respect to accounts held by the Defendant charities. Finally, Plaintiffs' allegations that Al Rajhi Bank has connections to Hamas supporters fails to state a claim because Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11. Even accepting all the allegations against Al Rajhi Bank as true, Plaintiffs have failed to state a claim that would entitle them to relief. Accordingly, Al Rajhi Bank's motion to dismiss the Burnett complaint is granted in its entirety.

### 2. Saudi American Bank

Saudi American Bank is based in Rihadh, Saudi Arabia and was formed in 1980 pursuant to a royal decree to take over the then-existing branches of Citibank in Riyadh and Jeddah. Ashton Complaint ¶ 603; Burnett Complaint ¶ 140. It is the second largest bank in Saudi Arabia and has offices in the United States, based in New York. Ashton Complaint ¶ 604; Burnett Complaint ¶¶ 141-42. Its chairman, Abdullahziz Bin Hamad Al Gosaibi is also the Chairman of the Saudi Cement Company in Damman, Saudi Arabia. Ashton Complaint ¶ 605; Burnett

Complaint ¶ 142 [41] Ahmed Ali Jumale, purportedly a close associate of Osama bin Laden and responsible for helping Defendant Al Baraka penetrate the United States banking system, allegedly worked for Saudi American Bank as a senior employee from 1979 to 1986. <u>Ashton</u> Complaint ¶ 602; <u>Burnett</u> Complaint ¶ 148. [42]

Plaintiffs claim that Saudi American Bank is the official correspondent of the al Baraka Bank Lebanon; the Riyadh correspondent of Defendant Al Faisal Islamic Bank, which is managed by Defendant Prince Mohamed; and the Riyadh correspondent bank for a branch of Defendant Al Shamal Islamic Bank, which is involved in the financing of al Qaeda. <u>Ashton</u> Complaint ¶¶ 606, 608; <u>Burnett</u> Complaint ¶¶ 143, 146. It is also the bank for Defendant Dallah Al Baraka Group, which is chaired by Defendant Saleh Abdullah Kamel. Saudi American Bank is close to the Saudi Bin Laden family, . . appears on its financial transactions" and provides banking services to its Sudanese operations. <u>Ashton</u> Complaint ¶¶ 607-8; <u>Burnett</u> Complaint ¶¶ 144, 146.

"In the year 2000, the Saudi American Bank participated in the fundraising campaign in Saudi Arabia for collecting donations to the 'heroes of the Al Quds uprising' (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO and Al Haramain Foundation." <u>Ashton</u> Complaint ¶ 609; <u>Burnett</u> Complaint ¶ 147.

The essence of Plaintiffs' claim is that through its relationships with other banks and support of the Saudi Binladin group's work in Sudan, Saudi American Bank provided material support to al Qaeda. It is not alleged to have done anything to directly support al Qaeda, Osama bin Laden, or their terrorist agenda. As the Court has stated before, there can be no bank liability for injuries caused by money routinely passing through the bank. Saudi American Bank is not alleged to have known that anything relating to terrorism was occurring through the services it provided. The <u>Ashton</u> Plaintiffs have dismissed their claims against Ahmed Nur Ali Jumale, allegedly an associate of Osama bin Laden. To the extent the <u>Burnett</u> Plaintiffs continue their claims against him, his employment at Saudi American Bank from 1979 to 1986 cannot be grounds for relief. Osama bin Laden did not organize al Qaeda until the late 1980s, Saudi American Bank is not alleged to have provided Jumale with a veil of legitimacy or shelter. Cf. <u>Burnett I</u>, 274 F. Supp. 2d at 104 (finding Al Haramain's employment of al Qaeda operative during height of al Qaeda activity a sufficient allegation of providing material support). The complaints have provided Saudi American Bank with no notice of Plaintiffs' claims or grounds for relief. Accordingly, Saudi American Bank's motions to dismiss the <u>Ashton</u> and <u>Burnett</u> complaints are granted in their entirety.

---

[41] The <u>Ashton</u> Plaintiffs voluntarily dismissed its claims against the Saudi Cement Company and the Arabian Cement Company on June 10, 2004. <u>See</u> 03 MD 1570 Docket # 230.

[42] The <u>Ashton</u> Plaintiffs voluntarily dismissed their claims against Ahmed Ali Jumale on June 10, 2004. <u>See</u> 03 MD 1570 Docket # 230.

### 3. Arab Bank

The Federal Plaintiffs claim Arab Bank is a financial institution headquartered in Egypt with branch offices throughout the world, including New York. Federal Complaint ¶ 357. Arab Bank claims it is actually a Jordanian bank headquartered in Amman, Jordan. Arab Bank allegedly has "long provided financial services and other forms of material support to terrorist organizations, including al Qaeda." Federal Complaint ¶ 358. Further, these Plaintiffs allege that the September 11 attacks were a "direct, intended and foreseeable product of Arab Bank's participation in al Qaeda's jihadist campaign." Id. ¶¶ 364, 363. These claims are based on the allegation that Arab Bank has "long known that accounts it maintained were being used to solicit and transfer funds to terrorist organizations [and despite this knowledge] Arab Bank has continued to maintain those accounts." Id. ¶ 362. Specifically, the Federal Plaintiffs claim Arab Bank accounts have been used for al Qaeda money transfers throughout the world and that Arab Bank maintains accounts for Defendant charities including IIRO, MWL, WAMY, BIF, Blessed Relief (Muwaffaq) Foundation, and Al Haramain. Id. ¶¶ 359, 360. Israeli officials allegedly have seized funds associated with several Arab Bank accounts maintained on behalf of known fronts for Hamas and identified by Arab Bank employees, "confirming the bank's specific knowledge that accounts it maintained were being used to sponsor terrorist activity." Id. ¶ 361.

The Burnett Plaintiffs claim that members of the Spanish al Qaeda cell used Arab Bank to make wire transfers. Burnett Complaint ¶ 138 (alleging Arab Bank is "used regularly by al Qaeda's Spanish cell for transfers of cash to members of al Qaeda operating in Germany, Pakistan, Afghanistan, Lebanon, Yemen, Bosnia, and elsewhere"); id. ¶¶ 139, 528 (alleging $6,400 wire transfer through Arab Bank from member of Spanish al Qaeda cell to an extremist associated with Chej Salah in Spain). These Plaintiffs conclude that "Arab Bank PLC has materially supported, aided, and abetted and financed al Qaeda." Id. ¶ 138.

The Federal and Burnett complaints do not include any facts to support the inference that Arab Bank knew or had to know that it was providing material support to terrorists by providing financial services to the charity Defendants or by processing wire transfers in Spain. The paragraphs do not allege any involvement by, knowledge of, or participation in any wrongful conduct by Arab Bank. These Plaintiffs do not claim that Arab Bank ignored any regulations regarding their customer accounts. Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability. While claiming Arab Bank has ties with known Hamas fronts, the Federal complaint does not contain any allegation of a connection between Hamas and Osama bin Laden, al Qaeda, or the September 11 attacks. A complaint alleging conclusions without supporting facts will not survive a Rule 12(b)(6) motion. In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 261 (S.D.N.Y. 2004). The Federal Plaintiffs asked for leave to amend their complaint with respect to Arab Bank, but they have not offered any facts to support an amendment. Therefore, Arab Bank's motions to dismiss the Federal and Burnett complaints are granted in their entirety.

### 4. Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel

The Ashton and Burnett complaints detail nearly identical claims against Al Baraka Investment & Development Corp. ("Al Baraka") and Saleh Abdullah Kamel. Ashton Complaint

¶¶ 583-601; Burnett Complaint ¶¶ 47-66  Saleh Abdullah Kamel was born in Saudi Arabia in 1941 and founded Dallah Albaraka Group LLC in 1969  Ashton Complaint ¶ 587; Burnett Complaint ¶ 51  Dallah Albaraka is a diversified conglomerate based in Jeddah and includes twenty-three banks in Arab and Islamic countries  Ashton Complaint ¶ 588; Burnett Complaint ¶ 52  Dallah Albaraka is a shareholder of Aqsa Islamic Bank, a bank that Israel has refused to approve, "citing its obvious ties with known terrorists " Ashton Complaint ¶¶ 596, 597; Burnett Complaint ¶¶ 60, 61  One of Dallah Albaraka's subsidiaries is Dallah Avco Trans-Arabia Co , based in Jeddah  Ashton Complaint ¶ 589; Burnett Complaint ¶ 53  Omar al Bayoumi, a suspect wanted by the FBI in connection with the September 11 attacks, was the Assistant to the Director of Finance for Dallah Avco and paid rent in San Diego for the house occupied by two September 11 hijackers of American Airlines Flight 77  Ashton Complaint ¶¶ 590, 592; Burnett Complaint ¶¶ 55, 54  Mr. Kamel is also one of three founders of Defendant Al Shamal Islamic Bank. Ashton Complaint ¶ 594; Burnett Complaint ¶ 58.

Dallah Albaraka's financial arm is Al Baraka Investment & Development Corp , a wholly owned subsidiary based in Jeddah.  Ashton Complaint ¶ 593; Burnett Complaint ¶ 57  Al Baraka is a holding company with 43 subsidiaries, which are mainly banks in Arab and Islamic countries.  Ashton Complaint ¶ 583; Burnett Complaint ¶ 47  It also has banks in Chicago, Illinois and Houston, Texas.  Burnett Complaint ¶ 47  Al Baraka allegedly provided financial infrastructures in Sudan to Osama bin Laden through Defendant charity Al Haramain.  Ashton Complaint ¶¶ 584, 585, 598; Burnett Complaint ¶¶ 48, 49, 62

Plaintiffs do not offer any factual allegations against Al Baraka or Mr. Kamel to withstand their motions to dismiss  The majority of the complaints' allegations regarding Al Baraka actually concern Dallah Albaraka.  The specific allegations against Al Baraka are that through Al Haramain it provided financial infrastructures in Sudan, it provided support to Al Haramain, and it is present in the Sudan banking business through banks it holds  The complaints do not allege that Al Baraka knew or had any reason to know that Al Haramain was supporting terrorism, nor do they allege facts from which such an inference could be drawn

The allegation that an employee of a Dallah Albaraka subsidiary financially supported two of the hijackers in San Diego does not translate into an allegation that Mr Kamel provided material support to terrorism or aided and abetted those that provided material support.  An employee's actions cannot be a basis for employer liability unless the employee was acting in furtherance of the employer's business  Iasso, 1997 WL 16066, at *6  There is no allegation that Mr Kamel knew Mr al Bayoumi or directed anyone at the Della Albaraka subsidiary to support al Qaeda or the hijackers.  Similarly, the allegation that Mr. Kamel was one of three founders of Al Shamal Islamic Bank in 1983, without additional allegations, does not state a claim for relief.  Thus, the Ashton and Burnett claims against Al Baraka and Mr. Kamel are dismissed in their entirety

### 5. NCB

The Ashton and Burnett Plaintiffs' allegations against NCB are outlined in Part I B 4 The Court finds it would be premature to analyze Plaintiffs' largely conclusory claims against

60

NCB under Rule 12(b)(6) at this time. NCB may be immune from suit and further discovery if it is found to be an instrumentality of the Kingdom of Saudi Arabia and its actions do not fit within the FSIA's exceptions to immunity. Additionally, the Court is not yet convinced that it would be proper to exercise personal jurisdiction over NCB. Accordingly, NCB's motion to dismiss for failure to state a claim is denied without prejudice. NCB may renew its motion upon completion of the limited jurisdictional discovery – first with respect to its instrumentality status – outlined by the Court above.

### 6. Sandi Binladin Group

The Ashton and Burnett allegations against the SBG are outlined in Part II.C.8. The same allegations that warrant limited jurisdictional discovery to investigate whether SBG purposefully directed its activities at the United States and its contacts with the United States preclude dismissal under 12(b)(6) at this time. SBG provided construction support to Osama bin Laden. Ashton Complaint ¶¶ 550, 552-53; Burnett Complaint ¶¶ 319-22. A branch of SBG purportedly provided shelter to an al Qaeda operative. Ashton Complaint ¶ 555; Burnett Complaint ¶ 324. SBG has, at some point, had a close relationship with Osama bin Laden, but the complaints do not specify when or whether the relationship continues. While these allegations are certainly not sufficient to reach a jury, if Plaintiffs demonstrate that this Court has personal jurisdiction over SBG they are entitled to the opportunity to develop these claims. SBG's motions to dismiss the Ashton and Burnett complaints for failure to state a claim are therefore denied without prejudice.

### 7. SAAR Network

The Federal Plaintiffs' allegations against the SAAR Network are outlined in Part II.C.9. The Court's analysis of the SAAR Network's arguments in favor of 12(b)(6) dismissal depend on a predicate finding of which entities are subject to this Court's personal jurisdiction and which entities – and under what circumstances – transferred money to terror fronts. Accordingly, the SAAR Network's motion to dismiss is denied without prejudice. It may be renewed upon completion of personal jurisdiction discovery.

### 8. Adel A. J. Batterjee

The Burnett Plaintiffs' allegations against Mr. Batterjee are outlined in Part II.C.10. For substantially the same reasons the Court found it had personal jurisdiction over Mr. Batterjee, it denies his motion to dismiss for failure to state a claim. The allegations against him and his designation as a terrorist are sufficient to permit the inference that he provided support to al Qaeda directly or through Al Shamal Islamic Bank, BIF, or WAMY. Burnett Complaint ¶¶ 75-76, 183-84, 196, 199, 230; Exec. Order 13224.

## IV. Conclusion and Order

For the reasons explained above, Prince Sultan's motions to dismiss the Burnett, Ashton, Tremsky, Salvo, Barrera, and Federal Insurance complaints for lack of subject matter and personal jurisdiction are granted. Prince Turki's motions to dismiss the Burnett, Ashton, Tremsky, Salvo, Barrera, and Federal Insurance complaints for lack of subject matter and personal jurisdiction are granted. The Kingdom of Saudi Arabia's motion to dismiss the Federal Insurance and Vigilant

Insurance complaints for lack of subject matter jurisdiction are granted. Prince Mohamed's motions to dismiss the Ashton and Federal Insurance complaints for lack of personal jurisdiction are granted. Mohammad Abdullah Aljomaih's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Sheikh Hamad al Husani's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Abdulrahman bin Mahfouz's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Tariq, Omar, and Bakr Binladin's motion to dismiss the Burnett complaint for lack of personal jurisdiction is granted. Al Rajhi Bank's motion to dismiss the Burnett complaint for failure to state a claim is granted. Saudi American Bank's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. Arab Bank's motions to dismiss the Burnett and Federal Insurance complaints for failure to state a claim are granted. Al Baraka and Saleh Abdullah Kamel's motions to dismiss the Burnett and Ashton complaints for failure to state a claim are granted. NCB's motions to dismiss the Burnett and Ashton complaints for lack of subject matter and personal jurisdiction are denied without prejudice. The Burnett and Ashton negligence claims against NCB are dismissed for failure to state a claim. The Saudi Binladin Group's motions to dismiss the Burnett and Ashton complaints for lack of personal jurisdiction and failure to state a claim are denied without prejudice, but the TVPA and negligence claims against SBG are dismissed. The SAAR Network's motion to dismiss the Federal complaint for lack of personal jurisdiction and failure to state a claim is denied without prejudice. The RICO, TVPA, assault and battery, intentional infliction of emotional distress, and negligence claims against the SAAR Network are dismissed. Adel Batterjee's motion to dismiss the Burnett complaint is denied.

So ordered.

Richard Conway Casey, U.S.D.J.

Dated:
January 18, 2005
New York, New York