**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| IN RE:  TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Civil Action No. 03 MDL 1570 (GBD) |

*This document relates to:  All Actions*

## SUPPLEMENTAL BRIEF ON SECOND CIRCUIT DECISION

October 17, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION AND SUMMARY ........................................................... 1

ARGUMENT ............................................................................................. 4

I.   THE SECOND CIRCUIT'S DECISION COMPELS DISMISSAL OF
     ALL OFFICIAL-CAPACITY CLAIMS AGAINST REMAINING FSIA
     DEFENDANTS ...................................................................................... 4

     A.   The FSIA Protects Individuals Acting in Their Official Capacity ......... 5

     B.   The Two Remaining Saudi Entities Are "Agencies or
          Instrumentalities" of Saudi Arabia ............................................... 6

     C.   The FSIA's Torts Exception Does Not Apply Here ........................... 9

     D.    The Commercial Activities Exception to the FSIA Does Not
          Apply Here .................................................................................. 11

II.  THE SECOND CIRCUIT'S PERSONAL JURISDICTION DECISION IS
     DISPOSITIVE OF MANY PENDING MOTIONS TO DISMISS .................. 12

     A.   The Second Circuit's Personal Jurisdiction Rulings ....................... 13

          1.   The Court of Appeals Rejected Plaintiffs' Reliance on
               Terrorism Cases Where Defendants Were Primary
               Participants in the Terrorist Acts ...................................... 16

          2.   Specific Jurisdiction Here Requires Intentional and
               Tortious Conduct Expressly Aimed at the United States
               from Which Plaintiffs' Injuries Arise ................................. 17

          3.   Plaintiffs' Mere Assertions of Support for Terrorism Do
               Not Warrant Jurisdictional Discovery ................................ 21

     B.   The Court Of Appeals' Rulings Dispose of Many Motions to
          Dismiss ...................................................................................... 21

          1.   Alleged Support to al Qaeda through Charities ..................... 22

          2.   Alleged Provision of Banking Services to al Qaeda ............... 28

          3.   Even More Remote Allegations .......................................... 30

CONCLUSION .......................................................................................... 34

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ...............................9

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000) ...................................................................5

*Burger King v. Rudzewicz,* 471 U.S. 462 (1985) ...........................................................15, 17, 18

*Calder v. Jones,* 465 U.S. 783 (1984) ...................................................................................17, 20

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000) ...................................................16

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004)........................................................................7

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ............................15, 22

*Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181 (2d Cir. 1998) ....................................................21

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)...............................................................15

*Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) ..........................................................11

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)...............................................................16

*Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627 (S.D.N.Y. 2005) ...............................7

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) .......................................................................16

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54
    (D.D.C. 2003) ........................................................................................................................16

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y.),
    *aff'd in part, dismissed in part*, 162 F.3d 748 (2d Cir. 1998)............................................16

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) .....................................................11

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ......................................................................................15

*Terrorist Attacks on Sept. 11, 2001*, *In re*:

    349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008)................ *passim*

    392 F. Supp. 2d 539, 572 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71
        (2d Cir. 2008)....................................................................................................4, 6

    538 F.3d 71 (2d Cir. 2008)............................................................................... *passim*

*Toys "R" Us, Inc. v Step Two, S.A.*, 318 F.3d 446 (3d Cir. 2003)...................................................21

**Statutes and Rules:**

28 U.S.C. § 1603(b) .......................................................................................................7

28 U.S.C. § 1605(a)(2).............................................................................................2, 11

28 U.S.C. § 1605(a)(5)...............................................................................................2, 9

28 U.S.C. § 1605A .....................................................................................................1, 9

28 U.S.C. § 1605A(a)(1)..............................................................................................10

Fed. R. Civ. P. 12(b)(1)..................................................................................................4

Fed. R. Civ. P. 12(b)(2)..................................................................................................6

Fed. R. Civ. P. 12(b)(5)..................................................................................................6

Fed. R. Civ. P. 12(b)(6)..................................................................................................6

**Other Materials:**

*The 9/11 Commission Report:  Final Report of the National Commission on
    Terrorist Attacks Upon the United States* (2004) ............................................33

U.S. Dep't of State, *State Sponsors of Terrorism*,
    http://www.state.gov/s/ct/c14151.htm (last visited Oct. 14, 2008)...................10

## INTRODUCTION AND SUMMARY

Consistent with this Court's September 15, 2008 order (Dkt. # 2133)[1], this supplemental brief "address[es] the import" of the recent opinion by the United States Court of Appeals for the Second Circuit, *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*"), with respect to pending motions to dismiss.  This brief first addresses the Second Circuit's holdings as to the Foreign Sovereign Immunities Act ("FSIA") and then addresses the Court's holdings relating to the exercise of personal jurisdiction under the Due Process Clause.

**1.**      With respect to the FSIA, a straightforward application of the Second Circuit's decision requires the dismissal of the remaining FSIA defendants.  The Second Circuit held, first, that an individual official of a foreign state, acting in his official capacity, is an "agency or instrumentality" of the foreign state, and is thereby protected by the FSIA's grant of immunity with respect to official-capacity acts.  That holding conclusively establishes that remaining official-capacity allegations against individual defendants are covered by the FSIA.  In addition, the Second Circuit held that an entity that, under the traditional five-factor test, is an organ of the foreign state is also an "agency or instrumentality" of that state protected by the FSIA.  That holding establishes that the two remaining FSIA defendants that are not individuals – the Saudi Red Crescent Society ("SRCS") and the Saudi Joint Relief Committee ("SJRC") – are likewise protected by the FSIA.

The Second Circuit's decision also forecloses plaintiffs' arguments that any exception to immunity applies here and divests the FSIA defendants of their immunity from suit.  To begin with, the Second Circuit made clear what is apparent from the text of the FSIA:  the FSIA's Terrorism Exception, 28 U.S.C. § 1605A (formerly 28 U.S.C. § 1605(a)(7)), cannot be applied to

---

[1] Unless otherwise noted, all docket references are to No. 03-MDL-1570.

a foreign state that has not been designated a state sponsor of terrorism by the United States. Because Saudi Arabia has not been so designated, that exception does not apply to it or to its officials, agencies, or instrumentalities.  The Second Circuit further held that plaintiffs cannot plead around that crucial limitation by arguing that their allegations of material support for terrorism fall within the FSIA's Torts Exception, 28 U.S.C. § 1605(a)(5).  That holding is dispositive here because plaintiffs' claims against the remaining FSIA defendants are based on one central allegation:  that these individuals and entities directly and indirectly provided material support to al Qaeda and are therefore responsible for the attacks of September 11, 2001. Because, as the Second Circuit held, that allegation can be pursued, if at all, through the FSIA's Terrorism Exception – and because that Exception does not apply here – plaintiffs' claims against the remaining FSIA defendants for purportedly providing material support to al Qaeda must be dismissed.

Finally, the Second Circuit held that the FSIA's Commercial Activities Exception, 28 U.S.C. § 1605(a)(2), does not apply to allegations that defendants indirectly provided material support for terrorism.  That is so, first, because permitting plaintiffs to proceed under the Commercial Activities Exception would be an end-run around Congress's judgment that allegations of state-sponsored terrorism can be pursued, if at all, only against foreign states that the Executive has designated as state sponsors of terrorism under the Terrorism Exception.  In addition, the Second Circuit held that allegations of donating money to charities (even when combined with conclusory charges of an intent that those resources be funneled to terrorist organizations) do not constitute commercial activity within the meaning of the FSIA.  Under the Second Circuit's decision, plaintiffs' attempt to recast their allegations as arising under the Commercial Activities Exception also fails.

**2.**     The Second Circuit's personal jurisdiction holdings also bear directly on many pending motions to dismiss.  Under settled principles of personal jurisdiction as articulated by the Supreme Court and other federal courts, it has always been clear that plaintiffs' claims against many defendants should be dismissed for the lack of personal jurisdiction.  The Second Circuit's decision drives home that conclusion.  Applying familiar principles of law, the Second Circuit held that there was no personal jurisdiction over personal-capacity claims against the Four Princes[2] and HRH Prince Mohamed Al Faisal ("Prince Mohamed"), and in doing so, the court of appeals rejected plaintiffs' principal theory of personal jurisdiction – namely, that any allegation of material support for al Qaeda, no matter how temporally, geographically or causally remote from the September 11 attacks, is sufficient, without more, to establish personal jurisdiction.

The settled principles of personal jurisdiction reflected in the Second Circuit's decision require the dismissal of many additional defendants.  The Second Circuit's decision establishes, for example, that allegations of generalized material support at any time to anyone affiliated with al Qaeda or other terrorist organizations cannot establish personal jurisdiction in U.S. courts.  Moreover, personal jurisdiction cannot exist in American courts based simply on allegations that a foreign defendant provided financial support for al Qaeda – through donations to foreign charities, banking services, or otherwise – at a time al Qaeda was known to be targeting U.S. interests.  Indeed, the Second Circuit held that, absent the required link to the September 11 attacks, even allegations of knowing and intentional support to al Qaeda are insufficient to establish personal jurisdiction.  These holdings follow from the court of appeals' conclusion, based on well-established personal jurisdiction principles, that a defendant has not "purposefully

---

[2] HRH Prince Sultan bin Abdulaziz, HRH Prince Naif bin Abdulaziz, HRH Prince Sultan bin Abdulaziz, and HRH Prince Turki Al-Faisal (collectively "the Four Princes").

directed" his conduct at the United States for jurisdictional purposes unless the defendant committed tortious acts that are expressly aimed at, and intended to cause injury to, residents of the United States.  *Terrorist Attacks III*, 38 F.3d at 94-95.

As explained below and as set forth in more detail in the chart defendants have prepared at the Court's direction, a straightforward application of the Second Circuit's decision compels the dismissal of all claims against many remaining defendants.

## ARGUMENT

### I. THE SECOND CIRCUIT'S DECISION COMPELS DISMISSAL OF ALL OFFICIAL-CAPACITY CLAIMS AGAINST REMAINING FSIA DEFENDANTS

In *Terrorist Attacks III*, the Second Circuit affirmed Judge Casey's dismissal on FSIA grounds of six defendants:  the Kingdom of Saudi Arabia, the Saudi High Commission ("SHC"), and four Saudi government officials.  There remain seven defendants with Rule 12(b)(1) motions to dismiss asserting immunity under FSIA that are ripe for decision – two Saudi government agencies (the SRCS and the SJRC), and five officials of the governments of Qatar and Saudi Arabia (Sheikh Abdullah bin Khalid Al Thani, Abdullah bin Saleh Al Obaid, Abdullah Muhsen Al Turki, Abdul Rahman Al Swailem, and Saleh Al-Hussayen).[3]  The Second Circuit's decision resolves four dispositive issues that compel dismissal of all official-capacity claims against each of these defendants.

---

[3] The Court has deferred further consideration of the FSIA defense of the eighth FSIA defendant – The National Commercial Bank ("NCB") – pending resolution of NCB's renewed motion to dismiss for lack of personal jurisdiction (filed July 22, 2008) (Dkt. # 2110-2115).  *See In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 572, 575 (S.D.N.Y. 2005) ("*Terrorist Attacks II*"), *aff'd*, 538 F.3d 71 (2d Cir. 2008).  Like NCB, the other seven FSIA defendants have asserted other grounds for dismissal, e.g., lack of personal jurisdiction, failure to state a claim, and insufficient service of process.  This portion of this supplemental brief addresses only their FSIA defenses.

## A.        The FSIA Protects Individuals Acting in Their Official Capacity

Many of plaintiffs' allegations in these cases have been directed at individual government officials who are alleged to have engaged in wrongdoing in their official conduct of government affairs.  Throughout this litigation, some plaintiffs have contended that the FSIA does not apply to government officials acting in their official capacity.  In *Terrorist Attacks III*, the Second Circuit squarely rejected this position, joining the five other courts of appeals that have held "that an individual official of a foreign state acting in his official capacity is the 'agency or instrumentality' of the state, and is thereby protected by the FSIA."  538 F.3d at 81 (citing decisions of the Fourth, Fifth, Sixth, Ninth, and D.C. Circuits).  As this Court has already explained, the Second Circuit held that, "[i]ndividual officials of a foreign state, acting in their official capacity, are an 'agency or instrumentality' of the foreign state, and are thereby protected by the FSIA grant of immunity for their official-capacity acts."  Order (Sept. 15, 2008) (Dkt. # 2134).

The Second Circuit grounded its holding in the text of the statute and its legislative history, which make clear that the FSIA was intended to replace the prior *ad hoc* approach to common-law immunity of foreign states and foreign officials.  *See Terrorist Attacks III*, 538 F.3d at 83-84.  The Court also relied upon the "act-of-state doctrine," which "precludes our courts from sitting in judgment 'on the acts of the government of another done within its own territory,' including acts committed by individual officials of foreign governments."  *Id.* at 84 (quoting *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 451 (2d Cir. 2000)).  Finally, the Second Circuit noted that the congressional enactment of specific provisions in FSIA governing claims arising from terrorist attacks "evince congressional recognition that claims against individual officials of a foreign government must be brought within the confines of FSIA."  *Id.*

5

There remain in these cases five individual government officials who have filed motions to dismiss pursuant to the FSIA. Each of these defendants has been sued for official-capacity acts and there is no dispute as to their status as government officials: Sheikh Abdullah bin Khalid Al Thani ("Sheikh Abdullah"), Abdullah bin Saleh Al Obaid, Abdullah Muhsen Al Turki, Abdul Rahman Al Swailem, and Saleh Al-Hussayen.[4] Each of these defendants has filed a motion to dismiss the claims against him on the ground that those claims are barred by the FSIA. The Second Circuit's holding puts beyond question that these defendants, as individuals, properly invoked the FSIA. That decision therefore compels the conclusion that these defendants are entitled to the protections of the FSIA insofar as plaintiffs' allegations are directed at actions they undertook in their roles as government officials.[5]

### B. The Two Remaining Saudi Entities Are "Agencies or Instrumentalities" of Saudi Arabia

In addition to suing the Kingdom of Saudi Arabia and its individual government officials, plaintiffs sued three Saudi humanitarian relief organizations: the SHC, the SRCS, and the SJRC. Each of these organizations was created by the Kingdom of Saudi Arabia to engage in humanitarian relief efforts abroad, and each accordingly claimed the protections of the FSIA as an "agency or instrumentality" of the Kingdom of Saudi Arabia. Certain plaintiffs claimed, however, that the SHC was not an agency or instrumentality of the Saudi government and that it was therefore not entitled to claim the protections of the FSIA. In *Terrorist Attacks II*, Judge

---

[4] Although plaintiffs do not dispute that defendant Sheikh Abdullah is a government official, they do contend that he is not being sued for any official-capacity acts. But, as explained in his motion to dismiss, all of the alleged conduct would have taken place in Sheikh Abdullah's official capacity. *See* Mem. of Law in Supp. of Abdullah bin Khalid Al Thani at 9-10 (filed Apr. 7, 2006) (Dkt. # 1760).

[5] To the extent plaintiffs allege that any of these defendants are liable for acts taken in their personal capacity, those defendants have also raised defenses of lack of personal jurisdiction under Rule 12(b)(2), improper or insufficient service of process under Rule 12(b)(5), and failure to state a claim under Rule 12(b)(6), which are briefed in their motions to dismiss.

Casey addressed that question, holding that the SHC is an agency or instrumentality of the Saudi government and is therefore subject to the protections of the FSIA.

Here again, the Second Circuit affirmed Judge Casey's ruling in full.  *See Terrorist Attacks III*, 538 F.3d at 85-86.  The Court explained that the FSIA's definition of "'agency or instrumentality'" encompasses "'an organ of a foreign state or political subdivision thereof.'"  *Id.* at 85 (quoting 28 U.S.C. § 1603(b)).  The Court then identified five criteria that can be used to determine whether an agency is an "organ" of a national government:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Id.* (quoting *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004)).

The Court stressed that an organization need not satisfy each of these criteria to qualify as an "organ" of a foreign government; rather, courts should "'engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of . . . the entity claiming FSIA immunity.'"  *Id.* (quoting *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005)).  As this Court has explained, the Second Circuit was clear that, "[w]here the district courts' consideration of the five *Filler* factors indicate that an entity is an organ of the foreign state, it is an 'agency or instrumentality' of the foreign state protected by the FSIA grant of immunity."  Order (Sept. 15, 2008) (Dkt. # 2134).

The Second Circuit then reviewed the submissions of the SHC and determined that it was an organ of the Kingdom of Saudi Arabia:

> Based on this undisputed record, the *Filler* factors indicate that the SHC is an organ of the Kingdom.  The SHC was created for a national purpose (channeling humanitarian aid to Bosnian Muslims); the Kingdom actively supervises it; many SHC workers are Kingdom employees who remain on the Kingdom's payroll; the

7

> SHC holds the "sole authority" to collect and distribute charity to Bosnia; and it can be sued in administrative court in the Kingdom.

*Terrorist Attacks III*, 538 F.3d at 86.  With respect to plaintiffs' arguments about the alleged "paucity of information about the SHC's ownership structure," the Court "d[id] not see the relevance of this factor" where, as here, the defendant is a "non-corporate governmental entity that . . . has no owners or shareholders."  *Id.*

Here, too, both the SRCS and the SJRC satisfy the *Filler* factors, as set forth in the declarations submitted in support of their motions to dismiss.  Both the SRCS and the SJRC were created by the Saudi government, are or were chaired by and/or run by senior government officials, included other government employees in their work force, and each had the exclusive authority to conduct its operations within Saudi Arabia (the SRCS had exclusive authority to operate as the national affiliate of the International Red Cross and Red Crescent; the SJRC had exclusive authority to collect and administer relief for Albanian refugees in Kosovo and for victims of hostilities in Chechnya).  *See* Mem. of Law in Supp. of the Saudi Arabian Red Crescent Society's Mot. to Dismiss at 5-11 (filed Apr. 9, 2004) (Dkt. # 99); Decl. of Abdul Rahman Al Swailem ¶¶ 3-4 (filed Apr. 9, 2004) (Dkt. # 99); Mem. of Law in Supp. of Saudi Arabian Red Crescent Society's & Dr. Abdul Rahman Al Swailem's Consol. Mot. to Dismiss at 6-11 (filed Sept. 6, 2005) (Dkt. # 1175); Mem. of Law In Supp. of Mot. to Dismiss of the Saudi Joint Relief Comm. at 9-11 (filed Jan. 17, 2005) (Dkt. # 631); Decl. of Dr. Abdul Rahman A. Al-Suwailem ¶¶ 3-10 (filed Jan. 17, 2005) (Dkt. # 631).

Under the Second Circuit's decision, both the SRCS and the SJRC are "organs" of the Kingdom of Saudi Arabia and hence entitled to sovereign immunity under the FSIA.  Indeed, even prior to the Second Circuit's decision, no party disputed the SRCS's and the SJRC's status as agencies or instrumentalities of the government of Saudi Arabia.

## C.      The FSIA's Torts Exception Does Not Apply Here

As plaintiffs' complaints make clear – and as the Second Circuit recognized – plaintiffs' claims against the FSIA defendants are based on one central allegation:  that these individuals and entities directly and indirectly provided material support to al Qaeda and are therefore responsible for the attacks of September 11, 2001.  Although plaintiffs attempted to couch this allegation as a tort in order to fit it within the FSIA's Torts Exception, 28 U.S.C. § 1605(a)(5), the Second Circuit held that such allegations can be brought, if at all, only pursuant to the Terrorism Exception to the FSIA, 28 U.S.C. § 1605A (formerly 28 U.S.C. § 1605(a)(7)).[6]  The Court further held that, because Saudi Arabia has never been designated a state sponsor of terrorism, plaintiffs cannot proceed under the Terrorism Exception, thus mandating dismissal. *See Terrorist Attacks III*, 538 F.3d at 86-88; *see also* Order (Sept. 15, 2008) (Dkt. # 2134) ("The 'terrorism exception,' to the jurisdictional immunity of a foreign state under the [FSIA], cannot be applied to a foreign state that has not been designated a state sponsor of terrorism by the United States.").

The Second Circuit stressed that the Torts Exception was originally enacted in 1976 to cover personal injuries resulting from "'traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law.'"  *Terrorist Attacks III*, 583 F.3d at 87 n.12 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-40 (1989).  In contrast, the Terrorism Exception specifically covers torts committed by designated state sponsors of terrorism, and sets up "an important procedural safeguard – that the foreign state be designated a state sponsor of terrorism" in order for a plaintiff to invoke the Terrorism Exception.  *Id.* at 89.  To allow private plaintiffs to bypass the strict "procedural safeguard" of

---

[6] The Terrorism Exception was first enacted in 1996, and was superseded and replaced on January 28, 2008.  *See Terrorist Attacks III*, 538 F.3d at 87 n.13.

the Terrorism Exception by suing a non-designated government or government official under the Torts Exception would impermissibly "read the statute in a way that would deprive the Terrorism Exception (or its limitations) of meaning." *Id.* Put differently, "[i]f the Torts Exception covered terrorist acts and thus encompassed the conduct set forth in the Terrorism Exception, there would be no need for plaintiffs ever to rely on the Terrorism Exception when filing suit." *Id.* Moreover, the Terrorism Exception "applies 'in any case not otherwise covered by this chapter.' 28 U.S.C. § 1605A(a)(1). . . . [C]laims based on terrorism must [therefore] be brought under the Terrorism Exception, and not under any other FSIA exception." *Id.* at 90.

This holding is dispositive here and mandates dismissal of all official-capacity claims against all remaining FSIA defendants. It is undisputed that Saudi Arabia has not been designated as a state sponsor of terrorism. *Id.* at 89. The same is true of Qatar.[7] Under the Second Circuit's holding, the plaintiffs therefore cannot pursue claims against government officials of Saudi Arabia or Qatar, insofar as those officials are alleged to have provided support for al Qaeda in their official capacities. Likewise, plaintiffs cannot proceed against the SRCS or the SJRC. With respect to each of those defendants, plaintiffs' claims – in essence, that these defendants supported al Qaeda and thereby were complicit in the attacks of September 11 – are squarely barred by the Second Circuit's decision. *See* Order (Sept. 15, 2008) (Dkt. # 2134) (the Second Circuit held that "[t]he FSIA 'torts exception' does not apply where the alleged conduct of the defendants amount[s] to terrorism within the meaning of the 'terrorism exception.'").

---

[7] *See* U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/s/ct/c14151.htm (last visited Oct. 14, 2008) (listing Cuba, Iran, Sudan, and Syria as the only designated state sponsors of terrorism). Six of the seven defendants with pending FSIA motions are Saudi agencies or government officials; Sheikh Abdullah is an official of the government of Qatar.

### D.     The Commercial Activities Exception to the FSIA Does Not Apply Here

Finally, the Second Circuit addressed and rejected plaintiffs' claim that the Commercial Activities Exception to FSIA, 28 U.S.C. § 1605(a)(2), applied to plaintiffs' allegations that the FSIA defendants made charitable contributions to terrorists or to other entities that in turn supported terrorism.  *See Terrorist Attacks III*, 538 F.3d at 90-93.

The Second Circuit first explained that "[t]he same analysis that renders inapplicable the Torts Exception likewise defeats" plaintiffs' reliance on the Commercial Activities Exception: permitting plaintiffs to proceed under the Commercial Activities Exception would be an end-run around Congress's judgment that allegations of state sponsored terrorism can be pursued, if at all, only against foreign states that the Executive Branch has designated as state sponsors of terrorism.  *Id.* at 91.  Furthermore, and in all events, the Court rejected plaintiffs' effort to fit their allegations into the Commercial Activities Exception by "characteriz[ing] the defendants' charitable contributions as a form of money laundering," *id.*, or alleging that "the defendants donated money to charities with the intent that it be funneled to terrorist organizations," *id.* at 92. "[T]he alleged conduct itself – giving away money," the Court explained, "is not a commercial activity."  *Id.*  Although the Second Circuit recognized that private citizens and corporations can also make charitable donations, *id.*, such "donations to charity are not part of the trade and commerce engaged in by a 'merchant in the marketplace,'" *id.* (quoting *Letelier v. Republic of Chile*, 748 F.2d 790, 796 (2d Cir. 1984)).  This distinction is critical, because the Commercial Activities Exception only applies "'when a foreign government acts, not as regulator of a market, but in the manner of a private player within it.'"  *Id.* at 91 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).  In short, making charitable donations, regardless of the purpose, "is not a commercial activity" within the meaning of the FSIA.  *Id.* at 92; *see* Order (Sept. 15, 2008) (Dkt. # 2134) (the Second Circuit held that "[t]he FSIA 'commercial activities

11

exception' does not apply where the only alleged conduct of the defendants is donating money to charities with the intent that it be funneled to terrorist organization").

The Second Circuit's ruling on this point compels the conclusion that plaintiffs' allegations as to the remaining seven FSIA defendants – that they made or funneled charitable donations in support of al Qaeda – do not fall within the Commercial Activities Exception to the FSIA.

* * *

For the reasons explained above, in their previously filed motions to dismiss, and in the Second Circuit's opinion, the motions to dismiss of the remaining FSIA defendants for lack of subject-matter jurisdiction should be granted.

## II.   THE SECOND CIRCUIT'S PERSONAL JURISDICTION DECISION IS DISPOSITIVE OF MANY PENDING MOTIONS TO DISMISS

The Second Circuit's personal jurisdiction holding – which applied familiar principles of personal jurisdiction to plaintiffs' allegations against five defendants is dispositive of the pending motions to dismiss of many of the defendants who have disputed personal jurisdiction under a "purposeful direction" or other "concerted action" theory of specific jurisdiction.  Indeed, the court of appeals' decision rejected plaintiffs' core jurisdictional theory:  that any allegation of material support for al Qaeda – no matter how temporally, geographically or causally remote from the September 11 attacks – is sufficient to establish personal jurisdiction.  The court's decision goes well beyond the holding that "[p]ersonal jurisdiction in American courts is not established by merely alleging that the defendant intended to fund al Qaeda through donations to Muslim charities."  *See* Order (Sept. 15, 2008) (Dkt. # 2134); *see Terrorist Attacks III*, 538 F.3d at 94.  The Court found that this conclusion applies "[e]ven assuming that the [defendants] were aware of Osama bin Laden's public announcements of jihad against the United States and al

Qaeda's attacks on the African embassies and U.S.S. Cole"; and, "[e]ven if the [defendants] were reckless in monitoring how their [charitable] donations were spent, or could and did foresee that recipients of their donations would attack targets in the United States." *Terrorist Attacks III*, 538 F.3d at 94-95.

The court of appeals also expressly held, with respect to one of the defendants before it, that personal jurisdiction in American courts is not established by allegations that a defendant provided "financial services" to al Qaeda or another "entity that carries out a terrorist attack on United States citizens." *Id.* at 96. These holdings follow from the court of appeals' reasoning that a defendant has not "purposefully directed" his conduct at the United States for jurisdictional purposes unless the defendant committed tortious acts that are expressly aimed at, and intended to cause injury to, residents of the United States. *Id.* at 94-95.

Plaintiffs have not alleged that any of the defendants whose motions to dismiss for lack of personal jurisdiction are before this Court intentionally provided funding to support the September 11 attacks against the United States. Consequently, the Second Circuit's decision mandates the dismissal of claims on which personal jurisdiction was alleged to be based on a purposefully directed or other concerted-action theory.

A.    **The Second Circuit's Personal Jurisdiction Rulings**

In addition to the FSIA issues discussed above, the appeal before the Second Circuit involved plaintiffs' claims that the district court had personal jurisdiction over five Saudi Princes for alleged conduct in their personal capacities. *See Terrorist Attacks III*, 538 F.3d at 77-78. Four of the Princes were alleged to have "supported Muslim charities knowing that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks." *Id*. at 94. The fifth, Prince Mohamed, was an executive of a Swiss bank that allegedly "actively

13

sponsored and supported the al Qaeda movement through several of its subsidiaries." *Id*. at 95. The Second Circuit conclusively rejected personal jurisdiction over all five Princes.

In so doing, the court of appeals rejected the foundation of plaintiffs' theory of personal jurisdiction, which rested on alleged support for a global terrorist group whose activities were centered in other parts of the world, as inconsistent with settled principles of personal jurisdiction.  For example, the *Federal Insurance* plaintiffs argued on appeal that "the planning, coordination and execution of the September 11th Attack would not have been possible without a global financial and logistical infrastructure, established by al Qaida over the course of more than a decade leading up to the September 11th Attack."  *Federal Ins*. Pls.-Appellants Br. at 6, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007) (citing *Federal Ins.* FAC ¶¶ 77, 79-83). Such alleged support to an amorphous "international terror network," *see*, *e.g*., *Ashton* Pls.-Appellants Br. at 55, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007), the court of appeals held, was too attenuated to permit specific jurisdiction based on purposeful direction of activities against the United States.

In rejecting plaintiffs' allegations, the Second Circuit reiterated three fundamental and well-settled jurisdictional principles.  First, plaintiffs bear the burden of showing that defendants are subject to personal jurisdiction.  *See Terrorist Attacks III*, 538 F.3d at 93.  Second, in assessing plaintiffs' showing, the court will neither "draw 'argumentative inferences' in the plaintiff's favor," nor "accept as true a legal conclusion couched as a factual allegation."  *Id*. (citations omitted).  Consequently, plaintiffs cannot rely on conclusory allegations that defendants intended to support terrorism against the United States, or that they purposefully directed their activities at the United States – allegations that do no more than crib the legal standard.  Third, apart from the specific long-arm statute at issue, the Due Process Clause

14

requires that the defendants have had fair warning that their conduct would subject them to jurisdiction in U.S. courts.

The Second Circuit's decision is consistent with long-established constitutional limits on specific jurisdiction announced by the Supreme Court, which require a tangible connection between defendant, the forum, and the cause of action:  "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations."  *Burger King v. Rudzewicz,* 471 U.S. 462, 471-72 (1985) (internal quotation marks omitted).  Thus, when "a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this . . . requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Id*. at 472-73 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984) & *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  The *Helicopteros* Court explained that, "[w]hen a controversy is related to or 'arises out of' a defendant's contacts with the forum, the Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of *in personam* jurisdiction."  466 U.S. at 414 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)) (emphasis added).

Based on these settled jurisdictional principles, the court of appeals rejected plaintiffs' broad contention that jurisdiction will lie with respect to any defendant who is alleged to have provided material support at any time to anyone affiliated with al Qaeda or other terrorist organizations.  It also rejected plaintiffs' specific argument that defendants are subject to personal jurisdiction if they are alleged to have provided financial support for al Qaeda – through donations to foreign charities, banking services, or otherwise – at a time al Qaeda was known to

be targeting U.S. interests.  Indeed, the Second Circuit properly found that even allegations of

knowing and intentional support to al Qaeda are not sufficient to establish personal jurisdiction

absent the required intent to injure U.S. citizens through the September 11 attacks.  *See Terrorist*

*Attacks III*, 538 F.3d at 94.

1. *The Court of Appeals Rejected Plaintiffs' Reliance on Terrorism Cases Where*
   *Defendants Were Primary Participants in the Terrorist Acts*

In rejecting plaintiffs' jurisdictional theory, the Second Circuit found inapposite five

terrorism cases on which plaintiffs have heavily relied to establish jurisdiction under a

"purposeful direction" theory.  *See id.* (citing *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005);

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006); *Rein v. Socialist People's Libyan Arab*

*Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y.), *aff'd in part, dismissed in part*, 162 F.3d 748 (2d Cir.

1998); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54 (D.D.C. 2003);

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000)).  The court of appeals found

these cases inapposite because in each the defendants were alleged to be "primary participants in

the terrorist acts" which injured U.S. persons.  *See id.* (discussing *Mwani*, 417 F.3d at 13

(allegations that Osama bin Laden was responsible for the bombing of U.S. embassies in Africa);

*Morris*, 415 F. Supp. 2d at 1336 (allegations against an al Qaeda member who helped plan al

Qaeda's terrorist agenda and convinced his son to attack American soldiers); *Rein*, 995 F. Supp.

at 327-30 (allegations that agents of the government of Libya, a designated state sponsor of

terrorism, bombed a U.S. aircraft that killed 189 U.S. residents); *Pugh*, 290 F. Supp. 2d at 56

(jurisdiction lies in the courts of a nation whose citizens die in the bombing of a commercial

airline by agents of the government of Libya); and *Daliberti*, 97 F. Supp. 2d at 40-41 (allegation

that the government of Iraq tortured American plaintiffs in a conscious design to affect U.S.

policy)).

Plaintiffs had argued that personal jurisdiction should lie over the defendants on appeal because the conduct alleged against them only differed in "degree [and] not kind" from that alleged against the defendants in the five terrorism cases.  *WTC & Euro Brokers* Pls.-Appellants Br. at 38, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007).  The Second Circuit disagreed. Because "plaintiffs do not allege that the Four Princes directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them," those five cases did not apply. *Terrorist Attacks III*, 538 F.3d at 94.  The court of appeals reached the same conclusion with respect to Prince Mohamed, the banking executive, "[f]or the same reasons."  *Id.* at 96.  Thus, the Second Circuit expressly "decline[d] to read *Mwani, Morris, Pugh*, *Daliberti*, and *Rein*" to support jurisdiction based either on contributions to Islamic charities or the provision of financial services to entities with terrorist ties.  *Id.*

>    2.    *Specific Jurisdiction Here Requires Intentional and Tortious Conduct Expressly Aimed at the United States from Which Plaintiffs' Injuries Arise*

Absent allegations that any of the relevant defendants were primary participants in the September 11 attacks, the Second Circuit held that plaintiffs must establish, under the familiar *Calder/Burger King* standard, that the defendant committed "'intentional, and allegedly tortious, actions . . . expressly aimed' at residents of the United States" and that plaintiffs' injuries "'arise out of or relate to' [that defendant's] activities."  *Id.* at 93 (quoting *Calder v. Jones,* 465 U.S. 783, 789 (1984), and *Burger King*, 471 U.S. at 472-73).  The court of appeals rejected plaintiffs' argument that allegations of knowledge of al Qaeda's hostility toward the United States and the consequent foreseeability of U.S. harm were sufficient to carry plaintiffs' burden of establishing jurisdiction:

> It may be the case that acts of violence committed against residents of the United States were a foreseeable consequence of the princes' alleged indirect funding of al Qaeda, but foreseeability is not the standard for recognizing personal jurisdiction.  Rather, the plaintiffs must establish that the Four Princes "expressly

> aimed" intentional tortious acts at residents of the United States. . . . Providing
> indirect funding to an organization that was openly hostile to the United States
> does not constitute this type of intentional conduct.  In the absence of such a
> showing, American courts lacked personal jurisdiction over the Four Princes.

*Id.* at 95.[8]  Thus, without more, allegations of providing general support to a global terrorist

organization, like al Qaeda – even if knowing and intentional – lack a sufficient nexus to the

September 11 attacks from which the plaintiffs' injuries arise or relate.

The Second Circuit further rejected plaintiffs' theory of personal jurisdiction with respect

to Prince Mohamed, holding that "[i]t may be that, but for access to financial institutions, al

Qaeda could not have funded its terrorist attacks.  But that does not mean that the managers of

those financial institutions 'purposefully directed' their 'activities at residents of [this] forum.'

. . .  [W]e decline . . . to say that the provision of financial services to an entity that carries out a

terrorist attack on United States citizens could make [a defendant] . . . subject to the jurisdiction

of American courts.'"  *Terrorist Attacks III*, 538 F.3d at 96 (quoting *Burger King*, 471 U.S. at

472).  The court of appeals also rejected the application of the fiduciary shield doctrine to Prince

Mohamed, holding that, while Prince Mohamed may have been a "'primary actor' with regard to

the operations of certain foreign banks that conducted business with al Qaeda," "[b]ecause the

transactions that Mohamed allegedly supervised had no direct contact with the United States,

Mohamed was not a 'primary actor' in any transaction that would cause him to be subject to the

jurisdiction of American courts" under that doctrine.  *Id.* at 96.[9]

---

[8] The court of appeals required a more stringent jurisdictional showing than that accepted by Judge Casey, who stated the required showing in terms of knowledge and intent to funnel money to terrorists, without a requirement that such activity be "expressly aimed" at the United States. *See*, *e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 813-14 (S.D.N.Y. 2005) ("*Terrorist Attacks I* "), *aff'd*, 538 F.3d 71 (2d Cir. 2008).

[9] In rejecting personal jurisdiction over Prince Mohamed under this theory, the Second Circuit also rejected the theory with respect to the banks themselves on whose boards Prince Mohamed served. Plaintiffs' effort to bootstrap jurisdiction based on the banks failed because, among other things, while those banks may have been alleged to have done business with al Qaeda, doing so outside the United

The Second Circuit's application of settled jurisdictional principles has direct application to the personal jurisdiction defenses of many defendants here.  That is because plaintiffs' jurisdictional theories are premised on the common theory that *any* alleged "material support to al Qaeda," at least during a time after it had declared hostility to the United States, necessarily constitutes conduct purposefully directed at the United States:

- "[W]e say anybody who provided material support to Al Qaeda knowing Al Qaeda was waging war against the United States is subject to jurisdiction . . ."  Status Conference Tr. at 25:18-21 (June 26, 2007) (statement of plaintiffs' counsel);

- "Plaintiffs assert that defendants who knowingly supported al Qaida in the years leading up to the September 11th Attack are properly regarded to have 'purposefully directed' their conduct at the United States[.]"  Letter from Plaintiffs' Executive Committees to Judge Daniels at 6-7 (Aug. 1, 2007).

The Second Circuit, however, rejected that theory.  Setting aside that plaintiffs have generally failed to allege facts from which intent to support al Qaeda can be fairly inferred, the court of appeals made clear that even intent to support al Qaeda cannot, without more, establish jurisdiction:  plaintiffs' "burden is not satisfied by the allegation that the Four Princes *intended* to fund al Qaeda through their donations to Muslim charities."  *Terrorist Attacks III*, 538 F.3d at 95 (emphasis added).  Intent to fund al Qaeda does not establish that the defendants "expressly aimed" any conduct at the United States.  *Id.*  That conclusion is hardly surprising given that plaintiffs themselves have alleged the global reach of al Qaeda, describing its activities from Afghanistan, to Sudan, Bosnia, Chechnya, and in other trouble spots throughout the world.  *See, e.g.*, *Federal Ins.* FAC ¶¶ 42, 75, 76, 78; *Ashton* 6AC ¶¶ 6, 124; *Burnett 9849* 3AC ¶¶ 210, 212; *WTC* Compl. ¶¶ 15, 18, 21, 22, 150.

---

States did not provide a basis for "purposefully directing" jurisdiction.  *See Terrorist Attacks III*, 538 F.3d at 96.

Throughout this litigation, plaintiffs have attempted to establish the absent connection between the defendants and the September 11 attacks by relying on anti-American statements by Osama bin Laden and earlier al Qaeda attacks on U.S. interests.  As it applied to the defendants before the Second Circuit, for example, the *Federal Insurance* complaint alleged:

> As Osama bin Laden had publicly announced that his organization's principal object was to wage war with the United States, and al Qaida had in fact conducted several attacks against U.S. interests over the years, it is clear that the Kingdom of Saudi Arabia and members [of] the Royal Family *knew and intended* that the funding and support funneled to al Qaida through the charities and banks *would be used to attack U.S. interests*.

*Federal Ins.* FAC ¶ 402 (emphases added).  The Second Circuit, however, rejected that bootstrapping attempt as well:

> Even assuming that the Four Princes were aware of Osama bin Laden's public announcements of jihad against the United States and al Qaeda's attacks on the African embassies and U.S.S. Cole, their contacts with the United States would remain far too attenuated to establish personal jurisdiction in American courts.

*Terrorist Attacks III*, 538 F.3d at 95.  "Rather," quoting *Calder*, the court of appeals explained "the plaintiffs must establish that the Four Princes 'expressly aimed' intentional tortious acts at residents of the United States."  *Id.* (quoting *Calder*, 465 U.S. at 789).  Therefore, no matter what facts plaintiffs allege to connect the defendants to generalized support of al Qaeda and its aims, those allegations cannot establish specific jurisdiction regarding claims arising out of the September 11 attacks.  The Second Circuit's decision, consistent with familiar principles of personal jurisdiction, requires allegations of some specific tortious conduct "expressly aimed" at the United States.

Moreover, plaintiffs cannot escape the impact of the Second Circuit's decision by asserting a collective conspiracy basis for jurisdiction.  The Second Circuit expressly held that plaintiffs' "concerted action theory of liability" was jurisdictionally insufficient under the Due Process Clause.  *Id.* at 94.  Indeed, plaintiffs pressed their conspiracy theory of jurisdiction both

in their appellate briefs, *see*, *e.g.*, *Federal Ins.* Pls.-Appellants Br. at 44, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007), and at oral argument, to no avail.  The Due Process Clause requires a direct connection to the United States, regardless of the theory of jurisdiction or the statutory basis asserted.

> 3.    *Plaintiffs' Mere Assertions of Support for Terrorism Do Not Warrant Jurisdictional Discovery*

Finally, the Second Circuit rejected plaintiffs' argument that they were entitled to jurisdictional discovery to search out a factual basis for their claims.  Plaintiffs invited the court of appeals to allow jurisdictional discovery for any theory deemed not "clearly frivolous."  *See Ashton* Pls.-Appellants Br. at 62, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007) (relying on *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003)).  The Second Circuit, however, rejected that argument in favor of the settled rule that requires plaintiffs to establish a "'a prima facie case that the district court had jurisdiction over [the defendants].'" *Terrorist Attacks III*, 538 F.3d at 96 (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir. 1998)).  It was on this ground that Judge Casey rejected plaintiffs' request for jurisdictional discovery against those defendants.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 811-12 (citing *Jazini* standard); 813-14, 816 (applying to Princes Sultan, Turki and Mohamed).  Having found plaintiffs' allegations of financial support for terrorism legally insufficient, the Second Circuit had no difficulty upholding that ruling and therefore found that plaintiffs' requests for jurisdictional discovery were properly denied.  *See Terrorist Attacks III*, 538 F.3d at 96.

**B.     The Court Of Appeals' Rulings Dispose of Many Motions to Dismiss**

The Second Circuit's application of settled principles of personal jurisdiction is dispositive of the motions to dismiss of the numerous defendants who have raised objections

based on the lack of specific personal jurisdiction.[10]  That is because plaintiffs have never even

pretended to make the jurisdictional showing the appellate court has required.  Before both the

court of appeals, as noted above, and in their oppositions to motions to dismiss, plaintiffs have

instead argued that they are not obligated to show any more than that the defendants allegedly

provided some kind of support to al Qaeda, irrespective of time, place, or purpose.  *See*, *e.g.*,

*Ashton* Pls.-Appellants Br. at 26-28, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007);

Pl. Consol. Mem. in Opp'n to Mot. to Dismiss of Khalid Bin Mahfouz at 13 (filed Aug. 24,

2005) (Dkt. # 1146); *Burnett 9849* Pl. Mem. of Law in Opp'n to Mot. of Def. Khalid Bin

Mahfouz to Dismiss the Compl. or, in the Alternative for a More Definite Stmt. at 21, No. 02-

1616 (JR) (D.D.C. filed Nov. 7, 2003) (Dkt. # 388).  Application of the Second Circuit's ruling

compels dismissal of the claims against many defendants.

       1.    *Alleged Support to al Qaeda through Charities*

A central theme of plaintiffs' complaints – indeed the featured theory in their oral and

visual presentation to this Court last year – is the admission that the foreign defendants who have

entered an appearance in these cases did not participate in any way in the September 11 attacks,

but instead provided support to ostensibly legitimate charities that in turn funded al Qaeda's

agenda.  *See* Letter from Plaintiffs' Executive Committee to Judge Daniels, Attach. 1 (Chart of

"Categories of Defendants") (Aug. 1, 2007).  The court of appeals' decision disposes of the

claims against these defendants because the allegations against them are materially

indistinguishable from those leveled against the four similarly situated defendants the Second

---

[10] The court of appeals did not address general personal jurisdiction, but that requires plaintiffs to allege a "considerably higher level of contacts" with New York or the United States than would be required for specific jurisdiction.  *Terrorist Attacks I*, 349 F. Supp. 2d at 811.  Indeed, general jurisdiction requires not simply a smattering of contacts amalgamated together, but a pattern of contacts with the forum that are "'systematic and continuous.'"  *Id.* at 816 (citing *Helicopteros*, 466 U.S. at 416).  Where applicable, defenses to general jurisdiction are addressed in individual motions to dismiss.

Circuit addressed.  There, as explained above, the Second Circuit assumed for the sake of analysis the truth of allegations that those defendants knew that their contributions to Muslim charities would be used to fund al Qaeda's activities and intended for that to happen.  Applying settled Supreme Court precedent, however, the Second Circuit held that such conduct could not be said to be "expressly aimed" at the United States for jurisdictional purposes.  The same conclusion follows for other defendants before this court.  Defendant Yousef Jameel (Mots. to Dismiss (Dkt. # 301, 303, & 1058)), for example, was similarly alleged to have made contributions to various Muslim charities without any further allegations of actions directed at the United States, nor even allegations that he had any knowledge of al Qaeda's intent.  *See*, *e.g.*, *Burnett 9849* Pl. More Definite Stmt. as to Def. Yousef Abdul Latif Jameel ¶¶ 17, 25 (filed Mar. 16, 2004) (Dkt. # 26); *WTC* Compl. ¶¶ 925, 933; *Euro Brokers* RICO Stmt., Ex. A (filed June 3, 2005) (Dkt. # 971); *Federal Ins.* RICO Stmt., Ex. A at 11-24 (filed June 3, 2005) (Dkt. # 969). The Second Circuit's decision compels the conclusion that he did not purposefully direct his activities at the United States.

Similarly, defendant Khalid Bin Mahfouz (Mots. to Dismiss, No. 02-1616 (JR) D.D.C. (Dkt. # 319) & No. 03-MDL-1570 (GBD) (Dkt. # 1016)) is alleged to have funded, and indeed founded, a Muslim charity called Muwafaq in 1991-92, but he is not alleged to have taken any other action with respect to that charity much less any action involving or directed at the United States.  Plaintiffs' jurisdictional claims are based on allegations that Muwafaq provided funds to al Qaeda at some point during the 1990's.  *See O'Neill (KSA)* Compl. ¶¶ 35, 126; *O'Neill (Al Baraka)* RICO Stmt., Ex. A (filed May 20, 2005) (Dkt. # 920); *Ashton* 6AC ¶ 431; *Continental Cas.* 2AC ¶ 351; *Federal Ins.* FAC ¶¶ 479, 488; *Federal Ins.* RICO Stmt., Ex. A (filed Dec. 29, 2004) (Dkt. # 595); *WTC* Compl. ¶¶ 666-667; *WTC* RICO Stmt., Ex. A (filed May 20, 2005)

(Dkt. # 924); *Euro Brokers* RICO Stmt., Ex. A (filed May 20, 2005) (Dkt. # 925).  Defendant

Abdul Aziz bin Ibrahim Al-Ibrahim is alleged to have "created the Ibrahim bin Abdul Aziz Al-

Ibrahim Foundation whose official stated aim is humanitarian assistance."  *Continental Cas.*

Compl. ¶ 313.  However, neither the allegation that Al-Ibrahim "created" the Foundation in

1990, nor the single allegation in the RICO Statements that "through his direction and control, he

entrusted the organization with the responsibility of realizing his objective of using it as a covert

vehicle for supporting the al Qaeda movement and other terrorists" (*Federal Ins.* RICO Stmt. at

7 (filed Aug. 26, 2005) (Dkt. # 1152); *Continental Cas.* RICO Stmt. at 6 (filed Aug. 29, 2005)

(Dkt. # 1159)) are sufficient to establish jurisdiction over Al-Ibrahim because there are no

allegations of fact that Al-Ibrahim did any such thing.  Clearly, for the same reasons as the court

of appeals applied to the defendants before it, funding a charity that allegedly supported al Qaeda

is not conduct "expressly aimed" at the United States.

      Other defendants are alleged to have made contributions to U.S. charities with supposed

ties to al Qaeda or to U.S. branches of overseas Muslim charities, but the fact that the

contributions were made in the United States has no bearing on the analysis.  The court of

appeals analyzed whether the defendants "'expressly aimed' *intentional tortious acts* at residents

of the United States."  *Terrorist Attacks III*, 538 F.3d at 95.  Therefore, it is not the locus of the

contributions, but whether the defendants themselves aimed any tortious act at the United States,

that is relevant to the jurisdictional inquiry.  In regard to these defendants, as to those before the

court of appeals, plaintiffs allege no facts beyond a supposed effort to fund al Qaeda generally,

and the court of appeals held that funding "an organization that [is] openly hostile to the United

States does not constitute [a] type of intentional conduct" sufficient to support personal

jurisdiction.  *Id.*  Thus, defendants such a Saleh Al-Hussayen (Mots. to Dismiss (Dkt. # 83 &

1178)) – who is alleged to have made donations to the Islamic Assembly of North America but not to have taken any other actions with respect to it or al Qaeda, *see WTC* Compl. ¶¶ 511, 519, 567, 1002-1003; *Federal Ins.* RICO Stmt., Ex. A (filed Sept. 30, 2005) (Dkt. # 1321) – stand in the same position as other alleged contributors to Muslim charities whom the court of appeals found had not, even taking all allegations as true, expressly aimed any tortious conduct at the United States.

Other defendants are alleged to have played administrative roles in various charities, but that difference is immaterial to the analysis because those roles have no bearing on whether those defendants expressly aimed their conduct at the United States.  For example,

- Defendant Safer Al-Hawali (Mots. to Dismiss (Dkt. # 81 & 1187)) is alleged to have been an agent of the Mercy International Relief Agency, an Irish organization, *see WTC* Compl. ¶ 1073; *Burnett 9849* 3AC ¶ 623; *Federal Ins.* RICO Stmt., Ex. A (filed Sept. 30, 2005) (Dkt. # 1326).

- Defendant Abdullah Al Obaid (Mots. to Dismiss (Dkt. # 98 & 1181)) allegedly served as an officer of the Rabita Trust, a Pakistani charitable organization, *see Burnett 9849* 3AC ¶ 273; *Continental Cas.* Compl. ¶ 550; *WTC* Compl. ¶ 448.

- Defendant Abdulrahman Bin Mahfouz (Mots. to Dismiss (Dkt. # 51 & 1448)) – whom Judge Casey already dismissed from *Burnett 9849* on substantially the same allegations, *see Terrorist Attacks I*, 349 F. Supp. 2d at 820-21, 837 – allegedly served on the board of directors of the Muwafaq Foundation (also known as Blessed Relief, *id.*), *see Ashton* 6AC ¶ 433; *Continental Cas.* 2AC ¶¶ 351, 373; *WTC* Compl. ¶ 666; *Federal Ins.* Compl. ¶ 497.

- Defendant Tariq Binladin (Mot. to Dismiss (Dkt. # 1645)) – whom Judge Casey already dismissed from *Burnett 9849* on identical allegations, *see Terrorist Attacks I*, 349 F. Supp. 2d at 822 – is alleged to have had a "prominent role" in 1990 at the International Islamic Relief Organization ("IIRO"), a Saudi charity, which even plaintiffs describe as "'working quietly for the orphans and the immigrants in the Islamic world.'" *WTC/Euro Brokers* RICO Stmts., Ex. A at 16-17 (filed Aug. 15, 2005) (Dkt. # 1123 & 1125); *Federal Ins.* RICO Stmt., Ex. A at 14-15 (filed Aug. 15, 2005) (Dkt. # 1120).

None of these defendants is alleged to have taken any action with respect to al Qaeda, much less action that could be described as "expressly aimed" at the United States.  Indeed, plaintiffs allege no specific actions at all in connection with the charities, but simply the associations themselves.  The court of appeals, however, clearly rejected such associational pleading, which falls far short of the intentional tortious acts "expressly aimed" at the United States that its opinion requires.[11]

Again, it also makes no difference to the analysis whether the charity is a U.S.-based organization.  Thus, for example, while defendant Talal Badkook (Mot. to Dismiss (Dkt. # 1193)) allegedly incorporated the U.S. branch of the Blessed Relief charity, *Continental Cas.* Compl. ¶ 354; *Federal Ins.*, RICO Stmt., Ex. A (filed Sept. 30, 2005) (Dkt. # 1319), defendant Shahir Batterjee (Mots. to Dismiss (Dkt. # 86 & 1199)) allegedly briefly served on the board of and made donations to the Benevolence International Foundation, an Illinois charity, in the early 1990's, *Burnett 9849* 3AC ¶ 228; *Continental Cas.* Compl. ¶ 429; *WTC* Compl. ¶ 429, and defendant Abdullah Binladin (Mot. to Dismiss (Dkt. # 1505)) allegedly founded and managed the U.S. offices of two foreign-based Islamic charities, *Federal Ins.* Compl. ¶¶ 160, 507; *Ashton* 6AC ¶ 261, 264; *Continental Cas.* 2AC ¶¶ 376, 573-577; *Burnett 9849* 3AC ¶¶ 296, 308; *WTC* Compl. ¶¶ 471, 474, plaintiffs do not allege any tortious acts by these defendants

---

[11] Numerous other examples are reflected in the chart of defendants filed contemporaneously. Defendant Bakr Binladin (Mot. to Dismiss (Dkt. # 1645)), for example, is alleged among other things to have made a 1992 donation for Bosnian relief to IIRO, a Saudi charity that plaintiffs characterize as an al Qaeda front.  *WTC* Compl. ¶ 390; *Federal Ins.* FAC ¶¶ 496-97; *NY Marine* 2AC ¶¶ 469-470.  In a final decision plaintiffs chose not to appeal, Judge Casey already dismissed Bakr Binladin from the *Burnett 9849* action based on substantially the same allegations.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 822. That decision was clearly correct under the court of appeals' analysis.  Equally inadequate is the allegation against defendant Hamad Al-Husaini (Mot. to Dismiss (Dkt # 1190)) who was alleged to have provided support to a Dutch charity, the al-Waqf-al-Islami, through a family company, but is not alleged to have taken any action with respect to that charity or al Qaeda.  *Compare* Pls. Opp'n Al-Husaini at 2 (filed Sept. 20, 2005) (Dkt. # 1253) *with* Al-Husaini Reply Br. at 6-7 (filed July 23, 2004) (Dkt. # 331) (discussing plaintiffs' newspaper article).

directed at the United States, or indeed any conduct at all that would connect them to al Qaeda's activities, let alone terrorist attacks specifically against U.S. residents.[12]

Likewise, plaintiffs' allegations regarding the so-called "Golden Chain" are equally unavailing.[13]  Judge Casey dismissed such allegations as nonprobative because plaintiffs fail to indicate "who wrote the list, when it was written, or for what purpose" it was written.  *Terrorist Attacks I*, 349 F. Supp. 2d at 817.  But, even accepting, *arguendo*, the proposition that the Golden Chain shows early funding to al Qaeda, plaintiffs make no attempt to show how the Golden Chain could possibly amount to tortious conduct aimed at the United States.

Finally, some allegations with respect to charities are too ambiguous to categorize but are, in any case, insufficient to meet the Second Circuit's standard.  Defendant NCB (Mot. to Dismiss (Dkt. # 2111)), for example, is alleged, in Saudi Arabia, to have "funneled," "channeled," and/or "transferred" funds to two overseas Islamic charities, Muwafaq and the IIRO no later than 1998, years before the September 11 attacks.  *See Ashton* 6AC ¶¶ 423, 429, 431-32; *Burnett 9849* 3AC ¶¶ 88, 94, 96; *Federal Ins.* FAC ¶¶ 286, 292.  Although plaintiffs do not specify whether the money was NCB's own money, or instead that of its owners or customers (*see id.*), the Second Circuit's decision moots the point, because even direct donations to Muslim charities that allegedly supported al Qaeda would not constitute conduct "expressly aimed" at the United States.  *See Terrorist Attacks III*, 538 F.3d at 94-95 ("Even if the [defendants] were reckless in monitoring how their donations were spent, or could and did

---

[12] Although plaintiffs claim that certain foreign branches of the charities with which Abdullah was involved had ties to al Qaeda, they do not allege that Abdullah had any connection to those foreign branches or that the U.S. branches engaged in any tortious conduct directed at the United States.  *See Ashton* 6AC ¶ 264; *Continental Cas.* 2AC ¶ 376; *Federal Ins.* Compl. ¶ 160.

[13] This Court already dismissed claims against several "Golden Chain" defendants.  Plaintiffs allege that the list includes defendants Bakr Binladin, Yousef Jameel, Saleh Kamel, Khalid Bin Mahfouz, Ahmed Zaki Yamani, and Hamad al-Hussaini.

foresee that recipients of their donations would attack targets in the United States, that would be insufficient to ground the exercise of personal jurisdiction.").[14]

    2.    *Alleged Provision of Banking Services to al Qaeda*

    As explained above, the Second Circuit also rejected plaintiffs' theory, applied to one of the defendants before that court, that the provision of foreign banking services to al Qaeda or its members could constitute conduct "expressly aimed" at the United States. *Terrorist Attacks III*, 538 F.3d at 95-96. Other defendants are alleged, much as was the defendant there, to have provided, or to have caused the provision of financial services to al Qaeda or to alleged fronts for al Qaeda. For example, defendant Saleh Al-Hussayen (Mots. to Dismiss (Dkt. # 83 & 1178)) allegedly served on the Islamic investing board of the Al Rajhi Banking & Investment Company, a Saudi bank that in turn allegedly provided financial services and contributed to Islamic charities (allegations which Judge Casey already found insufficient to support jurisdiction over the bank itself, *see Terrorist Attacks I*, 349 F. Supp. 2d at 831-33). *See Federal Ins.* RICO Stmt., Ex. A (filed Sept. 30, 2005) (Dkt. # 1321). Likewise, each of defendants Abdulrahman Bin Mahfouz (Mot. to Dismiss (Dkt. # 1448)) and Khalid Bin Mahfouz (Mots. to Dismiss, No. 02-1616 (JR) D.D.C. (Dkt. # 319), and No. 03-MDL-1570 (GBD) (Dkt. # 1016)) is alleged to have been an executive or board member at NCB, a Saudi bank that in turn allegedly provided financial services and directed contributions to Islamic charities which plaintiffs characterize as al Qaeda fronts. *See*, for Abdulrahman, *Ashton* 6AC ¶¶ 423, 432, 433; *WTC* Compl. ¶ 772; for Khalid, *see Ashton* 6AC ¶ 423, 424; *Cantor Fitz.* Compl. ¶ 96; *Cantor Fitz.* RICO Stmt., ¶ 2

---

[14] Thus, for example, even if the allegations against the Ibrahim bin Abdul Aziz Al-Ibrahim Foundation that "[t]he organization's branch in Nairobi in Kenya was associated with bin Laden's network according to the FBI's investigation into the attacks against the American embassies on August 7, 1998," were true, those allegations could not form the basis for liability over the Ibrahim bin Abdul Aziz Al-Ibrahim Foundation. *Federal Ins.* RICO Stmt. (filed Aug. 26, 2005) (Dkt. # 1152) & *Continental Cas.* RICO Stmt. (filed Aug. 29, 2005) (Dkt. # 1159).

(filed May 20, 2005) (Dkt. # 916); *Continental Cas.* Compl. ¶ 361; *Continental Cas.* RICO

Stmt., ¶ 2 (filed May 24, 2005) (Dkt. # 942); *Euro Brokers* Compl. ¶ 81; *Euro Brokers* RICO

Stmt., Ex. A (filed May 20, 2005) (Dkt. # 925); *Federal Ins.* FAC ¶ 286; *Federal Ins.* RICO

Stmt., Ex. A (filed May 27, 2005) (Dkt. # 953); *O'Neill (Al Baraka)* Compl. ¶ 34; *O'Neill (Al*

*Baraka)* RICO Stmt., Ex. A (filed May 20, 2005) (Dkt. # 920); *NY Marine* RICO Stmt., ¶ 2, No.

04-cv-6105 (S.D.N.Y. filed May 23, 2005 (Dkt. # 106)); *WTC* Compl. ¶¶ 225, 775; *WTC* RICO

Stmt., Ex. A (filed May 20, 2005) (Dkt. # 924).  Judge Casey acknowledged Abdulrahman's

alleged role at NCB in the course of dismissing him from *Burnett 9849*.  *See Terrorist Attacks I*,

349 F. Supp. 2d at 820-21, 837.  Plaintiffs' allegations fail to articulate, however, how any of

these defendants used their positions, any more than Prince Mohamed used his, to purposefully

direct his or NCB's activities at the United States.  Instead, plaintiffs go no further than alleging

that the bank's generalized financial services for al Qaeda-related charity fronts, which the court

of appeals found inadequate with respect to all of the defendants before it.  *See Terrorist Attacks*

*III*, 583 F.3d at 95, 96.

　　　Just as clearly outside U.S. jurisdiction under the court of appeals' analysis is NCB itself.

*See* Mem. of Law in Supp. of Renewed Mot. to Dismiss of Def. NCB for Lack of Personal

Jurisdiction (filed July 22, 2008) (Dkt. # 2111).  NCB allegedly served as a "financial conduit"

for donations by others to various overseas Islamic charities, including Muwafaq, IIRO, and the

Saudi Joint Relief Committee for Kosovo and Chechnya, by maintaining bank accounts for them

and providing other banking services, including loans and credit facilities, in Saudi Arabia.  *See*

*Ashton* 6AC ¶¶ 423-24, 430, 432; *Burnett 9849* 3AC ¶¶ 88-89, 95-96; *Federal Ins.*

FAC ¶¶ 290-295.  The Second Circuit, however, rejected the position that "the provision of

financial services to an entity that carries out a terrorist attack on United States citizens" could

suffice to establish action expressly aimed at the United States. *Terrorist Attacks III*, 583 F.3d at

96. That same conclusion applies with equal force to other financial industry defendants, such as

DMI Administrative Services S.A. (Mots. to Dismiss (Dkt. # 888, 1213-15, 1239-41, 1262,

1472-73, 1789)) and Faisal Islamic Bank (Sudan) (Mots. to Dismiss (Dkt. # 833-51)).

Along these same lines, conclusory allegations that defendants provided financially

related services to individuals or entities which are alleged to have themselves provided more

direct financial services to al Qaeda do not amount to conduct "expressly aimed" at residents of

the United States. For example, defendant Schreiber & Zindel Treuhand Anstalt, a Lichtenstein

trust company, and some of its principals, Frank Zindel, Engelbert Schreiber, Sr., and Engelbert

Schreiber, Jr., are alleged, in varying degrees, to have indirectly provided support to al Qaeda by

providing trust services to companies linked to Ahmed Idris Nasreddin, which in turn allegedly

provided direct financial services and aid to al Qaeda. *See* Supp. Mem. of Law in Supp.

of Schreiber & Zindel Defs. Mot. to Dismiss (filed Feb. 6, 2006) (Dkt. # 1675). The Schreiber &

Zindel defendants are one step removed from any defendants who are alleged to have directly

provided financial services to al Qaeda or alleged al Qaeda fronts. All the more reason the

Second Circuit's decision dictates dismissal of the action against these defendants. Absent

factual allegations that the Schreiber & Zindel defendants expressly aimed their conduct at

residents of this jurisdiction, none of which exist, or that they directed, controlled, or requested

that al Qaeda undertake terrorist activities against residents of the United States, no basis exists

for personal jurisdiction.

>    3.    *Even More Remote Allegations*

The Second Circuit's application of settled principles of personal jurisdiction is

instructive beyond the context of charitable activities, banks, and bank executives. The court of

appeals applied a settled standard of personal jurisdiction that cannot be squared with the

position on which plaintiffs have relied.  As discussed above, underpinning plaintiffs'

jurisdictional arguments is the theory that any support – however indirect – to al Qaeda (or, it

would seem, organizations with any terrorist ties) at any time constitutes conduct "expressly

aimed" at the United States given al Qaeda's animosity toward the United States.  Plaintiffs

therefore have labored mightily to allege any connection they can between the defendants and al

Qaeda.  Resting on a low pleading bar, they then argue that motions to dismiss cannot be granted

at this stage because they could develop some set of facts to support their allegations.  Numerous

defendants have demonstrated the lack of any substance to any of the allegations against them,

and especially to asserted connections to al Qaeda.  The Second Circuit, however, cut through

that process by rejecting the notion that a connection to al Qaeda, even if established, would not

amount to conduct "expressly aimed" at the United States under familiar principles of personal

jurisdiction.  If the allegations at issue on appeal, viewed in light of principles of personal

jurisdiction, were "far too attenuated to establish personal jurisdiction," *Terrorist Attacks III*,

583 F.3d at 95, then many allegations against other defendants are far more so.

     For example, defendants Safer Al-Hawali and Salman Al-Oadah (Mots. to Dismiss

(Dkt. # 81, 84 & 1187)) are alleged merely to have engaged in religious advocacy through

posting articles or speeches about Muslim issues on several websites and distributing speeches,

but they are not alleged to have intended to take any action against the United States through

their advocacy.  *See WTC* Compl. ¶¶ 515, 524-527, 529-530, 593-594, 598, 609-612, 616-618,

958, 970-975, 977-978, 982, 991, 998, 1010.[15]  Under the Second Circuit's analysis, such

conduct cannot be held to be directed at the United States.

---

[15] The allegations are taken entirely from the indictment of an individual who was subsequently
acquitted of the terrorism charges at a jury trial in Idaho.

Several defendants are alleged to have remote and tangential connections to actual or alleged terrorists.  Defendant Saleh Al-Hussayen (Mots. to Dismiss (Dkt. # 83 & 1178)), for example, allegedly stayed at the same large Virginia hotel as did several of the September 11 hijackers, but plaintiffs did not plead that he knew, let alone met with, any of them.  *See WTC Compl.* ¶¶ 1003-1004; *Federal Ins.* RICO Stmt., Ex. A (filed Sept. 30, 2005) (Dkt. # 1321). Such conduct certainly cannot constitute tortious activity expressly aimed at the United States. Defendant Saudi Binladin Group ("SBG") (Mots. to Dismiss, No. 02-1616 (JR) D.D.C. (Dkt. # 317), and No. 03-MDL-1570 (GBD) (Dkt. # 44))[16] on the other hand, through an alleged branch office (actually a separate company) allegedly assisted Mohammad Jamal Khalifa, the now-deceased spouse of a Binladin family member, to obtain a U.S. visa in 1994.  *See Federal Ins.* RICO Stmt., at 10, 15 (filed Aug. 15, 2005) (Dkt. # 1120); *Burnett 9849* 3AC ¶ 324. Mr. Khalifa was accused, but subsequently tried and acquitted, of terrorism-related charges in Jordan.  Although plaintiffs claim that he was an al Qaeda operative, *see Ashton* 6AC ¶ 408; *Burnett 9849* 3AC ¶ 324; *Continental Cas.* Compl. ¶ 344; *WTC* Compl. ¶ 637; *WTC* RICO Stmt., at 33 (filed Aug. 15, 2005) (Dkt. # 1124) – a claim he repeatedly denied – they claim no connection between him and the September 11 attacks or any other tortious conduct expressly aimed at the United States.

Plaintiffs also assert other tangential connections to al Qaeda which, even if credited completely, fall far short of conduct expressly directed at the United States.  Defendants Abdullah Al-Turki, Mohamed Mushayt, and Mushayt for Trading Establishment (Mots. to Dismiss (Dkt. # 85, 97, 1184 & 1202)), for example, are alleged to have made investments with a

---

[16] SBG does not have a motion to dismiss currently pending because it has been in jurisdictional discovery for more than three years.  It intends to submit a renewed motion to dismiss at the earliest opportunity once its discovery against plaintiffs is completed.

businessman in Spain (a Mr. Zouaydi), who in turn, allegedly diverted funds to al Qaeda

supporters in Germany.  Plaintiffs do not allege that these three defendants knew, much less

intended, that any investments would be diverted.  *See Ashton* 6AC ¶¶ 244-246, 248-249;

*Burnett 9849* 3AC ¶¶ 376-377, 384, 386, 388-90, 503, 509, 519-522, 524, 536-537, 539-541;

*Continental Cas.* Compl. ¶¶ 280-281, 286-288, 290-291; *Federal Ins.* Compl. ¶¶ 388-390, 395,

470; *WTC* Compl. ¶¶ 712-713, 719-722, 724-727, 834, 840, 850-853, 855, 867-872.[17]  In any

event, the fatal flaw in plaintiffs' jurisdictional argument is that, even if the funds had been

intentionally directed toward al Qaeda, the alleged conduct is not expressly aimed at the United

States.[18]

How far plaintiffs will reach to manufacture links to al Qaeda is well illustrated by

allegations against defendants SBG and Mohammed Binladin Company (Mot. to Dismiss

(Dkt. # 1645)).  They are alleged to have constructed the Port Sudan Airport from 1989 to 1992

pursuant to a contract with the government of Sudan, before Sudan was designated as a state

sponsor of terrorism by the United States.  *See Federal Ins.* FAC ¶ 367; *NY Marine* 2AC ¶ 340;

*Ashton* 6AC ¶ 403; *Burnett 9849* 3AC ¶ 319.  A company owned by Osama bin Laden is alleged

---

[17] Plaintiffs ignore that the 9/11 Commission Report found that there was no evidence that Mr. Zouaydi provided any funds to the terrorists or that any of his funds ever supported terrorism.  *Compare The 9/11 Commission Report:  Final Report of the National Commission on Terrorist Attacks Upon the United States* at 499 n.132 (2004) ("*9/11 Commission Report*") (discussing lack of evidence as to Zouaydi) and *Terrorist Attacks I*, 349 F. Supp. 2d at 785, 814 (finding no personal jurisdiction over Prince Turki or Prince Mohamed despite plaintiffs' allegations that they had business dealings with Zouaydi) *with Ashton* Compl. ¶¶ 244-246, 248-249; *Burnett 9849* 3AC ¶¶ 376-377, 384, 386, 388-90, 503, 509, 519-522, 524, 536-537, 539-541; *Continental Cas.* Compl. ¶¶ 280-281, 286-288, 290-291; *Federal Ins.* Compl. ¶¶ 388-390, 395, 470; *WTC* Compl. ¶¶ 712-713, 719-722, 724-727, 834, 840, 850-853, 855, 867-872.

[18] Similarly, with respect to defendant Sheikh Abdullah, a high-ranking Qatari official, plaintiffs' claim (found in the More Definite Statement filed by the *Euro Brokers*, *WTC*, and *Burnett 9849* plaintiffs (03 MDL 1570, Docket # 1275), but not in their pleadings) is that Sheikh Abdullah provided assistance in Qatar to several al Qaeda operatives in 1996, five years before the 9/11 attacks, including sheltering them on a farm and securing passports for their travel, which is vigorously disputed by Sheikh Abdullah.  Even accepting the claim as true, however, there is no suggestion, and even plaintiffs do not assert, that Sheikh Abdullah took any action "expressly aimed" at the United States or "intended" to cause it harm.

(falsely) to have participated in the project.  In any case, plaintiffs have not alleged that Port

Sudan was anything but a legitimate public works project and cannot possibly show that

constructing an airport in eastern Africa is conduct "expressly aimed" at the United States.

* * *

As detailed above, the reasoning articulated by the Second Circuit in affirming the

dismissal of certain defendants for want of personal jurisdiction is readily applicable to many

other defendants in this consolidated action against whom similar, if not identical, allegations

were made.  At bottom, the court of appeals rejected as inconsistent with settled principles of

personal jurisdiction the theoretical foundation of plaintiffs' theory of specific jurisdiction, and

the Second Circuit's reasoning should be uniformly applied to the remaining foreign defendants

in these actions.

## CONCLUSION

For the foregoing reasons, the Second Circuit's decision in *Terrorist Attacks III* compels

dismissal from these cases of numerous defendants with pending motions to dismiss on the basis

of the FSIA and personal jurisdiction.  In accordance with the Court's September 15, 2008 order,

defendants will identify those defendants and the docket numbers in which they have been

named as defendants in a list to be filed separately.

Respectfully submitted,

_____/s/_____

Michael K. Kellogg
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (phone)
(202) 326-7999 (fax)

*Chair of Defendants' Executive Committee*

34

## CERTIFICATE OF SERVICE

I hereby certify that, on October 17, 2008, I caused an electronic copy of the foregoing Supplemental Brief on Second Circuit Decision to be served electronically by the Court's Electronic Case Filing (ECF) System.

                                        /s/
                                        Michael K. Kellogg