UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (GBD)<br>ECF Case |
| *This document relates to:* | |
| *All Cases* | |

# PLAINTIFFS' SUPPLEMENTAL BRIEFING CONCERNING APPLICABILITY OF AUGUST 2008 SECOND CIRCUIT RULING

October 17, 2008

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION.............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

    I.    THE AUGUST 2008 RULING IS DISPOSITIVE WITH RESPECT TO A LIMITED GROUP
        OF DEFENDANTS ................................................................................................ 3

        A.    In Accordance with the Parties' Stipulations, the August 2008
               Ruling Is Dispositive with Respect to the Appellee Defendants
               in All Cases ........................................................................................... 3

        B.    The August 2008 Ruling May Be Dispositive With Respect to
               Claims Against Certain Non-Appellee Sovereign Defendants in
               Their Official Capacity ......................................................................... 4

    II.    THE AUGUST 2008 RULING HAS NO APPLICABILITY TO CERTAIN CATEGORIES
        OF DEFENDANTS ................................................................................................ 7

        A.    The August 2008 Ruling Has No Applicability to Disputes
               About Whether Non-Appellee Defendants Qualify as an
               Agency or Instrumentality of a Foreign Sovereign............................ 7

        B.    The August 2008 Ruling Has No Applicability to Plaintiffs'
               Assertions of General Jurisdiction over Non-Appellee
               Defendants ............................................................................................ 9

    III.    APPLICATION OF THE AUGUST 2008 RULING TO PLAINTIFFS' ASSERTIONS OF
        SPECIFIC JURISDICTION OVER NON-APPELLEE DEFENDANTS REQUIRES CASE-BY-
        CASE ANALYSIS ............................................................................................... 10

        A.    The Second Circuit Ruling Does Not Preclude the Exercise of
               Specific Personal Jurisdiction Over Defendants Who Provided
               Material Support Directly to al Qaeda or Osama bin Laden........... 10

        B.    This Court May Also Exercise Personal Jurisdiction Based on
               Plaintiffs' Conspiracy Allegations ..................................................... 17

i

TABLE OF AUTHORITIES

*Page*

## Cases

*American Broad. Co. v. Hernreich*, 338 N.Y.S.2d 146, 40 A.D.2d 800 (1st Dep't 1972) .................................................................................................................. 18

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)................................... 10, 18

*Calder v. Jones*, 465 U.S. 783 (1984) ................................................................... 10

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y.1991)........ 18

*Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574 (E.D.N.Y.1998) ............................... 18

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000)...................................... 11, 14

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004) ............................................................. 7, 8

*Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F.Supp. 559 (D.N.C. 1979) .................................................................................................................. 19, 20

*Helicopteros Nacionales de Colombia, S.A., v. Hall*, 466 U.S. 408 (1984)........................... 9

*In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008)................passim

*Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210 (Del. 1982) .................................................................................................................. 20

*Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F. Supp. 798, (S.D.N.Y.), *aff'd*, 527 F.2d 87 (2d Cir.1975) ................................................................................................ 18

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)............................................ 11, 12, 14

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)......................................................... 11, 14

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) .......................................................................................................... 11, 12, 13, 14

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) .................................... 11, 12

*Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95 (E.D.N.Y. 2000)........................................ 18

*Textor v. Bd. of Regents*, 711 F.2d 1387 (7th Cir. 1983)......................................... 19

*Van Riper v. United States*, 13 F.2d 961 (2d Cir. 1926) ......................................... 18

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .............................. 10, 18

## Statutes, Rules, and Regulations

28 U.S.C. § 1603 ................................................................................................ 5, 7

28 U.S.C. § 1603(b)............................................................................................ 7

28 U.S.C. § 1605(a)(7) ...................................................................................... 5

28 U.S.C. § 1605A ............................................................................................... 6

31 C.F.R. § 594.310 ........................................................................................... 16

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ...................... 16

## Other Authorities

Executive Order 13224 (Sept. 23, 2001) ................................................................. 16

May 23, 2007 Letter *Amicus* Brief of U.S. Department of Justice in *Kensington Int'l Ltd. v. Bruno Jean-Richard Itoua*, Nos. 06-1763, 06-2216 (2d Cir.) ........................... 8

## INTRODUCTION

The Plaintiffs' Executive Committees ("Plaintiffs") submit this supplemental briefing to assist the Court in applying the recent decision of the United States Court of Appeals for the Second Circuit to the expeditious resolution of the fully-briefed motions to dismiss pending in these multi-district proceedings.

On August 14, 2008, the Second Circuit issued its opinion in *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) (the "August 2008 Ruling"), resolving the appeals from the partial final judgment entered by the district court in this case pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.   The August 2008 Ruling involves only seven defendants (the "appellee defendants")[1], six of whom claimed immunity under the Foreign Sovereign Immunities Act ("FSIA").   The August 2008 Ruling resolved certain issues regarding application of the FSIA and also addressed the constitutional requirements of due process in the context of the exercise of personal jurisdiction over the five individual appellee defendants.[2,3]

---

[1] The seven appellee defendants are:  Sultan bin Abdulaziz Al-Saud, Turki al-Faisal bin Abdulaziz Al-Saud, Naif bin Abdulaziz Al-Saud, Salman bin Abdulaziz Al-Saud (the "Four Princes"), Mohamed al-Faisal Al-Saud, the Saudi High Commission for Relief to Bosnia and Herzegovina ("SHC"), and the Kingdom of Saudi Arabia.  Because three of the Four Princes are brothers, the fourth, Turki al-Faisal bin Abdulaziz Al-Saud is their nephew, and Mohamed al-Faisal Al-Saud is the brother of Turki, it would not add clarity to refer to any of them as Mr. Al-Saud.  Accordingly, without meaning any disrespect, Plaintiffs refer to each of these five defendants by their first names, which distinguish each of them, and, in this context, uniquely identify each of them in a way that their familial name would not.

[2] Mohamed is not a government official and had no claim to sovereign immunity.  The individual government officials – the Four Princes – were sued in their personal capacity as well as in their official capacity.  It was in the context of the claims against them in their personal capacity that the Court of Appeals addressed the question of personal jurisdiction.

[3] It goes almost (but not quite) without saying that the resolution of these issues is subject to review, and possible reversal or amendment, by the United States Supreme Court, as Plaintiffs intend to file a petition for *certiorari* to that body.   The rest of this memorandum should be read as subject to that limitation.

As the Court is aware, dozens of motions to dismiss filed by non-appellee defendants addressed to the pleadings in the cases combined in these coordinated proceedings remain pending, more than seven years after the terrorist attacks of September 11 that gave rise to these lawsuits and more than six years after the first of these cases was filed.  While the August 2008 Ruling disposes of a small number of these pending motions and provides guidance on many more, it does not dispose of the majority of the pending motions.

To begin with, the vast majority of the remaining defendants have no claim to sovereign immunity -- so far Plaintiffs have identified fewer than ten such defendants. The Second Circuit's resolution of issues arising under the FSIA has no applicability whatsoever to all of the rest of the defendants, who have not raised this defense.   Even the Court's discussion of personal jurisdiction has limited applicability.  That discussion is limited to the due process requirements associated with the exercise of "specific jurisdiction," where the claims asserted against a defendant arise from that defendant's contacts with the forum.  As explained below, the Court of Appeals had no occasion to discuss the requirements of due process in the context of general jurisdiction. Moreover, even the Court's rulings on specific jurisdiction do not resolve the pending motions to dismiss without further case-by-case analysis.  The defendants in these cases are diverse, encompassing individuals, charities, banks, al Qaeda fronts masquerading as banks or charities, persons and entities designated as terrorists by the U.S. government, individual donors to charities and charity-fronts, the founders, masterminds, operators, and operatives of various al Qaeda fronts, and individual members and/or supporters of al Qaeda and various overlaps among these categories. The allegations against the defendants are equally diverse and specific to each defendant.  As a result, there can be no mechanical, wholesale application of the August 2008 Ruling.  Rather, as explained in detail below, the guidance provided by the Second Circuit must be applied to each defendant in light of the specific allegations regarding

that particular defendant.   This memorandum offers Plaintiffs' suggestions on how that can be accomplished.

ARGUMENT

## I.   THE AUGUST 2008 RULING IS DISPOSITIVE WITH RESPECT TO A LIMITED GROUP OF DEFENDANTS

### A.   In Accordance with the Parties' Stipulations, the August 2008 Ruling Is Dispositive with Respect to the Appellee Defendants in All Cases

The August 2008 decision of the Second Circuit is dispositive with respect to the appellee defendants -- Sultan, Turki, Mohamed, the Kingdom of Saudi Arabia, Salman, Naif, and the SHC – in all cases in these multi-district proceedings.  In its August 2008 decision, the Court of Appeals affirmed a Rule 54(b) partial final judgment arising from two orders of the district court dismissing claims against the seven appellee defendants. In the first order, dated January 18, 2005, Judge Casey dismissed the claims against Sultan, Turki, Mohamed al Faisal, and the Kingdom of Saudi Arabia in the *Ashton* and *Federal Insurance* cases and re-affirmed Judge Robertson's earlier decision to dismiss the claims against Sultan and Turki in the *Burnett* case.  Thereafter, Judge Casey, finding that the allegations and evidence presented in the cases still pending against Sultan, Turki, Mohamed, the Kingdom of Saudi Arabia "do not materially differ from the allegations and evidence in the cases already dismissed," entered an order dismissing these defendants from all of the remaining cases as well.  The partial final judgment as to these four defendants thus resolved the claims against them in all of the cases consolidated in these proceedings. The Second Circuit affirmance as to these four appellee defendants is thus applicable and dispositive of all claims against them in this multi-district litigation.

In Judge Casey's second order, dated September 21, 2005, the court dismissed Salman, Naif, and the SHC from *Burnett, Ashton,* and *Federal Insurance*.  The court did not dismiss these defendants from any of the other cases and, as to these three

3

defendants, the partial final judgment by its terms applied only to the claims asserted in *Burnett*, *Ashton*, and *Federal Insurance*.  The Second Circuit affirmance as to these three appellee defendants technically disposes only of the claims against these defendants asserted by the *Burnett*, *Ashton*, and *Federal Insurance* plaintiffs.  However, on February 8, 2006, the district court so-ordered and entered a stipulation between counsel for plaintiffs in the *WTCP* and *Euro Brokers* cases and counsel for Salman, Naif, and the SHC in which the parties adopted as binding between them the district court's September 21, 2005 decision and further adopted as binding between them any "subsequent rulings by any appellate courts with regard to the Judgment entered in favor of Prince Naif, Prince Salman, and the SHC on January 10, 2006, as amended by Court order on January 17, 2006."   Similar stipulations in the other cases make the Second Circuit rulings with respect to Salman, Naif, and SHC applicable in all action in which they have been named defendants.

As a result, the August 2008 Ruling disposes of the claims of *all* plaintiffs, in all the pending cases, with respect to all of the appellee defendants.

### B.   The August 2008 Ruling May Be Dispositive With Respect to Claims Against Certain Non-Appellee Sovereign Defendants in Their Official Capacity

Plaintiffs recognize that the Second Circuit rulings concerning the FSIA are dispositive as to all claims against certain categories of non-appellee defendants *in their official capacity*.  These defendants – if there are any -- fall into three groups:  (1) foreign governments and entities whose status as an "agency or instrumentality" of a foreign government is not disputed and who have not been designated by the U.S. government as state-sponsors of terrorism; (2) individual senior members of a foreign state's government or a secretariat thereof, whose position as such is not disputed; and (3) individual senior members of a foreign state's government or secretariat whose claim to be an agency or instrumentality of a foreign sovereign was disputed solely on

the ground that the term "agency or instrumentality" in 28 U.S.C. § 1603 does not include individual foreign officials.  Pursuant to the ruling of the Second Circuit, these defendants may claim immunity under the FSIA and no exception to that immunity is applicable here.  *See In re Terrorist Attacks*, 538 F.3d at 80-85, 86-93.   This analysis follows directly from those portions of the August 2008 Ruling concerning the FSIA.

Subject to the exceptions spelled out in the statute, the FSIA grants immunity to foreign states, which it defines to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state. . . ." 28 U.S.C. § 1603(a).  Prior to the August 2008 Ruling, it was an open question in the Second Circuit whether individual officials were included within the meaning of "agency or instrumentality" for purposes of claiming immunity under the FSIA.  In the August 2008 Ruling, the Second Circuit held that "the FSIA grants immunity to individual officials of a foreign government for their official-capacity acts," but it limited its holding, noting specifically:

> We need not decide how broadly to construe this word ["agency"] in other contexts; however, it is easily open enough to include senior members of a foreign state's government and secretariat.

538 F.3d at 83. Thus, the Court decided only that "senior members of a foreign state's government and secretariat" are "agencies or instrumentalities" of a foreign sovereign for purposes of the FSIA.  The question whether other individual government officials – those who cannot be described as "senior members" of their government or secretariat – also qualify for immunity was not addressed in the August 2008 Ruling and remains an open one.

With respect to such senior members, and with respect to other agencies and instrumentalities of foreign governments, as well as the governments themselves, the Second Circuit held that the "tortious act" exception to the FSIA could not be used to lift immunity for injuries that result from conduct that amounts to terrorism within the meaning of the separate terrorism exception previously found in 28 U.S.C. § 1605(a)(7),

5

but now, in amended form, codified at 28 U.S.C. § 1605A. *See* 538 F.3d at 87-90. Plaintiffs agree that the injuries alleged in this case all arise from terrorist conduct. Plaintiffs also recognize that only government entities that have been designated by the U.S. government as state-sponsors of terrorism may be sued under the terrorism exception, in either its previous or in its current form. Thus, where a non-appellee defendant is concededly a foreign government or senior government official not designated as a state-sponsor of terrorism, this Court may apply the August 2008 Ruling to find that any such defendant is entitled to immunity under the FSIA for acts carried out in the individual's official capacity. The same is true where Plaintiffs did dispute a non-appellee defendant's claim to be an agency or instrumentality of a foreign government, but where the only basis for the dispute was the contention that the term "agency or instrumentality" does not include natural persons.

In applying this test, however, it is important to note that which individual officials qualify as "senior members of a foreign state's government and secretariat," and whether any other individual foreign officials should be treated as agents of their government for purposes of claiming sovereign immunity may not always be clear cut. Some government positions may be readily classified; with respect to others, in the event of a dispute, discovery may be necessary to determine the scope of the individual's role before Plaintiffs can even determine whether a defendant's claim to be a senior government official is disputed or not.

Even as to those individuals who concededly fall within the Second Circuit's ruling, Plaintiffs note that the FSIA provides immunity to government officials only with respect to claims asserted against them in their official capacity and, accordingly, these defendants have no immunity for claims asserted against them in their personal capacity, *see In re Terrorist Attacks*, 538 F.3d at 81. To the extent that Plaintiffs have asserted personal claims against persons who concededly hold senior government positions, the FSIA portions of the August 2008 Ruling do not dispose of such claims.

## II.     THE AUGUST 2008 RULING HAS NO APPLICABILITY TO CERTAIN CATEGORIES OF DEFENDANTS

### A.     The August 2008 Ruling Has No Applicability to Disputes About Whether Non-Appellee Defendants Qualify as an Agency or Instrumentality of a Foreign Sovereign

Although the Second Circuit resolved the question of the applicability of the "tortious act" exception to the Foreign Sovereign Immunities Act, this rule ruling does not resolve motions to dismiss filed by defendants as to whom there is a dispute as to whether that defendant qualifies as an "agency or instrumentality" of a foreign sovereign within the meaning of 28 U.S.C. § 1603.

In determining that the Saudi High Commission qualified as an agency of the Kingdom of Saudi Arabia, the Second Circuit re-iterated the analysis to be used in determining whether an entity should be treated as an "agency or instrumentality" in this context.  The Court noted that, as set forth in § 1603, an "agency or instrumentality of a foreign state" is any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

*See In re Terrorist Attacks*, 538 F.3d at 85, *citing* 28 U.S.C. § 1603(b).  The Court further noted that while the statute does not contain a definition of the term "organ" as used in § 1603(b)(2), five criteria have been established:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign state law.

*In re Terrorist Attacks*, 538 F.3d at 85, *citing Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004).  The Court went on to hold that "*Filler* invites district courts to engage in a

balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity claiming FSIA immunity." *In re Terrorist Attacks*, 538 F.3d at 85. Thus, for each defendant as to whom there is a dispute whether that defendant qualifies as an agency or instrumentality of a foreign government, this Court must consider the *Filler* factors and engage in the balancing process described by the Court. Because this analysis is, of necessity, intensely factual and specific to the particular entity claiming (or disclaiming) sovereign status, the Second Circuit's application of the *Filler* test to the Saudi High Commission does not resolve the status of other defendants as to whom there is a dispute on this point. Rather, this Court must still analyze the facts relevant to each defendant through the lens of the *Filler* factors and engage in the balancing process described by the Second Circuit.

The *Filler* factors do not, however, address the question of when a governmental employee is a "senior member[] of a foreign state's government and secretariat" who may be considered an "agency" of his or her government. In order to resolve disputes concerning whether a particular individual's position falls within this category, this Court should consider the scope of the common-law immunity that predated the FSIA as providing a guide to what Congress intended when it codified immunity in the FSIA. Certainly Plaintiffs are aware of nothing in the legislative history of the FSIA – which the Second Circuit specifically cited as a basis for its view that senior members of a government are protected by the state's immunity*, see* 538 F.3d at 83 -- that would suggest that Congress intended a wholesale expansion of immunity in enacting that statute. The U.S. government has taken the position that, "while common law immunity clearly extends to the official acts of *traditional government ministers*, such as [an] internal security minister," *see* May 23, 2007 Letter *Amicus* Brief of U.S. Department of Justice in *Kensington Int'l Ltd. v. Bruno Jean-Richard Itoua*, Nos. 06-1763, 06-2216 (2d Cir.), its applicability to other kinds of government employees is

unclear.   This would seem to suggest that "senior members of a foreign state's government and secretariat" may be limited to "traditional government ministers," in effect Cabinet-level and similar positions.   Plaintiffs do not believe that any of the few remaining non-appellee individual defendants who have asserted a defense of sovereign immunity would be able to claim immunity under this standard.

    B.    **The August 2008 Ruling Has No Applicability to Plaintiffs' Assertions of General Jurisdiction over Non-Appellee Defendants**

The Second Circuit addressed the applicability of the requirement of "minimum contacts" to the exercise of specific jurisdiction – that is, personal jurisdiction with respect to claims arising from specific acts carried out in, or aimed at, the forum.  *In re Terrorist Attacks*, 538 F.3d at 93.  The Second Court was quite specific in limiting its analysis to this aspect of personal jurisdiction, noting that "[t]he 'fair warning' requirement [of the due process clause] is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, *and the litigation results from alleged injuries that 'arise out of or relate to' those activities.*" *Id.* (emphasis added).

The Court of Appeals had no occasion to address standards relating to the assertion of general jurisdiction – that is, assertions of jurisdiction over defendants whose contacts with the forum are sufficiently systematic and continuous that the Court may exercise jurisdiction over them with respect to any claim, regardless of whether the claim is connected in any way with the forum contacts.  *See Helicopteros Nacionales de Colombia, S.A., v. Hall*, 466 U.S. 408, 414 (1984).  Plaintiffs did not argue in the Second Circuit that this Court had general jurisdiction over any of the appellee defendants and, accordingly, the August 2008 decision contains no analysis of the contacts necessary to support such an exercise of jurisdiction. For this reason, the August 2008 decision has no applicability, and provides no guidance, with respect to those motions to dismiss where Plaintiffs have asserted that defendants are subject to general jurisdiction in the United States.

III.   APPLICATION OF THE AUGUST 2008 RULING TO PLAINTIFFS' ASSERTIONS OF SPECIFIC JURISDICTION OVER NON-APPELLEE DEFENDANTS REQUIRES CASE-BY-CASE ANALYSIS

A.   **The Second Circuit Ruling Does Not Preclude the Exercise of Specific Personal Jurisdiction Over Defendants Who Provided Material Support Directly to al Qaeda or Osama bin Laden**

Application of the Second Circuit's ruling with respect to personal jurisdiction requires close, case-by-case scrutiny in order to separate defendants whose alleged role in supporting al Qaeda and its terrorist activities is insufficient to support the exercise of personal jurisdiction from those whose alleged role is sufficiently direct that they are subject to jurisdiction in the United States.

As the Second Circuit recognized, due process mandates that a defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *In re Terrorist Attacks*, 538 F.3d at 93, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).   The "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.   *In re Terrorist Attacks*, 538 F.3d at 93, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).   Thus, the Second Circuit stated, "personal jurisdiction is proper where the defendant took 'intentional, and allegedly tortious, actions . . . expressly aimed" at the forum state. *In re Terrorist Attacks*, 538 F.3d at 93, *quoting Calder v. Jones*, 465 U.S. 783, 789 (1984).   The Second Circuit went on to find that the Four Princes were not subject to personal jurisdiction in the United States because "providing indirect funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct." *In re Terrorist Attacks,* 538 F.3d at 95.   Similarly, the Court held that Mohamed was not subject to personal jurisdiction in the United States because his role in Faisal Islamic

Banks as the Second Circuit described it did not demonstrate that he had "engaged in 'intentional' conduct "expressly aimed at the United States." *Id.*

In reaching these holdings, the Second Circuit did not reject, but rather purported to distinguish, the authorities on which Plaintiffs relied, five cases involving acts of international terrorism in which defendants were found subject to personal jurisdiction in the United States: *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006); *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000), and *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998).   These cases, all involving terrorism against Americans or the U.S. government demonstrate that due process is not violated when those who deliberately target the United States are made to answer in American courts of law.

In *Mwani*, plaintiffs were Kenyan victims, relatives of victims, and businesses harmed by the Al Qaeda 1998 bombing of the U.S. Embassy in Nairobi. Defendants were Osama Bin Laden, Al Qaeda, Sudan and Afghanistan. The district court dismissed the claims against Bin Laden and Al Qaeda for lack of personal jurisdiction, finding that the plaintiffs had failed to demonstrate sufficient contacts with the forum to support the exercise of jurisdiction. The D.C. Circuit reversed, holding that Osama bin Laden and Al Qaeda were subject to jurisdiction in the courts of the United States because they had "engaged in unabashedly malignant actions directed at and felt in this forum." 417 F.3d at 13. The court concluded that "[t]he defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court." *Id.* at 14.

The court in *Morris v. Khadr* similarly focused on "unabashedly malignant action directed at and felt in" the United States. In *Morris*, plaintiffs were attacked by al

Qaeda members while they were serving in the U.S. military in Afghanistan. Defendant was an al Qaeda member who had "actively participated in and helped plan al Qaeda's terrorist agenda." 415 F.Supp.2d at 1336. The court held that such conduct was sufficiently directed at the United States to satisfy the "minimum contacts" test. *Id*. In *Rein*, the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland in 1988 were sufficient to establish the requisite contacts for personal jurisdiction. 995 F.Supp. at 330. Even though the attack in *Rein* did not take place in the United States, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of personal jurisdiction.

In *Pugh*, the court analyzed the minimum contacts of foreign officials who were sued in their personal capacity. 290 F.Supp.2d 54. Pugh arose out of the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad. The passengers, all of whom were killed, were from 17 different countries; seven passengers were Americans, and the action was brought by their survivors in the United States. The individual defendants were accused of conspiring in their individual capacity, and not merely as members of the Libyan government, to sabotage the plane. Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in the United States, the court in *Pugh* held that:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die. Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether

foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59. In language especially relevant to this case, the *Pugh* court continued:

The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before the UTA Flight 772 bombing, a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil in personam jurisdiction over those same individuals for the same acts.

*Id.* Accordingly, the court held that:

in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any "traditional notions of fair play and substantial justice."

*Id.* at 60.

Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States in a manner sufficient to subject themselves to jurisdiction in an American court even though the plane that was attacked was a French carrier and the flight was not scheduled to, nor did it, take off or land in the United States and even though defendants themselves did not attack the plane, but instead conspired with the

13

attackers. *See also Daliberti*, 97 F.Supp.2d at 54 (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns).

The Court distinguished these cases, characterizing the defendants in each of them as "primary participants" in terrorist acts, as distinguished from the roles of the Four Princes and Mohamed, which the Court found to be indirect. *See In re Terrorist Attacks,* 538 F.3d at 93-96.   But it is important to look at what "primary participant" means in this context, because in none of the other cases was jurisdiction limited to terrorists who actually committed the act.   In *Mwani*, for example, the defendants were *not* alleged to have gone to Nairobi themselves and blown up the American embassy there.   Like defendants here, they were alleged to be co-conspirators. 417 F.3d at 13.  So, too, the defendants in *Pugh,* did not blow up the plane; they conspired with the perpetrators who did.   290 F.Supp.2d at 59.   The same is true in *Morris*, where the defendant apparently remained in Canada and did not actually attack anyone.  Rather, the defendant in *Morris* was sued for his role as an aider and abettor and co-conspirator, for providing logistical and financial support to al Qaeda.  415 F.Supp.2d at 1327, 1336.

Thus, the Second Circuit's characterization of the defendants in these cases as "primary participants" cannot be taken to mean that personal jurisdiction in the United States is limited to the terrorists who actually plant the bomb or pull the trigger. Obviously, the Second Circuit was getting at something else.  In this regard, it should be emphasized that the Second Circuit did not reject or express disagreement with the holdings of *Mwani*, *Pugh*, or *Morris*, although plainly it could have. Instead, the Court said that it was distinguishing those cases from this one, which would mean that it, too, would have upheld jurisdiction in those cases, even though it did not do so with respect to the Four Princes or Mohamed.   Because *Mwani*, *Pugh*, and *Morris*, like this case,

14

involved aiders and abettors and co-conspirators, the August 2008 Ruling cannot be read to reject jurisdiction over those who "purposefully direct" their activities at the United States but do not themselves commit the heinous acts of terrorism at issue.

The distinction that the Second Circuit appeared to be making is perhaps best captured in its description of the support that the Four Princes gave to al Qaeda as having been "indirect." *See In re Terrorist Attacks*, 538 F.3d at 95 ("Providing *indirect* funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct.") (Emphasis added). Thus, defendants need not have participated themselves in planning or carrying out the September 11 attacks in order to be subject to personal jurisdiction in the United States based on the purposeful direction of their activities; rather, they need only have provided support or assistance *directly to al Qaeda* and not through some intermediary. An individual member of al Qaeda who assists in planning terrorist training would be considered to have directed his conduct at the United States, in light of al Qaeda's avowed purpose of attacking the United States. So would any individual or entity that provided material support – including funding, equipment, personnel, lodging, expert advice, weapons, training, passports or other travel documents, financial services – directly to al Qaeda. Those whose only role was to make financial contributions to al Qaeda through charity-front intermediaries may fall outside the scope of personal jurisdiction – but those who set up and/or ran the charity-fronts or were responsible for diverting funds from legitimate charities provided their assistance directly to al Qaeda and their conduct falls in the category of purposeful direction that would subject them to jurisdiction in the United States. Entities or individuals that set up banks for the purpose of providing funds to al Qaeda similarly provided their assistance directly to al Qaeda, and not through intermediaries.

For example (and only by way of illustration), defendant Yousef Nada was designated as a "specially designated global terrorist" ("SDGT") by the U.S.

government on November 7, 2001[4], and separately by the United Nations on November 9, 2001 for his involvement in al Qaeda. Nada is or was President of Bank al Taqwa in the Bahamas, which he founded in 1988 (*Burnett* Third Amended Complaint ["TAC"] ¶125); Bank al Taqwa is alleged to be a sponsor al Qaeda and SDGT. According to the U.S. Treasury Department: "Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists . . . for Osama bin Laden." *See* "Plaintiffs' More Definite Statement as to Defendants Bank Al Taqwa Limited, Al Taqwa Trade, Property And Industry Company, Ahmed Idris Nasreddin and Youssef M. Nada," *In re Terrorist Attacks on September 11, 2001*, Docket No. 03-MDL-1570 (S.D.N.Y.), item #1274. Nada was thus not merely a passive contributor to al Qaeda through intermediaries, but rather a direct supporter, who provided material support, in the form, *inter alia*, of banking services, directly to al Qaeda. His conduct was sufficiently direct that he should be deemed to have purposefully directed his conduct at the United States when he knowingly assisted al Qaeda in planning attacks with the intended target of the United States and its nationals. The August 2008 Ruling does not preclude jurisdiction over defendants like Nada.

The same is true for defendant Yassin al Kadi. Kadi is a SDGT; he ran the Blessed Relief Charity *aka* Muwafaq. According to the U.S. Treasury Dept: "Yassin al

---

[4] The term "specially designated global terrorist" or SDGT means "any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001." 31 C.F.R. § 594.310. Executive Order 13224 (Sept. 23, 2001) was issued by President George W. Bush on September 23, 2001 pursuant to the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.*) ("IEEPA") and other authority to address the national emergency presented by the attacks of September 11, 2001. The Executive Order declared that "because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists." The order authorized certain financial sanctions and designated particular entities and individuals as subject to those sanctions.

Kadi (heads) Muwafaq, an al Qaeda front" to benefit Osama bin Laden (*Burnett* TAC ¶ 330).  In 1995 Osama bin Laden praised the "Blessed Relief" (Muwafaq) organization. (*Burnett* TAC ¶ 333).   As is true with Yousef Nada, Kadi provided support directly to al Qaeda by creating a charity front to act as a material support apparatus for it.   In addition, however, Kadi incorporated Blessed Relief in the State of Delaware, *see Burnett* TAC ¶ 334, and is or was the Director of U.S.-based corporation Global Diamond Resources in the State of Nevada. (*Burnett* TAC ¶ 335). Kadi thus not only "purposefully directed" his conduct at the United States by his direct assistance to al Qaeda, he has additional contacts with the United States that clearly support the exercise of personal jurisdiction over him.

Many of the remaining defendants are more like Nada and Kadi; others are more like the defendants whom the Second Circuit held had not sufficiently directed their conduct at the United States to be subject to personal jurisdiction here.   Accordingly, this Court must now determine, with respect to each defendant whether that defendant provided material support directly to al Qaeda, and thus may be subject to jurisdiction in the United States under *Mwani*, *Pugh*, and *Morris*, or whether the support was provided sufficiently indirectly that jurisdiction is precluded by the August 2008 Ruling.[5]

B.     **This Court May Also Exercise Personal Jurisdiction Based on Plaintiffs' Conspiracy Allegations**

In considering whether specific defendants purposefully directed their conduct at the United States, this Court should also consider the extent of their involvement, as described in detail in the various complaints and other pleadings, in a conspiracy to

---

[5] In accordance with this Court's direction, on November 21, 2008, Plaintiffs will provide the Court a specific list of those defendants for whom there exists a good faith basis to assert that the August 2008 Ruling is not dispositive.

attack the United States of America.  This basis for personal jurisdiction was raised before the Second Circuit, but the Court did not address this issue.

As noted above, applying the due process standard for personal jurisdiction, as set forth in the August 2008 Ruling and elsewhere, the question for the Court is whether the defendants' involvements in the alleged conspiracy constituted "conduct and connection with the forum State . . . such that he should reasonably anticipate being haled into court there."  *In re Terrorist Attacks*, 538 F.3d at 93, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297.  In the context of a conspiracy, the actions taken by a co-conspirator are generally imputed to the other co-conspirators as "ad hoc agents."  *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926).  *See also Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 119 (E.D.N.Y. 2000) (*citing American Broad. Co. v. Hernreich*, 338 N.Y.S.2d 146, 148, 40 A.D.2d 800, 801 (1st Dep't 1972)); *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 581 (E.D.N.Y.1998); *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y.1991) (*citing Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F. Supp. 798, 806-07 (S.D.N.Y.), *aff'd*, 527 F.2d 87 (2d Cir.1975)).  Because a co-conspirator is, under the law, considered an agent of the defendant, the general rule of agency for jurisdiction is that actions "carried on in behalf of an out-of-state party . . . may sometimes be ascribed to the party."  *Burger King*, 471 U.S. at 479 n.22.  Thus, if a defendant is a knowing member of a conspiracy and the co-conspirators committed tortious actions "expressly aimed" at the forum state, the other members of the conspiracy should "reasonably anticipate being haled into court" in the state where the tortious actions of his co-conspirators was directed. Accordingly, in considering whether a defendant has sufficiently directed his conduct at the United States, this Court should also consider the actions of co-conspirators and the relationship between each particular defendant and the conspiracy that defendant was alleged to be a part of.

In considering the question of conspiracy jurisdiction, several courts have concluded that participation in a conspiracy provides the minimum contacts for personal jurisdiction where co-conspirators committed tortious acts in the forum state. For example, in *Textor v. Bd. of Regents*, 711 F.2d 1387, 1392 (7th Cir. 1983), the Seventh Circuit held that "if plaintiff's complaint alleges an actionable conspiracy then the minimum contacts test has been met," because "[t]he 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.'" In reaching this conclusion, the Seventh Circuit cited *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F.Supp. 559 (D.N.C. 1979).   In that case, the forum state, North Carolina, asserted long-arm jurisdiction to the full extent permitted under the due process clause.    The district court held that the conspiracy theory of jurisdiction permitted it to assert personal jurisdiction over the defendant based on allegations of its participation in a conspiracy, explaining:

> [W]hile the mere presence of a conspirator within the forum state is not sufficient to permit personal jurisdiction over co-conspirators, certain additional connections between the conspiracy and the forum state will support exercise of jurisdiction over co-conspirators. These additional connections exist where substantial acts in furtherance of the conspiracy were performed in the forum state and the co-conspirator knew or should have known that acts would be performed in the forum state

470 F.Supp. at 564.

Similarly, the Delaware Supreme Court, concluded that participation in a conspiracy "with knowledge of its acts in or effects in the forum state" satisfies the requirements of due process for the assertion of jurisdiction, where

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).  The court went on to conclude:

> [A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws.  It can further be said that such participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there.

*Id.* (citation omitted). The Delaware court accordingly held that where the test to assert conspiracy jurisdiction under the Delaware long-arm statute was satisfied, the requirements of due process were satisfied as well.

Although the tests set forth in *Hunter Engineering* and *Gemini Enterprises* are not identical, they each turn on (a) substantial acts in furtherance of the conspiracy in the forum and (b) knowledge on the part of the alleged co-conspirator defendant that acts would be performed in the forum or effects felt there.  These elements together provide the necessary "purposeful direction" of conduct at the forum state and the requisite notice that a defendant should reasonably anticipate being haled into court in the forum.

In these cases, Plaintiffs have alleged that many of the defendants conspired with al Qaeda to commit terrorist acts that, it was well-known, would occur in the United States. Because the Second Circuit did not address the extent to which the minimum contacts standard may be met by conspiracy allegations that include a defendant's participation in the conspiracy, substantial acts in the United States, and knowledge on the part of the defendant that the conspiracy would have direct and foreseeable effects in the United States, its August 2008 Ruling provides no guidance on this point.  Thus, for each defendant as to whom such conspiracy allegations have been made, this Court will need to consider whether the requirements of due process have been met.

Dated: October 17, 2008                    Respectfully Submitted,

/s/_____

Ronald L. Motley
rlmotley@motleyrice.com
Jodi Westbrook Flowers
Michael Elsner
Robert T. Haefele
Vincent I. Parrett
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel:  (843) 216-9000

Stephen A. Cozen
Elliott R. Feldman
Sean P. Carter
scarter@cozen.com
Mark T. Mullen
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel:  (215) 665-2000
Fax:  (215) 665-2013

James P. Kreindler
jkreindler@kreindler.com
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York 10017-5590
Tel: (212) 687-8181

Paul J. Hanly, Jr.
Jayne Conroy
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER
 & HAYES, LLP
112 Madison Avenue
New York, NY 10016
Tel:  (212) 784-6400
Fax:  (212) 213-5949

Jerry S. Goldman
jgoldman@andersonkill.com
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, N.Y. 10020-1182
Telephone:  (212) 278-1498
Fax:  (212) 278-1733

For the Plaintiffs' Executive Committees

## CERTIFICATE OF SERVICE

I hereby certify that, on October 17, 2008, I caused an electronic copy of the foregoing Plaintiffs' Supplemental Briefing Concerning Applicability of August 2008 Second Circuit Ruling to be served electronically by the Court's Electronic Case Filing (ECF) System.

_/s/ Andrea Bierstein_

Andrea Bierstein