**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

—————————————————————
                                                )
IN RE:  TERRORIST ATTACKS ON          )          **Civil Action No. 03 MDL 1570 (GBD)**
SEPTEMBER 11, 2001                              )
                                                )
—————————————————————)

*This document relates to:  All Actions*


### DEFENDANTS' REPLY TO PLAINTIFFS' SUPPLEMENTAL BRIEF ON SECOND CIRCUIT DECISION


November 25, 2008

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION AND SUMMARY ......................................................... 1

ARGUMENT ............................................................................................. 2

I.  THE SECOND CIRCUIT'S DECISION COMPELS DISMISSAL OF
    ALL OFFICIAL-CAPACITY CLAIMS AGAINST REMAINING FSIA
    DEFENDANTS ................................................................................... 2

    A.  This Court Should Dismiss All Official-Capacity Claims Against
        Individual FSIA Defendants ..................................................... 3

    B.  This Court Should Dismiss All Claims Against The Two
        Remaining Saudi Entities ......................................................... 5

II. PLAINTIFFS' ALLEGATIONS DO NOT MEET THE SECOND
    CIRCUIT'S REQUIREMENTS FOR SPECIFIC JURISDICTION ................... 7

    A.  Plaintiffs Ignore The Need For Allegations Of Intentional Acts
        Purposefully Directed At The United States From Which The
        Injury Arose ............................................................................. 9

    B.  The Second Circuit Refused Jurisdiction Over Plaintiffs'
        Conspiracy Allegations On The Same Grounds ........................ 15

CONCLUSION ......................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*United States:*

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987) .............................................8

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ..............................................................12, 17, 18

*Burrell v. United States*, 467 F.3d 160 (2d Cir. 2006)..............................................................15, 16

*Calder v. Jones*, 465 U.S. 783 (1984)....................................................................10, 12, 15, 16, 17

*Daventree Ltd. v. Republic of Azerbaijan¸* 349 F. Supp. 2d 736 (S.D.N.Y. 2004).......................17

*First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369 (S.D.N.Y. 2002) ...........................................................................................................................17

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002) .....................................................................................................................13, 14

*Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34 (D.D.C. 2005) ............................................................................................................13

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972) ........................8

*Lehigh Valley Indus. Inc. v. Birenbaum*, 527 F.2d 87 (2d Cir. 1975)............................................17

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)..........................................................9, 10

*Terrorist Attacks on Sept. 11, 2001*, *In re*:

    349 F. Supp. 2d 765 (S.D.N.Y. 2005), *aff'd*, 538 F. 3d 71 (2d Cir. 2008).............2, 10, 17

    538 F. 3d 71 (2d Cir. 2008)...................................................................... *passim*

*United States v. Minicone*, 994 F.2d 86 (2d Cir. 1993) .........................................................15, 16

*International:*

C-402/05 P & C-415/05 P, *Yassin Kadi & Al Barakaat Int'l Found. v. Council of the European Union & Comm'n of the European Communities*, 2008 E.C.R. 00 (Sept. 3, 2008) .................................................................................................13

**Statutes and Rules:**

28 U.S.C. § 1603.................................................................................................................4

28 U.S.C. § 1605A(a)(1).....................................................................................................5

**Other Materials:**

Exec. Order No. 13,224, 66 Fed. Reg. 186 (Sept. 25, 2001) ...................................13, 14

*Prosecutors drop terror investigation*, www.swissinfo.org (June 2, 2005) .................................15

## INTRODUCTION AND SUMMARY

In accord with this Court's September 15, 2008 order (Dkt. # 2133)[1], this reply brief responds to plaintiffs' supplemental brief (filed Oct. 17, 2008) (Dkt. # 2142) regarding application of the decision of the United States Court of Appeals for the Second Circuit, *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71 (2d Cir. 2008) ("*Terrorist Attacks III*") to pending motions to dismiss.

*First*, plaintiffs and defendants appear to agree on the proper disposition of the pending motions to dismiss of the remaining FSIA defendants. Defendants' opening brief identified seven remaining FSIA defendants (five individuals and two entities), and it explained that plaintiffs had never disputed those defendants' status as government officials and entities. Defendants further explained that the Second Circuit's decision – in particular, its holding that plaintiffs cannot pursue terrorism-related claims against "agencies or instrumentalities" of foreign states that have not been designated as state sponsors of terrorism – mandates dismissal of these seven defendants. Plaintiffs' brief acknowledges that critical holding and further explains that, as to individual officials and government entities whose status as such is not in dispute, the Second Circuit's decision warrants dismissal. Because plaintiffs have never disputed the status of the seven remaining FSIA defendants identified in defendants' opening brief, their motions to dismiss should be granted.

*Second*, plaintiffs' construction of the Second Circuit's personal jurisdiction analysis both is inconsistent with the view plaintiffs recently urged to the Supreme Court, *see* Pet. for Writ of Cert. at 26, *In re Terrorist Attacks on Sept. 11, 2001*, No. 08-640 (U.S. filed Nov. 12, 2008) ("Cert. Pet.") (excerpt attached hereto as Ex. A), and contradicts the Second Circuit's opinion.

---

[1] Unless otherwise noted, all docket references are to No. 03-MDL-1570.

Plaintiffs concoct a distinction between "direct" and "indirect" support to al Qaeda that formed no part of the appellate court's analysis.  Largely recycling arguments rejected by the Second Circuit, plaintiffs simply ignore the fact that the court based its holding not on plaintiffs' failure to allege an adequately "direct" nexus to al Qaeda, but rather on their failure to allege conduct by the defendants themselves that was "purposefully directed" at the United States and that caused the injury at issue.  Moreover, plaintiffs wrongly assert that the Second Circuit's decision did not dispose of their conspiracy argument.  The Second Circuit expressly rejected personal jurisdiction based on plaintiffs' "concerted action theory of liability." *Terrorist Attacks III*, 538 F.3d at 94-95.  As Judge Casey recognized, "[i]n New York, conspiracy and aiding and abetting are varieties of concerted action liability." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 797 (S.D.N.Y. 2005) ("*Terrorist Attacks I*").  Moreover, plaintiffs presented their conspiracy-jurisdiction argument to the Second Circuit, which rejected the foreseeability argument that plaintiffs now advance to justify a "defendant by defendant" inquiry.[2]

## ARGUMENT

## I.   THE SECOND CIRCUIT'S DECISION COMPELS DISMISSAL OF ALL OFFICIAL-CAPACITY CLAIMS AGAINST REMAINING FSIA DEFENDANTS

Plaintiffs acknowledge that the Second Circuit's decision mandates dismissal of official-capacity claims against "(1) foreign governments and entities whose status as an 'agency or instrumentality' of a foreign government is not disputed and who have not been designated by the U.S. government as state-sponsors of terrorism; [and] (2) individual senior members of a

---

[2] By specifically discussing only two defendants out of the more than fifty that have claimed that dismissal is appropriate on the basis of the FSIA and/or personal jurisdiction, plaintiffs' supplemental brief avoids addressing specific applications of plaintiffs' interpretation of the Second Circuit's decision to individual defendants.  Accordingly, depending on the degree of additional analysis that is embodied in the chart plaintiffs intend to submit with their reply brief, defendants may seek leave to provide a brief response specifically addressed to those issues.

foreign state's government or secretariat thereof, whose position as such is not disputed" (or "was disputed solely on the ground that the term 'agency or instrumentality' . . . does not include individual foreign officials"). Pls.' Br. at 4-5. The seven sovereign defendants identified in defendants' opening brief all fall into those two categories: (1) the five individuals identified in defendants' opening brief (Sheikh Abdullah bin Khalid Al Thani, Abdullah bin Saleh Al Obaid, Abdullah Muhsen Al Turki, Abdul Rahman Al Swailem, and Saleh Al-Hussayen) are officials of the governments of Qatar and Saudi Arabia "whose position as such is not disputed," *see* Defs.' Br. at 6 (filed Oct. 17, 2008) (Dkt. # 2140); (2) the Saudi Red Crescent Society ("SRCS") and the Saudi Joint Relief Committee ("SJRC") are both "agencies or instrumentalities" of Saudi Arabia whose status as such "is not disputed" and "who have not been designated . . . as state-sponsors of terrorism," *see id.* at 8. On plaintiffs' own reasoning, the Second Circuit's decision mandates dismissal of all official-capacity claims against each of these seven sovereign defendants.

### A.     This Court Should Dismiss All Official-Capacity Claims Against Individual FSIA Defendants

Plaintiffs properly acknowledge that the protections of the FSIA apply to individual government officials acting in their official capacity. Indeed, the Second Circuit expressly held that "an individual official of a foreign state acting in his official capacity . . . is . . . protected by the FSIA." *Terrorist Attacks III*, 538 F.3d at 81; *see* Defs.' Br. at 5-6. Plaintiffs further concede that, in light of that holding, official-capacity claims against "individual senior members of a foreign state's government or a secretariat thereof, whose position as such is not disputed," should be dismissed. Pls.' Br. at 4. That concession is dispositive as to the five individual government officials identified above and in defendants' opening brief. As defendants explained, each of the five is an official of the governments of Saudi Arabia or Qatar, and, with

respect to all five, their "position as such is not disputed." *See* Defs.' Br. at 6. The Court need go no further to resolve the motions to dismiss all official-capacity claims of these five FSIA defendants.

In particular, the Court need not address plaintiffs' claim that FSIA immunity for individuals is limited to "senior members of a foreign state's government and secretariat." Pls.' Br. at 9 (internal quotation marks omitted). Again, plaintiffs have acknowledged that the Second Circuit's decision requires dismissal of official-capacity claims against individual members of foreign governments whose status as such is not disputed, and, again, the status of the five individuals identified in defendants' opening brief is not contested. The Court thus need not and should not make any ruling with respect to precisely how far the protections of the FSIA sweep in order to resolve the motions to dismiss of these five individual defendants.

In any event, plaintiffs are wrong to contend that the protections of the FSIA apply only to "senior members" of a foreign government. The Second Circuit held, without limitation, "that the FSIA treats individual agents of the foreign state, when they undertake their official duties, as the 'foreign state' for the purposes of 28 U.S.C. § 1603." *Terrorist Attacks III*, 538 F.3d at 85. Nothing in that holding supports the proposition that individual immunity under the FSIA is limited to "senior members" of a foreign government.

To be sure, the court of appeals found support for its conclusion in the statutory term "agency," which, the court held, "is any thing or person through which action is accomplished." *Id.* at 83. And, as plaintiffs emphasize, the court then stated that there was no need for it to address how broadly the term "agency" might reach "in other contexts" because, the court held, it is "easily open enough to include senior members of a foreign state's government and secretariat." *Id.* But, contrary to plaintiffs' contention, nothing in that sentence limits immunity

to senior members of government:  the court was merely applying the law to the foreign officials before it (all of whom were self-evidently senior government officials).  Indeed, plaintiffs' narrow understanding of immunity would be at odds with the Second Circuit's reasoning for *why* the FSIA applies to individuals.  As the Second Circuit explained, it is "evident . . . that the state cannot act except through individuals"; the court emphasized that "the acts of the official representatives of the state are those of the state itself, when exercised within the scope of their delegated powers."  *Id.* at 84 (internal quotation marks omitted); *see also id.* (citing precedent that the acts of a "duly commissioned military commander" were acts of the state itself).  The Second Circuit also referenced examples of aides to Senators and law clerks, explaining that "the immunity of a principal does not amount to much without the extension of that immunity to its agents."  *Id.*  Because the official-capacity acts of foreign officials below the level of "senior member" are acts of the state itself no less than the official-capacity acts of senior members of government, the Second Circuit's analysis refutes the claim that immunity under the FSIA is limited to senior officials.[3]

### B.  This Court Should Dismiss All Claims Against The Two Remaining Saudi Entities

With respect to the remaining non-individual FSIA defendants (the SRCS and the SJRC), plaintiffs' concession – i.e., that dismissal is warranted for "entities whose status as an 'agency or instrumentality' of a foreign government is not disputed," Pls.' Br. at 4 – is likewise dispositive.

---

[3] Limiting immunity to only senior members of government would also conflict with the Second Circuit's analysis of 28 U.S.C. § 1605A(a)(1), which "evince[s] congressional recognition that claims against individual officials of a foreign government must be brought within the confines of the FSIA."  *Terrorist Attacks III*, 538 F.3d at 84.  Section 1605A(a)(1) applies to any "official, employee or agent," which plainly extends beyond senior members of a foreign government.

In moving to dismiss all claims against it, the SRCS set forth facts establishing that it is an agency and instrumentality of the Kingdom of Saudi Arabia.  *See* Mem. of Law in Supp. of Saudi Arabian Red Crescent Soc'y's & Dr. Abdul Rahman Al Swailem's Consol. Mot. to Dismiss at 2-3, 7 (filed Sept. 6, 2005) (Dkt. # 1175); Decl. of Abdul Rahman Al Swailem ¶¶ 3-4 (filed Sept. 6, 2005) (Dkt. # 1176).  In response, plaintiffs acknowledged that, "[f]or purposes of the sovereign immunity analysis, . . . the SRC[S]" is an "agenc[y], instrumentalit[y] or organ[] of the Kingdom within the meaning of the FSIA."  Pls.' Mem. of Law in Opp'n. to Consol. Mot. to Dismiss of the Saudi Red Crescent Soc'y & Dr. Abdul Rahman Al Swailem at 8 (filed Sept. 20, 2005) (Dkt. # 1245); *see also* Reply Br. in Supp. of Saudi Arabian Red Crescent Soc'y's & Dr. Abdul Rahman Al Swailem's Consol. Mot. to Dismiss at 1 (filed Sept. 26, 2005) (Dkt. # 1270).  Plaintiffs' own papers thus reveal that there is no dispute as to the status of the SRCS as an "agency or instrumentality" of Saudi Arabia, rendering dismissal appropriate.

The same is true of the SJRC.  Like the SRCS, the SJRC established its "agency and instrumentality" status in moving to dismiss all claims against it.  *See* Mem. of Law in Supp. of Mot. to Dismiss of the Saudi Joint Relief Comm. at 7-11 (filed Jan. 17, 2005) (Dkt. # 631); Decl. of Dr. Abdulrahman A. Al-Suwailem ¶¶ 2-12 (filed Jan. 17, 2005) (Dkt. # 631).  And, as with the SRCS, plaintiffs conceded the SJRC's status.  *See* Pls.' Mem. of Law in Opp'n. to Mot. to Dismiss of the Saudi Joint Relief Comm. for Kosovo & Chechnya at 1 ("SJRC is an organ of the Kingdom of Saudi Arabia" and subject to the "protections of the Foreign Sovereign Immunities Act.") (filed Mar. 18, 2005) (Dkt. # 744); Reply in Supp. of Mot. to Dismiss of the Saudi Joint Relief Comm. at 1 (filed Apr. 18, 2005) (Dkt. # 819).  In light of that concession and plaintiffs' recognition that entities whose status as "agencies or instrumentalities" is not disputed should be dismissed, the motion to dismiss of the SJRC should be granted.

## II.   PLAINTIFFS' ALLEGATIONS DO NOT MEET THE SECOND CIRCUIT'S REQUIREMENTS FOR SPECIFIC JURISDICTION

Since filing their supplemental brief, plaintiffs have advanced to the Supreme Court a construction of the Second Circuit's decision that clearly precludes specific jurisdiction over any of the defendants with pending motions to dismiss, since none are alleged to have any actual involvement in the September 11 attacks:

> The Second Circuit held that the Constitution permits federal courts to assert personal jurisdiction over only those who "directed" terrorist attacks or "commanded an agent . . . to commit them," but bars jurisdiction over persons who "could and did foresee that recipients of their donations would attack targets in the United States."

Cert. Pet. at 26.  Plaintiffs' admission regarding the scope of the Second Circuit's decision conflicts with plaintiffs' argument advanced to this Court in their supplemental brief.  In this Court, plaintiffs acknowledge that they cannot maintain specific jurisdiction based on their allegations of "indirect" support of al Qaeda – through, for instance, contributions to charities alleged to be al Qaeda "fronts" – but assert that "direct" support to al Qaeda anywhere at any time may still support jurisdiction in the United States.  Although plaintiffs can offer only two examples of such defendants (one of whom has made no appearance in this case), they state that "many" other defendants are similar and that the Court must now determine on a case-by-case basis "whether the support was provided sufficiently indirectly that jurisdiction is precluded" by the Second Circuit's opinion.  Pls.' Br. at 17.

The interpretation plaintiffs push here, however, bears no relation to the inquiry required by the Second Circuit.  As plaintiffs' petition (at 27) observes, the court assumed that "defendants knowingly funneled money to al Qaeda."  The court thus based its holding not on plaintiffs' failure to allege an adequately direct nexus to al Qaeda but on their failure to allege tortious conduct by the defendants themselves that was "purposefully directed" at the United

States and that was intended to and did cause the injury at issue.  *See Terrorist Attacks III*, 538

F.3d at 95.  The Second Circuit determined that plaintiffs cannot supply the required nexus to the

September 11 attacks, as they have attempted to do for virtually all defendants, by pointing to

"public announcements of jihad against the United States," prior attacks on U.S. installations, or

the foreseeability of an attack on United States residents.  *Id.*  Plaintiffs nevertheless persist in

arguing here that allegations of "direct" support of al Qaeda are jurisdictionally sufficient simply

"in light of al Qaeda's avowed purpose of attacking the United States."  Pls.' Br. at 15.  But there

is nothing in the court's analysis that suggests that "direct" support supplies the required nexus.

To the contrary, the Second Circuit found that even if Prince "Mohamed was a 'primary actor'

with regard to the operations of certain foreign banks that conducted business with al Qaeda" –

that is, *directly* with al Qaeda – such allegations were jurisdictionally insufficient because Prince

Mohamed's conduct was not directed at the United States.  *Terrorist Attacks III¸* 538 F.3d at 96.

     Simply casting the alleged support as "direct" or pursuant to a "conspiracy" did not in the

Second Circuit and cannot now supply the missing basis for jurisdiction.  Plaintiffs' theory not

only flies in the face of the Second Circuit's opinion, but also runs roughshod over the Supreme

Court's admonition that "[g]reat care and reserve should be exercised when extending our

notions of personal jurisdiction into the international field."  *Asahi Metal Indus. Co. v. Superior*

*Ct. of Cal.*, 480 U.S. 102, 115 (1987) (internal citation and quotation marks omitted); *see also*

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972)

(principles of extraterritorial exercise of personal jurisdiction "must be applied with caution,

particularly in an international context").

### A.    Plaintiffs Ignore The Need For Allegations Of Intentional Acts Purposefully Directed At The United States From Which The Injury Arose

Plaintiffs ask this Court not only to re-write the opinion of the Second Circuit but also to revisit arguments already advanced and rejected by the appellate court.  Purporting to address the impact of the Second Circuit's decision, plaintiffs devote nearly half of their argument on personal jurisdiction to the application of five cases – *Mwani*, *Pugh*, *Daliberti*, *Rein* and *Morris* – which the Second Circuit held did not apply because they, unlike the appeal before it, involved "primary participants" in terrorist acts.  *See Terrorist Attacks III*, 538 F.3d at 94.  Three pages of plaintiffs' argument are *identical*, word for word, to the argument the Second Circuit rejected. *Compare WTC & Euro Brokers* Pls.-Appellants' Br. at 37-42, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007) (excerpt attached hereto as Ex. B) *with* Pls.' Br. at 11-14.[4]  In any case, plaintiffs' argument is wrong for just the reasons the Second Circuit explained.  Because plaintiffs merely recycle the argument they made to the Second Circuit, they do not address what the court actually said about those cases and why it found them irrelevant here.  They ignore, for example, how the Second Circuit highlighted that *Mwani* addressed personal jurisdiction over al Qaeda and Osama Bin Laden themselves, *see Terrorist Attacks III*, 538 F.3d at 94, not any alleged foreign supporters.  They also ignore how the Second Circuit viewed the defendant in *Morris* not as plaintiffs described him – "as an aider and abettor and co-conspirator, . . . providing logistical and financial support to al Qaeda," Pls.' Br. at 14 – but as "an al Qaeda member who 'actively participated in and helped plan al Qaeda's terrorist agenda – so much so, in fact, that he convinced his son to risk his life and attack American soldiers' in Afghanistan, killing the plaintiffs' relatives in the course of the engagement." *Terrorist Attacks III*, 538 F.3d

---

[4] Plaintiffs omit half of one paragraph that, with no factual support, equated the Princes' alleged role in the September 11 attacks to Osama Bin Laden's role in the African embassy bombings.  *See WTC & Euro Brokers* Pls.-Appellants' Br. at 38.

at 94 (quoting *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006)).  In other words, the

defendant that plaintiffs describe as a mere "aider and abettor" had, as the Second Circuit

recognized, in fact participated in planning the very attack from which the plaintiffs' injuries

arose.

      As admitted in plaintiffs' brief (at 16) and petition (at 30), the Second Circuit

distinguished these cases on grounds that

> [t]he plaintiffs do not allege that the Four Princes directed the September 11
> attacks or commanded an agent (or authorized al Qaeda) to commit them.  *Cf.
> Calder* [*v. Jones*], 465 U.S. [783,] 790, 104 S.Ct. 1482 [(1984)] (affirming that
> court could exercise personal [jurisdiction] over "*primary participants* in an
> alleged wrongdoing *intentionally directed* at a California resident").

*Terrorist Attacks III*, 538 F.3d at 94 (emphasis added by the Second Circuit).  This language

reflects not just the *Calder* jurisdictional standards but also the substantive and jurisdictional

standards for concerted action liability, which, as Judge Casey recognized in *Terrorist Attacks I*,

require a showing that "the co-conspirators acting in New York [here, the September 11

hijackers] acted *at the direction or under the control or at the request of or on behalf of* the out-

of-state defendant."  349 F. Supp. 2d at 805 (emphasis added) (internal quotations and citation

omitted); *see also id.* (holding that, "[t]o establish personal jurisdiction on a conspiracy theory,

Plaintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the

inference that the defendant was a member of the conspiracy, and show that the defendant's co-

conspirator committed a tort in New York").

      Plaintiffs have not alleged that any of the defendants at issue in these motions had any

actual involvement in the September 11 attacks, much less that the September 11 hijackers

operated at the direction, under the control, at the request of, or on behalf of any of these

defendants.  In their supplemental brief, however, plaintiffs argue that the real distinction from

the primary participant cases the court intended to make is "perhaps best captured in its

description of the support as . . . 'indirect.'"  Pls.' Br. at 15.  While the Second Circuit said

nothing to suggest that the 'indirectness' of the alleged support was of controlling significance,

plaintiffs seek to rewrite the opinion to make it so.

The Second Circuit could not, however, have relied for dismissal on the fact that the Four

Princes allegedly gave money to al Qaeda only through charities rather than directly.

Throughout this litigation plaintiffs have emphasized that they were alleging that the charities

were mere al Qaeda fronts, or worse.  Most recently, plaintiffs stressed that the charities are

alleged to be "fully integrated components of al Qaeda's organizational structure."  Cert. Pet.

at 6.  The International Islamic Relief Organization ("IIRO"), for example, is described in the

allegations before the Second Circuit as a "vast independent terrorist machine."  *Burnett 9849*

3AC ¶ 234.  Al-Haramain, which Princes Sultan, Naif, and Turki were alleged to have supported,

is described as a "charity front of terror" as well as having had some of its branches designated

as terrorist entities.  *Burnett 9849* 3AC ¶ 150.  And the World Assembly of Muslim Youth was

allegedly identified as "'a suspected terrorist organization' by the FBI since 1996."  *Burnett*

*9849* 3AC ¶ 362.  Nor were those Princes alleged to be mere contributors to those "charity

fronts."  Among other things, plaintiffs allege that IIRO is a "direct arm of the Saudi royal

family," *Burnett 9849* 3AC ¶ 354, and Prince Sultan is alleged not merely to have contributed to,

but also to have had direct "oversight of IIRO" and maintained "close relations with the IIRO

organization headquarters."  *Burnett 9849* 3AC ¶ 360.[5]

Nothing in the Second Circuit's opinion says or even implies that the defendants avoided

U.S. jurisdiction because they were alleged to have written a check, as it were, to an al Qaeda

"charity front" rather than to al Qaeda itself.  On the contrary, the Second Circuit assumed that

---

[5] *See also*, *Ashton* 6AC ¶¶ 199, 201, 227, 347; *Federal Ins.* FAC ¶¶ 115, 131, 135, 153, 171; *Euro Brokers* Compl. ¶¶ 41, 64-67; *WTC* Compl. ¶¶ 298, 369, 371, 690.

the defendants intended their contributions to fund al Qaeda's activities and further assumed that the defendants knew of al Qaeda's prior attacks on and hostility toward U.S. interests.  What was missing was not some sort of "direct" support.  What was missing were allegations showing that the defendants "'expressly aimed' intentional tortious acts at residents of the United States," *Terrorist Attacks III*, 538 F.3d at 95 (quoting *Calder v. Jones*, 465 U.S. at 789), and allegations establishing "injuries that 'arise out of or relate to' those activities," *id*. at 93 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)).

Nothing in plaintiffs' "directness" theory addresses this deficiency.  Nevertheless, plaintiffs continue to argue that *any* alleged support for al Qaeda or its charity fronts amounts to an act directed at the United States and ignore the need to show a connection to the September 11 attacks.  Plaintiffs' *complaints* describe al Qaeda as a "decentralized" and "compartmentalized" organization that targets "non-Islamic governments with violence" and seeks "the overthrow of Islamic states that were considered to be too secular, or too beholden to the West" (*WTC* Compl. ¶¶ 8, 15),[6] but plaintiffs' *brief* argues that involvement in any al Qaeda training must of necessity be "directed at the United States, in light of al Qaeda's *avowed purpose* of attacking the United States."  Likewise, they argue that defendant Yousef Nada "should be deemed to have purposefully directed his conduct at the United States" simply because al Qaeda's "*intended target*" is "the United States and its nationals."  Pls.' Br. at 15, 16 (emphasis added).  This is, however, precisely the reasoning the Second Circuit rejected.  The court assumed for the sake of

---

[6] As plaintiffs describe it, al Qaeda has targeted governments and populations all over the world, not just in the United States, including Algeria, Egypt, Tajikistan, Bosnia, Chechnya, Pakistan, and the Philippines.  *See WTC* Compl. ¶ 18.  They have also acknowledged al Qaeda operations targeting Saudi Arabia, Somalia, Spain, Albania, Indonesia, Jordan, Afghanistan, Azerbaijan, Russia, Armenia, Uzbekistan, Eritrea, and Dagestan, among others.  *See id.*  ¶¶ 22, 180, 276, 297, 306-307, 308, 313, 315, 326, 334, 349, 350, 377, 421, 533-534, 572, 612, 680, 757, 758, 835, 880, 891, 929, 986, 1052, 1056, 1059, 1060; *Burnett 9849* 3AC at 209-10.

argument that the defendants before it "could and did foresee" that the groups they supported "would attack the United States," *Terrorist Attacks III*, 538 F. 3d at 94-95, but concluded that such "foreseeability is not the standard for recognizing personal jurisdiction." *Id.* at 95. Accordingly, plaintiffs' diverse allegations of material support for al Qaeda over the history of its scattered existence, whether given directly or indirectly, fail the jurisdictional test because they are uniformly bereft of any facts suggesting that the defendants intended to fund the September 11 attacks on the United States that caused plaintiffs' injury.

The scant examples plaintiffs chose illustrate the inadequacy of their "direct support" theory. Plaintiffs point to allegations that defendant Yassin al Kadi has been listed as a Specially Designated Global Terrorist ("SDGT") by the Treasury Department, and that Treasury described him as the head of the charity Muwafaq, "an al Qaeda front." Pls.' Br. at 16-17.[7] According to plaintiffs, this is enough to ground jurisdiction because it means that Mr. "Kadi provided support directly to al Qaeda by creating a charity front to act as a material support apparatus for it." *Id.* at 17. Even taking these allegations as true, they do not establish that Mr. al Kadi has supported terrorism directed at the United States, much less the September 11 attacks giving rise to plaintiffs' injuries.[8] Indeed, a Treasury memorandum that plaintiffs have already submitted to

---

[7] It is important to note that Treasury's designations do not require any connection to the United States, that Treasury can rely on *ex parte* evidence, including hearsay, and that because designations are, unlike this proceeding, matters of national security, those decisions are "largely immune from judicial inquiry or interference." *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005) (internal citation and quotation marks omitted). Mr. al Kadi has contested the decision of the European Community to follow the U.S. designation and was awarded a judgment by the European Court of Justice annulling an order freezing his assets. *See* J., C-402/05P & C-415/05P, *Yassin Kadi & Al Barakaat Int'l Found. v. Council of the European Union & Comm'n of the European Communities*, 2008 E.C.R. 00, 2008 WL 4056300 (Sept. 3, 2008).

[8] The SDGT list targets a long list of terrorist groups, including many that have never directed violence at the United States or at U.S. nationals, including the Irish Republican Army, Spain's ETA, Colombia's AUC, and a host of others. Individuals can be designated not only for

the Court explains that Mr. al Kadi was designated not because he supported terrorism directed at the United States, but because (1) he gave money to a Hamas "operative" in 1992, who was arrested distributing money in Israel in 1993, and (2) he ran the charity Muwafaq during the early and mid-1990's, during which time he employed three men whom Treasury believed to be associated with Islamic extremism in Tunisia, Albania and Pakistan, and worked with defendant Wa'el Julaidan, who fought with Osama Bin Laden against the Soviets in Afghanistan and was suspected of continued association with Osama Bin Laden or members of al Qaeda.[9]  The memorandum explaining the government's refusal to remove Mr. al Kadi from the terrorism list says nothing about the September 11 attacks or any other terrorist activities against the United States or its citizens, and does not dispute Mr. al Kadi's statement that Muwafaq ended its various operations in 1996 or 1997, long before the September 11 attacks.

Plaintiffs' offer of defendant Yousef Nada to illustrate their theory is even more puzzling because he has made no appearance in this action, has not filed a motion to dismiss, and therefore presents no issues presently before this Court.  Plaintiffs again rely on Treasury's designation of Mr. Nada as an SDGT, which states only that his bank in the Bahamas "has long been thought" to have had ties to al Qaeda and to extremist groups in Egypt, Algeria, Tunisia, and Palestine at unspecified times beginning in 1988.[10]  Plaintiffs do not argue that Mr. Nada had

engaging in terrorism or funding it, but also for being "otherwise associated" with terrorists or other listed people.  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 63 (D.D.C. 2002); Exec. Order No. 13,224, 66 Fed. Reg. 186 (Sept. 25, 2001).

[9] *See* Letter from Sean P. Carter to Hon. George B. Daniels, Ex. 6 (Apr. 25, 2008) (Mem. for R. Richard Newcomb).  *See also* Pls.' Mem. of Law in Supp. of *Prima Facie* Showing of Personal Jurisdiction, Ex. 7 (filed May 14, 2004) (Dkt. #154) (Letter from Treasury General Counsel David Aufhauser to Swiss Prosecutor Claude Nicati (Nov. 29, 2001)).

[10] *See* Pls.' Mem. of Law in Supp. of *Prima Facie* Showing of Personal Jurisdiction, Ex. 6 (filed May 14, 2004) (Dkt. #154) (Letter from Treasury Deputy General Counsel George Wolfe to Swiss Prosecutor Claude Nicati (Jan. 4, 2002)).  In June 2005, after a three and a half year investigation, Swiss prosecutors abandoned a criminal inquiry into Mr. Nada's purported

anything to do with the September 11 attacks, but only that Mr. Nada provided "direct" support to al Qaeda members through the provision of banking services at unknown times. *See* Pls.' Br. at 16. But these allegations are no different from those made against Prince Mohamed, which the Second Circuit found insufficient to support jurisdiction because the banking services at issue had no connection to the United States. *See* Defs.' Br. at 18. Neither a management role at a bank, nor the fact that the bank allegedly provided direct services to al Qaeda, nor the foreseeability of attacks on the United States were enough to establish jurisdiction over Prince Mohamed because he did not engage in tortious conduct expressly aimed at the United States.

### B.     The Second Circuit Refused Jurisdiction Over Plaintiffs' Conspiracy Allegations On The Same Grounds

Plaintiffs fall back on a theory of conspiracy jurisdiction, but in doing so they ignore both the record before the Second Circuit and the controlling legal standards for such jurisdiction in this Circuit. As noted (*supra* at 2, 10), the standards for conspiracy and other "concerted action" forms of specific jurisdiction embody the same requirements that exist for the exercise of specific jurisdiction under *Calder*. Plaintiffs nonetheless argue that this Court should engage in a defendant-by-defendant analysis of the conspiracy theory of personal jurisdiction because the Second Circuit purportedly "did not address this issue." Pls.' Br. at 18. But plaintiffs fail to mention that they strenuously argued conspiracy jurisdiction to that court.[11] By upholding the dismissal of the defendants in the face of that argument, and especially by doing so based on the

---

terrorism financing activities due to lack of evidence. In connection with that decision, a Swiss court criticized the prosecutor's office and awarded damages to Mr. Nada. *See Prosecutors drop terror investigation*, www.swissinfo.org (June 2, 2005), *available at* http://www.swissinfo.org/eng/front/detail/Prosecutors_drop_terror_investigation.html?siteSect=105&sid=5836044&cKey=1117651958000&ty=st.

[11] *See*, *e.g*., *O'Neill* Pls.-Appellants' Br. at 32-35, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007) (excerpt attached hereto as Ex. C); *Federal Ins.* Pls.-Appellants' Br. at 44, Nos. 06-0319-cv(L) et al. (2d Cir. filed Jan. 5, 2007) (excerpt attached hereto as Ex. D).

constitutional limits on jurisdiction, *see Terrorist Attacks III*, 538 F.3d at 93; *see also* Pls.' Br. at

10, the Second Circuit necessarily rejected plaintiffs' conspiracy claims.  *See Burrell v. United*

*States*, 467 F.3d 160, 165 (2d Cir. 2006) ("The mandate rule[, which] is a branch of the law-of-

the-case doctrine[,] . . . holds 'that where issues have been explicitly or implicitly decided on

appeal, the district court is obliged, on remand, to follow the decision of the appellate court.' ")

(quoting *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993)).

      The fact that the Second Circuit did not separately analyze plaintiffs' conspiracy claims

demonstrates only, as noted above, that the conspiracy jurisdiction issues are not substantively

different from those presented by plaintiffs' non-conspiracy *Calder* theory – in either case,

specific jurisdiction requires allegations of tortious conduct undertaken, directed or controlled by

the defendant and directed at the United States.  As explained in the defendants' opening brief

and above, the conspiracy jurisdiction argument (and aiding/abetting claims) are both simply

variations of a "concerted action theory of liability," *Terrorist Attacks III*, 538 F.3d at 94, which

the Second Circuit rejected on plaintiffs' allegations.

      The allegations of conspiracy against the defendants on appeal parallel those against the

bulk of defendants still before this Court.  The allegations against the five Princes – to the extent

there were any allegations of conspiracy at all – were nothing more than the general boilerplate

allegations that they "engaged in the aiding and abetting or material sponsorship of Osama bin

Laden, al Qaeda and international terrorism."  *Burnett 9849* 3AC ¶ 342; *see also id.* ¶ 363;

*Ashton* 6AC ¶¶ 192, 195, 201, 206 209; *Federal Ins.* FAC ¶¶ 66, 72, 73; *WTC* Compl. ¶¶ 678,

695, 699.  With respect to most of the moving defendants, plaintiffs make no allegations of

conspiracy or aiding and abetting other than boilerplate allegations directed at "all defendants,"

and, as to virtually all the rest, the allegations are similar, if not identical, to those against the five

Princes.[12]  As such, the result is no different.[13]

Apart from the absence of any conspiracy allegations to differentiate the defendants

before the Second Circuit from the rest of the defendants, plaintiffs' interpretation of the Second

Circuit's decision suffers from two substantive flaws.  First, plaintiffs seek to ascribe

jurisdictional contacts of any member of the alleged conspiracy to all other members (Pls.' Br. at

18), which is not the law.  In support, they quote *Burger King* for the proposition that the so-

called "general rule of agency for jurisdiction is that actions 'carried on in behalf of an out-of-

state party . . . may sometimes be ascribed to the party.' "  *Id.* at 18 (quoting *Burger King*, 471

U.S. at 479 n.22).  Plaintiffs pointedly omit the rest of the sentence from *Burger King*, which

reads:  "at least where [the defendant] is a 'primary participan[t]' in the enterprise and has acted

purposefully in directing those activities, *Calder v. Jones*, 465 U.S. at 790."  *Burger King*,

471 U.S. at 479 n.22.  Thus, what plaintiffs cast as a broader alternative to jurisdiction based on

*Calder*'s "purposeful direction" idea is in fact simply a variation of it, and fails for the same

---

[12] *See*, *e.g.*, *Ashton* 6AC ¶¶ 5, 35, 57, 444; *Burnett 9849* 3AC ¶¶ 308, 472; *Federal Ins.* FAC ¶¶ 66, 72, 73; *WTC* Compl. ¶¶ 7, 35, 134, 172, 246, 483, 803, 824, 919, 928.

[13] Judge Casey, applying settled circuit law, previously held that plaintiffs' claim that all defendants conspired with the al Qaeda terrorists to execute the September 11 attacks, without supporting factual allegations, was insufficient to establish an agency relationship.  *See Terrorist Attacks I*, 349 F. Supp. 2d at 805-06 (citing *Lehigh Valley Indus. Inc. v. Birenbaum*, 527 F.2d 87, 93-94 (2d Cir. 1975); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004) (citing *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 395 (S.D.N.Y. 2002))).  Judge Casey further found that there were no specific facts alleged from which he could infer that the defendants before him either "directed, controlled, or requested al Qaeda to undertake its terrorist activities" or that those defendants had "knowledge of, or consent[ed] to those activities."  *Id.* at 806.  (citations omitted).  In doing so, he anticipated the Second Circuit's focus on the absence of allegations that the defendants "directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them."  *Terrorist Attacks III*, 538 F.3d at 94.

reasons that the Second Circuit expressed:  The defendants are neither alleged to be primary participants nor to have engaged in tortious conduct purposefully directed at the United States.

Second, plaintiffs' conspiracy argument rests on the assumption that jurisdiction turns on the very concept of foreseeability that the Second Circuit definitively rejected.  Plaintiffs argue, as they did to the Second Circuit, that "it was well-known" that al Qaeda attacks "would occur in the United States" and they assert that the Second Circuit provided "no guidance" on whether jurisdiction may be satisfied based on an asserted conspiracy that "would have direct and foreseeable effects in the United States."  Pls.' Br. at 20.  Yet, in applying due process standards, the Second Circuit was clear that "foreseeability is not the standard for recognizing personal jurisdiction," *Terrorist Attacks III*, 538 F.3d at 95.  Indeed, in stating that principle, the court cited the very Supreme Court decision that plaintiffs mis-quote in support of their conspiracy theory.  *See id.* at 93 ("Mere foreseeability of harm in the forum state is insufficient" to support jurisdiction (citing *Burger King*, 471 U.S. at 474)).

Despite plaintiffs' claims, no further "guidance" is needed to address these points.  Their concerted action theories, whether labeled "conspiracy" or "purposeful direction," were presented to and definitively rejected by the Second Circuit.  The conspiracy allegations against the majority of the remaining defendants are essentially identical and demand the same treatment.

## CONCLUSION

For the foregoing reasons and those set forth in defendants' supplemental brief, the Second Circuit's decision in *Terrorist Attacks III* compels dismissal from these cases of numerous defendants with pending motions to dismiss on the basis of the FSIA and lack of personal jurisdiction.

Respectfully submitted,

 /s/ Michael K. Kellogg
Michael K. Kellogg
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (phone)
(202) 326-7999 (fax)

*Chair of Defendants' Executive Committee*

19

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 25, 2008, I caused an electronic copy of the foregoing

Defendants' Reply to Plaintiffs' Supplemental Brief on Second Circuit Decision to be served

electronically by the Court's Electronic Case Filing (ECF) System.

/s/ Michael K. Kellogg
Michael K. Kellogg