# Exhibit B

# 06-0319-cv(L),

06-0321- CV (CON);
06-0348-CV (CON); 06-0392- CV (CON); 06-0397- CV (CON); 06-0398- CV
(CON); 06-0436- CV (CON); 06-0442- CV (CON); 06-0453- CV (CON);
06-0458- CV (CON); 06-0461- CV (CON); 06-0473- CV (CON); 06-0477- CV
(CON); 06-0487- CV (CON); 06-0657- CV (CON); 06-0674- CV (CON);
06-0693- CV (CON); 06-0700- CV (CON); 06-0702- CV (CON),

# United States Court of Appeals

*for the*

## Second Circuit

IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, DOCKET NUMBERS BELOW:
03-md-1570, 04-cv-7279, 04-cv-7280

## BRIEF OF THE *WORLD TRADE CENTER PROPERTIES* and *EURO BROKERS* PLAINTIFFS-APPELLANTS

PAUL HANLY, JR., ESQ.
ANDREA BIERSTEIN
HANLY CONROY BIERSTEIN SHERIDAN
    FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, New York 10016
(212) 784-6400

*Of Counsel:*
RONALD L. MOTLEY, ESQ.
JODI W. FLOWERS, ESQ.
MICHAEL ELSNER, ESQ.
JUSTIN B. KAPLAN, ESQ.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000

*Attorneys for the World Trade Center Properties
and Euro Brokers Plaintiffs-Appellants*

January 5, 2007

## FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

Plaintiffs-appellants World Trade Center Properties LLC; 1 World Trade Center LLC; 2 World Trade Center LLC; 4 World Trade Center LLC; 5 World Trade Center LLC; Silverstein WTC Mgmt. Co. LLC; 7 World Trade Company L.P., hereby certify that there is no parent corporation for any of them and no publicly-held corporation owns 10% or more of the stock of any of them.

Plaintiffs-appellants Euro Brokers Inc., Maxcor Financial Group Inc., Maxcor Financial Inc., Maxcor Financial Asset Management Inc., Tradesoft Technologies, Inc., Maxcor Information Inc., Euro Brokers Ltd., Euro Brokers Financial Services Limited, Euro Brokers Mexico, S.A. de C.V., and Euro Brokers (Switzerland) S.A. hereby certify that they have no publicly-held corporate parents, affiliates, and/or subsidiaries and no publicly-held corporation owns 10% or more of the stock of any of them.

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT .............................................................1

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................3

STATEMENT OF THE CASE .............................................................5

    Nature of the Case ..................................................................5

    Course of Proceedings ..........................................................11

    Standard of Review................................................................17

STATEMENT OF FACTS .................................................................18

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT .................................................................................20

    I.    THE DISTRICT COURT ERRED IN HOLDING THAT THE FOUR
           PRINCES AND THE SHC WERE ENTITLED TO SOVEREIGN
           IMMUNITY ..........................................................................20

    II.   THE DISTRICT COURT ERRED IN HOLDING THAT NEITHER THE
           PRINCES NOR THE SHC NOR MOHAMED ARE SUBJECT TO
           PERSONAL JURISDICTION IN THE UNITED STATES.................20

           A.   To the Extent that the FSIA Does Not Immunize
                Defendants for Their Official Conduct, the District Court
                Had Personal Jurisdiction Over Them in Their Official
                Capacity ...............................................................22

        1.     *A Foreign Sovereign Has No "Due Process" Rights That Would Limit This Court's Personal Jurisdiction Over The Four Princes or the SHC* ...............................22

        2.     *The FSIA Exceptions Incorporate, And Exceed, Any Applicable "Minimum Contacts" Requirement* ............25

   **B.**    The District Court Improperly Required Plaintiffs to Prove Their Jurisdictional Allegations Without the Benefit of Discovery ................................................................27

        1.     *The District Court Had Personal Jurisdiction Over Mohamed and the Four Princes In Their Personal Capacity Because the Defendants Purposefully Directed Their Conduct at the United States* ................31

        2.     *The District Court Failed to Give Appropriate Weight to the Plaintiffs' Jurisdictional Allegations and to the Evidence They Submitted* ..............................43

        3.     *The District Court Erred in Refusing to Permit Plaintiffs to Take Jurisdictional Discovery* ...................49

CONCLUSION .........................................................................50

CERTIFICATE OF COMPLIANCE ................................................51

found were not proven to its satisfaction.  Before turning to the district court's erroneous jurisdictional analysis, it is important to revisit the jurisdictional theory on which plaintiffs proceeded and which the district court purported to apply, in order to place in context the allegations and evidence the court failed to credit.

1.  *The District Court Had Personal Jurisdiction Over Mohamed and the Four Princes In Their Personal Capacity Because the Defendants Purposefully Directed Their Conduct at the United States*

A federal court may exercise personal jurisdiction over a non-resident defendant when: (1) the defendant is amenable to service of process pursuant to a statute or rule of court that authorizes such an exercise; and (2) such an exercise is consistent with due process of law. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  "Due process" requires that "if the defendant 'be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *International Shoe*, 326 U.S. at 316. Three of the Four Princes – Sultan, Salman, and Naif – as well as Mohamed and the SHC conceded the first prong of this analysis and argued only that plaintiffs had not established sufficient "minimum contacts" between defendants and the United States to satisfy the requirements of due process.  Only Turki challenged the statutory basis for jurisdiction, but the district court found that plaintiffs had satisfied the statutory

prong necessary to establish personal jurisdiction, under either the New York long-arm statute or under F.R.C.P. 4(2)(k). The court nonetheless dismissed plaintiffs' claims for lack of personal jurisdiction because the court concluded that defendants did not have sufficient "minimum contacts" with the United States to satisfy the requirements of due process.[15]

The standard for determining whether a defendant has sufficient contacts with the forum is not a rigid one, nor can it be applied without reference to the nature of the underlying claims against the defendant. As the Supreme Court has explained, "'[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886,895 (1961). It is

---

[15] As is the case with personal jurisdiction in their official capacity, the relevant contacts for jurisdiction over the defendants in their private capacity are with the United States as a whole. Plaintiffs' claims include claims under the Anti-Terrorism Act and the RICO Act, each of which provides for nationwide service of process. *See* 18 U.S.C. § 2334(a); 18 U.S.C. § 1965(b). It is firmly established that where a cause of action is based on a federal statute that provides for nationwide service of process, the requisite "minimum contacts" are contacts with the United States, rather than with the particular forum state. *See, e.g., Omni Capital*, 484 U.S. at 102 n.54; *United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981). Similarly, where service is authorized (or waived) under F.R.C.P. 4(k)(2), the requisite contacts are with the United States. *See, e.g., ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001); *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 & n.10 (7th Cir. 2000); *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir. 1999).

for this reason that the Supreme Court has rejected a rigid formula for discerning the contacts necessary to satisfy due process, opting instead for an approach whereby each case could be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." *International Shoe*, 326 U.S. at 316. More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985). The D.C. Circuit, too, has recognized that policy considerations may play a part in determining what process is due in a particular situation. *See Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *see also Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements").

If ever a case called for recognition of the policy considerations that determine what process is due, it is this one. The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the cold-blooded manner in which the United States, U.S. residents and U.S. landmarks were attacked for no reason other than that they were here, on United States soil. The policies of "fair play" and "substantial justice" cannot be applied without

recognition of the deliberate devastating attacks on the United States that gave rise to plaintiffs' claims. When a defendant purposefully directs his activities so as to cause this kind of harm to and in the United States, he should not be heard to say that he has had no contact with this country.

This conduct was directed at the United States because, as alleged in the complaints and as demonstrated in the evidence that plaintiffs submitted, al Qaeda specifically targeted the United States (including, specifically, the World Trade Center) and its innocent civilian residents, proclaiming that "America is a state at war with us" and noting that "killing of women and the old and children of the war states . . . is permissible . . . ." A-3050 at ¶ 13; A-1197. In 1998, bin Laden issued a "fatwa" in which he proclaimed: "We . . . call on every Muslim . . . to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it." A-3055-3056 at ¶ 24; A-1199 at ¶ 213. Thus, al Qaeda made no secret of the fact that its intended target was the United States and its citizens, residents and monuments. Nor were these words an empty threat. Osama Bin Laden had carried out a serious of attacks against the United States: the 1993 WTC bombing, the 1998 the bombings of the U.S. embassies in East Africa, and the bombing of the *U.S.S Cole*. *See* A-1135-1136[16] Thus, to the extent that defendants knew that

---

[16]   These attacks demonstrated how literally al Qaeda took the words of Shaykh Omar Abdel Rahman, who, in 1998, issued a fatwa which called on all Muslims to (footnote continues on next page)

the charities they supported were providing assistance to al Qaeda and bin Laden, they knew that the ultimate purpose was to assist in attacks against the United States. In so doing, they sufficiently aimed their conduct at the United States to support the exercise of jurisdiction here.

In *Burger King*, the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S.at 472 (citations omitted). Physical presence is not a requirement. *Id.* at 475.   In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if none of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984). This is precisely what plaintiffs alleged in these cases. In *Calder*, the defendants had no contacts with California other than occasional trips and phone calls. Nonetheless, the Court held that the assertion of jurisdiction

---

kill American infidels, urging them to:
> Ruin their economies, burn their companies, destroy their benefits, sink their ships, shoot their aircraft and kill them on the ground, in the air and sea and wherever you find them.  Take them, besiege them and cripple them completely.  Kill all these infidels wherever you find them.  You kill them and Allah will punish them through your hands. A-2347-2348.

in California comported with due process. Since California was the focal point of the story and the harm suffered, jurisdiction over the defendants was proper in California "based on the 'effects' of their Florida conduct in California." *Id.* at 789.

The *Calder* court went on to distinguish the intentional tort of which defendants were accused from allegations of "untargeted negligence." 465 U.S. at 789. Recognizing that the mere foreseeability of an effect in the forum state is insufficient to satisfy the demands of due process, the Court held that jurisdiction was warranted because the defendants' intentional, and allegedly tortious, actions were "expressly aimed at California." *Id.* Because they knew that plaintiff would suffer injury in the state in which she lived and worked, the Court held that defendants should "reasonably anticipate being haled into court there to answer for the truth of the statements made in their article." *Id.* at 790. *See also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there"). Thus, the *Calder* Court concluded: "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." 465 U.S. at 790.

As the district court appeared to recognize, *Calder* provides the relevant analysis here. Like the defendants in *Calder*, defendants here are alleged to have

intentionally committed tortious acts; negligence is not at issue. Just as the *Calder* defendants knew that the plaintiff in that case would suffer her injury in California, so too in this case, it was not mere fortuity that plaintiffs' injury was suffered in the United States. Rather, the United States was the avowed target of Osama bin Laden and al Qaeda when defendants aided, abetted, conspired with or materially supported them. The plaintiff in *Calder* was targeted because she was a Hollywood celebrity – her residence and the site of her injuries was not merely incidental. Here, too, plaintiffs and their businesses and property (and in the case of the individual plaintiffs in the companion cases, their loved ones) were targeted because they were in the United States – as in *Calder*, their residence and the site of their injuries were not merely incidental.

The application of these principals in the context of international terrorism is, sadly, not an issue of first impression. Five cases involving terrorism against Americans or the U.S. government demonstrate that due process is not violated when those who deliberately target the United States are made to answer in American courts of law. In *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), plaintiffs were Kenyan victims, relatives of victims, and businesses harmed by the Al Qaeda 1998 bombing of the U.S. Embassy in Nairobi. Defendants were Osama Bin Laden, Al Qaeda, Sudan and Afghanistan. The district court dismissed the claims against Bin Laden and Al Qaeda for lack of personal jurisdiction, finding

that the plaintiffs had failed to demonstrate sufficient contacts with the forum to support the exercise of jurisdiction. The D.C. Circuit reversed, holding that Osama bin Laden and Al Qaeda were subject to jurisdiction in the courts of the United States because they had "engaged in unabashedly malignant actions directed at and felt in this forum." 417 F.3d at 13. The court concluded that "[t]he defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to 'reasonably anticipate being haled into' an American court." *Id*. at 14. The difference between the conduct at issue in *Mwani* and that alleged here is one of degree, not kind.  Just as the Four Princes or Mohamed did not fly the airplanes into the World Trade Center, Osama bin Laden did not himself drive the truck bomb at the U.S. Embassy in Nairobi.  His involvement was indirect, but material – he provided the leadership, the training, the motivation and the infrastructure, but he did not commit the terrorist acts himself.  Defendants here are alleged also to have assisted, but with the knowledge and intent that their assistance would aid, abet and materially support al Qaeda and its campaign of international terrorism targeted at the United States.

The court in *Morris v. Khadr*, 415 F.Supp.2d 1323 (D. Utah 2006) similarly focused on "unabashedly malignant action directed at and felt in" the United States.  In *Morris*, plaintiffs were attacked by al Qaeda members while they were

serving in the U.S. military in Afghanistan.  Defendant was an al Qaeda member who had "actively participated in and helped plan al Qaeda's terrorist agenda." 415 F.Supp.2d at 1336. The court held that such conduct was sufficiently directed at the United States to satisfy the "minimum contacts" test. *Id.*

In *Rein v. Socialist People's Libyan Arab Jamahiriya*, the court found that Libya's "intentional, tortious actions that were expressly aimed at the United States" in connection with the bombing of Pan Am Flight 103 over Lockerbie, Scotland in 1988 were sufficient to establish the requisite contacts for personal jurisdiction. 995 F.Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998). Even though the attack in *Rein* did not take place in the United States, the court found that the targeting of an American-flagged carrier provided a sufficient nexus for the assertion of personal jurisdiction.

In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, the court analyzed the minimum contacts of foreign officials who were sued in their personal capacity. 290 F.Supp.2d 54 (D.D.C. 2003). Pugh arose out of the terrorist downing of a French commercial aircraft en route from Brazzaville, Congo to Paris, with an intermediate stop in Chad. The passengers, all of whom were killed, were from 17 different countries; seven passengers were Americans, and the action was brought by their survivors in the United States. The individual defendants were accused of conspiring in their individual capacity, and not merely as members of the Libyan

39

government, to sabotage the plane. Applying the *World-Wide Volkswagen* test that requires the court to look at whether the defendant "should reasonably anticipate being haled into court" in the United States, the court in Pugh held that:

> Taking the factual allegations of the complaint as true for present purposes, the individual defendants in the instant action conspired to sabotage and succeeded in destroying a civilian commercial aircraft filled to capacity with innocent and unsuspecting passengers while in flight. As the plane they chose to destroy was on an international flight and expected to stop in several nations before reaching its final destination, the individual defendants could and should have reasonably postulated that passengers of many nationalities would be on board, from which they could also expect they might be haled into the courts of those nations whose citizens would die. Given the number of passengers on UTA Flight 772, and the international nature of the flight, it was also altogether foreseeable that some Americans would be aboard the plane, whose lives would be lost, and that the individual defendants would have to answer in some fashion in American courts for the consequences of their actions if their identities were ever discovered.

290 F.Supp.2d at 59. In language especially relevant to this case, the *Pugh* court continued:

> The interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years. Congress has not been indifferent to providing judicial sanctions for terrorist acts committed abroad. Beginning at least five years before the UTA Flight 772 bombing, a succession of federal statutes had evinced an intent to assure the criminal prosecution of foreign individuals who committed terrorist acts overseas against U.S. persons or property. . . . These criminal statutes all contemplated the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over

> such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil in personam jurisdiction over those same individuals for the same acts.

*Id.* Accordingly, the court held that:

> in light of the pre-existing statutory authority providing for the criminal prosecution of those who carry out terrorist acts, and the defendants' intentional targeting of foreign nationals at the risk of killing Americans among them, defendants should have anticipated the possibility of being 'haled into court' in the United States in some capacity. And because they should have anticipated as much, this Court concludes that it may constitutionally exercise personal jurisdiction over the individual defendants in their personal capacities without offending any "traditional notions of fair play and substantial justice."

*Id.* at 60.

Thus, in *Pugh*, the defendants were found to have purposefully directed their conduct at the United States in a manner sufficient to subject themselves to jurisdiction in an American court even though the plane that was attacked was a French carrier and the flight was not scheduled to, nor did it, take off or land in the United States and even though defendants themselves did not attack the plane, but instead conspired with the attackers. Here, by contrast, the entire September 11 attack was focused specifically on the United States.  It would be a cruel twist if the federal judiciary failed to exercise jurisdiction over the co-conspirators in the September 11 attacks, given the exercise of jurisdiction in cases like *Pugh* where the attacks took place outside the United States.  Moreover, the perpetrators of the attacks had publicly announced their intentions to attack the United States at the

41

time defendant provided material support to their terrorist projects. Just as the assertion of jurisdiction in a United States court over the defendants in *Pugh* was found to be consistent with the due process clause of the constitution, so, too, the assertion of jurisdiction over defendants in an American court is also proper. *See also Daliberti v. Iraq*, 97 F.Supp.2d 38, 54 (D.D.C. 2000) (assertion of personal jurisdiction did not offend "traditional notions of fair play and substantial justice" where defendant's targeting of Americans in overseas attack provided a sufficient nexus with the United States to satisfy due process concerns). In all five cases, *Mwani*, *Morris*, *Rein*, *Pugh*, and *Daliberti*, the attacks on Americans or American property took place abroad. In none of the cases were the defendants alleged to have taken any steps in the United States in furtherance of the plots. In all five cases, however, the court found that defendants had sufficiently targeted Americans, and that defendants had sufficient notice that United States law and United States courts would subject them to liability so that the assertion of personal jurisdiction was constitutional. Here, the attacks in question took place on American soil and were thus more specifically focused on the United States than were the attacks in *Mwani*, *Morris*, *Rein*, *Pugh*, and *Daliberti*.

The district court apparently found no flaw in this analysis and agreed that defendants would be subject to jurisdiction in the United States if they had purposefully directed their conduct here. But the court erred in applying this

standard, improperly requiring plaintiffs to *prove*, at the pleading stage, defendants' knowledge that they were assisting al Qaeda.

2.  *The District Court Failed to Give Appropriate Weight to the Plaintiffs' Jurisdictional Allegations and to the Evidence They Submitted*

The district court recognized that "[p]laintiffs need only make a prima facie showing that personal jurisdiction exists," that "[p]laintiffs may rely entirely on factual allegations," that "they will prevail even if Defendants make contrary arguments," and that the court is required to "read the complaints and affidavits in a light most favorable to Plaintiffs."  349 F.Supp.2d at 804, *citing PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997); *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir.1993). *Jazini,* 148 F.3d at 184.  But that is not what the court did.

First, the district court struck, and refused to consider, evidence that plaintiffs submitted in the MDL consolidated proceeding, rather than in connection with a specific motion.[17]  Even if the filing was somewhat procedurally improper, the district court did not give plaintiffs any other opportunity to file the evidence they sought to submit before it dismissed the claims against Sultan, Turki, and Mohamed, nor did it hold an evidentiary hearing.  Instead, it simply ignored

---

[17]  The court's order striking these submissions was particularly puzzling in light of the court's specific directives to the parties expressing a preference for consolidated briefing. *See, e.g.*, A-2137-2141

43