UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (GBD) ECF Case |
| *This document relates to:* | |

*All Cases*

# PLAINTIFFS' REPLY TO DEFENDANTS' SUPPLEMENTAL BRIEF ON SECOND CIRCUIT DECISION

November 25, 2008

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................. 3

    **I.**    DEFENDANTS HAVE READ THE SECOND CIRCUIT HOLDING CONCERNING APPLICATION OF THE FSIA TO INDIVIDUAL OFFICIALS TOO BROADLY .............. 3

        A.    Sheik Saleh al Hussayen.......................................................... 4

        B.    Dr. Abdul Rahman al-Swailem ............................................... 5

        C.    Abdullah bin Saleh al-Obaid .................................................. 5

        D.    Abdullah Muhsen Al Turki ..................................................... 6

    **II.**    THE SECOND CIRCUIT DID NOT REJECT THE ASSERTION OF JURISDICTION OVER DEFENDANTS WHO PROVIDED SUPPORT DIRECTLY TO AL QAEDA ................... 7

        A.    "Support to al Qaeda Through Charities" ......................... 12

        B.    "Banking Services" ............................................................. 15

        C.    Other Allegations ................................................................ 17

CONCLUSION ............................................................................................................ 19

i

## TABLE OF AUTHORITIES

*Page*

### Cases

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ................................................................. 10, 14

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886 (1961) ................................................................................................................................. 10

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000) ........................................ 7

*Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) .................................... 10

*Hanson v. Denckla,* 357 U.S. 235 (1958) ........................................................................... 14

*In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71 (2d Cir. 2008) ................. passim

*Kulko v. Superior Court of California In and For City and County of San Francisco*, 436 U.S. 84 (1978) ................................................................................... 12

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006) ................................................... 7

*Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ............................................................ 7

*Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir. 1988) .............................. 10

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003) ................................................................................................................................. 7

*Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998) ................................. 7

*Shaffer v. Heitner,* 433 U.S. 186 (1977) .......................................................................... 2, 12

### Statutes, Rules, and Regulations

18 U.S.C. § 2339B ............................................................................................................. 9

18 U.S.C. § 2339C ............................................................................................................. 9

### Other Authorities

FINAL REPORT OF THE 9/11 COMMISSION ........................................................................ 10, 11

## INTRODUCTION

The Supplemental Brief on Second Circuit Decision submitted by the DEC ("DEC Br.") goes far beyond construing the Second Circuit's holdings on the Foreign Sovereign Immunities Act ("FSIA") and the "minimum contacts" requirements of due process necessary for the assertion of personal jurisdiction.    Not content merely to take an unjustifiedly broad view of the Second Circuit's holdings, Defendants go on to mischaracterize Plaintiffs' allegations and to suggest a lack of merit to Plaintiffs' claims that has absolutely nothing to do with the issues before this Court, which are how to apply the Second Circuit's holdings on sovereign immunity and personal jurisdiction to the pending motions to dismiss filed by the non-appellee defendants.  Defendants' view that Plaintiffs' allegations are "made up," *see* DEC Br. at 33, or that they can be disregarded, *see* DEC Br. at 27, has nothing whatsoever to do with the issues of personal jurisdiction or sovereign immunity. This is especially true, because in its August 2008 Ruling,[1] the Second Circuit re-iterated its well-established holding that Plaintiffs' allegations are to be accepted as true at this point in the case.  *See In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71, 76 (2d Cir. 2008).[2]

When the DEC turns to the applicability of the August 2008 Ruling, it over-reads the opinion, expanding the scope of the Second Circuit's rulings and inventing rationales for the decision that appear nowhere in the text.  Thus, Defendants claim that the Second Circuit held that *all* individual officials of a foreign government are "agencies or instrumentalities" of the government, when in fact the Court of Appeals

---

[1] Terms in this Reply Memorandum have the same meaning assigned to them in Plaintiffs' opening Supplemental Briefing.

[2] It is also worth noting that the Second Circuit expressly rejected the defendants' efforts to characterize plaintiffs' allegations as "conclusory," instead finding that the complaints "include a wealth of detail (conscientiously cited to published and unpublished sources)." *Id.* at 76.

expressly declined to decide that issue, holding that while it was unnecessary to decide how broadly to construe "agency," the term is "easily open enough to include *senior members of a foreign state's government and secretariat*."  538 F.3d at 83 (emphasis added).  Defendants similarly mis-read the Court's holdings on personal jurisdiction, ignoring entirely the Court's language, which focused on the extent to which a defendant's support for al Qaeda was direct or indirect, and substituting instead a test based on specific links to the specific attacks of September 11, as opposed to support for al Qaeda and its agenda of attacks on the United States – a test that appears nowhere in the opinion.

Defendants' mis-readings of the August 2008 Ruling allow them to argue for an extraordinarily simplified view how that opinion is to be applied to the remaining defendants. They argue that the Court can simply dismiss nearly all of the remaining defendants without the need for case-by-case individual analysis.   Simplicity undoubtedly has its appeal, especially in light of the number of motions pending and the amount of time that has passed.  But nothing in the August 2008 Ruling or the prior jurisprudence of the United States Supreme Court concerning the "minimum contacts" necessary to satisfy the due process requirements for personal jurisdiction allows this Court to avoid considering, on a case-by-case basis with respect to each defendant, the relationship among the defendant, the forum, and the litigation, *see Shaffer v. Heitner,* 433 U.S. 186, 204 (1977), based on the allegations about that defendant, which must be accepted as true.  Just as Defendants' due process rights must be considered, so, too, Plaintiffs' due process rights require that, before their claims are dismissed, this Court consider which of the defendants are subject to jurisdiction in this Court.[3]

---

[3]  Accompanying this reply memorandum is Plaintiffs' Response to Defendants' List of Defendants ("Plaintiffs' Response"), which responds to the DEC position on each defendant whom the DEC contends that the August 2008 Ruling requires dismissal.  As the Court will note, in Plaintiffs' Response, Plaintiffs do not dispute that, under the (footnote continues on next page)

ARGUMENT

I. DEFENDANTS HAVE READ THE SECOND CIRCUIT HOLDING CONCERNING APPLICATION OF THE FSIA TO INDIVIDUAL OFFICIALS TOO BROADLY

Defendants argue that the August 2008 Ruling requires dismissal of all five remaining individual defendants who have asserted claims of sovereign immunity, but with respect to four of these defendants, the Second Circuit's decision is not dispositive of the issues presented. Defendants ignore three important limitations on the Second Circuit's holding that individual officials may claim the benefits of immunity under the FSIA. First, as noted in Plaintiffs' opening Supplemental Briefing, the Second Circuit held only that "senior members of a foreign state's government and secretariat" are "agencies or instrumentalities" of a foreign sovereign for purposes of the FSIA. *In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71, 83 (2d Cir. 2008). The Court had no occasion to, and did not, consider whether the term "agencies or instrumentalities" might sweep more broadly than that. *Id.* ("We need not decide how broadly to construe this word ["agency"] in other contexts; however, it is easily open enough to include senior members of a foreign state's government and secretariat. . . .").[4]

---

August 2008 Ruling, assuming it is not modified or reversed in the Supreme Court, certain of the defendants must be dismissed. As to other defendants, however, Plaintiffs take issue with both the DEC's description of the relevant allegations and the DEC's conclusion that dismissal is required. Although some defendants are discussed specifically in this memorandum, Plaintiffs respectfully refer this Court to Plaintiffs' Response for Plaintiffs' specific and comprehensive position on each defendant that the DEC proposes ought to be dismissed.

[4] In Plaintiffs' October 17 submission ("PEC Supp. Br."), we noted our intention to file a petition for a writ of *certiorari* in the Supreme Court. That petition was filed on November 12, 2008. In the petition, Plaintiffs address the applicability of the FSIA to individual foreign officials in the broad scope without distinction between senior officials and lower officials. Plaintiffs' arguments in the petition for *certiorari* should not be construed to imply that the Second Circuit held that all individual foreign officials may claim immunity under FSIA. Instead petitioners argue that FSIA should not be applied to any individual foreign officials as "[t]he square conflict among the circuits concerning whether FSIA applies to individual foreign officials is reason (footnote continues on next page)

Second, nothing in the Second Circuit's decision can be read to resolve *bona fide* disputes about the status of certain of the remaining individual officials who have claimed sovereign immunity.  Third, nor does the Second Circuit's decision undermine in any way the principle that governmental officials are entitled to immunity only for acts committed in their official capacity; no immunity is available for acts that were committed in a personal, rather than official, capacity.  Indeed, the Court specifically limited its ruling in this way, holding that "an individual official of a foreign state *acting in his official capacity* is the 'agency or instrumentality' of the state, and is thereby protected by the FSIA."  538 F.3d at 81 (emphasis added).  The August 2008 Ruling does not compel dismissal of such individuals and does not obviate the need for the Court to determine on a case-by-case basis whether these defendants have been sued for acts undertaken in their official or personal capacity and whether the position they hold is sufficiently high up in their government to fall within the Court's ruling. Specifically:

> A.   **Sheik Saleh al Hussayen**

The Second Circuit's decision is not dispositive as to Sheik al-Hussayen's FSIA defense.  Although Sheik al-Hussayen has held various positions within the Saudi government, the claims against Sheik Hussayen arise from conduct undertaken outside the scope of his governmental duties.  For instance, plaintiffs assert claims against al Hussayen based on support he provided to al Qaeda as a member of al Rajhi Banking & Investment Company's Sharia Board, and through the Islamic Association of North America.  *See* Federal Insurance RICO Statement Application to Sheikh al Hussayen, at

---

enough to warrant review by this Court."  *See* Plaintiffs' Petition for a Writ of *Certiorari* at 20.

Exhibit A.  The Second Circuit's decision makes clear that Sheik al-Hussayen does not enjoy FSIA protection with respect to these private capacity claims.[5]

B.     **Dr. Abdul Rahman al-Swailem**

The Second Circuit's decision is similarly not dispositive as to al Swailem's FSIA defense.  The claims against al-Swailem arise predominantly from conduct undertaken in his capacity as head of the Saudi Red Crescent (SRC).  Plaintiffs allege that al-Swailem used his control over the SRC to intentionally support al Qaeda's operations throughout the world.  In his capacity as the head of the SRC, al-Swailem is neither a "senior official" of the Saudi government, nor a member of the Kingdom's "general secretariat."  Accordingly, al-Swailem does not qualify as an "agency" of the Saudi government within the limited definition of that term, announced in the Second Circuit's decision.  Furthermore, even if al-Swailem can validly claim agency status as the head of a non-traditional governmental organ like the SRC, the Second Circuit's decision makes clear that he would enjoy FSIA protection only with respect to actions undertaken while acting within the scope of his office or employment.  *See* 538 F.3d at 81.  Accordingly, discovery would be required in order to determine whether al-Swailem was acting within the scope of his office and employment with respect to the actions underlying the claims at issue in these proceedings.

C.     **Abdullah bin Saleh al-Obaid**

Although Abdullah bin Saleh al-Obaid held the position of Saudi Minister of Education, the claims against him do not arise from that role, but rather from his activities as a senior official of numerous al Qaeda charities, including the Muslim World League, Rabita Trust, International Islamic Relief Organization, Sanabell, Inc.

---

[5] Sheik al-Hussayen is also subject to personal jurisdiction under theories of general jurisdiction, based on his continuous contacts with the United States.  Plaintiffs' general jurisdictional theories are not implicated by the Second Circuit's decision.  *See* PEC Supp Br. at 9.

and Sanabell al-Khair.  The Kingdom of Saudi Arabia has denied that the Muslim World League, Rabita Trust and International Islamic Relief Organization are "agencies" or "instrumentalities" of the Saudi government.  *See* Reply in Support of Motion to Dismiss of the Kingdom of Saudi Arabia, docket # 500, at p.2. Accordingly, to the extent al-Obaid claims FSIA protection in relation to his roles with those organizations, discovery would be required in order to first ascertain the status of those organizations under the FSIA.  Moreover, even assuming such discovery were to establish that those organizations are "instrumentalities" of the Saudi government, the Second Circuit's decision does not establish that al-Obaid, as an official of such a non-traditional governmental instrumentality, would himself be entitled to FSIA protection. In addition, discovery would also be required in order to determine whether al-Obaid was acting within the scope of his office and employment with respect to the actions underlying the claims at issue in these proceedings.[6]

> D.   **Abdullah Muhsen Al Turki**

The claims against Abdullah Muhsen al Turki arise, in part, from conduct undertaken in his capacity as Secretary-General of the Muslim World League (MWL). Plaintiffs allege that al Turki used his control over the MWL to intentionally support al Qaeda's operations throughout the world.  In his capacity as the head of the MWL, al Turki is neither a "senior official" of the Saudi government, nor a member of the Kingdom's "general secretariat."  Accordingly, al Turki does not qualify as an "agency" of the Saudi government within the Second Circuit's limited definition of that term. Furthermore, even if al Turki could validly claim agency status as the head of a non-traditional governmental organ like the MWL, the August 2008 Ruling makes clear that

---

[6] As is true for Sheik Saleh al Hussayen, al-Obaid is subject to personal jurisdiction under theories of general jurisdiction, based on his continuous contacts with the United States.  Plaintiffs' general jurisdictional theories are not implicated by the Second Circuit's decision.

he would enjoy FSIA protection only with respect to actions undertaken "while acting within the scope of his office or employment."   Accordingly, , discovery would be required in order to determine whether al Turki was acting within the scope of his office and employment with respect to the actions underlying the claims at issue in these proceedings.  As to any claims against al Turki in his personal capacity, moreover, this Court would have personal jurisdiction because al Turki is alleged to have directly sponsored al Qaeda via his control over the MWL, *see* Point II, *infra*.

## II.   THE SECOND CIRCUIT DID NOT REJECT THE ASSERTION OF JURISDICTION OVER DEFENDANTS WHO PROVIDED SUPPORT DIRECTLY TO AL QAEDA

Defendants also urge a more sweeping interpretation of the Second Circuit's decision with respect to personal jurisdiction than is warranted by the text of that decision.  Indeed, Defendants quote, and then ignore, the Court's important limitation on its holding:

> [T]he plaintiffs must establish that the Four Princes "expressly aimed" intentional tortious acts at residents of the United States . . . Providing *indirect* funding to an organization that was openly hostile to the United States does not constitute this type of intentional conduct.

538 F.3d at 95 (emphasis added); *see* DEC Supp. Br. at 18.  As Plaintiffs have already explained, *see* PEC Supp. Br. at 14-15, this focus on whether support was provided directly or indirectly is made necessary by the Second Circuit's treatment of the authorities on which Plaintiffs relied, *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006); *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D.D.C. 2003); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000), and *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 330 (E.D.N.Y. 1998), *aff'd in part, dis'd in part*, 162 F.3d 748 (2d Cir. 1998). None of these cases involved "primary participants" in the sense that Defendants seem to mean, but all involved defendants who provided support directly to the actual perpetrators of the acts.

Defendants suggest that a direct role in planning or conduct of the September 11 attacks is necessary for the assertion of jurisdiction, but nothing in the Second Circuit opinion supports that interpretation.  In its discussion of jurisdiction, the Second Circuit focuses on the need to allege that the defendants intentionally directed their own conduct at the United States in order for a U.S. court to assert jurisdiction over them.  But at no point did the Court hold as a matter of law, that a defendant intentionally planning terrorist attacks against the United States must know the particulars of a specific attack and specifically assist that particular attack, in order to be subject to jurisdiction.   What the Court found lacking in the allegations pertaining to the defendants before it was allegations sufficient to demonstrate that the defendants themselves directly supported al Qaeda, not, as Defendants would have it, a sufficient nexus to the September 11 attacks. Thus, it is telling that while Defendants claim that the Second Circuit found the requisite "link" to the September 11 attacks lacking, *see* DEC Br. at 3, and argue that Plaintiffs' allegations "lack a sufficient *nexus* to the September 11 attacks," *see id.* at 18 (emphasis added), neither the word "link" nor the word "nexus" appears anywhere in the Second Circuit's opinion.  Nor will this Court find words of similar import in that decision.  Rather, the Court held that providing assistance to al Qaeda indirectly, through charity intermediaries, did not demonstrate that the defendants directed their own conduct at the United States. Similarly, the Court found Mohamed's connection to the *banks* that funded al Qaeda to be insufficient, not his connection to the September 11 attacks.  *See In re Terrorist Attacks*, 538 F.3d at 96 ("Mohamed himself was never a director, officer, shareholder or employee of the banks that purportedly held terrorists' deposits.  He is related to those institutions only insofar as the Faisal Islamic Bank of Bahrain (which he once managed) invested in them.").[7]

---

[7] Plaintiffs disagree with the Second Circuit's description of Mohamed's relationships to the relevant institutions, but for purposes of understanding and applying the August
(footnote continues on next page)

The August 2008 Ruling is properly read to require that a defendant's assistance to al Qaeda have been sufficiently direct that one can infer that he was purposefully directing his own conduct at the United States, *not* as requiring that a defendant's assistance was directly and immediately connected to the September 11 attacks.  Such direct sponsors are properly viewed to have themselves directed terrorist conduct at the United States, within the meaning of the Second Circuit's decision.  For this reason, and because many of the remaining defendants were in direct league with al Qaeda and themselves controlled the mechanism for their direct funding and sponsorship of bin Laden's terrorist organization, plaintiffs respectfully submit that the core holding of the Second Circuit's decision is not dispositive as to such defendants.   Accordingly, it is the responsibility of this Court to resolve the pending motions of such defendants on a case by case basis, in light of all governing authorities.[8]

---

2008 Ruling, the facts *as the Second Circuit found them* provide important context.

[8] Plaintiffs anticipate that Defendants may argue that Plaintiffs' petition for *certiorari* to the United States Supreme Court offers a more expansive description of the Second Circuit ruling than that contained in Plaintiff's October 17 Supplemental Brief or herein. But Plaintiffs' October 17 Supplement Briefing, and this memorandum, are directed at application of the Second Circuit ruling to defendants not at issue in the August 2008 Ruling or the petition for *certiorari*.   Thus, Plaintiffs assume for purposes of this memorandum that the Second Circuit decision is controlling and address how, consistent with that decision, this Court may nonetheless exercise jurisdiction over certain other defendants differently situated than the defendants at issue in the August 2008 Ruling.  In the petition for *certiorari*, by contrast, petitioners argue that the Second Circuit decision is wrong and should be overturned.  This different purpose calls for focus on different aspects of the August 2008 Ruling. This is especially true because, although the Second Circuit distinguished between direct and indirect support to terrorists – a distinction that Plaintiffs urge this Court to apply when assessing motions for dismiss for lack of personal jurisdiction filed by non-appellee defendants – that distinction is not found in the Anti-Terrorism Act, *see* 18 U.S.C. §§ 2339B, 2339C, under which many of Plaintiffs' claims are pleaded, and Plaintiffs urge in the Supreme Court that this distinction must be rejected.  On the contrary, the ATA specifically includes within its scope both *direct and indirect* support to terrorists. *See* 18 U.S.C. § 2339C(a).

Furthermore, in the Petition, Plaintiffs argue that a broad interpretation of the Second Circuit's decision, such as the one presented by Defendants in their (footnote continues on next page)

The Defendants' interpretation of the August 2008 Ruling is especially untenable in light of the finding of the 9/11 Commission that very few individuals knew the specific targets, timing, operatives, and methods of attack for September 11; indeed, not all the hijackers had that information and even bin Laden's top operative in al Qaeda, Ayman al Zawahiri, learned of the operation only shortly beforehand. *See* FINAL REPORT OF THE 9/11 COMMISSION at n.180. If a direct connection to the 9/11 attacks themselves were the requirement that Defendants posit, then the courts of the United States would lack jurisdiction over bin Laden's second in command for the September 11 attacks, an absurd result that is surely not what the Second Circuit intended.

Nor is this Court at liberty to disregard Plaintiffs' allegations concerning direct support to al Qaeda as evidenced in the "Golden Chain" document. *See generally*

---

Supplemental Brief, could create drastic and unintended obstacles to victims of terrorism seeking to recover their losses from individuals and groups who materially supported or assisted the terrorists. Indeed, even an interpretation that limits application of the holding to indirect sponsors of terrorism substantially neuters the civil remedy provisions of the Anti-Terrorism Act, given the fact that virtually all international terrorist funding is channeled through some charity front or other intermediary. This view is consistent with our arguments before this Court that the Second Circuit's decision should be interpreted strictly to avoid depriving the 9/11 victims and their families from an opportunity to recover their losses. Nor are these policy considerations at odds with the constitutional nature of the jurisdictional inquiry. As the Supreme Court has explained, "[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886,895 (1961) . More recently, the Supreme Court has stated that "reasonableness considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King v. Rudzewicz*, 471 U.S. 462, 483-84 (1985). *See also Palestine Information Office v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 22-23 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements."). Thus, in the Supreme Court with respect to the correctness of the Second Circuit decision, and in this Court, in interpreting the scope and meaning of that decision as it now stands, the policy implications of asserting jurisdiction or not over these defendants is properly part of the Court's analysis.

Plaintiffs' Response.  Defendants urge this Court to reject those allegations, noting that Judge Casey refused to accept them because of Plaintiffs' lack of proof, *see* DEC Br. at 27, but in its August 2008 Ruling, the Second Circuit reiterated its prior holdings that, at the pleading stage, the Court must accept as true the allegations of the Complaint.  538 F. 3d at 76.[9]  This reminder should be seen as corrective to anything in Judge Casey's opinions to the contrary.  Thus, to the extent that Plaintiffs allege that particular defendants provided direct support to al Qaeda through founding donations, as, for example, evidenced in the "Golden Chain" list, the document recovered by the United States in Bosnia which lists the supporters who provided money from the founding of bin Laden's organization until at least the late 1990's, this Court should accept those allegations as true in determining whether the material support those defendants provided to al Qaeda was sufficiently direct that defendants can be said to have purposefully directed their conduct at the United States by providing assistance directly to a group sworn to attack the U.S. and its citizens.

The differences between Plaintiffs' construction of the August 2008 Ruling and that offered by the DEC are significant when applied to the remaining non-appellee defendants who have asserted that this Court lacks personal jurisdiction.   In particular, the categories that Defendants urge this Court to adopt focus on what kind of support a defendant provided to al Qaeda, not on how directly the support was provided.  As a

---

[9] Judge Casey's rejection of the "Golden Chain" document, was both procedurally and substantively improper.  Not only was Judge Casey required to accept Plaintiffs' allegations as true, but in this instance, there was also every reason to accept them as having been corroborated elsewhere, given that, after Judge's Casey's decisions, the 9/11 Commission cited, and relied on, the "Golden Chain" document in its final report. *See* Final Report of the 9/11 Commission at p.55 ("[Osama bin Laden's worldwide organization] included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs)."); *see also id.* at p. 66.

result, Plaintiffs believe that these categories are of little use in determining which defendants should be dismissed for lack of personal jurisdiction.  In addition, the categories are designed to obscure distinctions among the defendants, encouraging this Court to decide issues of personal jurisdiction on *en masse*, rather than on a case-by-case basis. The Supreme Court long ago warned against this approach:

> Like any standard that requires a determination of "reasonableness," the "minimum contacts" test of *International Shoe* is not susceptible to mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present. We recognize that this determination is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable.

*Kulko v. Superior Court of California In and For City and County of San Francisco*, 436 U.S. 84, 92 (1978) (citation omitted).  The "central concern of the inquiry into personal jurisdiction" is "the relationship among the defendant, the forum, and the litigation. . . ."  *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977).  Such an inquiry is, of necessity, an individualized one.

The inadequacy of each of Defendants' categories is demonstrated by an examination of each of them, to which we now turn.

A.     **"Support to al Qaeda Through Charities"**[10]

The DEC urges that all defendants who are alleged to have provided support to al Qaeda through what they describe as "ostensibly legitimate charities" should be dismissed for lack of personal jurisdiction.  But this fails to distinguish between those who merely made contributions through ostensibly legitimate charities and those who

---

[10] The categories discussed here and in the next section are the Defendants' as set forth in their brief.  Use of the Defendants' labels in order to respond to Defendants' arguments does not indicate that Plaintiffs adopt these categories, endorse the labels Defendants have given them, or believe that they provide a useful way of analyzing the remaining motions to dismiss.  We simply believe it adds clarity to identify which of Defendants' categories we are responding to.

set up charity-fronts or directed ostensibly legal charities and were responsible for the support those charities provided to al Qaeda.  The latter group provided their support directly to al Qaeda and the purposeful direction of their conduct at the United States can be inferred by that conduct, even if, under the August 2008 Ruling, purposeful direction cannot be inferred from contribution to such an organization alone.

Indeed, Defendants' approach would produce absurd results.   Under Defendants' view, the individual who reaches into his pocket and hands Osama bin Laden $100, saying "Here, use this to fly planes into the World Trade Center" is subject to jurisdiction in the United States, while the director of an ostensibly legitimate charity, who takes the $100 from the charity's assets and gives it to bin Laden for the exact same purpose, would not be.  And the individual who decides to *create* a charity, in order to generate many hundreds of dollars that he can then "give" to bin Laden for the same purpose, or more ambitiously, to fund a whole program of terror aimed at the United States, would similarly be outside the jurisdiction of the Court.  This cannot be what the Second Circuit was getting at when it found that the appellee defendants had not sufficiently purposefully directed their conduct at the United States.

Defendants' specific examples demonstrate the unhelpfulness of their approach. Yousef Jameel was one of the original funders of al Qaeda. His name appears on the "Golden Chain" document.  After his initial support of al Qaeda, Jameel did not stop supporting the terrorist organization. He continued to provide material support through a variety of means, including specially-designated terrorist Adel Batterjee, the specially-designated terrorist organization Al Haramain, as well as the Islamic Salvation Front and the Saudi Red Crescent.  Moreover, while Defendants claim that Plaintiffs have failed even to allege that Jameel had knowledge of al Qaeda's intent, *see* Dec Br. at 23, in fact, Plaintiffs allege that "[d]efendant Jameel provided material support to al Qaeda and its sponsors *with knowledge that the funds would be used to support al Qaeda and its international terrorist agenda.*"   *Burnett* More Definite Statement

13

("MDS") (emphasis added).  This is not the kind of indirect support that the Second Circuit addressed in its decision.

Similarly, Khalid bin Mahfouz is alleged not merely to have donated money through a charity, but actually to have set up a charity for the purpose of assisting al Qaeda and its mission of terrorist attacks on the United States.  *See* Plaintiffs' Response at 14-15 and citations therein.  According to the U.S. government, Muwafaq itself merged into al Qaeda in the early 1990s.  *Id.*  As a result, Muwafaq is properly viewed as an operational arm of al Qaeda itself, and not as a separate organization.  If, as alleged, bin Mahfouz established Muwafaq in order to provide a conduit for material support for al Qaeda, then bin Mahfouz purposefully directed his conduct at the United States every bit as much as if he had simply given bin Laden his own money.

The same is true for Abdul Aziz bin Ibrahim Al-Ibrahim, who is alleged not merely to have established a charity-conduit to provide material support to al Qaeda, but also to have used his "direction and control" to ensure that the charity in fact used its funds to support terrorism.  *See, e.g., Federal Ins.* RICO Stmt. at 7.  Again, this is not indirect material support, but direct support to bin Laden to support his terrorist agenda.

Astonishingly, the DEC claims that material support provided to al Qaeda *in the United States* does not support the exercise of personal jurisdiction and, indeed, does not change the analysis.  But, as this Court is well aware, the jurisdictional analysis turns on the extent to which a defendant has purposefully directed his conduct at the United States and/or purposefully availed himself of the privileges of conducting his activities here, *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474-75 (1985); *see also Hanson v. Denckla,* 357 U.S. 235, 253 (1958).  A defendant who provided material support to al Qaeda here has plainly directed his conduct at the United States and relied on U.S. banks and the protections of U.S. laws in making donations or otherwise providing material support to al Qaeda in the United States.

14

B.     **"Banking Services"**

The DEC takes the position that the provision of what it calls "banking services" (a term that is less accurate than the more inclusive "financial services," *but see* footnote 10) to al Qaeda can never provide the basis of jurisdiction in the United States for injuries arising from the September 11 attacks. Again, Defendants are wrong.  As with defendants who provided material support to al Qaeda through charities, the issue for this Court is whether a particular defendant's support was provided sufficiently directly and in support of plans to attack the United States that it can be said that that defendant "purposefully directed" his conduct here.  Thus, the question is not whether the material support that was provided was in the form of banking services, but how directly and with what knowledge and intention the services were provided.  In this respect, Defendants distort the meaning of the Second Circuit's holding by selective and misleading quotation.  Defendants contend that the Court of Appeals "rejected the position that 'the provision of financial services to an entity that carries out a terrorist attack on United States citizens' could suffice to establish action aimed expressly at the United States," DEC Br. at 29-30, *quoting In re Terrorist Attacks*, 538 F.3d at 96 [cited as "583 F.3d"], but that is not what the Court held. Rather, the Court held that, because Mohamed was "never a director, officer, shareholder or employee of the banks that purportedly held terrorists' deposits," the Court would not read the terrorism cases on which Plaintiff relied to hold that "the provision of financial services to an entity that carries out a terrorist attack on United States citizens could make Prince Mohamed, *in the circumstances presented here*, subject to the jurisdiction of American courts."  538 F.3d at 96 (emphasis added).

Omission of the phrase "in the circumstances presented here" makes the Court's holding appear more general, and more generalizable, than it fact it was.  The actual holding requires this Court to do more than note whether a defendant is alleged to have provided financial services to al Qaeda.  Rather, the Court must determine whether the

defendant's role in providing those services was sufficiently direct and intentional that the defendant can be said to have "purposefully directed" his conduct here.

For example, Dubai Islamic Bank ("DIB") laundered money for Osama bin laden and is alleged to have provided direct financial services and support for the 9/11 attacks. *See Burnett* Third Amended Complaint ("TAC") ¶¶ 113, 115. Thousands of dollars in money transfers went to the hijackers to pay for training and expenses. RICO Statement-*Federal, O'Neill – Al Baraka,*[11] *NY Marine, WTC, Euro Brokers*, 4/29/05, Dkt #'s 856-860. Moreover, Plaintiffs allege that "[s]o pervasive and apparent was DIB's money laundering on behalf of the [al Qaeda] Enterprise that in 1999 American officials visited Dubai to demand that the government take steps to end its lax supervision of the Bank." *See* Plaintiffs' Response at 7-8. Despite these clear warnings, Plaintiffs allege "United States authorities have identified at least $500,000.00" that was transferred between known Osama bin Laden operatives to the Florida accounts of hijackers Mohammed Atta and Mawan al-Shehhi from June 2000 up until the 9/11 attacks. *Burnett* TAC ¶117-123. Thus, Plaintiffs' allegations are clear, "Dubai Islamic Bank was directly involved in the 9/11 attacks." *See* RICO Statement-*Federal, O'Neill, NY Marine, WTC, Euro Brokers*, 4/29/05, Dkt #'s 856-860.

It should be clear that DIB is *not* alleged merely to have been a passive conduit, nor even merely to have provided funds to al Qaeda generally. Rather, DIB is alleged to have assisted in money transfers to al Qaeda including *directly to the hijackers* and to have done so for years after warnings that its services were being provided in precisely this way. From these allegations, the Court can and should infer that DIB acted with knowledge of how and to whom its services were being provided and in doing so purposefully directed its conduct at the United States in facilitating al Qaeda operatives'

---

[11] These allegations were, as well, incorporated into the More Definite Statements and the amended pleadings of September 30, 2008.

transfer of money to the United States for use of its operatives in this country.  This is especially true because of the amount of money transfers made directly to banks in the United States by known al Qaeda operatives.   This kind of support, direct and intentional, surely provides a basis for jurisdiction over DIB.

C.    **Other Allegations**

In an effort to lump together diverse allegations that require case-by-case analysis, the DEC mischaracterizes Plaintiffs' allegations about a number of defendants. For example, Defendants claim that Safer Al-Hawali and Salman Al-Oadah "are alleged merely to have engaged in religious advocacy . . . but they are not alleged to have intended to take any action against the United States through their advocacy."  DEC Br. at 31.  In fact, Plaintiffs have alleged that Safer Al-Hawali is a leader of al Qaeda, and not merely a religious advocate.   In September 1990, Al-Hawali released a tape which established an early vision for Osama bin Laden's war against the United States and the West:

> We have asked the help of our real enemies in defending us.  The point is that we need an internal change.  The first war should be against the infidels inside and then we will be strong enough to face our external enemy.  Brothers, you have a duty to perform.  The war will be long.  The confrontation is coming.

*Burnett* MDS at 19.  To call this religious advocacy slanders religion and ignores the real nature of what was being exhorted.  Moreover, if any doubt remains, Al-Oadah's statements were even more explicit.  On May 15, 2001, in an article called "Suicide Operations," Al-Oadah wrote:

> [T]he Mujahid (warrior) must kill himself if he knows that this will lead to killing a great number of the enemies, and that he will not be able to kill them without killing himself first, or demolishing a center vital to the enemy or its military force, and so on.  This is not possible except by involving the human element in the operation.  In this new era, *this can be accomplished with the modern means of bombing or bringing down an airplane on an important location that will cause the enemy great losses*.

*See* Plaintiffs' Response at 17 and sources cited therein.

17

Al-Hawali and Al-Oadah also used websites to spread their violent message of jihad against the United States. *Burnett* MDS at 25-27. (Al-Oadah's "Suicide Operations" article was published on such a website.) A member of Mohammed Atta's September 11 hijacker cell in Hamburg, Germany made several calls to Al Hawali and Al-Oadah. The sheiks provided ideological justifications and support for suicide attacks. *Burnett* MDS at 26. They set their sights on the United States and pointed young men in that direction. In this way, they "purposefully directed their conduct" at the U.S., all the more so because they helped set the direction for al Qaeda and indeed could be said to have chosen the target.

These illustrations demonstrate the importance of reviewing Plaintiffs' allegations against each defendant individually, rather than categorizing defendants on the basis of the DEC's characterizations or mischaracterizations. Such an individualized review shows that although the August 2008 Ruling may preclude the exercise of jurisdiction over some defendants, *see generally* Plaintiffs' Response, with respect to many others, the important differences between the appellee defendants and the non-appellee defendants compel a different result.

## CONCLUSION

This Court should reject the DEC's over-broad construction of the August 2008 Ruling and engage in a case-by-case review to determine which defendants are subject to jurisdiction in the United States based on the extent to which they purposefully directed their conduct here.

Dated: November 25, 2008          Respectfully Submitted,


/s/ Andrea Bierstein_____

Ronald L. Motley
rlmotley@motleyrice.com
Jodi Westbrook Flowers
Michael Elsner
Robert T. Haefele
Vincent I. Parrett
MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Tel: (843) 216-9000

Stephen A. Cozen
Elliott R. Feldman
Sean P. Carter
scarter@cozen.com
Mark T. Mullen
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000
Fax:  (215) 665-2013

James P. Kreindler
jkreindler@kreindler.com
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York 10017-5590
Tel: (212) 687-8181

19

Paul J. Hanly, Jr.
Jayne Conroy
Andrea Bierstein
abierstein@hanlyconroy.com
HANLY CONROY BIERSTEIN SHERIDAN FISHER
 & HAYES, LLP
112 Madison Avenue
New York, NY 10016
Tel:  (212) 784-6400
Fax:  (212) 213-5949

Jerry S. Goldman
jgoldman@andersonkill.com
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas, 42nd Floor
New York, N.Y. 10020-1182
Telephone:  (212) 278-1000
Fax:  (212) 278-1733

For the Plaintiffs' Executive Committees

CERTIFICATE OF SERVICE

I hereby certify that, on November 25, 2008, I caused an electronic copy of the foregoing Plaintiffs' Supplemental Briefing Concerning Applicability of August 2008 Second Circuit Ruling to be served electronically by the Court's Electronic Case Filing (ECF) System.

   /s/ Andrea Bierstein
Andrea Bierstein