# EXHIBIT A
# (Part 1 of 2)



**KREINDLER & KREINDLER LLP**
100 Park Avenue
New York, NY 10017-5590
(212) 687-8181
Fax: (212) 972-9432
www.kreindler.com

August 15, 2008

**Via Hand Delivery**
Honorable Frank Maas
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 740
New York, New York  10007-1312

Re:   *In re Terrorist Attacks on September 11, 2001 v. NCB*
      **03 MDL 1570 (GBD)(FM)**
      This document relates to:
      *Ashton, et al v. Al Qaeda Islamic Army, et al., Docket No. 02 CV 6977 (GBD)(FM)*
      *Burnett, et al v Al Baraka Inv. & Dev. Corp., et al., Docket No. 03 CV 9849 (GBD)(FM)*

Dear Judge Maas:

Pursuant to the Court's Order of July 11, 2008 (Docket Entry 2106)[1], the *Ashton* and
*Burnett* Plaintiffs respectfully request that the Court extend the time to respond to the "Renewed"
Motion to Dismiss filed by National Commercial Bank ("NCB") on July 22, 2008, until 60 days
after the full completion of the targeted jurisdictional discovery referenced herein.  The extension
requested herein is a necessary, efficient, and practical approach to this litigation inasmuch as the
extension will allow for the following: (1) The *Burnett, Ashton, O'Neill, Cantor, Continental,*
*and N.Y. Marine* Plaintiffs to complete specific jurisdictional discovery related to Plaintiffs'
newly acquired evidence and newly produced evidence that NCB submitted in support of its
motion.; (2) the *Burnett, Ashton, O'Neill, Cantor, Continental,  and N.Y. Marine* Plaintiffs to
receive responses to outstanding discovery requests; and (3) the *Federal Insurance* Plaintiffs to
commence and complete discovery so as to place the *Federal Insurance* case in the same

---

[1] In addition to granting NCB's request to file its Renewed Motion to Dismiss, the July 11, 2008 Order provides that
"[t]o the extent that plaintiffs believe that additional jurisdictional discovery is necessary prior to filing aresponse, a
specific discovery request and a request for a stay or extension of time in which to respond to the motion should be
made to the magistrate judge."

California Office                    Massachusetts Office              New Jersey Office
707 Wilshire Boulevard              277 Dartmouth Street             801 Franklin Avenue
Los Angeles, CA 90017-3613          Boston, MA 02116-2805            Franklin Lakes, NJ 07417
Tel: (213) 622-6469                 Tel: (617) 424-9100              Tel: (201) 343-7771
Fax: (213) 622-6019                 Fax: (617) 424-9120              Fax: (212) 972-9432

procedural posture as the other cases vis-à-vis NCB.  Notwithstanding any argument of NCB to the contrary, NCB will suffer no prejudice to this stay, particularly given the number of motions to dismiss older than NCB's that remain unresolved in the litigation.

In addition to the reasons discussed herein, the *Ashton* and *Burnett* Plaintiffs incorporate and adopt the reasons articulated in similar applications being filed by the other plaintiffs in this litigation – namely, by the *Federal Insurance* Plaintiffs, as well as by the *O'Neill, New York Marine Insurance, Continental Insurance*, and *Cantor Fitzgerald* Plaintiffs.[2]  Specifically, inasmuch as the discovery sought by the *Federal Insurance* plaintiffs is relevant to the jurisdictional theories of the remaining plaintiffs, the *Ashton* and *Burnett* Plaintiffs join in the request for that targeted jurisdictional discovery.  In addition, because the theories of jurisdiction as to NCB directly implicate the conduct and knowledge of former NCB executives, themselves defendants with their own motions to dismiss pending, the *Ashton* and *Burnett* Plaintiffs join in the request that the Court order simultaneous discovery and resolution of those jurisdictional contests.

**(1) The *Burnett, Ashton, O'Neill, Cantor, Continental, and N.Y. Marine* Plaintiffs should be permitted to complete specific jurisdictional discovery related to Plaintiffs' newly acquired evidence and newly produced evidence that NCB submitted in support of its motion.**

   **(a)**     **New Documents Acquired by the Plaintiffs.**

The Plaintiffs recently acquired copies of two French government diplomatic cables, dated July 19 and 21, 1999.  Haefele Affidavit, Exhibits 1 and 2.  These cables make clear that U.S. and French intelligence authorities were aware at that time that an investigation of the National Commercial Bank and its CEO, Khaleed Bin Mahfouz, undertaken by the Saudi government implicated the bank in several transfers benefiting organizations supporting Osama bin Laden's terrorist activities.  The first cable explains that "Saudi authorities have undertaken, since the end of 1998, a series of investigations targeting the principal financial establishments of the Kingdom in order to determine their possible implication in the financing of terrorist organizations…."  The cable further indicates that "A summary of the Saudi government investigative report concerning the National Commercial Bank has been transmitted by the American services. It makes reference to transfers executed for the benefit of [IIRO], created out of the Muslim World League, and reputedly close to the terrorist chief Osama Bin Laden."  The cable also comments that, "[a]ccording to [American] sources, [Bin Mafouz] still has personal and family contacts with Osama Bin Laden."  Haefele Affidavit, Exhibit 1 (diplomatic cable transmission from Ambassador Poletti, dated July 19, 1999, MR-FRE003225).

---

[2] *Federal Insurance Co. v. Al Qaida*, 04-cv-7280 (GBD) ; *Estate of John P. O'Neill, Sr., et al., v. Al Baraka Inv. & Dev. Corp., et al.*, 1:04-cv-1923 (GBD); *New York Marine and Gen. Ins. Co. v. Al Qaida, et al.*, 1:04-cv-6105 (GBD); *Continental Cas. Co., et al., v. Al Qaeda Islamic Army, et al.*, 1:04-cv-5970 (GBD); *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 1:04-cv-7065 (GBD).

The second cable simply makes reference to and attaches the summary information about the investigation that was referenced in the earlier cable. Haefele Affidavit, Exhibits 2 (diplomatic cable transmission from Poletti, dated July 21, 1999, MR-FRE003226).

A copy of the document attached to the second cable was contained in Request #46 of Plainitffs First Set of Jurisdictional Requests for Production of Documents, dated February 18, 2005. The document prompted the Court to direct NCB, fairly narrowly, to produce an audit of NCB conducted by SAMA. Given the new context presented by the two newly obtained French diplomatic cables, Plaintiffs ask that the Court direct NCB to produce any information in its control that concerns any investigation of NCB, Khaleed Bin Mahfouz, or other officers or directors of NCB, performed by Saudi authorities – including but not limited to SAMA, the Saudi Ministry of Interior, the General Directorate for Investigations, the Mabahith, or any other Saudi authority – during the time period from 1990 until 2003. The documents should include not only internal documents concerning any such investigations, but should also include documents that were provided to or received from any such investigating authority.

### (b) NCB New Affidavits and Documents in Support of Its Motion.

As part of NCB's Renewed Motion to Dismiss (filed July 22, 2008), NCB attached over one thousand pages of exhibits, including previously unproduced documents, as well as affidavits and declarations of NCB employees that were not previously disclosed and have not been subject to cross-examination. Included are affidavits from NCB employees whom the Plaintiffs had previously requested to depose. Specifically, the Plaintiffs wrote directly to Patton Boggs on November 7, 2006, requesting the deposition of Thomas Krohley or a person most knowledgeable of NCB's presence in the United States. As a result of that request, Lawrence Smith was eventually put forward by NCB as the person knowledgeable of "how NCB and potentially SNCB operated in New York." Haefele Affidavit, Exhibit 3 (Transcript of March 23, 2007, at p. 37).

However Mr. Smith was less than informative about SNCB, stating at his deposition: "I never did any work for SNCB. (Transcript of Smith Deposition at 38:14) I had nothing to do with SNCB, so I don't know (Transcript of Smith Deposition at 46:2-3). . . I didn't have any understanding what SNCB did. (Transcript of Smith Deposition at 47:25-48:1)." Instead of providing testimony from the witness NCB put forward on the subject, NCB has instead provided three affidavits from other current or former NCB employees, who were never offered for deposition.

After it became clear from Mr. Smith's deposition that either he knew little or was less than candid about NCB's banking operations after 1992, the Plaintiffs renewed their request to depose Thomas Krohley, in a letter to Judge Maas on August 7, 2007. However, in its letter opposing Plaintiffs' request, NCB responded that "the Court should not authorize depositions of former SNCB employees *because their testimony cannot possibly lead to evidence relevant to personal jurisdiction over NCB.*" Haefele Affidavit, Exhibit 4 (August 13, 2007 letter from Ron Liebman to Judge Maas, at page 3)(emphasis added). Judge Maas denied the Plaintiffs' request;

3

Plaintiffs objected to the September 19, 2007 Order to Judge Daniels on October 1, 2007, again requesting Thomas Krohley's deposition. This appeal was denied by Judge Daniels.

Mr. Krohley's affidavit is an egregious example not only because of NCB's previous representation that any testimony from him would be irrelevant, but also because at the time that NCB's lawyers were arguing that his testimony was irrelevant, they already had Mr. Krohley's affidavit in hand and were planning on using it as part of NCB's renewed motion to dismiss. Mr. Krohley's affidavit was notarized on June 22, 2007, during the same time period that NCB was arguing whether his deposition should be taken and several months before NCB argued in its August 13 letter that his testimony would be irrelevant. In his affidavit, Mr. Krohley comments that NCB's counsel assisted him in phrasing the affidavit and had advised him that it would be used in support of NCB's renewed motion to dismiss. Krohley Affidavit at ¶¶ 1, 2. Accordingly, both Mr. Krohley and NCB counsel were aware at the time that they were arguing against Mr. Krohley's deposition that they intended to submit sworn statements from him in support of NCB's renewed motion to dismiss.

NCB has now submitted the affidavits of Thomas Krohley, Jorge Juco[3], and Abubaker Ali Bagabir, all previously undeposed individuals, in support of its renewed motion to dismiss. Through those affidavits, NCB makes various factual assertions that Plaintiffs have not been permitted either to challenge or test, resulting in a fundamental denial of due process. *Gersten v. Senkowski*, 426 F.3d 588, 612 (2nd Cir. 2005), *cert.* denied by *Artus v. Gersten*, 547 U.S. 1191 (2006), *citing Hollis v. Smith*, 571 F.2d 685, 694 (2d Cir.1978). Accordingly, an extension of time should either include time for the Plaintiffs to depose Thomas Krohley, Jorge Juco, and Abubaker Ali Bagabir, or at the very least strike their affidavits and their attachments from NCB's motion papers.

**(2) The *Burnett, Ashton, O'Neill, Cantor, Continental and N.Y. Marine* Plaintiffs have outstanding discovery requests and the Plaintiffs' obligation to respond to NCB's motion to dismiss should be extended until after NCB has fully complied with those outstanding discovery requests.**

The extension requested would allow for the Plaintiffs to receive responses to outstanding jurisdictional discovery requests. In the Court's July 11, 2008 Order, the Court clearly envisioned the possibility that *additional* jurisdictional discovery may be necessary once NCB filed its renewed motion to dismiss; but in so recognizing that possibility, the Court apparently inadvertently overlooked the fact that certain jurisdictional discovery requests are presently outstanding and, because NCB has refused to respond to those requests, they are the subject of motions to compel pending before the Court. Specifically, on October 13, 2007, the *Ashton* and

---

[3] Mr. Juco states that his declaration in based, in part, on statements of "other [unidentified] NCB personnel who have knowledge about specific matters addressed in [his] declaration." Juco Declaration, at ¶ 1. Without knowing the other individuals' identities or the extent of Mr. Juco's own knowledge versus his reliance on others, Plaintiffs cannot properly assess the appropriate approach to the information for which Mr. Juco relied upon others, includng the need to engage in discovery concerning the other individuals or striking those portions of Mr. Juco's testimony, and accordingly reserve that issue.

*Burnett* Plaintiffs served on NCB discovery requests targeted to obtain information regarding NCB's involvement in the aviation business in the United States and regarding a trust account that NCB held for the benefit of Osama Bin Laden. NCB responded on November 13, 2007 and objected to this request and provided no information. Plaintiffs filed a Motion to Compel on December 20, 2007, which remains pending.

Plaintiffs anticipate that NCB will adopt its pattern of citing to self-serving affidavits proffered in a manner carefully calculated to avoid any cross-examination, to avoid responding to discovery requests in a proper manner. In its initial decision regarding NCB, the Court denied NCB's motion to dismiss and granted jurisdictional discovery because the record consisted of self-serving affidavits that had never been subject to cross-examination. *In Re: Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 792 (S.D.N.Y. 2005); *see also In Re: Terrorist Attacks on September 11, 2001*, Discovery Order (June 28, 2006) at 2. Notwithstanding the rationale for the Court's determination, throughout the jurisdictional discovery process, NCB has produced mountains of selected documents to respond to unidentified discovery requests and avoided responding to multiple inquiries by pointing to lawyer-crafted, self-serving affidavits and interrogatory responses. Rather than being permitted to hide behind such untested, self-serving submissions – many which were never produced to the plaintiffs during discovery – NCB should be required to respond fully and completely to Plaintiffs' discovery requests without mere reliance on the same type of "evidence" previously questioned by the Court's original opinion. To do otherwise would require the parties to approach the Court in little different position than they did in the first motion to dismiss.

**(a) NCB's Aviation Division – Plaintiffs Are Entitled to Discovery Regarding NCB's Aviation Division Notwithstanding NCB's Unchallenged, Self-Serving Affidavits to the Contrary.**

Regarding NCB's aviation business – which has gone by various names including NCB Aviation, Mid-East Jet and Skyways International – Plaintiffs, in their jurisdictional discovery responses have produced to NCB substantial information clearly raising the question of fact as to whether NCB has owned or operated an aviation division in the United States; NCB should not be permitted to simply dispel the question by baldly denying its truth. Although Plaintiffs have no obligation to provide evidentiary support to obtain discovery of facts relevant to Plaintiffs theories of personal jurisdiction, Plaintiffs have provided ample support for their requests for discovery concerning NCB's aviation division.[4]

Proof demonstrates that NCB has had an Aviation Department that has operated within the United States since at least the mid-1990's and apparently as late as 2002 or 2003. One item of proof produced as to the existence of an aviation department within NCB is a business card of an employee of NCB Aviation Department – Skyways International. Haefele Affidavit, Exhibit 5 (NCB Aviation Department—Skyways International Business Card). In fact, as late as January 2008, Saudi Arabian Airlines listed NCB Aviation as being a private domestic client. Haefele

---

[4] For a summary of the Aviation business evidence see Plaintiffs Letter to Judge Daniels of April 25, 2008.

Affidavit, Exhibit 6 (Saudi Arabian Airlines archived website
(http://web.archive.org/web/20080116014739/www.saudiairlines.com/catering/airlineserved.jsp
) (January 16, 2008).[5] The business card not only indicates that NCB had an aviation
department, but also relates the business to the entity known as Skyways International. Haefele
Affidavit, Exhibit 5 (NCB Aviation Department—Skyways International Business Card).
Skyways International, the aviation company with which NCB eschews any relation, once
operated as a Texas corporation, with offices registered in Austin, Texas. Haefele Affidavit,
Exhibit 7 (Skyway International Registration, Texas Secretary of State, 2003). At that time, the
Chairman of the company was Lawrence G. Smith, who was at the same time – as this Court is
aware from observing his deposition in this case – Executive Vice-President of NCB and advisor
to Khalid bin Mahfouz.. *Id.*; Haefele Affidavit, Exhibit 8 (Transcript of Lawrence G. Smith
7/27/07 Deposition, at 133:11-15).

The proof also indicates that the NCB Aviation Department has also operated as Mid East
Jet, with a business address listed as NCB Building Al Khaldiah, Prince Abdullah Street, Jeddah,
Saudi Arabia, Middle East. Defendant Khalid bin Mahfouz, former chairman of NCB who the
plaintiffs allege was ousted by the Saudi government following an investigation that concluded
he was supporting Osama bin Laden, has also been identified as the Chairman and Chief
Executive Officer of Mid East Jet. Haefele Affidavit, Exhibits 9 and 10 (Dun & Bradstreet
WorldBase Report of Mid East Jet, October 30, 2003 and ICP Update dated October 26, 2005).
The same Dun & Bradstreet report identifies Nadeem Farouki as the General Manager of Mid
East Jet. In addition, a June 10, 2005 Dun & Bradstreet WorldBase Report of Mid East Jet
identifies Nadim Farouki as the Operation Manager for Mid East Jet. Haefele Affidavit, Exhibit
11 (Dun & Bradstreet WorldBase Report of Mid East Jet, June 10, 2005; *see also* Exhibit 10,
*supra*, ICP Update dated October 26, 2005).

The same address used for NCB Aviation and Mid East Jet is also used for Skyways
International on a credit card receipt of a Skyways International employee in September 2002.
Haefele Affidavit, Exhibit 12 (September 1, 2002 Hotel Receipt of Muhammad Tahsin). In a
series of documents indicating hotel stays at a Paris hotel in 2001 and 2002, Mr. Tahsin is
identified as an employee of Skyways International. On a receipt for one of the stays in
September 2002, the same address indicated for Mid East Jet is identified for Skyways
International – namely, P.O. Box 9935, Jeddah, Saudi Arabia.

The proof also indicates that the NCB Aviation Department – Skyways International was
operating out of the same offices as Mid East Jet. One facsimile transmittal bearing indicia that
it came from an NCB Aviation employee in the Jeddah office of "Ndeem Farooqui," lists the
"complete address" of the NCB Aviation Department as "The National Commercial Bank,
Aviation Department, 3rd Floor, NCB Khalidiyah Branch Bldg., Prince Abdullah Street, District
Khalidiyah, P.O. Box 9935, Jeddah 21423, Saudi Arabia." Haefele Affidavit, Exhibit 13
(December 23, 1997 facsimile transmittal of Ndeem Farooqui). Except for transliteration

---

[5] The website has since been reconfigured and NCB Aviation has been deleted and Mid-East Jet has been added. See
the Partners link of http://www.saudiacatering.com.

differences typical in translating from Arabic to English, not only is the address identical to the address identified for Mid East Jet, but the facsimile header indicates that it was sent from Mr. Farouki, Mid East Jet's General Manager.

The proof also indicates that NCB Aviation has been operating in the United States as Mid East Jets and as Skyways International. The attached excerpts from the United States Federal Aviation Administration's database of U.S. Reduced Vertical Separation Minimum (RVSM) Approvals, as of January 2008, indicate that at least six Mid East Jet aircraft were approved or successfully monitored by the FAA in the past three years. Haefele Affidavit, Exhibit 14 (Excerpts of U.S. RVSM Approvals, January 18, 2008, pages 1, 8 and 9). Excerpts from FAA Flight Tracking Data of flights with tail numbers of the NCB aircraft shows more than 130 flights into United States airspace between 2000 and 2002. Haefele Affidavit, Exhibit 15 (excerpts of FAA Flight Tracking Data). In addition, Skyways International pilots have been U.S. residents with FAA certifications. For example, Keith Monroe, a National Commercial Bank Aviation Department flight engineer (*see* Haefele Affidavit, Exhibit. 5, NCB Aviation Department business card), resided in the United States and was registered and certified by the FAA. Haefele Affidavit, Exhibit 16 (Monroe FAA certification). Other Skyways International employees were similarly registered and/or certified by the FAA. *See, e.g.*, Haefele Affidavit, Exhibit 17 (February 18, 1998 facsimile transmittal of NCB Aviation identifying list of NCB Aviation crew, including "Buddy" Rogers and Johnny Antoon); Exhibit 18 (Rogers FAA Registration), Exhibit 19 (Antoon FAA certification). In addition, the FAA registered Skyway International employee Muhammad Tahsin at the Jeddah, Saudi Arabia address of Mid East Jets (P.O. Box 9935, Jeddah, Saudi Arabia) and certified him. Haefele Affidavit, Exhibit 20 (Tahsin FAA certification). Skyways International employee Tahsin was also identified in December 2002, by the U.S. Customs Service to French authorities as being suspected of having provided financially support to Ahmed al Ghamdi, one of the September 11, 2001 hijackers. Haefele Affidavit, Exhibit 21 (U.S. Customs December 30, 2002 correspondence).

Given the ample evidence Plaintiffs have produced that NCB Aviation has been operating in the United States as Mid East Jets and as Skyways International, including extensive documentation from several FAA databases, the Plaintiffs' requests cannot be dismissed with NCB's mere denials. Far too many interconnections exist among NCB, Skyways International, and Mid East Jets and their contacts with the United States, for defendant NCB's self-serving affidavits to simply dismiss the notion that NCB had any connection with the aviation business. Accordingly, NCB should be ordered to comply fully with the previous discovery requests and the plaintiffs' obligation to respond to NCB's motion to dismiss should be extended until after NCB has fully complied with those requests.

### (b) NCB Account for the benefit of Osama Bin Laden – Plaintiffs Are Entitled to Discovery Regarding NCB's Account held for the benefit of Osama Bin laden.

The other issue that was the subject to the discovery served on October 13, 2007, was the issue of the account at NCB which has been identified in certain documents as being for the benefit of Osama bin Laden. Notwithstanding the various characterizations of the account, the

documents reference that the value of Osama bin Laden's interests were to be placed into an account at NCB "to protect the aforementioned interest" until such time as Osama bin Laden returns to the Kingdom of Saudi Arabia. Haefele Affidavit, Exhibit 22 (SBG documents filed under seal). NCB has access to the documents related to that account and it could hardly be considered an undue burden on NCB to produce the documents regarding that single account. Accordingly, NCB should likewise be ordered to comply fully with the previous discovery requests concerning the NCB account holding the value of Osama bin Laden's interests and the plaintiffs' obligation to respond to NCB's motion to dismiss should be extended until after NCB has fully complied with those requests.

**(3) The *Federal Insurance* Plaintiffs should commence and complete the targeted jurisdictional discovery referenced in their applications, placing the *Federal Insurance* case in the same procedural posture as the other cases vis-à-vis NCB.**

For the reasons expressed in the Federal Insurance Plaintiffs' submission to the Court, the *Ashton* and *Burnett* Plaintiffs join in the *Federal Insurance* Plaintiffs' submission. Allowing all of the Plaintiffs to conduct and conclude the referenced jurisdictional discovery simultaneously furthers the Court's goal of moving the cases forward on a consolidated and expedient basis, without prejudicing either the Plaintiffs or NCB.

**(4) Because the theories of jurisdiction as to NCB directly implicate the conduct and knowledge of former NCB executives, themselves defendants with their own motions to dismiss pending, the Court should permit simultaneous discovery and resolution of those jurisdictional contests.**

For the reasons expressed in the *Federal Insurance* Plaintiffs' submission to the Court, the *Ashton* and *Burnett* Plaintiffs join in the *Federal Insurance* Plaintiffs' submission.

## CONCLUSION

For the foregoing reasons and the reasons expressed by the other plaintiffs in their independent submissions, the *Ashton* and *Burnett* Plaintiffs respectfully request that the Court grant an extension of time for the Plaintiffs to respond to NCB's renewed motion to dismiss until 60 days after the full completion of the targeted jurisdictional discovery referenced herein, including within the other plaintiffs' applications. The Court should order NCB to respond fully and completely to the targeted discovery and should order the production of the witnesses whose depositions have been sought. As to those witnesses whose affidavits or declarations have been offered in support of NCB's motion, to the extent that those individuals are not permitted to be deposed, their affidavits or declarations should be stricken.

Respectfully Submitted,

By: *James P. Kreindler*
James P. Kreindler, Esq. (JK7084)
Justin T. Green, Esq. (JG0318)

Marc S. Moller, Esq. (MM0143)
Andrew J. Maloney, Esq. (AM8684)
100 Park Avenue
New York, New York 10017
Phone:  (212) 687-8181
Facsimile:  (212) 972-9432


MOTLEY RICE LLC

By:_____
Ronald L. Motley, Esq.
Jodi Westbrook Flowers, Esq.
Michael Elsner, Esq.
Robert Haefele, Esq.
28 Bridgestone Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Phone: (843) 216-9000


cc:    Mitchell Berger, Esq. - Patton Boggs (Counsel for NCB)
       Plaintiffs Executive Committee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE: TERRORIST ATTACKS ON                    03 MDL No. 1570
SEPTEMBER 11, 2001

---

**This document relates to:**
*Burnett, et al. v. Al Baraka Inv. & Dev. Corp., et al, Case No. 03 CV 9849 (GBD)(FM)*
*Ashton, et al. v Al Qaeda Islamic Army, et al., Case No. 02 CV 6977 (GBD)(FM)*

### AFFIDAVIT OF ROBERT T. HAEFELE

I, Robert T. Haefele, state the following:

1.      I am an attorney admitted to practice *pro hac vice* before this Court and an Associate at the firm of Motley Rice LLC, counsel for Plaintiffs in *Burnett, et al. v. Al Baraka Investment & Development Corp., et al.*, Civil Action Nos. 03 CV 9849.  I submit this affidavit to provide the Court with the exhibits referenced in the *Ashton* and *Burnett* Plaintiffs' letter dated August 15, 2008, in support of the *Ashton* and *Burnett* Plaintiffs' request for an extension of time to respond to NCB's "renewed" motion to dismiss.

2.      Attached are true and correct copies of Plaintiffs' exhibits identified as follows in the *Ashton* and *Burnett* Plaintiffs' letter dated August 15, 2008:

   a)  Exhibit 1 – a copy of a Diplomatic Cable transmission from Ambassador Poletti, dated July 19, 1999, and a certified translation of the transmission.

   b)  Exhibit 2 – a copy of a Diplomatic Cable transmission from Ambassador Poletti, dated July 21, 1999, and a certified translation of the transmission.

   c)  Exhibit 3 – a copy of the March 23, 2007 transcript of the hearing before the Honorable Magistrate Judge Frank Maas, in the above-referenced litigation, at page 37.

d) Exhibit 4 – a copy of the August 13, 2007 letter from Ronald Liebman to Judge Maas, at page 3.

e) Exhibit 5 – a copy of an NCB Aviation Department – Skyways International Business Card.

f) Exhibit 6 – a copy of the Saudi Arabian Airlines archived website, dated January 16, 2008.

g) Exhibit 7 – a copy of the Skyway International Registration, Texas Secretary of State, 2003.

h) Exhibit 8 – a copy of the transcript of the deposition of Lawrence G. Smith in the above referenced litigation, taken on July 27, 2007, at page 133.

i) Exhibit 9 – a copy of Dun & Bradstreet WorldBase Report of Mid East Jet, October 30, 2003.

j) Exhibit 10 – a copy of ICP Updated dated October 26, 2005.

k) Exhibit 11 – a copy of Dun & Bradstreet WorldBase Report of Mid East Jet, June 10, 2005.

l) Exhibit 12 – a copy of a September 1, 2002 Hotel Receipt of Muhammad Tahsin.

m) Exhibit 13 – a copy of a December 23, 1997 facsimile transmittal of Ndeem Farooqui.

n) Exhibit 14 – a copy of excerpts of FAA U.S. RVSM Approvals dated January 18, 2008, pages 1, 8 and 9.

o) Exhibit 15 – a copy of excerpts of FAA Flight Tracking Data.

p) Exhibit 16 – a copy of an FAA certification of Keith Wyndham Monroe.

q) Exhibit 17 – a copy of a February 18, 1998 facsimile transmittal of NCB Aviation identifying a list of NCB Aviation crew, including "Buddy" Rogers and Johnny Antoon.

r) Exhibit 18 – a copy of an FAA Registration of Buddy Rogers.

s) Exhibit 19 – a copy of an FAA certification of Johnny Issac Antoon.

t) Exhibit 20 – a copy of an FAA certification of Muhammad Tahsin.

u) Exhibit 21 – a copy of US Customs correspondence, dated December 30, 2002.

v) Exhibit 22 – documents that are subject to a confidentiality agreement with defendant the Saudi Binladin Group, Bates labeled T0000024, T0000025, T0000038 and T0000042, and pursuant to that agreement shall be filed under seal.

I declare under penalty of perjury that the foregoing is true and correct, based on my knowledge, information and belief.

Executed on August 11, 2008,

in Mount Pleasant, South Carolina

_____
Robert T. Haefele

3

EXHIBITS 1 & 2

Diplomatic Cable Transmissions from Ambassador Poletti

dated July 19, 1999 & July 21, 1999

Case 1:03-md-01570-GBD-SN  Document 2159-2  Filed 02/23/09  Page 15 of 41



**GO GLOBAL WITH CONFIDENCE**™

# TRANSLATION CERTIFICATION

### For Translation From French into English

I, the undersigned, being first duly sworn, declare:

- That I, Kenneth Zwerdling, am the CEO of Foreign Translations, Inc.
- That our translator, Jane Wolfrum, is certified by the American Translators Association and is proficient in French to English translation.
- That our translator, Jane Wolfrum, has translated and edited the following document for Motley Rice, LLC:

Pieces 803-807 - MR-FRE003224-28

HERETO:

I certify that our translator, Jane Wolfrum, has translated and edited the above-mentioned document. I further certify that said documents are, to the best of my knowledge and belief, true and correct translations.

_____           _____
Ken Zwerdling – CEO                             8/1/08
Foreign Translations, Inc.                        Date

**www.foreigntranslations.com**

Foreign Translations, Inc.   55 Beattie Place   Suite 205   Greenville, SC 29601 USA   800-774-5986   translations@foreigntranslations.com

**00803**

Declassified evidence
<u>Annex 3</u>

MR-FRE003224

**00804**

TD RIYADH 142                                                    7/19/1999

---

**CONFIDENTIAL DIPLOMACY**

MIN PR1 PM1 CM1 CM2 CM3 SG SGA SGP

CMC

---

[TD] RIYADH 142                          JULY 19, 1999
                                         [1217 DE 16-3799 6 HH65]

                    RIYAD

URGENT
CONFIDENTAL DIPLOMATIC NUMBER
ORIGIN: AMBASSADOR
NB: DISTRIBUTION MESSAGE
        AD DIPLOMACY [159]
NB DIPLOMACY CM3 – CMC – PR – PM
NB [CDINT]
NB
NB
NB TRANSMISSION OF INFORMATION
TXT

SUBJECT: INFORMATION COMING FROM THE CENTRAL SAUDI BANK RELATED TO THE IMPLICATION OF A BANKER IN THE FINANCING OF TERRORISM.

SUMMARY: AN INVESTIGATION OF THE CENTRAL SAUDI BANK (SAMA) AND SAUDI INTELLIGENCE SERVICES REVEAL THE IMPLICATION OF A BANKER KHALEED BIN MAHFOUZ, DIRECTOR OF NATIONAL COMMERCIAL BANK, IN SEVERAL TRANSFERS BENEFITTING ORGANIZATIONS LINKED TO THE TERRORISM OF OSAMA BIN LADEN.

                                         XXX

THE SAUDI AUTHORITIES HAVE UNDERTAKEN, SINCE THE END OF 1998, A SERIES OF INVESTIGATIONS TARGETING THE PRINCIPAL FINANCIAL ESTABLISHMENTS OF THE KINGDOM IN ORDER TO DETERMINE THEIR POSSIBLE IMPLICATION IN THE FINANCING OF TERRORIST ORGANIZATIONS, FOLLOWING INFORMATION OBTAINED FROM AN AMERICAN SOURCE.

THE QUESTION WAS ADDRESSED AT THE HIGHEST LEVEL DURING INTERVIEWS WITH AMERICAN AUTHORITIES. THE SAUDI PARTY FOR A LONG TIME HAVING REFUSED TO SUPPORT INVESTIGATIONS AGAINST BANKS IN THE KINGDOM, THE CROWN PRINCE ABDALLAH ALLEGEDLY PERSONALLY GAVE HIS GREEN LIGHT AND INTERVENED IN THIS WAY.

A SUMMARY OF THE INVESTIGATION REPORT OF THE SAUDI AUTHORITIES CONCERNING THE NATIONAL COMMERCIAL BANK WAS TRANSMITTED BY THE AMERICAN AUTHORITIES. IT MAKES REFERENCE TO TRANSFERS EXECUTED FOR THE BENEFIT OF THE ORGANIZATION ISLAMIC RELIEF WORLDWIDE, CREATED OUT OF THE MUSLIM WORLD LEAGUE, AND REPUTEDLY CLOSE TO THE TERRORIST CHIEF OSAMA BIN LADEN.

ACCORDING TO THE SAME SOURCES, THE PRINCIPAL DIRECTOR OF THE NATIONAL COMMERCIAL BANK, ALREADY IMPLICATED IN THE BCCI BANK SCANDAL, STILL HAS PERSONAL AND FAMILY CONTACTS WITH OSAMA BIN LADEN.
SIGNED: POLETTI

Certified copy conforming with the original
The Clerk of Court

# 00805

TD RIYADH 159                                        7/21/1999 9:28 am - 107653

---

**CONFIDENTIAL DIPLOMACY**

MIN
-PR1 PM1 CM1 CM2 CM3 SG SGA SGP
-CMC

---

TD RIYADH 159                    JULY 21, 1999

           RIYADH        1217 July 21, 1999 at [4:18 pm]

URGENT
CONFIDENTAL DIPLOMATIC NUMBER
ORIGIN: AMBASSADOR
NB: DISTRIBUTION MESSAGE
        AD DIPLOMACY [142]
NB DIPLOMACY CM3 – CM[C] – PR – PM
NB CDINT
NB
NB
NB TRANSMISSION OF INFORMATION
TXT

SUBJECT: IMPLICATION OF A SAUDI BANKER IN THE FINANCING OF TERRORISM

REFERENCE: TD RIYADH 142

SUMMARY OF INFORMATION FROM THE SAUDI CENTRAL BANK (SAMA) INVESTIGATION ON THE NATIONAL COMMERCIAL BANK IN ANNEX, COMMUNICATED TODAY.
SIGNED: POLETTI

Certified copy conforming with the original
The Clerk of Court

MR-FRE003226

# CONFIDENTIAL

TRANSLATION

Summary of the Saudi National Commercial Bank Audit Report
SAMA SOURCE /AS

[Excerpts from the report]

-------- Audit conducted with the NCB audit committee and
Zakat Committee during the second half of year 1998.

-------- The focus of the report concerns Islamic banking
practices, Islamic charities accounts and operations within
the bank. Accountability practices where also reviewed for
establishing a higher control over general operations of
the bank by the Saudi authorities.

-------- Preliminary indications show operational revenues
to reach SR 6,113.6 million, up from SR 5,675.2 million in
1997. Operational expenditures in 1998 are estimated to SR
5,127.9 million, up from SR 4,699.7 million in the
preceding year.

Figures show a 2 per cent rise in net income to SR 1,062
million in 1998.

A net profit of SR 1,043.3 million was reported in 1997, up
from SR 915 million in 1996, or an increase of SR 128.3
million.

Loans, advances and discounts (net) stood at SR 56,414.4
million, up from SR 48,295.1 million in 1997. Customer
deposits increased to SR 65,743.6 million from SR 61,039.1
million in the year before.

Both assets and liabilities of the bank are balanced at SR
92,930.5 million, up from SR 86,438.1 million on the
corresponding date of 1997. Contra accounts totalled SR
89,488.8 million down from SR 90,029.5 million in the year
before.

The volume of its loan portfolio amounted at SR56.4 billion
compared to SR46.3 billion in 1997. The investment

MR-FRE003227

# CONFIDENTIAL

portfolio also increased from SR16.9 billion to SR19.2 billion.

The total deposits are estimated at SR65.7 billion against SR61.9 billion in 1997 with an increase of SR3.8 billion (6.2 percent).

Shareholders' equity increased to SR 8,027.6 million in 1998 from SR 7,786.7 million in 1997. The equity consisted of SR 6,000 million as paid up capital, SR 2,027.6 million as statutory reserve and SR 0.4 million as retained profits.

NCB's total assets at SR92.9 billion in 1998 against SR86.4 billion in the previous year, registering an increase of SR6.5 billion (7.5 percent).

The board of directors proposed to distribute SR 821.5 million as dividends to shareholders for 1998.

.......... However, current trends show that a provision of SR 646.8 million will be needed to offset losses resulting from doubtful debts, compared to a sum of SR 450.5 million in 1997.

In addition to oil prices impact, the loan loss provision have negatively affected the bank profits since 1996.

.......... We invite to a rapid relocation of assets and a reduction of loans and advances.

The overall result of these two movements will have a beneficial effect on the bank's capital and liquidity ratios, since loans and advances now represent 60 per cent.

.......... Given the current market conditions, the public quotation of NCB will increase the negative impact of the current figures, while 1997 results were already affected by the allocation of SR 450.5 million to offset losses of doubtful debts, which is almost the same as the amount of SR 450.6 million earmarked for doubtful debts in 1996.

.......... Last year economic conditions were as follows : Operational revenues of the bank in 1997 stood at SR 5,675.2 million, up from SR 5,320.3 million in 1996, while operational expenditures rose to SR 4,699.7 million from SR 4,351.2 million in 1996. Both assets and liabilities of the bank as on December 31, 1997 were balanced at SR 86,438.1

MR-FRE003227

# CONFIDENTIAL

million, up from SR 88,052.5 million on the corresponding date of 1996. Contra accounts, however, dropped to SR 87,816.4 million in 1997 from SR 124,192.7 million in 1996.

- - - - - - - - Loans and advances (net) stood at SR 46,290.1 million, up from SR 38,171 million in 1996. Customers deposits reached SR 61,929.1 million from SR 58,304 million in 1996.

- - - - - - - - Shareholders' equity slightly rose to SR 7,786.7 million from SR 7,654.8 million in 1996. The equity consisted of SR 6,000 million as capital, SR 1,761.6 million as statutory reserves and SR 25 million as retained profits.

- - - - - - - - The board of directors proposed to distribute the profits as follows:

- - - - - - - - - - - - - - - - - - SR 260.8 million to the statutory reserves,
- - - - - - - - - - - - - - - - - - SR 442.6 million to the partners before transformation of the bank into a joint stock company,
- - - - - - - - - - - - - - - - - - SR 300 million to be distributed as dividends among shareholders,
- - - - - - - - - - - - - - - - - - SR 16.7 million as Zakat,
- - - - - - - - - - - - - - - - - - SR 25 million to be carried forward.

- - - - - - - - Offset losses from doubtful debts resulted from irregularities due to extensive and unreported loans and advances granted by and for the bank's directors.

- - - - - - - - As such, without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organizations, along with banking facilities that were not reviewed by the Committees.

- - - - - - - - Direct donations were received through those facilities to the Red Crescent Saudi Committee, International Islamic Relief Organisation and Muwafaq Foundation.

- - - - - - - - Muwafaq charity received SR 11.38 million in loans and deposit.

- - - - - - - - NCB established special relations with the Saudi Joint Relief Committee for Kosovo and Chechnya and maintained two shared accounts with Al Rajhi Bank for the

MR-FRE003228



CONFIDENTIAL

Joint Relief Committee and International Islamic Relief
Organization donations in Kosovo and Chechnya.

........   The special accounts were not authorized nor
reviewed neither by the Audit Division nor by the Zakat
Committee in 1998. SR 279.5 million were transferred
through these two accounts to the International Islamic
Relief.

... ......   We stress the importance of establishing clear
rules for account managers in order to implement severe
control procedures due to the international context,
especially when dealing with charitable organisations.

MR-FRE003228

**TD RIYAD 142**

19.07.1999  14H03 - 134562

**00804**

---

**CONFIDENTIEL DIPLOMATIE**

MIN
- PR1 PM1 CM1 CM2 CM3 SG SGA SGP
- CMC

---

TD RIYAD 142                    LE 16 JUILLET 1999
            RIYAD :      1217  LE 16/07/99 A 11H05

URGENT
CHIFFRE CONFIDENTIEL DIPLOMATIE
ORIGINE : AMBASSADEUR
NB : DISTRIBUTION MESSAGE
    AD DIPLOMATIE 142
NB : DIPLOMATIE : CM3 – CMC – PR – PM
NB : CDINT
NB :
NB :
NB : TRANSMISSION D'INFORMATIONS
TXT :

OBJET : INFORMATIONS EN PROVENANCE DE LA BANQUE CENTRALE SAOUDIENNE RELATIVES A L'IMPLICATION D'UN BANQUIER DANS LE FINANCEMENT DU TERRORISME.

RESUME : UNE ENQUETE DE LA BANQUE CENTRALE SAOUDIENNE (SAMA) ET DES SERVICES DE RENSEIGNEMENT SAOUDIENS REVELERAIT L'IMPLICATION DU BANQUIER KHALEED BIN MAHFOUZ, DIRIGEANT DE NATIONAL COMMERCIAL BANK, DANS PLUSIEURS TRANSFERTS AU PROFIT D'ORGANISATIONS LIEES AU TERRORISTE OUSSAMA BEN LADEN.

X X X

LES AUTORITES SAOUDIENNES ONT ENTREPRIS DEPUIS LA FIN DE L'ANNEE 1998, UNE SERIE D'ENQUETES VISANT LES PRINCIPAUX ETABLISSEMENTS FINANCIERS DU ROYAUME AFIN DE DETERMINER LEUR EVENTUELLE IMPLICATION DANS LE FINANCEMENT D'ORGANISATION TERRORISTES, SUIVANT DES INFORMATIONS OBTENUES DE SOURCE AMERICAINE.

LA QUESTION A ETE ABORDEE AU PLUS HAUT NIVEAU LORS D'ENTRETIENS AVEC LES AUTORITES AMERICAINES, LA PARTIE SAOUDIENNE AYANT LONGTEMPS REFUSE DE DILIGENTER DES ENQUETES CONTRE LES BANQUES DU ROYAUME. LE PRINCE HERITIER ABDALLAH AURAIT PERSONNELLEMENT DONNE SON FEU VERT ET SERAIT INTERVENU EN CE SENS.

UNE SYNTHESE DU RAPPORT D'ENQUETE DES AUTORITES SAOUDIENNES CONCERNANT LA NATIONAL COMMERCIAL BANK A ETE TRANSMISE PAR LES SERVICES AMERICAINS, ELLE FAIT REFERENCE A DES TRANSFERTS OPERES AU PROFIT DE L'ORGANISATION DE SECOURS ISLAMIQUE MONDIAL, ISSUE DE LA LIGUE ISLAMIQUE MONDIALE, ET REPUTEE PROCHE DU CHEF TERRORISTE OUSSAMA BEN LADEN.

SELON LES MEMES SOURCES, LE PRINCIPAL DIRIGEANT DE LA NATIONAL COMMERCIAL BANK, DEJA IMPLIQUE DANS LE SCANDALE DE LA BANQUE BCCI, ENTRETIENDRAIT ENCORE DES LIENS PERSONNELS ET FAMILIAUX AVEC OUSSAMA BEN LADEN.
SIGNE : POLETTI

Copie certifiee conforme
à l'original
Le Graffier

**29863.001**

MR-FRE003225

MR-NCB003257

**TD RIYAD 159**                    23.07.1999 09H48 - 107653          **00805**

---

| CONFIDENTIEL DIPLOMATIE | ▬▬▬▬▬▬ |
|---|---|

MIN
- PR1 PM1 CM1 CM2 CM3 SG NGA SGP
- CMC

---

TD RIYAD 159                        LE 21 JUILLET 1999
                RIYAD        1217  LE 21/07/99 A 16H10

URGENT
CHIFFRE CONFIDENTIEL DIPLOMATIE
ORIGINE  AMBASSADEUR
NB  DISTRIBUTION MESSAGE
    AD DIPLOMATIE 159
NB  DIPLOMATIE  CM1 – CMC  – PR – PM
NB  CDINT
NB
NB
NB  TRANSMISSION D'INFORMATIONS
TXT

OBJET – IMPLICATION D'UN BANQUIER SAOUDIEN DANS LE FINANCEMENT DU TERRORISME.

REFERENCE  TD RIYAD 142.

SYNTHESE DES INFORMATIONS DE L'ENQUETE DE LA BANQUE CENTRALE SAOUDIENNE (SAMA)
SUR LA NATIONAL COMMERCIAL BANK  ANNEXEE, COMMUNIQUEE CE JOUR.
SIGNE    POLETTI

Copie certifiée conforme
à l'original
                    Le Greffier.

MR-FRE003226

MR-NCB003258

00806

## CONFIDENTIAL

TRANSLATION

Summary of the Saudi National Commercial Bank Audit Report
(SAMA SOURCE /A)

[Excerpts from the report]

......... Audit conducted with the NCB audit committee and Zakat Committee during the second half of year 1998.

......... The focus of the report concerns Islamic banking practices, Islamic charities accounts and operations within the bank. Accountability practices were also reviewed for establishing a higher control over general operations of the bank by the Saudi authorities.

......... Preliminary indications show operational revenues to reach SR 6,131.6 million, up from SR 5,675.2 million in 1997. Operational expenditures in 1998 are estimated to SR 5,122.9 million, up from SR 4,699.7 million in the preceding year.

Figures show a 2 per cent rise in net income to SR 1,062 million in 1998.

A net profit of SR 1,043.3 million was reported in 1997, up from SR 915 million in 1996, or an increase of SR 128.3 million.

Loans, advances and discounts (net) stood at SR 56,414.4 million, up from SR 48,290.3 million in 1997. Customer deposits increased to SR 65,742.6 million from SR 41,928.1 million in the year before.

Both assets and liabilities of the bank are balanced at SR 92,938.5 million, up from SR 86,618.1 million on the corresponding date of 1997. Contra accounts totalled SR 89,688.9 million down from SR 99,028.5 million in the year before.

The volume of its loan portfolio amounted at SR56.4 billion compared to SR46.3 billion in 1997. The investment

## CONFIDENTIAL

portfolio also increased from SR16.9 billion to SR18.2 billion.

The total deposits are estimated at SR65.7 billion against SR61.9 billion in 1997 with an increase of SR3.8 billion (6.2 percent).

Shareholders' equity increased to SR 6,027.6 million in 1998 from SR 7,706.7 million in 1997. The equity contained of SR 6,000 million as paid up capital, SR 2,027.6 million as statutory reserve and SR 6.4 million as retained profits.

NCB's total assets at SR92.9 billion in 1998 against SR86.4 billion in the previous year, registering an increase of SR6.5 billion (7.5 percent).

The board of directors proposed to distribute SR 821.5 million as dividends to shareholders for 1998.

......... However, current trends show that a provision of SR 450.5 million will be needed to offset remaining loss from doubtful debts, compared to a sum of SR 450.5 million in 1997.

In addition to sell prices impact, the loan loss provision have negatively affected the bank profits since 1996.

......... We invite to a rapid relocation of assets and a reduction of loans and advances.

The overall result of these two movements will have a beneficial affect on the bank's capital and liquidity ratios, since loans and advances now represent 50 per cent.

......... Given the current market conditions, the public quotation of NCB will increase the negative impact of the current figures. While 1997 results were already affected by the allocation of SR 450.5 million to offset losses of doubtful debts, which is almost the same as the amount of SR 450.4 million earmarked for doubtful debts in 1996.

Last year economic conditions were as follows: Operational revenue of the bank in 1997 stood at SR 5,675.2 million, up from SR 5,320.3 million in 1996. While operational expenditures rose to SR 4,699.7 million from SR 4,163.2 million in 1996. Both amounts resulted in the bank net on December 31, 1997 were balanced at SR 86,438.1

2

29863.002

MR-FRE003227

MR-NCB003259

**00807**

CONFIDENTIAL

million, up from SR 86,952.5 million on the corresponding date of 1996. Thanks accounts, however, dropped to SR 87,836.4 million in 1997 from SR 134,132.7 million in 1996.

........ Loans and advances limit stood at SR 46,290.1 million, up from SR 38,171 million in 1996. Customers deposits reached SR 61,929.1 million from SR 56,594 million in 1996.

........ Shareholders' equity slightly rose to SR 7,786.7 million from SR 7,694.9 million in 1996. The equity consisted of SR 6,000 million as capital, SR 1,762.5 million as statutory reserves and SR 26 million as retained profits.

........ The board of directors proposed to distribute the profits as follows:

........ SR 160.8 million to the statutory reserves.

........ SR 491.6 million to the partners before transformation of the bank into a joint stock company.

........ SR 300 million to be distributed as dividends among shareholders.

........ SR 16.7 million as Zakat.

........ SR 25 million to be carried forward.

........ Offset losses from doubtful debts resulted from irregularities due to excessive and unrequited loans and advances granted by and for the bank's directors.

........ As such, without knowledge of the Zakat Committee, NCB Directors established over the years credit and loans facilities for several charitable organisations, along with banking facilities that were not reviewed by the Committee.

........ Direct donations were received through these facilities to the Red Crescent, Saudi Committee, International Islamic Relief Organisation and Muwafaq Foundation.

........ Muwafaq charity received SR 11.38 million in loans and deposit.

........ NCB established special relations with the Saudi Joint Relief Committee for Kosovo and Chechnya and maintained two shared accounts with Al Rayhi Bank for the

CONFIDENTIAL

Joint Relief Committee and International Islamic Relief Organisation due Donations in Kosovo and Chechnya.

........ The special accounts were not authorized nor reviewed neither by the Audit Division nor by the Zakat Committee. In 1998, SR 279.5 million were transferred through these two accounts to the International Islamic Relief.

........ We stress the importance of establishing clear rules for account managers in order to implement severe control procedures due to the international context, especially when dealing with charitable organizations.

........------------------------

........------------------------

EXHIBIT 3

Transcript of March 23, 2007 p.37

1

73nrterc

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------x
2
3   In re:  TERRORIST ATTACKS ON
3           SEPTEMBER 11, 2001
4                           03 MDL 1570 (RCC)
4
5   ----------------------------x
5
6                       New York, N.Y.
6                       March 23, 2007
7                       10:00 a.m.
7
8   Before:
8
9       HON. FRANK MAAS
9
10                      Magistrate Judge
10
11
11
12      APPEARANCES
12
13
13
14   KREINDLER & KREINDLER
14   Attorneys for Ashton Plaintiffs
15      100 Park Avenue
15      New York, New York  10017
16      (212)  687-8181
16   BY:  ANDREW J. MALONEY, ESQ.
17
17
18   MOTLEY RICE, LLP
18   Attorneys for Burnett Plaintiffs
19      28 Bridgeside Boulevard
19      Mt. Pleasant, South Carolina  29465
20      (843) 216-9000
20   BY:  ROBERT T. HAEFELE, ESQ.

21
21
22   COZEN O'CONNOR
22   Attorneys for Federal Insurance Plaintiffs
23      1900 Market Street
23      Philadelphia, Pennsylvania 19103
24      (215) 665-2000
24   BY:  SEAN P. CARTER, ESQ.
25
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

73nrterc

1 minimum contacts within the jurisdiction.  That's just one of
2 several different criteria that we'd like to take a look at to
3 present to the Court.
4          THE COURT:  I'm going to rule on each of these
5 applications.  I am going to deny the request for correspondent
6 account information for the reason I just discussed with you,
7 Mr. Maloney, and because I think it is really the camel's nose
8 under the tent.  Assuming you got that information, the next
9 step, somewhat understandably, would be to say we need more
10 information to have an understanding what this means.  I do
11 think, without more, that goes too far.
12          With respect to the depositions, it's going to sound
13 like a Solomonic solution, but it's not intended to be.  I'm
14 going to deny the request to take the deposition of Ms. Pensa.
15 However, I am going to grant a deposition of Mr. Smith, who is,
16 as I understand it, no longer an employee and is in the New
17 York City area.
18          However, I'm not going to allow a full day of
19 deposition.  I'm going to allow a 3-hour deposition.  And it
20 will be conducted in the courthouse before me.  To revert to
21 the criminal analogy, since all of us come out of that field, I
22 guess it's akin to a preliminary hearing, where the ground
23 rules may be more constricted.
24          To avoid squabbles about what is and isn't fair game
25 and because I don't think I have clearly in my mind what may or
             SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

73nrterc

1  may not be fair, and I certainly don't know the questions you
2  will ask, I think that gives you an opportunity to better
3  understand first-hand from somebody who is in a position of
4  responsibility how NCB and potentially SNCB operated in New
5  York.
6          Mr. Smith presumably can tell you, without disclosing
7  customer names, in broad brush strokes perhaps volume of
8  correspondent account activity and the like without requiring
9  the production of a lot of other documents the defendant.
10         MR. MALONEY:  Your Honor, if I could make one request
11  to supplement that.  Mr. Smith, in advance of his deposition
12  before your Honor, I'd like to get a copy of the documents he
13  refers to in his affidavit in advance of the deposition.
14         MR. LIEBMAN:  Your Honor, I have a request as well.
15  Perhaps that deposition should go forward before your Honor
16  after your Honor has had an opportunity to review the 1998
17  Arthur Andersen examination.
18         THE COURT:  There is no question that that would be
19  the order.
20         MR. LIEBMAN:  Thank you, your Honor.
21         THE COURT:  One question is, when should we schedule
22  that?  I know you have to go to SAMA.
23         MR. LIEBMAN:  Yes.  Should I do that and then report
24  back to the Court, and then we can determine a schedule based
25  upon that?

EXHIBIT 4

August 13, 2007 letter from Ron Liebman to Judge Maas



2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 13, 2007

Ronald S. Liebman
202-457-6310
rliebman@pattonboggs.com

**BY FEDERAL EXPRESS**

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

       Re:    *In re Terrorist Attacks on September 11, 2001*, MDL 03-1570 (GBD);
             *Burnett v Al Baraka*, Case No. 03 CV 9849 (S.D.N.Y.)

Dear Judge Maas:

      On behalf of Defendant, The National Commercial Bank ("NCB"), we respectfully submit this response to the August 7, 2007 letter from plaintiffs' counsel, Andrew Maloney (the "Aug. 7 Letter"), opposing the request in our July 31, 2007 letter seeking leave to propound contention discovery concerning plaintiffs' theory of personal jurisdiction over NCB. Although Mr. Maloney's letter purports to raise "two primary reasons" in opposition to contention discovery, in substance his letter raises only one— *i.e.*, that contention discovery is "premature" because plaintiffs first wish to proceed with one or more depositions of former employees of SNCB Securities Inc. ("SNCB"), a former indirect U.S. subsidiary of NCB that was dissolved in 2001. (Aug. 7 Letter, at 1.) It does not appear that plaintiffs seriously intend to pursue their alternative argument that contention discovery is "potentially prejudicial" to them because NCB "bears the burden of proof" on personal jurisdiction once "plaintiffs have made a prima facie showing of jurisdiction." *Id*, at 3. The premise for this alternative argument is simply wrong: "The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff." *Hoffritz for Cutlery, Inc. v Amjac, Ltd*, 763 F.2d 55, 57 (2d Cir. 1985); *accord Ball v Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

      Despite plaintiffs' professed uncertainty about Your Honor's authority to resolve these issues (Aug. 7 Letter at 1 n.1), there is no question that the Court's March 23, 2007 Order expressly reserved decision on "NCB's application to serve contention interrogatories." (MDL Dkt. # 1964, at ¶5). In the March 23, 2007 Order, moreover, Your Honor also addressed, and denied, plaintiffs' request to take the deposition of former SNCB employee Virginia Pensa. *Id*, at ¶3. Accordingly—



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 13, 2007
Page 2

although plaintiffs now recharacterize their prior request as one to take a deposition of "Virginia Pensa and/or Tom Krohley" (Aug. 7 Letter, at 1)—plaintiffs in substance are seeking reconsideration of that March 23, 2007 Order, and of Your Honor's May 1, 2007 endorsement order, in which the Court "decline[d] to direct any further discovery (not previously ordered) related to NCB." (MDL Dkt. # 1971).

We respectfully submit that there is no basis to reconsider those prior orders, and that the Court therefore should grant NCB leave to propound contention discovery as requested in our July 31 letter. As we previously demonstrated in connection with the disputes that led to entry of the March 23, 2007 Order, plaintiffs' request to take depositions of former SNCB employees is outside the scope of the "limited jurisdictional discovery" concerning "NCB's contacts with the United States" as originally allowed by Judge Casey. *In re Terrorist Attacks I*, 349 F. Supp. 2d 765, 820 (S.D.N.Y. 2005); *In re Terrorist Attacks II*, 392 F. Supp. 2d 539, 575 (S.D.N.Y. 2005).

Specifically, after extensive production of SNCB documents to plaintiffs, there is no dispute that SNCB was dissolved in 2001, before any of the 9/11 lawsuits was filed. Accordingly, SNCB's activities are "irrelevant for purposes of the 'doing business' inquiry." *Data-Stream AS/RS Technologies, LLC v. Acequip Ltd.*, 2002 WL 1683736, at *6 (S.D.N.Y. July 24, 2002) ("'[T]he defendant corporation must be 'here' and therefore subject to the state's power, at the very time of the exercise of the jurisdiction itself.' ... There is no need to resolve the dispute as to whether Zimmerman was an agent of [defendant]. Zimmerman ceased his activities on June 11, 2001, almost a year before this suit was commenced. Therefore, his activities are irrelevant for purposes of the 'doing business' inquiry.")(internal citations omitted); *accord, e.g., Schenker v. Assicurazioni Generali S.p.A.*, 2002 WL 1560788, at *3, *4 (S.D.N.Y. July 15, 2002) (refusing to exercise personal jurisdiction over a foreign corporation based on the existence of an alleged U.S. subsidiary where the corporation's parent company had "sold [the subsidiary] and all other U.S. subsidiaries in October 1998-two months before the complaint in this action was filed on December 30, 1998"; holding that "[t]he only relevant inquiry is whether [the foreign defendant or its parent] had an 'agency' or 'mere department' relationship with [the alleged subsidiary] when the complaint was filed, such that any of [the alleged subsidiary's] past or present New York contacts could be attributed to [the defendant]. Because the evidence is clear that [the defendant] had sold any interest it once had in [the alleged subsidiary] as of December 30, 1998, [the alleged subsidiary's] contacts with New York cannot form a basis for personal jurisdiction over [the defendant].").

In connection with its motion to dismiss the *Burnett* and *Ashton* complaints, NCB provided the Court with authenticated copies of the Certificate of Dissolution of SNCB Securities Inc., filed with the Delaware Secretary of State on February 28, 2001. (MDL Dkt. # 416, Exh. 5, Attachment A) (copy attached hereto as Exhibit A). Since that time, NCB has produced over 60,000 pages of documents as part of "limited jurisdictional discovery," and most of those documents comprised the



Honorable Frank Maas
August 13, 2007
Page 3

operational files of SNCB. Plaintiffs' August 7 Letter does not identify any fact to dispute NCB's showing that SNCB was dissolved in 2001.[1]

Accordingly, the Court should not authorize depositions of former SNCB employees because their testimony cannot possibly lead to evidence relevant to personal jurisdiction over NCB. *See Melnick v Adelson-Melnick*, 346 F. Supp. 2d 499, 504-05 (S.D.N.Y. 2004) (in connection with a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "summary judgment practice offers guidance in the handling of such motions when they involve evidence outside the pleadings" and a plaintiff seeking jurisdictional discovery "must file a Rule 56(f) affidavit" that "must show," *inter alia*, "what facts are sought to resist the motion ... [and] why they might reasonably be expected to create a genuine issue of material fact" concerning personal jurisdiction) (emphasis added). Your Honor applied essentially this same analytic framework in denying a recent request for further jurisdictional discovery regarding an alleged U.S.-affiliate of another 9/11 litigation defendant, the Saudi Binladin Group ("SBG"). *See* Order (endorsement) of July 26, 2007 (MDL Dkt. # 1988). There, Your Honor held that, even if plaintiffs' allegations concerning the activities of the U.S. company were credited, "they do not suggest a basis for jurisdiction over SBG" and therefore denied "the request for discovery concerning Techmaster/PCM." *Id.* Likewise, here, even if plaintiffs' allegations concerning SNCB's activities were credited, they would not suggest a basis for jurisdiction over NCB because SNCB was dissolved in 2001, before the 9/11 lawsuits were filed.

Alternatively, even if SNCB's 2001 dissolution did not, by itself, dispose of the request for additional discovery, plaintiffs' assertions regarding the nature of SNCB's activities still would not suggest a basis for jurisdiction over NCB. Plaintiffs' claims against NCB allege that NCB provided banking services to help terrorist groups raise or transfer funds, or made direct donations to charities that were Al Qaeda fronts. *Burnett* 3rd Am. Complt., ¶¶ 45-46, 94-96; *Ashton* 6th Am. Complt., ¶¶ 429-433. Your Honor's June 28, 2006 Discovery Order held that the allegations of the *Burnett* complaint (which the *Ashton* complaint repeats) had "failed to make a prima facie showing of conspiracy" because they "establish neither that NCB or its customers contributed funds to organizations serving as Al Qaeda fronts with 'an awareness of the effects in New York' of such monetary contributions, nor that the co-conspirators in New York-namely, the Al Qaeda terrorists who executed the September 11 attacks-'acted at the direction or under the control or at the request

---

[1]     We are aware that SNCB filed a Surrender of Authority with the New York Department of Taxation and Finance on October 12, 2001, to which the Commissioner of Taxation and Finance consented on October 17, 2001. As a matter of New York law, these actions do not appear to mean that SNCB remained in existence through October 17, 2001, because "[w]hen a foreign corporation is dissolved ... in the jurisdiction of its incorporation," the certificate of dissolution is supposed to be delivered to the N.Y. Department of State, and thereupon has "the same effect as the filing of a certificate of a surrender of authority under section 1310." N.Y. BUS. CORP. LAW § 1305. We cannot confirm whether the Delaware Certificate of Dissolution of SNCB was filed with the New York Department of State before the Surrender of Authority was filed. Under any set of circumstances, however, the dissolution of SNCB was effective not later than the acceptance of the Surrender of Authority on October 17, 2001, nearly a year before any of the 9/11 lawsuits was filed.

3



Honorable Frank Maas
August 13, 2007
Page 4

of' NCB." *In re Terrorist Attacks on September 11, 2001*, 440 F. Supp. 2d 281, 287 (S.D.N.Y. 2006)(internal citations omitted). After extensive jurisdictional discovery, plaintiffs cannot point to any evidence to link SNCB to those already deficient allegations, or to show that SNCB was ever involved in any alleged NCB banking services or charitable donations.

"The term 'doing business' is used in reference to foreign corporations to relate to 'the ordinary business which the corporation was organized to do ... It is not the occasional contact or simple collateral activity which is included.'" *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 2003 WL 1807148, at *4 (S.D.N.Y. Apr. 4, 2003) (internal citations omitted). After extensive jurisdictional discovery, plaintiffs can offer no evidence that SNCB was involved in the business of banking— the "ordinary business" that NCB was organized to do. Indeed, NCB was prohibited from engaging in "any new banking business or holding itself out as available to conduct new banking business; including accepting any new deposits or granting any new loans" in the United States after its New York branch closed in 1992. *See* 1992 OCC Enf. Dec. LEXIS 225 at *4 (July 2, 1992) (Enforcement Action of the Office of the Comptroller of the Currency re National Commercial Bank New York Federal Branch).[2] Consistent with the prohibition on U.S. banking business, the purpose of SNCB— as set out in the audited financial statements of SNCB[3] that plaintiffs have attached to the August 7 Letter— was to "conduct[ ] limited activities in the U.S. for or on behalf of NCB with respect to the management services performed by NCB for certain off-shore investment funds which services were previously performed by the Investment Management Division of the New York branch office of NCB." In particular, as explained in the SNCB audit, SNCB activities included: "... identifying and developing investment products for NCB to market outside the U.S., assisting NCB in evaluating fund advisors and performing some limited administrative and clerical support services for NCB on behalf of the investment funds." (Aug. 7 Letter, attachment.) Those investment-advisory activities have nothing to do with "banking business" as prohibited by the OCC orders, or the type alleged NCB banking services on which plaintiffs' claims against NCB are based. SNCB's activities therefore could not serve as a basis to assert jurisdiction over NCB, even if SNCB had not been dissolved before these lawsuits were commenced.

---

[2]     Plaintiffs questioned Mr. Smith about the OCC orders concerning NCB at his deposition. Mr. Smith also testified that, to his knowledge, NCB did not engage in the business of banking in the United States following the 1992 closure of the New York branch, and that SNCB did not engage in the business of banking on behalf of NCB. Smith Dep. Tr., at 133:11-134:9. Although we understand that credibility determinations are beyond the scope of the issues before Your Honor, there is no basis for plaintiffs' gratuitous assertion that Mr. Smith's testimony "was less than candid about the bank being forced to close under a cloud of criminal conduct and banking fraud and other irregularities." The Comptroller of the Currency Enforcement Action (cited above and marked as an exhibit to Mr. Smith's deposition) refers to the "voluntary liquidation" of NCB's NY branch, which Mr. Smith described, and describes the prohibition that the OCC thereafter imposed on NCB's ability to conduct "any new banking business" in the United States.

[3]     It is worth noting that, consistent with SNCB's corporate separation from NCB, there was an annual outside financial audit of SNCB Securities Inc. that was separate from the annual outside financial audit of NCB. The annual SNCB audit reports were produced to plaintiffs as part of jurisdictional discovery.



Honorable Frank Maas
August 13, 2007
Page 5

Notwithstanding the jurisdictional irrelevance of SNCB's activities, at the March 23, 2007 hearing plaintiffs proffered an affidavit of former SNCB employee Jagan Reddy addressing SNCB's pre-dissolution activities. Plaintiffs apparently plan to rely on the Reddy affidavit to argue for the exercise of jurisdiction over NCB, although NCB has sought leave to propound contention discovery precisely to determine, *inter alia*, whether plaintiffs do indeed plan to rely upon the Reddy affidavit for that purpose.[4] If so, or if plaintiffs' responses to contention discovery otherwise makes it advisable for NCB to do so, then NCB would submit an affidavit of a more knowledgeable former SNCB employee to address the nature and scope of SNCB's operations. However, even if both plaintiffs and NCB opt to submit affidavits concerning SNCB's operations in litigating NCB's renewed motion to dismiss for lack of jurisdiction, there is no reason to authorize depositions of former SNCB employees at this time. Second Circuit law is clear that, following jurisdictional discovery, the district court is free to resolve the jurisdictional question without an evidentiary hearing, based on the pleadings and affidavits submitted in connection with the motion to dismiss. *Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985); *E-Z Bowz, L.L.C. v. Prof. Prod. Research Co.*, 2003 WL 22064259 at *4 (S.D.N.Y. Sept. 5, 2003). Consequently, the decision whether to authorize depositions of former SNCB employees should be made by the Court when it adjudicates NCB's renewed motion to dismiss for lack of jurisdiction. At that stage, the Court will have the benefit of full legal argument and the evidentiary context that will allow it to evaluate whether the Court needs to reach and resolve any disputed factual issue concerning the activities of SNCB.

In sum, plaintiffs already have received the "'fair opportunity' to conduct jurisdictional discovery" that they seek. (Aug. 7, 2007 Letter, at 2, citing *In re Ski Train Fire in Kaprun, Austria*, 230 F. Supp.2d 392, 400 (S.D.N.Y. 2002)). Plaintiffs' letter, however, fails to provide the full context of "fair opportunity" quote from *Ski Train Fire*, where the Court held that: "Such discovery must, however, be 'limited to the essentials necessary to determining the preliminary question of jurisdiction.' Plaintiffs may not conduct a fishing expedition, but must 'target[ ] information pertinent to the well established factors involved in a jurisdictional inquiry.'" *Id.* (emphasis added; internal citations omitted). As shown above, the activities of SNCB in the United States could not provide a basis for jurisdiction over NCB. Accordingly, plaintiffs' request to take depositions of former SNCB employees could not be "pertinent to the well established factors involved in a jurisdictional inquiry," *id.*, and should be denied, and NCB should be allowed to propound the contention discovery requests submitted for approval with our July 31 letter.

---

[4]      The Court's March 23, 2007 Order reserved decision on "plaintiffs' application to depose Jagan Mohan Reddy." (MDL Dkt. # 1964, at ¶ 5.)



Honorable Frank Maas
August 13, 2007
Page 6

Respectfully submitted,

Ronald S. Liebman
Counsel for Defendant The National Commercial Bank

cc:    All Counsel

6

**Exhibit A**



**PAGE  1**

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF DISSOLUTION OF "SNCB SECURITIES INC.", FILED IN THIS OFFICE ON THE TWENTY-EIGHTH DAY OF FEBRUARY, A.D. 2001, AT 9:45 O'CLOCK A.M.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

2308697  8100

030417119

AUTHENTICATION: 2492406

DATE: 06-24-03

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:45 AM 02/28/2001
  010100793 - 2308697

FEB-23-2001 09:17 FR S&S 16FL #3                    TO 00334#0644100072 P.02/02

## CERTIFICATE OF DISSOLUTION
### OF
### SNCB SECURITIES INC.

SNCB Securities Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware,

    DOES HEREBY CERTIFY:

    FIRST: That dissolution was authorized on October 23, 2000.

    SECOND: That dissolution has been authorized by the Board of Directors and stockholders of the corporation in accordance with the provisions of subsections (a) and (b) of section 275 of the General Corporation Law of the State of Delaware.

    THIRD: That the names and addresses of the directors and officers of SNCB Securities Inc. are as follows:

### DIRECTORS

| NAMES | ADDRESSES |
|---|---|
| Thomas M. Krohley | 129 Oldfield Road<br>Fairfield, CT 06430 |
| Fredrick O. Crawford | Wellington House, 4th Floor<br>125 Strand<br>London WC2R OAP<br>England |
| Mansour Kaki | NCB Investment Services<br>Al Nakeel Center<br>P.O. Box 15844<br>Jeddah 21454 Saudi Arabia |

### OFFICERS

| NAMES | OFFICES | ADDRESSES |
|---|---|---|
| Thomas M. Krohley | President, Treasurer | 129 Oldfield Road<br>Fairfield, CT 06430 |
| Virginia I. Pensa | Secretary | 45 Tuder City Place, Apt. 619<br>New York, NY 10017 |

Executed on the 23rd day of February, 2001.

By  _Thom M. Krohley_

     Thomas M. Krohley

     President