# EXHIBIT B
# (Part 1 of 10)



**COZEN**
**O'CONNOR**

A PROFESSIONAL CORPORATION

1900 MARKET STREET   PHILADELPHIA, PA 19103-3508   215.665.2000   800.523.2900   215.665.2013 FAX   www.cozen.com

**Sean P. Carter**
Direct Phone   215.665.2105
Direct Fax   215.701.2105
scarter@cozen.com

August 15, 2008

**VIA FEDERAL EXPRESS**

The Honorable Frank Maas
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 740
New York, NY 10007

Re:   *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD)
      *Federal Insurance Co., et al. v. al Qaida, et al.,* 03 CV 6978 (GBD)

Dear Judge Maas:

In accordance with the Court's Order of July 11, 2008, I write on behalf of the *Federal Insurance* Plaintiffs, to request an extension of time to respond to the "Renewed" Motion to Dismiss of National Commercial Bank (NCB), and for an Order compelling NCB to provide relevant and necessary discovery, including full and complete answers to the *Federal Insurance* Plaintiffs' outstanding jurisdictional discovery requests. More specifically, the *Federal Insurance* Plaintiffs request that the time for responding to NCB's Motion to Dismiss be extended to sixty days after the completion of targeted discovery relevant to the NCB jurisdictional analysis, to include discovery served upon closely related defendants Yassin al Kadi and Khalid bin Mahfouz, two former NCB executives whose conduct as agents and employees of NCB lies at the heart of Plaintiffs' theories of jurisdiction and liability as to NCB. The conduct of such discovery is necessary to create an adequate record relative to NCB's personal jurisdiction defense in the *Federal Insurance* case, where no discovery as to NCB has been conducted to date, and therefore represents a procedural prerequisite for the disposition of that defense in the *Federal Insurance* action.

August 15, 2008
Page 2

_____

In advocating this course, the *Federal Insurance* Plaintiffs by no means seek to replicate the discovery that has already been undertaken as to NCB in *Ashton* and *Burnett*. To the contrary, the *Federal Insurance* plaintiffs seek discovery as to only a few discrete issues and relationships, critical to the specific jurisdictional theories they have advanced as to NCB based on the unique allegations of their Complaint, and evidence which corroborates those detailed factual allegations.

The extension proposed by the *Federal Insurance* Plaintiffs will in no way prejudice NCB. In this regard it should be noted that the Court has already ruled that it does not intend to pass on any Motions to Dismiss for lack for personal jurisdiction until after it has resolved all of the pending Motions to Dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act. Moreover, there are at least 53 fully briefed and unresolved Motions to Dismiss for lack of personal jurisdiction already pending before the Court, several of which were filed more than 4 years ago. Thus, the *Federal Insurance* Plaintiffs respectfully submit that the targeted discovery they seek can be completed well before the Court will, in the normal course of its resolution of pending motions to dismiss in the MDL, even reach NCB's "Renewed" Motion to Dismiss.

## I.    PROCEDURAL BACKGROUND

On April 21, 2008, NCB filed a letter application with the Court, seeking leave to file a "Renewed" Motion to Dismiss in all of the pending MDL actions against it. At the time of that submission, NCB had a fully briefed Motion to Dismiss already pending in the *Federal Insurance* case, which had never been addressed by the Court, or withdrawn by NCB.

In response to NCB's April 21, 2008 application, the *Federal Insurance* Plaintiffs submitted an April 25, 2008 letter to the Court, through which they opposed NCB's request for leave to file a "Renewed" Motion to Dismiss for Lack of Personal Jurisdiction, and moved to compel NCB to provide full and complete responses to the *Federal Insurance* Plaintiffs' outstanding discovery requests.[1] Consistent with established Supreme Court and 2nd Circuit authority, the *Federal Insurance* Plaintiffs' April 25, 2008 letter correctly argued that the MDL consolidation of the various September 11th cases did not result in a merger of those actions, and that the separate discovery proceedings in the *Ashton* and *Burnett* cases consequently could not be deemed applicable to the *Federal Insurance* case.[2] Accordingly, the *Federal Insurance*

_____

[1] The *Federal Insurance* Plaintiffs' April 25, 2008 submission contains a thorough discussion of relevant procedural developments concerning NCB from the inception of the litigation, including the procedural disparities among the various cases, which is incorporated herein by reference.

[2] In its "Renewed" Motion to Dismiss, NCB argues that the *Federal Insurance* Plaintiffs are also bound by the *Ashton* and *Burnett* Plaintiffs' responses to NCB's contention discovery requests to those separate parties. The absurdity of that argument is demonstrated by the fact that NCB labeled those discovery requests as applicable only to *Ashton* and *Burnett*, rather than to all actions, a designation which necessarily means that those requests only applied to the *Ashton* and *Burnett* cases. See CMO 2 at ¶ 8. Moreover, NCB's Motion to Compel more complete responses to those discovery requests was directed only to the *Ashton* and *Burnett* Plaintiffs. Further, as the *Ashton* and *Burnett* Plaintiffs responded separately, it is impossible even to know which responses NCB believes to be binding upon the other cases.

August 15, 2008
Page 3
_____

Plaintiffs asserted that the conduct of targeted jurisdictional discovery was necessary to create an adequate record in the *Federal Insurance* case relative to NCB's personal jurisdiction defense, and represented the only valid means to harmonize the procedural status of the claims against NCB in all of the MDL cases.

The *Federal Insurance* Plaintiffs' April 25 letter went on to describe the factual and legal predicates for the *Federal Insurance* Plaintiffs' theories of specific jurisdiction as to NCB, and the diligent efforts the *Federal Insurance* Plaintiffs had previously undertaken to obtain discovery from NCB in support of those theories. As discussed in greater detail in that letter, the *Federal Insurance* Plaintiffs' theories of specific jurisdiction rest in part on the well supported contention that NCB knowingly provided financial and other forms of support to al Qaida. NCB's sponsorship of al Qaida flowed largely, although not exclusively, through the Muwafaq Foundation, an al Qaida front conceived, established and run by former NCB executives Khalid bin Mahfouz and Yassin al Kadi. Under well settled standards, the *Federal Insurance* Plaintiffs asserted that they had satisfied their burden to make a prima facie showing of jurisdiction as to NCB under their purposeful direction and conspiracy theories of jurisdiction, through the detailed allegations of their operative Complaint and the extrinsic evidence submitted in connection with their Opposition to NCB's then pending Motion to Dismiss in the *Federal Insurance* case.

Although under no obligation to provide additional evidentiary support in order to obtain discovery of facts relevant to those theories of personal jurisdiction, the *Federal Insurance* Plaintiffs submitted a United States Treasury Department evidentiary memo concerning Yassin al Kadi as an exhibit to their April 25 letter, in order to shed additional light on the relevance and importance of the requested discovery. The submitted evidentiary memorandum contains extensive information concerning the character of the relationships among NCB, Khalid bin Mahfouz, Yassin al Kadi, Muwafaq Foundation, and al Qaida, and describes in detail Muwafaq Foundation's pervasive involvement in the sponsorship of al Qaida and other terrorist organizations throughout the World.

On the basis of the complete record in their case, the *Federal Insurance* Plaintiffs asserted that they were entitled to full and complete responses to the jurisdictional discovery requests they served on NCB on August 24, 2007, which sought targeted discovery concerning the relationships among NCB, al Kadi, bin Mahfouz and Muwafaq Foundation.

On July 11, 2008, the Court entered an Order authorizing NCB to file a "Renewed" Motion to Dismiss in all of the pending MDL cases, but explicitly preserving the right of all plaintiffs to make application to Your Honor for a stay or extension of time for responding to NCB's Motion to Dismiss, and to compel NCB to respond to any discovery relevant to the personal jurisdiction analysis. Thus, the Court's July 11, 2008 Order did not address the substantive issues raised in the *Federal Insurance* Plaintiffs' April 25, 2008 letter concerning discovery in their case.

On July 22, NCB filed its "Renewed" Motion to Dismiss for Lack of Personal Jurisdiction in all of the pending MDL cases. Pursuant to paragraph 26 of Case Management

August 15, 2008
Page 4

Order 2 and paragraph 5 of Case Management Order 4, the present deadline for responding to that Motion is September 23, 2008.

Through the instant letter application, the *Federal Insurance* Plaintiffs request that the Court direct NCB to respond to discovery directly relevant to the NCB jurisdictional analysis, and extend the period of time for the *Federal Insurance* Plaintiffs to file their Opposition to NCB's "Renewed' Motion to Dismiss, to sixty days after the completion of all discovery relevant to the jurisdictional dispute raised in NCB's "Renewed" Motion to Dismiss.

## II.   ARGUMENT

### A.   Standard of Review

Rule 6 of the Federal Rules of Civil Procedure provides a district court with broad discretion to grant a request for an extension of time made prior to the expiration of the period prescribed. See Fed. R. Civ. P. 6(b). Indeed, courts will normally grant such applications in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party. Don King Prods. v. Hopkins, 2004 U.S. Dist. LEXIS 25917, *8 (S.D.N.Y. Dec. 23, 2004); See 4B Wright & Miller, Federal Practice and Procedure, § 1165 (updated by 2004 Pocket Part).

The Federal Rules also provide a comprehensive framework for resolving discovery disputes. Under the Rules, a court's analysis of any discovery contest must begin with Rule 26(b)(1), which as a threshold matter provides that litigants are *entitled* to obtain discovery regarding any matter "*relevant to the claim or defense of any party.*" Fed. R.Civ. P. 26(b) (emphasis supplied). "This obviously broad rule is liberally construed." Deval Steel Products Div. of Francosteel Corp. v . M/V Fakredine, 951 F.2d 1357, 1367 (2d Cir. 1991), *citing* Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (relevance under Rule 26(b)(1) broadly construed "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case"). In order to conclude that requested discovery is legally irrelevant under Rule 26(b)(1), a judge must find that the requested discovery could not, as a matter of law, lead to the discovery of admissible evidence. In other words, the judge must find that "even assuming the discovery yields the information Plaintiff suggests, that information could not be admitted at trial under Fed. R. Evid. 401 because – as a matter of law - a jury may not draw from that information the inference that Plaintiff seeks to elicit." Pisacane v. Enichem Am., 1996 U.S. Dist. LEXIS 9755, *8 (S.D. N.Y. 1996).

Rule 26(b)(1) establishes the appropriate scope of discovery not only as to the merits, but as to jurisdiction as well. Renner v. Lanard Toys Ltd., 33 F.3d 277, 283 (3d. Cir. 1994); Edmond v. United States Postal Serv. Gen. Counsel, 292 U.S. App. D.C. 240, 949 F.2d 415, 425 (D.C. Cir. 1991) ("As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction."). Thus, the starting point for a court's analysis of a jurisdictional discovery dispute is simply whether the discovery sought bears on, or reasonably could lead to other matter that could bear on, the plaintiffs' theories of jurisdiction, or any defenses raised by the defendant as to those theories of jurisdiction. Where jurisdictional facts are in dispute, a refusal to grant discovery as

August 15, 2008
Page 5

---

to matters bearing on the factual dispute constitutes an abuse of discretion.  Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332, (2d. Cir. 1990).

### B.     The *Federal Insurance* Plaintiffs Are Entitled to the Discovery They Seek Concerning NCB's Sponsorship of Al Qaida Through Muwafaq Foundation

As discussed above, the *Federal Insurance* Plaintiffs presented detailed factual and legal arguments in their April 25, 2008 letter to the Court, in support of their request that the Court direct NCB to provide responses to the *Federal Insurance* Plaintiffs' long outstanding discovery requests relating to NCB's sponsorship of al Qaida via Muwafaq Foundation.[3]  In lieu of restating the arguments contained in that letter herein, the *Federal Insurance* Plaintiffs incorporate that letter in its entirety.  For the Court's convenience, a copy of that submission is attached as Exhibit "A" hereto.

As a supplement to the facts and arguments presented in that letter and the broader record in their case,[4] the *Federal Insurance* Plaintiffs offer the following additional evidence in support of the present application, the essential significance of which is noted parenthetically below:

1.     *German Intelligence Service Summary of Findings - Investigation of Yassin Qadi and Muwafaq*, Exhibit "B" hereto.  Describes terrorism sponsorship activities of Yassin al Kadi, Khalid bin Mahfouz and Muwafaq, and NCB's role in facilitating transfers to al Qaida, via Muwafaq and IIRO.

2.     *Statement of Yassin Abdullah Kadi to the Office of Foreign Assets Control*, Exhibit "C" hereto.  Confirms that al Kadi was engaged by Khalid bin Mahfouz to establish NCB's Islamic Banking Division.  Indicates that bin Mahfouz and al Kadi jointly established Muwafaq in approximately 1991, while al Kadi was, in his own words, "working with [Khalid bin Mahfouz] *for NCB.*"   (emphasis supplied).

---

[3] In its "Renewed" Motion to Dismiss, NCB asserts that it did not maintain any accounts for the Muwafaq Foundation.  While Plaintiffs believe they are entitled to test the veracity of that assertion through discovery, it should be noted Plaintiffs' theories of specific jurisdiction arising from NCB's relationship with Muwafaq rest on specific allegations and evidence that NCB executives and officials used various accounts at the bank to make transfers to Muwafaq Foundation, and that NCB also channeled its own resources to Muwafaq.  Thus, the critical issue in the context of the present jurisdictional analysis is not simply whether Muwafaq held accounts at NCB, but rather whether NCB transferred any of its own assets, or facilitated transfers on behalf of other parties, to Muwafaq, and what NCB officials knew about the purposes of such transfers.  Those are the precise issues the *Federal Insurance* Plaintiffs seek to explore through discovery.

[4] Among other relevant filings, the record in the *Federal Insurance* case includes the *Federal Insurance* Plaintiffs' Oppositions to NCB's Initial Motion to Dismiss, Khalid bin Mahfouz's Motion to Dismiss, and Yassin al Kadi's Motion to Dismiss, including all exhibits submitted in relation to those Oppositions.  As the *Federal Insurance* Plaintiffs' entitlement to the requested discovery must be evaluated on the basis of a review of the complete record, they hereby incorporate by reference those Oppositions in their entireties.  See Docket #s 515, 516, 1146, 1147-49, 1761, and 1762-63.

August 15, 2008
Page 6

_____

     For the reasons stated in further detail in their April 25 letter, as supplemented by the additional facts and information submitted herewith, the *Federal Insurance* Plaintiffs respectfully request that the Court order NCB to provide full and complete responses to the *Federal Insurance* Plaintiffs' First Set of Jurisdictional Requests for Production of Documents Directed to the National Commercial Bank, which consist of 28 targeted discovery requests concerning the relationships among NCB, al Kadi, bin Mahfouz and Muwafaq. Those requests were served nearly a year ago, on August 24, 2007, and are attached as Exhibit 2 to the *Federal Insurance* Plaintiffs' April 25 letter.

     Upon completion of that written discovery, the *Federal Insurance* Plaintiffs request that the Court direct NCB to produce a company representative knowledgeable of the relationships among NCB, al Kadi, bin Mahfouz and Muwafaq for deposition, pursuant to Fed. R. Civ. P. 30(b)(6).

### C.    The *Federal Insurance* Plaintiffs Are Entitled to the Discovery They Seek Concerning NCB's Sponsorship of Al Qaida Through IIRO and the SJRC

     The *Federal Insurance* Plaintiffs have also asserted that NCB channeled funds through al Qaida via the International Islamic Relief Organization (IIRO), and the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC). These allegations are based on specific investigative facts demonstrating that those ostensible charities served as fronts for al Qaida, and that senior representatives of NCB knowingly conspired to use the Bank's infrastructure to facilitate transfers to al Qaida through those purported charities.

     There is no dispute that NCB provided financial services to the SJRC and IIRO. Accordingly, under governing legal standards, NCB will be subject to both jurisdiction and liability in the event that it knew the IIRO and SJRC were al Qaida fronts at times when it was providing financial services to those organizations.[5] See In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539 (S.D. N.Y. 2005) (in light of al Qaeda's public declaration of war against the United States, someone who is… a provider of financial and logistical support to al Qaeda, has purposely directed his activities at the United States such that the exercise of personal jurisdiction over him is reasonable.); See also In Re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D. N.Y. 2005) (finding that indirect contributions to al Qaeda are

_____

[5] Although it would be impractical to attempt to overview all of the relevant allegations and record evidence underlying the *Federal Insurance* Plaintiffs' contention that NCB knew the IIRO and SJRC were al Qaida fronts in this context, it is worth noting that Yassin al Kadi, the individual Khalid bin Mahfouz chose to establish NCB's Islamic Banking Division, is himself an Executive Order 13224 terrorist designee. Moreover, al Kadi acknowledges a close personal relationship with Wa'el Jelaidan, a founding member of al Qaida and the architect of al Qaida's global financial infrastructure. Jelaidan has held senior positions in many of al Qaida's charity fronts, *including the Saudi Joint Relief Committee and IIRO*. In addition, the Treasury Department Evidentiary memorandum concerning al Kadi makes clear that Jelaidan regularly enlisted al Kadi's assistance to support terrorist causes. The *Federal Insurance* Plaintiffs respectfully submit that these discrete facts are, in and of themselves, sufficient circumstantial evidence to establish al Kadi's awareness that the IIRO and SJRC were serving as fronts for al Qaida. By virtue of al Kadi's role with NCB, that knowledge is imputable to NCB. See In re Investors Funding Corp., 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980).

August 15, 2008
Page 7

_____

sufficient to establish a defendant's participation in al Qaeda's conspiracy to attack America, where the defendant knew the organization receiving those contributions to be a solicitor, collector, supporter, front or launderer for the terrorist organization).

Although the *Federal Insurance* Plaintiffs would be within their rights under the Rules to conduct complete discovery concerning NCB's relationships with the IIRO and SJRC, they have attempted to streamline that process by merely submitting discovery requests for any available lists or summaries, including lists or summaries which can be generated electronically, of accounts maintained by NCB for those organizations, and transactions carried out on behalf, or for the benefit of, those organizations. As a sophisticated international financial institution, the *Federal Insurance* plaintiffs anticipate that NCB can generate this required information with relative ease. In addition, the *Federal Insurance* Plaintiffs have submitted targeted discovery requests, concerning facts relevant to assessing NCB's knowledge of the terrorism sponsorship activities of the IIRO and SJRC. These requests are included in the *Federal Insurance* Plaintiffs' Second Set of Jurisdictional Requests for Production of Documents Directed to the National Commercial Bank, attached as Exhibit "D" hereto.

The *Federal Insurance* Plaintiffs respectfully request that the Court direct NCB to provide full and complete responses to these discovery requests. Upon completion of that written discovery, the *Federal Insurance* Plaintiffs request that the Court direct NCB to produce a company representative knowledgeable about the relationships among NCB, IIRO and SJRC for deposition, pursuant to Fed. R. Civ. P. 30(b)(6).

### D.   The *Federal Insurance* Plaintiffs Are Entitled to the Discovery They Seek Concerning the Duties, Responsibilities and Activities of Yassin al Kadi and Khalid bin Mahfouz, and the Operations of NCB's Islamic Banking Division

In its "Renewed" Motion to Dismiss, NCB argues in conclusory fashion that Yassin al Kadi and Khalid bin Mahfouz were necessarily acting outside of the scope of their employment with NCB in relation to any sponsorship of al Qaida, even though the infrastructure of the bank was knowingly used by those senior officers and agents of NCB to facilitate that support. In making this argument, NCB mischaracterizes Plaintiffs' claims against NCB, which in part rest on the theory that NCB, *as an institution*, knowingly provided material support and resources to al Qaida. In addition, NCB ignores the relevant legal standards for determining whether the actions of an employee or agent are attributable to a corporation. Of greater significance to the present application, NCB's "scope of employment" and "attribution" arguments interject disputed factual issues into the jurisdictional contest, relative to which discovery must be afforded.

While a full recitation of the standards for imposing liability on a corporation under applicable theories of direct and vicarious liability is beyond the scope of the present submission, it is worth noting that the relevant inquires are inherently fact sensitive under both New York law and federal common law. For instance, under New York law, the following factors must be considered in determining whether actions of an employee are attributable to a corporation under a vicarious liability theory:

August 15, 2008
Page 8

_____

        (1) the connection between the time, place and occasion for the act;
(2) the history of the relationship between the employer and
employee as spelled out in actual practice; (3) whether the act is
one commonly done by such an employee; (4) the extent of
departure from normal methods of performance; and (5) whether
the specific act was one that the employer could reasonably have
anticipated.

Riviello v. Waldron, 47 N.Y.2d 297, 391 N.E.2d 1278, 1281, 418 N.Y.S.2d 300, 303 (1969)
(citing Restatement (Second) of Agency § 229).[6]

        Critically, when the fact sensitive scope of employment inquiry is relevant to the question
of jurisdiction, as NCB acknowledges that it is here, a 12(b)(1) motion to dismiss cannot be
heard – and jurisdiction cannot be determined – until all relevant discovery as to the scope of
employment has been completed.  Hamm v. United States, 439 F. Supp. 2d 262, 264 (W.D.N.Y.
2006); Asto v. Mirandona, 372 F. Supp. 2d 702, 706 (E.D.N.Y. 2005); Pomeroy v. Quarles, 2001
U.S. Dist. LEXIS 18138, * 9-13 (N.D.N.Y 2001); Petrousky v. United States, 1989 U.S. Dist.
LEXIS 5355, *6-9 (N.D.N.Y 1989) (requiring that an evidentiary hearing be held to determine
whether the actions complained of were undertaken within the scope of her employment, and
refusing to grant a motion to dismiss or in the alternative summary judgment).[7]

        Consistent with the foregoing authorities, the _Federal Insurance_ Plaintiffs served
discovery requests upon NCB, promptly after receiving NCB's "Renewed" Motion to Dismiss,
relative to NCB's "scope of employment" and "attribution" defenses.  Those requests, which are
also included in the _Federal Insurance_ Plaintiffs' Second Set of Jurisdictional Requests for
Production of Documents Directed to the National Commercial Bank, Exhibit "D" hereto, seek
discovery concerning the relevant duties, responsibilities and activities of Khalid bin Mahfouz
and Yassin al Kadi.  In addition, as the _Federal Insuranc_e Plaintiffs contend that NCB's
sponsorship of al Qaida was directed largely through NCB's Islamic Banking Division, in
keeping with policies established by senior officials of that Division, the supplemental discovery
requests also seek relevant information concerning the operations of NCB's Islamic Banking
Division, and that Division's ties to al Qaida's charity fronts.  As these supplemental discovery
requests are all directly relevant to the fact sensitive "scope of employment" and "attribution"
questions implicated by the NCB jurisdictional dispute, the _Federal Insurance_ Plaintiffs
respectfully submit that they are entitled to complete that discovery prior to responding to NCB's

_____

[6] Contrary to NCB's asserted position, the cases make clear that for a tort to have been committed within
the scope of employment, an employee's primary motive need not have been to serve the master, nor need
the master have benefitted financially from the tort. See Sharkey v. Lasmo (AUL Ltd.), 992 F. Supp. 321,
329 (S.D.N.Y. 1998) (collecting cases).
[7] Although al Kadi was engaged by bin Mahfouz to establish NCB's Islamic Banking Division, NCB
disputes that al Kadi was ever an "employee" of NCB."  Given his role in establishing that Division and
setting its policies, the _Federal Insurance_ Plaintiffs submit that al Kadi acted at all relevant times as an
"agent" of NCB, even if not technically an "employee" of NCB.  In the present context, the difference is
largely semantic, as the analysis of whether al Kadi acted as an agent of NCB in relation to the relevant
conduct is also a fact sensitive inquiry, requiring discovery.  See Cabrera v. Jakabovitz, 24 F.3d 372, 386
(2d Cir. 1994)

August 15, 2008
Page 9

---

Renewed Motion to Dismiss. Accordingly, the *Federal Insurance* Plaintiffs request that the Court direct NCB to provide full and complete responses to that discovery. Upon completion of that written discovery, the *Federal Insurance* Plaintiffs request that the Court direct NCB to produce a company representative knowledgeable about the issues relevant to the scope of employment and attribution questions for deposition, pursuant to Fed. R. Civ. P. 30(b)(6).

For obvious reasons, Khalid bin Mahfouz and Yassin al Kadi also possess information and evidence relevant to the "scope of employment" and "attribution" disputes, and the jurisdictional contest relating to NCB more generally. As those defendants are no longer formally associated with NCB, discovery requests to NCB do not represent a viable means to develop the relevant information and evidence in possession of bin Mahfouz and al Kadi. Accordingly, the *Federal Insurance* Plaintiffs have served targeted discovery requests upon Khalid bin Mahfouz and Yassin al Kadi,[8] seeking relevant information and evidence in their possession concerning the NCB jurisdictional dispute, to include their roles in setting and implementing policies at NCB; their understanding of the nature of their duties and responsibilities at NCB; their involvement in channeling material support to al Qaida's charity fronts while employees and agents of NCB; their links to al Qaida and its charity fronts; and the relationship between NCB and al Qaida's charity fronts. Those discovery requests are attached as Exhibits "E" and "F" hereto.

Because the discovery sought from bin Mahfouz and al Kadi is also directly relevant to the NCB jurisdictional inquiry, the *Federal Insurance* Plaintiffs must be afforded an opportunity to obtain the requested discovery from those closely related defendants, before discovery as to NCB can properly be deemed "complete." Indeed, given the deeply inter-related nature of the theories of jurisdiction and liability advanced as to NCB, Khalid bin Mahfouz and Yassin al Kadi, the *Federal Insurance* Plaintiffs respectfully submit that all further proceedings as to those defendants should be conducted on a coordinated basis.[9] Accordingly, the *Federal Insurance* Plaintiffs respectfully request that the time for responding to NCB's renewed Motion to Dismiss be extended to a date sixty (60) days after the completion of jurisdictional discovery as to all three defendants.

---

[8] In addition to the referenced document requests, the *Federal Insurance* Plaintiffs have served Notices of Deposition upon Khalid bin Mahfouz and Yassin al Kadi.

[9] By singling out al Kadi and bin Mahfouz, the *Federal Insurance* Plaintiffs in no way mean to suggest that they are the only separate defendants with information and evidence relevant to NCB's jurisdictional defense. To the contrary, the theories of jurisdiction advanced as to NCB directly implicate many other defendants, to include the SJRC, IIRO, Wa'el Jelaidan, Abdulrahman bin Mahfouz, Suleiman al Rajhi and others. Under governing authority, these interrelationships may render it improper for the Court to entertain NCB's "Renewed Motion to Dismiss" until the completion of all relevant discovery, an argument the *Federal Insurance* Plaintiffs specifically preserve their right to advance. However, the *Federal Insurance* Plaintiffs are hopeful that the targeted discovery they seek herein will moot any such concerns. Ideally, discovery as to all defendants in the litigation would be proceeding on a coordinated basis in logical stages, to avoid these procedural complexities.

August 15, 2008
Page 10

---

**E.  The *Federal Insurance* Plaintiffs Are Entitled to the Discovery They Seek Concerning The Specifically Identified NCB Accounts, and the Operations of the Tahlia Branch of NCB**

Based on sensitive investigative materials,[10] Plaintiffs have identified several specific NCB accounts, which they believe were used to facilitate particularized funding of Osama bin Laden.  The available information indicates that senior officials of NCB worked with managers of NCB's Tahlia Branch to facilitate the sponsorship of al Qaida through these identified accounts.  In addition, the relevant investigative materials indicate that the Saudi Ministry of the Interior and/or its subdivisions, the Office of the General Investigations Directorate (Mahabith), conducted an investigation relating, in whole or in part, to the activities of Khalid bin Mahfouz.  On the basis of the information available to them, Plaintiffs have served discovery requests relating to these topics as well.  See Exhibit "D" hereto.  As the targeted requests in question seek particularized information relating to NCB's support for al Qaida, Plaintiffs respectfully request that the Court direct NCB to provide full and complete responses to those requests.  Upon completion of that written discovery, plaintiffs request that the Court direct NCB to produce for deposition witnesses with knowledge concerning the accounts, transactions and investigations at issue.  Notices have already been served for the depositions of two identified NCB representatives with knowledge relevant to those areas of inquiry.

**F.  The *Federal Insurance* Plaintiffs Are Entitled to the Discovery They Seek Concerning the Character of NCB's Relationship With the Government of Saudi Arabia**

Depending on the precise nature of the relationship between NCB and the Saudi government, the jurisdictional contacts of the government of Saudi Arabia may be attributable to NCB for purposes of establishing personal jurisdiction over NCB in the present case.  For this reason, the *Federal Insurance* Plaintiffs are entitled to conduct discovery as to NCB's relationship to the Kingdom of Saudi Arabia, in relation to NCB's personal jurisdiction defense.

Throughout the course of this litigation, NCB has maintained that it is owned by the Saudi government, and therefore an "agency or instrumentality" of the Kingdom.  While it is true that agencies of a foreign government are entitled to a presumption of juridical independence, the presumption of juridical independence must be disregarded: (1) where "internationally recognized equitable principals mandate attribution to avoid injustice;" or (2) where "the corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 632 (1983) (Bancec).  Where either of these circumstances apply, attribution of the contacts of the state to the agency, and vice versa, is appropriate.  See First City, Texas-Houston, N.A. v. Rafidian Bank, 150 F.3d 172, 176 (2d Cir. 1998).

---

[10] Due to the sensitive nature of the underlying materials, Plaintiffs do not believe it appropriate to submit them as attachments to this public filing.  Plaintiffs are examining the proper method to share these materials with the Court within the next week.

August 15, 2008
Page 11

---

Consistent with the foregoing authorities, discovery concerning the character of NCB's relationship with the Saudi state may warrant attribution of the government of Saudi Arabia's contacts with the United States to NCB, a result which would invariably establish the availability of personal jurisdiction over NCB in the present action. This suggestion is by no means fanciful. Once again, NCB itself asserts that it is owned by the Saudi government, one of the factors relevant to the jurisdictional attribution analysis. Moreover, NCB's website presently includes a statement strongly suggesting that the ownership of NCB, which according to NCB is the Saudi government, also directed the operations of the bank until the implementation of new corporate governance policies on January 1, 2006. In particular, the website contains the following statement:

> On October 1, 2005, Mr. Abdul Kareem Abu al Nasr was appointed as General Manager and later assumed the Bank's first Chief Executive Officer (CEO) position on January 1, 2006 *after NCB had applied the principles of corporate governance to separate between ownership and management of the Bank.*

http://www.alahli.com/content/aboutncb.asp, Exhibit "G" hereto.

In view of this statement from NCB's website, it appears that there was no distinction between the ownership and management of the Bank between 1999, when the Saudi government reorganized and took control of the institution, and January 1, 2006, when new corporate governance procedures were implemented to create independence between the ownership and management of the Bank.

For all of the foregoing reasons, the *Federal Insurance* Plaintiffs are entitled to conduct discovery concerning the character of the relationship between NCB and the government of Saudi Arabia, in order to assess whether Saudi Arabia's contacts with the United States are attributable to NCB for purposes of the personal jurisdiction analysis. Accordingly, the *Federal Insurance* Plaintiffs respectfully request that the Court direct NCB to provide full and complete responses to the *Federal Insurance* Plaintiffs' discovery requests concerning NCB's relationship with the government of Saudi Arabia. Upon completion of that written discovery, the *Federal Insurance* Plaintiffs request that the Court direct NCB to produce a company representative knowledgeable about NCB's relationship with the Saudi government for deposition, pursuant to Fed. R. Civ. P. 30(b)(6).

G.     **The *Federal Insurance* Plaintiffs Are Entitled to Depose the NCB Representatives Who Have Submitted Affidavits in Support of NCB's "Renewed" Motion to Dismiss**

In support of its "Renewed" Motion to Dismiss, NCB has submitted affidavits of several officials and employees of the bank. For the reasons set forth in the separate submissions of their Co-Plaintiffs, the *Federal Insurance* Plaintiffs respectfully submit that they are entitled to depose those NCB representatives, before responding to a Motion which invokes their testimony in support of the claims advanced against NCB.

August 15, 2008
Page 12

---

## III.  **CONCLUSION**

For all of the foregoing reasons, the *Federal Insurance* Plaintiffs respectfully request that the Court:  (1) confirm their entitlement to conduct discovery relative to the relationships, activities and issues identified above; (2) direct NCB to provide full and complete responses to all of the *Federal Insurance* Plaintiffs' written discovery; (3) direct NCB to produce a corporate designee or designees for deposition concerning the facts relevant to the jurisdictional analysis, as outlined above, pursuant to Fed. R. Civ. P. 30(b)(6); (4) direct NCB to produce the employees and representatives who submitted affidavits in support of NCB's Motion to Dismiss for deposition; and (5) extend the deadline for responding to NCB's Renewed Motion to Dismiss to sixty days after the completion of all discovery relevant to the NCB jurisdictional analysis, to include discovery served upon closely related defendants Yassin al Kadi and Khalid bin Mahfouz.

Respectfully submitted,

COZEN O'CONNOR

BY:  SEAN P. CARTER

SPC/bdw
Enclosure
cc:    The Honorable George B. Daniels (Via Federal Express w/enc.)
         All counsel of Record (Via email w/enc.)

PHILADELPHIA\3792694\1  117430.000



**COZEN**

**O'CONNOR**

A PROFESSIONAL CORPORATION

1900 MARKET STREET   PHILADELPHIA, PA 19103-3508   215.665.2000   800.523.2900   215.665.2013 FAX   www.cozen.com

**Sean P. Carter**
Direct Phone  215.665.2105
Direct Fax     215.701.2105
scarter@cozen.com

April 25, 2008

**VIA FEDERAL EXPRESS**

The Honorable George B. Daniels
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 630
New York, NY 10007

  Re: *In Re: Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (GBD)
    *Federal Insurance Co., et al. v. al Qaida, et al.,* 03 CV 6978 (GBD)

Dear Judge Daniels:

  I write on behalf of the *Federal Insurance* plaintiffs, to oppose the April 21, 2008 letter application submitted by National Commercial Bank (NCB), for leave to file a "renewed" Motion to Dismiss for lack of personal jurisdiction in all of the pending cases against it.

  For the reasons set forth in greater detail below, the filing of a "renewed" Motion to Dismiss by NCB in the *Federal Insurance* action is procedurally and substantively improper. NCB has a fully briefed Motion to Dismiss pending in the *Federal Insurance* case, and is therefore procedurally prohibited from filing a "renewed" Motion to Dismiss at this time.  The fact that certain jurisdictional discovery has been undertaken as to NCB in the *Burnett* and *Ashton* cases does not alter this fact, as those are separate cases and the discovery proceedings in those actions did not involve the *Federal Insurance* suit.  To bind the *Federal Insurance* plaintiffs by the discovery proceedings in those separate cases would violate established Supreme Court and Second Circuit authority, and deprive the *Federal Insurance* plaintiffs of fundamental rights guaranteed by the Federal Rules of Civil Procedure.

  Rather than the illegitimate procedural course NCB seeks to pursue, this Court should extend its prior denials of NCB's Motion to Dismiss the *Ashton* and *Burnett* actions for lack of

The Honorable George B. Daniels
April 25, 2008
Page 2

personal jurisdiction to the *Federal Insurance* case, and formally authorize the *Federal Insurance* plaintiffs to conduct limited jurisdictional discovery as to NCB. The conduct of such discovery is necessary to create an adequate record in the *Federal Insurance* case relative to NCB's personal jurisdiction defense, and therefore a procedural prerequisite for the disposition of that defense in *Federal Insurance*. Thus, the *Federal Insurance* plaintiffs' proposed approach represents the only valid means to harmonize the procedural status of the claims against NCB in all of the MDL cases and allow further proceedings against NCB to move forward on a consolidated basis, while at the same time protecting the procedural rights of *all* parties.

In advocating this course, the *Federal Insurance* plaintiffs by no means seek to replicate the discovery that has already been undertaken as to NCB in *Ashton* and *Burnett*. To the contrary, the *Federal Insurance* plaintiffs seek discovery as to only a few discrete issues and relationships, critical to the specific jurisdictional theories they have advanced as to NCB based on the unique allegations of their Complaint, and evidence which corroborates those detailed factual allegations. As discussed in greater detail below, the *Federal Insurance* plaintiffs have already served Requests for Production of Documents upon NCB relative to the limited topics at issue, consisting of only 28 individual requests.

By previously serving those requests, the *Federal Insurance* plaintiffs sought to promote efficiency in the MDL, by ensuring that jurisdictional discovery as to NCB in all of the MDL cases could be completed simultaneously. Unfortunately, NCB refused to substantively respond to that discovery, and also declined to voluntarily withdraw its pending Motion to Dismiss for lack of personal jurisdiction in the *Federal Insurance* case, as the *Federal Insurance* plaintiffs requested that it do in light of the prior denials of that Motion in *Ashton* and *Burnett*.

I.    PROCEDURAL BACKGROUND

On January 18, 2005, the Court issued a decision addressing NCB's then pending Motion to Dismiss the *Burnett* and *Ashton* actions only. In that decision, the Court denied without prejudice NCB's Motion to Dismiss for Lack of Subject Matter Jurisdiction Under the Foreign Sovereign Immunities Act, reasoning that NCB's entitlement to the protections of the FSIA was unclear, and that the *Ashton* and *Burnett* plaintiffs were entitled to "take discovery of the jurisdictionally relevant facts." Following that ruling, NCB urged the Court to rule on its personal jurisdiction defenses in the *Ashton* and *Burnett* cases, before permitting those plaintiffs to move forward with discovery as to the subject matter jurisdiction question. The Court consented to that approach, and thereafter issued a ruling authorizing the plaintiffs in the *Burnett* and *Ashton* cases, and no other plaintiffs, to move forward with discovery as to the jurisdictional theories advanced by those plaintiffs. In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 573-75. As that decision was limited to the *Burnett* and *Ashton* cases, the Court did not consider any of the factual or legal theories of personal jurisdiction advanced by the *Federal Insurance* plaintiffs in issuing that ruling.

During the early stages of discovery proceedings as to NCB in the *Ashton* and *Burnett* cases, several disputes arose between those plaintiffs and NCB, requiring judicial intervention. On April 18, 2006, the Court referred a number of particular disputes in those cases, outlined in an April 12, 2006 letter, to Judge Maas for resolution. Judge Maas issued a decision as to those

The Honorable George B. Daniels
April 25, 2008
Page 3

particular disputes on June 29, 2006. During the course of subsequent discovery proceedings, Judge Maas issued orders pertaining to a number of additional disputes between NCB and the *Ashton* and *Burnett* plaintiffs.

All of the discovery proceedings as to NCB to date have been expressly limited to the *Ashton* and *Burnett* actions. In this regard, it is notable that NCB itself designated all of its responses and objections to the discovery in question as applicable only to the *Ashton* and *Burnett* cases. See Relevant Pages from NCB's Discovery Responses, attached hereto as Exhibit 1. Furthermore, in resolving discovery disputes pertaining to NCB, Judge Maas considered only the allegations of the *Ashton* and *Burnett* Complaints, and the legal and factual submissions offered by those plaintiffs. Judge Maas never considered any of the allegations of the *Federal Insurance* Complaint, or the extrinsic evidence offered by those plaintiffs in opposition to NCB's Motion to Dismiss the *Federal Insurance* action. Judge Maas considered argument only from counsel for the *Ashton* and *Burnett* plaintiffs.

Given the fact that discovery proceedings as to NCB were expressly limited by both the Court and the parties to the *Ashton* and *Burnett* actions, the *Federal Insurance* plaintiffs were understandably surprised by NCB's assertion, in the parties' August 3, 2007 status report to the Court concerning jurisdictional discovery, that "NCB contends that *Federal Insurance* plaintiffs' counsel have participated in the jurisdictional discovery process as to NCB, without objection by NCB, and NCB's pending Motion to Dismiss the *Federal Insurance* Complaint therefore does not provide a reason to prolong the jurisdictional discovery process." By virtue of that statement, the *Federal Insurance* plaintiffs came to realize that NCB was seeking to avoid discovery in the *Federal Insurance* action altogether, and, in effect, bind the *Federal Insurance* plaintiffs by the discovery proceedings conducted in the separate *Burnett* and *Ashton* cases.

Although it is impossible for the *Federal Insurance* plaintiffs to know the precise thinking underlying NCB's stated strategy, it is logical to presume that NCB was concerned that the *Federal Insurance* plaintiffs' Complaint and submissions relative to NCB's Motion to Dismiss could potentially open the door to additional areas of discovery relating to personal jurisdiction, and that it was therefore to NCB's advantage to limit discovery to the *Burnett* and *Ashton* matters. Were that not the case, NCB would simply have voluntarily withdrawn its Motion to Dismiss the *Federal Insurance* case, and invited the *Federal Insurance* plaintiffs to actively participate in the jurisdictional discovery proceedings.[1]

In any event, promptly after NCB disclosed its planned strategy to avoid any jurisdictional discovery in the *Federal Insurance* action, the *Federal Insurance* plaintiffs took action to protect their rights and interests, by serving their First Set of Jurisdictional Requests for Production of Documents on NCB. See Exhibit 2. Following service of those discovery

---

[1] It should be noted that NCB did approach the *Federal Insurance* plaintiffs following the Court's decision to permit personal jurisdiction discovery in the *Burnett* and *Ashton* cases, to request that the *Federal Insurance* plaintiffs stipulate to postpone adjudication of NCB's Motion to Dismiss the *Federal Insurance* action. The *Federal Insurance* rejected that proposal because, among other things, it did not provide the *Federal Insurance* plaintiffs with the right to actively participate in the jurisdictional discovery proceedings in the other cases.

The Honorable George B. Daniels
April 25, 2008
Page 4

requests, counsel for NCB and counsel for the *Federal Insurance* plaintiffs exchanged a series of letters, outlining their respective positions as to the *Federal Insurance* plaintiffs' entitlement to jurisdictional discovery, and how that discovery should be approached given the differing procedural statuses of the various cases. In its first letter relating to the *Federal Insurance* discovery requests, attached hereto as Exhibit 3, NCB argued that the *Federal Insurance* plaintiffs discovery to NCB was improper, because the Court had never authorized the *Federal Insurance* plaintiffs to conduct discovery as to NCB. More specifically, NCB's letter stated as follows:

> As you know, NCB has a pending Motion to Dismiss the *Federal Insurance* Complaint (MDL DKT. #416), and briefing of that Motion was completed on November 29, 2004…. Accordingly, under Case Management Order No. 2, paragraph 17 (MDL DKT. #247), the *Federal Insurance* plaintiffs may not proceed with merits discovery as to NCB. Equally important, however, the Court has not authorized the *Federal Insurance* plaintiffs to proceed with jurisdictional discovery as to NCB.

Exhibit 3 at p. 1.

Notwithstanding its assertion that the *Federal Insurance* plaintiffs were procedurally prohibited from conducted discovery as to NCB, NCB's letter went on to argue that the *Federal Insurance* plaintiffs were bound by all discovery proceedings conducted in the separate *Ashton* and *Burnett* cases. In support of this argument, NCB argued that the *Federal Insurance* plaintiffs had participated "in the jurisdictional discovery process in *Burnett* and *Ashton*" by passively attending a few proceedings concerning the jurisdictional discovery as to NCB in *Ashton* and *Burnett*. Id. at p. 2.

The *Federal Insurance* plaintiffs responded to NCB's letter on September 14, 2007. In that letter, attached hereto as Exhibit 4, counsel explained that the arguments raised in NCB's August 31, 2007 letter were misplaced, and that the conduct of limited discovery as to NCB in *Federal Insurance* matter would promote efficiency and conserve judicial resources by allowing all jurisdictional discovery as to NCB in the MDL to be completed simultaneously. As a preliminary matter, the *Federal Insurance* plaintiffs noted that NCB's argument that they were bound by the discovery conducted as to NCB in the *Ashton* and *Burnett* actions misapprehended the fundamental nature of consolidated proceedings, explaining as follows:

> As the Supreme Court and 2nd Circuit have explained, consolidation is merely a procedural devise designed to promote judicial economy, and cannot affect the merger of the actions or the claims of the separate parties. Accordingly, consolidation does not change the rights of the parties in the separate suits. As a result, the district court is required to consider the jurisdictional basis of each suit in the consolidated proceeding separately. Johnson v. Manhattan RY, 289 U.S. 479, 496-97, 77 L.Ed. 1331,

The Honorable George B. Daniels
April 25, 2008
Page 5

_____

53 S. Ct. 721 (1933); Cole, et al. v. Schenley Industries, Inc., et al.,
563 F.2d 35, 38 (2nd Cir. 1977).

Exhibit 4 at p. 1.

In light of the controlling authorities establishing the distinct character of individual actions within a consolidated proceeding, the *Federal Insurance* plaintiffs noted that they simply could not have "actively participated" in the discovery in the *Burnett* and *Ashton* cases as NCB argued. "Because of the distinct and separate nature of the individual actions, the *Federal* plaintiffs have no standing to conduct discovery via the *Ashton* or *Burnett* cases, direct discovery conducted as to NCB in those cases, define the arguments raised to the Court in relation to discovery disputes in those separate actions, or otherwise protect their interest via discovery in those cases." Furthermore, as a factual matter, the *Federal Insurance* plaintiffs noted that they had not presented any argument at any of the discovery hearings concerning NCB, or asked any questions during the deposition of Lawrence Smith. Id. at p. 2.

In response to the *Federal Insurance* plaintiffs' September 14,2007 letter, NCB sent a correspondence on September 24, 2007, attached hereto as Exhibit 5, in which it advanced arguments inherently inconsistent with the positions asserted in its first letter, apparently due to an evolution in its thinking triggered by the legal authorities cited by the *Federal Insurance* plaintiffs. Specifically, despite having argued in its August 31, 2007 letter that the *Federal Insurance* plaintiffs were procedurally prohibited from conducting jurisdictional discovery as to NCB, the letter NCB sent to plaintiffs' counsel on September 24, 2007 asserted that the *Federal Insurance* plaintiffs were *compelled* to conduct discovery as to NCB in concert with the *Burnett* and *Ashton* plaintiffs. According to NCB's second letter, the *Federal Insurance* plaintiffs' "participation [in that discovery] was not elective...it was mandatory."[2] As support for its new position, NCB cited paragraph 20 of Case Management Order No. 2, which states: "*To the extent possible*, the parties shall conduct consolidated discovery…" (emphasis supplied). Exhibit 5 at p. 2.

Following the parties' exchange of letters, the *Federal Insurance* plaintiffs sought judicial intervention relative to their dispute with NCB. Specifically, in the plaintiffs' Executive Committee's November 16, 2007 letter to the Court regarding the proposed agenda for the case management conference that had been scheduled for January 15, 2008, plaintiffs requested that the Court take up the issue at the heart of the *Federal Insurance* plaintiffs' dispute with NCB:

Decisions Applicable in Fewer Than All Cases:

Plaintiffs would like to discuss with the Court their request that the
Court extend to all cases denials of motions to dismiss that Judge
Casey issued in some, but fewer than all, cases. Defense counsel
have taken inconsistent positions … arguing in some instances that

_____

[2] That this represented a new position for NCB is self-evident from the fact that NCB designated its discovery responses as applicable only to the *Ashton* and *Burnett* cases, and only served contention discovery requests relating to jurisdiction on those plaintiffs. In simple terms, NCB did not treat the *Federal Insurance* plaintiffs as participants in the jurisdictional discovery proceedings at any time.

The Honorable George B. Daniels
April 25, 2008
Page 6

_____

> discovery cannot proceed in the cases where motions are still
> pending, and in other cases that any discovery taking place now
> must be applied to all cases, including those in which motions are
> still pending.

The Court adjourned the January 15, 2008 case management conference until March 18,
2008, without issuing a decision relative to plaintiffs' request that the Court extend previous
denials of motions to dismiss to all remaining cases. Shortly before the scheduled March 18,
2008 conference, the Court requested that the parties identify any agenda items for the case
management conference which remained unresolved. In response to that inquiry, plaintiffs again
requested judicial intervention relative to the procedural complications and inefficiencies arising
from the differing procedural statuses of the various cases as to common defendants, including
NCB. By Order dated March 14, 2008, the Court invited the parties to submit specific
applications to have prior decisions in fewer than all cases extended to the remaining cases.

Before the *Federal Insurance* plaintiffs had an opportunity to submit such an application
as to NCB, that defendant filed its letter application for leave to file renewed Motion to Dismiss
in all of the pending actions, including the *Federal Insurance* case. In that letter, NCB argues
that it is entitled to file a renewed Motion to Dismiss in *Federal Insurance*, despite the fact that
its pending Motion to Dismiss has not been decided and it has refused to respond to discovery in
*Federal Insurance*, because (NCB theorizes) "the jurisdictional discovery record developed in
the *Ashton* and *Burnett* actions applies equally to all other MDL 1570 lawsuits because the case
management orders require all plaintiffs to conduct discovery on a consolidated basis."

For the reasons set forth below, NCB's position is fundamentally incorrect, and the
*Federal Insurance* plaintiffs are entitled to the limited discovery they seek in support of their
jurisdictional theories as to NCB.

II.   ARGUMENT

    A.    The *Federal Insurance* Plaintiffs Were Not Participants in the Discovery
           Proceedings as to NCB in the *Ashton* and *Burnett* Cases, and Cannot be Deemed
           Bound by the Discovery Proceedings in Those Separate Cases

NCB's contention that the jurisdictional discovery record developed in the *Ashton* and
*Burnett* actions applies equally to all other MDL 1570 lawsuits is legally and factually incorrect.
As explained in the *Federal Insurance* plaintiffs' September 14, 2007 letter to counsel for NCB,
the consolidation of these cases does not affect a merger of the actions or the claims of the
separate parties, and the district court is therefore *required* to consider the jurisdictional basis of
each suit in a consolidated proceeding separately. Johnson, 289 U.S. at 496-97; Cole, 563 F.2d
35, 38 (2nd Cir. 1977). NCB's effort to bind the *Federal Insurance* plaintiffs by the discovery
proceedings in the separate *Ashton* and *Burnett* cases runs afoul of those well established legal
principles, which at their core, serve to protect the fundamental procedural rights of litigants.

Moreover, the provisions of the relevant Case Management Orders do not (and could not)
alter this analysis. In advancing its argument based on the provisions of paragraph 20 of Case

The Honorable George B. Daniels
April 25, 2008
Page 7

_____

Management Order No. 2, NCB conveniently ignores the qualifying language of that provision, which dictates that consolidated discovery should be undertaken "to the extent possible...."[3] Significantly, other defendants in this litigation have specifically argued that this language precludes consolidated discovery where a decision authorizing discovery has been issued in fewer than all cases. In fact, defendant Jamal Barzinji has gone so far as to argue that discovery responses provided in a certain case cannot even be shared with plaintiffs who have not yet been authorized to proceed with discovery against him:

> Dr. Barzinji objects to producing any documents to any plaintiffs other than the *Federal Insurance* Plaintiffs.... Dr. Barzinji currently has outstanding Motions to Dismiss the claims asserted against him by the Plaintiffs in *Ashton, Burnett, NY Marine, Continental,* and *World Trade Center.* Unless and until those plaintiffs are found to have stated claims against Dr. Barzinji, the *Federal Insurance* plaintiffs should be precluded from sharing any discovery with any of the other plaintiffs.

Thus, NCB's argument is not only inconsistent with the plain language of Case Management Order No. 2, but also the stated positions of other defendants in this litigation.

Beyond the legal deficiencies in NCB's possession, its arguments fail as a factual matter, because the record makes clear that neither the Court nor the parties regarded the *Federal Insurance* plaintiffs to be participants in the jurisdictional discovery proceedings as to NCB, and consequently there has been no consideration of the factual and legal predicates underlying the *Federal Insurance* plaintiffs' jurisdictional theories as to NCB in the context of those proceedings. As mentioned previously, NCB's own actions in relation to the jurisdictional discovery proceedings demonstrate that it did not treat the *Federal Insurance* plaintiffs as participants in that process. NCB specifically labeled its responses to the discovery served upon it as applicable only to the *Ashton* and *Burnett* cases. See Exhibit 1. Furthermore, NCB limited its application for leave to serve contention discovery to the *Ashton* and *Burnett* cases, and in fact only served contention discovery upon those plaintiffs. Had NCB believed that the jurisdictional discovery proceedings concerning it were in fact consolidated and involved all plaintiffs, it most certainly would have designated its discovery responses as applicable to all actions, and served contention discovery requests relating to jurisdiction upon all plaintiffs.

More significantly, the record makes clear that the Court did not consider the *Federal Insurance* plaintiffs to be participants in the discovery as to NCB, and engaged in no consideration of the *Federal Insurance* plaintiffs' jurisdictional theories in resolving any of the discovery disputes pertaining to NCB. Indeed, in resolving the jurisdictional discovery disputes

_____

[3] Paragraph 9 of Case Management Order No. 3, which discusses the rights and duties of the Plaintiffs Executive Committees, contains similar qualifying language. More fundamentally, Case Management Order No. 3 governs the organizational structure of the Plaintiffs' Executive Committees and duties and responsibilities of the Committee members, and NCB, as a defendant, has no standing to invoke any of those provisions as protection against discovery. In fact, the defendants specifically refused to have any involvement in the drafting or approval of Case Management Order No. 3, because they deemed it to have no relevance to them.

The Honorable George B. Daniels
April 25, 2008
Page 8

_____

referred to him, Judge Maas considered only the allegation set forth in the *Burnett* and *Ashton* complaints, and the extrinsic evidence offered by those plaintiffs. The Court heard argument only from counsel for those plaintiffs, and only those plaintiffs questioned witnesses during depositions. As a result, the existing record is devoid of any analysis of the facts and arguments relevant to determining whether the *Federal Insurance* plaintiffs have made a *prima facie* showing sufficient to warrant discovery as to facts and relationships relevant to any of their theories of jurisdiction, including the facts and relationships at issue in the discovery requests they have served upon NCB.[4]

For all of the above reasons, the jurisdictional record as to NCB in the *Ashton* and *Burnett* cases simply has no applicability to the *Federal Insurance* case. As a result, NCB cannot file a "renewed" Motion to Dismiss in *Federal Insurance* based on that unrelated and inapplicable record.

      B.      The *Federal Insurance* Plaintiffs can Demonstrate Their Entitlement to the Discovery They Seek Through Allegations and Evidence Not Considered by Judge Maas in Connection with Discovery Proceedings in *Ashton* and *Burnett*

For the reasons stated above, the analysis of the *Federal Insurance* plaintiffs' entitlement to jurisdictional discovery must be based on a comprehensive review of the allegations of the *Federal Insurance* Complaint, and the briefs already submitted by the parties. Nonetheless, the *Federal Insurance* plaintiffs anticipate that NCB will argue that the unrelated record in the *Ashton* and *Burnett* cases does provide an adequate basis to rule on the *Federal Insurance* plaintiffs' request for discovery. More specifically, the *Federal Insurance* plaintiffs anticipate that NCB will argue that: the factual and legal theories of jurisdiction advanced by the *Federal Insurance* plaintiffs are substantively identical to the theories advanced by the *Ashton* and *Burnett* plaintiffs; the discovery the *Federal Insurance* plaintiffs seek mirrors that previously served by the *Ashton* and *Burnett* plaintiffs; Judge Maas has already denied the *Ashton* and *Burnett* plaintiffs' discovery as to the topics at issue in the *Federal Insurance* plaintiffs' document request to NCB; and that Judge Maas' rulings are binding in the *Federal Insurance* plaintiffs, or should be extended to the *Federal Insurance* case in the interests of judicial economy. Given NCB's anticipated arguments, the *Federal Insurance* plaintiffs will briefly explain why they are entitled to discovery as to the discrete topics at issue.

As mentioned above, the *Federal Insurance* plaintiffs' First Set of Jurisdictional Requests for Production of Documents to National Commercial Bank consists of twenty-eight (28) discrete document requests. Generally speaking, those document requests seek discovery of facts relevant to the *Federal Insurance* plaintiffs' two theories of specific jurisdiction: (1) that NCB purposely directed its conduct at the United States by knowingly providing material support and resources to al Qaida; and (2) that NCB is subject to personal jurisdiction in New

_____

[4] As explained in the Federal Insurance plaintiffs' September 14, 2007 letter, the existence of a developed record concerning the *Federal Insurance* plaintiffs' jurisdictional theories is absolutely necessary to the disposition of NCB's Motion to Dismiss in *Federal Insurance*, and in this setting requires that the *Federal Insurance* plaintiffs be afforded jurisdictional discovery. See Exhibit 4 at p. 2.

The Honorable George B. Daniels
April 25, 2008
Page 9

_____

York under the conspiracy theory of personal jurisdiction.[5]  These theories of specific jurisdiction are predicated, in part, on the detailed allegations and evidence the *Federal Insurance* plaintiffs have offered regarding NCB's knowing sponsorship of al Qaida via its relationship with the Muwafaq Foundation.  In support of those theories, the *Federal Insurance* plaintiffs seek limited discovery concerning NCB's relationships with Muwafaq and Yassin al Qadi and Khalid bin Mahfouz, two senior NCB executives who founded and/or ran Muwafaq.

        For the reasons set forth in greater detail in their pending Opposition to NCB's Motion to Dismiss, the detailed allegations and extrinsic evidence offered by the *Federal Insurance* plaintiffs are sufficient to make a *prima facie* showing of jurisdiction as to NCB, and trigger the *Federal Insurance* plaintiffs' entitlement to discovery.  In particular, the *Federal Insurance* plaintiffs have already submitted detailed factual allegations and evidence to support their contention that NCB provided funds and banking services to Muwafaq Foundation, with full knowledge that the Foundation was an al Qaida front.  The *Federal Insurance* plaintiffs' allegations of NCB's knowledge are supported by the submitted testimony of government officials, and detailed allegations and evidence regarding the overlapping management of Muwafaq and NCB, to include allegations and evidence concerning the extensive involvement of bin Mahfouz and al Qadi in the both entities.

        The significance of these allegations in relation to the *Federal Insurance* plaintiffs' theories of jurisdiction is discussed in detail in plaintiffs' pending opposition to NCB's Motion to Dismiss, and will not be recited at length herein.  However, it is worth noting that the Court has already held that an entity which directly or indirectly provided material support or resources to al Qaida, as those terms are defined under the Anti-Terrorism Act, is subject to personal jurisdiction in the United States for claims arising from the September 11th Attack.  See In Re: Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539 (S.D. N.Y. 2005) (in light of al Qaeda's public declaration of war against the United States, someone who is… a provider of financial and logistical support to al Qaeda, has purposely directed his activities at the United States such that the exercise of personal jurisdiction over him is reasonable.); See also In Re: Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D. N.Y. 2005) (finding that indirect contributions to al Qaeda are sufficient to establish a defendant's participation in al Qaeda's conspiracy to attack America, where the defendant knew the organization receiving those contributions to be a solicitor, collector, supporter, front or launderer for the terrorist organization).  Consistent with these prior rulings, the submitted allegations and evidence that NCB provided material support and resources to al Qaida through Muwafaq are sufficient to make a *prima facie* showing of jurisdiction over NCB, and entitles the *Federal Insurance* plaintiffs to discovery of facts relevant to its jurisdictional theories.[6]

_____

[5] While certain facts and categories of information have relevance to both of those specific theories of jurisdiction, it is important to note that they are distinct legal theories, governed by unique legal standards.  Accordingly, in analyzing whether plaintiff has made a *prima facie* showing of personal jurisdiction under one of those theories, the Court must apply two separate tests.

[6] Under Rule 9, the allegations of NCB's knowledge are themselves competent to satisfy the applicable test, and need not be supported by fact pleading or evidence.

The Honorable George B. Daniels
April 25, 2008
Page 10

_____

        As further support for their request that the Court direct NCB to respond to the *Federal Insurance* plaintiffs' discovery requests, those plaintiffs offer for the Court's consideration an Internal United States Treasury Department Memorandum regarding the evidentiary predicates for the United States government's designation of Yassin al Qadi as an al Qaida sponsor ("Treasury Evidentiary Memorandum" or "Memorandum"), which was recently released by the Treasury Department and is attached hereto as Exhibit 6. The Treasury Evidentiary Memorandum contains additional information concerning the character of the relationships among bin Mahfouz, al Qadi and Muwafaq Foundation, and describes in detail Muwafaq Foundation's pervasive involvement in the sponsorship of al Qaida and other terrorist organizations throughout the world. For the reasons discussed below, any fair reading of the Treasury Evidentiary Memorandum demonstrates that NCB knew that Muwafaq was an al Qaida front during the period that it provided funds and banking services to that organization.

        As a preliminary matter, the Treasury Department Evidentiary Memorandum indicates that Muwafaq Foundation was conceived and founded by Khaled Bin Mahfouz and Yassin al Qadi, while the two were working together as senior executives at NCB. In this regard, the Memorandum states as follows:

              Al Qadi and the Bin Mahfouz Family

              Kadi states in his submissions that during the 1990 to 1991 time
              period, he was working with Khalid Bin Mahfouz for National
              Commercial Bank, and they developed a relationship of mutual
              trust and respect. During this time period, Bin Mahfouz told Al
              Qadi that he wanted to start a charity in memory of his parents.

Exhibit 6 at p. 21.

        In the fulfillment of bin Mahfouz's aspiration to establish a "charity" to honor his parents, the two established the Muwafaq Foundation in 1992. Muwafaq was funded by a donation from bin Mahfouz, and al Qadi was charged with responsibility for the operation of the Foundation. In his submissions to the Treasury Department, Al Qadi acknowledges possibly meeting with Osama bin Laden as late as 1992, "during a time when Muwafaq was being initially created and funded." Id. at p. 20.

        From the date of Muwafaq's establishment, the Treasury Department Evidentiary Memorandum makes clear that the organization served as a conduit for financing al Qaida and other terrorist organizations, through offices located throughout the world. Muwafaq's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001. As reported in the Treasury Department Evidentiary Memorandum:

              Of [Muwafaq's] seven offices/operations:

              Sudan: Closed by Kadi following publication of *Africa Confidential* article
              linking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in

The Honorable George B. Daniels
April 25, 2008
Page 11

_____

1996 at about the same time that Bin Ladin left Sudan.  Additionally, AL-QADI is quoted as saying the office provided assistance to "jihad activities."

Pakistan:  Headed by Amir Mehdi [Redacted Text].  The Pakistani government on March 21, 1995 raided the office and Mehdi was arrested on May 29, 1995.  The office shut shortly thereafter.

Ethiopia:  Closed in 1995 by the Ethiopian government subsequent to the *Africa Confidential* report.

Europe:  Headed by Chafiq Ayadi, who is designated as an SDGT [Specially Designated Global Terrorist], and was a leader of the radical Tunisian Islami Front.

Albania:  Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and was deported from Albania in 1999 for his links to terrorism.

Id. at p. 6.

Significantly, the founders and officers of Muwafaq continued to support and operate the Foundation, in the face of the extensive reporting and evidence of its pervasive involvement in terrorist activities.   In fact, certain European offices of the organization may have been operational as late as 2002.  Id. at p. 20.

On the basis of the entirety of the evidence available to the U.S. government, including classified materials not appropriate for public release, the Treasury Evidentiary Memorandum concludes that Al Qadi was explicitly aware of Muwafaq's role in supporting al Qaida, and was personally involved in facilitating that support.  In this regard, the Treasury Evidentiary Memorandum states as follows:

Yassin Al Qadi is an experienced and sophisticated businessman and financier.  He has operated companies, including investment vehicles and banks, in many corners of the world.  He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.

Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.

There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and

The Honorable George B. Daniels
April 25, 2008
Page 12

---

extremist causes.  This evidence comes from both classified and unclassified sources.

Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi.  The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin.  Each one of these individuals handled significant sums of money provided to him by Al Qadi.

It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists.  These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf.  Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.

In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions.  [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error.  OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

Exhibit 6 at p. 28-9.

By any fair reading, the foregoing statements directly corroborate the *Federal Insurance* plaintiffs' allegation that senior NCB executive Yassin al Qadi was expressly aware that Muwafaq was an al Qaida front.

Because the Memorandum was prepared in relation to the designation of al Qadi, it not surprisingly does not directly discuss the extent of bin Mahfouz's awareness of Muwafaq's terrorist activities.  However, the content of the evidence presented in the Memorandum and other sources directly support the *Federal Insurance* plaintiffs' explicit allegation that bin Mahfouz was also expressly aware of those activities.  In particular, the Memorandum makes clear that bin Mahfouz established Muwafaq in memory of his parents.  Id. at p. 21.  Bin Mahfouz further acknowledges that he provided the initial funding for the Foundation.  Having established the Foundation to honor his parents and provided its funding, it logically follows that bin Mahfouz would have maintained some interest in the Foundation's activities, and would have been aware of the very public reporting about its terrorist ties, and the actions taken against Muwafaq by authorities throughout the world.  Moreover, the Memorandum makes clear that bin

The Honorable George B. Daniels
April 25, 2008
Page 13

Mahfouz maintained a close relationship of "mutual trust and respect" with al Qadi, who was responsible for running Muwafaq, and that bin Mahfouz's son, Abdulrahman Khalid bin Mahfouz, sat on the Board of the Foundation. Id. at 21, 5. All of these facts corroborate the *Federal Insurance* plaintiffs' allegation that bin Mahfouz was aware of Muwafaq's terrorist ties.

Importantly, the fact that al Qadi and bin Mahfouz were aware of Muwafaq's illicit activities necessarily means that NCB also knew of the Foundation's terrorist ties. Once again, bin Mahfouz and al Qadi were both senior executives of the bank until 1999. Bin Mahfouz was in fact its Chairman, and owned a controlling interest during relevant periods. Under well established legal standards, any knowledge bin Mahfouz or al Qadi possessed regarding Muwafaq's role in sponsoring al Qaida is imputable to NCB. See In re Investors Funding Corp., 523 F. Supp. 533, 540-41 (S.D.N.Y. 1980).[7]

When considered along with the other allegations and evidence the *Federal Insurance* plaintiffs have presented in support of their specific jurisdictional theories as to NCB, the Treasury Evidentiary Memorandum confirms the *Federal Insurance* plaintiffs' entitlement to the requested discovery concerning NCB's relationships with bin Mahfouz, al Qadi and Muwafaq. Specifically, when viewed in a light most favorable to plaintiffs, as it must be in this procedural setting, the Memorandum corroborates the following critical facts and allegations underlying plaintiffs' theories of specific jurisdiction as to NCB:

(1)     The Muwafaq Foundation was conceived and founded within the walls of NCB by NCB Senior Executives Yassin Al Qadi and Khaled Bin Mahfouz;

(2)     Senior NCB Executive Yassin Al Qadi was responsible for the operation of the Muwafaq Foundation, to include the distributions of its funds;

(3)     Senior NCB Executive Yassin Al Qadi met with Osama Bin Laden as late as 1992, during the time the Muwafaq Foundation was being funded and established;

(4)     Muwafaq Foundation served as a conduit for financing al Qaida from the date of its establishment by NCB Senior Executives Al Qadi and Bin Mahfouz;

(5)     Muwafaq Foundation's terrorist ties were the subject of public reporting in the years preceding the September 11th Attack, and authorities in several countries took action against the organization and its officers between 1995 and 2001;

---

[7] Plaintiffs anticipate that NCB will argue that its senor most officials were acting outside the scope of their employment in using NCB's infrastructure and resources to channel resources to al Qaida through Muwafaq. However, whether an employee was acting within the scope of his employment is heavily fact-dependant, and, therefore, this question is properly left to the jury to determine. Golodner v. Quessant Inc., 2007 U.S. Dist. LEXIS 72948, * 10 (S.D.N.Y. Sept. 27, 2007).

The Honorable George B. Daniels
April 25, 2008
Page 14

---

(6)     Senior NCB Executive Al Qadi was specifically aware of the terrorist
        activities of Muwafaq Foundation;

(7)     Senior NCB Executive Khaled Bin Mahfouz was aware of the terrorist
        activities of Muwafaq, by virtue of his close familial and personal
        relationships with members of Muwafaq's Board, including al Qadi, as
        well as the fact that Bin Mahfouz originally suggested the establishment of
        Muwafaq and provided its initial funding;

(8)     NCB was expressly aware of Muwafaq's terrorist activities, by virtue of
        the imputable knowledge of its senior officials;

(9)     NCB provided financial and banking services to Muwafaq, including the
        transfer of several million dollars to that terrorist front, with full
        knowledge of Muwafaq's role in sponsoring al Qaida.

In view of the foregoing facts, the *Federal Insurance* plaintiffs respectfully submit that
they have demonstrated their entitlement to the discovery at issue.   As a corollary, the above
discussion also defeats any argument that Judge Maas has already addressed all factual and legal
arguments relevant to whether the *Federal Insurance* plaintiffs are entitled to discovery as to the
topics and relationships at issue, via his rulings on the separate records in the *Ashton* and *Burnett*
cases.  Stated simply, the detailed allegations and evidence offered by the *Federal Insurance*
plaintiffs were not considered by Judge Maas in relation to the discovery disputes addressed in
the *Ashton* and *Burnett* cases.[8]  Indeed, Judge Maas' decision to deny those plaintiffs certain
discovery concerning accounts of Muwafaq at NCB was based on a finding that those plaintiffs
failed to present any non-conclusory allegations or evidence to make a *prima facie* showing that
NCB or its customers knowingly provided material support or resources to organizations serving
as al Qaida fronts.[9]  There is nothing conclusory about the detailed factual showing outlined
above, and more fully in the *Federal Insurance* plaintiffs' Complaint and Opposition to NCB's
pending Motion to Dismiss.   Accordingly, Judge Maas' prior ruling cannot be viewed to speak
meaningfully to the jurisdictional discovery dispute between the *Federal Insurance* plaintiffs and
NCB.

---

[8] In addition, although the *Ashton* and *Burnett* plaintiffs did seek limited discovery as to Muwafaq's bank
accounts with NCB, the *Federal Insurance* plaintiffs' document requests materially differ, in both form
and substance, from the discovery at issue in those other cases.
[9] It should also be noted that Judge Maas' decision addresses the availability of the requested discovery
only under the conspiracy theory of jurisdiction, and does not contain any analysis of the purposeful
direction theory.

The Honorable George B. Daniels
April 25, 2008
Page 15

III.    <u>CONCLUSION</u>

For all of the foregoing reasons, the *Federal Insurance* plaintiffs respectfully request that the Court deny NCB's application for leave to file a renewed Motion to Dismiss in the *Federal Insurance* case, and extend the prior denials of NCB's Motion to Dismiss for lack of personal jurisdiction in *Ashton* and *Burnett* to *Federal Insurance*. Upon extension of that prior ruling to their case, the *Federal Insurance* plaintiffs should be permitted to pursue limited discovery in support of their specific jurisdictional theories, under the supervision of the Court.

Respectfully,

COZEN O'CONNOR

BY:    SEAN P. CARTER

SPC/bdw
Enclosures

cc:    Judge Maas (Via Federal Express) (w/enc.)
       All Counsel of Record (Via email) (w/enc.)

PHILADELPHIA\3643743\1  117430.000

# **EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (RCC)<br>ECF Case |

*This document relates to:*
*Ashton v. Al Qaeda Islamic Army,* 02 CV 6977 (RCC)
*Burnett v. Al Baraka Investment & Develop. Corp.,* 03 CV 9849 (RCC)

## OBJECTIONS AND RESPONSES OF THE NATIONAL COMMERCIAL BANK TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, defendant The National Commercial Bank ("NCB") hereby submits the following objections and responses to Plaintiffs' First Set of Jurisdictional Requests for Production of Documents Directed to National Commercial Bank ("Document Requests"). NCB's objections and responses are based on information presently known to it, and NCB reserves the right to assert additional objections, and to supplement these objections, based on information that arises subsequently.

### GENERALLY APPLICABLE OBJECTIONS

1.    NCB objects to the Document Requests, including the definitions and instructions included therein, to the extent that they seek discovery beyond the scope authorized in the Discovery Order entered in this action on June 28, 2006 ("Discovery Order").

2.    NCB objects to the Document Requests, including the definitions and instructions included therein, to the extent that they otherwise go beyond the "limited jurisdictional discovery" ordered by the Court. *See In re Terrorist Attacks on September 11, 2001,* 349 F. Supp. 2d 765, 792 (S.D.N.Y. 2005) ("*Terrorist Attacks I*"); *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539, 572-73 (S.D.N.Y. 2005) ("*Terrorist Attacks II*").

4830194                                      1

**CONFIDENTIAL: This document contains material that is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD) (FM), United States District Court for the Southern District of New York. Confidential information and references to confidential documents are indicated by bold faced italics.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

*This document relates to:*
 *Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (GBD)
 *Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (GBD)

### OBJECTIONS OF THE NATIONAL COMMERCIAL BANK
### TO PLAINTIFFS' SUPPLEMENTAL REQUESTS
### FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, defendant The National Commercial Bank ("NCB") hereby submits the following objections to Plaintiffs' Supplemental Requests for Production of Documents Directed to National Commercial Bank ("Document Requests"). NCB's objections are based on information presently known to it, and NCB reserves the right to assert additional objections, and to supplement these objections, based on information that arises subsequently.

### GENERALLY APPLICABLE OBJECTIONS

NCB objects to the Document Requests, including the definitions and instructions included therein, for all of the following reasons:

1.     The Document Requests in their entirety exceed the scope of jurisdictional discovery as to NCB authorized by the Court because the Court's May 1, 2007 order (MDL Dkt. # 1971) "decline[d] to direct any further discovery (not previously ordered) related to NCB."

2.     The Document Requests at least in part seek information that post-dates the filing of the *Ashton* and *Burnett* actions on September 4 and August 15, 2002, respectively. *See In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 342 F. Supp. 2d 207, 215 n.62 (S.D.N.Y. 2004) (forum

# **EXHIBIT 2**