# EXHIBIT C
# (Part 1 of 5)

# ANDERSON KILL & OLICK, P.C.

Attorneys and Counselors at Law

1251 AVENUE OF THE AMERICAS ■ NEW YORK, NY 10020
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.andersonkill.com

Jerry S. Goldman, Esq.
Jgoldman@andersonkill.com
212-278-1000

*By Hand Delivery*

August 15, 2008

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the Southern
District of New York
500 Pearl Street, Room 740
New York, NY 10007

> Re: *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (GBD) (FM)
> *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-1923 (GBD) (FM)
> *New York Marine and General Ins. Co. v. Al Qaida, et al.*, 04-cv-6105 (GBD) (FM)
> *Continental Cas. Co., et al. v. Al Qaeda Islamic Army, et al.*, 04-cv-5970 (GBD) (FM)
> *Cantor Fitzgerald & Co., et al. v. Akidu Bank Private Ltd., et al.*, 04-cv-7065 (GBD) (FM)

Dear Judge Maas:

     Pursuant to the Court's Order of July 11, 2001 (MDL Dkt. # 2106),[1] we write on behalf of the Plaintiffs in the *O'Neill*, *New York Marine*, *Continental*, and *Cantor* matters ("Plaintiffs") to request the Court grant Plaintiffs an extension of time to respond to Defendant The National Commercial Bank's ("NCB") Renewed Motion to Dismiss (the "Motion"), which was filed on July 22, 2008, until sixty (60) days after the full completion of the necessary, ongoing jurisdictional discovery referenced herein. Furthermore, Plaintiffs request that the Court vacate the portion of its August 20, 2007 Order prohibiting the deposition of Mr. Krohley and allow Plaintiffs to take his deposition. Finally, Plaintiffs request that the Court grant the discovery being requested by letter requests in the *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-6977 (GBD) (FM), *Burnett, et al. v. Al Baraka Inv. & Dev. Corp. et al.*, 03-cv-9849 (GBD) (FM), and *Federal Insurance Co., et al v. al Qaida, et al.*, 03-cv-6978 (GBD) (FM). These letter requests are being filed by the plaintiffs in the related matters[2] and Plaintiffs hereby incorporate and adopt by reference the substance of those letter requests. For the reasons

---

[1] In the July 11, 2008 Order the Court granted NCB's request to file its Renewed Motion to Dismiss and for leave to have the Memorandum of Law accompanying the Motion be thirty-five (35) pages. The July 11, 2008 Order also permitted the plaintiffs in all of the *In re Terrorist Attacks on September 11, 2001* matters to make "specific discovery request[s] and requests for a stay or extension of time in which to respond to the motion," if additional jurisdictional discovery is necessary

[2] One letter is being filed by plaintiffs in *Ashton* and *Burnett* and another letter is being filed by plaintiffs in *Federal Insurance*.

PHIDOCS-58439.2

New York ■ Greenwich ■ Newark ■ Philadelphia ■ Washington, D.C.

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 2

discussed below and for the additional reasons specified in the *Ashton-Burnett* and *Federal Insurance* letter requests, good cause exists for Plaintiffs to receive an extension of time to respond to the Motion.

In conjunction with application for an extension of time, good cause also exists to vacate that part of the Court's August 20, 2007 Order prohibiting the depositions of various witnesses to allow Plaintiffs to depose Thomas M. Krohley, whose June 22, 2007 Affidavit was submitted by NCB in support of its Motion (the "Krohley Affidavit"),[3] NCB's reliance on the Krohley Affidavit is entirely misplaced. Yet, the Krohley Affidavit is dated June 22, 2007, nearly two full months prior to NCB's August 20, 2007 letter[4] to the Court in which NCB requested that the Court prohibit Plaintiffs from deposing former employees of SNCB Securities Inc. ("SNCB"). NCB neither attached the Affidavit to its August 20, 2007 letter nor disclosed its existence. NCB also failed to produce the Affidavit in response to then outstanding discovery requests. Yet, NCB now relies on the Krohley Affidavit in support of its Motion. NCB's actions demonstrate its continued efforts to obfuscate and even withhold key jurisdictional facts and witnesses and underscore the need for further jurisdictional discovery. Therefore, Plaintiffs respectfully request that the Court vacate the portion of its August 20, 2007 Order prohibiting the deposition of Mr. Krohley and allow Plaintiffs to take his deposition.

## I. RELEVANT PROCEDURAL HISTORY

In the above-referenced matters, Plaintiffs filed claims against NCB stemming from its involvement in the funding of the terrorist attack on September 11, 2001. The Plaintiffs in each of the matters entered into separate scheduling stipulations, which were adopted by the Court. *See* MDL Dkt. #532 (*Cantor*);[5] MDL Dkt. #542 (*O'Neill*);[6] MDL Dkt. #621 (*NY Marine and Continental*).[7] Pursuant to these stipulations, NCB had forty-five (45) days from the date on which the Court decided NCB's Motion to Dismiss in *Ashton v. Al Qaeda Islamic Army*, 02-cv-6977 and *Burnett v. Al Baraka Inv. & Dev. Corp.*, 03-cv-9849. On January 18, 2005, the Court denied without prejudice NCB's Motion to Dismiss in *Ashton* and *Burnett*, with leave to renew the motion after completing jurisdictional discovery. *See* MDL Dkt. #632 (Jan. 18, 2005 Op. and Order).[8]

---

[3]     A copy of the Affidavit of Thomas M. Krohley dated June 22, 2007 (MDL Dkt. # 2113) is attached hereto as Exhibit "A."

[4]     A copy of the August 20, 2007 letter from Ronald S. Liebman, Esq. of Patton Boggs LLP to The Honorable Frank Maas is attached hereto as Exhibit "B."

[5]     A copy of the *Cantor* scheduling stipulation is attached hereto as Exhibit "C."

[6]     A copy of the *O'Neill* scheduling stipulation is attached hereto as Exhibit "D."

[7]     A copy of the *NY Marine/Continental* scheduling stipulation is attached hereto as Exhibit "E."

[8]     A copy of the Court's January 18, 2005 Opinion and Order is attached hereto as Exhibit "F."

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 3

On March 7, 2005, Plaintiffs and NCB entered into a new Stipulation, which was signed by the Court on March 8, 2005. *See* MDL Dkt. #718 (Stipulation and Order Setting Schedule for The National Commercial Bank to Respond to Complaints (the "Stipulation").[9] Pursuant to the Stipulation, NCB would "file a consolidated Motion to Dismiss, or otherwise file individual responses to, the Complaints in *O'Neill*, *New York Marine*, *Continental Casualty*, and *Cantor* on the same date that NCB renews its Motion to Dismiss the *Burnett* and *Ashton* actions, as allowed by the Court's January 18, 2005, Opinion and Order."[10] (Stipulation ¶ 3). Plaintiffs would have sixty (60) days "from the date on which it is served with NCB's consolidated Motion to Dismiss to file their consolidated response to NCB's Motion to Dismiss." (Stipulation ¶ 4). Based on the Stipulation and NCB serving the Motion on July 22, 2008, Plaintiffs have to file their response, which is separate from a response by plaintiffs in *Ashton* and *Burnett*, or any other related matter, by September 22, 2008.[11]

Following the Court's dismissal of NCB's original Motion to Dismiss, the *Ashton* and *Burnett* parties began jurisdictional discovery. As part of this discovery, plaintiffs in *Ashton* and *Burnett* sought to depose former employees of SNCB with knowledge of the dealings between and relationship of SNCB and NCB. On August 16, 2007, counsel for *Burnett* sent a letter to the Court requesting, at a minimum, the right to depose Mr. Krohley "to determine the relationship between NCB-SNCB and how long they and others continued to conduct business for NCB or SNCB in the United States beyond 2001."[12] (Maloney Aug. 16, 2007 Ltr., p.2). On August 20, 2007, counsel for NCB sent a response to the Court arguing that evidence sufficient to show that jurisdictional discovery related to SNCB was unnecessary because "(i) SNCB did not ever engage in the business of banking on behalf of NCB; and (ii) SNCB ceased operations in 2001 following its formal dissolution as a Delaware corporation." (Liebman Aug. 20, 2007 Ltr., p.1). Based on these representations by NCB, the Court denied the *Burnett* plaintiffs request for the deposition of, amongst others, Mr. Krohley, because it "would be a fishing expedition."

---

[9]  A copy of the Stipulation is attached hereto as Exhibit "G."

[10]  On July 11, 2008, this Court granted leave for NCB to file a "single supporting memorandum of law not to exceed 35 pages," which appears to be in response to the requirements of the Stipulation that NCB file a consolidated Motion to Dismiss against Plaintiffs separate from its renewed motion to dismiss the *Ashton* and *Burnett* claims.

[11]  Plaintiffs in *Federal Insurance Co., et al. v. al Qaida, et al.*, 03-cv-6978 are filing separate motions that are also hereby incorporated. Because the motion to dismiss NCB filed against the *Federal Insurance* plaintiffs in 2004 remains pending, those plaintiffs are in a different procedural position than all other plaintiffs. Nonetheless, the *Federal Insurance* motions relate to the ongoing discovery disputes that are the basis for Plaintiffs' request for an extension of time.

[12]  A copy of the August 16, 2007 letter from Andrew J. Maloney, III, Esq. of Kreindler & Kreindler LLP to the Honorable Frank Maas is attached hereto as Exhibit "H."

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 4

Despite the arguments by NCB in its August 20, 2007 letter to the Court about the irrelevance of SNCB's employee's testimony to the jurisdictional dispute at issue, NCB had, in fact, sought and obtained an Affidavit from Mr. Krohley, a former employee of SNCB, prior to sending the August 20, 2007 letter to the Court. NCB's knowledge and involvement with the Krohley Affidavit, which is dated June 22, 2007, is evidenced by the statement in the Krohley Affidavit that Mr. Krohley had "been assisted by NCB's legal counsel in the phrasing of this Affidavit." (Krohley Aff. ¶ 2). Furthermore, in a letter dated August 13, 2007 from counsel for NCB to counsel for the *Burnett* plaintiffs, NCB stated that it would "submit an Affidavit of a more knowledgeable former SNCB employee to address the nature of and scope of SNCB's operations."[13] (Liebman Aug. 13, 2007 Ltr., p.5). In that letter, NCB further states that "the decision whether to authorize depositions of former SNCB employees should be made by the court when it adjudicates NCB's renewed Motion to Dismiss for lack of jurisdiction." (Liebman Aug. 13, 2007 Ltr., p.5). Nonetheless, NCB opted not to produce the Krohley Affidavit, which was signed two months prior to the August 20, 2007 letter to the Court, despite the Krohley Affidavit relating directly to NCB's claims regarding SNCB's involvement with NCB.

Last, on October 12, 2007, the plaintiffs in *Ashton* and *Burnett* served discovery requests seeking information related to NCB's involvement in the aviation business in the United States and a trust account that NCB held for Osama Bin Laden. On November 13, 2007, NCB objected to the requests and refused to provide any information. On December 20, 2007, a motion to compel production of this requested information was filed and remains pending.

## II.   ARGUMENT

### A.   Good Cause Exists To Extend The Time For Plaintiffs To Respond To NCB's Motion.

Pursuant to the Stipulation, Plaintiffs must file their response to the Motion on or before September 22, 2008. However, under Federal Rule of Civil Procedure 6(b), "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time." District courts have "wide discretion to grant an enlargement of time." *Choi v. Chemical Bank*, 939 F. Supp. 304, 309 (S.D.N.Y. 1996) (citing *Yonofsky v. Wernick*, 362 F. Supp. 1005, 1014 (S.D.N.Y. 1973). Here, the record fairly and reasonably supports the Court's exercise of discretion in favor of extending Plaintiffs' time to respond to until jurisdictional discovery is fully completed.

First, as a prudential matter, the Court should not even consider granting NCB the relief it seeks—an outcome which Plaintiffs believe NCB is in know way entitled—until the December 20, 2007 Motion to Compel filed by the *Ashton* and *Burnett* plaintiffs is decided. As the Court is aware, the Motion to Compel has been pending for many months now. Further, the

---

[13]   A copy of the August 13, 2007 letter from Ronald S. Liebman, Esq. to Andrew J. Maloney, III, Esq. is attached hereto as Exhibit "I."

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 5

Motion to Compel is important because it seeks relevant jurisdictional information including
NCB's involvement in activities in the United States and this district in the relevant time period.
Therefore, the Motion to Compel must be addressed on the merits before NCB's Motion is
deemed ripe for review. Otherwise, the Court risks error in considering NCB's Motion, then
granting the Motion to Compel, and then having to schedule another round of briefing on how to
best rejoin NCB as a party. Such a result would be an unfortunate waste of the Court's and
parties' limited resources, and can easily be avoided by granting the relief Plaintiffs presently
seek.

Second, even if the Court is inclined to deny the Motion to Compel, NCB's
Motion is still premature. All parties to the litigation have the right to respectfully disagree with
the Court's discovery rulings and to appeal those rulings to Judge Daniels. Hence, deciding
NCB's Motion while the Motion to Compel remains unresolved would be improvident because it
would undermine the parties' right to appeal any later decision on the Motion to Compel.

Third, it would be incongruous for NCB's Motion to be considered at this time
given the substance of the discovery sought in the Motion to Compel. The information is
obviously germane to the arguments NCB raises in its Motion—indeed, without the information,
NCB can easily challenge every basis upon which jurisdiction could conceivably be found
knowing that relevant facts remain hidden from discovery. NCB's misplaced reliance on the
Krohley Affidavit is a case in point. See Section B, infra.

Last, the plaintiffs in *Ashton* and *Burnett* and in *Federal Insurance* are filing
similar letter requests seeking an extension of time to respond to NCB's Motion. These bases
are all relevant to the Court's good cause analysis and include but are not limited to: (1) that
discovery has not yet commenced in *Federal Insurance*, and a stay in all other matters is
necessary to harmonize the procedural status of all of the cases; (2) that NCB has submitted
affidavits of employees in support of its Motion, even though it previously represented that these
same witnesses did not possess relevant knowledge, and a stay is consequently necessary to
allow for the depositions of those employees; (4) that the theories of jurisdiction as to NCB
directly implicate the conduct of several former executives of NCB, who are themselves
defendants, and that the Court should resolve the jurisdictional contests as to all of those
defendants simultaneously (in the interests of justice and to avoid prejudice); and (5) that there
remains unresolved discovery issues in the *Ashton* and *Burnett* matters. These letter requests
provide further good cause to grant an extension for Plaintiffs to respond to NCB's Motion.

    **B.**    **No Response To NCB's Motion Should Be Required Until Plaintiffs Are
Permitted To Depose Mr. Krohley And The Discovery Sought By The *Ashton*
And *Burnett* Plaintiffs And The *Federal Insurance* Plaintiffs Is Produced.**

On August 16, 2007, counsel for *Burnett* sent a letter to the Court requesting, at a
minimum, the right to depose Mr. Krohley "to determine the relationship between NCB-SNCB
and how long they and others continued to conduct business for NCB or SNCB in the United
States beyond 2001." It is clear that NCB had knowledge of the Krohley Affidavit at the time it

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 6

submitted its August 20, 2007 letter to the Court discussing the role of SNCB. It made the tactical decision not to produce the Krohley Affidavit at that time, and elected not to produce his written testimony in response to pending discovery requests. Instead, NCB represented to the Court that jurisdiction discovery was no longer needed while simultaneously withholding Mr. Krohley's written testimony so that he could not be cross-examined.

NCB's reliance on the Krohley Affidavit per se demonstrates that Mr. Krohley is a key witness. Plaintiffs, along with the plaintiffs in the related matters, should have the opportunity to depose Mr. Krohley before being required to respond to NCB's Motion. The fullness and accuracy of Plaintiffs' response to NCB's Motion should not be frustrated by NCB's bold attempt to defeat Plaintiffs' ability to fully explore the complex jurisdictional issues in this case by holding onto the Krohley Affidavit for over a year before producing it in support of the Motion. NCB's subterfuge and obfuscation provide good cause to extend discovery and grant Plaintiffs request to vacate the August 20, 2007 Order as to Mr. Krohley and allow Plaintiffs to depose him.

In addition, specific and necessary discovery is either in dispute, in the case of the pending December 20, 2007 Motion to Compel, or has been sought, in the case of various requests by *Federal Insurance*, and not responded to fully. These specific discovery issues are addressed more fully in the letter requests by *Ashton* and *Burnett* and by *Federal Insurance*. Until these discovery issues are resolved, Plaintiffs cannot fully respond to the arguments presented by NCB in its Motion. Thus, in order to ensure that Plaintiffs have a full and fair opportunity to investigate the entirety of the jurisdictional issues in these matters, the Court should grant the specific requests sought in the *Ashton-Burnett* and *Federal Insurance* letter requests.

C.   **NCB Will Not Be Prejudiced By The Granting Of Any Extension To Respond To The Motion.**

First, pursuant to the Court's March 14, 2008 Order, the Court intends to address subject matter jurisdiction motions prior to reaching motions, such as NCB's, which seek dismissal on personal jurisdiction grounds. Since a number of subject matter jurisdiction motions are long pending (as well as many earlier filed personal jurisdiction motions) it is unlikely that the Court will be able to resolve the issues raised by NCB's Motion without first disposing of the other matters before it. Therefore, the requested extension of time will in no way burden NCB.

Second, as discussed above, there remains outstanding discovery motions, including the Motion to Compel, which should be resolved before NCB's Motion becomes ripe for disposition. Until these discovery motions are fairly resolved, and the parties exhaust their rights to appeal vis-à-vis any adverse rulings on the motions, jurisdictional discovery is not—contrary to NCB—concluded. NCB's Motion is entirely premature, and it will suffer no prejudice if its Motion to set aside until discovery is completed.

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 7

Finally, any claim of prejudice is offset by NCB's inappropriate failure to disclose the Krohley Affidavit. NCB created the need for an extension by wrongfully withholding documents and information which are subject of the Motion to Compel. It then compounded its error by holding onto the Krohley Affidavit rather than producing it. NCB has therefore created the need to vacate the Court's Order to allow Plaintiffs to depose Mr. Krohley. NCB's unclean hands should preclude it from asserting any prejudice by the granting of this, or any other motion filed by Plaintiffs in these consolidated actions.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' request for an extension of time of sixty (60) days after the full completion of the necessary, ongoing jurisdictional discovery referenced herein. In addition, Plaintiffs respectfully request that this Court grant Plaintiffs' request for the Court to allow Plaintiffs to vacate in part its August 20, 2007 Order and allow Plaintiffs to depose Thomas M. Krohley and to allow the specific discovery sought by the *Ashton* and *Burnett* plaintiffs and the *Federal Insurance* plaintiffs in their respective letter requests.

Respectfully submitted,

ANDERSON KILL & OLICK, P.C.

Jerry S. Goldman (JG 8445)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 278-1000
Fax:    (212) 278-1733

*Counsel for plaintiffs in O'Neill*

BROWN GAVALAS & FROMM, LLP

Frank J. Rubino, Jr. (FR 6202)
355 Lexington Avenue
New York, NY 10017
Phone: (212) 983-8500
Fax:    (212) 983-5946

*Counsel for plaintiffs in New York Marine*

PHIDOCS-58439.2

**Anderson Kill & Olick, P.C.**

The Honorable Frank Maas
August 15, 2008
Page 8

FERBER FROST CHAN & ESSNER, LLP

Robert M. Kaplan (RK 1428)
530 Fifth Avenue
23d Floor
New York, NY  10036-5101
Phone: (212) 944-2200
Fax:    (212) 944-7630

*Counsel for plaintiffs in Continental
Casualty*

DICKSTEIN SHAPIRO LLP

Christopher T. Leonardo (CL 3043)
1825 Eye Street NW
Washington, DC  20006-5403
Phone: (202) 420-2200
Fax:    (202) 420-2201

JSG:whp
Enclosures

cc:   The Honorable George B. Daniels (via Fed. Ex.)
      Mitchell Berger, Esq. (via e-mail)
      Plaintiffs Executive Committee

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                  )
In Re TERRORIST ATTACKS on        )        03 MDL 1570 (GBD)
SEPTEMBER 11, 2001                )        ECF Case
                                  )
```

This document relates to:
  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 03 CV 9849 (GBD)
  *Ashton v. Al Qaeda Islamic Army*, 02 CV 6977 (GBD)

### AFFIDAVIT OF THOMAS M. KROHLEY

1.     My name is Thomas M. Krohley. I was employed as a Vice President at the New

York Branch of The National Commercial Bank ("NCB") from 1988 until it was closed in 1992. I

was also employed, at various times, as Director, President, C.E.O., Treasurer, and Vice President of

SNCB Securities, Inc. ("SNCB") from its inception in 1992 until its dissolution in February 2001. I

also worked as an independent contractor consultant to NCB to assist in the winding up of SNCB's

business in connection with its dissolution. I have been advised by NCB's counsel that this

Affidavit will be submitted in support of NCB's Renewed Motion to Dismiss this lawsuit.

2.     I am advised by NCB's counsel that this Affidavit is not intended by NCB or its

counsel to waive, in any way, NCB's claim of immunity from suit or its jurisdictional defenses, and is

not intended to be a general appearance by NCB in this lawsuit. I understand and believe the

following matters to be true, through the date of this Affidavit, based on my personal knowledge. I

have been assisted by NCB's legal counsel in the phrasing of this Affidavit.

3.     Before its dissolution in February 2001, SNCB was a Delaware corporation with its

principal place of business in New York City. SNCB was a subsidiary of SNCB Securities, Ltd., an

English company headquartered in London. SNCB Securities, Ltd. was a subsidiary of NCB.

4.     I understand from NCB's legal counsel that the Court has required NCB to provide

evidence concerning SNCB's activities during the time period from 1996 until the filing of these

lawsuits in 2002. During that time period, SNCB's relationship with NCB was established by a Services Agreement and a Realty Services Agreement entered into between NCB and SNCB on December 31, 1995 (collectively, the "1995 Agreements"). Attached as Exhibits A and B are true and correct copies of the 1995 Agreements. Prior versions of the same agreements between NCB and SNCB had been in effect from at or near the time to SNCB's formation in 1992. The only significant difference between the 1992 and 1995 versions of these Agreements was that the amount of fees owing to SNCB under those Agreements decreased in the 1995 version. When those 1992 agreements expired in 1995, NCB and SNCB entered into the 1995 Agreements to continue the relationship between the two companies. Subsequently, the 1995 Agreements were renewed by addenda until both were terminated in December 2000 at the time SNCB ceased doing business. In the addenda to the 1995 Agreements, no material changes were made except that the term of the Agreements were extended and the fees NCB owed to SNCB decreased.

5.     Under the relationship established by the 1995 Agreements, SNCB consulted with, and provided advice to, NCB with respect to the management of various British Virgin Islands investment trusts ("the BVI Trusts"), which held in trust funds belonging to NCB clients located exclusively in Saudi Arabia. Other indirect subsidiaries of NCB acted as trustees for the BVI Trusts, and each of the BVI Trusts owned one or more BVI limited companies ("the Operating Companies"). Each of the Operating Companies held and/or invested NCB client funds on behalf of those investors. The majority of the work performed by SNCB involved providing advisory and consultancy services to NCB relating to interests in U.S. real estate held by the BVI Trusts and the Operating Companies. The only services SNCB provided to NCB during its entire existence that were significantly facilitated by having an office in the U.S. were its advisory services relating to the U.S. real estate interests held by these BVI Trusts and Operating Companies.

2

6.     My responsibilities at SNCB included providing the advisory services specified in the 1995 Agreements. Initially, SNCB's advisory services to NCB related to the BVI Trusts named in Annex One to the 1995 Agreements and to the Operating Companies named on Annex Two of the 1995 Agreements. Thereafter, SNCB also provided advisory services to NCB in connection with additional open-ended mutual funds that did not hold U.S. real estate interests, but which instead held interests in other assets like commodities, currencies, and corporate equities. SNCB never expanded the scope of its U.S. real estate advisory services beyond what was set out in the 1995 Agreements.

7.     In the 1996 to 1997 time frame, the NCB Investment Committee made the decision to dissolve the United States real estate portfolio held by the BVI Trusts and the Operating Companies. Shortly after that decision, and by no later than the end of 1997, the BVI Trusts and the Operating Companies began the process of liquidating their real estate holdings. Although SNCB filed its certificate of dissolution in Delaware in February 2001, SNCB actually had closed its doors in December 2000 and never again did any business in the United States or elsewhere. As part of that process, SNCB formally surrendered the lease on its New York City office space on February 16, 2001. By the time that SNCB ceased doing business in December 2000, all of the Operating Companies that had held any United States real estate interests either already had been liquidated or were in the final stages of liquidation.

8.     After the liquidation of the Operating Companies that held interests in U.S. real estate, the tasks that remained for SNCB to perform generally involved monitoring of non-real estate assets (like commodities, currencies, and corporate equities) that were held by other Operating Companies. These remaining tasks did not require the type of local oversight that real estate involves, and therefore did not require that SNCB maintain personnel or an office in the United States. Accordingly, those remaining responsibilities were undertaken by NCB's Investment

3

Management Division in Jeddah going forward after SNCB's dissolution. In short, NCB's decision in the 1996 to 1997 time frame to liquidate the real estate-holding Operating Companies ultimately resulted in the decision to liquidate SNCB.

9.      To my knowledge, SNCB never acted as NCB's agent with respect to the BVI Trusts and the Operating Companies, as SNCB never entered into any agreements on NCB's behalf.

10.     NCB personnel, not SNCB personnel, made the investment decisions relating to NCB's interests in the BVI Trusts and the Operating Companies. However, the manner in which those decisions were implemented was up to the discretion of SNCB and its personnel. SNCB provided investment advice, as a consultant, concerning the BVI Trusts and the Operating Companies, and NCB would either accept or reject that advice.

11.     As a direct subsidiary of SCNB Securities, Ltd. in London, and an indirect subsidiary of NCB, SNCB required parent-company approval of major office-leasing decisions, establishment and funding of its budget, and payment of the final bonuses to SNCB's personnel upon SNCB's dissolution. However, SNCB was free to make its own operational decisions as to how to use its own funds once they were allocated to its budget. NCB did not control the operational policies of SNCB or the manner in which SNCB performed its business.

12.     SNCB negotiated its agreements with third-parties separately from NCB, including SNCB's lease agreements.

13.     SNCB retained and paid for its own attorneys for the many types of matters on which SNCB required legal advice. Primarily, SNCB retained Shearman & Sterling in New York as its outside counsel.

14.     SNCB's employees were selected by SNCB's Board of Directors, and NCB did not train or otherwise oversee the hiring of SNCB's employees.

4

15.     SNCB paid for its own overhead expenses as required by sections 4(b)(i)-(ii) of the 1995 Agreements.

16.     SNCB separately maintained its own individual financial and corporate books, records, and financial accounts. SNCB also maintained detailed accounts payable and accounts receivable showing what money was owed between SNCB and NCB, and both SNCB and NCB ensured that such payments were made and such receivables were collected.

17.     SNCB had its own policies and procedures separate from NCB's, including those relating to SNCB's accounting and financial practices.

18.     To the extent that SNCB declared dividends on its earnings, SNCB paid them directly to its parent company, SNCB Securities, Ltd. in London.

19.     Before working for SNCB, I worked at NCB's New York branch until the time that the branch closed. Comparing my experience with NCB's New York branch and with SNCB, I can say that SNCB did not operate as a branch of NCB, and did not conduct any banking operations on behalf of NCB. To my knowledge, following the closure of the New York branch, NCB ceased doing new banking business in the United States, and it wound up the affairs of the New York branch through companies other than SNCB. SNCB was not engaged in any activities relating to the wind up of NCB's New York branch and was not kept informed of matters relating to that process. Unlike the New York branch of NCB, SNCB did not have authority to act for, or to bind, NCB, and did not do so.

20.     SNCB did not provide any financing for the BVI Trusts, the Operating Companies or any other NCB investments.

21.     As set forth more fully above, based on my experience working with SNCB for the entire existence of that company, it is my view that SNCB and NCB always complied with the terms of Section 2 of the 1995 Agreements, which provided that SNCB had "no power or authority to

bind or contract for NCB," and that SNCB was not "subject to the supervision of either NCB" or any of its subsidiaries, trusts, or funds "in respect of the manner in which SNCB accomplishes the performance of its obligations under [the 1995 Agreements]," because NCB did not control the day-to-day operations of SNCB.

22    I have reviewed the March 21, 2007 Declaration of Jagan Mohan Reddy, which I understand has been submitted in this litigation. I know and, from time to time while employed with SNCB, have worked with Mr. Reddy. Based on my personal knowledge of SNCB, and for the reasons stated above, NCB did not control the day-to-day operations of SNCB. I therefore disagree with Mr. Reddy's statement in ¶ 4 of his Declaration that NCB controlled SNCB and used it as an "operating division within NCB," and I consider those statements to be false.


_____
Thomas M. Krohley

STATE OF NEW MEXICO    )
                       )  ss.
COUNTY OF GRANT        )

Sworn to and subscribed before me
this _____ day of ___June___, 2007.

_____
Notary Public

My Commission Expires: _July 3 2010_

OFFICIAL SEAL
**DORA GONZALES**
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: _July 3 2010_

6

# EXHIBIT B



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 20, 2007

Ronald S. Liebman
202-457-6310
rliebman@pattonboggs.com

**BY FEDERAL EXPRESS**

The Honorable Frank Maas
United States Magistrate Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 740
New York, NY 10007-1312

> Re:   *In re Terrorist Attacks on September 11, 2001*, MDL 03-1570 (GBD);
>        *Burnett v. Al Baraka*, Case No. 03 CV 9849 (S.D.N.Y.)

Dear Judge Maas:

This letter briefly replies, on behalf of The National Commercial Bank ("NCB"), to new arguments— raised for the first time in Mr. Maloney's August 16, 2007 letter— concerning plaintiffs' request to take depositions of former employees of SNCB Securities Inc. ("SNCB").

Plaintiffs acknowledge that they seek evidence concerning SNCB solely to support their theory of general ("doing business") jurisdiction over NCB. (Aug. 16 Ltr., p. 2.) Plaintiffs do not assert that SNCB had anything to do with the 9/11 attacks or that SNCB's activities relate to their theories of specific (conspiracy or purposefully-directed action) jurisdiction. SNCB depositions are not relevant to the question of general jurisdiction over NCB because SNCB was dissolved in 2001 and— as confirmed by the SNCB documents that NCB has produced— was not doing business for itself or for NCB at the time that the earliest of the 9/11 lawsuits was filed in August 2002. (*See* NCB's Aug. 13 Ltr., pp. 2-5.)

Plaintiffs' selection of documents from the SNCB document production simply confirms NCB's earlier showing (*id.*) that: (i) SNCB did not ever engage in the business of banking on behalf of NCB; and (ii) SNCB ceased operations in 2001 following its formal dissolution as a Delaware corporation. Specifically, in connection with SNCB's February 2001 dissolution:

- On February 16, 2001 SNCB terminated its lease on office space at 420 Lexington Avenue in Manhattan. (MDL Dkt. # 170, Exh. 8 at Exh. A) (copy attached hereto as Exh.



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Honorable Frank Maas
August 20, 2007
Page 2

1). Plaintiffs have provided the Court with an e-mail that simply discusses SNCB's earlier, December 2000 efforts to terminate that lease. (Aug. 16 Ltr., Exh. B at NCB01574.)

• NCB (as SNCB's ultimate parent) entered into short-term consulting agreements with former SNCB employees Thomas Krohley (ending June 30, 2001) and Virginia Pensa (ending February 28, 2001) to assist NCB with the "termination" and "liquidation" of SNCB's activities, including the "transfer" of its remaining activities to NCB in Saudi Arabia, and the "liquidation of the assets of Hospitality Investment Partners, an investment vehicle formed by and indirectly controlled by NCB." (*Id*, at NCB016258-60, NCB016264-66.)

• Discharging those functions, Mr. Krohley and Ms. Pensa operated from their homes (*id*, at NCB01574) and collected funds as part of the liquidation of the assets of Hospitality Investment Partners. (*Id*, at NCB01558, 1560-61, and 1568.) These and related activities— including the collection of tax refunds from the IRS— allowed the calculation of SNCB's final operating gain or loss and the "sending [of the] balance of money to LDN [SNCB Securities Ltd. in London] as dividend payment." (*Id*, at NCB01558.)

• All of these activities were completed before the termination of Mr. Krohley's consulting agreement at the end of June 2001. (*Id*) All of these documents are consistent with NCB's prior showing that SNCB was out of business not later than the October 17, 2001 filing of it Surrender of Authority in New York. (*See* NCB's Aug. 16 Ltr., p. 3 n.1.)

In sum, plaintiffs can point to no evidence that SNCB did any business— on behalf of itself, or on behalf of NCB, including the business of liquidating SNCB— beyond 2001 and at the time the 9/11 lawsuits were filed. Plaintiffs' application to take SNCB depositions should be denied.

Respectfully submitted,

Ronald S. Liebman
*Counsel for Defendant The National Commercial Bank*

cc:    All Counsel

# Exhibit 1

## SURRENDER AGREEMENT

SURRENDER AGREEMENT (this "Agreement") dated as of the 16ᵗʰ day of February, 2001 between SLG Graybar Sublease LLC, having an office c/o SL Green Realty Corp., 420 Lexington Avenue, New York, New York 10170 (hereinafter referred to as "Landlord") and SNCB Securities, Inc., a Delaware corporation, having an office at 420 Lexington, New York, New York 10170 (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, Landlord, as landlord, and Tenant, as tenant, entered into that certain lease agreement (the "Lease") made as of February 29, 2000, covering certain premises consisting of Room 460 more particularly described therein (the "Premises") in the building known as 420 Lexington, New York, New York (the "Building") under the terms and conditions contained therein; and

WHEREAS, the term of the Lease is set to expire on March 31, 2005 (the "Expiration Date") unless earlier terminated in accordance with the provisions thereof; and

WHEREAS, Tenant has requested that Landlord agree to cancel the Lease prior to the Expiration Date and accept surrender of the Premises effective as of January 31, 2001 (the "Early Cancellation Date") subject to and in accordance with the terms and conditions of this Agreement;

WHEREAS, Tenant acknowledges and agrees that Landlord intends to lease the Premises to a third-party for a term commencing immediately following the Early Cancellation Date; and

WHEREAS, Landlord has agreed to cancel the Lease prior to the Expiration Date and accept surrender of the Premises under the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.   Cancellation of Lease and Surrender of Premises.

Tenant hereby surrenders to Landlord effective as of January 31, 2001 (the "Early Cancellation Date") the Lease and the term and estate thereby granted (including all renewal and/or extension rights), together with the Premises thereby demised, with the intent and purposes that the estate of Tenant in and to the Premises shall be extinguished in its entirety and the term of the Lease shall expire on the Early Cancellation Date with the same force and effect as if the Early Cancellation Date were the original Expiration Date of the term of the Lease subject, however, to the provisions of this Agreement.  On or prior to the Early Cancellation

Date, Tenant shall deliver to Landlord possession of the Premises (i) vacant and broom clean, (ii) free of all rights in any other party, as tenant, subtenant or other occupant ("Occupancies") and all encumbrances and (iii) otherwise in accordance with the terms, covenants and conditions of the Lease as if the Early Cancellation Date were the Expiration Date.   On or before the Early Cancellation Date, Tenant shall pay to Landlord the sum of $23,327.50 (the "Surrender Consideration") as consideration for Landlord's Agreement to accept Tenant's surrender of the Premises in accordance with the provisions hereof; provided, however, that if Tenant surrenders the Premises to Landlord in accordance with the provisions of this Agreement on or before the Early Cancellation Date, time being of the essence, and is not in default of the Lease, Landlord shall apply the security deposit held by Landlord under the Lease (which Tenant acknowledges and agrees is in the amount of $23,327.50) towards the payment of the Surrender Consideration.

2.   Tenant's Representations and Warranties.

Tenant hereby represents and warrants to Landlord, its successors and assigns, that: (i) the Lease has not been assigned, pledged or encumbered, (ii) except for Tenant, the Premises are free of all Occupancies, (iii) Tenant has not created or suffered any Occupancies in and/or to the Premises through and including the date of this Agreement and (iv) no materials, personalty, furnishings, personal property, fixtures, trade fixtures and equipment ("Property") presently in the Premises are subject to any lien, encumbrance, chattel mortgage, title retention or security agreement and no action has been taken or suffered by Tenant as a result of which either the Premises or any Property shall or might be subject thereto.   Tenant covenants and agrees that it shall not at any time hereafter create, suffer or permit the creation of any such rights or encumbrances in or to the Premises or the Property contained therein.   Any Property left in the Premises by Tenant after the Early Cancellation Date shall be deemed to have been abandoned by Tenant, and Landlord shall have the right to retain or dispose of such Property in any manner at the expense of Tenant without any obligation to account to Tenant therefor.

3.   Survival of Obligations.

Neither the cancellation of the Lease hereunder nor the surrender of the Premises pursuant hereto shall release Tenant from its liability for any of its obligations accruing: (a) under this Agreement, or (b) under the Lease through and including the Early Cancellation Date.   Tenant acknowledges and agrees that (i) the Lease is in full force and effect, that Landlord is not in default in performance of any covenant, agreement or condition contained in the Lease and that there are no offsets or defenses which Tenant may have against Landlord and (ii) no consideration has been paid or is payable by Landlord in connection with the transaction which is the subject of this Agreement.

4.   Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

2

5.    Entire Agreement.

The Lease, as modified by this Agreement, represents the entire understanding between the parties with regard to the matters addressed herein and may only be modified by written agreement executed by all parties hereto. All prior understandings or representations between the parties hereto, oral or written, with regard to the matters addressed herein, other than the Lease, are hereby merged herein. Tenant acknowledges that neither Landlord nor any representative or agent of Landlord has made any representation or warranty, express or implied, except as specifically set forth in this Agreement. Tenant has not been induced by and has not relied upon any statement, representation or agreement, whether express or implied, not specifically set forth in this Agreement. Tenant shall not be liable or bound in any manner by any oral or written statement, broker's "set-up"," representation, agreement or information pertaining to this Agreement furnished by any real estate broker, agent, servant, employee or other person, unless specifically set forth herein, and no rights are or shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

6.    Effectiveness.

This agreement shall not be binding upon Landlord and Tenant until executed and delivered by both Landlord and Tenant.

7.    Ratification.

Except as specifically modified herein, all other terms, covenants and conditions of the Lease are and shall remain in full force and effect and are hereby ratified and confirmed. Tenant acknowledges that Landlord has not waived any requirement of the Lease, Landlord is not in breach of the Lease and Tenant has no claim for any failure of Landlord to perform it obligations under the Lease.

8.    No Brokers/Indemnification.

Tenant covenants, represents and warrants that Tenant has had no dealings or negotiations with any broker or agent in connection with the consummation of this agreement other than SL Green Leasing LLC with whom Tenant has dealt in connection with this Agreement solely as a consultant to Tenant, and Tenant covenants and agrees to defend, hold harmless and indemnify Landlord from and against any and all cost, expense (including reasonable attorneys' fees) or liability for any compensation, commissions or charges claimed by any broker or agent with respect to this Agreement or the negotiation thereof.

9.    Miscellaneous.

(a)    The captions in this Agreement are for convenience only are not to be considered in construing this agreement.

(b)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this agreement to be drafted.

3

(c)    Terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in the Lease.

(d)    If any provision of this Agreement or its application to any person or circumstances is invalid or unenforceable to any extent, the remainder of this agreement, or the applicability of such provision to other persons or circumstances, shall be valid and enforceable to the fullest extent permitted by law and shall be deemed to be separate from such invalid or unenforceable provisions and shall continue in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Agreement as of the day and year first above written.

SLG GRAYBAR SUBLEASE LLC, a New York limited liability company

BY:  SLG GRAYBAR SUBLEASE CORP., a New York corporation, its Managing Member

By: _____

Name:    Andrew S. Levine
Title:    Executive Vice President

Witness:

_____
Name:
Title:

SNCB Securities, Inc.

By: _____
Name:  THOMAS M. KROHLEY
Title:  President

Witness:

_____
Name:  ESPERANZA QUINTERO
Title:

4

# EXHIBIT C

```
USDC SDNY                        (A/E/S.
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  11-8-04
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
                              )
In Re TERRORIST ATTACKS on    )     03 MDL 1570 (RCC)
SEPTEMBER 11, 2001            )     ECF Case
                              )
```

*This document relates to:*
*Cantor Fitzgerald & Co. et al. v. Akida Bank Private Ltd., 04-CV-7065 (RCC)*

### STIPULATION AND ORDER SETTING SCHEDULE FOR
### THE NATIONAL COMMERCIAL BANK TO RESPOND TO
### THE FIRST AMENDED COMPLAINT

IT IS HEREBY STIPULATED AND AGREED, by and between undersigned counsel for Plaintiffs and for Defendant The National Commercial Bank ("NCB"), subject to the approval of the Court, as follows:

1.  Plaintiffs shall serve their RICO Statement concerning NCB, as required by Paragraph 7 of the Court's Standing Rules of Practice and in Paragraph 14 of Case Management Order No. 2, not later than thirty (30) days from the date the Court approves this Stipulation and Order.

2.  NCB shall have forty-five (45) days from the date on which the Court decides NCB's pending motions to dismiss in *Burnett* (03-CV-9849) and *Ashton* (02-CV-6977) to move to dismiss or otherwise respond to Plaintiffs' First Amended Complaint.

3.  Plaintiffs shall serve their opposition to NCB's motion to dismiss within forty-five (45) days from the date on which NCB serves such motion on Plaintiffs.

4.  NCB shall have thirty (30) days from the date on which NCB is served with Plaintiffs' opposition to reply to that opposition.

5.  The foregoing schedule is without waiver of any of NCB's defenses, including the defense of lack of personal jurisdiction, except that NCB does not challenge the sufficiency of Plaintiffs' service of process on NCB.

*DOCSNY.125816.1*                    1

Dated: Washington, D.C.
    October 26, 2004

Respectfully submitted,

PATTON BOGGS LLP

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

_____
Ronald S. Lieman (admitted *pro hac vice*)
Mitchell R. Berger (MB4112)
Ugo Colella (admitted *pro hac vice*)
2550 M Street, N.W.
Washington, DC 20037
Phone: (202) 457-6000
Fax:   (202) 457-6315
*Counsel for Defendant*
*The National Commercial Bank*

_____
Kenneth L. Adams (*pro hac vice* pending)
Richard W. Fields
Jonathan M. Goodman (JG 3031)
Stacey Saiontz (SS 1705)
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Phone: (212) 835-1400
Fax:   (212) 997-9880
*Counsel for Plaintiffs The Port Authority of New*
*York and New Jersey, Cantor Fitzgerald & Co., et al.*

Dated: New York, New York
October 29, 2004

**SO ORDERED:**

_____
Richard C. Casey
U.S.D.J.

10/5/04

# EXHIBIT D

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11 -15-04

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------
In Re TERRORIST ATTACKS on           )   03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                   )   ECF Case
                                     )
---------------------------------------------

*This document relates to:*
  *O'Neill v. Al Baraka Inv. & Dev. Corp.,* 04-CV-1923 (RCC)

**STIPULATION AND ORDER**
**FOR SERVICE OF PROCESS AND SETTING SCHEDULE FOR**
**THE NATIONAL COMMERCIAL BANK TO RESPOND TO**
**THE FIRST AMENDED COMPLAINT**

IT IS HEREBY STIPULATED AND AGREED, by and between undersigned counsel for

Plaintiffs and for Defendant The National Commercial Bank ("NCB"), subject to the approval of

the Court, as follows:

1.     A copy of the summons and First Amended Complaint, in both Arabic and English,

shall be served via Federal Express, or other major carrier, on the Ministry of Foreign Affairs, P.O.

Box 55937, Riyadh 11544, Kingdom of Saudi Arabia.  A copy of the air bill will be furnished to

counsel for NCB.  If the carrier will not deliver to a P.O. Box address, then Plaintiffs may use

"Nasseria" in place of the P.O. Box and add the telephone number +966 1 407 9255.

2.     A copy of the summons and First Amended Complaint, in both Arabic and English,

shall be served via Federal Express, or other major carrier, on NCB at its headquarters in Jeddah,

Saudi Arabia at the following address:  P.O. Box, Jeddah 21481, Kingdom of Saudi Arabia.  If the

carrier will not deliver to a P.O. Box address, then Plaintiffs may use "King Abdul Aziz St." in place

of the P.O. Box.  A copy of the airbill will be furnished to counsel for NCB.

3.     A courtesy copy of the summons and First Amended Complaint in English shall be

served via Federal Express and e-mail on Patton Boggs LLP in Washington, D.C.

1

4.     Plaintiffs shall serve their RICO Statement concerning NCB, as required by Paragraph 7 of the Court's Standing Rules of Practice and in Paragraph 14 of Case Management Order No. 2, not later than thirty (30) days from the date the Court approves this Stipulation and Order.

5.     NCB shall have forty-five (45) days from the date on which the Court decides NCB's pending motions to dismiss in *Burnett* (03-CV-9849) and *Ashton* (02-CV-6977) to move to dismiss or, answer the First Amended Complaint.

6.     Plaintiffs shall have forty-five (45) days from the date on which it is served with NCB's motion to dismiss to file an opposition, or response if required, to the answer.

7.     NCB shall have thirty (30) days from the date on which NCB is served with Plaintiffs' opposition to reply to that opposition.

8.     The foregoing schedule is without waiver of any of NCB's defenses, including the defense of lack of personal jurisdiction, except that NCB does not challenge the sufficiency of process or the sufficiency of Plaintiffs' service of process on NCB in this case if made in compliance with Paragraphs 1-3 above.

2

Dated: Washington, D.C.
    November _10_, 2004

Dated:  New York, NY
    November _11_, 2004

Respectfully submitted,

PATTON BOGGS LLP

_____

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB4112)
Ugo Colella (admitted *pro hac vice*)
2550 M Street, N.W.
Washington, DC 20037
Phone: (202) 457-6000
Fax:    (202) 457-6315

*Counsel for Defendant*
*The National Commercial Bank*

LAW OFFICES OF JERRY S. GOLDMAN
& ASSOCIATES, P.C.

_____

Jerry S. Goldman
111 Broadway
13th Floor
New York, New York 10006
Phone: (212) 242-2232
Fax:   (212) 346-4665

*Counsel for Plaintiffs*

Dated:  New York, New York
    November _12_, 2004

**SO ORDERED:**

_____
Richard C. Casey
U.S.D.J.

3

# EXHIBIT E

```
┌─────────────────────────────────┐
│ USDC SDNY                       │   (AIEY, S.
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED:  1-10-05            │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In Re TERRORIST ATTACKS on                )    03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                        )    ECF Case
                                          )
                                          )

*This document relates to:*
  *New York Marine & General Ins. Co. v. Al Qaida*, 04-CV-6105 (RCC)
  *Continental Casualty Co. v. Al Qaeda Islamic Army*, 04-CV-5970 (RCC)

**STIPULATION AND ORDER
FOR SERVICE OF PROCESS AND SETTING SCHEDULE FOR
THE NATIONAL COMMERCIAL BANK TO RESPOND TO
THE *NEW YORK MARINE* AND *CONTINENTAL CASUALTY* COMPLAINTS**   .

IT IS HEREBY STIPULATED AND AGREED, by and between undersigned counsel for

the *New York Marine* and *Continental Casualty* Plaintiffs (collectively, "Plaintiffs"), and for Defendant

The National Commercial Bank ("NCB"), subject to the approval of the Court, as follows:

1.      A copy of the summons and complaint in *New York Marine* and *Continental Casualty*,

in both Arabic and English, shall be served via Federal Express, or other major carrier, on the

Ministry of Foreign Affairs, P.O. Box 55937, Riyadh 11544, Kingdom of Saudi Arabia. A copy of

the air bill will be furnished to counsel for NCB. If the carrier will not deliver to a P.O. Box

address, then Plaintiffs may use "Nasseria" in place of the P.O. Box and add the telephone number

+966 1 407 9255.

2.      A copy of the summons and complaint in *New York Marine* and *Continental Casualty*,

in both Arabic and English, shall be served via Federal Express, or other major carrier, on NCB at

its headquarters in Jeddah, Saudi Arabia at the following address:   P.O. Box, Jeddah 21481,

Kingdom of Saudi Arabia. If the carrier will not deliver to a P.O. Box address, then Plaintiffs may

use "King Abdul Aziz St." in place of the P.O. Box. A copy of the airbill will be furnished to

counsel for NCB.

1

3.     A courtesy copy of the summons and complaint in *New York Marine* and *Continental Casualty* in English shall be served via Federal Express and e-mail on Patton Boggs LLP in Washington, D.C.

4.     Each plaintiff shall serve its RICO Statement concerning NCB, as required by Paragraph 7 of the Court's Standing Rules of Practice and in Paragraph 14 of Case Management Order No. 2, not later than thirty (30) days from the date the Court approves this Stipulation and Order.

5.     NCB shall have forty-five (45) days from the date on which the Court decides NCB's pending motions to dismiss in *Burnett* (03-CV-9849) and *Ashton* (02-CV-6977) to file a consolidated motion to dismiss, or to otherwise file individual responses to, the *New York Marine* and *Continental Casualty* complaints. The memorandum of law in support of NCB's consolidated motion shall not exceed 25 pages in length.

6.     Plaintiffs shall have forty-five (45) days from the date on which it is served with NCB's consolidated motion to dismiss to file their consolidated response to NCB's motion to dismiss. Plaintiffs' consolidated memorandum of law in response to NCB's consolidated motion shall not exceed 25 pages in length.

7.     NCB shall have 30 days thereafter to file a consolidated reply to Plaintiffs' opposition. NCB's consolidated reply memorandum of law shall not exceed 10 pages in length.

8.     The foregoing schedule is without waiver of any of NCB's defenses, including the defense of lack of personal jurisdiction, except that NCB does not challenge the sufficiency of Plaintiffs' service of process on NCB in this case if made in compliance with Paragraphs 1-3 above.

Dated: Washington, D.C.
~~December~~ , ~~2004~~
January 5, 2005

PATTON BOGGS LLP

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB4112)
Ugo Colella (admitted *pro hac vice*)
2550 M Street, N.W.
Washington, DC 20037
Phone: (202) 457-6000
Fax:    (202) 457-6315

*Counsel for Defendant*
*The National Commercial Bank*

Respectfully submitted,

BROWN GAVALAS & FROMM LLP

Frank J. Rubino, Jr. (FR-6202)
355 Lexington Avenue
New York, New York 10017
Phone: (212) 983-8500
Fax:    (212) 983-5946

*Counsel for Plaintiff*
*New York Marine & General Insurance Company*

FERBER FROST CHAN & ESSNER, LLP

Robert M. Kaplan (RK1428)
530 Fifth Avenue
23rd Floor
New York, New York 10036-5101
Phone: (212) 944-2200

*Counsel for Plaintiffs*
*Continental Casualty Co. et al.*

Dated: New York, New York
December ___, 2004

**SO ORDERED:**

Richard C. Casey
U.S.D.J.

3

Dated: Washington, D.C.
       December ___, 2004

PATTON BOGGS LLP

_____

Ronald S. Liebman (admitted *pro hac vice*)
Mitchell R. Berger (MB4112)
Ugo Colella (admitted *pro hac vice*)
2550 M Street, N.W.
Washington, DC 20037
Phone: (202) 457-6000
Fax:    (202) 457-6315

*Counsel for Defendant*
*The National Commercial Bank*

Respectfully submitted,

BROWN GAVALAS & FROMM LLP

_____

Frank J. Rubino, Jr.
355 Lexington Avenue
New York, New York 10017
Phone: (212) 983-8500
Fax:    (212) 983-5946

*Counsel for Plaintiff*
*New York Marine & General Insurance Company*

FERBER FROST CHAN & ESSNER, LLP

_____

Robert M. Kaplan (RK1428)
530 Fifth Avenue
23rd Floor
New York, New York 10036-5101
Phone: (212) 944-2200

*Counsel for Plaintiffs*
*Continental Casualty Co. et al.*

Dated: New York, New York
       December 7, 2004

SO ORDERED:

_____

Richard C. Casey
U.S.D.J.

3