# EXHIBIT C
# (Part 2 of 5)

# EXHIBIT F

ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------X

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

03 MDL 1570 (RCC)
ECF Case
**Opinion and**
**Order**

-------------------------------------------------------------------------------X

*This document relates to:*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-18-05

| | |
|---|---|
| Burnett v. Al Baraka Inv. & Dev. Corp. | 02 Civ. 1616 |
| Ashton v. al Qaeda Islamic Army | 02 Civ. 6977 |
| Tremsky v. Osama bin Laden | 02 Civ. 7300 |
| Salvo v. al Qaeda Islamic Army | 03 Civ. 5071 |
| Burnett v. Al Baraka Inv. & Dev. Corp. | 03 Civ. 5738 |
| Federal Insurance v. al Qaida | 03 Civ. 6978 |
| Barrera v. al Qaeda Islamic Army | 03 Civ. 7036 |
| Vigilant Insurance v. Kingdom of Saudi Arabia | 03 Civ. 8591 |

**Richard Conway Casey, United States District Judge:**

On September 11, 2001, nineteen members of the al Qaeda terrorist network hijacked four United States passenger airplanes and flew them into the twin towers of the World Trade Center in New York City, the Pentagon in Arlington, Virginia, and – due to passengers' efforts to foil the hijackers – an open field in Shanksville, Pennsylvania. Thousands of people on the planes, in the buildings, and on the ground were killed in those attacks, countless others were injured, and billions of dollars of property was destroyed.

Pursuant to 28 U.S.C. § 1407, on December 9, 2003 the Mulitidistrict Litigation Panel centralized six then-pending September 11-related cases before this Court "for coordinated or consolidated pretrial proceedings." Additional actions, that are not the subject of this opinion, have since been filed. Plaintiffs in these consolidated actions are more than three thousand survivors, family members, and representatives of victims, and insurance carriers seeking to hold responsible for the attacks the persons and entities that supported and funded al Qaeda. The complaints allege that over two hundred defendants directly or indirectly provided material support to Osama bin Laden and the al Qaeda terrorists. Generally, these defendants fall into one of several categories: al Qaeda and its members and associates; state sponsors of terrorism; and individuals and entities, including charities, banks, front organizations, terrorist organizations, and financiers who provided financial, logistical, and other support to al Qaeda.[1] See, e.g.,

---

[1] According to Plaintiffs, Osama bin Laden formed al Qaeda, which means "the Base" or "the Vanguard," into an international terrorist organization with the aim of violently opposing non-Islam governments and Islamic states too beholden to the West. See, e.g., Burnett

1

Ashton Complaint ¶ 5; Burnett Complaint "Introduction"; Federal Complaint ¶¶ 42-66. The complaints assert subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq.; and causes of action under the Torture Victim Protection Act ("TVPA"), 28 U.S.C.§ 1350 note; the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 et seq.; the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; theories of aiding and abetting, conspiracy, intentional infliction of emotional distress, negligence, survival, wrongful death, trespass, and assault and battery.

Several motions to dismiss are pending before the Court. At the suggestion of counsel, the Court scheduled oral arguments in groups organized generally by grounds for dismissal. On September 14, 2004, the Court heard oral argument on the motions to dismiss for lack of subject matter jurisdiction under the FSIA by HRH Prince Sultan bin Abdulaziz Al-Saud ("Prince Sultan"), HRH Prince Turki Al-Faisal bin Abdulaziz Al-Saud ("Prince Turki"),[2] and the National

---

Complaint at 275.

[2] Before the Multidistrict Panel transferred Burnett v. Al Baraka Inv. & Dev. Corp., 02 Civ. 1616, to this Court, Judge Robertson of the United States District Court for the District of Columbia dismissed the claims against Prince Sultan relating to acts performed in his official capacity for lack of subject matter jurisdiction. Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9, 23 (D.D.C. 2003) (hereinafter "Burnett II"). Finding that the court lacked personal jurisdiction over Prince Sultan, Judge Robertson dismissed without prejudice the allegations concerning acts taken in his personal, as opposed to official, capacity. Id. Judge Robertson dismissed the complaint against Prince Turki for lack of subject matter jurisdiction as well. Id.

Prince Sultan and Prince Turki both move to dismiss the complaints against them in Ashton v. Al Qaeda Islamic Army, 02 Civ. 6977 (S.D.N.Y.); Barrera v. Al Qaeda Islamic Army, 03 Civ. 7036 (S.D.N.Y.); Burnett v. Al Baraka Inv. & Dev. Corp., 02 Civ. 1616 (D.D.C.); Burnett v. Al Baraka Inv. & Dev. Corp., 03 Civ. 5738 (S.D.N.Y.); Salvo v. Al Qaeda Islamic Army, 03 Civ. 5071 (S.D.N.Y.); and Tremsky v. Osama bin Laden, 02 Civ. 7300 (S.D.N.Y.). Plaintiffs in these cases filed consolidated responses to Prince Sultan's and Prince Turki's motions. In Plaintiffs' words, the New York Burnett action is materially identical to the D.C. Burnett action and was filed as a "prophylactic" measure in the event the D.C. court found that it lacked subject matter jurisdiction. Burnett Complaint at 265. Additionally, at Plaintiffs' counsel request, this Court ordered the Barrera action consolidated with the Ashton case on December 6, 2004.

Prince Sultan and Prince Turki have each also filed a separate motion to dismiss in Federal Insurance v. Al Qaida, 03 Civ. 6978 (S.D.N.Y.), both of which are fully submitted and are resolved in this opinion. The Federal Insurance Plaintiffs are forty-one insurance companies that have paid and reserved claims in excess of $4.5 billion as a result of the September 11 attacks.

2

Commercial Bank ("NCB").[3] On October 12, 2004 the Court heard oral argument from Defendants who filed motions to dismiss for lack of personal jurisdiction, including Prince Sultan, HRH Prince Mohamed Al-Faisal Al-Saud ("Prince Mohamed"),[4] the estate of Mohammad Abdullah Aljomaih,[5] Sheikh Hamad Al-Husani,[6] NCB, Abdulrahman bin Mahfouz,[7] the Saudi Binladin Group, Tariq Binladin, Omar Binladin, and Bakr Binladin.[8] Although their counsel did not argue on that day, motions to dismiss by the African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Inc., Safa Trust, Sana-Bell Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation, (hereinafter collectively referred to as the "SAAR Network"),[9] Prince Turki, and Adel A. J.

---

The Burnett Plaintiffs filed a motion for reconsideration in conjunction with Prince Sultan's and Prince Turki's motions to dismiss certain consolidated complaints. While this Court reviews and gives deference to Judge Robertson's thoughtful opinion, it must evaluate Prince Sultan's and Prince Turki's motions on the merits de novo. See In re Grand Jury Proceedings (Kluger), 827 F.2d 868, 871 n.3 (2d Cir. 1987) ("A transfer under 28 U.S.C. § 1407 'transfers the action lock, stock, and barrel. The transferee district court has the power and the obligation to modify or rescind any orders in effect in the transferred case which it concludes are incorrect.'") (internal citations omitted). The Court bears in mind that it is bound by Second Circuit precedent while Judge Robertson applied D.C. Circuit law. Menowitz v. Brown, 991 F.2d 36, 40-41 (2d Cir. 1993) (explaining transferee court is to apply its interpretation of federal law, not that of the transferor circuit); In re Air Crash at Belle Harbor, New York, No. 02 Civ. 8411 (RWS), 2003 WL 124677, at *3 (S.D.N.Y. Jan. 15, 2003) (applying Second Circuit law after 28 U.S.C. § 1407 transfer from a district court in the Fifth Circuit).

[3] NCB moves to dismiss the complaints against it in Ashton and Burnett.

[4] Prince Mohamed moves to dismiss the complaints against him in Ashton and Federal Insurance.

[5] The estate of Mohammad Abdullah Aljomaih moves to dismiss the complaint in Burnett.

[6] Sheikh Hamad Al-Husani moves dismiss the complaint in Burnett.

[7] Abdulrahman bin Mahfouz moves to dismiss the complaint in Burnett.

[8] The Saudi Binladin Group moves to dismiss the complaints against it in Burnett and Ashton. Tariq Binladin, Omar Binladin, and Bakr Binladin move to dismiss the Burnett complaint.

[9] The SAAR Network moves to dismiss the Federal Insurance complaint.

Batterjee,[10] also raised personal jurisdiction defenses. On October 14, 2004 the Court heard oral argument from certain Defendants arguing Plaintiffs had failed to state a claim, including Al Rajhi Banking & Investment Corporation (hereinafter "Al Rajhi Bank"),[11] the Saudi American Bank,[12] Arab Bank,[13] NCB, the SAAR Network, Prince Mohamed, Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel,[14] Abdulrahman bin Mahfouz, the Saudi Binladin Group, and Adel A. J. Batterjee. Finally, the last of this group of motions was entertained on November 5, 2004, when the Court heard oral argument from the Kingdom of Saudi Arabia in its motion to dismiss the Federal Insurance complaint.[15]

## I.    Subject Matter Jurisdiction Under the FSIA

Under the FSIA, a foreign state and its instrumentalities are presumed immune from United States courts' jurisdiction. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); 28 U.S.C. §§ 1602-1607. The FSIA's exceptions to immunity provide the sole basis for obtaining subject matter jurisdiction over a foreign state and its instrumentalities in federal court. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989); Robinson v. Gov't of Malaysia, 269 F.3d 133, 138 (2d Cir. 2001). Federal courts must inquire at the "threshold of every action" against a foreign state whether the exercise of its jurisdiction is appropriate. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983).

### A. Standard of Review

In a Rule 12(b)(1) motion to dismiss challenging subject matter jurisdiction under the FSIA, "the defendant must first 'present a prima facie case that it is a foreign sovereign.'" Virtual Countries v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (quoting Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993)). In response, the plaintiff must present evidence that one of the statute's exceptions nullifies the immunity. Virtual Countries, 300 F.3d at 241 ("Determining whether this burden is met involves a 'review of the

---

[10] Adel A. J. Batterjee moves to dismiss the complaint in Burnett.

[11] Al Rajhi Bank renews its motion to dismiss the Burnett complaint. Judge Robertson denied its original motion and permitted it to serve a Rule 12(e) request on the Burnett Plaintiffs. Burnett v. Al Baraka Invest. & Dev. Corp., 274 F. Supp. 2d 86, 110 (D.D.C. 2003) (hereinafter "Burnett I").

[12] Saudi American Bank moves to dismiss the Ashton and Burnett complaints.

[13] Arab Bank moves to dismiss the Burnett and Federal Insurance complaints.

[14] Al Baraka Investment & Development Corporation and Saleh Abdullah Kamel move to dismiss the Ashton and Burnett complaints.

[15] The parties have agreed that resolution of this motion will also apply to Vigilant Insurance v. Kingdom of Saudi Arabia, 03 Civ. 8591 (RCC).

allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of fact.") (citing Robinson, 269 F.3d at 141); Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001) (explaining plaintiff may "rebut the presumption of immunity . . . by proffering evidence of record that the defendant undertook certain activities that fall within the scope" of one of the statutory exceptions) (citing Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for A.W. Galadari, 12 F.3d. 317, 325 (2d Cir. 1993)).  In challenging this Court's subject matter jurisdiction, the moving Defendants retain the ultimate burden of persuasion.  Virtual Countries, 300 F. 3d at 241 (citing Cargill, 991 F.2d at 1016); Robinson, 269 F.2d at 141 n.8 (noting defendant's burden must be met with a preponderance of the evidence).

Defendants may "challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." Robinson, 269 F.3d at 140 (citations omitted). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." Id. (internal quotations and citations omitted); Sweet v. Sheanhan, 235 F.3d 80, 83 (2d Cir. 2000). "But where evidence relevant to the jurisdictional question is before the court, 'the district court . . . may refer to that evidence.'" Robinson, 269 F.3d at 140 (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)); see also Filatech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) (explaining, where there are factual disputes regarding the immunity question, the court may not "accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction"). Thus, "on a 'challenge to the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" Filatech, 157 F.3d at 932 (explaining a court should consider all the submissions of the parties and may, if necessary, hold an evidentiary hearing to resolve the jurisdictional question) (quoting Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991)). The court must consult outside evidence if resolution of a proffered factual issue may result in the dismissal of the complaint for lack of jurisdiction. Robinson, 269 F.3d at 141 n.6. Defendants here challenge both the legal and factual sufficiency of Plaintiffs' claims. The Court will consider the affidavits submitted by the parties as necessary.

Before turning to the allegations against the Defendants claiming immunity, the Court notes it is keenly aware of the "delicate balanc[e] 'between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign's agency's legitimate claim to immunity from discovery.'" First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 176 (2d Cir. 1998) (ordering full discovery against defendant over whom court already had subject matter jurisdiction because such discovery would provide plaintiff an opportunity to obtain jurisdictional discovery regarding potentially sovereign alter ego co-defendant without further impinging that defendant's immunity) (quoting Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992) ("At the very least, discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.")). The Second Circuit has instructed "that generally a plaintiff may be allowed

limited discovery with respect to the jurisdictional issue; but until [plaintiff] has shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery." First City, 150 F.3d at 176-77 (quoting Filus v. Lot Polish Airlines, 907 F.2d 1328, 1332 (2d Cir. 1990)). Still, the Plaintiffs must allege sufficient facts to warrant jurisdictional discovery. Robinson, 269 F. 3d at 146 (citing Jazini v. Nissan Motor Co., 148 F. 3d 181, 185 (2d. Cir. 1998) (refusing jurisdictional discovery where plaintiffs' allegations lacked factual specificity to confer jurisdiction)); see also Burnett II, 292 F. Supp. 2d at 15 (denying Plaintiffs' request for discovery from Prince Turki where "suggestions of [his] individual activity are only conclusory").

### B. Allegations Against Defendants Asserting Foreign Sovereign Immunity
### 1. Prince Sultan

Prince Sultan has been Saudi Arabia's Minister of Defense and Aviation and Inspector General of its Armed Forces since 1962. Ashton Complaint ¶ 265; Burnett Complaint ¶ 352; Federal Complaint ¶ 427; William H. Jeffress, Jr. Decl. ¶ 4 at Notice of HRH Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss Consolidated Complaint (hereinafter "Consolidated Jeffress Decl."); Andrea Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss Consolidated Complaints Ex. 1, Sultan Bio, available at http://saudiembassy.net/Country/ Government/SultanBio.asp. In 1982, his brother King Fahd bin Abdulaziz Al-Saud named him Second Deputy President of Saudi Arabia's Council of Ministers, the Kingdom's governing body. Nizar Bin Obaid Nadani Decl. ¶ 2 at Notice of HRH Prince Sultan Bin Abdulaziz al-Saud's Motion to Dismiss Certain Consolidated Complaints Ex. 1 (hereinafter "Nadani Decl."); Consolidated Jeffress Decl. ¶ 4; Federal Complaint ¶ 427; Sultan Bio. As such, he is the third-highest ranking member of the Saudi government.

Especially relevant here, Prince Sultan is the Chairman of the Supreme Council of Islamic Affairs, which was established in 1995 and is responsible for the Kingdom's Islamic policy abroad. Consolidated Jeffress Decl. ¶ 5; Ashton Complaint ¶ 265; Federal Complaint ¶ 427. Prince Sultan disagrees with Plaintiffs' claim that the Supreme Council monitors and approves domestic and foreign charitable giving on behalf of the Kingdom. Prince Sultan prefers the characterization that the Supreme Council "carr[ies] out the foreign policy of Saudi Arabia as determined by the Council of Ministers." Abdulaziz H. Al-Fahad Decl. ¶ 5, at Sara E. Kropf Decl. Ex. 2. Finally, Prince Sultan, as the head of the Special Committee of the Council of Ministers, which is a foreign policy advisory resource for King Saud, exercises authority over disbursements by the Special Committee. Consolidated Jeffress Decl. ¶ 6. In the past, these disbursements, which are government funded, have included grants to Islamic charities. Id. at ¶ 6.

The various complaints make substantially similar accusations against Prince Sultan. See Consolidated Jeffress Decl. Ex. C (summarizing allegations against Prince Sultan in consolidated complaints). Prince Sultan is alleged to have met with Osama bin Laden after Iraq invaded Kuwait in the summer of 1990. Ashton Complaint ¶ 253; Burnett Complaint ¶ 340. At that meeting, which Prince Turki also attended, bin Laden purportedly offered his family's support to Saudi military forces. Ashton Complaint ¶ 253. Plaintiffs allege that, at the time of the Gulf War, Prince Sultan "took radical stands against western countries and publicly supported and

funded several Islamic charities that were sponsoring Osama bin Laden and al Qaeda operations." Ashton Complaint ¶ 266; Burnett Complaint ¶ 353. After the attacks of September 11, Prince Sultan allegedly advocated against granting the United States use of Saudi military bases to stage attacks against Afghanistan. Ashton Complaint ¶ 273; Burnett Complaint ¶ 356.

Prince Sultan allegedly made personal contributions, totaling $6,000,000 since 1994, to various Islamic charities that Plaintiffs claim sponsor or support al Qaeda. Ashton Complaint ¶ 269; Burnett Complaint ¶ 359; Federal Complaint ¶ 430. The specific charities that Prince Sultan donated to include Defendants International Islamic Relief Organization ("IIRO"),[16] Al Haramain,[17] Muslim World League ("MWL"),[18] and the World Assembly of Muslim Youth ("WAMY").[19] Ashton Complaint ¶¶ 269-272; Burnett Complaint ¶¶ 354, 359; Federal Complaint ¶ 430. According to Plaintiffs, with respect to his alleged donations, "[a]t best, Prince Sultan was grossly negligent in the oversight and administration of charitable funds, knowing they would be used to sponsor international terrorism, but turning a blind eye. At worse, Prince Sultan directly aided and abetted and materially sponsored al Qaeda and international terrorism." Burnett Complaint ¶ 363; Federal Complaint ¶¶ 429-31 (alleging Prince Sultan knew and intended that the contributions he made to various charities would be used to fund al Qaeda and international terrorism).[20]

---

[16] IIRO is allegedly an al Qaeda front that has been tied to the 1993 World Trade Center attack and the 1998 embassy bombings. See, e.g., Burnett Complaint ¶¶ 156, 240, 242.

[17] Beginning in 2002, certain branches of Al Haramain were designated by the United States as terrorist organizations. See Exec. Order No. 13224, 31 C.F.R. 595, available at http://www.treas.gov/offices/enforcement/ofac/sanctions/t11ter.pdf (hereinafter "Exec. Order No. 13224"). Judge Robertson denied Al Haramain's motion to dismiss the Burnett action. Burnett I, 274 F. Supp. 2d at 107.

[18] MWL is the parent of IIRO. See, e.g., Burnett Complaint ¶ 236.

[19] WAMY is a suspected al Qaeda front, allegedly "preaching good . . . while plotting evil," connected to charity Defendant Benevolence International Foundation ("BIF"). BIF is now a designated terrorist, but it previously concealed its relationship with Osama bin Laden and al Qaeda. See, e.g., Burnett Complaint ¶¶ 160, 205, 229, 362; Exec. Order 13224.

[20] Prince Sultan denies making any grants to Al Haramain and MWL and argues that contributions made to IIRO and WAMY were made strictly in his official capacity on behalf of the Saudi government. Further, he claims the four charities searched their records and confirmed that Prince Sultan did not make any personal contributions. These transmittal letters and government checks were included in Prince Sultan's motion to dismiss the D.C. Burnett action. Judge Robertson found these documents had "limited probative value, [as they] lack[ed] proper foundations to establish that the affiants could have known the actual source of the moneys they received." Burnett II, 292 F. Supp. 2d at 16. This Court has reviewed these affidavits and agrees with Judge Robertson's assessment. For example, one declarant who provided information

**2. Prince Turki**

Prince Turki is currently the Kingdom of Saudi Arabia's ambassador to the United Kingdom. Ashton Complaint ¶ 263. From 1977 until August 2001, he was the Director of Saudi Arabia's Department of General Intelligence ("DGI," also known by its Arabic name, Istakhbarat). Ashton Complaint ¶ 255; Burnett Complaint ¶ 343; Federal Complaint ¶ 445. As such, Plaintiffs allege he was or should have been aware of the terrorist threat posed by Osama bin Laden, al Qaeda, and the Taliban. Ashton Complaint ¶ 256; Burnett Complaint ¶ 343. Prince Turki allegedly met with Osama bin Laden five times in the mid-1980s and mid-1990s. Ashton Complaint ¶ 257; Burnett Complaint ¶ 344. At one of those meetings, which Prince Sultan also attended, bin Laden allegedly offered the Saudis the use of his family's engineering equipment and suggested bolstering Saudi military forces with militants. Ashton Complaint ¶ 253. Prince Turki is alleged to have close ties with an al Qaeda financier, Mr. Zouaydi, and is allegedly implicated in Mr. Zouaydi's financial support of al Qaeda. Ashton Complaint ¶ 241; Burnett Complaint ¶ 345. Further, Plaintiffs claim Prince Turki met with members of the Taliban and, in 1995, gave the Taliban financial and material support. Ashton Complaint ¶ 257; Federal Complaint ¶¶ 447-49 (alleging that, at the time Prince Turki provided support, the Taliban maintained a symbiotic relationship with al Qaeda and thus Prince Turki knew al Qaeda would benefit from the Kingdom's support). In July 1998, Prince Turki is alleged to have met with members of the Taliban and representatives of bin Laden and agreed to not extradite bin Laden or close terrorist camps in exchange for bin Laden's protection of the Saudi Royal family. Ashton Complaint ¶ 261; Burnett Complaint ¶ 348. Plaintiffs allege Prince Turki facilitated money transfers from wealthy Saudis to the Taliban and al Qaeda. Ashton Complaint ¶ 259; Federal ¶ 451. Additionally, the Federal Plaintiffs claim that, while Prince Turki was the head of DGI, Saudi Arabian intelligence officers allegedly trained a member of the al Qaeda Spanish cell in explosives and provided material support to two of the September 11 hijackers. Federal Complaint ¶ 449. The Federal complaint also alleges that Prince Turki made personal contributions to Saudi-based charities that he knew were sponsors of al Qaeda, including IIRO, MWL, WAMY, BIF, the Saudi High Commission, Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and Al Haramain. Federal Complaint ¶¶ 451-52.

Prince Turki denies the allegations against him in a declaration prepared in concert with his motion to dismiss the D.C. Burnett action. In reviewing this declaration, the Court gives "great weight to any extrinsic submissions made by the foreign defendant[] regarding the scope of [his] official responsibilities." Leutwyler, 184 F. Supp. 2d at 287 (internal quotation marks omitted). Prince Turki explains that the DGI "is involved in the collection and analysis of foreign intelligence and in carrying out foreign operations." Decl. of HRH Prince Turki ¶ 5, at

---

regarding alleged contributions relied on his personal knowledge of a charity's records, yet he had only been in his position for two months. See Decl. of Saleh Abdullah Al Saykhan ¶ 2, at Decl. of Sara E. Kropf in Support of Prince Sultan's Motion to Dismiss the D.C. Burnett action. As Judge Robertson pointed out, "the value of plaintiffs' showing that Prince Sultan did give money to these organizations in his personal capacity, however, is no greater." Burnett II, 292 F. Supp. 2d at 16 (referring to Saudi press reports of Prince Sultan's contributions).

HRH Prince Turki's Motion to Dismiss Certain Consolidated Complaints Ex. 1 (hereinafter "Prince Turki Decl."). He was active in Saudi Arabia's efforts to combat terrorism generally and the threat posed by Osama bin Laden and al Qaeda specifically, and served on a joint information-sharing committee with the United States beginning in 1997. Id. ¶¶ 6, 10. He states that all of his interactions with Osama bin Laden and the Taliban were part of his official functions. Id. ¶ 5. In June 1998, King Fahd sent Prince Turki to Kandahar to meet with the Taliban and to relay the official Saudi request that Osama bin Laden be extradited to Saudi Arabia for trial. Id. ¶ 11. The Taliban denied the Saudi request and Saudi Arabia subsequently suspended diplomatic relations with the Taliban in September 1998. Id. ¶ 13. Prince Turki denies facilitating money transfers to Osama bin Laden or al Qaeda, he denies offering material assistance to Osama bin Laden, his representatives, or al Qaeda in return for their not attacking Saudi Arabia, he denies promising or providing oil or financial assistance to the Taliban, and denies ever hearing of the Syrian financier Mr. Zouaydi, with whom he is alleged to have ties. Id. ¶¶ 14, 16, 17.

### 3. Kingdom of Saudi Arabia

The Federal Plaintiffs claim that "[m]ore than any other factor, al Qaida's phenomenal growth and development into a sophisticated global terrorist network were made possible by the massive financial, logistical and other support it received from the Kingdom of Saudi Arabia, members of the Saudi Royal family, and prominent members of Saudi society." Federal Complaint ¶ 398. Further, the Federal Plaintiffs allege September 11 was "a direct, intended and foreseeable product of the Kingdom of Saudi Arabia's participation in al Qaida's jihadist campaign." Id. ¶ 425. Specifically, the Kingdom allegedly maintained and controlled several of the charities within al Qaeda's infrastructure. Id. ¶ 399. The Federal Plaintiffs claim Saudi Arabia knew the threat that these charities posed particularly to the United States, and did nothing to stop it. Id. ¶¶ 400-02. The Kingdom allegedly used its relationship with the Taliban to sustain al Qaeda in the mid-1990s. Id. ¶¶ 403, 407. To the extent the Federal Plaintiffs rely on actions by members of the Saudi Royal family as allegations against the Kingdom, they make no claim that these individuals were acting on behalf of or at the behest of the Kingdom. See, e.g., id. ¶ 420 (claiming that in January 1999 Princess Haifa made payments to Al-Bayoumi, a Defendant alleged to have paid rent on behalf of two of the hijackers). Finally, Plaintiffs allege that members of the Saudi Royal family provided support to al Qaeda in their official capacities as members of the Supreme Council of Islamic Affairs. Federal Complaint ¶¶ 426-464.

### 4. National Commercial Bank

NCB was established in 1950 by Salim bin Mahfouz, the father of Defendant Khalid bin Mahfouz, as the first commercial bank of Saudi Arabia. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88. The Ashton Plaintiffs allege that the bin Mahfouz family controlled NCB until 1999 when the Saudi government bought a majority of its shares. Ashton Complaint ¶ 573.[21]

---

[21] The Ashton Plaintiffs moved to amend this allegation to claim that the Public Investment Fund ("PIF"), not the Saudi government, purchased a majority of NCB shares in 1999. Ashton Docket ## 137, 138.

The Ashton and Burnett Plaintiffs claim that NCB has a wholly-owned subsidiary in New York, SNCB Securities, Ltd., through which it operates an international banking business. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88.

Plaintiffs claim Osama bin Laden and al Qaeda used NCB as "a financial arm, operating as a financial conduit for [their] operations." Ashton Complaint ¶ 564; Burnett Complaint ¶ 89. In 1986, Khalid bin Mahfouz became NCB's President and CEO and remained so until 1999. Ashton Complaint ¶ 563; Burnett Complaint ¶ 88. Also in 1986, Khalid bin Mahfouz became the Chief Operating Officer and a major shareholder of the Bank of Credit and Commerce International ("BCCI"). Ashton Complaint ¶¶ 564, 566; Burnett Complaint ¶¶ 89, 91. He was subsequently indicted in New York state in connection with his involvement in BCCI's fraudulent practices, which also implicated NCB. Ashton Complaint ¶¶ 564, 566; Burnett Complaint ¶¶ 89, 91.

Plaintiffs claim both NCB and BCCI supported international terrorism. Ashton Complaint ¶¶ 564-68; Burnett Complaint ¶¶ 91-93. Specifically, a "1999 United States Senate Report on the BCCI scheme detailed the role of [NCB] in hiding assets, money laundering, the cover-up and obstruction of a Senate investigation, and sponsoring international terrorism." Burnett Complaint ¶ 89. Additionally, a 1998 NCB bank audit revealed irregularities involving direct donations to several charities and that $74 million had been funneled by the bank's Zakat Committee to IIRO.[22] Ashton Complaint ¶¶ 569-71; Burnett ¶¶ 94, 95. NCB also allegedly made loans to charitable organizations without the knowledge of the Zakat Committee. Id. Plaintiffs allege "direct donations were received through NCB facilities to the Red Crescent Committee, [IIRO], and the Muwaffaq Foundation," all Defendants in these actions. Ashton Complaint ¶ 570; Burnett Complaint ¶ 95. Muwaffaq allegedly provided Osama bin Laden with $3 million in 1998. Ashton Complaint ¶ 573. Plaintiffs claim NCB knew or should have known it was materially supporting al Qaeda, Osama bin Laden, and international terrorism. Ashton Complaint ¶ 570; Burnett Complaint ¶ 95.

### C. Defendants' Status as Foreign States for FSIA Purposes

The Court must first determine if the moving Defendants are "foreign states" for purposes of the FSIA. A "foreign state" is statutorily defined:

(a) A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity –

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States . . . nor created under

---

[22] Zakat is required almsgiving by all Muslims. See, e.g., Burnett Complaint at 275; id. ¶ 40.

the laws of any third country.

28 U.S.C. § 1603. There is no dispute that the Kingdom of Saudi Arabia is a foreign state. The status of each of the Princes and NCB are discussed below.

### 1. Prince Sultan and Prince Turki

Several courts have recognized that "[i]mmunity under the FSIA extends also to agents of a foreign state acting in their official capacities [since] '[i]t is generally recognized that a suit against an individual acting in his official capacity is the practical equivalent of a suit against the sovereign directly.'"[23] Bryks v. Canadian Broad. Corp., 906 F. Supp. 204, 210 (S.D.N.Y. 1995) (quoting Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101 (9th Cir. 1990) ("Nowhere in the text or legislative history does Congress state that individuals are not encompassed within 28 U.S.C. § 1603(b).")); see also Velasco v. Gov't of Indonesia, 370 F.3d 392, 398-99 (4th Cir. 2004) (collecting cases extending FSIA immunity to individuals sued in their official capacities); Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 388 (5th Cir. 1999) (acknowledging the FSIA protects individuals to the extent they act within their official duties); El Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (dismissing claims against government officials since they were sued in their official capacities); Leutwyler, 184 F. Supp. 2d at 286-87 ("[I]t has been generally recognized that individuals employed by a foreign state's agencies or instrumentalities are deemed 'foreign states' when they are sued for actions undertaken within the scope of their official capacities.") (citing Bryks, 906 F. Supp. at 210); Flatlow v. Islamic Republic of Iran, 999 F. Supp. 1, 11 n.3 (D.D.C. 1998) (noting favorable practice of applying FSIA to individuals). Thus, this Court finds that immunity may be available to Prince Sultan, as the third-highest ranking member of the Saudi government, and to Prince Turki, as the Director of Saudi Arabia's Department of General Intelligence, to the extent their alleged actions were performed in their official capacities.

The Federal Plaintiffs argue that the FSIA cannot apply to Prince Turki because, as of September 10, 2003 when the complaint was filed, Prince Turki was the Saudi ambassador to the United Kingdom, a position the Federal Plaintiffs allege is not entitled to immunity under the FSIA. In support of this argument, the Federal Plaintiffs cite Dole Food Co. v. Patrickson, 538 U.S. 468, 480 (2003), in which the Supreme Court held that instrumentality status is determined at the time of the filing of the complaint.

The Court disagrees with this reliance on Dole Food. The Supreme Court resolved two questions in Dole Food. "The first [was] whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary. The second question [was] whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time the suit is filed." Id. at 471. The Supreme Court held that a foreign state's ownership of an entity must be direct for the entity to be considered an instrumentality. Id. at 474. The Supreme Court also ruled that

---

[23] The FSIA is silent on the subject. Neither the Supreme Court nor the Second Circuit has specifically addressed the issue.

ownership must be determined as of the date on which the complaint was filed. Id. at 480. Neither of these points of law speaks, however, to the circumstances under which an individual is covered by the FSIA. Indeed, numerous other courts that have addressed this issue have held that the relevant inquiry for individuals is simply whether the acts in question were undertaken at a time when the individual was acting in an official capacity. See, e.g., Velasco, 370 F.3d at 398-99; Byrd, 182 F.3d at 388; Bryks, 906 F. Supp. at 210. This Court considers that precedent to be more consistent with the FSIA and unaltered by the decision in Dole Food. Thus, it deems Prince Turki the equivalent of the foreign state inasmuch as the complaints allege actions taken in his official capacity as the head of the DGI. Accordingly, both Prince Sultan and Prince Turki are immune from suit for their official acts unless an exception under the FSIA applies.

### 2. National Commercial Bank

NCB submits that it is an instrumentality of the Kingdom of Saudi Arabia and therefore immune from suit. See Decl. of Nizar Bin Obaid Madani, Assistant Minister of Foreign Affairs of Kingdom of Saudi Arabia ¶ 2, at Berger Decl. Ex. 7 ("It is the position of the Ministry of Foreign Affairs that NCB is a government instrumentality of the Kingdom of Saudi Arabia."). To enjoy immunity from suit under the FSIA, NCB must demonstrate that it is an agency or instrumentality, or a political subdivision of the Kingdom. 28 U.S.C. § 1603(a). As explained above, the FSIA defines an "agency or instrumentality" as (1) "a separate legal person, . . .(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) a non-U.S. citizen. 28 U.S.C. § 1603(b). Accordingly, NCB claims that (1) it is a separate legal person, (2) at the time the suit was filed a majority of its shares were owned by an administrative unit of the Saudi Ministry of Finance, the Public Investment Fund ("PIF"),[24] and (3) it is not a citizen of the United States or created under the laws of a third country.

In Dole Food, the Supreme Court held "that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement" outlined in § 1603(b). 538 U.S. at 474. Accordingly, the Kingdom of Saudi Arabia's ownership of NCB must be direct for NCB to enjoy immunity under the FSIA. That is, NCB will not be deemed an instrumentality of the Kingdom if the PIF, its majority owner, is determined to be an agency, instrumentality, or organ of the Kingdom. See § 1603(b)(2) (stating agency or instrumentality is entity whose majority

---

[24] After the parties submitted their briefs and argued the FSIA issue, the Ashton Plaintiffs filed supplemental affidavits, without leave of the Court, to contest, for the first time, the timing of the PIF's majority ownership. See 03 MD 1570 Docket # 455. The parties agree that the PIF bought 50% of NCB shares in May 1999. See John Fawcett Sept. 23, 2004 Supplemental Affidavit at Ex. 1 ("Fawcett Supp. Aff."). Later in 1999, the PIF sold 10% of its shares to the General Organization for Social Insurance. Fawcett Supp. Aff. at Ex. 2. Late in 2002 the PIF agreed to buy 30% of the remaining shares from the bin Mahfouz family, but Plaintiffs claim the purchase was not completed until January 2003, after the lawsuit was filed on September 4, 2002. See Fawcett Supp. Aff. at Ex. 3 & 4 (news accounts of sale). For the reasons that will be explained below, the Court finds it unnecessary to resolve this dispute at this time.

ownership interest is held by either the foreign state or a political subdivision thereof); Filler v. Hanvitt Bank, 378 F.3d 213 (2d Cir. 2004) (holding an organ's ownership of two banks did not, in turn, make the banks organs or instrumentalities of foreign state); see also In re Ski Train Fire in Kaprun, Austria, 198 F. Supp. 2d 420, 426 (S.D.N.Y. 2002) (holding ski resort owner, which was owned in part by instrumentality of Austrian government, was not instrumentality because it was not owned directly by the state or a subdivision thereof); Hyatt Corp. v. Stanton, 945 F. Supp 675, 688 (S.D.N.Y. 1996) (concluding "that corporations a majority of whose shares are owned by agencies or instrumentalities of foreign states are not themselves agencies or instrumentalities"). Thus, NCB must demonstrate that the PIF is the equivalent of the Kingdom of Saudi Arabia or a political subdivision thereof.

The PIF was established by Royal Decree with the sole function of "financing . . . investments in productive projects of a commercial nature whether they belong to the Government or the industrial lending institutions connected to it or to its public corporations and whether these projects are undertaken independently or in partnership between these administrative parties and private institutions." PIF Charter ¶ 2, at Berger Aff. Ex. 4B ("PIF Charter"); Affidavit of Abdallah Bin Hamad Al-Wohaibi ¶ 3, the Director of the Legal Department of the Ministry of Finance, at Berger Aff. Ex. 4 ("Al-Wohaibi Aff."). Its board of directors are all Saudi officials named in its charter, its employees are civil servants, and the Ministry of Finance is responsible for its costs. Id. ¶¶ 4, 8, 10; see also PIF Charter ¶¶ 4, 7. Its board must submit an annual report to Saudi Arabia's Council of Ministers summarizing its financial position and major operations. Al-Wohaibi Aff. ¶ 10. It has no separate legal status from the Ministry of Finance. Id. ¶ 4. The PIF holds shares of corporations and operational assets, "generally . . . on behalf of the Ministry of Finance." Id. ¶ 9. It may be sued as a department of the Ministry of Finance, and as such, the Ministry of Finance would be named as the defendant. Id. ¶ 12. It funds investments on behalf of the Kingdom and it provides financing terms for projects that commercial lenders do not. Id. ¶ 5; Supplemental Al-Wohaibi Aff. ¶¶ 8-10 (hereinafter "Supp. Al-Wohaibi Aff.").

### a. Status of the PIF

In Filler v. Hanvitt Bank, a case with facts very similar to those presented here, the Second Circuit reiterated Dole Food's requirement of direct ownership for instrumentality status. Two defendants were commercial banks majority-owned by the Korean Deposit Insurance Corporation ("KDIC"), a "governmental institution" run by the Korean Ministry of Finance and the Economy of the Republic of Korea. Filler, 378 F.3d at 215-16. In determining if KDIC was an organ of Korea, the court considered several factors:

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

Id. at 217 (citing Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846-47 (5th Cir. 2000) (alteration in original)). The Second Circuit held that the KDIC was an organ of Korea because it was formed by statute and presidential decree; it performs the governmental functions of

13

protecting depositors and promoting financial stability; its directors are appointed by the Ministry of Finance and Economy; its president is appointed by the President of the Republic of Korea; and many of its operations are overseen by the Ministry of Finance and Economy. Id.

The banks argued that once the court determined KDIC was an organ of the foreign state, the banks automatically became instrumentalities or agencies of the state because KDIC owned a majority of their stock. Id. The Second Circuit rejected this argument, finding such a holding would "permit an infinite number of subsidiaries to enjoy sovereign immunity, . . . would be incompatible with the purpose of the FSIA, would be to grant governmental, not private corporate immunity, and . . . would reflect infidelity to the Supreme Court's reasoning in Dole Food." Id. at 218. Accordingly, it reiterated that "'a subsidiary of an instrumentality is not itself entitled to instrumentality status' . . . and that 'only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement.'" Id. (quoting Dole Food, 538 U.S. at 473-74).

The Second Circuit determined the KDIC was an organ of Korea by considering whether it was created and supervised by a foreign state and whether public employees were performing public functions. Id. at 217. Under its reasoning, it would appear the PIF is also an organ. It was created by royal decree, it is supervised by the Kingdom's Council of Ministers and staffed with government employees. See PIF Charter.

Yet, under the "legal characteristics" test, the PIF could qualify as a political subdivision. See Hyatt, 945 F. Supp. at 680. In Hyatt, a court in this district reasoned that a statutory requirement of an agency or instrumentality, as opposed to a political subdivision, is that it is a "separate legal person . . . that can function independent of the state." Id. at 684. If an entity could sue and be sued, own property, and contract in its own name, it would be considered an agency or instrumentality and not a political subdivision. Id. at 685. NCB submits the PIF sues and is sued as, and generally holds property on behalf of, the Ministry of Finance. Al-Wohaibi Aff. ¶¶ 9, 12.

NCB argues the Court should employ the "core functions" test outlined in Transaero, Inc. v. La Fuerza Aerea Bolivian, 30 F.3d 148 (D.C. Cir. 1994), to find that the PIF is the equivalent of the Kingdom. Under this test, if the entity's core functions are governmental, it is considered the state itself. Id. at 153. If its functions are commercial in nature, it is considered an instrumentality. Id. This Court is governed by Second Circuit precedent and finds Filler and Hyatt to be controlling. Even if it were to adopt Transaero, however, the Court finds on the record before it that the PIF's emphasis on commercial projects precludes a finding that its core functions are governmental in nature. See PIF Charter ¶ 2 (noting the PIF's primary function of "financing . . . investments in productive projects of a commercial nature").

NCB also urges that O'Connell Machinery Co. v. M.V. "Americana," 734 F.2d 115 (2d Cir. 1984), mandates the finding that the PIF is a political subdivision of the Kingdom. In O'Connell, the Second Circuit reasoned that the legislative history of the FSIA indicated that "political subdivisions" were intended to include "all governmental units beneath the central government." Id. (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 15, reprinted in, 1976

14

U.S.C.C.A.N. 6604, 6613). Given the PIF's position under the Ministry of Finance, O'Connell could lead to the conclusion that the PIF is a political subdivision of the Kingdom of Saudi Arabia. Id.; but see In re Ski Train Fire, 198 F. Supp. 2d at 425 n.9 (distinguishing O'Connell on grounds that the court based its holding on a finding that the Italian government double-tiered its administrative agencies); Hyatt, 945 F. Supp. at 683-84 (finding definition of "political subdivision" in O'Connell too broad and suggesting the case should be limited to its facts and not applied widely). In the twenty years since O'Connell was decided, however, courts have been inclined to limit the FSIA's grant of immunity. See, e.g., Dole Food, 538 U.S. at 473-47; Filler, 378 F.2d at 218. Accordingly, the Court will not rely on O'Connell here.

### b. Limited Jurisdictional Discovery is Warranted

The Court finds that resolution of the PIF's and thereby NCB's status is not determinable on the current record and, therefore, limited jurisdictional discovery is warranted. As explained above, the PIF could qualify either as an organ or political subdivision of the Kingdom of Saudi Arabia. Additionally, the affidavits on which the parties ask the Court to rely have not been subjected to cross examination and are rather self-serving. The parties should have the opportunity to take discovery of the jurisdictionally relevant facts. First City, 150 F.3d at 177; see also In re Magnetic Audiotape Antitrust Litig., 335 F.3d 204, 208 (2d Cir. 2003) (instructing district court to permit discovery before granting motion to dismiss based on fact-sensitive, multi-factor test). Accordingly, NCB's motion to dismiss for lack of subject matter jurisdiction based on the FSIA is denied without prejudice. Limited jurisdictional discovery will be permitted to explore PIF's function, organizational structure, and place within the Kingdom of Saudi Arabia.

### D. Application of FSIA Exceptions to the Princes and Kingdom of Saudi Arabia

Three exceptions to foreign sovereign immunity are implicated in these motions – the commercial activities exception, 28 U.S.C. § 1605(a)(2), the state sponsor of terrorism exception, 28 U.S.C. § 1605(a)(7), and the torts exception, 28 U.S.C. § 1605(a)(5).

#### 1. Commercial Activities Exception

Section 1605(a)(2) states:

> A foreign state shall not be immune . . . in any case . . . in which the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The statute defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has explained, "when a foreign government acts, not as a regulator of the market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." Weltover, 504 U.S. at 614. Courts must inquire whether the foreign state's actions "are the type of actions by which a private party engages in trade and traffic or

15

commerce." Id. (internal citations omitted).

Judge Robertson determined that the commercial activity exception did not apply to the Burnett Plaintiffs' claims against Prince Sultan and Prince Turki because "the act of contributing to a foundation is not within our ordinary understanding of 'trade and traffic or commerce' nor, apparently was it within the contemplation of . . . Congress." Burnett II, 292 F. Supp. 2d at 18 (citing H.R. Rep. No. 94-1487, at 16, reprinted in 1976 U.S.C.C.A.N. at 6615). Thus, the consolidated Plaintiffs do not assert that the commercial activities exception is applicable to any of the Defendants raising FSIA defenses here. This Court adopts Judge Robertson's reasoning. To the extent any Plaintiffs' claims are based on a Defendant's contributions to charities, those acts cannot be considered commercial.

The Federal Plaintiffs allege that the Kingdom of Saudi Arabia, Prince Sultan, and Prince Turki financed terrorism by contributing to or supporting charities known to support terrorist activities. In these Plaintiffs' view, this is essentially money laundering and, therefore, a commercial activity. See, e.g., Federal Plaintiffs' Opp. to Motion to Dismiss of Prince Sultan at 18 (citing U.S. v. Goodwin, 141 F.3d 394, 399 (2d Cir. 1997)). The Second Circuit noted in Goodwin that "[m]oney laundering is a quintessential economic activity," 141 F.3d at 399, but that statement has no bearing here. In Goodwin the court was not deciding whether money laundering is a commercial activity for purposes of the FSIA. Id. (analyzing constitutionality of criminal money laundering statute). The Second Circuit has made very clear that, for purposes of the FSIA, a commercial activity must be one in which a private person can engage lawfully. Letelier v. Republic of Chile, 748 F.2d 790, 797-98 (2d Cir. 1984); see also Saudi Arabia v. Nelson, 507 U.S. 349, 360-62 (1993) (holding detaining and torturing plaintiff is not commercial activity since it "is not the sort of action by which private parties can engage in commerce"). Since money laundering is an illegal activity, see 18 U.S.C. § 1956 (criminalizing money laundering), it cannot be the basis for applicability of the commercial activities exception. See Letelier, 748 F.2d at 798 (holding alleged participation in an assassination is not a lawful activity and therefore not a commercial activity for purposes of the FSIA). Accordingly, the Court finds that the commercial activities exception outlined in § 1605(a)(2) is inapplicable to the allegations contained in the Federal complaint against the Kingdom of Saudi Arabia, Prince Sultan, and Prince Turki.

### 2. State Sponsor of Terrorism
Subsection (a)(7) lifts immunity in cases:
in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act . . . except that the court shall decline to hear a claim under this paragraph
(A) if the foreign state was not designated as a state sponsor of terrorism . . . .
28 U.S.C. § 1605(a)(7) (emphasis added). The parties agree that the Kingdom of Saudi Arabia has not been designated a state sponsor of terrorism. See 28 U.S.C. § 1605(a)(7)(A) (explaining there is no jurisdiction if "the foreign state was not designated as a state sponsor of terrorism under . . . the Export Administration Act of 1979 . . . or . . . the Foreign Assistance Act of 1961").

16

Thus, this exception does not provide an exception to immunity for any of the Defendants raising the FSIA defense here.

### 3. Torts Exception

In relevant part, the torts exception deprives a foreign sovereign of immunity in actions:

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this [exception] shall not apply to –
>
>> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused.

28 U.S.C. § 1605(a)(5). Second Circuit law instructs that district courts must determine whether the defendant's alleged acts were tortious under the laws of New York and, if so, whether the defendant's acts were discretionary. Robinson, 269 F.3d at 142 ("If those activities could not render the Malaysian government liable for a tort under New York law, then it remained immune under § 1605(a)(5).").  In the event that the act is tortious and the acts were not discretionary, the alleged tortfeasor is subject to suit under the FSIA.

The FSIA's discretionary function exception replicates the discretionary function exception found in the Federal Tort Claims Act. See 28 U.S.C. § 2680(a). Courts have found both exceptions are "intended to preserve immunity for 'decisions grounded in social, economic, and political policy.'" Marchisella v. Gov't of Japan, No. 02 Civ. 10023 (DC), 2004 WL 307248, at *2 (S.D.N.Y. Feb. 17, 2004) (citing United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 787, 814 (1984) (interpreting FTCA)).  Generally, acts are discretionary if they are performed at the planning level of government, as opposed to the operational level. Kline v. Kaneko, 685 F. Supp. 386, 392 (S.D.N.Y. 1988) (finding decision to expel plaintiff from Mexico was product of enforcement of immigration laws and therefore a discretionary function); Marchisella, 2004 WL 307248, at *2 (finding decision regarding placement of a water hose on a ship was an operational function and therefore not discretionary and not protected by the FSIA); Napolitano v. Tishman Constr. Corp., No. 96 Civ. 4402 (SJ), 1998 WL 102789, at *4 (E.D.N.Y. Feb. 26, 1998) (finding purchasing consulate buildings and hiring contractor to renovate is a planning function and therefore discretionary).

Defendants argue that the Court should not even consider the torts exception for two reasons.  First, they claim that for this exception to apply, the entire tort must have occurred in the United States, which Defendants argue is not the case here.  Second, Defendants claim that Plaintiffs impermissibly seek to contort a § 1605(a)(7) state sponsor of terrorism claim into a § 1605(a)(5) tort claim.

With respect to Prince Sultan's and Prince Turki's arguments that the entire tort, meaning both the tortious conduct and the injury, must occur in the United States, Judge Robertson disagreed and stated the FSIA "preserves immunity for tort claims unless injury or death occurs

17

in the United States." Burnett II, 292 F. Supp. 2d at 19 n.4 (quoting Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 775 (D.C. Cir. 1984) (Edwards, J., concurring) (some emphasis omitted). Courts in the Second Circuit seem to take the opposite approach. "Although cast in terms that may be read to require that only the injury rather than the tortious acts occur in the United States, the Supreme Court has held that this exception 'covers only torts occurring within the territorial jurisdiction of the United States.'" Cabiri v. Gov't of the Republic of Ghana, 165 F.3d 193, 200 n.3 (2d Cir. 1999) (quoting Amerada Hess, 488 U.S. at 441); see also Hirsh v. State of Israel, 962 F. Supp. 377, 383-84 (S.D.N.Y. 1997) (citing legislative history stating both the tort and injury must occur within the United States for the exception to apply and dismissing complaint where plaintiffs failed to allege specific tort or place tort occurred); Kline, 685 F. Supp. at 391 (finding tort exception inapplicable where victim was abducted in Mexico City and brought to the United States because "the entire tort must be committed in the United States").

Plaintiffs allege that the Kingdom, Prince Sultan, and Prince Turki tortiously aided and abetted the September 11 terrorists by supporting charities that, in turn, supported al Qaeda and international terrorism. Plaintiffs also claim that, in return for protection of the Kingdom, these Defendants essentially willfully ignored the threat that Osama bin Laden and al Qaeda posed to the United States. Plaintiffs do not claim that the Kingdom or the Princes undertook any of their alleged acts in the United States. Yet, in the Plaintiffs' view, the operative torts for the Court's consideration are the attacks of September 11, which did take place in the United States. See Burnett II, 292 F. Supp. 2d at 19 n.4 (noting death and injuries occurred in United States). Further, Plaintiffs claim it would be unjust to allow foreign nations to escape liability for tortious acts performed in the United States if they could show that some act of planning the tort took place outside the United States.

Additionally, Defendants submit that, since the allegations are precisely those outlined in § 1605 (a)(7) – that is, "personal injury or death that was caused by an act of . . . extrajudicial killing, aircraft sabotage . . . or the provision of material support or resources . . . for such an act" – none of the other exceptions should be read to apply in its place.[25] Defendants argue the Court's adjudication of Plaintiffs' claims would interfere with the executive branch's discretion to designate state sponsors of terror. See 28 U.S.C. § 1605(a)(7)(A) (listing statutes that give

_____

[25] Judge Robertson recognized the same difficulty. Although he did consider Plaintiffs's claims under the tort exception, he found that the language of the state sponsor of terrorism exception buttressed his ultimate conclusion that the tortious acts exception would not provide subject matter jurisdiction over Prince Sultan and Prince Turki. Unlike (a)(7), the tort exception "makes no mention of the 'provision of material support.'" Burnett II, 292 F. Supp. 2d at 20 n.5. After reviewing canons of statutory construction counseling that Congress acts intentionally when it includes particular language in one section of a statute but omits it from another, Judge Robertson concluded that Congress's omission of 'provision of material support' from (a)(5) should be treated as intentional." Id.; see also HCSC Laundry v. United States, 450 U.S. 1, 6 (1980) (per curiam) ("[I]t is a basic principle of statutory construction that a specific statute . . . controls over a general provision . . ., particularly when the two are interrelated and closely positioned.").

18

Secretary of State authority to designate countries as sponsors of terrorism). Finally, Defendants submit the purpose of (a)(5) was "to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." Amerada Hess, 488 U.S. at 439-40; Burnett II, 292 F. Supp. 2d at 19 (stating "the legislative history [of the FSIA] counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law").

Plaintiffs respond that if Congress intended (a)(5) and (a)(7) to be mutually exclusive or intended that (a)(5) never apply in the terrorism context, Congress would have said so. Indeed, Congress did so very explicitly with respect to (a)(5) and (a)(2) and between (a)(7) and (a)(2). See § 1605(a)(5) (explaining exception can only be used in situations "not otherwise encompassed in paragraph (2)"); §1605(a)(7) (same). To further buttress their argument, Plaintiffs note the two exceptions have been interpreted to encompass different situations. Subsection (a)(7) covers acts of terrorism committed abroad by a state sponsor of terrorism, while subsection (a)(5) governs tortious acts, including terrorism, performed in the United States. See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 15 (D.D.C. 1998) (finding (a)(7) applied to conduct outside the United States and stating "28 U.S.C. § 1605(a)(5) already provides jurisdiction over state-sponsored terrorist acts in the United States, . . . the state sponsored terrorism exception would be redundant if it were held to apply only within the United States"). Again, Plaintiffs argue that Defendants' argument of exclusivity would lead to absurd results, such that if a foreign sovereign not designated a state sponsor of terror was involved in a car accident stemming from negligence it would not be immune; but if it undertook a deliberate act of violence it would enjoy immunity from suit.

The Court understands Plaintiffs' desire to find a legal remedy for the horrible wrongs committed on September 11, 2001. If appropriate, however, these Defendants are entitled to immunity from litigating these gravely serious claims in this forum. Congress made a policy decision that the Executive branch, and not the courts, have the authority to label a foreign nation a terrorist. See 28 U.S.C. § 1605(a)(7)(A). But when it drafted the state sponsor of terror exception it did not include mutually exclusive language that would preclude the application of the torts exception here. It did include such language with respect to the commercial activities exception. See 28 U.S.C. § 1605(a)(7) ("A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case – not otherwise covered by paragraph (2) above."); see also 28 U.S.C. § 1605(a)(5) ("A foreign state shall not be immune from jurisdiction of courts of the United States or of the States in any case – not otherwise encompassed in paragraph (2) above."). Particularly in a case such as this where interests of sovereignty, comity, international relations, and separation of powers are implicated, the Court must be vigilant to exercise discipline to apply the law only as it is written. While there are certainly obstacles to (a)(5)'s application – and the Court is not convinced the Plaintiffs have or can overcome them – the Court will not rule as a matter of law that subsections (a)(7) and (a)(5) are mutually exclusive. Accordingly, the Court will consider Plaintiffs' evidence demonstrating the torts exception outlined in (a)(5) provides a basis for subject matter jurisdiction here.

To fit within the exception outlined in § 1605(a)(5), the Plaintiffs must come forward

19

with evidence demonstrating the Princes' or Kingdom's tortious acts or omissions caused Plaintiffs' injuries.[26] 28 U.S.C. § 1605(a)(5); Virtual Countries, 300 F.3d at 241; Cargill, 991 F.2d at 1016. "Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of knowingly and intentionally providing financial support to al Qaeda, given [the complaints'] allegations that, prior to September 11, al Qaeda and Osama bin Laden had proclaimed their intentions to commit murderous terrorist activities against the United States and its citizens, . . . and had accompanied these words with actions by implementing, and publicly acknowledging responsibility for, such terrorist schemes as the 1993 bombing of the World Trade Center, the 1998 attack of the U.S. embassies in Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in Yemen." Burnett I, 274 F. Supp. 2d at 105; see also Ashton Complaint ¶¶ 105-108 (1993 World Trade Center attack), 130-136 (embassy bombings), 152-55 (Cole attack); Federal Complaint ¶ 77 (alleging Osama Bin Laden established al Qaeda to wage war with the United States).

### a. Prince Sultan and Prince Turki

Both Princes are alleged to have tortiously aided and abetted terrorism through their contributions to, and support of, Islamic charities that they knew or should have known were supporting terrorist organizations such as al Qaeda.[27] Additionally, Plaintiffs allege Prince Turki aided and abetted the terrorists by attempting to deflect their activities away from Saudi Arabia and by serving as a "facilitator of Osama bin Laden's network of charities." Ashton Complaint ¶ 261; Burnett Complaint ¶ 350. Plaintiffs allege both Princes must have known that the United States would have been al Qaeda's target, making the attacks on September 11 a foreseeable result of the Princes' actions.

Pursuant to the Second Circuit's instruction, the Court must first determine whether the Princes' acts are tortious under New York law. Robinson, 269 F.3d at 142. In New York, conspiracy and aiding and abetting are varieties of concerted action liability. Pittman v. Grayson, 149 F.3d 111, 122 (2d Cir. 1998). There must be "(1) an express or tacit agreement to 'participate in a common plan or design to commit a tortious act,' (2) tortious conduct by each

---

[26] Plaintiffs argue that Judge Robertson held them to an unnecessarily stringent theory of causation and submit that the D.C. Circuit's subsequent decision in Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123 (D.C. Cir. 2004), effectively overrules the holding in Burnett II. See Kilburn, 376 F.3d at 1129 (evaluating a claim under § 1605(a)(7) and holding the requirement for jurisdictional causation was proximate cause). This Court does not read Burnett II as requiring but-for causation and Defendants agreed at oral argument that the proper inquiry at this stage of the litigation is the presence of proximate causation. See Sept. 14, 2004 Tr. at 121.

[27] To the extent that the consolidated Plaintiffs and the Federal Plaintiffs allege that Prince Sultan and Prince Turki made donations in their personal capacities, see, e.g., Ashton Complaint ¶ 269 (Prince Sultan); Federal Complaint ¶¶ 451-52 (Prince Turki), those claims are not subject to the FSIA's protection. The Court will determine whether it has personal jurisdiction over Prince Sultan and Prince Turki in Part II.

defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort.'" Id. (quoting Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (1992)). Conspiracy "requires an agreement to commit a tortious act." Id. at 122-23. Aiding and abetting "requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer." Id. at 123. "[U]nder either theory, the defendant must know the wrongful nature of the primary actor's conduct." Id. (finding no concerted action liability where airline had no knowledge mother was removing daughter from country without father's approval).

### i. Causation

Judge Robertson found his consideration of Prince Sultan's and Prince Turki's FSIA defenses did not present an opportunity for a general discourse on causation since Plaintiffs' theory would stretch causation to "terra incognita." Burnett II, 292 F. Supp. 2d at 20. This Court agrees with Judge Robertson's conclusion, but it undertakes the causation analysis because a similar review will be necessary in its consideration of the Defendants' motions for failure to state a claim. See Part III below.

Plaintiffs place great reliance on Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983) and Boim v. Quranic Literacy Institute. & Holy Land Foundation for Relief & Development, 291 F.3d 1000, 1023 (7th Cir. 2002) ("Boim II"). Neither of these cases concern the tortious activity exception to the FSIA, but they do explain liability under the ATA and for aiding and abetting and conspiracy.[28] In Halberstam, the defendant was found liable as a joint venturer for a killing that occurred during a burglary at which she was not present. Halberstam, 705 F.2d at 488; see also Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) ("[T]hose who aid or abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme."). The court found that the defendant's intimate relationship with the burglar and her assistance in his other illegal ventures "defie[d] credulity that [she] did not know that something illegal was afoot." Halberstam, 705 F.2d at 486.

In Boim, the district court had denied a motion to dismiss by U.S.-based charities alleged to have aided and abetted international terrorism. Boim v. Quranic Literacy Inst. & Holy Land Found., 127 F. Supp. 2d 1002, 1018 (N.D.Ill. 2001) ("Boim I"). The Seventh Circuit affirmed

---

[28] The court in Halberstam outlined the elements of aiding and abetting as: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Halberstam, 705 F.2d at 477. It described the elements of civil conspiracy as: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Id.

the decision and held that the parents of a yeshiva student killed in 1996 in Israel by members of the military wing of Hamas could prove that the defendants aided and abetted their son's murder under the ATA if they could demonstrate that the charities "knew of Hamas' illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities." Boim II, 291 F.3d at 1023. The court explained that "[f]oreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." Id. at 1012. Plaintiffs submit the court's decision in Boim – that the ATA was designed "to extend liability to all points along the causal chain of terrorism" – supports the finding that Prince Sultan's and Prince Turki's conduct caused the attacks on September 11, 2001. Id. at 1011.

Plaintiffs exert much effort outlining the connections between al Qaeda and the Defendant charities that Prince Sultan and Prince Turki supported. Plaintiffs argue that the indirect nature of the Princes' contributions to al Qaeda is not fatal to their claims since they allegedly knew that funds they donated to the Defendant charities were being diverted to al Qaeda. See Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Exs. 1-24. The Court has reviewed the exhibits on which Plaintiffs rely and finds only a handful relate to Plaintiffs' arguments.

Exhibit 11 is a report allegedly prepared for the President of the U.N. Security Council regarding a Saudi connection to terror financing. The report mentions Prince Sultan once in his role as the head of the Supreme Council of Islamic Affairs and does not conclude or suggest that he had any knowledge that charities to which he allegedly donated were funneling money to al Qaeda.

Exhibit 12 is a statement by the former French Minister of the Interior in which he claims to have met with Prince Sultan, Prince Turki, and other members of the Saudi Royal family in November 1994 and to have raised the "question of financial aid furnished by Saudi charitable organizations enjoying state support . . . to Islamist movements or terrorist groups." The only charity he names in his statement is the World Islamic League, not one of the charities to which the Princes allegedly donated.

Exhibits 21-24 are excerpts from The Muslim World regarding Prince Sultan's donations to IIRO and the Joint Saudi Committee for Relief of Kosovar Refugees ("JSCR"). There is no indication in these exhibits that IIRO or JSCR was funneling donations to al Qaeda. Even construing these allegations and exhibits in the light most favorable to Plaintiffs, and drawing all inferences in their favor, none of these exhibits amount to admissible evidence that Prince Sultan or Prince Turki knew the charities they supported were fronts for al Qaeda.

Alternatively, Plaintiffs argue that, since Osama bin Laden and al Qaeda made no effort to hide their hatred for the United States, Prince Sultan and Prince Turki had to have been aware that the United States was a target, making the atrocities of September 11, 2001 a foreseeable result of their actions. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss,

Exs. 2-10, 14, 15, 18, 20 (including reports and fatwas summarizing Osama bin Laden's and al Qaeda's repeated public threats to and denouncement of the United States). There is no question that in the years leading up to the September 11 attacks, Osama bin Laden and al Qaeda were increasingly vocal in their hatred of the United States and its interests. The question remains, however, whether Plaintiffs have adequately alleged that Prince Sultan's and Prince Turki's specific acts aided and abetted those terrorists.

Both Prince Sultan and Prince Turki claim Plaintiffs cannot demonstrate their alleged tortious activity caused Plaintiffs' injuries. They argue that Plaintiffs ignore that Osama bin Laden also targeted the Saudi Royal family. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Ex. 16 (Prince Turki, "Allied Against Terrorism," September 17, 2002, Washington Post, editorial in which Prince Turki explains the Saudis' practice of sharing information regarding Osama bin Laden and al Qaeda with the CIA and states that al Qaeda also targeted the Kingdom); Exs. 3, 5, 6 (fatwas issued by Osama bin Laden and Sheikh Omar Abdel Rahman targeting Americans and expressing extreme bitterness toward the Saudi Royal family). Prince Sultan argues that Plaintiffs blur the distinction between charities he is on record of supporting, IIRO and WAMY, and those he is not, Al Haramain and MWL. See supra note 20. Both Princes also distinguish the instant case from Boim and other cases cited by the Plaintiffs on the basis that groups that they are alleged to have supported were not designated as terrorist organizations by the United States government. See Boim II, 291 F.3d at 1002 (noting Hamas was designated a terrorist organization by President Clinton in 1995 and by the Secretary of State in 1997); see also Consolidated Plaintiffs' Opp. to Prince Sultan's Motion to Dismiss at 16-17 (citing Flatlow, 999 F. Supp. at 18 (holding Iran, a state sponsor of terrorism, liable as provider of material support to terrorist organization Palestine Islamic Jihad pursuant to 18 U.S.C. § 1605(a)(7)); Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 232 (S.D.N.Y. 2003) (granting default judgment against Iraq, a designated state sponsor of terror, after plaintiffs demonstrated it provided material support to Osama bin Laden and al Qaeda)); Consolidated Plaintiffs' Opp. to Prince Turki's Motion to Dismiss at 8 (same).

Although they did not involve New York law, the Court agrees that Halberstam and Boim are instructive. In Halberstam, the defendant enjoyed an extravagant lifestyle made entirely possible by her long-term live-in boyfriend's regular burglaries. The court concluded that she had to know of his criminal activities because she acted as a money launderer for her boyfriend's stolen metals business. Halberstam, 705 F.2d at 486-88. The court found the defendant was so close to the illegal activity that she had to be aware of her role in it. Id. at 486. In Boim, the court denied the defendants' motion to dismiss because the complaint contained specific factual allegations tying the defendants to Hamas. For example, one defendant entity allegedly employed an individual designated as a terrorist affiliated with Hamas, another entity admitted providing funds to Hamas, two individual defendants had documented and admitted ties to Hamas, and numerous links existed between the individual terrorist defendants and the entity defendants. Boim I, 127 F. Supp. 2d at 1006-1008. Unlike Hamas in Boim, none of the organizations the Princes are alleged to have supported in an official capacity were designated a sponsor of terrorism at the time of the alleged contributions. In fact, only BIF and certain branches of Al Haramain have since been designated. See Exec. Order No. 13224 (designating

23

BIF (November 19, 2002) and branches of Al Haramain (Bosnia, Somalia on March 11, 2002; Indonesia, Kenya, Pakistan, Tanzania on January 22, 2004; Afghanistan, Albania, Bangladesh, Ethiopia, the Netherlands on June 2, 2004)). Thus, pursuant to <u>Boim</u>, the Plaintiffs would have to allege specific facts showing that the Princes knew or should have known that the charities they supported were actually fronts for al Qaeda. <u>See</u> <u>Burnett I</u>, 274 F. Supp. 2d at 106.

Plaintiffs have pleaded al Qaeda's repeated, public targeting of the United States. They have not, however, pleaded facts to support an inference that the Princes were sufficiently close to the terrorists' illegal activities to satisfy <u>Halberstam</u> or New York law. Similarly, Plaintiffs have not pleaded facts to suggest the Princes knew they were making contributions to terrorist fronts and provided substantial assistance or encouragement to the terrorists to satisfy <u>Boim</u> or New York law. The Court has reviewed the complaints in their entirety and finds no allegations from which it can infer that the Princes knew the charities to which they donated were fronts for al Qaeda. The Court is not ruling as a matter of law that a defendant cannot be liable for contributions to organizations that are not themselves designated terrorists. But in such a case, there must be some facts to support the allegation that the defendant knew the receiving organization to be a solicitor, collector, supporter, front or launderer for such an entity. There must be some facts to support an inference that the defendant knowingly provided assistance or encouragement to the wrongdoer. Here, there are no such factual bases presented, there are only conclusions. <u>See</u> <u>Robinson</u>, 269 F. 3d at 146 ("[W]e note that the conclusory nature of [plaintiff's] allegations alone would give us pause before we would allow them to sustain jurisdiction.") (citing <u>Zappia Middle East Const. Co. v. Emirate of Abu Dhabi</u>, 215 F.3d 247, 253 (2d Cir. 2000) (finding, in context of FSIA 12(b)(1) motion, conclusory allegations in plaintiff's affidavit insufficient to sustain jurisdiction)). The law does not permit Plaintiffs

> to circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints – and then . . . rely on the federal courts to conclude that some conceivable non-discretionary tortious act falls within the purview of these generic allegations under the applicable substantive law. This is at odds with the goal of the FSIA to enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction.

<u>Robinson</u>, 269 F.3d at 146.

### ii. Discretionary Function

Plaintiffs argue that there is no discretion to conduct illegal activities and the so-called discretionary function exception to the tortious act exception should not apply to Prince Sultan or Prince Turki. <u>See, e.g.</u>, <u>Liu v. Republic of China</u>, 892 F.2d 1419, 1421, 1431 (9th Cir. 1989) (finding no discretion to violate Chinese law prohibiting murder where gunmen acting on direction of China's Director of Defense Intelligence Bureau killed plaintiff's husband); <u>Birnbaum v. United States</u>, 588 F.2d 319, 329-30 (2d Cir. 1978) (finding in FTCA case that the CIA had no authority and therefore no discretion to open U.S. first class mail departing for and arriving from the Soviet Union); <u>Glickman v. United States</u>, 626 F. Supp. 171, 175 (S.D.N.Y. 1985) (finding in FTCA case that CIA agent's secret administration of LSD to plaintiff was not discretionary function); <u>Letelier v. Republic of Chile</u>, 488 F. Supp. 665, 673 (D.D.C. 1980)

(holding no discretion to order or aid assassination of former Chilean ambassador and foreign minister). Prince Sultan insists that any recommendation of government grants to Islamic charities was a discretionary function. Prince Turki makes a similar argument regarding his actions as the head of DGI and urges the Court to find that all of his alleged actions should be subsumed by the discretionary function exception.

The Court finds the discretionary function exception independently bars Plaintiffs' claims against Prince Sultan and Prince Turki. Both Princes are accused of donating money or recommending government grants to charities that allegedly supported al Qaeda. As the head of DGI, Prince Turki is also alleged to have attempted to protect Saudi Arabia from terrorism and to have implemented the Kingdom's foreign relations with the Taliban and Osama bin Laden. In determining whether these were discretionary functions, the Court must decide whether the actions involved an element of choice or judgment based on considerations of public policy. See Callahan v. United States, 329 F. Supp. 2d 404, 408 (S.D.N.Y. 2004) (interpreting FTCA); Berkovitz v. United States, 486 U.S. 531, 536 (1988) (construing FTCA).

There can be little doubt that, as the chairman of the Supreme Council of Islamic Affairs, charged with making recommendations to the Council of Ministers regarding requests for aid from Islamic organizations located abroad, and as the head of the Special Committee of the Council of Ministers, charged with deciding which grants should be made to Islamic charities, Prince Sultan's decisions were made at the planning level of government, Kline, 685 F. Supp. at 392, and "grounded in social, economic, and political policy," Varig Airlines, 467 U.S. at 814. Similarly, as the head of DGI, Prince Turki's decisions regarding the treatment of the Taliban and Osama bin Laden were judgments based on considerations of public policy. See Callahan v. United States, 329 F. Supp. 2d at 408; see also Burnett II, 292 F. Supp. 2d at 20-21 ("[T]his conclusion would be nearly self-evident: Prince Turki, as director of intelligence, taking acts to protect Saudi Arabia from terrorism, and Prince Sultan, as chairman of the Supreme Council, making recommendations to the Council of Ministers about requests for assistance from Islamic organizations outside Saudi Arabia or, as head of the Special Committee, deciding what disbursements should be made to Islamic charitable organizations, were clearly making 'decisions grounded in social, economic, and political policy.'") (quoting Varig Airlines, 467 U.S. at 814).

Accordingly, to the extent that Plaintiffs allege acts Prince Sultan and Prince Turki performed in their official capacities, Prince Sultan's and Prince Turki's motions to dismiss the certain consolidated complaints[29] and the Federal complaint are granted. The Court denies Plaintiffs' request for jurisdictional discovery because Plaintiffs have not presented any factual basis for believing that discovery might reasonably be expected to result in evidence that would overcome the discretionary function exception. See 28 U.S.C. § 1605(a)(5)(A) (exception not applicable to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused.") The Court

---

[29] The consolidated complaints are Ashton, Barrera, Burnett, Salvo, and Tremksy.

will consider the appropriateness of exercising personal jurisdiction over Prince Sultan's and Prince Turki's personal acts in Part II below.

### b. Kingdom of Saudi Arabia

There is no dispute that the Kingdom of Saudi Arabia is a foreign state within the meaning of the FSIA. Federal Complaint ¶ 63. The Federal Plaintiffs have the "burden of going forward with evidence that, under exceptions to the FSIA, immunity should not be granted." Virtual Countries, 300 F.3d at 241 (internal quotations omitted). As explained above, the only possible applicable exception is the torts exception under 28 U.S.C. § 1605(a)(5).

The Federal Plaintiffs' allegations arise "predominantly from misconduct of ostensible charities under the Kingdom's control." Federal Opp. to Motion to Dismiss of the Kingdom of Saudi Arabia at 1.[30] Thus, the Federal Plaintiffs claim the Kingdom of Saudi Arabia aided and abetted the terrorists through these charities. In attempting to overcome the presumption of the Kingdom's sovereign immunity, the Federal Plaintiffs argue the merits of their claims against the charities.[31] Based on news accounts that the Kingdom has dissolved its international charities and terrorist financing reports that implicate certain charities, the Federal Plaintiffs urge the Court to find that the Kingdom had previously willfully ignored the charities' support for terrorism. See, e.g., Federal Opp. to Kingdom of Saudi Arabia Motion to Dismiss Ex. 2 ("Terrorist Financing, Report of an Independent Task Force Sponsored by the Council on Foreign Relations"), Ex. 3 (CNN.com June 2, 2004 "Saudis reform charities as antiterror measure" (mentioning only Al Haramain Islamic Foundation)), Ex. 5 (Senate Subcommittee Testimony, July 31, 2003 by Steven Emerson with Jonathan Levin, "Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror").

In response, the Kingdom argues that Plaintiffs ignore Osama bin Laden's public

---

[30] The Federal Plaintiffs allege that each of the following charities, which are all named as Defendants and represented by counsel in these actions, are agencies, instrumentalities, arms or organs of the Kingdom: MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Saudi High Commission for Relief to Bosnia and Herzegovina, SJRC, Rabita Trust, Saudi Red Crescent, and BIF. The Kingdom disputes the instrumentality status of MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Rabita Trust, and BIF. These Plaintiffs request discovery as to the instrumentality status of these charities. The request is denied at this time and may be more appropriate when the Court considers each of the charities' motions to dismiss.

[31]Rather than pleading specific facts showing that the Kingdom caused Plaintiffs' injuries, the Federal Plaintiffs focus predominantly on the charities' actions. For example, these Plaintiffs argue that the Kingdom has waived the defense of sovereign immunity because certain charities, which have not been designated as instrumentalities of the Kingdom and which are represented by separate counsel, did not raise the FSIA defense in their motions to dismiss. The Court is not convinced by this argument because the waiver of FSIA immunity must be explicit. See Banco de Seguros del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003).

targeting of the Kingdom. See, e.g., Bierstein Aff. in Opp. to Prince Sultan's Motion to Dismiss, Ex. 3 & 4; The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States, 48, 373 (July 2004) (hereinafter "9/11 Report"). The Kingdom also submits it has worked with the United States to share information in the fight against terrorism. 9/11 Report, at 115-22; Prince Turki Decl. ¶¶ 7, 8, 10. The U.S. State Department has not designated the Kingdom a state sponsor of terrorism. Additionally, the presidentially-appointed September 11 commission found no evidence of the Kingdom's funding or support for the September 11 terrorists. 9/11 Report, at 171 ("[W]e have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization.").

The Court finds the Plaintiffs' allegations cannot overcome the discretionary function exception to the tortious acts exception. Marchisella v. Gov't of Japan, 2004 WL 307248, at *2 (explaining acts performed at the planning, as opposed to operational, level of government are protected by immunity); Robinson, 269 F.3d at 146 (noting conclusory nature of allegations would not sustain jurisdiction). Saudi Arabia's treatment of and decisions to support Islamic charities are purely planning level "decisions grounded in social, economic, and political policy." Varig Airlines, 467 U.S. at 814; see also Kline, 685 F. Supp. at 392. The Federal Plaintiffs have not met their burden of demonstrating an exception to the FSIA applies to negate the Kingdom's immunity. "[S]overeign immunity under the FSIA is immunity from suit, not just from liability." Moran v. Kingdom of Saudi Arabia, 27 F.3d 169, 172 (5th Cir. 1994). Because there were no factual disputes raised in the Court's resolution of this motion, no jurisdictional discovery is necessary. See Filatech S.A. v. France Telecom S.A., 304 F.3d 180, 183 (2d Cir. 2002). The Kingdom of Saudi Arabia's motion to dismiss the Federal complaint for lack of subject matter jurisdiction is granted.

### II. Personal Jurisdiction

To avoid dismissal for lack of personal jurisdiction under Rule 12(b)(2), Plaintiffs must establish personal jurisdiction over each Defendant. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists. PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997); A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, A.I Trade, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. PDK Labs, 103 F.3d at 1108. It will not, however, accept legally conclusory assertions or draw "argumentative inferences." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (citing Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)).

### A. Bases for Personal Jurisdiction
### 1. New York Long-Arm Statute
"In a federal question case where a defendant resides outside the forum state, a federal

27

court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process." PDK Labs, 103 F.3d at 1108. Similarly, a federal court sitting in diversity exercises personal jurisdiction over a foreign defendant to the same extent as courts of general jurisdiction of the state in which it sits pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002). In such cases, courts must determine if New York law would confer jurisdiction through its long-arm statute, and then decide if the exercise of such jurisdiction comports with the requisites of due process under the Fourteenth Amendment. Id. (citing Bank Brussels, 171 F.3d at 784); Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).

### a. Conspiracy Theory

Plaintiffs claim that New York's long-arm statute provides a basis for personal jurisdiction. Rule 302(a)(2) of New York's Civil Practice Law & Rules states in part: "(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . (2) commits a tortious act within the state . . . ." N.Y. C.P.L.R. § 302(a)(2) (McKinney 2002). Courts have defined "agent" to include a defendant's co-conspirators "under certain circumstances." Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) (citing Lehigh Valley Indus., Inc. v. Birenbaum, 389 F. Supp. 798, 806-07 (S.D.N.Y. 1975), aff'd, 527 F.2d 87 (2d Cir. 1975)). Thus, "acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. 302(a)(2)." Chrysler Capital Corp. 778 F. Supp. at 1266.

Plaintiffs are not required to establish the existence of a "formal agency relationship" between the Defendants and their putative co-conspirators. Daventree Ltd. v. Republic of Azerbaijan, No. 02 Civ. 6356 (SHS), 2004 WL 2997881, at *18 (S.D.N.Y. Dec. 28, 2004). Yet, "the bland assertion of conspiracy . . . is insufficient to establish jurisdiction for the purposes of section 302(a)(2)." Lehigh Valley Indus. Inc., 527 F.2d at 93-94; Lamarr v. Klein, 315 N.Y.S.2d 695, 697-98 (App. Div. 1970) (holding that conclusory statements about defendant's role in conspiracy were insufficient to establish jurisdiction under the co-conspirator doctrine). To establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York. Chrysler Capital Corp., 778 F. Supp. at 1266 (citing Singer v. Bell, 585 F. Supp. 300, 302 (S.D.N.Y. 1984)).

"To plead a valid cause of action for conspiracy under New York law, a plaintiff must allege the primary tort and four elements: '(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'" Chrysler Capital Corp. 778 F. Supp. at 1267 (quoting Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986)). To warrant the inference that a defendant was a member of the conspiracy, Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of

28

the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." Chrysler Capital Corp., 778 F. Supp. at 1268-69 (quoting Dixon v. Mack, 507 F. Supp. 345, 350 (S.D.N.Y. 1980)).

"Whether an alleged conspiracy . . . existed is 'a mixed question of law and fact.'" Daventree, 2004 WL 2997881, at *19 (quoting Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d. 32, 36 (2d Cir. 2001)). Accordingly, the Court cannot accept "conclusory assertions on those issues; instead it must resolve such questions based upon an independent examination of the factual allegations while mindful of its duty to draw all factual inferences in plaintiffs' favor." Id. (rejecting conspiracy theory of personal jurisdiction without permitting jurisdictional discovery).

Plaintiffs claim that all Defendants in these actions conspired with the al Qaeda terrorists to perpetrate the attacks of September 11. See, e.g., Ashton Complaint ¶ 296; Federal Complaint ¶¶ 66, 72-74. Without supporting factual allegations, such a statement is insufficient to establish an agency relationship. Lehigh Valley Indus. Inc., 527 F.2d at 93-94; Daventree, 2004 WL 2997881, at *22 (citing First Capital Asset Mgmt. v. Brickellbush, Inc. 218 F. Supp. 2d 369, 395 (S.D.N.Y. 2002)). As will be highlighted below, the complaints do not allege any specific facts from which the Court could infer that Prince Sultan, Prince Turki, Mohammed Abdullah Aljomaih, Sheikh Hamad Al-Husani, or Abdulrahman bin Mahfouz directed, controlled, or requested al Qaeda to undertake its terrorist activities. Nor are there any specific allegations of their knowledge of, or consent to those activities. See Daventree, 2004 WL 2997881, at *22 (finding no personal jurisdiction under a conspiracy theory because there was no basis from which the court could impute to defendants the conduct of their putative co-conspirators); Chrysler Capital Corp., 778 F. Supp. at 1266 (requiring specific facts warranting the inference that the defendant was a member of the conspiracy). Accordingly, for Prince Sultan, Prince Turki, Mohammed Abdullah Aljomaih, Sheik Hamad Al-Husani, and Abdulrahman bin Mahfouz, personal jurisdiction cannot be based on a New York long-arm conspiracy theory. The Court will examine the possibility of exercising conspiracy theory personal jurisdiction over the remaining moving Defendants when it examines the specific claims against each of them below.

### 2. Federal Rule of Civil Procedure 4(k)

Under Federal Rule of Civil Procedure 4(k)(1)(D), service of process will establish personal jurisdiction over a defendant when so authorized by a federal statute.[32] Here, the ATA contains a nationwide service of process provision, such that proper service will confer personal

---

[32] Although the Court does not have subject matter jurisdiction over any of the moving Defendants pursuant to the FSIA, that statute also provides for personal jurisdiction if service is proper and subject matter jurisdiction has been established. 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign defendant shall exist as to every claim for relief of which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325, 329-330 (E.D.N.Y. 1998).